1   STUART F. DELERY
    Principal Deputy Assistant Attorney General
2   MAAME EWUSI-MENSAH FRIMPONG
       (Cal. Bar No. 222986)
3   MICHAEL S. BLUME
    ARTHUR R. GOLDBERG
4   JAMES T. NELSON
    BRADLEY COHEN
5   JENNIE KNEEDLER
    SONDRA L. MILLS   (Cal. Bar No. 090723)
6   THOMAS D. ZIMPLEMAN
    United States Department of Justice, Civil Division
7      P.O. Box 261, Ben Franklin Station
       Washington, D.C. 20044
8      Telephone:   (202) 616-0219/8474 [Main]
       Facsimile:   (202) 514-8742 & (202) 616-8470 [Main]
9      Email:   James.Nelson2@usdoj.gov / Bradley.Cohen@usdoj.gov
                Jennie.L.Kneedler@usdoj.gov / Sondra.Mills@usdoj.gov /
10               Thomas.D.Zimpleman@usdoj.gov

11  ANDRÉ BIROTTE JR.
    United States Attorney
12  GEORGE S. CARDONA   (Cal. Bar No. 135439)
    LEON W. WEIDMAN      (Cal. Bar No. 104078)
13  ANOIEL KHORSHID     (Cal. Bar No. 223912)
    RICHARD E. ROBINSON (Cal. Bar No. 090840)
14  Assistant United States Attorneys
       Room 7516 Federal Building
15     300 North Los Angeles Street
       Los Angeles, California 90012
16     Telephone:   (213) 894-8323/2404/6086/0713
       Facsimile:   (213) 894-7819 [Main]
17     Email:   George.S.Cardona@usdoj.gov / Lee.Weidman@usdoj.gov /
                Anoiel.Khorshid@usdoj.gov / Richard.Robinson@usdoj.gov
18
    Attorneys for Plaintiff United States of America
19
                    UNITED STATES DISTRICT COURT
20
                   CENTRAL DISTRICT OF CALIFORNIA
21

22  UNITED STATES OF AMERICA,          CASE NO. CV 13-00779 -DOC
                                                               (JCG)
23              Plaintiff,
                                       **COMPLAINT FOR CIVIL MONEY**
24              v.                     **PENALTIES AND DEMAND FOR**
                                       **JURY TRIAL**
25  MCGRAW-HILL COMPANIES, INC.,
    and STANDARD & POOR'S
26  FINANCIAL SERVICES LLC,            [12 U.S.C. § 1833a; 18 U.S.C. §§ 1341,
                                       1343 & 1344]
27              Defendants.

28

                              COMPLAINT

FILED
CLERK, U.S. DISTRICT COURT
FEB - 4 2013
CENTRAL DISTRICT OF CALIFORNIA
BY              DEPUTY

No Fee
I/s
31

# COMPLAINT FOR CIVIL MONEY PENALTIES

## Table of Contents

I.   Introduction .................................................................................... 1

II.  FIRREA ........................................................................................... 4

III. Jurisdiction and Venue ................................................................... 5

IV.  Parties ............................................................................................. 5

V.   Background ...................................................................................... 6

    A. RMBS ........................................................................................ 6

    B. CDOs .......................................................................................... 8

    C. The Central Role of S&P's Credit Ratings in Purchases of RMBS
      and CDOs by Financial Institutions ....................................... 9

        1.   S&P's NRSRO Status ......................................................... 9

        2.   S&P's Letter Grade Rating Scale ...................................... 10

        3.   S&P Knew the Importance of its Ratings to Financial
            Institutions Investing in RMBS and CDOs ...................... 10

    D. S&P's Credit Rating Business for RMBS and CDOs .............. 14

        1.   S&P's Structured Finance Department .............................. 14

        2.   S&P's RMBS and CDO Ratings Fees ............................... 16

        3.   The Profitability of S&P's RMBS and CDO Ratings ........ 17

    E. S&P's Credit Rating Process for RMBS .................................. 18

    F. S&P's Credit Rating Process for CDOs .................................. 20

        1.   CDO Evaluator and Genesis ............................................. 20

        2.   The Importance of Ratings of a CDO's Underlying
            Assets ................................................................................ 22

        3.   Effective Date Rating Agency Confirmations .................. 24

    G. S&P's Surveillance of RMBS and CDO Credit Ratings ......... 25

VI. S&P's Scheme to Defraud ............................................................. 28

    A. S&P Repeatedly Represented that its Ratings Were Objective, Independent, Uninfluenced by Any Conflicts of Interest that Might Compromise S&P's Analytic Judgment, and Reflected S&P's True Current Opinion Regarding Credit Risks ............................................................. 28

    B. S&P's Representations Were False ............................................................. 38

        1. Considerations Regarding Fees, Market Share, Profits, and Relationships with Issuers Improperly Influenced S&P's Rating Criteria and Models ............................................................. 39

            a. Decisions on Rating Criteria ............................................................. 39

            b. Development and Updating of LEVELS ............................................................. 42

            c. Development and Updating of CDO Evaluator ............................................................. 48

                i. Delays and Limitations of Updates ............................................................. 48

                ii. The E3 Transition Period and E3 Low ............................................................. 54

                iii. Bending the Model to Suit Business Needs ............................................................. 55

            d. Failing to Account for Increased Credit Risks of Non-Prime RMBS ............................................................. 58

        2. Considerations Regarding Fees, Market Share, Profits, and Relationships with Issuers Led S&P to Issue CDO Ratings that Failed to Account for Substantially Increased Credit Risks of Non-Prime RMBS to Which the CDOs Were Exposed ............................................................. 59

            a. In Late 2006, S&P Became Aware that the Performance of Non-Prime RMBS Was Demonstrating Unprecedented Deterioration ............................................................. 59

b. By February 2007, RMBS Surveillance Staff Recommended Negative Rating Actions on Large Numbers of Non-Prime RMBS .................................. 62

c. From March 2007 through June 27, 2007, S&P Issued CDO Ratings that Failed to Account for the Substantially Increased Credit Risks of Non-Prime RMBS ............................................................. 67

    i.   March 2007 .......................................... 68

    ii.  April 2007 ........................................... 80

    iii. May 2007 ............................................. 84

    iv. June 1, 2007 to June 27, 2007 ............ 90

d. On June 28, 2007, S&P Issued CDO Ratings that Failed to Account for Authorized Negative Rating Actions on Non-Prime RMBS .......................... 97

e. From June 29, 2007 through July 17, 2007, S&P Issued CDO Ratings that Failed to Account for Additional Negative Rating Actions S&P Was Working to Effect on Non-Prime RMBS .................. 98

f. On and After July 18, 2007, S&P Issued CDO Ratings that Disregarded S&P's Announced "Notching" Policy ............................................ 104

C. S&P's False Representations Were Material to Financial Institutions' Investment Decisions ................................ 106

D. Mailings and Wirings In Furtherance, and Executions, of the Scheme to Defraud ......................................................... 107

iii

COMPLAINT

VII.    Claims for Relief ..................................................................................... 116

    A. FIRREA: Mail Fraud; 12 U.S.C. § 1833a, 18 U.S.C. § 1341 ........ 116

    B. FIRREA: Wire Fraud; 12 U.S.C. § 1833a, 18 U.S.C. § 1343 ........ 116

    C. FIRREA: Financial Institution Fraud; 12 U.S.C. § 1833a,

       18 U.S.C. § 1344(1) ............................................................... 117

    D. FIRREA: Financial Institution Fraud; 12 U.S.C. § 1833a,

       18 U.S.C. § 1344(2) ............................................................... 117

VIII.    Prayer for Judgment ............................................................................. 118

Plaintiff, United States of America ("United States"), alleges and complains against defendants: (1) McGraw-Hill Companies, Inc. ("McGraw-Hill"); and (2) Standard & Poor's Financial Services LLC, a wholly owned subsidiary of McGraw-Hill, ("S&P LLC") (collectively "defendants"), as follows:

## I.    INTRODUCTION

1.    The United States brings this action pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, 12 U.S.C. § 1833a, to recover civil money penalties from defendants for: (a) mail fraud affecting federally insured financial institutions; (b) wire fraud affecting federally insured financial institutions; and (c) financial institution fraud.

2.    From 2004 through 2007, defendant McGraw-Hill, acting through Standard & Poor's Ratings Services ("S&P Ratings"), a unit within an unincorporated division of defendant McGraw-Hill (S&P Ratings and defendant McGraw-Hill hereafter collectively referred to as "S&P"), issued credit ratings for Residential Mortgage Backed Securities ("RMBS") and Collateralized Debt Obligations ("CDOs"). RMBS were structured debt securities that were collateralized by pools of residential mortgage loans. CDOs were structured debt securities that were collateralized by pools of existing debt securities, often including structured debt securities, and/or in some instances credit derivatives. The pooled structured debt securities underlying many CDOs consisted primarily of RMBS.

3.    Issuers of RMBS and CDOs typically pooled residential mortgages or debt securities, structured different classes of notes, commonly referred to as "tranches," securitized by the pools, and then engaged S&P and/or one or more other credit rating agencies to provide credit ratings for the various tranches.

4.    S&P rated RMBS and CDO tranches using a letter-grade scale ranging from AAA, the highest rating, to D, the lowest. S&P represented that its credit ratings reflected its current opinion of the creditworthiness, that is, the ability to timely pay interest and principal, of the different tranches. S&P announced its credit ratings to

1

COMPLAINT

the public and published them on S&P's website.

5.     RMBS and CDO tranches were marketed and sold primarily to financial institutions, including federally insured financial institutions, and other qualified institutional investors.

6.     S&P knew that its credit ratings of RMBS and CDO tranches were material to and relied upon by financial institutions, including federally insured financial institutions, to identify and compare credit risks among the different RMBS and CDO tranches. Unless the credit ratings for particular tranches were sufficiently high – typically a credit rating of BBB- or higher – most financial institutions would not invest in those tranches.

7.     As detailed more fully herein, beginning at the latest in or about September 2004 and continuing through at least in or about October 2007, within the Central District of California and elsewhere, S&P, knowingly and with the intent to defraud, devised, participated in, and executed a scheme to defraud investors in RMBS and CDO tranches, including federally insured financial institutions, as to material matters, and to obtain money from these investors by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

8.     In carrying out the scheme to defraud, S&P falsely represented that its credit ratings of RMBS and CDO tranches were objective, independent, uninfluenced by any conflicts of interest that might compromise S&P's analytic judgment, and reflected S&P's true current opinion regarding the credit risks the rated RMBS and CDO tranches posed to investors.

9.     As S&P knew, these representations were materially false, and concealed material facts, in that S&P's desire for increased revenue and market share in the RMBS and CDO ratings markets led S&P to downplay and disregard the true extent of the credit risks posed by RMBS and CDO tranches in order to favor the interests of large investment banks and others involved in the issuance of RMBS and CDOs who

1   selected S&P to provide credit ratings for those tranches.  In particular, to maintain
2   and grow S&P's share of the market for credit ratings of RMBS and CDOs and the
3   high fees and profits those ratings generated:

4           a.      Beginning at the latest in or about September 2004 and continuing
5   through at least in or about October 2007, S&P limited, adjusted, and delayed updates
6   to the ratings criteria and analytical models S&P used to assess the credit risks posed
7   by RMBS and CDO tranches, thereby weakening those criteria and models from what
8   S&P analysts believed was necessary to make them more accurate; and

9           b.      Beginning at the latest in or about March 2007, and continuing
10  through at least in or about October 2007, knowing that the credit risks of certain non-
11  prime RMBS tranches were increasing, were expected to continue to increase, and
12  were anticipated to result in negative Rating Actions, S&P knowingly disregarded the
13  true extent of the credit risks associated with those non-prime RMBS tranches in
14  issuing and/or confirming ratings for CDOs with exposure to those non-prime RMBS
15  tranches, which ratings S&P knew did not accurately reflect those CDOs' true current
16  credit risks because they failed to account for the increased credit risks posed by those
17  non-prime RMBS tranches.

18      10.     S&P's scheme to defraud caused investors, including Western Federal
19  Corporate Credit Union ("WesCorp"), a federally insured financial institution based in
20  the Central District of California, and other federally insured financial institutions, to:

21          a.      invest in RMBS and CDO tranches rated by S&P;

22          b.      be exposed to actual losses and increased risks of losses on the
23                  RMBS and CDO tranches S&P rated;

24          c.      accept lower rates of return for RMBS and CDO tranches receiving
25                  higher ratings from S&P in exchange for the supposedly lower
26                  risks such ratings purportedly represented; and

27          d.      pay for S&P's CDO ratings through the incorporation of S&P's
28                  rating fees into the costs of CDOs.

3
COMPLAINT

## II.   FIRREA

11.   Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), which included the provision codified at 12 U.S.C. § 1833a, as part of a comprehensive legislative plan to reform and strengthen the federal deposit insurance system and to enhance regulatory and enforcement powers relating to the operations of financial institutions.

12.   One of FIRREA's stated purposes was to provide "enhanced enforcement powers and increase criminal and civil money penalties for crimes of fraud against financial institutions and depositors." H.R. Rep. 101-54(I), 101st Cong., 1st Sess. 1989 at 18; *reprinted at* 1989 U.S.C.C.A.N. 86 at 118.

13.   FIRREA authorizes the Attorney General to recover civil penalties from whoever violates certain specified provisions of law. *See* 12 U.S.C. § 1833a(a). Among the violations for which FIRREA civil penalties may be sought are: (a) mail and wire fraud, in violation of 18 U.S.C. §§ 1341, 1343, "affecting a federally insured financial institution"; and (b) financial institution fraud, in violation of 18 U.S.C. § 1344. 12 U.S.C. § 1833a(c)(1) & (2).

14.   For purposes of the violations for which FIRREA civil penalties may be sought: (a) the term "financial institution" includes federally insured financial institutions, as well as branches and agencies of foreign banks; and (b) the term "federally insured financial institution" includes banks whose deposits are insured by the Federal Deposit Insurance Corporation and credit unions whose accounts are insured by the National Credit Union Share Insurance Fund. 18 U.S.C. § 20(1), (2) & (9). As used herein, these terms shall have the meaning attributed to them for purposes of FIRREA, as set forth above.

15.   FIRREA provides for a maximum civil penalty of $1,100,000 for each violation, or in the case of a "continuing violation," the lesser of $1,100,000 per day or $5,500,000. 12 U.S.C. § 1833a(b)(1)-(2); 28 C.F.R. § 85.3. FIRREA also provides that "[i]f any person derives pecuniary gain from the violation, or if the violation

4

COMPLAINT

1  results in pecuniary loss to a person other than the violator," including, but not limited
2  to, the Deposit Insurance Fund and the National Credit Union Share Insurance Fund,
3  the amount of the civil penalty may be increased up to "the amount of such gain or
4  loss." 12 U.S.C. § 1833a(b)(3)(A).

5  **III.   JURISDICTION AND VENUE**

6       16.    This Court has jurisdiction over the subject matter of this action pursuant
7  to 28 U.S.C. §§ 1331 & 1345.

8       17.    Venue is appropriate in this judicial district pursuant to 28 U.S.C.
9  § 1391(b)(1), (b)(2), (c) & (d), because defendants transact significant business within
10 this district and therefore are subject to personal jurisdiction in this district and
11 because a substantial part of the events giving rise to the claims alleged occurred in
12 this district.

13 **IV.   PARTIES**

14      18.    Plaintiff is the United States of America.

15      19.    Defendant McGraw-Hill is a New York corporation with its principal
16 place of business at 1221 Avenue of the Americas, New York, New York 10020.
17 Defendant McGraw-Hill is registered to do business in the State of California. From
18 at least 2004 through 2008, S&P Ratings was a unit within an unincorporated division
19 of defendant McGraw-Hill, and maintained an office at 1100 Glendon Avenue, Los
20 Angeles, California 90024.

21      20.    Defendant S&P LLC is a Delaware limited liability company, with its
22 principal place of business at 55 Water Street, New York, New York 10041.
23 Defendant S&P LLC is registered to do business in the State of California and
24 maintains an office at 1100 Glendon Avenue, Los Angeles, California 90024. As of
25 January 1, 2009, defendant S&P LLC was created as a wholly owned subsidiary of
26 defendant McGraw-Hill and took over the ratings business previously conducted by
27 S&P Ratings. Defendant S&P LLC is sued as the successor to S&P Ratings.

28

1   **V.   BACKGROUND**

2       **A.   RMBS**

3       21.   At all relevant times, RMBS were structured debt securities collateralized

4   by pools of residential mortgages.  Payments on the underlying mortgage loans

5   provided funds to pay RMBS investors their investments plus interest.

6       22.   To issue RMBS, an arranging entity and/or an investment bank

7   representing an arranging entity bundled large numbers of residential mortgage loans,

8   typically several hundred to several thousand individual mortgage loans, into a loan

9   pool held by a trust.  (The term "issuer" is used herein to refer collectively to the

10  entities that created and marketed a structured debt security; for an RMBS, these

11  entities were the arranging entity, the investment bank, and the trust.)  The issuer

12  typically issued different classes of notes, commonly referred to as "tranches,"

13  collateralized by the mortgage loan pool.  The different tranches paid different interest

14  rates corresponding to the different levels of credit protection afforded each particular

15  tranche.

16      23.   The primary source of credit protection was "subordination," which

17  created a hierarchy of cash flows and loss absorption among tranches.  Investors who

18  purchased the most senior tranche, which generally had the highest credit rating and

19  paid the lowest interest rate, were the first to be paid from the cash flow of the

20  underlying collateral.  Investors who purchased more junior tranches, which generally

21  had lower credit ratings and paid higher interest rates, were typically paid only after

22  investors in the more senior tranches.  Conversely, defaults and losses on underlying

23  collateral affected first the more junior tranches; only to the extent defaults and losses

24  could not be absorbed by more junior tranches would they affect the senior tranches.

25      24.   Other   common   sources   of   credit   protection   included   "over-

26  collateralization," which was the amount that the principal balance of the mortgage

27  loan pool exceeded the principal balance of the notes issued by the trust, and "excess

28  spread," which was the amount by which the total interest expected to be received on

the underlying mortgage loans exceeded the total interest payments to be made to RMBS investors plus the administrative expenses of the trust.

25.     S&P categorized RMBS according to the different types of mortgage loans contained in their underlying loan pools.  Prime RMBS generally carried the least risk.  Non-prime RMBS, including RMBS containing Alt-A, second-lien, and subprime loans, generally presented more risk than prime RMBS.

26.     The loan pools underlying prime RMBS were typically comprised of first-lien mortgage loans that generally satisfied traditional credit guidelines with borrowers considered good credit risks, that is, borrowers with high credit scores indicating that they were likely to pay back their loans.

27.     The loan pools underlying Alt-A RMBS were typically comprised of first-lien mortgage loans that satisfied some of the traditional credit guidelines, but had aspects that indicated greater credit risk, for example, less loan documentation or self-employed borrowers.

28.     The loan pools underlying second-lien RMBS were typically comprised of second-lien mortgage loans, which were riskier than first-lien mortgage loans.  If the borrower did not pay on the loans and a lender had to sell the residence to collect on the loans, the second mortgage was subordinate to the first, meaning that it was not repaid unless and until the first mortgage was paid in full.  Some second-lien RMBS were comprised in large part of closed-end second-lien mortgage loans, which were second mortgages taken out to enable borrowers to qualify for their first mortgages, for example, to fund, either partially or entirely, a down payment required by the first-lien mortgage lender.

29.     The loan pools underlying subprime RMBS were typically comprised of mortgage loans made to borrowers who had histories of delinquency, limited credit histories, or other credit problems such that they posed greater credit risks.

## B.   CDOs

30.   At all relevant times, CDOs were structured debt securities collateralized by pools of other debt securities, often including other structured debt securities, and/or in some instances credit derivatives.

31.   To issue CDOs, an arranging entity, and/or an investment bank representing an arranging entity, typically created a special purpose vehicle ("SPV") that, through a trust acting at the direction of the SPV, purchased collateral and issued CDO notes. (As noted in paragraph 22 above, the term "issuer" is used herein to refer collectively to the entities that created and marketed a structured debt security; for a CDO, these entities were the arranging entity, the investment bank, the SPV, and the trust.)   The issuer typically issued different classes of notes, often referred to as "tranches," collateralized by the underlying asset pool.   The different tranches paid different interest rates corresponding to the different levels of credit protection afforded each particular tranche.   As with RMBS, typical sources of credit protection were subordination, over-collateralization, and excess spread.

32.   S&P typically rated three types of CDOs: cash CDOs (also referred to as cash flow CDOs), synthetic CDOs, and hybrid CDOs.   Cash CDOs were collateralized by pools of existing debt securities, including but not limited to RMBS.   Synthetic CDOs were collateralized by credit derivatives, including in many instances credit default swaps, which were insurance contracts in which investor funds and commitments for investor funds were used to insure third parties against the default of an underlying asset in exchange for premium payments.   Hybrid CDOs were collateralized by combinations of debt securities, including but not limited to RMBS, and credit derivatives.

33.   In many cases, the debt securities providing collateral for cash CDOs included different tranches from multiple RMBS.   In many cases, the debt securities that were the subject of credit default swaps providing collateral for synthetic and hybrid CDOs included different tranches from multiple RMBS.

34.     Between September 2004 and October 2007, many of the RMBS tranches that were pooled and resecuritized into cash and/or hybrid CDOs rated by S&P, or that were the subject of credit default swaps that were pooled and resecuritized into synthetic and/or hybrid CDOs rated by S&P, were riskier, more junior, non-prime RMBS tranches.

**C.     The Central Role of S&P's Credit Ratings in Purchases of RMBS and CDOs by Financial Institutions**

**1.     S&P's NRSRO Status**

35.     S&P was a credit rating agency that was in the business of providing credit ratings, for which it charged substantial fees.  S&P was the largest credit rating agency in the world and held a dominant position in the United States credit rating market.

36.     Prior to September 24, 2007, pursuant to the no-action letter process of the United States Securities and Exchange Commission ("SEC"), S&P was identified as a Nationally Recognized Statistical Rating Organization ("NRSRO") based, in part, on the SEC staff's determination that S&P was recognized nationally by the predominant users of credit ratings as issuing credible and reliable ratings.

37.     Following passage of the Credit Rating Agency Reform Act of 2006, P.L. 109-291, 120 Stat. 1327 (Sep. 29, 2006), in accordance with the directives of that Act, the SEC implemented rules establishing a formal process for a credit rating agency to apply for and be registered as an NRSRO.

38.     On or about June 25, 2007, S&P submitted to the SEC its application for registration as an NRSRO.  In this application, in response to the SEC's request for "[p]olicies and procedures to address and manage conflicts of interest," S&P provided, among other things, the June 2007 version of its Code of Conduct, the contents of which are discussed in more detail in paragraph 115 below.

39.     Effective September 24, 2007, based on S&P's application, the SEC granted S&P registration as an NRSRO.

### 2. S&P's Letter Grade Rating Scale

40.     S&P used a scale of letter grades, from AAA to D, to denote its credit ratings of long-term investments such as RMBS and CDOs.

41.     S&P represented to investors that its AAA rating of a debt security indicated an "EXTREMELY STRONG capacity to meet its financial commitments" and was "the highest issuer credit rating assigned by Standard & Poor's." Traditionally, debt securities bearing AAA ratings were considered the safest, roughly comparable in risk to federal treasury bills, with a less than 1% probability of incurring defaults over the life of the debt security. S&P represented that AAA rated debt securities should, on average, be able to withstand economic conditions similar to those of the Great Depression.

42.     Each grade level down from AAA – for example, ratings of AA, A, BBB, BB, B, CCC, CC, SD ("Selective Default"), and D ("Default") – indicated a decrease in creditworthiness and an increase in risk of default.

43.     S&P also modified its credit ratings between "AA" and "CCC" by attaching a plus (+) sign, indicating an incrementally higher credit rating, or a minus (-) sign, indicating an incrementally lower credit rating.

44.     S&P defined investments rated by S&P as BBB- and higher as "investment grade." S&P defined those with ratings below BBB- as "non-investment grade" or "speculative grade." S&P commonly referred to those with ratings from A through BB, or some subset within that range, as "mezzanine."

### 3. S&P Knew the Importance of its Ratings to Financial Institutions Investing in RMBS and CDOs

45.     RMBS and CDOs were marketed and sold primarily to financial institutions (including federally insured financial institutions) and other qualified institutional investors.

46.     A key step in the process of creating and selling RMBS and CDOs to financial institutions and other qualified institutional investors was obtaining credit

ratings for each RMBS or CDO tranche (with the exception of the most junior "equity" tranche, which typically did not receive a rating and provided credit protection to all of the more senior tranches). To sell a particular RMBS or CDO tranche to a financial institution, it was typically necessary for that tranche to receive an "investment grade" credit rating, that is, a rating of BBB- or higher.

47.    Federal statutes and regulations required certain financial institutions to hold only securities with credit ratings that qualified them as "investment grade." For instance, long term investments in structured debt securities by credit unions that were members of the National Credit Union Administration were limited by regulation to those with a rating from at least one NRSRO that was no lower than "AA-." 12 C.F.R. § 704.6(d).

48.    As a result, financial institutions, including some that were required to do so by law, relied on credit ratings issued by NRSROs, including those issued by S&P, in making investment decisions relating to purchasing and holding RMBS and CDOs, including assessing compliance with diversification and capital requirements.

49.    S&P knew that financial institutions considered S&P's ratings of RMBS and CDOs to be material to their investment decisions. Thus, for example:

a.    In its January 5, 2006 CDO Strategic Plan, S&P listed "Financial Buyers" as one of "three fundamental revenue drivers for [CDO] ratings" and estimated that they represented "70% of the driving force behind the growth of the CDO ratings business." S&P explained:

> These are investors or counterparties who for any number of reasons require the tranche of the transaction they invest in to have a credit rating. The most common reason for the requirement is that a rating is required under the investment guidelines of the institution. A second reason is that the counterparty/investor in the transaction is relying on the rating agency to interpret and identify the credit risk of the instrument being offered by the dealer/arranger.

11
COMPLAINT

b.      In its January 5, 2006 CDO Strategic Plan, S&P further stated:

Fundamentally, investors and counterparties rely on S&P for review of the transaction, and for S&P to identify the credit risk (ratings) associated with the tranches they intend to purchase. They also rely on S&P to ensure that the ratings assigned remain consistent with the credit quality of the underlying portfolio and the credit enhancement afforded by the CDO structure throughout the lifetime of the rated debt.

c.      In a February 16, 2007 publication titled, "25 Years of Credit: The Structured Finance Market's Accumulated Wisdom," S&P referenced the original issuance of RMBS that were not guaranteed by the government and observed:

This created a quandary for investors looking for reliable ways to assess the creditworthiness of the privately issued securities. The value of the underlying assets became paramount, as did the strength of the cash flows they produced and the stability of the transaction's legal structure created to properly assess the issuer's ability to pay its debts. Enter the credit rating agencies, such as [S&P], which began to scrutinize these elements and assign ratings to the securitizations. This enabled conservative investors, such as pension funds and insurance companies, to gauge the risk of structured finance investments without tying up valuable resources by having to analyze the underlying assets themselves.

d.      In an August 23, 2007 publication titled, "The Fundamentals of Structured Finance Ratings," S&P stated:

[S]ecuritization works by providing buyers of risk with the risk they seek. But how can they know this complex structured finance tranche carries a level of credit risk with which they are comfortable? By providing an objective and independent assessment and a universal scoring system that allows like for like comparisons of credit risk, rating agencies assist in this process. . . . [T]he arrangers are selling to investors in each tranche a

specific type of risk and . . . investors compare these tranches using the
universal scoring system of the rating agency. . . .

50.    S&P also recognized that investor perception that S&P's ratings accurately reflected credit risk was crucial to S&P's business, including its competition with other ratings agencies for market share, which was often described internally at S&P as market or ratings "penetration" or "relevance," to reflect that frequently more than one rating agency would be hired to rate the same security. Thus, for example, in its January 5, 2006 CDO Strategic Plan, S&P stated:

> On a fundamental level, their reliance on ratings as a
> translator/explanation of credit risk ensures that rating agencies continue
> to play a critical role in the market.  Additionally, to the extent they place
> a higher value on S&P ratings, as compared to those of other agencies,
> they play a key role in ensuring that S&P continues its high ratings
> penetration and leading position in the ratings market.  To that extent a
> large portion of the CDO group's market outreach and publication effort
> is targeted to this customer group.

51.    To the extent S&P's credit ratings underestimated credit risks of RMBS or CDOs, S&P harmed investors, including financial institutions, by understating the risks of their investments.  Such underestimation of credit risks, however, benefitted issuers by making it possible for them to issue deals with less credit protection, thereby typically making deals more profitable for them.  This, in turn, could result in issuers bringing more ratings business to S&P.

52.    From in or about September 2004 through in or about October 2007, S&P issued credit ratings on over $2.8 trillion worth of RMBS and nearly $1.2 trillion worth of CDOs.  During this time, financial institutions, in the Central District of California and elsewhere, invested billions of dollars in RMBS and CDOs rated by S&P, including billions of dollars in CDOs with exposure to non-prime RMBS.

### D.     S&P's Credit Rating Business for RMBS and CDOs

#### 1.     S&P's Structured Finance Department

53.    At all relevant times, S&P's business of rating structured financial products, including RMBS and CDOs, was conducted by S&P's Structured Finance department ("Structured Finance").

54.    From June 1999 until the end of 2007, Joanne Rose was the Executive Managing Director in charge of Structured Finance. Rose also led the Structured Finance Leadership Team ("SFLT"), which was a management team that included business executives who ran the different groups within Structured Finance. Rose reported to Senior Executive A, the S&P Executive Vice President for Global Ratings.

55.    Within Structured Finance, initial ratings for RMBS, in the United States and abroad, were issued by the Global ABS/RMBS/New Assets group ("Global ABS"). From 2005 through August 2008, Global ABS was headed by Senior Executive B, a Managing Director who supervised personnel responsible for rating all new RMBS issuances, was a member of the SFLT, and reported to Rose.

56.    Within Global ABS, initial ratings for United States RMBS were issued by the U.S. Residential Mortgage Group ("US RMBS"). From January 2006 through December 2007, Executive C was the Managing Director in charge of US RMBS and reported to Senior Executive B.

57.    Within Structured Finance, initial ratings for most CDOs were issued by the Global CDO group ("Global CDO"). From February 2005 through 2007, Global CDO was headed by Managing Director Patrice Jordan. Jordan supervised personnel responsible for rating all new CDO issuances (other than CDOs composed primarily of commercial real estate assets) in the United States and abroad. Jordan was a member of the SFLT and reported to Rose. Before becoming the head of Global CDO in February 2005, Jordan served within Global ABS as a Global Practice Leader for RMBS ratings for fifteen years.

58.     From in or about 1999 until February 2005, Senior Executive D headed Global CDO and was a member of the SFLT.  From February 2005 until in or about November 2006, Senior Executive D led the quantitative analytics group within S&P's "Center of Excellence."   In that capacity, Senior Executive D supervised quantitative analysts who provided modeling and statistical support for all S&P ratings divisions, including supporting the models used by Global CDO.  Senior Executive D left his employment with S&P in or about November 2006.

59.     Within Global CDO, at all relevant times, David Tesher was the Managing Director in charge of the Cash CDO group ("Cash CDO"), and Andrea Bryan was the Managing Director in charge of the Synthetic CDO group ("Synthetic CDO").  As the heads of Cash CDO and Synthetic CDO respectively, Tesher and Bryan supervised the ratings of CDOs, including CDOs with exposure to non-prime RMBS.  Tesher and Bryan both reported to Jordan.

60.     Within Structured Finance, monitoring of existing RMBS and CDO ratings was the responsibility of the Global Surveillance/Servicer Evaluations group ("Global Surveillance"), which, from 1999 through August 2008, was headed by Senior Executive E, who reported to Rose and was a member of the SFLT.  Within Global Surveillance, at all relevant times, Executive F was in charge of the RMBS Surveillance Group ("RMBS Surveillance") and Executive G was in charge of the CDO Surveillance Group ("CDO Surveillance").  Executives F and G reported to Senior Executive E.

61.     Within Structured Finance, ratings criteria were the responsibility of the Research and Criteria group ("Research and Criteria"), which, at all relevant times, was headed by Thomas Gillis.  As head of Research and Criteria, Gillis had authority over criteria decisions affecting RMBS and CDO ratings.  Gillis reported to Rose and was a member of the SFLT.

## 2. S&P's RMBS and CDO Ratings Fees

62. S&P charged a fee for each RMBS it rated. S&P typically charged a fee up to $150,000 for each non-prime RMBS it rated.

63. S&P charged a fee for each CDO it rated. S&P typically charged a fee up to $500,000 for each cash CDO it rated and up to $750,000 for each synthetic CDO it rated. S&P imposed additional surcharges for ratings that were issued on compressed timetables or required additional analysis or legal research.

64. S&P also charged and collected in advance additional fees for future surveillance of the CDOs that it rated. S&P received up to $50,000 in surveillance fees for each CDO it rated.

65. If the rating process was not completed (for example, because the issuer believed the proposed rating was too low and withdrew the rating request), S&P usually received only a fraction of the rating fee it otherwise would earn.

66. Typically, the issuer (commonly the investment bank representing an arranging entity) made the decision to retain S&P to provide ratings of CDOs. As a result, S&P executives and staff viewed issuers as S&P's primary customers and as the source of S&P's rating business. Thus, for example, S&P's January 5, 2006 CDO Strategic Plan stated:

> The primary customers of the CDO group today are the **deal arrangers** (bankers/intermediaries). This customer group continues to be responsible for the vast majority of revenue, including all initial deal rating fees paid to S&P. (emphasis in original)

67. Although S&P typically was retained by – and charged its CDO ratings fees to – CDO issuers (that is, the arranging entities, the investment banks representing those entities, and/or the SPVs), those issuers ordinarily did not bear the cost of the CDO ratings fees. Instead, as S&P knew, the costs of those fees were passed through to the investors who purchased CDO tranches. Thus, for example:

a.    Documents implementing the issuance and sale of the various tranches of Novastar ABS CDO I, Ltd., made clear that S&P's rating fee was one of the "organizational and structuring fees and expenses" to be paid by the SPVs involved in the deal out of the proceeds of the sales of those tranches to investors. Indeed, the Purchase Agreement entered into between the SPVs and the investment bank involved in the issuance of the CDO specified that the SPVs would "pay from the proceeds of issuance of the Notes all of their expenses incident to the performance of their obligations" in connection with issuance of the CDO, including, in particular, "any fees charged by investment rating agencies for the rating of the Notes." In accordance with these provisions, on or about February 8, 2007, the SPVs issued instructions to pay S&P a rating fee of $243,040 out of the gross proceeds from the sale to investors of Novastar I tranches.

b.    Documents implementing the issuance and sale of the various tranches of Charles Fort CDO I, Ltd., contained similar provisions. In accordance with these provisions, on or about March 29, 2007, the SPV involved in this deal issued instructions to pay S&P a rating fee of $268,100 out of the gross proceeds from the sale to investors of Charles Fort I tranches.

c.    On or about October 24, 2007, Rose made remarks at a meeting of the Structured Finance Investor Council, a group of institutional investor representatives with whom S&P periodically met to discuss issues related to structured finance investments, in which she stated: "Investors need to publicly voice their opinions on issues like the issuer pay model – investors ultimately *do* pay – since all deal fees including rating fees are netted out of the total deal proceeds."

### 3.    The Profitability of S&P's RMBS and CDO Ratings

68.    At all relevant times, S&P considered Structured Finance to be a profit center and recognized the ratings business conducted by Global CDO and Global ABS as growing areas of revenues and profits.

69.   In 2005, 2006, and 2007, Global CDO generated revenues of approximately $96 million, $182 million, and $203 million, respectively.

70.   In 2006 and 2007, Global ABS generated revenues of more than $278 million and $243 million, respectively.

71.   In its 2005 annual report, McGraw-Hill recognized the large increases in revenue and operating profit from S&P's structured finance ratings from 2004 to 2005:

> The Financial Services segment's revenue and operating profit experienced double-digit growth in 2005, increasing 16.8% and 21.4%, respectively, over 2004 results. The Financial Services segment's increase in revenue and operating profit in 2005 is due primarily to the strong performance of structured finance and corporate finance (corporate finance and financial services) ratings, which represented approximately 40.3% and 17.0% of the growth in revenue respectively. Growth was experienced in all asset classes within structured finance.

72.   In its 2006 annual report, McGraw-Hill recognized the large increases in revenue and operating profit from S&P's structured finance ratings from 2005 to 2006:

> The Financial Services segment continued to experience double-digit growth in revenue and operating profit in 2006, increasing 14.4% and 18.0%, respectively, over 2005 results. The increases in revenue and operating profit were due to the performance of structured finance and corporate (industrial and financial services) and government ratings, which represented approximately 55.4% and 33.7%, respectively, of the growth in revenue.

**E.   S&P's Credit Rating Process for RMBS**

73.   S&P's rating process for RMBS typically began when an RMBS issuer contacted S&P to discuss a proposed RMBS. The RMBS issuer typically emailed to

S&P an electronic file containing statistical information on the underlying pool of residential mortgage loans, which typically ranged in size from several hundred to several thousand loans.

74.    To rate RMBS, S&P used a model known as the "Loan Evaluation & Estimate of Loss System" ("LEVELS").   S&P quantitative analysts ran each RMBS pool through LEVELS, which generated summary information for the pool as well as subordination levels for each rating category.   The LEVELS results were shared with the RMBS issuer.   Often the RMBS issuer would modify the submitted pool in an effort to decrease the level of subordination or other forms of credit support required.

75.    The results of the LEVELS analysis were taken to a committee of S&P analysts for sign-off.    After the committee accepted the LEVELS analysis, on occasion with slight modifications, it was passed along to a lead rating analyst, who then prepared a confidential rating committee presentation addressing the credit and structural aspects of the transaction.   The lead rating analyst also prepared a brief deal write-up that was intended for publication once the deal closed.

76.    The lead rating analyst made the presentation to an RMBS rating committee, which consisted of a rating chair and the presenting analyst.    The presentation would then be passed on to a second senior analyst for a second read, after which both the chair and second reader would sign off on the rating presentation. Most rating committees took less than 15 minutes to complete.   Numerous rating committees were conducted simultaneously in the same conference room.

77.    On the RMBS closing date, the lead rating analyst sent a rating letter to the RMBS issuer.   The rating letter typically provided the credit ratings issued by S&P to the different RMBS tranches and authorized the recipient of the rating letter to disseminate S&P's credit ratings to interested parties.   On the RMBS closing date, S&P also published the ratings on its website.

78.    On occasion, rating requests were withdrawn during the rating process. This was usually because another credit rating agency permitted lower credit support

levels, which generally made the RMBS riskier to investors but more profitable for the RMBS issuer.  Any time that a rating request was withdrawn, in whole or part, the rating analyst was required to submit to the head of Global ABS a "lost deal" memo that explained why S&P had lost the rating business.

### F.    S&P's Credit Rating Process for CDOs

#### 1.    CDO Evaluator and Genesis

79.    S&P's rating process for CDOs typically began when a CDO issuer contacted S&P to discuss a proposed CDO.  The CDO issuer typically supplied information to S&P regarding the pool of assets to be included in the CDO and the proposed structure of the deal.  There were often significant adjustments of the asset pool and the deal structure throughout the rating process.

80.    S&P represented to investors that, to achieve a certain rating, each CDO tranche had to survive a "specific default probability" that, "regardless of the different asset types in the pool," was "a function of the desired rating and maturity of the CDO tranche," making it "easier for investors to compare equally rated CDO tranches backed by different asset types."

81.    To rate CDOs, S&P used a model known as "CDO Evaluator," which determined whether the pool of assets could support the deal's proposed structure. S&P's CDO ratings were typically conducted by a lead rating analyst and a quantitative analyst.  These analysts ran information provided by the CDO issuer through CDO Evaluator and determined whether any changes to the assumptions and outputs of CDO Evaluator were required based on the particular assets underlying the CDO.  The analysts then prepared a Rating Analysis Methodology Profile report ("RAMP") that summarized the key rating issues relating to the CDO.  For cash and some hybrid CDOs, analysts would also generate the results of S&P's CDO Evaluator and Genesis cash-flow ("Genesis") models in a summary form referred to as a "Quantitative Ramp" or "Q-Ramp."

82. Genesis modeled how payments from the assets underlying the CDO would be converted into payments to investors who purchased the CDO's tranches. The Q-Ramp determined if a CDO had sufficient cash flow to meet the obligations of the CDO tranches being rated. The Q-Ramp did this by comparing a break-even default rate ("BDR") with the scenario default rate ("SDR") generated by CDO Evaluator. The BDR determined how many defaults a CDO tranche could withstand and still make all required payments to investors, while the SDR projected how many defaults in the CDO collateral pool would occur for a given rating level. The ratings of the underlying collateral in a CDO, as well as the correlation between the assets (how likely it was that the different assets would default at the same time), were the primary components of the SDR.

83. For tranches with higher rating levels, CDO Evaluator assumed greater SDRs. Thus, for example, for a tranche to be rated AAA, which was supposed, on average, to be able to survive economic conditions similar to the Great Depression, CDO Evaluator assumed the greatest SDR.

84. If a CDO tranche's BDR was higher than the SDR, S&P deemed the tranche "able to withstand the level of default stress at the desired rating category," and the tranche passed the Q-Ramp. If not, the CDO tranche failed the Q-Ramp. A Q-Ramp failure indicated that S&P's own models predicted the tranche would not be able to meet its cash-flow obligations based on S&P's default assumptions.

85. S&P analysts generally understood, consistent with the training S&P provided them, that for S&P to rate a cash CDO, every tranche had to pass the Q-Ramp. Sometimes there would not be a passing Q-Ramp when a CDO went before the CDO rating committee. When this happened, however, analysts expected that, if S&P were to rate the CDO, it would have a passing Q-Ramp before the deal closed.

86. The analysts presented the RAMP and Q-Ramp for discussion to a CDO rating committee that consisted of at least three voting members. Rating committees often made comments requiring the analysts to return to the CDO issuer to clarify

1    issues or have changes made to the deal documents or structure.  The analysts then

2    discussed the rating committee's comments with the CDO issuer and attempted to

3    complete the rating.

4         87.    Only under rare circumstances were the analysts required to reconvene a

5    CDO rating committee to discuss the resolution of the committee's comments.  This

6    would occur primarily when the CDO issuer refused to make the rating committee's

7    recommended changes or proposed a unique alternative way to address issues the

8    rating committee had identified.

9         88.    For cash CDOs, disputes that arose with CDO issuers regarding rating

10   committees' recommended changes were typically brought to the attention of Tesher.

11   There could be "management override" -- an exception to S&P's criteria authorized by

12   one of the business heads -- to allow a CDO to be rated notwithstanding that one or

13   more tranches failed the Q-Ramp.   Jordan and Tesher were the primary S&P

14   executives with this override authority.

15        89.    Prior to the release of S&P's CDO rating, the analysts customarily

16   prepared and issued a Pre-Sale Report that summarized the deal.  The Pre-Sale Report

17   was intended to provide comfort to potential CDO investors that S&P's rating was

18   forthcoming.

19        90.    On the CDO closing date, a rating letter was prepared, signed by an

20   analytical manager, and transmitted to the CDO issuer.  The rating letter typically

21   provided the credit ratings issued by S&P to the different CDO tranches and

22   authorized the recipient of the rating letter to disseminate S&P's credit ratings to

23   interested parties.  A press release was also issued and posted by S&P on its website

24   to officially announce the ratings.

25        **2.    The Importance of Ratings of a CDO's Underlying Assets**

26        91.    As S&P knew, the ratings on the assets underlying a CDO were the most

27   important factor in the CDO rating and were a primary input into CDO Evaluator.

28

92.     Beginning in or about 2006, if a CDO's underlying assets had been rated by S&P, as was often the case, it was standard practice for S&P CDO analysts when rating the CDO to simply accept the ratings of the underlying assets at face value. S&P was aware of and endorsed this standard practice.

93.     In particular, beginning in or about 2006, with respect to CDOs exposed to the credit risks of RMBS that had been rated by S&P, it was standard practice for S&P CDO analysts to accept S&P's ratings of the underlying RMBS and neither "notch" those RMBS ratings (that is, treat the ratings as if they were lower than they were) nor contact RMBS Surveillance to check on the status of the RMBS ratings. S&P was aware of and endorsed this standard practice.

94.     It was crucial to the validity of their analysis that CDO rating analysts know if the ratings of RMBS assets underlying the CDOs they were rating were being considered for possible downgrade.  S&P CDO analysts and executives knew that potential downgrades of the ratings on underlying RMBS assets were an important indicator of additional credit risk, ignoring that additional credit risk could and likely would lead to inflated CDO ratings, and considering this additional credit risk could and likely would cause analysts to give CDOs exposed to such RMBS lower credit ratings, or to not rate those CDOs.

95.     If CDO analysts did not know about, or failed to consider, potential downgrades to the RMBS underlying the CDOs they were rating, they could and likely would issue CDO ratings that were too high, thereby misrepresenting the credit risks of the rated CDO tranches and deceiving investors who purchased the CDO tranches.   S&P CDO analysts, however, typically were not told that RMBS surveillance was considering downgrading RMBS tranches underlying the CDOs they were rating unless S&P had already placed the RMBS tranches on a public list known as CreditWatch Negative that publicly identified RMBS tranches being considered for possible downgrade.

### 3.   Effective Date Rating Agency Confirmations

96.   For cash and hybrid CDOs, another part of S&P's CDO rating process was S&P's issuance of an additional credit rating determination known as an "Effective Date Rating Agency Confirmation," commonly referred to as an "Effective Date RAC."

97.   Cash and hybrid CDO deals often closed prior to all of the underlying assets being purchased. These CDO deals typically had a three to six-month window post-closing for all the underlying assets designated at closing by the issuer to be purchased and identified. This period was known as the "Ramp-Up Period." The date for completion of purchase of the underlying assets was typically set forth in the CDO's trust indenture and referred to as the CDO's "Effective Date." It was the exception, not the rule, that cash and hybrid CDOs were "fully ramped," that is, all underlying assets purchased, at the time of closing. Most cash and hybrid CDOs specified an Effective Date that defined a Ramp-Up Period to complete the purchase of underlying assets.

98.   Ratings for cash and hybrid CDOs that were not fully ramped at the time of closing were issued based on a portfolio of underlying assets that included both assets that had already been purchased and potential assets that were designated by type, rating, maturity date, and size, but had not yet been purchased by the issuer (known as "dummy assets"). For these CDOs, S&P ratings analysts were required to reaffirm the ratings after the Ramp-Up Period was completed, that is, after all "dummy assets" had been replaced by appropriate purchased assets. Letters from S&P to issuers confirming CDOs' ratings after post-closing ramp-up was completed were known as "Effective Date RAC letters."

99.   An Effective Date RAC letter confirmed that CDO tranches continued to receive S&P's original ratings after the CDO was fully funded and all of the CDO's underlying assets had been purchased. The Effective Date RAC letter indicated that, with all underlying assets actually purchased, the CDO tranches continued to satisfy

1   S&P's criteria for the ratings those tranches had previously been given at closing.

2       100. To determine whether a post-closing fully-ramped CDO still warranted

3   the ratings S&P had issued its tranches at closing, S&P ratings analysts ran the fully-

4   ramped CDO, with all assets actually purchased, through CDO Monitor, an S&P

5   model that essentially combined CDO Evaluator and Genesis into a single application,

6   customized for each transaction.

7       101. If every tranche of the fully-ramped CDO passed CDO Monitor, S&P

8   sent out an Effective Date RAC letter confirming S&P's ratings of the CDO tranches

9   based on review of the CDO's fully-ramped asset portfolio. If any tranche of the

10  CDO failed CDO Monitor, then S&P could not properly issue an Effective Date RAC

11  letter confirming its prior ratings. In such circumstances, in order to obtain an

12  Effective Date RAC letter, the CDO issuer could change the payout structure to give

13  priority to the higher-rated tranches at the expense of the lower ones or make

14  adjustments to the underlying asset portfolio or the structure of the CDO. If, despite

15  such changes, S&P remained unwilling to provide an Effective Date RAC letter, it

16  could result in the CDO being unwound and the investors' money refunded.

17      **G.    S&P's Surveillance of RMBS and CDO Credit Ratings**

18      102. S&P assured investors that after a rating was assigned by S&P, the rating

19  continued to be monitored through S&P's surveillance process. S&P represented that

20  the "purpose of surveillance is to ensure that the rating continues to reflect the

21  performance and structure of the transaction as it was analyzed at transaction closing"

22  and that S&P's "surveillance process encompasses monitoring issue performance and

23  identifying those issues that should be considered for either an upgrade or a

24  downgrade."

25      103. S&P's Code of Professional Conduct ("Code of Conduct"), which S&P

26  issued in October 2005, published on its website, and, as updated in June 2007,

27  submitted to the SEC as part of S&P's June 25, 2007, NRSRO application,

28  represented that S&P would monitor and timely update its ratings where appropriate:

[O]nce a rating is assigned Ratings Services shall monitor on an ongoing basis and update the rating by:

    a.    regularly reviewing the issuer's creditworthiness;

    b.    initiating a review of the status of the rating upon becoming aware of any information that might reasonably be expected to result in a Rating Action (including withdrawal of a rating) consistent with the applicable rating criteria and methodology; and,

    c.    updating on a timely basis the rating, as appropriate, based on the results of such review.

104. "Rating Action" was defined by S&P to mean "any initial rating, any change, withdrawal, or suspension of an existing rating, any CreditWatch action or the assignment of a new Outlook." S&P assured investors that once a credit rating was public, S&P would publicly disclose any subsequent Rating Action, generally with a short explanation of the basis for the action.

105. "CreditWatch" was defined by S&P to mean a public indication that highlights "the potential direction of a short- or long-term rating. It focuses on identifiable events and short-term trends that cause ratings to be placed under special surveillance by Standard & Poor's analytical staff." With respect to CreditWatch designations, S&P explained, "The 'positive' designation means that a rating may be raised; 'negative' means a rating may be lowered; and 'developing' means that a rating may be raised, lowered, or affirmed." S&P represented that under its guidelines, "we place ratings on CreditWatch when, in our analysts' opinion, there is at least a 50% likelihood that we will change the rating in the near term."

106. S&P represented that its own studies indicated that placements on CreditWatch "strongly signal future rating changes" in that "[s]ixty-six percent of CreditWatch listings with positive implications resulted in an upgrade; 59% of CreditWatch listings with negative implications resulted in a downgrade."

107. As part of its surveillance of RMBS ratings, S&P received from the entities that serviced the loans in the underlying mortgage loan pools monthly reports that provided information regarding the performance of the loans. Based on review of these reports and other information, RMBS Surveillance set certain parameters that identified RMBS tranches that were flagged for closer scrutiny for positive or negative Rating Action. These parameters were used to generate what S&P referred to as "exception reports," which were internal, non-public lists of RMBS tranches that RMBS Surveillance monitored more closely for possible Rating Action.

108. An important metric that RMBS Surveillance used to determine which RMBS tranches were likely to need negative Rating Action was the comparison of severe delinquencies to available credit support, a comparison known as "SD versus CS." "Severe delinquencies" referred to underlying mortgage loans that were in foreclosure, for which payments were more than 90 days delinquent, or that were "REO", that is, "Real Estate Owned," meaning that the residence was owned by the lender after an unsuccessful attempt to sell it at a foreclosure auction. RMBS that were collateralized by such loans were more likely to sustain losses. "Credit support" referred to the amount of losses a tranche could withstand and still be able to make all of the required payments to investors. The comparison between "severe delinquencies" and "credit support" was used by RMBS Surveillance to predict whether likely losses might exceed the ability of an RMBS tranche to withstand them, thereby causing the tranche to default.

109. CDO Surveillance monitored several parameters regarding the performance of CDOs to identify CDOs that required closer monitoring for possible Rating Action. When CDOs were identified that required this attention and possible Rating Action, CDO Surveillance would re-run S&P's rating models for new CDOs, that is, CDO Evaluator and, for cash and some hybrid CDOs, Genesis.

## VI.    S&P'S SCHEME TO DEFRAUD

### A.    S&P Repeatedly Represented that its Ratings Were  Objective, Independent, Uninfluenced By Any Conflicts of Interest That Might Compromise S&P's Analytic Judgment, and Reflected S&P's True Current Opinion Regarding Credit Risks

110.    S&P recognized the potential conflict of interest inherent in S&P being selected and retained by the issuers whose RMBS and CDOs S&P rated.  Beginning well before 2004 and continuing through at least October 2007, however, S&P repeatedly reassured investors, including financial institutions, and other participants in the financial markets, that its credit ratings, including those of RMBS and CDOs, were objective and independent, and that this potential conflict of interest, and the resulting incentives to favor issuers in order to maintain and increase S&P's ratings market share and profits, would not influence those ratings.

111.    In September 2004, S&P gathered and restated "established policies and procedures that are relevant to the rating and surveillance processes of Ratings Services" in a "Code of Practices and Procedures" that S&P made "freely available to the public on [S&P's] public website."  In its Code of Practices and Procedures, S&P made several representations regarding its ratings' objectivity, independence, and freedom from influence by any conflicts of interest:

a.    In the Introduction, S&P stated that its "mission has always remained the same – to provide high-quality, objective, independent, and rigorous analytical information to the marketplace" and that S&P "endeavors to conduct the rating and surveillance processes in a manner that is transparent and credible and that also ensures that the integrity and independence of the ratings and surveillance processes are not compromised by conflicts of interest, abuse of confidential information or other undue influences."

b.    Section 3.1.1 stated:

Conflicts of interest or other undue influences if not managed properly

could undermine Ratings Services' independence, objectivity and credibility. Ratings Services is aware of the significant role it plays in the global securities markets and understands the public's concern about conflicts of interest and how such conflicts may affect the rating and surveillance processes. Ratings Services endeavors to avoid conflicts of interest and, where this is not possible, has established policies and procedures to address the conflicts of interest through a combination of internal controls and disclosure.

        c.     Section 3.1.2 stated:

In all analytic processes, Ratings Services must preserve the objectivity, integrity and independence of its ratings. In particular, the fact that Ratings Services receives a fee from the issuer must not be a factor in the decision to rate an issuer or in the analysis and the rating opinion.

        d.     Section 3.1.4 stated:

Ratings Services' criteria and methodology shall be determined solely by [S&P's] Analytics Policy Board and Analysts.

        e.     Section 3.1.5 stated:

Ratings assigned by Ratings Services shall not be affected by an existing or a potential business relationship between Ratings Services (or any Non-Ratings Business) and the issuer or any other party, or the non-existence of such a relationship.

112. S&P reaffirmed and further codified its representations regarding its ratings' objectivity, independence, and freedom from influence by any conflicts of interest in October 2005, when S&P adopted and published on its website its Code of Conduct. The Code of Conduct assured investors, including financial institutions, that S&P "endeavors to conduct the rating and surveillance processes in a manner that is transparent and credible and that also ensures that the integrity and independence of such processes are not compromised by conflicts of interest, abuse of confidential

1    information, or other undue influences." The Code of Conduct also noted:

2         [S&P] fully supports the essential purpose of the IOSCO Code

3         [International Organization of Securities Commissions Code of Conduct

4         Fundamentals for Credit Rating Agencies], which is to promote investor

5         protection by safeguarding the integrity of the rating process. [S&P]

6         believes that the [Code of Conduct] is consistent with the IOSCO Code

7         and appropriately implements IOSCO's Statement of Principles

8         Regarding the Activities of Credit Rating Agencies published in

9         September 2003.

10        113.   One of the key principles set out in the IOSCO Code, which was first

11   published in December 2004, was the need for credit rating agencies to maintain

12   independence from the issuers that selected the rating agencies to rate their securities,

13   and were therefore the primary source of the agencies' ratings business. In particular,

14   the IOSCO Code set forth the principle that:

15        [T]he essential purpose of the Code Fundamentals is to promote investor

16        protection by safeguarding the integrity of the rating process. IOSCO

17        members recognize that credit ratings, despite their numerous other uses,

18        exist primarily to help investors assess the credit risks they face when

19        making certain kinds of investments. Maintaining the independence of

20        [credit rating agencies] vis-á-vis the issuers they rate is vital to achieving

21        this goal. Provisions of the Code Fundamentals dealing with CRA

22        [Credit Rating Agency] obligations to issuers are designed to improve the

23        quality of credit ratings and their usefulness to investors.

24        114.   The IOSCO Code also emphasized that "[r]ating analyses of low quality

25   or produced through a process of questionable integrity are of little use to market

26   participants," and that "[w]here conflicts of interest or a lack of independence is

27   common at a credit rating agency and hidden from investors, overall investor

28   confidence in the transparency and integrity of a market can be harmed."

1    115.   Consistent with these principles, S&P's Code of Conduct made several
2  representations about the manner in which S&P maintained its objectivity and
3  independence and avoided conflicts of interest posed by its relationships with issuers.
4  These representations were part of the Code of Conduct S&P adopted in October
5  2005, and remained part of the Code of Conduct when S&P updated and reissued it in
6  June 2007.  In particular:

7         a.       The Introduction stated that it was S&P's "mission" to:
8         provide high-quality, objective, independent, and rigorous analytical
9         information to the marketplace.  In order to achieve its mission, Ratings
10        Services strives for analytic excellence at all times, evaluates its rating
11        criteria, methodologies and procedures on a regular basis, and modifies
12        or enhances them as necessary to respond to the needs of the global
13        capital markets.

14        b.       Section 2.1 stated:
15        Ratings Services shall not forbear or refrain from taking a Rating Action,
16        if appropriate, based on the potential effect (economic, political, or
17        otherwise) of the Rating Action on Ratings Services, an issuer, an
18        investor, or other market participant.

19        c.       Section 2.2 stated:
20        Ratings Services and its Analysts shall use care and analytic judgment to
21        maintain both the substance and appearance of independence and
22        objectivity.

23        d.       Section 2.3 stated:
24        The determination of a rating by a rating committee shall be based only
25        on factors known to the rating committee that are believed by it to be
26        relevant to the credit analysis.

27        e.       Section 2.4 stated:
28        Ratings assigned by Ratings Services to an issuer or issue shall not be

31
COMPLAINT

1   affected by the existence of, or potential for, a business relationship
2   between Ratings Services (or any Non-Ratings Business) and the issuer
3   (or its affiliates) or any other party, or the non-existence of such a
4   relationship.

5   116.  S&P's November 2005 Analytic Firewalls Policy, published on S&P's
6   website, reaffirmed S&P's representations that its credit ratings would remain free
7   from improper influences from issuers or other third parties:

8      No employee of Standard & Poor's/McGraw-Hill shall attempt to exert
9      improper influence on the opinions of an Equity Analyst or a Ratings
10     Analyst.  In no circumstances shall an employee of Standard &
11     Poor's/McGraw-Hill try to influence the opinion of an Equity Analyst or
12     a Ratings Analyst by referring to the commercial relationship between
13     Standard & Poor's/McGraw-Hill and any third party.

14  117.  In a February 2006 "Report On Implementation of S&P's Rating
15  Services Code of Conduct," also published on S&P's website, S&P reaffirmed its
16  representations regarding its ratings' objectivity, independence, and freedom from
17  influence by any conflicts of interest posed by its relationships with issuers, stating:

18     a.   "[S&P] recognizes its role in the global capital markets and is
19  committed to providing ratings that are objective, independent and credible";

20     b.   "It is a central tenet of [S&P] that its ratings decisions not be
21  influenced by the fact that [S&P] receives fees from issuers.  To reinforce this central
22  tenet, commencing in 2004, [S&P] separated in a more formal manner its commercial
23  functions from its rating analytical functions"; and

24     c.   "[S&P's Code of Conduct] represented further alignment of its
25  policies and procedures with the IOSCO Code of Conduct."

26  118.  McGraw-Hill's Annual Reports also made repeated representations
27  regarding S&P's objectivity and independence.  In particular:

28     a.   McGraw-Hill's 2002 Annual Report described S&P as "the

1   world's leading provider of independent opinions and analysis on the debt and equity

2   markets," and noted that "securitization, disintermediation and privatization create a

3   growing demand for our independent ratings and analysis."

4           b.    McGraw-Hill's 2003 Annual Report emphasized that S&P "enjoys

5   a preeminent position in the world's financial architecture" and the company's

6   "ongoing commitment to improving transparency facilitates the global capital-

7   formation process."   Similarly, the 2003 Annual Report noted that S&P was

8   responding to new challenges created by the structured finance market "by building on

9   its market leadership as the world's foremost provider of independent credit ratings

10   and risk evaluation."

11           c.    McGraw-Hill's 2004 Annual Report stated that S&P "provides

12   investors with the independent benchmarks they need to feel more confident about

13   their investment and financial decisions."

14           d.    McGraw-Hill's 2005 Annual Report described S&P as "the

15   world's foremost provider of independent credit ratings, indices, risk evaluation and

16   investment research," adding that, as "[a]n essential part of the global financial

17   infrastructure, [S&P] provides investors with the independent benchmarks they need

18   to feel more confident about their investment and financial decisions."

19           e.    McGraw Hill's 2006 Annual Report stated that "[m]any investors

20   know [S&P] for its respected role as an independent provider of credit ratings. . . . As

21   financial markets grow more complex, the independent analysis, critical thinking,

22   opinions, news and data offered by [S&P] are an integral part of the global financial

23   infrastructure."

24           f.    McGraw Hill's 2007 Annual Report emphasized that "[s]ince

25   1916, markets across the globe have relied on the independent analysis and integrity

26   of [S&P's] credit ratings," and further stated that "S&P is highly valued by investors

27   and financial decision-makers everywhere for its analytical independence, its market

28   expertise and its incisive thought and leadership."

33

COMPLAINT

119. S&P repeatedly made public representations regarding its ratings' objectivity, independence, and freedom from influence of any conflicts of interest to regulatory and legislative bodies as well:

a.      On July 28, 2003, in a letter to the SEC, S&P stated, "Over almost a century, S&P Ratings Services' mission has remained the same - to provide high-quality, objective, rigorous analytical information to the marketplace."  The letter continued:

> Underlying the credibility and reliability . . . of S&P Ratings Services'
> rating opinions is the market's recognition of the independence, integrity,
> objectivity and quality of S&P Ratings Services' credit ratings, rating
> process and reputation . . . .

The letter also stated that S&P believed "that a critical factor in the success of the credit rating industry is the independence of the rating and analytic processes . . . from issuers and investors . . . ."

b.      On June 23, 2004, S&P Executive H, at the time the head of US RMBS, testified at a United States House of Representatives hearing, "Standard & Poor's believes that over the last century credit ratings have served the U.S. securities markets extremely well, providing an effective and objective tool in the market's evaluation and assessment of credit risk."

c.      On February 8, 2005, the then-President of S&P Ratings stated at a United States Senate hearing, "S&P Ratings Services has a longstanding commitment to ensuring that any potential conflicts of interest do not compromise our analytical independence."  She also stated, "Critical to a credit rating agency's ability to serve this role in the market is its commitment to, and achievement of, the highest standards of independence, transparency and quality."

d.      On April 17, 2007, in testimony at a United States Senate hearing, Executive C, at the time the Managing Director in charge of US RMBS, stated that S&P's credit ratings were "grounded in the cornerstone principles of independence,

transparency, credibility, and quality.  These principles have driven our long-standing track record of analytical excellence and objective commentary."

120.   In August 2007, S&P reaffirmed its representations regarding its ratings' objectivity, independence, and freedom from influence by any conflicts of interest posed by its relationships with issuers, and reacknowledged the importance of these representations to investors:

a.     In an August 23, 2007 publication titled "The Fundamentals of Structured Finance Ratings" that S&P posted on its website, S&P acknowledged the conflicts inherent in S&P being selected and retained by the issuers whose securities it rated, but reiterated:

> We are intensely aware that our entire franchise rests on our reputation
> for independence and integrity.  Therefore, giving into 'market capture'
> would reduce the very value of the rating, and is not in the interest of the
> rating agency.

b.     In the same publication, S&P denied that it weakened its criteria to get more business and acknowledged that doing so would be inconsistent with its internal rules:

> [S&P] is paid by the issuers we rate . . . .  Clearly, since there is a choice
> of rating agencies, the potential exists for a conflict of interest. In theory,
> one way to increase revenue would be for us to weaken our criteria to
> ensure that we are selected as the agency to rate   a   transaction   or   to
> ensure that a transaction that would not have been economically viable
> can take place.  This would, of course, violate our internal rules . . . .
> [W]e do not engage in such behavior.

c.     In an August 31, 2007, OpEd piece published in the Wall Street Journal titled "Don't Blame the Rating Agencies," Senior Executive A similarly reiterated S&P's representations regarding its objectivity and independence and recognized their importance to investors:

Rating agencies such as ours often are criticized for being paid by the issuers of the bonds we rate . . . . [T]his approach does not affect how we assign our ratings. Our criteria are publicly available, non-negotiable and consistently applied. In fact, we do not rate financial instruments that do not meet our criteria. Like newspapers and other media, we maintain a separation between the analytical and commercial activities associated with any given rating, to ensure the independence of our opinions.

121. At all relevant times, S&P represented to investors, including financial institutions, and other participants in the financial markets that its credit ratings of structured finance securities, including RMBS and CDOs, reflected its true current opinion of the credit risks posed by those securities. Thus, for example:

a. S&P attached to its rating letters for structured finance securities "Terms and Conditions" that stated that "an issue rating reflects [S&P's] current opinion of the likelihood that payments of principal and interest will be made on a timely basis in accordance with the terms of the obligations."

b. In its October 2005 Code of Conduct, S&P stated, "Ratings are current opinions regarding the future creditworthiness of issuers or issues."

c. On or about June 8, 2007, in a publication titled "An Introduction to CDOs and [S&P's] Global CDO Ratings," S&P stated, "A [S&P] rating represents our opinion of the future creditworthiness (that is, the likelihood of default) of either an obligor in general or a particular financial obligation."

d. On or about September 26, 2007, Senior Executive A testified before the United States Senate, "At their core, S&P's credit ratings represent our opinion of the likelihood that a particular obligor or financial obligation will timely repay owed principal and interest. Put another way, we assess the likelihood, and in some situations the consequences, of default – nothing more or less."

122. Beginning in late 2006 and continuing throughout 2007, S&P repeatedly reassured investors that it had an integrated surveillance process that would ensure

36

COMPLAINT

1    that S&P's ratings of both RMBS and CDOs would continue to reflect S&P's most

2    current view of their true credit risks. Thus, for example:

3         a.    On or about November 15, 2006, Executive G gave to the

4    Structured Finance Investor Council, a group of institutional investor representatives

5    with whom S&P periodically met to discuss issues related to structured finance

6    investments, a presentation titled "RMBS in CDO of ABS [Asset Backed Securities],"

7    in which he recognized that "[l]ater vintage CDO of ABS transactions collateralized

8    predominantly by mezzanine structured finance assets have significant exposure to

9    RMBS assets," but represented that "S&P has an integrated surveillance process to

10   ensure that RMBS assets in CDOs of ABS are appropriately monitored and reflect

11   [S&P's] most current credit view."

12        b.    On or about February 15, 2007, Executives F and G, a senior

13   analytical manager in US RMBS ("Senior Analyst A"), and an S&P RMBS

14   Surveillance analyst conducted a teleconference in which they reassured investors that

15   "[S&P] has an integrated surveillance process to ensure the ratings on our rated

16   RMBS bonds and CDO transactions reflect our most current credit view."

17        c.    On or about March 29, 2007, Jordan participated in an investor

18   conference call in which she reassured investors that:

19        [S&P's] CDO Surveillance group is informed by the RMBS Surveillance

20        group's current credit opinion, as well as outlook for ratings transactions,

21        and really just as importantly, [S&P's] RMBS Surveillance group is

22        aware of the RMBS exposure within CDO transactions that we have

23        rated. So we have a complete move [sic] as far as information flow and

24        rating decisions.

25        d.    On or about April 16, 2007, in a rewritten version of an article

26   originally published April 2, 2007 titled "Standard & Poor's Weighs In On The U.S.

27   Subprime Mortgage Market," S&P represented that, with respect to RMBS

28   surveillance, S&P was "taking a proactive approach to assess them earlier than we

37

COMPLAINT

have historically because of the current environment," and that with respect to CDOs:

> We integrate our RMBS surveillance with our CDO surveillance, so performance issues and rating actions that we're experiencing or taking on the RMBS side are integrated into our monitoring of CDOs that contain RMBS. And just as [S&P's] CDO surveillance group is informed by the RMBS surveillance group of its current credit opinions, and our outlooks on rated transactions, our RMBS surveillance group is aware of the RMBS exposure within CDO transactions that we have rated. So we have a complete loop when it comes to information flow and rating decisions. The result is that prior to the release of any RMBS rating actions we're fully aware of the exposures within our rated CDO transactions and have made at least a preliminary assessment of any potential CDO rating impact.

   e.   On April 17, 2007, in testimony at a United States Senate hearing, Executive C stated:

> After a rating is assigned, S&P monitors or 'surveils' the ratings to adjust for any developments that would impact the original rating. The purpose of this surveillance process is to ensure that the rating continues to reflect our credit opinion based on our assumption of the future performance of the transaction.

   f.   On or about June 8, 2007, in a publication titled "An Introduction to CDOs and Standard & Poor's Global CDO Ratings," S&P represented that S&P "has an integrated surveillance process to ensure the ratings on RMBS bonds and CDO transactions reflect our most current credit view."

**B.   S&P's Representations Were False**

   123.   As S&P knew, contrary to its representations to the public, S&P's desire for increased revenue and market share in the RMBS and CDO ratings markets, and its resulting desire to maintain and enhance its relationships with issuers that drove its

ratings business, improperly influenced S&P to downplay and disregard the true extent of the credit risks posed by RMBS and CDO tranches in order to favor issuers in its ratings of those tranches.

124.   In particular, to maintain and increase its share of the market for credit ratings of RMBS and CDOs and the high fees and profits those ratings generated:

a.   Beginning at the latest in or about September 2004 and continuing through at least in or about October 2007, S&P limited, adjusted, and delayed updates to the ratings criteria and analytical models S&P used to assess the credit risks posed by RMBS and CDO tranches, thereby weakening those criteria and models from what S&P analysts believed was necessary to make them more accurate; and

b.   Beginning at the latest in or about March 2007 and continuing through at least in or about October 2007, knowing that the credit risks of certain non-prime RMBS tranches were increasing, were expected to continue to increase, and were anticipated to result in negative Rating Actions, S&P knowingly disregarded the true extent of the credit risks associated with those non-prime RMBS tranches in issuing and/or confirming ratings for CDOs with exposure to those non-prime RMBS tranches, which ratings S&P knew did not accurately reflect those CDOs' true current credit risks because they failed to account for the increased credit risks posed by those non-prime RMBS tranches.

### 1.   Considerations Regarding Fees, Market Share, Profits, and Relationships with Issuers Improperly Influenced S&P's Rating Criteria and Models

a.   Decisions On Rating Criteria

125.   On or about April 20, 2004, a meeting of S&P executives was held to discuss a new process for implementing changes to S&P's rating criteria.   In attendance at the meeting were, among others, Jordan and Senior Executive B (who attended by phone).   Circulated at the meeting was a draft document setting out the

new process, which required consideration of "market insight" and "rating implications" and the polling of both "3 to 5 investors in the product" and "an appropriate number of issuers and investment bankers for a full 360-market perspective."

126.   Executive H objected to these new criteria procedures, and sent an email to, among others, Gillis, Executive C, and a senior analyst in Ratings and Criteria ("Senior Analyst B"):

> What do you mean by "market insight" with regard to a proposed criteria change? What does "rating implication" have to do with the search for truth? Are you implying that we might actually reject or stifle "superior analytics" for market considerations? Inquiring minds need to know. (As an aside, we also didn't know there was a "political" dimension to our ratings until we tried to publish our revised Predatory Lending Criteria, who'd a thought with our touted independence) . . . . What is "market perspective"? Does this mean we are to review our proposed criteria changes with investors, issuers and investment bankers? . . . [W]e NEVER poll them as to content or acceptability!

127.   Executive H's concerns were ignored, and he never received a response to his email. On July 1, 2004, Rose and Gillis circulated a memorandum titled "Global Structured Finance Criteria Process" that adopted many of the criteria procedures to which Executive H had objected. The memorandum recognized a role for S&P Client Value Managers ("CVMs"), who had "responsibility for managing the commercial relationship with clients," in "criteria discussion," and indicated that the CVMs should be "consulted for client information and feedback" and their input should be included in seeking "market perspective." The memorandum required consideration of "market perspective" and "rating implications" and the polling of "three to five investors in the product" and "an appropriate number of issuers and investment bankers for a full 360-market perspective."

128.   Rose and Gillis's July 1, 2004 memorandum also specified that "concerns with the objectivity, integrity, or validity" of the criteria process should be communicated in person rather than by email, stating, "If it is not practical to speak with the person, only then should these concerns be expressed in an email or written memorandum," and requiring any such email to be addressed to an S&P attorney or S&P's general counsel.

129.   S&P proceeded to reach out to investors, issuers, and investment bankers for their perspectives on S&P's rating criteria.  The feedback S&P received resulted in S&P – based on its desire to preserve market share and profits – limiting, adjusting, and delaying updates to the ratings criteria and analytical models it used to assess the credit risks posed by RMBS and CDO tranches, thereby weakening those criteria and models from what S&P analysts believed was necessary to make them more accurate.

130.   On or about August 17, 2004, the head of S&P's Commercial Mortgage Backed Securities ("CMBS") group sent an email to, among others, Senior Executive D, Jordan, Gillis, and Tesher, in which she stated, "We are meeting with your group this week to discuss adjusting criteria for rating CDOs of real estate assets this week because of the ongoing threat of losing deals."  On or about August 18, 2004, Senior Executive D responded in an email that went also to, among others, Jordan, Gillis, and Tesher, that "SFLT is aware of the competitive threats that Moody's is taking in CDOs and has authorized us to take certain actions."

131.   On or about June 27, 2005, the members of the SFLT, including Rose, Jordan, and Gillis, received S&P's "Credit Market Services Global Structured Finance Ratings 2006 Strategic Plan."  In this document, marked "Privileged & Confidential," S&P acknowledged that competition for business among the different credit rating agencies had affected S&P's ratings:

> Competition among rating agencies has helped drive down support levels
> in deals -- this will create more ratings volatility and put more pressure
> on surveillance resource needs.

41
COMPLAINT

132. S&P's January 5, 2006 CDO Strategic Plan, marked "Private & Confidential," confirmed that S&P considered its ratings criteria and models to be central to S&P's ability to attract ratings business:

> Criteria is one of the key competitive elements among the main rating agencies globally and regionally and for S&P the analytical rigor is one of it [sic] most important strategic pillars. Criteria will directly impact the economics of any transaction, and while the investor may have some say in which rating agency (ies) they want on the transaction, the banker/arranger will usually make that decision – especially in one-rating markets such as synthetics. Additionally, for new transaction types, the rapid development of criteria and analytical tools to rate the transaction becomes a critical competitive advantage, as arrangers will go with the agencies that are able to (1) meet their transaction schedule, and (2) use criteria that provide them with favorable economics for the transaction.

The January 5, 2006 CDO Strategic Plan continued:

> *Continuing to encourage and increase the need for ratings overall, is important as it ensures transactions will continue to be rated, however, having criteria and analytical tools that enable us to rate the transactions and meet the needs of the players in them [sic] market will ensure that S&P will continue to be the one agency rating the largest share of transactions.* (italics in original)

### b.    Development and Updating of LEVELS

133. S&P used LEVELS to, among other things, analyze credit risks associated with proposed RMBS and determine the credit protection requirements necessary to obtain a given S&P rating for each rated RMBS tranche.

134. S&P successfully marketed LEVELS as the industry standard for cradle-to-grave rating, from mortgage initiation to securitization.

135.  As of 1999, LEVELS calculated default probabilities based on a database comprised of 166,000 almost exclusively first-lien, fixed rate, prime mortgage loans.

136.  Over the next several years, the mortgage lending market began aggressively creating ever more risky non-prime mortgage loans, including Alt-A and subprime mortgage loans.  These non-prime mortgage loans were included in pools of mortgage loans that served as underlying collateral for certain RMBS.  Certain CDOs, in turn, were exposed to the credit risks of these RMBS.

137.  In November 2003, S&P assured investors, including financial institutions, that it regularly updated its RMBS models to reflect the changing and riskier underlying collateral.  In particular, in a publication posted on its website on November 5, 2003, S&P represented:

> As the U.S. RMBS market continues to grow in issuance and complexity, the use and precision of mortgage risk assessment models [such as LEVELS] takes on greater importance.  In such an environment, refinements and innovations to these models are an ongoing challenge. By regularly updating its mortgage risk assessment models, Standard & Poor's adjusts to the many intricacies that characterize this evolving market.

138.  In truth, however, S&P did not regularly or timely update LEVELS to incorporate relevant loan data S&P possessed that S&P knew would make its RMBS ratings more accurate.

139.  By 2002, S&P had acquired a data set of 642,000 residential mortgages originated between 1971 and 2001, which included many riskier mortgage loans.  As of 2004, however, S&P had failed to incorporate this more relevant loan data into LEVELS version 5.6 ("LEVELS 5.6") to more accurately calculate loan default probabilities for RMBS.  Instead, as of 2004, LEVELS 5.6 continued to calculate default probabilities based on the database comprised of 166,000 almost exclusively prime loans that were originated prior to 2000 and were not comparable to the types of

43

COMPLAINT

riskier loans being pooled to create RMBS.

140.    By in or about mid-2004, S&P had incorporated the 642,000 loan data set into a proposed LEVELS version 6.0 ("LEVELS 6.0").   Because the proposed LEVELS 6.0 was based on analysis of a larger, more current data set than that used by LEVELS 5.6, the proposed LEVELS 6.0 constituted a more accurate analytical model for rating RMBS.   S&P executives, including Rose and Jordan, knew that the larger and more representative the loan data set used, the more accurate the result when rating RMBS.

141.    S&P planned to release the proposed LEVELS 6.0 in the fourth quarter of 2004, for use on all deals effective January 1, 2005.

142.    In April 2004, S&P publicly announced the planned changes to LEVELS by posting on its website a document titled "Taking U.S. Mortgage Analytics to New LEVELS" that described in detail the increased accuracy of S&P's soon to be released LEVELS 6.0.   Sometime after S&P posted this document, S&P deleted it from its website.

143.    The proposed LEVELS 6.0 would have required issuers of Alt-A and subprime RMBS to provide higher loss coverage enhancements to obtain S&P's investment grade ratings.   Consequently, Alt-A and subprime RMBS rated with proposed LEVELS 6.0 would generally have been less profitable for issuers.

144.    On or about May 25, 2004, an S&P analyst sent Rose and Jordan an email advising them that S&P was losing a deal because S&P was more conservative than other rating agencies and that the analyst and her team leaders believed that S&P would need to change its stance on future deals.   Specifically, the analyst wrote, "We just lost a huge Mizuho RMBS deal to Moody's due to a huge difference in the required credit support level."   The analyst explained, "What we found from the arranger was that our support level was at least 10% higher than Moody's."   The analyst continued, "Losing one or even several deals due to criteria issues, but this is so significant that it could have an impact on future deals.   There's no way we can get

1    back on this one but we need to address this now in preparation for the future deals."

2         145.   By July 2004, S&P had prepared draft press releases announcing the

3    release of the proposed LEVELS 6.0 in late 2004.

4         146.   The proposed LEVELS 6.0, however, was not released in late 2004 as

5    scheduled, and, in fact, was never released by S&P.   Instead, S&P issued slightly

6    updated versions of LEVELS 5.6 in December 2004, April 2005, and March 2006.

7    None of these versions of LEVELS 5.6 significantly increased the loss coverage for

8    RMBS.

9         147.   In February 2005, at an offsite meeting of S&P Analytical Managers,

10   existing LEVELS 5.6 and proposed LEVELS 6.0 were discussed.   At the meeting, a

11   PowerPoint presentation was shown to the SFLT.   The PowerPoint presentation

12   detailed why, for several reasons, proposed LEVELS 6.0 was more accurate than

13   existing LEVELS 5.6 in assessing the credit risks posed by non-prime RMBS.

14        148.   Prior to March 2005, Executive H had suggested to Structured Finance

15   executives that proposed LEVELS 6.0 should be released as soon as possible, because

16   it did a better job of assigning RMBS ratings than the model S&P was running, had

17   better coverage on some new products, had more information on some more mature

18   products, and was simply a better model.   During his discussions with Structured

19   Finance executives, Executive H informed them that proposed LEVELS 6.0 would

20   require higher loss coverage levels for subprime loans and that S&P was underpricing

21   risk on RMBS deals by having loss coverage levels that were too low.

22        149.   The response Executive H received from Structured Finance executives

23   was that if proposed LEVELS 6.0 was not going to result in S&P increasing its market

24   share or gaining more revenue, there was no reason to spend money putting it in place.

25        150.   On or about March 23, 2005, a CVM in US RMBS who was responsible

26   for overseeing S&P's business relationships with RMBS issuers ("Executive I") sent

27   an email to, among others, Executive C and Senior Analysts A and B discussing a

28   proposed LEVELS version 5.7 ("LEVELS 5.7") that would not increase loss coverage

1    levels as high as would the proposed LEVELS 6.0.   In this email, Executive I

2    acknowledged, "We have known for some time (based upon pool level data and

3    LEVELS 6.0 testing)" that loss coverage levels for subprime "B and BB levels need to

4    be raised" and that loss coverage levels for Alt-A "B, BB and BBB levels need to be

5    raised (we have had a disproportionate number of downgrades)."  Executive I asked if

6    there was a "temporary fix we could put in to move the levels up a bit, while we are

7    waiting for 6.0?"

8        151.   On or about March 23, 2005, Senior Analyst B responded to Executive I,

9    with copies to, among others, Executive C and Senior Analyst A, as follows:

10            When we first reviewed [proposed LEVELS] Version 6.0 results **a

11            year ago** we saw the sub-prime and Alt-A numbers going up and that

12            was a major point of contention which led to all the model tweaking

13            we've done since.  Version 6.0 could've been released months ago and

14            resources assigned elsewhere if we didn't have to massage the sub-prime

15            and Alt-A numbers to preserve market share.

16        152.   On or about June 1, 2006, S&P announced the release of LEVELS 5.7,

17    effective for RMBS rated after July 1, 2006, that S&P claimed used a more "seasoned

18    and robust data set."  A consequence of implementing LEVELS 5.7 was an increase in

19    required loss coverage for RMBS tranches.  For example, the average loss coverage

20    for BBB rated tranches rated in the second half of 2006 using LEVELS 5.7 was more

21    than 60% greater than the average loss coverage for BBB rated tranches in the first

22    half of 2006 rated using LEVELS 5.6.

23        153.   In 2006, Executive I, who continued to be responsible for business

24    relationships with RMBS issuers, caused a change to be made in an assumption

25    underlying the soon-to-be-released LEVELS 5.7 in order to prevent S&P from issuing

26    RMBS ratings using the new LEVELS 5.7 that were more conservative, that is lower,

27    than the ratings given by Moody's to these securities.  The change had no analytical

28    justification and was contrary to data S&P possessed at the time.

154.   S&P scheduled the next update of LEVELS, labeled "6.0" but different and more favorable to issuers than the proposed LEVELS 6.0 under consideration from 2004 to 2006, for release in March 2007, to be effective for deals closing in May. Prior to the March 2007 release, S&P was concerned about the impact the new LEVELS 6.0 would have on its market share. In a February 14, 2007 monthly report to Senior Executive B, Executive C noted that "LEVELS 6.0 is substantially more accurate at both the pool and loan level than the current model," and then stated:

> The [updated LEVELS 6.0] model requires more credit enhancement for loans with high probabilities of early payment default, but we do not anticipate a significant change to market share.
>
> We are working closely with our colleagues in surveillance and CDO to gauge the effect if any on these associated markets. At this time no significant effect is anticipated.

155.   On or about February 21, 2007, Senior Executive B passed this information about the new LEVELS 6.0 on to Rose in a monthly report.

156.   On March 1, 2007, S&P announced the release of the next update of LEVELS, labeled 6.0, to be effective for deals closing in May. On average, the loss coverage required for BBB tranches calculated using this LEVELS 6.0 increased by 35% compared to LEVELS 5.7.

157.   In April 2007, Executive C submitted to Senior Executive B a monthly report noting, under the heading "RMBS Business Development Report," that with respect to LEVELS 6.0, S&P "continued to receive positive feedback about the changes from 5.7." In part, this was because LEVELS 6.0 treated some pools more favorably. As Executive C explained:

> RMBS released a new version (Version 6.0) of the LEVELs model on March 1, 2007. In general, the market continues to reply favorably. We are finding that our clients are running pools using 5.7 and 6.0 to determine best execution. Our bet is that deals whose pools receive

47

COMPLAINT

favorably [sic] treatment under 6.0 will push deals to close after April for a June first pay.

c.   Development and Updating of CDO Evaluator

158.   On or about November 16, 2004, an internal email that was copied to, among others, Tesher and Bryan, specified the following chain of command for the development of the new CDO default table, the foundation for S&P's CDO Evaluator rating model:

- "Overall Approver" – Senior Executive D, at the time the business head responsible for the profits and losses of Global CDO.
- "Decision Makers" – "Practice Leaders," which included Tesher and Bryan, the business heads responsible for the profits and losses of, respectively, Cash CDO and Synthetic CDO.
- "Consulted Participants" – "The Criteria, Quantitative and Surveillance Groups," that is, the analytical staff.

159.   Contrary to S&P's public representations regarding its ratings' objectivity, independence, and freedom from influence by any conflicts of interest posed by its relationships with issuers, S&P business executives who served as approvers and decision makers over the updates to CDO Evaluator caused S&P to limit, adjust, and delay those updates in order to favor issuers and so maintain and grow S&P's market share and profits.

(i)   Delays and Limitations of Updates

160.   In or about 2003, S&P began the process of updating CDO Evaluator, which S&P used to rate cash, synthetic, and hybrid CDOs.  S&P initiated this process because its quantitative analysts recognized that the key assumptions underlying CDO Evaluator, including the default assumptions, were inaccurate and not consistent with historical data.

161.   At the time, S&P enjoyed dominant market share in the non-investment grade cash CDO market, but had a smaller market share in the investment-grade synthetic CDO market.  A core goal of the CDO Evaluator update was to revise the underlying assumptions, while: (a) preserving S&P's market share in the highly lucrative non-investment grade cash CDO business by not negatively affecting the current model's ratings of these CDOs; and (b) improving S&P's market share in the investment-grade synthetic CDO business by making the model's ratings of these CDOs more competitive with other rating agencies.

162.   To achieve this goal, S&P executives, led by Senior Executive D and Tesher, directed the quantitative rating analysts to update CDO Evaluator in a way that minimized the impact to ratings on non-investment grade deals, and made it more competitive with respect to ratings on investment grade deals.

163.   In or about the first half of 2004, two teams of S&P quantitative analysts developed competing updates to CDO Evaluator, including proposed changes to the default matrix assumptions.

164.   One of the competing proposals would have resulted in higher ratings on the investment grade deals, but negatively impacted ratings on non-investment grade deals.  Senior Executive D and Tesher rejected this proposal because it would have damaged S&P's market-share position in the non-investment grade cash CDO business, which was an enormous source of ratings revenue for S&P.

165.   The other proposal failed to raise the ratings on the investment grade deals.  This proposal was also rejected by Senior Executive D, because it, too, threatened the market share goals set by S&P.

166.   By mid-2004, S&P analysts had reached an impasse in their efforts to update CDO Evaluator and had failed to develop proposals that would achieve the market share goals set by S&P executives.

167.   In an effort to break this impasse and achieve S&P's market share goals, Senior Executive D took matters into his own hands by developing his own default

matrix. In particular, Senior Executive D fused together the two competing proposals, choosing default assumptions that would better achieve S&P's ratings business market share goals. Senior Executive D then named the default matrix after himself, and, in an email sent on May 27, 2004 to, among others, Gillis, Tesher, and Bryan, directed the CDO group to begin testing it with S&P's customers, subject to any proposed changes that would "improve the results relative to the goal of small impacts to NIG [non-investment grade] deals and 2-3 notch improvements for IG [investment grade] and small basket deals."

168. The goals cited by Senior Executive D for the revised default matrix were market share and profit, as opposed to analytic, goals. Moreover, at the time, S&P quantitative analysts viewed Senior Executive D's proposed default matrix as indefensible, because it was cobbled together based on considerations of market share and profits, not analytics. Nevertheless, S&P moved forward in testing Senior Executive D's proposed default matrix with S&P's CDO issuer clients.

169. Ultimately, S&P executives decided not to use Senior Executive D's proposed default matrix, because testing revealed not only that it was analytically indefensible, but also that it had a negative impact on rating deals and would not achieve S&P's market share goals.

170. The version of CDO Evaluator that S&P ultimately released later in 2004 had the same historically inaccurate default matrix as the previous version, but was nonetheless used by S&P to rate CDOs through 2006.

171. S&P's goals of maintaining and increasing revenues and market share continued to play a central role in future CDO Evaluator updates. S&P continued to poll CDO issuers to determine their tolerance levels with respect to proposed updates to CDO Evaluator. S&P also continued to test proposed changes to CDO Evaluator against existing ratings to make sure the proposed changes would not negatively affect market share.

172.   In an email sent on or about February 15, 2005, Bryan stressed the need to poll a subgroup of CDO issuers to understand their tolerance for proposed revisions to CDO Evaluator that might make it more difficult for them to obtain desired ratings:

> We cannot understand the cost/benefit analysis that the dealer will perform [on CDOs collateralized in part by other CDOs]. So we may have to put this beta model in the hands of a few trusted souls and let them help us understand their tolerance level.

173.   On or about June 10, 2005, an S&P analyst stated in an email that new CDO criteria would "be meaningless unless we can compare them to either where the clients [CDO issuers] would expect the numbers to be or where our competitors were." This analyst went on to observe that:

> Thus this data is essential to move this on. In the absence of this data, the only way I can see to move this forward is to approach our clients and ask them for pools and levels, but this looks too much to me as though we are publicly backing into a set of levels driven by our clients.

174.   After receiving this email, on or about June 17, 2005, a London-based S&P senior analyst who previously led one of the competing proposals to update CDO Evaluator ("Senior Analyst C"), responded:

> I agree that we should talk about E3 [CDO Evaluator version 3.0] asap. Remember the dream of being able to defend the model with sound empirical research? The sort of activity a true quant CoE [Senior Analyst C's job title at the time] should be doing perhaps? If we are just going to make it up in order to rate deals, then quants are of precious little value. I still believe that people want the model to be consistent with history, and that the impact of the model will not destroy the business. If I'm wrong, then so be it.

175.   In July 2005, Senior Analyst C prepared a memorandum describing the evolution of the "CDO Credit and Cash Flow Methodologies," in which he discussed

1   "Understanding the Business Impact" of the update to E3, noting that the model

2   revisions in E3 would have the biggest impact on the high-yield cash CDO business

3   that was run by Tesher.

4       176.   Senior Analyst C concluded this memorandum with a section titled

5   "Balancing Risks & Rewards of E3," in which he recognized that the current CDO

6   Evaluator was "not analytically sound, given that it contains PD [Probability of

7   Default]/correlation assumptions that are inconsistent with historical data." He then

8   stated:

9       So how do we balance these risks and rewards to achieve our business

10      objectives?  For example, if our objectives were solely based on market

11      share, then one solution might be to create a different, more "favourable"

12      model for each type of transaction.  This solution might be detrimental to

13      other business needs, such as customer service (imagine the confusion

14      this would cause over the "right" model to use!) and analytical integrity

15      (for example assuming different PDs for the same firm in different

16      models).

17      This is of course hypothetical, as I do not believe that market share is our

18      only objective.   However, we cannot ignore the real risk of losing

19      transaction revenue.   My proposal would be to look carefully at the

20      different risks and rewards of E3, and attempt to create a balance based

21      on our "best guess" of the negative and positive impact of the model in

22      each business objective.  For example, the balance between market share

23      and analytical integrity is complex, as one needs to consider both "short-

24      term" and "long-term" market share.   In the short term, it may be

25      beneficial to use modelling assumptions that are more favourable to

26      transactions in the pipeline.   In the long term, however, it may be

27      beneficial to have a more robust model that can be quickly adapted to

28      new transactions (such as long/short, etc.), so that we don't lose new

1    opportunities to our competitors.

2        177.  S&P scheduled E3 to be released in July 2005.  Prior to the release,

3    however, S&P received feedback from issuers indicating that the new E3 rating model

4    would hurt S&P's market share.  For example, a CVM in the CDO group who was a

5    member of the CDO Leadership Team and also a former analyst ("Executive J")

6    described negative feedback from Bear Stearns in an email with the subject line "RE:

7    Bear NY E3 feedback" that was sent to, among others, Jordan, Tesher, and Bryan on

8    or about July 19, 2005.  In the email, Executive J summarized Bear Stearns' feedback

9    as follows: S&P's ratings generated using CDO Evaluator 2.4.3 had been the "best"

10   (by comparison to Moody's and Fitch) with respect to "more lowly rated" pools; S&P

11   would be giving up its advantage with respect to these pools by moving to E3; and

12   S&P would not make up for this with any increase in business in "the high quality

13   sector," because with respect to this sector, "Moody's and Fitch can do better than E3

14   already."

15       178.  Based on negative market feedback, including that from Bear Stearns,

16   S&P decided to delay the release of CDO Evaluator 3.0.  This decision was discussed

17   in a July 20, 2005, "Global CDO Activity Report" that Jordan sent to Rose:

18           Due to the not insignificant impact on lowly rated (BBB and

19       down) synthetic reference pools, where parallel cash flow and recovery

20       assumptions could not be tailored towards lessening rating pressure, we

21       have toned down and slowed down our roll out of E3 to the market,

22       pending further measures to deal with such negative results.

23           We have received controlled testing from various cash and

24       synthetic dealers.  Our first response from a major synthetics dealer, Bear

25       Stearns, has just materialized and as expected, E3 would not be

26       conducive towards rating low credit quality pools.  Importantly, Bear

27       Stearns pointed out that the potential business opportunities we would

28       miss by effectively having to walk away from such high yield structures

would NOT be compensated for by any increase in rating volume for highly rated collateral pools.  This is because Moody's and Fitch have been far more competitive in this area well before the roll-out of E3.  Our subordinations would improve.  But it would not be anywhere near enough to pick up the slack.

179.  In a section titled "Key Operational Highlights," the July 20, 2005 Global CDO Activity Report further stated: "Because of some complicated issues regarding the business impact of the new CDO Evaluator 3.0, the CDO Business has elected to delay the release until at least mid September."

180.  Throughout the summer of 2005, S&P continued to beta-test the business impact of E3, both on pending deals already at S&P and with its CDO issuer customers.  For example, on or about August 18, 2005, Bryan sent Jordan, Tesher, Executive J, and Senior Analyst C an email in which she stated:

As promised [sic] following our Tuesday meeting, here are the results of another pending HY [High Yield] deal (Criver) that we have in house. Note that under the new Eval. [E3] we have gone **from 3 notches better than Moody's to 2 notches worse.**  (emphasis in original)

(ii)  The E3 Transition Period and E3 Low

181.  In or about September 2005, S&P began to implement further measures to deal with the negative business effects of the updated E3.  In particular, S&P developed an alternative version of E3 called "E3 Low" that had less demanding assumptions than E3, thereby making it easier for a CDO issuer to achieve higher CDO ratings.  E3 Low was not based on historical research or analytical data.  Rather, the rationale behind this weaker model was to achieve the goal of preserving S&P's market share.

182.  On December 19, 2005, S&P publicly released E3.  The public release made no mention of the existence of E3 Low or of the fact that S&P would use this

54
COMPLAINT

less stringent version of the model to rate certain CDOs.

183.   With respect to synthetic CDOs, S&P's public release indicated that for a three-month transition period S&P would use E3 in conjunction with the earlier model, CDO Evaluator version 2.4.3, in order to rate synthetic CDOs.

184.   Despite this public assertion, and because of E3's potential negative effect on S&P's synthetic CDO business, in or about the first half of 2006, S&P rated certain synthetic CDOs using E3 Low instead of E3.  S&P instructed analysts to use the following procedure for rating synthetic CDOs:

- For new transactions, the dealers are encouraged to use E3, the model that was released on Dec. 19, 2005.

- For all transactions in house and those that are "pipelined/transitional until March 31, 2006," the deal will be first run through E3.

- If the transaction passes E3.0, GREAT!!  The deal is modeled, rated and surveilled with E3.0. . . .

- If the transaction fails E3, then use E3Low.

185.   S&P's December 19, 2005 public release also stated that E3 would not be used to rate cash CDOs until later in 2006.  In a FAQ prepared to provide S&P public representatives with talking points, S&P directed its representatives to tell the public that the delay in applying E3 to cash CDOs was due to "the complexity of the cash flow transactions," and further that "there are other criteria changes that need to be fully implemented that are separate from CDO Evaluator, such as improvements to our break-even default rate methodology."

186.   In fact, S&P exempted cash CDOs from E3 because of E3's potential negative effect on S&P's cash CDO business.  Moreover, S&P used the weaker E3 Low to rate some cash CDOs during the first few months of 2006.

(iii)   Bending the Model to Suit Business Needs

187.   In 2006, at a meeting attended by, among others, Tesher, S&P loosened to zero its correlation assumptions (a key measure of default risk) between "a CDO of

ABS asset" and "an RMBS asset in a CDO/ABS transaction." Tesher and other business personnel were in favor of this decision, which was made without the benefit of any data and would lead to S&P's rating models arriving at lower estimates of credit risks for CDOs collateralized by such assets. Commenting on this change on or about April 2, 2007, a CDO analyst indicated to a former coworker that it resulted in a loophole in S&P's rating model big enough to drive a Mack truck through. When the former coworker asked, "[w]ho was the genius who came up with this," the analyst replied:

> PL [Jordan] / cash flow cdo team leader [Tesher] clearly knew. . . Pat
> [Jordan] is ultimately resp. [¶] I am interested to see if any career
> consequences occur. Does company care about deal volume or sound
> credit standards? . . . .

188. Beginning in or about June 2006, S&P analysts again embarked on an effort to fundamentally revise the assumptions underlying its CDO rating model. This effort involved an outside consultant who would assist S&P in developing the updated model. Executive J was the project manager.

189. On May 10, 2007, Executive J sent an email to Jordan, Tesher, Bryan, Gillis and others attaching a PowerPoint presentation that summarized the consultant's work on the project. Under the heading "A Better Mousetrap," this presentation summarized S&P's old ways and new ways of updating its rating models. Satisfying S&P's "business needs" by settling on "business friendly" as opposed to "business unfriendly" models was a central component of both ways.

190. "The Old Way," characterized as a "One Way Street," worked as follows: "To come up with PDs [Probabilities of Default] and asset correlations in [CDO Evaluator] 2.4.3, we look at our raw data and come up with a statistical best fit. When this does not meet our business needs, we have to change our parameters ex-post to accommodate." The presentation added a graph that stated: "Does this work [for] our rating business? If it does not, need to tweak PDs."

191.   The "New Way," characterized as a "Two Way Street," worked as follows: S&P "came up with a new methodology emphasizing on flexibility.  We decide on a number of business friendly PD matrices first."   Then S&P used hypothesis testing to determine whether the business friendly matrices were "reasonable."

192.   An explanation of the new approach compared the business-friendly matrices to coins in a coin toss:  if one matrix that was "great for business" turned out not to be "plausible," S&P could just select another "business friendly" matrix, just as if flipping a different coin, until it found a result that was both "business friendly" and "plausible."   The presentation added: "In contrast, our old methodology gave us one single 'best coin' that is data driven.  But if it turns out to be business unfriendly, we are stuck."

193.   The presentation also explained how the new approach had been applied to a hypothesized "ABS default matrix" that was "just one of many hypothesis [sic] we can test!"   The presentation reported that this hypothesized matrix was determined to be "plausible" based on a statistical comparison to default data from the 1990 to 2003 vintage RMBS.  In contrast, the presentation noted that the "E3.2 ABS matrix" – a reference to CDO Evaluator 3.2, which S&P was using at the time as the basis for its CDO ratings – was determined to be implausible based on a statistical comparison to the same data.

194.   On or about May 14, 2007, Executive J, together with the coauthor of the "Better Mousetrap" PowerPoint, met with Jordan, Gillis, Senior Analyst B, and others.  At the meeting, Executive J and his coauthor went through every page of the PowerPoint, explaining each slide.  The meeting's attendees were generally pleased with the presentation, which was not viewed as controversial.  Neither Tesher, Jordan, Gillis, Senior Analyst B, nor anyone else who received the PowerPoint and/or attended the May 14, 2007 meeting took issue with or criticized any part of the PowerPoint.

195. On or about June 20, 2007, Executive J sent to Jordan an email proposing three stages for a "rating transition project" that would follow up on the approach set forth in the "Better Mousetrap" presentation. The third stage was described as "Data testing and deal testing (make sure new stuff doesn't kill our business)."

196. On or about August 2, 2007, Executive J sent to Jordan (with copies to, among others, Tesher and Bryan) an email seeking funding for the rating transition project. In this email, Executive J described the consultant's initial project, which had been set forth in the "Better Mousetrap" presentation, as an effort to develop a set of assumptions that would "buy us the operational freedom to defend multiple business friendly default matrices." The new project, to develop a "transition matrix," was described in roughly the same way: develop a hypothetical "transition matrix," "'bend' this transition matrix to suit our business needs," and "[r]efine hypothesized matrix so that it is business friendly." Executive J added: "How reasonable or defendable we are will now once again be gauged by Hypothesis Testing."

197. Executive J's August 2, 2007 email again referenced the E3.2 default matrix, which S&P had used as the foundation for many of the CDO ratings it issued in 2007, stating: "Hypothetical default matrix to be tested (i.e. where do we begin) itself is based on Maximum Likelihood Estimation (i.e. [an S&P analyst] couldn't really pull it out of thin air like we did with CDO E 3.2)."

198. Jordan approved the requested funding. The revised model was not implemented, however, because, by late 2007, the CDO market had collapsed.

        d.    <u>Failing to Account for Increased Credit Risks of Non-Prime RMBS</u>

199. As alleged in paragraphs 200 through 269 below, contrary to S&P's public representations regarding its ratings' objectivity, independence, and freedom from influence by any conflicts of interest posed by its relationships with issuers, beginning at the latest in or about March 2007 and continuing through at least in or

about October 2007, in order to favor issuers and so maintain and grow its market share and profits, in issuing and/or confirming ratings for CDOs exposed to the credit risks of non-prime RMBS, despite knowing that the credit risks of certain non-prime RMBS tranches were increasing, were expected to continue to increase, and were anticipated to result in negative Rating Actions, S&P failed to account for the increased credit risks posed by those non-prime RMBS, instead continuing to require that the existing ratings of those non-prime RMBS be taken at face value as inputs to CDO Evaluator.

> **2.** **Considerations Regarding Fees, Market Share, Profits, and Relationships with Issuers Led S&P to Issue CDO Ratings that Failed to Account for Substantially Increased Credit Risks of Non-Prime RMBS to Which the CDOs Were Exposed**
>
> a. In Late 2006, S&P Became Aware that the Performance of Non-Prime RMBS Was Demonstrating Unprecedented Deterioration

200. In 2006, analysts in RMBS Surveillance began noticing rising delinquencies in the mortgages underlying non-prime RMBS that S&P had rated. By late summer or early fall of 2006, S&P analysts from RMBS Surveillance and S&P analysts who rated new issue RMBS held a meeting to try to determine an approach to reflect the credit risk posed by these non-prime RMBS. The meeting was led by Senior Analyst A, and attendees included Executives C, F, and I.

201. At the meeting, S&P analysts discussed how they would develop new surveillance criteria to deal with rising delinquencies. The RMBS new issue analysts – led by Senior Analyst A – determined that they would develop new criteria by testing multiple assumptions, and then picking the assumptions that led to the results they wanted, that is, fewer and less severe downgrades.

202. At the meeting, a member of RMBS Surveillance protested this results-oriented approach, telling the group that they were using the ends to justify the means.

The same group of S&P analysts continued to meet throughout 2006 to discuss ways to revise the surveillance criteria. The RMBS Surveillance member who had raised these objections, however, after attending one further such meeting, was no longer invited to the meetings.

203. By in or about Fall 2006, S&P recognized that subprime mortgages underlying recent vintage RMBS, in particular 2006 RMBS, were severely underperforming. Analysts in RMBS Surveillance who were reviewing the performance of the mortgage loans underlying these RMBS viewed the numbers as unbelievable. Indeed, the performance of the mortgage loans underlying the 2006 subprime RMBS was so bad that analysts initially thought the data contained typographical errors.

204. The delinquencies in mortgage loans underlying 2006 subprime RMBS that S&P observed in Fall 2006 were so great that, in some instances, S&P was seeing realized losses in those mortgage loans. To see such losses in the first six to ten months of a loan rated for a 30-year maturity was unprecedented.

205. On or about September 24, 2006, Gillis sent to Rose a memorandum titled "Rating Quality & Knowledge Management Activity Report." The memorandum advised Rose that S&P needed to watch the RMBS ratings and their impact on CDO ratings. The memorandum stated, "Our first priority is the RMBS exposure in CDO transactions. Those RMBS classes held by CDOs that are determined to have the highest risk factors will be placed on quarterly review cycle." The memorandum also noted:

> [T]he largest category of RMBS held by far is sub-prime RMBS (accounting for 59% of the overall RMBS exposure in cash flow CDOs), and the deals have more than $26.3 billion in exposure to BBB and NIG [Non-Investment Grade] tranches from higher risk types of RMBS deals (those ranked 3/5 or worse by [an S&P RMBS surveillance analyst]).

206.   In or about Fall 2006, Executive F told Senior Executive E about the poor performance of the 2006 subprime RMBS approximately four to five days a week.

207.   In or about Fall 2006, Executive G expressed concern that Global CDO was taking 2006 subprime RMBS ratings at face value – in other words, taking the existing ratings without any analysis to account for the likelihood of negative Rating Action in the near-term – when issuing new CDO ratings.   During this time, CDO Surveillance was aware of and deeply concerned about the poor performance of subprime RMBS.

208.   In or about Fall 2006, RMBS Surveillance applied a standard under which RMBS with 10% severe delinquencies compared to available credit support typically required further analysis for the possibility of being placed on CreditWatch Negative or downgraded, while RMBS with 50% severe delinquencies versus available credit support typically required some negative Rating Action.

209.   On or about November 14, 2006, Executive F sent an email to Executives C and I and Senior Analyst A that stated:

> [A]s a follow up to our brief 2006 performance discussion, I have attached a report that shows that more than 50% of the sub prime deals rated in 2006 have severely delinquent loans that represent 25% or more of credit enhancement for the lowest rated [class].   Many have realized losses already.

210.   Attached to Executive F's November 14, 2006 email was a spreadsheet titled "Subprime_Trouble.XLS" that listed over 770 S&P-rated RMBS tranches for which severe delinquencies totaled more than 25% of available credit support.   Those 770 tranches came from 133 subprime RMBS deals, or more than half of the total subprime RMBS deals rated by S&P in the first half of 2006.

211.   Beginning in or about Fall 2006 and continuing through in or about Spring 2007, Executive F regularly expressed frustration to her colleagues that, notwithstanding the dire performance of subprime RMBS, she was prevented by Gillis

and other S&P executives from downgrading the ratings of subprime RMBS because of concern that S&P's ratings business would be affected if there were severe downgrades.

212.   On or about December 11, 2006, in his "Confidential Working Notes," Tesher observed: "On a separate issue, this market is a wildly spinning top which is going to end badly."

      b.    By February 2007, RMBS Surveillance Staff Recommended Negative Rating Actions on Large Numbers of Non-Prime RMBS

213.   On or about January 11, 2007, RMBS Surveillance held a meeting to discuss the subprime situation.  The agenda for the meeting described the objective as, "Establish a unified response to what we see happening in the residential mortgage sector."  The agenda was circulated in advance of the meeting via an email dated January 10, 2007, that stated, "Please try to organize your thoughts so we can form an opinion that is not easily swayed."

214.   At the meeting, RMBS Surveillance recognized that a "Housing Bubble" existed, that there was a "slowdown," that the "Bubble is deflating," and that the projection was for "20% default this year."  RMBS Surveillance concluded that there were "Issues with Subprime, some AltA," and that RMBS rated "A and below are in trouble for 80% of the deals."  RMBS Surveillance recommended that 2006 subprime RMBS be handled as follows: "Identify all the worst pools for 2006 (decide a cutoff for delinquencies 20-30%) and put all on CreditWatch."

215.   On or about January 23, 2007, Jordan sent Rose a "Global CDO Activity Report," which, in discussing "CDO Performance Outlook," stated:

      For later-vintage mezzanine SF CDOs, the rating outlook will be closely linked to the rating performance of mezzanine ('BBB' and 'BB' rated) tranches of Subprime RMBS transactions, which makes up the majority of collateral for these transactions.  If the number of downgrades taken

on 'BBB' and 'BB' rated tranches of RMBS transactions increases during 2007, we expect a significant increase in negative rating activity affecting tranches issued by mezzanine SF CDOs of ABS.

216. On or about January 26, 2007, in a publication titled "CDO Spotlight: U.S. Cash Flow CDO Rating Performance Hit New Highs In 2006, While Synthetics Showed Mixed Results; Outlook For 2007 Varies By Deal Type," S&P recognized that across "different types of CDO of ABS transactions," "subprime RMBS dominated the collateral at the end of 2006, accounting for 43.1% of the overall assets," while "RMBS Alt-A followed with 12.1% exposure." The publication recognized the connection between performance of CDOs and BBB and BB rated subprime RMBS tranches, noting that for "later vintage mezzanine SF CDOs (those rated in late 2002 or after), the rating outlook is closely linked to the performance of mezzanine ('BBB' and 'BB' rated) tranches of subprime RMBS transactions, which are the predominant collateral type for these deals" and that, "given the high concentration of 'BBB' and 'BB' rated subprime RMBS tranches found in later-vintage mezzanine SF CDO collateral pools, if subprime RMBS ratings perform worse than expected, it will have a major impact on the CDO ratings."

217. On or about February 3, 2007, Executive F sent Senior Executive E an email stating: "My group [RMBS Surveillance] is under serious pressure to respond to the burgeoning poor performance of sub-prime deals." Executive F complained that RMBS Surveillance was "really falling behind" after losing an analyst, and continued: "We need to talk about getting more resources in general. I am seeing evidence that I really need to add to staff to keep up with what is going on with sub prime and mortgage performance in general, NOW."

218. Later on or about February 3, 2007, Executive F sent Senior Executive E an email in which she stated: "I talked to Tommy [Gillis] yesterday and he thinks that the ratings are not going to hold through 2007. He asked me to begin discussing taking rating actions earlier on the poor performing deals."

219.   As indicated in Executive F's November 14, 2006 email, more than 770 RMBS tranches met the criteria proposed by RMBS Surveillance for placement on CreditWatch Negative.   Based on these criteria, RMBS Surveillance staff recommended at the February 7, 2007 RMBS Surveillance Committee meeting that 50 of these RMBS tranches be placed on CreditWatch Negative or Internal Watch – S&P's internal, non-public list of securities to be closely reviewed for possible rating action.   This was intended to be the first wave of what would ultimately be significantly more negative Rating Actions.   The RMBS tranches at issue were primarily those rated BBB and below.

220.   As confirmed by the agenda of the February 7, 2007 RMBS Surveillance Committee meeting, the proposal was based on data showing that these tranches were experiencing "higher than expected delinquency and loss performance," that "[s]everely delinquent percentages are increasing [at] a rapid pace," and that "[l]osses are occurring very early in some of the deals."   RMBS Surveillance proposed that the worst RMBS be identified by selecting those where the "[s]everely delinquent ratio to loss coverage exceeds 50%," and "[m]odified stress shows potential default with in [sic] 7 months."   The agenda also indicated that "CDO surveillance and new ratings will be advised prior to and following surveillance committee meetings of all intended rating actions" and that the "impact of rating actions to the SF business will be discussed and understood prior to public release of rating actions."

221.   Based on S&P's then existing criteria, had the RMBS tranches been placed on CreditWatch Negative, Global CDO would have been required to "notch" the ratings of those RMBS tranches (*i.e.,* consider the ratings to be lower than they were) when rating a CDO exposed to the credit risks of those RMBS tranches.   All other things being equal, this generally would have resulted in CDOs with exposure to RMBS placed on CreditWatch Negative receiving lower credit ratings.

222.   The RMBS Surveillance Committee that conducted the February 7, 2007 meeting was staffed with a majority of RMBS Surveillance personnel.  Also present at

the meeting were, among others, Gillis, Jordan, and Senior Analyst A.  The meeting was contentious.  In general, RMBS Surveillance personnel were in favor of taking the recommended negative Rating Actions, while RMBS new issue personnel were not.

223.  On or about February 7, 2007, after the meeting, Executive F sent Senior Executive E an email that stated: "The committee agreed that none of the deals will be downgraded at this time.  They agreed to the creditwatch and internal watch actions. They would like the press releases to go out by next Tuesday after we complete a ton of follow-ups."

224.  On or about February 7, 2007, after the meeting, Senior Analyst A sent Executive C an email that stated:

> Given discussions we had this afternoon (LT) and given a directive I just received from Tom Gillis, I want to make you aware of expectations from both Tommy [Gillis] and Pat Jordan whom I just sat with in a surveillance committee.
>
> The purpose of this committee was to identify deals to be put on credit watch.  Note that given the current surveillance criteria, the vast majority of these deals would not be put on credit watch because, for the most part while delinquencies are very high, losses are nil to minimal.  [Executive F], however,  was charged (I assume by Tommy [Gillis]) to come up with criteria that would identify problematic deals to place on credit watch and avoid the potential of large, rapid downgrades, should losses come in very quickly.
>
> The committee (TG [Gillis], PJ [Jordan], [Executive F] & her Group and myself) did not come to a conclusion this afternoon.  [Executive F] & I were charged with [several tasks] to accomplish (very quickly) . . . .

225.  Less than a week later, on or about February 12, 2007, Gillis convened a meeting of a new committee, comprised of a majority of RMBS new issue, as opposed

1    to surveillance, personnel, to review the proposed CreditWatch Negative actions.

2    Present at this meeting, among others, were Gillis, Jordan, and Senior Analyst A.

3    226.   The agenda for the February 12, 2007 meeting indicated that its purposes

4    were to: (a) "identify pools at risk for downgrade within the next six months"; (b)

5    "establish a methodology and process that will continuously identify pools at risk";

6    and (c) "understand the impact of RMBS ratings actions to CDO ratings prior to

7    taking rating action."

8    227.   At the February 12, 2007 meeting, the new committee, staffed by a

9    majority of non-surveillance personnel: (a) agreed to place on CreditWatch negative

10   only 18 RMBS tranches, as opposed to the 50 recommended by RMBS Surveillance;

11   (b) agreed to revise RMBS surveillance criteria to permit downgrades to RMBS with

12   high delinquencies but minimal or no realized losses; and (c) initiated a project known

13   as the "Surveillance Efficiency Project."  The Surveillance Efficiency Project was to

14   be supervised by Senior Analyst A and had as its primary mission, with a six-month

15   time frame, to automate the surveillance process to allow for faster and more accurate

16   review of RMBS tranches in batches.  This mission ultimately expanded to include the

17   development of new surveillance criteria that combined RMBS new issue and

18   surveillance methodologies and included the use of loan-level data.

19   228.   On or about February 14, 2007, S&P issued a press release announcing

20   that it had placed on CreditWatch with negative implications 18 tranches from 11 non-

21   prime 2006 RMBS deals.  The affected tranches had been rated BBB-, BB+, and BB.

22   The press release stated that these tranches were placed on CreditWatch based on

23   delinquencies in the underlying loans in the collateral pools.  The release also stated

24   that these CreditWatch placements would have "no impact on outstanding CDO

25   ratings."

26   229.   On or about February 27, 2007, Executive F sent for review to, among

27   others, Rose, Jordan, and Executives E and G, a draft email that stated, among other

28   things:

> Our rating performance outlook for Mezzanine SF CDO of ABS
> transactions is contingent upon the performance of mezzanine tranches
> issued by recent vintage Subprime RMBS transactions, but in the near
> term to medium term we expect moderately negative rating performance
> as a result of these transactions' exposure to mezzanine ('BBB' and 'BB'
> rated) tranches of Subprime RMBS transactions.  For the long term, it is
> still too early to say with any degree of certainty.

The draft email continued:

> With respect to CDO issuance, the market is currently in the midst of re-
> pricing the risk associated with pools of Subprime mortgages.  We're
> seeing an uptick in Q1 CDO issuance as underwriters close warehouse
> lines and move Subprime RMBS paper into new CDOs and other CDO
> sectors remain robust.  However, we expect to see a drop in the issuance
> of Mezzanine SF CDOs of ABS after Q1.

230.   In or about February 2007, RMBS Surveillance analysts ran an internal exception report designed to capture non-prime RMBS rated by S&P in 2006 with tranches where severe delinquencies exceeded 75% of available credit support.  The report identified 583 tranches from 151 subprime RMBS deals, including 92 tranches rated BBB and 122 tranches rated BBB-.

231.   From February 2007 through June 2007, the numbers of delinquencies represented in internal exception reports were communicated in a monthly report to, among others, Gillis and Executive C.  In addition, Executive F sent weekly reports on the performance of RMBS to, among others, Gillis, Rose, Bryan, and Jordan.

c.   From March 2007 through June 27, 2007, S&P Issued CDO Ratings that Failed to Account for the Substantially Increased Credit Risks of Non-Prime RMBS

232.   From in or about March 2007 through on or about June 27, 2007, S&P reaped record profits by issuing and/or confirming CDO credit ratings that S&P knew

did not accurately reflect the true credit risks of those CDOs because they failed to account for the substantially increased credit risks posed by certain non-prime RMBS tranches that backed those CDOs.

(i)     March 2007

233.   By March 2007, S&P knew that the performance of non-prime RMBS was bad and getting worse and that an ongoing review process was likely to result in large-scale negative Rating Actions for non-prime RMBS.   This knowledge was reflected in a number of conversations, emails, and other communications from, among, and between S&P executives and analysts, including those S&P executives with responsibility for supervising the rating of CDOs.  In particular:

a.     During conversations in or about March 2007, Jordan, Tesher, and other managers in Global CDO agreed that there were going to be significant negative Rating Actions on non-prime RMBS and that these negative Rating Actions would have a major impact on mezzanine cash CDOs.

b.     On or about March 1, 2007, Tesher held a meeting of CDO rating analysts that one CDO rating analyst characterized in a contemporaneous instant message to another CDO rating analyst as "a meeting to discuss the blow up of the resi[dential] market."   During the meeting, Tesher informed the analysts:

- A combination of factors relating to subprime RMBS had triggered a drop in prices on the ABX index, a secondary market tied to RMBS, in a very compressed time, with the result that 40 RMBS deals were no longer AAA based on market perception.

- The market was discounting subprime RMBS, issuers still had huge exposure to this RMBS, and issuers were very concerned.

- Issuers were shutting down and liquidating their warehouses (*i.e.*, stores of RMBS temporarily held by issuers as they assembled assets for future CDOs), in part to enable the issuers to avoid being required to mark their positions to market (*i.e.,* to reduce, on their books, the listed value of

retained RMBS to reflect the current market value) and being stuck with collateral that had suffered losses.

- CDO deals needed to be priced and closed to reduce issuers' exposure to the underlying RMBS collateral.

- A lot of investors were expected to drop out of the CDO market, but this would not stop the deals. Issuers could not let the deals fade away, and if investors had already signed up for deals, issuers had the incentive to make the deals happen rather than face losses on the underlying collateral.

- Issuers would still have to mark their positions in CDOs to market, but this was more favorable to these issuers than if they had to mark to market their positions in the underlying RMBS collateral.

- Tesher expected the analysts to be very busy as issuers pushed to price and close CDO deals quickly.

- Tesher wanted everyone to realize that they had to tell the issuers that they priced deals at their own risk and that the analysts would still need to comply with criteria and could not push those criteria, but that they should try to be cooperative and make sure to tell Tesher about any issues with CDO issuers.

- The analysts had to continue to believe in the ratings from the RMBS group.

- The marketplace was chaotic.

- Retranching (that is, repackaging structured debt securities, whose underlying collateral previously had been downgraded, into new structured debt securities) had occurred in the high-yield debacle, and Tesher saw this happening again for CDOs.

- In order to close, deals would take cuts and CDO issuers would cut their fees. It would be a challenging year for issuers to make up for losses, the analysts would see a lot of issuers under a lot of pressure, and the analysts should manage expectations.

69

COMPLAINT

1        c.      Immediately following Tesher's meeting, two CDO analysts

2  engaged in the following instant message exchange regarding Tesher's comments:

3     Analyst 1:   we got the gist of it

4     Analyst 2:   that means market will crash . . deals will rush in before

5                      they take further loss

6     Analyst 1:   yes

7     Analyst 2:   that means we will see grumpy analyst sand [sic] grumpy

8                      bankers and a grumpy [Managing Director in Global CDO

9                      ("Executive K")]

10    Analyst 1:   I'm grympy [sic] anyway

11    Analyst 2:   but then we should not push criteria

12                      but we give in anyway

13                      ahahhahaha

14        d.      In a telephone conversation on or about March 13, 2007, Senior

15  Analyst B told Senior Executive A that non-investment grade classes (that is, those

16  rated below BBB-) totaled more than 12% of the 2006 subprime RMBS and that more

17  than half of the 2006 subprime RMBS rated BB+ and BB were expected to take some

18  loss.

19        e.      On or about March 14, 2007, Executive G emailed a presentation

20  slide entitled "CDOs Have Increasingly Been Collateralized by RMBS Subprime," to,

21  among others, Jordan, Tesher, Gillis, Bryan, Senior Executives B and E, Executives C

22  and I, and Senior Analyst A.  The slide illustrated that the exposure of mezzanine cash

23  and hybrid CDOs to subprime RMBS collateral had increased steadily from 2000 to

24  2006, so that 2006 mezzanine cash and hybrid CDOs were made up of over 70%

25  subprime RMBS collateral, primarily from the 2005 and 2006 vintages.

26        f.      On or about March 19, 2007, Tesher wrote a memorandum titled

27  "The Fixed Income CDO Group, Monthly Activity Report, March 2007."  He sent this

28  memorandum to Executive K and it subsequently was forwarded to Rose, Jordan, and

COMPLAINT

other executives at McGraw-Hill headquarters.  In the memorandum, Tesher stated:

Regarding ABS CDOs – Many dealers accelerated the timing of CDO's that were in the pipeline in order to mitigate/manage their respective warehouse exposure.  We have seen the timeline for many CDO's of ABS transactions accelerate due to preferential "mark to market" treatment a dealer can receive for CDO "priced" liabilities versus owning warehouse risk in its "raw form" (i.e. at the underlying subprime mortgage level).  In turn, many dealers will be saddled with CDO of ABS Equity, Subordinate and Mezzanine tranches for transactions (predominantly supported by RMBS) which they aggressively priced over the last couple of weeks in order to mitigate their respective warehouse risk.

* * *

Market intelligence indicates that transactions that "priced" in order to shift/convert warehouse "mark to market risk" to SF CDO Liabilities were generally 70% along in the warehouse process.  Any transactions that were generally halfway ramped up have either had their warehouses liquidated or frozen.

g.      During the first two weeks of March 2007, S&P analysts, including Senior Analyst A and an analyst in Global RMBS ("Analyst D"), conducted a "risk ranking" analysis of 2006 vintage subprime RMBS.  The initial results showed that large numbers of subprime RMBS ratings issued in 2006 likely would be at "high risk" for downgrade.  On or about March 12, 2007, an RMBS Surveillance analyst ("Analyst E") forwarded the "risk ranking" analysis to Executive F, noting the performance predictions for RMBS deals based on LEVELS 5.7 (S&P's old model) and LEVELS 6.0 (the new model announced for use starting June 1, 2007).  Executive F responded "Wow, these deals are in huge trouble."  Analyst E then responded: "The transactions look much worse in [LEVELS] 6.0.  I wonder what [Senior Analyst A] is

going to do with this information."

h.    By on or about March 19, 2007, the analysts, including Senior Analyst A and Analyst D, had completed their analysis of the risks to the 2006 vintage subprime RMBS.  The analysis concluded that "approximately 4.5% and 13% of the BBB and BBB- bonds, respectively, will default."  The analysis also indicated that the overwhelming majority of BB+ and BB RMBS tranches were at high or medium risk of default.

i.    On or about March 19, 2007, Senior Analyst A gave an internal presentation titled "Structured Finance Ratings: Overview and Impact of the Residential Subprime Market" to McGraw-Hill executives.  In his presentation, Senior Analyst A referenced the risk ranking of BBB and BBB- subprime RMBS and, with respect to the "Impact of Subprime on CDOs," stated as follows:

- RMBS has grown as a source of collateral for CDOs; 33% of U.S. CDOs of ABS rated by S&P in 2006 had either Subprime RMBS or CDOs of Subprime RMBS as their largest single category of collateral held.

- Of CDOs collateralized primarily by Subprime RMBS (including CDO^2 transactions [CDOs made up of pieces of other CDOs] collateralized by CDOs of RMBS), 32% of the transactions rated in 2006 held primarily senior ('AAA' through 'A' rated) Subprime RMBS tranche collateral and 68% held primarily mezzanine ('A' through 'BB' rated).

- Across different types of CDOs of ABS, Subprime RMBS far outranks all other types of SF as a collateral type, comprising 43% of total CDO of ABS assets by par value held (Q4 2006).

- RMBS CreditWatch placements and downgrades undertaken during 2007 year to date have not yet led to any downgrades or CreditWatch placements on our CDO ratings.

- However, earlier (2002-2004 vintage) RMBS transactions are seeing increased downgrade activity, and the notes from these RMBS transactions appear in the collateral pools of CDOs of ABS issued in 2005 and before.

- Currently, 35 U.S. CDOs have seen 1% or more of their RMBS collateral placed on CreditWatch negative or downgraded since January 1st, 2007.

In his presentation, Senior Analyst A stated, "There will be some impact to CDOs as RMBS has been a growing source of collateral."

       j.    On or about March 19, 2007, Analyst D, who had conducted a "risk ranking" analysis of 2006 vintage RMBS, as described in paragraph 233(g) above, sent an email to several RMBS and CDO analysts, with the subject line: "Burning down the house – Talking Heads." The email stated:

> With apologies to David Byrne . . . here's my version of "Burning Down the House".
>
> Watch out
> Housing market went softer
> Cooling down
> Strong market is now much weaker
> Subprime is boi-ling o-ver
> Bringing down the house
>
> Hold tight
> CDO biz – has a bother
> Hold tight
> Leveraged CDOs they were after
> Going – all the way down, with

Subprime mortgages

\* \* \*

Own it

Hey you need a downgrade now

Free-mont

Huge delinquencies hit it now

Two-thousand-and-six-vintage

Bringing down the house.

k.      Minutes later on or about March 19, 2007, Analyst D sent a follow up email, stating: "For obvious, professional reasons please do not forward this song. If you are interested, I can sing it in your cube ;-)."

l.      On or about March 21, 2007, Analyst D circulated another email, attaching a video of him "singing and dancing" the first verse of the song in S&P offices, before an audience of laughing S&P coworkers.

m.      On or about March 21, 2007, Tesher prepared a draft of a presentation he was to give at the UBS Fifth Annual New York CDO Conference, which was scheduled to occur on March 29, 2007.  This draft presentation included, among other things, the following statements:

- Under the heading "ABS CDOs and Underlying RMBS/Consumer Credit," "The U.S. subprime mortgage bubble has burst – now what?"

- "ABS CDOs Have Increasingly Been Collateralized by [U.S.] RMBS Subprime."

- Under the heading "Impact of U.S. Subprime RMBS on ABS CDOs Wrap-up," "RMBS has grown as a source of collateral for CDOs; 33% of U.S. CDOs of ABS rated by S&P in 2006 had either Subprime RMBS or CDOs of Subprime RMBS as their largest single category of collateral."

- Under the heading "Integrated Process for CDO and RMBS Surveillance," "Standard & Poor's has an integrated surveillance process to ensure the

74

COMPLAINT

ratings in our rated RMBS bonds and CDO transactions reflect our most current credit view."

n.      On or about March 22, 2007, S&P published on its website a report authored by Senior Analyst A titled "A Comparison of 2000 and 2006 Subprime RMBS Vintages Sheds Light On Expected Performance." With respect to non-prime RMBS, the report stated:

> While subprime mortgages issued in 2000 have the distinction of being the worst-performing residential loans in recent memory, a good deal of speculation in the marketplace suggests that the 2006 vintage will soon take over this unenviable position. Based on our analysis, our current loss expectation for the 2006 subprime vintage is 5.25 - 7.75%. In subjecting the 2006 vintage deals rated by [S&P] to this loss scenario, we believe that the majority of 'BBB-' and 'BBB' tranches are protected; however, these tranches may experience significantly higher default rates than other similarly rated tranches have seen in recent history. In light of various market factors, such as slowing house price appreciation and potential fallout from imprudent underwriting standards that existed in late 2005 and 2006, the cause for concern is justified.

With respect to CDOs, the report recognized the steady increase in "exposure to RMBS, especially subprime RMBS" and particularly for "CDOs of ABS collateralized by mezzanine structured finance tranches, which have seen their average subprime RMBS exposure increase from 42% of assets in CDO transactions originated in 2003 all the way to 73.8% for transactions originated in 2006." The report then concluded, however:

> Because [S&P's] RMBS Surveillance and CDO Surveillance processes function in an integrated fashion, we believe it's important to consider what the impact would be on our rated CDO transactions if subprime loan losses were to reach 7.75%, the high end of the range presented

75

COMPLAINT

earlier in this article.   As such, we have taken the projections and reviewed the subprime exposures within our rated CDO transactions to determine what the impact might be under this hypothetical scenario. While it's clear that such a scenario could have a material impact on CDO ratings, our review indicated that the outcome for any individual CDO transaction will vary depending on certain deal-specific factors, including structure, vintage, timing of the RMBS rating actions within a given CDO pool, and, in particular, the asset selection made by the collateral manager for the CDO.

By asserting that S&P had an integrated surveillance process and had conducted a review to determine the impact of high, non-prime mortgage loan losses on CDOs, S&P lulled the public into believing that its CDO ratings fully accounted for the existing and anticipated deterioration of non-prime RMBS and reflected S&P's most current credit opinions with respect to the underlying RMBS.   In fact, S&P continued to rate new CDOs without making adjustments to account for continuing deterioration of underlying non-prime RMBS and in disregard of internal analyses and reports demonstrating the extent of this continuing deterioration.

o.      On or about March 23, 2007, an S&P employee sent to, among others, Gillis and Executives C, F, and I, an email that stated, "Finally the type of article I expected but dreaded to see in the respectable press."   Attached to the email was an article from *Fortune* magazine titled "Dropping the Ball" that stated:

AMID THE CHAOS of the escalating subprime mortgage crisis, the three major credit-rating agencies – Fitch, Moody's, and Standard & Poor's – have been voices of calm.   They've downgraded only a sliver of the debt backed by such mortgages, and they say they expect the mess to stay safely confined to the subprime sector.

But what if they're wrong?   It's not just their reputations . . . that

76

COMPLAINT

are at stake, but possibly the housing market itself.

To appreciate the role that the rating agencies play in today's housing market, you have to understand a piece of Wall Street alchemy: the process by which mortgages are combined, carved up, recombined, and carved up again in almost endless permutations to create new forms of debt (which usually go by three-letter abbreviations). A bank or brokerage bundles up hundreds of mortgages and sells investors debt that is backed by mortgage payments and secured with homes. These asset-backed securities – ABS's, in Street parlance – are sold in slices, each of which carries its own theoretical level of risk, ranging from the supposedly invulnerable (AAA) all the way down to the bottom rung of investment grade and even past that, to a highly speculative unrated slice. It's possible to create an AAA-rated asset out of somewhat shaky collateral, because the first dollar of income goes to the securities with the highest rating, while the first dollar of loss is assigned to those with the lowest. The bottom layers provide a cushion that supposedly protects the higher-rated securities.

Lately much of the bottom rung of investment-grade ABS's has been snapped up by another Street creation called a collateralized debt obligation (CDO), which, like an ABS is sold in slices. A large chunk of a CDO that consists of barely investment-grade securities can still secure a coveted AAA rating – again, because any losses have to eat through the bottom layers.

* * *

Today all of the rating agencies say they have scrubbed the numbers, and slices of debt that are rated investment grade will mostly stay that way, even if the collateral consists of subprime mortgages. Critics have their doubts.

77

COMPLAINT

p.      Gillis forwarded the email and attached article to, among others, Rose, Jordan, and Senior Executives B and E.  Senior Executive B, in turn, forwarded it to, among others, Rose, Jordan, Senior Executive A, and Executive C, via an email that stated:

> Seeing more articles like this in the last couple of days brought to mind [Senior Executive A]'s suggestion yesterday about hiring a firm specialized in helping us deal with this type of press and coordinating all the moving parts of our external outreach (politicians, specialized media, non-specialized media, normal customers of the ratings business, etc.).

q.      On or about March 26, 2007, Executive F sent to Gillis, Jordan, Bryan, Senior Executives B and E, Executives C and I, and Senior Analyst A an email to which she attached the March 19, 2007 risk analysis prepared by Senior Analyst A and his team of analysts, including Analyst D, as described above in paragraph 233(g). On March 26, 2007, Jordan forwarded this to Tesher.

234.   A primary source of ratings business for S&P during March 2007 was mezzanine CDOs, which contained significant exposure to non-prime RMBS tranches rated B to BBB+.   Notwithstanding S&P's knowledge regarding the increasing deterioration of non-prime RMBS, Cash CDO, under the supervision of Jordan and Tesher, issued and/or confirmed (through Effective Date RACs) ratings for CDOs, including such mezzanine CDOs, that S&P knew did not accurately reflect the credit risks of those CDOs, because they failed to account for the substantially increased credit risks of underlying non-prime RMBS tranches.  In particular, in March 2007, S&P issued and/or confirmed (through Effective Date RACs) ratings for 61 CDOs priced at more than $51 billion that were backed, at least in part, by non-prime RMBS. Portions of at least 18 of these CDOs, priced at more than $20.6 billion, were sold to financial institutions and/or to purchasers whose losses would affect federally insured financial institutions.  For example:

a.       On or about March 15, 2007, S&P rated Gemstone CDO VII Ltd., a $1.1 billion CDO consisting of approximately 66% 2006 subprime RMBS, 18% 2005 subprime RMBS, and nearly 2% 2007 subprime RMBS collateral. Approximately 56% of the collateral backing Gemstone VII was non-prime RMBS rated BBB or below.  Approximately $803 million (72%) of Gemstone VII was rated AAA by S&P.  AAA and AA tranches of Gemstone VII were purchased by federally insured financial institution M&T Bank, which based its decision to invest in Gemstone VII in part on S&P's ratings of the CDO.  In July 2007, S&P downgraded over 22% of the subprime collateral underlying Gemstone VII.  On April 15, 2008, Gemstone VII defaulted.  M&T Bank lost $80 million on Gemstone.

b.       On or about March 27, 2007, S&P rated Sorin CDO VI, Ltd., a $550 million CDO consisting of approximately 61% 2006 Alt-A RMBS, 24% 2007 Alt-A RMBS, and 8% 2005 Alt-A RMBS.  Approximately 55% of the collateral backing Sorin VI was non-prime RMBS rated BBB or below.  Approximately $396 million of Sorin VI was rated AAA by S&P.  Sorin VI was purchased by several financial institutions, including federally insured financial institution WesCorp, which purchased $100 million worth of an AAA tranche of this CDO.  WesCorp's decision to invest in Sorin VI was based, in part, on the credit ratings that S&P issued for the CDO.  S&P's primary CDO analyst on Sorin VI had received Analyst D's "Bringing Down the House" email and the subsequent videotaped vocal performance on March 19 and 21, respectively, and had asked if he could forward the song to others.  On May 12, 2008, Sorin VI defaulted.  WesCorp lost $90 million on Sorin VI.

c.       On or about March 29, 2007, S&P rated Cairn Mezzanine ABS CDO III Ltd., a $1.78 billion CDO consisting of approximately 28% 2006 subprime RMBS, 40% 2005 subprime RMBS, and 10% 2006 Alt-A RMBS.  Approximately 41% of the collateral backing Cairn Mezzanine III was non-prime RMBS rated BBB or below.  Approximately $773 million of Cairn Mezzanine was rated AAA by S&P. M&T Bank, relying in part on S&P's ratings, purchased an AAA tranche of Cairn

79

COMPLAINT

Mezzanine III.   Ultimately, Cairn Mezzanine III defaulted.   M&T Bank lost $50 million on Cairn Mezzanine III.

       d.     On or about March 29, 2007, S&P rated Charles Fort CDO I, Ltd., a $400 million CDO consisting of approximately 52% subprime RMBS and 34% Alt-A RMBS.   Approximately 51% of the collateral backing Charles Fort I was non-prime RMBS rated BBB or below.   Approximately $280 million of Charles Fort I was rated AAA by S&P.   WesCorp, relying in part on S&P's ratings, purchased $100 million of an AAA tranche of Charles Fort I.   Ultimately, Charles Fort I defaulted.   WesCorp lost $90 million on Charles Fort I.

(ii)     <u>April 2007</u>

     235.   In April 2007, S&P learned even more negative information regarding the performance of non-prime RMBS, and remained aware that an ongoing review process was likely to result in large-scale negative Rating Actions for non-prime RMBS.   This knowledge was reflected in a number of conversations, emails, and other communications from, among, and between S&P executives and analysts, including those executives with responsibility for rating CDOs.   In particular:

       a.     On or about April 5, 2007, two S&P CDO analysts engaged in an instant message exchange expressing their belief that S&P's CDO rating model was severely underestimating credit risks:

     [Analyst 1] btw that deal is ridiculous

     [Analyst 2] I know right…model def[initely] does not capture half of the . . . risk

     [Analyst 1] We should not be rating it

     [Analyst 2] we rate every deal . . . .  it could be structured by cows and we would rate it

     [Analyst 1] but there's a lot of risk associated with it – I personally don't feel comfy signing off as a committee member

80
COMPLAINT

b.     S&P's internal exception reports in April 2007 reflected the continuing deterioration of 2005 and 2006 subprime and Alt-A RMBS rated by S&P. As with the March 2007 reports, the April reports had a threshold of 75% severe delinquency versus credit support (meaning they would capture any tranche with equal or worse SD versus CS ratio), and they focused primarily on subprime and Alt-A RMBS rated in 2005 and 2006. The April reports pulled up even more at-risk deals than the March report (590 subprime deals and 481 Alt-A deals), though not as many tranches overall (723 subprime tranches and 532 Alt-A tranches). The average SD versus CS ratio for the subprime tranches was 121%, and 254% for the Alt-A tranches. The reports reflected a continuing decline in the creditworthiness of the BBB and BBB- rated tranches, showing the average SD versus CS ratio well over 100% (indicating that severe delinquencies already exceeded available credit support) for hundreds of BBB and BBB- tranches of Alt-A and subprime RMBS tranches. S&P analysts and executives knew that an SD versus CS ratio in excess of 100% meant that the RMBS tranche at issue would in the near term almost certainly be subject to a negative Rating Action.

c.     On or about April 10, 2007, Analyst D sent an email to a Director in RMBS Criteria that stated, among other things: "We should not be changing our base case scenario just because the subprime market is tanking. Rest of the economy is coasting fine." On or about April 18, 2007, Analyst D sent to, among others, Senior Executive E and Executive F, an email that attached a PowerPoint presentation that included the same statement.

d.     On or about April 25, 2007, an analyst in the RMBS group ("Analyst F") forwarded to Executives C and I, Senior Analyst A, and others an analysis of the 2005 and 2006 vintage subprime RMBS. Using even the conservative expected losses projected by S&P for these vintages, this analysis showed average defaults of investment grade RMBS that vastly exceeded S&P's expectations. For BBB tranches, the analysis showed average defaults of 47.44% for RMBS rated in

2005, 56.27% for RMBS rated during the first half of 2006, and 35% for RMBS rated during the second half of 2006. For BBB- tranches, this analysis showed average defaults of 64.44% for 2005 vintage RMBS, 71.74% for vintage RMBS from the first half of 2006, and 51.01% for vintage RMBS from the second half of 2006. By comparison, at that time CDOs were being rated with the assumption that the BBB RMBS assets they contained had an average default rate of approximately 3%. On or about April 30, 2007, Analyst F ran another analysis that produced similar, but slightly different, results for defaults of BBB and BBB- tranches. Analyst F presented similar information to Gillis on or about May 2, 2007.

   e.   On or about April 25, 2007, Executives F and G sent an email to, among others, Rose, Gillis, Jordan, Tesher, Bryan, and Senior Analyst A, to which was attached a memorandum regarding "RMBS & CDO Surveillance Weekly Subprime Update." The memorandum began by explaining: "This is the first of the weekly updates we propose sending to you so that you are apprised of the current state of RMBS rating performance and the impact to the CDOs." The Executive Summary section of the memorandum began by noting the continued deterioration of residential mortgage performance:

> Residential mortgage performance, particularly subprime mortgages, continued the trend of increasing delinquency and losses, which we have been closely monitoring since midyear, 2006. There is little evidence of early payment defaults abating in the pools.

   f.   On or about April 30, 2007, Executives F and G sent to, among others, Rose, Gillis, Jordan, Tesher, Bryan, and Senior Analyst A an "RMBS & CDO Surveillance Weekly Subprime Update." The report began by noting the continuing deterioration of residential mortgage performance: "Residential mortgage performance, particularly subprime mortgages, continued the trend of increasing delinquency and losses and rating performance remains predominately negative." With respect to CDO Surveillance, the report noted the growing exposure to

1  deteriorating RMBS, stating:

2  > [R]ating activity on the CDOs of ABS collateralized primarily by
3  > Mezzanine SF tranches have seen balanced rating activity during the year
4  > to date, with 10 upgrades and 10 downgrades. But, exposure to
5  > CreditWatched and downgraded RMBS bonds continues to build in these
6  > CDOs as RMBS tranche ratings continue to see negative rating activity,
7  > and this week we saw the first cash flow CDO of ABS downgrades that
8  > occurred primarily as a result of exposure to Subprime RMBS.

9  > While the CDO transactions with the highest levels of exposure to
10 > RMBS downgraded or CreditWatched since the start of 2007 are still
11 > those originated from 2002 through 2004, exposures are increasing in the
12 > 2005 and 2006 vintage CDO transactions as later vintage RMBS held by
13 > these CDOs sees more negative rating activity, and given the rate of
14 > increase in CDO exposure to RMBS that has seen negative rating
15 > activity, we expect to see a gradual increase in CDO negative rating
16 > activity as a result.

17  236.  Notwithstanding S&P's knowledge regarding the increasing deterioration
18 of non-prime RMBS, in April 2007, Cash CDO, under the supervision of Jordan and
19 Tesher, issued and/or confirmed (through Effective Date RACs) ratings for CDOs that
20 S&P knew did not accurately reflect the credit risks of those CDOs, because they did
21 not account for the substantially increased credit risks of underlying non-prime RMBS
22 tranches.  In particular, in April 2007, S&P issued and/or confirmed (through
23 Effective Date RACs) ratings for 47 CDOs priced at more than $24 billion that were
24 backed, at least in part, by non-prime RMBS, including at least three CDOs priced at
25 more than $4 billion that were sold to financial institutions and/or to purchasers whose
26 losses would affect federally insured financial institutions.  For example:

27  a.  On or about April 10, 2007, S&P rated Vertical ABS 2007-1, a
28 $1.5 billion CDO comprised of approximately 75% 2006 subprime RMBS, 8% 2007

subprime RMBS, and 6% 2005 subprime RMBS. Approximately 36.5% of the collateral backing Vertical 2007-1 was non-prime RMBS rated BBB or below. Federally insured financial institution Citibank purchased $15 million of an AAA rated tranche of Vertical 2007-1. On October 19, 2007, Vertical 2007-1 defaulted, resulting in Citibank losing its full $15 million investment.

b.      On or about April 24, 2007, S&P rated Corona Borealis CDO Ltd., a $1.5 billion CDO comprised of approximately 54% 2006 subprime RMBS and 32% 2005 subprime RMBS. Approximately 50% of the collateral backing Corona Borealis was non-prime RMBS rated BBB or below. Relying in part on S&P's ratings, federally insured financial institution Eastern Financial Florida Credit Union purchased tranches of Corona Borealis. On February 1, 2008, Corona Borealis defaulted, resulting in Eastern Financial Florida Credit Union losing its investment in Corona Borealis.

(iii)      May 2007

237.   In May 2007, S&P learned additional information reflecting the continued deterioration of non-prime RMBS and remained aware that an ongoing review process was likely to result in large-scale negative Rating Actions for non-prime RMBS. This knowledge was reflected in a number of conversations, emails, and other communications from, among, and between S&P executives and analysts, including those S&P executives with responsibility for supervising the rating of CDOs. In particular:

a.      In May 2007, RMBS Surveillance ran another set of internal exception reports, and the results were worse than any prior report. As with the previous months, the reports focused on 2005 and 2006 subprime and Alt-A RMBS with tranches exceeding 75% severe delinquencies versus available credit support. This time, the reports pulled 2,715 tranches from 631 subprime deals, and 2,000 tranches from 511 Alt-A deals. The average SD versus CS ratio for the 2,715 subprime tranches was 126%, while for the 2,000 Alt-A tranches it was 202%. The

Alt-A figures included 302 BBB tranches with an average of 139%, and 179 BBB-tranches with an average of 170%. Similarly, there were 466 BBB subprime tranches with an average of 120%, and 536 BBB- subprime tranches with an average of 139%. For all of these RMBS categories, severe delinquencies had, on average, already significantly exceeded available credit support.

b.      On or about May 7, 2007, Executives F and G sent to, among others, Rose, Gillis, Jordan, Tesher, Bryan, and Senior Analyst A an "RMBS & CDO Surveillance Weekly Subprime Update." With respect to RMBS, the Executive Summary stated that the "first quarter's reported performance for transactions issued in 2007 reveal delinquency performance that exceeds all prior vintages."

c.      On or about May 9, 2007, an associate in RMBS Surveillance forwarded to Analyst E the internal exception reports for February through April 2007, which illustrated the dismal performance of 2005 and 2006 Alt-A and subprime RMBS rated by S&P.

d.      On or about May 13, 2007, Analyst E reported that he had updated subprime and Alt-A RMBS performance statistics:

> As expected, delinquencies and losses continue to increase in the Alt-A and subprime sectors. After 6 and 12 months of seasoning, the 2006 vintage continues to be the worst performing vintage in terms of delinquencies and loss percentages.

e.      On or about May 14, 2007, Executives E and F sent to, among others, Rose, Jordan, Tesher, Bryan, Executive G, and Senior Analyst A an "RMBS & CDO Surveillance Weekly Subprime Update." With respect to RMBS, the Executive Summary of this update emphasized the continuing deterioration of 2006 subprime RMBS:

> The performance of the 2006 subprime vintage continues to deteriorate. After 12 months of seasoning, total delinquencies for the 2006 vintage represent approximately 15.20% of the current pool balance. This is a

85
COMPLAINT

2.5% increase when compared to the prior distribution date. After a similar amount of seasoning, total delinquencies for the 2006 vintage are approximately 30% higher than the 2000 vintage, which has the distinction of being the worst performing vintage. In addition to total delinquencies, serious delinquencies (90+ [days], foreclosure, REO) are also higher for transactions issued in 2006. After 12 months of seasoning, serious delinquencies for the 2006 subprime vintage represent approximately 8.38% of the current pool balance. When compared to the prior distribution date, serious delinquencies have increased by approximately 8%. Furthermore, serious delinquencies for the 2006 vintage are approximately 40% higher than the 2000 vintage. In terms of cumulative losses, the 2006 vintage continues to be the worst performing vintage.

f.     On or about May 21, 2007, Jordan sent Rose a "Global CDO Activity Report." In the report, Jordan explained that her group was analyzing previously-issued CDOs assuming that second-lien subprime collateral would "default with zero recovery," that is, that the collateral was worthless. Jordan did not describe any similar effort to reflect the deterioration of non-prime RMBS in the issuance and/or confirmation of new CDO ratings. Jordan did note, however, that the implosion of subprime RMBS had brought a rush of CDO ratings business to S&P as subprime RMBS issuers sought to offload the risk of this deteriorating collateral into CDOs:

> Because of the effect of the subprime RMBS situation, in March we experienced the highest monthly deal volume ever, doubling the total from the previous two months. The cash flow area closed an impressive 72 deals.

The report noted that the acceleration of cash CDOs during the first four months of 2007 was in part "due to preferential 'mark to market' treatment a dealer can receive

1  for CDO 'priced' liabilities versus owning warehouse risk in its 'raw form' (i.e. at the

2  underlying subprime mortgage level)."  The report also noted:

3        Through April 2007, the US CDO new issuance revenue reached $74.82

4        million dollars, with over half of the total revenue generated from cash

5        flow CDOs.  This represents a significant increase over the revenue of

6        $36.23 million reported for the same period in 2006.  May is expected to

7        generate $24.48 million in revenue, the highest total for the month of

8        May to date.

9        g.    On or about May 21, 2007, Executives F and G sent to, among

10  others, Rose, Gillis, Jordan, Tesher, Bryan, and Senior Analyst A an "RMBS & CDO

11  Surveillance Weekly Subprime Update."   With respect to RMBS, the Executive

12  Summary noted continuing negative rating performance:

13        Surveillance analyses continue to result in predominately negative rating

14        performance.   Rating actions are pending following committees held

15        during the week of May 14th as analysts continue to process the

16        committee approved rating actions.  One transaction, Long Beach 2006-

17        A, suffered the most severe rating cuts since the sub-prime performances

18        issue surfaced.   The three bottom classes defaulted and all remaining

19        classes except the 'AAA' had ratings lowered and or placed on

20        CreditWatch.  S&P and Moody's took similar rating actions just minutes

21        apart.

22        h.    On or about May 29, 2007, Executives F and G sent to, among

23  others, Rose, Gillis, Jordan, Tesher, Bryan, and Senior Analyst A an "RMBS & CDO

24  Surveillance Weekly Subprime Update."   With respect to RMBS, the Executive

25  Summary noted continuing negative rating performance as the result of building

26  delinquencies and losses:

27        Surveillance analyses continue to result in predominately negative rating

28        performance as delinquencies and losses continued to increase in the

87
COMPLAINT

pools.  Deal performance resulted in the ratings of 246 classes being impacted during the previous week.  Fifteen classes were upgraded, 40 were downgraded, 108 were downgraded and creditwatched and 83 were added to creditwatch with negative implications.  With respect to 2006 vintage RMBS in particular, the update reported that an "increase in negative rating actions" was being observed even on investment grade bonds.

238.  Notwithstanding S&P's knowledge regarding the increasing deterioration of non-prime RMBS, in May 2007, Cash CDO, under the supervision of Jordan and Tesher, continued to issue and/or confirm (through Effective Date RACs) ratings for CDOs exposed to the credit risks of non-prime RMBS that S&P knew did not accurately reflect the true credit risks of those CDOs, because they failed to account for the substantially increased credit risks of underlying non-prime RMBS tranches. In particular, in May 2007, S&P issued primary or effective date confirmation ratings for 29 CDOs priced at more than $33 billion that were backed, at least in part, by non-prime RMBS, including at least 7 CDOs priced at more than $12 billion that were sold to financial institutions and/or to purchasers whose losses would affect federally insured financial institutions.  For example:

a.  On or about May 3, 2007, S&P rated Stack 2007-1 Ltd., a $1.5 billion CDO comprised of approximately 40% 2006 subprime RMBS, 22% 2007 subprime RMBS, 5% 2005 subprime RMBS, and 24% 2007 Alt-A RMBS. Approximately 64% of the collateral backing Stack 2007-1 was non-prime RMBS rated BBB or below.  S&P rated AAA more than $1.1 billion of Stack 2007-1. Citibank and Eastern Financial Florida Credit Union both purchased tranches of Stack 2007-1.  On June 27, 2007, S&P confirmed its ratings for Stack 2007-1.  Less than six months later, on December 17, 2007, Stack 2007-1 defaulted, resulting in near total losses of the investments by Citibank and Eastern Financial Florida Credit Union.

1          b.      On or about May 9, 2007, S&P issued an Effective Date RAC
2  letter for Octonion I CDO, a $1 billion CDO comprised of approximately 76% 2006
3  subprime RMBS, 5% 2005 subprime RMBS, and 1% 2007 subprime RMBS.
4  Approximately 62% of the collateral backing Octonion I was non-prime RMBS rated
5  BBB or below. Approximately $772 million of Octonion I was rated AAA by S&P.
6  Citibank purchased approximately $20 million of AAA and AA tranches of Octonion
7  I. Octonion I had closed on March 6, 2007. To confirm Octonion I's ratings, S&P
8  analysts took the S&P ratings on the underlying non-prime RMBS at face value. Two
9  months later, S&P downgraded nearly 11% of the underlying non-prime RMBS
10  collateral, and on February 8, 2008, Octonion I defaulted. Citibank suffered a loss of
11  almost its entire investment in Octonion I.

12          c.      On or about May 9, 2007, S&P issued an Effective Date RAC
13  letter for Plettenberg Bay CDO, a $502 million CDO comprised of approximately
14  42% 2006 subprime RMBS, 39% 2005 subprime RMBS, and 1% 2007 subprime
15  RMBS. Approximately 52% of the collateral backing Plettenberg Bay was non-prime
16  RMBS rated BBB or below. S&P rated AAA approximately $436 million of
17  Plettenberg Bay. Citibank purchased approximately $8 million of A- and BBB
18  tranches of Plettenberg Bay. Plettenberg Bay had closed on March 8, 2007. To
19  confirm Plettenberg Bay's ratings, S&P analysts again took the S&P ratings on the
20  underlying non-prime RMBS at face value. Merely two months later, S&P
21  downgraded nearly 3% of the underlying non-prime RMBS collateral, and, on March
22  6, 2008, Plettenberg Bay defaulted. Citibank suffered an almost total loss of its
23  investment in Plettenberg Bay.

24          d.      On or about May 17, 2007, S&P rated Acacia Option ARM 1 CDO
25  Ltd., a $500 million CDO comprised of approximately 98% non-prime RMBS.
26  Approximately 21% of the collateral backing Acacia Option ARM 1 was non-prime
27  RMBS rated BBB or below. S&P rated approximately $420 million of Acacia Option
28  ARM 1 AAA, and approximately $470 million A or above. Federally insured

1    financial institution First Midwest Bank purchased approximately $8.8 million of an

2    A tranche of Acacia Option Arm 1. On October 3, 2007, S&P confirmed its ratings of

3    Acacia Option ARM 1. Less than two weeks later, S&P downgraded nearly 14% of

4    the underlying non-prime RMBS collateral. In May 2008, Acacia Option ARM 1

5    defaulted, resulting in First Midwest Bank losing almost its entire investment.

6                    (iv)    <u>June 1, 2007 to June 27, 2007</u>

7        239. Between June 1, 2007, and June 27, 2007, S&P learned additional

8    information reflecting the continued deterioration of non-prime RMBS -- including

9    reports indicating that non-prime tranches rated BBB and below were failing -- and

10    remained aware that an ongoing review process was likely to result in large-scale

11    negative Rating Actions for non-prime RMBS. This knowledge was reflected in a

12    number of conversations, emails, and other communications from, among, and

13    between S&P executives and analysts, including those S&P executives with

14    responsibility for supervising the rating of CDOs. In particular:

15          a.    On or about June 1, 2007, Executive G circulated an update to

16    CDO ratings leadership, including Jordan, Tesher, and Bryan, explaining that he was

17    tracking subprime RMBS delinquencies aggregated at the CDO pool level in order to

18    "get a forward look at which Mezz SF and High Grade SF CDOs might experience the

19    greatest levels of stress, rather than waiting for RMBS rating actions to find out."

20          b.    On or about June 4, 2007, Executives F and G sent to, among

21    others, Rose, Gillis, Jordan, Tesher, Bryan, and Senior Analyst A an "RMBS & CDO

22    Surveillance Weekly Subprime Update." With respect to RMBS, the Executive

23    Summary stated that "Surveillance analyses continue to result in predominately

24    negative rating performance as delinquencies and losses continued to increase in the

25    pools."

26          c.    On or about June 11, 2007, Executives F and G sent to, among

27    others, Rose, Gillis, Jordan, Tesher, Bryan, and Senior Analyst A an "RMBS & CDO

28    Surveillance Weekly Subprime Update." With respect to RMBS Surveillance, the

Executive Summary stated:

> Surveillance analyses continue to result in predominately negative rating performance as delinquencies and losses continued to increase in the pools. The number of severely delinquent loans exceeds 6% in the 2006 vintage deals and the dollar balance of loans in foreclosure and REO continues to increase. Research to determine the current time required to liquidate the loans has been initiated. We expect to obtain data necessary to adjust our severity assumptions and the anticipated timing of losses, both of which may negatively impact rating performance.

The update also detailed the determination that certain tranches of subprime RMBS were particularly vulnerable to Ratings Actions. The update stated that analysts had run all of S&P's 18,000 subprime RMBS ratings and found that, on average, the BBB and lower tranches of subprime RMBS had greater than 100% severe delinquencies versus available credit support. This was double the 50% SD versus CS ratio that, in February 2007, RMBS Surveillance had suggested be used for reviewing RMBS tranches for placement on CreditWatch Negative. Moreover, S&P analysts and executives knew that an SD versus CS ratio in excess of 100% meant that the RMBS tranche at issue would in the near term almost certainly be subject to a negative Rating Action. The update also attached a report that listed CDOs with high exposure to already downgraded 2006 subprime RMBS.

        d.    On or about June 17, 2007, Gillis sent to Rose a memorandum titled "Rating Quality & Knowledge Management Activity Report." The memorandum began by discussing RMBS, stating:

> Losses continue to pile up in the subprime market. Total losses for the 2006 book are currently at 0.25%. This compares to the previous worse performing year of 2000 with 0.05% of losses.

The memorandum also discussed the process underway to modify criteria, noting:

> This process has been marred by the lack of direction from management

91

COMPLAINT

on how to approach it. The group has responded marvelously to the effort, yet the rules under which we have to operate are continually changing. In addition, we have been restricted in what we have believe[d] should be done.

e. On or about June 18, 2007, Executives F and G sent to, among others, Rose, Gillis, Jordan, Tesher, Bryan, and Senior Analyst A an "RMBS & CDO Surveillance Weekly Subprime Update." With respect to RMBS, the Executive Summary stated, "The performance of the 2006 subprime vintage continued to deteriorate during the month of May." The Executive Summary further noted that "[t]otal and serious delinquencies rose slightly in the month of May" and that when "compared to the April distribution date, total and serious delinquencies have increased by 12% and 13% respectively." With respect to CDOs, the update stated: "Few CDO of ABS rating actions have occurred solely because of exposure to Subprime RMBS so far (and none for the 2006 vintage CDOs of ABS), but CDO rating cushions continue to erode as a result of RMBS rating actions."

f. On or about June 20, 2007, in response to an inquiry regarding the use of the term "highly volatile" when referring to certain RMBS ratings in the Weekly RMBS/CDO Surveillance Performance Updates, Executive F sent to S&P's Chief Credit Officer an email that stated, "By highly volatile ratings, I am referring to the subordinate bonds of 1,148 transactions that we have either placed on creditwatch with negative implications or have stepped up the internal monitoring due to poor performance. I believe that these ratings will be downgraded if credit performance continues to deteriorate."

g. On or about June 25, 2007, Executives F and G sent to, among others, Rose, Gillis, Jordan, Tesher, Bryan, and Senior Analyst A an "RMBS & CDO Surveillance Weekly Subprime Update" that reflected even worse performance. With respect to RMBS, the Executive Summary stated:

Data from the May 2007 distribution revealed continued decline in collateral performance and our analysis resulted in addition [sic] negative rating actions. During the previous week we took ratings actions on various classes from 62 different transactions from 23 different issuers. We downgraded 45 classes backed by closed-end second-lien collateral and placed 27 of those classes on Credit Watch with negative implications. Twelve of these classes remain on Credit Watch negative, and six were removed. In addition, we placed the ratings on 46 other classes backed by closed-end second-lien collateral on Credit Watch negative. Our rating actions affected a total of 34 closed-end second-lien deals from 12 different issuers. Our rating actions also affected 42 classes backed by subprime collateral from 30 different transactions from 15 different issuers. We placed 31 classes on Credit Watch negative and downgraded 11 classes: five were placed on Credit Watch negative, four remain on Credit Watch negative, and two were removed from Credit Watch negative.

With respect to CDOs, the update stated:

Cushions continue to tighten on Mezz SF CDO of ABS [Mezzanine cash CDO] tranches as a result of RMBS negative rating activity. While most of the negative cushions are still being seen on earlier vintage CDOs of ABS (2000 through 2002) that have already seen ratings lowered as a result of exposure to [other types of underlying collateral], some later vintage transactions have eroded their available rating cushion solely due to RMBS rating activity. As a result, CDO Surveillance is setting up calls with CDO managers for transactions likely to see CreditWatch placements in the near term future.

The update also attached a list of "all U.S. Cash Flow and Hybrid CDO transactions with exposure to RMBS tranches downgraded in 2007 through last week, or currently

1    on watch for downgrade."   The list included 197 mezzanine cash flow and hybrid
2    CDOs.

3         h.      On or about June 27, 2007, at a meeting of the SFLT attended by,
4    among others, Rose, Jordan, and Senior Executive B, Gillis began the meeting by
5    asking the group to reflect on its "subprime approach."  Based on discussions at the
6    meeting, Gillis and Senior Executive B were asked to report back to the SFLT with
7    recommendations on "closing the gap in between RMBS New Deal & Surveillance re-
8    rating."

9         i.       On or about June 27, 2007, Senior Analyst B reported to Gillis that
10   the 2006 vintage subprime RMBS "could see losses over 25%."  Senior Analyst B's
11   analysis was forwarded to Jordan, Senior Executives B and E, Executives C and F,
12   and Senior Analyst A the same day.  Executive F commented in an email later that
13   day that if Senior Analyst B was correct, S&P could see defaults at "AA" and "AAA"
14   rated tranches of subprime RMBS.  Later that same day, Analyst E responded to
15   Executive F's email that he and others in his group had come up with results similar to
16   Senior Analyst B's and that S&P "could expect losses to be approximately 20.50%."

17        240.  Notwithstanding their knowledge regarding the increasing deterioration
18   of non-prime RMBS, including the failure of BBB rated non-prime RMBS tranches,
19   Jordan and Tesher did not provide this information to line-level Cash CDO analysts.
20   In particular, Jordan and Tesher received the information contained in the June 11,
21   2007 report and recognized its significance for ratings of new CDOs that were backed
22   by non-prime BBB and below rated RMBS tranches.  Nevertheless, they did not
23   provide this information to line-level CDO analysts rating CDOs with exposure to
24   non-prime RMBS.

25        241.  Notwithstanding S&P's knowledge regarding the increasing deterioration
26   of non-prime RMBS, including the failure of BBB rated non-prime RMBS tranches,
27   from June 1, 2007 through June 27, 2007, Cash CDO, under the supervision of Jordan
28   and Tesher, continued to issue and/or confirm (through Effective Date RACs) ratings

for CDOs exposed to the credit risks of non-prime RMBS tranches that S&P knew did not accurately reflect the true credit risks of those CDOs, because they failed to account for the substantially increased credit risks of underlying non-prime RMBS tranches. In particular, between June 1, 2007 and June 27, 2007, S&P rated 30 CDOs priced at more than $27 billion that were backed, at least in part, by non-prime RMBS collateral, including at least 12 CDOs priced at more than $12 billion that were sold to financial institutions and/or purchasers whose losses would affect federally insured financial institutions. For example:

a.     On or about June 13, 2007, S&P issued an Effective Date RAC for NovaStar ABS CDO I, Ltd., a $374 million CDO comprised of approximately 72% 2006 subprime RMBS, 18% 2005 subprime RMBS, 5% 2007 subprime RMBS, and 4% 2006 Alt-A RMBS. Approximately 74% of the collateral backing NovaStar I was non-prime RMBS rated BBB or below. S&P rated approximately $277 million of NovaStar I AAA. WesCorp purchased an AAA rated tranche of NovaStar I. To confirm NovaStar I's ratings, S&P rating analysts took the ratings on the underlying non-prime RMBS at face value. One month later, S&P downgraded over 7% of the underlying non-prime RMBS collateral. NovaStar I defaulted on February 4, 2008, resulting in near total losses to investors. WesCorp lost $90 million on NovaStar I.

b.     On or about June 14, 2007, S&P rated Acacia CDO 12 Ltd., a $500 million CDO comprised of approximately 78% non-prime RMBS. Approximately 32% of the collateral backing Acacia CDO 12 was non-prime RMBS rated BBB or below. S&P rated approximately $391 million of Acacia CDO 12 AAA. WesCorp purchased an AAA rated tranche of Acacia CDO 12. In October 2007, S&P downgraded approximately 13% of the underlying non-prime RMBS collateral for Acacia CDO 12. Ultimately, Acacia CDO 12 defaulted, resulting in near total losses to investors. WesCorp lost $90 million on Acacia CDO 12.

c.     On or about June 15, 2007, S&P issued an Effective Date RAC for Pyxis ABS CDO 2007-1, a $1.5 billion CDO, of which over $1 billion was rated AAA

by S&P.  Pyxis 2007-1 was comprised of approximately 55% 2006 subprime RMBS, 31% 2005 subprime RMBS, and 2% 2007 subprime RMBS.  Approximately 46% of the collateral backing Pyxis 2007-1 was non-prime RMBS rated BBB or below.  To issue the Effective Date RAC, S&P analysts again took at face value the existing S&P ratings on the underlying non-prime RMBS collateral.  Less than one month later, S&P downgraded over 13% of the non-prime RMBS collateral, and Pyxis 2007-1 defaulted on February 1, 2008, resulting in near total losses to investors.

        d.    On or about June 20, 2007, S&P issued an Effective Date RAC for Ixis ABS CDO 3 Ltd., a $544 million CDO comprised of approximately 46% 2006 subprime RMBS, 26% 2005 subprime RMBS, and 2% 2006 Alt-A RMBS.  Approximately 49% of the collateral backing Ixis 3 was non-prime RMBS rated BBB or below.  S&P rated approximately $397 million of Ixis 3 AAA.  Eastern Financial Florida Credit Union invested in Ixis 3.  To confirm its ratings of Ixis 3, S&P analysts took at face value the existing S&P ratings on the underlying non-prime RMBS collateral.  Less than one month later, S&P downgraded 4% of the underlying non-prime RMBS collateral.  Ultimately, Ixis 3 defaulted, resulting in near total losses to investors, including Eastern Financial Florida Credit Union.

        e.    On or about June 27, 2007, S&P issued an Effective Date RAC for Stack 2007-1 Ltd., a $1.5 billion CDO that it had rated on May 3, 2007.  To issue the Effective Date RAC, S&P analysts again took at face value the existing S&P ratings on the underlying non-prime RMBS collateral.  Less than one month later, S&P downgraded 5% of the underlying non-prime RMBS collateral.  In October, S&P downgraded 34% of the underlying non-prime collateral.  On December 17, 2007, Stack 2007-1 defaulted, resulting in a near total loss to investors, including Citibank and Eastern Financial Florida Credit Union.

COMPLAINT

        d.     <u>On June 28, 2007, S&P Issued CDO Ratings that Failed to Account for Authorized Negative Rating Actions on Non-Prime RMBS</u>

242. On or about June 28, 2007, S&P decided to accelerate the process to revise surveillance criteria and to authorize immediate large-scale negative Rating Actions on non-prime RMBS ratings. Rose made the ultimate decision to proceed with these negative Rating Actions.

243. Jordan and Tesher were aware of the authorization of immediate large-scale negative Rating Actions on non-prime RMBS ratings, but did not inform line-level CDO analysts of this decision.

244. Unaware of the decision, line-level Cash CDO analysts, under the supervision of Jordan and Tesher, continued to issue and/or confirm (through Effective Date RACs) ratings for CDOs exposed to the credit risks of non-prime RMBS tranches that S&P knew did not accurately reflect the true credit risks of those CDOs, because they failed to account for the substantially increased credit risks of underlying non-prime RMBS tranches. For example:

        a.     On June 28, 2007, S&P issued an Effective Date RAC for Laguna Seca Funding I, Ltd., a $500 million CDO, of which approximately $379 million was rated AAA by S&P. Laguna Seca Funding I was comprised of approximately 31% 2006 subprime RMBS, 39% 2005 subprime RMBS, and 7% 2007 subprime RMBS. To issue the Effective Date RAC, S&P analysts took at face value existing S&P ratings on the non-prime RMBS collateral. Two weeks later, S&P downgraded 2% of the subprime RMBS collateral, and identified Laguna Seca Funding I as a CDO impacted by the downgrades. Laguna Seca Funding I defaulted on April 8, 2008, resulting in near total losses to investors.

        b.     On June 28, 2007, S&P rated Ridgeway Court Funding II Ltd., a $3 billion CDO, of which over $2.8 billion was rated AAA by S&P. Ridgeway Court Funding II was comprised of approximately 33% 2006 subprime RMBS, 10% 2005

subprime RMBS, and 7% 2007 subprime RMBS collateral. To issue its ratings for Ridgeway Court Funding II, S&P analysts took at face value the existing S&P ratings on the underlying non-prime RMBS collateral. Ridgeway Court Funding II defaulted on January 15, 2008, resulting in near total losses to investors, including Eastern Financial Florida Credit Union.

e. From June 29, 2007 through July 17, 2007, S&P Issued CDO Ratings that Failed to Account for Additional Negative Rating Actions S&P Was Working to Effect on Non-prime RMBS

245. Throughout the day on June 29, 2007, senior members of Structured Finance, including Rose, Gillis, Jordan, and Senior Executive B, discussed the plan to accelerate negative Rating Actions for non-prime RMBS. By the end of the day, a final decision had been made regarding the logistics for implementing the massive RMBS negative Rating Actions – a CreditWatch and criteria revision announcement, to be followed immediately by downgrades.

246. At 7:39 p.m., on June 29, 2007, Executive I sent an email regarding "the work needed to accelerate the surveillance actions" in which he stated, regarding the downgrades: "We have only a week or two for drastic action."

247. At 8:40 pm, on June 29, 2007, Senior Executive B sent an email to Executive C, stating: "We have shortened the dates to act . . . . [A]bsent any adverse event that may require us acting sooner than that, such timings tentatively include a CW [CreditWatch] press release on Monday July 9th."

248. On or about July 1, 2007, Gillis forwarded to Jordan, Senior Executives B and E, Executives C and I, and Senior Analysts A and B a spreadsheet identifying 428 subprime RMBS deals to be reviewed. Gillis's accompanying email stated, "We have estimated the potential losses we expect from the 2006 vintage as a basis for taking near term rating action that will truly reflect the appropriate rating levels." Gillis also noted that in the future the review would also need to be extended to

"closed end seconds" and "Alt-A" transactions.

249.  On July 3, 2007, a recently hired analyst in the Structured Finance group initiated an email string with an investment banker client.  On July 3, 2007, in response to an inquiry about how his new job was going, the analyst stated:

> Job's going great.  Aside from the fact that the MBS world is crashing, investors and the media hate us, and we're all running around to save face . . . . no complaints.

On July 5, as part of the same continuing email string, the analyst stated:

> The fact is, there was a lot of internal pressure in S&P to downgrade lots of deals earlier on before this thing started blowing up.  But the leadership was concerned of p*ssing off too many clients and jumping the gun ahead of Fitch and Moody's.

On July 6, as part of the same continuing email string, the investment banker responded:

> This might shake out a completely different way of doing biz in the industry.  I mean come on, we pay you to rate our deals, and the better the rating the more money we make?!?!  Whats [sic] up with that?  How are you possibly supposed to be impartial????

On July 11, as part of the same continuing email string, the analyst responded:

> Nah.  I'll admit it.  We dropped the ball on this one.  But you think it's bad now, wait 'till next week (hint, hint).

Later on July 11, as part of the same continuing email string, the analyst added:

> You should see how it is here right now.  It's like a friggin [sic] trading floor.  "Downgrade, Mortimer, downgrade!!!"

250.  On July 5, 2007, at 8:00 a.m., executives and analysts at S&P held a meeting to discuss an "acceleration" of the process to revise surveillance criteria. Among those notified of the meeting were Jordan and Gillis.  Later that day, analysts held a committee meeting to approve the specific ratings to be downgraded.

251.   On or about July 6, 2007, Jordan sent an email that was subsequently forwarded to Rose in which she stated:

I'm listening to the RMBS discussion about the dramatic changes we will very soon be making.  B/c the planned RMBS changes will result in unprecedented CDO downgrades, and currently all of this is firewalled and highly confidential, I struggle with how to answer these questions.

252.   On July 10, 2007, S&P publicly announced the placement of "credit ratings on 612 classes of [RMBS] backed by U.S. subprime collateral on CreditWatch with negative implications."  The affected RMBS classes totaled approximately $12 billion in securities.  The ratings placed on CreditWatch Negative included first-lien subprime RMBS from 2005 and 2006.  S&P indicated that large-scale downgrades to the ratings placed on CreditWatch Negative would immediately follow.  In addition, S&P announced significant changes to its new issue and surveillance criteria with respect to subprime RMBS.  In particular, S&P toughened its loss severity and loss timing assumptions for purposes of surveillance, and increased its credit enhancement requirements for new subprime transactions.   These were changes to RMBS Surveillance criteria that S&P had initiated on or about June 11, 2007.  Nevertheless, between June 11 and July 10, 2007, S&P continued to issue and/or confirm ratings for new CDOs without taking into account the expected effect of these planned changes on underlying RMBS.

253.   In the same July 10, 2007 announcement, S&P stated that it would be reviewing hundreds of CDOs backed by the identified RMBS collateral in anticipation of immediate downgrades.  S&P also announced that it would be reviewing other classes of RMBS collateral, including closed-end second-lien and Alt-A transactions.

254. On July 11, 2007, in an email titled "'PRIVILIGED [sic] & CONFIDENTIAL -- Quick Market Pulse' from CVMs", an S&P executive compiled a summary of reports from various CVMs regarding market reaction to the CreditWatch announcement from the day before.  The email was sent to Rose with

1    the opening statement, "Your eyes only for now.  Share only with GPLs [Group

2    Practice Leaders] and Tommy [Gillis]?  GPLs/Tommy [Gillis] and cc CVMs?  All

3    SFLT?"  The email included a report on the reaction in the CDO market to S&P's

4    massive CreditWatch actions from two CVMs, including Executive J, who stated that

5    CDO issuers and collateral managers were angry, because the downgrades were

6    affecting their ability to continue to issue CDOs.  The CVMs then stated:

7            [W]e have more rating action yet to come. . . .  [CDO] Deals that close

8            now will be downgraded if we don't stop them.  This is different from

9            what happened in March.  Deals could close then as people closed their

10           warehouses -- but we were not going to immediately downgrade the

11           underlying [RMBS collateral].  In contrast, we will be doing exactly this

12           on Thursday and next week.

13       255.  On July 12, 2007, S&P publicly announced a mass downgrade of 2005

14   and 2006 vintage subprime RMBS.

15       256.  At or about the time S&P announced the mass downgrades, analytical

16   managers in Cash CDO proposed that ratings of CDOs be discontinued until rating

17   actions on underlying RMBS collateral had settled down.

18       257.  Business leaders in Cash CDO, however, including Jordan and Tesher,

19   rejected this proposal, with Tesher noting, in the context of issuers still needing to

20   clear out warehouse lines, that S&P could not "close the window."

21       258.  On July 13, 2007, Jordan recognized that certain pipeline CDOs had

22   particular exposure to the credit risks of non-prime RMBS tranches.  After reviewing

23   a list of the most exposed CDO deals being proposed at that time, including Libertas

24   Preferred Funding V, Ltd., Delphinus CDO 2007 Ltd., and Biltmore CDO 2007-1,

25   Ltd., she concluded that the CDO group either needed to assume that the subprime

26   RMBS assets were rated at CCC or not rate those CDO deals at all.

27       259.  On July 13, an S&P CDO analyst emailed employees of two banks that

28   issued CDOs a cartoon that depicted asset-backed CDOs as a game of "Jenga," where

the object is to remove pieces from a structure, creating a more and more unstable structure, until the entire thing collapses.

260.   Between July 13 and July 17, 2007, as S&P continued to prepare for additional downgrades to non-prime RMBS deals, Tesher and S&P analysts prepared to announce a new policy of "notching" S&P's own RMBS ratings.   Under the planned new notching policy, ratings on certain classes of at-risk non-prime RMBS tranches would be considered to be rated lower than S&P's existing ratings for purposes of rating CDOs with exposure to them, in order to reflect the reality that entire classes of non-prime RMBS were under review and likely to be downgraded.

261.   Between June 29, 2007 and July 17, 2007, notwithstanding S&P's work to complete massive negative Rating Actions and the announcement of revised rating criteria for non-prime RMBS, notwithstanding the public announcement of downgrades of non-prime RMBS and the effects those downgrades would have on CDO ratings, and notwithstanding the preparation of a plan to notch non-prime RMBS ratings when using them in rating CDOs, Cash CDO, at Tesher's direction, continued to issue and/or confirm (through Effective Date RACs) ratings for CDOs exposed to the credit risks of non-prime RMBS tranches, taking the then-existing non-prime RMBS ratings at face value.   S&P knew that these CDO ratings did not accurately reflect the true credit risks of the rated CDOs, because the ratings continued to fail to account for the substantially increased credit risks of the underlying non-prime RMBS tranches, as reflected by the imminent impact of the planned negative Rating Actions. In particular:

a.   On July 3, 2007, S&P rated Pinnacle Peak CDO I, a $1.5 billion CDO, of which over $1.4 billion was rated AAA by S&P.   Pinnacle Peak I was comprised of approximately 28% subprime RMBS and 33% Alt-A RMBS. Citigroup was a purchaser of Pinnacle Peak I.   S&P issued an Effective Date RAC for Pinnacle Peak I on October 15, 2007, taking the ratings of underlying RMBS collateral at face value.   Within four days, S&P downgraded 5% of the RMBS collateral in the

just-RAC'd CDO.  Six months after it closed, on January 17, 2008, Pinnacle Peak I defaulted, resulting in a near total loss to investors, including Citigroup.  Citibank was affected by Citigroup's losses on Pinnacle Peak I.

        b.     On July 6, 2007, S&P issued an Effective Date RAC for Charles Fort CDO I, a $400 million CDO, of which $280 million was rated AAA by S&P.  Charles Fort I was comprised of approximately 52% subprime and 34% Alt-A RMBS.  In issuing the RAC, S&P took the ratings of underlying RMBS collateral at face value.  Charles Fort I was purchased in part by WesCorp.  Ultimately, Charles Fort I defaulted, resulting in near total losses to its investors, including WesCorp.

        c.     On July 11, 2007, S&P rated Pine Mountain CDO III, Ltd., a $500 million CDO, of which $380 million was rated AAA by S&P.  Pine Mountain III was comprised of approximately 22% 2006 subprime RMBS, 44% 2005 subprime RMBS, 16% 2007 subprime RMBS, and 11% alt-A RMBS.  Approximately 53.9% of the collateral backing Pine Mountain III was non-prime RMBS rated BBB or below.  In issuing this rating, S&P took the ratings of the underlying RMBS collateral at face value.  Ultimately, Pine Mountain III defaulted, resulting in near total losses to its investors.

        d.     On July 12, 2007, S&P rated Ballyrock CDO, a $500 million CDO of which 70% was rated AAA by S&P.  Ballyrock was comprised of approximately 46% 2006 subprime RMBS and 52% 2005 subprime RMBS.  Approximately 56% of the collateral backing Ballyrock was non-prime RMBS rated BBB or below.  In issuing its rating of Ballyrock, S&P took the ratings of the underlying RMBS collateral at face value.  Ultimately, Ballyrock defaulted, resulting in near total losses to investors.

        e.     Between July 13 and 18, 2007, S&P rated four CDOs priced at more than $1.6 billion that were backed by non-prime RMBS collateral.  Within less than 7 months, S&P had downgraded one or more tranches of all four CDOs.

f.   On and After July 18, 2007, S&P Issued CDO Ratings
that Disregarded S&P's Announced "Notching"
Policy

262.   On July 18, 2007, S&P publicly announced that it would "notch" its own ratings (that is, consider them to have lower ratings for purposes of rating CDOs with exposure to them) on certain tranches of non-prime RMBS when rating CDOs with exposure to them, due to the potential for further downgrades.  The purpose of the policy was to reassure the investing public that S&P had taken into account the possibility of downgrades in underlying RMBS when rating CDOs.  Investors could then be assured that the ratings were more accurate, because the notching policy built greater credit support into the structure of the CDOs.

263.   In reality, S&P did not apply this notching policy consistently to all deals.  Rather, it worked with issuers to use a deal-by-deal analysis that it never revealed to the public.  When this analysis showed that application of the publicly-announced notching policy would interfere with S&P's ability to rate a CDO, S&P used various methods to get around the publicly-announced policy and issue a rating for the CDO.

264.   For example, on the same day that S&P announced its new policy, it was preparing a closing date rating for Delphinus CDO, which contained a large number of subprime RMBS tranches.  When S&P analysts ran the Delphinus portfolio through CDO Evaluator with full notching at around 5:00 p.m. that night, they discovered that four CDO tranches failed the Q-Ramp test. The analysts then progressively scaled back the notching on subprime RMBS assets until, just after midnight, only one CDO tranche was failing.  S&P rated Delphinus on July 19, 2007, notwithstanding the continuing Q-Ramp failure of one CDO tranche.

265.   On or about August 2, 2007, S&P analysts were advised that they did not need to apply the publicly-announced notching criteria to CDOs that became effective after July 18, 2007, and had not yet received Effective Date RACs.  Rather, S&P

1  analysts were directed to continue to rely on the existing RMBS ratings that were
2  under review for likely downgrade when determining whether to issue an Effective
3  Date RAC.

4      266.   When use of notching resulted in a failure of S&P's critical Q-Ramp test,
5  S&P frequently ignored the results and issued an Effective Date RAC anyway,
6  without informing investors that the deal had failed a key S&P test when notching was
7  applied.

8      267.   Throughout September and the first half of October 2007, S&P analysts
9  reviewed and re-rated hundreds of non-prime RMBS tranches. Despite the inevitable
10 downgrade of hundreds more RMBS ratings, S&P continued to disregard the
11 prophylactic "notching" policy it had announced in July in issuing and/or confirming
12 (through Effective Date RACs), in September and early October 2007, at least 8
13 ratings for CDOs priced at more than $8.8 billion that were backed by non-prime
14 RMBS.

15     268.   On or about October 15, 17 and 19, 2007, S&P announced downgrades to
16 hundreds of additional non-prime RMBS ratings – including the almost complete re-
17 rating of all subprime RMBS issued in 2007. Those downgrades substantially
18 eliminated the credit support for dozens of RMBS-backed CDOs that S&P had rated –
19 including CDOs that S&P had rated just days earlier.

20     269.   Among the CDOs for which S&P issued Effective Date RACs without
21 applying its publicly-announced notching policy were:

22         a.      Corona Borealis CDO Ltd. (Effective Date RAC issued on July 30, 2007;
23         purchased by Eastern Financial Florida Credit Union);

24         b.      Pampellone CDO II (Effective Date RAC issued on July 27, 2007;
25         purchased by Eastern Financial Florida Credit Union); and

26         c.      Pinnacle Peak CDO I (Effective Date RAC issued on October 15, 2007;
27         losses affected Citibank, which had loaned funds to Pinnacle Peak I via a
28         revolving credit facility).

### C.   S&P's False Representations Were Material to Financial Institutions' Investment Decisions

270.   As set forth in detail in paragraphs 45-52 above, S&P knew that both its ratings of RMBS and CDOs and the perceived reliability of those ratings were significant factors considered by financial institutions, including federally insured financial institutions, in making their decisions to invest in RMBS and CDOs.

271.   As set forth in detail in paragraphs 123-269 above, S&P's competition for ratings business, that is, its desire to maintain and increase market share and profits, and its resulting desire to maintain its relationships with issuers who drove its ratings business, improperly influenced S&P to favor issuers in its ratings of RMBS and CDOs.  In particular, as alleged in detail in paragraphs 125-198 above, beginning at the latest in or about September 2004 and continuing through at least in or about October 2007, to maintain and increase its market share and profits, S&P limited, adjusted, and delayed updates to the ratings criteria and analytical models S&P used to assess the credit risks posed by RMBS and CDO tranches, thereby weakening those criteria and models from what S&P analysts believed was necessary to make them more accurate.

272.   Nevertheless, as set forth in detail in paragraphs 110-122 above, beginning at the latest in or about September 2004 and continuing through at least in or about October 2007, S&P falsely represented that its credit ratings of RMBS and CDO tranches were objective, independent, uninfluenced by any conflicts of interest that might compromise S&P's analytic judgment, and reflected S&P's true current opinion regarding the credit risks the rated RMBS and CDO tranches posed to investors.  These false representations were material to financial institutions' decisions to rely on S&P's ratings in making decisions to invest in RMBS and CDOs.

273.   As set forth in detail in paragraphs 91-95 above, the ratings on the assets that served as underlying collateral for a CDO were the most important factor in the CDO rating and were a primary input into CDO Evaluator.  As a result, pending

negative Rating Actions on the underlying collateral were an important source of credit risk, and to ignore this risk could lead to inflated CDO ratings that would mislead investors who purchased the CDO tranches.

274. As set forth in detail in paragraphs 200-269 above, beginning at the latest in or about March 2007 and continuing through at least in or about October 2007, S&P knew that the credit risks of certain non-prime RMBS tranches were increasing, were expected to increase, and were anticipated to result in negative Rating Actions, yet knowingly disregarded the true extent of the credit risks associated with those non-prime RMBS tranches in issuing and/or confirming for CDOs backed by those non-prime RMBS tranches ratings that S&P knew did not accurately reflect those CDOs' true current credit risks because they failed to account for the increased credit risks posed by those non-prime RMBS tranches.

275. In issuing these CDO ratings, S&P deceived financial institutions that invested in these CDOs into believing that S&P's ratings reflected its true current opinion regarding the credit risks of these CDOs, when in fact they did not. This deception was material to financial institutions' investment decisions, and the financial institutions suffered extensive losses, in excess of $5 billion, based on currently identified transactions, when the ratings ultimately were downgraded and the CDOs defaulted.

**D. Mailings and Wirings In Furtherance, and Executions, of the Scheme to Defraud**

276. Beginning at the latest in or about September 2004, and continuing at least through in or about October 2007, within the Central District of California and elsewhere, as described more fully in paragraphs 110-275 above, defendant McGraw-Hill, acting through S&P Ratings, the successor to which is defendant S&P LLC, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud investors in RMBS and CDOs, including federally insured financial institutions, as to material matters, and to obtain money from these investors by means

107

COMPLAINT

1  of material false and fraudulent pretenses, representations, and promises and the

2  concealment of material facts.

3  277.  For the purpose of executing this scheme to defraud, S&P deposited and

4  caused to be deposited correspondence for delivery by the United States Postal

5  Service or a private or commercial interstate carrier, and transmitted and caused to be

6  transmitted writings by means of wire communications in interstate and foreign

7  commerce.  In particular, as reflected in S&P's Code of Conduct, each time S&P

8  issued a rating of an RMBS or CDO, it posted the rating on S&P's public website,

9  which caused it to be transmitted by interstate wire, including in particular from

10 S&P's corporate headquarters in New York, New York, to investors and potential

11 investors located in the Central District of California and elsewhere outside of New

12 York state, and issued the rating through a wire feed to the media, which also caused it

13 to be transmitted by interstate wire, including in particular from S&P's corporate

14 headquarters in New York, New York, to media outlets located in the Central District

15 of California and elsewhere outside New York state.  In addition, when S&P issued

16 Effective Date RAC letters, it sent those letters by United States mail, private or

17 commercial interstate carrier, email, or facsimile, from S&P's corporate headquarters

18 in New York, New York, to issuers and others located elsewhere outside of New York

19 state.  In addition, S&P typically received its fees for issuing ratings by wire transfer,

20 often causing those fees to be transmitted by interstate wire, including in particular,

21 from places outside California to S&P's account at Bank of America in San Francisco,

22 California.  Each deposit of an Effective Date RAC letter for delivery by the United

23 States Postal Service and/or a private or commercial interstate carrier, and each

24 transmission by interstate wire of a rating, Effective Date RAC letter, or rating fee

25 occurring in connection with the scheme to defraud described in paragraphs 110-275,

26 and relating to an RMBS or CDO a portion of which was sold to a federally insured

27 financial institution and/or a purchaser whose losses would affect a federally insured

28 financial institution, constituted a mailing or transmission by means of wire

communication in interstate and foreign commerce for the purpose of executing the scheme to defraud that affected a federally insured financial institution.   Examples include, but are not limited to, the following:

| Date | CDO | Federally Insured Financial Institution(s) Affected | Mailing or Use of Interstate Wires |
|---|---|---|---|
| 3/6/2007 | Octonion I CDO Ltd. | Citibank | Internet posting of rating |
| 3/6/2007 | Pampelonne CDO II, Ltd. | Eastern Financial Florida Credit Union | Internet posting of rating |
| 3/8/2007 | Plettenberg Bay CDO | Citibank | Internet posting of rating |
| 3/8/2007 | Plettenberg Bay CDO | Citibank | Rating fee wire of $338,275 from La Salle National Bank, Chicago, IL |
| 3/8/2007 | Adams Square Funding II, Ltd. | Citibank | Internet posting of rating |
| 3/15/2007 | Gemstone CDO VII | M&T Bank | Internet posting of rating |
| 3/15/2007 | 888 Tactical Fund, Ltd. | Citibank | Internet posting of rating |
| 3/26/2007 | Novastar ABS CDO I Ltd. | Western Federal Corporate Credit Union | Rating fee wire of $243,040 from Deutsche Bank Trust, New York, NY |
| 3/27/2007 | Sorin CDO VI Ltd. | Western Federal Corporate Credit Union | Internet posting of rating |
| 3/29/2007 | Charles Fort CDO I Ltd. | Western Federal Corporate Credit Union | Internet posting of rating |
| 3/29/2007 | Armitage ABS CDO Ltd. | Citibank; Eastern Financial Florida Credit Union | Internet posting of rating |

COMPLAINT

| Date | CDO | Federally Insured Financial Institution(s) Affected | Mailing or Use of Interstate Wires |
|------|-----|-----|-----|
| 3/29/2007 | Armitage ABS CDO Ltd. | Citibank; Eastern Financial Florida Credit Union | Rating fee wire of $502,500 from La Salle National Bank, Chicago, IL |
| 3/29/2007 | Cairn Mezz ABS CDO III Ltd. | Citibank; M&T Bank | Internet posting of rating |
| 3/29/2007 | Cairn Mezz ABS CDO III Ltd. | Citibank; M&T Bank | Rating fee wire of $500,000 from La Salle National Bank, Chicago, IL |
| 4/5/2007 | Tourmaline CDO III Ltd. | Citibank | Internet posting of rating |
| 4/10/2007 | Vertical ABS CDO 2007-1 Ltd. | Citibank | Internet posting of rating |
| 4/24/2007 | Corona Borealis CDO Ltd. | Eastern Financial Florida Credit Union | Internet posting of rating |
| 5/1/2007 | Markov CDO I Ltd. | Eastern Financial Florida Credit Union | Internet posting of rating |
| 5/3/2007 | Stack 2007-1, Ltd. | Citibank; Eastern Financial Florida Credit Union | Internet posting of rating |
| 5/3/2007 | Stack 2007-1, Ltd. | Citibank; Eastern Financial Florida Credit Union | Rating fee wire of $500,000 from Investors Bank and Trust Co., Boston, MA |
| 5/9/2007 | Octonion I CDO Ltd. | Citibank | Effective Date RAC letter sent by mail, email and/or facsimile to Delaware, Texas, and Cayman Islands |

| Date | CDO | Federally Insured Financial Institution(s) Affected | Mailing or Use of Interstate Wires |
|------|-----|------|------|
| 5/9/2007 | Plettenberg Bay CDO Ltd. | Citibank | Effective Date RAC letter sent by mail, email and/or facsimile to Delaware and Ireland |
| 5/17/2007 | Acacia Option ARM 1 CDO Ltd. | First Midwest | Internet posting of rating |
| 5/24/2007 | High Grade Structured Credit CDO 2007-1 | Bank of America | Internet posting of rating |
| 5/24/2007 | High Grade Structured Credit CDO 2007-1 | Bank of America | Rating fee wire of $600,000 from La Salle National Bank, Chicago, IL |
| 6/7/2007 | Pinnacle Point Funding II Ltd. | Bank of America | Internet posting of rating |
| 6/7/2007 | Pinnacle Point Funding II Ltd. | Bank of America | Rating fee wire of $500,000 from La Salle National Bank, Chicago, IL |
| 6/8/2007 | Gemstone CDO VII Ltd. | M&T Bank | Rating fee wire of $500,000 from Deutsche Bank Trust, New York, NY |
| 6/8/2007 | Corona Borealis CDO Ltd. | Eastern Financial Florida Credit Union | Rating fee wire of $500,000 from JP Morgan Chase Bank, New York, NY |

COMPLAINT

| Date | CDO | Federally Insured Financial Institution(s) Affected | Mailing or Use of Interstate Wires |
|------|-----|-----------------------------------------------------|-------------------------------------|
| 6/13/2007 | Novastar ABS CDO I, Ltd. | Western Federal Corporate Credit Union | Effective Date RAC letter sent by mail, email and/or facsimile to California, Delaware, and Cayman Islands |
| 6/14/2007 | Acacia CDO 12 Ltd. | Western Federal Corporate Credit Union | Internet posting of rating |
| 6/14/2007 | HSPI Diversified CDO Fund II, Ltd. | Citibank | Internet posting of rating |
| 6/20/2007 | Ixis ABS CDO 3 Ltd. | Eastern Financial Florida Credit Union | Effective Date RAC letter sent by mail, email and/or facsimile to Delaware, Illinois, and Cayman Islands |
| 6/21/2007 | 888 Tactical Fund, Ltd. | Citibank | Effective Date RAC letter sent by mail, email and/or facsimile to Delaware, Texas, and Cayman Islands |
| 6/27/2007 | Markov CDO I Ltd. | Eastern Financial Florida Credit Union | Rating fee wire of $500,000 from Bank of New York, New York, NY |
| 6/27/2007 | Stack 2007-1, Ltd. | Citibank; Eastern Financial Florida Credit Union | Effective Date RAC letter sent by mail, email and/or facsimile to Delaware and Cayman Islands |
| 6/28/2007 | Ridgeway Court Funding II Ltd. | Eastern Financial Florida Credit Union | Internet posting of rating |

| Date | CDO | Federally Insured Financial Institution(s) Affected | Mailing or Use of Interstate Wires |
|------|-----|-----------------------------------------------------|------------------------------------|
| 6/28/2007 | ACA ABS 2007-2 Ltd. | Bank of America | Internet posting of rating |
| 7/3/2007 | Pinnacle Peak CDO I Ltd. | Citibank | Internet posting of rating |
| 7/6/2007 | Charles Fort CDO I Ltd. | Western Federal Corporate Credit Union | Effective Date RAC letter sent by mail, email and/or facsimile to Delaware, Pennsylvania, and Cayman Islands |
| 7/25/2007 | Armitage ABS CDO Ltd. | Citibank; Eastern Financial Florida Credit Union | Effective Date RAC letter sent by mail, email and/or facsimile to Delaware and Cayman Islands |
| 7/27/2007 | Pampelonne CDO II, Ltd. | Eastern Financial Florida Credit Union | Effective Date RAC letter sent by mail, email and/or facsimile to Cayman Islands |
| 7/27/2007 | Bonifacius | Citibank | Internet posting of rating |
| 7/27/2007 | Tourmaline CDO III Ltd. | Citibank | Effective Date RAC letter sent by mail, email and/or facsimile to Delaware and Cayman Islands |
| 7/30/2007 | Corona Borealis CDO Ltd. | Eastern Financial Florida Credit Union | Effective Date RAC letter sent by mail, email and/or facsimile to Delaware, Illinois, and Cayman Islands |

COMPLAINT

278. Each time S&P issued a rating or Effective Date RAC letter for an RMBS or CDO, a portion of which was purchased by a financial institution, it constituted a separate and distinct execution and/or attempted execution of the scheme to defraud, and to obtain money by means of false and fraudulent representations from, financial institutions.  Examples of such executions and/or attempted executions of the scheme include, but are not limited to, the following executions and/or attempted executions of the scheme to defraud, and to obtain money by means of false and fraudulent representations from, the following federally insured financial institutions on or about the following dates:

| Date | CDO | Federally Insured Financial Institution(s) | Execution |
|------|-----|---------------------------------------------|-----------|
| 3/6/2007 | Pampelonne CDO II, Ltd. | Eastern Financial Florida Credit Union | Issuance of rating |
| 3/8/2007 | Adams Square Funding II, Ltd. | Citibank | Issuance of rating |
| 3/15/2007 | Gemstone CDO VII | M&T Bank | Issuance of rating |
| 3/27/2007 | Sorin CDO VI Ltd. | Western Federal Corporate Credit Union | Issuance of rating |
| 3/29/2007 | Charles Fort CDO I Ltd. | Western Federal Corporate Credit Union | Issuance of rating |
| 3/29/2007 | Armitage ABS CDO Ltd. | Eastern Financial Florida Credit Union | Issuance of rating |
| 3/29/2007 | Cairn Mezz ABS CDO III Ltd. | M&T Bank | Issuance of rating |
| 4/24/2007 | Corona Borealis CDO Ltd. | Eastern Financial Florida Credit Union | Issuance of rating |
| 5/1/2007 | Markov CDO I Ltd. | Eastern Financial Florida Credit Union | Issuance of rating |
| 5/3/2007 | Stack 2007-1, Ltd. | Eastern Financial Florida Credit Union | Issuance of rating |
| 5/17/2007 | Acacia Option ARM 1 CDO Ltd. | First Midwest | Issuance of rating |
| 5/24/2007 | High Grade Structured Credit CDO 2007-1 | Bank of America | Issuance of rating |

114
COMPLAINT

| Date | CDO | Federally Insured Financial Institution(s) | Execution |
|------|-----|---------------------------------------------|-----------|
| 6/4/2007 | Cairn Mezz ABS CDO III Ltd. | M&T Bank | Issuance of Effective Date RAC letter |
| 6/7/2007 | Pinnacle Point Funding II Ltd. | Bank of America | Issuance of rating |
| 6/13/2007 | Novastar ABS CDO I, Ltd. | Western Federal Corporate Credit Union | Issuance of Effective Date RAC letter |
| 6/14/2007 | Acacia CDO 12 Ltd. | Western Federal Corporate Credit Union | Issuance of rating |
| 6/20/2007 | Ixis ABS CDO 3 Ltd. | Eastern Financial Florida Credit Union | Issuance of Effective Date RAC letter |
| 6/27/2007 | Stack 2007-1, Ltd. | Eastern Financial Florida Credit Union | Issuance of Effective Date RAC letter |
| 6/28/2007 | Ridgeway Court Funding II Ltd. | Eastern Financial Florida Credit Union | Issuance of rating |
| 6/28/2007 | ACA ABS 2007-2 Ltd. | Bank of America | Issuance of rating |
| 7/6/2007 | Charles Fort CDO I Ltd. | Western Federal Corporate Credit Union | Issuance of Effective Date RAC letter |
| 7/25/2007 | Armitage ABS CDO Ltd. | Eastern Financial Florida Credit Union | Issuance of Effective Date RAC letter |
| 7/27/2007 | Pampelonne CDO II, Ltd. | Eastern Financial Florida Credit Union | Issuance of Effective Date RAC letter |
| 7/30/2007 | Corona Borealis CDO Ltd. | Eastern Financial Florida Credit Union | Issuance of Effective Date RAC letter |

COMPLAINT

## VII.   CLAIMS FOR RELIEF

### A.   FIRREA: Mail Fraud; 12 U.S.C. § 1833a, 18 U.S.C. § 1341

279.   Plaintiff incorporates the allegations contained in paragraphs 1-278 above.

280.   Each deposit of an item for delivery by the United States Postal Service or a private or commercial interstate carrier by or caused by S&P for the purpose of executing the scheme to defraud and to obtain money by means of false and fraudulent representations described in paragraphs 110-275 above constitutes a separate violation of 18 U.S.C. § 1341.  Each such violation that affected a federally insured financial institution constitutes a separate violation of 12 U.S.C. § 1833a(c)(2).  For each such violation, pursuant to 12 U.S.C. § 1833a(b), the United States is entitled, and seeks, to recover a civil money penalty against defendants in an amount to be assessed by the Court.

### B.   FIRREA: Wire Fraud; 12 U.S.C. § 1833a, 18 U.S.C. § 1343

281.   Plaintiff incorporates the allegations contained in paragraphs 1-278 above.

282.   Each transmission by or caused by S&P by means of wire communication in interstate and foreign commerce for the purpose of executing the scheme to defraud and to obtain money by means of false and fraudulent representations described in paragraphs 110-275 above constitutes a separate violation of 18 U.S.C. § 1343.  Each such violation that affected a federally insured financial institution constitutes a separate violation of 12 U.S.C. § 1833a(c)(2).  For each such violation, pursuant to 12 U.S.C. § 1833a(b), the United States is entitled, and seeks, to recover a civil money penalty against defendants in an amount to be assessed by the Court.

C.   **FIRREA: Financial Institution Fraud; 12 U.S.C. § 1833a, 18 U.S.C. § 1344(1)**

283.   Plaintiff incorporates the allegations contained in paragraphs 1-278 above.

284.   Each execution and/or attempted execution by or caused by S&P of the scheme to defraud financial institutions set forth in paragraphs 110-275 above constitutes a separate violation of 18 U.S.C. § 1344(1), and, therefore, of 12 U.S.C. § 1833a(c)(1).  For each such violation, pursuant to 12 U.S.C. § 1833a(b), the United States is entitled, and seeks, to recover a civil money penalty against defendants in an amount to be assessed by the Court.

D.   **FIRREA: Financial Institution Fraud; 12 U.S.C. § 1833a, 18 U.S.C. § 1344(2)**

285.   Plaintiff incorporates the allegations contained in paragraphs 1-278 above.

286.   Each execution and/or attempted execution by or caused by S&P of the scheme to obtain money owned by and under the custody and control of financial institutions by means of false and fraudulent representations set forth in paragraphs 110-275 above constitutes a separate violation of 18 U.S.C. § 1344(2) and, therefore, of 12 U.S.C. § 1833(c)(1).  For each such violation, pursuant to 12 U.S.C. § 1833a(b), the United States is entitled, and seeks, to recover a civil money penalty against defendants in an amount to be assessed by the Court.

## VIII. PRAYER FOR JUDGMENT

WHEREFORE, the United States of America prays for judgment against defendants as follows:

A.    Civil money penalties under FIRREA up to the maximum amount allowed by law.

B.    All other relief this Court deems just and proper, including post-judgment interest, attorneys' fees and litigation fees as appropriate, and costs of this action.


DATED: February 4, 2013              Respectfully submitted,

STUART F. DELERY
Principal Deputy Assistant Attorney General
United States Department of Justice,
Civil Division

MAAME EWUSI-MENSAH FRIMPONG
Deputy Assistant Attorney General

MICHAEL S. BLUME
Director, Consumer Protection Branch
ARTHUR R. GOLDBERG
Assistant Director, Federal Programs Branch


JAMES T. NELSON
BRADLEY COHEN
JENNIE KNEEDLER
SONDRA L. MILLS
THOMAS D. ZIMPLEMAN
Trial Attorneys, Civil Division

ANDRÉ BIROTTE JR.
United States Attorney
Central District of California


GEORGE S. CARDONA
Chief Assistant United States Attorney
LEON W. WEIDMAN
ANOIEL KHORSHID
RICHARD E. ROBINSON
Assistant United States Attorneys


Attorneys for Plaintiff United States of America

118
COMPLAINT

1

# DEMAND FOR JURY TRIAL

2

3      Plaintiff United States of America hereby demands a trial by jury.

4

5   DATED:  February 4, 2013                    Respectfully submitted,

6                                               STUART F. DELERY
                                                Principal Deputy Assistant Attorney General
7                                               United States Department of Justice
                                                Civil Division
8
                                                MAAME EWUSI-MENSAH FRIMPONG
9                                               Deputy Assistant Attorney General

10                                              MICHAEL S. BLUME
                                                Director, Consumer Protection Branch
11                                              ARTHUR R. GOLDBERG
                                                Assistant Director, Federal Programs Branch
12

13

14                                              JAMES T. NELSON
                                                BRADLEY COHEN
15                                              JENNIE KNEEDLER
                                                SONDRA L. MILLS
16                                              THOMAS D. ZIMPLEMAN
                                                Trial Attorneys, Civil Division
17

18                                              ANDRÉ BIROTTE JR.
                                                United States Attorney
19                                              Central District of California

20

21                                              GEORGE S. CARDONA
                                                Chief Assistant United States Attorney
22                                              LEON W. WEIDMAN
                                                ANOIEL KHORSHID
23                                              RICHARD E. ROBINSON
                                                Assistant United States Attorneys
24

25                                              Attorneys for Plaintiff United States of America

26

27

28

119
COMPLAINT

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

| | |
|---|---|
| **I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)<br><br>UNITED STATES OF AMERICA | **DEFENDANTS**<br>MCGRAW-HILL COMPANIES, INC., and STANDARD & POOR'S FINANCIAL SERVICES LLC |
| **(b)** County of Residence of First Listed Plaintiff (Except in U.S. Plaintiff Cases): | County of Residence of First Listed Defendant (In U.S. Plaintiff Cases Only):<br>Los Angeles |
| **(c)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br><br>See Attachment 1 | Attorneys (If Known)<br><br>See Attachment 2 |

| **II. BASIS OF JURISDICTION** (Place an X in one box only.) | **III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only<br>(Place an X in one box for plaintiff and one for defendant.) | | | | |
|---|---|---|---|---|---|
| | | **PTF** | **DEF** | | **PTF** **DEF** |
| ☒ 1 U.S. Government Plaintiff ☐ 3 Federal Question (U.S. Government Not a Party) | Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 ☐ 4 |
| ☐ 2 U.S. Government Defendant ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) | Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 ☐ 5 |
| | Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☒ No  ☒ **MONEY DEMANDED IN COMPLAINT:** $ In excess of $5 billion.

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
The United States brings this action pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, 12 U.S.C. § 1833a, to recover civil money penalties from defendants for: mail and wire fraud affecting federally insured financial institutions; and financial institution fraud.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS<br>PERSONAL INJURY | TORTS<br>PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty<br>☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities /Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | SOCIAL SECURITY |
| ☒ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land<br>☐ 245 Tort Product Liability | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 290 All Other Real Property | | | | ☐ 871 IRS-Third Party 26 USC 7609 |

**VIII(a). IDENTICAL CASES:** Has this action been previously filed and dismissed, remanded or closed? ☒ No ☐ Yes
If yes, list case number(s):

**CV13-00779**

**FOR OFFICE USE ONLY:** Case Number:

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

VIII(b).  RELATED CASES: Have any cases been previously filed that are related to the present case? ☑ No   ☐ Yes

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

IX.  VENUE: List the California County, or State if other than California, in which EACH named plaintiff resides (Use an additional sheet if necessary)
☑ Check here if the U.S. government, its agencies or employees is a named plaintiff.

List the California County, or State if other than California, in which EACH named defendant resides. (Use an additional sheet if necessary).
☐  Check here if the U.S. government, its agencies or employees is a named defendant.
     Los Angeles County and New York State

List the California County, or  State if other than California, in which EACH claim arose.  (Use an additional sheet if necessary)
Note: In land condemnation cases, use the location of the tract of land involved.
     Los Angeles County and New York State

X.  SIGNATURE OF ATTORNEY (OR PRO PER): _____   AUSA Anoiel Khorshid   Date   February 4, 2013

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings
or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not
filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions
sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

# ATTACHMENT 1

Attorneys for Plaintiff UNITED STATES OF AMERICA

| | |
|---|---|
| ANDRÉ BIROTTE JR.<br>United States Attorney<br>GEORGE S. CARDONA<br>    California Bar No.:   135439<br>LEON W. WEIDMAN<br>    California Bar No.:   104078<br>ANOIEL KHORSHID<br>    California Bar No.:   223912<br>RICHARD E. ROBINSON<br>    California Bar No.:   090840<br>Assistant United States Attorneys<br><br>United States Attorney's Office, Central<br>District of California<br>    Room 7516 Federal Building<br>    300 North Los Angeles Street<br>    Los Angeles, California 90012<br>    Telephone:<br>        (213) 894-8323/2404/6086/0713<br>    Facsimile:<br>        (213) 894-7819 [Main]<br>    Emails:<br>        George.S.Cardona@usdoj.gov<br>        Lee.Weidman@usdoj.gov<br>        Anoiel.Khorshid@usdoj.gov<br>        Richard.Robinson@usdoj.gov | STUART DELERY<br>Principal Deputy Assistant Attorney General<br>MAAME EWUSI-MENSAH FRIMPONG<br>    California Bar No.:   222986<br>MICHAEL S. BLUME<br>ARTHUR R. GOLDBERG<br>JAMES T. NELSON<br>SONDRA L. MILLS<br>    California Bar No.:   090723<br>BRADLEY COHEN<br>JENNIE KNEEDLER<br>THOMAS D. ZIMPLEMAN<br>Trial Attorneys, Civil Division<br><br>United States Department of Justice, Civil<br>Division<br>    P.O. Box 261, Ben Franklin Station<br>    Washington, D.C. 20044<br>    Telephone:<br>        (202) 616-0219/8474 [Main]<br>    Facsimile:<br>        (202) 514-8742 & (202) 616-8470<br>    Emails:<br>        James.Nelson2@usdoj.gov<br>        Bradley.Cohen@usdoj.gov<br>        Jennie.L.Kneedler@usdoj.gov<br>        Sondra.Mills@usdoj.gov<br>        Thomas.D.Zimpleman@usdoj.gov |

# ATTACHMENT 2

Attorneys for Defendants MCGRAW-HILL COMPANIES, INC., and
STANDARD & POOR'S FINANCIAL SERVICES LLC

| | |
|---|---|
| Floyd Abrams<br>S. Penny Windle<br>Adam Zurofsky<br>CAHILL GORDON & REINDEL LLP<br>   80 Pine Street<br>   New York, NY 10005<br>   Emails:<br>      fabrams@cahill.com<br>      pwindle@cahill.com<br>      azurofsky@cahill.com | Carl H. Loewenson<br>Ronald G. White<br>MORRISON & FOERSTER LLP<br>   1290 Avenue of the Americas<br>   New York, NY 10104-0050<br>   Emails:<br>      cloewenson@mofo.com<br>      rwhite@mofo.com |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA



**NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY**

This case has been assigned to District Judge David O. Carter and the assigned discovery Magistrate Judge is Jay C. Gandhi.

The case number on all documents filed with the Court should read as follows:

## CV13- 779 DOC  (JCGx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

==========================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:



[ ] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| *Plaintiff(s)* | ) | Civil Action No. CV13-00779-DOC (JCGA) |
| v. | ) | |
| MCGRAW-HILL COMPANIES, INC., and  STANDARD & POOR'S FINANCIAL SERVICES LLC | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

FOR OFFICE USE ONLY

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  MCGRAW-HILL COMPANIES, INC.
1221 Avenue of the Americas, New York, NY 10020.

STANDARD & POOR'S FINANCIAL SERVICES LLC
1100 Glendon Avenue, Los Angeles, CA 90024

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:    [Listed in "ATTACHMENT 1", which is attached hereto]

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

FOR OFFICE USE ONLY

CLERK OF COURT

Date:  FEB - 4 2013

MARILYN DAVIS

*Signature of Clerk or Deputy Clerk*

# ATTACHMENT 1

Attorneys for Plaintiff UNITED STATES OF AMERICA

| | |
|---|---|
| ANDRÉ BIROTTE JR.<br>United States Attorney<br>GEORGE S. CARDONA<br>    California Bar No.:   135439<br>LEON W. WEIDMAN<br>    California Bar No.:   104078<br>ANOIEL KHORSHID<br>    California Bar No.:   223912<br>RICHARD E. ROBINSON<br>    California Bar No.:   090840<br>Assistant United States Attorneys<br><br>United States Attorney's Office, Central District of California<br>    Room 7516 Federal Building<br>    300 North Los Angeles Street<br>    Los Angeles, California 90012<br>    Telephone:<br>        (213) 894-8323/2404/6086/0713<br>    Facsimile:<br>        (213) 894-7819 [Main]<br>    Emails:<br>        George.S.Cardona@usdoj.gov<br>        Lee.Weidman@usdoj.gov<br>        Anoiel.Khorshid@usdoj.gov<br>        Richard.Robinson@usdoj.gov | STUART DELERY<br>Principal Deputy Assistant Attorney General<br>MAAME EWUSI-MENSAH FRIMPONG<br>    California Bar No.:   222986<br>MICHAEL S. BLUME<br>ARTHUR R. GOLDBERG<br>JAMES T. NELSON<br>SONDRA L. MILLS<br>    California Bar No.:   090723<br>BRADLEY COHEN<br>JENNIE KNEEDLER<br>THOMAS D. ZIMPLEMAN<br>Trial Attorneys, Civil Division<br><br>United States Department of Justice, Civil Division<br>    P.O. Box 261, Ben Franklin Station<br>    Washington, D.C. 20044<br>    Telephone:<br>        (202) 616-0219/8474 [Main]<br>    Facsimile:<br>        (202) 514-8742 & (202) 616-8470<br>    Emails:<br>        James.Nelson2@usdoj.gov<br>        Bradley.Cohen@usdoj.gov<br>        Jennie.L.Kneedler@usdoj.gov<br>        Sondra.Mills@usdoj.gov<br>        Thomas.D.Zimpleman@usdoj.gov |