KEKER & VAN NEST LLP
JOHN KEKER (SBN 49092)
jkeker@kvn.com
ELLIOT R. PETERS (SBN 158708)
epeters@kvn.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:   415 397 7188

CAHILL GORDON & REINDEL LLP
FLOYD ABRAMS (*pro hac vice*)
fabrams@cahill.com
S. PENNY WINDLE (*pro hac vice*)
pwindle@cahill.com
80 Pine Street
New York, New York 10005-1702
Telephone: 212 701 3000
Facsimile: 212 269 5420

KELLER RACKAUCKAS LLP
JENNIFER L. KELLER (SBN 84412)
keller@krlawllp.com
18500 Von Karman Avenue, Suite 560
Irvine, CA 92612
Telephone: 949 476 8700
Facsimile: 949 476 0900

Attorneys for Defendants THE MCGRAW-HILL
COMPANIES, INC., and STANDARD & POOR'S
FINANCIAL SERVICES LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                          Plaintiff,<br><br>      v.<br><br>MCGRAW-HILL COMPANIES, INC. and STANDARD & POOR'S FINANCIAL SERVICES LLC,<br><br>                          Defendants. | Case No. CV13-779 DOC (JCGx)<br><br>**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT PURSUANT TO FED. R. CIV. P. 9(b) AND 12(b)(6)**<br><br>Date:      May 20, 2013, 8:30 a.m.<br>Dept.:     Courtroom 9D<br>Judge:     Honorable David O. Carter<br><br>Complaint filed February 4, 2013 |

MEMORANDUM IN SUPPORT OF MCGRAW-HILL'S MOTION TO DISMISS THE COMPLAINT
PURSUANT TO FED. R. CIV. P. RULE 9(b) AND 12(b)(6)
CASE NO.  CV13-779 DOC (JCGX)

747795.01

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ......................................................................................ii

I.      INTRODUCTION.................................................................................. 1

II.     FACTUAL BACKGROUND ................................................................ 3

III.    THE COMPLAINT SHOULD BE DISMISSED BECAUSE IT
        FAILS TO PROPERLY ALLEGE EITHER A "SCHEME TO
        DEFRAUD" OR SPECIFIC INTENT REQUIRED FOR A
        VIOLATION OF THE FRAUD STATUTES. ........................................ 6

        A.      S&P's Statements Regarding Its Corporate Goals, Integrity
                and Objectivity are not Actionable under the Mail, Wire and
                Bank Fraud Statutes. ................................................................. 6

        B.      S&P's Credit Rating Opinions on CDOs are Not Actionable
                under the Mail, Wire and Bank Fraud Statutes.................... 11

        C.      The Complaint Fails To Allege That S&P Acted with
                Specific Intent To Defraud.................................................... 18

IV.     CONCLUSION ................................................................................... 21

i

MEMORANDUM IN SUPPORT OF MCGRAW-HILL'S MOTION TO DISMISS THE COMPLAINT
PURSUANT TO FED. R. CIV. P. RULE 9(b) AND 12(b)(6)
CASE NO.  CV13-779 DOC (JCGX)

747795.01

# TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*In re American Apparel, Inc. S'holder Litig.*,
   855 F. Supp. 2d 1043 (C.D. Cal. 2012) ........................................................7–8

*Boca Raton Firefighters and Police Fund* v. *Bahash*,
   2012 WL 6621391 (2d Cir. Dec. 20, 2012) ................................10-11, 10n –11n

*Buttonwood Tree Value Partners, LP* v. *Sweeney*,
   2012 WL 6644397 (C.D. Cal. Dec. 10, 2012) ............................................ 17–18

*Carpenter* v. *United States*,
   484 U.S. 19, 98 L. Ed. 2d 275, 108 S. Ct. 316 (1987) ..................................... 19

*County of Marin* v. *Deloitte Consulting LLP*,
   836 F. Supp. 2d 1030 (N.D. Cal. 2011) .............................................................7

*ECA and Local 134 IBEW Joint Pension Trust* v. *JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009) ........................................................................... 11n

*Forsyth* v. *Humana, Inc.*,
   114 F.3d 1467 (9th Cir.1997), *overruled in part on other grounds by Lacey* v.
   *Maricopa County*, 693 F.3d 896 (9th Cir. 2012) (en banc) .................................9

*Lazy Y Ranch Ltd.* v. *Behrens*,
   546 F.3d 580 (9th Cir. 2008) ............................................................................ 20

*In re Lehman Bros. Sec. and ERISA Litig.*,
   684 F. Supp. 2d 485 (S.D.N.Y. 2010) .............................................................. 14

*In re Livent, Inc. Noteholders Sec. Litig.*,
   151 F. Supp. 2d 371 (S.D.N.Y. 2001) .............................................................. 20

*Newcal Indus., Inc.* v. *Ikon Office Solution*,
   513 F.3d 1038 (9th Cir. 2008)........................................................................7, 9

*Ohio Police & Fire Pension Fund* v. *Standard & Poor's Fin. Servs., LLC*,
   813 F. Supp. 2d 871 (S.D. Ohio 2011),
   *aff'd*, 700 F.3d 829 (6th Cir. 2012) .............................................................14-15

MEMORANDUM IN SUPPORT OF MCGRAW-HILL'S MOTION TO DISMISS THE COMPLAINT
PURSUANT TO FED. R. CIV. P. RULE 9(b) AND 12(b)(6)
CASE NO. CV13-779 DOC (JCGX)

747795.01

*Ohio Police & Fire Pension Fund* v. *Standard & Poor's Fin. Servs. LLC*,
  700 F.3d 829 (6th Cir. 2012) ................................................................. 12

*Plumbers' Union Local No. 12 Pension Fund* v. *Nomura Asset Acceptance Corp.*,
  632 F.3d 762 (1st Cir. 2011) ................................................................. 12

*Rice* v. *Charles Schwab*,
  2010 WL 5156654 (C.D. Cal. Oct. 22, 2010) ....................................... 12

*Rubke* v. *Capitol Bancorp Ltd.*,
  551 F.3d 1156 (9th Cir. 2009) .............................................................. 12

*Space Coast Credit Union* v. *Merrill Lynch, Pierce, Fenner & Smith*,
  2013 WL 1131628 (S.D. Fla. Mar. 18, 2013) ..................................... 13–14, 13n

*United States* v. *Bennett*,
  621 F.3d 1131 (9th Cir. 2010) .............................................................. 19

*United States* v. *Ciccone*,
  219 F.3d 1078 (9th Cir. 2000) .............................................................. 19

*United States* v. *Cloud*,
  872 F.2d 846 (9th Cir. 1989) ................................................................ 19

*United States* v. *Lew*,
  875 F.2d 219 (9th Cir. 1989) ................................................................ 19

**Regulations**

Rule 10b-5, 17 C.F.R. § 204.106-5 (2013) ................................................ 10

**Rules**

Fed. R. Civ. P. 9(b) ............................................................................... 12, 14

**Statutes**

Financial Institutions Reform, Recovery, and Enforcement Act of 1989
  12 U.S.C. § 1833a (2006) ..................................................................... 1, 6, 6n

18 U.S.C. § 1341 (2006) ......................................................................... 2, 19

18 U.S.C. § 1343 (2006) ......................................................................... 2, 19

18 U.S.C. § 1344 (2006) ......................................................................... 2, 6n, 19

iii

747795.01

**Other Authorities**

H.R. Rep. No. 101-54(I) (1989) ................................................................. 6

MEMORANDUM IN SUPPORT OF MCGRAW-HILL'S MOTION TO DISMISS THE COMPLAINT
PURSUANT TO FED. R. CIV. P. RULE 9(b) AND 12(b)(6)
CASE NO.  CV13-779 DOC (JCGX)

747795.01

## I.       INTRODUCTION

On February 5, 2013, the Attorney General of the United States, the United States Attorney for the Central District of California, and other senior Department of Justice officials convened a nationally televised press conference in Washington, D.C. to announce the filing of the instant Complaint against The McGraw-Hill Companies, Inc. and Standard & Poor's Financial Services LLC (collectively "S&P").  With much fanfare, a parade of senior officials congratulated one another for their efforts—the hundreds of subpoenas they had served, the thousands of hours their team had devoted to the case, the millions of documents they had read.  Notwithstanding all the back-slapping, the Government's Complaint fails to state a claim.

From start to finish, the Complaint overreaches in targeting S&P, a rating agency that did not create, issue, sell or receive any interest in any security at issue in the case.  It claims fraud despite the fact that S&P acted in accordance with its well-established public practice of relying upon its own ratings, in which it believed, despite the fact that other rating agencies issued ratings **identical** to those of S&P on the same securities at issue, and despite the fact that its views were consistent with those of virtually every other market participant, including the financial institutions whose losses are cited in the Complaint, as well as officials at the highest level of the United States government.  If the Government's case appears to be a stretch, that is because it is.  S&P's inability, together with the Federal Reserve, Treasury and other market participants, to predict the extent of the most catastrophic meltdown since the Great Depression reveals a lack of prescience but not fraud.

The Government proceeds under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), a statute that permits the Government to bring a civil complaint for select criminal violations that "affect"

1

747795.01

federally insured financial institutions.  The Government alleges that S&P, a rating agency, engaged in two separate "schemes to defraud" federally insured purchasers of securities instruments known as Collateralized Debt Obligations ("CDOs") and Residential Mortgage-Backed Securities ("RMBSs") in violation of 18 U.S.C. §§ 1341, 1343 and 1344.  Each claim is infirm on its face.

First, the Government claims that S&P engaged in a scheme to defraud investors by asserting that its ratings were independent, objective and uninfluenced by conflicts of interest when S&P knew or believed that in truth they were not. This claim fails because the statements at issue are not actionable.  Each of the representations identified by the Government is the type of vague, generalized statement that court after court—in this District, this Circuit and elsewhere across the country—has held to be non-actionable in a federal fraud case such as this. Most notably and revealingly, the Government has simply chosen to ignore a Second Circuit opinion, filed just six weeks before the Government filed its Complaint and of which the Government was fully aware, holding that the **very same S&P statements the Government relies upon here** cannot be the basis for a finding of fraud under federal law.

Second, the Government claims that S&P engaged in a "scheme to defraud" when it issued ratings for CDOs from March through October 2007 that supposedly did not reflect its "true credit opinions."  This set of allegations also fails to state a claim because the Complaint does not and cannot allege that S&P's rating opinions—predictions about how securities might perform in the future— were false and fraudulent in that S&P did not believe in them at the time they were rendered.  The Complaint's allegations—even taken as true for the purpose of this motion—reveal a robust internal debate among S&P employees about the likely future performance of complex financial instruments at the beginning of what turned into a global economic tsunami.  The isolated snippets that the Government

2

747795.01

has chosen to extract from that internal debate, when properly viewed under applicable law, are far from sufficient to allege fraud under the heightened pleading standard that applies to such claims.

In addition, the Complaint fails to allege that S&P possessed the requisite intent to defraud the investors in the CDOs at issue. It is more than ironic that two of the supposed "victims," Citibank and Bank of America—investors allegedly misled into buying securities by S&P's fraudulent ratings—were the same huge financial institutions that were creating and selling the very CDOs at issue. In other words, the Complaint charges S&P with intending to defraud these financial institutions about the likely performance of their *own* products. With respect to other investors—those who were not also issuers of the securities at issue—the Government relies entirely on a claim that runs contrary to the rest of its case. For this narrow purpose, the Government claims that in fact the *investors* paid S&P's fees, even though for all other purposes it claims that S&P was motivated by the fact that *issuers* pay its rating fees, not investors. Such contradictory pleadings cannot suffice as an allegation of intent to defraud.

## II.   FACTUAL BACKGROUND

S&P is one of the three major credit rating agencies in the United States. Although S&P provides ratings on a variety of matters—from the risk of default for corporate and municipal securities to the risk of default by sovereign nations—of relevance here are S&P's rating activities for certain structured finance products. In particular, the Complaint focuses on S&P's ratings on certain CDOs issued in 2007 that were backed by RMBSs.

CDOs and RMBSs are similarly structured debt securities and are collateralized by underlying portfolios made up of, in the case of RMBSs, pools of

3

MEMORANDUM IN SUPPORT OF MCGRAW-HILL'S MOTION TO DISMISS THE COMPLAINT
PURSUANT TO FED. R. CIV. P. RULE 9(b) AND 12(b)(6)
CASE NO.  CV13-779 DOC (JCGX)

747795.01

residential mortgages, or in the case of CDOs, other structured debt instruments such as RMBSs, CDOs or credit derivatives.[1]  For both, an arranging entity and/or investment bank assembles the portfolio of assets, establishes a structure with one or more classes of securities with different risk characteristics (known as "tranches") and seeks a rating with respect to some or all of the tranches.[2]  Investors typically purchase the non-equity tranches of the securities, which entitle them to receive payments derived from the cash flow generated by the underlying portfolio.  Generally, cash flow from the portfolio underlying the RMBS or CDO is first used to satisfy the interest obligations to the investors in the higher tranches, following which excess payments flow to fulfill the obligations to the next highest tranche, and so on.[3]  Thus, investors in the higher tranches have a lower risk that the portfolio assets will fail to generate sufficient income to satisfy their interest obligations.  Because they are thus less risky, higher tranches tend to pay lower interest rates than do lower tranches.[4]

S&P provides a credit-rating opinion for the various securities (tranches) offered using a scale of letter grades.[5]  S&P did not create, issue, sell or receive any interest in RMBSs or CDOs, and S&P did not select the portfolio of assets underlying the RMBSs or CDOs.[6]  S&P—like other rating agencies—contracted with the issuer on behalf of the to-be-formed special purpose vehicle or trust to provide a rating for the RMBS or CDO tranches to be issued.[7]  For this work, S&P

---

[1] *See* Compl. ¶¶ 21, 30.
[2] *See id.* ¶¶ 22, 31.
[3] *See id.* ¶¶ 23, 31.
[4] *See id.* ¶¶ 22–23, 31.
[5] *See id.* ¶¶ 40–44.
[6] *See id.* ¶¶ 22, 31.
[7] *See id.* ¶¶ 66, 67.

MEMORANDUM IN SUPPORT OF MCGRAW-HILL'S MOTION TO DISMISS THE COMPLAINT
PURSUANT TO FED. R. CIV. P. RULE 9(b) AND 12(b)(6)
CASE NO.  CV13-779 DOC (JCGX)

747795.01

received a fee.[8]

As alleged in the Complaint, the Structured Finance group at S&P, which oversaw the ratings of securities like RMBSs and CDOs, was divided into groups such as the Global ABS (Asset-Backed Securities) and Global CDO groups.[9] These groups, in turn, had subgroups that were responsible for particular types of securities (*e.g.*, US RMBS, Cash CDOs, Synthetic CDOs),[10] for surveillance (the RMBS Surveillance and CDO Surveillance Groups)[11] and for ratings criteria (the Research and Criteria group).[12]   Each group used a variety of processes, tools and models in performing its functions.   For example, S&P had an established practice in which its CDO credit opinions relied in part on the existing rating of the underlying collateral (such as RMBSs) unless the collateral was subject to a "CreditWatch," in which case the CDO analysis would require additional "cushion" to account for the possibility that the rating could be downgraded.[13]   In late 2007, a large-scale precipitous decline in the housing market led to the downgrade of many lower-rated tranches of RMBSs.   As the decline intensified and a market-wide liquidity crisis developed, higher-rated tranches of both RMBSs and CDOs were downgraded, and some CDOs began to experience events of default.

Against this background, the Complaint alleges that S&P devised and participated in two schemes to defraud.   Neither alleged scheme is legally viable.

---

[8] *See id*. ¶¶ 62, 63, 67.

[9] *See id*. ¶¶ 55, 57.

[10] *See id*. ¶¶ 56, 59.

[11] *See id*. ¶ 60.

[12] *See id*. ¶ 61.

[13] *See id*. ¶¶ 91–95, 221.

MEMORANDUM IN SUPPORT OF MCGRAW-HILL'S MOTION TO DISMISS THE COMPLAINT
PURSUANT TO FED. R. CIV. P. RULE 9(b) AND 12(b)(6)
CASE NO.  CV13-779 DOC (JCGX)

747795.01

### III. THE COMPLAINT SHOULD BE DISMISSED BECAUSE IT FAILS TO PROPERLY ALLEGE EITHER A "SCHEME TO DEFRAUD" OR SPECIFIC INTENT REQUIRED FOR A VIOLATION OF THE FRAUD STATUTES.

The Government brings this Complaint under FIRREA, which was passed in the aftermath of the savings and loan crisis to "restore public confidence in the savings and loan industry in order to ensure a safe, stable, and viable system of affordable housing finance."  *See* H.R. Rep. No. 101-54(I), at 307 (1989).  Its civil penalty provision authorizes the Attorney General to bring a civil action for violations of certain criminal offenses—including mail fraud and wire fraud—that "affect" a federally insured financial institution.[14]  The Complaint fails to allege a cognizable theory under the fraud statutes and thus fails to state a claim under FIRREA.

#### A. S&P's Statements Regarding Its Corporate Goals, Integrity and Objectivity Are Not Actionable under the Mail, Wire and Bank Fraud Statutes.

The Complaint asserts first that S&P engaged in a scheme to defraud by "repeatedly reassur[ing] investors, including financial institutions, and other participants in the financial markets" that its "ratings were objective, independent, uninfluenced by any conflicts of interest that might compromise S&P's analytic judgment."[15]  In fact, S&P's ratings *were* objective, independent and uninfluenced by conflicts of interest.  That, however, is beside the point.  The Complaint's allegations fail because not one of the four types of statements made by S&P concerning its integrity and objectivity is actionable as fraud.

First, the Complaint identifies certain S&P statements regarding the *quality*

---

[14] 12 U.S.C. § 1833a; *see also* 18 U.S.C. § 1344 (addressing frauds on a financial institution).

[15] *See* Compl. at 28:2–5, ¶ 110.

6

747795.01

of its services as supporting the purported fraud.[16]  The Complaint notes that S&P described itself as "the world's leading provider of independent opinions and analysis on the debt and equity markets"[17] as well as "the world's foremost provider of independent credit ratings, indices, risk evaluation and investment research."[18]  By their nature, these kinds of statements are not actionable.  *See Newcal Indus., Inc.* v. *Ikon Office Solution*, 513 F.3d 1038, 1053 (9th Cir. 2008) ("general, subjective claim about a product is non-actionable puffery"); *County of Marin* v. *Deloitte Consulting LLP*, 836 F. Supp. 2d 1030, 1038–39 (N.D. Cal. 2011) (statements about the "superiority of [one's] qualifications" are not actionable).  Such general subjective claims about S&P's standing as a provider of independent credit ratings cannot form the basis of a federal fraud charge.

Second, the Complaint identifies as fraudulent certain statements about S&P's goals and aspirations.[19]  The Government notes that S&P asserted that its "*mission*" is to "provide high-quality, objective, rigorous analytical information to the marketplace" and also that "S&P Ratings Services has a longstanding *commitment* to ensuring that any potential conflicts of interest do not compromise our analytical independence."[20]  Courts have held such representations fail to state a claim for fraud because they are "couched in aspirational terms," not representations regarding current activity.  *See, e.g.*, *In re American Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1072 (C.D. Cal. 2012) (Morrow, J.) ("The repeated use of words like 'pursuing,' 'looking to build,' 'going to be,' and

---

[16] *See id*. ¶ 118.

[17] *See id*. ¶ 118(a).

[18] *See id*. ¶ 118(d); *see also id*. ¶¶ 118(b), 118(c), 118(e), 118(f).

[19] *See id*. ¶¶ 111(a), 111(b), 112, 115(a), 117(a), 117(b), 119(a), 119(c).

[20] *See id*. ¶¶ 119(a), 119(c) (emphases added).

747795.01

'committed to' indicates that the company was articulating goals it was trying to meet, not making factual statements about the current status of its financial compliance and accounting records.").

Third, the Complaint alleges that S&P misled the public through pronouncements—made in a November 2005 policy statement and in codes of conduct released in September 2004, October 2005 and June 2007—concerning how it should rate securities.[21]  The Complaint recites S&P statements that "No employee of Standard & Poor's/McGraw-Hill *shall* attempt to exert improper influence on the opinions of an Equity Analyst or a Rating Analyst"[22] and "In all analytic processes, Ratings Services *must* preserve the objectivity, integrity and independence of its ratings."[23]  These statements, however, are prescriptive statements S&P made to its employees concerning how they should carry out their business activities.  As with the aspirational statements above, they are commands for how business *should be conducted.*  They are not actionable representations of objective facts.

Finally, the Complaint corrals an assortment of unconnected statements concerning the company's activities.[24]  The Government cites an August 2007 publication posted on S&P's website:

> [S&P] is paid by the issuers we rate. . . . Clearly, since there is a choice of rating agencies, the potential exists for a conflict of interest.  In theory, one way to increase revenue would be for us to weaken our criteria to ensure that we are selected as the agency to rate a transaction or to ensure that a transaction that would not have been economically viable can take place.

---

[21] *See id*. ¶¶ 111(c), 111(d), 111(e), 115(b), 115(c), 115(d), 115(e), 116.

[22] *See id*. ¶ 116 (emphasis added).

[23] *See id*. ¶ 111(c) (emphasis added).

[24] *See id*. ¶¶ 119(b), 119(d), 120(a), 120(b), 120(c), 122.

8

747795.01

1   This would, of course, violate our internal rules . . . . [W]e do not engage in
2   such behavior.[25]

3   Elsewhere, the Government cites comments S&P made about its
4   surveillance program, such as the comments during an investor conference call in
5   which it was noted that S&P "has an integrated surveillance process to ensure the
6   ratings on our rated RMBS bonds and CDO transactions reflect our most current
7   credit view."[26]   Although these statements describe how S&P conducted its
8   business activities, the statements are altogether too general and vague to constitute
9   the basis for a fraud claim.   They speak in broad terms of whether criteria are
10  "weaken[ed]" or whether surveillance is "integrated" without offering any
11  specifics about the criteria or surveillance used in the first place.   Courts have
12  found similarly vague statements to be non-actionable.   *See, e.g.*, *Newcal Indus.,*
13  *Inc.,* 513 F.3d at 1053 (claims that company would deliver "flexibility" in their
14  contracts and would lower copying costs for consumers is not a "quantifiable
15  claim" but "classic puffery"); *Forsyth* v. *Humana, Inc.,* 114 F.3d 1467, 1481 (9th
16  Cir. 1997) (defendant's statements that it could "'control costs' [so] the employers
17  and employees can save money . . . were too general to be interpreted as defining
18  any calculation of insurance premiums"), *overruled in part on other grounds by*
19  *Lacey* v. *Maricopa County*, 693 F.3d 896, 925–28 (9th Cir. 2012).   The statements
20  the Government relies upon are neither quantifiable nor substantive enough to offer
21  any specific qualitative guidance.   Such statements are too general to serve as the
22  basis for a fraud claim.

23  As noted above, a recent decision by the United States Court of Appeals for
24  the Second Circuit holds that many of these very representations by S&P cannot

---

25  [25] *See id*. ¶ 120(b).   *See also id.* ¶ 120(c).
26  [26] *See id*. ¶ 122(b).   *See also id*. ¶¶ 122(a), 122(c), 122(d), 122(f).

28

9

747795.01

support a fraud claim. In *Boca Raton Firefighters and Police Pension Fund* v. *Bahash*, the court affirmed a district court's decision to dismiss a securities fraud action against S&P brought by a Florida-based pension fund. 2012 WL 6621391 (2d Cir. Dec. 20, 2012). *Boca Raton* involved a Rule 10b-5 action brought on behalf of shareholders against S&P for statements touting the objectivity, integrity and independence of its ratings while allegedly knowing that its ratings process was a "sham." *Id.* at *1. As the Government well knows, the plaintiffs in *Boca Raton* asserted as fraudulent many of the same or highly similar statements as those the Government relies upon here.[27] For example, both cases cite statements from S&P's Codes of Conduct describing S&P's "mission" to preserve the "objectivity, integrity and independence" of its ratings, to "endeavor[] to avoid conflicts of interest," and to "strive[] for analytic excellence at all times."[28] Both also cite public statements by S&P touting its "credibility and reliability," and that "[S&P] has a longstanding commitment to ensuring that any potential conflicts of interest do not compromise [its] analytical independence."[29]

The Second Circuit affirmed the district court's dismissal of the plaintiffs' claims in their entirety, finding that the statements concerning the "integrity and credibility and the objectivity of S&P's credit ratings" were exactly "the type of mere 'puffery' that we have previously held to be not actionable." *Id.* at *3. The court found such statements to be of a "generic, indefinite nature" and further that "generalizations about [S&P's] business practices and integrity" were "so general that a reasonable investor would not depend on [those statements.]" *Id.* at *3–4

---

[27] *Compare* Compl. ¶¶ 111–22, *with* Second Amended Complaint from *Boca Raton* (hereinafter, "*Boca Raton SAC*") ¶¶ 182, 253, 265, 271, 291, 302, 325, 329, 362, 384–88. *See* Keker Decl. Ex. A.

[28] *Compare* Compl. ¶¶ 111–15, *with Boca Raton SAC* ¶¶ 384–88.

[29] *Compare* Compl. ¶¶ 118–19, *with Boca Raton SAC* ¶¶ 265, 271, 291, 302.

747795.01

(citation and internal quotation marks omitted).[30]

Because S&P's statements about its objectivity, independence and integrity are the sort of vague, general statements that courts both within and outside this Circuit have found insufficient to support a fraud action, the Government's first alleged "scheme to defraud" fails.[31]

### B.   S&P's Credit Rating Opinions on CDOs Are Not Actionable under the Mail, Wire and Bank Fraud Statutes.

In addition to claiming that S&P duped investors with statements touting its independence and objectivity, the Government asserts that S&P engaged in a separate scheme to issue inflated credit rating opinions that did not reflect its "true current opinion" regarding the credit risks for the certain CDOs at issue.[32]   More specifically, the Complaint alleges that from March through October 2007, S&P issued ratings on 33 securities[33] that allegedly did not reflect its "true current

---

[30] *Boca Raton* also upheld dismissal of claims based upon statements that S&P had an "integrated surveillance process" for RMBSs and CDOs, though the court premised its decision on plaintiffs' failure to plead the falsity of those statements with particularity.  *Boca Raton*, 2012 WL 6621391, at *4 (dismissing claims based upon statements at *Boca Raton SAC* ¶¶ 202, 325 and 329).   In any event, the same standards apply here and warrant dismissal.  *See, e.g., ECA and Local 134 IBEW Joint Pension Trust* v. *JP Morgan Chase Co.*, 553 F.3d 187, 205–06 (2d Cir. 2009) (statements about qualities of risk management process "did not, and could not, amount to a guarantee that [defendant's] choices would prevent failures in its risk management practices").   Moreover, the Complaint contains allegations showing ample "integration" between S&P's RMBS and CDO groups.  *See, e.g.*, Compl. ¶¶ 221, 235(e), 235(f), 237(b), 237(e), 237(g), 237(h), 239(b), 239(c), 239(e), 239(g).

[31] As a result, all of the Complaint's allegations regarding the development of S&P's models and assumptions from 2004 through 2006 contained in paragraphs 125 to 198 are not relevant to any actionable claim of fraud.  The Government does not allege—because it cannot—that the models and assumptions discussed during that earlier time period were applied in the CDO ratings at issue in its second alleged "scheme to defraud."  Those models and assumptions are therefore irrelevant to the Government's second alleged scheme.

[32] *See* Compl. at 28:2–5.

[33] Among its other failures, the Government fails to identify exactly which CDOs and tranches it is suing on.  There are a number of CDOs discussed in the Complaint that do not appear in the tables at paragraphs 277 and 278, for example. *See id.* ¶¶ 241(c), 244(a), 258, 261(c), 264.  After an investigation of more than

---

11

747795.01

"opinion" regarding credit risk because it "knowingly disregarded the true extent of credit risk associated" with those securities.[34]

The Complaint fails to state a claim on this basis as well. "[C]redit ratings are opinions or predictions of . . . future creditworthiness" that are non-actionable unless those "who published credit ratings actually knew the credit ratings were false or did not believe that the credit ratings were true at the time that each credit rating was issued."  *See Rice* v. *Charles Schwab*, 2010 WL 5156654, at *3 (C.D. Cal. Oct. 22, 2010) (Carney, J.); *see also Ohio Police & Fire Pension Fund* v. *Standard & Poor's Fin. Servs. LLC*, 700 F.3d 829, 842 (6th Cir. 2012); *Plumbers' Union Local No. 12 Pension Fund* v. *Nomura Asset Acceptance Corp.*, 632 F.3d 762, 775 (1st Cir. 2011).  *Cf. Rubke* v. *Capitol Bancorp Ltd.*, 551 F.3d 1156, 1162 (9th Cir. 2009) (in the securities fraud context, opinions can only give rise to liability "if the complaint alleges with particularity that the statements were both objectively and subjectively false or misleading").  The Government has not sufficiently pled—because it cannot—that S&P's credit ratings were objectively false, nor that they were subjectively disbelieved by S&P when issued.

First, the Complaint fails to plead what the "true" credit risk associated with any of the 33 securities happened to be at the time S&P issued its credit rating and thus fails to plead with particularity—as is required under Rule 9(b) for a fraud claim such as this—that the ultimate rating that S&P did assign was incorrect or misleading.  The Complaint contains no allegations regarding the performance of the specific RMBSs contained in the CDOs at issue.  Instead, it alleges only that,

---

three years, the Government should at least be able to state specifically which ratings it believes were fraudulent.  We use the number 33 here to refer to the total number of CDOs that are identified by name in the Complaint.

[34] *See id.* ¶ 124(b).

747795.01

"on average," particular vintages[35] of subprime securities were experiencing delinquencies[36] and that the CDOs at issue contained subprime RMBSs from those vintages.[37]   But as S&P explained publicly, "the [rating] outcome for any individual CDO transaction will vary depending on certain deal-specific factors," including the specific "asset selection made by the collateral manager."[38]   In other words, the Government fails to identify how, if it all, the performance of the specific RMBSS contained in any of the CDOs identified should have actually impacted the rating of the CDO tranche at issue.  This failure is fatal to the Government's fraud claims.

A decision issued last month from the Southern District of Florida is instructive.  *See Space Coast Credit Union* v. *Merrill Lynch, Pierce, Fenner & Smith*, 2013 WL 1131628 (S.D. Fla. Mar. 18, 2013).  Space Coast Credit Union, the successor to one of the federally insured financial institutions the Government identifies as a "victim" in this case, brought a state law fraud claim against S&P.[39] The lawsuit alleged many of the same theories being asserted here—namely, that S&P's ratings of CDO tranches purchased by Space Coast Credit Union's predecessor were fraudulently inflated.  *See id*. at *1–2.  The court granted S&P's motion to dismiss, noting that although the complaint alleged S&P knew that certain pools of mortgage loans had deteriorating risk profiles, the complaint "d[id]

---

[35] The term "vintage" refers to RMBSs or CDOs issued within a given calendar year (*e.g.*, "2006 vintage RMBSs").

[36] Compl. ¶ 239(c).

[37] *Cf. id.* ¶ 234(a)–(d).

[38] *See id.* ¶ 233(n).

[39] Eastern Financial Florida Credit Union ("Eastern Financial") purchased CDOs between December 2005 and July 2007.  *See Space Coast Credit Union*, 2013 WL 1131628, at *1.  When the Credit Union became insolvent in June 2009, its assets and liabilities were acquired by Space Coast Credit Union, the entity that ultimately filed the lawsuit against S&P.  *Id.* at *1–2.

MEMORANDUM IN SUPPORT OF MCGRAW-HILL'S MOTION TO DISMISS THE COMPLAINT
PURSUANT TO FED. R. CIV. P. RULE 9(b) AND 12(b)(6)
CASE NO.  CV13-779 DOC (JCGX)

747795.01

not identify any specific CDOs that contained the defective loans." *Id.* at *6. Additionally, it noted that "even assuming that some unknown number of those loans was included in the CDOs at issue here, [plaintiff] has alleged no specific facts indicating that the loans changed the CDO notes' overall credit ratings." *Id.* In other words, the Credit Union—like the Government here—failed to state a claim for fraud because it could not allege with specificity that the CDOs at issue either contained securities that S&P knew had a heightened credit risk not reflected in S&P's current rating, or that any heightened credit risk in loans bundled into those CDOs would have changed the CDO's ultimate rating.

Second, the Complaint fails to plead with the particularity required under Rule 9(b) that the ratings ultimately issued did not reflect S&P's "true current opinion."  As an initial matter, the Government cannot claim that an alleged dispute among employees satisfies its obligation to plead with particularity that the ratings were not S&P's true opinion.   Courts have held that internal squabbles about appropriate rating methodology are insufficient to establish that a particular rating is "false" or "not believe[d]" by the rating agency.  For example, the court in *In re Lehman Bros. Sec. and ERISA Litig.* concluded that statements by an S&P employee that

> he believed that the new models would have provided an "earlier warning about the performance" of MBS [were] insufficient to support an inference that the ratings agencies did not actually hold the opinion about the sufficiency of the credit enhancements to justify each rating at the time each rating was issued.  At best, they support an inference that some employees believed that the ratings agencies could have used methods that better would have informed their opinions.  Consequently, the claims based on these statements fail.

684 F. Supp. 2d 485, 495 (S.D.N.Y. 2010); *see also Ohio Police & Fire Pension Fund* v. *Standard & Poor's Fin. Servs., LLC*, 813 F. Supp. 2d 871, 883 (S.D. Ohio 2011) (finding that "the complaint fail[ed] to allege that the Rating Agencies did not believe their ratings . . . . at the time they were made" despite allegations that

14

"the Rating Agencies ignored certain employees' warnings that their models were outdated"), *aff'd*, 700 F.3d 829 (6th Cir. 2012). Any disagreements within S&P are evidence of the robust debate that does and should take place in any large and diverse work place—not evidence the entity was engaged in a scheme to defraud.[40]

Nor can the Government satisfy its burden of pleading with particularity that S&P's ratings were "false" simply by incanting the conclusory allegation that S&P's CDO ratings "failed to account for the substantially increased credit risks posed by certain non-prime RMBS tranches that backed those CDOs."[41] The Complaint acknowledges that, even prior to 2007, S&P had an established practice by which its CDO credit opinions relied in part on S&P's existing ratings on any collateral backing the CDO at issue.[42] As the Complaint sets forth, S&P's practice included using its current rating for any such collateral, unless the rating was subject to a CreditWatch,[43] in which case the CDO analysis would require

---

[40] As the Complaint alleges, rating decisions at S&P are not made by individuals but by committees. *See* Compl. ¶¶ 75, 86. Thus, it is not evidence that S&P, as a rating agency, did not believe its ratings if an analyst expressed disagreement with a committee decision. To the contrary, this is what is to be expected in a robust decision-making process. For example, the Government alleges that S&P failed to apply a 50% ratio in assessing whether to put certain RMBS tranches on CreditWatch, as some had suggested earlier in the year. *See id.* ¶ 239(c). First, the allegation ignores the other components of the original "suggestion" as alleged by the Government itself (*compare id.* ¶ 220, alleging that the suggestion was to *also* apply a modified stress test for potential default within seven months). More importantly, however, the Government does not allege that this "suggestion" was the approach S&P actually adopted, as a rating agency, after a committee decision. And the Government further fails to allege—because it cannot—that S&P did not follow the approach that *was* agreed to by the committee throughout the next five months until the approach was further modified in July 2007. These are not merely technical deficiencies; they betray that the Government's Complaint is not about a fraud, but a difference of opinion within the company.

[41] *See* Compl. ¶ 232; *see also id.* ¶¶ 234, 238, 241, 244, 261.

[42] *See id.* ¶¶ 91–95.

[43] CreditWatch is defined in the Complaint as a "public indication" by S&P that, "in our analysts' opinion, there is at least a 50% likelihood that we will change the rating in the near term." *Id.* ¶ 105.

15

1  additional "cushion" to account for the possibility that the rating on the collateral

2  could be downgraded.[44]  This means that CDOs containing tranches of non-prime

3  RMBSs as collateral were evaluated using S&P's current rating of the specific

4  non-prime RMBSs within the CDO, and also took into account whether those same

5  specific RMBS tranches were on CreditWatch Negative—*i.e.,* whether S&P had

6  actually determined that a downgrade of those tranches was likely to occur in the

7  relatively near future.  The Complaint agrees, then, that S&P's non-prime ratings

8  were taken into account when it rated CDOs.

9      The Complaint further alleges that S&P's RMBS group became aware of

10  performance statistics relating to the mortgage loans supporting some of the

11  RMBSs that S&P had issued in 2006,[45] and that group's views regarding that

12  information were not directly communicated to analysts rating CDOs that might be

13  exposed to such RMBSs.[46]  But this allegation is not enough.  Preliminary

14  information does not equal a changed rating.  Because the CDO rating process, as

15  described by the Government itself, relied on the current ratings of the RMBS

16  tranches, the Government would have to claim what it knows it cannot: that the

17  RMBS ratings were not updated to take into account S&P's opinion of the

18  deteriorating loan performance.

19      In fact, the Government alleges the opposite.  As the Complaint

20  demonstrates, S&P *did* update its ratings of RMBSs based on that information.

21  The Complaint contains numerous allegations that S&P "incorporated its concerns

22  into its opinions," which support a conclusion that it "genuinely believed its

23  conclusions to be true."  *Buttonwood Tree Value Partners, LP* v. *Sweeney*, 2012

24  _____

25  [44] *See id*. ¶ 221.

26  [45] *See id*. ¶¶ 210, 230, 235(b), 237(a), 239(c).

27  [46] *See id*. ¶ 240.

28

MEMORANDUM IN SUPPORT OF MCGRAW-HILL'S MOTION TO DISMISS THE COMPLAINT
PURSUANT TO FED. R. CIV. P. RULE 9(b) AND 12(b)(6)
CASE NO.  CV13-779 DOC (JCGX)

747795.01

WL 6644397, at *6 (C.D. Cal. Dec. 10, 2012) (Carney, J.).  For example, the Complaint's allegations demonstrate that S&P:

- worked diligently throughout the fall of 2006 and spring of 2007 to analyze and understand the unprecedented performance in the RMBS market;[47]

- repeatedly published its views to that market, including an article on March 22, 2007 warning that, "[w]hile it's clear that [subprime exposure] could have a material impact on CDO ratings, our review indicated that *the outcome for any individual CDO transaction will vary depending on certain deal-specific factors*, including structure, vintage, timing of the RMBS rating actions within a given CDO pool, and, in particular, the asset selection made by the collateral manager for the CDO";[48] and

- updated its ratings on subprime RMBSs throughout the spring of 2007.[49]

It cannot have been fraudulent for S&P to continue to rely on its existing RMBS ratings if S&P continued to update its RMBS ratings in good faith. *Buttonwood* illustrates this point.  In that case, plaintiffs alleged that Deloitte & Touche engaged in a "scheme to defraud" the investing public by issuing rosy audit opinions about the financial condition of a bank so investors would purchase

---

[47] *See, e.g.*, *id.* ¶¶ 200–06, 224, 231, 235(e).  To be sure, the Government's one-sided selections from the voluminous work done by S&P throughout this time period do not tell the real story, but even the excerpts and snippets they choose to include demonstrate on their face that lots of people were doing lots of work to come to a view on what developing statistics could tell them about the future.

[48] *See id.* ¶ 233(n) (emphasis added).

[49] *See id.* ¶ 237(h) (reporting a combined 231 downgrades and CreditWatch actions taken during one week in May 2007).

17

the bank's securities at artificially inflated market prices.  *Buttonwood*, 2012 WL 6644397, at *1.  Plaintiffs argued that several allegations in the complaint adequately alleged the subjective falsity of the audit opinions, including that Deloitte: "recognized weaknesses in [the bank] and the [b]ank's financial reporting procedures"; "knew that [the bank's] year-end financial statements were false and misleading"; "knew its opinions were false and would deceive the investing public"; and had "blessed the financial statements [of the bank] when it knew it had no legal or professional justification for doing so."  *Id.* at *6.  But the court disagreed, finding the complaint "completely devoid of any *substantive* allegation demonstrating that Deloitte did not genuinely believe its opinions to be accurate when they were issued."  *Id.* (emphasis added).  Instead, the court highlighted several allegations in the complaint indicating that Deloitte "did not ignore or disregard the purported red flags, but rather that it examined the Bank's financial condition, recognized weaknesses, and provided recommendations."  *Id.* at *5.  The court held plaintiffs' "conclusory allegations to the contrary fail[ed] to allege subjective falsity with particularity."  *Id.* at *6.

Just as the *Buttonwood* plaintiffs' claims were undermined by their own allegations regarding Deloitte's good-faith efforts to issue accurate opinions, so too is the Government's claim defeated by its allegations that staff within S&P engaged in a discussion and analysis over the course of many months regarding how best to interpret and react to the unprecedented decline in the RMBS market.

## C.   The Complaint Fails To Allege that S&P Acted with Specific Intent To Defraud.

Beyond the fatal infirmities identified above, the Complaint fails for yet another reason: it does not properly allege that S&P acted with the requisite culpable state of mind—a specific intent to defraud.  To the contrary, its allegations contradict such a conclusion.

18

The specific intent element applicable to wire fraud, mail fraud and bank fraud requires a plaintiff to allege a "scheme to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises." *Carpenter* v. *United States*, 484 U.S. 19, 27, 98 L. Ed. 2d 275, 108 S. Ct. 316 (1987). *See also United States* v. *Ciccone*, 219 F.3d 1078, 1082 (9th Cir. 2000) (requiring "proof of intent to deprive the victim of money or property"); *United States* v. *Cloud*, 872 F.2d 846, 850 (9th Cir. 1989) (same). The Ninth Circuit has described the requisite state of mind as the intent "to obtain money or property *from the one who is deceived.*" *United States* v. *Lew*, 875 F.2d 219, 221 (9th Cir. 1989) (emphasis added). *See also United States* v. *Bennett*, 621 F.3d 1131, 1138 (9th Cir. 2010) ("the bank fraud statute makes it a crime fraudulently 'to obtain' assets 'owned by' a financial institution"). Thus, in order to plead successfully a claim under the federal criminal fraud statutes, the Government must plead that S&P acted with the specific intent to obtain money or property *from the parties who allegedly were deceived*—the investors in the CDOs identified in the Complaint.

The Complaint does not assert that S&P intended to obtain money from investors in the CDOs. When attempting to support a fraud, the Complaint alleges that S&P's compensation came from the investment banks that issued the CDOs, a well-known arrangement typically identified as the "issuer-pays model." The Government claims that this model gave rise to a conflict of interest, rendering S&P's representations about its own objectivity actionable as fraud in its first alleged scheme.[50] Apparently recognizing the need to allege a scheme to obtain money or property from *the purchasers* of the RMBSs and CDOs in order to

---

[50] *See, e.g., id.* ¶¶ 66, 123, 159, 199, 249, 271.

19

satisfy its pleading requirements, the Government sings an entirely different tune when it comes to pleading the intent component of its case.

The Government alleges that "[a]lthough S&P typically was retained by—and charged its CDO ratings fees to—CDO issuers," it nonetheless knew that "the costs of those fees were passed through to the investors who purchased CDO tranches."[51]  By this sudden and conclusory assertion the Government pivots from attacking the evils of the "issuer-pays" model to claiming both that (a) the investors actually paid, not the issuers, and (b) that S&P knew this and thereby was engaged in a scheme to defraud the investors.  This sleight of hand cannot support an allegation of fraud.  Because this conclusory allegation is inconsistent with the rest of the Complaint, the Court is permitted to disregard it.  *See Lazy Y Ranch Ltd.* v. *Behrens*, 546 F.3d 580, 588 (9th Cir. 2008) ("[W]e need not accept as true allegations contradicting documents that are referenced in the complaint or that are properly subject to judicial notice."); *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001) (court is not required to "accept as truth conflicting pleadings . . . that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely").  Since the Complaint fails properly to allege a specific intent to obtain money or property from the parties *that were deceived*, it fails to state a claim under the fraud statutes and the Complaint should be dismissed.

---

[51] *See id.* ¶ 67.

1    **IV.    CONCLUSION**

2        For all of the foregoing reasons, the Complaint should be dismissed with

3    prejudice.

4    Dated:  April 22, 2013            KEKER & VAN NEST LLP

5

6                          By:  /s/ *John W. Keker*

7                                John W. Keker

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

21

747795.01