# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| _____ x | | |
| CLAUDE A. REESE, Individually and on Behalf of All Others Similarly Situated, | : | Civil Action No. 1:08-cv-07202-SHS |
| | : | |
| | : | LEAD PLAINTIFF'S SECOND AMENDED |
| Plaintiff, | : | CONSOLIDATED CLASS ACTION |
| | : | COMPLAINT FOR SECURITIES FRAUD |
| vs. | : | |
| | : | |
| THE MCGRAW-HILL COMPANIES, INC., | : | |
| HAROLD MCGRAW III, and ROBERT J. | : | |
| BAHASH, | : | |
| | : | |
| Defendants. | : | |
| | : | |
| _____ x | | |

## TABLE OF CONTENTS

I.     INTRODUCTION AND NATURE OF THE ACTION .....................................................1

II.    JURISDICTION AND VENUE...................................................................................12

III.   THE PARTIES ..........................................................................................................13

IV.    THE INDIVIDUAL DEFENDANTS' ACCESS TO CRITICAL INFORMATION .......14

V.     CLASS ACTION ALLEGATIONS.............................................................................16

VI.    CONFIDENTIAL WITNESSES.................................................................................18

VII.   CONTEXT OF DEFENDANTS' FALSE AND MISLEADING STATEMENTS..........24

       A.     Background..................................................................................................24

       B.     The Evolution of Mortgage Lending Practices Leads to Increased Use of
              Mortgage-Backed Securities .......................................................................25

              1.     The Creation of RMBS and CDOs........................................................29

              2.     Credit Ratings of RMBS and CDOs......................................................31

       C.     The Company's Ratings of RMBS and CDOs was Tremendously
              Lucrative......................................................................................................36

       D.     The Race to the Bottom: The Pursuit of Market Share and Lucrative Fees
              Drive the Deliberate Lowering of Credit Analysis Standards............................36

       E.     To Preserve and Maintain Market Share, the Company Used Outdated,
              Ineffective, and Inaccurate Ratings Models .........................................................52

       F.     To Preserve and Maintain Market Share, the Company "Sees No Evil" as
              it Slaps AAA Ratings on Deteriorating Subprime Mortgages and Risky
              Deals Not Likely to Perform ...............................................................................64

       G.     The Chronic Shortage of Resources and the Impact of Top-Down
              Budgeting Left the Company Short of Staff and Unable to Conduct
              Timely and Meaningful Surveillance.....................................................................76

       H.     To Preserve and Maintain Market Share, the Company Shirks on
              Surveillance and Uses "Grandfathering" to Maintain Artificially High
              Ratings..........................................................................................................86

       I.     The Tidal Wave Crashes and the Company Downgrades Thousands of
              RMBS and CDO Securitizations .......................................................................105

       J.     After the Hammer Fell, S&P Settles with the SEC ...........................................113

K.  Congressional Hearings on Credit Rating Agencies ........................................... 114

VIII.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE
CLASS PERIOD ........................................................................................................ 116

IX.  THE TRUTH IS PARTIALLY REVEALED ............................................................. 257

X.  THE COMPANY'S CODE OF CONDUCT WAS ALSO FALSE AND
MISLEADING ........................................................................................................... 260

XI.  ADDITIONAL SCIENTER ALLEGATIONS ............................................................ 262

XII.  APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE
MARKET DOCTRINE ............................................................................................. 263

XIII.  LOSS CAUSATION ................................................................................................. 264

XIV.  NO SAFE HARBOR ................................................................................................ 269

XV.  COUNT I:  FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE
ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL
DEFENDANTS ......................................................................................................... 270

XVI.  COUNT II:  FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE
ACT AGAINST THE INDIVIDUAL DEFENDANTS ................................................. 273

XVII.  JURY TRIAL DEMANDED ..................................................................................... 275

CERTIFICATE OF SERVICE ............................................................................................ 277

1.      Lead Plaintiff Boca Raton Firefighters and Police Pension Fund ("Plaintiff"), individually and on behalf of a proposed class (the "Class") of all purchasers of the publicly traded common stock of The McGraw-Hill Companies, Inc. ("McGraw-Hill" or the "Company") between October 21, 2004 and March 11, 2008, inclusive (the "Class Period"), by and through its undersigned counsel, brings suit against McGraw-Hill, Harold McGraw III ("McGraw"), and Robert J. Bahash ("Bahash") (McGraw-Hill, McGraw, and Bahash are sometimes collectively referred to as "Defendants").

2.      Plaintiff seeks remedies under the Securities Exchange Act of 1934 (the "Exchange Act") as a result of the fraudulent scheme undertaken by the Defendants and the economic loss suffered when the true facts were partially revealed to the public through a series of disclosure events.  The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

## I.      INTRODUCTION AND NATURE OF THE ACTION

Ratings are designed to be stable.  Unlike market prices, they do not fluctuate on the basis of market sentiment.  But they can and do change – either as a result of fundamental adjustments to the risk profile of a bond or the emergence of new information.  Ratings are not recommendations to buy, sell or hold a particular security.  They simply provide a tool for investors to assess risk and differentiate credit quality [. . . .] we base our opinions on documented facts.  We are continually reviewing and refining our processes, and we make adjustments to our ratings when the facts demonstrate the need to make adjustments, and not a moment sooner.

> -- Vickie Tillman, Executive Vice President of Credit Market Services for Standard & Poor's, August 31, 2007 (printed in *The Wall Street Journal*)

Lord help our fucking scam . . . this has to be the stupidest place I have worked at.

> -- Excerpt of internal email from Elwyn Wong, Global CDO Client Value Manager of Standard & Poor's Structured Finance, Wednesday, November 23, 2005, 10:21 AM[1]

Let's hope we are all wealthy and retired by the time this house of cards falters. :o)

> -- Internal email from Chris Meyer, Associate Director of Standard & Poor's Structured Finance Ratings Global CDO Group, sent on Friday, December 15, 2006, 8:31 PM[2]

[W]e rate every deal. [I]t could be structured by cows and we would rate it.

> -- Internal instant message dialogue between two officials of Standard & Poor's Structured Finance Division in New York City, sent on April 5, 2007 at 3:59 PM[3]

Any thoughts you have would be helpful. To give you a confidential tidbit among friends the subprime brou haha [sic] is reaching serious levels – tomorrow morning key members of the RMBS rating division are scheduled to make a presentation to Terry McGraw CEO of McGraw-Hill Companies and his executive committee on the entire subprime situation and how we rated the deals and are preparing to deal with the fallout (downgrades) Yours truly is not among the anointed for that dubious 15 minutes of fame.

> -- Excerpt of internal email from Michael Gutierrez, Director of Standard & Poor's Structured Finance Division, Servicer Evaluations, sent on Sunday March 18, 2007, 4:02 PM[4]

---

[1] A true and correct copy of the email exchange, made public by the U.S. Senate Permanent Subcommittee on Investigations, Committee on Homeland Security and Governmental Affairs (the "Senate Subcommittee"), is attached hereto as **Exhibit 1**.

[2] A true and correct copy of the email exchange, made public by the U.S. House of Representatives Committee on Oversight and Government Reform (the "House Oversight Committee"), is attached hereto as **Exhibit 2**.

[3] A true and correct copy of the instant message exchange, made public by the House Oversight Committee , is attached hereto as **Exhibit 3**.

[4] A true and correct copy of the email exchange, made public by the Senate Subcommittee, is attached hereto as **Exhibit 4**.

The story of the credit rating agencies is a story of colossal failure. The credit rating agencies occupy a special place in our financial markets. Millions of investors rely on them for independent, objective assessments. The rating agencies broke this bond of trust, and federal regulators ignored the warning signs and did nothing to protect the public. The result is that our entire financial system is now at risk . . . .

> -- Opening Statement of Rep. Henry A. Waxman, Chairman, U.S. House of Representatives Committee on Oversight and Government Reform Hearing, *Credit Rating Agencies and the Financial Crisis*, October 22, 2008

For a hundred years, Main Street investors trusted U.S. credit rating agencies to guide them toward safe investments. Even sophisticated investors, like pension funds, municipalities, insurance companies, and university endowments, have relied on credit ratings to protect them from Wall Street excesses and distinguish between safe and risky investments.

But now, that trust has been broken. We used as case histories the two biggest credit rating agencies in the United States, Moody's and Standard & Poor's, and the ratings they gave to the key financial instruments that fueled the financial crisis – residential mortgage backed securities, or RMBS, and collateralized debt obligations, or CDOs. The Subcommittee investigation found that those credit rating agencies allowed Wall Street to impact their analysis, their independence, and their reputation for reliability. And they did it for the money.

> -- Opening Statement of Senator Carl Levin, Chairman, U.S. Senate Permanent Subcommittee on Investigations Hearing, *Wall Street and the Financial Crisis: The Role of Credit Rating Agencies*, April 23, 2010

3.      McGraw-Hill's Financial Services Segment, operating under the Standard & Poor's ("S&P") brand, assigns credit ratings to structured finance transactions and deals. This case is not about the substance of S&P's actual ratings of specific residential mortgage backed securities ("RMBS") and collateralized debt obligations ("CDOs"). It is not an attack on the veracity or reasonableness of those opinions; S&P cannot hide behind the First Amendment to overcome Plaintiff's claims here. Plaintiff does not seek to hold Defendants liable because of the content of S&P's ratings. This case, instead, is based upon Defendants' false and misleading statements regarding McGraw-Hill's true financial circumstances and future business prospects, and the

material omissions that would have rendered those statements not false and misleading.

4.      Despite Vickie Tillman's ("Tillman") statement that "ratings are designed to be stable" and change on the "emergence of new information" and "documented facts," the Company's ratings of RMBS and CDOs during the Class Period suffered from many problems – they were neither stable, reflective of an understood risk profile, nor indicative of current information – and Defendants knew it.  Defendants embarked on a fraudulent scheme and misled the Company's investors by sacrificing all that was considered holy at S&P – criteria, integrity, brand, reputation, and analytics – in the name of lucrative short term profits and market share penetration.  For example, Defendants misled the market regarding the technological ability of the Company's ratings models to properly and completely rate CDOs and RMBS.  S&P's models, however, were not equipped to do the job properly.  Defendants misled the market by touting the ratings models as state of the art, while deliberately not updating them to reflect broader, more recent data, because they knew doing so would require them to lower ratings and would cause the Company to lose market share to its competitors for lucrative CDO and RMBS ratings.  Defendants also misled the market as to the frequency of and quality of its ratings surveillance, and failed to disclose that it virtually abandoned its own procedures both to rate as many deals as possible and to avoid downgrading deals it had already rated.  None of these truths were disclosed to the market until the end of the Class Period.

5.      Indeed, the Company deliberately lowered and sacrificed its sacred ratings criteria in 2004 as it engaged in a now documented "race to the bottom" to avoid losing market share to its competitors.  Defendants put short term financial results ahead of the Company's invaluable integrity and reputation and, as a result, grossly misled Company shareholders.  Unbeknownst to the market, the Company's primary driver of financial success and outlook during the Class Period was literally, as the Company's Associate Director of S&P's Structured Finance Ratings Global CDO

Group stated, a "house of cards." That house of cards has collapsed on a grand scale, and with it has vanished the Company's financial performance, credibility, reputation, and stock price. Contrary to Defendants' Class Period statements, and Tillman's above, the Company focused not on rating actual credit risk underlying RMBS and CDOs, but on market share, an unchecked "race to the bottom," and not losing deals. Because of those facts, as specifically delineated throughout this Complaint, Defendants' Class Period statements set forth herein were materially false and misleading.

6.     At the start of the Class Period, the Company was beginning to ride a structured finance tidal wave of success. Rating RMBS and CDO transactions was big business for McGraw-Hill, and the Company reported eye-popping growth in its Financial Services Segment, which drove the Company's overall financial performance and stock price. Indeed, as the Company rode the RMBS and CDO – or "structured finance" – tidal wave, its stock price reached an intra-day, Class Period high price of $72.50 per share on June 5, 2007, up from $41.31 at the start of the Class Period.[5]

7.     As the Class Period progressed, however, fundamental problems in the structured finance market began to publicly rear their head (especially in the subprime lending area), slowly and gradually exposing the falsity of Defendants' Class Period statements. Despite the fact that Defendants knew of these problems (as disclosed and corroborated by the various confidential witnesses and internal company documents discussed below), among others, and failed to adequately warn McGraw-Hill shareholders of the negative impact they would have on the Company's financial

---

[5] The Company's stock price split two-for-one following the close of trading on May 17, 2005. For ease of reference, for all stock prices prior to May 18, 2005, Plaintiff is relying on adjusted closing prices that take into account the impact of the stock's split.

performance and stock price, Defendants issued falsely optimistic and misleading statements designed to quell investor unrest and maintain the artificial inflation of the Company's stock price.

8.     For example, although the Company's S&P brand alerted the market to some of the problems underlying the RMBS and CDO securitization markets as those markets deteriorated (and eventually imploded during late 2006 and throughout 2007), McGraw-Hill described itself as a company both positioned and capable of addressing such problems with its ratings, ratings staff, and ratings models, and through active surveillance of the transactions S&P rated.  As quoted above, Tillman assured investors the Company's ratings were stable, based on facts, reflected an understanding of the risk profile, and would change on the emergence of new information.

9.     The fallacy of Tillman and Defendants' statements and the Company's true financial condition and future business prospects, as exposed at the end of the Class Period, has been corroborated not only by Plaintiff's ongoing investigation, but by a Securities Exchange Commission ("SEC") examination, the House Oversight Committee hearing, an eighteen-month Senate Subcommittee investigation, and internal Company documents revealing that the Company's behind-closed-doors dialogue sang a much different tune than Defendants' public statements.  The truth was that Defendants omitted critical, then-known material facts concerning the "house of cards" upon which the Company's financial performance relied and its ongoing failure to monitor RMBS and CDO securitizations that it rated – thus making its ratings uninformed and outdated.  The result of these material omissions was that, at all times, Defendants' Class Period statements concerning the Company's financial performance and future business prospects lacked a reasonable basis, and McGraw-Hill investors were misled.

10.     The partial truth behind Defendants' false and misleading statements leaked out to the market in fits and spurts during the Class Period – Company investors learned of bits of truth here and there.  For example, on August 16, 2007, it was reported that the European Union would

examine why credit agencies such as McGraw-Hill's S&P brand were slow to react to early signs of U.S. loan defaults. Upon this news, which was a partial revelation of the truth behind the Company's financial condition and began to illuminate the consequences of problems with the Company's ratings models and surveillance, shares of the Company's stock dropped from $50.74 per share on August 15, 2007 to a low of $47.76 on August 16, 2007, on extremely heavy trading of 7,391,300 shares, more than three times the stock's daily trading average.

11. Also, as the Class Period progressed, the Company's Financial Services division slashed its assessments of *thousands* of subprime RMBS and CDOs – representing *billions of dollars* worth of structured finance securitized transactions. Since that time, the Company's S&P brand has seen its reputation and credibility vanish and has been maligned by critics for grossly underestimating the danger of bonds backed by subprime RMBS and CDOs tied to subprime mortgages. By November 2007, the Company's S&P division had lowered its credit ratings on more than $70 billion worth of structured finance transactions, and found itself under investigation or examination by the New York Attorney General, the Connecticut Attorney General, the Ohio Attorney General, and the SEC. At the same time, the Company's stock price fell below $50 per share. It was not until the end of the Class Period, however, that investors learned the truth with respect to the Company's true financial condition and saw the bigger picture behind Defendants' fraudulent scheme and material omissions – when on March 11, 2008, the Company abruptly withdrew its recently issued financial guidance for 2008 and refused to offer any revised guidance for its shareholders. At that point, investors learned that the Company had no handle on its ratings of RMBS and CDOs, or its financial outlook, and that the Company's stock price had been artificially inflated throughout the Class Period.

12. Indeed, on March 11, 2008, the last day of the Class Period, McGraw-Hill withdrew its recently issued forecast for 2% to 4% full-year revenue growth in its Financial Services Division

– citing deterioration in the U.S. housing market and the economy.  Speaking at a media conference of the now defunct Bear Stearns & Co. in Palm Beach, Florida, McGraw-Hill's Chief Executive Officer ("CEO"), McGraw, stated that "softness" in demand for new credit ratings would "clearly have an effect" on the Company's first-quarter financial results.  Moreover, the Company declined to give a new forecast for full-year revenue growth.  In response to the revelation that the Company was abruptly withdrawing revenue guidance (and revealing its true financial condition), the Company's stock price dropped, on a day of broad market gains, to as low as $36.32 on enormous trading volume of more than 8.775 million shares – *a 49% decline* from its Class Period high – removing the remaining artificial inflation from the Company's stock price.

13.     Although the abrupt removal of the guidance marks the end of the Class Period, since that time, volumes of additional evidence regarding Defendants' fraud have reached the market.  For example:

(a)     On May 1, 2008, the Company's S&P brand, in a stunning and unprecedented move, announced it would stop rating new bonds composed of U.S. second mortgages, admitting that it could not conduct a "meaningful analysis" of that market segment and could not understand the risk profile of the debt.  In other words, the Company admitted its rankings had failed on a fundamental level and were, in essence, meaningless.  The Company had never previously refused to rank broad classes of securities linked to U.S. home loans.

(b)     On June 5, 2008, the Office of the New York State Attorney General issued a press release announcing "Landmark Reform Agreements" with McGraw-Hill's S&P brand to, among other things, fundamentally reform the RMBS market, increase the independence of ratings agencies, ensure for the first time that "crucial loan data is provided to the agencies before they rate

loan pools, and increase the transparency in the RMBS market."[6]  As part of the settlement, S&P fundamentally altered how it is compensated by investment banks for providing ratings on loan pools.  The press release stated "The mortgage crisis currently facing this nation was caused in part by misrepresentations and misunderstanding of the true value of mortgage securities.  The tremendous reach of this crisis cannot be understated – out entire economy continues to feel aftershocks from the collapse of the mortgage industry," said Attorney General Cuomo.  "By increasing the independence of the rating agencies, ***ensuring they get adequate information to make their ratings***, and increasing industry-wide transparency, ***these reforms will address one of the central causes of that collapse***."[7]

        (c)     On July 8, 2008, the SEC released its Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies (the "Credit Agencies Report"), partially revealing additional disturbing truths about the three major credit rating agencies in the United States, including McGraw-Hill's S&P brand.[8]  These startling revelations, which shed additional light on the falsity of Defendants' Class Period statements, include:

- "One analyst expressed concern that her firm's model did not capture 'half' of the deal's risk, but that '***it could be structured by cows and we would rate it***.'"

- "In another email, an analytical manager in the same rating agency's CDO group wrote to a senior analytical manager that the rating agencies continue to create an 'even bigger monster - the CDO market.  Let's hope we are all wealthy and retired by the time this house of cards falters. ;o).'"

- "***[N]ot all our criteria is published***.  [F]or example, we have no published criteria on hybrid deals, which doesn't mean that we have no criteria."

---

[6] A true and correct copy of the June 5, 2008 press release is attached hereto as ***Exhibit 5***.

[7] Unless indicated otherwise herein, all emphasis is added.

[8] A true and correct copy of the Credit Agencies Report is attached hereto as ***Exhibit 6***.

- "Rating agencies made 'out of model adjustments' and did not document the rationale for the adjustment" and *one firm "did not publicly disclose the practice of overriding model outputs regarding loss expectations on subprime second liens*."

- "*None of the rating agencies examined had specific written procedures for rating RMBS and CDOs*."

(d)     On October 22, 2008, the U.S. House Oversight Committee called before it the heads of the three major credit rating agencies, including S&P.  During the House Oversight Committee's hearing, it also received testimony from Frank Raiter ("Raiter"), S&P's Managing Director and Head of Residential Mortgage Backed Securities Ratings from March 1995 through April 2005.  Among other things, it was publicly revealed that S&P deliberately compromised its ratings criteria (and thus its reputation) in order to preserve market share on RMBS and CDO deals, refused to use updated models that included extensive loan level data (now required by the Company's settlement with the New York Attorney General), despite being in possession of such updated models, and would have alerted the market in 2004 that RMBS and CDO securitizations were destined for catastrophic failure, and that S&P had lost its credibility in the marketplace.  On top of the foregoing, actual copies of internal S&P emails were made public for the first time and demonstrated a simple fact to the market:  the Company's internal dialogue contradicted and was a far cry from Defendants' false and misleading public statements.

14.     Significantly, following an eighteen month investigation into the causes and consequences of the country's financial crisis, on April 23, 2010, the Senate Subcommittee held a hearing on "Wall Street and the Financial Crisis: The Role of Credit Rating Agencies."  The hearing exclusively focused on the conduct of S&P and its competitor Moody's Investor Service ("Moody's").  The hearing, which centered on S&P and Moody's conduct during the entirety of the Class Period, represented the conclusion of a wide-ranging investigation undertaken by the Senate Subcommittee.  That investigation included a review of more than one million pages of documents,

more than 100 interviews and depositions, and consultations with dozens of government, academic, and private sector experts on banking, securities, financial, and legal issues. The end result of the Senate Subcommittee's extensive investigation into S&P and Moody's was nine formal findings of fact:[9]

1.     **Inaccurate Rating Models**. From 2004 to 2007, Moody's and Standard & Poor's used credit rating models with data that was inadequate to predict how high risk residential mortgages, such as subprime, interest only, and option adjustable rate mortgages, would perform.

2.     **Competitive Pressures**. Competitive pressures, including the drive for market share and need to accommodate investment bankers bringing in business, affected the credit ratings issued by Moody's and Standard & Poor's.

3.     **Failure to Re-evaluate**. By 2006, Moody's and Standard & Poor's knew their ratings of residential mortgage backed securities (RMBS) and collateralized debt obligations (CDOs) were inaccurate, revised their rating models to produce more accurate ratings, but then failed to use the revised model to re-evaluate existing RMBS and CDO securities, delaying thousands of rating downgrades and allowing those securities to carry inflated ratings that could mislead investors.

4.     **Failure to Factor In Fraud, Laxity, or Housing Bubble**. From 2004 to 2007, Moody's and Standard & Poor's knew of increased credit risks due to mortgage fraud, lax underwriting standards, and unsustainable housing price appreciation, but failed adequately to incorporate those factors into their credit rating models.

5.     **Inadequate Resources**. Despite record profits from 2004 to 2007, Moody's and Standard & Poor's failed to assign sufficient resources to adequately rate new products and test the accuracy of existing ratings.

6.     **Mass Downgrades Shocked Market**. Mass downgrades by Moody's and Standard & Poor's, including downgrades of hundreds of subprime RMBS over a few days in July 2007, downgrades by Moody's of CDOs in October 2007, and downgrades by Standard & Poor's of over 6,300 RMBS and 1,900 CDOs on one day in January 2008, shocked the financial markets, helped cause the collapse of the subprime secondary market, triggered sales of assets that had lost investment grade status, and damaged holdings of financial firms worldwide, contributing to the financial crisis.

---

[9] A true and correct copy of the Senate Subcommittee's April 23, 2010 memorandum prepared in conjunction with the hearing, which contains, among other things, the nine formal findings of fact, is attached hereto ***Exhibit 7***.

7.  **Failed Ratings**.  Moody's and Standard & Poor's each rated more than 10,000 RMBS securities from 2006 to 2007, downgraded a substantial number within a year, and, by 2010, had downgraded many AAA ratings to junk status.

8.  **Statutory Bar**.  The U.S. Securities and Exchange Commission is barred by statute from conducting needed oversight into the substance, procedures, and methodologies of the credit rating models.

9.  **Legal Pressure for AAA Ratings**.  Legal requirements that some regulated entities, such as banks, broker-dealers, insurance companies, pension funds, and others, hold assets with AAA or investment grade credit ratings, created pressure on credit rating agencies to issue inflated ratings making assets eligible for purchase by those entities.

15.  Along with the formal findings of fact, the Senate Subcommittee released a host of internal Company documents and related materials.[10]  For example, the Senate Subcommittee's exhibits included a chart entitled "Percent of the Original AAA Universe Currently Rated Below Investment Grade."  That chart, a true and correct copy of which is attached hereto as ***Exhibit 8***, revealed that for 2006 and 2007, ***at least 80% of all classes*** of RMBS securities given AAA ratings – with some classes reaching ***as high as 98%*** – are now rated as junk investments.  As a result, the credibility of S&P's AAA stamp of approval has been eviscerated.

16.  These post-Class Period revelations, among others, as well as the Senate Subcommittee's formal findings of fact, support a reasonable inference that Defendants' Class Period statements were materially false and misleading and made with scienter.

## II.  JURISDICTION AND VENUE

17.  This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

---

[10] Although the Senate Subcommittee Hearing occurred after the close of the Class Period, the documents and information underlying the Senate Subcommittee's conclusions and formal findings of fact are primarily from within the Class Period.

18.     Venue is proper in the Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b).  In addition, the causes of action asserted herein occurred and/or accrued, among other places, in this District.  At all times relevant to this action, McGraw-Hill was headquartered in this District, and many of the acts and transactions alleged herein, occurred in substantial part in this District.

19.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III.     THE PARTIES

20.     Plaintiff Boca Raton Firefighters and Police Pension Fund purchased McGraw-Hill securities on the open market during the Class Period, as set forth in its certifications previously filed with the Court.  On February 11, 2008, the Court appointed Plaintiff as Lead Plaintiff in this action.

21.     Defendant McGraw-Hill is a New York corporation with its principal place of business located at 1221 Avenue of the Americas, New York, New York 10020.

22.     Defendant McGraw has been Chairman of the Board since 2000 and President and CEO of the Company since 1998.  Prior to that, McGraw had been President and Chief Operating Officer of the Company since 1993.  McGraw was Executive Vice President, Operations, of the Company from 1989 to 1993.  Prior to that, he was President of McGraw-Hill Financial Services Company, among other things.  In addition, McGraw has served as a Director of the Company since 1987 and is the Chair of the Executive Committee.

23.     Defendant Bahash is the Company's Executive Vice President and CFO.  During the Class Period, he was also responsible for managing the Company's use of information technology, including the strategic direction of the Company's electronic commerce strategy, investor relations

and the Company's centralized manufacturing operations. Before his appointment to executive vice president and CFO in 1988, Bahash was Senior Vice President, Finance and Manufacturing. He joined McGraw-Hill in 1974 as manager of financial auditing, and has held a number of finance-related positions.

## IV.  THE INDIVIDUAL DEFENDANTS' ACCESS TO CRITICAL INFORMATION

24.     McGraw and Bahash (collectively the "Individual Defendants") were privy to confidential and proprietary information concerning McGraw-Hill, its operations, finances, financial condition, and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning McGraw-Hill, as discussed in detail below. Because of their positions with McGraw-Hill, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or were severely reckless in disregarding the fact that adverse facts specified herein had not been disclosed to, and were being concealed from (in order to mislead), the investing public.

25.     Throughout the Class Period, the Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed such filings, reports, releases, and other statements prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. The Individual Defendants were also able to, and did, directly or indirectly, control the conduct of McGraw-Hill's

business, the information contained in its filings with the SEC, and its public statements. Moreover, the Individual Defendants made or directed the making of affirmative statements to the investing public, and participated in meetings, conference calls, and discussions concerning such statements. Each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations that were being made were then false and misleading. As a result, each of the Individual Defendants is responsible for the accuracy of McGraw-Hill's corporate releases detailed herein and is therefore responsible and liable for the misrepresentations and omissions contained therein.

26.     The Individual Defendants are liable as direct participants and co-conspirators with respect to the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of McGraw-Hill's business.

27.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

28.     As senior executive officers and/or directors and controlling persons of a publicly traded company whose common stock and other securities were, and are, registered with the SEC pursuant to the Exchange Act, and whose shares traded on the New York Stock Exchange ("NYSE")

and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to McGraw-Hill's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so that the market price of McGraw-Hill's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

29. The Individual Defendants are liable as primary participants in a fraudulent scheme and wrongful course of business which operated as a fraud or deceit on purchasers of McGraw-Hill common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The fraudulent scheme employed by the Individual Defendants was a success, as it: (i) deceived the investing public regarding McGraw-Hill's prospects and business; (ii) artificially inflated the price of McGraw-Hill common stock; and (iii) caused Plaintiff and other members of the Class to purchase McGraw-Hill common stock at inflated prices (which artificial inflation came out of the stock when the relevant truth regarding the true financial condition of McGraw-Hill was revealed).

## V. CLASS ACTION ALLEGATIONS

30. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the securities of McGraw-Hill during the Class Period. Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

31. Because McGraw-Hill has millions of shares outstanding, and because the

Company's shares were actively traded on the NYSE, members of the Class are so numerous that joinder of all members is impracticable. According to McGraw-Hill's SEC filings, as of February 15, 2008 (shortly before the close of the Class Period), McGraw-Hill had more than 322 million shares of common stock outstanding. While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number at least in the thousands and that they are geographically dispersed.

32.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and all of the Class members sustained damages arising out of Defendants' wrongful conduct complained herein.

33.     Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel experienced and competent in class actions and securities fraud litigation. Plaintiff has no interests that are contrary to or in conflict with the members of the Class it seeks to represent.

34.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

35.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that Defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

(a)     Whether Defendants violated federal securities laws as alleged herein;

(b)     Whether Defendants' publicly disseminated press releases and statements

17

during the Class Period omitted and/or misrepresented material facts;

> (c) Whether Defendants breached any duty to convey material facts or to correct material facts previously disseminated;

> (d) Whether Defendants participated in and pursued the fraudulent scheme or course of business complained of;

> (e) Whether Defendants acted willfully, with knowledge or severe recklessness, in omitting and/or misrepresenting material facts;

> (f) Whether the market prices of McGraw-Hill common stock during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

> (g) Whether the members of the Class have sustained damages as a result of the decline in value of McGraw-Hill's stock when the truth was revealed and the artificial inflation came out and, if so, what is the appropriate measure of damages.

## VI.    CONFIDENTIAL WITNESSES

36.     Plaintiff's allegations herein, concerning the falsity of Defendants' statements and the scienter of the Individual Defendants, are based, in part, on interviews with dozens of former McGraw-Hill employees and others with knowledge of the facts underlying Defendants' fraud. Throughout the course of the investigation of Defendants' fraud, many confidential former insiders provided information regarding the various methods employed by Defendants in furtherance of their scheme to defraud shareholders. Indeed, among those confidential former employees interviewed in the course of the investigation of the fraudulent scheme and wrongful business practices complained of herein were a former Managing Director in S&P's Structured Finance department, a former S&P Executive Assistant, a former Secretary in the RMBS department, a S&P Research Associate in CDO Surveillance, a former Ratings Analyst Assistant, a former IT Manager, a former Senior

Contract Coordinator, a former RMBS Deals Research Assistant, a former Assistant Product Manager for S&P's LEVELS model, a former Structured Finance Associate in the Company's Surveillance Department, a former Director of Structured Finance Sales, and a former Director of RMBS Surveillance.

37.     These confidential witnesses included a former Company Managing Director in S&P's Structured Finance department.  This former Managing Director worked for the Company until April 2005, and was responsible for maintaining ratings criteria, developing relationships with clients, ratings quality control, staffing, and new product development, including creation and maintenance of S&P's models for rating RMBS deals.  This confidential witness initially reported to the Executive Managing Director of Structured Finance Ratings Joanne Rose ("Rose"), who, in turn, reported to Executive Vice President Tillman.  In approximately 2001, this confidential witness began reporting to the Managing Director of Global Asset Backed Securities ("ABS")/RMBS Pat Jordan ("Jordan").  In approximately 2005, Jordan was promoted and Rosario Buendia ("Buendia") assumed the title of Global Practice Leader for ABS/RMBS.  This former Managing Director has information concerning, among other things, the Company's ongoing failure to invest in and update its "LEVELS" model for rating RMBS, which caused the model to become outdated, its top-down budgeting process, which resulted in inadequate staffing, and the Company's refusal to use the LEVELS model for surveillance.

38.     Another confidential witness worked as a Secretary in S&P's RMBS group, within the Structured Finance department.  This former employee began work for S&P in 2004 and worked until she/he resigned in March 2008.  This former employee has knowledge concerning the groups within the RMBS department and stated that the subprime group was by far the largest.  She/he also recalled that in early 2008, Company employees "were shredding things like every five seconds."  This former employee recalled that the volume of document shredding was so significant that an

outside vendor was brought in specifically to shred documents. She/he also was responsible for working on downgrading the ratings of securities during 2007, and recalled that "there were so many downgrades" that administrative assistants had to "teach the secretaries how to do the downgrades." In addition, she/he recalled that although she/he had to work late to conduct downgrades, she/he was not permitted to bill overtime to downgrades, and was specifically instructed to bill overtime requests to "assisting with files."

39.     Another confidential witness worked for the Company for approximately 20 years, until late 2007, as S&P's Executive Assistant to the President. For most of this former employee's tenure, she/he served as the Executive Assistant to Kathleen Corbet ("Corbet"). Following Corbet's abrupt resignation in August 2007, this confidential witness was "asked to leave" and the new President Deven Sharma ("Sharma") retained his own Executive Assistant. This former employee has knowledge concerning the three regularly scheduled meetings that Corbet attended each month: (1) an Executive Committee Meeting; (2) a Pre-Management Review Meeting; and (3) a Management Review Meeting. She/he stated that the Executive Committee Meeting took place on the first Tuesday of every month in either Conference Room One or Conference Room Two on the 47th Floor, also known as the Executive Floor. This confidential witness recalled that members of the Executive Committee included S&P's Chief Financial Officer ("CFO") Patrick Milano ("Milano"), Tillman, Executive Managing Director Ed Emmer ("Emmer"), Managing Director of Global Emerging Markets Cynthia Stone ("Stone"), Director of Finance Ed Hannon ("Hannon"), Executive Managing Director Vladimir Stadnyk ("Stadnyk"), Head of Compliance/General Counsel Rita Bolger ("Bolger"), Communications Director Margie Appel ("Appel"), and Rose. This former employee also recalled that the Management Review Meeting took place on the third Thursday of every month and was designed for Corbet to report S&P's financial results to McGraw-Hill. Corbet and Milano participated in the meeting on behalf of S&P, and most of these meetings took place

telephonically. This former Executive Assistant believed that Bahash and McGraw both participated regularly in the Management Review Meetings. A week prior to each Management Review Meeting, Corbet would hold a pre-Management Review Meeting in either Conference Room One or Two on the 47th Floor. The purpose of these meetings was to "fine tune the financial information" to be provided during the Management Review Meetings. The participants in the pre-Management Review Meetings included Milano and Hannon.

40.     One confidential witness worked for S&P from Fall 2004 until Summer 2006 as a Research Associate. As part of her/his responsibilities, this former employee accounted for RMBS and CDO deals by "backing-up" S&P's databases. In that regard, this former employee reviewed CDO income statements for discrepancies. This former employee has information concerning, among other things, the Company's bias in rating CDOs and RMBS

41.     Another confidential witness worked for McGraw-Hill from December 2004 until November 2007, and worked as an IT Manager in the S&P Structured Finance Division from December 2004 until June 2006. This former employee reported initially to Senior IT Director of the Structured Finance Group Juan Vega ("Vega"), who was replaced by Elaina Pressner ("Pressner"). Vega and Pressner, in turn, reported to Company Vice President Rom Ranagoff ("Ranagoff"). As part of her/his responsibilities, this former employee maintained portfolio management software products for the Company, such as "CDO Evaluator" and "LEVELS." This former employee has knowledge, among other things, concerning the information used in the Company's structured finance models and the Company's surveillance on structured finance deals.

42.     One confidential witness worked for the Company as a Ratings Analyst Assistant from January 2007 through July 2007. This former employee reported to CDO Department Associate Director Jimmy Koyliski ("Koyliski"), who, in turn, reported to Steve Vandeberg ("Vandeberg"). This former employee was responsible for providing supportive work for the

Company's "CORE" database and has information concerning the S&P's CDO Department.

43.     One confidential witness worked for the Company as a Senior Contract Coordinator in the S&P Global Licensing and Contracts Department from 2000 until April 2007.  This former employee reported to Manager of Contract Operations Patrick Allen ("Allen"), who reported to Vice President of Global Licensing and Contracts Evonne Inglesh ("Inglesh").  As part of her/his responsibilities, this former employee supervised and reviewed Company contracts, including those for the Company's Structured Finance ratings transactions, and prepared weekly, monthly, quarterly, and year-end reports from the Contract Management Information System database.

44.     One confidential witness worked for the Company from October 2006 until January 2007 as a temporary consultant at S&P.  This former employee worked in the Company's Structured Finance Department as part of a team of consultants tasked with building ratings on structured finance transactions.  This former employee has knowledge regarding the Company's backlog of structured finance transactions that needed to be updated during the Class Period.

45.     Another confidential witness worked from Fall 2005 through June 2008 as an Assistant Product Manager for the Company's LEVELS model, which was used to rate structured finance transactions.  This former employee reported to LEVELS Product Manager Steven Galli ("Galli"), who reported to Global Practice Leader for ABS/RMBS Buendia.  After Buendia left the Company in 2008, Galli reported to Director David Goldstein ("Goldstein").  This former employee's responsibilities including all aspects of prices, enhancements, and releases of the LEVELS model.  She/he has information concerning, among other things, the Company's ongoing and deliberate failure to update its LEVELS model, including the Company's misrepresentations to its clients concerning those updates.  In addition, this former employee has information concerning McGraw's obsession with S&P's market penetration and absolute awareness of the Company's Structured Finance operations and financial results.  This former Assistant Product Manager

prepared a monthly Market Penetration Data Report, a summary of which was sent directly to McGraw on a monthly basis.

46.     One confidential witness worked from August 2007 until May 2008 as a Structured Finance Associate in the Surveillance Department and had responsibility for providing ongoing analysis of subprime RMBS.  She/he has knowledge of how the RMBS group was a department within the larger structured finance group, and that the RMBS group was further broken down into a ratings side and a surveillance side.  The RMBS surveillance side was then broken down into groups that provided surveillance for specific types of RMBS.  For example, this former employee worked primarily in a group tasked with providing surveillance to mostly subprime RMBS, a group that was headed by Director Andrew Verducci, who reported to Director of RMBS Surveillance Ernestine Warner ("Warner").  Warner, in turn, reported to Peter D'Erchia ("D'Erchia"), the Managing Director of RMBS Surveillance.  This confidential witness has information concerning how the surveillance group was understaffed and did not have enough employees for the work that had to be done.

47.     Another confidential witness worked in a variety of sales positions with the Company for approximately ten years, until mid-2008.  At the time she/he left the Company, this former employee worked as a Director of Structured Finance Sales.  This former employee recalled that in January 2007, she/he was told to focus solely on selling the Company's structured finance products, *i.e.*, its CDO and RMBS models and surveillance tools.  This former employee reported to Vice President in Charge of Rating Information Sales Carrie Bancroft, who reported to Senior Vice President Terry Shine, who led the U.S. sales group.  This former employee has information concerning how McGraw-Hill set internal budgets and that the internal dialogue within the Company was that McGraw pushed revenues so hard that the Structured Finance group was forced to issue more ratings.  She/he also has information concerning how the Company did not really have a

23

surveillance tool for RMBS.

48.     One confidential witness worked as a Director in the Company's RMBS Surveillance Department for approximately 19 years, until early 2009. This former employee reported to Warner, who reported to D'Erchia. D'Erchia oversaw the surveillance of five different structured finance groups, including CDO, ABS, CMBS, Servicer Evaluations, and RMBS. This former employee has information concerning how RMBS surveillance group analysts were assigned to monitor securities based on certain types of collateral. For example, certain analysts would handle subprime mortgage collateral while others would be responsible for Alt-A mortgage collateral. She/he has knowledge of how the Surveillance Department's goal was to rate deals once a year, that there was insufficient staffing necessary to conduct surveillance, and how, throughout most of the Class Period, the Company had a policy of not taking any ratings action until there were actual losses in the deals it rated, even if the Company knew the underlying collateral was non-performing and that a loss was inevitable. She/he also has information concerning how, despite what the Company's Code of Conduct stated, the Company always placed a higher emphasis on rating new deals, not surveillance.

49.     As demonstrated above, each of these corroborating confidential witnesses was sufficiently placed within the Company to hear, see, and read information relevant to Plaintiff's claims. Their direct interaction with S&P executives, as well as their day-to-day activities as members of the Structured Finance group within S&P's Financial Services segment, lends additional credibility to the facts they provided regarding Defendants' fraud and scienter.

## VII.    CONTEXT OF DEFENDANTS' FALSE AND MISLEADING STATEMENTS

### A.    Background

50.     McGraw-Hill was incorporated in December 1925, and touts itself as a leading global information services provider serving the financial services, education and business information markets. The Company has three reportable segments: McGraw-Hill Education, Financial Services,

and Information & Media. The Financial Services segment operates under the S&P brand as one reporting unit and, according to the Company, provides credit ratings, evaluation services, and analysis globally on corporations, financial institutions, securitized and project financings, and local, state and sovereign governments. McGraw-Hill states that its Financial Services segment provides a wide range of analytical and data services for investment managers and investment advisors globally.

51. Prior to and throughout the Class Period, the Company's Financial Services segment, operating as S&P, was heavily involved in rating structured finance transactions made up of RMBS and CDOs – including large amounts of transactions in the subprime market. The revenue associated with the Company's structured finance ratings was a tremendous driver of the Company's growth during the Class Period, and was also a primary driver of the Company's stock price. It accounted for some 75% of McGraw-Hill's total operating income in 2007, up from approximately 42% in 2000. Put simply, the Company's entire financial performance ballooned during the Class Period as a result of its ratings of RMBS and CDOs. Attached hereto as ***Exhibit 9*** is a true and correct copy of a chart demonstrating the tremendous revenue growth of the "Big 3" credit rating agencies between 2002-2007.[11]

**B.    The Evolution of Mortgage Lending Practices Leads to Increased Use of Mortgage-Backed Securities**

52. Prior to 1980, the mortgage market was dominated by savings and loan associations that originated conventional mortgage loans, mortgage bankers that originated government mortgage loans, and mortgage brokers that handled everything else. Changes enacted by the Depository Institutions Deregulation and Monetary Act of 1980 reduced the lending advantage that savings and

---

[11] The chart was made public by the House Oversight Committee and was also included in the Senate Subcommittee's exhibits for its April 23, 2010 hearing.

loans had enjoyed, and allowed the mortgage market to shift toward federal banks and federal government sponsored enterprises ("GSEs"). GSEs played a key role in the development of mortgage-backed securities.

53. The Alternative Mortgage Transaction Parity Act of 1982 authorized state-chartered lending institutions to offer alternative mortgage products, including those with variable interest rates and balloon payments, and has been credited with increasing parity among state- and federally-chartered mortgage banks. The Tax Reform Act of 1986 stimulated mortgage demand by retaining the federal income tax deduction for mortgage interest and eliminating similar deductions for consumer debt like car loans and educational loans. These legislative changes, together with the increased popularity of mortgage-backed securities, encouraged and facilitated product innovation and expanded credit availability during the 1980s.

54. Prior to the mid-1990s, most lenders required potential homeowners to put 20% down on their new home loans. People with damaged credit, employees with non-wage income, and young people with few savings for down payments were largely shut out of the housing market. As the millennium approached, however, the mortgage lending market changed dramatically, and credit became much more widely available.

55. The increasing popularity of the Internet and advances in computing technology made it easier and cheaper to process and package new loans. Electronic databases made it easier for lenders to rapidly attempt to assess the risk of lending to borrowers with damaged credit, and the secondary market for mortgage-backed securities helped lenders package riskier loans with less risky ones to theoretically mitigate an investor's risk exposure. Strong interest in highly-rated mortgage-backed securities from investors in the United States and abroad gave lenders a great incentive to lend – they were able to rapidly resell their loans on the secondary market, make a profit, and unload the risk of payment default to others. For this to occur, however, the securitized mortgages had to

26

receive high credit ratings from credit rating agencies such as McGraw-Hill's S&P.

56.     These changes had dramatic consequences for home ownership.  According to a recent study by the Federal Reserve Bank of Chicago, subprime lending put as many as two million families into homes over the past decade; helping push the United States homeownership rate to 69% in 2005, up from 65% in 1995.  Although subprime lending alone did not cause this change, it accounted for close to half of the four-percentage point rise in home ownership and is believed to have had almost as much of an impact on rising home ownership as demographic changes, low interest rates, and government programs combined.  Former Federal Reserve Chairman Alan Greenspan referred to subprime lending as "the democratization of credit."

57.     Changes over the past decade not only helped subprime homebuyers enter the market, but also first-time homebuyers.  In 2006, 45% of first-time homebuyers purchased their homes with no money down, up from 43% a year earlier, and up from nearly zero percent ten years before.

58.     At about the same time that credit became more readily available, housing prices were increasing, and doing so dramatically in certain areas, such as California and Florida. Homebuyers seeking to purchase increasingly expensive homes were gravitating toward mortgages with low introductory interest rates and other features that put previously unaffordable homes within their grasp.  Nontraditional mortgages became the norm and fed the appreciation in housing prices. Nationwide, nontraditional loans comprised over one-third of all loans made during the first nine months of 2006, up from about 2% in 2000.

59.     The growth of nontraditional mortgages changed the market for securities.  As the nonprime market has grown, so has the popularity of private-label mortgage backed securities (*i.e.*, those securitized by entities other than the GSEs).  Total outstanding private-label CDOs represented 29% of all CDOs in 2005, more than double its share in 2003.  At the same time, the share of CDOs held by the GSEs fell by 10 percentage points, from 53% to 43%.  The shift is a dramatic reflection

of investor choice. Investors left the guaranteed, GSE-backed mortgage market for higher interest rates in the potentially riskier, privately-backed mortgage securities market. As they did so, the amount of capital available to fund nontraditional mortgages grew, making more of these mortgages available to more borrowers.

60. In an effort to meet the needs of borrowers who could not fully document their income, employment, or assets, a new mortgage lending segment was started in the 1990s called Alt-A. Typically, these borrowers were self-employed and had good cash flow, but could not document their income via tax returns, W-2's and pay stubs. The typical Alt-A borrower had a higher FICO and a good credit history.

61. After 2003, however, Alt-A lending rapidly evolved into loans that had very little borrower information or had stated income and stated assets. In other words, information in the mortgage loan application (such as income and assets) was not verified by the lender, and lenders relied upon the borrowers' credit scores and the adequacy of the underlying collateral when underwriting loans.

62. This type of aggressive lending and relaxed underwriting, prior to and during the Class Period, enabled more and more borrowers to qualify for loans while providing little or no documentation. The more housing prices rose, the more popular Alt-A loans became. But, as the Alt-A business grew, more of these loans were offered to less creditworthy borrowers, creating what mortgage industry insiders called "Alt-B" products. The result was that the difference between Alt-A and subprime loans was virtually eliminated because Alt-A products were burdened with subprime deficiencies.

### 1.    The Creation of RMBS and CDOs[12]

63.    The process for creating a RMBS begins when an arranger, typically an investment bank, packages mortgage loans into a pool and transfers them to a trust that will issue securities collateralized by the pool.  There are generally thousands of separate loans in each pool.  The trust then purchases the loan pool and becomes entitled to the interest and principal payments made by the borrowers.  The trust finances the purchase of the loan pool through the issuance of RMBS to investors.  The monthly interest and principal payments from the loan pool are used to make monthly interest and principal payments to the investors in the RMBS.

64.    The trust typically issues different classes of RMBS – known as "tranches" – that offer a sliding scale of coupon rates based on the level of credit protection that is supposed to be afforded to the security.  Credit protection is theoretically designed to shield the tranche securities from the loss of interest and principal due to defaults of the loans in the pool.  The degree of credit protection afforded a tranche security is known as its "credit enhancement."

65.    The primary source of credit enhancement is subordination, which creates a hierarchy of loss absorption among the tranche securities.  For example, if a trust issued securities in 10 different tranches, the first (or senior) tranche would have nine subordinate tranches, the next highest tranche would have eight subordinate tranches and so on down the capital structure.  Any loss of interest and principal experienced by the trust from delinquencies and defaults in loans in the pool are allocated first to the lowest tranche until it loses all of its principal amount and then to the next lowest tranche and so on up the capital structure.  Consequently, the senior tranche should not incur any loss until all the lower tranches have absorbed losses from the underlying loans.

---

[12] The allegations contained in this section concerning the creation of RMBS and CDOs are primarily taken from the SEC's Credit Agencies Report. *See Exhibit 6*.

66. A second form of credit enhancement is over-collateralization, which is the amount that the principal balance of the mortgage pool exceeds the principal balance of the tranche securities issued by the trust. This excess principal creates an additional "equity" tranche below the lowest tranche security to absorb losses. In the example above, the equity tranche would sit below the tenth tranche security and theoretically protect it from the first losses experienced as a result of defaulting loans.

67. A third form of credit enhancement is excess spread, which is the amount that the trust's monthly interest income exceeds its monthly liabilities. Excess spread is comprised of the amount by which the total interest received on the underlying loans exceeds the total interest payments due to investors in the tranche securities (less administrative expenses of the trust, such as loan servicing fees, premiums due on derivatives contracts, and bond insurance). This excess spread can be used to build up loss reserves or pay off delinquent interest payments due to a tranche security.

68. The process for creating a typical CDO is similar to that of an RMBS. A sponsor creates a trust to hold the CDO's assets and issue its securities. Generally, a CDO is comprised of 200 or so debt securities. The CDO trust uses the interest and principal payments from the underlying debt securities to make interest and principal payments to investors in the securities issued by the trust. Similar to RMBS, the trust is structured to provide differing levels of credit enhancement to the securities it issues through subordination, over-collateralization, excess spread and bond insurance. In addition to the underlying assets, one significant difference between a CDO and an RMBS is that the CDO may be actively managed such that its underlying assets change over time, whereas the mortgage loan pool underlying an RMBS generally remains static.

69. When it comes to CDOs, rating companies such as McGraw-Hill's S&P brand actually do much more than evaluate them and give them letter grades. The raters play an integral

role in putting the CDOs together in the first place. In that regard, they help financial firms divide the CDOs into tranches, and participate in every level of packaging a CDO. They tell CDO arrangers how to squeeze the most profit out of the CDO by maximizing the size of the tranches with the highest ratings. Unlike the corporate bond market, in the Structured Finance market rating agencies "run the show." It is not a passive process of rating corporate debt. It is a financial engineering business.

70.     As the growth of CDOs exploded (fueled by AAA ratings), CDOs became some of the largest purchasers of subprime RMBS and the drivers of demand for those securities. It became, in effect, a self-fulfilling prophecy. According to one credit rating agency, the average percentage of subprime RMBS in the collateral pools of CDOs it rated grew from 43.3% in 2003 to 71.3% in 2006. As the market for mortgage-related CDOs grew, CDO issuers began to use credit default swaps to replicate the performance of subprime RMBS and CDOs. In this case, rather than purchasing subprime RMBS or CDOs, the CDO entered into credit default swaps referencing subprime RMBS or CDOs, or indexes on RMBS. These CDOs, in some cases, were composed entirely of credit default swaps ("synthetic CDOs") or a combination of credit default swaps and cash RMBS ("hybrid CDOs"). In other words, as CDOs became more popular, they exponentially grew in terms of complexity, to the point where few, if any, could determine the actual makeup of assets underlying a CDO. This immense and intense complexity led to substantially increased market reliance on ratings agencies, such as S&P, to serve as gatekeepers to the entire RMBS and CDO market.

### 2.     Credit Ratings of RMBS and CDOs

71.     A critical step in the process of creating and ultimately selling a subprime RMBS and CDO is the issuance of a credit rating for each of the tranches issued by the trust (with the exception of the most junior "equity" tranche). A credit rating for each rated tranche is supposed to indicate the credit rating agency's view as to the creditworthiness of the debt instrument in terms of the

likelihood that the issuer would default on its obligations to make interest and principal payments on the debt instrument. Put simply, without a credit rating, RMBS and CDOs cannot be sold.

72. Generally speaking, the arranger of the RMBS initiates the ratings process by sending the credit rating agency a range of data on the subprime loans to be held by the trust (*e.g.*, principal amount, geographic location of the property, credit history and FICO score of the borrower, ratio of the loan amount to the value of the property and type of loan: first lien, second lien, primary residence, secondary residence), the proposed capital structure of the trust and the proposed levels of credit enhancement to be provided to each RMBS tranche issued by the trust. Upon receipt of the information, rating agencies like S&P assign a lead analyst who is responsible for analyzing the loan pool, proposed capital structure and proposed credit enhancement levels, and, ultimately, for formulating a ratings recommendation for a rating committee composed of analysts and/or senior-level analytic personnel.

73. The next step in the ratings process is for the analyst to develop predictions, based on a quantitative expected loss model and other qualitative factors, as to how many of the loans in the collateral pool would default under stresses of varying severity. This analysis also includes assumptions as to how much principal would be recovered after a defaulted loan is foreclosed. To assess the potential future performance of the loan under various possible scenarios, each rating agency generally uses specific credit characteristics to analyze each loan in the collateral pool. These characteristics are supposed to include the loan information described above as well as the amount of equity that the borrowers have in their homes, the amount of documentation provided by borrowers to verify their assets and/or income levels and whether the borrowers intend to rent or occupy their homes.

74. The purpose of this loss analysis is to determine how much credit enhancement a given tranche security would need for a particular category of credit rating. The severest stress test

(*i.e.*, the one that would result in the greatest number of defaults among the underlying loans) is supposed to be run to determine the amount of credit enhancement required for an RMBS tranche issued by the trust to receive the highest rating. The next severest stress test is run to determine the amount of credit enhancement required of the next highest tranche and so on down the capital structure. The lowest rated tranche is analyzed under a more benign market scenario. Consequently, its required level of credit enhancement -- typically provided primarily or exclusively by a subordinate equity tranche -- is based on the number of loans expected to default in the normal course given the lowest possible level of macroeconomic stress.

75.    The next step in the ratings process is for the analyst to check the proposed capital structure of the RMBS against requirements for a particular rating. Typically, if the analyst concludes that the capital structure of the RMBS does not support the desired rating, this preliminary conclusion would be conveyed to the arranger. The arranger could accept that determination and have the trust issue the securities with the proposed capital structure and the lower rating or adjust the structure to provide the requisite credit enhancement for the senior tranche to get the desired highest rating. Generally, arrangers aim for the largest possible senior tranche, *i.e.*, to provide the least amount of credit enhancement possible, since the senior tranche -- as the highest rated tranche -- pays the lowest coupon rate of the RMBS' tranches and, therefore, costs the arranger the least to fund.

76.    The next step in the process is for the analyst to conduct a cash flow analysis on the interest and principal expected to be received by the trust from the pool of subprime loans to determine whether it will be sufficient to pay the interest and principal due on each RMBS tranche issued by the trust. The rating agency uses quantitative cash flow models that analyze the amount of principal and interest payments expected to be generated from the loan pool each month over the terms of the RMBS tranche securities under various stress scenarios. The outputs of this model are

compared against the priority of payments (the "waterfall") to the RMBS tranches specified in the trust legal documents. The waterfall documentation could specify over-collateralization and excess spread triggers that, if breached, reallocated principal and interest payments from lower tranches to higher tranches until the minimum levels of over-collateralization and excess spread were reestablished. Ultimately, the monthly principal and interest payments derived from the loan pool need to be enough to satisfy the monthly payments of principal and interest due by the trust to the investors in the RMBS tranches as well as to cover the administrative expenses of the trust. The analyst also reviews the legal documentation of the trust to evaluate whether it is bankruptcy remote, *i.e.*, isolated from the effects of any potential bankruptcy or insolvency of the arranger.

77. Following these steps, the analyst develops a rating recommendation for each RMBS tranche and then presents it to a rating committee composed of analysts and/or senior-level analytic personnel. The rating committee is supposed to vote on the ratings for each tranche and communicate its decision to the arranger. In most cases, an arranger can appeal a rating decision, although the appeal is not always granted (and, if granted, may not necessarily result in any change in the rating decision). Final ratings decisions are published and are supposed to be subsequently monitored through an ongoing surveillance process. Typically, the rating agency is paid only if the credit rating is issued, though sometimes it receives a breakup fee for the analytic work undertaken even if the credit rating is not issued.

78. The rating agencies' process for assigning ratings to subprime CDOs is similar and also involves a review of the creditworthiness of each tranche of the CDO. As with RMBS, the process centers on an examination of the pool of assets held by the trust and an analysis of how they would perform individually and in correlation during various stress scenarios. However, this analysis is based primarily on the credit rating of each RMBS or CDO in the underlying pool (or referenced through a credit default swap entered into by the CDO) and does not include an analysis

34

of the underlying asset pools in the RMBS.

79.     CDOs collateralized by RMBS or by other CDOs often are actively managed. Consequently, there can be frequent changes to the composition of the cash assets (RMBS or CDOs), synthetic assets (credit default swaps), or combinations of cash and synthetic assets in the underlying pool.  As a result, ratings for managed CDOs are based not on the composition of the pool but instead on covenanted limits for each potential type of asset that could be put in the pool.  Typically, following a post-closing period in which no adjustments can be made to the collateral pool, the CDO's manager has a predetermined period of several years in which to adjust that asset pool through various sales and purchases pursuant to covenants set forth in the CDO's indenture.  These covenants set limitations and requirements for the collateral pools of CDOs, often by establishing minimum and maximum concentrations for certain types of securities or certain ratings.

80.     In developing a rating for a CDO, the analyst uses the CDO's indenture guidelines to run "worst-case" scenarios based on the collateral that is permitted under the indenture.  In preparing a rating for that CDO, an analyst will run the rating agency's models based on all possible collateral pools permissible under the indenture guidelines, placing the most weight on the results from the weakest potential pools (i.e., the minimum permissible amount, 10%, of the highest-rated securities and the lowest-rated investment grade securities for the remaining 90%).  As with RMBS ratings, the analyst then compares the model results against the capital structure of the proposed CDO to confirm that the level of subordination, over-collateralization and excess spread available to each tranche provides the necessary amount of credit enhancement to sustain a particular rating.  The process is the same as for an RMBS rating – the analyst makes a recommendation for a rating to a ratings committee, which votes on the rating for each tranche and usually communicates its decision to the arranger.

## C. The Company's Ratings of RMBS and CDOs was Tremendously Lucrative

81.     Rating RMBS and CDOs became a tremendous profit center for the Company. Indeed, the Company's revenues ballooned through the Class Period as it rode the structured finance wave by rating RMBS and CDOs.  *See Exhibit 9*.  Commenting on the same chart attached hereto as *Exhibit 9*, during the April 23, 2010 hearing on *Wall Street and the Financial Crisis: The Role of Credit Rating Agencies*, Senator Levin stated, in relevant part:

> This chart. . . shows that from 2002 to 2007 the three top credit rating agencies doubled their revenues from less than $3 billion to over $6 billion per year.  Most of this increase came from rating complex financial instruments.  According to Standard & Poor's, between 2000 and 2006 investment banks underwrote nearly $2 trillion in mortgage-backed securities, $435 billion or 36 percent of which were backed by subprime mortgages.[13]

> All of those securities needed ratings.  Moody's and S&P each rated about 10,000 RMBSs – RMBS securities over the course of 2006 and 2007.  Credit rating executives got paid Wall Street-sized salaries.

82.     According to Richard Gugliada ("Gugliada"), S&P's global ratings chief for CDOs until 2005, a typical CDO paid 6 to 8 basis points, with a basis point being a hundredth of a percent. Because that amount was far more than the Company would earn by rating a typical corporate bond, Defendants were highly motivated to ride the structured finance tidal wave that crested during the Class Period.

## D. The Race to the Bottom:  The Pursuit of Market Share and Lucrative Fees Drive the Deliberate Lowering of Credit Analysis Standards

83.     The goal of Defendants' fraud was simple: maximize the Company's short term financial performance at all costs.  Although the means to achieve Defendants' fraudulent end were varied – and are detailed below – they all stemmed from one root cause:  maximize market share for

---

[13] A true and correct copy of a S&P chart detailing 2006 originations and RMBS, made public by the Senate Subcommittee, is attached hereto as *Exhibit 10*.

RMBS and CDOs in order to obtain lucrative fees. Investors, misled by Defendants' plethora of false and misleading statements, were never clued into Defendants' fraudulent game, and were never told Defendants were knee-deep in a race-to-the-bottom market share war over fattened fees. Indeed, the Defendants concealed that the Company's storied reputation for credibility and unassailable ratings criteria had become as meaningless as the AAA ratings S&P would willingly slap on pools of toxic mortgages and related assets. Moreover, Defendants hid the reality that the Company's volcanic eruption in financial performance was a passing fallacy built upon ratings structured to label what was nothing more than junk as investment grade.

84.     It is a documented fact that the Company bowed to competitive pressures during the Class Period. *See Exhibit 7* (Senate Subcommittee Finding of Fact No. 2). These competitive pressures, which manifested themselves primarily in the relentless pursuit of maximum market share, included S&P accommodating the desires of the very investment bankers who brought business to S&P. In other words, if investment bankers wanted high ratings (and why would they not?) S&P was happy to oblige, for a lucrative fee, and in order to prevent its customers from defecting to the competition (*i.e.*, Moody's) in search of a more accommodating rating.

85.     For example, according to a September 24, 2008 article on *Bloomberg.com*, entitled "Bringing Down Wall Street as Ratings Let Loose Subprime Scourge," "[d]riven by competition for fees and market share, the New York-based [ratings] companies stamped out top ratings on debt pools that included $3.2 trillion of loans to homebuyers with bad credit and undocumented incomes between 2002 and 2007. As subprime borrowers defaulted, the companies have downgraded more than three-quarters of the structured investment pools known as [CDOs] issued in the last two years and rated AAA." The article continued, "Without those AAA ratings, the gold standard for debt, banks, insurance companies, and pension funds wouldn't have bought the products. Bank writedowns and losses on the investments totaling $523.3 billion led to the collapse or disappearance

37

of Bear Stearns Cos., Lehman Brothers Holdings, Inc. and Merrill Lynch & Cos. and compelled the Bush administration to propose buying $700 billion of bad debt from distressed financial institutions."

86.     Describing the severity with which S&P went after market share and fees at the expense of ratings integrity, and the Company's reputation, Senator Levin – after completing an eighteen month investigation, stated during the Senate Subcommittee hearing:

> Some witnesses here today will describe how the environment changed from an academic culture focused on accurate ratings to one of intense pressure to get the deals done and preserve market share. The documents also show how the crushing volume of ratings undermined the ratings process.

> Despite record profits, both credit rating agencies were understaffed and overwhelmed with complex deals that investment bankers wanted to close within days. The documents show how investment bankers argued with the credit rating analysts, substituted worse assets at the last minute, and pressured analysts to waive their procedures and standards.

> We even saw instances of bankers pushing to remove analysts who were not playing ball and, at times, analysts who resisted banker demands or challenged ratings were restricted from rating deals.

> A focus on short-term profits also permeated the industry. One of the witnesses here today will describe how, when he once questioned a banker about the term of a deal, the banker replied, "IBGYBG." When asked what that meant, the banker explained, "I'll be gone, you'll be gone." In other words, why give me a hard time when we're both making a lot of money, and we'll be long gone before the house of cards comes crashing down.

87.     Likewise, the SEC's July 8, 2008 Credit Rating Agencies Report specifically identified the Company's S&P brand as one of the credit agencies that mislead the market regarding its ratings of the RMBS and CDOs. Importantly, the examination review period underlying the Credit Agencies Report covered January 2004 through July 2008, and included extensive on-site interviews and review of a large quantity of internal records and email communications.[14]  The

---

[14] Despite the fact that the Credit Agencies Report was issued after the close of the Class Period, the data, documents, and information underlying its conclusions are from within the Class Period.

startling revelations of the Credit Agencies Report, which shed additional light on the falsity of Defendants' Class Period statements, are referenced herein and in the appropriate sections, below.[15]

88.     According to S&P's top mortgage official, the Company placed a "For Sale" sign on its reputation on March 20, 2001, as S&P was competing for fees on a $484 million structured finance deal called Pinstripe I CDO Ltd.  Unbeknownst to investors, on that day, according to a September 24, 2008 article on *Bloomberg.com*, a member of an S&P executive committee ordered Managing Director and head of RMBS ratings Raiter to grade a real estate investment he had never reviewed.  In other words, Raiter was being directed to piggy-back on the rating of other ratings agencies, which violated S&P's own policies.  In a 2001 email exchange between two high-ranking managing directors at S&P, Raiter asked for the "collateral tapes" so he could assess the creditworthiness of the home loans backing the Pinstripe CDO.  A true and correct copy of the 2001 email exchange is attached hereto as ***Exhibit 12***.  The response he received from Gugliada, S&P's Managing Director for CDOs was that:

> Any request for loan level tapes is TOTALLY UNREASONABLE!!! Most investors don't have it and can't provide it.  Nevertheless we MUST produce a credit estimate. . . .
>
> It is your responsibility to provide those credit estimates and your responsibility to devise some method for doing so.  Please provide the credit estimates requested!

89.     As stated by Representative Henry Waxman in his October 22, 2008 opening statement for the House Oversight Committee, the email shows that Raiter "was stunned" because

---

[15] There is no question that significant portions of the Credit Agencies Report resulted from information that came from McGraw-Hill and its S&P brand, including some e-mails and statements that have been directly attributed to S&P.  In an August 2, 2008, the *Wall Street Journal* reported that "[p]roblems keeping up with the surging growth of mortgage-related debt products were particularly acute at [S&P]. . ." and that "[s]ome of the most strongly worded e-mails from analysts questioning [the firms'] own ratings came from S&P. . . the largest bond-rating firm by revenue."  *See **Exhibit 11***, Aaron Lucchetti, *Behind the Ratings*, WALL. ST. J., Aug. 2, 2008, at B1.  The article revealed that in "one e-mail, an S&P analytical staffer e-mailed another that a mortgage or structured settlement deal was 'ridiculous' and that 'we should not be rating it.'"  *Id.*

"[h]e was being directed to rate Pinstripe without access to essential credit data." Raiter then e-mailed back: "This is the most amazing memo I have ever received in my business career."

90.     As set forth in the September 24, 2008 *Bloomberg.com* article, Gugliada was asking Raiter "to just guess, put anything down." Raiter was "surprised that somebody didn't say, 'Richard [Gugliada], don't ever put this crap in writing.'"

91.     When a credit rating agency relies on a competitor's credit rating analysis, instead of conducting its own, that is called "notching." When notching occurs, the relying agency assigns a slightly lower rating to the competitor's original rating because of the uncertainty of the judgment. For the Pinstripe deal referenced in the email exchange above, over Raiter's objections, S&P graded 73% of the Pinstripe bonds AAA.

92.     According to the September 24, 2008 *Bloomberg.com* article, S&P outlined the alchemy of structured finance in a March 2002 paper for clients entitled "Global Cash Flow and Synthetic CDO Criteria." The article stated that "While arguing that the process wasn't 'turning straw into gold,' the authors said 'the goal' was to create a capital structure with a higher credit rating than the underlying assets would qualify for without financial engineering."

93.     The Company's descent into deceit as a result of Defendants' fraud was memorialized in a host of internal S&P communications during the Class Period that reveal a constant and disturbing disconnect between Defendants' false public statements and the Company's internal dialogue. These communications reveal that the Company set forth on a path to purposefully lower its ratings criteria in order to compete with other ratings agencies and maintain market share – the quality of ratings was no longer of paramount importance.

94.     For example, while Defendants touted the Company's explosive financial growth in its Financial Services segment, Company analysts were internally calling the CDO market a "monster" and a "house of cards." In one email, an analytical manager in S&P's CDO group wrote

40

to a senior analytical manager that the "[r]ating agencies continue to create an even bigger monster – the CDO market.  Let's hope we are all wealthy and retired by the time this house of cards falters. ;o)."  *See* **Exhibit 2**.

95.     For example, on May 25, 2004, just a few months before the start of the Class Period, Yu-Tsung Chang, S&P's Managing Director and Regional Manager for Japan and Korea, sent an email to Rose, S&P's Executive Managing Director for Structured Finance Ratings, and Jordan, S&P's Managing Director of Global ABS, under the subject "Competition with Moody's."[16]  The email focused on problems with S&P losing deals because its ratings criteria was not as loose as Moody's, and stated that there should be a shift in thinking to lower criteria so that more deals would not be lost in the future.  Specifically, the May 25, 2004 email stated:

> Joanne/Pat
>
> I was hoping to get your thoughts on this.
>
> We just lost a huge Mizuho RMBS deal to Moody's due to a huge difference in the required credit support level.  It's a deal that six analysts worked through Golden Week so it especially hurts.  What we found from the arranger was that our support level was at least 10% higher than Moody's.  The arranger told us the breakdown of the support levels and we found that Moody's analysis of commingling risk and interest rate risk (30 year floaters but a significant majority of the mortgages could convert into fixed rate causing serious negative carry risk) were that those two risks did not require any credit support.  Based on arranger's feedback, we suspect that because Mizuho is a mega bank, they ignored commingling risk and for interest rate risk, they took a stance that if interest rate rises, they'll just downgrade the deal.
>
> **Losing one or even several deals due to criteria issues [sic], but this is so significant that it could have an impact on future deals.  There's no way we can get back on this one but we need to address this now in preparation for the future deals**.
>
> I had a discussion with the team leaders here and **we think that the only way to compete is to have a paradigm shift in thinking**, especially with the interest rate risk.  Perhaps sizing for interest rate risk for the next 3-5 years only but take a stance

---

[16] A true and correct copy of the May 25, 2004 email, made public by the Senate Subcommittee, is attached hereto as **Exhibit 13**.

that we need to downgrade if interest rate risk rises beyond what is reasonable for the next 3-5 years.

In any case, I'm interested in your thoughts as to how to address this problem, and whether it is something I should work with Tommy [Gillis] on the criteria issues.

96. Another example occurred just prior to the start of the Class Period, in August 2004, when S&P took a bigger step down the slippery slope of compromising its own rating criteria in order to preserve market share and not lose deals to its competitors, without ever disclosing to the market that it was abandoning its own rating criteria (let alone the reasons for doing so). In that regard, on August 17, 2004, in response to an email from Gugliada stating that S&P had "no plans on changing our methodology", S&P Managing Director Gale Scott ("Scott") sent an email to Gugliada, David Tesher ("Tesher"), a Managing Director of Structured Finance Ratings, Jordan, Raiter, and Thomas Gillis ("Gillis"), the Managing Director and Chief Quality Office for Structured Finance Ratings, among others, to discuss lowering ratings criteria for rating CDOs because of the ongoing threat of losing deals.[17] Scott urged colleagues to adjust the Company's rating requirements for securities backed by commercial properties because of the "threat of losing deals" to competitors unless the Company relaxed (*i.e.*, deliberately lowered and compromised) its rating requirements. Specifically, the email stated, in pertinent part:

> **Subject**: RE: [Structure Finance] CIA: CDO methodology invokes reactions
>
> **Importance**: High
>
> Privileged and Confidential – Kim Diamond added
>
> Rich [Gugliada],
>
> We are meeting with your group this week **to discuss adjusting criteria for rating CDOs of real estate assets this week because of the ongoing threat of losing deals**. I am much less concerned about whether it is an actual investor attack or not.

---

[17] A true and correct copy of the August 17, 2004 email, made public by the Senate Subcommittee, is attached hereto as ***Exhibit 14***.

Whatever the reason, the fact is, bonds below 'AAA' are pricing wider which impacts the weighted average pricing on the deals. Ultimately issuers will react by taking the path of least resistance and making sure Moody's is on the deals. Thereafter, it's only a matter of time before their rating is also mandated for the primary deal as well. [Emphasis in original].

So yes, Moody's reaction is indeed predictable but if they have the ability to influence the market, what will be the impact on S&P?

97. On August 18, 2004, Raiter responded to Gillis with the following email: "Mickey, we particularly like the bold language from a discovery perspective." *See **Exhibit 14***.

98. Thereafter, on November 9, 2004, Scott sent an email concerning proposed changes to S&P's ratings methodology. Scott's concern centered not on the accuracy of ratings, but whether the Company could lose business, and she wrote, in pertinent part: "I'm trying to ascertain whether we can determine at this point if we will suffer any loss of business because of our decision and if so, how much? We should have an effective way of measuring the impact of our decision over time."[18]

99. Later in the Class Period, criteria discussions continued to focus on not losing market share. For example, on May 5, 2006, Thomas Warrack, a Managing Director in S&P's RMBS Group, sent an internal email discussing proposed changes to the Company's modeling criteria, which stated, in part: "We certainly did [not] intend to do anything to bump us off a significant amount of deals."[19] Echoing that sentiment, during an email exchange with Gillis and others on June 15, 2006, Curt Moulton, a S&P Managing Director and Chief Quality Officer, wrote, in pertinent part:[20]

---

[18] A true and correct copy of the November 9, 2004 email, made public by the Senate Subcommittee, is attached hereto as ***Exhibit 15***.

[19] A true and correct copy of the May 5, 2006 email, made public by the Senate Subcommittee, is attached hereto as ***Exhibit 16***.

[20] A true and correct copy of the June 15, 2006 email, made public by the Senate Subcommittee, is attached hereto as ***Exhibit 17***.

First scenario:

Let's assume for a moment that S&P does not change the current approach to ratings in the corporate area and that Moody's implements their proposal. We assume this scenario to be negative for the corporate business because Moody's will be giving out higher ratings on secured loans so issuers will be less likely to ask for an S&P rating on the issue. But what would this mean for the [Structured Finance] business?

Second scenario:

Let's assume S&P follows Moody's and elevates secured loan ratings by, say, 3-4 notches. We assume this would keep us competitive with Moody's on corporate ratings. But what would this mean for the [Structured Finance] business?

Final question: Is there any difference in impact to our [Structured Finance] business from these two scenarios?

100.    The above-email demonstrates that the true driving force behind the Company's purportedly hallowed criteria was not accuracy, predictiveness, or clarity with investors; rather, it was keeping pace with the competition and to preserve, or expand, market share.

101.    The severity of lowering criteria to appease issuers and preserve market share was not lost on others working at S&P. In a March 23, 2005 email discussing the Company's ratings models, Dr. Frank Parisi ("Parisi"), S&P's Chief Criteria Officer for Global RMBS Ratings, writing about the Company's models, described how the Company was "massag[ing] the sub-prime and Alt-A numbers to preserve market share."[21] On June 14, 2005, Parisi again expressed concern, sending an email that stated, "***Screwing with criteria to 'get the deal' is putting the entire S&P franchise at risk – it's a bad idea***."[22] Company executives, however, ran roughshod over such concerns, and it is now a documented fact that the Company lowered criteria to get more deals and maintain market share.

---

[21] A true and correct copy of the March 23, 2005 email, made public by the Senate Subcommittee, is attached hereto as ***Exhibit 18***.

[22] A true and correct copy of the June 14, 2005 email, made public by the Senate Subcommittee, is attached hereto as ***Exhibit 19***.

102.     The explosive growth in Structured Finance made it the key driver of McGraw-Hill's financials during the Class Period.  Indeed, in their Class Period statements, the Individual Defendants frequently pointed to Structured Finance as the global pacesetter for the Company's revenue growth.  Accordingly, a former Assistant Product Manager for the Company's LEVELS model stated that McGraw kept very close track of the Company's Structured Finance group. McGraw was "obsessed with market penetration."  This former employee described the Structured Finance group as McGraw's "bread and butter" and stated that "without Structured Finance, [McGraw] couldn't even keep daddy's company afloat."  In other words, McGraw was "absolutely aware" of the Structured Finance operations and financial results.  Similarly, the former Managing Director stated that Bahash was certainly seeing the Structured Finance Group's budget numbers and because the Structured Finance was "just exploding" with growth, the Individual Defendants "were tracking the numbers very closely."  The former Executive Assistant to the President also described regularly scheduled Executive Committee Meetings, Pre-Management Review Meetings, and Management Review Meetings where S&P's financial results were analyzed and discussed by the highest ranking members of the Company, including the Individual Defendants.

103.     In that regard, each month this former Assistant Product Manager prepared a Market Penetration Data Report, a summary of which was sent directly to McGraw.  She/he knew that McGraw received the report each month because this former employee was "enticed" to take on the responsibility of preparing the Market Penetration Data Report by the promise that it would be seen each month by McGraw.  This former employee was responsible for preparing the European portion of the Market Penetration Data Report.  Another S&P employee, Amy Yen, was responsible for preparing the sections covering the United States.  This former Assistant Product Manager recalled that she/he spent approximately 15 hours each month preparing her/his part of the report, and that she/he would be in the office until 1:00 AM at the end of each month in order to prepare it.  The

Market Penetration Data Report "basically showed how many deals were out there and who rated the deals."

104.     Echoing the disturbing details revealed by internal S&P documents and confidential witnesses, and describing the market-share penetration that McGraw was so obsessed with (to the point that the Company secretly compromised its own ratings criteria), in an article titled "'Race to Bottom' at Moody's, S&P Secured Subprime's Boom, Bust," *Bloomberg.com* reported on September 25, 2008 that S&P repeatedly eased its standards as it pursued profits from structured finance investment pools sold by its clients, "according to company documents, e-mails and interviews with more than 50 Wall Street professionals." Former S&P Managing Director Gugliada stated that it amounted to a "market share war where criteria were relaxed." Gugliada told *Bloomberg.com* "I knew it was wrong at the time." "It was either that or skip the business. That wasn't my mandate. My mandate was find a way. Find the way." The market, of course, never knew the Company was playing this game. To the contrary, Defendants *always* touted the Company's credibility, reputation, and integrity. Among other things, the *Bloomberg.com* article stated, in pertinent part:[23]

> 'Would Have Stopped Flow'
>
> "Without these AAA ratings, that would have stopped the flow of money," says [Joseph] Stiglitz, 65, a professor at Columbia University in New York who won the Nobel Prize in 2001 for his analysis of markets with asymmetric information. *S&P and Moody's "were trying to please clients," he said. "You not only grade a company but tell it how to get the grade it wants."*
>
> *             *             *
>
> *S&P and Moody's earned as much as three times more for grading the most complex of these products, such as the unregulated investment pools known as collateralized debt obligations, as they did from corporate bonds*. As homeowners

---

[23] A true and correct copy of the September 25, 2008, *Bloomberg.com* article is attached hereto as *Exhibit 20*.

defaulted, the raters have downgraded more than three-quarters of the AAA-rated CDO bonds issued in the last two years.

<center>*     *     *</center>

S&P's Model Changes

Meanwhile, S&P tinkered with its methodology for grading CDOs that bought commercial mortgage securities backed by apartments, hotels, offices and stores, according to an Aug. 17, 2004, e-mail obtained by Bloomberg. ***Managing Director Gale Scott warned of the "threat of losing deals" to Moody's unless the company relaxed its rating requirements***.

***"OK with me to revise criteria," replied Gugliada, then S&P's top CDO-rating executive, the e-mail exchange shows***.

***In an interview, Gugliada confirmed the e-mail's contents and said it led to <u>one of</u> S&P's adjustments to accommodate clients***. He says Scott did research supporting a relaxation of S&P's assumptions about how closely correlated the default probabilities were for commercial real estate securities.

More Flexibility

The changes gave S&P's clients more flexibility. The switch directly preceded "aggressive underwriting and lower credit support" in the market for commercial mortgage-backed securities from 2005 to 2007, according to an S&P report that Scott co-wrote in May 2008. This led to growing delinquencies, defaults and losses, the report said.

Scott left in August as S&P cut staff. The company declined to make her available for comment before her departure, and subsequently she couldn't be reached.

Errors sometimes worked their way into the analysis. Kai Gilkes, 40, a former S&P quantitative analyst in London, says he discovered a flaw in the company's main CDO model, the CDO Evaluator, which he updated in late 2005.

In some cases, the S&P system overstated the quality of synthetic CDO Squared securities, Gilkes says. These complex investment pools are based on credit default swaps, a type of insurance against corporate default.

"On collateral rated AA or higher, the S&P model did not properly stress the default behavior of the underlying CDOs, resulting in assets with a lower default probability than their ratings suggested," Gilkes says.

'Line in Sand Shifts'

He says he fixed the glitch during "a major revision" that December and doesn't know whether any investment was inappropriately rated as a result of the error.

***Still, Gilkes says he believed that competitive considerations, as communicated by***

<center>47</center>

*management, intruded on S&P's ratings decisions up until he left the London office in 2006.*

*"The discussion tends to proceed in this sort of way," he says. "'Look, I know you're not comfortable with such and such assumption, but apparently Moody's are even lower, and, if that's the only thing that is standing between rating this deal and not rating this deal, are we really hung up on that assumption?' You don't have infinite data. Nothing is perfect. So the line in the sand shifts and shifts, and can shift quite a bit."*

"Golden Goose"

*Gugliada says that when the subject came up of tightening S&P's criteria, the co-director of CDO ratings, David Tesher, said: "Don't kill the golden goose."*

105.    Summing up the immense value S&P placed on market share, Raiter testified on

April 23, 2010 that:

> Raiter:  . . . The other thing that was heard constantly, and it was in one of these emails: if we change, everybody will think that we've been wrong. And that just put a real anchor on any new ideas quickly going through the process, because they were afraid somebody would suggest that they hadn't been right before and they'd have liability or they'd lose some market share. That was not doing the right thing, and they don't have a referee or anyone to tell them when they've crossed the line.

<p style="text-align:center">*      *      *</p>

> Sen. Levin:  So the market share was a factor there as well as to whether or not you would use the new available information to re-rate the existing securities?

> Raiter:  Yes, sir.

106.    Indeed, the Minutes of the Regular Meeting of Board of Directors for McGraw-Hill

held on December 5, 2007, reflect that there was a discussion on how the market would react to

ratings that changed too quickly. The minutes state that McGraw "noted the market would reject

ratings that were too volatile because ratings are supposed to be less volatile than market prices."[24]

107.    In conjunction with the Senate Subcommittee's hearing on April 23, 2010, the

Attorney General for the State of Connecticut, Richard Blumenthal ("Blumenthal"), submitted

---

[24] A true and correct copy of the minutes of the December 5, 2007 meeting of McGraw-Hill's Board of Directors, made public by the Senate Subcommittee, is attached hereto as *Exhibit 21*.

written testimony. Blumenthal's testimony supports Plaintiff's allegations, the confidential witness statements identified herein, and the conclusions and findings of fact of the Senate Subcommittee. Blumenthal testified, in pertinent part, that:[25]

> Although credit rating agencies repeatedly emphasized their independence and objectivity when rating structured finance securities, I found that Moody's and S&P knowingly failed to fulfill their representations. In particular, their ratings on structured finance securities were tainted by their desire to earn lucrative fees.

> Moody's and S&P knowingly catered to the demands of investment banks and other large issuers of structured finance securities to increase their own revenues. As a result, many risky structured finance securities undeservedly received Moody's and S&P's highest ratings.

> Essentially, these credit rating agencies gave the best ratings money could buy, thus serving their powerful investment banking clients, rather than objectively rating risky securities. They misled investors and others -- including individuals, banks, mutual funds, insurance companies, hedge funds, pension funds and government regulators - - into believing that their credit ratings were independent and objective. Many investors may have avoided particular investments if they knew that these instruments contained far more risk than the agencies' ratings indicated, with many ultimately proving nearly worthless.

>     \*  \*  \*

> As guardians of America's financial markets, Moody's and S&P have an obligation to fulfill their promises of independence and objectivity. Similarly, they must end their misplaced focus on meeting the demands of their big financial firm clients at the cost of objective analysis and maximizing revenue to the detriment of ratings quality. Competition between the rating agencies cannot be a race to the bottom -- victory going to the company that most quickly and deftly weakens its methodologies to satisfy a powerful customer.

> The rating agencies have been enablers of the wrongdoing that brought our nation to the brink of economic catastrophe.

> This insidious dynamic was thrust into public view by the lawsuit filed last week by the Securities and Exchange Commission ("SEC") against Goldman Sachs & Company. According to the SEC's complaint, the ABACUS CDO -- a security that unknown to investors was designed to fail -- was given the highest rating by both Moody's and S&P, and yet was nearly worthless within months of its issuance. As described in an email contained in the SEC's complaint, "rating agencies . . . have all

---

[25] A true and correct copy of Blumenthal's written testimony is attached hereto as *Exhibit 22*.

the incentives to keep the game going, while 'real money' investors have neither the analytical tools nor the institutional framework" to prevent such calamities.

\*　　　\*　　　\*

Moody's and S&P are aware of investors and other market participants' reliance on their ratings of structured finance securities and encourage this reliance by making repeated public representations assuring the independence and objectivity of their analysis. Indeed, Moody's and S&P take every opportunity to proclaim that their ratings are objective, independent, and not influenced by either their own or their clients' financial interests. These statements of independence and objectivity are simply untrue, and Moody's and S&P know it.

Specifically, as far back as 2001, Moody's and S&P knowingly catered to the demands of investment banks and other large issuers of structured finance securities in order to increase their own revenues. As a result, many risky structured finance securities undeservedly received Moody's and S&P's highest ratings.

Moreover, the users of Moody's and S&P's structured finance ratings received a product or service significantly different from what Moody's and S&P publicly represented that they were providing to the marketplace. Instead of being independent and objective, Moody's and S&P placed their own financial interests, and those of their largest clients, ahead of those they pledged to protect -- the investing public.

\*　　　\*　　　\*

As my investigation and others show, Moody's and S&P decided that the best way to please issuers of structured finance securities was to weaken criteria for evaluating these investments so that a high credit rating was more readily given. Contrary to their public promises, both Moody's and S&P willfully relaxed standards in order to further their own and their clients' financial interests.

\*　　　\*　　　\*

Between at least 2006 and 2007, both Moody's and S&P were repeatedly pitched by issuers attempting to influence the rating assigned to a specific security. Upon learning of the rating the competition was likely to assign to a transaction, Moody's and S&P routinely relaxed their analysis and agreed to provide the higher rating. Moody's and S&P's greed clouded their judgment, as both companies chose to increase their revenue rather than lose out on business to a competitor.

\*　　　\*　　　\*

Changes to Ratings Methodologies Based on a Quest for Revenue

The pressure to increase revenue and win business also ultimately influenced the methodologies that Moody's and S&P developed for rating structured finance securities. Going back to at least 2001 for S&P and 2004 for Moody's, both companies hid from the general public that their respective ratings methodologies

50

were directly influenced by the wishes of their clients. Moody's and S&P adopted this approach specifically to please their clients (i.e., the issuers that paid their fees) and to enhance their revenue. Whether Moody's and S&P's ratings methodologies accounted for all the credit risk that Moody's and S&P knew existed was of secondary importance to their own bottom line. Moreover, the independence and objectivity that both companies promised to the marketplace was largely forgotten.

S&P in particular knew that its ratings methodologies were based on limited and out-of-date data about the actual performance of the new sub-prime mortgage products flooding the market. Rather than obtain that data, which was readily available to S&P, and implement the necessary changes to update its rating methodologies, S&P simply continued using the models that were already generating the high ratings that its clients desired. In the words of one S&P executive, the primary factor in S&P's decision not to update its model was that ". . . [S&P] enjoyed the largest ratings market share among the three major ratings agencies (often 92% or better), and improving the model would not add to S&P's revenues."

S&P's flagrant disregard for independent and objective credit analysis also impacted how it monitored the structured finance ratings that it already had assigned. S&P publicly represented that it conducted extensive surveillance on the structured finance securities that it rated so as to make sure that its ratings continued to correctly reflect its current assessment of credit risk. In actuality, however, prior to at least 2008, S&P deliberately subverted its surveillance team, which was woefully understaffed, saddled with outmoded monitoring resources and thus rendered incapable of keeping up with S&P's voluminous deal flow.

Specifically, S&P failed to employ its rating models or knowledge and updates its analysts garnered about how poorly sub-prime loans were performing to review ratings on earlier vintage RMBS or other structured finance securities. S&P failed to do so because it knew that if it actually carried through on its public representations of a thorough surveillance process, it would have to acknowledge that many of the structured finance securities that it had previously rated AAA were undeserving of such a high rating. This would have resulted in multiple downgrades and, ultimately, S&P making less money.

*     *     *

As the above examples demonstrate, rather than being the independent and objective evaluators of credit risk they claimed to be, Moody's and S&P were hopelessly conflicted and allowed this conflict to compromise the integrity of their ratings. As a result, many investors purchased structured finance securities riddled with concealed risk that ultimately proved to be nearly worthless.

Moody's and S&P's willful dereliction of their standards was particularly harmful because their ratings pervaded the entire financial system, including investors, issuers, government regulators, and private financial contracts (i.e., credit default swaps). As the financial collapse has demonstrated, widespread issuance and investment in the toxic assets enabled by Moody's and S&P's biased and tainted ratings process has touched nearly every facet of our economy and has put our entire

51

financial system at risk.

The harm caused by this catastrophic failure was not just born by the wealthy. In addition to financial institutions and hedge funds, structured finance securities are found in the portfolios and pension funds of schoolteachers, policemen, and factory workers; hardworking average Americans who count on these investments for their future.

In closing, I commend the Senate Subcommittee's work on this important issue. I want to emphasize that significant reform of the credit rating agencies' business practices is vital. In thinking of Moody's and S&P's misaligned priorities, I am reminded of a quote from the Chinese Zen Master Hsi Tang - - "Although gold dust is precious, when it gets in your eyes it obstructs your vision." That is clearly what happened to the rating agencies.

E.    **To Preserve and Maintain Market Share, the Company Used Outdated, Ineffective, and Inaccurate Ratings Models**

108.    At all relevant times during the Class Period, Defendants knowingly used credit rating models for RMBS and CDOs that were inadequate and unable to predict, in any relevant or significant way, how high-risk residential mortgages, such as subprime, interest only, and option adjustable rate mortgages would perform. As set forth in more detail below, ***at least 80% of every class*** of RMBS rated AAA by S&P during 2006 and 2007 has been downgraded to junk status. For 2005 vintages, ***at least 53% (and up to 81%) of almost every class*** of RMBS rated AAA by S&P has been downgraded to junk. *See **Exhibit 8***. Defendants were intensely motivated to preserve market share and earn lucrative Structured Finance fees. On top of lowering criteria, they achieved their fraud by utilizing outdated, ineffective, and inaccurate ratings models. The immense failure of the Company's ratings to even remotely stand the test of time is a sad testament to the deliberate and documented infirmities Defendants ensured existed in S&P's models.

109.    These facts were documented in the SEC's Credit Agencies Report, which included startling revelations that illuminate the falsity of Defendants' Class Period statements, including that:

- An S&P analyst expressed concern that her firm's model did not capture "half" of the deal's risk, but that "it could be structured by cows and we would rate it."

- "[N]ot all our criteria is published. [F]or example, we have no published criteria on

hybrid deals, which doesn't mean that we have no criteria."

- "Rating agencies made 'out of model adjustments' and did not document the rationale for the adjustment. In certain instances, the loss level that was returned by application of the rating agency's quantitative model was not used, and another loss level was used instead. These decisions to deviate from the model were approved by ratings committees but in many cases the rating agency did not have documentation explaining the rationale for the adjustments, making it difficult or impossible to identify the factors that led to the decision to deviate from the model. Two rating agencies frequently used "out of model" adjustments in issuing ratings . . . it appears that [one rating agency] did not publicly disclose the practice of overriding model outputs regarding loss expectations . . . ."

- "None of the rating agencies examined had specific written procedures for rating RMBS and CDOs" and "[r]atings agencies do not appear to have specific policies and procedures to identify or address errors in their models or methodologies."

*See **Exhibit 6*** at 14-19.

110.    Looking back to 1995, the Company had a model in place to rate RMBS. This spreadsheet model sorted out the collateral in the pools and assigned enhancement requirements. One former Company employee that worked as a Managing Director stated that she/he recommended to Gillis, the Managing Director of Research and Criteria, that a lot of people would like to buy the modeling system. As a result, this confidential witness set out to "re-write" the modeling system and define a larger database that would assign more information to loan performance history. Her/his promise to clients was to keep the model updated and continue to refine it as the Company got larger databases to work with.

111.    This former Managing Director stated that the model generated interest with Freddie Mac, which assumed the model would provide its clients with a solution for loans not eligible to be purchased by Freddie Mac. Following this, the former Managing Director went to McGraw-Hill's corporate headquarters and suggested that selling the model could be a profit center for the Company. This confidential witness initially estimated she/he could generate $18-20 million annually selling the model, but McGraw "didn't like that" because McGraw "liked really big numbers." The former Managing Director recalled that the "magic number" was $50 million, and

that Tillman pledged to McGraw that that Company would generate $50 million in annual revenue from selling the model externally. The confidential witness recalled that this was a typical process at the Company in that "it wasn't what you thought you could do, but more it is what they wanted you to do."

112. One result of the Company's top-down budgeting process, described in detail below, was that the Company failed to implement improvements to its RMBS ratings model – LEVELS – that would have assured a more powerful and accurate ratings model and been capable of identifying the collapse of the subprime market. The former Managing Director recalled that the Company "used to talk about how it maintained the highest standards of analytical excellence." During this confidential witness' tenure, however, she/he became increasingly frustrated with the models being employed to rate RMBS transactions. She/he stated that the models were not sufficiently "up to date" and only received "band aids," not upgrades. This former high-ranking employee stated that the basic premise leading to the Company's failure to invest in analytical models was that "we already have market share, why invest in analytics?" This premise was continually communicated to this confidential witness in the top-down budgeting process. But, by not funding requests to improve analytics by upgrading models (as opposed to slapping on band aids), according to the former Managing Director, S&P "was not fulfilling its ethical guidelines to continue to improve analytics." Despite this resistance, the former Managing Director continued to push for better, improved versions of the LEVELS model.

113. She/he explained that the first version of LEVELS included a database of approximately 500,000 "prime quality jumbo loans" and that "we had to beg for the data." The data produced an algorithm that "was much better than what we had been using." The next version, which was completed approximately 18 months after the first version, included a database of approximately 1,000,000 loans. This former employee produced two subsequent versions of

54

LEVELS, which she/he referred to as Version 5.0 and Version 6.0. She/he received the data for Version 5.0 in 2001, which was completed by early 2002. Version 5.0 included a "full blown data dump" from a data swap with an entity named Loan Performance.

114. In late 2004, this former Managing Director had "worked out a deal" for S&P to acquire additional data from Loan Performance (data now required by the Company's settlement with the New York Attorney General). By late 2004 or early 2005, she/he had created LEVELS 6.0, which included a database of 10,000,000 loans. This confidential witness created the new models because she/he "knew that the models we were using were getting stale – we were just putting band aids on them and trying to adjust to new information." Because this former employee understood the key significance of acquiring additional loan data, in December 2005, she/he made a detailed presentation to Corbet regarding acquiring Loan Performance. The presentation was made in Corbet's conference room and was made to Corbet and her Executive Committee, which at the time included Rose, Tillman, Rita Bolger ("Bolger") and Milano. During the presentation, the former Managing Director provided a detailed history of all the LEVELS versions she/he had created and described in detail how the additional loan data was necessary to improve the ratings process. At the conclusion of the presentation, Corbet told the former Managing Director the presentation was the best acquisition presentation Corbet had ever seen. The Company, however, did not acquire Loan Performance, did not acquire that loan level data from any other company, and never used the vastly improved, existing LEVELS models created by the former Managing Director. These willful refusals to improve LEVELS are strong evidence of the falsity of Defendants' Class Period statements regarding the sophistication, application, and sufficiency of the Company's rating models.

115. The former Managing Director stated that the models were bandaged so much and that there was such better data available that it was a "crying shame" that the Company was still

putting on band aids.

116. The former Managing Director stated that what small improvements were created for the models were done by Company analysts "in their spare time" because "there was no staff dedicated to model development or improvements." She/he recalled in this regard that McGraw liked to say that the Company's Business Unit Managers had all the resources they needed, and that the Business Unit Managers were just not using them properly. This confidential witness stated that McGraw's reaction stifled requests to hire additional, needed analysts. Indeed, it is now a documented fact that the Company was inadequately staffed and did not improve its models because doing so would have threatened to ***increase*** the quality of ratings (thereby lowering the ratings) and potentially cause the Company to miss out on lucrative Structured Finance deals. *See Exhibit 7* (Senate Subcommittee Finding of Fact Nos. 1, 5)

117. The Company, however, never implemented Version 5.0 or Version 6.0. To the best of the former Managing Director's knowledge, neither Version 5.0 nor Version 6.0 had been implemented through mid-2008. Based on her/his experience in the industry, however, this former high-ranking Managing Director stated that had the Company implemented either Version 5.0 or Version 6.0 of LEVELS, the Company would have had a "better idea of how the new products [it was rating] were going to perform." The confidential witness stated that the new versions would have provided S&P with a sample of new loan products such as "No Income, No Asset" loans, fixed-floating loans, 2/28 or 3/27s. As a result, "we would have known what the enhancement requirements really should have been." "The enhancement requirements were lower than they should have been" because the Company's models were outdated and lacked sufficient data.

118.    For example, as part of an email exchange to analytical managers of S&P's mortgage group concerning the LEVELS model, on March 23, 2005, Parisi admitted that an updated version of LEVELS could have been released:[26]

> While I agree with number 1, I'm puzzled. When we first reviewed 6.0 results **a year ago** we saw the sub-prime and Alt-A numbers going up and that was a major point of contention which led to all the model tweaking we've done since. Version 6.0 could have been released months ago and resources assigned elsewhere if we didn't have to massage the sub-prime and Alt-A numbers to preserve market share.

119.    Commenting on the internal March 23, 2005 email, the following exchange occurred during the April 23, 2010 Senate Subcommittee Hearing:

> Raiter: No, sir. They should not have been massaged. I think I stated earlier that as the models were developed by our consultant and they were tested in house to verify that they were accurate and that their predictiveness was an improvement over the model that was currently running, the models were immediately put into force. We ran out of financing and funding and our budgets in 2003 to put this version 6.0 in place, but the preliminary analysis, as Dr. Parisi suggested, was that we were not adequately rating the transactions.
>
> That model was delivered I believe in September of 2006. They did an accuracy evaluation. It was determined to be accurate, better than what they were running and the consultant was paid. But they also performed what was called – it was an impact analysis on the ratings. We had never done that before, so I do not know where the order came to start doing impact analysis on the effective new models on market share. But it's apparent that that's what happened.
>
> Levin: What was your reaction when you read that e-mail? What was your reaction when you read that e-mail?
>
> Raiter: I was amazed. I mean, Frank Parisi was one of the Ph.D.s that worked on these models. He's very knowledgeable. He's one of the best analysts they have and very outspoken.
>
> Levin: Were you bothered by it?
>
> Raiter: Certainly.

120.    The former Managing Director also stated that as the LEVELS model got older, analysts and members of the Structured Finance department would see that it was not handling the

---

[26] See **Exhibit 18**.

deals properly. The result was that the analysts would multiply certain things as enhancements in an attempt to account for the model's deficiencies. The confidential witness stated that "it was a guess." The Company failed to disclose the deficiencies in their models or that its supposedly top-notch ratings, integrity, and reputation were being mortgaged by and had decayed into mere guesses.[27]

121.     Along the same lines, during the April 23, 2010 Senate Subcommittee hearing, Senator Levin raised the issue of whether S&P used a so-called "magic number" when it had insufficient data to predict how a new loan would perform. In response, Raiter testified:

> When we couldn't get the data in order to do a full analysis on a major revision to the model, they would come up with a multiplier that could be applied to the model results that were being run, which were inadequate, in order to beef that number up. And it was always intended that those magic numbers would be replaced with full-blown analytics when the data came in.
>
> And it's my understanding that there were some magic numbers installed in early 2005 when they made adjustments to the existing model. And if they were massaging information on the 6.0 model when it came out, it would typically be in the form of these multipliers that they would use.

122.     One telling example of how sensitive the Company was to potentially losing business because of criteria changes to its LEVELS model occurred in an email exchange between May 3-5, 2006. Specifically, on May 3, 2006, Robert Morelli at UBS sent an email to S&P stating, "[H]eard you guys are revising your residential mbs rating methodology – getting very punitive on silent seconds. heard your ratings could be 5 notches back of moddys [sic] equivalent. gonna kill your

---

[27] According to a former Managing Director, the committee of analysts assigned to review a rating in the Structured Finance Department is a "quality control process." The analysts would check to see if collateral has been reviewed and analyzed, if the enhancement was appropriate, and if the documents met the applicable standards. The lead analyst would simply make sure that the deal appeared to have been done properly. According to the confidential witness, there was not a vote, and it is "completely bogus whenever [the Company] raises that argument." In other words, the committee was not really a committee – it was an exercise in procedural formality. The former Managing Director stated that there is a committee, but not the same type of committee as with S&P's rating of corporates.

resi[dential MBS] biz. may force us to do moodyfitch [sic] only cdos!" In response, S&P employees internally discussed the ramifications of some proposed, moderate tightening to the Company's liberal modeling standards in a May 5, 2006 email with the subject "Confidential – Criteria Changes in LEVELS 5.7", which stated, in pertinent part:[28]

> We put out some criteria changes a couple of weeks ago that we will begin to use for deals closing in July.
>
> Significant changes included an update to our Housing Volatility Index (a home price indicator) which will be increasing our loss severity calculations and a more conservative approach to first liens with piggyback (silent seconds). Together these two changes will be making a moderate change in raising our credit support requirements going forward.
>
> However to say that these changes will leave us 5 notches back of Moody's sounds like a gross over statement, especially since we have been a notch or two more liberal than they have been (causing the split rating issues) for over the last year or two. The simulations that we did on the impact of our changes, more often then not we believe will bring our requirements close to theirs or in certain situations slightly higher.
>
> **We certainly did [not] intend to do anything to bump us off a significant amount of deals.**
>
> I'd like to respond aggressively to this, I'd be happy to contact Robert Morelli at UBS to discuss further. Is he on the CDO side of the business?

123. Similarly, a former Assistant Project Manager for the Company's LEVELS model from Fall 2005 through June 2008 stated that while LEVELS was "useful at one point" in time, the model "should have been updated" more. She/he stated that the Company was "telling clients certain components were going to be updated on a quarterly basis," but, in fact, the components were likely to be updated "maybe" on an annual basis. The failure to update LEVELS in a manner consistent with what the Company was telling clients (and the market), according to this confidential witness, began even before she/he started working for S&P in Fall 2005. Indeed, as this former

---

[28] *See **Exhibit 16**.*

employee continued working with LEVELS over time, the timeframe for updating the model became "progressively slower." In other words, it got more and more out of date.

124. For example, the former Assistant Project Manager for the Company's LEVELS model stated that S&P was always behind on updating the Housing Price Volatility Index ("HPI"). LEVELS employed a housing price index from the Office of Federal Housing Enterprise Oversight ("OFHEO"), as opposed to using the S&P Case Schiller Housing Price Index.[29] In addition to the fact that the Company was slow on implementing the HPI into LEVELS is that the OFHEO HPI was much slower than the S&P Case Schiller Index to pick up on the softening of home prices. Thus, S&P was not only behind on implementing the HPI at a time of falling house prices, but it knew that its own internal S&P Case Schiller Home Price Index showed a more dramatic slowing of the housing market than the HPI actually used in LEVELS.

125. Explaining why updates were not made to LEVELS, the former Assistant Project Manager for the Company's LEVELS model recalled that S&P analysts were "always too busy." The LEVELS product management team, including LEVELS Product Manager Galli and Assistant Product Manager Susanne Carter ("Carter") "had no input into criteria." The former employee recalled that the Company's clients were "always calling [her/him] to ask 'why aren't you updating LEVELS?'" The former employee stated that the decision not to update LEVELS was made by RMBS Managing Director Susan Barnes ("Barnes"), Managing Director Warrack, Senior Director Scott Mason ("Mason"), and RMBS Analyst Brian Vonderhorst ("Vonderhorst").

---

[29] For example, in a November 5, 2007 press release regarding an update to LEVELS, the Company announced: "Standard & Poor's Housing Volatility Index (HVI) adjustments will reflect newly released Office of Federal Housing Enterprise Oversight (OFHEO) house price data that may, depending on geographic dispersion, result in increased loss severity and loss coverage levels."

126.    During the House Oversight Committee hearing on October 22, 2008, Raiter testified, although he was not an expert in CDOs, that in the CDO arena, the Company's diversity index did not make sense:

> Well, again, I'm not an expert on the CDO model or the methods they used.  But what I have read about is it's tremendously driven by this diversity index that is supposed to tell you whether the bonds that are put in one of those transactions are correlated, so if one sector of the market starts to go down, whether that might have an impact on the performance of other bonds.  As they started, in my opinion, putting more residential mortgage and consumer bonds in these transactions, they were highly correlated in our intuition.  We weren't working on it, but it was highly correlated.  ***It really amazed us that they could put so many mortgages in the pool and still believe that it had diversification risk***.

127.    Later during the hearing, Raiter testified that the Company's failure to update its models prevented it from identifying problems in the subprime market as they occurred:

> I believe that Standard & Poor's at this time, there was a raging debate between the business managers and the analysts.  The analysts were in the trenches.  We saw the transactions coming in.  We could see the shifts that were taking place in the collateral. And we were asking for more staff and more investment in being able to build the databases and the models that would allow us to track what was going on.  The corporation, on the other hand, was interested in trying to maximize the money that was being sent up to McGraw-Hill, and the requests were routinely denied.  So, by 2005, when I retired, we did have two very excellent models that were developed but not implemented.  And it's my opinion that had we built the databases and been allowed to run those models and continually populated that base and do the analysis on a monthly quarterly basis, we would have identified the problems as they occurred.

128.    During the April 23, 2010 Senate Subcommittee hearing, Raiter testified that "as the market exploded and the new products arrived, we really should have been looking at coming out with new models every six months.  You know, a year at the worst."  In response to a question whether management was concerned about what effect not updating the Company's models would have on the "massive influx of new business," Raiter testified:

> No.  We didn't get any indication that it really bothered them, because they were turning us down for staff, they were turning us down for the resources we needed.  And what they were looking at was, you must not have been working very hard, because your volume doubled and nobody's quitting. So I guess you had slack down there.

And they were just enjoying the revenue. And by 2005 when I left, we were getting calls from corporate – monthly – how much money are you going to make this month? I mean, structured was driving the whole ratings business and our MBS was the fastest growing unit.

129.    During the April 23, 2010 Senate Subcommittee Hearing, the following exchange

occurred between Senator Kaufman and Raiter regarding the Company's models.

Sen. Kaufman: Let me just ask one question I have. You king of imply – do you think the decision not to move with the more advanced models was a financial decision, or do you think it was a decision made with the fact that it was going to make things more difficult to give higher ratings, and therefore, be not as competitive?

Raiter: I think the initial decisions not to fund it were because of resource constraints and the desire to maintain higher profits. I think the decisions that were made when it was finally developed and available for implementation would indicate whether they were stating to take a more serious look at what the impact on market and profitability was than just the analytics. I was gone by then.

130.    Summing up the Company's willingness to pursue lucrative ratings and market share

while refusing to update the models used to rate deals, Raiter testified during the October 22, 2008

House Oversight Committee hearing that revenues were what drove the Company – not the integrity

of its ratings or models – and that if the Company had timely updated its models, it would have seen

the subprime collapse coming from the very start of the Class Period:

Well, profits were what drove it starting in about 2001 at Standard & Poor's. It was the growth in the market and the growth--profits were running the show. In a nutshell, that was the simple answer. And the business managers that were in charge just wanted to get as much of the [revenue] as they saw like this, growing out in the street, into their coffers.

And the breakdown, in my opinion, was that while we can talk about or you all can consider different ways of fixing the rating agencies' current situation, by and large, the analysts, as we have seen in the e-mails, they were honest, hardworking people. And they were sending messages to the business managers through the [Managing Directors], et cetera, and they weren't getting any response.

So there was a big breakdown, and that reputation that was lost shouldn't be totally blamed on the analysts because most of them were trying to do the right thing, but the money became so great that the management lost focus.

In residential mortgages alone, just that piece of the business, from 1995 when I joined the firm to 2005, grew from $16 million a year for S&P to $150-plus million,

a tenfold increase. And the market was just being driven--it was being driven by low interest rates, by these new products that were coming out so fast and furious that it took a lot of money to track them and analyze them, and the money wasn't available. So our analysts spent their time just trying to get the ratings out the door and to alert management what was going on, and none of that money was plowed back and reinvested.

*And I firmly believe that had we continued to track at the loan level those new products, we would have seen things in 2004-2005 that would have forewarned us.*

And when you talk about the way these deals work, you can't lose the fact that triple-A bond has support; just like you should have equity in your house, the support underneath that was established by the rating. *With more information about those new products, that support requirement could have gone up significantly and made some of those products uneconomic to originate. But because they weren't tracking the data, they weren't allowing the analysts to collect it and analyze it continuously, those alerts waited until 2007 when everything collapsed.*

*There were good people in those firms at Moody's and S&P and Fitch that saw what was coming, and they tried to make management aware of it.* And money was the overriding concern at the top of the firm.

And the point Mr. Sarbanes made is right on the money. Some of these people are the same ones that brought Enron and WorldCom to us, and now they're going to give us another list of things. And you can go back and check; a lot of things on that list they promised to do after Enron and WorldCom exploded, and they still haven't done it--so the same people still in charge of the hen house.

131. To be clear, Plaintiff's claims are not based on the Company's business judgment regarding which models to use, when to update them, or how to apply them. The Company's poor business decisions are of no consequence to this case. Instead, Plaintiff's claims are based on Defendants' false and misleading statements, and their failure to disclose the truth. Defendants convinced the market that the Company's ratings were reliably created by sufficient and uniformly applied ratings models and criteria. While the Company was free to make a business decision to rate securities using insufficient and intermittently applied ratings models and criteria, or, as Parisi wrote, to engage in "[s]crewing with criteria to 'get the deal'" and put "the entire S&P franchise at risk," Defendants were not free to do so without disclosing that decision to the market.

**F.     To Preserve and Maintain Market Share, the Company "Sees No Evil" as it Slaps AAA Ratings on Deteriorating Subprime Mortgages and Risky Deals Not Likely to Perform**

132.    Although they have only recently grown to comprise a significant portion of the mortgage market, nontraditional mortgage loans have been available for many years.  In the past, nontraditional mortgage loans were offered only to higher-income borrowers, those with promising long-term earnings potential, such as young lawyers and doctors just finishing law and medical school, and to borrowers with uneven income streams, such as stock brokers or salespeople who receive large commission checks one or more times a year.  As set forth above, in the past several years, nontraditional loans have increasingly been used to help home buyers, especially those considered subprime borrowers, obtain credit.

133.    In an effort to qualify new borrowers for homes they would otherwise be unable to afford and to allow existing homeowners to refinance, even as interest rates were rising, lenders began lending to ever-riskier borrowers on ever more favorable terms.  These findings are not simply anecdotal; they are supported by several federal studies and examinations.  For example:

- In mid-2005, all five federal banking regulators (the Office of the Comptroller of the Currency ("OCC"), Federal Reserve Board ("FRB"), Federal Deposit Insurance Corporation ("FDIC"), Office of Thrift Supervision ("OTS"), and National Credit Union Administration ("NCUA")) reviewed data from six of the most sophisticated residential mortgage lenders in the country, looking for trends and current practices. The six lenders chosen represented half of the projected 2005 nontraditional mortgage product originations, as well as half of all mortgage originations.  The agencies' review found indications of loosening in underwriting standards, instances of borrowers not being qualified based on fully amortizing payments, an increase in piggyback loans, and an increase in the use of credit scores in lieu of income and asset verification. The layering of these activities on top of subprime nontraditional mortgages added additional layers of credit risk. The survey also found concentrations of nontraditional products in areas experiencing the most rapid home price appreciation.

- In January 2006, the FRB issued a report in which it found that a sizeable number of borrowers with ARMs did not fully understand the terms of their loans, particularly the percent by which their interest rates could change, whether there was a cap on interest rate increases, and the index to which their rates are tied.  These findings were particularly true for lower-income borrowers and those with less education.

- In an annual survey of credit underwriting practices at nationally chartered banks, released in October 2006, the OCC found that 26% of lenders had eased their lending standards in the prior year, most often by increasing the use of nontraditional mortgage products. The 2006 survey was the first in the survey's 11-year history in which a net easing in credit underwriting was found.

134. Thus, by early to mid-2006 it had been clearly established that mortgage brokers and lenders were lending to borrowers who, in the past, would have never qualified for loans. On top of lending to buyers who only a few years prior would have never qualified for loans, fraud was rampant as a result of stated income and non-traditional lending practices. In 2005, a white paper issued by the Federal Financial Institutions Examination Council ("FFIEC"), Washington, D.C., reported that as many as 10 percent of all mortgage loan applications annually in the U.S. residential real estate market involved a "material misrepresentation."

135. In October 2005, USA Today reported, "As the U.S. housing market hits record highs, mortgage fraud appears to be rising from California to Florida." The story quotes the author of a report on mortgage fraud, who noted that "fraud is costing the industry tens of millions of dollars."

136. As an additional example, at the May 2005 Mortgage Bankers Association's Secondary Marketing Conference, there was a panel discussion regarding mortgage fraud. On the mortgage fraud panel was George Kimmel ("Kimmel"), associate director of S&P's Structured Finance Group. Kimmel's comments at the conference included that "[S&P's] Structured Finance Group estimated the annual cost of mortgage fraud in 2003 at 3 basis points, or $1.2 billion . . . ."

137. Various studies were completed during the 2005 to 2007 time frame that indicated a sharp rise in mortgage loan fraud. A 2007 study by Basis Analytics of 16,000 defaulted residential mortgage loans found that *over 70% contained significant misrepresentations* in their respective mortgage loan files. A 2006 study by the Mortgage Asset Research Institute showed that almost *60% of the stated income loans had misrepresented stated income by at least 50%*. Also, mortgage fraud complaints more than doubled in the U.S. from 2003 to 2006 according to the Financial

Crimes Enforcement Network, a division of the U.S. Treasury Department. Suspicious activity reports pertaining to mortgage fraud increased 14-fold from 1997 to 2005.

138. On April 6, 2005, S&P issued comments at an industry event held at Amelia Island, Florida, concerning fraud and risks related to newer mortgage products. In its commentary, S&P stated:

> [T]here is growing concern around the increased usage of these mortgages in new RMBS securitization, which may pose significant credit risk. According to [S&P's] credit analyst Ernestine Warner, a director in RMBS Surveillance, some of the inherent risks that may arise include payment shock due to interest rate increases, coupled with the addition of principal repayment, undercollaterlization with regard to negative amortization, and home price depreciation.

> "Despite these risks, there isn't any performance information available on any of these products just yet because they are still very new to the subprime market. Due to the time lag associated with delinquencies and losses in RMBS pools, and the nature of these risks, it will be several years before the product performance is tested. It is anticipated that all risks associated with these loans have been adequately covered. However, monthly performance data will be closely scrutinized as the products mature," Ms. Warner noted.

139. The statement above was false, however, because had the Company kept its LEVELS model current, instead of merely applying "band-aids" it would have had significant additional loan performance information. Indeed, the former Managing Director stated that Versions 5.0 and 6.0 of LEVELS, which were created but never implemented, would have included information on millions of additional loans, and would have required substantial additional enhancement to the deals the Company rated.

140. Shortly after S&P's April 6, 2005 comments concerning mortgage fraud, a mortgage broker emailed Barnes, S&P's Managing Director for RMBS, imploring her to make sure that S&P

"put at stop to this madness!!!" Needless to say, the individual's warning fell upon deaf ears. The email stated:[30]

> Hello Susan,
>
> I saw you today on CNBC and the reason for my email is that I am extremely afraid of the seeds of destruction the financial markets have planted. I have contacted the OTS, FDIC and others and my concerns are not addressed. I have been a mortgage broker for the past 13 years and I have never seen such a lack of attention to loan risk. I am confident our present housing bubble is not from supply and demand of housing, but from money supply. In my professional opinion the biggest perpetrator is Washington Mutual.
>
> 1) No income documentation loans.
>
> 2) Option ARMS (negative amortization). on over-leveraged collateral.
>
> 2b) Interest income on negative amortization is not taxed, but booked as revenue. Increase in loan balance shows as an increase on balance sheet and loan losses are not increased. Looks great for financials, but terrible for bank depositors.
>
> 2c) Option ARMS are funded and held from depositors. (huge risk to FDIC)
>
> 3) Option ARMS make up 90% of Bay Area loans in CA.
>
> 4) WAMUs recent bid for Providian is the purchase of another highly leveraged/securitized bank.
>
> 5) 100% financing loans.
>
> I have seen instances where WAMU approved buyers for purchase loans; where the fully indexed interest only payments represented 100% of borrower's gross monthly income. We need to put a stop to this madness!!!

141. Despite this specific warning, S&P continued to churn out AAA ratings to mortgage-backed deals it knew were rife with fraud and impossible loan scenarios. The Company slapped AAA ratings on deals made up of the most toxic types of mortgages, including Alt-A Fixed, Alt-A ARMS, Option ARMs, and subprime. According to internal S&P documents, subprime and Alt-A

---

[30] A true and correct copy of the April 6, 2005 email, made public by the Senate Subcommittee, is attached hereto as ***Exhibit 23***.

issuances alone made up 76% of all mortgages generated in 2006.[31]  Now, more than 80% of all

these types of RMBS deals rated AAA by S&P in 2006 and 2007 – with as much as 98% in some

asset classes – have been downgraded to junk status.  *See Exhibit 8*.  This shocking fact serves to

underscore the fact that the Company, in order to maintain market share and unsustainable financial

results, was willing to bestow AAA stamps of approval on non-performing loans.

142.    As stated by Senator Levin during the Senate Subcommittee hearing:

> In addition to inaccurate models and competitive pressures, the credit rating agencies failed to adjust their ratings to take into account credit risks from the fraud and lax underwriting standards that increasingly characterized the mortgages securitized and sold on Wall Street.  In August of 2006, an S&P employee wrote, quote, "There has been rampant appraisal and underwriting fraud in the industry for quite some time as pressures mounted to feed the origination machine," close quote.[32]

> In September of 2006, another S&P employee wrote, quote, "I think it's telling – I think it's telling us that underwriting fraud, appraisal fraud and the general appetite for new product among originators is resulting in loans being made that shouldn't be made," close quote.  A colleague responded that the head of the S&P surveillance group, quote, "told me that broken down to loan level, which she is seeing, is losses as bad as high 40s (percent), low 50%.  I'd love to be able to publish a commentary with this data, but may be too much of a powder keg," close quote.[33]

> Well, not taking into account mortgage fraud and lax underwriting standards did, indeed, turn into a powder keg, one that helped blow up the RMBS and CDO markets and triggered the 2008 financial crisis.

143.    According to a former Managing Director, CDOs exploded because "suddenly people

could sell garbage they otherwise couldn't."  She/he stated that it did not matter what was in a deal,

and that CDOs would buy up all of the lowest rated tranches of RMBS.  CDOs would buy up non-

---

[31] *See Exhibit 10*.

[32] A true and correct copy of the August 7, 2006 email referred to by Senator Levin and made public by the Senate Subcommittee, is attached hereto as *Exhibit 24*.

[33] An excerpt of the September 29, 2006 email referred to by Senator Levin is referenced in the materials and exhibits made public by the Senate Subcommittee, and is attached hereto as *Exhibit 25*.

investment grade tranches and the "market exploded." She/he stated that large arrangers used to have to hold the lower level tranches on their books, but that with CDOs, they were able to sell everything. This confidential witness stated that CDOs rely on ratings of other rating agencies for the underlying assets, *i.e.*, notching. For example, at S&P, they were requested to "notch" and rate transactions that had been rated by Moody's or Fitch, even though S&P did not have access to and had not seen the data underlying the transactions.

144.    The former Managing Director described the CDOs as "absolute alchemy." According to published reports, there are two caveats for CDOs: (1) it's nearly impossible to find out exactly what is in a CDO; and (2) CDOs are not regulated.

145.    In response to a question regarding CDOs being a "house of cards," Raiter testified:

> I don't believe they didn't have the information. I believe it was available on both the residential side and on the CDO side. I believe there was a breakdown in the analytics that they relied on. ***And that the house of cards, intuitively, to a lot of us analysts that were outside the CDO area but were looking at it through the glass, intuitively, it didn't make a whole lot of sense***.

> And as Mr. Egan has suggested, we are all relatively well educated and intelligent people; and if you couldn't explain it to us, we were real curious how this product was enjoying such a tremendous success. And, unfortunately, anecdotally, we were told that it was enjoying a lot of success because they were selling these bonds in Europe and Asia and not in the United States, particularly the lower-rated pieces.

146.    S&P was rating such risky deals that by at least September 2006, Company employees were internally expressing their fears. In an email exchange on September 2, 2006 under the subject "Nightmare Mortgages," Robert Mackey, a S&P Financial Analyst in Servicer Evaluations, wrote to Gutierrez, S&P's Director of Servicer Evaluations for Structured Finance, and another person that:[34]

---

[34] A true and correct copy of the September 2, 2006 email, made public by the Senate Committee, is attached hereto as ***Exhibit 26***.

This is frightening. It wreaks of greed, unregulated brokers, and "not so prudent" lenders. However, some borrowers are at fault as well. When I first heard of this product, just two years ago, I though it might work for a small niche of the housing market. That's where it should have remained:

Option ARMs were created in 1981 and for years were marketed to well-heeled home buyers who wanted the option of making low payments most months and then paying off a big chunk all at once. For them, option ARMs offered flexibility.

***Hope our friends with large portfolios of these mortgages are preparing for the inevitable***.

147.    Similarly, an internal S&P email from Gutierrez on October 20, 2006 concerning the state of the mortgage market read "Pretty grim news ***as we suspected*** – note also the 'mailing in the keys and walking away' epidemic has begun – I think things are going to get mighty ugly next year!"[35]

148.    At the Company's highest levels, it was surely no secret within S&P that there were immense problems with the Company's ratings of RMBS and CDOs tied to the subprime market. For example, in a March 18, 2007 email, Gutierrez wrote, in pertinent part:[36]

To give you a confidential tidbit among friends the subprime brou haha [sic] is reaching serious levels – tomorrow morning key members of the RMBS rating division are scheduled to make a presentation to Terry McGraw CEO of McGraw-Hill Companies and his executive committee on the entire subprime situation and how we rated the deals and are preparing to deal with the fallout (downgrades) Yours truly is not among the anointed for that dubious 15 minutes of fame.

149.    Indeed, Company executives and employees were well aware that S&P had been issuing inflated ratings to deals made up of toxic collateral. In an April 26, 2007 email, Kim

---

[35] A true and correct copy of the October 20, 2006 email, which was made public by the Senate Subcommittee, is attached hereto as ***Exhibit 27***.

[36] *See* ***Exhibit 4***.

Diamond ("Diamond"), the Managing Director in S&P's Global Real Estate Finance Group, wrote,

in pertinent part:[37]

> Gale, the newest sickening trend.  Issuers trying to pass their loss of profitability
> resulting from the latest blow out in spreads by demanding severe rating fee pricing
> reductions…. we lost the pwr deal because we refused to reduce our fee from 1.4
> million to 1.1 million for a 4 billion dollar pool… ***unbelievable… the bankers make
> shitty loans with such skinny margins tha[t] they can't make any money and expect
> us to eat it***.  Given our current staffing (i.e. Not enough analysts to rate the current
> pipeline of deals), the opportunity cost of doing the deal at that ridiculously low fee
> and risking eroding our pricing structure going forward was deemed too high…lets
> just hope the deal prices like crap without us.

150.    The Senate Subcommittee hearing revealed several instances where the ratings

agencies rated deals they knew would not perform – at the ultimate expense of their reputation,

credibility, and integrity – to pursue market share and lucrative fees.  In one example, in January

2007, S&P was asked to rate an RMBS with subprime loans issued by Fremont Investment and Loan

("Fremont"), a subprime lender known at the time for originating very poor quality loans.

Specifically, on January 24, 2007, Sai Uppuluri ("Uppuluri"), an Associate Director for S&P's

Structured Finance Ratings, sent an email to his supervisor that stated:  "I have a Goldman deal with

subprime Fremont collateral.  Since Fremont collateral has been performing not so good, is there

anything special I should be aware of?"[38]  In other words, Uppuluri was asking whether special

considerations should be made because the Company knew that Fremont was making poor quality

loans.

151.    In response, one supervisor, Jeff Watson, wrote, "No, we don't treat their collateral

any differently . . ."  Another supervisor, David Glehan, wrote that as long as the FICO scores were

---

[37] A true and correct copy of the April 26, 2007 email, made public by the Senate Subcommittee, is
attached hereto as ***Exhibit 28***.

[38] A true and correct copy of the January 24, 2007 email, made public by the Senate Subcommittee,
is attached hereto as ***Exhibit 29***.

current, the analyst was "good to go."[39]  A few days later, on February 1, 2007, an article was

circulated via email to dozens of people within S&P, including Barnes, under the subject "Defaults

cause Fremont to end ties to 8,000 brokers."[40]  The email quoted the article as stating, in pertinent

part:

> Subprime mortgage lender Fremont Investment and Loan on Monday said it severed
> ties last quarter with some 8,000 brokers *whose loans were responsible for some of
> the highest delinquency rates in the industry*.
>
>         *        *        *
>
> The brokers "released" were "highly correlated" to the sudden rise in defaults on
> Fremont loans. . . .Fremont was the fifth-biggest originator of subprime loans last
> year, with about $33 billion of loans issued.

152.     On February 27, 2007, Fremont – whose collateral S&P did not treat any differently

than any other lender – received a proposed cease and desist order from the FDIC that, among other

things, called for Fremont to make a variety of changes designed to restrict the level of lending in its

subprime residential mortgage business.  On March 2, 2007, Fremont issued a press release

announcing it intended "to exit its sub-prime residential real estate lending operations."

153.     Despite all this information and the fact that Fremont collateral was known to be non-

performing, with among the worst delinquency rates in the country, in the spring of 2007 S&P put

AAA ratings on five tranches of RMBS securities backed by Fremont mortgages.  Today, all five

AAA tranches have been downgraded to junk status.  In other words, it made no difference to S&P

that Fremont's collateral was known within S&P to be non-performing.  Indeed, during the April 23,

---

[39] A true and correct copy of the January 24, 2007 email, made public by the Senate Subcommittee,
is attached hereto as ***Exhibit 30***.

[40] A true and correct copy of the February 1, 2007 email, made public by the Senate Subcommittee,
is attached hereto as ***Exhibit 31***.

2010 Senate Subcommittee hearing, Senator Levin questioned Barnes on the AAA ratings S&P gave to Fremont collateral:

> Sen. Levin:  If Fremont does [not] get a higher credit risk, I'm trying to figure out who does.  I don't understand how you can just simply say it doesn't make any difference, and defend something which says – you folks are supposed to be giving, assessing credit risks here.  It doesn't make any difference that their collateral isn't performing?
>
> Barnes:  No, it –
>
> Sen. Levin:  That's what the email says.  It – we don't treat their collateral any differently.
>
> *      *      *
>
> Sen. Levin:  He was told to ignore it. . . I mean this is what the thing which it seems to be is going to shake up the folks that are listening to this testimony as to how much these credit ratings can be relied on.  Here you had a chart . . . Now this is a Moody's deal.  Here's, so I'm going to ask Moody's as well.  Here's the chart of the top 10 issuers of high delinquencies.  It comes back, "Holy cow, is this data correct? I just graphed it and Fremont is such an outlier."  In other words, they're terrible.
>
> Barnes:  Mm hmm.
>
> Sen. Levin:  Is it relevant?
>
> Barnes:  It's definitely relevant.
>
> Sen. Levin:  So why doesn't the supervisor say, "You're damned right, it's relevant."
>
> Barnes:  Well I guess I'm trying to make a differentiating point.
>
> Sen. Levin:  You're trying not to answer the question. . . .

154.    This specific example serves as but one instance of how S&P sacrificed everything in the name of rating more deals – including those it knew would be non-performing – and preserving market share, despite falsely touting its integrity and credibility to the market.

155.    Likewise, in April 2007, the Company was busy rating a $1.5 billion synthetic CDO deal called Vertical ABS CDO 2007-1 – a deal Company analysts knew was unlikely to perform because it was set up to take risks off the books of Bank of America.  The exotic CDO was tied heavily to the subprime market and to other ABS CDOs.  It was set up to primarily reference (*i.e.*,

bet on the performance of) other subprime RMBS (about 55%) with "midprime" securities and ABS

CDOs making up the remainder at the time of closing.[41] The deal was expected to be 95% synthetic

at closing. In an April 5, 2007 S&P email, analysts described how there was a "lack of

responsiveness/cooperation from UBS" on the Vertical deal. In response, S&P analyst James

Halprin wrote:[42]

> Vertical is politically closely tied to B of A – and is mostly a marketing shop –
> *helping to take risk off books of B o A*. Don't see why we have to tolerate lack of
> cooperation. *Deals likely not to perform*. JH

156. Despite knowing the "deals [were] likely not to perform," S&P gave AAA ratings to

the top four tranches of the Vertical deal in April 2007. But just six months later, S&P (along with

Moody's was already downgrading Vertical, which later collapsed. In an internal S&P email

exchange dated October 25-26, 2007 under the subject "PRIVILEGED AND CONFIDENTIAL:

FW: (BMP) Moody's Downgrades Vertical ABS CDO 2007-1 Notes; Further", Company employees

wrote, in pertinent part, "*Oh, well. The cat is out of the bag*."[43]

157. The Vertical deal, portions of which S&P rated AAA, was one of the worst-

performing deals imaginable. As stated by Senator Levin during the Subcommittee Hearing:

> One of the purchasers [of Vertical], a hedge fund called Pursuit Partners, sued over
> the CDO's quick demise. Standard & Poor's and Moody's were dropped from the
> lawsuit since current law does not authorize private lawsuits against them, even for
> reckless or unreasonable ratings, but the court ordered UBS to set aside $35 million
> for a possible award to the investor. The legal pleadings included internal emails at

---

[41] The composition of the Vertical CDO was described in a Moody's Pre-Closing Committee
Memorandum, made public by the Senate Subcommittee, a true and correct copy of which is
attached hereto as *Exhibit 32*.

[42] A true and correct copy of the April 5, 2007 email, made public by the Senate Subcommittee, is
attached hereto as *Exhibit 33*.

[43] A true and correct copy of the October 25-26, 2007 email exchange, made public by the Senate
Subcommittee, is attached hereto as *Exhibit 34*.

UBS referring to supposedly investment-grade Vertical securities as "crap" at the same time that the bank was selling them.

158.    Another example of how S&P rated a deal that it knew was unlikely to perform occurred in July 2007, when the Company rated the Delphinus deal – which was rated and downgraded within six months by S&P.  As set forth in internal S&P emails on August 20, 2007, the assets actually rated by S&P were dummies not included in the final version of the deal.  The email exchange stated, in relevant part:[44]

> Regarding Delphinus, it appears that the closing date portfolio they gave us for analysis and the effective date portfolio (closing date = effective date) were not the same.  *It appears that the 25ish assets that they included in our closing date portfolio that were dummies were replaced less than 24 hours [later] with assets that would have been notched and made the portfolio worse*.  The issue is that given they would have provided us with this portfolio at closing date, the SDR's would have gone up and they would not have been able to close as they would not have been passing.  They are, however, passing effective date with the effective date portfolio.  *Do you want to address this with them, or let it go?*

159.    Another internal S&P email exchange reveals how the Company rated a CDO named Kodiak CDO I, even though it never met the requirements to be rated.  On August 7, 2007, Andrew Loken, a S&P Structured Finance Credit Analyst, wrote to Shannon Mooney, a S&P Senior Research Assistant in the Global CDO Group:[45]

> Back in May, the deal had 2 assets default, which caused it to fail.  We tried some things, and it never passed anything I ran.  Next thing I know, I'm told that because it had gone effective already, it was surveillance's responsibility, and I never heard about it again.  Anyway, because of that, I never created a new monitor.

160.    The above internal emails belie Defendants' public statements during the Class Period.  The Company's internal dialogue demonstrates that, among other things, it was engaging in

---

[44] A true and correct copy of the August 20, 2007  email exchange, made public by the Senate Subcommittee, is attached hereto as ***Exhibit 35***.

[45] A true and correct copy of the August 7, 2007  email exchange, made public by the Senate Subcommittee, is attached hereto as ***Exhibit 36***.

the undisclosed practice of rating deals it knew were destined for failure. These telling internal Company documents embody greed incarnate, and are powerful evidence of the depths of Defendants' scheme to pursue market share and lucrative fees at any cost.

### G. The Chronic Shortage of Resources and the Impact of Top-Down Budgeting Left the Company Short of Staff and Unable to Conduct Timely and Meaningful Surveillance

161. Despite record profits from 2004 through 2007, it has been documented that S&P failed to assign sufficient resources to adequately rate new products and test the accuracy of existing ratings. For example, in an article entitled "Behind the Ratings," *The Wall Street Journal* reported on August 2, 2008 that, "The unredacted version of the SEC's report also shows that S&P . . . didn't add staff dealing with CDOs as fast as that business was growing. At S&P, revenue from rating the mortgage-laden bond portfolios grew more than 800% from 2002 to 2006, but relating staffing [only] doubled." *See **Exhibit 11***. The Credit Agencies Report concluded that at least two of the rating agencies struggled to adapt to the increase in the volume and complexity of the deals they rated, and that "[t]here are indications that ratings were issued notwithstanding that one or more issues raised during the analysis of the deal remained unresolved." For example, documents in a deal file regarding an issue with a collateral manager state "We didn't ha [sic] time to discuss this in detail at the committee, so they dropped the issue for this deal due to timing. We will need to revisit in the future." Another document described an outstanding issue as "poorly addressed – needs to be checked in the next deal" and addresses the question of weighted average recovery rate by writing "(WARR – don't ask )."

162. In fact, one confidential witness described how the Company's top-down budgeting process left the RMBS unit chronically short of needed resources. As a business unit manager at S&P, the former Managing Director had budget responsibilities for the RMBS ratings group. She/he submitted her/his budget to McGraw-Hill corporate through S&P's Vice President, Finance and

Administration, Milano. This budget information included staffing requirements, deal volumes and monies required for improving analytics. In reality, however, this confidential witness stated that budgets were "not driven by what you needed, but by demand from corporate that they needed a certain amount of money." Corporate would take initial budgets and *cut staff* and "jack up" revenues. As a result, S&P's RMBS ratings group was consistently understaffed, yet tasked with an ever-increasing volume of deals that increased in complexity, as well as increasing revenue responsibilities – setting the stage for the ultimate collapse of the "house of cards."

163. During the budgeting process, Director of Finance Colbert collected budget information. The former Managing Director recalled that Milano had the conversations with Bahash about the budgets, and clearly recalled that the budget information went "right up to the top." This confidential witness stated that "things started to get hot and heavy in 2002" because the Structured Finance department was "making buckets of money" for the Company. The confidential witness stated that Structured Finance had grown rapidly and accounted for a "very healthy share" of McGraw-Hill's stated earnings, and that the Ratings Group accounted for approximately 60% of Structured Finance's profits. As a result, Milano would call this confidential witness several times a month to check on the progress of the RMBS Group towards making its budgeted numbers. Put simply, RMBS was critical to the Company's earnings and overall financial performance.

164. The former Managing Director stated that she/he maintained "deal logs" of historic numbers that helped forecast RMBS deals going forward. She/he also maintained a "Pipeline Chart" that tracked the "number of tapes coming." This confidential witness tracked all the RMBS deals that came into S&P to potentially be rated and the deals S&P eventually got awarded. By tracking this information, the Managing Director was able to assume a certain percentage of deals would be awarded of all the deals, or tapes, in the pipeline. "We had a pretty good idea" of how many RMBS deals the Company would be awarded to rate, the confidential witness recalled. The former

Managing Director stated that when "things fell out" and the RMBS market collapsed, the Company would know quickly because "the tapes would stop coming in."

165.    This confidential witness stated that the budgets "were driven by corporate" – *i.e.*, McGraw-Hill. She/he recalled that every year she/he put together a budget, the response every year was to reduce expenditure estimates – to "low ball." There was a pattern where "every year they ignored what we sent them and told us what we were going to do." "There was always push-back coming from Terry McGraw." "There was a running joke within S&P that Terry [McGraw] told Pat Milano he wanted to make this much money this year," meaning that McGraw would set the amount of money the Company was supposed to make for the coming year. The confidential witness often wondered with other business unit managers why they should even bother preparing budgets when McGraw would ignore them and tell them what he wanted.

166.    Similarly, a former Director of Structured Finance Sales stated the problem with McGraw-Hill was how it allocated revenue budgets internally. She/he stated the Company would promise investors revenue growth, and based on that promise, calculate how much it needed to make. McGraw-Hill would then divide the revenue number up amongst its subsidiaries – senior management would, for example, tell S&P what numbers to take. She/he stated that the internal Company discussion was that McGraw was pushing revenues so hard that the Structured Finance group had to issue ratings just to keep up. The group had to use its existing ratings models, despite internal questions that anyone might have regarding their quality.

167.    The results of the top-down budgeting, the consistent under-staffing, and tremendous growth within the Structured Finance Department was that by 2000, senior managers were "working an inordinate amount of hours" and "getting completely burned out." "The hours became so onerous." By 2005, S&P RMBS analysts were "doing eight to ten deals at a time," which the former Managing Director described as "just too many." This confidential witness recalled that every year,

she/he begged for more analysts, but was never given permission to hire additional analysts. As a result, the confidential witness stated that "our product quality suffered" and that "mistakes were made" as the RMBS ratings group was working people to death. This occurred, in part, because as time went on, the deals got more and more complicated, and the documents requiring review also got more complicated. The former Managing Director stated that the "documents were more complicated as the products evolved." The Credit Agencies Report corroborates the statements of this confidential witness that there was a substantial increase in the number and in the complexity of RMBS and CDO deals and that the rating agencies "struggled" to keep up.

168. Likewise, in an email dated April 26, 2007, Diamond sent the following to Scott, among others, "*Given our current staffing (i.e. Not enough analysts to rate the current pipeline of deals*), the opportunity cost of doing the deal at that ridiculously low fee and risking eroding our pricing structure going forward was deemed too high…lets just hope the deal prices like crap without us."[46]

169. With record profits pouring in, as set forth above, it is a documented fact that the Company failed to assign the resources or staff necessary to rate new deals coming in or to perform surveillance on existing deals it had already rated. *See Exhibit 7* (Senate Subcommittee Findings of Fact Nos. 3, 5). One way in which the Company's surveillance department experienced a shortage of resources was that S&P's ratings department would poach surveillance-dedicated employees. As Barnes testified, S&P's ratings department was short of staff and would borrow employees from the surveillance department at the time the Company's surveillance department was also short of staff. This occurred despite the fact during 2006, delinquency rates for loans supporting subprime securities were hitting record levels.

---

[46] *See Exhibit 28*.

170.     The former Director of RMBS Surveillance recalled that each year, each S&P employee was asked to sign a Code of Conduct. The Code of Conduct, which is publicly available, stated, amongst other things, that the Company placed a higher emphasis on surveillance than it did on issuing new ratings. The former Director of RMBS Surveillance stated while "that might be true on paper," it "certainly [was] not true in the real world." She/he stated the "focus of the Structured Finance Group was getting revenues in the door and increasing our market share." It was "obvious" within the Company that this was the goal. She/he recalled that new issuance analysts were "loaded up" with deals and it would be "so hectic" that the Company pulled surveillance employees to rate new issuance. She/he personally recalled being pulled out of surveillance to rate new issuance on a number of occasions during 2006 – at least two to three times a month during 2006.

171.     The SEC's Credit Agencies Report (*see Exhibit 6*) documented the extensive failures of S&P to conduct surveillance, revealing, among other things, that:

- "[C]ertain significant aspects of the ratings process and methodologies used to rate RMBS and CDOs were not always disclosed, or were not fully disclosed." One criteria officer in the Structured Finance Surveillance Group remarked, "our published criteria as it currently stands is a bit too unwieldy and all over the map in terms of being current or comprehensive. It might be too much of a stretch to say that we're complying with it because our SF [structured finance] rating approach is inherently flexible and subjective, while much of our written criteria is detailed and prescriptive. Doing a complete inventory of our criteria and documenting the areas where it is out of date or inaccurate would appear to be a huge job – that would require far more man-hours than writing the principles-based articles."

- Despite charging issuers upfront or annually for ratings surveillance fees, at least one agency lacked sufficient personnel and an internal email reflected a concern that surveillance criteria used during part of the review process were inadequate. Also, there was "poor documentation of the surveillance conducted" and "[t]wo rating agencies [did] not have internal written procedures documenting the steps that their surveillance staff should undertake to monitor RMBS and CDOs."

172.     The failures identified in the Credit Agencies Report were echoed in Raiter's testimony given during the October 22, 2008 House Oversight Committee's hearing on the Credit Rating Agencies and the Financial Crisis, where he stated, in pertinent part:

Another big area that Mr. Egan has discussed is there are two sides to the rating. You have an initial rating when the bonds are sold, and then you have the surveillance. And at some point in the mid-1990s, the management in Standard & Poor's decided to make surveillance a profit center instead of an adjunct critical key part of keeping investors informed as to how their investments were performing after they bought the bonds. And as a result, they didn't have the staff or the information. *They didn't even run the ratings model in the surveillance area which would have allowed them to have basically re-rated every deal S&P had rated to that time and see exactly what was going on and whether the support was there for those triple-A bonds*.

The reason they gave for not doing it was because they were concerned that the ratings would get volatile and people would start to feel- like all triple-As aren't the same. And it was a much more pragmatic business decision than really focusing on how to protect the franchise and the reputation by doing the right thing for the investors.

$$*\qquad*\qquad*$$

There is a big difference in this market between the rating at issue and the surveillance. A breakdown occurred both in the proper sizing of the rating at issue. But *surveillance has been atrocious*.

173. With regard to surveillance, the former Managing Director recalled that prior to her/his leaving the Company, S&P started charging a "one time" fee for surveillance. Previously, the fee had been charged to the investment bank annually to conduct surveillance. Once the Company went to the "one time" fee arrangement, it started to use the present value of all of the surveillance fees it would have collected for the life of the security, and have the investment bank pay that one time up front for S&P to conduct surveillance over the life of the security. According to the former Managing Director, this made it "so there was even less incentive to devote resources to surveillance."

174. Internal Company documents paint a clear picture of just how atrocious S&P's surveillance was. In an October 6, 2005 email from Roy Chun ("Chun"), S&P's Managing Director for Surveillance who reported to D'Erchia, Chun wrote, in pertinent part, the following in answer to

the question of "How do we handle existing deals especially if there are material changes that can cause existing ratings to change?":[47]

> I think the history has been to only re-review a deal under new assumptions/criteria when the deal is flagged for some performance reason. I do not know of a situation where there were wholesale changes to existing ratings when the primary group changed assumptions or even instituted new criteria. ***The two major reasons why we have taken the approach is: (i) lack of sufficient personnel resources and (ii) not having the same models/information available for surveillance to relook at an existing deal with the new assumptions (i.e. no cash flow models for a number of assets). The third reason is concerns of how disruptive wholesale rating changes, based on a criteria changes [sic], can be to the market***.

175.    In an email dated April 28, 2006, Warner, S&P's Director of RMBS Surveillance, described how "RMBS has an all time high of 5900 transactions. Each time I consider what my group is faced with, I become more and more anxious."[48]  On June 1, 2006, Warner continued to express her great concern regarding lack of adequate staffing, writing an email in response to an email from Chun, which stated, in pertinent part:[49]

> Roy, thanks for taking the time to write the e-mail. It really feels like I am repeating myself when it comes to completing a very simple project and addressing some of the other surveillance needs. We have talked about this project several times and the proposal has been put in writing. The inability to make a decision about how the project is going to be resourced is causing undue stress.
>
> <center>*       *       *</center>
>
> ***In addition to the project above that involves 863 deals, I have a back log of deals that are out of date with regard to ratings***. When Steve and Kristie join the group as research assistants, they will take on the responsibilities of Jessica Rivera and some from Ash Rao so that Jessica can review the deals full time and Ash can review them maybe 50% of the time. This will help cover the void Lal left when he became the

---

[47] A true and correct copy of the October 6, 2005 email exchange, made public by the Senate Subcommittee, is attached hereto as ***Exhibit 37***.

[48] A true and correct copy of the April 28, 2006 email, made public by the Senate Subcommittee, is attached hereto as ***Exhibit 38***.

[49] A true and correct copy of the June 1, 2006 email, made public by the Senate Subcommittee, is attached hereto as ***Exhibit 39***.

business analysts [sic] for the initiative, but again, does not move us any closer to FTS in the short term. ***We recognize that I am still understaffed with these two additional bodies***. Lal being offline clearly exacerbates this problem and ***we may be falling further behind at the rate the deals are closing***. If we [do] not agree on the actual number, certainly we can agree that ***I need more recourse if I am ever going to be near compliance***.

<div align="center">*     *     *</div>

Two of the four summer associates Gail referred to started with my group on Tuesday. According to the rules for summer associates, they must do the surveillance reviews and a project. They will review around 100 transactions (hopefully) and test our exception reports.

The two other summer associates went to CMBS surveillance.

176.  As the above email indicates, despite an all-time high in transactions and a backlog of deals, the Company was relying on college interns and temporary employees to bridge the surveillance resource shortfall – and was still understaffed and ill-equipped. This reliance on temporary employees continued in December 2006 as the subprime market imploded, when the following email was sent from Warner to Chun under the subject "Please continue temps", which stated, in relevant part:[50]

[Warner]:  Good afternoon. In light of the current state of residential mortgage performance, especially sub-prime, I think it would be very beneficial for the RMBS surveillance team to have the work being done by the temps to continue. It is still very important that performance data is loaded on a timely basis as this has an impact on our exception reports. Currently, there are nearly 1,000 deals with data loads aged beyond one month. It is also important that the temps continue to resolve the 429 transactions that seem not to be supported by Intex. It is possible that models should be build [sic] for these transactions. Since the number is so significant, eliminating this backlog would be significantly impact full [sic] to the review process. In addition, the 203 deals that have failed to match classes would represent a quick win that the temps should be able to accomplish.

177.  The pronounced lack of staffing and resources remained an internal Company concern into 2007. On January 5, 2007, Patrick Coyne ("Coyne"), a Managing Director in S&P's

---

[50] A true and correct copy of the December 20, 2006 email exchange, which was made public by the Senate Subcommittee, is attached hereto as ***Exhibit 40***.

Surveillance department, wrote an email to Julio Serrano (which was forwarded to Warner) discussing the lack of adequate staffing resources. The email stated, in pertinent part:[51]

> *Now that we are into 2007, I want to take a moment to reiterate my concerns regarding the significant deficit in terms of the # of analysts currently assigned to work on US ABS and RMBS data needs. Additionally, the caliber of the few resources currently assigned to work on these deals, which by the way number more than 8,000, is not at all sufficient*. Furthermore, it's not clear to me what the rationale for the current distribution of Data COE resources is on a global level (e.g. why are there 10+ resources working on a couple of hundred UK ABS deals and only 1 to 2 FTE's assigned to the 2,000 US ABS deals?).
>
> I apologize for being blunt, however, the value proposition offered by Surveillance is significantly dependent on having timely access to quality data. This is even more true in the future. While I've mentioned these concerns to you in passing during last year, I thought it would be helpful to summarize them in a single e-mail. I'm hoping to gain better insight into what the next steps are to address these concerns.
>
> By the way, Gail Houston has done an excellent job and I am very happy with her enthusiasm and drive, however, given her significant task of managing data needs for ABS and RMBS, I am concerned that she will burnout or move on unless these issues are addressed in the near future, not to mention the impact on the business.

178.    In February 2007, officials within S&P's surveillance department continued to clamor for more resources so that they could conduct surveillance and keep up with the "burgeoning poor performance of sub-prime deals." After receiving word that a meeting of the Company's Finance Team resulted in "no approval . . . for upgrade or replacement for Associate Headcount" – *i.e.*, no new staff would be forthcoming, a February 3, 2007 internal email exchange occurred between Warner, the Company's head of RMBS surveillance, and D'Erchia. That email exchange included, in pertinent part, the following under the subject "RE: Headcount for RMBS Surveillance?/":[52]

---

[51] A true and correct copy of the January 5, 2007 email, which was made public by the Senate Subcommittee, is attached hereto as *Exhibit 41*.

[52] A true and correct copy of the February 3, 2007 email exchange, which was made public by the Senate Subcommittee, is attached hereto as *Exhibit 42*.

[Warner, 11:45 AM]  Peter, what can we do now?  *My group is under serious pressure to respond to the burgeoning poor performance of sub-prime deals*.  After losing Taoheed, *we are really falling behind*.

We need to talk about getting more resources in general.  *I am seeing evidence now that I really need to add to staff to keep up with what is going on with sub prime and mortgage performance in general, NOW.*  We talked about adding three people several months ago.  We need to reopen that discussion.

<p style="text-align:center">*     *     *</p>

[D'Erchia, 11:50 AM]  Write a one paragraph need for the title upgrade and send it to Nancy Farrelly.  I think it will be approved.  Thanks.  Peter.

[D'Erchia, 11:55 AM]  Also you should be getting 4 or 5 new Associates from the 2007 Associate class for 12 and continuing ti [sic] get them going forward.  That might help.

[Warner, 12:02 PM]:  That [sic] right.  They will be a great help but they will not start until August, right?  Let's talk about anything that we might be able to do in the interim.  *I talked to Tommy yesterday and he thinks that the ratings are not going to hold through 2007.  He asked me to begin discussing taking rating actions earlier on the poor performing deals.  I have been thinking about this for much of the night.  We do not have the resources to support what we are doing now.  A new process, without the right support, would be overwhelming*.[53]

179.    Later that month, on February 13, 2007, Warner wrote, in pertinent part, to D'Erchia that "We really need help.  Sub prime is going down hill.  The 20% not covered by our system is also of great concern."[54]

180.    In April 2007, as it had been for years, the Company's RMBS surveillance unit remained short-staffed, as documented, in relevant part, in the following email sent on April 24,

---

[53] The "Tommy" referred to in the email exchange is Gillis, S&P's Managing Director of Research and Criteria.

[54] A true and correct copy of the February 13, 2007 email exchange, made public by the Senate Subcommittee, is attached hereto as *Exhibit 43*.

2007 from Abe Losice, a Managing Director in S&P's Structured Finance Department, to Barnes under the subject, "Staffing for RMBS Surveillance":[55]

> Here is a review regarding staffing for RMBS Surveillance.
>
> We have worked together with Ernestine Warner (EW) to produce a staffing model for RMBS Surveillance (R-Surv).  It is intended to measure the staffing needed for detailed surveillance of the 2006 vintage and also everything issued prior to that. This model shows that the R-Surv staff is short by 7 FTE- about 3 Directors, 2 AD's, and 2 Associates.  The model suggests that the current staff may have been right sized if we excluded coverage of the 2006 vintage, but was under titled lacking sufficient seniority, skill, and experience.
>
> We worked together With EW to craft a rationale for 4 adds to staff- 2 Associates and 2 AD's.  The adds will be conduct [sic] monthly review of the 2006 vintage and to maintain surveillance on the all other [sic] transactions, with the possibility of increasing review frequency.  It will also be to provide thought leadership, add communication skills and strong technical skills.  We need people who have industry experience who can change our functionality.

181.    While Defendants were free to short-staff the Company's surveillance and ratings department all they wanted, that was not the picture they painted for the investing public.  Quite the opposite, whenever Defendants described the Company, they touted a commitment to analytics, ratings quality, and surveillance.  What they did not reveal, however, is that those goals could not be achieved because of the now documented failure to commit resources and staff – which were nothing more than a consequence of Defendants' scheme to pursue market share at all costs.

### H.    To Preserve and Maintain Market Share, the Company Shirks on Surveillance and Uses "Grandfathering" to Maintain Artificially High Ratings

182.    Put simply, because of the increasing use of non-traditional loan products, the information underlying the mortgages that made up subprime and Alt-A RMBS and CDO transactions was increasingly unreliable.  Because there was little to no proof of a borrower's

---

[55] A true and correct copy of the April 24, 2007 email, which was made public by the Senate Subcommittee, is attached hereto as ***Exhibit 44***.

income, assets, or ability to pay back the mortgage, the market was "running on faith."  The

importance of this fact, which was known at all relevant times at the highest levels of the Company,

cannot be overstated, because the Company's models for rating RMBS and CDO loans were only as

reliable as the information underlying them.  For that reason, it was of paramount importance for the

Company's S&P brand to remain fully informed as to the performance of mortgages making up the

loan pools *after* the initial rating through detailed surveillance as it represented to the market it

would.  For example, on April 17, 2007, as loan delinquencies and defaults were skyrocketing,

Barnes, S&P's Managing Director of Rating Services, testified before the Senate Banking, Housing

and Urban Affairs Committee's Securities, Insurance and Investment Subcommittee that:

> "S&P *actively monitors* trends in the housing market, the mortgage finance market,
> consumer credit and the economy to ensure that our models, methodologies, criteria
> and analysis. . . *are fully informed*," said Ms. Barnes. She also explained Standard &
> Poor's rigorous process for rating RMBS transactions which includes: an analysis of
> every loan, a simulation of the cash flow generated by each deal, a review of
> originator and servicer operational procedures, review of the transactional documents
> for legal and structural provisions, and *a surveillance process that allows S&P to
> monitor the ongoing performance of subprime mortgages included in subprime
> RMBS.*

183. The truth, however, as detailed below, was that the Company did not analyze "every

loan" and did not timely monitor "the ongoing performance of subprime mortgages included in

subprime RMBS;" facts that Defendants failed to disclose to the market.

184. On top of not improving LEVELS to include critical amounts of additional data that

could be used to accurately rate RMBS transactions, the former Managing Director recalled that the

LEVELS model was never employed to provide surveillance of RMBS transactions the Company

rated.  In discussing why the model was not used for surveillance, this confidential witness stated

that the "inside answer" was that "if we re-rated the transactions every month, the ratings volatility

would go way up."  This was considered a problem within S&P because with an increase in ratings

volatility (and accuracy), the structured finance products would no longer "look like corporate

[ratings]." This confidential witness recalled that the "mantra was AAA was AAA" – meaning that a AAA-rated RMBS should be equivalent to a AAA corporate rating – but that "those of us on the Structured Finance side knew it was just ludicrous." She/he described the "risks" of ratings volatility as twofold: (1) "investors would be pissed" at learning they were exposed to a lot more risk and the Company would likely lose market share; and (2) it would have been impossible to do a deal – "it would have shrunk the lending arena." Put another way, the result would have been that The Street would have required more coverage and enhancement on their bonds. With this additional information that would have required an accurate level of enhancement, the banks and lenders would have stopped underwriting the loans. In other words, the already-developed, never implemented models would have effectively halted the subprime lending craze fueled by inaccurate ratings that has resulted in the country's current economic crisis.

185.   In that regard, the former Managing Director stated that the Company's recently announced and promised reforms are the same things she/he was begging the Company to do in 2002 or 2003, and that the Company has been acting like "it just dawned on them."

186.   The former Managing Director held conversations on almost a monthly basis with Gillis and Managing Director of Surveillance D'Erchia, discussing why LEVELS was not being used for surveillance. This confidential witness recalled having these conversations with D'Erchia as far back as 1998. The former Managing Director would tell D'Erchia that the Company needed loan level detail for the models, but D'Erchia was always adamantly opposed to it. In 2005, the Surveillance Department was taken out of the ratings group in an effort to turn it into a profit center.

187.   Discussing the surveillance process, the former Managing Director stated that it involved pulling remittance reports showing 30/60/90-day delinquencies and foreclosures. The surveillance department basically compared the foreclosure and delinquency numbers against the bond enhancement. If the enhancement on the bond was the higher number, the rating was

considered to be fine. This process of surveillance was, according the former Managing Director, "not anywhere near as accurate as actually re-rating the bond" through LEVELS-based surveillance.

188.    In that regard, this former Managing Director made a presentation to former S&P President Corbet as to the reasons why S&P should acquire Loan Performance, and thus obtain loan level data. The presentation instructed Corbet that the improved loan level data would improve S&P ratings across the board. This confidential witness suggested Gillis was in charge of ratings criteria and was certainly aware of the problems associated with having inadequate loan level detail. Gillis was copied on any number of emails about the fact that there was guessing in the ratings and changing the criteria (*i.e.*, lowered its standards) to maintain market share.

189.    In 2004, the former Managing Director assigned Client Value Manager Michael Stock ("Stock") to do an analysis of the Alt-A market because the Managing Director was convinced "the market was not what it was supposed to be." Stock's review of the Alt-A market revealed that the loans were not Alt-A – they were B or lower quality.

190.    According to the former Director of RMBS Surveillance, the RMBS surveillance group consisted of approximately 30 analysts "at the height," which was not until 2008. She/he stated the goal of the surveillance group was to review once a year all the securities S&P rated. Until approximately mid-2007, the surveillance group conducted a review of securities based on the issuers. For example, the goal of the surveillance group was to review all RMBS issued by Lehman Brothers every 12 months. The surveillance group was supposed to review each RMBS on its own and then bring the results of the review to a committee for possible ratings action.

191.    The former Director of RMBS Surveillance stated that the Company "was not able" to provide surveillance for 100% of deals in the 12-month time frame. She/he stated that if a security was not issued by a major issuer, it might not be reviewed for 18 months. The former Director of RMBS Surveillance recalled that there was no uniform criteria established for creating

"exception reports," which were supposed to bring poorly performing deals to the attention of analysts. Because there was no set criteria, each surveillance analyst could create their own given criteria for generating exception reports.

192. The former Director of RMBS Surveillance recalled that each of the collateral group heads in the surveillance department met once a week to discuss what they were seeing in the surveillance of their given collateral group. During the meetings, the group heads would share their problems with Warner. This former employee recalled there were constant grumblings during these meetings regarding the inadequate amount of people assigned to conduct surveillance. This former employee recalled being labeled a troublemaker by Scott because she/he once complained about the surveillance department's lack of adequate resources.

193. Among other things, the former Director of RMBS Surveillance stated that the Company "never took a rating action" unless there were actual losses. In other words, unless a class of a bond suffered an actual cash flow loss, the S&P policy was to not downgrade RMBS. The result of the "first dollar loss" policy was particularly troubling because the surveillance department "could see the performance of the underlying collateral was real bad" and would be seeing "large amounts of delinquencies," but was unable to take the appropriate ratings action. This former Director of RMBS Surveillance stated that the problem with waiting for the first dollar loss – when such losses were inevitable – was that "when the losses came – they came in real fast." Thus, the Company was playing "catch up" by the time it actually downgraded deals. Indeed, the Company was so late in downgrading that some RMBS were trading at "pennies on the dollar" before S&P downgraded them.

194. The former Director of RMBS Surveillance stated that in the Spring of 2007, the Company "gave us the ok to downgrade." This was a major shift in policy to change from first dollar loss to anticipated "end-of-class value for the rating." The decision to make the downgrades

so severe was made by a committee spearheaded by Gillis and Parisi. As a result of this policy shift towards the end of the Class Period, the Company changed the way it conducted surveillance. Instead of determining which issues to monitor based on the issuer, the Company began to conduct surveillance based on the vintage and collateral type. For example, all classes of transactions consisting of 2006 subprime collateral took priority.

195. One confidential witness worked for the Company's S&P brand as a Research Associate who was responsible for "accounting for RMBS and CDOs." This former employee received a print-out of "every CDO S&P rated."

196. This former Research Assistant stated that it was her/his responsibility to input the data from the print-outs into S&P's database and to "balance out the discrepancies" from the CDO income statements.

197. This former employee also stated that "S&P was definitely biased" in rating CDOs and RMBS, stating that the way S&P rated such securities was very beneficial to the people selling the securities – the issuers. This former employee stated that there was no clear way to see the risk behind the transactions because the products were "all bundled together." The former employee stated that the CDOs, for example, were "so volatile with so many parts that it didn't even make sense to rate them in the first place." This confidential witness stated that S&P knowingly used its reputation in the marketplace to convince investors to believe in the Company's ratings on RMBS and CDOs.

198. Despite these troubling facts, the Company did not alert its investors during the Class Period that it was unable and/or unwilling to provide adequate surveillance to the structured finance transactions it rated – transactions where fraud had become rampant.

199. According to a former Structured Finance Associate, when she/he first began working for S&P in August 2007, the RMBS surveillance group "didn't have enough employees for the work

that had to be done." In that regard, one former Company employee who worked as a consultant from October 2006 through January 2007 stated that she/he was retained to work in S&P's Structured Finance department on the 42nd floor of the S&P headquarters as "part of a team of consultants retained to build ratings for RMBS deals." This former consultant was one of eight consultants retained in October 2006.

200. The former consultant stated that S&P needed the eight consultants because there was *a backlog of RMBS deals that needed to be updated*. Information regarding the deals was supposed to be provided to S&P by one of S&P's vendors named Intex. Intex was tasked with tracking the Company's deals and providing information and data to S&P so that S&P could update its ratings. The former employee stated that Intex tracked information regarding securitized structured finance deals, including how different tranches of the deals are being paid down and the balances outstanding.

201. The former consultant stated that the Company used a "CORE Ratings System" database that "was supposed to be linked" to Intex. But, the former employee stated that the information from Intex was not always transferred. In that regard, the former consultant's responsibilities including reviewing the CORE Ratings System to determine which RMBS deals had not been updated properly. She/he stated that "[i]f a deal had not been updated for *at least a year*," she/he would attempt to gather the monthly statements, or "deal sheets," from Intex, which provided specific details of a given mortgage backed security, including the balance outstanding and the amount being paid down for each different tranche.

202. Once the former consultant gathered the deal sheets from Intex, she/he packaged the deal sheets for the previous year – or longer – for use by the S&P ratings analysts. The ratings analysts were supposed to go over the deal sheet packages on a regular basis, *but there was always a lag of analysts' review of the packages that the former consultant put together.* For example, the

former consultant estimates that during her/his tenure with the Company, she/he put together *at least 50 or 60 deal sheet packages*. The former consultant believed that the other eight consultants in the same role did a similar amount of work, meaning that during a period of just a few months, the Company's S&P brand was more than one year delinquent on updating its ratings of at least hundreds of structured finance deals – at a time when the structured finance market was literally imploding. This was not disclosed to the market. In fact, the Company represented to the market that it consistently monitored and utilized a fully-integrated surveillance process for the RMBS and CDO deals S&P rated.

203. Moreover, the former consultant stated that her/his work meant that *S&P maintained ratings on RMBS deals without up to date information*. *In other words, the ratings on the RMBS deals were maintained despite the fact that S&P did not have any information regarding the deal from Intex for a period of <u>at least</u> twelve months*.

204. *The former consultant stated that large numbers of mortgages providing the foundation for a RMBS deal could be in default or foreclosure during the prior year, and S&P would retain its rating because it did not have accurate or updated information*. The Company's S&P brand simply did not know what was happening to the securities it rated – despite telling the market that it was active in surveillance and that staying active was critical to its success.

205. The accounts of the former consultant detailed above make it clear that the Company lacked a reasonable basis for maintaining ratings on *at least* hundreds of transactions throughout the Class Period. By failing or refusing to commit the resources necessary to maintain up-to-date information on such transactions – many of which were backed by risky subprime and Alt-A loans – the Company was playing fast and loose with its reputation and Defendants were making false and misleading statements to the market. While Plaintiff does not base its claims on the Company's business decision not to monitor the deals it rated, Defendants' failure to disclose the Company's

decisions renders their statements false and misleading.

206.    In addition, it was not until October 2007 that S&P published a report admitting that fraud was a factor in faulty RMBS performance, despite the fact that it was well known to Defendants – since 2005 – that fraud was prevalent in the risky subprime and Alt-A transactions it rated.  In its report, S&P attempted to state that it was not responsible for detecting mortgage fraud in the RMBS transactions it rated.  Yet, at the same time, the Company touted S&P's models as capable of accurately rating RMBS transactions.

207.    The Company's modeling data was limited by recent favorable trends from 2003 to 2005 (*e.g.*, low interest rates, strong house price appreciation and a good economic environment). The Company, however, was aware of the risks associated with the new mortgage loan products, but failed to make substantive inquiries or rating reviews focused on fraud and poor underwriting.  It took until January 23, 2008 for the Company's S&P brand to issue a report discussing mortgage fraud and resulting changes to its models to capture additional fields of information that would relate to fraud.

208.    As the subprime RMBS and CDO markets further deteriorated during 2006 and 2007, the Company's S&P brand continuously misled the market that its modeling and surveillance were adequate to monitor the performance of structured finance transactions, and touted the Company's ability to quickly move in a "fast-changing" environment through surveillance.

209.    But, the Company had conflicting incentives when it came to rating and surveillance of securitization transactions.  The Company's S&P brand was paid by issuers and the revenue from issuers far surpassed revenue from investor subscriptions.  Structured finance contributed over 40% of revenues to S&P – or 4 times that of traditional debt ratings for corporations.  At the same time, there was very little revenue associated with surveillance, which was not ever being completed on a timely basis, as set forth above.  Moreover, it was to the benefit of the Company to allow RMBS and

CDO issuance to continue as long as possible and forestall the collapse in revenues associated therewith. In other words, the Company knew that if it downgraded its previously issued ratings, it would lose business and its earnings would evaporate. Indeed, as the former Managing Director stated, conducting accurate, timely surveillance with the LEVELS model would have substantially increased ratings volatility, which would have upset issuers and disrupted the structured finance cash cow. Rather than increase accuracy, the Company compromised its standards to avoid losing deals, mortgaged its reputation, and put its head in the sand when it came to surveillance, all the while failing to disclose its decisions and conduct to the market.

210. Because the Company was seriously delinquent in its surveillance, ratings were being maintained on billions of dollars worth of subprime and Alt-A RMBS and CDOs without any review whatsoever, despite the Company's representations to the contrary. This allowed securitization transactions to deteriorate horribly without the Company being aware of the level of defaulted loans and subsequent losses, while its ratings remained stagnant.

211. Another important factor that the Company failed to disclose to Company investors was that while its S&P brand had the ability to access data regarding the mortgage loans securing RMBS and the performance of the securities related to CDOs, it chose to perform surveillance (what little surveillance it did do) on a "pool level" basis. Put simply, instead of looking at the performance of individual mortgages underlying structured finance transactions, the Company looked at entire pools as a whole, which further prevented the Company from conducting meaningful surveillance.

212. Despite the former Managing Director's repeated call for extensive loan level data through her/his tenure as a necessary requirement for the maintenance of LEVELS and adequate surveillance, it was not until October of 2007 that the Company first attempted to get loan level data from loan servicers, as set forth in the Company's request for comment, below:

Standard & Poor's Ratings Services is requesting comments from U.S. residential
mortgage securitization market participants, including investors, issuers, and
servicers, **on its proposal for responsible parties to provide us monthly loan-level
origination variables, data, and performance information.**  Analogous to our
existing new rating requirements, **this proposal reflects our effort to conduct
surveillance and other analytical activity based on detailed collateral data and
information beyond the pool level.**  We expect this data to further our ongoing
efforts to enhance our analytics and processes, and help us provide additional
insightful research to the mortgage and securitization markets.

**Standard & Poor's will request an updated loan-level file complete with updated
origination variables, including loan performance information on all outstanding
loans (loans not paid in full or liquidated), for all U.S. residential mortgage-backed
securities (RMBS) transactions closing on or after Jan. 1, 2008.**  Responsible
parties should deliver loan-level data in a bulk file for all Standard & Poor's rated
transactions on the first business day following the distribution day. At this time, we
are requesting feedback on the servicer's ability to deliver monthly the proposed
fields in the referenced format below starting Jan. 1, 2008 (see Ratings Impact). **We
will also request loan performance information on all outstanding loans for U.S.
RMBS transactions rated before Jan. 1, 2008 (existing transactions).**  We
recognize the large volume of existing transactions and are interested in market
feedback regarding the servicer's or trustee's ability to meet this request.

Beginning in 2008, the governing documents of Standard & Poor's rated U.S. RMBS
transactions should incorporate a covenant of the responsible parties to submit
monthly loan-level performance information.  If there is a master servicer on a
transaction, we would expect the master servicer to be the responsible party, or
absent a master servicer, the primary servicer.  We expect the master servicers and/or
primary servicers will be responsible for coordinating the submission of a single file
of loan-level data representing all outstanding loans from the combined sub-servicers
on the transaction where applicable.  If the transaction contains multiple primary
servicers and no master servicer, we would like feedback on the ability of one of the
primary servicers to be designated the responsible party to send a single submission
or, alternatively, on the trustee's ability to aggregate the separate files and submit one
file to us.  We will not accept multiple loan-level data files from multiple servicers.
The governing documents should incorporate the provision that this responsibility be
transferable to all successor servicers. **Availability of loan-level information will be
a positive consideration in determining a transaction's rating.  The unavailability
of loan-level data may adversely affect our rating determination.**

213.  After requesting comments in October 2007, **the Company did not require loan level
data until May 1, 2008**, after the close of the Class Period, as set forth in the Company's April 9,
2008 release:

> **Beginning with transactions that close on or after May 1, 2008, Standard & Poor's
> Ratings Services requests that issuers of U.S. residential mortgage backed
> securities (RMBS) send us monthly performance data customarily sent to trustees**

96

*and other third parties and include a representations [sic] and warranty that all loan variables and performance data fields sent to us at the time we assign our rating and monthly for the transaction's life are true and correct.*

Loan-Level Performance Data Will Enhance Surveillance And Strengthen Our Ratings Process

*By receiving ongoing collateral attributes and performance data, we plan to develop a loan-level approach to surveilling outstanding U.S. RMBS ratings and move forward with efforts to conduct more granular analysis of the factors influencing borrower behavior in the residential mortgage market.* The additional data may also help identify patterns and trends in the market, enhance our surveillance of outstanding transactions, and help us provide additional insightful research to the mortgage and securitization markets. The provision of regular loan-level performance data transmitted to Standard & Poor's for rated U.S. RMBS transactions expands on its existing practice in Europe and Australia.

On Feb. 7, 2008, Standard & Poor's announced a series of broad measures intended to enhance its governance, analytics, information dissemination, and investor education to strengthen its ratings process (see Related Research). In this article, *Standard & Poor's stated that it will take actions to improve its surveillance process through strengthened surveillance functions, improve timeliness and effectiveness of its surveillance process through the addition of improved surveillance tools, and work with market participants to improve disclosure of collateral underlying structured securities.* The collection and dissemination of loan-level data is also consistent with extensive market feedback, which indicates a desire for more transparency on outstanding transactions and more insight into developing markets. We're also actively engaged with market participants to potentially develop an industry standard reporting package of loan-level data and have offered the Standard & Poor's glossary of terms for residential mortgage data transmittal as the starting point for industry efforts to develop standard definitions and terms (see Related Research). Market feedback confirms this effort to be an important step in improving data quality in the U.S. RMBS sector.

214. Because of the Company's failure to conduct surveillance on a timely basis, its inability to account for fraud in its models, and its Class Period failure to seek loan-level data when conducting its limited surveillance (none of which was disclosed to the market), its ratings changes for structured finance transactions during the Class Period ended up being delayed and extreme. Indeed, some of the RMBS and CDO securities rated by the Company dropped by 2 to 3 ratings levels, which demonstrates that the Company's models *had no predictive capability*. From a statistical perspective, a decline by 3 ratings levels would be outside a 95% confidence interval,

making the predictive capability of the Company's models useless. Again, however, this case is not based upon S&P's failure to monitor its rated RMBS and CDOs, nor is it based upon the Company's failed ratings models. Instead, it is based upon Defendants' misrepresentations regarding how the Company conducted business during the Class Period, as well as misrepresentations regarding the Company's true financial condition and prospects.

215. As stated by D'Erchia at the April 23, 2010 Senate Subcommittee hearing, whenever S&P made a criteria change to its RMBS model, and that change was more conservative than the previous model, S&P did not retest the old deals to see if their structures still passed, for ratings purposes.

216. During the April 23, 2010 Subcommittee Hearing, Raiter testified that concerns over maintaining market share impacted S&P's surveillance, as detailed in the following exchange:

> Sen. Levin: Mr. Raiter, were there discussions within S&P about using rating models to conduct surveillance?

> Raiter: Yes, there were.

> Sen. Levin: And were those discussions heated at times?

> Raiter: I'm sorry, sir?

> Sen. Levin: Were they heated discussions? Were there disagreements over that?

> Raiter: Yes, there were disagreements. Yes, sir.

> Sen. Levin: And what was the argument about?

> Raiter: Well, there was a certain number of analysts, on our side, that thought that it would make a lot of sense to protect the investors – to go back and look at exactly how these deals were performing with new criteria, and with the marks that were available in the model, to mark the properties when the prices went down or up. And there was the other side of the argument, that it would increase ratings' volatility, which might make us look bad in the eyes of the investor and could cost us market share.

> Sen. Levin: So the market share was a factor there as well as to whether or not you would use the new available information to re-rate the existing securities?

> Raiter: Yes, sir.

98

217.     Another tactic the Company used occurred when the Company's models for rating deals did change – even though those changes themselves were only band aids.  Under those circumstances, the Company did not use the new models to reevaluate existing RMBS deals because the result would have been downgrades for many of those securities.  This practice was known as "grandfathering."  Put simply, ratings on RMBS deals were grandfathered even though they would have ended up with different (lower) ratings being assigned if they had been rated with the updated model.  During the April 23, 2010 Subcommittee Hearing, Barnes testified that the Company "did not" use revised models to reevaluate existing RMBS, even though such securities were all under surveillance.

218.     The use of grandfathering was documented in a host of internal Company communications.  For example, on June 24-25, 2004, internal emails discussed allowing the Federal Home Loan Bank of Indianapolis to use LEVELS 5.5 instead of the more updated LEVELS 5.6.  In that regard, on June 24, 2004, Terry Osterweil sent an email to Raiter, Parisi, Barnes, and others, which stated, in pertinent part:[56]

> Tony DiGiovanni from FHLB Indianapolis asked if they (and possibly the other FLHBs) can use LEVELS 5.5 to analyze the loans under a Master Commitment that was established when 5.5 was in effect.  With the model changes from 5.5 to 5.6, some of their commitments which were structured to achieve a "0" loss coverage at "AA" when using 5.5 are now showing a loss coverage > 0 under 5.6
>
> I think their request seems reasonable since we do not require additional enhancement for an already rated transaction if a new model goes into effect and that new model would show an increase in enhancement required.  The same methodology holds true if we rated a deal using a specific version of our model and subsequently implemented another version after which we received a prefunding pool for the rated deal.  In this case, we would use the prior version since that was what was used when rating the transaction.

---

[56] A true and correct copy of the June 24-25, 2004 email exchange, made public by the Senate Subcommittee, is attached hereto as ***Exhibit 45***.

219.     Pointing out the problems with catering to client demands to use less accurate, outdated models, in response, Raiter wrote, "What happens when we migrate to 6.0? Will they want three versions in play, to facilitate pools structured across three different time frames?" Ultimately, Patrick Mahoney wrote to Raiter, Parisi, Osterweil, Barnes and others that the old models could be brought back to life:

> Yes, we can [do] this if required. IT can resurrect 5.5 and send the banks a "key" to unlock them. The Help Desk can handle the calls, if any. All of the FHLB banks have the documentation associated with 5.5.

220.     Thus, despite knowing it had an updated, more accurate model, the Company decided to let its customers use outdated, prior versions so that those same issuers would not have to adjust the structure of their deals to avoid showing loss coverage.

221.     Similar grandfathering tactics were afoot with the Company's rating of CDOs. For example, on June 21, 2005, Cliff Griep ("Griep"), S&P's Chief Credit and Quality Officer, sent an email to Jordan, S&P's Managing Director of Global ABS/RMBS, Gillis, and D'Erchia, about the "implications of proposed new criteria." The email stated, in pertinent part:[57]

> Pat, Peter, have we had a chance to review the implications of the proposed new criteria on outstanding transactions. What is the status of this exercise and has it raised any policy issues?
>
> Also, is it possible to see what the ratings impact would be on portfolios rated under the new criteria, and recently rated transactions under existing criteria, were we to see corporate default rates reach the same levels experienced in the last downturn?

222.     Jordan responded:

> Assuming you're referring to our proposed (we have not definitely decided to release it) updated version of [CDO] Evaluator (3.0), we have tested a number of deals but have more to test – both in NY and London. We also have some select clients currently reviewing the Beta version and providing us with feedback.

---

[57] A true and correct copy of the June 21, 2005 email, made public by the Senate Subcommittee, is attached hereto as **Exhibit 46**.

This has proven to be a complex update and review, and many issues have arisen and continue to arise. ***The overarching issue at this point is what to do with currently rated transactions if we do release a new version of Evaluator***. Some of [us] believe for both logistical and market reasons that the existing deals should mainly be "grand fathered". Others believe that we should run all deals using the new Evaluator. The problem with running all deals using E3 is twofold: ***we don't have the model or resource capacity to do so***, nor do we all believe that even if we did have the capability, it would be the responsible thing to do to the market.

223. Finishing up the email chain, Griep described how the Company lacked a "consistent set of considerations/guidelines" for when to apply new models to existing deals, writing:

Thanks Pat. Yes, I was referring to Evaluator 3.0 which I knew from the APB discussions was being tested, and I wanted to check in on the status. I had been in contact with Kai, who passed me the technical document to be released with 3.0, and I understand the supporting criteria article is being drafted.

The issue raised by the applicability of the revised criteria to outstanding issues is, I agree, a difficult one, but also extends to other areas in structured [finance], and potentially C&G, where we depend upon models. It's complicated all the more by potential selective disclosure issues raised by client beta testing of models that potentially embed forthcoming criteria, or the actual release of models that embed new criteria which provides selective insight into future rating changes. It might be helpful to raise this issue with APB when you are nearing or have reached a recommendation ***to see if we can forge a consistent set of considerations/guidelines, or policy, for the firm in making these judgments***. I agree it's the overarching issue.

Tom had mentioned at APB his interest, one that I share, in reviewing whether the new criteria would reduce ratings volatility for newly rated transactions relative to the 1997-1999 vintage of corporate bond transactions, an least when subjected to the same default levels that prevailed in the last downturn. I understand this may be tough to test in light of the other protections built into new transactions, some driven by our previous criteria changes and others by investor demand, but I understand some of the testing was yielding positive results in this regard. I can catch up with Tom on this.

224. Yet another example of how the Company's surveillance lacked manpower and analytical tools for surveillance, and did not have established procedures on how to address existing deals when there have been material changes that could cause existing ratings to change, was documented in an internal S&P email on October 6, 2005 from Chun, S&P's Managing Director of

Surveillance, to Gillis, Barnes, Buendia, D'Erchia, Jordan, Rose, Scott, and many others, which

stated, in pertinent part:[58]

> In various asset classes, the way surveillance is done is different from how a new deal is done *because of the lack of models/methods (analytical and cash flow models) that can be used for both surveillance and new deal*. Thus, changes in new deal assumptions are not necessarily pertinent to how surveillance is done. In my opinion, this creates a sense of disconnect and analysts (new deal and surveillance) do not feel a need to make sure there is a good process and procedure in place to identify basic global assumption changes

> - How do we handle existing deals especially if there are material changes that can cause existing ratings to change?

> I think the history has been to only re-review a deal under new assumptions/criteria when the deal is flagged for some performance reason. I do not know of a situation where there were wholesale changes to existing ratings when the primary group changed assumptions or even instituted new criteria. *The two major reasons why we have taken the approach is (i) lack of sufficient personnel resources and (ii) not having the same models/information available for surveillance to relook at an existing deal with the new assumptions (i.e. no cash flow models for a number of assets). The third reason is concerns of how disruptive wholesale rating changes, based on a criteria changes, can be to the market*.

225.     The serious problems associated with the Company's selective use of updated models

to rate some deals and not others was memorialized in an email exchange on November 23, 2005

between Elwyn Wong to Andrea Brown under the subject, "Disclaimer – Help", which stated, in

pertinent part:[59]

> [Brian Neer, Morgan Stanley] Elwyn,

> We are in a bit of a pickle here. My legal staff is not letting me send anything out to any investor on anything with an S&P rating right now. We are waiting for you to tell us you [sic] approve the disclaimer or are grandfathering our existing and pipeline deals. My business is on "pause" right now.

> *     *     *

---

[58] *See Exhibit 37*.

[59] *See Exhibit 1*.

[Wong]  Lord help our fucking scam … this has to be the stupidest place I have
worked at.  Marc Steinberg is sending us a CDO of ABS portfolio to check as we
speak

\*          \*          \*

[Brown]  Yes.  What happens when they hear that cash deals won't be using [CDO
Evaluator] e3.

[Wong]  Only gets better

226.    On January 31, 2006, Timothy Gallagher from Goldman Sachs sent an email to

Diamond, concerning the issue of whether methodology changes would be applied to existing deals

that would be downgraded.  The email stated:[60]

Kim – lets speak asap on my voice mail.  I think the investor spoke to someone else.
Below is the direct feedback:

"Rabo Tango are withdrawing any interest from LNR because they had a call with
S&P who confirmed that this was being rated off the old methodology.  Rabo's
conclusion was that they felt this deal was a prime candidate for a downgrade when
the new methodology kicked in."

I apologize if my voice mail seemed curt but this is a huge issue for us and the
investor came to this conclusion immediately after the call with the S&P person.

227.    Within the Company, discussions continued into 2007 as to whether the Company

would consistently apply new ratings criteria to existing deals.  On July 15, 2007, Griep sent an

email to Buendia, Gillis, Barnes, Warner, and others under the subject "Special APB meeting."  The

email stated:[61]

The issues that came up when I briefed the group were 1. Alignment of surveillance
methodology and new criteria.  2.  What is changing regarding criteria  3.  How do
we handle the grandfathering issue in the context of consistent application of criteria
4.    Alignment  of  surveillance  methodology  and  ratings  actions  with  ratings

---

[60] A true and correct copy of the January 31, 2006 email exchange, which was made public by the
Senate Subcommittee, is attached hereto as *Exhibit 47*.

[61] A true and correct copy of the July 15, 2007 email, made public by the Senate Subcommittee, is
attached hereto as *Exhibit 48*.

definitions. 5. Implications for rated subprime book overall. 6. Communication within S&P.

228. Internal documents from S&P make it clear that grandfathering of ratings was a significant issue where the Company's primary concern was not with accuracy of ratings, but with not upsetting the proverbial apple cart. Rather than simply applying the best, most credible, and most accurate ratings methodology, it has been documented that the Company tried to cater to arranger and investment bank interests so that the flow of lucrative ratings fees would not be disrupted and market share would be preserved. The result was that the Company put off and delayed taking a stance on applying new ratings methodology to old ratings – it was unresolved and unclear at all relevant times during the Class Period, further watering down the Company's once-sacred ratings criteria. Moreover, S&P's surveillance department did not have the models or manpower to apply new criteria to old deals.

229. Summarizing the Company's grandfathering tactic, Senator Levin stated at the Senate Subcommittee hearing that:

> In the summer of 2002, S&P had revamped its CDO model but put the model on hold for more than a year as it struggled to rationalize why it would not use the new model to retest existing CDO securities. It's clear from over a year of internal emails that S&P delayed and delayed the decision, anticipating that the revised model would require existing CDO securities to be downgraded, disrupt the CDO market, and reduce public confidence in its CDO ratings. It would also have disrupted S&P profits from CDO ratings.

> In July 2007, S&P made a major change to its RMBS rating model but decided not to retest existing RMBS securities. The revised RMBS model projected much higher default rates for high risk mortgages, and required greater protection against loss including 40% more credit protection for triple B graded subprime securities. That meant a 40% larger cushion to protect against losses, re-evaluating existing RMBS securities with the revised model would likely have led to downgrades, angry issuers and even angrier investors, so S&P didn't do it. Moody's didn't either.

> After strengthening its RMBS model to issue new ratings, it chose not to apply it to existing securities. Recently, S&P has adopted a policy requiring retesting of rated securities within one year of a model change.

I.     **The Tidal Wave Crashes and the Company Downgrades Thousands of RMBS and CDO Securitizations**

230.     Delinquencies related to subprime and Alt-A mortgage loans began to spike in August of 2006 and reached historical highs by the end of November 2006. Subprime loans 60 days or more delinquent represented more than 30% of the pool balance for 2006 securitizations.[62] Loans underlying RMBS and CDO transactions were defaulting immediately after origination and staying delinquent. This same pattern emerged for Alt-A mortgage loans, but with smaller percentages than subprime mortgage loans.

231.     Although the subprime RMBS and CDO market was under intense pressure and collapsing, the Company's S&P brand did not begin significantly downgrading structured finance transactions until July 2007 – in part because of the Company's inability and failure to conduct surveillance. Confirming the accounts of the former Director of RMBS Surveillance, D'Erchia testified at the April 23, 2010 Senate Subcommittee hearing that, "When we started to see the increased delinquencies, we switched to doing vintage reviews on the '06 and '07 transactions."

232.     Indeed, in late 2006, D'Erchia, S&P's head of surveillance, advised the Company's head of Structured Finance, Rose, that the subprime market was rapidly deteriorating and that the Company should start significantly downgrading its subprime based ratings. Rose, however, refused. Into 2007, D'Erchia continued to bring up the Company's need to significantly downgrade its subprime based ratings. As revealed in the Senate Subcommittee hearing, the disagreement went so far that Rose gave D'Erchia a bad performance evaluation.

233.     On a July 12, 2007 conference call with S&P, Steven Eisman ("Eisman"), a managing director for a hedge fund, had a question. Referring to S&P's massive downgrade of billions of

---

[62] Any loan over 60 days delinquent has a high probability of moving to 90 days delinquent and into foreclosure.

dollars of RMBS, he said, "I'd like to understand why you're making this move today and why you didn't do this many, many months ago." An S&P analyst responded, "It's a good question" Eisman countered with, "You need to have a better answer." The Company could have revealed the truth – that it was engaged in a race to the bottom market share war, that it's models "didn't capture half the risk," that its surveillance was atrocious – but it did none of those things. Instead, it attempted to brush Eisman's pointed question aside, leaving investors and the market in limbo. The exchange did not go unnoticed within the Company. On that same day, Company employees commented on an internal email with the subject "Tomorrow's FT Column – Saskia Sholtes," wherein they referred to Eisman as "the very first questioner, the jerk who wouldn't let go. . ." Calling the Company's response arrogant, Ian Bell wrote the following to Rose and Gillis on July 13, 2007:[63]

> Joanne/Tommy
>
> More for the post-mortem than now but one aspect of our handling of the subprime that really concerns me is what I see as our arrogance in our messaging. Maybe it is because I am away from the center of the action and so have more of an "outsider's" point of view. The comment from Chris below [calling Eisman a jerk] for me is a sign of that attitude.
>
> I listened to the telecom TWICE. That guy was not a "jerk". He asked an entirely legitimate question that we should have anticipated. He then got upset when we totally fluffed our answer. We did sound like the Nixon White House. Instead of dismissing people like him or assuming some dark motive on their part, we should ask ourselves how we could have so mishandled the answer to such an obvious question.
>
> I have thought for awhile now that if this company suffers from an Arthur Andersen event, we will not be brought down by a lack of ethics as I have never seen an organisation [sic] more ethical, nor will it be by greed as this plays so little role in our motivations; it will be arrogance.

234. As set forth below, over the span of several months, the Company's S&P brand downgraded **billions** of dollars worth of RMBS and CDO transactions:

---

[63] A true and correct copy of the July 13, 2007 email, made public by the Senate Subcommittee, is attached hereto as **Exhibit 49**.

- July 10, 2007 – *S&P downgrades 498 U.S. RMBS worth more than $5 billion* backed by U.S. First Lien Subprime Mortgages and securities rated from the fourth quarter of 2005 through the fourth quarter of 2006 and *places 74 securities on credit watch*.

- July 16, 2007 – S&P puts additional CDO transactions put on credit watch.

- July 19, 2007 – *S&P downgrades 418 U.S. RMBS worth more than $3.8 billion* backed by U.S. Second Lien Mortgages and securities rated from the beginning of 2005 through the fourth quarter of 2006 and *places 74 securities on credit watch*.

- August 7, 2007 – *S&P downgrades 207 classes of RMBS* backed by first-lien Alt-A mortgage loans securities rated from the beginning of 2005 through the fourth quarter of 2006.   In addition, CDO transactions are now starting to be reviewed by S&P.

- August 17, 2007 – *S&P downgrades 158 Alt-A RMBS classes worth more than $660 million* and cites "revised surveillance assumptions."

- August 28, 2007 – *S&P places 34 tranches of CDOs on credit watch negative*, but does not officially downgrade them.

- October 17, 2007 – *S&P downgrades 1713 classes of U.S. RMBS worth more than $23 billion* backed by first-lien subprime mortgage loans, first-lien Alt-A mortgage loans, and closed-end second-lien mortgage loans *issued from January 1, 2007 through June 30, 2007*.  In addition, *S&P places 646 other classes, representing $3.3 billion*, on credit watch negative.

- October 19, 2007 – *S&P downgrades 1,413 classes of 1st lien subprime RMBS* for securities issued during 2005 and 2006.

- November 16, 2007 – *S&P downgrades 536 1st Lien Subprime, 1st lien Alt-A, closed-end 2nd lien 2007 vintage RMBS classes*.

- December 19, 2007 – *S&P places an additional 74 tranches of CDOs* on credit watch negative.

- December 19, 2007 – *S&P downgrades 1,292 classes of Alt-A loans* relating to securities issued in 2005 to 2006.

- January 30, 2008 – *S&P takes action on 6,389 U.S. subprime RMBS ratings.  S&P also takes negative action on 1,953 CDO ratings estimated to be worth more than $200 billion.*

- February 26, 2008 – *S&P lowers ratings on 374 classes* insured by FGIC and XLCA.

235.    In the midst of the Company's extraordinary volume of ratings downgrades, the

Company's S&P brand fired its President on August 30, 2007. In a press release issued that day, the

Company stated, in part:

> The McGraw-Hill Companies (NYSE: MHP) today announced the appointment of Deven Sharma as president of Standard & Poor's, the Corporation's financial services division, effective immediately. Mr. Sharma has served as executive vice president of Investment Services and Global Sales for Standard & Poor's since November 1, 2006. *He succeeds Kathleen Corbet, who is stepping down from her position to pursue other opportunities*. Mr. Sharma will report to Harold McGraw III, chairman, president and chief executive officer of The McGraw-Hill Companies.

236. Also during the Company's intense ratings downgrades outlined above, on November

9, 2007, the *Wall Street Journal* reported on the astonishing wave of debt downgrades:

> Get Set for Wave of Debt Downgrades --- With Investors Frazzled, Real-Estate Softening, Three Rating Firms Have Their Markers Out

> The credit-rating downgrade deluge that's been rocking financial markets isn't over.

> In the next few weeks, debt-rating services like Moody's Investors Service, *Standard & Poor's* and Fitch Ratings *look poised to downgrade hundreds of mortgage-related investments worth tens of billions of dollars*, creating the potential for more market unrest.

> The three major rating firms -- owned respectively by Moody's Corp., *McGraw-Hill* Cos. and Fimalac SA of Paris -- *have been maligned by critics for originally underestimating the danger of bonds backed by subprime mortgages and other investments tied to mortgages*.

> Now they're moving in the other direction, aggressively reassessing where they stand on a wide assortment of debt. Behind the about-face: a worsening real-estate backdrop and frazzled investors.

> Credit-rating firms have lowered their credit ratings on *more than $70 billion* in mortgage-related bonds in the past few months, setting off waves of distress in the stock and bond markets. They've also expressed concerns about the outlook for a range of related industries from banking to bond insurance. Banks and Wall Street firms including Citigroup Inc. and Merrill Lynch & Co. took large charges when they were forced to reassess the value of even their highest-rated mortgage debt.

> The latest turmoil to hit markets has been a reminder that the raters -- despite all of the criticism about their approach -- still have great sway. Many pensions and other institutional investors are bound to hold only investment-grade debt. A downgrade into junk territory can have an impact on demand for securities.

> Moreover, because many mortgage instruments are so hard to value, some banks and

hedge funds rely on credit ratings even when they know the ratings could be flawed.

"We are going to be seeing ratings actions coming for awhile" on mortgage-related debt, says Yuri Yoshizawa, a group managing director overseeing U.S. derivatives at Moody's.

*Collateralized debt obligations, or CDOs, look primed for more distress. These are investments often backed by portfolios of mortgage-backed securities. They're sold in pieces, or tranches, with varying levels of risk and return. The CDO tranches -- widely held by banks and investors -- haven't been downgraded as quickly as the underlying mortgage securities they hold.*

As of Nov. 1, S&P had lowered ratings on 381 tranches of residential mortgage-related CDOs. It still had a "Credit Watch negative" on 709 CDO tranches, meaning the bonds face a good chance of a downgrade.

<div align="center">*    *    *</div>

While the rating downgrades of mortgage-backed securities were expected by many analysts, the speed and magnitude of the corresponding CDO downgrades caught many banks, brokerage firms and investors off guard. *This past spring, even as mortgage delinquencies kept rising, some rating executives told investors that they didn't foresee CDO downgrades until 2008.*

That's all changed as the rating companies have slashed their assessments of thousands of subprime mortgage-backed securities. That's had an especially severe impact on a class of CDOs backed by low-investment-grade securities. According to J.P. Morgan research, several CDOs had over 80% of their underlying collateral affected by the downgrades or reviews. The Aaa tranches on some of these CDOs were subsequently cut by multiple notches -- some to junk -- days after the mortgage-backed securities downgrades.

"There will be a lot of chain reactions," says David Yan, director and head of CDO research at Credit Suisse Group.

237.    Amidst the downgrades, problems with the Company's LEVELS model were drawing scrutiny from the market. For example, in an email exchange between Kurt Havnaer of Jensen Investment and Donald Rubin ("Rubin"), the Senior Vice-President of Investor Relations for McGraw-Hill, the following question was posed to the Company:[64]

---

[64] A true and correct copy of the November 23, 2007 email exchange, made public by the Senate Subcommittee, is attached hereto as *Exhibit 50*.

I have a question on the recent downgrades of RMBS backed by pools of sub-prime mortgages originated in 2005 and 2006. My question is based on reading Vickie Tillman's Congressional testimony. I believe she indicated that the performance of sub-prime mortgages issued in 2005 and 2006 was very different than the performance of sub-prime mortgages issued prior to 2005. In her testimony, she implies that the characteristics of the mortgage loans originated in 2005 and 2006 were different from those originated prior to 2005. For example, on page 23 of my copy of her testimony she indicates that, "many of the 2006 transactions may be showing weakness because of origination issues, such as aggressive residential mortgage loan underwriting, first-time home-buyer programs, piggyback second-lien mortgages, speculative borrowing for investor properties, and the concentration of affordability loans." While I'm certainly not a mortgage expert, I wonder if the performance difference was due to the possibility that the characteristics of the sub-prime mortgage loans issued in 2005 and 2006 were different from the sub-prime mortgage loans issued prior to 2005. My understanding is that your LEVELS model analyzes historical mortgage loan defaults and is used, along with other models, to assign ratings to RMBS. It seems possible to me that some of the RMBS issued in 2005 and 2006 that have already been downgraded were originally rated too high because the LEVELS model did not account for differences in the characteristics of the sub-prime mortgage loans originated in 2005 and 2006 relative to those originated prior to 2005. My guess is that other investors have brought this point up, and I'm wondering how management is responding to this line of reasoning. Thanks for your time. I appreciate it.

238. In response, Rubin forwarded the email to Tillman, Milano, and Adam Schuman, and Tillman then passed the email to Gillis and Barnes, asking them to "get answers to these questions by Monday." Barnes responded internally on November 26, 2007, with the following email to Tillman and Gillis:

Vickie,

Here's our proposed response to Kurt's question. If you have any questions or need further clarification feel free to give us a call. Regards, Susan.

Standard & Poor's LEVELS model evaluates loan characteristics and assigns a default probability on a loan level basis. *These loan characteristics that you mention including piggy back, speculative borrowing, and affordability loans have been included in various forms of mortgage loans and securitizations for some time. And therefore are included in our analysis, specifically the LEVELS model.* What is transpiring is how the performance of these characteristics is differing from historical norms. The cause or causes at this time are still uncertain. Macroeconomic factors as well as the combination of these higher risk characteristics coupled with fraud seem to be the most likely reasons for the anomalous behavior.

While the ultimate performance of these loans still remains to be seen, Standard & Poor's adjusted it's default expectations for the anomalous behavior and has increased

its default expectations accordingly for all loans analyzed since July 2007.

239. After receiving the proposed response, on November 26, 2007, Tillman responded that it "looks fine". Thus, in response to a direct inquiry that rightfully called into question the internally known inadequacies in the Company's LEVELS model, Tillman, Barnes, and McGraw-Hill's Senior Vice-President of Investor Relations prepared a false and misleading response that actually touted the Company's model. The content of the Company's response flies in the face of, among other things, Congressional findings of fact, and omits material information that the Company deliberately did not update its LEVELS model so that it would not "kill the golden goose" that permitted it to assign lucrative ratings to compilations of toxic mortgages.

240. Moreover, according to a confidential witness that worked as a Secretary in the Company's RMBS group, in early 2008 Company employees were shredding documents at an alarming rate. She/he stated that they "were shredding things like every five seconds" and that an outside vendor was brought in specifically to shred structured finance documents. On top of that, this former Secretary was responsible for working on downgrades of complex structured finance transactions during 2007. There "were so many downgrades" that administrative assistants taught "secretaries how to do the downgrades." While this former Secretary was forced to work late to downgrade deals, she/he was not allowed to bill overtime to downgrades, and was specifically instructed to bill that overtime to "assisting with files."

241. As of April 21, 2008, S&P had reviewed 31,926 U.S. RMBS & CDO structured finance transactions spanning from the first quarter of 2005 through the third quarter of 2007. Of the 31,926 securities reviewed, ***38.5% were downgraded***. Of the 31,926 securities reviewed, 11,226 or 35% of the securities were related to subprime RMBS. ***Of the 11,226 subprime securities reviewed, 52% were downgraded***. The charts below demonstrate the tremendous volume of downgrades by the Company's S&P brand:

**Original-to-Current Rating Transitions**
SECTOR = U.S. RMBS & CDO of ABS and SIV-Lite    For Vintages: Q1 2005 - Q3 2007    Date Updated = April 21, 2008

| Original | AAA | AA+ | AA | AA- | A+ | A | A- | BBB+ | BBB | BBB- | BB+ | BB | BB- | B+ | B | B- | CCC+ | CCC | CCC- | CC | C | D | # of Ratings | # of Down | Down % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AAA | 3397 | 30 | 56 | 17 | 27 | 25 | 27 | 21 | 42 | 35 | 20 | 67 | 13 | 9 | 44 | 19 | 38 | 45 | 78 | 53 | 0 | 16 | 4079 | 682 | 16.72% |
| AA+ | 0 | 1930 | 49 | 16 | 21 | 35 | 7 | 10 | 43 | 3 | 9 | 59 | 0 | 1 | 62 | 2 | 2 | 30 | 1 | 4 | 0 | 1 | 2285 | 355 | 15.54% |
| AA | 3 | 9 | 3132 | 58 | 47 | 84 | 46 | 30 | 89 | 26 | 28 | 122 | 10 | 12 | 120 | 14 | 27 | 193 | 54 | 108 | 0 | 19 | 4231 | 1087 | 25.69% |
| AA- | 0 | 1 | 8 | 1108 | 32 | 32 | 16 | 18 | 37 | 14 | 10 | 54 | 6 | 4 | 93 | 16 | 34 |  |  |  | 0 | 19 | 1787 | 670 | 37.49% |
| A+ | 0 | 0 | 0 | 0 | 1039 | 26 | 28 | 29 | 42 | 17 | 17 | 65 | 7 | 6 | 60 | 8 | 3 | 430 | 12 | 31 | 0 | 16 | 1836 | 797 | 43.41% |
| A | 0 | 0 | 2 | 1 | 4 | 2116 | 59 | 48 | 91 | 40 | 41 | 119 | 18 | 29 | 79 | 17 | 12 | 477 | 48 | 212 | 0 | 48 | 3461 | 1338 | 38.66% |
| A- | 0 | 0 | 0 | 0 | 1 | 0 | 1030 | 63 | 72 | 28 | 16 | 86 | 22 | 13 | 81 | 20 | 5 | 490 | 19 | 162 | 0 | 52 | 2161 | 1130 | 52.29% |
| BBB+ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 841 | 46 | 43 | 35 | 94 | 24 | 18 | 89 | 18 | 3 | 491 | 7 | 172 | 0 | 71 | 1952 | 1111 | 56.92% |
| BBB | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 1 | 1799 | 81 | 90 | 146 | 29 | 31 | 159 | 25 | 12 | 491 | 57 | 403 | 0 | 90 | 3417 | 1614 | 47.23% |
| BBB- | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 1 | 941 | 56 | 117 | 35 | 21 | 153 | 34 | 4 | 569 | 7 | 405 | 0 | 115 | 2460 | 1516 | 61.63% |
| BB+ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 256 | 26 | 14 | 11 | 56 | 13 | 0 | 241 | 5 | 275 | 0 | 136 | 1033 | 777 | 75.22% |
| BB | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1027 | 40 | 15 | 236 | 20 | 1 | 237 | 5 | 167 | 0 | 88 | 1838 | 809 | 44.02% |
| BB- | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 96 | 7 | 14 | 3 | 0 | 15 | 0 | 6 | 0 | 8 | 149 | 53 | 35.57% |
| B+ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 47 | 0 | 0 | 5 | 0 | 0 | 0 | 2 | 55 | 7 | 12.73% |
| B | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 787 | 60 | 1 | 10 |  |  | 0 | 9 | 1134 | 346 | 30.51% |
| B- | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 40 | 1 | 6 | 0 | 1 | 0 |  | 48 | 8 | 16.67% |

1. AAA ratings from the same transaction are treated as a single rating in the calculation of this table.
2. Multiple rating actions are aggregated to calculate a security's cumulative rating performance
3. Last rating before withdrawal due to redemption is used in the transition rate calculation.

| | D | # of Ratings | # of Down | Down % |
|---|---|---|---|---|
| Investment Grade | 447 | 27669 | 10300 | 37.23% |
| Speculative Grade | 243 | 4257 | 2000 | 46.98% |
| ALL | 690 | 31926 | 12300 | 38.53% |

**Original-to-Current Rating Transitions**
SECTOR = U.S. RMBS    For Vintages: Q1 2005 - Q3 2007    Date Updated = April 21, 2008

| Original | AAA | AA+ | AA | AA- | A+ | A | A- | BBB+ | BBB | BBB- | BB+ | BB | BB- | B+ | B | B- | CCC+ | CCC | CCC- | CC | C | D | # of Ratings | # of Down | Down % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AAA | 3110 | 10 | 30 | 8 | 10 | 18 | 14 | 6 | 24 | 19 | 4 | 59 | 0 | 0 | 22 | 0 | 0 | 7 | 0 | 0 | 0 | 0 | 3341 | 231 | 6.91% |
| AA+ | 0 | 1906 | 44 | 15 | 18 | 35 | 7 | 9 | 42 | 3 | 9 | 58 | 0 | 1 | 62 | 0 | 0 | 30 | 1 | 0 | 0 | 0 | 2241 | 335 | 14.95% |
| AA | 2 | 8 | 2892 | 52 | 27 | 73 | 37 | 11 | 76 | 10 | 6 | 109 | 3 | 5 | 111 | 0 | 0 | 167 | 0 | 3 | 0 | 0 | 3597 | 695 | 19.32% |
| AA- | 0 | 1 | 2 | 1072 | 29 | 29 | 15 | 15 | 34 | 11 | 9 | 46 | 3 | 2 | 135 | 1 | 0 | 225 | 0 | 4 | 0 | 13 | 1646 | 571 | 34.69% |
| A+ | 0 | 0 | 0 | 0 | 1015 | 25 | 26 | 28 | 41 | 15 | 17 | 65 | 7 | 6 | 60 | 8 | 0 | 427 | 0 | 25 | 0 | 16 | 1781 | 766 | 43.01% |
| A | 0 | 0 | 2 | 1 | 4 | 1972 | 50 | 41 | 74 | 24 | 25 | 108 | 11 | 14 | 70 | 8 | 0 | 462 | 0 | 57 | 0 | 34 | 2957 | 978 | 33.07% |
| A- | 0 | 0 | 0 | 0 | 1 | 0 | 989 | 58 | 68 | 21 | 12 | 82 | 22 | 10 | 79 | 19 | 0 | 485 | 0 | 135 | 0 | 50 | 2031 | 1041 | 51.26% |
| BBB+ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 818 | 46 | 42 | 35 | 93 | 23 | 18 | 89 | 18 | 0 | 488 | 0 | 148 | 0 | 67 | 1885 | 1067 | 56.60% |
| BBB | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 1 | 1650 | 69 | 90 | 129 | 26 | 20 | 155 | 17 | 0 | 467 | 0 | 185 | 0 | 75 | 2856 | 1202 | 42.09% |
| BBB- | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 1 | 890 | 55 | 116 | 35 | 19 | 153 | 33 | 0 | 568 | 0 | 319 | 0 | 103 | 2294 | 1401 | 61.07% |
| BB+ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 227 | 25 | 10 | 9 | 56 | 12 | 0 | 240 | 0 | 188 | 0 | 131 | 898 | 671 | 74.72% |
| BB | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 952 | 39 | 13 | 232 | 17 | 0 | 236 | 0 | 133 | 0 | 85 | 1709 | 755 | 44.18% |
| BB- | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 77 | 7 | 14 | 2 | 0 | 15 | 0 | 3 | 0 | 8 | 126 | 49 | 38.89% |
| B+ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 34 | 0 | 0 | 5 | 0 | 0 | 0 | 2 | 42 | 7 | 16.67% |
| B | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 769 | 60 | 0 | 266 | 0 | 8 | 0 | 9 | 1112 | 343 | 30.85% |
| B- | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 32 | 0 | 0 | 0 | 6 | 1 | 39 | 7 | 17.95% |

1. AAA ratings from the same transaction are treated as a single rating in the calculation of this table.
2. Multiple rating actions are aggregated to calculate a security's cumulative rating performance
3. Last rating before withdrawal due to redemption is used in the transition rate calculation.

| | D | # of Ratings | # of Down | Down % |
|---|---|---|---|---|
| Investment Grade | 363 | 24629 | 8287 | 33.65% |
| Speculative Grade | 235 | 3926 | 1832 | 46.66% |
| ALL | 598 | 28555 | 10119 | 35.44% |

**Original-to-Current Rating Transitions**
SECTOR = U.S. RMBS Subprime    For Vintages: Q1 2005 - Q3 2007    Date Updated = April 21, 2008

| Original | AAA | AA+ | AA | AA- | A+ | A | A- | BBB+ | BBB | BBB- | BB+ | BB | BB- | B+ | B | B- | CCC+ | CCC | CCC- | CC | C | D | # of Ratings | # of Down | Down % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AAA | 927 | 5 | 27 | 1 | 0 | 13 | 0 | 0 | 15 | 2 | 0 | 35 | 0 | 0 | 2 | 0 | 0 | 35 | 0 | 0 | 0 | 0 | 1027 | 100 | 9.74% |
| AA+ | 0 | 973 | 28 | 9 | 14 | 30 | 1 | 2 | 40 | 0 | 4 | 53 | 0 | 1 | 48 | 0 | 0 | 15 | 0 | 1 | 0 | 0 | 1219 | 246 | 20.18% |
| AA | 0 | 0 | 940 | 28 | 3 | 32 | 2 | 3 | 61 | 1 | 1 | 94 | 3 | 3 | 93 | 0 | 0 | 127 | 0 | 3 | 0 | 0 | 1393 | 453 | 32.52% |
| AA- | 0 | 0 | 0 | 459 | 5 | 19 | 1 | 5 | 24 | 0 | 3 | 35 | 1 | 1 | 126 | 0 | 0 | 190 | 0 | 3 | 0 | 0 | 874 | 415 | 47.48% |
| A+ | 0 | 0 | 0 | 0 | 430 | 6 | 9 | 26 | 4 | 1 | 46 | 3 | 2 | 45 | 3 | 0 | 391 | 0 | 20 | 0 | 0 |  | 992 | 562 | 56.65% |
| A | 0 | 0 | 0 | 0 | 0 | 425 | 7 | 31 | 3 | 6 | 47 | 3 | 4 | 48 | 3 | 0 | 399 | 0 | 53 | 0 | 0 |  | 1036 | 611 | 58.98% |
| A- | 0 | 0 | 0 | 0 | 0 | 0 | 348 | 10 | 31 | 6 | 2 | 88 | 3 | 3 | 49 | 2 | 0 | 372 | 0 | 78 | 0 | 0 | 947 | 599 | 63.25% |
| BBB+ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 328 | 15 | 5 | 12 | 59 | 4 | 5 | 55 | 8 | 0 | 412 | 0 | 135 | 0 | 0 | 1044 | 716 | 68.58% |
| BBB | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 277 | 14 | 38 | 7 | 8 | 65 | 5 | 0 | 372 | 0 | 164 | 0 | 1 |  | 960 | 683 | 71.15% |
| BBB- | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 205 | 12 | 39 | 6 | 5 | 79 | 9 | 0 | 371 | 0 | 206 | 0 | 6 | 938 | 733 | 78.14% |
| BB+ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 82 | 16 | 3 | 5 | 40 | 4 | 0 | 196 | 0 | 150 | 0 | 19 | 515 | 433 | 84.08% |
| BB | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 43 | 0 | 0 | 11 | 1 | 0 | 101 | 0 | 68 | 0 | 26 | 250 | 207 | 82.80% |
| BB- | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 1 | 4 | 0 | 0 | 7 | 0 | 4 | 0 | 0 | 23 | 16 | 69.57% |
| B+ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 1 | 7 | 5 | 71.43% |
| B | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |  | 1 | 1 | 100.00% |
| B- | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  | 0 | 0 |  |

1. AAA ratings from the same transaction are treated as a single rating in the calculation of this table.
2. Multiple rating actions are aggregated to calculate a security's cumulative rating performance
3. Last rating before withdrawal due to redemption is used in the transition rate calculation.

| | D | # of Ratings | # of Down | Down % |
|---|---|---|---|---|
| Investment Grade | 7 | 10430 | 5118 | 49.07% |
| Speculative Grade | 50 | 796 | 662 | 83.17% |
| ALL | 57 | 11226 | 5780 | 51.49% |

**How-To-Read**

These tables document the transitions of the original rating-to-the current rating for U.S. CDO of ABS as well as U.S. RMBS transactions. They show the original issuance rating and the current rating for each security, as well as the percentage of ratings that were lowered. For example, the U.S. RMBS table indicates that about 93% of all original 'AAA' ratings have stayed at the same rating level, and only about 7% experienced any downgrade transitions. The original and the current ratings are shown in the first column and the first row below the title, respectively.

242.    The number of downgrades represented a historical event for the Company that had

never been seen before – but the majority of the downgrades did not take place until December 2007 through January 2008, towards the end of the Class Period when Defendants were still misleading investors by touting growth prospects for 2008.

243.    The devastating impact of the downgrades destroyed much of the Company's reputation.  Describing the events of 2007, Senator Levin stated:

> Finally in July of 2007, within days of each other, Moody's and Standard & Poor's announced mass downgrades of hundreds of subprime mortgage backed securities. The mass downgrades shocked financial markets and the subprime secondary market dried up overnight.  Banks, security firms, pension funds, and others were left holding billions of dollars of suddenly unmarketable securities.  The value of those securities began dropping like a stone and the financial crisis was on.

> Two months later in October, Moody's began downgrading over $10 billion of CDOs.  On January 30, 2008, Standard & Poor's downgraded over 8,000 securities including 6,300 RMBS and 1,900 CDO securities, an unprecedented onslaught of downgrades.  The CDO market like the RMBS market evaporated.  Financial firms around the world were suddenly struck with even more unmarketable securities and by September 2008, major global financial institutions like Lehman Brothers, AIG, Citibank, Goldman Sachs and Morgan Stanley were either bailed out, bankrupt or struggling.

> Looking back, if any single event can be identified as the immediate trigger of the 2008 financial crisis, my vote would be for the mass downgrades starting in July 2007, when the credit rating agencies realized their AAA ratings wouldn't hold and finally stopped labeling toxic mortgages as safe investments.  Those mass downgrades hit the markets like a hammer, making it clear the investment grade ratings had been a colossal mistake.

> This chart . . . shows just how big a mistake it was.  It shows that 91% of the AAA subprime RMBS securities issued in 2007, and 93% of those issued in 2006, have now been downgraded to junk status.  The numbers for option ARM mortgages are even worse. . . .

## J.    After the Hammer Fell, S&P Settles with the SEC

244.    Significantly, rating agencies like S&P, whose misrepresentations set forth below were revealed instantaneously by the Credit Agencies Report agreed to an informal settlement with the SEC.  *See **Exhibit 6**.*  S&P agreed to engage in remedial actions to correct the wrongs identified in the Credit Agencies Report.  These remedial actions for S&P – which are essentially admissions

of the falsity of Defendants' Class Period statements, as well as their scienter – include:

- Evaluating, both at the present time and on a periodic basis, whether it has sufficient staff and resources to manage its volume of business and meet its obligations under the Exchange Act;

- Conducting a review of its current disclosures relating to processes and methodologies for rating RMBS and CDOs to assess whether it is fully disclosing its ratings methodologies in compliance with the Exchange Act;

- Reviewing whether its policies governing the timing of disclosure of a significant change to a process or methodology are reasonably designed to comply with these requirements;

- Conducting a review to determine whether its written policies and procedures used to determine credit ratings for RMBS and CDOs are fully documented;

- Conducting a review of its current policies and practices for documenting the credit ratings process and the identities of RMBS and CDO ratings analysts and committee members to review whether they are reasonably designed to ensure compliance with Rule 17g-2 and to address weaknesses in the policies or in adherence to existing policies that result in gaps in documentation of significant steps and participants in the credit ratings process;

- Conducting a review to determine if adequate resources are devoted to surveillance of outstanding RMBS and CDO ratings. This review will include, for example, whether the rating agency maintains adequate staffing and has adequate expertise dedicated to performing ongoing surveillance. The Company will also ensure that it has comprehensive written surveillance procedures and all appropriate surveillance records shall be maintained; and

- Reviewing its practices, policies and procedures for mitigating and managing the "issuer pays" conflict of interest.

245. The remedial actions listed in the Credit Agencies Report are directly relevant to the claims specifically alleged herein, and are, in fact, evidence in support of those claims.

**K.  Congressional Hearings on Credit Rating Agencies**

246. On October 22, 2008, the House Oversight Committee held a hearing on Credit Rating Agencies and the Financial Crisis. Like the SEC's Credit Agencies Report, although the hearing occurred after the close of the Class Period, it focused on Class Period data, documents, and information from the three major credit rating agencies, including S&P.

247.     During this hearing, among other things, the House Oversight Committee heard testimony from former employees, including former S&P Managing Director of RMBS Raiter, extensively questioned the heads of S&P, Moody's, and Fitch, and publicly revealed, for the first time, actual copies of internal company documents demonstrating the Company was aware that the structured finance markets from which it was handsomely profiting were nothing more than a "house of cards."  Specifically, the House Oversight Committee unveiled a small number of internal emails and instant messages that showed how senior executives at S&P warned that it was engaged in a "race to the bottom" that deliberately compromised rating standards for a share of the profits from the boom-time RMBS and CDO credit markets.  These internal emails and instant messages were also referenced and quoted (without attribution) in the SEC's Credit Agencies Report.

248.     During the House Oversight Committee hearing, the Committee also heavily criticized and called into question the credibility and veracity of the heads the three major credit rating agencies, S&P, Moody's Investor Service, and Fitch Ratings.  For example, Committee member Jackie Speier called the rating agencies' conduct "a bone-chilling definition of corruption."  Committee Chairman Waxman said that "[t]he story of the credit rating agencies is a story of colossal failure," and that they "broke a bond of trust . . . and the result is that our entire financial system is now at risk."

249.     Other House Oversight Committee members were equally damning in their comments to the heads of the three major credit reporting agencies.  House Oversight Committee member Souder stated that "It is clear that greed led to not only 'see no evil, hear no evil' but 'report no evil.' It is clear that there was fraud here.  But there is also to me incredible gross incompetence."  House Oversight Committee member Souder continued, "The problem is if they're incompetent and greedy and corrupt and behaving illegal[ly], then the conflict of interest pushes them over the top and it destroys their industry, which is what happened here."  Similarly, House Oversight Committee

member Shays stated "I happen to think the ratings agencies are useless now. I think they have no brand. I wouldn't trust them if I had money to invest."

250.    The House Oversight Committee hearing and related testimony revealed substantial additional information that further corroborates the Complaint's allegations as to why Defendants' Class Period statements (set forth below) were materially false and misleading. On a more basic level, had Defendants told Class members that the primary driver of McGraw-Hill's financial performance during the Class Period was a "house of cards," then the Company's stock price would not have been artificially inflated during the Class Period and would not have declined when the Company's true financial condition was revealed.

251.    Moreover, as detailed herein, on April 23, 2010, the Senate Subcommittee concluded its eighteen month investigation into the ratings agencies – which included more than 100 interviews and depositions and the review of more than 1,000,000 pages of documents – with a hearing focused solely on the conduct of S&P and Moody's. In conjunction with the hearing, the Senate Subcommittee released many internal S&P documents and emails that established a common theme – the Company's inner dialogue was nothing like Defendants' public statements to the market about the Company's ratings, surveillance, or financial performance. These Class Period documents along with the Senate Subcommittee's formal findings of fact, support Plaintiff's allegations and are powerful evidence of Defendants' scienter.

## VIII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

252.    The Class Period begins on October 21, 2004. On that date, McGraw-Hill issued a press release entitled, "The McGraw-Hill Companies Reports 11.9% Increase in EPS from Continuing Operations for Third Quarter of 2004 Increases Guidance to Double-Digit EPS Growth in 2004," which stated, in relevant part:

The McGraw-Hill Companies (NYSE: MHP) today reported third quarter 2004

116

diluted earnings per share from continuing operations of $1.69, an 11.9% increase over $1.51 for the same period last year.

Income from continuing operations in the third quarter grew by 12.2% to $324.5 million. Revenue for the third quarter increased 5.8% to $1.7 billion.

"*Record results in Financial Services*, improvement in higher education, a pickup in advertising and careful cost controls all *contributed to our third quarter performance,*" said Harold McGraw III, chairman, president and chief executive officer of The McGraw-Hill Companies. "*As a result, we increased our operating margin to 32.4% in the third quarter*.

<p style="text-align:center">*       *       *</p>

"Revenue for the first nine months grew to $3.8 billion, an increase of 6.4% over the comparable period last year.

<p style="text-align:center">*       *       *</p>

*Financial Services: "Revenue for this segment in the third quarter increased 14.1% to $502.8 million and operating profit grew by 17.7% to $202.0 million compared to the same period last year.* Favorable foreign exchange rates contributed $6.1 million to revenue and had a negative impact of $1.4 million on operating profit in the third quarter.

"*The results underscore the strength and resilience of our portfolio. Even in the face of some softness in the U.S. corporate and public finance markets, Standard & Poor's again produced a record quarter.* International ratings grew faster than domestic operations, accounting for approximately 35% of ratings revenue, and equity services continued to improve.

"*Structured finance set the pace globally with growth in virtually all asset classes*. The structured finance market also followed its usual pattern with a rush of activity in the final month of the quarter.

"*The residential mortgage-backed securities market continued to defy all expectations of a slowdown by the third quarter. Instead, residential mortgage-backed securities issuance grew in the U.S. and Europe as investors showed an undiminished appetite for mortgage debt. There also was strong demand for commercial mortgage-backed securities and collateralized debt obligations.*

<p style="text-align:center">*       *       *</p>

The outlook: "With a solid performance in our seasonally most important quarter of the year now in the record book, we are again raising our earnings guidance for 2004.

253.    Also on October 21, 2004, McGraw-Hill hosted a conference call to discuss its third quarter 2004 financial results. The Individual Defendants participated in the call on behalf of the

<p style="text-align:center">117</p>

Company.  During the call, numerous false and misleading statements were made that were designed

to artificially inflate the Company's stock price.  For example:

> Okay, with that, *let me turn now to our financial services segment*.  In the third
> quarter here, revenue increased 14.1%, operating profits grew by 17.7% and the
> operating margin expanded to 40.2%.  *Our results at Standard & Poor's illustrate,
> again, how we can overcome mixed market conditions* with a strong and diverse
> portfolio that has been created over the last several years.  *Standard and Poor's has
> a record -- has had a record quarter, even though there was softness, once again,
> in the U.S. corporate and the public finance sector*.

> \*        \*        \*

> A third area is recurring fees.  *Revenue for surveillance activity in customers with
> annual fee arrangements also contribute to our growth*.  And finally, new
> opportunities in the equity markets have demonstrated terrific results.  S&P's equity
> information product are contributing very nicely to our improved performance.  *But
> structured finance was a global driver* and, once again, we witnessed a surge of
> activity in the third month of the quarter as issuers took the opportunity to adjust
> balance sheets at the end of the period.  *Dollar volume, new issue dollar volume, for
> mortgage-backed securities climbed 50.9% in the U.S. market.*  The strength of the
> residential mortgage-backed securities market continues to be one of this year's
> major surprises.  Some of our forecasting capabilities here are, obviously, somewhat
> challenged.  We had anticipated a 25% decline in the residential mortgage-backed
> market coming into this year.  But it now looks as if issuance could top last year's
> strong performance by probably over 25%.  *We have already seen more residential
> mortgage-backed security issuance in the U.S. market this year in 9 months then
> all of last year and that was a record year!*  For 9 months of 2004, 627 billion has
> been issued versus 597 billion for all of 2003.  *The increase in the third quarter
> alone was 53.5%*.  We have seen a shift in the mix of residential mortgage-backed
> security issuance this year.  *Sub-prime issues, which are less sensitive to interest
> rate, and home equity loans and home equity lines of credit, which are driven by
> home price appreciation, have emerged as the market leaders in 2004.
> Commercial mortgage-backed securities and collateralized debt obligations also
> contributed to third quarter improvement and are expected to do so again in the
> fourth quarter*.  US asset-backed market started to pick up in the second quarter and
> the momentum continued in the third quarter with issuance growing by 19.2%.
> Issuance for the fourth quarter looks, also, very healthy.

> \*        \*        \*

> In closing with financial services segment, let me briefly comment on the ongoing
> regulatory process.  Last month S&P published its own code of practices and
> procedures.  It is an aggregation of our existing policies and procedures.  And by the
> way, you can find that on the website at S&P.com.  Importantly, it is consistent with
> the International Organization of Security's Commissioners, IOSCO, and their
> principals and, again, *underscores our own dedication towards transparent and*

*independent decision-making process . . . .*[65]

254. On October 29, 2004, McGraw-Hill filed its interim quarterly financial report on Form 10-Q for the quarter ending September 30, 2004. The financial results reported in the 10-Q were substantially similar to those reported in the Company's October 21, 2004 press release. The Form 10-Q was signed by Bahash, and contained required Sarbanes-Oxley certifications signed by McGraw and Bahash stating that the Form 10-Q did not include any material misrepresentations. In discussing what drove McGraw-Hill's improved financial performance, the October 29, 2004 10-Q stated, in relevant part:

> In the third quarter of 2004, the Company achieved growth in revenue and income from continuing operations. Revenue growth of 5.8% outpaced a 2.9% increase in expenses resulting in a 12.2% increase in income from continuing operations. Favorable foreign exchange rates contributed $10.4 million to revenue and had a slightly negative impact on income from continuing operations.
>
> ***The revenue increase is primarily attributable to growth in the Financial Services segment. . . .*** Service revenue increased to $662.0 million, an increase of 12.8%, as compared to the prior year's third quarter, ***due primarily to the growth in Financial Services***. ***Strong growth in structured finance reflects continued favorable market conditions***, including a low interest rate environment.
>
> \*     \*     \*
>
> Financial Services
>
> Financial Services' revenue increased 14.1% to $502.8 million. Operating profit increased 17.7% to $202.0 million in the third quarter of 2004, benefiting from reduced investment spending. Foreign exchange had a favorable impact contributing $6.1 million to revenue or 1.4 percentage points of growth and had a negative impact on operating profit of $1.4 million.
>
> \*     \*     \*
>
> ***The Financial Services segment's increase in revenue and operating profit is due to the performance of structured finance ratings which represented approximately 55.8% of the growth in revenue. In structured finance, the continuing favorable***

---

[65] The Company's publicly released Code of Conduct also contained numerous false and misleading statements, which are addressed in Section X, below.

*interest rate environment led to strong growth in the issuance of U.S. residential mortgage-backed securities (RMBS)*. Commercial mortgage-backed issuance (CMBS) increased both in the U.S. and in Europe. *Collateralized debt obligations (CDOs) experienced strong growth due to improving credit quality and favorable interest rate spreads . . . . Revenues from recurring fees for surveillance activities and from customers on annual fee arrangements also contributed to the year-to-year increase . . . .*

*Total U.S. structured finance new issue dollar volume increased 45.8%, driven primarily by RMBS issuance, which grew 53.5% according to Harrison Scott Publications. RMBS issuance was strong in the quarter, despite a decline in refinancing activity. Significant growth was experienced both in sub-prime mortgages and home equity loan issuance as a result of continued low interest rates. Issuance for U.S. CDOs increased 85.2% over the prior year due to the favorable interest rate environment and spreads, as well as improving credit quality*. According to Securities Data, U.S. new issue dollar volume for corporate issuers for the third quarter of 2004 decreased 12.6%, with investment grade issuance down 11.1% and high yield issuance down 20.3%. Comparisons to prior year were challenged due to the significant growth in both high yield and investment grade issuance in the third quarter of 2003 . . . . International market growth was also strong as the favorable trends of securitization, disintermediation and privatization continue. In Europe, issuance levels rose in both the corporate and structured finance sectors. European issuance by corporate entities was driven by growth in investment grade issuance, primarily financial services firms, while structured finance experienced solid growth across most asset classes.

<p style="text-align:center">*      *      *</p>

*The market for credit ratings as well as research, investment advisory and broker-dealer services is very competitive. The Financial Services segment competes domestically and internationally on the basis of a number of factors, including quality of ratings, research and investment advice, client service, reputation, price, geographic scope, range of products and technological innovation*.

<p style="text-align:center">*      *      *</p>

The Company maintains disclosure controls and procedures that are designed to ensure that information required to be disclosed in the Company's reports filed with the Securities and Exchange Commission is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including its CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure.

<p style="text-align:center">*      *      *</p>

As of September 30, 2004, an evaluation was performed under the supervision and with the participation of the Company's management, including the CEO and CFO, of the effectiveness of the design and operation of the Company's disclosure controls

and procedures. Based on that evaluation, the Company's management, including the
CEO and CFO, concluded that the Company's disclosure controls and procedures
were effective as of September 30, 2004. Except as noted above, there have been no
other changes in the Company's internal controls over financial reporting during the
most recent quarter that have materially affected, or are reasonably likely to
materially affect, the Company's internal controls over financial reporting.

255.  In response to the October 21, 2004 press release and conference call, and the

October 29, 2004 Form 10-Q, the Company's stock price posted a steady increase from a closing

price of $37.99 on October 20, 2004 to closing prices of $38.95 on October 21, 2006 and $40.66 on

October 29, 2004, as demonstrated in the chart below:



256.  The statements referenced in ¶¶252-54 were each materially false and misleading

when made as they misrepresented and/or omitted adverse facts which then existed and disclosure of

which was necessary to make the statements not false and/or misleading.  The true facts, which were

then known to or recklessly disregarded by each of the Defendants, were:

- The Company's revenue stream for Structured Finance transactions, especially
subprime and Alt-A RMBS and CDOs was materially threatened by outdated
models, inadequate surveillance, and the Company's unchecked "race to the bottom"
market share war.

- The Company was over-worked, under-staffed, and under-funded with respect to

surveillance of previously-rated RMBS and CDOs. As a result, S&P was perpetually late in conducting its surveillance of RMBS and CDO transactions. Because of the abject failure to conduct timely surveillance, Defendants' assessments of the performance of the Company's Structured Finance division, including its financial outlook, lacked a reasonable basis.

- The LEVELS ratings model was outdated, despite the fact that vastly enhanced versions were readily available. But Defendants chose not to use them, fearing that resulting downgrades and ratings volatility (*i.e.*, accuracy) would negatively impact the Company's market share and reputation. As a result, Defendants' statements regarding the Company's financial performance and future business prospects were materially false and misleading.

- The Company refused to use its LEVELS model to conduct surveillance of the RMBS transactions it rated. The "inside" reason for this was that Defendants knew if they re-rated transactions, and thus increased the accuracy of their ratings, volatility would go up and threaten a lucrative revenue stream and the Company's quest to maintain and increase market share at all costs. In addition, it would have alerted the market that a AAA rating of a RMBS or CDO transaction was nowhere near as stable as a AAA corporate rating. The already-developed, never implemented models would have halted the subprime lending craze fueled by stale ratings, and would have materially threatened the Company's financial performance and future business prospects.

- The Company's rating models were ill-equipped to rate CDOs and RMBS, especially with respect to sub-prime mortgages. As a result, Defendants' assessments of the Company's Structured Finance division, and its financial outlook, lacked a reasonable basis.

- Internally, the Company's employees and the Individual Defendants knew that McGraw-Hill's public statements regarding the sufficiency of its ratings models and surveillance were false and misleading, calling the ratings business a "house of cards," stating that the Company rated "every deal" and that deals "could be structured by cows" and S&P would rate them. In addition, the Company engaged in a "race to the bottom" and deliberately lowered its ratings criteria because of the "threat of losing deals." As a result, Defendants' Class Period statements were false and misleading.

- The Company departed from its own internal protocols and ratings standards in order to get deals done, but failed to disclose such departures to the market. As a result, Defendants' statements regarding the Company's financial performance and future business prospects lacked a reasonable basis.

- Defendants' ongoing departure from its own surveillance protocols (*i.e.*, substantial delays and stale criteria) had the cause and effect of forestalling massive revenue decreases for the Company. If the Company had conducted timely and appropriate surveillance of RMBS and CDOs, its ratings revenue would have substantially declined, it would have seen a decrease in transaction volume as customers would have fled, and the Company's financial condition would have been materially and

122

negatively impacted.

- Although the Company told the market that its Financial Services segment competed on the basis of, among other things, the Company's reputation, Defendants had, from the start of the Class Period, placed a "For Sale" sign on the Company's reputation by compromising ratings criteria, failing to conduct timely surveillance, and choosing to only put band aids on its models. As a result, Defendants' Class Period statements were materially false and misleading.

- The Company's record results were illusory because they were coming at a tremendous cost that remained hidden from the market – the Company's credibility and reputation. Defendants' now documented "at all costs" pursuit of market share and lucrative structured finance fees resulted in the undisclosed lowering of credit analysis standards, the undisclosed practice of placing AAA ratings on deals the Company knew would be non-performing, a continual paucity of staff and resources for surveillance, and the undisclosed use of grandfathering to avoid downgrading already-rated deals. Had these documented, undisclosed facts been revealed to the market, investors would have seen the Company's "record results" for what they were: passing, unsustainable short-term results leveraged against the Company's entire reputation.

257. On January 25, 2005, McGraw-Hill issued a press release entitled "Strong Growth Reported by The McGraw-Hill Companies, Achieves Earnings Per Share of $3.92 for 2004 and $0.98 for Fourth Quarter," which stated, in relevant part:

> The McGraw-Hill Companies (NYSE: MHP) today reported diluted earnings per share from continuing operations for 2004 of $3.92, a 9.5% increase over the same period in 2003.
>
>          *       *       *
>
> Net income for 2004 increased 9.9% to $755.8 million compared to $687.7 million in 2003, which includes a $57.2 million gain and a $57.3 million loss on the dispositions of ComStock and the juvenile retail publishing business, respectively.
>
> Revenue in 2004 increased 7.4% to $5.3 billion.
>
>          *       *       *
>
> For the fourth quarter of 2004, diluted earnings per share from continuing operations were $0.98. Diluted earnings per share of $1.12 in 2003 include an after-tax gain of $0.30 from the sale of real estate.
>
> Net income for the fourth quarter of 2004 was $190.0 million.
>
> Revenue for the fourth quarter of 2004 increased 10.6% to $1.4 billion.
>
> ***"Standard & Poor's completed the best year in its history with a record fourth***

*quarter performance*," said Harold McGraw III, chairman, president and chief executive officer of The McGraw-Hill Companies. . . We also benefited from rigorous cost controls. As a result, our operating margin for the fourth quarter of 2004 expanded to 24.6%, up from 22.2% last year."

\*　　\*　　\*

*Financial Services: "For 2004, revenue in the segment grew by 16.2% to $2.1 billion and operating profit increased by 25.7% to $839.4 million compared to 2003. The operating margin increased to 40.8% from 37.7%.*

*"In the fourth quarter, revenue for the segment grew by 19.6% to $591.4 million while operating profit increased 39% to $249.3 million*. Foreign exchange rates contributed $7.7 million to growth in revenue and had no material impact on operating profit in the fourth quarter.

\*　　\*　　\*

*"Structured finance was a key global driver in 2004 with virtually all asset classes showing improvement. U.S. residential mortgage-backed securities issuance again surged in the fourth quarter as this market set a new record for the second year in a row.*

\*　　\*　　\*

*"In the U.S., new issue dollar volume increased 19.0%, driven by a 53.0% gain in the issuance of mortgage-backed securities over the comparable quarter in 2003.* Corporate issuance declined 2.2%. Public finance was down 9.1%. Asset-backed issuance was off 15.9%.

\*　　\*　　\*

The outlook: "For 2005, we expect another year of double-digit growth in earnings per share from continuing operations. That now includes 10-12 cents of dilution from acquisitions last year and changes in pension plan assumptions for 2005, but it excludes the 2004 non-cash benefit of 10 cents per share from accrued tax liabilities and a change in accounting for share- based compensation effective July 1, 2005."

258.     Also on January 25, 2005, McGraw-Hill hosted a conference call to discuss its fourth quarter 2004 financial results. The Individual Defendants participated in the call on behalf of the Company. During the call, numerous false and misleading statements were made that were designed to artificially inflate the Company's stock price. For example, McGraw stated:

Okay, let's go over to the financial services segment. *We had a record year and a record fourth quarter at Standard & Poor's*. We're very pleased.

*     *     *

*Mortgage backed securities and its issuance was clearly the star performer, increasing 53 percent for the year and 45.9 percent for the quarter. That's the core reason why total issuance in the U.S. bond market increased by 9.8 percent here and 19 percent in the fourth quarter*.

Now, there's no doubt that a record level of activity in the U.S. residential mortgage-backed securities market made 2004 an even better year than we originally anticipated. However, if we had not seen growth in the residential markets executed, we still would have had double digit top and bottom-line performance. *U.S. residential mortgage-backed securities increased 48.8 percent in 2004, 58.6 percent in the fourth quarter, both very, very strong records.* We start the first quarter of 2005 with a favorable pipeline for residential mortgage-backed securities, but we don't expect 2005 will match last year's remarkable activity. Instead we expect new issuance of U.S. residential mortgage-backed securities to decline probably about 20 percent. And our track record on predicting this has not been good.

But, you know, [you] just have to believe that as strong as that will be we will see it about 20 percent and given the equipment spending numbers, that are very healthy double-digit numbers, we expect to see a shift throughout the year from the residential to the commercial mortgage-backed security market. *Nevertheless, we are still forecasting double-digits, top and bottom-line growth for our financial service segment for 2005.* Some of the same trends that contributed to our performance in 2004 will keep us growing in 2005. New rating products and services. Bank loan ratings, for example. They're not tied to new issuance, they'll continue to grow faster than many of our traditional ones. In 2004, they represented approximately 21 percent of ratings revenue. 10 years ago, they represented only about 8 percent of ratings revenue.

*Our international ratings revenue will continue to grow and it will continue to grow more rapidly than our domestic revenue*. Overseas revenue represented over 35 percent of ratings in 2004 total and more than 38 percent of ratings fourth quarter revenue. We expect international ratings to continue to grow in 2005 and beyond and represent an increasing proportion of the total. *Securitization will continue to [be] an important driver of international growth*. The recent European securitization from last week forecasted record issuance for the market there in 2005. Survey respondents in Europe expect substantial growth, collateralized debt obligations, as well as commercial mortgage-backed securities. And, incidentally, 10 years ago, when we were in the real buildup phase of our global network with some 32 locations around the world, overseas business accounted for only about 21 percent.

*     *     *

*We are encouraged, very encouraged, by the growing acknowledgement that independent and objective opinions are essential to the functioning of open markets*.

125

259.   On February 25, 2005, the Company filed its annual financial report on Form 10-K for the year ending December 31, 2004.  The financial results reported in the 10-K were substantially similar to those reported in the Company's January 25, 2005 press release.  The Form 10-K was signed by McGraw and Bahash, and contained required Sarbanes-Oxley certifications signed by McGraw and Bahash stating that the Form 10-K did not include any material misrepresentations.  In discussing what drove McGraw-Hill's improved financial performance, the February 25, 2005 10-K included a letter to the Company's shareholders that stated, in relevant part:

> Our consistent growth record has allowed us to deliver an annualized total return to shareholders of 10.0% over the last five years, exceeding the -2.3% annualized return of the S&P 500 and the 1.5% gain of our proxy peer group.
>
> \*       \*       \*
>
> *In Financial Services, we had a record performance in 2004 and are positioned for continued strong growth in revenue and earnings*.  The global need for capital to support public- and private-sector development is substantial and is fueling demand for Standard & Poor's research, analysis and index products.
>
> Global debt issuance has soared in the last five years, reaching $4 trillion in 2004 – an amount equal to the total debt issued from 1990 to 1994.  Fueled by growth in Europe and other international markets, which will account for nearly half of our total ratings revenue by 2009, we expect debt issuance to reach $30 trillion over the next five years.  *Growth is especially strong in the structured finance market, which is now nearly as large as the corporate bond market and benefits from the in-depth analysis Standard & Poor's provides*.
>
> \*       \*       \*
>
> Revenue and income from continuing operations increased 7.4% and 10.0%, respectively, in 2004.  *Results from operations improved primarily on the strength of the Financial Services segment*, which has benefited from the continued low interest rate environment.
>
> \*       \*       \*
>
> *In 2005, the Company expects its key drivers of growth to be . . . [a]chievement of double-digit top- and bottom-line growth for the Financial Services segment*, despite a projected 20% decline in the issuance of residential mortgage-backed securities in the U.S. market.
>
> \*       \*       \*

The Company maintains disclosure controls and procedures that are designed to ensure that information required to be disclosed in the Company's reports filed with the Securities and Exchange Commission (SEC) is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms, and that such information is accumulated and communicated to the Company's management, including its Chief Executive Officer (CEO) and Chief Financial Officer (CFO), as appropriate, to allow timely decisions regarding required disclosure.

As of December 31, 2004, an evaluation was performed under the supervision and with the participation of the Company's management, including the CEO and CFO, of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) under the U.S. Securities Exchange Act of 1934). Based on that evaluation, the Company's management, including the CEO and CFO, concluded that the Company's disclosure controls and procedures were effective as of December 31, 2004.

<p style="text-align:center">*    *    *</p>

***Revenue and operating profit growth in 2004 was driven by service revenue from the Financial Services segment***.

<p style="text-align:center">*    *    *</p>

Service revenue increased in 2004, ***primarily due to an increase in revenue in the Financial Services segment***. Strong growth in structured finance and corporate finance ratings (corporate finance and financial services) reflects continued favorable market conditions, including a low interest rate environment. Service revenue comprises the revenue of the Financial Services segment and the remaining revenue of the Information and Media Services segment and represents information-related services and advertising.

<p style="text-align:center">*    *    *</p>

***The Financial Services segment was a key growth driver this year as revenue and operating profit grew 16.2% and 25.7%, respectively***. Operating margins increased 3 percentage points as a result of a strong mix which included:

• Growth in structured finance and corporate finance ratings, which reflects favorable market conditions, including a continued low interest rate environment.

• Strong U.S. residential mortgage-backed securities issuances, which rose to record levels in the U.S. as interest rates remained low.

• Strong growth internationally, particularly in structured finance, as international issuers have embraced securitization as a source of funding. Overseas activity now produces 31.3% of total Standard & Poor's revenues, a 26.0% increase over prior year.

\*      \*      \*

*The increase in 2004 income from continuing operations is primarily attributable to revenue growth in the Financial Services segment*.

\*      \*      \*

In 2004, Financial Services produced double-digit revenue and operating profit growth due primarily to the performance of structured finance ratings and corporate finance (corporate finance and financial services) ratings, which represented approximately 43% and 27% of the growth in revenue, respectively. Operating margin increased to 41% from 38% in 2003.

\*      \*      \*

In structured finance, the continuing favorable interest rate environment led to strong growth in the issuance of U.S. residential mortgage-backed securities (RMBS), collateralized debt obligations (CDOs) and commercial mortgage-backed securities (CMBS), both in the U.S. and Europe. The growth in corporate finance ratings is attributable to *revenues from recurring fees for surveillance activities* and from customers on annual fee arrangements.

\*      \*      \*

The securitization market has grown significantly over the last decade in the United States. Total U.S. structured finance new issue dollar volume increased 36.1%, driven primarily by RMBS issuance, which grew 48.8% according to Harrison Scott Publications. RMBS issuance rose to record levels in the U.S. as interest rates remained low and the drivers of mortgage origination remained favorable. These included new and existing home sales, as well as appreciation in home prices. Issuance of U.S. CMBS and U.S. CDOs increased over the prior year due primarily to the favorable interest rate environment. An improving economy, strong consumer spending, increasing investor confidence and *the quality of the underlying transaction collateral in CDOs also contributed to the increases*.

\*      \*      \*

International market growth was strong as the favorable trends of securitization, disintermediation and privatization continued. In Europe, issuance levels rose in 2004 with strong growth in issuance in both the corporate and structured finance sectors. Issuance by corporate entities was driven by growth in both high-yield and investment-grade issuance, while structured finance experienced solid growth in mortgage-backed securities and asset-backed securities issuance.

\*      \*      \*

The market for credit ratings as well as research, investment advisory and broker-dealer services is very competitive. *The Financial Services segment competes domestically and internationally on the basis of a number of factors, including*

128

*quality of ratings*, research and investment advice, client service, *reputation*, price, geographic scope, range of products and *technological innovation*.

260. In response to the January 25, 2005 press release and conference call, and the February 25, 2005 Form 10-K, the Company's stock price held steady ground, and traded between approximately $43 and $44 per share. If not for Defendants' false and misleading statements, the Company's share price would have declined during this time period.

261. The statements referenced in ¶¶257-59 were each materially false and misleading when made for the reasons set forth in ¶256 and the factual detail contained throughout this Complaint. In addition, the statements referenced in ¶¶257-59 were each false and misleading when made as they misrepresented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading. The true facts, which were then known to or recklessly disregarded by each of the Defendants, were:

- Rather than completing "the best year in its history," McGraw-Hill put a for sale sign on its reputation and credibility as Defendants relentlessly pursued market share and lucrative structured finance fees regardless of the long-term negative impact it would have on the Company.

- Although labeled by Defendants as the Company's "star performer," the RMBS was, in reality, a ticking time bomb for McGraw-Hill. Because the Company's RMBS models were outdated

- Defendants' forecasted double digit growth depended heavily on a continued race to the bottom in the Company's Financial Services segment.

- Although Defendants professed to be "encouraged, very encouraged, by the growing acknowledgement that independent and objective opinions are essential to the functioning of open markets," they never told the market that the Company's opinions were fatally flawed for numerous reasons, including the fact that the Company's ratings criteria were lowered or abandoned and ongoing surveillance was a farce.

- Despite pointing to the "quality of the underlying transaction collateral in CDOs," Defendants knew the collateral was loaded with risky, toxic mortgages and related assets that were rife with fraud, shoddy underwriting, and depended upon unsustainable housing price appreciation to perform. Thus, Defendants lacked a reasonable basis for touting the collateral underlying the transactions S&P rated.

262.     On March 29, 2005, McGraw participated in the Banc of America Securities Media, Telecommunications and Entertainment Conference on behalf of the Company.   During the conference, McGraw discussed the Company's surveillance of the deals it rated:

> *Earlier I mentioned that the long term trends in our market are very favorable and that we expect to benefit from them for many years.   That is certainly true at Standard & Poor's where we continue to take advantage of some very powerful trends.*   The globalization of financial markets, the growing use of securitization, the rise of public markets and the disintermediation of the banks and the growth of privatization.
>
> I've already pointed out that we are continuing to expand our global network.  Last year, 35% of our revenue in ratings came from overseas and that proportion will continue to increase for the rest of this decade, probably approaching 50% around 2008, 2009 and then it will soon thereafter flip.   We've also worked very hard to reduce our dependence on the interest rate cycle and issuance in the U.S. bond market.   That meant creating new ratings products and services that are not tied to new issuance.
>
> Today, products like bank loan ratings, counter party ratings, etc., represent about 21% of ratings revenue.   They are growing faster than many of our traditional products and we expect that trend to continue in 2005.  *We have deliberately created a fee structure that produces an ongoing revenue stream that is less interest rate sensitive.  We monitor an instrument until it matures or is called.  That produces surveillance fees that have grown with the surge in global issuance*.

263.     On April 26, 2005, McGraw-Hill issued a press release entitled "The McGraw-Hill Companies Reports First Quarter Earnings Per Share of $0.41; Revenue Increases by 11.9%," which stated in relevant part:

> The McGraw-Hill Companies (NYSE: MHP) today reported diluted earnings per share from continuing operations of $0.41 for the first quarter of 2005 versus $0.39 for the same period last year.
>
> *            *            *
>
> Net income for the first quarter of 2005 was $78.7 million.
>
> Revenue for the first quarter grew by 11.9% to $1.0 billion.
>
> *"Record first quarter results at Financial Services were key to our performance, enabling us to improve the operating margin to 14.4%,*" said Harold McGraw III, chairman, president and chief executive officer of The McGraw-Hill Companies. "We are also making investments in this period in people and products to position us

130

for future growth.

\*　　\*　　\*

***Financial Services: "Revenue for this segment in the first quarter increased 19.9% to $547.3 million and operating profit grew by 28% to $222.5 million compared to the same period in 2004.*** Foreign exchange rates contributed $3.6 million to revenue and $1.5 million to operating profit in the first quarter of 2005.

\*　　\*　　\*

"***Structured finance was the global pacesetter again***. In Europe, our largest overseas market, Residential Mortgage-Backed Securities, Commercial Mortgage-Backed Securities and Collateralized Debt Obligations were all strong.

"In the U.S. Residential Mortgage-Backed Securities market, momentum from a record fourth quarter in 2004 carried into the first quarter of 2005. U.S. Residential Mortgage-Backed Securities grew by 67% to set a new record for first quarter dollar volume issuance. Favorable interest rates and credit spreads produced solid growth in Commercial Mortgage-Backed Securities and Collateralized Debt Obligations.

"Corporates continued to grow mainly due to increased annual fee and surveillance revenue.

\*　　\*　　\*

The outlook: "We are off to a good start, and while our first quarter is the smallest of the year, we are excited about the outlook for 2005. As we have stated in previous guidance, we expect high single-digit growth in earnings per share from continuing operations, including $0.16 to $0.19 of dilution from acquisitions last year, recently announced acquisitions in 2005 and changes in pension plan assumptions for 2005, but excluding the 2004 non-cash benefit of $0.10 per share from accrued tax liabilities. We continue to aspire to double-digit growth in 2005."

264.    Also on April 26, 2005, McGraw-Hill hosted a conference call to discuss its first quarter 2005 financial results. The Individual Defendants participated in the call on behalf of the Company. During the call, numerous false and misleading statements were made that were designed to artificially inflate the Company's stock price. For example, McGraw stated:

***Structured finance was an important driver globally in the first quarter***. In the U.S. market, we started the year with a good pipeline of residential mortgage backed securities even after the record performance of the fourth quarter. The momentum continued throughout the first quarter. ***As a result, residential mortgage-backed security issuance increased by 67% and set a new record for the first quarter.***

\*　　\*　　\*

We also saw record issuance in the first quarter of commercial mortgage-backed securities.  Investor demand for them has been strong since they represent high-quality instruments that produce better returns than AAA rated corporate. This was a shift that we had been looking for and we are very pleased to see it and ***coupled with a strength on the residential side it has given us some very good strength.  All of that adds up to a better outlook for the mortgage-backed securities in the U.S. market for the year.***

***There was also a strong investor appetite for U.S. collateralized debt obligations, CDOs in the U.S. and in Europe***.  The asset-backed business flattened out in the first quarter and faces significant decline in credit issuance.  Auto loans, students loans showed some strength and we expect credit card issuance to increase for the full year.  As a result, we look forward to a pickup in the asset-backed market. The U.S. corporate market was soft, but surveillance fees and annual contracts helped us keep moving ahead.  We currently don't expect much, if any growth, in U.S. corporates this year, but we anticipate good growth in Europe.

265.     As the call continued, McGraw commented on regulatory issues facing the Company,

stating, in part:

***In short, I think there is greater understanding today on the role of rating agencies in the capital market, and the markets need for on a global basis for objective, independent opinions.***  And that's good.  We continue to believe that there will be no material adverse change in any way to Standard & Poor's conduct of its business.

266.     Later in the call, the following exchange occurred in response to a question

concerning market share.  The Individual Defendants did not disclose, however, that the Company

was sacrificing ratings criteria and surveillance to maintain market share:

Fred Searby  - JP Morgan – Analyst:  A couple questions.  One, can you give us an update on Basel 2 and issuance, trends in April.  What you saw.  We obviously saw very strong on the asset-backed side and residential mortgage side in the first quarter.  Did that continue for you into April?  ***And if you could also give us some sense following up just on share.  Are there any share shifts, is Fitch, mean Fitch seems to be having some success and there's some apparently asset-backed transactions where there is one rating agency being used in Europe.  If you could just give us an update on your thoughts there***.  Thank you.

McGraw: ***Thanks.  On the latter part, we are not losing any share.  Europe, as you well know, is very, very strong on the structured side.  And so there's obviously a lot of appetite.  I won't speak for any the competitors but I do think that you are correct that Fitch has the capability there and has a presence in the structured side of that market, but we are not losing any share. In fact when all is said and done, I think we will probably complete this year in an even more advantageous position . . . .***

132

267.    On April 27, 2005, McGraw-Hill held its annual meeting of Company shareholders. The Individual Defendants participated at the meeting, where they made additional false and misleading statements.  For example, McGraw stated:

> In fact, we are pleased to have outperformed the S&P 500 and our proxy peer group the last ten-year period, seven, five, three and again in [2004].  We're very proud of that record and we take it very seriously.

> \*       \*       \*

> ***A key component of our strong performance for the year was double-digit top and bottom line growth at McGraw-Hill Financial Services.  In fact, it was another record year for Standard & Poor's.***

> S&P's performance reflects its continued global growth, the diversity of its products and services, its decreased dependence on new issuance in the U.S. bond market.  Its reduced sensitivity to the interest rate cycle, and most importantly, the thought leadership that it brings to capital markets. ***Simply put, Standard & Poor's plays an essential role in the global capital market***.

268.    On April 29, 2005, McGraw-Hill filed its interim quarterly financial report on Form 10-Q for the quarter ending March 31, 2005.  The financial results reported in the 10-Q were substantially similar to those reported in the Company's April 26, 2005 press release.  The Form 10-Q was signed by Bahash, and contained required Sarbanes-Oxley certifications signed by McGraw and Bahash stating that the Form 10-Q did not include any material misrepresentations.  In discussing what drove McGraw-Hill's improved financial performance, the April 29, 2005 10-Q stated, in relevant part:

> In the first quarter of 2005, the Company achieved growth in revenue and income from operations. Revenue growth of 11.9% outpaced a 9.0% increase in expenses. ***The increase in revenue and income from continuing operations is primarily attributable to growth in the Financial Services segment***.  Foreign exchange rates contributed $5.3 million to revenue and had a slightly positive impact on income from continuing operations.

> \*       \*       \*

> ***Service revenue increased 15.8% in the first quarter of 2005, due to an increase in revenue in the Financial Services segment***.  Strong growth in structured finance reflects continued favorable market conditions, including a low interest rate environment.  Growth in corporate finance ratings (corporate finance and financial

133

services) is *attributable primarily to revenues from recurring fees for surveillance activities* and customers on annual fee arrangements.

\*       \*       \*

Financial Services revenue and operating profit increased over 2004 first quarter results. Foreign exchange rates contributed $3.6 million to revenue and had a positive impact on operating profit of $1.5 million.

\*       \*       \*

*The Financial Services segment's increase in revenue and operating profit is due primarily to the performance of structured finance ratings* and corporate finance (corporate finance and financial services) ratings, which represented approximately 33.0% and 15.7% of the growth in revenue, respectively. In structured finance, the continuing favorable interest rate environment led to strong growth in the issuance of U.S. residential mortgage-backed securities (RMBS) and collateralized debt obligations (CDOs). *The growth in corporate finance ratings is attributable primarily to revenues from recurring fees for surveillance activities* and customers on annual fee arrangements.

Total U.S. structured finance new issue dollar volume increased 62.4%, driven primarily by RMBS issuance, which grew 66.8% according to Harrison Scott Publications. While RMBS issuance was strong in the quarter, the Company expects RMBS issuance to decline in the latter half of the year as mortgage rates begin to rise. The Company anticipates that RMBS issuance will decline approximately 15%-20% in 2005. Comparisons later in 2005 will be more challenging as a result of the record year of growth in U.S. RMBS issuance in 2004. Issuance for U.S. commercial mortgage-backed securities (CMBS) and CDOs increased over the prior year due to favorable interest rates and credit spreads . . . . International growth was also strong as the favorable trends of securitization, disintermediation and privatization continue. In Europe, issuance levels rose 11.2% in the quarter with strong growth in issuance in structured finance, which experienced solid growth in mortgage-backed securities. Issuance for corporates in Europe was up approximately 12.3%; industrial issuance declined while financial services issuance increased due to low rates and tighter interest rate spreads. Bank loan ratings experienced higher growth rates than more traditional ratings products.

\*       \*       \*

*The market for credit ratings as well as research, investment advisory and broker-dealer services is very competitive. The Financial Services segment competes domestically and internationally on the basis of a number of factors, including quality of ratings, research and investment advice, client service, reputation, price, geographic scope, range of products and technological innovation.*

\*       \*       \*

The Company maintains disclosure controls and procedures that are designed to

ensure that information required to be disclosed in the Company's reports filed with the Securities and Exchange Commission (SEC) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including its Chief Executive Officer (CEO) and Chief Financial Officer (CFO), as appropriate, to allow timely decisions regarding required disclosure.

As of March 31, 2005, an evaluation was performed under the supervision and with the participation of the Company's management, including the CEO and CFO, of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) under the U.S. Securities Exchange Act of 1934). Based on that evaluation, the Company's management, including the CEO and CFO, concluded that the Company's disclosure controls and procedures were effective as of March 31, 2005.

269.    In response to the April 26, 2005 press release and conference calls, and the April 29, 2005 Form 10-Q, the Company's stock price posted gains from a close of $39.27 on April 25, 2005 to $41.34 on April 29, 2005, as demonstrated in the chart below:



270.    The statements referenced in ¶¶262-68 were each materially false and misleading when made for the reasons set forth in ¶256 and the factual detail contained throughout this Complaint. In addition, the statements referenced in ¶¶262-68 were each false and misleading when made as they misrepresented and/or omitted adverse facts which then existed and disclosure of

which was necessary to make the statements not false and/or misleading. The true facts, which were then known to or recklessly disregarded by each of the Defendants, were:

- The Company's "record first quarter" and "record year" were dependent upon Defendants' willingness to sacrifice ratings quality in exchange for increased revenue and market share.

- Despite touting the Company's structured finance segment as the "global pacesetter again," Defendants knew that it was driving growth because the Company was, put simply, cutting corners. Rather than bolstering analytical models, staff, and surveillance to keep pace with the dramatic rise in use of RMBS and CDO issuance, Defendants avoided all of those things so that S&P could continue to churn out AAA stamps of approval on pools of toxic assets.

- Despite claiming there was a "greater understanding" of "the role of rating agencies in the capital market" and pointing to the market's "need for on a global basis for objective, independent opinions," Defendants knew the Company's S&P brand was providing none of those things. In reality, Defendants' hid the role S&P played – which was one of catering to issuers and cutting corners to obtain lucrative fees on deals it was incapable of understanding or rating.

- McGraw's comments that the Company was "not losing any share" to its competitors omitted that, in reality, the quid pro quo for maintaining market share required the Company to succumb to competitive pressures. The truth was that "not losing any share" was achieved by compromising ratings, using outdated models, ignoring toxic mortgage assets, shirking on surveillance, and sacrificing the Company's future in the name of short term fees on RMBS and CDOs.

271. On June 21, 2005, McGraw and Rose participated in the Newspaper Association of America Mid-Year Media Review conference on behalf of the Company. During the conference, Rose discussed the Company's future business prospects in the structured finance market:

Thank you, Terry. Structured Finance has become the finance tool of choice for an ever-broadening array of global issuers. Whether in the form of securitization or complex derivatives Structured Finance's ability to isolate complex credit risks is its key to its value to both investors and issuers. While the need to be efficient in the use of capital is the driving long-term force behind the structured finance market, three key trends have pushed the market over the recent past and continue in 2005. These trends are, first, globalization; second, a growing sophistication of the market which has led to new types of transactions, customization, and even greater financial efficiency; and third, the continuing lower interest rate environment. *Since any structured finance transaction involves complex structures and the transfer of complex credit risks, the key to a successful transaction is an independent and objective analysis of both the structure and the credit risk. And it is in this function that Standard & Poor's Structured Finance ratings have excelled.*

<p style="text-align:center">*     *     *</p>

First, beginning in 2003, corporate credit stabilized and began to improve, but more importantly tight spreads in corporate bonds and lack of a diverse enough supply of corporate bonds caused both the rangers and investors for the first time to look to asset-backed, mortgage-backed, and even other CDOs as assets for these vehicles. This opened the market to investors who were interested in stability and extra yield provided by the underlying structured assets, as well as the customization enabled by synthetic structures. *As investors have become more sophisticated in their understanding of financial engineering techniques the CDO market has continued to grow and we have seen a wave of innovation which includes synthetic structures, credit default swaps, and even CDOs squared. We expect to see continued development in growth in these new types of transactions. Moreover, since these transactions have very high levels of complexity a Standard & Poor's rating is very desirable to both issuers and investors*.

Now, the third key trend that has been continuing is the low interest rate environment we have been experiencing. Nowhere has this effect been more felt than in the market for securities backed by residential mortgages. Now, here I'm talking about global issuance excluding the U.S. Government sponsored mortgage agencies. Low interest rates have led to massive wave of refinancings of existing mortgages and new home purchases in the U.S., United Kingdom, and Australia, and many other countries. This in turn has generated a high volume in the RMBS market since a very large percentage of residential mortgages are securitized in these countries. But while low interest rates have been the main story they are not the only story. *Innovation has also contributed to the growth in this market and will continue to make a contribution as we go forward. Residential mortgage securities have been used as collateral in CDOs, thereby increasing demand for these securities. There has also been a proliferation of innovative mortgage products in these markets and that has made mortgages available to even a larger number of people*.

The next slide shows the growth in the volume of these new mortgage products; Hybrid ARMs, negative amortization loans, silent seconds, interest-only loans, insured products, and floating rate mortgages have increased the volume of new mortgages and the complexity of analyzing the structured finance transactions. *This has led to a higher demand for S&P ratings on all types of RMBS transactions. Now, leadership in the structured finance market is built on two pillars, credibility and service. Credibility comes from the performance of your ratings over time and is built slowly but can be lost quickly. Service is delivering to the markets the most informative ratings and other credit risk evaluation services at the time and in the manner that the markets need them. We strive for excellence on both these measures. For example, we have a dedicated surveillance unit to oversee the continuing credibility of our ratings. All ratings are regularly reviewed and our surveillance group back tests our ratings to show their credibility over time. Each year we publish the results of these default and transition studies for the market to see.*

*When we talk about service, we are talking about providing a quality experience for each market participant who interacts with us. That means having well-*

<p style="text-align:center">137</p>

*trained, accessible, experienced staff that can handle the complex analysis these transactions require, and they can communicate the results. That means publishing our criteria so that the market can see and understand how we look at those transactions. That means having the information that the participant is looking for when they need it and in the form they want it. We believe that we are second to none in the scope and quality of our staff and the information we provide to the structured finance market. Standard & Poor's Structured Finance Ratings Department strategy is to maintain our leadership position by responding to the trends of globalization and innovation in this rapidly growing structured finance market. This strategy is focused on leveraging Standard & Poor's brand; our overwhelming recognition for quality, independence and objectivity; our global network; and most importantly, our most valuable asset, our employees.*

*I am very excited about the long-term prospects of the Standard & Poor's Structured Finance Ratings Department*, governments, regulators, financial institution and corporations all over the world are seeing the benefits of structured finance. *And why not? Structured finance has proven to be a reliable, highly flexible financing tool*. Thank you very much for your attention.

272.     On July 26, 2005, McGraw-Hill issued a press release entitled "The McGraw-Hill Companies Reports 18.6% Increase In Second Quarter EPS to $0.51; Revenue Grows by 16.9% ," which stated, in relevant part:

The McGraw-Hill Companies (NYSE: MHP) today announced diluted earnings per share from continuing operations of $0.51 for the second quarter of 2005, an 18.6% increase over the $0.43 reported for the same period last year.

\*          \*          \*

"Net income for the second quarter was $195 million versus $165.6 million for the same period last year.

"Revenue for the second quarter grew by 16.9% to $1.5 billion.

"*A record performance at Financial Services* and a solid increase at McGraw-Hill Education were *key to our second quarter results*," said Harold McGraw III, chairman, president and chief executive officer of The McGraw-Hill Companies.

\*          \*          \*

Financial Services: "Revenue for this segment in the second quarter increased 18.4% to $597.4 million and operating profit grew by 20.6% to $258.3 million compared to the same period in 2004. Foreign exchange rates contributed $4.4 million to revenue and $5.3 million to operating profit in the second quarter of 2005.

\*          \*          \*

138

"*Issuer and investor appetite for securitized debt again played a key role in our results. Structured finance showed strength across all asset classes and in all of our international regions* - Europe, Asia, Latin America and Canada. In Europe, our largest overseas market, Mortgage-Backed Securities and Collateralized Debt Obligations, were particularly strong as investors sought a combination of attractive yields, good credit quality and asset protection.

*"In the United States, the Residential Mortgage-Backed Securities market continued to confound predictions of a slowdown. A strong housing market, lower than expected interest rates and a proliferation of new mortgage products, including hybrid adjustable rate mortgages, negative amortization loans and interest-only mortgages, helped produce a 39.9% increase in new issue dollar volume in the second quarter.*

"The Commercial Mortgage-Backed Securities market set a new U.S. record for issuance in the second quarter as dollar volume soared by 75.8%.

*"The Collateralized Debt Obligations in the U.S. market grew by 64.1% in the second quarter versus the same period last year.*

<p style="text-align:center">*    *    *</p>

"New issue dollar volume grew in the United States and European bond markets in the second quarter versus the same period in 2004. In the U.S., total new issue dollar volume was up 23.0%. Corporate new issuance declined by 2.0%. Public finance grew by 3.0%. Mortgage-Backed issuance climbed by 44.2% while Asset-Backed issuance increased 29.1% according to reports from Securities Data Corporation and Harrison Scott Publications.

"In Europe, new issue dollar volume was up 47.8%, according to Securities Data Corporation and Harrison Scott Publications.

"We continue to benefit from ratings and services that are not tied to new issuance. They represent just over 19% of ratings revenue in the second quarter as financial strength ratings of insurance companies, counterparty credit ratings and *performance evaluation services* helped offset a decline in bank loan ratings and rating evaluation services.

<p style="text-align:center">*    *    *</p>

The Outlook: "Given the strength of our first-half performance and the outlook for the second half, we are increasing our earnings guidance for the year. We now expect double-digit growth in earnings per share from continuing operations, including $0.08 to $0.09 dilution from acquisitions in 2004 and 2005 and changes in pension plan assumptions for 2005, but excluding the 2004 non-cash benefit of $0.05 per share from accrued tax liabilities."

273. Also on July 26, 2005, McGraw-Hill hosted a conference call to discuss its second

quarter 2005 financial results. The Individual Defendants participated in the call on behalf of the

Company. During the call, numerous false and misleading statements were made that were designed

to artificially inflate the Company's stock price. For example, McGraw stated:

> Okay, let me now turn over to the financial services segment. ***We had an outstanding performance at Standard and Poor's***. In the second quarter, revenue increased 18.4%. Operating profit grew by 20.6% and the operating margin increased to 43.2%. For the first half, revenue is up 19.1, operating profit grew 23.9 and the operating margin increased to 42%. ***We have consistently predicted double-digit top and bottom line performance in growth in 2005 for this segment and clearly we're on track to achieve our forecast***.

> Unexpected strength, particularly in the U.S. residential mortgage-backed securities market, made the improvement that we had anticipated even better for the second quarter. As you may recall, I hope you don't, but as you may recall, we had expected dollar volume issuance in the market to decline by as much as 20% this year. U.S. residential mortgage-backed securities dollar volume issuance grew by 40% in the second quarter and was up 51% for the first half. So we're going to stop forecasting for the residential mortgage-backed market because it's just continuing to go up. Comparisons are going to be more challenging in the second half or should be. Residential mortgage-backed security dollar volume issuance was up 59% in the second half of last year, which also set unbelievable new records. But in view of the first half strength this year, we no longer expect a decline in dollar volume issuance in the U.S. morning-backed securities for the year 2005.

> Now, we also forecasted that the U.S. mortgage-backed securities market would also do very well this year. And here we're on target. Because it had benefited from a real nice surge in the commercial mortgage-backed securities area. U.S. dollar volume issuance for the commercial mortgage-backed securities set a new record. It was up 76% in the second quarter and is up for the first half by 70%.

> That's not the whole story. There were other important contributors to Standard and Poor's second quarter performance. Our international ratings grew faster than S&P's domestic ratings in the second quarter, again, and accounted for a little over 35% of ratings revenue, up from about 33% for the same period last year. Growth overseas was broad-based, international ratings grew in all four economic regions; Europe, Asia-Pacific, Canada and Latin America. In Europe, ratings revenue has been increasingly delinked from changes in both the region's growth, GDP, as well as bond volume issuance. We are adding new issuers and improving our market penetration that disintermediation, the movement way from banks, continues in Europe. Where even far more corporate debt remains on banks' balance sheets than in the United States.

> \*    \*    \*

> ***All of this activity underscores the market's embrace of securitization and the continued strength of structured finance around the world whether it be asset-***

140

*backed, mortgage-backed, commercial, residential and so forth. It also is another demonstration of why S&P continues growing, even though the issuance of corporates in the U.S. bond markets actually trails last year.* In the second quarter, total U.S. new issuance dollar volume increased by 23%. Corporate issuance was down 2%. And public finance grew by only plus 3%. Mortgage-backed securities were up 44.2% and asset-backed securities were up 29.1%.

Just to giving you the same numbers for the first half, for the first half, total U.S. dollar volume was up 21%. Corporates were off 11.5%. Public finance was up 8.4. Mortgage-backed securities were up 53.4% and asset-backed securities grew by 18.9.

We continue to benefit from ratings and services that are not tied to new issuance. These are the nontraditional rating activity. They accounted for more than 19% of ratings revenue in the second quarter. Financial strength ratings of insurance companies counter-party credit ratings and performance evaluation services offset a slowdown in both bank loan ratings and rating evaluation services. *We're benefiting from growth in surveillance fees* and the annual fee arrangements. Again, that reduces any potential volatility.

274.    On July 29, 2005, McGraw-Hill filed its interim quarterly financial report on Form 10-Q for the quarter ending June 30, 2005. The financial results reported in the 10-Q were substantially similar to those reported in the Company's July 26, 2005 press release. The Form 10-Q was signed by Bahash, and contained required Sarbanes-Oxley certifications signed by McGraw and Bahash stating that the Form 10-Q did not include any material misrepresentations. In discussing what drove McGraw-Hill's improved financial performance, the July 29, 2005 10-Q stated, in relevant part:

> In the second quarter of 2005, the Company achieved growth in revenue and income from continuing operations of 16.9% and 17.7%, respectively. *The increase in revenue is primarily attributable to growth in the Financial Services* and McGraw-Hill Education segments, *which contributed $92.9 million* and $81.3 million *to the growth in revenue*, respectively. Foreign exchange rates contributed $7.9 million to revenue and $5.3 million to income from continuing operations during the second quarter.
>
> *                *                *
>
> Service revenue increased 20.7% in the second quarter of 2005, *due primarily to an increase in revenue in the Financial Services segment of $92.9 million* and the acquisition of J.D. Power and Associates which contributed $33.6 million of revenue. *Strong growth in structured finance reflects continued favorable global market conditions*, including a low interest rate environment. Growth in corporate finance ratings (corporate finance and financial services) is attributable primarily to revenues

from *recurring fees for surveillance activities* and customers on annual fee arrangements.

<p style="text-align:center">*       *       *</p>

Financial Services revenue and operating profit dramatically increased over 2004 second quarter results. Foreign exchange rates contributed $4.4 million to revenue and had a positive impact on operating profit of $5.3 million.

*The Financial Services segment's increase in revenue and operating profit is due primarily to the performance of structured finance ratings* and corporate finance (corporate finance and financial services) ratings, which represented approximately 38.6% and 8.7% of the growth in revenue, respectively. *In structured finance, the continuing favorable interest rate environment led to strong growth in the issuance of U.S. residential mortgage-backed securities (RMBS), commercial mortgage-backed securities (CMBS) and collateralized debt obligations (CDOs). The growth in corporate finance ratings is attributable primarily to revenues from recurring fees for surveillance activities* and customers on annual fee arrangements.

Total U.S. structured finance new issue dollar volume increased 42.3%; solid growth was experienced across all asset classes. U.S. CDO issuance increased 64.1% according to Harrison Scott Publications. *The U.S. CDO market was driven by stabilization of the asset class due to fewer downgrades, strong investor demand as well as an increase in new structures (customizations) and arbitrage opportunities*. U.S. CMBS issuance increased 75.8% over the prior year primarily due to the favorable interest rate environment and the refinancing of maturing debt. U.S. RMBS issuance increased 39.9% according to Harrison Scott Publications. Issuance in this asset class continues to benefit from the low interest rate environment, continuing appreciation in home prices, *as well as a shift from agency to private origination associated with innovative new and variable rate mortgage products. These variable rate mortgage products are commanding between 55%-60% of total mortgage originations*. Although U.S. RMBS issuance volumes have been strong overall, the number of issues increased only slightly, leading to issue sizes that are substantially larger than last year. The Company had originally anticipated that RMBS issuance would decline approximately 15%-20% in 2005. Assuming no change in current market conditions such as a large and sudden rise in interest rates, no decline is anticipated in issuance versus last year's levels. According to Securities Data, U.S. new issue dollar volume for corporates for the second quarter of 2005 decreased 2.0% with high yield dollar volume issuance decreasing 36.1% . . . International growth was also strong as the favorable trends of securitization, disintermediation and privatization continue. In Europe, issuance levels rose in the quarter driven by strong issuance in structured finance, especially mortgage-backed securities and CDOs. The European CDO market was driven primarily by an increase in private synthetic CDOs. Issuance for corporates in Europe was up reflecting strength in financial services as a result of low rates and favorable spreads.

<p style="text-align:center">*       *       *</p>

<p style="text-align:center">142</p>

*The market for credit ratings as well as research, investment advisory and broker-dealer services is very competitive. The Financial Services segment competes domestically and internationally on the basis of a number of factors, including quality of ratings*, research and investment advice, client service, *reputation*, price, geographic scope, range of products and *technological innovation*.

<div align="center">*    *    *</div>

The Company maintains disclosure controls and procedures that are designed to ensure that information required to be disclosed in the Company's reports filed with the Securities and Exchange Commission (SEC) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including its Chief Executive Officer (CEO) and Chief Financial Officer (CFO), as appropriate, to allow timely decisions regarding required disclosure.

As of June 30, 2005, an evaluation was performed under the supervision and with the participation of the Company's management, including the CEO and CFO, of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) under the U.S. Securities Exchange Act of 1934). Based on that evaluation, the Company's management, including the CEO and CFO, concluded that the Company's disclosure controls and procedures were effective as of June 30, 2005.

275.     In response to the July 26, 2005 press release and conference call, and the July 29, 2005 Form 10-Q, the Company's stock price posted a quick gain from a closing price of $44.43 on July 25, 2005 to closing price of $46.53 on July 26, 2005, and $46.01 on July 29, 2005, as demonstrated in the chart below:



276.   The statements referenced in ¶¶271-74 were each materially false and misleading when made for the reasons set forth in ¶256 and the factual detail contained throughout this Complaint.  In addition, the statements referenced in ¶¶271-74 were each false and misleading when made as they misrepresented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The true facts, which were then known to or recklessly disregarded by each of the Defendants, were:

• Contrary to Rose's statements on behalf of the Company, S&P's structured finance ratings were anything but "independent and objective" and S&P ratings had not "excelled" in that function.  Quite the opposite, the Company's ratings were compromised by Defendants' fraud, which centered on a desire to maximize market share and short-term profits at the expense of ratings criteria, independence, and objectivity.

• Despite touting that new financial engineering techniques were extremely complex and that it was "very desirable to both issuers and investors" to have S&P rate deals, Defendants omitted that the quality of the Company's ratings had taken a back seat to Defendants' fraud.  Rather than invest in analytics to rate the increasingly complex deals, the Company knowingly used credit rating models with data that was inadequate to predict how high-risk structured finance products would perform.  Moreover, the Company's credit ratings were influenced by competitive pressures, including the drive to maintain market share and accommodate investment bankers bringing in business to the Company.

- The Company was unable, and indeed, unwilling, to keep pace with the innovation contributing to the growth of the RMBS and CDO markets. Had the Company utilized the resources and models necessary to keep pace, it would have known that the ratings being assigned were overblown and unsustainable, causing it to lose deals and lose market share, and Defendants' scheme would have been unsuccessful.

- The "higher demand for S&P ratings on all types of RMBS transactions" was illusory. Because of Defendants' scheme, the demand was not created legitimately and was a misleading indicator of the "market's embrace of securitization"; rather, it was a byproduct of the Company's willingness to cater to issuers and lower or outright abandon ratings criteria.

- Despite claiming that "leadership in the structured finance market is built on two pillars, credibility and service" it is now a documented fact that throughout the Class Period, the Company abandoned those pillars, leaving them to crumble in favor of unsustainable short term profits built on nothing more than a "house of cards," a house constructed of shoddy ratings criteria, intentionally outdated models, and abandoned surveillance.

- Although the Company proclaimed that it published its ratings criteria, it has been revealed that not all of the Company's criteria was published and that the Company frequently made out-of-model adjustments to ratings, "massaged" ratings results, and applied "magic number" modifications to models to achieve desired results and pocket lucrative ratings fees.

- In light of the foregoing, Defendants had no reasonable basis to tout the long-term prospects of the S&P Structured Finance Ratings Department. The "outstanding performance" at S&P was nothing more than a mirage.

- Strong growth in the Company's financial services segment was not attributable to favorable market conditions; rather, it was attributable to Defendants' scheme to maximize market share by lowering ratings criteria and catering to the demands of issuers in exchange for lucrative fees.

- The US CDO market was fueled not by "stabilization of asset classes" or "strong investor demand" – the reality was that it was driven by the AAA ratings S&P slapped on what was, as S&P's Managing Director for Structured Finance, Raiter, stated, "crap."

- The "increase in new structures" was likewise fueled by S&P's gross inability to adequately or accurately rate such "new structures" both because of the decision not to acquired updated, available data and because the rating models themselves were inadequate to keep up with the ever-changing synthetic CDO market. This, in turn, created a self-fulfilling prophecy whereby the Company's willingness to rate transactions it was incapable of comprehending further spurred the wildfire of growth in exotic asset classes and the alchemy of financial engineering.

- Defendants knew that the "shift from agency to private origination associated with innovative new and variable rate mortgage products" that were "commanding

145

between 55%-60% of total mortgage originations" meant that the Company was incapable of rating RMBS and CDOs comprised of those "innovative" – *i.e.*, subprime, Alt-A, stated income – loans, and the Company sought out such products solely to preserve market share at the expense of its credibility and long-term financial condition.

277.    On October 20, 2005, McGraw-Hill issued a press release entitled "The McGraw-Hill Companies Reports 17.7% Increase in Third Quarter EPS to $1.00; Revenue Grows by 14.8%," which stated, in relevant part:

> The McGraw-Hill Companies (NYSE: MHP) today reported third quarter diluted earnings per share from continuing operations of $1.00, which includes a $0.01 gain on the sale of Corporate Value Consulting, the valuation services unit of the Financial Services segment.  Diluted earnings per share from continuing operations in 2005 were up 17.7% over the same period last year.
>
> *            *            *
>
> Net income for the third quarter was $381.3 million versus $324.5 million for the same period last year.
>
> Revenue for the third quarter grew by 14.8% to $2.0 billion.
>
> "Outstanding results by our elementary-high school group and ***another record performance at Standard & Poor's were key to our third quarter***," said Harold McGraw III, Chairman, President and Chief Executive Officer of The McGraw-Hill Companies.   "As a result, we improved our operating margin for the third quarter.
>
> *            *            *
>
> ***Financial Services: "Revenue for this segment in the third quarter increased 20.5% to $605.8 million while operating profit improved by 24.7% to $251.9 million compared to the same period last year.***  Foreign exchange rates had no material effect on revenue and had a negative impact on operating profit of $2.6 million in the third quarter of 2005.
>
> "Solid growth in debt and equity markets around the world produced another record performance at Standard & Poor's.  International credit ratings and services grew faster than domestic ratings and produced more than 36% of ratings revenue, slightly higher than last year.
>
> "***Structured finance again was the global pacesetter.  In the U.S., Residential Mortgage-Backed Securities continued to benefit from low interest rates and the prevalence of affordable products, including interest-only mortgages, negative amortization loans and hybrid adjustable-rate mortgages.  Investor demand remained high for Commercial Mortgage-Backed Securities and Collateralized Debt Obligations.***  Asset-Backed Securities benefited from growth in credit card,

146

commercial revolving credit and aircraft leasing deals.

<p style="text-align:center">*     *     *</p>

"International ratings overcame a decline in new issuance in Europe in the third quarter with *growth in annual fees and ratings and services that are not tied to new issuance*. And while structured finance softened in Europe in the third quarter, securitization was strong in other regions, most notably Asia- Pacific and Latin America.

"New issue dollar volume increased in the U.S. bond market, but declined in Europe in the third quarter versus the same period last year. In the U.S., total new issue dollar volume was up 17.4%. Corporate new issuance declined 12.2%. Public finance grew by 9.6%. Mortgage-Backed Securities issuance was up 32.9% while Asset-Backed Securities issuance increased 13.0%, according to reports from Securities Data Corporation and Harrison Scott Publications.

"In Europe, new issue dollar volume was off 16.3%, according to Securities Data Corporation and Harrison Scott Publications.

*We continue to experience growth in ratings and services that are not tied to new issuance. They accounted for more than 20% of ratings revenue in the third quarter.* We saw a pickup in rating evaluation services, global infrastructure finance ratings and *structured finance related ratings and services*. There was modest growth in bank loan ratings.

<p style="text-align:center">*     *     *</p>

The Outlook: "For 2005, we expect double-digit growth in earnings per share from continuing operations, including $0.08 to $0.09 dilution from acquisitions in 2004 and 2005 and changes in pension plan assumptions for 2005, but excluding a $0.01 gain on the sale of Corporate Value Consulting and the 2004 non-cash benefit of $0.05 per share from accrued tax liabilities."

278. On October 28, 2005, McGraw-Hill filed its interim quarterly financial report on Form 10-Q for the quarter ending September 30, 2005. The financial results reported in the 10-Q were substantially similar to those reported in the Company's October 20, 2005 press release. The Form 10-Q was signed by Bahash, and contained required Sarbanes-Oxley certifications signed by McGraw and Bahash stating that the Form 10-Q did not include any material misrepresentations. In discussing what drove McGraw-Hill's improved financial performance, the October 28, 2005 10-Q stated, in relevant part:

<p style="text-align:center">147</p>

In the third quarter of 2005, the Company achieved growth in revenue and operating profit of 14.8% and 17.5%, respectively. *The increase in revenue is primarily attributable to growth in* the McGraw-Hill Education and *Financial Services* segments, *which contributed* $110.0 million and *$103.0 million to the growth in revenue*, respectively.

*       *       *

*Financial Services revenue and operating profit dramatically increased over 2004 third quarter results*. Foreign exchange rates had no material effect on revenue and had a negative impact on operating profit of $2.6 million.

*       *       *

*The Financial Services segment's increase in revenue and operating profit is due to the performance of structured finance ratings and corporate finance (corporate finance and financial services) ratings, which represented approximately 29.2% and 17.6% of the growth in revenue, respectively. Growth was experienced in all asset classes within structured finance. The continuing favorable interest rate environment led to strong growth in the issuance of U.S. residential mortgage-backed securities (RMBS), commercial mortgage-backed securities (CMBS) and collateralized debt obligations (CDOs). The growth in corporate finance ratings is attributable to increases in revenue from* customers on annual fee arrangements, *recurring fees for surveillance activities* and transaction revenue from improving high yield issuance and financial services, primarily in the insurance sector.

*       *       *

Total U.S. structured finance new issue dollar volume increased 35.7%; with solid growth experienced across all asset classes. U.S. CDO issuance increased 120.6% according to Harrison Scott Publications. *The U.S. CDO market was driven by favorable spreads, stable credit quality and continuing demand by investors seeking higher yields*. U.S. CMBS issuance increased 96.9% over the prior year primarily due to the favorable interest rate environment, which spurred a record level of originations. *U.S. RMBS issuance increased 27.0% according to Harrison Scott Publications. Issuance in this asset class continues to benefit from the low interest rate environment, continuing appreciation in home prices, as well as a shift from agency to private origination associated with the prevalence of affordability products such as hybrid ARMs, negative amortization loans, interest only mortgages and silent seconds*. Although U.S. RMBS issuance volumes have been strong overall, the number of issues increased only moderately leading to issue sizes that are substantially larger than last year . . . In Europe, issuance levels declined in the quarter driven by a decrease in corporates, primarily financial services. Issuance in financial services was down in Europe during the third quarter as pre-funding occurred in the first half of the year in part due to the expiration of the Pfandbrief in Germany and the introduction of new filing regulations. European CDO issuance also decreased largely due to the effect of the Ford and General Motors downgrades on the synthetic CDO market, followed by the tightening of spreads, which reduces arbitraging opportunities. Declines in RMBS issuance in Europe were partially

offset by strong issuance in CMBS.

\*　　\*　　\*

*The market for credit ratings as well as research, investment advisory and broker-dealer services is very competitive. The Financial Services segment competes domestically and internationally on the basis of a number of factors, including quality of ratings, research and investment advice, client service, reputation, price, geographic scope, range of products and technological innovation.*

\*　　\*　　\*

The Company maintains disclosure controls and procedures that are designed to ensure that information required to be disclosed in the Company's reports filed with the Securities and Exchange Commission (SEC) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including its Chief Executive Officer (CEO) and Chief Financial Officer (CFO), as appropriate, to allow timely decisions regarding required disclosure.

As of September 30, 2005, an evaluation was performed under the supervision and with the participation of the Company's management, including the CEO and CFO, of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) under the U.S. Securities Exchange Act of 1934). Based on that evaluation, the Company's management, including the CEO and CFO, concluded that the Company's disclosure controls and procedures were effective as of September 30, 2005.

279.　　In response to the October 20, 2005 press release and conference call, and the October 28, 2005 Form 10-Q, the Company's stock price traded at a steadily positive pace and increased from a closing price of $46.56 on October 20, 2005 to a closing price of $47.69 on October 21, 2005 and $48.73 on October 28, 2005, as demonstrated in the chart below:



280.    The statements referenced in ¶¶277-78 were each materially false and misleading

when made for the reasons set forth in ¶256 and the factual detail contained throughout this

Complaint.  In addition, the statements referenced in ¶¶277-78 were each false and misleading when

made as they misrepresented and/or omitted adverse facts which then existed and disclosure of

which was necessary to make the statements not false and/or misleading.  The true facts, which were

then known to or recklessly disregarded by each of the Defendants, were:

- The US CDO market was not being driven by "stable credit quality," such "quality"
  was in name only and was created as a result of Defendants' fraudulent scheme.

- The "record performance" at S&P that was "key" to the third quarter 2005 was
  premised upon the fruits of Defendants' fraud.  With "[s]tructured finance again [as]
  the global pacesetter," Defendants were touting and promoting unsustainable, short
  term financial gains they knew would evaporate once the truth was revealed.

281.    On December 6, 2005, McGraw participated in the UBS 33rd Annual Media

Conference on behalf of the Company.  During the conference, McGraw described the expected

growth in the CDO market, and falsely described McGraw-Hill as being capable of rating CDOs:

*We also expect continued growth in the market for the collateralized debt*
*obligations, CDOs.  The market is being bolstered by the successful introduction of*
*new structures.  To accompany this growth Standard & Poor's continues to expand*

*its CDO product suite by helping market participants to better understand what S&P thinks. These products are allowing investors and issuers to be more proactive in their investment decisions and in their deal creation.*

282.    On January 9, 2006, McGraw participated in the Citigroup 16th Annual Global Entertainment, Media, and Telecommunications Conference on behalf of the Company.  During the conference, McGraw further misled the market by making false and misleading statements concerning the Company's ability to rate structured finance transactions and its future business prospects.  For example, McGraw stated:

*Let's begin [with] the Financial Services segment, in Financial Services, which will have another very good year in 2006.*  Excluding revenue from Corporate Value Consulting before its divestiture last year, we're looking for double-digit top line growth from continuing operations.  *We also expect a double-digit increase in operating profit.*  Corporate Value Consulting produced more than $100 million in revenue for Financial Services before the divestiture at the end of the third quarter last year.  We expect a similar operating margin for the segment this year to the margin that we achieved in 2005.  This is the year that we expect the U.S. residential mortgage-backed securities market to finally cool off with issuance declining probably around 10%.  It will also probably be a more challenging year in U.S. public finance as rising interest rates make refunding a little bit less attractive, but we have worked very hard in recent years to strengthen Standard & Poor's resiliency by creating a more diverse revenue stream. . . .

*Our ability to rate a growing array of instruments and provide new tools and models to our customers; a fee structure that reduces our dependency on transactions through the growth of frequent issuer and surveillance programs. We price for value some more complex instruments, obviously produce a better return than the more commoditized asset classes, such as certain types of asset-backed securities. Balance -- we rate virtually every asset class.*  Each of them has different attributes and behaves differently in different economic environments.  Creating that balance has clearly reduced our dependency on the performance of any single asset class.

With this framework, let's look more closely at expectations for market activity this year.  *Structured finance will continue to drive global growth in 2006 with increases expected in all of the regions around the world.*  It is a key reason why we expect international ratings to grow faster than domestic ratings.  In 2005, international ratings accounted for a little over 35% of ratings revenue.  That proportion should increase again this year and should get to about 50% by the time we get to the end of the decade.

<div align="center">*        *        *</div>

Earlier I pointed out that we expect a decline in the U.S. residential mortgage-backed security market, although it will be very healthy. The comparisons will be a little difficult, but we are looking for very strong growth in the commercial mortgage-backed securities market. Improvement in commercial real estate fundamentals, refinancing of older deals and investor demand will be key factors. We expect more growth in the U.S. asset-backed securities market as auto manufacturers continue to use securitization as a source of funding and there is also a pickup in credit card activity with credit card receivables because consumers will rely less on home equity loans.

We also expect continued growth, both here, in Europe and in Japan with collateralized debt obligations.

283.   On January 25, 2006, McGraw-Hill issued a press release entitled "The McGraw-Hill Companies Reports 12.8% Increase in Earnings Per Share for 2005; Revenue Grows by 14.3%," which stated in relevant part:

The McGraw-Hill Companies (NYSE: MHP) today reported a 12.8% increase for 2005 diluted earnings per share from continuing operations of $2.21, which includes a $0.01 gain on the sale of Corporate Value Consulting, a $0.04 restructuring charge, and a $0.03 increase in income taxes on the repatriation of funds.

*       *       *

Net income for 2005 increased 11.7% to $844.3 million.

Revenue for 2005 grew 14.3% to $6.0 billion.

*       *       *

Revenue increased 13.2% in the fourth quarter to $1.5 billion.

"*Record results at Standard & Poor's* and a strong finish to an outstanding year in the education market *were our growth engines in the fourth quarter and for 2005*," said Harold McGraw III, chairman, president and chief executive officer of The McGraw-Hill Companies.

*       *       *

*Financial Services: "For 2005, revenue in this segment grew by 16.8% to $2.4 billion and operating profit increased by 21.4% to $1.0 billion compared to 2004. The operating margin expanded to 42.5% from 40.8% in 2004*.

"In the fourth quarter of 2005, revenue for Financial Services grew by 10% to $650.4 million. Excluding the prior year revenue of $32.4 million from Corporate Value Consulting, which was sold at the end of September 2005, fourth quarter revenue increased by 16.4% on a non-GAAP basis. Operating profit for the fourth quarter increased 14.9% to $286.5 million. The operating margin improved to 44.0% from

42.2% for the same period a year ago. Foreign exchange rates decreased revenue by $9.0 million and negatively impacted operating profit by $1.9 million in the fourth quarter.

*"The record revenue, operating profit and operating margin for both 2005 and the fourth quarter underscore another outstanding performance by Standard & Poor's in global financial markets*.

"A strong worldwide structured finance market was key to double-digit growth in U.S. and international ratings in 2005. International ratings accounted for 37% of ratings revenue in 2005, slightly higher than last year.

"In the fourth quarter of 2005, U.S. ratings benefited from a late surge in structured finance activity to outpace international results. For the fourth quarter of 2005, international ratings accounted for 38.4% of revenue, down from 39.3% in 2004. More challenging year-to-year comparisons, especially in Europe, were also a key factor in the fourth quarter.

*"Structured finance finished the year strongly, producing 73.2% of the revenue growth in Financial Services in the fourth quarter. In 2005, structured finance represented 40.3% of Financial Services' revenue growth. U.S. residential mortgage-backed securities, U.S. commercial mortgage-backed securities and collateralized debt obligations hit record levels in the fourth quarter as issuers continued to take advantage of low interest rates, improving credit quality and innovative new structures*. Ratings also benefited from a solid fourth quarter in the U.S. asset-backed securities market. With the Securities and Exchange Commission requiring more disclosure under Regulation AB on January 1, 2006, there also was some acceleration of deals closed in the fourth quarter.

<p style="text-align:center">*     *     *</p>

"New issue dollar volume increased in the U.S. and European bond markets in the fourth quarter versus the same period in 2004, according to reports from Securities Data Corporation and Harrison Scott Publications.

"In the U.S., total new issue dollar volume increased 23.5%. Corporate new issuance was up 0.1%. Public finance grew by 12.3%. Mortgage-Backed Securities issuance was up 33.0%. Asset-Backed Securities were up 81.7%.

"In Europe, new issue dollar volume was up 23.7%.

<p style="text-align:center">*     *     *</p>

The Outlook: "In 2006, we confidently expect The McGraw-Hill Companies to produce another year of earnings growth. It will be a more challenging year in the K-12 education marketplace, which will decline in 2006 after a very strong performance in 2005. *We also expect another very good performance from Financial Services, which once again is expected to achieve a double-digit increase in revenue* -- excluding revenue from Corporate Value Consulting which was

<p style="text-align:center">153</p>

divested in 2005 -- *and a double-digit increase in operating profit.*"

284.    Also on January 25, 2006, McGraw-Hill hosted a conference call to discuss its fourth quarter 2005 financial results.  The Individual Defendants participated in the call on behalf of the Company.  During the call, numerous false and misleading statements were made that were designed to artificially inflate the Company's stock price.  For example, McGraw stated:

> *Now moving over to our final segment, the Financial Services Segment, we completed a record year with a strong fourth quarter. In 2005 revenue increased by 16.8%, operating profit grew by 21.4%. The operating margin expanded to 42.5% and that's up from 40.8% in 2004*, a growing and diversified lineup produced outstanding results in fixed income and equity markets.

> *Structured finance was the biggest driver of our global growth in 2005*. The ratings also benefit from the improvement in corporate finance and from ratings products and services that are not linked to new issuance.

> In ratings, 37% of the revenue came from offshore, just over 21% of the revenue was produced by rating services that are not tied to the new issue buy out. A lot of attention has been focused on the U.S. residential mortgage backed securities market, but to appreciate the breadth and strength of the market, it's worth noting that the commercial mortgage backed issuance market, the asset backed issuance market, and the collateralized debt obligation market as well as U.S. Residential Market all contributed quite handsomely.

> Without exception issuance of each of these asset classes showed year-over-year growth in each quarter of 2005 compared to 2004. Very impressive.

> The fourth quarter growth rate for dollar volume issuance in the United States commercial mortgage backed securities market was at 111%. It was 82% at asset backed securities which eclipsed the 24% increase in the U.S. residential mortgage backed securities market.

> New dollar volume issuance in all four asset classes grew substantially this year in the U.S. market. 37% for the residential mortgage backed market, 89% for the commercial mortgage backed, 32% for the asset backed securities and 64% for collateralized debt obligation.

> These statistics are based on reports from Securities Data Corporation and Harrison Scott Publications.

> New issue statistics don't tell the whole story. U.S. corporate dollar volume issuance was down 8.2% in 2005, but we showed solid growth in corporate finance. *That's another indication obviously of the resiliency that we've been creating in this portfolio through the growth, the frequent issuer and surveillance program*.

Standard & Poor's data and information products also showed good growth, but the focus now is on the prospects for 2006. For Financial Services we are looking for double digit top line growth, excluding revenue from corporate value consulting. Before the divestiture at the end of the third quarter last year corporate value consulting contributed more than $100 million in revenue to Financial Services.

We also expect double digit growth in operating profits. The operating margin will be similar to what we achieved in 2005 which was 42.5%. ***Structured finance will be the pace-setter again in 2006***. International ratings are expected to grow faster than domestic ratings. International ratings as we said before accounted for about 37% of ratings revenue in 2005 and that proportion should increase again this year.

285. As the conference call continued, McGraw described the RMBS market as "healthy" and, in response to a question regarding price increases, stated that "[t]he structured finance area would be more aggressive because of the complexity of the instrumentation especially on CDOs and more modest on the corporate side." McGraw also falsely described the Company's surveillance, stating:

Sure. Again, in terms of the volatility associated with transactions versus creating more substantive relationships and ***being able to create surveillance streams*** and so forth, there has been some change in that when you talk about international only because of the size of the relationships. ***As the relationships get bigger so too do the value proposition that we can propose to those clients and therefore a surveillance fee relationship***.

286. On February 24, 2006, the Company filed its annual financial report on Form 10-K for the year ending December 31, 2005. The financial results reported in the 10-K were substantially similar to those reported in the Company's January 25, 2006 press release. The Form 10-K was signed by McGraw and Bahash, and contained required Sarbanes-Oxley certifications signed by McGraw and Bahash stating that the Form 10-K did not include any material misrepresentations. In discussing what drove McGraw-Hill's improved financial performance, the February 24, 2006 10-K included a letter to the Company's shareholders that stated, in relevant part:

To Our Shareholders:

It's a world that is smaller, more open, more accessible and more dynamic—as well as more complex and competitive.

It's a world in which economies, societies and markets are increasingly linked,

learning and knowledge are vital, and reliable, trusted information is essential.

It's the world we live and work in today.

And for our customers, our employees and our shareholders, it truly is a world of opportunity.

The insight, analysis and solutions we provide open a world of opportunity for countries, markets, businesses, institutions and people around the globe by helping to meet three critical needs which drive global progress and economic growth: the need for capital, the need for knowledge and *the need for information transparency*.

The strengths of our markets and leading brands, coupled with the talent and commitment of our people, are driving a world of opportunity for The McGraw-Hill Companies. As a result, we have achieved a long-term record of superior performance and *enjoy strong prospects for future growth. Simply stated, our success is based on an effective approach that emphasizes continuous growth, exceptional talent and world-class execution*.

World-Class Performance

Our solid financial performance in 2005 underscores our ability to capture market opportunities and create lasting value for our shareholders

<p style="text-align:center">*     *     *</p>

As part of our commitment to maximizing shareholder value, in January 2006 we announced a 10% increase in the regular quarterly cash dividend on the Corporation's common stock. The new annual dividend of $0.726 per share represents a compound annual growth rate of 10.3% since 1974, and marks our 33rd consecutive annual dividend increase.

In addition, we also announced plans to repurchase up to 45 million — or approximately 12.1% — of the Corporation's outstanding shares. During 2006, we expect to repurchase up to 15 million shares as part of this new program, subject to market conditions, and to also acquire 3.4 million shares remaining under our previous buyback plan.

The combination of earnings growth, dividends and share repurchases has enabled us to continue generating increased value for our investors. The Corporation's total return to shareholders nearly tripled that of the S&P 500 in 2005. In fact, our shares have outperformed the S&P 500 over the past one-, three-, five-, seven- and 10-year periods.

<p style="text-align:center">*     *     *</p>

A World of Growth

*For McGraw-Hill Financial Services, Standard & Poor's success in broadening its geographic presence and expanding its ratings of asset classes and financial*

<p style="text-align:center">156</p>

*instruments underlie its continued strong performance and excellent prospects. 2006 is expected to be another year of strong growth.*

*The structured finance market, particularly collateralized debt obligations, is expected to increase in size and complexity, driving growth in international ratings. We also expect growth in products and services not tied to new bond issuance, such as Bank Loan Ratings, Ratings Evaluation Services, Advanced Analytics, Corporate Credit Ratings and Credit Assessments.*

287. The 2005 10-K continued:

The Financial Services segment operates under the Standard & Poor's brand as one reporting unit and provides independent credit ratings, indices, risk evaluation, investment research and data to investors, corporations, governments, financial institutions, investment managers and advisors globally. The segment and the markets it serves are impacted by interest rates, the state of the economy, credit quality and investor confidence. The Financial Services segment also continues to be favorably impacted by the current trend of the disintermediation of banks and the increased use of securitization as a source of funding. In 2005, the Financial Services segment was favorably impacted by the continued low interest rate environment.

\*　　　\*　　　\*

Revenue and income from continuing operations increased 14.3% and 11.6%, respectively, in 2005. *Results from operations improved primarily on the strength of the Financial Services segment*, which has benefited from the continued low interest rate environment.

\*　　　\*　　　\*

*Despite challenging market conditions, the Company expects to achieve double-digit revenue growth for the Financial Services segment* and modest revenue growth in the McGraw-Hill Education segment.

In Financial Services, strong international growth, as favorable trends of securitization, disintermediation and privatization continue, and product diversification will help mitigate the anticipated decline in U.S. RMBS issuance volumes.

\*　　　\*　　　\*

The Company maintains disclosure controls and procedures that are designed to ensure that information required to be disclosed in the Company's reports filed with the Securities and Exchange Commission (SEC) is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms, and that such information is accumulated and communicated to the Company's management, including its Chief Executive Officer (CEO) and Chief Financial Officer (CFO), as appropriate, to allow timely decisions regarding required disclosure.

As of December 31, 2005, an evaluation was performed under the supervision and with the participation of the Company's management, including the CEO and CFO, of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) under the U.S. Securities Exchange Act of 1934). Based on that evaluation, the Company's management, including the CEO and CFO, concluded that the Company's disclosure controls and procedures were effective as of December 31, 2005.

\*     \*     \*

Service revenue increased 15.4% primarily due to increased revenue in the Financial Services segment, which increased 16.8% or $345.5 million. *Financial Services revenue increased due to the strong performance of structured finance ratings* and corporate finance ratings (corporate finance and financial services).

\*     \*     \*

The Financial Services segment's revenue and operating profit experienced double-digit growth in 2005, increasing 16.8% and 21.4%, respectively, over 2004 results. *The Financial Services segment's increase in revenue and operating profit in 2005 is due primarily to the strong performance of structured finance* and corporate finance (corporate finance and financial services) ratings, which represented approximately 40.3% and 17.0% of the growth in revenue, respectively. *Growth was experienced in all asset classes within structured finance. The continuing favorable interest rate environment led to strong growth in the issuance of U.S. residential mortgage-backed securities (RMBS), commercial mortgage-backed securities (CMBS) and collateralized debt obligations (CDOs). The growth in corporate finance ratings was primarily attributable to increased revenues from recurring fees for surveillance activities* and customers on annual fee arrangements. International revenue for the Financial Services segment continues to increase and represented 37% of the total revenue for the segment. Foreign exchange rates contributed $2.3 million to operating profit and had a slightly negative impact on revenue.

\*     \*     \*

*Total U.S. structured finance new issue dollar volume increased in 2005 due to solid growth across all asset classes*. RMBS issuance was a primary driver of this growth, increasing 36.8% according to Harrison Scott Publications and S&P's internal estimates (Harrison Scott Publications/S&P). *RMBS issuance rose to record levels due to the continued low interest rate environment and further appreciation in home values, as well as a shift from agency to private origination associated with the prevalence of affordability products such as hybrid adjustable rate mortgages, negative amortization loans, interest only mortgages and silent seconds. In the fourth quarter of 2005, issuance was up significantly across virtually all classes* and was favorably impacted in part by deals closing prior to the implementation of the Securities and Exchange Commission (SEC) Regulation AB, which became effective on January 1, 2006. Although U.S. RMBS issuance volumes have been strong overall, the number of issues increased only moderately leading to

issue sizes that were substantially larger than last year, which adversely impacted pricing due to fee caps. The low interest rate environment and refinancing opportunities also drove a record increase in CMBS issuance in 2005. U.S. CDO dollar volume issuance in 2005 increased 64.0% according to Harrison Scott Publications/S&P. *Growth was driven by stabilization of the asset class, improving credit quality and strong investor demand, as well as innovation in new structures and arbitrage opportunities*.

<div align="center">*    *    *</div>

International issuance growth remained strong in 2005 as the favorable trends of securitization, disintermediation and privatization continued. In Europe, the growth in issuance levels was primarily driven by strong corporate issuance in the first half of the year. Corporate issuance in Europe was up primarily due to the strength in financial services which resulted in part from pre-funding that occurred in the first half of the year, partly as a result of the expiration of the Pfandbrief in Germany and the introduction of new filing regulations. *Structured finance also experienced strong issuance in the fourth quarter of 2005, primarily in RMBS due to three large transactions*.

<div align="center">*    *    *</div>

*The market for credit ratings as well as research, investment advisory and broker-dealer services is very competitive. The Financial Services segment competes in the U.S. and internationally on the basis of a number of factors, including quality of ratings, research and investment advice, client service, reputation, price, geographic scope, range of products and technological innovation.*

<div align="center">*    *    *</div>

*Structured finance will continue to drive global growth in 2006 with increases expected in all the regions around the world*. However, growth rates in the Financial Services segment are expected to decline compared to the growth rates experienced over the last several years. The declining growth rates are primarily due to the anticipated decline in U.S. RMBS issuance from the robust issuance experienced in 2005 and 2004. The Mortgage Bankers Association is forecasting a 20% decline in mortgage originations, as mortgage rates continue to rise and the rate of home price appreciation levels off. The Company anticipates that RMBS issuance will decline approximately 10–15% in 2006. Strong international growth and product diversification will help mitigate the anticipated decline in U.S. RMBS issuance volumes.

The U.S. CMBS market will be driven by continued improvement in commercial real estate fundamentals, investor demand for relative yield and refinancing of older deals. U.S. CDO issuance in 2006 will continue to be driven by the stabilization of the asset class resulting in fewer downgrades, and more new structures and arbitrage opportunities.

<div align="center">159</div>

\* \* \*

International market growth will continue to be strong as the favorable trends of securitization, disintermediation and privatization continue. In Europe, new structured finance issuers continue to enter the market, increasing the volume of these securitizations, despite high personal indebtedness levels and the cooling off of property markets in the most active RMBS countries. The Company expects strong repeat issuance for RMBS in Europe. Strong growth is anticipated in Germany and emerging markets for ABS and RMBS issuance. CMBS issuance is expected to grow in Europe as borrowers increasingly access capital markets directly as institutional real estate funds follow real estate companies in replacing bank borrowings with capital market execution. CDO issuance in Europe will continue to be driven by innovative new structures in the synthetic space and continued demand for certain cash CDO products. Corporate issuance in Europe is expected to remain strong.

The outlook in Asia is favorable due to expected continued strong economic growth across the region and ongoing development of regional capital markets.

288. In response to the January 25, 2006 press release and conference call, and the February 24, 2006 Form 10-K, the Company's stock price posted steady increases from a closing price of $49.79 on January 25, 2006 to a closing price of $54.31 on February 24, 2006, as demonstrated in the chart below:



289.    The statements referenced in ¶¶281-87 were each materially false and misleading when made for the reasons set forth in ¶256 and the factual detail contained throughout this Complaint. In addition, the statements referenced in ¶¶281-87 were each false and misleading when made as they misrepresented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading. The true facts, which were then known to or recklessly disregarded by each of the Defendants, were:

- Issuers were not taking advantage of low interest rates, improving credit quality and innovative new structures; rather, they were taking advantage of the fact that, with S&P's help, they could structure their CDOs to achieve AAA ratings despite the fact that the deals were, in reality, junk. S&P facilitated this endeavor by slapping investment grade quality ratings on deals it could not understand and knew would not perform, applying insufficient rating models and stale data.

- By 2006, S&P knew its ratings of RMBS and CDOs were inaccurate, and some within S&P revised the Company's ratings models to produce more accurate ratings. The Company however, refused to use the revised models to re-evaluate existing RMBS and CDO securities – the so-called grandfathering described herein, delaying thousands of ratings downgrades and allowing those securities to carry inflated ratings that misled investors and the market.

290.    On February 28, 2006, McGraw participated in the Bear, Stearns & Co. 19th Annual Media Conference on behalf of the Company. During the conference, McGraw made false and misleading statements concerning the Company's ability to rate complex structured finance transactions, as well as its surveillance capabilities, stating:

As global investors become more sophisticated in their understanding of structured finance, the collateralized debt obligations, or CDO, market is rapidly expanding trade. *As a result, both issuers and investors are turning to Standard & Poor's for globally consistent CDO ratings*, whether the transaction is issued in New York, London, Hong Kong or Mumbai.

*To help customers create deals, track performance, monitor risk exposure, we have developed a fleet of CDO products*. . . .

*            *            *

Well, when we take, again, a look at what we have built, what we have achieved -- again, a portfolio that create some balance that focuses on potential markets that are growing and that are going to offer these kind of opportunities, and then our capabilities to be able to drive and execute on that. *I agree with you, that Standard*

*and Poor's is doing extremely well and it has done extremely well, and for good reason*.

When you start talking about really about the 2000, 2001 period, we have seen a third stage step-up, if you well, in the structured finance market. The structured finance market really started in the mid-80s, when banks were trying to unload some of their risk. We saw a step-up in the mid-90s on that one. As we went from asset-backed securities into commercial, mortgage-backed markets, the residential mortgage-backed market, the residential mortgage-backed market was a really small part of all that.

*And then it took off in the housing boom, if you will, that started really in the 2000, 2001 time period with the low interest rate environment. So that created the third step-up on the structured finance market. I don't see that letting up, and outside the United States, I think that is only going to accelerate. So we have benefited very, very nicely from, again, that third space step-up of that capability*.

Will that continue in perpetuity? I don't think so. I think what we're going to see is a more robust corporate and government markets. I think you are going to have to be very cognizant of the financial information in play, data and information, some of the index services, some of the equity research. But again, some of those transparency factors that are only going to support those (indiscernible) the network. So if you are not in those markets, you run a bit of the risk in terms of betting on one capability.

So we like the balance in the overall portfolio. We believe, as we were talking about on the education market -- and a lot of the things that go on in terms of the digital asset management, again across the board -- we believe that we're right at the beginning of one of the most substantial -- we're 33 years into a 75-year trend in the growth of the capital markets, I believe we're right at the beginning of the learning cycle in terms of that knowledge accounting that we expect to benefit. We've been investing heavily in that side of it throughout the '90s to be able to do it. I think on the media as we go online, I think those capabilities are going to give us even more balance.

So there are some balance issues at this point, but I think in terms of the markets overall, the health of the essential markets that we are in an arcade ability to execute on that, I think we're going to have a much more robust.

Now, the whole notion of the balanced portfolio was to create superior returns, that you can get consistent earnings and sustainable earnings. *And so far, when we talk about the 10, 7, 5, 3, 1, all those years, we've been able to achieve and outperform the market throughout all that. And I'm very confident that we're going to be able to continue to do that because of the excitement of the essence of the markets that we're in and where they are going.* Again, global and online -- all (indiscernible) data, all those online.

291.     On March 13, 2006, McGraw participated in the Credit Suisse Global Services Conference on behalf of the Company.  During the conference, McGraw made false and misleading statements touting the Company's reputation and integrity, stating:

> The need for market insights, transparency, intelligence and continuing education is crucial and increasing and that's the course in our knowledge-based economy. ***Independent and objective information is what professionals expect and get from us.  Respect for the integrity of information is part of our company's makeup***.  It is also wide brand extensions, new products and new combinations of existing products that we are creating to help professionals become more effective and efficient and will enable us to improve our market penetration in the future particularly in non-U.S. markets.

> \*     \*     \*

> As global investors become more sophisticated in their understanding of structured finance the collateralized debt obligation market or CDOs is rapidly expanding. ***As a result both issuers and investors are turning to the Standard & Poor's for globally consistent CDO ratings*** whether the transaction is issued in New York, London, Hong Kong, or Mumbai.  ***To help customer create deals, track performance and monitor risk exposure we've developed a suite of CDO products***.

292.     During the "breakout session" of the conference, McGraw touted the Company's ability to rate complex CDOs and conduct ongoing surveillance:

> ***No, it's -- you're going to see the continued trend towards surveillance or relationship basis.  Now, one of the things that we want to do in anything that we're about is you want to be able to know where things have a potential of being more volatile and volatility is something you want to get after right away***.

> \*     \*     \*

> The explosion of instrumentation and all that allows you now, with that kind of complexity, to really go deep in terms of risk management and some of the skill sets associated with that.  And you don't want to be so transaction focused, these are going to be very complex deals.

> ***It is going to take a lot of scrutiny and you want to have a relationship with that issuer and with that investment for a longer period of time to continue to track the risk profile associated with that, especially when you start talking about the collateralized debt obligation market***.

> ***These are huge instruments as we all know, and they contain a lot of things to it and you need to continue to measure***.  You can't go up and then down and get up the curve again and down.  It's just too risky.  You have to have a much more

relationship format to it.

293.    On April 25, 2006, McGraw-Hill issued a press release entitled "The McGraw-Hill Companies Reports First Quarter EPS of $0.20, Including $0.04 Charge for Ending Restoration Stock Option Program; Revenue Increases by 10.9%," which stated in relevant part:

> The McGraw-Hill Companies (NYSE: MHP) today reported diluted earnings per share from continuing operations of $0.20 for the first quarter of 2006, which includes the recently announced one-time charge of $0.04 for the elimination of the restoration stock option program.  The first quarter results also reflect incremental stock-based compensation of $0.04.  Net income for the first quarter of 2006 was $74.2 million. Revenue for the first quarter of 2006 increased 10.9% to $1.1 billion.
>
> ***"Financial Services is normally the key contributor to our first quarter due to the seasonality affecting education and advertising and that is the case again this year," said Harold McGraw III, chairman, president and chief executive officer of The McGraw-Hill Companies.***
>
> <div align="center">*        *        *</div>
>
> Financial Services: "Revenue for this segment increased 9.6% in the first quarter to $600.0 million compared to the same period last year.  Excluding the prior year's revenue of $33.5 million from Corporate Value Consulting, which was sold at the end of September 2005, and the current year's revenue from Vista Research (acquired April 1, 2005) and CRISIL, Ltd., (majority interest acquired on June 1, 2005), revenue for the first quarter grew by 13.7% on a non-GAAP basis.  Of the non-GAAP revenue growth, 52.0% was produced by structured finance, and 22.9% came from corporate and government ratings.
>
> <div align="center">*        *        *</div>
>
> "Both U.S. and international ratings grew at double-digit rates in the first quarter.  Despite a slow start in the European market after a strong finish last year, international ratings accounted for 35.6% of ratings revenue in the first quarter versus 35.8% for the same period a year ago.
>
> "In the robust structured finance market, all U.S. asset classes contributed to growth.  Buoyed by favorable market conditions, the U.S. residential mortgage-backed and commercial mortgage-backed securities markets continued to expand.  The asset-backed securities market benefited from increased activity in the credit card sector and the U.S. collateralized debt obligation market was strong.
>
> <div align="center">*        *        *</div>
>
> "In the U.S., total new issue dollar volume was up 15.9%.  Corporate new issuance increased 22.1%.  Public finance declined by 25.7%.  ***Mortgage-backed securities issuance grew by 16.4%***. Asset-backed securities were up 27.9% ***while collateralized***

<div align="center">164</div>

***debt obligations issuance was up 75.4%***.  In Europe, new issue dollar volume was
up 15.8%.

\*        \*        \*

The Outlook: "We are encouraged by our start this year, which reinforces our
confidence in the earnings guidance that was provided at the end of January.
Excluding the expensing of stock options, we still expect earnings per share of $2.36
to $2.41 in 2006. With more robust market opportunities taking shape next year, we
expect to return to double-digit earnings growth in 2007."

294.    On April 28, 2006, the Company filed its interim quarterly financial report on Form

10-Q for the quarter ending March 31, 2006.  The financial results reported in the 10-Q were

substantially similar to those reported in the Company's April 25, 2006 press release.  The Form 10-

Q was signed by Bahash, and contained required Sarbanes-Oxley certifications signed by McGraw

and Bahash stating that the Form 10-Q did not include any material misrepresentations.   In

discussing what drove McGraw-Hill's improved financial performance, the April 28, 2006 10-Q

stated, in relevant part:

In the first quarter of 2006, the Company achieved growth in revenue and operating
profit of 10.9% and 5.2%, respectively. ***The increase in revenue is primarily
attributable to growth in the Financial Services segment*** and the 2005 acquisition of
J.D. Power and Associates, which contributed $52.7 million and $43.8 million to the
growth in revenue, respectively.

\*        \*        \*

***Financial Services revenue and operating profit increased substantially over first
quarter 2005 results***, despite the negative effect of foreign exchange rates of $8.1
million on revenue and a $2.4 million on operating profit.

\*        \*        \*

***The Financial Services segment's increase in revenue and operating profit was
due to the performance of structured finance*** and corporate (industrial and financial
services) and government ratings, which represented approximately 69.6% and
30.7%, respectively, of the growth in revenue.  Growth in first quarter revenue was
reduced by 63.6% from the divestiture of CVC.  In the U.S., growth was experienced
across all asset classes in structured finance.  The issuance of U.S. residential
mortgage-backed securities (RMBS), commercial mortgage-backed securities
(CMBS) and collateralized debt obligations (CDOs) remained strong due to
favorable market conditions.  Mortgage rates were within historical norms and at
levels that kept home purchase and improvement activity and debt consolidation

robust. Commercial real estate fundamentals and investor demand for these securities also remained strong. The growth in corporate finance ratings was attributable to increases in industrial issuance, driven primarily by the market's favorable financing conditions and healthy merger and acquisition (M&A) activity.

<p align="center">*       *       *</p>

Total U.S. structured finance new issue dollar volume increased 24.1%. U.S. CDO issuance increased 75.4%, according to Harrison Scott Publications and S&P's internal estimates (Harrison Scott Publications/S&P). The U.S. CDO market was driven by new structures (hybrids) and arbitrage opportunities within the cash flow and synthetic sectors. U.S. CMBS issuance increased 53.2% over the prior year driven by strong investor demand, strong commercial origination trends, and issuers coming to market in anticipation of higher interest rates. U.S. RMBS issuance increased 11.3%, driven by the sub-prime and affordability products and home equity sectors as these products are less sensitive to increases in interest rates. Mortgage rates, albeit rising, remained within historical norms and were low enough to keep home purchase and improvement activity and the debt consolidation market healthy.

<p align="center">*       *       *</p>

In Europe for the first quarter, RMBS was the strongest sector of issuance, representing 60.6% of total European structured finance issuance. Overall, European structured finance market grew modestly in the first quarter after coming off a strong fourth quarter of 2005. CDO issuance was driven by a surge in cash CDO deals and the market for collateralized loan obligations (CLOs) was robust. European corporate issuance was up in the first quarter due to solid M&A activity and opportunistic issuance in anticipation of further increases in interest rates by the European Central Bank.

<p align="center">*       *       *</p>

*The market for credit ratings as well as research, investment advisory and broker-dealer services is very competitive. The Financial Services segment competes domestically and internationally on the basis of a number of factors, including quality of ratings, research and investment advice, client service, reputation, price, geographic scope, range of products and technological innovation.*

<p align="center">*       *       *</p>

The Company maintains disclosure controls and procedures that are designed to ensure that information required to be disclosed in the Company's reports filed with the Securities and Exchange Commission (SEC) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including its Chief Executive Officer (CEO) and Chief Financial Officer (CFO), as appropriate, to allow timely decisions regarding required disclosure.

<p align="center">166</p>

As of March 31, 2006, an evaluation was performed under the supervision and with the participation of the Company's management, including the CEO and CFO, of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) under the U.S. Securities Exchange Act of 1934). Based on that evaluation, the Company's management, including the CEO and CFO, concluded that the Company's disclosure controls and procedures were effective as of March 31, 2006.

295.    In response to the April 25, 2006 press release and the April 28, 2006 Form 10-Q, the Company's stock price declined slightly on an average volume of nearly 3 million shares traded, from a close of $56.25 on April 25, 2006 to a close of $55.66 on April 28, 2006.  But for Defendants' false and misleading statements, the Company's stock price would have declined more over this same period.

296.    The statements referenced in ¶¶290-94 were each materially false and misleading when made for the reasons set forth in ¶256 and the factual detail contained throughout this Complaint.  In addition, the statements referenced in ¶¶290-94 were each false and misleading when made as they misrepresented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The true facts, which were then known to or recklessly disregarded by each of the Defendants, were:

- While it was true that "issuers and investors [were] turning to Standard & Poor's" for CDO ratings, they were doing so because Defendants were willing to cater to issuer demands and compromise criteria and ratings quality in the name of lucrative fees associated with rating those deals.

- The Company's "fleet of CDO products" was outdated and ineffective, and when it was updated, the Company did not employ it to re-rate existing deals because doing so would have led to ratings downgrades and loss of market share.

- By 2006, S&P knew its ratings of RMBS and CDOs were inaccurate, and some within S&P revised the Company's ratings models to produce more accurate ratings. The Company however, utilized grandfathering and refused to use the revised models to re-evaluate existing RMBS and CDO securities, delaying thousands of ratings downgrades and allowing those securities to carry inflated ratings that misled investors and the market.

- The Company was not producing "[i]ndependent and objective information" and "[r]espect for the integrity of information" had long ago ceased to be a "part of the company's makeup." Indeed, internal Company documents during the Class Period

demonstrate that the Company was ready, willing, and able – and did – sacrifice the integrity of information, models, criteria, and surveillance in order to not kill the golden goose that was structured finance ratings fees.

297.    On June 21, 2006, McGraw and Rose participated in the Newspaper Association of America 2006 Mid-Year Media Review Conference on behalf of the Company. During the conference, McGraw made statements lacking a reasonable basis concerning the sustainability of the Company's financial services growth and business prospects. For example, McGraw stated:

> *There's nothing temporary about the growth in financial services. In the last 10 years, the segment's revenue grew at a compound annual growth rate of 13%. In that same period, operating profits grew at a compound annualized rate of 16.9%.*
>
> *In 2006 we expect another double-digit growth year in revenue and in operating profit*, excluding the impact of the divestiture of CVC and the stock-based compensation. *Growth will continue in 2006 because of our geographic and product diversification and continued strong growth in international markets.*
>
> In ratings alone, we have significantly diversified the revenue stream in the last decade. In 1994 international revenue represented 21% of ratings. At the end of last year, it was 37% of the mix. In 1994 non-traditional products and services such as bank loan ratings accounted for only about 8% of revenue. By 2005 non-traditional products and services were 22%. In 1994 60% of ratings revenue was dependent upon debt transactions and now that number has been ranging between 45% and 50% due to increasing levels of fee diversification and the introduction of products and services that aren't dependent on new issuance.
>
> *As we move through the second quarter, the pipeline for the U.S. residential mortgage-backed securities market looks very good*, but we do anticipate a decline in the second half when year-over-year comparisons could be somewhat tougher. We will continue to see strength in the issuance of both the U.S. commercial mortgage-backed security market, as well as collateralized debt obligations, CDOs.
>
> \*       \*       \*
>
> Securitization has been one of the most important growth drivers in recent years. Our ability to provide a rating to the proliferation of structured instruments adds another dimension to our growth, as well as to our diversification.

298.    As the conference continued, Rose made additional false and misleading statements:

> While the need to be efficient in the use of capital is the driving long-term need behind structured finance, there are three key trends that have pushed the market in the recent past and continue in 2006 -- first, globalization; second, the growing sophistication of the market, which has led to many new types of transactions, customization and even greater financial efficiency; and third, historically low

interest rates. *Since any structured finance transaction involves complex structures and the transfer of complex credit risks, the key to a successful transaction is an independent and objective analysis of both the structure and the credit risk and it is in this function that Standard & Poor's structured finance ratings have excelled*.

\*          \*          \*

Since that time, several factors have led to a rising investor acceptance of a new crop of CDOs and other similar structures. First, beginning in 2003, corporate credits stabilized and actually began to improve, but more importantly, tight spreads in corporate bonds and a lack of diverse-enough supply of corporate bonds caused both the arrangers and the investors for the first time to look to asset-backed, mortgage-backed and even other CDOs as assets for these vehicles.

This market opened-- this opened the market to investors who were interested in the stability and extra yield that were provided by the underlying structured assets. In addition, we began to see a lot of customization and that was enabled by the synthetic structures that evolved in those years.

*As investors have become more sophisticated in their understanding of financial engineering techniques, the CDO market has continued to grow and we have seen a wave of innovation which includes synthetic structures, credit default swaps, CDOs of commercial real estate, hybrid CDOs and even CDOs-squared, which are CDOs of CDOs. We expect to see continued development and growth in these new types of assets. Moreover, since these transactions are very high in level of complexity, a Standard & Poor's rating is very desirable to both issuers and investors.*

The third key trend that has been continuing is the historically low interest rate environment we have been experiencing. Nowhere has this effect been more felt than the market for securities backed by residential mortgages. Here I'm talking about global issuance, excluding the U.S. government-sponsored mortgage agencies.

Historically low interest rates have led to a massive wave of refinancing of existing mortgages and new home purchases in the United States, United Kingdom and Australia, and many other countries. This, in turn, has generated a high volume in the RMBS market, since a very large percentage of residential mortgages in all of these countries are securitized.

But while low interest rates have been the main story, they are not the only story. We have also observed an increasing securitization rate in the residential arena. This means that a greater percentage of the mortgages originated are actually winding up in securitized transactions and off the balance sheets of financial institutions.

*But most importantly, innovation is driving growth of this market. Residential mortgage securities have been used as collateral in CDOs, thereby increasing demand for these securities. There has also been a proliferation of innovative mortgage products in these markets and this has made mortgages available to an*

*even-larger number of people.*

*The next slide shows the growth in volume of these new mortgage products -- hybrids ARMs, 40-year amortization loans, negative amortization loans, silent seconds, interest-only loans, insured products and floating-rate mortgages have increased the volume of new mortgages and the complexity of analyzing the structured finance transactions. This has led to a higher demand for our ratings on all types of RMBS transactions.*

*Now leadership in the structured finance market is built on two pillars -- credibility and service. Credibility comes from the performance of your ratings over time and is built slowly but could be lost quickly. Service is delivering to the markets the most informative ratings and other credit-risk evaluation services at the time and in the manner that the markets need them.*

*We strive for excellence on both these measures. For example, we have a dedicated surveillance unit to oversee the continuing credibility of all of our ratings. All ratings are regularly reviewed by our surveillance group who back-test our ratings to show their credibility over time. Each year we publish a study that shows defaults and transitions for the entire market to see.*

When we talk about service, we are talking about providing a quality experience for each market participant who interacts with us. That means having well-trained, accessible, experienced staff that can handle the complex analysis these transactions require and then communicate the results. **This means publishing our criteria so that the market can see and understand how we look at those transaction.** That means having the information that the participant is looking for, when they need it, in the form they want it.

*We believe that we are second to none in the scope and quality of our staff and the information we provide to the structured finance market. Our leadership in the structured finance market continues to evolve through our new product offerings such as LEVELS*, SPIRE, CDS Accelerator, CDS Xpress and CDOI.

*LEVELS provides loan-level risk analysis based on our residential mortgage ratings criteria and determines the credit enhancement required for securitizations. It enables issuers to perform best execution analysis, which leads to faster, better informed decisions on origination. It is the market leader.*

SPIRE also improves the quality of execution. It is the same cash flow model used by our analysts. It evaluates potential securitization structures with our criteria, as well as alternative scenarios. Since its launch last fall, it is has gained steady market acceptance.

CDS Accelerator and CDS Xpress enable participants in the synthetic or credit derivatives market to reduce execution risk by quickly and accurately analyzing new and existing CDO transactions by linking our CDO analysis, criteria and ratings data.

Standard & Poor's structured finance ratings strategy is to maintain our leadership position by responding to the trends of globalization and innovation in this rapidly growing market. *The strategy is focused on leveraging Standard & Poor's brand, our overwhelming recognition for quality, independence and objectivity, our global network and, most importantly, our most valuable asset, our employees*.

*I'm very excited about the long-term prospects of Standard & Poor's structured finance ratings. Governments, regulators, financial institutions and corporations all over the world are seeing the benefits of structured finance and why not? Structured finance has proven to be a reliable, highly flexible financing tool*.

Thank you very much for your attention.

299.    On July 25, 2006, McGraw-Hill issued a press release entitled "The McGraw-Hill Companies Reports Second Quarter EPS of $0.60, a 17.6% Increase," which stated, in relevant part:

"*Record results at Financial Services*, a solid performance in the U.S. college and university market, and effective cost containment were key to our second quarter," said Harold McGraw III, chairman, president and chief executive officer of The McGraw-Hill Companies. "As a result, our operating margin improved to 25.8%, up from 23.6% for the same period last year.

\*        \*        \*

*Financial Services: "Revenue for this segment increased 13.4% in the second quarter to $677.3 million compared to the same period last year*. Excluding the prior year's revenue of $34.8 million from Corporate Value Consulting, which was sold at the end of September 2005, and April and May revenue of $8.1 million from CRISIL, Ltd. (majority interest acquired on June 1, 2005), revenue for the second quarter grew by $106.6 million on a non-GAAP basis. *Of the non-GAAP revenue growth, 38.6% was produced by structured finance* and 34.8% came from corporate and government ratings.

"Including the incremental expenses of $6.3 million for stock-based compensation in the second quarter, *the segment's operating profit increased 21.5% to $313.9 million*. Corporate Value Consulting contributed approximately $7.5 million to operating results in the second quarter of 2005.

"*Strong double-digit growth for ratings in the U.S. and international markets helped Financial Services set new records for revenue and operating profit in the second quarter. International ratings accounted for 37.4% of ratings revenue in the second quarter versus 36.7% for the same period a year ago*.

"*Strength in global structured finance was again a key factor* as all asset classes contributed to the year-over-year improvement. *Particularly noteworthy was the activity in U.S. Collateralized Debt Obligations, which was driven by leveraged loans for mergers and acquisitions, new hybrid structures and arbitrage opportunities. And, while dollar volume issuance in U.S. Residential Mortgage-*

*Backed Securities market declined by 1.2% in the second quarter, we benefited from an 8.6% pick up in the number of deals coming to market and solid gains in more active overseas markets.*

\*          \*          \*

"In the U.S., total new issue dollar volume was up 16.7%. Corporate new issuance was up 54.7%. Public finance declined by 6.8%. Mortgage-backed securities were off 0.7%. Asset-backed securities were down 12.5%, *while collateralized debt obligations were up 162.0%*. In Europe, new issue dollar volume was up 1.7%.

\*          \*          \*

*The Outlook: "Based on the strength of our first half performance, we are raising our guidance for the year*.

"Our previous guidance called for earnings per share of $2.36 to $2.41, excluding the incremental impact of all stock-based compensation.

"Our new guidance for 2006 improves the full-year forecast by $0.08. Therefore, we now expect EPS for 2006 of $2.44 to $2.49 excluding the incremental impact of all stock-based compensation ($0.13 for incremental stock-based compensation and $0.04 for the one-time charge for the elimination of the restoration stock option program in the first quarter).

*"With more robust opportunities taking shape next year, we expect to return to double-digit earnings growth in 2007."*

300.    Also on July 25, 2006, McGraw-Hill hosted a conference call to discuss its second quarter 2006 earnings and outlook. The Individual Defendants participated in the call on behalf of the Company. During the call, numerous false and misleading statements were made that were designed to artificially inflate the Company's stock price. For example, McGraw stated:

In the U.S. residential mortgage-backed securities market, we saw the first signs in the second quarter that new issue volume was softening a little bit. Now these are the comparisons, year-over-year comparisons softening a little. New issue dollar volume for the U.S. residential mortgage-backed securities slipped by 1.2% in the second quarter. But these figures, like the estimates for the gross domestic product, are regularly updated. Frequently the estimates grow, *so I don't take today's figures as the last word on market activity here*. Rating smaller deals is a plus for Standard & Poor's, *so we benefited in the second quarter from an 8.6% increase in the number of U.S. residential mortgage-backed security issues. We also benefited from a 20% increase in residential mortgage-backed securities dollar volume issuance in Europe in the second quarter*. We also enjoyed solid growth in the U.S. commercial mortgage-backed securities market, *but the major factors in structured*

*finance in the second quarter were U.S. collateralized debt obligations, CDOs.*

*New issue dollar volume for U.S. collateralized debt obligations grew by 162%. Collateralized debt obligations are an excellent example of the financial market's ability to innovate by pooling bonds and loans and derivatives that are then split into tranches with varying risk profiles for various investor audiences.*

What emerges are collateralized debt obligations that are based on cash flow, which are backed by the actual bonds, loans or asset-backed securities, synthetics backed by derivatives, or some combination of both called hybrids. *Strong growth in collateralized debt obligations throughout 2006 has been driven by a number of positive factors, including robust debt origination in areas like leveraged loans, residential mortgage-backed securities, commercial mortgage-backed securities which are used to create pools of available loans to be put into these large baskets, these collateralized debt obligation structures.* Strong investor demand as CDOs provide opportunities for higher yields in a low interest rate environment and diversification across credit. And attractive arbitrage opportunities for issuers and investors to transfer specific risks or to take advantage of spreads between asset income and liability funding costs. The asset-backed securities market softened because of a sharp decline in auto loan issuance, but we did see strong pickup in activity in the credit card receivable end and student loan sectors.

301.    As the call continued, McGraw warned of softening in the U.S. RMBS market, but

omitted material facts when he also stated:

Our optimism is based on continued strength in international ratings, as well as products and services that are not tied to new issuance. There are tougher comparisons ahead in the U.S. residential mortgage-backed securities markets, which enjoyed a spectacular second half as we all know in 2005. Residential mortgage-backed securities growth continued into the second quarter this year, and the U.S. residential mortgage-backed securities dollar volume issuance is up 13.5% for the first half of 2006.

We still have a very good pipeline of business heading into the third quarter, but probably not enough to expect year-over-year growth in the face of the challenging comparisons. We now expect U.S. residential mortgage-backed security issuance to decline by about 5% in 2006. But in Europe we expect the residential mortgage-backed securities and the commercial mortgage-backed securities markets to show year-over-year growth in the second half. Prospects for the U.S. commercial mortgage-backed securities, asset-backed securities and public finance look a little soft to us right now. *But the pipeline for U.S. collateralized debt obligation issuance, CDOs, remains very strong, very strong indeed.*

302.    McGraw also discussed the invaluable nature of S&P's reputation:

*Standard & Poor's has been rating bonds since 1916, so the market knows our capability and our reputation very well. The integrity, reliability and credibility of S&P has enabled us to compete successfully in an increasingly global and complex*

*market, and that is true today and we are confident it will be so in the future.*

303.   Later in the call, McGraw stated that the CDO market was "red hot" and "doing extremely well," and stated:

> On CDOs, it is really right across the board. The whole structured finance market or the securitized market is the desired choice of most investors, most financial institutions, because it gives them more options in terms of being able to specifically tailor their investment portfolios to components that they need. So, with the collateralized debt obligation market, you are able to have a lot of flexibility in the multitude of tranches that you can take advantage of, and these are very large, very complex instruments. And, therefore, I would expect those to continue.

304.   On July 28, 2006, the Company filed its interim quarterly financial report on Form 10-Q for the quarter ending June 30, 2006. The financial results reported in the 10-Q were substantially similar to those reported in the Company's July 25, 2006 press release. The Form 10-Q was signed by Bahash, and contained required Sarbanes-Oxley certifications signed by McGraw and Bahash stating that the Form 10-Q did not include any material misrepresentations. In discussing what drove McGraw-Hill's improved financial performance, the July 28, 2006 10-Q stated, in relevant part:

> *In the second quarter of 2006, the Company achieved growth in revenue and operating profit of 4.9% and 14.9%, respectively. The increase in revenue is primarily attributable to growth in the Financial Services segment*. Foreign exchange rates had minimal impact on revenue or operating profit during the second quarter.
>
> *           *           *
>
> *Service revenue increased 11.0% in the second quarter of 2006, due primarily to a 13.4% increase in Financial Services revenue* and the acquisition of JDPA. *Financial Services revenue increased primarily due to the performance of structured finance ratings* and corporate (corporate finance and financial services) and government finance ratings; somewhat offset by the divestiture of the Corporate Value Consulting (CVC) business which contributed $34.8 million to 2005 second quarter revenue. Issuance in structured finance was mixed in the second quarter, *U.S. collateralized debt obligations (CDOs) issuance was up*, while issuance of U.S. residential mortgage-backed securities (RMBS) and commercial mortgage-backed securities (CMBS) were down. . . .
>
> *           *           *

Financial Services revenue and operating profit increased substantially over the second quarter of 2005.

<p style="text-align:center">*      *      *</p>

The Financial Services segment's increase in revenue and operating profit was due to the performance of structured finance and corporate (industrial and financial services) and government ratings, which represented approximately 51.5% and 46.4%, respectively, of the growth in revenue [ . . . .]  Issuance in structured finance was mixed in the second quarter, as issuance of U.S. collateralized debt obligations (CDOs) and commercial mortgage-backed securities (CMBS) was up, while issuance of U.S. residential mortgage-backed securities (RMBS) was down.  CDO issuance was driven by growth in leveraged loans related to merger and acquisition (M&A) activity, new structures (hybrids) and arbitrage opportunities within the cash flow and synthetic sectors. . . .

<p style="text-align:center">*      *      *</p>

Total U.S. structured finance new issue dollar volume increased 10.0%. U.S. ***CDO issuance increased 162.0%, according to Harrison Scott Publications and S&P's internal estimates (Harrison Scott Publications/S&P)***.  Driven by investor demand and origination levels, U.S. CMBS issuance increased 2.8%.  ***Despite a decline in RMBS issuance dollar volume the number of issues was up.  RMBS issuance was driven by home equity products***.  The Mortgage Bankers Association currently forecasts mortgage originations to decline 18% in 2006 as mortgage rates continue to increase. . . .

<p style="text-align:center">*      *      *</p>

In the U.S., growth in issuance was experienced across most asset classes in structured finance.  ***The issuance of U.S. residential mortgage-backed securities (RMBS), commercial mortgage-backed securities (CMBS) and collateralized debt obligations (CDOs) remained strong due to favorable market conditions. Mortgage rates were within historical norms and at levels that kept refinancing and debt consolidation robust.***  Commercial real estate fundamentals and investor demand for these securities also remained strong. The growth in corporate issuance was attributable to increases in industrial issuance, driven primarily by the market's favorable financing conditions and healthy merger and acquisition (M&A) activity.

Total U.S. structured finance new issue dollar volume increased 20.0%. U.S. CDO issuance increased 107.5%, according to Harrison Scott Publications and S&P's internal estimates (Harrison Scott Publications/S&P). The U.S. CDO market was driven by growth of leveraged loans related to M&A activity, new structures (hybrids) and arbitrage opportunities within the cash flow and synthetic sectors. U.S. CMBS issuance increased 26.7% over the prior year driven by strong investor demand, strong commercial origination trends, and issuers coming to market in anticipation of higher interest rates. U.S. RMBS issuance increased 13.5%, driven by the home equity sector as these products are less sensitive to increases in interest rates. Mortgage rates, albeit rising, remained within historical norms and were low

<p style="text-align:center">175</p>

enough to keep home purchase and improvement activity and the debt consolidation market healthy. However, as mortgage rates continue to increase, the rate of home price appreciation levels off, and as sub-prime lenders tighten lending standards for affordability products, RMBS issuance is anticipated to decline. . . .

\*    \*    \*

***The market for credit ratings as well as research, investment advisory and broker-dealer services is very competitive. The Financial Services segment competes domestically and internationally on the basis of a number of factors, including quality of ratings, research and investment advice, client service, reputation, price, geographic scope, range of products and technological innovation***.

\*    \*    \*

The Company maintains disclosure controls and procedures that are designed to ensure that information required to be disclosed in the Company's reports filed with the Securities and Exchange Commission (SEC) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including its Chief Executive Officer (CEO) and Chief Financial Officer (CFO), as appropriate, to allow timely decisions regarding required disclosure.

As of June 30, 2006, an evaluation was performed under the supervision and with the participation of the Company's management, including the CEO and CFO, of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) under the U.S. Securities Exchange Act of 1934). Based on that evaluation, the Company's management, including the CEO and CFO, concluded that the Company's disclosure controls and procedures were effective as of June 30, 2006.

305.    In response to the July 25, 2006 press release and the July 28, 2006 Form 10-Q, the Company's stock price increased dramatically – by more than 12% from a close of $50.40 on July 24, 2006 to closing prices of $54.32 on July 25, 2006 and $56.30 on July 31, 2006, as reflected in the chart below:



306. The statements referenced in ¶¶297-304 were each materially false and misleading when made for the reasons set forth in ¶256 and the factual detail contained throughout this Complaint. In addition, the statements referenced in ¶¶297-304 were each false and misleading when made as they misrepresented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading. The true facts, which were then known to or recklessly disregarded by each of the Defendants, were:

- By 2006, S&P knew its ratings of RMBS and CDOs were inaccurate, and some within S&P revised the Company's ratings models to produce more accurate ratings. The Company however, utilized grandfathering and refused to use the revised models to re-evaluate existing RMBS and CDO securities, delaying thousands of ratings downgrades and allowing those securities to carry inflated ratings that misled investors and the market.

- The growth in Financial Services was most certainly temporary as it was fueled by Defendants' fraudulent scheme to achieve and preserve market share at all costs. This created an unsustainable set of circumstances where the Company's willingness to slap AAA stamps of approval on toxic assets was bound to catch up to it eventually, resulting in the evisceration of the Company's ratings, reputation, and

177

financial performance in Financial Services.

- The pipeline for the US RMBS market was anything but "very good." Rather, according to the Company's internal documents, approximately 76% of 2006 RMBS issuance was comprised of subprime and Alt-A mortgages. At least 93% of all such assets included in deals rated AAA by S&P during 2006 have been downgraded to junk status.

- The Company's ratings models were ill-equipped to deal with the "wave of innovation" in the structured finance market. What Defendants hid from the market was that the Company knew it was completely incapable of accurately rating or understanding the performance of the exotic deals it was rating, which were made up of toxic loans such as hybrids, ARMS, negative amortization loans, and the like.

- Defendants were certainly "leveraging Standard & Poor's brand" and its "recognition for quality, independence and objectivity." Indeed, they were leveraging it against short-term, lucrative fees that depended upon the performance of toxic assets the Company and its employees knew were destined for failure. Defendants knew the Company's integrity was poised to be washed away in a sea of materially delayed downgrades.

307. On September 20, 2006, McGraw-Hill participated in the Goldman Sachs Communacopia XV Conference. Bahash participated in the conference on behalf of the Company. During the conference, Bahash made several false and misleading statements designed to artificially inflate the Company's stock price. For example, Bahash stated:

> In assessing the current outlook, ***Financial Services continues to show strength and may actually do a little bit better than we had originally anticipated***. We are seeing ***substantial strength*** in the global issuance of commercial mortgage-backed securities and ***collateralized debt obligations***. Corporates in both the U.S. and Europe are doing very well too.

> We also are seeing the expected slowdown in the rate of growth in U.S. residential mortgage-backed securities issuance that we hadn't mentioned earlier.

> \*     \*     \*

> ***We continue to see very significant growth in the CDO market,*** CMBS, the securitization in terms of derivative side of the equation, credit default swaps, clearly outside the U.S. are very, very significant to us. ***So those are particular areas that are growing rather dramatically***.

> I think also we're seeing significant growth in bank loan ratings, the nontraditional side, counterparty risks ratings, rating evaluation services. So I think the one area that gets the most attention with regard to perhaps fluctuations would be the residential mortgage-backed securities market. ***And clearly as I mentioned we are***

178

*seeing a slowdown there. But we right now are thinking that roughly 10% to 12% decline is what we expect for 2006, and early on -- and this is really on -- but we are expecting a decline in that same range for 2007, so not a significant impact.*

308.    The statements referenced in ¶307 were each materially false and misleading when made for the reasons set forth in ¶256 and the factual detail contained throughout this Complaint. In addition, the statements referenced in ¶307 were each false and misleading when made as they misrepresented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The true facts, which were then known to or recklessly disregarded by each of the Defendants, were:

- By 2006, S&P knew its ratings of RMBS and CDOs were inaccurate, and some within S&P revised the Company's ratings models to produce more accurate ratings. The Company however, utilized grandfathering and refused to use the revised models to re-evaluate existing RMBS and CDO securities, delaying thousands of ratings downgrades and allowing those securities to carry inflated ratings that misled investors and the market.

- The significant growth the Company was seeing in the CDO market was a ruse because it depended upon the continuation of Defendants' fraudulent scheme, which required outdated models, stale data, inadequate staffing, grandfathering, and a willingness to rate deals that were not likely to perform.

309.    On October 19, 2006, the Company issued a press release entitled "The McGraw-Hill Companies Reports Third Quarter EPS of $1.06, a 6% Increase; Raises Earnings Guidance for 2006," which stated, in relevant part:

"Net income for the third quarter was $382.3 million. Revenue was up 0.8% to $2.0 billion versus the same period last year.

"***Record results at Financial Services*** and stringent cost management in the face of a softer education market this year ***were key factors in our third quarter***," said Harold McGraw III, chairman, president and chief executive officer of The McGraw-Hill Companies.

*       *       *

***Financial Services: "Revenue for this segment increased 11.4% to $675.1 million compared to the same period last year*** [. . . .] Of the non-GAAP revenue growth, 48.3% was produced by structured finance and 21.6% came from corporate and government ratings.

179

"Including the incremental expenses of $8.0 million for stock-based compensation in the third quarter, *the segment's operating profit increased 17.3% to $295.7 million*.

      \*      \*      \*

*"The global pacesetter again was structured finance.* Growth in cash flow and synthetic Collateralized Debt Obligations increases in Commercial Mortgage-Backed Securities due to favorable interest rates, strength in commercial mortgage originations and strong leveraged loan activity were key factors in the structured finance market.

*"Dollar volume issuance in the U.S. Residential Mortgage-Backed Securities market fell again, declining 11.2% in the third quarter after slipping by 1.2% in the second quarter. But we continued to benefit from an increase in the number of deals, up 1.7% in the third quarter, and from more active Residential Mortgage-Backed Securities issuance in international markets.*

      \*      \*      \*

*The Outlook:* "*Based on our record of achievement for the first nine months, we are raising our guidance for the full year*.

"Our previous guidance called for diluted earnings per share of $2.44 to $2.49 excluding the incremental impact of all stock-based compensation. That excluded $0.13 for stock-based compensation and $0.04 for the one-time charge for the elimination of the restoration stock option program in the first quarter.

"The new guidance calls for diluted earnings per share of $2.53 to $2.55 excluding the incremental impact of all stock-based compensation and restructuring charges. The incremental impact of stock-based compensation has been revised to $0.11, down from $0.13 estimated at the start of the year. For 2007, we fully expect to achieve double-digit earnings growth."

310.    Also on October 19, 2006, McGraw-Hill hosted a conference call to discuss its third quarter 2006 earnings and outlook. The Individual Defendants participated in the call on behalf of the Company. During the call, numerous false and misleading statements were made that were designed to and, in fact, did artificially inflate the Company's stock price. For example, McGraw stated:

In looking at the fourth quarter, *the structured finance pipeline still looks very healthy*. We expect strength in the collateralized debt obligation, *a very large market and getting better*, and the commercial mortgage-backed securities markets, which we have seen for the last couple of years now gaining strength. U.S. residential mortgage-backed security issuance in the fourth quarter is expected to decline, the year-over-year comparisons. The absolute volume is still quite high.

Corporates still looks very solid, and again, both here and outside of the United
States. And the leveraged loan market will continue to be strong and international
issuance looks very good.

311.     Later in the call, in response to a question from a JP Morgan analyst, McGraw stated:

Yes, thanks, Fred. *In the structured finance market, obviously, it has been strong
for the last several years and it's going to continue to be strong. And the good part
is that it continues to gain strength outside the United States.* As we were saying in
just some of the issuance numbers, the issuance for collateralized debt obligations,
which is very large and in a big area, was up almost 120%, and it was up -- new issue
dollar volume in Europe was up roughly 52%. *So it's very, very strong. We
continue to benefit*, obviously, from the shift there.

*Now remember, on the residential mortgage-backed securities market, even though
we're seeing year-over-year declines a little bit in the third and fourth quarter, it is
still very large. Overall, in 2006 in the residential mortgage-backed market, we
sold $1.2 trillion of new issuance, and that's in the U.S. alone. So it is very large
and it continues to grow very strong*, and the residential mortgage-backed market in
Europe is also doing -- is growing very nicely and is doing really well. So that,
overall, *the structured finance market is strong and it's going to continue to stay
strong*. We'll see the year-over-year comparisons in residential start to decline a
little bit, actually for the full year. I expect it to be flat to probably even positive,
given where we see the pipeline.

On the commercial mortgage-backed market, you're going to see the continued
strong increases that we have been seeing since last year. On the asset-backed, a little
bit softer on the asset-backed, but again, the CDO market and the collateralized loan
obligation market are going to continue strong.

312.     On October 27, 2006, the Company filed its interim quarterly financial report on

Form 10-Q for the quarter ending September 30, 2006. The financial results reported in the 10-Q

were substantially similar to those reported in the Company's October 19, 2006 press release. The

Form 10-Q was signed by Bahash, and contained required Sarbanes-Oxley certifications signed by

McGraw and Bahash stating that the Form 10-Q did not include any material misrepresentations. In

discussing what drove McGraw-Hill's improved financial performance, the October 27, 2006 10-Q

stated, in relevant part:

*In the third quarter of 2006, the Company achieved growth in revenue and
operating profit of 0.8% and 2.8%, respectively. The increase in revenue is
primarily attributable to growth in the Financial Services segment*.

*     *     *

*Service revenue increased 10.7% in the third quarter of 2006, due primarily to an 11.4% increase in Financial Services revenue. Financial Services revenue increased primarily due to the performance of structured finance ratings* and corporate (corporate finance and financial services) and government finance ratings; somewhat offset by the divestiture of the Corporate Value Consulting (CVC) business which contributed $33.0 million to 2005 third quarter revenue. *Issuance in structured finance was mixed in the third quarter, U.S. collateralized debt obligations (CDOs) and commercial mortgage-backed securities (CMBS) issuance was up, while issuance of U.S. residential mortgage-backed securities (RMBS) were down*. . . .

*     *     *

*The Financial Services segment's increase in revenue and operating profit was due to the performance of structured finance* and corporate (industrial and financial services) and government ratings, which represented approximately 71.3% and 31.9%, respectively, of the growth in revenue. Growth in third quarter revenue was reduced by 47.6% due to the divestiture of CVC. *Issuance in U.S. structured finance was mixed in the third quarter, as issuance of collateralized debt obligations (CDOs) and commercial mortgage-backed securities (CMBS) were up, while the issuance of U.S. residential mortgage-backed securities (RMBS) was down. CDO issuance was driven by strong investor demand for both the cash flow and synthetic sectors, fueled by more innovative structures, arbitraging opportunities* and growth of the Collateralized Loan Obligations (CLO) sector, which benefited from increases in leveraged loans related to merger and acquisition (M&A) activity. U.S. CMBS issuance increased on strong commercial real estate fundamentals, growth in origination levels and strong investor demand. *Residential housing market fundamentals have begun to weaken with home price appreciation slowing, inventories of unsold homes increasing and new housing starts declining, however issuance was favorably impacted by non-traditional mortgage loans being sold into the non-Agency markets and refinancing of Adjustable Rate Mortgages (ARMs) into fixed-rate product.* The growth in U.S. corporate issuance was attributable to increases in industrial and financial services issuance, driven primarily by the market's favorable financing conditions and healthy M&A activity. *The third quarter saw strong issuance in Europe for corporates and across all structured finance asset classes. Recurring surveillance activities and customers on annual arrangements had a positive impact on results in the third quarter of 2006.* Bank loan ratings showed strong growth in the quarter.

*Total U.S. structured finance new issue dollar volume increased 8.2%* according to Harrison Scott Publications and S&P's internal estimates (Harrison Scott Publications/S&P). *U.S. CDO issuance increased 118.7%*, and U.S. CMBS issuance increased 13.9%. *Despite an 11.2% decline in RMBS issuance dollar volume, the number of issues was up slightly*. The Mortgage Bankers Association currently forecasts mortgage originations to decline 20% in 2006. According to Thomson Financial Securities Data, U.S. corporate dollar volume issuance for the third quarter of 2006 increased 25.9%, while high yield issuance decreased 13.6%.

The high yield market was off as many issuers opted to finance in the leveraged loan market. Following a trend that began in December 2005, U.S. public finance issuance decreased in the third quarter of 2006.

*The third quarter saw continued growth in the European structured finance market. RMBS was the largest sector in terms of issuance, representing 50.6% of total European structured finance issuance*. The European securitization market remains strong, with the CMBS dollar volume issuance increasing 159.3% in the third quarter of 2006, after declining in the second quarter. *CDO issuance increased 122.9% due to strong growth within the cash flow sector*. European corporate issuance increased in the third quarter driven primarily by strong M&A activity.

<div align="center">*　　　*　　　*</div>

*In the first nine months of 2006, the Company achieved growth in revenue and operating profit of 4.4% and 6.8%, respectively. The increase in revenue is primarily attributable to growth in the Financial Services segment* and the 2005 acquisition of J.D. Power and Associates, which contributed $202.0 million and $61.1 million to the growth in revenue, respectively. Foreign exchange rates had no material impact on revenue or operating profit for the nine months ended September 30, 2006.

<div align="center">*　　　*　　　*</div>

*Service revenue increased 11.5% in the first nine months of 2006, due primarily to an 11.5% increase in Financial Services* and the acquisition of JDPA. *Financial Services increased primarily due to the performance of structured finance ratings* and corporate (corporate finance and financial services) and government finance ratings; somewhat offset by the divestiture of the Corporate Value Consulting (CVC) business which contributed $101.3 million to 2005 nine month revenue. *Strong growth in structured finance reflects continued favorable global market conditions*.

<div align="center">*　　　*　　　*</div>

*The market for credit ratings as well as research, investment advisory and broker-dealer services is very competitive. The Financial Services segment competes domestically and internationally on the basis of a number of factors, including quality of ratings, research and investment advice, client service, reputation, price, geographic scope, range of products and technological innovation*.

<div align="center">*　　　*　　　*</div>

The Company maintains disclosure controls and procedures that are designed to ensure that information required to be disclosed in the Company's reports filed with the Securities and Exchange Commission (SEC) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including its Chief Executive Officer (CEO) and Chief Financial Officer (CFO), as appropriate, to allow timely decisions regarding required disclosure.

<div align="center">183</div>

As of September 30, 2006, an evaluation was performed under the supervision and with the participation of the Company's management, including the CEO and CFO, of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) under the U.S. Securities Exchange Act of 1934). Based on that evaluation, the Company's management, including the CEO and CFO, concluded that the Company's disclosure controls and procedures were effective as of September 30, 2006.

313.    In response to the October 19, 2006 press release and October 27, 2006 Form 10-Q, the Company's stock price posted a healthy 7% increase – from a closing price of $59.03 on October 19, 2006 to closing prices of $62.80 on October 19, 2006 and $63.26 on October 27, 2006, as demonstrated in the chart below:



314.    The statements referenced in ¶¶309-12 were each materially false and misleading when made for the reasons set forth in ¶256 and the factual detail contained throughout this Complaint.  In addition, the statements referenced in ¶¶309-12 were each false and misleading when made as they misrepresented and/or omitted adverse facts which then existed and disclosure of

which was necessary to make the statements not false and/or misleading. The true facts, which were then known to or recklessly disregarded by each of the Defendants, were:

- By 2006, S&P knew its ratings of RMBS and CDOs were inaccurate, and some within S&P revised the Company's ratings models to produce more accurate ratings. The Company however, utilized grandfathering and refused to use the revised models to re-evaluate existing RMBS and CDO securities, delaying thousands of ratings downgrades and allowing those securities to carry inflated ratings that misled investors and the market.

- The raised guidance was a misleading indicator of the Company's financial health and future financial performance, because it depended on the continued effectuation of Defendants' fraudulent scheme to pursue structured finance ratings and market share at the expense of all else, including the Company's reputation, credibility, and analytical criteria.

- The structured finance pipeline was anything but "very healthy." Rather, according to the Company's internal documents, approximately 76% of 2006 RMBS issuance was comprised of subprime and Alt-A mortgages. At least 93% of all such assets included in deals rated AAA by S&P during 2006 have been downgraded to junk status. Rather than getting better, the market was getting more toxic. Defendants and the Company knew this fact, and decided to look the other way in order to pursue market share.

315. On December 5, 2006, McGraw spoke on behalf of the Company at the UBS 34th Annual Global Media Conference. During the conference, McGraw made additional false and misleading statements, and stated:

> *Let's go over to the Financial Services segment prospects here. There are important and fundamental reasons why Standard & Poor's will continue its double-digit growth. Clearly, we are taking advantage of powerful, endurable trends that have stimulated growth and financial markets for some time, and will continue to do so for many more years*. The globalization of financial markets clearly leads the list, as issuers continue to enhance their ability to assess capital around the world at lower costs.

> The increasing complexity of capital markets also is creating new opportunities for Standard & Poor's. The continued global growth of securitization is unmistakable, and as *investors* seek superior returns in the face of relatively low interest rates and narrow bond spreads, they *need our ratings and more sophisticated tools and models S&P provides to measure the risks of these complex new instruments*.

316. At the Citigroup 17th Annual Entertainment, Media and Telecommunications Conference on January 10, 2007, McGraw made additional false and misleading statements:

The ***outlook for the ratings business is excellent***. The market is both robust and innovative. Although the new issuance mix has changed significantly over the last 20 years there has been one constant, a growing demand for fixed income securities as global investors have sought bonds for yield and risk diversification. Structured finance has been a key driver with global new issuance growing at a compound annual rate of 35% since 2000.

<div align="center">*     *     *</div>

Risk arbitrage is the key to making all investors happy with a spread that they are earning at a risk they are assuming. As ***investors*** seek superior returns in the face of relatively low interest rates and narrow bond spreads, they ***need our ratings and the sophisticated tools and models that S&P provides to measure the risk of more complex instruments that create more opportunity to generate revenue***.

317.    The statements referenced in ¶¶315-16 were each materially false and misleading when made for the reasons set forth in ¶256 and the factual detail contained throughout this Complaint. In addition, the statements referenced in ¶¶315-16 were each false and misleading when made as they misrepresented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading. The true facts, which were then known to or recklessly disregarded by each of the Defendants, were:

- By 2006, S&P knew its ratings of RMBS and CDOs were inaccurate, and some within S&P revised the Company's ratings models to produce more accurate ratings. The Company however, utilized grandfathering and refused to use the revised models to re-evaluate existing RMBS and CDO securities, delaying thousands of ratings downgrades and allowing those securities to carry inflated ratings that misled investors and the market.

- S&P's prospects for double-digit growth were based on the continuation of Defendants' fraudulent scheme and the ongoing leveraging of the Company's reputation, brand, and integrity against toxic pools of mortgages packaged into pools of RMBS and CDOs that the Company's models were incapable of assessing.

- Despite raking in record profits, the Company continued to refuse to commit the necessary resources to adequately rate new deals and test the accuracy of existing ratings.

- The Company was well aware that the increased credit risks that had existed for years in the subprime, Alt-A, and exotic mortgage markets had already taken hold. Despite this fact, Defendants continued to point to supposedly "powerful, endurable" growth that was, in reality, an illusion cast by Defendants' scheme.

<div align="center">186</div>

318.    On January 25, 2007, the Company issued a press release announcing its financial results for the fourth quarter and full year 2006 entitled "The McGraw-Hill Companies Reports 8.6% Increase in Earnings Per Share for 2006[,] EPS Grows By 12.0% In Fourth Quarter," which stated in relevant part:

*Net income for 2006 increased 4.5% to $882.2 million.  Revenue for 2006 grew by 4.2% to $6.3 billion.*

*            *            *

*Net income for the fourth quarter increased 8.2% to $204.8 million.  Revenue grew by 3.4% to $1.6 billion.*

*"A strong finish to an outstanding year in Financial Services and effective cost controls in a softening education market were key to our performance in 2006,"* said Harold McGraw III, chairman, president and chief executive officer of The McGraw-Hill Companies.

*            *            *

*Financial Services:  "Revenue for this segment in 2006 increased 14.4% to $2.7 billion.* Excluding the prior year's revenue of $101.3 million from Corporate Value Consulting, which was sold at the end of September 2005, *revenue in 2006 grew by 19.4% on a non-GAAP basis.  Of the non-GAAP revenue growth, 42.9% was produced by structured finance* and 26.1% came from corporate and government ratings.  Foreign exchange rates benefited revenue by $5.6 million and did not materially impact operating results.

"Including incremental expenses of $30.0 million for stock-based compensation and a one-time charge for the elimination of the restoration stock option program in 2006, *the segment's operating profit increased 18.0% to $1.2 billion compared to 2005. The operating margin for 2006 was 43.8%, up from 42.5% in 2005.*  The sale of Corporate Value Consulting produced a pre-tax gain of $6.8 million in 2005.

*"In the fourth quarter, revenue grew by 22.1% to $794.1 million.  Structured finance produced 44.7% of the revenue increase;* 30.5% came from corporate and government ratings.  *Operating profit increased 19.1% to $341.1 million in the fourth quarter compared to the same period in 2005.*

*            *            *

*Continued worldwide strength in structured finance and a surging corporate finance market for both investment-grade and high-yield bonds were key factors in the fourth quarter for ratings.*

*"Rapid growth in the U.S. market for collateralized debt obligations and solid increases in commercial mortgage-backed securities kept the structured market*

187

*moving ahead. The collateralized debt obligation market in the U.S. is being
driven by cash flow CDOs of high-yield collateralized loan obligations and asset-
backed securities transactions. Hybrid transactions, a combination of cash flow
and synthetics, also continue to gain broader acceptance among investors.*

\*          \*          \*

*"The anticipated slowdown in the U.S. residential mortgage-backed securities
market was evident in the fourth quarter. Increases in mortgage rates, a slowing
in the rate of home price appreciation and tightening by sub-prime lenders all
contributed to the softening market. In Europe, however, the residential mortgage-
backed securities market again produced substantial gains. The asset-backed
securities market softened as auto manufacturers curtailed securitization while
they reorganized their businesses.*

\*          \*          \*

The Outlook:  *"With continued strength in Financial Services and a rebounding
education market, we are poised for double-digit earnings growth in 2007*."

319.    Also on January 25, 2007, McGraw-Hill hosted a conference call to discuss its fourth

quarter and full year 2006 earnings and outlook. The Individual Defendants participated in the call

on behalf of the Company. During the call, numerous false and misleading statements were made

that were designed to and, in fact, did artificially inflate the Company's stock price. For example,

McGraw stated:

*The structured finance market continues to be a strong driver. In the fourth
quarter, structured finance's performance was primarily attributable to growth in
the collateralized debt obligations and the commercial mortgage-backed securities
market. In the CDO market there was strong investor demand in cash flow in
synthetic sectors as well as increases in collateralized loan obligations which
benefited from the growth in leveraged loans stimulated by merger and acquisition
activity . . . .*

320.    On January 31, 2007, the Company issued a press release entitled "The McGraw-Hill

Companies Increases Dividend by 12.9% and Approves New Stock Buyback Plan for up to 45

Million Shares." The press release stated in relevant part that the Company "approved a 12.9%

increase in the regular quarterly cash dividend on the Corporation's common stock and also

authorized a new stock repurchase program for up to 45 million shares, or *approximately 12.7% of*

*the Corporation's outstanding shares*."

321.    In response to the January 31, 2007 press release, the Company's stock price reacted favorably.  The day before the press release (January 30, 2007), the stock closed at $66.19.  On January 31, 2007, it reached $66.08 on volume of more than 3.6 million shares traded, and climbed the next day, closing at $67.89 on February 1, 2007.

322.    On February 28, 2007, the Company filed its annual financial report on Form 10-K for the year ending December 31, 2006.  The financial results reported in the 10-K were substantially similar to those reported in the Company's January 25, 2007 press release.  The Form 10-K was signed by McGraw and Bahash, and contained required Sarbanes-Oxley certifications signed by McGraw and Bahash stating that the Form 10-K did not include any material misrepresentations.  In discussing what drove McGraw-Hill's improved financial performance, the February 28, 2007 10-K stated, in relevant part:

> The Financial Services segment continues to be favorably impacted by the current trend of the disintermediation of banks and the increased use of securitization as a source of funding.  In 2006, the Financial Services segment was favorably impacted by the continued low interest rate environment and an improved merger and acquisition market.  The mortgage-backed securities market for commercial and residential mortgages remained strong for 2006, as mortgage rates were within historical norms and at levels that kept refinancing and debt consolidation robust in the early part of the year.  Corporate issuance in 2006 also was robust, especially high yield issuance.
>
> *              *              *
>
> • Revenue and income from operations increased 4.2% and 4.5%, respectively, in 2006. ***Results from operations improved on the strength of the Financial Services segment, primarily due to the performance of structured finance*** and corporate (corporate finance and financial services) and government ratings, and the impact of the April 1, 2005 acquisition of J.D. Power and Associates.
>
> *              *              *
>
> Outlook
>
> ***Comparisons in 2007 will be less challenging as Standard & Poor's continues to grow***, McGraw-Hill Education enters a stronger state new adoption market and

Information & Media receives the benefits of the Sweets transformation.

\* \* \*

In Financial Services, continued global expansion and product diversification as well as a favorable interest rate environment, increased capital spending, and robust merger and acquisition activity by companies will mitigate the anticipated decline in U.S. residential mortgage-backed securities. ***The U.S. residential mortgage-backed securities market is projected to decline 10–15% in 2007***.

\* \* \*

***In 2006, the Company achieved growth in revenue and income from operations. The results are primarily attributable to growth in the Financial Services segment*** and the impact of the April 1, 2005 acquisition of J.D. Power and Associates which contributed $43.8 million in revenue in the first quarter of 2006 and had no material impact on operating profit.

\* \* \*

***Service revenue increased 10.0% primarily due to increased revenue in the Financial Services segment, which increased 14.4% or $345.6 million. Financial Services revenue increased due to the strong performance of structured finance*** and corporate (industrial and financial services) and government ratings.

\* \* \*

***The 2006 operating profit increased as a result of the Financial Services segment*** . . . .

\* \* \*

***The Financial Services (FS) segment's 2006 operating profit and margin grew by 18.0%*** and a 1.3 percentage point change, respectively, from 2005. These results were primarily due to the following items:

• ***Growth in structured finance related to the continued strength in issuance of U.S. commercial mortgage-backed securities and collateralized debt obligations (CDOs)*** in 2006, ***primarily driven by strong investor demand for both asset classes, strong commercial real estate origination trends and new CDO structures and arbitraging opportunities***.

\* \* \*

***The Financial Services segment continued to experience double-digit growth in revenue and operating profit in 2006, increasing 14.4% and 18.0%, respectively, over 2005 results. The increases in revenue and operating profit were due to the performance of structured finance*** and corporate (industrial and financial services) and government ratings, which represented approximately 55.4% and 33.7%,

190

respectively, of the growth in revenue.

\* \* \*

*In the U.S., in 2006, strong growth was experienced in the issuance of commercial mortgage-backed securities (CMBS) and collateralized debt obligations (CDOs)*. CDO issuance was driven by strong investor demand in both the cash flow and synthetic sectors, fueled by more innovative structures, arbitraging opportunities and growth of the collateralized loan obligations (CLOs) sector, which benefited from increases in leveraged loans related to merger and acquisition (M&A) activity. CMBS issuance was driven by strong investor demand and strong commercial real estate origination trends. The residential mortgage backed securities (RMBS) market was up slightly year-over-year, as increases in mortgage rates, a slowing of the rate of home price appreciation, and the tightening of lending standards by sub-prime lenders for affordability products adversely impacted RMBS issuance. The growth in U.S. corporate issuance was attributable to increases in industrial and financial services issuance, driven primarily by the market's favorable financing conditions and healthy M&A activity. Bank loan ratings showed strong growth in 2006.

*Total U.S. structured finance new issue dollar volume increased 12.1% in 2006* according to Harrison Scott Publications and S&P's internal estimates. *U.S. CDO issuance increased 85.4%, and U.S. CMBS issuance increased 27.6% over the prior year. RMBS issuance increased 1.4%, but the number of issues, while smaller in size, increased by 12.6%.*

\* \* \*

*Growth rates in 2007 in the Financial Services segment are expected to remain double-digit despite the declining growth rates primarily due to the anticipated fall-off in the U.S. RMBS market*. The Mortgage Bankers Association is forecasting approximately a 5% decline in mortgage originations, as mortgage rates continue to rise and the housing market continues to soften resulting in reduced refinancing. *The Company anticipates that RMBS issuance will decline approximately 10-15% in 2007. Strong international growth and product diversification will help mitigate the anticipated decline in the U.S. RMBS issuance volumes*.

The U.S. CMBS market in 2007 will be driven by continued strength in commercial real estate fundamentals, investor demand for relative yield and refinancing of maturing deals. *U.S. CDO issuance in 2007 will continue to be driven by the robust performance of the asset class resulting in fewer downgrades, more new structures and arbitrage opportunities as well as an increasing investor base*. Issuance in U.S. asset-backed securities market is anticipated to grow moderately in 2007 as auto manufacturers continue to rely on securitization as a source of funding. The resiliency of the consumer should also lead to growth in the credit card and student loan sectors.

\* \* \*

191

*The market for credit ratings as well as research and investment advisory services is very competitive. The Financial Services segment competes domestically and internationally on the basis of a number of factors, including quality of ratings, research and investment advice, client service, reputation, price, geographic scope, range of products and technological innovation.*

<p style="text-align:center">*       *       *</p>

The Company maintains disclosure controls and procedures that are designed to ensure that information required to be disclosed in the Company's reports filed with the Securities and Exchange Commission (SEC) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including its Chief Executive Officer (CEO) and Chief Financial Officer (CFO), as appropriate, to allow timely decisions regarding required disclosure.

As of December 31, 2006, an evaluation was performed under the supervision and with the participation of the Company's management, including the CEO and CFO, of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) under the U.S. Securities Exchange Act of 1934). Based on that evaluation, the Company's management, including the CEO and CFO, concluded that the Company's disclosure controls and procedures were effective as of December 31, 2006.

323.    In response to the January 25, 2007 press release and the February 28, 2007 Form 10-K, the Company's stock price declined slightly, falling from a close of $68.40 on January 24, 2007 to closing prices of $66.36 on January 25, 2007 and $64.56 on February 28, 2007. If not for Defendants' false and misleading statements and omissions, however, the Company's stock price would have declined even further.

324.    The statements referenced in ¶¶318-19 and ¶322 were each materially false and misleading when made for the reasons set forth in ¶256 and the factual detail contained throughout this Complaint. In addition, the statements referenced in ¶¶318-19 and ¶322 were each false and misleading when made as they misrepresented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading. The true facts, which were then known to or recklessly disregarded by each of the Defendants, were:

- By 2006, S&P knew its ratings of RMBS and CDOs were inaccurate, and some within S&P revised the Company's ratings models to produce more accurate ratings. The Company however, utilized grandfathering and refused to use the revised models

to re-evaluate existing RMBS and CDO securities, delaying thousands of ratings downgrades and allowing those securities to carry inflated ratings that misled investors and the market.

- Rather than experiencing a "strong finish," the Company stood on the precipice of disaster. The internally expected implosion of the subprime markets was occurring, and the Company was delaying massive ratings downgrades in order to squeeze the last bits of life out of its structured finance ratings business before the hammer fell.

325. On March 5, 2007, McGraw participated in the Bear Stearns 20th Annual Media Conference on behalf of the Company. During the conference, McGraw made additional false and misleading statements, which included the following:

We realize that there has been concern about the sub-prime mortgage market, so I appreciate the opportunity to share perspective on the credit quality of residential mortgage-backed securities and collateralized debt obligations rated by Standard & Poor's and the prospects for our structured finance business as well. Let's start with the sub-prime market.

Sub-prime market, which represents 20% of rated U.S. residential mortgage-backed securities issuance in 2006. *It is true that delinquencies in this segment of the market have increased, but the impact of overall credit ratings has not been significant. In 2006 we lowered about 1.5% of roughly 10,000 outstanding sub-prime ratings. To date, in 2007, there were no downgrades and only 10 credit watch actions relating to almost 5000 vintage 2006 sub-prime ratings. That is only 0.2% of the outstanding ratings, so you can see that these actions really represent only a small percentage of total rating.*

*Despite probably near-term increases in losses and downgrades, S&P expects the residential mortgage-backed securities market to perform well over the long term, and obviously it certainly has.* Most of those residential mortgage-backed security transactions now on credit watch were issued during the first half of 2006, before S&P raised loss coverage levels for certain sub-prime mortgages. *It is also worth nothing that the residential mortgage-backed security instrument placed on credit watch have had no current impact on any outstanding collateralized debt obligation rating.*

S&P saw early signs of poor performance of the collateral backing for these residential mortgage-backed securities transactions that are now on credit watch. By placing these instruments on credit watch when the transactions had not yet experienced a loss, *S&P was signaling the market that it was adopting a new, more stringent standard for the surveillance of these types of transactions. It notified the market in April that it was going to be strengthening loss coverage and implemented three months later*.

*S&P was able to take this early action because it regularly monitors credit markets, and the credit performance of these rated transactions, and systematically report*

*on them at the same time*. S&P regularly communicates its opinions on not only what is happening, but what may happen through credit watch and its rating actions. That's why professionals closely watch our credit watch actions.

*I think S&P has [been] very on top of the situation in the sub-prime market. When lending standards started to deteriorate last year in the sub-prime market, S&P raised the level of credit support for riskier sub-prime deals and tightened some surveillance standards for residential mortgage-backed securities. Moreover, S&P has fully integrated surveillance process for residential mortgage-backed securities and CDOs. That means that S&P will determine what effect, if any, the increase in delinquencies on certain sub-prime mortgages has on both its rated residential mortgage-backed security transactions, and those collateralized debt obligation transactions which hold residential backed securities.*

We do not expect the problems in the sub-prime market to impact the growth prospects that we anticipate in 2007 for structured finance. We do not expect the problems in sub-prime market. Generally, residential mortgage-backed security transactions issued during the second half of 2006 are supported by higher loss coverage and are still performing as expected, but as a cautionary note I would point out that it is very early in the life of these transactions, and I've already pointed out that last July, S&P increased its loss coverage for sub-prime deals.

So what's the current outlook? S&P believes that the 2006 vintage residential mortgage-backed securities transactions will underperform relative to 2005 transactions, but based on our current economic scenarios, *S&P does not believe that 2006 transactions will perform as badly as some have suggested*. S&P is anticipating losses in the 5.25 to 7.75% range, which is slightly above vintage year 2000, the previous worst-performing year with average cumulative losses of about 5%.

*Overall we expect the residential mortgage-backed securities to maintain strong credit quality and returns that continue to attract investors* at a time when high grade corporate issuance is in short supply. Today the credit quality of a U.S. corporate bond is average BBB-.

Between 1978 and 2006, S&P has issued roughly 47,000 residential mortgage-backed securities ratings. 85% were initially investment grade, AAA to BBB. Last year, 2006 vintage residential mortgage-backed securities, 88 were rated investment grade. Of the 3.6 trillion in par value of S&P ratings outstanding as of January 1, 2007, 88.1% are rated AAA. In general, then, the vast majority of residential mortgage-backed securities ratings have been investment grade and are very stable. *S&P believes its models have captured the deterioration in credit quality of the 2006 sub-prime mortgages and the sub-prime mortgage obligations may decline this year, but the sub-prime market will not evaporate. These mortgages are profitable for lenders and represent, for many people, an opportunity to own a home who would otherwise never qualify for a prime mortgage*.

In a detailed report at the end of January, the Mortgage Bankers Association pointed that, and I quote, "Even with the expansion of credit availability with the growth of

the sub-prime market, foreclosures are well below their historic high and will not have a macroeconomic impact." Some other key points from the Mortgage Banker report, *the residential financial market is fundamentally sound and working efficiently*. Mortgage obligations will fall in 2007 relative to 2006, given the decline of home sales and the diminished refinancing activity. Baring any unexpected downturn in the economy, the recent increase in mortgage delinquency rates will likely peak by the end of 2007, but at levels low below those of past peaks. The lower peak will come despite the change in the composition of the outstanding loans, namely the larger portion of the sub-prime loans in recent years. All of which points me back to the starting point.

We began by predicting a 10 to 15% year over year decline in the U.S. residential mortgage-backed securities market in 2007. That is a continuation of the slowdown experienced in 2006 when the U.S. residential mortgage-backed securities issuance rose by only 1%. It was also a year in which our financial services segment had double-digit top and double-digit bottom-line growth and margin expansion.

We started 2007 expecting another year of double-digit increases even though loan originations and issuance would decline. Except for the U.S. residential mortgage-backed securities issuance we continue to expect increases in all other asset classes, and that includes collateralized debt obligations where the financial community's innovation is clearly evident in its ability to meet investor demand for returns and obvious, specific risk reward attributes.

<center>*     *     *</center>

*Collateralized debt obligations will show continued strength in the United States and abroad driven by new structures and increasing investor base. U.S. collateralized debt obligations grew a little over 140% in January, and even faster globally; this is a very high quality market. For currently outstanding collateralized debt obligations, the overwhelming majority are investment grade. Of the $828 billion of outstanding U.S. collateralized transactions, 98% are investment grade, 82% are rated AAA.*

326. As the call continued, McGraw stated:

We've been saying on the residential mortgage-backed market that we would see year-over-year declines. Gosh, I think I've been saying that for two years. And even last year, we knew we were going to see year-over-year declines, and it was actually up 1%. But the numbers are so enormous. It's still a tremendous market. It's just going to be -- year-over-year comparisons are going to be more difficult.

327. Later in the call, the following exchange took place, in which McGraw touted the

Company's objectivity and ability to monitor the Company's ratings of CDOs:

**Audience Member**: [inaudible] -- your CDO business? Can you talk a little bit about, institutionally, what kind of structures you have in place to maintain objectivity while managing revenue growth? Obviously, there's a little bit of a

<center>195</center>

contradiction between wanting to -- between revenue growth and making sure that
you're entirely accurate in all of your ratings. Can you talk about your internal
structure, and how you maintain that objectivity?

**McGraw III:** Thank you for raising that. ***It's critical. Standard and Poor's, on the
rating side, is a trusted business. It's a reputation business. If you have a
propensity to get things wrong, and people lose confidence in your credibility to do
that, you can [be] damage[d] severely.*** Your compliance -- it's a process; and your
compliance to those kind of things, has got to be extremely, extremely strong.

We have independent compliance officers that are outside management's purview
that can go anywhere. We monitor all of our process. We're very strong in it.
We've been very strong in terms of the credit rating agency performance. And as
you know -- comments are finished up this week -- we're in that 30-day period for
comments, and SEC by Congress has to report back by June with the finished
product. In large part, we've very sanguine with that; First Amendment protections
and all of those things, are all in that. ***With the size and complexity of some of these
instruments, especially CDO, it takes a lot of monitoring activity; it takes a lot of
compliance; and we have very, very strong processes in place, and we measure
them.***

328.    The statements referenced in ¶¶325-27 were each materially false and misleading

when made for the reasons set forth in ¶256 and the factual detail contained throughout this

Complaint. In addition, the statements referenced in ¶¶325-27 were each false and misleading when

made as they misrepresented and/or omitted adverse facts which then existed and disclosure of

which was necessary to make the statements not false and/or misleading. The true facts, which were

then known to or recklessly disregarded by each of the Defendants, were:

- McGraw's statements regarding the small number of ratings downgrades taken to
date were materially false and misleading. If the Company's S&P brand had
conducted surveillance on a timely basis utilizing sufficient models, it would have
downgraded thousands of subprime and Alt-A structured finance transactions – as
ultimately happened – much sooner, which would have revealed the Company's true
financial condition to the market.

- The Company's S&P brand was not "on top of the situation in the sub-prime
market." Rather, the Company had no reasonable basis for predicting the
performance of 2006 transactions, despite having more current analytical tools and
data at its disposal if it had chosen to use them. The Company was helping lead the
charge down the subprime rabbit hole by compromising every aspect of its ratings
criteria and methodologies so that it could make sure it captured the most market
share and rated as many deals as possible.

196

- The Company's inability to conduct surveillance on the transactions it rated, and its unwillingness to downgrade transactions on a timely basis, would cause substantial damage to the Company's reputation and credibility.

- The Company's surveillance process for RMBS and CDOs was not "fully integrated." Indeed, the Company failed to look at loan-level data, which meant it did not understand the performance of deals it rated. In addition, it refused to allocate the people and resources necessary to properly provide surveillance of its previously rated deals, violating its publicly touted commitment to surveillance.

- McGraw lacked a reasonable basis for stating that S&P expected "the residential mortgage backed securities market to perform well over the long term." His statement was the exact opposite of the well-documented internal statements of the Company and it's high-ranking employees set forth herein.

- McGraw was further misleading the market by pointing out the purported increase in surveillance standards and "strengthening loss coverage." The reality was that the surveillance department was understaffed and lacked the necessary resources to evaluate existing deals. Moreover, because the Company's models had no predictive capability for the toxic RMBS and CDOs it had been rating, the Company had no idea how much loss coverage was actually required to make sure the deals it rated did not implode and collapse.

- McGraw lacked a reasonable basis for stating that S&P did not believe that 2006 transactions would perform as badly as some suggested. McGraw's statement is directly contradicted by a host of internal Company documents demonstrating that S&P did indeed expect 2006 transactions to perform poorly, which is exactly what they did. McGraw's purported reassurance to investors was nothing more than a complete and total lie.

- McGraw lacked a reasonable basis for claiming the Company believed its models had captured the deterioration in credit quality of 2006 subprime mortgages. As detailed throughout this Complaint and as determined by the Senate Subcommittee, S&P knew its models were inaccurate and unable to capture the risks of the subprime mortgages the Company rated.

- While McGraw correctly pointed out that the trust and reputation of S&P was critical to the success of its ratings business, he omitted any disclosure of how Defendants' pursuit of short term profits and market share would destroy the Company's reputation when the truth was revealed. Indeed, the Company's head of surveillance, D'Erchia, had been clamoring for the Company to undertake significant downgrades since 2006. Despite this, McGraw painted a deceptively rosy picture for the market that the Company had everything under control and was well equipped to assess the risks of the structured finance market.

329. On March 12, 2007, Bahash participated in the Credit Suisse Group Global Services Conference on behalf of the Company. During the conference, Bahash made additional false and

misleading statements, which included the following:

Let's turn now to the Financial Services. We continue to forecast double digit top and bottom line growth for this segment despite an estimate decline in the U.S. dollar buy and issuance of U.S. Residential Mortgage-Backed Securities, or RMBS, of 10 to 15%. That is a continuation of the slowdown experienced in 2006 when the U.S. RMBS market rose by only 1%. It was also a year in which Financial Services had double digit top and bottom line growth and margin expansion.

Except for U.S. RMBS issuance, we continue to expect increases in all other asset classes. By the way, issuance for U.S. RMBS was off 9.3% in January, the only month for which we have statistics. That fall-off is mostly due to a decline in home equity loan issuance. *We recognize there has been a concern about the sub-prime market*, so I want to review the situation here.

*It is true that delinquencies in the sub-prime market have increased, but the impact on overall credit ratings has not yet been significant. In 2006 we lowered about 1.5% of the almost 10,000 outstanding sub-prime ratings. To date in 2007, there were no downgrades, and only 10 credit watch actions relating to almost 5,000 vintage 2006 sub-prime ratings. That is only 0.2% of the outstanding ratings. S&P has been on top of the situation in the sub-prime market.*

*When lending standards started to deteriorate last year in the sub-prime market, S&P notified the industry in April 2006 that it would be raising in July 2006 the level of credit support for riskier sub-prime deals and tightened surveillance standards for Residential Mortgage-Backed Securities.*

*S&P has a fully integrated surveillance process for RMBS and Collateralized Debt Obligations, or CDOs.* That means S&P will determine what effect, if any, the increase in delinquencies on certain sub-prime mortgages has on both its rated RMBS transactions and those CDO transactions which hold Residential Mortgage-Backed Securities.

*We do not expect the problems in the sub-prime market to impact the growth prospects we anticipated in 2007 for structured finance.* Generally, RMBS transactions issued during the second half of 2006 are supported by higher loss coverage and are still performing as expected. But as a cautionary note, I would point out that it is very early in the life of these transactions.

So, what's the current outlook? S&P believes that the 2006 vintage RMBS transactions will underperform relative to the 2005 transactions. *But based on our current economic scenarios, S&P does not believe the 2006 transactions will perform as badly as some have suggested.* S&P is anticipating losses in the 5.25% to 7.75% range, which is slightly above vintage year 2000, the previous worst performing year, with average cumulative losses of about 5%.

*Overall, we expect the RMBS market to maintain strong credit quality and returns that continue to attract investors at a time when high-grade corporate issuance is in short supply.* Today, the credit quality of U.S. corporate bonds is averaging BBB-

minus.

Between 1978 and 2006, S&P has issued about 47,000 RMBS securities ratings. 85% were initially investment grade, AAA to BBB. Of the 3.6 trillion in par value of S&P ratings outstanding as of January 1, 2007, 88.1% are rated AAA. In general, then, the vast majority of RMBS ratings have been investment grade and very stable.

***S&P believes its models have captured the deterioration in the credit quality of the 2006 sub-prime mortgages. The sub-prime mortgage originations may decline this year, but the market will not evaporate.*** The mortgages are profitable for lenders and represent an opportunity to own a home for many people who would never qualify for a prime mortgage.

330.    The statements referenced in ¶329 were each materially false and misleading when made for the reasons set forth in ¶256 and the factual detail contained throughout this Complaint. In addition, the statements referenced in ¶329 were each false and misleading when made as they misrepresented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading. The true facts, which were then known to or recklessly disregarded by each of the Defendants, were:

- Bahash's statements regarding the small number of ratings downgrades taken to date were false and misleading. If the Company's S&P brand had conducted surveillance on a timely basis utilizing sufficient models, it would have downgraded thousands of subprime and Alt-A structured finance transactions – as ultimately happened – much sooner, which would have revealed the Company's true financial condition to the market.

- The Company's S&P brand was not "on top of the situation in the sub-prime market." Rather, the Company had no reasonable basis for predicting the performance of 2006 transactions, despite having more current analytical tools and data at its disposal if it had chosen to use it. The Company was helping lead the charge down the subprime rabbit hole by compromising every aspect of its ratings criteria and methodologies so that it could make sure it captured the most market share and rated as many deals as possible.

- The Company's inability to conduct surveillance on the transactions it rated, and its unwillingness to downgrade transactions on a timely basis, would cause substantial damage to the Company's reputation and credibility.

- The Company's surveillance process for RMBS and CDOs was not "fully integrated." Indeed, the Company failed to look at loan-level data, which meant it did not understand the performance of deals it rated.

199

- Bahash lacked a reasonable basis for stating that S&P expected "the RMBS market to maintain strong credit quality and returns." His statement was the exact opposite of the well-documented internal statements of the Company and it's high-ranking employees set forth herein.

- Bahash was further misleading the market by highlighting the purported "tightened surveillance standards" and increased "credit support for riskier subprime deals." The reality was that the surveillance department was understaffed and lacked the necessary resources and data to evaluate existing deals. Moreover, because the Company's models had no predictive capability for the toxic RMBS and CDOs it had been rating, the Company had no idea how much loss coverage was actually required to make sure the deals it rated did not implode and collapse.

- Bahash lacked a reasonable basis for stating that S&P did not believe that 2006 transactions would perform as badly as some suggested. Bahash's statement is undermined by a host of internal Company documents demonstrating that S&P did indeed expect 2006 transactions to perform poorly, which is exactly what they did. Bahash's purported reassurance to investors was nothing more than a complete and total lie.

- Bahash lacked a reasonable basis for claiming the Company believed its models had captured the deterioration in credit quality of 2006 subprime mortgages. As detailed throughout this Complaint and as determined by the Senate Subcommittee, S&P knew its models were inaccurate and unable to capture the risks of the subprime mortgages the Company rated.

331. By March 2007, the market was clearly concerned with a meltdown of the subprime and Alt-A credit markets. At this time, news articles were released that began to partially reveal the true picture at McGraw-Hill, even while Defendants continued making false and misleading statements to the contrary. For example, on March 22, 2007, the *Wall Street Journal* reported that the market was beginning to distrust McGraw-Hill's ratings, pointing to a "widening gap" between bond pricing and the opinions of large ratings providers like McGraw-Hill's S&P brand:

The meltdown in mortgages for risky, "subprime" borrowers is claiming its latest casualties: credit-ratings companies.

***Trading in many bonds backed by subprime mortgages reveals a widening gap between investors' perception of their risk and the opinions of large ratings providers like** Moody's Investors Service, **Standard & Poor's** and Fitch Ratings. **Some subprime-mortgage bonds that were assigned investment-grade ratings as recently as 2006 are even trading at prices that imply they could be as risky as junk bonds. Yet most of their ratings haven't changed.***

At the same time, the stock prices of Moody's Corp. and S&P's parent, McGraw-Hill Cos., have taken a hit over concerns that turmoil in the subprime-mortgage market may spread to the broader credit markets and damp issuance of other types of debt products like collateralized debt obligations.

Moody's and McGraw Hill's shares are down 11% and 6%, respectively, since early February, versus a 1% fall in the S&P 500-stock index over the same period.

For years, the ratings companies reaped profits by charging issuers for rating bonds backed by home loans to borrowers with weak credit, known as subprime mortgages. Many Wall Street firms also followed guidelines from the ratings companies when they bundled loans together and sold billions of dollars in highly rated securities backed by them.

The ratings providers "were at least as interested as the investment banks in getting the deals done because they would get paid for rating them," notes Edward Grebeck, chief executive of Tempus Advisors, a debt-markets strategist in Stamford, Conn.

Executives at ratings companies deny a conflict exists. "Issuers pay us because investors believe our opinions about the risk of the assets have value," says Glenn Costello, a managing director at Fitch. He adds that "it is still too early to determine which bonds are going to be most at risk."

Stock analysts who track Moody's and McGraw Hill say subprime-related ratings revenue make up a small part of their businesses and they don't expect the subprime issues to affect their forecasts of double-digit earnings growth at the companies this year.

To come up with ratings on mortgage bonds, ratings companies use financial models that consider historical default rates among pools of mortgage loans and try to predict how newer loan pools will hold up under various economic scenarios. Assumptions about movements in interest rates and home prices also are factored in.

The models help determine how many bonds backed by a pool of loans may be so insulated from losses that they can be rated AAA, and how many are less protected and thus bear weaker ratings like A or BBB. The bonds usually are backed by loans whose value exceeds the bonds' principal so as to provide a cushion for expected losses among the mortgage pool.

"What's driving the market now is that defaults are coming significantly faster than historical simulations," says Brian Carlin, head of fixed-income trading at J.P. Morgan Private Bank.

If ratings companies end up having to downgrade a large number of subprime bonds issued in 2006, "it would mean they completely misjudged the risk," says Thomas Lawler, a housing economist in Vienna, Va.

Ratings-company officials say their ratings still accurately reflect the probability of actual losses on mortgage bonds. "Subprime mortgages by their nature usually perform poorly, and we took that into account when we assigned our ratings," says

201

Brian Clarkson, co-chief operating officer of Moody's.

Susan Barnes, a managing director at S&P, says the firm expected that subprime loans originated last year would be weaker than previous years and modified its rating criteria. "We expect very infrequent defaults in the investment-grade bonds over their life cycle," she says.

332.    Similarly, by April 24, 2007, the *Wall Street Journal* was reporting that the market's concern had placed McGraw-Hill's S&P brand under a large cloud of uncertainty:

These should be sunny days for Standard & Poor's and Moody's Investors Service, Wall Street's two big credit-rating companies, which profit when debt issuance booms. But a cloud hangs over them.

S&P and Moody's -- which charge debt issuers fees to rate different flavors of bonds and loans -- report first-quarter results today and tomorrow, respectively. Thanks in part to the corporate-debt boom, analysts expect 29% growth in earnings per share, excluding one-time items, for S&P's parent, McGraw-Hill Cos., and 18% expansion for Moody's parent, Moody's Corp., according to Thomson Financial.

*Yet the shares of both companies are down during the past three months, because of the housing slowdown. Both companies built up big franchises rating mortgage-backed bonds in recent years.*

*Now they have a double-barreled problem. First, the housing slowdown means fewer bonds to rate. Second, they have a reputation dilemma, the kind that often crops up for the raters after debt disasters strike.*

When Enron collapsed, critics wondered why Moody's and S&P didn't spot it sooner. Now, some critics are asking why they didn't spot the mess in subprime mortgages -- which cater to especially risky homeowners.

The market value of many subprime-mortgage-backed bonds has been falling, in anticipation of severe increases in defaults on the loans that back them. S&P and Moody's say most of these bonds are well-cushioned from losses. But Friday, Moody's said losses among 2006 subprime-loan pools "will be somewhat higher than our initial expectations." It also said it expects more volatility in ratings on weaker subprime-mortgage bonds.

Moody's says it has been adapting to the environment as it changes. But the latest acknowledgment "throws up a red flag," says Christian Stracke, an analyst at independent debt-research firm CreditSights. The company is "implicitly admitting that its initial assumptions. . . did not adequately predict the damage that was to come."

333.    Despite the uncertainty pointed to in the articles referenced above, any such partial revelations were tempered and muted by Defendants' continued false and misleading statements about the quality of the Company's ratings, its integrity and reputation, and its surveillance procedures.  For example, on April 24, 2007, the Company issued a press release entitled "The McGraw-Hill Companies Reports First Quarter EPS of $0.40, Including $0.03 Gain on Divestiture[,] Revenue Increases by 13.7%," which stated in relevant part:

> *Net income for the first quarter of 2007 was $143.8 million.  Revenue for the first quarter increased 13.7% to $1.3 billion.*

> "*A strong performance by Financial Services*, and improvement in Education and Information & Media *contributed to our first quarter*," said Harold McGraw III, chairman, president and chief executive officer of The McGraw-Hill Companies. "The operating margin improved in all three segments."

> *            *            *

> *Financial Services:  "Revenue for this segment in the first quarter increased 21.5% to $728.9 million compared to the same period last year*.  Including a pre-tax gain of $17.3 million on the sale of a mutual fund data business, *operating profit grew by 38.3% to $348.0 million*.

> "Standard & Poor's had the best first-quarter performance in its history as fixed income and equity information products and services contributed to new records for revenue, operating profit and the operating margin, which was 47.7%, including the gain on the sale of the mutual fund data business.  *Structured finance produced 40.8% of the revenue growth.*  Corporate and government ratings contributed 34.3% of the revenue increase.

> "Both U.S. and international ratings grew at double-digit rates in the first quarter. International credit ratings and services accounted for 36.1% of ratings revenue in the first quarter versus 35.6% for the same period a year ago.

> "*Structured finance benefited substantially from a robust U.S. collateralized debt obligations market where concerns about widening spreads resulting from credit quality deterioration in the sub-prime market and an increase in collateralized loan obligations resulting from strength in the corporate loan market led to a strong pick up in activity in the first quarter.*

> "*Collateralized debt obligations also grew rapidly in Europe.  We had solid results from residential mortgage-backed securities in Europe and steady improvement in the European commercial mortgage-backed securities market*.  Auto issuance slumped, but increases in credit card and student loans kept asset-backed securities

growing in the U.S.

\* \* \*

"New issuance dollar volume increased in the U.S. and European bond markets in the first quarter versus the same period last year, according to reports from Thomson Financial, Harrison Scott Publications and S&P estimates. In the U.S., total new issue dollar volume was up 28.5% in the first quarter as corporates climbed 42.9%. Public finance was up 46.8%. ***Mortgage-backed securities, reflecting the anticipated decline in U.S. residential mortgage-backed securities issuance, decreased by 4.3%. Asset-backed securities were up 49.7%*** in Europe, new issue dollar volume was up 34.1%.

\* \* \*

The Outlook: "We're off to a good start to achieving our goal of producing double-digit earnings growth in 2007. ***There will be more double-digit growth and margin expansion for the balance of the year in Financial Services***, although probably not at the exceptional rate of growth we experienced in the first quarter."

334. Also on April 24, 2007, McGraw-Hill hosted a conference call to discuss its first quarter 2007 earnings and outlook. The Individual Defendants participated in the call on behalf of the Company. During the call, numerous false and misleading statements were made that were designed to artificially inflate the Company's stock price. For example, McGraw stated:

Structured finance produced another strong quarter despite a 10.8% decline in the U.S. residential mortgage back security issuance. As I pointed out earlier, we anticipated a 10 to 15% decline in the U.S. residential mortgage back security issuance this year. A slowing housing sector, rising mortgage rates, lower housing price appreciation and fewer housing starts were factors in shaping our forecast. ***As part of its ongoing ratings and surveillance process for residential mortgage back securities. S&P carefully monitors trends in the housing and mortgage finance markets, consumer credit, and in the economy overall.*** Last Spring, a little over a year ago, S&P foresaw the trend in the quality of mortgage lending that led to the concerns that have arisen in the subprime market today. As a result of the deteriorating credit quality of certain subprime mortgage loans in 2006, ***S&P enhanced the credit support necessary for a rating by 50% compared to transactions from 2005. While there is a lot going on in the sub-prime market, nothing has occurred so far this year to cause us to materially change our expectations on the level of issuance that we originally anticipated for 2007***. It is also worth pointing out that the U.S. residential mortgage backed securities market has not come to a dead stop in 2007, not with a $254.1 billion in issuance in the first quarter. $254.1 billion in issuance in the first quarter. ***Prime and Alt-A issuance increased 5.6%, particularly offsetting the 24.4% decline in sub-prime issuance in the first quarter.***

204

335.     During the question and answer portion of the April 24, 2007 conference call, the

following exchanges took place, during which the Individual Defendants made additional false and

misleading statements:

*Lisa Monaco (Morgan Stanley, Analyst):*    Terry [McGraw III] can you comment a
little bit -- a bit of a follow-up to Peter's question, just on the debt issuance in the
first quarter.  How much of that was related to potential deals being pulled into
March from future periods?  And then if you could just talk to the strength in the
CDO market and what is driving that.  And if you can quantify what percent of the
CDOs that you rate are related -- are tied to RMBS in the subprime market and given
the slow down in RMBS (Inaudible) how is the growth in CDO issuance (Inaudible).
Thanks.

*McGraw III:*    Thanks, Lisa.  Bob, did you can get that last one.  Between us we will
get these.  A lot of questions there.  There always is timing issues, Lisa.  The pipeline
has been strong in '05, '06, and again, the folks work very hard to get it all
completed, but there are carry-over and timing issues on that one, but, again, it is just
very, very strong.  At this point, there is no let up on that.  ***The CDOs are very
attractive because it is the instrument of choice of so [many] financial institutions
because of all of the variability that CDOs have in terms of being able to break up
into various attributes and risk reward capabilities and the like, and it just gives
portfolio managers more flexibility to do more things in terms of the construction
of those portfolios.***

***So the CDO strength that we are seeing now is a continuation of the attractiveness
of those investment[s]***.  With residential mortgage back, the U.S. market was down
10.8%.  And -- and again, the sub-prime market was down 24.4 on that part.  ***Now,
the thing on the sub-prime, it has gotten, in my opinion, an awful lot of spotlight in
the general press as-- and I don't think it is as warranted or deserved.***  I don't want
to understate it.  But, when you are talking about an economy that's in its sixth year
of expansion, the Fed Reserve worked hard to bring down the growth rate with the 17
rate hikes from last year, the housing sector has been most affected.  And, therefore,
with the rise in those rates, we have seen some defaults on the sub-prime side.  ***Yes,
there were some lenders that were way too aggressive.  And that's why over a year
ago, S&P changed some of the loss coverage criteria for those lenders.  And put
those into effect such that it reflected the fact that some of these lenders were too
aggressive***.  Of the outstanding mortgage loan volume, sub-prime is about 13%, of
that market.  And, yes, I think the housing market slump has bottomed on that in
terms of sales and new starts, but we will see throughout the year certain defaults on
some of the sub-prime loans, but it won't have a material impact in our opinion on
our results.  So we just think that these are in the housing sector, these excesses we
all know get into the markets, and we see that those that are least able to afford
certain things, you are going to see some defaults on that.  Bob, do you want to add
anything?

*Bahash:*    Yes, Lisa, the growth in the CDO area continues in our case to be
driven by some of the new structures of the hybrids, the arbitrage opportunities

within the class flow and synthetic factors. *And clearly sub-prime issuance is part of some of the CDO packages, but as Terry pointed out it's a small piece relative to the total issuance volume*.

<div align="center">*     *     *</div>

*Michael Meltz (Bear Stearns, Analyst):*     Great, thank you. I think I have three questions on S&P. Terry, I think -- there was a slide where you talked about the outlook specifically for the CDO area and you mentioned growth should decelerate or might decelerate. Can you talk a little bit though, are you still expecting revenue growth from the CDO business throughout the rest of the year? I know it is a broad -- a general question, but I think it is important. And then, Bob, are you -- on the margin side, can you just talk a little bit about S&P and the accruals. Was there anything -- did you normalize anything this quarter or anything we should be aware of on the margin side? Last question, of the 21% revenue growth of the quarter, ratings versus nonratings, which grew faster? Thank you.

*McGraw III:*     Okay. Michael, on the *collateralized debt obligation market. Again, this has been a very strong market* and multiyear and has been growing as the acceptance of CDOs and variability of CDO usage is taken -- taken hold of the marketplace. *The CDO market was up 154% in Q1*. And -- and that's coming off a pretty good base. So, I mean, *that is pretty stunning growth*. Now I just don't think that we can expect 154% growth in each quarter going forward on that one. So we are just saying that we think there is a slower growth rate in subsequent quarters, but it is going to grow on that one. And we see nothing to hold that back. Bob?

*Bahash:*     Yes. Just to expand upon that point. Our second-quarter estimate at this point in time based on external data calls for *significant growth in the U.S. in the CDO area in terms of par value, up over 60%*. That's in the U.S. and in Europe we are forecasting close to 23% growth in the CDO marketplace. That is the second quarter. *So very, very strong*. On your question with regard to margins and accruals. We are very high in there. What you are seeing is what you are getting. There is a very strong quarter. The margin improvement clearly driven by the higher revenue elements, as well as the containment of costs.

336.     On April 25, 2007, at McGraw-Hill's annual meeting of shareholders, the Individual Defendants made additional false and misleading statements. For example, McGraw stated, "Just about a year ago S&P alerted investors that underwriting standard in the subprime market had deteriorated and S&P would raise the level of credit support for riskier subprime assets in order to protect investors. Standard and Poor's also tightened surveillance standards for the residential mortgage backed securities. And the leadership Standard and Poor's demonstrated anticipating weakness in this subprime market illustrates why S&P is one of the most respected names in the

<div align="center">206</div>

financial services industry."

337.    On April 27, 2007, the Company filed its interim financial report on Form 10-Q for the quarter ending March 31, 2007.  The financial results reported in the 10-Q were substantially similar to those reported in the Company's April 24, 2007 press release.  The Form 10-Q was signed by Bahash, and contained required Sarbanes-Oxley certifications signed by McGraw and Bahash stating that the Form 10-Q did not include any material misrepresentations.  In discussing what drove McGraw-Hill's improved financial performance, the April 27, 2007 10-Q stated, in relevant part:

> *In the first quarter of 2007 the Company achieved growth in revenue and operating profit of 13.7% and 71.0%, respectively.  The increase in revenue is primarily attributable to growth in the Financial Services segment*.

> *       *       *

> *Service revenue increased 17.4% in the first quarter of 2007, due primarily to a 21.5% increase in Financial Services.  Financial Services increased primarily due to the performance of structured finance ratings* and corporate (industrial and financial services) and government finance ratings.  *In the U.S., collateralized debt obligations (CDOs) drove growth in structured finance*.  The growth in corporate finance ratings was attributable to increases in industrials, driven by merger and acquisition activity, and public finance issuance, driven by refundings.  The service margin increased to 32.3%.

> *       *       *

> *The Financial Services segment's increase in revenue and operating profit was due to the performance of structured finance* and corporate (industrial and financial services) and government ratings, *which represented approximately 40.8%* and 34.3%, respectively, *of the growth in revenue*.  *In the U.S., collateralized debt obligations (CDOs) drove growth in structured finance*.  The growth in corporate finance ratings was attributable to industrials, driven primarily by bond and loan issuance related to acquisition financing.  Public finance also performed well in the quarter with issuance driven primarily by refundings.

> *Total U.S. structured finance new issue dollar volume increased 17.2% in the first quarter versus prior year.  U.S. CDO issuance increased 153.6%*, according to Harrison Scott Publications and Standard & Poor's internal estimates (Harrison Scott Publications/S&P).  Growth in the U.S. CDO market continues to be driven by new structures (hybrids) and arbitrage opportunities within the cash flow and synthetic sectors; however, *in the first quarter issuance volumes were also favorably impacted by concerns about widening spreads resulting from credit quality*

*deterioration in the subprime mortgage market*. U.S. commercial mortgage-backed securities (CMBS) issuance increased 34.9% over the prior year due to the historically low interest rate environment and strong commercial real estate fundamentals, which are driving commercial originations and the refinancing of maturing deals as well as rising property values. ***U.S. residential mortgage-backed securities (RMBS) issuance decreased 10.8%, driven primarily by declines in the subprime and affordability products and home equity sectors***.

\* \* \*

In Europe for the first quarter, structured finance issuance grew 160.9% as all structured finance asset classes experienced growth, with CDOs and RMBS being particularly strong. CDO issuance was driven by a surge in cash CDO deals and a robust market for collateralized loan obligations (CLOs). A stable economic backdrop combined with moderate home price growth in most European countries fueled demand for mortgage credit and RMBS volumes picked up as new and existing issuers took advantage of tight spreads. European corporate issuance was up in the first quarter due primarily to solid growth in the financial services sector.

\* \* \*

***The market for credit ratings as well as research, investment advisory and broker-dealer services is very competitive. The Financial Services segment competes domestically and internationally on the basis of a number of factors, including quality of ratings, research and investment advice, client service, reputation, price, geographic scope, range of products and technological innovation.***

\* \* \*

The Company maintains disclosure controls and procedures that are designed to ensure that information required to be disclosed in the Company's reports filed with the Securities and Exchange Commission (SEC) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including its Chief Executive Officer (CEO) and Chief Financial Officer (CFO), as appropriate, to allow timely decisions regarding required disclosure.

As of March 31, 2007, an evaluation was performed under the supervision and with the participation of the Company's management, including the CEO and CFO, of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) under the U.S. Securities Exchange Act of 1934). Based on that evaluation, the Company's management, including the CEO and CFO, concluded that the Company's disclosure controls and procedures were effective as of March 31, 2007.

338. In response to the April 24, 2007 press release and conference call, and the April 27, 2007 Form 10-Q, the Company's stock price reacted favorably. Specifically, on April 23, 2007, the

stock closed at $63.54. In response to the press release, conference call, and Form 10-Q, the stock closed at $66.23 on April 24, 2007 and $66.25 on April 27, 2007, as demonstrated in the chart below:



339.    The statements referenced in ¶¶333-37 were each materially false and misleading when made for the reasons set forth in ¶256 and the factual detail contained throughout this Complaint. In addition, the statements referenced in ¶¶333-37 were each false and misleading when made as they misrepresented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading. The true facts, which were then known to or recklessly disregarded by each of the Defendants, were:

- Defendants misled the market when they told investors that the Company understood the credit quality deterioration problems impacting the Company's Structured Finance division. The truth was that although the Company was aware of such problems, its models and data were outdated and insufficient to address them, ratings downgrades would reach into the thousands (representing billions of dollars), and the Company lacked a reasonable basis for predicting its financial performance.

- Although the CDO market was helping drive the Company's Structured Finance division, the CDOs were made up of underlying subprime RMBS, and those underlying subprime RMBS were failing at an astonishing rate. The growth attributed to the CDO market was unsustainable and the Company would downgrade tremendous percentages of its CDOs.

- The Company did not carefully monitor trends and conduct surveillance for RMBS. In fact, its surveillance process was lagging more than one year behind schedule and its own surveillance protocols were being abandoned.

- Defendants' statements regarding Alt-A issuance were misleading as well, because the Alt-A and subprime markets had converged, making the traditional performance metrics for Alt-A transactions inapplicable to the Alt-A transactions rated by the Company's S&P brand.

340.    On June 19, 2007, McGraw and other Company executives participated in the NAA Mid-Year Media review on behalf of the Company. During the conference, Tillman , S&P's Executive Vice President, discussed the Company's exposure to RMBS and stated:

> Let me talk a little bit about the residential mortgage-backed market, which has been getting a lot of attention of late. We started this year by forecasting that we were going to be down about 10% to 15% in terms of dollar volume increases in the US residential mortgage-backed market. Issuance [have] been off, primarily due to a slowdown in the subprime area; again, which has been a headliner for a while. But the interesting statistic is that it's up 15% so far in the second quarter.
>
> *As you are aware, the subprime residential mortgage market is attracting considerable attention amid mounting delinquencies and defaults. Standard and Poor's took decisive action in 2006 by increasing loss expectation and required additional support in the transactions to address issues that we saw in the marketplace. Subprime that originated in 2006 -- this is a class of transactions that were sold in the year 2006 with mortgages that were originated there -- are having the most difficulty. Subprime issuance has been a significant and increasing component of the mortgage lending market over the last two years. Numerous subprime lenders are facing financial difficulties, while larger, more diversified firms have also been experiencing some of the pinch. Subprime downgrades will continue increasing, especially in the 2006 vintage.* And again, when we talk about the 2006 vintage, these are the mortgages that were originated in 2006.

341.    The statements referenced in ¶340 were each materially false and misleading when made for the reasons set forth in ¶256 and the factual detail contained throughout this Complaint. In addition, the statements referenced in ¶340 were each false and misleading when made as they

misrepresented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading. The true facts, which were then known to or recklessly disregarded by each of the Defendants, were:

- Defendants misled the market when they told investors that the Company understood the credit quality deterioration problems impacting the Company's Structured Finance division. The truth was that although the Company was aware of such problems, its models and data were outdated and insufficient to address them, ratings downgrades would reach into the thousands (representing billions of dollars), and the Company lacked a reasonable basis for predicting its financial performance.

- The Company was further misleading the market by identifying the purported increased loss expectations and credit support for riskier subprime deals. The reality was that the surveillance department was understaffed and lacked the necessary resources to evaluate existing deals. Moreover, because the Company's models had no predictive capability for the toxic RMBS and CDOs it had been rating, the Company had no idea how much loss coverage was actually required to make sure the deals it rated did not implode and collapse.

342. As alleged herein, on July 10, 2007, the Company cut and placed under review its ratings on billions of dollars worth of mortgage-related deals it had rated. A July 10, 2007 *Reuters* article titled "ABX plunges as S&P warns may cut $12 bln subprime RMBS" stated, in pertinent part:

A downgrade warning by Standard & Poor's on $12.0 billion U.S. subprime mortgage securities triggered a precipitous plunge in the benchmark ABX index on Tuesday, driving it to a record low, traders and investors said.

"The index sold off by over 6 points after S&P's rating action. The bid to offer was about 3 points wide. Right now the message out there is don't trade unless you absolutely need to," said Mike Kagawa, portfolio manager at Payden & Rygel in Los Angeles.

The ABX 2007-1 "BBB-minus" index, which references risky home loans made in last year's second half, fell 6.5 points to 49 from 55.5 on Monday, traders said. It has fallen 49 percent since January.

The credit defaults swaps index, which is tied to 20 ABS securities backed by subprime loans, is used by investors to hedge their subprime mortgage exposure.

*S&P said it may cut 612 residential mortgage-backed securities totaling $12.0 billion, which represent 2.13 percent of the $565.3 billion U.S. subprime market.* Poor collateral performance, expectations of increasing losses on underlying pools of loans which would result in a reduction of credit support triggered the "CreditWatch"

actions, S&P said.

"We have been surveilling these transactions on a regular basis and have been monitoring market trends. At this time, we do not foresee the poor performance abating," said S&P. "Loss rates, which are being fueled by shifting patterns in loss behavior and further evidence of lower underwriting standards and misrepresentations in the mortgage market, remain in excess of historical precedents and our initial assumptions."

"The focus this morning is on S&P and the fact that they have basically put all ratings of pending securitizations on hold. It's not clear as to why they have taken this action, but while the cloud of uncertainty exists it will weigh on an already fragile market," said another trader.

A downgrade of that magnitude would trigger severe losses as investors who are prevented from holding anything other than investment grade issues would unload their holdings en masse, market participants said.

Many managers of collateralized debt obligations (CDOs) have been big buyers of securities backed by subprime mortgage loans, which they use to layer into their structured deals. The sector has come under severe pressure as a result.

"Higher margin requirements for financed ABS and CDO positions and concerns over forthcoming forced CDO liquidations have put further selling pressure on ABX prices," said Christopher Flanagan, analyst at JP Morgan, noting the index is frequently used as a hedge for long risk positions.

Concerns that hedge funds that gambled on risky subprime investments would collapse en masse have been growing since Bear Stearns Asset Management last month scrambled to rearrange financing for two leveraged funds after creditors abruptly pulled out.

Heavy redemptions from investors concerned about their holdings of subprime mortgage securities claimed the Galena Street Fund of the Braddock Financial Corp. as the latest hedge fund victim. United Capital Asset Management also temporarily suspended redemptions to investors in its Horizon hedge funds after investors demanded refunds.

S&P said it was reviewing CDO ratings. "We are also conducting a review of CDO ratings where the underlying portfolio contains any of the affected securities subject to these rating actions," it said.

The rating agency announced changes to its rating methodology for new transactions, as well.

343.    In another *Reuters* article on July 10, 2007 titled "ANALYSIS-Downgrade avalanche stings risk-takers" it was reported, in pertinent part, that:

S&P said it may soon cut 612 residential mortgage-backed securities totaling $12.1 billion, which represent 2.13 percent of the $565.3 billion U.S. subprime market.

Most of the mortgage-backed bonds were packed into collateralized debt obligations. CDOs, in turn, have been a rapidly growing class of securities created by packaging together bonds, including risky subprime loans, junk or high-yield bonds, and high-grade debt, to help diversify risk.

If that weren't enough, rival credit-rating agency Moody's slashed its ratings on 399 mortgage-backed securities and may cut ratings of another 32, affecting a total of $5.2 billion of securities, citing higher-than-expected delinquencies in the underlying home loans.

*        *        *

"Markets should not be surprised by S&P's warning, but rather investors should be angry with both S&P and Moody's for not having a more rigorous modeling effort that measure the risk structured product from a top down and bottom up approach," said Tom Sowanick, chief investment officer at Clearbrook Financial LLC in Princeton, New Jersey.

344.    The likelihood of immense downgrades surrounded by pointed questions at S&P's timing and modeling ability began to reveal to the market a portion of the truth behind Defendants' fraud. Indeed, market commentators began to question why the Company was so late to take action on ratings that rested upon toxic mortgages. On July 11, 2007, *The Wall Street Journal* published an article titled, "Ratings Cuts By S&P, Moody's Rattle Investors – Critics Say Companies Are Reacting Too Late To Subprime Debt Woes." The article stated, in pertinent part:

The widening meltdown in the subprime-mortgage market caught up with the nation's two big debt-rating companies yesterday, with Standard & Poor's and Moody's announcing plans to downgrade hundreds of bonds backed by the risky home loans.

The moves jolted jittery financial markets as investors adjusted to the idea that the downturn in the nation's housing market is worsening and that a rebound might be months away, at best. The Dow Jones Industrial Average tumbled 148.27 points, or 1.1%, to close at 13501.70 as investors fled stocks and low-quality bonds, and some of them criticized the ratings giants for being too slow to act.

In an acknowledgment that it severely misjudged the risk of bonds tied to subprime mortgages, Standard & Poor's Ratings Service said it is looking to slash credit ratings on as many as 612 such bonds, with a value of $12 billion, because of mounting delinquencies on the underlying mortgages. Subprime mortgages are made to

213

borrowers with shaky credit profiles.

S&P said its action reflected several factors, including persistent mortgage delinquencies, weak home prices and lax loan-underwriting standards. It also cited mortgage fraud, a concern highlighted yesterday when the U.S. attorney for the Southern District in New York charged 26 people with taking part in "a wide-ranging scheme" to commit fraud at mortgage brokers.

S&P said it would take a tougher look at the steps lenders were taking to minimize fraud and misrepresentation of the data it receives.

Hours after S&P's move, Moody's Investors Service said it was downgrading 399 mortgage-backed securities issued in 2006 and reviewing an additional 32 for downgrade, affecting $5.2 billion of bonds. It also downgraded 52 bonds issued in 2005.

"The level of losses continues to exceed historical precedents and our expectations," said Susan Barnes, an S&P managing director, in a conference call with investors to discuss the looming downgrades.

The ratings actions come after months of intensifying turmoil in the market. They drew howls from some investors who have complained that S&P and Moody's put excessively high ratings on many classes of bonds backed by subprime mortgages during the housing boom and then were too slow to lower those ratings when the housing market started sinking.

"Why now?" said Steve Eisman, managing director at hedge fund Frontpoint Partners, in the S&P conference call. "Delinquencies have been a disaster for many months. It couldn't be that you just woke up to it. The rest of the world was yelling and screaming about your ratings for months," added Mr. Eisman, whose fund has been bearish on the subprime market.

"We did it as fast as we could given the information we had," Tom Warrack, an S&P managing director, said in response.

Shares of Moody's parent Moody's Corp. fell $1.11, or 1.8%, to $60.39 yesterday, and shares of S&P parent McGraw-Hill Cos. dropped $2.98, or 4.4%, both in 4 p.m. composite trading on the New York Stock Exchange.

Subprime loans have played an increasingly important role in the mortgage market, accounting for 20% of all mortgages originated in 2006, according to Inside Mortgage Finance. In all, $2.3 trillion of subprime loans were taken out by borrowers between 2002 and 2006, according to Inside Mortgage Finance. Key to their growth was the ability of lenders to spread the risks by packaging the loans into securities and selling them to a large number of investors from pension funds to hedge funds, who used the S&P and Moody's ratings to help gauge the quality of the bonds.

Ratings on such bonds are critical because many investors depend on them to decide whether a bond is safe enough to own. Lower ratings could force some investors to

214

dump bonds they had in their portfolios or mark down their value.

One kind of investment could be especially vulnerable -- collateralized debt obligations, or CDOs -- which are bundles of bonds that often contain many subprime-mortgage-backed securities. CDOs have been sold by investment banks to many pensions, insurance companies and hedge funds. S&P said it is assessing whether these investments might also require ratings downgrades.

<p style="text-align:center">*     *     *</p>

Yesterday, S&P said it is likely to lower its ratings on most of the 612 bonds under review very shortly. Many of them already had low ratings. But some bore investment-grade single-A or double-A ratings. In all, they represented 2.13% of the $565 billion in residential mortgage-backed securities that S&P rated between October 2005 and the end of 2006.

S&P also said it is revising its methodology and assumptions for rating new subprime bonds and will require more collateral to provide bigger cushions against losses.

Moody's latest downgrades affected around 1.2% of the dollar value of 2006 subprime bonds it rated, most of them investment grade. Some of the downgrades hit bonds backed by loans originated by Fremont Investment & Loan and New Century Mortgage Corp., lenders whose problems have been well-known for months.

New data from credit bureau Equifax Inc. and Moody's Economy.com show delinquency rates continued to climb across the broader economy in the second quarter, reaching 3.15% of all mortgages, compared with 2.87% in the first quarter. In some bonds targeted for downgrade by S&P and Moody's, delinquencies were around 20%.

S&P and Moody's reaped millions of dollars in fees during the housing boom for assigning ratings to mortgage bonds and other "structured finance" securities backed by subprime assets.

Typically, the bonds are diced and sliced so that some investors bear more risk than others. Some bonds get single-A, double-A or even triple-A ratings because holders of these bonds are the last to suffer when defaults on underlying mortgages start rising. The fact that they are now being scrutinized for downgrades is a sign of the potential depth of the fallout.

**Downgrade Wave**

Number of bonds backed by subprime mortgages downgraded or placed on review for credit-rating downgrades yesterday

| Original Rating | Moody's | Standard & Poor's |
|---|---|---|
| AAA | 0 | 0 |
| AA | 0 | 3 |
| A | 7 | 88 |
| BBB | 239 | 366 |
| BB (junk) | 185 | 155 |
| **Total** | **431** | **612** |

Source: Moody's Investors Service; Standard & Poor's

345.     Thereafter, on July 12, 2007, the *Financial Times*' website, www.ft.com, published an article titled "Rating agencies under scrutiny." The article stated, in relevant part:

When debt investments turn sour, the rating agencies have grown accustomed to drawing criticism for spotting problems too late and then taking too long to act on them.

The current turmoil in the US subprime mortgage market is no different for them. The crisis has generated a barrage of such investor criticism, which reached fever pitch this week in response to a swathe of downgrades of mortgage bonds and related complex debt products.

One investor repeatedly asked analysts at Standard & Poor's on a conference call this week: "What is it that you know today that the markets didn't know three months ago?"

Amid the steady drumbeat of bad subprime news – late payments and defaults on subprime home loans have been worryingly high for several months – the downgrades were broadly expected. But investors and analysts are struggling to understand what additional evidence the agencies were waiting for to justify the moves, and have raised a series of questions over the reliability of their analysis.

Susan Barnes, analyst at S&P said on the conference call that the rating agency waits for a body of evidence to accumulate before taking action: "It takes a period of time for these deals to show their true performance. We have been reviewing these deals closely and felt it was time to take action."

However, the rating agencies admit that the level of losses continues to exceed their initial expectations and historical precedent, prompting both Moody's and S&P to review their loss estimates and ratings process. Moody's announced its review in April, and S&P followed this week.

For many investors, the delay in taking action has raised concerns over the agencies' dependence on performance data that could be unreliable. This is partly because structural changes in the mortgage market and a higher incidence of mortgage fraud mean that relying on comparisons with data from previous housing downturns could give an incomplete picture.

Meanwhile, some analysts raise concerns that the rating agencies are not asking some of the most basic questions. Christian Stracke, analyst at research firm CreditSights, said: "An apparent lack of basic analysis behind [mortgage bond] ratings was on display in S&P's discussion of their estimate of the sensitivity of [late payment] rates to changes in interest rates: namely, they have no such estimate."

Josh Rosner, consultant at research firm Graham Fisher said: "The rating agencies appear to have relied, almost exclusively, on information provided to them by issuers and even have chosen not to require some meaningful disclosures about underlying residential loans included in the structures."

Mr Rosner points to an April report from Moody's that showed the rating agency did not consider debt-to-income ratios as a primary piece of data in their mortgage models, although this is generally considered as one of the three key predictors of mortgage default.

In the same report Moody's said it would for the first time request loan level data detailing the structure of adjustable-rate mortgages, the servicer, the month of the first interest rate adjustment and other data that would allow them to analyse risks. S&P admitted this week that it does not receive this kind of granular data on performance of individual loans within the mortgage pools backing the bonds that it rates.

***One revelation that analysts have described as "extraordinary" this week is that S&P has no specific estimate of how much turmoil in the housing market would be needed to force downgrades of the AAA and AA ratings that have been left untouched in this round of downgrades and constitute the bulk of the principal value of most mortgage-backed deals.*** Moody's also said in an interview that it had no such estimate.

The rating agencies wield enormous influence, not only because their pronouncements can affect the cost of funds for issuers of debt, but because ratings are often enshrined in the regulations that govern what securities can be bought by insurance companies, pension plans and mutual funds.

Analysts say some of the main reasons that initial ratings for subprime bonds may have been over-optimistic are weaker underwriting standards, fraud, and concentration in overvalued regions. Some analysts also warn that other parts of the mortgage market are beginning to show symptoms of similar troubles.

Meanwhile, many of these bonds are held by complex collateralised debt obligations. Roughly half of the CDOs issued in 2005 and 2006 were backed by mortgage-related debt.

Vishwanath Tirupattur, CDO analyst at Morgan Stanley said in a recent report: "Like it or not, rating agencies, as arbiters of credit quality, wield enormous influence – nowhere more so than in the context of CDOs."

346.   The partial revelations that reached the market on July 10-12, 2007 had a significant impact on the Company's stock price.  As investors began to learn a portion of the truth behind Defendants' false and misleading statements, the Company's stock price declined sharply, falling from a closing price of $67.22 on July 9, 2007 to a closing price of $62.10 on July 12, 2007, representing a decline of more than 7.5%, as demonstrated in the chart below:



347.   On July 24, 2007, the Company issued a press release entitled "The McGraw-Hill Companies Reports Second Quarter EPS of $0.79, a 31.7% Increase," which stated in relevant part:

*Revenue for the second quarter of 2007 increased by 12.5% to $1.7 billion compared to the same period in 2006*.

\*       \*       \*

*"A very strong performance by Financial Services was a key factor in our second quarter," said Harold McGraw III, chairman, president and chief executive officer of The McGraw-Hill Companies*.  "We also benefited from the McGraw-Hill School

Education Group's strong start in this year's state new adoption market and solid performances in higher education, professional and international markets.

*       *       *

*"Revenue for the first half grew to $3.0 billion, a 13.0% increase over the same period in 2006.*

*       *       *

*Financial Services:* "Revenue for this segment increased 21.2% in the second quarter to $821.0 million compared to the same period last year. Operating profit grew by 27.9% to $401.4 million.*

*       *       *

"Strength in fixed income and equity information services in domestic and international markets produced a record second quarter performance for revenue, operating profit and operating margin at Standard & Poor's. The operating margin for the second quarter was 48.9%. *Structured finance contributed 42.1% of the revenue growth*. Corporate and government ratings produced 38.1% of the revenue increase.

*       *       *

*"Structured finance was strong globally. In the domestic market, Standard & Poor's benefited from robust activity in commercial mortgage-backed securities and collateralized debt obligations. Despite a contraction in the U.S. subprime market, domestic collateralized debt obligations remained strong in the second quarter as arrangers focused on hybrids, synthetics and collateralized loan obligations. As a result, the issuance of collateralized debt obligations grew by 58.0% in the second quarter. In Europe, we saw solid performances in all asset classes.*

*       *       *

"In the U.S., total new issue dollar volume grew by 15.3% in the second quarter. Corporates increased 34.5%, setting a new record for issuance for the second consecutive quarter. Public finance was up 15.3%. Mortgage-backed securities dollar volume was off by 5.7%, reflecting a 12.4% decline in residential mortgage-backed securities issuance. Asset-backed securities were up 8.3%. In Europe, new issue dollar volume was up 33.4%.

*       *       *

The Outlook: "*We expect to achieve our goal of double-digit earnings growth in 2007* even though the growth rate will probably slow during the second half of the year as compared to our very strong first half performance. Although we expect low double-digit growth from Financial Services in the second half, tougher comparisons will make the fourth quarter more challenging. Some operating margin compression

219

may occur in our segments in the second half, but we still expect improved operating margins in all three segments for the full year."[66]

348.   Also on July 24, 2007, McGraw-Hill hosted a conference call to discuss its second quarter 2007 earnings and outlook.  The Individual Defendants participated in the call on behalf of the Company.  During the call, numerous false and misleading statements were made that were designed to artificially inflate the Company's stock price.  For example, McGraw attempted to downplay the rapid deterioration of the subprime market, characterizing market concerns as an "obsession":

> In the second quarter, *the obsession with subprime issues obscured some very, very positive trends in the ratings market*.  International markets grew at a double-digit rate and contributed 38.9% of ratings revenue in the second quarter, up from 36.6% for the same period a year ago.  The U.S. corporate market set a new record for issuance for the second quarter in a row, as both U.S. investment grade, which was up 33% and high-yield, which was up 42.6%, grew substantially.  Public finance coming off a slow second quarter last year grew solidly because of new money issuance, but also because of refundings.  *Structured finance was strong globally, despite a 12.4% decline in the dollar volume issuance of residential mortgage-backed securities in the United States*.
>
> *             *             *
>
> In Europe, the corporate sector is off to a solid start and the current pipeline of business is strong and it's across all sectors.  Dollar volume issuance in the U.S. public finance started the year on an upswing, but even though this may be a record year for issuance, we expect somewhat slower growth for the balance of 2007. *Similar volume issuance in the U.S. residential mortgage-backed securities market is off 11.6% in the first half of this year, and we anticipate a further decline in the second half.  We now estimate that dollar volume issuance of U.S. residential mortgage-backed securities will decline by 15% to 20% this year.  Our prior*

---

[66] On July 24, 2007, the Company issued a revised press release, stating: "This amendment pertains to Exhibit 2 of the Registrant's earnings release filed on Form 8-K on July 24, 2007.  In the Operating Results by Segment-Operating Profit, for the three and six month periods presented, the percentage of change for General corporate expense and Interest expense were inadvertently presented as favorable, when they were unfavorable.  In the Operating Results by Segment-Operating Profit, for the six month period presented, the percentage of change for McGraw-Hill Education Operating loss was inadvertently presented as unfavorable when it was favorable.  In all other respects, the earnings release and related exhibits filed on Form 8-K on July 24, 2007 did not require any change."

*guidance here was 10% to 15% and we think maybe just a little bit more, up to about 20% is right. Activity is being driven primarily by Alt-A and net interest margin security deals and the refinancing of adjustable rate mortgages*. Many potential deals are on hold as issuers reprice to the new criteria and gauge the market's appetite for residential mortgage-backed securities.

The U.S. commercial mortgage-backed securities market is up 36.8% in the first half, and of course that's driven by low interest rates and strong commercial real estate fundamentals, but the pipeline for commercial mortgage-backed securities is robust. Dollar volume issuance in the U.S. asset-backed securities market is up 22.5% for the first half, and the pipeline looks very solid. The U.S. collateralized debt obligation market, CDO market, soared last year and is off to a fast start in 2007. We expect more growth in the collateralized debt obligation market in the second half, but at rates well below the blistering pace established in the third and the fourth quarters last year.

349.    As the July 24, 2007 conference call continued, McGraw-Hill executives continued to downplay the problems of the subprime market and made additional false and misleading disclosures. Tillman further attempted to minimize the problems facing the Company:

*There's been a great deal of commentary recently about the deterioration of the subprime market. Not all of it has been particularly insightful or accurate, so we think it's important to share with you Standard & Poor's' perspective on our market conditions and our ratings*. In the brief time I have this morning, I would like to make five key points.

First, the current situation did not develop overnight. *For more than a year, Standard & Poor's have been signaling the market about the deterioration in residential mortgage-backed securities backed by subprime loans and their potential affect on credit worthiness*. Second, *S&P continues to alert the market to new problems*. On June 2, for example, we commented to the market about emerging issues with collateral debt obligation. S&P said that covenant-like juggernaut is raising CLO risks and that we were raising the collateralized loan obligation loss criteria to reflect potential expectations of increased loss exposure on covenant light loans. Third, we do not structure or engineer transactions nor do we arbitrate on which deals can or cannot proceed. Our guidelines and criteria are publicly available.

Fourth, criteria is a factor in whether or not Standard & Poor's is selected to do a rating. Tightening criteria may have an adverse impact on our market share, but we will continue to develop and adjust our criteria to reflect how changing conditions impact credit risk. *We are driven to improve our ratings process because it is our excellent track record that makes Standard & Poor's a rating agency of choice. Fifth, the performance of Standard & Poor's structured finance ratings have been exceptionally strong over a long period of time.* Our regularly-published default studies show the clear relationship between the initial ratings signed by Standard & Poor's and the likelihood of default. Since 1978, the average five-year default rate

for investment-grade structured securities is 0.87%. The default rate for speculative-grade securities is 15.42%. We identified heightened credit exposure with so-called affordability products and the layering of multiple risk factors in loan programs over a year ago and adjusted our assumptions going back to April 2006. In any rating decision, we are concerned about the duration and the severity of issues affecting future credit performance. *We need sufficient time and data to show how collateral pools are performing. Our recent actions are a continuation of that view and in applying our adjusted assumptions to the delinquency default and loss trends to make decisions on some of the RMBS transactions*.

Let me quickly sum up our latest actions in July. *S&P downgraded 562 classes of rated RMBS transactions that were backed by first lien subprime loans from the fourth quarter of 2005 through the fourth quarter of 2006.* It's worth noting that the 6.3 -- *$6.3 billion of securities* represented only 1.1% of all first lien subprime RMBS deals rated during this period. *We also downgraded 418 classes of S&P rated RMBS transactions, which were backed by closed-end second liens. That represented $3.8 billion in volume or 6.1% of this class.* As a result of the first lien subprime downgrades, *74 synthetic CDOs were downgrades, 19 classes of cash flow and hybrid CDOs were placed on credit watch negative, 17 classes of cash flow and hybrid CDOs were placed on credit watch negative as a result of the closed end second lien downgrades, and yesterday an additional 33 tranches from eight U.S. cash flow and hybrid CDOs were also placed on credit watch negativ*e. *Again, the result of downgrades of the first lien subprime transactions.* The downgrades we announced on the first lien subprime collateral did not impact any AAA ratings.

*Also note that while eight classes of the AAA second lien RMBS deals were downgraded, none of these fell below investment grade. Of course, we will continue to monitor these issues and will take any further rating actions we deem to be appropriate*. In fact, the actions we have taken in July are part of Standard & Poor's ongoing process of adjusting its assumptions and ratings to reflect current trends in the housing market, the mortgage finance market, consumer credit, and the overall economy as they move over time. We have provided the market with information on our approach for rating new CDOs containing RMBS securities, which are backed by nonprime collateral, and *S&P is currently reviewing RMBS transactions, which are backed by Alt-As and the net interest margin collateral.* That will be completed over the next several weeks. Transactions issued after January 2007 have not had adequate seasoning. We are monitoring these transactions under new assumptions and will take such ratings actions as we deem appropriate and as more loss data becomes available. In our view, loans made prior to January '05 are not at the same level of risk as those made since then.

I'll wrap up with one final observation. *Our role is to provide an independent opinion on credit worthiness based on demonstrable facts*. Sometimes that puts us at odds with the ebb and flow of market sentiment. While the market doesn't always agree with our ratings, we take a longer-term view and do what we believe is right for the market. And I would make one further note. Tomorrow, Standard & Poor's structured finance group will be holding a teleconference discussing the details of the downgrades that I have gone over with you today, as well as some future actions and the changes and assumptions that we have made, and I encourage any of you that are

interested in this detail to please dial in. The teleconference facts will be made available today. Thank you.

350. As the call continued, McGraw told analysts and the market that 2008 would be a

very good year for the Company's Financial Services division:

> **Karl Choi (Merrill Lynch, Analyst):** Hi. A couple of questions here. First, Terry, your comment about the fourth quarter for S&P being a little bit more challenging in terms of comps. It's a little bit early, but comps will remain difficult for all of '08 then, given what's going on in the subprime market and if some maybe liquidity growing out of the credit market here, does this change your confidence about S&P's ability to deliver double-digit topline growth next year?

> **McGraw III:** Well, it's a little early to get into 2008. I want to get through this year on this one. I feel very good about our guidance on double-digit growth, top and bottom line for S&P for the remainder of the year. Albeit, it's going to be at a lower rate and we have to see what the affect in some of the subprime there, but, again, it's going to be a smaller impact because of the strength overall, globally as well as in the corporate market. But on -- *our planning process that is underway now for 2008, I think 2008 for Standard & Poor's is going to be a very good year. But it's too early to quantify that, and so we'll give guidance come December on what we expect on that one, but I have every reason to believe that it's going to be a very good year*.

351. Later in the July 24, 2007 conference call, Tillman made additional false statements

to the market:

> I'm mentioning that we're going to adjust our criteria as we see fit, and if that requires higher subordination levels and higher support levels, it's then up to an issuer to make that choice in terms of whether they're going to go with S&P or not. To date, we have made moves in adjusting our criteria and in some regards, especially in a collateralized mortgage-backed securities area, as you probably have read, *we saw the changes in the real estate market a while ago, saw that the leveraging and the structuring of the deals and the underwriting was beginning to really begin to deteriorate somewhat and even further in the first quarter of '07, at which point again we called it like it was and just raised our requirements in terms of ratings. This can in fact have an adverse impact on whether they come to Standard & Poor's or not, but that's not what we're concerned about. We're concerned about calling it as it is*.

352. On July 27, 2007, the Company filed its interim financial report on Form 10-Q for the

quarter ending June 30, 2007. The financial results reported in the 10-Q were substantially similar to

those reported in the Company's July 24, 2007 press releases. The Form 10-Q was signed by

Bahash, and contained required Sarbanes-Oxley certifications signed by McGraw and Bahash stating that the Form 10-Q did not include any material misrepresentations. In discussing what drove McGraw-Hill's improved financial performance, the July 27, 2007 10-Q stated, in relevant part:

> *In the second quarter of 2007 the Company achieved growth in revenue and operating profit of 12.5% and 25.8%, respectively. The increase in revenue is primarily attributable to growth in the Financial Services segment.*
>
> \*      \*      \*
>
> *Service revenue increased 16.0% in the second quarter of 2007, due primarily to a 21.2% increase in Financial Services. Financial Services increased primarily due to the performance of structured finance ratings* and corporate (industrial and financial services) and government finance ratings. *In the U.S., issuance of collateralized debt obligations (CDOs) and commercial mortgage-backed securities (CMBS) drove growth in structured finance, while in Europe issuance across all asset classes grew at a double-digit pace.*
>
> \*      \*      \*
>
> *Financial Services revenue and operating profit increased substantially over second quarter 2006 results.* Foreign exchange positively impacted revenue growth by $12.1 million and had an immaterial impact on operating profit growth.
>
> *The Financial Services segment's increase in revenue and operating profit was due to the performance of structured finance* and corporate (industrials and financial services) and government ratings, which represented approximately 42.1% and 38.1%, respectively, of the growth in revenue. *In the U.S., issuance of collateralized debt obligations (CDOs) and commercial mortgage-backed securities (CMBS) drove growth in structured finance, while in Europe issuance across all asset classes grew at a double-digit pace.* The growth in corporate ratings issuance was driven primarily by acquisition financing, while public finance also performed well in the quarter with issuance driven by new money issuance and refundings.
>
> *Total U.S. structured finance new issue dollar volume increased 5.5% in the second quarter versus prior year. U.S. CDO issuance increased 58.0%,* according to Harrison Scott Publications and Standard & Poor's internal estimates (Harrison Scott Publications/S&P). *Despite weakness in issuance of cash CDOs backed by subprime residential mortgage-backed securities, overall issuance of U.S. CDOs remained strong* due to growth in other sectors such as issuance of hybrids and synthetics as well as issuance of collateralized loan obligations (CLOs) which was fueled by the robust acquisition financing market. U.S. commercial mortgage-backed securities (CMBS) issuance increased 38.5% over the prior year due to higher mortgage originations driven by the low interest rate environment and strong commercial real estate fundamentals as well as rising property values and refinancing of maturing deals. *U.S. residential mortgage-backed securities (RMBS) issuance decreased 12.4%, driven primarily by declines in the subprime and home equity*

*sectors*. According to Thomson Financial, U.S. corporate issuance by dollar volume for the second quarter of 2007 increased 34.5%, with investment grade up 33.0% and high yield issuance up 42.6%, driven by continued robust merger and acquisition activity and opportunistic financing as issuers took advantage of favorable market conditions.

<p style="text-align:center">*       *       *</p>

Structured finance will continue to drive global growth in 2007 with increases expected in all regions around the world. However, financial market concerns regarding the credit quality of subprime mortgages could adversely impact future debt issuance of residential mortgage backed securities and CDOs backed by subprime RMBS in the United States. ***On July 10, 2007, Standard & Poor's placed 612 classes of residential mortgage-backed securities backed by U.S. subprime collateral on CreditWatch with negative implications. Some of these classes have subsequently been downgraded. Standard & Poor's also indicated that it would assess the impact of these potential negative movements on related asset classes, such as CDOs.*** Similar actions were taken by other credit ratings agencies as well. Notwithstanding the current market environment in the U.S., the Company had been anticipating a decline in residential mortgage originations as well as a slow down in the rate of growth of CDO issuance versus the significant rates of growth experienced in the past. U.S. residential mortgage backed securities issuance is expected to decline by approximately 20%-30% in the second half of the year which would result in approximately a 15%-20% decline in issuance for the year. Slower growth in U.S. CDO issuance is also expected, with growth rates ranging from approximately 15%-20% for the balance of the year. U.S. CDO growth for the year is expected to range between approximately 40-45% versus 93% in the first half of 2007. ***The outlook for both asset classes as well as others is dependent upon many factors including the general condition of the economy, interest rates, credit quality and spreads, and the level of liquidity in the financial markets***.

<p style="text-align:center">*       *       *</p>

***The market for credit ratings as well as research, investment advisory and broker-dealer services is very competitive. The Financial Services segment competes domestically and internationally on the basis of a number of factors, including quality of ratings, research and investment advice, client service, reputation, price, geographic scope, range of products and technological innovation.***

<p style="text-align:center">*       *       *</p>

The Company maintains disclosure controls and procedures that are designed to ensure that information required to be disclosed in the Company's reports filed with the Securities and Exchange Commission (SEC) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including its Chief Executive Officer (CEO) and Chief Financial Officer (CFO), as appropriate, to allow timely decisions regarding required disclosure.

As of June 30, 2007, an evaluation was performed under the supervision and with the participation of the Company's management, including the CEO and CFO, of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) under the U.S. Securities Exchange Act of 1934). Based on that evaluation, the Company's management, including the CEO and CFO, concluded that the Company's disclosure controls and procedures were effective as of June 30, 2007.

353.    In response to the July 24, 2007 press releases and conference call, and the July 27, 2007 Form 10-Q, the Company's stock price declined, falling approximately 5.5% from a close of $63.37 on July 23, 2007 to closing prices of $59.79 on July 24, 2007 and $60.01 on July 27, 2007. If not for Defendants' false and misleading statements and omissions, however, the Company's stock price would have declined even further.

354.    The statements referenced in ¶¶347-52 were each materially false and misleading when made for the reasons set forth in ¶256 and the factual detail contained throughout this Complaint. In addition, the statements referenced in ¶¶347-52 were each false and misleading when made as they misrepresented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading. The true facts, which were then known to or recklessly disregarded by each of the Defendants, were:

- The Company's S&P brand had not yet taken "decisive action" (and, in fact, would not until its settlement with the SEC). The Company's ongoing inability or refusal to conduct meaningful and timely surveillance meant that any action taken by the Company was materially delayed.

- Although Defendants purported to give insight into the ongoing problems impacting the Company's Financial Services segment, the reality was they were misleading investors because the Company's models were insufficient for rating the performance of subprime and Alt-A RMBS and CDOs.

- Although the Company claimed to be reviewing RMBS transactions for future ratings actions, its surveillance was more than one year behind, and was very severely understaffed.

- In light of the foregoing, the Company's forecast for earnings lacked a reasonable basis and McGraw was in no position to comment on the Company's 2008 financial outlook.

355.     On August 16, 2007, investors were shocked when the *Associated Press* published an article entitled "EU to Examine Credit Rating Agencies" reported that "the European Union will examine why credit rating agencies were slow to react to early signs of U.S. loan defaults that are now worrying investors worldwide." The *Associated Press* article stated in relevant part:

### EU to Examine Credit Rating Agencies

EU to Look at Why Credit Rating Agencies Were Slow to Downgrade Subprime Losses

BRUSSELS, Belgium (AP) – The European Union will examine why credit rating agencies were slow to react to early signs of U.S. loan defaults that are now worrying investors worldwide, EU officials said Thursday.

The inquiry will look specifically at whether there were conflicts of interest, they said.

***Credit rating agencies such as Standard & Poor's Corp., Moody's Investors Service Inc. and Fitch Ratings are paid by the banks that they rate for credit-worthiness***.

A senior EU official, who spoke on a condition he not be quoted by name because of the sensitivity of the issue, said the EU needed to look at possibly strengthening its code of conduct and whether other measures would be appropriate.

He said there was a "very significant delay" between banks reporting a sharp climb in poor returns from U.S. subprime housing loans made to people with poor credit and the agencies putting banks on credit watch.

Agencies continued to support debt trading at a discount after banks' first quarter results this spring showed a growing number of mortgage defaults, he said.

In the United States, Rep. Barney Frank, chairman of the House Financial Services Committee, in a recent interview promised a "serious inquiry" this fall into the ratings agencies, which have been criticized for not properly evaluating the risks of bonds backed by mortgages given to borrowers with weak credit.

EU spokeswoman Antonia Mochan confirmed that the European Commission and its high-level advisory group on financial services, the Committee of European Securities Regulators, would be looking at how credit rating agencies assess structured products, investments that derive their value from real assets and are used to spread risk.

Mochan said the EU's executive arm would look at the governance of these agencies, their management of conflict of interests and their ratings performance.

In addition, CESR will in parallel report on the agencies next April. A code of conduct drawn up by the International Organization of Securities Commissions was also under review, she said.

"We have a general eye on market developments including regulatory supervision and hedge funds," Mochan said. "We are following the situation and will draw any lessons that need to be drawn from what we see over the last weeks and in the coming days and weeks."

Moody's spokesman Anthony Mirenda said the agency, "is committed to continuing the constructive dialogue that we've had with regulators and policymakers to enhance the overall understanding of the structured financial market, the various players in that sector and the role of ratings and rating agencies in the market."

A spokesman for S&P, part of McGraw-Hill Cos., declined to comment other than to say that S&P is participating in the European review. A Fitch spokesman, James Jockle, said that Fitch has not yet been contacted by the EU but "would be happy to answer whatever questions they may have about our business."

The worsening credit situation prompted French President Nicolas Sarkozy to urge the Group of Seven industrial countries to better monitor international financial markets. In a letter to German Chancellor Angela Merkel, he called for an investigation of the role of credit agencies in identifying risks.

Sarkozy has repeatedly sought a greater role for governments in managing the economy – and has sought to wrest some control of monetary policy from European Central Bank regulators.

356.    Investors were shocked by this news, which partially revealed the Company's true financial condition, and reacted negatively, causing the price of McGraw-Hill shares to fall as low as $48 per share – on unusually heavy trading volume – as detailed in the chart below:



357. The decline in the Company's stock price was described in a *Reuter's* article published on August 16, 2007, which stated:

Rating agency shares fall on report of EU review

New York, Aug 16 (Reuters) – Rating agencies' shares were falling on Thursday after a European Union executive announced a review of the code used by the raters, a probe that could be critical of the industry.

EU Internal Market Commissioner Charlie McCreevy said that the crisis in the U.S. subprime mortgage sector has highlighted apparent failings in the voluntary code now used by the raters.

The three largest U.S. raters are Moody's Corp [], Standard & Poor's, a unit of McGraw-Hill Cos. Inc. [] and Fitch, a unit of France's Fimalac[].

Moody's shares were off 1.7 percent or 84 cents in afternoon trading at $48.26 on the New York Stock Exchange, below their previous year low of $48.28 set last August; they fell as low as $43.70 earlier.

***Shares of McGraw-Hill were off 5.1 percent or $2.60 in NYSE trading, below their year low of $50.59 last August; they fell as low as $48.00 earlier.***

Fimalac shares fell 8 percent in Paris to 54.40 euros.

"There's likely to be a headline risk in this story," said Neil Godsey, and analyst with Friedman, Billings, Ramsey & Co. "And it will stay that way until the subprime turmoil subsides."

After the collapse of energy trader Enron Corp. in 2001, the global market regulators come out with a voluntary code. This was targeted at what they saw as conflicts of interest in the sector, whereby rating agencies are paid by the firms they rate.

"The Commission is going to be looking at the issue of credit ratings agencies, particularly as they relate to rating of structured products," Commission spokeswoman Antonia Mochan told a regular news briefing.

In Brussels, Mochan said the Commission would look at a number of issues – governance of the agencies, their management of conflicts of interest, resourcing and ratings performance.

She said the Commission would focus on "the concerns we have in regard to their apparent slowness in responding to material market evidence of deterioration since 2006."

Mochan said the review would take at least until April 2008, but analysts said scapegoats were being hunted for the subprime fallout.

"THE BLAME GAME"

"The blame game has already started, with a growing criticism of the rating agencies," Citigroup economist Richard Reid said.

McCreevy will meet next month with the chairman of the Committee of European Securities Regulators (CESR), which groups the EU's 27 national market watchdogs, to discuss the issue.

Moody's spokesman Anthony Mirenda said his company would not comment on its stock price butt was "committed to constructive dialogue with regulators and policymakers."

S&P said it was already participating in the CESR's review of hose the industry complied with the code.

James Jockle, a managing director of Fitch, said his company had not been contacted by the EU regarding the review but would be happy to participate. "We talk frequently to world regulators," he said.

358.    On August 30, 2007, the Company announced that it had terminated its relationship with S&P's president, Corbet. On August 31, 2007, the *Wall Street Journal* reported on the Company's shift in leadership:

*McGraw-Hill Cos. replaced the top executive at Standard & Poor's Corp. as criticism of the company's financial-information division mounts for its role in the unfolding subprime-mortgage crisis.*

Kathleen Corbet, S&P's president, is leaving to pursue other opportunities, McGraw-Hill Cos. said yesterday, without elaborating. She will be succeeded by Deven Sharma, 51 years old, a senior McGraw-Hill executive who has been at S&P since late last year.

*S&P's bond-rating arm and several other rating services have downgraded hundreds of mortgage-backed securities tied to subprime loans in recent months. Critics charge S&P and others were too optimistic about the market for too long. Ratings firms say they did the best they could with the information available at the time. The company also compiles stock indexes such as the S&P's Composite Index of 500 stocks, commonly known as the S&P 500.*

McGraw-Hill spokesman Steven Weiss said Ms. Corbet's departure wasn't related to criticism of its subprime-bond ratings.

<p style="text-align:center">*    *    *</p>

McGraw-Hill's shares soared during most of [Corbet's] S&P tenure, in part because of booming credit markets. Shares have tumbled 26% since the start of this year. Earlier this month, they hit a 52-week low of $47.15. The shares rose 48 cents to $50.27 yesterday in 4 p.m. New York Stock Exchange composite trading.

<p style="text-align:center">*    *    *</p>

The credit-market turmoil has caused a sharp decline in the issuance of mortgage-backed securities and derivatives like collateralized debt obligations. During the past few years, a large chunk of S&P's revenue has come from rating these "structured-finance" products, which bring in more fees than rating corporate and municipal bonds.

For the first six months of 2007, McGraw-Hill reported net income of $421 million, or $1.18 a share, up 49% from a year ago, in part because the previous year included a charge. Revenue was up 13% to $3.01 billion, half of which came from S&P, which chalked up growth of 21%. Analysts expect McGraw-Hill to report earnings of $3.05 a share for the full year, up 22% from 2006, according to Thomson Financial. They are expected to rise 14% in 2008. In addition to worries about a slowing market, investors have been concerned that the rating business will face litigation and more government regulation.

359.    On September 7, 2007, *The Wall Street Journal* reported that the SEC and State

Attorneys General of New York and Ohio were investigating and subpoenaing McGraw-Hill.

Although the subpoenas attracted media coverage, McGraw-Hill did not disclose their existence to

investors for several weeks.  The article stated, in part:

### Ratings Firms' Practices Get Rated

### SEC Probes if Conflicts Fueled Subprime Troubles

In the wake of mortgage-market turmoil, regulators plan to probe how the big credit-rating companies are paid and whether they are independent enough of the Wall Street firms that issue bonds.

*The Securities and Exchange Commission and state attorneys general in New York and Ohio have begun to examine how the ratings firms evaluated subprime-mortgage-backed securities that grew into a trillion-dollar market.  The ratings firms include McGraw-Hill Cos.' Standard & Poor's*; the Moody's Investors Service unit of Moody's Corp., whose stock has soared in recent years; and Fitch Ratings, a unit of Fimalac SA of Paris.

Wall Street bankers churned out profits in recent years by bundling mortgages into securities and selling them to investors.  *Ratings firms played an important role because they gave investment-grade ratings to many of those securities, making it easier for Wall Street firms to sell the bonds*.

*Hundreds of those securities have since been downgraded by the ratings companies*.

*Though that is a small portion of all the securities graded by the ratings firms, the reversal contributed to a rout in credit markets last month* and has sparked criticism of the ratings firms.

\*        \*        \*

In New York state, Attorney General Andrew Cuomo has subpoenaed documents from S&P and Fitch as part of a broader probe into the mortgage market.  In Ohio, Attorney General Marc Dann is looking into the ways that rating firms interacted with Wall Street underwriters.  "The more we look at it, the more we realize that these firms are important," said Mr. Dann.

360.    On September 10, 2007, *CNBC* reported that more states were joining in the probe of

McGraw-Hill's S&P brand:

Half a dozen states are working together to investigate rating agencies, banks and other players that benefited from the onetime boom in subprime mortgages that has since turned into a meltdown, Ohio Attorney General Marc Dann told Reuters.

Cooperating with Ohio, states including Massachusetts, Illinois and New York, as well as the District of Columbia, are gathering data to determine if agencies are independent enough from Wall Street banks that issue mortgage bonds and other securities, he said.

Dann also stressed that the investigation focuses on all the firms that participated in the booming market for mortgage securities: mortgage brokers, appraisers, wholesale and retail lenders, investment banks, law firms and accounting firms.

"Everybody knows they don't get paid until the transaction gets a triple-A rating," said Dann, who has been looking into rating agencies since July.

"The system clearly is broken, and the poster child for that breakdown is the securitization of fraudulently obtained mortgages now known as subprime bonds," Dann said in a brief interview Friday. "Something has to be done about it."

A spokesman for Massachusetts Secretary of the Commonwealth William Galvin confirmed the office is looking into subprime market issues.

New York Attorney General spokesman Jeffrey Lerner declined to comment on the credit agencies probe. "We have not commented on the ongoing investigation."

### Incentives for Ratings Agencies?

Dann in recent months has been among the most vocal critics of the mortgage securities industry. He argues that agencies such as the Moody's Investors Service unit of Moody's and Standard & Poor's, part of McGraw-Hill, had an incentive to work with underwriters and ultimately grant high ratings to securities packaged by Wall Street banks.

Those ratings in several cases were downgraded after subprime loans went sour, leading to losses in related securities. The rating cuts sparked a wider panic in debt markets that has triggered losses for investors and a credit crunch more broadly.

Thousands of Ohio homeowners now face default and state pension funds suffered losses on mortgage bonds that were supposed to be as safe as Treasuries, Dann said.

On Wednesday, the Securities and Exchange Commission said it had begun a probe into the role of rating agencies in the mortgage market. The review, an SEC official told a Congressional hearing, looks at advisory services provided by agencies to underwriters and to lenders, the potential for conflicts of interest, disclosures and the performance of credit ratings after issuance.

Moody's said it is cooperating with the various probes.

"In light of developments in the market we've received and anticipate receiving various government inquiries and we will assist with each of these inquiries," Moody's spokesman Tony Mirenda said. S&P officials were not immediately available for comment.

Dann declined to comment on the specifics of his probe. He did say the state plans to hire an outside legal counsel over the next few weeks and has beefed up staff assigned to handle the expanding probe.

Looking ahead, Dann said he expects these actions will lead to industry reforms,

including greater transparency surrounding the relationship between banks and agencies. He also hopes the industry can create a different evaluation process for bonds that prevent conflicts of interest.

"We're going to work as hard as we can for consumers and pensioners, to hold accountable all those who created such a perverted version of our capital markets," Dann said.

361.    On September 18, 2007, the Company issued a press release entitled "The McGraw-

Hill Companies Reaffirms Double-Digit Earnings Growth for 2007," which stated in relevant part:

In a presentation today at Goldman Sachs' Communacopia XVI 2007 conference, Harold **McGraw III**, chairman, president and CEO of The McGraw-Hill Companies (NYSE: MHP), **reaffirmed that the Corporation expects to achieve double-digit earnings growth in 2007**, continuing its long-standing record of growth.

"We expect to achieve our goal of double-digit earnings growth for the year even though the rate of growth is expected to slow during the second half of the year as compared to our very strong first-half performance," said Mr. McGraw. "For the full year, we also still expect to achieve double-digit top- and bottom-line growth in Financial Services, as well as improved operating margins in our McGraw-Hill Education and Financial Services business segments."

*       *       *

**In Financial Services we anticipate top-line growth of nine-to-12 percent and double-digit bottom-line growth in the third quarter**, while our Information & Media businesses will continue to battle the impact of a soft advertising market for the remainder of the year, which may affect our hopes for 2007 margin improvement in this business segment."

Mr. McGraw noted that Standard & Poor's faces the toughest comparisons of the year in the fourth quarter given that its revenue grew by 22.1 percent in the fourth quarter of 2006. **In reviewing current deceleration in the U.S. structured finance market, Mr. McGraw commented that "assuming it continues, we anticipate flat to declining revenue in the fourth quarter and a reduction in operating profit versus the same period last year" in Financial Services**.

**"We are obviously coming through a challenging period in Financial Services, but we believe the issues are short-term and can be addressed.  Furthermore, favorable long-term trends, including the globalization of financial markets, securitization, privatization and the disintermediation of the banks in favor of public markets, will continue to drive our business for some time to come," said Mr. McGraw.**

"We look forward to continuing Standard & Poor's tradition of service to investors around the globe by working with government officials as they review the role our industry plays in the capital markets and the way credit ratings are set," added Mr. McGraw.

234

362. Also on September 18, 2007, McGraw participated in the Goldman Sachs Communacopia XVI Conference. During the conference, McGraw made additional false and misleading statements to the market:

> S&P has always lived in a goldfish bowl. **Our business model has always been built on transparency and regulators now require it**. That is why we publish our ratings and analysis free to investors and to others around the world in real time. Each day, S&P publicly issues between 500 and 1000 ratings opinions across the globe. Today, there are more than 1.2 million public and private opinions on debt outstanding, most of which are available for free at standardandpoors.com. Investors can access up to nine million current and historical ratings on S&P's RatingsDirect.
>
> Because the market wants to scrutinize our ratings, we also host conferences, seminars, teleconferences around the world and we publish articles explaining assumptions, methodologies, criteria guidelines, transition studies and performance data on our ratings opinions. **We have institutional safeguards in place to ensure the independence and integrity of those opinions**.
>
> For all that transparency, we still see misunderstanding starting with the basic notion of what a credit rating represents. A rating is an impartial and independent opinion on the credit quality of bonds and the likelihood that investors will be paid interest and principal in a timely fashion. At S&P, these ratings are decided by committees, not by individual analysts. Rating the ultimate credit risk of course is not the same as pricing the bond.
>
> In our view, credit ratings do not and should not fluctuate like bond prices. Bond prices are anticipatory, while **bond ratings are based on current and expected credit performance**. In other words, bond ratings are an assessment of the current credit worthiness of an obligation in accordance with its terms. We are not operating a buy/sell/hold business. Ratings in comparison to the ebb and flow of market prices are designed to be stable. They do change of course, but that is based on new information or fundamental adjustments to risk profiles that drive the assumptions behind our credit opinions.
>
> We do not structure transactions nor do we determine which deals can or cannot proceed. We are not investment advisors and we are not consultants. **There is no distinction between a rating of a corporate bond or a rating of just one tranche of a structured finance transaction. In both cases, Standard & Poor's is applying its own predetermined, nonnegotiable and publicly available criteria and assumptions to the facts presented.**
>
> So while there may be more dialog between S&P and an issuer in the structured finance transaction, that does not change the reality that at its core, S&P is still just applying its own predetermined, nonnegotiable, publicly available criteria in a factual context.

As part of the ratings process, we do have regular dialog with bond issuers. We think it is necessary and the international regulatory community insists on openness, transparency and dialog. This dialog helps issuers understand our ratings criteria and it **helps S&P understand the structured securities so that it can arrive at better informed opinions on credit worthiness**.

S&P has been criticized by some for moving too fast or too slow, moving too slowly as the charge in the subprime market. The problems in the subprime market did not develop overnight. We are in the 20th month of a housing recession. **By early 2006, S&P was informing the market about increased risk**. Here is a headline from the S&P RatingsDirect in January 2006. US residential mortgage backed securities market still robust, but risks are increasing and growth drivers are softening.

In April of 2006, S&P told the market that it was raising the level of credit support, credit enhancement, collateral required for riskier subprime deals. Here is a headline from S&P RatingsDirect in May 2006. A more stressful test of a housing market decline on US residential mortgage backed securities. By July 2006, S&P was reporting sector report card, the heat is on for subprime mortgage. **The point is that Standard & Poor's was already clearly informing the market in early 2006 about risks that it perceived in the residential mortgage backed securities backed by subprime loans and the potential effect on credit worthiness.**

363. The statements referenced in ¶¶361-62 were each materially false and misleading when made for the reasons set forth in ¶256 and the factual detail contained throughout this Complaint. In addition, the statements referenced in ¶¶361-62 were each false and misleading when made as they misrepresented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading. The true facts, which were then known to or recklessly disregarded by each of the Defendants, were:

- The so-called "challenging period" being experienced in Financial Services was the direct result of Defendants' fraudulent scheme and concealed risks resulting therefrom. Moreover, Defendants lacked a reasonable basis for labeling the issues as "short-term." Quite the opposite, they were fully aware they had leveraged the Company's entire reputation on the pursuit of market share at any cost.

- McGraw's statement that the Company's ratings of tranches of structured finance transactions was based on S&P applying its "own predetermined, nonnegotiable and publicly available criteria and assumptions to the facts presented" was a complete and total fabrication. It is a documented fact that the Company's criteria was negotiable and not entirely publicly available. Defendants' entire race to the bottom in pursuit of market share required the continual downward negotiation of ratings criteria so that the Company could rate more deals and not lose deals to its competition, including Moody's, among others.

- McGraw was further misleading the market by hiding behind the purported warnings S&P gave to the market in 2006 about increased credit risk. The reality was that because the Company's models had no predictive capability for the toxic RMBS and CDOs it had been rating, the Company had no idea how much loss coverage was actually required to make sure the deals it rated did not implode and collapse.

364. On October 18, 2007, the Company issued a press release entitled "The McGraw-Hill Companies Reports Third Quarter EPS of $1.34, a 26.4% Increase," which stated in relevant part:

The McGraw-Hill Companies (NYSE: MHP) today reported diluted earnings per share increased 26.4% to $1.34 in the third quarter compared to $1.06 for the same period last year. Diluted earnings per share in 2006 included *a $0.03 charge for restructuring business operations*.

\* \* \*

"Double-digit growth and increased share in the elementary-high school market in the most important quarter of the year for education and *solid performances in Financial Services even as the structured finance market deteriorated were key to our results*," said Harold McGraw III, chairman, president and chief executive officer of The McGraw-Hill Companies. "The operating margin expanded in all three segments.

\* \* \*

*Financial Services: "Revenue for this segment increased 12.5% in the third quarter to $759.6 million compared to the same period last year. Operating profit grew by 17.3% to $346.7 million.* Foreign exchange rates positively affected revenue growth by $12.6 million and had an immaterial impact on operating profit growth.

"Double-digit growth in Standard & Poor's international fixed income markets, a strong performance by corporate and government ratings, and outstanding results from financial information products and services offset growing weakness in structured finance. *Although new issuance in the U.S. bond market declined precipitously in September, the segment improved its operating margin to 45.6%, up from 43.8% for the same period in 2006.*

"International credit ratings and services accounted for 41.6% of ratings revenue in the third quarter versus 38.5% for the same period last year.

*"Structured finance revenues declined modestly in the third quarter due to difficult conditions in the credit markets created by the performance of subprime mortgages.* Solid growth overseas partially offset a decline in the U.S. market. *The contraction in U.S. residential mortgage-backed securities activity and the related impact on the collateralized debt obligation sector were the biggest contributors to the revenue shortfall in structured finance*. Revenue increased in the asset-backed

securities market.

<div align="center">*     *     *</div>

"For the third quarter, new issue dollar volume declined by 19.7% in the U.S. market
and by 23.6% in Europe, according to reports from Thomson Financial and Harrison
Scott Publications and Standard & Poor's estimates.

"In the U.S., investment-grade corporate dollar volume issuance increased 9.4%
while speculative volume fell 76.8%. As a result, total corporate issuance was flat.
Public finance issuance was up 3.8%. ***Mortgage-backed securities issuance was off
43.9% as residential mortgage-backed securities fell 59.3%. Asset-backed securities
issuance was off 7.6%.***

<div align="center">*     *     *</div>

The Outlook : "We are still on course to produce double-digit earnings per share
growth in 2007, as well as improved operating margins in the Financial Services and
McGraw-Hill Education segments. For the fourth quarter, revenues and earnings
will not match last year's results because of challenging conditions in the structured
finance market and some softness in education."

365.    Also on October 18, 2007, McGraw-Hill hosted a conference call to discuss its third

quarter 2007 earnings and outlook. The Individual Defendants participated in the call on behalf of

the Company. During the call, numerous false and misleading statements were made that were

designed to artificially inflate the Company's stock price. For example, McGraw stated:

***Credit quality issues and the repricing and re-evaluation of risks, due in part to the
concerns regarding the performance of subprime mortgages, all contributed to that
decline***.

<div align="center">*     *     *</div>

Although new issue volume is an imperfect measure of our performance in any one
period, recent issuance does illustrate the trajectory of business in the third quarter.
As this chart indicates, after a slow start in July, there was strong acceleration in new
dollar issuance in the U.S. industrial market in August and September and obviously
for the third quarter. There also was modest improvement in the public finance
sector, which was encouraging, ***but we saw a sharp decline in new issuance dollar
volume in the U.S. structured finance markets as the third quarter progressed***. The
following charts illustrate the pattern I have just described. You can see year-over-
year volume plunging in September for the U.S. residential mortgage-backed
securities, and also somewhat for the U.S. commercial mortgage-backed securities,
and U.S. collateralized debt obligations, CDOs.

<div align="center">238</div>

The activity that we're seeing in the U.S. structured finance so far in October is tracking the level of issuance we saw in September. We already pointed out that the year-to-year comparisons are challenging in the fourth quarter for structured finance. It is a large quarter seasonally for that business, and the revenue model is heavily transaction oriented. ***We now expect new issue dollar volume in the U.S. residential mortgage-backed securities market to decline by 70 to 75% in the fourth quarter versus last year, which obviously was robust. Declines of 85% to 90% are possible in the new issuance of U.S. CDOs, collateralized debt obligations, in the fourth quarter versus last year. As these charts illustrate, new issue dollar volume in the fourth quarter of 2006 actually surged in December for U.S. residential mortgage-backed securities, and collateralized debt obligations. The comparisons may not be quite as challenging for asset-backed securities, and possibly U.S. commercial mortgage-backed securities***.

366.     Regarding the problems in the subprime market, McGraw downplayed the extent of problems facing the Company:

Well, we're in to subjective territory, Craig. My opinion is just one. I personally don't think a two-year timeframe for a credit crunch in the structured finance market to return is realistic. We're already seeing signs of things like the commercial mortgage-backed market starting to pick up again, and I think it was just a pause it had taken there because we had seen since early 2005 that market do very well. ***But, I think we have to assume that there's going to be some softness, certainly with CDOs and residential mortgage-backed securities going forward here, but I don't think we're going to see an extended credit crunch.*** I think that would have implications on the economy overall, and I don't think that would be in the best interest of the major lending institutions either, so I just don't see that taking place. There is enormous liquidity that still exists in the system because of all of the worldwide surpluses and that still has to be employed. ***So, I see this as more temporary in nature rather than long-term in nature***.

367.     Later in the conference call, the following exchange took place as one analyst questioned how McGraw-Hill's S&P brand would be impacted by the extreme problems in the structured finance market:

***David Einhorn (Greenlight Capital, Analyst):***     Oh, thanks for taking my question as well. My question is, as you look at the structured finance market, are there parts of that it you feel, looking back -- it's not a question that they -- there's a temporary issue, but maybe some of this just wasn't such a good idea to begin with? And, second, I'm wondering ***how you view Standard & Poor's from a brand, and what might be happening to the brand as a result of what's gone on in the structured finance market?*** Thanks so much.

***McGraw III:*** Yes, David, the market is what the market is, and what we do is provide access to the capital markets, and provide in the structured area, credit ratings that relate to the risk a particular instrument has in terms of defaulting on its

239

interest or on its principal payment.  So, the structured finance market is a -- is a market that institutional investors like, and a lot.  The reason is, is because with structured product you can -- you can divide them up in to tranches and you can get just the risk reward characteristics or attributes that you are looking for in terms of your own portfolio construction on that one.  So, if the market wants those kinds of products, and the institutional investors want those products, then we move with the market and we're going to rate whatever on that part.

Give even the current environment I think what you are going to see is more of a flight to quality, and -- and less to speculative grade on that, and -- and we're reflecting that now.  In terms of Standard & Poor's as a brand, no. I mean, your constantly growing.  You're constantly learning.  You're constantly involved in not only the rating side of the market, but providing the transparency in terms of all of the financial information products.  And we are -- *we take that responsibility very seriously, and the credibility that S&P has as a brand, in terms of serving the markets in a lot of areas here and around the world, is only going to grow with the growth of the capital markets*.

368.    On October 26, 2007, Connecticut Attorney General Blumenthal confirmed that his office issued subpoenas to the three largest debt rating agencies as part of an antitrust investigation into the commercial debt rating industry.  Blumenthal sent the subpoenas October 10, 2007 to S&P, among others.  McGraw-Hill did not disclose the subpoena until October 26, 2007.

369.    Also on October 26, 2007, the Company filed its interim financial report on Form 10-Q for the quarter ending September 30, 2007.  The financial results reported in the 10-Q were substantially similar to those reported in the Company's October 18, 2007 press releases.  The Form 10-Q was signed by Bahash, and contained required Sarbanes-Oxley certifications signed by McGraw and Bahash stating that the Form 10-Q did not include any material misrepresentations.  In discussing what drove McGraw-Hill's improved financial performance, the October 26, 2007 10-Q stated, in relevant part:

> *In the third quarter of 2007 the Company achieved growth in revenue and operating profit of 9.8% and 17.0%, respectively.  The increase in revenue is primarily attributable to growth in the McGraw-Hill Education and the Financial Services segments.*

<p style="text-align:center">*       *       *</p>

Service revenue increased 10.5% in the third quarter of 2007, due primarily to a 12.5% increase in Financial Services.  Financial Services increased primarily due to

<p style="text-align:center">240</p>

the performance of corporate (industrial and financial services) and government finance ratings. *Structured finance ratings faced challenging market conditions as a result of the performance in the subprime mortgage sector as well as concerns about credit quality across most debt asset classes*. The service margin increased to 34.4% from 30.0% in the third quarter of 2006.

*In Financial Services, because of current credit market conditions, issuance levels have deteriorated across all asset classes and regions during the latter half of the third quarter. The impact on U.S. residential mortgage-backed securities and U.S. collateralized debt obligations has been the greatest. If current market conditions persist, the Company expects global issuance levels to decline significantly in the fourth quarter of 2007 versus the prior year, primarily in structured finance. The outlook for both asset classes as well as others is dependent upon many factors including the general condition of the economy, interest rates, credit quality and spreads, and the level of liquidity in the financial markets.*

\*　　\*　　\*

The performance of corporate (industrials and financial services) and government ratings contributed to the segment's increase in revenue and operating profit. *Structured finance ratings faced challenging market conditions as a result of the performance in the subprime mortgage sector as well as concerns about credit quality across most debt asset classes*. In the U.S., issuance declines were experienced in the quarter across all structured asset classes with the exception of commercial mortgage-backed securities (CMBS), while in Europe, issuance increased across all structured asset classes with the exception of CMBS. A flight to quality led to increases in U.S. corporate investment grade issuance and U.S. public finance as well as a large decline in speculative grade issuance.

Total U.S. structured finance new issue dollar volume declined 33.6% in the third quarter versus prior year. U.S. commercial mortgage-backed securities issuance increased 52.5% over the prior year, according to Harrison Scott Publications and Standard & Poor's internal estimates (Harrison Scott Publications/S&P), as commercial real estate fundamentals remained strong through the first half of the year, which favorably impacted the third quarter. *U.S. residential mortgage-backed securities (RMBS) issuance decreased 59.3%, driven primarily by declines in the subprime, Alt-A and home equity sectors and a weak housing market. U.S. collateralized debt obligation (CDO) issuance declined 13.3%. The unfavorable conditions in the credit markets contributed to weakness in CDOs by curtailing issuance of CDOs of asset-backed securities (ABS) and collateralized loan obligations (CLOs)*. According to Thomson Financial, U.S. corporate issuance by dollar volume for the third quarter of 2007 was flat compared to the same period in 2006, with investment grade issuance up 9.4% but high yield issuance down 76.8%, driven primarily by investor flight to quality. The U.S. municipal market grew modestly at 3.8%, coming off a slow third quarter 2006, with new money issuance outpacing the decline in refundings.

In Europe for the third quarter, structured finance issuance decreased 4.4% as a result of a large decline in CMBS. European corporate issuance declined 34.0% in the

third quarter with decreases in both financial services and industrials. High yield and investment grade issuance in Europe were down 8.7% and 34.5%, respectively, for the quarter.

Financial market concerns regarding the credit quality of subprime mortgages have adversely impacted debt issuance of residential mortgage-backed securities and CDOs backed by subprime RMBS in the United States and in Europe. The Company had been anticipating a decline in residential mortgage originations and RMBS issuance as well as a slowdown in the rate of growth of CDO issuance versus the significant growth rates experienced in the past. U.S. residential mortgage-backed securities issuance is expected to decline by approximately 70%-75% in the fourth quarter, as compared to the fourth quarter of 2006, which would result in approximately a 35%-40% decline in issuance for the year. Slower growth in U.S. CDO issuance is also expected; with declines in the range of 85%-90% for the fourth quarter, as compared to the fourth quarter of 2006, and flat to declining for the year. Because of the current credit market conditions, issuance levels have deteriorated across all asset classes and regions during the latter half of the third quarter. The impact on U.S. RMBS and U.S. CDOs has been the greatest. If current market conditions persist, the Company expects global issuance levels to decline significantly in the fourth quarter of 2007 versus the prior year, primarily in structured finance. The outlook for both asset classes as well as others is dependent upon many factors including the general condition of the economy, interest rates, credit quality and spreads, and the level of liquidity in the financial markets.

<p style="text-align:center">*     *     *</p>

*In the third quarter of 2007, rating agencies became subject to scrutiny for their ratings on structured finance transactions that involve the packaging of subprime residential mortgages, including residential mortgage-backed securities (RMBS) and collateralized debt obligations (CDOs).*

*On August 29, 2007, Standard & Poor's received a subpoena from the New York Attorney General's Office requesting information and documents relating to Standard & Poor's ratings of securities backed by residential real estate mortgages. Standard & Poor's is responding to this request.*

*On October 16, 2007, Standard & Poor's received a subpoena from the Connecticut Attorney General's Office requesting information and documents relating to the conduct of Standard & Poor's credit ratings business. The subpoena appears to relate to an investigation by the Connecticut Attorney General into whether Standard & Poor's, in the conduct of its credit ratings business, violated the Connecticut Antitrust Act. The Company is responding to the subpoena.*

*In September 2007, the SEC commenced an examination of rating agencies' policies and procedures regarding conflicts of interest and the application of those policies and procedures to ratings on RMBS and related CDOs. Standard & Poor's is cooperating with the SEC staff in connection with this examination.* On September 26, 2007, Standard & Poor's testified before the U.S. Senate Committee

<p style="text-align:center">242</p>

on Banking, Housing and Urban Affairs concerning the role of rating agencies in the capital markets and, specifically, the subprime market. On September 27, 2007, Standard & Poor's also testified before the U.S. House of Representatives (Financial Services Committee) Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises concerning the role of rating agencies in the structured finance market.

<p style="text-align:center">*      *      *</p>

*The market for credit ratings as well as research and investment advisory services is very competitive. The Financial Services segment competes domestically and internationally on the basis of a number of factors, including quality of ratings, research and investment advice, client service, reputation, price, geographic scope, range of products and technological innovation.*

<p style="text-align:center">*      *      *</p>

The Company maintains disclosure controls and procedures that are designed to ensure that information required to be disclosed in the Company's reports filed with the Securities and Exchange Commission (SEC) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including its Chief Executive Officer (CEO) and Chief Financial Officer (CFO), as appropriate, to allow timely decisions regarding required disclosure.

As of September 30, 2007, an evaluation was performed under the supervision and with the participation of the Company's management, including the CEO and CFO, of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) under the U.S. Securities Exchange Act of 1934). Based on that evaluation, the Company's management, including the CEO and CFO, concluded that the Company's disclosure controls and procedures were effective as of September 30, 2007.

370.    In response to the October 18, 2007 press release and conference call, and the October 26, 2007 Form 10-Q, the Company's stock price declined slightly, trading at closing prices of $51.42 on October 18, 2007 and $49.75 on October 26, 2007. If not for Defendants' materially false and misleading statements during that time period, the Company's stock price would have suffered additional declines.

371.    The statements referenced in ¶¶364-67 and ¶369 were each materially false and misleading when made for the reasons set forth in ¶256 and the factual detail contained throughout this Complaint. In addition, the statements referenced in ¶¶364-67 and ¶369 were each false and

misleading when made as they misrepresented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading. The true facts, which were then known to or recklessly disregarded by each of the Defendants, were:

- McGraw lacked a reasonable basis for downplaying the problems facing the Company and labeling them as temporary in nature. It was well documented within the Company that S&P had been rating toxic deals that were unlikely to perform, that the models used to do so were wholly inadequate and inaccurate, and that surveillance of the deals it rated had been nothing short of atrocious.

- The Company's brand was on life support. Defendants were fully aware that once the totality of their fraud was exposed, the S&P brand would no longer be trusted to "serve the markets" because it would lack any semblance of credibility.

- The Company's structured finance ratings faced much more than "challenging market conditions." It faced the culmination of Defendants' fraud and the evaporation of the unsustainable, lucrative fees the Company had raked in throughout the Class Period through the use of inadequate models and relaxed criteria standards.

372. On December 3, 2007, McGraw spoke at the UBS Global Media Conference on behalf of the Company. During the conference, McGraw made numerous false and misleading statements designed to minimize the impact of the subprime market meltdown on the Company and to maintain the artificial inflation in the Company's stock price. For example, McGraw stated:

Financial services also faces challenging comparisons in the first half next year and into the third quarter. We will be obviously providing constant updates as the market recovers. But getting some still to be determined level of activity in 2008, we expect to see a reduced appetite for complex structured products, a tightening of credit standards by originators who remain in the marketplace, more issuance by higher quality issuers, and although there will be a pullback in the U.S. structured finance market next year and whereas there is some weakness in Europe, the fundamentals of structured finance remain very positive there.

\*　　　\*　　　\*

With that, let's spend a little bit of time on the regulatory and the legal risks that we face. For the record, the U.S. Securities and Exchange Commission on September 24th officially registered at Standard & Poor's as a nationally recognized statistical rating organization under the U.S. Credit Rating Agency Reform Act of 2006, which went into effect in June of this year. The SEC is using its new authority to examine S&P's policies and procedures, and obviously not only are we cooperating fully, it is in our best interest to do everything possible to make sure that we are supporting the SEC and to ensure that the new process works effectively and efficiently. And we are

working with the various appropriate entities outside the United States as well.

Because as we all are aware, the SEC isn't the only interested party in rating agencies. In the wake of recent events in the subprime mortgage market, we are also dealing obviously with the Congress, with regulators in Europe, and that would be both CESR, the security regulators as well as IOSCO, the security commissioners, State Attorney Generals, other government agencies, and representatives.

Lawsuits have been filed with federal courts in California and in Washington, but so far none has been served with a complaint in either case. Much has been written about all of this and it is disappointing how much of the commentary is misinformed. We see default on subprime loans confused with defaults on AAA-rated U.S. residential mortgage-backed securities.

<p style="text-align:center">*    *    *</p>

S&P is currently studying a range of voluntary actions in four key areas, governance, analytics, education, and information and communication. And in all of these areas, over the next three weeks you'll be hearing a number of pronouncements that we will be making in terms of what we're going to do in terms of voluntary actions to make things even tighter.

373.    As the conference continued, McGraw continued to tout the strength of the subprime

mortgage market:

What we're seeing now -- by the way, *subprime gets a lot of hard knocks.  The subprime market is a fabulous market*.  It was established about 20 years ago and the first ten years of it was fairly small in terms of volume.  It was used for a lot of debt consolidation, paying credit card bills, things like that.  It was about ten years ago when the volume took off and what the subprime market was designed -- at again, the innovation of the capital markets -- was designed to do was to provide access to credit and access to homeownership to the underclass. And in the last ten years, homeownership in America has gone from 64% to 69%.

So it has been a very lucrative market.  Where the problem is is in the 2005/2006 vintage loans, and it's more than end of cycle kind of phenomenon.  So what we have seen is that there has been a lot of speculation in those loans.  After the fact, we now know that about 36% of the 2005/2006 vintage were used for speculative investment. This is where I would buy your house, fix it up, and flip it in four months.  There was a lot of that activity.

<p style="text-align:center">*    *    *</p>

We saw that problem at the end of 2005 and we are working with regulators in terms of being able to strengthen some of these underwriting standards.  In April of '06, we came out with an announcement saying the criteria and the assumptions that you need to focus on that are publicly available to make a credit rating have to be strengthened.  That is when we did that, but then you need the hard evidence of

<p style="text-align:center">245</p>

delinquencies and defaults and so forth before you can actually initiate a downgrade.
You can't do it on sentiment.

<div align="center">*     *     *</div>

So we have to -- we're going to have to see what those activities are on that one. So
we got a three-tiered cost structure plan. The first one is where we are right now.
You are screwing everything you have. Do we have a hiring freeze? No. Are we
hiring? No. We just don't -- you don't want to be going to that for internal purposes
and all of those kind of things. But we are watching that.

374. On January 8, 2008, the Company issued a press release announcing that it had

terminated 600 employees. The press release was entitled "The McGraw-Hill Companies

Announces Restructuring of Select Business Operations," and stated in part:

> The McGraw-Hill Companies (NYSE: MHP) today announced that it restructured a
> limited number of business operations in the fourth quarter of 2007 to fortify the
> Corporation's long-term growth prospects.

<div align="center">*     *     *</div>

> ***In the fourth quarter of 2007, the Corporation incurred a restructuring charge of
> $43.7 million, pre-tax, consisting mostly of employee severance costs related to a
> workforce reduction of approximately 600 positions across the Corporation. This
> reduction represents approximately three percent of the Corporation's global
> workforce. The total restructuring charge after tax is $27.3 million, or $0.08 per
> diluted share of fourth quarter 2007 earnings***.

> "Reducing staff is never an easy decision, but we believe the steps we have taken
> will strengthen our organization, enhance our ability to serve our customers and
> maximize shareholder value," said Mr. McGraw.

<div align="center">*     *     *</div>

> ***The Financial Services segment accounts for $18.8 million, pre-tax, of the
> restructuring charge***. In this segment, the reduction was driven by the current
> business environment, as well as the consolidation of several support functions
> across Standard & Poor's global operations. The segment's restructuring actions
> affected both Standard & Poor's ratings and non-ratings businesses.

375. On January 24, 2008, the Company issued a press release announcing its financial

results for the fourth quarter and full year 2007 entitled "The McGraw-Hill Companies Reports

22.5% Increase in 2007 EPS," which stated in part:

<div align="center">246</div>

The McGraw-Hill Companies (NYSE: MHP) today reported 2007 diluted earnings per share of $2.94, an increase of 22.5% versus $2.40 in 2006. The 2007 results include a $0.03 diluted per share gain on the divestiture of a mutual fund data business and *an $0.08 restructuring charge mainly for employee severance costs for a reduction of 611 positions*.

<p align="center">*     *     *</p>

Net income for 2007 increased 14.9% to $1.0 billion compared to 2006. Revenue in 2007 grew by 8.3% to $6.8 billion versus 2006.

<p align="center">*     *     *</p>

Net income for the fourth quarter of 2007 was $140.6 million versus $204.8 million in 2006. Revenue declined 1.5% to $1.6 billion in the fourth quarter of 2007.

<p align="center">*     *     *</p>

Financial Services : "Revenue for this segment in 2007 increased by 10.9% to $3.0 billion compared to last year. Operating profit grew by 13.1% to $1.4 billion. Included in the segment's operating profit is a pre-tax gain of $17.3 million on the divestiture of a mutual fund data business in the first quarter and *an $18.8 million pre-tax restructuring charge in the fourth quarter consisting mostly of severance relating to a workforce reduction of 172 positions, driven by the current business environment, as well as the consolidation of business support functions*.

<p align="center">*     *     *</p>

"In the fourth quarter, revenue declined by 7.2% to $736.7 million. Including the restructuring charge, operating profit in the fourth quarter fell by 22.8% to $263.4 million.

<p align="center">*     *     *</p>

*The Outlook: "We are facing a challenging economic environment in 2008. Nevertheless, we expect revenue growth in 2008 of 6% to 8% at McGraw-Hill Education and Information & Media, and a 2% to 4% increase at Financial Services*.

"The diversity and breadth of our portfolio again will be a significant factor in the performance of Financial Services in 2008. The negative impact on the segment's operating margin from the fall-off in structured finance will be partially offset by growth in other ratings markets and by Standard & Poor's Investment Services. As a result, the segment's operating margin may decline between 125 and 225 basis points in 2008.

<p align="center">*     *     *</p>

*"As a result, we now expect to produce another year of growth with earnings per share increasing by 3% to 5% in 2008.* Net income, reflecting increased interest

<p align="center">247</p>

expense for share buybacks, will decline slightly.

376.     Reacting to the Company's press release, analysts responded favorably. For example,

on January 21, 2008, analysts from Bear Stearns stated, in part:

> The point was well taken – S&P seems to have good diversification, and **management is confident that the credit crunch will not eviscerate revenues/profits in 2008. In fact, S&P guidance for 2008 is better than expected – revenues +2-4% with margin down 125-225 basis points**.
>
> *            *            *
>
> [McGraw-Hill] shares jumped 7% today – short covering likely provided some of the boost. However, **we think management did a good job detailing the expected revenue build-up for S&P in 2008**.

377.     On February 7, 2008, the Company issued a press release entitled "S&P Announces

New Actions to Enhance Independence, Strengthen the Ratings Process, and Increase Transparency

to Better Serve Global Markets," which stated in part:

> Standard & Poor's Ratings Services ("S&P") today announced that **we have begun implementing a broad set of new actions to further strengthen our ratings operations** and better serve capital markets around the world.
>
> "The ongoing transformation of the financial markets requires us to continue to bring more innovative thinking, greater resources, and improved analytics to the ratings process," said Deven Sharma, president of S&P.   "By **further enhancing independence, strengthening the ratings process**, and increasing transparency, the actions we are taking will serve the public interest by building greater confidence in credit ratings and supporting the efficient operation of the global credit markets."
>
> The actions, which will be implemented throughout S&P's global organization, include enhancements in the following four areas:
>
> •     Governance: S&P is implementing new measures that build on existing governance policies and protections and further strengthen the integrity of the ratings process to ensure its independence, make the effectiveness of our governance even more transparent and to maintain investor confidence.
>
> •     Analytics: S&P is taking steps to ensure that our ratings models, processes, and analytical talent continue to be of the highest quality and that S&P remains fully equipped to rate complex financial structures with increasing transparency regarding assumptions.
>
> •     Information: S&P is providing market participants with greater

transparency about the ratings process and greater clarity about the risks that could cause a change in ratings assumptions.

- Education: S&P is undertaking an extensive educational outreach program to help market participants better understand what a credit rating is – and is not. The goal is to help them use ratings appropriately.

S&P has already adopted a number of these enhancements and will implement the remainder throughout the year. S&P also is evaluating additional actions and intends to introduce further measures throughout the year.

"This initial set of actions is the product of a comprehensive, formal assessment of our policies and practices conducted in collaboration with an independent third-party expert, as well as active dialogue with market participants, regulators, and legislators. These actions are consistent with our commitment to continuous improvement," said Sharma. "Our goal is not only to enhance specific processes but also to minimize even the potential for perceived conflicts of interest and provide the public a greater understanding of how our ratings are determined, what they mean, and how market trends and events affect them.

"We are committed to playing a leadership role, in collaboration with market participants, regulators, and experts, in addressing the issues currently facing the global credit markets. We will continue to engage with market participants and policymakers on an ongoing basis and consider additional steps in response to the feedback we receive," concluded Sharma.

Highlights of S&P's New Actions

Below are brief descriptions of some of the major new actions that S&P is undertaking. Details of all 27 individual measures that S&P is implementing are available at http://www.spnewactions.com/.

Enhancing Governance

- Establish an Office of the Ombudsman that will address concerns related to potential conflicts of interest and to analytical and governance processes across S&P's businesses that issuers, investors, employees, and other market participants may raise. The Ombudsman will oversee the handling of all issues, with authority to escalate any unresolved matters, as necessary, to the CEO of The McGraw-Hill Companies and the Audit Committee of the Board of Directors.

- Engage an external firm to periodically conduct an independent review of S&P Ratings' compliance and governance processes. This firm will issue a public opinion that addresses whether S&P is effectively managing potential conflicts of interest and maintaining the independence of our ratings.

- Institute periodic rotations for lead analysts.

- Implement "look back" reviews whenever an analyst leaves to work for an issuer to ensure the integrity of prior ratings.

## Strengthening Analytics

- Complement traditional credit ratings analysis by highlighting non-default risk factors such as liquidity, volatility, correlation, and recovery that can influence the valuation and performance of rated securities and portfolios of these securities.

- Add new surveillance capabilities, including tools, models, and data sets, that will enable S&P to better monitor the performance of collateral pools over time.

- Establish a Model Oversight Committee within the Quantitative Analytics Group, which will be separate from and independent of the business unit, to assess and validate the quality of models and tools.

- Increase annual analyst training requirements, enhance training programs, and establish an analyst certification program.

## Increasing Transparency of Information

- Develop an identifier that will highlight to the market that the rating is on a securitization or on a new type of instrument.

- Include "what if" scenario analysis in rating reports to explain key rating assumptions and the potential impact on the rating of unexpected events. The goal is to help investors better assess an issue's risk profile.

- Work with issuers and investors to improve disclosure of information on collateral supporting structured securities.

- Request greater minimum portfolio disclosure criteria of issuers of certain structured securities.

- Collect more information about the procedures issuers and originators use to assess the accuracy and integrity of their data and to detect fraud.

## Educating the Public

- Create a Credit Ratings User Manual and Investor Guidelines to promote better understanding of our ratings process and the role of ratings in the financial markets.

- Establish an Advisory Council with membership that includes risk managers, academics, and former government officials to provide guidance on addressing complex issues and to establish topics for market education.

- Broaden distribution of analysis and opinions via the Web and other media.

378. The response to the Company's broad-based reforms of its operations was negative. For example, on February 7, 2008, *Dow Jones Factiva* and the *Wall Street Journal* reported that the reforms were referred to as "window dressing" and "too little, too late" by the New York Attorney General:

> New York Attorney General Andrew Cuomo wants ratings firms to go further in their efforts to fix their processes for rating mortgage bonds.
>
> After McGraw-Hill Cos.' (MHP) Standard & Poor's and Moody's Corp.'s (MCO) Moody's Investors Service this week put out plans to improve their methodologies for rating mortgage-related bonds and other hard-hit structured finance vehicles, Cuomo's office will release a statement Thursday **calling the moves "window dressing" that fall short of the systemic reform needed to restore investor confidence**, according to a person familiar with the matter.
>
> Cuomo's office is investigating the rating firms to ascertain how culpable they are for assigning ratings that were far too high for various bonds backed by subprime mortgages. Many collateralized debt obligations, or CDOs, that heavily invested in mortgage instruments were also highly rated, but many have now been downgraded, forcing billions of dollars in write-offs at financial firms. **The New York Attorney General's Office has subpoenaed both S&P and Moody's in an effort to find out how much each knew about flaws in the mortgage products that they rated triple-A.** The rating firms have been meeting with representatives of the Attorney General's Office in recent weeks.
>
> While critics of the rating firms say they grew too close to the investment banks that sold billions of dollars in mortgage bonds, others say they simply made bad judgment calls about the direction of the housing market and relied on incomplete or incorrect data provided by banks and mortgage firms.
>
> Cuomo is meeting with executives of the three major ratings firms this week, the person familiar with the matter said. In addition to Moody's and S&P, Fimalac SA's (3794.FR) Fitch Ratings is a big player in ratings. **"The supposed reforms announced today by Standard & Poor's and by Moody's on Tuesday are too little too late," the attorney general said in his statement.**
>
> **In an interview with CNBC, Standard & Poor's President Deven Sharma deflected questions about an investigation**, saying only that "we are very happy to engage

251

with the attorney general on any and every question that he may have as we will cooperate and offer him all of the information that his office may need to come to appropriate conclusions."

379.     On the following day, the Company's stock price fell approximately 5.5%, dropping from a close of $43.01 on February 7, 2008 to a closing price of $40.66 on February 8, 2008, as demonstrated in the chart below:



380.     On February 29, 2008, the Company filed its annual financial report on Form 10-K for the year ending December 31, 2007. The financial results reported in the 10-K were substantially similar to those reported in the Company's January 24, 2008 press release. The Form 10-K was signed by the Individual Defendants, and contained required Sarbanes-Oxley certifications signed by the Individual Defendants stating that the Form 10-K did not include any material misrepresentations. In discussing what drove McGraw-Hill's improved financial performance, the 2007 10-K stated, in relevant part:

TO OUR SHAREHOLDERS:

For The McGraw-Hill Companies, 2007 was filled with significant achievements— and some equally big challenges.

It was a year in which we delivered record results and impressive growth thanks to the outstanding performance of our business portfolio. But it was also a year in which the U.S. housing bubble burst and the market for mortgage-related securities deteriorated, fueling disruption in the capital markets and causing a slowdown in our fourth-quarter results.

It was a year in which phrases like "subprime mortgage" and "credit crunch" made headlines and ratings agencies were thrust into an unfamiliar spotlight—with questions raised about their performance, policies and practices.

As we reflect on the events of the past year and focus on our opportunities for 2008 and beyond, there is one imperative shared by the management team across The McGraw-Hill Companies—to extend our record of growth while generating superior shareholder value.

Our senior leadership team is actively managing through the current environment. We believe that steps we are taking now will strengthen our operations and position us for continued growth. And while it's difficult to make definitive predictions, history tells us that our markets will stabilize and the current turmoil will eventually pass.

<center>*     *     *</center>

Focusing on Another Year of Growth

***Entering 2008, we expect to achieve another year of growth,*** although at a slower pace than in 2007. We anticipate that the economy and conditions in the credit markets will begin to improve later in the year, and we are ready to capitalize on all available opportunities.

To prepare us for the year ahead, we restructured certain business operations in the fourth quarter of 2007, consistent with our efforts to streamline operations and lower costs. The steps we took resulted in a ***3% reduction in our workforce***, and while the decision to reduce staff is never easy, we believe these steps will strengthen our efficiency.

<center>*     *     *</center>

As we look ahead, we remain confident about our prospects in the U.S. corporate and public finance markets in 2008, while expecting a more conservative approach to financing in the structured markets and reduced investor appetite for complex products.

<center>*     *     *</center>

In Financial Services, issuance levels deteriorated across all asset classes and regions during the latter part of the year because of the current credit market conditions. The impact on U.S. residential mortgage-backed securities ("RMBS") and U.S. collateralized debt obligations ("CDOs") had the greatest impact on structured finance ratings. The Company expects the current market conditions and global

<center>253</center>

issuance levels to persist through the first half of 2008 versus the prior year, primarily in structured finance. The outlook for U.S. RMBS and CDOs as well as other asset classes is dependent upon many factors including the general condition of the economy, interest rates, credit quality and spreads, and the level of liquidity in the financial markets.

<center>*     *     *</center>

In 2007, the Financial Services segment incurred restructuring charges totaling $18.8 million pre-tax. The pre-tax charge consists of employee severance costs related to a workforce reduction of approximately 170 positions across the segment. The current business environment and the consolidation of several support functions drove these restructuring activities across the segment's global operations. The segment's restructuring actions affected both its Credit Market Services and Investment Services businesses.

<center>*     *     *</center>

*In the third quarter of 2007, rating agencies became subject to scrutiny for their ratings on structured finance transactions that involve the packaging of subprime residential mortgages, including residential mortgage-backed securities ("RMBS") and collateralized debt obligations ("CDOs").*

*On August 29, 2007, Standard & Poor's received a subpoena from the New York Attorney General's Office requesting information and documents relating to Standard & Poor's ratings of securities backed by residential real estate mortgages.* Standard & Poor's is responding to this request.

*In September 2007, the SEC commenced an examination of rating agencies' policies and procedures regarding conflicts of interest and the application of those policies and procedures to ratings on RMBS and related CDOs.* Standard & Poor's is cooperating with the SEC staff in connection with this examination.

*On October 16, 2007, Standard & Poor's received a subpoena from the Connecticut Attorney General's Office requesting information and documents relating to the conduct of Standard & Poor's credit ratings business.* The subpoena appears to relate to an investigation by the Connecticut Attorney General into whether Standard & Poor's, in the conduct of its credit ratings business, violated the Connecticut Antitrust Act. Subsequently, a second subpoena dated December 6, 2007, seeking information and documents relating to the rating of securities backed by residential real estate mortgages, and a third subpoena dated January 14, 2008, seeking information and documents relating to the rating of municipal and corporate debt, were served. The Company is responding to the subpoenas.

*On November 8, 2007, Standard & Poor's received a civil investigative demand from the Massachusetts Attorney General's Office requesting information and documents relating to Standard & Poor's ratings of securities backed by residential real estate mortgages. Standard & Poor's is responding to this request.*

<center>254</center>

\*      \*      \*

In 2007, total U.S. structured finance new issue dollar volume decreased 22.2% versus prior year due primarily to a decline of 40.4% in U.S. residential mortgage-backed securities ("RMBS") issuance attributable to reductions in mortgage originations in the subprime and affordability products and home equity sectors. *Although U.S. collateralized debt obligation ("CDO") issuance was strong during the first half of 2007, it slowed significantly during the second half due to deteriorating market conditions* and was up only 1.4% for the full year 2007 as compared with 2006 according to Harrison Scott Publications and Standard & Poor's internal estimates ("Harrison Scott Publications/S&P"). U.S. commercial mortgage-backed securities ("CMBS") issuance increased 6.8% over the prior year due to higher mortgage originations driven by the low interest rate environment and strong commercial real estate fundamentals as well as rising property values and refinancing of maturing deals experienced over the first three quarters of the year offset by sharp declines in issuance in the fourth quarter of 2007.

\*      \*      \*

*Financial market concerns regarding the credit quality of sub-prime mortgages adversely impacted debt issuance of RMBS and CDOs backed by subprime RMBS in the United States*. The Company had been anticipating a decline in residential mortgage originations as well as a slowdown in the rate of growth of CDO issuance versus the significant rates of growth experienced in the past. U.S. RMBS declined by 70.5% in the second half of the year, as compared with the same period in 2006, which resulted in a 40.4% decline in issuance for the year. U.S. CDO issuance declined 48.5% in the second half of the year, as compared to the same period in 2006, and was up a slight 1.4% for the year.

*Because of the current credit market conditions, issuance levels deteriorated across all asset classes and all regions* with the exception of Europe, which was up a slight 1.8% during the second half of the year. The impact on U.S. RMBS and U.S. CDOs has been the greatest. The Company expects the current market conditions and global issuance levels to persist through the first half of 2008, primarily in structured finance. The outlook for U.S. RMBS and U.S. CDOs asset classes as well as other asset classes is dependent upon many factors, including the general condition of the economy, interest rates, credit quality and spreads, and the level of liquidity in the financial markets.

Growth rates in 2008 for Credit Market Services will be unfavorably impacted for at least the first half of the year due to expected lower issuance levels for most U.S. structured finance and challenging comparisons to the same period of the prior year. The Mortgage Bankers Association is forecasting approximately a 16% decline in mortgage originations due to continued weakness in the housing market, which is expected to adversely impact the U.S. RMBS sector. International growth and product diversification may help mitigate the anticipated decline in most U.S. structured finance issuance volumes.

The U.S. CMBS market in 2008 is expected to decline significantly due to lower commercial origination levels and investor aversion to risk. U.S. CDO issuance will be impacted by an anticipated decrease in investor demand for complex securities in favor of those that are less complex as well as a decline in the availability of underlying collateral. Issuance in the U.S. asset-backed securities market is anticipated to grow moderately in 2008 as auto manufacturers continue to rely on securitization as a source of funding. The resiliency of the consumer should also lead to growth in the credit card and student loan sectors.

\*       \*       \*

The Company maintains disclosure controls and procedures that are designed to ensure that information required to be disclosed in the Company's reports filed with the Securities and Exchange Commission ("SEC") is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including its Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), as appropriate, to allow timely decisions regarding required disclosure.

As of December 31, 2007, an evaluation was performed under the supervision and with the participation of the Company's management, including the CEO and CFO, of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) under the U.S. Securities Exchange Act of 1934). Based on that evaluation, the Company's management, including the CEO and CFO, concluded that the Company's disclosure controls and procedures were effective as of December 31, 2007.

381.    The statements referenced in ¶¶372-75, ¶377, and ¶380 were each materially false and misleading when made for the reasons set forth in ¶256 and the factual detail contained throughout this Complaint. In addition, the statements referenced in ¶¶372-75, ¶377, and ¶380 were each false and misleading when made as they misrepresented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading. The true facts, which were then known to or recklessly disregarded by each of the Defendants, were:

- The subprime market was anything but a fabulous market. Defendants' ratings models were insufficient, as demonstrated by the extreme volume of significant ratings downgrades, and as admitted to by the Company on May 1, 2008, when it announced it would stop rating certain structured finance transactions.

- The Company lacked any reasonable basis to predict 2008 revenue growth, and would abruptly withdraw its recently issued guidance at the end of the Class Period.

- Given the substantial surveillance failures and time lag, management could not "be confident" that the credit crunch would not destroy the Company's revenues.

- The actions to "further strengthen" the Company's ratings were admissions that the Company's ratings protocols were abandoned and that surveillance was inadequate during the Class Period.

## IX.   THE TRUTH IS PARTIALLY REVEALED

382.   On March 11, 2008, the Company withdrew its financial forecasts for its Financial Services segment. In response, analysts from Lehman Brothers cut their target price for the stock, as the *Associated Press* reported:

### Lehman Cuts Price Target on McGraw-Hill

McGraw-Hill Hits New Low As Lehman Cuts Price Target; Downgrades Moody's Rating

NEW YORK (AP) -- ***Shares of textbook publisher and Standard & Poor's owner McGraw-Hill Cos. dipped Tuesday even as the Dow surged 260 points***, as a Lehman Brothers analyst lowered his price target on the stock to take into account risk associated with fundamentals, regulatory, and litigation.

Analyst Craig Huber dropped his 12-month target price on the stock to $47 from $63, but maintained an "Overweight" rating on shares. He said the stock is attractive for long-term investors, but warned that S&P ratings revenue comparisons will be very difficult through August.

McGraw-Hill owns credit ratings agency Standard & Poor's. Huber said he prefers McGraw-Hill (S&P) shares over those of Moody's Corp., another credit ratings firm, due to the diversity of its portfolio and the fact that it trades at a discount.

Historically, Moody's and McGraw-Hill`s S&P Ratings business models have been quite successful with each currently having 40 percent global market share of credit ratings. However, Huber originally expected a rebound in the fixed income markets in September, but is now not expecting the market to regain ground until January 2009. Therefore, new issue dollar volume is expected to drop 42.5 percent, much lower than his prior estimate for a 30 percent drop in 2008.

"If new issuance stays at these low levels, for say 2-3 years, then the fixed income markets are just not working and would signal significant global financial distress further hurting Moody's fundamentals," he wrote in a note to clients.

He is modeling a 15 percent rebound in 2009, however, "given expected pent-up

demand and a healthier global credit market."

Huber cut Moody's to "Underweight" from "Overweight" with a 12-month price target of $29 -- forecasting 18 percent downside to the stock's current $34.60 price. Since August, Moody`s ratings business has been experiencing pressure from a significant downturn in new issuance of fixed income products, furthermore, because of market criticism of the ratings agencies' responsibility for rating troubled securities linked to the subprime mortgage crisis, there could be changes made to the business model and/or sector that could alter the nature of the credit ratings business.

"Investor concerns regarding litigation risk are quite widespread in the marketplace," he added. "Moody`s may be sued under various theories such as contract, tort, or a fraud-type claim."

Huber thinks litigation concerns have been quite heavily reflected in the stock price already, but nevertheless discounts the stock's value to account for further uncertainty.

McGraw-Hill shares fell 69 cents, or 1.8 percent, to close at $37.30, having earlier hit a new 52-week low of $36.32. Moody's dropped 31 cents, or less than a percent, to $35.19. Meanwhile, the Dow Jones Industrial average surged 340 points, or nearly 3 percent, to 12,080 in late afternoon trading after the Federal Reserve and other central banks said they will pump $200 billion into the financial markets to help ease the strain from the credit crisis.

383.    Similarly, on March 11, 2008, *Dow Jones Factiva* and *Reuters* reported on the

negative reaction to McGraw-Hill's abrupt withdrawal of its recently issued guidance:

The parent companies of Moody's Investors Service and Standard & Poor's, the largest credit rating agencies, Tuesday cut their 2008 forecasts, saying capital markets turmoil will persist at least through mid-year as the economy slows.

Moody's Corp said profit and revenue will decline more than expected. ***McGraw-Hill Cos said revenue from its financial services unit, which includes S&P, and overall profit should both fall short of its prior forecast***.

"We have just a complete freeze in some market sectors, and we are trying to, frankly, catch up with that reality," Moody's Chief Executive Raymond McDaniel said at a Bear Stearns & Co media conference in Palm Beach, Florida.  "We have declining prices, we have liquidity issues, we have confidence issues."

Moody's expects 2008 profit per share of $1.90 to $2.00, with revenue declining by a mid- to high-teens percent-age. On Feb. 7, Moody's had forecast profit per share of $2.17 to $2.25, with a low double-digit drop in revenue.

***McGraw-Hill Chief Executive Harold "Terry" McGraw said his company is unlikely to achieve its Jan. 24 forecast for 2008 profit growth of 3 percent to 5 percent excluding items, compared with $2.99 per share in 2007.***

*He also withdrew his forecast for 2 percent to 4 percent revenue growth in financial services, after demand for ratings fell below expectations in January and February.*

"Uncertainty remains high," McGraw said at the Bear Stearns conference. "Nobody can predict when the credit crunch is going to unwind."

Moody's and S&P have suffered as the housing crisis led to disappearing demand for a wide variety of debt, including "structured products" such as collateralized debt obligations. This reduced demand for ratings needed to sell such debt.

Analysts on average expected Moody's to post 2008 profit of $2.12 per share on revenue of $2 billion, the latter reflecting an 11 percent drop, according to Reuters Estimates.

McGraw Hill's full-year profit was expected to be $3.01 per share. The company also publishes textbooks and magazines such as BusinessWeek, and owns researcher J.D. Power & Associates.

*On a day of broad market gains*, Moody's shares closed down 31 cents at $35.19, while *McGraw-Hill shares fell 69 cents to $37.30*.

DISTRESS IN CREDIT MARKETS

Lehman Brothers Inc analyst Craig Huber assigned an "underweight" rating and $29 price target to Moody's. He rates McGraw-Hill "overweight," but cut its price target to $47 from $63. Huber expects the dollar volume of fixed-income securities issuance to fall 42.5 percent this year.

"If new issuance stays at these low levels, for say two to three years, then the fixed-income markets are just not working and would signal significant global financial distress further hurting Moody's fundamentals," Huber wrote.

Critics have faulted the rating agencies for long being willing to assign "triple-A" credit ratings to securities backed by risky debt, including subprime mortgages.

But the quantity and speed of downgrades over the last several months have exacerbated the credit crunch.

McDaniel, Moody's chief executive, said it would be "disingenuous" to say his company's reputation hasn't been hurt by the market turmoil.

Moody's has said it might change how it rates structured products, and may drop its usual 21 traditional letter grades -- which range from "Aaa" to "C" -- for numerical ratings.

Meanwhile, S&P last month announced 27 actions it said would help bolster confidence in, and accuracy of, its ratings.

New York Attorney General Andrew Cuomo, who is conducting a broad

investigation into lending-related problems and abuses, last month called the proposed changes "too little, too late."

The largest investor in Moody's is Warren Buffett's Berkshire Hathaway Inc, which reported a 19.1 percent stake at year end. (Editing by Derek Caney, Phil Berlowitz)

## X. THE COMPANY'S CODE OF CONDUCT WAS ALSO FALSE AND MISLEADING

384.    At all times relevant hereto, S&P maintained a code of conduct that it published on its website. That code of conduct purported to set forth the Ratings Services' mission to "provide high-quality, objective, independent, and rigorous analytical information to the marketplace." To achieve that mission, S&P's October 2005 code of conduct, which replaced its September 2004 code of conduct, stated that:[67]

> Ratings Services strives for analytic excellence at all times, evaluated its ratings criteria, methodologies and procedures on a regular basis, and modifies or enhances them as necessary to respond to the needs of the global capital markets.

> Ratings Services endeavors to conduct the rating and surveillance processes in a manner that is transparent and credible and that also ensures that the integrity and independence of such processes are not compromised by conflicts of interest, abuse of confidential information or other undue influences.

385.    Discussing the "quality and integrity of the ratings process," the code of conduct stated, in pertinent part:

> Each rating shall be based on a thorough analysis of all information known to Ratings Services and believed by Ratings Services to be relevant to its analysis according to Ratings Services' established criteria and methodology.

> Ratings Services shall use rating criteria and methodologies that take into consideration Ratings Services' goal of maintaining rigorous analysis and systematic processes, and, where possible, result in ratings that can be subjected to some form of objective validation based on historical experience.

> In assessing the creditworthiness of an issuer or issue, Analysts involved in the preparation or review of any Rating Action shall use criteria and methodologies established by Ratings Services. Analysts shall consistently apply the then existing

---

[67] A true and correct copy of S&P's October 2005 code of conduct is attached hereto as *Exhibit 51*.

rating criteria and methodologies in the analytical process for any Rating Action, in each case, as determined by Ratings Services.

<center>*        *        *</center>

Ratings Services shall endeavor to devote sufficient resources to perform credible credit assessments for all issuers and issues it rates. When deciding whether to rate or continue rating an issuer or issue, Ratings Services shall assess whether it is able to devote sufficient Analysts with sufficient skill sets to make a credible credit assessment, and whether its Analysts likely will have access to sufficient information needed in order to make such an assessment.

386.    Turning to surveillance, the code of conduct stated, in pertinent part:

In accordance with Rating Services' established policies and procedures for surveillance, unless the issuer requests a rating without surveillance, once a rating is assigned Ratings Services shall monitor on an ongoing basis and update the rating by:

      a. regularly reviewing the issuer's creditworthiness;

      b. Initiating a review of the status of the rating upon becoming aware of any information that might reasonably be expected to result in a Rating Action (including withdrawal of a rating), consistent with the applicable rating criteria and methodology; and

      c. updating on a timely basis the rating, as appropriate, based on the results of such review.

387.    Discussing independence, the code of conduct stated, in pertinent part:

Ratings assigned by Ratings Services to an issuer or issue shall not be affected by the existence of, or potential for, a business relationship between Ratings Services (or any Non-Ratings Business) and the issuer (or its affiliates) or any other party, or the non-existence of such a relationship.

388.    Addressing S&P's responsibilities to the public and publication of rating actions, the

code of conduct stated, in part:

Ratings Services shall publish sufficient information about its procedures, methodologies and assumptions (including financial statement adjustments that deviate materially from those contained in the issuer's published financial statements) so that outside parties can understand how a rating was arrived at by Ratings Services. This information will include (but not be limited to) the meaning of each rating category and the definition of default or recovery, and the time horizon Ratings Services used when making a rating decision.

<center>261</center>

When publishing a rating, Ratings Services shall explain in its press releases and reports, if any, the key elements underlying the rating, subject to any restrictions imposed by applicable confidentiality agreements and any applicable laws regarding the release of Confidential Information.

389.    As documented extensively herein, the procedures and "mission" purported to be established in S&P's code of conduct were nothing more than a farce to Defendants.  Rather than adhere to the code of conduct, which would have ensured the continuation of the Company's reputation, credibility, and integrity, the Defendants pushed a fraudulent scheme that trampled over the code of conduct.  This fact is established by, among other things, the confidential witnesses detailed herein, the internal Company documents made public by the House Oversight Committee and the Senate Subcommittee, as well as the Senate Subcommittee's formal findings of fact.  As a result, S&P's published code of conduct, and all Class Period versions thereof, served as nothing more than one more instance of Defendants making materially false statements designed to mislead investors and the market, which had the effect of artificially inflating the price of the Company's common stock until the truth was revealed and such artificial inflation was removed at the end of the Class Period.

## XI.    ADDITIONAL SCIENTER ALLEGATIONS

390.    As alleged herein, Defendants acted with scienter in that they knew or disregarded with severe recklessness that the public documents and statements, issued or disseminated in the name of the Company, were materially false and misleading, knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail throughout this complaint, Defendants, by virtue of their receipt of information reflecting the true facts regarding McGraw-Hill, their control over, and/or receipt and/or modification of McGraw-Hill's allegedly materially misleading misstatements and/or their associations with the Company which

made them privy to confidential proprietary information concerning McGraw-Hill, participated in the fraudulent scheme alleged herein.

391. Defendants knew and/or disregarded with severe recklessness the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including each of the Individual Defendants.

## XII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

392. At all relevant times, the market for McGraw-Hill's publicly-traded securities was an efficient market for the following reasons, among other things:

(a) McGraw-Hill's securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, McGraw-Hill filed periodic public reports with the SEC; and

(c) McGraw-Hill regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

393. As a result, the market for McGraw-Hill's publicly-traded securities promptly digested current information regarding McGraw-Hill from all publicly-available sources and reflected such information in McGraw-Hill's securities prices. Under these circumstances, all purchasers of McGraw-Hill's publicly traded securities during the Class Period suffered similar injury through their purchase of McGraw-Hill's publicly-traded securities at artificially inflated

prices and a presumption of reliance applies.

## XIII. LOSS CAUSATION

394.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated McGraw-Hill's stock price and operated as a fraud or deceit on Class Period purchasers of McGraw-Hill stock by misrepresenting the Company's business success and future business prospects, including but not limited to misrepresentations regarding the growth and financial performance of the Financial Services division of Standard and Poor's, which, during the Class Period, was the driver of the Company's revenue growth and income generation.

395.    As a result of Defendants' fraudulent conduct as alleged herein, the prices at which McGraw-Hill securities traded were artificially inflated during the Class Period. When Plaintiff and other members of the Class purchased their McGraw-Hill securities, the true value of such securities was substantially lower than the prices actually paid by Plaintiff and the other members of the Class.

396.    During the Class Period, Defendants improperly concealed the true reasons behind the increases in McGraw-Hill's financial performance and outlook, and, consequently, the price of its stock was artificially inflated throughout the Class Period. Defendants also misrepresented the reasons behind McGraw-Hill's reported results and made numerous false and misleading statements regarding many aspects of its business and future prospects. Later, however, when the truth regarding McGraw-Hill's true financial circumstances leaked out and Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, McGraw-Hill stock fell precipitously as the prior artificial inflation came out of McGraw-Hill's stock price. As a result of their purchases of McGraw-Hill stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

397. By misrepresenting the success of the Company's business and concealing its improprieties, Defendants presented a misleading picture of McGraw-Hill's business and prospects. These claims of future profitability caused and maintained the artificial inflation in McGraw-Hill's stock price throughout the Class Period until the truth was partially revealed to the market.

398. As a result of Defendants' materially false and misleading statements and documents, as well as the adverse, undisclosed information known to the Defendants, Plaintiff and other members of the Class relied, to their detriment on such statements and documents, and/or the integrity of the market, in purchasing their McGraw-Hill stock at artificially inflated prices during the Class Period. Had Plaintiff and the other members of the Class known the truth, they would not have taken such actions.

399. As explained herein, these false statements directly or proximately caused, or were a substantial contributing cause of the damages and economic loss suffered by Plaintiff and other members of the Class, and maintained the artificial inflation in McGraw-Hill's stock price throughout the Class Period and until the truth leaked into and was partially revealed to the market, at which time the prior inflation came out of the stock.

400. Defendants' false and misleading statements had the intended effect and directly and proximately caused, or were a substantial contributing cause of McGraw-Hill's stock trading at artificially inflated levels, reaching as high as more than $72.00 per share, throughout the Class Period.

401. Between July 10-12, 2007, partial revelations reached the market as the Company slashed its credit ratings on approximately $12 billion worth of bonds because of mounting delinquencies on the underlying mortgages. Various articles published by *Reuters*, *The Wall Street Journal*, and the *Financial Times* pointed to a cloud of uncertainty around the Company, calling into question S&P's modeling abilities and surveillance, among other things. As the market began to

realize the extent of problems at S&P and the misstatements made by Defendants, the Company's stock price declined more than 7.5% between July 9, 2007 and July 12, 2007.

402. On August 16, 2007, the *Associated Press* published a story on McGraw-Hill that disclosed the European Union's commitment to closely examine why McGraw-Hill, among others, was slow to react to early signs of U.S. loan defaults that formed the bedrock of the Company's explosive growth in its Financial Services division. As investors and the market became aware of McGraw-Hill's prior misstatements and concealments and that McGraw-Hill's actual business prospects were, in fact, driven by static ratings, as opposed to dynamic ratings that reacted to tremendous changes in market characteristics, at least a portion of the prior artificial inflation came out of McGraw-Hill's stock price, damaging investors.

403. As a direct result of the public revelations regarding the truth about McGraw-Hill's conduct, financial condition, and its actual business prospects going forward, the volume of trading in the Company's stock soared to more than 7.39 million shares and the stock price dropped from $50.74 per share on August 15, 2007 to a low of $47.76 per share on August 16, 2007 – a difference of 6% – before closing at $48.85 later that day – a drop of approximately 4%. These drops removed at least a portion of the inflation from McGraw-Hill's stock price, causing real economic loss to investors who had purchased the stock during the Class Period, as evidenced by the chart below:



404. The decline in McGraw-Hill's stock price on August 16, 2007 was a direct result of and proximately caused by the nature and extent of Defendants' fraud partially being revealed to investors and the market. Similarly, the 5.5% decline in the Company's stock price on February 8, 2008, and the approximately 3% decline to a low of $36.32, on enormous volume of more than 8.75 million shares, on March 11, 2008, were the direct and proximate cause of the partial revelation of Defendants' fraud and the Company's true financial condition, as demonstrated in the chart below:



405.    The timing and magnitude of McGraw-Hill's stock price declines negate any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate McGraw-Hill's stock price and the subsequent significant declines in the value of McGraw-Hill's stock when Defendants' prior misrepresentations and other ongoing fraudulent conduct were revealed and the artificial inflation came out of McGraw-Hill's stock.

406.    In addition, the declines in McGraw-Hill's stock price were a natural and probable consequence of Defendants' fraud and should have been foreseen by Defendants in light of the attending circumstances.  The market reaction to the partial disclosure of McGraw-Hill's true financial condition was foreseeable to Defendants and well within the "zone of risk" concealed by

Defendants' fraudulent conduct.

407. In sum, there were no changed economic circumstances, changed investor expectations, new industry-specific facts or McGraw-Hill-specific facts, conditions or other events, which taken separately or together account for the decline in the price of McGraw-Hill stock described therein.

## XIV.  NO SAFE HARBOR

408. The federal statutory safe harbor provision, which provides for forward-looking statements under certain circumstances, does not apply to any of the allegedly false statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of McGraw-Hill who knew that those statements were false when made.  Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## XV.  COUNT I:  FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

409.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against all Defendants.

410.    During the Class Period, McGraw-Hill and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the investing public, Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of McGraw-Hill's publicly traded securities; and (iii) cause Plaintiff and other members of the Class to purchase McGraw-Hill's publicly-traded securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, McGraw-Hill and the Individual Defendants, and each of them, took actions set forth herein.

411.    These Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operate as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for McGraw-Hill's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  These Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued as controlling persons of McGraw-Hill, as alleged below.

412.    In addition to the duties of full disclosure imposed on Defendants as a result of their making affirmative statements and reports, or participating in the making of affirmative statements and reports, or participating in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to

270

investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 *et seq.*) and S-K (17 C.F.R. §229.10 *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, surveillance, financial condition and operational performance, so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

413. McGraw-Hill and each of the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of McGraw-Hill as specified herein.

414. These Defendants each employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of McGraw-Hill's value and performance, financial and operational growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state necessary facts in order to make the statements made about McGraw-Hill and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of McGraw-Hill securities during the Class Period.

415. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: a) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; b) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the

Company, was privy to and participated in the creation, development and reporting of the Company's financial performance, projections and/or reports; and c) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public which each knew or disregarded with severe recklessness was materially false and misleading.

416. Each of these Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with severely reckless disregard for the truth in that each failed to ascertain and to disclose such facts, even though such facts were available to each of them. Such Defendants' material misrepresentations and/or omissions were done knowingly or with severe recklessness and for the purpose and effect of concealing McGraw-Hill's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' misstatements of the Company's financial condition and performance throughout the Class Period, each of the Individual Defendants, if he did not have actual knowledge of the misrepresentations and omissions alleged, was severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false and misleading.

417. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of McGraw-Hill's securities were artificially inflated during the Class Period. In ignorance of the fact that market prices of McGraw-Hill's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or disregarded with severe recklessness by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired McGraw-Hill securities during the Class Period at artificially high prices and were

damaged thereby, as evidenced by, among others, the stock price declines on or about July 10-12,
2007, August 16, 2007, February 8, 2008, and March 11, 2008, when the artificial inflation was
released from McGraw-Hill stock.

418.    At the time of said misrepresentations and omissions, Plaintiff and other members of
the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other
members of the Class and the marketplace known of the true performance, future prospects and
intrinsic value of McGraw-Hill, which were not disclosed by Defendants, Plaintiff and other
members of the Class would not have purchased or otherwise acquired their McGraw-Hill publicly-
traded securities during the Class Period, or they would not have done so at the artificially inflated
prices which they paid.

419.    By virtue of the foregoing, McGraw-Hill and the Individual Defendants have each
violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

420.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the
other members of the Class suffered damages in connection with their respective purchases and sales
of the Company's securities during the Class Period, as evidenced by, among others, the stock price
declines on or about July 10-12, 2007, August 16, 2007, February 8, 2008, and March 11, 2008,
when the artificial inflation was released from McGraw-Hill stock.

## XVI.   COUNT II:  FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

421.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth
herein.  This claim is asserted against the Individual Defendants.

422.    Each of the Individual Defendants acted as a controlling person of McGraw-Hill
within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-
level positions with the Company, participation in and/or awareness of the Company's operations

and/or intimate knowledge of the Company's fraudulent marketing and promotions and actual performance, each of the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

423. In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.

424. As set forth above, McGraw-Hill and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, each of the Individual Defendants is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period, as evidenced by, among others, the stock price declines on or about July 10-12, 2007, August 16, 2007, February 8, 2008, and March 11, 2008, when the artificial inflation was released from McGraw-Hill stock.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action and designating Lead Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class

members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

        (c)      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

        (d)      Such other and further relief as the Court may deem just and proper.

## XVII. JURY TRIAL DEMANDED

425.    Plaintiff hereby demands a trial by jury.

DATED: July 1, 2010

ROBBINS GELLER RUDMAN &
    DOWD LLP
DAVID J. GEORGE (*pro hac vice*)
DOUGLAS WILENS (*pro hac vice*)
ROBERT J. ROBBINS (*pro hac vice*)


        DAVID J. GEORGE

120 E. Palmetto Park Road, Suite 500
Boca Raton, FL 33432-4809
Telephone: 561/750-3000
561/750-3364 (fax)

ROBBINS GELLER RUDMAN &
    DOWD LLP
DAVID A. ROSENFELD
MARIO ALBA, JR.
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

*Lead Counsel for Plaintiff*

SUGARMAN & SUSSKIND
ROBERT SUGARMAN
100 Miracle Mile, Suite 300
Coral Gables, FL 33134
Telephone: 305/529-2801
305/447-8115 (fax)

*Additional Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I, David J. George, hereby certify that on July 1, 2010, I caused a true and correct copy of the

attached:

Lead Plaintiff's Second Amended Consolidated Class Action Complaint for Securities
Fraud

to be: (i) filed by hand with the Clerk of the Court; and (ii) served by first-class mail to all parties

listed below.

Floyd Abrams
Susan Buckley
Tammy L. Roy
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, NY 10005
Telephone: 212-701-3000
Facsimile: 212-269-5420

*Attorneys for Defendants The McGraw-Hill*
*Companies, Inc., Harold McGraw III, and*
*Robert J. Bahash*

David J. George