STUART DELERY
Acting Assistant Attorney General
MAAME EWUSI-MENSAH FRIMPONG
  (CA Bar No.: 222986)
ARTHUR R. GOLDBERG
MICHAEL S. BLUME
JAMES T. NELSON
BRADLEY COHEN
JENNIE KNEEDLER
SONDRA L. MILLS (CA Bar No. 090723)
THOMAS D. ZIMPLEMAN
United States Department of Justice, Civil Division
  P.O. Box 261, Ben Franklin Station
  Washington, D.C. 20044
  Telephone: (202) 616-2376
  Facsimile: (202) 514-8742
  Email: James.Nelson2@usdoj.gov

ANDRÉ BIROTTE JR.
United States Attorney
GEORGE S. CARDONA (CA Bar No. 135439)
LEON W. WEIDMAN (CA Bar No. 104078)
ANOIEL KHORSHID (CA Bar No. 223912)
RICHARD E. ROBINSON (CA Bar No. 090840)
Assistant United States Attorneys
  Room 7516 Federal Building
  300 N. Los Angeles St.
  Los Angeles, California 90012
  Telephone: (213) 894-8323/6086
  Facsimile: (213) 894-6269/7819
  Email: George.S.Cardona@usdoj.gov / Anoiel.Khorshid@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　　　　v.<br><br>MCGRAW-HILL COMPANIES, INC.,<br>and STANDARD & POOR'S<br>FINANCIAL SERVICES LLC,<br><br>　　　　　Defendants. | No. 2:13-cv-00779-DOC-JCG<br><br>UNITED STATES' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 9(b) AND 12(b)(6)<br><br>Hearing Date: July 8, 2013<br>Time: 8:30 a.m.<br>Courtroom 9-D,<br>Hon. David O. Carter. |

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES............................................. ii

I.    INTRODUCTION............................................... 1

II.   ARGUMENT................................................... 2

      A.    THE COMPLAINT ALLEGES ACTIONABLE FALSE STATEMENTS THAT
            WERE NOT MERE PUFFERY ............................... 2

            1.    The Complaint Alleges Knowingly False Statements
                  of Specific Facts on Which S&P Intended
                  Investors Rely................................. 3

            2.    S&P's Reliance on *Boca Raton* Is Misplaced......... 7

            3.    Three of the Four Alleged Fraud Predicates Do
                  Not Require Proof of Specific Misrepresentations.. 10

      B.    THE COMPLAINT ALLEGES WITH SUFFICIENT PARTICULARITY
            THAT S&P ISSUED CDO RATINGS IT KNEW DID NOT
            ACCURATELY REFLECT THE CDOS' TRUE CREDIT RISKS......... 11

            1.    Rule 9(b)'s Limited Particularity Requirements.... 12

            2.    The Complaint Alleges Objective Falsity With
                  Sufficient Particularity........................ 14

            3.    Though Not Required, the Complaint Also Alleges
                  Subjective Falsity With Sufficient Particularity.. 20

      C.    THE COMPLAINT ALLEGES THAT S&P ACTED WITH THE REQUIRED
            SPECIFIC INTENT TO DEFRAUD............................ 22

III.  CONCLUSION................................................. 25

1

**TABLE OF AUTHORITIES**

2

<u>CASES</u>                                                                                    <u>PAGE</u>

3

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc.,*
         651 F. Supp. 2d 155 (S.D.N.Y. 2009)........................... 20

4

*Anthony Distributors, Inc. v. Miller Brewing Co.,*

5

         904 F. Supp. 1363 (M.D. Fla. 1995)........................... 12

6

*Ashcroft v. Iqbal,*
         556 U.S. 662 (2009)........................................... 3

7

*Atlas v. Accredited Home Lenders Holding Co.,*

8

         556 F. Supp. 2d 1142 (S.D. Cal. 2008)........................ 6

9

*Bell Atlantic Corp. v. Twombly,*
         550 U.S. 544 (2007)........................................... 3

10

*Boca Raton Firefighters and Police Pension Fund v. Bohash,*

11

         2012 WL 6621391 (2d Cir. Dec. 20, 2012)..................... 7-9

12

*Buttonwood Tree Value Partners, LP v. Sweeney,*
         --- F. Supp. 2d ---,

13

         2012 WL 6644397 (C.D. Cal. Dec. 10, 2012)................... 20

14

*Casella v. Webb,*
         883 F.2d 805 (9th Cir. 1989)................................. 3

15

*Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.,*

16

         911 F.2d 242 (9th Cir. 1990)................................. 3

17

*County of Marin v. Deloitte Consulting LLP,*
         836 F. Supp. 2d 1030 (N.D. Cal. 2011)........................ 9

18

*ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan*

19

*Chase, Co.,*
         553 F.3d 187 (2d Cir. 2009).................................. 9

20

*Forsyth v. Humana, Inc.,*

21

         114 F.3d 1467 (9th Cir. 1997),
         *overruled on other grounds,*

22

         *Lacey v. Maricopa County,*
         693 F.3d 896 (9th Cir. 2012)................................. 9

23

*Gammel v. Hewlett-Packard Co.,*

24

         --- F. Supp. 2d ---,
         2012 WL 5945089 (C.D. Cal. Aug. 29, 2012)................... 3

25

*Genesee County Employees' Retirement System v. Thornburg Mortg.*

26

*Securities Trust 2006-3,*
         825 F. Supp. 2d 1082 (D.N.M. 2011).......................... 13

27

28

ii

*In re Am. Apparel, Inc. S'holder Litig.*,
    855 F. Supp. 2d 1043 (C.D. Cal 2012) ........................... 9

*In re Cardiac Devices Qui Tam Litig.*,
    221 F.R.D. 318 (D. Conn. 2004) ............................... 14

*In re Countrywide Fin. Corp. Derivative Litig.*,
    554 F. Supp. 2d 1044 (C.D. Cal. 2008) ......................... 6

*In re Glenfed, Inc. Sec. Litig.*,
    42 F.3d 1541 (9th Cir. 1994) (en banc),
    *superseded by statute*, 15 U.S.C. § 78u-4 .......... 12-13, 18, 20

*In re IndyMac Mortgage-Backed Sec. Litig.*,
    718 F. Supp. 2d 495 (S.D.N.Y. 2010) .......................... 18

*In re Lehman Bros. Sec. and ERISA Litig.*,
    684 F. Supp. 2d 485 (S.D.N.Y. 2010) .......................... 21

*In re Moody's Corp. Sec. Litig.*,
    599 F. Supp. 2d 493 (S.D.N.Y. 2009) ........................... 8

*In re New Century*,
    588 F. Supp. 2d 1206 (C.D. Cal. 2008) ......................... 6

*In re Wells Fargo Mortgage-Backed Certificates Litig.*,
    712 F. Supp. 2d 958 (N.D. Cal. 2010) ......................... 18

*Lazy Y Ranch, Ltd. v. Behrens*,
    546 F.3d 580 (9th Cir. 2008) .................................. 3

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ................................ 13

*Moss v. U.S. Secret Service*,
    572 F.3d 962 (9th Cir. 2009) .................................. 3

*Neder v. United States*,
    527 U.S. 1 (1999) ............................................ 10

*Newcal Indus. v. Ikon Office Solution*,
    513 F.3d 1038 (9th Cir. 2008) ................................. 9

*Odom v. Microsoft Corp.*,
    486 F.3d 541 (9th Cir. 2007) (en banc) ....................... 13

*Ohio Police & Fire Pension Fund v. Standard & Poor's Financial
Services, LLC*,
    813 F. Supp. 2d 871 (S.D. Ohio 2011),
    *aff'd*, 700 F.3d 829 (6th Cir. 2012) ......................... 21

*People of the State of Ill. v. McGraw-Hill Co., Inc., et al.*,
    2012 WL 5440768 (Ill. Cir. Ct. Nov. 7, 2012) .................. 8

*Rice v. Charles Schwab*,
    2010 WL 5156654 (C.D. Cal. Oct. 22, 2010) .................... 12

iii

*Space Coast Credit Union v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
--- F.R.D. ---, 2013 WL 1131628 (S.D. Fla. Mar. 18, 2013).... 19

*State v. Moody's Corp., et al.,*
2012 WL 2149408 (Conn. Super. Ct. May 10, 2012).............. 8

*State v. McGraw-Hill Co., Inc., et al.,*
No. HHD-CV-10-6008838-S, Order
(Conn. Super. Ct. May 10, 2012)............................. 8

*United States ex rel. Cafasso v. General Dynamics C4 Systems, Inc.,*
637 F.3d 1047 (9th Cir. 2011).............................. 12

*United States ex rel. Ebeid v. Lungwitz,*
616 F.3d 993 (9th Cir. 2010).............................. 14

*United States ex rel. Lee v. SmithKline Beecham, Inc.,*
245 F.3d 1048 (9th Cir. 2001).............................. 12

*United States v. Ali,*
620 F.3d 1062 (9th Cir. 2010).......................... 10, 23

*United States v. Bennett,*
621 F.3d 1131 (9th Cir. 2010).............................. 23

*United States v. Ciccone,*
219 F.3d 1078 (9th Cir. 2000).............................. 22

*United States v. Dowie,*
411 Fed. Appx. 21, 2010 WL 4904309 (9th Cir. 2010)........... 23

*United States v. Halbert,*
640 F.2d 1000 (9th Cir. 1981).............................. 10

*United States v. Hickey,*
580 F.3d 922 (9th Cir. 2009).............................. 22

*United States v. Lew,*
875 F.2d 219 (9th Cir. 1989)........................... 22-24

*United States v. Lewis,*
67 F.3d 225 (9th Cir. 1995).............................. 10

*United States v. Rizk,*
660 F.3d 1125 (9th Cir. 2011).............................. 22

*United States v. Treadwell,*
593 F.3d 990 (9th Cir. 2010)........................... 10, 22

*Walling v. Beverly Enterprises,*
476 F.2d 393 (9th Cir. 1973)........................... 13, 18

**STATUTES & RULES**

15 U.S.C. § 78o-7(h)(3) ............................................ 7

15 U.S.C. § 78u-4 ............................................. 12, 13

18 U.S.C. § 1344(1), (2) ..................................... 10, 23

Fed. R. Civ. P. 9(b) ............................. 11-13, 18, 20-21

Fed. R. Civ. P. 12(b)(6) .......................................... 3

## I.    INTRODUCTION

It would no doubt come as some surprise to many -- RMBS and CDO investors, regulators, and legislators among them -- that S&P's repeated assurances that its ratings were objective, independent, and uninfluenced by any conflict of interest were "mere puffery," entitled to no more weight than an infomercial hawker's claim that his knife will outlast any other.  This, however, is what S&P now asserts in an effort to disavow its prior assurances that is unsupported by fact or law.  As the Complaint alleges, S&P marketed its analytical objectivity and independence and trumpeted the specific measures it had put in place to assure that it would remain unaffected by the "issuer pays" system under which S&P was retained by those whose securities it was rating.  S&P touted these measures not only to investors in those securities, but also to the SEC to satisfy requirements for maintaining its status as a Nationally Recognized Statistical Rating Organization ("NRSRO") (a status S&P had to have for its ratings to be relied on by many institutional investors) and to Congress in addressing legislation that might have imposed stricter regulation of NRSROs.  S&P's claim that, as a matter of law, its assurances could not be material to investors in RMBS and CDOs improperly ignores both the nature of S&P's assurances and the context in which they were made.

S&P's other arguments also fail.  S&P's claim that the Complaint fails to allege with sufficient particularity that S&P knew its ratings of certain CDOs did not reflect their true credit risks discounts the mass of internal S&P documents cited in the Complaint to demonstrate that throughout Spring and Summer 2007, to accommodate its issuer clients and reap the resulting rating fees,

1

S&P rated CDOs packed with classes of subprime RMBS that it knew were failing, yet chose not to take any measures to account for the anticipated failures.  Similarly, S&P's claim that the Complaint fails to allege the required specific intent to obtain money from defrauded investors disregards the fact, evidenced by a prior representation by S&P's head of Structured Finance, that though S&P was retained by and negotiated its fees with issuers, those fees were ultimately passed through to investors and "netted out of the total deal proceeds."  COM ¶ 67(c).[1]

S&P's own prior statements and actions, as detailed and quoted at length, render the Complaint both particular and sufficient.  As a result, S&P's Motion to Dismiss must be denied.

**II.  ARGUMENT**

    **A.  THE COMPLAINT ALLEGES ACTIONABLE FALSE STATEMENTS THAT WERE NOT MERE PUFFERY**

S&P first argues that its representations that its ratings were objective, independent, and uninfluenced by conflicts of interest -- representations S&P itself repeatedly characterized as "central" and "critical" to and the "cornerstone" of its identity and operations[2] -- are inactionable "mere puffery."  The Ninth Circuit, however, has distinguished puffery, described by many courts as "involving outrageous generalized statements, not making specific claims, that are so exaggerated as to preclude reliance by consumers," from what the Complaint alleges -- fraudulent representations on which consumers are "induced [to rely] by specific rather than general

---

[1] As used throughout, "COM" refers to the Complaint and is followed by citations by paragraph number.

[2] COM ¶¶ 117(b), 119(a), 119(c), 119(d).

assertions." *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 246 (9th Cir. 1990) (internal quotation and citation omitted).[3]  The Complaint identifies specific representations by S&P regarding particular policies and procedures S&P purported to employ to separate its business interests from its analytical methods and so ensure its ratings remained objective, independent, and free from influence by conflicts of interest.  The Complaint alleges S&P made these representations knowing they were false and misleading and intending they be relied on, and sets out in detail the facts that rendered them so.  These allegations are sufficient to establish that S&P's representations were not mere "puffery," but rather specific, fraudulent assertions made to induce reliance on S&P's ratings.[4]

> 1.   The Complaint Alleges Knowingly False Statements of Specific Facts on Which S&P Intended Investors Rely

S&P represented not that it generally endeavored to avoid conflicts of interest, but rather that it had "established policies and procedures to address the conflicts of interest through a combination of internal controls and disclosure."  COM ¶ 111(a). The Complaint cites specific statements made by S&P as part of these

---

[3]  *See also Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation."); *Gammel v. Hewlett-Packard Co.*, --- F.Supp.2d ---, 2012 WL 5945089 at *9-*13 (C.D. Cal. Aug. 29, 2012) (Guilford, J.).

[4]  Under Rule 12(b)(6), factual allegations pleaded in the Complaint must be "accepted as true and construed in the light most favorable to the plaintiff." *Lazy Y Ranch, Ltd. v. Behrens,* 546 F.3d 580, 588 (9th Cir. 2008).  To survive a motion to dismiss, a complaint's "non-conclusory 'factual content,' and reasonable inferences from that content" need only be "plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)).

established policies and procedures.  *See*, *e.g.*, *id.* ¶¶ 111–117
(describing September 2004 "Code of Practices and Procedures,"
October 2005 and June 2007 versions of "Code of Conduct," November
2005 "Analytic Firewalls Policy," February 2006 "Report on
Implementation of S&P's Rating Services Code of Conduct").  These
statements were not simply aspirational, but rather made specific
assertions regarding S&P's existing practices.  For example, S&P
represented:  (a) "that Rating Services receives a fee from the
issuer must not be a factor in the decision to rate an issuer or in
the analysis and the rating opinion," COM ¶ 111(c); (b) ratings
"criteria and methodology shall be determined solely by [S&P's]
Analytics Policy Board and Analysts," COM ¶ 111(d); (c) ratings
"shall not be affected by an existing or a potential business
relationship between Rating Services (or any Non-Ratings Business)
and the issuer or any other party, or the non-existence of such a
relationship," COM ¶ 111(e); (d) "Ratings Services shall not
forebear or refrain from taking a Rating Action, if appropriate,
based on the potential effect (economic, political, or otherwise) of
the Rating Action on Ratings Services, an issuer, an investor, or
other market participant," COM ¶ 115(b); and (e) "In no
circumstances shall an employee of Standard & Poor's/McGraw-Hill try
to influence the opinion of an Equity Analyst or a Ratings Analyst
by referring to the commercial relationship between Standard &
Poor's/McGraw-Hill and any third party," COM ¶ 116.  S&P also
maintained that its ratings represented at the time they were
issued, and through surveillance would continue to represent, S&P's
true, accurate, and current opinion of the credit risks, that is,
the "likelihood that payments of principal and interest will be made

4

on a timely basis in accordance with the terms of the obligations."
COM ¶¶ 121, 122.

Each of these factual representations is specific and
verifiable.  The Complaint alleges they were false and misleading
because S&P acted in direct violation of the policies and procedures
it claimed were in place.  For example, the Complaint alleges:
(a) to preserve market share and ratings fees, S&P delayed and
watered down updates to the model used to rate RMBS, COM ¶¶ 133-157;
(b) S&P altered the model used to rate CDOs to protect S&P's market-
share in a segment of the CDO business, COM ¶¶ 161-171; (c) S&P, in
the words of one S&P executive, "toned down and slowed down," COM ¶
178, the release of an update to its CDO rating model because
issuers, such as Bear Stearns, told S&P that the updated version
would cause S&P to lose certain business to competitor ratings
agencies, COM ¶¶ 172-180; (d) Patrice Jordan and David Tesher, both
CDO group business heads, asked that a key assumption in determining
the rating of a CDO be changed in an effort to achieve higher
ratings for certain CDOs, COM ¶¶ 187-88; (e) through Summer 2007,
S&P continued to explore business-needs motivated changes to its CDO
rating model, COM ¶¶ 187-198; and (f) S&P refrained from downgrading
large numbers of 2006 RMBS transactions so that it could continue to
assign high ratings to CDOs containing those assets to accommodate
issuer interests and collect high rating fees, COM ¶¶ 200-241.

Other courts have found actionable statements similar to those
alleged in the Complaint where specific facts are alleged showing
those statements to be false or misleading.  For example, a court
found actionable New Century's representations that it had loans of
"higher credit quality," "improved underwriting controls and

appraisal review process," "a strategy [of selecting borrowers with increasing credit scores]," "strict underwriting and risk management disciplines," and "better credit quality." *In re New Century*, 588 F. Supp. 2d 1206, 1225-26 (C.D. Cal. 2008) (Pregerson, J.). The court rejected New Century's claim that the statements should be "chalked up to 'mere puffery,'" holding that the allegations suggested "repeated assurances of strong credit quality and strict underwriting practices" and were set "against detailed allegations of practices that utterly failed to meet those standards. That is sufficient to plead false and misleading statements." *Id.* at 1226.[5] The same is true here.

That S&P's claims were not mere puffing is further supported by the Complaint's allegations that S&P made them knowing that they were material to and would be relied on by investors in RMBS and CDOs. *See, e.g.*, COM ¶¶ 49(d), 50, 119(a), 119(c), 120(a)-(b), 270. For example, the Complaint alleges (quoting an internal S&P document as support) that S&P knew that "investor perception that S&P's ratings accurately reflected credit risk was crucial to S&P's business." COM ¶ 50.

Congress' conditioning of NRSRO licenses on managing conflicts of interest further confirms that statements regarding policies and procedures put in place to accomplish this are material and cannot

---

[5] *See also In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1053-54, 1057-59, 1072 (C.D. Cal. 2008) (Pfaelzer, J.) (holding actionable Countrywide statements that it "actively managed credit risk," "applied more stringent underwriting standards for riskier loans," and was "actively monitoring the delinquency and default experience" of loan pools; *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1149-50, 1155 (S.D. Cal. 2008) (holding actionable representations that Accredited was "focused more on credit quality than merely increasing the volume of loans originated" and that "its underwriting procedures were more conservative than those of other sub-prime mortgage lenders").

be treated as empty commercial boasting.  *See* 15 U.S.C. § 78o-7(h)(3) (SEC shall establish rules to prevent sales and marketing concerns from influencing ratings decisions).  The Complaint alleges that in June 2007, "in response to the SEC's request for '[p]olicies and procedures to address and manage conflicts of interest,' S&P provided, among other things, the June 2007 version of its Code of Conduct," which included many of the specific representations alleged in the Complaint and referenced above.  COM ¶ 38.  Moreover, the Complaint alleges that S&P made similar representations to Congress at hearings on, among other things, the ratings process, the potential influence on ratings of the conflicts of interest posed by the issuer-pays model, and whether additional regulation of the ratings industry was needed.  COM ¶¶ 119(b)-(d).

    2.   S&P's Reliance On *Boca Raton* Is Misplaced

    S&P rests its "puffery" defense primarily on an unpublished, out-of-circuit opinion addressing securities fraud claims by S&P shareholders.  Defendants' Memorandum ("Mem.") at 9-11 (discussing *Boca Raton Firefighters and Police Pension Fund v. Bahash*, 2012 WL 6621391 (2d Cir. Dec. 20, 2012)) ("*Boca Raton*")).  In contrast, the focus of the action here is the effect of S&P's statements not on S&P shareholders, but on investors in the RMBS and CDOs S&P rated.  This is a crucial difference.  For shareholders, *Boca Raton* notes that it might not matter (and might even be to their benefit) that S&P's "business practices reflected a "scheme to pursue market share at all costs" or that S&P was "more focused on 'pragmatic business decision[s]' than serving the interests of those who relied on its ratings."  2012 WL 6621391 at *5. [6]  These same practices, in

_____

[6] Even in a shareholder suit, in a decision from the same district as *Boca Raton*, the court found actionable similar assertions by Moody's

7

violation of S&P's representations to the contrary, would certainly matter to those who did rely on S&P's ratings.  In this different context, two state courts faced with similar arguments by S&P that its representations regarding objectivity and independence were mere puffing have rejected those claims and found S&P's assertions actionable.  *See People of the State of Ill. v. McGraw-Hill Co., Inc., et al.*, Mem. Op. and Order at 5-8, 2012 WL 5440768 (Ill. Cir. Ct. Nov. 7, 2012); *State v. Moody's Corp., et al.*, 2012 WL 2149408 at *7 (Conn. Super. Ct. May 10, 2012).[7]  S&P has failed to cite any court decision accepting S&P's argument that its representations regarding the objectivity and independence of its ratings are immaterial as a matter of law to the end users of those ratings.

*Boca Raton* is further distinguishable because, as discussed at pages 3-5 above, the Complaint alleges specific, verifiable representations by S&P that it had in place and abided by policies and procedures to manage conflicts of interest, to separate ratings from commercial activity, and to ensure that its ratings reflected its true, accurate, and current opinion of the credit risks posed by the rated securities, COM ¶¶ 111-122, and specific facts showing that these representations were false and misleading, COM ¶¶ 123-269.[8]  These allegations stand in sharp contrast to "the generic,

Corporation (S&P's primary rating agency competitor) regarding its objectivity and independence.  *See In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 508-09 (S.D.N.Y. 2009) (Moody's "listed verifiable actions it was taking to ensure its independence").

[7] In a one page order the same day, the Connecticut court rejected S&P's puffing claim for the reasons set forth in its ruling on Moody's similar claim.  *State v. McGraw-Hill Co., et al.*, No. HHD-CV-10-6008838-S, Order (Conn. Super. Ct. May 10, 2012).

[8] S&P points to paragraphs in the *Boca Raton* Second Amended Complaint ("SAC") that it claims are "the same or highly similar" to the Complaint in this case.  *See* Mem. at 10.  Most of these paragraphs concern representations completely unrelated to the claims in this

8

indefinite nature of the statements at issue" in *Boca Raton*. 2012 WL 6621391 at *4.[9]

case. *See*, *e.g.*, *Boca Raton* SAC, ¶¶ 253, 265, 271, 302, 329, 362. Even the limited portions of the *Boca Raton* SAC that are arguably relevant to this case, *id*, ¶¶ 182, 325, 329, 384-89, are distinguishable because they were not linked to specific allegations that S&P undertook actions conflicting with these representations. Indeed, S&P acknowledges that *Boca Raton* upheld dismissal of the claims based on statements regarding S&P's surveillance of its ratings not because they were "mere puffing" but because plaintiffs failed "to plead the falsity of those statements with particularity." Mem. at 11 n.30. By contrast, the Complaint here alleges that S&P failed to adhere to its publicly announced policies and procedures in both its initial ratings and its surveillance decisions. *See* COM ¶¶ 123-199 (alleging that consideration of fees, market share, profits, and relationships with issuers improperly influenced S&P's ratings criteria and models); *id.*, ¶¶ 200-269 (alleging that, contrary to S&P's representations, between March 2007 and October 2007, to favor issuers and maintain its market share and profits, S&P failed to account for what it knew were increased credit risks posed by non-prime RMBS and instead continued to rely upon existing ratings of non-prime RMBS when rating CDOs). Moreover, the *Boca Raton SAC* cited only two sections from S&P's 2005 Code of Conduct in common with the Complaint here (compare COM ¶ 115(a), (e) w/ Boca Raton SAC ¶¶ 384, 387), and did not cite or discuss the other specific assertions of fact discussed in the text above that cannot be dismissed as "mere puffing." *See* COM ¶¶ 111-117. The court in *Boca Raton* never specifically discussed whether the 2005 Code of Conduct provisions referenced in ¶¶ 384 and 387 of the *Boca Raton SAC* were puffing.

[9] The specific allegations in the Complaint also distinguish the false statements in this case from those at issue in the other cases relied on by Defendants. *See Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1053 (9th Cir. 2008) ("general assertion"); *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1481 (9th Cir. 1997), *overruled on other grounds by Lacey v. Maricopa County*, 693 F.3d 896 (9th Cir. 2012) (statements "too general"); *ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009) (statements "merely generalizations regarding JPMC's business practices"); *In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1072 (C.D. Cal. 2012) (Morrow, J.) (statements aspirational rather than "factual statements about the current status of [defendant's] financial compliance and accounting records"); *County of Marin v. Deloitte Consulting LLP*, 836 F. Supp. 2d 1030, 1038-39 (N.D. Cal. 2011) (representations "vague, highly generalized, and subjective statements" made in sales context rather than specific assertions that induce reliance).

### 3.   Three of the Four Alleged Fraud Predicates Do Not Require Proof of Specific Misrepresentations

S&P's claim that its representations regarding objectivity and independence are either "general subjective claims" about its reputational standing, or "altogether too general and vague" to be technically true or false, Mem. at 7, 9, fails for an additional reason.  Under the mail and wire, and certain bank (those charged under 18 U.S.C. § 1344(1)),[10] fraud predicates of the alleged FIRREA violations, proof of any particular false statement is not required.  *See United States v. Ali*, 620 F.3d 1062, 1170-71 (9th Cir. 2010) ("Under the mail fraud statute the government is not required to prove any particular false statement was made.  Rather, there are alternative routes to a mail fraud conviction, one being proof of a scheme or artifice to defraud, which may or may not involve any specific false statements.").[11]  Thus, even if each individual representation by S&P were for some reason deemed "mere puffing," the Complaint would still allege a viable scheme to defraud because its allegations, read in their totality, demonstrate an overall course of conduct by S&P intended to mislead investors in RMBS and CDOs about the manner in which S&P produced its ratings and the influence issuers had on those ratings.  *See supra* pages 3-5.

[10] Under 18 U.S.C. § 1344(1), bank fraud is committed through a scheme "to defraud."  Under § 1344(2) it requires a scheme to obtain money or property "by means of false or fraudulent pretenses, representations, or promises."

[11] *See also United States v. Halbert*, 640 F.2d 1000, 1007 (9th Cir. 1981) ("A defendant's activities can be a scheme or artifice to defraud whether or not any specific misrepresentations are involved.").  Though these cases address the mail fraud statute, the elements of wire and bank fraud are similar.  *See Neder v. United States*, 527 U.S. 1, 20-21 (1999).  The Ninth Circuit looks to case law construing the mail fraud statute for guidance in interpreting and applying both the wire and bank fraud statutes.  *See United States v. Treadwell*, 593 F.3d 990, 997 n.6 (9th Cir. 2010); *United States v. Lewis*, 67 F.3d 225, 233 n.12 (9th Cir. 1995).

**B.   THE COMPLAINT ALLEGES WITH SUFFICIENT PARTICULARITY THAT S&P ISSUED CDO RATINGS IT KNEW DID NOT ACCURATELY REFLECT THE CDOS' TRUE CREDIT RISKS**

As part of S&P's scheme to defraud, the Complaint alleges that from March through October 2007, S&P issued ratings for CDOs that S&P "knew did not accurately reflect those CDOs' true current credit risks."  COM ¶¶ 9(b), 124(b), 232, 274. [12]  S&P argues that the Complaint fails to allege with sufficient particularity either "objective falsity," that the CDO ratings at issue did not accurately reflect the CDOs' true credit risks, or "subjective falsity," that S&P knew this to be the case at the time the CDO ratings were issued.  Mem. at 12-18.  Both arguments are without merit.  The Complaint satisfies Rule 9(b) by alleging with particularity facts demonstrating the objective falsity of the CDO ratings at issue.  And, though Rule 9(b)'s particularity requirement does not extend to subjective falsity, the Complaint nevertheless

---

[12]  S&P mischaracterizes the Complaint, asserting that it alleges "a separate scheme" relating to defendants' conduct in March through October 2007.  Mem. at 11; *see also* Mem. at 2,5.  In fact, the Complaint alleges a single scheme to defraud, spanning September 2004 through October 2007, of which S&P's ratings of CDOs between March and October 2007 was a part.  COM ¶¶ 7-10, 276-278.  In connection with its claim that the Complaint alleges two separate schemes, S&P asserts that the Complaint "does not allege – because it cannot – that the models and assumptions discussed" in what S&P refers to as the "first" alleged scheme to defraud "were applied in the CDO ratings at issue in" what S&P characterizes as the "second" alleged scheme to defraud.  Mem. at 11 n.31.  This too is incorrect.  The Complaint's allegations relating to the criteria and models S&P used to rate RMBS and CDOs apply to the time period, March 2007 through October 2007, in which S&P is alleged to have issued CDO ratings it knew did not reflect the CDOs true credit risks.  *See* COM ¶¶ 9(a), 124(a) (alleging that weakening of criteria for business reasons extended through at least October 2007); ¶¶ 189-197 (discussing continuing "business needs" motivated efforts to revise CDO Evaluator from June 2006 through August 2007, and citing internal S&P documents stating that default matrix for version 3.2 of CDO Evaluator, being used at time to rate CDOs, "was determined to be implausible" and had been pulled "out of thin air").

11

alleges with particularity facts demonstrating S&P's knowledge of the inaccuracies in its CDO ratings at the time they were issued.[13]

### 1. Rule 9(b)'s Limited Particularity Requirements

Rule 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." To satisfy Rule 9(b), a complaint alleging fraud must specify "the who, what, when, where, and how of the misconduct charged" as well as "what is false or misleading about [the purportedly fraudulent] statement, and why it is false." *United States ex rel. Cafasso v. General Dynamics C4 Systems, Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011).[14] This particularity requirement applies only to the conduct that constitutes the fraud. As the second sentence of Rule 9(b) makes clear, allegations relating to "intent, knowledge, and other conditions of a person's mind may be made generally." *See In re Glenfed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547, 1549 (9th Cir. 1994) (en banc), *superseded by statute,* Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 ("PSLRA") ("We conclude that

---

[13] Based, in particular, on *Rice v. Charles Schwab*, 2010 WL 5156654 (C.D.Cal. Oct. 22, 2010) (Carney, J.), S&P acknowledges, Mem. at 12, that credit ratings are actionable if the "representatives who published credit ratings actually knew the credit ratings were false or did not believe that the credit ratings were true at the time that each credit rating was issued." *Id.* at *3 (citations omitted).

[14] If the fraud alleged involves numerous acts over a long period of time, Rule 9(b)'s "specificity requirements are less stringently applied." *Anthony Distributors, Inc. v. Miller Brewing Co.*, 904 F. Supp. 1363, 1366 (M.D. Fla. 1995); *accord United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1051 (9th Cir. 2001) ("Rule 9(b) may not require Lee to allege, in detail, all facts supporting each and every instance of false testing over a multi-year period."). Also, Rule 9(b)'s particularity requirements "may be relaxed to permit discovery in a limited class of corporate fraud cases where the evidence is within a defendant's exclusive possession." *Lee*, 245 F.3d at 1052.

plaintiffs may aver scienter generally, just as the rule states.");[15] *Walling v. Beverly Enterprises*, 476 F.2d 393, 397 (9th Cir. 1973) ("[Rule 9(b) does not] require any particularity in connection with an averment of intent, knowledge or condition of the mind.").

The Complaint, brought by the United States under FIRREA, is not subject to the PSLRA, which, in private securities fraud actions, imposes a heightened pleading standard that not only has more "exacting requirements" for pleading falsity but also requires a complaint to "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061, 1065-66, 1070 (9th Cir. 2008) (quoting 15 U.S.C. § 78(u)-4(b)(2); emphasis omitted). Because the Complaint is subject only to Rule 9(b), not the PSLRA, it need not plead S&P's knowledge and intent with particularity. *See Odom v. Microsoft Corp.*, 486 F.3d 541, 554 (9th Cir. 2007) (en banc) ("only aspects of wire fraud that require particularized allegations are the factual circumstances of the fraud itself"); *Genesee County Employees' Retirement System v. Thornburg Mortg. Securities Trust 2006-3*, 825 F.Supp. 2d 1082, 1238-39 (D.N.M. 2011) ("The issue here is the Rating Agency Defendants' beliefs or knowledge, which falls within the second provision of rule 9(b).").

---

[15] Decided before the PSLRA, *Glenfed* applied Rule 9(b) to the securities fraud claims before it, rejecting Second Circuit decisions that had interpreted Rule 9(b) to require a heightened scienter pleading standard in such cases.

2.   The Complaint Alleges Objective Falsity With Sufficient Particularity

The Complaint alleges with more than sufficient particularity the reasons why specific CDO ratings issued by S&P did not accurately reflect their true credit risks.  The Complaint identifies examples of the CDOs for which S&P is alleged to have issued or confirmed ratings that did not accurately reflect their true credit risks.  COM ¶¶ 234(a)-(d), 236(a)-(b), 238(a)-(d), 241(a)-(e), 244(a)-(b), 261(a)-(e), 269(a)-(c).[16]  The Complaint alleges in detail S&P documents showing that S&P knew that whole classes of non-prime RMBS being packed into these CDOs were rapidly deteriorating and were expected to be downgraded, that the deterioration of these classes of non-prime RMBS would affect the credit risks of these CDOs, that the ratings of these CDOs were not adjusted to account for the deterioration of these classes of non-prime RMBS, and that S&P nonetheless issued the ratings for these CDOs.  In particular, the Complaint alleges:

The ratings on the assets underlying a CDO were the most important factor in the CDO rating and were a primary input into the CDO rating model.  COM ¶¶ 91, 94-95.  In early 2007, S&P recognized that the ratings of "later-vintage mezzanine SF CDOs" would be "closely linked to the performance of mezzanine ('BBB' and 'BB'

---

[16]   S&P avers that "[a]mong its other failures, the Government fails to identify exactly which CDOs and tranches it is suing on."  Mem. at 11-12 n.33.  The Complaint makes clear, however, that its allegations of falsity extend to all CDOs exposed to subprime RMBS rated by S&P from March to October 2007, and that the specific CDOs referenced are cited only as examples.  COM ¶¶ 232, 234, 236, 238, 241, 244, 261, 266-267, 269.  This is sufficient for pleading purposes given the scope and duration of the alleged fraud.  *See* *United States ex rel. Ebeid v. Lungwitz*, 616 F.3d 993, 998-99 (9th Cir. 2010) ("representative examples" of false claims sufficient to satisfy requirements of Rule 9(b)); *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 333-34, 336-38 (D. Conn. 2004) ("categorical information" about actual claims submitted sufficient).

14

rated) tranches of Subprime RMBS transactions, which makes up the majority of collateral for these transactions" and that downgrades of this collateral would affect the ratings of these CDOs.  COM ¶¶ 215, 216, 229.  *See also* COM ¶ 233(i) (March 19, 2007 internal presentation recognizing "There will be some impact to CDOs as RMBS has been a growing source of collateral").  In fact, non-prime RMBS, including in particular non-prime RMBS rated BBB and below, made up large portions of the collateral for many of the CDOs cited as specific examples in the Complaint.[17]

From late 2006 through summer 2007, internal S&P analyses showed the continuing deterioration of non-prime RMBS, and indicated that, in the near term, negative rating actions were anticipated for, in particular, non-prime RMBS rated BBB and below.  COM ¶¶ 208-210, 233(g), 233(h), 235(b), 235(d), 237(a), 237(c), 237(d), 239(c), 239(d), 239(i)[18]  The results of S&P's internal analyses showing the dismal and worsening performance of non-prime RMBS were provided to S&P business heads, including David Tesher and Patrice Jordan, who oversaw the issuance of ratings for new CDOs.  As a result, they, as

---

[17] For example, Western Financial Federal Credit Union purchased tranches in four CDOs for which the percentages of collateral consisting of non-prime RMBS, and more particularly non-prime RMBS rated BBB or below were: Sorin CDO VI, Ltd. -- 92% & 55%, COM ¶ 234(b); Charles Fort CDO I Ltd. -- 86% & 51%, COM ¶ 234(d); NovaStar ABS CD I, Ltd. -- 99% & 74%, COM ¶ 241(a); and Acacia CDO 12 Ltd. -- 78% & 32%, COM ¶ 241(b).

[18] For example, an internal June 11, 2007 report stated "analysts had run all of S&P's 18,000 subprime RMBS ratings and found that, on average, the BBB and lower tranches had greater than 100% severe delinquencies versus available credit support," which S&P analysts and executives "knew meant that the RMBS tranche[s] at issue would in the near term almost certainly be subject to a negative Rating Action."  COM ¶ 239(c).  The comparison of severe delinquencies to available credit support was "used by RMBS Surveillance to predict whether losses might exceed the ability of an RMBS tranche to withstand them, thereby causing the tranche to default."  COM ¶ 108.

well as other S&P business heads and analysts, understood as early as March 2007 that there would be unprecedented downgrades of non-prime RMBS, and that these would result in downgrades to CDOs exposed to those RMBS.[19]  For example, on March 1, 2007, Tesher conducted a meeting of the CDO analysts he supervised at which he stated, among other things, that while they should continue to rate CDOs, he anticipated the need for subsequent "retranching" of those CDOs, that is, repackaging of those CDOs as the result of downgrades of their underlying collateral.  COM ¶ 233(b).

Tesher, Jordan, and other business heads also understood from as early as March 2007 that issuers were scrambling to offload the risk of failing non-prime RMBS into CDOs, and that this was resulting in increased ratings business and record revenues for S&P.[20]  The desire to take advantage of this increased ratings business contributed to two actions.  First, through Spring and

[19] *See* COM ¶ 218 (on February 3, 2007, executive in charge of RMBS Surveillance sent to her immediate supervisor email stating: "I talked to [the executive in charge of Research and Criteria] yesterday and he thinks that the ratings are not going to hold through 2007"); COM ¶ 233(a) ("During conversations in or about March 2007, Jordan, Tesher, and other managers in Global CDO agreed that there were going to be significant negative Rating Actions on non-prime RMBS and that these negative Rating Actions would have a major impact on mezzanine cash CDOs."); COM ¶ 233(j) (in March 2007, S&P analyst circulated within S&P parody of song "Burning Down the House" that referenced how the 2006 vintage subprime RMBS were "Bringing down the house" including "leveraged CDOs").

[20] *See* COM ¶ 233(c) (during March 1, 2007 meeting with CDO analysts he supervised, Tesher stated that issuers were "shutting down and liquidating their warehouses" of RMBS assets, that CDO deals would need "to be priced and closed to reduce issuers' exposure to the underlying RMBS collateral," and that he "expected the analysts to be very busy as issuers pushed to price and close CDO deals quickly"); COM ¶ 237(f) (on May 21, 2007, Jordan sent Rose report stating, "[b]ecause of the effect of the subprime RMBS situation, in March we experienced the highest monthly deal volume ever, doubling the total from the previous two months" and predicting that "May is expected to generate $24.48 million in revenue, the highest total for the month of May to date.") (emphasis added).

Summer 2007, S&P business heads interfered with, delayed, and restricted analysts' efforts to take negative rating actions on failing non-prime RMBS.[21]   Second, during the same time period, S&P business heads continued efforts to revise the methods used to generate its CDO rating models to ensure that those rating models would be "business friendly."   COM ¶¶ 189-198.

Despite the anticipation that non-prime RMBS ratings "would not hold" and would be the subject of near term negative Rating Actions, throughout Spring and Summer 2007, S&P continued to use those ratings, without adjustment, to issue and confirm CDO ratings.   COM ¶¶ 234, 236, 238, 240-241.   Even in late June and early July 2007, after S&P made the decision to institute large-scale negative rating actions on non-prime RMBS, and despite the recognition that those pending negative rating actions would affect CDOs with exposure to non-prime RMBS,[22] S&P continued to rate such CDOs using non-prime RMBS ratings without any adjustments.   COM ¶¶ 243-244, 261.

---

[21] *See* COM ¶ 211 (from Fall 2006 through Spring 2007, executive in charge of RMBS Surveillance "regularly expressed frustration to her colleagues that, notwithstanding the dire performance of subprime RMBS, she was prevented by [S&P executives] from downgrading the ratings of subprime RMBS because of concern that S&P's ratings business would be affected if there were severe downgrades"); COM ¶ 239(d) (on June 17, 2007, Gillis sent Rose a memorandum stating, "[l]osses continue to pile up in the subprime market" and, in discussing the process underway to modify criteria, noting, "we have been restricted in what we have believe[d] should be done."); COM ¶ 249 (on July 5, 2007, S&P analyst sent email to investment banker stating, "The fact is, there was a lot of internal pressure in S&P to downgrade lots of deals earlier on before this thing started blowing up.  But the leadership was concerned of p*ssing off too many clients and jumping the gun ahead of Fitch and Moody's.").

[22] *See* COM ¶ 251 (on July 6, 2007, Jordan sent an email noting "dramatic changes we will very soon be making" and stating "planned RMBS changes will result in unprecedented CDO downgrades"); COM ¶ 254 (on July 11, 2007, S&P executive sent Rose an email stating, "more rating action yet to come. . . .  [CDO] Deals that close now will be downgraded if we don't stop them").

The Complaint's allegations summarized above satisfy Rule 9(b) because they explain why S&P's March to October 2007 CDO ratings were "untrue or misleading when made" by "pointing to inconsistent contemporaneous statements or information (such as internal reports) which were made by or available to" S&P. *Glenfed,* 42 F.3d at 1549.

S&P argues that to satisfy Rule 9(b) the Complaint must also plead what the "true credit risk associated with any of the 33 [specifically identified CDOs] happened to be at the time S&P issued its credit rating," detail "the performance of the specific RMBSs contained in the CDOs at issue," and "identify how, if [at] all, the performance of the specific RMBSs contained in any of the CDOs identified should have actually impacted the rating of the CDO tranche at issue." Mem. at 12-13. This would graft into Rule 9(b) a requirement it does not impose, namely, that the Complaint allege with particularity the degree to which S&P's CDO ratings were false or misleading. The case law neither requires nor encourages this level of detail at the pleading stage. *See Walling,* 476 F.2d at 397 (pleading rules are "designed to avoid and reduce long and technical allegations" and Rule 9(b) "does not require nor make legitimate the pleading of detailed evidentiary matter").[23]

---

[23] *See also In re IndyMac Mortgage-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 509-10 (S.D.N.Y. 2010) (alleged "widespread abandonment" of "underwriting guidelines during the relevant time period" and increase in "percentage of defaulting loans" created "sufficient nexus" between "alleged underwriting standard abandonment" and relevant loans despite absence of "factual allegations about any of the actual loans held" in underlying pools); *In re Wells Fargo Mortgage-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 972 (N.D. Cal. 2010) (allegations that "challenged conduct infected the entire underwriting process, including with respect to prime loans" and "practices permitted the pervasive and systematic use of inflated appraisals, affecting all types of mortgages" sufficient to tie conduct to loans at issue). The level of detail requested by S&P seems particularly unnecessary in that, as the entity that rated the CDOs at issue, S&P necessarily has in its possession information regarding the RMBS collateral to which the CDOs had exposure.

To support its arguments, S&P cites only to *Space Coast Credit Union v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* ---F.R.D.---, 2013 WL 1131628 (S.D. Fla. Mar. 18, 2013).  The complaint in *Space Coast* did not contain any specific facts supporting its allegations of falsity with respect to the 12 CDOs purchased by plaintiff, instead relying on academic articles, working papers, and government studies relating to rating agencies' general practices, with no allegations to tie these general studies to the ratings of the CDOs purchased by plaintiff.[24]  In contrast, the Complaint here alleges particular facts showing that S&P knew that the models and criteria that affected <u>every</u> CDO S&P rated had been watered down to further S&P's financial interests, acceding to issuer demands to minimize credit support requirements.[25]  For the 2007 CDO ratings cited as examples, the Complaint alleges with particularity the uniformly large amounts of those CDOs composed of deteriorating categories of non-prime RMBS collateral.[26]  This is sufficient to tie the alleged fraud (S&P's knowing failure to account for the deterioration of these categories of collateral) to the ratings of those CDOs.  *See*

---

[24]  *See id.* at *4, *6, *8 ("no indication that any of the twelve CDOs in which Eastern invested . . . were part of the research study, much less that they were among the CDOs whose credit ratings were found to deviate from S&P's quantitative models"; "Space Coast yet again gives no factual support for its claim that the cross-referencing of mortgage securities in the broader CDO market affected Eastern's CDO notes and their credit ratings").

[25]  COM ¶¶ 125-198.

[26]  *See* COM ¶¶ 234(a)-(d), 236(a)-(b), 238(a)-(d), 241(a)-(e), 244(a)-(b), 261(a)-(e), 269(a)-(c).  *See also* note 18 above.  For example, with respect to Eastern Financial Florida Credit Union (whose CDO purchases were at issue in *Space Coast*) the Complaint alleges that it purchased tranches in three CDOS for which the percentages of collateral consisting of non-prime RMBS, and more particularly non-prime RMBS rated BBB or below, were: Corona Borealis CDO Ltd. -- 86% & 50%, COM ¶ 236(b); Stack 2007-1 Ltd. -- 91% & 64%, COM ¶ 238(a); Ixis ABS CDO 3 Ltd. -- 74% & 49%, COM ¶ 241(d).

note 24 above; *Cf. Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 178-79 (S.D.N.Y. 2009) (where rating agencies "knew that the ratings process was flawed, knew that the portfolio was not a safe, stable investment, and knew that [they] could not issue an objective rating because of the effect it would have on their compensation, it may be plausibly inferred that [they] knew they were disseminating false and misleading ratings").

### 3.   Though Not Required, the Complaint Also Alleges Subjective Falsity With Particularity

In arguing that the Complaint fails to allege with particularity "subjective falsity," that is, S&P's knowledge that its CDO ratings did not accurately reflect their true credit risks at the time issued, S&P relies extensively on *Buttonwood Tree Value Partners, LP v. Sweeney*, --- F. Supp. 2d ---, 2012 WL 6644397 (C.D. Cal. Dec. 10, 2012) (Carney, J.).  Mem. at 16-18.  *Buttonwood*, however, applied not only the PSLRA's heightened scienter pleading standard, but an arguably more demanding version of this standard applicable to securities fraud claims made against an outside auditor.  *See id.* at *3.  Here the PSLRA does not apply; as a result, in accordance with Rule 9(b), S&P's knowledge and intent are not subject to a particularity requirement, and may be averred generally.  *See supra* pages 12-13 & nn.14-15.

Though Rule 9(b) does not require it, the Complaint alleges with particularity S&P's knowledge that its March to October 2007 ratings of CDOs supported by non-prime RMBS collateral did not accurately reflect their true credit risks.  *See supra* pages 14-17 & nn.17-23; *GlenFed*, 42 F.3d at 1549 ("inconsistent contemporaneous statements or information (such as internal reports) which were made

by or available to the defendants" "may support an inference of scienter, but that is not required under Rule 9(b)").

S&P's claim that the Complaint reveals nothing more than a dispute among employees, Mem. at 14-15 & n.40, ignores allegations that the S&P executives responsible for S&P's CDO ratings recognized the deterioration of underlying non-prime RMBS collateral and the effects of this deterioration on the CDO ratings, but nevertheless interfered with and delayed negative rating actions to enable S&P to please its issuer clients and increase its revenues by continuing to issue and confirm the ratings of CDOs packed with this deteriorating collateral. *See supra* pages 14-17 & nn.17-23.[27] Similarly off point is S&P's claim that, because it had a practice of relying on the existing ratings of underlying RMBS collateral when rating CDOs and adjusting those ratings only when the underlying RMBS collateral was placed on CreditWatch Negative, it could not have committed fraud by continuing to follow these practices, particularly when the Complaint also alleges that during the relevant time period S&P both placed on CreditWatch Negative and downgraded some non-prime RMBS. Mem. at 15-17. Such an approach would insulate from claims of fraud any institution that continued to follow existing practices, even where it knew the result of those practices was the making of false or misleading representations. In short, this is what the Complaint

---

[27] These allegations regarding internal documents revealing the knowledge and motivations of S&P executives responsible for CDO ratings distinguish this case from those cited by S&P, Mem. At 14-15, in which the plaintiffs, relying on "a newspaper article and Congressional testimony from 2008," made allegations relating only to S&P's failures timely to update its rating models. *See In re Lehman Bros. Sec. and ERISA Litig.,* 684 F. Supp. 2d 485, 494-95 (S.D.N.Y. 2010); *Ohio Police & Fire Pension Fund v. Standard & Poor's Financial Services, LLC,* 813 F.Supp. 2d 871, 883-84 (S.D. Ohio 2011), aff'd, 700 F.3d 829 (6th Cir. 2012).

alleges –– despite its knowledge that ratings of large categories of non-prime RMBS were not going to hold, S&P deliberately delayed taking large-scale negative rating actions, and concealed information regarding the deterioration of those non-prime RMBS from the analysts rating CDOS, to permit S&P to rely on its existing practices and continue to issue CDO ratings that did not account for deterioration of non-prime RMBS collateral.

### C. THE COMPLAINT ALLEGES THAT S&P ACTED WITH THE REQUIRED SPECIFIC INTENT TO DEFRAUD

The mail, wire, and bank fraud violations alleged as predicates of the charged FIRREA violations all have similar elements.  *See* note 11 above.  These elements encompass the requirement that a defendant "specifically intend 'to deprive' the victim of money or property."  *Treadwell,* 593 F.3d at 996; *United States v. Ciccone,* 219 F.3d 1078, 1082 (9th Cir. 2000) ("offense's specific intent element . . . require[s] proof of intent to deprive the victim of money or property").[28]

Relying on *United States v. Lew,* 875 F.2d 219, 221 (9th Cir. 1989), S&P argues that the mail, wire, and bank fraud violations alleged as FIRREA predicates require proof not just of an intent to deprive investors of money or property, but also of an intent to

---

[28]   As *Treadwell* makes clear, for wire fraud, while the defendant must act with intent to deprive the victim of money or property, this does not require that the defendant act with intent to cause pecuniary loss or a permanent taking away of property.  593 F.3d at 996-97.  The same is true for mail fraud, *see United States v. Hickey,* 580 F.3d 922, 930 (9th Cir. 2009) ("loss to investors is not an element of either mail fraud or securities fraud, nor is an intent to cause loss"), and bank fraud, *see United States v. Rizk,* 660 F.3d 1125, 1135 (9th Cir. 2011) (Circuit has not adopted requirement that intent to defraud include "intent to expose a lender to a risk of loss"). As *Treadwell* also makes clear, the Ninth Circuit Model Criminal Jury Instructions comport with "our precedents" in defining intent to defraud as "an intent to deceive or cheat."  593 F.3d at 994, 996.

"obtain money or property from the one who is deceived."  S&P
contends that the Complaint fails to satisfy this requirement
because it fails to allege "that S&P intended to obtain money from
investors in the CDOs."  Mem. at 19.[29]  S&P's argument is both
legally and factually flawed.

    The Ninth Circuit has recognized that in frauds involving more
complex transactions, money need not flow "directly to the defendant
from the party deceived by the defendant."  *Ali*, 620 F.3d at 1064;
*see also United States v. Dowie*, 411 Fed. Appx. 21, 27-28, 2010 WL
4904309, at **3 - **4 (9th Cir. 2010) ("defendant may be guilty of
fraud where the deceived party is indirectly deprived of money or
property as a result of the fraud").  Thus, *Lew* does not impose the
requirement S&P asserts.

    Even if *Lew* is read to impose the requirement S&P asserts, the
Complaint alleges facts sufficient to satisfy that requirement.  The
Complaint alleges that, with "intent to defraud" S&P engaged in a
"scheme to defraud investors in RMBS and CDO tranches" and "to
obtain money from these investors by means of material false and
fraudulent pretenses, representations, and promises, and the
concealment of material facts."  COM ¶ 7; *see also* COM ¶ 276.  The
Complaint also alleges that S&P's motive for doing so was "to
maintain and increase its share of the market for credit ratings of

---

[29]  Though *Lew* was a mail fraud case, for the reasons discussed in
note 11 above, it may be looked to for guidance with respect to the
wire and bank fraud statutes.  The only bank fraud case cited by S&P
in support of its arguments, Mem. at 19, addresses not intent, but
the separate jurisdictional requirement in bank fraud cases brought
under 18 U.S.C. § 1344(2) that the crime be "fraudulently 'to
obtain' assets 'owned by' a financial institution."  *United States
v. Bennett*, 621 F.3d 1131, 1138 (9th Cir. 2010) (conviction under 18
U.S.C. § 1344(2) could not be sustained on theory that bank owned
assets of subsidiary that was subject of fraud).

RMBS and CDOs and the high fees and profits those ratings generated." COM ¶ 124; *see also* COM ¶ 9. Finally, the Complaint alleges that S&P knew this scheme to defraud would result in S&P obtaining funds from investors in CDOs because, though S&P charged its ratings fees to CDO issuers, "those issuers ordinarily did not bear the cost of the ratings fees. Instead, as S&P knew, the costs of those fees were passed through to the investors who purchased CDO tranches." COM ¶ 67. Because this allegation would satisfy any requirement imposed by *Lew,* S&P asks that it be disregarded, characterizing it as "sleight of hand," "conclusory," and "inconsistent with the rest of the Complaint." Mem. at 20. It is none of these.

This allegation is not conclusory because it is immediately followed by three specific factual allegations provided to demonstrate: (1) though S&P was paid its rating fees by the issuer, the payment was made out of the proceeds of the sales of CDO tranches to investors; and (2) S&P knew this. The first two allegations, citing to and quoting from the deal documents for two specific CDOs, establish that S&P's rating fees were paid "out of the gross proceeds from the sale to investors of [the CDO's] tranches." COM ¶¶ 67(a), (b). These two allegations demonstrate that S&P's fees were passed through to investors and paid out of the gross amounts of their investments. The third allegation demonstrates S&P's knowledge of this pass-through arrangement, quoting comments made by Joanne Rose, S&P's head of Structured Finance, to a group of institutional investor representatives: "Investors need to publicly voice their opinions on issues like the issuer pay model – underwriters ultimately *do* pay – since all deal fees

24

<u>including rating fees are netted out of the total deal proceeds.</u>"

COM ¶ 67(c) (emphasis added).

These allegations are not inconsistent with the rest of the Complaint.  As alleged, S&P's potential conflict arose from "S&P being selected and retained by the issuers whose RMBS and CDOs S&P rated" COM ¶ 110; *see also* COM ¶ 66.  That the issuers subsequently (and with S&P's knowledge) passed S&P's fees through to investors is in no way inconsistent with the existence of the potential conflict of interest.  Asking the Court to disregard this allegation is another effort by S&P to distance itself from and disregard statements of its own employees recognizing the realities of the conduct in which S&P was engaged.

**III. CONCLUSION**

For all the reasons set forth above, S&P's Motion to Dismiss should be denied.

Dated: May 20, 2013                          Respectfully submitted,

STUART F. DELERY                    ANDRÉ BIROTTE JR.
Acting Assistant Attorney General   United States Attorney
United States Department of Justice
Civil Division
MAAME EWUSI-MENSAH FRIMPONG
Deputy Assistant Attorney General   /S//George S. Cardona/
MICHAEL S. BLUME                    GEORGE S. CARDONA
Director, Consumer Protection Branch LEON W. WEIDMAN
ARTHUR R. GOLDBERG                  ANOIEL KHORSHID
Assistant Director, Fed.Prog.Branch RICHARD E. ROBINSON
JAMES T. NELSON                     Assistant U.S. Attorneys
BRADLEY COHEN
JENNIE KNEEDLER
SONDRA L. MILLS
THOMAS D. ZIMPLEMAN
Trial Attorneys, Civil Division