1   KEKER & VAN NEST LLP
    JOHN KEKER (SBN 49092)
2   jkeker@kvn.com
    ELLIOT R. PETERS (SBN 158708)
3   epeters@kvn.com
    633 Battery Street
4   San Francisco, CA 94111-1809
    Telephone:  415 391 5400
5   Facsimile:   415 397 7188

6   CAHILL GORDON & REINDEL LLP
    FLOYD ABRAMS (*pro hac vice*)
7   fabrams@cahill.com
    S. PENNY WINDLE (*pro hac vice*)
8   pwindle@cahill.com
    80 Pine Street
9   New York, New York 10005-1702
    Telephone: 212 701 3000
10  Facsimile:  212 269 5420

11  KELLER RACKAUCKAS UMBERG ZIPSER LLP
    JENNIFER L. KELLER (SBN 84412)
12  jkeller@kruzlaw.com
    18300 Von Karman Avenue, Suite 930
13  Irvine, CA 92612-1057
    Telephone: 949 476 8700
14  Facsimile: 949 476 0900

15  Attorneys for Defendants MCGRAW-HILL
    COMPANIES, INC., and STANDARD & POOR'S
16  FINANCIAL SERVICES LLC

17

18              UNITED STATES DISTRICT COURT

19              CENTRAL DISTRICT OF CALIFORNIA

20                    WESTERN DIVISION

21  UNITED STATES OF AMERICA,          | Case No. CV 13-779 DOC (JCGx)

22                      Plaintiff,      | **REPLY IN SUPPORT OF MOTION
                                        | TO DISMISS COMPLAINT**
23          v.
                                        | Date:      July 8, 2013
24  MCGRAW-HILL COMPANIES, INC.         | Time:      8:30 a.m.
    and STANDARD & POOR'S               | Dept.:     Courtroom 9-D
25  FINANCIAL SERVICES LLC,             | Judge:     Honorable David O. Carter

26                      Defendants.     | Complaint filed February 4, 2013

27

28

759896

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     Introduction ................................................. 1

II.    Argument ..................................................... 3

    A.     S&P's Representations Concerning Its Business Objectives
       and Practices Are Not Actionable Under the Fraud Statutes ............... 3

       1.     Statements drawn from S&P's Code of Conduct are
          not actionable because they are merely prescriptive in
          nature. .................................................. 4

       2.     Statements drawn from S&P's Codes of Conduct are
          not actionable because they are not material. ............................ 6

       3.     *Boca Raton* found nearly identical Code of Conduct
          statements to be non-actionable .................................. 8

       4.     The Complaint fails to allege a scheme or artifice to
          defraud. .................................................. 9

    B.     The Complaint Fails to Plead S&P's Ratings Were False ................. 10

       1.     The Complaint fails to allege ratings were untrue or
          that S&P believed them to be untrue at the time they
          were issued .............................................. 12

       2.     The Government Fails to Plead Why S&P's Ratings
          Were "False." ............................................ 15

    C.     The Government's Failure to Allege a Specific Intent to
       Defraud the CDO Investors Is Fatal to Its Claim. ............................ 18

III.   Conclusion ................................................... 21

759896

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Bias v. Wells Fargo & Co.*
No. 12-cv-00664-YGR, 2013 WL 1787158 (N.D. Cal. Apr. 25, 2013) ............ 10

*Boca Raton Firefighters & Police Pension Fund v. Bahash*
No. 12-1776-cv, 2012 WL 6621391 (2d Cir. Dec. 20, 2012) ......................... 8, 9

*Buttonwood Tree Value Partners, LP v. Sweeney*
No. SACV 10-00537-CJC, 2012 WL 6644397
(C.D. Cal. Dec. 10, 2012) ................................................................... 14, 15

*County of Marin v. Deloitte Consulting LLP*
836 F. Supp. 2d 1030 (N.D. Cal. 2011) ............................................................. 7

*ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*
553 F.3d 187 (2d Cir. 2009) ................................................................................ 8

*Glassman v. Computervision Corp.*
90 F.3d 617 (1st Cir. 1996) ............................................................................... 11

*Glen Holly Enter., Inc. v. Tektronix, Inc.*
100 F. Supp. 2d 1086 (C.D. Cal. 1999) ............................................................ 14

*In re Countrywide Fin. Corp. Derivative Litig.*
554 F. Supp. 2d 1044 (C.D. Cal. 2008) .............................................................. 5

*In re Glenfed, Inc. Sec. Litig.,* 42 F.3d 1541, 1549
(9th Cir. 1994), *superseded by statute on other grounds as recognized in
Ronconi v. Larkin,* 253 F.3d 423 (9th Cir. 2001) .................................. 13, 14, 15

*In re Impac Mortg. Holdings, Inc. Sec. Litig.*
554 F. Supp. 2d 1083 (C.D. Cal. 2008) .............................................................. 4

*In re New Century*
588 F. Supp. 2d 1206 (C.D. Cal. 2008) .............................................................. 5

*Rice v. Charles Schwab*
No. SACV 10-00398-CJC, 2010 WL 5156654 (C.D. Cal. Oct. 22, 2010) ........ 12

*Space Coast Credit Union v. Merrill Lynch, Pierce, Fenner & Smith Inc.*
No. 12-60430-CIV, 2013 WL 1131628 (S.D. Fla. Mar. 18, 2013) ....... 16, 17, 18

*United States ex rel. Cafasso v. General Dynamics C4 Systems, Inc.*
637 F.3d 1047 (9th Cir. 2011) .................................................................... 10, 18

*United States v. Ali*
620 F.3d 1062 (9th Cir. 2010) .................................................................... 19, 20

*United States v. Ciccone*
219 F.3d 1078 (9th Cir. 2000) .......................................................................... 18

ii

759896

*United States v. Cloud*
  872 F.2d 846 (9th Cir. 1989) ............................................................................. 18

*United States v. Corinthian Colleges*
  655 F.3d 984 (9th Cir. 2011) ............................................................................. 6

*United States v. Dowie*
  411 Fed. Appx. 21 (9th Cir. 2010) ............................................................... 19, 20

*United States v. Lew*
  875 F.2d 219 (9th Cir. 1989) ..................................................................... 18, 19

*United States v. Neder*
  527 U.S. 1, 24-25, 144 L. Ed. 2d 35, 119 S. Ct. 1827 (1999) ............................. 7

**State Cases**

*People of the State of Ill. v. The McGraw-Hill Cos., Inc.*, No. 12 CH 02535,
  2012 WL 5440768 (Ill. Cir. Ct. Nov. 7, 2012) ................................................... 9

*State v. Moody's Corp.*
  No. HHD-cv-10-6008838-S, 2012 WL 2149408
  (Conn. Super. Ct. May 10, 2012) ..................................................................... 9

**Federal Rules**

Federal Rule of Civil Procedure 9(b) ................................................................*passim*

Federal Rule of Civil Procedure 12(b)(6) ................................................................ 6

759896

# I.     Introduction

Notwithstanding the length of the Department of Justice's investigation leading to the filing of the Complaint and of that document itself, the Complaint fundamentally fails to state a claim.  The Government's Opposition does not cure its flaws.  It simply exposes them.

In its effort to revive its claims, the Government focuses on two distinct categories of statements made by S&P: (1) aspirational statements contained in S&P's Codes of Conduct, internal policy documents and the like, and (2) ratings S&P issued on all CDOs between March and October 2007.  Neither of these sets of statements is actionable as pled and combining them cannot make them so.

This Court should not credit the Government's feigned surprise at the notion that S&P's statements about its corporate goals and objectives do not give rise to a fraud claim.  As the Government's counsel are well aware, S&P relies on well-established federal law that has been confirmed and applied by federal judges around the nation at the motion to dismiss stage—including a recent Second Circuit ruling dismissing a fraud action against S&P based on the very documents relied on in this case.  In fact, since nearly every company in the United States has a code of conduct, the proposition that any corporate conduct inconsistent with those codes can constitute criminal fraud is particularly far-fetched.

The Opposition argues, as well, that every CDO rating S&P issued between March and October 2007 was fraudulent, but the Opposition cannot cure the pleading deficiencies fatal to the Government's claims on that front.  The Government has not alleged—as it must—that the ratings were actually false, or that they would have been different absent the alleged fraud, or that S&P believed its ratings to be untrue at the time they were made.

Rather than attempt to address these holes in its Complaint, the Government offers a compendium of what it apparently cannot prove and thus supposedly need not plead, including:

1

759896

- that S&P's ratings were untrue or misleading when made;
- that S&P knew its 2007 CDO ratings were false;
- the identity of the specific, affected CDOs that form the basis for the Government's penalty demand;
- proof of any particular false statement;
- the "true" credit risk associated with the affected CDOs;
- the performance of RMBSs that underlie the affected CDOs, or how that performance should have impacted the ratings; or
- any specific intent to defraud.

The Government is mistaken. Like all plaintiffs, it is not exempt from the deliberately heightened federal pleading requirements of Rule 9(b), especially in a case in which it alleges a supposed fraud by S&P so vast in scope, so long in duration, and involving so many individuals. And although the Complaint identifies by name only 33 CDOs in the March to October 2007 time period affected by allegedly fraudulent ratings, the Government now tells us that this case is actually about *every* CDO and RMBS rated by S&P between 2004 and 2007. That sweeping pronouncement puts at issue more than 700 CDOs and more than 4,700 RMBSs rated by S&P in that timeframe, each with multiple tranches of differing risk characteristics. Against this backdrop, the Complaint's deficiencies are all the more striking.

Nor can the Government's strained effort to satisfy these requirements by identifying disconnected and unrelated allegations as one scheme suffice. The Government attempts to cobble together two entirely distinct categories of statements—Code of Conduct provisions and CDO ratings—and then argues that two non-actionable statements become actionable when placed next to each other in a complaint. But simply asserting that these statements form "one scheme to defraud" cannot make it so. Whether the Government claims to identify one "scheme" or a dozen, the essential elements of fraud remain the same. And

1   because the Government has not and cannot properly alleged those elements, its

2   claims must be dismissed.

3   **II.     Argument**

4           **A.     S&P's Representations Concerning Its Business Objectives and
                     Practices Are Not Actionable Under the Fraud Statutes.**

5

6           The Opposition is notable both for what it persists in arguing and for what it

7   no longer does.  Both serve to highlight the infirmities in the Government's

8   Complaint.  Nowhere is this more evident than in the Opposition's defense of the

9   Government's allegations regarding S&P's business objectives and internal

10  practices.

11          The Complaint accuses S&P of fraud for making four kinds of statements:

12  (1) statements regarding the quality of S&P's services; (2) statements regarding

13  S&P's corporate goals and aspirations; (3) general, vague, unconnected statements

14  concerning how S&P conducted its business activities; and (4) prescriptive

15  statements made in select S&P policy documents such as the Codes of Conduct.

16  *See* S&P's Motion to Dismiss ("Mot.") at 6-9.  S&P's Motion addressed each

17  category of statements and demonstrated why each is non-actionable under well-

18  established federal law.  In response, however, the Government now focuses

19  almost exclusively on the statements made in S&P's Code of Conduct, effectively

20  conceding that first three types of statement cannot support its claim.  *See*

21  Government's Opposition ("Opp.") at 4-5.

22          As for the statements contained in S&P's Code of Conduct, those too are not

23  actionable.  The Code of Conduct operates as an employee handbook articulating

24  prescriptive guidelines for how S&P employees should conduct themselves.  The

25  Complaint cites passages from the September 2004, October 2005, and June 2007

26  Codes of Conduct, and the Opposition argues these passages "made specific

27  assertions concerning S&P's existing practices," including false representations

28  about how ratings decisions shall be made and what factors should or should not

3

759896

1  inform them.  Opp. at 4.  This is simply not the case.  As explained below, the

2  Government cannot convert statements in a company's code of conduct into

3  actionable fraud because they are prescriptive in nature, not factual, and immaterial

4  as a matter of law.

5                **1.**      **Statements drawn from S&P's Code of Conduct are not**

6                             **actionable because they are merely prescriptive in nature.**

7        The Government's effort to avoid the weight of authority in this area focuses

8  almost exclusively on the argument that representations in the Code were "not

9  mere puffing," but "specific assertions regarding S&P's existing practices."  Opp.

10  at 4, 6.  That argument is defeated by the plain language of the excerpts the

11  Government cites.  For instance, the Government cites the September 2004 Code

12  of Conduct, which instructs that ratings criteria "*shall* be determined" solely by

13  S&P's Analytics Policy Board and Analysts; that ratings "*shall* not be affected" by

14  certain business relationships; that "[i]n no circumstances *shall* an employee"

15  engage in certain conduct, and so on.  *Id*. (emphasis added).  In another example,

16  the Government argues that "S&P represented *not* that it generally endeavored to

17  avoid conflicts of interest, but rather that it had 'established policies and

18  procedures to address the conflicts of interest through a combination of internal

19  controls and disclosure."  *Id.* at 3 (emphasis added).  Yet the full text of the

20  statement from which the Government selectively quotes reveals the actual

21  substance of the Code's provisions:

22          *Ratings Services endeavors to avoid conflicts of interest* and, where

23          this is not possible, has established policies and procedures to address
        the conflicts of interest through a combination of internal controls and

24          disclosure.

25  Compl. ¶111(b) (emphasis added).  Courts have held such statements are not

26  actionable because they are not "capable of objective verification" or tethered to "a

27  standard against which a reasonable investor could expect them to be pegged."  *In*

28  *re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1096 (C.D. Cal.

759896

2008) (finding statements related to future loan originations and acquisitions non-actionable).[1]

The Government's purported support to the contrary does not warrant a different conclusion in this case. First, the Government points to *In re New Century*, 588 F. Supp. 2d 1206, 1225-26 (C.D. Cal. 2008). The representations at issue in *New Century* were public statements concerning specific guidelines used by the company, which were described as "'strict,' 'improved,' and 'strong'." *Id.* at 1215. Those were factual statements describing specific underwriting practices and loan origination standards; they were not directives given to all employees about how business *should be* conducted in general. *Id.* The *New Century* court did not address whether general, prescriptive statements intended to govern general standards of employee conduct could give rise to fraud. *Id.* at 1226.

The Government's reliance on *In re Countrywide Fin. Corp. Derivative Litig.,* 554 F. Supp. 2d 1044 (C.D. Cal. 2008) fares no better. Again, the statements at issue concerned specific actual risk management practices, i.e., that Countrywide "actively managed credit risk, applied more stringent underwriting standards for risker loans," and "only retained high credit quality mortgages in its loan portfolio." *Id.* at 1072. The holding in *Countrywide*, as in *New Century*, is premised on the specific and factual nature of the statements at issue, which concerned its actual practices in a particular area of its business. Here, by contrast, the Opposition focuses almost entirely on general governance policies found in S&P's Code of Conduct, which, as discussed above, are prescriptive guidelines, not factual representations about S&P's actual practices in specific areas of its business.[2]

---

[1] It is clear, as well, that the Government is not claiming that the portion of this statement citing the *existence* of "established policies and procedures" is false; their existence is confirmed in the Complaint itself, which cites them directly.

[2] Although the vast majority of the statements the Government relies upon come from the Code of Conduct, it also cites stray comments from the 2005 Analytic Firewalls Policy and the February 2006 Report on Implementation of S&P's Rating Services Code of Conduct. These documents contain statements no

## 2. Statements drawn from S&P's Codes of Conduct are not actionable because they are not material.

The Government is equally misguided in arguing that S&P issued its Code of Conduct knowing the statements therein were material to and would be relied upon by investors in RMBS and CDOs. Opp. at 6. The ***introduction*** to the Codes of Conduct—which the Government fails to cite in its Complaint or in its Opposition—states in no uncertain terms:

> **In order to disclose this Code to the public, this Code is available without charge to the public on Standard & Poor's public website, www.standardandpoors.com. However, by making this Code available to the public, Ratings Services does not assume any responsibility or liability to any third party arising out of or relating to this Code. This Code shall not form a part of any contract with any third party and no third party shall have any right (contractual or otherwise) to enforce any of this Code's provisions, either directly or indirectly. Ratings Services in its sole discretion may revise this Code to reflect changes in market, legal and regulatory circumstances and changes to Ratings Services' controls, policies and procedures.**

*See* Declaration of John Keker, Ex. B (bold in original).[3] This language appears in bold on the first page of S&P's October 2005 Code of Conduct, and the 2004 and 2007 Codes contain identical or substantially similar language. *Id.*, Exs. A, C. Thus, on its face, the Code of Conduct tells the reader that (1) S&P assumes no liability or responsibility arising out of relating to the Code; (2) that no third party has any right—contractual or otherwise—to enforce the Code, directly or indirectly; and (3) fatal to the Government's reliance argument, that S&P can change its rating policies and procedures at any time in its sole discretion.[4]  S&P

different from the Code of Conduct. They are highly generalized, prescriptive, aspirational in nature, and similarly non-actionable. *See* Compl. ¶¶116-117.

[3] In the context of a Rule 12(b)(6) motion to dismiss, the Court may consider unattached evidence on which the Complaint necessarily relies if the Complaint refers to the document, the document is central to the plaintiff's claim, and the authenticity of the document is not in question. *See United States v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011).

[4] The notion that these representations were material to the relevant investors is particularly implausible given that a number of the supposed victims identified by the Government—whose losses represent the vast majority of the financial harm relied upon by the Government—are the very same banks that arranged the CDOs in question. *See, e.g.*, Compl. ¶¶277-78 (identifying Bank of America and

could not have been clearer that the Code is an internal governance document only, subject to unilateral revision by S&P at any time.

This language undermines the Government's argument that the Code of Conduct was "intend[ed] to be relied on" by investors.  Opp. at 3.  Even assuming that S&P's intent was pled as such, intent to deceive cannot result in criminal fraud liability "if the particular means chosen turn out to be immaterial, i.e., incapable of influencing the intended victim."  *United States v. Neder*, 527 U.S. 1, 24-25, 144 L. Ed. 2d 35, 119 S. Ct. 1827 (1999).  It is no answer that a statement was made to potential users of a company's product or services; indeed, it is "in the sales context" in which courts routinely apply the rule.  *See, e.g.*, *County of Marin v. Deloitte Consulting LLP*, 836 F. Supp. 2d 1030, 1039 (N.D. Cal. 2011) ("highly subjective, generalized statements of the superiority of [a defendant's] qualifications *made in a sales context*" are not actionable (emphasis added)).  The Code of Conduct makes clear that statements contained therein are not actionable, enforceable, or permanent, and as such they could not be material.[5]

Even setting aside S&P's explicit disclaimer of materiality, it is simply implausible that any particular investor would consider vague statements made in a Code of Conduct to be material when S&P affirmatively disclosed information relating specifically to the securities it rates, including a presale report explaining the rationale for its rating (Compl. ¶89), a publicly disclosed rationale, (*id.* at ¶90), and regularly-published research and commentary regarding the rating of various types of securities.  *See, e.g., id.* at ¶233(n).  Courts have made clear that a corporation's "broad, general" representations regarding its own integrity are not

---

Citibank as "victims" of the scheme).  The banks that arranged the CDOs knew better than S&P what they contained, and S&P's general representations about its aspirations could not have been material to such a knowledgeable party.

[5] The Government also suggests in passing that S&P's Codes somehow became material as a result of Congress' "conditioning of [Nationally Recognized Statistical Rating Organization] licenses on managing conflicts of interest."  Opp. at 6.  The Government alleges no violation of any SEC rule, however.

759896

material to investors "in assessing a potential investment." *ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009).  While a corporation's reputation "is undeniably important, that does not render a particular statement by a [corporation] regarding its integrity per se material."  *Id.*  In light of the various specific disclosures made by S&P with regard to any particular rated security, the general statements cited by the Government "are no more than 'puffery.'"  *Id.*

### 3.    *Boca Raton* found nearly identical Code of Conduct statements to be non-actionable.

Despite the Government's efforts to distance itself from it, *Boca Raton Firefighters & Police Pension Fund v. Bahash*, No. 12-1776-cv, 2012 WL 6621391 (2d Cir. Dec. 20, 2012), is squarely on point.  *Boca Raton* affirmed the dismissal of a fraud claim based on not merely the same ***kinds*** of statements alleged here, but many of ***the same*** statements.  First, the Government posits as a "crucial difference" the fact that *Boca Raton* involved shareholders who were defrauded, whereas the Government argues that S&P defrauded investors.  Opp. at 7-8.  This is a distinction without difference.  The shareholders in *Boca Raton* claimed to have been misled by exactly the same statements at issue here.  The Second Circuit found the statements not actionable because they were simply too "generic" and "indefinite"—qualities that inhere in the nature of the statements themselves, not in the identity of the listener.

The Government further argues that only "limited portions of the Boca Raton SAC" are "arguably relevant to this case," and are nonetheless distinguishable because they "were not linked to specific allegations that S&P undertook actions conflicting with these representations."  Opp. at 8, n.8.  This argument is incorrect and inapposite.  Many of the Code of Conduct statements that underpin the Government's fraud claims here are nearly identical to those at issue in *Boca Raton*.  *Compare* Compl. ¶111(a) *and* Boca Raton SAC ¶384;

8

759896

1    Compl. ¶111(e) *and* Boca Raton SAC at ¶387.[6]

2         The Government's argument that these statements are distinguishable

3    "because they were not linked to specific allegations that S&P undertook actions

4    conflicting with these representations" has no basis.  Opp. at 8-9, n.8.  The Second

5    Circuit held that the statements in the *Boca Raton* SAC were non-actionable ***by***

6    ***their nature***—not because plaintiffs failed to couple them with allegations

7    concerning S&P's actual conduct.  *Boca Raton*, at *4.[7]

8              **4.    The Complaint fails to allege a scheme or artifice to**
                       **defraud.**
9

10        Finally, the Government tries to salvage its allegations by arguing that even

11   if the Code of Conduct statements are non-actionable, "proof of any particular false

12   statement is not required" under the fraud predicates of the alleged FIRREA

13   violations and that the Government has satisfied its pleading obligations because

14   the "allegations read in their totality, demonstrate an overall course of conduct by

---

[6] The Government responds that despite the near-identical nature of the *Boca Raton* SAC ¶¶384 and 387 with the Code of Conduct statements at issue here, *Boca Raton* is inapplicable because it "did not cite or discuss the other specific assertions of fact" in ¶¶111-117 of the Complaint "that cannot be dismissed as 'mere puffing.'"  Opp. at 8-9, n.8.  But the allegations in those paragraphs are no different than the ones considered in *Boca Raton*.  Paragraphs 111-117 of the Complaint purport to recite representations that S&P "recognizes its role in the global capital markets and is committed to providing ratings that are objective, independent, and credible," and that "[i]t is a central tenet of [S&P] that its ratings decisions not be influenced by the fact that [S&P] receives fees from issuers."  Compl. ¶117.  The additional alleged representations parrot the prescriptive statements described above from the Code of Conduct, which are not actionable.  *Id*.

[7] The Government further relies on two state court decisions in which certain statements made by S&P and Moody's regarding independence and objectivity were held to be actionable under state law.  In *People of the State of Illinois v. The McGraw-Hill Cos., Inc.*, the Illinois Circuit Court addressed the sufficiency of a complaint alleging S&P's statements were actionable under the Illinois Consumer Fraud and Deceptive Business Practices Act.  *People of the State of Ill. v. The McGraw-Hill Cos., Inc.*, No. 12 CH 02535, 2012 WL 5440768 (Ill. Cir. Ct. Nov. 7, 2012).  Similarly, *State v. Moody's Corp.* (as well as *State v. McGraw Hill Co.*, employing the same reasoning) addressed alleged violations of Connecticut's Unfair Trade Practices Act.  *State v. Moody's Corp.*, No. HHD-cv-10-6008838-S, 2012 WL 2149408 (Conn. Super. Ct. May 10, 2012).  These decisions are state court opinions addressing different allegations under state consumer protection laws—not the federal mail and wire fraud statutes.

9

759896

1   S&P intended to mislead investors."  Opp. at 10.  The Government mistakes

2   quantity for quality.  Insufficient allegations do not gain strength merely because

3   they are thrown in with a jumble of other insufficient allegations.

4         Federal Rule of Civil Procedure 9(b) requires a complaint alleging fraud to

5   specify the "who, what, when, where, and how of the misconduct charged, as well

6   as what is false or misleading about the [purportedly fraudulent] statement, and

7   why it is false."  *United States ex rel. Cafasso v. General Dynamics C4 Systems,*

8   *Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011).  The Government cannot satisfy Rule

9   9(b)'s particularity requirement by merely referring to allegations "in their totality"

10  or to a generalized "overall course of conduct" because it cannot otherwise allege

11  actionable or fraudulent misrepresentations.

12        Further, the overall course of conduct that the Government alleges cannot be

13  deemed a "scheme to defraud" for the same reasons that the statements on which it

14  relies cannot be deemed fraudulent: S&P could not have defrauded investors with a

15  series of statements that are insufficiently factual, specific, or verifiable as a matter

16  of law.  "The gravamen of both [the mail and wire fraud] offenses is the scheme to

17  defraud."  *Bias v. Wells Fargo & Co.*, No. 12-cv-00664-YGR, 2013 WL 1787158,

18  at *14 (N.D. Cal. Apr. 25, 2013) (citation omitted).  Thus even if the Government

19  were correct that it could mount a $5 billion fraud case without pleading a single

20  false statement, it has not done so here.  The Complaint relies explicitly and

21  exclusively on the alleged falsity of the statements cited in paragraphs 110 to 122,

22  and the Government cannot retreat from that fact in its Opposition.  Lacking a

23  theory properly pled that S&P engaged in a scheme to defraud separate and apart

24  from the non-actionable statements the Complaint identifies, the Complaint should

25  be dismissed.

26      **B.**    **The Complaint Fails to Plead S&P's Ratings Were False.**

27        Although the Government concedes, as it must, that its allegations

28  concerning the alleged falsity of S&P's credit ratings must satisfy a heightened

pleading standard under Rule 9(b), *see* Opp. at 12, it then labors vigorously to strip this requirement of all substance.  The Government is quick to catalogue everything it believes it does <u>not</u> have to do: offer specific "allegations relating to 'intent, knowledge, and other conditions of a person's mind," (Opp. at 12); offer any "particularity in connection with an averment of intent, knowledge or condition of the mind" (*id*. at 13); offer any "particularized allegations" that fall outside the scope of the "factual circumstances of the fraud itself" (*id.*); offer any particular facts about S&P's "beliefs," "knowledge and intent" (*id.*); offer anything more than "representative examples" of or "categorical information" about the alleged false claims (*id*. at 14, n.16); or offer any particular allegations about "the degree to which S&P's CDO ratings were false or misleading." *Id.* at 18.

The Government then argues that Rule 9(b)'s specificity requirements should be "less stringently applied" here because the alleged fraud spans a long period of time, and because "Rule 9(b)'s particularity requirements 'may be relaxed'" to permit the Government discovery into the case—notwithstanding the intense three-year investigation the Government has already conducted.  *Id.* at 12, n.14.  In essence, the Government believes it can accuse a company of criminal fraud and seek penalties in excess of $5 billion on nothing more than a patchwork of half-pled allegations premised on unconnected, legally non-actionable statements and the hope of future discovery.  *See* part II.D, *infra.*  Neither Rule 9(b) nor the case law is so forgiving.  If anything, the rules should be more stringently applied here given the fact that the Government has already conducted an investigation lasting more than three years, involving hundreds of subpoenas and millions of documents.  *See Glassman v. Computervision Corp.*, 90 F.3d 617, 628 (1st Cir. 1996) ("We are mindful that the case comes to us after over three years of litigation and full discovery. We thus look more closely at the factual allegations to see if they support the legal conclusions pled.")

The Government must plead that S&P "actually knew the credit ratings were

11

false or did not believe that the credit ratings were true at the time that each credit rating was issued." *Rice v. Charles Schwab*, No. SACV 10-00398-CJC (MLGx), 2010 WL 5156654, at *3 (C.D. Cal. Oct. 22, 2010); Opp. at 12, n.13.  Under Rule 9(b), it must plead that credit ratings were false, why they were false, and must allege specific facts demonstrating that S&P knew the credit ratings to be false at the time they were issued.  The Government fails on all fronts.

> **1.     The Complaint fails to allege ratings were untrue or that S&P believed them to be untrue at the time they were issued.**

The Complaint fails to allege with any particularity that the ratings S&P issued on CDOs in 2007 were false or misleading, or failed to accurately reflect the "true credit risk."  Although the Government repeats this conclusion over and over, the facts it pleads do not support and, in many cases, actually contradict that conclusion.

The Government acknowledges, as it must, that S&P's conduct in 2007 was simply a continuation of its existing, longstanding practices in rating CDOs—a practice that involved placing RMBSs on CreditWatch and downgrading them when appropriate under its criteria, and relying on those current RMBS ratings (including CreditWatch actions) when rating CDOs backed by those RMBS.  Opp. at 21.  In other words, S&P publicly continued to do what it had always done, what it had told no one it would do differently, and what, in fact, incorporated S&P's rating opinion—an opinion arrived at by S&P committees applying S&P's criteria—into its CDO ratings.  The Government contends that following existing practices is no defense if S&P "knew the result of those practices was the making of false or misleading representations."  Opp. at 21.  The Government argues that it has pleaded facts showing that S&P had such knowledge, that it "deliberately delayed taking large-scale negative rating actions," and that it "concealed information regarding the deterioration of those non-prime RMBS from the

759896

1   analysts rating CDOs."  Opp. at 22.  It has not.  These are the Government's

2   conclusions; the specific facts it pleads tell a different story.  The Complaint

3   acknowledges that S&P recognized and discussed the deteriorating performance of

4   certain RMBS in 2007, that an S&P committee approved new, more stringent,

5   standards for reviewing RMBS ratings in light of that performance, and disclosed

6   those actions to the public.  Compl. ¶¶ 223-228.  The Government even

7   acknowledges that these new RMBS surveillance standards resulted in RMBS

8   being placed on CreditWatch *earlier than they would have been under then-*

9   *existing criteria.  Id.* ¶ 224 ("given the current surveillance criteria, the vast

10   majority of these deals would not be put on credit watch").  And if those standards

11   resulted in a CreditWatch action or a downgrade on a particular RMBS, that was

12   taken into account in rating any CDO containing that RMBS.  The Government

13   thus concedes, as it must, that S&P took action on RMBSs in 2007.

14          Of course there can be, and were, differences of opinion about what

15   warranted a CreditWatch action or downgrade.  The Government argues that

16   because the Complaint identifies conflicting, internal opinions within S&P

17   regarding how ratings should be made, the Complaint has sufficiently pled that

18   S&P's ratings on all CDOs rated between March and October 2007 were false and

19   actionable under the fraud statutes.  Opp. at 15-16.  Not so.  Those allegations still

20   fail to plead with the required particularity that S&P knew how future RMBS

21   performance would impact RMBS ratings used in the CDO ratings process, and

22   *knew that the CDO ratings were false when made*.  The Government has not

23   properly pled fraud; it has merely highlighted differing opinions that arose within

24   S&P during the analytic process.

25          *In re Glenfed, Inc. Sec. Litig.*, on which the Government relies, is instructive.

26   The Government cites *Glenfed* for the proposition that by "pointing to inconsistent

27   contemporaneous statements or information (such as internal reports) which were

28   made by or available to" S&P, the Complaint sufficiently alleges that S&P's 2007

13

759896

credit ratings were "untrue or misleading when made." *In re Glenfed, Inc. Sec. Litig.,* 42 F.3d 1541, 1549 (9th Cir. 1994)*, superseded by statute on other grounds as recognized in Ronconi v. Larkin,* 253 F.3d 423, 429 n.6 (9th Cir. 2001). But that is an inaccurate statement of the law. In fact, *Glenfed* holds that when a company may have different permissible internal opinions, the standard for alleging fraud is higher:

> The fact that an allegedly fraudulent statement and a later statement are *different* does not necessarily amount to an explanation as to why the earlier statement was false. . . . In order to allege the circumstances constituting fraud **plaintiff must set forth facts explaining why the difference between the earlier and the later statements is not merely the difference between two permissible judgments, but rather the result of a falsehood.**

*Id*. (emphasis added). This is precisely where the Complaint fails. The Complaint merely alleges that the RMBS group became aware of performance conditions relating to non-prime RMBS, and that the RMBS group communicated that data to individuals with responsibility for S&P's CDO group. Opp. at 15. The CDO group's decision not to take immediate, large-scale negative downgrading action based on those opinions does not mean all ratings issued thereafter were untrue, or that S&P believed them to be untrue. Even if the data suggested to some that more downgrades should be taken earlier than they were, that only establishes a difference of opinion within S&P as to an immediate course of conduct—not that the ratings were "false" when made. "[A] plaintiff does not satisfy the falsity requirement by merely asserting that a company's later revelation of bad news means that 'earlier, cheerier' statements must have been false." *Glen Holly Enter., Inc. v. Tektronix, Inc.*, 100 F. Supp. 2d 1086, 1098 (C.D. Cal. 1999) (citation omitted). That is classic "fraud by hindsight" and cannot establish falsity. *Id.*

*Glenfed* is also inconsistent with the Government's attempt to distinguish *Buttonwood Tree Value Partners, LP v. Sweeney*, No. SACV 10-00537-CJC, 2012 WL 6644397 (C.D. Cal. Dec. 10, 2012). As explained in S&P's opening brief, *Buttonwood* demonstrates that the Government must do more than allege in a

conclusory fashion that a defendant—in *Buttonwood*, an accountant—was aware of financial concerns that were in tension with its audit opinion in order to state a fraud claim; instead, it must include a "substantive allegation demonstrating that [the accountant] did not genuinely believe its opinions to be accurate when they were issued." *Id.* at *6. The Government argues in its Opposition that *Buttonwood*'s holding turns on PSLRA pleading standards not applicable here, (Opp. at 20-22), but *Glenfed* belies that assertion. *Glenfed* itself, upon which the Government relies and which predates the PSLRA, similarly held that a plaintiff must do more than simply identify inconsistencies. As explained above, in order to avoid dismissal the Government "must set forth facts explaining why the difference" between the two opinions "is not merely the difference between two permissible judgments, but rather the result of a falsehood." *Glenfed*, 42 F.3d at 1549. The Government fails to allege such facts, and its claims are therefore inadequate.

### 2. The Government Fails to Plead Why S&P's Ratings Were "False."

As with other elements where its allegations fall short, the Government runs from its obligations under Rule 9(b), arguing that Rule 9(b) does not require "that the Complaint allege with particularity the degree to which S&P's CDO ratings were false or misleading." Opp. at 18. Not so. To allege fraud with particularity, the Government "must set forth *more* than neutral facts necessary to identify the transaction"; it must plead "what is false or misleading about a statement, and why it is false." *See Glenfed,* 42 F.3d at 1548. Here, not only does the Complaint fail to allege with particularity "the degree" to which S&P's ratings were false or misleading, it fundamentally fails to allege that S&P's ratings would have even been *different* if they had been adjusted to take account of the future deterioration of the housing market that the Government insists S&P—alone among the rating agencies and a host of government-employed experts—knew would come with the

759896

speed, depth, and severity that eventually came to pass.  This failure is fatal to the Government's claims.  *See Space Coast Credit Union v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 12-60430-CIV, 2013 WL 1131628, at *6 (S.D. Fla. Mar. 18, 2013) (granting S&P's motion to dismiss based in part on plaintiff's failure to allege specific facts that CDOs would have warranted different ratings).

For example, the Government alleges that 52% of the collateral backing the Plettenberg Bay CDO was non-prime RMBS rated BBB or below.  *See* Compl. ¶238(c).  The CDO was rated in March 2007, and it was affirmed two months before S&P announced large-scale downgrades to non-prime RMBS ratings in July 2007.  *Id.*  The Government does not allege, and it cannot, that those large-scale downgrades—the very actions that it alleges S&P "knew" it was going to take back in March 2007—had *any* impact on the rating of the CDO.  To the contrary, the Government claims that those downgrades impacted a mere 3% of RMBS collateral and does not allege *any impact* on the rating of the CDO.  *Id.*[8]  If downgrades to the underlying RMBSs did not have any impact on the CDO when they were taken in July, there is no reason to believe that S&P's supposed "knowledge" that they were coming back in March would have had any impact then either.

The Government's allegations relating to the Novastar CDO provides another example.  *See* Compl. ¶241(a).  There, the Government faults S&P for issuing a rating affirmation for that CDO on June 13 given that 74% of its underlying collateral was non-prime RMBS rated BBB or lower.  The Government apparently believes that this rating occurred at the same time S&P "knew" that all of that collateral was at imminent risk of downgrade.  Opp. at 15-16.  Yet when the large-scale actions that the Government claims S&P delayed were actually taken a

---

[8] In the place of this necessary factual component, the Government offers innuendo, providing the irrelevant pleading that the CDO "defaulted" a year after it was rated, in March 2008.  Needless to say, the Government does not mention the unprecedented liquidity crisis that crippled the markets in August 2007 as having contributed to that default in any way.

month later, a mere fraction of that collateral (7%) was actually downgraded, and the Government alleges no impact on the CDO rating resulting from those downgrades.  Compl. ¶241(a).  Once again, even if it is assumed that S&P knew those downgrades were coming and deliberately delayed them, the Government's own pleading demonstrates that those downgrades would not have had an impact on the CDO's original rating.

The Government's attempt to distinguish *Space Coast* is thus baseless.  *See* Opp. at 19.  While it is true that the *Space Coast* complaint relied on academic articles, papers, and government studies that were deemed insufficient, the court specifically noted that even assuming certain of those deficiencies could be cured, the plaintiff still failed to allege "specific facts indicating that the [defective] loans changed the CDO notes' overall credit ratings."  *Space Coast*, 2013 WL 1131628, at *6.  That is precisely the Government's failure here as well, given that the Complaint fails to allege that the significant rating actions taken by S&P in July had any impact on the allegedly "false" CDO ratings.

For similar reasons, the Government's reliance on *In re IndyMac Mortgage-Backed Sec. Litig.* is misplaced.  718 F. Supp. 2d 495 (S.D.N.Y. 2010).  In *IndyMac*, the court considered whether IndyMac Bank's offering documents contained false and misleading statements regarding IndyMac's underwriting standards and the process by which ratings agencies determined ratings on certain securities certificates issued by the bank.  *Id.*  The *IndyMac* court concluded that to allege material misrepresentation, plaintiffs need not offer factual allegations about the underlying loans because the complaint otherwise sufficiently alleged IndyMac had abandoned its underwriting guidelines.  *Id.* at 509-10.

More on point, though, is the court's analysis with respect to the ratings on securities certificates.  Plaintiffs contended the offering documents contained misleading statements about the ratings agencies' processes similar to those at issue here—namely, that the ratings process relied on outdated models and was

759896

"highly compromised" due to conflicts of interest within the ratings agencies. *Id.* at 511. As to these claims, the court found the complaint deficient because plaintiff failed to provide sufficient factual allegations that the ratings were false. *Id.* The closest plaintiffs came was in their allegations that the "ratings agencies 'failed to properly consider the credit quality of the mortgage loans.'" *Id.* But the court held these allegations "do not support a plausible inference that the ratings did not express each rating agency's judgment at the time they were issued," and to the extent they attempted to suggest that different models "might have resulted in a different rating," the allegations were insufficient to state a claim on that theory, too. *Id.* at 512.

*IndyMac's* reasoning is directly on point. At a minimum, the Government must allege with particularity (1) that S&P's 2007 CDO ratings were false or misleading because they should have been different, and (2) why the actual rating was wrong. *United States ex rel. Cafasso*, 637 F.3d at 1054-55. The Government has not done so here, and the Complaint's allegations as to S&P's ratings thus fail as a matter of law.

## C. The Government's Failure to Allege a Specific Intent to Defraud the CDO Investors Is Fatal to Its Claim.

Ninth Circuit cases unanimously require "proof of intent to deprive the victim of money or property" in wire fraud, mail fraud, and bank fraud cases. *See, e.g.*, *United States v. Ciccone*, 219 F.3d 1078, 1082 (9th Cir. 2000) (citation omitted) (requiring "proof of intent to deprive *the victim* of money or property" in wire fraud case (emphasis added)); *United States v. Lew*, 875 F.2d 219, 221 (9th Cir. 1989) (same, in mail fraud case); *United States v. Cloud*, 872 F.2d 846, 850 (9th Cir. 1989) (same, in bank fraud case). The Government's Complaint, however, fails to allege that S&P had the specific intent to deprive the CDO investors—the supposed victims—of any money or property. *See* Mot. at 18-20. Instead, it focuses on the alleged evils of the "issuer-pays model," in which the

759896

banks that issued the CDOs actually paid S&P's fees.  But because those issuing banks are not the victims of the alleged scheme to defraud, each of the Government's fraud claims lacks an essential element and must therefore be dismissed.[9]

Even as to investors that did not package CDOs, the Government responds that it need not allege that S&P had the specific intent to deprive them of money and cites two cases in support.  Opp. at 23 (citing *United States v. Ali*, 620 F.3d 1062 (9th Cir. 2010) and *United States v. Dowie*, 411 Fed. Appx. 21 (9th Cir. 2010)).  Neither case is on point.

The Government cites *United States v. Ali* for the proposition that "in frauds involving more complex transactions" the money in question need not flow "directly" to the defendant from the party deceived by the defendant.  Opp. at 23. The Government mischaracterizes *Ali*.  The *Ali* court does not purport to impose any special rule for "more complex transactions."  On the contrary, it cites directly to *Lew* and agrees that the victim must be the party "from whom property was taken."  *Ali*, 620 F.3d at 1071 (citing *Lew*).  Moreover, the issue before the court in *Ali* was whether depriving a victim of "property rightfully due" is sufficient, and whether "the property must actually be taken directly from the victim."  *Id.* at 1070.  Everybody agreed that the victim, not some other party, had lost "property rightfully due," even though the property had not been directly "taken" from the victim.  That question is not relevant here.  The loss in question in *Ali*, like in all the cases cited above, was the *victim*'s loss, not some other party's loss.

The Government also cites *United States v. Dowie*, 411 Fed. Appx. 21, 27-

---

[9] Indeed, the Government *could not* allege a scheme to defraud the issuing banks because those banks were themselves responsible for packaging the CDOs in question, and thus knew more about their creditworthiness than any other party, S&P included.  The Government never explains how S&P could have specifically intended to deceive the parties that knew the most about the CDOs at issue.  Yet the Government is so bold as to rely on alleged losses incurred by these same issuing banks on their own CDOs as comprising the vast bulk of the losses supporting its gargantuan proposed penalty.

28 (9th Cir. 2010), where the defendants were convicted of wire fraud for over-billing the Los Angeles County Department of Water and Power ("DWP"). Defendants there argued that because they were paid by the City of Los Angeles, but had deceived the DWP, a separate governmental entity, they could not be guilty of fraud.  The court rightly noted that even if the check was issued by a separate governmental entity, the DWP was "ultimately deprived . . . of budgetary funds."  *Id.* at 28.  All parties agreed that the DWP had, in fact, suffered a monetary loss.  Thus, just as in *Ali*, there was never any suggestion that fraud had not in fact deprived the victim of money or property.  Similarly here, the Government must allege that S&P had the intent to deprive the CDO investors—not the CDO arrangers or issuers, who are not alleged to have been deceived—of money or property.

The Government concedes that any "investment losses" that may have been suffered by CDO investors were not the object of the scheme it alleges, disclaiming any obligation to plead or prove that S&P intended to cause such losses.  Opp. at 22, n.28.  Instead, the Government alleges that S&P's intent was to "increase its share of the market for credit ratings of RMBS and CDOs and the high fees and profits those ratings generated."  Opp. at 23-24.[10]  This argument fails to support a claim that S&P intended to deprive investors of money or property.

First, the argument is fundamentally inconsistent with the Government's theory in this case, which is that the issuing banks, who could not have been deceived by S&P, made the decision which credit rating agency would be selected for any given transaction and paid the fees of the agency or agencies it selected.  Compl. ¶66 ("Typically, the issuer (commonly the investment bank representing an

---

[10] The Government alleges that S&P "typically charged a fee up to $500,000 for each cash CDO it rated" (Compl. ¶63) and identifies 26 such CDOs in paragraphs 277 and 278 of the Complaint.  Even crediting its theory, the Government thus asserts an alleged scheme that had as its object approximately $14 million in rating fees—not $5 billion in investment losses.

REPLY IN SUPPORT OF MOTION TO DISMISS COMPLAINT
CASE NO. CV 13-779 DOC (JCGX)

759896

1    arranging entity) made the decision to retain S&P to provide ratings of CDOs.  As

2    a result, ***S&P executives and staff viewed issuers as S&P's primary customers***

3    ***and as the source of S&P's ratings business***.") (emphasis added).  This is a theory

4    that S&P was motivated to obtain money or property "in the hands of" the issuers,

5    not the investors.

6             Second, even if the Government is correct that issuers pay rating fees from

7    proceeds derived from the subsequent sales of rated securities to investors, this

8    would not establish that any investors were deprived of money or property.  There

9    is no allegation, for example, that the amount of S&P's fees had any impact on the

10   price paid by any investor.  Nor is it alleged that there were no other rating

11   agencies to which S&P's "share" of the proceeds would have been paid if it had

12   not been selected by the issuer.  Indeed, the *only* losses of money or property that

13   any deceived entity is alleged to have experienced are investment losses.  *See*

14   Compl. ¶ 275.  Because the Government explicitly disclaims any obligation to

15   plead or prove that S&P intended to cause those losses, its claims should be

16   dismissed.

17   **III.    Conclusion**

18           For the reasons discussed above, the Complaint should be dismissed with

19   prejudice.

20

21   Dated:  June 3, 2013                    KEKER & VAN NEST LLP

22

23

24                                     By:  /s/ *John Keker*
                                           John Keker

25

26

27

28

759896