1   KEKER & VAN NEST LLP
    JOHN KEKER (SBN 49092)
2   jkeker@kvn.com
    ELLIOT R. PETERS (SBN 158708)
3   epeters@kvn.com
    633 Battery Street
4   San Francisco, CA 94111-1809
    Telephone:  415 391 5400
5   Facsimile:   415 397 7188

6   Attorneys for Defendants MCGRAW-HILL COMPANIES, INC., and
    STANDARD & POOR'S FINANCIAL SERVICES LLC
7
    ANDRÉ BIROTTE JR.
8   United States Attorney
    GEORGE S. CARDONA (CA Bar No. 135439)
9   LEON W. WEIDMAN (CA Bar No. 104078)
    ANOIEL KHORSHID (CA Bar No. 223912)
10  RICHARD E. ROBINSON (CA Bar No. 090840)
    Assistant United States Attorneys
11      Room 7516 Federal Building
        300 N. Los Angeles St.
12      Los Angeles, California 90012
        Telephone: (213) 894-8323/6086
13      Facsimile: (213) 894-6269/7819
        Email: George.S.Cardona@usdoj.gov / Anoiel.Khorshid@usdoj.gov
14
15  Attorneys for Plaintiff UNITED STATES OF AMERICA
16
17  *(Additional counsel on next page)*

18                  UNITED STATES DISTRICT COURT

19                  CENTRAL DISTRICT OF CALIFORNIA

20                        SOUTHERN DIVISION

21  | UNITED STATES OF AMERICA, | Case No. CV13-779 DOC (JCGx) |
22  | | |
    |                Plaintiff, | **JOINT REPORT OF PARTIES'** |
23  |          v. | **MEETING PURSUANT TO** |
    | | **FEDERAL RULE OF CIVIL** |
24  | | **PROCEDURE 26(f)** |
    | MCGRAW-HILL COMPANIES, INC. | |
25  | and STANDARD & POOR'S | **[Fed. R. Civ. P. 26(f); Local Civil Rule** |
    | FINANCIAL SERVICES LLC, | **26-1]** |
26  | | |
    |                Defendants. | Scheduling Conference:  7/8/2013 |
27  | | Time:      8:30 a.m. |
    | | Dept.:     Courtroom 9D |
28  | | Judge:    Honorable David O. Carter |

766081.01

1 | *(Additional counsel):*

2

3 | CAHILL GORDON & REINDEL LLP
   | FLOYD ABRAMS
4 | fabrams@cahill.com
   | S. PENNY WINDLE
5 | pwindle@cahill.com
   | 80 Pine Street
6 | New York, New York 10005-1702
   | Telephone: 212 701 3000
7 | Facsimile:  212 269 5420

8 | KELLER RACKAUCKAS LLP
   | JENNIFER L. KELLER (SBN 84412)
9 | jkeller@kruzlaw.com
   | 18300 Von Karman Avenue, Suite 930
10 | Irvine, CA 92612
   | Telephone: 949 476 8700
11 | Facsimile: 949 476 0900

12 | Attorneys for Defendants MCGRAW-HILL COMPANIES, INC., and
   | STANDARD & POOR'S FINANCIAL SERVICES LLC

13

14 | STUART DELERY
   | Acting Assistant Attorney General
15 | MAAME EWUSI-MENSAH FRIMPONG
   |     (CA Bar No.: 222986)
16 | ARTHUR R. GOLDBERG
   | MICHAEL S. BLUME
17 | JAMES T. NELSON
   | BRADLEY COHEN
18 | JENNIE KNEEDLER
   | SONDRA L. MILLS (CA Bar No. 090723)
19 | THOMAS D. ZIMPLEMAN
   | United States Department of Justice, Civil Division
20 |     P.O. Box 261, Ben Franklin Station
   |     Washington, D.C. 20044
21 |     Telephone: (202) 616-2376
   |     Facsimile: (202) 514-8742
22 |     Email: James.Nelson2@usdoj.gov

23 | Attorneys for Plaintiff UNITED STATES OF AMERICA

24

25

26

27

28

CASE NO.  CV13-779 DOC (JCGx)

Pursuant to the Court's Order Setting Scheduling Conference (filed April 23, 2013), Rule 26-1 of the Local Rules of the United States District Court for the Central District of California, and Rule 26(f) of the Federal Rules of Civil Procedure, the parties have, through a series of telephone conferences on April 25, 2013, May 22, 2013, June 3, 2013, and June 17, 2013, and the exchange of written draft reports, conducted the required conference of counsel, and report as follow:

## I.   FACTUAL SUMMARY; CLAIMS AND DEFENSES

### A.   Statement of the United States

The United States has filed this action seeking civil penalties from defendants pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, 12 U.S.C. § 1833a.  The United States alleges that defendants committed the following violations of law, each of which is listed in FIRREA (12 U.S.C. § 1833a(a), as a violation of law for which civil penalties may be imposed: (a) mail fraud in violation of 18 U.S.C. § 1341 "affecting a federally insured financial institution"; (b) wire fraud in violation of 18 U.S.C. § 1343 "affecting a federally insured financial institution"; and (c) financial institution fraud in violation of 18 U.S.C. § 1344.  For each proven FIRREA violation, the United States seeks FIRREA penalties up to the greater of (a) $1,100,00, (b) the gains derived by S&P from the proven FIRREA violation, or (c) the losses resulting from the proven FIRREA violation to financial institutions.

The United States' allegations relate to credit ratings issued by Standard & Poor's Ratings Services, which from 2004 to 2008 was a unit within an unincorporated division of defendant McGraw-Hill Companies, Inc., now known as McGraw Hill Financial, Inc. ("McGraw-Hill").  Standard & Poor's Ratings Services and McGraw-Hill are collectively referred to herein as "S&P".  As of January 1, 2009, McGraw-Hill transferred the U.S operations of the credit ratings business to a newly-created, wholly-owned McGraw-Hill subsidiary, defendant Standard & Poor's Financial Services LLC ("S&P LLC").  Defendant S&P LLC is

1

sued as the successor to Standard & Poor's Ratings Services.

S&P was a Nationally Recognized Statistical Rating Organization that, among other things, issued credit ratings for a variety of financial instruments, including corporate bonds and different types of structured debt securities.  S&P ordinarily was retained to rate financial instruments by the corporations, investment banks, and/or others involved in the issuance of those financial instruments.

The United States alleges that from September 2004 through October 2007, S&P, knowingly and with intent to defraud, engaged in a scheme to defraud investors, including federally insured financial institutions, in two types of structured debt securities, Residential Mortgage Backed Securities ("RMBS") and Collateralized Debt Obligations ("CDOs").  In particular, the United States alleges that during this time period, in order to maintain and increase its market share for and revenue from RMBS and CDO ratings, S&P falsely represented that its credit ratings of RMBS and CDOs were objective, independent, uninfluenced by any conflicts of interest that might compromise S&P's analytic judgment, and reflected S&P's true current opinion regarding the credit risks the rated RMBS and CDOs posed to investors.  The United States alleges that S&P knew that these representations were false because S&P downplayed and disregarded the true credit risks posed by RMBS and CDOs in order to favor investment banks and others involved in issuing RMBS and CDOs who retained S&P to rate those RMBS and CDOs.  In particular, the United States alleges that S&P knew that these representations were false because: (a) from September 2004 through October 2007, S&P limited, adjusted, and delayed updates to the ratings criteria and analytical models it used to assess the credit risks posed by RMBS and CDOs, weakening those criteria and models from what S&P's own analysts believed was necessary to make them more accurate; and (b) from March 2007 through October 2007, despite knowing that the credit risks posed by non-prime RMBS were

2

significantly increasing, S&P knowingly disregarded the true extent of those credit risks when rating CDOs exposed to those non-prime RMBS, and, as a result, issued CDO ratings that it knew did not reflect the true credit risks of those CDOs.[1]

The Complaint alleges examples of specific mailings and wirings in furtherance of, and executions of, the scheme to defraud, each of which gives rise to a separate FIRREA violation. The Complaint makes clear that these are merely examples and that the actual number of FIRREA violations arising from the alleged scheme to defraud is far greater. For example, with respect to wire fraud FIRREA predicates, the Complaint alleges: (a) each wire transmission caused by S&P "for the purpose of executing the scheme to defraud" that "affected a federally insured financial institution" gives rise to a separate FIRREA violation under 12 U.S.C. § 1833(a)(c)(2), COM ¶ 282; and (b) each "transmission by interstate wire of a rating, Effective Date RAC letter, or rating fee" occurring in connection with the scheme to defraud and relating to "an RMBS or CDO a portion of which was sold to a federally insured financial institution and/or a purchaser whose losses would affect a federally insured financial institution" constituted such a wire transmission caused by S&P for the purpose of executing the scheme to defraud, COM ¶ 277. Contrary to S&P's claims, therefore, in seeking discovery regarding and pursuing penalties based on FIRREA violations beyond those alleged as specific examples, the government is not "expanding its case beyond the theories and scope presented in the complaint."[2]

---

[1] S&P contends, both in this report and in its motion to dismiss, that the Complaint alleges two separate schemes to defraud. In fact, the Complaint alleges a single scheme to defraud, spanning September 2004 through October 2007, and encompassing the two different types of conduct described in the text above, which occurred during overlapping time periods and rendered false and deceptive S&P's representations regarding its objectivity and independence. *See* COM ¶¶ 7-10, 276-278.

[2] S&P argues that the Complaint's scope is limited because the Complaint's allegations specifically identify only "26 CDOs" as "having been allegedly faulty" (that is, as being giving ratings that S&P did not believe reflected their true credit risks) and because "there is not a single reference to any RMBS rating that the Government alleges S&P did not believe at the time it was issued." This

3

The Complaint estimates that the FIRREA violations alleged as specific examples in the Complaint resulted in losses in excess of $5 billion.  COM ¶ 275. In its initial disclosures, the United States provided S&P with a breakdown of these losses.  S&P takes issue with approximately $4.5 billion of this amount on the basis that it is "attributed to Bank of America and Citibank – two of the major institutions responsible for arranging the very CDOs and RMBS at issue – not unsuspecting 'victims' of a fraudulent scheme."  As a matter of law, the United States believes this objection is invalid.  *See United States v. Bank of New York Mellon*, No. 11-cv-06969-LAK, Opinion at 16-40 (S.D.N.Y.)  (discussing text and history of FIRREA to conclude that because its purpose is "to deter frauds that might put federally insured deposits at risk" it applies even if the affected financial institution was a "willful participant in the scheme").

S&P also contends that the potential penalties should be limited by the fees S&P charged for the CDO ratings cited as examples in the Complaint, noting that these are, in the aggregate, less than $15 million.  As an initial matter, the perpetrator's gain is only one factor appropriately considered by the court in assessing a FIRREA penalty.  *See United States v.* Menendez, 2013 WL 828926 at *5-*8 (C.D. Cal. 2013) (Morrow, J.) (in addition to defendant's gain, listing among factors to be considered defendant's "good or bad faith" and "the degree of his scienter," "injury to the public," "whether the defendant's conduct created

---

misapprehends the nature of the alleged fraud.  In particular, the Complaint alleges that S&P's representations regarding the objectivity and independence of its ratings process were false for reasons independent of its ultimate belief in the accuracy of any particular RMBS and CDO ratings that resulted from that process, namely, because between September 2004 and October 2007 S&P allowed the criteria and models it used to perform ratings to be influenced by the issuers that retained S&P to provide ratings.  The Complaint also alleges that S&P's representations regarding its objectivity and independence were false because S&P knew that certain of its CDO ratings issued between March 2007 and October 2007 did not accurately reflect the credit risks of those CDOs.  But these more particular allegations with respect to this latter time period (for which certain of the specific CDOs cited in the Complaint serve as examples) do not transform the overall scheme into one that requires a showing with respect to every RMBS and CDO affected by the scheme that S&P did not believe the rating at the time it was issued.

substantial loss or the risk of substantial loss to other persons," "egregiousness of the violation," "the isolated or repeated nature of the violation," defendant's "financial condition and ability to pay," and "criminal fine that could be levied for this conduct").  Moreover, as noted above, the Complaint's allegations go beyond the specific CDO ratings cited as examples, and potentially encompass each rating of an RMBS or CDO, any portion of which was purchased by a federally insured financial institution or a purchaser whose losses would affect a federally insured financial institution during the period September 2004 through October 2007.  On May 31, 2013, in response to a request from the United States, S&P provided a list of RMBS and CDOs backed by RMBS rated by S&P during the relevant period that includes more than 4,500 RMBS and more than 700 CDOs.  Whether using the fees charged by S&P (the Complaint alleges that S&P typically charged a fee up to $150,000 for each non-prime RMBS it rated and a fee up to $500,000 for each cash CDO it rated, COM ¶¶ 62-63) or the statutory maximum penalty of $1,100,000 per FIRREA violation, this would result in an exposure to penalties far, far in excess of the $15 million cited by S&P.

There is no justification for S&P's effort to disregard the scope of the fraudulent conduct alleged in the Complaint and, prior to discovery, cabin its exposure to penalties by prematurely narrowing the scope of the case against it. Throughout the Rule 26(f) meet and confer process, S&P has refused to propose any schedule for discovery or other proceedings, asserting that it cannot do so until the United States identifies exactly a limited set of the exact CDO and RMBS ratings that will be the subject of proof at the ultimate trial in this case.  S&P bases this claim on its assertion that because individual ratings were determined by rating committees, "the circumstances of each rating will be central to the factual presentation of the Government's claim and S&P's defense that a particular rating was fraudulent."  S&P's claim is fundamentally flawed.  The Complaint alleges fraud not at the individual rating committee level, but based on top-level

determinations as to the criteria, models, and model inputs to be used by individual rating committees. In connection with this alleged fraud, the same factual issues are presented regardless of the number of individual deals ultimately rated.[3]

Nevertheless, the United States has advised S&P that, as a practical matter, the government recognizes the need to limit its case for trial. The United States anticipates engaging in discovery regarding the losses suffered by financial institutions as the result of their purchases of RMBS and CDOs of RMBS rated by S&P between September 2004 and October 2007. Once this discovery is complete, the United States anticipates designating a limited set of RMBS and CDOs that will form the basis for its proof at trial. Discovery in this regard is necessary to enable the United States to select a set of RMBS and CDOs that are both representative of the scope of the fraudulent conduct alleged in the Complaint and provide a more complete basis for the court to exercise its discretion in assessing penalties that reflect both S&P's gains from that fraudulent conduct and the harm it caused to financial institutions.

The facts relevant to the United States allegations include facts regarding:

- the manner in which S&P conducted its ratings business for RMBS and CDOs;
- the revenues and profits generated by that ratings business;
- the representations made by S&P regarding its ratings of RMBS and CDOs, including representations in documents made available to the public on S&P's public website, in letters issued in conjunction with ratings of RMBS and CDOs, and in submissions to and testimony

---

[3] At the same time S&P seeks to prematurely limit the scope of the government's case, it takes an expansive view of the discovery to which it should be entitled, contending that this extends to such irrelevant and/or immaterial areas as the motivations for the government's filing of this case; reviews of RMBS and CDO investment decisions by Treasury, the Federal Reserve, the SEC, the FDIC, and the National Credit Union Administration; and all government investigations of other entities involved in the issuance and rating of RMBS and CDOs. The United States will address S&P's overbroad requests for discovery as they arise in the discovery process.

766081.01

before regulators and legislators;

- the procedures, criteria, and analytic models developed and/or used by S&P to rate RMBS and CDOs;

- changes made, delayed, and not made to the rating criteria and analytical models (including in particular LEVELS and SPIRE) used by S&P in rating RMBS between 2004 and 2007, the reasons for making, delaying, and not making those changes, and the intent of S&P employees in directing, overseeing, and/or participating in making, delaying, and not making those changes;

- the effects of the changes made, delayed, and not made to these rating criteria and analytical models (including in particular LEVELS and SPIRE) on S&P's ratings of RMBS and CDOs between 2004 and 2007;

- changes made, delayed, and not made to the rating criteria and analytical models (including in particular CDO Evaluator and Genesis) used by S&P in rating CDOs between 2004 and 2007, the reasons for making, delaying, and not making those changes, and the intent of S&P employees in directing, overseeing, and/or participating in making, delaying, and not making those changes;

- the effects of the changes made, delayed, and not made to these rating criteria and analytical models (including in particular CDO Evaluator and Genesis) on S&P's ratings of CDOs between 2004 and 2007;

- S&P's knowledge of the unprecedented deterioration and resulting increased credit risks of non-prime RMBS from late 2006 through 2007;

- actions taken, delayed, and not taken by S&P to address the increased credit risks of non-prime RMBS from late 2006 through 2007, the reasons for taking, delaying, and not taking these actions, and the

7

intent of S&P employees in directing, overseeing, and/or participating in taking, delaying, and not taking these actions;

- the effects of the increased credit risks of non-prime RMBS on S&P's ratings of CDOs exposed to those non-prime RMBS;

- S&P's knowledge that from March 2007 through October 2007 the ratings it issued and/or confirmed for CDOs exposed to non-prime RMBS failed to reflect their true credit risks;

- the intent of S&P employees in directing, overseeing, and/or participating, from March 2007 through October 2007, in the issuance and/or confirmation for CDOs exposed to non-prime RMBS of ratings that failed to reflect their true credit risks;

- mailings and interstate wires made in connection with S&P's issuance and confirmation of RMBS and CDO ratings;

- the materiality of the ratings of RMBS and CDOs issued by S&P to financial institutions making investment decisions;

- the materiality of S&P's representations regarding those ratings and its conduct in issuing and/or confirming those ratings to financial institutions making investment decisions;

- gains derived by S&P from its issuance and/or confirmation of RMBS and CDO ratings from September 2004 through October 2007; and,

- losses incurred by financial institutions as the result of investing in RMBS and CDOs rated by S&P from September 2004 through October 2007.

## B.   Statement of S&P

The Government cannot prove that any given rating of any RMBS or CDO was made in bad faith or with intent to deceive, because none were.  The Government cannot establish the predicate criminal violations necessary to establish liability under FIRREA, and with good reason.  Neither FIRREA, nor the

8

wire, mail or bank fraud statutes were enacted to criminalize rating agencies and their public, detailed, and comprehensive ratings.  Given these fundamental problems with the Government's case, it is not surprising that the Rule 26 process reveals that the Government has yet to settle on the case it intends to bring.

The Government's complaint describes two separate alleged "schemes to defraud," which it claims provide the predicate criminal violations of the mail, wire, and/or bank fraud statutes.  While the Government disputes this characterization – claiming that its complaint sets forth broadly a single scheme – the Government cannot deny its schemes involve different time periods, different securities, and different theories to establish liability.  Whether the Government calls it one broad scheme or, more properly, two separate schemes, neither course of conduct detailed in the complaint constitutes an actionable fraud claim.

The first scheme alleged by the Government arises from public statements by S&P concerning its corporate intentions, independence and the like, which the Government claims were false as allegedly proven by conflicting internal discussions during the same time period concerning S&P's analytical assumptions, criteria, and models.  The complaint does not identify any RMBS or CDO whose rating was made false or fraudulent by these allegedly false statements.  The second scheme in the complaint arises from S&P's issuance of ratings on 26 CDOs between March 2007 and October 2007—ratings the Government claims were fraudulent because S&P knowingly underestimated the credit risk.

Recently, in response to S&P's Motion to Dismiss and in its Initial Disclosures and a later supplement, the Government has indicated that it is expanding its case beyond the theories and scope presented in the complaint. Now, the Government maintains that a FIRREA violation occurred each time S&P rated or confirmed a rating for a RMBS or CDO backed by RMBS collateral from September 2004 to October 2007.  This claim places at issue over *5,000* separate RMBS or CDO issues, each of which generally included up to 10 or more rated

9

tranches.  Yet each of S&P's ratings was determined by a separate S&P committee based on its unique collateral and characteristics and the information available at that time, meaning the circumstances of each rating will be central to the factual presentation of the Government's claim and S&P's defense that a particular rating was fraudulent.

Nor is the Government correct when it takes the position, above, that it is not seeking to expand its case beyond what is alleged in the Complaint.  The Government cites paragraph 277 of the Complaint as encompassing a case that potentially puts at issue the rating of *any* RMBS or CDO rated by S&P during the applicable time period.  But this is not what the Complaint actually claims.  It claims that a predicate violation of the FIRREA statute occurred when ratings issued "in connection with the scheme to defraud described in paragraphs 110-275."  Those paragraphs of the Complaint identify only 26 CDOs as having been allegedly faulty.  There is not a single reference to any RMBS rating that the Government alleges S&P did not believe at the time it was issued.

With this broadened scope, the Government now proposes a schedule involving potentially thousands of FIRREA violations, more than 250 potential witnesses, untold numbers of depositions, and 24 trial days for the Government's case alone.  This case is not manageable, and some narrowing of the scope of the case should occur before a schedule is fixed.  Given the uniqueness and lack of any fraud with respect to each rating, it is critically important that the exact number and identity of the ratings at issue be resolved as soon as possible, and that the ratings at issue be narrowed to a manageable scope.  That narrowing may occur as a result of the Court's ruling on the Motion to Dismiss, or it may occur because the Government limits the scope voluntarily or because the Court says it must.

The Government has indicated that it is willing to consider limiting its case, but has not indicated how it plans to do so, what the scope of the accused securities would be, or how the case could proceed in a manageable way for both discovery

10

766081.01

and trial.  Instead, during the Rule 26(f) conference, the Government stated that every RMBS and every CDO backed by RMBS that was rated between September 2004 and October 2007 is potentially at issue, that it is only now, after investigating S&P for more than three years, undertaking a review of this enormous volume of ratings and that it believes it will need to take discovery in order to do so.

The Government's inability at this late date to identify definitively the specific securities at issue – all the while maintaining that each and every security is fraudulent—is both inexplicable and prejudicial.  S&P provided the Government with unfettered discovery for the past three years, and the Government has brought to bear enormous resources to investigate S&P.  The Government has no excuse for not knowing each and every FIRREA violation it intends to pursue by now, and to have that list narrowly tailored for litigation.

Any orderly and reasonable scope of discovery in this matter hinges on the Government timely identifying the specific FIRREA violations it seeks to pursue, and the specific securities the Government alleges had faulty ratings.  The Government's unwillingness to commit to a definitive identification of the securities precludes effective management of discovery and prejudices S&P's ability to defend itself.  The Government should be required to provide a specific identification of the alleged FIRREA violations and the specific securities at issue at an early date.

S&P has moved the Court for an order dismissing the complaint in its entirety.  As discussed more fully in S&P's briefs, the first alleged "scheme" should be dismissed because the corporate statements of intent, independence and the like are not actionable.  Dismissal of the Government's claim in this respect, even if it would not dismiss the case in its entirety, would significantly reduce the scope of this case and focus discovery on the 26 CDOs identified in the complaint as false as part of the Government's "second scheme."  That second alleged

11

"scheme" – arising from specific CDO rating opinions – should be dismissed because the Government has failed to allege that S&P's established practice of relying on its current RMBS ratings when rating CDOs containing those RMBS resulted in rating opinions that were "false" under federal law.  In addition, all of the Government' allegations fail for failure to plead that S&P had the requisite intent to defraud the federally-insured financial institutions that allegedly purchased the rated CDO tranches.

        If the complaint is not dismissed, S&P will defend against the Government's first theory, that S&P falsely represented its "independence," with at least the following:

- such statements were both subjectively and objectively true when made;

- such statements were not rendered false by internal discussions regarding the development of S&P's analytical assumptions, criteria and models;

- S&P's development and implementation of the assumptions, criteria and models referenced in the complaint were in fact conducted in good faith;

- such statements were not material to investors and/or to the sophisticated financial institutions that the Government claims were "affected" by S&P's conduct;

- S&P did not have the intent to defraud the financial institutions identified in the complaint; and

- none of the federally-insured financial institutions identified in the complaint were "affected" by a fraud within the meaning of the FIRREA statute.

        As to any claims that are not dismissed, S&P will defend itself against the Government's second theory concerning faulty ratings on certain CDOs issued

12

between March 2007 and October 2007, as follows:

- S&P, as a rating agency and through the operation of its committee-based processes, believed in its ratings at the time they were issued;

- S&P had a well-established and disclosed practice of relying on its current RMBS ratings when rating CDOs of RMBS and adhered to that practice in good faith;

- its rating opinions with respect to those CDOs were not materially different from the views of other rating agencies;

- its views regarding the residential mortgage market and its potential impact on the broader economy were not materially different from those of  the United States Treasury, the Federal Reserve Board and other sophisticated market participants;

- its rating opinions were only one factor that could have and/or should have been taken into account by the federally-insured financial institutions in making their investment decisions;

- S&P in fact considered the performance data available at the time and took the rating actions that it deemed appropriate under its criteria;

- S&P did not have the requisite intent to defraud the financial institutions identified in the complaint; and

- none of the federally-insured financial institutions identified in the complaint was "affected" by a fraud within the meaning of the FIRREA statute.

Finally, if the claims of the Government are not dismissed prior to trial, S&P will challenge as grossly overreaching the requested penalty under the FIRREA statute:

- The Government will not be able to justify its request for a penalty that exceeds $5 billion calculated as some sort of loss resulting from the FIRREA violation.  Indeed, the losses detailed in the complaint

13

total $542 million, not $5 billion.  Moreover, the Government's purported calculation of losses in support of the remainder of the more than $5 billion it seeks in penalties raises more questions than it answers and will not survive scrutiny.  For example, 89% of the purported losses that the Government believes it can use to set a penalty are attributed to Bank of America and Citibank – two of the major institutions responsible for arranging the very CDOs and RMBS at issue – not unsuspecting 'victims' of a fraudulent scheme.

- Additionally, the supplemental disclosures reveal that the Government is seeking a penalty that is *not* based on actual credit losses resulting from allegedly mis-rated securities.  Although the complaint alleges that Citibank, Bank of America and others experienced "investment" losses, at least $4 billion of the claimed $5 billion in "losses" were incurred by Bank of America or a Citibank affiliate in their roles as underwriters, arrangers, lenders and counterparties.  For example, the Government includes as losses for this purposes "hung warehouse credit risk exposure" of Citigroup in the form of tranches of CDOs that it was not able to securitize, losses relating from a "credit line" providing financing to the CDO itself, and billions in alleged "losses" to Bank of America in its role as a counterparty to a Commercial Paper program.  More than $1 billion in losses are claimed on a class of floating rate extendible notes that were never even issued.  In other words, the purported losses are the result of the country's largest institutions own activities separate and apart from any action of S&P, more than $4 billion of which does not even arise from investments in CDOs or RMBS.  These are not losses that should yield any FIRREA penalty.

- With respect to the other federally-insured financial institutions

14

identified in the complaint – the credit unions – the complaint ignores voluminous public evidence, including reports by the National Credit Union Administration, documenting the mismanagement, poor oversight and excessive risk-taking that actually caused harm to these institutions.

- S&P earned, in the aggregate, *less than $15 million in revenue* (and even less in profits) for issuing the CDO rating opinions identified in the complaint.  Given that the Government's sole evidence of any alleged intent to defraud arises from these ratings fees – albeit on the profoundly inconsistent theory that the fees were actually paid by investors, not the issuers – it should not be heard to seek more than *300 times* the amount of those fees as a penalty.

- If the Government provides additional detail or allegations that it will seek to use to support a calculation of penalty, S&P is confident that those allegations will suffer many of the deficiencies described above.

## II.    SYNOPSIS OF THE PRINCIPAL ISSUES

### A.    United States' Synopsis of Principal Issues

1.    Whether from September 2004 through October 2007 S&P, knowingly and with intent to defraud, made false representations regarding its ratings of RMBS and CDOs.  As part of this determination:

a.    Whether from September 2004 through October 2007, S&P limited, adjusted, and delayed updates to the ratings criteria and analytical models it used to assess the credit risks posed by RMBS and CDOs, weakening those criteria and models from what S&P's own analysts believed was necessary to make them more accurate.

b.    Whether from March 2007 through October 2007, despite knowing that the credit risks posed by non-prime RMBS were significantly increasing, S&P knowingly disregarded the true extent of those credit risks when

rating CDOs exposed to those non-prime RMBS, and, as a result, issued CDO ratings that it knew did not reflect the true credit risks of those CDOs.

2.      A determination of the mailings and interstate wirings made in furtherance of S&P's scheme to defraud as that scheme to defraud affected federally insured financial institutions, including, in particular, a determination of the mailings and interstate wirings made in connection with S&P's issuance and/or confirmation of ratings for those RMBS and/or CDOs, any portion of which was sold to a federally insured financial institution, whose ratings were affected by S&P's scheme to defraud.

3.      A determination of the executions of S&P's scheme to defraud, and to obtain money by means of false and fraudulent representations from, financial institutions, including, in particular, a determination of the ratings issued and/or confirmed by S&P for those RMBS and/or CDOs, any portion of which was sold to a financial institution, whose ratings were affected by S&P's scheme to defraud.

4.      Determinations of S&P's gains derived from, and the losses incurred by financial institutions resulting from, each FIRREA violation, together with determinations regarding the other factors to be considered in assessing civil penalties, including:

> (a)  the degree of S&P's scienter;
>
> (b)  injury to the public;
>
> (c)  the substantial loss or risk of loss to other persons;
>
> (d)  the egregiousness of the violations;
>
> (e)  the repeated nature of the violations; and,
>
> (f)  the criminal fine that could be levied for S&P's conduct.

**B.     S&P's Synopsis of Principal Issues**

Assuming the Government limits itself to the factual theories presented in the complaint:

1.      Whether from September 2004 through October 2007 S&P knowingly

16

and with intent to defraud made false representations regarding its corporate intentions, independence and the like, as alleged in paragraphs 110 to 199 of the complaint, including

     a.    A determination of the specific false statements the Government believes are at issue;

     b.    A determination whether those statements were false;

     c.    With respect to each such statement, a determination as to the materiality of such statement to the investment decision(s) of the relevant federally-insured financial institution;

     d.    With respect to each such statement, a determination of the good faith basis for the statement;

     e.    With respect to each such statement, a determination of whether S&P intended to defraud any of the alleged financial institution victims identified by the Government, and if necessary;

     f.    A determination of the penalty issues identified below.

2.    Whether from March 2007 through October 2007 S&P knowingly and with intent to defraud issued new CDO rating opinions that did not reflect the "true" credit risks of the CDOS identified in the complaint, including

     a.    A determination of the specific rating opinions that the Government claims were fraudulent;

     b.    Whether those rating opinions were false;

     c.    With respect to each such credit rating opinion, a determination of the materiality of that opinion to the investment decision of the relevant federally-insured financial institution, taking into account the rules and guidelines applicable to that institution, the contemporaneous opinions of other rating agencies and market participants, the role, if any, of the financial institution in the arrangement, origination, structuring, issuance or sale of the debt instrument at issue, and any other relevant factors;

d.      With respect to each such credit rating opinion, a determination of the good faith basis for the decision by an S&P credit rating committee to issue the rating;

e.      With respect to each such credit rating opinion, a determination of whether S&P intended to defraud any of the alleged financial institution victims identified by the Government; and, if necessary,

3.      A determination of the civil penalties to be imposed for each proven FIRREA violation, including the following factors:

a.      a determination of S&P's good faith;

b.      a determination of S&P's actual gain;

c.      a determination of the factors affecting the decision of the identified federally-insured financial institution to make the investment at issue;

d.      a determination of the type and extent of losses actually suffered by any identified federally-insured financial institutions;

e.      a determination of all factors that contributed to any losses suffered by the alleged victim financial institutions.

The Government raises herein entirely new matters that it apparently intends to pursue in discovery, potentially covering all RMBS and CDO ratings issued by S&P over a three-year time period.  As discussed further in the following sections, the scope of this case needs to be resolved as soon as possible, and S&P reserves the right to amend and supplement the foregoing when that resolution is achieved.

## III.   ADDITION OF PARTIES AND AMENDMENT OF PLEADINGS

The parties do not anticipate the addition of any parties.

S&P has filed a motion to dismiss under Federal Rules of Civil Procedure 9(b) and 12(b)(6) alleging that the complaint fails to properly allege either a scheme to defraud or the specific intent required for a violation of the fraud statutes.  If the motion to dismiss is denied, the United States does not anticipate amending the complaint.  If the motion to dismiss is granted, either in whole or in

18

part, the United States anticipates that it will amend the complaint to address and remedy the grounds for dismissal.

## IV. COMPLEXITY

The parties do not believe that the Court needs to adopt the procedures in the Manual for Complex Litigation.

## V. LAW AND MOTION MATTERS

Absent admissions by S&P, the United States may file motions for partial summary judgment and/or summary adjudication on certain elements of liability including, in particular, whether S&P made the representations alleged in paragraphs 111-122 of the Complaint.  The United States expects to file a motion seeking bifurcation of the determinations of liability and penalties and seeking to have the determination of penalties, including the determination of gains derived and losses resulting from established FIRREA violations, made by the court, and not a jury.  *See* 12 U.S.C. § 1833a(a) (FIRREA violator "subject to a civil penalty in an amount assessed by the court"); *Menendez*, 2013 WL 828926 at *4-5 (court determination of FIRREA penalty).

As noted above, S&P has filed a motion to dismiss under Federal Rules of Civil Procedure 9(b) and 12(b)(6) alleging that the complaint fails to properly allege either a scheme to defraud or the specific intent required for a violation of the fraud statutes.

S&P may file motions for summary judgment and/or summary adjudication with respect to liability and penalties.  As for the Government's proposed motion for bifurcation, S&P may oppose that motion depending upon the ultimate relief that the Government seeks.  S&P believes that if the case proceeds to trial the jury should determine all factual issues, even if some of those issues may also be considered in the penalty analysis under 12 U.S.C. § 1833a.  For example, the complaint alleges that S&P intended to defraud the financial institution victims of the rating fees that were paid in connection with each rating opinion, but ***also***

19

alleges that S&P was conflicted because *issuers*, not the purported victims, paid their fees.  Similarly, the Government is required to prove that a FIRREA violation "affected" an identified federally-insured financial institution within the meaning of the statute and may seek a penalty in excess of the statutory maximum ($1.1 million) only if losses in excess of that amount "resulted from" the violation.  S&P will seek to have such factual issues resolved by the jury and does not believe that bifurcation is appropriate.

Any proposed schedule for dispositive or partially dispositive motions necessarily depends upon the schedule for conducting discovery.  The parties' discussion of the scheduling issues is set forth below in Section IX.

## VI.    SETTLEMENT DISCUSSIONS AND PROCEDURES

The parties had extensive settlement discussions prior to the United States' filing of the complaint.  Those settlement discussions involved not only S&P and the United States, but also the Securities and Exchange Commission and various states that have since filed separate state-law causes of action against S&P.  The parties were unable to reach a settlement, which resulted in the United States filing this action.

In accordance with Local Rule 16-15.4 and this Court's Order Setting Scheduling Conference, the parties have conferred and have selected suggested ADR Procedure No. 1 (option 3 in the court's Order Setting Scheduling Conference), that is, a settlement conference before the Magistrate Judge assigned to this case.  As required by Local Rules 16-2 and 16-15.2, the parties will confer to schedule a settlement conference before the Magistrate Judge as soon as the parties believe such a conference may be useful, but no later than 45 days prior to the Final Pretrial Conference, to exhaust all possibilities of settlement.

The parties have also discussed the possibility of seeking to have the Court refer this case for a settlement conference before a District Judge who is not involved in any other way in this case.

## VII.   DISCOVERY PLAN

### A.     Initial Disclosures

The United States provided its initial disclosures on May 9, 2013.  The United States provided supplemental initial disclosures on May 28, 2013 after meeting and conferring with S&P's counsel about S&P's claims regarding the adequacy of the United States' initial disclosures.  In addition, on April 26, 2013, and May 8, 2013, the United States provided S&P with copies, in pdf and, for the transcripts themselves, electronic text format, of sworn testimony taken by the Department of Justice from witnesses during the course of the Department's FIRREA investigation, together with the exhibits used during the taking of that testimony.

S&P provided its initial disclosures on May 9, 2013. In addition to these disclosures, S&P has previously provided the Government with extensive document productions over the course of its more than three-year investigation. S&P estimates that the electronic information produced during the investigation amounts to the equivalent of more than 30 million pages of materials.  On May 31, 2013, at the request of the United States, and in an effort to assist the United States in narrowing its case, S&P provided the United States with a list of all RMBS and CDOs backed by RMBS that S&P rated between 2004 and 2007.

### B.     Subjects On Which Discovery May Be Needed

#### 1.     Statement of the United States

The United States obtained many relevant documents from S&P during the course of the FIRREA investigation that led to the filing of the complaint.  In particular, in response to 24 FIRREA subpoenas, S&P produced in electronic format approximately 18.8 million pages of documents as well as additional electronically stored information ("ESI") (a total of approximately 2.75 terabytes of data).  In addition, the United States interviewed a number of former S&P employees and took sworn testimony from a number of current and former S&P

employees.  As noted above, the United States produced the transcripts and accompanying exhibits of that sworn testimony to S&P as part of its initial disclosures.  The United States has not produced its interview reports, which are subject to work product protection.

The United States will require further document discovery from S&P.  The United States also anticipates taking depositions from additional witnesses.  With respect to certain of these additional witnesses as well as certain of the witnesses from whom the United States took sworn testimony during the course of the FIRREA investigation, the United States anticipates the need for depositions that will serve as these witnesses' trial testimony because they are outside the United States' subpoena power in connection with this action.

While, as required by Rule 26(a)(1)(A)(i), the United States in its initial disclosures identified approximately 255 individuals or entities "likely to have discoverable information" that the United States "*may* use to support its claims" (emphasis added), the vast majority of these are current or former S&P employees, many were also identified by S&P in its initial disclosures, and the United States does not expect either to depose or to call as trial witnesses anywhere near this number of witnesses.

The United States requires discovery as to all issues raised in the Complaint that S&P does not admit.  Specifically, the United States requires discovery on the following issues:

a.    the manner in which S&P conducted its ratings business for RMBS and CDOs;

b.    the revenues and profits generated by that ratings business;

c.    the procedures, criteria, and analytic models developed and/or used by S&P to rate RMBS and CDOs;

d.    changes made, delayed, and not made to the rating criteria and analytical models (including in particular LEVELS and SPIRE) used by S&P in

22

rating RMBS between 2004 and 2007, the reasons for making, delaying, and not making those changes, and the intent of S&P employees in directing, overseeing, and/or participating in making, delaying, and not making those changes;

e. the effects of the changes made, delayed, and not made to these rating criteria and analytical models (including in particular LEVELS and SPIRE) on S&P's ratings of RMBS and CDOs between 2004 and 2007;

f. changes made, delayed, and not made to the rating criteria and analytical models (including in particular CDO Evaluator and Genesis) used by S&P in rating CDOs between 2004 and 2007, the reasons for making, delaying, and not making those changes, and the intent of S&P employees in directing, overseeing, and/or participating in making, delaying, and not making those changes;

g. the effects of the changes made, delayed, and not made to these rating criteria and analytical models (including in particular CDO Evaluator and Genesis) on S&P's ratings of CDOs between 2004 and 2007;

h. S&P's knowledge of the unprecedented deterioration and resulting increased credit risks of non-prime RMBS from late 2006 through 2007;

i. actions taken, delayed, and not taken by S&P to address the increased credit risks of non-prime RMBS from late 2006 through 2007, the reasons for taking, delaying, and not taking these actions, and the intent of S&P employees in directing, overseeing, and/or participating in making, delaying, and not taking those actions;

j. the effects of the increased credit risks of non-prime RMBS on S&P's ratings of CDOs exposed to those non-prime RMBS;

k. S&P's knowledge that from March 2007 through October 2007 the ratings it issued and/or confirmed for CDOs exposed to non-prime RMBS failed to reflect their true credit risks;

l. the intent of S&P employees in directing, overseeing, and/or

23

participating, from March 2007 through October 2007, in the issuance and/or confirmation for CDOs exposed to non-prime RMBS of ratings that failed to reflect their true credit risks;

m. mailings and interstate wires made in connection with S&P's issuance and confirmation of RMBS and CDO ratings;

n. the materiality of the ratings of RMBS and CDOs issued by S&P to financial institutions making investment decisions;

o. the materiality of S&P's representations regarding those ratings and its conduct in issuing and/or confirming those ratings to financial institutions making investment decisions;

p. gains derived by S&P from its issuance and/or confirmation of RMBS and CDO ratings from September 2004 through October 2007;

q. losses incurred by financial institutions as the result of investing in RMBS and CDOs rated by S&P from September 2004 through October 2007; and

r. other factors relating to the assessment of penalties, including injury to the public, substantial risk of loss to others, losses actually incurred by others, and S&P's financial condition and ability to pay.

The United States also requires discovery on S&P's defenses, as set forth in this report. As discovery proceeds, the United States will evaluate the need to take discovery on any additional issues as they arise.

In seeking document discovery from S&P, the United States will take care not to duplicate document discovery obtained from S&P during the course of the FIRREA investigation.

For the reasons set forth in Section I(A) above, there is no basis for limiting the United States' discovery, as S&P contends, to the 26 CDOs referenced in paragraphs 277 and 278 of the Complaint.

24

## 2.      Statement of S&P

S&P has set forth above a synopsis of the principal issues to be tried with respect to each credit rating opinion that may be at issue in this case.  Each rating was determined by a separate S&P committee based on its unique collateral and characteristics and the information available at that time.  It is therefore critically important that the exact number and identity of the ratings at issue be resolved as soon as possible, and that the ratings at issue be narrowed to a manageable scope.  This should not be difficult to do, given that the Government has the benefit of a more than three-year investigation and a massive trove of information from S&P and others.  Discovery in this case, accordingly, should be limited to the 26 CDOs that are actually identified in paragraphs 277 and 278 the complaint.[4]

The Government's statements above, however, as well as its statements during the parties' Rule 26(f) Conference, make it clear that the Government is not in fact ready to proceed to litigate the case it has actually brought.  Instead, it apparently plans to conduct a new investigation into all RMBS and CDOs rated by S&P between September 2004 and October 2007.  Until the Government offers a specific identification of the securities at issue, it will be difficult for S&P to begin mounting a defense, much less to know precisely what it needs to seek in discovery.

With that reservation, S&P offers the following tentative identification of matters and parties from whom it will seek discovery:

S&P will require discovery from the Department of Justice including (i) transcripts of all sworn and unsworn testimony taken by the Government in its investigation; (ii) transcripts of all interviews conducted by the Government during its investigation and/or information concerning what individuals stated during their

---

[4] There are 7 additional CDOs identified in the complaint that are **_not_** included in the enumeration of alleged violations in paragraphs 277 and 278.  S&P submits that only the CDOs enumerated in those two paragraphs, which allege 45 violations relating to 26 specific CDOs, are legitimately at issue in this case.

interviews with the Government; (iii) all material the Government obtained from or provided to any third party (including counsel to any third-party) during its investigation of S&P and all investigations relating to the securities that are ultimately determined to be at issue in this case;[5] (iv) all materials concerning the interaction between the Department of Justice and any federal and/or state governmental agency or personnel concerning the investigation of S&P; (v) all materials concerning the losses of any purported victim the Government relies upon to support its penalty demand.

S&P anticipates requiring discovery from other Governmental agencies (as well as their personnel, contractors and agents) including the Department of Justice, the Treasury Department, the Federal Reserve, the Securities and Exchange Commission, the Federal Deposit Insurance Corporation, and the National Credit Union Administration. The subjects of discovery include at a minimum (1) the Government's decision to authorize the filing of this litigation; (2) review and analysis of investment decisions made by financial institutions that packaged, structured, sold, or purchased the securities at issue in the Government's case; and (3) analysis, opinions, and projections regarding the residential mortgage market and its potential impact on the broader economy.

S&P intends to take discovery from the purported victim financial institutions identified by the Government. The subjects of discovery include at a minimum: (1) information concerning the financial institutions' purchase and analysis of RMBS and/or CDOs, including communications with the originators, sponsors, underwriters or sellers of the RMBS and/or CDOs and with any rating agency; (2) any other role of the financial institution with respect to the securities at issue; (3) the financial institutions' historic and current exposure to RMBS

---

[5] This includes information received by the Government in investigations of entities other than S&P that relate to the same securities, including investigations of arrangers, sponsors, underwriters, issuers, sellers and other rating agencies.

and/or CDOs; (4) the decision to commence this action in connection with the financial institutions' purchase of CDOs rated by S&P; (5) involvement in any action or other legal proceeding related to the financial institutions' exposure to RMBS and/or CDOs; (6) internal or third-party review of the financial institutions' investment practices and procedures; (7) communications with other federally insured financial institutions who purchased CDOs rated by S&P; and (8) the type and extent of any losses suffered by the financial institution and all factors contributing to any such losses.

S&P also intends to take discovery from various third parties that packaged, structured and sold each of the securities at issue in the Government's case including arrangers, CDO managers, and trustees.  Subjects of discovery include (1) the structuring of the securities products at issue in the Government's case; (2) communications with third parties, including purchasers and other ratings agencies; (3) and knowledge such third parties possessed regarding the securities they packaged and/or sold, including without limitations the credit risks thereof.

As the case proceeds, S&P anticipates that additional issues may arise that will be relevant to S&P's defenses.  S&P will evaluate the need to take discovery on such issues as they arise.

## C. Whether Discovery Should Be Conducted In Phases or Otherwise Limited

With the exception of a proposed expert discovery phase, the parties currently see no reason to conduct discovery in phases or to otherwise limit it, except that S&P believes, for the reasons discussed in sections I.B and VII.B.2, that the Government should not be permitted to launch a new investigation into S&P's ratings of all RMBS and CDOs over a three year period, but that discovery instead should be limited to the CDOs identified in the Complaint or to some other limited set of securities identified at an early stage by the Government.

766081.01

### D.     Changes in Limitations on Discovery

#### 1.     Interrogatories

The Government believes that 25 substantive interrogatories are sufficient, as provided in Fed. R. Civ. P. 33.  S&P believes that, given the expansive nature of the Government's allegations and the fact that the Government is apparently not yet prepared to define the universe of securities potentially at issue in this case, at least 50 substantive interrogatories are needed for S&P to fully flesh out the matters at issue.

#### 2.     Depositions

##### a.     Statement of the United States

The United States currently anticipates requiring the depositions of approximately 50 current and former employees of S&P who were involved in S&P's ratings of RMBS and CDOs from 2004 through 2007.  In addition, the United States anticipates that it will need to take depositions of representatives of certain investment banks that arranged for S&P to be retained to rate RMBS and CDOS from 2004 through 2007, as well as representatives of certain financial institutions that invested in RMBS and CDOs rated by S&P during this same time period.  Accordingly, it will be necessary to expand the limitation on the total number of depositions set forth in Fed. R. Civ. P. 30(a)(2)(A).

The United States anticipates that many of the depositions will be trial depositions necessary to preserve the complete testimony of witnesses not available to testify at trial.[6]  Other depositions will be primarily for fact discovery and discovery of individuals designated pursuant to Fed. R. Civ. P. 30(b)(6). Based on the government's experience in its FIRREA investigation, and its review

---

[6]  S&P has stated that it "objects to the government's proposal to use deposition testimony at trial instead of live witnesses."  The use of deposition testimony at trial, however, is anticipated by the Civil Rules.  See Fed. R. Civ. P. 32 ("Using Depositions in Court Proceedings"); Civil L.R. 32-1 ("Use at Trial or in a Motion").

766081.01

of depositions in other civil actions against S&P, the government believes that some of the depositions will take more than the limit of 1 day of 7 hours imposed by Fed. R. Civ. P. 30(d)(1).  The United States will make every effort to complete depositions within this limit, but anticipates that it will be seeking agreement and/or court permission to exceed this limit for a limited number of witnesses.

The United States anticipates that there are many witnesses whom the United States and S&P will both seek to depose.  The United States anticipates that for certain of these witnesses it will be seeking agreement from S&P and/or court permission to exceed the 7-hour limit in order to allow both parties sufficient time to complete their examinations of the witnesses.  In the absence of an agreed-upon or court-permitted extension of the 7 hour limit, the United States and S&P agree that where both the United States and S&P seek to depose the same witness, both parties shall divide the 7 hours equally unless they both agree or a party obtains court permission for an alternative division of time.

### b.      Statement of S&P

Like the Government, S&P is not yet in a position to identify how many third parties it will need to depose, and notes that the Government has disclosed 255 separate individuals and entities that it believes have relevant information that it may use to support its case.  S&P anticipates that it will require deposition testimony from those persons or entities it identified in Section VII.B above.  S&P agrees it will be necessary to increase the limitation on the total number of depositions set forth in Fed. R. Civ. P. 30(a)(2)(A). S&P does not believe that any individual witness should be subjected to more than seven hours of deposition by an individual party.

S&P objects to the Government's proposal to use deposition testimony at trial instead of live witnesses.  S&P needs to depose these witnesses for discovery purposes, which must of necessity be conducted in a very different manner than trial testimony.  Having chosen this Southern California forum in which to file its

29

complaint, apparently for tactical reasons, the Government cannot now complain of the difficulty of procuring its necessary trial witnesses, most of whom work and reside on the eastern seaboard.

### E.   Discovery of Electronically Stored Information

The parties agree that as of the filing of this joint statement: (a) S&P will make any future productions of its own ESI in accordance with the Production Specifications attached as Exhibit B (the "ESI Production Specifications"); (b) S&P will produce ESI in its possession that it has obtained from third parties either in accordance with the ESI Production Specifications or in the form obtained from the third parties, at S&P's option; (c) the Department will make any future productions of its own ESI in accordance with the ESI Production Specifications; (d) the Department will produce ESI in its possession that it has obtained from third parties other than S&P in the course of its FIRREA investigation either in accordance with the ESI Production Specifications or in the form obtained from the third parties, at the Department's option; and (e) to the extent that any ESI produced by S&P to the Department during the course of its FIRREA investigation is produced in discovery in this case, such ESI will be produced in the form it was produced in the FIRREA investigation.

### F.   Claims of Privilege or Protection as Trial-Preparation Materials

The parties anticipate entering into an agreement to handle any potential inadvertent production of attorney-client privileged and/or work product protected documents.

In response to FIRREA subpoenas, S&P withheld and/or redacted a large number of documents on the basis of assertions of attorney-client privilege and/or work product protection.  The parties engaged in lengthy correspondence that resulted in S&P producing more detailed privilege logs.  The United States anticipates that it may object to S&P's assertions of privilege and/or protection as to certain documents or portions of documents that were produced in response to

30

FIRREA subpoenas and, depending on the scope of S&P's assertions of privilege and/or protection with respect to additional documents sought in discovery, to certain of those assertions as well.  S&P and the United States agree that for purposes of enabling the United States to proceed with any objections to S&P's assertions of attorney-client privilege and/or work product protection, and for this purpose only, the privilege logs produced by S&P during the FIRREA investigation, together with the documents redacted and/or withheld as referenced in those privilege logs, shall be deemed to have been produced and redacted and/or withheld in discovery in this case.

### G.   Proposed Discovery Schedule (including timing of disclosures of expert witnesses)

#### 1.   Statement of the United States

The United States proposes the discovery schedule set forth in attached Exhibit A, which includes the following proposed discovery cutoff dates:

Non-Expert Discovery:                6/23/2014

Expert Discovery:                     9/1/2014

For the reasons set forth in Sections I(A) and VII(B) above, the United States disagrees with S&P's claim that it is unable to propose a reasonable schedule for discovery until the United States has identified a limited set of the exact CDO and RMBS ratings that will be the subject of proof at the ultimate trial in this case.

#### 2.   Statement of S&P

Because the Government's initial disclosures, supplemental initial disclosures, and above statements describe a case of immense size, without any limitation or further specific identification of the alleged FIRREA violations and the precise securities at issue, S&P cannot provide the Court with a realistic schedule for the case at the current time.  Each security that may ultimately be at issue in this case brings with it a host of specific factual issues and the list of

766081.01

individuals and entities with discoverable information expands accordingly.  The Government believes that at least 255 separate individuals and entities have relevant information that the Government may use to support its case, and that even more persons and entities with relevant information will be identified as discovery proceeds.  S&P cannot, in good faith, propose a schedule that could be adhered to with such uncertainty as to the breadth of the case.  If the Government limits its case to the 26 CDOs identified in the complaint or is required to disclose the securities it intends to pursue at an early date, S&P can craft an appropriate discovery plan and schedule.

S&P believes that the Government's proposed schedule is not realistic even if the Government were limited to the specific securities identified in the complaint. The Government conducted a three year investigation entailing the production of millions of documents and had free range to interview countless witnesses, yet its schedule drastically reduces S&P's time to conduct discovery. The Government's proposed schedule calls for a June 23, 2014 fact discovery cut-off and a September 1, 2014 expert discovery cut-off.  This leaves only 11 months for fact discovery and roughly three months for expert discovery.  The Government's investigation yielded its identification of 255 separate individuals and corporate representatives that it may use to support its claim and defenses – many of which S&P is being informed of for the first time now.  It suggests above that it will need depositions of at least 50 current and former S&P employees and an as yet unidentified number of third parties, to say nothing of the depositions that S&P might require to defend itself.  Even if the Government's efforts were so limited, this would result in more than one deposition every week for 11 months straight for the Government's witnesses alone.  By broadly claiming that all S&P RMBS and CDOs ratings and confirmations were fraudulent, the Government's case remains a shifting target and the notion that all needed discovery – for both the Government and for S&P—could be completed in 11 months is impractical.

The same problems plague the Government's proposal for a mere three months of expert discovery. This case will require substantial expert testimony on issues relating to the complicated securities at issue, the rating processes, the alleged losses suffered by financial institutions, and other subjects.  Compressing expert discovery into only 3 months would be challenging even if the contours of the Government's case were known. Conducting such extensive discovery in such a limited period when much about the Government's case is unknown is unfeasible.

### H.    Other Issues Affecting the Management of the Case: Prior Confidentiality Agreement and New Protective Order

In connection with the Department's FIRREA investigation, on or about March 10, 2010, the Department and S&P entered into a Confidentiality Agreement under which a presumption of confidentiality would apply to any "record or information" obtained by the Department from S&P that S&P labeled "Confidential Information" and that did not fall within one of the following three exceptions: the Department had obtained it from another source, S&P had made it publicly available, or the Department was able to obtain it from a publicly available source.  Confidentiality Agreement ¶ II(A)(1).  After entering into the Confidentiality Agreement, S&P labeled as "Confidential Information" virtually every document that it produced in response to the Department's FIRREA subpoenas.  S&P believes that this was the result of its need to respond to mass requests for the production of millions of documents from confidential files under very strict time limitations, and that it labeled as "Confidential Information" volumes of documents produced from files and electronic sources that were believed to contain Confidential Information within the meaning of the Confidentiality Agreement that was not reasonably segregable from non-confidential material within the time limitations imposed by the Department.

The parties agree that, by its terms, the Confidentiality Agreement does not

766081.01

apply to any record or information, including in particular any document, produced by S&P in discovery in this case on or after April 25, 2013.  In connection with discovery in this case, the parties will meet and confer to attempt to agree, prior to the July 8, 2013 scheduling conference, on a protective order setting forth procedures for addressing claims by S&P that any record or information, including in particular any document, it produces in discovery must be maintained in confidence because it includes proprietary business information or information that is entitled to confidential treatment for some other reason.  If the parties are unable to agree on the terms of a protective order, they will notify the Court prior to the July 8, 2013 scheduling conference and seek the Court's assistance in resolving any differences regarding the terms of a protective order.  The protective order that is issued by the Court, whether on agreement of the parties or otherwise, shall govern any discovery produced by S&P in this case on or after April 25, 2013.

The United States believes that the protective order should supersede, replace, and render void the Confidentiality Agreement so that there is a single order governing the disclosure, use, and handling of all information properly entitled to confidential treatment in this case, whether previously produced in the course of the FIRREA investigation or produced in discovery on or after April 25, 2013.  S&P does not believe that the agreement under which it agreed to produce millions of documents to the Government during its pre-complaint investigation should now be rendered void.  To the extent that materials produced in that investigation are deemed to be part of the discovery materials in this case, S&P agrees that the protective order that the parties are endeavoring to finalize should govern, to the extent that it is not in conflict with the parties' existing agreement.

## VIII. TRIAL

### A.    Statement of the United States

The United States seeks trial by jury on liability.  The United States estimates that trial on liability will take approximately 24 trial days (excluding jury

34

selection).  As noted above in Section V, the United States expects to file a motion seeking bifurcation of the determinations of liability and penalties and seeking to have the determination of penalties, including the determination of gains derived and losses resulting from established FIRREA violations, made by the court, and not a jury.  The United States anticipates that the bulk of the presentation regarding penalties can be made in writing, with the court determining whether it needs to hear testimony regarding the penalty determination after reviewing the parties' written submissions.

### B.    Statement of S&P

As noted in Section V above, S&P has serious concerns about the Government's proposal to bifurcate the liability and penalty phase and to try the latter exclusively before the Court.  S&P also roundly rejects the notion that "the bulk of the presentation regarding penalties can be made in writing."  The suggestion that the Government could seek a $5 **billion** penalty through mere submission of briefs is unsupportable and prejudicial.  The determination of losses that may have resulted from any violation, as just one example, is highly contested and extensive witness testimony is needed to determine — for each and every security the Government places at issue — a host of issues concerning the purported victims' losses including:  (i) the type and extent of losses claimed; (ii) with respect to any alleged investment losses, how much principal and/or interest was actually not paid to the victim when due and all reasons for any such failures; (iii) the role S&P's ratings played, if any, in the financial institution's purchase of the security; (iv) the culpability of the financial institution and/or third parties in any alleged loss; (v) and any other factor that may have affected or contributed to the financial institution's alleged losses.  In addition, many of these issues potentially relevant to the determination of a penalty overlap with determinations necessary to establish a violation of the FIRREA statute, including determinations regarding S&P's good faith, materiality and whether a financial institution was

35

"affected" within the meaning of the statute.

With respect to all factual matters to be determined by the jury, in addition to the 24 trial days the Government requires to try its case in chief, S&P estimates that it will require another 30 trial days to present its defenses and any matters relevant to determination of a penalty, subject to its ability to revise this estimate when there is greater clarity about the scope of this case.

## IX.   PROPOSED DATES

### A.   Statement of the United States

The United States proposes the following for the four specific dates required by the Court's Order Setting Scheduling Conference:

Discovery Cut-Off Date

| | |
|---|---|
| Non-Expert Discovery: | 6/23/2014 |
| Expert Discovery: | 9/1/2014 |
| Dispositive Motion Cut-Off Date: | 11/17/2014 |
| Final Pretrial Conference: | 1/26/2015 |
| Trial: | 2/17/2015 |

The United States proposes these dates in conjunction with its more complete proposed schedule for proceedings in this case, which is attached as Exhibit A.  For the reasons set forth in Sections I(A) and VII(B) above, the United States disagrees with S&P's position that setting of a discovery and trial schedule should be postponed until the United States has identified a limited set of the exact CDO and RMBS ratings that will be the subject of proof at the ultimate trial in this case.

### B.   Statement of S&P

For the reasons set forth above, S&P submits that these dates are not reasonable, and the Court should postpone establishing a discovery and trial schedule until the issues raised by the Motion to Dismiss are settled and/or until the Government commits to a universe of securities that it intends to litigate.

36

Toward that end, S&P requests another scheduling conference be set after one or both of these things have occurred.  At that time a realistic trial date and discovery schedule can be established.

**X.     CONCLUSION**

Counsel for plaintiff and defendants jointly submit this report.  The joint submission should not be taken as reflecting agreement with respect to any position identified as being that of an individual party.

Dated:     June 24, 2013                              KEKER & VAN NEST LLP


                                                      By:  /s/
                                                          John W. Keker


Dated:     June 24, 2013                              Respectfully Submitted,

STUART F. DELERY                                      ANDRE BIROTTE JR.
Acting Assistant Attorney General                    United States Attorney
United States Department of Justice
Civil Division
MAAME EWUSI-MENSAH
FRIMPONG
Deputy Assistant Attorney General                    //s//George S. Cardona/
MICHAEL S. BLUME                                      GEORGE S. CARDONA
Director, Consumer Protection Branch                 LEON W. WEIDMAN
ARTHUR R. GOLDBERG                                    ANOIEL KHORSHID
Assistant Director, Fed. Prog. Branch                RICHARD E. ROBINSON
JAMES T. NELSON                                       Assistant United States Attorneys
BRADLEY COHEN
JENNIE KNEEDLER
SONDRA L. MILLS
THOMAS D. ZIMPLEMAN
Trial Attorneys, Civil Division

RULE 26(f) CONFERENCE REPORT

CASE NO.  CV13-779 DOC (JCGx)

766081.01