

# United States Department of Justice

## United States Attorney's Office
## Central District of California

| | |
|---|---|
| *George S. Cardona* | *United States Courthouse* |
| *Phone: (213) 894-8323* | *312 North Spring Street, 12th Floor* |
| *E-mail: george.s.cardona@usdoj.gov* | *Los Angeles, California 90012* |

July 1, 2013

<u>Via Electronic Filing</u>

Hon. David O. Carter
United States District Court
Central District of California -- Southern Branch
U.S. Courthouse -- Courtroom 9D
411 West Fourth Street
Santa Ana, California 92701

> Re:   <u>United States v. McGraw-Hill Companies, Inc., and Standard & Poor's Financial Services LLC</u>, No. CV 13-00779-DOC (JCGx)
> Hearing on Motion to Dismiss -- July 8, 2013, 8:30 am
> Submission of Supplemental Authorities

Hon. David O. Carter:

The above-referenced case is currently scheduled for a hearing on July 8, 2013, at 8:30 a.m., on defendants' motion to dismiss. Briefing on the motion has been completed. In connection with the scheduled hearing, the government hereby submits the following supplemental authorities, which bear on defendants' claims that certain of their statements alleged by the Complaint to be false and misleading were not material, including their claim that certain of these statements were "mere puffing":

(1)   <u>In re Countrywide Financial Corporation Mortgage-Backed Securities Litigation</u>, 588 F.Supp.2d 1132, 1144, 1153, 1185 (C.D.Cal. 2008) (Pfaelzer, J.);

(2)   <u>Richman v. Goldman Sachs Group, Inc.</u>, 868 F.Supp.2d 261, 276-281 & n.8 (S.D.N.Y. 2012); and,

(3)   <u>Federal Housing Finance Agency v. Deutsche Bank AG</u>, 903 F.Supp.2d 285, 289 (S.D.N.Y. 2012).

On July 1, 2012, I provided the citations to these authorities to John Keker, counsel for defendants, who advised that he had no objection to the submission of this letter. I advised Mr. Keker that I had no objection to Mr. Keker's submission of a similar letter setting out as supplemental authorities three cases to which Mr. Keker provided the citations.

Hon. David O. Carter
Re: US v. McGraw-Hill
July 1, 2013
Page 2

For the court's convenience, copies of these opinions are attached to this letter.

Sincerely,

/s//George S. Cardona/
George S. Cardona
Chief Assistant United States Attorney

cc:     John Keker, Counsel for Defendants

Attachments

In re COUNTRYWIDE FINANCIAL
CORPORATION SECURITIES
LITIGATION.

No. CV–07–05295–MRP (MANx).

United States District Court,
C.D. California.

Dec. 1, 2008.

**Background:** Shareholder filed class action against mortgage company, company's officers, underwriters, and auditors, alleging violations of federal securities laws involving publicly traded equity securities and publicly traded, unsecured debt instruments that mortgage company used to raise capital from investors. Defendants moved to dismiss.

**Holdings:** The District Court, Mariana R. Pfaelzer, J., held that:

(1) allegations were sufficient to state claim against mortgage company under Securities Act;

(2) class representatives had standing to bring securities claims;

(3) allegations were insufficient to state Securities Act claim against auditor;

(4) allegations were sufficient to state claim against company officers as control persons;

(5) allegations were insufficient to state securities fraud claim against auditor; and

(6) allegations were sufficient to state insider trading claims against officers.

Motions granted in part and denied in part.

**1. Securities    Regulation    ⟐60.51(2), 60.53**

For a fraud claim under Private Securities Litigation Reform Act (PSLRA), a court must balance competing inferences in evaluating the facts underlying falsity and scienter.   Private Securities Litigation

Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u–4(b)(2).

**2. Securities Regulation ⟐60.53**

Where plaintiffs alleging securities fraud rely on both confidential witnesses and on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false. Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u–4.

**3. Securities Regulation ⟐60.28(13)**

Investors' class action securities complaint adequately pleaded that mortgage company's Securities and Exchange Commission (SEC) filings were either false or materially misleading in that they failed to contain facts permitting inference that company systematically departed from underwriting standards, as required to state claim against company under Securities Exchange Act; SEC form touted that company's proprietary underwriting systems improved consistency of underwriting standards, assessed collateral adequacy and helped prevent fraud, and SEC disclosures described extensive post-funding quality control process.

**4. Securities    Regulation    ⟐25.25, 60.51(1)**

Investors' class action complaint in securities action provided sufficient notice to mortgage company's auditors of claims against it, although complaint was not short plain statement as required under pleading rules; complexity of factual allegations, length of class period, and large number of defendants made precision in complaint difficult.   Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u–4; Securities Act of 1933, § 11, 15 U.S.C.A. § 77k; Fed.Rules Civ. Proc.Rules 8(a), 41(b), 28 U.S.C.A.

IN RE COUNTRYWIDE FINANCIAL CORP. SEC. LITIGATION   1133
Cite as 588 F.Supp.2d 1132 (C.D.Cal. 2008)

**5. Securities Regulation ⬤60.51(1, 2)**

Securities plaintiffs must meet three separate pleading standards: the short and plain statement rule, the particularity requirement, and the Private Securities Litigation Act (PSLRA)'s requirement that the facts underlying falsity and scienter be pled with particularity sufficient to create a cogent and compelling inference of falsity and scienter. Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u–4(b)(2); Fed.Rules Civ. Proc.Rules 8(a), 9(b), 28 U.S.C.A.

**6. Federal Civil Procedure ⬤187**

Named plaintiff in securities class action against mortgage company, officers, auditors and underwriters, was holder of equity security at issue, and thus lead plaintiffs had standing to bring Securities Act claims based on equity security, although lead plaintiffs did not purchase security; lead plaintiffs were not required to have standing to assert all claims, as long as complaint identified and included named plaintiffs who had standing. Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u–4(a)(3)(B); Securities Act of 1933, §§ 11, 12(a)(2), 15, 15 U.S.C.A. §§ 77k, 77l(a)(2), 77o.

**7. Federal Civil Procedure ⬤187**

Nothing in the Private Securities Litigation Reform Act (PSLRA) requires that the lead plaintiffs have standing to assert all of the claims so long as lead plaintiffs identify and include named plaintiffs who have standing. Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u–4(a)(3)(B).

**8. Limitation of Actions ⬤100(11)**

Reasonable investors did not have inquiry notice of mortgage company's alleged systematic shift from sound underwriting, as required for statute of limitations to bar shareholders' Securities Act claims against mortgage company, company's officers, auditors and underwrit-

ers, although company was huge, closely watched company; analysts were shocked by revelations regarding underwriting practices. Securities Act of 1933, § 13, 15 U.S.C.A. § 77m.

**9. Limitation of Actions ⬤100(11)**

Where a market appears to have all the ordinary hallmarks of efficiency but a complaint still plausibly alleges the market was fooled, it is preposterous to argue at the pleadings stage that a "reasonable investor" should have been on inquiry notice for limitations purposes. Securities Act of 1933, § 13, 15 U.S.C.A. § 77m.

**10. Securities Regulation ⬤25.62(1)**

Disclosures in prospectuses from company's sale of mortgage-backed securities on private secondary market, which contained statistics about underlying mortgages, and which were on file with Securities and Exchange Commission (SEC) and publicly available, did not provide notice regarding mortgage company's systematic shift from sound underwriting, as required for company to assert truth on the market defense in shareholders' class action alleging securities violations against company and officers; company's market-based securities were complex instruments and prospectuses were very large documents. Securities Act of 1933, § 1 et seq., 15 U.S.C.A. § 77a et seq.

**11. Evidence ⬤48**

Court would take judicial notice in shareholders' securities action against mortgage company, company's officers, auditors and underwriters, of prospectuses from company's sale of mortgage-backed securities on private secondary market, which contained statistics about underlying mortgages, and which were on file with Securities and Exchange Commission (SEC) and publicly available. Securities Act of 1933, § 1 et seq., 15 U.S.C.A. § 77a et seq.

**12. Evidence ⬅47**

Court would take judicial notice in shareholders' securities action against mortgage company, company's officers, auditors and underwriters, of Securities and Exchange Commission (SEC) regulation governing disclosure of historical loan performance data in market-based securities prospectuses. 17 C.F.R. § 229.1100 et seq.

**13. Securities Regulation ⬅25.20(3)**

Investors' allegations in class action complaint that mortgage company underwent dramatic changes to core operations and underwriting that began in mid-2003, and that audit conclusions were incorporated into Securities and Exchange Commission (SEC) filings during class period were insufficient to allege that audit was materially false or misleading as required to state Securities Act claim against auditor; auditor completed company audit in early 2003 and did not perform any additional audits during class period. Securities Act of 1933, § 11, 15 U.S.C.A. § 77k.

**14. Securities Regulation ⬅25.18**

To state a claim for defective registration statement, a plaintiff must demonstrate (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment. Securities Act of 1933, § 11(b)(3), 15 U.S.C.A. § 77k(b)(3).

**15. Federal Civil Procedure ⬅636**
   **Securities Regulation ⬅25.65**

Securities Act claims are subject to ordinary notice pleading requirements unless the allegations sound in fraud. Securities Act of 1933, § 1 et seq., 15 U.S.C.A. § 77a et seq.; Fed.Rules Civ.Proc.Rules 8(a), 9(b), 28 U.S.C.A.

**16. Securities Regulation ⬅25.65**

In evaluating a Securities Act claim, a court must strip away the allegations that sound in fraud and see if the remaining allegations state a claim. Securities Act of 1933, § 1 et seq., 15 U.S.C.A. § 77a et seq.

**17. Federal Civil Procedure ⬅636**
   **Securities Regulation ⬅25.65**

Investors' class action complaint alleging unified course of abandoning sound underwriting practices by mortgage company, company's officers, underwriters and auditors, did not sound in fraud, and thus ordinary pleading requirements, rather than particularity requirements, applied to investors' Securities Act claims; only certain defendants were expressly alleged to act fraudulently, complaint specified unique, particularized facts as to those defendants, and particularized facts raised scienter inference as to those defendants, but not all. Securities Act of 1933, § 1 et seq., 15 U.S.C.A. § 77a et seq.; Fed.Rules Civ.Proc.Rules 8(a), 9(b), 28 U.S.C.A.

**18. Securities Regulation ⬅25.19**

Though initial and aftermarket buyers alike have standing for Securities Act violation concerning registration statement, aftermarket buyers face the additional task of tracing their purchase to the registration statement. Securities Act of 1933, § 11(a), 15 U.S.C.A. § 77k(a).

**19. Securities Regulation ⬅25.19**

Standing to allege Securities Act violation in registration statement is satisfied so long as the purchase can be traced to a registration statement containing, in any part, a false or misleading statement as of that part's effective date. Securities Act of 1933, § 11(a), 15 U.S.C.A. § 77k(a).

**20. Securities Regulation ⬅25.19**

Standing to allege Securities Act violation in registration statement is straightforward in a traditional issuance case,

where all the securities are issued under identical documentation and share a single effective date. Securities Act of 1933, § 11(a), 15 U.S.C.A. § 77k(a).

**21. Securities Regulation ⬅25.18**

Where there are continuous or serial offerings under a shelf registration, the registration statement for each issuance will comprise different pricing supplements and perhaps other documents, including Securities and Exchange Commission (SEC) filings made after the first issuance. Securities Act of 1933, § 2(a)(8), 15 U.S.C.A. § 77b(a)(8).

**22. Securities Regulation ⬅25.19**

If a registration statement that was not materially false or misleading at the first effective date becomes so, due to intervening events, by the second effective date, buyers that can trace their purchase to the second effective date have a claim for Securities Act violation regarding registration statement while those who can only trace their purchase to the first do not. Securities Act of 1933, § 6(a), 15 U.S.C.A. § 77f(a); 17 C.F.R. § 229.512(a)(2).

**23. Securities Regulation ⬅25.25**

Investors sufficiently alleged decline in investment value due to materially false or misleading information in registration statement, as required to state Securities Act claim against mortgage company and company's officers, by stating in class action complaint that they suffered economic loss in connection with purchase or sale of securities and providing schedule that identified their securities' purchase and sale dates, together with exact prices. Securities Act of 1933, § 11(e), 15 U.S.C.A. § 77k(e); Fed.Rules Civ.Proc.Rule 8(a)(2), 28 U.S.C.A.

**24. Securities Regulation ⬅25.25**

A plaintiff alleging Securities Act claims is required (1) to allege that he purchased the relevant securities, and (2) to allege facts creating the reasonable inference that the value of the securities on the presumptive damages date, that is, either the value at the time plaintiff sold the securities, or the value at the time of suit, if the plaintiff still holds the securities, is less than the purchase price. Securities Act of 1933, § 11(e), 15 U.S.C.A. § 77k(e).

**25. Federal Civil Procedure ⬅1831, 2511**

Because an analysis of causation is often fact-intensive, negative causation is generally established by a defendant in Securities Act action on a motion for summary judgment or at trial, rather than on a motion to dismiss. Securities Act of 1933, § 11(e), 15 U.S.C.A. § 77k(e).

**26. Securities Regulation ⬅25.21(5)**

Investors' class action securities complaint alleged at least fifty misleading statements or omissions over course of three years by mortgage company, company officers, underwriters and auditors and cited several examples of disclosures on or after date of public disclosure of new underwriting practices and subsequent decline in securities value, that allegedly corrected previous misstatements, and thus company, officers, underwriters and auditors could not assert loss causation defense. Securities Act of 1933, § 11(e), 15 U.S.C.A. § 77k(e).

**27. Accountants ⬅8**

"Generally accepted accounting principles (GAAP)" are the standard metric by which courts determine whether accounting statements are false or misleading; GAAP is not a single-source accounting rulebook, but rather the conventions, rules, and procedures that define accepted accounting practice at a particular point in time.

See publication Words and Phrases for other judicial constructions and definitions.

**28. Securities Regulation ⇔25.25**

Investors' allegations in class action complaint that as loan sales decreased, value of mortgage company's mortgage servicing rights continued to increase misapprehended nature of mortgage servicing rights, and thus failed to state claim against mortgage company and officers under Securities Act.  Securities Act of 1933, § 11, 15 U.S.C.A. § 77k.

**29. Securities Regulation ⇔25.18**

Mortgage company's statements that loans it kept on balance sheet were "very prime" were false and misleading in light of company's internal definition of "prime," as required for investors to state Securities Act claim against mortgage company and officers.  Securities Act of 1933, § 11, 15 U.S.C.A. § 77k.

**30. Securities Regulation ⇔25.18**

Investors' allegations in class action complaint that mortgage company's representations and warranties were understated were sufficient to state claim against mortgage company and officers under Securities Act.  Securities Act of 1933, § 11, 15 U.S.C.A. § 77k.

**31. Securities Regulation ⇔25.18**

Investors' allegations in class action complaint that mortgage company's retained interest values increased during class period, despite reduced quality of company's loans failed to state claim against mortgage company and officers under Securities Act.  Securities Act of 1933, § 11, 15 U.S.C.A. § 77k.

**32. Securities Regulation ⇔25.18**

Investors' allegations in class action complaint that mortgage company had sufficient internal controls, but that mechanisms were used to avoid deteriorating underwriting guidelines were sufficient to state claim against mortgage company and officers under Securities Act.  Securities Act of 1933, § 11, 15 U.S.C.A. § 77k.

**33. Securities Regulation ⇔25.18**

Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.

**34. Evidence ⇔20(1)**

Court would not take judicial notice in investors' securities regulation class action against mortgage company, company's officers, auditors, and underwriters, of American Institute of Certified Public Accountants (AICPA) interpretation of Financial Accounting Standards No. 5 (FAS 5).

**35. Securities Regulation ⇔25.25**

Investors' allegations in class action complaint that mortgage company's balance sheet items changed dramatically between Securities and Exchange Commission (SEC) forms were insufficient to infer falsity, as required to state claim against mortgage company and officers under Securities Act.  Securities Act of 1933, § 11, 15 U.S.C.A. § 77k.

**36. Securities Regulation ⇔25.18**

Investors' allegations in class action complaint that mortgage company's statements about "solid" quarters, "strong" revenues, or "impressive results" in Securities and Exchange Commission (SEC) forms were false or misleading failed to state claim under Securities Act.  Securities Act of 1933, § 11, 15 U.S.C.A. § 77k.

**37. Securities Regulation ⇔25.25**

Investors' allegations in class action complaint that mortgage company's practices were completely transformed compared to earlier practices, that negative amortization increased and delinquencies increased, were sufficient to allow inference that accounting-related statements were false when made, as required to state claim under Securities Act against mortgage company, officers and outside auditors.  Securities Act of 1933, § 11, 15 U.S.C.A. § 77k.

**38. Securities Regulation ⟺25.21(4)**

Underwriters' reliance on auditor's and mortgage company's false or misleading accounting-related statements incorporated in registration statements was not unreasonable, and thus underwriters could assert due diligence defense to investors' Securities Act claim. Securities Act of 1933, § 11(b)(3), 15 U.S.C.A. § 77k(b)(3).

**39. Securities Regulation ⟺25.62(1), 25.65**

Presumptive damages for inclusion of untrue statement of material fact in prospectus are not limited to those caused by the violation and loss causation is not an element that a plaintiff needs to allege; some cognizable loss, however, must be alleged. Securities Act of 1933, § 12(a), 15 U.S.C.A. § 77l(a).

**40. Securities Regulation ⟺25.61(1, 2)**

The "offers or sells" clause limits liability for inclusion of untrue statement of material fact in prospectus to two narrow classes of defendants: (1) immediate sellers; and (2) those who solicit purchases to serve their own financial interests or those of the securities owner. Securities Act of 1933, § 12(a)(2), 15 U.S.C.A. § 77l(a)(2).

**41. Securities Regulation ⟺25.56**

The elements of a violation of prohibition against inclusion of untrue statement of material fact in prospectus are: (1) a direct offer or sale of a security to the plaintiff, (2) in interstate commerce, (3) by means of a prospectus or oral communication, (4) that includes a material misstatement or omission, and (5) an allegation of some loss, where the face of the complaint and judicially noticeable facts do not conclusively negate loss or loss causation. Securities Act of 1933, § 12(a)(2), 15 U.S.C.A. § 77l(a)(2).

**42. Securities Regulation ⟺11.19**

The section of Securities Act governing liability of controlling parties creates joint and several liability for control persons after a primary securities violation is found. Securities Act of 1933, § 15, 15 U.S.C.A. § 77o.

**43. Securities Regulation ⟺11.50**

Whether a defendant is a control person under Securities Act is a fact question rarely appropriate for motion practice. Securities Act of 1933, § 15, 15 U.S.C.A. § 77o.

**44. Securities Regulation ⟺11.19**

Investors' allegations in class action complaint that mortgage company's Securities and Exchange Commission (SEC) filings were either false or materially misleading in that they failed to contain facts permitting inference that company systematically departed from underwriting standards were sufficient to state claims against mortgage company officers as control persons under Securities Act. Securities Act of 1933, § 15, 15 U.S.C.A. § 77o.

**45. Securities Regulation ⟺60.18, 60.37**

After standing for a securities fraud claim is established, by a purchase or sale of a security, a plaintiff must prove the following elements in connection with the purchase or sale: (1) a material (2) misrepresentation or omission (3) made with scienter (4) on which plaintiff relied, (5) suffering an economic loss (6) caused by the misrepresentation or omission. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**46. Securities Regulation ⟺60.37**

Standing to bring securities fraud claim under Securities Exchange Act does not require a common registration statement, but instead a purchase or sale in connection with any security. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5; Securities Act of 1933, § 11(a), 15 U.S.C.A. § 77k(a).

**1138**        **588 FEDERAL SUPPLEMENT, 2d SERIES**

**47. Securities Regulation ⟺60.37**

Investors purchased each relevant security in securities fraud action against mortgage company and its officers, as required for investors to have standing to state claim against company and officers under Securities Exchange Act.  Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**48. Federal Civil Procedure ⟺636**
    **Securities Regulation ⟺60.51(1)**

For purposes of securities fraud claim, materiality must be pled with particularity.  Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5;  Fed.Rules  Civ.Proc.Rule 9(b),  28 U.S.C.A.; Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u–4(b).

**49. Securities Regulation ⟺60.45(1)**

False or misleading statements or omissions often help lead to an inference of scienter for purposes of a securities fraud claim.  Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**50. Securities Regulation ⟺60.45(1)**

Knowing or intentional conduct satisfies the required state of mind to find scienter in securities fraud action.  Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5; Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u–4(b)(2).

**51. Securities Regulation ⟺60.51(2)**

Though omissions and ambiguities count against inferring scienter, in a securities fraud action, failing to precisely specify each fact and date is not fatal.  Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u–4(b)(2).

**52. Securities Regulation ⟺60.51(2)**

The Private Securities Litigation Reform Act (PSLRA) neither prohibits nor endorses the pleading of insider trading as evidence of scienter, but requires that the evidence, like all other evidence, meet the strong inference standard.  Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u–4(b)(2).

**53. Securities Regulation ⟺60.51(2)**

One key inquiry when determining whether insider sales amounts to scienter under Private Securities Litigation Reform Act (PSLRA) is whether the insiders' sales of stock are suspicious, namely, whether they are dramatically out of line with prior trading practices at times calculated to maximize personal benefit from undisclosed inside information.  Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u–4(b)(2).

**54. Securities Regulation ⟺60.51(2)**

In some circumstances it is appropriate to use a defendant's position and responsibilities within the company to support a strong inference of scienter for securities fraud; this is especially appropriate when the alleged misrepresentations relate to a company's core operations.  Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u–4(b)(2).

**55. Securities Regulation ⟺60.27(6)**

Investors' allegations in class action complaint that company's statements regarding underwriting standards, including statements in Securities and Exchange Commission (SEC) filings that company's proprietary underwriting systems improved consistency of underwriting standards, were false, were sufficient to state securities fraud claim against mortgage company.  Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**56. Securities Regulation ⇐60.51(2)**

Investors' allegations in class action complaint regarding mortgage company's chairman and chief executive officer's understanding of company's day-to-day operations, including his self-proclaimed "hands on" approach, his long career with company, and detailed loan and exception statistics, supported inference that officer intended his statements to mislead market during entire class period, as required to state securities fraud claim. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**57. Securities Regulation ⇐60.27(5)**

Statements made by mortgage company's chairman, that company would never "sacrifice sound lending" for 30 percent market share, were not forward looking statements protected by safe harbor provision in Private Securities Litigation Reform Act (PSLRA), in investors' securities fraud class action against company and officers; there were particularized allegations that unsound business practices had already been undertaken at time statement was made, making chairman's statement false when made. Securities Exchange Act of 1934, § 21E(i)(1), 15 U.S.C.A. § 78u–5(i)(1).

**58. Securities Regulation ⇐60.51(2)**

Investors' allegations in class action complaint that executive director at mortgage company created and oversaw exception processing system used for loans originated in-house, and that director received numerous reports detailing company's approval of exceptions, along with director's job positions, duties, and access to corporate reports and information systems gave rise to strong inference of scienter, as required to state securities fraud claim against director. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**59. Securities Regulation ⇐60.51(2)**

Investors' allegations in class action complaint that president and chief operating officer made statements that mortgage company's strategy was the same, that company's pay-option adjustable rate mortgage loans all had high credit scores, and that company had not loosened standards, while company was deviating from underwriting practices, were sufficient to raise inference of scienter for time officer was employed by company, as required to state securities fraud claim against officer. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**60. Securities Regulation ⇐60.51(2)**

Investors' allegations in class action complaint that executive managing director and chief financial officer was directly responsible for mortgage company's financials, which depended on company's operations, and that officer stated that company was not changing protocol relative to volume of loans, while company deviated from previous underwriting standards, were sufficient to raise inference of scienter, as required for securities fraud claim against officer. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**61. Securities Regulation ⇐60.51(2)**

Investors' allegation in class action complaint that mortgage company's external auditor made false or misleading statements in audit certifications and accounting reports or was negligent in failing to discover that mortgage company's practices had changed so dramatically that historical data was of limited use, were insufficient to infer deliberate recklessness, as required to state securities fraud claim against auditor. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**62. Securities Regulation ⊜60.51(2)**

The "red flag" doctrine guides the generally accepted accounting principles (GAAP) and generally accepted auditing standard (GAAS) inquiries in a securities fraud action: the more facts alleged that should have caused a reasonable auditor to investigate further before making a representation, the more cogent and compelling a scienter inference becomes. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**63. Securities Regulation ⊜60.51(2)**

As with any alleged misrepresentation, generally accepted accounting principle (GAAP) violations should generally be more than minor or technical in nature and constitute widespread and significant inflation to contribute to a strong inference of scienter for purposes of securities fraud action. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**64. Securities Regulation ⊜60.51(2)**

Alleging a poor audit is not equivalent to alleging an intent to deceive for purposes of securities fraud claim. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**65. Securities Regulation ⊜60.48(3)**

Investors' allegations in class action complaint that there were specific correlations between mortgage company's common stock and some debt instruments invested in, suggesting that market for some debt was relatively efficient, were sufficient to establish reliance through fraud-on-the-market presumption, as required to state securities fraud claims against company and officers. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5; Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u–4(b); Fed.Rules Civ.Proc. Rule 9(b), 28 U.S.C.A.

**66. Federal Civil Procedure ⊜636**

Investors quantified economic loss from mortgage company's alleged fraud through exhibits to class action complaint, including transaction schedule and historical common stock prices, and thus investors' pled loss with particularity, as required to state securities fraud claim against company and officers. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**67. Securities Regulation ⊜60.47**

For purposes of a securities fraud claim, loss causation is simply a causal connection between the material misrepresentation and the loss. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**68. Securities Regulation ⊜60.51(1)**

For purposes of a securities fraud claim, pleading loss causation generally should not prove burdensome for a plaintiff that actually suffered economic harm in connection with the purchase or sale of a security. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**69. Securities Regulation ⊜60.51(1)**

To satisfy requirement to plead loss causation in a securities fraud claim, a plaintiff must allege a mispricing caused by the securities violation, followed by a subsequent price correction caused when the market appreciated, or began to appreciate, the truth; otherwise, the alleged violations cannot have proximately caused whatever loss the plaintiff suffered. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**70. Federal Civil Procedure ⊜636**

Investors' allegations in class action complaint that price of mortgage company's securities dropped as disclosures re-

garding underwriting practices accumulated, and that most corrective disclosures correlated tightly with declines, were sufficient to plead loss causation with particularity, as required to state securities fraud claim against company and officers.  Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**71. Securities Regulation ⟺60.47**

Mortgage company's president resigned prior to first alleged disclosures regarding company's underwriting practices and decline in price of securities, and thus investors' allegations in class action complaint that price of mortgage company's securities dropped as disclosures accumulated were insufficient to plead loss causation, as required to state securities fraud claim against president.  Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5; Fed.Rules Civ.Proc.Rule 8(a)(2), 28 U.S.C.A.

**72. Securities Regulation ⟺60.51(1)**

Although the circumstances of the primary violators' fraud must be pled with particularity under federal rules and the Private Securities Litigation Reform Act (PSLRA), the control element is not a circumstance that constitutes fraud and therefore need not be pled with particularity.  Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u–4; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**73. Securities Regulation ⟺60.28(2.1)**

Insider trading is actionable under the Securities Exchange Act on two theories: (1) the traditional or classical theory that insiders have a duty to disclose or abstain from trading because of the necessity of preventing a corporate insider from taking unfair advantage of uninformed stockholders, and (2) a misappropriation theory that a person commits fraud when he misappropriates confidential information in breach of a duty of confidence.  Securities

Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**74. Securities Regulation ⟺60.45(1), 60.47**

Scienter and loss causation for insider trading requires that the insider actually use the inside information in deciding to make the trade.  Securities Exchange Act of 1934, § 20A(a), 15 U.S.C.A. § 78t–1(a).

**75. Securities Regulation ⟺60.28(4)**

Investors' allegations in class action complaint that mortgage company's officers possessed material, non-public information regarding true state of company's operations, about which officers intentionally misled markets, and that officers initiated securities transactions before disclosures, were sufficient to state claim for insider trading against officers.  Securities Exchange Act of 1934, § 20A(a), 15 U.S.C.A. § 78t–1(a).

**76. Federal Civil Procedure ⟺636**

Contemporaneous trading in securities fraud action must be pleaded with particularity.  Securities Exchange Act of 1934, § 20A(a), 15 U.S.C.A. § 78t–1(a); Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**77. Federal Civil Procedure ⟺636**

Under the contemporaneousness rule, in order to plead insider actively traded security with requisite particularity, plaintiffs must allege that they traded on the other side of an insider's transaction and plead facts showing they traded the same class of security on the same trading day, or one trading day after, the insider's transaction.  Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.; Securities Exchange Act of 1934, § 20A(a), 15 U.S.C.A. § 78t–1(a).

**78. Federal Civil Procedure ⟺636**

Common stock transactions listed in exhibit attached to investors' class action complaint, which listed mortgage company officers' sales of securities next to contemporaneous class representatives purchases,

were sufficient to allege insider trading claims against officers with particularity, as required to state insider trading claim against officers.  Securities Exchange Act of 1934, § 20A(a), 15 U.S.C.A. § 78t–1(a).

—————

### OMNIBUS ORDER ON DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT AND ALL PENDING REQUESTS FOR JUDICIAL NOTICE

MARIANA R. PFAELZER, District Judge.

### INTRODUCTION

This Court has consolidated numerous securities actions related to Countrywide Financial Corporation ("Countrywide") [1] into three cases pending before it.[2]  The present case involves publicly traded equity securities and publicly traded, unsecured debt instruments that Countrywide used to raise capital from investors.

On August 14, 2007, George Pappas, on behalf of himself and all others similarly situated, filed suit against Countrywide and several individuals alleging securities law violations.  On November 28, 2007, this Court consolidated the *Pappas* action with several other cases involving publicly traded Countrywide securities.  The Court designated New York Funds ("NY Funds")[3] as lead plaintiffs.  In this Order, "Plaintiffs" refers to all the named plaintiffs in this consolidated case; "NY Funds" is used when referring to the lead plaintiffs in particular.

Plaintiffs filed a 416–page Consolidated Amended Class Action Complaint ("CAC") on April 14, 2008.  The CAC's proposed class period spans the nearly 4 years between March 12, 2004 and March 7, 2008.  The CAC contains 21 claims and names 50 defendants.  Defendants now move to dismiss.

The Court feels obliged to issue this comprehensive—and regrettably long—Order to establish much of the law of the case, narrow the issues, and discourage some of the parties' more tenuous arguments.[4]  This document shall guide the

---

**1.**  On July 1, 2008, Countrywide completed a forward triangular merger into a subsidiary of Bank of America ("BofA") called Red Oak Merger Corporation ("Red Oak").  To effect the merger, Countrywide shareholders received shares of BofA in exchange for their Countrywide shares.  Red Oak was then renamed Countrywide Financial Corporation.  Countrywide Fin. Corp., Form 10–Q (Aug. 11, 2008).  The merger postdates the class period and the allegations in the complaint.  Therefore, "Countrywide" as used in this Order refers to the entity as constituted before the merger (and, where applicable, its subsidiaries or affiliates).

**2.**  The other two cases are *In re Countrywide Fin. Corp. Deriv. Litig.*, 2:07–CV–06923–MRP, and *Argent Classic Convertible Arbitrage Fund L.P. v. Countrywide Fin. Corp.*, 2:07–CV–07097–MRP.

The *Derivative Litigation* case comprises derivative claims by Countrywide shareholders before the BofA merger.  *Argent* involves nonpublicly traded debt instruments that Coun-

trywide used to raise capital from qualified institutional buyers.  The Court kept *Argent* a separate case because it anticipated that reliance issues in the private placement market—the fraud on the market presumption and actual reliance—would raise unique issues.  Consol. Order 12–13 (Nov. 28, 2007).

Judge John F. Walter of this District is presiding over the ERISA claims against Countrywide.  *Alvidres v. Countrywide*, 2:07–CV–5810–JFW (C.D.Cal.).

**3.**  "New York Funds" refers to Thomas P. DiNapoli, Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement Systems, as Trustee of the New York State Common Retirement Fund, and as Trustee of the New York City Pension Funds.

**4.**  To "discourage" is not to "preclude."  The Court does not intend to tell the parties how to litigate their case; it only intends to manage and streamline this litigation.

parties and save the Court detailed expositions in future orders.

For reasons explained below, the motions are granted in part and denied in part. The Conclusion section of this Order summarizes which claims are dismissed.

## TABLE OF CONTENTS

OVERVIEW OF ALLEGATIONS AND CLAIMS..................................1144
  A.  Overview of allegations about Countrywide's core business .................1145
      i.  Countrywide changes strategy ......................................1145
      ii.  How Countrywide's core mortgage-related operations affect
          investment value .................................................1151
      iii.  Examples of allegedly false statements ............................1153
  B.  Overview of claims and defendants ......................................1154

LEGAL ANALYSIS ........................................................1156
  A.  Rule 8(a) .............................................................1156
  B.  Issues common to the '33 and '34 Act claims ............................1157
      i.  Standing ..........................................................1157
      ii.  Statute of limitations..............................................1159
      iii.  Truth on the market ...............................................1159
      iv.  Grant Thornton's involvement .....................................1160
  C.  '33 Act Claims .......................................................1162
      i.  Section 11 .........................................................1162
          1.  "Sounds in fraud" ..........................................1162
          2.  Section 11 standing .........................................1164
          3.  Loss .......................................................1167
          4.  Loss causation..............................................1170
          5.  Market forces and causation.................................1173
          6.  Falsity .....................................................1174
      ii.  Section 12(a)(2).....................................................1182
      iii.  Section 15 .........................................................1183
  D.  '34 Act Claims .......................................................1184
      i.  Section 10(b) ......................................................1184
          1.  Standing ....................................................1184
          2.  Materiality ..................................................1185
          3.  Falsity & scienter ...........................................1185
              a.    Countrywide ........................................1192
              b.    Angelo Mozilo ......................................1192
              c.    David Sambol .......................................1194
              d.    Stanford Kurland ...................................1195
              e.    Eric Sieracki .......................................1196
              f.    KPMG .............................................1197
          4.  Reliance ....................................................1198
          5.  Loss .......................................................1199
          6.  Loss causation..............................................1200
      ii.  Section 20(a) ......................................................1201
      iii.  Section 20A ........................................................1202

CONCLUSION ............................................................1205

## I.

### OVERVIEW OF ALLEGATIONS AND CLAIMS

The Court first summarizes Plaintiffs' basic allegations and states the general nature of their legal claims. Specific additional allegations are discussed as relevant in the legal analysis section (Section II).

While the facts of this case are inextricably intertwined with the mortgage-backed securities ("MBS") that Countrywide sold to investment banks and other sophisticated investors, none of the actions before this Court are based on MBS purchases. Rather, the present case is brought on behalf of those who invested in Countrywide's business. The investments' values depend in great part on the soundness of Countrywide's core mortgage-related operations. These operations include originating mortgages, purchasing mortgages from other originators, servicing mortgages, investing in mortgages, and packaging mortgages into MBS for resale.[5] Core mortgage-related operations accounted for the vast majority of Countrywide's earnings during the class period—93% of fiscal year ("FY") 2006 pretax earnings. *See* ¶¶ 82–83.[6]

As explained in the legal analysis, the federal securities laws deal with false or misleading statements in connection with investments. The federal securities laws

do not create liability for poor business judgment or failed operations. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). Nor do the laws require public companies to disclose every change in operations. But the CAC's allegations present the extraordinary case where a company's essential operations were so at odds with the company's public statements that many statements that would not be actionable in the vast majority of cases are rendered cognizable to the securities laws.

For example, descriptions such as "high quality" are generally not actionable; they are vague and subjective puffery not capable of being material as a matter of law. On an individual level, this is because a reasonable person would not rely on such descriptions; on a macro scale, the statements will have little price effect because the market will discount them. *See Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Svc. Inc.*, 911 F.2d 242, 245–46 (9th Cir.1990) (collecting and discussing puffery cases, including securities cases). However, the CAC adequately alleges that Countrywide's practices so departed from its public statements that even "high quality" became materially false or misleading; and that to apply the puffery rule to such allegations would deny that "high quality" has any meaning.[7]

---

**5.** Approximately 96% of Countrywide's mortgages were packaged into MBS. Hearing Tr. at 22:11 (statement of counsel for Countrywide); Countrywide, Form 10–K at 2 (2004); Form 10–K at 93 (2005); Form 10–K at 101 (2006).

**6.** All paragraph citations refer to the CAC.

**7.** *Cf. In re Dura Pharm., Inc. Sec. Litig.*, 452 F.Supp.2d 1005, 1033 (S.D.Cal.2006) (because "the facts alleged … lead to a strong inference there was no reasonable basis for believing such statements to be true … the

puffery rule does not insulate Defendants from liability" under the securities laws); *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 282 (3d Cir.1992), *cert. denied*, 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992) ("[W]here a defendant affirmatively characterizes management practices as 'adequate,' 'conservative,' 'cautious,' and the like, the subject is 'in play.' For example, if a defendant represents that its lending practices are 'conservative' … the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting these representations.").

IN RE COUNTRYWIDE FINANCIAL CORP. SEC. LITIGATION   **1145**
Cite as 588 F.Supp.2d 1132 (C.D.Cal. 2008)

Thus, to understand Plaintiffs' claims, one must first understand the facts Plaintiffs allege about Countrywide's core operations.

## A. Overview of allegations about Countrywide's core business

*Legal standard.* A motion to dismiss tests whether the allegations in a complaint, if true, amount to an actionable claim. *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir.2001). In evaluating a motion to dismiss under Fed.R.Civ.P. 12(b)(6), a court must accept as true all allegations of material fact in the complaint and read the complaint in the light most favorable to the nonmoving party. *Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir.2001); *Parks Sch. of Bus., Inc. v. Symington,* 51 F.3d 1480, 1484 (9th Cir.1995). However, a court need not accept as true unreasonable inferences; nor need it accept legal conclusions cast in the form of factual allegations. *Sprewell,* 266 F.3d at 988. A court reads the complaint as a whole, together with matters appropriate for judicial notice, rather than isolating allegations and taking them out of context. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499, 2509, 168 L.Ed.2d 179 (2007). Dismissal is appropriate only where a complaint fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007).

**[1]** Accordingly, the discussion below provides an overview of some key facts that Plaintiffs allege, stated in the light most favorable to the Plaintiffs.[8]

### i. Countrywide changes strategy

"In or about mid–2003," the CAC alleges, Countrywide began a systematic shift from its traditional mortgage business. ¶ 3.

**[2]** *Underwriting practices.* From mid–2003 onward, Countrywide continually loosened its underwriting guidelines to the point of nearly abandoning them by 2006. Countrywide's highest-level managers authored official documents—underwriting matrices and guidelines—such as those for Countrywide's Corresponding Lending Division ("CLD") that memorialized Countrywide's systematically lowered lending standards. ¶¶ 127, 149–52, 154. Numerous Confidential Witnesses ("CWs") from different levels and involved in different aspects of the company corroborate the nature of Countrywide's strategy shift.[9] *See, e.g.,* ¶¶ 155–57. The CAC and CWs identify specific documents and their dates. ¶¶ 130–47 (alleging underwriting matrix updates from January 2004 to March 2006), 155–57 (CWs alleging dramatic changes in practices during 2005 and 2006).

Chairman and CEO Angelo Mozilo's stated goal was to gain 30% market share. ¶ 405. To do so, he and other high-ranking executives at Countrywide ordered many of the lowered standards. *See, e.g.,* ¶¶ 405, 419.

---

8. The Public Securities Litigation Reform Act ("PSLRA") heightens the standard for pleading fraud claims. For fraud, a court must balance competing inferences in evaluating the facts underlying falsity and scienter. *Tellabs, Inc.,* 551 U.S. 308, 127 S.Ct. 2499. That balancing takes place in Section II.D, which addresses fraud. The present Section recites the allegations according to the ordinary motion to dismiss standard.

9. "Where plaintiffs rely on both confidential witnesses and on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false." *In re Daou Sys.,* 411 F.3d 1006, 1015 (9th Cir.2005) (internal quotations and citation omitted).

Nothing alleged thus far amounts to a securities violation. The claims arise because, throughout the class period, Countrywide officers publicly denied that underwriting standards had deteriorated. Countrywide officers expressly said they would not lower underwriting standards in service of the market share goal. *See, e.g.,* ¶¶ 122, 237, 253, 403, 690, 731, 803–05.

Underwriting standards changed so much during the class period that, in December 2007, Countrywide told reporters that billions of dollars of loans in 2005 and 2006 could not have been made under "new" guidelines. Those "new" guidelines actually represented Countrywide's pre-class period guidelines. ¶ 32. Countrywide revealed that 89% ($64 bn.) of its 2006 pay-option ARMs would not have been approved under the new-old guidelines; nor would 83% ($74 bn.) of its 2005 pay-option ARMs. *Id.* Pay-option ARMs, explained below, are one of the riskiest classes of loans.[10]

*"Subprime."* Countrywide also employed a misleading definition of "subprime."

¶¶ 5–6. The definition was known internally but not disclosed to the public until 2007. ¶ 10. Thus, the CAC alleges, Countrywide's public statements about its "subprime" operations were inherently misleading to investors.

Countrywide, and most lenders, use a credit score system called "FICO." Named for the system's creator, Fair Isaac Credit Organization, FICO refers to a method for calculating a borrower's credit worthiness. FICO's workings are largely proprietary, but based on the information in a credit bureau's files—e.g., credit card usage and payment history, other revolving loan history, installment loan history, previous bankruptcy, judgments, and liens—FICO returns a score between 300 and 800. CAC at 45 n. 6. The higher the score, the more creditworthy the borrower; the more creditworthy the borrower, the less likely the borrower is to default.

Though "subprime" has no universal definition, the CAC adequately alleges that industry custom regarded 660 as the prime-subprime dividing line. ¶¶ 217–20,

---

**10.** Countrywide Defendants quibble with some portions of the CAC's narrative, especially the underwriting matrices' relevance. First, Countrywide Defendants note that the matrices only apply to the Correspondent Lending Division ("CLD"), which purchases loans originated by third parties and does not originate its own loans. Therefore, Countrywide Defendants argue, the matrices merely "address the loan origination practices of . . . third parties" that have nothing to do with Countrywide's underwriting standards. Countrywide Defs.' Mot. at 21. But Plaintiffs label this a distinction without a difference, and the Court agrees: it would make little sense for Countrywide to maintain looser standards for loans that it paid for than for loans originated in-house. What is more, Plaintiffs' detailed account of weakened underwriting standards in one division, CLD, is also (1) strongly corroborated by the other confidential witnesses positioned throughout the company and (2) allegedly originated from a central corporate office that wrote

matrices and guidelines "for all Countrywide divisions that originated and purchased loans." ¶ 149.

Under *Tellabs,* the Court reads the entire complaint as a whole, but Countrywide Defendants would have the Court evaluate the matrices outside the context of other, non-CLD-related allegations. Such a reading violates clear Supreme Court case law.

Countrywide Defendants also state that the matrices only apply to first-lien subprime loans and therefore the matrices "do not reflect overall CLD guidelines." Countrywide Defs.' Mot. to Dismiss at 21. Plaintiffs protest that this raises facts outside their Complaint. Even if Defendants' assertion were considered, however, it is unclear why the probative value of those documents would be diminished. *See* Pls.' Opp'n at 17 n. 12 ("Defendants do not, and cannot, assert that lending guidelines were not loosened in corresponding fashion for these unspecified other loans CLD purchased.").

232. Further, the U.S. median score is 720. ¶ 215. The dispersion is such that only 27% of the population has a score below 650 and 15% of the population scores below 600. *Id.*

Countrywide internally used 620 to mark the subprime line.[11] *See, e.g.,* ¶¶ 177, 192, 223, 226. According to two CWs—one a manager in Full Spectrum Lending ("FSL"), Countrywide's loan origination and purchasing division, and the other a loan originator who worked in a branch that only underwrote "prime" loans—some loans to borrowers with scores as low as 500 were classified as "prime." ¶ 164, 170, 221, 223, 226. Countrywide revealed its internal deviation from the industry norm to the public in a July 24, 2007 conference call. ¶ 231 (Countrywide's Chief Risk Officer disclosing and defending Countrywide's classification system and suggesting that Countrywide classified borrowers "with FICOs in the low 500s" as "prime"). Some analysts expressed shock. ¶¶ 232–34. Countrywide's stock price fell that day. ¶ 944.

As Countrywide lowered standards, borrowers with lower FICO scores could take out larger loans (in absolute-dollar terms) with higher loan-to-value ratios. ¶¶ 141–46. The loan-to-value ratio measures the amount owed on the loan against the appraised value of the home. A higher ratio indicates higher risk because the more owed relative to the home's value, the less likely a borrower can (or has strong enough incentives to) pay off the loan.

More to the point from a lienholder's perspective: in the event of foreclosure, it becomes less likely the lienholder can recover the loan net of foreclosure expenses.

*Exception loans.* Countrywide often waived even its weakened standards, routinely approving loans that fell well outside its guidelines. ¶ 5. Its goal was to "[a]pprove virtually every borrower and loan profile with pricing add on [sic] when necessary." ¶¶ 5, 176. These exceptions made Countrywide's public disclosures even more misleading insofar as they stated information regarding loan types and its customers' credit quality.

One common practice for loans that Countrywide originated in-house involved a computer system called the Exception Processing System ("EPS"). ¶ 175. EPS was created and overseen by one of Countrywide's longest-serving officers and directors, David Sambol. ¶ 178.

High-risk loans that did not meet the stated underwriting matrices could be originated using the EPS. A loan officer would "enter a customer's FICO score, loan amount, property value used as collateral, and a description of the client's situation" into the EPS. *Id.* CW9, a retail underwriter in the branch that was "the 'top grossing' branch in the nation, closing more than $2 billion in loans during its highest-producing year," alleges that exception loans "including loans in the 500 FICO range, would be approved as 'prime loans.'" ¶¶ 170, 223.

**11.** Again, only 27% of the population has a score below 650 and 15% of the population scores below 600. ¶ 215. Where "prime" and "subprime" refer to the borrowers—that is, where they define relative creditworthiness of a buyer as revealed by his credit history—then it becomes difficult to believe that a fraction of the population *significantly smaller* than the bottom 1/3 would not be "subprime."

However, both CAC and Countrywide use "prime" and "subprime" to describe the over-

all quality of a loan as well as a borrower's personal credit history. Where "subprime" describes the overall loan, rather than just the borrower's credit worthiness, additional factors may be able to outweigh a low FICO score to make "prime" not misleading, at least assuming reasonable investors and the market would have this understanding. On this motion to dismiss, Plaintiffs have the benefit of the inference that "subprime" applies to borrowers' creditworthiness.

CW9 further alleges that "approximately 80%" of loans at his branch went into the EPS. ¶ 179. In the office of CW10, a loan originator, 15–20% of each day's originations were processed by the EPS. *Id.;* ¶ 173. During parts of the class period, CW12 reports that Countrywide processed between 15,000 and 20,000 loans per month through EPS. *Id.* Whatever the absolute numbers, exception loans made up significant portions of Countrywide's loan originations even early in the class period. *See, e.g.,* ¶ 193 (internal document reporting that exception loans made up 15–40% of loans coming into FSL from various Countrywide divisions).

Loans put into EPS were sent to Countrywide's central corporate underwriting offices, known as the ("Structured Loan Desks") ("SLDs"). Countrywide set up an incentive system that encouraged the SLDs to approve as many loans as possible.[12] ¶¶ 183–85. One SLD allegedly had a stated policy of keeping its decline rate at 1%. ¶ 185. Low decline rates were allegedly imposed on the SLD managers by the highest level officers and directors. *See, e.g.,* ¶ 410, 423.

Rather than a risk management system, EPS was a tool for generating higher fees for Countrywide and enabling the company to gain market share. ¶ 182. Loans processed through EPS were priced with risk-based "add-ons" (additional fees and mark-ups meant to compensate for risk)

using a system called "Price Any Loan." ¶¶ 182–83. Countrywide's internal philosophy, the CAC alleges, was that no loan was too risky to be out of the question. *See, e.g.,* ¶¶ 183 and 192. David Sambol's "mantra . . . was that 'Countrywide will make every loan possible.' " ¶ 419.

The highest-placed people in the company, including Mozilo and Sambol, monitored the EPS exceptions closely and acted on EPS reports. These and other top executives knew the exception rates and revised underwriting guidelines downward in response to EPS reports. ¶¶ 405, 412–29.[13] Reports to the executives, including EPS reports, were detailed and broke down exceptions by, for example, branch and region. ¶¶ 420–27.

Countrywide did not originate all the loans it serviced or packaged into MBS. It also bought loans from other subprime lenders. ¶ 190. Approximately 1–10% of these purchased loans were audited. ¶¶ 190, 335. If the audit showed that the loans failed Countrywide's "underwriting guidelines, the guidelines would be 'tweaked' midstream in order to get the package to conform by processing the loans as exceptions through" a computer system similar to EPS, called the "GEMS exception module." ¶ 190.

*Appraisals.* One Countrywide insider, Mark Zachary, states that in September 2006 he "informed Countrywide executives

---

**12.** There is absolutely nothing improper about a strong incentive structure on its own. Rather, it is to be expected and perhaps encouraged in most industries.

However, extraordinary incentives may corroborate sound allegations that are based on independent allegations. For example, the CAC's incentive-related allegations bolster inferences that (1) there was a widespread push from the top to abandon sound risk management; (2) a high volume of exception loans were processed; and (3) even raw data entered by loan officers into Countrywide's com-

puter systems was falsified more than the market would expect.

**13.** David Farrell, Senior Vice President of CLD sent an email on December 4, 2003 to two distribution lists within the company. ¶ 127. The email explained that Countrywide had lowered its underwriting guidelines to "incorporate a wider range of credit scores" while "increasing loan amounts." ¶¶ 127–28. The "bottom line," Farrell wrote, was that "we expanded our guidelines in order to allow more loans to be approved without requiring an exception approval." ¶ 128.

that there was a problem with appraisals" on one of Countrywide's joint ventures. ¶ 194. He alleges specific dates when he reported to Countrywide's board and states that the board "knew that appraisers were strongly encouraged to inflate appraisal values by as much as 6% to allow homeowners to 'roll up' [into their mortgage] all closing costs." *Id.*

Rolling-up makes it easier to sell a home, but can result in the borrower owing more than the home is worth—even before a housing market shift or negative amortization. ¶ 195. If not limited to the joint venture—the CAC does not say how substantial the venture was—more widespread, and accounting for a higher percentage of stated values than perhaps known to the market, then faulty appraisal practices make assessing the value and quality of Countrywide's loans and MBS more difficult.

Further, CW8 (an FSL manager) alleges that, "until at least mid–2005 . . . all of Countrywide's origination divisions" allowed loan officers to "hire appraisers of their own choosing" and then "discard appraisals that did not support loan transactions, and substitute more favorable appraisals . . . to obtain a more favorable loan to value ratio so that the loan would 'qualify' for approval." ¶ 205.

*Documentation practices.* In "stated-income," "stated-asset," or "no-doc" loans, the borrower simply asserts his income (or assets) on a form. ¶ 101. Countrywide told borrowers there would be no income verification. *Id. See also* ¶ 131 (stating that Countrywide removed from its guidelines a statement that "income verification could be requested"); ¶ 134 (Countrywide internal document states that "income on [a no doc] application is generally not verified" so long as "the stated income is 'reasonable for the borrower's professional [sic] and level of experience' "); ¶ 161 (discussing low verification rates).

CW2, a supervising underwriter, describes a process by which loans were approved based on the borrowers' stated income and then rationalized post hoc. CW2 states that CLD underwriters had to "paper the file" and "build the case" that stated-income, stated-asset loans had been appropriately approved, "because [underwriters] knew the borrower file had to have some type of documentation to support or substantiate the borrower's income in order for the loan to be sold on the secondary market." *Id.* ¶¶ 129, 160–162 (describing how CW2 and other underwriters would use printouts from a website, salary.com, which provided generic salary ranges based on a borrower's particular job title and zip code). This was done even when "CLD underwriters knew that the borrower's income could not reasonably be what was represented on the loan application." *Id.* ¶ 161. Thus, many loans that did not meet the matrices may have been approved without having to process an exception.

The incentive system at the CLD was set up so that *denying* loans required more work by an underwriter than approving loans within his threshold authority: denying loans of any value required additional review and a second signature. ¶ 158. For example, a junior officer with the discretionary authority to approve a loan up to $350,000 could not decline that same loan without additional review and work. *Id.* Combined with the other allegations, the incentive system contributes an inference that Countrywide policies were designed from top to bottom to encourage increased risk. *But see supra* n. 12 (emphasizing the limits of incentive-based inferences).

During the class period, official underwriting matrices progressively lowered the metrics required for no-doc loans. ¶¶ 135–37. By the end of the period, a borrower

with a FICO score of 500 *and* whose bankruptcy had been discharged a single day before origination could get a loan up to $700,000—without providing income documentation. ¶ 137.

*New products.* The above practices were combined with a shift to new, inherently more risky loan products.

One example is the adjustable-rate mortgage ("ARM"). ARMs give homeowners a low "teaser" interest rate for an introductory period, typically between 2–10 years. ¶ 96. After the teaser period expires, ARMs "reset" to higher interest rates for the remainder of the mortgage period. *Id.* After the reset, buyers have higher minimum payments. *Id.*

Pay-option ARMs are a type of ARM designed to give buyers flexibility in paying back their mortgage. The buyer may, in a given month, choose (1) to pay down the principal; (2) make an interest-only payment; or (3) make a minimum payment lower than the interest for the period. ¶ 97. If a buyer chooses option 3, the remaining interest will be capitalized. *Id.* This is known as "negative amortization." *Id.* Countrywide's pay-option ARMs have amortization caps (usually 110–125% of the original loan amount). ¶ 99. When a buyer hits the cap, the interest rates typically reset and buyers must begin paying down the principal. *Id.* Thus, the risk of default increases as the principal reaches the amortization cap. Further, the "vast majority" of pay-option ARMs were made on a low-doc or no-doc basis. ¶ 6.

Interest-only mortgages allow the borrower to make only interest payments for an introductory period. ¶ 102. After the introductory period, minimum payment requirements increase, making these loans inherently riskier as well. *Id.* Interest-only loans could be fixed rate or ARM loans. *Id.*

A Home Equity Line of Credit ("HE-LOC") is a second mortgage secured by the difference between the value of the home and amount due on the first mortgage. ¶ 103. The smaller that delta, the more likely that even a slight decrease in property value will render the HELOC's collateral worthless.

Traditionally, a buyer financing more than 80% of a home's value had to purchase Private Mortgage Insurance ("PMI") to protect the lender from default on the mortgage. ¶ 106. Countrywide internal documents state that Countrywide's loan origination and purchasing division "does NOT require Private Mortgage Insurance (PMI) on any loan—ever!" *Id.* Instead, a buyer could finance 100% of the purchase price by simultaneously taking out (1) a mortgage for 80% of the home's value and (2) a "piggyback" loan for remaining 20%. *Id.* The piggyback loan is a second lien. Therefore, it is subject to the same risks as a HELOC. *Id.* n. 5.

*Loan-to-value ratios.* Both HELOCs with slim margins between the home's value and the amount due on the first mortgage and piggyback loans that allow 100% financing increase risk. *See* ¶ 942 (Countrywide representative on conference call explaining that "leverage [here, the loan-to-value ratio] at origination matters. More leverage means more serious delinquencies.").

Relatively high loan-to-value ratios at origination were exacerbated by negative amortization on pay-option ARMs and the riskiness of Countrywide's other new products. Pay-option ARMs and 100% financing plans increased dramatically during the class period. In 2004, 15% of the pay-option ARMs packaged into MBS had loan-to-value ratios of greater than 90%. ¶ 113. By 2006, the percentage of securitized pay-option ARMs had almost doubled to 29% of securitized loans. *Id.*

### ii. How Countrywide's core mortgage-related operations affect investment value

Again, Countrywide's core mortgage-related operations accounted for the vast majority of Countrywide's earnings during the class period—93% of pretax earnings for 2006. *See* ¶¶ 82–83. Therefore, virtually all the value of an investment in Countrywide derived from its ability to carry on mortgage-related businesses. *Cf. Atlas v. Accredited Home Lenders Holding Co.,* 556 F.Supp.2d 1142, 1155 (S.D.Cal.2008) ("[A]s a mortgage lender . . . underwriting practices would be among the most important information looked to by investors.").

*Origination fees.* A substantial portion of Countrywide's income came from loan origination fees. Writing more mortgages generates more fees, as explained above. Countrywide's continued ability to originate loans apace would therefore increase the value of investments in the company.

However, Countrywide could only keep originating loans at a high rate if (1) the housing market remained healthy; (2) people continued to invest capital in Countrywide as a going concern; (3) Countrywide's own investments in loans rose in value; and (4) Countrywide could continue to sell the mortgages it originated to third parties so that it could use the proceeds to originate more mortgages. Steps 2–4 could only continue if Countrywide's underwriting practices were basically sound and the mortgages performed adequately. If Countrywide's loans began systematically to perform below expectations, Countrywide's value as a going concern would rapidly diminish.

*Servicing fees.* Countrywide also earns fees from servicing mortgages. "Servicing" refers to processing payments and dealing with customers. Therefore, the longer the loan exists, the more servicing fees the servicer can collect. Countrywide valued these assets on its balance sheet as mortgage-servicing rights ("MSRs"). MSRs' value is a function of the likelihood Countrywide will continue to service the mortgage, discounted by interest rate risk and other market risks extrinsic to the mortgages. ¶ 327. Controlling for extrinsic risks, the value of MSRs increases with mortgages' expected life spans. The life of a mortgage ends (1) upon payment in full (either payment over the mortgage's stated period or pre-payment before the mortgage's stated period runs); or (2) default and foreclosure. Risky loans increase the risk of default, thereby decreasing the value of MSRs.

*Loans packaged into MBS for resale.* Countrywide's Capital Markets division created collections of mortgages for sale to relatively sophisticated investors such as investment banks.

MBS separate the operational risk of the mortgage originator from mortgage risk. As such, investors in Countrywide could expect decreased exposure to low-performing mortgages. Likewise, those who invested in MBS could expect decreased exposure to Countrywide's ongoing operations.

MBS also pool loan risk. By gathering mortgages into MBS, the risk of individual mortgage defaults is mitigated by other mortgages: some high-risk, high-yield mortgages are made more attractive by being offset by lower-risk, lower-yield mortgages.[14]

---

**14.** According to the CAC, Sambol's strategy was to take the risk-offsetting logic of MBS to an illogical extreme. The CAC compares his strategy to a pyramid scheme: to keep generating a high volume of even the riskiest (and hence highest-fee generating) loans, assuming that relatively few higher quality loans at the

top would offset defaults lower on the pyramid. ¶ 93. This could work only for so long as the value of the collateral backing up those risky loans would continue to rise; that is, if home values kept rising at the pace of the early 2000s, many foreclosed mortgages could

MBS investors buy the right to receive an income stream from a pool of underlying mortgages. Countrywide would put the mortgages into an entity created to issue the MBS (commonly known as a Special Investment Vehicle ["SIV"]). The SIV are trusts with no assets except the right to receive mortgage payments. Countrywide would then collect mortgage payments (that is, service the mortgages) and pass the payments (net of its servicing fees) on to the SIV.[15]

The SIVs would issues debt instruments to investors. Those instruments are the MBS. They are sold in income tiers known as "tranches." The tranches are paid in descending order—with each subsequent tranche yielding higher interest to compensate for the increased risk that the last dollar will be taken by a higher tranche. Thus, the lowest tranche (the "residual interest") takes the first loss, the next level takes the next loss, and so on until the highest tranche (the "supersenior tranche") takes the last loss.

To attract investors, Countrywide would often hold the residual interest (as well as some higher tranches). Countrywide thereby bore additional risk to further reduce MBS investors' risk. Countrywide booked these assets as "retained interests" ("RIs"). ¶ 115.

Further, Countrywide made representations and warranties ("R & Ws") to MBS purchasers. The R & Ws obligated Countrywide to replace some securitized loans if they failed to perform at a certain level. ¶ 87. Both RIs and R & Ws increased Countrywide's own financial exposure in the event that the loans it originated began systematically failing.

Investors in an MBS receive a prospectus with statistics regarding the loans un-

derlying the MBS. The prospectuses contain tables of statistics about the loans behind the MBS. The tables break down the loans into ranges by such criteria as FICO, loan-to-value ratio, documentation level, and sometimes a credit quality classification such as "prime" or "nonprime." *See, e.g.,* Countrywide Defs.' Supp. Req. for Jud. Notice, Exs. 77–79; *infra* Section II.B.iii (discussing the truth on the market defense).

To the extent that the loans underlying MBS fail to perform, the ability of Countrywide to continue to sell MBS to investors (known as selling into the "secondary market") would be impaired. The secondary market's appetite for Countrywide's MBS was a primary source of liquidity (i.e., cash to continue the business of loaning money for mortgages). *See, e.g.,* ¶ 376. To the extent the data about the mortgages entered into Countrywide's computer system was misleading, the MBS may not perform as well as the MBS prospectus' disclosures would suggest. Such poor performance could lead to an increase in Countrywide's R & Ws liability as well as an inability to continue selling mortgages to investors in MBS. ¶¶ 85–87.

*Loans held by Countrywide.* The value of the loans held for investment ("LHIs") by Countrywide's banking division depended on the quality of the underlying mortgages as well as interest rate and other market risks extrinsic to the mortgages. LHIs are kept on the balance sheet at amortized cost—the loan's unpaid principal balance less an allowance for projected loan losses. ¶¶ 267, 278–79; Fair Accounting Statement No. 115 ("FAS 115"). If the LHIs had losses greater than the assumptions used to establish the allowance amount, the inadequate allowance would inflate Countrywide's book value.

---

**15.** *See, e.g.,* Countrywide Defs.' Supp. Req. for Judicial Notice, Exs. 77–79.

still break even or turn a profit (and then new people would buy the homes and new origination fees could be generated).

IN RE COUNTRYWIDE FINANCIAL CORP. SEC. LITIGATION   **1153**
Cite as 588 F.Supp.2d 1132 (C.D.Cal. 2008)

Countrywide also held loans for sale. If the loans could not be sold, they would eventually have to be discounted and moved to the LHI balance sheet item. ¶¶ 354–55. Thus, if the credit quality of the loans Countrywide intended to sell deteriorated while held for sale, it would be more difficult to sell the loans and they could eventually be reclassified and discounted, lowering Countrywide's net book value.

### iii.   Examples of allegedly false statements

The CAC contains myriad statements that occur throughout the 4–year class period. The following are illustrative examples of the statements the CAC alleges were materially false or misleading.

*Directors and officers.* Specific misrepresentations by the Officer Defendants are discussed below in connection with the CAC's fraud allegations. Section II.D.3.

[3] *Countrywide.* Countrywide's SEC Forms 10–K during the class period "touted the Company's 'proprietary underwriting systems . . . that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud.' " ¶ 118. Countrywide's SEC disclosures "also described an 'extensive postfunding quality control process.' " *Id. See*

*also, e.g.,* ¶¶ 350–51. The CAC's allegations raise the inference that Countrywide's computer systems, such as EPS, could not reasonably be said to "improve consistency," "assess collateral adequacy," or "prevent fraud." References to "underwriting standards" or a "quality control process" may also be actionable in these circumstances. *See also* ¶ 673. As explained above, the CAC sufficiently alleges that Countrywide systematically departed so far from any reasonable interpretation of "quality" and "standards" that such statements could be materially false or misleading.

It cannot be emphasized enough that in the vast majority of cases such statements would be nonactionable puffery. Given the gravity of the CAC's allegations about Countrywide's operations—as well as the market's subsequent realizations regarding Countrywide's business and mortgages—the Court cannot dismiss such claims at the pleading stage.

The CAC also alleges that Countrywide did not disclose to its own investors how many of Countrywide's riskiest loans were originated on a reduced documentation basis. *See* Pls.' Opp. at 29–30 (noting 80% of Countrywide's pay-option ARMs originated in 2004 were low-doc mortgages; and roughly 80% of its HELOCs and pay option ARMs held in the Countrywide Bank portfolio as of July 2007 were low doc).[16]

---

**16.** However, it may have been possible to piece together a rough picture of Countrywide's practices if one were willing and able to analyze a vast amount of data released by Countrywide's SIVs. *See infra* Section II.B.iii (discussing truth on the market); *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 503 (9th Cir.1992) (to use a truth on the market defense, defendant must show that the information was "transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by the insiders' one sided representations" (quotations and citation omitted)). Defendants also claim that the

company disclosed "as early as January 2005" that nearly all its pay-option ARMs were originated in this way, and therefore did not mislead investors. *See* Countrywide Defs.' Mot. to Dismiss at 20. Though evaluating the adequacy of the Company's disclosures of adverse information is generally not appropriate on a motion to dismiss, Plaintiffs note in any case that any disclosure that loans were made on a reduced-documentation basis did *not* reveal the fact that Countrywide had performed little or no meaningful borrower verification, even for certain "prime" loans. Pls.' Opp. at 14.

Moreover, the CAC sufficiently alleges that statements attributable to Countrywide that speak in terms of "prime" versus "subprime" (or "nonprime") were also misleading before Countrywide's June 2007 disclosure of its internal definition of prime. ¶ 232, 625; *supra* Section I.A.1. These misrepresentations continued throughout the class period and until at least April 2007. ¶ 867–70 (Countrywide representative stating to finance industry conference that "over 90% of Countrywide loan origination volume is prime quality" and that Countrywide's loan were "[k]ind of the opposite of subprime").

Some Defendants argue that the CAC itself bars any allegation of falsity after Countrywide released its financials for 3Q07, as it states that the company was "forced to admit the poor quality of its mortgage loans" at that time. *See* CAC ¶ 353. This argument, which strips the CAC's allegation from its context, borders on the frivolous. Plaintiffs allege that the 3Q07 disclosures failed to correct all misrepresentations; rather, the truth only gradually leaked out and was often coupled with further misrepresentations to blunt the disclosures' impact on the value of Countrywide securities, ¶¶ 997–1058. It is possible that a complaint could allow only the inference that corrective disclosure

was complete by a certain point and thus all statements thereafter could not be false (or material or causally related to a loss, see *infra* Sections II.C.i.4, II.D.i.6). The CAC is no such complaint.

The CAC alleges actionable statements by Countrywide from at least 2004 and continuing throughout the class period.

*Auditors and accounting-related statements.* Plaintiffs allege that Countrywide's practices made virtually every accounting-related statement actionable. The basic theory is that various balance sheet items—including the LHIs, RIs, R & Ws, and MSRs explained above—should have changed much more dramatically than they did during the class period, given the changes underway in Countrywide's operations. The inferences one can draw from the accounting-related statements are analyzed in *infra* Section II.C.i.6.

**B. Overview of claims and defendants**

The Complaint names fifty Defendants: Countrywide, Countrywide Capital V, Countrywide Securities Corp., four "Officer Defendants," [17] sixteen additional "Individual Defendants," [18] twenty-five "Underwriter Defendants," [19] and two "Auditor Defendants." [20] At the time of briefing, Individual Defendants Michael E. Dough-

---

**17.** *"Officer Defendants"* refers to Angelo R. Mozilo, David Sambol, Eric P. Sieracki, and Stanford L. Kurland.

**18.** *"Individual Defendants"* refers to the Officer Defendants, as well as Kathleen Brown, Henry G. Cisneros, Jeffrey M. Cunningham, Robert J. Donato, Michael E. Dougherty, Ben M. Enis, Carlos M Garcia, Andrew Gissinger III, Edwin Heller, Gwendolyn Stewart King, Thomas K McLaughlin, Martin R. Melone, Robert T. Parry, Oscar P. Robertson, Keith P. Russell, and Harley W. Snyder.

**19.** *"Underwriter Defendants"* refers to ABN AMRO Inc., A.G. Edwards & Sons, Inc., Banc of America Securities LLC, Barclays Capital Inc., BNP Paribas Securities Corp., BNY Cap-

ital Markets, Inc., Citigroup Global Markets Inc., Deutsche Bank Securities Inc., Dresdner Kleinwort Wasserstein Securities Inc., Goldman, Sachs & Co., Greenwich Capital Markets, Inc., HSBC Securities (USA) Inc., J.P. Morgan Securities Inc., Lehman Brothers Inc., Merrill, Lynch, Pierce, Fenner & Smith Inc., Morgan Stanley & Co. Inc., RBC Capital Markets Corp., RBC Dominion Securities Inc., RBC Dain Rauscher Inc., Scotia Capital Inc., SG Americas Securities LLC, TD Securities Inc., UBS Securities LLC, Wachovia Capital Markets LLC, and Wachovia Securities, Inc.

**20.** *"Auditor Defendants"* refers to Grant Thornton LLP ("Grant Thornton") and KPMG LLP ("KPMG").

IN RE COUNTRYWIDE FINANCIAL CORP. SEC. LITIGATION 1155
Cite as 588 F.Supp.2d 1132 (C.D.Cal. 2008)

erty and Kathleen Brown had their own counsel. Dougherty and Brown's ("D & B's") arguments are therefore identified separately where appropriate. KPMG submitted separate briefing. GT also submitted separate briefing. All other Defendants (Countrywide, its affiliated entities,[21] and Individual Defendants besides D & B) submitted consolidated briefing; collectively, they are "Countrywide Defendants" for the purposes of referring to their arguments and papers.

The first group of claims—Counts 1–15[22]—are brought under the Securities Act of 1933 ("'33 Act"). These claims are based on five Countrywide-related securities. Six classes of securities are unsecured debt instruments: Series A Medium–Term Notes ("Series A Notes"), Floating Rate Subordinated Notes Due April 1, 2011 ("2011 Notes"), Series B Medium–Term Notes ("Series B Notes"), Series A Floating Rate Senior Convertible Debentures Due 2037 ("Series A Debentures"), Series B Floating Rate Senior Convertible Debentures Due 2037 ("Series B Debentures"),[23] and 6.25% Subordinated Notes Due May 15, 2016 ("6.25% Notes"). The last security is an equity security "7% Capital Securities" in Countrywide Capital V, a Delaware Statutory Trust, the sole assets of which are Countrywide subordinated debt. For each of these five securities, Plaintiffs allege three Counts. Each Count alleges violations of §§ 11, 12(a)(2), and 15, respectively.

Plaintiffs bring § 11 claims against: (1) those Individual Defendants who signed the relevant registration statements; (2) the Auditor Defendants that certified the audited financial statements contained or incorporated in the registration statements; (3) the Underwriter Defendants that acted as underwriters in the securities' offerings; and (4) other Defendants who "owed a duty to make a reasonable and diligent investigation of the statements" in connection with public offerings. The § 12(a)(2) claims are brought against the Underwriter Defendants that allegedly served as "sellers" within the meaning of the '33 Act for the relevant security. Finally, § 15 claims are brought against the Individual Defendants who allegedly served as "control persons" of Countrywide when the registration statements were filed and became effective.

The remaining claims (Counts 16–21) allege violations of the Securities Exchange Act of 1934 ('34 Act).

Count 16 alleges violations of § 10(b) and SEC Rule 10b–5 against Countrywide and the Officer Defendants with respect to common stock and "other publicly traded securities, including but not limited to, public debt and preferred securities specifically alleged." Count 18 alleges the same against Auditor Defendants.

Count 17 alleges § 20(a) violations against the Officer Defendants with respect to common stock and "other publicly traded securities, including but not limited to, public debt and preferred securities specifically alleged." Count 21 alleges § 20A violations against Mozilo, Sambol, and Kurland for the same securities.

---

**21.** Countrywide Securities Corporation is a Countrywide affiliate that acted as an underwriter. The CAC treats it as an "Underwriter Defendants." However, the Corporation shares counsel with Countrywide, so this Order includes it as a "Countrywide Defendant." Many of the Underwriter Defendants' arguments apply to the Corporation.

**22.** The CAC's headings use Roman numerals, but the Court uses Arabic numerals for clarity in prose.

**23.** Series A and B Debentures were also sold in the private placement market. Privately traded Debentures are part of the *Argent* case. *See supra* n. 2.

Count 19 alleges § 10(b) and SEC Rule 10b–5 against Countrywide and the Officer Defendants with respect to publicly traded Series A and B Debentures.  Count 20 alleges § 20(a) violations against Mozilo, Sambol, and Sieracki as to the same Debentures.

## II.

### LEGAL ANALYSIS

Six separate motions to dismiss are before the Court: (1) Underwriter Defendants' Motion to Dismiss; (2) KPMG's Motion to Dismiss; (3) Countrywide and Certain Individual Defendants' Motion to Dismiss; (4) Grant Thornton's Motion to Dismiss; (5) Dougherty and Brown's Motion to Dismiss; and (6) KPMG's Motion under Fed. R. Civ. Proc. 8, 12(e), and 41(b).

The motions and opposition raise dozens of arguments.  Most Defendants' motions expressly adopt portions of other Defendants' motions.  The Court addresses the arguments deemed important in turn, without necessarily identifying which Defendants made which arguments.

### A.  Rule 8(a)

[4]  KPMG filed a motion asking the Court to dismiss Plaintiffs' CAC under Rule 41(b) for failure to comply with Rule 8, which requires that pleadings include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. Proc. 8(a)(2).[24]

[5]  Today's securities plaintiffs must meet three separate pleading standards—Rule 8(a)'s short and plain statement rule, Rule 9(b)'s particularity requirement ("In all averments of fraud or mistake, the

circumstances constituting fraud or mistake shall be stated with particularity"), and the Private Securities Litigation Act ("PSLRA")'s requirement that the facts underlying falsity and scienter be pled with particularity sufficient to create a cogent and compelling inference of falsity and scienter.  *Tellabs*, 127 S.Ct. 2499.  In a case such as this, navigating and reconciling these standards can be an onerous task.

Plaintiffs' 416–page CAC is neither "short" nor "plain."  However, the Court declines to dismiss it on these grounds.  *Stephenson v. Deutsche Bank AG* is instructive.  282 F.Supp.2d 1032, 1075 (D.Minn.2003).  *Stephenson* recognized that, where a complaint includes a '34 Act claim, "Rule 8(a) must be read in harmony with Rule 9(b)."  *Id.*  Given that case's complicated facts, in *Stephenson* it was "appropriate that Plaintiffs present their allegations in detail to comply with Rule 9(b)['s requirement that fraud be plead with particularity] and the heightened pleading standards of the [PSLRA]."  *Id.*  That is, *Stephenson* heeded the second part of Rule 8(a): the short and plain statement must still be sufficient to "show[ ] that the pleader is entitled to relief" according to whatever other rules and laws govern the action.  Fed. R. Civ. Proc. 8(a)(2).

The Court (and Defendants) would have appreciated a complaint that is more concise, less redundant, and better organized.  This Court has little patience for excess—and 416 pages is excessive.  But, given the extraordinary complexity of this case's factual allegations, the lengthy class period, and the wide swath of defendants, focusing

---

**24.** The motion's caption also states that KPMG moves under Rule 12(e) for a more definite statement, but KPMG does not identify any indefinite statements or "point out the details desired."  Fed. R. Civ. Proc. 12(e).  Indeed, the motion's supporting memoran-

dum does not discuss Rule 12(e).  At any rate, the CAC is far from "so vague or ambiguous that [KPMG] cannot reasonably prepare a response."  *Id.*  This should be apparent from *supra* Section I.A's narrative taken from the CAC.

on the CAC's rhetorical and structural flaws would be a pointless enterprise.

Plaintiffs have, as a general matter, successfully navigated the pleading standards. In so doing, Plaintiffs provided KPMG a complaint that fairly puts KPMG on notice of the claims against it.

KPMG's motion is DENIED.

## B. Issues common to the '33 and '34 Act claims

### i. Standing

Various Defendants attack Plaintiffs' standing as to several claims. The Court does not find these arguments persuasive and rejects them all. However, D & B correctly point out a formal pleading requirement that Plaintiffs failed to meet with respect to the 2011 Notes. Plaintiffs state that they are prepared to remedy the error. Plaintiffs have leave to amend for this purpose.

**[6]** *7% Securities.* Underwriter Defendants argue that no one in this case has standing to sue on the 7% Securities because N.Y. Funds did not purchase those particular securities. NY Funds do not have standing for the 7% Securities, but other named plaintiffs do.

**[7]** Underwriter Defendants would have this Court interpret the PSLRA's lead plaintiff provision as working a sea change in the law of standing and, paradoxically, inhibiting this Court's discretion to appoint lead plaintiffs. As lead plaintiffs, N.Y. Funds may bring claims on behalf of other named parties, and "nothing in the PSLRA requires that the lead plaintiffs have standing to assert all of the claims" so long as lead plaintiffs "identify and include named plaintiffs who have

standing." *In re Global Crossing, Ltd. Sec. Litig.,* 313 F.Supp.2d 189, 205 (S.D.N.Y.2003).

Underwriter Defendants' interpretation of the lead plaintiff provision, utterly unsupported by its text, 15 U.S.C. § 78u–4(a)(3)(B), would require this Court to appoint even more lead plaintiffs. By so doing, Underwriter Defendants' proposed rule would require courts either (1) to increase lawyer-driven litigation and conflicts of interest by elevating more lawyers to lead counsel status;[25] or (2) to waste judicial resources by litigating securities cases in separate actions rather than by allowing the Court to exercise its discretion in consolidating several named plaintiffs' actions into a single case, led by a single plaintiff. It is therefore no surprise that "Judges presiding over complex securities class actions under the PSLRA have repeatedly rejected arguments ... that seek to confuse the role of lead plaintiffs under the PSLRA with that of named plaintiffs...." *Global Crossing,* 313 F.Supp.2d at 205.

In this case, it is undisputed that named Plaintiff Brahn holds the relevant security. Underwriter Defendants make the meritless assertion, buried in a footnote, that N.Y. Funds "quietly inserted [Brahn] into this litigation without notice to the court or the Defendants" to cure an "obvious" lack of standing. Underwriters' Mot. at 24 n. 22. Brahn filed his own case on November 5, 2007 and the Court consolidated it on November 28, 2007 with a written order describing the case—after a hearing with all the parties where Brahn's case was discussed. *See* Nov. 28 Order Consolidating Cases and Appointing Lead Plaintiff

---

**25.** Indeed, "The purpose of the lead plaintiff section of the PSLRA was never to do away with the notion of class representatives or named plaintiffs in securities class actions. Rather, the purpose was to ensure that securi-

ties litigation was investor-driven, as opposed to lawyer-driven." *In re Initial Public Offering Securities Litigation,* 214 F.R.D. 117, 123 (S.D.N.Y.2002).

and Lead Counsel, at 5–6; Nov. 19, 2007 Hearing Tr. at 46:31–47.

The 7% Securities remain in this litigation.

*2011 Notes.* D & B correctly point out that the CAC fails to include the 2011 Notes in the same counts as a security for which any named Plaintiff has standing. D & B's Reply at 9–10. Thus, Plaintiffs cannot state a claim in Counts 4–6 because those counts rely solely on the 2011 Notes. Plaintiffs agreed on this point at the hearing. Oct. 20, 2008 Hearing Tr. at 135:5–16.[26] *See also infra* Section II.C.i.2 (discussing § 11 standing for the 2011 Notes).

Accordingly, Counts 4–6 are DISMISSED WITHOUT PREJUDICE. Plaintiffs have LEAVE TO AMEND.

*Matured debt.* At the hearing, the parties inexplicably continued to debate debt instruments that have already matured.

Plaintiffs cannot recover—and do not seek recovery—on debt instruments held to maturity because Countrywide paid on the agreed terms. *See* CAC Ex. B; Pls.' Opp. Appx. A; Hearing Tr. at 132:2–10. More debt will come due during the litigation. This will, of course, defeat standing for and recovery on the matured instruments if Countrywide pays in full. But no company's future is certain. It also is possible that, as the law contemplates, Plaintiffs will sell the instruments at a loss caused by the alleged securities law violations between now and maturity. *See, e.g.,*

15 U.S.C. § 77k(e) (defining § 11 damages).

Plaintiffs allege the type of economic injury the securities laws require. *See infra* Section II.C.i.3. Matured debt will raise damages issues. If all securities in one category of debt matures, then standing as to that category will be defeated.[27] The Court defers further consideration of matured debt until the summary judgment or damages stage; or until Plaintiffs lose standing because all debt of one category has matured.[28]

Counsel for Underwriter Defendants at the hearing indicated that some Underwriter Defendants should be dismissed because all the particular instruments they underwrote have matured. Hearing Tr. 52:11–17 ("I have … underwriter clients whose only involvement in this case is to have underwritten those short-term notes which are now fully paid …. and my clients are wondering why they're still involved, because these things are gone.").

Counsel did not bring this to the Court's attention in the papers.[29] If the Court correctly understands Underwriter Defendants' assertion at the hearing, then counsel for Underwriter Defendants should have pointed this out earlier.

Counsel for both sides are INSTRUCTED to meet and confer as to any necessary amendment on this matter.

BofA's guarantee may well cause the debt securities' value to increase, but there is still the fact question whether Plaintiffs suffered a loss.

**26.** All further "Hearing" cites refer to the October 20, 2008 hearing on the present motions.

**27.** This does not appear likely given the stated maturity dates of the securities in issue. Pls.' Opp. Appx. A.

**28.** The Court takes notice that BofA recently agreed to guarantee many Countrywide debt obligations. BofA, Form 8–K (Nov. 7, 2008). This does not change the above analysis.

**29.** Appendix D to Underwriter Defendants' motion discloses whether unnamed "Underwriter Defendants [were] Involved" in a particular offering. The appendix does not explain which of the 25 Underwriter Defendants should be dismissed because all the notes they underwrote matured and were paid in full.

IN RE COUNTRYWIDE FINANCIAL CORP. SEC. LITIGATION   **1159**
Cite as 588 F.Supp.2d 1132 (C.D.Cal. 2008)

### ii.  Statute of limitations

Underwriter Defendants also argue that the statute of limitations bars Plaintiffs' '33 Act claims.

The '33 Act provides that "[n]o action shall be maintained to enforce any liability created under section 11 or section 12(a)(2) . . . unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m.

In this case, the statute of limitations would bar Plaintiffs' claims if they discovered or should have discovered the actionable statements by mid–2006.

The Ninth Circuit presently applies a two-prong "inquiry-plus-reasonable-diligence" standard to determine the applicability of this provision. *Betz v. Trainer Wortham & Co., Inc.*, 519 F.3d 863, 871 (9th Cir.2008), *subseq. hist. at* — U.S. ——, 129 S.Ct. 339, 172 L.Ed.2d 15 (2008) (inviting Solicitor General's comment on cert. petition). First, a court identifies when, if at all, an investor had inquiry notice ("when there exists sufficient suspicion of fraud to cause a reasonable investor to investigate the matter further.") *Id.* Second, a court determines when a reasonably diligent investor making such an investigation would have discovered the facts underlying the alleged fraud. *Id.*

**[8]** The Court finds it unnecessary to address *Betz's* reasonable diligence prong. Countrywide's alleged systematic shift from sound underwriting could not have been maintained through the class period if reasonable investors had inquiry notice.

Countrywide was a huge, closely watched company. Even so, analysts were still said to have been shocked by Countrywide's 2007 revelations. ¶¶ 233–34. Countrywide allegedly continued its misrepresentations even while it began issuing corrective disclosures. ¶¶ 997–1058. The ratings agencies have testified to Congress that they failed to get sound analysis on the market.[30] Countrywide's mortgage-related operations and mortgage securitizations were complex financial transactions that were relatively difficult to value.[31]

**[9]** Where a market appears to have all the ordinary hallmarks of efficiency but a complaint still plausibly alleges the market was fooled, it is preposterous to argue at the pleadings stage that a "reasonable investor" should have been on inquiry notice. *See Betz*, 519 F.3d at 865 (Kozinski, C.J., dissenting from denial of rehearing *en banc*) (observing that statute of limitations arguments are difficult for defendants in "those byzantine securities cases involving risk-indexed convertible debentures or rupee-denominated strip bonds [and] Gibbon-length, fine-print prospectus[es] artfully concealing liabilities").

### iii.  Truth on the market

**[10, 11]** Shortly before the hearing, Countrywide Defendants began propounding a new argument in a request for judicial notice. Countrywide Defendants point out that the majority of Countrywide's

---

**30.** For example, see the prepared statements of Stephen W. Joynt, President and CEO of Fitch, Inc., Raymond W. McDaniel, Chairman and CEO of Moody's Corp., and Deven Sharma, President of Standard & Poor's, to the House Comm. on Oversight and Gov't Reform, Hearing on Credit Rating Agencies and the Financial Crisis (Oct. 22, 2008), *available*

*at* http://oversight.house.gov/story.asp?ID= 2250 (last accessed Nov. 7, 2008).

**31.** The Court doubts that the extent and effect of Countrywide's alleged practices has been revealed. Countrywide originated and securitized a huge volume of loans during the class period. The CAC alleges that the documentation underlying the loans is untrustworthy.

mortgages were securitized into MBS and sold into the private secondary market. The prospectuses from these MBS contain some statistics of varying specificity about the underlying mortgages. *See, e.g.,* Countrywide Defs.' Supp. Req. for Judicial Notice, Exs. 77–79. The prospectuses are on file with the SEC and available to the public. Countrywide Defendants assert that these documents put the truth on the market, thereby foreclosing the possibility that Plaintiffs "relied" on the misrepresentations in paying a market price for the securities. *See Hanon v. Dataproducts Corp.,* 976 F.2d 497, 503 (9th Cir.1992). The Court takes notice of these prospectuses, but not for the truth of the matters asserted therein.

[12] The Court also notes SEC Regulation AB, which governs many of the disclosures in MBS prospectuses. 17 C.F.R. § 229.1100 *et seq.* Regulation AB relies heavily on disclosing historical loan performance data. Countrywide's historical loan performance data should have become increasingly false or misleading as Countrywide's loan underwriting standards declined. Failing to disclose the evaporation of the most fundamental assumption that makes historical performance data useful—that the current loans materially resemble the previous loans—could be independently false or misleading. *Cf.* 17 C.F.R. § 229.1110(b); *id.* 229.1111(c) (always requiring historical data on the current asset pool); SEC Div. of Corp. Finance, Manual of Publicly Available Telephone Interpretations, Regulation AB and Related Rules (SEC interpretation emphasizing that general principles of

materiality guide any additional disclosures necessary to prevent the historical data provided under Regulation AB from being materially false or misleading), *available at* http://www.sec.gov/interps/telephone/cftelinterps_regab.pdf (last accessed Nov. 13,2008).

Countrywide Defendants argue that these approximately 250,000 pages of prospectuses, issued by SIVs and not Countrywide itself, put the truth on the market and thereby negate the reliance element. For substantially the same reasons elaborated above in discussing the statute of limitations, the Court rejects a truth-on-the-market defense at the pleading stage.[32] *Hanon,* 976 F.2d at 503 (to use a truth on the market defense, defendant must show that the information was "transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by the insiders' one-sided representations" (quotations and citation omitted)).

Countrywide's MBS were complex instruments and the prospectuses are very large documents; it is perfectly reasonable to infer that this complexity, coupled with Countrywide's alleged public misrepresentations, would blunt the effect of any disclosures in MBS' prospectuses.

### iv. Grant Thornton's involvement

[13] Auditor Defendant Grant Thornton ("GT") conducted Countrywide's 2003 audit. The audit was completed in February 2004. GT performed no other Countrywide audits during the class period. GT's 2003 audit conclusions were incorpo-

**32.** Of course, it is *possible* that a hedge fund somewhere had a computer analyzing the loan detail tables in all these prospectuses. That hypothetical fund may have pieced together that Countrywide's origination practices had deteriorated to some degree. Even then, the CAC adequately alleges that the data Countrywide used to generate those tables

was faultier than a market participant would realize. The argument requires a further inference that such a hypothetical fund had any substantial effect in remedying the mispricing through its trading. Contrary to their suggestions at the hearing, Countrywide Defendants are not entitled to such speculation.

rated, with GT's consent, into subsequent SEC filings during the class period.

The CAC's allegations about Countrywide's core operations depict dramatic underwriting changes that began in mid–2003 and continued throughout the class period. *See supra* Section I.A.i. However, Plaintiffs do not allege sufficient facts to allow the inference that Countrywide's new practices had gone on long enough, or had yet dramatically enough departed from previous practices, to have resulted in any accounting-related material misstatement or omission for the 2003 fiscal year.

Instead, the most egregious departures from sound underwriting are not alleged to have occurred until after GT completed its work in February 2004. Countrywide's departure from previous underwriting practices did not allegedly peak until about 2005. ¶¶ 130–47 (alleging underwriting matrix updates from January 2004 to March 2006), 155–57 (CWs alleging dramatic changes in practices during 2005 and 2006). Further, it is reasonable to infer that buyers who intended to refinance their ARMs or interest-only loans near the reset date would not cause much trouble until approximately two years after origination (and even then likely if underwriting practices had changed or the housing market cooled). *See, e.g.*, ¶ 96 (ARMs generally set within 2 years ["2/28" loans]); ¶ 99 (pay-option ARMs have negative amortization caps, at which point they reset). *See also* ¶ 317 (CW1 alleging that loose underwriting standards made default likely within 18 months of origination); Countrywide, Form 10–K at 42 (2006) ("[W]hen the required monthly payments for pay-option loans eventually increase . . . borrowers may be less able to pay the

increased amounts and, therefore, more likely to default on the loan, than a borrower with an amortizing loan. Our exposure to this higher credit risk is increased by any negative amortization that has been added to the principal balance.").

Even if the 2003 changes were serious enough to make balance sheet items based on 2003 mortgages materially false or misleading further down the road, significant mortgage default rates would take longer to manifest than the short time between the mid–2003 shifts [33] and the end of 2003. It is reasonable to infer that delinquency probability rises at some point after origination before declining over the loan's life. *See* ¶ 317 (CW1 alleging that loose underwriting standards made default likely within 18 months of origination); Countrywide, Form 10–K at 42 (2006) ("[W]hen the required monthly payments for pay-option loans eventually increase . . . borrowers may be less able to pay the increased amounts and, therefore, more likely to default on the loan, than a borrower with an amortizing loan. Our exposure to this higher credit risk is increased by any negative amortization that has been added to the principal balance."). The Court cannot infer that this default probability curve on the mid–2003 mortgages—based on underwriting practices that had only recently begun to deteriorate—would deviate enough by the end of 2003 for GT's audit to be materially false or misleading.

By the time of GT's audit, Countrywide's loan performance would not have borne out—and, based on all reasonable inferences from the CAC, did not yet bear out—the alleged changes in Countrywide's mortgage-related operations.

---

**33.** It is not even clear that "mid–2003" is the best starting point, though that is what the CAC alleges. ¶ 3. Many of the CAC's particularized allegations cannot be placed earlier than December 2003. *See, e.g.*, ¶ 128 (Farrell

email announcing reduced guidelines on December 3, 2003); ¶ 131 (December 2003 underwriting matrix compared with February 2003 underwriting matrix).

Plaintiffs in the eight months between the first *Pappas* complaint and the CAC had sufficient opportunity to investigate GT's involvement and make allegations sufficient to state a claim. They have not. Given the timeline of the CAC's allegations, Plaintiffs cannot state a claim against GT. *Lopez v. Smith,* 203 F.3d 1122, 1129 (9th Cir.2000) (dismissing with prejudice is appropriate where plaintiff cannot cure by amendment).

Accordingly, all claims against GT are DISMISSED WITH PREJUDICE.

### C. '33 Act Claims

#### i. Section 11

Section 11 provides a remedy for plaintiffs that purchased a security they can trace to a defective registration statement.

**[14]** To state a claim under § 11, a plaintiff "must demonstrate (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *In re Stac Elecs. Sec. Litig.,* 89 F.3d 1399, 1403–04 (9th Cir.1996) (quotations and citation omitted), *cert. denied sub. nom. Anderson v. Clow,* 520 U.S. 1103, 117 S.Ct. 1105, 137 L.Ed.2d 308 (1997). Defendants are liable for innocent or negligent material misstatements or omissions, subject to a few affirmative defenses. The most notable affirmative defense is due diligence. 15 U.S.C.

§ 77k(b)(3); *In re Stac,* 89 F.3d at 1404. Reliance is not an element.[34]

#### 1. "Sounds in fraud"

**[15, 16]** '33 Act claims are subject to Rule 8(a)'s ordinary notice pleading requirements unless the allegations "sound in fraud." *In re Daou Sys., Inc.,* 411 F.3d 1006, 1027 (9th Cir.2005), *cert. denied sub. nom. Daou Sys., Inc. v. Sparling,* 546 U.S. 1172, 126 S.Ct. 1335, 164 L.Ed.2d 51 (2006). *Id.* In evaluating a '33 Act claim, a court must strip away the allegations that sound in fraud and see if the remaining allegations state a claim. *Id.* at 1028.

**[17]** The CAC's '33 Act allegations do not sound in fraud. The CAC does the work of "stripping" the allegations that sound in fraud. It levies fraud allegations against a select few defendants. Those allegations are addressed in the '34 Act discussion. *Infra* Section II.D.

Several defendants take a contrary view. KPMG argues, for example, that the law provides that "[w]hen a misrepresentation forming the basis of a Section 11 claims is also alleged to support a claim for fraud under Section 10(b), the Section 11 claim is 'grounded in fraud' and the plaintiff must plead that claim with particularity." KPMG's 12(b)(6) Mot. to Dismiss at 7.

The Court rejects this statement of the law. *In re Daou* endorses a bright line only where plaintiffs allege "a unified course of fraudulent conduct and rely *entirely* on that course of conduct as the basis of a claim." *In re Daou,* 411 F.3d at

---

**34.** There are two possible exceptions. One arises where the issuer released an earnings statement that covers a twelve-month (or greater) period that began after the effective date. In that case, aftermarket purchasers who acquired the security after the earnings statement must also prove reliance on the registration statement. 15 U.S.C. § 77k(a). There is some authority for another exception in the unusual case where it appears from the

face of the complaint that a plaintiff cannot have actually relied on the registration statement. *APA Excelsior III L.P. v. Premiere Techs., Inc.,* 476 F.3d 1261, 1271 (11th Cir. 2007); *In re Levi Strauss & Co. Sec. Litig.,* 527 F.Supp.2d 965, 974–78 (N.D.Cal.2007) (locating *APA Excelsior's* reliance analysis in the materiality element). Otherwise, reliance is presumed.

IN RE COUNTRYWIDE FINANCIAL CORP. SEC. LITIGATION **1163**
Cite as 588 F.Supp.2d 1132 (C.D.Cal. 2008)

1027 (emphasis added) (quoting *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1103–04 (9th Cir.2003)). Similarly, *In re Stac* held only that the particularity requirements of Rule 9(b) are applicable to § 11 claims "where the gravamen of the Complaint is plainly fraud" and a plaintiff makes only "nominal efforts" to disclaim fraud as to some defendants. 89 F.3d at 1405 n. 2. *See also In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 272–73 (3d Cir.2006) (interpreting the sounds in fraud doctrine of *In re Daou* and *In re Stac* more narrowly than this Court does and holding, "where the plaintiff has exercised care in differentiating asserted negligence claims from fraud claims and in delineating the allegations that support the negligence cause of action as distinct from the fraud ..." the complaint does not sound in fraud).

Plaintiffs here do not rely on a unified course of fraudulent conduct against all Defendants. Rather, as explained in *supra* Section I.A.i, Plaintiffs describe a unified course of abandoning sound underwriting practices. No fraud lies in changed practices alone. The alleged fraudulent conduct, not yet fully explained in this Order, is distinct from this conduct. The fraud consists in intentionally misrepresenting Countrywide's underwriting practices.

Not all Defendants are alleged to have participated in the fraud. The CAC clearly specifies which defendants participated in which allegedly fraudulent conduct. For example, Underwriter Defendants are nowhere implicated in fraudulent conduct. Neither are the vast majority of the Individual Defendants. As to those Defen-

dants who are implicated in fraud, the CAC provides additional, particularized allegations. *See, e.g.*, ¶¶ 8, 500 (expressly alleging mental states less than fraud against some Defendants and specifying the nonfraudulent course of conduct giving rise to the violations). *See also infra* Section II.D.i.3 (discussing scienter).

The CAC's carefully circumscribed fraud allegations recognize important truths where § 11 and § 10(b) claims are pled together: § 11 liability arises against a vast array of participants in an offering. It is unlikely that so many individuals and entities could all act fraudulently together. At some point, repeated misrepresentations, as well as additional corroborating facts, may allow an inference of fraud as to some participants. Heightened pleading standards properly force plaintiffs to limit their fraud allegations to those participants who are likely to have acted fraudulently. Heightened pleading gives those participants the deserved protection of Rule 9(b); and frees the rest from defending against unreasonable and unfounded fraud claims.

But it eviscerates § 11 to give all defendants Rule 9(b) protection when (1) only certain defendants are expressly alleged to act fraudulently; (2) a complaint specifies unique, particularized facts as to those defendants; and (3) the particularized facts raise a scienter inference as to those defendants, but not all. *Accord In re McKesson HBOC, Inc. Sec. Litig.*, 126 F.Supp.2d 1248, 1266 (N.D.Cal.2000) (holding that a '33 Act § 14(a) claim sounded in fraud only as to some defendants, as to whom particularized fraud allegations were specifically made).[35]

---

**35.** This Court previously determined, in assessing derivative claims under § 14(a) of the Exchange Act, 15 U.S.C. § 78j(b), brought by a different lead plaintiff, "the Complaint clearly sounds in fraud, and thus both Rule 9(b) and the **PSLRA** apply." *In re Country-*

*wide Financial Corp. Deriv. Litig.*, 554 F.Supp.2d at 1076. However, the present CAC asserts different claims, based on different allegations, and names different defendants. The CAC also better articulates those allegations that are substantially the same.

**1164**          **588 FEDERAL SUPPLEMENT, 2d SERIES**

### 2.  Section 11 standing

NY Funds purchased the 2011 Notes but sold them at a profit.  Plaintiffs therefore concede their purchase of the 2011 Notes does not give them standing.  Pls.' Opp. at 122 n. 99. No other named plaintiff purchased the 2011 Notes.  Nor did any named plaintiff purchase either the 2– or 3–Year Notes.  However, N.Y. Funds did purchase debt instruments issued under the same shelf registration as these Notes: the CAC alleges that the 2011, 2– and 3–Year Notes were part of the Series A Notes issuances originally registered on the same Form S–3 with the same base prospectus. ¶¶ 888, 898.

**[18, 19]**  Under § 11, if "*any part* of the registration statement, *when such part became effective*, contained an untrue statement of a material fact or omitted to state a material fact," then any person acquiring "such security" pursuant to the registration statement has standing to sue a variety of participants in the security's issuance.  15 U.S.C.  § 77k(a) (emphasis added).  A § 11 violation occurs in the registration statement; but the security's purchase date and value are needed to determine whether and to what extent the violation injured the purchaser.  Though initial and aftermarket buyers alike have standing, aftermarket buyers face the additional task of tracing their purchase to the registration statement.  *Hertzberg v. Dignity Partners, Inc.,* 191 F.3d 1076 (9th Cir.1999).  Thus, standing is satisfied so long as the purchase can be traced to a registration statement containing, in any part, a false or misleading statement as of that part's effective date.

**[20]**  Standing is straightforward in a traditional issuance case, where all the securities are issued under identical documentation and share a single effective date.  But in a shelf registration, the issuer files a registration with the SEC and then either (1) keeps this registration "on the shelf" by waiting until a later date to go effective; or (2) completes one offering of less than the authorized securities on the effective date and puts the registration statement on the shelf for further issuances at later dates.  The delayed, continuous, or serial offerings may continue until they reach the total issuance authorized by the shelf registration.  Thus, the registration may be "pulled down" from the shelf to issue securities as needed.  *See Finkel v. Stratton Corp.,* 962 F.2d 169, 174 (2d Cir.1992) (outlining shelf registration mechanics).

Together with the registration form filed with the SEC, the prospectus, prospectus supplement, and SEC filings (and other documents incorporated by reference) constitute the "registration statement" for each subsequent offering.  15 U.S.C. § 77b(a)(8) (except where otherwise provided, "[t]he term 'registration statement' means the statement provided for in section 77f of this title, and includes any amendment thereto and any report, document, or memorandum filed as part of such statement or incorporated therein by reference.").

**[21]**  Where there are continuous or serial offerings under a shelf registration, the "registration statement" for each issuance will comprise different pricing supplements and perhaps other documents, including SEC filings made after the first issuance.  Section 6(a) of the '33 Act states, "A *registration statement* shall be *deemed effective* only as to the securities specified therein *as proposed to be offered.*"  15 U.S.C. § 77f(a) (emphasis added). By regulation, each new issuance requires amending the "registration statement" for the shelf registration, thereby creating a new "registration statement" for purposes of giving rise to § 11 liability while comporting with § 6(a).  17 C.F.R. § 229.512(a)(2).

**[22]** The registration statement is "new" because the representations in it are deemed made again at the effective date. However, the amended statement only creates a new claim for the purchasers that can trace their security to the registration statement as amended. *Finkel*, 962 F.2d at 174; *Guenther v. Cooper Life Scis., Inc.*, 759 F.Supp. 1437, 1439–41 (N.D.Cal.1990); *In re Metropolitan Sec. Litig.*, 532 F.Supp.2d 1260, 1285 (E.D.Wash.2007). Thus, if a statement that was not materially false or misleading at the first effective date becomes so (due to intervening events) by the second effective date, buyers that can trace their purchase to the second effective date have a claim while those who can only trace their purchase to the first do not. *Guenther*, 759 F.Supp. at 1439–41.

The question becomes: do continuous or serial offerings *under the same initial registration form and base prospectus,* resulting in multiple issuances having "registration statements" that speak as of different dates and incorporate different documents qualify as a registration statement for § 11 standing purposes *if those registrations have in common misrepresentations or omissions that were actionable on the effective date of both registrations?* [36]

The answer lies in distinguishing when SEC regulations deem there to be a new "registration statement" for liability purposes—an administrative application of the "effective date" limitation on a "registration statement" in § 6(a)—from the "registration statement" in the first clause of § 11. A new registration statement for '33 Act liability purposes simply means that each new offering (or other event that requires amending the registration statement) *creates potential new liability* to those who acquired the security under the registration statement after the amendment's effective date. 17 C.F.R. § 229.512(a). Again, this is so because the registration statement for each issuance under the same shelf registration will (1) incorporate new statements (even if they are as minor as the purchase date and price) and (2) all the statements made in the shelf registration and prospectus that have not been altered for the new issuance are deemed to be made again at the new effective date. *Guenther*, 759 F.Supp. at 1439–41.

The statute contemplates the possibility that the "registration statement" in the first clause of § 11 is not the same in every respect as the "registration statement" for a particular security because "parts" of the "registration statement" may "bec[o]me effective" at different times. 15 U.S.C. § 77k(a) ("[A]ny part of the registration statement, *when such part became effective . . . .*"). To require that "registration statement" of § 11's first clause be absolutely identical for each security traceable to the same initial registration and prospectus would rewrite "such part" to read "registration statement." *See also* 15 U.S.C. § 77b (defining registration statement "*unless the context otherwise requires*"). The statute grants standing to anyone who buys "such security"—one traceable to a defective registration statement. *Hertzberg*, 191 F.3d 1076. If the initial shelf registration statement contained an actionable statement or omission that is common to more than one issuance under the shelf registration, then

---

**36.** For example, the CAC alleges that the 2011 Notes' registration statement contains a September 25, 2005 prospectus supplement that the Series A Notes' prospectus does not. ¶¶ 888, 898. The Series A and 2011 Notes registration statements, however, share the same registration form and base prospectus (but have different prospectus supplements and pricing supplements) and incorporate many of the same allegedly false or misleading SEC filings by reference. ¶¶ 887–903.

purchasers in those issuances may be able to trace the same injury to the same "registration statement."

Therefore, it is not necessarily the case that someone who purchased securities that were first registered on the same form and prospectus, but that were issued with different prospectus or pricing supplements, lacks standing to represent prior purchasers. So long as (1) the securities are traceable to the same initial shelf registration and (2) the registration statements share common "parts" that (3) were false and misleading at each effective date, there is § 11 standing.[37]

A contrary rule would mean that someone who purchases before an amendment could not have standing to represent some-

one who happened to purchase after the most *de minimis* amendment, even if the only violation is common to both the original registration statement and the amended statement.[38] It could also create problems for class representation where, as here, § 12(a)(2) claims are also involved. Section 12 claims can be based on a "prospectus"—a much broader set of documents than the "registration statement"—and a false or misleading prospectus may be shared in a shelf registration. 15 U.S.C. § 77l(a); *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 584, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) ("[T]he term 'prospectus' refers to a document soliciting the public to acquire securities."). *See also infra* Section II.C.ii (discussing Plaintiffs' § 12(a)(2) claims).

---

**37.** There is authority for an even less demanding rule: that *any* shared defective part is enough, at least where that part contains the only actionable statements. The allegations in this case do not require the Court to examine whether that rule satisfies the statute's tracing requirement. *See Hertzberg,* 191 F.3d 1076 (discussing tracing).

For example, a court in the Northern District recently found § 11 standing where plaintiffs purchased a class of securities that shared with a second class of securities nothing more than a false financial statement incorporated by reference. *In re Juniper Networks, Inc. Secs. Litig.,* 542 F.Supp.2d 1037, 1051–52 (N.D.Cal.2008). (The *Juniper* Court observed that the "Registration Statement is not the basis for a claim because the source of the injury to the noteholders arises not from the Notes Registration Statement itself, but from the false financial statements referenced . . . ."). *Id.* 1052.

Further, at least one court has found § 11 standing satisfied where the parent company issued common stock on the same day that one of its separately incorporated subsidiaries issued notes. *In re MobileMedia Sec. Litig.,* 28 F.Supp.2d 901, 911 n. 7, 915 (D.N.J.1998). The stock and notes shared the same prospectus and incorporated the same allegedly false or misleading Form 10–K by reference. *Id.* Even though the stock and notes were different types of securities—one equity, one debt— and were backed by formally different corpo-

rations, the *MobileMedia* court still found standing for note purchasers where the named plaintiffs bought only equity. *Id.* at 911 n. 7. As this Court does *infra,* the *MobileMedia* Court found the defendants' arguments better addressed at class certification. *Id.*

**38.** The Court found one case that engaged in more than a cursory analysis and still squarely rejected the rule adopted here.

That case (1) failed to appreciate § 11's use of "registration statement" and language contemplating that "parts" can become effective at different times; (2) looked for different "offerings," a term which § 11 only uses for the damages calculation—by referring to the "offering price"—instead of analyzing what constitutes a "registration statement"; (3) did not consider shelf registrations in the analysis; and (4) extrapolated too much from *WorldCom,* where the lead plaintiff that was denied standing on § 11 claims bought *nothing at all* pursuant to an actionable registration statement. *Ong ex rel. Ong IRA v. Sears, Roebuck & Co.,* 388 F.Supp.2d 871, 890–91 (N.D.Ill.2004). *Accord In re WorldCom, Inc. Sec. Litig.,* 294 F.Supp.2d 392, 420–21 (S.D.N.Y.2003) (lead plaintiff bought stock and tracking stock in WorldCom and therefore lacked standing on its own because it could not allege that it purchased anything under an actionable registration statement).

IN RE COUNTRYWIDE FINANCIAL CORP. SEC. LITIGATION    **1167**
Cite as 588 F.Supp.2d 1132 (C.D.Cal. 2008)

The Court emphasizes the narrow application of the above analysis. First, it only applies where there is more than one issuance of securities originally registered at the same time. Second, it is possible that later issuances could incorporate very different alleged violations and have in common only a minor common misrepresentation or omission. The differences could be significant enough to lead a Court to deny standing for class plaintiffs on a motion to dismiss.

Much more commonly, the differences between the registration documents will make a putative class representative unsuitable. The well developed class certification framework will better guide this inquiry and lead to more efficient resolution of class claims than standing's sometimes-arbitrary distinctions. *See Guenther*, 759 F.Supp. at 1439 n. 1.

Because the CAC adequately alleges common misrepresentations or omissions, and because this litigation purports to comprise a large number of § 11 offerings—spread out over nearly a year—under the same shelf registration and base prospectus, the Court declines to make further standing decisions on the record as it now exists.[39]

### 3. Loss

**[23]** Several Defendants argue that some '33 Act claims should be dismissed for not sufficiently pleading a "loss" in connection with some securities.

Section 11(e) provides a formula for measuring presumptive damages or loss. 15 U.S.C. § 77k(e). These damages are "presumptive" because they are subject to a proviso creating an affirmative loss causation defense, explained below. *Id.*

("Provided, That if the defendant proves. . . .").

*Where a security is sold before suit or held through judgment.* Section 11 presumptive damages are the difference between the amount paid for the security and either (1) the security's value at the time of suit (if it is still held at the time of suit) or (2) the price at which the security was sold (if it was sold before suit). *Id.* This is so whether the price of the security rises or falls after the date of suit; the subsequent rise or fall is *not* part of the measure of damages.

*Where a security is sold after suit but before judgment.* A plaintiff may hold the security at the time of suit *and* sell before judgment. In this situation, the plaintiff's recovery is limited to the lesser of (1) the ordinary damages measure described above or (2) the difference between the purchase and sale price. *Id.* Thus, a plaintiff who holds a security during litigation can capture price increases during litigation but is not protected against declines.

The case law cited by the parties is less than precise about § 11's loss-related pleading requirements. The Supreme Court has stated, "If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

*Type of injury.* Nevertheless, courts appropriately find a complaint deficient under § 11 when it fails to "plead facts demonstrating that he suffered the particular type of injury contemplated by the statute." *In re Mutual Funds Investment Litigation*, 384 F.Supp.2d 845 (D.Md.2005)

---

**39.** Underwriter Defendants' Article III standing argument is unworthy of lengthy discussion. The actual injuries Plaintiffs allegedly suffered arose from the same harmful conduct and is of the same type as the injuries to those they propose to represent. *Lewis v. Casey*, 518 U.S. 343, 357–58, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996).

**1168**            **588 FEDERAL SUPPLEMENT, 2d SERIES**

(citing *Metz v. United Counties Bancorp*, 61 F.Supp.2d 364, 378 (D.N.J.1999)). The "type of injury" the statute contemplates is a decline in investment value due to materially false or misleading information in the registration statement.

This is best addressed as a standing inquiry. Namely, whether a plaintiff suffered a compensable *economic loss on the securities*. If the complaint demonstrates that a plaintiff cannot have suffered the type of injury contemplated by the statute, then it fails Rule 8(a)(2) for failure to "show[ ] that the pleader is entitled to relief." Fed. R. Civ. Proc. 8(a)(2).

Defendants rely heavily on *Mutual Funds*, 384 F.Supp.2d 845, and *Metz*, 61 F.Supp.2d at 364. In *Metz* and *Mutual Funds*, the plaintiffs were unable to allege the kind of loss that the § 11 damages provision requires. The Court agrees that the relevant portions of *Metz* and *Mutual Funds* are correctly decided; but the cases' reasoning does not apply to the present CAC.[40]

Defendants argue *Metz* and *Mutual Funds* could be read to put the pleading burden on Plaintiffs. Defendants read portions of the cases to require that a plaintiff allege (1) the securities' value at the time of purchase; and (2) the securities' value at the time of sale (or at the time of suit). *Metz*, 61 F.Supp.2d at 377 ("*The defendants argue* that . . . the plaintiff must at least plead, if not prove, such diminution . . ." to survive 12(b)(6)) (emphasis added); *Mutual Funds*, 384 F.Supp.2d at 867 ("[P]laintiffs have not alleged facts demonstrating that they . . . have sold their shares (or could have sold their shares) for an amount less than they paid"). The Court rejects Defendants' strained interpretation of these passages.[41]

The plaintiffs in *Metz* were former employees of a company that disappeared in a merger. 61 F.Supp.2d at 368–69. Those plaintiffs did not plead anything that suggested "diminution in the value of the securities involved." *Id.* at 378. Instead, the *Metz* plaintiffs alleged they "sustained injuries pursuant to misrepresentations in the registration statements." *Id.* However, the injuries the *Metz* plaintiffs identified were related only to their employment status and the merger conduct. *See id.* at 368–70. Therefore, they did not allege anything suggesting an economic loss in the securities' value.

---

**40.** The Court does observe, however, that *Metz* (and, later, *Mutual Funds* by adopting *Metz's* language) may have erred by stating that "damages" are an element. Damages are not an element. *See Herman*, 459 U.S. at 382, 103 S.Ct. 683; *In re Stac*, 89 F.3d at 1403–04; *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F.Supp.2d 1248, 1258, 1261 (N.D.Cal.2000) (treating damages as an affirmative defense). *Metz's* analysis began unobjectionably: It parsed the § 11 damages provision to determine the "type of injury" that the statute addresses. 61 F.Supp. at 377. It then concluded that the injuries the *Metz* plaintiffs alleged were not the *type* of injury required. *Id.* In summarizing its conclusion, *Metz* abandoned its "type of injury" language, stating instead that *damages* are an "element." *Id. Mutual Funds*, 384 F.Supp.2d at 866.

**41.** The Court observes that Defendants' argument contradicts *Dura*, which holds that, in a '34 Act claim for fraud, a bare allegation of an inflated purchase price is not enough. Rather, in the purchase and sale context, there must be an inflated purchase price coupled with a decline in price due to the actionable statement. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). That is, even in a fraud claim, where loss and loss causation are elements, the minimum pleading requirements are facts showing (1) a purchase at an inflated price due to a misrepresentation or omission; and (2) a decline in value due to corrective disclosure of the misrepresentation or omission. *See infra* Section II.D.6.

*Mutual Funds* likewise rejected a peculiar harm theory. The economic injuries in *Mutual Funds* were also unrelated to "price differentials" between securities trading prices. 384 F.Supp.2d at 867. The *Mutual Funds* defendants allegedly deprived mutual fund holders from realizing all the *profits* the fund holders *could have realized* if not for arbitrage transactions (both legal and illegal per se) that allegedly increased transaction costs and compelled selling assets in bear markets, generating adverse tax consequences for the funds. *Id.* at 856–57 (describing the transactions), 864 (explaining plaintiffs' theory of injury). *Mutual Funds* held that these damages sufficed for § 10(b), but that nothing in the complaint gave rise to an inference that plaintiffs "paid more for their shares than they received (or could have received) in selling them." *Id.* That is, the allegations did not lead the court to infer that there were any "price differentials" between the mutual funds' purchase and sale prices that were *caused* by the transactions. *Id.* (emphasis added) [42]

*Lack of damages as an affirmative defense.* Relatedly, Defendants suggest that cases that found a complete lack of damages on the face of a complaint support their proposed pleading burden. The cases do not. They appropriately treat § 11(e)'s damages measure as an "affirmative defense." *See, e.g., In re McKesson HBOC, Inc. Sec. Litig.,* 126 F.Supp.2d 1248, 1258 (N.D.Cal.2000).

The Ninth Circuit provided useful guidance when it affirmed a Rule 12(b)(6) dismissal by this Court in another case. *In re Broderbund/Learning Co. Sec. Litig.,* 294 F.3d 1201, 1203 (9th Cir.2002). This Court dismissed a putative class that suffered no cognizable damages under the '33 Act because it was indisputable that all class members profited from the sale of the relevant securities. *Id.* The holding in *Broderbund* (and the other cases Defendants cite) creates the rule that a complaint must be dismissed where it is apparent from the face of the complaint (and matters of which a court may take judicial notice) that plaintiffs cannot have suffered a decline in value of their securities. *See also Pierce v. Morris,* 2006 WL 2370343, at *3, 2006 U.S. Dist. LEXIS 57366, at *15 (N.D.Tex. Aug.16, 2006) ("Where a plaintiff fails to allege any conceivable damages for violation of the Securities Act his claims must be dismissed.") (citing, *inter alia, Broderbund,* 294 F.3d 1201); *In re Initial Pub. Offering Sec. Litig.,* 241 F.Supp.2d 281, 347 (S.D.N.Y.2003) ("Section 11 claims brought by Plaintiffs who sold securities at prices above the offering price must be dismissed because these Plaintiffs have no damages") (also citing *Broderbund,* 294 F.3d 1201).

**[24]** A plaintiff is required (1) to allege that he purchased the relevant securities; and (2) to allege facts creating the reasonable inference that the value of the securities on the presumptive damages date—that is, either the value at the time plaintiff sold the securities; or the value at the time of suit, if the plaintiff still holds the

---

**42.** As suggested by the emphasis, this Court considers "loss causation" the better analytical slot in which to fit the *Mutual Funds* decision. The problem in *Mutual Funds* was that defendants' loss causation defense was apparent on the face of the complaint: due to the nature of that alleged misconduct, it would be impossible for plaintiffs to point to a price differential caused by the arbitrage un-less the *Mutual Funds* court was willing to accept an intrinsic value theory of the mutual funds—that is, that the funds had a value that could be determined without reference to a market. *Id.* at 866 n. 20 (rejecting an intrinsic value theory as a matter of law on the facts there alleged). *See infra* Section II.D.i.6 (discussing loss causation).

securities—is *less* than the purchase price.[43]  So long as the other allegations in the complaint (and matters of which a court may take judicial notice) do not conclusively demonstrate that plaintiffs cannot prove a loss, the complaint survives a motion to dismiss.[44]  The statute, the Ninth Circuit, and the Supreme Court do not require more.[45]

Plaintiffs here sufficiently allege that their securities suffered a diminution in value.  Nothing on the face of the CAC, nothing in the Plaintiffs' appended purchase and sale history, and nothing that the Court can take judicial notice of shows that Plaintiffs cannot have suffered the "type of injury"—economic loss in connection with the purchase or sale of securities—that the law requires.[46]  *Metz*, 61 F.Supp.2d at 378.

### 4.  Loss causation

*Pleading burden.*  Loss causation is not a § 11 element.  *In re Worlds of Wonder*

*Sec. Litig.*, 35 F.3d 1407, 1422 (9th Cir. 1994), *cert. denied sub. nom.  Miller v. Pezzani*, 516 U.S. 868, 116 S.Ct. 185, 133 L.Ed.2d 123 (1995);  *Levine v. AtriCure, Inc.*, 508 F.Supp.2d 268, 272 (S.D.N.Y. 2007).

Rather, § 11(e) makes the absence of loss causation (or "negative causation") an affirmative defense to reduce or avoid liability under § 11.  *See* 15 U.S.C. § 77k(e) (containing a proviso to the damages calculation: "if the *defendant proves* that any portion or all of" the presumptive damages) (emphasis added);  *Levine*, 508 F.Supp.2d at 272.  This is in contrast to '34 Act fraud liability under § 10(b).  *See In re WorldCom, Inc. Sec. Litig.*, 388 F.Supp.2d 319, 346 n. 39 (S.D.N.Y.2005) (loss causation in § 11 is the "mirror image" of the plaintiffs' burden on loss causation in § 10(b)).[47]

---

**43.**  Plaintiffs here went further.  They provided a schedule that identified their securities' purchase and sale dates, together with exact prices.  CAC Ex. B.

**44.**  The PSLRA's particularity requirements do not add elements.  It is true that the PSLRA "may require a plaintiff to plead certain facts with particularity, which may establish" an affirmative defense on a complaint's face.  *Johnson v. Aljian*, 490 F.3d 778, 782 n. 13 (9th Cir.2007), *cert. denied*, —— U.S. ——, 128 S.Ct. 1650, 170 L.Ed.2d 354 (2008) (rejecting a similar argument that the PSLRA elevated the § 10(b) statute of limitations to an element).  This is because the PSLRA forces plaintiffs to say more, increasing the likelihood she will "plead herself out of court" by alleging "facts compelling a decision one way."  *Weisbuch v. County of L.A.*, 119 F.3d 778, 783 n. 1 (9th Cir.1997) (internal quotations and citation omitted).

**45.**  Moreover, requiring a plaintiff to allege more would invert the burden of the defendants' causation defense, expressly framed as such in a statutory proviso.  15 U.S.C. § 77k(e).  The practical effect would be to try damages on the pleadings.

**46.**  To the extent that Defendants' arguments rely on the use of "suffered damage thereby"

in the CAC's Counts, the Court rejects Defendants' formalism.  Nothing requires that plaintiffs use magic words to allege their loss in each count, so long as the allegation is naturally read to allege a plausible loss and other portions of the CAC adequately allege the type of injury the securities laws address.  The CAC gives value declines in connection with each alleged corrective disclosure.  *See, e.g.*, CAC at 348; ¶¶ 1058–64 (alleging "precipitous declines" in the value of all the class securities and stating declines in representative securities' value in both dollar and percentage terms).  Further, the CAC's "damage" language directly tracks the statute, which *only* uses the term "damages."  15 U.S.C. § 77k(e).

**47.**  The different treatment is not without reason.  Section 11 is a harsh, nearly strict-liability rule designed to make sure those involved in securities offerings meticulously prepare the registration statement.  *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 381–82, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).  The universe of potentially actionable statements is limited to statements in those disclosures;  and the universe of plaintiffs contains only those who purchased pursuant to the registration statement.  Given these inherent

IN RE COUNTRYWIDE FINANCIAL CORP. SEC. LITIGATION   **1171**
Cite as 588 F.Supp.2d 1132 (C.D.Cal. 2008)

**[25]** "Because an analysis of causation is often fact-intensive, negative causation is generally established by a defendant on a motion for summary judgment or at trial." *Levine,* 508 F.Supp.2d at 272. There are cases, of course, where the face of the complaint or judicially noticeable facts demonstrate that the plaintiff cannot establish loss causation. In such cases, 12(b)(6) dismissal may be appropriate.

The face of a complaint can provide a complete causation defense where the vast majority of a security's decline cannot be attributed to an alleged corrective disclosure. Such a situation is most likely to occur where there (1) are a few relatively simple misrepresentation or omissions that (2) could be substantially corrected by (3) a relatively small number of simple disclosures. For instance, if a registration statement makes one very important misrepresentation, it is easy to determine when the truth came to the market: in an efficient market, the security's value is likely to drop dramatically at that time. *See No. 84 Employer–Teamster Joint Council Pension Trust Fund v. America West Holding Corp.,* 320 F.3d 920, 933–34 (9th Cir.2003) (explaining that even in efficient markets, price drops may not be perfectly correlated with declines).

The Ninth Circuit in *Metzler* recently discussed loss causation in just such a case. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.,* 534 F.3d 1068, *as amended by* 540 F.3d 1049 (9th Cir.2008). *Metzler* was a § 10(b) case, where loss causation is an element, but the panel's reluctance to dismiss on loss causation is instructive in the § 11 context.

The *Metzler* complaint alleged securities fraud against Corinthian Colleges, a trade school operator. *Id.* at 1055. The fraud allegations were based on (1) a potentially

dangerous incentive structure for individual school administrators, combined with (2) some evidence of fraudulent admissions practices by a few individual school administrators and (3) executives' *access* to the admissions data those administrators entered into their computers. *Id.* at 1059–60. The *Metzler* complaint identified only two discrete disclosures: First, a journal article revealing that some campuses were under federal investigation. A stock price drop quickly followed the article, but within three days Corinthian's stock price *exceeded* the pre-disclosure price. *Id.* at 1059. Second, a statement that the *Metzler* plaintiffs could only convert into a "disclosure" by a tortuous interpretation: those plaintiffs alleged that the statement that its campuses had "higher than anticipated attrition" was code for pervasive admissions fraud. *Id.* at 1059–60. This second statement was accompanied by disclosure that Corinthian failed to hit analysts' estimates for the reported period. *Id.* at 1064. This earnings-miss disclosure was not allegedly false or misleading and made finding causation difficult. *Id.* Together, implausible "disclosures" and a convincing supervening cause of the second stock decline led the *Metzler* panel to reject that complaint as a matter of law. *Id.* at 1064–65. *Accord Twombly,* 127 S.Ct. at 1974 (dismissal appropriate where plaintiffs fail to "allege enough facts to state a claim for relief that is plausible on its face").

Another court found defendants had a complete negative causation defense on the face of the complaint where (1) the securities in issue dropped in value 76.5% before (2) a single, simple corrective disclosure occurred. *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,* 272

---

limitations, it is perfectly reasonable to create what is effectively "a factual presumption that any decline in value is caused by the misrep-

resentation in the registration statement." *Levine,* 508 F.Supp.2d at 275 (internal quotation and alteration omitted).

F.Supp.2d 243, 253–255 (S.D.N.Y.2003). *See also id.* 289 F.Supp.2d 429, 437 (S.D.N.Y.2003) (in a related consolidated case, the *Merrill Lynch* Court reached the same conclusion for a 74% drop before disclosure). *See also In re Impax Labs., Inc. Sec. Litig.,* 2008 WL 1766943, at *7 (N.D.Cal. Apr. 17, 2008) (in a '34 Act claim, where loss causation *is* an element that plaintiff must plead, finding that the face of the complaint negated loss causation when a simple, single disclosure reached the market and fully corrected the misstatement *after* plaintiff sold); *60223 Trust v. Goldman, Sachs & Co.,* 540 F.Supp.2d 449, 461 (S.D.N.Y.2007) ("The essential point is that by the time of the disclosures which allegedly caused the economic loss . . . the stock had already lost almost all its value . . . ."); *In re Portal Software, Inc. Sec. Litig.,* 2007 WL 2385250, at *3, 2006 U.S. Dist. LEXIS 61589 at *9–10 (N.D.Cal. Aug. 17, 2006) ("[B]ecause the Complaint on its face does not foreclose the possibility that defendants caused plaintiffs' losses, a failure to plead loss causation cannot sink plaintiffs' claims on the present motion to dismiss") (citations omitted).

[26] Defendants here argue that the claims involving the 6.25% Notes must be dismissed because Plaintiffs disposed of their holdings at a loss by July 19, 2007, but the first expressly identified disclosure did not occur until July 24, 2007. This is not the law for '33 Act claims.

*Levine's* reasoning is more sophisticated than the analysis Defendants urge. *Levine* observes that declines in value before corrective disclosure generally may not be charged to the defendant. 508 F.Supp.2d at 273. However, "this is not necessarily the case in situations, for example, where the negative undisclosed information leaks into the marketplace." *Id.* at 274. Defendants bear the burden under the '33 Act "to show when the information first entered the marketplace." *Id.*[48]

This is the better view when a complaint alleges a lengthy and complex series of misrepresentations or omissions.[49] Where, as here, a plaintiff alleges a complex series of misrepresentations and omissions over a long period of time, it is likely that some information came to the market, but the full extent of the decline attributable to the misrepresentations and omissions were not priced into the security until later, more significant disclosures.

The CAC alleges at least fifty misleading statements or omissions over the course of some three years. It then cites several examples of disclosures on or after July 24, 2007 that allegedly corrected the previous misstatements.

Plaintiffs nowhere allege that *no* corrective disclosure or other information leak occurred before July 24, 2007. Plaintiffs

---

**48.** The *Metzler* panel cabined the complete-defense-on-its-face theory—even for § 10(b) where loss causation is the plaintiff's burden. The panel renounced, in dicta, a proposed rule of law that would require plaintiffs to identify a monolithic point where complete disclosure occurred and then foreclose loss causation *after* that point. *Metzler,* 534 F.3d at 1084 n. 9. For § 11 allegations that give rise to a plausible inference that information leaked into the market before the first clearly articulable alleged disclosure, *Metzler's* reasoning can be extended to loss causation *before* an alleged disclosure because the loss

causation burden under § 11 rests on defendants.

**49.** Defendants' proposed rule, on the other hand, would perversely encourage slow information leaks and give management a strong incentive to correct market misperceptions as slowly and ambiguously as possible. If taken to its logical conclusion, Defendants' rule would eliminate liability for even the most egregious fraud where corrective disclosure comes in such minute increments that no plaintiff could locate a discrete point of "correction."

do just the opposite. The CAC demonstrates that this is a case where there was a series of partial corrective disclosures and corrective disclosures coupled with continued misrepresentations to blunt the effect of the corrections.[50] They allege that "*[n]o later than* July 24, 2007," Countrywide began to partially reveal the "truth." CAC ¶ 934 (emphasis added). With so many alleged misstatements of varying substance over such a long period of time, it is all but certain that some corrective information leaked to the market before July 24, 2007.[51] The CAC supports this inference: by 2006, the CAC shows that analysts were questioning Countrywide's stagnant loan loss reserves as Countrywide's growth kept increasing at a rapid pace. *See, e.g.*, ¶ 753. Mozilo's repeated amendments to his 10b5–1 trading plans also became a subject of analyst concern around this time. ¶ 754. In response to these concerns, Countrywide continually gave explanations that, if the CAC's allegations are borne out, could be found materially false or misleading. *See, e.g.*, ¶¶ 753–54. This is the sort of situation § 11's functional "factual presumption" accommodates. *See Levine*, 508 F.Supp.2d at 275.

Underwriter Defendants identify even more ways that "reasonable investors" could have learned of some misrepresentations "well prior" to September 18, 2006. Underwriter Defs.' Mot. at 20. Likewise, Countrywide Defendants cite statements they say corrected some misstatements. Country Defs.' Mot. Appx. 5; Countrywide Defs.' Reply at 5–10. Some of those disclosure are buried in MBS registration statements—issued by SIVs, not Countrywide—that Countrywide Defendants argue Countrywide investors should have read. *See supra* Section I.B.iii (discussing truth on the market). Thus, Defendants themselves argue that some of the alleged misrepresentations and omissions were corrected well before July 24, 2007. If nothing else, these arguments illustrate that the corrective effect of the dozens of statements made by Countrywide before July 24, 2007 is a fact question.[52]

The Court DENIES all '33 Act motions to dismiss based on loss causation.

### 5.  Market forces and causation

It is not the Court's role to speculate on the causes of the current economic situation. *In re Countrywide Financial Corp. Deriv. Litig.*, 554 F.Supp.2d at 1065. However, it is the Court's task to manage this litigation efficiently and avoid wasteful arguments. For the past year, almost all Defendants have recited—at hearings and in their papers—that an "unprecedented"

---

**50.**  KPMG makes a more specific version of this argument that the alleged corrective disclosures do not correct the alleged falsity of its audit opinions, and rather, "that the decline in Countrywide's stock price and its debt instruments were caused by multiple factors independent of any corrective disclosures pertaining to KPMG's allegedly false statements." KPMG's Mot. at 24. Even if true, however, those allegations do not establish that "negative causation" appears on the face of the Complaint as KPMG concludes.

**51.**  This is particularly true on these facts, where N.Y. Funds' 6.25% Securities were sold just five days prior to the July 24, 2007 con-

ference call. Information leaks are probably the most likely in the days leading up to an earnings release.

**52.**  The Court's view on corrective disclosures here is consistent with its observation that the CAC does not establish that plaintiffs were on inquiry notice by mid–2006. *See supra* Section I.B.ii (disposing of the statute of limitations argument). There are many public statements prior to July 24, 2007, and it is not possible, at this juncture, to establish what corrective or notice effect on investors they would have had, either individually or in combination.

external "liquidity crisis" caused all (or most) of Countrywide's decline.

The CAC's basic theory is simple: Countrywide's operations so diverged from soundness that Countrywide's repeated assurances of good practices, quality loan origination, and consistently prudent underwriting guidelines were rendered false. This triggered a sharp decline in the value of Countrywide-related securities as the truth emerged. Even as the market began its recent downturn, Countrywide held itself out for a long while as situated differently from other subprime lenders. Thus, the CAC alleges, Countrywide's continued misrepresentations and omissions—made concurrently with some alleged corrective disclosures—extended the class period into early 2008.

It is true, the dramatic market shifts will raise complicated questions on damages. It will be the fact-finder's job to determine which losses were proximately caused by Countrywide's misrepresentations and which are due to extrinsic or insufficiently linked forces.

The Court will not be distracted by liquidity versus solvency and other macroeconomic arguments. The CAC's allegations invite the cogent and compelling inference that Countrywide's deteriorating lending standards were causally linked to at least some of the macroeconomic shifts of the past year. The CAC alleges that reasonable people may differ about how much of situation is attributable to Countrywide and its industry. For example, it quotes Treasury Secretary Paulson as having said, "[T]his turbulence wasn't precipitated by problems in the real economy. This came about as a result of some bad lending practices." ¶ 13.

The issue at present is *whether* the alleged securities violations caused a loss. Not *how much* of the loss the alleged violations proximately caused.[53]

### 6. Falsity

Plaintiffs must adequately allege that statements incorporated into the registration statements for each of the five securities at issue are false or materially misleading ("falsity").

There are two broad categories of allegedly actionable statements. The first are the non-accounting related statements. These statements are attributable to Countrywide, those who signed the registration statement, and the security's underwriters. The registration statements for the securities incorporated prior SEC filings by reference. It is in these filings that the alleged accounting-related misrepresentations or omissions occurred. Accounting-related statements are attributable to their auditor, Countrywide, those who signed the statement, and the underwriters. *Monroe v. Hughes*, 31 F.3d 772, 774 (9th Cir.1994) ("Section 11 of the 1933 Act permits an action against an accountant based on material misstatements or omissions in a registration statement, but only as to those portions of the statement that purport to have been prepared or certified by the accountant.").

Section 11 provides a due diligence defense. 15 U.S.C. § 77k(b)(3). The defense is calibrated to the objective reasonable person in each defendant's position. *In re Software Toolworks Inc.*, 50 F.3d 615, 621 (9th Cir.1994); *Escott v. BarChris Const. Corp.*, 283 F.Supp. 643

---

**53.** As another court put it, "[J]ust as the Court could take judicial notice of the fact that the country suffered from the Great Depression in the 1930s, the Court cannot use that fact to infer anything in particular about a business operating at the time." *In re 2007 Novastar Financial, Inc. Sec. Litig.*, 2008 WL 2354367, at *1, 2008 U.S. Dist. LEXIS 44166, at *5 (W.D.Mo. June 4, 2008).

IN RE COUNTRYWIDE FINANCIAL CORP. SEC. LITIGATION   **1175**
Cite as 588 F.Supp.2d 1132 (C.D.Cal. 2008)

(S.D.N.Y.1968). Reasonableness is generally a fact issue, rarely suitable for summary judgment, let alone a motion to dismiss. *Software Toolworks*, 50 F.3d at 621–22. However, as explained below, Underwriter Defendants have a due diligence defense on the face of the CAC as a matter of law. The defense only covers *accounting-related* allegations in one year. This is because underwriters may reasonably rely on auditors' statements, absent red flags that the underwriters were in a position to see.

The accounting-related falsity allegations in the CAC are sometimes difficult to unravel. Consequently, this section proceeds as follows: First, it provides an overview of the CAC's accounting-related theories. This high-level overview results in finding that one category of statements—those about retained interests—fail to state a claim.

Next, this section analyzes each of the remaining accounting theories—in addition to theories based on non-accounting statements—by evaluating the allegedly false or misleading statements in chronological order. This portion of the analysis is organized by year. Countrywide's fiscal year ("FY") coincides with the calendar year. Therefore, SEC filings related to a particular FY or quarter are discussed with registration statements issued the same year. The actionability of the CAC's allegations vary by year and type of defendant.[54]

In sum, Plaintiffs meet their burden as to all Defendants named in the '33 Act claims except for (1) GT for all Counts; and (2) KPMG for statements related to FY04 and FY05. Plaintiffs are granted leave to amend their accounting-related claims for Countrywide, KPMG, and Underwriter Defendants.

**[27]** *GAAP.* "Financial accounting is not a science. It addresses many questions as to which the answers are uncertain and is a process that involves continuous judgments and estimates." *Shalala v. Guernsey Memorial Hosp.*, 514 U.S. 87, 100, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995). Generally accepted accounting principles ("GAAP") are the standard metric by which courts determine whether accounting statements are false or misleading. GAAP is not "a single-source accounting rulebook," but rather "the conventions, rules, and procedures that define accepted accounting practice at a particular point in time." *Id.* at 101, 115 S.Ct. 1232 (internal quotations and citations omitted). There are many different GAAP sources, "any number of which might present conflicting treatments of a particular accounting question." *Id.*; SEC, STUDY PURSUANT TO SECTION 108(D) OF THE SARBANES-OXLEY ACT OF 2002 ON THE ADOPTION BY THE UNITED STATES FINANCIAL REPORTING SYSTEM OF A PRINCIPLES-BASED ACCOUNTING SYSTEM (2003), available at http://www.sec.gov/news/studies/principlesbasedstand.htm

---

54. The results of this analysis differ slightly from the results in the *Derivative Litigation*. 554 F.Supp.2d at 1069–71. The accounting allegations in the *Derivative Litigation* purported to support a scienter finding in a § 10(b) claim. Thus, the heightened PSLRA standard applied to those allegations. Under those standards, the Court found the accounting-related statements in the *Derivative Litigation* were based on too many subjective evaluations and judgment calls to bolster a "strong inference of scienter" on the facts there alleged.

By contrast, the present CAC alleges a § 11 violation subject only to Rule 8(a) notice pleading and the *Twombly* plausible-on-its-face standard. Further, as explained below, the present CAC presents a reasonable theory to explain why some of its accounting allegations are actionable. Moreover, as in the *Derivative Litigation*, most of the accounting allegations do not state a claim—at least absent some other theory which neither group of plaintiffs have thus far pled.

(last accessed Nov. 14, 2008). The parties generally agree, with one notable exception discussed below, that the Financial Accounting Standards Board's official Statements are the best guide for the theories in issue.

The Court approaches the accounting-related allegations with the reasonable deference a subjective process deserves.

*Overview of accounting-related theories.* Plaintiffs' main MSR theory is that Countrywide overstated MSR values by not properly accounting for default rates in its models. ¶¶ 332–33 (alleging that Countrywide's 10–Ks do not list default rate as an input into the model). Countrywide pro-

tests that it did not need to account for foreclosure rates separately because foreclosures were part of the "prepayment" input. It is irrelevant which MSR valuation input included foreclosure rates: Countrywide's MSR inputs were based on "the historical performance of the loans underlying the Company's MSRs." ¶ 338.[55] This historical data would foreseeably overstate the performance of Countrywide's new loans, which differed greatly from its historical loans.[56]

**[28]** The inference is supported by independent corroboration: Countrywide marked down its MSR values by over $1bn for FY07. ¶ 338.[57] Such a great decline is

---

**55.** Defendants argue that MSR statements were accurate because MSRs were accounted at the lower of cost or market. FAS 140. This argument is unavailing. The models Countrywide used to determine MSRs' value still used historical performance, which reasonably includes historical default rates. *See* ¶¶ 332–33. Even if "market value" was higher than an MSR value derived from models based on information withheld from the market, the result is a fact question inappropriate for 12(b)(6) resolution.

Likewise, Defendants' assertion that interest rates are the most important variable for determining MSR value, only raises a fact question, especially in light of Countrywide's statements about interest-rate risk and its ability to hedge that risk. *See* FAS 113, *Implementation Issue F8* (suggesting that interest rates are the most important variable, at least in the ordinary case because lowered interest rates increase the likelihood of prepayment as borrowers elect to refinance at the new, lower rate); ¶ 674 (Countrywide representative downplaying "interest rate risk" in 2005); ¶ 868 (the same in 2007); ¶ 85 (Countrywide represented that it used financial instruments designed to hedge interest rate risk); ¶ 628 (analyst approving Countrywide's February 2005 explanation that earnings were off because of "the volatility" of [Countrywide's] "servicing hedge"). *See also South Ferry LP No. 2 v. Killinger,* 542 F.3d 776, 780–81 (9th Cir.2008) (discussing MSRs' interest rate risk as well as other risks the CAC does not mention).

**56.** The Court emphasizes that the balance sheet items addressed here are based on projections. These projections are subjective and give management and auditors a fair amount of leeway to make reasonable judgments. *See In re Countrywide Financial Corp. Deriv. Litig.,* 554 F.Supp.2d 1044, 1069–71. Relying on historical data should not be discouraged. However, the CAC presents the rare case where, just as with statements that would ordinarily be puffery, using historical data without adjusting for a dramatic change in practices generates materially false or misleading statements. Perhaps Countrywide could have rendered these MSR statements nonactionable by qualifying them with an explanation that the type and underwriting quality of Countrywide's new loans differed substantially from its historical models; or by stating that it used historical models adjusted due to significant changes in its practices.

**57.** Plaintiffs' other MSR theories do not state a claim. For instance, Plaintiffs allege that MSR values must have been misstated because "as loan sales decreased, the value of Countrywide's MSRs continued to increase." ¶ 337. This allegation misapprehends the nature of MSRs, which do not necessarily correlate perfectly with loan origination volume; MSRs are cumulative—older MSRs remain and new MSRs are added. Further, Plaintiffs do not even state whether the "volume" on which they rely is in terms of aggregate dollar value of loans or total number of loans. MSR value should more closely track the number

not easily attributable to extrinsic forces without fact finding. Of course, this independent corroboration—the fact that the balance sheet items, in hindsight, were inaccurately estimated—is not enough on its own to state a claim. *Shapiro*, 964 F.2d at 283.

[29] Plaintiffs allege that LHI value was materially and unreasonably overstated because Countrywide's origination standards declined more than represented by the LHI impairments Countrywide recognized.[58] This is in part because Countrywide continued to use historical data to project losses on loans that differed greatly from loans that generated the historical data, ¶¶ 267, 278–79. In the present unusual circumstances, relying on historical data could be misleading, at least absent a disclaimer that a significant change in circumstances foreseeably renders historical data a misleading predictor, unless the model factors in the change. *Supra* n. 56. Further, failed loans that had to be repurchased under Countrywide's R & W exposure were eventually moved to LHI if they could not be "repaired," something allegedly not revealed until the FY07 Form 10–K. ¶¶ 354–57.[59]

[30] Likewise, R & W values may have been materially understated for much of the class period because they do not appear to have risen in accordance with the decreased quality of Countrywide loans. For instance, the CAC relates that $177.3mn, or 60%, of the increase in R & W reserves in 3Q07 were related to the repurchase of loans misleadingly labeled "prime" (inviting the inference that the market would not have expected so many defaults, absent knowing what Countrywide's internal definition of "prime" was and its origination practices). ¶¶ 352–53. That same quarter, Countrywide added $291.5mn in R & W liabilities "to account for the Company's breaches of its representations and warranties." ¶ 352. Further, like LHIs, one of R & Ws' key inputs is historical default rate, ¶ 347; FAS 140.

[31] Plaintiffs' RI theory is similar, but fails because the nature of the R & W contingent liability and the RI asset differ. The CAC alleges that RI values increased during the class period, despite the reduced quality of Countrywide's loans. ¶ 318–20. The CAC's RI theory is not actionable as currently articulated. The CAC only states that the RI value should

---

of loans originated than the raw dollar volume. Plaintiffs recognize the implausibility of the allegation, by conclusorily adding a premise at the end of the MSR allegations: "Had the Officer Defendants properly written-down the fair value of the Company's MSRs, investors would have been alerted to the Company's loan portfolio and failing financial health." *Id.* This does not save the MSR theory. As with the RIs, it plausible that Countrywide was marking down its MSRs as it added new MSRs.

58.  Unlike MSRs, LHIs are accounted for on a historical-cost basis, discounted for impairments. FAS 115. Recognition of impaired loans is discussed below.

59.  Defendants object, arguing that nothing in the CAC shows the LHIs were misstated. They make LHI-related arguments—directed

to the '34 Act—that Countrywide disclosed the quality of its loans and that the loans selected to be held for investment were of higher quality than others. *See* Countrywide Defs.' Mot. at 13, 15. The Court cannot draw Defendants' requested inferences on a motion to dismiss; but even if it did, the Court observes that Countrywide represented that the loans it kept on its balance sheet were "very prime." ¶ 867. This description was false and misleading in light of Countrywide's internal definition of "prime." *Supra* Section I.A.ii. Even if some categories of LHI-related statements were true, the CAC adequately alleges that others were materially misleading. *But see infra* n. 78 (finding, under heightened PSLRA standards, that a statement requiring *both* the internal prime-subprime distinction allegations *and* a statement of future intent was insufficiently particularized *as of 2004* ).

have decreased rather than increasing during the class period. It is entirely possible that RI values increased, even as delinquencies increased (on a percentage basis), because Countrywide was adding more RI to its portfolio (on an absolute basis) while properly marking down the old RIs. *See* ¶ 314.[60]

**[32]** Plaintiffs' final accounting-related theory is that internal controls were inadequate. "Internal controls" allegations cover two areas: (1) whether Countrywide had "adequate" internal controls and (2) whether Countrywide's internal controls were "effective." The Court is not persuaded by the "adequacy" allegations. The CAC alleges that Countrywide had sufficient internal controls—such as the EPS and the constant reports that executives received—but that these mechanisms were in fact used to avoid Countrywide's deteriorating underwriting guidelines. *See, e.g.*, ¶ 430; *supra* Section II.A.i (discussing Countrywide's EPS and GEMS systems). The CAC therefore states a claim for statements about "effective internal controls" and there being no change in

internal controls that would affect the accuracy of financial reports, at least by relatively late in the class period. The CAC alleges that Countrywide's standard practice was to use its internal controls ineffectively—indeed, to aid the weakening of guidelines.

*FY 2003–related filings.* For the reasons explained above, the CAC fails to allege falsity for FY03–related accounting statements. *Supra* Section II.B.iv (dismissing GT with prejudice for statements related to this period).

Accordingly, all allegations that rest solely on accounting-related statements in the FY03 Form 10–K are DISMISSED WITH PREJUDICE.

**[33]** The CAC also quotes from 2003 Form 10–K statements by Countrywide management about mortgage quality and underwriting practices. ¶¶ 550–58. For the reasons explained in *supra* Section I. A, these mortgage quality-related statements are adequately pleaded as materially false or misleading.[61] Therefore, the CAC does state a claim with regard to these statements.[62]

---

**60.** By contrast, the theory suffices for R & Ws because the R & W liability appears more likely to increase with the number of loans securitized (more securitizations results in more potential loans to replace at a loss). On the other hand, RIs' correlation with securitization is less certain—RI value depends on the number of interests retained, discounted by their projected losses. The CAC does not allege anything about other variables that could affect RI value.

**61.** Defendants argue that none of the statements related to the quality of LHIs were misleading because Plaintiffs do not challenge the fact that the mean FICO score and LTV for loans in the bank were a respectable 726 and 79%, respectively. Countrywide Defs.' Mot. to Dismiss at 26, 29–30. However, these figures could be misleading without providing the dispersion around the mean or the average when weighted by loan amount. *See* Pls.' Opp. at 21; ¶ 241 (alleging the means disclosed in some Forms 10–K omitted FICO

score bands). After all, the increase in loan loss reserves to $1.84 billion at the end of 2007 corresponded only to an increase of less than 2% (from 0.66% to 2.87%) in 90-day delinquencies among the loans held for investment by Countrywide's bank. *See* ¶ 281. The reduced-documentation basis for many of the loans held for investment is another reason why loan quality could have been lower than the averages indicate. In any case, Defendants do not deny that the significant 2Q07 write-downs were directed to the assets in Countrywide Bank, which held the LHI portfolio. *See, e.g.*, ¶ 938. Plaintiffs' LHI theories cannot be dismissed altogether.

**62.** Of course, the bespeaks caution doctrine protects defendants from liability where warnings about future risks are adequate. This Form 10–K, like Forms 10–K, listed risk factors. However, "cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has tran-

The 2003 10–K was incorporated into the registration statements for the Series A Notes, ¶ 889, and the 2011 Notes. ¶ 899. These statements are attributable to all Defendants except Auditor Defendants.

*FY 2004–related filings.* The CAC as it now stands does not sufficiently allege accounting misrepresentations in the FY04 materials with respect to the following contingent liabilities and assets: (1) R & Ws; (2) loan loss allowance and therefore LHI value; or (3) MSRs. The value of these balance sheet items is tied to loan quality.

For its R & W and LHI theories, the CAC barely attempts to apply the relevant accounting principles. Defendants, on the other hand, convincingly argue that the general accounting principles that are alleged in the CAC could in fact be read to preclude Countrywide from making the estimates Plaintiffs propound.

The parties agree that Financial Accounting Standards No. 5 ("FAS 5") guides accounting for loss contingencies. The relevant loss contingency here is which loans are "impaired" such that Countrywide was likely to take on additional liability. FAS 5 applies to LHIs because they are held at historical cost less impaired assets. FAS 5 is also used to determine which loans are impaired for the R & W contingent liability.

FAS 5 requires that two conditions be met before adding to an estimated loss contingency: (1) an asset is *impaired or liability incurred at the date of the financial statements* (further, "[i]t is implicit in this condition that it *must be probable that one or more future events will occur* confirming the *fact of the loss* "); and (2) the loss amount "can be reasonably estimated." ¶ 269 (emphasis added). The emphasized language requires that an issuer have a great deal of information about an impairment at the time a statement is issued. *See, e.g.,* Hearing Tr. at 71:3–10; Countrywide Defs.' Mot. to Dismiss at 7–8 (citing FINANCIAL ACCOUNTING STANDARDS BOARD, OVERVIEW TO THE FASB STAFF IMPLE-MENTATION GUIDANCE, APPLICATION OF FASB STATEMENTS 5 AND 114 TO A LOAN PORTFOLIO). The CAC therefore does not sufficiently allege that the loans written under Countrywide's new practices were "impaired" at the time of the FY04 filings.

Plaintiffs all but concede this conclusion. Just days before the hearing, Plaintiffs lodged with the Court a request for judicial notice of an American Institute of Certified Public Accountants (AICPA). The AICPA appears to advise that loans should be considered impaired at origination if underwriting guidelines are not followed. Pls.' Supp. Req. for Judicial Notice, Ex. 5, at 127. At the hearing, many of Plaintiffs' accounting arguments turned on this interpretation of FAS 5. *See* Hearing Tr. at 113, 126–27.

**[34]** The Court declines Plaintiffs' invitation to take judicial notice of the AICPA interpretation of FAS 5. Nothing in the CAC fairly apprises Defendants of this interpretation of FAS 5. AICPA is a well known and reputable body and AICPA's interpretation of FAS 5 may be quite reasonable. However, the Court cannot say, based on the CAC, that the AICPA's possible interpretation of FAS 5 is inevitable or even apparent. *Cf. Shalala,* 514 U.S. at 100–01, 115 S.Ct. 1232 (discussing the potential for conflicting GAAP interpretations). Plaintiffs did not attempt to articulate an impaired-at-origination theory in the CAC. Plaintiffs will not be allowed to impose upon the CAC a theory not pleaded in it.

MSRs use a different accounting basis; the FAS 5 discussion above does not apply to them. However, Countrywide's prac-

spired." *Rombach v. Chang,* 355 F.3d 164, 173 (2d Cir.2004).

tices had not changed enough by the end of FY03 for the Court to draw a reasonable inference that MSR value was overstated. *See* FAS 140 (stating the relevant accounting rules); *supra* n. 57 (explaining an actionable theory).

[35] Plaintiffs have another accounting falsity theory that merits some discussion They point out that some of Countrywide's balance sheet items changed dramatically between the FY03 and FY04 Forms 10–K. Plaintiffs suggest that this alone is enough to infer falsity. Plaintiffs are perhaps correct in pointing out that auditors are well advised to examine a company's books especially closely when a company undergoes a sudden increase in growth or operations. *See* ¶ 512. A sudden increase coupled with another, more significant or unusual cause for further inquiry may be enough to raise a falsity question. But the business cycle's upswing alone gives rise to no inference at all.

Plaintiffs do not allege enough corroborating facts in addition to dramatic growth in Countrywide's business to allow the inference that the FY04 statements were false. Some of the alleged changes in mortgage origination statistics between FY03 and FY04 might raise eyebrows. For example, ARMs as a percentage of total loans increased from 21% to 52.27%. ¶ 107. But some alleged statistics cut the other way: total loan dollar volume declined between FY03 and FY04. *Id.* Such ambiguous data do not state a claim for accounting statements subject to a fair degree of deference to accounting judgments. Again, the mortgages were not yet well seasoned enough to tell whether their default rate would be significantly different because not enough time had passed between the alleged change in practices—begun in 2003—and FY04 for the changes to have manifested themselves in higher default rates. The CAC thus does not

state a claim on this accounting theory either.

All accounting-related allegations based on FY04–related statements are DISMISSED WITHOUT PREJUDICE. Plaintiffs have LEAVE TO AMEND.

Countrywide's 2004 10–K and 2Q04 10–Q, on the other hand, contain adequately alleged misrepresentations and omissions as to Countrywide's loan classification, quality, and underwriting standards, ¶¶ 601, 635–36, 638 (statements regarding prime-subprime classifications), 638–39 (statements regarding loan quality control and underwriting standards). *But see infra* n. 78 (finding, under heightened PSLRA standards, that a statement requiring the Court to credit *both* the internal prime-subprime distinction allegations and find false a statement of future intent was insufficiently particularized *as of 2004* ).

These misrepresentations and omissions may be charged to Countrywide Defendants, the relevant Officer and Individual Defendants, and Underwriter Defendants.

The 2004 10–K was incorporated by reference into the registration statements for the 2011 Notes, ¶ 899, the Series B Medium–Term Notes, ¶ 906, and the 6.25% Subordinated Notes. ¶ 913.

[36] *FY 2005–related filings.* Plaintiffs allege that statements in FY05 Forms 8–K were false or misleading. For example, they allege that statements about "solid" quarters, "strong" revenues, or "impressive results" were inherently false or misleading given their accounting allegations. ¶¶ 710, 721, 728. These allegations do not state a claim. First, these allegations all presuppose the same impaired-at-origination theory already rejected as inadequately pled. Second, even if the impaired-at-origination theory were adequately pled, such statements would still

not be actionable. The statements refer to the financial results for the quarter; but the CAC's core business allegations allow the inference that Countrywide was a house of cards, destined for impending failure, and that virtually any statement about (1) underwriting standards and (2) loan quality was materially false or misleading. The "solid quarter" statements, on the other hand, refer only to the specific quarter. In terms of the CAC's narrative: the house of cards survived the relevant quarter—an accurate statement of past fact.

Therefore, all theories based on the FY05 Forms 8–K are DISMISSED WITH PREJUDICE insofar as they allege "solid quarter" and the like were materially false or misleading.

The FY05 quarterly report allegations fail to state a claim against any Defendant about accounting-related statements. This is so for the same reasons explained in the FY03 and FY04 discussions *supra*.

The theories based on quarterly reports are DISMISSED WITHOUT PREJUDICE. Plaintiffs have LEAVE TO AMEND.

Plaintiffs adequately allege actionable statements or omissions in the FY05 Forms 10–Q. ¶¶ 664, 701–02, 734 (prime-subprime classifications); 665, 703, 724 (quality of LHI portfolio). At least one Form 10–Q for FY05 was incorporated into the registration statements for the Series B Medium–Term Notes, ¶ 906, and the 6.25% Subordinated Notes, ¶ 913.

Plaintiffs adequately allege actionable misstatements in the FY05 Form 10–K. ¶¶ 741–45 (subprime-prime classifications and loan quality). This Form was incorporated by reference into the 7% Capital Securities. ¶ 920.

These misrepresentations and omissions may be charged to Countrywide Defendants, the relevant Officer and Individual Defendants, and Underwriter Defendants.

**[37]** *FY 2006 filings.* Even without a new accounting theory, the CAC's allegations about Countrywide's core operations raise the fact question whether, by the time of the April 27, 2006 Form 8–K, Countrywide's accounting-related statements were actionable misrepresentations or omissions.

By FY06 the CAC alleges that Countrywide's underwriting practices had been completely transformed as compared to the 2003 practices. Countrywide's loans originated in 2004 and 2005, if the allegations are correct, could have been failing by 2006 at rates that were alarming relative to 2003 levels. Between FY05 and FY06, negative amortization on Countrywide's LHIs increased from $74.7mn to $645mn. ¶ 290. Delinquencies on HELOCs and pay-option ARMs also increased markedly in FY06. ¶¶ 292–93. These increases strongly suggest many of Countrywide's loans were impaired and therefore should have triggered close inquiry into Countrywide's loan-related balance sheet items.[63] All these things, taken together, allow the inference that the accounting-related statements were false when made, even on the currently pled accounting theory.

**[38]** The Underwriter Defendants' liability for FY06 accounting-related statements (and non-accounting related statements) incorporated into registration statements effective during 2006 is a much closer question. In hindsight, it is appealing to say the same red flags could have

---

**63.** Even nonauditor outsiders were beginning to see red flags by early 2006. Analysts' questions had markedly shifted from fairly general questions about loan quality and valuations to

specific questions about why loan loss reserves were not changing at the same pace as Countrywide's growth and insider trading. *See, e.g.,* ¶¶ 753–54.

**1182**                    **588 FEDERAL SUPPLEMENT, 2d SERIES**

put Underwriter Defendants on notice that the accounting-related statements were false or misleading. But the present CAC does not adequately allege that Underwriter Defendants' reliance on KPMG and Countrywide management's accounting-related statements during this period was unreasonable.

Thus, even if Plaintiffs do not amend their complaint to allege another accounting theory, the CAC does state claims for the accounting-related statements in Countrywide's FY06 SEC filings against KPMG and Countrywide Defendants.

The Court does not dismiss the FY06–related accounting allegations against KPMG and Countrywide Defendants, but nevertheless grants Plaintiffs LEAVE TO AMEND if they wish to add another cognizable accounting theory.

Because their due diligence defense appears on the face of the CAC, the Court DISMISSES the FY06 accounting-related allegations against Underwriter Defendants WITHOUT PREJUDICE. Plaintiffs have LEAVE TO AMEND.

The CAC also alleges actionable statements about prime-subprime classifications in the FY06–related filings that state a claim for the reasons explained above.

These misrepresentations and omissions may be charged to Countrywide, the relevant Officer and Individual Defendants, and Underwriter Defendants.

The April 27, 2006 Form 8–K and several FY06 Forms 10–Q were incorporated by reference into the 7% Capital Securities. ¶ 920.

The FY06 Form 10–K was incorporated into the registration statement for the Series A and B Debentures public offering, ¶ 931, as were some Forms 10–Q. *Id.*

*FY 2007 Filings.* The Form 8–K filed on April 26, 2007 contained a press release that contains alleged misstatement about "strong" financial results. ¶¶ 859–61.

These falsity allegations fail for the same reason as the FY05 8–K discussed above.

The 1Q07, 2Q07, and 3Q07 Forms 10–Q contains adequate accounting and nonaccounting statements for the reasons discussed above. ¶¶ 875–886, 951, 953, 957, 959, 1010–1017. The Court notes that these 10–Qs also contained some alleged corrective disclosures in addition to misrepresentations.

By FY07, unlike FY06, the Court cannot say that Underwriter Defendants lacked sufficient red flags to have a due diligence defense as to accounting-related statements on the CAC's face.

Thus, there are actionable statements in the FY07 10–Qs as to all Defendants against whom they are asserted.

The FY07 10–Qs were incorporated by reference into the Series A and B Debentures public offering. ¶ 931.

In sum: Plaintiffs do not state a claim against (1) GT as to all claims; (2) KPMG, but only on the Series A Medium–Term Notes and the 2011 Notes; and (3) Underwriter Defendants, but only on FY06 accounting-related statements.

Claims against GT are dismissed with prejudice; those against KPMG and Underwriter Defendants with leave to amend.

**ii.  Section 12(a)(2)**

Section 12(a)(2) provides that any person who "offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact" shall be liable to the person purchasing such security. 15 U.S.C. § 77*l*(a)(2); *Miller v. Thane Intern., Inc.,* 519 F.3d 879, 885 (9th Cir.2008), *cert. denied,* —— U.S. ——, 129 S.Ct. 161, 172 L.Ed.2d 43 (2008).

**[39]** Section 12(a) allows a purchaser to rescind the affected transaction if he still owns the security. 15 U.S.C. § 77*l*(a). Therefore, presumptive damages are not limited to those caused by the violation and loss causation is not an element that a plaintiff needs to allege. *See Randall v. Loftsgaarden,* 478 U.S. 647, 655, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986); *In re Daou Systems, Inc.,* 411 F.3d 1006, 1029 (9th Cir.2005). Some cognizable loss, however, must be alleged. *In re Daou,* 411 F.3d at 1029 (citing *In re Broderbund/Learning Co. Sec. Litig.,* 294 F.3d 1201, 1205 (9th Cir.2002)).

If the purchaser already sold the security at a loss, he may sue for damages. 15 U.S.C. § 77*l*(a)(2) (stating that a plaintiff may "recover the consideration paid for [the] security with interest thereon, less the amount of any income received thereon, upon the tender of the security, or for damages if he no longer owns the security"). The PSLRA subjects § 12(a)(2) to a negative causation defense very similar to that under § 11. *See* 15 U.S.C. § 77*l*(b); *supra* Section II.C.i.4 (explaining that a § 11 negative causation defense can only foreclose a claim on a motion to dismiss if the face of the complaint and judicially noticeable facts conclusively negate loss or loss causation).

Section 12(a)(2) also has a "reasonable care" defense. *In re Software Toolworks Inc.,* 50 F.3d 615, 621 (9th Cir.1994), *cert. denied,* 516 U.S. 907, 116 S.Ct. 274, 133 L.Ed.2d 195 (1995).

**[40]** A defendant's legal status, not scienter, circumscribes the otherwise sweeping liability described above. The "offers or sells" clause limits § 12(a)(2) liability to two narrow classes of defendants: (1) immediate sellers ("remote purchasers are precluded from bringing actions against remote sellers"); and (2) those who solicit purchases to serve their "own financial interests or those of the securities owner." *Pinter v. Dahl,* 486 U.S. 622, 644 n. 21, 646, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988).

**[41]** Therefore, the elements of a § 12(a)(2) violation are: (1) a direct offer or sale of a security to the plaintiff; (2) in interstate commerce; (3) by means of a prospectus or oral communication; (4) that includes a material misstatement or omission; and (5) an allegation of some loss, where the face of the complaint and judicially noticeable facts do not conclusively negate loss or loss causation.

Plaintiffs fail to plead that they purchased the securities directly from specific underwriters, or directly traceable to specific underwriters, as required. *Pinter,* 486 U.S. 622, 108 S.Ct. 2063. Plaintiffs acknowledge the deficiency and state that they are prepared to replead. Hearing Tr. at 135:17–24.

Therefore, the Court DISMISSES the § 12(a)(2) claims—Counts 2, 5, 8, 11, and 14—WITHOUT PREJUDICE. Plaintiffs have LEAVE TO AMEND.

### iii.  Section 15

**[42, 43]** Section 15 extends liability created under §§ 11 and 12(a)(2) to "[e]very person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under sections [11 or 12.]" 15 U.S.C. § 77*o*. The section creates joint and several liability for control persons after a primary securities violation is found. *In re Daou,* 411 F.3d at 1029–30. Whether a defendant is a control person is a fact question rarely appropriate for motion practice. *In re Worlds of Wonder Sec. Litig.,* 694 F.Supp. 1427, 1435 (N.D.Cal.1988).

**[44]** The CAC adequately alleges primary violations for the claims not dismissed above. The § 15 defendants (Offi-

**1184**       588 FEDERAL SUPPLEMENT, 2d SERIES

cer Defendants and McLaughlin) are plausible control persons.

The § 15 claims that fail for lack of a primary claim are DISMISSED WITHOUT PREJUDICE. Plaintiffs have LEAVE TO AMEND.

### D.  '34 Act Claims

#### i.  Section 10(b)

Counts 16 and 18–19 are based on the implied right of action under § 10(b) and Rule 10b–5 of the 1934 Act (hereinafter " § 10(b)"). *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5.

Count 16, involving Countrywide's publicly traded securities, names as defendants Countrywide and Officer Defendants (Mozilo, Sambol, Sieracki, and Kurland). Count 18 is brought against KPMG for its statements other than those made in the registration statements discussed above.[64] Count 19 is brought against Countrywide, Mozilo, Sambol, Sieracki, and KPMG; Count 19 is based solely on the Series A and Series B Debentures sold in the public market.

[45]  Section 10(b) creates a claim for fraud in connection with the purchase or sale of a security. After standing is established—by a purchase or sale of a security—a plaintiff must prove the following elements in connection with the purchase or sale: (1) a material ["materiality"] (2)

misrepresentation or omission ["falsity"] (3) made with scienter ["scienter"] (4) on which plaintiff relied ["reliance"], (5) suffering an economic loss ["loss"] (6) caused by the misrepresentation or omission ["loss causation"]. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 341–42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005).

These requirements are subject to various pleading standards, noted where relevant below.

#### 1.  Standing

The § 10(b) implied right of action requires that a named plaintiff actually purchase or sell a security. *Blue Chip,* 421 U.S. 723, 95 S.Ct. 1917.

[46]  Section 10(b) standing differs from § 11 standing: it does not require a common "registration statement," but instead "a purchase or sale in connection with any security." *Blue Chip,* 421 U.S. at 756, 95 S.Ct. 1917. This is a less demanding test that Plaintiffs pass *a fortiori*.[65]

[47]  Therefore, for reasons explained in *supra* Section II.C.i.2 (discussing § 11 standing), a plaintiff named in this case has purchased each relevant security—both debt and equity, as well as common stock.

The Court will take up the more significant issues whether Plaintiffs are appropriate class representatives for each type of security at class certification.

---

**64.** Count 18 also asserts a § 10 violation against GT, but GT has already been dismissed with prejudice for the reasons discussed in *supra* Section II.B.iv.

**65.** *See also Zelman v. JDS Uniphase Corp.,* 376 F.Supp.2d 956, 959–63 (N.D.Cal.2005) (discussing § 10(b) standing at length and finding reciprocal standing between purchasers of securities that had far more differences—and, because one class of securities was not even issued by the defendant corpora-

tion, much more likely to exponentially increase potential 10b–5 plaintiffs—than the securities here); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.,* 2005 WL 2148919, at *7–8, 2005 U.S. Dist. LEXIS 19506, at *33–35 (S.D.N.Y. Sept.6, 2005) (finding standing in a far more analogous case where "a class representative who purchased certain classes of securities has standing to pursue claims on behalf of purchasers of other classes of securities from the *same issuer*" (emphasis in original)).

### 2.  Materiality

**[48]**  Materiality must be pled with particularity.  *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 951 (9th Cir.2003).  It is one of the "circumstances constituting fraud" not subject to Public Securities Litigation Reform Act ("PSLRA") standards.  Fed. R. Civ. Proc. 9(b); 15 U.S.C. § 78u–4(b).  Therefore, it is subject to Rule 9(b).

The materiality of the representations and omissions are not persuasively disputed.  *See Atlas v. Accredited Home Lenders Holding Co.*, 556 F.Supp.2d 1142, 1155 (S.D.Cal.2008) ("[A]s a mortgage lender . . . underwriting practices would be among the most important information looked to by investors.");  *supra* Section I.A.ii (explaining how the quality of Countrywide's underwriting affected the company's value).  *See also infra* n. 76 (rejecting PSLRA safe harbor and bespeaks caution arguments Defendants make).

### 3.  Falsity & scienter

**[49]**  *Falsity's Role.*  False or misleading statements or omissions (collectively, "falsity") often help lead to an inference of scienter.  The Ninth Circuit approves analyzing falsity together with scienter.  *In re Daou*, 411 F.3d at 1015 ("[F]alsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, and the two requirements may be combined into a unitary inquiry under the PSLRA" (internal citations and quotations omitted)).  Therefore, particular false statements attributable to each of the relevant defendants are identified in discussing the cogent and compelling inference of scienter that the CAC raises as to each defendant.

The Court emphasizes that it is not bootstrapping its scienter analysis to the falsity analysis.  The statements mentioned go to scienter because they are strong and directly contradict the CAC's allegations about Countrywide's core operations.  If the CAC's allegations are accurate, these statements are so objectively out of line with Countrywide's practices that they contribute to a strong inference of scienter.

*Pleading standards.*  The PSLRA requires that falsity allegations in securities fraud claims meet an even higher standard than Rule 9(b)'s particularity requirement.  The complaint must (1) explain why the statement is false or misleading and, (2) if alleged on information and belief, the complaint must "state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u–4(b)(1).

The PSLRA requires that the facts underlying scienter meet another heightened standard.  To state a '34 Act claim, a pleading must allege with "particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2).  The Supreme Court glosses "strong inference" as one that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S.Ct. 2499, 2504–05, 168 L.Ed.2d 179 (2007).  To find a strong inference, a court must determine that a scienter inference is "at least as likely as any plausible opposing inference."  *Id.* at 2513.  This requires a "comparative evaluation" of competing inferences that can be drawn from the allegations.  *Id.* at 2504.  However, the evaluation is still made in light of the entire complaint—a court must not isolate each allegation and determine whether that allegation meets the standard—as well as judicially noticeable facts.  *Id.* at 2509.

**[50]**  "[K]nowing or intentional conduct" satisfies the "required state of mind."  *S. Ferry LP, No. 2 v. Killinger*,

542 F.3d 776, 782 (9th Cir.2008) (internal quotations omitted). Every Circuit also agrees that some degree of recklessness satisfies § 10(b)'s scienter requirement, but the Supreme Court has expressly reserved the question. *Tellabs*, 127 S.Ct. at 2507 n. 3. The Ninth Circuit has one of the most demanding recklessness standards, requiring "deliberate recklessness," which is recklessness that "reflects some degree of intentional or conscious misconduct"—apparently something more than gross recklessness and less than actual knowledge that the statement was false or misleading. *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 976 (9th Cir.1999), *reh'g en banc denied*, 195 F.3d 521 (9th Cir.1999); *South Ferry*, 542 F.3d at 782.

[51] Defendants attack certain allegations as insufficiently particularized. For example, they object that the CAC fails to allege the extent to which the EPS was employed in 2004 and 2005; and that the CAC fails to explain how the 15,000 to 20,000 loans a month processed through EPS in 2006 were significant in light of the total loans approved by Countrywide that year. Though "omissions and ambiguities count against inferring scienter," failing to precisely specify each fact and date is not fatal. *Tellabs*, 127 S.Ct. at 2503. Accordingly, the Court somewhat discounts most of the allegations that Defendants brought to its attention. Discounting those relatively minor omissions and ambiguities does not alter the final result.

*Core mortgage-related operations.* The CAC appears to be the result of the careful research and investigation encouraged by the PSLRA. *See* 15 U.S.C. § 78u–4(b)(3)(B). Taking the CAC as a whole, Plaintiffs have created a cogent and compelling inference of a company obsessed with loan production and market share with little regard for the attendant risks, despite the company's repeated assurances to the market. With respect to loan origi-

nation practices, they raise strong inferences that (1) borrower requirements were progressively loosened over the Class Period; (2) in many instances, the actual loan quality was lower than the borrower's FICO score and LTV ratio suggested because Countrywide misrepresented how lax its verification practices became; and (3) Countrywide management routinely circumvented the normal underwriting process by approving highly risky loans for sale into the secondary market. *See supra* Section I.A.i.

The Court draws these inferences from the public sources and Countrywide internal documents cited in the CAC and from the corroboration furnished by the CAC's numerous confidential witness accounts. *See generally In re Daou*, 411 F.3d at 1015 (observing that confidential witnesses may be probative of scienter where their identities are "described in the Complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged") (internal quotations and citations omitted); *In re Countrywide Financial Corp. Deriv. Litig.*, 554 F.Supp.2d at 1058–59 (finding credible the accounts of various CWs that, as here, spanned levels of Countrywide hierarchy and geographic origin, where the accounts remained consistent over time).

[52, 53] *Insider sales.* The CAC alleges suspicious insider sales by the Officer Defendants. The PSLRA "neither prohibits nor endorses the pleading of insider trading as evidence of scienter," but requires that the evidence, like all other evidence, "meet the 'strong inference' standard." *In re Daou Systems, Inc.*, 411 F.3d 1006, 1022 (9th Cir.2005) (citing *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 197 (1st Cir.1999)). One key inquiry is whether the insiders' sales of stock are "suspicious," namely, whether they are

IN RE COUNTRYWIDE FINANCIAL CORP. SEC. LITIGATION    **1187**
Cite as 588 F.Supp.2d 1132 (C.D.Cal. 2008)

"dramatically out of line with prior trading practices at times calculated to maximize personal benefit from undisclosed inside information." *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 986 (9th Cir. 1999). *Silicon Graphics* established some relevant factors: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history. *Id.*

The *Silicon Graphics* factors do not purport to be exclusive. *Tellabs'* flexible inquiry prevents such arbitrary limitation of the inquiry. The Court finds an additional factor useful for this case: whether innocent explanations for trading-related conduct are economically rational. This requires straightforward *Tellabs* balancing— are the innocent explanations at least as cogent and compelling as inferences that encourage a scienter finding?

In this case, insider selling while Countrywide's practices begin to be disclosed to the market contributes to an inference that some Countrywide insiders recognized that more disclosures were yet to come and made an effort to cash out. If this is so, one may infer that Countrywide insiders knew they had misled—and were continuing to mislead—the market.

Most of the CAC's insider trading allegations do not support any inference at all, let alone scienter. Most of the stock-sale allegations are comparisons between the four-year class period and the four-year period before the class period. *See* ¶¶ 449–70. Numerous variables confound any comparison between these lengthy periods. For example, Countrywide was growing dramatically, officers grew closer to retirement, and stock option compensa-tion packages may have become more or less common between the periods. Further, according to the allegations, one of the Officer Defendants, Eric Sieracki, had no *net* sales during the class period.

Nevertheless, some trading allegations do contribute to a strong inference of scienter.[66] Countrywide began its first-ever stock repurchase plan in November 2006. It announced a second in May 2007. Meanwhile, some Countrywide insiders allegedly began selling their Countrywide stock at higher-than-usual rates during the repurchases. Countrywide's buying could reasonably have augmented market demand, making it easier for insiders to find buyers and allowing more sales without depressing prices. *See In re Countrywide Financial Corp. Deriv. Litig.,* 554 F.Supp.2d at 1067 (discussing the insider trading patterns during the repurchases).

Further, companies generally repurchase their undervalued stock with their own cash (or other assets) because they believe its own stock will yield a better return than other investments. That is, repurchases signal to the market that a company believes its stock is undervalued, ¶¶ 494–95. Repurchases therefore might contribute to a price increase, propping up the prices insiders receive.[67] But Countrywide's rationale may have been different: rather than investing its own money, Countrywide raised capital from outside investors to finance at least part of the repurchases. Countrywide Form 8–K (Oct. 24, 2006) ("[T]he Company intends to repurchase $1 billion to $2 billion of its common stock in the fourth quarter financed through the issuance of high equity-content debt securities.").

---

66. The Court previously discussed similar trading allegations in the *Derivative Litigation.* 554 F.Supp.2d 1044, 1066–69.

67. It may also give rise to an inference that Countrywide insiders were manipulating the market price of Countrywide stock to reduce the gradual corrective disclosures' effect on the market price.

**1188**            **588 FEDERAL SUPPLEMENT, 2d SERIES**

Again, as insiders were selling, Countrywide was buying—with newly raised capital rather than existing cash reserves. The CAC therefore creates a strong inference that Countrywide's explanation for its stock repurchase plan was economically suspect.[68] As the Court observed in the *Derivative Litigation*, "How could the [Countrywide] Board members approve a repurchase of $2.4 billion dollars worth of stock, and nearly contemporaneously liquidate $148 million of their personal holdings just months before the stock dropped some 80–90%?" 554 F.Supp.2d at 1067.[69]

Chairman and CEO Mozilo's increase in selling during the repurchase and disclosures was the most pronounced. Even if the repurchase was entirely unobjectionable, Mozilo's increased sales—as disclo-

sures snowballed—contributes independently to an inference of scienter. Though Mozilo used 10b5–1 plans to sell based on predetermined events, he amended these plans so frequently during this period that he "appear[ed] to defeat the very purpose of the 10b5–1 plans." *In re Countrywide Financial Corp. Deriv. Litig.,* 554 F.Supp.2d at 1069; ¶¶ 471–93; 17 C.F.R. § 240.10b5–1 (providing a safe harbor for plans in good faith).[70] Indeed, Mozilo made a 10b5–1 amendment three days after announcing the first repurchase; and he then made two more amendments during the first repurchase. ¶ 496.

The CAC, as explained above, only gives aggregate sales data for Sambol, Kurland, and Sieracki.[71] The Court will not draw any inference based on that dataset and

---

**68.** Open market repurchases have also received some attention from academics and the SEC. The Court expresses no opinion about the propriety of open market repurchases generally; as with any transaction, there are surely many legitimate reasons for a repurchase. For example, repurchasing shares reduces the number of shares outstanding, thereby increasing earnings per share and allowing enhanced dividend distribution.

However, the following alleged facts contribute to a strong inference of scienter—(1) two large open market repurchases while disclosures mounted and (2) raising money from outside investors while (3) insiders increased their selling.

These allegations do not fit neatly into the *Silicon Graphics* factors, but they do find some basis in the literature. *See* Jesse M. Fried, Informed Trading and False Signaling with Open Market Repurchases, 93 Cal. L.Rev. 1323 (2005) (discussing some economics of and incentives for repurchases). *See also* 17 C.F.R. § 240.10b–18(b) (providing issuers and affiliated purchasers, but not inside sellers, a limited safe harbor for open market repurchases).

**69.** The *Derivative Litigation* named different defendants, of course, so the absolute numbers involved here are not as great. But the observation at the core of this inference re-

mains valid for the CAC: it is suspect for those in a position to understand Countrywide's true state to initiate a huge repurchase while liquidating their holdings shortly before a precipitous drop.

**70.** The Court declines Defendants' invitation to reconsider its conclusion in the *Derivative Litigation* that the timing of Defendant Mozilo's stock plans are probative of scienter. Defendants dispute the timing of Mozilo's new employment agreement, which they argue is dated December 22, 2006, not October 20, 2006, as Plaintiffs allege. Countrywide Defs.' Mot. at 45–46. Thus, they argue, Mozilo's public explanation for amending his December 2006 plan is consistent with the date of his employment agreement. *Id.;* ¶ 484. The Court found in its previous order that the very fact that Mozilo was so actively amending his 10b5–1 plans, which were designed to be passive, was relevant to scienter. *See* 554 F.Supp.2d at 1069.

**71.** The allegations discussed in the *Derivative Litigation* order did include absolute-dollar values of Sambol's sales during the repurchase periods. Even if the Court were inclined to take judicial notice of those figures, they give no comparison with any earlier period and therefore no reason to infer that Sambol's behavior changed during the repurchases. *See* 554 F.Supp.2d at 1067.

assumes, for purposes of the present motions only, that these three defendants sold no stock.

Kurland left Countrywide in September 2006—before the first repurchase plan. ¶ 29. There are no other allegations about Kurland's trading behavior. The repurchase allegations therefore do not contribute to a scienter inference for Kurland.

The weak support for scienter that the CAC provides as to Sambol and Sieracki derives only from (1) the suspicious structure of the repurchase plans and (2) the CAC's allegations that Mozilo's insider trading was brought to the Officer Defendants' attention. *See, e.g.*, ¶¶ 491, 752, 753.[72]

[54]  *Position-based inferences.*  In some circumstances it is appropriate to use a defendant's position and responsibilities within the company to support a strong inference of scienter. This is especially appropriate when the alleged misrepresentations relate to a company's "core operations."

The Court analyzes position-based inferences after a flurry of recent Ninth Circuit opinions on the issue. This Court recently discussed such inferences in the *Derivative Litigation.* 554 F.Supp.2d at 1057–71 (finding that it was "absurd to suggest" some key insiders lacked knowledge about Countrywide's core mortgage-related operations). Because the Court did not then have the benefit of *Metzler Inv. GMBH v. Corinthian Colleges, Inc.,* 534 F.3d 1068, *as amended by* 540 F.3d 1049 (9th Cir. 2008), *Berson v. Applied Signal Tech.,* 527 F.3d 982 (9th Cir.2008) (Kozinski, C.J.), and *S. Ferry LP, No. 2 v. Killinger,* 542 F.3d 776 (9th Cir.2008), the Court now

undertakes a more thorough discussion of the law.

*Metzler* rejected a complaint alleging fraud at Corinthian Colleges ("Corinthian"), a trade school operator with campuses nationwide. 527 F.3d at 1055. *See also supra* Section II.C.i.4 (discussing *Metzler's,* loss causation analysis). Corinthian's core business depended on enrolling students and receiving tuition payments. The *Metzler* complaint alleged that Corinthian's colleges were "pervaded by fraudulent practices" because some campus administrators falsified reports. 540 F.3d at 1055–56, 1059–60. The *Metzler* confidential witnesses had only campus-level knowledge and represented just a few Corinthian campuses. *Id.*

To monitor its core operations, Corinthian "had in place a management information system that monitored enrollment and other data company-wide." *Id.* at 1067–68. That information system apparently reported fairly high-level enrollment data: just "enrollment and placement figures." *Id.* at 1068. The complaint alleged that "management had a "general awareness" of the company's day-to-day workings." *Id.*

The *Metzler* panel, facing such a deficient complaint, rejected a strong inference of scienter. It has been long established in this Circuit that "general awareness of the day-to-day workings of the company's business does not establish scienter." *Id.* Further, even if the *Metzler* defendants had actual knowledge of the data reported by the system, there was apparently no basis for inferring that the data would reveal the alleged pervasive fraud. First, the alleged fraud was a plan to systematically falsify

---

**72.** *Accord No. 84 Employer–Teamster Joint Council Pension Trust Fund v. America West Holding Corp.,* 320 F.3d 920, 944 (9th Cir. 2003) ("Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period . . . the lack of stock sales by a defendant is not dispositive. . . .")

enrollment data throughout the company. But the allegations came only from a few scattered campuses and nothing suggested that the individual defendants orchestrated a plan from the top rather than supervisory failures. *See id.* at 1056. Second, even if administrators were falsifying data on a significant scale, nothing about the enrollment data gave rise to a strong inference that the data's recipients must have known of the fraud: even if the data the campus administrators entered was systematically fraudulent, administrators would have had strong incentives to make the data look legitimate.

By contrast, the present CAC persuasively alleges that systematic changes in Countrywide came from the top down and pervaded virtually every office. *See supra* Section II.A.i (explaining allegations about Countrywide's core mortgage-related operations). Countrywide directors and officers were allegedly not just generally aware of EPS and other exception-tracking systems, they were, according to many corroborating CWs, regularly provided detailed exception statistics. *See, e.g.,* ¶¶ 405, 412–29. As discussed *infra*, each Officer Defendant against whom scienter is alleged publicly professed knowledge of Countrywide's underwriting practices at the time in question.[73]

Moreover, the exception figures that Countrywide's systems tracked were not high-level data that would not clearly point up Countrywide's true position. Rather, the figures track exactly the business practices in issue—systematically lowering, avoiding, and undermining guidelines while approving low-quality mortgages as "prime." The analog for *Metzler* would be a system that tracked when Corinthian or Department of Education guidelines were disregarded, not a system that tracked enrollment data.[74]

*Berson* is most instructive for evaluating the present CAC. 527 F.3d 982. In *Berson*, defendant corporation Applied Signal received 80% of its revenue from contracts with two government agencies. *Id.* at 984. Countrywide, similarly, received over 90% of its revenue from its core mortgage-related operations for at least part of the class period. ¶¶ 82–83. Therefore, Applied Signal's business revolved around a few major government contracts, just as sound mortgage underwriting practices were undeniably central to Countrywide's ongoing vitality.

The government agencies could order work on the contracts stopped at any time. 527 F.3d at 984. Once stopped, Applied Signal stopped earning money. *Id.* Just as important, once work was stopped there was a high probability that the agency would unilaterally cancel the contract. *Id.*

Applied Signal received four stop-work orders—one of which was on a project

---

**73.** *Accord In re Daou,* 411 F.3d 1006, 1022 ("[S]pecific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database are factors in favor of inferring scienter . . . ." (discussing the inference in the context of accounting fraud)); *Metzler,* 540 F.3d at 1066 (scienter requires "specific contemporaneous statements *or conditions* that demonstrate the intentional or deliberately reckless false or misleading nature of the statements when made") (quoting *Ronconi v. Larkin,* 253 F.3d 423, 432 (9th Cir.2001) (emphasis added)).

**74.** This is not to discourage effective management information systems. In fact, as with effective internal controls over financial accounting, strong information systems and involved management may often contribute to an inference of good faith by demonstrating a commitment to sound practices. But when there are both strong systems and allegations of long-running misconduct of the type those systems aim to prevent, a strong inference of scienter may be more likely.

IN RE COUNTRYWIDE FINANCIAL CORP. SEC. LITIGATION **1191**
Cite as 588 F.Supp.2d 1132 (C.D.Cal. 2008)

worth approximately $12mn. *Id.* at 986–87. Applied Signal allegedly misled the market by not properly accounting for the greatly increased risk it would lose the stopped contracts, thereby making it look like the $12mn was still coming in (or was likely to come in). *See id.* at 987, 990.

*Berson* held that these facts gave rise to a strong inference of scienter for Applied Signal's CEO and CFO. *Id.* at 987–88. The *Berson* complaint, unlike the present CAC, did not refer to confidential witnesses who could allege first-hand knowledge of the CEO and CFO's practices. Rather, *Berson* approved the inference that the CEO and CFO knew of the stopwork orders because the suggestion that these corporate insiders—the top executive and the top financial officer—would be unaware of a development so crucial to the business was "absurd." *Id.* at 987–88.

Prior to *Berson* there was some confusion in the Circuit as to whether core operations inferences were appropriate. *Berson* explained that the Circuit had rejected only two inappropriately lax pre-*Tellabs* standards: (1) a bald statement that core operations and important transactions "may be attributed to the company and its officers" without any elaboration on how high the hurdles to such an inference are; and (2) a standard that would contravene the text of the PSLRA by testing core operations inferences for a "reasonable inference" of scienter. *Id.* at 988–89 (explicating *In re Read–Rite Corp. Sec. Litig.*, 335 F.3d 843 (9th Cir.2003) and *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920 (9th Cir. 2003)).

Finally, *South Ferry* resolved any misinterpretations of *Berson* and clarified the

position-based inference analysis. 542 F.3d 776. *South Ferry* recognized that complaints must rely on circumstantial evidence of scienter. In some cases it is "absurd to suggest" that management's position is not a highly probative circumstance. *Tellabs* does not allow courts to create "separate[ ] rules of thumb for each type of scienter allegation"; instead, the circumstances must always be viewed as a whole. *Id.* at 784. For position-based allegations to satisfy the PSLRA, plaintiffs must "bridge the gap" between a defendant's mere access to information and an inference of knowledge. *Id.* at 783. In most cases, this will require additional particularized facts about the defendants—perhaps, as in the present CAC, a defendant's own public statements or confidential witness reports about a defendant's specific activities.

In "exceedingly rare" circumstances, *South Ferry* explained, a "bare core operations inference" may suffice. *Id.* at 785 n. 3 (citing and discussing *Berson*, 527 F.3d 982). The complaint must show that it is "absurd to suggest" the defendants, by virtue of their positions, would not have knowledge of developments in core operations or important transactions. *Id.* at 786 (quoting *Berson*, 527 F.3d at 988).

From these cases, the Court derives the following principles: (1) a defendant's position within the company is a relevant circumstance to consider in the *Tellabs* analysis; (2) all particularized allegations about a defendant's activities and statements should be considered before making a position-based inference, just as in any *Tellabs* analysis; and (3) position alone creates a strong inference of scienter only in the extraordinary case where it is "absurd to suggest" that a defendant did not know. These principles inform the following discussion.[75]

---

**75.** *Berson* and *South Ferry* renounce any language in *Metzler* or pre-*Tellabs* cases could be interpreted to require more. *See South Ferry*, 542 F.3d at 784–85 (discounting the approach

of several pre-*Tellabs* cases and only citing *Metzler* for the proposition that a "bare core

### a. Countrywide

[55]  The alleged falsity of statements made by the company has already been discussed above in Sections I.A.iii and II. C.i.6. Even revising the core business allegations to further discount confidential witnesses, see *In re Daou*, 411 F.3d at 1015, and otherwise reflect the PSLRA's heightened pleading standards, the CAC still adequately alleges fraud against Countrywide.  If the highly particularized allegations about Countrywide's core business operations give even a rough sketch of what Countrywide's business practices looked like during the class period, then many statements the Court has already discussed—and others raised in the CAC—may well have been fraudulent.

### b. Angelo Mozilo

[56]  Chairman and CEO Mozilo made numerous public statements about Countrywide and its practices during the class period.  Some of his public statements appear to demonstrate that he knew others of his statements were false when made.  Thus, the Court need not impute knowledge to Mozilo from his position alone.

*2004.*  In April 2004, Mozilo distinguished Countrywide's "very, very good solid subprime business" from the "frothy business [where lenders] are taking 400 FICOs with no documentation."  ¶ 119.  Mozilo declared Countrywide's "very strong disciplines in the origination of subprime loans" and assured the market that "maintaining that discipline is critically important to" Countrywide.  *Id.* Mozilo concluded, "[W]hen you look at sub-prime, you have to look at it in tranches, and we are at the high end of that tranche."  *Id. See also* ¶ 120 (discussing further statements on the same conference call).  *Cf.* ¶¶ 132–34 (discussing official underwriting matrices from 2003 that contradict Mozilo's 2004 representations).

The CAC's timeline of continually deteriorating underwriting standards—especially when coupled with exception processing and reckless documentation practices—gives rise to a strong inference that, by April 2004 Countrywide was already in the "frothy" subprime business that Mozilo derided.

*2005.*  In March 2005, Mozilo continued to distinguish Countrywide from its would-be peers.  He chastised his competition for "pushing further down the credit chain into the 500 FICOs, and below 550 . . . as you get down to those levels, it becomes very problematic and I don't think there's any amount of money you can charge upfront to cover your losses on those types of loans." ¶ 121.

Mozilo represented that Countrywide, by contrast, "had to remain very disciplined" and therefore Mozilo said he had "to separate it" from the competition.  *Id.* Through 2006 and into 2007 Mozilo continued to differentiate Countrywide and even said that Countrywide's "profile in the subprime market has been one where we have, for the most part, been on the sidelines."  ¶ 806, 836.  *Cf.* ¶ 135 (discussing 2004 Countrywide official underwriting matrix that contradicts Mozilo's 2005 representations).  *See also* ¶ 156 (discussing continued deterioration in 2005 underwriting standards); ¶ 169 (quoting Countrywide internal documents touting loan approvals where borrowers had FICOs in the low 500s); ¶¶ 152, 153 (CW4 alleging Countrywide monitored its competitors and revised practices downward in response to its peers).

Further, it is alleged that Mozilo understood the risks that Countrywide was taking.  On a March 2005 conference call, he said, "I don't think there's any amount of money you can charge upfront to cover your losses on" loans with "500 FICOs and

operations inference" based solely on "man-

agement's general awareness" is insufficient).

below 550, 540, 530." ¶ 121. This directly contradicts the "Price Any Loan" system discussed above and Countrywide's internal documents that systematically encouraged approving virtually any loan with additional "add-on" fees, ¶¶ 182–83.

Mozilo in a July 2005 conference call also assured his investors, "I do participate in originations myself, and it keeps me apprised of what's happening. I think that the situation has stabilized. I don't see any deterioration in the quality of those loans being originated." ¶ 403. Mozilo, in the same call, added that he was "not aware of any change of substance in underwriting policies" and that "[w]e don't view that we have taken any steps to reduce the quality of our underwriting regimen at all." ¶ 690. In a September 2005 call, Mozilo added that Countrywide's "loan underwriting guidelines are conservative and under constant review." ¶ 708. Throughout 2006, Mozilo still represented that Countrywide's "loan quality remains extremely high." ¶¶ 731, 803–05.

Mozilo made similar statements about Countrywide's 30% market share goal. Mozilo repeatedly assured the market that Countrywide's 30% market share target was "totally unrelated to quality [sic] of loans we go after . . . there will be no compromise in that as we grow market share." ¶ 94. Mozilo in 2005 also said that "under no circumstances will Countrywide

ever sacrifice sound lending and margins for the sake of getting to that 30% market share." ¶ 122.

*2006.* Mozilo explained in 2006 that his customers allowed their principal balances to increase through negative amortization on Pay–Option ARMs because they "had never seen in their adult life real-estate values go down." ¶ 292. The same year, Mozilo himself predicted in the housing market "a general decline of 5% to 10% throughout the country, some areas 20%. And in areas where you have had heavy speculation, you could have 30%." ¶ 429.

Notwithstanding the foregoing statements, Mozilo in a 2007 conference call told analysts, as Countrywide's business entered crisis, that "nobody saw this coming." ¶ 439.

*2007.* In early 2007, Mozilo represented that "7%" of Countrywide's originations were "subprime" and that "0.2%" of Countrywide's assets were "subprime." ¶ 855, 856.

**[57]** Accepting the CAC's extensive allegations regarding Mozilo's understanding of Countrywide's day-to-day operations—his self-proclaimed "hands on" approach, his long career with Countrywide, and the detailed loan and exception statistics—the CAC supports the inference that Mozilo intended his statements to mislead the market during the entire class period.[76]

---

**76.** Defendants make no serious claim to the PSLRA safe harbor for forward-looking statements. They argue that Mozilo's March and July 2005 representations that CFC would never "sacrifice sound lending" for 30% market share are forward-looking. Countrywide Defs.' Mot. to Dismiss at 28. It is not clear this is the kind of statement protected by the safe harbor provision. *See* 15 U.S.C. § 78u–5(i)(1) (defining forward-looking statement as, among other things, a projection of revenues or other financial data; a statement of future economic performance; or plans and objectives relating to products or services of the issuer). Plaintiffs argue, "Promising inves-

tors that an unsound business practice will never be undertaken . . . is entirely different than attempting to predict future earnings." Pls.' Opp'n at 36–37. That may be, but "sound lending" is still a subjective phrase that may be subject to the puffery rule in the ordinary case. The Court finds this statement not protected by the safe harbor because there are particularized allegations that the unsound business practices had already been undertaken, making Mozilo's statement false when made. *See generally No. 84 Employer–Teamster Joint Council Pension Trust Fund v. America West Holding Corp., 320 F.3d 920,*

**1194**      **588 FEDERAL SUPPLEMENT, 2d SERIES**

There does not appear to be a plausible competing inference against which to balance an inference of scienter.

**c. David Sambol**

Sambol joined Countrywide in 1985 and has occupied many prominent leadership positions at Countrywide, including "Executive Managing Director for Business Segment Operations, heading all revenue-generating operations of the Company," becoming Chief Operating Officer ("COO") in September 2006 and joining the board of directors in September 2007. ¶ 27. He served on the Executive Strategy Committee, composed of a handful of the company's top executives and charged with day-to-day management. ¶ 392. Sambol was also part of the Credit Committee, which reviewed and monitored credit risk and the actual and projected credit losses for all of the company's portfolios, and also evaluated loan loss reserves and the methodology for calculating them. ¶¶ 392–94 (noting that the Credit Committee was composed of the Chief Risk Officer and other senior executives).

[58] Sambol created and oversaw the EPS. ¶ 178. In addition, the CAC alleges that Sambol received numerous reports detailing the company's approval of exceptions. *See* ¶¶ 422, 425 (describing "AMPS" reports, which summarized all exception loans); ¶ 426 (characterizing confidential "Trend Analysis" reports that documented increases in the rate of exceptions granted); ¶¶ 431–34 (describing proprietary systems, including "Turquoise," which provided real-time data on every individual loan; "Status Mart," which provided detailed information about the company-wide loan production pipeline; and "Virtual Loan File," containing "an electronic image of virtually all application documents for Countrywide loans").

Sambol made statements in 2006 about Countrywide's "maintaining a very strong internal control environment and what we believe is best-of-class governance [together in a] culture . . . characterized by a very high degree of ethics and integrity in everything that we do." ¶ 752. Meanwhile, CW12 alleges that Countrywide loan officers "were told, 'don't take no from underwriting, don't take no from your branch manager, escalate as high as you have to. If it has to go to Sambol, just get the deal done.' "

Taken together, Sambol's job positions, duties, and access to corporate reports and information systems give rise to a strong inference of scienter. Though the core business knowledge that is imputed to the Defendants is not in the form of discrete events as in *Berson*, the alleged underwriting quality and credit risk management issues were so fundamental to Countrywide, and on such a broad scale, should have been so apparent that "it would be difficult to conclude that those Defendants at the top levels of Countrywide management did not know what was going on." *In re Countrywide Financial Corp. Deriv. Litig.*, 554 F.Supp.2d at 1066.

This is not a case like *Metzler*, where the plaintiffs had not demonstrated that any enrollment fraud was widespread, and had inadequately pled why the company's information systems would have informed defendants of this fraud. *See* 540 F.3d at 1049. The CAC gives rise to the inference that Sambol was aware not only of the culture change and the loosening of underwriting guidelines, but the concomitant effect on loan quality and credit risk.[77]

---

936–37 (9th Cir.2003) (discussing the PSLRA's safe harbor provision).

**77.** Again, for Defendants Mozilo and Sambol, Plaintiffs go beyond alleging scienter based on job positions alone; the CAC avers that Mozi-

lo and Sambol in fact led the charge to abandon sound underwriting. *See* ¶¶ 93, 419 ("CW1 further reported that Sambol took a contrary position, maintaining that by originating and procuring large volumes of loans,

The Court finds that the CAC raises a strong inference of scienter as to Sambol for the entire class period. The scienter inference is of actual knowledge or intent, not deliberate recklessness. The plausible alternative inference is willful ignorance.

#### d. Stanford Kurland

[59] Kurland was President and COO until resigning on September 7, 2006. ¶ 29. Like Defendants Mozilo and Sambol, he was also on the Executive Strategy Committee and the Credit Committee, and was also on "the Asset/Liability Committee."

On a February 2005 conference call, Kurland engaged in the following exchange:

Stan Kurland: *Our strategy is pretty much the same* as we have been operating it for . . . .

Bob Napoli—Piper Jaffray—Analyst: The answer is no. There has been no real change to take more risk[?]

Stan Kurland—Countrywide Financial Corporation—President and Chief Operating Officer: *No, no, no.*

¶ 624 (emphasis in original).

Kurland also stated on both April and July 2005 conference calls that Countrywide's pay-option ARM loans were "all high FICO." ¶ 237. He said on the July 2005 conference call that "[we at Countrywide] have not loosened our standards relative to what the bank acquires to the extent that we have standards that reflect

and pricing that reflects where [sic] we are able to deliver loans into the secondary market." ¶ 689. This latter statement has less force than the others because it refers only to LHIs and not general underwriting standards; it also appears to suggest that the standards are relative to what Countrywide was able to sell into the secondary market. But it is still materially misleading because the CAC alleges that even what Countrywide was selling into the secondary market had profoundly changed in risk character by July 2005; and, if and when the market became aware of the risk, many loans would not have been saleable.

As explained *supra*, the CAC raises a strong inference that, by the time of these statements, Countrywide's strategy shift was complete. Section II.C.i.6 (discussing primarily accounting-related falsity inferences and finding that by FY05 the changes were undeniably reflected in Countrywide's loan performance, as evidenced by rapidly rising negative amortization). Kurland's primary job as COO was to oversee Countrywide's operations. The only plausible alternative inference to a strong inference of scienter as to Kurland by February 2005 is gross recklessness. That inference is less compelling than one of actual knowledge or intent.

In sum, the Court finds that the CAC raises a strong inference of scienter as to Kurland from February 2005 until the

---

regardless of their relative risk, any losses incurred by the riskier loans would be covered by the profits generated on other loans"); ¶ 409–10 (relating CW1's allegation that Sambol put pressure on employees on a regular basis "to price risky loans in a way that would not take into account the extent of the risk the loans presented"); ¶¶ 178, 418 (alleging that Sambol directed the creation of the Exception Processing System); ¶ 423 (relating CW12's allegation that Sambol was unhappy with EPS/SLD loan production); ¶¶ 413–15 (describing Sambol as highly en-

gaged in the operation and performance of each Company division). *See also* ¶ 403 (relating Mozilo's 2005 statement that he was involved "every day" in loan originations and his opinion, based on personal experience, on whether there had been a decline in credit quality of loans). Thus, *Corinthian* is distinguishable for the further reason that the plaintiffs there did not allege, as here, that the executives named as defendants actively contributed to the underlying situation in that case.

time he left Countrywide in September 2006. The inference is of actual knowledge or intent, not deliberate recklessness. The CAC raises no strong inference as to Kurland before February 2005.[78]

### e. Eric Sieracki

[60]  Defendant Sieracki became Executive Managing Director and Chief Financial Officer ("CFO") in 2005. ¶ 28. During the class period, he was a member of several management committees: the Executive Strategy Committee; the Credit Committee; and the Asset/Liability Committee, of which he was chairman. *Id.* ¶¶ 28, 393, 395. He is also alleged to have received the same internal reports described above, and to have had the same access to the company's proprietary information systems as Mozilo and Sambol.

Defendants object that Sieracki's job had nothing to do with loan underwriting. However, a strong inference of scienter is warranted for two reasons. First, as CFO, Sieracki was directly responsible for Countrywide's financials. Those financials, as explained in *supra* Section II.C.i.6, depended on Countrywide's operations. *See also In re Countrywide Financial Corp. Deriv. Litig.,* 554 F.Supp.2d at 1066 (finding scienter with respect to Sieracki based on similar allegations). Second, scienter is appropriate for the same reasons that this Court found scienter with respect to the *outside directors* in the derivative case. In addition to his role as CFO, Sieracki served on the board as a member of the Credit Committee—which had "primary responsibility for setting strategies to achieve [Countrywide's] cred-

it risk goals and objectives," ¶ 393—and chairman of "the Asset/Liability Committee," which maintained a Pipeline and Portfolio Risk Management Subcommittee that met daily regarding credit risk issues, ¶ 396.

Sieracki said in an April 2005 conference call, "We don't see any change in our protocol relative to the volume [of] loans that we're originating." ¶ 253. In July 2005, he said that Countrywide "operate[s] at the very top of the nonprime credit spectrum." ¶ 692.

One alternative inference for Sieracki, as with Kurland, is gross recklessness—that he had reviewed Countrywide's operations and analyzed its extensive internal reports for his new role as CFO, but did not recognize the alleged practices his statements contradict. This inference is especially weak because Sieracki had been in various executive positions since joining Countrywide in 1988 and, indeed, was Executive Vice President of Corporate Finance since 1989. ¶ 28. The second alternative inference as to Sieracki is deliberate recklessness—that he gave the market strong, false assurances without having looked at Countrywide's operations and their history, despite his long service in Countrywide's financial department.

Therefore, the Court finds that the CAC raises a strong inference of scienter as to Sieracki from his statement on the April 2005 conference call onward. This inference is of actual knowledge or intent, not deliberate recklessness.

---

**78.**  For example, the only other particularized allegation that Kurland himself made a false or misleading statement is from an April 2004 conference call. On that call, Kurland said Countrywide did not *intend* to hold "subprime" loans for investment. *See* ¶ 572. The CAC lacks an adequately particularized factual basis to infer that this statement—a state-

ment of *future intent*—was false when made in April 2004. The Court cannot say that this statement, so soon after Countrywide's alleged mid–2003 shift, was materially false or misleading under the PSLRA's standards. *But see supra* n. 59 (finding such statements actionable in FY04 under more deferential § 11 review).

IN RE COUNTRYWIDE FINANCIAL CORP. SEC. LITIGATION   **1197**
Cite as 588 F.Supp.2d 1132 (C.D.Cal. 2008)

### f. KPMG

[61] Plaintiffs allege that KPMG made false or misleading statements in its audit certifications and accounting reports attributable to KPMG.

[62] To establish auditor scienter, courts look primarily to the alleged GAAP and Generally Accepted Auditing Standard ("GAAS") violations, as well as any other allegations about KPMG's representations or conduct. The "red flag" doctrine guides the GAAP and GAAS inquiries: the more facts alleged that should have caused a reasonable auditor to investigate further before making a representation, the more cogent and compelling a scienter inference becomes. *See DSAM Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385, 389 (9th Cir.2002); *In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 279–80 (3d Cir.2006); *In re AOL Time Warner Sec. & ERISA Litig.,* 381 F.Supp.2d 192, 240 (S.D.N.Y.2004). As with all scienter standards under the PSLRA, the Court balances competing inferences and takes the complaint as a whole. *Tellabs,* 127 S.Ct. at 2504–05; *South Ferry,* 542 F.3d at 784 (cautioning against "separate[ ] rules of thumb for each type of scienter allegation").

KPMG is an outside auditor, making a position-based inference rather more difficult because outsider auditors have more limited information than, for example, the committee members who oversee the au-

dit. Further, an auditor's job requires complex and subjective professional judgments that courts are not ideally positioned to second guess.[79]

[63] *GAAP.* As with any alleged misrepresentation, GAAP violations should generally be more than "minor or technical in nature" and "constitute[ ] widespread and significant inflation" to contribute to a strong inference of scienter. *In re Daou Systems, Inc.,* 411 F.3d 1006, 1017 (9th Cir.2005). Applying a much more deferential standard of review—Rule 8(a)(2) rather than the PSLRA standard that applies here—the Court has already found actionable representations by KPMG beginning with FY06–related accounting statements. *Supra* Section II.C.i.6 & n. 63 (noting that even nonauditor outsiders were beginning to see red flags by early 2006). The Court found no actionable GAAP violations before FY06. *Id.*

Adjusting for the PSLRA's heightened particularity inquiry, the CAC alleges few FY06 accounting-related GAAP violations with particularity. The $570.3mn increase in negative amortization between FY05 and FY06 is a significant red flag, ¶ 290. So are the increased delinquencies on HELOCs and pay-option ARMs in FY06. ¶¶ 292–93. The Court therefore draws only a modest inference from the alleged FY06 accounting-related violations.

---

**79.** Some courts have given outside auditors as a class remarkable deference, in part because some courts think outside auditors lack "any rational economic incentive to participate in its client's fraud." *Reiger v. Price Waterhouse Coopers, LLP,* 117 F.Supp.2d 1003 (S.D.Cal. 2000), *aff'd sub. nom. DSAM Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385 (9th Cir.2002). The Court finds this supposition suspect, at best. Auditors are hired and retained by insiders. A few top auditing firms compete for high-profile clients such as Countrywide. Therefore, they have strong struc-

tural incentives to yield to management on close questions. More to the point, *Tellabs* and *South Ferry* put to rest the misguided idea that courts should create categorical rules and presumptions for different kinds of actors and statements. An outside auditor's lack of information relative to management, and the subjective professional judgments that auditors must make, *do* weigh in outside auditors' favor under a *Tellabs* analysis; outside auditors' economic incentives weigh, if at all, somewhat against auditors.

[64] *GAAS.* Where GAAP refers to how financials are reported, GAAS refers to how an audit is conducted. Of course, "[a]lleging a poor audit is not equivalent to alleging an intent to deceive." *Ezra Charitable Trust v. Tyco Int'l Ltd.*, 466 F.3d 1, 12 n. 10 (1st Cir.2006). Rather, just as with GAAP, the more likely it is that a reasonable auditor, having conducted a reasonable audit, would have discovered the truth, the stronger the scienter inference.

The CAC recites GAAS' basic general, fieldwork, and reporting standards. But it makes little effort to apply the standards. The Court discerns, however, a couple of potentially significant red flags.

First, a high rate of growth in a loan portfolio is a red flag under GAAS' fieldwork standards that the CAC pleads specifically enough. ¶¶ 510–11.

Second, GAAS' fieldwork standards require that auditors obtain sufficient "evidential matter" to support their conclusions. ¶ 532. The CAC alleges that insufficient evidential matter was collected, but does not explain what that matter should have been. Were the auditors supposed to go back to Countrywide's loan origination files where they could see the poor level of documentation? *See* ¶¶ 532–34. And if KPMG should have gone back to the underlying files, what should KPMG's sampling or testing practices have looked like? The CAC is frustratingly vague on these points. *Cf. DSAM Global*, 288 F.3d at 390 (alleging poor documentation practices at the audited company, with little more, is more likely to generate an inference of a "negligent audit rather than scienter").

The CAC does allege that KPMG was required under GAAS to evaluate the models that Countrywide used to value its MSRs. ¶ 519. As discussed above, to the extent those models used historical loan data, they may have been misleading. But the CAC does not provide a particularized basis for the Court to infer that KPMG was more than negligent or reckless if it failed to discover that Countrywide's practices had changed so dramatically that historical data was of limited use.

The Court therefore draws only the weakest of inferences from the GAAS allegations.

*Other KPMG statements and actions.* The CAC offers nothing more about KPMG.

*Conclusion.* The CAC does not "bridge the gap" between gross recklessness and "some degree of intentional or conscious misconduct" to satisfy the deliberate recklessness standard. *See South Ferry*, 542 F.3d at 783. The Court is not even satisfied that the KPMG scienter allegations allow much more than a negligence inference.

Counts 18 and 19 are DISMISSED as to KPMG WITHOUT PREJUDICE. Plaintiffs have LEAVE TO AMEND.

**4. Reliance**

The reliance element is subject to the pleading requirements of Rule 9(b) because it is one of the "circumstances constituting fraud" not subject to PSLRA standards. Fed. R. Civ. Proc. 9(b); 15 U.S.C. § 78u–4(b). Therefore, reliance must be pled with particularity to state a claim. Fed. R. Civ. Proc. 9(b). *See Concha v. London*, 62 F.3d 1493, 1503 (9th Cir.1995), *cert. denied*, 517 U.S. 1183, 116 S.Ct. 1710, 134 L.Ed.2d 772 (1996) ("Fraud arises from the plaintiff's reliance. . . .").

The Supreme Court in *Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), validated the rebuttable presumption of reliance in sufficiently efficient markets. An efficient market gives plaintiffs a shortcut for pleading reli-

## IN RE COUNTRYWIDE FINANCIAL CORP. SEC. LITIGATION   1199
### Cite as 588 F.Supp.2d 1132 (C.D.Cal. 2008)

ance because an efficient market is presumed to impound new information—including fraudulent information—quickly into asset prices.

**[65]** Defendants have not yet disputed in this case that there was an efficient market for Countrywide's publicly traded securities. The Court takes notice that at least some types of Countrywide securities were traded in large volume and that Countrywide was a large company closely watched by analysts. The CAC also alleges specific correlations between Countrywide common stock—quite heavily traded—and some of the debt instruments in this case, suggesting that the market for some debt was relatively efficient. *See, e.g.,* ¶¶ 996, 1039. The present CAC thus establishes reliance through the fraud-on-the-market presumption.[80] *See also supra* Section II.B.iii (rejecting Defendants' truth-on-the-market defense at this stage of litigation).

Having before it no reasonable arguments against reliance, the Court DENIES the motions to dismiss on reliance grounds as to all securities.

### 5. Loss

Neither the Ninth Circuit nor the Supreme Court has decided whether Rule 8(a)(2)'s notice pleading standard or Rule 9(b)'s particularity requirement governs loss and loss causation. *Berson,* 527 F.3d at 989 (citing *Dura,* 544 U.S. at 346, 125 S.Ct. 1627).

**[66]** The lack of clarity in the law presents no problem in this case. The CAC satisfies the particularity requirement for loss.

Plaintiffs need not plead their exact damages. Contrary to some Defendants' suggestions, nothing requires that Plaintiffs allege their exact damages or the price dollar value of declines.

Without holding that a plaintiff must always do so, the Court observes that

---

**80.** As previously discussed by this Court in the related *Argent* case, the fraud on the market presumption usually makes a plaintiff's job—even with the particularity requirement—quite straightforward. Plaintiffs can frequently point to an archetypal efficient market (e.g., the market for an actively traded stock on the New York Stock Exchange). However, the first consolidated *Argent* complaint was dismissed for insufficient particularity as to reliance. This was in part because Argent conclusively pled reliance on an efficient market for the price of a private-placement security, but it was not at all clear from that complaint that there was a sufficiently efficient market to rely on. *Argent Classic Convertible Arbitrage Fund v. Countrywide Fin. Corp.,* No. 2:07–CV–07097–MRP, slip. op. (C.D.Cal. Nov. 13, 2008). *See also Boyle v. Merrimack Bancorp, Inc.,* 756 F.Supp. 55, 61 (D.Mass.1991) (requiring reliance be pled with particularity where the face of the complaint suggests that plaintiff may not have relied on the market at all).

The Series A and B Debentures in this case are substantively the same bonds in *Argent.*

The Series A and B Debentures were originally put in the private placement market in May 2007. ¶¶ 925–27. Those privately traded bonds are the subject of *Argent.* Countrywide registered the bonds for public trading on November 15, 2007. ¶ 929. The Plaintiffs in this case bring § 10(b) claims on those publicly traded Debentures.

The parties have not disputed the Debentures in this case. However, the Court anticipates some potential reliance issues: (1) what impact, if any, the late registration and trading of these securities has; (2) whether the market for these securities was efficient; and (3) whether N.Y. Funds is an appropriate class representative because they bring only '34 Act, and not '33 Act, claims on the Debentures. *See APA Excelsior III L.P. v. Premiere Techs., Inc.,* 476 F.3d 1261, 1271 (11th Cir. 2007), *reh'g and reh'g en banc denied,* 254 Fed.Appx. 800 (2007); *In re Levi Strauss & Co. Sec. Litig.,* 527 F.Supp.2d 965, 974–78 (N.D.Cal.2007) (suggesting a reliance-related reason why N.Y. Funds may not have brought '33 Act claims). The Court expects these issues to be addressed at class certification.

Plaintiffs here quantify their economic losses on the securities in numerous ways—and with particularity. *See, e.g.,* CAC at 348 (historical common stock prices); CAC Ex. B (transaction schedule).

### 6. Loss causation

[67] Loss causation is simply "a causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). Plaintiffs have the burden to plead loss causation on § 10(b). *In re WorldCom, Inc. Sec. Litig.*, 388 F.Supp.2d 319, 346 n. 39 (S.D.N.Y.2005) (observing that the loss causation element of § 10(b) is the "mirror image" of the defendants' burden on loss causation on § 11).

[68, 69] However, loss causation generally "[s]hould not prove burdensome for a plaintiff" that actually suffered economic harm in connection with the purchase or sale of a security. *Dura*, 544 U.S. at 346, 125 S.Ct. 1627. *Dura* requires a plaintiff to allege more than just an "inflated" stock price. *Id.* Instead, a plaintiff must allege a mispricing caused by the securities violation, followed by a subsequent price correction caused when the market appreciated (or began to appreciate) the truth. *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1056–57 (9th Cir.2008). Otherwise, the alleged violations cannot have proximately caused whatever loss the plaintiff suffered.

Loss causation is ordinarily shown by alleging a corrective disclosure and a price correction shortly thereafter. Of course, the more efficient the market, the more quickly a court should expect the price drop to occur. However, corrective information sometimes comes to the market slowly, making it likely other variables will confound loss causation.

For example, management could "leak" information slowly into the market, either innocently (they were only gradually discovering the extent of the misrepresentation themselves) or with an eye to spreading out the losses over time (either to reduce price volatility or, perhaps, even to make ascertaining loss causation more difficult). *See id.* at 1058 (partial disclosures may "not contain enough information to significantly undermine" a misrepresentation, but that does not render them nonactionable *per se* ). Further, corrective information often comes at the same time as good news (again, either innocently or in order to minimize volatility or confound loss causation).

And sometimes the market is not perfectly efficient, even as to companies that are closely watched and traded in relatively high volume. *See America West*, 320 F.3d at 933–34 (rejecting a bright-line rule that stock price changes must be occur "immediately" upon a disclosure because markets are sometimes "subject to distortions that prevent the ideal of a free and open public market" (internal quotation and citation omitted)). For example, in some specialized industries an audience other than financial professionals may appreciate a partial corrective disclosure's true significance. Thus, the Ninth Circuit has approved an inference that a pharmaceutical company's stock price decline was caused by a partial corrective disclosure from three months prior. *Gilead*, 536 F.3d at 1058. The panel reasoned that the disclosure's gravity was better understood by physicians than the market, and therefore found actionable that a price decline that did not occur until the company's next financial statements showed the effect on sales. *Id.*

The point is that showing loss causation is not precluded by a series of disclosures; serial disclosures just make it more difficult for plaintiffs as a practical matter. *See In re Gilead*, 536 F.3d at 1055 ("The [disclosure of the] misrepresentation need

IN RE COUNTRYWIDE FINANCIAL CORP. SEC. LITIGATION 1201
Cite as 588 F.Supp.2d 1132 (C.D.Cal. 2008)

not be the sole reason for the decline in value of the securities, but it must be a substantial cause." (internal quotations and citation omitted)); *In re Daou*, 411 F.3d at 1026 (analyzing a series of partial disclosures).

**[70]** Defendants here attack Plaintiffs' loss causation theories because Countrywide's corrective disclosures were made over an extended period of time and often in combination with alleged further misrepresentations that dampened the disclosures' price effects. The point, however, is that the price of Countrywide securities dropped as the disclosures accumulated. By the end, Countrywide stock, at least, had plummeted. Most corrective disclosures correlate tightly with declines, as is expected in an efficient market. Plaintiffs identify these disclosures with particularity. ¶¶ 934–1059.

For the Court's related rejection of Defendants' truth on the market defense, see *supra* Section I.B.iii.

**[71]** There is, however, a serious loss causation defect in the CAC. Plaintiffs have not adequately alleged loss causation for Kurland. The Court found in *supra* Section II.D.i.3.d that the CAC only adequately alleges scienter for Kurland between February 2005 and his September 2006 resignation. The first alleged disclosure and decline is on July 24, 2007. ¶¶ 936–44. While § 11's lesser requirements keep Defendants from defeating those claims on loss causation grounds, *supra* Section II.D.i.6, it is too far a stretch—even assuming Rule 8(a)(2) applies—to state a claim that Kurland's 2005–2006 statements could have proximately caused losses almost a year later.

The motions to dismiss on Counts 16 and 18 are DENIED as to all Officer Defendants except Kurland. Counts 16 and 18 and DISMISSED WITHOUT PREJUDICE as to Kurland. Plaintiffs have LEAVE TO AMEND.

#### ii. Section 20(a)

Count 17 alleges a § 20(a) violation against the Officer Defendants on Countrywide "common stock and other publicly traded securities." ¶ 1297. Count 20 alleges the same for the Series A and B Debentures.

Section 20(a) creates joint and several liability for control persons who aid and abet '34 Act violations. *America West*, 320 F.3d at 945. The elements of § 20(a) are "(1) a primary violation of federal securities law and (2) that the defendant exercised actual power or control over the primary violator." *Id.* (internal citation and quotations omitted). There is "a good faith defense if [a defendant] can show no scienter and an effective lack of participation." *Id.* Whether a defendant is a control person is "an intensely factual question." *Id.*

**[72]** "Although the circumstances of the primary violators' fraud must be pled with particularity under Rule 9(b) [and the PSLRA], the control element is not a circumstance that constitutes fraud and therefore need not be pled with particularity." *In re LDK Solar Sec. Litig.*, 2008 WL 4369987, at *12, 2008 U.S. Dist. LEXIS 80717, at *38 (N.D.Cal. Sept.24, 2008).

The CAC adequately alleges primary violations for Mozilo, Sambol, and Sieracki, as discussed in *supra* Section II.D.

These three Officer Defendants are plausible control persons who allegedly aided and abetted Countrywide's violations. *See supra* Section II.D.i.3 (explaining the Defendants' positions and responsibilities at Countrywide).

The CAC does not, however, adequately allege a primary violation by Kurland. *Supra* Section II.D.i.6. Counts 17 and 20 are therefore DISMISSED WITHOUT PREJUDICE as to Kurland. Plaintiffs have LEAVE TO AMEND.

**1202**         588 FEDERAL SUPPLEMENT, 2d SERIES

### iii.  Section 20A

Count 21 arises under § 20A(a) against Mozilo, Sambol, and Kurland (i.e., all Officer Defendants except Sieracki) (collectively, " § 20A Defendants").

Section 20A(a), part of the 1988 Insider Trading and Securities Fraud Enforcement Act amendments to the '34 Act, creates an express private right of action against insiders who commit a '34 Act violation by trading while in possession of material, nonpublic information. 15 U.S.C. § 78t–1(a); *Johnson v. Aljian*, 490 F.3d 778 (9th Cir.2007), *cert. denied*, —— U.S. ——, 128 S.Ct. 1650, 170 L.Ed.2d 354 (2008). *See also U.S. v. O'Hagan*, 521 U.S. 642, 666 n. 11, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997).

A § 20A(a) plaintiff must plead (1) that defendant committed a '34 Act violation "by purchasing or selling a security while in possession of material, nonpublic information"; and (2) facts showing that the defendant's trade occurred "contemporaneously" with a complementary trade by the plaintiff (i.e., if defendant sold that class of security, plaintiff must have purchased that class of security, and vice-versa). 15 U.S.C. § 78t–1(a); *Johnson*, 490 F.3d 778. If successful, plaintiffs may be able to recover up to the insider's profit gained or loss avoided, offset by any disgorgements to the SEC. *See* 15 U.S.C. § 78t–1(b)(1)–(2).

It bears emphasis that the predicate violation must be made "*by* purchasing or selling." Though there is some dicta sug-gesting the contrary in cases not binding on this Court, this language means that the predicate violation must be an act of insider trading, not just trading while si-multaneously committing a free-floating '34 Act violation. *In re Take–Two Inter-active Sec. Litig.*, 551 F.Supp.2d 247, 308–11 (S.D.N.Y.2008) (squarely taking this po-sition). This is consistent with the legisla-tive history as well as the plain text of Section 20A.[81] Thus, the Court must deter-mine whether the Section 20A Defendants engaged in insider trading that is action-able under the '34 Act.

**[73]** Insider trading is actionable un-der the '34 Act on two theories: (1) "the 'traditional' or 'classical theory' [that insid-ers have] a duty to disclose or abstain from trading because of the necessity of preventing a corporate insider from taking unfair advantage of uninformed stockhold-ers"; and (2) a " 'misappropriation' theory . . . that a person commits fraud . . . when he misappropriates confidential informa-tion" in breach of a duty of confidence. *O'Hagan*, 521 U.S. at 651–52, 117 S.Ct. 2199 (internal quotations, citations, and modifications omitted).

**[74]** The significant differences be-tween the '34 Act claims properly stated against Mozilo and Sambol (the only § 20A Defendants that the CAC properly states a '34 Act claim against) and a '34 Act insider trading claim theory involve the scienter, loss causation, and loss elements. Scien-ter and loss causation for insider trading

---

**81.** To be clear, the Court has found no case that actually applies § 20A to a non-insider trading claim. The Committee Report on the 1988 amendments makes explicit that Section 20A requires that a '34 Act insider trading violation be the predicate. H.R.Rep. No. 100–910, 100th Cong., 2d Sess. 26–28 (1988), U.S.Code Cong. & Admin.News 1988, p. 6043, 6063–65 ("[T]his section would codify an express right of action against insider trad-ers and tippers" and was created to make the misappropriation theory of insider trading— which the courts had been somewhat reluc-tant to accept—actionable). The leading commentators concur. 3 THOMAS LEE HAZEN, TREATISE ON THE LAW OF SECURITIES REGULATION § 12.16[7][B] at 536 (5th ed.2005) (calling § 20A "the express insider trading private remedy"); LOUIS LOSS, ET AL. FUNDAMENTALS OF SECURITIES REGULATION 1018 (5th ed.2003) (ex-plaining the conduct § 20A targets).

## IN RE COUNTRYWIDE FINANCIAL CORP. SEC. LITIGATION   1203
### Cite as 588 F.Supp.2d 1132 (C.D.Cal. 2008)

requires that the insider *actually use* (scienter) the inside information in deciding to make the trade (loss causation). *U.S. v. Smith,* 155 F.3d 1051, 1067–69 (9th Cir.1998). *See also America West,* 320 F.3d at 937 (trading based on material nonpublic information is a deceptive device that can create a § 10(b) violation).[82] Loss, on the other hand, is the insider's profit gained or loss avoided. 15 U.S.C. § 78t–1(b)(1)–(2).

Contemporaneous trading must be pled with specificity under Rule 9(b). *Neubronner v. Milken,* 6 F.3d 666, 670 (9th Cir.1993). The predicate insider trading violation is subject to the PSLRA.

[75] *Trading on material, nonpublic information.* The CAC alleges with particularity—and at great length—what material, nonpublic information Defendants possessed. The material inside information is the true state of Countrywide's operations, about which Defendants intentionally misled the markets. This is a classic insider trading theory, not a misappropriation theory. For much of the class period, § 20A Defendants must have known that Countrywide's true operations would eventually be revealed; but how

long the alleged practices could persist, they could not have known. The practices could presumably go undetected until a change in the housing market or the loans in new MBS loans were seasoned enough to infer that their performance deviated significantly from prior securitized loans. However, the PSLRA requires the Court determine when § 20A Defendants knew *with sufficient certainty* that truth would be revealed *soon enough* for this knowledge to create a strong inference that they actually used it in deciding to make their trades. The initial July 2007 corrective disclosure that the CAC identifies is a very significant disclosure that gives rise to a strong inference of scienter. The Court finds that § 20A Defendant transactions shortly before this disclosure (and for the remainder of the class period) suffice to state a claim—even against Kurland, who did have transactions during this actionable period. CAC Ex. G. Therefore, unlike the § 10(b) claim discussed above, plaintiffs adequately allege loss causation against Kurland (in addition to the other § 20A Defendants).

[76] *Contemporaneous trading.* There is no law binding on this Court as to

---

**82.** *Smith* was a criminal case. The panel used the prodefendant presumptions that apply in the criminal context to support its conclusion that only "actual use" allows a scienter finding; it also used the case's criminal nature to renounce a presumption, used in at least one other Circuit, that possession of knowledge allows an inference of use. *Id.* at 1068–69.

The *Smith* Court expressly held open that a lesser standard could apply to a civil enforcement action. *Id.* at 1069 n. 27. It may be that a less stringent standard now applies to SEC civil enforcement actions. *See U.S. v. Nacchio,* 519 F.3d 1140, 1167–68 (10th Cir.2008) (discussing developments after *Smith* ).

However, the present case is a private securities action to which the PSLRA applies. Only *Smith's* "actual use" standard satisfies the PSLRA and the Ninth Circuit's demand-

ing deliberate recklessness or actual knowledge or intent standards. The Court therefore adopts actual use, subject to *Tellabs* balancing. The Court also rejects the presumption that knowledge triggers an actual-use inference. The Court recognizes that it parts ways with another District Court in its jurisdiction, see *Johnson v. Aljian,* 394 F.Supp.2d 1184, 1197–99 (C.D.Cal.2004) (adopting the presumption), *aff'd in part,* 490 F.3d 778 (9th Cir.2007) (not addressing the presumption), on this point, but *Aljian* was pre-*Tellabs.* The Court cannot reconcile *Aljian's* presumption with *Tellabs* balancing and *South Ferry's* astute observation that, after *Tellabs,* courts cannot establish categorical presumptions in PSLRA analyses. *See supra* Section II.D.i.3; *Tellabs* 551 U.S. 308, 127 S.Ct. 2499; *S. Ferry,* 542 F.3d at 784 (cautioning against "separate[ ] rules of thumb for each type of scienter allegation").

**1204**

what constitutes "contemporaneous" trading. The Ninth Circuit has said that the timeframe required for an insider's trade to be "contemporaneous" with a plaintiff's trade is "not fixed." *Neubronner*, 6 F.3d at 670. The Ninth Circuit more recently declined to elaborate on the period's "exact contours." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1004 (9th Cir.2002). *See also In re Countrywide Financial Corp. Deriv. Litig.*, 554 F.Supp.2d at 1074–75 (collecting various district court approaches to contemporaneousness). Nevertheless, "contemporaneous trading must be pleaded with particularity." *Neubronner*, 6 F.3d at 670.[83]

The Court must therefore adopt a contemporaneousness rule suitable for the current fact pattern and decide whether the CAC states a claim. The Court adopts a modified version of the contemporaneousness rule from *In re Fed. Nat'l Mortgage Ass'n Sec., Deriv. and ERISA Litig.*, 503 F.Supp.2d 25, 46–48 (D.D.C.2007).

The *In re Fed. Nat'l* Court relied on opinions from the Ninth Circuit and District Courts in California, among others around the country, to find an emerging consensus that contemporaneous purchases—at least in actively traded markets—are those that occur (1) on the same day (2) after the insider sold.[84] *Id.* Section 20A is designed to force an insider to recompense the trader on the transaction's other end. *Id.* The contemporaneousness requirement roughly approximates privity while sparing a plaintiff the task—nearly impossible in modern markets—of establishing that he traded directly with the insider. *Id.*

On this "privity-substitute" view, the insider must have offered his security for sale before the outsider purchased in order for there to be a possibility that the trade was between them. *Id.* In markets for actively traded securities there is a much lower probability that the insider actually traded with someone who bought a day later. Therefore, on a motion to dismiss, the same-day rule appears, at first, a judicially manageable rule that balances market realities with a strong deterrent effect by reasonably limiting the universe of potential plaintiffs.[85] *See id.*

However, a literal "same-day" rule invites a stratagem: if it means by the close of the trading day, then insiders could trade near the close and greatly reduce the universe of potential successful plaintiffs. On the other hand, interpreting "same day" to mean the 24–hour period after the insider's transaction presents a problem on motions to dismiss: most plaintiffs will only be able to determine the date—not the time—of the insider's transactions. *See Concha v. London*, 62 F.3d

---

**83.** In the *Derivative Litigation*, this Court declined to adopt a specific formulation of the contemporaneousness requirement. 554 F.Supp.2d at 1074–75. Instead, it held that the repurchase plan was enough to make sales during November 2006 and May 2007 "contemporaneous." *Id.* at 1075. On further consideration, the Court retracts that conclusion as a matter of law. Section 20A creates liability for those who traded *with a § 20A defendant*. Countrywide, not the named Officer Defendants, performed the repurchase transactions.

**84.** Of course, where an insider buys, the outsider's offer must come before the insider's

bid, but the CAC alleges insider sales while outsiders bought. ¶ 1324.

**85.** Even if one rejects the "privity-substitute" view and prefers the theory that insider's trade altered the market price, the insider's transaction still must occur first (to have an effect on the market price) and, at least in markets for actively traded securities, "contemporaneous"—for purposes of a motion to dismiss—should still be limited to a 24–hour period (because supervening causes will almost certainly overpower any trade-related price effect after a day).

IN RE COUNTRYWIDE FINANCIAL CORP. SEC. LITIGATION     **1205**
Cite as 588 F.Supp.2d 1132 (C.D.Cal. 2008)

1493, 1503 (9th Cir.1995) ("Rule 9(b) . . . requires that plaintiffs specifically plead those facts surrounding alleged acts of fraud to which they can reasonably be expected to have access.").

**[77]** The contemporaneousness rule adopted here is: (1) on a motion to dismiss (2) related to an actively traded security (3) plaintiffs must allege that they traded on the other side of an insider's transaction (4) and plead facts showing they traded the same class of security on the same trading day, or one trading day after, the insider's transaction.

The Court leaves open the possibility for later proof on the mixed question of law and fact whether, in this case, a period other than 24 hours should be adopted for determining liability.

**[78]** The CAC states a § 20A(a) claim against the § 20A Defendants based on their common stock transactions. CAC Ex. G (listing § 20A Defendants' sales next to contemporaneous N.Y. Funds purchases).

Defendants' motions to dismiss on Count 21 are DENIED.

## III.

### CONCLUSION

Plaintiffs are GRANTED LEAVE TO AMEND within 20 days of this Order.

Due to the complexity of this case and the length of the CAC, if Plaintiffs amend by submitting a Second Consolidated Amended Complaint ("SCAC"), Plaintiffs are REQUESTED (1) to provide the Court and all Defendants a redline indicating all changes to between the CAC and the SCAC; and (2) to provide the Court and all Defendants a conversion table indicating which CAC paragraphs have been renumbered in the SCAC. Plaintiffs are admonished not to make unnecessary changes, as unnecessary changes will only

further delay the proceedings and may add to the already overlong CAC.

All pending Requests for Judicial Notice not granted in this Order are DENIED.

Underwriter Defendants and Plaintiffs are INSTRUCTED to meet and confer as to which underwriters should be removed from any SCAC because all the particular securities they underwrote have matured.

All parties are advised that the Court will schedule a status conference shortly to discuss discovery on the claims that survive this Order.

To summarize:

- All claims against GT are DISMISSED **WITH PREJUDICE.**

- Counts 2, 4, 5, 8, 11, and 14 against those Underwriter Defendant(s) (including Countrywide Securities Corporation) as to whom they are asserted are DISMISSED WITHOUT PREJUDICE.

- Counts 4, 18, and 19 against KPMG are DISMISSED WITHOUT PREJUDICE.

- Counts 4 and 6 against Mozilo are DISMISSED WITHOUT PREJUDICE.

- Counts 4, 6, 16, and 17 against Kurland are DISMISSED WITHOUT PREJUDICE.

- Counts 4, 5, 6, 8, 11, and 14 against those Countrywide Defendant(s) as to whom they are asserted are DISMISSED WITHOUT PREJUDICE.

As to the remaining Counts, theories based on:

- Retained interest-related statements are DISMISSED WITHOUT PREJUDICE.

- FY03 accounting-related statements are DISMISSED **WITH PREJUDICE.**

- FY04 and FY05 accounting-related statements are DISMISSED WITHOUT PREJUDICE.
- FY06 accounting-related statements are DISMISSED WITHOUT PREJUDICE as against Underwriter Defendants *only*.
- All theories based on language such as "solid quarter" (and other language which describes present financial performance as evidenced in documentation accompanying the statements) from Forms 8–K are DISMISSED **WITH PREJUDICE.**

Plaintiffs have LEAVE TO AMEND all claims and theories that are dismissed without prejudice.

Plaintiffs have LEAVE TO AMEND their accounting-related theories for all years, even as to those theories not dismissed.

IT IS SO ORDERED.



### In re NEW CENTURY.
### No. CV 07–00931 DDP (JTLx).

United States District Court,
C.D. California.

Dec. 3, 2008.

**Background:** Investors brought securities class action against officers and directors of sub-prime mortgage lender, its auditor, and the underwriters of its stock offering. Defendants filed motions to dismiss and auditor filed motion to strike.

**Holdings:** The District Court, Dean D. Pregerson, J., held that:

(1) officer defendants' false and misleading public statements regarding issuer's repeated assurances of strong credit quality and strict underwriting practices provided a basis for actionable securities law violations;

(2) investors sufficiently alleged facts giving rise to a strong inference that the officer defendants were at least deliberately reckless in making misrepresentations as to loan quality, internal controls, and various financial statements; and

(3) investors sufficiently pled loss causation element of their securities fraud claims.

Motions denied.

**1. Federal Civil Procedure ⟜1772**

Court will not hesitate to dismiss long, unwieldy pleadings.

**2. Federal Civil Procedure ⟜1832**

In deciding motions to dismiss, court may consider documents that are referred to in the complaint, that are "central" to the plaintiff's claims, and whose authenticity is undisputed.

**3. Evidence ⟜48**

Courts may take judicial notice of Securities and Exchange Commission (SEC) filings.  Fed.Rules Evid.Rule 201(b), 28 U.S.C.A.

**4. Federal Civil Procedure ⟜1104, 1125.1**

Motions to strike are not favored and should not be granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation.  Fed.Rules Civ.Proc.Rule 12(f), 28 U.S.C.A.

**5. Federal Civil Procedure ⟜1130**

Courts will not grant motions to strike unless convinced that there are no questions of fact, that any questions of law are clear and not in dispute, and that under no set of circumstances could the claim or

RICHMAN v. GOLDMAN SACHS GROUP, INC.   **261**
Cite as 868 F.Supp.2d 261 (S.D.N.Y. 2012)

### APPENDIX B: INFRINGING MFF PRODUCTS BY SKU

The following SKUs bear the Quattro G Pattern.  Those in bold also bear the GRG Stripe:

| SKU | Color Code(s) |
| --- | --- |
| Boris2 | NAMFB |
| Craig2 | NAMFB |
| Curtis | BRFMB |
| Cyrus | NAMFB |
| **DeWayne** | **BRMLE** |
| Donte2 | BRMLE |
| Farley | BRMLE |
| JayJay2 | NAMFB |
| Jerry2 | NAMFB |
| Jerry2–UG | NAMFB |
| **Johnson** | **NAMFB** |
| Johnson2 | BRMFB |
| Kaloon | BRMFB |
| **Macario** | **BRMLE** |
| Melrose2 | NAMFB |
| Melrose4 | NAMFB |
| **Mette** | **BRMFB** |
| Orion | BRMFB |
| Pacific | BRMLE |
| Phreedom2 | NAMFB |
| Phyre2 | NAMFB |
| Player2 | BRMFB |
| Rogan | BRMFB |
| Silas2 | BRMFB |
| **Turbow** | **NAMFB** |
| Vieno2 | BRMFB |
| Arabella2 | NAMFB |

### APPENDIX B: INFRINGING MFF PRODUCTS BY SKU—Continued

| Blair2 | BRMFB |
| --- | --- |
| Effort | BRMLE |
| Gratifia | NAMFB, BRMFB |
| Jerica | NAMFB, GOMFB |
| Kessie | LBRFB, DBRFB |
| Looly | LBRFB, DBRFB |
| Pastrana | BRMFB |
| Peachy | GOMFB |
| Tatyanna | BRMFB |

The following SKU bears only the GRG Stripe:

| SKU | COLOR |
| --- | --- |
| Dennis2 | NAMFB |
| Melrose | DBRLE |



**Ilene RICHMAN, Individually and on behalf of all others similarly situated, Plaintiffs**

**v.**

**GOLDMAN SACHS GROUP, INC., et al., Defendants.**

**No. 10 Civ. 3461(PAC).**

United States District Court, S.D. New York.

June 21, 2012.

**Background:**  Investors brought putative class action against corporation and certain employees, asserting claims for alleged securities fraud and control person liability under Securities Exchange Act. Defendants moved to dismiss.

**Holdings:**  The District Court, Paul A. Crotty, J., held that:

(1) failure to disclose corporation's receipt of Wells notices was not material omission supporting securities fraud claim;

(2) failure to disclose corporation's receipt of Wells notices did not show recklessness supporting scienter element of securities fraud claim;

(3) investors adequately pleaded that corporation made material misstatements and omissions about its role in synthetic collateralized debt obligation (CDO) transactions and its conflicts of interest stemming from CDO transactions with intent to defraud its own shareholders;

(4) investors plausibly pleaded facts creating strong inferences of scienter;

(5) investors adequately alleged loss causation element of securities fraud; and

(6) investors adequately alleged scienter on part of corporation's employees.

Motion granted in part and denied in part.

**1. Securities Regulation ⬤60.51(1)**

　Plaintiffs bringing claims for security fraud must meet heightened pleading requirements of fraud pleading rule and Private Securities Litigation Reform Act (PSLRA).   Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5; Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u–4(b)(1);  Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**2. Securities Regulation ⬤60.18**

　To state a securities fraud claim in a private action under § 10(b) and Rule 10b–5, plaintiff must allege (1) a material misrepresentation or omission by defendant, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, or transaction causation, (5) economic loss, and (6) loss causation.   Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**3. Securities Regulation ⬤60.28(13)**

　Investigation, on its own, is not "pending legal proceeding," within meaning of federal securities regulation requiring company to describe briefly any material pending legal proceedings known to be contemplated by governmental authorities, until investigation reaches a stage at which agency or prosecutorial authority makes known that it is contemplating filing suit or bringing charges.   17 C.F.R. § 229.103.

　　See publication Words and Phrases for other judicial constructions and definitions.

**4. Evidence ⬤22(1)**

　District court can take judicial notice of Securities and Exchange Commission (SEC) filings in securities fraud action. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**5. Securities Regulation ⬤60.28(10.1)**

　Omission is actionable under federal securities fraud laws where (1) the omitted fact is material, and (2) the omission is (a) in contravention of an affirmative legal disclosure obligation, or (b) needed to prevent existing disclosures from being misleading.   Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u–4(b)(1);  Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**6. Securities Regulation ⬤60.28(2.1)**

　When a corporation chooses to speak, even where it lacks a duty to speak, it has a duty under federal securities laws to be both accurate and complete, although a corporation only has to reveal such facts, if any, that are needed so that what was revealed would not be so incomplete as to mislead.

**7. Securities Regulation ⬳60.28(10.1)**

Federal securities laws do not require a company to accuse itself of wrongdoing.

**8. Securities Regulation ⬳60.28(13)**

Securities fraud defendants are not bound to predict as the imminent or likely outcome of investigations that indictments of company and its chief officers will follow, with financial disaster in their train. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**9. Securities Regulation ⬳60.28(13)**

Corporation and its employees were not required to disclose receipt of Wells notices indicating that corporation was at risk of Securities and Exchange Commission (SEC) enforcement action with respect to its synthetic collateralized debt obligation (CDO) practices, and therefore failure to make such disclosure was not material omission supporting securities fraud claim; notices did not establish that litigation was substantially certain to occur, but instead reflected only the desire of agency enforcement staff to move forward, and corporation had provided some notice of ongoing governmental investigations into its synthetic CDO practices. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. §§ 229.103, 240.10b–5, 240.12b–20.

**10. Securities Regulation ⬳60.28(10.1)**

Under federal securities laws, corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**11. Securities Regulation ⬳60.28(13)**

Corporation's press release pertaining to newspaper article which focused on corporation and indicated that Securities and Exchange Commission (SEC), Congress, and Financial Industry Regulatory Authority (FINRA) were scrutinizing disastrously performing synthetic collateralized debt obligation (CDO) securities, but did not address or mention investigations into corporation's synthetic CDO practices, did not trigger duty on corporation's part to disclose its receipt of Wells notices indicating that corporation was at risk of SEC enforcement action that made corporation's failure to disclose notices a material omission supporting securities fraud claim. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. §§ 229.103, 240.10b–5, 240.12b–20.

**12. Federal Civil Procedure ⬳1832**

Newspaper article upon which plaintiffs obviously relied in drafting securities fraud complaint could be considered by district court in deciding motion to dismiss for failure to state claim. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**13. Securities Regulation ⬳60.28(13)**

Corporation did not have regulatory duty upon which § 10(b) or Rule 10b–5 claim could be based to disclose its receipt of Wells notices indicating that corporation was at risk of enforcement action by Securities and Exchange Commission (SEC) based on its synthetic collateralized debt obligation (CDO) practices, pursuant to regulation requiring company to describe material pending legal proceedings known to be contemplated by governmental authorities, which did not mandate disclosure of such notices until regulatory investigation matured to point at which litigation was apparent and substantially certain to occur. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. §§ 229.103, 240.10b–5, 240.12b–20.

**14. Securities Regulation ⇐60.28(13)**

Corporation did not have duty upon which § 10(b) or Rule 10b–5 claim could be based to disclose its receipt of Wells notices indicating that corporation was at risk of enforcement action by Securities and Exchange Commission (SEC) based on its synthetic collateralized debt obligation (CDO) practices, due to corporation's violation of rules established by Financial Industry Regulatory Authority (FINRA) or National Association of Securities Dealers' (NASD), which did not confer private rights of action. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**15. Securities Regulation ⇐60.45(1)**

Requisite state of mind, or scienter, in an action under § 10(b) and Rule 10b–5 is an intent to deceive, manipulate, or defraud. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**16. Federal Civil Procedure ⇐636**

To satisfy fraud pleading rule in alleging scienter element of securities fraud claim, plaintiff must allege facts that give rise to a strong inference of fraudulent intent. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**17. Federal Civil Procedure ⇐636**

Under fraud pleading rule, securities fraud plaintiff can plead scienter either (1) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (2) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**18. Federal Civil Procedure ⇐636**

When plaintiff asserting securities fraud seeks to raise strong inference of scienter required by fraud pleading rule through strong circumstantial evidence of conscious misbehavior or recklessness, strength of circumstantial allegations must be correspondingly greater if there is no motive to commit fraud. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**19. Federal Civil Procedure ⇐636**

Recklessness sufficient to establish scienter element of securities fraud claim under fraud pleading rule involves conduct that is highly unreasonable and represents an extreme departure from the standards of ordinary care. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5; Fed.Rules Civ.Proc. Rule 9(b), 28 U.S.C.A.

**20. Federal Civil Procedure ⇐636**

Strong inference of scienter may arise in securities fraud case where plaintiff alleges that defendants knew facts or had access to information suggesting that their public statements were not accurate, or failed to check information which they had a duty to monitor. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5; Fed.Rules Civ. Proc.Rule 9(b), 28 U.S.C.A.

**21. Federal Civil Procedure ⇐636**

Corporation and its employees did not have obvious duty to disclose receipt of Wells notices indicating that corporation was at risk of enforcement action by Securities and Exchange Commission (SEC) related to its synthetic collateralized debt obligation (CDO) practices, and therefore recklessness supporting scienter element of investors' securities fraud claim could not inferred from failure to disclose no-

tices. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. §§ 229.103, 240.10b–5, 240.12b–20; Fed. Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**22. Securities Regulation ⬟60.47**

To state securities fraud claim based upon corporation's alleged misstatements and fraudulent conduct in collateralized debt obligation (CDO) transactions, corporation's shareholders, who did not invest in CDO transactions, had to allege that corporation made material misstatements and omissions with intent to defraud its own shareholders. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**23. Securities Regulation ⬟60.27(4, 5)**

Expressions of puffery and corporate optimism do not give rise to securities violations.

**24. Securities Regulation ⬟60.20**

Allegations of corporate mismanagement, without an element of deception or manipulation, are not actionable as securities fraud. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**25. Securities Regulation ⬟60.27(5)**

Corporation's optimistic statements may be actionable under federal securities fraud laws upon a showing that defendants did not genuinely or reasonably believe positive opinions that they touted, such that opinions were without basis in fact or that speakers were aware of facts undermining positive statements, or upon a showing that opinions imply certainty. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**26. Securities Regulation ⬟60.28(13)**

Under federal securities fraud laws, upon putting topic of cause of its financial success at issue, company becomes obligat-ed to disclose information concerning source of its success, since reasonable investors would find that such information would significantly alter mix of available information. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**27. Securities Regulation ⬟60.27(5), 60.28(10.1)**

Disclaimers do not always shield defendant from liability for securities fraud, and cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**28. Securities Regulation ⬟60.28(1)**

Disclosure required by securities laws is measured not by literal truth, but by the ability of the material to accurately inform, rather than mislead, prospective buyers.

**29. Securities Regulation ⬟60.27(1), 60.28(13)**

Investors asserting securities fraud claims adequately pleaded that corporation, with intent to defraud its own shareholders, made material misstatements and omissions about its business practices and conflicts of interest in connection with its roles in synthetic collateralized debt obligation (CDO) transactions by alleging that corporation hid role played by favored client in asset selection process for one transaction, knowing that client, which held undisclosed short position, selected assets that would perform poorly or fail, that, as to other transactions, corporation affirmatively represented that it held long positions without disclosing its substantial short positions, and that, in light of such conduct, corporation could not have believed its disputed statements, including that it complied with the law and that its continued success relied upon compliance. Securities Exchange Act of 1934, § 10(b),

15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

#### 30. Securities Regulation ⟜60.28(16)

While defendant in securities fraud class action can be found liable only for those statements made during the class period, a prior misstatement does not require dismissal if the prior statement is relevant in determining whether defendant had a duty to make a corrective disclosure during the class period.  Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

#### 31. Securities Regulation ⟜60.28(11), 60.46

Securities fraud complaint may not be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.  Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

#### 32. Securities Regulation ⟜60.28(13), 60.46

Corporation's statements regarding its business practices and conflicts of interest, including that it complied with the letter and spirit of the law, that its success depended upon such compliance, that it had ability to address potential conflicts of interest, and that it valued its reputation, were not so obviously unimportant to reasonable investor as to render such statements and alleged related omissions not "material" under securities fraud laws in putative class action alleging that corporation and its employees hid favored client's role and investment position in synthetic collateralized debt obligation (CDO) transaction and hid its own investment positions in three other CDO transactions.  Securi-

ties Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

   See publication Words and Phrases for other judicial constructions and definitions.

#### 33. Federal Civil Procedure ⟜636

Investors asserting securities fraud claims based upon corporation's alleged material misstatements and omissions about its business practices and conflicts of interest with respect to synthetic collateralized debt obligation (CDO) transaction plausibly pleaded facts creating strong inference of scienter, based on corporation's knowledge of misstatements and omissions, by alleging that corporation knew that its favored client played active but concealed role in transaction's asset selection process, that corporation knew that client's interests were adverse to CDO investors, and that corporation enlisted third party as only disclosed portfolio selection agent for CDO to leverage agent's credibility and franchise to help distribute transaction.  Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

#### 34. Securities Regulation ⟜60.51(2)

Investors asserting securities fraud claims based upon corporation's alleged material misstatements and omissions about its business practices and conflicts of interest with respect to its involvement in synthetic collateralized debt obligation (CDO) transactions plausibly pleaded facts creating strong inference of scienter by alleging that corporation knew that its statements about holding long positions in CDOs and having aligned its interests with CDO investors were inaccurate, due to its undisclosed substantial short positions, and that corporation knew that its repeated reassurances to its own shareholders that it was complying with the letter and spirit of the law and had procedures in place to

address potential conflicts of interest were inaccurate and incomplete, given its practice of making material misrepresentations to third-party investors.   Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**35.  Securities Regulation ☞60.45(1)**

When securities fraud defendant is a corporate entity, the law imputes the state of mind of the employees or agents who made the challenged statements to the corporation.   Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**36.  Securities Regulation ☞60.51(1)**

Allegations of loss causation in securities fraud action are not subject to the heightened pleading requirements of fraud pleading rule and Private Securities Litigation Reform Act (PSLRA); rather, a short and plain statement is all that is necessary at pleading stage of the litigation.   Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u–4(b)(1); 17 C.F.R. § 240.10b–5; Fed.Rules Civ.Proc. Rules 8(a), 9(b), 28 U.S.C.A.

**37.  Securities Regulation ☞60.51(1)**

To survive motion to dismiss with respect to loss causation element of securities fraud claim, plaintiff need only allege either (1) facts sufficient to support an inference that it was defendant's fraud, rather than other salient factors, that proximately caused plaintiff's loss, or (2) facts that would allow a factfinder to ascribe some rough proportion of the whole loss to defendant's fraud.   Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**38.  Securities Regulation ☞60.47**

Loss causation element of securities fraud claim has to do with the relationship between plaintiff's investment loss and the information misstated or concealed by defendant; if that relationship is sufficiently direct, loss causation is established, but if the connection is attenuated, or if plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie.   Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**39.  Securities Regulation ☞60.47**

Decline in stock price following a public announcement of "bad news" does not, by itself, demonstrate loss causation supporting securities fraud claim.   Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**40.  Securities Regulation ☞60.47**

Securities fraud plaintiff may successfully allege loss causation by alleging that the market reacted negatively to a corrective disclosure which revealed alleged misstatement's falsity or disclosed that allegedly material information had been omitted, and such corrective disclosure need not take the form of a single announcement, but can occur through a series of disclosing events.   Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**41.  Securities Regulation ☞60.47**

Investors adequately alleged loss causation element of securities fraud claims based upon corporation's material misstatements and omissions about its business practices and conflicts of interest concerning its involvement in synthetic collateralized debt obligation (CDO) transactions by asserting that they bought corporation's stock before such misstatements

and conflicts of interest came to light through filing of fraud charges by Securities and Exchange Commission (SEC) related to one CDO transaction, through Senate's release of corporation's internal e-mails reflecting its practice of betting against securities that it sold to investors, and through SEC announcement that it was investigating another CDO transaction; actions and investigations constituted series of corrective disclosures that revealed corporation's pattern of making misstatements and its conflicts of interest. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**42. Securities Regulation ⟺60.40**

For individual defendants to be liable for securities fraud, they must be responsible for corporation's misleading statements and omissions. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**43. Securities Regulation ⟺60.40**

Allegations that corporate employees helped prepare Securities and Exchange Commission (SEC) filings underlying alleged securities fraud adequately pleaded employees' responsibility for corporation's misleading statements and omissions, as required for investors to state securities fraud claims against employees. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**44. Federal Civil Procedure ⟺636**

Investors asserting securities fraud claims based upon corporation's material misstatements and omissions about its business practices and conflicts of interest with respect to synthetic collateralized debt obligation (CDO) transactions adequately pleaded scienter on part of three corporate employees by alleging facts showing that employees actively monitored status of corporation's subprime assets and

subprime deals during relevant time and knew that corporation was trying to purge these assets from its books and stay on the short side, creating strong inference that employees knew that corporation was making material misstatements in CDOs when it sold poor-quality assets to investors without disclosing its or its favored client's substantial short positions, and that employees were in position to know that corporation's statements about its practices were inaccurate and incomplete. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**45. Securities Regulation ⟺60.40**

To maintain claim for control person liability pursuant to Securities Exchange Act, a plaintiff must allege facts showing (1) a primary violation by the controlled person, (2) control of the primary violator by the targeted defendant, and (3) that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated. Securities Exchange Act of 1934, § 20(a), 15 U.S.C.A. § 78t(a).

**46. Securities Regulation ⟺60.40**

Allegations sufficient to plead scienter for the purposes of primary liability for securities fraud pursuant to § 10(b) necessarily satisfy the culpable participation pleading requirement for claims alleging control person liability. Securities Exchange Act of 1934, §§ 10(b), 20(a), 15 U.S.C.A. §§ 78j(b), 78t(a); 17 C.F.R. § 240.10b–5.

———

Samuel Howard Rudman, David Avi Rosenfeld, Robbins Geller Rudman & Dowd LLP, Melville, NY, Catherine J. Kowalewski, Danielle S. Myers, Darren J. Robbins,

Eric I. Niehaus, Jonah H. Goldstein, Spencer A. Burkholz, Robbins Geller Rudman & Dowd LLP, David C. Walton, Lerach, Coughlin, Stoia, Geller, Rudman & Robbins, L.L.P., San Diego, CA, Kenneth A. Elan, Kenneth A. Elan, Esq, New York, NY, Mark W. Carbone, Carbone & Blaydes, PLLC, Charleston, WV, Robert R. Henssler, Jr., Robbins Geller Rudman & Dowd LLP, San Francisco, CA, for Plaintiffs.

Benjamin Robert Walker, David Maxwell Rein, Richard Howard Klapper, Theodore Edelman, Sullivan and Cromwell, LLP, New York, NY, for Defendants.

*OPINION & ORDER*

PAUL A. CROTTY, District Judge:

Plaintiffs in this class action allege that Goldman Sachs & Co. ("Goldman"), Lloyd C. Blankfein, David A. Viniar, and Gary D. Cohn (the "Individual Defendants," and collectively with Goldman, the "Defendants") violated § 10(b) of the Exchange Act, and Rule 10b–5 promulgated thereunder (Count One); and § 20(a) of the Exchange Act (Count II). Plaintiffs, who are purchasers of Goldman's common stock during the period February 5, 2007 through June 10, 2010, claim that Defendants made material misstatements and omissions regarding: (1) Goldman's receipt of "Wells Notices" from the Securities and Exchange Commission ("SEC") relating to Goldman's role in the synthetic collateralized debt obligation ("CDO"), titled ABACUS 2007 AC–1 ("Abacus"); and (2) Goldman's conflicts of interest that arose from its role in the Abacus, Hudson Mezzanine Funding 2006–1 ("Hudson"), The Anderson Mezzanine Funding 2007–1 ("Anderson"), and Timberwolf I CDO transactions.

Defendants move, pursuant to Fed. R.Civ.P. 9(b) and 12(b)(6), to dismiss the Consolidated Class Action Complaint (the "Complaint"). For the following reasons, Defendants' motion with respect to the failure to disclose the Wells Notices is GRANTED, and otherwise DENIED.

*BACKGROUND*

**I. Abacus and the SEC Investigation**

On April 26, 2007, the Abacus synthetic CDO transaction closed.[1] Goldman served as the underwriter or placement agent, the lead manager, and the protection buyer for the Abacus transaction. (Compl. ¶ 50 & n. 3.) Plaintiffs claim that "the Abacus transaction [ ] was designed from the outset by [Goldman] to allow a favored client to benefit at the expense of Goldman's other clients." (*Id.* ¶ 147.) Specifically, Plaintiffs claim that Goldman allowed Paulson & Co., a hedge fund client, to "play[ ] an active and determinative role in the selection process," and knew that Paulson was picking assets that it "believed would perform poorly or fail." (*Id.* ¶¶ 53, 64.) Indeed, "Paulson had agreed to pay Goldman a higher fee if Goldman could provide Paulson with CDS contracts containing premium payments below a certain level." (*Id.* ¶ 77.) Rather than disclose Paulson's role in the asset selection process, Gold-

---

1. In a typical CDO, a special purpose vehicle ("SPV") issues notes and uses the proceeds to acquire a portfolio of assets, such as residential mortgage-backed securities ("RMBS"). The SPV makes payments to noteholders from the income generated by the underlying assets. In a synthetic CDO, the SPV contains a CDO and credit default swap ("CDS"). The SPV obtains derivative exposure to a "reference" portfolio—which may be RMBS or CDOs—by entering into a CDS, pursuant to which counterparties agree to make periodic payments to the SPV in exchange for commitment by the SPV to make payments to the counterparties in the event that the reference securities experience adverse credit events. (*See* Compl. ¶ 50 & n. 3.)

man "falsely identified ACA [Management LLC] as the only portfolio selection agent for the CDO." (*Id.* ¶¶ 59–66.) Goldman hid Paulson's role, because it "expect[ed] to leverage ACA's credibility and franchise to help distribute this Transaction." (*Id.* ¶ 61 (quoting a Goldman internal memorandum)). The Abacus transaction performed poorly, as Paulson intended; the investors lost approximately $1 billion, and Paulson, holding the sole short position, profited by this amount. (*Id.* ¶ 81.)

In August 2008, the SEC notified Goldman that it had commenced an investigation into Abacus and served Goldman with a subpoena. (Compl. ¶ 88.) Goldman disclosed in its SEC filings that it had "received requests for information from various governmental agencies and self-regulatory organizations relating to subprime mortgages, and securitizations, collateralized debt obligations and synthetic products relating to subprime mortgages" and that Goldman was "cooperating with the requests." (*Id.* ¶¶ 129, 130.) On July 29, 2009, the SEC issued a Wells Notice to Goldman, notifying it that the SEC's Enforcement Division staff "intends to recommend an enforcement action" and providing Goldman with "an opportunity to respond concerning the recommendation." (*Id.* ¶ 90.) On September 10 and 25, 2009, Goldman provided written Wells submissions to the SEC. (*Id.* ¶ 91.) Goldman thereafter met with the SEC on numerous occasions. (*Id.* ¶ 91.) Plaintiffs claim that by failing to disclose its receipt of a Wells Notice, Goldman "hid its improper conduct of betting against" its clients, and caused its stock to trade at artificially inflated levels. (*Id.* ¶¶ 49, 99.)

On September 28, 2009 and January 29, 2010, the SEC issued Wells Notices to Fabrice Tourre and Jonathan Egol, two Goldman employees involved in the Abacus

transaction. (*Id.* ¶¶ 93, 94.) On April 16, 2010, the SEC filed a complaint against Goldman and Tourre—but not Egol—alleging securities fraud violations. (*Id.* ¶ 83.) As a result, Goldman's stock dropped from $184.27 to $160.70 per share, a drop of approximately 13%. (*Id.* ¶ 99.)

On July 14, 2010, Goldman reached a $550 million settlement with the SEC, in which Goldman acknowledged that its marketing material was incomplete and that it had made a mistake:

[T]he marketing material for the ABACUS 2001–AC 1 transaction contained incomplete information. In particular, it was a mistake for the Goldman marketing materials to state that the reference portfolio was "selected by" ACA Management LLC without disclosing the role of Paulson & Co. Inc. in the portfolio selection process and that Paulson's economic interests were adverse to CDO investors.

(*Id.* ¶ 87.)

On November 9, 2010, the Financial Industry Regulatory Authority ("FINRA") announced that it fined Goldman $650,000 for failing to disclose, within 30 days, that Tourre and Egol had received Wells Notices, in violation of National Association of Securities Dealers' ("NASD") Conduct Rule 3010 (which became FINRA Rule 2010, when FINRA succeeded NASD). (*Id.* ¶¶ 100–102.) In settling with FINRA, Goldman admitted that it violated these rules. (*Id.* ¶¶ 101, 102.)

## II.  Hudson

Hudson was a synthetic CDO that commenced on or around December 5, 2006, which Goldman packaged and sold. (*Id.* ¶¶ 148, 164.) Plaintiffs allege that Goldman had "clear conflicts of interest" in the Hudson transaction because it knew that the reference assets were poor quality mortgage related securities which were

likely to lose value, and yet, sold these products to its clients at higher prices than Goldman believed they were worth, while betting against those very securities, "thereby allowing the Company to reap billions in profits at their clients direct expense." (*Id.* ¶ 148.) Goldman had told investors that it "has aligned incentives with the Hudson program by investing in a portion of equity," without disclosing that it also held 100% of the short position at the same time. (*Id.* ¶¶ 165, 171, 177.) Goldman's incentive from holding $6 million in equity was substantially outweighed by its $2 billion short position. (*Id.* ¶ 171.) Further, Goldman had not disclosed that the assets had been taken directly from Goldman's inventory, and had been priced by Goldman's own personnel. (*Id.* ¶¶ 174, 177.)

### III. Anderson

Anderson was a synthetic CDO transaction that closed on March 20, 2007, for which Goldman served as the sole credit protection buyer and acted as an intermediary between the CDO and various broker-dealers. (Compl. ¶¶ 190, 191, 202.) Goldman was the source of 28 of the 61 CDS contracts that made up Anderson, and held a 40% short position. (*Id.* ¶¶ 189–191.) Plaintiffs allege that Goldman developed misleading talking points for its sales force, which did not adequately disclose the asset selection process and touted that Goldman would hold up to 50% of the equity tranche in the CDO, which was worth $21 million, without mentioning its $135 million short position. (*Id.* ¶¶ 204–207.)

### IV. Timberwolf I

Timberwolf I is a hybrid CDO squared transaction,[2] which closed in March 2007, that Goldman constructed, underwrote,

and sold. (*Id.* ¶ 213.) In its marketing booklet, Goldman stated that it was purchasing 50% of the equity tranche, but failed to disclose that it was the largest source of assets and held a 36% short position in the CDO. (*Id.* ¶¶ 214, 216.) Goldman aggressively sold Timberwolf I without explaining its pricing methodology. (*Id.* ¶ 255.) Plaintiffs allege that Goldman knew it was selling poorly quality assets at inflated prices, and profited from its short position. (*Id.* ¶¶ 264–67.)

### *LEGAL STANDARDS*

[1] Since Plaintiffs bring claims for security fraud, they must meet heightened pleading requirements of Fed.R.Civ.P. 9(b), and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *ATSI Comm'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir.2007); *see also* 15 U.S.C. § 78u–4(b)(1).

Section 10(b) of the Exchange Act prohibits any person from using or employing "any manipulative or deceptive device or contrivance in contravention" of SEC rules. 15 U.S.C. § 78j(b). Rule 10b–5, promulgated under Section 10(b), prohibits "any device, scheme, or artifice to defraud" and "any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading. . . ." 17 C.F.R. § 240.10b–5.

[2] To state a claim in a private action under section 10(b) and Rule 10b–5, a plaintiff must prove: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission [or transaction causation]; (5)

---

**2.** A CDO squared is backed by a pool of CDO    tranches.

economic loss; and (6) loss causation." *Stoneridge Inv. Partners, L.L.C. v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008).

Defendants argue that the Complaint should be dismissed because: (1) Plaintiff failed to plead an actionable misstatement or omission; (2) Plaintiffs failed to allege facts giving rise to a strong inference of scienter; and (3) Plaintiffs failed to adequately allege loss causation.

## ANALYSIS

### I. Goldman's Failure to Disclose Its Receipt of Wells Notices

#### A. *Disclosure Requirements and The Wells Notice Process*

Under Section 13 of the Exchange Act, Regulation S–K Item 103, a company is required to "[d]escribe briefly any material pending legal proceedings . . . known to be contemplated by governmental authorities." 17 C.F.R. § 229.103. Section 240.12b–20 "supplements Regulation S–K by requiring a person who has provided such information in 'a statement or report . . . [to] add[ ] such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading.' " *United States v. Yeaman*, 987 F.Supp. 373, 381 (E.D.Pa. 1997).

The SEC provides a target of an investigation with a Wells Notice "whenever the Enforcement Division staff decides, even preliminarily, to recommend charges." *In re Initial Public Offering Sec. Litig.*, No. 21 MC 92(SAS), 2004 WL 60290, at *1 (S.D.N.Y. Jan. 12, 2004). The party at risk of an enforcement action is then entitled, under SEC rules, to make a "Wells submission" to the SEC, "presenting arguments why the Commissioners should reject the [Enforcement Division] staff's rec-

ommendation for enforcement." *WHX Corp. v. S.E.C.*, 362 F.3d 854, 860 (D.C.Cir. 2004) (citing 17 C.F.R. § 202.5(c)). A party's entitlement to make a Wells submission is "obviously based on recognition that staff advice is not authoritative." *Id.* Indeed, "[t]he Wells process was implemented so that the Commission would have the opportunity to hear a defendant's arguments before deciding whether to go forward with enforcement proceedings." *In re Initial Public Offering*, 2004 WL 60290, at *1. Accordingly, receipt of a Wells Notice does not necessarily indicate that charges will be filed.

[3] "An investigation on its own is not a 'pending legal proceeding' until it reaches a stage when the agency or prosecutorial authority makes known that it is contemplating filing suit or bringing charges." *ABA Disclosure Obligations under the Federal Securities Laws in Government Investigations—Part II.C.; Regulation S–K, Item 103: Disclosure of "Legal Proceedings,"* 64 Bus. Law. 973 (2009). A Wells Notice may be considered an indication that the staff of a government agency is considering making a recommendation, *id.*, but that is well short of litigation. Further, Plaintiffs conceded at oral argument that no court has ever held that a company's failure to disclose receipt of a Wells Notice constitutes an actionable omission under § 10(b) or Rule 10b–5. (May 21, 2012 Oral Arg. Tr. 22:17–22.)

In addition to Regulation S–K, Item 103, FINRA Rule 2010, and NASD Conduct Rule 3010 explicitly require financial firms to report an employee's receipt of a Wells Notice to FINRA within 30 days. (Compl. ¶ 100.)

[4] In this case, the Defendants disclosed, as early as January 27, 2009, that there were governmental investigations into, *inter alia*, Goldman's synthetic CDO

practices.[3] Goldman never disclosed the Wells Notices that it and its employees received on July 29, 2009, September 28, 2009, and January 29, 2010. (Compl. ¶¶ 90–94, 129.)

[5] An omission is actionable where (1) the omitted fact is material; and (2) the omission is (a) "in contravention of an affirmative legal disclosure obligation"; or (b) needed "to prevent existing disclosures from being misleading." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir.2010). Plaintiffs argue (1) that Defendants had to disclose their receipt of Wells Notices in order to prevent their prior disclosures about government investigations from being misleading, and (2) that Defendants had an affirmative legal obligation to disclose their receipt of Wells Notices under Regulation S–K, Item 103, FINRA and NASD Rules.

### B. A Duty to Be Accurate and Complete in Making Disclosures

Plaintiffs' primary argument is that Defendants' disclosures about governmental investigations triggered a duty to disclose Goldman's subsequent receipt of Wells Notices. Specifically, Plaintiffs argue that by failing to disclose that the government inquiries resulted in Wells Notices, Defendants misled the public into "erroneously" concluding that "no significant developments had occurred which made the investigation more likely to result in formal charges." (Pl. Opp. 6.)

[6–8] When a corporation chooses to speak—even where it lacks a duty to speak—it has a "duty to be both accurate and complete." *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir.2002). A corporation, however, "only [has to reveal] such [facts], if any, that are needed so that what was revealed would not be so incomplete as to mislead." *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F.Supp.2d 148, 160 (S.D.N.Y.2008) (citation omitted). The federal securities laws "do not require a company to accuse itself of wrongdoing." *In re Citigroup, Inc. Sec. Litig.*, 330 F.Supp.2d 367, 377 (S.D.N.Y.2004) (citing *In re Am. Express Co. Shareholder Litig.*, 840 F.Supp. 260, 269–70 (S.D.N.Y.1993)); *see also Ciresi v. Citicorp*, 782 F.Supp. 819, 823 (S.D.N.Y.1991) (dismissing Exchange Act claims in part because "the law does not impose a duty to disclose uncharged, unadjudicated wrongdoing or mismanagement"). Moreover, "defendants [a]re not bound to predict as the 'imminent' or 'likely' outcome of the investigations that indictments of [the company] and its chief officer[s] would follow, with financial disaster in their train." *Ballan v. Wilfred Am. Educ. Corp.*, 720 F.Supp. 241, 248 (E.D.N.Y.1989).

[9] In *In re Citigroup*, plaintiffs' 10(b) claims premised on Citigroup's failure to disclose "litigation risks associated with its Enron-related, analysis/investment banking and reporting activities" were dismissed because "Citigroup was not required to make disclosures predicting such litigation"; plaintiffs did not allege that litigation "was substantially certain to occur"; and the SEC filings at issue contained some "discuss[ion of] pending litigation." 330 F.Supp.2d at 377. Similarly,

---

**3.** Plaintiffs' Complaint cites to the 2009 10–K concerning "requests for information from various governmental agencies" regarding, *inter alia,* synthetic CDOs. (Compl. ¶ 129.) Both parties refer to this statement as notice of governmental "investigations." (*See e.g.,* Pl. Opp. 4.) Defendants attached SEC filings

going back to at least January 27, 2009 that contain an identical disclosure. (*See* Walker Decl. Ex. J.) While these materials were not attached to the Complaint, the Court can take judicial notice of SEC filings. *See Finn v. Barney,* 471 Fed.Appx. 30, 31–32 (2d Cir. 2012).

here, Plaintiffs do not allege that litigation was substantially certain to occur, and concede that Defendants provided some notice about ongoing governmental investigations in their SEC disclosures. Indeed, Plaintiffs cannot claim that a Wells Notice indicated that litigation was "substantially certain to occur" because Jonathan Egol, a Goldman employee, received a Wells Notice regarding the Abacus transaction and ultimately was not sued by the SEC. While Goldman and Tourre were sued, the Defendants were not obligated to predict and/or disclose their predictions regarding the likelihood of suit. *See Ballan*, 720 F.Supp. at 248.

[10] Moreover, revealing one fact about a subject does not trigger a duty to reveal all facts on the subject, so long as "what was revealed would not be so incomplete as to mislead." *In re Bristol Myers*, 586 F.Supp.2d at 160 (quoting *Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir. 1990)). Plaintiffs have not shown that Defendants were required to disclose their receipt of Wells Notice to prevent their prior disclosures from being inaccurate or incomplete, as their receipt of Wells Notices indicated that the governmental investigations were indeed ongoing. While Plaintiffs claim to want to know about the Wells Notices, "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *In re Time Warner Sec. Litig.*, 9 F.3d 259, 267 (2d Cir.1993). At best, a Wells Notice indicates not litigation but only the desire of the Enforcement staff to move forward, which it has no power to effectuate. This contingency need not be disclosed.

[11, 12] Plaintiffs also argue that Defendants' statements in response to a De-

cember 24, 2009 New York Times Article (the "Article") triggered a duty to disclose the Wells Notices. The Article, which mentioned other investment companies but focused on Goldman, stated that the SEC, Congress, and FINRA are scrutinizing "[h]ow these disastrously performing [synthetic CDO] securities were devised." (Walker Decl. Ex. O at 1.)[4] In response, Goldman released a one-page press release addressing answers to questions the Times had asked prior to publication, but which had not been included in the Article. Goldman explained how synthetic CDOs worked and why they were created. (Compl. ¶ 124.) Goldman's response did not address or mention the existence of governmental investigations. Accordingly, Goldman's press release contained nothing concerning the investigations that could be considered inaccurate or incomplete.

In sum, Plaintiffs have not shown that Defendants' nondisclosure of their receipt of Wells Notices made their prior disclosures about ongoing governmental investigations materially misleading; or that Defendants breached their duty to be accurate and complete in making their disclosures.

#### C.  *A Regulatory Duty To Disclose*

[13] Plaintiffs also argue that Defendants had an affirmative legal obligation to disclose their receipt of Wells Notices under Regulation S–K, Item 103, FINRA and NASD Rules. There is nothing in Regulation S–K, Item 103 which mandates disclosure of Wells Notices. Item 103 does not explicitly require disclosure of a Wells Notices, and no court has ever held that this regulation creates an implicit duty to disclose receipt of a Wells Notice. When the regulatory investigation matures to the point where litigation is apparent

---

**4.** Since Plaintiffs obviously relied on this Article in drafting their Complaint, the Court can

consider it here. *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir.2007)

and substantially certain to occur, then 10(b) disclosure is mandated, as discussed above. Until then, disclosure is not required. Moreover, even if Goldman had such a duty here, "[i]t is far from certain that the requirement that there be a duty to disclose under Rule 10b–5 may be satisfied by importing the disclosure duties from [an] S–K [regulation]." *In re Canandaigua Sec. Litig.*, 944 F.Supp. 1202, 1210 (S.D.N.Y.1996) (addressing S–K regulation 303).

[14] With respect to FINRA Rule 2010 and NASD Conduct Rule 3010, there is no dispute that Goldman was bound by and violated these regulations by failing to disclose Tourre and Egol's receipt of Wells Notices within 30 days. (Compl. ¶¶ 100–103.) Courts, however, have cautioned against allowing securities fraud claims to be predicated solely on violations of NASD rules [5] because such "rules do not confer private rights of action." *Weinraub v. Glen Rauch Sec., Inc.*, 399 F.Supp.2d 454, 462 (S.D.N.Y.2005); *Tucker v. Janney Montgomery Scott, Inc.*, No. 96 Civ. 1923(LLS), 1997 WL 151509, at *3 (S.D.N.Y. Apr. 1, 1997); *see also GMS Grp., LLC v. Benderson*, 326 F.3d 75, 81–82 (2d Cir.2003) ("arguably there is no right of action simply for a violation of NASD rules.").[6]

Plaintiffs have not shown that Goldman had a regulatory duty, upon which a Section 10(b) or Rule 10b–5 claim can be based, to disclose its receipt of Wells Notices. Accordingly, Plaintiffs' claim premised on Defendants' failure to disclose receipt of Wells Notices fails.

### D. *Scienter*

While there was no duty to disclose, even if there was such a duty, Plaintiffs' claim would still fail because Plaintiffs have not adequately alleged scienter.

[15–17] "The requisite state of mind, or scienter, in an action under section 10(b) and Rule 10b–5 is 'an intent to deceive, manipulate or defraud.' " *In re GeoPharma, Inc. Sec. Litig.*, 411 F.Supp.2d 434, 441 (S.D.N.Y.2006) (quoting *Ganino v. Citizens Utils. Corp.*, 228 F.3d 154, 168 (2d Cir.2000)). Moreover, to satisfy Rule 9(b), a plaintiff must allege "facts that give rise to a strong inference of fraudulent intent." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). A plaintiff claiming fraud can plead scienter "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006).

[18–20] While Plaintiffs failed to raise a strong inference of motive and opportunity,[7] "they could raise a strong inference

---

**5.** This is applicable to FINRA rules, since FINRA is NASD's successor.

**6.** A violation of Item 103 or NASD rules may nonetheless be relevant to a 10(b) and 10b–5 analysis. *See GMS Grp.*, 326 F.3d 75, 82 (NASD "violations may be considered relevant for purposes of § 10(b) unsuitability claims"); *Clark v. John Lamula Investors, Inc.*, 583 F.2d 594, 601 (2d Cir.1978).

**7.** Plaintiffs argue (in a footnote) that Defendants "had a motive to maintain [Goldman's]

appearance of financial health...." (Pl. Opp. 20–21 n. 17 (quoting *RMED Intern., Inc. v. Sloan's Supermarkets, Inc.*, 878 F.Supp. 16, 19 (S.D.N.Y.1995)).) In *RMED Intern.*, the court found that Defendants had a motive to hide the existence of an FTC investigation in order to "maintain [Defendant's] appearance of financial health to both its existing shareholders and its potential investors." *Id.* This argument is made in Plaintiffs' opposition brief, but their Complaint does not allege that Defendants omitted any mention of Wells Notices in order to maintain the appearance of

of scienter under the 'strong circumstantial evidence [of conscious misbehavior or recklessness]' prong, 'though the strength of the circumstantial allegations must be correspondingly greater' if there is no motive." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,* 553 F.3d 187, 198–99 (2d Cir.2009) (quoting *Kalnit v. Eichler,* 264 F.3d 131, 143–44 (2d Cir.2001)). Recklessness sufficient to establish scienter involves conduct that is "highly unreasonable and . . . represents an extreme departure from the standards of ordinary care." *Chill v. Gen. Elec. Co.,* 101 F.3d 263, 269 (2d Cir.1996) (quoting *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 47 (2d Cir.1978)). A strong inference of scienter may arise where a plaintiff alleges, *inter alia,* defendants " 'knew facts or had access to information suggesting that their public statements were not accurate'; or [ ] 'failed to check information they had a duty to monitor.' " *Novak v. Kasaks,* 216 F.3d 300, 311 (2d Cir.2000).

[21] Plaintiffs argue that Defendants knew of the Wells Notices and admitted that their failure to disclose Tourre and Egol's receipt of Wells Notices violated FINRA and NASD rules. As previously indicated, Defendants' failure to disclose receipt of Wells Notices did not make their prior and ongoing disclosures inaccurate. Thus, Defendants "failure to disclose [their receipt of Wells Notices], by itself, can only constitute recklessness if there was an obvious duty to disclose that information." *In re GeoPharma,* 411 F.Supp.2d at 446 (citing *Kalnit,* 264 F.3d at 143–44). The requirement that the duty be "obvious" ensures that fraudulent intent will not be imputed to a company every time a public statement lacks detail. *See Bragger v. Trinity Capital Enter. Corp.,* No. 92 Civ. 2124(LMM), 1994 WL 75239, at *4 (S.D.N.Y. Mar. 7, 1994).

Plaintiffs failed to show that Defendants had an obvious duty to disclose their receipt of Wells Notices. Regulation S–K, Item 103 and FINRA and NASD Rules do not create an obvious duty to disclose, sufficient for Section 10(b) and Rule 10b–5 purposes; no court has ever held otherwise. Since "the duty to disclose . . . was not so clear," Defendants' "recklessness cannot be inferred from the failure to disclose." *Kalnit,* 264 F.3d at 143 (holding that since "this case does not present facts indicating a clear duty to disclose, plaintiff's scienter allegations do not provide *strong* evidence of conscious misbehavior or recklessness."); *see also In re GeoPharma,* 411 F.Supp.2d at 446–47 (holding that defendants had no "obvious duty to disclose [the contents of an] FDA letter" given "what defendants *did* disclose" in their press release).

In sum, Plaintiffs failed to satisfy both the duty and scienter requirements to state a Section 10(b) and Rule 10b–5 claim. Accordingly, Defendants' motion to dismiss Plaintiffs' claims premised on Defendants' failure to disclose their receipt of Wells Notices is GRANTED.

## II. Goldman's Alleged Conflicts of Interest

[22] Plaintiffs claim that Goldman made material misstatements and omissions concerning Goldman's business practices and conflicts of interest, which are actionable in light of Goldman's misstatements and fraudulent conduct in the Abacus, Hudson, Anderson, and Timberwolf I

---

financial health. Even if Plaintiffs had made such an allegation, the Second Circuit has since held: "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high . . . do not constitute 'motive' for purposes of this inquiry." *ECA,* 553 F.3d at 198.

CDO transactions.  Plaintiffs are Goldman's own shareholders—not investors in the Abacus, Hudson, Anderson, and Timberwolf I CDO transactions.  Accordingly, to state a claim, Plaintiffs have to show that Goldman made material misstatements and omissions with the intent to defraud its own shareholders.  *See In re Sadia, S.A. Sec. Litig.*, 643 F.Supp.2d 521, 532 (S.D.N.Y.2009) (distinguishing acts that deceive a company's *own* shareholders, which can give rise to shareholders' securities fraud claims, from those that deceive investors in the securities of other companies, which are not actionable when raised by the company's own shareholders).

### A.  Actionable Misstatements and Omissions

Plaintiffs claim that Goldman's conduct in the Abacus, Hudson, Anderson, and Timberwolf I CDO transactions made the following disclosures materially misleading:

- "[W]e increasingly have to address potential conflicts of interest, including situations where our services to a particular client or our own proprietary investments or other interests conflict, or are perceived to conflict, with the interest of another client...." (Compl. ¶ 134 (Form 10–K));

- "We have extensive procedures and controls that are designed to ... address conflicts of interest" (Compl. ¶¶ 134, 154 (Form 10–K));

- "Our clients' interests always come first.  Our experience shows that if we serve our clients well, our own success will follow." (Compl. ¶ 154 (Goldman Annual Report));

- "We are dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us.  Our continued success depends upon unswerving adherence to this standard." (Compl. ¶ 154 (Goldman Annual Report));

- "Integrity and honesty are at the heart of our business" (Compl. ¶ 289 (Goldman Annual Report));

- "Most importantly, and the basic reason for our success, is our extraordinary focus on our clients" (Compl. ¶ 154 (Viniar's Statements on Goldman's Investor Conference Call));

- "Our reputation is one of our most important assets" (Compl. ¶ 154 (Form 10–K)).

Defendants argue that these statements are non-actionable statements of opinion, puffery, or mere allegations of corporate mismanagement (Def. Br. 20–21); and that Goldman's conflict of interest disclosures foreclose liability (Def. Reply Br. 8–10).[8]

[23–26]  "Expressions of puffery and corporate optimism do not give rise to securities violations."  *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir.2004) (citation omitted).  "Likewise, allegations of corporate mismanagement without an element of deception or manipulation are not actionable."  *Lapin v. Goldman Sachs Grp., Inc.*, 506 F.Supp.2d 221, 239 (S.D.N.Y. 2006) (citing *In re Citigroup, Inc. Sec. Litig.*, 330 F.Supp.2d 367, 375–76 (S.D.N.Y.2004)).  "The important limitation on these principles is that optimistic statements may be actionable upon a showing that the defendants did not genuinely or reasonably believe the positive opinions they touted (i.e., the opinion was

---

**8.**  Goldman's arguments in this respect are Orwellian.  Words such as "honesty," "integrity," and "fair dealing" apparently do not mean what they say; they do not set standards; they are mere shibboleths.  If Goldman's claim of "honesty" and "integrity" are simply puffery, the world of finance may be in more trouble than we recognize.

without a basis in fact or the speakers were aware of facts undermining the positive statements), or that the opinions imply certainty." *Id.* (citing cases). Moreover, by putting the "topic of the cause of its financial success at issue, [a company] then [ ] is 'obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information.' " *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F.Supp.2d 388, 400–01 (S.D.N.Y.2005) (quoting *In re Providian Fin. Corp. Sec. Litig.*, 152 F.Supp.2d 814, 824–25 (E.D.Pa. 2001)).

[27, 28] Additionally, disclaimers do not always shield a defendant from liability. For example, "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach*, 355 F.3d at 173. Indeed, "under certain circumstances, cautionary statements can give rise to Section 10(b) liability." *In re Van der Moolen*, 405 F.Supp.2d at 400. "[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *McMahan v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir.1990).

[29] With respect to the Abacus transaction, Plaintiffs argue that Goldman's conduct "involved both client conflicts and outright fraud." (Pl. Opp. 15). Plaintiffs allege that Goldman knowingly allowed Paulson to select the assets for the Abacus CDO, and knew that Paulson was selecting assets that it believed would perform poorly or fail. (*See, e.g.,* Compl. ¶¶ 59–66.) To compound this absence of transparency, Goldman hid Paulson's role, and disclosed only ACA's role in the asset selection process, in order to "leverage ACA's credibility and franchise to help distribute this

Transaction." (*Id.*) Plaintiffs have thus plausibly alleged that Goldman made a material omission regarding Paulson's role in the asset selection process when it spoke about this topic. *See Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir.2002) (holding that corporations have a "duty to be both accurate and complete" in their disclosures). Investors on the long side of this offering, the ratings agencies, and ACA were kept in the dark.

Goldman's assertion that it "neither admitted, nor denied" that its Abacus disclosures were fraudulent is eviscerated by its concession that "it was a mistake for the Goldman marketing materials to state that the reference portfolio was 'selected by' ACA Management LLC without disclosing the role of Paulson & Co. Inc. in the portfolio selection process and that Paulson's economic interests were adverse to CDO investors." (*Id.* ¶ 144.) Goldman paid a $550 Million settlement to the SEC—the largest SEC penalty in history—because of the "mistake" it acknowledged. (*Id.*) In the SEC action, District Court Judge Barbara S. Jones found Tourre's conduct fraudulent because: "having allegedly affirmatively represented Paulson had a particular investment interest in ABACUS—that it was long—in order to be both accurate and complete, Goldman and Tourre had a duty to disclose Paulson had a different investment interest—that it was short . . . [because it was] a fact that, if disclosed, would significantly alter the 'total mix' of available information." *S.E.C. v. Goldman Sachs & Co.*, 790 F.Supp.2d 147, 162–63 (S.D.N.Y.2011) (internal citations and quotations omitted).

[30] In the Hudson, Anderson, and Timberwolf I CDO transactions Goldman affirmatively represented that it held a long position in the equity tranches, without disclosing its substantial short positions. Specifically, in the Hudson transac-

tion, Goldman stated that it had "aligned incentives" with investors by "investing in a portion of equity," which amounted to $6 Million, without disclosing that it also held 100% of the short position at the same time, which amounted to $2 Billion. (Compl. ¶¶ 148, 164, 165, 171, 174, 177.) [9] Goldman's talking points in the Anderson transaction touted that Goldman would hold up to 50% of the equity tranche, which would be worth up to $21 Million, without mentioning its $135 Million short position. (*Id.* ¶¶ 204–207.) Goldman's marketing booklet for the Timberwolf I transaction stated that Goldman was purchasing 50% of the equity tranche, without disclosing that it was the largest source of assets and held a 36% short position in the CDO. (*Id.* ¶¶ 214, 216.) Thus, as with the Abacus transaction, Plaintiffs have plausibly alleged that Goldman made material omissions in the Hudson, Anderson, and Timberwolf I transactions because "having allegedly affirmatively represented [Goldman] had a particular investment interest in [these synthetic CDOs]—that it was long—in order to be both accurate and complete, Goldman . . . had a duty to disclose [it] had a [greater] investment interest [from its] short [position] . . . . [because that was] a fact that, if disclosed, would significantly alter the 'total mix' of available information." *S.E.C. v. Goldman Sachs & Co.*, 790 F.Supp.2d at 162–163.

Plaintiffs plausibly allege that Goldman's material omissions in the Abacus, Hudson, Anderson, and Timberwolf I transactions:

(1) made its disclosures, to its own shareholders, concerning its business practices materially misleading; and (2) conflicted with its shareholders' interests, because fraudulent conduct hurts a company's share price, and concealing such conduct caused Goldman's stock to trade at artificially high prices, as discussed below. Given Goldman's fraudulent acts, it could not have genuinely believed that its statements about complying with the letter and spirit of the law—and that its continued success depends upon it, valuing its reputation, and its ability to address "potential" conflict of interests were accurate and complete. *See Lapin*, 506 F.Supp.2d at 240 (upholding securities law claims where the complaint "alleges that Goldman knew about the pervasive conflicts and the effect they had on its research reports and buy recommendations, allegedly one of its core competencies, yet, they allegedly failed to disclose such material information to its investors."); *see also In re Sadia, S.A. Sec. Litig.*, 643 F.Supp.2d at 532 (upholding securities law claims where plaintiffs alleged that defendants materially misstated in their Sarbanes–Oxley certifications that there was not "any fraud" at the company, while "knowingly conceal[ing] that the Company had entered into substantial high-risk currency hedging contracts in violation of its internal hedging policy.")

Goldman must not be allowed to pass off its repeated assertions that it complies with the letter and spirit of the

---

**9.** Goldman's statements in the Hudson transaction were made before the beginning of the class period. (Compl. ¶¶ 148, 164, 165, 171, 174, 177.) While a defendant can be found "liable only for those statements made during the class period," *In re IBM Sec. Litig.*, 163 F.3d 102, 107 (2d Cir.1998), a prior misstatement does not require dismissal, if the prior statement is "relevant in determining whether defendants had a duty to make a corrective disclosure during the Class Period." *In re*

*Quintel Entm't Sec. Litig.*, 72 F.Supp.2d 283, 290–291 (S.D.N.Y.1999). Here, it was Goldman's subsequent statements regarding its business practices and conflicts of interest, which were made during the relevant time period, that are alleged to be material misstatements when viewed in light of Goldman's previous conduct in the Hudson transaction. Accordingly, the Court need not dismiss such conduct.

law, values its reputation, and is able to address "potential" conflicts of interest as mere puffery or statements of opinion. Assuming the truth of Plaintiffs' allegations, they involve "misrepresentations of existing facts." *Freudenberg v. E\*Trade Financial Corp.*, 712 F.Supp.2d 171, 190 (S.D.N.Y.2010) (finding "statements touting risk management [that] were . . . juxtaposed against detailed factual descriptions of the Company's woefully inadequate or non-existent credit risk procedures" were actionable misstatements) (quoting *Novak*, 216 F.3d at 315). Moreover, Goldman's allegedly manipulative, deceitful, and fraudulent conduct in hiding Paulson's role and investment position in Abacus transaction, and in hiding its own investment position in Hudson, Anderson, and Timberwolf I transactions takes Plaintiffs' claim beyond that of mere mismanagement. *See Lapin*, 506 F.Supp.2d at 240 ("Goldman also misconstrues Plaintiff's allegations as merely stating it mismanaged its research business by allowing conflicts to proliferate[,] . . . . [when the complaint] actually alleges that Goldman knew about the pervasive conflicts and the effect they had on its research reports and buy recommendations, allegedly one of its core competencies, yet, they allegedly failed to disclose such material information to its investors."); *see also Freudenberg*, 712 F.Supp.2d at 193 ("Because Plaintiffs allege that Defendants intentionally misled the public, rather than simply making bad business decisions, Plaintiffs have pled more than mere mismanagement.").

**[31, 32]** Defendants also argue that the above statements were not material. A complaint, however, "may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously un-

important to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA*, 553 F.3d at 197 (quoting *Ganino*, 228 F.3d at 162). Plaintiffs have sufficiently alleged that Goldman's misstatements in the Abacus, Hudson, Anderson, and Timberwolf I transactions were material. *See S.E.C. v. Goldman Sachs*, 790 F.Supp.2d at 162–63 (finding that Paulson's role was "a fact that, if disclosed, would significantly alter the 'total mix' of available information."). Accepting Plaintiffs allegations as true at this juncture, as the Court must, the Court cannot say that Goldman's statements that it complies with the letter and spirit of the law and that its success depends on such compliance, its ability to address "potential" conflict of interests, and valuing its reputation, would be so obviously unimportant to a reasonable investor. *See generally, Lapin*, 506 F.Supp.2d at 240–41 ("[I]t defies logic to suggest that, for example, an investor would not reasonably rely on a statement, contained in . . . a list of Goldman's business principles, that recognized Goldman's dedication to complying with the letter and spirit of the laws and that Goldman's success depended on such adherence."); *In re Citigroup Inc. Sec. Litig.*, 753 F.Supp.2d 206, 236 (S.D.N.Y. 2010).

Accordingly, Plaintiffs have sufficiently alleged that Goldman made material misstatements about its business practices and conflicts of interest, viewed in light of its role and conduct in the Abacus, Hudson, Anderson and Timberwolf I transactions.

### B. *Scienter*

A strong inference of scienter can arise where defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Novak*, 216 F.3d at 311.

**[33]** With respect to Abacus, Goldman certainly knew that Paulson played an active role in the asset selection process. How else could Goldman admit that it was a "mistake" not to have disclosed such information. Goldman knew that Paulson's interests were adverse to investors as "Paulson had agreed to pay Goldman a higher fee if Goldman could provide Paulson with CDS contracts containing premium payments below a certain level." (*Id.* ¶ 77.) Goldman approached and enlisted ACA without disclosing Paulson's intended role as the sole short party. (*Id.* ¶ 61.) Goldman "expressed hope that ACA's involvement would improve sales" and "expect[ed] to leverage ACA's credibility and franchise to help distribute this transaction." (*Id.*) Rather than disclose Paulson's role or adverse interests, however, Goldman concealed its actions and put forward ACA as the sole asset selector. (*Id.* ¶ 66.) Plaintiffs have thus plausibly created a strong inference of scienter with respect to Goldman's knowledge of its material misstatements and omissions in the Abacus transaction. *See S.E.C. v. Goldman Sachs & Co.,* 790 F.Supp.2d at 163.

**[34, 35]** With respect to the Hudson, Anderson, and Timberwolf I CDOs, Plaintiffs have plausibly alleged that Goldman knew that its statements about holding long positions and having aligned interest with investors were inaccurate due to its substantial short positions. Indeed, Plaintiffs have referenced a number of internal Goldman communications showing that Goldman believed that the "[s]ubprime en-

vironment" was "bad and getting worse," and wanted to make a "structured exit" by "trying to close everything down, but stay on the short side." [10] (Compl. ¶¶ 195, 202.) Goldman concealed its efforts to shut "everything down" and "stay on the short side" in the Hudson, Anderson, and Timberwolf I CDOs by claiming to have aligned interest with investors and disclosing only its long position.

Meanwhile, Goldman repeatedly reassured its own shareholders that it was complying with the letter and spirit of the law and that its "continued success depends upon unswerving adherence to this standard"; and that it had procedures in place to address "potential conflicts of interest." (Compl. ¶¶ 134, 154). Given Goldman's practice of making material misrepresentations to third party investors regarding its short position, or Paulson's short position, Goldman knew or should have known that its statements about complying with the letter and spirit of the law, and its disclaimers regarding "potential" conflicts of interest were inaccurate and incomplete. *See Lapin,* 506 F.Supp.2d at 241–42; *In re Citigroup Inc. Sec. Litig.,* 753 F.Supp.2d 206, 238 (S.D.N.Y.2010) (finding Plaintiffs adequately alleged scienter by showing that "Citigroup was taking significant steps internally to address increasing risk in its CDO portfolio but at the same time it was continuing to mislead investors about the significant risk those assets posed."). Accepting Plaintiffs allegations as true, there is a strong inference of scienter with respect to Goldman's con-

---

**10.** "When the defendant is a corporate entity, the law imputes the state of mind of the employees or agents who made the statement(s) to the corporation." *In re Vivendi Universal, S.A. Sec. Litig.,* 765 F.Supp.2d 512, 543 (S.D.N.Y.2011) (citing *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,* 531 F.3d 190, 195 (2d Cir.2008) ("To prove liability against a corporation, of

course, a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation.")). Accordingly, the scienter reflected in Goldman's Mortgage Department Head's statements can be attributed to Goldman.

duct in the Hudson, Anderson and Timber-wolf I transactions.

## C. *Loss Causation*

[36]   Allegations of loss causation are not subject to the heightened pleading requirements of Rule 9(b) and the PSLRA. Rather, a "short and plain statement"—the standard of Rule 8(a)—"is all that is necessary at this stage of the litigation." *CompuDyne Corp. v. Shane*, 453 F.Supp.2d 807, 828 (S.D.N.Y.2006).

[37, 38]   To survive a motion to dismiss, a plaintiff need only allege either: "(i) facts sufficient to support an inference that it was a defendant's fraud—rather than other salient factors—that proximately caused plaintiff's loss," *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 177 (2d Cir.2005), or (ii) "facts that would allow a factfinder to ascribe some rough proportion of the whole loss to . . . [the defendant's fraud]." *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007). "[L]oss causation has to do with the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant.  If that relationship is sufficiently direct, loss causation is established, but if the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie." *Lentell*, 396 F.3d at 174 (quotations and citations omitted).

[39, 40]   A decline in stock price following a public announcement of "bad news" does not, by itself, demonstrate loss causation.  *See Leykin v. AT & T Corp.*, 423 F.Supp.2d 229, 245 (S.D.N.Y.2006).   A plaintiff may, however, "successfully allege loss causation by . . . alleging that the market reacted negatively to a 'corrective disclosure,' which revealed an alleged mis-statement's falsity or disclosed that allegedly material information had been omitted." *In re Merrill Lynch & Co. Research Reports & Sec. Litig.*, No. 02 Civ. 9690(JFK), 2008 WL 2324111, at *5 (S.D.N.Y. June 4, 2008).   "[A] corrective disclosure need not take the form of a single announcement, but rather, can occur through a series of disclosing events." *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F.Supp.2d 148, 165 (S.D.N.Y.2008) (citing cases).

[41]   Plaintiffs claim to have purchased Goldman stock at inflated values because they purchased stock before Goldman's practice of making material misstatements and omissions came to light.  (Compl. ¶ 329.)   They claim that Goldman's misstatements and conflicts of interest came to light on: (1) April 16, 2010, when the SEC filed fraud charges related to the Abacus transaction, which caused Goldman's stock to drop from $184.27 per share to $160.70 per share (a 13% drop); (2) April 25–26, 2010, when the Senate released Goldman's internal emails reflecting its practice of betting against the securities it sold to investors, which caused a stock drop from $157.40 per share to $152.03 per share (a 3% drop); and (3) June 10, 2010, when the SEC announced it was investigating the Hudson CDO transaction, which caused a stock drop from $136.80 per share to $133.77 per share (a 2% drop).  (Compl. ¶¶ 329–35.)

While Defendants argue that the lawsuits and investigations themselves cause the stock decline, these suits and investigations can more appropriately be seen as a series of "corrective disclosures," because they revealed Goldman's material misstatements—and indeed pattern of making misstatements—and its conflicts of interest.   *See In re Bristol Myers*, 586 F.Supp.2d at 164 (finding that a "disclosure of the Justice Department investiga-

tion" was "more akin to a corrective disclosure" because it revealed that Defendants had not complied with their obligation to present accurate information to regulators which resulted in the investigation). Plaintiffs' allegations are thus sufficient at this juncture to show that Goldman's misstatements and omissions caused, or at least contributed to, Plaintiffs' losses. *See id.* at 164–66; *see also Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.,* 343 F.3d 189, 197 (2d Cir.2003) (viewing the facts most favorably to plaintiff and finding allegations that defendants artificially inflated the stock before "dumping" their own was adequate to allege loss causation).

## III.   Individual Defendants

**[42, 43]**   For the Individual Defendants "to be liable for securities fraud, these defendants must also be responsible for [Goldman's] misleading statements and omissions." *In re Citigroup Inc. Sec. Litig.,* 753 F.Supp.2d 206, 239 (S.D.N.Y. 2010). Each of the Individual Defendants is alleged to have helped prepare the SEC filings at issue. (Compl. ¶ 38–40, 154.)

**[44]**   To show scienter, Plaintiffs allege that each of the Individual Defendants had knowledge of Goldman's synthetic CDO operations. Specifically, Plaintiffs allege that in February 2007—before the Abacus, Anderson, and Timberwolf I CDOs closed, Blankfein reviewed the Mortgage Department's efforts to reduce its subprime RMBS positions and asked about: "losses stemming from residual positions in old deals. Could/should we have cleaned up these books before and are we doing enough right now to sell off cats and dogs in other books throughout the division." (Compl. ¶ 194.) Viniar and Cohn were the recipients of the email from Goldman's Mortgage Department Head stating that Goldman was trying to make a "structured

exit" from the subprime market by "trying to close everything down, but stay on the short side." (Compl. ¶ 202.) Cohn and Viniar were alerted to Hudson's sales efforts, and how the CDO assets were valued. (Compl. ¶ 181.) Viniar was also alerted to how the CDOs were valued in general, Goldman's sales efforts with respect to CDOs, and even chaired multiple meetings on the CDO transactions at issue. (Compl. ¶¶ 181, 233.) "Although plaintiffs do not allege with specificity the matters discussed at these meetings, their mere existence is indicative of scienter: That defendants engaged in meetings concerning [Goldman's] CDO risks is inconsistent with the company's public statements" that they held equity positions and had interests that were aligned with the purchasers of the synthetic CDOs. *In re Citigroup,* 753 F.Supp.2d at 238–239 (S.D.N.Y. 2010).

These allegations, taken as true, show that each Individual Defendant actively monitored the status of Goldman's subprime assets and subprime deals during the relevant time, and that each knew that Goldman was trying to purge these assets from its books and stay on the short side. These allegations create a strong inference that the Individual Defendants knew that Goldman was making material misstatements in the Abacus, Hudson, Anderson, and Timberwolf I CDOs, when it sold poor quality assets to investors without disclosing its or Paulson's substantial short positions. Given such knowledge, the Individual Defendants were in a position to know that Goldman's statements about complying with the letter and spirit of the law, valuing its reputation, and disclaimers regarding "potential" conflicts of interest were inaccurate and incomplete.

## IV.   Section 20 Claims

**[45]**   To maintain a claim for control person liability pursuant to Section 20(a), a

plaintiff must "allege facts showing (1) 'a primary violation by the controlled person,' (2) 'control of the primary violator by the targeted defendant,' and (3) that the 'controlling person was in some meaningful sense a culpable participant in the fraud perpetrated.'" *In re Citigroup*, 753 F.Supp.2d at 248 (quoting *In re Beacon Assocs. Litig.*, 745 F.Supp.2d 386, 411 (S.D.N.Y.2010)).

**[46]** The Individual Defendants do not contest their control person status; rather they argue that Plaintiffs have not alleged a primary violation by a controlled person. For the reasons above, however, Plaintiffs have plausibly alleged § 10(b) and 10b–5 claims against Goldman. Moreover, for the reasons above, Plaintiffs have adequately alleged culpable participation with respect to the Individual Defendants, because "[a]llegations sufficient to plead scienter for the purposes of primary liability pursuant to Section 10(b) 'necessarily satisfy' the culpable participation pleading requirement for Section 20(a) claims." *Id.* Accordingly, Defendants' motion to dismiss Count Two is denied.

### CONCLUSION

In conclusion, Defendants' motion to dismiss is GRANTED with respect to Plaintiffs' claim relating to Defendants' failure to disclose their receipt of Wells Notices, and DENIED in all other respects. The Clerk of Court is directed to terminate this motion.



**NATIONAL IMMIGRATION PROJECT OF the NATIONAL LAWYERS GUILD, American Civil Liberties Union Foundation, Immigrant Defense Project, Post–Deportation Human Rights Project, and Rachel Rosenbloom, Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF HOMELAND SECURITY, United States Citizenship and Immigration Services, United States Customs and Border Protection, United States Immigration and Customs Enforcement, United States Department of Justice, United States Department of State, Defendants.**

No. 11 Civ. 3235(JSR).

United States District Court,
S.D. New York.

June 25, 2012.

**Background:** Requesters brought Freedom of Information Act (FOIA) action against Department of Homeland Security (DHS), its component agencies, Department of Justice (DOJ), and Department of State (DOS) seeking records relating to a representation made in a brief submitted on behalf of the government to the Supreme Court regarding the treatment of aliens who were removed pending judicial review but then prevailed before the courts. The parties filed partial summary judgment motions.

**Holdings:** The District Court, Jed S. Rakoff, J., held that:

(1) deliberative-process privilege did not apply to exempt documents from disclosure;

(2) work-product privilege did not apply to exempt documents from disclosure; and

903 F.Supp.2d 285
**(Cite as: 903 F.Supp.2d 285)**

H

United States District Court,
S.D. New York.
FEDERAL HOUSING FINANCE AGENCY, etc.,
Plaintiff,
v.
DEUTSCHE BANK AG, et al., Defendants.

No. 11 Civ. 6192(DLC).
Nov. 12, 2012.

**Background:** Federal Housing Finance Agency (FHFA), as conservator for government sponsored enterprises (GSEs), brought action against various financial institutions, alleging misconduct in connection with the offer and sale of certain mortgage-backed securities purchased by the GSEs. Defendants moved to dismiss.

**Holdings:** The District Court, Denise Cote, J., held that:

(1) FHFA sufficiently pled fraud with respect to the offering materials' representations regarding mortgage-underwriting standards;

(2) New York's Martin Act did not preclude a private plaintiff from bringing a securities-related claim rooted in some other source of law; and

(3) issue of whether a particular defendant was liable as a successor-in-interest to another defendant could not be resolved on motion to dismiss.

Motion granted in part and denied in part.

West Headnotes

**[1] Fraud 184 ⟨⟩13(1)**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k8 Fraudulent Representations
            184k13 Falsity and Knowledge Thereof
                184k13(1) k. Falsity of representations. Most Cited Cases

Allegations of Federal Housing Finance Agency (FHFA), as conservator for government sponsored enterprises (GSEs), that the data incorporated into the prospectus supplements to residential mortgage–back securities (RMBS) certificates, which were alleged to have contained most of the misrepresentations, was the very same data included in the preliminary materials provided to the GSEs, was sufficient to plead the falsity of overlapping information in the preliminary materials as well, for purposes of pleading fraud with respect to the offering materials' representations regarding mortgage-underwriting standards.

**[2] Fraud 184 ⟨⟩36**

184 Fraud
    184II Actions
        184II(A) Rights of Action and Defenses
            184k36 k. Defenses. Most Cited Cases

Disclaimers in the term sheets and free writing prospectuses for residential mortgage–backed securities (RMBS) certificates, which stated the information contained therein was "preliminary" and "subject to change," did not preclude the Federal Housing Finance Agency (FHFA), as conservator for government sponsored enterprises (GSEs), from pleading reasonable reliance as a matter of law on its fraud claim; the statements were not disclaimers of reliability, and the use of the preliminary materials to market and sell the certificates suggested that defendants fully intended the GSEs to rely on the representations they contained.

**[3] Securities Regulation 349B ⟨⟩241**

349B Securities Regulation
    349BII State Regulation
        349BII(A) In General
            349Bk241 k. Power to regulate. Most Cited Cases

States 360 ⟨⟩18.77

360 States

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

903 F.Supp.2d 285
**(Cite as: 903 F.Supp.2d 285)**

360I Political Status and Relations
　360I(B) Federal Supremacy; Preemption
　　360k18.77 k. Securities and exchange regulations. Most Cited Cases

Federal law does not enjoy complete preemptive force in the field of securities.

**[4] Action 13 ☞17**

13 Action
　13II Nature and Form
　　13k17 k. What law governs. Most Cited Cases

Under New York's interest analysis approach, the first step in addressing any choice-of-law issue is to determine whether a true conflict exists between the interests of the jurisdictions with respect to the particular legal issue; if, after examining the policies and purposes sought to be vindicated by the conflicting laws, it appears that one jurisdiction has no interest in applying its law, that jurisdiction must give way.

**[5] Securities Regulation 349B ☞278**

349B Securities Regulation
　349BII State Regulation
　　349BII(A) In General
　　　349Bk278 k. Fraudulent or other prohibited practices. Most Cited Cases

New York's Martin Act does not preclude a private plaintiff from bringing a securities-related claim rooted in some other source of law. N.Y.McKinney's General Business Law § 352 et seq.

**[6] Federal Civil Procedure 170A ☞1831**

170A Federal Civil Procedure
　170AXI Dismissal
　　170AXI(B) Involuntary Dismissal
　　　170AXI(B)5 Proceedings
　　　　170Ak1827 Determination
　　　　　170Ak1831 k. Fact issues. Most Cited Cases

Issue of whether a particular defendant was li-

able as a successor-in-interest to another defendant for certain misstatements and omissions in a security's registration statement could not be resolved at motion to dismiss phase because the issue turned on an issue of fact.

***286** Philippe Z. Selendy, Kathleen M. Sullivan, Adam M. Abensohn, Jordan A. Goldstein, Quinn Emanuel Urquhart & Sullivan, LLP, New York, NY, for Plaintiff, Federal Housing Finance Agency.

Thomas C. Rice, David J. Woll, Alan Turner, Simpson Thacher & Bartlett LLP, New York, NY, for Defendants.

*OPINION & ORDER*

DENISE COTE, District Judge.

This is one of sixteen actions currently before this Court in which the Federal Housing Finance Agency ("FHFA" or "the ***287** Agency"), as conservator for Fannie Mae and Freddie Mac (together, the "Government Sponsored Enterprises" or "GSEs"), alleges misconduct on the part of the nation's largest financial institutions in connection with the offer and sale of certain mortgage-backed securities purchased by the GSEs in the period between 2005 and 2007.[FN1] As amended, the complaints in each of the FHFA actions assert that the Offering Documents used to market and sell Residential Mortgage–Backed Securities ("RMBS") to the GSEs during the relevant period contained material misstatements or omissions with respect to the owner-occupancy status, loan-to-value ("LTV") ratio, and underwriting standards that characterized the underlying mortgages. On the basis of these allegations, the complaints assert claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, *l* (a)(2), *o*; the Virginia Securities Act, VA Code Ann. § 13.1–522(A)(ii), (C); and the District of Columbia Securities Act, D.C.Code § 31–5606.05(a)(1)(B), (c). In six of the cases, including this one, the Agency has also asserted claims of fraud and aiding and abetting fraud against the entity defendants under the common law of New York State (the "Fraud Claim Cases"). As

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

903 F.Supp.2d 285
**(Cite as: 903 F.Supp.2d 285)**

pleaded, these fraud claims attach to each of the three categories of misstatements upon which the plaintiff's securities law claims are based.

> FN1. The sixteen cases are: *FHFA v. UBS Americas, Inc., et al.,* 11 Civ. 5201(DLC); *FHFA v. JPMorgan Chase & Co., et al.,* 11 Civ. 6188(DLC); *FHFA v. HSBC North America Holdings, Inc., et al.,* 11 Civ. 6189(DLC); *FHFA v. Barclays Bank PLC, et al.,* 11 Civ 6190(DLC); *FHFA v. Deutsche Bank AG, et al.,* 11 Civ. 6192(DLC); *FHFA v. First Horizon National Corp., et al.,* 11 Civ 6193(DLC); *FHFA v. Bank of America Corp.,* et al., 11 Civ. 6195(DLC); *FHFA v. Citigroup Inc., et al.,* 11 Civ. 6196(DLC); *FHFA v. Goldman, Sachs & Co., et al.,* 11 Civ. 6198(DLC); *FHFA v. Credit Suisse Holdings (USA), Inc., et al.,* 11 Civ. 6200(DLC); *FHFA v. Nomura Holding America, Inc., et al.,* 11 Civ. 6201(DLC); *FHFA v. Merrill Lynch & Co., Inc.,* et al., 11 Civ. 6202(DLC); *FHFA v. SG Americas, Inc., et al.,* 11 Civ. 6203(DLC); *FHFA v. Morgan Stanley, et al.,* 11 Civ. 6739(DLC); *FHFA v. Ally Financial Inc., et al.,* 11 Civ. 7010(DLC); *FHFA v. General Electric Co., et al,* 11 Civ. 7048(DLC). The FHFA has also brought two similar actions, which are pending in federal courts in California and Connecticut. *See FHFA v. Countrywide Financial Corp., et al.,* No. 12 Civ. 1059(MRP) (C.D.Cal.); *FHFA v. Royal Bank of Scotland,* No. 11 Civ. 1383(AWT) (D.Conn).

The Court has already issued several Opinions addressing motions to dismiss in other cases brought by the FHFA.[FN2] Familiarity with those Opinions is assumed; all capitalized terms have the meanings previously assigned to them.

> FN2. *Federal Housing Finance Agency v. UBS Americas, Inc. et al.,* 858 F.Supp.2d 306 (S.D.N.Y.2012) (" *UBS I* "); *Federal*

*Housing Finance Agency v. UBS Americas, Inc., et al.,* No. 11 Civ. 5201(DLC), 2012 WL 2400263 (S.D.N.Y. June 26, 2012) (" *UBS II* "); *Federal Housing Finance Agency v. JPMorgan Chase & Co., et al.,* No. 11 Civ. 6188(DLC), 902 F.Supp.2d 476, 2012 WL 5395646 (S.D.N.Y. Nov. 5, 2012) ("*Chase* "); *FHFA v. Merrill Lynch & Co.,* 903 F.Supp.2d 274, 2012 WL 535118 (S.D.N.Y.2012) (" *Merrill* ").

Following this Court's decision of the motion to dismiss in *FHFA v. UBS,* discovery began in all of the coordinated cases. Briefing of defendants' motions to dismiss in the remaining fifteen cases has occurred in two phases, with the motions in this case and the other Fraud Claim Cases becoming fully submitted on October 11, 2012. The motions in the remaining nine cases were fully submitted November 9, 2012. Depositions are to begin in all cases in January 2013, and all fact and expert discovery in this matter, 11 Civ. 6192(DLC), must be concluded by December 6, 2013. Trial in this matter is scheduled to begin on September 29, 2014, **\*288** as part of the third tranche of trials in the coordinated actions.

DISCUSSION

This case concerns RMBS Certificates allegedly purchased by the GSEs between September 2005 and October 2007. Each of the GSE Certificates pertains to one of 40 securitizations offered for sale pursuant to one of eight shelf-registration statements. The lead defendant is Deutsche Bank AG. Various corporate affiliates of Deutsche Bank and associated individuals are also defendants. Deutsche Bank affiliates served as lead underwriter for all 40 of the securitizations at issue, and as sponsor and depositor for 35 of them. Each individual defendant signed one or more of the Offering Documents.

Defendants' motion presses a number of arguments that are also pressed by other defendants in these coordinated actions, some of which have been addressed by this Court's previous Opinions. The

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

903 F.Supp.2d 285
**(Cite as: 903 F.Supp.2d 285)**

Court hereby adopts by reference the reasoning and, to the extent they are relevant here, the rulings of those prior Opinions.

The motion to dismiss devotes particular attention to the claim that the FHFA's scienter allegations are insufficient to support its fraud claims. These defendants' footprint in the mortgage-backed securities market differed somewhat from that of the defendants in *Chase.* Despite this fact and the different allegations that flow from it, however, the Amended Complaint fails and survives in similar fashions. As in *Chase,* the facts alleged in the Amended Complaint are sufficient to plead fraud with respect to the Offering Materials' representations regarding mortgage-underwriting standards. With respect to the scienter component of FHFA's fraud claims based on LTV and owner-occupancy information, however, the Amended Complaint relies entirely on the disparity between the statistics reported by the defendants and the results of the Agency's own analysis. Without additional support, this disparity is insufficient to allege fraudulent intent with the specificity required by Rules 8(a) and 9(b), Fed.R.Civ.P. Accordingly, the defendants' motion to dismiss is granted with respect to the plaintiff's fraud claims based on LTV and owner-occupancy reporting.

The defendants also raise several arguments that were not fully addressed by this Court's prior Opinions. These arguments will be addressed in turn.

I. Reliance on Term Sheets and Free Writing Prospectuses

Defendants argue that the FHFA's fraud claims must be dismissed because the Amended Complaint does not allege "that any representative of either GSE read or relied on" the Prospectus Supplements, which are alleged to have contained most of the misrepresentations, "before deciding to purchase the Certificates." As described in the Amended Complaint, the GSEs purchased the securities at issue on the basis of term sheets and free writing prospectuses ("Preliminary Materials") that identified

the originators of the underlying loans and contained "critical data as to the Securitizations, including with respect to anticipated credit ratings by the credit rating agencies, loan-to-value and combined loan-to-value ratios for the underlying collateral, and owner occupancy statistics." These Preliminary Materials also referred to registration statements and base prospectuses on file with the SEC, which included places for assurances regarding mortgage originators' adherence to their stated underwriting guidelines.[FN3] **\*289** This information was subsequently incorporated into Prospectus Supplements that the GSEs received after their purchases of the securitizations closed.

> FN3. Consistent with SEC Rule 344, the term sheets and free writing prospectuses included a legend that substantially provided, in relevant part:
>
> > The issuer has filed a registration statement (including a prospectus) with the SEC for the offering to which this term sheet relates. Before you invest, you should read the prospectus in that registration statement and other documents the issuer has filed with the SEC for more complete information about the issuer and this offering.
>
> *See* 17 C.F.R. § 230.433(c)(2)(i) (mandating such language in free writing prospectuses); *see also* Securities Offering Reform, SEC Release No. 75, 2005 WL 1692642, at \*48 (July 19, 2005) ("Preliminary term sheets and other descriptive material containing only the terms of the securities or the offering ..., whether or not filed, are ... free writing prospectuses.").

Defendants maintain that because the GSEs did not receive or read the final prospectus supplements until after closing, they could not reasonably have relied on the information contained therein in deciding to purchase the securities. Defendants also

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

903 F.Supp.2d 285
**(Cite as: 903 F.Supp.2d 285)**

argue that, to the extent the Agency's fraud claims rely on representations made in Preliminary Materials that *were* available to the GSEs prior to their purchase of the securities, they must be dismissed (1) because the Amended Complaint does not quote from or cite to these materials, and (2) these materials contained certain disclaimers regarding the accuracy of the information contained therein.

[1] These arguments are meritless. Although it is true that the Amended Complaint focuses primarily on statements that were made in the Prospectus Supplements to support FHFA's securities law claims, it also alleges that the data "incorporated into the Prospectus Supplements" was the very same data included in the Preliminary Materials provided to the GSEs. The plaintiff's allegations regarding the falsity of the Prospectus Supplements are therefore sufficient to plead the falsity of overlapping information in the Preliminary Materials as well.

[2] Nor are defendants correct that disclaimers in the term sheets and free writing prospectuses preclude the plaintiff from pleading reasonable reliance as a matter of law. Although the Preliminary Materials stated that the information contained therein was "preliminary" and "subject to change," such statements are not disclaimers of reliability; to the contrary, the use of these materials to market and sell the Certificates suggests that defendants fully intended the GSEs to rely on the representations they contained. In any case, FHFA's complaint is not that the information in the Preliminary Materials was inconsistent with that in the final Prospectus Supplements but that both sets of materials contained the same, inaccurate, information.

Defendants also point to the fact that the Preliminary Materials instructed investors to "read the prospectus ... and other documents ... filed with the SEC" before investing. But, their selective elision of the verb "has," *see supra* note 3, obscures the fact that this SEC-mandated language refers to documents *already* on file at the time the term sheets were circulated, not to any final Prospectus Supplement that may be filed in the future. Nor does the

fact that the final Prospectus Supplements told investors to "rely only on information contained in this document" establish as a matter of law that the GSEs' previously concluded purchases could not have been made in reliance on representations in the Preliminary Materials that were materially identical to those in the final Prospectus *290 Supplements. FN4

FN4. Defendants' reliance on language in the Prospectus Supplements notifying investors that the offering entities had "not authorized anyone to provide you with different information," is likewise unavailing both because, as noted, the information in the Preliminary Materials was not different and because the information they contained was provided by defendants themselves, not anyone requiring authorization to speak on their behalf.

II. Law Applicable to Plaintiff's Blue Sky Claims

Next, defendants assert that the plaintiff's Blue Sky claims are governed by New York's Martin Act, not the Virginia and D.C. securities statutes. Defendants cite this Court's conclusion in *UBS I* that New York rather than D.C. and Virginia law governed FHFA's common law negligent misrepresentation claims and argue that a similar analysis should apply here.

The premise of this argument—that choice-of-law analysis is appropriate where a defendant's conduct is arguably governed by the statutes of multiple jurisdictions—is debatable. FHFA's Blue Sky claims do not arise under the common law but are instead creatures of statute. Virginia and the District of Columbia are indisputably independent sovereigns, distinct from the State of New York and capable of statutorily proscribing conduct that touches or concerns them. The plaintiff asserts claims under Virginia and District of Columbia law because these jurisdictions host the headquarters of Freddie Mac and Fannie Mae, respectively. Notably, defendants have made no argument that the conduct at issue is beyond the legislative authority

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

903 F.Supp.2d 285
**(Cite as: 903 F.Supp.2d 285)**

of either jurisdiction. *See Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 813, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) (Scalia, J., dissenting) (defining legislative jurisdiction as "the authority of a state to make its law applicable to persons or activities" (citation omitted)); *see also Allstate Ins. Co. v. Hague,* 449 U.S. 302, 308, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981) (requiring a state to have "significant contacts" with an activity in order for the states law to be applicable).

[3] In other contexts, it is uncontroversial that the securities regulations of competing sovereigns may be simultaneously applied to a single set of facts. For example, as in this case, plaintiffs regularly assert state and federal securities claims simultaneously. Defendants do not suggest, however, that such claims create a conflict that must be resolved through preemption or choice-of-law analysis. Nor could they. "It is well-settled that federal law does not enjoy complete preemptive force in the field of securities." *Baker, Watts & Co. v. Miles & Stockbridge,* 876 F.2d 1101, 1107 (4th Cir.1989). Section 16 of the Securities Act explicitly provides that "[t]he rights and remedies provided by this subchapter shall be in addition to any and all other rights and remedies that may exist at law or in equity." 15 U.S.C. § 77p. The Virginia and D.C. Blue Sky statutes contain nearly identical disclaimers. *See* VA Code Ann. § 13.1–522(G); D.C.Code § 31–5606.05(j). And although no such language appears in New York's Martin Act, a recent holding of the New York Court of Appeals that "an injured investor may bring a common-law claim (for fraud or otherwise) that is not entirely dependent on the Martin Act for its viability," *Assured Guar. v. J.P. Morgan Inv. Mgmt.,* 18 N.Y.3d 341, 199 N.Y.S.2d 274, 962 N.E.2d 765, 770 (2011), suggests *a fortiori* that the Martin Act does not purport to bar claims that have been statutorily authorized by a co-equal sovereign. For these reasons, the majority of jurisdictions that have considered the issue have rejected defendants' suggestion that a plaintiff may not challenge a single course **\*291** of conduct under the Blue Sky Laws of multiple jurisdictions simul-taneously. *See In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.,* Nos. 2:11–ML–02265–MRP, 2:11–CV–10414 MRP, 2012 WL 1322884, at \*2 (C.D.Cal. Apr. 16, 2012) (collecting cases).

[4] Even assuming that a choice of law analysis is appropriate, however, defendants are incorrect that plaintiff's claims are governed by New York's Martin Act. As in *UBS I,* the plaintiff's state-law claims are governed by New York choice-of-law principles pursuant to *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under New York's interest analysis approach, the first step in addressing any choice-of-law issue is to determine whether a "true conflict" exists between the interests of the jurisdictions with respect to the particular legal issue. If, after examining "the policies and purposes sought to be vindicated by the conflicting laws," it appears that one jurisdiction has no interest in applying its law, that jurisdiction must give way. *In re Crichton's Estate,* 20 N.Y.2d 124, 281 N.Y.S.2d 811, 228 N.E.2d 799, 806 n. 8 (1967).

[5] Here, defendants posit a conflict between New York's Martin Act, which provides no private cause of action for violations of its provisions, and the securities statutes of Virginia and the District of Columbia, which do permit private suits. As already noted, however, the New York Court of Appeals has recently made clear that, although the Martin Act did not create a private right of action to enforce its provisions, it does not preclude a private plaintiff from bringing a securities-related claim rooted in some other source of law. *Assured Guar. v. J.P. Morgan Inv. Mgmt.,* 939 N.Y.S.2d 274, 962 N.E.2d at 770. Thus, because New York has no interest in precluding claims like those brought by the plaintiff, even if defendants were correct that choice-of-law analysis is appropriate here, their effort to obtain dismissal of the Blue Sky claims would fail.

III. Successor Liability of DB Products/DBPS

[6] Finally, the motion argues that defendant

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

903 F.Supp.2d 285
**(Cite as: 903 F.Supp.2d 285)**

DB Products is not liable as a successor to Mort-gageIt, which served as depositor for certain of the securitizations and originated some of the underly-ing mortgages. The Amended Complaint alleges that "Defendant DB Products is liable as successor-in-interest to [MortgageIT] for the misstatements and omissions in that Registration Statement under Section 11 of the Securities Act." Similar allega-tions are made in support of its Virginia Securities Law and common law fraud claims. Defendants dispute whether DB Products is a legal successor to MortgageIT, citing the terms of the merger agree-ment that led to the acquisition of the company by the Deutsche Bank group. But this argument turns on an issue of fact that is inappropriate for resolu-tion on a motion to dismiss. Defendants remain free to raise the issue of DB Products' successor liability on summary judgment.

### CONCLUSION

The defendants' July 13 motion to dismiss is granted with respect to the plaintiff's claims of owner-occupancy and LTV-ratio fraud and denied in all other respects.

SO ORDERED.

S.D.N.Y.,2012.
Federal Housing Finance Agency v. Deutsche Bank AG
903 F.Supp.2d 285

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.