LAW OFFICES

# KEKER & VAN NEST
### LLP

633 BATTERY STREET
SAN FRANCISCO, CA 94111-1809
TELEPHONE (415) 391-5400
FAX (415) 397-7188

JOHN W. KEKER
jkeker@kvn.com

July 1, 2013

The Honorable David O. Carter
U.S. District Court, Central District of California
Santa Ana Division
Ronald Reagan Federal Building and United States Courthouse
411 West Fourth Street, Courtroom 9D
Santa Ana, CA 92701-4516

Re:   *United States of America v. McGraw Hill Companies, Inc. and Standard & Poor's*
      *Financial Services LLC*, Case No. CV13-00779-DOC (JCGx)

Dear Judge Carter:

     I write to bring your attention to three relevant cases from the Second Circuit that I expect to rely upon at the upcoming hearing on Standard & Poor's motion to dismiss the Government's complaint.  The cases are: *United States v. Novak*, 443 F.3d 150 (2d Cir. 2006); *United States v. Starr*, 816 F.2d 94 (2d Cir. 1987); and *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970).  For your convenience, I have attached copies of the opinions to this letter.

     I informed George Cardona, counsel for the Government, of my intention to submit these cases to the Court in advance of the hearing, and he has no objection.

Very truly yours,

JOHN W. KEKER

JWK:jas
Enclosures

cc:   George Cardona, Esq.
      Stuart Delery, Esq.
      Arthur R. Goldberg, Esq.

767575.01

443 F.3d 150
United States Court of Appeals,
Second Circuit.

UNITED STATES of America, Appellee,

v.

Charles NOVAK, Defendant-Appellant.

Docket No. 05-0108-CR.   |   Argued,
Nov. 18, 2005.   |   Decided: April 3, 2006.

### Synopsis

**Background:** Defendant was convicted by jury in the United States District Court for the Eastern District of New York, David G. Trager, J., of unlawful receipt of labor payments, making false statements under Employee Retirement Income Security Act (ERISA), mail fraud, money laundering, racketeering, and conspiracy. Defendant appealed.

**Holdings:** The Court of Appeals, Eaton, Judge, held that:

[1] evidence supported conviction for unlawful receipt of labor payments;

[2] evidence did not support mail fraud conviction; and

[3] defendant's objection to venue for charges of making false ERISA statements, raised for first time at close of government's evidence, was timely.

Affirmed in part, reversed in part, and supplemental briefing ordered.

### Attorneys and Law Firms

**\*153** Diarmuid White, White & White, New York, NY, for Defendant-Appellant.

Charles S. Kleinberg (Roslynn R. Mauskopf), United States Attorney for the Eastern District of New York, on the brief; Peter A. Norling, of counsel), Brooklyn, NY, for Appellee.

Before: SOTOMAYOR and KATZMANN, Circuit Judges, and EATON, Judge. *

\* The Honorable Richard K. Eaton, Judge of the United States Court of International Trade, sitting by designation.

### Opinion

EATON, Judge.

Defendant-Appellant Charles Novak ("Novak") appeals from a January 7, 2005 judgment of conviction entered in the United States District Court for the Eastern District of New York (Trager, J.) following a jury trial. Novak was found guilty of offenses related to his position as a union official, including the unlawful receipt of labor payments (29 U.S.C. § 186(b)(1) (2000)), making false statements under the Employee Retirement Income Security Act ("ERISA") (18 U.S.C. § 1027 (2000)), mail fraud (18 U.S.C. § 1341 (2000)), money laundering (18 U.S.C. § 1956(a) (2000)), racketeering (18 U.S.C. § 1962(c) (2000)), and conspiracy (18 U.S.C. §§ 371, 1956(h) and 1962(d) (2000)). He was sentenced principally to 108 months' imprisonment. Before us is Novak's appeal of the convictions for unlawful receipt of labor payments, mail fraud, making false ERISA statements, and, consequently, the conspiracy and Racketeering Influenced and Corrupt Organization Act ("RICO") charges. For the reasons set forth below, we affirm the convictions for unlawful receipt of labor payments and for the RICO conspiracy and substantive RICO violations, reverse the convictions for mail fraud and making false ERISA statements, and order supplemental briefing regarding Novak's remaining convictions.

### I.

Novak was the vice-president and business manager of Local One of the International Union of Elevator Constructors ("Local One" or "the Union"). Among other things, the Union's members operate the temporary elevators used to carry workers at construction sites in New York City. Part of Novak's job was to ensure that employers (usually construction contractors) at the sites complied with the Union's collective bargaining agreement. Novak received his salary directly from Local One.

At each job site, a "lead operator" supervised the other Union operators and decided what hours they were to work. In addition, at the close of each work week, the lead operator filled out the employees' time sheets, submitted them

to a representative of the employer, and often distributed the weekly paychecks to the elevator operators. The lead operator's salary was paid by the contractor, not the Union. Nevertheless, Novak determined which Union members would act as lead operators.

The evidence at trial demonstrated that the submitted time sheets regularly included hours not actually worked by Union members. For a variety of reasons, however, the contractors agreed to the submission **154 of these "no-show" hours. For example, the discovery that a contractor was using non-union labor to operate the elevators might lead to the issuance of a check to a Local One operator for hours not actually worked. This payment would constitute a settlement for the contractor's violation of the collective bargaining agreement. On other occasions, advance agreements between the Union and a contractor would allow the use of non-union labor, or permit a contractor to employ Union elevator operators for fewer than the contractually agreed-upon hours. These agreements required the contractor to pay the Union operators as if they had worked those hours. In each case, a time sheet would be submitted for a Local One member claiming the hours, and the contractor would issue a check payable to that member. Novak's scheme took advantage of the contractors' payments by requiring the check's recipient to kick back a portion of the wages received for the no-show hours. These kickback payments to Novak were made without the contractors' knowledge.

In order to gain the cooperation of the Union members in his corrupt arrangement, Novak used his power to assign jobs. Local One maintained hiring lists, which contained the names of members who had been laid off or were between jobs. According to Union practice, a preference was to be accorded Union members who had been on the list for the longest period of time. In other words, those who had been out of work the longest were to be the first hired. Novak, however, with the assistance of his chosen lead operators, would often ignore the hiring lists and instead refer for work favored Union members whom he trusted to participate in his kickback plan without objection. By controlling the lead operators and the assigned Union workers, Novak assured his receipt of the kickback payments. This activity served as the foundation for Novak's indictment and subsequent convictions at trial.

## II.

**[1]** **[2]** "It [is] unlawful for an officer of a labor organization to receive or accept anything of value from someone who employs members of that labor organization." *United States v. Cody,* 722 F.2d 1052, 1057 (2d Cir.1983); 29 U.S.C. § 186(b)(1). Likewise, it is also a crime for an employer to "pay, lend, or deliver" anything of value to any representative of his or her employees. 29 U.S.C. § 186(a)(1). "[A]ny person who willfully violates this section shall, upon conviction thereof, be guilty of a felony." 29 U.S.C. § 186(d)(2). Novak argues that his conviction under § 186(b)(1) should be overturned because the contractors were not aware that he was receiving any of the money paid to the operators. According to Novak, this absence of knowledge by the contractors is fatal to the Government's charge. It is the Government's position, and that of the district court, that Novak's receipt of a portion of the contractors' payments as kickbacks was alone sufficient to justify a conviction under the statute. This being the case, we must determine whether Novak's conviction for violating § 186(b)(1) can be sustained if the contractors were not aware that a portion of their payments to their employees was being received by a union representative.

**[3]** We first note that not all payments from an employer to a labor representative are prohibited by § 186. For instance, the statute provides an exception for certain payments made by an employer for deposit in an employee trust fund. *See* 29 U.S.C. § 186(c).[1] Indeed, the Supreme Court in **155 *Arroyo v. United States,* 359 U.S. 419, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959),* reversed the conviction of a union official who deposited, for his own account, checks from an employer intended for deposit into such a fund. While acknowledging that the actions of the union representative were not devoid of criminality, the Court found that the conduct did not amount to a violation of § 186. Justice Stewart explained, "[t]he checks were drawn by the employers and delivered to the petitioner as payment to a union welfare fund. Their receipt by [petitioner], therefore, was not a violation of the federal statute, whether his intent to misappropriate existed at the time of receipt or was formed later." *Arroyo,* 359 U.S. at 424, 79 S.Ct. 864. Thus, *Arroyo* stands for the proposition that a lawful payment, lawfully received, even if later converted, does not support a conviction under § 186.

---

[1]     The statute provides that:

    The provisions of [§ 186] shall not be applicable ... (5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of

the employees of such employer, and their families and dependents.

29 U.S.C. § 186(c).

**[4]** Where employer payments received by a union representative are not within a statutory exception, however, the result has been different. *See Cody,* 722 F.2d at 1052. In *Cody,* a jury convicted the defendant, the leader of a local union, of "receiving illegal benefits from employers in violation of 29 U.S.C. § 186(b)(1)." *Id.* at 1055. The basis for the conviction was defendant's participation in an arrangement whereby members of his union were paid by their employers to perform construction-related work, but instead spent their working hours acting as his personal chauffeurs. *Id.* at 1056. On appeal, defendant maintained that the government failed to establish that the employers intended to provide him with the services and, thus, that his conviction should be reversed. In upholding the conviction, this Court held "that nothing [in § 186] 'requires mutuality of guilt for the conviction of either the employer or the representative of employees.'" *Id.* at 1059 (quoting *Arroyo,* 359 U.S. at 423, 79 S.Ct. 864). To convict the defendant, "[i]t was enough to show that the employers paid, lent or delivered the chauffeurs and that [defendant] accepted their services." *Id.* Moreover, the Court rejected defendant's argument that his case was outside the scope of the statute because the services he received were from the employees as opposed to the employers, by stating that "[t]o hold that these services came from other than the employers ... would allow § 186 to be circumvented almost at will." *Id.* at 1060. Thus, under *Cody,* even though the payment does not violate the statute, its receipt by a labor representative can provide the basis for a conviction under § 186(b)(1). For this to be the case, however, we understand the rule of *Cody* to be that such conviction requires a showing that the transfer from the employer to the employee and the transfer from that employee to the union official are so closely related as to constitute a single transaction.

Novak's central argument is that *Cody* implicitly recognizes that the employers knew that their employees were providing personal chauffeur services. Nothing in *Cody,* however, compels this reading. Rather, this Court's observation that mutuality of guilt is not a prerequisite for the conviction of either an employer or a labor representative suggests otherwise. Moreover, that observation is consistent with the statute's structure. While sections 186(a) and (b) state that the making and receiving of certain payments are illegal **\*156** without imposing an intent requirement, section 186(d) provides that, for a statutory violation to be found, an individual must have acted willfully. *See* 29 U.S.C. § 186(d).

Thus, because the employers in *Cody* did not willfully transfer something of value to the union representative, they were not guilty of a crime. Nonetheless, Cody's willful receipt of the employees' services, paid for by their employers, warranted his conviction.

We find that the facts in *Cody* are significantly similar to those presented here. The employers in *Cody* engaged in the same conduct as the contractors in this case, i.e., they issued checks to employees as compensation. In both cases, the employees then provided a union representative with money or something of value resulting from that compensation. In each case, the employers were the source of the payment and the recipient was a union representative. The nature of the arrangements in both cases rendered the transfer of the money or other benefit from the contractor to the employee and then to the union official a single transaction. That is, in *Cody,* this Court found that there was no difference between the proven arrangement and one in which the employers "simply paid the salary of some person Cody had hired to be his chauffeur." *Cody,* 722 F.2d at 1060. Here, the kickbacks to Novak were inextricably linked to the employees' receipt of the paychecks from the contractors. Had the employees not agreed, for whatever reason, to participate in Novak's scheme, they would not have received paychecks from the contractors. Thus, the employees' receipt of paychecks from the contractors, and the employees' subsequent payments to Novak, were so closely related that a jury could conclude that the transfers in this case, like those in *Cody,* were actually between an employer and a union representative. Because we find the scenario presented here to be substantially the same as that found in *Cody,* we affirm Novak's conviction for receipt of unlawful labor payments under § 186(b)(1).

### III.

### A.

**[5]** **[6]** **[7]** Novak next disputes his conviction for mail fraud under 18 U.S.C. § 1341. The foundation for the mail fraud charge lay in Novak's receipt, through the mail, of portions of the money that the contractors paid Local One members for the no-show hours. That is, the indictment charged Novak with using the mail to defraud and to obtain the property of the contractors. The statute prohibits using the mail in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C.

§ 1341. This Court has interpreted this statutory language as requiring the government to show "proof of a 'scheme or artifice to defraud,' " which itself demands a showing that the defendant possessed a fraudulent intent. *United States v. Starr,* 816 F.2d 94, 98 (2d Cir.1987) (quoting 29 U.S.C. §§ 1341, 1343). While this language does not require the government to prove that the victims of the fraud were *actually* injured, the government "must, at a minimum, prove that defendants *contemplated* some actual harm or injury to their victims." *Id.* (emphasis in original). Indeed, "[o]nly a showing of intended harm will satisfy the element of fraudulent intent." *Id.* Thus, the question presented on this appeal is whether Novak, as a part of the kickback scheme, contemplated harming the contractors.

**B.**

[8]     According to the Government, the element of fraudulent intent is satisfied by **\*157** the contractors' unwitting participation in Novak's plan. The Government's contention is that the contractors would never have issued checks for the no-show hours had they known that a portion of the money would be received by Novak, since doing so would have exposed them to criminal liability for unlawful payments to an employee representative under 29 U.S.C. § 186(a). Novak counters that no such harm to the contractors was ever intended. Rather, the money came from the Union members, thus suggesting that, if any harm was intended, it was to the property rights of the operators and not the contractors.

[9]    [10]    While not explicitly set out, Novak's argument is that there was insufficient evidence to find that he intended to defraud the contractors. *See Starr,* 816 F.2d at 97. "We review a claim of insufficient evidence *de novo.*" *United States v. Lewter,* 402 F.3d 319, 321 (2d Cir.2005) (citations and internal quotation marks omitted). A defendant seeking a reversal of the jury's verdict on this ground, however, " 'faces a heavy burden, because we must view the evidence in the light most favorable to the government and ask only whether a rational jury could find beyond a reasonable doubt' that the appellant[ ] intended or contemplated some harm to the [contractors]." *United States v. Frank,* 156 F.3d 332, 335 (2d Cir.1998) (quoting *United States v. LaBarbara,* 129 F.3d 81, 84 (2d Cir.1997)).

While Novak's burden is indeed heavy, when faced with similar facts this Court has found the position urged by the Government to be untenable. In *Starr,* the defendants were

owners of a bulk mail service. Customers of the service would calculate the postage for their mail and then issue a check to the defendants in that amount. Defendants' plan involved burying those pieces subject to higher postage rates under the lower-priced bulk mail, thus ensuring that the higher-priced mail would be sent at the bulk rate and allowing the defendants to keep for themselves the difference in postage. *See Starr,* 816 F.2d at 96. Given the relatively brief searches undertaken by Postal Officials, the defendants' scheme was, for a time, successful. Once their plan was uncovered, the government charged them with having violated the mail fraud statute by defrauding their customers. *Id.* at 95. In reversing the jury's guilty verdict, this Court found that, although the customers were unquestionably deceived, no evidence indicated that the defendants intended to defraud them. *Id.* at 99. In other words, while the customers' assumption that the money they paid to defendants would be directed toward a lawful purpose did "implicitly constitute[ ] a part of the bargain between the parties, that defeated expectation alone [did] not affect the nature or quality of the services [sic] that was the basis of the customers' bargain." *Id.* at 99-100. Therefore, this Court found that defendants possessed no intent to defraud their customers because "[t]he customers received exactly what they paid for." *Id.* at 98.

The Government argues that the holding in *Starr* has been modified by this Court's subsequent opinions in *United States v. Schwartz,* 924 F.2d 410 (2d Cir.1991), *United States v. Frank,* 156 F.3d 332 (2d Cir.1998), and *United States v. Walker,* 191 F.3d 326 (2d Cir.1999). For the Government, these opinions permit a conviction under the mail fraud statute if the victims would not have entered into the transaction had they known of the deception. We examine each cited case in turn.

In *United States v. Schwartz,* the defendants bought night vision goggles by falsely promising to abide by the manufacturer's explicit conditions that: (1) the **\*158** merchandise not leave the United States until the proper export certificates were obtained; (2) the identity of the end user be revealed; and (3) the merchandise not be sold in violation of the applicable arms export laws. *See Schwartz,* 924 F.2d at 414, 420-21. Despite their promises to fulfill these conditions, the defendants smuggled the merchandise into Argentina, provided the manufacturer with a false end user, and sold it in violation of the arms exports laws. *Id.* at 414. The defendants were then charged with wire fraud under 18 U.S.C. § 1343[2] for "falsely representing, over interstate wires, that proper arms export licenses would

be obtained before the goggles were shipped outside the United States." *United States v. Berg,* 710 F.Supp. 438, 439 (E.D.N.Y.1989). [3] Upon appeal of the conviction, this Court found that the receipt of full monetary compensation for the goods, and thus the avoidance of pecuniary harm, did not necessarily mean that the manufacturer, a government contractor, "received all it bargained for." *Schwartz,* 924 F.2d at 421. Indeed, the Court found that the illegal export and sale of the merchandise "deprived [the manufacturer] of the right to define the terms for the sale of its property," and resulted in a loss of business good will. *Id.* Given the central nature of the promises to the completion of the sale, the Court held that defendants' "misrepresentations went to an essential element of the bargain." *Id.* Thus, even though full payment was made for the merchandise, an intent to harm the manufacturer was shown by the defendants' acts and the conviction was affirmed. *Id.*

2        The *Schwartz* Court noted that "[b]ecause the mail fraud and the wire fraud statutes use the same relevant language, we analyze them the same way." *Schwartz,* 924 F.2d at 416 (citation omitted).

3        When tried by the district court, the case appealed in *Schwartz* was referred to as *United States v. Berg.*

In *United States v. Frank,* the transaction involved a contract between a sewage transport company and various New York State municipalities for the removal of raw sewage and its subsequent disposal at sea. Newly enacted federal regulations required that the raw sewage be disposed of 106 miles from the shore, a significant increase from the previous distance of twelve miles. *See Frank,* 156 F.3d at 334-35. The contract called for the municipalities to be charged based on the operating costs incurred for moving the sewage the full distance. *Id.* at 335. The evidence indicated that the municipalities "paid a premium for that service." *Id.* Nevertheless, the transport company continually dumped the waste at distances far less than those contracted for, thereby resulting in a windfall equal to the difference between the contract price and the actual operating costs. *Id.* As in *Starr,* the defendant argued that the municipalities had received exactly what they bargained for, i.e., sewage removal. This Court found the argument to be without merit given the premium paid by the municipalities for disposal of the waste at the federally required distance. *Id.* That is, compliance with the regulations was an essential part of the bargain and thus, unlike in *Starr,* the municipalities did not get what they paid for. This Court, therefore, found the evidence sufficient to

establish that the transport company possessed an intent to harm the municipalities. *Id.*

Finally, in *United States v. Walker,* the defendants, an immigration attorney and a language interpreter, challenged their convictions for mail fraud based on a scheme in which they filed fraudulent work authorization and asylum applications with the **\*159** Immigration and Naturalization Service on behalf of their clients. *See Walker,* 191 F.3d at 331-32. As part of the plan, the clients signed blank forms, which the defendants subsequently completed with one of a series of stories previously found to garner a successful result in the application process. *Id.* Acknowledging that "[the] case [bore] a surface resemblance to *United States v. Starr,*" this Court went on to distinguish it on its facts. *Id.* at 335. Unlike the defendants in *Starr,* the defendants in *Walker* "consistently misrepresented to their clients the nature and quality of the legal services they were providing." *Id.* This Court further noted that "[i]n *Starr,* the clients dealt with the defendants just as they would have dealt with an honest business. [In *Walker* ], the clients were obliged to become parties to a dishonest scheme and were required to sign false statements themselves." *Id.* at 336. Indeed, "the applications embroiled several of [the clients] in legal difficulty, forcing them to sign cooperation agreements to avoid prosecution." *Id.* at 336 n. 1. As a result, this Court found that "there was sufficient proof that Walker intended to harm his clients by charging substantial fees for dishonest legal representation." *Id.* at 336. Thus, because the clients did not get what they bargained for, this Court found that the defendants intended to cause them harm. *Id.*

**[11]    [12]**    We find unconvincing the Government's argument that the instant case falls within the ambit of *Schwartz, Frank,* and *Walker.* An intent to harm a party to a transaction cannot be found where the evidence merely indicates that the services contracted for were dishonestly completed. That is the teaching in *Starr.* In *Schwartz, Frank,* and *Walker,* an intent to harm was found because the defendants' compliance with the law in carrying out their contractual obligations was a fundamental part of the bargain between the parties. Although the Government insists that the contractors would not have paid for the no-show hours had they been aware that Novak would receive a portion of the money, that hypothetical contention is inadequate to support a finding of fraudulent intent. To support a mail fraud claim, "the harm contemplated [in a scheme to defraud] must affect the very nature of the bargain itself. Such harm is apparent where there exists a 'discrepancy between benefits reasonably

anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver.' " *Starr,* 816 F.2d at 98 (quoting *United States v. Regent Office Supply Co.,* 421 F.2d 1174, 1182 (2d Cir.1970)). Here, as in *Starr,* the contractors received all they bargained for, and Novak's conduct did not affect an essential element of those bargains. Without more, the evidence is insufficient to show the requisite intent to harm. Because the Government failed to carry its burden of establishing that Novak intended to harm the contractors, we find the evidence insufficient to support the jury's verdict regarding the mail fraud charge, and thus reverse Novak's conviction on that count.

## IV.

### A.

Next, Novak asserts that his convictions under 18 U.S.C. § 1027 [4] on three counts **\*160** of making false ERISA statements should be overturned because the Eastern District of New York was not a proper venue for these charges. The statements that were the basis of these counts were reports made pursuant to Title I of ERISA relating to employee welfare and benefit plans. Specifically, it was alleged that Novak knowingly and intentionally reported in ERISA documents false information regarding the no-show hours attributed to several Union members. At the close of the Government's case, Novak made a motion pursuant to Rule 29 of the Federal Rules of Criminal Procedure [5] for a judgment of acquittal on these counts, asserting that venue in the Eastern District of New York was improper because the evidence demonstrated that the conduct on which the charges were based took place solely in the Southern District of New York. [6] The Government concedes that the Eastern District was not a proper venue for the charges, but argues that the venue defect was apparent on the face of the indictment, and that Novak thus waived his right to contest venue by failing to object prior to trial. The district court agreed and denied Novak's motion.

[4]     Section 1027 provides that:

Whoever, in any document required by title I of the Employee Retirement Income Security Act of 1974 (as amended from time to time) to be published, or kept as part of the records of any employee welfare benefit plan or employee pension benefit

plan, or certified to the administrator of any such plan, makes any false statement or representation of fact, knowing it to be false, or knowingly conceals, covers up, or fails to disclose any fact the disclosure of which is required by such title or is necessary to verify, explain, clarify or check for accuracy and completeness any report required by such title to be published or any information required by such title to be certified, shall be fined under this title, or imprisoned not more than five years, or both.

18 U.S.C. § 1027.

[5]     Under the Federal Rules of Criminal Procedure:

After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction. If the court denies a motion for a judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the right to do so.

Fed.R.Crim.P. 29(a).

[6]     Novak, having been acquitted of the other charges included in the Rule 29(a) motion, the only offenses contained in the motion relevant to this appeal are those regarding the false ERISA statements.

### B.

[13]    [14]    "Both Rule 18 of the Federal Rules of Criminal Procedure and the Constitution require that a person be tried for an offense where that offense is committed." [7] *United States v. Cabrales,* 524 U.S. 1, 5, 118 S.Ct. 1772, 141 L.Ed.2d 1 (1998) (citations and internal quotation marks omitted); *see also United States v. Anderson,* 328 U.S. 699, 703, 66 S.Ct. 1213, 90 L.Ed. 1529 (1946) ("[T]he *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it."). Indeed, the Constitution protects a criminal defendant's right to proper venue in two places: Article III; and the Sixth Amendment. [8] An example **\*161** of the strength of that protection is manifested in the principle that, when an indictment charges a defendant with multiple counts, "venue must be proper with respect to each count." *United States v. Beech-Nut Nutrition Corp.,* 871 F.2d 1181, 1188 (2d Cir.1989).

[7]     Pursuant to Rule 18 of the Federal Rules of Criminal Procedure:

Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed. The court must set the place of trial within the district with due regard for the convenience of the defendant and the witnesses, and the prompt administration of justice.

Fed.R.Crim.P. 18.

8  Article III, § 2, cl. 3 of the Constitution provides that "[t]he Trial of all Crimes ... shall be held in the State where the said Crimes shall have been committed." Similarly, the Sixth Amendment requires that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed."

[15]  [16]  [17]  "[T]he constitutional underpinning and importance of proper venue dictate that waiver of objections to venue should not be readily inferred." *United States v. Price,* 447 F.2d 23, 27 (2d Cir.1971). That being the case, this Court has found a waiver of the right to challenge venue in a criminal trial only under extraordinary circumstances. One such circumstance is "when the indictment or statements by the prosecutor clearly reveal [a venue] defect but the defendant fails to object." *Id.; see also United States v. Khan,* 821 F.2d 90, 93 (2d Cir.1987) (finding waiver in light of a clear defect in venue apparent on the face of the indictment); *United States v. Levasseur,* 816 F.2d 37, 45 (2d Cir.1987) (agreeing with the district court that defendant had waived his right to contest venue at the close of evidence where "the indictment gave clear notice of venue defects."). Therefore, even though it is afforded significant Constitutional protection, a defendant's right to proper venue is a personal defense subject to waiver. *See United States v. Calderon,* 243 F.3d 587, 590 (2d Cir.2001).

[18]  [19]  [20]  These cases establish a clear rule concerning the timeliness of a defendant's objection to venue in a criminal action. When the defect in venue is apparent on the face of the indictment, a defendant waives the right to contest the issue if he or she fails to object prior to trial. It follows that, when a venue defect is not clear on the face of the indictment, a defendant may raise the objection for the first time in a motion for acquittal at the close of the government's evidence.

With respect to the ERISA charges, Novak's indictment contained a narrative paragraph stating that the unlawful activity took place "within the federal judicial districts listed below and elsewhere." In addition, this portion of the

indictment contained a grid, with a column headed "Federal Judicial District." For each charge, the grid listed the Southern District of New York as the Federal Judicial District. Thus, a fair reading of the Novak indictment, taking into account the information contained in the narrative as well as that contained in the grid, is that the filing of the false reports took place in "the Southern District of New York and elsewhere."

In support of its contention that this language demonstrated an obvious venue defect, the Government points to a Ninth Circuit case, *United States v. Johnson,* 297 F.3d 845 (9th Cir.2002). In *Johnson,* the indictment bore some similarity to that charging Novak. There, a narrative paragraph and a grid were used to charge the defendant with wire fraud under 18 U.S.C. § 1343. *Johnson,* 297 F.3d at 876. The narrative paragraph stated that the acts constituting the wire fraud took place "in the District of Arizona and elsewhere." *Id.* The grid then set out the origin and destination of each offending telephone call under columns marked "Call From," and "Call To." *Id.* As to eight of the counts, an examination of the information in these columns revealed that the acts constituting the crimes charged took place entirely outside the District of Arizona. *Id.* Under these facts, the Ninth Circuit held that the venue defect was apparent on the face of the indictment and noted that "[i]t is clear from [the] grid that certain counts did not involve any activity within the District of Arizona, as certain counts did not list Arizona **\*162** as either the site of origination or the site of destination." *Id.* at 861. Put another way, because the indictment contained all of the facts relating to the *situs* of the crimes charged, it was evident that there was no relation between the alleged acts and the District of Arizona.

There are important differences between the indictment in *Johnson* and the one at issue here. In *Johnson,* all of the information relating to the location of the alleged acts was contained in the "Call From" and "Call To" columns in the indictment. Here, there was no such clarity. That is, nothing in Novak's indictment precluded the conclusion that at least some of the charged criminal activity occurred in the Eastern District of New York. Indeed, because Novak's Union activities included conduct in both the Southern and Eastern Districts of New York, [9] he could have reasonably believed that the "and elsewhere" language meant that the Government intended to produce some evidence at trial linking the ERISA crimes to both the Southern and Eastern Districts. Thus, the venue defect was not evident on the face of the indictment.

9    Novak was responsible for territory that included the East Side of Manhattan, Staten Island, and part of Queens. Thus, part of his job was in the Eastern District of New York, and part of it was in the Southern District of New York.

As a result, we hold that Novak's venue objection made at the close of the Government's evidence was timely and, as the Government concedes, meritorious. We thus reverse, for improper venue, Novak's convictions for making false ERISA statements in violation of 18 U.S.C. § 1027.

### V.

Novak was also convicted of conspiracy to violate the RICO statute, as well as substantive RICO violations. The mail fraud conviction, and the convictions for receipt of unlawful labor payments, served as the predicate acts required to prove a pattern of racketeering activity under 18 U.S.C. § 1962(c). *See* 18 U.S.C. § 1961(5) (defining a "pattern of racketeering activity" as requiring "at least two acts of racketeering activity."). Because we affirm Novak's multiple convictions for receiving unlawful labor payments, the RICO conspiracy and substantive RICO convictions are unaffected by the mail fraud reversal. We therefore affirm these convictions.

### VI.

The briefing before the Court as to how our reversals may affect Novak's convictions on other counts was necessarily limited. Therefore, we direct the parties to submit supplemental briefs addressing the question of whether our reversals have eliminated the underlying acts required for Novak's convictions for money laundering (Count 29), conspiracy to commit money laundering (Count 36), and "The No-Show Jobs Conspiracy" (Count 3).

### VII.

Novak was sentenced on December 1, 2004, prior to the Supreme Court's decision in *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). At sentencing, Novak objected under *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), to the compulsory application of the Sentencing Guidelines and thus preserved the error. *See United States v. Fagans,* 406 F.3d 138, 140 (2d Cir.2005). Although we agree with the parties that this case must ultimately be returned to the district court for resentencing, we await ordering remand until we have considered the parties' supplemental briefs.

### *163 VIII.

We have considered Novak's remaining claims and find them to be without merit.

### IX.

For the foregoing reasons, we AFFIRM Novak's convictions for unlawful receipt of labor payments, RICO conspiracy, and substantive RICO violations. We REVERSE the convictions for mail fraud and for making false ERISA statements. Finally, the Office of the Clerk of Court will issue a scheduling order for the submission of the supplemental briefs referenced above.

**Parallel Citations**

152 Lab.Cas. P 10,640

---

End of Document    © 2013 Thomson Reuters. No claim to original U.S. Government Works.

816 F.2d 94
United States Court of Appeals,
Second Circuit.

UNITED STATES of America, Appellee,

v.

Charles L. STARR, Jr., and Charles
L. Starr, III, Defendants-Appellants.

Nos. 122, 123, Dockets 86-1219, 86-1220.  |
Argued Sept. 23, 1986.  |  Decided April 9, 1987.

Owners of bulk mailing service were convicted in the United States District Court for the District of Vermont, Franklin S. Billings, Jr., J., of mail and wire fraud, and they appealed. The Court of Appeals, Meskill, Circuit Judge, held that there was insufficient evidence to support convictions in connection with scheme whereby higher rate mailings were buried in lower rate bulk mailings without paying Postal Service correct postage due or refunding excess funds to customers, where service adequately carried out its contracts with customers.

Conviction reversed and indictment dismissed.

Jon O. Newman, Circuit Judge, concurred and filed opinion.

Van Graafeiland, Circuit Judge, dissented and filed opinion.

**Attorneys and Law Firms**

 **\*95**  Robert B. Hemley, Burlington, Vt. (Gravel and Shea, Burlington, Vt., of counsel), for defendants-appellants.

Christopher B. Baril, Asst. U.S. Atty., D. Vermont, Rutland, Vt. (George W.F. Cook, U.S. Atty., Kenneth J. Melilli, Asst. U.S. Atty., D.Vt., Rutland, Vt., of counsel), for appellee.

Before VAN GRAAFEILAND, MESKILL and NEWMAN, Circuit Judges.

**Opinion**

MESKILL, Circuit Judge:

This is an appeal from a judgment of conviction entered on May 2, 1986, in the United States District Court for the District of Vermont, Billings, J., after a jury trial. The jury returned a verdict of guilty on all counts under a fifteen count indictment charging defendants Charles L. Starr, Jr. and Charles L. Starr, III with mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 (1982). [1] The indictment alleged that defendants engaged in a scheme to defraud customers of their so called "lettershoppe" business, American Mailing Systems (AMS), by means of "burying" higher rate mailings in lower rate bulk mailings and failing either to pay the postal service the correct postage due or to refund the excess funds to their customers. This appeal followed. We reverse the judgment of the district court.

[1]     Defendants were sentenced to two years imprisonment, fined $10,000 and each ordered to make restitution of $50,000 on count fifteen. Defendants were given three years probation on counts one through fourteen.

**BACKGROUND**

The principals in this criminal prosecution, Charles L. Starr, Jr. (Charles Starr) and Charles L. Starr, III (Larry Starr), father and son, formed Starr Industries, Inc. in 1981 and shortly thereafter began operating a lettershoppe service for bulk mail customers. In the period covered by the grand jury's indictment, September 4, 1981, through May 1984, the Starrs performed these bulk mailing services under the name American Mailing Systems.

The Starrs had no prior experience in the operation or management of a lettershoppe business. To compensate for their shortfall in practical experience, the Starrs hired Douglas Whitaker to work for and advise them in developing their business. Whitaker, an unindicted co-conspirator, testified for the government, describing the Starrs' conduct that supposedly showed a scheme to defraud their customers. [2]

[2]     In exchange for his testimony, Douglas Whitaker pleaded guilty to one count of stealing a United States Postal Service date stamp in violation of 18 U.S.C. § 1707 and also pleaded guilty to eleven counts of violating 18 U.S.C. § 1723. After the Starrs were convicted, Whitaker was sentenced to twelve months incarceration, six months of which were to be served and the remainder suspended with one year probation. Whitaker was fined a total of $1,500.

Most of AMS' customers were institutional entities who advertised educational seminars. They sent unsorted, unaddressed mailing brochures to AMS in one bulk shipment.

AMS addressed the brochures, **\*96** then sorted and packaged them for delivery to the post office.

AMS billed customers for sorting, labeling, packaging and handling their mailings. This charge was entered on the books as income to AMS. The customers individually calculated the postage due for their mailings based on the number of pieces to be mailed and the applicable postage rate. The customers then wrote a check payable to AMS for the cost of the necessary postage. AMS maintained these funds in a separate account. A record of such transfers was kept by Larry Starr in a notebook on his desk. As customers' mailings were dispatched to the post office, AMS paid the postage due for each customer from this separate account.

The process of actual delivery of the lettershoppe customers' mailings to the post office entailed a number of different procedures. Individual brochures were assembled in zip code order and placed into mail sacks provided by the post office. AMS presented the mailings to the postal service together with postal form 3602. This form contained the name of the AMS client, the permit number, the rate and pounds or pieces of mail included in the mailing. To verify this information, a postal employee would choose only one sack to determine its contents. When the employee was satisfied that the material in the single sack was being mailed at the proper rate, the postage due was calculated and collected for all of the sacks and they were accepted for delivery.

The Starrs' scheme to defraud lettershoppe customers, as charged by the indictment, operated as follows. Douglas Whitaker, aware of the meager verification process employed by the postal service, "buried" or concealed higher postage rate mail inside bulk rate mailing sacks. The process required the various items of mail to be strategically arranged in the sacks to avoid detection by postal employees. Fraudulent postal receipt forms (3602 forms) were then submitted to the post office and the lower postal rate for the mailing was paid for the entire shipment. AMS then prepared a second, false 3602 form to be sent to the customer, indicating that the legally correct postage had in fact been paid. The resulting surplus funds remaining in the separate AMS customer account would then be appropriated by AMS and listed on its books under fictitious income categories such as "presort income." AMS performed no legitimate labor function that justified the retention of customer funds.

The scheme netted the Starrs approximately $418,000 during the period covered by the indictment. The operation became so profitable that the Starrs carried out a similar scheme at Canadian post offices. AMS customers, however, remained blissfully ignorant of the Starrs' activities. The customers paid the postage that they themselves calculated to be legally due. Mail was sent on time and arrived at the appropriate destination. In fact, AMS customers testified at trial that they were satisfied with the service they received from AMS.[3] The customers' receipt of 3602 forms, together with their own verification that AMS delivered their mail, effectively concealed the Starrs' appropriation of customer funds.

[3] Dan Harding, an AMS customer, for example, testified to the following on direct examination:

> Q. So to put it in the converse, as an overall review made by you, you're satisfied that the mail went out as you had directed?
> A. Yes.
> Q. And in connection with these mailings, you had determined in advance the amount of postage that you expected to pay in order to have these mailings sent out. Correct?
> A. That's right.
> Q. And are you satisfied upon reviewing your records and looking at your checks that at no time you paid anymore [sic] than the amount of postage that you had predetermined should be associated with the transmission of those mailings? Understand my question?
> A. I'm satisfied that we didn't pay any more than we should have paid.
> Q. So far as your companies are concerned, we can agree that you and your companies got what it paid for from American Mailing. Correct?
> A. Yes.
>
> J.App. at 63-64.

Postal officials finally exposed the scheme in January 1984. Police conducted a search of AMS pursuant to a search **\*97** warrant and seized AMS business records. The Starrs eventually sold the business in May 1984.

On August 1, 1985, a District of Vermont grand jury returned an indictment that charged the Starrs with fifteen counts of mail and wire fraud. The indictment contained a detailed description of the alleged scheme to defraud customers. According to the indictment:

> The purpose of defendants [sic] scheme was to defraud its lettershoppe customers by inducing them, by means of false and fraudulent pretenses [sic],

representations and promises and by concealing material facts, to pay and prepay postage money for mailing their advertising material.

J.App. at 10-11.

At trial, the Starrs moved for judgment of acquittal at the close of the government's evidence. They argued, *inter alia,* that the evidence could not support a finding that they intended to defraud their lettershoppe customers. Instead, the Starrs argued, the government at most proved a scheme to defraud the United States Postal Service. They contended that such a scheme was not properly charged by the indictment and urged the court to direct a verdict in their favor. The court, however, denied the motion. The Starrs were ultimately convicted and this appeal followed.

## DISCUSSION

Properly viewed, the Starrs' claim is one of insufficiency of the evidence with regard to the element of intent to defraud the lettershoppe customers. [4] Br. of Defendants at 17-19. Of course, our scope of **\*98** review for such a claim is limited. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Nevertheless, on the basis of the record before us, we conclude that there was insufficient evidence that the object of the Starrs' scheme was to defraud their lettershoppe customers. This evidentiary deficiency applies equally to the mail fraud and wire fraud counts.

[4]   Defendants initially mount a rather aggressive, albeit disingenuous, challenge to their mail and wire fraud convictions. Defendants maintain that the government's proof is at variance with the charging document because the indictment does not charge a scheme to defraud the United States Postal Service and that such a variance must be considered fatal. The Starrs posit that the government constructively amended the indictment by pursuing a theory of the case not considered by the grand jury. Br. of Defendants at 8-16. We cannot agree.

While it is true that the grand jury's indictment, much to our dismay, does not charge specifically a scheme to defraud the postal service, the indictment does

list facts necessary to find fraud either as to the lettershoppe customers or as to the postal service.

The relevant portion of the grand jury's indictment, paragraph eleven, reads as follows:

IV.   *THE PURPOSE OF DEFENDANTS [sic] SCHEME*

11.   *The purpose of defendants* [sic] *scheme was to defraud its lettershoppe customers* by inducing them, by means of false and fraudulent pretenses [sic], representations and promises and by concealing material facts, to pay and prepay postage money for mailing their advertising material. The defendants doing business as American Mailing Systems "stuffed" and "buried" higher postage rate mail within or under lower postage rate mail and failed to pay the correct postage to both the United States Postal Service and Canada Post (Canadian Postal Service-hereinafter Canada Post) and further failed to refund to the lettershoppe customers the difference between the postage due and postage actually paid. The defendants converted to the defendants' personal use and/or to the use of the subsidiaries of the Corporation named in paragraph 7 of this count, for start-up capital investment and other purposes in excess of $400,000.00 in postage monies which were due the United States and Canada Post or to the lettershoppe clients.

J.App. at 10-11 (emphasis added).

It is difficult to fathom defendants' argument that the evidence varied from the particulars in count one of the indictment. In order for the government to prove its overall theory of defrauding the customers, it was necessary to establish facts that constituted some elements of defrauding the postal service. Defendants were not, therefore, deprived of their rights to fair notice of facts the government sought to establish. Moreover, there is no danger that defendants were convicted of an offense not charged in the indictment because the jury was not instructed that defendants could be found guilty of defrauding the postal service. Judge Billings' charge to the jury was limited to the theory presented by the indictment. The court charged the jury as follows:

Counts 1 through 9 allege that the defendants schemed to defraud its [lettershoppe] customers by inducing them by means of false and fraudulent pretenses, representations, and promises and by concealing material facts to pay and prepay postage money for mailing their advertising material.

Additionally, stuffed and buried higher postage mail within or under lower postage rate mail and, failed to pay correct postage to both the United States Postal Service and the Canadian


> Postal Service, and further failed to refund to the customers the difference between the postage due and the postage actually paid.
>
> ....
>
> Counts 10 through 14 allege that the defendants schemed to defraud its [lettershoppe] customers by inducing them by means of false and fraudulent pretenses, representations, and promises, and by concealing material facts to pay or prepay postage money for mailing their advertising material. Additionally, defendants stuffed and buried higher postage mail within or under lower postage rate mail, and failed to pay correct postage to both the United States Postal Service and the Canadian Postal Service, and further failed to refund to the customers the difference between the postage due and the postage actually paid.

J.App. at 65-67.

**[1] [2] [3]** An essential element of the government's proof in a mail fraud prosecution or a wire fraud prosecution is proof of a "scheme or artifice to defraud." 18 U.S.C. §§ 1341, 1343. Critical to a showing of a scheme to defraud is proof that defendants possessed a fraudulent intent. However, the government is not required to prove that an intended victim was actually defrauded to establish a violation by the defendants. *Durland v. United States,* 161 U.S. 306, 315, 16 S.Ct. 508, 512, 40 L.Ed. 709 (1896); *United States v. Andreadis,* 366 F.2d 423, 431 (2d Cir.1966). No actual pecuniary injury, therefore, need result to the victim of the fraud.

**[4]** Although the government is not required to prove actual injury, it must, at a minimum, prove that defendants *contemplated* some actual harm or injury to their victims. Only a showing of intended harm will satisfy the element of fraudulent intent. Such was our holding in *United States v. Regent Office Supply Co.,* 421 F.2d 1174 (2d Cir.1970). In *Regent,* an indictment was handed down charging defendant with mail fraud. It appeared that defendant's salesmen engaged in aggressive marketing techniques designed to sell their products, including frequent misrepresentations of certain facts. For instance, these salesmen represented that they had been referred by a friend, that they had a large inventory to be disposed of, or that the agent was a doctor who needed to dispose of stationery. 421 F.2d at 1176. These facts, however, were only collateral to the sale and did not concern the quality or nature of the goods being sold. The misrepresentations, therefore, did not go to the basis of the customers' bargain with the salesmen. The customers received exactly what they paid for and no customer testified that he had been cheated. On the basis of these facts, we concluded in *Regent* that defendant did not contemplate an actual injury to the alleged victims of the fraud. At most, the evidence had shown an intent to deceive and to induce the customers to enter into the transaction. Absent any evidence of an intent to harm the victims, however, we concluded that the evidence was insufficient to demonstrate a fraudulent intent as required by the mail fraud statute. 421 F.2d at 1181.

**[5]** Our decision in *Regent* identifies an important distinction that the government appears to lose sight of in this case. Misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution. Instead, the deceit must be coupled with a contemplated harm to the victim. Moreover, the harm contemplated must affect the very nature of the bargain itself. Such harm is apparent where there exists a "discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver." 421 F.2d at 1182.

Proceeding now to the facts before us, we note that the government adduced no ***99** evidence of an intent to harm the lettershoppe customers. Although all *reasonable* inferences must be drawn in favor of the government on this appeal, we are convinced that the jury must have resorted to rank speculation in finding fraudulent intent here.

The jury heard the following evidence that the Starrs practiced a deceit on their customers. The Starrs represented that funds deposited with them would be used only to pay for their customers' postage fees. In fact, the Starrs used only a portion of those funds to pay postage; the remainder was appropriated to their own use. Moreover, the Starrs caused fraudulent postal receipt forms to be sent to their customers in order to avoid detection of their scheme. Clearly, their lettershoppe customers were deceived.

**[6]** The record, however, shows little else. Specifically, the evidence does not identify what harm, if any, the Starrs intended to inflict on their customers. In fact, proof offered on this element is quite to the contrary. The Starrs did in fact mail their customers' brochures promptly as promised and caused them to arrive at the correct destination. The agreement for the timely shipment and handling of bulk mail was the basis of the bargain between the Starrs and their customers. The Starrs in no way misrepresented to their customers the nature or quality of the service they were providing. Indeed, satisfied customers were a necessary ingredient

in the successful operation of their business. Therefore, because AMS customers received exactly what they paid for, there was no discrepancy between benefits "reasonably anticipated" and actual benefits received. An intent to defraud the lettershoppe customers was not demonstrated either directly or circumstantially.

We wish to address the assertion made by Judge Van Graafeiland in his dissenting opinion that customers' bargains were violated because mail was "dumped" or not mailed. Lori Lemnah, an AMS employee, did in fact testify on cross-examination by the defense that approximately thirty sacks of mail were dumped on one occasion. Tr. III-120. A full reading of her testimony, however, indicates that this occurred as a result of Douglas Whitaker's inadvertance in failing to deliver the mailing on time to the post office. Tr. III-102-04, 119-21. Testimony from this witness provides not the slightest support for the notion that the mail was dumped as part of a scheme to defraud the Starrs' customers. At most, Ms. Lemnah's testimony demonstrates that the dumping was an isolated occurrence motivated by Whitaker's desire to conceal his misfeasance from his employer, AMS. Defense counsel's purpose in extracting this testimony from a government witness was to expose Whitaker as an untrustworthy employee. The dissenting opinion does not reconcile Lemnah's testimony with the complete lack of testimony from AMS customers that they had been cheated.

Judge Van Graafeiland also argues that AMS pocketed the savings in postage gained as a result of presorting first class mail instead of refunding the difference to customers. Ms. Lemnah testified that AMS presorted mail for only one customer, Timberlane Dental Group. Tr. II-176. Postage savings with respect to the Timberlane account amounted to $60 per month. Again, however, there is no showing that this legitimate charge to a single customer operated as part of an overall scheme to defraud defendants' lettershoppe customers of over $400,000. A close reading of Lemnah's testimony reveals that the charge was justified as part of AMS' labor cost in presorting Timberlane mailings. Tr. III-2-5.

The government contends that the Starrs defeated the expectations of their customers by misappropriating funds paid to them to cover postage fees. This expectation, according to the government, was part of the bargain between AMS and its customers and resulted in an injury sufficient to support a finding of fraudulent intent. We do not agree. Although it may be assumed that the use to which the money would be put, and the concomitant expectation that it would

be used for a specific purpose, implicitly constituted a part of the bargain between the parties, that defeated expectation *100 alone would not affect the nature or quality of the services that was the basis of the customers' bargain. The misappropriation of funds simply has no relevance to the object of the contract; namely, the delivery of mail to the appropriate destination in a timely fashion. Nor does the government's argument explain how the Starrs *intended* the misappropriation to cause direct pecuniary harm to their alleged victims. As previously noted, an inference of such intention is unreasonable in light of the purpose of the scheme. Therefore, any "harm" intended by the Starrs is, at most, metaphysical and certainly not of the character identified in *Regent* as being sufficient to infer fraudulent intent.

The government also argues that AMS customers suffered a harm because they were entitled to a refund of monies not paid to the postal service. This argument is without merit. As between the postal service, the Starrs and AMS customers, only the postal service could legally claim a right to the unspent postage fees. The customers at that point had received the service for which they had paid. If the money not paid to the postal service were refunded to the customers, they could become accessories to the fraud committed by the Starrs unless they immediately turned over the money to the post office. Once AMS customers paid for and received the service to which they were entitled, they were in no position to claim a refund for themselves.

Judge Van Graafeiland in his dissenting opinion argues that, according to postal regulations, principals are liable for postage deficiencies caused by their agents. Under postal regulation DMM § 111.3 (1985), the mailer is "required to assure that he has complied with the prescribed laws and regulations governing domestic mail." Therefore, according to the dissenting opinion, the Starrs caused harm to their lettershoppe customers because the post office now has recourse against the customers for postage deficiencies.

The record shows, however, that AMS, and *not* the lettershoppe customer, is listed as the "mailer" on the 3602 forms that were submitted to the post office. J.App. at 211-12. Although an AMS customer is listed as the permit holder, AMS appears under the caption "NAME AND ADDRESS OF INDIVIDUAL OR ORGANIZATION FOR WHICH MAILING IS PREPARED (*If other than permit holder* )."

Furthermore, whether or not the post office has recourse against the Starrs' customers based on agency principles is irrelevant. No agency theory was included in the indictment or the bill of particulars. The theory was never argued by the government to the jury. Neither was the theory included in the jury charge. Therefore, the jury had no legal basis for inferring injury to the customers from this hypothetical recovery-over by the post office.

The dissenting opinion quotes from the mail fraud statute as follows: " 'Whoever, having devised or intending to devise any scheme or artifice to defraud, *or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ....*' " (emphasis added). The dissenting opinion then argues that the italicized portion of the statute provides direct support for the jury's verdict.

We do not see how the mail fraud statute provides support for this conviction. The statute outlaws any scheme to obtain money by "false or fraudulent pretenses." Fraudulent intent is a basic element of mail fraud. We have defined fraudulent intent as requiring a contemplated harm to the victim. *See United States v. Regent Office Supply,* 421 F.2d 1174, 1182 (2d Cir.1970). Unless the dissenting opinion is prepared to say that our holding in *Regent* was directly contrary to the terms of the statute, then the jury's verdict, unsupported by evidence of contemplated injury, must fall.

The dissenting opinion also cites language in *United States v. Rowe,* 56 F.2d 747, 749 (2d Cir.), *cert. denied,* 286 U.S. 554, 52 S.Ct. 579, 76 L.Ed. 1289 (1932), for the argument that the italicized portion of the mail fraud statute encompasses the conduct of defendants in this case. In **\*101** *Rowe,* Judge Learned Hand stated that: "A man is none the less cheated out of his property, when he is induced to part with it by fraud, because he gets a quid pro quo of equal value." *Id.* The *Rowe* case, however, was thoroughly distinguished in *Regent.* We said in *Regent* that "neither the *Rowe* case nor the language quoted will support the conclusion that no definable harm need be contemplated by the accused to find him guilty of mail fraud." 421 F.2d at 1181. Further, in *Rowe* itself, the victims suffered a definable harm because they were induced to pay large sums of money for worthless property. After *Regent,* therefore, there can be no doubt that *Rowe* has been deprived of much of its vitality.

Although this case involves a contract for services rather than a contract for the sale of goods as in *Regent,* the evidence produced here calls for the same result. As in *Regent,* no

evidence of tangible injury was shown from which the jury could infer an intent to defraud. Accordingly, "we conclude that the defendants intended to deceive their customers but they did not intend to defraud them." *Regent,* 421 F.2d at 1182. The evidence is, therefore, insufficient to support convictions for mail or wire fraud.

[7]  [8]   We address one further point. In his charge to the jury, the district judge stated: "To act with intent to defraud means to act knowingly, and with a specific intent to deceive someone, ordinarily for the purpose of causing some financial loss to another *or* bringing about some financial gain to one's self." Supp.App. of Gov. at 200 (emphasis added). To the extent that the charge permits the jury to find an intent to defraud based solely on the defendants' appropriation of a benefit to themselves, it is error. In *Regent,* we held that "the government can[not] escape the burden of showing that some actual harm or injury was *contemplated* by the schemer." 421 F.2d at 1180. While a finding that defendants garnered some benefit from their scheme may be helpful to the jury to establish motive, it cannot be probative of fraudulent intent unless it results, or is contemplated to result, from a corresponding loss or injury to the victim of the fraud. The district court's charge effectively permits the jury to disregard any evidence of contemplated harm and runs afoul of our *Regent* holding.

Finally, the dissenting opinion cites *United States v. London,* 753 F.2d 202 (2d Cir.1985), for the proposition that a trial judge need not charge a jury that it must find contemplated harm to infer fraudulent intent. *London* held that harm or injury can be inferred "when the scheme has such effect as a necessary result of carrying it out." *Id.* at 206. We hold only that it is error for a trial judge to charge a jury that contemplated harm is *not* an element of fraudulent intent. *London* did not eliminate contemplated harm as an element of fraudulent intent and the jury charge to that effect in our case was error.

**CONCLUSION**

Evidence adduced by the government at trial was insufficient to sustain a finding that defendants intended to defraud their lettershoppe customers. Also, the district court's charge to the jury on intent to defraud is error because it permits the jury to infer such an intent based solely on defendants' appropriation of a benefit to themselves. The judgment of conviction is reversed and the indictment is dismissed.

JON O. NEWMAN, Circuit Judge, concurring:
Customers of the defendants paid them money to have a service rendered-the mailing of letters. In performing that service, the defendants defrauded the United States Postal Service by scheming to pay less than the proper amount of postage. No doubt many customers would not have wished to do business with the defendants had they known that the defendants were defrauding the Post Office in the course of performing the service the customers had purchased. And no doubt many customers would not wish to do business with the defendants if the defendants were defrauding any other person from whom the defendants obtained goods or services necessary **\*102** for conducting their business-the supplier of printed forms, the landlord, or the telephone company. But a customer's regret at doing business with a company that defrauds one of its trade creditors does not transform fraud upon the creditor into fraud upon the customer.

The Government has simply indicted the defendants for defrauding the wrong party. An indictment for defrauding the Postal Service would have led to a conviction that would surely have been affirmed. However, the indictment for defrauding the customers has led to a conviction that must be reversed, for all of the reasons cogently explained in Judge Meskill's opinion, in which I concur.

VAN GRAAFEILAND, Circuit Judge, dissenting:
Because my understanding of the crucial facts and the law pertaining thereto differs sharply from that of my colleagues, I dissent.

**THE FACTS**

Appellants' scheme, as alleged in the indictment and charged to the jury, was to defraud its lettershoppe customers by inducing them, by means of false and fraudulent pretenses, representations and promises and by concealing material facts, to pay and prepay postage money for mailing their advertising material and then converting over $400,000 of this amount to their personal use. The undisputed facts in support of this charge are:

1. Postage had to be paid in advance before the customers' brochures could be mailed.

2. Appellants promised that they would pay the postage if their customers advanced the money for this purpose.

3. Appellants pocketed over $400,000 of the postage money which the customers advanced.

I do not understand how, in the light of the foregoing undisputed facts, my colleagues can say that the Starrs "in no way misrepresented to their customers the nature or quality of the service they were providing" and that "there was no discrepancy between benefits 'reasonably anticipated' and actual benefits received."

Without belaboring the point, I simply include herewith an excerpt from the testimony of the president of one of appellants' customers and leave it to the reader to decide whether those customers received the benefits they were promised.

Q. Why is it, as you testified with AMS, you were paying them for the postage, you were issuing a check to them? How did that come to be?

A. Mr. Starr asked me to write checks directly out to his organization, as it would simplify matters, he told me. It would make it easier for them, and they would keep two separate accounts so that at any point in time I could tell just exactly how much money I had in my postage account, just as the postmaster would have done. And I agreed to that. And I might say now, quite foolishly. And not because of this case, but because, irregardless of the letter shop I made my postage checks out to, there was certainly not the trust that the post office was going to, in turn, make payments to the post office, as I had, you know, expected when the post-you know, the letter shop can do anything they want with money. They can use it to pay overhead, they can, you know, put it in their pockets and go out of business. They can do anything they like. So it was a real foolish move on my part, something we're not doing any longer.

At a later point the same witness described AMS as "our agent for transporting the money, at least I thought, from our account to the post office's account."

If the reader decides, after reading the foregoing testimony and viewing it in the light most favorable to the Government, that appellants made no false representations or promises and concealed no material facts, and that there was no discrepancy between the benefits appellants' customers anticipated and the benefits they received, the reader need proceed no further in

this **103** opinion-appellants are innocent. [1] However, on the assumption that the reader will view the facts differently from my colleagues, I will go on to the law.

[1]   In order to arrive at a correct decision, the reader should know that every question by defense counsel concerning customer satisfaction was related to and based upon the customers' assumption that all of the mail for which they had paid postage to appellants went out. No customer testified that he was satisfied with the fact that appellants had embezzled over $400,000 of customer money. Unlike my colleagues, the jury was not taken in by this clever questioning ploy of the defense lawyers.

### THE LAW

The mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, read in pertinent part as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises,....

The use of the word "or" between the two clauses signifies that they are disjunctive rather than conjunctive. *United States v. Astolas,* 487 F.2d 275, 279-80 (2d Cir.1973), *cert. denied,* 416 U.S. 955, 94 S.Ct. 1968, 40 L.Ed.2d 305 (1974). Accordingly, the statute is not limited to fraudulent schemes that contemplate the actual loss of money or property. *United States v. Margiotta,* 688 F.2d 108, 121 (2d Cir.1982), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *United States v. Castor,* 558 F.2d 379, 382-83 (7th Cir.1977), *cert. denied,* 434 U.S. 1010, 98 S.Ct. 720, 54 L.Ed.2d 752 (1978); *United States v. States,* 488 F.2d 761, 764 (8th Cir.1973), *cert. denied,* 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974). Appellants' customers were just as surely defrauded if they were deprived of their chance to bargain with all the material facts before them.

The mail fraud statute formerly was codified in 18 U.S.C. at § 338. Prior to 1899, the statute did not contain the clause "or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." These words were added by statutory amendment at the turn of the century, and the reason for the addition was aptly described in *Moore v.*

*United States,* 2 F.2d 839, 841 (7th Cir.1924), *cert. denied,* 267 U.S. 599, 45 S.Ct. 354, 67 L.Ed. 807 (1925):

> The added words were evidently intended to enlarge the scope of the act, and to denounce and punish the use of the mails in execution not only of a scheme to defraud, but also of a scheme to obtain money or property by means of false representations or promises, and would in its terms include any scheme to obtain money from another by means of false pretenses, under circumstances where, but for the false pretenses or promises, the money or property would not have been parted with.

In *United States v. Rowe,* 56 F.2d 747, 749 (2d Cir.), *cert. denied,* 286 U.S. 554, 52 S.Ct. 579, 76 L.Ed. 1289 (1932), Judge Learned Hand, citing the *Moore* holding with approval, said:

> Civilly of course the action would fail without proof of damage, but that has no application to criminal liability. A man is none the less cheated out of his property, when he is induced to part with it by fraud, because he gets a quid pro quo of equal value. It may be impossible to measure his loss by the gross scales available to a court, but he has suffered a wrong; he has lost his chance to bargain with the facts before him. That is the evil against which the statute is directed.

In *United States v. Regent Office Supply Co.,* 421 F.2d 1174, 1182 (2d Cir.1970), the case much relied upon by the majority, Judge Moore, referring to *Rowe,* said:

> Thus, taken in its factual context, the formulation of law stated in the *Rowe* decision was perfectly accurate in affirming that a wrong has been suffered when a man is deprived of his chance to bargain "with the facts before him" where the absent facts are facts material to the bargain he is induced thereby to enter.

See also *United States v. Rodolitz,* 786 F.2d 77, 80-81 (2d Cir.1986), where we said:

> **\*104** To sustain the conviction the government needed to prove only that Rodolitz employed a deceptive scheme intending to prevent the insurer from determining for itself a fair value of recovery.

In *United States v. Hasenstab,* 575 F.2d 1035 (2d Cir.), *cert. denied,* 439 U.S. 827, 99 S.Ct. 100, 58 L.Ed.2d 120 (1978), defendant, a purchasing supervisor for Pan American World Airways, Inc., received kickbacks from suppliers of business forms. The Court did not indicate in its opinion that Pan American paid excessive amounts to the suppliers. We held, nonetheless, that the essential element of the scheme to defraud "was the creation of a system under which Pan American would buy forms and paper from Barney's company that it would normally have purchased elsewhere." *Id.* at 1038. *See also United States v. Bryza,* 522 F.2d 414, 422 (7th Cir.1975), *cert. denied,* 426 U.S. 912, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976); *United States v. Fischl,* 797 F.2d 306, 311 (6th Cir.1986).

The testimony in the instant case shows that AMS sent its customers no written bills for postage. Instead, "Larry Starr would call them up and tell them that your mailing is going out tomorrow, please wire us so much money." When the check for postage came in, it would either have the word "postage" written on the memo portion of the check, "[o]r they would attach a little note with a check saying, 'This check is for our postage mailing that's going out at the end of the week,' or something like that." In one case, however, the customer opened a special bank account and gave Charles Starr authorization to write checks on that account.

I think it clear that AMS acted as an agent for the delivery of its customers' postage money to the post office and, as such, owed them the fiduciary duty of honesty and good faith. "An agent is a fiduciary with respect to the matters within the scope of his agency." *Restatement (Second) of Agency* § 13. "The law requires the utmost good faith from agents. The relation is one of trust and confidence, and an agent will not be permitted to make profit for himself in the transaction of the business of his principal." *Noyes v. Landon,* 59 Vt. 569, 574, 10 A. 342 (1887). *See also Vermont Marble Co. v. Mead,* 85 Vt. 20, 28, 80 A. 852 (1911); 2A C.J.S. Agency

§§ 4a, 5. Moreover, where, as here, money is placed in the hands of another earmarked and kept separate for delivery to a third party, a trust will be imposed on the funds for the accomplishment of the intended use. *McKee v. Lamon,* 159 U.S. 317, 322, 16 S.Ct. 11, 13, 40 L.Ed. 165 (1895); *Carrier Corp. v. J.E. Schecter Corp.,* 347 F.2d 153, 155 (2d Cir.), *cert. denied,* 382 U.S. 904, 86 S.Ct. 239, 15 L.Ed.2d 157 (1965); *Cumberland Portland Cement Co. v. Reconstruction Finance Corp.,* 140 F.Supp. 739, 749 (E.D.Tenn.1953), *aff'd,* 232 F.2d 930 (6th Cir.1956).

"There is abundant authority that a scheme to use a private fiduciary position to obtain direct pecuniary gain is within the mail fraud statute." *United States v. Dixon,* 536 F.2d 1388, 1399 (2d Cir.1976) (*citing United States v. Buckner,* 108 F.2d 921, 926-27 (2d Cir.), *cert. denied,* 309 U.S. 669, 60 S.Ct. 613, 84 L.Ed. 1016 (1940), and *United States v. Groves,* 122 F.2d 87 (2d Cir.), *cert. denied,* 314 U.S. 670, 62 S.Ct. 135, 86 L.Ed. 536 (1941)). The failure of a fiduciary to disclose material information, where the failure to disclose could result in harm to his principal, also violates the mail fraud statute. *United States v. Weiss,* 752 F.2d 777, 784 (2d Cir.), *cert. denied,* 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985); *United States v. Siegel,* 717 F.2d 9, 14 (2d Cir.1983) (*citing United States v. Newman,* 664 F.2d 12, 19 (2d Cir.1981)).

Appellants' failure to disclose that they did not pay or intend to pay the correct postage that was owed by their customers could indeed result in tangible harm to the customers. As every layman knows, postage must be fully prepaid on all mail at the time of mailing. *See* 39 C.F.R. Pt. 3001, Subpt. C, App. A § 3000.010. The jury was informed that there are three methods of demonstrating prepayment of postage for presorted third-class mail-adhesive stamps, metered stamps, or permit imprints. "Permit imprints are printed indicia indicating postage has been paid by the sender under the permit number shown." **\*105** 39 C.F.R. Pt. 3001, Subpt. C, App. A, General Definitions .07. We are concerned in this case only with permit imprint mailings. A permit to use imprints is obtained by applying to the post office where mailings are to be made and paying a prescribed fee. Upon issuance of the permit, the post office opens an advance deposit trust account for the permit holder against which drawings are made for postage. Each piece of mail sent under permit must bear the permit imprint which indicates that postage has been paid, and the postage must be charged against the permit holder. For this reason, each "Statement of

Mailing with Permit Imprints", Form 3602, must contain the name and address of the permit holder.

AMS had a permit to use imprints. So also, however, did many of its customers. Although AMS insisted that all of its customers' postage checks be made payable to it, when it used a customer's permit number, as it often did, it channeled the postage money through that customer's advance deposit trust account. This was done by drawing against AMS's account, depositing the withdrawn funds in the customer's trust account and immediately withdrawing the funds from the latter and redepositing them in the former. In this manner, the post office was able to identify the customer and establish whether it was complying with all its permit requirements. The customer's permit would be revoked if it was used in operating any unlawful scheme or for any noncompliance with the regulations governing the use of permit imprints. *See* Domestic Mail Manual (DMM) § 145.2.22.

AMS processed both regular and nonprofit bulk mail for its customers. One of its nonprofit mailers, the American Institute for Professional Education, mailed between 12 and 15 million pieces of mail a year. "Nonprofit bulk mail is third-class mail mailed by authorized nonprofit organizations or associations of the following types [religious, educational, etc.]." 39 C.F.R. Pt. 3001, Subpt. C, App. A § 300.0212. *See also* DMM §§ 623.1, 623.2.21. When AMS processed mailings for the American Institute, or any of its other nonprofit customers, it used the customer's mailing permit. A Form 3602 had to be prepared and signed by either the "Permit Holder or Agent". In almost every case, the Statement was signed by an AMS representative as Agent for the Permit Holder. Each Form 3602 carried a clear printed warning that "[b]oth principal and agent are liable for any postage deficiency incurred." Unlike my colleagues, I am prepared to assume that the jurors could read the numerous Form 3602's that were placed in evidence, and that the most untutored among them knew what was meant by the simple statement that both principal and agent were liable for postage deficiencies.

Once the trier of fact has found for the Government, all permissible inferences must be construed in favor of the Government. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Martino,* 759 F.2d 998, 1002 (2d Cir.1985). Instead of discussing the above-quoted Form 3602 clause and the only logical conclusion the jury could draw from it, my colleagues simply disregard it. They say that whether or not the post office

has recourse against appellants' customers is "irrelevant". Perhaps it is this strange logic which leads them to conclude that the only harm in this case is "metaphysical".

My colleagues also disregard the provisions of the mail regulations which provide that nonprofit bulk mail is third-class mail "mailed" by authorized nonprofit organizations and which forbid such organizations to "mail" at the special rates unless their applications to "mail" at the special rates are approved. *See* 39 C.F.R. Pt. 3001, Subpt. C, App. A § 300.0212; DMM §§ 623.1, 623.2.21, 642.4. The DMM provides that, "[n]otwithstanding any statement contained in this manual or the statements of any employee of the United States Postal Service, the burden rests with the mailer to assure that he has complied with the prescribed laws and regulations governing domestic mail." DMM § 111.3. Nonprofit organizations, such as the American Institute, cannot escape their **\*106** designation as "mailers" by using the services of AMS. As a result of the majority's unfortunate holding that appellants' customers got everything to which they were entitled, if the post office decides to seek recovery of the underpayments from "mailers" such as the American Institute, these "mailers" surely will be met with the defense of collateral estoppel if they attempt to claim over against appellants. *See, e.g., Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).

### THE CHARGE

In instructing the jury concerning the law which is pertinent on this appeal, the district judge commenced his discussion by reading 18 U.S.C. §§ 1341 and 1343, the statutes which appellants were charged with violating. This was perfectly proper. *Williams v. United States,* 328 F.2d 256, 262 (8th Cir.), *cert. denied,* 377 U.S. 969, 84 S.Ct. 1651, 12 L.Ed.2d 739 (1964); *Smith v. United States,* 269 F.2d 217, 218 (D.C.Cir.), *cert. denied,* 361 U.S. 865, 80 S.Ct. 130, 4 L.Ed.2d 108 (1959); *Maynard v. United States,* 215 F.2d 336, 339 (D.C.Cir.1954). Then, with the obvious assistance of Devitt and Blackmar's authoritative work, *Federal Jury Practice and Instructions,* he paraphrased and enlarged upon the statutes, referring first to the mail fraud statute and then in identical language to the wire fraud statute:

> In order to establish that the
> defendants are guilty of mail fraud,
> the government must prove beyond
> a reasonable doubt, first, that the

defendants made up a plan or scheme which was reasonably calculated to defraud another or for obtaining money or property by means of false pretenses, representations, or promises; second, that for the purpose of carrying out the scheme or attempting to do so, the defendant used the United States mails or caused the United States mails to be used in the manner charged in that particular count; and *third, that the defendant did so knowingly and with intent to defraud.* (emphasis supplied).

He then charged:

The word scheme includes any plan or course of action intended to deceive others and to obtain by false or fraudulent pretenses, representations or promises money or property from persons so deceived.

A statement or representation is false or fraudulent if it relates to a material fact and is known to be untrue or is made with reckless indifference as to its truth or falsity, and is made or caused to be made with an intent to defraud.

He continued:

A statement or representation may also be false or fraudulent when it constitutes half a truth or effectively conceals a material fact with intent to defraud.

A material fact is a fact that would be important to a reasonable person in deciding whether to engage or not to engage in a particular transaction. To act with intent to defraud means to act knowingly, and with a specific intent to deceive someone, ordinarily for the purpose of causing some financial loss to another or bringing about some financial gain to one's self.

Finally, the court said:

The mail fraud statute can be violated whether or not there's any loss or damage to the victim of a crime.

Reference to Devitt and Blackmar will disclose that the district judge hewed closely to their recommended instructions. While these instructions are not the equivalent of Holy Writ, they have been widely adopted and are eminently

correct. *See, e.g., United States v. Alexander,* 743 F.2d 472, 478 (7th Cir.1984); *United States v. Feldman,* 711 F.2d 758, 765 (7th Cir.), *cert. denied,* 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 317 (1983); *United States v. Seymour,* 576 F.2d 1345, 1347-48 (9th Cir.), *cert. denied,* 439 U.S. 857, 99 S.Ct. 171, 58 L.Ed.2d 164 (1978). Moreover, both the Government and appellants based their requests to charge in large measure upon **\*107** Devitt and Blackmar, and so indicated to the district court.

Nowhere in appellants' principal brief or reply brief is there a contention that the district court erred in its charge to the jury. *See Fed.R.App.P. 28(a)(4); Sullivan v. Town of Salem,* 805 F.2d 81, 87 (2d Cir.1986); *Zuccarello v. Exxon Corp.,* 756 F.2d 402, 407-08 (5th Cir.1985); *United States v. Tamura,* 694 F.2d 591, 598 (9th Cir.1982). As a result, the correctness of the charge has not been briefed by the Government. Nonetheless, my colleagues have taken it upon themselves to find error. They say that "[t]o the extent that the charge permits the jury to find an intent to defraud based solely on the defendants' appropriation of a benefit to themselves, it is error." I find no such permission given in the charge. In the above-quoted portions of the charge, the district court listed three elements that the Government was required to prove, and the third of these was that the defendants acted "knowingly, with the intent to defraud." Since both the mail fraud and wire fraud statutes were involved, this charge was given twice. Indeed, when the jury came in for instructions, it was given a third time. On three occasions, the court told the jury that the defendant had to act "knowingly, with intent to defraud." The court charged the jury that "if ... any one of these propositions has not been proved beyond a reasonable doubt, then you should find the defendant not guilty."

I have read the charge very carefully, and nowhere can I find any basis for the majority's statement that the court erred in charging the jury that "contemplated harm is *not* an element of fraudulent intent." The district court charged only that "[t]he mail fraud statute can be violated whether or not there's any loss or damage to the victim of a crime." There was nothing wrong with this. *See United States v. Margiotta, supra,* 688 F.2d at 121; *United States v. Von Barta,* 635 F.2d 999, 1005-06 (2d Cir.1980), *cert. denied,* 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981).

The indictment charged, and the Government proved, that appellants, through false representations and the concealment of material facts, induced their customers to prepay postage money for mailing the customers' documents. The district

court charged the jury without exception that "[a] material fact is a fact that would be important to a reasonable person in deciding whether to engage or not to engage in a particular transaction." I take it as a given that every legitimate businessman wants to operate his business honestly and to avoid dealing with those who would do otherwise. I would like to think my colleagues would agree that, had appellants' customers known that appellants were thieves and embezzlers, who would pocket over 41 percent of the money advanced to them for postage, the customers would have taken their business elsewhere. *See United States v. Hasenstab, supra,* 575 F.2d at 1038. Appellants' scheme, which deprived their customers of the right to have their business conducted honestly, was a scheme to defraud. *United States v. Bohonus,* 628 F.2d 1167, 1172 (9th Cir.), *cert. denied,* 447 U.S. 928, 100 S.Ct. 3026, 65 L.Ed.2d 1122 (1980).

Our decision in *United States v. Regent Office Supply Co., supra,* 421 F.2d 1174, is not to the contrary. *Regent* was a most unusual case in that it was tried upon stipulations of fact and admissions. The district court was asked to determine whether certain stipulated representations by the defendant's sales agent constituted mail fraud; *viz.,* that the agent had been referred by a friend of a customer or an officer of a corporate customer, or that the agent or a friend had stationery which had to be disposed of. *Id.* at 1176. "The reaction, if any, of any customers to the representations or the effect, if any, of such reaction on the commercial transactions was not revealed." *Id.* There was no evidence that any of the customers failed to receive merchandise of the quality promised. *Id.* at 1177. In viewing the paucity of proof, this Court said:

> Without a fuller factual disclosure than here afforded, we are confronted with the proposition of simply declaring that any untrue statement designed to obtain the sympathetic ear of a potential customer **\*108** comes within the purview of the mail fraud statute. We believe it prudent to avoid this pitfall.

*Id.* at 1178. The Court then concluded:

> Does solicitation of a purchase by means of false representations not directed to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the bargain, constitute

a "scheme to defraud" or "obtaining money by false pretenses" within the prohibition of 18 U.S.C. § 1341? We hold that, as here presented, it does not and the convictions should be reversed.... But this is not to say that we could not, on different facts or more specific proof, arrive at a different conclusion.

*Id.* at 1179.

The instant case supplies the "different facts" and "more specific proof". Here, appellants' customers were deprived of their chance to bargain with facts material to the bargain before them. Here, in the language of *Regent Office Supply,* "fraud in the bargaining may be inferable from facts indicating a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver." *Id.* at 1182.

In *United States v. London,* 753 F.2d 202 (2d Cir.1985), the indictment charged that the defendant and his cohorts devised a scheme "to obtain money by means of false and fraudulent pretenses, representations, and promises...." *Id.* at 206. Appellant in that case argued that the court's charge was inadequate because it failed to require a finding of contemplation of actual harm or injury before the jury could convict appellant of participating in the scheme with which he was charged. *Id.* at 205. Rejecting this argument, we said that there was nothing in the case of *United States v. Siegel, supra,* 717 F.2d 9, upon which appellant London relied, "to indicate that it is error for a court to fail to charge a jury with the specific language 'the prosecution must show that some harm or injury was contemplated by the scheme.' " *Id.* at 206. We also said, quoting *Regent Office Supply, supra,* that harm or injury may be inferred "when the scheme has such effect as a necessary result of carrying it out." *Id.* Quoting again from *Regent Office Supply,* we said that "[w]here the false representations *are directed* to the quality, adequacy or price of the goods themselves, the fraudulent intent is apparent because the victim is made to bargain without facts obviously essential in deciding whether to enter the bargain." *Id.* (emphasis added in opinion). These statements are clearly applicable to the charge in the instant case.

**CONCLUSION**

The Government's proof was overwhelming. Defense counsel conceded in summation that "the numbers and the statements that [the prosecutor] made ... about the postage shortage are all absolutely true." Defense counsel also told the district court at the close of proof:

> They [appellants] do not argue with the Government's evidence that the post office received less postage than it was due. Nor do they argue with the evidence that while they owned the American Mailing Systems their employees buried higher rate mail within lower rate mail, and even dumped mail on occasion.

Although I have proceeded up to this point upon the same assumption which appellants' customers made-that all their mail went out-the fact of the matter, as appellants concede, is that some of the mail was dumped. On one occasion, approximately thirty bags of mail were destroyed. Figuring about 200 pieces of mail to a bag, this totals about 6,000 pieces. My colleagues, ignoring the fact that appellants' customers received no credit for either the destroyed mail or the unused postage, forgetting that Mr. Whitaker, the "dumper" of the mail, was a co-conspirator of appellants, and, paying only lip service to the requirement that all evidence with regard to the destruction of the mail must be construed in the light most favorable to the Government, blithely dismiss the destruction of the 6,000 pieces as unimportant.

There were other occasions when appellants cheated a customer without also **\*109** cheating the post office. Presorted first-class mail can be sent at a lower rate than unsorted. AMS presorted the mail without letting the client know that it had done so and pocketed the savings from the unsorted rate which the client had advanced. My colleagues call this a "legitimate" charge; I suggest that no hidden charge ever can be "legitimate". I point out also that an overcharge of $60 per month on a continuing basis, as here, adds up to the non-trivial sum of $720 per year. My colleagues pooh-pooh this as an indicia of fraud; I do not.

In all probability, the federal authorities would not have indicted appellants if the just described incidents of wrongdoing were all that were involved. However, as everyone, including my colleagues, concede, there is no doubt whatever that appellants secretly pocketed over $400,000 that had been entrusted to them for other purposes. Purely and simply, they embezzled it. *See* 2 LaFave and Scott, *Substantive Criminal Law* § 8.6 (1986); 13 Vt.Stat.Annot. § 2531 (1974). I believe this is exactly the type of wrongdoing the mail fraud statute was designed to prevent. I regret that this Court is now holding otherwise.

**ADDENDUM**

Judge Newman's concurring opinion was not received until after the above dissent was written. Because Judge Newman's comments highlight in a few words the differences that separate the majority and the dissent, they merit comment.

These differences inhere in the analogy which the concurring opinion would draw between the United States Post Office and "the supplier of printed forms", "the landlord", "the telephone company", or appellants' other "trade creditors". The third party to appellants' scam was not some unidentified "trade creditor" of appellants but was instead the United States Government, to whom appellants' customers owed both allegiance and postage. The analogy takes no cognizance of the undisputed fact that appellants conned their customers into entrusting them with the customers' postage money, which appellants specifically undertook and agreed to transmit to the post office. The concurrence does not deny that appellants owed a fiduciary obligation with regard to the postage funds thus entrusted to them. The concurrence does not, and indeed cannot, challenge the dissent's assertion that appellants embezzled their customers' funds. The concurrence overlooks the undisputed facts that appellants hid their misappropriations from their customers by sending them false statements of mailing, certified with a sealing stamp which had been stolen from the post office. Finally, the concurrence does not dispute the possibility that appellants' customers might be held liable for the unpaid postage. In short, Judge Newman seems to be discussing an entirely different case than the one presently before us.

Simplification of the issues is always a result to be desired. I suggest, however, that the issue whether appellants were guilty of mail and wire fraud can be more accurately resolved by reference to three short statements of undisputed fact.

1. Appellants' customers entrusted appellants with the customers' postage money, which appellants kept separate

and apart from their own funds and which they undertook and agreed to transmit to the post office.

2. Until the postage money was delivered to the post office, it remained the property of appellants' customers.

3. Appellants did not deliver all of the customers' funds to the post office as they had agreed to do, but, instead, stole,

or in Judge Meskill's words "appropriated", over $400,000 of those funds.

I submit that appellants did not receive absolution from the embezzlement of their customers' money by stuffing and burying higher postage rate mail under lower postage rate mail so as to conceal the evidence of their thefts.

---

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

421 F.2d 1174
United States Court of Appeals, Second Circuit.

UNITED STATES of America, Appellee,
v.
REGENT OFFICE SUPPLY CO., Inc., and
Oxford Office Systems, Inc., Appellants.

No. 169, Docket 33498. | Argued
Oct. 8, 1969. | Decided Jan. 29, 1970.

Defendants were convicted in the United States District Court for the Southern District of New York, Edward Jordan Dimock, J., of violation of mail fraud statute, and they appealed. The Court of Appeals, Moore, Circuit Judge, held that where there was no showing that defendants' agents made any false representations in connection with sales of stationery supplies regarding quality or price of the merchandise and there was no suggestion of material benefits which customer might receive from transaction beyond inherent utility of goods purchased, falsity of representations was not shown to be capable of affecting customer's understanding of bargain or of influencing his assessment of value of bargain to him and no injury was shown and conduct did not come within prohibition of mail fraud statute.

Convictions reversed.

**Attorneys and Law Firms**

 **\*1175** Jacob P. Lefkowitz, New York City (Abraham Glasser, New York City, of counsel), for appellants.

Richard A. Givens, Asst. U.S. Atty. (Robert M. Morgenthau, U.S. Atty., for the Southern District of New York, New York City, and John E. Sprizzo, Asst. U.S. Atty., on the brief), for appellee.

Before WATERMAN, MOORE and KAUFMAN, Circuit Judges.

**Opinion**

MOORE, Circuit Judge.

Regent Office Supply, Inc. (Regent) and Oxford Office Systems, Inc. (Oxford) were indicted and tried under a somewhat unusual procedure whereby the accused corporations, through their officers and their attorney, in effect agreed to be indicted and expeditiously tried upon certain 'admissions and stipulations' of fact constituting the alleged crime. Through the indictment and the one-day trial, both defendants and the government were interested primarily in ascertaining whether or not the admitted conduct fell within the prohibition of 18 U.S.C. § 1341, the federal mail fraud statute.

Having been convicted- much to their chagrin- by the District Court, defendants sought to challenge the jurisdiction of the court by a post-verdict, pre-sentence motion to dismiss the indictment, protesting the irregularity of the pre-indictment procedure in which originally they had cooperated so enthusiastically with the government.

On this appeal from conviction and sentence, appellants renew their challenge to the justiciability of the issue as presented by the (at least cooperative) indictment. They further protest their own stipulation as to the presence of the **\*1176** jurisdictional element of the crime- use of the mails- and they continue to challenge the applicability of the mail fraud statute to their admittedly deceitful operation. Rounding out their attack on the conviction, they register broad assertions of due process violations in the present application of an otherwise constitutional statute and, for the finale, suggest that the statute itself is unconstitutionally vague.

I. JURISDICTION

The appellants are in the business of selling stationery supplies through salesmen (called 'agents') who solicit orders for their merchandise by telephone. Worried by the dubious propriety of a 'sales pitch,' which according to their formal admission included 'false pretenses and representations to customers,' and probably even more worried by an investigation into their practices by the Post Office Department and the possibility of governmental prosecution, they adopted (obviously with the cooperation of the federal government) a procedure which they hoped would obtain for them (and the 'sales pitch') the blessing of the courts. Accordingly they stipulated in writing that their agents 'secured sales' by making false representations to potential customers that:

(a) the agent had been referred to the customer by a friend of the customer.

(b) the agent had been referred to customer firms by officers of such firms.

(c) the agent was a doctor, or other professional person, who had stationery to be disposed of.

(d) stationery of friends of the agent had to be disposed of because of a death and that the customer would help to relieve this difficult situation by purchasing it.

So anxious were the accused parties to have judicially approved- or disapproved- their salesmen's customer approach that they sought an immediate trial even to the extent of waiving 'trial by jury if indicted for mail fraud in violation of 18 U.S.C. sec. 1341' and agreeing 'to stand trial on the basis of these admissions * * * and stipulations, reserving, however, the right to offer testimony to amplify, but not to contradict, the facts contained in these admissions and stipulations.' They quite candidly stipulated that they wished 'to submit to the court the issue whether a procedure or plan to sell stationery (as described above) constitutes a scheme to defraud or to obtain money by false or fraudulent representations or (promises) within the meaning of 18 U.S.C. Sec. 1341.' If the court should so find against them they stipulated that 'judgment may be entered against the corporations.'

The indictment (undated) was filed on October 3, 1968. Since the grand jury minutes were not transcribed (delivery and transcription were waived by the defendants), this Court is not aware of what, if anything, was presented to the grand jury.[1] The only description of any false and fraudulent pretenses is the enumeration, in substance, of the (a), (b), (c) and (d) of the stipulation.

[1]  Although a Postal Inspector apparently testified before the grand jury, the stipulation obviously must have been considered by it.

With lightning speed Regent and Oxford pleaded not guilty and waived jury trial. The trial commenced and concluded on October 16, 1968. The government's case consisted entirely of the defendants' stipulation. The reaction, if any, of any customers to the representations or the effect, if any, of such reaction on the commercial transactions was not revealed. On the stipulation the government rested its case. Decision of the motion for acquittal was reserved.

For its defense, the accused corporations called the president of Regent, Harold Hartwig, who testified that the firms sell well-known, nationally advertised brands of stationery, such as Swingline staples, Faber pencils, Perma- **\*1177** Write pens, etc., and some paper to large users among

which are corporations such as Goodyear, General Electric and Rexall; that many of these customers provide a large volume of reorder business; that the Regent-Oxford enterprise has over 20,000 customers; that sales are made exclusively through their customers' purchasing agents; that the false representations listed in the stipulation were made as a preliminary part of the salesmen's solicitation; that price and quality of the merchandise are always discussed honestly; that the price offered has been lower than the purchasing agent is or was paying at the time of the solicitation; that the goods could be returned if found to be unsatisfactory; and that when a complaint is made an additional discount is offered to induce the customer to keep the goods.

Cross-examination elicited that visits to the Regent-Oxford offices had been made by the Better Business Bureau and by a Post Office Inspector; that the 'lies' were to 'get by' secretaries on the telephone and to get 'the purchasing agent to listen to our agent'; and that for business reasons various fictitious names were used both for their companies in different localities and for individuals. A Postal Inspector then testified for the government as to an interview with Hartwig in which the description of the sales method used was merely reiterated.

The trial transcript reveals that following the presentation of this minimal evidence, some sixty pages of argument between court and counsel ensued, during which many hypothetical fact situations were posed, none of which are found in any testimony by salesmen or customers. The government advanced several theories. 'The primary harm is in the circumstance of the person who is selling stationery in a legitimate way.' (What might be the 'legitimate way' was never disclosed.) Another 'primary theory' was that 'the person who is purchasing the item is also defrauded in another way, that he is entitled to give his patronage based on honest information, and if he wants to do somebody a favor and use his buying power for a charitable purpose or to reward his friends, he is entitled to do that, and not to be misled.' (Again there was no proof of any such situation.) The government immediately backed away from 'fraud' by relying on the disjunctive 'false pretenses' language of the statute and when questioned by the trial court as to whether this would not be 'the first time that there would be any judicial decision on obtaining property by false pretenses where there was no pecuniary harm done to the person from whom the property was obtained' replied, 'On the precise facts, this would be a case of first impression,' and straightway turned to a case involving 'charitable contributions.' (United States v. Roth, 285 F.Supp. 364 (S.D.N.Y.1968)).

The government throughout insisted that what these purchasing agents 'were after was to give business to a friend and/or to someone whose relatives had died.' (No proof of this assumption appears in the record.) Little wonder that the trial court, with no factual background available, said, 'It is pretty hard for me to pass on the question of whether the scheme was illegal or not, if I don't know what it was.'

The Opinion Below

The trial court found that the defendants' conduct constituted a 'scheme to defraud' but that there was 'no evidence that defendants intended to get 'something for nothing,' United States v. Harrison, (Harrison v. United States) 200 F. 662 (6th Cir. 1912) from the customer or that any of their customers failed to receive merchandise of the quality promised.' However, after thoroughly analyzing the many mail fraud cases, the court found the defendants guilty as charged. They received minimal fines for their violations, but they press this appeal because they are obliged to, in their words, 'as a matter of their sheer business survival.'

**\*1178** The Post-Verdict Motion

Faced with disapproval of their business practices in such annoyingly concrete form as an actual criminal conviction, it suddenly dawned on the Regent-Oxford strategists that 'this case possesses an apparently unique feature whose import defense counsel did not perceive until re-study of the case,' namely, that it was not a 'case or controversy' after all and they were 'not aware that the federal criminal prosecutive jurisdiction may be set in operation in this manner,' the 'manner' being the 'stipulation-indictment' procedure, an 'ill-conceived purpose to obtain a constitutionally impermissible 'advisory opinion' from this Federal District Court' and that defendants, 'finding themselves bedeviled by innovation-minded government officers, desired to find out where they stood and so the defendants joined hands with the government in practically writing their own 'test case' indictment, both sides thus cooperating to get an 'advisory opinion' from a United States District Court.'

Were there not important issues here presented having serious commercial consequences, it might seem advisable to let the defendants suffer from their 'imprudently avid' plan to obtain an advisory opinion by allowing the conviction to stand. However, cases 'of first impression' have an obvious potential for creating precedents which might have far-reaching consequences, and we are not prepared to declare ourselves in favor of the departure in fraud prosecutions

such a conviction might import on the hastily gathered and incomplete evidence before us in this case. The indictment was a skeleton at best and the stipulation did little to clothe it. Without a fuller factual disclosure than here afforded, we are confronted with the proposition of simply declaring that any untrue statement designed to obtain the sympathetic ear of a potential customer comes within the purview of the mail fraud statute. We believe it prudent to avoid this pitfall. To illustrate the dangers of rendering such an advisory opinion in this field:

(1) A salesman telephones saying 'I am calling long distance from Chicago. I would like to speak to Mr. X (the purchasing agent).' Impressed by the long distance call the secretary puts Mr. X on the phone and as a result of the favorable offer the salesman then makes, he obtains an order. The salesman is sitting at his desk in New York- not in Chicago.

(2) A salesman tells a potential customer 'we have an overly large inventory which must be reduced. For this reason I can give a very low price on nationally known merchandise.' The inventory is in fact not large at all.

(3) The salesman says to the secretary 'I am a very good friend of Mr. X (one of the company's officers).' The secretary puts the purchasing agent on the wire, and an order is successfully solicited. The salesman is not a very good friend and only met Mr. X once and quite casually at a cocktail party.

The courts cannot dwell in their ivory towers without descending occasionally into the market place where they will see day after day such signs as 'GOING OUT OF BUSINESS IN 30 DAYS'; 'FIRE SALE'; 'BANKRUPTCY SALE' and many others designed to catch a prospective purchaser's eye. Query whether the word 'defraud' covers or was intended to cover these inducements to enter into purchase transactions in which quality merchandise is acquired at discount prices. And yet the 30 days come and go, the fire, if any, is very inconsequential and only a portion of the goods was acquired from bankruptcy.

A resolution of all these hypothetical situations must await some future case. We simply note them here to demonstrate the dangers of rendering a decision on such speculative evidence as is presented by the stipulation procedure here, particularly where we are asked, in effect, to give approval or disapproval to the myriad of sales pitches used for various **\*1179** purposes in the diversified world of commerce.

 [1]   For the present, we must decide initially whether there is jurisdiction over this case. What proof the government might have produced before the grand jury but for the stipulation we

will never know. We do know, however, that an indictment was returned and that the case was submitted as an adversary proceeding. Borderline though this case may be we hold that there was jurisdiction.

## II. USE OF THE MAILS

Upon the stipulated facts, the only connection with the United States mail in the Regent-Oxford operation was the routine billing and receipt of money in consummation of the sales resulting from the deceptive initial contacts. Since the false representations were made in telephone conversations and not in correspondence carried through the mails, appellant argues that the jurisdictional element of the crime of mail fraud- use of the mails- is absent, and thus no jurisdiction exists under the mail fraud statute to prosecute them for their wilful misrepresentations.

 [2]  [3]   The language of the statute itself prescribes criminal jurisdiction of a very broad scope, including the act of taking or receiving 'any matter or thing whatever' through the mail 'for the purpose of executing' a scheme or artifice to defraud. That receipt of money in consummation of a scheme to defraud falls within the meaning of that language was firmly settled by the Supreme Court in Pereira v. United States, 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435 (1954). In Pereira, the government proved that the defendants were given a check, drawn on a California bank, by the victim of their confidence scheme. By presenting the check for payment at a bank in El Paso, Texas and collecting the proceeds, defendants 'caused' the check to be sent through the mails, since transmission of the item by mail between the banks was the reasonably foreseeable result of its presentation for payment. Thus prosecution of the fraud was cognizable under section 1341, because the mails were put in the service of defendants, however indirectly, in furtherance of their fraud. Considerably more direct use of the United States mail service was reasonably foreseeable in the normal course of the Regent-Oxford business operation, and the jurisdictional element of the crime is amply established by the facts stipulated.

## III. SCHEME TO DEFRAUD

 [4]  [5]   The important substantive question on this appeal is: Does solicitation of a purchase by means of false representations not directed to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the bargain, constitute a 'scheme to defraud' or 'obtaining money by false pretenses' within the prohibition of 18 U.S.C. §

1341? We hold that, as here presented, it does not and the convictions should be reversed. We do not, however, condone the deceitfulness such business practices represent nor do we approve the cynical view advanced in defendants' rhetorical flourishes that such blatant dishonesty should be encouraged by reason of its 'social utility' and 'social necessity * * * in keeping with the most praiseworthy standards of business morality and worthy competitive enterprise.' We do not find the practices defended by counsel to be 'innocuous' or conduct 'which at worst may evoke in the breast of the perfectionistic moral idealist a sense of reproach towards the imperfections of man's soul during the mortal span.' On the contrary, we find these 'white lies' repugnant to 'standards of business morality.' Nevertheless, the facts as stipulated in the case before us do not, in our view, constitute a scheme to defraud or to obtain money by false pretenses punishable under section 1341. But this is not to say that we could not, on different facts or more specific proof, arrive at a different conclusion.

The case presented by the Regent-Oxford operation is unique (as the government, **1180 in effect, concedes) among prosecutions for violation of section 1341. The most nearly analogous cases sustaining convictions for mail fraud have involved sales tactics and representations which have tended to mislead the purchaser, or prospective purchaser, as to the quality or effectiveness of the thing being sold, or to mislead him with regard to the advantages of the bargain which should accrue to him. Thus claims or statements in advertising may go beyond mere puffing and enter the realm of fraud where the product must inherently fail to do what is claimed for it. United States v. Andreadis, 366 F.2d 423 (2d Cir. 1966), cert. denied, 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967) (claim that 'Regimen Tablets' could reduce weight without dieting contradicted scientific evidence); United States v. New South Farm and Home Company, 241 U.S. 64, 36 S.Ct. 505, 60 L.Ed. 890 (1916) (false representations regarding climate, ability to grow crops, and expected future improvements in promotion of land sales); Wilson v. United States, 190 F. 427 (2d Cir. 1911) (sale of intrinsically worthless stock). And promotion of an inherently useful item may also be fraud when the scheme of promotion is based on claims of additional benefits to accrue to the customer, if the benefits as represented are not realistically attainable by the customer. United States v. Armantrout, 411 F.2d 60, 64 (2d Cir. May 16, 1969) (carpet sold at inflated price on customer's expectation that defendant's 'chain referral' scheme would return purchase price and produce profit for him); United States v. Baren,

305 F.2d 527 (2d Cir. 1962) (promotion of knitting machines on representation that women customers could easily make complicated knitted garmets for profitable resale, after it became known that average prospects could not so operate them). But see United States v. Rabinowitz, 327 F.2d 62 (6th Cir. 1964) (similar knitting machine promotion- conviction reversed for insufficiency of evidence to establish intent to defraud).

The government does not contend that the Regent-Oxford agents made any false representations regarding the quality or price of their nationally advertised merchandise. Nor is there any suggestion of material benefits which the customer might expect from the transaction beyond the inherent utility of the goods purchased and the discount price at which they were offered. Thus the present case cannot fall within either of the classes of commercial fraud cases we have previously considered. We must, therefore, examine the government's theory that fraud may exist in a commercial transaction even when the customer gets exactly what he expected and at the price he expected to pay. The government argues that the business conduct of the defendant corporations, as evidenced by the stipulation of false representations, constitutes fraud despite the absence of any evidence of tangible harm suffered by customers because of the bargain struck through the defendants' solicitations. Its argument, we believe, is grounded in a misplaced emphasis on the language, rather than the substance, of a long line of mail fraud cases.

[6] [7] [8]   It is generally stated that there are two elements to the offense of mail fraud: use of the mails and a scheme to defraud. Since only a 'scheme to defraud' and not actual fraud is required for conviction, we have said that 'it is not essential that the Government allege or prove that purchasers were in fact defrauded.' United States v. Andreadis, 366 F.2d 423, 431 (2d Cir. 1966). But this does not mean that the government can escape the burden of showing that some actual harm or injury was contemplated by the schemer. Proof that someone was actually defrauded is unnecessary simply because the critical element in a 'scheme to defraud' is 'fraudulent intent,' Durland v. United States, 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709 (1896), and therefore the accused need not have succeeded in his scheme to be guilty of the crime. E.g., *1181 Pritchard v. United States, 386 F.2d 760 (8th Cir. 1967); Adjmi v. United States, 346 F.2d 654 (5th Cir. 1965). But the purpose of the scheme 'must be to injure, which doubtless may be inferred when the scheme has such effect as a necessary result of carrying it out.' Horman v. United States, 116 F. 350, 352 (6th Cir. 1902). Of course proof that someone was actually victimized by the fraud is good evidence of the schemer's intent.

The government has offered no direct proof that any customer was actually defrauded by the Regent-Oxford selling campaign. Instead it offers a stipulation which shows that false representations were made, and that they were made by defendants' agents with knowledge of their falsehood. As a result of the transactions of which the untrue statements were a part, money and property changed hands. With no further proof, the government urges upon us the inference that customers were induced to part with their money because of the false representations, and that such calculated inducement amounted to fraud in the terminology of section 1341. The defendants helped the government over the difficult hurdle of proving that the false representations were 'reasonably calculated' to induce purchasing agents of 'ordinary prudence,' see Silverman v. United States, 213 F.2d 405, 407 (5th Cir. 1954), to buy their wares by admitting in writing that the representations were made to secure sales. On this stipulation an intent to deceive, and even to induce, may have been shown; but this does not, without more, constitute the 'fraudulent intent' required by the statute.

If there is no proof that the defendants expected to get 'something for nothing,' Harrison v. United States, 200 F. 662 (6th Cir. 1912) or that they intended to get more for their merchandise than it was worth to the average customer, it is difficult to see any intent to injure or to defraud in the defendants' falsehoods. Instead of offering proof of some tangible injury to the objects of the Regent-Oxford promotion, the government argues in the negative that 'it is not essential * * * (to) * * * prove that purchasers were in fact defrauded,' United States v. Andreadis, supra, and therefore that 'pecuniary loss' need not be shown for fraud to exist. It may be true, as Judge Learned Hand stated in United States v. Rowe, 56 F.2d 747, 749 (2d Cir. 1932), that:

* * * (a) man is none the less cheated out of his property, when he is induced to part with it by fraud, because he gets a quid pro quo of equal value. It may be impossible to measure his loss by the gross scales available to a court, but he has suffered a wrong; he has lost his chance to bargain with the facts before him.

Nevertheless, neither the Rowe case nor the language quoted will support the conclusion that no definable harm need be contemplated by the accused to find him guilty of mail fraud. For that is what the government is arguing: that these false representations, in the context of a commercial transaction, are per se fraudulent despite the absence of any

proof of actual injury to any customer. In the Rowe case, although the court felt that it was not necessary to measure the victims' loss in pecuniary terms, the injustice done was very real and made itself felt in the victims' pocketbook. The scheme as it was outlined in the opinion showed that the defendants, on the basis of gross misrepresentations of the value of certain pieces of land as well as a complicated structure of supporting false representations, had persuaded their victims to part with substantial sums of money in return for essentially worthless property. There was no question that the principal fraud lay in the defendants' representations that the property was worth much more than they knew it was in fact worth, thereby inducing the victims to part with their money on the basis of the inflated valuation, together with the other fabrications they wove for their purchasers. Although the land sold had some inherent utility, the false representations **1182** grossly misled the victims of the scheme with regard to the bargain they were induced to enter by the representations. The defendants' representations regarding the value of the lots were unquestionably false representations of fact material to the bargain. Although the victims got something for their money- thus there was a quid pro quo- they were cheated out of the additional pecuniary benefits which the false representations led them reasonably to expect. Thus, taken in its factual context, the formulation of law stated in the Rowe decision was perfectly accurate in affirming that a wrong has been suffered when a man is deprived of his chance to bargain 'with the facts before him' where the absent facts are facts material to the bargain he is induced thereby to enter.

 [9]     [10]    We believe this to be a correct interpretation of Rowe, because we have found no case in which an intent to deceive has been equated with an 'intent to defraud' where the deceit did not go to the nature of the bargain itself. Where the false representations are directed to the quality, adequacy or price of the goods themselves, the fraudulent intent is apparent because the victim is made to bargain without facts obviously essential in deciding whether to enter the bargain. In closer cases, where the representations do not mislead as to the quality, adequacy of inherent worth of the goods themselves, fraud in the bargaining may be inferable from facts indicating a discrepancy between benefits reasonably

anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver. United States v. Baren, supra; see United States v. Andreadis, 366 F.2d at 431. In either instance, the intent of the schemer is to injure another to his own advantage by withholding or misrepresenting material facts. Although proof that the injury was accomplished is not required to convict under 1341, we believe the statute does require evidence from which it may be inferred that some actual injury to the victim, however slight, is a reasonably probable result of the deceitful representations if they are successful. See Horman v. United States, 116 F. 350, 352 (6th Cir. 1902).

 [11]    The Regent-Oxford agents did not attempt to deceive their prospective customers with respect to the bargain they were offering; rather, they gave a false reason for being able to offer the bargain. There was no substitution of merchandise contrary to the customer's understanding of the offer, and no 'quid pro quo of equal value' exchanged for the customer's money which did not meet his reasonable expectations. No customer testified that he felt he had been cheated. The government asks us to infer some injury from the mere fact of the falseness of the representations and their connection with a commercial transaction. On the evidence before us, consisting principally of the stipulated falsehoods and the testimony of the defendants' president, we conclude that the defendants intended to deceive their customers but they did not intend to defraud them, because the falsity of their representations was not shown to be capable of affecting the customer's understanding of the bargain nor of influencing his assessment of the value of the bargain to him, and thus no injury was shown to flow from the deception.


Having concluded that the conduct described in the defendant corporations' admissions and stipulations of fact does not come within the prohibition of the mail fraud statute, we need not pass upon their arguments with respect to the power of Congress under the Constitution to proscribe such deceitful business methods by appropriate legislation. Because the skeletal facts presented by the stipulation do not evidence a fraudulent scheme within the meaning of 18 U.S.C. § 1341, the convictions are reversed.

---

**End of Document**                    © 2013 Thomson Reuters. No claim to original U.S. Government Works.