UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| | |
|---|---|
| Case No.    CV 13-0779-DOC(JCGx) | Date    July 8, 2013 |

Title    UNITED STATES OF AMERICA -V- MCGRAW-HILLCOMPANIES, INC., ET AL.

Present: The Honorable        DAVID O. CARTER, United States District Judge

| Julie Barrera | Debbie Gale, Maria Dellaneve | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| James Nelson | John Keker, Steven Taylor |
| George Cardona | Paven Malhotra, Jennifer Keller |
| Anoiel Khorshid | Floyd Abrams, Penny Windle |

Proceedings:        DEFENDANTS' MOTION TO DISMISS THE COMPLAINT [16]

SCHEDULING CONFERENCE

Tentative Ruling issued, of which a copy is attached hereto.

The case is called and counsel make their appearances.  The Court hears argument on Defendant's Motion to Dismiss and the matter is trailed to 3:00 p.m.

Later in the P.M., the case is recalled.  The Court continues to hear argument on Defendant's Motion to Dismiss.  The Court takes the matter under submission.

The Scheduling Conference is continued to July 29, 2013 at 3:00 p.m.

| | | |
|---|---|---|
| | Mtn to Dism | 3: 29 |
| | Sched Conf | : 05 |
| Initials of Clerk | jcb | |

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| **UNITED STATES,** | **Case No.: SACV 13-779 DOC(JCGx)** |
| **Plaintiff,** | |
| **vs.** | **[Tentative] ORDER DENYING DEFENDANTS' MOTION TO DISMISS** |
| **McGRAW-HILL COMPANIES, INC.; STANDARD AND POORS FINANCIAL SERVICES LLC,** | |
| **Defendants.** | |

_____

Before the Court is a Motion to Dismiss Complaint (Dkt. 16) filed by Defendants McGraw-Hill Companies, Inc., and Standard and Poors Financial Services LLC ("Defendants" or "S&P"). After considering all briefing in support of this motion and in opposition, the Court [tentatively] DENIES Defendants' motion.

**I.      Background**

This is a case about credit ratings—how they are created, whose interests they serve, and how they may or may not have been manipulated during the period leading up to this country's financial meltdown.

The following factual background is based on the government's complaint ("Compl.") (Dkt. 1).

### a.  Credit Ratings

Specifically, this case involves S&P, one of the three major credit rating agencies in the United States, and the ratings that it issued for certain structured debt securities: Residential Mortgage Backed Securities ("RMBSs"), which are collateralized by pools of residential mortgage loans, and Collateralized Debt Obligations ("CDOs"), which are collateralized by pools of other debt securities that often include RMBSs.  *See* Compl. ¶ 2.

During the period relevant to this case, from 2004 through 2007, the issuers of RMBSs and CDOs would structure different classes of notes, or "tranches," securitized by the RMBSs and CDOs, and then these issuers would pay S&P (or a rival agency) to provide letter-grade credit ratings for each tranche based on its creditworthiness.  *Id.* ¶¶ 2-4.  Ratings ranging from AAA, the highest, to D, the lowest, were issued publicly and published to S&P's website.  *Id.* ¶¶4-5.  Ratings were important, because a system of "subordination" between tranches meant that more senior tranches, with higher credit ratings but lower interest rates, paid out to investors before more junior tranches, which typically had lower credit ratings and higher interest rates based on the risk associated with heightened likelihood of default.  *Id.* ¶23.

Investors in the tranches included federally insured financial institutions, and they relied S&P's credit ratings to "identify and compare credit risks" between tranches; most financial institutions would avoid investing in tranches with ratings lower than BBB-.  *Id.* ¶¶ 5-6.  In

addition, the United States Securities and Exchange Commission ("SEC") identified S&P as a Nationally Recognized Statistical Rating Organization ("NRSRO") based on SEC's determination that S&P was known for credible and reliable ratings. *Id.* ¶ 36. As of June, 2007, NRSRO status was based, in part, on S&P's submission to SEC of its "Code of Conduct" to address questions about the management of "conflicts of interest." *Id.* ¶ 38.

### b. Allegations of manipulation and misrepresentation

Despite the conflicts of interest that arose from S&P accepting and relying on fees from CDO and RMBS issuers in order rate those same CDOs and RMBSs, S&P publicly stated that it had "established policies and procedures to address the conflicts of interest through a combination of internal controls and disclosure." Compl. ¶ 111(a). Specifically, those policies were laid out in various "Codes of Conduct" and official policy statements. *See id.* ¶¶ 111-117 (describing September 2004 "Code of Practices and Procedures," October 2005 and June 2007 versions of "Code of Conduct," November 2005 "Analytic Firewalls Policy," February 2006 "Report on Implementation of S&P's Rating Services Code of Conduct").

Regarding issuer fees, S&P stated "that Rating Services receives a fee from the issuer must not be a factor in the decision to rate an issuer or in the analysis and the rating opinion," Compl. ¶ 111(c); that ratings "criteria and methodology shall be determined solely by [S&P's] Analytics Policy Board and Analysts," Compl. ¶ 111(d); that ratings "shall not be affected by an existing or a potential business relationship between Rating Services (or any Non-Ratings Business) and the issuer or any other party, or the non-existence of such a relationship," Compl. ¶ 111(e); that "Ratings Services shall not forebear or refrain from taking a Rating Action, if appropriate, based on the potential effect (economic, political, or otherwise) of the Rating Action on Ratings Services, an issuer, an investor, or other market participant," Compl. ¶ 115(b); and that "[i]n no circumstances shall an employee of Standard & Poor's/McGraw-Hill try to influence the opinion

of an Equity Analyst or a Ratings Analyst by referring to the commercial relationship between Standard & Poor's/McGraw-Hill and any third party," Compl. ¶ 116.

Regarding the ratings themselves, S&P stated that they represented the "current opinions regarding the future creditworthiness of issuers or issues," and the "likelihood that payments of principal and interest will be made on a timely basis in accordance with the terms of the obligations." Compl. ¶¶ 121, 122 (identifying "Terms and Conditions" attached to credit rating letters, various codes of conduct, statements made by S&P executives to the U.S. Senate, and statements to investors reaffirming that ongoing monitoring ensured credit ratings reflected current views of creditworthiness).

Beginning in 2007, however, the government's complaint identifies numerous specific occasions when S&P issued or confirmed ratings that did not accurately reflect true credit risks. Compl. ¶¶ 234(a)-(d), 236(a)-(b), 238(a)-(d), 241(a)-(e), 244(a)-(b), 261(a)-(e), 269(a)-(c). These sections of the complaint describe and quote S&P documents showing that S&P knew that certain classes of high-risk RMBSs that backed CDOs were rapidly deteriorating and were expected to be downgraded, that the deterioration of these classes of non-prime RMBSs would affect the credit risks of these CDOs, that the ratings of these CDOs were not adjusted to account for the deterioration of these classes of nonprime RMBS, and that S&P nonetheless issued the ratings for these CDOs. *See id.*

The details of these alleged misrepresentations are laid out in the government's complaint. First, the government alleges that ratings on the assets underlying a CDO were the most important factor in the CDO rating and were a primary input in S&P's CDO rating model. Compl. ¶¶ 91, 94-95. However, in early 2007, S&P recognized that the ratings of "later-vintage mezzanine SF CDOs" would be "closely linked to the performance of mezzanine ('BBB' and 'BB'rated) tranches of Subprime RMBS transactions, which makes up the majority of collateral for these transactions," and thus that downgrades of this collateral should negatively affect the

-4-

ratings of the CDOs. Compl. ¶¶ 215, 216, 229; *see also* Compl. ¶ 233(i) (March 19, 2007, internal presentation recognizing "There will be some impact to CDOs as RMBS has been a growing source of collateral").  Non-prime RMBSs rated BBB and below made up large portions of the collateral for certain CDOs cited as specific examples by the government.  *See, e.g.*, Compl. ¶ 241(b).

While internal S&P analyses showed the continuing deterioration of non-prime RMBSs, and indicated  that, starting in March 2007, negative rating actions were anticipated  for, in particular, non-prime RMBSs rated BBB and below, Compl. ¶¶ 208-210, 233(g), 233(h), 235(b), 235(d), 237(a), 237(c), 237(d), 239(c), 239(d), 239(i), S&P executives who wanted to take advantage of the record profits that were coming in prevented analysts from issuing credit ratings that accurately represented the falling creditworthiness of CDOs backed by RMBSs.  *See* Compl. ¶ 211 (from Fall 2006 through Spring 2007, the executive in charge of RMBS Surveillance "regularly expressed frustration to her colleagues that, notwithstanding the dire performance of subprime RMBS, she was prevented by [S&P executives] from downgrading the ratings of subprime RMBS because of concern that S&P's ratings business would be affected if there were severe downgrades").

Throughout spring and summer of 2007, S&P executives regularly revised the methods used to generate CDO rating models to ensure that those rating models would be "business friendly." Compl. ¶¶ 189-198.   While S&P analysts insisted that non-prime RMBS ratings "would not hold," S&P continued to use those RMBS ratings, without adjustment, to issue and confirm CDO ratings. Compl. ¶¶ 234, 236, 238, 240-241.  As late as June and early July 2007, after S&P made the decision to institute large-scale negative rating actions on non-prime RMBS, and despite the recognition that those pending negative rating actions would affect CDOs with exposure to non-prime RMBS, S&P continued to rate such CDOs using non-prime RMBS ratings without any adjustments.  Compl. ¶¶ 243-244, 261.

### c.  The current complaint

Pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1833a, the government seeks to obtain civil penalties for S&P's violations of three criminal fraud statutes: 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud); and 18 U.S.C. § 1344(1), (2) (financial institution fraud).

Defendants filed their motion to dismiss on April 22, 2013.  The government filed its opposition (Dkt. 20) on May 20, 2013.  Defendants filed a reply (Dkt. 21) on June 3, 2013.  Oral arguments were held on July 8, 2013.

## II.    Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed when a plaintiff's allegations fail to state a claim upon which relief can be granted.  Dismissal for failure to state a claim does not require the appearance, beyond a doubt, that the plaintiff can prove "no set of facts" in support of its claim that would entitle it to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561 (2007) (abrogating *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). In order for a complaint to survive a 12(b)(6) motion, it must state a claim for relief that is plausible on its face.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009).  A claim for relief is facially plausible when the plaintiff pleads enough facts, taken as true, to allow a court to draw a reasonable inference that the defendant is liable for the alleged conduct.  *Id.* at 1949.  If the facts only allow a court to draw a reasonable inference that the defendant is possibly liable, then the complaint must be dismissed.  *Id.*  Mere legal conclusions are not to be accepted as true and do not establish a plausible claim for relief.  *Id.* at 1950.  Determining whether a complaint states a plausible claim for relief will be a context-specific task requiring the court to draw on its judicial experience and common sense.  *Id.*

In evaluating a 12(b)(6) motion, review is "limited to the contents of the complaint." *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754 (9th Cir. 1994).  However, exhibits attached

to the complaint, as well as matters of public record, may be considered in determining whether dismissal was proper without converting the motion to one for summary judgment. *Parks School of Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).   Further, a court may consider documents "on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).   "The Court may treat such a document as 'part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6).'" *Id.* (quoting *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003)).

## III.    Discussion

Defendants claim that, because the government's complaint "fails to allege a cognizable theory under the fraud statutes," and because this civil action under FIRREA must be tied to the violation of a criminal fraud statute, the entire complaint must be dismissed.  Mot. at 6. Defendants provide three arguments in support of this contention.  First, they argue that the allegedly fraudulent statements identified by the government's complaint are not actionable because they consist of generalized aspirational language and "puffery."  *See* Mot. at 6-11. Second, they argue that the government's complaint fails to plead facts showing that S&P's credit ratings were, objectively or subjectively, false and misleading.  *See* Mot. at 11-18. Finally, they argue that the government's complaint fails to plead that Defendants had "the requisite culpable state of mind" to have violated the fraud statutes, specifically, that Defendants had "the intent to obtain money or property *from the parties who allegedly were deceived*—the investors in the CDOs identified in the Complaint."  Mot. at 19.  This order addresses each argument in turn.

### a.  Puffery and aspirational exhortations

Defendants claim that, out of all the public statements that S&P made to investors, issuers, regulators, and legislators regarding the company's procedures for providing objective, data-based credit ratings that were unaffected by potential conflicts of interest, not one statement should have been relied upon by investors, issuers, regulators, or legislators who needed to be able to count on objective, data-based credit ratings.

Defendants correctly note that a "general, subjective claim about a product is non-actionable puffery." Mot. at 7 (quoting *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1053 (9th Cir. 2008)). The case that Defendants cite for this proposition is instructive; in *Newcal*, the Ninth Circuit held that the plaintiff lessors of the defendant IKON's copier equipment could not rely on the defendant's statement "that IKON [] would deliver 'flexibility' in their 'cost-per-copy' contracts and that they would lower copying costs for consumers," since that statement "is a general assertion that IKON provides its customers with low costs and with flexibility." 513 F.3d at 1053. The court explained, "[a] statement is considered puffery if the claim is extremely unlikely to induce consumer reliance." *Id.*

Similarly, Defendants argue that statements "couched in aspirational terms" cannot be the basis of a fraud claim. Mot. at 7 (quoting *In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1072 (C.D. Cal. 2012)). The plaintiffs in *American Apparel* relied heavily on "words like 'pursuing,' 'looking to build,' 'going to be' and committed to'" in their complaint, and the court held that the defendant company was "not making factual statements about the current status of its financial compliance" and so could not be held liable for false statements. *Id.* at 1072. However, the court in *American Apparel* went on provide examples of the "type of facts regarding internal controls and financial conservatism that should be alleged to survive a motion to dismiss," including "statements that attest[ed] to [defendant's] progressively riskier loan origination practices . . . [and] data, that corroborate[d] the witnesses," along with "allegations that the defendant had actually loosened *its own* underwriting standards." *Id.* at 1074 (emphasis

-8-

in original) (citing *In re New Century,* 588 F.Supp.2d 1206 (C.D.Cal.2008); *Atlas v. Accredited Home Lenders Holding Co.,* 556 F.Supp.2d 1142 (S.D.Cal.2008)).

In contrast to the defendant in *Newcal* and *American Apparel*, and much more like the defendants in *New Century* and *Atlas*, S&P stands accused of fashioning a unified public image of trustworthiness backed by specific statements designed to induce consumers to rely on the objectivity of its ratings.  S&P's statements were not a "general, subjective claim" about the avoidance of conflicts of interest, but rather a promise that it had "established policies and procedures to address the conflicts of interest through a combination of internal controls and disclosure." Compl. ¶ 111(a).  Specific examples of these policies and procedures make up the bulk of the government's complaint, and they appear designed to induce reliance on current policies and practices. *See, e.g., id.* ¶¶ 111-117 (describing September 2004 "Code of Practices and Procedures," October 2005 and June 2007 versions of "Code of Conduct," November 2005 "Analytic Firewalls Policy," February 2006 "Report on Implementation of S&P's Rating Services Code of Conduct").

Examples of Plaintiff's detailed pleadings include:

> (1) "that Rating Services receives a fee from the issuer must not be a factor in the decision to rate an issuer or in the analysis and the rating opinion," Compl. ¶ 111(c);
>
> (2) ratings "criteria and methodology shall be determined solely by [S&P's] Analytics Policy Board and Analysts," Compl. ¶ 111(d);
>
> (3) ratings "shall not be affected by an existing or a potential business relationship between Rating Services (or any Non-Ratings Business) and the issuer or any other party, or the non-existence of such a relationship," Compl. ¶ 111(e);
>
> (4) "Ratings Services shall not forebear or refrain from taking a Rating Action, if appropriate, based on the potential effect (economic, political, or otherwise) of the

Rating Action on Ratings Services, an issuer, an investor, or other market participant," Compl. ¶ 115(b);

(5) "In no circumstances shall an employee of Standard & Poor's/McGraw-Hill try to influence the opinion of an Equity Analyst or a Ratings Analyst by referring to the commercial relationship between Standard & Poor's/McGraw-Hill and any third party," Compl. ¶ 116;

(6) that ratings represented S&P's true, accurate, and current opinion of credit risks, that is, the "likelihood that payments of principal and interest will be made on a timely basis in accordance with the terms of the obligations." Compl. ¶¶ 121, 122.

Despite Defendants' protestations to the contrary, the Court cannot find that all of these "shalls" and "must nots" are the mere aspirational musings of a corporation setting out vague goals for its future. Rather, they are specific assertions of current and ongoing policies that stand in stark contrast to the behavior alleged by the government's complaint. For example, the complaint alleges:

(1) to preserve market share and ratings fees, S&P delayed and watered down updates to the model used to rate RMBS, Compl. ¶¶ 133-157;

(2) S&P altered the model used to rate CDOs to protect S&P's market share in a segment of the CDO business, Compl. ¶¶ 161-171;

(3) S&P, in the words of one S&P executive, "toned down and slowed down," Compl. ¶ 178, the release of an update to its CDO rating model because issuers, such as Bear Stearns, told S&P that the updated version would cause S&P to lose certain business to competitor ratings agencies, Compl. ¶¶ 172-180;

(4) Patrice Jordan and David Tesher, both CDO group business heads, asked that a key assumption in determining the rating of a CDO be changed in an effort to achieve higher ratings for certain CDOs, Compl. ¶¶ 187-88;

(5) through the summer of 2007, S&P continued to explore business-needs motivated changes to its CDO rating model, Compl. ¶¶ 187-198; and

(5) S&P refrained from downgrading large numbers of 2006 RMBS transactions so that it could continue to assign high ratings to CDOs containing those assets to accommodate issuer interests and collect high rating fees, Compl. ¶¶ 200-241.

These statements are similar to defendant New Century's representations that it had loans of "higher credit quality," "improved underwriting controls and appraisal review process," "a strategy [of selecting borrowers with increasing credit scores]," "strict underwriting and risk management disciplines," and "better credit quality." *New Century*, 588 F. Supp. at 1225-26. The Plaintiff's allegations are also similar to those in *Atlas*, in which the defendant "allegedly deviated from its own underwriting guidelines." *Atlas*, 556 F.Supp.2d at 1152.

The issue of reliance also weighs heavily in favor of Plaintiff's arguments.  The government's complaint goes to great lengths to plead that S&P made specific representations knowing that they were material to and would be relied on by the investors who used their credit ratings to gauge the creditworthiness of potential investments. *See* Compl. ¶¶ 49(d), 50, 119(a), 119(c), 120(a)-(b), 270. The complaint quotes from internal documents suggesting that S&P knew that "investor perception that S&P's ratings accurately reflected credit risk was crucial to S&P's business." Compl. ¶ 50. The complaint also highlights how SEC approval of NRSRO status depended on S&P managing conflicts of interest, and that S&P executives made representations about objectivity to Congress in order to avoid stricter regulation of the issuer-pays model. *See* Compl. ¶ 38 (alleging that "in response to the SEC's request for '[p]olicies and procedures to address and manage conflicts of interest,' S&P provided, among other things, the June 2007 version of its Code of Conduct," which included many of the specific representations alleged throughout the complaint); *see also* 15 U.S.C. § 78o–7(h)(3); Compl. ¶¶ 119(b)-(d) (regarding congressional hearings).

-11-

Much of Defendants' argument is spent discussing *Boca Raton Firefighters and Police Pension Fund v. Bahash*, 506 Fed.Appx. 32, 39 (2d Cir. 2012), in which the Second Circuit affirmed the dismissal securities fraud claims made by S&P shareholders. Mot. at 9-11.  In that case, the court found that "the generic, indefinite nature of the statements at issue" the shareholder plaintiffs' complaint rendered them inactionable. 506 Fed.Appx. at 37.  The Court finds that this case is distinguishable for a number of reasons.  First, as described above, the here the government's complaint alleges specific, verifiable representations by S&P regarding the objectivity of its ratings, Compl. ¶¶ 111-122, specific facts showing that these representations were false and misleading, Compl. ¶¶ 123-269, and numerous examples of widespread reliance on S&P's claims of objectivity and accuracy.

In addition, *Boca Raton* was a suit brought by S&P shareholders.  Their interests in and reliance on S&P's representations regarding the accuracy of credit ratings are very different from those of the investors at issue in this case.  Indeed, the court in *Boca Raton* noted that, while executives were "alleged to have defrauded McGraw-Hill investors by acting 'to the benefit of the Company,'" such statements would "seem to negate" any intent to harm S&P's shareholders.  *Id.* at 39.  As the government points out, Defendant has failed to cite any court decision accepting S&P's argument that its representations regarding the objectivity and independence of its ratings are immaterial as a matter of law to the end users of those ratings.

**b.  The accuracy of S&P's credit ratings.**

Allegations of fraud must meet the requirements of Rule 9(b), which states that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." A complaint must include "the who, what, when, where, and how of the misconduct charged" as well as "what is false or misleading about [the purportedly

fraudulent] statement, and why it is false." *United States ex rel. Cafasso v. General Dynamics C4 Systems, Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011).

Defendants argue that "the Government has not sufficiently pled—because it cannot—that S&P's credit ratings were objectively false, nor that they were subjectively disbelieved by S&P when issued."  Mot. at 12 (citing *Rice v. Charles Schwab*, 2010 WL 5156654, at *3 (C.D. Cal. Oct. 22, 2010) (requiring that those "who published credit ratings actually knew the credit ratings were false or did not believe that the credit ratings were true at the time that each credit rating was issued")).  Defendants also cite *Space Coast Credit Union v. Merrill Lynch, Pierce, Fenner & Smith*, 2013 WL 1131628 (S.D. Fla. Mar. 18, 2013), in which a plaintiff credit union's fraud claim against S&P was dismissed because the complaint did "not identify any specific CDOs that contained the defective loans," and "even assuming that some unknown number of those loans was included in the CDOs at issue here, [plaintiff] has alleged no specific facts indicating that the loans changed the CDO notes' overall credit ratings." *Id*. at *6.

First, there is some dispute regarding whether or not the government was required to plead intent with a high degree of particularity.  While the Private Securities Litigation Reform Act ("PSLRA"), the statute frequently at issue in private securities fraud actions, imposes a heightened pleading standard with more "exacting requirements" for pleading falsity and requires a complaint to "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,'" *Metzler Inv. GMBH v. Corinthian Colleges, Inc*., 540 F.3d 1049, 1061, 1065-66, 1070 (9th Cir. 2008) (quoting 15 U.S.C. § 78(u)-4(b)(2); emphasis omitted), here the government's FIRREA claims are brought pursuant to the general fraud statutes that do not impose the same requirements as PSLRA; specifically, intent need not be pleaded with particularity. *See Odom v. Microsoft Corp*., 486 F.3d 541, 554 (9th Cir. 2007) (en banc) ("only aspects of wire fraud that require particularized allegations are the factual circumstances of the fraud itself"); *Genesee County Employees' Retirement System v.*

*Thornburg Mortg. Securities Trust 2006-3*, 825 F.Supp. 2d 1082, 1238-39 (D.N.M. 2011) ("The issue here is the Rating Agency Defendants' beliefs or knowledge, which falls within the second provision of rule 9(b).").

In any case, here the government has alleged with sufficient particularity that S&P's ratings were both objectively and subjectively false. While S&P spends a number of pages challenging the government's facts and arguing that any "internal squabbles about appropriate rating methodology" would not have resulted in materially false credit ratings, the Court finds that S&P largely identifies disputes of fact that are not appropriately decided at the motion to dismiss stage. It is clear that the government's complaint identifies and describes in detail examples of the CDOs for which S&P is alleged to have issued or confirmed ratings that did not accurately reflect their true credit risks. Compl. ¶¶ 234(a)-(d), 236(a)-(b), 238(a)-(d), 241(a)-(e), 244(a)-(b), 261(a)-(e), 269(a)-(c).

The complaint also describes, in comprehensive detail, S&P statements and documents showing that S&P had clear knowledge that CDOs were backed by deteriorating RMBSs, that such a change should have affected the credit rating of those CDOs, but that those credit ratings were not adjusted when S&P issued the ratings for these CDOs. The specifics are voluminous, and the complaint takes the time to allege, in a comprehensive fashion, how and why S&P's ratings were both false and material. Initially, the complaint alleges that ratings on the assets underlying a CDO were the most important factor in the CDO rating and were a primary input into the CDO rating model. Compl. ¶¶ 91, 94-95. According to the complaint, in early 2007, S&P recognized that the ratings of "later-vintage mezzanine SF CDOs" would be "closely linked to the performance of mezzanine ('BBB' and 'BB'rated) tranches of Subprime RMBS transactions, which makes up the majority of collateral for these transactions" and that downgrades of this collateral would affect the ratings of these CDOs. Compl. ¶¶ 215, 216, 229; *see also* Compl. ¶ 233(i) (March 19, 2007, internal presentation recognizing "There will be some impact to CDOs as RMBS has been a growing source of collateral").

Next, the complaint alleges that, from late 2006 through summer 2007, internal S&P analyses showed that non-prime RMBSs were growing less and less creditworthy, and specified that BBB-rated RMBSs and below would have to be downgraded. Compl. ¶¶ 208-210, 233(g), 233(h), 235(b), 235(d), 237(a), 237(c), 237(d), 239(c), 239(d), 239(i).  Regarding knowledge and intent, the government's complaint alleges that S&P executives, including David Tesher and Patrice Jordan, who oversaw the issuance of ratings for new CDOs, knew of these analyses and knew that such an accelerated downgrading should be reflected in any accurate credit rating. *See* Compl. ¶ 218 (on February 3, 2007, executive in charge of RMBS Surveillance sent to her immediate supervisor email stating: "I talked to [the executive in charge of Research and Criteria] yesterday and he thinks that the ratings are not going to hold through 2007"); Compl. ¶ 233(a) ("During conversations in or about March 2007, Jordan, Tesher, and other managers in Global CDO agreed that there were going to be significant negative Rating Actions on non-prime RMBS and that these negative Rating Actions would have a major impact on mezzanine cash CDOs.").  Consequently, the complaint alleges that S&P business executives and analysts knew as early as March 2007 that CDOs backed by deteriorating RMBSs should be downgraded.

S&P might disagree with the government's version of these facts, but the opportunity to challenge such facts comes later in the litigation process—the government has satisfied the heightened pleading standard of Rule 9(b) and has also sufficiently pleaded both objective falsity and subjective knowledge and intent.  While Defendants go on to argue that the government's complaint must also plead the "true credit risk associated with any of the 33 [CDOs] at the time S&P issued its credit rating," detail "the performance of the specific RMBSs contained in the CDOs at issue," and "identify how, if [at] all, the performance of the specific RMBSs contained in any of the CDOs identified should have actually impacted the rating of the CDO tranche at issue," Mot. at 12-13, the Court finds that such a level of detail at the pleading stage is neither required nor desired. *See Walling*, 476 F.2d at 397 (pleading rules are "designed

to avoid and reduce long and technical allegations" and Rule 9(b) "does not require nor make legitimate the pleading of detailed evidentiary matter"). Plaintiff has pleaded that each of these CDOs were "rated" with "ratings" that did not accurately reflect their creditworthiness, and consequently that these did not represent what S&P stated that they should.

Defendant's citation to *Space Coast* is not persuasive. The complaint in *Space Coast* failed to allege facts supporting the falsity of ratings related to the CDOs purchased by plaintiff. *See* 2013 WL 1131628, at *4, *6, *8 (dismissing a complaint that relied on working papers, academic articles, and government studies relating to rating agencies' general practices). Here, the government's allegations detail how S&P's ostensibly objective models were adulterated and how these changes resulted in credit ratings that were false and misleading. The complaint also alleges that these misrepresentations were made in order to further S&P's financial interests, and to obtain money from the issuers and the investors who relied on the objectivity of S&P's ratings. *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 178-79 (S.D.N.Y. 2009) (where rating agencies "knew that the ratings process was flawed, knew that the portfolio was not a safe, stable investment, and knew that [they] could not issue an objective rating because of the effect it would have on their compensation, it may be plausibly inferred that [they] knew they were disseminating false and misleading ratings").

### c. The required intent

Finally, Defendants argue that the complaint fails to allege that S&P acted "with the specific intent to obtain money or property *from the parties who allegedly were deceived*," the investors. *See* Mot. at 19. They argue that the Ninth Circuit requires an intent "to obtain money or property from the one who is deceived" as a prerequisite for a fraud claim. *See United States v. Lew*, 875 F.2d 219, 221 (9th Cir. 1989). The Court finds that the government's complaint has sufficiently alleged the required intent.

The underlying fraud claims that support the government's FIRREA action all require that a defendant  "specifically intend 'to deprive' the victim of money or property." 593 F.3d at 996; *United States v. Ciccone*, 219 F.3d 1078, 1082 (9th Cir. 2000) ("offense's specific intent element . . . require[s] proof of intent to deprive the victim of money or property"). Regarding the nature of that intent, the Court agrees with Plaintiffs that the Ninth Circuit has recognized that money need not flow "directly to the defendant from the party deceived by the defendant." *Ali*, 620 F.3d at 1064; *see also United States v. Dowie*, 411 Fed. Appx. 21, 27-28, 2010 WL 4904309, at **3 - **4 (9th Cir. 2010) ("defendant may be guilty of fraud where the deceived party is indirectly deprived of money or property as a result of the fraud"). In this case, the government has alleged that S&P both intended to (and did) obtain money from issuers that was constructively paid by the very investors who were deceived by false credit ratings.

First, the government alleges that S&P engaged in a "scheme to defraud investors in RMBS and CDO tranches" and "to obtain money from these investors by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts"with "intent to defraud" Compl. ¶ 7; see also Compl. ¶ 276.  Allegedly, S&P knew this scheme to defraud would result in S&P obtaining funds directly from the investors who were fooled by their ratings, since S&P charged its ratings fees to CDO issuers and "those issuers ordinarily did not bear the cost of the ratings fees. Instead, as S&P knew, the costs of those fees were passed through to the investors who purchased CDO tranches." Compl. ¶ 67(a), (b) (S&P's rating fees were paid "out of the gross proceeds from the sale to investors of [the CDO's] tranches").  The alleged motive for doing so was "to maintain and increase its share of the market for credit ratings of RMBS and CDOs and the high fees and profits those ratings generated," Compl. ¶ 124; *see also* Compl. ¶ 9.  Finally, the complaint alleges that S&P's executives knew of this investor-pays arrangement, quoting comments made by Joanne Rose, S&P's head of Structured Finance, to a group of institutional investor representatives:

"Investors need to publicly voice their opinions on issues like the

issuer pay model – *investors ultimately do pay* – since all deal fees
including rating fees are netted out of the total deal proceeds*."*

Compl. ¶ 67(c) (emphasis added).

The Court finds that Plaintiff has sufficiently pleaded the intent required to support its fraud claims.  Any dispute over the veracity of these claims, or contested facts, are properly challenged at a later stage of litigation.

**IV.    Disposition**

For the foregoing reasons, the Court hereby DENIES Defendants' motion.

DATED:

_____

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE