SACV 13-779-DOC - 07/08/2013 - VOL. 2

1              **UNITED STATES DISTRICT COURT**

2              **CENTRAL DISTRICT OF CALIFORNIA**

3         **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                  **CERTIFIED TRANSCRIPT**

5                   - - - - - - -

6   UNITED STATES OF AMERICA,          )
                                       )
7             PLAINTIFF(S),            )
                                       )
8        VS.                           ) NO. SACV 13-779-DOC
                                       )       VOL. 2
9   MCGRAW-HILL COMPANIES, INC. ET     )
    AL,                                )
10                                     )
              DEFENDANT(S).            )
11  _____)

12

13

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                SANTA ANA, CALIFORNIA

17                MONDAY, JULY 08, 2013

18

19

    *MARIA BEESLEY-DELLANEVE, RPR, CSR 9132*
20  *OFFICIAL FEDERAL REPORTER*
    *RONALD REAGAN FEDERAL BUILDING, ROOM 1-053*
21  *411 WEST 4TH STREET*
    *SANTA ANA, CALIFORNIA 92701*
22  *(714) 564-9259*

23

24

25

```
                SACV 13-779-DOC - 07/08/2013 - VOL. 2


 1   APPEARANCES OF COUNSEL:

 2   FOR THE PLAINTIFF:  ANDRÉ BIROTTE, JR.
                         UNITED STATES ATTORNEY
 3                       BY:  GEORGE CARDONA,
                              ANOIEL KHORSHID,
 4                       ASSISTANT UNITED STATES ATTORNEY
                         312 NO. SPRING STREET,
 5                       LOS ANGELES, CALIFORNIA 90012

 6

 7   FOR THE PLAINTIFF(S)  U.S. DEPT. OF JUSTICE
                           BY:  STUART DELERY, ESQ.
 8                         CIVIL DIVISION
                           P.O. BOX 261 BEN FRANKLIN STATION
 9                         WASHINGTON DC 20044
                           (202)616-0219
10

11   FOR THE DEFENDANT(S):   KEKER AND VAN NEST LLP
                             BY:   JOHN KEKER, ESQ.
12                           AND   PETER MALHOTRA
                             710 SANSOME STREET
13                           SAN FRANCISCO, CALIFORNIA 94111
                             (415)391-5400
14

15
     FOR THE DEFENDANT(S)  KELLER RACKAUCKAS
16                         BY:  JENNIFER KELLER, ESQ.
                           18300 VON KARMAN AVENUE
17                         SUITE 930
                           IRVINE, CALIFORNIA 92612
18

19   FOR THE DEFENDANT(S): CAHILL GORDON & REINDEL
                           BY:  FLOYD ABRAMS, ESQ.
20                         80 PINE STREET
                           NEW YORK NEW YORK 10005
21                         (212)701-3000

22

23

24

25
```

SACV 13-779-DOC - 07/08/2013 - VOL. 2

1      **SANTA ANA, CALIFORNIA, MONDAY, JULY 08, 2013**

2                          **VOL. 2**

3                          (3:09)

03:09  4          THE COURT:  LET ME RECALL THE MATTER OF MCGRAW-HILL,

5      PLEASE.  COUNSEL, YOU HAVE PREVIOUSLY MADE YOUR APPEARANCE.  YOU

6      DON'T NEED TO MAKE APPEARANCES AGAIN.

03:09  7          BUT I'D LIKE TO BEGIN WITH THE DEFENSE, AND I WANT YOU

8      TO TAKE THIS TENTATIVE, AND I WANT YOU TO TEAR IT APART.

03:09  9          MR. KEKER:  A TASK I RELISH, YOUR HONOR.  LET ME START

10     BY CORRECTING A FACTUAL PART RELATED TO THE COMPLAINT BECAUSE IT

11     RUNS INTO A THEME THAT, BASICALLY, I THINK I'LL BE SAYING THAT I

12     THINK THAT THE TENTATIVE MISREADS, MISCITES THE COMPLAINT IN MANY

13     INSTANCES.  BUT I'M GOING TO START WITH LINE 5 OF THE -- PAGE 5,

14     EXCUSE ME, OF THE TENTATIVE, LINE 21, WHICH SAYS --

03:10 15          THE COURT:  JUST A MOMENT.

03:10 16          MR. KEKER:  LINES 19 TO 21 SAYS:  "THROUGHOUT THE SPRING

17     AND SUMMER OF 2007, S&P REGULARLY REVISED THE METHODS USED TO

18     GENERATE CDO RATING MODELS TO ENSURE THAT THESE RATING MODELS

19     WOULD BE 'BUSINESS FRIENDLY,'" COMPLAINT 189 TO 198.

03:10 20          IF YOU LOOK AT THE COMPLAINT, PARAGRAPH 198 --

03:10 21          THE COURT:  JUST A MOMENT.  189 TO 198, AND THAT WOULD

22     BE ON PAGE 58, I BELIEVE, 198:  "JORDAN APPROVED THE REQUESTED

23     FUNDING.  THE REVISED MODEL WAS NOT IMPLEMENTED, HOWEVER, BECAUSE

24     BY LATE 2007, THE CDO MARKET HAD COLLAPSED."

03:11 25          MR. KEKER:  SO WHAT THIS SAYS, S&P EXECUTIVES REGULARLY

SACV 13-779-DOC - 07/08/2013 - VOL. 2

1    REVISED THE METHODS USED TO GENERATE TO MAKE THEM BUSINESS

2    FRIENDLY, AND THEN IT SORT OF DROPS A LITTLE NOTE THAT SAYS, YOU

3    KNOW, THAT ACTUALLY NEVER HAPPENED, NO RATING WAS EVER AFFECTED BY

4    ANY OF THIS.  AND IT'S THAT KIND OF MISREADING OF THE COMPLAINT

5    THAT I WANT TO TALK ABOUT A LITTLE BIT MORE, BUT I WANT TO START

6    BY SAYING THAT THIS OPINION IS OBVIOUSLY VERY CLOSE TO THE

7    ARGUMENTS IN THE GOVERNMENT'S OPPOSITION, AND I THOUGHT WE DID A

8    GOOD JOB IN OUR REPLY BRIEF, AND I COMMEND OUR REPLY BRIEF TO THE

9    COURT, ANSWERING A LOT OF THESE ARGUMENTS.

03:12 10          BUT LET ME GO ON AND TALK SPECIFICALLY ABOUT THE

11    TENTATIVE.  THERE IS NOTHING IN IT ABOUT MATERIALITY.  I

12    UNDERSTAND THERE WAS TALK ABOUT RELIANCE, BUT THE DISCUSSION OF

13    MATERIALITY, AND THE CONCEPT OF THE TOTAL MIX OF INFORMATION

14    AVAILABLE AND WHAT WOULD OR WOULD NOT MATERIALLY ALTER THAT, IS

15    NOT IN THE TENTATIVE OPINION.

03:12 16          THESE MODELS AND THE DATA THAT GO INTO THEM WERE KNOWN

17    TO THE ISSUERS.  THE MODELS WERE PUBLISHED.  THE ISSUERS KNEW WHAT

18    THEY WERE.  THE BANKS KNEW WHAT THEY WERE, THEY HAD TO WORK WITH

19    THEM ALL THE TIME.  THE BANKS' ISSUERS PROVIDED THE DATA.  AND OUR

20    QUESTION IS THAT I DON'T BELIEVE THE COMPLAINT ADDRESSES

21    SUFFICIENTLY IS, HOW COULD GENERIC STATEMENTS OR ANY OF THESE

22    STATEMENTS THAT THEY TALK ABOUT MATERIALLY AFFECT THE TOTAL MIX OF

23    INFORMATION WHEN IT COMES TO THE ISSUERS WHO ARE, AS WE SAID

24    BEFORE, 90 PERCENT OF THIS CASE.

03:13 25          AND ALONG THOSE LINES, HOW COULD 89 PERCENT OF THE

SACV 13-779-DOC - 07/08/2013 - VOL. 2

1    SECURITIES THAT WERE NEVER SOLD TO THE PUBLIC, HOW COULD THE

2    RATING BE MATERIAL TO ANYBODY?

03:13 3        THE COMPLAINT TALKS ABOUT, WHEN IT TALKS ABOUT

4    MATERIALITY, IT TALKS ABOUT THESE THINGS ARE SUPPOSED TO AFFECT

5    INVESTMENT DECISIONS.  WELL, THE ISSUERS WHO HUNG ON TO THESE

6    THINGS DIDN'T MAKE AN INVESTMENT DECISION.  NO INVESTOR MADE AN

7    INVESTMENT DECISION.  THE ONLY THING THAT HAPPENED WAS THE

8    INVESTOR -- EXCUSE ME -- THE BANK ENDED UP WITH THESE IN ITS

9    WAREHOUSES.  AND WHEN THE LOSSES CAME, THE BANKS SUFFERED THE

10   LOSS.

03:13 11       SO FOR 90 PERCENT OF WHAT WE ARE DEALING WITH IN THIS

12   RULE 56 LIST, THE MATERIALITY JUST CAN'T BE MET FOR AT LEAST THE

13   ONES THAT ARE ISSUED BY THE ISSUER, AND WE BELIEVE THAT CAN'T BE

14   MET FOR ANYBODY.

03:14 15       THE SECOND THING I WANTED TO TALK ABOUT IS EXEMPLIFIED

16   BY PAGE 4, LINES 12 THROUGH 20 --

03:14 17       THE COURT:  JUST A MOMENT.

03:14 18       MR. KEKER:  PAGE 4, 12 THROUGH 20 OF THE TENTATIVE.

03:14 19       YOUR HONOR, AS LONG AS YOU ARE WRITING, IT'S ALSO

20   REPEATED ESSENTIALLY AT THE SAME POINT, PAGE 14, AT LINES 5

21   THROUGH 13 OF THE TENTATIVE.

03:14 22       THE COURT:  JUST A MOMENT, PLEASE.  THANK YOU.

03:16 23       MR. KEKER:  THANK YOU, YOUR HONOR.

03:16 24       AND SO ESSENTIALLY, WHAT BOTH OF THESE REFERENCES SAY IS

25   THAT BEGINNING IN 2007, AND I THINK THE COMPLAINT SAYS MARCH 2007,

SACV 13-779-DOC - 07/08/2013 - VOL. 2

1   THE GOVERNMENT'S COMPLAINT IDENTIFIES NUMEROUS SPECIFIC OCCASIONS

2   WHEN S&P ISSUED OR CONFIRMED RATINGS THAT DID NOT ACCURATELY

3   REFLECT TRUE CREDIT RISKS.

03:16 4        THE FIRST POINT ABOUT THAT WHICH REALLY ISN'T DEALT WITH

5   HERE AT ALL IS THAT THAT'S, AT MOST, AT BEST, THAT'S THE FIRST

6   TIME THAT THAT HAPPENED.  SO FOR THE 5,000 OR SO CDO'S AND RMBS'S

7   THAT WERE RATED BEFORE MARCH OF 2007, THE COMPLAINT DOESN'T

8   IDENTIFY ANY ONE THAT DOESN'T ACCURATELY REFLECT TRUE CREDIT RISK.

03:16 9        BUT GOING ON, THESE ARE THE PARAGRAPHS I WANTED TO --

10  THAT I WAS ARGUING ABOUT THIS MORNING:  234, 236, 238.  THESE ARE

11  THE ONES THAT LIST -- MAKE A GENERAL ALLEGATION, IF YOU KNEW THE

12  CREDIT WAS GOING TO DETERIORATE, AND HERE'S SOME EXAMPLES, AND

13  THEN THEY SAY:  YOU RATED THIS AT SUCH AND SUCH A TIME, MAYBE YOU

14  DOWNGRADED SOME OF IT LATER, AND AT SOME SUBSEQUENT TIME IT

15  DEFAULTED.

03:17 16       THEY NEVER MAKE THE "WHO, WHAT, HOW" ALLEGATIONS.  THEY

17  NEVER SAY THAT, AT THE TIME THESE RATINGS WERE MADE, SOMEBODY WHO

18  IS RESPONSIBLE AT S&P AND CAN BIND THE CORPORATION BY THEIR

19  POSITION, BY THEIR MENTAL STATE, COMMITTED A CRIME, A SCHEME TO

20  DEFRAUD, WITH RESPECT TO THESE TRIPLE-A TRANCHES, WHICH IS ALL

21  WE'RE DEALING WITH IN THIS COMPLAINT.

03:17 22       THEY TALK ABOUT THEY HAD OPINIONS ABOUT THE

23  NON-INVESTMENT-GRADE SECURITIES.  THEY HAVE DEFINED THAT IN THE

24  COMPLAINT AS SOMETHING OTHER THAN THE TRIPLE-A, DOUBLE-A.  WHAT

25  THEY'RE TALKING ABOUT IS, PEOPLE THOUGHT THEIR MODELS MIGHT NOT

SACV 13-779-DOC - 07/08/2013 - VOL. 2

1    ACCURATELY REFLECT THE RATED DEFAULT FOR SOME OF THE LOWER

2    TRANCHES.  BUT THERE IS NO ALLEGATION THAT ANYBODY THOUGHT THAT

3    THESE TRIPLE-A RATINGS THAT WERE ISSUED, THAT ARE AT ISSUE IN THIS

4    CASE BY THE COMPLAINT, WERE WRONG.

03:18  5         AND THERE CERTAINLY IS NO ALLEGATION THAT, UNDER 9B, OF

6    WHO THOUGHT THEY WERE WRONG, OR THAT THE RATING COMMITTEE -- THERE

7    IS AN ALLEGATION THAT A RATING COMMITTEE MADE THESE RATES.  THERE

8    IS NO IDENTIFICATION OF WHAT RATING COMMITTEE THOUGHT THEY WERE

9    WRONG AND SO ON.

03:18 10         AND IF THE CREDIT RATING WOULDN'T HAVE CHANGED, IF THE

11   PEOPLE WHO WERE WORRIED ABOUT, MAYBE WE DON'T ACCURATELY -- WE

12   DON'T HAVE ENOUGH OF A READ ON THE LOWER TRANCHES, IF THAT

13   WOULDN'T HAVE AFFECTED THE UPPER TRANCHES, HOW IS THIS A SCHEME TO

14   DEFRAUD THE VICTIMS THEY HAVE IDENTIFIED; NAMELY, FEDERALLY

15   INSURED INSTITUTIONS AND SO ON, WHO HAVE TO BUY INVESTMENT-GRADE

16   SECURITIES.  THEY CAN'T BY THE NON-INVESTMENT GRADE.  THEY HAVE TO

17   BUY, BY REGULATION, THE HIGHER TRANCHES.

03:19 18         SO OUR POINT IS, IF YOU READ THOSE PARAGRAPHS, THEY

19   DON'T TELL YOU THE "WHO, WHAT, WHEN, HOW," FRAUD, OR WHAT WAS

20   WRONG WITH THE TRIPLE-A RATING.  SO WE DISAGREE THAT, AS THE

21   OPINION SAYS, THAT THAT SOMEHOW IDENTIFIES FRAUD, IN THE BACK PART

22   OF THE COMPLAINT, OR THE 2007 PART.  BUT CERTAINLY IT'S VIRTUALLY

23   AN ADMISSION THAT NOTHING THAT HAPPENED BEFORE THAT WAS -- ARE

24   THEY ALLEGING WAS FALSELY RATED.

03:19 25         AND THE ONLY THING THEY SAY ABOUT THE FIRST PART -- WHAT

SACV 13-779-DOC - 07/08/2013 - VOL. 2

1    WE HAVE CALLED A SEPARATE SCHEME, THEY SAY IT'S THE SAME SCHEME.

2    THE FIRST PART, WHICH IS 2004 TO MARCH OF 2007, WHERE THEY'RE NOT

3    CLAIMING THAT THE RATINGS DIDN'T ACCURATELY REFLECT THE CREDIT

4    RATING, IS THAT THE RATINGS WERE SOMEHOW AFFECTED WITH THE DESIRE

5    TO PLEASE THE ISSUERS.

03:20  6         FIRST OF ALL, HOW COULD THAT POSSIBLY BE MATERIAL OR

7    INTENT TO DEFRAUD THE 90 PERCENT OF THE ISSUERS WHO ENDED UP

8    HOLDING THEIR OWN SECURITIES.  THAT DOESN'T MAKE SENSE.  THERE IS

9    NO APPROPRIATE ALLEGATION OF TRYING TO PLEASE THE ISSUERS.  THEY

10   WERE TRYING TO GET THE -- THE COMPLAINT READS JUST AS WELL, THAT

11   THEY WERE TRYING TO GET IT RIGHT.

03:20  12         AGAIN, THERE IS NO SPECIFIC ALLEGATION OF WHO, WHAT,

13   WHEN, COMMITTED A CRIME OF MAIL FRAUD, WIRE FRAUD, OR BANK FRAUD

14   FOR ALL THOSE 5,000 SECURITIES.

03:20  15         AND THEN ANOTHER POINT THAT DOESN'T LINE UP, THEY TALK

16   ABOUT THE STATEMENTS AT PAGE 9 AND 10 OF THE TENTATIVE OPINION.

17   THERE IS A LIST OF THE EXAMPLES OF PLAINTIFF'S DETAILED PLEADINGS

18   WHICH CONTAIN WHAT WE BELIEVE ARE PRETTY GENERAL GENERIC

19   STATEMENTS, THAT RATINGS SERVICES RECEIVES A FEE FROM THE ISSUE --

20   THAT IT RECEIVES A FEE FROM THE ISSUER MUST NOT BE A FACTOR IN THE

21   DECISION TO RATE; THE CRITERIA METHODOLOGY SHALL BE DETERMINED

22   SOLELY THE ANALYTICS POLICY BOARD; RATINGS SHALL NOT BE AFFECTED

23   BY THE EXISTING OR POTENTIAL BUSINESS RELATIONSHIP; RATINGS SHALL

24   NOT -- RATING SERVICES SHALL NOT FORBEAR OR REFRAIN TO TAKE AN

25   ACTION IF APPROPRIATE BASED ON THE POTENTIAL EFFECT.  THESE ARE

SACV 13-779-DOC - 07/08/2013 - VOL. 2

1    ALL FROM THE CODE OF CONDUCT.

03:21 2          AND THEN WHAT THE TENTATIVE OPINION DOES IS LIST A

3    NUMBER OF THINGS THAT DON'T LINE UP WITH, EXCEPT IN SOME REALLY

4    VAGUE WAY, WITH WHAT THESE GENERIC STATEMENTS ARE.

03:21 5          AND THEY APPEAR ON PAGE 10, AT LINE 18 THROUGH 28.  AND

6    HERE, AGAIN, THERE IS JUST A LOT OF MISQUOTING.  THE FIRST ONE

7    THEY SAY THAT SOMEHOW SHOWS THE THINGS ABOVE ARE FALSE, ARE THAT

8    THEY DELAYED AND WATERED DOWN UPDATES.  AND THE PARAGRAPHS OF THE

9    COMPLAINT THAT THEY CITE CERTAINLY SHOW LOTS OF DEBATE ABOUT

10   UPDATES, BUT THEY DON'T SAY ANYTHING THAT THE -- ABOUT THE RATINGS

11   DURING THAT PERIOD NOT BEING THE RATINGS THAT THE STANDARD & POOR

12   HIERARCHY AND RATING SERVICES AND COMMITTEE SYSTEM THOUGHT WERE

13   THE RIGHT RATINGS.  THERE IS NO ALLEGATION THAT THERE WAS ANY

14   DISHONEST RATING DURING THIS PERIOD.

03:22 15         THE SECOND ONE IS THAT THEY ALTERED THE MODEL.  IT SAYS

16   S&P ALTERED THE MODEL USED TO RATE CDO'S TO PROTECT S&P'S MARKET

17   SHARE WITH A SEGMENT OF THE CDO BUSINESS.

03:22 18         FIRST OF ALL, THE COMPLAINT MAKE PLAIN THAT THEY DIDN'T

19   ALTER THE MODEL.  THAT'S IN PARAGRAPH 170.  THERE IS ALL THAT TALK

20   ABOUT A DEFAULT MATRIX.  AND THEY DEBATED IT, AND IT DIDN'T WORK.

21   THEY DIDN'T ALTER THE MODEL.

03:22 22         AND THEY WERE TALKING ABOUT COMPETING PROPOSALS, THIS IS

23   PARAGRAPH 164, AND HOW THEY AFFECTED NON-INVESTMENT-GRADE

24   SECURITIES, WHICH IS NOT WHAT WE'RE DEALING WITH HERE.  THEY WERE

25   ARGUING ABOUT:  IF WE CHANGE THE MODEL THIS WAY, IT DOESN'T DO --

SACV 13-779-DOC - 07/08/2013 - VOL. 2

1  ACCORDING TO THE COMPLAINT, I'M NOT SAYING THIS IS TRUE, BUT

2  ACCORDING TO THE COMPLAINT, WHICH YOU ARE ACCEPTING AS TRUE, THEY

3  SAID THAT THE MODEL DOESN'T AFFECT MUCH THE INVESTMENT GRADE,

4  THESE PROPOSED CHANGES DON'T -- DOESN'T AFFECT THE INVESTMENT

5  GRADE, WHICH IS WHAT WE'RE DEALING WITH HERE, BUT THEY DO AFFECT

6  THE NON-INVESTMENT GRADE, WHICH IS EXACTLY WHAT WE'RE NOT DEALING

7  WITH HERE.  SO I DON'T KNOW WHAT THAT -- HOW THAT RELATES TO ANY

8  OF THE ASPIRATIONAL STATEMENTS ABOVE TO BE UNTRUE IN A MATERIAL

9  WAY HERE.

03:23 10       THE NEXT ONE THAT THEY HAVE ON PAGE 10 IS, IN THE WORDS

11  OF ONE S&P EXECUTIVE, THEY TONED DOWN AND SLOWED DOWN THEIR

12  RELEASE OF AN UPDATE TO THE CDL RATING MODEL.  AND AGAIN,

13  PARAGRAPH 177 MAKES PLAIN THEY'RE TALKING ABOUT LOW-RATED POOLS.

14  THEY'RE NOT TALKING ABOUT WITH THE SECURITIES AT ISSUE HERE.

03:24 15       AND FINALLY, MAYBE THE WORST ONE, IS NUMBER 4,

16  IDENTIFYING TWO NAMES.  NOW, ALL OF A SUDDEN, YOU HAVE GOT SOME

17  NAMES.  MAYBE THEY'RE THE CULPRITS OR THE VILLAINS THAT THE

18  GOVERNMENT IS ALLEGING.

03:24 19       THEY SAY:  "JORDAN AND TESHER, BOTH CDO GROUP BUSINESS

20  HEADS, ASK THAT A KEY ASSUMPTION IN DETERMINING THE RATING OF THE

21  CDO BE CHANGED IN AN EFFORT TO ACHIEVE HIGHER RATINGS FOR CERTAIN

22  CDO'S."

03:24 23       THAT'S THE COMPLAINT OF 187 AND 188.  IF YOU LOOK AT

24  198, THAT'S WHAT WE JUST LOOKED AT, IT NEVER HAPPENED.  IT NEVER

25  HAPPENED.  THE TREE FELL IN THE FOREST, IT DIDN'T MAKE A SOUND.

SACV 13-779-DOC - 07/08/2013 - VOL. 2

03:24  1          AND SO WE DON'T THINK THAT THE GENERIC STATEMENTS THAT

2    THE COMPLAINT -- THAT THE TENTATIVE OPINION SUGGESTS ARE CONCRETE

3    ENOUGH TO BE THE BASIS OF A SCHEME TO DEFRAUD HAVE ANY LINEUP WITH

4    THE, EVEN WITH FALSITY IN THE WAY THE COMPLAINT IS WRITTEN.  AND I

5    HAVE TO NOTE THAT MOST OF THE STATEMENTS THAT WE'RE COMPLAINING

6    ABOUT THAT ARE THROUGHOUT THIS COMPLAINT ARE NOT DEALT WITH AT

7    ALL.

03:25  8          WHAT DOES IT MEAN, TO BE INDEPENDENT?

03:25  9          S&P IS INDEPENDENT.  THEY'RE NOT OWNED BY A BANK.

10   THEY'RE INDEPENDENTLY OWNED.  THEY'RE NOT INDEPENDENT OF THEIR

11   STOCKHOLDERS.  IT'S A GENERAL TERM.

03:25 12          WHAT DOES IT MEAN TO BE OBJECTIVE?  THAT'S ALMOST

13   EPISTEMOLOGICAL QUESTION.

03:25 14          WHAT DOES IT MEAN, TO AVOID IMPROPER INFLUENCE?

03:25 15          EVERYBODY TRIES TO AVOID IMPROPER INFLUENCE.  THESE KIND

16   OF STATEMENTS, TO TRY TO PROVE THEM RIGHT OR WRONG, THESE ARE

17   STATEMENTS OF ASPIRATION.  WE HAVE MADE THAT ARGUMENT ALREADY, AND

18   THE TENTATIVE OPINION HAS REJECTED IT.  BUT I URGE YOU TO

19   RECONSIDER IT, IF YOU ARE WILLING.

03:25 20          AND THEN FINALLY -- AND THEN I'M GOING TO STOP, UNLESS

21   YOU HAVE QUESTIONS.  FINALLY, THE SPECIFIC INTENT TO DEFRAUD.

22   THIS IS PAGE 17.  YOU'LL RECALL THAT THIS MORNING, WHEN I WAS

23   ARGUING, I SAID THERE ARE THREE REASONS WHY THIS ISN'T A SCHEME TO

24   DEFRAUD.  THERE'S THE GENERIC-TYPE STATEMENTS CAN'T BE FRAUDULENT;

25   THE MATERIALITY; AND THEN THEY HAVEN'T ALLEGED SPECIFIC INTENT TO

SACV 13-779-DOC - 07/08/2013 - VOL. 2

1   DEFRAUD.  AND AT PAGE 17, LINE 13 THROUGH 16, THEY SAY --

03:26  2              THE COURT:  JUST A MINUTE.  WHAT LINE?

03:26  3              MR. KEKER:   THIRTEEN THROUGH SIXTEEN.

03:26  4              IT SAYS:  "FIRST, THE GOVERNMENT ALLEGES THAT S&P

5   ENGAGED IN A 'SCHEME TO DEFRAUD INVESTORS IN RMBS AND CDO

6   TRANCHES' AND 'TO OBTAIN MONEY FROM THESE INVESTORS BY MEANS OF

7   MATERIAL, FALSE, AND FRAUDULENT PRETENSES, REPRESENTATIONS AND

8   PROMISES, AND THE CONCEALMENT OF MATERIAL FACTS' WITH 'INTENT TO

9   DEFRAUD.'"

03:27 10              AND THEY CITE THE COMPLAINT AT PARAGRAPH 7, AND

11   PARAGRAPH 276, AND BOTH OF THEM ARE ESSENTIALLY THE SAME.  THEY

12   ARE THE MOST GENERIC STATEMENT OF INTENT TO DEFRAUD.

03:27 13              SEVEN SAYS:  "AS DETAILED MORE FULLY THEREIN, BEGINNING

14   AT THE LATEST ON OR ABOUT SEPTEMBER 2004, AND CONTINUING THROUGH

15   AT LEAST OCTOBER 2007, WITHIN THE CENTRAL DISTRICT OF CALIFORNIA

16   AND ELSEWHERE, S&P KNOWINGLY AND WITH THE INTENT TO DEFRAUD

17   DEVISE, PARTICIPATED IN" -- YOU COULD READ IT.  IT'S JUST A

18   GENERIC -- THERE WAS A SCHEME TO DEFRAUD, AND THEY HAD THE INTENT

19   TO DEFRAUD.

03:27 20              AND TWO -- THE OTHER PARAGRAPH IS JUST AS BAD, 276.

21   THEY DON'T BEGIN TO MEET THE HEIGHTENED PLEADING STANDARD OF

22   RULE 9B.  THEY'RE JUST BLURS FROM THE STATUTE VIRTUALLY.

03:28 23              AND YOU HAVE TO ASK YOURSELF -- WHAT THE OPINION PUTS A

24   LOT OF EMPHASIS ON IS THAT, AT ONE POINT, IT TALKS ABOUT, FINALLY,

25   THE COMPLAINT ALLEGES THAT JOANNA ROSE -- THEY BASICALLY KNEW,

SACV 13-779-DOC - 07/08/2013 - VOL. 2

1      THAT S&P EXECUTIVES KNEW OF THE INVESTOR-PAYS ARRANGEMENT.

03:28  2            WHO DIDN'T, IS OUR QUESTION.  EVERYBODY IN THE WORLD

3      KNEW ABOUT THE INVESTOR-PAYS ARRANGEMENT.  ANYBODY WHO EVER BOUGHT

4      AN INVESTMENT-GRADE SECURITY UNDERSTOOD IT, AND CERTAINLY THE

5      ISSUERS WHO HAD TO DO THE PAYING.  THE INTENT TO DEFRAUD IS FOUND

6      BECAUSE THESE PEOPLE WHO KNEW ABOUT THE INVESTOR-PAY

7      RELATIONSHIP -- IT JUST SEEMS RIDICULOUS.

03:28  8            BUT THEY GO ON, AND I THINK THIS IS IMPORTANT, IN THE

9      OPINION.  THIS IS THE ONLY THING I LIKED ABOUT IT.  IT SEEMS TO

10     ASSUME, AT LINES 16 THROUGH 18, AND ALSO AT LINE 11, ON THAT SAME

11     PAGE, THAT THE INVESTORS HAD TO BE PEOPLE WHO WERE DECEIVED BY

12     FALSE CREDIT RATINGS.  AND IT STAYS IT TWICE:  "IN THIS CASE, THE

13     GOVERNMENT HAS ALLEGED THAT S&P BOTH INTENDED TO AND DID OBTAIN

14     MONEY FROM ISSUERS THAT WAS CONSTRUCTIVELY PAID BY THE VERY

15     INVESTORS WHO WERE DECEIVED BY FALSE CREDIT RATINGS."

03:29  16           NOW, WE DISAGREE THAT THAT'S BEEN PROPERLY ALLEGED.  BUT

17     IF THE OPINION -- THE OPINION IS RIGHT ON.  THEY SEEM TO

18     RECOGNIZE, YOU HAVE GOT TO GET TO THE POINT OF SAYING, THAT

19     INVESTOR WAS DECEIVED BY A FALSE OBJECTION CREDIT RATING, AND

20     WE'RE GOING TO SHOW THAT THAT CREDIT RATING WAS FALSE, AND THAT'S

21     GOING TO HELP US PROVE OUR CASE.

03:29  22           IT SAYS IT AGAIN IN 16 THROUGH 18:  "ALLEGEDLY, S&P KNEW

23     THE SCHEME TO DEFRAUD WOULD RESULT IN S&P OBTAINING FUNDS DIRECTLY

24     FROM THE INVESTORS WHO WERE FOOLED BY THEIR RATINGS."

03:30  25           SO THAT'S WHERE WE ARE ARGUING WE NEED TO END UP.  WE

SACV 13-779-DOC - 07/08/2013 - VOL. 2

 1  NEED A COMPLAINT THAT SAYS, IF THEY CAN ALLEGE IT, THAT SAYS S&P

 2  ISSUED A CREDIT RATING THAT WAS WRONG, THAT SHOULD HAVE BEEN

 3  DIFFERENT, AND WITH THE INTENT TO GET MONEY AND PROPERTY FROM THE

 4  INVESTORS WHO WERE GOING TO LEARN ABOUT THAT CREDIT RATING.  WE

 5  ACCEPT THAT, IF THEY ALLEGE IT PROPERLY UNDER 9B.  BUT OUR

 6  ARGUMENT IS, THEY HAVEN'T DONE IT YET, AND THIS IS THE TIME TO DO

 7  IT.

03:30  8          AND IN CONCLUSION, I WANT TO SAY THAT WE ARE HOPING THAT

 9  YOU WILL USE THE HEIGHTENED PLEADING REQUIREMENTS OF RULE 9B, TO

10  GET A COMPLAINT THAT ACTUALLY ALLEGES A SCHEME TO DEFRAUD, THAT

11  HAS THE ELEMENTS, THAT IS CONCRETE ENOUGH FOR US TO TRY.  AND I

12  THINK IT'S PRETTY APPARENT FROM THESE ARGUMENTS THIS MORNING THAT

13  EVEN THE GOVERNMENT RECOGNIZES THINGS AREN'T CONCRETE ENOUGH TO

14  GET THIS CASE TO TRIAL AT THIS POINT.

03:31 15          OTHERWISE, THERE IS GOING TO BE CHAOS.  TO GO FORWARD ON

16  THIS COMPLAINT WITH THE NATURE OF THESE ALLEGATIONS, WITHOUT THE

17  "WHO, WHAT, WHEN," WHAT RATINGS ARE FALSE, AND HOW ARE THEY FALSE,

18  IS GOING TO BE AN EXTREMELY DIFFICULT TASK.

03:31 19          AND WITH THAT I'LL CONSULT WITH MY COLLEAGUES, IF YOU'LL

20  LET ME.  THANK YOU.  THANK YOU, YOUR HONOR.

03:31 21          THE COURT:  COUNSEL.

03:31 22          MR. CARDONA:  I'LL START FIRST WITH A COUPLE OF THINGS

23  THAT I AGREE WITH MR. KEKER WITH.

03:32 24          FIRST HE TALKED ABOUT PAGE 5, LINES 19 THROUGH 21.  HE

25  IS CORRECT THERE, THAT THE ALLEGATIONS THERE, IN THE TIME PERIOD

SACV 13-779-DOC - 07/08/2013 - VOL. 2

1    IN 2007, RELATING TO THE MODIFICATIONS OF THE MODEL, WHAT THEY

2    WERE DISCUSSING AT THE TIME WAS A PROPOSED REVISION OF HOW THEY

3    WOULD GENERATE THOSE MODELS.  THAT PROPOSED REVISION WENT THROUGH

4    CHANNELS, AND WENT ALL THE WAY UP TO PATRICE JORDAN, WHO

5    RECOMMENDED ITS APPROVAL, BUT THEY DID NOT ADOPT THAT NEW METHOD.

03:32  6        HOWEVER, I WOULD NOTE FOR THE COURT, WAS WE MADE CLEAR

7    THERE, IN THE COURSE OF TALKING ABOUT THAT, THEY TALK NOT ONLY

8    ABOUT WHAT THEY'RE PLANNING, BUT INCLUDED IN THEIR CONVERSATIONS

9    IS AN NOTATION THAT NOT ONLY THEIR NEW WAY OF DOING THINGS, BUT

10   ALSO THE EXISTING WAY OF DOING THINGS WAS STRUCTURED SO IT WAS

11   BUSINESS FRIENDLY.  THAT IS SO THAT IT TOOK INTO ACCOUNT THE

12   INTERESTS OF THOSE WITH WHOM THEY WERE WORKING.

03:33 13        SO WITH THAT, I THINK IT STILL SUPPORTS THE POINT THE

14   COURT IS MAKING THERE, BUT IT IS CORRECT THAT THOSE REVISIONS WERE

15   NOT ACTUALLY ADOPTED BECAUSE OF THE DOWNTURN IN THE CDO MARKET.

03:33 16        THE NEXT POINT IS GOING TO BE A LITTLE BROADER BECAUSE

17   IT HAS TO DO AGAIN WITH WHAT WE ALLEGE AND WHAT WE DON'T ALLEGE.

18   WITH RESPECT TO THE MARCH-TO-OCTOBER 2007 TIME PERIOD, AS YOUR

19   HONOR HAS RECOGNIZED, WE DO ALLEGE, AND I BELIEVE WE ALLEGE

20   SUFFICIENTLY FOR PURPOSES OF BOTH RULE 12(B)(6) AND RULE 9B, THAT

21   S&P KNOWINGLY ISSUED RATINGS THAT IT KNEW DID NOT ACCURATELY

22   REFLECT THE CREDIT RISKS, FOR ALL THE REASONS THAT THE COURT HAS

23   CITED.

03:33 24        ONE THING I WILL NOTE IS THAT WE ARE NOT DEALING WITH

25   JUST THE TRIPLE-A RATINGS.  INDEED, CERTAIN OF OUR ALLEGATIONS

SACV 13-779-DOC - 07/08/2013 - VOL. 2

1  RELATE TO PURPOSES THAT ARE NOT TRIPLE-A.  SO, FOR EXAMPLE, IN

2  PARAGRAPH 238D THE COMPLAINT, WE ALLEGE THAT, I BELIEVE IT WAS

3  M&T BANK, ONE OF THEIR PURCHASES WAS NOT OF AN AAA TRANCHE, BUT OF

4  AN A-RATED TRANCHE.

03:34  5      AND THIS GETS TO A LARGER PICTURE THAT HAS TO DO WITH

6  HOW STRUCTURED FINANCE WORKS AND HOW RATINGS WORK.

03:34  7      WHEN S&P RATES A DEAL, THEY ARE RATING THE STRUCTURE AS

8  A WHOLE, FROM AAA, AT THE TOP, DOWN TO WHATEVER ELSE IS RATED.

9  AND THE EFFECT ON THE UPPER TRANCHES DEPENDS, IN PART, ON THE

10  STRUCTURE OF THE OVERALL SYSTEM.  SO EFFECTS ON LOWER TRANCHES

11  HAVE AN EFFECT ON THE UPPER RATED TRANCHES BECAUSE IT EFFECTS THE

12  RISK OF THOSE ARE BEARING THE HIGHER RATED TRANCHES.  SO TO TALK

13  ABOUT THIS AS JUST RELATED TO AAA IS INACCURATE, AND THE WAY THE

14  TENTATIVE TALKS ABOUT IT IS CORRECT.

03:34 15      IN LINE WITH THAT, THE NEXT COMPLAINT IS WITH RESPECT TO

16  THE EARLIER PORTION OF THE FRAUD, THE PORTION THAT RELATES TO THE

17  TIME PERIOD PRIOR TO MARCH OF 2007.  FROM MARCH TO OCTOBER 2007,

18  WE SPECIFICALLY ALLEGE THEY ISSUED CDO RATINGS THAT THEY KNEW

19  DIDN'T REFLECT TRUE CREDIT RISK.  PRIOR TO THAT, IT IS CORRECT, WE

20  DO NOT ALLEGE THAT, PRIOR TO THAT, THEY ISSUED RATINGS THAT THEY

21  KNEW WERE INCORRECT.  THAT'S THE NOT FRAUD THERE.

03:35 22      THE FRAUD THERE RELATES TO THEIR REPRESENTATIONS

23  REGARDING THEIR OBJECTIVITY, THEIR INDEPENDENCE, THE

24  REPRESENTATIONS THAT THEY PUT IN THE MARKET TO LEAD INVESTORS TO

25  BELIEVE THAT THEY WERE NOT BEING INFLUENCED BY THIS CONFLICT, OF

                    SACV 13-779-DOC - 07/08/2013 - VOL. 2

 1    WHICH MR. KEKER IS CORRECT, EVERYBODY KNEW ABOUT THE ISSUE OF

 2    PACEMO (PHONETIC).  EVERYBODY KNEW ABOUT THE POTENTIAL CONFLICT

 3    POSED ABOUT THAT.  AND S&P PUT INTO THE MARKETPLACE THEIR

 4    REPRESENTATIONS ABOUT THE THINGS THEY WERE DOING TO ADDRESS THAT

 5    CONFLICT.

03:35  6          AND FOR THAT EARLIER TIME PERIOD, OUR ALLEGATIONS ARE

 7    THAT S&P KNEW THESE REPRESENTATIONS WERE NOT CORRECT.  THEY

 8    WEREN'T DOING WHAT THEY SAID THEY WERE DOING.  WHAT THEY SAID IN

 9    THEIR CODE OF CONDUCT THEY WOULD DO, WHAT THEY CLAIMED THEY WERE

10    DOING WHEN THEY REPRESENTED THEY WERE BEING OBJECTIVE AND

11    INDEPENDENT.

03:36 12          FOR THOSE PURPOSES, WE DO NOT HAVE TO SHOW THAT THE

13    RATINGS WERE FALSE FOR PRECISELY THE REASONS I TALKED ABOUT

14    EARLIER THIS MORNING, WITH THE ANALOGY TO THE ORGANIC PEACH, AS

15    MR. KEKER REFERS TO IT.  THOSE ARE STATEMENTS IN AND OF

16    THEMSELVES, REGARDLESS OF WHETHER THE RATINGS WERE ACCURATE OR

17    NOT, AFFECTED THE BENEFIT OF THE BARGAIN THAT THE INVESTORS WERE

18    GETTING.  THEY WERE NOT GETTING WHAT THEY BELIEVED THEY WERE

19    GETTING, WHICH WAS A RATING THAT WAS PROTECTED BY S&P ACTUALLY

20    BEING AN IMPARTIAL ARBITER.

03:36 21          SO FOR THOSE REASONS THE TENTATIVE'S ADDRESS TO THOSE

22    ALLEGATIONS IS CORRECT.  THEY ARE DIFFERENT BECAUSE THE FRAUD IS

23    DIFFERENT.  AND WE HAVE ALLEGED THE "WHO, WHAT, WHERE, WHEN, HOW"

24    BY ALLEGING WHO MADE THOSE FALSE STATEMENTS AND WHO WAS AWARE OF

25    THE INFORMATION THAT REVEALED THAT THOSE STATEMENTS WERE NOT

SACV 13-779-DOC - 07/08/2013 - VOL. 2

1    ACCURATE, WHICH IS CONTAINED IN THE PORTIONS OF THE COMPLAINT THAT

2    YOUR HONOR HAS CITED, IN PARTICULAR ON PAGES 9 AND 10.

03:37  3         THAT'S WHAT THOSE ALLEGATIONS GO TO, NOT THAT THE

4    RATINGS THEMSELVES ARE INACCURATE, BUT THE STATEMENTS S&P MADE

5    ABOUT HOW THEY GOT TO THOSE RATINGS WERE INACCURATE, WHICH WERE

6    NOT ASPIRATIONAL STATEMENTS.

03:37  7         UNLESS THE COURT HAS QUESTIONS, I DON'T WANT TO GO BACK

8    THROUGH, IN ANY DETAIL, WHAT THE PORTIONS OF THE COMPLAINT ARE

9    THAT WE BELIEVE SHOW THE KNOWLEDGE AND THE FALSITY OF THE CDO

10    RATINGS, BECAUSE I THINK THE COURT HAS GOTTEN THAT CORRECT, AND WE

11    DISCUSSED THAT AT LENGTH BEFORE.  THOSE ARE THE THINGS I THINK --

12    I SHOULD ADDRESS -- THE ONLY OTHER THING I WILL SAY IS, WITH

13    RESPECT TO THE INTENT TO DEFRAUD CLAIM, THE FACT THAT WE ONLY MAKE

14    GENERIC ALLEGATIONS, THAT'S SIMPLY NOT TRUE.  WE DO MAKE THOSE

15    ALLEGATIONS IN PARAGRAPH 7, AND 276, WHICH IS THE SUMMARY OF

16    ALLEGATIONS.

03:38 17         AND THEN, FOR EXAMPLE, IN PARAGRAPH 276, WE EXPLAIN THAT

18    THE FACTUAL BASIS FOR THAT ALLEGATION ABOUT INTENT TO DEFRAUD, THE

19    SPECIFIC FACTS THAT SUPPORT THAT, AND THAT SUPPORT THE INFERENCE

20    OF INTENT TO DEFRAUD, ARE IN FACT THE OTHER FACTUAL ALLEGATIONS IN

21    THE COMPLAINT; NOT THOSE SPECIFIC PARAGRAPHS, THOSE ARE THE

22    SUMMARY PARAGRAPHS THAT REFER BACK.

03:38 23         SO, FOR EXAMPLE, IN PARAGRAPH 276, ON PAGE 107, IT SAYS:

24    "BEGINNING AT THE LATEST, IN OR ABOUT SEPTEMBER 2004, TO

25    OCTOBER 2007, WITHIN THE" --

SACV 13-779-DOC - 07/08/2013 - VOL. 2

03:38  1          THE COURT:  COUNSEL, JUST A LITTLE SLOWER.  START AGAIN.

03:38  2          MR. CARDONA:  "BEGINNING AT THE LATEST, IN OR ABOUT

       3   SEPTEMBER 2004, CONTINUING AT LEAST THROUGH IN OR ABOUT

       4   OCTOBER 2007, WITHIN THE CENTRAL DISTRICT OF CALIFORNIA AND

       5   ELSEWHERE, AS DESCRIBED MORE FULLY IN PARAGRAPHS 110 TO 275 ABOVE,

       6   DEFENDANT MCGRAW-HILL, ACTING THROUGH S&P RATINGS, THE SUCCESSOR

       7   TO WHICH IS DEFENDANT S&P L.L.C., KNOWINGLY AND WITH INTENT TO

       8   DEFRAUD."

03:39  9          SO THE FACTUAL PREDICATES FOR THAT GENERAL ALLEGATION

       10  ARE, IN FACT, THE FACTS ALLEGED IN PARAGRAPHS 110 TO 275, WHICH

       11  RELATE TO, FOR EXAMPLE, THE MODELS, HOW THOSE WERE MANIPULATED,

       12  HOW THEY WERE CHANGED, HOW THEY WERE NOT CHANGED; THE COURSE OF

       13  CONDUCT THAT WENT INTO THAT; AND THE FACT THAT THEY KNEW THE

       14  RATINGS WERE FALSE, THAT THEY ISSUED THOSE RATINGS NEVERTHELESS.

       15  ALL OF THAT IS SUFFICIENT, UNDER RULE 12 (B)(6) AND 9B, TO ALLEGE

       16  WHAT WE HAVE ALLEGED AND SUPPORT THOSE ALLEGATIONS.

03:40  17         WITH RESPECT, FINALLY, TO THEIR CLAIMS ABOUT MATERIALITY

       18  AS IT RELATES TO, FOR EXAMPLE, BANK OF AMERICA AND CITIBANK,

       19  AGAIN, THIS GETS BACK TO THE NATURE OF THE STRUCTURE AND THE

       20  STRUCTURED FINANCE.  WITHOUT THE RATINGS THAT STANDARD & POOR

       21  ISSUED, THOSE RATINGS, THE STRUCTURE COULD NOT HAVE GONE FORWARD

       22  AT ALL, AND CITIBANK AND BANK OF AMERICA COULDN'T HAVE MADE THE

       23  PURCHASES OR SUFFERED THE LOSSES THEY DID.

03:40  24         AND FOR PURPOSES OF FIRREAA, AS WE HAVE CITED THE BANK

       25  OF NEW YORK CASE OUT OF THE SOUTHERN DISTRICT OF NEW YORK, A FRAUD

SACV 13-779-DOC - 07/08/2013 - VOL. 2

1  FOR PURPOSES OF FIRREAA CAN BE ADDRESSED EVEN AT ISSUERS WHO ARE

2  INVOLVED IN THAT, AND IT CAN AFFECT THOSE ISSUERS.  IN OTHER

3  WORDS, EVEN IF THE FRAUD WAS DIRECTED AT OTHER INVESTORS WHO

4  PURCHASED THOSE CDO'S, IF THE FINANCIAL INSTITUTIONS SUFFERED

5  LOSSES RESULTING FROM THOSE CDO'S, THAT COULD STILL BE AFFECTING

6  THOSE FINANCIAL INSTITUTIONS FOR PURPOSES OF FIRREAA.  AND THE

7  BANK OF NEW YORK CASE MAKES THAT CLEAR.

03:41 8          WITH THAT, UNLESS THE COURT HAS QUESTIONS, I WILL

9  CONSULT WITH MY CO-COUNSEL, AND THEN YIELD THE FLOOR.

10               (COUNSEL CONFER)

03:41 11          MR. CARDONA:  NOTHING FURTHER, YOUR HONOR.

03:41 12          THE COURT:  COUNSEL, LAST ROUND.

03:41 13          MR. KEKER.

03:41 14          MR. KEKER:  THE BANK OF NEW YORK CASE STANDS FOR THE

15  UNEXCEPTIONAL PROPOSITION THAT, IN A CRIMINAL CASE, AND I HAVE HAD

16  THE MISFORTUNE EVER TRYING ONE LIKE THIS, WHERE THE BANK OFFICER

17  MAY HAVE BEEN IN ON IT, BUT YOU COULD STILL DEFRAUD THE FINANCIAL

18  INSTITUTION, EVEN IF THE BANK OFFICER IS IN ON IT.  THAT DOESN'T

19  GO, THOUGH, TO THE ISSUE OF MATERIALITY AS IT SITS HERE IN THIS

20  CASE.

03:41 21          THE MATERIALITY HAS TO DEAL WITH THE REASONABLE ISSUER.

22  A REASONABLE ISSUER, THE BANK, PACKAGES IT -- I WON'T SAY IT

23  AGAIN.  I HAVE BEEN THROUGH IT FIVE TIMES.  THE REASONABLE ISSUER

24  KNOWS EVERYTHING, PROVIDES ALL THE INFORMATION.  HE KNOWS WHAT THE

25  RATING MODEL IS, AND THEN KNOWS WHO IT'S PAYING AND SO ON, AND

SACV 13-779-DOC - 07/08/2013 - VOL. 2

1    THEN GETS BACK A RATING.  AND THE NOTION THAT A STATEMENT OF, "I'M

2    OBJECTIVE, I'M A MAN OF HIGH INTEGRITY, I'M INDEPENDENT," THAT

3    THAT WOULD AFFECT THE TOTAL MIX OF INFORMATION FOR A REASONABLE

4    INVESTOR WHO WAS ALSO AN ISSUER IS RIDICULOUS.  THAT'S WHAT WE'RE

5    SAYING, NOT THAT -- SO I THINK OF THE BANK OF NEW YORK CASE IS

6    BEING MISUSED IN THE CONTEXT OF HOW WE'RE ARGUING IT.

03:42 7          THE COURT:  IN 2007, EARLY 2007, AND BEFORE, I THINK

8    THAT IT MAY HAVE BEEN RECOGNIZED THAT THERE WERE POTENTIAL

9    CONFLICTS.  AND I HAVE CONSTRUED THAT MANY OF THE THINGS THAT S&P

10   AND OTHER ENTITIES MAY HAVE DONE IS TRIED TO ALLAY THOSE CONCERNS,

11   AND ONE WAS THE CODE OF CONDUCT, ET CETERA.

03:43 12         IF THOSE WERE MEANT AS REPRESENTATIONS TO CALM THE

13   CONCERN OF CONFLICTS, DID S&P VIOLATE THOSE ACTIONS AND EFFORTS ON

14   THEIR PART AFTER 2007; OF COURSE, YOUR ANSWER IS GOING TO BE NO.

03:43 15         MR. KEKER:  BUT MY ANSWER IS ALSO GOING TO BE, THERE

16   WASN'T ANYTHING NEW -- YES, THEY HAD TO DO SOMETHING BECAUSE OF

17   S.E.C. RULES, BUT S&P, THROUGHOUT IT'S 100-SOMETHING-YEAR HISTORY,

18   HAS BEEN SAYING THE SAME THING:  WE'RE INDEPENDENT; WE'RE AN

19   INDEPENDENT RATING SERVICE; WHAT WE GIVE OUT IS OUR OBJECTIVE

20   ASSESSMENT OF AN OPINION OF HOW THE SECURITY IS GOING TO DO; AND

21   WE'RE GOING TO DEFINE WHAT WE MEAN BY AAA, WHAT WE MEAN BY AA, AND

22   SO ON; AND WE'LL TELL YOU WHERE WE THINK THAT FITS.

03:44 23         THEY GIVE AN OPINION.  PEOPLE, ALL THESE YEARS, HAVE

24   LEARNED TO RELY ON IT.  IN THIS CASE THEIR OPINION WAS THE SAME AS

25   MOODIES.  NOTHING CHANGED IN THAT REGARD IN 2007.  WHAT CHANGED IN

SACV 13-779-DOC - 07/08/2013 - VOL. 2

1   2007, IS THAT PEOPLE BEGAN TO REALIZE THAT -- AND THERE WERE --

2   EVERYBODY -- THE 2006 VINTAGE IS OPERATED DIFFERENTLY THAN 2005,

3   2004.  RESIDENTIAL MORTGAGES SEEM TO BE GETTING MORE RISKY, AND

4   EVERYBODY WAS SCRAMBLING AROUND TO DO THEIR BEST TO REACT TO THE

5   NEW CIRCUMSTANCES.  BUT THAT DOESN'T CHANGE THE MEANING OR THE

6   REASSURANCE FACTOR OF S&P SAYING:  "WE ARE OBJECTIVE, WE TRY NOT

7   TO LET BUSINESS CONSIDERATIONS" -- ALL THE ASPIRATIONAL THINGS

8   THAT THEY PUT IN THEIR CODE OF CONDUCT.  THAT WASN'T NEW, AND THAT

9   WASN'T TO QUIET SOME MARKET.  THE MARKET COULDN'T BE QUIETED IN

10  2007.

03:45 11        THE COURT:  OKAY.  COUNSEL, LAST ROUND.

03:45 12        MR. CARDONA:  I DON'T WANT TO REPEAT MYSELF SO I'LL

13  ADDRESS THAT.  WE AGREE THEY WEREN'T NEW.  S&P, IN FACT, IN 2004,

14  AND THIS IS ONE REASON WHY THEY'RE ACTIONABLE, IS THE

15  REPRESENTATIONS THAT IT MADE IN SEPTEMBER 2004, WHEN IT PUT ITS

16  CODE OF CONDUCT, FOR THE FIRST TIME, ITS CODE OF PRACTICES AND

17  PROCEDURES, WHICH IS WHAT IT WAS CALLED AT THAT POINT, WHEN IT

18  FIRST PUT THAT IN FORMAL FORM, IT REPRESENTED:  THIS IS WHAT WE

19  HAVE BEEN DOING, AND THIS IS WHAT WE'RE GOING TO CONTINUE TO DO.

03:45 20        AND THOSE WERE PUT OUT THERE TO ALLAY CONCERNS.  AND THE

21  CONCERNS WERE PARTICULARLY IMPORTANT HERE BECAUSE, FOR MOST OF

22  S&P'S HISTORY, ITS RATINGS HAD BEEN ADDRESSED TO BONDS, CORPORATE

23  BONDS, OTHER TYPES OF THINGS.  STRUCTURED FINANCE WAS RELATIVELY

24  NEW, AND RELATIVELY OPAQUE.  AND SO THOSE ASSURANCES, I THINK,

25  ATTAIN AN GREATER LEVEL OF MATERIALITY AT THAT POINT IN TIME.

SACV 13-779-DOC - 07/08/2013 - VOL. 2

03:46 1      SO WITH THAT, AGAIN, I DON'T WANT TO REPEAT MYSELF SO

2  I'LL SUBMIT.

03:46 3      THE COURT:  ALL RIGHT.  LET ME ASK YOU AND YOUR

4  CO-COUNSEL, THIS TENTATIVE WAS PREPARED AS A TENTATIVE, AND I'D

5  LIKE SOME TIME FOR REFLECTION ABOUT THIS TENTATIVE.  IF I HOLD TO

6  A TENTATIVE THAT'S BEEN ISSUED TO YOU, WITH SOME MODIFICATIONS

7  OBVIOUSLY, THEN I WOULD BE BRINGING YOU BACK IN A WEEK TO 10 DAYS

8  PROBABLY, MAYBE TWO WEEKS, BECAUSE I'M GOING TO PUT SOME TIME

9  CONSTRAINTS ON MYSELF TO GET RIGHT BACK AT THIS.  IF WE'RE NOT

10  GOING TO FORWARD THEN, OF COURSE, THAT RESOLVES THE ISSUE.

03:47 11      I WOULD ASSUME FROM S&P, YOU'D LIKE TO DELAY ANY FURTHER

12  DISCUSSIONS UNTIL THE COURT EITHER ADOPTS THIS TENTATIVE OR

13  CHANGES THE TENTATIVE.

03:47 14      MR. KEKER:  YES, YOUR HONOR.

03:47 15      THE COURT:  OKAY.  AND I WOULD ASSUMED THAT YOU WOULD

16  LIKE TO GO FORWARD WITH THE SCHEDULING COVERAGES TODAY.

03:47 17      MR. CARDONA:  WE WOULD LIKE TO GO FORWARD WITH THE

18  SCHEDULING COVERAGES AND, IN PARTICULAR, GET TO A POINT WHERE WE

19  CAN MOVE FORWARD WITH THE DISCOVERY THAT WE NEED TO DO.

03:47 20      THE COURT:  OKAY.  NOW, LET ME SET OUT WHAT LITTLE I

21  KNOW ABOUT THIS CASE, AND IT'S NOT FACT, BUT WE CAN'T HELP BUT

22  OCCASIONALLY -- ALTHOUGH I HAVE STOPPED READING ABOUT YOUR CASE IN

23  THE PAPER ON PURPOSE.

03:47 24      YOU VALIDATED THAT YOU HAD BEEN INVESTIGATING THE CASE

25  FOR THREE YEARS, TRUE?

SACV 13-779-DOC - 07/08/2013 - VOL. 2

03:48 1          MR. CARDONA:  YES, YOUR HONOR.

03:48 2          THE COURT:  IT SAYS RIGHT IN THE DOCUMENTS.  AND

3     APPARENTLY YOU ASK THE COURT FOR, WHAT IS IT, A SIX-MONTH

4     CONTINUANCE WHEN THE CASE WAS FIRST ASSIGNED TO YOU, OR A

5     FOUR-MONTH CONTINUANCE?

03:48 6          MR. CARDONA:  THERE WAS A REQUEST BY S&P FOR AN

7     EXTENSION OF TIME TO FILE THEIR MOTION.

03:48 8          THE COURT:  THERE WAS AN AGREEMENT BETWEEN THE PARTIES.

03:48 9          MR. CARDONA:  WE AGREED TO THAT AND DIDN'T OBJECT TO

10    GIVING THEM MORE TIME TO FILE THEIR MOTION TO DISMISS AND SET AN

11    AGREEABLE SCHEDULE FOR THE BRIEFING.

03:48 12          THE COURT:  THEN WHY IS 7 TO 10 DAYS DETRIMENTAL TO

13    EITHER ONE OF THESE PARTIES?

03:48 14          MR. CARDONA:  YOUR HONOR, I DON'T THINK 7 TO 10 DAYS

15    WOULD BE DETRIMENTAL TO US.  WE WOULD LIKE TO MOVE FORWARD.  BUT

16    IF THE COURT WANTS TO TAKE THE 7 TO 10 DAYS, WE DON'T HAVE AN

17    OBJECTION.

03:48 18          THE COURT:  I WANT TO TAKE THE 7 TO 10 DAYS.  I WANT

19    TIME FOR REFLECTION ON THIS.

03:48 20          I WANT TO SAY TO BOTH OF YOU, THUS FAR THE BRIEFING HAS

21    BEEN EXTRAORDINARY, AND I THINK IT'S BEEN VERY HELPFUL.  IN FACT,

22    SOME OF THE DIALOGUE BACK AND FORTH HAS BEEN HELPFUL TO ME TODAY.

23    SO I APPRECIATE THE CONVERSATION I HAD WITH BOTH OF YOU.

03:49 24          IF WE'RE NOT GOING FORWARD, IT WOULD NOT BE A DISMISSAL

25    WITH PREJUDICE OBVIOUSLY.  IF WE ARE GOING FORWARD, ALREADY YOU

                    SACV 13-779-DOC - 07/08/2013 - VOL. 2

        1   HAVE POINTED OUT SOME CONCERNS IN BOTH THE FACTUAL SITUATION OF

        2   THIS THAT I'D LIKE TO RELOOK AT OBVIOUSLY, ESPECIALLY IN LIGHT OF

        3   PARAGRAPH 198.

03:49   4           BUT COULD I RAISE A COUPLE ISSUES, IN CASE WE WERE GOING

        5   FORWARD, THAT MIGHT SAVE YOU A LITTLE BIT OF TIME UPON REFLECTION;

        6   IT MIGHT SAVE YOU A COUPLE WEEKENDS, IN FACT.

03:49   7           THESE ARE NOT RULINGS.  THESE ARE JUST SOME TENTATIVE

        8   THOUGHTS.  SO LET ME HAVE A CONVERSATION WITH YOU FOR A MOMENT.

03:49   9           AND, FIRST, I UNDERSTAND THE GOVERNMENT'S POSITION

       10   CONCERNING A BIFURCATED TRIAL.  I UNDERSTAND I HAVE A DISCRETION.

       11   YOU MIGHT FIND THE COURT HESITANT TO HAVE A BIFURCATED TRIAL AND

       12   HAVE THE ISSUE OF DAMAGES SUBMITTED TO A COURT.  IT RAISES ALL

       13   SORTS OF CONSTITUTIONAL ISSUES, UNNECESSARY ISSUES, QUITE FRANKLY.

       14   BUT THAT MEANS THAT THE COURT IS IN THE POSITION, IF IT SUBMITS A

       15   DAMAGES ISSUE TO THE JURY, OF HAVING TO RETAIN THE SAME JURY.

       16   IT'S LIKE A DEATH PENALTY CASE.  YOU CAN'T SEND THEM HOME FOR ONE

       17   TO SIX MONTHS AND THEN BRING THEM BACK.  SO WHATEVER TIME

       18   QUALIFICATION THAT JURY WOULD HAVE, WOULD HAVE TO ENCOMPASS SOME

       19   IDEA OF WHAT THE DAMAGES TRIAL WOULD LOOK LIKE.  AND THERE IS THE

       20   DIFFICULTY THAT THE DEFENSE WOULD HAVE, THIS CHAOS THAT'S BEEN

       21   ALLUDED TO BY MR. KEKER.

03:51  22           YOU HAVE ASKED FOR ADDITIONAL TIME ON THE GOVERNMENT'S

       23   PART, AND I DON'T KNOW THAT YOUR CASE WOULD BE ANY DIFFERENT THAN

       24   A LOT OF OTHER CASES.  I DON'T KNOW THAT YOU ARE NOT ENTITLED TO

       25   SOME DISCOVERY.  BY THE SAME TOKEN, I THOUGHT THAT WHAT WOULD BE

SACV 13-779-DOC - 07/08/2013 - VOL. 2

1   TREMENDOUSLY DAMAGING TO THE DEFENSE, AND MR. KEKER, IS IF YOU

2   TOOK EIGHT MONTHS HYPOTHETICALLY, AND ON ONE OF THE PAGES IN THE

3   SCHEDULING CONFERENCE ORDER, SOMEONE ALLUDED TO THE STRENUOUSNESS

4   OF HAVING ONE DEPOSITION A WEEK, AND WHAT A BURDEN THAT WOULD BE.

5   YOU CAN MESH THE CHAOS OF ME SETTING A TRIAL DATE, AND SETTING

6   ASIDE OVER 20 DAYS FOR JUST THE GOVERNMENT'S CASE-IN-CHIEF, AND I

7   WOULD THINK AT LEAST AN EQUAL AMOUNT OF TIME FROM THE DEFENSE'S

8   PERSPECTIVE, AND THEN HAVING TO DELAY THAT TRIAL DATE BECAUSE YOU

9   HAD THE DISCOVERY THAT YOU NEEDED IN AN ATTEMPT TO HONE THESE

10  ALLEGATIONS, AND YOU THEN GAVE THAT TO THE DEFENSE WHO, FOR THE

11  FIRST TIME FROM THEIR PERSPECTIVE, AT LEAST ALTHOUGH YOU CLAIM

12  THEY'RE PREPARED AND THEY HAVE THE SAME KNOWLEDGE YOU DO, AND

13  MAYBE MORE, BUT THE RECORD WOULD THEN APPEAR THAT THEY WERE CAUGHT

14  IN THIS VICE-LIKE GRIP OF YOU PROCEEDING FORWARD IN THIS VAST

15  ARRAY OF ALLEGATIONS AND FINALLY HONING IT, AND THEN THEY NEEDED

16  DEPOSITIONS.  NOW THE PROBLEM WOULD BECOME YOUR AVAILABILITY, AND

17  I WOULD GET CAUGHT IN A BIND OF HAVING TO CONTINUE TRIAL DATES.  I

18  DON'T WANT TO DO THAT.

03:52 19        SO THE FIRST ISSUE WOULD BE, IF WE GET INTO A POSITION

20  OF YOU NEEDING DISCOVERY, HOW LONG.

03:53 21        AND THERE ARE TWO WAYS OF CONDUCTING A CASE.  ONE IS

22  THAT WE HAVE ABSOLUTE NO COOPERATION BETWEEN THE TWO OF YOU, WHICH

23  I DON'T EXPECT AGREEMENTS AT THE PRESENT TIME.  BUT A VERY WISE

24  PERSON ONCE TOLD ME TO CONTROL MY OWN FATE BEFORE THE COURT DID,

25  ONE TIME.

SACV 13-779-DOC - 07/08/2013 - VOL. 2

03:53  1          SO RIGHT NOW I KNOW S&P'S POSITION IS A VIRTUOUS ONE; IN

       2   OTHER WORDS:  JUDGE, DON'T GO FORWARD, IT SHOULD BE DISMISSED, AND

       3   IF YOU DO THERE IS CHAOS.  IF WE'RE GOING FORWARD, I'M GOING TO

       4   ASK YOU FOR YOUR PARTICIPATION AGAIN, YOUR WISDOM, BUT YOU DON'T

       5   HAVE TO.  RIGHT NOW YOU ARE IN A DIFFERENT POSITION.  YOU SHOULD

       6   BE MAINTAINING THE POSITION YOU ARE IN.

03:53  7          THE SECOND THING IS, YOU HAVE 280-SOME WITNESSES OUT

       8   THERE THAT THE GOVERNMENT, YOU KNOW, ALLUDES TO AS THIS VAST

       9   AMOUNT, ALONG WITH 30 PAGES OF MATERIAL.  YOU HAD TO, IN THE THREE

      10   YEARS, ALREADY TALKED TO A NUMBER OF PEOPLE AND HAVE SOME IDEA OF

      11   THOSE SPECIFIC PEOPLE YOU NEED TO DEPOSE; 285 PEOPLE, I DON'T

      12   THINK YOU ARE ASKING FOR THAT, AND I DON'T MEAN TO INFER THAT.

      13   BUT UNLESS I CAN GET A REASONABLE NUMBER WITH FINALITY, IF WE'RE

      14   GOING FORWARD, THEN YOU LEAVE IT TO ME TO CHOOSE.  AND I DON'T

      15   KNOW WHETHER THAT'S 20, 35, 50; IN OTHER WORDS, THE COURT STARTS

      16   MAKING ARBITRARY DECISION.  AND I WOULD RATHER HAVE YOUR WISDOM,

      17   AS LONG AS -- AS WELL AS THE DEFENSE'S WISDOM ON THAT, AND WHAT

      18   DOES EACH SIDE NEED TO MAKE THIS A FAIR TRIAL IF WE'RE GOING

      19   FORWARD.

03:54 20          NUMBER 3, A 12(B)(6) IS A LOT DIFFERENT THAN A SUMMARY

      21   JUDGMENT MOTION.  REGARDLESS OF TWOMBLY, I HAVEN'T DECIDED,

      22   ALTHOUGH I'M WRESTLING WITH THE SAME PROBLEM MR. KEKER DOES, AND

      23   THAT IS, IF THE JURY IS GOING TO HAVE DAMAGES PLACED IN FRONT OF

      24   THEM, THEY'RE ENTITLED TO DEFEND.  AND IT'S NOT A BILL OF

      25   PARTICULARS IN A SENSE, BUT IT HAS TO BE NARROW SO THAT THE

SACV 13-779-DOC - 07/08/2013 - VOL. 2

1    DEFENSE CAN, IN FACT, DEFEND AND KNOW THE ALLEGATIONS.  OTHERWISE

2    IT'S JUST A SCATTERGUN APPROACH OF 30 MILLION DOCUMENTS AND

3    EVERYBODY GUESSING.  AND I THINK YOU REPRESENT IN GOOD FAITH YOU

4    ARE GOING TO MAKE THAT ATTEMPT.  FROM THE ADVERSARIAL POINT OF

5    VIEW, THEY DON'T BELIEVE YOU.

03:55  6    NEXT, DEPOSITIONS.  I DON'T KNOW THE PARTIES HERE.  I

7    KNOW THAT YOU HAVE BEEN UP IN LOS ANGELES, AND COME DOWN TO THE

8    COURT.  I KNOW MS. KELLER FROM A PRIOR CASE.  IT'S MY FIRST

9    MEETING WITH EVERYBODY ELSE, I THINK, LITERALLY IN THE ROOM.  SO I

10   DON'T KNOW YET, ALTHOUGH I EXPECT VIGOROUS ADVOCACY, IF I CAN

11   PARTICIPATE OR EXPECT ANY PARTICIPATION.  IN OTHER WORDS, IT MAY

12   BE LIKE DOING TO THE DENTIST AND PULLING TEETH WITHOUT NOVOCAINE.

03:56 13    SO WHAT I HAVE TO DECIDE IS, YOU CHOSE THE FORUM ON THE

14   WEST COAST, WHICH THE DEFENSE STATES IN THEIR SCHEDULING

15   CONFERENCE ORDER ON ONE OF THE PAGES, THAT WAS YOUR CHOICE, BUT

16   THEY POINT OUT THAT THE MAJORITY OF THE WITNESSES ARE ON THE EAST

17   COAST.

03:56 18    SO WHAT DO I DO WITH THAT?

03:56 19    SO LET ME TALK TO YOU ABOUT SOME THOUGHTS.  THESE ARE

20   NOT RULINGS FOR BOTH OF YOU, BUT GIVE YOU SOME TIME FOR REFLECTION

21   IF WE'RE GOING FORWARD, IT WILL SAVE YOU 24, 48 HOURS OF SITTING

22   AROUND.

03:56 23    FIRST, A PERSON SHOWS UP FOR A DEPOSITION IN NEW YORK OR

24   WASHINGTON, D.C.  NEITHER OF YOU HAVE ASSIGNED A EXCELLENT

25   ASSOCIATE COUNSEL OR A PARTNER WHO IS ABOUT TO MAKE THEIR MARK,

SACV 13-779-DOC - 07/08/2013 - VOL. 2

1   THEY'RE EXTRAORDINARY ON BOTH SIDES, BUT THIS IS THEIR TIME IN THE

2   SUN, AND THEY'RE GOING TO GET IN THERE AND OBJECT LITERALLY TO

3   EVERYTHING, OR INSTRUCT A CLIENT OR A DEPONENT NOT TO ANSWER.

03:57 4        NOW WE STOP THE DEPOSITION, WHICH IS IN NEW YORK OR

5   WASHINGTON, D.C., AND THE COURT IS OUT IN CALIFORNIA, AND I

6   LITERALLY HAVE NO POWER EXCEPT TIME DELAY.  SO THAT PERSON IS

7   BEING DEPOSED NOW GOES AWAY AND IS INCONVENIENCED AGAIN.  AND I

8   THINK WE HAD THAT SITUATION WITH MR.  LARIAN, WHO HAD BEEN DEPOSED

9   30 TIMES, OR SOMETHING, WITH MS. KELLER'S CASE.  I FORGET.  IT WAS

10  RIDICULOUS.

03:57 11       SO FIRST, DO I GET A SPECIAL MASTER?

03:57 12       FROM THE GOVERNMENT'S POSITION, NO, YOU DON'T WANT TO

13  PAY FOR IT.  BUT WITHOUT A SPECIAL MASTER, IF THE DEPOSITIONS ARE

14  TAKING PLACE ON THE EAST COAST, I CAN'T COUNTENANCE DELAY, AND

15  YOUR TREASURY IS JUST AS GREAT, IF NOT GREATER, THAN S&P'S.

03:57 16       SO DO I GET A SPECIAL MASTER TO FLY TO THE EAST COAST?

03:58 17       IF I DON'T, THEN THE DEPOSITIONS NEED TO TAKE PLACE

18  HERE.

03:58 19       NOW, ONE OF YOU IS GOING TO TELL ME THAT I DON'T HAVE

20  JURISDICTION OUTSIDE OF 120 MILES.  THIS WAS MADE UP IN THE 18OOS

21  SOMETIME.  THE GOVERNMENT HAS NATIONWIDE JURISDICTION.  YOU CAN

22  GET ANYBODY, FROM YOUR PERSPECTIVE, TO COURT THAT YOU WANT.  AND

23  S&P CAN ALSO.

03:58 24       I'M NOT THREATENING YOU, BUT THERE HAVE BEEN OTHER

25  CASES -- YES, I AM.  THERE HAVE BEEN OTHER CASES WHERE I DIDN'T

SACV 13-779-DOC - 07/08/2013 - VOL. 2

1   HAVE DEPONENTS WHO APPEARED FROM ISRAEL OR WHATEVER, AND THAT

2   CAUSED AN ADVERSE INFERENCE AGAINST DIRECT TV AND OTHER FOLKS.  IN

3   OTHER WORDS, IF YOU HAVE THE PERSON EMPLOYED BY S&P OR SOMEBODY

4   WHO IS WITHIN THE GOVERNMENT OFFICES, IF THE DISCOVERY EXTENDS TO

5   THE TREASURY, AS YOU HAVE ALLUDED TO, OR THE S.E.C., THEN THAT

6   PERSON NEEDS TO BE HERE.  AND THEIR POSITION THAT THEY'RE IN

7   WASHINGTON, D.C., IS FALLACIOUS.

03:58   8       I'M WORRIED ABOUT THE OVERSEAS.  I'M WORRIED ABOUT

9   INTERROGATORIES OR LETTERS THAT HAVE TO BE SENT OUT, AND HOW THAT

10   OCCURS IF WE GO FORWARD, AND WHO THOSE PEOPLE TRULY ARE.

03:59   11       MOST OF THE PEOPLE THAT SEEM TO BE INVOLVED IN YOUR CASE

12   STILL SEEM TO BE PERSONS WHO MAY HAVE RESPONSIBILITY WORLDWIDE,

13   BUT THEY SEEM TO BE WITHIN THE CONFINES OF THE UNITED STATES.  AND

14   IF WE'RE GOING FORWARD, I'M GOING TO BE ASKING WHO IS OUTSIDE THIS

15   COUNTRY THAT YOU BELIEVE YOU NEED.

03:59   16       GIVE ME ONE MOMENT.  LET ME GIVE YOU AN EXAMPLE OF ONE

17   OF MY CONCERNS.  I THINK IT'S IN PARAGRAPH 60, ACCORDING TO MY

18   NOTES.  IT'S A PERSON REFERRED TO AS "EXECUTIVE E."  AND I'M GOING

19   TO JUST TRY TO READ FROM MY OWN NOTES.  WHILE YOU KNOW YOUR CASE

20   AFTER THREE AND A HALF YEARS, I'M JUST ABSORBING A BARE COMPLAINT

21   RIGHT NOW.

04:00   22       EXECUTIVE E IS WITHIN THE STRUCTURED FINANCE DEPARTMENT,

23   MONITORING OF RMB'S AND CDO'S RATINGS, AND IS RESPONSIBLE -- OR

24   SHE IS RESPONSIBLE FOR GLOBAL SURVEILLANCE, WHO REPORTED TO ROSS,

25   AND MEMBERS OF SFLT, WHICH OF COURSE IS THE STRUCTURE FINANCE

SACV 13-779-DOC - 07/08/2013 - VOL. 2

1  ENTITY.

04:01  2         EXECUTIVE F -- WHO I HAVE NO IDEA WHO THIS PERSON IS, BY

3  THE WAY -- IS IN CHARGE OF MBS SURVEILLANCE.  AND EXECUTIVE G IS

4  IN CHARGE OF CDO.

04:01  5         IT APPEARS THAT EXECUTIVE A, WHO I ASKED YOU ABOUT, IS

6  EXECUTIVE VICE PRESIDENT OF GLOBAL RATINGS.  I NOW KNOW IT'S A

7  VICKIE TILLMAN, WHO I HAD NO IDEA ABOUT BEFORE BECAUSE OF THE

8  DRAFTING OF THE COMPLAINT.  SO, THEREFORE, I'M ASSUMING THAT SHE

9  IS WITHIN THE UNITED STATES, BUT SHE COULD BE, WITH THIS TITLE, IN

10  LONDON FOR ALL I KNOW.

04:02  11         SO I'M GOING TO ASK YOU TO THINK, IF WE ARE GOING

12  FORWARD, BECAUSE YOU'LL GET A WRITTEN DECISION FROM ME.  IF WE'RE

13  NOT, YOU ARE GOING TO HAVE A CHANCE TO AMEND.  IF WE ARE, THEN

14  BEFORE YOU COME INTO COURT, YOU MIGHT HAVE THAT CONVERSATION WITH

15  YOUR TRIAL TEAM ABOUT THOSE PEOPLE YOU WANT TO HAVE DEPOSED AND

16  WHY, GIVE ME AN EXPLANATION.

04:02  17         I WOULD IMAGINE, AND I'M GUESSING, THAT THE FIRST

18  PORTION FROM S&P'S PERSPECTIVE, IF WE'RE GOING FORWARD, WOULD BE

19  TO NOT AS AGGRESSIVELY PURSUE DEPOSITIONS UNTIL YOU SEE WHAT THE

20  GOVERNMENT'S REQUEST ARE CONCERNING WHO THEY WANT TO DEPOSE.  MUCH

21  OF WHAT YOU DO IS GOING TO BE BASED INITIALLY UPON SOME --

22  REFLECTS TO WHAT THEY'RE DOING.  THAT'S UNDERSTANDABLE.

04:03  23         SO I'M NOT PUTTING THE SAME BURDEN ON YOU TO SORT OUT

24  YOUR ADDITIONAL DEPONENTS AS I WOULD THE GOVERNMENT BECAUSE I'M

25  GOING TO WANT TO KNOW WHO THEY ARE.

SACV 13-779-DOC - 07/08/2013 - VOL. 2

04:03  1          DO I HAVE THE DEPOSITIONS, YOU KNOW, HERE IN ORANGE

       2  COUNTY?

04:03  3          NOW, LET ME TALK TO YOU ABOUT DEPOSITIONS.  THEY'RE

       4  VALUABLE BUT WORTHLESS TO ME IN TRIAL.  INTERROGATORIES, YOU MAY

       5  HAVE A LOT OF FUN WITH, THEY'RE OF NO VALUE TO ME.  THEY'RE

       6  WRITTEN BY ATTORNEYS NORMALLY.  SOMETIMES THEY GIVE VALUE.  VERY

       7  OFTEN, WHEN THEY'RE READ TO THE JURY, THERE IS AN EXPLANATION FROM

       8  THE WITNESS THAT HE OR SHE DIDN'T WRITE THEM.  IT USUALLY DESTROYS

       9  THE VALUE OF THAT INTERROGATORY.  SO THEY'RE GREAT FOR DISCOVERY

      10  PURPOSES, THEY'RE NOT GOOD TO TRIAL PURPOSES.

04:04 11          FOR DEPOSITION, WHOEVER IS BEING DEPOSED FINDS

      12  THEMSELVES IN A POSITION OF BEING DEPOSED, AND IT'S VERY VALUABLE

      13  BECAUSE ONE PARTY WILL GET SOMEBODY IN A STATEMENT THAT CAN LATER

      14  BE USED AT TRIAL.  WHAT I'M NOT GOING TO DO IS, I'M NOT GOING TO

      15  ALLOW -- AND LET ME SAY IT RIGHT FROM THE BEGINNING SO THAT THERE

      16  IS NO MISTAKING IT -- A PERSON TO COME INTO THIS COURT, UNLESS

      17  THEY'RE DEAD OR DYING, AND HAVE A DEPOSITION READ INTO THE RECORD.

04:04 18          THE REASON FOR THAT IS, I THINK IT'S CONSTITUTIONALLY

      19  INFIRM.  JURIES HAVE A RIGHT TO LOOK AND LISTEN TO WITNESSES TO

      20  JUDGE THEIR DEMEANOR, AND THEY HAVE THE RIGHT TO DO THAT IN THE

      21  PRESENCE OF A COURTROOM.  AND TAKING A DEPOSITION AND CHOPPING IT

      22  UP TO EACH PARTY'S INTEREST ISN'T GOING TO MEET WITH ANY FAVOR BY

      23  THE COURT.  SO YOU KNOW RIGHT GOING IN THAT THEY MAY BE GREAT

      24  DISCOVERY TOOLS, DEPOSE THE PEOPLE YOU WANT, GET THEM IN THE

      25  STATEMENTS OR POSITIONS TO IMPEACH THEM OR VALIDATE THEIR

SACV 13-779-DOC - 07/08/2013 - VOL. 2

1   CREDIBILITY.  YOU CAN READ THOSE STATEMENTS INTO COURT IF THEY'RE

2   RELEVANT LEGALLY.  BUT AS FAR AS A SUBSTITUTION, THAT'S NOT GOING

3   TO BE APPROPRIATE AS FAR AS THE COURT IS CONCERNED.  I DON'T CARE

4   IF YOUR TRIAL TAKES 40 DAYS OR 90 DAYS.  IT MAKES ABSOLUTELY NO

5   DIFFERENCE TO ME.  YOU'LL FIND THAT TIME IS NOT A CONCERN.  TAKE A

6   PICTURE OF EACH OTHER AND HOW YOUNG YOU LOOK RIGHT NOW.  YOU WON'T

7   BELIEVE THE HOURS YOU ARE ABOUT TO SPEND WITH ME, IF WE GO

8   FORWARD.  AND I'M NOT SURE WE ARE YET, SO MAYBE YOU ARE GOING TO

9   BE AMENDING THIS.

04:05 10        THIRD, I THINK, MR. KEKER, I THINK YOU ARE RIGHT ABOUT

11  THIS, AND THAT IS, IT'S A NIGHTMARE AT THE PRESENT TIME.  IN OTHER

12  WORDS, IN TERMS OF CASE MANAGEMENT, IF THIS GOES FORWARD IN ITS

13  PRESENT FORM, THE GOVERNMENT MAY SURVIVE A 12(B)(6), BUT THE

14  MANAGEMENT PROBLEMS OF THIS ARE SO BROAD THAT, UNLESS YOU

15  ETHICALLY AND DILIGENTLY LIMIT THIS, THEN YOU MAY BE SEEING A

16  SUMMARY JUDGMENT WITH A FAR DIFFERENT POSITION IN TERMS OF -- AND

17  A COUPLE MORE JUST THOUGHTS, JUST RANDOM THOUGHTS, THAT I HAVE

18  BEEN THINKING ABOUT FOR THE LAST COUPLE WEEKS.

04:06 19        I HAVE NEVER ISSUED A GAG ORDER, AND I NEVER WILL.

20  DON'T TRY THIS CASE IN THE PRESS.  I CAN'T DO TOO MUCH TO YOU IF

21  YOU DO, BUT LET ME GIVE YOU ONE EXAMPLE OF SOMETHING THAT DOESN'T

22  CONCERN ME AND IT DOES CONCERN ME.  I DON'T KNOW WHAT TO DO WITH

23  THE STATEMENT ABOUT BURNING DOWN THE HOUSE.  THAT SEEMED TO

24  CAPTURE AND TITILLATE THE PRESS.

04:06 25        BUT WHAT HAPPENS IF THAT'S A MIDDLE-MANAGEMENT PERSON

SACV 13-779-DOC - 07/08/2013 - VOL. 2

1    WHO HAD THIS ACCESS IN THE ELECTRONIC AGE, SIMPLY SENDS THAT OUT

2    IN AN E-MAIL.  AND ALLEGEDLY IT'S TO BE TAKEN DOWN THE NEXT DAY.

3    I DON'T KNOW IF THAT'S A RELEVANT PIECE OF EVIDENCE IF NOT ADOPTED

4    BY THE MANAGEMENT OF S&P.  IT MAY BE FAR DIFFERENT, THOUGH, IF

5    THIS PERSON IS A PERSON OF IMPORTANCE.  AND I DON'T KNOW WHO THIS

6    IS.  BUT WHEN THE CASE FIRST GOT ASSIGNED TO ME, THE HEADLINES

7    SEEMED TO TRIUMPH THIS PIECE OF EVIDENCE WHICH COULD BE HIGHLY

8    RELEVANT AND HIGHLY INFLAMMATORY AND NOT ADMISSIBLE.

04:07  9         FINALLY, DO WE REALLY WANT TO TRY THE CASE IN 2015?

04:07 10         I DON'T KNOW IF YOUR PRINCIPALS ARE HERE, MR. KEKER.

04:07 11         ANYBODY FROM S&P HERE?

04:07 12         MR. KEKER:  NO, YOUR HONOR.  THE ASSOCIATE GENERAL

13    COUNSEL IS HERE.

04:07 14         THE COURT:  WHERE IS THAT PERSON?

04:07 15         THANK YOU VERY MUCH.  IT'S A PLEASURE MEETING YOU.

04:07 16         I WANT TO ASSUME FOR A MOMENT THAT IF THE CASE WENT TO

17    TRIAL THAT S&P WAS NOT LIABLE, OR THE DAMAGES WERE DE MINIMUS

18    AFTER TRIAL, THE HARM FROM A PUBLICITY STANDPOINT COULD BE

19    DEVASTATING TO S&P.  I KNOW THAT THEY'RE LARGE, ET CETERA, BUT

20    THEY'RE NOT TOO BIG TO FAIL.

04:08 21         AND DO YOU REALLY WANT THE TRIAL IN 2015?

04:08 22         THAT'S A YEAR AND A HALF OR MORE FROM NOW.  AND

23    MEANWHILE, THIS CASE WILL, I IMAGINE, CONTINUE TO TRY HEADLINES

24    UNTIL THERE IS A LOT OF DEVASTATION IF THERE IS NO LIABILITY OR

25    MINIMAL DAMAGES IN A CASE LIKE THIS.

SACV 13-779-DOC - 07/08/2013 - VOL. 2

04:08  1          NUMBER TWO, DOES THE GOVERNMENT REALLY NEED UNTIL 2015?

04:08  2          AND I'M HUMBLY ASKING YOU TO THINK ABOUT THIS.  THE

3    PREPARATION OF A CASE THAT'S TAKEN THREE YEARS WITH A SIX-MONTH

4    CONTINUANCE REQUEST ON THIS COURT'S PART.  I JUST DON'T KNOW WHY

5    IT'S NOT TRIED A LOT SOONER, BUT THAT MEANS A LOT OF WORK.

04:08  6          NUMBER TWO, I DON'T EXPECT ONE DEPOSITION A WEEK.  I

7    EXPECT THREE TO FIVE DEPOSITIONS A WEEK.  AND I TEND TO CONTROL

8    THOSE.  I'LL HANDLE ALL THE DISCOVERY ISSUES HERE.  I'LL KNOW

9    VERY, VERY QUICKLY WHAT THE PROBLEM IS, IF WE GET INTO A TRIAL

10   POSTURE, FOR THIS REASON:  IF YOU HAVE A DISCOVERY ISSUE AND YOU

11   TAKE IT TO THE MAGISTRATE JUDGE, HE OR SHE MAKES A RULING.  BY THE

12   TIME THE NEXT FLOOD OF COMPLAINTS COMES IN, I HAVE TO DECIDE THE

13   FIRST GROUP DE NOVO, WHICH MEANS IF I'M DOING MY JOB, I NEED TO

14   PICK UP THAT RECORD FRESH, WHY DO I WANT TO BE BOTHERED BY ANOTHER

15   JURIST OPINION.  IN OTHER WORDS, IT TAKE ME DOUBLE TIME.

04:09 16         NUMBER TWO, I SEE WHAT THE PROBLEMS ARE IMMEDIATELY

17   BECAUSE EVERY TIME YOU GIVE ME A PROBLEM IN DISCOVERY, I GET TO

18   LOOK UNDER THE TENT, SO I UNDERSTAND YOUR CASE BETTER.  IN OTHER

19   WORDS, DISCOVERY DISPUTES ARE OFTEN AN AID TO THE COURT, NOT A

20   DETRIMENT.  I WANT TO SEE YOU 7:00 O'CLOCK IN THE MORNING, I WANT

21   TO SEE YOU AT 5:30 OR 6:00 0'CLOCK AT NIGHT BECAUSE I AM CARRYING

22   400 OTHER CASES.  AND IT'S NOT AN AFFRONT TO YOU, THAT'S JUST MY

23   TIME SCHEDULE.

04:09 24         EXPERTS.  I WOULD THINK YOU ARE GOING TO NEED SOME

25   EXPERTS TO TRY TO EXPLAIN RMB'S AND CDO'S, AND THE STRUCTURES,

SACV 13-779-DOC - 07/08/2013 - VOL. 2

1   SYNTHETIC CDO'S, CASH CDO'S.  THE PROBLEM IS THAT THEY CAN'T BE

2   REDUNDANT.  I'M NOT GOING TO LIMIT YOU, BUT I WILL LIMIT YOU IN

3   TERMS OF TIME.  SO I'M NOT GOING TO BE VERY IMPRESSED WITH

4   SOMEBODY WHO COMES IN WITH SEVEN EXPERTS AND SOMEBODY COMES IN

5   WITH TWO.  SOMEHOW WE HAVE TO REACH A MODICUM OF WHAT IS FAIR

6   ABOUT THAT.

04:10  7           AS FAR AS TIME CONCERN, IF YOU WANT TO GO TO TRIAL IN

8   2015, AND YOU FINALLY AGREE ABOUT THAT, IF WE'RE GOING FORWARD,

9   THAT'S FINE.  I HAVE NO COMPLAINT ABOUT THE DATES.

04:10  10          I JUST CAUTION YOU, MR. KEKER, IF WE ARE GOING FORWARD,

11   YOUR COMPANY, THE FIRM YOU REPRESENT CAN BE IN A DIFFICULT

12   POSITION.

04:10  13          MR. KEKER:  WE'RE WELL AWARE OF THAT.  IT REALLY IS TIED

14   IN, THE STAGE WHERE WE ARE NOW, I DON'T EVEN KNOW HOW WE'LL GO TO

15   TRIAL IN 2015.  BUT IF THE CASE WERE NARROWED TO SOMETHING THAT

16   WERE MORE SENSIBLE, WE CAN GO BACK TO GROUND ZERO.  WE WORK VERY

17   WELL WITH MR. CARDONA.

04:11  18          THE COURT:  I THINK YOU DO TO.  I DON'T HAVE ANY

19   PROBLEMS WITH THE ETHICS OF THE PARTY.  I THINK IT'S GOING TO BE A

20   WELL-MATCHED TEAM.

04:11  21          LET ME GIVE YOU A THOUGHT.  IF WE WERE GOING FORWARD, I

22   WOULD PUT TREMENDOUS PRESSURE ON THE GOVERNMENT, IN TERMS OF SOME

23   DEPOSITIONAL TIME, TO TELL ME WHO THESE PEOPLE ARE TO BE DEPOSED.

24   BUT THAT'S GOING TO PUT PRESSURE ON YOU.  AND I JUST DON'T KNOW

25   EACH OF YOUR SCHEDULES.  SO I'M A LITTLE WORRIED ABOUT A

SACV 13-779-DOC - 07/08/2013 - VOL. 2

1    ASSOCIATES TAKING THE PLACE OF LEAD COUNSEL, BUT I DON'T WANT TO

2    PUNISH LEAD COUNSEL UNTIL SHOWN DIFFERENTLY THAT YOU CAN'T HANDLE

3    THIS THROUGH ASSOCIATES.

04:11   4           SO I HAVEN'T SORTED THAT OUT IN MY MIND YET.  I HAVE NO

5    PROBLEM IN TERMS OF THE ETHICS AND COMPETENCY.  I WANT YOU TO

6    THINK ABOUT THAT.  IT'S GOING TO SAVE YOU A LOT OF TIME IF I HOLD

7    TO THIS TENTATIVE WITH SOME MODIFICATIONS ABOUT THE QUESTIONS I'M

8    GOING TO ASKING WHEN WE GET BACK TOGETHER.  AND I'M GOING TO PICK

9    A DATE AND ASK IF YOU ARE AVAILABLE ON A COUPLE DATES I THROW OUT

10   TO YOU.

04:12   11          MR. CARDONA:  YOUR HONOR, I CAN TELL THE COURT, HAVING

12   HEARD SOME OF YOUR COURT'S COMMENTS, ONE OF THE THINGS, ONE OF THE

13   REASONS WE BELIEVED WE WOULD NEED MORE DEPOSITIONS THAN WE MAY,

14   GIVEN WHAT THE COURT HAS SAID, IS WE WERE ANTICIPATING SOME

15   WITNESSES NOT BE ABLE TO BE HERE.  IF THE COURT WILL ASSIST US IN

16   GETTING WITNESSES HERE, I THINK WE CAN LIMIT THE NUMBER OF

17   DEPOSITIONS.

04:12   18          THE COURT:  LET'S TAKE AN EXAMPLE.  LET'S JUST TAKE

19   EXECUTIVE ZZZ, SO WE'RE NOT PICKING ON ANY EXECUTIVE.  S&P WILL

20   PRODUCE THAT PERSON VOLUNTARILY.  S&P DOES NOT WANT AN ADVERSE

21   INFERENCE IF THAT PERSON IS EMPLOYED, OR HAS RETIRED AND RECEIVING

22   A PENSION, FROM THE COURT TO HAVE THEM HERE.  BY THE SAME TOKEN,

23   WAS IT MR. VOLCKER, IF WE NEED HIM HERE, GUESS WHAT, HE'LL BE

24   HERE.  AND YOU CAN GET HIM HERE.  SO THE SAME COURTESY.

04:12   25          AND REMEMBER, AS YOU REQUEST TO EXPAND YOUR CASE, THERE

SACV 13-779-DOC - 07/08/2013 - VOL. 2

1    IS EVERY PROBABILITY THAT YOU GET TO EXPAND YOUR CASE.  SO YOU

2    INFER YOU MIGHT WANT DEPOSITIONS OF TREASURY THE, F.T.C., REMEMBER

3    THAT IN YOUR SCHEDULING ORDER, PAGE 38, OR WHATEVER?

04:13  4         FINE.  IN OTHER WORDS, AS BROAD AS THEY'RE MAKING THE

5    CASE, YOU GET THAT BREADTH OF DEFENSE.  AND THEN WE NARROW THAT AT

6    THE TIME OF SUMMARY JUDGMENT, WE SEE WHAT IS LEFT.

04:13  7         SO I TEND TO GIVE YOU PRETTY FULL REIGN, BUT THAT PUTS

8    TREMENDOUS STRESS ON YOU.  SO, THEREFORE, I NEED YOU ON THE

9    WEEKENDS.  I DON'T KNOW HOW MANY WEEKENDS YET, BUT YOU HAVE TO

10   GIVE ME WEEKENDS BECAUSE THAT'S MY ONLY TIME FOR SOME OF THIS, IN

11   TERMS OF COMPLEX LITIGATION.  I'M CARRYING A LOT OF OTHER CASES.

04:13  12        SO I'LL TRY TO BE COURTEOUS ABOUT THAT.  AND THAT MEANS

13   DEPOSITIONS ON WEEKENDS ALSO.  SO WHAT YOU HAVE TO FIGURE OUT:

14   CAN YOU SAVE MONEY AND HAVE IT INSIDE THIS BUILDING, FOR INSTANCE;

15   DO YOU NEED TO RENT SPACE ACROSS THE STREET.

04:14  16        FOR THOSE ON THE EAST COAST, I AM REQUIRING A SPECIAL

17   MASTER.

04:14  18        WHO IS HERE FROM D.C?

04:14  19        MR. DELERY:  I AM, YOUR HONOR.

04:14  20        THE COURT:  YOU'LL BE PAYING FOR IT.

04:14  21        SO IF YOU HAVE ANY JUST GENERAL QUESTIONS.  I HAVE BEEN

22   HAVING THESE CONVERSATIONS WITH MYSELF IN CASE WE WENT FORWARD,

23   ESPECIALLY AFTER I DRAFTED THE INITIAL TENTATIVE, BECAUSE THE

24   INITIAL TENTATIVE SAID WE WERE GOING FORWARD.  NOW I HAVE TO BACK

25   UP AND TAKE A LOOK AT THIS AGAIN.

SACV 13-779-DOC - 07/08/2013 - VOL. 2

04:14  1          MR. KEKER, THOUGHTS?

04:14  2          MR. KEKER:  WE HAVE A LOT OF QUESTIONS, YOUR HONOR, MANY

     3  OF WHICH ARE REFERENCED IN THE RULE 26F REPORT.  BUT IT SEEMS

     4  THESE ARE VERY HELPFUL.  I THINK WHAT WE HAVE GOT TO DO IS HAVE A

     5  CONVERSATION WITH MR. CARDONA, AND SEE IF WE CAN MAKE SOME

     6  PROGRESS IN SOME OF THE AREAS THAT YOU POINTED OUT, BUT COME BACK

     7  FOR A RULE 26F CONFERENCE IF WE NEED TO, AT A TIME THAT'S

     8  CONVENIENT FOR YOU.  WE'LL ASK OUR QUESTIONS THEN.  WE'RE TELLING

     9  YOU WHAT WE --

04:15 10          THE COURT:  THESE ARE NOT RULINGS.  OTHERWISE WE WOULD

    11  BE HAVING THIS DISCUSSION SEVEN TO TEN DAYS TO A MONTH FROM NOW,

    12  AND THEN YOU WOULD BE OUT IN THE HALLWAY THINKING ABOUT THEM FOR

    13  THE FIRST TIME.

04:15 14          MR. KEKER:  THIS WOULD BE GOOD.  I THINK THIS IS

    15  ACTUALLY QUITE HELPFUL AND WILL LEAD TO FURTHER MEET-AND-CONFER

    16  WITH THE GOVERNMENT.

04:15 17          THE COURT:  WHO -- I DON'T WANT TO LIMIT YOU AT PRESENT,

    18  BUT WHO ARE MY PRIMARY ATTORNEYS; WHO ARE THE ONES WHO ARE GOING

    19  TO GET UP IN FRONT OF THE JURY AND ARGUE THIS MATTER?

04:15 20          MR. CARDONA:  YOUR HONOR, FOR THE GOVERNMENT, THAT WILL

    21  BE US THREE.

04:15 22          THE COURT:  OKAY.

04:15 23          MR. KEKER:  YOUR HONOR, FOR OUR SIDE IT WOULD BE ME; MY

    24  PARTNER, ELLIOT PETERS, WHO SENDS HIS REGRETS, HE IS IN THE

    25  GALAPAGOS.

SACV 13-779-DOC - 07/08/2013 - VOL. 2

04:15  1              THE COURT:  FINE.

04:15  2              MR. KEKER:  AND MS. KELLER.

04:15  3              THE COURT:  WHO IS GOING TO DO THE MOTION -- YOU'LL ALL

       4  BE INVOLVED IN THE MOTION WORK.

04:15  5              WHO IS GOING TO ARGUE THE MOTIONS BEFORE THE COURT IF WE

       6  GO FORWARD?

04:15  7              MR. CARDONA:  I WILL BE ARGUING MANY OF THEM.

       8  MR. KHORSHID AND MR. NELSON MAY BE ARGUING SOME OF THEM.

04:16  9              THE COURT:  SAME THREE ATTORNEYS.  OKAY.

04:16 10              MR. KEKER:  DEPENDING ON THE MOTION, IT COULD BE ANY ONE

      11  OF US WHO IS HERE.  ALL OF THE ATTORNEYS HERE ARE PARTNERS IN VERY

      12  REPUTABLE LAW FIRMS.

04:16 13              THE COURT:  NO LIMITATIONS, I'M KIND OF CURIOUS.

04:16 14              WHO IS GOING TO BE TAKING DEPOSITIONS?

04:16 15              MR. KEKER:  EVERYBODY YOU ARE LOOKING AT, I THINK,

      16  PROBABLY MORE.

04:16 17              THE COURT:  ALL SIX OF YOU?

04:16 18              MR. KEKER:  PROBABLY ADDITIONAL IF THERE IS GOING TO BE

      19  THAT MANY PER WEEK.

04:16 20              THE COURT:  I WANT YOU TO TALK TO MS. KELLER ABOUT THAT.

      21  HAVE A QUIET CONVERSATION WITH HER ABOUT THAT.  I DON'T MIND A

      22  FEW, BUT I MIND THE PARTICIPATION, IF YOU WILL, IN TERMS OF

      23  WISDOM.

04:16 24              MR. KEKER:  I TALKED TO MS. KELLER A LOT.  YOU PROBABLY

      25  DON'T KNOW, BUT I REPRESENTED CARTER BRYANT BEFORE WE SETTLED IN

SACV 13-779-DOC - 07/08/2013 - VOL. 2

```
        1   THE BRATZ.
04:16   2               THE COURT:  OH, MY GOODNESS, WHICH PHASE?
04:16   3               MR. KEKER:  BOY, WAS I GLAD WE SETTLED JUST BEFORE THE
        4   FIRST TRIAL BEFORE JUDGE LARSON.  SO I HAVE TALKED TO MS. KELLER A
        5   LOT.
04:17   6               THE COURT:  MR. CARDONA, ANY THOUGHTS, QUESTIONS?
04:17   7               MR. CARDONA:  JUST VERY QUICKLY.  I SAID WE WERE ENGAGED
        8   IN EFFORT TO TRY AND NARROW THE CASE, AND WE ARE.  AS PART OF
        9   THAT, WE HAVE PREPARED SOME THIRD-PARTY SUBPOENAS WE WOULD LIKE TO
       10   GET OUT SOONER THAN LATER, AND TRY AND WORK TOWARDS NARROWING THE
       11   CASE.  SO WE WOULD LIKE TO GET THOSE OUT, EVEN WHILE WE'RE WAITING
       12   FOR THE SEVEN TO TEN DAYS TO HEAR FROM THE COURT, UNLESS THE COURT
       13   OBJECTS TO IT.
04:17  14               THE COURT:  YEAH, I DO.  I'M GOING TO WAIT.  I JUST
       15   WANT, FROM MY OWN SENSE OF WELLBEING, TO KNOW THAT I'M NOT PUSHING
       16   DOWN THE ROAD AND TAKING ACTIONS THAT THEN SUBTLY LEAD ME TO A
       17   POSITION OF SAYING, WELL, IT'S GOING FORWARD.  I WANT TO GO BACK
       18   AND REALLY LOOK AT THIS AGAIN.  SO THAT SEVEN TO TEN DAYS IS NOT
       19   GOING TO CAUSE AN ISSUE.
04:17  20               DO YOU HAVE CALENDARS WITH YOU?
04:18  21               MR. CARDONA:  YES, YOUR HONOR.
04:18  22               THE COURT:  WHY DON'T I REPRESENT TO YOU THAT I'LL HAVE
       23   A FINAL RESOLUTION AND TO YOU BY MONDAY JULY 15.
04:18  24               WHY THAT DATE; BECAUSE I'M GOING TO BE ENGAGED IN OTHER
       25   MATTERS DURING THE WEEK, AND SOMETIMES PIECEMEAL THINGS COME TO
```

SACV 13-779-DOC - 07/08/2013 - VOL. 2

1    YOU, SO YOU CAN'T GET THE SIX TO EIGHT TO TWENTY HOURS YOU NEED.

2    BUT THAT GIVES ME THE WEEKEND; IN OTHER WORDS, IT GIVES ME

3    SATURDAY AND SUNDAY, AND A CLEAR OPPORTUNITY.

04:18  4          AND IF THIS WAS TO YOU BY JULY 15, IF WE WERE GOING

5    FORWARD, I'D LIKE TO SET A SCHEDULING CONFERENCE DATE OF JULY 22.

6    IF WE'RE NOT GOING FORWARD, IF I'M ALLOWING YOU TO AMEND, I'M

7    SIMPLY GOING TO VACATE.

04:19  8          WOULD YOU CHECK YOUR CALENDAR, AND THE FIRST DATE I'M

9    GOING TO TOSS OUT TO YOU IS JULY 22.

04:19 10          ARE YOU AVAILABLE THAT DATE?

04:19 11          IF YOU HAVE A VACATION, TELL ME.

04:19 12          RIGHT 2:  I'M ON VACATION, YOUR HONOR.

04:19 13          THE COURT:  JULY 29, BACK?

04:19 14          RIGHT 2:  I'M BACK.

04:19 15          MR. KEKER:  TWENTY-NINTH IS FINE FOR US.

04:19 16          THE COURT:  CHECK.

04:19 17          MR. KEKER:  I'M NOT GUARANTEEING THAT ALL SIX OF US WILL

18    BE HERE, BUT I KNOW SOME OF US WILL BE HERE.

04:19 19          THE COURT:  I DON'T WANT ALL FOUR OF YOU ON ONE SIDE AND

20    SIX OF YOU HERE ANYWAY.  I'M JUST JOKING.

04:19 21          MR. KEKER:  WE'LL MAKE THE 29 WORK, YOUR HONOR.

04:19 22          THE COURT:  MS. KELLER, SO YOU ARE BACK AS ONE OF THE

23    PRIMARY COUNSEL.

04:20 24          AND, MR. KEKER, YOU ARE AVAILABLE.

04:20 25          AND, MR. CARDONA, LET ME TURN TO YOU.

SACV 13-779-DOC - 07/08/2013 - VOL. 2

04:20  1          MR. CARDONA:  YES, I HAVE CHECKED, AND JULY 29 IS FINE.

04:20  2          THE COURT:  SO OUR CALENDARS ARE FAIRLY LARGE.  I'M JUST

3    WONDERING IF I MIGHT SCHEDULE IN THE AFTERNOON, FOR THE SCHEDULING

4    CONFERENCE, SO YOU ARE NOT WAITING THROUGH A MONDAY 7:30 OR

5    8:30 CALL, AND I'M WONDERING IF I COULD TRY TO SET YOU AT

6    3:00 O'CLOCK, LIKE WE DID TODAY, WHEN I CALLED YOU BACK.

04:20  7          MR. CARDONA:  THAT'S FINE WITH US, YOUR HONOR.

04:20  8          THE COURT:  COUNSEL FROM D.C., YOU ARE COMING OUT.

04:20  9          LEFT 2:  YES, YOUR HONOR.

04:20 10          THE COURT:  IF YOU ARE FLYING AGAINST THE TIME FRAME,

11    YOU JUST MIGHT MAKE IT OKAY.

04:20 12          DOES THAT WORK FOR YOU, 3:00 O'CLOCK?

04:20 13          MR. KEKER:  YES, YOUR HONOR.

04:20 14          THE COURT:  COMING FROM SAN FRANCISCO?

04:20 15          MR. KEKER:  YES, YOUR HONOR.

04:20 16          THE COURT:  YOU ARE COMING FROM --

04:20 17          MR. ABRAMS:  NEW YORK.

04:20 18          THE COURT:  HOPEFULLY, 3:00 O'CLOCK, YOU PICK UP THREE

19    HOURS COMING WEST, SO IF YOU CAN CATCH THE EARLY MORNING FLIGHT

20    YOU DON'T HAVE TO BE AWAY FROM FAMILY, IF YOU CHOOSE NOT TO.

04:21 21          THINK ABOUT YOUR 30(B)(6) WITNESSES. YOU MAY NEED A

22    VARIETY OF WITNESSES IF WE'RE GOING FORWARD.  FOR DIFFERENT

23    PORTIONS THAT THE GOVERNMENT MAY BE TRYING TO DEPOSE, ONE MAY

24    SUFFICE.  I JUST DON'T KNOW.

04:22 25          ON PAGE 13 OF THE SCHEDULING CONFERENCE, LINES 9 TO 12,

SACV 13-779-DOC - 07/08/2013 - VOL. 2

1   I WANT TO READ TO YOU:  "ITS VIEWS REGARDING THE RESIDENTIAL

2   MORTGAGE MARKET AND ITS POTENTIAL IMPACT ON THE BROADER ECONOMY

3   WERE NOT MATERIALLY DIFFERENT FROM THOSE OF THE UNITED STATES

4   TREASURY, THE FEDERAL RESERVE BOARD, AND OTHER SOPHISTICATED

5   MARKET PARTICIPANTS."

04:22  6          THAT'S WHERE I PICKED UP AND ASSUMED THAT YOU MIGHT BE

7   ASKING FOR BROAD DISCOVERY CONCERNING A DIFFERENT GOVERNMENT

8   AGENCY.  THAT MAY BE A FALSE ASSUMPTION ON MY PART, BUT THAT'S

9   WHERE I GOT THAT CONCERN FROM.

04:22 10          MR. KEKER:  NOT FALSE, YOUR HONOR.

04:22 11          THE COURT:  OKAY.  IN OTHER WORDS, FROM YOUR POSITION,

12  IF YOU ARE GOING FORWARD, WHAT WAS EVERYBODY DOING WHEN THIS WAS

13  SO WELL-KNOWN, WHAT WERE GOVERNMENT AGENCIES DOING.  AND IF YOU

14  ARE COMING AFTER YOUR CLIENT, WHY AREN'T WE, ON THE S&P SIDE,

15  ENTITLED TO LOOK AT TREASURY, THE S.E.C, ET CETERA.  IN OTHER

16  WORDS, IT'S CAUGHT NOBODY BY SURPRISE.

04:23 17          MR. KEKER:  VERY PUBLIC STATEMENTS THAT THEY MADE.

04:23 18          THE COURT:  CONCERNING MOTIONS FOR LIABILITY AND

19  PENALTIES ON PAGE 19, AT LINE 21 THROUGH 23, I'D APPRECIATE THAT

20  THE SUMMARY JUDGMENT MOTIONS ARE HEARD AT ONE TIME IF WE SET A

21  SCHEDULING CONFERENCE, BUT IT MAY BE BY STIPULATION OF BOTH OF YOU

22  THAT YOU WANT ME TO TRY TO RESOLVE SOME ISSUES ALONG THE WAY.  IF

23  YOU BOTH STIPULATE TO SOMETHING, YOU'LL FIND I'LL USUALLY

24  ACCOMMODATE YOU; IN OTHER WORDS, WHEN I HAVE TWO ATTORNEYS

25  AGREEING.

SACV 13-779-DOC - 07/08/2013 - VOL. 2

04:24  1        YOU KNOW YOUR CASE EXTRAORDINARILY WELL RIGHT NOW.  I

       2   WILL CATCH UP TO YOU IN KNOWLEDGE AT SOME POINT.  BUT RIGHT NOW,

       3   AFTER THREE YEARS, FOR EACH SIDE, OBVIOUSLY YOU KNOW THIS CASE

       4   VERY, VERY WELL.  THE COURT REMEMBERS PICKING THIS UP.  I'LL BE UP

       5   WITH YOU VERY SHORTLY, BELIEVE ME.

04:24  6        ON PAGE 21, LINES 24 THROUGH 25:  "S&P PRODUCED IN

       7   ELECTRONIC FORMAT 18.8 MILLION PAGES OF DOCUMENTS, AS WELL AS

       8   ADDITIONAL ELECTRONICALLY STORED ESI, A TOTAL OF APPROXIMATELY

       9   2.75 TERABYTES OF DATA."

04:24 10        NOW, YOU HAVE SAID TO ME THAT YOU ARE WORKING VERY WELL

      11   TOGETHER, AND I BELIEVE THAT, BUT SOMETIMES ONE OF THE PARTIES

      12   WILL COME TO ME AND WANT A DATABASE SEARCH, AND THE TERMS THAT WE

      13   PUT IN DICTATE HOW BROAD THAT SEARCH IS.

04:24 14        ARE YOU PRETTY WELL SATISFIED, WORKING WITH EACH OTHER,

      15   THAT THE ELECTRONIC INFORMATION HAS BEEN VOLUNTARILY TURNED OVER

      16   AND THAT YOU HAVE GOT WHAT YOU NEED, OR ARE WE GOING TO GO THROUGH

      17   ANOTHER DATABASE SEARCH?

04:25 18        IF SO, I'M GOING TO NEED MORE THAN A SPECIAL MASTER.

      19   I'M GOING TO NEED -- WELL --

04:25 20        MR. CARDONA:  YOUR HONOR, THE COURSE OF THE

      21   INVESTIGATION, WE MADE REQUESTS, AND WE'RE COMFORTABLE WE GOT WHAT

      22   WE WERE LOOKING FOR.  SOME OF THOSE WERE DONE BY WORD SEARCHES ON

      23   THEIR DATABASE, AND THERE MAY BE SOME REQUESTS THAT REQUEST

      24   ADDITIONAL WORD SEARCHES, BUT I HAVE --

04:25 25        THE COURT:  SEE, THAT CAUSES A RERUN AGAIN.  THAT'S

SACV 13-779-DOC - 07/08/2013 - VOL. 2

1    EXPENSIVE AND TIME CONSUMING.  AND ALL OF A SUDDEN WE GO FROM 18.8

2    TO THE 30 MILLION PAGES THAT'S MENTIONED IN ANOTHER PORTION.  SO

3    BE CAREFUL WITH THAT.

04:25  4         MR. CARDONA:  WE UNDERSTAND THAT, AND WE'LL TRY TO LIMIT

5    THAT, TO THE EXTENT WE CAN, AS MUCH AS POSSIBLE.

04:25  6         THE COURT:  ON PAGE 22, LINES 9 THROUGH 11:  "UNITED

7    STATES ANTICIPATES THE NEED FOR DEPOSITIONS THAT WILL SERVE AS

8    WITNESSES' TRIAL TESTIMONY BECAUSE THEY'RE OUTSIDE THE UNITED

9    STATES SUBPOENA POWER IN CONNECTION WITH THIS ACTION."

04:26 10         WATCH OUT.  THEY BETTER REALLY BE OUTSIDE THE

11    JURISDICTION BECAUSE, MARK MY WORDS, PEOPLE WHO APPEAR HERE BY

12    DEPOSITION TESTIMONY WILL BE VERY, VERY FEW, IF ANY.  I'M GOING TO

13    WANT TO KNOW WHY WE CAN'T GET THEM HERE.

04:26 14         I THINK, ON PAGE 28, IN FOOTNOTE 6, THAT S&P STATED IT

15    OBJECTS TO THE GOVERNMENT'S PROPOSAL TO USE DEPOSITION TESTIMONY

16    AT TRIAL INSTEAD OF LIVE WITNESSES.

04:26 17         NOT A RULING, BUT JUST HAVING THIS CONVERSATIONS, I

18    GENERALLY AGREE ON THIS AND MOST OTHER CASES.

04:26 19         AND I ASSUME THAT'S STILL YOUR POSITION, MR. KEKER.

04:26 20         MR. KEKER:  YES, SIR.

04:26 21         THE COURT:  AS FAR AS THE DEPOSITION IS CONCERNED, IF I

22    HAVE A SPECIAL MASTER, OR YOU ARE ACROSS THE STREET AND YOU RUN

23    INTO PROBLEMS, I DON'T CARE ABOUT THE ARBITRARINESS OF SEVEN

24    HOURS.  IF YOU START AT 8:00 OR 8:30, AND RUN INTO PROBLEMS, AND

25    THINGS ARE GETTING INTERESTING FOR ALL SIDES, YOU CAN COME ACROSS

1  THE STREET AND TELL ME:  JUDGE, I NEED MORE TIME.

04:27  2       I SIT HERE, QUITE FRANKLY, AT NIGHT AND WAIT FOR YOU.

3  SO WHETHER YOU ARE DONE AT 9:00 OR 10:00, OR WHATEVER, IS OF NO

4  IMPORT BECAUSE I'M SITTING HERE WAITING TO MAKE SURE YOU HAVE NO

5  PROBLEMS.  I'LL KEEP YOUR HOURS WITH YOU.  I WON'T SEND YOU OUT TO

6  DO THIS BY YOURSELF.  I'LL ALWAYS BE HERE.

04:27  7       PRIVILEGED LOGS.  SOMETIMES IN CASES I GET CAUTION TO

8  BEGIN WITH, WHICH IS WELL-TAKEN, AND THAT IS, WE GET PRIVILEGED

9  LOGS, AND THEY'RE JUST VOLUMINOUS.  EVERYTHING IS PRIVILEGED.  I

10  DON'T KNOW WHAT YOUR PRIVILEGED LOGS LOOK LIKE YET.  I DON'T KNOW

11  IF THEY'RE VOLUMINOUS FROM S&P'S PART.  I DON'T KNOW IF THEY'LL BE

12  VOLUMINOUS FROM THE GOVERNMENT'S PART EVENTUALLY, IF WE GET INTO

13  DISCOVERY.  BUT SOMEHOW WE HAVE GOT TO WRESTLE WITH THAT, AND I

14  HAVE TO HAVE THE TIME.

04:27 15       SO I DON'T KNOW IF THAT'S A SPECIAL MASTER FIRST, OR IF

16  THAT'S THE COURT GOING THROUGH THAT, BUT I JUST SAY TO EACH OF

17  YOU, TAKE A LOOK AT THOSE PRIVILEGE LOGS BECAUSE YOU NEVER WANT A

18  JUDGE TO TAKE THE FIRST TEN AND SAY, "NOT PRIVILEGED, NOT

19  PRIVILEGED, NOT PRIVILEGED," AND IT GETS REALLY EASY ON THE ONE

20  THAT IS PRIVILEGED TO MAKE A MISTAKE AND SAY, "NOT PRIVILEGED."

21  YOU ALWAYS WANTS TO START OFF WITH A GOOD CHECK, OKAY?

04:28 22       ON PAGE 31, I AGREE, MR. KEKER, WITH MOST OF YOUR

23  STATEMENTS NOW.  IF WE'RE GOING FORWARD, I PROMISE YOU, WE'LL GET

24  THIS IN THE SHAPE OR FORM FOR BOTH PARTIES SO IT'S A FAIR

25  PROCEEDING.  I QUITE DON'T KNOW HOW TO DO THAT RIGHT NOW THOUGH.

SACV 13-779-DOC - 07/08/2013 - VOL. 2

1    I'M A LITTLE BIT BAFFLED RIGHT NOW IN TERMS OF WHAT THIS WILL LOOK

2    LIKE.

04:28  3        THAT'S WHY I KEEP SAYING TO THE GOVERNMENT:  PROBABLY

4    GOING TO GIVE YOU YOUR DEPOSITIONAL TESTIMONY, BUT I'M GOING TO

5    PUT TREMENDOUS PRESSURE ON YOU.  SO IF YOU NEED MORE RESOURCES, IF

6    YOU NEED A FOURTH ATTORNEY, BRING HIM NEXT TIME.  OKAY?

04:28  7        MR. KEKER:  I'LL MAKE A SUGGESTION RIGHT NOW:  IF THEY

8    LIMITED THEIR PROOF TO THE CDO'S THAT THEY HAVE IDENTIFIED IN THE

9    COMPLAINT --

04:29 10        THE COURT:  I KNOW, THE 500 MILLION.

04:29 11        MR. KEKER:  NO, NO, TO THE ONES THEY HAVE IDENTIFIED IN

12    THE COMPLAINT WHERE THEY ACTUALLY DESCRIBE THEM, THAT WOULD BE A

13    TOTAL OF ABOUT --

04:29 14        THE DEFENDANT:  SEE THEM VIGOROUSLY SHAKING THEIR HEAD

15    "NO."

04:29 16        MR. KEKER:  THAT'S THE PROBLEM, AS LONG AS THEY'RE JUST

17    EXAMPLES --

04:29 18        THE COURT:  LISTEN, IT WILL GET NARROWED, I PROMISE YOU,

19    VERY QUICKLY.  BECAUSE UNLESS THE PARTIES CAN GIVE ME GOOD

20    INFORMATION, I'LL NARROW IT.  THESE AREN'T DIFFICULT DECISIONS.  I

21    JUST DON'T WANT THEM TO BE ARBITRARY.

04:29 22        MR. KEKER:  THE OTHER THING I WANT TO SAY IS THAT THE

23    ARGUMENT ABOUT WHETHER OR NOT ALL THIS EVIDENCE THAT THEY HAVE,

24    THESE NASTY E-MAILS FROM 2004, TO 2007, THAT'S AN ARGUMENT THAT WE

25    WOULD HAVE AT TRIAL, WE WOULD MOVE --

SACV 13-779-DOC - 07/08/2013 - VOL. 2

04:29  1          THE COURT:  IN LIMINES, SURE.

04:29  2          MR. KEKER:  WHETHER OR NOT THAT'S RELEVANT TO WHAT IS

       3   GOING ON IN 2007, WOULD BE RULED ON BY YOU.  I DON'T THINK WE'RE

       4   SAYING THEY'RE -- WE'RE DECIDING NOW THAT THEY CAN'T USE THE

       5   EVIDENCE.  WE'RE SAYING:  COME ON, LET'S NOT HAVE EVERY SECURITY.

04:30  6          THE COURT:  I CAN DO MORE DAMAGE AT THE BEGINNING OF THE

       7   CASE, AND COURTS, CAN BECAUSE WE DON'T KNOW THE CASE WELL.  SO IF

       8   THERE IS A CAUTION ON MY PART TO BEGIN WITH, IT'S BECAUSE I WANT

       9   TO MAKE SURE THAT, WHATEVER I'M DOING, IT DOESN'T HARM THE PARTIES

      10   IN THE FUTURE, IN TERMS OF HAVING A FAIR TRIAL BETWEEN YOU.

04:30 11          QUITE FRANKLY, IN LIMINE MOTIONS ARE ONE OF THE GREAT

      12   TOOLS THAT A COURT CAN DO DAMAGE WITH, AND IT LIMITS THE CASE.  I

      13   USED TO HAVE A COLLEAGUE, IN A PRIOR PRACTICE WHEN I WAS

      14   LITIGATING, TOLD ME THAT IF MY CASE LOOKED 60 PERCENT, LIKE WHAT

      15   WAS INITIALLY PRESENTED TO ME AT TIME OF TRIAL, I WOULD BE DOING

      16   WELL.  AND THAT'S PROBABLY TRUE.

04:30 17          THE COMMENT ON PAGE 32:  "THE GOVERNMENT'S CASE REMAINS

      18   A SHIFTING TARGET, AND THE NOTION THAT ALL NEEDED DISCOVERY FOR

      19   BOTH THE GOVERNMENT AND FOR S&P COULD BE COMPLETED IN 11 MONTHS IS

      20   IMPRACTICAL," THERE IS GOING TO BE TREMENDOUS STRESS TO EACH OF

      21   YOU RIGHT AT THE BEGINNING SO THAT I KNOW WHAT I'M DEALING WITH.

04:31 22          AND I'M JUST SAYING THAT TO THE GOVERNMENT.  IF YOU NEED

      23   ADDITIONAL RESOURCES, GET ANOTHER ATTORNEY INVOLVED NOW, SO IT'S

      24   NOT JUST THE FOUR OF YOU.

04:31 25          INITIALLY, I THINK THAT YOU ESTIMATED 24 DAYS.  IF YOU

SACV 13-779-DOC - 07/08/2013 - VOL. 2

1    COME BACK AND IN GOOD FAITH TELL ME YOU NEED 30 DAYS, THAT'S FINE.

2    THE DEFENSE TELLS ME YOU NEED 30 DAYS, WHATEVER, THAT'S FINE.

3    THAT JUST TELLS ME WHAT TO DO TO QUALIFY THE JURY.  BUT I THINK

4    AFTER SUMMARY JUDGMENT WE'LL HAVE A MORE, A BETTER PERSPECTIVE AND

5    I THINK THAT'S THE TIME WE SHOULD HAVE THAT DISCUSSION, QUITE

6    FRANKLY, NOT NOW, AND NOT ARBITRARILY SETTING A TIME FOR EACH OF

7    YOU.  I THINK THAT'S PREMATURE.

04:32  8         AS YOU ALREADY HEARD, I'M NOT INCLINED TO BIFURCATE.

9    THAT'S NOT A RULING.  I'M JUST HAVING A CONVERSATION WITH YOU.

10   I'M NOT INCLINED TO GIVE THE CIRCUIT OR SUPREME COURT ONE

11   ADDITIONAL ISSUE.  IT'S DISCRETIONARY.  THE STATUTE APPEARS TO BE

12   LITTLE USED.  AS SUCH, I'M GOING TO BE CAUTIOUS.  I BELIEVE IN THE

13   JURY SYSTEM.  AND I'LL PROBABLY ABIDE BY THAT.  SO ONCE YOU HAVE

14   THAT FEELING, IF WE'RE GOING WITH LIABILITY AND DAMAGES, THEN

15   MR. KEKER HAS GOT AN AWFULLY STRONG ARGUMENT, AND HOW DO WE DEFEND

16   UNLESS WE HAVE SPECIFICITY.  IF I WAS THE PERSON MECHANICALLY

17   PLUGGING IN A FORMULA WITH THE FACTORS, AND I DON'T MEAN

18   MECHANICALLY BUT WITH THE FACTORS, THEN YOU MIGHT HAVE A BETTER

19   POSITION.  BUT I'M NOT INCLINED TO DO THAT.

04:32 20         BEYOND THAT, THOSE ARE JUST THOUGHTS.  THOSE ARE

21   CONVERSATIONS I HAVE BEEN HAVING WITH MYSELF AND TRYING TO NOT

22   COME OUT WITH A RESOLUTION, BUT JUST TRYING TO THINK THROUGH WHERE

23   WE'RE GOING TO BE IN A YEAR TO 15 MONTHS.  YOU CAN TRY THIS CASE

24   IN NINE MONTHS, IF YOU WANT.

04:33 25         MR. KEKER, YOU HEAR ME?

*MARIA BEESLEY-DELLANEVE, OFFICIAL REPORTER*

SACV 13-779-DOC - 07/08/2013 - VOL. 2

04:33   1          MR. KEKER:  YES, SIR.

04:33   2          THE COURT:  NINE MONTHS, NO PROBLEM.  BUT YOU CAN TRY IT

        3   IN 15 MONTHS ALSO, IF YOU WANT TO.

04:33   4          AND THE SAME FOR THE GOVERNMENT:  YOU CAN TRY IT IN NINE

        5   MONTHS IF YOU WANT, OR 15 MONTHS, JUST COME UP WITH SOMETHING

        6   REALISTIC.  AND I THINK THE BEST THING YOU CAN DO IS LET ME APPLY

        7   THE PRESSURE FOR THE DEPOSITIONS AND DISCOVERY, SEE WHAT YOU CAN

        8   DO TO NARROW IT, OR WHAT THE COURT DOES TO NARROW IT, IF AT ALL,

        9   AND THEN GIVE YOURSELF A LITTLE BIT MORE TIME BETWEEN THE SUMMARY

        10   JUDGMENT MOTION AND YOUR PRETRIAL, AND YOUR PRETRIAL AND YOUR

        11   TRIAL, THAN YOU NORMALLY GIVE IN MOST CASES.

04:33   12          BECAUSE I HAVE GOT TO TIME QUALIFY A JURY.  AND WE HAD,

        13   ON THE ARYAN BROTHERHOOD CASES, I THINK WE HAD TO -- NO, THE

        14   MEXICAN MAFIA, WE HAD TO SEND OUT 18,000 JURY SUMMONS TO GET

        15   JURORS WHO COULD SIT.

04:33   16          SO THAT'S THE PROCESS WE'LL GO THROUGH.  AND ONCE I GO

        17   THROUGH THAT PROCESS, UNLESS YOU ARE DEAD, WE'RE GOING ON THE DAY

        18   THAT I HAVE AN AGREEMENT WITH YOU ON.  AND THAT'S WHY.

04:34   19          IF YOU HAVE ANY FURTHER COMMENTS I REALLY WELCOME THEM.

        20   WHENEVER I LEFT COURT WHEN I WAS TRYING TO LITIGATE, I KNEW IF I

        21   SAID ONE MORE THING IT WOULD HAVE PERSUADED THE JUDGE.

04:34   22          COUNSEL, EITHER ONE OF YOU?

04:34   23          MR. CARDONA:  YOUR HONOR, A QUESTION.  AS WE THINK ABOUT

        24   SOME OF THE THINGS, AND THINK ABOUT THE COMMENTS THAT YOU HAVE

        25   MADE TODAY, AND I HAVEN'T THOUGHT THIS THROUGH FULLY, BUT WOULD

SACV 13-779-DOC - 07/08/2013 - VOL. 2

1    YOUR HONOR BE AMENABLE TO, IF WE WERE TO PROPOSE A KIND OF A

2    PHASED DISCOVERY WHERE WE DID AN INITIAL PHASE DOING THE DISCOVERY

3    WE NEEDED TO LIMIT THE CASE, AND THEN COME BACK TO YOU WITH THE

4    LIMITED CASE, AND THEN BEGIN FULL DISCOVERY?

04:34  5        THE COURT:  AS LONG AS I GET AN AGREEMENT BETWEEN THE

6    TWO OF YOU.  I DON'T WANT TO SAY YES WITHOUT HAVING THAT

7    CONVERSATION WITH MR. KEKER, OR INITIALLY THE TWO OF YOU HAVING

8    THAT CONVERSATION.

04:34  9        MR. CARDONA:  WE WILL HAVE THAT CONVERSATION.  BUT I

10   WANTED TO MAKE SURE THAT WAS SOMETHING THE COURT WOULD NOT RULE

11   OUT FROM THE START.

04:34 12        THE COURT:  YOU MAY NEVER LIMIT THIS CASE, BUT YOU MAY

13   FIND IT'S NOT 5 MILLION, THAT YOU THINK IT'S REALLY 3.2, OR 2.

14   AND I'D RATHER HAVE YOU VOLUNTARILY DO THAT THAN HAVING THE

15   DISCOVERY THAT YOU'VE ASKED FOR BECAUSE YOU GET THAT IN MOST

16   CASES.  MOST CASES DON'T HAVE DEFINED DAMAGES GOING IN.  IT'S THE

17   ABILITY TO DEFEND AGAINST THAT WITH SPECIFICITY THAT'S OF CONCERN.

18   DON'T THINK I'M GOING TO CAUSE A BILL OF PARTICULARS.  I'LL JUST

19   WATCH AND WAIT.

04:35 20        SO I DON'T KNOW THE TIME PERIOD.  IT DEPENDS UP TO 255

21   OR 285 WITNESSES.  THAT WAS THE NUMBER THROWN OUT AT ME IN THE

22   DOCUMENTS.  MY GUESS IS YOU ARE NOT GOING TO DEPOSE OR EVEN WANT

23   TO DEPOSE THE VAST MAJORITY OF THOSE.  BUT THERE ARE CERTAIN ONES

24   YOU HAVE TO DEPOSE.  AND I DON'T WANT TO ARBITRARILY SAY 25 OR 35

25   OR 45, OR COME UP WITH SOME LUDICROUS NUMBER, BECAUSE THAT'S JUST

SACV 13-779-DOC - 07/08/2013 - VOL. 2

1   NOT FAIR TO THE PLAINTIFFS IN THE MATTER.

04:35  2        BUT BY THE SAME TOKEN, THEY'RE GOING TO GET A ROUND OF

3   DISCOVERY THAT'S GOING TO BE JUST AS VIGOROUS, QUITE FRANKLY.  AND

4   THERE MAY BE SOME FOLKS WHO JUST DO NOT EXPECT TO BE DEPOSED.  AND

5   YOU MAY NOT BE ABLE TO CONTROL THEM.  THEY MAY BE OF GREAT

6   PROMINENCE.  TRUST ME, THEY'LL GET DEPOSED.

04:36  7        ALL RIGHT.  MR. KEKER AND MS. KELLER, YOU OKAY?

04:36  8        MR. KEKER:  WE'RE FINE, YOUR HONOR.

04:36  9        THE COURT:  ARE ALL YOU FOLKS OKAY?

04:36 10        MR. CARDONA:  FINE, YOUR HONOR.

04:36 11        THE COURT:  IT'S BEEN A PLEASURE VISITING WITH YOU.  I

12   PROMISE SOMETIME ON MONDAY YOU'LL GET A FINAL OPINION.  THAT PUTS

13   THE PRESSURE ON ME TO GET RIGHT BACK TO THIS.

14        *(WHEREUPON THE PROCEEDINGS WERE ADJOURNED AT 4:36.)*

15                       *-OOO-*

16                    *CERTIFICATE*

17        *I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28,*

18   *UNITED STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT*

19   *OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE*

20   *ABOVE-ENTITLED MATTER.*

21   *DATE:  JULY 10, 2013*

22

23   */S/*

     _____
24   *OFFICIAL COURT REPORTER*

25

*MARIA BEESLEY-DELLANEVE, OFFICIAL REPORTER*