1        **UNITED STATES DISTRICT COURT**

2        **CENTRAL DISTRICT OF CALIFORNIA**

3        **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                  – – – – – – –

5    UNITED STATES OF AMERICA,            )
                                          )
6              Plaintiff,                 )
                                          )
7         vs.                             ) No. LACV 1300779 DOC
                                          )      Volume I
8    McGRAW–HILL COMPANIES, INC., and     )
     STANDARD & POOR'S FINANCIAL          )
9    SERVICES LLC,,                       )
                                          )
10             Defendants.                )
     _____ )

11

12

13

14              REPORTER'S TRANSCRIPT OF PROCEEDINGS

15              Hearing on Motion to Dismiss

16                 Santa Ana, California

17                 Monday, July 8, 2013

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141

24

25   13cv0779 McGraw-Hill 2013-07-08 V1

1    **APPEARANCES OF COUNSEL:**

2

     FOR THE UNITED STATES OF AMERICA:
3

4
        OFFICE OF US ATTORNEY
5       BY:  George S. Cardona
             Chief Assistant United State Attorney
6       312 North Spring Street
        12th Floor
7       Los Angeles, California 90012-4700
        213-894-2434
8

9       Anoiel Khorshid
        AUSA – Office of US Attorney
10      Civil Division – Federal Building
        300 North Los Angeles Street
11      Room 7616
        Los Angeles, California 90012
12      213-894-6086

13
        James T. Nelson, Trial Attorney
14      United States Department of Justice
        P.O. Box 386
15      Washington, D.C. 20044
        202-616-2376
16

17

18   FOR DEFENDANT McGRAW-HILL COMPANIES, INC. and STANDARD & POOR'S
     FINANCIAL SERVICES LLC:
19
            John W. Keker
20          KEKER AND VAN NEST LLP
            710 Sansome Street
21          San Francisco, California 94111
            415-391-5400
22
            Steven K. Taylor
23          KEKER AND VAN NEST LLP
            633 Battery Street
24          San Francisco, California 94111
            415-391-5400
25

1

2      **APPEARANCES OF COUNSEL (Continued):**

3

4      FOR THE DEFENDANT McGRAW-HILL COMPANIES, INC. and STANDARD & POOR'S
       FINANCIAL SERVICES LLC:

5

6              Jennifer L. Keller
               KELLER RACKAUCKAS UMBERG ZIPSER LLP

7              18300 Von Karman Avenue
               Suite 930

8              Irvine, California 92612
               949-476-8700

9

10             Floyd Abrams
               CAHILL GORDON AND REINDEL LLP

11             80 Pine Street
               New York, New York 10005

12             212-701-3000

13             S. Penny Windle
               CAHILL GORDON AND REINDEL LLP

14             80 Pine Street
               New York, New York 10005

15             212-701-3000

16             Paven Malhotra
               KEKER AND VAN NEST LLP

17             710 Sansome Street
               San Francisco, California 94111

18             415-391-5400

19

20      ALSO PRESENT:

21             Prasanth R. Akkapeddi
               Associate General Counsel

22             McGraw Hill Financial

23

24

25

1                         **I N D E X**

2      **PROCEEDINGS**                              **PAGE**

3      Hearing on Motion to Dismiss                   5

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|  |  |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| 10:06 | 4 |
| | 5 |
| 10:06 | 6 |
| | 7 |
| | 8 |
| 10:06 | 9 |
| | 10 |

**SANTA ANA, CALIFORNIA, MONDAY, JULY 8, 2013**

**Volume I**

(10:06 a.m.)

THE COURT:  United States of America v. McGraw-Hill Companies.

Counsel, could I start with the government very slowly, and I'm visual, so I'm going to have you be seated in certain places.

Counsel, Mr. Cardona, would you make your appearance, please.

MR. CARDONA:  George Cardona from the U.S. Attorney's Office for the plaintiff.

MR. KHORSHID:  Good morning, Your Honor.  Anoiel, spelled, A-N-O-I-E-L; last name, K-H-O-R-S-H-I-D, like David, for the United States.

MR. NELSON:  Your Honor, Jim Nelson, from the U.S. Department of Justice Consumer Protection Branch for the United States.

THE COURT:  Mr. Nelson, are you from the Los Angeles area or Washington D.C.?

MR. NELSON:  No, Your Honor.  I'm from Washington D.C.

THE COURT:  Okay.  And I want you to help me with the pronunciation of your last name.  Khorshid?

MR. KHORSHID:  Yes, sir, that's correct.

10:07   1          THE COURT:  Where are you located?

10:07   2          MR. KHORSHID:  The U.S. Attorney's Office in

3  Los Angeles.

10:07   4          THE COURT:  In Los Angeles.

10:07   5          MR. KHORSHID:  Yes.

10:07   6          THE COURT:  Okay.  Thank you.

10:07   7          Mr. Cardona, you're still in Los Angeles?

10:07   8          MR. CARDONA:  Yes, Your Honor.

10:07   9          THE COURT:  Okay.  Thank you very much.

10:07  10          MR. KEKER:  Good morning, Your Honor.  I'm John

11  Keker, Keker & Van Nest.  Our offices are in San Francisco.

10:07  12          THE COURT:  And are you located in San Francisco?

10:08  13          MR. KEKER:  Absolutely.

10:08  14          THE COURT:  That's your home.  Okay.  Great city.

10:08  15          Ms. Keller, I know you, but you record doesn't.

10:08  16          MS. KELLER:  Good morning.  Jennifer Keller,

17  Keller Rackauckas Umberg & Zipser in Irvine, on behalf of

18  McGraw-Hill.

10:08  19          THE COURT:  Gentlemen, I don't know you.  My

20  apologies.

10:08  21          MR. TAYLOR:  Steve Taylor of Keker & Van Nest in

22  San Francisco.

10:08  23          THE COURT:  So you're with that gentleman?

10:08  24          MR. TAYLOR:  I'm with Mr. Keker, yes.

10:08  25          MR. ABRAMS:  Good morning, Your Honor.  I'm Floyd

1    Abrams from the Cahill Gordon firm in New York.

10:08    2    THE COURT:  You're from New York?

10:08    3    MR. ABRAMS:  Yes.

10:08    4    THE COURT:  Is that your home also?

10:08    5    MR. ABRAMS:  Yes.

10:08    6    THE COURT:  Would you have a seat for just a

7    second.

10:08    8    We started at 7:30 this morning.  Would you mind

9    if we took a brief -- now, all of you folks, I have no idea

10    who's out in the audience.  Are these associates and related

11    counsel?  Who do I have out there generally?

10:09    12    MR. KEKER:  Your Honor, we have two others:  Paven

13    Malhotra and Penny Windle.

10:09    14    THE COURT:  Why don't you make your appearances.

15    It's good for the record.  You're associates?

10:09    16    MS. WINDLE:  I'm a partner of Mr. Abrams at the

17    Cahill Gordon law firm.

10:09    18    THE COURT:  Excellent.

10:09    19    MR. MALHOTRA:  Pavin Malhotra.  I'm a partner of

20    Mr. Keker.

10:09    21    THE COURT:  Okay.  It's good for the record that

22    you're on the record, then.  All right.  Have a seat.

10:09    23    Now, who are the rest of these folks out here?

10:09    24    MR. CARDONA:  Your Honor, there are some other

25    individuals from my office.

| | | |
|---|---|---|
| 10:09 | 1 | THE COURT:  Why don't you introduce me to 'em. |
| 10:09 | 2 | MR. CARDONA:  Certainly.  From the Department of |
| | 3 | Justice, we have Tony West, who's the Assistant Attorney |
| | 4 | General. |
| 10:09 | 5 | THE COURT:  Pleasure.  It's nice meeting you.  Are |
| | 6 | you from Washington D.C.? |
| 10:09 | 7 | MR. WEST:  Yes, Your Honor, I am. |
| 10:09 | 8 | THE COURT:  I'm going to want to address a lot of |
| | 9 | the associates, senior counsel for both sides throughout the |
| | 10 | day and this evening about your roles and what counsel |
| | 11 | expect you to play.  So it's good to have you here. |
| 10:09 | 12 | Who else? |
| 10:09 | 13 | MR. CARDONA:  We also have Geoff Graber from |
| | 14 | Washington D.C., as well, Mr. West's office. |
| 10:09 | 15 | THE COURT:  So you must be playing some role |
| | 16 | already, and I want to talk to you gentlemen when I talk to |
| | 17 | counsel.  A lot of decisions we make today or tonight or |
| | 18 | tomorrow or wherever are going to be pretty far-reaching. |
| 10:10 | 19 | Once made, they'll be final.  So I'm going to be |
| | 20 | looking for everybody's wisdom. |
| 10:10 | 21 | Counsel? |
| 10:10 | 22 | MR. CARDONA:  Leon Weidman, who's the chief of our |
| | 23 | civil division here in Los Angeles. |
| 10:10 | 24 | THE COURT:  Pleasure.  Here in Los Angeles.  Okay. |
| 10:10 | 25 | MR. CARDONA:  Richard Robinson, who's the chief of |

1    our major fraud section.

10:10  2         THE COURT:  Great.  Would you move to that side of

3    the room.

10:10  4         MR. ROBINSON:  Sure.

10:10  5         THE COURT:  Anybody else on your team or

6    associated with you?  I'd like to put them over there.

10:10  7         MR. CARDONA:  There are some other observers, but

8    not associated with our team.

10:10  9         THE COURT:  Okay.  Ms. Keller, Mr. Keker,

10   Mr. Abrams.

10:10  11        MS. KELLER:  Your Honor, we have Allison Shalinsky

12   in the audience, who's a partner with my firm.

10:10  13        THE COURT:  Nice seeing you again.  Pleasure.

10:10  14        And who else?

10:10  15        MR. KEKER:  None for us.

10:10  16        THE COURT:  The rest are observers or press or

17   somebody?

10:10  18        MR. ABRAMS:  Yes, sir.

10:10  19        THE COURT:  Before we take the break, we already

20   have a tentative prepared.  I'm not certain that that's the

21   correct decision.

10:11  22        So I thought that I'd let you argue your case

23   de novo without a tentative in front of you.  And if I'm

24   convinced that I'm wrong or I've got a strong suspicion, I'm

25   going to hold back that tentative.

10:11    1          If I still think I'm right, I'm going to
         2     distribute that tentative and have you re-argue it again.
         3     You've put a lot of effort into it.  I think you're three
         4     years in the investigation, four months of negotiation
         5     between the parties, so you know your case pretty well; and
         6     I'm catching up with you.

10:11    7          I think that's a fair way to do it.  I'm a little
         8     afraid if I put the tentative in front of you that you might
         9     argue based upon that tentative and there may be things that
        10     I haven't seen or considered that wouldn't be fair to each
        11     side.

10:11   12          If I think that that tentative eventually is still
        13     correct, I'll indicate to you; but whether I do or not or
        14     hold back on that tentative, I'm going to start talking to
        15     you about the scheduling conference today.

10:11   16          A lot of the decisions you make today are going to
        17     have a tremendous bearing -- or tonight or tomorrow or
        18     whenever -- are going to have a tremendous bearing on how we
        19     conduct the case.

10:12   20          There's already a dispute between Mr. Keker,
        21     Ms. Keller, Mr. Cardona, and you gentlemen about the breadth
        22     of the case.  Reading your scheduling conference orders, one
        23     of the things that jumps out is the scope of discovery; the
        24     ability of you to prepare; what the government is bringing;
        25     the government's representation that eventually they may cut

1    the case before summary judgment, which is going to cause

2    great consternation if I give you that leeway, because if

3    it's late, how can you possibly prepare.

4              Number two, the request to conduct discovery of

5    some of the government agencies and how relevant that is.

6              Number three, if this is going to be bifurcated or

7    not.

8              And all of those issues that we start trying to

9    decide today make a tremendous difference in terms of the

10   conduct of the case.

11             Today, I'm listening.  I really want your input so

12   we shape a case that makes sense to both of you if we're

13   going forward to litigation.

14             So I'm going to take a recess.  I'll come back in

15   about half an hour.  We're going to resume at 10:45.

16             Why don't you go down to the cafeteria and get a

17   cup of coffee.  Just leave your things here.  I wanted to

18   clear off the lunch hour for you.  We've got a 1:30

19   calendar, but just leave the documents on the table.

20             *(Recess taken at 10:20 a.m.)*

21             *(Proceedings resumed at 10:48 a.m.)*

22             THE COURT:  We'll begin with the argument

23   concerning the 12(b)(6).  I'll turn to the defense first.

24             MR. CARDONA:  Your Honor, if I may interrupt for

25   one second.  I was remiss in introducing Mr. Birotte, our

|        |    |                                                          |
|--------|----|----------------------------------------------------------|
|        | 1  | U.S. Attorney, who has also arrived.                     |
| 10:48  | 2  | THE COURT:  Thank you for being here.                    |
| 10:48  | 3  | Counsel.                                                 |
| 10:48  | 4  | MR. CARDONA:  And, Your Honor, all of the people I       |
|        | 5  | introduced, just so the Court is aware, while they're here, |
|        | 6  | will likely have to leave before we're done today.       |
| 10:48  | 7  | THE COURT:  I wouldn't do that, if they're going         |
|        | 8  | to have any association with the case.  After we're done |
|        | 9  | with the 12(b)(6), the decisions we make this evening are |
|        | 10 | going to have a tremendous impact on your office and on the |
|        | 11 | defense.  I'll leave that to your discretion.  They're   |
|        | 12 | welcome to go home at 5:00 o'clock.  I wouldn't do that if |
|        | 13 | they're going to have any association with this case.    |
| 10:49  | 14 | MR. KEKER:  And, Your Honor, I have omitted to           |
|        | 15 | introduce one person.  Prasanth Akkapeddi is here in the |
|        | 16 | courtroom.  He's the associate general counsel of        |
|        | 17 | McGraw-Hill Financial.  And I should have introduced him |
|        | 18 | before.  Sorry.                                          |
| 10:49  | 19 | THE COURT:  Thank you.                                    |
| 10:49  | 20 | MR. KEKER:  Your Honor, with respect to the motion       |
|        | 21 | to dismiss, as prelude, the Government is seeking to hold |
|        | 22 | Standard & Poor's and McGraw-Hill responsible for improperly |
|        | 23 | rating over 5500 RMBS and CDO securities, each of which has |
|        | 24 | to be multiplied by 10, because there's 10 tranches, without |
|        | 25 | proving that any particular rating was wrong or should have |

1    been different or did not accurately reflect the credit risk

2    at the time of the rating.

3            THE COURT:  Are you comfortable if I ask you

4    questions as we go?

5            MR. KEKER:  Yes, please.

6            THE COURT:  And I'm happy to come back to them.

7    Which is better for you?

8            MR. KEKER:  For you to let me know what is on your

9    mind.

10           THE COURT:  In your scheduling conference order,

11   you stated that one of your concerns was that a different

12   committee decided these ratings.  And it wasn't clear to me

13   if the committee was deciding the –– or different committees

14   were deciding individual tranches within what I'm going to

15   call a securitization, or if different committees were

16   deciding the securitizations, or the packaging, as I call

17   them, and the tranches within that securitization were

18   decided by the same committee.

19           MR. KEKER:  I believe ––

20           THE COURT:  That may be unclear.  Do you

21   understand?

22           MR. KEKER:  No, I think it's clear.  And it's the

23   latter.

24           The same committee, the same three people take a

25   proposed CDO; here's the collateral that's going to go into;

1    how much of this are we going to rate triple A, how much

2    double A, and so on down through the tranches.  They're the

3    ones --

10:51    4            THE COURT:  The same committee decides the

5    tranches within RMBSs or CDOs or whatever?

10:51    6            MR. KEKER:  Yes, sir, of that individual CDO.

10:51    7            Now, the next CDO that's rated the same day or

8    next day may be rated by three different people, but that's

9    the rating committee for another CDO.

10:51   10            THE COURT:  You said 5500 tranches.  What --

10:51   11            MR. KEKER:  I'm sorry, excuse me.

10:51   12            THE COURT:  Is it CDOs?

10:51   13            MR. KEKER:  No.  5500 RMBS or CDOs, each of which

14    has 8 to 10 individual tranches.  So if you want to

15    challenge a rating -- and this is sort of one of my big

16    points here --

10:51   17            THE COURT:  Okay.

10:51   18            MR. KEKER:  -- everything that is alleged in the

19    complaint specifically deals with a triple A tranche.

20    There's one allegation about a double A tranche, but these

21    are the tranches where what Standard & Poor's is saying we

22    believe that this is a very, very secure security; and if

23    you buy it, what we're telling you is that some huge number

24    of defaults -- let's say the CDO has 50 percent triple A --

25    this isn't exact, but some huge number, maybe up to

1    50 percent of the underlying collateral has to default

2    before the triple A gets hit.  Everybody down the line gets

3    hurt, but the Triple A is still safe.  So don't worry about

4    it.  And it's why banks would buy these things.  They loaded

5    up with Triple A, because nobody thought, no matter what was

6    going on down the line, that triple A would ever be hit.

7    They're still buying them in 2007.  They're buying them

8    right up to the apocalypse, when everything goes over the

9    cliff.

10:52    10         Our point, if there's one point we're trying to

11   make here is that when they allege that the model wasn't

12   right or you should have changed the model faster or you

13   didn't change -- you didn't do something about the

14   underlying collateral, the examples they give have to do

15   with subprime, which maybe makes up 50 percent -- there's

16   different percentages in here -- 50 percent of the

17   collateral for an individual CDO.  And then they say, a few

18   months later, you downgraded 10 percent of that collateral.

19   Well, 10 percent of 50 is 5 percent.  So you've downgraded

20   5 percent of the collateral.  What does that have to do with

21   the triple A tranche that the financial institution has

22   purchased?

10:53    23         Now, if they were coming in here to protect

24   triple B investors or equity investors, they might be making

25   different arguments; but when we come to --

10:53   1          THE COURT:  Just a moment, then.  I want to repeat

2    back what I just heard.

10:53   3          MR. KEKER:  Yeah.

10:53   4          THE COURT:  That, hypothetically, 50 percent are

5    rated less than Triple A.  And what does this have to do

6    with the Triple A.  I think the response from the other side

7    would be that the downgrade in these, I'm gonna call

8    securitization packages, CDOs, are going to have a dramatic

9    affect.  Because if you take out some of the -- I'll call

10   'em subprime or non-prime, then that weakens the entire

11   package, because the entire package has some percentage of

12   non-prime.

10:54   13          So, therefore, it weakens the selling of these

14   back to the Street, because even though you might have

15   50 percent triple A or 25 percent, whatever that percentage

16   is, the package has less value.

10:54   17          MR. KEKER:  I expect that is the argument that

18   we're gonna hear from them.

10:54   19          THE COURT:  Okay.  How do you respond to that?

10:54   20          MR. KEKER:  Our response to that is that there are

21   reasons why these security -- why this is not a mail fraud,

22   wire fraud, or bank fraud case.  In order to have a scheme

23   to defraud, there has to be fraud.  Here, we have three

24   reasons why there is not a scheme to defraud.

10:55   25          The first is the *Boca Raton* argument, that most of

1    the statements they're relying on have to do with general,

2    generic statements that are neither true or false and are

3    just general statements of code of conduct.  Without tying

4    those to some intent to harm the investor, a specific intent

5    to harm the investor, those generic statements don't make

6    any -- don't make a scheme to defraud.

7         THE COURT:  Doesn't the case law strike against

8    that argument that you don't have to have a specific

9    investor; it could even be a third-party harm, i.e, banks?

10        MR. KEKER:  No, I don't think the case law -- for

11   a scheme to defraud, there's got to be a specific intent to

12   harm the investor, a specific intent to harm the victim; and

13   here, the victim is claimed to be the investor.

14        Now, the second argument I was gonna make is that

15   apparently 90 percent of these losses, the investor that

16   they say is harmed are the banks that issued the securities.

17   And that's the materiality argument.  How in the world could

18   the banks, who have all of this information about what they

19   are rating and about what goes into it and how they're

20   putting it together -- how can that be -- how can a

21   statement about independence or our aspiration or

22   objectivity -- how could a statement like that change

23   meaningfully the total mix of information?  That's the

24   second argument.

25        The first argument is the argument that most of

 1    these statements they're alleging, all of them, really,

 2    because they haven't alleged anything specific about any

 3    false rating.  They're all sort of general, generic

 4    statements, which don't -- don't support a mail fraud scheme

 5    or wire fraud or a bank fraud scheme.

 6                 Second argument is materiality, which I want to go

 7    over in a little more detail.

 8                 And then the third argument is that mail fraud,

 9    wire fraud, bank fraud requires a specific intent to take

10    money or property from somebody, and what they seem to be

11    saying is your specific intent was to get the investors to

12    buy these and, therefore, you'll be able to sell your

13    services, your ratings services.

14                 But that's not -- that was just part of the

15    bargain; that's what the investors bought.  The investors

16    were perfectly happy to end up with a rating from S&P.  What

17    the specific intent has to be under the *Novak* and *Star* and

18    other cases, is -- is to not give them a true rating, to not

19    give them the rating that's the true belief of Standard &

20    Poor's at the time the rating was issued or at the time it

21    was re-upped.

22                 And here, they want to take try to take that case

23    and prove it without proving that any of the ratings were

24    false or affected a financial institution which owned the

25    triple A tranche or resulted in pecuniary loss to the triple

1   A -- I mean, to the financial institution that owned the

2   triple A tranche.

10:58   3           That's what the -- that's really the main point of

4   our argument on a motion to dismiss.  If they want to bring

5   a criminal case -- and I've done a lot of criminal cases

6   of -- in mail fraud.  The shoe has got to drop someplace,

7   and when the shoe drops, it's not just somebody said

8   something that you can quibble about whether or not it was

9   true; it's got to be -- got to be intended to get money

10  improperly from the victim.

10:58   11          Here, they're not willing to allege that.  They

12  haven't alleged it from 2004 to March of 2007, when all they

13  say during that period is that, oh, you didn't change your

14  models fast enough because you wanted to get business; but

15  they don't make any allegation of an intent to harm anybody

16  or actual harm to anybody or whatever.

10:59   17          And then the third -- then the second part of that

18  is from March to October, when the market was changing

19  radically, when the Fed and the Federal Reserve system and

20  the Treasury Department and other rating agencies, which

21  were issuing the exact same ratings as Standard & Poor's

22  about the identified CDOs during that period, when everybody

23  was scrambling to figure out what was going on, they still

24  haven't alleged that anybody at S&P who issued those ratings

25  didn't believe what they were issuing.

10:59    1          They have pointed out through snippets of

         2    conversations about should we change the model, should we do

         3    this do, should we do that; quoting e-mails.  But they

         4    haven't alleged the who, what, when, where, how that is

         5    required for a criminal case.  And that's the -- that's the

         6    evil in this Complaint that we're complaining about.

11:00    7          You look -- shall I go on?

11:00    8          The problem is they're seeking to basically blame

         9    the financial crisis on Standard & Poor's.  These are

        10    ratings for which Standard & Poor's, the ones identified in

        11    the complaint, was paid $15 million.  They're seeking more

        12    than 5 million.  Lord knows how much they're seeking in

        13    penalties from the Court.

11:00   14          THE COURT:  5 million?

11:00   15          MR. KEKER:  Five billion, 5 billion.  I mean, we

        16    were paid 15 million, and they're seeking more than

        17    5 billion.  We were paid that to rate the securities, and

        18    they don't want to prove that any rating was false; that any

        19    of it was a false opinion.  They don't want to prove

        20    anything about the true credit risk, how it should it have

        21    been different.  They want to ignore the fact that Moody's

        22    rated them exactly the same way, and want to do it without

        23    proving that there was a specific intent by somebody at

        24    Standard & Poor's enough to hold Standard & Poor's liable

        25    criminally to defraud investors of their money and property.

11:01    1          And so I've mentioned the three reasons.

11:01    2          Let me go back to the first one.  The Boca *Raton*

3    case and the fact that many of these statements that they're

4    alleging in this complaint are exactly what the Second

5    Circuit -- I mean, precisely the statements the Second

6    Circuit looked at and said, no, no, no, this is not the

7    stuff of a scheme to defraud.

11:01    8          And consider what some of those statements are:

11:01    9          "That S&P's mission is to provide high quality,

10   objective, independent, and rigorous analytic information to

11   the marketplace."  That's at Complaint 111(a).  We --

12   Standard & Poor's insists that's a true statement, but it's

13   not the kind of statement that can lead to litigation about

14   a scheme to defraud.

11:02   15          Another one is "The rating services must preserve

16   the objectivity, integrity and independence of the ratings."

17   Again, it's true, but it's not the kind of generic statement

18   that can be alleged to be part of a scheme to defraud.

11:02   19          "No employee shall attempt to exert improper

20   influence on the opinions of a rating analyst."

11:02   21          Again, no specific allegation that that ever

22   happened.  Standard & Poor's takes the position it didn't

23   happen.  But it's not the kind of statement that can support

24   a scheme to defraud.

11:02   25          "Our criteria are publicly available,

1   non-negotiable, and consistently applied."

11:02   2         Again, it's true; but for purposes of analyzing

3   whether that's the kind of statement that could support a

4   scheme to defraud, we say no.

11:02   5         "Ratings are current opinions."

11:02   6         Again, true; but not the kind of thing -- it's too

7   generic to support a scheme to defraud.

11:03   8         So those statements are really statements that are

9   hard to see how you would -- how you'd litigate the truth or

10   falsity.  They're -- they're, I guess, objective, but

11   they're also subjective.  None of it can be false, unless

12   they're willing to show that some particular rating is

13   false.  That's what -- if you were ever gonna say that they

14   were false, you'd have to get to the rating.

11:03   15         But they don't want to do that.  How can that be.

16   That's argument number one.

11:03   17         The second one I've already talked about:

18   Materiality.

11:03   19         The Complaint does not allege a scheme to defraud

20   in that these statements are not material and that no

21   reasonable investor would believe they would change,

22   meaningfully alter, the total mix of information available.

11:03   23         Think about two of the investors here that are

24   identified:  Citibank and Bank of America.

11:03   25         And we know from our 26(f) work that so far,

1    89 percent of the losses that they're claiming were

2    resulting from this scheme to defraud are to Citibank and

3    Bank of America.

4            These are the banks that issued these securities,

5    that packaged 'em.  They created 'em.  They analyzed 'em.

6    They asked S&P to rate them.  They knew perfectly well that

7    Standard & Poor's' opinion alleged in Paragraph 233(n) of

8    the Complaint, in which it said, "Boy, this 2006 vintage is

9    really volatile and scary" -- they knew that.

10            They knew the market was highly uncertain and

11    volatile.  They knew that S&P competed with other rating

12    agencies for business with Moody's and Fitch.  They knew

13    that they paid -- this idea that S&P was somehow fooling 'em

14    because the banks were paying 'em for the ratings.  They

15    knew that they were paying Standard & Poor's.

16            The banks together with all these -- with all

17    other investors got these presale reports that had a lot of

18    information in 'em.  That's Paragraph 89 of the Complaint.

19    They got rating letters with more information.

20    Paragraph 90.  They knew the models -- in the case of the

21    banks, the banks knew the models that were used to rate.

22            And under these circumstances, the idea that some

23    generic statement about independence, objectivity; we try

24    our best; we give current opinions, that that's -- that's--

25    "meaningfully alters the total mix of information" is absurd

 1     when it comes, at least, to the banks that are issuing these

 2     securities.

 3                 And we know from *Netter v. the United States*, the

 4     Supreme Court case, that materiality is an important element

 5     of all of these crimes that are charged.

 6                 And we know from the JPMorgan Chase that we cited

 7     that it's a different -- where they say it's one -- of

 8     course, saying that you've got integrity is important; it's

 9     not that it's not important, but you can't conflate that

10     with materiality.

11                 And -- and if you look -- I mean, in their -- in

12     their complaint they -- and in the 26(f) report, they --

13     they say that this is what the complaint means; that the

14     reason that Standard & Poor's is liable for everything that

15     happened from 2004 to March of 2007 is that they were not

16     objective or independent because they were influenced in

17     their ratings by the issuers.

18                 So you would think that if the issuer was doing --

19     if they were right about that, that the issuer would know it

20     and it would be hard to show -- it would be hard to say why

21     that's a material matter at least for the securities that

22     were rated where the issuer was the one who created 'em.

23                 I'm just going on to the third reason, unless the

24     Court has any questions.

25                 The third reason, and I've mentioned this, that

1   the government hasn't alleged an actual scheme to defraud

2   that could support a criminal case -- 'cause that's the way

3   I think we have to think about it -- is that there's no

4   allegation in this complaint of a specific intent to defraud

5   investors of their money and property or property.  And

6   there we're relying on the *Star* and the *Novak* cases in the

7   Second Circuit.  The *Novak* case was when Justice Sotomayor

8   was on that panel in the Second Circuit; it's as recent as

9   2006.

11:07   10           They make plain that just sort of

11   misrepresentations, generally, that amount only to a deceit

12   are insufficient by themselves to maintain a mail or wire or

13   bank fraud prosecution.  To have a scheme to defraud, the

14   deceit must be coupled with contemplated harm to the victim.

15   If the investors get exactly what they bargained for, they

16   aren't harmed.

11:08   17           And here, S&P's opinion about how the security

18   should be rated is what the investors wanted.  It's what

19   they got.  And in order to have a scheme to defraud, the

20   Government's got to show, not some generic stuff, but that

21   they didn't get what they bargained for; that the ratings

22   were false.

11:08   23           And that's what we're attacking this Complaint

24   about.  Without alleging that the rating was false and that

25   it should have been different, that the credit risk was

1  different, without taking on that burden, they are not

2  proving a scheme to defraud.

11:08  3       And that's basically the same in other contexts,

4  Your Honor.  We've cited other cases.  In securities cases

5  where a rating opinion comes up -- and this is *Reis v.*

6  *Charles Schwab*, which is cited.  It's pretty clear that a

7  rating opinion isn't false unless the government can prove:

8  (a) it's false, or (b) it wasn't believed.  I mean, it could

9  be false if it were completely reckless and so on, but you

10  have to allege that the rating was false in order to have a

11  securities case.

11:09  12       Same thing under the False Claims Act.  The

13  *Cafasso* case, which is a *qui tam* action.  It's the one where

14  the, quote, who, what, when, where, and how of the

15  misconduct, as well as what is false or misleading and why

16  it is false, has to be alleged.

11:09  17       That's at 637 F.3d 1047 at 1055, and that's a

18  Ninth Circuit case.

11:09  19       Same thing in the *Space Coast* case, the District

20  Court case against McGraw-Hill and Standard & Poor's; no

21  specific allegations about any particular CDO or RMBS.

11:09  22       And again, I would refer you to the list, and I'm

23  not gonna go through this in too much detail.  But it's --

24  when they identify specific CDOs, they do it in

25  Paragraphs 234, 236, 238, 241, and 261; and look at what

1     they say.  We'll start -- we'll take Octonian in 238,

2     subparagraph (b).  Octonian is one that I happen to know

3     about.  It was issued by Citibank -- Citigroup.  They, of

4     course, don't mention that in the complaint, so all you see

5     is that Citigroup bought something.  They don't tell you

6     that Citigroup issued it.  And they say, look, you issued it

7     in May, and then you downgraded 7 percent of the non-prime

8     collateral in July.  In other words, as more information

9     came, you downgraded it.

11:10   10     And then it defaulted.  Did it default July 31st?

11    No.  It defaulted in March of 2008, when the world for these

12    kind of things had fallen apart.

11:10   13     And again, it's sort of misleading, because there,

14    62 percent of Octonian was subprime.  It wasn't all

15    subprime.  So if they downgraded 11 percent, what they're

16    actually downgrading is about 7 percent of the collateral.

11:11   17     Now, if you have the triple -- I mean, what impact

18    does that have on the triple A?  They're not telling you.

19    It's possible, I suppose, but that's not what they've

20    alleged.  They should come in and say something about

21    Octonian.  Octonian was a scheme to fraud because -- the

22    intent to defraud and so on.

11:11   23     THE COURT:  Why are what I call securitizations --

24    let's just take a hypothetical: $400 million.  I've got a

25    revolving line of credit.  I'm going to sell that back to

1     the Street.  Why are securitizations in tranches?  Why don't

2     I have the 400 million in all triple A, for instance?  Next

3     400 million, I rate BB.  Why, on the Street, do I mix these

4     in tranches in the same securitization package?

11:11  5          MR. KEKER:  The answer is supply and demand.  I

6     mean, this is a time when there was -- I think the record's

7     gonna show there's tremendous demand for people who want to

8     buy.  There's tremendous demand for people -- by banks who

9     want to sell.

11:12  10          THE COURT:  I know that.  It was the Wild West,

11    okay?  I'm just kidding you.

11:12  12          MR. KEKER:  You weren't kidding.  It was the Wild

13    West.

11:12  14          THE COURT:  It was interesting.

11:12  15          Why on the Street -- remember, federal courts have

16    to be very careful in our rulings, because we can affect the

17    Street.  We can affect this dynamic thing called capitalism,

18    not because we're legislating, but because our decisions

19    here can send a message to the Street, intended or

20    unintended.  So we need to be careful with this wonderful

21    mechanism our country has.

11:12  22          Why -- and I'll ask it again -- don't I have, as a

23    hypothetical, a $400 million and it's all triple A, and the

24    next one is all subprime, okay?  It's all B or below.

11:12  25          In other words, why couldn't that be packaged

        1    because I, then, as an investor would know exactly that that

        2    was triple A.  If there was a misrating and I had subprime

        3    mixed, it would be very clear.

11:13   4         I just don't understand why we have these

        5    different tranches within different packages, because the

        6    volume was so high on the Street, it was easily done.

11:13   7         MR. KEKER:  If you were an investor who only

        8    wanted prime RMBS --

11:13   9         THE COURT:  I want triple A.

11:13  10         MR. KEKER:  -- prime RMBS that yielded triple A,

       11    you could buy it.  But the interest rate that you would get,

       12    the return to you for buying it, would be less as they pay

       13    the bottoms than if you took a little bit more risk.  It's

       14    the same as most things.

11:13  15         So if you put together a CDO that's a little

       16    riskier, that's got less triple A and more of these lower

       17    tranches where the collateral is, as many of these were,

       18    mezzanine CDOs, triple B-rated, and you package them

       19    together -- you could go out and package triple A into

       20    another CDO and sell everybody triple A.

11:13  21         THE COURT:  I understand that.

11:13  22         MR. KEKER:  But in order to get a return and to

       23    get both sides of this transaction working where the

       24    banks --

11:13  25         THE COURT:  We're going to play with that.  I

1    understand that.

11:14    2         MR. KEKER:  Okay.

11:14    3         THE COURT:  When I buy bonds, Treasury bonds, I

4    know that my rate of return is low, right?

11:14    5         MR. KEKER:  Right.

11:14    6         THE COURT:  I go invest in a foreign mutual fund

7    that's out of Thailand or Singapore, and I know my risk is

8    higher.  I don't think you and I have the answer to that

9    question.  But it would be much simpler for the American

10   investor if we knew that we were buying, not tranches, but a

11   securitization of X amount that was triple A.  I know

12   exactly what my investment is.  I get a lower interest rate.

11:14    13        But when the Street mixes that, when they start

14   getting into tranches because it gives a higher return, it

15   means we have this incredible fluidity within that package,

16   if you will.  We have triple A; we've got subprime that's

17   moving around -- let's say non-prime that's moving around.

18   And, therefore, the rating agency would seem to become

19   critical as long as the Street chooses to bring what I call

20   these mixed securitizations, these mixed packages.

11:15    21        And I still don't understand, for the life of

22   me -- and I don't think you can explain it to me, but I'm

23   wide open to it -- why we don't have a more pristine

24   situation where I know that I'm buying 400 million of triple

25   A; my return is 1.4 percent.  If I want to take a bigger

| | 1 | risk, I can buy B.  But then I'm buying $400 million of B |
| | 2 | and I've got a greater risk, but I've got a greater return. |
| | 3 | Okay?  Maybe I get 6 percent. |
| 11:15 | 4 | MR. KEKER:  There's a lot of people, starting |
| | 5 | maybe with Paul Volker, who would sit down and come up with |
| | 6 | a regulatory scheme that would lead to that conclusion. |
| 11:15 | 7 | THE COURT:  Can we call him? |
| 11:15 | 8 | MR. KEKER:  I am sure.  He could be the court |
| | 9 | expert, I guess. |
| 11:15 | 10 | THE COURT:  I might need a 706 on this. |
| 11:15 | 11 | *(Laughter in the courtroom.)* |
| 11:15 | 12 | MR. KEKER:  It's a question -- it's a question |
| | 13 | that people have been grappling with since 2008, but for |
| | 14 | purposes of this case -- I mean, in 2004 -- this is one of |
| | 15 | the things I want to get across.  From 2004 until 2007, when |
| | 16 | there's probably 5,000 of these RMBS, the Government has |
| | 17 | not, after three years of investigation, taken any effort to |
| | 18 | sort out how many of those were all prime mortgages. |
| 11:16 | 19 | THE COURT:  And the virtue for S&P is that they're |
| | 20 | not the issuer; the banks were deciding that. |
| 11:16 | 21 | MR. KEKER:  Right. |
| 11:16 | 22 | THE COURT:  S&P is reacting to what the banks have |
| | 23 | already set in motion in terms of these packages. |
| 11:16 | 24 | MR. KEKER:  Yes, sir. |
| 11:16 | 25 | THE COURT:  Okay. |

11:16     1          MR. KEKER:  And what S&P is trying to do is

          2     reflect, based on the only thing it has -- a lot of this in

          3     the Complaint -- based on historical data.  When was the

          4     biggest disaster in the housing market in the United States?

          5     The year 2000.  How bad was it?  Okay.  How does this

          6     compare to the year 2000?  Are we close to that?

11:16     7          Anyway, they try to put together a rating that is

          8     their honest opinion about where the danger -- where the

          9     stress tests are in this particular CDO.  How much has to

         10     default before what you buy, your tranche, is gonna get hit?

11:17    11          And especially if you're the bank, as here, that

         12     buys it.  I have issued it -- I'm the bank.  I issue it.  I

         13     get it rated, and then I buy the senior tranches.  I feel

         14     great.

11:17    15          2008 comes along and all of a sudden we need TARP.

         16     I mean, it's -- it wasn't the rating that caused 2008 to

         17     come along.  It was the fact that the economy was -- was

         18     headed into an unprecedented, shocking, never-before

         19     experienced collapse in the housing market.  And when people

         20     who were trying to predict where the risks are start with

         21     historical data and use that historical data as best they

         22     can.

11:17    23          And recognize, in historical data, one of the

         24     things that happens here is do defaults mean losses?  Well,

         25     no, not necessarily.  Lots of people default on their

1    mortgage for this month, that month, then get things back

2    together again.  It doesn't necessarily lead to losses.  It

3    doesn't lead to foreclosure.  Historically, how do you do

4    that?

11:18    5         What the Complaint makes plain is that, at least

6    in 2000, when S&P was changing what it was doing, it was

7    trying -- it was changing its procedures to keep up with

8    what was going on, the Government is turning that against

9    'em and saying that's part of the scheme to defraud.

11:18    10        What we're saying is, you want to prove that some

11    rating we issued wasn't our honest opinion?  Bring it on.

12    If you can allege it, we'll defend it.  But don't give us

13    this generic everything you did is wrong because we found

14    some e-mails from people who disagreed with what somebody

15    else in the place was doing, when they don't name one rater,

16    one rating committee that did something that they didn't

17    honestly believe in.  Not one allegation of that.

11:19    18        And Rule 9(b) requires more if they can get away

19    with it.

11:19    20        So our fundamental position is they've had three

21    years.  There's a 10-year statute of limitations.  They're

22    coming in here now and telling us we don't have to prove any

23    false statement; we don't have to, basically, prove much of

24    anything.  And we say they do.

11:19    25        And if they do, then what we ought to do is go

1    back to the drawing board.  The Motion to Dismiss should be

2    granted.  They should take their time.  As I say, they've

3    got a 10-year statute of limitation.  Identify what it is

4    they're talking about and where they want to prove that a

5    rating was false, that it wasn't honestly believed, and so

6    on.

7    11:19    We don't think they can do it.  As I said, every

8    one of these ratings they have specifically mentioned was

9    mimicked by Moody's, who is not here.  We have no idea why

10   the distinction.

11   11:19    And, fundamentally, Your Honor, this is a case

12   that's based -- it's a criminal case, or criminal proof -- I

13   mean, not beyond a reasonable doubt, but FIRREA invokes

14   criminal statutes and it's based entirely on hindsight.

15   That's not the way criminal case laws are brought.

16   11:20    And they're blaming S&P for an unprecedented

17   financial collapse that nobody foresaw.

18   11:20    We've also argued that the case is just

19   fundamentally unmanageable as pled.  They've got to sort out

20   the CDOs or RMBS that they think could be a problem from the

21   ones -- I mean, a lot of these maybe a financial institution

22   didn't even buy.

23   11:20    So without the allegation that one of the ratings

24   was false and proving it, we believe that nothing that

25   Standard & Poor's did could be found to, quote, "affect" a

| | |
|---|---|
| 1 | bank, a financial institution, within the meaning of the |
| 2 | statute or, quote, "result in a pecuniary loss," which is |
| 3 | what they're going after when they say, "This defaulted; |
| 4 | therefore, you're at fault. |
| 5 | And unless the Court has questions, I think I'm |
| 6 | done. |
| 7 | THE COURT:  RMBSs, I want you to educate me and |
| 8 | the government in just a moment.  You both have been working |
| 9 | at this for three years and negotiating, apparently, for a |
| 10 | period of time.  So I'm a little behind you, and I say this |
| 11 | humbly. |
| 12 | CDOs can have a component of RMBSs.  I want you to |
| 13 | give me specific examples of other kinds of debts included |
| 14 | in a CDO.  Are they credit card debt? |
| 15 | What other obligations or debt is included in a |
| 16 | CDO? |
| 17 | MR. KEKER:  It could be anything -- |
| 18 | THE COURT:  Not "could be."  I want specificity. |
| 19 | Give me an example. |
| 20 | MR. KEKER:  Credit card debt is one. |
| 21 | THE COURT:  Hold on. |
| 22 | MR. KEKER:  They call it ABS, Asset Backed |
| 23 | Securities. |
| 24 | THE COURT:  Credit card debt could be one. |
| 25 | What else? |

| | | |
|---|---|---|
| 11:21 | 1 | MR. KEKER:  Student loans. |
| 11:21 | 2 | THE COURT:  Student loans. |
| 11:22 | 3 | What else? |
| 11:22 | 4 | MR. KEKER:  Help me. |
| 11:22 | 5 | MR. TAYLOR:  Commercial loans, Your Honor. |
| 11:22 | 6 | MR. KEKER:  Commercial loans. |
| 11:22 | 7 | THE COURT:  Commercial loans. |
| 11:22 | 8 | Give me more examples.  Well, you're not held to |
| | 9 | this, but I want you to educate me. |
| 11:22 | 10 | MR. TAYLOR:  Aircraft loans, car loans. |
| 11:22 | 11 | THE COURT:  Aircraft loans.  Leasing.  United |
| | 12 | Leasing. |
| 11:22 | 13 | MR. TAYLOR:  Any sort of loan you put out there, |
| | 14 | anything that would generate a periodic payment. |
| 11:22 | 15 | THE COURT:  Okay.  Just a moment. |
| 11:22 | 16 | They're not backed by -- strike that. |
| 11:22 | 17 | In an aircraft loan, I have the actual aircraft as |
| | 18 | the asset.  I have something tangible, correct? |
| 11:22 | 19 | MR. TAYLOR:  Correct. |
| 11:22 | 20 | THE COURT:  And in an RMBS I'd have something |
| | 21 | tangible.  I have a house, correct? |
| 11:22 | 22 | MR. TAYLOR:  Correct. |
| 11:22 | 23 | THE COURT:  Explain to me what I have that's |
| | 24 | tangible in a credit card loan. |
| 11:22 | 25 | MR. KEKER:  The obligation. |

| | | |
|---|---|---|
| 11:22 | 1 | THE COURT:  No, no.  Just a moment.  Come up and |
| | 2 | help him. |
| 11:22 | 3 | MR. TAYLOR:  Yes, Your Honor, Steve Taylor. |
| 11:22 | 4 | THE COURT:  Use the lectern. |
| 11:22 | 5 | Now, you two talk for a moment, and I don't want a |
| | 6 | bunch of garbage.  I want specificity. |
| 11:22 | 7 | MR. KEKER:  I'm garbage; he's specificity. |
| 11:22 | 8 | THE COURT:  No, no, you're doing fine.  Get closer |
| | 9 | together.  It's a wonderful picture. |
| 11:23 | 10 | Tell me what specific I have as collateral -- I |
| | 11 | understand an aircraft loan.  I've got a shell, an aircraft. |
| | 12 | I understand an RMBS.  I understand that they can both come |
| | 13 | together in a CDO.  What I'm confused about is what asset do |
| | 14 | I have that backs up a personal credit card obligation if |
| | 15 | I've 15- to $60,000 on my credit card. |
| 11:23 | 16 | MR. TAYLOR:  I think the short answer is you don't |
| | 17 | have a tangible -- |
| 11:23 | 18 | THE COURT:  I don't have anything, do I? |
| 11:23 | 19 | MR. TAYLOR:  Correct. |
| 11:23 | 20 | THE COURT:  Zero. |
| 11:23 | 21 | MR. TAYLOR:  Correct. |
| 11:23 | 22 | THE COURT:  Student loans.  What asset do I have |
| | 23 | on a student loan that's a tangible asset unlike an RMBS |
| | 24 | that backs up my student loan? |
| 11:23 | 25 | Nothing. |

11:23   1            MR. TAYLOR:  Correct.

11:23   2            THE COURT:  Nothing, right?

11:23   3            MR. TAYLOR:  Nothing tangible.  What you would

4    have there, what they would argue, since we don't have them

5    here, is the obligation to pay.

11:24   6            THE COURT:  So what I'm reading in this

7    hundred-some-page document and trying to discern is this:

8    That an RMBS actually has something tangible.  It has a

9    piece of property that I can look at or securitization of

10   hundreds of pieces or thousands of pieces of property with

11   an interest rate, supposedly, some which may go into default

12   or disclosure -- or foreclosure; and I'm making a value

13   judgment of what the value is when it gets sold back to the

14   Street when I purchase it.  My return might be 7 percent.

15   It might be 6 percent.  I know, out of 2,000 mortgages, I

16   might get some default ratio.  My computer can historically

17   figure that out.

11:24   18           What do I have in a CDO that gives me that same

19   confidence in making an investment when that's mixed with an

20   RMBS?

11:24   21           MR. KEKER:  Well, you don't --

11:24   22           THE COURT:  Because your CDOs are mixed with

23   RMBSs, aren't they?

11:24   24           MR. KEKER:  Well, no.  The CDOs that they've

25   alleged with particularity here are all backed by RMBS --

11:25    1              THE COURT:  Let me say that again.

11:25    2              MR. KEKER:  -- the collateral.

11:25    3              The collateralized debt obligation, which is the

         4    CDO, has as -- as the collateral are tranches of RMBS

         5    security --

11:25    6              THE COURT:  Just a moment --

11:25    7              MR. KEKER:  -- and they're not concrete.

11:25    8              THE COURT:  -- some tranches --

11:25    9              MR. KEKER:  Agreed.  Triple B tranches.

11:25   10              THE COURT:  -- in a CDO, can't I have a mixture of

        11    RMBSs and these other kinds of debts that aren't backed by

        12    some tangible asset?

11:25   13              In other words, in a CDO -- as I try to look at

        14    what the Street's doing and understand this dynamic

        15    marketplace, in a CDO isn't the difference that I can have

        16    an RMBS in a tranche, but I can also have these student

        17    loans or credit debt?  And that's the difference between a

        18    CDO and an RMBS, or am I wrong?

11:25   19              MR. KEKER:  I think you're wrong, actually.

11:26   20              THE COURT:  Help me, then.

11:26   21              MR. KEKER:  Let me go back to RMBS.  It's not

        22    backed by a house.  That's one of the problems.  RMBSs are

        23    you get a bunch of mortgages.  They're sold to somebody.

11:26   24              THE COURT:  I'm sorry.  I misspoke.  You're right.

        25    Mortgages.

11:26   1          MR. KEKER:  Okay.

11:26   2          THE COURT:  Take me back to CDOs.

11:26   3          MR. KEKER:  The mortgage is the same thing as the

4    credit card.  It's a promise to pay, and then you try to

5    figure out how much that promise to pay is worth.  Is it

6    face value, or do you discount it?  But an RMBS is backed by

7    a large number of mortgages, which an investor can go in and

8    they do go in and look at those mortgages.  Where are they,

9    how many --

11:26   10         THE COURT:  I apologize.  I misspoke and I took

11   you off the target.  I disagree with you.

11:26   12         I think that an RMBS, even though they're

13   mortgages, has something that can be foreclosed upon.  It

14   has some tangible asset.

11:26   15         I think that CDOs have a far different, if you

16   will, and more risky problem; and that is, they can be

17   RMBSs, and can also mix what I'm going to call nontangibles,

18   a student loan, and they also mix in credit card debt --

11:27   19         MR. KEKER:  That's true.

11:27   20         THE COURT:  -- and that makes them more risky.

21   And that seems to be the overwhelming difference between the

22   two.  And I understand CDOs can have RMBSs; they may have 80

23   percent.

11:27   24         I want you to correct me if I'm wrong.

11:27   25         MR. KEKER:  I think you're right about everything

|          |    |                                                            |
|----------|----|------------------------------------------------------------|
|          | 1  | except it's not what makes them more risky.  What makes them |
|          | 2  | more risky is what is the asset backed security or RMBS that |
|          | 3  | is the collateral.                                          |
| 11:27    | 4  | THE COURT:  And if it's that student loan, it's            |
|          | 5  | nothing.                                                    |
| 11:27    | 6  | MR. KEKER:  Student loan sounds pretty bad.                |
| 11:27    | 7  | THE COURT:  If it's a credit card debt, it's              |
|          | 8  | nothing.                                                    |
| 11:27    | 9  | MR. KEKER:  Well, okay.  I mean, but that's not           |
|          | 10 | the way the Street looks at it.  The Street looks at it and |
|          | 11 | says, "What are my chances of getting paid here?"         |
| 11:27    | 12 | THE COURT:  Well, in 2007, 2008, not very good.           |
| 11:27    | 13 | MR. KEKER:  Again, in hindsight.  But in 2004 to         |
|          | 14 | 2007, Wall Street and investors look at what's the        |
|          | 15 | collateral and how much confidence do I have in that      |
|          | 16 | collateral.  And one of the areas where there was a lot of |
|          | 17 | confidence that turned out to be, perhaps, misplaced was in |
|          | 18 | residential mortgages.                                     |
| 11:28    | 19 | THE COURT:  The last question is, are CDOs, it            |
|          | 20 | appears to me, also, obviously, initiated by banks?       |
| 11:28    | 21 | MR. KEKER:  Yes.                                          |
| 11:28    | 22 | THE COURT:  Standard & Poor's doesn't do that.           |
| 11:28    | 23 | MR. KEKER:  Right.                                         |
| 11:28    | 24 | THE COURT:  Banks start that process, if you will,       |
|          | 25 | and they turn to your client as a ratings service and said, |

1    "Sort this out in terms of rating."  They make the initial

2    decision of how to mix this; you don't.

11:28   3        MR. KEKER:  Absolutely.  I mean, that's -- and

4    what happens is they put it together, and then they take it

5    to their syndicate desk and say, "Can we sell this?"  And

6    the syndicate desk -- "I don't think so.  They're never

7    gonna buy it.  So let's change the mix."

11:28   8        So they finally get it right, and then they take

9    it to Standard & Poor's and say, "Please run it through your

10   models and rate it."  And then they look at it and say,

11   "This looks good; we think we can sell this," or, "We don't

12   have enough triple A in there.  Let's change the mix again."

11:29  13        The banks put this together, put the package

14   together, write the prospectus that tells the investor what

15   they're buying.  These triple A investors go out there --

16   I've tried one of these cases -- they go out there and they

17   go, "Look --"

11:29  18        THE COURT:  Why aren't the banks included in this

19   lawsuit?

11:29  20        MR. KEKER:  We didn't bring it, Your Honor.

11:29  21        THE COURT:  I'll ask the Government in a moment.

22   Why isn't Moody's, if your claims are correct, included in

23   this lawsuit?

11:29  24        MR. KEKER:  Well, the only distinction that I know

25   is that Standard & Poor's at some point downgraded the

|   |   |
|---|---|
| | 1 |
| | 2 |
| 11:29 | 3 |
| 11:29 | 4 |
| 11:29 | 5 |
| 11:29 | 6 |
| | 7 |
| | 8 |
| | 9 |
| | 10 |
| 11:29 | 11 |
| | 12 |
| 11:29 | 13 |
| 11:30 | 14 |
| | 15 |
| | 16 |
| | 17 |
| 11:30 | 18 |
| 11:30 | 19 |
| | 20 |
| 11:30 | 21 |
| 11:30 | 22 |
| 11:30 | 23 |
| 11:30 | 24 |
| 11:30 | 25 |

1  credit of the United States, much to the consternation of

2  the United States; Moody's didn't.

3          THE COURT:  So you think it's payback?

4          MR. KEKER:  Yes.

5          THE COURT:  Okay.

6          MR. KEKER:  I don't know.  Maybe that's a question

7  the Government can answer.  Why isn't Moody's, who rated all

8  these tranches -- at least the ones that are identified

9  specifically in the complaint, every single one is rated

10  just like --

11          THE COURT:  Well, they may have changed their

12  model.  I don't know yet.  Moody's isn't before me.

13          Well, Counsel, I'll come back to you.

14          Why don't you step over with your colleagues for

15  just a moment.  Why don't you have a consultation, see if

16  he's missed anything, or if there's anything else you'd like

17  to add in the first round.

18          MR. KEKER:  We're fine.

19          THE COURT:  You're okay for the first round.

20  There's going to be a second round.

21          MR. KEKER:  Yes, sir.

22          THE COURT:  Counsel, ready?

23          MR. CARDONA:  Yes.

24          THE COURT:  Where's Moody's?

25          MR. CARDONA:  Moody's is not here because the

1    evidence we developed was against S&P, and we filed the suit

2    based on the evidence we had against --

11:30   3    THE COURT:  Did Moody's change their model during

4    this period of time?

11:30   5    MR. CARDONA:  Moody's operated with a different

6    set of models.  Different procedures --

11:30   7    THE COURT:  Where are the banks?  Where are the

8    banks?

11:30   9    MR. CARDONA:  The banks are not here, again --

11:30   10   THE COURT:  Why?

11:30   11   MR. CARDONA:  -- because our evidence in this case

12   is against S&P.  We have not brought allegations against the

13   banks.

11:30   14   And if I could, what I'd like to start with is to

15   step back a little bit and go through kind of the

16   structuring of these entities and of these instruments and

17   how that works and why that shows how important the

18   representations that S&P was making were to the people who

19   were investing in them.

11:31   20   With that, let's start with an RMBS.  And I'm

21   going to talk about RMBS, and then about CDOs made up of

22   RMBS, because the CDOs that we have alleged are, in fact,

23   CDOs made up almost entirely of two things:  Either RMBS or

24   other CDOs that themselves are based on RMBS.  And I'll

25   explain that in a second when we get there.

11:31    1         So I'm not gonna get into the credit card loans or

         2    the student loans or the airplane loans, because they don't

         3    really play a role in our case.

11:31    4         So let's start with an RMBS.  As Your Honor has

         5    recognized, what an RMBS is, is basically a debt instrument

         6    that is based on other debt instruments.  And the other of

         7    debt instruments that make up the RMBS are, in fact,

         8    residential mortgages.

11:31    9         And a mortgage, as Your Honor has recognized,

        10    basically has two things.  If you're a bank making a

        11    mortgage loan, there's two things you look at, right?

11:32   12         There's the value of the property, 'cause that's

        13    what you're gonna recover against if, in fact, the person

        14    who's borrowing it can't pay, and then you look at the

        15    ability of the borrower to repay.  Things like their FICO

        16    credit scores, their credit histories, their incomes, their

        17    debt to income ratio, those type of things that go to their

        18    ability to repay the loan.

11:32   19         So you have these series of mortgage loans, and

        20    each mortgage loan has a term.  It's typically a 30-year

        21    term in which the borrower had committed to making periodic

        22    payments.

11:32   23         So the bank is in a position where they can

        24    collect those payments over that time.  And the bank has

        25    made an assessment that given the risks involved in that

```
 1   loan, they are going to make that loan at a particular
 2   interest rate and collect that stream of payments over time.
11:32
 3         What an RMBS does is basically package a whole
 4   group of mortgages of varying risks and varying interest
 5   rates, with varying risks that those payment streams will
 6   continue and be made, and repackage that into a structured
 7   debt security.
11:33
 8         And you're correct, it's the banks who initially
 9   propose the structure for that.  And what they say is, okay,
10   we've got a bunch of mortgage loans --
11:33
11         THE COURT:  Same question.  Do you mind if I ask?
11:33
12         MR. CARDONA:  No, no, I'm perfectly okay with
13   questions.
11:33
14         THE COURT:  Why does the Street take non-prime,
15   such as subprime, and mix them in packages --
16   securitizations I'm going to call them, bundling, if you
17   will, where I've got risky tranches or, let's say, less
18   secure tranches, and I have supposedly tranches that are
19   triple A, that are golden.
11:33
20         The only reason it appears to me that the Street
21   does that is because, first of all, they can bring bigger
22   packages:  400 million, 800 million, revolving lines of
23   credit so they get money back to reinvest.  That's one
24   reason.
11:34
25         Number two, the banks could cut that down.  They
```

Case 2:13-cv-00779-DOC-JCG   Document 32   Filed 07/16/13   Page 47 of 102   Page ID #:911
LACV 1300779 DOC – 7/8/2013 – Volume I

47

 1   could bring 100 million or 150 million in all triple A.

 2   They could bring the next in double B, if you will, and the

 3   investor would know right to begin with that I'm getting

 4   less money.  Now, Moody's and Standard & Poor's might have a

 5   place to play even in that rating system and charge a fee to

 6   do some due diligence on that.  I don't know.

11:34   7              MR. CARDONA:  Here's why, if I could.

11:34   8              THE COURT:  Why?

11:34   9              MR. CARDONA:  Let me -- and it's going to involve

10   the -- how these things are structured.

11:34  11              THE COURT:  Okay.

11:34  12              MR. CARDONA:  So let's take an RMBS, for example.

13   A bank or an investment bank comes to it, and it has a group

14   of mortgages that it wants to package.  Those mortgages will

15   most likely be of varying types of risk.  Some of them will

16   be subprime; some of them may be Alt-A mortgages, in which

17   there's problems with other things other than the credit

18   score; some of them may be closed-in second liens.  These

19   are all different types.  The bank will pick a package, and

20   it will put it together.  And they will then put together a

21   structure.  And in --

11:35  22              THE COURT:  You know, I actually understand that.

23   I'm going to come back and ask my question --

11:35  24              MR. CARDONA:  -- and in terms of why --

11:35  25              THE COURT:  -- no, no just a moment.

11:35   1          If I went and bought a Treasury bond right now, I

2      know its got the full faith and credit of the United States,

3      but my interest rate is low, in fact, probably nonexistent

4      right now.  Okay?  But I wouldn't expect to go buy a bond

5      and find out it was also mixed with a go-go fund in

6      Singapore.  Now, with Government regulation, why is the

7      Street allowed to mix these?

11:35   8          MR. CARDONA:  I -- I --

11:35   9          THE COURT:  Where was the regulation here?

11:35  10          MR. CARDONA:  The regulation was on the back end,

11     and that some types of investors were required to only buy

12     tranches that were rated in certain ways; whereas, others

13     weren't.

11:35  14          In other words, some financial institutions,

15     pursuant to regulations, could only buy, you know,

16     investment-grade-rated bonds.  Others couldn't.

11:36  17          But in terms of getting back to the answer as to

18     why they're mixed:  In theory, you could structure an RMBS

19     where, basically, all you had was you had a cushion below

20     that wasn't being sold.  And that cushion just supported an

21     AAA tranche.  And all you issued was the AAA tranche, and

22     everything else went to support it.  And an investment bank

23     could, in theory, go to S&P and propose that as a structure.

11:36  24          The reason you see that not happening, but these

25     other tranches -- lower value tranches with higher risk --

1    being packed, is that, let's say, for example, we have this

2    much cushion, and then above that, we've got this much

3    triple A.  Okay?  Now there's an opportunity for the bank to

4    make more money by marketing some portion of what was

5    otherwise the cushion as a lower-rated bond, where everybody

6    understands there's a higher risk; but it's gonna pay a

7    higher interest rate.

11:36    8         And so what the bank, the investment bank, wants

9    to do is basically sell as much of this overall structure as

10   they can, from triple A, double A, single A, triple B,

11   double B.  They want to structure it in such a way that they

12   are selling as much as possible and leaving a thinner equity

13   cushion at the bottom that then supports all the upper

14   tranches above.  That's part of what they propose to S&P.

11:37    15        The structure they propose to S&P is, here is the

16   structure we think will provide enough structure to sport

17   the AAA, the AA.  So that each tranche has enough support

18   below it to support it, but at the same time, they're

19   marketing that support as a higher risk security.

11:37    20        And this explains the importance -- um, if I may,

21   for CDOs, it's basically take that one step up.  Each RMBS

22   now -- each tranche of an RMBS is a -- basically, an

23   obligation that -- to pay out payments over a series of

24   time.  And each tranche, depending on its rating, has a

25   particular risk and is paying an interest rate based on

1    that.

11:37    2            So, again, when a CDO comes in and looks and says,

3    okay, now we're gonna package those cash flows.  Look at the

4    risks and the cash return and put together a structure in

5    much the same way.  We're gonna package all those RMBS, and

6    then we're gonna create a structure, such that there's a

7    tier that's AAA with support below it.  And then we're going

8    to, again, price the lower tiers and move down until we get

9    to that low equity cushion.  And from the bank's point of

10   view, try to leave the equity cushion as thin as possible.

11   So that's both CDOs and RMBS.

11:38    12           And the, one level above that, again, CDOs, which

13   now are also cash flow obligations that have payments over

14   time, are then often repackaged into what were known as CDOs

15   squared.

11:38    16           So, again, we take the risks of the particular

17   tranches with their cash flows, package those into what is

18   now a CDO of CDOs.

11:38    19           Now you're starting to see some of the issues

20   here.  Because, when we look at an individual mortgage, if

21   I'm an investor in that mortgage, if I'm a bank selling that

22   mortgage, I can look and I can see, okay, here's the

23   property.  It's a big house in Bel Air, and the person who

24   owns it, you know, has a credit score of 800.  That's pretty

25   low risk.  That's good investment.  Okay.

11:39  1    But now, when we package them, when we move from

2    one mortgage to a whole group of "mortgage," with this

3    structure, now you start to see the importance of the

4    rating.  That in and of itself is opaque.  Someone on the

5    outside, an outside investor looking at that package, that

6    package of risks that's been put together, would have an

7    extraordinarily hard time trying to figure out, okay, what

8    actually is supporting my AAA tranche, and how is that done.

11:39  9    That's where the rating agencies came in.  The

10    issuers went to the rating agency with their proposed

11    packages and said, here's what we propose as the structure.

12    S&P, in theory, ran that through their models, ran that

13    through their rating process -- ran it through their rating

14    process, ran it through their credit committees, and then

15    had back and forth with the investment bank saying, "We

16    don't think that will work; we need you to do this."  The

17    investment banks would say, "You shouldn't need us to do

18    this; instead we'll do this."  And, ultimately, arrive at

19    what is the structure that S&P says will support that

20    rating.

11:40  21    And this now gets to why are the representations

22    that S&P makes significant?

11:40  23    Because when you buy something from an issuer,

24    when you go to an investment bank, and an investment bank

25    says to you, "I've got this great package of mortgages we've

1    put together, and now we've taken a bunch of triple B rated

2    mortgages or triple B rated RMBS, and we've packaged

3    together.  And we've got this very low risk CDO we want you

4    to buy with a very low interest rate."

5            You know, if there's the investment bank coming to

6    you, you're going, hmm, that's the person selling this,

7    should I really trust them?

8            S&P, in essence, served as a third party that

9    represented that it was objective; that it was independent;

10   that it was not influenced by the issuers of these

11   instruments; and that it was, in essence, acting as an

12   impartial arbitor, who was looking at this stuff and

13   deciding, okay, you can trust the issuing bank's structure;

14   it will support this rating; it is a low risk investment

15   that deserves a triple A rating and, therefore, will pay

16   this low interest rate.

17           And that's precisely why, to investors in these

18   securities, the very representations that we have alleged in

19   the Complaint were material and important and not mere

20   puffing.

21           S&P itself recognized the potential for the

22   conflict of interest with the issuers.  It recognized that

23   it was being retained by the issuers.  The issuers put

24   together the package.  They went to S&P and said, "S&P, we

25   want you to be the rater; we want to have this back and

1    forth; we want you to give the rating."

2          S&P recognized and regulators recognized and

3    Congress recognized that there was a potential conflict of

4    interest there; that S&P, which depended on the investment

5    banks for its business, might be influenced to act on behalf

6    of the investment banks, as opposed to being this impartial

7    arbiter of the ratings and the risks.

8          And to counter that, to convey to investors and

9    the market and to the SEC and to Congress that, in fact,

10   they were acting as this impartial arbiter; that they

11   weren't being influenced by their relationships with the

12   issuers, they made the representations we allege.  They put

13   in place their code of practices and conducts.  They made

14   their repeated representations that they were objective and

15   independent.

16          THE COURT:  Now, could I ask you a question?

17          How in the world would Congress ever accept that?

18   S&P or any other credit agency has to be completely

19   dependent upon the bank.

20          The bank comes to them and says, I've got X amount

21   of triple A; I've got X amount of BB.  The bank isn't in a

22   position to go out and examine -- and you use the word

23   "model."  They're not going to go to each of those mortgages

24   and see if they're truly triple A.  There might be a

25   thousand triple A's and maybe some of those are B's or BB's

1  or double A.  So the bank, then, takes this information --

2  I'm sorry -- the rating service takes this information.

11:43  3  How in the world would I believe that S&P had the

4  ability to test the credibility of the information received

5  from the bank?  What is so magic about this model that's

6  been run, which I don't understand yet?

11:44  7  Because it seems to me that all the information is

8  dependent, from a ratings service, on what they receive from

9  the issuer, from the bank.

11:44  10  It's kind of like a lawyer in court who says,

11  Judge, I represent the following:  My client told me so.

12  Never get the two confused.  The client may have said X, and

13  the lawyer's conveying it, but that doesn't mean it's true.

14  It's not the fault of the lawyer.  It's the information we

15  receive from our client.

11:44  16  So what I'm having trouble with is what is the

17  independent obligation of the bank -- strike that -- of the

18  ratings service under these circumstances where there's an

19  obvious conflict and there always will be?

11:44  20  MR. CARDONA:  Um, that's part of the problem.

21  There was an obvious conflict.

11:44  22  THE COURT:  Then what was Congress doing --

11:44  23  MR. CARDONA:  Well, um --

11:44  24  THE COURT:  -- before 2007?

11:44  25  And what were the agencies doing, like the SEC and

1    FTC and Treasury before 2007?

2    MR. CARDONA:  Before 2007, um, there was an act

3    put in place that shifted the rules for designation as a

4    nationally recognized statistical rating organization, and

5    required that effective as of 2007, that that would be

6    subject to SEC approval.

7    THE COURT:  Okay.

8    MR. CARDONA:  And that, again, gets to what

9    these -- why these representations we allege were important.

10   As part of that, as part of that regulatory action in 2007,

11   S&P -- I'm sorry -- the SEC required S&P -- and this is in

12   the Complaint -- the SEC required S&P to submit what it was

13   relying on to address this potential conflict of interest.

14   And, in fact, what S&P submitted, in part, to

15   address that was precisely its code of conduct.  Its code of

16   conduct in which it made representations regarding the

17   practices and procedures that it had in place that would

18   address and, in there view, overcome these conflicts.

19   Things like the sections that Mr. KekerKeker read

20   to you:  Analysts shall separate from the business side.

21   Essentially, that's what it was, a series of practices and

22   procedures that S&P represented separate our analytics, the

23   people who are running the models, who are doing the

24   analysis and coming up with whether the ratings are

25   sufficient from our business side, the people who are out

1    there negotiating with the banks about whether we should

2    have their business how much they're going to pay us for our

3    ratings, that kind of stuff.  But there was this separation.

11:46    4         Our allegations are that that wasn't true.  And

5    that's why we get to a fraud case.

11:46    6         And this is a fraud case.  As Mr. Keker has

7    recognized, this is a FIRREA case, which requires us to

8    prove, as predicates, mail, wire, and bank fraud.

11:46    9         And it's the elements that I'm sure Your Honor is

10    familiar with, with respect to those.  You know, a scheme to

11    defraud or a scheme to make false statements,

12    representations, or promises with the intent to obtain money

13    from the victims.

11:46    14        Materiality, a capacity to influence, and an

15    intent to defraud, which in the Ninth Circuit is an intent

16    to deceive or cheat.

11:47    17        Those are all elements that we have to prove --

18    will have to prove, and those are all elements that are

19    alleged in the Complaint.

11:47    20        So let me turn to those allegations for a second

21    to explain what our allegations are and why, with the

22    respect to a number of those allegations, we don't have to

23    prove that the actual rating on a particular instrument was

24    false.

11:47    25        THE COURT:  So we recognize that there's an

 1    inherent conflict in what the rating services do; Congress

 2    recognizes that, the different federal agencies do; and

 3    therefore, we turn to resolving that conflict by statements

 4    from the entity that's profit-motivated.

 5    11:47        MR. CARDONA:  Right.  S&P made representations as

 6    to its practices, its procedures that it would keep this

 7    separation and that, therefore, it would be objective and

 8    independent; and those were, in fact, relied on by the

 9    investors.

10    11:47        Not that we have to prove reliance, because,

11    remember, again, this is not a securities fraud action.  We

12    don't have to prove reliance.  We just have to prove that

13    their representations regarding their objectivity and

14    independence, the practices and procedures that they had in

15    place, the things we allege that were false or misleading --

16    we just have to prove that those had the capacity to

17    influence investors.

18    11:48        And they certainly did, because those investors

19    knew, as well, that S&P was operating under this potential

20    conflict of interest, and these were the representations

21    made to address it.

22    11:48        THE COURT:  Okay.  Sit down, please.

23    11:48        Not you, Counsel.  There's somebody behind you.

24    Please continue.

25    11:48        No, that was not directed at you.  I just don't

1    want people standing.

11:48    2         MR. CARDONA:  So let me get to the allegations as

3    to what we have alleged.  So what we have alleged is that

4    there were these representations that were made, and we've

5    alleged that those representations were made over a period

6    of time from September 2004, all the way through 2007 in

7    various forms.

11:48    8         And we allege that they were false for a variety

9    of reasons, but the primary reason we allege they were false

10   is they were false because S&P was not maintaining the

11   separation and was allowing the business side to influence

12   their ratings side.

11:49   13         And the examples of that influence and why those

14   representations were false, we've essentially alleged two

15   different things.

11:49   16         First, we have alleged that from September of 2004

17   through October 2007; that is, the entire time that we

18   allege there was a scheme to defraud, one way in which S&P

19   allowed that conflict to affect them, contrary to their

20   representations, was that they manipulated their models;

21   they manipulated their models and their criteria that they

22   used to rate RMBS and CDOs.  And this gets back to the

23   models that you talked about, which will be the sub -- which

24   are named in the complaint and are alleged and will be

25   subject of proof at trial:  The LEVELS model for RMBS, the

1    CDO evaluator model for CDOs and other criteria that related

2    to those models.  Our allegation is they allowed the issues

3    to influence that criteria and the development of those

4    models in contradiction to their representations.

5         In that regard, we believe that the falsity of

6    those representations was material to investors regardless

7    of whether the actual rating would have been affected or

8    not.

9         And the reason is this.  If I have an investor and

10   I'm looking at a structured finance security, and I'm saying

11   I want to buy an AAA-rated security, when I look at it and

12   say S&P gave this an AAA-rated security, you know, I'm not

13   just looking at the fact of the rating; I'm looking at the

14   entire package, the quality of the process by which that

15   rating was arrived at.  And this is entirely consistent with

16   the Second Circuit cases that Mr. KekerKeker has relied on.

17        If the Court looks at *Novak*, *Star*, *Regioned Office

18   (phonetic)*, the other cases that they've cited, what they

19   talk about is deceit alone isn't enough, but deceit is but a

20   false statement that goes to the package of what the

21   investor sought to purchase does matter.

22        And in that sense, you know, I'll try an analogy,

23   and I apologize if the Court doesn't think it works.  But,

24   you know, when I go to purchase a piece of organic fruit in

25   the grocery store and it's certified organic, you know, it

 1    may be that that certified organic fruit, in fact, turns out

 2    to be identical to the noncertified organic fruit; but when

 3    I buy that, I'm buying it with the peace of mind that comes

 4    with knowing that it has been grown organically.  And I'm

 5    not taking the risk that I take when I buy the nonorganic

 6    fruit.  When I buy the nonorganic fruit, I may end up with a

 7    piece of fruit that doesn't have any pesticide residue,

 8    doesn't have anything else and is identical, but I'm taking

 9    that risk.

11:52   10        When I buy a certified organic, I'm not taking

 11    that risk because I'm relying on the representations of the

 12    people certifying it to be organic.

11:52   13        And that's exactly the same thing here.  When I go

 14    out and I buy a triple A tranche that has been rated by S&P,

 15    I'm buying the peace of mind that comes with knowing or

 16    believing that, in fact, S&P has engaged in an objective and

 17    independent rating process and arrived at that without being

 18    influenced by the issues.

11:52   19        It may be by chance that -- by chance, that rating

 20    is the same as would have been arrived at through a

 21    nonindependent-rating process, but I'm buying that total

 22    package.  And that's materiality.  And the Second Circuit

 23    cases recognize that.

11:52   24        And, moreover, the *Treadwell* case, out of the

 25    Ninth Circuit, which we cited in our papers, in *United*

1    *States v. Treadwell*, dealt with a very similar situation.

2    In *United States v. Treadwell*, a claim was made that the

3    Second Circuit standard's were different from the Ninth

4    Circuit's, and the Court basically said, Look, we're not

5    gonna say whether there has to be an intent to harm, but

6    even if there was, it's satisfied here.

7    11:53        It's satisfied here because there was a harm to

8    the individual's property interest in depriving the victim

9    of the opportunity to weigh the true benefits and risks of

10   the transaction, regardless of whether or not they're gonna

11   suffer a permanent loss of property.

12   11:53        That's precisely what we have here.  Even if the

13   ratings would have turned out to be the same, there was

14   still a deprivation of the investor's right to make an

15   investment decision based on the full range of information.

16   And *Treadwell* recognizes that that can be the subject of a

17   fraudulent scheme, as do the Second Circuit cases.

18   11:53        So that's the importance.  That's the materiality.

19   And I'd like to turn -- unless the Court has questions on

20   that, I'd like to turn to the other two arguments that

21   Mr. KekerKeker made.

22   11:53        The arguments about puffing under *Boca Raton*.

23   And, in all honesty, I think I've addressed those, because

24   puffing is, in fact, part of the materiality analysis.  As

25   *Boca Raton* and the other case laws that they've relied on

1   make clear, that's part and parcel of looking at:  Are these

2   representations of a type that have the capacity to

3   influence an investor?  For precisely the reasons I've

4   explained, they are not puffing here.  Because you need to

5   look at them in context.  In all the cases that have been

6   cited, all the cases we've cited make that clear.

7           I'll just give the Court an example, you know, in

8   the Countrywide case that we cited that Judge Pfaelzer ruled

9   on.  The representations in that case, in the Countrywide

10  case, included representations about the, quote, "high

11  quality" of mortgage loans in general.

12          And as Judge Pfaelzer recognized, you know, in

13  most contexts, a statement of high quality is precisely the

14  type of statement that would be viewed as puffing.  It's

15  akin to things like "strong," you know, "we have strong

16  mortgage business."  It's akin to other words that courts

17  have repeatedly found to be normally puffing.

18          But in that case, in context, in particular in

19  context with a set of business practices that appeared to be

20  completely contrary to that, the Court found that even

21  though it ordinarily was puffing, in context, it wasn't.

22          And that's precisely the situation here.  In

23  context, with both the other representations, with the

24  importance to the investors of being assured that these

25  potential conflicts of interest would not affect the

 1    ratings, they were material; they were not puffing.

11:55  2         So the next argument I'd like to turn to is the

 3    allegation of intent to defraud.  In part, I've already

 4    addressed that by addressing *Treadwell*.  The only other case

 5    I'd like to address is the *Liu* case, which they raise, which

 6    is an intent to obtain money from the investors.  In

 7    *United States v. Liu*, which the Court is probably familiar

 8    with, but if I may be indulged just for a second to go into

 9    the facts.  That was a case very, very different from here.

11:56 10         In that case, we had a lawyer, who, on behalf of

11    his clients, who, the evidence suggested, were perhaps

12    involved in the fraud, made false statements to the INS in

13    order to obtain visas for his clients.  And the issue there

14    was, you know, is this a *McNally* fraud, where we're not

15    depriving anybody of a property right, but instead we're

16    just --

11:56 17         THE COURT:  A little slower.

11:56 18         MR. CARDONA:  In *Liu*, the issue was, essentially,

19    do we have a scheme to defraud of money or property, or do

20    we have what is akin to an honest services fraud in

21    violation of McNally, because the only false statements are

22    directed to a government agency and the only nonculpable

23    participant is the government agency who could conceivably

24    be defrauded.

11:57 25         That's far different from the situation we have

Case 2:13-cv-00779-DOC-JCG  Document 32  Filed 07/16/13  Page 64 of 102  Page ID #:928
LACV 1300779 DOC – 7/8/2013 – Volume I

64

         1    here.
11:57    2              THE COURT:  Just a moment, Counsel.  Too fast.
         3    Slow down.
11:57    4              MR. CARDONA:  My apologies.
11:57    5              Importantly, in *Liu*, *Liu* discussed another case.
         6    *United States v. Bonello*.  And in *Bonello*, there was a
         7    similar claim, as S&P's claim here, that was rejected by the
         8    court.
11:57    9              In *Bonello*, a bank employee was convicted of bank
        10    fraud for making automatic teller withdrawals and then
        11    altering the computer records so that, in fact, customer
        12    accounts were charged for those automatic teller
        13    withdrawals.
11:57   14              And the claim was, Look, the bank employee is not
        15    obtaining money from the banks; he's actually obtaining
        16    money from the customer accounts, because they're the ones
        17    who actually lose the money.
11:57   18              And the Court rejected that, concluding that
        19    because there was a mechanism in place such that the bank
        20    would repay the customers for the amounts of money that they
        21    lost out of their accounts, that was sufficient to satisfy a
        22    scheme to defraud, a scheme to obtain money from the
        23    victims.
11:58   24              That's precisely what we have here.  Even though
        25    it's the investment banks, the issuers who retain S&P,

```
 1    ultimately the costs of S&P's services are reimbursed or
 2    paid by the investors.  And S&P's fee, in essence, comes out
 3    of the investment funds that the investors put in.  And
 4    that's sufficient under Liu and Bonello to satisfy that
 5    requirement.
 6            And, indeed, we have allegations in the Complaint,
 7    allegations at Paragraph 67 that describe that and, in fact,
 8    cite a high level S&P executive, Joanne Rose, who was in
 9    charge of their Structured Finance Department, making a
10    statement recognizing that investors ultimately do pay since
11    all deal fees, including rating fees, are netted out of the
12    total deal proceeds.
13            So, in essence, we have a situation that satisfies
14    the Liu/Bonello requirement.
15            So with that, Your Honor, if you have no other
16    questions, I'll turn the lectern over to Mr. Keker again.
17            THE COURT:  Same courtesy; I want you to step over
18    with your trial team and take a moment, make sure you've
19    answered or propounded your arguments.
20            MR. CARDONA:  We're fine, Your Honor.
21            THE COURT:  Okay.  Then help me understand a CDO
22    once again.  I'm still confused.
23            David Tesher is the -- let me see if I can read
24    may own notes here -- is allegedly the managing director in
25    charge of Cash CDO.  I think you find that at Paragraph 59
```

1    or around that portion of your Complaint.

11:59    2    MR. CARDONA:  Correct.

11:59    3    THE COURT:  Mr. Tesher reports to the person you

4    just named, Patrice Jordan.

12:00    5    MR. CARDONA:  Mr. Tesher reports to Patrice

6    Jordan, who reports to Joanne Rose.

12:00    7    THE COURT:  Okay.  We'll make it even more

8    complicated.  Who reports to Executive A?  Who is

9    Executive A?

12:00    10    MR. CARDONA:  That was, I believe, Vicky Tillman.

12:00    11    THE COURT:  Okay.  'Cause so far that person's

12    just referred to as Executive A, aren't they?

12:00    13    MR. CARDONA:  Correct.

12:00    14    THE COURT:  All right.  Now, in the same general

15    part of your Complaint, besides referring to David Tesher,

16    who's the managing director in charge of Cash CDOs, you have

17    a managing director, Andrea Brown, of Synthetic CDOs.

12:00    18    Help me.  What is the difference between a Cash

19    CDO and a Synthetic CDO?

12:00    20    MR. CARDONA:  A Cash CDO is a CDO that is backed

21    by actual assets, so the assets are --

12:01    22    THE COURT:  Just a moment.

12:01    23    And what's a Synthetic CDO?

12:01    24    MR. CARDONA:  A Synthetic CDO is an instrument

25    that is backed by --

12:01    1              THE COURT:  Nothing.

12:01    2              MR. CARDONA:  -- in many instances, credit default

         3    swaps.  So it's promises to pay dependent on the performance

         4    of other instruments.

12:01    5              THE COURT:  Let me repeat.  Nothing.  I can't find

         6    anything in a Synthetic CDO that has any, you know, tangible

         7    piece of property, aircraft shell.  Can you?

12:01    8              MR. CARDONA:  Synthetic CDOs, no.

12:01    9              THE COURT:  Don't repeat back to me.

12:01   10              Is there a tangible something that I can get my

        11    hands on, like a piece of property in a foreclosure sale or

        12    the shell of an aircraft in a Synthetic CDO?

12:01   13              MR. CARDONA:  Not directly.

12:01   14              THE COURT:  What was the mix of Synthetic CDOs in

        15    a CDO?  Now, you've told me before that "An RMBS made up,

        16    Judge, the vast majority of the CDOs," that they're RMBSs.

        17    I want to know what a synthetic CDO is and what portion of

        18    CDOs are these Synthetic CDOs.

12:02   19              MR. CARDONA:  Synthetic CDOs, in essence, are made

        20    up of or can be considered as bets on other assets.  So

        21    directly, there's nothing there.  But indirectly, they are

        22    indexed to or hinged to other assets, such as the ones

        23    you've been talking about.

12:02   24              THE COURT:  What I'm trying to figure out from

        25    this Complaint is, what am I dealing with in terms of a CDO?

 1    Am I dealing with 20 percent that were these Synthetic CDOs?

 2    Am I dealing with 5 percent?  What is this, you know, term?

 3            MR. CARDONA:  The CDOs that we have focused on in

 4    the complaint are Cash CDOs and/or Cash CDOs squared.

 5            THE COURT:  No Synthetic CDOs?

 6            MR. CARDONA:  The reason I'm hesitating is there

 7    may be one or two that were, in fact, indexed to or hinged

 8    on other RMBS or Cash CDOs.

 9            THE COURT:  Okay.

10            MR. CARDONA:  The majority of them, however, are

11    Cash CDOs that were, in fact, rated by David Tesher's group.

12            THE COURT:  Okay.  Thank you very much.

13    Appreciate it.

14            Thank you.

15            MR. KEKER:  I'd like to go to that question,

16    because it, both on the Motion to Dismiss and later

17    discussions, we need to know what we're dealing with here.

18    I mean, that's the point.  And a synthetic, I mean, so far

19    we haven't seen.  And a synthetic, I mean, so far we haven't

20    seen the specific allegations of Synthetic CDOs being at

21    issue; but then they've made a big point this is all just

22    "for example" is the only think they've alleged.  "For

23    example."

24            THE COURT:  That's my problem.  If this was going

25    forward, your position is, how do we defend?

12:04   1          MR. KEKER:  Yes.  What we have to defend is --

2   have a trial on -- as far as we know, 5500 times 10

3   tranches; 55,000 securities, and try to show that the rating

4   committee that did each one of those was acting in good

5   faith.

12:04   6          THE COURT:  And the government's position is,

7   "Trust me."

12:04   8          What we'll do, Mr. Cardona, is, apparently from

9   your perspective, sort this out at a later time.  In fact,

10   you make the statement that we may even narrow this before

11   summary judgment.  But if we're going forward -- join your

12   colleague there -- if we're going forward, trust us, as the

13   government, to either trim this or make this more clear at a

14   later time.

12:05   15          If I did that and it was too late, the defense has

16   no way to defend.  It comes to them a month before summary

17   judgment, two months before summary judgment.  They don't

18   know how to defend this lawsuit.

12:05   19          MR. CARDONA:  If I may --

12:05   20          THE COURT:  We're jumping ahead a little bit.

12:05   21          MR. CARDONA:  Understood.

12:05   22          THE COURT:  Okay.

12:05   23          MR. CARDONA:  But, again, just so I can get back

24   to our allegations, in terms of the second part of our

25   fraud, which actually does go to the ratings; in other

| | |
|---|---|
| 1 | words, there is a portion of our fraud where we allege the |
| 2 | ratings were false.  That's the second portion from March to |
| 3 | October 2007.  There, we have provided a list of -- I think |
| 4 | it's 30 or 34 CDOs that are named in the Complaint -- |
| 5 | THE COURT:  Twenty- -- regardless, okay. |
| 6 | MR. CARDONA:  -- as to which we intend to prove |
| 7 | that those ratings were false. |
| 8 | Now, those are examples, and there may be |
| 9 | additional examples that we identify that we determine we |
| 10 | wish to proceed on after doing some discovery. |
| 11 | And, again, I would come back to, Your Honor, this |
| 12 | is the initial stages here.  There is discovery we need to |
| 13 | do.  We have somal third-party subpoenas ready to go. |
| 14 | There's information that we need to identify some CDOs and |
| 15 | some RMBS as to which we're going to allege specifically of |
| 16 | losses and/or that those were the RMBS or CDOs affected by |
| 17 | the fraud. |
| 18 | THE COURT:  Just a moment.  Stop. |
| 19 | Okay.  Counsel. |
| 20 | MR. CARDONA:  Again, from our point of view, based |
| 21 | on our allegations, as to the initial part of the fraud, |
| 22 | whether or not the rating was actually false, doesn't |
| 23 | matter. |
| 24 | Now, I understand Mr. Keker has a different |
| 25 | position.  We've discussed that with him, and he's asserted |

Timestamps in left margin: 12:05 (lines 5, 6, 8, 11), 12:06 (lines 18, 19, 20, 24)

1    that as part of his defense he believes he should be

2    entitled to go into the validity of each rating.

12:06    3    And in light of that and in light of what would

4    be -- you know, if, in fact, that is going to be the defense

5    and if the Court is going to allow that defense, we would

6    try to narrow the case.

12:07    7    But in terms of narrowing the case, there are some

8    important things that we have to take into account.  You

9    know, Mr. Keker has made his claims about the damages, the

10   losses that flowed from the various specific CDOs that we

11   alleged the ratings were false.  And we've provided him with

12   information showing that those were a total of in excess of

13   $5 billion.

12:07    14   He has come back and contended that with respect

15   to Citibank and Bank of America, those losses shouldn't be

16   considered because they were also issuers.  Now, we don't

17   believe that's correct, and indeed, there's a case out of

18   the Southern District of New York, Bank of New York Mellon,

19   which we cite in the Rule 26(f) report, which indicates that

20   even those losses can be considered in fixing penalties.

12:07    21   But what we need to do and what we need to get

22   discovery before we can do it is to pick a set of RMBS and

23   CDOs that we believe will provide a representative sample of

24   losses flowing from the fraud that would provide this Court,

25   in the penalty phase, with a basis for setting penalties

1    that we believe would be appropriate to reflect the scope of

2    the fraudulent conduct.

12:08    3         So I understand the Court's desire and I

4    understand Mr. Keker's desire to have the -- for trial, to

5    have what will be proved narrowed, but before we can get to

6    that point, there is some additional discovery that we need

7    to do and take to determine how we're going to narrow that

8    for trial.

12:08    9         THE COURT:  All right.  Thank you.

12:08    10         Mr. Keker.

12:08    11         MR. KEKER:  And on that point, Your Honor, the

12    Government has tremendous powers under FIRREA, which it has

13    exercised, making Standard & Poor's and McGraw-Hill deliver

14    tens of millions of documents, taking depositions,

15    investigating.

12:08    16         THE COURT:  Page 21, line 15 to 16, 30 million

17    pages of material.

12:09    18         MR. KEKER:  Correct.

12:09    19         And our position is that if they needed to

20    investigate more, they ought to just admit it.  This

21    complaint should be dismissed, and they should do the

22    investigation they need and then bring a case they can

23    actually try that includes what they said on February 5th,

24    2013, which is when Attorney General Holder stood up and

25    said, We allege that by knowingly issuing inflated credit

DEBBIE GALE, U.S. COURT REPORTER

1    reported ratings for the CDOs and so on, Associate Attorney

2    General West, who's here, said, S&P knew these ratings were

3    inflated at the time they issued them.

12:09    4         What ratings?  Who knew it?  How is it false?

5    Please tell us, and we'll defend that case.  We don't think

6    they can even make that allegation.  We certainly don't

7    think they can prove that allegation if they make it.  But

8    we're urging that under Rule 9(b) and sort of common sense

9    that this -- that if they think some ratings were false,

10   they ought to say what they are.

12:10   11         Now, with respect to the later ratings, they have

12   not alleged that they're false.  They just alleged here's

13   what happened.  Here's -- and then later, a year later, they

14   defaulted.  You can look through these examples.  Here's

15   what the CDO is, and then, later, it defaulted.  So what?

16   Unless they can connect it up with the intent to harm the

17   victim and something that actually matters under the mail

18   fraud statute.

12:10   19         If I may, in response to a few things, they have

20   continuously said and they're arguing to you still that --

21   that they don't have to prove any false statement here,

22   including any false rating.  And they cite the *United States*

23   *v. Ali* case, and now they've cited the *Treadwell* case.

12:10   24         The -- *Ali* was a scam on Microsoft.  And if you

25   read the case, it's -- they went out and got -- set up phony

1  companies to buy from Microsoft under an educational

2  program.  Got the computer equipment at a lower price and

3  then resold it on the open market.  It's a scam that's been

4  going on with Apple and Microsoft; clearly a scheme to

5  defraud using deceit and misrepresentations.

12:11  6  They cite the *Munoz* case which is -- in the *Munoz*

7  case, it was a Ponzi scheme in which they talked about

8  deliberately misleading.

12:11  9  False statement under the mail fraud, wire fraud,

10  bank fraud statute includes the concept of something that's

11  deliberately misleading and/or willfully omitted and

12  necessary to make a false statement true.

12:11  13  The *Treadwell* case, which Mr. Cardona just talked

14  about, involved going to people -- it's a Ponzi scheme;

15  again, $40 million.  You go to people and you say, Loan us

16  the money, we've got a great gold mine in Mexico.  And the

17  argument in the *Treadwell* case is, well, we didn't mean to

18  permanently deprive 'em of money; we just wanted the loan.

19  And the Court said, "No, no, no.  That's a scheme to deprive

20  people of money or property.  Who cares if it's permanent

21  deprivation."

12:12  22  So our argument is that, first, this concept that

23  somehow not maintaining separation -- I'm not even sure what

24  that means.  Standard & Poor's and McGraw-Hill are

25  profit-making entities.  Everybody in the world knew that.

DEBBIE GALE, U.S. COURT REPORTER

         1    Everybody in the world knew that the banks would come to

         2    them to get rated and pay for it, just like they do with

         3    Fitch and Moody's.  That can't possibly be material

         4    information to somebody who was evaluating the situation.

12:12    5          They -- what they have not alleged in this

         6    Complaint is what's required by Rule 9(b) of the federal

         7    rules; and that is the "Who committed the crime," "When was

         8    it committed," "How was it committed," "What was -- what was

         9    the falsity that makes up the scheme to defraud."

12:13   10          And then another thing that gets confused here,

        11    what is S&P?  S&P is a very large corporation with a lot of

        12    people with different functions and a lot of people -- a lot

        13    of very smart and good people with different ideas.

        14    Sometimes they think their boss's ideas aren't good;

        15    sometimes they think their subordinate's ideas -- they have

        16    disagreements.

12:13   17          But Standard & Poor's, as alleged in the

        18    complaint, has a method which it holds out to the world --

        19    you can go on its website and see what it is -- of making

        20    these decisions about ratings.  And they try -- and it

        21    involves judgment.  It involves these three people on a

        22    committee.  It involves the people who sign off on 'em.  And

        23    there's not a word from the Government about which of those

        24    people committed what are alleged to be criminal acts.

12:13   25          When the Government says that these models were

1    manipulated, a careful reading of the complaint shows that

2    what they're complaining about is that you didn't change it

3    soon enough.  And that constantly people were saying, well,

4    maybe we should look into this, and maybe we should do that.

5    And for myriad reasons, they didn't do it.  And then the

6    Government says you didn't do it.

12:14  7    Then when you do do it, in 2007, in February, they

8    did change it, and then they complained about that.  They

9    changed it again in July in response to all these

10   conditions.

12:14  11   So "manipulation" is an easy word to throw around,

12   but just saying it doesn't make a scheme to defraud.

12:14  13   Finally, the certified organic peach, or whatever

14   it was that Mr. Cardona so valued.  The equivalent here is

15   the honest opinion of Standard & Poor's with respect to a

16   particular rating.  When we say that 56 percent of this CDO

17   is going to go into a triple A tranche, that's our honest

18   opinion at the time.  If they can allege and prove that

19   that's not true, we -- we believe they have -- they have a

20   case.  They haven't alleged that, though.

12:15  21   This Complaint doesn't allege it, and we shouldn't

22   go forward until they're prepared to make that allegation,

23   which we hope and think they shouldn't do.

12:15  24   One more point about what's at stake here.

12:15  25   This is a company that was paid $15 million for

 1    these 26 CDOs.  The numbers that we're throwing around here

 2    really are financial crisis TARP-type numbers, huge, huge,

 3    huge numbers.  What we've added up and when we look at those

 4    26 and what they allege was the loss -- 80 million here, 100

 5    million there -- it seems to add up to $500 million.  All of

 6    that -- those are different cases than this "bet the

 7    company" litigation that they've started here.  Which is why

 8    we are so hopeful that a hard look -- and it sounds like you

 9    intend to do this -- a hard look at the case now right when

10    it's beginning and making tough decisions now could get us

11    into a shape to litigate the case or otherwise handle it,

12    but not -- you know, sort of get it -- get it where it ought

13    to be.

14            Unless you have questions, I think that's all I

15    have.

16            THE COURT:  Well, some, but why don't you consult

17    with your clients and with your co-counsel for a moment.

18            MR. KEKER:  I think we're fine, Your Honor.

19            THE COURT:  Okay.  Counsel.

20            MR. CARDONA:  I understand the Court probably

21    realizes this, but I just want that make sure it's on the

22    record.  Mr. Keker has repeatedly said that we don't allege

23    that ratings were false.  For the March to October 2007 time

24    period, we do specifically allege that they were false.  And

25    I'll point the Court, for example, to Paragraph 234 --

12:17   1          THE COURT:  Okay.

12:17   2          MR. CARDONA:  -- one of the ones that Mr. Keker

3    pointed to, on page 78 of our Complaint, where we

4    specifically allege, um, "notwithstanding S&P's knowledge

5    regarding the increasing deterioration of non-prime RMBS,

6    Cash CDO, the group headed by Mr. Tesher, under the

7    supervision of Jordan and Tesher, issued and/or confirmed

8    ratings for CDO including mezzanine -- such mezzanine CDOs

9    that S&P knew did not accurately reflect the credit risks of

10   those CDOs, because they failed to account for the

11   substantially increased credit risks of underlying non-prime

12   RMBS tranches."

12:17  13          That, in fact, is an allegation that those

14   ratings, the ratings set out in the paragraphs that follow,

15   the subparagraphs, were false.  They were ratings that we

16   allege S&P knew did not accurately reflect the credit risks,

17   which is what a rating was supposed to do.

12:18  18          That is an allegation that those ratings were

19   false and that S&P knew it.  And the factual support for

20   that is provided in the other allegations that precede and

21   follow that.

12:18  22          THE COURT:  And let's add those subparagraphs up.

23   Subparagraph (a), M&T Bank, the loss was?

12:18  24          MR. CARDONA:  One second.

12:18  25          THE COURT:  80 million.

| | | |
|---|---|---|
| 12:18 | 1 | MR. CARDONA:  I believe for M&T Bank -- |
| 12:18 | 2 | THE COURT:  80 million? |
| 12:18 | 3 | MR. CARDONA:  -- uh, yes. |
| 12:18 | 4 | THE COURT:  Okay.  To WestCorp, 90 million? |
| 12:18 | 5 | MR. CARDONA:  In subparagraph (b). |
| 12:18 | 6 | THE COURT:  Okay.  That's 270. |
| 12:18 | 7 | 50 million to M&T. |
| 12:18 | 8 | MR. CARDONA:  Yes, Your Honor. |
| 12:18 | 9 | THE COURT:  320? |
| 12:18 | 10 | MR. CARDONA:  Yes. |
| 12:18 | 11 | MR. KEKER:  It's 220, Your Honor. |
| 12:18 | 12 | THE COURT:  I'm sorry.  220. |
| 12:18 | 13 | I went to a public school.  I'm kidding you, |
| | 14 | Counsel. |
| 12:19 | 15 | MR. CARDONA:  Your Honor, perhaps -- |
| 12:19 | 16 | THE COURT:  No, no, no.  Bear with me. |
| 12:19 | 17 | MR. CARDONA:  -- I can speed this because I have |
| | 18 | an exhibit that was part of our -- |
| 12:19 | 19 | THE COURT:  I don't need an exhibit, believe it or |
| | 20 | not. |
| 12:19 | 21 | 90 million to Charles Ford? |
| 12:19 | 22 | MR. CARDONA:  Yes. |
| 12:19 | 23 | THE COURT:  Okay.  So help me.  How much is that? |
| 12:19 | 24 | MR. KEKER:  310, Your Honor. |
| 12:19 | 25 | THE COURT:  Thank you.  Now, that seems to be |

1    specifically alleged.  Where's the rest of the specificity?

2    12:19        MR. CARDONA:  Your Honor, if you turn to -- if I

3    may have a second.

4    12:19        THE COURT:  Sure.

5    12:19        MR. CARDONA:  But there are other paragraphs like

6    that throughout.  And I'll turn to those.

7    12:19        234.

8    12:19        THE COURT:  We need to get to 5 billion, right?

9    12:19        MR. CARDONA:  The total for the CDOs that are

10   alleged specifically in the tables at the end totals

11   5 billion.

12   12:19        And if Your Honor would like, I have a chart that

13   I can give Your Honor that has that.

14   12:19        THE COURT:  Sure.  I appreciate that.  Thank you.

15   12:20        MR. CARDONA:  And I'm giving Mr. Keker a copy.

16   12:20        And just so Your Honor knows what this is, this

17   was a chart that was included in our initial disclosures to

18   the defense.

19   12:20        THE COURT:  All right.  But I thought that you got

20   to 5 billion because you took 1.1 million times the number

21   of RMBSs and CDOs and simply multiplied that out, and you

22   have asked the Court to bifurcate the trial and to make this

23   mechanistic evaluation?

24   12:20        MR. CARDONA:  No, Your Honor.  There are multiple

25   ways of arriving at the penalty phase.  Without any showing

DEBBIE GALE, U.S. COURT REPORTER

```
 1   of losses or gains, the maximum penalty under the statute is

 2   1.1 million per FIRREA violation.

 3              Alternatively, the Court can consider both the

 4   gains to S&P and/or the losses resulting from the FIRREA

 5   violations.

 6              THE COURT:  Okay.  Now, have I seen this chart

 7   before?  I don't recall this chart.

 8              MR. CARDONA:  No, you have not.  This is in our

 9   initial disclosures to S&P, which is not filed with the

10   Court.

11              THE COURT:  Oh.  Great.  Thank you very much.

12              So if you'd like to continue.

13              MR. CARDONA:  This lays out the losses that relate

14   to and flow from the specific CDOs that we have referenced

15   in the Complaint.

16              THE COURT:  And each of these are referenced in

17   the Complaint.  In other words, if I went back in this

18   Complaint and went to page 2, bottom, Bank of America,

19   $643,137,500, where would I find that in my Complaint?

20              MR. CARDONA:  You would find that in the table --

21   may I have one second?

22              THE COURT:  Sure.  Just point me to the page and

23   the paragraph.

24              MR. CARDONA:  If Your Honor turns to page 111 --

25              THE COURT:  Just one minute.
```

12:22    1            I'm sorry, to page 111?

12:22    2            MR. CARDONA:  111.

12:22    3            THE COURT:  And I can do this for each sum in the

         4    Complaint?  In other words, I can take this chart that I

         5    haven't seen before, and I can trace back to a specific

         6    paragraph for each sum that you've listed and apparently

         7    given to the defense?

12:22    8            MR. CARDONA:  No.  The -- the loss amounts for all

         9    of these are not listed in the Complaint.

12:22   10            THE COURT:  Okay.

12:22   11            MR. CARDONA:  Each of these CDOs is referenced in

        12    the Complaint as being part of what we allege was a result

        13    of the fraudulent conduct.  We did not allege the loss

        14    amount for each CDO in the Complaint, which is why we

        15    provided this in initial disclosures to S&P after they

        16    requested it.

12:23   17            THE COURT:  I'm just trying to discern the

        18    difficulty of defending this and how specific you are.

12:23   19            So I'm now looking at page 111, and I'm looking

        20    for the number 643 million plus.

12:23   21            MR. CARDONA:  You will not find that in the

        22    Complaint, Your Honor.

12:23   23            THE COURT:  I don't think so either.  So why am I

        24    looking at page 111?

12:23   25            MR. CARDONA:  You are looking at page 111 to see

1    that the Bank of America, the CDO that we are talking about,

2    the high-grade structured CDO credit, CDO 2007-1 is, in

3    fact, alleged in the Indictment as a specific CDO that we

4    allege was part -- the rating in -- that resulted, in part,

5    from the fraudulent conduct.

6         THE COURT:  Is that Pinnacle Point Funding?  The

7    high-grade structured credit?

8         MR. CARDONA:  I'm not sure what your question is.

9         THE COURT:  Well, is it line 9?

10        MR. CARDONA:  Right.

11        THE COURT:  Or 10 or 15 or -- strike that -- or --

12        MR. CARDONA:  Right.

13        THE COURT:  -- 13, 14.  Those are all Bank of

14   America?

15        MR. CARDONA:  The next entry, Pinnacle Point

16   Funding is Bank of America, yes.

17        THE COURT:  And the first one, if you go above

18   that, is high-grade structured credit, and I'm asking what

19   you're referring to.

20        MR. CARDONA:  I was referring to high-grade

21   structured credit because I thought that was the one you

22   asked about.

23        THE COURT:  That would then comport with page 2 of

24   3, the bottom entry that you gave to --

25        MR. CARDONA:  Correct.

DEBBIE GALE, U.S. COURT REPORTER

12:24    1              THE COURT:  -- S&P.  Okay.

12:24    2          And from that, you expand from an amount in lines

         3    8 and 9 on May 24, 2007, high-grade structured credit CDO

         4    2001 Bank of America internet posting of rating.

12:24    5          And the next entry is 5/24/2007, high-grade

         6    structured CDO 2001 Bank of America, rating fee wire of

         7    600,000 from La Salle National Bank of Chicago, Illinois.

12:25    8              How would I know that you're requesting

         9    643 million from this Complaint?

12:25   10              MR. CARDONA:  Your Honor, from the Complaint

        11    itself, you wouldn't.  That number is not in here.  What's

        12    alleged in the Complaint are the FIRREA violations.

12:25   13              THE COURT:  How does the defense defend, then?

        14    What is their ability to discern what you're charging?

        15    Because I assume that these are not only -- there must be a

        16    number of tranches?  How are you getting to the 643 million?

12:25   17              MR. CARDONA:  The 643 million are the losses that

        18    resulted to Bank of America from this CDO.

12:25   19          If I may step back for one second, Your Honor.

12:25   20              THE COURT:  No, not yet.

12:25   21          Where do I see that in the Complaint, so I

        22    understand this Complaint?

12:25   23              MR. CARDONA:  You will not see that loss figure in

        24    here, and the reason for that is the structure of the FIRREA

        25    statute.  And if I may, this is part of the reason why we

1     indicated that we believe it's appropriate to bifurcate the

2     liability and penalties phase.

12:26     3          The FIRREA statute itself, to establish a FIRREA

4     violation, this is not like after a civil action where there

5     are damages that automatically flow from the finding of a

6     FIRREA violation.

12:26     7          The way the FIRREA statute is structured is this:

8     There's certain things that are defined to be FIRREA

9     violations; and in particular, in our case, it's mail fraud

10     or wire fraud to the extent that mail fraud or wire fraud

11     affects a federally insured financial institution, or bank

12     fraud.

12:26     13          Once a FIRREA violation is established, then the

14     Court -- essentially akin to a sentencing in a criminal

15     case, the Court then has the discretion to consider a host

16     of factors in setting what the Court believes are the

17     appropriate penalties to be imposed on S&P for that FIRREA

18     violation.

12:27     19          Amongst the things the Court can consider are:

20     The gain to S&P, the losses that result from the individual

21     FIRREA violation, and other factors that were laid out in

22     another decision that we've cited in our 26(f) report, the

23     Menendez case that was decided by, I believe, Judge

24     Phillips -- Judge Morrow; that goes through and says, Look,

25     here are the things we can consider:  Loss, gains, the

1    degree of culpability, the kind of typical things that the

2    Court would look at in a sentencing.  That's really what

3    this is; it's a determination of the FIRREA violations.

12:27   4          And we have alleged in the Complaint those FIRREA

5    violations.  After that, there would be a determination by

6    the Court as to what the appropriate penalty is to impose.

12:27   7          THE COURT:  I'm going to repeat back to you what I

8    heard so you can know I either absorbed or mis-absorbed, and

9    then correct me.  And I'm humbly asking you.

12:27  10          What you're really saying is that if the jury

11   finds, in a liability phase, that there is liability for

12   high-grade structured credit CDO 2000-1, that basically,

13   because of that finding of liability, this should be

14   bifurcated and the damages should simply pass to the Court

15   using criteria.

12:28  16          MR. CARDONA:  The Court would have to make a

17   determination as to whether those losses resulted from the

18   FIRREA violation.

12:28  19          THE COURT:  I understand that the statute may

20   allow that, but I don't think that it reads "shall."  I

21   think it's entirely discretionary, and I can't imagine why a

22   Court would take that away from a jury in terms of

23   determining the amount of damages, nor take that chance with

24   this Circuit or any other Circuit or the Supreme Court.

12:28  25          And I can't imagine why I would bifurcate this.

12:29  1    MR. CARDONA:  First, you are correct.  You have

2    discretion to decide how you want to do that.  If you wanted

3    to have the jury make a determination of what the losses

4    resulting from it were, that's fine.

12:29  5    THE COURT:  Doesn't that reach constitutional

6    dimensions when you're deciding damages?  I know that the

7    statute allows it.  That doesn't mean, upon examination by

8    Ninth Circuit or the Supreme Court, that they're going to

9    say that that's appropriate when you're dealing with a

10    request for $5 billion.

12:29  11    It would seem to me that the jury, the same jury

12    that decided liability would be in a good position, if we're

13    going to trust the jury system, which I think we do, to

14    decide that very issue.

12:29  15    MR. CARDONA:  I don't think it would rise to a

16    constitutional violation, because, again, the Court -- it's

17    not like a straight forward damages assessment, where those

18    damages then presumptively set what it's at.  It would

19    simply set the maximum, within which the Court would have

20    discretion --

12:29  21    THE COURT:  Let's hypothetically --

12:29  22    MR. CARDONA:  -- but assuming you throw it to the

23    jury, you could have the jury to make the determination of

24    the losses flowing from or the gains flowing from, both of

25    which would be relevant -- you would still have --

Case 2:13-cv-00779-DOC-JCG  Document 32  Filed 07/16/13  Page 88 of 102  Page ID #:952
LACV 1300779 DOC – 7/8/2013 – Volume I

88

1  ultimately, after that, you would be the one determining

2  what the penalty should be.

12:30
3  THE COURT:  And how in a jury setting does S&P

4  defend other than knowing that high-grade structured credit

5  CDO 2000-1 is in play, as you alleged in page 111 -- I'm

6  humbly asking this -- against a claim of eventually an

7  argument to the jury that there's $643 million plus -- in

8  other words, doesn't -- isn't S&P, if this does go forward,

9  entitled to know how that $643 million is broken down,

10  whether they're securitizations, as I call them, bundling,

11  or if they're tranches within those securitizations or

12  bundlings?

12:31
13  MR. CARDONA:  That will be the subject of proof at

14  trial and discovery in the course of proceedings in this

15  case.  We have complied with the requirements of Rule

16  12(b)(6) and Rule 9 by basically putting them on notice,

17  advising them what the nature of the fraud scheme is, what

18  the fraud is; that this is one of the results of that fraud;

19  that wirings and mailings connected with this were in fact

20  wirings and mailings that we contend are FIRREA violations;

21  and now we will be engaged in discovery in the civil

22  process.  So they can inquire about that, depose about that,

23  do the defense that they need to do.

12:31
24  But, again, Your Honor, we are at the initial

25  stages.  We filed our Complaint.  There's been a Motion to

 1    Dismiss filed.  We're under a Rule 12(b)(6) standard.  I

 2    understand there's going to be a discovery process to iron

 3    out the issues, just as there commonly is in civil cases.

12:31    4         But we have complied with the requirements of

 5    putting them on notice about that and providing them with

 6    enough information to defend.  They know the nature of the

 7    fraud, and they know the CDOs and RMBS that we allege were

 8    affected by that.

12:32    9         THE COURT:  For 12(b)(6) purposes.

12:32   10         MR. CARDONA:  For 12(b)(6) purposes.  And I don't

11    think we can separate this from that standard.

12:32   12         THE COURT:  Okay.

12:32   13         All right.  Now --

12:32   14         MR. KEKER:  Could I --

12:32   15         THE COURT:  Certainly.

12:32   16         MR. KEKER:  -- address this, because I want to

17    make sure that we're all on the same page about these

18    numbers, because I think they're important.

12:32   19         If you go through the Complaint and look at the

20    paragraphs, like 234 that you just looked at, and add up the

21    losses, as you started to do in 234 when you got 310, you

22    will get about $500 million.  That's all.

12:32   23         Then, they want to switch back -- and I'm gonna

24    come back to 234 in a second.

12:32   25         They want to jump back to 111 and say

1    willy-nilly -- I mean, just say, here's a lot of mailings

2    about a lot of CDOs that have never even been mentioned,

3    except generically, anywhere else in the Complaint.

12:33    4        And then what they provided us based on 111 -- I

5    think this is awfully important -- is what they're talking

6    about -- this is the 111 part.  They're not described in the

7    Complaint; they're just mentioned.  But if you look at 'em,

8    Citibank has all these losses that they're claiming.  It's

9    called Hung Warehouse Credit Risk Exposure.

12:33    10       You know, what that is?  What that is are CDOs and

11   RMBS that Citibank prepared and managed and put together and

12   got rated, but couldn't sell.

12:33    13       Poor Citibank was stuck with 'em.  And if you add

14   those -- and the same thing for Bank of America in here --

15   you get 4 billion of the $5 billion.

12:34    16       The reason this is a $5 billion case at this

17   point -- and I think that they can go further -- is that

18   poor Bank of America and poor CitiGroup couldn't sell what

19   S&P rated, and they're claiming that that's a loss affecting

20   a financial institution.  We think that's extraordinary.

12:34    21       And in terms of materiality and in terms of all of

22   our -- all of our arguments, what are we doing here?  Now,

23   with respect to their claim --

12:34    24       THE COURT:  Well, let me ask you both something

25   and get your wisdom again.

12:34   1          It's not a criminal case, but if it was, since it

2      has this hybrid to it, the defense would have the right to a

3      Bill of Particulars.  They could come to the Court and ask

4      the Court to have more specificity.  And on the criminal

5      level, sometimes courts grant that.  Here, this case is a

6      civil proceedings, but it has "hybrid," if you will,

7      of -- well, some criminal elements, allegedly.

12:35   8          If you'd met the 12(b)(6) standard, what in the

9      future gives the defense, once again -- and I'm asking you

10     this -- the ability to defend?  Other than you coming before

11     the Court and saying, "Judge, we alleged on page 111, and in

12     Paragraph 234, high-grade structured credit."  Because I

13     don't know that, if you proved that, that the damages flow,

14     especially if I submit this to a jury.

12:35  15          So is there anything in the civil law that is

16     analogous to a Bill of Particulars in the criminal law that

17     allows -- in other words, you can charge -- you have

18     500-some million minimally.  If I later get into a discovery

19     issue, if you get past the 12(b)(6) stage, I'm going to have

20     to sort that out very quickly with you.  And I'm going to be

21     concerned about particularity.  Because what I'm not going

22     to do, if we get to that stage, is allow you just to go down

23     the road of discovery, to come back in nine months or ten

24     months, when we have a pending trial date or motion date,

25     and in good faith you've gone through the discovery, you

then give it to the defense and the defense is going to have

a very viable claim to the Court, "Hey, we just got this.

You've spent three years investigating this, eight months of

discovery.  We've got a trial date in 2015.  It's six months

before or four months before, we need to do our own

depositions now."

In other words, it's a continuing problem for the

Court in terms of setting a specific date, which is the

defense's claim in the scheduling conference.  "Judge, don't

set a date right now."

So how are you going to cure that?  In other

words, you may have $5 billion, but it may require a lot of

specificity, not for 12(b)(6) purposes, but looking ahead,

if you've gotten through that hurdle, or if you get through

that hurdle, I've got to sort that out.

MR. CARDONA:  Your Honor, I would come back again

to -- first, let me drop back to a criminal case for a

second, because in a criminal case, typically, there aren't

allegations as to the losses or other things that are

included in the Indictment.  And typically, that's not the

proper subject of a Bill of Particulars.

THE COURT:  No.  But, for instance, if we have

narcotics sales, people are entitled to know the date, the

quantity, who possessed it.  It's the same.  They're

entitled to know the amount of damages, what tranches,

1    et cetera.

12:37  2              MR. CARDONA:  I -- I understand that.  And, in

3    terms of that, you know, first, again, the fraud we've

4    alleged with respect to the RMBS and CDO ratings prior to

5    March of 2007 does not hinge on the individual ratings.  And

6    they know what that fraud is.  Remember, while we have been

7    investigating, S&P has been on the other side of that

8    investigation for the three years.  The vast bulk of the

9    information --

12:37 10              THE COURT:  That's not the record S&P is going to

11   set for the Ninth Circuit or the Supreme Court.  The record

12   that they're going to set is that they're caught by surprise

13   and unable to defend.  I mean, it's clear in the scheduling

14   conference that that will be the argument.

12:38 15              MR. CARDONA:  I understand that will be the

16   argument.  I don't think that will be well-founded.  I

17   understand that will be their argument.  We have advised

18   them, and will tell the Court, you know, look, we plan on

19   taking some discovery.  To the extent we can, we will narrow

20   the case for purposes of trial.  And, you know, to the

21   extent the Court wants us to provide some more specifics

22   about this as we move along, we will do our best to do so.

12:38 23              But we are in a position now where we have clearly

24   alleged a fraud that satisfies the 12(b)(6) standards.  We

25   have provided specificity with respect to a host of

         1   examples, particular CDOs, as to which we allege the ratings
         2   were false.  All of the --
12:38    3           THE COURT:  I've already heard that argument.
12:38    4           MR. CARDONA:  And we will try to provide that, but
         5   we're gonna need some discovery before we can come up with a
         6   narrowed set of examples that we can proceed on.
12:38    7           THE COURT:  The last question, then.  How, if you
         8   need discovery, did you come up with a specific figure of
         9   $643,137,500?  You must have discovered something.  And each
        10   of these are specific numbers --
12:39   11           MR. CARDONA:  Yes
12:39   12           THE COURT:  -- so you must have people or --
12:39   13           MR. CARDONA:  Yes.
12:39   14           THE COURT:  -- or attached to these.  How did you
        15   come up with these numbers?
12:39   16           MR. CARDONA:  The information we gathered in the
        17   course of the investigation, in many instances from these
        18   financial institutions, was information from them regarding
        19   the losses that they suffered on those CDOs.
12:39   20           THE COURT:  Okay.  Let me turn to Mr. Keker.
12:39   21           Counsel.
12:39   22           MR. KEKER:  Just -- just the final point,
        23   Your Honor.  I don't accept -- we don't accept that
        24   Paragraph 234 or paragraphs like it properly allege under
        25   Rule 9(b) the who, how, what of fraud.  If you read it

1    carefully, it says that S&P knew, did not accurately reflect

2    the credit risk of those CDOs, because they failed to

3    account for a substantially increased credit risk of

4    underlying non-prime RMBS.  What difference did it make?

5    Was the rating -- are they saying the rating was wrong?  Or

6    are they saying -- what are they saying?  They're not saying

7    that this was not triple A, that these examples that follow

8    should not have been rated triple A.

9            When you turn to their specific allegations in A,

10   for example, they say, in March, S&P -- again, no person.

11   Who's the evil rating person here? -- rated Gemstone.  It

12   had approximately 66 percent -- blah, blah, blah.

13   56 percent of the collateral backing Gemstone was non-prime,

14   rated triple B.  Approximately 803 million, 72 percent of it

15   was rated triple A.  Triple A and double A tranches of

16   Gemstone were purchased by a bank.

17           I mean, there's no allegation that the triple A

18   and double A tranches were improperly rated or didn't show

19   the credit -- properly the credit risks of that.  There is

20   no specific allegation as required by 9(b).

21           And that is true for every single paragraph.  And

22   I can give you, just quickly for the record, the paragraphs

23   that tell us -- that bring in the specifics -- are 234,

24   236 -- that's what happened in April.  238 is May.  241 is

25   June, and 261 is July.

12:41 1          And those -- and all of 'em were prefaced by the

2     words, "For example."  So these are thrown out.  There's no

3     specific allegation as would be required by 9(b) that

4     somebody -- David Tesher -- I mean, you -- somebody who

5     had -- was in a position of authority over that rating

6     didn't honestly believe it at the time that it was done.  If

7     they can't allege that, the case shouldn't go forward on

8     12(b)(6) and they should start over.

12:41 9          THE COURT:  Okay.  Before I turn back to your

10    colleague, make sure you've concluded your arguments.

12:42 11         MR. KEKER:  Ms. Keller's helped me out.

12:42 12         Your Honor, there is something analogous to the

13    Bill of Particulars in a criminal case.  And the analogy in

14    this case is the heightened pleading requirement of 9(b).

15    You can't start a fraud case without saying the who, what,

16    when, where, as we quoted from *Corvaso (phonetic)*.

12:42 17         Thank you.  I have nothing further.

12:42 18         THE COURT:  Thank you very much.

12:42 19         Counsel?

12:42 20         MR. CARDONA:  With respect to the CDO ratings, the

21    specifics as to the falsity are alleged.  We allege that the

22    ratings were false; that is, that they didn't reflect their

23    true credit risks because that's what a rating is.

12:43 24         According to S&P, a rating is their true and

25    current opinion as to the credit risks of the CDO.  We have

1    alleged in Paragraphs 234, 236, 238, 241, 244 and 261 that,

2    in fact, they issued ratings knowing and believing that they

3    were not -- that it did not reflect the true credit risks.

4    And the basis for that is specifically alleged in the

5    paragraphs that precede those.  And in particular, the

6    allegations are these:

12:43    7        What we allege is that during this time period,

8    from March through October 2007, S&P -- and, in particular,

9    Mr. Tesher and Ms. Jordan and Ms. Rose -- were aware that

10    CDOs were being packaged with BBB and below-rated RMBS.

11    S&P, when they rated the CDOs, continually took those

12    ratings at face value and didn't adjust 'em.

12:44    13        Nevertheless, during that same time period, S&P

14    realized and came to realize that, in fact, those ratings

15    that they were using to rate the CDOs, the RMBS ratings,

16    were not accurate.  They would not hold.  And we cite to

17    specifics about that.

12:44    18        So, for example -- um, in, uh, Paragraph 218, on

19    page 63, we cite an e-mail between Executive F and Senior

20    Executive E, in which one of those says, "I talked to Tommy

21    Gillis yesterday and he thinks that the ratings are not

22    going to hold through 2007."

12:44    23        That's demonstrating the knowledge of the people

24    who were in charge of the rating process that the ratings on

25    which they were relying in rating the CDOs are not going to

```
 1    hold.  And we have extensive allegations about that, the
 2    internal analyses that showed them that those RMBS ratings
 3    were no longer valid, communication indicating their
 4    knowledge to that effect, communication indicating that they
 5    realized that because so many of those RMBS were packed into
 6    those CDOs that it was going to affect those ratings -- all
 7    of that satisfies 9(b).  It provides the specifics as to why
 8    we allege these ratings were false.
 9          And the same is true of the other part of the
10    fraud, the part of the fraud that Mr. Keker doesn't want to
11    pay attention to, the first part, the objectivity and
12    independence.  We have alleged the specifics as to when
13    those statements were made, who made them, what they said;
14    and then the Complaint alleges why those were false.  Why
15    those were false:  Because the models and criteria were, in
16    fact, manipulated in response to pressure from issuers.
17          So we have satisfied both Rule 12(b)(6) and
18    Rule 9(b).  And what we are offering is, as a recognition of
19    the practicalities of trial, to more specifically narrow our
20    allegations once we get discovery.  Um, but that's not
21    something that we would be required to do.  I mean, the fact
22    of the matter is that S&P, as the largest rating agency in
23    the world, rated 5,000 instruments during the time when we
24    allege their statements about what they were doing was
25    false.
```

12:46  1          Um, it's not our fault that their scope of what

2      they did was so broad.  And we would be entitled to pursue

3      that case.  I recognize that, for practical purposes, we're

4      going to need to narrow that case for trial, and we are

5      willing to do that, but that's going to require discovery.

6      I mean, that's where we are.

12:46  7          And the rest, I think, deals more with the

8      scheduling order than with the Motion to Dismiss, and I want

9      to make sure we keep those separate 'cause they're two

10     different things.

12:46  11         THE COURT:  What's the loss between March and

12     October of 2007?

12:46  13         MR. CARDONA:  That is the $5 billion figure that

14     we have given, based on the CDOs that are specifically

15     alleged in the Complaint.

12:46  16         THE COURT:  So, in that approximately six-month

17     period of time, $5 billion?

12:46  18         MR. CARDONA:  5 billion in losses resulted from

19     the CDOs that were rated by S&P during that time period.

12:47  20         I should note that there are additional losses

21     flowing from RMBS that were rated by S&P prior to that time

22     period, and we are still in the process of taking discovery

23     on that as well.

12:47  24         THE COURT:  All right.  Here's a thought for both

25     of you:  I'm going to hand out a tentative that I had

|       | 1  | previously prepared now. |
| 12:47 | 2  | But you can't take this tentative as a final, |
|       | 3  | which you will do immediately.  When you get it, one of you |
|       | 4  | will think you've prevailed, and the other will think you've |
|       | 5  | lost. |
| 12:47 | 6  | We have a criminal calendar this afternoon, so I |
|       | 7  | think by 3:00 o'clock I'm going to invite you back.  That |
|       | 8  | will give you time to absorb the tentative.  I'm going to |
|       | 9  | open it up to one more round to show me the fallacy of the |
|       | 10 | tentative, from either side.  And I think I can conclude the |
|       | 11 | criminal calendar by 3:00 o'clock.  If not, please be |
|       | 12 | patient with me. |
| 12:48 | 13 | So go have a nice lunch.  We'll see you at |
|       | 14 | 3:00 o'clock. |
| 12:48 | 15 | Now, if you want to remain -- |
| 12:48 | 16 | (To the clerk and law clerk:) Julie, Bobby, I'm |
|       | 17 | going to need multiple copies. |
| 12:48 | 18 | Counsel, if you would come back at 1:30, we'll |
|       | 19 | make five copies for the government. |
| 12:48 | 20 | MR. CARDONA:  That's fine. |
| 12:48 | 21 | Tell me what you need. |
| 12:48 | 22 | MR. CARDONA:  If we could have 10, that would be |
|       | 23 | great. |
| 12:48 | 24 | THE COURT:  10?  Okay. |
| 12:48 | 25 | Well, then co-equal.  10? |

12:48    1              MR. KEKER:  We don't need 10.

12:48    2              THE COURT:  Yes, you do.  It's co-equal.

12:48    3              MR. KEKER:  Sure.  We want what the government

         4    gets.

12:48    5              THE COURT:  All right.  10 and 10.  Thank you.

12:49    6         *(Lunch recess held at 12:49 p.m.)*

12:49    7         *(Further proceedings to be reported by Maria*

         8      *Dellaneve in Volume II.)*

         9                        -oOo-

        10

        11

        12

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

DEBBIE GALE, U.S. COURT REPORTER

1                                –oOo–

2

3                             CERTIFICATE

4

5          I hereby certify that pursuant to Section 753,

6     Title 28, United States Code, the foregoing is a true and

7     correct transcript of the stenographically reported

8     proceedings held in the above-entitled matter and that the

9     transcript page format is in conformance with the

10    regulations of the Judicial Conference of the United States.

11

12    Date:  July 9, 2013

13

14

15                         /s/ Debbie Gale
                           _____
16                         DEBBIE GALE, U.S. COURT REPORTER
                           CSR NO. 9472, RPR, CCRR
17

18

19

20

21

22

23

24

25