1              **UNITED STATES DISTRICT COURT**

2             **CENTRAL DISTRICT OF CALIFORNIA**

3        **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4               - - - - - - -

5  UNITED STATES OF AMERICA,     )
                           )

6          Plaintiff,       )
                           )

7     vs.                ) No. LACV 13-0779 DOC
                           )   Item No. 8

8  McGRAW-HILL COMPANIES, INC., and  )
  STANDARD & POOR'S FINANCIAL     )

9  SERVICES, LLC,            )
                           )

10         Defendants.      )
  _____)

11

12

13

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS

15            Scheduling Conference

16            Santa Ana, California

17           Monday, July 29, 2013

18

19

20

21 Debbie Gale, CSR 9472, RPR, CCRR
  Federal Official Court Reporter

22 United States District Court
  411 West 4th Street, Room 1-053

23 Santa Ana, California 92701
  (714) 558-8141

24

25 13cv0779 McGraw-Hill 2013-07-29 SchConf

1    **APPEARANCES OF COUNSEL:**

2

     FOR THE UNITED STATES OF AMERICA:
3

4              UNITED STATES DEPARTMENT OF JUSTICE
               OFFICE OF THE UNITED STATES ATTORNEY
5              BY:  George S. Cardona
                    Chief Assistant U.S. Attorney
6              312 North Spring Street
               12th Floor
7              Los Angeles, California 90012-4700
               213-894-2434
8

9              UNITED STATES DEPARTMENT OF JUSTICE
               OFFICE OF THE UNITED STATES ATTORNEY
10             Civil Division
               BY:  Anoiel Khorshid
11                  Assistant U.S. Attorney
               300 North Los Angeles Street
12             Room 7616
               Los Angeles, California 90012
13             213-894-6086

14

15             UNITED STATES DEPARTMENT OF JUSTICE
               BY:  James T. Nelson
                    Trial Attorney
16             P.O. Box 386
               Washington, D.C. 20044
17             202-616-2376

18

19

20

21

22

23

24

25

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR THE DEFENDANT McGRAW-HILL COMPANIES, INC. and
     STANDARD & POOR'S FINANCIAL SERVICES LLC:

4

5              KEKER AND VAN NEST LLP
               BY:  John W. Keker
                    Paven Malhotra
6                   Attorneys at Law
               710 Sansome Street
7              San Francisco, California 94111
               415-391-5400

8

9

10             KELLER RACKAUCKAS UMBERG ZIPSER LLP
               BY:  Jennifer L. Keller
                    Attorney at Law
11             18300 Von Karman Avenue
               Suite 930
12             Irvine, California 92612
               949-476-8700

13

14

15             CAHILL GORDON AND REINDEL LLP
               BY:  Floyd Abrams
                    S. Penny Windle
16                  Attorney at Law
               80 Pine Street
17             New York, New York 10005
               212-701-3000

18

19

20

21

22

23

24

25

DEBBIE GALE, U.S. COURT REPORTER

1                           **I N D E X**

2       **PROCEEDINGS**                                    **PAGE**

3       Scheduling Conference                                5

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DEBBIE GALE, U.S. COURT REPORTER

**SANTA ANA, CALIFORNIA, MONDAY, JULY 29, 2013**

**Item No. 8**

(3:59 p.m.)

03:59  THE COURT:  All right.  We're on the record.

03:59  Counsel, would you be kind enough to make your appearances, please.

03:59  MR. CARDONA:  George Cardona, together with Anoiel Khorshid and James Nelson, for the United States.

03:59  THE COURT:  Okay.

03:59  MR. KEKER:  John Keker on behalf of Standard & Poor's and McGraw-Hill.  And with me is Paven Malhotra, Jennifer Keller, Floyd Abrams, and Penny Windle.

03:59  THE COURT:  Great.  Thank you very much, Counsel.

03:59  I want the record to indicate the Court has had a very informal discussion with Counsel about some initial thoughts and feelings.

03:59  First of all, the Court has privately and certainly the record compliments counsel for both sides for an extraordinarily well-written attempt to move discovery along.  The gist of this document is really a 120-day trial period where there will be a number of witnesses deposed. In all likelihood, the majority of those witnesses will come as requests by the government, and many of those may be 30(b)(6) witnesses; some of those will be on the East Coast, if not most, apparently.

04:00  1          There's been a discussion about the general

2     jurisdiction of this Court and the problems of the majority

3     of witnesses apparently being on the East Coast, and the

4     limited jurisdiction this Court has on the West Coast to

5     impose its jurisdiction.

04:00  6          There's been a general discussion, not meant to

7     concern either side, but somewhat of a general philosophy by

8     this Court that I'm more apt to be more progressive or open

9     to discovery for both sides than possibly the admissible

10    evidence at the time of trial.  The reason for that is that

11    the Court strongly feels that the limitation of discovery

12    can cause both parties harm.  That doesn't mean wide-open

13    discovery without reason, but it does mean, given two equal

14    calls, that the parties can expect some openness in terms of

15    those people that they're able to depose and shape their

16    case.

04:01 17          There's been a general discussion also about the

18    value of interrogatories, which, although valuable in a

19    legal sense, the Court has expressed a view that oftentimes

20    they're written by lawyers and responded to by witnesses

21    that give limited value.  But I trust and believe that the

22    parties will make use of these wisely.

04:01 23          As far as depositions are concerned, I've tried to

24    put the parties on notice and in a warning in as gentle a

25    way possible that this Court doesn't believe that

Case 2:13-cv-00779-DOC-JCG   Document 47   Filed 08/13/13   Page 7 of 29   Page ID #:1076
LACV 13-0779 DOC - 7/29/2013 - Item No. 8

7

1    depositions are valuable, as far as a jury trial is

2    concerned, or as valuable as what the parties assume.  And

3    the reason for that is I believe the American jury should be

4    able to look at and listen to witnesses who testify.  Their

5    determination of credibility is one of the many bastions

6    that they undertake; and under those circumstances,

7    depositions, even video depositions, fail miserably in front

8    of a jury.  So I've asked/cautioned and, I think, in a very

9    good faith response from the parties, that they're going to

10   do their very best to have people appear.

04:02  11          We've talked a little bit about the split cases in

12   New York -- I'm sorry -- on the East Coast, and a district

13   judge having motions before that judge as well as motions

14   before this Court -- or the federal court, we'll say -- the

15   federal case in Los Angeles and the state cases that are in

16   some form of resolution, whether they'll be referred back to

17   the states or whether they will be consolidated in New York.

18   And I think I raised the question:  Why the divided courts?

04:03  19          It's premature to ask that.  There's no response

20   to it.  Those cases very well may go back to the other

21   courts.  But I've indicated that I'm always open to talking

22   to that other judge, and I assume vice versa; but, at the

23   present time, perhaps there's no reason.

04:03  24          My greatest fear is you might have two courts on

25   the same issue making two different decisions; and I don't

1  know if that would be possible, plausible, or could occur,

2  but consolidation always seems to be better.

04:03  3      We talked about this good faith effort.  And I've

4  indicated to counsel that I take them at their word that

5  they're going to really take, in the next 120 days, a good

6  faith effort to at least shape, if not narrow, the case.

7  That isn't the ultimate goal on behalf of the government.

8  It's the fact that I think you can get in discovery, though.

9  And S&P, through their complaints, can decide if they're in

10  a more enviable position in terms of defending.

04:04  11      We talked a little bit about settlements, not that

12  the Court's encouraging one; in fact, I've jokingly said

13  "Don't."  But the end result is I know that that will come

14  up again.  And I had raised the question, I think, with

15  counsel about how could a case possibly settle in a divided

16  posture if, in fact, those cases are in New York -- the

17  state cases, let's call them -- and the federal cases here.

18  And I think counsel have counseled this Court that that's

19  entirely possibly if they ever got to the position of a

20  reasonable settlement, from their perspective.

04:04  21      I think, lastly, the document only has two

22  disagreements.  They're on page 12 and 14.  And I'm going to

23  hear that on the record in just a moment.

04:05  24      Oh.  From S&P's perspective, I think that the

25  Court can anticipate that they're going to ask for at least

1    the depositions or discovery concerning a number of

2    prominent government officials.  Although it sounds to the

3    Court, in the informal discussion, that S&P may be in a

4    position of not doing that initially.  But those officials

5    will start becoming known to the Court during the next

6    120 days.

04:05    7        Also raised was the possibility of, I think,

8    successive summary judgments.  In the past, I haven't done

9    that.  It's --

04:05    10        MR. KEKER:  I'm sorry, Your Honor.  I didn't mean

11    "successive."  I just meant at the summary judgment time, I

12    think we'll have a lot to say.

04:05    13        THE COURT:  Okay.

04:05    14        MR. KEKER:  That's all.  Not successive.

04:06    15        THE COURT:  I raised lastly the possibility of a

16    special master.  I understand that there's a payment issue,

17    from the government's perspective.  I also think that S&P,

18    if they were paying those costs to begin with, would be

19    perceived by the public and the press to be almost admitting

20    liability, so that's a tricky situation.

04:06    21        By the same token, it could be, if the government

22    lost, that they compensated for that motion.  But I think

23    we'll leave that on the table after listening to all

24    counsel, with this caveat:  I think that a special master is

25    extraordinarily wise.  The magistrate judge can't be used.

04:06   1        First, they're carrying their own cases.

04:06   2        Second, I don't think that they're able to get on

3   the plane for most of these depositions.

04:06   4        Third, even if that person was available, there's

5   a three-hour time difference if many of these depos are

6   going to take place on the East Coast, and this Court's

7   certainly not going to be available, unless I took

8   extraordinary measures, to answer all the questions that a

9   depo has during the mediacy of that deposition.

04:07   10       For the time being, although I think it's a good

11  idea, I'm going to leave it to counsel to see how well we do

12  the first 120 days, in good faith.

04:07   13       So, Counsel, if there's anything else we covered

14  that's of any import, I want to make certain that the record

15  gets memorialized.  So let me turn to S&P.

04:07   16       MR. KEKER:  I think you've covered it, Your Honor.

04:07   17       THE COURT:  Counsel?  Ms. Keller?

04:07   18       MS. KELLER:  Yes, Your Honor.  I agree.

04:07   19       THE COURT:  Counsel, if there's anything else,

20  please.

04:07   21       Mr. Cardona?  And Counsel?

04:07   22       MR. CARDONA:  Your Honor, I think you've

23  summarized the discussions.

04:07   24       THE COURT:  Well, once again, I can't tell you how

25  much I enjoy having you here, so it's a pleasure.

04:07  1          Well, let's take these two issues.

04:07  2          Page 12 --

04:08  3          MR. KEKER:  Your Honor, you indicated something to

       4  the effect that you thought you agreed with the government.

       5  I would like to provide some background before you give us

       6  your tentative on this matter, if I could.

04:08  7          THE COURT:  Please.

04:08  8          MR. KEKER:  And that is that this has become

       9  particularly contentious in this case because of what's

      10  already happened.

04:08 11          S&P, during the investigation, produced 30 million

      12  pages, many of which were designated "confidential."  They

      13  resulted in investigative depositions, many of which had

      14  confidential information in it.

04:08 15          We found out, around the time that we began to get

      16  information from the government, that they were giving --

      17  they gave three of those depositions to the civil law firm

      18  of Robbins Geller, which has five cases against Standard &

      19  Poor's.  They're making it something of an occupation to go

      20  after Standard & Poor's.

04:08 21          Two of 'em are still alive:  The *Boca Raton* case

      22  in the Southern District of New York, and the *Space Coast*

      23  case in the Southern District of Florida, which you're

      24  familiar with from the motion to dismiss.

04:09 25          And we challenged the government about that and

LACV 13-0779 DOC - 7/29/2013 - Item No. 8

12

1    said, "What in the worl are you giving confidential

2    information to plaintiffs' counsel who are -- who are

3    plaintiffs' counsel?"  And they said that, under the

4    circumstances, they thought that was well within -- I mean,

5    they could do that.

04:09    6         And, to us, that has made this protective order

7    situation extremely sensitive.

04:09    8         THE COURT:  I see.

04:09    9         MR. KEKER:  And so that's the background.

04:09    10        And then these two issues -- the first issue that

11   I'll talk about doesn't directly relate to that, but it sort

12   of does.  Who is gonna bear the burden of running to you

13   saying that somebody is abusing the confidentiality process?

14   And our position is that Standard & Poor's, who is going to

15   be the one designating most of the documents, 'cause they're

16   the private company, should get the benefit of the doubt.

17   And if the government thinks that we're doing it improperly,

18   they should bear the burden of bringing that to your --

19   meeting and conferring with us, and then bringing it to your

20   attention.  And that that's an important consideration.

04:10    21        The second part of it that we've briefed is this

22   problem of what are they going to do with the confidential

23   information?  Because, from our point of view, there's no

24   enforceability of this.  They're going to get somebody to

25   sign the protective order.  We don't know who they're

showing the information to. I've seen it happen before --
quite often, actually -- that the note you show somebody in
an e-mail and you say, "Have you ever seen this before?"
And they say, "No." And the claim is that -- well, that
person, that's relevant information. We've shown 'em
confidential information. They say we've never seen it.
Therefore, we've learned something that's useful. We're
worried about that sort of thing happening, which is why
we've taken our position.

04:10    So I can go into that more, but it's all within
this background of the Robbins Geller situation that we're
really concerned about lots of confidential competitive
information getting out there in a way that Standard &
Poor's has no way of enforcing or protecting itself against.

04:11    THE COURT: Tell me who Robbins and Geller
represents?

04:11    MR. KEKER: Robbins and Geller represent -- in
five cases against Standard & Poor's -- they have four in
the Southern District of New York and one in the Southern
District of Florida. The ones that I know about are the
*Boca Raton* pension fund case, which we briefed in the --
when we talked about, if you'll recall -- and that's the one
that went to the Second Circuit, and the Second Circuit said
these generic statements aren't enough -- many of the same
statements involved here -- that was a Robbins Geller case.

1    And now they're using these depositions to try to get

2    reconsideration of that ruling in the District Court.

04:11    3             And then in the *Space Coast* case, again, was a

4    federal credit unit that they're representing in the

5    Southern District of Florida.  I think I have that right.

6    But of that, the one where they were relying on generic

7    statements in, um, news releases and academic papers and so

8    on to prove their case, and the Court said, no, that's not

9    enough.

04:12   10             But again, they're using these depositions that

11    the government gave them from their investigation to try to

12    make hay in that case.  And it's that kind of cooperation

13    and close working together with plaintiffs' counsel that we

14    think is inappropriate and -- and that we're worried about

15    in terms of the entering of this protective order.

04:12   16             THE COURT:  Well, thank you.

04:12   17             Okay.  Counsel?

04:12   18             MR. CARDONA:  If I may, so I make sure I speak

19    into the microphone?

04:12   20             THE COURT:  Sure.

04:12   21             MR. CARDONA:  I'll address briefly the Robbins

22    Geller situation first.  What we disclosed to Robbins Geller

23    was not confidential information.  What S&P had disclosed to

24    us that they marked confidential were a host of documents

25    that were provided to us in response to FIRREA subpoenas.

04:13  1          What we provided to Robbins Geller were, in fact,

2     redacted versions of voluntary interviews, sworn statements

3     that were provided to us by three individuals.  From those,

4     we redacted all the references to information that S&P had

5     designated as confidential information.

04:13  6          So what we were giving over were, in essence,

7     voluntary interview statements that had been given to us.

8     And we provided those with respect to two witnesses:  Two

9     witnesses who we believed were going to be witnesses in

10    trials.  And we wanted to make sure that both sides -- the

11    disclosures to Robbins Geller was only made after S&P had

12    obtained them, and we wanted to make sure that both sides

13    had the same statements.  So I don't think that's a basis

14    for being concerned about properly designated confidential

15    information.

04:14  16         And our position on page 12 is, quite simply, um,

17    you know, we all agree that, in terms of arguing to the

18    Court whether something should be confidential, the burden

19    of persuasion rests with the party who's designating it as

20    confidential.  And from our point of view, the party who

21    bears the burden of persuasion should be the one who has to

22    bring the motion to put that issue before the Court.

04:14  23         And I think that's consistent with a number of

24    other protective orders that have been issued in a number of

25    cases, both where McGraw-Hill has been a party, and where

1    other private parties have been parties.

04:14    2    So that's, in essence, our position.

04:14    3    MR. KEKER:  May I briefly respond, Your Honor?

04:14    4    THE COURT:  Please.

04:14    5    MR. KEKER:  First of all, the other protective

6    orders, the Courts do it different ways.  The Southern

7    District does it our way -- the Southern District of

8    California.  The Northern District does it their way.  I

9    think you -- this is precedent.  Doesn't really help you

10    here.

04:14    11    Here, though, where this protective order is going

12    to be submitted to third parties -- this is gonna be the

13    protective order in the case, so banks will be looking at

14    it; others will be looking at it -- we think that discovery

15    will work most smoothly if the third-party deponents who are

16    worried about what's in a protective order as they turn over

17    documents know that, at least initially, their designation

18    will be respected.

04:15    19    And if the government -- the government has to do

20    more than just say, "We don't like what you did."  They have

21    to actually make -- make the motion, and come and incur the

22    wrath of the Court, if the Court thinks that they're being

23    too petty about it.  Whereas, a third party, just like

24    Standard & Poor's, has no interest in being in that position

25    where we have to keep running to you every time they make an

1    unreasonable demand by saying, "That's not confidential.

2    You have to go prove it's confidential to Judge Carter."  I

3    mean, that really puts the burden on the wrong party, we

4    believe, both for Standard & Poor's and for these third

5    parties who are going to need this protective order.

6         So we're asking, with respect to that, to make

7    sure that it's the government's burden to challenge a

8    confidentiality designation if they think it hasn't been

9    made properly.

10         THE COURT:  Okay.  Counsel?

11         MR. CARDONA:  I'll very briefly note the

12    presumption should be, and is -- and virtually every

13    protective order recognizes this -- the presumption is that

14    are information should not ordinarily be designated as

15    confidential information, and that should only be done where

16    there's a legitimate reason for doing so.  As a result, the

17    burden should rest with the party who is seeking to maintain

18    something confidential against that presumption, to bring

19    the motion to get the designation.

20         And in terms of us just being able to say, "No.

21    We think that's wrong," that's not what it provides for.  It

22    mandates a meet and confer process where we have discussions

23    with the other side, provide them with our reasons and give

24    them a basis for reconsidering whether or not they're going

25    to designate it.  So it's not that we can just say, "We

LACV 13-0779 DOC - 7/29/2013 - Item No. 8

18

```
 1    don't think so."
 2              And with that, I'll submit, Your Honor.
 3              THE COURT:  Okay.  Are you both satisfied?
 4              MR. CARDONA:  Yes.
 5              MR. KEKER:  Yes, sir.
 6              THE COURT:  Sure?  Okay.
 7              Page 14, the inclusion that you're requesting is
 8    subsection -- or Subparagraph F.  And S&P's position is that
 9    this paragraph shouldn't be included.
10              So why don't you, once again, go through the
11    issues for this.
12              MR. KEKER:  This one has to do with showing a
13    witness confidential information that otherwise is
14    covered -- let me see if I can find it.  We've already got
15    in here that witnesses can be shown:
16              "...any document for whom it is evident
17               that the person prepared, received,
18               reviewed or otherwise has been -- had
19               been provided access to the confidential
20               information prior to the production
21               pursuant to discovery in this action."
22              So anybody that legitimately has handled or seen
23    or dealt with a document before, under this protective
24    order, can be shown it.  So we're not talking about that.
25              What we're talking about, therefore, in this
```

 1  paragraph are people who don't fall under that other

 2  category; namely, someone for whom there's no indication

 3  that they've handled the document before; and instead,

 4  they're being shown willy-nilly confidential information, no

 5  basis to think they've seen it, and they now are given the

 6  confidential information to read.  And then they go off with

 7  that information in their craw, whatever their answer is.

 8  We think that's improper and that the confidential

 9  information shouldn't be used that way, and that the

10  protective order's specificity about how it can be used with

11  a person who's handled the document before is all that's

12  necessary.

13  THE COURT:  Okay.

14  Counsel?

15  MR. CARDONA:  Your Honor, there are two particular

16  instances that are particularly important in this case that

17  render this clause appropriate.  And, first, I would note

18  that this type of clause has been in a number of other

19  discovery -- a number of other protective orders that have

20  been issued in various courts, including ones in which S&P

21  has been a party.

22  The reason it's particularly important is two

23  things:  One, part of our case involves whether certain

24  employees within S&P were aware of information that was

25  being generated within other parts of S&P.  Many of those

DEBBIE GALE, U.S. COURT REPORTER

1    employees are now former employees and so they wouldn't fall

2    within the current employee exception, which is also in the

3    protective order.

04:19    4            And for many of those witnesses we anticipate,

5    during either interviews or depositions, needing to show

6    them documents -- documents that we anticipate S&P may

7    designate as confidential and asking them, you know, "Did

8    you ever see these when you were doing whatever you were

9    doing?"

04:19    10            The second thing is the issue of materiality,

11    which, as you know, has been raised by S&P as a defense.

12    And again, we anticipate the need to show witnesses who

13    won't necessarily have seen documents, or at least refer to

14    them and summarize information that S&P -- may have been

15    designated confidential, and ask if that information would

16    have been significant to their decisions.

04:20    17            In neither instance would those people fall within

18    any of the other exceptions.

04:20    19            Now, we recognize the concern that they have.  And

20    this is one reason why we agreed to putting in the exception

21    to this for those who are currently employed by competitors

22    of S&P, which I think addresses their primary concern.  But

23    all of these witnesses, in order for us to do that, would

24    have to sign on to the protective order.

04:20    25            THE COURT:  Where is that noted?

DEBBIE GALE, U.S. COURT REPORTER

04:20  1      MR. CARDONA:  That they would have to sign on to

2  the protective order?

04:20  3      THE COURT:  No.  The competitors of S&P.

04:20  4      Is it with the clause, "with the exception of

5  those employed by a competitor of S&P?"

04:20  6      MR. CARDONA:  Yes.

04:20  7      THE COURT:  Okay.  Thank you.

04:20  8      MR. CARDONA:  And then the protection that S&P

9  gets is that -- on page 15, in Paragraph 4, it makes clear

10  that anybody who's getting access to confidential

11  information pursuant that -- uh, to the disputed clause on

12  page 14, couldn't get it unless and until they sign on and

13  agree to be bound by the protective order.

04:21  14      So with that protection, I think it provides S&P

15  with protection and provides us with the ability to ask

16  questions that are, I think, essential to developing the

17  case.

04:21  18      MR. KEKER:  Very briefly, Your Honor?

04:21  19      THE COURT:  Please.

04:21  20      MR. KEKER:  The -- they don't need to show

21  documents designated confidential to prove a negative.  They

22  can -- they can ask "What" -- "Did you learn anything to

23  the" -- or whatever, but they don't need to show the

24  document to a witness to prove that the witness didn't --

25  didn't see it.  Because what -- the question is what did the

LACV 13-0779 DOC - 7/29/2013 - Item No. 8

22

1   witness know and when did he know it.

04:21  2           And the same with materiality.  They can ask a

3   question, "Would it have been material to you to know that,"

4   or something.  But what we're talking about is taking a

5   document -- an e-mail, a report, a whatever -- putting it in

6   front of a witness who's never seen it before, and asking

7   'em these questions, and trying to tie the two -- I think,

8   just as an evidentiary matter, it's not even proper.  So

9   that's our argument about why they don't need it and they

10  shouldn't be able to -- they shouldn't be able to do it.

04:22 11          Again, I emphasize, any indication that that

12  person has -- has seen or handled or used the document in

13  the past, that's not what we're talking about.

04:22 14          THE COURT:  Counsel?

04:22 15          You don't have to respond.  I'm just giving both

16  sides two rounds.

04:22 17          MR. CARDONA:  I understand.

04:22 18          I mean, I remain of the position that this is

19  appropriate given that, you know, the alternative of just

20  basically summarizing the information from the document, in

21  essence, we're conveying the same information that they've

22  designated as confidential.

04:22 23          THE COURT:  Okay.  Now, everything else was

24  resolved between the two of you.

04:23 25          Why is the Court imposing its will concerning

DEBBIE GALE, U.S. COURT REPORTER

 1    those two sections?  In other words, this protective order,

 2    et cetera, is an agreement between the two of you.  Why am I

 3    imposing my will?

 4         I'm happy to do so.  I'm happy to make a ruling.

 5    And if you both stipulate that you're comfortable with that,

 6    I'll decide the issue.  But I'm asking each of you why want

 7    me to do that.

 8         MR. CARDONA:  Your Honor, we have -- we have tried

 9    over an extensive period of conversations to reach

10    agreement.

11         THE COURT:  Why don't you just see how it develops

12    with the first one or two?  In other words, when you take

13    this 120 day run -- well, first of all, these are easy

14    issues for me to resolve, so -- and I'll do that in writing,

15    instead of verbally from the bench.

16         But I'm asking each of you, as we start our

17    relationship with one another, why, in a protective order

18    drawn by the parties, do you want me to intercede, is an

19    adversarial way?  Why isn't this left to develop as a

20    problem -- you know, if it is a problem -- during the course

21    of the discovery?  In other words, you'll be in close

22    contact with me.  I'm going to know right away.  Otherwise,

23    I'm happy to resolve this, believe me.  This is a 5-second

24    decision for me, probably -- well, give me five minutes

25    anyway.  I'm just joking with you.

DEBBIE GALE, U.S. COURT REPORTER

04:24    1          But I'm asking why.

04:24    2          MR. CARDONA:  Your Honor, I think from our point

3   of view -- I mean, ordinarily, we would be happy to try and

4   see how it goes over time.  But the problem is that we're

5   going to be issuing third-party subpoenas fairly quickly

6   after this hearing.  And we anticipate that a number of the

7   parties to whom we're issuing those third-party subpoenas

8   are going to want to see the protective order in its final

9   form before they produce the documents pursuant to that

10   protective order.

04:24   11          So, unfortunately, I don't think we have the time

12   to let it sit for a period of time before we can -- to see

13   how it works out.

04:24   14          THE COURT:  There's my disadvantage:  I don't know

15   who those people are.  That's why we started the informal

16   discussion today with "Who and how many?"  You very well may

17   be right.  But also, protective orders change.  The party

18   who's viewing this protective order to begin with could find

19   that this protective order has substantially changed, as I

20   become more experienced with the case, frankly.  So I'd like

21   to start off humbly.  But if you both agree that this has to

22   be resolved, I'm happy to do it.

04:25   23          MR. KEKER:  Your Honor, we --

04:25   24          THE COURT:  I just hate an adversarial position

25   over a protective order to begin with.  It's a bad way to

LACV 13-0779 DOC - 7/29/2013 - Item No. 8

25

```
          1    start.
04:25     2         MR. KEKER:  Standard & Poor's can certainly accept
          3    and live with a protective order that has no Paragraph 4 on
          4    page 12, and no Paragraph Sub (f) -- E sub (f) on page 14.
          5    So if they just went away and the protective order read the
          6    way it reads without them, that's fine with us.
04:25     7         THE COURT:  I don't think the government's willing
          8    to accede that because, basically, they would have conceded
          9    page 14, so...
04:26    10         All right.  What I'm hearing is you'd like the
         11    Court to resolve that.
04:26    12         MR. CARDONA:  Just those two issues, Your Honor.
04:26    13         THE COURT:  Okay.  And Standard & Poor's has made
         14    its position clear.
04:26    15         Let me think about that for a while.  Especially
         16    in light of a protective order, it's a horrible way to
         17    start.
04:26    18         Well, let's do this:  Do you have any further
         19    business?  And, if so, let's get to it; and if not, I want
         20    to wish you the best.  You'll hear from me sometime
         21    tomorrow.
04:26    22         MR. KEKER:  Your Honor, we have -- we've submitted
         23    a stipulation extending the time to answer, which is agreed.
04:26    24         THE COURT:  I saw that.
04:26    25         MR. KEKER:  And we need -- since it's due
```

|       |    |                                                                        |
|-------|----|------------------------------------------------------------------------|
|       | 1  | tomorrow, and we'd just as soon not default in this case,             |
|       | 2  | we'd like to get that stipulation --                                   |
| 04:26 | 3  | THE COURT:  Why don't I, as soon as I step off the                     |
|       | 4  | bench, stamp it.                                                       |
| 04:26 | 5  | MR. KEKER:  And the second --                                          |
| 04:26 | 6  | THE COURT:  *(To the clerk:)*  Julie, remind me when                   |
|       | 7  | I step off the bench to stamp that.  Okay?  Or just sign it.          |
| 04:26 | 8  | THE CLERK:  I'll do it right now.                                      |
| 04:26 | 9  | MR. KEKER:  We've done another order memorializing                     |
|       | 10 | all of this, and including in it language which is terribly            |
|       | 11 | important to Standard & Poor's, saying that this initial               |
|       | 12 | period is without prejudice, according to you, to taking               |
|       | 13 | the -- going back to take another deposition.                          |
| 04:27 | 14 | THE COURT:  That's correct.  It's in this order.                       |
| 04:27 | 15 | MR. KEKER:  Yeah.                                                       |
| 04:27 | 16 | THE COURT:  In fact, you explicitly set that out                       |
|       | 17 | in one of the paragraphs that this does not prejudice you              |
|       | 18 | from going back and taking a further deposition.                       |
| 04:27 | 19 | MR. KEKER:  And if we got those -- those two                           |
|       | 20 | things would send us back here with a much narrowed case and           |
|       | 21 | a proposed schedule on December 16th.                                  |
| 04:27 | 22 | THE COURT:  Sure.                                                      |
| 04:27 | 23 | I just don't have -- first of all, once again, let                     |
|       | 24 | me compliment you.  It's an extraordinarily well-written               |
|       | 25 | document.  I don't have the implementation phase underway so           |

```
 1    I don't really know how this is going to resolve.  But I'll
 2    know very quickly.  I'm just worried about the East Coast,
 3    West Coast divergence, and the jurisdictional aspects.  But
 4    beyond that, it's like everything else:  Woulda, coulda
 5    shoulda.  We'll look at it as it goes.
 6         Now, do you have anything further on behalf of
 7    Standard & Poor's?
 8         MR. KEKER:  No, Your Honor.
 9         THE COURT:  Counsel?
10         MR. MALHOTRA:  No, Your Honor.
11         THE COURT:  Ms. Keller?
12         MS. KELLER:  No.
13         THE COURT:  And when's your motion in New York?
14         MR. ABRAMS:  I'm sorry?
15         THE COURT:  And when's your motion in New York?
16         MR. ABRAMS:  October 4th is the argument on the
17    motion to remand, Your Honor.
18         THE COURT:  Okay.  Well, give my best to the Judge
19    in New York.  Okay?
20         MR. ABRAMS:  I will.
21         THE COURT:  And I'm open any time or -- or I hope
22    vice versa.
23         MR. ABRAMS:  I will tell him that.
24         THE COURT:  I just don't know why we'd communicate
25    right now.
```

LACV 13-0779 DOC - 7/29/2013 - Item No. 8

28

04:28    1            Okay.  Counsel, anything further on behalf --

2   Mr. Cardona?

04:28    3            MR. CARDONA:  No, Your Honor.  Nothing further.

04:28    4            THE COURT:  Counsel?

04:28    5            MR. KHORSHID:  No, Your Honor.

04:28    6            THE COURT:  Counsel?

04:28    7            MR. NELSON:  No, Your Honor.

04:28    8            THE COURT:  Well, thank you very much.  It's been

9   a pleasure visiting with you.

04:28   10            MR. ABRAMS:  Thank you, Your Honor.

04:28   11         *(Proceedings adjourned at 4:28 p.m.)*

04:30   12           *(Proceedings adjourned at 4:30 p.m..)*

04:30   13                  -oOo-

04:30   14

15

16

17

18

19

20

21

22

23

24

25

DEBBIE GALE, U.S. COURT REPORTER

-oOo-

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  August 6, 2013

/s/ Debbie Gale
_____
DEBBIE GALE, U.S. COURT REPORTER
CSR NO. 9472, RPR, CCRR