1  KEKER & VAN NEST LLP
   JOHN KEKER (SBN 49092)
2  jkeker@kvn.com
   ELLIOT R. PETERS (SBN 158708)
3  epeters@kvn.com
   633 Battery Street
4  San Francisco, CA 94111-1809
   Telephone:  415 391 5400
5  Facsimile:   415 397 7188

6  CAHILL GORDON & REINDEL LLP
   FLOYD ABRAMS (*pro hac vice*)
7  fabrams@cahill.com
   S. PENNY WINDLE (*pro hac vice*)
8  pwindle@cahill.com
   80 Pine Street
9  New York, New York 10005-1702
   Telephone: 212 701 3000
10 Facsimile:  212 269 5420

11 KELLER RACKAUCKAS UMBERG ZIPSER LLP
   JENNIFER L. KELLER (SBN 84412)
12 jkeller@kruzlaw.com
   18300 Von Karman Avenue, Suite 930
13 Irvine, CA 92612-1057
   Telephone: 949 476 8700
14 Facsimile: 949 476 0900

15 Attorneys for Defendants
16 MCGRAW-HILL COMPANIES, INC., and
   STANDARD & POOR'S FINANCIAL
17 SERVICES LLC

18            **UNITED STATES DISTRICT COURT**

19        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

20 UNITED STATES OF AMERICA,           ) CASE NO.:  **CV13-00779 (DOC)**
                                       )
21             Plaintiff,              )
                                       )
22            - against -              ) CORRECTED ANSWER AND
                                       ) DEMAND FOR JURY TRIAL
23 MCGRAW-HILL COMPANIES, INC.,        )
   AND STANDARD & POOR'S               )
24 FINANCIAL SERVICES LLC,             )
                                       )
25             Defendants.             )
                                       )
26 _____ )

27

28

                    CORRECTED ANSWER
                 CASE NO. CV13-00779 (DOC)

778956.01

Defendants McGraw Hill Financial and Standard & Poor's Financial
Services, LLC (collectively, "S&P") answer Plaintiff United States of America's
Complaint as follows:

## I.    INTRODUCTION

1.    S&P denies that the Complaint states a claim under any section of the
Financial Institutions Reform, Recovery, and Enforcement Act of 1989, 12 U.S.C.
§ 1833a ("FIRREA").

2.    S&P admits that Standard & Poor's Ratings Services ("S&P Ratings")
issued credit rating opinions with respect to RMBS and CDOs between September
2004 and October 2007 ("the Time Period at Issue"), avers that each security had its
own unique collateral, structure and features and otherwise denies the allegations in
Paragraph 2.

3.    S&P admits that sponsors, arrangers and/or other non-rating agency
entities were responsible for arranging and structuring RMBS and/or CDOs,
including creating classes (or "tranches") of notes to be issued, and that these
entities often sought credit ratings for some or all of the tranches from S&P Ratings
and/or other credit rating agencies.  S&P otherwise denies the allegations in
Paragraph 3.

4.    S&P admits that credit ratings are forward-looking opinions about
credit risk, that S&P Ratings typically expresses its ratings on long-term debt
securities in the form of letter grades that range from 'AAA' to 'D', reflecting its
opinion with respect to the relative likelihood of default and the issuer's ability to
pay timely principal and interest, and that S&P Ratings typically announces its
credit ratings and publishes them on its website.  S&P otherwise denies the
allegations in Paragraph 4.

5.    S&P admits upon information and belief that other entities marketed
and sold RMBS and CDO tranches to financial institutions and other investors, that

CORRECTED ANSWER
CASE NO. CV13-00779 (DOC)

778956.01

1   some of those financial institutions may have been federally-insured, and that some

2   RMBS and CDO tranches could only be marketed or sold to "qualified institutional

3   buyers" by reason of rules promulgated by the United States Securities and

4   Exchange Commission ("SEC").  S&P otherwise denies the allegations in

5   Paragraph 5.

6       6.   S&P avers that S&P Ratings' credit ratings are not indicators of

7   investment merit, are not recommendations to buy, sell or hold any security, and

8   should not be relied upon as investment or financial advice.  S&P further avers, on

9   information and belief, that several of the financial institutions identified in the

10  Complaint were themselves involved (directly or through affiliates) in arranging,

11  structuring, evaluating, marketing and/or selling the RMBS and/or CDOs

12  referenced in the Complaint and that S&P's credit ratings were not and could not

13  have been material to such institutions.  S&P otherwise denies the allegations in

14  Paragraph 6.

15      7.   S&P denies the allegations in Paragraph 7.

16      8.   S&P denies the allegations in Paragraph 8.

17      9.   S&P denies the allegations in Paragraph 9 and avers as follows:

18      S&P Ratings' ratings opinions were independent and based upon a good

19  faith assessment of, among other things, the performance of residential mortgages

20  during a tumultuous time in the market.  Like nearly every other market

21  participant, analyst, and interested government entity, S&P Ratings did not

22  anticipate the full speed, severity, and breadth of the collapse of the housing

23  market and its impact on the economy as whole.  S&P Ratings was not alone.

24  Other rating agencies that have not been charged with fraud or misconduct by the

25  United States issued ratings similar to and often identical with those of S&P

26  Ratings.  Indeed, every CDO tranche cited in the Complaint received identical

27  ratings from S&P Ratings and at least one other rating agency.

28

CORRECTED ANSWER
CASE NO. CV13-00779 (DOC)

778956.01

Moreover senior officials of the United States who were reviewing the same data that S&P Ratings was reviewing throughout 2007 proved no more prescient than S&P Ratings.  When Ben S. Bernanke, then Chairman of the Board of Governors of the Federal Reserve System, stated in March 2007, that "the central scenario that housing will stabilize sometime during the middle of the year remains intact," his views (and those of other Governors) were similar to those of S&P Ratings.  Similarly, when Secretary of the Treasury Henry M. Paulson stated in April 2007 that "subprime is obviously an outgrowth of the housing market," that "in terms of the systemic risks, the economic risks, you know, the macro risk, I don't see it posing a serious problem" and that "I think it's going to be largely contained," his views were consistent with those of S&P.  And when Mr. Bernanke, looking back with several years of hindsight in December 2009 said, "I did not anticipate a crisis of this magnitude and this severity," that was also true of S&P Ratings.

With respect to the period from September 2004 through October 2007 specified in Paragraph 9(a) of the Complaint, S&P Ratings did not weaken the criteria and analytical models it used in rating RMBS and CDOs in order to increase its revenue or market share.  S&P incorporates herein and refers to its specific responses to Paragraphs 125 to 198 of the Complaint.  The final decisions regarding updates to S&P Ratings' assumptions and criteria, and its ultimate rating opinions, reflected S&P Ratings' good faith analytical judgment and opinion as determined by a committee of analysts.

With respect to the period between March 2007 and October 2007 specified in Paragraph 9(b) of the Complaint, S&P did not issue or confirm credit rating opinions on CDOs backed by non-prime RMBS with knowledge that the ratings underestimated the creditworthiness of the CDOs.  S&P Ratings strengthened its standards for conducting surveillance of RMBS during this time period, which

resulted in S&P taking CreditWatch or rating actions on increasing numbers of non-prime RMBS in the first half of 2007, ahead of the other rating agencies. These actions reflected and updated S&P Ratings' credit rating opinion with respect to both the RMBS and any CDO backed by the RMBS.  S&P Ratings conducted these analyses independently and in good faith during a period of unprecedented performance issues in the residential mortgage market.  Although in hindsight it is now known that the speed, severity and depth of the deterioration in the residential mortgage market was far beyond what S&P Ratings expected at the time, this is also true of every other Nationally Recognized Statistical Rating Organization ("NRSRO") (and many agencies and high-ranking officials in the federal government who were reviewing the same data at the same time).

10.     S&P denies the allegations in Paragraph 10.

11.     To the extent Paragraph 11 contains a legal conclusion, S&P makes no response to those allegations, except admits that the Plaintiff purports to institute proceedings pursuant to 12 U.S.C. § 1833a, and otherwise denies the allegations in Paragraph 11.

12.     To the extent Paragraph 12 contains a legal conclusion, S&P makes no response to those allegations, except admits that the Plaintiff purports to institute proceedings pursuant to 12 U.S.C. § 1833a, and otherwise denies the allegations in Paragraph 12.

13.     To the extent Paragraph 13 contains a legal conclusion, S&P makes no response to those allegations, except admits that the Plaintiff purports to institute proceedings pursuant to 12 U.S.C. § 1833a, and otherwise denies the allegations in Paragraph 13.

14.     To the extent Paragraph 14 contains a legal conclusion, S&P makes no response to those allegations, except admits that the Plaintiff purports to institute proceedings pursuant to 12 U.S.C. § 1833a, and otherwise denies the allegations in

778956.01

Paragraph 14.

15.   To the extent Paragraph 15 contains a legal conclusion, S&P makes no response to those allegations, except admits that the Plaintiff purports to institute proceedings pursuant to 12 U.S.C. § 1833a, and otherwise denies the allegations in Paragraph 15.

16.   S&P admits the allegations in Paragraph 16.

17.   S&P does not dispute that venue is appropriate in this judicial district, but denies that a substantial part of the events alleged in the Complaint occurred in this district.

18.   S&P admits the allegation in Paragraph 18.

19.   S&P admits the allegation in Paragraph 19.

20.   S&P admits the allegation in Paragraph 20, except denies that S&P LLC, as defined in the Complaint, is a successor to Standard & Poor's Ratings Services.

21.   S&P avers that each security had its own unique collateral, structure and features and otherwise denies the allegations in Paragraph 21.

22.   S&P admits that sponsors, arrangers and/or other non-rating agency entities were responsible for arranging and structuring RMBS, including creating classes (or "tranches") of notes to be issued, avers that each security had its own unique collateral, structure and features, and otherwise denies the allegations in Paragraph 22.

23.   S&P avers that each security had its own unique collateral, structure and features and otherwise denies the allegations in Paragraph 23.

24.   S&P avers that each security had its own unique collateral, structure and features and otherwise denies the allegations in Paragraph 24.

25.   S&P avers that each security had its own unique collateral, structure and features and otherwise denies the allegations in Paragraph 25.

778956.01

26.     S&P avers that each security had its own unique collateral, structure and features and otherwise denies the allegations in Paragraph 26.

27.     S&P avers that each security had its own unique collateral, structure and features and otherwise denies the allegations in Paragraph 27.

28.     S&P avers that each security had its own unique collateral, structure and features and otherwise denies the allegations in Paragraph 28.

29.     S&P avers that each security had its own unique collateral, structure and features and otherwise denies the allegations in Paragraph 29.

30.     S&P avers that each security had its own unique collateral, structure and features and otherwise denies the allegations in Paragraph 30.

31.     S&P admits that sponsors, arrangers and/or other non-rating agency entities were responsible for arranging and structuring CDOs, including creating classes (or "tranches") of notes to be issued, avers that each security had its own unique collateral, structure and features, and otherwise denies the allegations in Paragraph 31.

32.     S&P avers that each security had its own unique collateral, structure and features and otherwise denies the allegations in Paragraph 32.

33.     S&P avers that each security had its own unique collateral, structure and features and otherwise denies the allegations in Paragraph 33.

34.     S&P admits that, during the Time Period at Issue, many RMBS tranches that were referenced in credit default swaps and/or included in pools that provided collateral for CDOs rated by S&P Ratings were tranches of RMBS backed predominantly by non-prime residential mortgages, and that many such tranches were rated lower than AAA.  S&P otherwise denies the allegations in Paragraph 34.

35.     S&P admits that S&P Ratings was in the business of providing credit rating opinions, among other things, during the Time Period at Issue and that S&P Ratings typically charged fees in connection with its ratings services.  S&P admits

- 7 -

1  upon information and belief that S&P Ratings was one of the largest credit rating

2  agencies in the world during the Time Period at Issue.  S&P otherwise denies the

3  allegations in Paragraph 35.

4       36.     S&P admits the allegations in Paragraph 36.

5       37.     S&P admits the allegations in Paragraph 37.

6       38.     S&P admits the allegations in Paragraph 38, except to the extent the

7  allegations refer to Paragraph 115, and refers to its response to Paragraph 115.

8       39.     S&P admits the allegations in Paragraph 39.

9       40.     S&P admits the allegations in Paragraph 40.

10       41.     S&P refers to its published ratings definitions for their full content.

11  S&P otherwise denies the allegations in Paragraph 41.

12       42.     S&P refers to its published ratings definitions for their full content.

13  S&P otherwise denies the allegations in Paragraph 42.

14       43.     S&P admits the allegations in Paragraph 43, and refers to its published

15  ratings definitions for their full content.

16       44.     S&P admits that securities rated BBB- and higher on its scale were

17  generally referred to as "investment grade" by market participants, that securities

18  with ratings below BBB- were generally referred to as "non-investment grade" or

19  "speculative grade" by market participants, and that securities rated in the range

20  between A and BB were sometimes referred to as "mezzanine" securities by market

21  participants.  S&P otherwise denies the allegations in Paragraph 44.

22       45.     S&P denies the allegations in Paragraph 45 and incorporates herein its

23  response to Paragraph 5 above.

24       46.     S&P denies the allegations in Paragraph 46 and incorporates herein its

25  response to Paragraph 6 above.

26       47.     S&P admits that 12 C.F.R. § 704.6(d) exists, avers that regulation  §

27  704.6 further requires federally-chartered credit unions to "operate according to a

28

778956.01

1   credit risk management policy that is commensurate with the investment risks and

2   activities it undertakes," refers to the full regulation for its complete content, and

3   otherwise denies the allegations in Paragraph 47.

4          48.     S&P denies the allegations in Paragraph 48 and incorporates herein its

5   response to Paragraph 6 above.

6          49.     S&P denies the allegations in Paragraph 49, except as set forth in its

7   responses to the subparagraphs below, and incorporates herein its response to

8   Paragraph 6 above.

9          a.      S&P admits that the language quoted in Paragraph 49(a) appears in

10  S&P Ratings' 2006 CDO Strategic Plan, avers that the allegations are a selective

11  quote from the document that do not reflect its true content, refers to the full

12  document for its complete content, and otherwise denies the allegations in

13  Paragraph 49(a).  S&P incorporates herein its response to Paragraph 6 above.

14         b.      S&P admits that the language quoted in Paragraph 49(b) appears in

15  S&P Ratings' 2006 CDO Strategic Plan, avers that the allegations are a selective

16  quote from the document that do not reflect its true content, refers to the full

17  document for its complete content, and otherwise denies the allegations in

18  Paragraph 49(b).  S&P incorporates herein its response to Paragraph 6 above.

19         c.      S&P admits that the language quoted in Paragraph 49(c) appears in a

20  February 16, 2007 publication entitled, "25 Years of Credit: The Structured

21  Finance Market's Accumulated Wisdom," avers that the allegations are a selective

22  quote from the publication that do not reflect its true content, refers to the full

23  publication for its complete content, and otherwise denies the allegations in

24  Paragraph 49(c).  S&P incorporates herein its response to Paragraph 6 above.

25         d.      S&P admits that the language quoted in Paragraph 49(d) appears in an

26  August 23, 2007 publication entitled, "The Fundamentals of Structured Finance

27  Ratings," avers that the allegations are a selective quote from the publication that

28

- 9 -

1    do not reflect its true content, refers to the full publication for its complete content,

2    and otherwise denies the allegations in Paragraph 49(d). S&P incorporates herein

3    its response to Paragraph 6 above.

4         50.    S&P admits that S&P Ratings' reputation for the quality of its rating

5    opinions is important to S&P, admits that the language quoted in Paragraph 50

6    appears in S&P Ratings' 2006 CDO Strategic Plan, avers that the allegations are a

7    selective quote from the document that do not reflect its true content, refers to the

8    full document for its complete content, and otherwise denies the allegations in

9    Paragraph 50. S&P also admits that more than one credit rating agency typically

10   rated the same security and avers that each CDO identified in the Complaint was

11   rated by more than one credit rating agency.

12        51.    S&P avers that issuers (as defined in the Complaint) sometimes

13   retained tranches or equity portions of the RMBS or CDOs they arranged,

14   structured, marketed or sold and that the alleged "loss to investors" identified in

15   Paragraphs 238(a), 238(b), 238(c), 241(e), 261(a), 269(c) and 277 in fact refers to

16   losses allegedly incurred by issuers of the identified securities in many instances,

17   and otherwise denies the allegations in Paragraph 51.

18        52.    S&P admits on information and belief that the financial institutions

19   identified in the Complaint, and others, purchased RMBS and CDO tranches rated

20   by S&P Ratings (and/or other NRSROs) and issued during the Time Period at Issue

21   and otherwise denies the allegations in Paragraph 52.

22        53.    S&P admits that S&P Ratings had a Structured Finance department

23   and otherwise denies the allegations in Paragraph 53.

24        54.    S&P admits that, between 2004 and 2007, Joanne Rose was the

25   Executive Managing Director in charge of the Structured Finance Group, reported

26   to the Executive Vice President for Credit Market Services, and was a member of

27   the Structured Finance Leadership Team. S&P otherwise denies the allegations in

28

- 10 -

778956.01

Paragraph 54.

55.     S&P admits that, between 2005 and 2007, the Managing Director in charge of the Global ABS/RMBS/New Assets group reported to Rose and was a member of the Structured Finance Leadership Team.  S&P otherwise denies the allegations in Paragraph 55.

56.     S&P admits that, between 2006 and 2007, the Managing Director in charge of the RMBS North America group reported to the Managing Director in charge of the Global ABS/RMBS/New Assets group.  S&P otherwise denies the allegations in Paragraph 56.

57.     S&P admits that, between February 2005 and 2007, Patrice Jordan was the Managing Director in charge of the Global CDO group, reported to Rose, and was a member of the Structured Finance Leadership Team.  S&P otherwise denies the allegations in Paragraph 57.

58.     S&P admits that the managing director who was head of Global CDO prior to Jordan was a member of the SFLT and head of the Center of Excellence Quantitative Analytics Group through November 2006.  S&P otherwise denies the allegations in Paragraph 58.

59.     S&P admits that David Tesher was a managing director in charge of the Cash CDO group, that Andrea Bryan was a managing director in charge of the Synthetic CDO group, and that both reported to Jordan during the Time Period at Issue.  S&P otherwise denies the allegations in Paragraph 59.

60.     S&P admits that the managing director who was head of the surveillance group reported to Rose and was a member of the SFLT and that the heads of the RMBS Surveillance group and CDO Surveillance group reported to the head of the Structured Finance Surveillance group during the Time Period at Issue. S&P otherwise denies the allegations in Paragraph 60.

61.     S&P admits that Thomas Gillis was head of the Research and Criteria

CORRECTED ANSWER
CASE NO. CV13-00779 (DOC)
778956.01

1  group, reported to Rose, and was a member of the SFLT during the Time Period at

2  Issue.  S&P otherwise denies the allegations in Paragraph 61.

3       62.    S&P admits that S&P Ratings typically charges a fee to issuers in

4  connection with its engagement to rate RMBS and that in 2007 the fee for rating

5  RMBS securities could range from $25,000 to $150,000.  S&P otherwise denies the

6  allegations in Paragraph 62.

7       63.    S&P admits that S&P Ratings typically charges a fee to issuers in

8  connection with its engagement to rate CDOs and that in 2007 the fee for rating

9  cash flow CDOs could range from $150,000 to $500,000 and for synthetic CDOs

10 could range from $30,000 to $700,000, avers that the new issue rating fees charged

11 in connection with the 26 CDOs identified in Paragraphs 277 and 278 totaled less

12 than $12 million, and avers that the new issue rating fees charged in connection

13 with all 33 CDOs identified anywhere in the Complaint totaled less than $15

14 million.  S&P otherwise denies the allegations in Paragraph 63.

15      64.    S&P admits that S&P Ratings typically charges a fee to issuers in

16 connection with its surveillance of CDOs and that in 2007 the fee for annual

17 surveillance of cash flow CDOs could range from $35,000 to $50,000 and for

18 synthetic CDOs could range from $10,000 to $50,000 and otherwise denies the

19 allegations in Paragraph 64.

20      65.    S&P admits that S&P Ratings may not receive the full fee for rating a

21 structured finance security if a rating is not issued and otherwise denies the

22 allegations in Paragraph 65.

23      66.    S&P admits that the language quoted in Paragraph 66 appears in S&P

24 Ratings' 2006 CDO Strategic Plan, avers that the allegations are a selective quote

25 from the document that do not reflect its true content, avers that S&P Ratings was

26 typically engaged to rate CDOs during the Time Period at Issue through the

27 arranger of the CDO, refers to the full document for its complete content, and

28

778956.01

otherwise denies the allegations in Paragraph 66.

67.   S&P denies the allegations in Paragraph 67.  S&P further avers that the operative documents cited in Paragraphs 67(a) and 67(b) do not state, in words or substance, that any rating fee was to be paid out of the proceeds of sales "to investors."

68.   S&P denies the allegations in Paragraph 68.

69.   S&P denies the allegations in Paragraph 69.

70.   S&P denies the allegations in Paragraph 70.

71.   S&P admits that the language quoted in Paragraph 71 appears in a 2005 annual report, avers that the allegations are a selective quote from the document that do not reflect its true content, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 71.

72.   S&P admits that the language quoted in Paragraph 72 appears in a 2006 annual report, avers that the allegations are a selective quote from the document that do not reflect its true content, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 72.

73.   S&P avers that the specific rating process for each security may vary or differ as a result of the security's unique collateral, structure and features and otherwise denies the allegations in Paragraph 73.

74.   S&P admits that versions of the LEVELS model were used during the Time Period at Issue in connection with requests for ratings on new issue U.S. RMBS, avers that the specific rating process for each security may vary or differ as a result of the security's unique collateral, structure and features and otherwise denies the allegations in Paragraph 74.

75.   S&P denies the allegations in Paragraph 75.

76.   S&P denies the allegations in Paragraph 76.

77.   S&P admits that S&P Ratings' decision to issue an RMBS rating was

778956.01

typically conveyed both by publication and in a rating letter to the RMBS issuer, refers to the specific terms and contents of any such letter for its actual contents, and otherwise denies the allegations in Paragraph 77.

78.    S&P admits that, during the Time Period at Issue, requests for U.S. RMBS ratings were sometimes withdrawn and that S&P Ratings had a practice of preparing a "lost deal" memo in such circumstances, and otherwise denies the allegations in Paragraph 78.

79.    S&P avers that the specific rating process for each security may vary or differ as a result of the security's unique collateral, structure and features and otherwise denies the allegations in Paragraph 79.

80.    S&P admits that the language quoted in Paragraph 80 appears in a June 8, 2007 publication entitled, "An Introduction to CDOs and Standard & Poor's Global CDO Ratings," avers that the allegations are a selective paraphrase of the publication that do not reflect its true content, refers to the full publication for its complete content, and otherwise denies the allegations in Paragraph 80.

81.    S&P admits that versions of the CDO Evaluator model were used during the Time Period at Issue in connection with the rating of CDOs, avers that the specific rating analysis for each security may vary or differ as a result of the security's unique collateral, structure and features and otherwise denies the allegations in Paragraph 81.

82.    S&P admits that Q-Ramp reports typically included a comparison of a break-even default rate ("BDR") calculated with the Genesis model and a scenario default rate ("SDR") calculated with the CDO Evaluator model, admits that a BDR reflected a projected rate of default on the underlying collateral that could occur before a particular CDO tranche was expected to experience a default, admits that the SDR reflected a projected rate of default at a particular rating level, and otherwise denies the allegations in Paragraph 82.

CORRECTED ANSWER
CASE NO. CV13-00779 (DOC)

778956.01

83.     S&P denies the allegations in Paragraph 83.

84.     S&P avers that the specific rating process for each security may vary or differ as a result of the security's unique collateral, structure and features and otherwise denies the allegations in Paragraph 84.

85.     S&P avers that the specific rating process for each security may vary or differ as a result of the security's unique collateral, structure and features and otherwise denies the allegations in Paragraph 85.

86.     S&P avers that the specific rating process for each security may vary or differ as a result of the security's unique collateral, structure and features and otherwise denies the allegations in Paragraph 86.

87.     S&P avers that the specific rating process for each security may vary or differ as a result of the security's unique collateral, structure and features and otherwise denies the allegations in Paragraph 87.

88.     S&P avers that the specific rating process for each security may vary or differ as a result of the security's unique collateral, structure and features and otherwise denies the allegations in Paragraph 88.

89.     S&P admits that S&P Ratings at times prepared Pre-Sale Reports in connection with structured finance ratings and otherwise denies the allegations in Paragraph 89.

90.     S&P admits that S&P Ratings' decision to issue a CDO rating was typically conveyed both by publication and in a rating letter to the CDO issuer, refers to the specific terms and contents of any such letter for its actual contents, and otherwise denies the allegations in Paragraph 90.

91.     S&P admits that S&P Ratings' analysis for new CDOs backed by assets it rated used S&P Ratings' then-current rating of those assets as inputs in the analysis conducted using CDO Evaluator, and otherwise denies the allegations in Paragraph 91.

CORRECTED ANSWER
CASE NO. CV13-00779 (DOC)

778956.01

92.     S&P avers that it was the longstanding practice of S&P Ratings, since prior to 2006, that its CDO group would use the rating assigned by its RMBS group to any RMBS used as collateral for a CDO in conducting its CDO credit rating analysis, that this practice included taking into account any CreditWatch action that the RMBS group had determined to take on such underlying collateral, avers that it was not its practice to have CDO analysts "re-rate" or otherwise change the rating assigned by the RMBS group to such collateral, and otherwise denies the allegations in Paragraph 92.

93.     S&P admits that it was the longstanding practice of S&P Ratings, since prior to 2006, to use its ratings on underlying collateral backing a CDO, including any RMBS, in conducting its rating analysis of that CDO, avers that pursuant to this longstanding practice the rating used for any underlying RMBS that was on CreditWatch Negative would be adjusted down by one "notch" and the rating used for any underlying RMBS that was on CreditWatch Positive would adjusted up one "notch," avers that it was not S&P's practice prior to July 2007 to make such adjustments if the RMBS group had not decided to place the underlying RMBS on CreditWatch, and otherwise denies the allegations of Paragraph 93.

94.     S&P avers that S&P Ratings' longstanding practice for rating CDOs, since prior to 2006, took into account whether any underlying RMBS assets were on CreditWatch for a potential downgrade or upgrade and otherwise denies the allegations of Paragraph 94.

95.     S&P avers that S&P Ratings' longstanding practice for rating CDOs, since prior to 2006, took into account whether any underlying RMBS assets were on CreditWatch for a potential downgrade or upgrade and otherwise denies the allegations in Paragraph 95.

96.     S&P admits that S&P Ratings sometimes received requests during the Time Period at Issue to issue an "Effective Date Rating Agency Confirmation"

CORRECTED ANSWER
CASE NO. CV13-00779 (DOC)

778956.01

1   confirming its rating as of a specified date in connection with cash and hybrid

2   CDOs it had rated and otherwise denies the allegations in Paragraph 96.

3       97.   S&P avers that the specific rating process for each security may vary

4   or differ as a result of the security's unique collateral, structure and features and

5   otherwise denies the allegations in Paragraph 97.

6       98.   S&P avers that the specific rating process for each security may vary

7   or differ as a result of the security's unique collateral, structure and features and

8   otherwise denies the allegations in Paragraph 98.

9       99.   S&P avers that the specific rating process for each security may vary

10  or differ as a result of the security's unique collateral, structure and features and

11  otherwise denies the allegations in Paragraph 99.

12      100.  S&P avers that it used a model called CDO Monitor in connection

13  with the rating of certain structured finance securities and otherwise denies the

14  allegations in Paragraph 100.

15      101.  S&P admits that versions of the CDO Monitor model were used in

16  connection with reviewing requests for Effective Date RAC letters during the Time

17  Period at Issue, avers that S&P Ratings' analysis in connection with such requests

18  was conducted on a case-by-case basis and depended upon specific collateral and

19  structural features of the particular CDO, avers that the effect of an issuer's failure

20  to obtain an Effective Date RAC letter was described in the operative legal

21  documents for each particular CDO, and otherwise denies the allegations in

22  Paragraph 101.

23      102.  S&P admits that the language quoted in Paragraph 102 appears in a

24  1999 publication entitled, "U.S. Residential Subprime Mortgage Criteria," avers

25  that the allegations are a selective quote from the publication that do not reflect its

26  true content, refers to the full publication for its complete content, and otherwise

27  denies the allegations in Paragraph 102.

28

778956.01

103.   S&P admits that the language quoted in Paragraph 103 appears in a 2005 Code of Conduct, avers that the allegations are a selective quote from the document that do not reflect its true content, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 103.

104.   S&P admits that the language quoted in Paragraph 104 appears in a 2005 Code of Conduct, avers that the allegations are a selective quote from the document that do not reflect its true content, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 104.

105.   S&P admits that the language quoted in Paragraph 105 appears in an August 7, 2007 publication entitled, "CreditWatch and Rating Outlooks Provide Powerful Warning Signals," avers that the allegations are a selective paraphrase of the publication that do not reflect its true content, refers to the full publication for its complete content, and otherwise denies the allegations in Paragraph 105.

106.   S&P admits that the language quoted in Paragraph 106 appears in an August 7, 2007 publication entitled, "CreditWatch and Rating Outlooks Provide Powerful Warning Signals," avers that the allegations are a selective paraphrase of the publication that do not reflect its true content, refers to the full publication for its complete content, and otherwise denies the allegations in Paragraph 106.

107.   S&P admits that S&P Ratings typically received data on a monthly basis regarding the performance of pools of mortgages that backed RMBS it rated, that during the Time Period at Issue S&P Ratings used this data as well as other data to monitor the performance of outstanding RMBS, that S&P Ratings' monitoring activity included the use of "exception reports" of various types and for various purposes, and that between February and July 2007 S&P Ratings used exception reports as one method for identifying RMBS tranches for further review for potential CreditWatch action.  S&P avers that the appearance of an RMBS tranche on such an exception report was not, by itself, an indication that the tranche

CORRECTED ANSWER
CASE NO. CV13-00779 (DOC)

778956.01

was then under consideration for potential downgrade, that the data it relied on regarding delinquency rates of residential mortgages was available to the government and the marketplace through third party data providers and elsewhere, and that throughout the first half of 2007 there was public discussion and analysis of that data in the marketplace.  S&P avers upon information and belief, the Federal Open Market Committee of the Federal Reserve reviewed and discussed the same or similar data in meetings in 2007 that were attended by, among others, Ben S. Bernanke, Chairman of the Board of Governors of the Federal Reserve System and Timothy F. Geithner, then President of the Federal Reserve Bank of New York. S&P otherwise denies the allegations in Paragraph 107.

108.   S&P admits that S&P Ratings at times referred to mortgages that were more than 90 days delinquent, REO or in foreclosure as "severe delinquencies," admits that S&P Ratings referred to the amount of support that it expected an RMBS tranche to receive over time that could be used to absorb losses as "credit support" but that the use of the phrase "credit support" may not always have referred to all forms of credit support during the Time Period at Issue.  S&P admits that S&P Ratings at various times during the Time Period at Issue conducted analyses comparing the amount of severe delinquencies in an RMBS pool to the expected credit support for particular tranches backed by that pool, and avers that such a "SD versus CS" calculation was not used to determine whether an RMBS tranche should be downgraded but rather as one among many monitoring methods to help identify RMBS tranches that might need to be further reviewed for potential CreditWatch action.  S&P otherwise denies the allegations in Paragraph 108.

109.   S&P avers that the specific rating process for each security may vary or differ as a result of the security's unique collateral, structure and features and otherwise denies the allegations in Paragraph 109.

110.   S&P admits that S&P Ratings has publicly recognized and disclosed

the potential conflict of interest that could arise, or could be perceived to arise, when its rating fees are paid by the entity that is being rated and that this was common knowledge in the marketplace, avers that its credit ratings reflected its independent and good faith opinions, and otherwise denies the allegations in Paragraph 110.

111.    S&P admits that the language quoted in Paragraph 111 appears in a 2004 Code of Practices and Procedures, avers that the allegations are a selective quote from the document that do not reflect its true content, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 111.

112.    S&P admits that the language quoted in Paragraph 112 appears in a 2005 Code of Conduct, avers that the allegations are a selective quote from the document that do not reflect its true content, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 112.

113.    S&P admits that the language quoted in Paragraph 113 appears in the IOSCO Code, avers that the allegations are a selective quote from the document that do not reflect its true content, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 113.

114.    S&P admits that language similar to that quoted in Paragraph 114 appears in the IOSCO Code, avers that the allegations are a selective quote from the document that do not reflect its true content, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 114.

115.    S&P admits that the language quoted in Paragraph 115 appears in a 2005 Code of Conduct, avers that the allegations are a selective quote from the document that do not reflect its true content, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 115.

116.    S&P admits that the language quoted in Paragraph 116 appears in the

778956.01

S&P Ratings' 2005 Analytic Firewalls Policy, avers that the allegations are a selective quote from the document that do not reflect its true content, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 116.

117.   S&P admits that the language quoted in Paragraph 117 appears in the February 2006 "Report On Implementation of S&P's Rating Services Code of Conduct," avers that the allegations are a selective quote from the document that do not reflect its true content, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 117.

118.   S&P admits that the language quoted in Paragraph 118 appears in the referenced Annual Reports, avers that the allegations are selective quotations from the documents that do not reflect their true content, refers to the full documents for their complete content, and otherwise denies the allegations in Paragraph 118.

119.   S&P admits that the language quoted in Paragraph 119(a) appears in a July 28, 2003 letter to the SEC written by an S&P Ratings employee, admits that the language quoted in Paragraph 119(b) appears in June 2004 congressional testimony by an S&P Ratings employee, admits that the language quoted in Paragraph 119(c) appears in February 2005 congressional testimony by an S&P Ratings employee, admits that the language quoted in Paragraph 119(d) appears in April 2007 congressional testimony by an S&P Ratings employee, avers that the allegations are selective quotations from the documents that do not reflect their true content, refers to the full documents for their complete content, and otherwise denies the allegations in Paragraph 119.

120.   S&P admits that the language quoted in Paragraphs 120(a) and 120(b) appears in an August 23, 2007 publication entitled, "The Fundamentals of Structured Finance Ratings," admits that the language quoted in Paragraph 120(c) appears in an August 31, 2007 OpEd piece written by an S&P Ratings employee

- 21 -

CORRECTED ANSWER
CASE NO. CV13-00779 (DOC)

778956.01

and published in the Wall Street Journal entitled, "Don't Blame the Rating Agencies," avers that the allegations are selective quotations from the publications that do not reflect their true content, refers to the full publications for their complete content, and otherwise denies the allegations in Paragraph 120.

121.    S&P admits that the language quoted in Paragraph 121(a) appears in S&P Ratings letters for structured finance securities, admits that the language quoted in Paragraph 121(b) appears in a 2005 Code of Conduct , admits that the language quoted in Paragraph 121(c) appears in a June 8, 2007 publication entitled, "An Introduction to CDOs and Standard & Poor's Global CDO Ratings," admits that the language quoted in Paragraph 121(d) appears in September 2007 congressional testimony by an S&P Ratings employee, avers that the allegations are selective quotations from the documents that do not reflect their true content, refers to the full documents for their complete content, and otherwise denies the allegations in Paragraph 121.

122.    S&P admits that the language quoted in Paragraph 122(a) appears in a November 2006 presentation, admits that the language quoted in Paragraph 122(b) appears in a February 2007 presentation, admits that language similar to that quoted in Paragraph 122(c) appears in a transcript of statements made by an S&P Ratings employee on a March 29, 2007 conference call, admits that the language quoted in Paragraph 122(d) appears in a publication originally published on April 2, 2007, and republished on April 5, 2007 entitled, "Standard & Poor's Weighs in on the U.S. Subprime Mortgage Market," admits that the language quoted in Paragraph 122(e) appears in April 2007 congressional testimony by an S&P Ratings employee, admits that the language quoted in Paragraph 122(f) appears in a June 8, 2007 publication entitled, "An Introduction to CDOs and Standard & Poor's Global CDO Ratings," avers that the allegations are selective quotations from the documents that do not reflect their true content, and otherwise denies the allegations

in Paragraph 122.

123.   S&P denies the allegations in Paragraph 123 and incorporates herein its response to Paragraph 9 above.

124.   S&P denies the allegations in Paragraph 124 and incorporates herein its response to Paragraph 9 above.

125.   S&P admits that language quoted in Paragraph 125 appears in a draft document that was circulated in preparation for a meeting scheduled for April 20, 2004, avers that the allegations are a selective paraphrase of the document that do not reflect its true content, avers that seeking input and feedback from various market participants regarding, and assessing the rating implications of, a proposed criteria change was permissible under and consistent with S&P Ratings' policies and procedures, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 125.

126.   S&P admits that the language quoted in Paragraph 126 appears in an email sent by an S&P Ratings employee, avers that the allegations are a selective quote from the document that do not reflect its true content, avers that seeking input and feedback from various market participants regarding, and assessing the rating implications of, a proposed criteria change was permissible under and consistent with S&P Ratings' policies and procedures, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 126.

127.   S&P admits that the language quoted in Paragraph 127 appears in a 2004 document entitled, "Global Structured Finance Criteria Process," avers that the allegations are a selective quote from the document that do not reflect its true content, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 127.

128.   S&P admits that the language quoted in Paragraph 128 appears in a 2004 document entitled, "Global Structured Finance Criteria Process," avers that

778956.01

1   the allegations are a selective quote from the document that do not reflect its true

2   content, refers to the full document for its complete content, and otherwise denies

3   the allegations in Paragraph 128.

4          129.   S&P denies the allegations in Paragraph 129.

5          130.   S&P admits that the language quoted in Paragraph 130 appears in

6   emails dated August 17 and 18, 2004 sent by S&P Ratings employees, avers that

7   the document cited in Paragraph 130 was also cited in the *Summary Report of*

8   *Issues Identified in the Commission Staff's Examination of Select Credit Rating*

9   *Agencies* publicly issued by the SEC in July 2008 and that the SEC stated, in the

10  same section of the report, that "there is no evidence that decisions about rating

11  methodology or models were made based on attracting or losing market share,"

12  avers that the communication did not reflect or result in any change to S&P Ratings

13  criteria that was not determined to be analytically appropriate by an S&P Ratings

14  committee, and avers that the allegations are a selective paraphrase of the document

15  that do not reflect its true content.  S&P refers to the full document for its complete

16  content and otherwise denies the allegations in Paragraph 130.

17         131.   S&P admits that language similar to that quoted in Paragraph 131

18  appears in a Credit Market Services Global Structured Finance Ratings 2006

19  Strategic Plan, avers that the allegations are selective quote from the document that

20  do not reflect its true content, refers to the full document for its complete content,

21  and otherwise denies the allegations in Paragraph 131.

22         132.   S&P admits that the language quoted in Paragraph 132 appears in a

23  2006 CDO Strategic Plan, avers that the allegations are a selective quote from the

24  document that do not reflect its true content, refers to the full document for its

25  complete content, and otherwise denies the allegations in Paragraph 132.

26         133.   S&P admits that S&P Ratings used versions of the LEVELS model as

27  part of its rating analysis for new issue U.S. RMBS during the Time Period at Issue,

28

778956.01

that the LEVELS model was used in part to assess the amount of expected losses to a particular pool in various rating scenarios, and otherwise denies the allegations in Paragraph 133.

134.   S&P denies the allegations in Paragraph 134.

135.   S&P denies the allegations in Paragraph 135.

136.   S&P admits upon information and belief that originations of mortgage loans variously categorized as "Alt-A" and "subprime" increased between 1999 and 2006, admits that such Alt-A and subprime mortgages were included in the collateral pools backing certain RMBS issued during the same time period, admits that some CDOs issued during the same time period were backed by pools of collateral that included some portion of RMBS backed in whole or in part by such Alt-A or subprime mortgages, and otherwise denies the allegations in Paragraph 136.

137.   S&P admits that language quoted in Paragraph 137 appears in a November 5, 2003 publication entitled, "Refinements in Standard & Poor's LEVELS and DACSS Keep Pace with Fast-Moving U.S. RMBS Market," avers that the allegations are a selective quote from the document that do not reflect its true content, refers to the full publication for its complete content, and otherwise denies the allegations in Paragraph 137.

138.   S&P denies the allegations in Paragraph 138.

139.   S&P admits that S&P Ratings acquired a data set concerning approximately 643,000 residential mortgages in or about 2002, admits that the data set included adjustable rate loans in addition to fixed rate loans, avers that the data was purchased and analyzed in connection with an ongoing research effort toward the development of an econometric equation for predicting potential mortgage defaults (the "Equation"), avers that the results of those efforts were deemed to be insufficiently reliable to be incorporated into S&P Ratings' models, and otherwise

CORRECTED ANSWER
CASE NO. CV13-00779 (DOC)

778956.01

denies the allegations in Paragraph 139.

140.   S&P admits that, during 2004, S&P Ratings considered potentially incorporating the Equation referenced in Paragraph 139 into a new version of the LEVELS model that would be called LEVELS 6.0, avers that the incorporation of the Equation into the proposed model produced results that were deemed to be insufficiently reliable for incorporation into any actual S&P Ratings model, and otherwise denies the allegations in Paragraph 140.

141.   S&P avers that the proposed new model was not approved as analytically appropriate and otherwise denies the allegations in Paragraph 141.

142.   S&P admits that S&P Ratings released an April 26, 2004 publication entitled, "Taking U.S. Mortgage Analytics to New LEVELS," admits that at some point after its publication the article was removed from the website, avers that the proposed model described in the publication was never approved as analytically appropriate and was therefore never released, and otherwise denies the allegations in Paragraph 142.

143.   S&P avers that the effect of the unreleased LEVELS 6.0 model that was being considered in 2004 would have varied from transaction to transaction, depending upon the specific characteristics of the loans in any particular pool of collateral.  For example, some testing of a test model that included the Equation showed that it would have estimated a lower probability of default for certain adjustable rate and hybrid mortgages than for certain fixed-rate mortgages.  This was among the reasons that the results of the Equation, and the proposed LEVELS version that would have included it, were deemed insufficiently reliable to be included in an S&P Ratings model.  S&P otherwise denies the allegations in Paragraph 143.

144.   S&P admits that language similar to that quoted in Paragraph 144 appears in an email dated May 25, 2004 sent by an S&P Ratings employee, avers

CORRECTED ANSWER
CASE NO. CV13-00779 (DOC)

778956.01

that the email cited in Paragraph 144 was also cited in the *Summary Report of Issues Identified in the Commission Staff's Examination of Select Credit Rating Agencies* publicly issued by the SEC in July 2008 and that the SEC stated, in the same section of the report, that "there is no evidence that decisions about rating methodology or models were made based on attracting or losing market share," avers that the email states that S&P's criteria was significantly more conservative than Moody's, avers that no change to S&P Ratings' criteria in fact occurred as a result of the communication (which related to a Japanese RMBS issuance and did not relate to the LEVELS model), and avers that the allegations are a selective quote from the document that do not reflect its true content.  S&P refers to the full document for its complete content and otherwise denies the allegations in Paragraph 144.

145.   S&P denies the allegations in Paragraph 145.

146.   S&P admits that the version of LEVELS under consideration in 2004, to be called LEVELS 6.0, was never released by S&P Ratings in part because it included the Equation which was deemed insufficiently reliable to be included in an S&P Ratings model, admits that S&P Ratings updated LEVELS model multiple times between 2004 and 2006, and throughout the Time Period at Issue, avers that the impact of any version of the LEVELS model on any particular RMBS issuance could only be determined on a case-by-case basis using the specific characteristics of the loans providing collateral for the issuance, and otherwise denies the allegations of Paragraph 146.

147.   S&P admits on information and belief that a PowerPoint presentation was shown to the SFLT at an offsite meeting in February 2005, refers to that presentation for its actual content, but otherwise denies the allegations in Paragraph 147.

148.   S&P denies the allegations in Paragraph 148.

778956.01

149.   S&P denies the allegations in Paragraph 149.

150.   S&P admits that the language quoted in Paragraph 150 appears in an email dated March 23, 2005 written by an S&P Ratings employee, avers that the allegations are a selective quote from the document that do not reflect its true content, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 150.

151.   S&P admits that the language quoted in Paragraph 151 appears in an email dated March 23, 2005 written by an S&P Ratings employee, avers that the allegations are a selective quote from the document that do not reflect its true content, avers that the communication neither reflected nor resulted in any decision to not adopt criteria that was believed to be analytically appropriate, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 151.

152.   S&P admits that the language quoted in Paragraph 152 appears in a June 1, 2006 publication entitled, "Standard & Poor's Enhances LEVELS® 5.7 Model," avers that the allegations are a selective paraphrase of the document that do not reflect its true content, avers that the impact of any version of the LEVELS model on any particular RMBS issuance could only be determined on a case-by-case basis using the specific characteristics of the loans providing collateral for the issuance, refers to the full publication for its complete content, and otherwise denies the allegations in Paragraph 152.

153.   S&P avers that no executive could have or did make any change to the LEVELS 5.7 model unilaterally, avers that the version of LEVELS 5.7 that was released in 2006 did not, in fact, prevent S&P Ratings from issuing lower ratings than Moody's, and otherwise denies the allegations in Paragraph 153.

154.   S&P admits that the language quoted in Paragraph 154 appears in a February 14, 2007 document entitled, "Global ABS/RMG February 2007 Activity

CORRECTED ANSWER
CASE NO. CV13-00779 (DOC)
778956.01

Report," avers that the allegations are a selective quote from the document that do not reflect its true content, refers to the full document for its complete content, avers that the document also states "[g]ood news from the Fed about rate stability and positive signs for housing and inflation," and otherwise denies the allegations in Paragraph 154.

155.   S&P admits that a February 21, 2007 document entitled, "Activity Report: Feb. 2007," was sent to Rose that discusses LEVELS, avers that the referenced document did not contain all of the language quoted in Paragraph 154, and otherwise denies the allegations in Paragraph 155.

156.   S&P admits that Paragraph 156 references a March 1, 2007 publication entitled, "Standard & Poor's Enhances LEVELS® 6.0 Model," avers that the allegations are a selective paraphrase of that publication that do not reflect its true content, avers that the impact of any version of the LEVELS model on any particular RMBS issuance could only be determined on a case-by-case basis using the specific characteristics of the loans providing collateral for the issuance, refers to the full publication for its complete content, and otherwise denies the allegations in Paragraph 156.

157.   S&P admits that the language quoted in Paragraph 157 appears in an April 2007 document entitled, "Global ABS/RMBS April 2007 Activity Report," avers that the allegations are a selective quote from the document that do not reflect its true content, avers that the document also contains the following statements:

- "As expected, the Federal Open Market Committee left the federal funds rate unchanged at 5.25 percent for the sixth consecutive meeting. . . . Long-term yields declined in response to the drop in the tightening bias but later reversed following the stronger-than-expected existing home sales."; and

- "Federal Reserve Board Chairman Ben Bernake [sic] spoke before

- 29 -

778956.01

Congress on February 28, 2007 and stated 'there's not much indication that subprime issues have spread into the broader mortgage market.'" S&P refers to the full document for its complete content and otherwise denies the allegations in Paragraph 157.

158.   S&P denies the allegations in Paragraph 158.

159.   S&P denies the allegations in Paragraph 159.

160.   S&P admits that versions of the CDO Evaluator model were used by S&P Ratings in connection with the rating of cash, synthetic and hybrid CDOs and the model was updated several times after 2003, and otherwise denies the allegations in Paragraph 160.

161.   S&P denies the allegations in Paragraph 161.

162.   S&P denies the allegations in Paragraph 162.

163.   S&P admits that S&P Ratings employees proposed updates to the CDO Evaluator model in the first half of 2004 and otherwise denies the allegations in Paragraph 163.

164.   S&P denies the allegations in Paragraph 164.

165.   S&P denies the allegations in Paragraph 165.

166.   S&P denies the allegations in Paragraph 166.

167.   S&P denies the allegations in Paragraph 167.

168.   S&P admits that S&P Ratings tested a proposed default table for corporate assets and otherwise denies the allegations in Paragraph 168.

169.   S&P admits that S&P Ratings decided not to use the proposed corporate default table after concluding that it was not analytically justified, and otherwise denies the allegations in Paragraph 169.

170.   S&P denies the allegations in Paragraph 170.

171.   S&P denies the allegations in Paragraph 171.

172.   S&P admits that the language quoted in Paragraph 172 appears in an email dated February 15, 2005 written by an S&P Ratings employee, avers that the allegations are a selective paraphrase of the document that do not reflect its true content, avers that the communication neither reflected nor resulted in any decision to adopt criteria that was not believed to be analytically appropriate, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 172.

173.   S&P admits that the language quoted in Paragraph 173 appears in an email dated June 10, 2005 written by an S&P Ratings employee, avers that the allegations are a selective paraphrase of the document that do not reflect its true content, avers that the communication neither reflected nor resulted in any decision to adopt criteria that was not believed to be analytically appropriate, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 173.

174.   S&P admits that the language quoted in Paragraph 174 appears in an email dated June 17, 2005 written by an S&P Ratings employee, avers that the allegations are a selective quote from the document that do not reflect its true content, avers that the communication neither reflected nor resulted in any decision to adopt criteria that was not believed to be analytically appropriate, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 174.

175.   S&P admits that Paragraph 175 references a July 2005 memorandum entitled, "CDO Credit and Cash Flow Methodologies," avers that the allegations are a selective paraphrase of that document that do not reflect its true content, avers that the "business impact" assessed in the memorandum related to the impact on outstanding ratings (whether they would be subject to potential upgrade or downgrade if certain proposed assumptions were applied), avers that it is necessary

CORRECTED ANSWER
CASE NO. CV13-00779 (DOC)

778956.01

to understand the potential impact of updated assumptions on outstanding ratings in order to assess whether those results would be analytically appropriate, and avers that the memorandum neither reflected nor resulted in any decision to adopt criteria that was not believed to be analytically appropriate.  S&P avers that this internal memorandum also contains the following statement:  "Overall, the belief is that current ratings and credit enhancements are adequate, and the update to the CDO Evaluator assumptions should not lead to significant changes in our requirements." S&P refers to the full document for its complete content and otherwise denies the allegations in Paragraph 175.

176.   S&P admits that the language quoted in Paragraph 176 appears in a July 2005 memorandum entitled, "CDO Credit and Cash Flow Methodologies," avers that the allegations are a selective paraphrase of the document that do not reflect its true content, avers that the memorandum neither reflected nor resulted in any decision to adopt criteria that was not believed to be analytically appropriate, and avers that this internal memorandum also contains the following statement: "Overall, the belief is that current ratings and credit enhancements are adequate, and the update to the CDO Evaluator assumptions should not lead to significant changes in our requirements."  S&P refers to the full document for its complete content and otherwise denies the allegations in Paragraph 176.

177.   S&P denies the allegations in Paragraph 177.

178.   S&P admits that the language quoted in Paragraph 178 appears in a July 20, 2005 document entitled "Global CDO Activity Report," avers that the allegations are a selective quote from the document that do not reflect its true content, avers that the document neither reflected nor resulted in any decision to adopt criteria that was not believed to be analytically appropriate, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 178.

778956.01

179.   S&P admits that the language quoted in Paragraph 179 appears in a July 20, 2005 document entitled "Global CDO Activity Report," avers that the allegations are a selective quote from the document that do not reflect its true content, avers that the document neither reflected nor resulted in any decision to adopt criteria that was not believed to be analytically appropriate, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 179.

180.   S&P admits that the language quoted in Paragraph 180 appears in an email dated August 18, 2005 written by an S&P Ratings employee, avers that the allegations are a selective quote from the document that do not reflect its true content, avers that the deal referenced in the communication is not a CDO of RMBS, refers to the full document for its complete content and otherwise denies the allegations in Paragraph 180.

181.   S&P avers that "E3 Low" was not an alternative version of CDO Evaluator, but rather one of several stress scenarios utilized in the analysis of certain CDOs that was publicly disclosed, including in a December 19, 2005 publication entitled, "S&P Launches Latest Version Of CDO Modeling Tool" ("December 19 Press Release") and a December 27, 2005 publication entitled, "CDO Spotlight: Release of CDO Evaluator 3.0 To Have Limited Ratings Impact On U.S. Synthetic CDO Transactions," refers to those publications for their complete content, and otherwise denies the allegations in Paragraph 181.

182.   S&P admits that S&P Ratings publicly announced the launch of CDO Evaluator Version 3.0 in the December 19 Press Release, avers that "E3 Low" was not an alternative version of CDO Evaluator, but rather one of several stress scenarios utilized in the analysis of a CDO tranche and was publicly disclosed in the publications referenced in its response to Paragraph 181, and avers that the December 19 Press Release also contains the following statement:  "We recognize

CORRECTED ANSWER
CASE NO. CV13-00779 (DOC)

778956.01

that transactions are often structured for some time before ultimately reaching our pipeline.  We therefore felt that a reasonable period is required to ensure an orderly transition in the market.  Until March 31, 2006, arrangers, managers, and investors can use either version of the model to obtain a rating from us.  During this period, we will internally be using both E2.4.3 and E3.0 in parallel, and may request additional credit enhancement if the gap between the models is outside a certain level of tolerance."  S&P refers to that publication for its complete content and otherwise denies the allegations in Paragraph 182.

183.   S&P admits that the December 19 Press Release states: "We recognize that transactions are often structured for some time before ultimately reaching our pipeline. We therefore felt that a reasonable period is required to ensure an orderly transition in the market.  Until March 31, 2006, arrangers, managers, and investors can use either version of the model to obtain a rating form us. During this period, we will internally be using both E2.4.3 and E3.0 in parallel, and may request additional credit enhancement if the gap between the models is outside a certain level of tolerance."  S&P avers that the allegations are a selective paraphrase of the document that do not reflect its true content, refers to that publication for its complete content, and otherwise denies the allegations in Paragraph 183.

184.   S&P admits that the language referenced in Paragraph 184 appears in a December 2005 presentation entitled, "E3: Updating the CDO Evaluator," avers that the allegations are a selective quote from the document that do not reflect its true content, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 184.

185.   S&P admits that the December 19 Press Release states that "E3.0 will not be used for cash CDOs until early 2006," admits that language quoted in the second sentence of Paragraph 185 appears in a "FAQ" circulated within S&P

778956.01

Ratings in and around December 2005, avers that the allegations are a selective paraphrase of the documents that do not reflect their true content, refers to the full documents for their complete content, and otherwise denies the allegations in Paragraph 185.

186.   S&P avers that the analysis of cash flow CDOs requires additional assumptions that were incorporated in CDO Evaluator Version 3.0 and that CDO Evaluator Version 3.0 was used to rate cash flow CDOs when these assumptions were approved, and otherwise denies the allegations in Paragraph 186.

187.   S&P admits the language quoted in Paragraph 187 appears in emails dated April 2, 2007, avers that the allegations are a selective paraphrase of the documents that do not reflect their true content, avers that the communication neither reflected nor resulted in any decision to adopt criteria that was not believed to be analytically appropriate, refers to the full documents for their complete contents, and otherwise denies the allegations in Paragraph 187.

188.   S&P admits that S&P Ratings utilized an outside consultant to assist in the development of some assumptions that were used in its CDO rating models and otherwise denies the allegations in Paragraph 188.

189.   S&P denies the allegations in Paragraph 189.

190.   S&P admits that the language quoted in Paragraph 190 appears in an April 2007 presentation entitled, "A New Approach to Estimating ABS PDs," avers that the allegations are a selective paraphrase of the document that do not reflect its true content, avers that the document neither reflected nor resulted in any decision to adopt criteria that was not believed to be analytically appropriate, and otherwise denies the allegations in Paragraph 190.

191.   S&P admits that the language quoted in Paragraph 191 appears in an April 2007 presentation entitled, "A New Approach to Estimating ABS PDs," avers that the allegations are a selective paraphrase of the document that do not reflect its

CORRECTED ANSWER
CASE NO. CV13-00779 (DOC)
778956.01

true content, avers that the document neither reflected nor resulted in any decision to adopt criteria that was not believed to be analytically appropriate, and otherwise denies the allegations in Paragraph 191.

192.   S&P admits that the language quoted in Paragraph 192 appears in an April 2007 presentation entitled, "A New Approach to Estimating ABS PDs," avers that the allegations are a selective paraphrase of the document that do not reflect its true content, avers that the document neither reflected nor resulted in any decision to adopt criteria that was not believed to be analytically appropriate, and otherwise denies the allegations in Paragraph 192.

193.   S&P admits that the language quoted in Paragraph 193 appears in an April 2007 presentation entitled, "A New Approach to Estimating ABS PDs," avers that the allegations are a selective paraphrase of the document that do not reflect its true content, avers that the document neither reflected nor resulted in any decision to adopt criteria that was not believed to be analytically appropriate, and otherwise denies the allegations in Paragraph 193.

194.   S&P avers that a meeting appears to have been held on May 14, 2007 concerning a proposed default matrix and otherwise denies the allegations in Paragraph 194.

195.   S&P admits that the language quoted in Paragraph 195 appears in an email dated June 20, 2007 written by an S&P Ratings employee, avers that the allegations are a selective paraphrase of the document that do not reflect its true content, avers that the statement does not accurately describe any testing that took place, and otherwise denies the allegations in Paragraph 195.

196.   S&P admits that the language quoted in Paragraph 196 appears in an email dated August 2, 2007 written by an S&P Ratings employee, avers that the allegations are a selective paraphrase of the document that do not reflect its true content, avers that the statement does not accurately describe any testing that took

CORRECTED ANSWER
CASE NO. CV13-00779 (DOC)

778956.01

place, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 196.

197.   S&P admits that the language quoted in Paragraph 197 appears in an email dated August 2, 2007 written by an S&P Ratings employee, avers that the allegations are a selective quote from the document that do not reflect its true content, avers that the statement does not accurately describe any criteria or rating process, refers to the full document for its complete content, otherwise denies the allegations in Paragraph 197.

198.   S&P admits that Jordan approved a contract to engage an outside consultant concerning a default matrix project on or about September 13, 2007 and otherwise denies the allegations in Paragraph 198.

199.   S&P hereby incorporates its responses to Paragraphs 200 through 269, and otherwise denies the allegations in Paragraph 199.

200.   S&P admits that RMBS Surveillance analysts were monitoring delinquencies in the mortgage pools underlying non-prime RMBS that S&P Ratings had rated throughout 2006, 2007 and thereafter, admits that by the fall of 2006 RMBS Surveillance was observing rising delinquency rates in those mortgage pools and met on numerous occasions to discuss those delinquencies and their potential impact on RMBS rated by S&P Ratings, and otherwise denies the allegations in Paragraph 200.

201.   S&P denies the allegations in Paragraph 201.

202.   S&P denies the allegations in Paragraph 202.

203.   S&P admits that RMBS Surveillance analysts were monitoring delinquencies in the mortgage pools underlying non-prime RMBS that S&P Ratings had rated throughout 2006, 2007 and thereafter, admits that by the fall of 2006 RMBS Surveillance was observing rising delinquency rates in those mortgage pools and met on numerous occasions to discuss those delinquencies and their potential

778956.01

impact on RMBS rated by S&P Ratings, denies knowledge and information sufficient to form a belief as to the private, subjective reaction of any particular individual, and otherwise denies the allegations in Paragraph 203.

204.    S&P admits that by the fall of 2006 RMBS Surveillance was observing delinquency rates in pools of mortgages underlying non-prime RMBS that S&P Ratings had rated at levels that exceeded their expectations and that realized losses were also materializing faster than expected (although much more slowly than delinquencies and in very low amounts at that point in time), avers that S&P Ratings' surveillance of these pools resulted in it taking rating actions earlier than it historically would have, and otherwise denies the allegations in Paragraph 204.

205.    S&P admits that the language quoted in Paragraph 205 appears in a September 24, 2006 document entitled, "Rating Quality & Knowledge Management Activity Report," avers that the allegations are a selective paraphrase of the document that do not reflect its true content, and avers that the document also states that the "[RMBS] Surveillance group is actively reviewing and heightening our surveillance procedures to ensure that our RMBS remain as timely as possible during the current weakening in the property markets," and that the "good news so far is that: 1) there isn't any undue concentration in a limited number of RMBS bonds (i.e., the CDO of ABS managers haven't all piled into the same high spread RMBS bonds), and 2) on the whole the CDOs of ABS are holding higher rated RMBS tranches (70% of the RMBS bonds held in CDOs of ABS are rated 'A-' or higher)." S&P refers to the full document for its complete content and otherwise denies the allegations in Paragraph 205.

206.    S&P denies the allegations in Paragraph 206.

207.    S&P denies the allegations in Paragraph 207.

208.    S&P denies the allegations in Paragraph 208.

CORRECTED ANSWER
CASE NO. CV13-00779 (DOC)

778956.01

209.   S&P admits that the language quoted in Paragraph 209 appears in an email dated November 14, 2006 written by an S&P Ratings employee, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 209.

210.   S&P admits that Paragraph 210 references a spreadsheet attached to an email dated November 14, 2006 written by an S&P Ratings employee, avers that the spreadsheet may not take into account all potentially available sources of credit support for the listed tranches since the use of the phrase "credit support" may not always have referred to all forms of credit support, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 210.

211.   S&P avers that the allegations in Paragraph 211 are contradicted by the allegation in Paragraph 218 that as early as February 3, 2007 Gillis asked Executive F to "begin discussing taking rating actions earlier on the poor performing deals" and otherwise denies the allegations in Paragraph 211.

212.   S&P admits that the language quoted in Paragraph 212 appears in personal notes entitled, "Confidential Working Notes," avers that the allegations are a selective quote from the document that do not reflect its true content, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 212.

213.   S&P admits that a RMBS Surveillance meeting occurred on or about January 11, 2007, admits that the language quoted in Paragraph 213 appears in an email dated January 10, 2007 and the attached agenda, avers that the allegations are selective quotations from the documents that do not reflect their true content, refers to the full documents for their complete content, and otherwise denies the allegations in Paragraph 213.

214.   S&P admits that language similar to that quoted in Paragraph 214 appears in a January 11, 2007 document entitled, "Surveillance Staff Meeting

CORRECTED ANSWER
CASE NO. CV13-00779 (DOC)

778956.01

Minutes," avers that the allegations are a selective paraphrase of the document that do not reflect its true content, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 214.

215.   S&P admits that the language quoted in Paragraph 215 appears in a January 23, 2007 document entitled, "Global CDO Activity Report," avers that the allegations are a selective quote from the document that do not reflect its true content, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 215.

216.   S&P admits that the language quoted in Paragraph 216 appears in a January 26, 2007 publication entitled, "CDO Spotlight: U.S. Cash Flow CDO Rating Performance Hit New Highs In 2006, While Synthetics Showed Mixed Results; Outlook For 2007 Varies By Deal Type," avers that the allegations are a selective paraphrase of the publication that do not reflect its true content, refers to the full publication for its complete content, and otherwise denies the allegations in Paragraph 216.

217.   S&P admits that the language quoted in Paragraph 217 appears in an email dated February 3, 2007 written by an S&P Ratings employee, avers that the allegations are a selective paraphrase of the document that do not reflect its true content, and avers that in the *Summary Report of Issues Identified in the Commission Staff's Examination of Select Credit Rating Agencies* publicly issued by the SEC in July 2008 the SEC stated that "each rating agency's staffing increase approximately matched the percentage increase in [RMBS] deal volume."  S&P refers to the full document for its complete content and otherwise denies the allegations in Paragraph 217.

218.   S&P admits that RMBS Surveillance was asked to discuss taking rating actions earlier than they might historically have done given the performance trends that were emerging, admits that the language quoted in Paragraph 218

- 40 -

appears in an email dated February 3, 2007 written by an S&P Ratings employee, avers that the allegations are a selective quote from the document that do not reflect its true content, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 218.

219.    S&P admits that a meeting occurred on February 7, 2007 during which analysts considered a list of 52 RMBS tranches, generally rated BBB and below, admits that some analysts at the meeting recommended that 30 of the tranches be placed on CreditWatch Negative and 22 others be placed on an Internal Watch list, avers that the RMBS tranches on the list would not have been considered appropriate for CreditWatch action under the surveillance methodologies that had been applied prior to the meeting, and otherwise denies the allegations in Paragraph 219.

220.    S&P admits that the language quoted in Paragraph 220 appears in an agenda from a February 7, 2007 meeting concerning RMBS Surveillance, avers that the allegations are selective paraphrase of the document that do not reflect its true content, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 220.

221.    S&P admits that it was S&P Ratings' then-existing practice to "notch" the ratings of RMBS tranches included in pools of collateral backing new CDOs if those RMBS tranches were on CreditWatch Negative, admits that all other things being equal such notching would increase S&P Ratings' estimated probability of default for that RMBS tranche, which may or may not have had an impact on its rating opinion with respect to any tranche of the CDO, and otherwise denies the allegations in Paragraph 221.

222.    S&P denies the allegations in Paragraph 222.

223.    S&P admits that the language quoted in Paragraph 223 appears in an email dated February 7, 2007 written by an S&P Ratings employee and otherwise

CORRECTED ANSWER
CASE NO. CV13-00779 (DOC)
778956.01

1  denies the allegations in Paragraph 223.

2       224.   S&P admits that the language quoted in Paragraph 224 appears in an
3  email dated February 7, 2007 written by an S&P Ratings employee, avers that the
4  allegations are a selective quote from the document that do not reflect its true
5  content, and avers that the document also states that Gillis "is eager to put
6  something on Credit [W]atch that will achieve this objective and have reasonable
7  answers to literally the hundreds of phone calls he expects after this action as to our
8  expectations of the future and rationale behind the action."  S&P refers to the
9  complete document for its full content and otherwise denies the allegations in
10 Paragraph 224.

11      225.   S&P admits that a meeting occurred on February 12, 2007 concerning
12 RMBS Surveillance and otherwise denies the allegations in Paragraph 225.

13      226.   S&P admits that the language quoted in Paragraph 226 appears in an
14 agenda from a February 12, 2007 meeting concerning RMBS Surveillance, refers to
15 the full document for its complete content, and otherwise denies the allegations in
16 Paragraph 226.

17      227.   S&P avers that a committee agreed on February 12, 2007 to place
18 RMBS tranches from 11 transactions on CreditWatch Negative, avers that it was
19 not determined at the February 12, 2007 meeting (or at any time) that RMBS
20 surveillance criteria should permit downgrades of RMBS solely on the basis of
21 observed delinquencies, but rather by measuring deal performance against the
22 stressed time to disposition of the loans and a reinstatement rate assumption of zero
23 for all severely delinquent loans, and otherwise denies the allegations in Paragraph
24 227.

25      228.   S&P admits that the language quoted in Paragraph 228 appears in a
26 February 14, 2007 publication entitled, "19 Subprime, Alt-A, Closed-End Second-
27 Lien Ratings From 2006 Vintage Deals Put On Watch Neg," avers that the

28

allegations are a selective paraphrase of the publication that do not reflect its true content, refers to the full publication for its complete content, and otherwise denies the allegations in Paragraph 228.

229.   S&P admits that the language quoted in Paragraph 229 appears in a February 27, 2007 email written by an S&P Ratings employee, avers that the allegations are a selective quote from the document that do not reflect its true content, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 229.

230.   S&P denies the allegations in Paragraph 230.

231.   S&P admits that starting in April 2007 Executive F sent weekly reports to, among others, Gillis, Rose, Bryan, and Jordan concerning CreditWatch and other rating actions being taken by RMBS Surveillance, admits that exception reports were generated for RMBS pools relating to the months of February 2007 through June 2007 and were used by RMBS Surveillance to conduct surveillance, resulting in increasing numbers of CreditWatch actions during that time period which were communicated to S&P Ratings managers and publicly, and otherwise denies the allegations in Paragraph 231.

232.   S&P makes no response to the allegations in Paragraph 232 because these allegations call for a legal conclusion.  To the extent Paragraph 232 contains factual allegations, S&P denies the allegations in Paragraph 232.

233.   S&P denies the allegations in Paragraph 233, except as set forth in its responses to the subparagraphs below.

a.   S&P denies the allegations in Paragraph 233(a).

b.   S&P admits that the language quoted in the first sentence of Paragraph 233(b) appears in a March 1, 2007 instant message exchange between S&P Ratings employees, avers that the allegations are a selective paraphrase of the document that do not reflect its true content, refers to the full document for its

complete content, and otherwise denies the allegations in Paragraph 233(b).

c.     S&P admits that the language quoted in Paragraph 233(c) appears in a March 1, 2007 instant message exchange between S&P Ratings employees, avers that the allegations are a selective quote from the document that do not reflect its true content, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 233(c).

d.     S&P denies knowledge or information sufficient to form a belief as to the content of a telephone conversation of any particular individual.

e.     S&P admits that Paragraph 233(e) references a slide entitled, "CDOs Have Increasingly Been Collateralized by RMBS Subprime" from a March 2007 presentation.  To the extent that Paragraph 233(e) purports to describe the referenced document, S&P avers that the allegations are a selective paraphrase of the document that do not reflect its true content, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 233(e).

f.     S&P admits that the language quoted in Paragraph 233(f) appears in a March 19, 2007 document entitled, "The Fixed Income CDO Group, Monthly Activity Report, March 2007," avers that the allegations are a selective quote from the document that do not reflect its true content, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 233(f).

g.     S&P admits that the language quoted in Paragraph 233(g) appears in emails dated March 12, 2007 written by S&P Ratings employees, avers that the allegations are selective quotations from the documents that do not reflect their true content, avers that the analysis discussed was a scenario analysis, not a rating analysis, refers to the full documents for their complete content, and otherwise denies the allegations in Paragraph 233(g).

h.     S&P admits that the language quoted in Paragraph 233(h) appears in a document created on or around March 19, 2007, avers that the allegations are a

- 44 -

1    selective quote from the document that do not reflect its true content, avers that the

2    document relates to a scenario analysis, not a rating analysis, refers to the full

3    document for its complete content, and otherwise denies the allegations in

4    Paragraph 233(h).

5      i.  S&P admits that the language quoted in Paragraph 233(i) appears in a

6    March 2007 presentation entitled, "Structured Finance Ratings: Overview and

7    Impact of the Residential Subprime Market," avers that the allegations are a

8    selective quote from the document that do not reflect its true content, avers that the

9    presentation also states that "[w]e expect losses to be only slightly worse than 2000

10   vintage [RMBS] ratings" and "[s]ubprime downgrades will continue to increase

11   moderately," refers to the full document for its complete content, and otherwise

12   denies the allegations in Paragraph 233(i).

13     j.  S&P admits that the language quoted in Paragraph 233(j) appears in

14   an email dated March 19, 2007 written by an S&P Ratings employee, avers that the

15   allegations are a selective quote from the document that do not reflect its true

16   content, refers to the full document for its complete content, and otherwise denies

17   the allegations in Paragraph 233(j).

18     k.  S&P admits that the language quoted in Paragraph 233(k) appears in

19   an email dated March 19, 2007 written by an S&P Ratings employee, avers that the

20   allegations are a selective quote from the document that do not reflect its true

21   content, refers to the full document for its complete content, and otherwise denies

22   the allegations in Paragraph 233(k).

23     l.  S&P admits that the language quoted in Paragraph 233(l) appears in

24   an email dated March 21, 2007 written by an S&P Ratings employee, avers that the

25   allegations are a selective quote from the document that do not reflect its true

26   content, refers to the full document for its complete content, and otherwise denies

27   the allegations in Paragraph 233(l).

28

778956.01

m.      S&P admits that language similar to that quoted in Paragraph 233(m) appears in a draft presentation dated March 21, 2007, avers that the allegations are a selective quote from the document that do not reflect its true content, avers that the document also states that there is a "[h]eightened sensitivity around surveillance" at S&P Ratings, that RMBS "[d]eals with high risk profiles are being flagged and scrutinized shortly after issuance," and that "[s]ubprime downgrades will continue to increase moderately," refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 233(m).

n.      S&P admits that the language quoted in Paragraph 233(n) appears in a March 22, 2007 publication entitled, "A Comparison of 2000 and 2006 Subprime RMBS Vintages Sheds Light On Expected Performance," avers that the allegations are a selective quote from the document that do not reflect its true content, avers that the referenced publication also states that "[i]f the country experiences a recession, or if home prices fall dramatically, losses may exceed the 7.75% threshold," refers to the full publication for its complete content, and otherwise denies the allegations in Paragraph 233(m).

o.      S&P admits that the language quoted in the first sentence of Paragraph 233(o) appears in an email dated March 23, 2007 written by an S&P Ratings employee, avers that the allegations are a selective quote from the document that do not reflect its true content, and refers to the full document for its complete content.  To the extent Paragraph 233(o) quotes language that appears in a Fortune magazine article, S&P refers to the referenced publication for its complete content.  S&P otherwise denies the allegations in Paragraph 233(o).

p.      S&P admits that language similar to that quoted in Paragraph 233(p) appears in an email dated March 23, 2007 written by an S&P Ratings employee, avers that the allegations are a selective quote from the document that do not reflect its true content, refers to the full document for its complete content, and

CORRECTED ANSWER
CASE NO. CV13-00779 (DOC)

778956.01

1    otherwise denies the allegations in Paragraph 233(p).

2        q.    S&P admits that Paragraph 233(q) appears to reference an email dated

3    March 26, 2007 written by an S&P Ratings employee, avers that Jordan describes

4    the attached scenario analysis as "preliminary," and refers to full document for its

5    complete content.  S&P incorporates its response to Paragraph 233(g) above and

6    otherwise denies the allegations in Paragraph 233(q).

7        234.    S&P denies the allegations in Paragraph 234, except as set forth in its

8    responses to the subparagraphs below.

9        a.    S&P admits that S&P Ratings issued a rating letter for Gemstone

10   CDO VII Ltd. on or about March 15, 2007 and refers to the full document for its

11   complete content.  S&P avers that the ratings on Gemstone CDO VII were not

12   impacted by the CreditWatch or downgrades taken on RMBS in July 2007.  S&P

13   avers upon information and belief that all tranches of the Gemstone VII CDO rated

14   AAA by S&P Ratings were rated Aaa by Moody's, and that the tranche of the

15   Gemstone CDO VII that S&P Ratings rated AA was rated Aa2 by Moody's.  S&P

16   further avers upon information and belief that the "loss" alleged in the Complaint

17   relates to a decision by M&T Bank to take a write-off relating to the CDO, and that

18   it has since recovered at least $55 million related to that CDO.  S&P otherwise

19   denies the allegations in Paragraph 234(a).

20       b.    S&P admits that S&P Ratings issued a rating letter for Sorin CDO VI,

21   Ltd. on or about March 27, 2007, refers to the full document for its complete

22   content, and admits that the primary analyst for the transaction received the

23   referenced email, asked whether he could forward the email on to others, and later

24   received the video.  S&P avers that the ratings on Sorin CDO VI were not

25   impacted by the CreditWatch or downgrades taken on RMBS in July 2007.  S&P

26   avers upon information and belief that all tranches of the Sorin CDO VI rated

27   AAA by S&P Ratings were rated Aaa by Moody's, that the "loss" alleged in the

28

- 47 -

CORRECTED ANSWER
CASE NO. CV13-00779 (DOC)

778956.01

1    Complaint relates to a decision by Western Corporate Federal Credit Union
2    ("WesCorp") to take a write-off relating to the CDO, and that the National Credit
3    Union Administration ("NCUA") found as part of its Material Loss Review of
4    WesCorp that the credit union's management "implemented an aggressive
5    investment strategy with unreasonable limits in place . . . left WesCorp
6    increasingly vulnerable to significant credit risk, market risk, and liquidity risk
7    through the portfolio's exposure to economic conditions in the residential sector."
8    S&P otherwise denies the allegations in Paragraph 234(b).

9         c.    S&P admits that S&P Ratings issued a rating letter for Cairn Mezz
10   ABS CDO III Ltd. on or about March 29, 2007 and refers to the full document for
11   its complete content.  S&P avers that the ratings on Cairn Mezz ABS CDO III
12   were not impacted by the CreditWatch or downgrades taken on RMBS in July
13   2007.  S&P avers upon information and belief that all tranches of the Cairn Mezz
14   ABS CDO III that were rated AAA by S&P Ratings were rated Aaa by Moody's.
15   S&P further avers upon information and belief that the "loss" alleged in the
16   Complaint relates to a decision by M&T Bank to take a write-off relating to the
17   CDO.  S&P otherwise denies the allegations in Paragraph 234(c).

18        d.    S&P admits that S&P Ratings issued a rating letter for Charles Fort
19   CDO I, Ltd. on or about March 29, 2007 and refers to the full document for its
20   complete content.  S&P avers that the ratings on Charles Fort CDO I were not
21   impacted by the CreditWatch or downgrades taken on RMBS in July 2007.  S&P
22   avers upon information and belief that all tranches of the Charles Fort CDO I that
23   were rated AAA by S&P Ratings were rated Aaa by Moody's, that the "loss"
24   alleged in the Complaint relates to the decision by WesCorp to take a write-off
25   relating to the CDO, and that the NCUA found as part of its Material Loss Review
26   of WesCorp that the credit union's management "implemented an aggressive
27   investment strategy with unreasonable limits in place . . . left WesCorp
28

778956.01

1   increasingly vulnerable to significant credit risk, market risk, and liquidity risk
2   through the portfolio's exposure to economic conditions in the residential sector."
3   S&P otherwise denies the allegations in Paragraph 234(d).

4       235.   S&P denies the allegations in Paragraph 235, except as set forth in its
5   responses to the subparagraphs below.

6       a.   S&P admits that the language quoted in Paragraph 235(a) appears in
7   an April 5, 2007 instant message exchange between two S&P Ratings employees,
8   avers that the instant message purportedly cited in Paragraph 235(a) was also cited
9   in the *Summary Report of Issues Identified in the Commission Staff's Examination*
10  *of Select Credit Rating Agencies* publicly issued by the SEC in July 2008 and that
11  the SEC's report, after citing the instant message and other materials, stated that
12  "there is no evidence that decisions about rating methodology or models were
13  made based on attracting or losing market share," avers that the cited instant
14  message exchange did not refer to "S&P's CDO rating model" at all but rather to a
15  modeling proposal submitted by an entity seeking a rating on a CLO, and avers
16  that S&P Ratings did not issue a rating on the CLO until the analysts were satisfied
17  that the model did capture what they believed to be the risk.  S&P refers to the full
18  document for its complete content and otherwise denies the allegations in
19  Paragraph 235(a).

20      b.   S&P denies the allegations in Paragraph 235(b).

21      c.   S&P admits that language similar to that quoted in the first sentence
22  of Paragraph 235(c) appears in an email dated April 10, 2007, admits that the
23  language referenced in the second sentence of Paragraph 235(c) appears in a
24  presentation attached to an email dated April 18, 2007, avers that the allegations
25  are selective quotations from the documents that do not reflect their true content,
26  refers to the full documents for their complete content, and otherwise denies the
27  allegations in Paragraph 235(c).

28

d.      S&P avers that an S&P Ratings employee conducted internal scenario analyses of the 2005 and 2006 vintage RMBS in April 2007, avers that such a scenario analysis is not a ratings analysis and does not reflect a change in rating opinion by S&P Ratings, avers that the assumptions used for the scenario analysis were neither "conservative" nor reasonable, avers that the analysis was never validated, approved or endorsed by any other S&P Ratings analyst, and otherwise denies the allegations in Paragraph 235(d).

e.      S&P admits the language quoted in Paragraph 235(e) appears in an April 25, 2007 "RMBS & CDO Surveillance Weekly Subprime Update" memorandum, avers that the allegations are a selective quote from the document that do not reflect its true content, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 235(e).

f.      S&P admits that language similar to that quoted in Paragraph 235(f) appears in an April 30, 2007 "RMBS & CDO Surveillance Weekly Subprime Update" memorandum, avers that the allegations are a selective quote from the document that do not reflect its true content, avers that the document also describes significant surveillance actions taken that week, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 235(f).

236.    S&P denies the allegations in Paragraph 236, except as set forth in its responses to the subparagraphs below.

a.      S&P admits that S&P Ratings issued a rating letter for Vertical ABS 2007-1, Ltd. on or about April 10, 2007 and refers to the full document for its complete content.  S&P avers that the ratings on Vertical ABS 2007-1 were not impacted by the CreditWatch or downgrades taken on RMBS in July 2007.  S&P avers upon information and belief that all tranches of the Vertical ABS 2007-1 CDO that were rated AAA by S&P Ratings were rated Aaa by Moody's and that the "loss" alleged in the Complaint relates to alleged "hung warehouse credit risk

CORRECTED ANSWER
CASE NO. CV13-00779 (DOC)

778956.01

exposure" of Citibank.  S&P otherwise denies the allegations in Paragraph 236(a).

b.      S&P admits that S&P Ratings issued a rating letter for Corona Borealis CDO Ltd. on or about April 24, 2007 and refers to the full document for its complete content.  S&P avers that the ratings on Corona Borealis CDO were not impacted by the CreditWatch or downgrades taken on RMBS in July 2007.  S&P avers upon information and belief that all tranches of the Corona Borealis CDO that were rated AAA by S&P Ratings were rated Aaa by Moody's and all tranches that were rated AA by S&P Ratings were rated Aa2 by Moody's, that the "loss" alleged in the Complaint relates to a decision by Eastern Financial Florida Credit Union ("EFFCU") to take a write-off relating to the CDO, and that the NCUA found as part of its Material Loss Review of Eastern Financial Florida Credit Union that the credit union's management did not "adjust[ ] the Board and management's ability to handle the growth and sophistication of the Credit Union's activities, including complex CDO investments and construction and development (C&D) lending" and that "[m]anagement allowed the CDO investment exposure to represent a significant concentration compared to net worth over a short period of time and failed to impose practical limits in the complex and risky investments."  S&P otherwise denies the allegations in Paragraph 236(b).

237.    S&P denies the allegations in Paragraph 237, except as set forth in its responses to the subparagraphs below.

a.      S&P avers that the methodology used to create the exception report referenced therein was different from the methodology applied in prior months and does not take into account all potentially available forms of credit support and is thus not comparable to the result of other exception reports, and otherwise denies the allegations in Paragraph 237(a).

b.      S&P admits that the language quoted in Paragraph 237(b) appears in a May 7, 2007 "RMBS & CDO Surveillance Weekly Subprime Update"

CORRECTED ANSWER
CASE NO. CV13-00779 (DOC)

778956.01

memorandum, avers that the allegations are a selective quote from the document that do not reflect its true content, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 237(b).

c. S&P admits that Paragraph 237(c) references an email dated May 9, 2007 written by an S&P Ratings employee and attached report, refers to the full documents for their complete content, and otherwise denies the allegations in Paragraph 237(c).

d. S&P admits that language similar to that quoted in Paragraph 237(d) appears in a document entitled, "Residential Mortgage Surveillance, Activity Report – May 2007," avers that the allegations are a selective quote from the document that do not reflect its true content, avers that the document also states that the analyst "[c]ontinued to meet with the CDO Surveillance Group to keep them up to date on the various issues affecting outstanding RMBS transactions," refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 237(d).

e. S&P admits that the language quoted in Paragraph 237(e) appears in a May 14, 2007 "RMBS & CDO Surveillance Weekly Subprime Update" memorandum, avers that the allegations are a selective quote from the document that do not reflect its true content, avers that the document also states that there has not been "any significant increase in CDO exposure to Subprime RMBS bonds that have seen ratings lowered or placed on CreditWatch negative," refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 237(e).

f. S&P admits that the language quoted in Paragraph 237(f) appears in a May 21, 2007 document entitled, "Global CDO Activity Report," avers that the allegations are a selective paraphrase of the document that do not reflect its true content, refers to the full document for its complete content, and otherwise denies

the allegations in Paragraph 237(f).

g.      S&P admits that the language quoted in Paragraph 237(g) appears in a May 21, 2007 "RMBS & CDO Surveillance Weekly Subprime Update" memorandum, avers that the allegations are a selective quote from the document that do not reflect its true content, avers that the document also confirms that increasing numbers of RMBS had been put on CreditWatch so far that year, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 237(g).

h.      S&P admits that the language quoted in Paragraph 237(h) appears in a May 29, 2007 "RMBS & CDO Surveillance Weekly Subprime Update" memorandum, avers that the allegations are a selective quote from the document that do not reflect its true content, avers that the "negative rating performance" referenced therein refers to CreditWatch and downgrade actions already taken by S&P, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 237(h).

238.   S&P denies the allegations in Paragraph 238, except as set forth in its responses to the subparagraphs below.

a.      S&P admits that S&P Ratings issued a rating letter for Stack 2007-1 Ltd. on or about May 3, 2007, and an Effective Date RAC letter on or about June 27, 2007, and refers to the full documents for their complete content.  S&P avers that the ratings on Stack 2007-1 were not impacted by the CreditWatch or downgrades taken on RMBS in July 2007.  S&P avers upon information and belief that all tranches of the Stack 2007-1 CDO that were rated AAA by S&P Ratings were rated Aaa by Moody's, that Citigroup Global Markets, Inc. served as the underwriter for the CDO, and that the "loss" alleged in the Complaint relates to "hung warehouse credit risk exposure" of Citibank.  S&P otherwise denies the allegations in Paragraph 238(a).

b.      S&P admits that S&P Ratings issued a letter on or about May 9, 2007 affirming, as of the effective date of May 2, 2007, the ratings issued on March 6, 2007 for Octonion I CDO, Ltd., and refers to the full document for its complete content.  S&P avers that the ratings on Octonion I CDO were not impacted by the CreditWatch or downgrades taken on RMBS in July 2007.  S&P further avers upon information and belief that all tranches of the Octonion I CDO that were rated AAA by S&P Ratings were rated Aaa by Moody's that the tranche of the Octonion I CDO that S&P Ratings rated AA was rated Aa2 by Moody's, that Citigroup Global Markets, Inc. was the arranger for the CDO, and that the "loss" alleged in the Complaint relates to "hung warehouse credit risk exposure" of Citibank.  S&P otherwise denies the allegations in Paragraph 238(b).

c.      S&P admits that S&P Ratings issued a letter on or about May 9, 2007 affirming, as of the effective date of March 18, 2007, the ratings issued on March 8, 2007 for Plettenberg Bay CDO Limited, and refers to the full document for its complete content.  S&P avers that the ratings on Plettenberg Bay CDO were not impacted by the CreditWatch or downgrades taken on RMBS in July 2007.  S&P further avers upon information and belief that all tranches of the Plettenberg Bay CDO rated AAA by S&P Ratings were rated Aaa by Moody's and that the tranches rated A- and BBB were rated A3 and Baa2 respectively by Moody's, that Citigroup Global Markets, Inc. served as the underwriter for the CDO, and that the "loss" alleged in the Complaint relates to "hung warehouse credit risk exposure" of Citibank.  S&P otherwise denies the allegations in Paragraph 238(c).

d.      S&P admits that S&P Ratings issued a rating letter for Acacia Option ARM 1 CDO, Ltd. on or about May 17, 2007, and an Effective Date RAC letter on or about October 3, 2007, and refers to the full documents for their complete content.  S&P avers that the ratings on Acacia Option ARM 1 CDO were not impacted by the CreditWatch or downgrades taken on RMBS in July 2007.  S&P

1  avers upon information and belief that all tranches of the Acacia Option ARM

2  1CDO rated AAA by S&P Ratings were rated Aaa by Moody's and that the

3  tranche rated A by S&P was rated A2 by Moody's, and that the "loss" alleged in

4  the Complaint relates to a decision by First Midwest Bank to take a write-off

5  relating to the CDO.  S&P otherwise denies the allegations in Paragraph 238(d).

6       239.   S&P denies the allegations in Paragraph 239, except as set forth in its

7  responses to the subparagraphs below.

8       a.     S&P admits that the language quoted in Paragraph 239(a) appears in

9  an email dated June 1, 2007 written by an S&P Ratings employee, avers that the

10  allegations are a selective quote from the document that do not reflect its true

11  content, avers that the document also states that "[e]ach week, as RMBS

12  Surveillance is taking negative rating actions on Subprime and other RMBS, we're

13  monitoring the list of CDOs that have exposure. . . .[and] CDO Surveillance

14  analysts are reviewing transactions with significant exposure to

15  downgraded/CreditWatched RMBS," refers to the full document for its complete

16  content, and otherwise denies the allegations in Paragraph 239(a).

17       b.     S&P admits that the language quoted in Paragraph 239(b) appears in a

18  June 4, 2004 "RMBS & CDO Surveillance Weekly Subprime Update"

19  memorandum, avers that the allegations are a selective quote from the document

20  that do not reflect its true content, avers that the document also states that "[e]ach

21  week, as RMBS Surveillance is taking negative rating actions on Subprime and

22  other RMBS, we're monitoring the list of CDOs that have exposure. . . . [and]

23  CDO Surveillance analysts are reviewing transactions with significant exposure to

24  downgraded/CreditWatched RMBS," refers to the full document for its complete

25  content, and otherwise denies the allegations in Paragraph 239(b).

26       c.     S&P admits that the language quoted in Paragraph 239(c) appears in a

27  June 11, 2007 "RMBS & CDO Surveillance Weekly Subprime Update"

28

CORRECTED ANSWER
CASE NO. CV13-00779 (DOC)

778956.01

memorandum, avers that the allegations are a selective paraphrase of the document that do not reflect its true content, and avers that such a "SD versus CS" calculation was not used to determine whether an RMBS tranche should be downgraded but rather to help identify RMBS tranches that might need to be further reviewed, using different methodologies, for potential CreditWatch.  S&P refers to the full document for its complete content and otherwise denies the allegations in Paragraph 239(c).

    d.    S&P admits that the language quoted in Paragraph 239(d) appears in a June 17, 2004 document entitled, "Rating Quality & Knowledge Management Activity Report," avers that the allegations are a selective paraphrase of the document that do not reflect its true content, avers that the document also states that S&P Ratings employees were "actively trying to determine the shape and peak of this current loss cycle."  S&P refers to the full document for its complete content and otherwise denies the allegations in Paragraph 239(d).

    e.    S&P admits that the language quoted in Paragraph 239(e) appears in a June 18, 2007 "RMBS & CDO Surveillance Weekly Subprime Update" memorandum, avers that the allegations are a selective paraphrase of the document that do not reflect its true content, and avers that the document also states that increasing numbers of RMBS had been put on CreditWatch so far that year.  S&P refers to full document for its complete content, and otherwise denies the allegations in Paragraph 239(e).

    f.    S&P admits that language similar to that quoted in Paragraph 239(f) appears in a June 20, 2007 email written by an S&P Ratings employee, avers that the allegations are a selective quote from the document that do not reflect its true content, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 239(f).

    g.    S&P admits that Paragraph 239(g) references an email dated June 25,

CORRECTED ANSWER
CASE NO. CV13-00779 (DOC)

778956.01

2007 written by an S&P Ratings employee, admits that Paragraph 239(g) references a list attached to that email, and admits that language similar to that quoted in Paragraph 239(g) appears in a June 25, 2007 "RMBS & CDO Surveillance Weekly Subprime Update" memorandum.  S&P avers that the allegations are a selective paraphrase of the documents that do not reflect their true content, avers that only four CDOs rated during 2007 appeared on the referenced list of cash flow and hybrid CDOs with exposure to RMBS tranches downgraded or on CreditWatch Negative so far that year, refers to the full documents for their complete content, and otherwise denies the allegations in Paragraph 239(g).

h.      S&P admits that language similar to that quoted in Paragraph 239(h) appears in minutes of a June 27, 2007 SFLT meeting, avers that the allegations are a selective paraphrase of the document that do not reflect its true content, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 239(h).

i.      S&P admits that the language quoted in Paragraph 239(i) appears in emails dated June 27, 2007 written by S&P Ratings employees, avers that the allegations are a selective paraphrase of the documents that do not reflect their true content, refers to the full documents for their complete content and otherwise denies the allegations in Paragraph 239(i).

240.    S&P denies the allegations of Paragraph 240.

241.    S&P denies the allegations in Paragraph 241, except as set forth in its responses to the subparagraphs below.

a.      S&P admits that S&P Ratings issued a letter on or about June 13, 2007 affirming, as of the effective date of May 9, 2007, the ratings issued on February 8, 2007 for NovaStar ABS CDO I, Ltd., and refers to the full document for its complete content.  S&P avers that the ratings on NovaStar ABS CDO I were not impacted by the CreditWatch or downgrades taken on RMBS in July 2007.

778956.01

S&P avers upon information and belief that all tranches of the NovaStar ABS CDO I rated AAA by S&P Ratings were rated AAA by Fitch, that the "loss" alleged in the Complaint relates to a decision by WesCorp to take a write off relating to the CDO, and that the NCUA found as part of its Material Loss Review of WesCorp that the credit union's management "implemented an aggressive investment strategy with unreasonable limits in place . . . left WesCorp increasingly vulnerable to significant credit risk, market risk, and liquidity risk through the portfolio's exposure to economic conditions in the residential sector."   S&P otherwise denies the allegations in Paragraph 241(a).

b.      S&P admits that S&P Ratings issued a rating letter for Acacia CDO 12 Ltd. on or about June 14, 2007 and refers to the full document for its complete content.  S&P avers that the ratings on Acacia CDO 12 were not impacted by the CreditWatch or downgrades taken on RMBS in July 2007.  S&P avers upon information and belief that all tranches of the Acacia CDO 12 rated AAA by S&P Ratings were rated the equivalent Aaa by Moody's, that the "loss" alleged in the Complaint relates to a decision by WesCorp to take a write-off relating to the CDO, and that the NCUA found as part of its Material Loss Review of WesCorp that the credit union's management "implemented an aggressive investment strategy with unreasonable limits in place . . . left WesCorp increasingly vulnerable to significant credit risk, market risk, and liquidity risk through the portfolio's exposure to economic conditions in the residential sector."  S&P otherwise denies the allegations in Paragraph 241(b).

c.      S&P admits that S&P Ratings issued a letter on or about June 15, 2007 affirming, as of the effective date of May 11, 2007, the ratings issued on March 6, 2007 for Pyxis ABS CDO 2007-1 Ltd., and refers to the full document for its complete content.  S&P avers that the ratings on Pyxis ABS CDO 2007-1 were not impacted by the CreditWatch or downgrades taken on RMBS in July

CORRECTED ANSWER
CASE NO. CV13-00779 (DOC)

778956.01

2007.  S&P avers upon information and belief that all tranches of the Pyxis ABS CDO 2007-1 rated AAA by S&P Ratings were rated Aaa by Moody's.  S&P otherwise denies the allegations in Paragraph 241(c).

d.    S&P admits that S&P Ratings issued a letter on or about June 20, 2007 affirming, as of the effective date of February 2, 2007, the ratings issued on November 2, 2006 for IXIS ABS CDO 3 Ltd., and refers to the full document for its complete content.  S&P avers that the ratings on IXIS ABS CDO 3 were not impacted by the CreditWatch or downgrades taken on RMBS in July 2007.  S&P avers upon information and belief that all tranches of the IXIS ABS CDO 3 that were rated AAA by S&P Ratings were rated Aaa by Moody's.  S&P otherwise denies the allegations in Paragraph 241(d).

e.    S&P admits that S&P Ratings issued a letter on or about June 27, 2007 affirming, as of the effective date of June 18, 2007, the ratings it issued on May 3, 2007 for Stack 2007-1 Ltd., and refers to the full document for its complete content.  S&P avers that the ratings on Stack 2007-1 were not impacted by the CreditWatch or downgrades taken on RMBS in July 2007.  S&P avers upon information and belief that all tranches of the Stack 2007-1 CDO that were rated AAA by S&P Ratings were rated Aaa by Moody's, that Citigroup Global Markets, Inc. served as the underwriter for the CDO, and that the "loss" alleged in the Complaint relates to "hung warehouse credit risk exposure" of Citibank.  S&P otherwise denies the allegations in Paragraph 241(e).

242.   S&P denies the allegations in Paragraph 242.

243.   S&P denies the allegations in Paragraph 243.

244.   S&P denies the allegations in Paragraph 244, except as set forth in its responses to the subparagraphs below.

a.    S&P admits that S&P Ratings issued a letter on or about June 28, 2007 affirming, as of the effective date of May 27, 2007, the ratings it issued on

778956.01

March 28, 2007 for Laguna Seca Funding I, Ltd., and refers to the full document for its complete content.  S&P avers that the ratings on Laguna Seca Funding I were not impacted by the CreditWatch or downgrades taken on RMBS in July 2007.  S&P avers upon information and belief that all tranches of the Laguna Seca Funding I CDO that were rated AAA by S&P Ratings were rated Aaa by Moody's.  S&P otherwise denies the allegations in Paragraph 244(a).

b.     S&P admits that S&P Ratings issued a rating letter for Ridgeway Court Funding II Ltd. on or about June 27, 2007 and refers to the full document for its complete content.  S&P avers that the ratings on Ridgeway Court Funding II were not impacted by the CreditWatch or downgrades taken on RMBS in July 2007.  S&P avers upon information and belief that all tranches of the Ridgeway Court Funding II CDO that were rated AAA by S&P Ratings were rated Aaa by Moody's, and that the "loss" alleged in the Complaint relates to a decision by EFFCU to take a write down relating to the CDO.  S&P otherwise denies the allegations in Paragraph 244(b).

245.   S&P denies the allegations in Paragraph 245.

246.   S&P admits that the language quoted in Paragraph 246 appears in an email dated June 29, 2007 written by an S&P Ratings employee, avers that the allegations are a selective quote from the document that do not reflect its true content, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 246.

247.   S&P admits that the language quoted in Paragraph 247 appears in an email dated June 29, 2007 written by an S&P Ratings employee, avers that the allegations are a selective quote from the document that do not reflect its true content, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 247.

778956.01

248.   S&P admits that the language quoted in Paragraph 248 appears in an email dated July 1, 2007 written by an S&P Ratings employee, avers that the allegations are a selective quote from the document that do not reflect its true content, and avers that the spreadsheet identifying RMBS tranches to be reviewed had not been finalized at the time, as Gillis acknowledges in the referenced email: "The list needs some additional work."  S&P refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 248.

249.   S&P admits that language similar to that quoted in Paragraph 249 appears in emails dated July 3 through July 11, 2007, including emails written by an S&P Ratings employee, avers that the allegations are a selective quote from the document that do not reflect its true content, avers that the author of the email had no personal knowledge regarding the statements quoted from July 5, refers to the full documents for their complete content, and otherwise denies the allegations in Paragraph 249.

250.   S&P avers that S&P Ratings held a meeting on July 5, 2007 concerning the timing for the implementation of certain proposed procedures for RMBS Surveillance, that S&P Ratings held a meeting on July 5, 2007 concerning proposed criteria changes regarding RMBS Surveillance, and otherwise denies the allegations in Paragraph 250.

251.   S&P admits that language similar to that quoted in Paragraph 251 appears in an email dated July 6, 2007 written by an S&P Ratings employee, avers that the allegations are a selective quote from the document that do not reflect its true content, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 251.

252.   S&P admits that S&P Ratings issued a July 10, 2007 publication entitled, "612 U.S. Subprime RMBS Classes Put On Watch Neg; Methodology Revisions Announced," avers that S&P Ratings issued a corrected version of this

1  press release on July 11, 2007, refers to the full documents for their complete

2  content, and otherwise denies the allegations in Paragraph 252.

3      253.   S&P admits that Paragraph 253 references a July 10, 2007 publication

4  entitled, "612 U.S. Subprime RMBS Classes Put On Watch Neg; Methodology

5  Revisions Announced," avers that the allegations are a selective paraphrase of the

6  publication that do not reflect its true content and are inaccurate, refers to the

7  corrected version of the full document issued on July 11, 2007 for its complete

8  content, and otherwise denies the allegations in Paragraph 253.

9      254.   S&P admits that language similar to that quoted in Paragraph 254

10 appears in an email dated July 11, 2007 written by an S&P Ratings employee, avers

11 that the allegations are a selective quote from the document that do not reflect its

12 true content, refers to the full document for its complete content, and otherwise

13 denies the allegations in Paragraph 254.

14     255.   S&P admits that Paragraph 255 references a July 12, 2007 publication

15 entitled, "Various U.S. First-Lien Subprime RMBS Classes Downgraded," refers to

16 the full publication for its complete content, and otherwise denies the allegations in

17 Paragraph 255.

18     256.   S&P denies the allegations in Paragraph 256.

19     257.   S&P denies the allegations in Paragraph 257.

20     258.   S&P admits that Paragraph 258 references a July 12, 2007 email

21 written by an S&P Ratings employee, avers that the allegations are a selective

22 paraphrase of the document that do not reflect its true content, refers to the full

23 document for its complete content, and otherwise denies the allegations in

24 Paragraph 258.

25     259.   S&P admits that an S&P Ratings employee forwarded an email on

26 July 13, 2007 attaching the cartoon referenced in Paragraph 259 to two non-S&P

27 employees, avers that the allegations describe this document inaccurately, avers that

28

778956.01

the referenced cartoon appears to have originated from outside S&P, refers to the full document for its complete content, and otherwise denies the allegations in Paragraph 259.

260.   To the extent that Paragraph 260 purports to describe S&P Ratings' criteria and methodologies in the connection with its analysis of structured finance securities, S&P refers to its published criteria, including the July 18, 2007 publication entitled, "S&P Comments On Process For Rating New CDOs With U.S. RMBS Exposure" ("July 18 Press Release"), for its complete content.  S&P otherwise denies the allegations in Paragraph 260.

261.   S&P denies the allegations in Paragraph 261, except as set forth in its responses to the subparagraphs below.

a.   S&P admits that S&P Ratings issued a rating letter for Pinnacle Peak CDO I, Ltd. on or about July 3, 2007, and an Effective Date RAC letter on or about October 15, 2007, and refers to the full documents for their complete content.  S&P avers upon information and belief that all tranches of the Pinnacle Peak CDO I that were rated AAA by S&P Ratings were rated Aaa by Moody's, that Citigroup Global Markets, Inc. served as the underwriter for the CDO, and that the "loss" alleged in the Complaint relates to a credit line extended by Citibank to the CDO.  S&P otherwise denies the allegations in Paragraph 261(a).

b.   S&P admits that S&P Ratings issued a letter on or about July 6, 2007 affirming, as of the effective date of June 15, 2007, the ratings it issued on March 29, 2007 for Charles Fort CDO I, Ltd., and refers to the full document for its complete content.  S&P avers that the ratings on Charles Fort CDO I were not impacted by the CreditWatch or downgrades taken on RMBS in July 2007.  S&P avers upon information and belief that all tranches of the Charles Fort CDO I that were rated AAA by S&P Ratings were rated Aaa by Moody's, that the "loss" alleged in the Complaint relates to a decision by WesCorp to take a write-off with

778956.01

1   respect to the CDO, and that the NCUA found as part of its Material Loss Review
2   of WesCorp that the credit union's management "implemented an aggressive
3   investment strategy with unreasonable limits in place . . . left WesCorp
4   increasingly vulnerable to significant credit risk, market risk, and liquidity risk
5   through the portfolio's exposure to economic conditions in the residential sector."
6   S&P otherwise denies the allegations in Paragraph 261(b).

7          c.     S&P admits that S&P Ratings issued a rating letter for Pine Mountain
8   CDO III, Ltd. on or about July 11, 2007 and refers to the full document for its
9   complete content.   S&P avers that the ratings on Pine Mountain CDO III were not
10  impacted by the CreditWatch or downgrades taken on RMBS in July 2007.  S&P
11  avers upon information and belief that all tranches of Pine Mountain CDO III that
12  were rated AAA by S&P Ratings were rated Aaa by Moody's.  S&P otherwise
13  denies the allegations in Paragraph 261(c).

14         d.     S&P admits that S&P Ratings issued a rating letter for Ballyrock ABS
15  CDO 2007-1 Limited on or about July 12, 2007 and refers to the full document for
16  its complete content.  S&P avers that the ratings on Ballyrock ABS CDO 2007-1
17  were not impacted by the CreditWatch or downgrades taken on RMBS in July
18  2007.  S&P avers upon information and belief that all tranches of the Ballyrock
19  ABS CDO 2007-1 that were rated AAA by S&P Ratings were rated Aaa by
20  Moody's.  S&P otherwise denies the allegations in Paragraph 261(d).

21         e.     S&P denies the allegations in Paragraph 261(e).

22         262.   S&P admits that Paragraph 262 references the July 18 Press Release,
23  avers that the allegations are a selective paraphrase of the publication that do not
24  reflect its true content and are inaccurate, and avers that the July 18 Press Release
25  contains the following statement: "These guidelines are intended to increase levels
26  of credit support for new CDO transactions to help mitigate the impact of future
27  changes in the ratings on the underlying U.S. RMBS collateral and CDO collateral."
28

- 64 -

778956.01

1  S&P refers to the full publication for its complete content and otherwise denies the

2  allegations in Paragraph 262.

3      263.   To the extent that Paragraph 263 purports to describe S&P Ratings'

4  criteria and methodologies in the connection with its analysis of structured finance

5  securities, S&P refers to its published criteria, including the July 18 Press Release,

6  for its complete content.  S&P avers that the July 18 Press Release contains the

7  following statement: "[S&P Ratings] will continue to evaluate proposed

8  transactions on a case-by-case basis (including those that consist of a mix of the

9  Affected U.S. RMBS and CDO Collateral, and other types of collateral), taking into

10 consideration the proposed structure, collateral, and desired rating."  S&P otherwise

11 denies the allegations in Paragraph 263.

12     264.   S&P admits that S&P Ratings issued a closing date rating letter for

13 Delphinus CDO 2007-1 on or about July 19, 2007 and refers to that document for

14 its complete content.  S&P avers that on July 18, 2012 the SEC charged the

15 structurer of Delphinus CDO 2007-1 and three of its former employees with

16 misleading investors by providing false information about the collateral backing the

17 CDO to S&P in order to "inflate" S&P's credit rating opinion.  The SEC

18 specifically alleged, among other things, that the structurer and employees knew

19 that "if they had supplied S&P with the true asset portfolio on July 18, 2007,

20 Delphinus would not have received the necessary ratings and thus could not have

21 closed as planned."  S&P otherwise denies the allegations in Paragraph 264.

22     265.   S&P denies the allegations in Paragraph 265.

23     266.   S&P denies the allegations in Paragraph 266.

24     267.   S&P admits that S&P Ratings issued press releases on October 15, 17

25 and 19, 2007 announcing ratings actions on certain RMBS securities and refers to

26 the full publications for their complete content.  S&P denies knowledge or

27 information sufficient to form a belief as to the truth or falsity of the allegations

28

778956.01

concerning the pricing of CDOs, and otherwise denies the allegations in Paragraph 267.

268.   S&P admits that S&P Ratings issued press releases on October 15, 17 and 19, 2007 announcing ratings actions on certain RMBS securities and refers to the full publications for their complete content.  S&P otherwise denies the allegations in Paragraph 268.

269.   S&P denies the allegations in Paragraph 269.

270.   S&P repeats and restates its responses set forth in Paragraphs 45 through 52, inclusive, as if fully set forth herein, incorporates herein its responses to Paragraphs 5 and 6, and otherwise denies the allegations in Paragraph 270.

271.   S&P repeats and restates its responses set forth in Paragraphs 123 through 269, inclusive, as if fully set forth herein, incorporates herein its response to Paragraph 9, and otherwise denies the allegations in Paragraph 271.

272.   S&P repeats and restates its responses set forth in Paragraphs 110 through 122, inclusive, as if fully set forth herein, incorporates herein its response to Paragraph 9, and otherwise denies the allegations in Paragraph 272.

273.   S&P repeats and restates its responses set forth in Paragraphs 91 through 95, inclusive, as if fully set forth herein, and otherwise denies the allegations in Paragraph 273.

274.   S&P repeats and restates its responses set forth in Paragraphs 200 through 269, inclusive, as if fully set forth herein, incorporates herein its response to Paragraph 9, and otherwise denies the allegations in Paragraph 274.

275.   S&P avers on information and belief that the "losses . . . in excess of $5 billion" referenced in Paragraph 275 include more than $4.6 billion of losses allegedly incurred by Bank of America and Citibank (or their affiliates) with respect to CDOs (or related issuances) that they or their affiliates arranged, structured, marketed and/or sold, and avers upon information and belief that some or all of the

778956.01

1   losses alleged did not arise from "investment decisions" by these entities, but rather
2   from their roles as arranger, structurer, counterparty, or underwriter of the CDOs or
3   issuances related to the CDOs.  S&P further avers upon information and belief that
4   more than $1 billion of the alleged losses relate to notes that were never issued.
5   S&P otherwise denies the allegations in Paragraph 275.

6        276.   S&P repeats and restates its responses set forth in Paragraphs 110
7   through 275, inclusive, as if fully set forth herein and otherwise denies the
8   allegations in Paragraph 276.

9        277.   S&P denies the allegations in Paragraph 277.

10        278.   S&P denies the allegations in Paragraph 278.

11        279.   S&P denies the allegations in Paragraph 279 and repeats and restates
12   its responses set forth in Paragraphs 1 through 278, inclusive, as if fully set forth
13   herein.

14        280.   To the extent Paragraph 280 contains a legal conclusion, S&P makes
15   no response to those allegations, except admits that the Plaintiff purports to institute
16   proceedings pursuant to 12 U.S.C. § 1833a, and otherwise denies the allegations in
17   Paragraph 280.

18        281.   S&P repeats and restates its responses set forth in Paragraphs 1
19   through 278, inclusive, as if fully set forth herein.

20        282.   To the extent Paragraph 282 contains a legal conclusion, S&P makes
21   no response to those allegations, except admits that the Plaintiff purports to institute
22   proceedings pursuant to 12 U.S.C. § 1833a, and otherwise denies the allegations in
23   Paragraph 282.

24        283.   S&P repeats and restates its responses set forth in Paragraphs 1
25   through 278, inclusive, as if fully set forth herein.

26        284.   To the extent Paragraph 284 contains a legal conclusion, S&P makes
27   no response to those allegations, except admits that the Plaintiff purports to institute

28

778956.01

proceedings pursuant to 12 U.S.C. § 1833a, and otherwise denies the allegations in Paragraph 284.

285.   S&P repeats and restates its responses set forth in Paragraphs 1 through 278, inclusive, as if fully set forth herein.

286.   To the extent Paragraph 286 contains a legal conclusion, S&P makes no response to those allegations, except admits that the Plaintiff purports to institute proceedings pursuant to 12 U.S.C. § 1833a, and otherwise denies the allegations in Paragraph 286.

## **DEFENSES**

Defendants assert the following Defenses in response to the allegations set forth in the Complaint.  Defendants reserve the right to amend this Answer, to amend, modify and/or supplement its Defenses, and to plead and assert additional Defenses as they become known and appropriate during the course of the litigation. The statement of any Defense does not assume the burden of proof on any issue as to which applicable law places the burden on Plaintiff.  To the extent that any of the Defenses asserted herein or to be asserted in the future is mutually exclusive with another Defense asserted herein or to be asserted in the future, such Defense is asserted in the alternative to the other.

### FIRST DEFENSE

Defendants are not liable because the statements challenged in the Complaint were not false or misleading.

### SECOND DEFENSE

Defendants are not liable because any actions they took with respect to the matters alleged in the Complaint were taken in good faith.

### THIRD DEFENSE

Defendants are not liable because they did not possess the intent required to establish the violations alleged.

- 68 -

## FOURTH DEFENSE

Defendants are not liable because the financial institutions referenced in the Complaint did not act in reliance on any of the statements challenged in the Complaint.

## FIFTH DEFENSE

Defendants are not liable because the statements challenged in the Complaint were not material.

## SIXTH DEFENSE

Defendants are not liable, in whole or in part, because the "bespeaks caution" doctrine applies to the forward-looking statements challenged in the Complaint.

## SEVENTH DEFENSE

Defendants are not liable, in whole or in part, because the alleged damage, injury, or loss, if any, is a result of the comparative fault of third parties.

## EIGHTH DEFENSE

Defendants are not liable, in whole or in part, because the financial institutions referenced in the Complaint, and/or their regulators or administrators, failed to use reasonable care to prevent or diminish any alleged damage, injury or loss.

## NINTH DEFENSE

Defendants are not liable, in whole or in part, because their alleged acts and omissions were not the proximate cause of any damage, loss, injury or gain to any financial institution referenced in the Complaint and the conduct of persons or entities other than Defendants was superseding or intervening cause of any alleged damage, loss, injury or gain.

## TENTH DEFENSE

Defendants are not liable because the financial institutions referenced in the

778956.01

Complaint had actual knowledge of all or some of the facts allegedly misrepresented.  In many cases, the financial institutions referenced in the complaint themselves acted as originator, arranger, warehouse facility, structurer, sponsor, counterparty, lender, underwriter and/or marketer of the CDOs and/or RMBS at issue.

## ELEVENTH DEFENSE

Plaintiff commenced this action in retaliation for Defendants' exercise of their free speech rights with respect to the creditworthiness of the United States of America.  Such free speech is protected under the First Amendment to the United States Constitution and the retaliation, causing and embodied in the commencement of this impermissibly selective, punitive and meritless litigation, is unconstitutional.  Only S&P Ratings downgraded the United States and only S&P Ratings has been sued by the United States, even though the S&P ratings challenged by the United States were no different than those of at least one other rating agency and other rating agencies have made the same assertions of "independence" that are challenged in the Complaint as against S&P.

## TWELFTH DEFENSE

Plaintiff does not have standing to bring a FIRREA claim for violations of 18 U.S.C. §§ 1341 or 1343 because no federally-insured financial institution was affected by any such violation within the meaning of 18 U.S.C. § 1833a.

## THIRTEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, for failure to state a claim upon which relief can be granted.

## FOURTEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because the damage, loss, injury or gain alleged did not result from any violation of 18 U.S.C. §§ 1341, 1343 or 1344.

CORRECTED ANSWER
CASE NO. CV13-00779 (DOC)

778956.01

## FIFTEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because the financial institutions described in the Complaint have recovered, in whole or in part, on their damages, injuries and/or losses.

## SIXTEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of ratification to the extent that the financial institutions referenced in the Complaint, and/or their regulators or administrators, have continued to use S&P's ratings services after first learning of the information that forms the basis for the allegations in the Complaint.

## SEVENTEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, based upon the doctrine of unclean hands on the part of those allegedly "affected" by the alleged scheme.

## EIGHTEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, based upon the doctrine of assumption of risk by those allegedly "affected" by the alleged scheme.

## NINETEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because an award of the civil penalties sought by the Plaintiff would violate the Excessive Fines Clause of the Eighth Amendment of the United States Constitution.

**WHEREFORE**, Defendants respectfully request that a final judgment be entered in their favor dismissing the Complaint with prejudice; awarding Defendants the reasonable costs of this action, including reasonable attorneys' fees; and granting Defendants such other and further relief as the Court deems just and proper.

778956.01

**DEMAND FOR JURY TRIAL**

Defendants hereby demand a jury trial.

Dated:  September 3, 2013            KEKER & VAN NEST LLP


By: */s/ John W. Keker*
John W. Keker

CORRECTED ANSWER
CASE NO. CV13-00779 (DOC)

778956.01