1    **UNITED STATES DISTRICT COURT**

2    **CENTRAL DISTRICT OF CALIFORNIA**

3    **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                  – – – – – – –

5    UNITED STATES OF AMERICA,          )
                                        )
6              Plaintiff,               )
                                        )
7         vs.                           ) No. LACV 1300779 DOC
                                        )      Volume I
8    McGRAW-HILL COMPANIES, INC., and   )
     STANDARD & POOR'S FINANCIAL        )
9    SERVICES LLC,,                     )
                                        )
10             Defendants.              )
     _____)

11

12

13

14              REPORTER'S TRANSCRIPT OF PROCEEDINGS

15               Hearing on Motion to Dismiss

16                 Santa Ana, California

17                 Monday, July 8, 2013

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141
24

25   13cv0779 McGraw-Hill 2013-07-08 V1

1    **APPEARANCES OF COUNSEL:**

2

     FOR THE UNITED STATES OF AMERICA:

3

4

5        OFFICE OF US ATTORNEY
         BY:  George S. Cardona
             Chief Assistant United State Attorney
6        312 North Spring Street
         12th Floor
7        Los Angeles, California 90012-4700
         213-894-2434

8

9        Anoiel Khorshid
         AUSA – Office of US Attorney
10       Civil Division – Federal Building
         300 North Los Angeles Street
11       Room 7616
         Los Angeles, California 90012
12       213-894-6086

13

         James T. Nelson, Trial Attorney
14       United States Department of Justice
         P.O. Box 386
15       Washington, D.C. 20044
         202-616-2376

16

17

18   FOR DEFENDANT McGRAW-HILL COMPANIES, INC. and STANDARD & POOR'S
     FINANCIAL SERVICES LLC:

19

         John W. Keker
20       KEKER AND VAN NEST LLP
         710 Sansome Street
21       San Francisco, California 94111
         415-391-5400

22

         Steven K. Taylor
23       KEKER AND VAN NEST LLP
         633 Battery Street
24       San Francisco, California 94111
         415-391-5400

25

LACV 1300779 DOC – 7/8/2013 – Volume I

3

1

2    **APPEARANCES OF COUNSEL (Continued):**

3

4    FOR THE DEFENDANT McGRAW-HILL COMPANIES, INC. and STANDARD & POOR'S
     FINANCIAL SERVICES LLC:

5

6              Jennifer L. Keller
               KELLER RACKAUCKAS UMBERG ZIPSER LLP
7              18300 Von Karman Avenue
               Suite 930
8              Irvine, California 92612
               949-476-8700

9

10             Floyd Abrams
               CAHILL GORDON AND REINDEL LLP
11             80 Pine Street
               New York, New York 10005
12             212-701-3000

13             S. Penny Windle
               CAHILL GORDON AND REINDEL LLP
14             80 Pine Street
               New York, New York 10005
15             212-701-3000

16             Paven Malhotra
               KEKER AND VAN NEST LLP
17             710 Sansome Street
               San Francisco, California 94111
18             415-391-5400

19

20   ALSO PRESENT:

21             Prasanth R. Akkapeddi
               Associate General Counsel
22             McGraw Hill Financial

23

24

25

1

## **I N D E X**

2        **PROCEEDINGS**                                    **PAGE**

3        Hearing on Motion to Dismiss                        5

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LACV 1300779 DOC – 7/8/2013 – Volume I

5

| | |
|---|---|
| 1 | **SANTA ANA, CALIFORNIA, MONDAY, JULY 8, 2013** |
| 2 | **Volume I** |
| 3 | (10:06 a.m.) |
| 10:06  4 | THE COURT:  United States of America v. |
| 5 | McGraw-Hill Companies. |
| 10:06  6 | Counsel, could I start with the government very |
| 7 | slowly, and I'm visual, so I'm going to have you be seated |
| 8 | in certain places. |
| 10:06  9 | Counsel, Mr. Cardona, would you make your |
| 10 | appearance, please. |
| 10:06  11 | MR. CARDONA:  George Cardona from the |
| 12 | U.S. Attorney's Office for the plaintiff. |
| 10:06  13 | MR. KHORSHID:  Good morning, Your Honor.  Anoiel, |
| 14 | spelled, A-N-O-I-E-L; last name, K-H-O-R-S-H-I-D, like |
| 15 | David, for the United States. |
| 10:07  16 | MR. NELSON:  Your Honor, Jim Nelson, from the U.S. |
| 17 | Department of Justice Consumer Protection Branch for the |
| 18 | United States. |
| 10:07  19 | THE COURT:  Mr. Nelson, are you from the |
| 20 | Los Angeles area or Washington D.C.? |
| 10:07  21 | MR. NELSON:  No, Your Honor.  I'm from |
| 22 | Washington D.C. |
| 10:07  23 | THE COURT:  Okay.  And I want you to help me with |
| 24 | the pronunciation of your last name.  Khorshid? |
| 10:07  25 | MR. KHORSHID:  Yes, sir, that's correct. |

| | | |
|---|---|---|
| 10:07 | 1 | THE COURT:  Where are you located? |
| 10:07 | 2 | MR. KHORSHID:  The U.S. Attorney's Office in |
| | 3 | Los Angeles. |
| 10:07 | 4 | THE COURT:  In Los Angeles. |
| 10:07 | 5 | MR. KHORSHID:  Yes. |
| 10:07 | 6 | THE COURT:  Okay.  Thank you. |
| 10:07 | 7 | Mr. Cardona, you're still in Los Angeles? |
| 10:07 | 8 | MR. CARDONA:  Yes, Your Honor. |
| 10:07 | 9 | THE COURT:  Okay.  Thank you very much. |
| 10:07 | 10 | MR. KEKER:  Good morning, Your Honor.  I'm John |
| | 11 | Keker, Keker & Van Nest.  Our offices are in San Francisco. |
| 10:07 | 12 | THE COURT:  And are you located in San Francisco? |
| 10:08 | 13 | MR. KEKER:  Absolutely. |
| 10:08 | 14 | THE COURT:  That's your home.  Okay.  Great city. |
| 10:08 | 15 | Ms. Keller, I know you, but you record doesn't. |
| 10:08 | 16 | MS. KELLER:  Good morning.  Jennifer Keller, |
| | 17 | Keller Rackauckas Umberg & Zipser in Irvine, on behalf of |
| | 18 | McGraw-Hill. |
| 10:08 | 19 | THE COURT:  Gentlemen, I don't know you.  My |
| | 20 | apologies. |
| 10:08 | 21 | MR. TAYLOR:  Steve Taylor of Keker & Van Nest in |
| | 22 | San Francisco. |
| 10:08 | 23 | THE COURT:  So you're with that gentleman? |
| 10:08 | 24 | MR. TAYLOR:  I'm with Mr. Keker, yes. |
| 10:08 | 25 | MR. ABRAMS:  Good morning, Your Honor.  I'm Floyd |

1    Abrams from the Cahill Gordon firm in New York.

10:08    2          THE COURT:  You're from New York?

10:08    3          MR. ABRAMS:  Yes.

10:08    4          THE COURT:  Is that your home also?

10:08    5          MR. ABRAMS:  Yes.

10:08    6          THE COURT:  Would you have a seat for just a

7    second.

10:08    8          We started at 7:30 this morning.  Would you mind

9    if we took a brief -- now, all of you folks, I have no idea

10   who's out in the audience.  Are these associates and related

11   counsel?  Who do I have out there generally?

10:09   12          MR. KEKER:  Your Honor, we have two others:  Paven

13   Malhotra and Penny Windle.

10:09   14          THE COURT:  Why don't you make your appearances.

15   It's good for the record.  You're associates?

10:09   16          MS. WINDLE:  I'm a partner of Mr. Abrams at the

17   Cahill Gordon law firm.

10:09   18          THE COURT:  Excellent.

10:09   19          MR. MALHOTRA:  Pavin Malhotra.  I'm a partner of

20   Mr. Keker.

10:09   21          THE COURT:  Okay.  It's good for the record that

22   you're on the record, then.  All right.  Have a seat.

10:09   23          Now, who are the rest of these folks out here?

10:09   24          MR. CARDONA:  Your Honor, there are some other

25   individuals from my office.

LACV 1300779 DOC – 7/8/2013 – Volume I

8

| | | |
|---|---|---|
| 10:09 | 1 | THE COURT:  Why don't you introduce me to 'em. |
| 10:09 | 2 | MR. CARDONA:  Certainly.  From the Department of |
| | 3 | Justice, we have Tony West, who's the Assistant Attorney |
| | 4 | General. |
| 10:09 | 5 | THE COURT:  Pleasure.  It's nice meeting you.  Are |
| | 6 | you from Washington D.C.? |
| 10:09 | 7 | MR. WEST:  Yes, Your Honor, I am. |
| 10:09 | 8 | THE COURT:  I'm going to want to address a lot of |
| | 9 | the associates, senior counsel for both sides throughout the |
| | 10 | day and this evening about your roles and what counsel |
| | 11 | expect you to play.  So it's good to have you here. |
| 10:09 | 12 | Who else? |
| 10:09 | 13 | MR. CARDONA:  We also have Geoff Graber from |
| | 14 | Washington D.C., as well, Mr. West's office. |
| 10:09 | 15 | THE COURT:  So you must be playing some role |
| | 16 | already, and I want to talk to you gentlemen when I talk to |
| | 17 | counsel.  A lot of decisions we make today or tonight or |
| | 18 | tomorrow or wherever are going to be pretty far-reaching. |
| 10:10 | 19 | Once made, they'll be final.  So I'm going to be |
| | 20 | looking for everybody's wisdom. |
| 10:10 | 21 | Counsel? |
| 10:10 | 22 | MR. CARDONA:  Leon Weidman, who's the chief of our |
| | 23 | civil division here in Los Angeles. |
| 10:10 | 24 | THE COURT:  Pleasure.  Here in Los Angeles.  Okay. |
| 10:10 | 25 | MR. CARDONA:  Richard Robinson, who's the chief of |

DEBBIE GALE, U.S. COURT REPORTER

1    our major fraud section.

10:10    2         THE COURT:  Great.  Would you move to that side of

3    the room.

10:10    4         MR. ROBINSON:  Sure.

10:10    5         THE COURT:  Anybody else on your team or

6    associated with you?  I'd like to put them over there.

10:10    7         MR. CARDONA:  There are some other observers, but

8    not associated with our team.

10:10    9         THE COURT:  Okay.  Ms. Keller, Mr. Keker,

10   Mr. Abrams.

10:10    11        MS. KELLER:  Your Honor, we have Allison Shalinsky

12   in the audience, who's a partner with my firm.

10:10    13        THE COURT:  Nice seeing you again.  Pleasure.

10:10    14        And who else?

10:10    15        MR. KEKER:  None for us.

10:10    16        THE COURT:  The rest are observers or press or

17   somebody?

10:10    18        MR. ABRAMS:  Yes, sir.

10:10    19        THE COURT:  Before we take the break, we already

20   have a tentative prepared.  I'm not certain that that's the

21   correct decision.

10:11    22        So I thought that I'd let you argue your case

23   de novo without a tentative in front of you.  And if I'm

24   convinced that I'm wrong or I've got a strong suspicion, I'm

25   going to hold back that tentative.

10:11   1          If I still think I'm right, I'm going to

2   distribute that tentative and have you re-argue it again.

3   You've put a lot of effort into it.  I think you're three

4   years in the investigation, four months of negotiation

5   between the parties, so you know your case pretty well; and

6   I'm catching up with you.

10:11   7          I think that's a fair way to do it.  I'm a little

8   afraid if I put the tentative in front of you that you might

9   argue based upon that tentative and there may be things that

10   I haven't seen or considered that wouldn't be fair to each

11   side.

10:11   12          If I think that that tentative eventually is still

13   correct, I'll indicate to you; but whether I do or not or

14   hold back on that tentative, I'm going to start talking to

15   you about the scheduling conference today.

10:11   16          A lot of the decisions you make today are going to

17   have a tremendous bearing -- or tonight or tomorrow or

18   whenever -- are going to have a tremendous bearing on how we

19   conduct the case.

10:12   20          There's already a dispute between Mr. Keker,

21   Ms. Keller, Mr. Cardona, and you gentlemen about the breadth

22   of the case.  Reading your scheduling conference orders, one

23   of the things that jumps out is the scope of discovery; the

24   ability of you to prepare; what the government is bringing;

25   the government's representation that eventually they may cut

1    the case before summary judgment, which is going to cause

2    great consternation if I give you that leeway, because if

3    it's late, how can you possibly prepare.

4              Number two, the request to conduct discovery of

5    some of the government agencies and how relevant that is.

6              Number three, if this is going to be bifurcated or

7    not.

8              And all of those issues that we start trying to

9    decide today make a tremendous difference in terms of the

10   conduct of the case.

11             Today, I'm listening.  I really want your input so

12   we shape a case that makes sense to both of you if we're

13   going forward to litigation.

14             So I'm going to take a recess.  I'll come back in

15   about half an hour.  We're going to resume at 10:45.

16             Why don't you go down to the cafeteria and get a

17   cup of coffee.  Just leave your things here.  I wanted to

18   clear off the lunch hour for you.  We've got a 1:30

19   calendar, but just leave the documents on the table.

20             *(Recess taken at 10:20 a.m.)*

21             *(Proceedings resumed at 10:48 a.m.)*

22             THE COURT:  We'll begin with the argument

23   concerning the 12(b)(6).  I'll turn to the defense first.

24             MR. CARDONA:  Your Honor, if I may interrupt for

25   one second.  I was remiss in introducing Mr. Birotte, our

1    U.S. Attorney, who has also arrived.

2         THE COURT:  Thank you for being here.

3         Counsel.

4         MR. CARDONA:  And, Your Honor, all of the people I

5    introduced, just so the Court is aware, while they're here,

6    will likely have to leave before we're done today.

7         THE COURT:  I wouldn't do that, if they're going

8    to have any association with the case.  After we're done

9    with the 12(b)(6), the decisions we make this evening are

10   going to have a tremendous impact on your office and on the

11   defense.  I'll leave that to your discretion.  They're

12   welcome to go home at 5:00 o'clock.  I wouldn't do that if

13   they're going to have any association with this case.

14        MR. KEKER:  And, Your Honor, I have omitted to

15   introduce one person.  Prasanth Akkapeddi is here in the

16   courtroom.  He's the associate general counsel of

17   McGraw-Hill Financial.  And I should have introduced him

18   before.  Sorry.

19        THE COURT:  Thank you.

20        MR. KEKER:  Your Honor, with respect to the motion

21   to dismiss, as prelude, the Government is seeking to hold

22   Standard & Poor's and McGraw-Hill responsible for improperly

23   rating over 5500 RMBS and CDO securities, each of which has

24   to be multiplied by 10, because there's 10 tranches, without

25   proving that any particular rating was wrong or should have

1    been different or did not accurately reflect the credit risk

2    at the time of the rating.

10:49    3    THE COURT:  Are you comfortable if I ask you

4    questions as we go?

10:50    5    MR. KEKER:  Yes, please.

10:50    6    THE COURT:  And I'm happy to come back to them.

7    Which is better for you?

10:50    8    MR. KEKER:  For you to let me know what is on your

9    mind.

10:50    10    THE COURT:  In your scheduling conference order,

11    you stated that one of your concerns was that a different

12    committee decided these ratings.  And it wasn't clear to me

13    if the committee was deciding the -- or different committees

14    were deciding individual tranches within what I'm going to

15    call a securitization, or if different committees were

16    deciding the securitizations, or the packaging, as I call

17    them, and the tranches within that securitization were

18    decided by the same committee.

10:50    19    MR. KEKER:  I believe --

10:50    20    THE COURT:  That may be unclear.  Do you

21    understand?

10:50    22    MR. KEKER:  No, I think it's clear.  And it's the

23    latter.

10:50    24    The same committee, the same three people take a

25    proposed CDO; here's the collateral that's going to go into;

Case 2:13-cv-00779-DOC-JCG  Document 54  Filed 09/10/13  Page 14 of 102  Page ID #:1308
LACV 1300779 DOC 7/8/2013 - Volume I

14

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | how much of this are we going to rate triple A, how much     |
|       | 2  | double A, and so on down through the tranches.  They're the  |
|       | 3  | ones --                                                      |
| 10:51 | 4  | THE COURT:  The same committee decides the                   |
|       | 5  | tranches within RMBSs or CDOs or whatever?                   |
| 10:51 | 6  | MR. KEKER:  Yes, sir, of that individual CDO.                |
| 10:51 | 7  | Now, the next CDO that's rated the same day or               |
|       | 8  | next day may be rated by three different people, but that's  |
|       | 9  | the rating committee for another CDO.                        |
| 10:51 | 10 | THE COURT:  You said 5500 tranches.  What --                 |
| 10:51 | 11 | MR. KEKER:  I'm sorry, excuse me.                            |
| 10:51 | 12 | THE COURT:  Is it CDOs?                                      |
| 10:51 | 13 | MR. KEKER:  No.  5500 RMBS or CDOs, each of which            |
|       | 14 | has 8 to 10 individual tranches.  So if you want to          |
|       | 15 | challenge a rating -- and this is sort of one of my big      |
|       | 16 | points here --                                               |
| 10:51 | 17 | THE COURT:  Okay.                                            |
| 10:51 | 18 | MR. KEKER:  -- everything that is alleged in the             |
|       | 19 | complaint specifically deals with a triple A tranche.        |
|       | 20 | There's one allegation about a double A tranche, but these   |
|       | 21 | are the tranches where what Standard & Poor's is saying we   |
|       | 22 | believe that this is a very, very secure security; and if    |
|       | 23 | you buy it, what we're telling you is that some huge number  |
|       | 24 | of defaults -- let's say the CDO has 50 percent triple A --  |
|       | 25 | this isn't exact, but some huge number, maybe up to          |

1    50 percent of the underlying collateral has to default

2    before the triple A gets hit.  Everybody down the line gets

3    hurt, but the Triple A is still safe.  So don't worry about

4    it.  And it's why banks would buy these things.  They loaded

5    up with Triple A, because nobody thought, no matter what was

6    going on down the line, that triple A would ever be hit.

7    They're still buying them in 2007.  They're buying them

8    right up to the apocalypse, when everything goes over the

9    cliff.

10:52   10        Our point, if there's one point we're trying to

11   make here is that when they allege that the model wasn't

12   right or you should have changed the model faster or you

13   didn't change -- you didn't do something about the

14   underlying collateral, the examples they give have to do

15   with subprime, which maybe makes up 50 percent -- there's

16   different percentages in here -- 50 percent of the

17   collateral for an individual CDO.  And then they say, a few

18   months later, you downgraded 10 percent of that collateral.

19   Well, 10 percent of 50 is 5 percent.  So you've downgraded

20   5 percent of the collateral.  What does that have to do with

21   the triple A tranche that the financial institution has

22   purchased?

10:53   23        Now, if they were coming in here to protect

24   triple B investors or equity investors, they might be making

25   different arguments; but when we come to --

Case 2:13-cv-00779-DOC-JCG   Document 54   Filed 09/10/13   Page 16 of 102   Page ID #:1310
LACV 1300779 DOC 7/8/2013 - Volume I

16

10:53    1          THE COURT:  Just a moment, then.  I want to repeat

    2    back what I just heard.

10:53    3          MR. KEKER:  Yeah.

10:53    4          THE COURT:  That, hypothetically, 50 percent are

    5    rated less than Triple A.  And what does this have to do

    6    with the Triple A.  I think the response from the other side

    7    would be that the downgrade in these, I'm gonna call

    8    securitization packages, CDOs, are going to have a dramatic

    9    affect.  Because if you take out some of the -- I'll call

   10    'em subprime or non-prime, then that weakens the entire

   11    package, because the entire package has some percentage of

   12    non-prime.

10:54   13          So, therefore, it weakens the selling of these

   14    back to the Street, because even though you might have

   15    50 percent triple A or 25 percent, whatever that percentage

   16    is, the package has less value.

10:54   17          MR. KEKER:  I expect that is the argument that

   18    we're gonna hear from them.

10:54   19          THE COURT:  Okay.  How do you respond to that?

10:54   20          MR. KEKER:  Our response to that is that there are

   21    reasons why these security -- why this is not a mail fraud,

   22    wire fraud, or bank fraud case.  In order to have a scheme

   23    to defraud, there has to be fraud.  Here, we have three

   24    reasons why there is not a scheme to defraud.

10:55   25          The first is the *Boca Raton* argument, that most of

1   the statements they're relying on have to do with general,

2   generic statements that are neither true or false and are

3   just general statements of code of conduct.  Without tying

4   those to some intent to harm the investor, a specific intent

5   to harm the investor, those generic statements don't make

6   any -- don't make a scheme to defraud.

10:55    7        THE COURT:  Doesn't the case law strike against

8   that argument that you don't have to have a specific

9   investor; it could even be a third-party harm, i.e, banks?

10:55   10        MR. KEKER:  No, I don't think the case law -- for

11   a scheme to defraud, there's got to be a specific intent to

12   harm the investor, a specific intent to harm the victim; and

13   here, the victim is claimed to be the investor.

10:56   14        Now, the second argument I was gonna make is that

15   apparently 90 percent of these losses, the investor that

16   they say is harmed are the banks that issued the securities.

17   And that's the materiality argument.  How in the world could

18   the banks, who have all of this information about what they

19   are rating and about what goes into it and how they're

20   putting it together -- how can that be -- how can a

21   statement about independence or our aspiration or

22   objectivity -- how could a statement like that change

23   meaningfully the total mix of information?  That's the

24   second argument.

10:56   25        The first argument is the argument that most of

1  these statements they're alleging, all of them, really,

2  because they haven't alleged anything specific about any

3  false rating.  They're all sort of general, generic

4  statements, which don't -- don't support a mail fraud scheme

5  or wire fraud or a bank fraud scheme.

10:57  6          Second argument is materiality, which I want to go

7  over in a little more detail.

10:57  8          And then the third argument is that mail fraud,

9  wire fraud, bank fraud requires a specific intent to take

10  money or property from somebody, and what they seem to be

11  saying is your specific intent was to get the investors to

12  buy these and, therefore, you'll be able to sell your

13  services, your ratings services.

10:57  14          But that's not -- that was just part of the

15  bargain; that's what the investors bought.  The investors

16  were perfectly happy to end up with a rating from S&P.  What

17  the specific intent has to be under the *Novak* and *Star* and

18  other cases, is -- is to not give them a true rating, to not

19  give them the rating that's the true belief of Standard &

20  Poor's at the time the rating was issued or at the time it

21  was re-upped.

10:58  22          And here, they want to take try to take that case

23  and prove it without proving that any of the ratings were

24  false or affected a financial institution which owned the

25  triple A tranche or resulted in pecuniary loss to the triple

Case 2:13-cv-00779-DOC-JCG   Document 54   Filed 09/10/13   Page 19 of 102   Page ID #:1313
LACV 1300779 DOC 7/8/2013 - Volume I

19

       1    A -- I mean, to the financial institution that owned the

       2    triple A tranche.

10:58  3            That's what the -- that's really the main point of

       4    our argument on a motion to dismiss.  If they want to bring

       5    a criminal case -- and I've done a lot of criminal cases

       6    of -- in mail fraud.  The shoe has got to drop someplace,

       7    and when the shoe drops, it's not just somebody said

       8    something that you can quibble about whether or not it was

       9    true; it's got to be -- got to be intended to get money

      10    improperly from the victim.

10:58 11            Here, they're not willing to allege that.  They

      12    haven't alleged it from 2004 to March of 2007, when all they

      13    say during that period is that, oh, you didn't change your

      14    models fast enough because you wanted to get business; but

      15    they don't make any allegation of an intent to harm anybody

      16    or actual harm to anybody or whatever.

10:59 17            And then the third -- then the second part of that

      18    is from March to October, when the market was changing

      19    radically, when the Fed and the Federal Reserve system and

      20    the Treasury Department and other rating agencies, which

      21    were issuing the exact same ratings as Standard & Poor's

      22    about the identified CDOs during that period, when everybody

      23    was scrambling to figure out what was going on, they still

      24    haven't alleged that anybody at S&P who issued those ratings

      25    didn't believe what they were issuing.

10:59    1          They have pointed out through snippets of

2    conversations about should we change the model, should we do

3    this do, should we do that; quoting e-mails.  But they

4    haven't alleged the who, what, when, where, how that is

5    required for a criminal case.  And that's the -- that's the

6    evil in this Complaint that we're complaining about.

11:00    7          You look -- shall I go on?

11:00    8          The problem is they're seeking to basically blame

9    the financial crisis on Standard & Poor's.  These are

10    ratings for which Standard & Poor's, the ones identified in

11    the complaint, was paid $15 million.  They're seeking more

12    than 5 million.  Lord knows how much they're seeking in

13    penalties from the Court.

11:00    14         THE COURT:  5 million?

11:00    15         MR. KEKER:  Five billion, 5 billion.  I mean, we

16    were paid 15 million, and they're seeking more than

17    5 billion.  We were paid that to rate the securities, and

18    they don't want to prove that any rating was false; that any

19    of it was a false opinion.  They don't want to prove

20    anything about the true credit risk, how it should it have

21    been different.  They want to ignore the fact that Moody's

22    rated them exactly the same way, and want to do it without

23    proving that there was a specific intent by somebody at

24    Standard & Poor's enough to hold Standard & Poor's liable

25    criminally to defraud investors of their money and property.

11:01  1     And so I've mentioned the three reasons.

11:01  2     Let me go back to the first one.  The Boca *Raton*

3  case and the fact that many of these statements that they're

4  alleging in this complaint are exactly what the Second

5  Circuit -- I mean, precisely the statements the Second

6  Circuit looked at and said, no, no, no, this is not the

7  stuff of a scheme to defraud.

8     And consider what some of those statements are:

11:01  9     "That S&P's mission is to provide high quality,

10  objective, independent, and rigorous analytic information to

11  the marketplace."  That's at Complaint 111(a).  We --

12  Standard & Poor's insists that's a true statement, but it's

13  not the kind of statement that can lead to litigation about

14  a scheme to defraud.

11:02  15     Another one is "The rating services must preserve

16  the objectivity, integrity and independence of the ratings."

17  Again, it's true, but it's not the kind of generic statement

18  that can be alleged to be part of a scheme to defraud.

11:02  19     "No employee shall attempt to exert improper

20  influence on the opinions of a rating analyst."

11:02  21     Again, no specific allegation that that ever

22  happened.  Standard & Poor's takes the position it didn't

23  happen.  But it's not the kind of statement that can support

24  a scheme to defraud.

11:02  25     "Our criteria are publicly available,

1    non-negotiable, and consistently applied."

11:02    2         Again, it's true; but for purposes of analyzing

3    whether that's the kind of statement that could support a

4    scheme to defraud, we say no.

11:02    5         "Ratings are current opinions."

11:02    6         Again, true; but not the kind of thing -- it's too

7    generic to support a scheme to defraud.

11:03    8         So those statements are really statements that are

9    hard to see how you would -- how you'd litigate the truth or

10    falsity.  They're -- they're, I guess, objective, but

11    they're also subjective.  None of it can be false, unless

12    they're willing to show that some particular rating is

13    false.  That's what -- if you were ever gonna say that they

14    were false, you'd have to get to the rating.

11:03    15         But they don't want to do that.  How can that be.

16    That's argument number one.

11:03    17         The second one I've already talked about:

18    Materiality.

11:03    19         The Complaint does not allege a scheme to defraud

20    in that these statements are not material and that no

21    reasonable investor would believe they would change,

22    meaningfully alter, the total mix of information available.

11:03    23         Think about two of the investors here that are

24    identified:  Citibank and Bank of America.

11:03    25         And we know from our 26(f) work that so far,

1    89 percent of the losses that they're claiming were

2    resulting from this scheme to defraud are to Citibank and

3    Bank of America.

4         These are the banks that issued these securities,

5    that packaged 'em.  They created 'em.  They analyzed 'em.

6    They asked S&P to rate them.  They knew perfectly well that

7    Standard & Poor's' opinion alleged in Paragraph 233(n) of

8    the Complaint, in which it said, "Boy, this 2006 vintage is

9    really volatile and scary" -- they knew that.

10        They knew the market was highly uncertain and

11   volatile.  They knew that S&P competed with other rating

12   agencies for business with Moody's and Fitch.  They knew

13   that they paid -- this idea that S&P was somehow fooling 'em

14   because the banks were paying 'em for the ratings.  They

15   knew that they were paying Standard & Poor's.

16        The banks together with all these -- with all

17   other investors got these presale reports that had a lot of

18   information in 'em.  That's Paragraph 89 of the Complaint.

19   They got rating letters with more information.

20   Paragraph 90.  They knew the models -- in the case of the

21   banks, the banks knew the models that were used to rate.

22        And under these circumstances, the idea that some

23   generic statement about independence, objectivity; we try

24   our best; we give current opinions, that that's -- that's--

25   "meaningfully alters the total mix of information" is absurd

DEBBIE GALE, U.S. COURT REPORTER

1    when it comes, at least, to the banks that are issuing these

2    securities.

11:05    3            And we know from *Netter v. the United States*, the

4    Supreme Court case, that materiality is an important element

5    of all of these crimes that are charged.

11:05    6            And we know from the JPMorgan Chase that we cited

7    that it's a different -- where they say it's one -- of

8    course, saying that you've got integrity is important; it's

9    not that it's not important, but you can't conflate that

10    with materiality.

11:06    11           And -- and if you look -- I mean, in their -- in

12    their complaint they -- and in the 26(f) report, they --

13    they say that this is what the complaint means; that the

14    reason that Standard & Poor's is liable for everything that

15    happened from 2004 to March of 2007 is that they were not

16    objective or independent because they were influenced in

17    their ratings by the issuers.

11:06    18           So you would think that if the issuer was doing --

19    if they were right about that, that the issuer would know it

20    and it would be hard to show -- it would be hard to say why

21    that's a material matter at least for the securities that

22    were rated where the issuer was the one who created 'em.

11:06    23           I'm just going on to the third reason, unless the

24    Court has any questions.

11:06    25           The third reason, and I've mentioned this, that

        1    the government hasn't alleged an actual scheme to defraud

        2    that could support a criminal case -- 'cause that's the way

        3    I think we have to think about it -- is that there's no

        4    allegation in this complaint of a specific intent to defraud

        5    investors of their money and property or property.  And

        6    there we're relying on the *Star* and the *Novak* cases in the

        7    Second Circuit.  The *Novak* case was when Justice Sotomayor

        8    was on that panel in the Second Circuit; it's as recent as

        9    2006.

11:07  10            They make plain that just sort of

       11    misrepresentations, generally, that amount only to a deceit

       12    are insufficient by themselves to maintain a mail or wire or

       13    bank fraud prosecution.  To have a scheme to defraud, the

       14    deceit must be coupled with contemplated harm to the victim.

       15    If the investors get exactly what they bargained for, they

       16    aren't harmed.

11:08  17            And here, S&P's opinion about how the security

       18    should be rated is what the investors wanted.  It's what

       19    they got.  And in order to have a scheme to defraud, the

       20    Government's got to show, not some generic stuff, but that

       21    they didn't get what they bargained for; that the ratings

       22    were false.

11:08  23            And that's what we're attacking this Complaint

       24    about.  Without alleging that the rating was false and that

       25    it should have been different, that the credit risk was

 1    different, without taking on that burden, they are not

 2    proving a scheme to defraud.

11:08

 3          And that's basically the same in other contexts,

 4    Your Honor.  We've cited other cases.  In securities cases

 5    where a rating opinion comes up -- and this is *Reis v.*

 6    *Charles Schwab*, which is cited.  It's pretty clear that a

 7    rating opinion isn't false unless the government can prove:

 8    (a) it's false, or (b) it wasn't believed.  I mean, it could

 9    be false if it were completely reckless and so on, but you

10    have to allege that the rating was false in order to have a

11    securities case.

11:09

12          Same thing under the False Claims Act.  The

13    *Cafasso* case, which is a *qui tam* action.  It's the one where

14    the, quote, who, what, when, where, and how of the

15    misconduct, as well as what is false or misleading and why

16    it is false, has to be alleged.

11:09

17          That's at 637 F.3d 1047 at 1055, and that's a

18    Ninth Circuit case.

11:09

19          Same thing in the *Space Coast* case, the District

20    Court case against McGraw-Hill and Standard & Poor's; no

21    specific allegations about any particular CDO or RMBS.

11:09

22          And again, I would refer you to the list, and I'm

23    not gonna go through this in too much detail.  But it's --

24    when they identify specific CDOs, they do it in

25    Paragraphs 234, 236, 238, 241, and 261; and look at what

Case 2:13-cv-00779-DOC-JCG   Document 54   Filed 09/10/13   Page 27 of 102   Page ID #:1321
LACV 1300779 DOC - 7/8/2013 - Volume I

27

  1    they say.  We'll start -- we'll take Octonian in 238,

  2    subparagraph (b).  Octonian is one that I happen to know

  3    about.  It was issued by Citibank -- Citigroup.  They, of

  4    course, don't mention that in the complaint, so all you see

  5    is that Citigroup bought something.  They don't tell you

  6    that Citigroup issued it.  And they say, look, you issued it

  7    in May, and then you downgraded 7 percent of the non-prime

  8    collateral in July.  In other words, as more information

  9    came, you downgraded it.

11:10  10           And then it defaulted.  Did it default July 31st?

 11    No.  It defaulted in March of 2008, when the world for these

 12    kind of things had fallen apart.

11:10  13           And again, it's sort of misleading, because there,

 14    62 percent of Octonian was subprime.  It wasn't all

 15    subprime.  So if they downgraded 11 percent, what they're

 16    actually downgrading is about 7 percent of the collateral.

11:11  17           Now, if you have the triple -- I mean, what impact

 18    does that have on the triple A?  They're not telling you.

 19    It's possible, I suppose, but that's not what they've

 20    alleged.  They should come in and say something about

 21    Octonian.  Octonian was a scheme to fraud because -- the

 22    intent to defraud and so on.

11:11  23           THE COURT:  Why are what I call securitizations --

 24    let's just take a hypothetical: $400 million.  I've got a

 25    revolving line of credit.  I'm going to sell that back to

1    the Street.  Why are securitizations in tranches?  Why don't

2    I have the 400 million in all triple A, for instance?  Next

3    400 million, I rate BB.  Why, on the Street, do I mix these

4    in tranches in the same securitization package?

11:11    5    MR. KEKER:  The answer is supply and demand.  I

6    mean, this is a time when there was -- I think the record's

7    gonna show there's tremendous demand for people who want to

8    buy.  There's tremendous demand for people -- by banks who

9    want to sell.

11:12    10    THE COURT:  I know that.  It was the Wild West,

11    okay?  I'm just kidding you.

11:12    12    MR. KEKER:  You weren't kidding.  It was the Wild

13    West.

11:12    14    THE COURT:  It was interesting.

11:12    15    Why on the Street -- remember, federal courts have

16    to be very careful in our rulings, because we can affect the

17    Street.  We can affect this dynamic thing called capitalism,

18    not because we're legislating, but because our decisions

19    here can send a message to the Street, intended or

20    unintended.  So we need to be careful with this wonderful

21    mechanism our country has.

11:12    22    Why -- and I'll ask it again -- don't I have, as a

23    hypothetical, a $400 million and it's all triple A, and the

24    next one is all subprime, okay?  It's all B or below.

11:12    25    In other words, why couldn't that be packaged

|    | 1  | because I, then, as an investor would know exactly that that |
|----|----|-------|
|    | 2  | was triple A.  If there was a misrating and I had subprime |
|    | 3  | mixed, it would be very clear. |
| 11:13 | 4  | I just don't understand why we have these |
|    | 5  | different tranches within different packages, because the |
|    | 6  | volume was so high on the Street, it was easily done. |
| 11:13 | 7  | MR. KEKER:  If you were an investor who only |
|    | 8  | wanted prime RMBS -- |
| 11:13 | 9  | THE COURT:  I want triple A. |
| 11:13 | 10 | MR. KEKER:  -- prime RMBS that yielded triple A, |
|    | 11 | you could buy it.  But the interest rate that you would get, |
|    | 12 | the return to you for buying it, would be less as they pay |
|    | 13 | the bottoms than if you took a little bit more risk.  It's |
|    | 14 | the same as most things. |
| 11:13 | 15 | So if you put together a CDO that's a little |
|    | 16 | riskier, that's got less triple A and more of these lower |
|    | 17 | tranches where the collateral is, as many of these were, |
|    | 18 | mezzanine CDOs, triple B-rated, and you package them |
|    | 19 | together -- you could go out and package triple A into |
|    | 20 | another CDO and sell everybody triple A. |
| 11:13 | 21 | THE COURT:  I understand that. |
| 11:13 | 22 | MR. KEKER:  But in order to get a return and to |
|    | 23 | get both sides of this transaction working where the |
|    | 24 | banks -- |
| 11:13 | 25 | THE COURT:  We're going to play with that.  I |

1   understand that.

2         MR. KEKER:  Okay.

3         THE COURT:  When I buy bonds, Treasury bonds, I

4   know that my rate of return is low, right?

5         MR. KEKER:  Right.

6         THE COURT:  I go invest in a foreign mutual fund

7   that's out of Thailand or Singapore, and I know my risk is

8   higher.  I don't think you and I have the answer to that

9   question.  But it would be much simpler for the American

10  investor if we knew that we were buying, not tranches, but a

11  securitization of X amount that was triple A.  I know

12  exactly what my investment is.  I get a lower interest rate.

13        But when the Street mixes that, when they start

14  getting into tranches because it gives a higher return, it

15  means we have this incredible fluidity within that package,

16  if you will.  We have triple A; we've got subprime that's

17  moving around -- let's say non-prime that's moving around.

18  And, therefore, the rating agency would seem to become

19  critical as long as the Street chooses to bring what I call

20  these mixed securitizations, these mixed packages.

21        And I still don't understand, for the life of

22  me -- and I don't think you can explain it to me, but I'm

23  wide open to it -- why we don't have a more pristine

24  situation where I know that I'm buying 400 million of triple

25  A; my return is 1.4 percent.  If I want to take a bigger

|       |    |                                                                       |
|-------|----|-----------------------------------------------------------------------|
|       | 1  | risk, I can buy B.  But then I'm buying $400 million of B              |
|       | 2  | and I've got a greater risk, but I've got a greater return.            |
|       | 3  | Okay?  Maybe I get 6 percent.                                          |
| 11:15 | 4  | MR. KEKER:  There's a lot of people, starting                         |
|       | 5  | maybe with Paul Volker, who would sit down and come up with            |
|       | 6  | a regulatory scheme that would lead to that conclusion.                |
| 11:15 | 7  | THE COURT:  Can we call him?                                           |
| 11:15 | 8  | MR. KEKER:  I am sure.  He could be the court                          |
|       | 9  | expert, I guess.                                                       |
| 11:15 | 10 | THE COURT:  I might need a 706 on this.                                |
| 11:15 | 11 | *(Laughter in the courtroom.)*                                         |
| 11:15 | 12 | MR. KEKER:  It's a question -- it's a question                         |
|       | 13 | that people have been grappling with since 2008, but for              |
|       | 14 | purposes of this case -- I mean, in 2004 -- this is one of            |
|       | 15 | the things I want to get across.  From 2004 until 2007, when          |
|       | 16 | there's probably 5,000 of these RMBS, the Government has               |
|       | 17 | not, after three years of investigation, taken any effort to          |
|       | 18 | sort out how many of those were all prime mortgages.                   |
| 11:16 | 19 | THE COURT:  And the virtue for S&P is that they're                    |
|       | 20 | not the issuer; the banks were deciding that.                          |
| 11:16 | 21 | MR. KEKER:  Right.                                                     |
| 11:16 | 22 | THE COURT:  S&P is reacting to what the banks have                    |
|       | 23 | already set in motion in terms of these packages.                      |
| 11:16 | 24 | MR. KEKER:  Yes, sir.                                                  |
| 11:16 | 25 | THE COURT:  Okay.                                                      |

11:16   1        MR. KEKER:  And what S&P is trying to do is

        2   reflect, based on the only thing it has -- a lot of this in

        3   the Complaint -- based on historical data.  When was the

        4   biggest disaster in the housing market in the United States?

        5   The year 2000.  How bad was it?  Okay.  How does this

        6   compare to the year 2000?  Are we close to that?

11:16   7        Anyway, they try to put together a rating that is

        8   their honest opinion about where the danger -- where the

        9   stress tests are in this particular CDO.  How much has to

       10   default before what you buy, your tranche, is gonna get hit?

11:17  11        And especially if you're the bank, as here, that

       12   buys it.  I have issued it -- I'm the bank.  I issue it.  I

       13   get it rated, and then I buy the senior tranches.  I feel

       14   great.

11:17  15        2008 comes along and all of a sudden we need TARP.

       16   I mean, it's -- it wasn't the rating that caused 2008 to

       17   come along.  It was the fact that the economy was -- was

       18   headed into an unprecedented, shocking, never-before

       19   experienced collapse in the housing market.  And when people

       20   who were trying to predict where the risks are start with

       21   historical data and use that historical data as best they

       22   can.

11:17  23        And recognize, in historical data, one of the

       24   things that happens here is do defaults mean losses?  Well,

       25   no, not necessarily.  Lots of people default on their

1    mortgage for this month, that month, then get things back

2    together again.  It doesn't necessarily lead to losses.  It

3    doesn't lead to foreclosure.  Historically, how do you do

4    that?

11:18    5         What the Complaint makes plain is that, at least

6    in 2000, when S&P was changing what it was doing, it was

7    trying -- it was changing its procedures to keep up with

8    what was going on, the Government is turning that against

9    'em and saying that's part of the scheme to defraud.

11:18    10         What we're saying is, you want to prove that some

11    rating we issued wasn't our honest opinion?  Bring it on.

12    If you can allege it, we'll defend it.  But don't give us

13    this generic everything you did is wrong because we found

14    some e-mails from people who disagreed with what somebody

15    else in the place was doing, when they don't name one rater,

16    one rating committee that did something that they didn't

17    honestly believe in.  Not one allegation of that.

11:19    18         And Rule 9(b) requires more if they can get away

19    with it.

11:19    20         So our fundamental position is they've had three

21    years.  There's a 10-year statute of limitations.  They're

22    coming in here now and telling us we don't have to prove any

23    false statement; we don't have to, basically, prove much of

24    anything.  And we say they do.

11:19    25         And if they do, then what we ought to do is go

1    back to the drawing board.  The Motion to Dismiss should be

2    granted.  They should take their time.  As I say, they've

3    got a 10-year statute of limitation.  Identify what it is

4    they're talking about and where they want to prove that a

5    rating was false, that it wasn't honestly believed, and so

6    on.

11:19    7        We don't think they can do it.  As I said, every

8    one of these ratings they have specifically mentioned was

9    mimicked by Moody's, who is not here.  We have no idea why

10    the distinction.

11:19    11        And, fundamentally, Your Honor, this is a case

12    that's based -- it's a criminal case, or criminal proof -- I

13    mean, not beyond a reasonable doubt, but FIRREA invokes

14    criminal statutes and it's based entirely on hindsight.

15    That's not the way criminal case laws are brought.

11:20    16        And they're blaming S&P for an unprecedented

17    financial collapse that nobody foresaw.

11:20    18        We've also argued that the case is just

19    fundamentally unmanageable as pled.  They've got to sort out

20    the CDOs or RMBS that they think could be a problem from the

21    ones -- I mean, a lot of these maybe a financial institution

22    didn't even buy.

11:20    23        So without the allegation that one of the ratings

24    was false and proving it, we believe that nothing that

25    Standard & Poor's did could be found to, quote, "affect" a

1    bank, a financial institution, within the meaning of the

2    statute or, quote, "result in a pecuniary loss," which is

3    what they're going after when they say, "This defaulted;

4    therefore, you're at fault.

11:21    5        And unless the Court has questions, I think I'm

6    done.

11:21    7        THE COURT:  RMBSs, I want you to educate me and

8    the government in just a moment.  You both have been working

9    at this for three years and negotiating, apparently, for a

10   period of time.  So I'm a little behind you, and I say this

11   humbly.

11:21    12       CDOs can have a component of RMBSs.  I want you to

13   give me specific examples of other kinds of debts included

14   in a CDO.  Are they credit card debt?

11:21    15       What other obligations or debt is included in a

16   CDO?

11:21    17       MR. KEKER:  It could be anything --

11:21    18       THE COURT:  Not "could be."  I want specificity.

19   Give me an example.

11:21    20       MR. KEKER:  Credit card debt is one.

11:21    21       THE COURT:  Hold on.

11:21    22       MR. KEKER:  They call it ABS, Asset Backed

23   Securities.

11:21    24       THE COURT:  Credit card debt could be one.

11:21    25       What else?

LACV 1300779 DOC 7/8/2013 – Volume I

36

| | | |
|---|---|---|
| 11:21 | 1 | MR. KEKER:  Student loans. |
| 11:21 | 2 | THE COURT:  Student loans. |
| 11:22 | 3 | What else? |
| 11:22 | 4 | MR. KEKER:  Help me. |
| 11:22 | 5 | MR. TAYLOR:  Commercial loans, Your Honor. |
| 11:22 | 6 | MR. KEKER:  Commercial loans. |
| 11:22 | 7 | THE COURT:  Commercial loans. |
| 11:22 | 8 | Give me more examples.  Well, you're not held to |
| | 9 | this, but I want you to educate me. |
| 11:22 | 10 | MR. TAYLOR:  Aircraft loans, car loans. |
| 11:22 | 11 | THE COURT:  Aircraft loans.  Leasing.  United |
| | 12 | Leasing. |
| 11:22 | 13 | MR. TAYLOR:  Any sort of loan you put out there, |
| | 14 | anything that would generate a periodic payment. |
| 11:22 | 15 | THE COURT:  Okay.  Just a moment. |
| 11:22 | 16 | They're not backed by -- strike that. |
| 11:22 | 17 | In an aircraft loan, I have the actual aircraft as |
| | 18 | the asset.  I have something tangible, correct? |
| 11:22 | 19 | MR. TAYLOR:  Correct. |
| 11:22 | 20 | THE COURT:  And in an RMBS I'd have something |
| | 21 | tangible.  I have a house, correct? |
| 11:22 | 22 | MR. TAYLOR:  Correct. |
| 11:22 | 23 | THE COURT:  Explain to me what I have that's |
| | 24 | tangible in a credit card loan. |
| 11:22 | 25 | MR. KEKER:  The obligation. |

| | | |
|---|---|---|
| 11:22 | 1 | THE COURT:  No, no.  Just a moment.  Come up and |
| | 2 | help him. |
| 11:22 | 3 | MR. TAYLOR:  Yes, Your Honor, Steve Taylor. |
| 11:22 | 4 | THE COURT:  Use the lectern. |
| 11:22 | 5 | Now, you two talk for a moment, and I don't want a |
| | 6 | bunch of garbage.  I want specificity. |
| 11:22 | 7 | MR. KEKER:  I'm garbage; he's specificity. |
| 11:22 | 8 | THE COURT:  No, no, you're doing fine.  Get closer |
| | 9 | together.  It's a wonderful picture. |
| 11:23 | 10 | Tell me what specific I have as collateral –– I |
| | 11 | understand an aircraft loan.  I've got a shell, an aircraft. |
| | 12 | I understand an RMBS.  I understand that they can both come |
| | 13 | together in a CDO.  What I'm confused about is what asset do |
| | 14 | I have that backs up a personal credit card obligation if |
| | 15 | I've 15- to $60,000 on my credit card. |
| 11:23 | 16 | MR. TAYLOR:  I think the short answer is you don't |
| | 17 | have a tangible –– |
| 11:23 | 18 | THE COURT:  I don't have anything, do I? |
| 11:23 | 19 | MR. TAYLOR:  Correct. |
| 11:23 | 20 | THE COURT:  Zero. |
| 11:23 | 21 | MR. TAYLOR:  Correct. |
| 11:23 | 22 | THE COURT:  Student loans.  What asset do I have |
| | 23 | on a student loan that's a tangible asset unlike an RMBS |
| | 24 | that backs up my student loan? |
| 11:23 | 25 | Nothing. |

11:23   1            MR. TAYLOR:  Correct.

11:23   2            THE COURT:  Nothing, right?

11:23   3            MR. TAYLOR:  Nothing tangible.  What you would

        4   have there, what they would argue, since we don't have them

        5   here, is the obligation to pay.

11:24   6            THE COURT:  So what I'm reading in this

        7   hundred-some-page document and trying to discern is this:

        8   That an RMBS actually has something tangible.  It has a

        9   piece of property that I can look at or securitization of

        10  hundreds of pieces or thousands of pieces of property with

        11  an interest rate, supposedly, some which may go into default

        12  or disclosure -- or foreclosure; and I'm making a value

        13  judgment of what the value is when it gets sold back to the

        14  Street when I purchase it.  My return might be 7 percent.

        15  It might be 6 percent.  I know, out of 2,000 mortgages, I

        16  might get some default ratio.  My computer can historically

        17  figure that out.

11:24   18           What do I have in a CDO that gives me that same

        19  confidence in making an investment when that's mixed with an

        20  RMBS?

11:24   21           MR. KEKER:  Well, you don't --

11:24   22           THE COURT:  Because your CDOs are mixed with

        23  RMBSs, aren't they?

11:24   24           MR. KEKER:  Well, no.  The CDOs that they've

        25  alleged with particularity here are all backed by RMBS --

11:25    1         THE COURT:  Let me say that again.

11:25    2         MR. KEKER:  -- the collateral.

11:25    3         The collateralized debt obligation, which is the

4   CDO, has as -- as the collateral are tranches of RMBS

5   security --

11:25    6         THE COURT:  Just a moment --

11:25    7         MR. KEKER:  -- and they're not concrete.

11:25    8         THE COURT:  -- some tranches --

11:25    9         MR. KEKER:  Agreed.  Triple B tranches.

11:25   10         THE COURT:  -- in a CDO, can't I have a mixture of

11   RMBSs and these other kinds of debts that aren't backed by

12   some tangible asset?

11:25   13         In other words, in a CDO -- as I try to look at

14   what the Street's doing and understand this dynamic

15   marketplace, in a CDO isn't the difference that I can have

16   an RMBS in a tranche, but I can also have these student

17   loans or credit debt?  And that's the difference between a

18   CDO and an RMBS, or am I wrong?

11:25   19         MR. KEKER:  I think you're wrong, actually.

11:26   20         THE COURT:  Help me, then.

11:26   21         MR. KEKER:  Let me go back to RMBS.  It's not

22   backed by a house.  That's one of the problems.  RMBSs are

23   you get a bunch of mortgages.  They're sold to somebody.

11:26   24         THE COURT:  I'm sorry.  I misspoke.  You're right.

25   Mortgages.

| | | |
|---|---|---|
| 11:26 | 1 | MR. KEKER:  Okay. |
| 11:26 | 2 | THE COURT:  Take me back to CDOs. |
| 11:26 | 3 | MR. KEKER:  The mortgage is the same thing as the |
| | 4 | credit card.  It's a promise to pay, and then you try to |
| | 5 | figure out how much that promise to pay is worth.  Is it |
| | 6 | face value, or do you discount it?  But an RMBS is backed by |
| | 7 | a large number of mortgages, which an investor can go in and |
| | 8 | they do go in and look at those mortgages.  Where are they, |
| | 9 | how many -- |
| 11:26 | 10 | THE COURT:  I apologize.  I misspoke and I took |
| | 11 | you off the target.  I disagree with you. |
| 11:26 | 12 | I think that an RMBS, even though they're |
| | 13 | mortgages, has something that can be foreclosed upon.  It |
| | 14 | has some tangible asset. |
| 11:26 | 15 | I think that CDOs have a far different, if you |
| | 16 | will, and more risky problem; and that is, they can be |
| | 17 | RMBSs, and can also mix what I'm going to call nontangibles, |
| | 18 | a student loan, and they also mix in credit card debt -- |
| 11:27 | 19 | MR. KEKER:  That's true. |
| 11:27 | 20 | THE COURT:  -- and that makes them more risky. |
| | 21 | And that seems to be the overwhelming difference between the |
| | 22 | two.  And I understand CDOs can have RMBSs; they may have 80 |
| | 23 | percent. |
| 11:27 | 24 | I want you to correct me if I'm wrong. |
| 11:27 | 25 | MR. KEKER:  I think you're right about everything |

|       | 1  | except it's not what makes them more risky.  What makes them |
|       | 2  | more risky is what is the asset backed security or RMBS that |
|       | 3  | is the collateral. |
| 11:27 | 4  | THE COURT:  And if it's that student loan, it's |
|       | 5  | nothing. |
| 11:27 | 6  | MR. KEKER:  Student loan sounds pretty bad. |
| 11:27 | 7  | THE COURT:  If it's a credit card debt, it's |
|       | 8  | nothing. |
| 11:27 | 9  | MR. KEKER:  Well, okay.  I mean, but that's not |
|       | 10 | the way the Street looks at it.  The Street looks at it and |
|       | 11 | says, "What are my chances of getting paid here?" |
| 11:27 | 12 | THE COURT:  Well, in 2007, 2008, not very good. |
| 11:27 | 13 | MR. KEKER:  Again, in hindsight.  But in 2004 to |
|       | 14 | 2007, Wall Street and investors look at what's the |
|       | 15 | collateral and how much confidence do I have in that |
|       | 16 | collateral.  And one of the areas where there was a lot of |
|       | 17 | confidence that turned out to be, perhaps, misplaced was in |
|       | 18 | residential mortgages. |
| 11:28 | 19 | THE COURT:  The last question is, are CDOs, it |
|       | 20 | appears to me, also, obviously, initiated by banks? |
| 11:28 | 21 | MR. KEKER:  Yes. |
| 11:28 | 22 | THE COURT:  Standard & Poor's doesn't do that. |
| 11:28 | 23 | MR. KEKER:  Right. |
| 11:28 | 24 | THE COURT:  Banks start that process, if you will, |
|       | 25 | and they turn to your client as a ratings service and said, |

1    "Sort this out in terms of rating."  They make the initial

2    decision of how to mix this; you don't.

3              MR. KEKER:  Absolutely.  I mean, that's -- and

4    what happens is they put it together, and then they take it

5    to their syndicate desk and say, "Can we sell this?"  And

6    the syndicate desk -- "I don't think so.  They're never

7    gonna buy it.  So let's change the mix."

8              So they finally get it right, and then they take

9    it to Standard & Poor's and say, "Please run it through your

10   models and rate it."  And then they look at it and say,

11   "This looks good; we think we can sell this," or, "We don't

12   have enough triple A in there.  Let's change the mix again."

13             The banks put this together, put the package

14   together, write the prospectus that tells the investor what

15   they're buying.  These triple A investors go out there --

16   I've tried one of these cases -- they go out there and they

17   go, "Look --"

18             THE COURT:  Why aren't the banks included in this

19   lawsuit?

20             MR. KEKER:  We didn't bring it, Your Honor.

21             THE COURT:  I'll ask the Government in a moment.

22   Why isn't Moody's, if your claims are correct, included in

23   this lawsuit?

24             MR. KEKER:  Well, the only distinction that I know

25   is that Standard & Poor's at some point downgraded the

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | credit of the United States, much to the consternation of  |
|       | 2  | the United States; Moody's didn't.                         |
| 11:29 | 3  | THE COURT: So you think it's payback?                       |
| 11:29 | 4  | MR. KEKER: Yes.                                             |
| 11:29 | 5  | THE COURT: Okay.                                            |
| 11:29 | 6  | MR. KEKER: I don't know. Maybe that's a question           |
|       | 7  | the Government can answer. Why isn't Moody's, who rated all |
|       | 8  | these tranches -- at least the ones that are identified     |
|       | 9  | specifically in the complaint, every single one is rated   |
|       | 10 | just like --                                               |
| 11:29 | 11 | THE COURT: Well, they may have changed their               |
|       | 12 | model. I don't know yet. Moody's isn't before me.          |
| 11:29 | 13 | Well, Counsel, I'll come back to you.                      |
| 11:30 | 14 | Why don't you step over with your colleagues for           |
|       | 15 | just a moment. Why don't you have a consultation, see if   |
|       | 16 | he's missed anything, or if there's anything else you'd like|
|       | 17 | to add in the first round.                                 |
| 11:30 | 18 | MR. KEKER: We're fine.                                      |
| 11:30 | 19 | THE COURT: You're okay for the first round.                |
|       | 20 | There's going to be a second round.                        |
| 11:30 | 21 | MR. KEKER: Yes, sir.                                        |
| 11:30 | 22 | THE COURT: Counsel, ready?                                  |
| 11:30 | 23 | MR. CARDONA: Yes.                                           |
| 11:30 | 24 | THE COURT: Where's Moody's?                                 |
| 11:30 | 25 | MR. CARDONA: Moody's is not here because the               |

|          | 1  | evidence we developed was against S&P, and we filed the suit |
|          | 2  | based on the evidence we had against -- |
| 11:30    | 3  | THE COURT:  Did Moody's change their model during |
|          | 4  | this period of time? |
| 11:30    | 5  | MR. CARDONA:  Moody's operated with a different |
|          | 6  | set of models.  Different procedures -- |
| 11:30    | 7  | THE COURT:  Where are the banks?  Where are the |
|          | 8  | banks? |
| 11:30    | 9  | MR. CARDONA:  The banks are not here, again -- |
| 11:30    | 10 | THE COURT:  Why? |
| 11:30    | 11 | MR. CARDONA:  -- because our evidence in this case |
|          | 12 | is against S&P.  We have not brought allegations against the |
|          | 13 | banks. |
| 11:30    | 14 | And if I could, what I'd like to start with is to |
|          | 15 | step back a little bit and go through kind of the |
|          | 16 | structuring of these entities and of these instruments and |
|          | 17 | how that works and why that shows how important the |
|          | 18 | representations that S&P was making were to the people who |
|          | 19 | were investing in them. |
| 11:31    | 20 | With that, let's start with an RMBS.  And I'm |
|          | 21 | going to talk about RMBS, and then about CDOs made up of |
|          | 22 | RMBS, because the CDOs that we have alleged are, in fact, |
|          | 23 | CDOs made up almost entirely of two things:  Either RMBS or |
|          | 24 | other CDOs that themselves are based on RMBS.  And I'll |
|          | 25 | explain that in a second when we get there. |

11:31  1          So I'm not gonna get into the credit card loans or

2      the student loans or the airplane loans, because they don't

3      really play a role in our case.

11:31  4          So let's start with an RMBS.  As Your Honor has

5      recognized, what an RMBS is, is basically a debt instrument

6      that is based on other debt instruments.  And the other of

7      debt instruments that make up the RMBS are, in fact,

8      residential mortgages.

11:31  9          And a mortgage, as Your Honor has recognized,

10     basically has two things.  If you're a bank making a

11     mortgage loan, there's two things you look at, right?

11:32  12         There's the value of the property, 'cause that's

13     what you're gonna recover against if, in fact, the person

14     who's borrowing it can't pay, and then you look at the

15     ability of the borrower to repay.  Things like their FICO

16     credit scores, their credit histories, their incomes, their

17     debt to income ratio, those type of things that go to their

18     ability to repay the loan.

11:32  19         So you have these series of mortgage loans, and

20     each mortgage loan has a term.  It's typically a 30-year

21     term in which the borrower had committed to making periodic

22     payments.

11:32  23         So the bank is in a position where they can

24     collect those payments over that time.  And the bank has

25     made an assessment that given the risks involved in that

Case 2:13-cv-00779-DOC-JCG   Document 54   Filed 09/10/13   Page 46 of 102   Page ID #:1340
LACV 1300779 DOC 7/8/2013 – Volume I

46

```
11:32
11:33
11:33
11:33
11:33
11:33
11:34
```

 1    loan, they are going to make that loan at a particular

 2    interest rate and collect that stream of payments over time.

 3         What an RMBS does is basically package a whole

 4    group of mortgages of varying risks and varying interest

 5    rates, with varying risks that those payment streams will

 6    continue and be made, and repackage that into a structured

 7    debt security.

 8         And you're correct, it's the banks who initially

 9    propose the structure for that.  And what they say is, okay,

10    we've got a bunch of mortgage loans --

11         THE COURT:  Same question.  Do you mind if I ask?

12         MR. CARDONA:  No, no, I'm perfectly okay with

13    questions.

14         THE COURT:  Why does the Street take non-prime,

15    such as subprime, and mix them in packages --

16    securitizations I'm going to call them, bundling, if you

17    will, where I've got risky tranches or, let's say, less

18    secure tranches, and I have supposedly tranches that are

19    triple A, that are golden.

20         The only reason it appears to me that the Street

21    does that is because, first of all, they can bring bigger

22    packages:  400 million, 800 million, revolving lines of

23    credit so they get money back to reinvest.  That's one

24    reason.

25         Number two, the banks could cut that down.  They

| | | |
|---|---|---|
| | 1 | could bring 100 million or 150 million in all triple A. |
| | 2 | They could bring the next in double B, if you will, and the |
| | 3 | investor would know right to begin with that I'm getting |
| | 4 | less money.  Now, Moody's and Standard & Poor's might have a |
| | 5 | place to play even in that rating system and charge a fee to |
| | 6 | do some due diligence on that.  I don't know. |
| 11:34 | 7 | MR. CARDONA:  Here's why, if I could. |
| 11:34 | 8 | THE COURT:  Why? |
| 11:34 | 9 | MR. CARDONA:  Let me -- and it's going to involve |
| | 10 | the -- how these things are structured. |
| 11:34 | 11 | THE COURT:  Okay. |
| 11:34 | 12 | MR. CARDONA:  So let's take an RMBS, for example. |
| | 13 | A bank or an investment bank comes to it, and it has a group |
| | 14 | of mortgages that it wants to package.  Those mortgages will |
| | 15 | most likely be of varying types of risk.  Some of them will |
| | 16 | be subprime; some of them may be Alt-A mortgages, in which |
| | 17 | there's problems with other things other than the credit |
| | 18 | score; some of them may be closed-in second liens.  These |
| | 19 | are all different types.  The bank will pick a package, and |
| | 20 | it will put it together.  And they will then put together a |
| | 21 | structure.  And in -- |
| 11:35 | 22 | THE COURT:  You know, I actually understand that. |
| | 23 | I'm going to come back and ask my question -- |
| 11:35 | 24 | MR. CARDONA:  -- and in terms of why -- |
| 11:35 | 25 | THE COURT:  -- no, no just a moment. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:35 | 1 | If I went and bought a Treasury bond right now, I |
| | 2 | know its got the full faith and credit of the United States, |
| | 3 | but my interest rate is low, in fact, probably nonexistent |
| | 4 | right now.  Okay?  But I wouldn't expect to go buy a bond |
| | 5 | and find out it was also mixed with a go-go fund in |
| | 6 | Singapore.  Now, with Government regulation, why is the |
| | 7 | Street allowed to mix these? |
| 11:35 | 8 | MR. CARDONA:  I -- I -- |
| 11:35 | 9 | THE COURT:  Where was the regulation here? |
| 11:35 | 10 | MR. CARDONA:  The regulation was on the back end, |
| | 11 | and that some types of investors were required to only buy |
| | 12 | tranches that were rated in certain ways; whereas, others |
| | 13 | weren't. |
| 11:35 | 14 | In other words, some financial institutions, |
| | 15 | pursuant to regulations, could only buy, you know, |
| | 16 | investment-grade-rated bonds.  Others couldn't. |
| 11:36 | 17 | But in terms of getting back to the answer as to |
| | 18 | why they're mixed:  In theory, you could structure an RMBS |
| | 19 | where, basically, all you had was you had a cushion below |
| | 20 | that wasn't being sold.  And that cushion just supported an |
| | 21 | AAA tranche.  And all you issued was the AAA tranche, and |
| | 22 | everything else went to support it.  And an investment bank |
| | 23 | could, in theory, go to S&P and propose that as a structure. |
| 11:36 | 24 | The reason you see that not happening, but these |
| | 25 | other tranches -- lower value tranches with higher risk -- |

1   being packed, is that, let's say, for example, we have this

2   much cushion, and then above that, we've got this much

3   triple A.  Okay?  Now there's an opportunity for the bank to

4   make more money by marketing some portion of what was

5   otherwise the cushion as a lower-rated bond, where everybody

6   understands there's a higher risk; but it's gonna pay a

7   higher interest rate.

11:36    8       And so what the bank, the investment bank, wants

9   to do is basically sell as much of this overall structure as

10  they can, from triple A, double A, single A, triple B,

11  double B.  They want to structure it in such a way that they

12  are selling as much as possible and leaving a thinner equity

13  cushion at the bottom that then supports all the upper

14  tranches above.  That's part of what they propose to S&P.

11:37   15       The structure they propose to S&P is, here is the

16  structure we think will provide enough structure to sport

17  the AAA, the AA.  So that each tranche has enough support

18  below it to support it, but at the same time, they're

19  marketing that support as a higher risk security.

11:37   20       And this explains the importance -- um, if I may,

21  for CDOs, it's basically take that one step up.  Each RMBS

22  now -- each tranche of an RMBS is a -- basically, an

23  obligation that -- to pay out payments over a series of

24  time.  And each tranche, depending on its rating, has a

25  particular risk and is paying an interest rate based on

Case 2:13-cv-00779-DOC-JCG  Document 54  Filed 09/10/13  Page 50 of 102  Page ID
#:1344
LACV 1300779 DOC 7/8/2013 – Volume I

50

1    that.

11:37    2         So, again, when a CDO comes in and looks and says,

3    okay, now we're gonna package those cash flows.  Look at the

4    risks and the cash return and put together a structure in

5    much the same way.  We're gonna package all those RMBS, and

6    then we're gonna create a structure, such that there's a

7    tier that's AAA with support below it.  And then we're going

8    to, again, price the lower tiers and move down until we get

9    to that low equity cushion.  And from the bank's point of

10    view, try to leave the equity cushion as thin as possible.

11    So that's both CDOs and RMBS.

11:38    12         And the, one level above that, again, CDOs, which

13    now are also cash flow obligations that have payments over

14    time, are then often repackaged into what were known as CDOs

15    squared.

11:38    16         So, again, we take the risks of the particular

17    tranches with their cash flows, package those into what is

18    now a CDO of CDOs.

11:38    19         Now you're starting to see some of the issues

20    here.  Because, when we look at an individual mortgage, if

21    I'm an investor in that mortgage, if I'm a bank selling that

22    mortgage, I can look and I can see, okay, here's the

23    property.  It's a big house in Bel Air, and the person who

24    owns it, you know, has a credit score of 800.  That's pretty

25    low risk.  That's good investment.  Okay.

11:39    1         But now, when we package them, when we move from

    2    one mortgage to a whole group of "mortgage," with this

    3    structure, now you start to see the importance of the

    4    rating.  That in and of itself is opaque.  Someone on the

    5    outside, an outside investor looking at that package, that

    6    package of risks that's been put together, would have an

    7    extraordinarily hard time trying to figure out, okay, what

    8    actually is supporting my AAA tranche, and how is that done.

11:39    9         That's where the rating agencies came in.  The

   10    issuers went to the rating agency with their proposed

   11    packages and said, here's what we propose as the structure.

   12    S&P, in theory, ran that through their models, ran that

   13    through their rating process -- ran it through their rating

   14    process, ran it through their credit committees, and then

   15    had back and forth with the investment bank saying, "We

   16    don't think that will work; we need you to do this."  The

   17    investment banks would say, "You shouldn't need us to do

   18    this; instead we'll do this."  And, ultimately, arrive at

   19    what is the structure that S&P says will support that

   20    rating.

11:40   21         And this now gets to why are the representations

   22    that S&P makes significant?

11:40   23         Because when you buy something from an issuer,

   24    when you go to an investment bank, and an investment bank

   25    says to you, "I've got this great package of mortgages we've

1    put together, and now we've taken a bunch of triple B rated

2    mortgages or triple B rated RMBS, and we've packaged

3    together.  And we've got this very low risk CDO we want you

4    to buy with a very low interest rate."

5              You know, if there's the investment bank coming to

6    you, you're going, hmm, that's the person selling this,

7    should I really trust them?

8              S&P, in essence, served as a third party that

9    represented that it was objective; that it was independent;

10   that it was not influenced by the issuers of these

11   instruments; and that it was, in essence, acting as an

12   impartial arbitor, who was looking at this stuff and

13   deciding, okay, you can trust the issuing bank's structure;

14   it will support this rating; it is a low risk investment

15   that deserves a triple A rating and, therefore, will pay

16   this low interest rate.

17             And that's precisely why, to investors in these

18   securities, the very representations that we have alleged in

19   the Complaint were material and important and not mere

20   puffing.

21             S&P itself recognized the potential for the

22   conflict of interest with the issuers.  It recognized that

23   it was being retained by the issuers.  The issuers put

24   together the package.  They went to S&P and said, "S&P, we

25   want you to be the rater; we want to have this back and

1    forth; we want you to give the rating."

11:42    2         S&P recognized and regulators recognized and

3    Congress recognized that there was a potential conflict of

4    interest there; that S&P, which depended on the investment

5    banks for its business, might be influenced to act on behalf

6    of the investment banks, as opposed to being this impartial

7    arbiter of the ratings and the risks.

11:42    8         And to counter that, to convey to investors and

9    the market and to the SEC and to Congress that, in fact,

10    they were acting as this impartial arbiter; that they

11    weren't being influenced by their relationships with the

12    issuers, they made the representations we allege.  They put

13    in place their code of practices and conducts.  They made

14    their repeated representations that they were objective and

15    independent.

11:42    16         THE COURT:  Now, could I ask you a question?

11:42    17         How in the world would Congress ever accept that?

18    S&P or any other credit agency has to be completely

19    dependent upon the bank.

11:43    20         The bank comes to them and says, I've got X amount

21    of triple A; I've got X amount of BB.  The bank isn't in a

22    position to go out and examine -- and you use the word

23    "model."  They're not going to go to each of those mortgages

24    and see if they're truly triple A.  There might be a

25    thousand triple A's and maybe some of those are B's or BB's

|  | 1 | or double A.  So the bank, then, takes this information -- |
|---|---|---|
|  | 2 | I'm sorry -- the rating service takes this information. |
| 11:43 | 3 | How in the world would I believe that S&P had the |
|  | 4 | ability to test the credibility of the information received |
|  | 5 | from the bank?  What is so magic about this model that's |
|  | 6 | been run, which I don't understand yet? |
| 11:44 | 7 | Because it seems to me that all the information is |
|  | 8 | dependent, from a ratings service, on what they receive from |
|  | 9 | the issuer, from the bank. |
| 11:44 | 10 | It's kind of like a lawyer in court who says, |
|  | 11 | Judge, I represent the following:  My client told me so. |
|  | 12 | Never get the two confused.  The client may have said X, and |
|  | 13 | the lawyer's conveying it, but that doesn't mean it's true. |
|  | 14 | It's not the fault of the lawyer.  It's the information we |
|  | 15 | receive from our client. |
| 11:44 | 16 | So what I'm having trouble with is what is the |
|  | 17 | independent obligation of the bank -- strike that -- of the |
|  | 18 | ratings service under these circumstances where there's an |
|  | 19 | obvious conflict and there always will be? |
| 11:44 | 20 | MR. CARDONA:  Um, that's part of the problem. |
|  | 21 | There was an obvious conflict. |
| 11:44 | 22 | THE COURT:  Then what was Congress doing -- |
| 11:44 | 23 | MR. CARDONA:  Well, um -- |
| 11:44 | 24 | THE COURT:  -- before 2007? |
| 11:44 | 25 | And what were the agencies doing, like the SEC and |

LACV 1300779 DOC 7/8/2013 – Volume I

55

```
        1   FTC and Treasury before 2007?
11:44   2        MR. CARDONA:  Before 2007, um, there was an act
        3   put in place that shifted the rules for designation as a
        4   nationally recognized statistical rating organization, and
        5   required that effective as of 2007, that that would be
        6   subject to SEC approval.
11:45   7        THE COURT:  Okay.
11:45   8        MR. CARDONA:  And that, again, gets to what
        9   these -- why these representations we allege were important.
       10   As part of that, as part of that regulatory action in 2007,
       11   S&P -- I'm sorry -- the SEC required S&P -- and this is in
       12   the Complaint -- the SEC required S&P to submit what it was
       13   relying on to address this potential conflict of interest.
11:45  14        And, in fact, what S&P submitted, in part, to
       15   address that was precisely its code of conduct.  Its code of
       16   conduct in which it made representations regarding the
       17   practices and procedures that it had in place that would
       18   address and, in there view, overcome these conflicts.
11:45  19        Things like the sections that Mr. KekerKeker read
       20   to you:  Analysts shall separate from the business side.
       21   Essentially, that's what it was, a series of practices and
       22   procedures that S&P represented separate our analytics, the
       23   people who are running the models, who are doing the
       24   analysis and coming up with whether the ratings are
       25   sufficient from our business side, the people who are out
```

DEBBIE GALE, U.S. COURT REPORTER

Case 2:13-cv-00779-DOC-JCG   Document 54   Filed 09/10/13   Page 56 of 102   Page ID #:1350
LACV 1300779 DOC 7/8/2013 – Volume I

56

          1    there negotiating with the banks about whether we should

          2    have their business how much they're going to pay us for our

          3    ratings, that kind of stuff.  But there was this separation.

11:46     4             Our allegations are that that wasn't true.  And

          5    that's why we get to a fraud case.

11:46     6             And this is a fraud case.  As Mr. Keker has

          7    recognized, this is a FIRREA case, which requires us to

          8    prove, as predicates, mail, wire, and bank fraud.

11:46     9             And it's the elements that I'm sure Your Honor is

         10    familiar with, with respect to those.  You know, a scheme to

         11    defraud or a scheme to make false statements,

         12    representations, or promises with the intent to obtain money

         13    from the victims.

11:46    14             Materiality, a capacity to influence, and an

         15    intent to defraud, which in the Ninth Circuit is an intent

         16    to deceive or cheat.

11:47    17             Those are all elements that we have to prove --

         18    will have to prove, and those are all elements that are

         19    alleged in the Complaint.

11:47    20             So let me turn to those allegations for a second

         21    to explain what our allegations are and why, with the

         22    respect to a number of those allegations, we don't have to

         23    prove that the actual rating on a particular instrument was

         24    false.

11:47    25             THE COURT:  So we recognize that there's an

Case 2:13-cv-00779-DOC-JCG   Document 54   Filed 09/10/13   Page 57 of 102   Page ID
#:1351
LACV 1300779 DOC 7/8/2013 - Volume I

57

1    inherent conflict in what the rating services do; Congress

2    recognizes that, the different federal agencies do; and

3    therefore, we turn to resolving that conflict by statements

4    from the entity that's profit-motivated.

11:47    5    MR. CARDONA:  Right.  S&P made representations as

6    to its practices, its procedures that it would keep this

7    separation and that, therefore, it would be objective and

8    independent; and those were, in fact, relied on by the

9    investors.

11:47    10    Not that we have to prove reliance, because,

11    remember, again, this is not a securities fraud action.  We

12    don't have to prove reliance.  We just have to prove that

13    their representations regarding their objectivity and

14    independence, the practices and procedures that they had in

15    place, the things we allege that were false or misleading --

16    we just have to prove that those had the capacity to

17    influence investors.

11:48    18    And they certainly did, because those investors

19    knew, as well, that S&P was operating under this potential

20    conflict of interest, and these were the representations

21    made to address it.

11:48    22    THE COURT:  Okay.  Sit down, please.

11:48    23    Not you, Counsel.  There's somebody behind you.

24    Please continue.

11:48    25    No, that was not directed at you.  I just don't

| | | |
|---|---|---|
| | 1 | want people standing. |
| 11:48 | 2 | MR. CARDONA: So let me get to the allegations as |
| | 3 | to what we have alleged. So what we have alleged is that |
| | 4 | there were these representations that were made, and we've |
| | 5 | alleged that those representations were made over a period |
| | 6 | of time from September 2004, all the way through 2007 in |
| | 7 | various forms. |
| 11:48 | 8 | And we allege that they were false for a variety |
| | 9 | of reasons, but the primary reason we allege they were false |
| | 10 | is they were false because S&P was not maintaining the |
| | 11 | separation and was allowing the business side to influence |
| | 12 | their ratings side. |
| 11:49 | 13 | And the examples of that influence and why those |
| | 14 | representations were false, we've essentially alleged two |
| | 15 | different things. |
| 11:49 | 16 | First, we have alleged that from September of 2004 |
| | 17 | through October 2007; that is, the entire time that we |
| | 18 | allege there was a scheme to defraud, one way in which S&P |
| | 19 | allowed that conflict to affect them, contrary to their |
| | 20 | representations, was that they manipulated their models; |
| | 21 | they manipulated their models and their criteria that they |
| | 22 | used to rate RMBS and CDOs. And this gets back to the |
| | 23 | models that you talked about, which will be the sub -- which |
| | 24 | are named in the complaint and are alleged and will be |
| | 25 | subject of proof at trial: The LEVELS model for RMBS, the |

1    CDO evaluator model for CDOs and other criteria that related

2    to those models.  Our allegation is they allowed the issues

3    to influence that criteria and the development of those

4    models in contradiction to their representations.

5          In that regard, we believe that the falsity of

6    those representations was material to investors regardless

7    of whether the actual rating would have been affected or

8    not.

9          And the reason is this.  If I have an investor and

10   I'm looking at a structured finance security, and I'm saying

11   I want to buy an AAA-rated security, when I look at it and

12   say S&P gave this an AAA-rated security, you know, I'm not

13   just looking at the fact of the rating; I'm looking at the

14   entire package, the quality of the process by which that

15   rating was arrived at.  And this is entirely consistent with

16   the Second Circuit cases that Mr. KekerKeker has relied on.

17         If the Court looks at *Novak*, *Star*, *Regioned Office

18   (phonetic)*, the other cases that they've cited, what they

19   talk about is deceit alone isn't enough, but deceit is but a

20   false statement that goes to the package of what the

21   investor sought to purchase does matter.

22         And in that sense, you know, I'll try an analogy,

23   and I apologize if the Court doesn't think it works.  But,

24   you know, when I go to purchase a piece of organic fruit in

25   the grocery store and it's certified organic, you know, it

1   may be that that certified organic fruit, in fact, turns out

2   to be identical to the noncertified organic fruit; but when

3   I buy that, I'm buying it with the peace of mind that comes

4   with knowing that it has been grown organically.  And I'm

5   not taking the risk that I take when I buy the nonorganic

6   fruit.  When I buy the nonorganic fruit, I may end up with a

7   piece of fruit that doesn't have any pesticide residue,

8   doesn't have anything else and is identical, but I'm taking

9   that risk.

10      When I buy a certified organic, I'm not taking

11   that risk because I'm relying on the representations of the

12   people certifying it to be organic.

13      And that's exactly the same thing here.  When I go

14   out and I buy a triple A tranche that has been rated by S&P,

15   I'm buying the peace of mind that comes with knowing or

16   believing that, in fact, S&P has engaged in an objective and

17   independent rating process and arrived at that without being

18   influenced by the issues.

19      It may be by chance that -- by chance, that rating

20   is the same as would have been arrived at through a

21   nonindependent-rating process, but I'm buying that total

22   package.  And that's materiality.  And the Second Circuit

23   cases recognize that.

24      And, moreover, the *Treadwell* case, out of the

25   Ninth Circuit, which we cited in our papers, in *United*

1    *States v. Treadwell*, dealt with a very similar situation.

2    In *United States v. Treadwell*, a claim was made that the

3    Second Circuit standard's were different from the Ninth

4    Circuit's, and the Court basically said, Look, we're not

5    gonna say whether there has to be an intent to harm, but

6    even if there was, it's satisfied here.

7    11:53          It's satisfied here because there was a harm to

8    the individual's property interest in depriving the victim

9    of the opportunity to weigh the true benefits and risks of

10   the transaction, regardless of whether or not they're gonna

11   suffer a permanent loss of property.

12   11:53          That's precisely what we have here.  Even if the

13   ratings would have turned out to be the same, there was

14   still a deprivation of the investor's right to make an

15   investment decision based on the full range of information.

16   And *Treadwell* recognizes that that can be the subject of a

17   fraudulent scheme, as do the Second Circuit cases.

18   11:53          So that's the importance.  That's the materiality.

19   And I'd like to turn -- unless the Court has questions on

20   that, I'd like to turn to the other two arguments that

21   Mr. KekerKeker made.

22   11:53          The arguments about puffing under *Boca Raton*.

23   And, in all honesty, I think I've addressed those, because

24   puffing is, in fact, part of the materiality analysis.  As

25   *Boca Raton* and the other case laws that they've relied on

1    make clear, that's part and parcel of looking at:  Are these

2    representations of a type that have the capacity to

3    influence an investor?  For precisely the reasons I've

4    explained, they are not puffing here.  Because you need to

5    look at them in context.  In all the cases that have been

6    cited, all the cases we've cited make that clear.

7           I'll just give the Court an example, you know, in

8    the Countrywide case that we cited that Judge Pfaelzer ruled

9    on.  The representations in that case, in the Countrywide

10   case, included representations about the, quote, "high

11   quality" of mortgage loans in general.

12          And as Judge Pfaelzer recognized, you know, in

13   most contexts, a statement of high quality is precisely the

14   type of statement that would be viewed as puffing.  It's

15   akin to things like "strong," you know, "we have strong

16   mortgage business."  It's akin to other words that courts

17   have repeatedly found to be normally puffing.

18          But in that case, in context, in particular in

19   context with a set of business practices that appeared to be

20   completely contrary to that, the Court found that even

21   though it ordinarily was puffing, in context, it wasn't.

22          And that's precisely the situation here.  In

23   context, with both the other representations, with the

24   importance to the investors of being assured that these

25   potential conflicts of interest would not affect the

Case 2:13-cv-00779-DOC-JCG  Document 54  Filed 09/10/13  Page 63 of 102  Page ID #:1357
LACV 1300779 DOC 7/8/2013 - Volume I

63

1    ratings, they were material; they were not puffing.

2        So the next argument I'd like to turn to is the

3    allegation of intent to defraud.  In part, I've already

4    addressed that by addressing *Treadwell*.  The only other case

5    I'd like to address is the *Liu* case, which they raise, which

6    is an intent to obtain money from the investors.  In

7    *United States v. Liu*, which the Court is probably familiar

8    with, but if I may be indulged just for a second to go into

9    the facts.  That was a case very, very different from here.

10       In that case, we had a lawyer, who, on behalf of

11   his clients, who, the evidence suggested, were perhaps

12   involved in the fraud, made false statements to the INS in

13   order to obtain visas for his clients.  And the issue there

14   was, you know, is this a *McNally* fraud, where we're not

15   depriving anybody of a property right, but instead we're

16   just --

17       THE COURT:  A little slower.

18       MR. CARDONA:  In *Liu*, the issue was, essentially,

19   do we have a scheme to defraud of money or property, or do

20   we have what is akin to an honest services fraud in

21   violation of McNally, because the only false statements are

22   directed to a government agency and the only nonculpable

23   participant is the government agency who could conceivably

24   be defrauded.

25       That's far different from the situation we have

Case 2:13-cv-00779-DOC-JCG  Document 54  Filed 09/10/13  Page 64 of 102  Page ID #:1358
LACV 1300779 DOC 7/8/2013 - Volume I

64

1    here.

11:57    2        THE COURT:  Just a moment, Counsel.  Too fast.

3    Slow down.

11:57    4        MR. CARDONA:  My apologies.

11:57    5        Importantly, in *Liu*, *Liu* discussed another case.

6    *United States v. Bonello*.  And in *Bonello*, there was a

7    similar claim, as S&P's claim here, that was rejected by the

8    court.

11:57    9        In *Bonello*, a bank employee was convicted of bank

10   fraud for making automatic teller withdrawals and then

11   altering the computer records so that, in fact, customer

12   accounts were charged for those automatic teller

13   withdrawals.

11:57   14        And the claim was, Look, the bank employee is not

15   obtaining money from the banks; he's actually obtaining

16   money from the customer accounts, because they're the ones

17   who actually lose the money.

11:57   18        And the Court rejected that, concluding that

19   because there was a mechanism in place such that the bank

20   would repay the customers for the amounts of money that they

21   lost out of their accounts, that was sufficient to satisfy a

22   scheme to defraud, a scheme to obtain money from the

23   victims.

11:58   24        That's precisely what we have here.  Even though

25   it's the investment banks, the issuers who retain S&P,

```
 1    ultimately the costs of S&P's services are reimbursed or
 2    paid by the investors.  And S&P's fee, in essence, comes out
 3    of the investment funds that the investors put in.  And
 4    that's sufficient under Liu and Bonello to satisfy that
 5    requirement.
 6         And, indeed, we have allegations in the Complaint,
 7    allegations at Paragraph 67 that describe that and, in fact,
 8    cite a high level S&P executive, Joanne Rose, who was in
 9    charge of their Structured Finance Department, making a
10    statement recognizing that investors ultimately do pay since
11    all deal fees, including rating fees, are netted out of the
12    total deal proceeds.
13         So, in essence, we have a situation that satisfies
14    the Liu/Bonello requirement.
15         So with that, Your Honor, if you have no other
16    questions, I'll turn the lectern over to Mr. Keker again.
17         THE COURT:  Same courtesy; I want you to step over
18    with your trial team and take a moment, make sure you've
19    answered or propounded your arguments.
20         MR. CARDONA:  We're fine, Your Honor.
21         THE COURT:  Okay.  Then help me understand a CDO
22    once again.  I'm still confused.
23         David Tesher is the -- let me see if I can read
24    may own notes here -- is allegedly the managing director in
25    charge of Cash CDO.  I think you find that at Paragraph 59
```

11:58
11:59
11:59
11:59
11:59
11:59
11:59
11:59

1    or around that portion of your Complaint.

11:59    2    MR. CARDONA:  Correct.

11:59    3    THE COURT:  Mr. Tesher reports to the person you

4    just named, Patrice Jordan.

12:00    5    MR. CARDONA:  Mr. Tesher reports to Patrice

6    Jordan, who reports to Joanne Rose.

12:00    7    THE COURT:  Okay.  We'll make it even more

8    complicated.  Who reports to Executive A?  Who is

9    Executive A?

12:00    10    MR. CARDONA:  That was, I believe, Vicky Tillman.

12:00    11    THE COURT:  Okay.  'Cause so far that person's

12    just referred to as Executive A, aren't they?

12:00    13    MR. CARDONA:  Correct.

12:00    14    THE COURT:  All right.  Now, in the same general

15    part of your Complaint, besides referring to David Tesher,

16    who's the managing director in charge of Cash CDOs, you have

17    a managing director, Andrea Brown, of Synthetic CDOs.

12:00    18    Help me.  What is the difference between a Cash

19    CDO and a Synthetic CDO?

12:00    20    MR. CARDONA:  A Cash CDO is a CDO that is backed

21    by actual assets, so the assets are --

12:01    22    THE COURT:  Just a moment.

12:01    23    And what's a Synthetic CDO?

12:01    24    MR. CARDONA:  A Synthetic CDO is an instrument

25    that is backed by --

12:01  1              THE COURT:  Nothing.

12:01  2              MR. CARDONA:  -- in many instances, credit default

3      swaps.  So it's promises to pay dependent on the performance

4      of other instruments.

12:01  5              THE COURT:  Let me repeat.  Nothing.  I can't find

6      anything in a Synthetic CDO that has any, you know, tangible

7      piece of property, aircraft shell.  Can you?

12:01  8              MR. CARDONA:  Synthetic CDOs, no.

12:01  9              THE COURT:  Don't repeat back to me.

12:01  10             Is there a tangible something that I can get my

11     hands on, like a piece of property in a foreclosure sale or

12     the shell of an aircraft in a Synthetic CDO?

12:01  13             MR. CARDONA:  Not directly.

12:01  14             THE COURT:  What was the mix of Synthetic CDOs in

15     a CDO?  Now, you've told me before that "An RMBS made up,

16     Judge, the vast majority of the CDOs," that they're RMBSs.

17     I want to know what a synthetic CDO is and what portion of

18     CDOs are these Synthetic CDOs.

12:02  19             MR. CARDONA:  Synthetic CDOs, in essence, are made

20     up of or can be considered as bets on other assets.  So

21     directly, there's nothing there.  But indirectly, they are

22     indexed to or hinged to other assets, such as the ones

23     you've been talking about.

12:02  24             THE COURT:  What I'm trying to figure out from

25     this Complaint is, what am I dealing with in terms of a CDO?

1   Am I dealing with 20 percent that were these Synthetic CDOs?

2   Am I dealing with 5 percent?  What is this, you know, term?

12:03   3   MR. CARDONA:  The CDOs that we have focused on in

4   the complaint are Cash CDOs and/or Cash CDOs squared.

12:03   5   THE COURT:  No Synthetic CDOs?

12:03   6   MR. CARDONA:  The reason I'm hesitating is there

7   may be one or two that were, in fact, indexed to or hinged

8   on other RMBS or Cash CDOs.

12:03   9   THE COURT:  Okay.

12:03   10   MR. CARDONA:  The majority of them, however, are

11   Cash CDOs that were, in fact, rated by David Tesher's group.

12:03   12   THE COURT:  Okay.  Thank you very much.

13   Appreciate it.

12:03   14   Thank you.

12:03   15   MR. KEKER:  I'd like to go to that question,

16   because it, both on the Motion to Dismiss and later

17   discussions, we need to know what we're dealing with here.

18   I mean, that's the point.  And a synthetic, I mean, so far

19   we haven't seen.  And a synthetic, I mean, so far we haven't

20   seen the specific allegations of Synthetic CDOs being at

21   issue; but then they've made a big point this is all just

22   "for example" is the only think they've alleged.  "For

23   example."

12:04   24   THE COURT:  That's my problem.  If this was going

25   forward, your position is, how do we defend?

12:04  1          MR. KEKER:  Yes.  What we have to defend is --
2    have a trial on -- as far as we know, 5500 times 10
3    tranches; 55,000 securities, and try to show that the rating
4    committee that did each one of those was acting in good
5    faith.

12:04  6          THE COURT:  And the government's position is,
7    "Trust me."

12:04  8          What we'll do, Mr. Cardona, is, apparently from
9    your perspective, sort this out at a later time.  In fact,
10    you make the statement that we may even narrow this before
11    summary judgment.  But if we're going forward -- join your
12    colleague there -- if we're going forward, trust us, as the
13    government, to either trim this or make this more clear at a
14    later time.

12:05  15          If I did that and it was too late, the defense has
16    no way to defend.  It comes to them a month before summary
17    judgment, two months before summary judgment.  They don't
18    know how to defend this lawsuit.

12:05  19          MR. CARDONA:  If I may --

12:05  20          THE COURT:  We're jumping ahead a little bit.

12:05  21          MR. CARDONA:  Understood.

12:05  22          THE COURT:  Okay.

12:05  23          MR. CARDONA:  But, again, just so I can get back
24    to our allegations, in terms of the second part of our
25    fraud, which actually does go to the ratings; in other

1    words, there is a portion of our fraud where we allege the

2    ratings were false.  That's the second portion from March to

3    October 2007.  There, we have provided a list of -- I think

4    it's 30 or 34 CDOs that are named in the Complaint --

12:05   5         THE COURT:  Twenty- -- regardless, okay.

12:05   6         MR. CARDONA:  -- as to which we intend to prove

7    that those ratings were false.

12:05   8         Now, those are examples, and there may be

9    additional examples that we identify that we determine we

10   wish to proceed on after doing some discovery.

12:05   11        And, again, I would come back to, Your Honor, this

12   is the initial stages here.  There is discovery we need to

13   do.  We have somal third-party subpoenas ready to go.

14   There's information that we need to identify some CDOs and

15   some RMBS as to which we're going to allege specifically of

16   losses and/or that those were the RMBS or CDOs affected by

17   the fraud.

12:06   18        THE COURT:  Just a moment.  Stop.

12:06   19        Okay.  Counsel.

12:06   20        MR. CARDONA:  Again, from our point of view, based

21   on our allegations, as to the initial part of the fraud,

22   whether or not the rating was actually false, doesn't

23   matter.

12:06   24        Now, I understand Mr. Keker has a different

25   position.  We've discussed that with him, and he's asserted

1    that as part of his defense he believes he should be

2    entitled to go into the validity of each rating.

12:06    3         And in light of that and in light of what would

4    be -- you know, if, in fact, that is going to be the defense

5    and if the Court is going to allow that defense, we would

6    try to narrow the case.

12:07    7         But in terms of narrowing the case, there are some

8    important things that we have to take into account.  You

9    know, Mr. Keker has made his claims about the damages, the

10   losses that flowed from the various specific CDOs that we

11   alleged the ratings were false.  And we've provided him with

12   information showing that those were a total of in excess of

13   $5 billion.

12:07    14        He has come back and contended that with respect

15   to Citibank and Bank of America, those losses shouldn't be

16   considered because they were also issuers.  Now, we don't

17   believe that's correct, and indeed, there's a case out of

18   the Southern District of New York, Bank of New York Mellon,

19   which we cite in the Rule 26(f) report, which indicates that

20   even those losses can be considered in fixing penalties.

12:07    21        But what we need to do and what we need to get

22   discovery before we can do it is to pick a set of RMBS and

23   CDOs that we believe will provide a representative sample of

24   losses flowing from the fraud that would provide this Court,

25   in the penalty phase, with a basis for setting penalties

        1    that we believe would be appropriate to reflect the scope of

        2    the fraudulent conduct.

12:08   3            So I understand the Court's desire and I

        4    understand Mr. Keker's desire to have the -- for trial, to

        5    have what will be proved narrowed, but before we can get to

        6    that point, there is some additional discovery that we need

        7    to do and take to determine how we're going to narrow that

        8    for trial.

12:08   9            THE COURT:  All right.  Thank you.

12:08  10            Mr. Keker.

12:08  11            MR. KEKER:  And on that point, Your Honor, the

       12    Government has tremendous powers under FIRREA, which it has

       13    exercised, making Standard & Poor's and McGraw-Hill deliver

       14    tens of millions of documents, taking depositions,

       15    investigating.

12:08  16            THE COURT:  Page 21, line 15 to 16, 30 million

       17    pages of material.

12:09  18            MR. KEKER:  Correct.

12:09  19            And our position is that if they needed to

       20    investigate more, they ought to just admit it.  This

       21    complaint should be dismissed, and they should do the

       22    investigation they need and then bring a case they can

       23    actually try that includes what they said on February 5th,

       24    2013, which is when Attorney General Holder stood up and

       25    said, We allege that by knowingly issuing inflated credit

DEBBIE GALE, U.S. COURT REPORTER

1    reported ratings for the CDOs and so on, Associate Attorney

2    General West, who's here, said, S&P knew these ratings were

3    inflated at the time they issued them.

12:09   4            What ratings?  Who knew it?  How is it false?

5    Please tell us, and we'll defend that case.  We don't think

6    they can even make that allegation.  We certainly don't

7    think they can prove that allegation if they make it.  But

8    we're urging that under Rule 9(b) and sort of common sense

9    that this -- that if they think some ratings were false,

10   they ought to say what they are.

12:10   11           Now, with respect to the later ratings, they have

12   not alleged that they're false.  They just alleged here's

13   what happened.  Here's -- and then later, a year later, they

14   defaulted.  You can look through these examples.  Here's

15   what the CDO is, and then, later, it defaulted.  So what?

16   Unless they can connect it up with the intent to harm the

17   victim and something that actually matters under the mail

18   fraud statute.

12:10   19           If I may, in response to a few things, they have

20   continuously said and they're arguing to you still that --

21   that they don't have to prove any false statement here,

22   including any false rating.  And they cite the *United States*

23   *v. Ali* case, and now they've cited the *Treadwell* case.

12:10   24           The -- *Ali* was a scam on Microsoft.  And if you

25   read the case, it's -- they went out and got -- set up phony

Case 2:13-cv-00779-DOC-JCG   Document 54   Filed 09/10/13   Page 74 of 102   Page ID #:1368
LACV 1300779 DOC 7/8/2013 – Volume I

74

```
 1    companies to buy from Microsoft under an educational
 2    program.  Got the computer equipment at a lower price and
 3    then resold it on the open market.  It's a scam that's been
 4    going on with Apple and Microsoft; clearly a scheme to
 5    defraud using deceit and misrepresentations.
 6           They cite the Munoz case which is -- in the Munoz
 7    case, it was a Ponzi scheme in which they talked about
 8    deliberately misleading.
 9           False statement under the mail fraud, wire fraud,
10    bank fraud statute includes the concept of something that's
11    deliberately misleading and/or willfully omitted and
12    necessary to make a false statement true.
13           The Treadwell case, which Mr. Cardona just talked
14    about, involved going to people -- it's a Ponzi scheme;
15    again, $40 million.  You go to people and you say, Loan us
16    the money, we've got a great gold mine in Mexico.  And the
17    argument in the Treadwell case is, well, we didn't mean to
18    permanently deprive 'em of money; we just wanted the loan.
19    And the Court said, "No, no, no.  That's a scheme to deprive
20    people of money or property.  Who cares if it's permanent
21    deprivation."
22           So our argument is that, first, this concept that
23    somehow not maintaining separation -- I'm not even sure what
24    that means.  Standard & Poor's and McGraw-Hill are
25    profit-making entities.  Everybody in the world knew that.
```

12:11
12:11
12:11
12:12

| | | |
|---|---|---|
| | 1 | Everybody in the world knew that the banks would come to |
| | 2 | them to get rated and pay for it, just like they do with |
| | 3 | Fitch and Moody's.  That can't possibly be material |
| | 4 | information to somebody who was evaluating the situation. |
| 12:12 | 5 | They -- what they have not alleged in this |
| | 6 | Complaint is what's required by Rule 9(b) of the federal |
| | 7 | rules; and that is the "Who committed the crime," "When was |
| | 8 | it committed," "How was it committed," "What was -- what was |
| | 9 | the falsity that makes up the scheme to defraud." |
| 12:13 | 10 | And then another thing that gets confused here, |
| | 11 | what is S&P?  S&P is a very large corporation with a lot of |
| | 12 | people with different functions and a lot of people -- a lot |
| | 13 | of very smart and good people with different ideas. |
| | 14 | Sometimes they think their boss's ideas aren't good; |
| | 15 | sometimes they think their subordinate's ideas -- they have |
| | 16 | disagreements. |
| 12:13 | 17 | But Standard & Poor's, as alleged in the |
| | 18 | complaint, has a method which it holds out to the world -- |
| | 19 | you can go on its website and see what it is -- of making |
| | 20 | these decisions about ratings.  And they try -- and it |
| | 21 | involves judgment.  It involves these three people on a |
| | 22 | committee.  It involves the people who sign off on 'em.  And |
| | 23 | there's not a word from the Government about which of those |
| | 24 | people committed what are alleged to be criminal acts. |
| 12:13 | 25 | When the Government says that these models were |

        1    manipulated, a careful reading of the complaint shows that

        2    what they're complaining about is that you didn't change it

        3    soon enough.  And that constantly people were saying, well,

        4    maybe we should look into this, and maybe we should do that.

        5    And for myriad reasons, they didn't do it.  And then the

        6    Government says you didn't do it.

12:14   7            Then when you do do it, in 2007, in February, they

        8    did change it, and then they complained about that.  They

        9    changed it again in July in response to all these

       10    conditions.

12:14  11            So "manipulation" is an easy word to throw around,

       12    but just saying it doesn't make a scheme to defraud.

12:14  13            Finally, the certified organic peach, or whatever

       14    it was that Mr. Cardona so valued.  The equivalent here is

       15    the honest opinion of Standard & Poor's with respect to a

       16    particular rating.  When we say that 56 percent of this CDO

       17    is going to go into a triple A tranche, that's our honest

       18    opinion at the time.  If they can allege and prove that

       19    that's not true, we -- we believe they have -- they have a

       20    case.  They haven't alleged that, though.

12:15  21            This Complaint doesn't allege it, and we shouldn't

       22    go forward until they're prepared to make that allegation,

       23    which we hope and think they shouldn't do.

12:15  24            One more point about what's at stake here.

12:15  25            This is a company that was paid $15 million for

Case 2:13-cv-00779-DOC-JCG   Document 54   Filed 09/10/13   Page 77 of 102   Page ID #:1371
LACV 1300779 DOC 7/8/2013 - Volume I

77

     1    these 26 CDOs.  The numbers that we're throwing around here

     2    really are financial crisis TARP-type numbers, huge, huge,

     3    huge numbers.  What we've added up and when we look at those

     4    26 and what they allege was the loss -- 80 million here, 100

     5    million there -- it seems to add up to $500 million.  All of

     6    that -- those are different cases than this "bet the

     7    company" litigation that they've started here.  Which is why

     8    we are so hopeful that a hard look -- and it sounds like you

     9    intend to do this -- a hard look at the case now right when

    10    it's beginning and making tough decisions now could get us

    11    into a shape to litigate the case or otherwise handle it,

    12    but not -- you know, sort of get it -- get it where it ought

    13    to be.

    14             Unless you have questions, I think that's all I

    15    have.

    16             THE COURT:  Well, some, but why don't you consult

    17    with your clients and with your co-counsel for a moment.

    18             MR. KEKER:  I think we're fine, Your Honor.

    19             THE COURT:  Okay.  Counsel.

    20             MR. CARDONA:  I understand the Court probably

    21    realizes this, but I just want that make sure it's on the

    22    record.  Mr. Keker has repeatedly said that we don't allege

    23    that ratings were false.  For the March to October 2007 time

    24    period, we do specifically allege that they were false.  And

    25    I'll point the Court, for example, to Paragraph 234 --

LACV 1300779 DOC 7/8/2013 - Volume I

| 12:17 | 1 | THE COURT:  Okay. |
| 12:17 | 2 | MR. CARDONA:  -- one of the ones that Mr. Keker |
| | 3 | pointed to, on page 78 of our Complaint, where we |
| | 4 | specifically allege, um, "notwithstanding S&P's knowledge |
| | 5 | regarding the increasing deterioration of non-prime RMBS, |
| | 6 | Cash CDO, the group headed by Mr. Tesher, under the |
| | 7 | supervision of Jordan and Tesher, issued and/or confirmed |
| | 8 | ratings for CDO including mezzanine -- such mezzanine CDOs |
| | 9 | that S&P knew did not accurately reflect the credit risks of |
| | 10 | those CDOs, because they failed to account for the |
| | 11 | substantially increased credit risks of underlying non-prime |
| | 12 | RMBS tranches." |
| 12:17 | 13 | That, in fact, is an allegation that those |
| | 14 | ratings, the ratings set out in the paragraphs that follow, |
| | 15 | the subparagraphs, were false.  They were ratings that we |
| | 16 | allege S&P knew did not accurately reflect the credit risks, |
| | 17 | which is what a rating was supposed to do. |
| 12:18 | 18 | That is an allegation that those ratings were |
| | 19 | false and that S&P knew it.  And the factual support for |
| | 20 | that is provided in the other allegations that precede and |
| | 21 | follow that. |
| 12:18 | 22 | THE COURT:  And let's add those subparagraphs up. |
| | 23 | Subparagraph (a), M&T Bank, the loss was? |
| 12:18 | 24 | MR. CARDONA:  One second. |
| 12:18 | 25 | THE COURT:  80 million. |

| | | |
|---|---|---|
| 12:18 | 1 | MR. CARDONA:  I believe for M&T Bank -- |
| 12:18 | 2 | THE COURT:  80 million? |
| 12:18 | 3 | MR. CARDONA:  -- uh, yes. |
| 12:18 | 4 | THE COURT:  Okay.  To WestCorp, 90 million? |
| 12:18 | 5 | MR. CARDONA:  In subparagraph (b). |
| 12:18 | 6 | THE COURT:  Okay.  That's 270. |
| 12:18 | 7 | 50 million to M&T. |
| 12:18 | 8 | MR. CARDONA:  Yes, Your Honor. |
| 12:18 | 9 | THE COURT:  320? |
| 12:18 | 10 | MR. CARDONA:  Yes. |
| 12:18 | 11 | MR. KEKER:  It's 220, Your Honor. |
| 12:18 | 12 | THE COURT:  I'm sorry.  220. |
| 12:18 | 13 | I went to a public school.  I'm kidding you, |
| | 14 | Counsel. |
| 12:19 | 15 | MR. CARDONA:  Your Honor, perhaps -- |
| 12:19 | 16 | THE COURT:  No, no, no.  Bear with me. |
| 12:19 | 17 | MR. CARDONA:  -- I can speed this because I have |
| | 18 | an exhibit that was part of our -- |
| 12:19 | 19 | THE COURT:  I don't need an exhibit, believe it or |
| | 20 | not. |
| 12:19 | 21 | 90 million to Charles Ford? |
| 12:19 | 22 | MR. CARDONA:  Yes. |
| 12:19 | 23 | THE COURT:  Okay.  So help me.  How much is that? |
| 12:19 | 24 | MR. KEKER:  310, Your Honor. |
| 12:19 | 25 | THE COURT:  Thank you.  Now, that seems to be |

1    specifically alleged.  Where's the rest of the specificity?

12:19    2        MR. CARDONA:  Your Honor, if you turn to -- if I

3    may have a second.

12:19    4        THE COURT:  Sure.

12:19    5        MR. CARDONA:  But there are other paragraphs like

6    that throughout.  And I'll turn to those.

12:19    7        234.

12:19    8        THE COURT:  We need to get to 5 billion, right?

12:19    9        MR. CARDONA:  The total for the CDOs that are

10   alleged specifically in the tables at the end totals

11   5 billion.

12:19    12       And if Your Honor would like, I have a chart that

13   I can give Your Honor that has that.

12:19    14       THE COURT:  Sure.  I appreciate that.  Thank you.

12:20    15       MR. CARDONA:  And I'm giving Mr. Keker a copy.

12:20    16       And just so Your Honor knows what this is, this

17   was a chart that was included in our initial disclosures to

18   the defense.

12:20    19       THE COURT:  All right.  But I thought that you got

20   to 5 billion because you took 1.1 million times the number

21   of RMBSs and CDOs and simply multiplied that out, and you

22   have asked the Court to bifurcate the trial and to make this

23   mechanistic evaluation?

12:20    24       MR. CARDONA:  No, Your Honor.  There are multiple

25   ways of arriving at the penalty phase.  Without any showing

1    of losses or gains, the maximum penalty under the statute is

2    1.1 million per FIRREA violation.

12:20    3         Alternatively, the Court can consider both the

4    gains to S&P and/or the losses resulting from the FIRREA

5    violations.

12:20    6         THE COURT:  Okay.  Now, have I seen this chart

7    before?  I don't recall this chart.

12:20    8         MR. CARDONA:  No, you have not.  This is in our

9    initial disclosures to S&P, which is not filed with the

10   Court.

12:20    11        THE COURT:  Oh.  Great.  Thank you very much.

12:21    12        So if you'd like to continue.

12:21    13        MR. CARDONA:  This lays out the losses that relate

14   to and flow from the specific CDOs that we have referenced

15   in the Complaint.

12:21    16        THE COURT:  And each of these are referenced in

17   the Complaint.  In other words, if I went back in this

18   Complaint and went to page 2, bottom, Bank of America,

19   $643,137,500, where would I find that in my Complaint?

12:21    20        MR. CARDONA:  You would find that in the table --

21   may I have one second?

12:21    22        THE COURT:  Sure.  Just point me to the page and

23   the paragraph.

12:21    24        MR. CARDONA:  If Your Honor turns to page 111 --

12:22    25        THE COURT:  Just one minute.

| | | |
|---|---|---|
| 12:22 | 1 | I'm sorry, to page 111? |
| 12:22 | 2 | MR. CARDONA:  111. |
| 12:22 | 3 | THE COURT:  And I can do this for each sum in the |
| | 4 | Complaint?  In other words, I can take this chart that I |
| | 5 | haven't seen before, and I can trace back to a specific |
| | 6 | paragraph for each sum that you've listed and apparently |
| | 7 | given to the defense? |
| 12:22 | 8 | MR. CARDONA:  No.  The -- the loss amounts for all |
| | 9 | of these are not listed in the Complaint. |
| 12:22 | 10 | THE COURT:  Okay. |
| 12:22 | 11 | MR. CARDONA:  Each of these CDOs is referenced in |
| | 12 | the Complaint as being part of what we allege was a result |
| | 13 | of the fraudulent conduct.  We did not allege the loss |
| | 14 | amount for each CDO in the Complaint, which is why we |
| | 15 | provided this in initial disclosures to S&P after they |
| | 16 | requested it. |
| 12:23 | 17 | THE COURT:  I'm just trying to discern the |
| | 18 | difficulty of defending this and how specific you are. |
| 12:23 | 19 | So I'm now looking at page 111, and I'm looking |
| | 20 | for the number 643 million plus. |
| 12:23 | 21 | MR. CARDONA:  You will not find that in the |
| | 22 | Complaint, Your Honor. |
| 12:23 | 23 | THE COURT:  I don't think so either.  So why am I |
| | 24 | looking at page 111? |
| 12:23 | 25 | MR. CARDONA:  You are looking at page 111 to see |

|      |    |                                                                              |
|------|----|------------------------------------------------------------------------------|
|      |  1 | that the Bank of America, the CDO that we are talking about,                  |
|      |  2 | the high-grade structured CDO credit, CDO 2007-1 is, in                       |
|      |  3 | fact, alleged in the Indictment as a specific CDO that we                     |
|      |  4 | allege was part -- the rating in -- that resulted, in part,                   |
|      |  5 | from the fraudulent conduct.                                                  |
| 12:23 |  6 |         THE COURT:  Is that Pinnacle Point Funding?  The               |
|      |  7 | high-grade structured credit?                                                 |
| 12:23 |  8 |         MR. CARDONA:  I'm not sure what your question is.              |
| 12:24 |  9 |         THE COURT:  Well, is it line 9?                                |
| 12:24 | 10 |         MR. CARDONA:  Right.                                           |
| 12:24 | 11 |         THE COURT:  Or 10 or 15 or -- strike that -- or --             |
| 12:24 | 12 |         MR. CARDONA:  Right.                                           |
| 12:24 | 13 |         THE COURT:  -- 13, 14.  Those are all Bank of                  |
|      | 14 | America?                                                                      |
| 12:24 | 15 |         MR. CARDONA:  The next entry, Pinnacle Point                   |
|      | 16 | Funding is Bank of America, yes.                                              |
| 12:24 | 17 |         THE COURT:  And the first one, if you go above                 |
|      | 18 | that, is high-grade structured credit, and I'm asking what                    |
|      | 19 | you're referring to.                                                          |
| 12:24 | 20 |         MR. CARDONA:  I was referring to high-grade                    |
|      | 21 | structured credit because I thought that was the one you                      |
|      | 22 | asked about.                                                                  |
| 12:24 | 23 |         THE COURT:  That would then comport with page 2 of             |
|      | 24 | 3, the bottom entry that you gave to --                                       |
| 12:24 | 25 |         MR. CARDONA:  Correct.                                         |

12:24    1       THE COURT: -- S&P. Okay.

12:24    2       And from that, you expand from an amount in lines

      3   8 and 9 on May 24, 2007, high-grade structured credit CDO

      4   2001 Bank of America internet posting of rating.

12:24    5       And the next entry is 5/24/2007, high-grade

      6   structured CDO 2001 Bank of America, rating fee wire of

      7   600,000 from La Salle National Bank of Chicago, Illinois.

12:25    8       How would I know that you're requesting

      9   643 million from this Complaint?

12:25   10       MR. CARDONA: Your Honor, from the Complaint

   11   itself, you wouldn't. That number is not in here. What's

   12   alleged in the Complaint are the FIRREA violations.

12:25   13       THE COURT: How does the defense defend, then?

   14   What is their ability to discern what you're charging?

   15   Because I assume that these are not only -- there must be a

   16   number of tranches? How are you getting to the 643 million?

12:25   17       MR. CARDONA: The 643 million are the losses that

   18   resulted to Bank of America from this CDO.

12:25   19       If I may step back for one second, Your Honor.

12:25   20       THE COURT: No, not yet.

12:25   21       Where do I see that in the Complaint, so I

   22   understand this Complaint?

12:25   23       MR. CARDONA: You will not see that loss figure in

   24   here, and the reason for that is the structure of the FIRREA

   25   statute. And if I may, this is part of the reason why we

Case 2:13-cv-00779-DOC-JCG   Document 54   Filed 09/10/13   Page 85 of 102   Page ID #:1379
LACV 1300779 DOC  7/8/2013 - Volume I

85

1  indicated that we believe it's appropriate to bifurcate the

2  liability and penalties phase.

12:26    3          The FIRREA statute itself, to establish a FIRREA

4  violation, this is not like after a civil action where there

5  are damages that automatically flow from the finding of a

6  FIRREA violation.

12:26    7          The way the FIRREA statute is structured is this:

8  There's certain things that are defined to be FIRREA

9  violations; and in particular, in our case, it's mail fraud

10  or wire fraud to the extent that mail fraud or wire fraud

11  affects a federally insured financial institution, or bank

12  fraud.

12:26    13          Once a FIRREA violation is established, then the

14  Court -- essentially akin to a sentencing in a criminal

15  case, the Court then has the discretion to consider a host

16  of factors in setting what the Court believes are the

17  appropriate penalties to be imposed on S&P for that FIRREA

18  violation.

12:27    19          Amongst the things the Court can consider are:

20  The gain to S&P, the losses that result from the individual

21  FIRREA violation, and other factors that were laid out in

22  another decision that we've cited in our 26(f) report, the

23  Menendez case that was decided by, I believe, Judge

24  Phillips -- Judge Morrow; that goes through and says, Look,

25  here are the things we can consider:  Loss, gains, the

1    degree of culpability, the kind of typical things that the

2    Court would look at in a sentencing.  That's really what

3    this is; it's a determination of the FIRREA violations.

12:27    4         And we have alleged in the Complaint those FIRREA

5    violations.  After that, there would be a determination by

6    the Court as to what the appropriate penalty is to impose.

12:27    7         THE COURT:  I'm going to repeat back to you what I

8    heard so you can know I either absorbed or mis-absorbed, and

9    then correct me.  And I'm humbly asking you.

12:27    10         What you're really saying is that if the jury

11    finds, in a liability phase, that there is liability for

12    high-grade structured credit CDO 2000-1, that basically,

13    because of that finding of liability, this should be

14    bifurcated and the damages should simply pass to the Court

15    using criteria.

12:28    16         MR. CARDONA:  The Court would have to make a

17    determination as to whether those losses resulted from the

18    FIRREA violation.

12:28    19         THE COURT:  I understand that the statute may

20    allow that, but I don't think that it reads "shall."  I

21    think it's entirely discretionary, and I can't imagine why a

22    Court would take that away from a jury in terms of

23    determining the amount of damages, nor take that chance with

24    this Circuit or any other Circuit or the Supreme Court.

12:28    25         And I can't imagine why I would bifurcate this.

12:29    1           MR. CARDONA:  First, you are correct.  You have

         2    discretion to decide how you want to do that.  If you wanted

         3    to have the jury make a determination of what the losses

         4    resulting from it were, that's fine.

12:29    5           THE COURT:  Doesn't that reach constitutional

         6    dimensions when you're deciding damages?  I know that the

         7    statute allows it.  That doesn't mean, upon examination by

         8    Ninth Circuit or the Supreme Court, that they're going to

         9    say that that's appropriate when you're dealing with a

        10    request for $5 billion.

12:29   11           It would seem to me that the jury, the same jury

        12    that decided liability would be in a good position, if we're

        13    going to trust the jury system, which I think we do, to

        14    decide that very issue.

12:29   15           MR. CARDONA:  I don't think it would rise to a

        16    constitutional violation, because, again, the Court -- it's

        17    not like a straight forward damages assessment, where those

        18    damages then presumptively set what it's at.  It would

        19    simply set the maximum, within which the Court would have

        20    discretion --

12:29   21           THE COURT:  Let's hypothetically --

12:29   22           MR. CARDONA:  -- but assuming you throw it to the

        23    jury, you could have the jury to make the determination of

        24    the losses flowing from or the gains flowing from, both of

        25    which would be relevant -- you would still have --

1    ultimately, after that, you would be the one determining

2    what the penalty should be.

12:30  3         THE COURT:  And how in a jury setting does S&P

4    defend other than knowing that high-grade structured credit

5    CDO 2000-1 is in play, as you alleged in page 111 -- I'm

6    humbly asking this -- against a claim of eventually an

7    argument to the jury that there's $643 million plus -- in

8    other words, doesn't -- isn't S&P, if this does go forward,

9    entitled to know how that $643 million is broken down,

10   whether they're securitizations, as I call them, bundling,

11   or if they're tranches within those securitizations or

12   bundlings?

12:31  13        MR. CARDONA:  That will be the subject of proof at

14   trial and discovery in the course of proceedings in this

15   case.  We have complied with the requirements of Rule

16   12(b)(6) and Rule 9 by basically putting them on notice,

17   advising them what the nature of the fraud scheme is, what

18   the fraud is; that this is one of the results of that fraud;

19   that wirings and mailings connected with this were in fact

20   wirings and mailings that we contend are FIRREA violations;

21   and now we will be engaged in discovery in the civil

22   process.  So they can inquire about that, depose about that,

23   do the defense that they need to do.

12:31  24        But, again, Your Honor, we are at the initial

25   stages.  We filed our Complaint.  There's been a Motion to

|      |    |                                                             |
|------|----|-------------------------------------------------------------|
|      | 1  | Dismiss filed.  We're under a Rule 12(b)(6) standard.  I    |
|      | 2  | understand there's going to be a discovery process to iron  |
|      | 3  | out the issues, just as there commonly is in civil cases.   |
| 12:31| 4  | But we have complied with the requirements of               |
|      | 5  | putting them on notice about that and providing them with   |
|      | 6  | enough information to defend.  They know the nature of the   |
|      | 7  | fraud, and they know the CDOs and RMBS that we allege were  |
|      | 8  | affected by that.                                           |
| 12:32| 9  | THE COURT:  For 12(b)(6) purposes.                          |
| 12:32| 10 | MR. CARDONA:  For 12(b)(6) purposes.  And I don't           |
|      | 11 | think we can separate this from that standard.              |
| 12:32| 12 | THE COURT:  Okay.                                           |
| 12:32| 13 | All right.  Now --                                          |
| 12:32| 14 | MR. KEKER:  Could I --                                      |
| 12:32| 15 | THE COURT:  Certainly.                                      |
| 12:32| 16 | MR. KEKER:  -- address this, because I want to             |
|      | 17 | make sure that we're all on the same page about these       |
|      | 18 | numbers, because I think they're important.                 |
| 12:32| 19 | If you go through the Complaint and look at the             |
|      | 20 | paragraphs, like 234 that you just looked at, and add up the|
|      | 21 | losses, as you started to do in 234 when you got 310, you   |
|      | 22 | will get about $500 million.  That's all.                   |
| 12:32| 23 | Then, they want to switch back -- and I'm gonna            |
|      | 24 | come back to 234 in a second.                               |
| 12:32| 25 | They want to jump back to 111 and say                      |

Case 2:13-cv-00779-DOC-JCG   Document 54   Filed 09/10/13   Page 90 of 102   Page ID #:1384
LACV 1300779 DOC 7/8/2013 - Volume I

90

<table>
<tr><td>1</td><td>willy-nilly -- I mean, just say, here's a lot of mailings</td></tr>
</table>

1    willy-nilly -- I mean, just say, here's a lot of mailings

2    about a lot of CDOs that have never even been mentioned,

3    except generically, anywhere else in the Complaint.

12:33   4        And then what they provided us based on 111 -- I

5    think this is awfully important -- is what they're talking

6    about -- this is the 111 part.  They're not described in the

7    Complaint; they're just mentioned.  But if you look at 'em,

8    Citibank has all these losses that they're claiming.  It's

9    called Hung Warehouse Credit Risk Exposure.

12:33   10       You know, what that is?  What that is are CDOs and

11   RMBS that Citibank prepared and managed and put together and

12   got rated, but couldn't sell.

12:33   13       Poor Citibank was stuck with 'em.  And if you add

14   those -- and the same thing for Bank of America in here --

15   you get 4 billion of the $5 billion.

12:34   16       The reason this is a $5 billion case at this

17   point -- and I think that they can go further -- is that

18   poor Bank of America and poor CitiGroup couldn't sell what

19   S&P rated, and they're claiming that that's a loss affecting

20   a financial institution.  We think that's extraordinary.

12:34   21       And in terms of materiality and in terms of all of

22   our -- all of our arguments, what are we doing here?  Now,

23   with respect to their claim --

12:34   24       THE COURT:  Well, let me ask you both something

25   and get your wisdom again.

DEBBIE GALE, U.S. COURT REPORTER

12:34

1        It's not a criminal case, but if it was, since it

2    has this hybrid to it, the defense would have the right to a

3    Bill of Particulars.  They could come to the Court and ask

4    the Court to have more specificity.  And on the criminal

5    level, sometimes courts grant that.  Here, this case is a

6    civil proceedings, but it has "hybrid," if you will,

7    of -- well, some criminal elements, allegedly.

12:35

8        If you'd met the 12(b)(6) standard, what in the

9    future gives the defense, once again -- and I'm asking you

10   this -- the ability to defend?  Other than you coming before

11   the Court and saying, "Judge, we alleged on page 111, and in

12   Paragraph 234, high-grade structured credit."  Because I

13   don't know that, if you proved that, that the damages flow,

14   especially if I submit this to a jury.

12:35

15       So is there anything in the civil law that is

16   analogous to a Bill of Particulars in the criminal law that

17   allows -- in other words, you can charge -- you have

18   500-some million minimally.  If I later get into a discovery

19   issue, if you get past the 12(b)(6) stage, I'm going to have

20   to sort that out very quickly with you.  And I'm going to be

21   concerned about particularity.  Because what I'm not going

22   to do, if we get to that stage, is allow you just to go down

23   the road of discovery, to come back in nine months or ten

24   months, when we have a pending trial date or motion date,

25   and in good faith you've gone through the discovery, you

1    then give it to the defense and the defense is going to have

2    a very viable claim to the Court, "Hey, we just got this.

3    You've spent three years investigating this, eight months of

4    discovery.  We've got a trial date in 2015.  It's six months

5    before or four months before, we need to do our own

6    depositions now."

12:36

7         In other words, it's a continuing problem for the

8    Court in terms of setting a specific date, which is the

9    defense's claim in the scheduling conference.  "Judge, don't

10   set a date right now."

12:36

11        So how are you going to cure that?  In other

12   words, you may have $5 billion, but it may require a lot of

13   specificity, not for 12(b)(6) purposes, but looking ahead,

14   if you've gotten through that hurdle, or if you get through

15   that hurdle, I've got to sort that out.

12:37

16        MR. CARDONA:  Your Honor, I would come back again

17   to -- first, let me drop back to a criminal case for a

18   second, because in a criminal case, typically, there aren't

19   allegations as to the losses or other things that are

20   included in the Indictment.  And typically, that's not the

21   proper subject of a Bill of Particulars.

12:37

22        THE COURT:  No.  But, for instance, if we have

23   narcotics sales, people are entitled to know the date, the

24   quantity, who possessed it.  It's the same.  They're

25   entitled to know the amount of damages, what tranches,

1    et cetera.

2            MR. CARDONA:  I -- I understand that.  And, in

3    terms of that, you know, first, again, the fraud we've

4    alleged with respect to the RMBS and CDO ratings prior to

5    March of 2007 does not hinge on the individual ratings.  And

6    they know what that fraud is.  Remember, while we have been

7    investigating, S&P has been on the other side of that

8    investigation for the three years.  The vast bulk of the

9    information --

10           THE COURT:  That's not the record S&P is going to

11   set for the Ninth Circuit or the Supreme Court.  The record

12   that they're going to set is that they're caught by surprise

13   and unable to defend.  I mean, it's clear in the scheduling

14   conference that that will be the argument.

15           MR. CARDONA:  I understand that will be the

16   argument.  I don't think that will be well-founded.  I

17   understand that will be their argument.  We have advised

18   them, and will tell the Court, you know, look, we plan on

19   taking some discovery.  To the extent we can, we will narrow

20   the case for purposes of trial.  And, you know, to the

21   extent the Court wants us to provide some more specifics

22   about this as we move along, we will do our best to do so.

23           But we are in a position now where we have clearly

24   alleged a fraud that satisfies the 12(b)(6) standards.  We

25   have provided specificity with respect to a host of

|   |   |
|---|---|
| | 1   examples, particular CDOs, as to which we allege the ratings |
| | 2   were false.  All of the -- |
| 12:38 | 3   THE COURT:  I've already heard that argument. |
| 12:38 | 4   MR. CARDONA:  And we will try to provide that, but |
| | 5   we're gonna need some discovery before we can come up with a |
| | 6   narrowed set of examples that we can proceed on. |
| 12:38 | 7   THE COURT:  The last question, then.  How, if you |
| | 8   need discovery, did you come up with a specific figure of |
| | 9   $643,137,500?  You must have discovered something.  And each |
| | 10  of these are specific numbers -- |
| 12:39 | 11  MR. CARDONA:  Yes |
| 12:39 | 12  THE COURT:  -- so you must have people or -- |
| 12:39 | 13  MR. CARDONA:  Yes. |
| 12:39 | 14  THE COURT:  -- or attached to these.  How did you |
| | 15  come up with these numbers? |
| 12:39 | 16  MR. CARDONA:  The information we gathered in the |
| | 17  course of the investigation, in many instances from these |
| | 18  financial institutions, was information from them regarding |
| | 19  the losses that they suffered on those CDOs. |
| 12:39 | 20  THE COURT:  Okay.  Let me turn to Mr. Keker. |
| 12:39 | 21  Counsel. |
| 12:39 | 22  MR. KEKER:  Just -- just the final point, |
| | 23  Your Honor.  I don't accept -- we don't accept that |
| | 24  Paragraph 234 or paragraphs like it properly allege under |
| | 25  Rule 9(b) the who, how, what of fraud.  If you read it |

1    carefully, it says that S&P knew, did not accurately reflect

2    the credit risk of those CDOs, because they failed to

3    account for a substantially increased credit risk of

4    underlying non-prime RMBS.  What difference did it make?

5    Was the rating -- are they saying the rating was wrong?  Or

6    are they saying -- what are they saying?  They're not saying

7    that this was not triple A, that these examples that follow

8    should not have been rated triple A.

9            When you turn to their specific allegations in A,

10   for example, they say, in March, S&P -- again, no person.

11   Who's the evil rating person here? -- rated Gemstone.  It

12   had approximately 66 percent -- blah, blah, blah.

13   56 percent of the collateral backing Gemstone was non-prime,

14   rated triple B.  Approximately 803 million, 72 percent of it

15   was rated triple A.  Triple A and double A tranches of

16   Gemstone were purchased by a bank.

17           I mean, there's no allegation that the triple A

18   and double A tranches were improperly rated or didn't show

19   the credit -- properly the credit risks of that.  There is

20   no specific allegation as required by 9(b).

21           And that is true for every single paragraph.  And

22   I can give you, just quickly for the record, the paragraphs

23   that tell us -- that bring in the specifics -- are 234,

24   236 -- that's what happened in April.  238 is May.  241 is

25   June, and 261 is July.

12:41  1          And those -- and all of 'em were prefaced by the
       2    words, "For example."  So these are thrown out.  There's no
       3    specific allegation as would be required by 9(b) that
       4    somebody -- David Tesher -- I mean, you -- somebody who
       5    had -- was in a position of authority over that rating
       6    didn't honestly believe it at the time that it was done.  If
       7    they can't allege that, the case shouldn't go forward on
       8    12(b)(6) and they should start over.

12:41  9          THE COURT:  Okay.  Before I turn back to your
       10   colleague, make sure you've concluded your arguments.

12:42  11         MR. KEKER:  Ms. Keller's helped me out.

12:42  12         Your Honor, there is something analogous to the
       13   Bill of Particulars in a criminal case.  And the analogy in
       14   this case is the heightened pleading requirement of 9(b).
       15   You can't start a fraud case without saying the who, what,
       16   when, where, as we quoted from *Corvaso (phonetic).*

12:42  17         Thank you.  I have nothing further.

12:42  18         THE COURT:  Thank you very much.

12:42  19         Counsel?

12:42  20         MR. CARDONA:  With respect to the CDO ratings, the
       21   specifics as to the falsity are alleged.  We allege that the
       22   ratings were false; that is, that they didn't reflect their
       23   true credit risks because that's what a rating is.

12:43  24         According to S&P, a rating is their true and
       25   current opinion as to the credit risks of the CDO.  We have

         1    alleged in Paragraphs 234, 236, 238, 241, 244 and 261 that,

         2    in fact, they issued ratings knowing and believing that they

         3    were not -- that it did not reflect the true credit risks.

         4    And the basis for that is specifically alleged in the

         5    paragraphs that precede those.  And in particular, the

         6    allegations are these:

12:43    7           What we allege is that during this time period,

         8    from March through October 2007, S&P -- and, in particular,

         9    Mr. Tesher and Ms. Jordan and Ms. Rose -- were aware that

        10    CDOs were being packaged with BBB and below-rated RMBS.

        11    S&P, when they rated the CDOs, continually took those

        12    ratings at face value and didn't adjust 'em.

12:44   13           Nevertheless, during that same time period, S&P

        14    realized and came to realize that, in fact, those ratings

        15    that they were using to rate the CDOs, the RMBS ratings,

        16    were not accurate.  They would not hold.  And we cite to

        17    specifics about that.

12:44   18           So, for example -- um, in, uh, Paragraph 218, on

        19    page 63, we cite an e-mail between Executive F and Senior

        20    Executive E, in which one of those says, "I talked to Tommy

        21    Gillis yesterday and he thinks that the ratings are not

        22    going to hold through 2007."

12:44   23           That's demonstrating the knowledge of the people

        24    who were in charge of the rating process that the ratings on

        25    which they were relying in rating the CDOs are not going to

Case 2:13-cv-00779-DOC-JCG Document 54 Filed 09/10/13 Page 98 of 102 Page ID #:1392
LACV 1300779 DOC 7/8/2013 - Volume I

98

1    hold.  And we have extensive allegations about that, the

2    internal analyses that showed them that those RMBS ratings

3    were no longer valid, communication indicating their

4    knowledge to that effect, communication indicating that they

5    realized that because so many of those RMBS were packed into

6    those CDOs that it was going to affect those ratings -- all

7    of that satisfies 9(b).  It provides the specifics as to why

8    we allege these ratings were false.

9          And the same is true of the other part of the

10   fraud, the part of the fraud that Mr. Keker doesn't want to

11   pay attention to, the first part, the objectivity and

12   independence.  We have alleged the specifics as to when

13   those statements were made, who made them, what they said;

14   and then the Complaint alleges why those were false.  Why

15   those were false:  Because the models and criteria were, in

16   fact, manipulated in response to pressure from issuers.

17         So we have satisfied both Rule 12(b)(6) and

18   Rule 9(b).  And what we are offering is, as a recognition of

19   the practicalities of trial, to more specifically narrow our

20   allegations once we get discovery.  Um, but that's not

21   something that we would be required to do.  I mean, the fact

22   of the matter is that S&P, as the largest rating agency in

23   the world, rated 5,000 instruments during the time when we

24   allege their statements about what they were doing was

25   false.

12:46    1          Um, it's not our fault that their scope of what

2    they did was so broad.  And we would be entitled to pursue

3    that case.  I recognize that, for practical purposes, we're

4    going to need to narrow that case for trial, and we are

5    willing to do that, but that's going to require discovery.

6    I mean, that's where we are.

12:46    7          And the rest, I think, deals more with the

8    scheduling order than with the Motion to Dismiss, and I want

9    to make sure we keep those separate 'cause they're two

10    different things.

12:46   11          THE COURT:  What's the loss between March and

12    October of 2007?

12:46   13          MR. CARDONA:  That is the $5 billion figure that

14    we have given, based on the CDOs that are specifically

15    alleged in the Complaint.

12:46   16          THE COURT:  So, in that approximately six-month

17    period of time, $5 billion?

12:46   18          MR. CARDONA:  5 billion in losses resulted from

19    the CDOs that were rated by S&P during that time period.

12:47   20          I should note that there are additional losses

21    flowing from RMBS that were rated by S&P prior to that time

22    period, and we are still in the process of taking discovery

23    on that as well.

12:47   24          THE COURT:  All right.  Here's a thought for both

25    of you:  I'm going to hand out a tentative that I had

Case 2:13-cv-00779-DOC-JCG  Document 54  Filed 09/10/13  Page 100 of 102  Page ID #:1394
LACV 1300779 DOC 7/8/2013 – Volume I

100

```
        1   previously prepared now.
12:47   2           But you can't take this tentative as a final,
        3   which you will do immediately.  When you get it, one of you
        4   will think you've prevailed, and the other will think you've
        5   lost.
12:47   6           We have a criminal calendar this afternoon, so I
        7   think by 3:00 o'clock I'm going to invite you back.  That
        8   will give you time to absorb the tentative.  I'm going to
        9   open it up to one more round to show me the fallacy of the
       10   tentative, from either side.  And I think I can conclude the
       11   criminal calendar by 3:00 o'clock.  If not, please be
       12   patient with me.
12:48  13           So go have a nice lunch.  We'll see you at
       14   3:00 o'clock.
12:48  15           Now, if you want to remain --
12:48  16           (To the clerk and law clerk:) Julie, Bobby, I'm
       17   going to need multiple copies.
12:48  18           Counsel, if you would come back at 1:30, we'll
       19   make five copies for the government.
12:48  20           MR. CARDONA:  That's fine.
12:48  21           Tell me what you need.
12:48  22           MR. CARDONA:  If we could have 10, that would be
       23   great.
12:48  24           THE COURT:  10?  Okay.
12:48  25           Well, then co-equal.  10?
```

LACV 1300779 DOC 7/8/2013 - Volume I

101

12:48  1                MR. KEKER:  We don't need 10.

12:48  2                THE COURT:  Yes, you do.  It's co-equal.

12:48  3                MR. KEKER:  Sure.  We want what the government

4      gets.

12:48  5                THE COURT:  All right.  10 and 10.  Thank you.

12:49  6           *(Lunch recess held at 12:49 p.m.)*

12:49  7            *(Further proceedings to be reported by Maria*

8             *Dellaneve in Volume II.)*

9                              -oOo-

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DEBBIE GALE, U.S. COURT REPORTER

1                              –oOo–

2

3                          CERTIFICATE

4

5         I hereby certify that pursuant to Section 753,

6    Title 28, United States Code, the foregoing is a true and

7    correct transcript of the stenographically reported

8    proceedings held in the above–entitled matter and that the

9    transcript page format is in conformance with the

10   regulations of the Judicial Conference of the United States.

11

12   Date:  July 9, 2013

13

14

15                      /s/ Debbie Gale
                     _____
16                      DEBBIE GALE, U.S. COURT REPORTER
                        CSR NO. 9472, RPR, CCRR
17

18

19

20

21

22

23

24

25