KEKER & VAN NEST LLP
JOHN KEKER (SBN 49092)
jkeker@kvn.com
ELLIOT R. PETERS (SBN 158708)
epeters@kvn.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:   415 391 5400
Facsimile:   415 397 7188

Attorneys for Defendants MCGRAW-HILL COMPANIES, INC., and
STANDARD & POOR'S FINANCIAL SERVICES LLC

ANDRÉ BIROTTE JR.
United States Attorney
GEORGE S. CARDONA (CA Bar No. 135439)
LEON W. WEIDMAN (CA Bar No. 104078)
ANOIEL KHORSHID (CA Bar No. 223912)
RICHARD E. ROBINSON (CA Bar No. 090840)
Assistant United States Attorneys
    Room 7516 Federal Building
    300 N. Los Angeles St.
    Los Angeles, California 90012
    Telephone: (213) 894-8323/6086
    Facsimile: (213) 894-6269/7819
    Email: George.S.Cardona@usdoj.gov / Anoiel.Khorshid@usdoj.gov

Attorneys for Plaintiff UNITED STATES OF AMERICA

*(Additional counsel on next page)*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> MCGRAW-HILL COMPANIES, INC. and STANDARD & POOR'S FINANCIAL SERVICES LLC, <br><br> Defendants. | Case No. CV13-779 DOC (JCGx) <br><br> **SECOND SUPPLEMENTAL JOINT REPORT OF PARTIES PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(f); EXHIBITS 1-3** <br><br> **[Fed. R. Civ. P. 26(f); Loc. Civ. R. 26-1]** <br><br> Scheduling Conference:   12/16/2013 <br> Time:          3:00 p.m. <br> Dept.:         Courtroom 9D <br> Judge:        Honorable David O. Carter |

1  *(Additional counsel):*

2

3  CAHILL GORDON & REINDEL LLP
   FLOYD ABRAMS
4  fabrams@cahill.com
   S. PENNY WINDLE
5  pwindle@cahill.com
   80 Pine Street
6  New York, New York 10005-1702
   Telephone: 212 701 3000
7  Facsimile:  212 269 5420

8  KELLER RACKAUCKAS UMBERG ZIPSER LLP
   JENNIFER L. KELLER (SBN 84412)
9  jkeller@kruzlaw.com
   18300 Von Karman Avenue, Suite 930
10 Irvine, CA 92612
   Telephone: 949 476 8700
11 Facsimile: 949 476 0900

12 Attorneys for Defendants MCGRAW-HILL COMPANIES, INC., and
   STANDARD & POOR'S FINANCIAL SERVICES LLC
13

14 STUART DELERY
   Acting Assistant Attorney General
15 MAAME EWUSI-MENSAH FRIMPONG (CA Bar No. 222986)
   ARTHUR R. GOLDBERG
16 MICHAEL S. BLUME
   JAMES T. NELSON
17 BRADLEY COHEN
   JENNIE KNEEDLER
18 SONDRA L. MILLS (CA Bar No. 090723)
   THOMAS D. ZIMPLEMAN
19 United States Department of Justice, Civil Division
       P.O. Box 261, Ben Franklin Station
20     Washington, D.C. 20044
       Telephone: (202) 616-2376
21     Facsimile: (202) 514-8742
       Email: James.Nelson2@usdoj.gov
22
   Attorneys for Plaintiff UNITED STATES OF AMERICA
23

24

25

26

27

28

After the scheduling conference conducted by the Court on July 29, 2013, in accordance with the initial scheduling order issued by the Court on August 2, 2013, the parties have engaged in an initial phase of limited discovery as described below and in status reports filed by the parties with the court on October 14, 2013.  In the course of this initial phase of limited discovery, through telephone conferences on September 6, 2013, September 20, 2013, September 27, 2013, October 1, 2013, October 9, 2013, October 24, 2013, November 1, 2013, and November 25, 2013, and the exchange of written documents, the parties have conducted additional conferences of counsel, and jointly submit the following supplemental report pursuant to Federal Rule of Civil Procedure 26(f).

## I.   THE GOVERNMENT'S NOVEMBER 18, 2013 SUPPLEMENTAL DISCLOSURE

On November 18, 2013, the United States served a second supplement to its initial disclosures (Second Supplement To Plaintiff United States' Initial Disclosures Pursuant To Federal Rule Of Civil Procedure 26(a)(1)(A); Exhibits A And B ("November 18 supplement")) that set forth: (a) the sets of RMBS and CDOS ("the Specified RMBS and CDOs"), together with the particular tranches and tranche purchasers, that will form the basis for its proof at trial; (b) the financial institutions the United States will contend were affected by the alleged fraud; and (c) the financial institution losses the United States will contend provide a basis for the determination of FIRREA penalties.

### A.   Statement of the United States

The Complaint in this case alleges that S&P engaged in a fraudulent scheme that extended from September 2004 through October 2007.  In particular, the Complaint alleges that throughout this time period, in order to maintain and increase its market share for and revenue from RMBS and CDO ratings, S&P falsely represented that its credit ratings of RMBS and CDOs were objective,

1

independent, and uninfluenced by any conflicts of interest that might compromise S&P's analytic judgment. S&P's motion to dismiss these allegations was denied by the Court.  In particular, the Court rejected S&P's contention that its assertions regarding its objectivity and independence should be disregarded as "mere puffery" that were immaterial as a matter of law, finding this assertion "deeply and unavoidably troubling when you take a moment to consider its implications." [Dkt. 34 at 7]

Between 2004 and 2007, the period covered by the fraudulent scheme alleged in the Complaint, S&P rated a total of 4,462 RMBS and 704 CDOs.  S&P's repeated assertions of its own objectivity and independence extended to all these ratings.  The United States, however, as it represented it would, has agreed to narrow its case substantially, identifying as the RMBS and CDOs that will form the basis for its proof at trial only 56 RMBS (less than 1.5% of the total RMBS rated by S&P during the period 2004 to 2007) and 107 CDOs (less than 16% of the CDOs rated by S&P during that same period).[1]

As discussed below, the United States has proposed a discovery plan it believes more than reasonable for this case as narrowed, particularly given that during the initial discovery period, the United States has provided S&P with all of the sworn testimony and virtually all of the documents it gathered in the course of its FIRREA investigation, and the parties have identified those limited areas in which unresolved discovery disputes will require court rulings.[2]  S&P, however,

---

[1]  The figures above are for RMBS and CDOs considered as a whole.  On a tranche level, the narrowing of the government's case is equally substantial.  Of 67,503 RMBS tranches rated by S&P between 2004 and 2007, the government has identified 62 (approximately 0 .1%).  Of 3,916 CDO tranches rated by S&P between 2004 and 2007, the government has identified 724 (approximately 18.5%).  The relatively larger number of CDOs reflects the fact that the Complaint limits to CDOs its allegations that between March and October 2007 S&P issued ratings it knew did not reflect those CDOs' true credit risks.

[2]  The United States has not produced to S&P summaries and notes of witness

continues to assert that it cannot propose any schedule for the case as narrowed by the government.  Its arguments in support of this position are without merit,

First, S&P argues that rather than narrowing this case, the United States has expanded it.  This argument is based on S&P's flawed contention that the case should be held to have been originally limited to the 26 CDOs explicitly referenced in paragraphs 277 and 278 of the Complaint.  As the United States explained in the parties' original joint Rule 26(f) submission, the Complaint made clear that these 26 CDOs were alleged in the Complaint as "examples and that the actual number of FIRREA violations arising from the alleged scheme to defraud is much greater." [Dkt. 23 at 5-6 & n.3]  Pleading in this way is neither improper nor unusual. Indeed, in a recent FIRREA case tried in the Southern District of New York, the United States' complaint itself identified only 7 specific loans that defaulted, but discovery, trial, and the determination of penalties currently pending before the court have proceeded on the basis that the fraud alleged encompassed at least 11,481 loans.  See United States ex rel. O'Donnell v. Bank of America Corp., 12-cv-1422 (JSR) (Dkt. 315, filed Nov. 20, 2013) (Bank Defendants' Memorandum Of Law Regarding Penalties at 18-20 – contending to court that fraud found by jury was limited to 11,481 loans, while noting government's contention that fraud extended to 28,882 loans).  In short, there is no basis for S&P's contention that the original Complaint limited the scope of the alleged fraud to 26 CDOs, and hence no basis for its contention that the United States' significant, and voluntary, limiting of its case is, to the contrary, an expansion.

interviews conducted by the Department of Justice during the course of the FIRREA investigation because these documents are protected by the attorney-client privilege, deliberative process privilege, law enforcement privilege, work-product doctrine, and/or joint prosecution/common interest doctrine.  As noted below, S&P has elected not to challenge the United States' assertions of these protections at this time, while reserving its ability to challenge them on a case-by-case basis as discovery proceeds.

SECOND SUPPLEMENTAL RULE 26(f) CONFERENCE REPORT
CASE NO.  CV13-779 DOC (JCGx)

Second, S&P contends that each separate RMBS and CDO "will raise a host of deal-specific issues" requiring discovery and trial time that continue to render the case, even as narrowed by the government, "unmanageable."  In making this argument, S&P continues to misapprehend the nature of the FIRREA violations at issue.  This is not a securities fraud case in which reliance and loss causation would be elements of liability.  To the contrary, the underlying FIRREA predicates are ordinary mail, wire, and bank fraud, which require that the United States establish only that S&P made false or misleading representations, that were material, with the intent to defraud.  E.g., Neder v. United States, 527 U.S. 1, 24-25 (1999) ("By prohibiting the 'scheme to defraud,' rather than the completed fraud, the elements of reliance and damage would clearly be inconsistent with the statutes Congress enacted"); United States v. Reynolds, 189 F.3d 521, 525 (7th Cir. 1999) ("[e]vidence that the bank would not have relied on [defendant's] representations, and instead would have made an exception for him, does not establish that the representations were immaterial"; "there is no requirement that the statement must in fact influence the decisionmaker (that would be reliance)").  As these elements make clear, what is at issue in establishing liability is S&P's conduct.  That remains the case even with respect to the Complaint's allegations that between March and October 2007 S&P acted contrary to its representations of objectivity and independence by issuing credit ratings for CDOs that it knew did not reflect those CDOs' true credit risks – the issue is whether S&P, based on the information it had, knowingly issued such ratings during this limited time period.

Though S&P continues to make every effort to shift the focus from its own conduct to that of those who issued or purchased the rated securities, that effort is unavailing.  The law is clear that neither negligence nor gullibility on the part of a victim is a defense to mail, wire, or bank fraud.  E.g, United States v. Hanley, 190 F.3d 1017, 1023 (9th Cir. 1999) ("In this circuit, it is immaterial whether only the

4

most gullible would have been deceived by the defendants' scheme"); United States v. Taylor, 832 F.2d 1187, 1198-99 (10th Cir. 1987) (no defense that victim could have eliminated deception by reviewing document).  Moreover, with respect to FIRREA violations, three separate courts have ruled that liability may apply even where the affected financial institution was a "willful participant in the scheme."  United States v. Bank of New York Mellon, --- F. Supp. 2d ---, 2013 WL 1749418 (S.D.N.Y. Apr. 24, 2013) (Kaplan, J.) (discussing text and history of FIRREA at length); United States v. Countrywide Financial Corp., et al., --- F. Supp. 2d ---, 2013 WL 4437232 (S.D.N.Y. Aug. 16, 2013) (Rakoff, J.); United States v. Wells Fargo Bank N.A., --- F. Supp. 2d ---, 2013 WL 5312564, at *20, *28 (S.D.N.Y. Sep. 24, 2013)  (Furman, J.).

In light of this law, S&P's assertions regarding Western Corporate Federal Credit Union ("WesCorp") are particularly illuminating.  As an initial matter, the NCUA findings cited by S&P to the effect that WesCorp's executives placed undue reliance on S&P's ratings of RMBS and CDOs would seem to support the Complaint's allegations that ratings were material and that S&P's representations regarding its objectivity and independence encouraged just such reliance.  More importantly, however, in citing these findings, S&P contends they are "critical because they belie any suggestion that the sizeable losses that the Government now claims S&P should pay in the form of a penalty could have resulted from any misconduct by S&P."  As this suggests, the relevance, if any, of S&P's contentions regarding issuers and purchasers goes to the determination of penalties, not liability.   With respect to penalties, the United States has limited the losses it will contend give rise to FIRREA penalties to those suffered by a total of 22 victims, hardly an unmanageable number.  And, the United States remains of the view that that the determination of penalties is appropriately a question for the court, after a

bifurcated determination of liability by the jury.[3]  In the Bank of America FIRREA case cited above, the court followed just this course, removing any consideration of penalties from the jury's determination of liability and conducting its own separate determination of penalties.  See United States ex rel. O'Donnell v. Bank of America Corp., et al., 12-cv-1422 (JSR) (Dkt. 266, filed Oct. 23, 2013) (The Court's Instructions Of Law To The Jury at 10, Instruction No. 8: "I remind you that, if liability is found as to any defendant, the issue of what monetary penalties, if any, are to be imposed is an issue for the Court, not the jury.").

In light of all of the above, there is no basis for S&P's contention that this case must be further narrowed.  It is easy to understand S&P's incentives for seeking such a narrowing, as it would limit both the government's proof and S&P's potential exposure.  But there is simply no basis for S&P's contention that this case, as already significantly narrowed by the United States, remains unmanageable and must for this reason be further narrowed.  A determination of whether S&P engaged in the alleged scheme to defraud with respect to the limited set of 65 RMBS and 107 CDOs does not present an unmanageable task either for discovery or trial, particularly given that much of that discovery has already occurred.  In the Bank of America FIRREA case cited above, the court proceeded to trial on liability on a scheme to defraud alleged to encompass more than 11,000 fraudulent loans, with a discovery period believed to have been of less than one year and a trial that lasted only approximately 21 days.  There is no reason this case, as already significantly narrowed by the United States, cannot proceed on a

---

[3]  Though this Court has expressed its inclination to put the question of losses, which will determine the maximum FIRREA penalties, to the jury, this issue has not been briefed, and the Court's initial comments were made prior to the trial in the Bank of America FIRREA case, in which, as discussed below, the court removed consideration of penalties from the jury and is in the process of itself determining the losses that will set the maximum FIRREA penalties.

similar time frame as proposed by the United States below.[4]

### B.   Statement of S&P

The Government's case—involving more than 150 securities and nearly two dozen alleged victim financial institutions—is unworkable, unmanageable, and in violation of the Court's August 2, 2013 Order.  Should the Court permit the Government to proceed on all identified securities, *at least* two years of discovery and several months for trial are needed.  Should the Court instead elect to try this case in a shorter period, it should limit the present case to the adjudication of liability and penalty for a narrowed set of securities.  S&P respectfully submits such a narrowed trial should focus upon securities that allegedly resulted in losses to Citigroup and its affiliates.  Because Citigroup purchased more securities and allegedly suffered greater losses than any other entity, such a narrowed trial would still enable the Government to try a robust set of securities and, if successful, attempt to secure substantial penalties—indeed approximately one-third of all losses the Government has identified stem from securities purchased by Citigroup. Such a narrowed trial would have the added benefit of providing guidance to the parties for any possible future proceeding.

### 1.   The Government Failed to Narrow its Case as Required by the Court's August 2, 2013 Order.

On August 2, this Court ordered the Government to narrow its case and "identify the limited set of RMBS and CDOs . . . that will form that basis for its

---

[4]  S&P proposes as an alternative that the court require the United States to try this case first with respect only to those CDOs in which Citigroup and its affiliates are alleged to have incurred losses, with unspecified "future proceedings" to address the remaining substantial losses alleged to have been incurred by other entities as the result of S&P's fraud.  Such a proposal is completely unworkable as it would potentially require multiple presentations, to multiple juries, of the same evidence relating to S&P's liability.  In short, there is no way to sever S&P's fraudulent conduct as it related to one purchaser/investor from that conduct as it related to other purchasers/investors.

proof at trial."  The purpose of this supplemental disclosure, and the initial discovery period that the Government asserted was necessary for it to do so, was to "facilitate the parties' ability to more clearly define the breadth and necessary time for subsequent discovery."  [Dkt. 44]  Instead of narrowing its case, the Government now proposes that discovery and trial in this action will concern more than *five times as many securities* as it identified in the Complaint, while simultaneously proposing a *shorter schedule* for the rest of discovery.  The Government's disclosure identifies more than 100 CDOs and more than 50 RMBS,[5] as well as hundreds of specific tranches, hundreds of tranche purchasers and other entities involved in the transactions that the Government contends were "affected" under the FIRREA statute, and more than 20 financial institutions that it will contend suffered losses.  The Government thus identifies hundreds of ratings and hundreds of allegedly affected institutions that will "form the basis for the government's proof at trial."

A trial of this magnitude remains unmanageable, most certainly on anything like the schedule proposed by the Government.  Assuming the parties devote at least one trial day for each RMBS and CDO at issue, a trial on the more than 150 securities identified in the Government's November 18 supplement is likely to last more than eight months —and this is before S&P even begins to put on its defense case.[6]  This is an extraordinary burden to put on a jury, the parties, and the Court.

---

[5]  S&P believes that due to a number of errors in the Government's disclosure, the number of securities identified is not accurately cited in the Government's summary above.  It is clear, however, that more than 150 separate securities and hundreds of tranche-level ratings are identified.

[6]  The Government's reliance on *United States ex rel. O'Donnell v. Bank of America Corp* for the proposition that discovery in this case can be completed in less than a year is misplaced.  That case involved a single underwriting program lasting at most nine months, whereas here the conduct at issue spans more than 3 years, involves numerous different rating methodologies, and entailed continuous work over that period to update the models and methodologies used to arrive at the ratings now challenged by the Government.  *See e.g.,* Bank Defendants'

8

At the same time, S&P will require commensurate discovery into the facts unique to each deal. The Government's proposed eleven-month schedule for fact discovery was unworkable when it had identified only 26 CDOs as giving rise to predicate violations of the FIRREA statute. Now that it proposes to offer proof with respect to more than 100 CDO ratings and more than 50 RMBS ratings, its proposed schedule (which provides even less time for S&P to take discovery on its defenses) is even more unreasonable. Should the Court permit the Government to proceed on all of the more than 150 securities it has identified, S&P is prepared to proceed as well—but it must be given adequate time to take discovery and present its case at trial. This is because each security presents unique issues relevant to both liability and penalties, as discussed below.

### 2.    S&P is Entitled to and Intends to Defend Itself as to Each Security.

S&P will require adequate time to take discovery on and ultimately present its defenses at trial. As detailed by S&P in the June 24 Joint Report, each security raises individualized issues of liability and loss, and S&P will need and, in any event, may choose, to defend itself as to *each* of the securities at trial.[7]  The Government attempts to minimize these concerns by arguing "This is not a securities fraud case in which reliance and loss causation would be elements of liability." But this misses the mark. The Government has already told this Court that it intends to prove that each of S&P's ratings were false.  In the July 8, 2013 hearing on S&P's Motion to Dismiss, counsel for the Government stated:

> But, again, just so I can get back to our allegations, in
> terms of the second part of our fraud, which actually does

Memorandum of Law Regarding Penalties (Nov. 20, 2013 S.D.N.Y. 12-cv-1422 (JSR)) at 31.

[7] *See* Joint Report at 12-15.

go to the ratings; in other words, ***there is a portion of our fraud where we allege the ratings were false***. That's the second portion from March to October 2007. There, we have provided a list of—I think its 30 or 34 CDOs that are named in the Complaint . . . ***as to which we intend to prove that those ratings were false***.

Tr. 69:23-70:7 (emphasis added).[8]

Even if the Government is now moving away from this representation to the Court, its current position remains that it will seek to prove at trial that "S&P falsely represented that its ***credit ratings*** of RMBS and CDOs were objective, independent, and uninfluenced by any conflicts of interest that might compromise S&P's analytic judgment." *Supra* at 1-2. Regardless of the manner in which *the Government* intends to meet its burden of proof with respect to each of the credit ratings at issue, *S&P* is entitled to prove that each rating reflected its good faith opinion of the credit risks associated with the security and that each rating was neither motivated by an intent to defraud nor material. S&P is entitled to take discovery on all of these issues for each CDO and RMBS that the Government will introduce at trial. S&P is also entitled to take discovery as to the identical ratings issued by other rating agencies with respect to the same securities as to which S&P is now accused of fraud.

For each security, S&P is also entitled to take discovery and present facts at trial regarding penalties. The Government dismisses the scope of this project by noting, "With respect to penalties, the United States has limited the losses … [to] 22 victims, hardly an unmanageable number." *Supra* at 5. But what matters in

---

[8]  In fact, counsel for the Government acknowledged that *precisely because* S&P intends to defend the validity of each rating, the case must be narrowed to a manageable size. Tr. at 71:24-72:6 ("[I]f, in fact, [the validity of each rating] is going to be the defense and if the Court is going to allow that defense, we would try to narrow the case.").

assessing penalties is not simply the number of victims, but the details behind the alleged victim's purchase of each security as well as the factors that contributed to the losses allegedly suffered as a result.  The Court has already recognized that these factual issues are properly within the province of the jury.  *See* July 8, 2013 Hearing on Motion to Dismiss Tr. at 25:11-13, 50:12-13 ("You might find the Court hesitant to have a bifurcated trial and have the issue of damages submitted to a court.  It raises all sorts of constitutional issues . . . I'm not inclined to bifurcate.").[9]

The Government's trial plan simply offers no proposal for how a fact-finder is to assess the amount of the alleged loss incurred by affected financial institutions and any resulting penalty; indeed, after four months of discovery on this issue, the Government remains unable to identify *any* losses for nearly half of the CDOs nor most of the hundreds of purchasers it identified in its November 18 supplement.  Moreover, the Government's suggestion that much of the necessary discovery has already occurred is disingenuous.  While the Government has provided S&P transcripts of on-the-record testimony from certain witnesses, it has refused to provide information about what occurred and what was said in other portions of those same interviews that the Government chose not to place on-the-record.  In any event, none of the interviews conducted by the Government are admissible since S&P was not permitted to attend and participate, and thus most, if not all, of those witnesses will need to be deposed.  Moreover, not a single purchaser of *any* of the securities at issue has yet been deposed, and, as discussed above, that testimony will go to the heart of S&P's defenses on both liability and penalty.  But

---

[9] Although S&P reserves the right to dispute the Government's theories with respect to the permissible and appropriate range of penalties available under FIRREA, it must nevertheless take the discovery necessary to address the Government's theories on the facts, which necessarily involves a highly detailed inquiry.

even if, as the Government argues, that discovery is relevant only to the penalty aspect of the case, S&P is entitled to take it, and there is much to learn.

Indeed, public information suggests that each CDO and RMBS will raise a host of deal-specific issues—many of which undermine the Government's theory of *both* liability and penalty.  For instance, the securities identified in the Government's November 18 supplement include CDOs where the "victim" institution accused parties other than S&P of fraud in connection with the deal; CDOs where the "victim" institution was *itself* accused of fraud in connection with the deal; and CDOs where the issuing banks have been sued for fraud for lying to the rating agencies about the quality of the underlying collateral.  Such facts bear directly on the elements of liability and penalty.  A look at a few CDOs and alleged victims identified by the Government is illustrative:

### a.    High Grade CDO

High Grade Structured Credit CDO 2007-1 ("High Grade CDO") was a $4 billion CDO-squared structured by Bank of America in May 2007.[10]   Bank of America arranged, sold, and insured the CDO, which received identical ratings from both S&P and Moody's.  Two features of High Grade CDO are relevant here: how the security was rated and who Bank of America—the alleged victim— believes is responsible for its alleged losses.

*First*, a significant portion of Bank of America's losses on High Grade are attributable to a put agreement entered with respect to the CDO's commercial paper notes.  Although the Complaint suggests all CDOs were rated in the same manner, in fact, S&P's process for rating commercial paper notes applied specific criteria that depended in part upon the credit rating of the put counterparty – *i.e.*,

---

[10] "Bank of America" as used in this section refers to Bank of America, National Association and Banc of America Securities, LLC.

Bank of America itself – and thus implicate entirely unique issues with respect to the rating process and any alleged losses incurred as a result of the put agreement.

*Second*, Bank of America itself took the position in litigation against the CDO manager—Bear Stearns—that its losses arose not from issues with the credit rating of the CDO but from representations or omissions by Bear Stearns with respect to the market value of the underlying collateral.[11]  Bank of America's expert in the case opined that it had overpaid for the initial collateral by hundreds of millions of dollars for reasons totally unrelated to S&P's credit rating opinions.[12]

### b.    Armitage ABS CDO

Armitage ABS CDO, another CDO identified by the Government, is the subject of ongoing litigation in the Southern District of New York.  In 2012, Woori Bank sued the CDO's arranger Citigroup Global Markets, Inc. ("Citigroup") for fraud and negligent misrepresentation, alleging that Citigroup knew but failed to disclose to S&P that many of the loans underlying the RMBS assets contained in the CDOs failed to conform with underwriting guidelines.[13]  Woori alleges that Citigroup "made misrepresentations and omissions ***to the ratings agencies with the knowledge that the ratings agencies would rely on them*** and give CDOs, including the Armitage CDO, inflated ratings."[14]  In this case, by contrast, the Government asserts that a penalty should be imposed on S&P in the amount of the losses allegedly incurred ***by Citigroup.***

---

[11] Second Amended Complaint at ¶¶ 72-74, *Bank of America v. Bear Stearns Asset Management*, 2013 WL 4734495 (S.D.N.Y. July 19, 2012).

[12] *Bank of America v. Bear Stearns Asset Management*, 2013 WL 4734495, at *5 (S.D.N.Y. Sept. 3, 2013).

[13] *See* Amended Complaint, *Woori Bank v. Citigroup*, No. 12-cv-3868 (S.D.N.Y Aug. 28, 2013).  [Dkt. 59]

[14] *Id*. at ¶98 (emphasis added).

13

### c.   Ridgeway Court Funding II CDO

Similarly, Ridgeway Court Funding II was the subject of a lawsuit concerning credit default swaps executed between Ambac Credit Products, LLC ("Ambac") and Citigroup, Inc.[15]  Ambac alleged that Citigroup "*either intentionally provided the ratings agencies with false information or withheld information that [they] knew was necessary for the ratings agencies to accurately rate the true credit quality of Ridgeway II's notes*."[16]  In 2012, Citigroup paid $590 million to settle a separate class action case filed in the Southern District of New York, alleging securities fraud against it in connection with Ridgeway Court Funding II and six other CDOs that the United States has now identified and is seeking to attribute all losses to S&P.[17]

///

### d.   Western Corporate Federal Credit Union

S&P will not only need to present evidence regarding each of the securities at issue, but also facts and testimony regarding the purchasing decisions of the alleged victims.  These details, as evidenced in the discussion below, are critical because they belie any suggestion that the sizeable losses that the Government now claims S&P should pay in the form of a penalty could have resulted from any misconduct by S&P.

---

[15]  "Citigroup, Inc." as used in the context of the *Ambac* lawsuit refers to Citigroup, Inc. and its wholly-owned subsidiary Citigroup Global Markets Ltd., both of which were named defendants.

[16]  *See* Complaint at ¶90, *Ambac Credit Prods., LLC v. Citigroup, Inc., et al.* (Sup. Ct. N.Y. 602387/2009) (emphasis added).

[17]  "Citigroup" as used in reference to this class action case refers to Citigroup Inc., as well as current and former Citigroup employees who were individual named defendants.  *See* Amended Consolidated Class Action Complaint, *In re Citigroup Inc. Securities Litig.*, No. 07-cv-9901 (S.D.N.Y. Feb. 24, 2009) (Dkt. 74); Final Judgment and Order of Dismissal With Prejudice, *In Re Citigroup Inc. Securities Litig.*, No. 07-cv-9901 (Dkt. 276).

14

Western Corporate Federal Credit Union ("WesCorp") is one of five credit union "victims" identified by the Government.  Although the Department of Justice now seeks to pin WesCorp's sizeable losses from RMBS investments upon *S&P*, another agency of the United States government—the National Credit Union Administration ("NCUA")—previously concluded that WesCorp shouldered significant blame for its losses, suing the former officers and directors of WesCorp *in this very Court* for their alleged malfeasance.[18]

The NCUA placed WesCorp into conservatorship in March 2009 and issued a report on November 16, 2010 identifying the misconduct of WesCorp executives that gave rise to the ultimate demise of the credit union.[19]  The Report criticized WesCorp's "aggressive investment strategy" as having "unreasonable limits in place that allowed for excessive investments in privately-issued residential mortgage backed securities."  The Report criticized WesCorp for failing to adequately manage "concentration risk, credit risk, market risk, and liquidity risk" because it allowed "overexpos[ure]" to certain types of mortgage related securities.[20]  The Report pointedly noted:

> A credit rating is not a substitute for prudent due diligence and should only be considered as one factor in an investment decision.  The ratings and other opinions issued by rating agencies are not recommendations to buy securities and there is not a warranty on the accuracy, timeliness, completeness or fitness of the information provided.

---

[18] *National Credit Union Administration Board as Conservator for Western Corporate Federal Credit Union v. Robert A. Siravo, et al.,* Case No. 10-cv-1597 (C.D. Cal.) (MANx).

[19] Material Loss Review of Western Corporate Federal Credit Union, Report # OIG-10-19 (Nov. 16, 2010), National Credit Union Administration Office of Inspector General (hereinafter "MLR") at 1(The NCUA noted that it "did not analyze the role that third party conduct, including but not limited to, the conduct of underwriters, issuers, and raters, may have played in WesCorp's losses….").

[20] MLR at 13, 15-16.

It also noted, "Credit Analysts are not expected to possess greater insights than rating agencies, but they are expected to understand the implications and conclusions of a rating agency's research and form an independent judgment."[21] These are the *Government's* findings.

In its Report, the NCUA did not spare itself from criticism. The Report noted that NCUA's Office of Corporate Credit Unions failed to "adequately and aggressively address WesCorp's increasing concentration of privately-issued RMBS and the increasing exposure of WesCorp's balance sheet to credit, market, and liquidity risks."[22]

In March 2010, the NCUA intervened in a state court action against executives of WesCorp filed by WesCorp's credit union members and removed that case to this Court. In its complaint, the NCUA accused WesCorp executives of breaching their fiduciary duties and committing fraud that resulted in the collapse of WesCorp. Many of these executives ultimately entered settlements with NCUA requiring them to pay a fine and forego future employment at other credit unions.

*** 

Although the facts recounted above are examples presently known to S&P based upon public information, additional relevant information is expected to come out during discovery. The jury and this Court must learn these details in order to make a fair determination of liability and the facts relevant to the assessment of any penalty in this case. To conduct this exercise with respect to more than 100 CDOs, more than 50 RMBS and more than 20 alleged purchasers of rated securities, as now proposed by the Government, would require lengthy discovery

---

[21] *Id*. at 15.
[22] *Id*. at 1.

and result in an unwieldy and unmanageable trial in this action.

The Court is thus left with two options: either (1) permit the Government to proceed on the vast scope it has proposed, which will require at least 2-3 years of discovery and result in a trial lasting many months or (2) narrow the case in a manner consistent with the purpose of the initial discovery phase that has just been completed, as the Government has failed to do.  Should the Court elect the latter course, S&P proposes that the Government's proof be limited to the securities it identified in the November 18 supplement where Citigroup and its affiliates allegedly incurred losses.  This would narrow discovery and trial to 15 CDOs – still an enormously complex scope, but far more manageable than what the Government now proposes.  The scope of such a narrowed case would also include a substantial portion of the universe of ratings and supposed victims and losses that the Government is now proposing.

## II.    INITIAL PHASE OF LIMITED DISCOVERY

Between July 29, 2013 and November 18, 2013, the parties engaged in the initial phase of limited discovery authorized by the initial scheduling order issued by the Court on August 2, 2013 [Dkt. 44].  The parties described the progress of this initial phase of limited discovery in status reports filed with the Court on October 14, 2013 [Dkt. 60, 61].

### A.    United States' Rule 45 Subpoenas

On August 5, 6, and 9, 2013, pursuant to Federal Rule of Civil Procedure 45(b)(1), the United States served subpoenas for documents as set forth in the United States' Status Update Re: Initial Discovery; Exhibits 1-4 filed with the Court on October 14, 2013 [Dkt. 61].  The recipients of these document subpoenas included: federally insured financial institutions, foreign banks, collateral managers, investment banks, and trustees, from whom the subpoenas sought records relating to certain specifically identified CDOs; and broker/dealers, from

17

whom the subpoenas sought records identifying purchasers of a broader set of CDOs and RMBS.

Pursuant to agreement with S&P, in response to certain of S&P's Rule 34 document requests, and subject to the protections of the protective order in this case, the United States has been producing to S&P on an ongoing basis the records produced pursuant to these subpoenas. On September 23, October 8, October 11, October 21, October 24, November 7, 2013, and November 22, 2013, the United States provided S&P with the materials produced pursuant to these subpoenas.

**B.    Rule 30(b)(6) Depositions**

The United States served 30(b)(6) deposition subpoenas on Bank of America and Citigroup on the limited issues of: the roles played by them and their federally insured affiliates in certain specified CDOs; purchases/retentions by them and their federally insured affiliates of tranches in these CDOs; and losses accruing to them and their federally insured affiliates as the result of their roles in and/or purchases/retentions of tranches in these CDOs. The United States coordinated scheduling of these depositions with defendants. The United States advised S&P that the production of documents by these entities obviated the need for the United States to conduct these depositions prior to the United States' submission of its supplemental disclosures on November 18, 2013.

**C.    United States' Rule 34 Document Request**

On September 27, 2013, the United States served on S&P the United States' First Request for Production of Documents ("US First Request"), which sets forth 9 document requests. In discussions among the parties, S&P agreed to the United States' request to give priority to requests 1-3, and advised that (with the exception of some emails falling within the scope of these requests) it believed it could complete a substantial production on these requests within the 30-days specified in the US First Request. On October 30, 2013, defendants served a formal written

18

response to the US First Request (Defendants' Responses and Objections to Plaintiff's First Request for Production of Documents).  Also on October 30, 2011, defendants produced an initial set of documents responsive to requests 1- 6 in the US First Request.  The parties will continue to discuss production of the balance of the documents sought by the US First Request.

**D.     S&P's Rule 34 Document Request**

On August 20, 2013, S&P served on the United States Defendants' First Request for Production of Documents ("S&P's First Request"), which sets forth 53 requests for categories of documents.  S&P agreed to the United States' request to extend to October 19, 2013 the time for the United States' response to S&P's First Request.  Pursuant to this extension, the United States served its formal written response to S&P's First Request on October 18, 2013 (United States' Response To Defendants' First Request For Production Of Documents; Exhibits 1-2).

The parties have engaged in a series of discussions regarding S&P's First Request, the US First Request, depositions, the United States' Rule 45 subpoenas, and other matters, including nine telephone conferences, as set forth on page 1 above.  The results of certain of these discussions are reflected in sections A through C above.  With respect to S&P's First Request, as a result of these discussions, among other things:

(1)     With respect to documents gathered and sworn testimony taken in the course of the United States' FIRREA investigation of S&P that led to the filing of the Complaint, the United States has advised S&P that it has already provided the sworn testimony (with accompanying exhibits) taken by DOJ attorneys during the FIRREA investigation, and that, absent objection from the third-parties who produced documents, it intends to provide S&P with the documents gathered in the FIRREA investigation, as well as the FIRREA subpoenas issued to third-parties and the United States' communications with those third-parties relating to those

19

FIRREA subpoenas.[23]  Attached as Exhibit 1 is a table describing the materials already produced to S&P and the dates on which those materials were produced. Due to the volume of documents involved, production remains ongoing.

The United States has stated that it is withholding some documents or portions of documents provided by third parties and received by it pursuant to Rule 45 requests or otherwise responsive to S&P's Rule 34 requests because of confidentiality objections expressed by those third parties.  To date, the United States has stated that it has withheld only redactions from two pages of materials obtained from one third party, but that it has received objections from third parties to its production of a limited number of other documents and is not now in a position to estimate the volume of material it will be withholding based on those objections.  S&P believes that any objections to the production of responsive materials in the United States' possession due to third party confidentiality concerns is unsustainable on its face and is in any event misplaced in light of this Court's entry of a protective order.  If the parties are unable to resolve this matter, S&P will seek judicial intervention.

(2)    With respect to a number of the requests, including in particular requests that require the attorneys for the United States in this case to reach out to other United States Attorney's Offices ("USAOs"), other DOJ components, and other federal agencies, S&P, at the United States' request, provided additional information to focus and/or narrow the requests.  With this additional information, the United States reached out to other USAOs, other DOJ components, and certain other federal agencies to ascertain their positions.  These inquiries were slowed by

---

[23] Although the United States has provided sworn testimony from certain witnesses it has not produced information relating to facts gleaned during the interviews that on occasion preceded the sworn testimony.  While S&P is not now pursuing its document requests seeking interview notes with respect to such witnesses, it reserves its right to seek such notes on a witness-by-witness basis.

the intervening government shutdown and the resulting furloughs of a number of government employees.  In a November 18, 2013, letter, the United States advised S&P of the results of its inquiries.  The parties anticipate additional discussions regarding the requests that were the subject of the government's inquiries.

(3) Although the parties continue to meet and confer, they have reached an impasse upon three issues:

(a)    The parties continue to disagree as to S&P's requests seeking any analyses made by the United States of the independence of ratings or rating agencies and the quality of credit ratings of RMBS or CDOs, and of any documents received from any rating agency bearing on such issues.  With respect to any such documents gathered in the course of any pending investigation that are held by the Department of Justice (or other offices of the United States) the United States has asserted both investigatory privilege and work product protection.[24]

To address these concerns, S&P narrowed its request to documents created by other branches of the United States government or by third parties (*i.e. not*

---

[24]  The attorneys for the United States in this case have advised S&P that (a) they will not respond to a Rule 34 discovery request addressed to the United States as party plaintiff on behalf of the Board of Governors and the Open Market Committee of the Federal Reserve System; and (b) that documents are properly sought from those entities by Rule 45 subpoena.  *See United States v. American Telephone & Telegraph Co.*, 461 F. Supp. 1314, 1334-36 & n.65 (D.D.C. 1978).  S&P contends that this position is contrary to the position the United States took in *United States in Starr International Company, v. United States*, No. 11-CV-00779-TCW (Fed. Cl.).  The United States has stated to S&P that it does not agree with this view.  While not agreeing with the United States' position, S&P has served Rule 45 subpoena on these entities (as well the New York Federal Reserve Bank).  To date, objections have been made by each of those entities.  Meet and confer conferences have been held with each and it appears that judicial intervention may be required.

Because the United States has refused to produce in response to a Rule 34 document request documents from a number of what the United States has identified as "independent regulatory entities," S&P likely will issue Rule 45 subpoenas to certain of those independent entities.  The identity of those entities and the precise scope of the requests will be a product of S&P's review of the November 18 disclosures and this Court's resolution of S&P's proposal set forth above for narrowing the case for trial.

21

material generated by the DOJ in its investigation efforts), including materials third parties produced starting with material received in investigations already closed.[25] The United States has advised that it stands on its objections to production of these documents as set forth in its formal response to S&P's document request, and the parties remain at an impasse.

(b)     The parties continue to disagree as to S&P's requests seeking documents gathered in investigations by the United States into the conduct of various mortgage lenders, financial institutions, and security issuers concerning the types of securities at issue here.  The United States has objected to production primarily on grounds of relevancy, burden, and investigatory privilege.  S&P has offered to limit its request to documents received from third parties (*i.e. not generated by the United States in the course of its investigation*), and to start, at least, with materials obtained in investigations now closed.

While refusing to produce underlying third party documents collected on these issues, the United States identified in a November 18, 2013 letter a number of publicly available summary reports on the subject of mortgage fraud.  S&P counsel are reviewing these reports now to determine if the data and other information described therein can provide any substitute for the actual third-party documents sought.  Any motion filed on this subject would reflect the results of such review and any follow-up meet and confer conference with the United States.

(c)     S&P seeks discovery related to S&P's pleaded defense that the United States has, in violation of the First Amendment, improperly singled out S&P as the target of a FIRREA action because S&P downgraded the United States' credit rating.  The United States asserts that S&P has not made, and cannot make,

---

[25]  S&P is not now pursuing the request for interview notes reflected in Request No. 38, while, as noted above, reserving the right to seek such notes as needed on a witness by witness basis.

the preliminary showing required to obtain discovery relating to such an asserted defense (including in particular discovery of documents that otherwise would be protected from discovery by the attorney-client and deliberative process privileges and the work product doctrine).  See United States v. Bass, 536 U.S. 862, 863-64 (2002) (per curiam); United States v. Armstrong, 517 U.S. 456, 468-70 (1996); United States v. One 1985 Mercedes, 917 F.2d 415, 421 (9th Cir. 1990); United States v. Sequoia Orange Co., 1994 WL 903688 (E.D. Cal. Mar. 14, 1994).  S&P submits that unlike the ruling in United States v. National Broadcasting Co., 65 F.R.D 415, 417 (C.D.Cal 1974), none of these cases relate to a claim that an action was initiated against a defendant in retaliation for the exercise of its First Amendment rights, that no threshold standard is imposed by law, and that the Federal Rules in any event entitle S&P to discovery relevant to its defense of constitutionally improper motive.[26]  In any event, in support of its motion to compel this discovery, S&P intends to describe the differential treatment of similarly situated entities, as well as evidence of retaliatory intent.  The parties have determined that agreement cannot be reached with respect to this issue.

The Parties seek the Court's permission to address the three issues identified above through the filing by S&P of a comprehensive motion to compel production relating to these issues, pursuant to the proposed briefing schedule set out below. It may be possible that materials relating to one or more of the issues listed above can be confined to entities identified as the result of the November 18 disclosure by the United States, but this awaits further review by both parties of the impact of

---

[26]  The United States believes the National Broadcasting opinion cited by S&P to be inapposite because it addressed only the appropriate sanction for the government's failure to comply with an existing discovery order -- not the facts or legal basis for the issuance of that discovery order, which related to the defendants' claim that the antitrust action being pursued against them was retaliation by the Nixon administration for their exercise of First Amendment rights.

such a compromise in light of the specifics of that disclosure.  That process is currently underway.  The parties believe the schedule set out below will permit a timely and efficient consideration of the issues while also allowing sufficient time for a comprehensive review by S&P of the United States' recent submission to determine whether any of the disputes can be narrowed.  While Local Rule 37-2 sets out procedures for the filing of certain discovery motions, the parties respectfully submit that briefing this matter directly to the Court on the proposed schedule will best serve the interests of the parties and the Court in resolving the issues identified above as expeditiously as possible.

        (1)     Deadline for filing moving papers – January 20, 2014

        (2)     Deadline for filing opposition papers – February 17, 2014

        (3)     Deadline for filing reply papers – February 24, 2014

## III.   DISCOVERY PLAN

### A.   Initial Disclosures

The United States served its initial disclosures on May 9, 2013.  The United States served supplemental initial disclosures on May 28, 2013 after meeting and conferring with S&P's counsel about S&P's claims regarding the adequacy of the United States' initial disclosures.  In addition, on April 26, 2013, and May 8, 2013, the United States provided S&P with copies, in pdf and, for the transcripts themselves, electronic text format, of sworn testimony taken by the Department of Justice from witnesses during the course of the Department's FIRREA investigation, together with the exhibits used during the taking of that testimony.

S&P provided its initial disclosures on May 9, 2013.  In addition to these disclosures, S&P has previously provided the Government with extensive document productions over the course of its more than three-year investigation. S&P estimates that the electronic information produced during the investigation amounts to the equivalent of more than 30 million pages of materials.  On May 31,

24

2013, at the request of the United States, and in an effort to assist the United States in narrowing its case, S&P provided the United States with a list of all RMBS and CDOs backed by RMBS that S&P rated between 2004 and 2007.

The United States supplemented its Initial Disclosures pursuant to the Court's August 2, 2013 Initial Scheduling Order [Dkt. 44].  The November 18 Supplement is discussed in detail at Section I.A, *supra*.

### B.    Subject On Which Discovery May Be Needed

The parties' positions on this issue are reflected in Section VII.B of the June 25 Joint Report [Dkt. 23].

### C.    Whether Discovery Should Be Conducted in Phases or Otherwise Limited

The United States believes that, with the exception of the recently concluded initial phase of limited discovery, and a proposed expert discovery phase, it currently sees no reason to conduct discovery in phases or to otherwise limit it. For the reasons set forth in detail in Section I(A)(1) above, the United States does not agree with S&P's contentions that this case, as already significantly narrowed by the United States, is unmanageable, or that the case should be limited to securities on which Citigroup is alleged to have incurred losses.  Nor does the United States agree that at least two years will be needed for discovery.  Rather, the United States believes that the discovery schedule it proposes below is reasonable and appropriate for this case as already narrowed.

S&P believes, for the reasons set forth in more detail at Section I(A)(2) above, the current scope of the case is unmanageable.  Should the Court not limit the scope of this case to those securities allegedly purchased by Citigroup then S&P contends that at least two years will be needed for discovery.

### D.   Changes in Limitations on Discovery

#### 1.   Interrogatories

The Government believes that 25 substantive interrogatories are sufficient, as provided in Fed. R. Civ. P. 33.  S&P believes that, given the expansive nature of the Government's allegations, and in light of the overbroad universe of securities currently at issue in this case, at least 50 substantive interrogatories are needed.  If the Court orders that the parties will try securities upon which Citigroup suffered a loss, S&P agrees that 25 substantive interrogatories will be sufficient.

#### 2.   Depositions

##### a.   Statement of the United States

Assuming the availability of certain witnesses to testify at trial, the United States currently anticipates requiring the depositions of approximately 40 witnesses.  This estimate includes: current and former S&P employees who were involved in S&P's ratings of the Specified RMBS and CDOs; current and former S&P employees who were involved in the development and modification of the models used to provide those ratings; representatives of certain investment banks that arranged for S&P to be retained to rate the Specified RMBS and CDOS; and representatives of certain financial institutions that purchased, retained, otherwise invested in, and/or played other roles in the Specified RMBS and CDOs.  These depositions will include discovery of individuals designated pursuant to Fed. R. Civ. P. 30(b)(6).  Accordingly, it will be necessary to expand the limitation on the total number of depositions set forth in Fed. R. Civ. P. 30(a)(2)(A).  If certain witnesses that the United States plans to call at trial are unavailable to testify at trial, the United States anticipates that it will require additional depositions to preserve the complete testimony of those witnesses not available to testify at trial.[27]

---

[27]  S&P has stated that it "objects to the government's proposal to use deposition testimony at trial instead of live witnesses."  The use of deposition testimony at

26

Based on the government's experience in its FIRREA investigation, and its review of depositions in other civil actions against S&P, the government believes that some of the depositions will take more than the limit of 1 day of 7 hours imposed by Fed. R. Civ. P. 30(d)(1).  The United States will make every effort to complete depositions within this limit, but anticipates that it will be seeking agreement and/or court permission to exceed this limit for a limited number of witnesses.

The United States anticipates that there are many witnesses whom the United States and S&P will both seek to depose.  The United States anticipates that for certain of these witnesses it will be seeking agreement from S&P and/or court permission to exceed the 7-hour limit in order to allow both parties sufficient time to complete their examinations of the witnesses.  In the absence of an agreed-upon or court-permitted extension of the 7 hour limit, the United States and S&P agree that where both the United States and S&P seek to depose the same witness, both parties shall divide the 7 hours equally unless they both agree or a party obtains court permission for an alternative division of time.

The Attorneys General of Connecticut and Illinois, both of which have lawsuits pending against S&P in their respective state courts that are proceeding into discovery, have approached both the United States and S&P to discuss the possibility of coordinating depositions of individuals who would otherwise likely be deposed separately in this case and in the lawsuits brought by these Attorneys General.  The United States has raised with S&P the possibility of such coordination, and the parties are considering it.

---

trial, however, is anticipated by the Civil Rules.  See Fed. R. Civ. P. 32 ("Using Depositions in Court Proceedings"); Civil L.R. 32-1 ("Use at Trial or in a Motion").

### b.      Statement of S&P

S&P agrees it will be necessary to increase the limitation on the total number of depositions set forth in Fed. R. Civ. P. 30(a)(2)(A).  Given the breadth of the Government's November 18 supplement and until this Court indicates whether the Government can proceed on all of the securities it has identified, S&P is not yet in a position to identify precisely how many depositions will be required.  However, S&P views the Government's statement that it will require only 40 depositions to be implausible, given the breadth of its supplemental disclosures which identify, among other things, more than 20 different purchasers of rated CDOs and RMBS, as well as hundreds of other allegedly "affected" institutions   S&P anticipates that it will require deposition testimony from at least the following individuals or entities: (i) individuals interviewed by the Government during its investigation of S&P; (ii) Governmental agencies, including the Department of Justice, the Treasury Department, the Federal Reserve, the Securities and Exchange Commission, the Federal Deposit Insurance Corporation, and the National Credit Union Administration; (iii) purported "affected" financial institutions identified by the Government in its November 18 supplement, which at present include all purchasers and deal participants, regardless of whether or not they suffered a loss; and (iv) third parties that packaged, structured, and/or sold each of the RMBS and CDOs at issue in the Government's case, including arrangers, CDO managers, and trustees.  To the extent the Court orders a narrowing of the case to those securities purchased by Citigroup, or otherwise narrows the scope of the Government's case, the depositions described in parts (iii) and (iv) would be limited accordingly.  S&P does not believe that any individual witness should be subjected to more than seven hours of deposition by an individual party.

### E.      Discovery of Electronically Stored Information

The parties' agreement on this issue is reflected in Section VII.E of the June

28

1 | 24 Joint Report [Dkt. 23].

2 | **F.    Claims of Privilege or Protection as Trial-Preparation Materials**

3 | Any potential inadvertent production of attorney-client privileged and/or

4 | work product protected documents will be governed by the Protective Order [Dkt.

5 | 56] and the Rule 502(d) Order [Dkt. 75] currently in place in this case.  The

6 | parties' agreement on this issue is otherwise reflected in Section VII.F of the June

7 | 24 Joint Report [Dkt. 23].

8 | **G.    Proposed Discovery Schedule (including timing of disclosures of
9 | expert witnesses)**

10 | The Government proposes the discovery schedule set forth in attached

11 | Exhibit 2, which includes the following proposed discovery cutoff dates:

12 | ///

13 | Non-Expert Discovery:                   8/25/2014

14 | Expert Discovery:                        11/3/2014

15 | S&P proposes that if the trial is limited to those securities that allegedly

16 | resulted in losses to Citigroup and its affiliates, non-expert discovery should close

17 | on October 15, 2014 and expert discovery should close on March 30, 2015.

18 | Should the case proceed on all of the securities the Government has added to its

19 | list, S&P proposes no discovery cutoff or trial date be set at this time.  Given the

20 | vast number of securities and institutions upon which discovery would have to be

21 | conducted, the time needed for discovery is likely to be at least two years.  Rather

22 | than setting a trial date now, S&P proposes a further CMC be held after the parties

23 | have made substantial progress upon discovery at which point a trial can be

24 | scheduled.

25 | **IV.    TRIAL**

26 | The Government's plans for trial is reflected in Section VIII.A of the June

27 | 24 Joint Report [Dkt. 23].

28 |

The Government proposes the following for the four specific dates required by the Court's Order Setting Scheduling Conference:

Discovery Cut-Off Date

| | |
|---|---|
| Non-Expert Discovery: | 8/25/2014 |
| Expert Discovery: | 11/3/2014 |
| Dispositive Motion Cut-Off Date: | 12/8/2014 |
| Final Pretrial Conference: | 4/27/2015 |
| Trial: | 5/19/2015 |

The Government proposes these dates in conjunction with its more complete proposed schedule for proceedings in this case, which is attached as Exhibit 2.

S&P proposes the following dates should the Court limit the securities at issue to those that allegedly resulted in losses to Citigroup and its affiliates:

| | |
|---|---|
| Non-Expert Discovery Cutoff: | 10/15/2014 |
| Expert Discovery Cutoff: | 3/31/2015 |
| Dispositive Motion Cut-Off Date: | 4/23/2015 |
| Final Pretrial Conference: | 10/7/2015 |
| Trial: | 11/9/2015 |

S&P proposes these dates in conjunction with its more complete proposed schedule for proceedings in this case should the Court limit the securities at issue to those that allegedly resulted in losses to Citigroup and its affiliates, attached hereto as Exhibit 3.

///

SECOND SUPPLEMENTAL RULE 26(f) CONFERENCE REPORT
CASE NO.  CV13-779 DOC (JCGx)

**V.    CONCLUSION**

Counsel for plaintiff and defendants jointly submit this report and request that the Court resolve the issues identified herein.  The joint submission should not be taken as reflecting agreement with respect to any position identified as being that of an individual party.

Dated:     December 2, 2013                    KEKER & VAN NEST LLP



By: /s/ John W. Keker
John W.  Keker



Dated:     December 2, 2013                    Respectfully Submitted,

STUART F. DELERY                          ANDRE BIROTTE JR.
Acting Assistant Attorney General         United States Attorney
United States Department of Justice
Civil Division
MAAME EWUSI-MENSAH
FRIMPONG
Deputy Assistant Attorney General         /s/George S. Cardona/
MICHAEL S. BLUME                          GEORGE S. CARDONA
Director, Consumer Protection Branch      LEON W. WEIDMAN
ARTHUR R. GOLDBERG                        ANOIEL KHORSHID
Assistant Director, Fed. Prog. Branch     RICHARD E. ROBINSON
JAMES T. NELSON                           Assistant United States Attorneys
BRADLEY COHEN
JENNIE KNEEDLER
SONDRA L. MILLS
THOMAS D. ZIMPLEMAN
Trial Attorneys, Civil Division

31

1
2
3
4
5
6
7
8
9
10
11
12

# Exhibit 1

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SECOND SUPPLEMENTAL RULE 26(f) CONFERENCE REPORT
CASE NO.  CV13-779 DOC (JCGx)

**Exhibit 1: Documents Produced Responsive to S&P's First Request**

| Date | Documents |
|------|-----------|
| April 26 & 28, 2013 | Transcripts and exhibits for sworn testimony taken by DOJ attorneys in the course of the FIRREA investigation of S&P (with text files & videos where available) |
| September 23, 2013 | Rule 45 Subpoena Documents |
| October 8, 2013 | Rule 45 Subpoena Documents |
| October 11, 2013 | (a) Rule 45 Subpoena Documents<br><br>(b) Additional videos of sworn testimony taken by DOJ attorneys from two witnesses in the course of the FIRREA investigation of S&P<br><br>(c) Hard drive with documents obtained in the course of the FIRREA investigation of S&P from 8 entities and one individual |
| October 21, 2013 | Rule 45 Subpoena Documents |
| October 24, 2013 | Rule 45 Subpoena Documents |
| October 25, 2013 | (a) Transcripts and exhibits obtained by DOJ from the SEC in the course of the FIRREA investigation of S&P (with videos where available)<br><br>(b) Discs containing wave files obtained in the course of the FIRREA investigation of S&P from one entity |
| October 30, 2013 | (a) Hard drive with documents obtained in the course of the FIRREA investigation of S&P from 5 entities and 12 individuals<br><br>(b) Discs containing replacement materials for possibly corrupted materials in October 11 production<br><br>(c) Hardcopies of certain FIRREA subpoenas issued to and correspondence with two entities in the course of the FIRREA investigation of S&P |
| November 7, 2013 | Rule 45 Subpoena documents |

| November 18, 2013 | (a)  Links to certain materials publicly available on federal government agency and entity websites<br><br>(b)  Hardcopies of certain materials obtained from DOJ, FBI, and NARA |
|---|---|
| November 18, 2013 | (a)  Two hard drives containing documents obtained by DOJ from the SEC in the course of the FIRREA investigation of S&P<br><br>(b)  Two hard drives with documents obtained in the course of the FIRREA investigation of S&P from 10 entities<br><br>(c)  Discs containing documents obtained in the course of the FIRREA investigation from two entities<br><br>(d)  Discs containing replacement materials for possibly corrupted materials in October 30 production |
| November 22, 2013 | (a)  Rule 45 Subpoena documents<br><br>(b)  Hard drive with documents obtained in the course of the FIRREA investigation of S&P from one entity |

SECOND SUPPLEMENTAL RULE 26(f) CONFERENCE REPORT
CASE NO.  CV13-779 DOC (JCGx)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 2

SECOND SUPPLEMENTAL RULE 26(f) CONFERENCE REPORT
CASE NO.  CV13-779 DOC (JCGx)

## DOJ PROPOSED SCHEDULE

| Event | Proposed Date |
|-------|---------------|
| Complaint Filed **[Actual]** | 2/4/2013 |
| Complaint Served **[Actual]** | 2/13/2013 |
| Defendants' Notice of Appearance **[Actual]** | 2/20/2013 |
| S&P Motion to Dismiss Complaint **[Actual]** | 4/22/2013 |
| Rule 26(f) Conferences **[Actual]** | 4/25/2013, 5/22/2013, 6/3/2013, 6/17/2013, 7/22/2013, 7/24/2013, 7/25/2013, 7/26/2013, 11/22/2013 |
| US Response to Motion to Dismiss **[Actual]** | 5/20/2013 |
| S&P Reply re Motion to Dismiss **[Actual]** | 6/3/2013 |
| Rule 26(f) Report **[Actual]** | 6/24/2013 |
| Hearing on Motion to Dismiss **[Actual]** | 7/8/2013 |
| Scheduling Conference **[Actual]** | 7/8/2013 |
| Order Denying Motion to Dismiss **[Actual]** | 7/16/2013 |
| Scheduling Conference **[Actual]** | 7/29/2013 |
| Initial Scheduling Order **[Actual]** | 8/2/2013 |
| S&P Corrected Answer to Complaint **[Actual]** | 9/3/2013 |
| Initial Discovery Period **[Actual]** | through 11/18/2013 |
| S&P and US Status Updates re Initial Discovery  **[Actual]** | 10/14/2013 |
| US Supplemental Rule 26(e) Disclosure **[Actual]** | 11/18/2013 |
| Updated Rule 26(f) Report **[Actual]** | 12/2/2013 |
| Scheduling Conference (to set Discovery Cutoff, Discovery Motion, Dispositive Motion, Pretrial Conference, and Trial dates) | 12/16/2013 |

| | |
|---|---|
| S&P Motion to Compel (First Amendment retaliation, Rule 45, Brady) | 1/20/2014 |
| US Response to Motion to Compel | 2/17/2014 |
| S&P Reply re Motion to Compel | 2/24/2014 |
| Hearing on Motion to Compel | TBD |
| Non-Expert Discovery Cutoff | 8/25/2014 |
| Expert Witness Disclosure | 9/15/2014 |
| Rebuttal Expert Witness Disclosure | 10/20/2014 |
| Expert Discovery Cutoff | 11/3/2014 |
| Dispositive Motions | 12/8/2014 |
| Responses to Dispositive Motions | 1/12/2015 |
| Replies on Dispositive Motions | 1/26/2015 |
| Last Day for Hearing Dispositive Motions | 2/16/2015 |
| Meeting of Counsel Before Final Pretrial Conference; Last Day to Conduct Settlement Conference | 3/16/2015 |
| Lodge Pretrial Conference Order; File Exhibit and Witness Lists; File Memorandum of Contentions of Fact and Law; File Status Report re Settlement; File Agreed-On Set of Jury Instructions and Verdict Forms; File Joint Statement re Disputed Jury Instructions and Verdict Forms; File Motions in Limine | 4/6/2015 |
| Responses to Motions in Limine | 4/20/2015 |
| Final Pretrial Conference; Proposed Voir Dire Questions lodged; Agreed-to Statement of Case filed; Hearing on Motions in Limine; Hearing on Disputed Jury Instructions | 4/27/2015 |
| Trial Date | 5/19/2015 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 3

SECOND SUPPLEMENTAL RULE 26(f) CONFERENCE REPORT
CASE NO.  CV13-779 DOC (JCGx)

### S&P PROPOSED SCHEDULE

| Event | Proposed Date |
|---|---|
| Scheduling Conference (to set Discovery Cutoff, Discovery Motion, Dispositive Motion, Pretrial Conference, and Trial dates) | 12/16/2013 |
| S&P Motion to Compel | 1/20/2014 |
| U.S. Response to Motion to Compel | 2/10/2014 |
| S&P Reply re Motion to Compel | 2/17/2014 |
| Hearing on Motion to Compel | TBD |
| Non-Expert Discovery Cutoff | 10/15/2014 |
| Expert Witness Disclosure | 12/17/2014 |
| Rebuttal Expert Witness Disclosure | 2/12/2015 |
| Expert Discovery Cutoff | 3/31/2015 |
| Dispositive Motions | 4/23/2015 |
| Responses to Dispositive Motions | 5/28/2015 |
| Replies on Dispositive Motions | 6/25/2015 |
| Last Day for Hearing Dispositive Motions | 8/25/2015 |
| Meeting of Counsel Before Final Pretrial Conference; Last Day to Conduct Settlement Conference | 8/28/2015 |
| Memorandum of Contentions of Facts and Law; Witness Lists; Joint Exhibit List; Motions in Limine | 9/16/2015 |
| Responses to Motions in Limine | 9/24/2015 |
| Lodge Final Pretrial Conference Order | 9/25/2015 |
| Final Pretrial Conference | 10/7/2015 |
| Trial Briefs | 11/2/2015 |
| Trial Date | 11/9/2015 |