

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

DEC 9 2013

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

1   William Michael Cunningham, PRO SE
    5308 Ludlow Drive
2   Temple Hills, MD 20748
    202-455-0430

3

4              UNITED STATES DISTRICT COURT FOR

5               THE CENTRAL DISTRICT OF CALIFORNIA

6

7   UNITED STATES OF AMERICA,          )  Case No.: 2:13-cv00779-DOC- JCG
                                       )
8              Plaintiff,              )  **AMICUS BRIEF SUBMITTED BY**
                                       )  **WILLIAM MICHAEL**
9        vs.                           )  **CUNNINGHAM IN SUPPORT OF**
                                       )  **THE PUBLIC INTEREST**
10  MCGRAW-HILL COMPANIES, INC.,       )
                                       )  Hearing Date:
11  and STANDARD & POOR'S              )  Time:
                                       )  Judge: Hon. David O. Carter
12  FINANCIAL SERVICES, LLC, ET.       )  Courtroom: 9D, Santa Ana
                                       )
13  AL.,                               )
                                       )
14             Defendant(s)            )

15

16

17

18

19

20

21

22

23

24

25

26



RECEIVED
BUT NOT FILED

DEC 9 2013

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION
BY

# Contents

TABLE OF AUTHORITIES ................................................................3

STATUTES ........................................................................................3

OTHER AUTHORITIES ...................................................................3

ARGUMENT .....................................................................................6

I. Market participants, including the Defendants, abandoned ethical principles in the pursuit of material wellbeing, damaging the Public ............................................6

II. The Public is Unprotected ...........................................................8

III. NRSRO Status of Defendant .....................................................8

a. The NRSRO Market is Oligopolistic .........................................8

b. Free Speech, NRSROs and Credit Ratings ...............................11

c. NRSRO Performance Standard to Protect The Public................11

IV. The Public Interest ...................................................................12

a. Plaintiff should conduct a census of all relevant transaction data ......................13

b. Create a Financial Institution Court .........................................14

V. The Role of Transaction Costs ..................................................15

VI. Calculation of Total Loss .........................................................16

VII. Summary.................................................................................17

Appendix 1 – Financial Marketplace Malfeasance from 2003 to 2011 ..................20

**TABLE OF AUTHORITIES**

CASES

Supreme Court of the United States. No. 97–5066. William Michael Cunningham, Petitioner v. Board of Governors of the Federal Reserve System. Petition for writ of certiorari to the United States Court of Appeals for the District of Columbia Circuit.

United States Court of Appeals FOR THE DISTRICT OF COLUMBIA CIRCUIT. No. 97-1256 William Michael Cunningham, APPELLANT v. Board of Governors of the Federal Reserve System, Appellee. Decided April 30, 1997.

United States Court of Appeals FOR THE DISTRICT OF COLUMBIA CIRCUIT. No. 98-1459 William Michael Cunningham, APPELLANT v. Board of Governors of the Federal Reserve System, Appellee. October, 1998.

US v. McGraw-Hill Companies Inc., et. al. Case No. CV 13-0779-DOC (JCGx). Document 81.

**STATUTES**

PUBLIC LAW 109–291—SEPT. 29, 2006 120 STAT. 1327

12 U.S.C § 1833a

18 U.S.C. §§ 1341, 1343 & 1344.

**OTHER AUTHORITIES**

2012 SUMMARY REPORT OF COMMISSION STAFF'S EXAMINATIONS OF EACH NATIONALLY RECOGNIZED STATISTICAL RATING ORGANIZATION. Report of the Staff of the U.S. Securities and Exchange Commission. November 2012.

Adam Smith on the Current Financial Crisis.

http://twisri.blogspot.com/2009/04/adam-smith-on-current-financial-crisis.html

"Bank accused of predatory practices. Lawsuit alleges black neighborhood, churches targeted." Gazette.net. Online at:

http://www.gazette.net/stories/06182009/collnew182411_32521.shtml

Comments dated 12/22/2003 - Warning the SEC of the Coming Crisis

http://www.sec.gov/rules/proposed/s71903/wmccir122203.pdf

Cunningham, William M. "The New Center of Power: China Overtakes the U.S. as the Globe's Biggest Energy Consumer." (2010):88 pp. Creative Investment Research, Inc. Creative Investment Research, Inc., 1 Aug. 2010.

Cunningham, William M. *US Economic and Market Forecast: 2014 to 2020. Fully Adjusted Return® Analysis.* Washington, DC: Creative Investment Research, 2013. Print.

Financial Crisis Response in Charts. US Dept. of Treasury. April 13 2012. Online at: http://www.treasury.gov/resource-center/data-chart-center/Documents/20120413_FinancialCrisisResponse.pdf

George Stigler, "The Theory of Economic Regulation," Bell Journal of Economics, 2, 1971:3-21.

Gary S. Becker (1957, 1971, 2nd ed.). The Economics of Discrimination. Chicago, University of Chicago Press.

"Giving Wall Street a Break." New York Times on the Web 2 Feb. 2012.

http://www.nytimes.com/interactive/2012/02/02/business/Giving-Wall-Street-a-Break.html?ref=business

Global Market Turmoil Graphic and Financial Crisis Calendar Graphic, Creative Investment Research, Inc., December, 2008 and November, 2009.

Letter to US Senator Richard Shelby commenting on the financial rescue plan currently under consideration by the US House and the US Senate. See: http://www.ethicalmarkets.com//wp-content/uploads/2008/12/financialbailoutcomment1.pdf

Mortgage GSE's, Predatory Lending and Minority Banks (2007 Prediction: Bear Stearns Will Fail.) http://twisri.blogspot.com/2007/08/morgage-gses-predatory-lending-and.html

Partial Revised Transcript from the Global Research Analyst Settlement Fairness Hearing. April 11, 2005. In the U.S. District Court for the District of New York. http://www.creativeinvest.com/sri/fairness.html

Property Flipping Remediation Yields Investment-grade Security http://www.socialfunds.com/news/article.cgi?sfArticleId=682

Racial Bias in Securitization and Community Lending http://twisri.blogspot.com/2009/08/wells-fargo-sued-for-racially-biased.html

The relationship between investment banks and the economy http://twisri.blogspot.com/2009/04/commercial-and-investment-banks-used.html

This Week in Socially Responsible Investing, August 16, 2011. (Published August 15, 2011) http://eepurl.com/fd3BE

Transaction Cost Theory of the Crisis http://www.prlog.org/10746429-firm-releases-transaction-cost-theory-of-the-financial-crisis.html

"Wall Street's Repeat Violations, Despite Repeated Promises." New York Times on the Web 7 Nov. 2011. http://www.nytimes.com/interactive/2011/11/08/business/Wall-Streets-Repeat-Violations-Despite-PromisesStsssss.html.

Pope Francis, Apostolic Exhortation *Evangelii Gaudium* (24 November 2013).

# ARGUMENT

## I. Market participants, including the Defendants, abandoned ethical principles in the pursuit of material wellbeing, damaging the Public

The following are the simple facts. Repeatedly over the past thirty years, signal market participants, operating in the most materially advantaged country ever to exist, abandoned ethical principles in the pursuit of material wellbeing to the detriment of the general welfare. By 2013, marketplace ethics reached a new low, as detailed in Appendix 1. Senior management at major firms unfairly transferred value from outsider to insider shareholders and/or engaged in fraudulent and unethical business behavior. This is no trivial matter. This is a multi-decade set of unethical business practices spanning every major firm in the country. There are hundreds of other cases.[1]  Envy, hatred, and greed[2] have flourished in capital market institutions, propelling ethical standards of behavior downward. Thus, unethical behavior has become standard in the financial services marketplace,[3] to the benefit of a narrow set of non-minority individuals. Markets cannot survive continuously elevated levels of fraud, since fraudulent practices mask an entity's true value and misallocates capital by moving investment dollars from deserving entities and companies to unworthy ones. Without meaningful reform there

---

[1] For each successfully prosecuted incident, we estimate nine others either go undetected or do not make it to the prosecution and settlement phase.
[2] See: Transaction Cost Theory of the Crisis http://www.prlog.org/10746429-firm-releases-transaction-cost-theory-of-the-financial-crisis.html..
[2] "Bank accused of predatory practices. Lawsuit alleges black neighborhood, churches targeted." Gazette.net. Online at: http://www.gazette.net/stories/06182009/collnew182411_32521.shtml
[2] The relationship between investment banks and the economy. http://twisri.blogspot.com/2009/04/commercial-and-investment-banks-used.html and http://twisri.blogspot.com/2009/03/why-market-failed.html
[3] These "ideologies which defend the absolute autonomy of the marketplace and financial speculation..reject the right of states, charged with vigilance for the common good, to exercise any form of control. A new tyranny is thus born, invisible and often virtual, which unilaterally and relentlessly imposes its own laws and rules." FRANCIS, Apostolic Exhortation Evangelii Gaudium (26 November 2013)

remains a significant and growing risk that our economic system will simply cease functioning.[4] Given this, the future of American democratic capitalism is at stake. Fully identifiable entities engaged in illegal activities.[5] They have, for the most part, evaded prosecution of any consequence. We note that Goldman Sachs, fined $1.159 billion by the Plaintiff for various efforts to defraud investors, subsequently received $75 million in Federal Government tax credits.[6] Alliance Capital Management, fined $250 million for defrauding mutual fund investors, received a contract[7] in August, 2004 from the U.S Department of the Interior (DOI) Office of Special Trustee for American Indians, to manage $404 million in Federal Government trust funds.[8]

Recently, we have observed several cases where corporate management unfairly transferred value from outsider to insider shareholders.[9] These abuses have been linked to the abandonment of ethical principles noted earlier.

---

[4] Proportional hazard models created by WMC and reflecting the probability of system wide market failure first spiked in September, 1998. The models spiked again in January and August, 2001. On December 22, 2005, we met with Ms. Elaine M. Hartmann and others from the Division of Market Regulation, U.S. Securities and Exchange Commission and specifically detailed our model findings.

[5] See: Racial Bias in Securitization and Community Lending http://twisri.blogspot.com/2009/08/wells-fargo-sued-for-racially-biased.html, Mortgage GSE's, Predatory Lending and Minority Banks (2007 Prediction: Bear Stearns Will Fail.) http://twisri.blogspot.com/2007/08/morgage-gses-predatory-lending-and.html

[6] The tax credits were awarded under the U.S. Department of the Treasury New Markets Tax Credit (NMTC) Program. (See: http://www.cdfifund.gov/programs/nmtc/).

[7] Contract number NBCTC040039.

[8] The contract was awarded despite the fact that placing Alliance Capital Management in a position of trust is, given the Commission's enforcement action, inconsistent with common sense, with the interests of justice and efficiency and with the interests of Indian beneficiaries. Alliance is also in violation of DOI Contractor Personnel Security & Suitability Requirements.

[9] Including, but not limited to, Adlephia Communications, the aforementioned Alliance Capital Management, American Express Financial, American Funds, AXA Advisors, Bank of America's Nations Funds, Bank One, Canadian Imperial Bank of Commerce, Canary Capital, Charles Schwab, Cresap, Inc., Empire Financial Holdings, Enron, Federated Investors, FleetBoston, Franklin Templeton, Fred Alger Management, Freemont Investment Advisors, Gateway, Inc., Global Crossing, H.D. Vest Investment Securities, Heartland Advisors, Homestore, Inc., ImClone, Interactive Data Corp., Invesco Funds Group Inc., Janus Capital Group Inc., Legg Mason, Limsco Private Ledger, Massachusetts Financial Services Co., Millennium Partners, Mutuals.com, PBHG Funds, Pilgrim Baxter, PIMCO, Prudential Securities, Putnam Investment Management LLC, Raymond James Financial, Samaritan Asset Management, Security Trust Company, N.A., State Street Research, Strong Mutual Funds, Tyco, UBS AG, Veras Investment Partners, Wachovia Corp., and WorldCom. Accounting firms, including Arthur Andersen and Ernst & Young aided and abetted efforts to do so. We believe there are hundreds of other cases.

## II. The Public is Unprotected

The economic crisis of 2006 to 2013 resulted in the loss of millions of jobs, cost thousands of lives[10] and imposed trillions of dollars in actual and potential losses. This downturn was entirely predictable and the public remains at risk.[11]

## III. NRSRO Status of Defendant

The current lawsuit claims that Defendant S&P knew that its credit ratings were "materially false, and concealed material facts, in that S&P's desire for increased revenue and market share in the RMBS and CDO ratings markets led S&P to downplay and disregard the true extent of the credit risks posed by RMBS and CDO tranches in order to favor the interests of large investment banks and others in the issuance of RMBS and CDOs.." They did so in order to "maintain and grow S&P's share of the market for credit ratings of RMBS and CDOs and the high fees and profits those ratings generated." This behavior is consistent with that of the leader of a market damaging oligopoly, and reduces competition, increasing prices, generating widespread and negative social impacts, contributing to the financial crisis.

### a. The NRSRO Industry is Oligopolistic

Significant barriers to entry exist, consistent with an oligopolistic industry structure and confirmed by both Mr. Cunningham's 1997 and 2003 experience and by the 2012 NRSRO Summary Report of the SEC issued in November, 2012.[12]

---

[10] "Just as the commandment 'Thou shalt not kill' sets a clear limit in order to safeguard the value of human life, today we also have to say 'thou shalt not' to an economy of exclusion and inequality. Such an economy kills." Pope Francis. EVANGELII GAUDIUM. Page 45. November 24, 2013.

[11] Supreme Court of the United States. No. 97–5066. William Michael Cunningham, Petitioner v. Board of Governors of the Federal Reserve System. Petition for writ of certiorari to the United States Court of Appeals for the District of Columbia Circuit.

Table 1 below, taken from this report, shows the number of ratings issued by each current NRSRO. The Defendant accounted for 44.828% of all ratings issued. Oligopoly members earn outsized profits. On 2012 revenue of $2.7 billion, the other major NRSRO, Moody's (with 38% of all ratings issued in 2011), earned $1.9 billion. (Thus this Court's suggestion that "Mr. Cunningham is free –if he so chooses-to apply for NRSRO status again" is false.[13] To apply again would be a *Futile Gesture:* biased industry and regulatory practices will simply not allow it.[14])

| NRSRO | # Ratings 2011 | % of Total |
|-------|---------------:|-----------:|
| M Best | 6,792 | 0.260% |
| DBRS | 51,570 | 1.975% |
| EFJ | 1,136 | 0.043% |
| Fitch | 348,536 | 13.346% |
| JCR | 722 | 0.028% |
| KBRA | 17,278 | 0.662% |
| Moody's | 998,878 | 38.248% |
| Morningstar | 16,070 | 0.615% |
| *S&P* | *1,170,600* | *44.823%* |
| **Total** | **2,611,582** | **100.000%** |

The oligopolistic industry structure damages the public in a number of ways. First, the barrier to entry that is a feature of oligopolistic industries limits new entrants. By limiting new entrants, incumbents are able to issue low quality or even completely false ratings, with no consequences or fear that new entrants will provide more accurate ratings. Second, the oligopolistic structure leads to increased prices. Since new entrants cannot access the market, incumbents have no reason to fear price competition. Incumbents are

---

[12] 2012 SUMMARY REPORT OF COMMISSION STAFF'S EXAMINATIONS OF EACH NATIONALLY RECOGNIZED STATISTICAL RATING ORGANIZATION. Report of the Staff of the U.S. Securities and Exchange Commission. November 2012.

[13] Case No. CV 13-0779-DOC (JCGx). US v. McGraw-Hill Companies Inc., et. al. Document 81.

[14] Mr. Cunningham invokes the Futile Gesture (McDonnell Douglas) Doctrine. He 1.) Is a member of a protected class. 2.) He applied for and was qualified for NRSRO status. 3.) He was rejected despite his qualifications and 4.) as this case shows, other less competent, less ethical applicants received the designation after Mr. Cunningham was rejected.

free to charge, within limits, what they like. Yet, to obtain the NRSRO designation,

NRSRO participants must pledge that they will "operate independently of

economic pressures or control.."

Finally, NRSRO designations granting entry to the rating provider marketplace are

manufactured and distributed by the Plaintiff. Indeed, the NRSRO industry

structure was created, maintained and guarded by the Plaintiff. We note the

Plaintiff has no incentive to highlight their responsibility for and complicity in

these matters.



The result is shown in Figure 1, left. Output *(Q)*, measured by either the number of firms in the industry or the number and quality of ratings issued, is lower *(Q1)* that would be the case under competitive market equilibrium *(Q and P)*. The price *(P)* of these outputs is higher *(P1)*. Profits to and, consequently, the value of firms in the industry is also higher that it would be under a competitive market structure. A first level, cursory summary of damage to

society is shown as *Net welfare loss*. This is consistent with the data in Table 1 and

with NRSRO return on equity data.

These "necessary element(s) to the proceedings" are critical to a fair, consistent

and competent evaluation of the case. Neither Plaintiff or Defendant raises or

presents these facts, however.

### b. Free Speech, NRSROs and Credit Ratings

Legal experts appear confused about the "freedom of speech" based protected status of credit ratings. Text written by NRSROs that describes issuers and instruments are protected by free speech. Ratings (AAA, AA, A, BBB, BB, B, etc.) are not: they are product warning labels. Their consideration and review is not optional for institutional market participants.

### c. NRSRO Performance Standard to Protect the Public

It is our belief that the Court must enforce an NRSRO performance standard[15] to determine if a credit rating agency's credit ratings should be relied on by the marketplace. That is, if the point of having NRSRO ratings is to determine the probability of default, then NRSRO rating agencies should be evaluated based on their performance in predicting default.

By any reasonable standard, the Defendant failed and in so doing damaged the public. Even if the Defendant is found not to have known its ratings were faulty, the result was, at best, gross incompetence. Its status as an NRSRO credit rating agency should be suspended or terminated immediately, regardless of the outcome of this case. Given that profits generated were based on NRSRO status, all profits generated over the relevant time period should be recaptured.

Finally, we suggest the creation of a database showing the transaction chain (seller, buyer, intermediary) for each and every financial instrument at issue. As part of this process, data showing all commission or bonus payments made that were

---

[15] Public Law 109–291 provides a performance standard. The Plaintiff "shall censure, place limitations on the activities, functions, or operations of, suspend for a period not exceeding 12 months, or revoke the registration of any nationally recognized statistical rating organization if the (Plaintiff) finds..that such censure, placing of limitations, suspension, or revocation is necessary for the protection of investors and in the public interest.."

based on the securities at issue is one way to get highly relevant information on all transactions.

Those responsible for creating and selling the securities at issue received compensation based on assuming the securities performed in a manner consistent with NRSRO credit rating agency data. That is, they were paid as if NRSRO ratings were true and accurate. Compensation was calculated as if these securities were designed to perform in a manner consistent with their NRSRO ratings. They were not and did not.

In addition, to trace the impact this behavior had on the general public, data detailing the exact identity and standing (profit and/or loss) of each and every security investor should be compiled.

## IV. The Public Interest

The overriding public interest is in fair, efficient, fully functioning markets. Fully functioning securities markets minimize informational asymmetries. Indeed, free, clear, and fully functioning markets operate as price discovery mechanisms via "the process of determining the price of an asset in the marketplace through the interactions of informed, rational buyers and sellers." The actions of the Defendant, intentional or not, prevented accurate security valuation. Buyers were not informed: they paid too much for the securities at issue, given the undisclosed and elevated risk of loss.

The Plaintiff's regulatory approach facilitates, and the Defendant's business model depends upon, the continuation of the informational asymmetry. Security buyers use information on ratings, regulatory compliance and legal standing to determine, in part, with whom to conduct business. Without a formal fraud determination, buyers are likely to continue to be at the mercy of powerful, unethical sellers. The

informational asymmetry at the center of this case reasserts itself. Market failure, at some point, results.

Without a parallel criminal case, market participants have one less opportunity to obtain information concerning the probability that the defendant/seller will act in a fraudulent, unethical manner. The informational asymmetry at the center of this case above reasserts itself. Market failure, at some point, results.

### a. Plaintiff should conduct a census of all relevant transaction data

We note the lack of a database showing the transaction chain (seller, buyer, intermediary) for each and every rating and financial instrument at issue. We first suggested this in 2008.[16] Data showing all commission and bonus payments made based on the ratings and securities at issue is the only way to get highly relevant information on all transactions. Yet, the Plaintiff has not done so.

Given advancements in information processing, this is not a daunting task. Further, we suggest that the Federal Deposit Insurance Corporation, the FDIC, be tasked with this job. The FDIC, through its Division of Supervision, has a great deal of experience in this area. In closing down failed banks, the FDIC conducts the type of asset and compensation data review we highlight here. Specifically, we suggest that the Court engage the Director, Division of Risk Management Supervision, FDIC, to manage this data collection and analysis task.

Those responsible for rating, creating and selling the securities at issue received compensation based on an assumption that the securities at issue performed in a manner consistent with rating document data. That is, they were paid as if the

---

[16] Letter to US Senator Richard Shelby commenting on the financial rescue plan currently under consideration by the US House and the US Senate. In the appendix to that letter, we provided a four step plan for dealing with the crisis. See: http://www.ethicalmarkets.com//wp-content/uploads/2008/12/financialbailoutcomment1.pdf

ratings were true and accurate. Compensation was calculated as if these securities performed well to maturity. As we know, they did not and could not.

In addition, to trace the impact this behavior had on the general public, data detailing the exact identity and standing (profit and/or loss) of each and every investor should be compiled.

Finally, should the defendant be found guilty, we believe any penalty should incorporate the following:

1.     All net income for the three years preceding the date of the first action alleged in this matter should be confiscated from the Defendant.

2.     All bonuses and commissions paid to any Defendant employees involved in the transaction chain should be specifically recaptured or clawed back

### b. Create a Financial Institution Court

Portions of any fines assessed on renegade financial institutions should be used to create a special Financial Institution Court of Law. This Court would be responsible for both financial institution and financial institution regulator oversight. The Court would provide flexible oversight that ramps up when needed. This proposed Court might become active when the number of cases against Wall Street firm exceeds some predetermined number, or when damage due to financial market fraud exceeds some dollar amount. Once cases and damages fall, the Court could be suspended.

A key part of this oversight would be the creation of a database containing all electronic mail messages at all regulatory agencies and all financial institutions subject to regulatory oversight. Advances in information technology make this a feasible proposition, since computer storage costs have fallen. Indeed, the entirety of Defendant emails could be stored on a single 120 petabyte drive. That same

drive could hold all email messages sent by all institutions subject to SEC, FDIC and FRB oversight.

The data would be collected in real time, stored at the Financial Institution Court. Should there be a need to review the data, we have developed a procedure to allow access in a manner fair to all.

When industry participants, despite continual enforcement actions, act repeatedly and with impunity in a manner that clearly damages the industry, the country and the global economy, a Court must step in to protect the public.

There is no other rational choice.

## V. The Role of Transaction Costs

To understand the role transaction costs played in the financial crisis, it helps to definite them as financial instrument market existence costs, or as exchange-related costs that arise due to the existence of the financial instrument marketplace. Research shows that as marketplace ethics decreased, transaction costs increased. Eventually, transaction costs rose to a level that caused general market failure, or the financial crisis. General market failure is defined as an inefficient allocation of liquidity in the global financial marketplace. This liquidity crisis was caused, at core, by an inability to either independently determine or believe (trust) the value of securities pledged as collateral for short term, or repo, loans.

Declining trust increased transaction costs in three ways:

• First, opportunistic behavior on the part of key financial market participants, commercial, investment banks, and NRSRO's, led to higher security prices. They simply gouged customers.

- Second, these same institutions developed a set of racially biased,[17] low added value, high cost financial practices and products, designed solely to maximize firm revenue and profit. They concealed the fact that these products had limited value from both customers and regulators.

- Financial market participants attempted to use imagination to deal with the ethics/trust/ transaction cost issue. They did so via swaps, derivatives and other financial market "innovations" designed as 'safe-guards' to protect parties vulnerable to opportunistic behavior in financial transactions. These contracts were supposed to eliminate the need to be concerned about the behavior of unscrupulous actors and the impact that behavior might have on one's financial standing. Ratings on securities served as another type of insurance policy. Both sets of "insurance policies" proved ineffective, however, and only increased transaction costs. These significantly increased transaction costs precipitated and caused global market failure in 2007 and 2008. Practices and policies that increase trust and thereby reduce transaction costs will restore functionality to the financial and economic marketplace. These will also help prevent a reoccurrence of the financial crisis.

## VI. Calculation of Total Loss

In an effort to help the Court, below we outline the Total Loss calculation using proprietary Fully Adjusted Return® (FAR) Methodology.

The total loss consists of the following:

---

[17] Racial Bias in Securitization and Community Lending http://twisri.blogspot.com/2009/08/wells-fargo-sued-for-racially-biased.html

a.      Monetary losses: $P_b - P_s$  where $P_b$ = Price investment bought; $P_s$=Price sold. (In all cases, sold refers to the price at which ownership can be changed if desired. A transaction need not take place.)

b.      Opportunity costs. These are gains (or losses) from holding alternative investments that would have been purchased if the securities at issue had not. $P_{aib}$ − $P_{ais}$, where $P_{aib}$ = Price at which alternative investment bought; $P_{ais}$ = Price at which alternative investment sold.

c.      Transaction Related Social Returns. (TRSR) These include the social gains or costs of global market failure that can be attributed to this specific security transaction, impacts on ethical standards of marketplace behavior, informational asymmetry impacts (demand and supply side bargaining power impacts).

d.      Market Related Social Returns (MRSR). These include non transaction specific secondary and tertiary impacts on society as a whole. In this category we include the impact changes in final product supply (housing) and all attendant final market factors have.  To the maximum initial total monetary loss we add the monetary value of societal impacts. We estimate the final monetary loss at, according to FAR®, $16 billion.

### VII. Summary

The Plaintiff's incompetence and the Defendant's greed helped cost the nation $19.2 trillion,[18] increased the speed with which China will overtake the U.S. in GDP terms,[19] and set the stage for the eventual replacement of the US dollar as

---

[18] Financial Crisis Response in Charts. US Dept. of Treasury. April 13 2012. Online at: http://www.treasury.gov/resource-center/data-chart-center/Documents/20120413_FinancialCrisisResponse.pdf
[19] Cunningham, William M. "The New Center of Power: China Overtakes the U.S. as the Globe's Biggest Energy Consumer." (2010):88 pp. Creative Investment Research, Inc. Creative Investment Research, Inc., 1 Aug. 2010.

global reserve currency.[20]  These events tend not to be in the public interest. Plaintiff's and Defendant's preference for discrimination contributed to this outcome. People and institutions discriminate because they have a preference (taste) for it. They understand there is a cost, and are willing to pay it.[21] Figure 2, below, shows a maroon demand curve, a blue supply curve, a market equilibrium, and a green triangle supporting the market. The green triangle represents the full set of cultural/ethical traditions and legal practices, including the



ability to enforce contracts. Normally, this triangle is invisible: it is a given that markets depend upon the rule of law to function. Our models show the base of this triangle has gotten narrower over time. As a result, markets have become less stable. Regulatory capture[22], ineffective prosecution, and collusion (too big to fail, etc.) have moved the triangle in the direction of supporting suppliers in the financial service marketplace. Until

[20] Cunningham, William M. US Economic and Market Forecast: 2014 to 2020. Fully Adjusted Return® Analysis. Washington, DC: Creative Investment Research, 2013. Print.
[21] Gary S. Becker (1957, 1971, 2nd ed.). The Economics of Discrimination. Chicago, University of Chicago Press.
[22] George Stigler, "The Theory of Economic Regulation," Bell Journal of Economics, 2, 1971:3-21.

the generalized level of fraud and malfeasance in the financial marketplace is lowered and trust is increased, aggregate economic activity will remain at lower than normal levels. Our models indicate a successful (for the Plaintiff) outcome in this lawsuit is one of several critically important steps along the path to the restoration of normalcy.

Unfortunately, unless the Judiciary steps up, we see little chance the Public will prevail.

Respectfully submitted,

Dated this 6th day of December, 2013

By: /S/

/William Michael Cunningham/
PRO SE
5308 Ludlow Drive
Temple Hills, MD 20748
202-455-0430

**Appendix 1 – Financial Marketplace Malfeasance from 2003 to 2011**

• April 28, 2003, every major US investment bank, including Merrill Lynch, Goldman Sachs, Morgan Stanley, Citigroup, Credit Suisse First Boston, Lehman Brothers Holdings, J.P. Morgan Chase, UBS Warburg, and U.S. Bancorp Piper Jaffray, were found to have aided and abetted efforts to defraud investors.

• May, 2003, the Securities and Exchange Commission ("SEC") disclosed that several "brokerage firms paid rivals that agreed to publish positive reports on companies whose shares..they issued to the public."

• September 3, 2003, the New York State Attorney General "obtained evidence of widespread illegal trading schemes, 'late trading' and 'market timing,' that potentially cost mutual fund shareholders billions of dollars annually."

• September 4, 2003, Goldman Sachs, admitted that it had misused material, nonpublic information that the US Treasury would suspend issuance of the 30-year bond.

• December 18, 2003, the SEC "announced an enforcement action against Alliance Capital Management L.P. (Alliance Capital) for defrauding mutual fund investors.. the Commission found that Alliance Capital breached its fiduciary duty to (it's) funds and misled those who invested in them."

• October 8, 2004, the SEC "announced..enforcement actions against Invesco Funds Group, Inc. (IFG), AIM Advisors, Inc. (AIM Advisors), and AIM Distributors, Inc. (ADI) that required IFG to pay $215 million in disgorgement and $110 million in civil penalties, and require AIM Advisors and ADI to pay, jointly and severally, $20 million in disgorgement and an aggregate $30 million in civil penalties."

- November 4, 2004, the SEC "filed a settled civil action in the US District Court for the District of Columbia against Wachovia Corporation. Wachovia paid a $37 million penalty."

- November 17, 2004, the SEC announced "charges concerning undisclosed market timing against Harold J. Baxter and Gary L. Pilgrim in the Commissions' pending action in federal district court in Philadelphia." Baxter and Pilgrim agreed to "pay $80 million – $60 million in disgorgement and $20 million in civil penalties."

- November 30, 2004, the SEC announced "American International Group, Inc. (AIG) agreed to pay a total of $126 million, consisting of a penalty of $80 million, and disgorgement and prejudgment interest of $46 million."

- December 22, 2004, "the SEC, NASD and the New York Stock Exchange announced Edward D. Jones & Co., L.P., a registered broker-dealer in St. Louis, Missouri.. agreed to pay $75 million in disgorgement and civil penalties."

- January 25, 2005, "the SEC announced separate settled civil injunctive actions against Morgan Stanley & Co. Incorporated (Morgan Stanley) and Goldman, Sachs & Co. (Goldman Sachs) relating to the firms' allocations of stock to institutional customers in initial public offerings (IPOs) underwritten by the firms during 1999 and 2000."

- January 31, 2005, "the nation's largest insurance brokerage company, Marsh & McLennan Companies Inc., (paid) $850 million to policyholders and issues a public apology calling its conduct "unlawful" and "shameful.."

- February 9, 2005, the SEC "announced the settlement of an enforcement action against Columbia Management Advisors, Inc. (Columbia Advisors), Columbia Funds Distributor, Inc. (Columbia Distributor), and three former Columbia executives. Columbia paid $140 million."

• March 23, 2005, the SEC "announced Putnam Investment Management, LLC (Putnam) will pay $40 million for failing to adequately disclose conflicts of interest."

• March 23, 2005, the SEC "announced that it settled an enforcement action against Citigroup Global Markets, Inc. (CGMI)."

• April 19, 2005, the SEC "announced that KPMG LLP settled charges against it in connection with the audits of Xerox Corp. from 1997 through 2000." KPMG paid a fine totaling $22.475 million.

• April 12, 2005, the SEC "settled an enforcement action against the New York Stock Exchange, Inc."

• April 28, 2005, the SEC announced "that it has instituted settled enforcement proceedings against Tyson Foods, Inc. and its former Chairman and CEO Donald "Don" Tyson.

• May 31, 2005, the SEC "announced settled fraud charges against two subsidiaries of Citigroup, Inc. Citigroup paid $208 million in disgorgement and penalties."

• June 2, 2005, the SEC "filed securities fraud charges against Amerindo Investment Advisors, Inc., et. al., for misappropriating at least $5 million from an Amerindo client."

• June 9, 2005, the SEC announced that "Roys Poyiadjis, a former CEO of AremisSoft Corporation, consented to disgorge approximately $200 million of unlawful profit from his trading in AremisSoft stock."

• July 20, 2005, the SEC "announced a settled administrative proceeding against Canadian Imperial Bank of Commerce's (CIBC) for..facilitating deceptive market timing and late trading of mutual funds by certain customers. The firm paid $125 million in disgorgement and penalties."

- August 15, 2005, the SEC "charged four brokers and a day trader with cheating investors through a fraudulent scheme that used squawk boxes to eavesdrop on the confidential order flow of major brokerages."

- August 22, 2005, the SEC "filed civil fraud charges against two former officers of Bristol-Myers Squibb Company for orchestrating a fraudulent earnings management scheme."

- August 23, 2005, the SEC "filed charges against two former top Kmart executives for misleading investors."

- November 2, 2005, the SEC "filed enforcement actions against seven individuals alleging they aided and abetted a massive financial fraud at U.S. Foodservice, Inc. subsidiary of Royal Ahold (Koninklijke Ahold N.V.)."

- November 28, 2005, the SEC announced "that three affiliates of one of the country's largest mutual fund managers..agreed to pay $72 million to settle charges they harmed long-term mutual fund shareholders."

- December 1, 2005, the SEC "announced settled enforcement proceedings against American Express Financial Advisors Inc. AEFA paid $30 million in disgorgement and civil penalties."

- December 1, 2005, the SEC "announced a settled administrative proceeding against Millennium Partners, L.P., et. al., The respondents paid $180 million in disgorgement and penalties."

- December 19, 2005, the SEC "announced that it filed and settled insider trading charges both against an accountant and a former executive of Sirius Satellite Radio, Inc."

- On December 21, 2005, the SEC "sued top executives of National Century Financial Enterprises, Inc. (NCFE), alleging that they participated in a scheme to defraud investors. NCFE suddenly collapsed in October 2002, causing investor

losses exceeding $2.6 billion and approximately 275 health-care providers were forced to file for bankruptcy protection."

• January 3, 2006, the SEC announced "that it filed charges against six former officers of Putnam Fiduciary Trust Company (PFTC)."

• January 4, 2006, the SEC "filed securities fraud charges against McAfee, Inc. McAfee paid a $50 million civil penalty."

• January 9, 2006, the SEC "announced that Daniel Calugar and Security Brokerage, Inc. (SBI), agreed to settle the SEC's charges. Calugar disgorged $103 million in ill-gotten gains and paid a civil penalty of $50 million."

• February 2, 2006, the SEC "announced that it filed an enforcement action against five former senior executives of General Re Corporation (Gen Re) and American International Group, Inc. (AIG) for helping AIG mislead investors."

• February 9, 2006, the SEC announced "the settlement of charges that American International Group, Inc. (AIG) committed securities fraud. AIG paid in $1.6 billion to resolve claims related to improper accounting, bid rigging and practices involving workers' compensation funds."

• March 9, 2006, the SEC filed a lawsuit "against BMA Ventures, Inc. and its president, William Robert Kepler, 35, of Dallas, Texas, alleging that they illegally obtained approximately $1.9 million in a fraudulent scheme from January 2004 through March 2005.

• On March 16, 2006, the SEC "announced a settled enforcement action against Bear, Stearns & Co., Inc. (BS&Co.) and Bear, Stearns Securities Corp. (BSSC). Bear Stearns paid $250 million in disgorgement penalties."

• April 11, 2006, the SEC announced "charges against individuals involved in widespread and brazen international schemes of serial insider trading. The schemes

were orchestrated by..a research analyst in the Fixed Income division of Goldman Sachs."

•       April 17, 2006, the SEC brought  "Settled Charges Against Tyco International Ltd. Alleging (a) Billion Dollar Accounting Fraud."

•       May 10, 2006, the SEC ordered "Former Chairman and CEO of Gemstar-TV Guide International, Inc. .. to Pay Over $22 Million For Role in Accounting Fraud."

•       May 10, 2006, the SEC sued "Morgan Stanley."

•       "May 23, 2006, the (SEC) filed a settled enforcement proceeding against the Federal National Mortgage Association ('Fannie Mae')."

•       May 30, 2006, the SEC brought "Settled Charges Against Tribune Company for Reporting Inflated Circulation Figures and Misstating Circulation Revenues."

•       May 31, 2006, Bear, Stearns & CO. Inc.; Citigroup Global Markets, Inc.; Goldman, Sachs & Co.; J.P. Morgan Securities, Inc.; Lehman Brothers Inc.; Merrill Lynch, Pierce, Fenner & Smith Incorporated; Morgan Stanley & Co. Incorporated and Morgan Stanley DW Inc.; RBC Dain Rauscher Inc.; Banc of America Securities LLC; A.G. Edwards & Sons, Inc.; Morgan Keegan & Company, Inc.; Piper Jaffray & Co.; Suntrust Capital Markets inc.; and Wachovia Capital Markets, LLC,  settled "SEC Charges Involving Violative Practices in the Auction Rate Securities Market."

•       June 27, 2006, the SEC charged "Morgan Stanley With Failure To Maintain And Enforce Policies To Prevent Misuse of Inside Information."

•       June 28, 2006, the SEC settled with "Raytheon Company, it's former CEO, and Subsidiary Controller for Improper Disclosure and Accounting Practices."

•       June 30, 2006, a jury found "Former PIMCO Equity Funds Chairman Defrauded Investors in Market Timing Case."

1   •       August 7, 2006, "Martha Stewart and Peter Bacanovic Settle(d) SEC's

2   Insider Trading Charges."

3   •       August 28, 2006, Prudential Securities Inc. (APSI) was ordered "to Pay

4   $600 Million in Global Settlement of Fraud Charges..."

5   •       September 27, 2006, the SEC charged "Former CEO and Two Former

6   Executives Affiliated with RenaissanceRe Holdings Ltd. with Securities Fraud."

7   •       October 30, 2006, the SEC charged "Delphi Corporation and Nine

8   Individuals in wide-ranging financial fraud."

9   •       November 2, 2006, the SEC settled "Charges against Eight Former Officers

10  and Directors of Spiegel, Inc."

11  •       November 14, 2006, the SEC sanctioned "the City Of San Diego for

12  Fraudulent Municipal Bond Offerings and Order(ed) the City to Retain an

13  Independent Consultant."

14  •       December 4, 2006, "Jefferies & Co., Inc. (Jefferies) Settle(d) SEC Charges."

15  •       January 18, 2007, "Fred Alger Management and Fred Alger & Company

16  (agreed) to Pay $40 Million to Settle Market Timing and Late Trading Violations."

17  •       January 29, 2007, "MBIA Settle(d) Securities Fraud Charges for Misuse of

18  Reinsurance Contracts."

19  •       March 1, 2007, "The SEC announced insider trading charges against

20  fourteen defendants in connection with two..insider trading schemes."

21  •       March 12, 2007, the SEC charged "Four Former Senior Executives of Nortel

22  Networks Corporation in Wide-Ranging Financial Fraud Scheme."

23  •       March 14, 2007, the SEC and the NYSE settled "Enforcement Actions

24  Against (a) Goldman Sachs Unit for Role in Customers' Illegal Trading Scheme."

25

26

- March 14, 2007, the SEC brought an enforcement action "Against Banc of America Securities for Failing to Safeguard Nonpublic Research Information and Publishing Fraudulent Research." The firm agreed to pay $26 Million.
- March 15, 2007, the SEC settled "With Former Raytheon Officers For Improper Disclosure and Accounting Practices."
- March 15, 2007, the SEC announced a "$28.7 Million Settlement of Fraud Charges against F. David Radler, Former COO of Hollinger International, Inc."
- March 22, 2007, the SEC charged "American Stock Exchange and Former Chairman and CEO Salvatore Sodano with Failing to Exercise Regulatory Oversight Responsibilities."
- March 29, 2007, Nicor paid "$10 Million to Settle Fraud Charges."
- April 2, 2007, the SEC charged "Tenet Healthcare Corporation and Four Former Senior Executives With Concealing Scheme to Meet Earnings Targets by Exploiting Medicare System."
- April 24, 2007, the SEC charged the "Former Apple General Counsel for Illegal Stock Option Backdating."
- April 26, 2007, the SEC charged "Baker Hughes With Foreign Bribery and With Violating 2001 Commission Cease-and-Desist Order."
- May 9, 2007, "Morgan Stanley (agreed) to Pay $7.9 Million to Settle Best Execution Case."
- May 14, 2007, the SEC charged "Former Oracle Vice President with Illegal Insider Trading in Stocks of Oracle Acquisition Targets."
- "May 23, 2007, the SEC filed a civil injunctive action in US District Court for the Southern District of New York charging the BISYS Group, Inc. with violating the financial reporting, books-and-records, and internal control provisions

of the Securities Exchange Act of 1934. BISYS paid $25 million in disgorgement and interest."

• May 31, 2007, "The SEC..filed civil fraud charges against Mercury Interactive, LLC and four former senior officers of Mercury. The SEC alleges that the former senior officers perpetrated a fraudulent and deceptive scheme from 1997 to 2005 to award themselves and other employees undisclosed, secret compensation by backdating stock option grants and failing to record hundreds of millions of dollars of compensation expense."

• July 25, 2007, "The SEC..filed civil charges against ConAgra Foods, Inc. for fraudulent, accounting practices."

• July 26, 2007, "The SEC..filed a civil action against Cardinal Health, Inc. Cardinal agreed to pay $35 million."

• September 5, 2007, the SEC charged "26 Defendants in $428 Million Securities Fraud That Targeted Senior Citizens and Retirement Savings."

• September 19, 2007, "Evergreen Investment Management Company and Affiliates (agreed) to Pay $32.5 Million to Settle Market Timing Violations."

• September 19, 2007, "HSBC Bank Settle(d) SEC Charges and Agree(d) to Pay $10.5 Million."

• "September 20, 2007, the SEC filed a civil injunctive action charging 28 defendants in a series of fraudulent schemes."

• "September 27, 2007, the SEC filed a settled enforcement action charging the Federal Home Loan Mortgage Corporation ('Freddie Mac')."

• October 25, 2007, "the SEC.. announced the filing of securities fraud charges against David H. Brooks, the former Chief Executive Officer and Chairman of the Board at DHB Industries, Inc., charging that Brooks engaged in a pervasive accounting fraud at DHB between 2003 and 2005, violated insider

trading laws in 2004, and used millions of dollars in corporate funds to pay personal expenses."

• November 14, 2007, "the SEC.. filed Foreign Corrupt Practices Act books and records and internal controls charges against Chevron Corporation ('Chevron')."

• February 5, 2008, "the SEC..announced settled insider trading charges against four Hong Kong residents for illegal tipping and trading in the securities of Dow Jones & Company, Inc. ('Dow Jones'). The alleged tip originated with David Li Kwok Po ('David Li'), who served on the Dow Jones board of directors."

• May 1, 2008, "The Securities and Exchange Commission..filed a civil injunctive action against McCann-Erickson Worldwide, Inc. ('McCann') and the Interpublic Group of Companies, Inc. ('IPG')."

• May 1, 2008, the SEC charged "Banc of America Investment Services With Failing to Disclose It Favored Affiliated Mutual Funds."

• July 30, 2008, "The Securities and Exchange Commission..charged New Hampshire-based Pax World Management Corp. with violating investment restrictions."

• August 11, 2008, "The Securities and Exchange Commission..filed charges against Wextrust Capital, LLC (Wextrust), its principals, and four affiliated Wextrust entities, alleging that defendants conducted a massive Ponzi-type scheme from 2005 or earlier that raised approximately $255 million from approximately 1,200 investors. The targets of the fraudulent offerings are primarily members of the Orthodox Jewish community."

• September 3, 2008, the "Securities and Exchange Commission..charged two Wall Street brokers (at Credit Suisse Securities (USA) LLC) with defrauding their

customers when making more than $1 billion in unauthorized purchases of subprime-related auction rate securities."

• September 3, 2008, The "SEC charged former Kellogg, Brown & Root, Inc. (KBR) executive Albert Jackson Stanley with violating the anti-bribery provisions of the Foreign Corrupt Practices Act (FCPA).."

• September 14, 2008, the SEC "announced..that, together with the Treasury and the Federal Reserve, it is working with Lehman Brothers to address the issues that it faces."

• September 15, 2008, the SEC "charged the former chairman and CEO of ..KB Home, Inc., for his participation in a multi-year scheme to backdate stock options to himself and other company officers and employees, depriving investors of accurate information about executive compensation at the company."

• October 7, 2008, the "SEC..charged a former vice president at..Restoration Hardware with insider trading."

• November 18, 2008, the SEC "charged four individuals for engaging in a fraudulent scheme to overvalue the commodity derivatives trading portfolio at Bank of Montreal (BMO)."

• December 11, 2008, the SEC "finalized settlements with Citigroup Global Markets, Inc. (Citi) and UBS Securities LLC and UBS Financial Services, Inc. (UBS) that will provide nearly $30 billion to tens of thousands of customers."

• December 11, 2008, the SEC "charged Bernard L. Madoff and his investment firm, Bernard L. Madoff Investment Securities LLC, with securities fraud."

• December 18, 2008, the SEC "charged seven individuals and two companies involved in an insider trading ring, alleging that Matthew Devlin, at Lehman Brothers, Inc. in NY,, traded on confidential information."

1   •       December 22, 2008, the SEC "filed a civil injunctive action against

2   UnitedHealth Group Inc., alleging that it engaged in a scheme to backdate stock $1

3   billion in options."

4   •       February 5, 2009, the SEC "charged seven individuals involved in an insider

5   trading ring that generated more than $11.6 million in illegal profits and avoided

6   losses.

7   •       The SEC allege(d) that two mergers and acquisitions professionals, at UBS

8   Investment Bank and at Blackstone Advisory Services, L.P., tipped five

9   individuals with material nonpublic information about three impending corporate

10  acquisitions."

11  •       February 5, 2009, the SEC "filed an enforcement action against UBS AG,

12  charging the firm with acting as an unregistered broker-dealer and investment

13  adviser."

14  •       February 17, 2009, the SEC "charged Robert Allen Stanford with

15  orchestrating a fraudulent, multi-billion dollar investment scheme."

16  •       March 2, 2009, the SEC "charged Sunwest Management Inc. with securities

17  fraud."

18  •       February 25, 2009, the SEC "obtained an asset freeze against two New York

19  residents and their three affiliated entities, who orchestrated a brazen investment

20  fraud involving the misappropriation of as much as $554 million in investor

21  assets."

22  •       March 4, 2009, the SEC "brought enforcement actions against 14 specialist

23  firms for unlawful proprietary trading on several regional and options exchanges."

24  •       March 11, 2009, the SEC "charged Merrill Lynch, Pierce, Fenner & Smith

25  Inc. with securities laws violations."

26

- May 12, 2009, the SEC "charged Julio Ramirez, Jr., in connection with a multi-million dollar kickback scheme involving New York's largest pension fund."
- June 24, 2009, the SEC "charged a money manager.. in Wayland, Mass., for conducting a multi-million dollar Ponzi scheme."
- July 22, 2009, the SEC "asked a court to order the former chief executive officer of CSK Auto Corporation to reimburse the company and its shareholders more than $4 million that he received in bonuses and stock sale profits while CSK was committing accounting fraud."
- July 28, 2009, the SEC "obtained a court order to halt an alleged offering fraud and Ponzi scheme being conducted in the Detroit area by two individuals and two companies they control."
- August 3, 2009, the SEC "charged Bank of America Corporation for misleading investors about billions of dollars in bonuses that were being paid to Merrill Lynch & Co. executives at the time of its acquisition of the firm."
- September 28, 2009, the SEC "charged (a) Detroit-area stock broker..with fraud, alleging that he lured elderly investors into a $250 million Ponzi scheme."
- October 16, 2009 — the SEC "charged billionaire Raj Rajaratnam and his New York-based hedge fund advisory firm Galleon Management LP with engaging in a massive insider trading scheme."
- November 4, 2009, the SEC "charged J.P. Morgan Securities Inc. and two of its former managing directors for their roles in an unlawful payment scheme."
- November 4, 2009, the SEC "charged Milwaukee-based Merge Healthcare Incorporated and two former senior executives for their roles in an accounting fraud."

- November 4, 2009, the SEC "charged New York City-based investment adviser Value Line Inc., its CEO, its former Chief Compliance Officer and its affiliated broker-dealer with defrauding the Value Line family of mutual funds."
- November 5, 2009, the SEC "charged a pair of lawyers for tipping inside information in exchange for kickbacks."
- November 16, 2009, the SEC "charged four individuals and two companies involved in perpetrating a $30 million Ponzi scheme."
- December 7, 2009, the SEC "charged three former top officers of New Century Financial Corporation with securities fraud for misleading investors as New Century's subprime mortgage business was collapsing in 2006."
- January 5, 2010, the SEC "announced that a former Perot family companies employee it charged with insider trading in September has agreed to return all of his illicit profits — a total of more than $8.6 million."
- January 20, 2010, the SEC "charged General Re Corporation for its involvement in separate schemes by American International Group (AIG) and Prudential Financial, Inc. to manipulate and falsify their reported financial results."
- On February 4, 2010, the SEC "charged Boston-based State Street Bank and Trust Company with misleading its investors about their exposure to subprime investments while selectively disclosing more complete information to specific investors."
- On March 4, 2010, the SEC "charged a self-proclaimed psychic who fraudulently raised $6 million after telling investors he could predict stock market highs and lows."
- On March 5, 2010, the SEC "charged a San Diego-based broker-dealer with failing to reasonably supervise one of its registered representatives who engaged in unauthorized fraudulent trading in the accounts of two Florida municipalities."

- Om March 24, 2010, the SEC "filed fraud charges against a prominent New Mexico realtor and obtained an emergency court order to halt his $80 million Ponzi scheme."

- On March 29, 2010, the SEC "charged an Ohio-based investment adviser with fraud for lying about his investment strategy, fabricating account statements to hide losses, and using investor money to buy property and pay unrelated business expenses."

- On April 1, 2010, the SEC "announced a settlement with Daimler AG for violations of the Foreign Corrupt Practices Act (FCPA), alleging that the..automobile manufacturer engaged in a repeated and systematic practice of paying bribes to foreign government officials to secure business in Asia, Africa, Eastern Europe and the Middle East."

- On April 7, 2010, the SEC charged "Morgan Keegan and Two Employees With Fraud Related to Subprime Mortgages."

- On April 15, 2010, the SEC "charged a private investment firm and one of its affiliated entities for participating in a widespread kickback scheme to obtain investments from New York's largest pension fund."

- On April 16, 2010, the SEC "charged Goldman, Sachs & Co. and one of its vice presidents for defrauding investors by misstating and omitting key facts about a financial product tied to subprime mortgages as the U.S. housing market was beginning to falter."

- On April 22, 2010, the SEC "charged a private equity firm, a money manager and his friend with participating in a fraudulent scheme through which they stole more than $3 million invested by three Detroit-area public pension funds."

• On May 7, 2010, the California's attorney general announced a lawsuit targeting "two former officials from Calpers, the nation's largest public pension fund, alleging that they took kickbacks in exchange for a piece of the fund's lucrative investment portfolio."

• On June 16, 2010, the SEC "charged the former chairman and majority owner of what was once the nation's largest non-depository mortgage lender with orchestrating a large-scale securities fraud scheme and attempting to scam the U.S. Treasury's Troubled Asset Relief Program (TARP)."

• On June 21, 2010, the SEC "charged a New York-based investment adviser and three of his affiliated firms with fraudulently managing investment products tied to the mortgage markets as they came under pressure in 2007."

• On July 15, 2010, the SEC "announced that Goldman, Sachs & Co. will pay $550 million and reform its business practices to settle SEC charges that Goldman misled investors in a subprime mortgage product just as the U.S. housing market was starting to collapse."

• On July 22, 2010, the SEC "charged Dell Inc. with failing to disclose material information to investors and using fraudulent accounting to make it falsely appear that the company was consistently meeting Wall Street earnings targets and reducing its operating expenses. Dell Inc. agreed to pay a $100 million penalty to settle the SEC's charges."

• On July 29, 2010, the SEC "charged Citigroup Inc. with misleading investors about the company's exposure to subprime mortgage-related assets."

• On August 4, 2010, the SEC "charged a former Deloitte and Touche LLP partner and his son with insider trading in the securities of several of the firm's audit clients."

•     On August 6, 2010, the SEC "charged two global tobacco companies with violations of the Foreign Corrupt Practices Act (FCPA) for paying more than $5 million in bribes to government officials in Thailand and other countries to illicitly obtain tobacco sales contracts."

•     On August 18, 2010, the SEC "charged the State of New Jersey with securities fraud for misrepresenting and failing to disclose to investors in billions of dollars worth of municipal bond offerings that it was underfunding the state's two largest pension plans."

•     On September 29, 2010, the SEC "charged ABB Ltd with violations of the Foreign Corrupt Practices Act (FCPA) for using subsidiaries to pay bribes to Mexican officials to obtain business with government-owned power companies, and to pay kickbacks to Iraq to obtain contracts under the U.N. Oil for Food Program."

•     On October 15, 2010, the SEC "announced that former Countrywide Financial CEO Angelo Mozilo will pay a record $22.5 million penalty to settle SEC charges that he and two other former Countrywide executives misled investors as the subprime mortgage crisis emerged."

•     On November 4, 2010, the SEC "announced sweeping settlements with global freight forwarding company Panalpina, Inc., Pride International, Inc., Tidewater Inc., Transocean, Inc., GlobalSantaFe Corp., and Noble Corporation, all companies in the oil services industry who, according to the SEC, violated the Foreign Corrupt Practices Act (FCPA) by paying millions of dollars in bribes to foreign officials to receive preferential treatment and improper benefits during the customs process."

•     On December 27, 2010, the SEC "charged Paris-based telecommunications company Alcatel-Lucent, S.A. with violating the Foreign Corrupt Practices Act

(FCPA) by paying bribes to foreign government officials to illicitly win business in Latin America and Asia."

• On January 25, 2011, the SEC "charged Merrill Lynch, Pierce, Fenner & Smith Incorporated with securities fraud for misusing customer order information to place proprietary trades for the firm and for charging customers undisclosed trading fees. To settle the SEC's charges, Merrill..agreed to pay a $10 million penalty and consent to a cease-and-desist order."

• On February 3, 2011, the SEC "charged three AXA Rosenberg entities with securities fraud for concealing a significant error in the computer code of the quantitative investment model that they use to manage client assets. The error caused $217 million in investor losses."

• On March 1, 2011, the SEC "announced insider trading charges against a business consultant who has served on the boards of directors at Goldman Sachs and Procter & Gamble for illegally tipping Galleon Management founder and hedge fund manager Raj Rajaratnam with inside information about the quarterly earnings at both firms as well as an impending $5 billion investment by Berkshire Hathaway in Goldman."

• On April 6, 2011, the SEC "charged a corporate attorney and a Wall Street trader with insider trading in advance of at least 11 merger and acquisition announcements involving clients of the law firm where the attorney worked."

• On June 21, 2011, the SEC "announced that J.P. Morgan Securities LLC will pay $153.6 million to settle SEC charges that it misled investors in a complex mortgage securities transaction just as the housing market was starting to plummet."

• On June 22, 2011, the Securities and Exchange Commission, state regulators, and the Financial Industry Regulatory Authority (FINRA)

1   announced..that Morgan Keegan & Company and Morgan Asset Management have

2   agreed to pay $200 million to settle fraud charges related to subprime mortgage-

3   backed securities."

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7), the typeface requirement of Fed. R. App. P. 32(a)(5), and the typestyle requirements of Fed. R. App. P. 32(a)(6). This brief contains 3,341 words, excluding Appendix 1 and other parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). Including the appendix, it contains 8,021 words and is prepared in a proportionally spaced typeface (14- point Times New Roman).

/s/ William Michael Cunningham