1           **UNITED STATES DISTRICT COURT**

2           **CENTRAL DISTRICT OF CALIFORNIA**

3       **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                   – – – – – – –

5   UNITED STATES OF AMERICA,        )
                                     )
6               Plaintiff,           )
                                     )
7           vs.                      ) No. LACV 13-0779 DOC
                                     )    Item No. 2
8   McGRAW-HILL COMPANIES, INC., and )
    STANDARD & POOR'S FINANCIAL      )
9   SERVICES, LLC,                   )
                                     )
10              Defendants.          )
    _____ )

11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                 Scheduling Conference

16                  Santa Ana, California

17             Thursday, December 12, 2013

18

19

20

21  Debbie Gale, CSR 9472, RPR, CCRR
    Federal Official Court Reporter
22  United States District Court
    411 West 4th Street, Room 1-053
23  Santa Ana, California 92701
    (714) 558-8141

24

25  13cv0779 McGraw-Hill 2013-12-12 Sched

LACV 13-0779 DOC - 12/12/2013 - Item No. 2

2

1    **APPEARANCES OF COUNSEL:**

2

     FOR THE UNITED STATES OF AMERICA:

3

4         OFFICE OF U.S. ATTORNEY
          BY:  George S. Cardona
5              Chief Assistant U.S. Attorney
          312 North Spring Street
6         12th Floor
          Los Angeles, California 90012-4700
7         213-894-2434

8

          OFFICE OF U.S. ATTORNEY
9         BY:  Anoiel Khorshid
               Assistant U.S. Attorney
10        Civil Division
          300 North Los Angeles Street
11        Room 7616
          Los Angeles, California 90012
12        213-894-6086

13

          UNITED STATES DEPARTMENT OF JUSTICE
14        BY:  James T. Nelson
               Trial attorney
15        P.O. Box 386
          Washington, D.C. 20044
16        202-616-2376

17

18

19

20

21

22

23

24

25

DEBBIE GALE, U.S. COURT REPORTER

1    **APPEARANCES OF COUNSEL (Continued):**

2

     FOR DEFENDANT McGRAW-HILL COMPANIES, INC. and STANDARD &
3    POOR'S FINANCIAL SERVICES LLC:

4         John W. Keker
          KEKER AND VAN NEST LLP
5         710 Sansome Street
          San Francisco, California 94111
6         415-391-5400

7         Steven K. Taylor
          KEKER AND VAN NEST LLP
8         633 Battery Street
          San Francisco, California 94111
9         415-391-5400

10        Elliot R. Peters
          KEKER AND VAN NEST LLP
11        633 Battery Street
          San Francisco, California 94111
12        415-391-5400
          epeters@kvn.com
13
          Jennifer L. Keller
14        KELLER RACKAUCKAS UMBERG ZIPSER LLP
          18300 Von Karman Avenue
15        Suite 930
          Irvine, California 92612
16        949-476-8700

17        Floyd Abrams
          CAHILL GORDON AND REINDEL LLP
18        80 Pine Street
          New York, New York 10005
19        212-701-3000

20        S. Penny Windle
          CAHILL GORDON AND REINDEL LLP
21        80 Pine Street
          New York, New York 10005
22        212-701-3000

23

24   ALSO PRESENT:

25             Michelle Ybarra *(not on court docket)*

1                            **I N D E X**

2    **PROCEEDINGS**                                    **PAGE**

3    General discussion                                  5

4    Statements by Mr. Keker                            26

5    Statements by Mr. Cardona                          42

6    Statements by Mr. Keker                            66

7    Further statements by Mr. Keker                    92

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LACV 13-0779 DOC – 12/12/2013 – Item No. 2

5

| | |
|---|---|
| 1 | **SANTA ANA, CALIFORNIA, THURSDAY, DECEMBER 12, 2013** |
| 2 | **Item No. 2** |
| 3 | (3:01 p.m.) |
| 03:01 4 | THE COURT:  Well, how is everybody?  Hope all of |
| 5 | you are well.  Listen, I want to apologize.  We took the |
| 6 | bench and nobody was here, so we figured you'd resolved the |
| 7 | case -- that's just a joke -- so we discovered that we |
| 8 | locked you out. |
| 03:01 9 | So we'll go on the record with our apologies in |
| 10 | the matter of United States v. McGraw-Hill Companies, et |
| 11 | al., commonly known as S&P. |
| 03:01 12 | Counsel, I know who each of you are, but for my |
| 13 | record, if you'd be so kind. |
| 03:01 14 | MR. CARDONA:  Your Honor, George Cardona, Anoiel |
| 15 | Khorshid and James Nelson for the U.S. |
| 03:01 16 | MR. KEKER:  Good afternoon, Your Honor.  John |
| 17 | Keker.  I'm here with Jennifer Keller, Floyd Abrams, Elliot |
| 18 | Peters, Michelle Ybarra, Steven Taylor, and Penny Windle. |
| 03:01 19 | THE COURT:  Nice seeing all of you.  Why don't you |
| 20 | have a seat for a second. |
| 03:02 21 | Before we get into the dispositive motions, I want |
| 22 | to talk to you about something that's been on my mind |
| 23 | concerning a gentleman named Tom Umberg, who works with |
| 24 | Jennifer Keller.  Mr. Umberg is now a member of Jennifer |
| 25 | Keller's firm. |

03:02   1      And let me go back, before your lawsuit was filed,

2   to the year 2007.  A man named Robert O'Brien, who worked as

3   the under secretary in United Nations through Condoleezza

4   Rice, had a wonderful idea about forming a public-private

5   partnership.  Pierre Prosper *(phonetic)* was involved and

6   another person name Tom Schwack *(phonetic)*.  They were all

7   involved in that administration.  And the idea was they

8   would form a public-private partnership in which the

9   government and private law firms, apparently that they were

10  going to target, would participate concerning human rights

11  in Afghanistan.  And the idea was that there would be study

12  groups that came to the United States, endowed chairs in

13  Herat, Mazar-e-Sharif eventually, and Kabul.

03:03  14      And initially the thought that at some point there

15  would be young people brought to the United States to study,

16  but that hadn't been fleshed out in 2007.  And Mr. O'Brien

17  then went to one of my colleagues on the bench, Steve

18  Larson, and he came to me a little after Mr. Larson, and

19  asked if we would like to be involved.  And as long as this

20  wasn't a fund-raising effort -- in other words, as long as

21  we weren't out raising funds -- we thought that this was a

22  wonderful opportunity to become involved in a human rights

23  project.  And the idea, initially, was to focus on women and

24  enhancing the position of women who would become leaders in

25  Afghanistan.  There was a huge rollout ceremony at the State

1    Department under Condoleezza Rice's administration.  And it

2    was always hoped that, if the administration changed to a

3    Democratic administration from a Republican administration,

4    it would be bipartisan and non-partisan.

03:04    5         And maybe that was why Judge Larson was picked,

6    because he'd been a Bush appointment; and maybe that's why I

7    was picked, because I'd been a Clinton appointment.  So it

8    kind of balanced out, and hoped it had the perception that

9    this was totally a nonpartisan effort, no politics involved.

03:04   10         But Steve and I always had to be very careful of

11   our ethics because if O'Brien was out, you know, asking for

12   money, we couldn't be any part of that.  We could be part of

13   an effort and go overseas, but we had to separate ourselves.

14   So apparently a separate foundation -- a foundation arm was

15   founded.

03:05   16         Now, keep in mind Tom Umberg's no place on the

17   scene at this time.

03:05   18         Oh, I'll tell you couple quick stories.  The first

19   time we went over in 2007 and talked to Judge Azeemi and --

20   the Chief Justice of the Supreme Court.  And he had 40

21   applicants, none of which were women.  And I asked why we

22   didn't have women.  It just wasn't -- didn't seem

23   appropriate for what we wanted to accomplish.  And it didn't

24   have to be all women but there had to be a balance.  He

25   said, "We have no women."  I said, "We have no money."  He

LACV 13-0779 DOC - 12/12/2013 - Item No. 2

8

1   found a couple women very quickly.

03:05   2        Since then, this effort over the years has grown

3   with yearly trips into Afghanistan in an effort to bring

4   these bright, wonderful young people to the United States

5   for a year of training, usually at a law school, and then

6   send them back.

03:05   7        And this year I think we have scholarships.  I

8   think Harvard became involved, initially, with Stanford, as

9   some of the, what you'd think, more prestigious law schools.

10  But right here Chapman, equally prestigious, in my opinion,

11  and Whittier and other schools became involved in Orange

12  County.  And I think it was a pretty successful effort so

13  that now we have 16, maybe 20 this year, law schools who

14  literally will allow one more student into their incoming

15  class of 300.  It doesn't cost them a cent.  And then the

16  State Department supplies $25,000 for living expenses.

17  Okay?

03:06   18       So, in other words, my country saves a huge amount

19  of money because, normally, to bring a student here, it

20  would cost you 65- to $75,000, if you were paying a law

21  school; but now, it costs the country $25,000, and these

22  young people come and hopefully they go back as leaders of

23  their country.

03:06   24       Some months ago -- Tom Umberg is a Colonel in the

25  army; his wife, Robin, is a General.  And some months ago --

DEBBIE GALE, U.S. COURT REPORTER

1    in fact last year at this time, I think he became President

2    of PPP, succeeding O'Brien.  Because the administrations

3    changed.  And although it took two years for -- almost three

4    years for the Obama administration to change out of O'Brien,

5    who'd been well-connected with Condoleezza Rice, into

6    Umberg, who had been involved in politics -- I think his

7    first trip with me was last year with Tom and Robin Umberg

8    and five other people.  There were eight in the contingent

9    to go over and go to Herat to set up a Chair to interview

10   students.  I think we had 200 applicants and interviewed

11   over 50 young people.

03:07   12          That was last year, in December.  I committed and

13   have gone back every year since 2007.  And I'm due to go

14   back tomorrow and return on December 21st.

03:08   15          Initially, I had noted that, some months ago,

16   Mr. Umberg went from another law firm -- I think Jones Day.

03:08   17          MS. KELLER:  Manatt.

03:08   18          THE COURT:  Manatt.  Close enough.

03:08   19          -- Manatt to Ms. Keller's law firm, and had become

20   associated along with another person named Dean Zipser.

03:08   21          I called Mr. Umberg a month and a half ago, two

22   months ago, three months ago, and said, "You've made the

23   transition.  I've just found out" -- a month ago or whatever

24   the time period was -- two months ago -- I'm losing track of

25   time -- "that I've gotten the S&P case."  And I can't

1    remember specifically, but I think I got the S&P case first

2    and then Umberg went over to Ms. Keller's firm, but I could

3    be reversed.  He may have gone over to your firm and then I

4    got the S&P case.  But I'm almost certain I got the S&P case

5    first and then Umberg went over to your firm.

6                  So I already had your case.

7                  MS. KELLER:  You're correct, Your Honor.

8                  THE COURT:  So I got the S&P case first.

9                  MS. KELLER:  Yes.

10                 THE COURT:  And then Umberg goes over to your

11   firm.

12                 I didn't think much of that for a while, until I

13   thought of the size of the firm.  And, looking at our

14   ethics, the ethics say that ethically a court, for instance,

15   can preside over a case like Wells Fargo or some banking

16   industry and still have an account with that bank.  I can

17   shop at Sears Roebuck and still have a -- are they still in

18   business?  Okay.  Good.  I can still -- I'm just joking, of

19   course -- or Target.  I can shop at those places because

20   there it's so large.

21                 So in talking to some of the folks in the ethics

22   committee, initially, I didn't see a problem, based upon our

23   ethics in terms of actual conflict.

24                 I called Mr. Umberg and said, "What is your

25   position with -- in Ms. Keller's firm?"  And I think it was

LACV 13-0779 DOC - 12/12/2013 - Item No. 2

11

|  |  |
|---|---|
| | a couple months ago, maybe six weeks ago.  And he said that |
| | he'd, quote/unquote, been "walled-off," and had nothing to |
| | do with this particular piece of legislation -- so I went |
| | back and talked to some more of the folks on the ethics |
| | committee.  And the ethics rules seem to say that ethically |
| | I don't have a conflict, an actual conflict. |

1    a couple months ago, maybe six weeks ago.  And he said that
2    he'd, quote/unquote, been "walled-off," and had nothing to
3    do with this particular piece of legislation -- so I went
4    back and talked to some more of the folks on the ethics
5    committee.  And the ethics rules seem to say that ethically
6    I don't have a conflict, an actual conflict.

03:10
7         Here's what I'm worried about:  It's the
8    perception of conflict in the future.  It's the idea that
9    you come from a smaller firm, not a firm like Manatt or
10   Jones Day.  And, even if Mr. Umberg has been walled-off, in
11   the future there may be so much stress, you know, on your --
12   in your firm, depending on, you know, some of the things we
13   resolve today -- that you have to get Mr. Umberg involved.

03:11
14        So I'm gonna make the following record:  I'm going
15   I think with six people to Afghanistan tomorrow.  I don't
16   perceive that I have an actual conflict, but I think, after
17   this trip, I could have a perceived convict.

03:11
18        And the reason I'm concerned about that is, if
19   this was a large 300-person firm that Mr. Umberg was
20   involved with Ms. Keller, I don't think there's an issue,
21   and I don't think that the ethics committee thinks there's
22   an issue.  But I worry, in the future, in a smaller firm,
23   with four, five, six -- I don't know how many attorneys are
24   in your firm right now, but it's not a 200-person firm --
25   that the perception of that small firm a year from now, two

DEBBIE GALE, U.S. COURT REPORTER

LACV 13-0779 DOC  12/12/2013 - Item No. 2

12

| | |
|---|---|
| | years from now, et cetera, could be much different. |
| 03:11 | Now, here's what I'm prepared to do: |
| 03:11 | First, I'm prepared not to take the trip.  Okay? |
| | They're refundable tickets.  My wife would appreciate that, |
| | in fact, around Christmastime. |
| 03:12 | Second, I'm prepared to take the trip with |
| | Mr. Umberg and Ms. Keller's representation that he's truly |
| | been walled-off to this point. |
| 03:12 | But, third, apparently Mr. Umberg was willing to |
| | resign as President of PPP. |
| 03:12 | I should resign.  In other words, I should have no |
| | further dealing with this until your case is resolved with |
| | S&P, because I don't want those efforts harmed by a jurist |
| | sitting on the bench.  And it's with great sadness I say |
| | that 'cause I'm one of the three founders of this. |
| 03:12 | But, I think, having this case come to the Court, |
| | I want to take every, every precaution in terms of both of |
| | you. |
| 03:12 | Now, normally, I don't think the ethics rules |
| | really allow a judge to say, quote/unquote, "What do you |
| | think?"  If you look at the ethics rules, we're not supposed |
| | to ask you your opinion.  But that's the action I'm prepared |
| | to take so that there's no ethical dilemma.  And I don't |
| | find that there's an actual conflict. |
| 03:12 | I just worry about a year from now:  Smaller firm, |

DEBBIE GALE, U.S. COURT REPORTER

LACV 13-0779 DOC  12/12/2013 - Item No. 2

13

1    do they get involved, do they have a conversation.

03:13    2         I'm going to turn to the government, and then I'm

3    going to turn to the defense.  If either of you would like,

4    or think it's better at this time, not to the take this

5    trip, you have no animosity from me, and it's off.  But I

6    need to call the State Department and tell them that.

03:13    7         Number two, the one thing that you don't have a

8    choice in is my resignation.  I think that that's well-taken

9    under every circumstance.  And I don't think that Mr. Umberg

10   and your firm, Ms. Keller, should be in the position of

11   having to go to the Secretary of the State and then say that

12   he's resigning because a jurist is still involved.

03:13    13        So let me turn to either one of you for any

14   comments.  And if you can think of any better method or way

15   of just, you know, making certain that none of you are

16   concerned in the future.  And it's only the future I'm

17   worried about:  A perception.

03:13    18        So why don't you talk about that for a moment.

19   Give me your best guidance and wisdom.

03:14    20        Oh, by the way, we just got the University of

21   Mississippi.

03:14    22        MS. KELLER:  Great.

03:14    23        THE COURT:  Yeah.  We made an inroad into the

24   South.  And we're gonna get Duke.

03:14    25        Mr. Cardona, what are your thoughts?

DEBBIE GALE, U.S. COURT REPORTER

LACV 13-0779 DOC   12/12/2013 - Item No. 2

14

03:14    1      Well, let the other side huddle for a moment.

2   Because, you see, I can avoid any conflict by taking

3   whatever action.  I just want to make sure that there's no

4   question for either one of you.

03:14    5      So, Mr. Cardona.

03:14    6      MR. CARDONA:  Your Honor, from our point of

7   view -- I mean, you know, I don't want to speak for the

8   judicial ethics people, which have to kind of apply their

9   rules --

03:14   10      THE COURT:  Well, I haven't gone to the full

11   committee yet.  You know, I've had a quiet chat with a

12   couple folks on it, but it's ultimately my call.  There's

13   nothing on point.

03:14   14      MR. CARDONA:  I mean, from our point of view, we

15   don't have a concern.  I mean, from our point of view, the

16   work you're doing with Mr. Umberg on the Afghanistan trips

17   is not judicial work, not -- I mean, it's quasi legal work,

18   but it's more humanitarian work than anything.  It has no

19   relationship to our case.  We certainly don't think you need

20   to not take the trip that you've scheduled for tomorrow.  I

21   think there's no issue with that.

03:15   22      THE COURT:  I'm gonna resign, though.

03:15   23      MR. CARDONA:  I don't think, from our point of

24   view, we would need you to resign from the board.

03:15   25      THE COURT:  I appreciate that.

03:15   1        MR. CARDONA:  But that's your decision.

03:15   2        THE COURT:  I appreciate that.  I think I'm going

3  to do that anyway.

03:15   4        Number two, though, I may be involved in this way:

5  I want to continue to reach out to law schools, because you

6  get somebody on the phone named -- you know,

7  Judge Schmuckatoli --

03:15   8        *(To the reporter:)* I don't know how to spell

9  that -- Judge Jones.  Okay?

03:15  10        *(Reporter laughs.)*

03:15  11        THE COURT:  And Judge Jones can somehow get

12  through at least the Dean's assistant.  And by the way, I'm

13  struggling with whether this is ethical or not, also.  And

14  Judge Jones says, "You know, you're over there at Stanford,"

15  and, "Dean, would you mind considering if we could bring a

16  really bright Afghan to the United States, and this didn't

17  cost you any money, to accepting one more person for one

18  year into any kind of program that you think would be

19  appropriate?"

03:16  20        I'd like to continue to make those calls 'cause

21  what I'm afraid of is, if I desist in those calls, we're not

22  gonna get too many more law schools, so -- kind of acting

23  maybe in an *ex officio* capacity.  But I'm even concerned

24  about that.  And I think I would inform you that -- when I

25  made those calls.

LACV 13-0779 DOC  12/12/2013 - Item No. 2

16

03:16    1          I can tell you, we just finished with the

2    University of Mississippi, but I went through my good friend

3    the former Presiding Judge, Judge Michael Mills, down there,

4    who called over the school.

03:16    5          I'm chasing my former colleague, Dean Levi down at

6    Duke.  Okay?  And I'm gonna go after Rachael Moran up at

7    UCLA, and Erwin Shermaninski over at UCI.  Those are my

8    future plans.  Okay?

03:17    9          If you're comfortable, at least that far, why

10   don't I keep both of you apprized of what I'm doing.  And if

11   at any point there's any discomfort, even in an *ex officio*

12   capacity, I'm going to take the added precaution of just --

13   just desist.

03:17   14          But, right now, trip acceptable?

03:17   15          'Cause, if not, I'm happy to -- and so is my wife,

16   by the way.  She's happy to have me stay at home for the

17   holidays, too.

03:17   18          MR. CARDONA:  It's fine with me, Your Honor.

19   Although, I don't know want to be held responsible for

20   depriving your wife --

03:17   21          THE COURT:  Well, you may have to answer to her,

22   Counsel.  I'm just joking.

03:17   23          Mr. Keker and Ms. Keller?

03:17   24          MR. KEKER:  I think anybody willing to go to

25   Afghanistan in the winter, Your Honor, should go.

DEBBIE GALE, U.S. COURT REPORTER

LACV 13-0779 DOC - 12/12/2013 - Item No. 2

17

| | | |
|---|---|---|
| 03:17 | 1 | THE COURT:  And stay? |
| 03:17 | 2 | MR. KEKER:  Shocking trip. |
| 03:17 | 3 | No.  I just want to make sure that we -- what we |
| | 4 | don't want to do is put you in an uncomfortable position or |
| | 5 | anybody in an uncomfortable position. |
| 03:17 | 6 | THE COURT:  Yeah. |
| 03:17 | 7 | MR. KEKER:  And I have great respect for |
| | 8 | Mr. Umberg, as you know, and as you do, I'm sure, too.  Your |
| | 9 | work that -- the work in Afghanistan, which I've talked to |
| | 10 | him about, is completely unrelated to what we're doing here, |
| | 11 | as far as we're concerned. |
| 03:18 | 12 | If you don't think it is, then you should tell us |
| | 13 | how far to stay away from Mr. Umberg.  But Ms. Keller is |
| | 14 | prepared -- we don't want to lose our team because of |
| | 15 | anything that's making you uncomfortable. |
| 03:18 | 16 | We don't see a problem, and we don't see a |
| | 17 | conflict. |
| 03:18 | 18 | THE COURT:  I think that's more a protection for |
| | 19 | all of you, than me.  I'm comfortable that there's no actual |
| | 20 | conflict.  I'm just worried, in a year or two, depending |
| | 21 | upon which way rulings go, et cetera, that there's any |
| | 22 | perception. |
| 03:18 | 23 | And also, I don't know the size of your firm.  It |
| | 24 | may be very unfair that, in a year, Mr. Umberg has to become |
| | 25 | involved.  You see, I don't know what your resource base is. |

DEBBIE GALE, U.S. COURT REPORTER

 1    So don't make any representations now.  I just think I would

 2    feel more comfortable resigning, and then maybe resuming,

 3    you know, my efforts in a year or two, or in six months when

 4    the case is tried -- I'm just "joking" you.

 5         Okay.  So let's just -- I'll take the trip.  I

 6    think I'm going to put my resignation in right afterwards.

 7    I could inform both of you, I'd like to act in an *ex officio*

 8    capacity, continue to make some phone calls on their behalf

 9    to the deans, and try to get some of these wonderful kids

10    over and then back.

11         Okay.  Well, we're here for a scheduling

12    conference.  And I understand that there's a number of

13    issues that require the Court's attention.  I almost called

14    you in earlier, and I almost called you in, in, I think,

15    early October to talk to you about the issue I just raised

16    with you.

17         But I want to begin with a couple things:  At

18    4:00 o'clock, I need to swear in a new magistrate nextdoor.

19    You're all invited to the ceremonial court, if you'd like

20    to.  I think Andre Birotte's coming down from your office.

21    I think, Ms. Keller, you would want to be there, also.  And

22    any local or out-of-town counsel are welcome to be present.

23         It's going to take about an hour, with all the

24    judges coming down, and then a brief reception just to put a

25    friendly face on the Court, because I'm the senior person,

LACV 13-0779 DOC  12/12/2013 - Item No. 2

19

```
 1   and then right back to work here.
 2           So, Debbie, late night.  I don't know how late.
 3           So, first, the question of whether government has
 4   complied with this Court's August 2nd, 2013, order in which
 5   I requested that the government identify the limited set of
 6   RMB's (verbatim) and CDO's that will form the basis is for
 7   proof at trial.
 8           I understand that S&P believes and argues in their
 9   paper that the government has expanded, not narrowed, this
10   case.  I want to say, though, I was never under the
11   impression that the 26 CDO's listed in the Complaint were
12   exclusively at issue.  And, in fact, the Complaint
13   explicitly prefaced the list with a phrase, quote, "examples
14   include, but are not limited to any of the following."  So
15   that's the assumption that I've always been operating under.
16           Now, the government has asserted that S&P executed
17   a fraud scheme from 2004 to 2007; and during that time, S&P
18   rated 4462 RMB's and 704 CDO's.  After this initial
19   discovery period, the government now identifies 56 RMB's,
20   less than 1.5 percent of the 4462 that were potentially at
21   issue.  The government also identifies 107 CDO's, less than
22   16 percent of the 704 potentially at issue.
23           So initially, subject to your arguments,
24   initially, my thought and feeling is, but not a ruling, that
25   this appears to the Court that the United States has done
```

LACV 13-0779 DOC   12/12/2013 - Item No. 2

20

| | |
|---|---|
| | 1  exactly what you stated you would attempt to do, and that's |
| | 2  substantially comply with this Court's request. |
| 03:21 | 3        Now let me stop for a moment.  I used the word |
| | 4  "request," but I growled at you.  What I really said:  "You |
| | 5  narrow it, or I'll narrow it."  You see, I have no power. |
| | 6  In the 12(b)(6), it either goes forward or it doesn't.  I |
| | 7  don't have a narrowing power.  If there was a narrowing |
| | 8  power, it would be at the time of the summary judgment. |
| 03:22 | 9        But I think you got the message.  And from my |
| | 10  perspective, subject to S&P's arguments, I think you've |
| | 11  substantially complied with my request to narrow the scope |
| | 12  of this case; and you've, more precisely, identified the |
| | 13  basis for proof at trial, and it was both:  It was narrowing |
| | 14  and focusing. |
| 03:22 | 15        Now, there's a related issue:  And even if you did |
| | 16  not narrow the scope of this case, whether it's otherwise |
| | 17  manageable. |
| 03:22 | 18        I think, Mr. Keker, that's always been your |
| | 19  position and always will be your position. |
| 03:22 | 20        Specifically, I think that there's a belief that |
| | 21  this would take two years of discovery, and I'm not |
| | 22  concerned with that; and it would take eight months of |
| | 23  trial, and I'm not concerned with that. |
| 03:22 | 24        I think it can, quite frankly, be a little less |
| | 25  time.  And I want to talk to both of you about that in a |

DEBBIE GALE, U.S. COURT REPORTER

 1   moment after your arguments, if I still feel the same.  For

 2   instance, I -- four-month.  I think it's only a four- or

 3   five-month trial, actually.  And I'll tell you why in a

 4   moment.

03:23   5          So, in a moment, I want you to explain both of

 6   your positions, and I especially want to listen to

 7   Ms. Keller and Mr. Keker on this because, tentatively, I

 8   think the government's substantially complied.

03:23   9          Um, the next issue is there are a couple minor

10   disputes about the number of interrogatories and

11   depositions, and I want to talk to you about those.  I think

12   the government wants 25 interrogatories and S&P wants 50.

13   And I'm going to state to you, and I'll say facetiously,

14   they won't be much value at trial.  They might help you

15   narrow and start down the road for depositional testimony,

16   but, honestly and practically -- and I hate to say this --

17   not too many people pay attention to 'em.  They're usually

18   written by attorneys, gone over 15 times in drafts.  And

19   when the jury hear's them, it's with a blank stare.  But I

20   leave that to your wisdom.

03:24  21          I'd much rather start expanding your deposition

22   work where it's somewhat of an adversarial position; and if

23   not, a great discovery vehicle.  But if I expand your

24   interrogatories, I'm more inclined to -- not reduce, but not

25   give you the depositions that you may want.

DEBBIE GALE, U.S. COURT REPORTER

03:24 1            So I'd just encourage you to really think about if

2     you need the interrogatories because, tentatively, I think

3     S&P's correct.  There's no reason why you shouldn't have,

4     tentatively, 50 interrogatories.

03:24 5            And the second issue is, the government believes

6     it will be necessary to depose some witnesses for longer

7     than 7 hours.  I think that's absolutely true.  And S&P

8     doesn't think that that's necessary.  The problem is who it

9     is.  The majority of your witnesses won't need more than 7

10    hours, but I'd hate to see a blanket drawn by Court where

11    you can't continue on with critical witnesses.  I'd just

12    like to know who they are.

03:25 13           I want to tell you that I'm inclined to think

14    about appointing two special masters.  And let me talk to

15    you about why, and the costs, and how that could be spread,

16    and then give you all the latitude in terms of a briefing

17    schedule on some of these issues.

03:25 18           This coast seems -- this case seems to be more

19    East Coast -- let's say, witness-focused -- than West Coast.

20    And therefore, I'm picturing a whole set of problems that a

21    Court runs into, into terms of jurisdiction, even subject to

22    the new rules:

03:25 23           The witnesses who might be deposed, but then

24    decide not to testify; different agencies that would be more

25    located on the East Coast that you seek to have a deposition

DEBBIE GALE, U.S. COURT REPORTER

03:26

1  take place of where I don't really have that kind of, you

2  know, "hundred and whatever it was" jurisdiction in miles.

3      So my thought was, I don't want to see a witness

4  sent home, regardless of their walk of life, and then be

5  inconvenienced and have to come back to a deposition;

6  because it's harder for you to get them back, to coordinate

7  their vacation schedule, and all of the reasons that will

8  occur because now they have animosity.  They've had to

9  return.  The first time was tough enough; the second time

10  gets more difficult for you.

03:26

11      So I don't know that I'd need a special master in

12  all your depositions.  I think, from my perspective, you're

13  conducting yourselves admirably.  But I may need them for

14  some -- depending on some of the future rulings that are

15  made.

03:26

16      So I've approached two people to see if they're

17  willing, but -- your choice:

03:27

18      I've approached Robert O'Brien, because I've had

19  really good success with him on preservation technologies

20  that he's working on, the Bratz/Mattel case -- although he

21  was Judge Larson's initial person, I only accepted him --

22  and didn't know him at the time -- because of continuity.

03:27

23      I've approached Judge Smith, because I've a huge

24  amount of trust in him and his integrity.  And he's always

25  looking for an opening, although he's a special master, to

1    say, "Well, Counsel, I know I'm only a special master.  But,

2    you know, if you were to settle this case" -- and I'm joking

3    with you.  He's got a great amount of wisdom.

03:27    4        You can pick anybody you want.  I could care less.

5    But I'm really thinking about a special master.

03:27    6        Now, the problem becomes:  How do you pay for it?

7    Well, there's two ways:  First of all, you just split the

8    costs.

03:28    9        I would expect the government to come back and

10   say, "Well, Judge, we're the public.  It costs us money.

11   Why don't you just use a magistrate judge?"

03:28   12        'Cause my magistrate judge would be overwhelmed.

13   Absolutely overwhelmed.

03:28   14        Second, why wouldn't this cost be equally borne by

15   both of you?  The government has as deep a pocket as you do,

16   and probably deeper on the S&P side.  So I don't see the

17   public problem.

03:28   18        But it could be a second method, and that is, a

19   winner-take-all system.  And I'm just tossing these things

20   out to you.

03:28   21        The government doesn't pay and S&P initially pays.

22   But anything that comes to the Court -- any motion that the

23   government loses or wins or whatever -- that side pays for

24   it.

03:28   25        Now, I don't like that latter one but, you know, I

DEBBIE GALE, U.S. COURT REPORTER

LACV 13-0779 DOC  12/12/2013 - Item No. 2

25

1    toss it out.  So I'm not inclined to appoint a magistrate

2    judge.

03:29   3    Two more things.  I know there've been three

4    significant disputes between the parties, thus far.  And I

5    believe that, if the government's going to bring a suit like

6    this that, on balance, as a Court, philosophically, I think

7    that transparency is a must.

03:30   8    But -- I need to set a briefing schedule, but

9    you've got to help me.  I don't want to disturb another case

10   that I'm in trial in, carrying 400 cases, to take a Friday

11   all day or a Thursday all day.  And I'm not sure at some

12   point how much I want to tie up your Saturdays and Sundays.

13   I don't propose to do that at the present time.

03:30   14   So I was looking at a briefing schedule that got

15   this before the Court on January 3rd.  But you're requesting

16   all the way out to March on some of this.  And my concern is

17   that if it goes to March, it starts holding up the

18   depositions, which I intend to start and help you with

19   almost immediately.

03:31   20   So I'm going to desist for a moment because

21   there's, I think, a lot to discuss this evening.  And Ms.

22   Keller, Mr. Keker, wherever you'd like to start with any and

23   all issues, or if you'd like to argue one issue and come

24   back and argue another, that's perfectly acceptable.

03:31   25   And then however government would like to respond.

DEBBIE GALE, U.S. COURT REPORTER

1    If you want to respond in an omnibus way, fine.  If you want

2    to break those down, fine.

03:31    3        Counsel.

03:31    4            **STATEMENTS BY MR. KEKER**

03:31    5        MR. KEKER:  I would like to respond to the sort of

6    big-picture item, and then talk about this motion schedule,

7    and leave -- the others, I think we can work out fairly

8    easily.  We need to talk to the government about the special

9    master, and so on.

03:31   10        But the big picture item is this:  I heard what

11   Your Honor said.  You're satisfied with what they did.  They

12   narrowed what they said originally.

03:31   13        But what they have done is brought in 150 -- more

14   than 150 securities, more than 724 CDO tranches within those

15   securities, hundreds of purchasers, which are listed in

16   their table -- I don't know if you've had a chance to go

17   through their table.

03:32   18        THE COURT:  I've seen it, but it doesn't mean too

19   much to me right now.

03:32   20        MR. KEKER:  It doesn't -- it's -- what they say

21   for -- these are CDO's, and these are the poor victims that

22   were over there that -- under that "purchaser" column --

23   these are the victims who bought those CDO's and, therefore,

24   that means something; there's some -- there's some fraud

25   going on there.

03:32  1          And what we're fundamentally appealing to you, as

2    a trial judge, is that this is an workable trial.  It's

3    unfair to a jury.  It's unfair to you.  It's unfair to

4    Standard & Poor's.

03:32  5          What the government wants to do, from reading

6    their brief, is they wanna get up and wave their hands and

7    make some general points, and sit down.  And that's it.

03:33  8          What we wanna do is show the jury

9    security-by-security-by-security, by bringing in the people

10   that rated 'em, by bringing in the people who instructed the

11   raters to use this model or that model, each security, that

12   it was fairly and properly rated; that it was rated just

13   like Moody's rated the same security; and that whatever

14   problems there were with respect to that security were

15   matters that did not involve Standard & Poor's.

03:33  16         What they involved were, at one point, an economic

17   meltdown in the United States, which was beyond anybody's

18   anticipation.  In many other instances, which we put before

19   Court in our case management statement, they -- they

20   involve, or may involve, misrepresentations made by

21   certain -- uh, certain people -- Bear Stearns, for

22   example -- to the issuer.  There's all these lawsuits that

23   are out there of people blaming each other over what's wrong

24   with some of the underlying collateral in these securities.

25   And we need to be able to show that, as we've laid out, on a

1   security-by-security basis.

03:34    2       Now, what -- I've been in cases before, and I'm

3   sure the Court has been, where the initial Complaint is

4   simply unmanageable:  Too many claims.  Too many things to

5   do.  You get it in patent cases.  You get it in trade secret

6   cases.

03:34    7       And what I've seen happen very successfully is

8   take some sampling of cases, which is what we're suggesting,

9   and try that.  And all kind of things happen when that

10  happens.  You -- first of all, you -- the law of the case is

11  established about many, many important issues.

03:34    12      The -- one side or the other wins on a lot of

13  those important issues, which very possibly could be

14  collateral estoppel, so that the non-sample cases get taken

15  care of as a matter of law.  Even if they don't get taken

16  care of as a matter of law, the parties understand, once the

17  law of the case is established, once -- in this case, once

18  the Judge perhaps has -- has some opportunity to react to

19  the kind of evidence that's been presented, and give one

20  side or the other some idea of what -- what the Judge thinks

21  has been proven, which makes a settlement possible at -- for

22  the rest of the case.

03:35    23      In short, that's why we're suggesting take --

24  instead of 22 victims or several hundred so-called victims,

25  take one big one, like Citibank, or one big one, like --

LACV 13-0779 DOC   12/12/2013 - Item No. 2

29

 1    which is almost a third of the losses that they're alleging

 2    now -- or a big one like Bank of America.

03:35  3         The Citibank offering would include 15 CDO's that

 4    cover the entire period 2004.  There's one from 2006.

 5    There's one from -- there's several from 2007.  And the

 6    trial of that case would be something that a jury, we

 7    believe -- that could be discovered in kind of reasonable

 8    time, uh, that could be tried so that a jury could

 9    understand it.

03:36 10         You're not, you know, going from institution to

 11   institution.  You're talking about Citibank-issued

 12   securities.  The issues could get before a jury in a way

 13   that they could wrap their head around.  And we think that

 14   case could be tried in three or four weeks, uh, in a way

 15   that's fair to Standard & Poor's, and where we can drill

 16   down and say this is why we rated the things, and this is

 17   why we were fair and honest.

03:36 18         THE COURT:  Why is that a fair sampling?  Across

 19   the board, why taking one bank -- regardless of how much the

 20   assets or amounts are, why is that a fair sampling?

03:36 21         MR. KEKER:  Well, we picked it because it -- it

 22   was -- it had a lot of CDO's, it had a third of the alleged

 23   losses, and because it didn't have -- we could do discovery

 24   of Citibank, which is gonna take a long time in any event,

 25   rather than having -- do discovery of a lot of banks.

LACV 13-0779 DOC  12/12/2013 - Item No. 2

03:37    1              But we're not wedded to that.  Pick some other

2    sample.  There could be, uh -- there could be a sample of --

3    pick five CDO's with 5 different issuers.  I mean, we're

4    not -- we're not committed to that.

03:37    5              What we are committed to is the argument, which we

6    think is right, that in order to make this case manageable,

7    you have got to limit -- you cannot try a hundred CDO's and

8    50 RMBS and allow a jury to understand about each one of

9    those:  How it was rated; why it was rated; and why the

10   rating was proper.

03:37   11              I mean, we can't mound a defense with many -- and

12   what the government -- this is a great advantage to the

13   government 'cause what they wanna do is wave their hands

14   over it and say, "Don't worry about the differences.  Don't

15   worry about the details.  Don't worry about the rating of

16   any given CDO.  Just look at the big picture here, and don't

17   get down into what was actually done with respect to

18   these -- these securities.

03:38   19              Our defense -- and that's fine if they want to the

20   try the case that way.  That's their -- that's their choice.

21   Our defense, though, is exactly the opposite.  Our defense

22   is don't get stuck up in the clouds.  Come and look at the

23   person -- I mean, listen to the person that rated this

24   particular security.  Listen to the -- to all the

25   circumstances about that security.  Learn it.  Understand

```
1   it.  And these are complicated.  Each one is complicated.
2   And at this end, you'll see that it was rated fairly.  It
3   was rated just like Moody's.  It was rated -- I mean, we did
4   the best -- best we could, and that's our defense and -- and
5   so on.
6        The government just wants to go past that and --
7   and get up -- somewhere else.  So that's what -- that's
8   really what we're objecting to is the unmanageability of
9   this, and the need to analyze every security.
10       The government wants to, by making these arguments
11  about "We don't have to prove reliance.  We don't have to
12  prove, uh, really anything except this high-level, uh, that
13  you, generally, had -- had, um, criminal intent under these
14  various statutes."
15       And we get to defend on the grounds -- they're
16  telling us we had criminal intent with -- with -- with
17  respect to rating a particular security.  We get to bring in
18  the people who were involved and say, "Tell us about rating
19  this security.  Did you do it with criminal intent?" and so
20  on.  And at the end of the case, say, "That security was not
21  rated with criminal intent.  It might not have worked out,
22  like most of the things in the economy didn't work out; just
23  like Moody's ratings didn't work out, but it wasn't done
24  with criminal intent."
25       And we'd need to do that case-by-case,
```

DEBBIE GALE, U.S. COURT REPORTER

1    security-by-security.  And if we can't do that, we can't get

2    a fair trial.

03:39  3         The -- what the government doesn't accept, I

4    guess, but what you need to understand, is that there are

5    hundreds of witnesses for each -- I mean, for these things.

6    Each -- each issuer has a lot of people that were involved

7    in what they were putting together that goes into these

8    CDO's, the RMBS.

03:40  9         "Where'd you get 'em?"

03:40  10         "How did you classify 'em?" and so on.

03:40  11         "What information did you get from the people that

12    were giving you the underlying securities?"

03:40  13         "What information did you provide to the rating

14    agency?"

03:40  15         "What information did you provide to the people

16    who bought these securities?"

03:40  17         "What did the people who bought these securities

18    think they were buying?"

03:40  19         I mean, they knew -- it's not like people didn't

20    understand that there were risks here.  And all of that, for

21    any one security, is a great big discovery effort.  I mean,

22    I've tried -- I tried a case involving one security two

23    summers ago in New York.  And it was incredibly complicated,

24    just one of these CDO's.  It's not one that's listed here,

25    but it's one that was issued by Citibank.

03:40  1         Took us a long time to understand it.  Took us

2  quite awhile to get the jury to understand it.  I'm not sure

3  at the end how well they did understand it.  Because, I

4  remember at the end putting up kind of a cloud of all these

5  terms that we'd been using in the trial that they had never

6  heard of when they -- when they first came in to be jurors

7  in the case two weeks before.  Uh, it's complicated stuff.

03:41  8         And if -- if the government gets away with a

9  hand-waving type trial, S&P doesn't have a chance.  We need

10  to be able to defend this case.  And to defend this case,

11  we've got to be able to litigate a small enough number of

12  securities so that jurors at the end of the day can

13  understand.

03:41  14         Now, how you pick 'em -- I mean, we tried to make

15  a suggestion that was useful -- but pick 'em some other way.

16  Pick four.  Pick five.  Pick six.  Let the government pick

17  'em.  We could work on that.  But trying 150 securities with

18  all these tranches in one trial is unworkable.

03:41  19         As we pointed out, one day per security -- which

20  is probably not enough -- is more than an eight-month trial.

21  And, right there, that's abusive.  I think jurors, for all

22  this technical stuff, to have 'em sit and have to listen to

23  things before deciding a case for eight months is unfair.

24  Particularly where, once they decide the case about a few of

25  'em, once you make all the rulings you need to do, figure

1    out what the jury instructions are gonna be, rule on summary

2    judgment motions, sort of clear out the underbrush,

3    everybody's gonna have a much better sense of -- of what

4    will happen for the securities that aren't included in the

5    sample.  And that's the way we think you ought to do it.

03:42    6              With respect to the motions, Your Honor, I mean,

7    we are expecting, and were expecting, to get started on

8    depositions.  There are so many -- no matter what you rule

9    here, whether it's three securities to be litigated or

10   whatever, or 150 securities -- there's so many depositions,

11   so many subpoenas, so many everything to get out there, that

12   the fact that we're litigating the government part -- the

13   "government subpoena's" part on a sensible schedule that

14   doesn't ruin the holiday season and New Year's for

15   everybody, and get a ruling later -- we've already fought

16   with them about this -- we could take those depositions

17   starting in March.  And that's not gonna slow down anything

18   'cause there's a lotta work to do in -- in matters that

19   don't have anything to do with those depositions.

03:43    20             So I guess that's -- I -- the -- the 7-hour

21   depositions.  We agree that there's gonna be certain

22   instances, and we expect that we can work that out with

23   them -- certain instances where we have to go more than 7

24   hours.  And we can talk about that in advance or provide you

25   with a list of what we both agree maybe need to be a little

1    bit longer.  We just don't want the default rule to be

2    anything other than 7 hours.

03:43    3         The special masters, we're gonna -- we need to

4    talk among ourselves and think about it.  But we hear you.

5    If you want a special master, I'm sure you'll get a special

6    master in the case.

03:44    7         So I don't know what else to tell you about the

8    manageability issue, but it really -- except that S&P

9    insists that trying too many of these at once -- and there's

10    no -- there's no legal impediment.  A different jury can

11    decide the others, if that -- if that becomes necessary.

12    But I really don't think it's gonna become necessary.

03:44    13         We're gonna have a trial.  At the end of the

14    trial, people will understand what the world looks like.

15    And we'll be able to move on from there, probably without

16    another trial.

03:44    17         THE COURT:  Let me ask you just a couple

18    questions.

03:44    19         MR. KEKER:  Sure.

03:44    20         THE COURT:  And then I need to take a recess.

03:44    21         By the way, you're all co-equally invited to

22    Magistrate Judge McCormick's -- well, Installation -- I call

23    it "embalming ceremony" -- but Installation, or none of you.

24    It doesn't matter.  But it will go on in just a few moments.

03:44    25         Let me explore a couple things with you.

03:44   1          First, don't worry about the Court.  My time's not

        2   a consideration you have to be concerned with.

03:45   3          Second, whether it's a four-month trial or an

        4   eight-month trial, I'm not concerned.  What I'm concerned

        5   about is this:  I'm concerned about a prejudice argument

        6   that S&P might cover.

03:45   7          Everybody in the room assumes that S&P is a big

        8   company.  But it's not a big company compared to the

        9   government resources.  And therefore, the argument that

       10   strikes me the most that you've made is that you could be

       11   out-weighted -- "out-weighted" -- that, bringing enough

       12   claims, even if many of them turned out not to be, well, by

       13   a preponderance of the evidence -- just the weight of that,

       14   the continuing weight of that.

03:45  15          But I don't know how narrowing that, you know,

       16   randomly makes that any fairer process.  In fact, in some

       17   ways, it seems to make it an unfair process.

03:45  18          Now, in a moment, the government is thinking, "I

       19   don't want to pay for an outside source."

03:46  20          Correct?

03:46  21          You don't want to pay for special masters.

03:46  22          MR. CARDONA:  No.

03:46  23          THE COURT:  No, you don't.

03:46  24          MR. CARDONA:  I think there are ways to avoid it.

       25   But if that's what it takes, I'm sure we can work that out.

Case 2:13-cv-00779-DOC-JCG   Document 93   Filed 12/30/13   Page 37 of 104   Page ID #:1697
LACV 13-0779 DOC   12/12/2013 - Item No. 2

37

1    I'm sure we can work that out in some way.

03:46   2        THE COURT:  We'll talk about that.  Maybe there's

3    an alternative you can think of that doesn't cost either

4    side money, and I'm open to that.

03:46   5        It's the potential redundancy and weight that

6    comes from one incident after another incident, and if 30 or

7    40 of those aren't proven by a preponderance, that the jury

8    just looks at the holistic cloud and says, you know,

9    "liability."  That does concern me.

03:47   10        But I'm looking for an alternative that makes that

11    fairer, and I'm not certain how just a random sampling

12    necessarily makes that fairer.  And I heard that you said,

13    "Well," quote/unquote, "even the government can choose."

14    You don't want to do that.  They'll pick the six slam-dunks

15    if you do that.

03:47   16        MR. KEKER:  Your Honor, there aren't six

17    slam-dunks, Your Honor.  We don't think there's six

18    slam-dunks.

03:47   19        THE COURT:  I see.  So any six that they pick?

20    Any twelve they pick?

03:47   21        MR. KEKER:  I think it would be fairer to allow

22    us -- excuse me.  I'm interrupting you.

03:47   23        THE COURT:  No.  I'm sorry.

03:47   24        MR. KEKER:  You say you don't understand how a

25    sample could be fair.  What I am not getting across is that

```
 1   we need to defend on a CDO-by-CDO basis RMBS-by-RMBS --
 2        THE COURT:  Oh, no, no.  I'm sorry.  I apologize.
 3   I heard you.  You don't have to waste your time with that.
 4        MR. KEKER:  And to do too many -- I mean, for
 5   example -- like, let's say, one of 'em was the Armitage ABS.
 6   We -- there's a lawsuit going on saying that people misled
 7   the rating agencies.  CitiGroup misled the rating agencies
 8   about the RMBS that went into those CDO's.  They didn't
 9   level with 'em.
10        Well, in order for people to understand what the
11   Armitage CDO was is -- is gonna be an effort.  And then to
12   understand what went wrong with the Armitage CDO is gonna be
13   an effort.  And so we can do that for one, two, three, four,
14   or five.  But you can't do that for 140 because, as you say,
15   you just glaze over.
16        That's why we suggested take something that at
17   least focuses it.  These are CDO's issued by CitiGroup.
18   Let's -- we're just gonna talk about that -- 15 of 'em.  Or
19   on Bank of America.  We're just gonna talk about that, 9 of
20   'em, or whatever the number is -- or some other method of
21   picking.  But 150 can't be done.
22        THE COURT:  That's not what I was saying.  I heard
23   you, and I appreciate that.
24        What I was saying is whatever scheme, other than
25   trying the entire, you know, unmanageable lawsuit from your
```

1    perspective, that the Court came up with, I don't think you

2    want to give your opposition what you just stated to me; and

3    that is, *carte blanche* to pick the six or twelve or

4    whatever.

03:49    5         I would encourage you not to take that position.

03:49    6         MR. KEKER:  Well, then we won't.

03:49    7         THE COURT:  I just think there's some unfairness

8    in that.  It'd have to be some -- if the Court came up with

9    the idea of trying to narrow the lawsuit, there would have

10   to be some kind of random basis, or each of you picking six

11   or 12 coequally.

03:50   12         When I've done that in the past, I get sometimes

13   the outer extremes.  I get the very best for one side and

14   the very best for the other side and I'm not sure that's any

15   better sampling.  So I'm completely open to that.  But, in a

16   few moments, I'm going to hear from the government.  Okay?

03:50   17         But, right now, I've got to take a recess 'cause

18   in 7 minutes that ceremony starts -- with my apologies.

03:50   19         Okay?  I almost called you in this morning.  But I

20   thought you were coming from so far away, and I represented

21   to you it would always be at 3:00 o'clock, so we'll just go

22   late tonight.

03:50   23         Okay.  So we'll see you about 5:30.

03:50   24         MR. KEKER:  Your Honor, the "late tonight" part,

25   would we -- I've got to get back.  How late?  I'm hoping we

| | |
|---|---|
| 1 | can be done by 8:00.  Is that possible? |
| 03:50  2 | THE COURT:  You two control your own future. |
| 03:50  3 | MR. KEKER:  Okay. |
| 03:50  4 | THE COURT:  And I don't want you disadvantaged by |
| 5 | a prior commitment where they "out weight" you.  Okay?  So |
| 6 | why don't we say that you can expect to leave at |
| 7 | 8:00 o'clock, wherever we are, as a courtesy.  But from now |
| 8 | on, please be prepared to stay until we're done. |
| 03:50  9 | MR. KEKER:  Sure. |
| 03:50  10 | THE COURT:  So, as a courtesy, if you have another |
| 11 | plan, you're out of here by 8:00.  And if we don't get that |
| 12 | done, though, you have to come back.  Okay? |
| 03:51  13 | MR. KEKER:  Yes, Your Honor. |
| 03:51  14 | THE COURT:  Fair enough? |
| 03:51  15 | MR. KEKER:  Certainly. |
| 03:51  16 | THE COURT:  So you keep that commitment.  But from |
| 17 | now on, if I'm going to bring you out at 3:00 o'clock, I get |
| 18 | till midnight or whatever time I need. |
| 03:51  19 | MR. KEKER:  All right. |
| 03:51  20 | THE COURT:  Okay.  We'll see you at 5:30. |
| 03:51  21 | *(Proceedings recessed at 3:51 p.m.)* |
| 05:32  22 | *(Proceedings resumed at 5:40 p.m.)* |
| 05:40  23 | THE COURT:  Counsel, thank you for your courtesy. |
| 05:40  24 | Let me hear from the government about your |
| 25 | thoughts. |

LACV 13-0779 DOC   12/12/2013 - Item No. 2

41

05:40   1           So, Mr. Cardona.
05:40   1                    **STATEMENTS BY MR. CARDONA**

05:40   2           MR. CARDONA:  Thank you, Your Honor.  I'll kind of

3   start from the back with the things that I don't think

4   there's much of a dispute about.

05:40   5           Um, you know, we agree that -- with you -- the

6   transparency is important.  In discovery process, we've been

7   trying to do that.  You know, as we set out in the

8   submission, even as of now, disclosed to S&P the vast

9   majority of all the documents we gathered in the course of

10  our free investigation.  The disputes that remain are, I

11  think, fairly narrow ones that relate to privileges,

12  work-product protections that we're alleging as to certain

13  specific documents.

05:41   14          And I agree with Mr. Keker:  I don't think that

15  the briefing schedule we've proposed would delay the

16  discovery on the bulk of the case.

05:41   17          THE COURT:  Could I stop you right there for a

18  moment.  That's my greatest concern; and that is, I don't

19  want to take two or three months in briefing that then

20  begins the process of depositions or interrogatories.  But

21  if both of you really agree that we can get down to the

22  start of depositions, however big or small this case is,

23  then I'm going to bow to your wisdom.  I just picked January

24  3rd.  And I'm not wishing you a miserable holiday.  I'm

25  probably gonna have a miserable holiday.  But I just didn't

LACV 13-0779 DOC  12/12/2013 - Item No. 2

42

1    want to delay that and then stretch that out to...

05:42  2         So if you both agree that we can get started with

3    whatever's finally decided, I can lighten up on the briefing

4    schedule.

05:42  5         MR. CARDONA:  I honestly do.  I think there's more

6    than enough for both of us to do to fill our time over the

7    next three months.

05:42  8         THE COURT:  Okay.  I'll bow to both of your wisdom

9    probably then.

05:42  10         MR. CARDONA:  Moving to a special master, we will

11    need to go back and talk about how we get it paid for and

12    who would be appropriate.

05:42  13         I'm not -- I am familiar with Mr. O'Brien.  I've

14    heard him.  *(Verbatim.)* I don't know a lot about him.  I'm

15    not familiar with Judge Smith.  I don't know -- do you have

16    his first name?

05:42  17         THE COURT:  He's done real well ever since he got

18    off probation.  I'm just joking, Counsel.  He's the former

19    presiding judge in Superior Court.

05:42  20         MR. CARDONA:  Here in Orange County?

05:42  21         THE COURT:  Yeah, here in Orange County.

05:42  22         MR. CARDONA:  Okay.

05:42  23         THE COURT:  So check both of them.  It's just --

05:42  24         MR. CARDONA:  They're --

05:42  25         THE COURT:     -- I've worked with them for so

DEBBIE GALE, U.S. COURT REPORTER

LACV 13-0779 DOC  12/12/2013 - Item No. 2

|  |  |
|--|--|
| | 1 |
| | 2 |
| 05:43 | 3 |
| | 4 |
| | 5 |
| | 6 |
| | 7 |
| 05:43 | 8 |
| | 9 |
| | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| | 15 |
| | 16 |
| | 17 |
| 05:43 | 18 |
| | 19 |
| | 20 |
| 05:43 | 21 |
| | 22 |
| | 23 |
| | 24 |
| | 25 |

1  long, and I've got a lot of confidence in their integrity

2  and their ability.

3  　　　MR. CARDONA:  That's fine.  One thing we may talk

4  with them about is seeing if we could potentially agree on a

5  special master on the East Coast, since I do agree with

6  Your Honor that a large number of the depositions will be on

7  the East Coast.

8  　　　In terms of the interrogatories, um, you know, we

9  agree with Your Honor; but, um, you know, quite frankly, a

10  number between 25 and 50 is fine.  Um, whatever is

11  appropriate in terms of the depositions, I think we've

12  resolved that.  You know, we've -- we've met with -- we've

13  had, I think, meaningful and useful discussions on discovery

14  to date.  I think we've resolved most of our differences.  I

15  would hope we can do that on a going-forward basis as it

16  applies to the length of various depositions, as well.  So I

17  think that we don't need to spend a lot of time on that.

18  　　　So, turning finally to the last thing, which I

19  think is the manageability issue in this case.  And, as

20  Your Honor has noted, we've narrowed it significantly.

21  　　　I'd like to talk about a couple of things kind of

22  as a preface, which is, you know, we're not going to be just

23  waving our arms in the air.  Obviously, we have alleged a

24  fraud.  We have alleged it with a high degree of specificity

25  in the Complaint.  What we need to prove are mail fraud and

1    wire fraud and bank fraud violations under the FIRREA

2    statute, and, obviously, those have certainly elements.  And

3    we will be presenting proof to prove those elements.  And

4    Court will be instructing the jury on what those are, and

5    the proof will come, and the defenses will come in as

6    they've been narrowed through motions appropriately before

7    trial.

05:44    8         So, in terms of that, um, you know, there are a

9    number of things there that I think are important:

05:44    10        One, you know, the law is clear:  We're not

11   required to prove reliance as an element of liability.  The

12   negligence and gullibility of victims is not a defense.  And

13   for FIRREA purposes, in terms of proving that a fraud

14   affected a financial institution, the law is clear that it

15   can affect the financial institution, even if they are

16   involved -- not saying that that's the case here.

05:45    17        THE COURT:  But the defense has the right to slow

18   down the mushroom-shaped cloud and to delve into each part

19   of that.

05:45    20        MR. CARDONA:  I don't disagree with that.

05:45    21        THE COURT:  And they have the right to not only do

22   that from the overall perspective of what a jury might be

23   thinking, but also from what I'm going to call a damages

24   perspective.  And so, let me take for a moment this idea of

25   Citibank.

05:45  1          On first blush, it doesn't sound reasonable to me.

2   But if Citibank was the only entity that you prosecuted, how

3   much of the lawsuit -- how much am I dealing with here in

4   terms of the RMBS's?

05:46  5          MR. CARDONA:  Uh, none.

05:46  6          THE COURT:  And the CDO's?

05:46  7          MR. CARDONA:  On the CDO's, they were involved in

8   the issuance of -- let me have one second -- CitiGroup was

9   the issuer on 16 of the CDO's.

05:46  10         THE COURT:  So it would be 16 out of 107.  Hold on

11  for just a moment.  Bear with me.

05:46  12         Once you get the key witnesses on a CDO, what I'm

13  having trouble understanding is why it takes that long.  In

14  other words, instead of thinking about the individual CDO's,

15  I'm starting to think about groupings.

05:46  16         So if Citibank is 16, the defense has represented

17  to me that that's one of the larger entities.  And so I'm

18  assuming that, as we go down the line, if we group these, I

19  might have -- what? -- 50, 60, 70 different entities?

05:47  20         MR. CARDONA:  I can narrow it even more,

21  Your Honor.

05:47  22         THE COURT:  How much?

05:47  23         MR. CARDONA:  The 109 CDO's that we've alleged,

24  uh, there are 16 issuers.

05:47  25         THE COURT:  So 16 issuers.

Case 2:13-cv-00779-DOC-JCG  Document 93  Filed 12/30/13  Page 46 of 104  Page ID #:1706
LACV 13-0779 DOC  12/12/2013 - Item No. 2

46

05:47   1              Now, first of all, an eight-month trial doesn't

2    concern me.  Let me just say that to both of you.  It's not

3    going to have any affect on me, whether it's a four-month

4    trial or an eight-month trial.  In fact -- but it would on

5    the jury, of course.

05:47   6              And in the Aryan Brotherhood case, which lasted

7    nine months, we had to send out almost 18,000 jury summons

8    to get a pool of 150 jurors who could sit on a nine-month

9    death penalty case.  This isn't that kind of case.

05:47  10              My guess is is that we probably have to send out

11   8- to 12,000 -- I'm taking a rough guess -- to get people

12   who could sit that long -- And you'd need 10 alternates.

05:48  13              And, unfortunately, we'd probably have to go

14   nextdoor, and somehow I'd have to tear down or do something

15   with the configuration, because it looks like the Nuremberg

16   war trials over there.  It's a criminal court.

05:48  17              And I'd have to seat both of you in those tiers,

18   if I couldn't tear it down.  And so all those things are

19   running through my mind about what does that look like in a

20   civil case law.

05:48  21              MR. CARDONA:  Well, let me add some numbers there

22   in terms of manageability.

05:48  23              For a number of reasons, I don't think this is

24   "unman-able."  First, as I've just said, we've narrowed it

25   down to 16 issuers on the CDO's.

LACV 13-0779 DOC  12/12/2013 - Item No. 2

47

05:48   1          On the RMBS, you know, the allegations as to the

2    RMBS are not that the RMBS ratings were false, so let me put

3    that aside for a second.

05:48   4          On the CDO's, we've alleged 16 issuers.  You know,

5    based on the documents we have seen, just as there is

6    significant overlap at S&P amongst the analysts at S&P who

7    worked on multiple CDO's, so we believe there's overlap

8    amongst the analysts at the investment banks who worked on

9    multiple CDO's from the particular issuers.  So there's

10   gonna be overlap there, which is going to narrow the scope

11   of the witnesses.

05:49   12         Um, as I said, with respect to the S&P analysts

13   who were involved in the analysis, you know, based on

14   documentation we've seen, there appears to be a group of

15   approximately 39 people who were the primary analysts and

16   quantitative analysts on the CDO's that we've looked at --

17   and that's an approximation; that may go one way or the

18   other, but that's a rough figure -- um, so, again, I don't

19   think an unmanageable number of witnesses there.

05:49   20         In terms of the financial institutions that we

21   allege suffered losses that we're going to be arguing to the

22   Court should be used as the basis for FIRREA subpoenas on

23   the CDO's, there's a total of 15.

05:49   24         On the RMBS, there's a total of seven, and there's

25   an overlap of one there because one financial institution,

Case 2:13-cv-00779-DOC-JCG   Document 93   Filed 12/30/13   Page 48 of 104   Page ID #:1708
LACV 13-0779 DOC   12/12/2013 - Item No. 2

48

| | 1 | Western Federal -- Western Corporate Federal Credit Union, |
| | 2 | is actually a victim on both the RMBS and the CDO side, so |
| | 3 | there's some overlap there, as well. |
| 05:50 | 4 | So again, those numbers -- you know, 16 issuers, |
| | 5 | 15 financial institutions that were going to be alleged |
| | 6 | suffered loss -- 22 if you count the RMBS -- those don't |
| | 7 | appear to us to be unmanageable in terms of discovery. |
| 05:50 | 8 | The final thing I'll say is, in terms of the |
| | 9 | discovery process, and in terms of this concept of |
| | 10 | potentially sampling out some set, there is a massive amount |
| | 11 | of overlap in just how CDO's and RMBS were rated. |
| 05:50 | 12 | For the RMBS, same models were used over all of |
| | 13 | them.  There may be variations in the version of that model |
| | 14 | that were used.  The methodology and the committee system |
| | 15 | that was used at S&P was the same.  Our explanation to the |
| | 16 | jury as to what an "RMBS" is, is something we should only |
| | 17 | have to do once to cover all of those. |
| 05:51 | 18 | When we look at CDO's, it's the same. |
| 05:51 | 19 | THE COURT:  How long do you think the trial would |
| | 20 | take?  Mr. Keker represented he believes it might be as much |
| | 21 | as eight months or even longer. |
| 05:51 | 22 | What are your thoughts? |
| 05:51 | 23 | MR. CARDONA:  I don't believe it will be eight |
| | 24 | months or longer. |
| 05:51 | 25 | THE COURT:  Well, how much?  How much time? |

05:51    1            MR. CARDONA:  Our estimate for our case is

    2    roughly, we think, between 24 and 30 days.

05:51    3            THE COURT:  Okay.

05:51    4            MR. CARDONA:  The defense, Mr. Keker has told us

    5    that he thinks his part will be much longer, based on this

    6    case-by -- this kind of security-by-security approach.

05:51    7            THE COURT:  Okay.

05:51    8            MR. CARDONA:  I think some of that will

    9    necessarily be the subject of, you know, either summary

    10   judgment motions to narrow the issues or motions in limine

    11   to narrow the issues before we get to trial.

05:51    12           THE COURT:  So roughly eight weeks for the

    13   defendant case?

05:52    14           MR. CARDONA:  Um.

05:52    15           THE COURT:  Eight -- "4" into "30," would be --

    16   four days a week.

05:52    17           MR. CARDONA:  Somewhere between six and eight

    18   weeks.

05:52    19           THE COURT:  Yeah.  But that doesn't sound

    20   unreasonable to me.

05:52    21           MR. CARDONA:  It doesn't to me either.

05:52    22           THE COURT:  Now, I'll turn to Mr. Keker for a

    23   moment, in terms of the defense.  But that does not sound

    24   unreasonable at all, and that's assuming four days a week --

05:52    25           MR. CARDONA:  Right.

LACV 13-0779 DOC   12/12/2013 - Item No. 2

50

05:52       1              THE COURT:  -- and I don't think trial counsel

            2   should be expected to hold up to five days a week.  There's

            3   a significant diminution in performance when you get five

            4   days.  I've seen that over in Superior Court for years.

            5   It's not even catching back at the offices -- your

            6   respective offices.  It's just that you start to see folks

            7   just fall off.  So it would probably be four days a week.

05:52       8              Now, let me ask you this, and have Mr. Keker and

            9   Ms. Keller think about this for a moment:

05:53      10              No matter what choice a Court made, whether each

           11   of you picked, you know, twelve, of whatever those were --

           12   whether it was a random sampling, it seems to me that your

           13   discovery process doesn't change one bit.  And the reason it

           14   doesn't change one bit is because, if the lawsuit in the

           15   first stage doesn't meet, you know, the criteria of another

           16   party to, quote/unquote, settle out in the second stage -- I

           17   mean, that's why you stage trials -- then the discovery

           18   process has to start over for the next segment.

05:53      19              So a Court will always push all of the discovery

           20   into one block of time.  So I'm not hearing, from my

           21   perspective, that your discovery time is going to be any

           22   less no matter what method I pick.  What I'm hearing is that

           23   your trial time could be significantly different.  And I'm

           24   not minimizing that.  I'm just saying your discovery is

           25   going to have to be all-encompassing no matter whether the

DEBBIE GALE, U.S. COURT REPORTER

1   entire case gets presided over, I give you a choice

2   randomly, or I try to make that fair and each side also

3   picks, you know, 6 or 12.

05:54   4         We just did that in the Eastern District with a

5   case.  I'm not sure how it worked out -- or it would have

6   worked out, because it settled literally the day that the

7   jury was coming down on a water case out of San Joaquin

8   Valley, after Judge Wanger resigned.

05:54   9         Let me ask you this:  I want to jump ahead for a

10   moment and have you think about this position:  There's what

11   I call the "trickle-up theory."  It goes like this:  We have

12   an institution.  And Ms. Keller and Mr. Keker want to

13   interview as many of the top-flight people in an

14   organization as they possibly can.  And a Court's very

15   cautious, and we start at this level and then we work up to

16   this level, and then we work up to this level; and, finally,

17   you want somebody who's really at the top.  That's

18   extraordinarily wasteful, from my position, if a Court is

19   inclined to allow those building blocks to take place versus

20   basically starting close to the top with the people

21   responsible for policy.

05:55   22         And what I've been anticipating is that --

23   Mr. Keker and Ms. Keller alluded on the last occasion to

24   asking for what you might think would be people in different

25   government organizations who normally wouldn't be involved

LACV 13-0779 DOC  12/12/2013 - Item No. 2

52

|  |  |
|---|---|
|  | 1 | in a deposition.  And I understand your position that the |
|  | 2 | Justice Department doesn't control, for instance, Treasury. |
| 05:55 | 3 | What authority does a Court have on the |
|  | 4 | West Coast, you know, dealing with an East Coast-centered |
|  | 5 | Treasury Department, or a bank, to start imposing orders in |
|  | 6 | depositions of some of the employees and personnel you want |
|  | 7 | from a bank -- and going pretty high, I imagine -- and some |
|  | 8 | of the requests they're going to make concerning government |
|  | 9 | agencies? |
| 05:56 | 10 | How do I impose my will on a case that seems to be |
|  | 11 | centered with a majority of the witnesses on the East Coast? |
|  | 12 | How do I get compliance?  Because somebody eventually is |
|  | 13 | going to throw up, "Judge, they're outside your |
|  | 14 | jurisdiction."  And now I've got to work with a jurist in |
|  | 15 | New York or Washington D.C. |
| 05:56 | 16 | How do I resolve that? |
| 05:56 | 17 | MR. CARDONA:  Well, obviously, you have control |
|  | 18 | over this case, so you can take actions in this case to |
|  | 19 | penalize one side or the other. |
| 05:56 | 20 | THE COURT:  Just a moment.  Let's think that |
|  | 21 | through, though.  You're the Justice Department.  And in |
|  | 22 | your motions you've said basically, and I'll be specific, |
|  | 23 | "We don't have control over Treasury." |
| 05:57 | 24 | MR. CARDONA:  Actually, we do have control over |
|  | 25 | Treasury. |

DEBBIE GALE, U.S. COURT REPORTER

05:57    1              THE COURT:  Oh, you do.

05:57    2              MR. CARDONA:  It's some others.  It's the Board of

         3    Governors of the Federal Reserve.

05:57    4              THE COURT:  Oh, my apologies.  Let's take the

         5    Board of Governors of the Federal Reserve.  And I apologize.

         6    Well, it's good to know, and I'll mark that down that you

         7    control Treasury.

05:57    8              MR. CARDONA:  Wouldn't say "control," but they are

         9    part of us for purposes of Rule 30 requests.

05:57   10              THE COURT:  Okay.  The Board of Governors of the

        11    Federal Reserve.  I can just imagine a request by the

        12    defendants -- and you know it's coming -- to depose somebody

        13    who's at least that level.  Walk through this with me:  How

        14    do I impose my authority as a Court without working with a

        15    sister court in Washington D.C. or New York or whatever?

05:58   16              MR. CARDONA:  Um, in most instances, you wouldn't.

        17    I mean, the Rule 45 subpoena would be issued out of the

        18    court that has jurisdiction over that entity.

05:58   19              THE COURT:  And that's what makes it difficult for

        20    me watching this across-the-nation case; and that is, if I

        21    make an order, I expect that it will be carried out.  And

        22    I'm not bargaining with that order.  And therefore, I feel

        23    that I'm going to have to be in a position occasionally of

        24    bargaining, in a sense, or getting another court, who isn't

        25    really dealing with this case, to carry out what I think is

LACV 13-0779 DOC   12/12/2013 - Item No. 2

54

05:58

05:59

05:59
05:59

05:59

05:59

05:59

| | |
|---|---|
| 1 | best for both parties in terms of fairness during this |
| 2 | discovery process. |
| 3 | And that leads full circle to this:  That's why I |
| 4 | need the special master in -- not all the time.  In |
| 5 | 80 percent of the witnesses maybe you'll never need a |
| 6 | special master.  But there may come that time for your |
| 7 | benefit or the defense's benefit that you really need that |
| 8 | special master.  And he calls up and says, "You know, |
| 9 | Judge Carter, we got to 7 hours, but they really need three |
| 10 | more days." |
| 11 | Okay? |
| 12 | MR. CARDONA:  I don't disagree with that.  And I |
| 13 | think we will discuss, you know, who we could have as a |
| 14 | special master.  And, as I've said, we may discuss whether |
| 15 | we could have one that would be on the East Coast to be able |
| 16 | to deal with that without the time lag. |
| 17 | THE COURT:  Now, second for both of you to think |
| 18 | about:  How do I deal with the problem when one of you comes |
| 19 | to me and says, "We deposed the person in New York or |
| 20 | Washington D.C., but they won't come out and testify and, |
| 21 | Judge, you don't have jurisdiction.  But we will put on |
| 22 | depositional testimony"? |
| 23 | From my perspective, that's absolutely worthless. |
| 24 | It takes away the demeanor of the person. |
| 25 | So, right to begin with, I would expect that |

DEBBIE GALE, U.S. COURT REPORTER

LACV 13-0779 DOC   12/12/2013 - Item No. 2

55

```
 1    anybody that we depose should be subject to the Court's
 2    jurisdiction, and has to appear in front of the jury, and
 3    has to testify here.  How do I impose that kind of --
 4    because I'm not going to allow -- now listen carefully --
 5    I'm not going to allow -- like, "Read my lips.  No new
 6    taxes" -- I'm not going to allow depositional testimony if
 7    there's any possibility of that person, you know, in the
 8    United States.  And that doesn't mean a legal possibility
 9    and my restriction of 120 hours (verbatim).  That just
10    constitutionally takes away the right of the jury to view
11    credibility factors.
12              So I want to think about that.  How am I going to
13    do that?
14              MR. CARDONA:  We have taken that message from the
15    last hearing we had, and we have been thinking about that.
16    And we'll make our best efforts to try and get as many of
17    the witnesses as we can here.
18              THE COURT:  Let's assume that I believe you and
19    the Justice Department, that you'll do that for those people
20    you have authority over, like Treasury and yourself.  But I
21    don't know about the Board of Governors or other agencies
22    who come in here.  And I would imagine that their first
23    reaction is going to be to try to quash the subpoena.
24              And the second is going to be try to resist, on
25    either party's part, by the way -- whether a major person at
```

06:00  12
06:00  14
06:00  18
06:01  24

DEBBIE GALE, U.S. COURT REPORTER

```
06:01
```

 1    a bank or the Board of Governors -- that they're gonna try

 2    to resist this.

 3              MR. CARDONA:  We do have experience with that.

 4    They have served Rule 45 subpoenas on the Board of

 5    Governors.  And the Board of Governors --

 6              THE COURT:  That's why I'm having that discussion

 7    now.  I mean, you can see it coming, and I'd just as soon

 8    start talking about it tonight, even if we don't resolve it

 9    tonight.  Okay?

10              Okay.  I'm sorry.  I interrupted you.

11              MR. CARDONA:  I think those were the points I

12    wanted to make.  Essentially, we think the case is

13    manageable.  We don't think it will cause undue prejudice to

14    S&P at trial.  You know, I think counsel will have the

15    obligation to explain things to the jury, just as we do in

16    most cases.  The Court will be instructing them.

17              And, to a certain extent -- to the extent there's

18    jury confusion, because we have the burden, ultimately that

19    will likely end up cutting against us to the extent we can't

20    simplify the case and make it something that the jury can

21    understand.

22              THE COURT:  In making this representation, would

23    you be willing to take a limitation of 30 trial days for the

24    presentation of your evidence, not counting your opening

25    statement, not counting jury selection, but the actual

1    presentation computed at six hours a day?

06:02   2              And let me tell you why "six hours."  In trial

3    work, if you can get in six hours of quality time, you are

4    really pushing it.

06:02   5              So I just want to take the hours for a moment.

6    Let's say we start at 8:00 o'clock hypothetically.  Let's

7    say we have an hour and a half, till 9:30 -- or, better yet,

8    let's go to 10:00, for two hours.  Right?

06:02   9              Let's now take a half an hour break so the jurors

10   can go down, get a cup of coffee.  We're at what?  10:30,

11   aren't we?

06:03   12             Now, another hour and a half.  That's three and a

13   half hours, right?

06:03   14             MR. CARDONA:  Yes.

06:03   15             THE COURT:  Okay.  Now mark this down:  Three and

16   a half hours.  Watch what happens.

06:03   17             Now, a judge has the choice.  If we're unfairly

18   pushing, what we do is jamb you into an hour for lunch.

19   Counsel can't hold up because, not only do you have to have

20   lunch, you've got to refresh, you've gotta think about the

21   next series of direct or cross-examinations that are coming.

22   And the jury, after awhile, can hold up to that for the two

23   weeks in complex litigation.  They can't hold up to that

24   after two weeks.  Okay?

06:03   25             Now we go what I call "sleepy time."  We're lucky

```
 1    to get in one hour before you see somebody who drops their
 2    head because they had too much to eat.  So now we're at
 3    2:30.  And we're going to take a half hour for lunch, and
 4    we're going to push it at 3:00 o'clock for an hour and a
 5    half to 4:30.
 6            Add up "two and a half" and "three and a half,"
 7    and what do we have?  Excellent.  Six.
 8            MR. CARDONA:  Six hours.
 9            THE COURT:  Six hours.  Okay.
10            Now, you can't hold 'em usually after 4:30 because
11    you've got child care problems.  In fact, we're lucky to get
12    jurors here at 8:00 o'clock.  Most courts start at 9:00.
13    We're gonna start at 8:00.
14            So, if you look at that schedule, that hopefully
15    gets the jury home.  But since I'm pretty demanding
16    concerning evidence, our evening just starts.  And I've
17    gotta be careful.  I've got to make sure I don't burn you
18    out.  So go out to dinner at 4:30.  Come back at 5:30.  I
19    get to see every piece of evidence for the next day.  And
20    how long that takes -- can take an hour but it could be
21    midnight.  And every dispute gets resolved so that the next
22    day we're not having what I call "taxpayer time" in the
23    hallway, when you've got these great American folks who are
24    volunteering at 50 bucks a day to serve, and we're having
25    sidebar conferences.  It just isn't gonna happen.  That
```

06:03 (line 6)
06:04 (line 8)
06:04 (line 9)
06:04 (line 10)
06:04 (line 14)

LACV 13-0779 DOC  12/12/2013 - Item No. 2

59

| | |
|---|---|
| | 1   means I'm unprepared.  And it's never gonna happen. |
| 06:04 | 2          So six hours times four days a week:  24 hours |
| | 3   times -- you see what I mean? |
| 06:05 | 4          So if I take six hours a day, 24 -- about 24 hours |
| | 5   roughly a week.  I want to be sure that you can -- you know, |
| | 6   I'm giving you the max that you said:  30 days. |
| 06:05 | 7          Can you make it in 30 days?  I want you to sit |
| | 8   down and calculate that out at six hours a day for a moment |
| | 9   with your colleague and just be sure. |
| 06:05 | 10          MR. CARDONA:  We've discussed this.  And I believe |
| | 11   we can -- |
| 06:05 | 12          THE COURT:  All right. |
| 06:05 | 13          MR. CARDONA:  -- assuming, again, that |
| | 14   cross-examinations are reasonably related to the directs -- |
| 06:05 | 15          THE COURT:  No, no.  I'm just giving you that |
| | 16   time. |
| 06:05 | 17          MR. CARDONA:  To -- oh, for us to present our |
| | 18   case? |
| 06:05 | 19          THE COURT:  Yeah. |
| 06:05 | 20          MR. CARDONA:  Oh, yes. |
| 06:05 | 21          THE COURT:  Now, what happens if I -- the problem |
| | 22   is I don't know how to spend that time yet with the defense, |
| | 23   because Mr. Keker's going to take the position that, for the |
| | 24   30 days, he may need 60 or 90 days.  I don't know what that |
| | 25   position is yet.  And I don't think he knows yet.  Okay? |

LACV 13-0779 DOC  12/12/2013 - Item No. 2

60

1    We're all guessing right now.

06:06    2         So what I can't do is I can't limit you, let's

3    say, to 24 times 8, which should be the number of hours -- I

4    think that's about 192 hours -- because that's just the

5    presentation of your case.

06:06    6         Now, does the presentation of your case mean

7    direct and redirect?

06:06    8         MR. CARDONA:  We actually -- I think when we gave

9    the estimate of the 30 days, we were factoring in direct,

10   reasonable crosses, and redirect.

06:06    11        THE COURT:  Okay.  Two months does not sound

12   unreasonable to me.  And so, from my perspective, at least

13   as far as the government putting on the case, I don't think

14   it's unmanageable at all.

06:07    15        So, eventually, I'm going to turn to you,

16   Mr. Keker, and we're going to go through some calculations,

17   but I know we're guessing right now.  Okay?

06:07    18        Let me give you an example of some initial

19   thoughts.

06:07    20        Concerning your discovery -- this is not a

21   ruling -- first, I know that there's a continuing

22   disagreement as to S&P's request seeking analysis made by

23   various independent agencies of the United States

24   Government.  It's not a ruling, but when you brief this, you

25   have to know that I think a Court is going to think

LACV 13-0779 DOC  12/12/2013 - Item No. 2

61

06:08

06:08

06:08

06:09

06:09

| | |
|---|---|
| 1 | tentatively, "Why not?"  And so answer that question:  "Why |
| 2 | not?"  It has a lot to do with transparency, a fair defense. |
| 3 | The second is, S&P seeks documents gathered in |
| 4 | investigations by the United States into the conduct of |
| 5 | various mortgage lenders and financial institutions. |
| 6 | Well, I don't know if I'm going to run into an |
| 7 | attorney-client privilege there.  I don't know if I'm going |
| 8 | to run into what I call a work, you know, privilege.  I |
| 9 | don't know what to anticipate, but I -- when I read that |
| 10 | motion initially, I was thinking:  Does this pertain to |
| 11 | other ratings agencies?  Is this what that motion is being |
| 12 | driven at in terms of disparity? |
| 13 | It says, "Mortgage lenders and financial |
| 14 | institutions," so I assume it's not a competitor like |
| 15 | Moody's or others.  But what happens if that raises its |
| 16 | head, and the defense comes to the Court and says, "We have |
| 17 | disparate treatment here"? |
| 18 | I don't know how to resolve that yet because it's |
| 19 | not in front of me.  So I'm just thinking -- I'm trying to |
| 20 | look down the road a year or two and start anticipating. |
| 21 | All of this is speculation. |
| 22 | Third, S&P has already sought discovery, or is |
| 23 | sounding as if they'll seek discovery related to the defense |
| 24 | it was improperly targeted by the United States.  And |
| 25 | there -- there I started to think about the disparity issue. |

                1    You know, what happens if the claim is, "We need discovery

                2    because we have like institutions and other institutions in

                3    the same area are being" -- let's say, "not investigated as

                4    vigorously."

06:09           5           It's not my concern unless there's any kind of

                6    deal that's been cut, or any kind of agreement, wink, nod or

                7    anything else that the government is going to take the

                8    position of investigating -- and I don't know if you've

                9    started with any other agencies at all -- and then holding

               10    back to see what happens with S&P.  Then the defense might

               11    have a good argument of getting into those other

               12    institutions, and then I can expect resistance.

06:10          13           The problem is, right now, I don't think there's a

               14    way to make a reasoned decision with what each of you have

               15    said, other than I think that the case is manageable as far

               16    as the presentation on the prosecution's part.  I'm not sure

               17    it's fair and manageable yet when I factor in the defense,

               18    okay?  So I'm going to talk to them in just a moment.

06:10          19           When would you like the case tried?

06:10          20           MR. CARDONA:  Your Honor, we propose a schedule

               21    that we think is reasonable.  We moved the trial date back

               22    to May of 2015.

06:11          23           THE COURT:  Now, let's talk about that for a

               24    moment.

06:11          25           Sounds fine.  Fine.  2015, though, depending upon

Case 2:13-cv-00779-DOC-JCG   Document 93   Filed 12/30/13   Page 63 of 104   Page ID
#:1723
LACV 13-0779 DOC   12/12/2013 - Item No. 2

63

1    who you think you're going to pick as jurors -- vacations

2    occur in June.  I'm going to be fighting with a jury -- now

3    if it's an eight-month trial, it doesn't matter when we

4    start, frankly.

06:11    5          What happens if it turns out to be a three- to

6    four-month trial?  My preference would be, to give you a

7    broader jury pool and to have people back in school or off

8    of the summer vacations -- because I'm going to be fighting

9    with jurors who have different vacation schedules all summer

10   long, unless we do this:

06:11   11          You both would send out what we normally send out

12   and that is a letter.  And that letter is a time qualifying

13   letter.  But it also states that the Court is planning to

14   take vacations or be in recess or whatever on these dates.

15   And we're specific about the recesses and dates we give so

16   the jury knows that they're not going eight months straight

17   through, or four months straight through, or five months

18   straight through.  And the people who can't comply with that

19   let your jury commissioner know immediately.  They write in

20   and say, "You know, we're taking a June 1st vacation, and

21   the Court says it will be in recess on the week of July

22   4th."

06:12   23          That's the only way we've gotten around the

24   complex litigation and tried to avoid the problems of jurors

25   just popping up after they're selected and saying, "Oh, by

DEBBIE GALE, U.S. COURT REPORTER

LACV 13-0779 DOC - 12/12/2013 - Item No. 2

64

| | |
|---|---|
| | 1 |
| | 2 |
| 06:12 | 3 |
| | 4 |
| | 5 |
| | 6 |
| | 7 |
| | 8 |
| 06:13 | 9 |
| | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 06:13 | 15 |

```
 1   the way, Judge, I've got a vacation that's planned.  And
 2   this is the only time I can take my kids out of school."
 3            So I toss that out to you.  We're not making any
 4   decisions tonight.  We're just trying to wind through
 5   whether it's a four-month or eight-month trial.  And if it's
 6   a four-month trial, May is a bad time to start.  You'd
 7   rather start in February.  Okay?  Or late January.  Or
 8   September -- no, not September because of Thanksgiving.
 9            What I don't want to do is this:  Finally, before
10   I talk to Ms. Keller and Mr. Keker, I don't want to say that
11   eight weeks or 30 days is fair from your perspective, and
12   then say to the defense, "You have the same amount of time,"
13   because the same amount of time may not be fair at all.  You
14   may -- Mr. Keker may need double that amount of time.
15            Do you have anything else you'd like to say at the
16   present time?
17            MR. CARDONA:  No, Your Honor.
18            The only -- the only thing I will say is that I
19   think many of those issues, in terms of what would be the
20   necessary time, et cetera, will be resolved as we start
21   going through the discovery process and as we narrow some of
22   the issues as a result of depositions and various motions
23   that may be made.
24            THE COURT:  Okay.
25            MR. CARDONA:  Other than that, I will submit.
```

06:12  3
06:13  9
06:13  15
06:13  17
06:13  18
06:13  24
06:13  25

DEBBIE GALE, U.S. COURT REPORTER

06:14  1          THE COURT:  Mr. Keker, your thoughts.

06:14  2          MR. KEKER:  Thank you, Your Honor.

06:14  3                  **STATEMENTS BY MR. KEKER**

06:14  4          MR. KEKER:  There's a lot here to chew on.  I want

5    to stop -- start with something I'm getting a little

6    discouraged about, but the -- the numbers.  I think that

7    they are seriously underestimating these numbers.

06:14  8          There are 109 CDO's.  There's 50-some RMBS.

06:14  9          Just take our "Citi" proposal.  And I'm not stuck

10   with that; I'm just saying just as an example.  There's

11   16 -- there's one issuer.  There's 16 CDO's.  There's 175

12   purchasers of those CDO's, all of whom did due diligence,

13   looked at 'em, and made their own decisions.  That is an

14   enormous case.

06:15  15         He said there's 39 analysts at, uh -- at S&P who

16   did this work.  Well, there's a lot of people who supervised

17   'em.  There's a lotta people who went into efforts of

18   looking at the, um -- at the models.  For each one of these

19   CDO's, each one of the RMBS, our defense is going to be:

06:15  20         We fairly and honestly rated it without criminal

21   intent.  Government, you're right.  Bottom fell out of the

22   market.  This thing fell with it.  But we weren't criminals

23   when we -- when we rated that.

06:15  24         The only way we can do that is to get people to

25   understand one-by-one, we believe, what they're talking

 1    about.  And this -- I think this idea that it could be done

 2    simply -- if you're government -- the government wants to

 3    come in and -- what I said before is "hand-waving."  Maybe

 4    that's not -- maybe that's not fair.  But they want to do a

 5    broadbrush.  They want to do: "This model stinks, and

 6    people at S&P knew it.  Look at an e-mail here.  And look at

 7    another e-mail here."  And then, at the end of the case,

 8    stand up and say, "We have proved to you something that you

 9    may not understand -- you may not even understand what a CDO

10    is -- but we've shown you a few emails and -- and, you know,

11    they're guilty of a crime.  They must have had criminal

12    intent."

06:16    13    We have to break that down.  I mean, to defend

14    that case, we have to break it down just as -- as you would

15    do in a criminal case.

06:16    16    I'm reminded of this magnificent case that was --

17    some crime family was tried in Newark.  And a friend of mine

18    was one of the prosecutors.  It went on for two years, which

19    is a little exaggerated from this one.  But people had

20    babies, all kinds of things happened.  At the end of it, one

21    of defendant lawyers stood up, said to the jury, "Now you'll

22    remember my -- my client -- my client was the one who

23    crossed the street, got the dope, did this, did that,"

24    talked about 15 minutes.  And then he turned to the jury and

25    he said, "Do any of you remember that?  Do any -- you've

```
 1    been sitting here so long.  Everything I just told you is
 2    completely false.  There's no evidence of any of the things
 3    there.  You don't remember anything about my client," and --
 4    and so on.
 5              So, I'm -- I'm worried about the same thing
 6    happening here.  We get up at the end and say, "Ladies and
 7    gentlemen, you remember that Armitage ABS?  Remember the one
 8    that they -- that so-and-so lied to those rating agencies
 9    about?  Do you remember the fact that the issuer didn't tell
10    us this, that, or the other thing, and they just --
11    (gestures and makes sound) -- it goes over 'em.
12              So our point is we need to carve it up some way
13    into some kind of manageable thing.  And, I think what we're
14    missing in all of this is, if you do, there will be
15    tremendous advantages.
16              First, there'll be juror comprehension so that
17    there will be a fair result from a jury.
18              Second, there will be rulings by the Court, which
19    will establish the law of the case.
20              And so this -- this sample, I think -- I mean,
21    it's a risk for every -- for both sides.  But the sample is
22    very well gonna be the whole megillah.  I mean, if they --
23    and there may be collateral estoppel effects.  I'm not --
24    but you can imagine what can grow out of that.
25              Plus, when we come to the penalty business, where
```

06:17 (line 5)
06:17 (line 12)
06:17 (line 16)
06:17 (line 18)
06:17 (line 20)
06:18 (line 25)

1    you -- you, at the end of the day, having listened to what

2    the jury has to say about -- about what financial

3    institutions were affected and how much and so on, you're

4    gonna have tremendous discretion to say, "Well, I'm gonna

5    look at this as a problem of how much S&P gained," which, I

6    must say, is gonna be less than the legal fees that are

7    spent on this case, I mean, if -- if that's the way you

8    looked at it.  Or I'm gonna look at it some other way

9    that -- a more punitive way that the government wants to

10   look at it.

06:18  11          But you, having heard the evidence, will have a

12   chance to say, "You know, when it comes to -- when it comes

13   to what I'm eventually going to do to S&P, even if they are

14   found liable," it's not gonna be what the government is

15   seeking, which is a company-busting sort of -- sort of

16   damage numbers.

06:19  17          So we urge you to go back to these ideas or --

18   that you have about, you know, pick 'em, pick 'em randomly,

19   pick a few each, and -- and, uh -- and do something that

20   will allow a trial, which will probably take four months

21   anyway of -- of a lesser number, but a manageable number, of

22   CDO's and RMBS.

06:19  23          If you choose not to do that, we said in our

24   pretrial conference, that -- and I think this is extremely

25   optimistic and we can't really do it -- we said we'd need at

DEBBIE GALE, U.S. COURT REPORTER

1    least two years for discovery and -- and we'd rather not do

2    it that way.  We'd rather have some manageable number, spend

3    a year in discovery, then get moving, and then have a trial

4    and get this thing done in 2000 -- at least get the sample

5    done in 2015.  We don't think we could fairly do that unless

6    the trial we're preparing for is somehow narrowed.

06:20    7         Now, let me speak to your concern about discovery

8    and having to do discovery twice.

06:20    9         First of all, our discovery of the government

10   would apply across the board, so whatever discovery we need

11   to do there is going to apply.  I mean, that's gonna happen

12   in this phase, or it's gonna happen period.

06:20   13        The only -- the -- what -- what we are asking not

14   to have to do is, instead of going to 16 issuers of these

15   securities -- Merrill -- I mean, every big bank -- having to

16   fight with every single big bank on Wall Street, we would

17   like to fight with some lesser number.  We were suggesting

18   one:  Citi.

06:20   19        But you could make a different rule, but not --

20   not 16.  Instead of going to something like 800 purchasers

21   to find out what their records show and depose somebody

22   about why you bought this stuff, with Citi we just have 175.

23   Some other sampling we'd have, but at least it would be a

24   lesser number.

06:21   25        So -- so we think that the discovery is kind of a

1    mixed bag; that -- that if it were -- if we could just

2    discover the CDO's specific information -- insurers,

3    purchasers, and so on -- of a lesser number, we could do

4    that fairly, you know, sooner.  It's still a huge job.

06:21    5    And then the government discovery would go ahead

6    and cover everything.

06:21    7    This trickle-up problem that you talked about

8    we're greatly concerned about.  We -- Standard & Poor's is

9    basically the victim of this problem because the government

10   chose to bring this case far, far, far from the company and

11   the witnesses, far from the banks, far -- there's only one

12   savings and loan, or -- or whatever they call 'em now --

13   credit union that's in this district, I think.  And

14   everybody else is somewhere else --

06:21    15   THE COURT:  Yeah.

06:21    16   MR. KEKER:  -- mostly in New York.

06:21    17   So, when it comes to the government, anybody who

18   works for the government, our position is going to be, uh,

19   the government should go lean on 'em.  And if they say,

20   "Well, we're technically separate 'cause we work for the

21   Federal Reserve" -- well the last I heard, the United States

22   taxpayer pays those people's salaries.  And the government

23   outta be able to get 'em here, and we outta be able to solve

24   that problem.

06:22    25   There are other people that are gonna be harder.

Case 2:13-cv-00779-DOC-JCG   Document 93   Filed 12/30/13   Page 71 of 104   Page ID #:1731
LACV 13-0779 DOC 12/12/2013 - Item No. 2

71

1    These banks are not particularly interested in cooperating

2    with -- well, we'll see.  We'll see how we do with the

3    banks.  But that is going to be a big problem.  And it's

4    going to be -- if there's 16 banks we have to fight with,

5    it's 16 times as much effort, 16 times as much confusion, 16

6    times as much problem to get a jury to understand what's

7    going on, as opposed to one or two issuer banks.

06:22    8    Um, and the special master I'm sure we will work

9    out and be able to -- as we've gone many things with the

10   government, we're -- we disagree with the government in this

11   case vociferously, but we get along with government counsel

12   in terms of getting this case moving.

06:23    13   And we hear you loud and clear that there's no

14   deposition testimony allowed if there is any possibility of

15   getting that person to trial.  But I have a feeling we

16   are -- I mean, we may be stuck and be coming before you, and

17   say, "Judge, we -- we completely agree with you.  We think

18   deposition testimony is terrible.  We wish we could put the

19   witness on.  But if we can't get what this witness has to

20   say in some measure before the jury, we just can't make our

21   arguments or -- and are too prejudiced."

06:23    22   THE COURT:  Let me give you an example of that:

06:23    23   An institution, like a bank, might be embarrassed

24   to be anyplace around this trial.  I mean, it sullies their

25   alleged reputation.  So you take a deposition on the East

LACV 13-0779 DOC   12/12/2013 - Item No. 2

72

```
       1    Coast.  The subpoena's then served for the president or vice
       2    president or whomever to come out to the West Coast, and
       3    they refuse to do so through their counsel.  That's
       4    extraordinarily prejudicial to S&P.
06:24  5            And that's why I'm asking the question, you know,
       6    how do I start getting jurisdiction, not just over
       7    government agencies that DOJ doesn't control, but also
       8    financial institutions that seem to be East Coast oriented,
       9    and I'm reaching with this long arm out trying to assert
      10    authority on the West Coast.
06:24 11            I'm at a tremendous disadvantage in enforcing the
      12    power of trying to get people here to testify in person in
      13    front of a jury.  And that's what the adversarial system's
      14    all about.  It's not depositional testimony for one reason:
06:24 15            In a deposition, somebody is boring in on the
      16    deponent.  And the other side is usually sitting, or
      17    defending, or objecting.  That's not the true adversarial
      18    system.  That has nothing to do with the adversarial system.
06:25 19            Only when we get that witness in court and the
      20    deposition is a discovery vehicle do we get the fairness in
      21    terms of cross-examination by either side.  So I've never
      22    seen a deposition as a fair substitute at time of trial.
06:25 23            MR. KEKER:  I -- we're -- we totally agree.  We
      24    completely agree with the idea of having to try a case by
      25    deposition is appalling, is unfair, is not gonna permit the
```

DEBBIE GALE, U.S. COURT REPORTER

LACV 13-0779 DOC  12/12/2013 - Item No. 2

73

| | |
|---|---|
| 06:25 | 1 |
| | 2 |
| | 3 |
| | 4 |
| | 5 |
| | 6 |
| 06:25 | 7 |
| 06:25 | 8 |
| | 9 |
| | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| | 15 |
| | 16 |
| | 17 |
| | 18 |
| 06:26 | 19 |
| | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| | 25 |

1   jury to understand it; it's not gonna lead to a fair result.

2         I do have this comment, though:  These big banks,

3   as long as you don't have to take on too many of 'em --

4   these big banks, when the government -- they're all --

5   they're so totally regulated, they are -- I shouldn't get --

6   I won't get political about this.

7         THE COURT:  Oh, that's okay.

8         MR. KEKER:  They are completely regulated and

9   there are times when they do exactly what the government

10  tells 'em.  They have an interest in getting along with the

11  government.  If they need to get -- if the government wants

12  to give 'em $13 billion to get 'em off their back, they get

13  $13 billion.  There are a lot of ways that the SEC -- if the

14  SEC says, "We're gonna settle with you, but we wanna put in

15  this thing that if you cooperate with defense counsel or you

16  do anything, you have to tell us," take away all kinds of

17  rights that a normal witness would have.  They sign on the

18  dotted line.

19        I haven't give up on the idea, if we could focus

20  enough on one bank or two banks or -- instead of the

21  whole -- all Wall Street, that you, by working -- getting

22  the government to use some of their good offices to these

23  regulated banks, to say, "This Judge really wants your

24  witnesses out there, and this Judge doesn't" -- and so on.

25  I haven't given up that that wouldn't -- that that couldn't

```
                     work.
06:26            2          It can't work if this becomes the Honorable David
                 3   Carter takes on Wall Street, every bank, every minute.  If
                 4   it becomes some kind of war, then they all rise up and fight
                 5   back.
06:27            6          THE COURT:  I'm terrified.
06:27            7          MR. KEKER:  But one -- no, I -- I know you're not
                 8   terrified, but I'm just talking about effectiveness.  I'm
                 9   talking about -- I mean -- but, anyway.
06:27           10          THE COURT:  And you're right.  It's a problem.
06:27           11          MR. KEKER:  I think you get it.
06:27           12          THE COURT:  How do I assert jurisdiction when the
                13   law does not allow that jurisdiction, and I start relying on
                14   voluntary compliance.
06:27           15          MR. KEKER:  But if -- and what I'm saying is, if
                16   this case were about one transaction -- I mean, I'm
                17   exaggerating.  If it were about one CDO and one -- and you
                18   said, "I want the people responsible for that.  I want 'em
                19   in front of me," and so on, it would be a lot easier to get
                20   somebody to think, "Well, we better cooperate," than if
                21   we're doing it for a hundred and --
06:27           22          THE COURT:  I don't know that, though.  So let me
                23   toy with that idea for a moment.
06:27           24          First, I'm not convinced that my discovery time
                25   changes, even if I took your suggestion for this reason:
```

1    We're assuming that if I segment this trial in some way,

2    some manageable way from your perspective, into one or more

3    institutions, that that acts as a baseline for settlement

4    purposes.  It establishes the rule of the case, but it also,

5    frankly, is supposed to act as a baseline to let the parties

6    voluntarily discuss what a reasonable settlement would be.

06:28

7          I have no guarantee that if I undertook

8    abbreviated discovery, which would still be, you know, a

9    lengthy period of time, that my better investment isn't to

10   complete discovery and then make the decision about what the

11   trial would look like.

06:29

12         So let me toss another thought back to you:  If I

13   truly don't believe that I save very much time at all in

14   this, the breadth of this discovery, why aren't I in a

15   better position to decide around the time of dispositive

16   motions what this case looks like?

06:29

17         MR. KEKER:  Well, I think you are.  How much

18   better you are, where -- dispositive motions are not gonna

19   decide things like criminal intent, I don't think.  Maybe

20   I'm wrong.  But that doesn't sound summary judgment-able to

21   me from the government's perspective, so that -- so we'll

22   have summary judgment motions, I'm sure, on various things.

23   But it's just -- so, anyway, that's a possibility.

06:29

24         Uh, I said that if we're going to discover

25   everything before we come to grips with what might actually

```
 1    be tried at the time of dispositive motions, that that's
 2    gonna be -- in fairness, that's got to be a lot longer
 3    period than the one you're thinking about.
 4          The idea that this case could be tried in 2015 --
 5    I mean, we're urging you and we deeply believe what it is
 6    would be unfair and unreasonable.  If we have to do
 7    discovery on 150 of these -- with all the issuers, with all
 8    the purchasers, plus our discovery of the government --
 9    that's gonna -- that is at least a two-year period.  And I
10    think that's pushing it.
11          THE COURT:  Okay.
12          MR. KEKER:  So depositive motions should be after
13    that.
14          And, yes, at that point, you could decide we're
15    gonna try a few -- I mean, you could carve it up, obviously,
16    at any time during the pretrial process.  But what we're
17    begging, I guess, is not to get the government's proposed
18    schedule, or even our proposed schedule, if we just tried
19    Citi, of a year of discovery and then all of the sudden
20    we're ready for dispositive motions and trial.  We can't do
21    it.  There's too many -- too many moving parts.
22          I mean, and I -- I go back.  The -- there's just
23    hundreds of witnesses:  The CDO arrangers, the managers, the
24    investors, the purchasers, other rating agencies, what was
25    Moody's doing, and why did they do it? -- and Fitch --
```

06:30 (line 4)
06:30 (line 11)
06:30 (line 12)
06:30 (line 14)
06:31 (line 22)

|       |    |                                                                     |
|-------|----|---------------------------------------------------------------------|
|       | 1  | former S&P employees who are all over the place, some of 'em         |
|       | 2  | working for the government now.                                      |
| 06:31 | 3  | Uh, issues that deal with specific securities.                       |
|       | 4  | Why did Bear Stearns accuse -- why did Bear Stearns get              |
|       | 5  | accused by CitiGroup of lying to the rating agencies.  Why           |
|       | 6  | did this -- we have -- go look into the lawsuit of -- Ambac          |
|       | 7  | Credit Products accused CitiGroup of cheating it on Ridgeway         |
|       | 8  | Court Funding by hiding information from the credit                  |
|       | 9  | agencies.                                                            |
| 06:32 | 10 | Uh, the WestCorp Credit Union case -- we put in                      |
|       | 11 | our brief -- where the regulators come and say these people         |
|       | 12 | are the -- you know, foulest credit union managers in the            |
|       | 13 | history of the world.                                                |
| 06:32 | 14 | Um, the high-grade CDO I've mentioned is where                       |
|       | 15 | Bank of America sued Bear Stearns and blamed them for                |
|       | 16 | everything that the government's now blaming S&P for.                |
| 06:32 | 17 | That's a lot of discovery, Your Honor, as -- as                      |
|       | 18 | I'm sure, I know by now, you recognize.                              |
| 06:32 | 19 | THE COURT:  I'm going to give you an even stronger                    |
|       | 20 | argument for the government to think about.                          |
| 06:32 | 21 | Remember, the government said "30 days to put on                      |
|       | 22 | our case"?  And my assumption was that that was direct and           |
|       | 23 | redirect.                                                            |
| 06:32 | 24 | Now, I want to take, if you will, just 30 days to                    |
|       | 25 | put on your case, hypothetically.  60 days?                          |

LACV 13-0779 DOC  12/12/2013 – Item No. 2

06:32    1          Now, I want to the take another 30 days for each

2    of you for cross-examination.  In other words, the

3    government's representing to me right now "30 days to put on

4    our case."  But that doesn't cover the 30 days they may want

5    for cross-examination, an equal amount of time to your case.

06:33    6          So if you take 30 days and they take 30 days, I'm

7    really talking about 120-day trial, aren't I?

06:33    8          MR. KEKER:  Well, that's what we're talking about.

06:33    9          THE COURT:  I mean, that's very supportive of your

10   position.

06:33   11          MR. KEKER:  And -- and it's unfair to those people

12   who sit in that jury box, in this highly technical area, to

13   unload --

06:33   14          THE COURT:  Yeah.

06:33   15          MR. KEKER:  -- and, in the end you just have to --

16   you just zone out.

06:33   17          I've been in a five-month trial with 20 or so

18   experts, and a much simpler situation than this.  And it's

19   really hard for jurors.  You know more about it than I do.

20   But the -- and this isn't a criminal case where they can sit

21   there and try to wait for the shoe to drop and so on.  This

22   is -- or I guess it is a criminal case, the way they're

23   trying it.

06:33   24          But this is a highly technical financial case

25   about instruments and circumstances that almost none of

DEBBIE GALE, U.S. COURT REPORTER

LACV 13-0779 DOC   12/12/2013 - Item No. 2

79

1    these jurors will start out knowing anything about.  So the

2    education process will get along (verbatim).  By the time

3    they get it, they'll go, "Oh, that's what they were talking

4    about three weeks ago."  By then, they'll have forgotten

5    what happened six weeks ago.

06:34   6         So that's why -- I mean, we're willing -- we're

7    willing to try this case any way you want it, but -- but too

8    much, too much, too much for the jury means a -- not as fair

9    a result.

06:34   10        THE COURT:  The way I want this is fair for both

11   sides.  And I'm not sure yet I have enough information that

12   I feel confident that it's fair for both sides.

06:34   13        So why don't you stay there for just a moment.

14   Don't go away.  I want to talk to the government again.

06:34   15        Why don't you come up and join Mr. Keker.

06:34   16        MR. CARDONA:  Certainly, Your Honor.

06:34   17        THE COURT:  If you were to toss out -- don't go

18   away, Mr. Keker.

06:34   19        If you were to toss out a total amount of time --

20   presentation of your case, cross-examination -- I want you

21   to struggle with a number -- or number of days or hours, and

22   I'm tell you why.

06:34   23        That's what Mr. Keker's struggling with.  And when

24   he says I don't know how big his case is, I'd like to see

25   how much of a limitation you think you're placing on

DEBBIE GALE, U.S. COURT REPORTER

| | |
|---|---|
| | 1  yourself, when Mr. Keker presents his case for, you know, |
| | 2  this total direct, cross-examination. |
| 06:35 | 3  What kind of time do you think you need?  If you |
| | 4  say, "I don't know because I don't know Mr. Keker's case" |
| | 5  then you're supporting Mr. Keker's argument. |
| 06:35 | 6  MR. CARDONA:  I understand that. |
| 06:35 | 7  THE COURT:  Okay. |
| 06:35 | 8  MR. CARDONA:  Are you asking me for an estimate |
| | 9  of -- |
| 06:35 | 10  THE COURT:  Yeah.  Let's say I just arbitrarily |
| | 11  came off the wall tonight, with the little information I |
| | 12  have, and I arbitrarily said to you, "You have a total of 40 |
| | 13  days." |
| 06:35 | 14  Six times 40 is 240 hours.  That is your |
| | 15  limitation for direct, cross, redirect, recross.  That is |
| | 16  your total time, Counsel. |
| 06:35 | 17  MR. CARDONA:  For the entire trial? |
| 06:35 | 18  THE COURT:  For the entire trial. |
| 06:35 | 19  MR. CARDONA:  I mean, look, I -- |
| 06:35 | 20  THE COURT:  No, no.  Time out. |
| 06:35 | 21  There's a great team for you to consult with.  Be |
| | 22  really careful because that might sound just terrific to me. |
| 06:36 | 23  MR. CARDONA:  No.  I understand. |
| 06:36 | 24  THE COURT:  Okay. |
| 06:36 | 25  How much time for your entire trial? |

DEBBIE GALE, U.S. COURT REPORTER

06:36  1      MR. CARDONA:  I mean, as I said, I think

2  reasonably our estimate of the 30 days, at 6 hours a day,

3  for us to put on our case --

06:36  4      THE COURT:  Now, that's not what I asked.

06:36  5      MR. CARDONA:  I understand that.  I'm getting

6  now -- but what I want to do is break it down and get to the

7  total, and explain to you how I got to that.

06:36  8      Our 30-day estimate for our case was based on us

9  putting on our direct with reasonable crosses included.

06:36  10      If Mr. Keker puts on his case in chief, if his

11  estimate is that his case in chief -- his directs and

12  redirects are going to take, I think he said somewhere on

13  the order of 60 days -- um, to be honest, I don't think our

14  cross-examinations of the bulk of the witness that Mr. Keker

15  is going to put on will take that long.

06:36  16      THE COURT:  So give me a number.

06:36  17      MR. CARDONA:  If he's taking 60 days at six hours

18  a day, which is 360 hours, to put on his case in chief, I

19  would estimate that our cross -- our crosses covering those

20  entire witnesses is gonna take no more than a third of that.

06:37  21      THE COURT:  Okay.  Now, just a moment.  I'm going

22  to write down some hypothetical numbers.

06:37  23      30 days.  Six hours a day.  180 hours.

06:37  24      MR. CARDONA:  I think that is more than --

06:37  25      THE COURT:  Okay.

06:37   1           Cross-examination, et cetera, add 120.

06:37   2           That's 300 hours, right?

06:37   3           MR. CARDONA:  If he's only 180 hours --

06:37   4           THE COURT:  No, no.  He's 360 hours.  And you

        5   think you can do your cross in a third.  So I'm taking a

        6   third of that:  120 hours hypothetically.

06:37   7           MR. CARDONA:  Yes.

06:37   8           THE COURT:  You're already at 300 hours.  All

        9   right?

06:37  10           MR. CARDONA:  240 for our case in chief and --

06:37  11           THE COURT:  No.  I think you said 30 days, six

       12   hours a day.  I'm sorry.  You're absolutely right:  200

       13   and -- no.

06:37  14           That's 180 hours, isn't it?

06:37  15           180, plus one-third of Mr. Keker's time,

       16   hypothetically -- you're not bound to this now; we're just

       17   playing -- that's 300 hours, isn't it?

06:38  18           MR. CARDONA:  Yes.

06:38  19           THE COURT:  Okay.  Hold on.

06:38  20           300 hours, divided by 6 should be about 50 days,

       21   right?

06:38  22           MR. CARDONA:  Yes.

06:38  23           THE COURT:  Okay.  Now hold on.

06:38  24           Now, I'm gonna take Mr. Keker's estimate.

06:38  25           MR. KEKER:  I don't remember saying 60 days,

```
        1    Your Honor.  If I did, I misspoke.
06:38   2         THE COURT:  Well, I'm just gonna take it 'cause it
        3    sounds fun.  Okay?  We're having fun.
06:38   4         MR. KEKER:  It's his estimate of what I said.
06:38   5         THE COURT:  I know.  We're just having fun.
06:38   6         MR. KEKER:  Yes, sir.
06:38   7         THE COURT:  That's 360 hours, right?
06:38   8         Now, I want to the take a half, not even a third,
        9    for cross-examination.  And I think you're gonna have to
       10    spend more time than that, frankly.  But I'm just playing
       11    take right now.
06:38  12         That is 540 hours.
06:38  13         Would somebody divide 540 hours by 6?
06:39  14         MR. CARDONA:  That would be 90.
06:39  15         THE COURT:  90 days.
06:39  16         So 50 plus 90 is 140 days.  Wow!
06:39  17         I mean, you see how quickly we get there,
       18    depending upon whose estimates.  Or you just get an
       19    arbitrary judge, on the first conference that we have, who
       20    walks in, pretends that we're, you know, being fair, and
       21    tosses out a number and locks you into it.  That's not
       22    right.
06:39  23         So it seems to me a jurist can't make an
       24    intelligent decision fair for both sides until we get
       25    through the discovery process.
```

LACV 13-0779 DOC   12/12/2013 - Item No. 2

84

06:39    1            And I don't like the discovery process getting

         2    divided out on the assumption that if we have a trial run,

         3    then we just may get a settlement.  Because if we're wrong,

         4    then I've got to start all over with discovery again.  And

         5    that's absolutely uneconomical.  So I'd just rather take the

         6    alligator on right to begin with.  Okay?

06:39    7            With those thoughts in mind, I don't think it's

         8    fair to you that I just have to decide that issue tonight.

         9    Okay?  I want some time to think about that.

06:40   10            What are you doing between now and January 3rd?

06:40   11            First of all, whatever plans you have, you're

        12    doing.  Let me take the anxiety level off, okay?  You're

        13    gonna have a nice holiday.  So whatever you have planned,

        14    I'm not disturbing that.

06:40   15            But what are you doing between now and January 3rd

        16    on this case?

06:40   17            MR. CARDONA:  Between now and January 3rd?

06:40   18            THE COURT:  On this case.

06:40   19            MR. CARDONA:  Our anticipation is that we will be

        20    serving additional document requests, additional Rule 45

        21    subpoenas -- now that we move into general discovery -- and

        22    noticing some depositions for probably mid January.

06:40   23            THE COURT:  Are interrogatories going to hold me

        24    up?  In other words, do these interrogatories interfere with

        25    the ability for you to get to depositions?

LACV 13-0779 DOC - 12/12/2013 - Item No. 2

85

06:40   1        MR. CARDONA:  From my point of view --
06:40   2        THE COURT:  And, by the way, go consult with each
        3   other.  There's not a time track.  Go talk to your folks.
06:41   4        'Cause in a moment, I think I'm going to start
        5   handing down some preliminary rulings that are going to
        6   start affecting you.  Okay?  So cuddle. *(Verbatim.)* Talk.
06:41   7        *(Various counsel confer.)*
06:42   8        THE COURT:  All right.
06:42   9        Counsel, here's some more thoughts.  I'm inclined
        10  to rule that I'm going to have complete discovery take
        11  place.  And if I do that, what I would see are the problems
        12  that develop along the way through a special master.  And it
        13  would give me a fairer ruling about what this trial should
        14  look --
06:42   15        Ben, come on up.
06:42   16        *(Court confers with law clerk.)*
06:42   17        THE COURT:  It would give me a fairer ruling after
        18  discovery's complete because I'm gonna start getting
        19  "readbacks" from my special master about what problems
        20  you're running into.
06:43   21        And the more discovery that gets dumped on my
        22  shoulders, the better because the more discovery problems
        23  you give me, the better insight I get into your cases.
06:43   24        Now, I'm not encouraging that.  I'm just telling
        25  you it makes a jurist a lot smarter rather than just laying

DEBBIE GALE, U.S. COURT REPORTER

1    back.

06:43    2                So I'm pretty far down the line on that, frankly,

3    and that's the completion of your discovery.  What I'm

4    weighing is, you know, what the burn-out factor is.  I'm not

5    starting down the road like Bratz and Mattel.  Okay?  I'm

6    not going down that road right now.  I'm not looking for

7    Saturdays and Sundays with you.  I'm not starting with that

8    kind of milieu that landed in this court.

06:43    9                But I don't know what a fair time is right now.

10    In other words, I don't know if nine months is fair, which I

11    think is ludicrous.  A year?  Oh, it has a nice ring to it,

12    but there's nothing good about a year.  Two years seems a

13    little long.  Am I arbitrary and say 14 months, 16 months?

14    I don't know.

06:44    15                Isn't that refreshing:  I don't know.

06:44    16                Number two, I'd have a better idea of the sampling

17    and coupling that you're talking about because, remember,

18    you've been living this case apparently for a significant

19    period of time before you brought it to my court.  Isn't

20    this refreshing that you know your case better than I do?

21    Okay?  And I think you've probably exchanged a lot of

22    information, and I get to catch up with your wisdom.

06:44    23                So I can make tremendous mistakes right now that's

24    harmful to one of you by pretending that I have that kind of

25    wisdom that you already acquired, although you have

1  differing viewpoints.

06:44  2          I'm not going to put you across the street.  I'm

3  not gonna put you into depositions and have you run over

4  here, like the Mattel and Bratz case that you were involved

5  in.  It's not necessary.

06:44  6          By the same token, I've got to solve this problem

7  of this seemingly East Coast orientation with the bulk of

8  witnesses coming from the East Coast so I've got

9  jurisdiction.  I need to be able to enforce orders.  When I

10  hand down an order, I think to myself:  Am I capable of

11  enforcing this by contempt?  And if I'm not, why am I

12  handing down an order?

06:45  13          So when I think of -- you know, let's say, pick a

14  bank.  Bank X.  Well, Bank X does business across the

15  country.  I would think that most of these institutions have

16  an L.A. base.  Maybe not all, but most of 'em ought to have

17  an L.A. base.  Citibank, Chase, whoever you're going to

18  mention.

06:45  19          Why don't these witnesses come right out of

20  Los Angeles?  In other words, why are we chasing out to

21  New York?  Why, in fact, aren't these folks -- I don't care

22  if they live in New York or not.  Why aren't they flying to

23  Los Angeles, taking the deposition in Los Angeles,

24  representing that they'll be available?  Or, if not, get rid

25  of that person and get somebody out of the L.A. office.

DEBBIE GALE, U.S. COURT REPORTER

06:45   1           Now, you're gonna tell me that there's some

2   banks -- and I understand it -- some major institutions.  My

3   biggest problem won't be that.  It will be with the Federal

4   Reserve or government institutions.

06:46   5           I think I can put enough pressure on the banks out

6   on the -- as national institutions to get them out here with

7   a representation that whoever's testifying -- or I'll drag

8   the whole bank in.  I'll drag the Los Angeles office in and

9   start with that.  And after going through that process,

10   trust me, nobody wants to go through that, including a bank.

11   I've got ways of doing that, and I don't want to.

06:46   12           So it seems to me by biggest problem's going to be

13   the segmentation of the hierarchy of some of these

14   government institutions that you don't control.  That's

15   gonna be my major problem.  Not the banks.

06:46   16           MR. CARDONA:  Well, we will continue, as we have

17   been, to make efforts to work with them.

06:46   18           THE COURT:  I believe you.

06:46   19           I don't believe lawyers for these institutions yet

20   who have not appeared in my court.  And I know that they're

21   on the way to quash it.

06:46   22           MR. CARDONA:  As they arise, we will -- and we

23   have been advising Mr. Keker of the issues that have been

24   coming up, and we will continue to do our best to resolve

25   them, if we can.

DEBBIE GALE, U.S. COURT REPORTER

06:47   1          THE COURT:  It's hard for a court to understand

2   that, although these may be segmented institutions, they're

3   part of the United States Government.  And I understand the

4   Executive Branch versus the -- but it's hard to understand

5   that kind of segmentation, if it's a government entity.

06:47   6          So I understand the legal barriers.  I really do.

7   And I sympathize that you don't have the power from Justice

8   to tell the Federal Reserve to do X, Y or Z.  It's an

9   executive body, I think.

06:47  10          Okay.  Well, continue your discussions for a

11  moment.  But I'm pretty far down the line.

06:47  12          MR. KEKER:  Can I respond to a couple of things,

13  Your Honor?

06:47  14          THE COURT:  Sure.

06:47  15          And let me tell you a couple other things I'm

16  pretty far down the line on.

06:47  17          If you really want 50 interrogatories, I don't see

18  any difference between 50, 25, and 20 and 35.  I mean, it's

19  just arbitrary.  You've got 50 interrogatories.  Decide that

20  tonight.  Okay?

06:48  21          MR. KEKER:  Okay.

06:48  22          THE COURT:  You want to go after the top-flight

23  institutional people?  I would encourage you to.  Instead of

24  chasing up the ladder with, you know, rung one, rung two,

25  rung three, why don't you bring me that motion right to

1    begin with.

06:48    2         MR. KEKER:  Yes, sir.

06:48    3         THE COURT:  Okay.  Is, you know, Volcker gonna

4    testify?  I don't know.  But, I mean, if you're gonna reach

5    the top, and if I grant that -- now, hold on.  If I grant

6    that, then you're gonna have problems with me with the lower

7    rungs because usually you go after the lower rungs to get to

8    the top folks, and you never quite get to the top folks

9    sometimes.

06:48    10        So bring that to me early and I'll decide it one

11    way or the other.

06:48    12        MR. KEKER:  We will bring it to you early.  But

13    we've got to get those documents early too.

06:48    14        THE COURT:  What have you two been doing, then?  I

15    tell you what.  I read a newspaper article just before I got

16    this case.  Believe it or not, it made the press.  And I had

17    Lehman Brothers originally, when they first came in here, in

18    a case called *First Alliance.*  And I'll say again:  Any

19    Congressperson who tells me that their office didn't see the

20    subprime scandal coming didn't pay attention to what was

21    happening right here in little Orange County.

06:49    22        Two have been at it exchanging information for at

23    least a year, and some accounts were over two years.  So now

24    I'm gonna ask you directly for my record:  How long have you

25    been exchanging information between the two of you?

LACV 13-0779 DOC  12/12/2013 - Item No. 2

91

06:49   1          You can stipulate to this.

06:49   2          MR. CARDONA:  I mean, we had discussions with,

        3  then, Cahill Reindel, which was representing S&P in

        4  connection with the investigation for, I believe, at least a

        5  year before we filed the case --

06:49   6          THE COURT:  So we've already got a year --

06:49   7          MR. CARDONA:  -- confirm that --

06:49   8          THE COURT:  Now, here's what I heard from

        9  Mr. Keker:  "Gosh.  Golly, gosh, Judge, we cooperated."  In

       10  other words, "We turned over everything."  That's what you

       11  said at the first appearance, and I'm going to accept that

       12  for a moment on behalf of your client:  That you voluntarily

       13  turned over information to the government that you thought

       14  would be transparent because you hoped to avoid this

       15  situation.

06:50  16          If that, in fact, occurred, which I accept, and

       17  the government had this for a year, we're already a year

       18  down the way in discovery.

06:50  19          I just don't understand why it takes two years.

06:50  20          MR. KEKER:  Can I explain?

06:50  21          THE COURT:  Yeah.

06:50  22          **FURTHER STATEMENTS BY MR. KEKER**

06:50  23          MR. KEKER:  The -- first of all, what we're

       24  talking about is what Standard & Poor's turned over to the

       25  government.  We know what they turned over to the

1    government.  That's not the discovery that we are talking

2    about that we need.

3            The government -- and we've been very polite about

4    this and been working very cooperatively, but the fact of

5    the matter is that, after all this discussion, we still

6    don't have the documents, which the government says we're

7    gonna get, that -- the complete set of documents that they

8    got during their FIRREA investigation.

9            We've said from the beginning of this case, "Give

10   us what your investigation turned up so that we can begin to

11   process it, get ready, make witness files, do that."  We

12   still don't have it.  We sent Rule 34 subpoenas.  We spent a

13   lotta time talking about the -- not "subpoenas" -- "requests

14   to produce."  We spent a lot of time talking about it.

15   We've reached a lot of agreements.  We've reached three

16   areas where we have issues that we're gonna bring to you by

17   motion -- that we've agreed we're gonna bring by motion,

18   but -- and I'm not -- but we still don't have what they've

19   agreed to give us under Rule 34.

20           They are giving us some things.  It's a rolling

21   production.  These are -- I don't even know the terms --

22   "Google bytes "-- or huge amounts of information.  We're

23   getting -- some of it we get (sic) in a CD.  We spend some

24   time processing it, but we don't -- huge amounts of it we

25   don't still have.

06:51   1          And so we need to get it.  I mean, the start --

2    just the logical thing:  We need to get what the government

3    got in its investigation.  And we don't have that yet.  We

4    need to get what we asked for, for Rule 34, from the

5    government.  "Please go out to the agencies and get this."

6    We don't have that yet.

06:52   7          And now we need -- and we need to get what the

8    federal agencies that we've subpoenaed, who have stiffed us,

9    have -- we've asked for, and we're not there yet.  We've

10   sent Rule 45 subpoenas.

06:52   11              THE COURT:  Which agencies have stiffed you?

06:52   12              MR. KEKER:  The Federal Reserve.

06:52   13              THE COURT:  The Federal Reserve.  They keep coming

14   up.

06:52   15              MR. KEKER:  I'll ask Ms. Windle, to be specific,

16   so that I don't get it wrong.

06:52   17              THE COURT:  Okay.

06:52   18              MS. WINDLE:  The Federal Reserve Bank of New York.

06:52   19              THE COURT:  Bank of New York.

06:52   20              MS. WINDLE:  The Board of Governors of the Federal

21   Reserve.

06:52   22              THE COURT:  I'm sorry?

06:52   23              MS. WINDLE:  The Board of Governors of the Federal

24   Reserve.

06:52   25              THE COURT:  And the Board of Governors of the

1    Federal Reserve.

06:52   2                MS. WINDLE:  And the Federal Open Market

3    Committee.

06:52   4                THE COURT:  And the Federal Open Market Committee.

06:52   5                Now, I'm going to be the first to admit I don't

6    know what the Federal Open Market Committee is.

06:52   7                Who are they?

06:52   8                MS. WINDLE:  There're a set of governors within

9    the Federal Reserve system who meet every two months or so.

06:52  10                THE COURT:  Okay.

06:52  11                MS. WINDLE:  And there're public records of their

12    meetings.

06:53  13                THE COURT:  Where do they sit?

06:53  14                Like, for instance, I have different Federal

15    Reserves across the country.  I have that segmented into the

16    11th and whatever -- not like the Circuit Courts, but I have

17    different Federal Reserves.  And therefore, I know I've got

18    jurisdiction over the Federal Reserve that sits out here.

19    Okay?

06:53  20                MS. WINDLE:  Right.

06:53  21                THE COURT:  Where does the Federal Open Market

22    Committee sit?

06:53  23                MS. WINDLE:  Their records appear to be in

24    New York.  They meet in New York.

06:53  25                THE COURT:  They meet in New York.  But how are

DEBBIE GALE, U.S. COURT REPORTER

LACV 13-0779 DOC   12/12/2013 – Item No. 2

| | |
|---|---|
| | 1   they composed.  Are they composed of members from different |
| | 2   parts of the country? |
| 06:53 | 3              MS. WINDLE:  You're correct, Your Honor. |
| 06:53 | 4              The Governor, for example, of the Federal Reserve |
| | 5   system of Chicago or, you know, for the various Federal |
| | 6   Reserves, I believe, traveled to New York.  But I'm not a |
| | 7   hundred percent -- |
| 06:53 | 8              THE COURT:  Do we have one in Los Angeles? |
| 06:53 | 9              MS. WINDLE:  We will check. |
| 06:53 | 10             THE COURT:  See, I don't know. |
| 06:53 | 11             MS. WINDLE:  I don't know either. |
| 06:53 | 12             THE COURT:  Well, if the Federal Open Market |
| | 13   Committee is composed of people in Los Angeles, why can't we |
| | 14   get access to those records and people who can potentially |
| | 15   testify by subpoena? |
| 06:53 | 16             MS. WINDLE:  It's possible that the records of the |
| | 17   member who traveled from Los Angeles to New York for the |
| | 18   meeting could be obtained that way.  We're looking for |
| | 19   something more comprehensive, but that's a -- |
| 06:54 | 20             THE COURT:  Okay. |
| 06:54 | 21             MS. WINDLE:  -- that's a very constructive idea. |
| 06:54 | 22             THE COURT:  Okay.  Well, the benefit of that is |
| | 23   you may get a very bad witness or a good witness.  I don't |
| | 24   know who that person is. |
| 06:54 | 25             MR. KEKER:  What -- what I know is -- what -- I |

DEBBIE GALE, U.S. COURT REPORTER

1    think your idea is intriguing.  And we need to explore it

2    and need to try to make it happen.  But the fact -- I know

3    what's going to happen initially.  They're gonna say, "We

4    don't" -- "The information that you're seeking is in

5    New York.  The witnesses with knowledge are in New York or

6    Washington."  I mean, these are East Coast --

06:54    7             THE COURT:  Just a moment.

06:54    8             So then the judge orders, hypothetically, for that

9    Federal Reserve person, whoever that is, or the Federal Open

10   Market Committee person, to produce those records.

06:54    11            MR. KEKER:  Good.  Fine.

06:54    12            THE COURT:  No, no.  Just a moment.

06:54    13            They say, "no."  The judge then holds them in

14   contempt.

06:54    15            MR. KEKER:  Fine.

06:54    16            THE COURT:  This is all hypothetical.

06:54    17            MR. KEKER:  I hope it's not hypothetical.

06:55    18            THE COURT:  No, but -- but you see that there's

19   ways -- that's why I'm asking these questions, so I can gain

20   some wisdom about who is on this board.

06:55    21            Now, the second problem is you may find that that

22   is an extraordinarily competent witness, and you wish you

23   had Mr. or Ms. Dull-Minded from the East Coast.

06:55    24            MR. KEKER:  No.  This is -- I mean, the people

25   that we're talking about are the people -- I mean, for

1    example, in the Open Markets Committee, when -- when the

2    government says anybody in this month of -- of, uh -- of

3    2007 had to know what was about to happen in the housing

4    market --

06:55    5    THE COURT:  Just a moment.

06:55    6    Would you mind if I Google?

06:55    7    *(To the law clerk:)* Would you go back and ask

8    Grace to start Googling and give me more information?

06:55    9    Counsel, would you mind? -- about the Federal Open

10    Market Committee, who they are, and where they sit?

06:55    11    MR. KEKER:  We certainly don't mind.

06:55    12    MR. CARDONA:  No.

06:55    13    THE COURT:  Okay.

06:55    14    *(To the law clerk:)* Ben, also, I want to know the

15    Federal Reserve, who we have out here from the Federal

16    Reserve in this area of the country.

06:56    17    *(To counsel:)* Okay.  Now we're just playing right

18    now.  I'm just trying to sort out --

06:56    19    MR. KEKER:  But if I --

06:56    20    THE COURT:  -- when this person gets up, in the

21    government, and says, "I'm not gonna come out here, and I'm

22    not gonna produce these records," how I gain access to that.

23    Could I really have any authority to do that?

06:56    24    MR. KEKER:  Your Honor, before you go, could I

25    finish my answer about --

LACV 13-0779 DOC - 12/12/2013 - Item No. 2

98

06:56    1        THE COURT:  I'm sorry.

06:56    2        MR. KEKER:  You said, "Why two years?  I don't get

3   why two years."  And I'm trying to tell you, we don't have

4   the fundamentals.  We have what we gave them, but we don't

5   have what they got.  We don't have what our Rule 34 request

6   was.  We don't have what we're just talking about.  And we

7   certainly don't have -- because we came here, and we got

8   their list, and we know that there's 16 issuers.

06:56    9        We have not -- we were hoping to get some kind of

10   limitation on the number of issuers, the number of

11   purchasers, the investors and all that in this hearing.

12   Since we're not, we are going to go back and issue subpoenas

13   and begin the process of getting the documents that we need

14   from all of those people.  And those are -- those are

15   hundreds of subpoenas.

06:57    16        So you -- so you asked -- and then, with hundreds

17   of people to fuss with.  I mean, you know, we're talking

18   about these problems.  And it's not gonna happen

19   immediately.  And we really don't want to take the one and

20   only shot we get at Timothy Geithner or Ben Bernanke or --

21   or some high-level official or somebody at a bank -- that's

22   really important at a bank, without getting their documents.

23   So we're gonna be going through that process.

06:57    24        And it is -- it's a cumbersome process.  And then

25   you get something, and then you follow up.  And we take your

 1    suggestion.  We avoid the "Liberty Mutual" kind of

 2    arguments.  We try to go right to the top; in various

 3    instances, we're gonna do that.

06:57  4            But there is an awful lot to do when you have 150

 5    securities issued by 16 different, enormous -- I mean, this

 6    is everybody on Wall Street we're gonna be fighting with.

06:58  7            THE COURT:  Okay.  I want to take and go back now

 8    to the Federal Open Market Committee and the Board of

 9    Governors.  I may be willing and able to solve that problem

10    by getting a person out of Los Angeles who sits in that body

11    to produce information.  I don't know.

06:58 12            The more difficult problem you just raised is, if

13    you go after Ben Bernanke, or somebody of that stature, in

14    either or both of the administrations around this period of

15    time, whether I've got the jurisdiction over them, if I

16    grant your request.  I don't know.  And I can tell you right

17    now that I will have a flood of lawyers in here trying to

18    quash that subpoena, I promise you.

06:58 19            MR. KEKER:  We've seen --

06:58 20            THE COURT:  Yeah.

06:58 21            MR. KEKER:  -- do it every time.

06:58 22            THE COURT:  And that could get really, really

23    embarrassing.  Because I thought that in some ways, although

24    I understand your position on behalf of the Justice

25    Department not controlling these folks -- that's still the

          1    United States Government.  And I don't see how it segments

          2    itself out, you know, in a practical way.  I don't think the

          3    public would ever understand that.

    06:59  4           MR. CARDONA:  There are obviously other issues, as

          5    well, we have raised, and we think there are objections as

          6    to the relevance or the -- whether this testimony really has

          7    anything to do with this case, which are obviously things

          8    that would have to be resolved first.

    06:59  9           THE COURT:  You're absolutely right.  I haven't

         10    made the ruling.

    06:59 11           MR. CARDONA:  Right.

    06:59 12           THE COURT:  I'm just speculating.

    06:59 13           MR. CARDONA:  I understand.

    06:59 14           THE COURT:  I'm trying to spin out what would

         15    happen in my court a year or two years from now.

    06:59 16           I don't know.  Okay.

    06:59 17           Debbie, you need a break.  We'll see you at 7:15.

    06:59 18       *(Recess held at 6:59 p.m.)*

    07:24 19       *(Proceedings resumed at 7:24 p.m.)*

    07:24 20           THE COURT:  We're back on record.

    07:24 21           The Court has had an informal discussion with

         22    counsel concerning the jurisdiction over different

         23    witnesses.

    07:24 24           Some of the far-fetched ideas that the Court

         25    discussed was, if I sat by designation in another part of

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | the country, which I'm not offering to do, to try to resolve |
|       | 2  | the problem of jurisdiction over the subpoenas.  But the     |
|       | 3  | Court's fairly convinced that the best tactic is for         |
|       | 4  | discovery to take place in one time period.                  |
| 07:24 | 5  | But it is agreed by counsel that the motions will            |
|       | 6  | be heard on March 11th; that the final briefings are to the  |
|       | 7  | Court based upon the schedule which we have, and we'll send  |
|       | 8  | out a notice on that schedule, so you'll have it in writing  |
|       | 9  | by February 24th.                                            |
| 07:25 | 10 | Also, I'm going to allow the 50 interrogatories to           |
|       | 11 | go forward.  I, frankly, don't see any difference between    |
|       | 12 | 25, 35, 45 and 50.  But I really question their value.       |
| 07:25 | 13 | And you're going to do your best to subpoena those           |
|       | 14 | institutions and banks, et cetera, and see what the          |
|       | 15 | compliance rate is, and what problems we have by March 11th. |
| 07:25 | 16 | I want to commend both of you.  I think that that            |
|       | 17 | gives me a process to better make a decision than some       |
|       | 18 | arbitrary decision this evening between a year and two years |
|       | 19 | of discovery.  And I think it'll eventually give me a better |
|       | 20 | decision, although I'm not certain I'll make it by           |
|       | 21 | March 11th, about whether this should be one institution,    |
|       | 22 | each side picks six institutions, or everything.             |
| 07:26 | 23 | And one of the things you might think about is,              |
|       | 24 | let's assume that you don't get one, and let's assume that   |
|       | 25 | you don't get all.  But let's assume that I let each of you  |

              1    pick six.  I, once again, don't know how many institutions

              2    there are.  Let's just say 20, hypothetically, just rough

              3    numbers.  That still leaves eight.  I'll always wonder if I

              4    shouldn't have just presided over the eight, and how much

              5    time I really saved.

07:26         6            Although, I do believe, with this process, that

              7    you have a better argument now because, if all of the

              8    discovery is complete, you take away one of my concerns; and

              9    that is, that I'd have to go back and reinvent discovery

             10    again for the 30 or 40 percent.  Okay?

07:26        11            Now, finally, I don't see any big problem with

             12    whether the case is tried in the latter part of 2015.  So

             13    you know, May, fine.  But it could be October or whatever.

             14    I just worry about the holiday season of Thanksgiving and

             15    Christmas.

07:27        16            It's hard with that one week off that you have to

             17    take at Thanksgiving, 'cause the jurors leave on Monday or

             18    over the weekend, for a week.  But it might also be a good

             19    break.  So I'm going to give you another schedule:  That you

             20    start in September.  Then you go ahead and take Thanksgiving

             21    and you go ahead and take two weeks at Christmas, and let

             22    the case conclude sometime in January.  So if I need to move

             23    it back, I'm not concerned.

07:27        24            What I'm doubtful of is that I'm going hear the

             25    case some time in 2016.  It just doesn't ring a bell, and I

1   may be wrong about that, and you'll tell me on March 11th.

07:27   2         MR. KEKER:  Yes, sir.

07:27   3         THE COURT:  *(To the defense:)* You'll always

4   maintain the position that it's too big.

07:27   5         *(To the government:)* And you'll always maintain

6   the position it's absolutely manageable.

07:28   7         Okay.  Why don't you leave tonight and catch a

8   plane.  You have a good holiday, okay?

07:28   9         MR. KEKER:  Thank you, sir.

07:28  10         THE COURT:  Hopefully, this let's you spend a

11  little bit of time with your families, 'cause, frankly, I

12  don't think you will have accomplished a lot over

13  Thanksgiving -- I mean, over Christmas anyway.

07:28  14         *(Proceedings adjourned at 7:28 p.m.)*

07:28  15                        -oOo-

07:28  16

17

18

19

20

21

22

23

24

25

```
07:28    1                          -oOo-

07:28    2

07:28    3                        CERTIFICATE

07:28    4

07:28    5        I hereby certify that pursuant to Section 753,

         6   Title 28, United States Code, the foregoing is a true and

         7   correct transcript of the stenographically reported

         8   proceedings held in the above-entitled matter and that the

         9   transcript page format is in conformance with the

        10   regulations of the Judicial Conference of the United States.

07:28   11

07:28   12   Date:  December 19, 2013

07:28   13

07:28   14
07:28
07:28                           /s/ Debbie Gale
07:28   15            _____
07:28                    DEBBIE GALE, U.S. COURT REPORTER
07:28   16              CSR NO. 9472, RPR, CCRR

07:28   17

        18

        19

        20

        21

        22

        23

        24

        25
```

DEBBIE GALE, U.S. COURT REPORTER