KEKER & VAN NEST LLP
JOHN KEKER (SBN 49092)
jkeker@kvn.com
ELLIOT R. PETERS (SBN 158708)
epeters@kvn.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:   415 397 7188

CAHILL GORDON & REINDEL LLP
FLOYD ABRAMS (*pro hac vice*)
fabrams@cahill.com
S. PENNY WINDLE (*pro hac vice*)
pwindle@cahill.com
80 Pine Street
New York, New York 10005-1702
Telephone: 212 701 3000
Facsimile: 212 269 5420

KELLER RACKAUCKAS LLP
JENNIFER L. KELLER (SBN 84412)
keller@krlawllp.com
18300 Von Karman Avenue, Suite 930
Irvine, CA 92612
Telephone: 949 476 8700
Facsimile: 949 476 0900

Attorneys for Defendants THE MCGRAW-HILL
COMPANIES, INC., and STANDARD & POOR'S
FINANCIAL SERVICES LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MCGRAW-HILL COMPANIES, INC.<br>and STANDARD & POOR'S<br>FINANCIAL SERVICES LLC,<br><br>Defendants. | Case No. CV13-779 DOC (JCGx)<br><br>**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL DISCOVERY**<br><br>Date:        March 11, 2014 7:30 a.m.<br>Dept.:       Courtroom 9D<br>Judge:      Honorable David O. Carter<br><br>Complaint filed February 4, 2013 |

# TABLE OF CONTENTS

**Page**

I.   Introduction ................................................................................................. 1

II.  Argument ...................................................................................................... 2

    A.   The United States Must Produce Documents Relating to the Independence or Objectivity of Ratings or Rating Agencies. ............. 3

    B.   The United States Must Produce Documents Relating to the Conduct of Mortgage Lenders, Financial Institutions and Issuers of the Securities at Issue. ....................................................... 12

    C.   The United States Must Produce Documents Relevant to S&P's First Amendment Retaliation Defense. .................................. 16

III. Conclusion ................................................................................................. 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Anderson* v. *Marion County Sheriff's Department*,
220 F.R.D. 555 (S.D. Ind. 2004) .......................................................... 10

*Diagnostics Systems Corp.* v. *Symantec Corp.*,
2008 WL 9396386 (C.D. Cal. Apr. 4, 2008) ................................... 2, 23

*Dobson* v. *Twin City Fire Insurance Co.*,
2011 WL 6288103 (C.D. Cal. Dec. 14, 2011) ............................... 2, 12

*Duenez* v. *City of Manteca*,
2013 WL 684654 (E.D. Cal. Feb. 22, 2013) ...................................... 9

*FDIC* v. *Broom*,
2013 WL 4781706 (D. Colo. Sept. 5, 2013) ..................................... 11

*FOMC* v. *Merrill*,
443 U.S. 340 (1979) ...................................................................... 12

*Frankenhauser* v. *Rizzo*,
59 F.R.D. 339 (E.D. Pa. 1973) ...................................................... 10n

*Franzon* v. *Massena Memorial Hospital*,
32 F. Supp. 2d 528 (N.D.N.Y. 1998) .............................................. 23

*Friedman* v. *Bache Halsey Stuart Shields, Inc.*,
738 F.2d 1336 (D.C. Cir. 1984) ...................................................... 9

*FTC* v. *Warner Communications Inc.*,
742 F.2d 1156 (9th Cir. 1984) ....................................................... 9

*Gaison* v. *Scott*,
59 F.R.D. 347 (D. Haw. 1973) ....................................................... 8

*In re Grand Jury Subpoenas Dated March 19, 2002 & August 2, 2002*,
318 F.3d 379 (2d Cir. 2003) .......................................................... 16

ii

*Green* v. *Baca*,
226 F.R.D. 624 (C.D. Cal. 2005) ................................................................. 10n

*Greenpeace* v. *National Marine Fisheries Service*,
198 F.R.D. 540 (W.D. Wash. 2000) ............................................................. 10n

*Hickman* v. *Taylor*,
329 U.S. 495 (1947) ........................................................................................ 2

*Martin* v. *Reynolds Metals Corp.*,
297 F.2d 49 (9th Cir. 1961) ............................................................................. 8

*Murray* v. *Atkinson*,
2007 WL 4126622 (E.D. Mich. Nov. 20, 2007) ............................................. 8

*Noble* v. *Gonzalez*,
2013 WL 4517774 (E.D. Cal. Aug. 26, 2013) ............................................... 23

*Puckett* v. *City of Glen Cove*,
631 F. Supp. 2d 226 (E.D.N.Y. 2009) ........................................................... 23

*In re Remington Arms Co.*,
952 F.2d 1029 (8th Cir. 1991) ....................................................................... 12

*Roberts* v. *Americable International, Inc.*,
883 F. Supp. 499 (E.D. Cal. 1995) .............................................................. 10n

*In re Sealed Case*,
856 F.2d 268 (D.C. Cir. 1988) ........................................................................ 9

*SEC* v. *Strauss*,
2009 WL 3459204 (S.D.N.Y. Oct. 28, 2009) ............................................ 9, 16

*SEC* v. *Mizuho Securities USA Inc.*,
12-cv-5550 (S.D.N.Y. July 18, 2012) .......................................................... 14n

*Stanislaus Towing & Recovery Services, Inc.* v. *City of Modesto*,
2011 WL 5375000 (E.D. Cal. Nov. 4, 2011) ................................................ 23

*In re United States Department of Homeland Security*,
459 F.3d 565 (5th Cir. 2006) ........................................................................... 9

iii

*United States* v. *ABC*,
   Nos. 72-821 (C.D. Cal. 1974) ................................................................. 21

*United States* v. *Armstrong*,
   517 U.S. 456 (1996) .............................................................24-25, 24n, 25n

*United States* v. *Bass*,
   536 U.S. 862 (2002) ...................................................................... 24n, 25

*United States* v. *CBS*,
   Nos. 72-820 (C.D. Cal. 1974) ................................................................. 21

*United States* v. *Deloitte LLP*,
   610 F.3d 129 (D.C. Cir. 2010) ................................................................. 8

*United States* v. *Dwyer*,
   287 F. Supp. 2d 82 (D. Mass. 2003)........................................................ 25n

*United States* v. *Ernstoff*,
   183 F.R.D. 148 (D.N.J. 1998) ................................................................. 9

*United States* v. *Marshall*,
   2010 WL 1409445 (D.S.D. Apr. 1, 2010)................................................. 10

*United States* v. *Menendez*,
   2013 WL 828926 (C.D. Cal. Mar. 6, 2013) .............................................. 15

*United States* v. *NBC*,
   65 F.R.D. 415 (C.D. Cal. 1974) .......................................................... 21-22

*United States* v. *NBC*,
   No. 72-819 (C.D. Cal. July 17, 1974) ..................................................... 22n

*United States* v. *NBC*,
   Nos. 72-819 (C.D. Cal. 1974) ................................................................ 21

*United States* v. *One 1985 Mercedes*,
   917 F.2d 415 (9th Cir. 1990)................................................................. 24n

*United States* v. *Sequoia Orange Co.*,
   1994 WL 903688 (E.D. Cal. Mar. 14, 1994) ............................................ 24n

iv

*United States* v. *Steele*,
   461 F.2d 1148 (9th Cir. 1972).................................................................24

*United States* v. *Tuitt*,
   68 F. Supp. 2d 4 (D. Mass. 1999)........................................................25

## Constitutional Provisions

U.S. Const. Amend. I...........................................................................*passim*

## Regulations

5 C.F.R. § 2635.502(d) (2013) ..............................................................6n

12 C.F.R. § 363.3 (2013) .......................................................................5n

17 C.F.R. § 210.2-01(b) (2013) .............................................................5n

29 C.F.R. § 2509.75-9 (2013)................................................................5n

## Rules

Fed. R. Civ. P. 26(b)(1) ...................................................................2, 23

Fed. R. Civ. P. 26(b)(3)(A)(ii)..............................................................10n

Fed. R. Civ. P. 26(b)(5)(A) ..................................................................16n

Fed. R. Civ. P. 26(c) .............................................................................11

## Treatises

6 James W. Moore, *Moore's Federal Practice* § 26.101 (3d ed. 2013) ................11

## Other Authorities

AICPA Code of Professional Conduct ET § 101.01-.17 (2013).............................6n

AICPA Code of Professional Conduct ET § 102.01-.07 (2013).............................6n

AICPA Statements on Auditing Standards AU § 220.01-.07 (2013)....................6n

Daniel M. Covitz & Paul Harrison, Testing Conflicts of Interest at Bond Ratings
Agencies with Market Anticipation: Evidence that Reputation Incentives
Dominate (Dec. 2003) ........................................................................... 6n

GAO Government Auditing Standards §§ 3.02-3.26 (2011) ............................5n-6n

Moody's Investors Service Code of Professional Conduct (Oct. 2007) ................ 7n

NASDAQ Equity Rule 5605(a)(2) (2009) ........................................................ 6n

NYSE Listed Company Manual § 303A.02(a)(i)-(ii) (2013)................................. 6n

Oversight of Credit Rating Agencies Registered as Nationally Recognized
Statistical Rating Organizations, Exchange Act Release No. 55,857, 72 Fed.
Reg. 33,564, 33,595 (June 18, 2007)..................................................... 5n

SEC Press Release, SEC Charges Mizuho Securities USA with Misleading
Investors by Obtaining False Credit Ratings for CDO: Firm to Pay $127.5
Million to Settle Charges (July 18, 2012) ......................................... 14n

Public Company Accounting Oversight Board Rules 3520-23 (2011).................. 5n

United States Securities and Exchange Commission, Summary Report of Issues
Identified in the Commission Staff's Examination of Select Credit Rating
Agencies (July 2008 ) ......................................................................... 5n

## I.   INTRODUCTION

Having reaped the benefits of pursuing S&P[1] under the FIRREA statute—a statute that enabled the United States to take astonishingly broad discovery *before* this lawsuit was even filed[2] and now permits it to proceed under the lower, civil burden of proof—the United States resists accepting the consequences of its election: subjecting itself to the liberal discovery allotted defendants in civil litigation in the federal courts.  If the United States was unwilling to subject itself to such scrutiny, it should not have commenced litigation against S&P.  The United States made its choice—and now must accept its implications.

S&P moves the Court to order the United States to produce three categories of documents: materials concerning (1) the independence or objectivity of ratings or rating agencies; (2) the practices of financial institutions implicated in the securities the United States plans to pursue at trial; and (3) information relevant to S&P's claim that this lawsuit is retaliation for S&P's decision to downgrade the credit rating of the United States in August 2011.

The requested materials are relevant and discoverable.  At the heart of the Complaint is the notion that S&P's ratings were neither "independent" nor "objective" and documents from the United States itself relating to the independence and objectivity of ratings and rating agencies are surely relevant to such a determination.  Similarly, documents concerning the practices of various financial institutions, particularly any evidence of fraud or deception by institutions

---

[1] "S&P" refers collectively to defendants McGraw Hill Financial, Inc. ("McGraw Hill") and Standard & Poor's Financial Services LLC.

[2] Before the United States filed the Complaint in February 2013, it had already received from S&P approximately 30 million pages of documents and interviewed at least 45 of its current and former employees.

the United States identified in its November 18, 2013 disclosure, bear directly on whether S&P's ratings were false and whether the United States' penalty demand sweeps too broadly by seeking to hold S&P liable for the misdeeds of others. Finally, material concerning S&P's retaliation defense is unquestionably relevant—the United States does not disagree.  The central dispute is whether S&P must make a threshold showing to demand such discovery.  It need not, but it has, in any event, made a showing that would meet any such test.

The United States' refusal to produce documents relevant to each of these issues cannot be squared either with the breadth and scope of its own Complaint or with the Rules of Civil Procedure.  The Court should order the United States to produce the requested materials.

## II.  ARGUMENT

Federal Rule of Civil Procedure 26(b) is liberally interpreted to permit wide-ranging discovery of information.  *See Dobson* v. *Twin City Fire Insurance Co.*, 2011 WL 6288103, at *2 (C.D. Cal. Dec. 14, 2011) (Carter, J.); *Hickman* v. *Taylor*, 329 U.S. 495, 507 (1947) (stating that the Federal Rules of Civil Procedure "are to be accorded a broad and liberal treatment").  "[A] party 'may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party' and the court may order discovery of any matter that 'appears reasonably calculated to lead to the discovery of admissible evidence.'" *Diagnostics Systems Corp.* v. *Symantec Corp.*, 2008 WL 9396386, at *4 (C.D. Cal. Apr. 4, 2008) (Carter, J.) (quoting Fed. R. Civ. P. 26(b)(1)).  Additionally, this Court has recognized a "general philosophy" for "more progressive or open" discovery because "the limitation of discovery can cause both parties harm."[3]  This

---

[3] *See* Transcript of July 29, 2013 Scheduling Conference (Declaration of Floyd Abrams dated January 20, 2014 ("Abrams Decl.") Ex. C) at 6:6-12.

is all the more important where, as here, the discovery relates to actions of the United States.

### A. The United States Must Produce Documents Relating to the Independence or Objectivity of Ratings or Rating Agencies.

S&P moves to compel on four requests seeking documents in the United States' possession relating to the independence or objectivity of ratings and rating agencies.

- Request 31 seeks documents concerning analyses the United States made during the period 2004-2008 regarding the independence or objectivity of any rating agency.

- Request 32 seeks evaluations, studies, assessments or analyses by the United States relating to the independence, quality and performance of ratings of RMBS and/or CDOs backed by RMBS.

- Request 38 seeks documents concerning the rating methodologies and procedures of other rating agencies.

- Request 40 seeks documents the Department of Justice received from any rating agency concerning the independence or objectivity of ratings.[4]

The United States has refused to produce these materials on several grounds, including relevance, privilege, and confidentiality.[5]  Each of these objections lacks merit.

*Relevance*:  The materials sought here are directly relevant to the claims and defenses in this action.   The United States alleges that from September 2004 through October 2007, in order to maintain and increase its market share and

---

[4] *See* S&P's First Request for Production of Documents ("S&P Req.") (Abrams Decl. Ex. A) at 14-15, 16-18.

[5] *See* United States' Response to Defendants' First Request for Production of Documents ("DOJ Resp.") (Abrams Decl. Ex. B) at 38–43, 55–58 & 59–60.

revenue from RMBS and CDO ratings, S&P "falsely represented that its credit ratings of RMBS and CDO tranches were objective, independent, [and] uninfluenced by any conflicts of interest that might compromise S&P's analytic judgment."[6]  The United States also contends that S&P's ratings themselves were false.[7]

These allegations put directly at issue the manner in which S&P conducted its rating business for RMBS and CDOs and the way in which that rating business was understood in the marketplace.  It is axiomatic that the understanding of the marketplace is relevant to evaluating the claims of the alleged falsity and materiality of statements concerning independence and objectivity because it is the marketplace's understanding that the United States has put at issue.  As the United States has acknowledged, to prevail on its claims it will need to establish, at the very least, that S&P's statements were material, false, and made with the intent to defraud.[8]

The United States argues that S&P falsely represented that it would be "independent" and "objective" in providing ratings, although it, like other NRSROs, disclosed that it was paid by issuers of the securities it rated and the SEC has refused to ban what has become known as the "issuer-pays" model.[9]

---

[6] Complaint (hereinafter, "Compl.") ¶ 8.

[7] *See* Transcript of July 8, 2013 Hearing on Motion to Dismiss, Vol. I ("July 8 Tr.") (Abrams Decl. Ex. D) at 69:23–70:7.

[8] Second Supplemental Joint Report of Parties Pursuant to Federal Rule of Civil Procedure 26(f) ("Dec. 2 Joint Report") (Abrams Decl. Ex. E) at 1-2, 4.

[9] The SEC has determined that potential conflicts arising from the "issuer-pays" compensation model fall into the group of permitted conflicts that are "appropriate in the public interest and for the protection of investors."  *See* Oversight of Credit Rating Agencies Registered as Nationally Recognized Statistical Rating Organizations, Exchange Act Release No. 55,857, 72 Fed. Reg. 33,564, 33,595

Consequently, the United States necessarily must give meaning to the key phrases "independent" and "objective" and explain how S&P's conduct was at odds with that meaning.  S&P seeks documents reflecting how various agencies of the United States have *themselves* viewed NRSRO independence and objectivity.

The Department of Justice has offered no articulation as to its interpretation of "independence" and "objectivity," though the Complaint suggests it views any consideration of business interests to be inherently inconsistent with those terms. Yet there is every reason to believe that other agencies of the United States—and entities in the marketplace—had a far less simplistic and far more nuanced idea of what these terms mean in the context of a regulated for-profit business.[10]  Indeed, the complexity of the terms is evidenced by the sheer mass of definitions of independence employed by various agencies of the United States government and other regulatory bodies.[11]  Several of these articulations expressly incorporate the views of "reasonable" third parties.[12]

---

(June 18, 2007) (finding that prohibiting such conflicts outright could "adversely impact the ability of an NRSRO to operate as a credit rating agency").

[10] For example, the SEC examined much of the same conduct at issue here and found "no evidence that decisions about rating methodology or models were based on attracting or losing market share."  United States Securities and Exchange Commission, Summary Report of Issues Identified in the Commission Staff's Examination of Select Credit Rating Agencies (July 2008) (Abrams Decl. Ex. P(1)) at 25.

[11] *See, e.g.*, 17 C.F.R. § 210.2-01(b) (2013) (SEC); 29 C.F.R. § 2509.75-9 (2013) (Dep't of Labor); 12 C.F.R. § 363.3 (2013) (FDIC); GAO Government Auditing Standards §§ 3.02-3.26 (2011); Public Company Accounting Oversight Board Rules 3520-23 (2011); AICPA Statements on Auditing Standards AU § 220.01-.07 (2013); AICPA Code of Professional Conduct ET §§ 101.01-.17, 102.01-.07 (2013); NYSE Listed Company Manual § 303A.02(a)(i)-(ii) (2013); and NASDAQ Equity Rule 5605(a)(2) (2009).

[12] *See, e.g.*, GAO Government Auditing Standards § 3.04 (2011) ("Auditors and

S&P is entitled to review documents in the possession of the United States that relate to these issues or that bear on what those in the marketplace have said about them.  To the extent market participants or employees or agencies of the United States have expressed or acted on views about what "independence" and "objectivity" meant with respect to NRSROs that are at odds with the Department of Justice's position in this case, those views are surely relevant both to the alleged falsity of those statements and to S&P's intent.[13]

Documents relating to Moody's Investors Service ("Moody's") and other NRSROs are also relevant since they also bear on what others were saying about and hence what was understood to be the meaning of "independence" and "objectivity."  The relevance of such documents is underscored by the fact that

---

audit organizations maintain independence so that their opinions, findings, conclusions, judgments, and recommendations will be impartial and viewed as impartial by *reasonable and informed third parties*.  Auditors should avoid situations that could lead *reasonable and informed third parties to conclude that the auditors are not independent* and thus are not capable of exercising objective and impartial judgment on all issues associated with conducting the audit and reporting on the work.") (emphasis added); *see also* 5 C.F.R. § 2635.502(d) (2013) (Office of Government Ethics standards concerning conduct that "would raise a question in the mind of a reasonable person about his impartiality").

[13] Federal employees have been studying for years the issues of rating agency independence in the face of the well-known potential conflict of interest occasioned by rating the very institutions that paid for the ratings.  For example, employees of the Board of Governors of the Federal Reserve System published a paper that directly addresses credit rating agency independence and objectivity. Daniel M. Covitz & Paul Harrison, Testing Conflicts of Interest at Bond Ratings Agencies with Market Anticipation: Evidence that Reputation Incentives Dominate (Dec. 2003) (Abrams Decl. Ex. F) at 1 ("The findings strongly indicate that rating changes do not appear to be importantly influenced by rating agency conflicts of interest but, rather, suggest that rating agencies are motivated primarily by reputation-related incentives.").

MEMORANDUM IN SUPPORT OF MCGRAW HILL'S MOTION TO COMPEL
CASE NO.  CV13-779 DOC (JCGX)

Moody's and other NRSROs have also made public statements concerning their independence and objectivity.[14] Materials relating to the methodologies employed by Moody's and other NRSROs (*see, e.g.*, S&P Req. (Abrams Decl. Ex. A) No. 38(b) & (e)), are relevant because the conduct of similarly situated entities contemporaneously performing the same role as S&P, involving the same market conditions and the same securities, and producing similar and often identical ratings bear on the alleged "falsity" of S&P's statements.

By its own conduct, the United States has itself acknowledged the relevance of these materials. During its pre-Complaint FIRREA investigation, the United States took sworn statements from representatives of a number of financial institutions that had invested in CDOs and/or RMBS rated by S&P. In each of these interviews, DOJ sought to elicit testimony about how S&P's statements of objectivity and independence were understood by market participants.[15] While

---

[14] *See, e.g.*, Moody's Investors Service Code of Professional Conduct (Oct. 2007) (Abrams Decl. Ex. G) at 11 ("[Moody's] and its Analysts will use care and professional judgment to maintain both the substance and appearance of independence and objectivity.").

[15] *See, e.g.*, Transcript of July 18, 2012 DOJ Examination of James Hotchkiss (Executive Vice President and Treasurer of First Midwest Bank) (Abrams Decl. Ex. H) at 9:24-10:01 ("Q. And was it your understanding that S&P was objective and independent in the way it issued credit ratings, including ratings on CDOs?"); 11:01-04 ("Q. . . . Is that statement consistent with your understanding in 2005 to 2007 of S&P's representations regarding its objectivity and independence?"); and 11:06-08 ("Q. And was that understanding an important and significant factor in making your investment recommendation on behalf of First Midwest Bank?"); Transcript of June 28, 2012 DOJ Examination of Alexander Craig (employee of M&T Bank) (Abrams Decl. Ex. I) at 9:18-20, 11:16-18 & 16:20-22 (same questions); and Transcript of July 19, 2012 DOJ Examination of Dale Gibbons (CFO of Western Alliance Bancorp. (f/k/a BankWest Nevada Corp.) and Executive Vice President of Bank of Nevada) (Abrams Decl. Ex. J) at 9:06-08, 10:01-03 & 10:05-07 (same questions).

---

S&P is not, on this Motion, seeking DOJ's notes related to those interviews, this line of questioning makes plain the relevance of the materials sought by S&P. S&P cannot fairly defend an action that attacks the independence and objectivity of its ratings without relevant materials in the United States' possession that speak to those very issues. *See Martin* v. *Reynolds Metals Corp.*, 297 F.2d 49, 56 (9th Cir. 1961) ("One of the purposes of the Federal Rules of Civil Procedure was to take the sporting element out of litigation, partly by affording each party full access to evidence in the control of his opponent.").

*Privilege*: In its response to S&P's Requests, the United States has invoked a laundry list of privileges and protections (*e.g.*, investigative privilege, deliberative process privilege and attorney work-product doctrine). In an effort to address the privilege concerns asserted by the United States, S&P has agreed to limit its requests by excluding documents created by DOJ itself in the course of its investigations. Yet, although production in response to the narrowed requests would not disclose the mental impressions or thought processes that the asserted privileges are intended to protect, the United States still refuses to produce responsive documents. The United States' assertions of privilege are misplaced.

First, *none* of the asserted privileges bars the production of the *factual material* implicated by S&P's requests. *See, e.g.*, *Gaison* v. *Scott*, 59 F.R.D. 347, 352-53 (D. Haw. 1973) (investigative privilege does not shield factual material); *Murray* v. *Atkinson*, 2007 WL 4126622, at *2 (E.D. Mich. Nov. 20, 2007) (same); *FTC* v. *Warner Communications Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984) (same for deliberative process privilege); *United States* v. *Ernstoff*, 183 F.R.D. 148, 153 (D.N.J. 1998) (same); *United States* v. *Deloitte LLP*, 610 F.3d 129, 138-39 (D.C. Cir. 2010) (same for work product); *SEC* v. *Strauss*, 2009 WL 3459204, at *10 (S.D.N.Y. Oct. 28, 2009) (same). At the very least, then, the United States should produce any factual material contained in any of the withheld material.

8

Second, even if some of the withheld materials *could* be protected by privilege, the United States fails to satisfy its burden of demonstrating that any of the privileges apply, much less a facial showing that they might apply.

- The United States has not produced a privilege log thereby depriving S&P and this Court of any means to determine which responsive documents exist and which privilege, if any, justifies their withholding.

- The United States failed to make the showings needed to invoke either the investigative *or* deliberative process privileges: (i) the privilege must be asserted by the head of the department in control of the document after consideration by that officer; (ii) the department head must provide precise reasons for asserting the privilege; and (iii) the information or document being shielded must be identified and described. *In re Sealed Case*, 856 F.2d 268, 271 (D.C. Cir. 1988) (investigative privilege); *Friedman* v. *Bache Halsey Stuart Shields, Inc.*, 738 F.2d 1336, 1342 (D.C. Cir. 1984) (same); *United States* v. *Ernstoff*, 183 F.R.D. at 152 (deliberative process privilege). The United States has not satisfied any of these prerequisites.

- The United States has failed to articulate, as it must, the "*specific* governmental and privacy interests at stake." *Duenez* v. *City of Manteca*, 2013 WL 684654, at *12 (E.D. Cal. Feb. 22, 2013) (citation and internal quotation marks omitted) (emphasis in original).

Third, even if the United States had properly invoked the investigative privilege, S&P would *still* be entitled to discovery of documents from closed investigations. *See In re United States Department of Homeland Security*, 459 F.3d 565, 571 (5th Cir. 2006) ("[T]he [investigative] privilege lapses either at the close of an investigation or at a reasonable time thereafter based on a particularized assessment of the document."); *United States* v. *Marshall*, 2010 WL 1409445, at *4 (D.S.D. Apr. 1, 2010) (privilege is intended to protect ongoing investigations).

Finally, each of the asserted privileges is qualified and thus can be overcome by showing a need for the privileged materials. *See, e.g.*, *Anderson* v. *Marion*

9

*County Sheriff's Department*, 220 F.R.D. 555, 563-68 (S.D. Ind. 2004) (addressing factors that overcome the deliberative process and investigative privileges).[16]  Even if the documents at issue in this motion were privileged, S&P's need for the materials is clear.  Information about how officers of the United States understood the key, undefined terms on which the United States has pinned so much of its case lies exclusively in the hands of the United States, and only process directed to the United States can obtain it.  Moreover, scores or possibly even hundreds of other marketplace participants have provided the United States with documents bearing on the meaning of those terms, and there is no other practical way to gather such materials, certainly not in a timeframe consistent with the trial dates being considered in this case.

*Confidentiality*:  The United States has also stated that it is withholding: (a) "documents subject to requests for confidential treatment by or other confidentiality obligations to non-parties to this action," and (b) documents obtained "from any other NRSRO" that "likely would contain or reference proprietary or other business sensitive information as to which the other NRSROs *would* seek protection."[17]  These objections are unsustainable.

---

[16] *See also* Fed. R. Civ. P. 26(b)(3)(A)(ii) (work product protection can be overcome by the party seeking discovery if "it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means"); *Green* v. *Baca*, 226 F.R.D. 624, 652 (C.D. Cal. 2005) (addressing overcoming work product protection); *Roberts* v. *Americable International, Inc.*, 883 F. Supp. 499, 506-07 (E.D. Cal. 1995) (same); *Frankenhauser* v. *Rizzo*, 59 F.R.D. 339, 344 (E.D. Pa. 1973) (listing factors courts often look to when evaluating whether the investigative privilege can be overcome), *superseded on other grounds by* Fed. R. Evid. 501; *Greenpeace* v. *National Marine Fisheries Service*, 198 F.R.D. 540, 543 (W.D. Wash. 2000) (addressing overcoming the deliberative process privilege).

[17] *See* DOJ Resp. (Abrams Decl. Ex. B) at 14, 40 & 50 (emphasis added).

For example, DOJ has refused to produce thousands of pages of documents that it received from financial companies on the grounds that the companies have asserted confidentiality interests and were "directing" the United States not to produce the documents to S&P. But the Rule 34 request has been outstanding for months and the United States cannot avoid its obligations to produce documents by asserting that a third party has "directed" or "instructed" it not to produce material. *See* 6 James W. Moore et al., *Moore's Federal Practice* § 26.101 (3d ed. 2013). Rather, "[t]he affected third parties must [themselves] intervene directly to seek a protective order." *Id.* In any event, this Court has already entered a Protective Order, and the United States has not explained why that is inadequate to protect any confidential information of third parties. *See FDIC* v. *Broom*, 2013 WL 4781706, at *2 (D. Colo. Sept. 5, 2013) (ordering the production of documents, withheld on the basis of confidentiality obligations to third parties, where a protective order was in place and because "documents are not immune from discovery merely because they are subject to contracts requiring that they be maintained confidentially") (citation omitted).

Confidential information, including trade secrets, may be protected under Fed. R. Civ. P. 26(c), but there is no absolute privilege for such information. *Dobson*, 2011 WL 6288103, at *3 (citing *FOMC* v. *Merrill*, 443 U.S. 340, 362 (1979)). The party seeking to prevent discovery must show that disclosure of relevant information will cause injury. *Id.* at *4 (quoting *In re Remington Arms Co.*, 952 F.2d 1029, 1032 (8th Cir. 1991)). The United States has not even tried to meet this burden and, indeed, is in no position to determine which documents among its collection are deserving of such protection.

Accordingly, the Court should order the United States to produce all documents being withheld solely on the basis of confidentiality and to produce all documents responsive to S&P's Requests 31, 32, 38 and 40.

**B.**    **The United States Must Produce Documents Relating to the Conduct of Mortgage Lenders, Financial Institutions and Issuers of the Securities at Issue.**

The United States acknowledges that it is obliged to show that S&P's ratings of RMBS and CDOs were knowingly false,[18] that "S&P knew that its credit ratings of RMBS and CDO tranches were material to and relied upon by financial institutions"[19] and that those financial institutions suffered billions of dollars of losses as a result.[20]

To understand, test and rebut the United States' theories, S&P served document requests seeking documents concerning mortgage lenders, financial institutions, and issuers involved in the packaging, sale and purchase of RMBS and CDOs, whether these documents had been gathered by the DOJ in its investigations of fraud concerning RMBS and CDOs or were otherwise in the possession of any agency of the United States.[21]    In light of the November 18 Disclosure by the United States identifying the CDOs and RMBS ratings it intends to put at issue, S&P has since offered to narrow its request to encompass documents relating only to the purchasers, issuers, arrangers, sponsors, underwriters, or sellers of those RMBS and CDOs.   The United States has nonetheless categorically refused production on grounds of relevance, burden, and privilege.[22]   Each of these objections is meritless.

*Relevance*:    The requested materials are relevant to the United States'

---

[18] July 8 Tr. (Abrams Decl. Ex. D) at 69:23–70:7.

[19] Compl. ¶ 6; *see also* Compl. ¶¶ 35–52.

[20]  Compl. ¶¶ 15, 275; Second Supplement to Plaintiff United States' Initial Disclosures ("November 18 Disclosure") (Abrams Decl. Ex. K) at 4.

[21] S&P Req. (Abrams Decl. Ex. A) Nos. 44-46.

[22] DOJ Resp. (Abrams Decl. Ex. B) at 65–68.

allegations that S&P made material, false, and misleading representations and issued false and material ratings.[23]   As discussed in Part II.A, *supra*, information about how market participants understood and used ratings in issuing, purchasing, and selling RMBS and CDOs will provide the marketplace's interpretation of statements that a rating agency operates objectively and independently.  And to the extent that purchasers engaged in parallel analyses concerning credit quality and arrived at the same or similar result as S&P, that would tend to rebut the allegations of intentional falsity of any rating.  Among other things, the requested documents bear on materiality, demonstrating how, if at all, the ratings and any statements as to "independence" and "objectivity" figure in the decision to purchase.[24]   The materials will also demonstrate how such factors as fraud by issuers and arrangers contributed, along with the systemic market events occurring at the time, to the losses suffered on the investments at issue.

For example, the SEC has obtained from Mizuho Financial Group an agreement to settle charges arising from the structuring and marketing of Delphinus CDO 2007-1, one of the CDOs put at issue in the November 18 Disclosure.[25]   According to the SEC, Mizuho and its employees furnished *to S&P*

---

[23] *See* July 8 Tr. (Abrams Decl. Ex. D) at 69:23-70:7 ("Mr. Cardona:  But, again, just so I can get back to our allegations, in terms of the second part of our fraud, which actually does go to the ratings; in other words, *there is a portion of our fraud where we allege the ratings were false*. . . . There, we have provided a list of—I think its 30 or 34 CDOs that are named in the Complaint . . . *as to which we intend to prove that those ratings were false.*") (emphasis added); *id.* at 25:11-13.

[24] The United States concedes that it must prove materiality as part of its case.  *See* Compl. ¶¶ 270-275; July 8 Tr. (Abrams Decl. Ex. D) at 56:9-19; Dec. 2 Joint Report (Abrams Decl. Ex. E) at 4.

[25] SEC Press Release, SEC Charges Mizuho Securities USA with Misleading Investors by Obtaining False Credit Ratings for CDO:  Firm to Pay $127.5 Million

inaccurate information about the Delphinus portfolio in order to obtain the ratings needed to close the deal.  The SEC claimed that Mizuho, having misled S&P, had defrauded purchasers by using the improperly obtained ratings in selling the notes.  In the face of such charges against Mizuho, it is hard to fathom how S&P could possibly be required to pay a penalty equivalent to any, let alone all, losses arising from the Delphinus transaction.  At the least, S&P should be entitled to test such facially contradictory theories through discovery of documents in the possession of the United States concerning Mizuho and to explore whether any other market participants involved with the CDOs and RMBS identified by the United States in its November 18 Disclosure engaged in fraud in their disclosures to S&P.

The requested materials are also relevant to the DOJ's proposed method for calculating penalties in this case because they will demonstrate that other factors are responsible for or contributed to the losses suffered by the financial institutions at issue.  *See United States* v. *Menendez*, 2013 WL 828926, at *9 (C.D. Cal. Mar. 6, 2013) (finding the United States' ability to demonstrate the extent to which the allegedly fraudulent "conduct caused [the federally insured financial institution] to suffer a loss" to be relevant when assessing a FIRREA penalty).

*Burden*:    That the United States' burden objection is spurious is demonstrated by the fact that the United States has itself made a comparable request to S&P.  The first subpoena DOJ served on S&P during the FIRREA investigation included a request for all materials produced by S&P in the course of other governmental investigations, including state AG, SEC and Congressional

---

to Settle Charges (July 18, 2012) (Abrams Decl. Ex. L) at 1.  The SEC further alleged that in its dealings with other rating agencies Mizuho made misrepresentations and/or omissions concerning Delphinus.  *See* Complaint at 9-11, *SEC* v. *Mizuho Securities USA Inc.*, 12-cv-5550 (S.D.N.Y. filed July 18, 2012).

inquiries.   In any event, S&P offered to narrow its requests to encompass only documents relating to financial institutions or securities involved with the particular RMBS and CDOs listed in the United States' November 18 Disclosure, yet the United States continues to refuse production.   The requested materials are relevant and there are efficient means by which to isolate the material sought here by S&P (*e.g.*, the subpoenas used to gather these materials (when produced by the United States) can be reviewed to identify which requests are most likely to contain responsive documents).

*Privilege*:   Finally, as explained in Part II.A, the United States' broad assertions of privilege are improper and inconsistent with the system of civil discovery imposed by the Federal Rules.   S&P has offered to limit its request to documents received from third parties (*i.e.*, not documents *created* by DOJ as part of any investigation) and to start, at least, with materials obtained in investigations now closed. That offer has not been accepted and S&P continues to seek, and is entitled to, the information obtained by the United States whether the information was obtained in an investigation now formally closed or otherwise. Because the materials sought are purely factual, the United States' expansive assertions of investigatory privilege, deliberative process privilege, and work-product protection are inapplicable.   *See supra* Part II.A.   Indeed, it is difficult, if not impossible, to understand how the production of third-party documents will in any way reveal the *United States'* state of mind. *See In re Grand Jury Subpoenas Dated March 19, 2002 & August 2, 2002*, 318 F.3d 379, 386 (2d Cir. 2003) ("To fit within what we have repeatedly characterized as a 'narrow exception' to the general rule that third-party documents in the possession of an attorney do not merit work product protection, the party asserting the privilege must show 'a real, rather than speculative, concern' that counsel's thought processes . . . will be exposed . . . .") (citation omitted); *SEC* v. *Strauss*, 2009 WL 3459204, at *10 (access to a third-

15

party database of documents would not disclose protected work product) (citation omitted).

### C.   The United States Must Produce Documents Relevant to S&P's First Amendment Retaliation Defense.

S&P's Eleventh Defense pleads that the United States, in violation of the First Amendment, filed its lawsuit in retaliation for S&P's decision to downgrade the credit rating of the United States.   S&P propounded a number of requests concerning this defense.[26]   The United States did not move to strike the defense but nevertheless flatly refuses to search for, produce, or even log the documents sought in these requests.   It has argued that S&P has not made a preliminary showing supposedly needed to obtain discovery.[27]   Although no preliminary showing is in fact needed, S&P is prepared to make, and makes, such a showing below.   The United States must produce the requested materials.

From the outset of this case, the Court has noted the conspicuous absence of any other rating agency defendants; indeed, it asked at the first hearing, "Where's Moody's?"[28]   The United States has not disputed that its theory of liability here

---

[26] S&P Req. (Abrams Decl. Ex. A) Nos. 21, 33, 34, 51, 52 & 53.

[27] To the extent that the United States also relies upon various asserted privileges in refusing to produce this category of documents, all such privileges are inapplicable, all else aside, because the United States is required under Federal Rule of Civil Procedure 26(b)(5)(A) to log such documents descriptively and specify any asserted privileges as to each document.   For reasons set forth in Parts II.A and II.B, *supra*, the various asserted privileges would likely be unavailable even had the documents in question been logged as required.   In the absence of any log, there is no basis even to consider the asserted privilege claims.

[28] *See* July 8 Tr. (Abrams Decl. Ex. D) at 43:24.   To be very clear, S&P is not suggesting that any litigation should have been commenced against Moody's or any other NRSRO; its position is that no such litigation should have been commenced against any of the NRSROs, but that doing so against S&P alone, for reasons set forth in the text, violates the First Amendment.

would apply as well to other rating agencies that made the same representations about their independence and objectivity and issued all but identical ratings on the CDOs and RMBS at issue in this case. Yet the United States has never offered this Court any explanation for its decision to pursue a FIRREA action against S&P alone.

The most obvious explanation is apparent. S&P alone among the major rating agencies downgraded the securities issued by the United States.[29] As described below, the chronology of events relating to the downgrade and the commencement of this lawsuit provides powerful evidence linking the two. And beyond this showing, S&P submits with this motion the affidavit of the Chairman and, in August 2011, Chief Executive Officer and President of McGraw Hill, Harold McGraw III. Mr. McGraw describes personal communications made to him first on behalf of the Secretary of the Treasury, and then personally by the Secretary himself in the days following the downgrade. The Treasury Secretary angrily chastised S&P for the downgrade, stating that S&P's conduct would be "looked at very carefully" and that such behavior could not occur without a response from the United States.[30] All this is the predicate to the discovery sought.

Though it bears no burden to do so, S&P has prepared a Chronology in Support of S&P's First Amendment Retaliation Defense (the "Chronology") (Abrams Decl. Ex. P), and submits the Chronology as well as the McGraw

---

[29] The only rating agency other than S&P to lower its credit rating on the United States, Egan-Jones Ratings Company, was subjected to an enforcement action by the SEC after announcing its downgrade. The SEC obtained Egan-Jones' agreement to a settlement barring Egan-Jones from rating government debt— including that of the United States—for a period of eighteen months.

[30] Affidavit of Harold McGraw III, sworn to on October 28, 2013 ("McGraw Aff.") (Abrams Decl. Ex. O) ¶¶ 3-6.

Affidavit in support of this motion.  These submissions document S&P's basis for asserting a defense of First Amendment retaliation and contain powerful support for the conclusion that S&P's Requests 21, 33, 34, 51, 52 and 53 are reasonably calculated to lead to the discovery of admissible evidence relevant to that defense. The following are highlights of those submissions:

- In the period preceding the 2007-2008 financial crisis, Moody's, Fitch, and S&P each issued nearly identical statements regarding the "independence" and "objectivity" of their ratings processes.

- For each CDO and RMBS at issue here, the ratings issued by S&P were similar to and generally identical with those issued by Moody's and Fitch.

- In the aftermath of the financial crisis, the United States began multiple investigations regarding the role of S&P, Moody's, and Fitch in the turmoil in the subprime mortgage-related securities markets.  These investigations all included a focus on the potential conflict of interest for all three credit rating agencies caused by the "issuer-pays" business model.

- In the aftermath of the financial crisis, multiple lawsuits (both private and public) alleging misrepresentations about objectivity, independence, and conflicts of interest were brought against all three major credit rating agencies.

- S&P's April 2011 change in credit outlook and August 2011 downgrade of the credit rating of the United States were met with harsh and angry criticism from the highest levels of the United States government, as expressed by individuals including Treasury Secretary Timothy Geithner, Director of the National Economic Council and Assistant to the President for Economic Policy Gene Sperling, and President Obama himself.

- S&P's downgrade of the United States occurred on Friday, August 5, 2011.  That Sunday, August 7, Harold McGraw III, the Chairman, Chief Executive Officer and President of McGraw Hill (of which S&P was a unit), received a telephone message from a high-ranking official of the

18

New York Federal Reserve Bank; when the call was returned, the official conveyed the personal displeasure of the Secretary of the Treasury with S&P's rating action.[31]

- This was followed on Monday by a call to Mr. McGraw from the Secretary of the Treasury, Timothy Geithner, in which Secretary Geithner stated that S&P had made a "huge error" for which it was "accountable." He said that S&P had done "an enormous disservice to yourselves and your country," that S&P's conduct would be "looked at very carefully," and that such behavior could not occur without a response.[32]

- The McClatchy Newspapers subsequently reported in a piece authored by Kevin G. Hall and Greg Gordon that while the United States' original investigation included S&P and Moody's, "[i]nvestigator interest in Moody's apparently dropped off around the summer of 2011, about the same time S&P issued the historic downgrade of the United States' creditworthiness because of mounting debt and deficits." A source familiar with the investigations was quoted as stating: "After the U.S. downgrade, Moody's is no longer part of this."

- In the year preceding S&P's downgrade of the United States, two states, Mississippi and Connecticut, had initiated proceedings alleging deceptive practices based specifically on an alleged lack of independence. Each of those states named *both* Moody's and S&P as defendants. After the downgrade, additional state lawsuits were commenced, with allegations nearly identical to those of the Connecticut and Mississippi complaints. Drafted after coordination and consultation with the U.S. Department of Justice, none of those lawsuits named Moody's.

The import of this chronology has not been lost on informed observers across the political spectrum. Thus:

- *The Atlantic* published an article by Daniel Indiviglio on August 18, 2011

---

[31] McGraw Aff. (Abrams Decl. Ex. O) ¶ 3.

[32] McGraw Aff. (Abrams Decl. Ex. O) ¶¶ 4-6.

19

entitled "The Backlash Against S&P Begins," stating that "[e]ven if this investigation was started before any of this downgrade business began, it is now hopelessly compromised.  To the extent that those who have influence in Washington can push the Justice Department to go harder on S&P, they probably will.  It's also worth noting that the other rating agencies—which made just as terrible mistakes as S&P during the housing bubble—are not known to be targets of similar investigations."

- *The Guardian* published an article by Marc Joffe on February 25, 2013 entitled "Moody's, S&P and Other Credit Rating Agencies Deserve a Failing Grade," in which the author concluded: "Further, Egan Jones and S&P share two characteristics that should raise an eyebrow: both downgraded the US and subsequently faced disciplinary action from the US government."

- On September 9, 2013, The *Wall Street Journal* published an editorial entitled "S&P and Downgrade Payback," in which it laid out a timeline supporting S&P's retaliation defense.  The editorial concluded with the following: "We don't think Justice's dubious claims should be leveled against anyone, and its banks-as-victims argument is ludicrous.  But far more troubling is that this case has the aroma of political payback."[33]

If news outlets across such a broad spectrum can conclude, even without knowledge of the facts set forth in Mr. McGraw's affidavit, that this action was commenced in retaliation for S&P's downgrade of the United States, surely a set of lay jurors could as well.  At the very least, S&P should be permitted to pursue this matter through discovery.

The propriety of the discovery S&P seeks concerning its retaliation defense was decided some forty years ago by this Court in *United States* v. *NBC*, No. 72-819 (C.D. Cal. 1974); *United States* v. *CBS*, No. 72-820 (C.D. Cal. 1974); *United States* v. *ABC*, No. 72-821 (C.D. Cal. 1974) (collectively "NBC").  In *NBC*, three

---

[33] The articles cited are reproduced at Abrams Decl. Exs. P(30), P(37) and P(39).

television networks asserted that antitrust actions brought against them were retaliation for criticism they had lodged against President Richard Nixon. The United States moved to strike the defendants' First Amendment retaliation defenses and sought a protective order against the defendants' discovery (steps the United States has not taken here). *United States* v. *NBC*, 65 F.R.D. 415, 417 (C.D. Cal. 1974), *appeal dismissed*, 421 U.S. 940 (1975).[34] After denying those motions, Judge Kelleher ordered that discovery on the properly pled affirmative defenses proceed. *Id.* When the United States failed to identify or produce the requested documents, Judge Kelleher dismissed the United States' case in its entirety. *Id.* at 418, 422.

Though S&P has repeatedly cited the *NBC* case to the United States during the "meet and confer" process in an effort to resolve these discovery issues, the United States has never responded to it other than to state in the December 2 Joint Report that the *NBC* decision published at 65 F.R.D. 415, "addressed only the appropriate sanction for the government's failure to comply with an existing discovery order."[35] But in fact the cited decision contains ample discussion of the *discovery* that this court ordered "plaintiff to answer" including "interrogatories calling for the identification of documents and tapes located, *inter alia*, in the Executive Office of the President." *Id.* at 417. It quotes specific portions of the discovery order entered in that case requiring, among other things, that the United States:

> [Identify] [e]ach document relating or referring to actual or prospective antitrust litigation, or any suggestion, proposal or decision to commence or not to commence such litigation . . . against . . . the

---

[34] A copy of the reported opinion is attached to the Abrams Declaration at Ex. M.

[35] Dec. 2 Joint Report (Abrams Decl. Ex. E) at 23 n.26.

television networks or the news media, written, recorded, sent or received by the President, any person employed in, assigned to or acting on behalf of the Executive Office of the President [during the relevant time period].

*Id.* at 418 (bracketed changes in the first line in original).[36]

S&P asks this Court to compel just the same sort of discovery that Judge Kelleher ordered on just the same sort of affirmative defense: discovery as to documents from the highest levels of the government and the DOJ concerning the decision to commence a litigation that was arguably filed to punish those whose speech offended the government.

The United States is unable to distinguish *NBC*.  Nor can the United States overcome the well-established rule that in civil cases discovery is permitted as to all "nonprivileged matter that is relevant to any party's claim or defense."  Fed. R. Civ. P. 26(b)(1);  *see also Diagnostics Systems Corp.* v. *Symantec Corp.*, 2008 WL 9396386, at *4 (C.D. Cal. Apr. 4, 2008).  This fundamental principle has been routinely applied to authorize civil discovery in First Amendment retaliation cases without imposing any threshold requirements.  *See Franzon* v. *Massena Memorial Hospital*, 32 F. Supp. 2d 528, 533 (N.D.N.Y. 1998) (ruling that "[b]ecause the Federal Rules of Civil Procedure permit discovery of information that reasonably will lead to the discovery of admissible evidence, plaintiffs are entitled to obtain discovery of that which would tend to support their claim of retaliation," and further explaining that this included discovery of "evidence demonstrating that he

---

[36] The court also set a schedule for the deposition of the high-ranking officials of the Department of Justice involved in the decision to bring the civil claim against the networks and for the concomitant production of requested documents.  *See* an unpublished Order in *United States* v. *NBC*, No. 72-819 (C.D. Cal. July 17, 1974) (Abrams Decl. Ex. N) (requiring the United States to provide discovery).

was treated differently than other employees because of his alleged protected speech." (internal citations omitted)); *see also Noble* v. *Gonzalez*, 2013 WL 4517774, at *6 (E.D. Cal. Aug. 26, 2013) (granting motion to compel even where relevance of requested documents "appear[ed] remote" but could relate to First Amendment retaliation claim); *Stanislaus Towing & Recovery Services, Inc.* v. *City of Modesto*, 2011 WL 5375000, at *10 (E.D. Cal. Nov. 4, 2011) (denying motion for a more definite statement of claim, and ruling that where plaintiff had made a clear First Amendment retaliation allegation, "[d]etails regarding the exact statements made and the form of the retaliatory conduct are properly sought during discovery"); *Puckett* v. *City of Glen Cove*, 631 F. Supp. 2d 226, 241 (E.D.N.Y. 2009) (allowing First Amendment retaliation claim to proceed and permitting discovery, even though the court was clear that decision did *not* indicate a likelihood that the claim would ultimately succeed).

The United States has repeatedly cited throughout the "meet and confer" process four cases involving claims of selective prosecution, none of which relates to a claim that a civil action was initiated in retaliation for the defendant's exercise of its First Amendment rights.[37]  S&P is aware of no case applying the discovery standard articulated in *United States* v. *Armstrong,* 517 U.S. 456 (1996), in the context of a First Amendment retaliation defense.

S&P's showing on this motion would, in any event, satisfy the *Armstrong* standard.  S&P has presented evidence of differential treatment by the United States of similarly situated NRSROs.  *See United States* v. *Steele*, 461 F.2d 1148,

---

[37] The four cases are *United States* v. *Bass*, 536 U.S. 862, 863-64 (2002) (per curiam), *United States* v. *Armstrong*, 517 U.S. 456, 468-70 (1996), *United States* v. *One 1985 Mercedes*, 917 F.2d 415, 421 (9th Cir. 1990), and *United States* v. *Sequoia Orange Co.*, 1994 WL 903688 (E.D. Cal. Mar. 14, 1994).

23

1151 (9th Cir. 1972) (reversing conviction where defendant "located six other persons who had completely refused on principle to complete the census forms" and "[n]one of those had taken a public stand against the census and none were recommended for prosecution"). The S&P ratings challenged in this action by the United States were no different from those published by other NRSROs that also made statements about "independence" and "objectivity." But as the Chronology reflects, the United States' investigators reportedly stopped pursuing Moody's and shifted focus to S&P around the summer of 2011, following S&P's change in credit outlook and subsequent downgrade of the United States' credit rating. S&P has also presented evidence indicating that this lawsuit is the product of constitutionally improper motive. United States officials including the Treasury Secretary and the President spoke out publicly and privately against S&P within days of its August 2011 downgrade of the United States' credit rating. The McGraw Affidavit and the Chronology set forth direct and circumstantial evidence tending to show that the decision at the highest levels of the United States to file this action against S&P was the result of S&P's exercise of its First Amendment rights. No more is required for S&P to obtain the discovery that it seeks by Requests 21, 33, 34, 51, 52 and 53. *See United States* v. *Bass*, 536 U.S. 862, 863 (2002) (requiring "some evidence of both discriminatory effect and discriminatory intent").[38] The *Armstrong* standard does not require actual knowledge of improper motivation on the part of those determining to initiate a prosecution, because if it

---

[38] S&P would also meet the showing required of defendants claiming vindictive prosecution, a version of the *Armstrong* standard that does not require the defendant to show differential treatment since selectivity is not an element of the claim. *See United States* v. *Dwyer*, 287 F. Supp. 2d 82, 88 (D. Mass. 2003) (requiring a showing of "some objective evidence tending to show prosecutorial vindictiveness for discovery to be allowed").

did, "the discovery standard would be impossible to meet." *United States* v. *Tuitt*, 68 F. Supp. 2d 4, 10 (D. Mass. 1999) (granting discovery and noting that "[a] discriminatory effect which is severe enough can provide sufficient evidence of discriminatory purpose"). Thus even under the standard advocated for by the United States, S&P is entitled to its requested discovery.

## III.   CONCLUSION

For all the foregoing reasons, this Court should order the United States to produce the categories of documents sought in this motion. The United States may not avail itself of the benefits of civil litigation without submitting itself to the rules of discovery that accompany that decision.

Dated: January 20, 2014                           CAHILL GORDON & REINDEL LLP

                                                  By:    /s/ Floyd Abrams
                                                  Floyd Abrams