# EXHIBIT A

1  KEKER & VAN NEST LLP
   JOHN KEKER (SBN 49092)
2  jkeker@kvn.com
   ELLIOT R. PETERS (SBN 158708)
3  epeters@kvn.com
   633 Battery Street
4  San Francisco, CA 94111-1809
   Telephone:  415 391 5400
5  Facsimile:  415 397 7188

6  CAHILL GORDON & REINDEL LLP
   FLOYD ABRAMS
7  fabrams@cahill.com
   S. PENNY WINDLE
8  pwindle@cahill.com
   80 Pine Street
9  New York, New York 10005-1702
   Telephone: 212 701 3000
10 Facsimile: 212 269 5420

11 KELLER RACKAUCKAS UMBERG ZIPSER LLP
   JENNIFER L. KELLER (SBN 84412)
12 jkeller@kruzlaw.com
   18300 Von Karman Avenue, Suite 930
13 Irvine, CA 92612
   Telephone: 949 476 8700
14 Facsimile: 949 476 0900

15 Attorneys for Defendants MCGRAW-HILL
   COMPANIES, INC., and STANDARD & POOR'S
16 FINANCIAL SERVICES LLC

17

18            UNITED STATES DISTRICT COURT

19            CENTRAL DISTRICT OF CALIFORNIA

20                  SOUTHERN DIVISION

21 UNITED STATES OF AMERICA,          | Case No. CV13-779 DOC (JCGx)

22                      Plaintiff,     | **DEFENDANTS' FIRST REQUEST
                                        | FOR PRODUCTION OF
23       v.                            | DOCUMENTS**

24 MCGRAW-HILL COMPANIES, INC.        | Judge:    Honorable David O. Carter
   and STANDARD & POOR'S
25 FINANCIAL SERVICES LLC,            | Complaint filed February 4, 2013

26                      Defendants.

27

28

                        DEFENDANTS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS
                              CASE NO.  CV13-779 DOC (JCGX)

776385

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, defendants McGraw-Hill Financial, Inc.[1] and Standard & Poor's Financial Services LLC (collectively "S&P" or "Defendants") hereby request that Plaintiff, the United States of America, produce for inspection and copying at the offices of Cahill Gordon & Reindel LLP, 80 Pine Street, New York, New York 10005-1702, in accordance with the Definitions and Instructions below, all documents and things in its possession, custody or control requested herein within 30 days of the date of service hereof pursuant to the Federal Rules of Civil Procedure.

## DEFINITIONS

1.      The term "document" and "documents" shall be construed in the broadest sense allowed by Rule 34 of the Federal Rules of Civil Procedure, and includes, but is not limited to, any writings, drawings, graphs, charts, photographs, phonograph records, tape recordings, notes, diaries, calendars, books, papers, accounts, electronic or videotape recordings, and any computer-generated, computer-stored, or electronically stored matter from which information can be obtained and translated, if necessary, into reasonable useable form.  This includes preliminary versions, drafts, and revisions.

2.      "Action" means this action captioned *United States* v. *McGraw-Hill Cos.*, No. 2:13-cv-00779 (JCGx), pending in the United States District Court for the Central District of California.

3.      "CDO" means collateralized-debt obligation.

4.      "Change in Outlook" means the April 18, 2011 action by S&P changing its long-term outlook on the sovereign credit rating for Plaintiff, the United States of America, from stable to negative.

---

[1] As of May 1, 2013, The McGraw-Hill Companies, Inc. was renamed McGraw Hill Financial, Inc.

1

776385

5.     "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

6.     "Complaint" means the February 4, 2013 Complaint against Defendants, *United States* v. *McGraw-Hill Cos.*, No. 2:13-cv-00779 (JCGx) (C.D. Cal.), ECF No. 1.

7.     "CreditWatch Action" means the July 14, 2011 action by S&P placing the long-term and short-term sovereign credit ratings for Plaintiff, the United States of America, on CreditWatch with negative implications.

8.     "DOJ" means the U.S. Department of Justice.

9.     "Downgrade" means the August 5, 2011 action by S&P changing its long-term sovereign credit rating on Plaintiff, the United States of America, from AAA to AA+.

10.    "FIRREA" means Section 951 of the Financial Institutions Reform, Recovery and Enforcement Act, codified at 12 U.S.C. § 1833a.

11.    The term "FIRREA Investigation" means the investigation conducted by Plaintiff, the United States of America, culminating in the filing of the Complaint.

12.    "Including" means including but not limited to.

13.    "NRSRO" means Nationally Recognized Statistical Rating Organization, as defined in 15 USC § 78c(a)(62).

14.    The term "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all documents and information that would be excluded if such word were not so construed.

776385

15.     The term "relating to" means relating to, referring to, concerning, describing, pertaining to, evidencing, reflecting, regarding, constituting, involving, or touching upon in any way.  Each of these terms may be used interchangeably herein and will be treated as encompassing all these meanings.

16.     "RMBS" means residential mortgage-backed securities.

17.     "SEC" means the U.S. Securities & Exchange Commission.

18.     "Treasury" means the U.S. Department of the Treasury.

19.     "You" or "Your" means the Plaintiff United States of America, including all of the departments, agencies, bureaus and other sub-divisions of the Executive Branch.

20.     Words in the singular include the plural, and words in the plural include the singular.  "Each" and "any" are both singular and plural.

## INSTRUCTIONS

1.     If a document is withheld on the ground of privilege or otherwise, please prepare a privilege log in compliance with Rule 26 of the Federal Rules of Civil Procedure.

2.     Notwithstanding the assertion of any objections to the document requests set forth below, Plaintiff shall produce all documents responsive to all parts of each request to which objection is not made.

3.     If portions of documents are withheld on the basis of privilege or otherwise, the withheld portions must be stamped with the word "redacted," the remainder of the document must be produced, and the information requested in Instruction Nos.1-2, above, shall be provided with respect to the redacted or withheld portion of the document.

3

776385

4.     If any document responsive to the document requests set forth below has been destroyed, lost, discarded or is otherwise not capable of being produced, please identify each such document and provide for each (a) the author(s) thereof; (b) the recipient(s) thereof; (c) the subject matter thereof; (d) the date of the document; (e) the document's length; (f) the date on which the document was lost or destroyed; and (g) if the document was destroyed, the reason(s) for its destruction, the manner of its destruction, and the identity of the person(s) requesting, authorizing and performing the destruction.

5.     In response to the document requests set forth below, Plaintiff shall produce all documents in the Plaintiff's possession, custody or control and all documents in the possession, custody or control of any of the Plaintiff's agents, attorneys or representatives, regardless of the location of such documents.

6.     If, after Plaintiff submits its response to the document requests set forth below, Plaintiff becomes aware of or acquires additional documents responsive thereto, Plaintiff shall, in accordance with Rule 26(e) of the Federal Rules of Civil Procedure, supplement and amend its response to the document requests by producing promptly those additional documents.

7.     Words in the past tense include the present, and words in the present tense include the past.

## DOCUMENTS TO BE PRODUCED

1.     All documents, to the extent not previously produced, constituting or relating to transcriptions, summaries, notes, recordings, and videos of interviews or depositions, whether such interviews or depositions were conducted under oath or not, of the 49 individuals for whom some transcriptions were previously produced as identified in DOJ's May 8, 2013 letter to John W. Keker, Esq., a copy of which is attached hereto as Exhibit A.  You may exclude from production, but should log,

4

776385

1   any information constituting the mental impressions, conclusions, opinions or legal
2   theories of counsel.

3       2.      All documents, to the extent not previously produced, constituting or
4   relating to transcriptions, summaries, notes, recordings, and videos of all
5   depositions or interviews, whether such depositions or interviews were conducted
6   under oath or not, of each individual identified in Exhibit A-1 of the Supplement to
7   Plaintiff United States' Initial Disclosures Pursuant to Federal Rule of Civil
8   Procedure 26(a)(1)(A) served on May 28, 2013, a copy of which is attached hereto
9   as Exhibit B. You may exclude from production, but should log, any information
10  constituting the mental impressions, conclusions, opinions or legal theories of
11  counsel.
12

13      3.      All documents, to the extent not previously produced, constituting or
14  relating to transcriptions, summaries, notes, recordings, and videos of depositions
15  or interviews, whether such depositions or interviews were conducted under oath
16  or not, conducted by the DOJ of any individual in connection with the FIRREA
17  Investigation. You may exclude from production, but should log, any information
18  constituting the mental impressions, conclusions, opinions or legal theories of
19  counsel.
20

21      4.      All documents and communications reflecting DOJ policies, practices
22  and procedures governing the creation, use or retention of such transcriptions,
23  summaries, notes, recordings and videos of depositions or interviews, as referenced
24  in Requests 1-3 above, including but not limited to all guidelines, instructions,
25  check-lists and training materials.

26      5.      All documents containing statements or information that You contend
27  support the allegations in the Complaint.
28

776385

6.     All documents referenced, relied on, or otherwise used in formulating the allegations in the Complaint.

7.     All documents referenced, relied on, or otherwise used in formulating Supplement to Plaintiff United States' Initial Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(1)(A) served on May 28, 2013, a copy of which is attached hereto as Exhibit B.

8.     All documents referenced, relied on, or otherwise used in formulating Plaintiff United States' Initial Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(1)(A), served on May 9, 2013, and attached hereto as Exhibit C.

9.     All documents and information received from or relating to any individual or entity named in Exhibit A-1 of the Supplement to Plaintiff United States' Initial Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(1)(A) served on May 28, 2013 and attached hereto as Exhibit B.

10.     All documents containing statements or information that refute or rebut the allegations in the Complaint.

11.     All documents containing statements or information that would tend to exculpate S&P.

12.     All documents containing statements or information relating to any potential penalty You contend should be ordered against S&P.

13.     All documents containing statements or information that would tend to reduce the penalty that You contend should be ordered against S&P.

14.     All subpoenas for documents or testimony You issued to anyone other than S&P in connection with the FIRREA Investigation.

776385

15.     All documents You received in response to subpoenas You issued to anyone other than S&P relating to the FIRREA Investigation or any of the allegations contained in the Complaint.

16.     All subpoenas for documents or testimony You issued (or issue) to anyone other than S&P in connection with this Action.

17.     Copies of all written correspondence between You and any third-party relating to subpoenas for documents or testimony You issued (or issue) to anyone other than S&P in connection with this Action.

18.     All documents You received (or receive) in response to subpoenas You issued (or issue) to anyone other than S&P relating to this Action or any of the allegations contained in the Complaint.

19.     All documents containing statements or information supporting Your contention that any federally insured financial institution was affected by any action by S&P.

20.     All documents containing statements or information supporting any contention You make that any other financial institution suffered losses resulting from any action by S&P actionable under the Complaint.

21.     All documents relating to the origination of, use of, or reference to the "codename" "Alchemy" mentioned in the February 5, 2013 remarks of then Acting Associate Attorney General Tony West. *Acting Associate Attorney General Tony West Speaks at the Press Conference Announcing Lawsuit Against S&P* (Feb. 5, 2013) (available at: http://www.justice.gov/iso/opa/asg/speeches/2013/asg-speech-130205.html).

22.     All documents or other information reviewed, considered and/or

7

776385

relied upon by Henry M. Paulson, Jr., then Secretary of the United States Department of the Treasury, in making each of the following statements:

    a.  A statement during an interview with CNBC on March 13, 2007: "[the fallout in subprime mortgages is] going to be painful to some lenders, but it is largely contained. . . . We have had a significant housing correction in the U.S. . . . The correction has been significant. You can't have a correction like that without causing some dislocation. It is too early to tell whether it has bottomed. We'll know more in the next month or two."

    b.  A statement before The Committee of 100 on April 20, 2007: "I believe we have a very healthy and well balanced US economy . . . and we've made a transition and we're making a transition -- I think a successful transition -- from an economy that was growing at a level, at a rate that was not sustainable to one that's going to be sustainable. We've clearly had a big correction in housing, in the housing market. Retail housing was growing for some time at a level that wasn't sustainable. I think it's too early to say with certainty but there's all the signs I look at lead me to believe that the housing market is at or near the bottom. Now, subprime is obviously an outgrowth of the housing market. And as I look at it in terms of the systemic risks, the economic risks, you know, the macro risk, I don't see it posing a serious problem. I think it's going to be largely contained."

    c.  A statement before the U.S. House of Representatives, Committee on Financial Services on November 18, 2008: "We have not in our lifetime dealt with a financial crisis of this severity and unpredictability."

23.    Documents sufficient to identify each of the individuals, by name and employing entity, involved in the (i) preparing, (ii) considering or (iii) discussing with Secretary Paulson, any of the statements in Request 22 (a)-(c), including, but not limited to, individuals who provided documents or other information reviewed, referenced, relied upon or used in connection with the preparation or review of any of the statements.

776385

24.     As to each individual identified by the document responses to Request 23 and as to Henry M. Paulson, Jr. himself, all documents prepared, reviewed or received by that individual through December 31, 2009 constituting, containing or referring to:

       a.  Any subsequent comments made or received with respect to any of the statements identified in Request 22, above;

       b.  The expected performance of the U.S. residential housing market in any portion of the period 2004-2008;

       c.  Any prediction of a decline in home prices to occur in 2007 and/or 2008, and any response to any such prediction;

       d.  The expected performance of non-prime residential mortgages originated or securitized in any portion of the period 2004-2008;

       e.  The expected performance of RMBS and/or CDOs exposed to RMBS issued in any portion of the period 2004-2008;

       f.  Any assessment, discussion or analysis of the ratings issued by any NRSRO with respect to RMBS and/or CDOs exposed to RMBS issued in any portion of the period 2004-2008;

       g.  Any comparison of the performance of ratings issued by different NRSROs in any portion of the period 2004-2008, whenever such comparisons were prepared;

       h.  Any identification of factors considered or to be considered at any time in the period 2004-2008 in evaluating the expected and/or actual performance of (i) the United States residential housing market generally; (ii) non-prime residential mortgages; (iii) RMBS or (iv) CDOs exposed to RMBS.

25.     All documents or other information in Your possession, custody or control reviewed, considered and/or relied upon by Ben S. Bernanke, Chairman of the Board of Governors of the Federal Reserve System, in making each of the following statements:

a. A statement at a meeting of the Federal Open Market Committee on March 20-21, 2007: "The housing market is, of course, central to near-term developments. The central scenario that housing will stabilize sometime during the middle of the year remains intact, but there have been a few negative innovations. We've noted the subprime issues and the possibility of foreclosures, reduced confidence, and tightened credit terms, and I've also noted that reports from builders about the spring selling season have not been particularly upbeat, in general. At the same time, we continue to see rough stability in sales, starts, and permits. The effects of the decline in subprime lending may have already been mostly seen, since that has slowed from last fall. Mortgage rates, of course, remain quite low, and the labor market is a key determinant of housing demand and of mortgage delinquencies, particularly cross-sectionally. Across the country, there's a very close correlation between foreclosure rates and state unemployment rates. So long as the labor market remains strong, I would think that the general health of the housing market would be improving. The housing market, I think, will follow the same scenario, but there are a few negative innovations."

b. A statement before the Joint Economic Committee of the U.S. Congress on March 28, 2007: "At this juncture, however, the impact on the broader economy and financial markets of the problems in the subprime market seems likely to be contained."

c. A statement at the Federal Reserve Bank of Chicago's 43rd Annual Conference on Bank Structure and Competition on May 17, 2007: "All that said, given the fundamental factors in place that should support the demand for housing, we believe the effect of the troubles in the subprime sector on the broader housing market will likely be limited, and we do not expect significant spillovers from the subprime market to the rest of the economy or to the financial system."

d. A statement at a meeting of the Federal Open Market Committee on October 30-31, 2007: "Let me try to summarize this discussion. It is a little harder than usual. Broadly, the macroeconomic news came in slightly better than expected during the intermeeting period. Housing has been very weak, as expected; but consumption, investment, and net exports were

10

776385

relatively strong in recent months. In the aggregate data, there is yet no clear sign of a spillover from housing. Most participants expect several weak quarters followed by recovery later next year."

e. A statement referenced in the article, "Anatomy of a Meltdown," published in The New Yorker on December 1, 2008: "I and others were mistaken early on in saying that the subprime crisis would be contained. The causal relationship between the housing problem and the broad financial system was very complex and difficult to predict."

f. A statement before the U.S. Senate Banking Committee on December 3, 2009: "I did not anticipate a crisis of this magnitude and severity."

26.   Documents in Your possession, custody or control sufficient to identify each of the individuals, by name and employing entity, involved in the (i) preparing, (ii) considering or (iii) discussing with Chairman Bernanke, any of the statements in Request 25 (a)-(f), including, but not limited to, individuals who provided documents or other information reviewed, referenced, relied upon or used in connection with the preparation or review of any such statements.

27.   As to each individual identified by the document responses to Request 26 and as to Ben S. Bernanke himself, all documents in Your possession, custody or control prepared, reviewed or received by that individual through December 31, 2009 constituting, containing or referring to:

a. Any subsequent comments made or received with respect to any of the statements identified in Request 25, above;

b. The expected performance of the U.S. residential housing market in any portion of the period 2004-2008;

c. Any prediction of a decline in home prices to occur in 2007 and/or 2008, and any response to any such prediction;

11

776385

d. The expected performance of non-prime residential mortgages originated or securitized in any portion of the period 2004-2008;

e. The expected performance of RMBS and/or CDOs exposed to RMBS issued in any portion of the period 2004-2008;

f. Any assessment, discussion or analysis of the ratings issued by any NRSRO with respect to RMBS and/or CDOs exposed to RMBS issued in any portion of the period 2004-2008;

g. Any comparison of the performance of ratings issued by different NRSROs in any portion of the period 2004-2008, whenever such comparisons were prepared;

h. Any identification of factors considered or to be considered at any time in the period 2004-2008 in evaluating the expected and/or actual performance of (i) the United States residential housing market generally; (ii) non-prime residential mortgages; (iii) RMBS or (iv) CDOs exposed to RMBS.

28.   All documents or other information in Your possession, custody or control reviewed, considered and/or relied upon by Timothy Geithner in making each of the following statements:

a. A statement at a meeting of the Federal Open Market Committee on January 30-31, 2007: "Let me just go through the principal questions briefly. Is the worst behind us in both housing and autos? Probably, but we can't be sure yet. If we get some negative shock to income—to demand growth—we're still vulnerable to a more adverse adjustment in housing prices with potentially substantially negative effects on growth, in part because of the greater leverage now on household balance sheets. How strong does the economy look outside autos and housing? Pretty strong, it seems. We see no troubling signs of weakness, despite the disappointment on some aspects of investment spending."

b. A statement at a meeting of the Federal Open Market Committee on June 27-28, 2007: "With financial markets, we are at a delicate moment. The losses in subprime are still working their way through the system. Rating agencies are

12

776385

likely to downgrade a larger share of past issues, more than they have already. The marks that people show indicate that both hedge funds and dealers in a lot of this stuff may still have a way to go to catch up with the movement in market prices. This dynamic itself could induce a further reduction in willingness to finance new mortgages. You could see pockets of losses in the system, liquidity pressures in hedge funds and their counterparties, and further forced liquidations. It is possible that we will still have a bunch of that effect ahead of us, even if no big negative shock to demand occurs and induces a broader distress in consumer credit. We could also see it spread to commercial real estate. We could see a broader pullback from CDOs and CLOs as well, either from a general erosion of faith in the rating models—as Bill said, it is a possibility— or from just concerns about liquidity in those instruments. We could see a sharp, substantial widening of credit spreads provoked by an unanticipated default or two or just a general reassessment of risk at current prices."

c. A statement at a meeting of the Federal Open Market Committee on October 30-31, 2007: "Housing prices are still obviously sliding down. We don't really claim to know much about where they're going to end up or where we are in that process, but it seems that they are falling and probably at an accelerating rate."

29.    Documents in Your possession, custody or control sufficient to identify each of the individuals, by name and employing entity, involved in the (i) preparing, (ii) considering or (iii) discussing with Mr. Geithner, any of the statements in Request 28 (a)-(c), including, but not limited to, individuals who provided documents or other information reviewed, referenced, relied upon or used in connection with the preparation or review of any such statements.

30.    As to each individual identified by the document responses to Request 29 and as to Mr. Geithner himself, all documents in Your possession, custody or control prepared, reviewed or received by that individual through December 31, 2009 constituting, containing or referring to:

13

776385

a. Any subsequent comments made or received with respect to any of the statements identified in Request 28, above;

b. The expected performance of the U.S. residential housing market in any portion of the period 2004-2008;

c. Any prediction of a decline in home prices to occur in 2007 and/or 2008, and any response to any such prediction;

d. The expected performance of non-prime residential mortgages originated or securitized in any portion of the period 2004-2008;

e. The expected performance of RMBS and/or CDOs exposed to RMBS issued in any portion of the period 2004-2008;

f. Any assessment, discussion or analysis of the ratings issued by any NRSRO with respect to RMBS and/or CDOs exposed to RMBS issued in any portion of the period 2004-2008;

g. Any comparison of the performance of ratings issued by different NRSROs in any portion of the period 2004-2008, whenever such comparisons were prepared;

h. Any identification of factors considered or to be considered at any time in the period 2004-2008 in evaluating the expected and/or actual performance of (i) the United States residential housing market generally; (ii) non-prime residential mortgages; (iii) RMBS; or (iv) CDOs exposed to RMBS.

31.   All documents relating to, consisting of or reflecting any evaluation, assessment, study, finding or analysis made by You between 2004 and 2008 regarding the independence of any NRSRO.

32.   All documents relating to, consisting of or reflecting any evaluation, assessment, study, finding or analysis made by You concerning credit ratings issued with respect to RMBS and/or CDOs exposed to RMBS issued between 2004 and 2008, relating to:

a. the accuracy of the ratings of any NRSRO;

14

776385

b. the existence of perceived conflicts of interest of any NRSRO in its ratings;

c. the advisability of any institution or individual relying on ratings of any NRSRO;

d. communications with any NRSRO as to items (a)-(c);

e. the relative performance of various NRSROs.

33.   All documents reflecting or referring to *both* (i) the FIRREA Investigation (or this Action); *and* (ii) any of the following: (a) S&P's credit rating of the United States of America, or (b) the Downgrade, or (c) the Change in Outlook, or (d) the CreditWatch Action.

34.   All documents prepared between January 1, 2011 and November 30, 2011, reflecting or referring to *both* (i) S&P's credit rating of the United States of America, or the Downgrade, or the Change in Outlook, or the CreditWatch Action; *and* (ii) an investigation of S&P for any potential civil or criminal violation.

35.   All documents and communications reflecting DOJ policies, practices and procedures, in effect for any period between January 1, 2009 and the present, for investigating or obtaining authorization to bring legal actions against any entity in connection with possible FIRREA violations, including but not limited to all guidelines, instructions, check-lists and training materials.

36.   All documents constituting or relating to transcriptions, summaries, notes, recordings, and videos of depositions or interviews, whether such depositions or interviews were conducted under oath or not, conducted by the DOJ in connection with any investigation of any NRSRO relating to credit ratings issued with respect to RMBS and/or CDOs exposed to RMBS issued between 2004 and 2008 to the extent any such document constitutes, includes, or refers to:

a. Any discussion of S&P;

15

776385

b.  present or former S&P employees;

c.  a comparison of the rating assigned by any other NRSRO and
the rating assigned by S&P;

d.  a comparison of the performance of NRSROs; or

e.  any statements or information regarding the accuracy or quality
of information provided to any NRSRO in connection with the
rating of any such RMBS or CDO.

You may exclude from production, but should log, any
information constituting the mental impressions, conclusions, opinions or legal
theories of counsel.

37.  All documents relating to depositions or interviews conducted by the
DOJ in connection with any investigation relating to the securitization of RMBS
and/or CDOs exposed to RMBS issued between 2004 and 2008 to the extent such
document constitutes, includes, or refers to:

a.  Any discussion of S&P;

b.  present or former S&P employees;

c.  a comparison of the rating assigned by any other NRSRO and
that assigned by S&P;

d.  a comparison of the performance of NRSROs; or

e.  any statements or information regarding the accuracy or quality
of information provided to any NRSRO in connection with the
rating of any such RMBS or CDO.

You may exclude from production, but should log, any
information constituting the mental impressions, conclusions, opinions or legal
theories of counsel.

38.  All documents, including interview notes in the possession, custody or
control of the DOJ, relating to the practices of other NRSROs with respect to:

16

776385

a. Policies or procedures concerning the updating of CDO ratings, including the incorporation of the actual or projected changes in ratings or ratings methodologies with respect to the classes of underlying securities to which CDOs are exposed;

b. the timing of changes in rating methodologies and analytical models implemented in 2007 relating to changing perceptions of the performance of the U.S. residential housing market in 2006-2008;

c. policies or procedures related to addressing any perceived conflicts of interest in connection with rating structured finance securities;

d. the development and updating of rating methodologies and analytical models used in the ratings process;

e. accounting for the deterioration in the performance of non-prime RMBS when issuing new ratings on structured finance securities or surveilling existing ratings on structured finance securities;

f. the utilization of loan level data in rating RMBS and CDOs backed by RMBS.

39.     All documents reflecting communications between DOJ and any NRSRO relating to credit ratings issued with respect to RMBS and/or CDOs exposed to RMBS issued between 2004 and 2008.

40.     All documents received by DOJ, from any NRSRO in the period from January 1, 2009 to the present, relating to:

a. the independence of any NRSRO;

b. the quality of the ratings of any NRSRO;

c. the existence of perceived conflicts of interest of any NRSRO in its ratings;

d. the advisability of any institution or individual relying on ratings of any NRSRO;

17

776385

e.  communications with any NRSRO as to items (a)-(d);

f.  the relative performance of various NRSROs.

41.    All documents received from any NRSRO in the course of the FIRREA Investigation relating to any conduct by the NRSRO that is alleged by You, whether in the Complaint or otherwise, to constitute a FIRREA violation with respect to the same conduct by S&P.

42.    All documents constituting or relating to communications between DOJ and the SEC regarding the investigation of any NRSRO, credit ratings issued with respect to RMBS and/or CDOs exposed to RMBS issued between 2004 and 2008 or the accuracy or quality of any statement made to any NRSRO in connection with the rating of any RMBS or CDO.

43.    All documents constituting or relating to communications between DOJ and any State Attorney General regarding the investigation of any NRSRO, credit ratings issued with respect to RMBS and/or CDOs exposed to RMBS issued between 2004 and 2008 or the accuracy or quality of any statement made to any NRSRO in connection with any rating of any RMBS or CDO.

44.    All documents relating to DOJ's investigation of any issuer, arranger, sponsor, underwriter or seller of RMBS or CDOs for fraud or deceptive practices relating to RMBS and/or CDOs exposed to RMBS issued between 2004 and 2008.

45.    All documents and communications relating to Your knowledge or awareness between 2004 and 2008 of instances of residential mortgage loan origination fraud, including but not limited to complaints and investigations relating to the practices of any issuer, arranger, sponsor, underwriter or seller of RMBS or CDOs.

46.    All documents relating to investigations conducted by You involving

18

776385

fraud, misrepresentations or omissions with respect to material information relating to RMBS or CDOs backed by RMBS supplied by any federally insured financial institution, or any other financial institution to S&P during the 2004 to 2008 time period.

47.    All documents in the possession, custody or control of DOJ relating to both (i) S&P or the FIRREA Investigation; *and* (ii) former S&P employees now employed by the United States government, including documents received by the DOJ from such employees and documents provided by DOJ to such employees or to the actual or potential supervisor of such employee.

48.    All documents relating to any of the individuals identified in Exhibit A-1 of the Supplement to Plaintiff United States' Initial Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(1)(A) served on May 28, 2013, and attached hereto as Exhibit B, that are in the possession, custody or control of the DOJ and were received from any employees in any Executive Department, the SEC, and/or the Federal Reserve System.

49.    All documents relating to S&P that are in the possession, custody or control of the DOJ and were received from any employees in any Executive Department, the SEC, and/or the Federal Reserve System.

50.    All documents relating to the FIRREA Investigation that are in the possession, custody or control of the DOJ and were received from any employees in any Executive Department, the SEC, and/or the Federal Reserve System.

51.    All documents constituting, referring or relating to any statement or inquiry by Gene Sperling, Director of the National Economic Council and Assistant to the President for Economic Policy, created during the time period from January 1, 2011 – February 4, 2013, concerning the possibility of civil or criminal

776385

1   actions, sanctions or other possible steps of any kind leading to adverse
2   consequences of any kind against S&P.

3       52.   All documents constituting, referring or relating to any statement or
4   inquiry by Timothy Geithner, created during the time period from January 1, 2011
5   through the end of his term as Secretary of the United States Department of the
6   Treasury, concerning the possibility of civil or criminal actions, sanctions or other
7   possible steps of any kind leading to adverse consequences of any kind against
8   S&P.
9

10      53.   All documents sent or received by DOJ, whether internal or external,
11  relating to S&P's credit rating of the United States of America, or the Downgrade,
12  or the CreditWatch Action, or the Change in Outlook.

13

14  Dated:  August 20, 2013            KEKER & VAN NEST LLP

15

16                                  By:  /s/ John W. Keker
17                                       John W. Keker

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS
CASE NO.  CV13-779 DOC (JCGX)

776385

# EXHIBIT B

1  STUART DELERY
   Assistant Attorney General
2  MAAME EWUSI-MENSAH FRIMPONG
      (CA Bar No. 222986)
3  ARTHUR R. GOLDBERG
   MICHAEL S. BLUME
4  JAMES T. NELSON
   BRADLEY COHEN
5  JENNIE KNEEDLER
   SONDRA L. MILLS (CA Bar No. 090723)
6  THOMAS D. ZIMPLEMAN
   United States Department of Justice, Civil Division
7     P.O. Box 261, Ben Franklin Station
      Washington, D.C. 20044
8     Telephone: (202) 616-2376
      Facsimile: (202) 514-8742
9     Email: James.Nelson2@usdoj.gov

10 ANDRÉ BIROTTE JR.
   United States Attorney
11 GEORGE S. CARDONA (CA Bar No. 135439)
   LEON W. WEIDMAN (CA Bar No. 104078)
12 ANOIEL KHORSHID (CA Bar No. 223912)
   RICHARD E. ROBINSON (CA Bar No. 090840)
13 Assistant United States Attorneys
      Room 7516 Federal Building
14    300 N. Los Angeles St.
      Los Angeles, California 90012
15    Telephone: (213) 894-8323/6086
      Facsimile: (213) 894-7819 [Main]
16    Email: George.S.Cardona@usdoj.gov / Anoiel.Khorshid@usdoj.gov

17 Attorneys for Plaintiff
   United States of America

18

19              UNITED STATES DISTRICT COURT

20          FOR THE CENTRAL DISTRICT OF CALIFORNIA

21 UNITED STATES OF AMERICA,        No. 2:13-cv-00779-DOC-JCG

22          Plaintiff,              UNITED STATES' RESPONSE TO
                                    DEFENDANTS' FIRST REQUEST FOR
23          v.                      PRODUCTION OF DOCUMENTS;
                                    EXHIBITS 1-2
24 MCGRAW-HILL COMPANIES, INC.,
   and STANDARD & POOR'S
25 FINANCIAL SERVICES LLC,

26          Defendants.

27

28

Pursuant to Rules 26(b) and 34(b)(2) of the Federal Rules of Civil Procedure, plaintiff United States provides these responses to the First Request for Production of Documents (the "First Request") propounded by defendants McGraw-Hill Financial, Inc., and Standard & Poor's Financial Services LLC (collectively "defendants" or "S&P").

## I.

### GENERAL OBJECTIONS

The United States incorporates all of the following General Objections into each of its specific responses to the First Request, whether or not each such General Objection is expressly referenced in the specific response. The assertion of the same, similar, or additional objections or the provision of partial responses to any specific document request does not and should not be construed to waive or modify any of the United States' General Objections.

The United States has the following General Objections to the First Request:

1.   The United States objects to the First Request to the extent it seeks to impose requirements or obligations on the United States in addition to, beyond the scope of, or different from those imposed by the Federal Rules of Civil Procedure or the Local Rules of the United States District Court for the Central District of California.

2.   The United States objects to the First Request to the extent it seeks documents that are not relevant, are not related to any claim or defense raised in this action,[1] or are not reasonably

---

[1] As used throughout, "this action" refers to the filed case, *United States v. McGraw-Hill Companies, Inc. and Standard & Poor's Financial Services LLC*, No. 13-CV-00779-DOC(JCGx).

1  calculated to lead to the discovery of admissible evidence.  <u>See</u>

2  Fed. R. Civ. P. 26(b)(1).

3      3.   The United States objects to the First Request to the

4  extent it seeks information and documents that are in the

5  possession, custody, or control of S&P, or that are publicly

6  available, or that can be obtained from some other source that is

7  more convenient, less burdensome, or less expensive.  <u>See</u> Fed. R.

8  Civ. P. 26(b)(2)(C)(i).

9      4.   The United States objects to the First Request to the

10  extent it seeks documents for which the burden or expense of the

11  proposed discovery outweighs its likely benefit in resolving the

12  issues in this action.  <u>See</u> Fed. R. Civ. P. 26(b)(2)(C)(iii).

13      5.   The United States objects to the First Request to the

14  extent it seeks expert discovery prior to the time set for such

15  expert discovery pursuant to Federal Rule of Criminal Procedure

16  26(a)(2).

17      6.   The United States objects to the First Request to the

18  extent it seeks documents or information protected from discovery by

19  any privilege or doctrine, including but not limited to the

20  attorney-client privilege, deliberative process privilege,

21  investigatory files privilege, law enforcement privilege,

22  presidential communications privilege, work-product doctrine, and/or

23  joint prosecution/common interest doctrine.  <u>See</u> Fed. R. Civ. P.

24  26(b)(3)(a) & (b)(5).  The United States reserves its right to

25  object to the introduction into evidence before the Court at any

26  time before or at trial of any document or information that is

27  privileged or otherwise protected under law that was revealed or

28  produced inadvertently.  The United States does not, by responding

3

or producing documents in response to any specific request, waive any claim of privilege or the protection of any doctrine. <u>See</u> Fed. R. Civ. P. 26(b)(5)(B). Moreover, any response or production of documents by the United States shall be subject to the Federal Rule of Evidence 502(d) Order issued by the Court in this case.

7.    The United States objects to the First Request to the extent that responding would require the United States to disclose documents or information in violation of any Court order, statute, or Federal Rule of Criminal Procedure, in the context of a grand jury proceeding, a criminal sentencing or other disposition, a sealed False Claims Act *qui tam* matter, or any other matter. The United States will not separately object to any specific request to assert this ground where doing so would itself violate the order, statute, or rule at issue.

8.    The United States objects to the First Request to the extent it seeks documents subject to a request for confidential treatment by or other confidentiality obligation to a non-party to this action without the prior consent of that non-party.

9.    To the extent the First Request seeks "all" documents concerning a particular subject, the United States objects that it is overly broad, vague, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

10.    To the extent the First Request seeks information and documents without specification of a relevant time period, the United States objects that it is overly broad, vague, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

11.   The United States objects to the First Request's definition of the terms "You" and "Your" as vague, ambiguous, and overly broad for purposes of identifying those government entities falling within the scope of the United States' discovery obligations under Fed. R. Civ. P. 34.  In particular, the United States objects to this definition insofar as it purports to bring within the scope of the First Request (which is made pursuant to Fed. R. Civ. P. 34) independent regulatory agencies, boards, committees, and commissions such as the Board of Governors of the Federal Reserve System ("the Board"), the Federal Open Market Committee ("FOMC"), the Securities and Exchange Commission ("SEC"), the Office of the Comptroller of the Currency ("OCC"), the Federal Deposit Insurance Corporation ("FDIC"), and the National Credit Union Administration ("NCUA") (collectively "the Independent Regulatory Entities"), which are not properly treated as subject to a request for discovery served pursuant to Fed. R. Civ. P. 34 on the United States as party plaintiff in this action, and from which documents are properly sought by way of subpoena issued pursuant to Fed. R. Civ. P. 45. The United States also objects to this definition insofar as it purports to bring within the scope of the First Request non-governmental entities, including private corporations in which the United States holds an interest, such as the Federal Reserve Bank of New York ("FRBNY") (collectively "Non-Governmental Entities"), which also are not properly treated as subject to a request for discovery served pursuant to Fed. R. Civ. P. 34 on the United States as party plaintiff in this action, and from which documents are properly sought by way of subpoena issued pursuant to Fed. R. Civ. P. 45. Subject to and without waiving the foregoing General Objection, the

5

1  United States will interpret "United States," "Plaintiff," "You,"

2  and "Your," to mean the offices and agencies of the Executive Branch

3  of the United States government, excluding Independent Regulatory

4  and Non-Governmental Entities, that are known by counsel for the

5  United States in this matter ("US counsel") to possess or to be

6  reasonably likely to possess responsive documents or information and

7  the employees of those offices and agencies.

8       12.  When the United States responds that it will produce

9  documents in response to a specific request, it will produce such

10 documents to the extent that they exist and can be reasonably

11 obtained.  By stating that it will produce documents, the United

12 States does not represent that it has determined that any such

13 documents or things in fact exist, or that they are within its

14 possession, custody or control.  The specific responses set out

15 below and any productions made pursuant thereto are based upon

16 information available to US counsel after having made or caused to

17 be made a diligent search of files in the possession, custody, or

18 control of offices and agencies of the Executive Branch of the

19 United States government, excluding Independent Regulatory and Non-

20 Governmental Entities, that are known by US counsel to possess or to

21 be reasonably likely to possess documents or information that

22 reasonably relate to the specific requests set out in the First

23 Request.  The United States objects to the First Request to the

24 extent it purports to require a search of files outside this scope.

25      13.  Each response is subject to all objections as to

26 competence, relevance, materiality, privilege, and admissibility,

27 and any and all other objections on grounds that would require the

28 exclusion of any statement or information contained herein if the

6

introduction of such evidence was sought at the time of trial, all of which objections and grounds are reserved and may be interposed at the time of trial. The fact that the United States has responded to any part or all of any specific request is not intended to and shall not be construed to be a waiver by the United States of any such objection.

14. The United States' responses to the First Request shall not be construed as a waiver of any objection to other discovery requests involving or relating to the same or similar subject matter of any of the specific requests set out in the First Request.

15. The United States' response or objection to any specific request should not be construed as an admission or acknowledgment of any fact set forth in, assumed by, or inferred from the specific request.

16. Subject to and without waiving any objections, the United States will respond to the First Request or portions thereof to the best of its present ability. The United States has not completed its discovery of the facts pertaining to this action or its preparation of this action for trial. As a result, the responses and objections set forth below are based on present knowledge and recollection and information currently and reasonably known to the United States and US counsel, and are made without prejudice to the United States' right to amend and supplement its responses and assert additional objections based upon any facts, documents, or other evidence that may develop or come to the United States' attention at a later time.

# II.

## RESPONSES AND OBJECTIONS TO INDIVIDUAL REQUESTS FOR PRODUCTION

Request For Production No. 1

All documents, to the extent not previously produced, constituting or relating to transcriptions, summaries, notes, recordings, and videos of interviews or depositions, whether such interviews or depositions were conducted under oath or not, of the 49 individuals for whom some transcriptions were previously produced as identified in DOJ's May 8, 2013 letter to John W. Keker, Esq., a copy of which is attached hereto as Exhibit A. You may exclude from production, but should log, any information constituting the mental impressions, conclusions, opinions or legal theories of counsel.

Response to Request For Production No. 1

In addition to the General Objections set forth above, the United States objects to this request on the grounds that it seeks:

(a)  summaries and notes of interviews of the 49 individuals, which summaries and notes constitute protected attorney-work product; and

(b)  transcripts and videos of depositions taken in litigation to which S&P was a party or otherwise participated, which transcripts and videos (together with supporting exhibits) are already in S&P's possession or are readily obtainable by S&P from another source that is more convenient, less burdensome, or less expensive.

Subject to and without waiving either the General Objections or these specific objections, the United States:

(a)  has already produced the videos, transcripts, and accompanying exhibits of sworn statements taken under oath

8

1    by Department of Justice ("DOJ") attorneys from the 49

2    individuals during the course of the FIRREA investigation

3    of S&P that led to the filing of the Complaint in this

4    action (the "FIRREA Investigation"); and

5    (b)   to the extent DOJ has previously obtained them from the

6          SEC in the course of the FIRREA Investigation, will

7          produce the videos, transcripts, and accompanying exhibits

8          of sworn testimony taken by SEC attorneys from the 49

9          individuals in connection with various SEC investigations.

10   Request for Production No. 2

11   All documents, to the extent not previously produced,

12   constituting or relating to transcriptions, summaries, notes,

13   recordings, and videos of all depositions or interviews, whether

14   such depositions or interviews were conducted under oath or not, of

15   each individual identified in Exhibit A-1 of the Supplement to

16   Plaintiff United States' Initial Disclosures Pursuant to Federal

17   Rule of Civil Procedure 26(a)(1)(A) served on May 28, 2013, a copy

18   of which is attached hereto as Exhibit B. You may exclude from

19   production, but should log, any information constituting the mental

20   impressions, conclusions, opinions or legal theories of counsel.

21   Response to Request for Production No. 2

22   In addition to the General Objections set forth above, the

23   United States objects to this request on the grounds that it seeks:

24   (a)   summaries and notes of interviews of the identified

25         individuals, which summaries and notes constitute

26         protected attorney-work product; and

27   (b)   transcripts and videos of depositions taken in litigation

28         to which S&P was a party or otherwise participated, which

9

1   transcripts and videos (together with supporting exhibits)

2   are already in S&P's possession or are readily obtainable

3   by S&P from another source that is more convenient, less

4   burdensome, or less expensive.

5   Subject to and without waiving either the General Objections or

6   these specific objections, the United States:

7   (a)   has already produced the videos, transcripts, and

8   accompanying exhibits of sworn statements taken under oath

9   by DOJ attorneys from the identified individuals during

10   the course of the FIRREA Investigation; and

11   (b)   to the extent DOJ has previously obtained them from the

12   SEC in the course of the FIRREA Investigation, will

13   produce the videos, transcripts, and accompanying exhibits

14   of sworn testimony taken by SEC attorneys from the

15   identified individuals in connection with various SEC

16   investigations.

17   Request for Production No. 3

18   All documents, to the extent not previously produced,

19   constituting or relating to transcriptions, summaries, notes,

20   recordings, and videos of depositions or interviews, whether such

21   depositions or interviews were conducted under oath or not,

22   conducted by the DOJ of any individual in connection with the FIRREA

23   Investigation. You may exclude from production, but should log, any

24   information constituting the mental impressions, conclusions,

25   opinions or legal theories of counsel.

26   Response to Request for Production No. 3

27   In addition to the General Objections set forth above, the

28   United States objects to this request on the grounds that it seeks:

10

(a)   summaries and notes of interviews of individuals, which
      summaries and notes constitute protected attorney-work
      product; and

(b)   transcripts and videos of depositions taken in litigation
      to which S&P was a party or otherwise participated, which
      transcripts and videos (together with supporting exhibits)
      are already in S&P's possession or are readily obtainable
      by S&P from another source that is more convenient, less
      burdensome, or less expensive.

Subject to and without waiving either the General Objections or
these specific objections, the United States:

(a)   has already produced the videos, transcripts, and
      accompanying exhibits of sworn statements taken under oath
      by DOJ attorneys from individuals during the course of the
      FIRREA Investigation; and

(b)   to the extent DOJ has previously obtained them from the
      SEC in the course of the FIRREA Investigation, will
      produce the videos, transcripts, and accompanying exhibits
      of sworn testimony taken by SEC attorneys from individuals
      in connection with various SEC investigations.

Request for Production No. 4

All documents and communications reflecting DOJ policies,
practices and procedures governing the creation, use or retention of
such transcriptions, summaries, notes, recordings and videos of
depositions or interviews, as referenced in Requests 1-3 above,
including but not limited to all guidelines, instructions, check-
lists and training materials.

11

Response to Request for Production No. 4

In addition to the General Objections set forth above, the United States objects to this request on the grounds that:

(a)   such policies, practices, and procedures are not relevant, are not related to any claim or defense raised in this action, and are not reasonably calculated to lead to the discovery of admissible evidence;

(b)   it seeks internal DOJ policies, practices, and procedures that provide only internal DOJ guidance and are not intended to, and may not be relied upon, to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal;

(c)   it seeks documents protected by the attorney-client privilege, deliberative process privilege, and/or work-product doctrine; and

(d)   it seeks documents that are publicly available, including but not limited to the Federal Records Act, 44 U.S.C. § 3101 and United States Attorney's Manual § 3-13.300.

Following discussions with counsel for S&P regarding this request, in a letter dated October 8, 2013, S&P provided examples of what it sought by this request as including: "(i) identification of any policies or procedures relating to the retention of such materials, so we can assess whether any potentially relevant materials may have been destroyed, (ii) identification of any policies pertaining to the permissible uses of such materials, including the propriety of sharing such material with third parties for their private use, and (iii) identification of any policies or privileges concerning the use of non-lawyers to record factual

12

1   information obtained during the investigation."   Subject to and

2   without waiving either the General Objections or the specific

3   objections set forth above, US counsel has agreed to search for

4   documents using these examples as a guide and then produce or advise

5   S&P further regarding its objections to production.   The United

6   States has advised S&P that its search may be slowed as a result of

7   the furlough of certain DOJ staff during the recently-completed

8   government shutdown.

9   <u>Request for Production No. 5</u>

10      All documents containing statements or information that You

11  contend support the allegations in the Complaint.

12  <u>Response to Request for Production No. 5</u>

13      In addition to the General Objections set forth above, the

14  United States objects to this request on the grounds that:

15      (a)   to the extent it seeks documents falling within requests

16            for production 1-3 above, it is subject to the specific

17            objections to those requests set forth above, which

18            objections are incorporated herein by reference;

19      (b)   it seeks public documents and documents already within

20            S&P's possession, including in particular but not limited

21            to documents produced by S&P to the United States in

22            response to subpoenas issued as part of the FIRREA

23            Investigation ("FIRREA Subpoenas");

24      (c)   it seeks documents protected by the attorney-client

25            privilege, deliberative process privilege, investigatory

26            files privilege, law enforcement privilege, work-product

27            doctrine, and/or joint prosecution/common interest

28            doctrine, including in particular but not limited to

13

notes, outlines, memoranda, summaries, and presentations
prepared by DOJ attorneys and personnel;

(d)  it seeks documents subject to requests for confidential
treatment by or other confidentiality obligations to non-
parties to this action without the prior consent of those
non-parties; and

(e)  to the extent it seeks factual and legal conclusions
supporting the allegations contained in the Complaint, it
constitutes an improper contention interrogatory that is
premature at this preliminary stage of discovery.

Subject to and without waiving either the General Objections or
these specific objections, the United States:

(a)  has already produced the videos, transcripts, and
accompanying exhibits of sworn statements taken under oath
by DOJ attorneys from individuals during the course of the
FIRREA Investigation;

(b)  to the extent DOJ has previously obtained them from the
SEC in the course of the FIRREA Investigation, will
produce the videos, transcripts, and accompanying exhibits
of sworn testimony taken by SEC attorneys from individuals
in connection with various SEC investigations;

(c)  to the extent that, in the course of the FIRREA
Investigation, the United States obtained documents from a
source other than S&P, plans to produce (i) those non-
privileged documents that were provided without any
request for confidential treatment and free from any other
confidentiality obligation and (ii) subject to S&P's
agreement, as reflected in a letter agreement signed by

14

1    S&P's counsel on October 2, 2013, to accord the documents

2    produced treatment as "Confidential Information" under the

3    Protective Order in place in this case, those non-

4    privileged documents that were provided with a request for

5    confidential treatment or are otherwise subject to a

6    confidentiality obligation, but as to which the source has

7    consented to production;

8    (d)  as evidenced by Exhibit C to the First Request, has

9         previously produced to S&P copies of non-privileged

10        documents (and a list by Bates Numbers of those documents)

11        that, together with the exhibits to the sworn testimony

12        and depositions referenced in footnote 2 of Exhibit C to

13        the First Request, support the allegations in the

14        Complaint; and

15   (e)  will provide a supplement to the list referenced in

16        subsection (d) above identifying, by Bates Numbers or

17        otherwise, additional non-privileged documents referenced,

18        relied on, or otherwise used in formulating the

19        allegations in the Complaint.

20   Request for Production No. 6

21   All documents referenced, relied on, or otherwise used in

22   formulating the allegations in the Complaint.

23   Response to Request for Production No. 6

24   The United States' response to request for production 6 is the

25   same as its response to request for production 5 set forth above,

26   which response is incorporated herein by reference.

27

28

15

1  <u>Request for Production No. 7</u>

2      All documents referenced, relied on, or otherwise used in

3  formulating Supplement to Plaintiff United States' Initial

4  Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(1)(A)

5  served on May 28, 2013, a copy of which is attached hereto as

6  Exhibit B.

7  <u>Response to Request for Production No. 7</u>

8      In addition to the General Objections set forth above, the

9  United States objects to this request on the grounds that:

10      (a)  to the extent it seeks documents falling within requests

11           for production 1-3 and 5-6 above, it is subject to the

12           specific objections to those requests set forth above,

13           which are incorporated herein by reference;

14      (b)  it seeks public documents and documents already within

15           S&P's possession, including in particular but not limited

16           to documents produced by S&P to the United States in

17           response to FIRREA Subpoenas;

18      (c)  it seeks documents protected by the attorney-client

19           privilege, deliberative process privilege, investigatory

20           files privilege, law enforcement privilege, work-product

21           doctrine, and/or joint prosecution/common interest

22           doctrine, including in particular but not limited to

23           notes, outlines, memoranda, summaries, and presentations

24           prepared by DOJ attorneys and personnel;

25      (d)  it seeks documents subject to requests for confidential

26           treatment by or other confidentiality obligations to non-

27           parties to this action without the prior consent of those

28           non-parties; and

1    (e)  to the extent it seeks factual and legal conclusions

2         supporting the allegations contained in the Complaint, it

3         constitutes an improper contention interrogatory that is

4         premature at this preliminary stage of discovery.

5    Subject to and without waiving either the General Objections or

6    these specific objections, the United States will produce documents

7    as set forth in the responses to requests for production 1-3 and 5-6

8    above, which responses are incorporated herein by reference.

9    Request for Production No. 8

10   All documents referenced, relied on, or otherwise used in

11   formulating Plaintiff United States' Initial Disclosures Pursuant to

12   Federal Rule of Civil Procedure 26(a)(1)(A), served on May 9, 2013,

13   and attached hereto as Exhibit C.

14   Response to Request for Production No. 8

15   The United States' response to request for production 8 is the

16   same as its response to request for production 7 set forth above,

17   which response is incorporated herein by reference.

18   Request for Production No. 9

19   All documents and information received from or relating to any

20   individual or entity named in Exhibit A-1 of the Supplement to

21   Plaintiff United States' Initial Disclosures Pursuant to Federal

22   Rule of Civil Procedure 26(a)(1)(A) served on May 28, 2013 and

23   attached hereto as Exhibit B.

24   Response to Request for Production No. 9

25   In addition to the General Objections set forth above, the

26   United States objects to this request on the grounds that:

27   (a)  to the extent it seeks documents falling within requests

28        for production 1-3 and 5-6 above, it is subject to the

17

1    specific objections to those requests set forth above,

2    which are incorporated herein by reference;

3    (b)  it seeks public documents and documents already within

4         S&P's possession, including in particular but not limited

5         to documents referenced as exhibits during sworn

6         statements taken under oath by DOJ attorneys from

7         individuals during the course of the FIRREA Investigation

8         and during depositions in private litigation in which S&P

9         was a party or otherwise participated; and

10   (c)  it seeks documents subject to confidentiality obligations

11        to non-parties to this action without the prior consent of

12        those non-parties.

13   Subject to and without waiving either the General Objections or

14   these specific objections, the United States will produce documents

15   as set forth in the responses to requests for production 1-3 and 5-6

16   above, which responses are incorporated herein by reference.

17   Request for Production No. 10

18   All documents containing statements or information that refute

19   or rebut the allegations in the Complaint.

20   Response to Request for Production No. 10

21   In addition to the General Objections, the United States

22   objects to this request on the grounds that it seeks attorney work

23   product in that it seeks to have US counsel identify documents that

24   in their opinion refute or rebut the allegations in the Complaint.

25   Subject to this additional specific objection, the United States

26   incorporates as its response to this request for production 10 its

27   responses to requests for production 6 and 7 set forth above, which

28   responses are incorporated herein by reference.

18

Request for Production No. 11

All documents containing statements or information that would tend to exculpate S&P.

Response to Request for Production No. 11

In addition to the General Objections, the United States objects to this request on the grounds that it seeks attorney work product in that it seeks to have US counsel identify documents that in their opinion exculpate S&P. Subject to this additional specific objection, the United States incorporates as its response to this request for production 11 its responses to requests for production 6 and 7 set forth above, which responses are incorporated herein by reference.

Request for Production No. 12

All documents containing statements or information relating to any potential penalty You contend should be ordered against S&P.

Response to Request for Production No. 12

The United States' response to request for production 12 is the same as its response to request for production 7 set forth above, which response is incorporated herein by reference.

Request for Production No. 13

All documents containing statements or information that would tend to reduce the penalty that You contend should be ordered against S&P.

Response to Request for Production No. 13

In addition to the General Objections, the United States objects to this request on the grounds that it seeks attorney work product in that it seeks to have US counsel identify documents that in their opinion would tend to reduce any penalty ordered against

1   S&P.   Subject to this additional specific objection, the United
2   States incorporates as its response to this request for production
3   13 its response to request for production 7 set forth above, which
4   response is incorporated herein by reference.
5   Request for Production No. 14
6       All subpoenas for documents or testimony You issued to anyone
7   other than S&P in connection with the FIRREA Investigation.
8   Response to Request for Production No. 14
9       Subject to and without waiving the General Objections, the
10  United States will produce the FIRREA Subpoenas issued by the United
11  States to persons or entities other than S&P.
12  Request for Production No. 15
13      All documents You received in response to subpoenas You issued
14  to anyone other than S&P relating to the FIRREA Investigation or any
15  of the allegations contained in the Complaint.
16  Response to Request for Production No. 15
17      In addition to the General Objections set forth above, the
18  United States objects to this request on the grounds that it seeks
19  documents produced by persons or entities in response to FIRREA
20  Subpoenas subject to requests for confidential treatment by or other
21  confidentiality obligations to those persons or entities without the
22  prior consent of those persons or entities.
23      Subject to and without waiving either the General Objections or
24  this specific objection, the United States will produce non-
25  privileged documents provided by persons or entities (other than
26  S&P) in response to FIRREA Subpoenas issued by the United States to
27  the extent that the recipients of the FIRREA Subpoenas: (a) produced
28  documents not subject to a request for confidential treatment or any

20

other confidentiality obligation; or (b) produced documents subject to a request for confidential treatment or other confidentiality obligation but consent to production, subject to the agreement by S&P, as reflected in a letter agreement signed by S&P's counsel on October 2, 2013, to accord the documents treatment as "Confidential Information" under the Protective Order in place in this action.

Request for Production No. 16

All subpoenas for documents or testimony You issued (or issue) to anyone other than S&P in connection with this Action.

Response to Request for Production No. 16

Subject to and without waiving the General Objections, the United States has produced, and will continue to produce, to S&P copies of subpoenas issued by the United States in this action to persons and entities other than S&P.

Request for Production No. 17

Copies of all written correspondence between You and any third-party relating to subpoenas for documents or testimony You issued (or issue) to anyone other than S&P in connection with this Action.

Response to Request for Production No. 17

Subject to and without waiving the General Objections, the United States will produce copies of non-privileged written correspondence between DOJ attorneys and recipients (other than S&P) of subpoenas issued by the United States in this action relating to those subpoenas.

Request for Production No. 18

All documents You received (or receive) in response to subpoenas You issued (or issue) to anyone other than S&P relating to this Action or any of the allegations contained in the Complaint.

21

1  Response to Request for Production No. 18

2      In addition to the General Objections set forth above, the

3  United States objects to this request on the grounds that it seeks

4  documents produced by persons or entities in response to subpoenas

5  issued by the United States in this action that are subject to

6  requests for confidential treatment by or other confidentiality

7  obligations to those persons or entities without the prior consent

8  of those persons or entities.

9      Subject to and without waiving either the General Objections or

10  this specific objection, and subject to documents being accorded

11  treatment as "Confidential Information" under the Protective Order

12  in place in this action as appropriate, the United States will

13  produce documents obtained from persons or entities pursuant to

14  subpoenas issued by the United States in this action.

15  Request for Production No. 19

16      All documents containing statements or information supporting

17  Your contention that any federally insured financial institution was

18  affected by any action by S&P.

19  Response to Request for Production No. 19

20      The United States' response to request for production 19 is the

21  same as its responses to requests for production 5 and 7 set forth

22  above, which responses are incorporated herein by reference.

23  Request for Production No. 20

24      All documents containing statements or information supporting

25  any contention You make that any other financial institution

26  suffered losses resulting from any action by S&P actionable under

27  the Complaint.

28

22

Response to Request for Production No. 20

The United States' response to request for production 20 is the same as its responses to requests for production 5 and 7 set forth above, which responses are incorporated herein by reference.

Request for Production No. 21

All documents relating to the origination of, use of, or reference to the "codename" "Alchemy" mentioned in the February 5, 2013 remarks of then Acting Associate Attorney General Tony West.

Response to Request for Production No. 21

In discussions with counsel for S&P regarding this request, S&P has identified only two possible bases on which the documents sought are asserted to be relevant: (a) S&P asserts that this request seeks documents to support its asserted defense that the Complaint in this action was selectively filed in retaliation for S&P's asserted exercise of First Amendment rights in making preliminary announcements relating to and ultimately issuing a downgrade of the credit rating of the United States Government (the "First Amendment selective retaliation defense") (see Corrected Answer (Docket No. 53) at 70, Eleventh Defense); and (b) S&P asserts that this request seeks documents relevant to S&P's assertion that the government improperly prejudged the case.

To the extent this request seeks documents to support the asserted First Amendment selective retaliation defense, in addition to the General Objections set forth above, it is subject to the specific objections set forth in the response to request for production 33 set forth below, which response is incorporated herein by reference.

23

To the extent this request seeks documents for some other purpose, in addition to the General Objections set forth above, the United States objects to this request on the grounds that:

    (a)   the origination of, uses of, and references to the "codename" "Alchemy" are not relevant, are not related to any claim or defense properly raised in this action, and are not reasonably calculated to lead to the discovery of admissible evidence, in that, among other reasons, they can have no bearing on allegations that S&P made materially false and misleading representations regarding its own rating process and the creditworthiness of specific securities because the origination of, uses of, and references to the "codename" "Alchemy" were not known to S&P at the time of S&P's alleged misrepresentations; and

    (b)   the burden and expense of the proposed discovery would be excessive, and would outweigh any benefit of the discovery in resolving the issues in this action, as it would require searches of hardcopy documents and emails, including archival email searches, for all DOJ personnel who worked on the FIRREA Investigation, and subsequent review of any recovered documents; and

    (c)   it seeks documents protected by the attorney-client privilege, deliberative process privilege, investigatory files privilege, law enforcement privilege, work-product doctrine, and/or joint prosecution/common interest doctrine, including in particular but not limited to

1       notes, outlines, memoranda, summaries, and presentations

2       prepared by DOJ attorneys and personnel.

3       Following discussions with counsel for S&P regarding this

4  request, in a letter dated October 8, 2013, S&P requested: "In order

5  to help us narrow the scope and burden posed by this request, we ask

6  that you identify (i) the date on which the phrase ["Project

7  Alchemy"] was first put into use, (ii) who selected the code phrase,

8  and (iii) an identification of what the phrase refers to . . . ."

9  Subject to and without waiving either the General Objections or the

10 specific objections set forth above, US counsel has agreed to

11 conduct inquiries and/or searches for documents to obtain the

12 answers to these three questions and then either provide the answers

13 to S&P or advise S&P further regarding any objections to providing

14 the answers.   The United States has advised S&P that its inquiries

15 and searches may be slowed as a result of the furlough of certain

16 DOJ staff during the recently-completed government shutdown.

17 Request for Production No. 22

18      All documents or other information reviewed, considered and/or

19 relied upon by Henry M. Paulson, Jr., then Secretary of the United

20 States Department of the Treasury, in making each of the following

21 statements:

22      a.   A statement during an interview with CNBC on March
23           13, 2007: "[the fallout in subprime mortgages is]
             going to be painful to some lenders, but it is
             largely contained. . . . We have had a significant
24           housing correction in the U.S. . . . The correction
             has been significant. You can't have a correction
25           like that without causing some dislocation. It is too
             early to tell whether it has bottomed. We'll know
26           more in the next month or two."

27      b.   A statement before The Committee of 100 on April 20, 2007:
             "I believe we have a very healthy and well balanced US
28           economy . . . and we've made a transition and we're making

a transition -- I think a successful transition -- from an economy that was growing at a level, at a rate that was not sustainable to one that's going to be sustainable. We've clearly had a big correction in housing, in the housing market. Retail housing was growing for some time at a level that wasn't sustainable. I think it's too early to say with certainty but there's all the signs I look at lead me to believe that the housing market is at or near the bottom. Now, subprime is obviously an outgrowth of the housing market. And as I look at it in terms of the systemic risks, the economic risks, you know, the macro risk, I don't see it posing a serious problem. I think it's going to be largely contained."

c.   A statement before the U.S. House of Representatives, Committee on Financial Services on November 18, 2008: "We have not in our lifetime dealt with a financial crisis of this severity and unpredictability."

Response to Request for Production No. 22

In addition to the General Objections set forth above, the United States objects to this request on the grounds that:

(a)   it is vague, overbroad, and unduly burdensome, and seeks documents that are not relevant, are not related to any claim or defense raised in this action, and are not reasonably calculated to lead to the discovery of admissible evidence, in that documents reviewed, considered, or relied on internally by the Secretary during the deliberative process that resulted in these public statements can have no bearing on allegations that S&P made materially false and misleading representations regarding its own rating process and the creditworthiness of specific securities because none of the Secretary's internal deliberations or communications would have been known to S&P at the time of S&P's alleged misrepresentations;

26

(b)   to the extent S&P contends that during the deliberative process that resulted in these public statements the Secretary reviewed, considered or relied on "the same data" that S&P was reviewing in arriving at its own assessments of the financial and housing markets (Corrected Answer (Docket No. 53) at 4, ¶ 9), it seeks documents and information already in S&P's possession;

(c)   to the extent that during the deliberative process that resulted in these public statements the Secretary reviewed, considered, or relied on publicly available documents, a search of Treasury's documents and files would produce no new information while requiring Treasury to incur large costs in terms of both time and money – more specifically, a search would require review of materials, both electronic and hard copy, of a very large number of Treasury officials who worked on matters related to the housing and financial markets during and prior to the 2007-2008 time period spanned by the statements cited in this request;

(d)   because the Secretary's statements identified in the request are of a general nature, addressing in broad terms the housing and financial markets, and so likely were based on a number of factors, including the Secretary's past experience, his own market observations, and various views, data, and information provided by economists, policy officials, and others, it is impossible to narrow the source of these views down to a discrete set of documents; consequently, any documents produced would

1        paint a picture that would be incomplete and misleading

2        and would therefore not be relevant;

3   (e) it seeks documents protected by the attorney-client and/or

4        deliberative process privilege, including in particular

5        but not limited to documents reviewed, considered, or

6        relied on by the Secretary during the deliberative process

7        that resulted in the decision to make these public

8        statements.

9    Following discussions with counsel for S&P regarding this

10 request, in a letter dated October 8, 2013, S&P provided examples of

11 what it sought to obtain by this request as including: "documents

12 relating to residential mortgage delinquency and loss data, reports

13 on residential mortgage fraud and economic projections relating to

14 the residential housing and residential mortgage markets."  Subject

15 to and without waiving either the General Objections or the specific

16 objections set forth above, US counsel has agreed to consult with

17 Treasury regarding these examples and then advise S&P further

18 regarding its positions.  The United States has advised S&P that its

19 consultation with Treasury may be slowed as a result of the furlough

20 of certain DOJ and Treasury staff during the recently-completed

21 government shutdown.

22 <u>Request for Production No. 23</u>

23    Documents sufficient to identify each of the individuals, by

24 name and employing entity, involved in the (i) preparing, (ii)

25 considering or (iii) discussing with Secretary Paulson, any of the

26 statements in Request 22 (a)-(c), including, but not limited to,

27 individuals who provided documents or other information reviewed,

28

1  referenced, relied upon or used in connection with the preparation

2  or review of any of the statements.

3  Response to Request for Production No. 23

4       The United States' response to request for production 23 is the

5  same as its response to request for production 22 set forth above,

6  which response is incorporated herein by reference.

7  Request for Production No. 24

8       As to each individual identified by the document responses to

9  Request 23 and as to Henry M. Paulson, Jr. himself, all documents

10  prepared, reviewed or received by that individual through December

11  31, 2009 constituting, containing or referring to:

12       a.   Any subsequent comments made or received with respect to
             any of the statements identified in Request 22, above;
13
14       b.   The expected performance of the U.S. residential housing
             market in any portion of the period 2004-2008;

15       c.   Any prediction of a decline in home prices to occur in
             2007 and/or 2008, and any response to any such prediction;
16
17       d.   The expected performance of non-prime residential
             mortgages originated or securitized in any portion of the
18           period 2004-2008;

19       e.   The expected performance of RMBS and/or CDOs exposed to
             RMBS issued in any portion of the period 2004-2008;

20       f.   Any assessment, discussion or analysis of the ratings
             issued by any NRSRO with respect to RMBS and/or CDOs
21           exposed to RMBS issued in any portion of the period 2004-
             2008;
22
23       g.   Any comparison of the performance of ratings issued by
             different NRSROs in any portion of the period 2004-2008,
             whenever such comparisons were prepared;
24
25       h.   Any identification of factors considered or to be
             considered at any time in the period 2004-2008 in
26           evaluating the expected and/or actual performance of (i)
             the United States residential housing market generally;
27           (ii) non-prime residential mortgages; (iii) RMBS or (iv)
             CDOs exposed to RMBS.

28

1  Response to Request for Production No. 24

2      The United States' response to request for production 24 is the

3  same as its response to request for production 22 set forth above,

4  which response is incorporated herein by reference, with

5  modification to subparagraph (c) of that response to reflect that

6  the burden imposed by this request for production 24 is excessive in

7  that a search for responsive documents would require review of

8  materials, both electronic and hard copy, of a very large number of

9  Treasury officials who worked on matters related to the housing and

10  financial markets throughout the period 2004 through 2009.

11  Request for Production No. 25

12      All documents or other information in Your possession, custody

13  or control reviewed, considered and/or relied upon by Ben S.

14  Bernanke, Chairman of the Board of Governors of the Federal Reserve

15  System, in making each of the following statements:

16      a.   A statement at a meeting of the Federal Open Market
            Committee on March 20-21, 2007: "The housing market is, of
17          course, central to near-term developments. The central
            scenario that housing will stabilize sometime during the
18          middle of the year remains intact, but there have been a
            few negative innovations. We've noted the subprime issues
19          and the possibility of foreclosures, reduced confidence,
            and tightened credit terms, and I've also noted that
20          reports from builders about the spring selling season have
            not been particularly upbeat, in general. At the same
21          time, we continue to see rough stability in sales, starts,
            and permits. The effects of the decline in subprime
22          lending may have already been mostly seen, since that has
            slowed from last fall. Mortgage rates, of course, remain
23          quite low, and the labor market is a key determinant of
            housing demand and of mortgage delinquencies, particularly
24          cross-sectionally. Across the country, there's a very
            close correlation between foreclosure rates and state
25          unemployment rates. So long as the labor market remains
            strong, I would think that the general health of the
26          housing market would be improving. The housing market, I
            think, will follow the same scenario, but there are a few
27          negative innovations."

28

b.   A statement before the Joint Economic Committee of the
U.S. Congress on March 28, 2007: "At this juncture,
however, the impact on the broader economy and financial
markets of the problems in the subprime market seems
likely to be contained."

c.   A statement at the Federal Reserve Bank of Chicago's 43rd
Annual Conference on Bank Structure and Competition on May
17, 2007: "All that said, given the fundamental factors in
place that should support the demand for housing, we
believe the effect of the troubles in the subprime sector
on the broader housing market will likely be limited, and
we do not expect significant spillovers from the subprime
market to the rest of the economy or to the financial
system."

d.   A statement at a meeting of the Federal Open Market
Committee on October 30-31, 2007: "Let me try to summarize
this discussion. It is a little harder than usual.
Broadly, the macroeconomic news came in slightly better
than expected during the intermeeting period. Housing has
been very weak, as expected; but consumption, investment,
and net exports were relatively strong in recent months.
In the aggregate data, there is yet no clear sign of a
spillover from housing. Most participants expect several
weak quarters followed by recovery later next year."

e.   A statement referenced in the article, "Anatomy of a
Meltdown," published in The New Yorker on December 1,
2008: "I and others were mistaken early on in saying that
the subprime crisis would be contained. The causal
relationship between the housing problem and the broad
financial system was very complex and difficult to
predict."

f.   A statement before the U.S. Senate Banking Committee on
December 3, 2009: "I did not anticipate a crisis of this
magnitude and severity."

Response to Request for Production No. 25

       To the extent this request seeks documents from the Board

and/or FOMC, in addition to and without waiving the General

Objections set forth above or any other specific objections that the

United States might interpose were this request appropriately

addressed to the United States as party plaintiff in this action:

(a) the United States objects to this request on the grounds that

the Board and FOMC are Independent Regulatory Entities from which

31

1  documents are properly sought, and from which S&P has sought the

2  documents encompassed by this request, by way of subpoenas issued

3  pursuant to Fed. R. Civ. P. 45 (attached as Exhibit 1 is a copy of

4  the letter sent to S&P by counsel for the Board and the FOMC

5  responding to S&P's Rule 45 subpoenas (the "Board Letter")); and

6  (b) the United States adopts by reference the objections set forth

7  by counsel in the Board Letter.  As indicated in the Board Letter,

8  counsel for the Board and the FOMC has indicated that they "are

9  willing to engage in further discussions with [S&P] regarding the

10 Subpoenas" and to facilitate such discussion has invited S&P to

11 "identify with particularity any specific types of relevant, non-

12 privileged information and documents that re not already available

13 from another source that you seek from the Board or FOMC."

14     To the extent this request seeks documents from the United

15 States (as defined in paragraph 10 of the General Objections above

16 to exclude Independent Regulatory Entities and Non-Governmental

17 Entities), to the extent any such documents exist, in addition to

18 the General Objections set forth above, the United States adopts by

19 reference the objections set forth by counsel in the Board Letter,

20 and is willing to engage in further discussions with S&P regarding

21 this request similar to those referenced in the Board Letter.

22     Following discussions with counsel for S&P regarding this

23 request, in a letter dated October 8, 2013, S&P provided examples of

24 what it sought to obtain by this request as including: "documents

25 relating to residential mortgage delinquency and loss data, reports

26 on residential mortgage fraud and economic projections relating to

27 the residential housing and residential mortgage markets."  Subject

28 to and without waiving either the General Objections or the specific

1  objections set forth above, US counsel has agreed to consult with

2  counsel for the Board and FOMC regarding these examples and then

3  advise S&P further regarding its positions.

4  Request for Production No. 26

5       Documents in Your possession, custody or control sufficient to

6  identify each of the individuals, by name and employing entity,

7  involved in the (i) preparing, (ii) considering or (iii) discussing

8  with Chairman Bernanke, any of the statements in Request 25 (a)-(f),

9  including, but not limited to, individuals who provided documents or

10 other information reviewed, referenced, relied upon or used in

11 connection with the preparation or review of any such statements.

12 Response to Request for Production No. 26

13      The United States' response to request for production 26 is the

14 same as its response to request for production 25 set forth above,

15 which response is incorporated herein by reference.

16 Request for Production No. 27

17      As to each individual identified by the document responses to

18 Request 26 and as to Ben S. Bernanke himself, all documents in Your

19 possession, custody or control prepared, reviewed or received by

20 that individual through December 31, 2009 constituting, containing

21 or referring to:

22      a.   Any subsequent comments made or received with respect to
            any of the statements identified in Request 25, above;
23
24      b.   The expected performance of the U.S. residential housing
            market in any portion of the period 2004-2008;
25      c.   Any prediction of a decline in home prices to occur in
            2007 and/or 2008, and any response to any such prediction;
26
27      d.   The expected performance of non-prime residential
            mortgages originated or securitized in any portion of the
            period 2004-2008;
28

33

e.   The expected performance of RMBS and/or CDOs exposed to RMBS issued in any portion of the period 2004-2008;

f.   Any assessment, discussion or analysis of the ratings issued by any NRSRO with respect to RMBS and/or CDOs exposed to RMBS issued in any portion of the period 2004-2008;

g.   Any comparison of the performance of ratings issued by different NRSROs in any portion of the period 2004-2008, whenever such comparisons were prepared;

h.   Any identification of factors considered or to be considered at any time in the period 2004-2008 in evaluating the expected and/or actual performance of (i) the United States residential housing market generally; (ii) non-prime residential mortgages; (iii) RMBS or (iv) CDOs exposed to RMBS.

Response to Request for Production No. 27

The United States' response to request for production 27 is the same as its response to request for production 25 set forth above, which response is incorporated herein by reference.

Request for Production No. 28

All documents or other information in Your possession, custody or control reviewed, considered and/or relied upon by Timothy Geithner in making each of the following statements:

a.   A statement at a meeting of the Federal Open Market Committee on January 30-31, 2007: "Let me just go through the principal questions briefly. Is the worst behind us in both housing and autos? Probably, but we can't be sure yet. If we get some negative shock to income—to demand growth—we're still vulnerable to a more adverse adjustment in housing prices with potentially substantially negative effects on growth, in part because of the greater leverage now on household balance sheets. How strong does the economy look outside autos and housing? Pretty strong, it seems. We see no troubling signs of weakness, despite the disappointment on some aspects of investment spending."

b.   A statement at a meeting of the Federal Open Market Committee on June 27-28, 2007: "With financial markets, we are at a delicate moment. The losses in subprime are still working their way through the system. Rating agencies are likely to downgrade a larger share of past issues, more than they have already. The marks that people show indicate that both hedge funds and dealers in a lot of

34

this stuff may still have a way to go to catch up with the
movement in market prices. This dynamic itself could
induce a further reduction in willingness to finance new
mortgages. You could see pockets of losses in the system,
liquidity pressures in hedge funds and their
counterparties, and further forced liquidations. It is
possible that we will still have a bunch of that effect
ahead of us, even if no big negative shock to demand
occurs and induces a broader distress in consumer credit.
We could also see it spread to commercial real estate. We
could see a broader pullback from CDOs and CLOs as well,
either from a general erosion of faith in the rating
models—as Bill said, it is a possibility—or from just
concerns about liquidity in those instruments. We could
see a sharp, substantial widening of credit spreads
provoked by an unanticipated default or two or just a
general reassessment of risk at current prices."

c. A statement at a meeting of the Federal Open Market
Committee on October 30-31, 2007: "Housing prices are
still obviously sliding down. We don't really claim to
know much about where they're going to end up or where we
are in that process, but it seems that they are falling
and probably at an accelerating rate."

Response to Request for Production No. 28

To the extent this request seeks documents from the FRBNY
and/or FOMC, in addition to and without waiving the General
Objections set forth above or any other specific objections that the
United States might interpose were this request appropriately
addressed to the United States as party plaintiff in this action:
(a) the United States objects to this request on the grounds that
the FRBNY is a Non-Governmental Entity and the FOMC is an
Independent Regulatory Entity, from both of which documents are
properly sought, and from which S&P has sought the documents
encompassed by this request, by way of subpoena issued pursuant to
Fed. R. Civ. P. 45 (US counsel is advised that counsel for the FRBNY
sent to S&P in response to S&P's Rule 45 subpoena a letter (the
"FRBNY Letter") similar to the Board Letter); and (b) the United
States adopts by reference the objections set forth by counsel in

35

1 | the FRBNY and Board Letters.  US counsel is advised that counsel for
2 | the FRBNY has indicated that it, like the Board, is willing to
3 | engage in further discussions with S&P regarding the Rule 45
4 | subpoenas and has invited S&P to identify with particularity any
5 | specific types of relevant, non-privileged information and documents
6 | that are not readily available from another source that S&P seeks
7 | from the FRBNY.

8 | To the extent this request seeks documents from the United
9 | States (as defined in paragraph 10 of the General Objections above
10 | to exclude Independent Regulatory Entities and Non-Governmental
11 | Entities), to the extent any such documents exist, in addition to
12 | the General Objections set forth above, the United States adopts by
13 | reference the objections set forth by counsel in the FRBNY and Board
14 | Letters, and is willing to engage in further discussions with S&P
15 | regarding this request similar to those referenced in the FRBNY and
16 | Board Letters.  In this regard, following discussions with counsel
17 | for S&P regarding this request, in a letter dated October 8, 2013,
18 | S&P provided examples of what it sought to obtain by this request as
19 | including: "documents relating to residential mortgage delinquency
20 | and loss data, reports on residential mortgage fraud and economic
21 | projections relating to the residential housing and residential
22 | mortgage markets."  Subject to and without waiving either the
23 | General Objections or the specific objections set forth above, US
24 | counsel has agreed to consider these examples and then advise S&P
25 | further regarding its positions.

26 | Request for Production No. 29

27 | Documents in Your possession, custody or control sufficient to
28 | identify each of the individuals, by name and employing entity,

36

1  involved in the (i) preparing, (ii) considering or (iii) discussing

2  with Mr. Geithner, any of the statements in Request 28 (a)-(c),

3  including, but not limited to, individuals who provided documents or

4  other information reviewed, referenced, relied upon or used in

5  connection with the preparation or review of any such statements.

6  <u>Response to Request for Production No. 29</u>

7      The United States' response to request for production 29 is the

8  same as its response to request for production 28 set forth above,

9  which response is incorporated herein by reference.

10  <u>Request for Production No. 30</u>

11      As to each individual identified by the document responses to

12  Request 29 and as to Mr. Geithner himself, all documents in Your

13  possession, custody or control prepared, reviewed or received by

14  that individual through December 31, 2009 constituting, containing

15  or referring to:

16     a.   Any subsequent comments made or received with respect to
         any of the statements identified in Request 28, above;
17

18     b.   The expected performance of the U.S. residential housing
         market in any portion of the period 2004-2008;

19     c.   Any prediction of a decline in home prices to occur in
         2007 and/or 2008, and any response to any such prediction;
20

21     d.   The expected performance of non-prime residential
         mortgages originated or securitized in any portion of the
22         period 2004-2008;

23     e.   The expected performance of RMBS and/or CDOs exposed to
         RMBS issued in any portion of the period 2004-2008;

24     f.   Any assessment, discussion or analysis of the ratings
         issued by any NRSRO with respect to RMBS and/or CDOs
25         exposed to RMBS issued in any portion of the period 2004-
         2008;
26

27     g.   Any comparison of the performance of ratings issued by
         different NRSROs in any portion of the period 2004-2008,
         whenever such comparisons were prepared;
28

1       h.   Any identification of factors considered or to be
             considered at any time in the period 2004-2008 in
2            evaluating the expected and/or actual performance of (i)
             the United States residential housing market generally;
3            (ii) non-prime residential mortgages; (iii) RMBS; or (iv)
             CDOs exposed to RMBS.

4

5   Response to Request for Production No. 30

6       The United States' response to request for production 30 is the

7   same as its response to request for production 28 set forth above,

8   which response is incorporated herein by reference.

9   Request for Production No. 31

10      All documents relating to, consisting of or reflecting any

11  evaluation, assessment, study, finding or analysis made by You

12  between 2004 and 2008 regarding the independence of any NRSRO.

13  Response to Request for Production No. 31

14      US counsel are aware of studies and analyses performed by: the

15  SEC (Summary Report of Issues Identified in the Commission Staff's

16  Examinations of Select Credit Rating Agencies, July 2008; Annual

17  Reports to Congress on Nationally Recognized Statistical Rating

18  Organizations, June 2008, September 2009, January 2011, March 2012,

19  and December 2012; and Annual Summary Reports of Commission Staff's

20  Examinations of Each Nationally Recognized Statistical Rating

21  Organization, September 2011 and November 2012); the United States

22  Senate, Committee on Homeland Security and Governmental Affairs,

23  Permanent Subcommittee on Investigations (Wall Street and the

24  Financial Crisis: Anatomy of a Financial Collapse, April 2011); and

25  the Financial Crisis Inquiry Commission ("FCIC") (Final Report of

26  the National Commission on the Causes of the Financial and Economic

27  Crisis in the United States, January 2011).  Following discussions

28  with counsel for S&P regarding this request, in a letter dated

                                38

1  October 8, 2013, S&P provided four additional examples of studies

2  S&P asserts "contain responsive materials" -- studies prepared by or

3  on behalf of or presented to the President's Working Group on

4  Financial Markets, the Council of Economic Advisors, the OCC, the

5  FDIC, and the Board.

6      To the extent this request seeks these studies and analyses, or

7  publicly available exhibits and documents supporting these studies

8  and analyses, in addition to the General Objections set forth above,

9  the United States objects because all of these studies and analyses,

10  and the publicly available exhibits and documents supporting these

11  studies and analyses, appear to be publicly available, in many

12  instances online.

13      To the extent this request seeks non-public exhibits and

14  documents supporting and/or gathered in the course of preparing the

15  SEC and Senate subcommittee studies and analyses, in addition to and

16  without waiving the General Objections set forth above or any other

17  specific objections that the United States might interpose were this

18  request appropriately addressed to the United States as party

19  plaintiff in this action, the United States objects to this request

20  on the grounds that it seeks documents from the SEC, OCC, FDIC, and

21  Board, all Independent Regulatory Entities, and from a Senate

22  subcommittee, which is part of the Legislative Branch, from all of

23  which documents are properly sought by way of subpoena issued

24  pursuant to Fed. R. Civ. P. 45.

25      To the extent this request seeks non-public exhibits and

26  documents supporting and/or gathered in the course of preparing the

27  FCIC study and analysis, the FCIC ceased to exist on February 13,

28  2011, and its records were transferred to and are in the possession,

1  custody, and control of the National Archives and Records

2  Administration ("NARA").  Attached as Exhibit 2 is a February 10,

3  2011 letter from FCIC chairman Phil Angelides to NARA confirming

4  that FCIC records transferred to NARA that were not already publicly

5  available would not be made public until February 13, 2016, and that

6  certain specified categories of records would remain non-public even

7  after that date.  With respect to any non-public FCIC records sought

8  by this request, in addition to the General Objections set forth

9  above, the United States objects to this request on the grounds

10 that:

11        (a)   it is vague, overbroad, and unduly burdensome, and

12              encompasses documents that are not relevant, are not

13              related to any claim or defense properly raised in this

14              action, and are not reasonably calculated to lead to the

15              discovery of admissible evidence;

16        (b)   to the extent it seeks documents obtained by the FCIC from

17              any other NRSRO, because S&P and the other NRSROs are

18              business competitors, the documents sought likely would

19              contain or reference proprietary or other business

20              sensitive information as to which the other NRSROs would

21              seek protection, and S&P should seek any such documents

22              directly from the other NRSROs, who would be in a far

23              better position than the United States to identify and

24              seek appropriate protection for such information;

25        (c)   to the extent it seeks documents obtained by the FCIC

26              subject to requests for confidential treatment by or other

27              confidentiality obligations to non-parties to this action,

28

40

1    it seeks documents covered by the resulting

2    confidentiality obligations; and

3    (d)   the burden and expense of the proposed discovery would be

4    excessive, and would outweigh any benefit of the discovery

5    in resolving the issues in this action, as it would

6    require review of all of the FCIC records held by NARA,

7    which encompasses approximately 550 boxes of hardcopy

8    documents and more than 16 terabytes of electronic data.

9    Subject to and without waiving either the General Objections or

10   these specific objections, the United States is willing to engage in

11   further discussions with S&P to attempt to identify with

12   particularity any specific types of relevant, non-privileged

13   information and documents gathered in the course of the FCIC's

14   investigation that are not readily available from another source

15   that are sought pursuant to this request and that can be searched

16   for and reviewed within the massive volume of documents held by NARA

17   without posing undue burdens.

18   With respect to the additional studies identified by S&P as

19   examples in its October 8 letter, subject to and without waiving

20   either the General Objections or the specific objections set forth

21   above, US counsel has agreed to consult with White House counsel and

22   counsel for the OCC, FDIC, and Board regarding these studies, and

23   then advise S&P further regarding its positions.  The United States

24   has advised S&P that its consultation with these counsel may be

25   slowed as a result of the furlough of certain DOJ and other federal

26   agency staff during the recently-completed government shutdown.

27

28

41

<u>Request for Production No. 32</u>

All documents relating to, consisting of or reflecting any evaluation, assessment, study, finding or analysis made by You concerning credit ratings issued with respect to RMBS and/or CDOs exposed to RMBS issued between 2004 and 2008, relating to:

    a.   the accuracy of the ratings of any NRSRO;

    b.   the existence of perceived conflicts of interest of any NRSRO in its ratings;

    c.   the advisability of any institution or individual relying on ratings of any NRSRO;

    d.   communications with any NRSRO as to items (a)-(c);

    e.   the relative performance of various NRSROs.

<u>Response to Request for Production No. 32</u>

To the extent this request seeks documents encompassed by request for production 31 above, the United States' response is the same as its response to request for production 31 set forth above, which response is incorporated herein by reference.

To the extent this request seeks documents generated by the United States in the course of the FIRREA Investigation or its litigation of this action, in addition to the General Objections set forth above, the United States objects to this request on the grounds that:

    (a)   it seeks documents protected by the attorney-client privilege, deliberative process privilege, investigatory files privilege, law enforcement privilege, work-product doctrine, and/or joint prosecution/common interest doctrine, including in particular but not limited to notes, outlines, memoranda, summaries, and presentations prepared by DOJ attorneys and personnel; and

42

1        (b)    it seeks expert discovery prior to the time set for such

2               expert discovery pursuant to Federal Rule of Civil

3               Procedure 26(a)(2).

4  Request for Production No. 33

5     All documents reflecting or referring to *both* (i) the FIRREA

6  Investigation (or this Action); *and* (ii) any of the following: (a)

7  S&P's credit rating of the United States of America, or (b) the

8  Downgrade, or (c) the Change in Outlook, or (d) the CreditWatch

9  Action.

10  Response to Request for Production No. 33

11     In addition to the General Objections set forth above, the

12  United States objects to this request on the grounds that it is

13  vague, overbroad, and unduly burdensome, and seeks documents that

14  are not relevant, are not related to any claim or defense properly

15  raised in this action, and are not reasonably calculated to lead to

16  the discovery of admissible evidence.  In particular, in discussions

17  with counsel for S&P, S&P has identified as a basis for relevance of

18  the documents sought only its asserted First Amendment selective

19  retaliation defense.  In support of this defense, S&P alleges only

20  as follows: "Only S&P Ratings downgraded the United States and only

21  S&P Ratings has been sued by the United States, even though the S&P

22  ratings challenged by the United States were no different than those

23  of at least one other rating agency and other rating agencies have

24  made the same assertions of 'independence' that are challenged in

25  the Complaint as against S&P."  (Corrected Answer (Docket No. 53) at

26  70, Eleventh Defense).

27     To be entitled to discovery relating to this asserted defense,

28  S&P is required to make a preliminary showing both: (a) that

1  "similarly situated defendants" could have been, but were not, the

2  subject of similar civil enforcement actions; and (b) that the

3  decision to file a civil enforcement action against S&P was the

4  result of S&P's exercise of First Amendment rights.  See United

5  States v. Bass, 536 U.S. 862, 863-64 (2002) (per curiam); United

6  States v. Armstrong, 517 U.S. 456, 468-70 (1996); United States v.

7  One 1985 Mercedes, 917 F.2d 415, 421 (9th Cir. 1990); United States

8  v. Sequoia Orange Co., 1994 WL 903688 (E.D. Cal. Mar. 14, 1994).

9  Requiring such a preliminary showing is particularly appropriate

10  here, where S&P seeks documents relating to the United States'

11  deliberative process in deciding to file a civil enforcement action

12  against S&P, documents that are subject to the deliberative process

13  privilege and as to which discovery would intrude on the executive's

14  discretionary authority to pursue civil enforcement actions.

15       Even assuming that S&P's downgrade of the United States' credit

16  rating is considered a protected exercise of First Amendment rights

17  for these purposes, S&P neither has made nor can make the required

18  preliminary showing.  There is no dispute that the United States

19  initiated its investigation of S&P well before the downgrade,

20  issuing investigative FIRREA Subpoenas pursuant to 12 U.S.C. §

21  1833a(g)(1) to S&P itself beginning as early as November 18, 2009.

22  Moreover, in light of the court's ruling denying S&P's motion to

23  dismiss, it is clear that the United States' lengthy investigation

24  resulted in a Complaint whose allegations are sufficient to support

25  the full scope and breadth of the United States' claims.  Given

26  this, S&P's assertions are insufficient to make even a preliminary

27  showing either: (a) that any other rating agency is similarly

28  situated in that the United States had at the time of filing of the

44

1  Complaint developed evidence sufficient to pursue claims of similar

2  scope and breadth against it but chose not to; or (b) that the

3  decision to sue S&P was predicated on anything other than an

4  evaluation by the United States of the evidence developed in its

5  lengthy investigation of S&P.

6      Incorporating the above, in addition to the General Objections

7  set forth above, the United States objects to this request on the

8  grounds that:

9      (a)  the documents it seeks are not relevant, are not related

10          to any claim or defense properly raised in this action,

11          and are not reasonably calculated to lead to the discovery

12          of admissible evidence;

13     (b)  to the extent the request seeks documents reflecting

14          communications other than those directed to and from the

15          individuals who actually made the decision to authorize

16          filing of the Complaint, it is overbroad in that S&P's

17          asserted defense could be premised only on a showing that

18          those decision makers were influenced by a retaliatory

19          motive;

20     (c)  the burden and expense of the proposed discovery would be

21          excessive, and would outweigh any benefit of the discovery

22          in resolving the issues in this action, as it would

23          require searches of both hard copy documents and emails,

24          including archival email searches, for all DOJ personnel

25          who worked on the FIRREA Investigation, and subsequent

26          review of any recovered documents; and

27     (d)  because it necessarily seeks documents relating to the

28          United States' deliberative process in deciding to file a

45

civil enforcement action against S&P, it seeks documents protected by the attorney-client privilege, deliberative process privilege, investigatory files privilege, law enforcement privilege, work-product doctrine, and/or joint prosecution/common interest doctrine, including in particular but not limited to notes, outlines, memoranda, summaries, and presentations prepared by DOJ attorneys and personnel.

Request for Production No. 34

All documents prepared between January 1, 2011 and November 30, 2011, reflecting or referring to *both* (i) S&P's credit rating of the United States of America, or the Downgrade, or the Change in Outlook, or the CreditWatch Action; *and* (ii) an investigation of S&P for any potential civil or criminal violation.

Response to Request for Production No. 34

The United States' response to request for production 34 is the same as its response to request for production 33 set forth above, which response is incorporated herein by reference.

Request for Production No. 35

All documents and communications reflecting DOJ policies, practices and procedures, in effect for any period between January 1, 2009 and the present, for investigating or obtaining authorization to bring legal actions against any entity in connection with possible FIRREA violations, including but not limited to all guidelines, instructions, check-lists and training materials.

46

1    Response to Request for Production No. 35

2         In addition to the General Objections set forth above, the

3    United States incorporates the first three paragraphs of the United

4    States' response to request for production 33 above and objects to

5    this request on the grounds that:

6         (a)    such policies, practices, and procedures are not relevant,

7                are not related to any claim or defense properly raised in

8                this action, and are not reasonably calculated to lead to

9                the discovery of admissible evidence;

10        (b)    it seeks internal DOJ policies, practices, and procedures

11               that provide only internal DOJ guidance and are not

12               intended to, and may not be relied upon, to create any

13               rights, substantive or procedural, enforceable at law by

14               any party in any matter civil or criminal;

15        (c)    it seeks documents protected by the attorney-client

16               privilege, deliberative process privilege, and/or work

17               product doctrine; and

18        (d)    it seeks documents that are publicly available, including

19               but not limited to United States Attorneys' Manual §§ 4-

20               1.210, 4-1.213, 4-1.313, 4-1.513, 9-27.001 to .320 and

21               Leon Weidman, "Civil Remedies for Mortgage Fraud," United

22               States Attorneys' Bulletin (May 2010) (available online at

23               http://www.justice.gov/usao/eousa/foia_reading_room/usab58

24               03.pdf).

25   Request for Production No. 36

26        All documents constituting or relating to transcriptions,

27   summaries, notes, recordings, and videos of depositions or

28   interviews, whether such depositions or interviews were conducted

47

1  under oath or not, conducted by the DOJ in connection with any

2  investigation of any NRSRO relating to credit ratings issued with

3  respect to RMBS and/or CDOs exposed to RMBS issued between 2004 and

4  2008 to the extent any such document constitutes, includes, or

5  refers to:

6      a.   Any discussion of S&P;

7      b.   present or former S&P employees;

8      c.   a comparison of the rating assigned by any other NRSRO and
9          the rating assigned by S&P;

    d.   a comparison of the performance of NRSROs; or
10

11     e.   any statements or information regarding the accuracy or
        quality of information provided to any NRSRO in connection
12         with the rating of any such RMBS or CDO.

13 You may exclude from production, but should log, any information

14 constituting the mental impressions, conclusions, opinions or legal

15 theories of counsel.

16 Response to Request for Production No. 36

17     In addition to the General Objections set forth above, the

18 United States objects to this request on the grounds that:

19     (a)   to the extent it seeks documents falling within requests

20          for production 1-3 above, it is subject to the specific

21          objections to those requests set forth above, which are

22          incorporated herein by reference;

23     (b)   to the extent it seeks documents to support S&P's asserted

24          First Amendment selective retaliation defense, it is

25          subject to the specific objections set forth in the

26          response to request for production 33 set forth above,

27          which objections are incorporated herein by reference;

28

(c)  to the extent, if any, that there have been any such
     investigations of any NRSROs other than S&P (which
     potential investigations will, without admitting or
     denying whether there have been or are any such
     investigations, hereafter be referred to collectively as
     the "NRSRO Investigations"), to the extent any such NRSRO
     Investigations remain pending, the materials gathered in
     any such NRSRO Investigations would be subject to and
     protected from production by the investigative files and
     law enforcement privileges;

(d)  it is vague, overbroad, and unduly burdensome, and
     encompasses documents that are not relevant, are not
     related to any claim or defense properly raised in this
     action, and are not reasonably calculated to lead to the
     discovery of admissible evidence, in that, among other
     things, it would require production of documents gathered
     in any such NRSRO Investigations that (i) reference in any
     way S&P or any current or former S&P employee, regardless
     of whether the references relate at all to any claim or
     defense at issue in this action and (ii) relate to the
     accuracy of information provided to other NRSROs, which,
     to the extent not also provided to S&P, can have no
     bearing on allegations that S&P made materially false and
     misleading representations regarding its own rating
     process and the creditworthiness of specific securities
     because the information provided to the other NRSROs would
     not have been known to S&P at the time of S&P's alleged
     misrepresentations;

49

(e)   to the extent S&P contends that it received inaccurate information that was also provided to any other NRSROs, it seeks documents and information already in S&P's possession;

(f)   to the extent it seeks documents obtained from any other NRSRO, because S&P and the other NRSROs are business competitors, the documents sought likely would contain or reference proprietary or other business sensitive information as to which the other NRSROs would seek protection, and S&P should seek any such documents directly from the other NRSROs, who would be in a far better position than the United States to identify and seek appropriate protection for such information;

(g)   to the extent documents falling within the scope of this request were obtained in any NRSRO Investigations subject to requests for confidential treatment by or other confidentiality obligations to non-parties to this action, it seeks documents covered by the resulting confidentiality obligations;

(h)   the burden and expense of the proposed discovery would be excessive, and would outweigh any benefit of the discovery in resolving the issues in this action, as it would require, among other things, email searches, including archival email searches, through the emails of all DOJ personnel who worked on any such NRSRO Investigations, and subsequent review of any recovered documents, if any exist; and

50

1       (i)   it seeks documents protected by the attorney-client

2           privilege, deliberative process privilege, law enforcement

3           privilege, work-product doctrine, and/or joint

4           prosecution/common interest doctrine, including in

5           particular but not limited to, if and to the extent any

6           such exist, notes and summaries prepared by DOJ attorneys

7           and personnel.

8        Subject to and without waiving either the General Objections or

9    these specific objections, to the extent this request seeks

10   documents falling within requests for production 1-3 above, the

11   United States has produced and will produce materials as specified

12   in the responses to requests for production 1-3, which responses are

13   incorporated herein by reference.

14   Request for Production No. 37

15       All documents relating to depositions or interviews conducted

16   by the DOJ in connection with any investigation relating to the

17   securitization of RMBS and/or CDOs exposed to RMBS issued between

18   2004 and 2008 to the extent such document constitutes, includes, or

19   refers to:

20      a.   Any discussion of S&P;

21      b.   present or former S&P employees;

22      c.   a comparison of the rating assigned by any other NRSRO and
23          that assigned by S&P;

24      d.   a comparison of the performance of NRSROs; or

25      e.   any statements or information regarding the accuracy or
            quality of information provided to any NRSRO in connection
26          with the rating of any such RMBS or CDO.

27

28

1   You may exclude from production, but should log, any information

2   constituting the mental impressions, conclusions, opinions or legal

3   theories of counsel.

4   Response to Request for Production No. 37

5       US counsel are aware of investigations relating to the

6   securitization of RMBS and/or CDOs exposed to RMBS issued between

7   2004 and 2008 (the "RMBS Investigations"), which RMBS Investigations

8   are being conducted under the coordination of the RMBS Working

9   Group, the identity and purpose of which have been the subject of

10  public announcements, and the members of which include various

11  United States Attorney's Offices, DOJ components, Independent

12  Regulatory Entities, and state Attorneys General.

13      Incorporating the above, and in addition to the General

14  Objections set forth above, the United States objects to this

15  request on the grounds that:

16      (a)  to the extent it seeks documents falling within requests

17           for production 1-3 and 36 above, it is subject to the

18           specific objections to those requests set forth above,

19           which objections are incorporated herein by reference;

20      (b)  to the extent the RMBS Investigations remain pending, the

21           materials gathered in those RMBS Investigations would be

22           subject to and protected from production by the

23           investigative files and law enforcement privileges;

24      (c)  it is vague, overbroad, and unduly burdensome, and

25           encompasses documents that are not relevant, are not

26           related to any claim or defense properly raised in this

27           action, and are not reasonably calculated to lead to the

28           discovery of admissible evidence, in that, among other

1        things, it would require production of documents gathered

2        in the RMBS Investigations that (i) reference in any way

3        S&P or any current or former S&P employee, regardless of

4        whether the references relate at all to any claim or

5        defense at issue in this action and (ii) relate to the

6        accuracy of information provided to other NRSROs, which,

7        to the extent not also provided to S&P, can have no

8        bearing on allegations that S&P made materially false and

9        misleading representations regarding its own rating

10       process and the creditworthiness of specific securities

11       because the information provided to the other NRSROs would

12       not have been known to S&P at the time of S&P's alleged

13       misrepresentations;

14  (d)  to the extent S&P contends that it received inaccurate

15       information that was also provided to the other NRSROs, it

16       seeks documents and information already in S&P's

17       possession;

18  (e)  to the extent it seeks documents obtained from any other

19       NRSRO, because S&P and the other NRSROs are business

20       competitors, the documents sought likely would contain or

21       reference proprietary or other business sensitive

22       information as to which the other NRSROs would seek

23       protection, and S&P should seek those documents directly

24       from the other NRSROs, who would be in a far better

25       position than the United States to identify and seek

26       appropriate protection for such information;

27  (f)  to the extent documents falling within the scope of this

28       request were obtained in any RMBS Investigation subject to

requests for confidential treatment by or other confidentiality obligations to non-parties to this action, it seeks documents covered by the resulting confidentiality obligations;

(g)   the burden and expense of the proposed discovery would be excessive, and would outweigh any benefit of the discovery in resolving the issues in this action, as it would require, among other things, (i) email searches, including archival email searches, through the emails of all DOJ personnel who worked on the RMBS Investigations, and subsequent review of any recovered documents and (ii) searches through databases containing documents obtained in the course of RMBS Investigations that encompass more than 22 Terabytes (more than 21 million documents), and subsequent review of any recovered documents; and

(h)   it seeks documents protected by the attorney-client privilege, deliberative process privilege, law enforcement privilege, work-product doctrine, and/or joint prosecution /common interest doctrine, including in particular but not limited to notes, outlines, memoranda, summaries, and presentations prepared by DOJ attorneys and personnel.

Subject to and without waiving either the General Objections or these specific objections, to the extent this request seeks documents falling within requests for production 1-3 above, the United States has produced and will produce materials as specified in the responses to requests for production 1-3, which responses are incorporated herein by reference.

54

Request for Production No. 38

All documents, including interview notes in the possession, custody or control of the DOJ, relating to the practices of other NRSROs with respect to:

a.   Policies or procedures concerning the updating of CDO ratings, including the incorporation of the actual or projected changes in ratings or ratings methodologies with respect to the classes of underlying securities to which CDOs are exposed;

b.   the timing of changes in rating methodologies and analytical models implemented in 2007 relating to changing perceptions of the performance of the U.S. residential housing market in 2006-2008;

c.   policies or procedures related to addressing any perceived conflicts of interest in connection with rating structured finance securities;

d.   the development and updating of rating methodologies and analytical models used in the ratings process;

e.   accounting for the deterioration in the performance of nonprime RMBS when issuing new ratings on structured finance securities or surveilling existing ratings on structured finance securities;

f.   the utilization of loan level data in rating RMBS and CDOs backed by RMBS.

Response to Request for Production No. 38

In addition to the General Objections set forth above, the United States objects to this request on the grounds that:

(a)   to the extent it seeks documents falling within requests for production 1-3, 5-9, and 36-37 above, it is subject to the specific objections to those requests set forth above, which are incorporated herein by reference;

(b)   to the extent it seeks documents to support S&P's First Amendment selective retaliation defense, it is subject to the specific objections set forth in the response to

55

1    request for production 33 set forth above, which response
2    is incorporated herein by reference;

3    (c)   to the extent any RMBS and/or NRSRO Investigations remain
4          pending, the materials gathered in those investigations
5          would be subject to and protected from production by the
6          investigative files and law enforcement privileges;

7    (d)   it is vague, overbroad, and unduly burdensome, and
8          encompasses documents that are not relevant, are not
9          related to any claim or defense properly raised in this
10         action, and are not reasonably calculated to lead to the
11         discovery of admissible evidence, in that, among other
12         things, (i) the comparative practices of other NRSROs can
13         have no bearing on allegations that S&P made materially
14         false and misleading representations regarding its own
15         rating process; and (ii) to the extent not known to S&P,
16         the actions of other NRSROs in rating specific securities
17         could have no bearing on allegations that S&P made
18         misleading representations regarding the creditworthiness
19         of those specific securities;

20   (e)   to the extent S&P knew of the actions of other NRSROs in
21         rating specific securities, it seeks documents and
22         information already in S&P's possession;

23   (f)   it seeks public documents and documents already within
24         S&P's possession, including in particular but not limited
25         to documents produced by S&P to the United States in
26         response to the FIRREA Subpoenas;

27   (g)   to the extent it seeks documents obtained from any other
28         NRSRO, because S&P and the other NRSROs are business

56

competitors, the documents sought likely would contain or reference proprietary or other business sensitive information as to which the other NRSROs would seek protection, and S&P should seek those documents directly from the other NRSROs, who would be in a far better position than the United States to identify and seek appropriate protection for such information;

(h)     to the extent documents falling within the scope of this request were obtained in the FIRREA Investigation, any RMBS Investigation, and/or any NRSRO Investigation subject to requests for confidential treatment by or other confidentiality obligations to non-parties to this action, it seeks documents covered by the resulting confidentiality obligations;

(i)     the burden and expense of the proposed discovery would be excessive, and would outweigh any benefit of the discovery in resolving the issues in this action, as it would require, among other things, (i) email searches, including archival email searches, through the emails of all DOJ personnel who worked on the FIRREA, RMBS, and/or any NRSRO Investigations, and subsequent review of any recovered documents and (ii) searches through databases containing documents obtained in the course of RMBS Investigations that encompass more than 22 Terabytes (more than 21 million documents), and subsequent review of any recovered documents; and

(j)     it seeks documents protected by the attorney-client privilege, deliberative process privilege, investigatory

57

1          files privilege, law enforcement privilege, work-product

2          doctrine, and/or joint prosecution/common interest

3          doctrine, including in particular but not limited to

4          notes, outlines, memoranda, summaries, and presentations

5          prepared by DOJ attorneys and personnel.

6     Subject to and without waiving either the General Objections or

7  these specific objections, to the extent this request seeks

8  documents falling within requests for production 1-3 and 5-7 above,

9  the United States has produced and will produce materials as

10  specified in the responses to requests for production 1-3 and 5-7

11  set forth above, which responses are incorporated herein by

12  reference.

13  Request for Production No. 39

14     All documents reflecting communications between DOJ and any

15  NRSRO relating to credit ratings issued with respect to RMBS and/or

16  CDOs exposed to RMBS issued between 2004 and 2008.

17  Response to Request for Production No. 39

18     To the extent this request seeks documents to support S&P's

19  First Amendment selective retaliation defense, it is subject to the

20  specific objections to request for production 33 above, which

21  objections are incorporated herein by reference.

22     To the extent this request seeks documents reflecting any

23  communications with NRSROs in the course of the FIRREA

24  Investigation, any RMBS Investigations, or any NRSRO Investigations,

25  the United States' responses are the same as its responses to

26  requests for production 1-3, 5 and 7, and 36-38  above, which

27  responses are incorporated herein by reference.

28

1    To the extent this request seeks documents beyond those

2  referenced above, in addition to the General Objections set forth

3  above, the United States objects on the basis that it is vague,

4  overbroad, and unduly burdensome, and seeks documents that are not

5  relevant, are not related to any claim or defense raised in this

6  action, and are not reasonably calculated to lead to the discovery

7  of admissible evidence.

8  Request for Production No. 40

9    All documents received by DOJ, from any NRSRO in the period

10  from January 1, 2009 to the present, relating to:

11    a.   the independence of any NRSRO;

12    b.   the quality of the ratings of any NRSRO;

13    c.   the existence of perceived conflicts of interest of any
         NRSRO in its ratings;

14

15    d.   the advisability of any institution or individual relying
         on ratings of any NRSRO;

16    e.   communications with any NRSRO as to items (a)-(d);

17    f.   the relative performance of various NRSROs.

18  Response to Request for Production No. 40

19    To the extent this request seeks documents obtained by the

20  United States in the course of any NRSRO Investigation and/or any

21  RMBS Investigation, the United States' response to this request for

22  production is the same as its responses to requests for production

23  36-39 above, which responses are incorporated herein by reference.

24    To the extent this request seeks documents obtained by the

25  United States in the course of the FIRREA Investigation, the United

26  States' response to this request for production is the same as its

27  responses to requests for production 5 and 7 above, which responses

28  are incorporated herein by reference.

59

1       To the extent this request seeks documents beyond those
2   referenced above, in addition to the General Objections set forth
3   above, the United States objects on the basis that it is vague,
4   overbroad, and unduly burdensome, and seeks documents that are not
5   relevant, are not related to any claim or defense raised in this
6   action, and are not reasonably calculated to lead to the discovery
7   of admissible evidence.
8   Request for Production No. 41

9       All documents received from any NRSRO in the course of the
10  FIRREA Investigation relating to any conduct by the NRSRO that is
11  alleged by You, whether in the Complaint or otherwise, to constitute
12  a FIRREA violation with respect to the same conduct by S&P.
13  Response to Request for Production No. 41

14      The United States' response to request for production 41 is the
15  same as its responses to requests for production 5 and 7 set forth
16  above, which responses are incorporated herein by reference.  In
17  addition, the United States objects on the basis that this request
18  is vague, overbroad, and unduly burdensome, and seeks documents that
19  are not relevant, are not related to any claim or defense raised in
20  this action, and are not reasonably calculated to lead to the
21  discovery of admissible evidence.
22  Request for Production No. 42

23      All documents constituting or relating to communications
24  between DOJ and the SEC regarding the investigation of any NRSRO,
25  credit ratings issued with respect to RMBS and/or CDOs exposed to
26  RMBS issued between 2004 and 2008 or the accuracy or quality of any
27  statement made to any NRSRO in connection with the rating of any
28  RMBS or CDO.

Response to Request for Production No. 42

    In addition to the General Objections set forth above, the United States objects to this request on the grounds that:

    (a)  to the extent it seeks documents to support S&P's First Amendment selective retaliation defense, it is subject to the specific objections to request for production 33 above, which objections are incorporated herein by reference;

    (b)  to the extent it seeks documents obtained by the United States in the course of the FIRREA Investigation, any RMBS Investigations, or any NRSRO Investigations, it is subject to the specific objections to request for production 1-3, 5 and 7, and 36-39 above, which objections are incorporated herein by reference;

    (c)  to the extent it seeks documents beyond those referenced above, it is vague, overbroad, and unduly burdensome, and seeks documents that are not relevant, are not related to any claim or defense raised in this action, and are not reasonably calculated to lead to the discovery of admissible evidence in that, among other things, the documents it seeks would principally involve deliberative discussions between DOJ and SEC relating to the identified investigations that could have no bearing on allegations that S&P made materially false and misleading representations regarding its own rating process and the creditworthiness of particular securities;

    (d)  the burden and expense of the proposed discovery would be excessive, and would outweigh any benefit of the discovery

in resolving the issues in this action, as it would require, among other things, email searches, including archival email searches, through the emails of all DOJ personnel who worked on the FIRREA Investigation, any NRSRO Investigations, and any RMBS Investigations, and subsequent review of any recovered documents;

(e)    to the extent it seeks documents in the possession of the SEC that are not also in the possession of DOJ, it seeks documents in the possession, custody, and control of an Independent Regulatory Entity from which documents are properly sought by way of subpoena issued pursuant to Fed. R. Civ. P. 45; and

(f)    it seeks documents protected by the attorney-client privilege, deliberative process privilege, investigatory files privilege, law enforcement privilege, work-product doctrine, and/or joint prosecution/common interest doctrine, all of which are, pursuant to statute, not deemed waived by the sharing of information between the SEC and DOJ.  See 15 U.S.C. § 78x(f) ("Sharing privileged information with other authorities.").

Subject to and without waiving either the General Objections or these specific objections, to the extent this request seeks non-privileged factual materials obtained by DOJ from the SEC in the course of the FIRREA Investigation, the United States has produced and will produce materials as specified in the responses to requests for production 1-3 and 5-7, which responses are incorporated herein by reference.

62

<u>Request for Production No. 43</u>

All documents constituting or relating to communications between DOJ and any State Attorney General regarding the investigation of any NRSRO, credit ratings issued with respect to RMBS and/or CDOs exposed to RMBS issued between 2004 and 2008 or the accuracy or quality of any statement made to any NRSRO in connection with any rating of any RMBS or CDO.

<u>Response to Request for Production No. 43</u>

In addition to the General Objections set forth above, the United States objects to this request on the grounds that:

(a)  to the extent it seeks documents to support S&P's First Amendment selective retaliation defense, it is subject to the specific objections to request for production 33 above, which objections are incorporated herein by reference;

(b)  to the extent it seeks documents obtained by the United States in the course of the FIRREA Investigation, any RMBS Investigations, or any NRSRO Investigations, it is subject to the specific objections to request for production 1-3, 5 and 7, and 36-39 above, which objections are incorporated herein by reference;

(c)  to the extent it seeks documents beyond those referenced above, it is vague, overbroad, and unduly burdensome, and seeks documents that are not relevant, are not related to any claim or defense raised in this action, and are not reasonably calculated to lead to the discovery of admissible evidence in that, among other things, the documents it seeks would principally involve deliberative

63

discussions between DOJ and the State Attorneys General relating to the identified investigations that could have no bearing on allegations that S&P made materially false and misleading representations regarding its own rating process and the creditworthiness of particular securities;

(d) the burden and expense of the proposed discovery would be excessive, and would outweigh any benefit of the discovery in resolving the issues in this action, as it would require, among other things, email searches, including archival email searches, through the emails of all DOJ personnel who worked on the FIRREA Investigation, any NRSRO Investigations, and any RMBS Investigations, and subsequent review of any recovered documents;

(e) to the extent it seeks documents in the possession of any State Attorney General that are not also in the possession of DOJ, it seeks documents in the possession, custody, and control of an entity, the relevant State, from which documents are properly sought by way of subpoena issued pursuant to Fed. R. Civ. P. 45; and

(f) it seeks documents protected by the attorney-client privilege, deliberative process privilege, investigatory files privilege, law enforcement privilege, work-product doctrine, and/or joint prosecution/common interest doctrine, all of which are not deemed waived by the sharing of information between DOJ and State Attorney Generals in connection with investigations being pursued jointly or in furtherance of common interests.

1    Subject to and without waiving either the General Objections or
2   these specific objections, to the extent this request seeks non-
3   privileged factual materials obtained by DOJ from a State Attorney
4   General in the course of the FIRREA Investigation, the United States
5   has produced and will produce materials as specified in the
6   responses to requests for production 1-3 and 5-7, which responses
7   are incorporated herein by reference.

8   Request for Production No. 44

9    All documents relating to DOJ's investigation of any issuer,
10  arranger, sponsor, underwriter or seller of RMBS or CDOs for fraud
11  or deceptive practices relating to RMBS and/or CDOs exposed to RMBS
12  issued between 2004 and 2008.

13  Response to Request for Production No. 44

14   The United States' response to this request is the same as its
15  responses to requests for production 37-39 above, which responses
16  are incorporated herein by reference.

17  Request for Production No. 45

18   All documents and communications relating to Your knowledge or
19  awareness between 2004 and 2008 of instances of residential mortgage
20  loan origination fraud, including but not limited to complaints and
21  investigations relating to the practices of any issuer, arranger,
22  sponsor, underwriter or seller of RMBS or CDOs.

23  Response to Request for Production No. 45

24   In addition to the General Objections set forth above, the
25  United States objects to this request on the grounds that:
26   (a)  to the extent this request seeks documents obtained by the
27       United States in the course of any RMBS Investigation, it
28       is subject to the specific objections set forth in the

65

1    responses to requests for production 37-39, which

2    objections are incorporated herein by reference;

3    (b)   to the extent this request seeks documents pertaining to

4    mortgage loan origination fraud investigations generally,

5    (i) it is vague, overbroad, and seeks documents that are

6    not relevant, are not related to any claim or defense

7    properly raised in this action, and are not reasonably

8    calculated to lead to the discovery of admissible

9    evidence, in that it would seek documents relating to all

10    investigations of mortgage loan origination fraud

11    conducted between 2004 and 2008, without regard to whether

12    the alleged frauds had any relation to any of the

13    allegations in this action regarding S&P's fraudulent

14    conduct; and (ii) it is unduly burdensome in that it would

15    require DOJ to search for, locate, and review hard copy

16    documents and emails generated in or related to all of the

17    large number of mortgage loan origination fraud

18    investigations conducted between 2004 and 2008; and

19    (c)   it seeks documents protected by the attorney-client

20    privilege, deliberative process privilege, investigatory

21    files privilege, law enforcement privilege, work-product

22    doctrine, and/or joint prosecution/common interest

23    doctrine.

24    Following discussions with counsel for S&P regarding this

25    request, in a letter dated October 8, 2013, S&P stated with respect

26    to this request as follows:  "As a first step, in order to enable us

27    to consider narrowing the scope of this request, we believe that the

28    United States should determine whether any reports, studies or

1  similar analysis was conducted by any of the following entities

2  during the 2004 to 2008 time frame concerning mortgage loan

3  origination fraud: DOJ, FBI, HUD (including OFHEO), OCC, Treasury,

4  and the Board of Governors.   (We intentionally refer to reports,

5  studies, or analyses to make clear that the inquiries in this letter

6  focus on relatively formal work and not on anecdotal reports or

7  emails at this time.)"   Subject to and without waiving either the

8  General Objections or the specific objections set forth above, US

9  counsel has agreed to consult with certain agency counsel regarding

10  this request for "formal work" of the type referenced in S&P's

11  October 8, 2013 letter and then advise S&P further regarding its

12  positions.   US counsel has advised S&P that its consultation with

13  agency counsel may be slowed as a result of the furlough of certain

14  DOJ and agency staff during the recently-completed government

15  shutdown.

16  Request for Production No. 46

17     All documents relating to investigations conducted by You

18  involving fraud, misrepresentations or omissions with respect to

19  material information relating to RMBS or CDOs backed by RMBS

20  supplied by any federally insured financial institution, or any

21  other financial institution to S&P during the 2004 to 2008 time

22  period.

23  Response to Request for Production No. 46

24     To the extent this request seeks documents obtained by the

25  United States in the course of any NRSRO Investigation and/or any

26  RMBS Investigation, the United States' response to this request for

27  production is the same as its responses to requests for production

28  36-39 above, which responses are incorporated herein by reference.

1    To the extent this request seeks documents obtained by the
2  United States in the course of the FIRREA Investigation, the United
3  States' response to this request for production is the same as its
4  responses to requests for production 5, 7, and 9 above, which
5  responses are incorporated herein by reference.

6    To the extent this request seeks documents beyond those
7  described in the two paragraphs above, in addition to the General
8  Objections set forth above, the request is subject to the specific
9  objections set forth in response to request for production 49 below,
10 which objections are incorporated herein by reference.

11 Request for Production No. 47

12   All documents in the possession, custody or control of DOJ
13 relating to both (i) S&P or the FIRREA Investigation; *and* (ii)
14 former S&P employees now employed by the United States government,
15 including documents received by the DOJ from such employees and
16 documents provided by DOJ to such employees or to the actual or
17 potential supervisor of such employee[s].

18 Response to Request for Production No. 47

19   The United States' response to this request is the same as its
20 response to request for production 46 above, which response is
21 incorporated herein by reference.

22 Request for Production No. 48

23   All documents relating to any of the individuals identified in
24 Exhibit A-1 of the Supplement to Plaintiff United States' Initial
25 Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(1)(A)
26 served on May 28, 2013, and attached hereto as Exhibit B, that are
27 in the possession, custody or control of the DOJ and were received

28

1  from any employees in any Executive Department, the SEC, and/or the

2  Federal Reserve System.

3  Response to Request for Production No. 48

4       The United States' response to this request is the same as its

5  response to request for production 46 above, which response is

6  incorporated herein by reference.

7  Request for Production No. 49

8       All documents relating to S&P that are in the possession,

9  custody or control of the DOJ and were received from any employees

10 in any Executive Department, the SEC, and/or the Federal Reserve

11 System.

12 Response to Request for Production No. 49

13      To the extent this request seeks documents encompassed by

14 requests for production 1-48 above, the United States' response is

15 the same as its responses to requests for production 1-48 set forth

16 above, which responses are incorporated herein by reference.

17      To the extent this request seeks documents "relating to S&P"

18 beyond those encompassed by requests for production 1-48 above, in

19 addition to the General Objections set forth above, the United

20 States objects to this request on the grounds that:

21      (a)  given the scope of requests for production 1-48 above, it

22           is vague, overbroad, and unduly burdensome, and seeks

23           documents that are not relevant, are not related to any

24           claim or defense properly raised in this  action, and are

25           not reasonably calculated to lead to the discovery of

26           admissible evidence;

27      (b)  the burden and expense of the proposed discovery would be

28           excessive, and would outweigh any benefit of the discovery

in resolving the issues in this action, as it would require, among other things, hard copy and email searches, including archival email searches, through the documents and emails of all DOJ personnel who worked on any matter "relating to S&P," and subsequent review of any recovered documents;

(c)  it seeks documents protected by the attorney-client privilege, deliberative process privilege, investigatory files privilege, law enforcement privilege, work-product doctrine, and/or joint prosecution/common interest doctrine, including in particular, but not limited to, notes, outlines, memoranda, summaries, and presentations prepared by DOJ attorneys and personnel.

Request for Production No. 50

All documents relating to the FIRREA Investigation that are in the possession, custody or control of the DOJ and were received from any employees in any Executive Department, the SEC, and/or the Federal Reserve System.

Response to Request for Production No. 50

In that this request does not appear to seek any documents beyond those already encompassed by requests for production 1-49 above, the United States' response is the same as its responses to requests for production 1-49 set forth above, which responses are incorporated herein by reference.

Request for Production No. 51

All documents constituting, referring or relating to any statement or inquiry by Gene Sperling, Director of the National Economic Council and Assistant to the President for Economic Policy,

1  created during the time period from January 1, 2011 - February 4,

2  2013, concerning the possibility of civil or criminal actions,

3  sanctions or other possible steps of any kind leading to adverse

4  consequences of any kind against S&P.

5  <u>Response to Request for Production No. 51</u>

6      In addition to the General Objections set forth above, the

7  United States objects to this request on the grounds that:

8      (a)  to the extent it seeks documents to support S&P's First

9          Amendment selective retaliation defense, it is subject to

10         the specific objections set forth in the response to

11         request for production 33 set forth above, which

12         objections are incorporated herein by reference;

13     (b)  the documents it seeks are not relevant, are not related

14         to any claim or defense properly raised in this action,

15         and are not reasonably calculated to lead to the discovery

16         of admissible evidence;

17     (c)  the burden and expense of the proposed discovery would be

18         excessive, and would outweigh any benefit of the discovery

19         in resolving the issues in this action, as it purports to

20         require every Executive agency of the United States

21         government to conduct a search of every document received

22         or transmitted over the course of a two-year time period

23         to determine if any of those materials contain, refer to,

24         or relate to a statement or inquiry made by Mr. Sperling,

25         an employee of the Executive Office of the President;

26     (d)  the excessive burden and expense of the proposed discovery

27         is amplified by the sweeping and vague nature of the

28         request, which seeks documents relating to any statements

71

1    about "possible steps of *any kind* leading to adverse

2    consequences of *any kind* against S&P" (emphasis added);

3    (e)   it calls for a search for responsive materials to be

4          conducted by the Executive Office of the President, where

5          S&P has not even attempted to show that it has satisfied

6          the heightened standards that apply when discovery

7          requests are directed to that entity, see Cheney v. U.S.

8          Dist. Court for Dist. Of Columbia, 542 U.S. 367, 384–90

9          (2004); and

10   (f)   it seeks the production of materials protected by the

11         attorney-client privilege, deliberative process privilege,

12         investigatory files privilege, law enforcement privilege,

13         work-product doctrine, joint prosecution/common interest

14         doctrine, and/or presidential communications privileges.

15   In discussions with counsel for S&P regarding this request on

16   October 9, 2013, S&P requested that the United States consider its

17   position with respect to a limitation of this request to

18   communications to and from Mr. Sperling himself.  Subject to and

19   without waiving either the General Objections or the specific

20   objections set forth above, US counsel has agreed to consult with

21   White House counsel regarding this proposed limitation and then

22   advise S&P further regarding its positions.  The United States has

23   advised S&P that its consultation with White House counsel may be

24   slowed as a result of the furlough of certain DOJ and White House

25   counsel staff during the recently-completed government shutdown.

26   Request for Production No. 52

27       All documents constituting, referring or relating to any

28   statement or inquiry by Timothy Geithner, created during the time

72

period from January 1, 2011 through the end of his term as Secretary of the United States Department of the Treasury, concerning the possibility of civil or criminal actions, sanctions or other possible steps of any kind leading to adverse consequences of any kind against S&P.

Response to Request for Production No. 52

In addition to the General Objections set forth above, the United States objects to this request on the grounds that:

(a)   to the extent it seeks documents to support S&P's First Amendment selective retaliation defense, it is subject to the specific objections set forth in the response to request for production 33 set forth above, which objections are incorporated herein by reference;

(b)   the documents it seeks are not relevant, are not related to any claim or defense properly raised in this action, and are not reasonably calculated to lead to the discovery of admissible evidence;

(c)   the burden and expense of the proposed discovery would be excessive, and would outweigh any benefit of the discovery in resolving the issues in this action, as it purports to require every Executive agency of the United States government to conduct a search of every document received or transmitted over the course of a two-year time period (Mr. Geithner stepped down from his position as Secretary in January 2013) to determine if any of those materials contain, refer to, or relate to a statement or inquiry made by Mr. Geithner;

1    (d)   the excessive burden and expense of the proposed discovery

2          is amplified by the sweeping and vague nature of the

3          request, which seeks documents relating to any statements

4          about "possible steps of *any kind* leading to adverse

5          consequences of *any kind* against S&P" (emphasis added);

6          and

7    (e)   it seeks the production of materials protected by the

8          attorney-client privilege, deliberative process privilege,

9          investigatory files privilege, law enforcement privilege,

10         work-product doctrine, joint prosecution/common interest

11         doctrine, and/or presidential communications privileges.

12   In discussions with counsel for S&P regarding this request on

13   October 9, 2013, S&P requested that the United States consider its

14   position with respect to a limitation of this request to

15   communications to and from Mr. Geithner himself.  Subject to and

16   without waiving either the General Objections or the specific

17   objections set forth above, US counsel has agreed to consult with

18   Treasury regarding this proposed limitation and then advise S&P

19   further regarding its positions.  The United States has advised S&P

20   that its consultation with Treasury counsel may be slowed as a

21   result of the furlough of certain DOJ and Treasury staff during the

22   recently-completed government shutdown.

23   Request for Production No. 53

24   All documents sent or received by DOJ, whether internal or

25   external, relating to S&P's credit rating of the United States of

26   America, or the downgrade, or the CreditWatch Action, or the Change

27   in Outlook.

28

74

1    <u>Response to Request for Production No. 53</u>

2         The United States' response to this request for production is

3    the same as its response to request for production 33, which

4    response is incorporated herein by reference.

5

6    Dated: October 18, 2013

7

8    STUART F. DELERY                    ANDRÉ BIROTTE JR.
     Acting Assistant Attorney General  United States Attorney
     United States Department of Justice
9    Civil Division
     MAAME EWUSI-MENSAH FRIMPONG
10   Deputy Assistant Attorney General  <u>/S//George S. Cardona/</u>
     MICHAEL S. BLUME                    GEORGE S. CARDONA
11   Director, Consumer Protection Branch  LEON W. WEIDMAN
     ARTHUR R. GOLDBERG                  ANOIEL KHORSHID
12   Assistant Director, Fed.Prog.Branch  RICHARD E. ROBINSON
     JAMES T. NELSON                     Assistant U.S. Attorneys
13   BRADLEY COHEN
     JENNIE KNEEDLER
14   SONDRA L. MILLS
     THOMAS D. ZIMPLEMAN
15   Trial Attorneys, Civil Division

16

17

18

19

20

21

22

23

24

25

26

27

28

                              75

# EXHIBIT C

LACV 13-0779 DOC - 7/29/2013 - Item No. 8

1

1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3      HONORABLE DAVID O. CARTER, JUDGE PRESIDING

4              - - - - - - -

5    UNITED STATES OF AMERICA,              )
                                            )
6              Plaintiff,                   )
                                            )
7         vs.                               ) No. LACV 13-0779 DOC
                                            )    Item No. 8
8    McGRAW-HILL COMPANIES, INC., and       )
     STANDARD & POOR'S FINANCIAL            )
9    SERVICES, LLC,                         )
                                            )
10             Defendants.                  )
     _____)

11

12

13

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS

15             Scheduling Conference

16             Santa Ana, California

17            Monday, July 29, 2013

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141
24

25   13cv0779 McGraw-Hill 2013-07-29 SchConf

DEBBIE GALE, U.S. COURT REPORTER

LACV 13-0779 DOC - 7/29/2013 - Item No. 8

2

1   **APPEARANCES OF COUNSEL:**

2

    FOR THE UNITED STATES OF AMERICA:

3

4           UNITED STATES DEPARTMENT OF JUSTICE
            OFFICE OF THE UNITED STATES ATTORNEY
5           BY:  George S. Cardona
                 Chief Assistant U.S. Attorney
6           312 North Spring Street
            12th Floor
7           Los Angeles, California 90012-4700
            213-894-2434

8

9           UNITED STATES DEPARTMENT OF JUSTICE
            OFFICE OF THE UNITED STATES ATTORNEY
10          Civil Division
            BY:  Anoiel Khorshid
11               Assistant U.S. Attorney
            300 North Los Angeles Street
12          Room 7616
            Los Angeles, California 90012
13          213-894-6086

14

            UNITED STATES DEPARTMENT OF JUSTICE
15          BY:  James T. Nelson
                 Trial Attorney
16          P.O. Box 386
            Washington, D.C. 20044
17          202-616-2376

18

19

20

21

22

23

24

25

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR THE DEFENDANT McGRAW-HILL COMPANIES, INC. and
      STANDARD & POOR'S FINANCIAL SERVICES LLC:

4

5              KEKER AND VAN NEST LLP
               BY:   John W. Keker
6                    Paven Malhotra
                     Attorneys at Law
7              710 Sansome Street
               San Francisco, California 94111
8              415-391-5400

9

10             KELLER RACKAUCKAS UMBERG ZIPSER LLP
               BY:  Jennifer L. Keller
11                  Attorney at Law
               18300 Von Karman Avenue
12             Suite 930
               Irvine, California 92612
13             949-476-8700

14

15             CAHILL GORDON AND REINDEL LLP
               BY:  Floyd Abrams
16                  S. Penny Windle
                    Attorney at Law
17             80 Pine Street
               New York, New York 10005
18             212-701-3000

19

20

21

22

23

24

25

LACV 13-0779 DOC - 7/29/2013 - Item No. 8

4

1                        I N D E X

2     PROCEEDINGS                              PAGE

3     Scheduling Conference                      5

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DEBBIE GALE, U.S. COURT REPORTER

LACV 13-0779 DOC - 7/29/2013 - Item No. 8

5

|       |    |                                                           |
|-------|----|-----------------------------------------------------------|
|       | 1  | **SANTA ANA, CALIFORNIA, MONDAY, JULY 29, 2013**          |
|       | 2  | **Item No. 8**                                            |
|       | 3  | (3:59 p.m.)                                                |
| 03:59 | 4  | THE COURT:  All right.  We're on the record.              |
| 03:59 | 5  | Counsel, would you be kind enough to make your            |
|       | 6  | appearances, please.                                      |
| 03:59 | 7  | MR. CARDONA:  George Cardona, together with Anoiel        |
|       | 8  | Khorshid and James Nelson, for the United States.         |
| 03:59 | 9  | THE COURT:  Okay.                                          |
| 03:59 | 10 | MR. KEKER:  John Keker on behalf of Standard &            |
|       | 11 | Poor's and McGraw-Hill.  And with me is Paven Malhotra,   |
|       | 12 | Jennifer Keller, Floyd Abrams, and Penny Windle.          |
| 03:59 | 13 | THE COURT:  Great.  Thank you very much, Counsel.         |
| 03:59 | 14 | I want the record to indicate the Court has had a         |
|       | 15 | very informal discussion with Counsel about some initial  |
|       | 16 | thoughts and feelings.                                    |
| 03:59 | 17 | First of all, the Court has privately and                 |
|       | 18 | certainly the record compliments counsel for both sides for |
|       | 19 | an extraordinarily well-written attempt to move discovery |
|       | 20 | along.  The gist of this document is really a 120-day trial |
|       | 21 | period where there will be a number of witnesses deposed. |
|       | 22 | In all likelihood, the majority of those witnesses will come |
|       | 23 | as requests by the government, and many of those may be   |
|       | 24 | 30(b)(6) witnesses; some of those will be on the East Coast, |
|       | 25 | if not most, apparently.                                  |

LACV 13-0779 DOC - 7/29/2013 - Item No. 8

6

04:00    1         There's been a discussion about the general
         2    jurisdiction of this Court and the problems of the majority
         3    of witnesses apparently being on the East Coast, and the
         4    limited jurisdiction this Court has on the West Coast to
         5    impose its jurisdiction.

04:00    6         There's been a general discussion, not meant to
         7    concern either side, but somewhat of a general philosophy by
         8    this Court that I'm more apt to be more progressive or open
         9    to discovery for both sides than possibly the admissible
        10    evidence at the time of trial.  The reason for that is that
        11    the Court strongly feels that the limitation of discovery
        12    can cause both parties harm.  That doesn't mean wide-open
        13    discovery without reason, but it does mean, given two equal
        14    calls, that the parties can expect some openness in terms of
        15    those people that they're able to depose and shape their
        16    case.

04:01   17         There's been a general discussion also about the
        18    value of interrogatories, which, although valuable in a
        19    legal sense, the Court has expressed a view that oftentimes
        20    they're written by lawyers and responded to by witnesses
        21    that give limited value.  But I trust and believe that the
        22    parties will make use of these wisely.

04:01   23         As far as depositions are concerned, I've tried to
        24    put the parties on notice and in a warning in as gentle a
        25    way possible that this Court doesn't believe that

DEBBIE GALE, U.S. COURT REPORTER

LACV 13-0779 DOC — 7/29/2013 - Item No. 8

7

1    depositions are valuable, as far as a jury trial is

2    concerned, or as valuable as what the parties assume.  And

3    the reason for that is I believe the American jury should be

4    able to look at and listen to witnesses who testify.  Their

5    determination of credibility is one of the many bastions

6    that they undertake; and under those circumstances,

7    depositions, even video depositions, fail miserably in front

8    of a jury.  So I've asked/cautioned and, I think, in a very

9    good faith response from the parties, that they're going to

10   do their very best to have people appear.

11              We've talked a little bit about the split cases in

12   New York -- I'm sorry -- on the East Coast, and a district

13   judge having motions before that judge as well as motions

14   before this Court -- or the federal court, we'll say -- the

15   federal case in Los Angeles and the state cases that are in

16   some form of resolution, whether they'll be referred back to

17   the states or whether they will be consolidated in New York.

18   And I think I raised the question:  Why the divided courts?

19              It's premature to ask that.  There's no response

20   to it.  Those cases very well may go back to the other

21   courts.  But I've indicated that I'm always open to talking

22   to that other judge, and I assume vice versa; but, at the

23   present time, perhaps there's no reason.

24              My greatest fear is you might have two courts on

25   the same issue making two different decisions; and I don't

04:02
04:03
04:03

DEBBIE GALE, U.S. COURT REPORTER

LACV 13-0779 DOC - 7/29/2013 - Item No. 8

8

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
|       | 1  | know if that would be possible, plausible, or could occur, |
|       | 2  | but consolidation always seems to be better.             |
| 04:03 | 3  | We talked about this good faith effort.  And I've        |
|       | 4  | indicated to counsel that I take them at their word that |
|       | 5  | they're going to really take, in the next 120 days, a good |
|       | 6  | faith effort to at least shape, if not narrow, the case. |
|       | 7  | That isn't the ultimate goal on behalf of the government. |
|       | 8  | It's the fact that I think you can get in discovery, though. |
|       | 9  | And S&P, through their complaints, can decide if they're in |
|       | 10 | a more enviable position in terms of defending.          |
| 04:04 | 11 | We talked a little bit about settlements, not that       |
|       | 12 | the Court's encouraging one; in fact, I've jokingly said |
|       | 13 | "Don't."  But the end result is I know that that will come |
|       | 14 | up again.  And I had raised the question, I think, with   |
|       | 15 | counsel about how could a case possibly settle in a divided |
|       | 16 | posture if, in fact, those cases are in New York -- the  |
|       | 17 | state cases, let's call them -- and the federal cases here. |
|       | 18 | And I think counsel have counseled this Court that that's |
|       | 19 | entirely possibly if they ever got to the position of a  |
|       | 20 | reasonable settlement, from their perspective.           |
| 04:04 | 21 | I think, lastly, the document only has two               |
|       | 22 | disagreements.  They're on page 12 and 14.  And I'm going to |
|       | 23 | hear that on the record in just a moment.                |
| 04:05 | 24 | Oh.  From S&P's perspective, I think that the            |
|       | 25 | Court can anticipate that they're going to ask for at least |

DEBBIE GALE, U.S. COURT REPORTER

LACV 13-0779 DOC - 7/29/2013 - Item No. 8

9

1    the depositions or discovery concerning a number of

2    prominent government officials.  Although it sounds to the

3    Court, in the informal discussion, that S&P may be in a

4    position of not doing that initially.  But those officials

5    will start becoming known to the Court during the next

6    120 days.

04:05   7         Also raised was the possibility of, I think,

8    successive summary judgments.  In the past, I haven't done

9    that.  It's --

04:05   10        MR. KEKER:  I'm sorry, Your Honor.  I didn't mean

11   "successive."  I just meant at the summary judgment time, I

12   think we'll have a lot to say.

04:05   13        THE COURT:  Okay.

04:05   14        MR. KEKER:  That's all.  Not successive.

04:06   15        THE COURT:  I raised lastly the possibility of a

16   special master.  I understand that there's a payment issue,

17   from the government's perspective.  I also think that S&P,

18   if they were paying those costs to begin with, would be

19   perceived by the public and the press to be almost admitting

20   liability, so that's a tricky situation.

04:06   21        By the same token, it could be, if the government

22   lost, that they compensated for that motion.  But I think

23   we'll leave that on the table after listening to all

24   counsel, with this caveat:  I think that a special master is

25   extraordinarily wise.  The magistrate judge can't be used.

DEBBIE GALE, U.S. COURT REPORTER

LACV 13-0779 DOC - 7/29/2013 - Item No. 8

10

| 04:06 | 1 | First, they're carrying their own cases. |
| 04:06 | 2 | Second, I don't think that they're able to get on |
| | 3 | the plane for most of these depositions. |
| 04:06 | 4 | Third, even if that person was available, there's |
| | 5 | a three-hour time difference if many of these depos are |
| | 6 | going to take place on the East Coast, and this Court's |
| | 7 | certainly not going to be available, unless I took |
| | 8 | extraordinary measures, to answer all the questions that a |
| | 9 | depo has during the mediacy of that deposition. |
| 04:07 | 10 | For the time being, although I think it's a good |
| | 11 | idea, I'm going to leave it to counsel to see how well we do |
| | 12 | the first 120 days, in good faith. |
| 04:07 | 13 | So, Counsel, if there's anything else we covered |
| | 14 | that's of any import, I want to make certain that the record |
| | 15 | gets memorialized.  So let me turn to S&P. |
| 04:07 | 16 | MR. KEKER:  I think you've covered it, Your Honor. |
| 04:07 | 17 | THE COURT:  Counsel?  Ms. Keller? |
| 04:07 | 18 | MS. KELLER:  Yes, Your Honor.  I agree. |
| 04:07 | 19 | THE COURT:  Counsel, if there's anything else, |
| | 20 | please. |
| 04:07 | 21 | Mr. Cardona?  And Counsel? |
| 04:07 | 22 | MR. CARDONA:  Your Honor, I think you've |
| | 23 | summarized the discussions. |
| 04:07 | 24 | THE COURT:  Well, once again, I can't tell you how |
| | 25 | much I enjoy having you here, so it's a pleasure. |

DEBBIE GALE, U.S. COURT REPORTER

LACV 13-0779 DOC - 7/29/2013 - Item No. 8

29

| | | |
|---|---|---|
| 04:30 | 1 | -oOo- |
| 04:30 | 2 | |
| 04:30 | 3 | CERTIFICATE |
| 04:30 | 4 | |
| 04:30 | 5 | I hereby certify that pursuant to Section 753, |
| | 6 | Title 28, United States Code, the foregoing is a true and |
| | 7 | correct transcript of the stenographically reported |
| | 8 | proceedings held in the above-entitled matter and that the |
| | 9 | transcript page format is in conformance with the |
| | 10 | regulations of the Judicial Conference of the United States. |
| 04:30 | 11 | |
| 04:30 | 12 | Date:  August 6, 2013 |
| 04:30 | 13 | |
| 04:30 | 14 | |
| 04:30 | 15 | /s/ Debbie Gale |
| 04:30 | 16 | DEBBIE GALE, U.S. COURT REPORTER |
| | | CSR NO. 9472, RPR, CCRR |
| 04:30 | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

# EXHIBIT D

LACV 1300779 DOC - 7/8/2013 - Volume I

1

1      **UNITED STATES DISTRICT COURT**

2      **CENTRAL DISTRICT OF CALIFORNIA**

3      **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                      - - - - - - -

5   UNITED STATES OF AMERICA,            )
                                         )
6              Plaintiff,                )
                                         )
7         vs.                            ) No. LACV 1300779 DOC
                                         )    Volume I
8   McGRAW-HILL COMPANIES, INC., and     )
    STANDARD & POOR'S FINANCIAL          )
9   SERVICES LLC,,                       )
                                         )
10             Defendants.               )
    ─────────────────────────────────────)

11

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15              Hearing on Motion to Dismiss

16                Santa Ana, California

17               Monday, July 8, 2013

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141

24

25   13cv0779 McGraw-Hill 2013-07-08 V1

LACV 1300779 DOC - 7/8/2013 - Volume I

2

1    **APPEARANCES OF COUNSEL:**

2
     FOR THE UNITED STATES OF AMERICA:
3

4
         OFFICE OF US ATTORNEY
5        BY:  George S. Cardona
              Chief Assistant United State Attorney
6        312 North Spring Street
         12th Floor
7        Los Angeles, California 90012-4700
         213-894-2434
8

9        Anoiel Khorshid
         AUSA - Office of US Attorney
10       Civil Division - Federal Building
         300 North Los Angeles Street
11       Room 7616
         Los Angeles, California 90012
12       213-894-6086

13
         James T. Nelson, Trial Attorney
14       United States Department of Justice
         P.O. Box 386
15       Washington, D.C. 20044
         202-616-2376
16

17

18   FOR DEFENDANT McGRAW-HILL COMPANIES, INC. and STANDARD & POOR'S
     FINANCIAL SERVICES LLC:
19
         John W. Keker
20       KEKER AND VAN NEST LLP
         710 Sansome Street
21       San Francisco, California 94111
         415-391-5400
22
         Steven K. Taylor
23       KEKER AND VAN NEST LLP
         633 Battery Street
24       San Francisco, California 94111
         415-391-5400
25

LACV 1300779 DOC – 7/8/2013 – Volume I

3

1

2  **APPEARANCES OF COUNSEL (Continued):**

3

4  FOR THE DEFENDANT McGRAW-HILL COMPANIES, INC. and STANDARD & POOR'S
   FINANCIAL SERVICES LLC:

5

6          Jennifer L. Keller
           KELLER RACKAUCKAS UMBERG ZIPSER LLP
7          18300 Von Karman Avenue
           Suite 930
8          Irvine, California 92612
           949-476-8700

9

10         Floyd Abrams
           CAHILL GORDON AND REINDEL LLP
11         80 Pine Street
           New York, New York 10005
12         212-701-3000

13         S. Penny Windle
           CAHILL GORDON AND REINDEL LLP
14         80 Pine Street
           New York, New York 10005
15         212-701-3000

16         Paven Malhotra
           KEKER AND VAN NEST LLP
17         710 Sansome Street
           San Francisco, California 94111
18         415-391-5400

19

20  ALSO PRESENT:

21         Prasanth R. Akkapeddi
           Associate General Counsel
22         McGraw Hill Financial

23

24

25

DEBBIE GALE, U.S. COURT REPORTER

LACV 1300779 DOC – 7/8/2013 – Volume I

41

```
        1    except it's not what makes them more risky.  What makes them
        2    more risky is what is the asset backed security or RMBS that
        3    is the collateral.
11:27   4                THE COURT:  And if it's that student loan, it's
        5    nothing.
11:27   6                MR. KEKER:  Student loan sounds pretty bad.
11:27   7                THE COURT:  If it's a credit card debt, it's
        8    nothing.
11:27   9                MR. KEKER:  Well, okay.  I mean, but that's not
       10    the way the Street looks at it.  The Street looks at it and
       11    says, "What are my chances of getting paid here?"
11:27  12                THE COURT:  Well, in 2007, 2008, not very good.
11:27  13                MR. KEKER:  Again, in hindsight.  But in 2004 to
       14    2007, Wall Street and investors look at what's the
       15    collateral and how much confidence do I have in that
       16    collateral.  And one of the areas where there was a lot of
       17    confidence that turned out to be, perhaps, misplaced was in
       18    residential mortgages.
11:28  19                THE COURT:  The last question is, are CDOs, it
       20    appears to me, also, obviously, initiated by banks?
11:28  21                MR. KEKER:  Yes.
11:28  22                THE COURT:  Standard & Poor's doesn't do that.
11:28  23                MR. KEKER:  Right.
11:28  24                THE COURT:  Banks start that process, if you will,
       25    and they turn to your client as a ratings service and said,
```

DEBBIE GALE, U.S. COURT REPORTER

|  | | |
|---|---|---|
| | 1 | "Sort this out in terms of rating."  They make the initial |
| | 2 | decision of how to mix this; you don't. |
| 11:28 | 3 | MR. KEKER:  Absolutely.  I mean, that's -- and |
| | 4 | what happens is they put it together, and then they take it |
| | 5 | to their syndicate desk and say, "Can we sell this?"  And |
| | 6 | the syndicate desk -- "I don't think so.  They're never |
| | 7 | gonna buy it.  So let's change the mix." |
| 11:28 | 8 | So they finally get it right, and then they take |
| | 9 | it to Standard & Poor's and say, "Please run it through your |
| | 10 | models and rate it."  And then they look at it and say, |
| | 11 | "This looks good; we think we can sell this," or, "We don't |
| | 12 | have enough triple A in there.  Let's change the mix again." |
| 11:29 | 13 | The banks put this together, put the package |
| | 14 | together, write the prospectus that tells the investor what |
| | 15 | they're buying.  These triple A investors go out there -- |
| | 16 | I've tried one of these cases -- they go out there and they |
| | 17 | go, "Look --" |
| 11:29 | 18 | THE COURT:  Why aren't the banks included in this |
| | 19 | lawsuit? |
| 11:29 | 20 | MR. KEKER:  We didn't bring it, Your Honor. |
| 11:29 | 21 | THE COURT:  I'll ask the Government in a moment. |
| | 22 | Why isn't Moody's, if your claims are correct, included in |
| | 23 | this lawsuit? |
| 11:29 | 24 | MR. KEKER:  Well, the only distinction that I know |
| | 25 | is that Standard & Poor's at some point downgraded the |

LACV 1300779 DOC - 7/8/2013 - Volume I

43

|        |    |                                                                      |
|--------|----|----------------------------------------------------------------------|
|        | 1  | credit of the United States, much to the consternation of            |
|        | 2  | the United States; Moody's didn't.                                   |
| 11:29  | 3  | THE COURT:  So you think it's payback?                               |
| 11:29  | 4  | MR. KEKER:  Yes.                                                     |
| 11:29  | 5  | THE COURT:  Okay.                                                    |
| 11:29  | 6  | MR. KEKER:  I don't know.  Maybe that's a question                  |
|        | 7  | the Government can answer.  Why isn't Moody's, who rated all         |
|        | 8  | these tranches -- at least the ones that are identified             |
|        | 9  | specifically in the complaint, every single one is rated            |
|        | 10 | just like --                                                        |
| 11:29  | 11 | THE COURT:  Well, they may have changed their                       |
|        | 12 | model.  I don't know yet.  Moody's isn't before me.                 |
| 11:29  | 13 | Well, Counsel, I'll come back to you.                               |
| 11:30  | 14 | Why don't you step over with your colleagues for                    |
|        | 15 | just a moment.  Why don't you have a consultation, see if           |
|        | 16 | he's missed anything, or if there's anything else you'd like        |
|        | 17 | to add in the first round.                                          |
| 11:30  | 18 | MR. KEKER:  We're fine.                                             |
| 11:30  | 19 | THE COURT:  You're okay for the first round.                        |
|        | 20 | There's going to be a second round.                                 |
| 11:30  | 21 | MR. KEKER:  Yes, sir.                                               |
| 11:30  | 22 | THE COURT:  Counsel, ready?                                         |
| 11:30  | 23 | MR. CARDONA:  Yes.                                                  |
| 11:30  | 24 | THE COURT:  Where's Moody's?                                        |
| 11:30  | 25 | MR. CARDONA:  Moody's is not here because the                      |

DEBBIE GALE, U.S. COURT REPORTER

LACV 1300779 DOC – 7/8/2013 – Volume I

44

|  |  |  |
|---|---|---|
| | 1 | evidence we developed was against S&P, and we filed the suit |
| | 2 | based on the evidence we had against -- |
| 11:30 | 3 | THE COURT:  Did Moody's change their model during |
| | 4 | this period of time? |
| 11:30 | 5 | MR. CARDONA:  Moody's operated with a different |
| | 6 | set of models.  Different procedures -- |
| 11:30 | 7 | THE COURT:  Where are the banks?  Where are the |
| | 8 | banks? |
| 11:30 | 9 | MR. CARDONA:  The banks are not here, again -- |
| 11:30 | 10 | THE COURT:  Why? |
| 11:30 | 11 | MR. CARDONA:  -- because our evidence in this case |
| | 12 | is against S&P.  We have not brought allegations against the |
| | 13 | banks. |
| 11:30 | 14 | And if I could, what I'd like to start with is to |
| | 15 | step back a little bit and go through kind of the |
| | 16 | structuring of these entities and of these instruments and |
| | 17 | how that works and why that shows how important the |
| | 18 | representations that S&P was making were to the people who |
| | 19 | were investing in them. |
| 11:31 | 20 | With that, let's start with an RMBS.  And I'm |
| | 21 | going to talk about RMBS, and then about CDOs made up of |
| | 22 | RMBS, because the CDOs that we have alleged are, in fact, |
| | 23 | CDOs made up almost entirely of two things:  Either RMBS or |
| | 24 | other CDOs that themselves are based on RMBS.  And I'll |
| | 25 | explain that in a second when we get there. |

LACV 1300779 DOC – 7/8/2013 – Volume I

45

11:31  1      So I'm not gonna get into the credit card loans or

2      the student loans or the airplane loans, because they don't

3      really play a role in our case.

11:31  4      So let's start with an RMBS.  As Your Honor has

5      recognized, what an RMBS is, is basically a debt instrument

6      that is based on other debt instruments.  And the other of

7      debt instruments that make up the RMBS are, in fact,

8      residential mortgages.

11:31  9      And a mortgage, as Your Honor has recognized,

10      basically has two things.  If you're a bank making a

11      mortgage loan, there's two things you look at, right?

11:32  12      There's the value of the property, 'cause that's

13      what you're gonna recover against if, in fact, the person

14      who's borrowing it can't pay, and then you look at the

15      ability of the borrower to repay.  Things like their FICO

16      credit scores, their credit histories, their incomes, their

17      debt to income ratio, those type of things that go to their

18      ability to repay the loan.

11:32  19      So you have these series of mortgage loans, and

20      each mortgage loan has a term.  It's typically a 30-year

21      term in which the borrower had committed to making periodic

22      payments.

11:32  23      So the bank is in a position where they can

24      collect those payments over that time.  And the bank has

25      made an assessment that given the risks involved in that

DEBBIE GALE, U.S. COURT REPORTER

LACV 1300779 DOC — 7/8/2013 — Volume I

46

1    loan, they are going to make that loan at a particular

2    interest rate and collect that stream of payments over time.

11:32    3        What an RMBS does is basically package a whole

4    group of mortgages of varying risks and varying interest

5    rates, with varying risks that those payment streams will

6    continue and be made, and repackage that into a structured

7    debt security.

11:33    8        And you're correct, it's the banks who initially

9    propose the structure for that.  And what they say is, okay,

10    we've got a bunch of mortgage loans —

11:33    11        THE COURT:  Same question.  Do you mind if I ask?

11:33    12        MR. CARDONA:  No, no, I'm perfectly okay with

13    questions.

11:33    14        THE COURT:  Why does the Street take non-prime,

15    such as subprime, and mix them in packages —

16    securitizations I'm going to call them, bundling, if you

17    will, where I've got risky tranches or, let's say, less

18    secure tranches, and I have supposedly tranches that are

19    triple A, that are golden.

11:33    20        The only reason it appears to me that the Street

21    does that is because, first of all, they can bring bigger

22    packages:  400 million, 800 million, revolving lines of

23    credit so they get money back to reinvest.  That's one

24    reason.

11:34    25        Number two, the banks could cut that down.  They

DEBBIE GALE, U.S. COURT REPORTER

LACV 1300779 DOC - 7/8/2013 - Volume I

53

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | forth; we want you to give the rating."                           |
| 11:42 | 2  | S&P recognized and regulators recognized and                      |
|       | 3  | Congress recognized that there was a potential conflict of         |
|       | 4  | interest there; that S&P, which depended on the investment         |
|       | 5  | banks for its business, might be influenced to act on behalf       |
|       | 6  | of the investment banks, as opposed to being this impartial        |
|       | 7  | arbiter of the ratings and the risks.                              |
| 11:42 | 8  | And to counter that, to convey to investors and                   |
|       | 9  | the market and to the SEC and to Congress that, in fact,           |
|       | 10 | they were acting as this impartial arbiter; that they             |
|       | 11 | weren't being influenced by their relationships with the          |
|       | 12 | issuers, they made the representations we allege.  They put        |
|       | 13 | in place their code of practices and conducts.  They made          |
|       | 14 | their repeated representations that they were objective and        |
|       | 15 | independent.                                                       |
| 11:42 | 16 | THE COURT:  Now, could I ask you a question?                       |
| 11:42 | 17 | How in the world would Congress ever accept that?                 |
|       | 18 | S&P or any other credit agency has to be completely                |
|       | 19 | dependent upon the bank.                                           |
| 11:43 | 20 | The bank comes to them and says, I've got X amount                |
|       | 21 | of triple A; I've got X amount of BB.  The bank isn't in a         |
|       | 22 | position to go out and examine -- and you use the word             |
|       | 23 | "model."  They're not going to go to each of those mortgages       |
|       | 24 | and see if they're truly triple A.  There might be a               |
|       | 25 | thousand triple A's and maybe some of those are B's or BB's        |

DEBBIE GALE, U.S. COURT REPORTER

LACV 1300779 DOC - 7/8/2013 - Volume I

54

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | or double A.  So the bank, then, takes this information --          |
|       | 2  | I'm sorry -- the rating service takes this information.             |
| 11:43 | 3  | How in the world would I believe that S&P had the                  |
|       | 4  | ability to test the credibility of the information received         |
|       | 5  | from the bank?  What is so magic about this model that's            |
|       | 6  | been run, which I don't understand yet?                            |
| 11:44 | 7  | Because it seems to me that all the information is                 |
|       | 8  | dependent, from a ratings service, on what they receive from       |
|       | 9  | the issuer, from the bank.                                          |
| 11:44 | 10 | It's kind of like a lawyer in court who says,                     |
|       | 11 | Judge, I represent the following:  My client told me so.           |
|       | 12 | Never get the two confused.  The client may have said X, and       |
|       | 13 | the lawyer's conveying it, but that doesn't mean it's true.        |
|       | 14 | It's not the fault of the lawyer.  It's the information we         |
|       | 15 | receive from our client.                                           |
| 11:44 | 16 | So what I'm having trouble with is what is the                    |
|       | 17 | independent obligation of the bank -- strike that -- of the        |
|       | 18 | ratings service under these circumstances where there's an         |
|       | 19 | obvious conflict and there always will be?                        |
| 11:44 | 20 | MR. CARDONA:  Um, that's part of the problem.                       |
|       | 21 | There was an obvious conflict.                                     |
| 11:44 | 22 | THE COURT:  Then what was Congress doing --                        |
| 11:44 | 23 | MR. CARDONA:  Well, um --                                           |
| 11:44 | 24 | THE COURT:  -- before 2007?                                        |
| 11:44 | 25 | And what were the agencies doing, like the SEC and                |

DEBBIE GALE, U.S. COURT REPORTER

LACV 1300779 DOC – 7/8/2013 – Volume I

55

1    FTC and Treasury before 2007?

2                MR. CARDONA:  Before 2007, um, there was an act

3    put in place that shifted the rules for designation as a

4    nationally recognized statistical rating organization, and

5    required that effective as of 2007, that that would be

6    subject to SEC approval.

7                THE COURT:  Okay.

8                MR. CARDONA:  And that, again, gets to what

9    these -- why these representations we allege were important.

10   As part of that, as part of that regulatory action in 2007,

11   S&P -- I'm sorry -- the SEC required S&P -- and this is in

12   the Complaint -- the SEC required S&P to submit what it was

13   relying on to address this potential conflict of interest.

14                And, in fact, what S&P submitted, in part, to

15   address that was precisely its code of conduct.  Its code of

16   conduct in which it made representations regarding the

17   practices and procedures that it had in place that would

18   address and, in there view, overcome these conflicts.

19                Things like the sections that Mr. KekerKeker read

20   to you:  Analysts shall separate from the business side.

21   Essentially, that's what it was, a series of practices and

22   procedures that S&P represented separate our analytics, the

23   people who are running the models, who are doing the

24   analysis and coming up with whether the ratings are

25   sufficient from our business side, the people who are out

11:44  (line 2)
11:45  (line 7)
11:45  (line 8)
11:45  (line 14)
11:45  (line 19)

LACV 1300779 DOC - 7/8/2013 - Volume I

56

1    there negotiating with the banks about whether we should

2    have their business how much they're going to pay us for our

3    ratings, that kind of stuff.  But there was this separation.

4           Our allegations are that that wasn't true.  And

5    that's why we get to a fraud case.

6           And this is a fraud case.  As Mr. Keker has

7    recognized, this is a FIRREA case, which requires us to

8    prove, as predicates, mail, wire, and bank fraud.

9           And it's the elements that I'm sure Your Honor is

10   familiar with, with respect to those.  You know, a scheme to

11   defraud or a scheme to make false statements,

12   representations, or promises with the intent to obtain money

13   from the victims.

14          Materiality, a capacity to influence, and an

15   intent to defraud, which in the Ninth Circuit is an intent

16   to deceive or cheat.

17          Those are all elements that we have to prove --

18   will have to prove, and those are all elements that are

19   alleged in the Complaint.

20          So let me turn to those allegations for a second

21   to explain what our allegations are and why, with the

22   respect to a number of those allegations, we don't have to

23   prove that the actual rating on a particular instrument was

24   false.

25          THE COURT:  So we recognize that there's an

57

1  inherent conflict in what the rating services do; Congress

2  recognizes that, the different federal agencies do; and

3  therefore, we turn to resolving that conflict by statements

4  from the entity that's profit-motivated.

11:47  5       MR. CARDONA:  Right.  S&P made representations as

6  to its practices, its procedures that it would keep this

7  separation and that, therefore, it would be objective and

8  independent; and those were, in fact, relied on by the

9  investors.

11:47  10       Not that we have to prove reliance, because,

11  remember, again, this is not a securities fraud action.  We

12  don't have to prove reliance.  We just have to prove that

13  their representations regarding their objectivity and

14  independence, the practices and procedures that they had in

15  place, the things we allege that were false or misleading —

16  we just have to prove that those had the capacity to

17  influence investors.

11:48  18       And they certainly did, because those investors

19  knew, as well, that S&P was operating under this potential

20  conflict of interest, and these were the representations

21  made to address it.

11:48  22       THE COURT:  Okay.  Sit down, please.

11:48  23       Not you, Counsel.  There's somebody behind you.

24  Please continue.

11:48  25       No, that was not directed at you.  I just don't

LACV 1300779 DOC — 7/8/2013 — Volume I

58

```
 1        want people standing.
 2   11:48        MR. CARDONA:  So let me get to the allegations as
 3        to what we have alleged.  So what we have alleged is that
 4        there were these representations that were made, and we've
 5        alleged that those representations were made over a period
 6        of time from September 2004, all the way through 2007 in
 7        various forms.
 8   11:48        And we allege that they were false for a variety
 9        of reasons, but the primary reason we allege they were false
10        is they were false because S&P was not maintaining the
11        separation and was allowing the business side to influence
12        their ratings side.
13   11:49        And the examples of that influence and why those
14        representations were false, we've essentially alleged two
15        different things.
16   11:49        First, we have alleged that from September of 2004
17        through October 2007; that is, the entire time that we
18        allege there was a scheme to defraud, one way in which S&P
19        allowed that conflict to affect them, contrary to their
20        representations, was that they manipulated their models;
21        they manipulated their models and their criteria that they
22        used to rate RMBS and CDOs.  And this gets back to the
23        models that you talked about, which will be the sub -- which
24        are named in the complaint and are alleged and will be
25        subject of proof at trial:  The LEVELS model for RMBS, the
```

DEBBIE GALE, U.S. COURT REPORTER

LACV 1300779 DOC - 7/8/2013 - Volume I

59

1    CDO evaluator model for CDOs and other criteria that related

2    to those models.  Our allegation is they allowed the issues

3    to influence that criteria and the development of those

4    models in contradiction to their representations.

11:50    5         In that regard, we believe that the falsity of

6    those representations was material to investors regardless

7    of whether the actual rating would have been affected or

8    not.

11:50    9         And the reason is this.  If I have an investor and

10   I'm looking at a structured finance security, and I'm saying

11   I want to buy an AAA-rated security, when I look at it and

12   say S&P gave this an AAA-rated security, you know, I'm not

13   just looking at the fact of the rating; I'm looking at the

14   entire package, the quality of the process by which that

15   rating was arrived at.  And this is entirely consistent with

16   the Second Circuit cases that Mr. KekerKeker has relied on.

11:50    17        If the Court looks at *Novak*, *Star*, *Regioned Office*

18   *(phonetic)*, the other cases that they've cited, what they

19   talk about is deceit alone isn't enough, but deceit is but a

20   false statement that goes to the package of what the

21   investor sought to purchase does matter.

11:51    22        And in that sense, you know, I'll try an analogy,

23   and I apologize if the Court doesn't think it works.  But,

24   you know, when I go to purchase a piece of organic fruit in

25   the grocery store and it's certified organic, you know, it

DEBBIE GALE, U.S. COURT REPORTER

 1    may be that that certified organic fruit, in fact, turns out

 2    to be identical to the noncertified organic fruit; but when

 3    I buy that, I'm buying it with the peace of mind that comes

 4    with knowing that it has been grown organically.  And I'm

 5    not taking the risk that I take when I buy the nonorganic

 6    fruit.  When I buy the nonorganic fruit, I may end up with a

 7    piece of fruit that doesn't have any pesticide residue,

 8    doesn't have anything else and is identical, but I'm taking

 9    that risk.

11:52   10        When I buy a certified organic, I'm not taking

 11    that risk because I'm relying on the representations of the

 12    people certifying it to be organic.

11:52   13        And that's exactly the same thing here.  When I go

 14    out and I buy a triple A tranche that has been rated by S&P,

 15    I'm buying the peace of mind that comes with knowing or

 16    believing that, in fact, S&P has engaged in an objective and

 17    independent rating process and arrived at that without being

 18    influenced by the issues.

11:52   19        It may be by chance that -- by chance, that rating

 20    is the same as would have been arrived at through a

 21    nonindependent-rating process, but I'm buying that total

 22    package.  And that's materiality.  And the Second Circuit

 23    cases recognize that.

11:52   24        And, moreover, the *Treadwell* case, out of the

 25    Ninth Circuit, which we cited in our papers, in *United*

LACV 1300779 DOC — 7/8/2013 — Volume I

61

1    *States v. Treadwell*, dealt with a very similar situation.

2    In *United States v. Treadwell*, a claim was made that the

3    Second Circuit standard's were different from the Ninth

4    Circuit's, and the Court basically said, Look, we're not

5    gonna say whether there has to be an intent to harm, but

6    even if there was, it's satisfied here.

11:53    7          It's satisfied here because there was a harm to

8    the individual's property interest in depriving the victim

9    of the opportunity to weigh the true benefits and risks of

10   the transaction, regardless of whether or not they're gonna

11   suffer a permanent loss of property.

11:53    12         That's precisely what we have here.  Even if the

13   ratings would have turned out to be the same, there was

14   still a deprivation of the investor's right to make an

15   investment decision based on the full range of information.

16   And *Treadwell* recognizes that that can be the subject of a

17   fraudulent scheme, as do the Second Circuit cases.

11:53    18         So that's the importance.  That's the materiality.

19   And I'd like to turn —— unless the Court has questions on

20   that, I'd like to turn to the other two arguments that

21   Mr. KekerKeker made.

11:53    22         The arguments about puffing under *Boca Raton*.

23   And, in all honesty, I think I've addressed those, because

24   puffing is, in fact, part of the materiality analysis.  As

25   *Boca Raton* and the other case laws that they've relied on

DEBBIE GALE, U.S. COURT REPORTER

LACV 1300779 DOC – 7/8/2013 – Volume I

62

1    make clear, that's part and parcel of looking at:  Are these

2    representations of a type that have the capacity to

3    influence an investor?  For precisely the reasons I've

4    explained, they are not puffing here.  Because you need to

5    look at them in context.  In all the cases that have been

6    cited, all the cases we've cited make that clear.

11:54    7        I'll just give the Court an example, you know, in

8    the Countrywide case that we cited that Judge Pfaelzer ruled

9    on.  The representations in that case, in the Countrywide

10    case, included representations about the, quote, "high

11    quality" of mortgage loans in general.

11:54    12        And as Judge Pfaelzer recognized, you know, in

13    most contexts, a statement of high quality is precisely the

14    type of statement that would be viewed as puffing.  It's

15    akin to things like "strong," you know, "we have strong

16    mortgage business."  It's akin to other words that courts

17    have repeatedly found to be normally puffing.

11:55    18        But in that case, in context, in particular in

19    context with a set of business practices that appeared to be

20    completely contrary to that, the Court found that even

21    though it ordinarily was puffing, in context, it wasn't.

11:55    22        And that's precisely the situation here.  In

23    context, with both the other representations, with the

24    importance to the investors of being assured that these

25    potential conflicts of interest would not affect the

LACV 1300779 DOC - 7/8/2013 - Volume I

63

|       |    |                                                               |
|-------|----|---------------------------------------------------------------|
|       | 1  | ratings, they were material; they were not puffing.           |
| 11:55 | 2  | So the next argument I'd like to turn to is the               |
|       | 3  | allegation of intent to defraud.  In part, I've already       |
|       | 4  | addressed that by addressing *Treadwell*.  The only other case |
|       | 5  | I'd like to address is the *Liu* case, which they raise, which |
|       | 6  | is an intent to obtain money from the investors.  In          |
|       | 7  | *United States v. Liu*, which the Court is probably familiar  |
|       | 8  | with, but if I may be indulged just for a second to go into   |
|       | 9  | the facts.  That was a case very, very different from here.   |
| 11:56 | 10 | In that case, we had a lawyer, who, on behalf of              |
|       | 11 | his clients, who, the evidence suggested, were perhaps        |
|       | 12 | involved in the fraud, made false statements to the INS in    |
|       | 13 | order to obtain visas for his clients.  And the issue there   |
|       | 14 | was, you know, is this a *McNally* fraud, where we're not     |
|       | 15 | depriving anybody of a property right, but instead we're      |
|       | 16 | just --                                                       |
| 11:56 | 17 | THE COURT:  A little slower.                                   |
| 11:56 | 18 | MR. CARDONA:  In *Liu*, the issue was, essentially,          |
|       | 19 | do we have a scheme to defraud of money or property, or do    |
|       | 20 | we have what is akin to an honest services fraud in           |
|       | 21 | violation of McNally, because the only false statements are   |
|       | 22 | directed to a government agency and the only nonculpable      |
|       | 23 | participant is the government agency who could conceivably    |
|       | 24 | be defrauded.                                                 |
| 11:57 | 25 | That's far different from the situation we have               |

DEBBIE GALE, U.S. COURT REPORTER

LACV 1300779 DOC — 7/8/2013 — Volume I

64

|        |    |                                                                    |
|--------|----|--------------------------------------------------------------------|
|        | 1  | here.                                                              |
| 11:57  | 2  | THE COURT: Just a moment, Counsel. Too fast.                       |
|        | 3  | Slow down.                                                         |
| 11:57  | 4  | MR. CARDONA: My apologies.                                         |
| 11:57  | 5  | Importantly, in *Liu*, *Liu* discussed another case.              |
|        | 6  | *United States v. Bonello*. And in *Bonello*, there was a         |
|        | 7  | similar claim, as S&P's claim here, that was rejected by the      |
|        | 8  | court.                                                             |
| 11:57  | 9  | In *Bonello*, a bank employee was convicted of bank               |
|        | 10 | fraud for making automatic teller withdrawals and then           |
|        | 11 | altering the computer records so that, in fact, customer         |
|        | 12 | accounts were charged for those automatic teller               |
|        | 13 | withdrawals.                                                       |
| 11:57  | 14 | And the claim was, Look, the bank employee is not               |
|        | 15 | obtaining money from the banks; he's actually obtaining         |
|        | 16 | money from the customer accounts, because they're the ones      |
|        | 17 | who actually lose the money.                                      |
| 11:57  | 18 | And the Court rejected that, concluding that                     |
|        | 19 | because there was a mechanism in place such that the bank       |
|        | 20 | would repay the customers for the amounts of money that they    |
|        | 21 | lost out of their accounts, that was sufficient to satisfy a    |
|        | 22 | scheme to defraud, a scheme to obtain money from the           |
|        | 23 | victims.                                                          |
| 11:58  | 24 | That's precisely what we have here. Even though                 |
|        | 25 | it's the investment banks, the issuers who retain S&P,          |

DEBBIE GALE, U.S. COURT REPORTER

LACV 1300779 DOC — 7/8/2013 — Volume I

65

1     ultimately the costs of S&P's services are reimbursed or

2     paid by the investors.  And S&P's fee, in essence, comes out

3     of the investment funds that the investors put in.  And

4     that's sufficient under *Liu* and *Bonello* to satisfy that

5     requirement.

11:58    6              And, indeed, we have allegations in the Complaint,

7     allegations at Paragraph 67 that describe that and, in fact,

8     cite a high level S&P executive, Joanne Rose, who was in

9     charge of their Structured Finance Department, making a

10    statement recognizing that investors ultimately do pay since

11    all deal fees, including rating fees, are netted out of the

12    total deal proceeds.

11:59   13              So, in essence, we have a situation that satisfies

14    the *Liu/Bonello* requirement.

11:59   15              So with that, Your Honor, if you have no other

16    questions, I'll turn the lectern over to Mr. Keker again.

11:59   17              THE COURT:  Same courtesy; I want you to step over

18    with your trial team and take a moment, make sure you've

19    answered or propounded your arguments.

11:59   20              MR. CARDONA:  We're fine, Your Honor.

11:59   21              THE COURT:  Okay.  Then help me understand a CDO

22    once again.  I'm still confused.

11:59   23              David Tesher is the —— let me see if I can read

24    may own notes here —— is allegedly the managing director in

25    charge of Cash CDO.  I think you find that at Paragraph 59

DEBBIE GALE, U.S. COURT REPORTER

LACV 1300779 DOC - 7/8/2013 - Volume I

66

| | | |
|---|---|---|
| | 1 | or around that portion of your Complaint. |
| 11:59 | 2 | MR. CARDONA:  Correct. |
| 11:59 | 3 | THE COURT:  Mr. Tesher reports to the person you |
| | 4 | just named, Patrice Jordan. |
| 12:00 | 5 | MR. CARDONA:  Mr. Tesher reports to Patrice |
| | 6 | Jordan, who reports to Joanne Rose. |
| 12:00 | 7 | THE COURT:  Okay.  We'll make it even more |
| | 8 | complicated.  Who reports to Executive A?  Who is |
| | 9 | Executive A? |
| 12:00 | 10 | MR. CARDONA:  That was, I believe, Vicky Tillman. |
| 12:00 | 11 | THE COURT:  Okay.  'Cause so far that person's |
| | 12 | just referred to as Executive A, aren't they? |
| 12:00 | 13 | MR. CARDONA:  Correct. |
| 12:00 | 14 | THE COURT:  All right.  Now, in the same general |
| | 15 | part of your Complaint, besides referring to David Tesher, |
| | 16 | who's the managing director in charge of Cash CDOs, you have |
| | 17 | a managing director, Andrea Brown, of Synthetic CDOs. |
| 12:00 | 18 | Help me.  What is the difference between a Cash |
| | 19 | CDO and a Synthetic CDO? |
| 12:00 | 20 | MR. CARDONA:  A Cash CDO is a CDO that is backed |
| | 21 | by actual assets, so the assets are -- |
| 12:01 | 22 | THE COURT:  Just a moment. |
| 12:01 | 23 | And what's a Synthetic CDO? |
| 12:01 | 24 | MR. CARDONA:  A Synthetic CDO is an instrument |
| | 25 | that is backed by -- |

DEBBIE GALE, U.S. COURT REPORTER

LACV 1300779 DOC – 7/8/2013 – Volume I

67

| | | |
|---|---|---|
| 12:01 | 1 | THE COURT:  Nothing. |
| 12:01 | 2 | MR. CARDONA:  -- in many instances, credit default |
| | 3 | swaps.  So it's promises to pay dependent on the performance |
| | 4 | of other instruments. |
| 12:01 | 5 | THE COURT:  Let me repeat.  Nothing.  I can't find |
| | 6 | anything in a Synthetic CDO that has any, you know, tangible |
| | 7 | piece of property, aircraft shell.  Can you? |
| 12:01 | 8 | MR. CARDONA:  Synthetic CDOs, no. |
| 12:01 | 9 | THE COURT:  Don't repeat back to me. |
| 12:01 | 10 | Is there a tangible something that I can get my |
| | 11 | hands on, like a piece of property in a foreclosure sale or |
| | 12 | the shell of an aircraft in a Synthetic CDO? |
| 12:01 | 13 | MR. CARDONA:  Not directly. |
| 12:01 | 14 | THE COURT:  What was the mix of Synthetic CDOs in |
| | 15 | a CDO?  Now, you've told me before that "An RMBS made up, |
| | 16 | Judge, the vast majority of the CDOs," that they're RMBSs. |
| | 17 | I want to know what a synthetic CDO is and what portion of |
| | 18 | CDOs are these Synthetic CDOs. |
| 12:02 | 19 | MR. CARDONA:  Synthetic CDOs, in essence, are made |
| | 20 | up of or can be considered as bets on other assets.  So |
| | 21 | directly, there's nothing there.  But indirectly, they are |
| | 22 | indexed to or hinged to other assets, such as the ones |
| | 23 | you've been talking about. |
| 12:02 | 24 | THE COURT:  What I'm trying to figure out from |
| | 25 | this Complaint is, what am I dealing with in terms of a CDO? |

DEBBIE GALE, U.S. COURT REPORTER

LACV 1300779 DOC – 7/8/2013 – Volume I

68

|  |  |  |
|---|---|---|
| | 1 | Am I dealing with 20 percent that were these Synthetic CDOs? |
| | 2 | Am I dealing with 5 percent?  What is this, you know, term? |
| 12:03 | 3 | MR. CARDONA:  The CDOs that we have focused on in |
| | 4 | the complaint are Cash CDOs and/or Cash CDOs squared. |
| 12:03 | 5 | THE COURT:  No Synthetic CDOs? |
| 12:03 | 6 | MR. CARDONA:  The reason I'm hesitating is there |
| | 7 | may be one or two that were, in fact, indexed to or hinged |
| | 8 | on other RMBS or Cash CDOs. |
| 12:03 | 9 | THE COURT:  Okay. |
| 12:03 | 10 | MR. CARDONA:  The majority of them, however, are |
| | 11 | Cash CDOs that were, in fact, rated by David Tesher's group. |
| 12:03 | 12 | THE COURT:  Okay.  Thank you very much. |
| | 13 | Appreciate it. |
| 12:03 | 14 | Thank you. |
| 12:03 | 15 | MR. KEKER:  I'd like to go to that question, |
| | 16 | because it, both on the Motion to Dismiss and later |
| | 17 | discussions, we need to know what we're dealing with here. |
| | 18 | I mean, that's the point.  And a synthetic, I mean, so far |
| | 19 | we haven't seen.  And a synthetic, I mean, so far we haven't |
| | 20 | seen the specific allegations of Synthetic CDOs being at |
| | 21 | issue; but then they've made a big point this is all just |
| | 22 | "for example" is the only think they've alleged.  "For |
| | 23 | example." |
| 12:04 | 24 | THE COURT:  That's my problem.  If this was going |
| | 25 | forward, your position is, how do we defend? |

DEBBIE GALE, U.S. COURT REPORTER

LACV 1300779 DOC – 7/8/2013 – Volume I

69

| | | |
|---|---|---|
| 12:04 | 1 | MR. KEKER:  Yes.  What we have to defend is -- |
| | 2 | have a trial on -- as far as we know, 5500 times 10 |
| | 3 | tranches; 55,000 securities, and try to show that the rating |
| | 4 | committee that did each one of those was acting in good |
| | 5 | faith. |
| 12:04 | 6 | THE COURT:  And the government's position is, |
| | 7 | "Trust me." |
| 12:04 | 8 | What we'll do, Mr. Cardona, is, apparently from |
| | 9 | your perspective, sort this out at a later time.  In fact, |
| | 10 | you make the statement that we may even narrow this before |
| | 11 | summary judgment.  But if we're going forward -- join your |
| | 12 | colleague there -- if we're going forward, trust us, as the |
| | 13 | government, to either trim this or make this more clear at a |
| | 14 | later time. |
| 12:05 | 15 | If I did that and it was too late, the defense has |
| | 16 | no way to defend.  It comes to them a month before summary |
| | 17 | judgment, two months before summary judgment.  They don't |
| | 18 | know how to defend this lawsuit. |
| 12:05 | 19 | MR. CARDONA:  If I may -- |
| 12:05 | 20 | THE COURT:  We're jumping ahead a little bit. |
| 12:05 | 21 | MR. CARDONA:  Understood. |
| 12:05 | 22 | THE COURT:  Okay. |
| 12:05 | 23 | MR. CARDONA:  But, again, just so I can get back |
| | 24 | to our allegations, in terms of the second part of our |
| | 25 | fraud, which actually does go to the ratings; in other |

DEBBIE GALE, U.S. COURT REPORTER

LACV 1300779 DOC — 7/8/2013 — Volume I

70

1    words, there is a portion of our fraud where we allege the

2    ratings were false.  That's the second portion from March to

3    October 2007.  There, we have provided a list of -- I think

4    it's 30 or 34 CDOs that are named in the Complaint --

12:05    5              THE COURT:  Twenty- -- regardless, okay.

12:05    6              MR. CARDONA:  -- as to which we intend to prove

7    that those ratings were false.

12:05    8              Now, those are examples, and there may be

9    additional examples that we identify that we determine we

10   wish to proceed on after doing some discovery.

12:05   11              And, again, I would come back to, Your Honor, this

12   is the initial stages here.  There is discovery we need to

13   do.  We have somal third-party subpoenas ready to go.

14   There's information that we need to identify some CDOs and

15   some RMBS as to which we're going to allege specifically of

16   losses and/or that those were the RMBS or CDOs affected by

17   the fraud.

12:06   18              THE COURT:  Just a moment.  Stop.

12:06   19              Okay.  Counsel.

12:06   20              MR. CARDONA:  Again, from our point of view, based

21   on our allegations, as to the initial part of the fraud,

22   whether or not the rating was actually false, doesn't

23   matter.

12:06   24              Now, I understand Mr. Keker has a different

25   position.  We've discussed that with him, and he's asserted

DEBBIE GALE, U.S. COURT REPORTER

LACV 1300779 DOC – 7/8/2013 – Volume I

71

1    that as part of his defense he believes he should be

2    entitled to go into the validity of each rating.

12:06  3          And in light of that and in light of what would

4    be -- you know, if, in fact, that is going to be the defense

5    and if the Court is going to allow that defense, we would

6    try to narrow the case.

12:07  7          But in terms of narrowing the case, there are some

8    important things that we have to take into account.  You

9    know, Mr. Keker has made his claims about the damages, the

10   losses that flowed from the various specific CDOs that we

11   alleged the ratings were false.  And we've provided him with

12   information showing that those were a total of in excess of

13   $5 billion.

12:07  14         He has come back and contended that with respect

15   to Citibank and Bank of America, those losses shouldn't be

16   considered because they were also issuers.  Now, we don't

17   believe that's correct, and indeed, there's a case out of

18   the Southern District of New York, Bank of New York Mellon,

19   which we cite in the Rule 26(f) report, which indicates that

20   even those losses can be considered in fixing penalties.

12:07  21         But what we need to do and what we need to get

22   discovery before we can do it is to pick a set of RMBS and

23   CDOs that we believe will provide a representative sample of

24   losses flowing from the fraud that would provide this Court,

25   in the penalty phase, with a basis for setting penalties

DEBBIE GALE, U.S. COURT REPORTER

LACV 1300779 DOC - 7/8/2013 - Volume I

72

| | | |
|---|---|---|
| 12:08 | 1 | that we believe would be appropriate to reflect the scope of |
| | 2 | the fraudulent conduct. |
| 12:08 | 3 | So I understand the Court's desire and I |
| | 4 | understand Mr. Keker's desire to have the -- for trial, to |
| | 5 | have what will be proved narrowed, but before we can get to |
| | 6 | that point, there is some additional discovery that we need |
| | 7 | to do and take to determine how we're going to narrow that |
| | 8 | for trial. |
| 12:08 | 9 | THE COURT: All right. Thank you. |
| 12:08 | 10 | Mr. Keker. |
| 12:08 | 11 | MR. KEKER: And on that point, Your Honor, the |
| | 12 | Government has tremendous powers under FIRREA, which it has |
| | 13 | exercised, making Standard & Poor's and McGraw-Hill deliver |
| | 14 | tens of millions of documents, taking depositions, |
| | 15 | investigating. |
| 12:08 | 16 | THE COURT: Page 21, line 15 to 16, 30 million |
| | 17 | pages of material. |
| 12:09 | 18 | MR. KEKER: Correct. |
| 12:09 | 19 | And our position is that if they needed to |
| | 20 | investigate more, they ought to just admit it. This |
| | 21 | complaint should be dismissed, and they should do the |
| | 22 | investigation they need and then bring a case they can |
| | 23 | actually try that includes what they said on February 5th, |
| | 24 | 2013, which is when Attorney General Holder stood up and |
| | 25 | said, We allege that by knowingly issuing inflated credit |

DEBBIE GALE, U.S. COURT REPORTER

LACV 1300779 DOC - 7/8/2013 - Volume I

102

-oOo-

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  July 9, 2013

/s/ Debbie Gale
_____
DEBBIE GALE, U.S. COURT REPORTER
CSR NO. 9472, RPR, CCRR

DEBBIE GALE, U.S. COURT REPORTER