# EXHIBIT E

1   KEKER & VAN NEST LLP
    JOHN KEKER (SBN 49092)
2   jkeker@kvn.com
    ELLIOT R. PETERS (SBN 158708)
3   epeters@kvn.com
    633 Battery Street
4   San Francisco, CA 94111-1809
    Telephone:   415 391 5400
5   Facsimile:   415 397 7188

6   Attorneys for Defendants MCGRAW-HILL COMPANIES, INC., and
    STANDARD & POOR'S FINANCIAL SERVICES LLC
7
    ANDRE BIROTTE JR.
8   United States Attorney
    GEORGE S. CARDONA (CA Bar No. 135439)
9   LEON W. WEIDMAN (CA Bar No. 104078)
    ANOIEL KHORSHID (CA Bar No. 223912)
10  RICHARD E. ROBINSON (CA Bar No. 090840)
11  Assistant United States Attorneys
        Room 7516 Federal Building
12      300 N. Los Angeles St.
        Los Angeles, California 90012
13      Telephone: (213) 894-8323/6086
14      Facsimile: (213) 894-6269/7819
        Email: George.S.Cardona@usdoj.gov / Anoiel.Khorshid@usdoj.gov
15
16  Attorneys for Plaintiff UNITED STATES OF AMERICA

17  (Additional counsel on next page)

18                  UNITED STATES DISTRICT COURT

19                  CENTRAL DISTRICT OF CALIFORNIA

20                       SOUTHERN DIVISION

21  UNITED STATES OF AMERICA,          Case No. CV13-779 DOC (JCGx)

22                     Plaintiff,       SECOND SUPPLEMENTAL JOINT
                                        REPORT OF PARTIES PURSUANT
23                                      TO FEDERAL RULE OF CIVIL
         v.                             PROCEDURE 26(f); EXHIBITS 1-3
24
    MCGRAW-HILL COMPANIES, INC.         [Fed. R. Civ. P. 26(f); Loc. Civ. R. 26-1]
25  and STANDARD & POOR'S
    FINANCIAL SERVICES LLC,             Scheduling Conference:  12/16/2013
26                                      Time:      3:00 p.m.
                      Defendants.       Dept.:     Courtroom 9D
27                                      Judge:     Honorable David O. Carter

28

1 | *(Additional counsel):*

2

3 | CAHILL GORDON & REINDEL LLP
4 | FLOYD ABRAMS
| fabrams@cahill.com
| S. PENNY WINDLE
5 | pwindle@cahill.com
| 80 Pine Street
6 | New York, New York 10005-1702
| Telephone: 212 701 3000
7 | Facsimile: 212 269 5420

8 | KELLER RACKAUCKAS UMBERG ZIPSER LLP
| JENNIFER L. KELLER (SBN 84412)
9 | jkeller@kruzlaw.com
| 18300 Von Karman Avenue, Suite 930
10 | Irvine, CA 92612
| Telephone: 949 476 8700
11 | Facsimile: 949 476 0900

12 | Attorneys for Defendants MCGRAW-HILL COMPANIES, INC., and
| STANDARD & POOR'S FINANCIAL SERVICES LLC

13

14 | STUART DELERY
| Acting Assistant Attorney General
15 | MAAME EWUSI-MENSAH FRIMPONG (CA Bar No. 222986)
| ARTHUR R. GOLDBERG
16 | MICHAEL S. BLUME
| JAMES T. NELSON
17 | BRADLEY COHEN
| JENNIE KNEEDLER
18 | SONDRA L. MILLS (CA Bar No. 090723)
| THOMAS D. ZIMPLEMAN
19 | United States Department of Justice, Civil Division
| P.O. Box 261, Ben Franklin Station
20 | Washington, D.C. 20044
| Telephone: (202) 616-2376
21 | Facsimile: (202) 514-8742
| Email: James.Nelson2@usdoj.gov

22 | Attorneys for Plaintiff UNITED STATES OF AMERICA

23

24

25

26

27

28

---

SECOND SUPPLEMENTAL RULE 26(f) CONFERENCE REPORT
CASE NO. CV13-779 DOC (JCGx)

1    After the scheduling conference conducted by the Court on July 29, 2013, in
2    accordance with the initial scheduling order issued by the Court on August 2, 2013,
3    the parties have engaged in an initial phase of limited discovery as described below
4    and in status reports filed by the parties with the court on October 14, 2013.  In the
5    course of this initial phase of limited discovery, through telephone conferences on
6    September 6, 2013, September 20, 2013, September 27, 2013, October 1, 2013,
7    October 9, 2013, October 24, 2013, November 1, 2013, and November 25, 2013,
8    and the exchange of written documents, the parties have conducted additional
9    conferences of counsel, and jointly submit the following supplemental report
10   pursuant to Federal Rule of Civil Procedure 26(f).

11   **I.    THE GOVERNMENT'S NOVEMBER 18, 2013 SUPPLEMENTAL DISCLOSURE**
12       On November 18, 2013, the United States served a second supplement to its
13   initial disclosures (Second Supplement To Plaintiff United States' Initial
14   Disclosures Pursuant To Federal Rule Of Civil Procedure 26(a)(1)(A); Exhibits A
15   And B ("November 18 supplement")) that set forth: (a) the sets of RMBS and
16   CDOS ("the Specified RMBS and CDOs"), together with the particular tranches
17   and tranche purchasers, that will form the basis for its proof at trial; (b) the
18   financial institutions the United States will contend were affected by the alleged
19   fraud; and (c) the financial institution losses the United States will contend provide
20   a basis for the determination of FIRREA penalties.

21   **A.    Statement of the United States**
22       The Complaint in this case alleges that S&P engaged in a fraudulent scheme
23   that extended from September 2004 through October 2007.  In particular, the
24   Complaint alleges that throughout this time period, in order to maintain and
25   increase its market share for and revenue from RMBS and CDO ratings, S&P
26   falsely represented that its credit ratings of RMBS and CDOs were objective,
27
28

1

Case 2:13-cv-00779-DOC-JCG   Document 82   Filed 12/02/13   Page 4 of 41   Page ID #:1559

1   independent, and uninfluenced by any conflicts of interest that might compromise

2   S&P's analytic judgment. S&P's motion to dismiss these allegations was denied by

3   the Court. In particular, the Court rejected S&P's contention that its assertions

4   regarding its objectivity and independence should be disregarded as "mere

5   puffery" that were immaterial as a matter of law, finding this assertion "deeply and

6   unavoidably troubling when you take a moment to consider its implications."

7   [Dkt. 34 at 7]

8       Between 2004 and 2007, the period covered by the fraudulent scheme

9   alleged in the Complaint, S&P rated a total of 4,462 RMBS and 704 CDOs. S&P's

10   repeated assertions of its own objectivity and independence extended to all these

11   ratings. The United States, however, as it represented it would, has agreed to

12   narrow its case substantially, identifying as the RMBS and CDOs that will form

13   the basis for its proof at trial only 56 RMBS (less than 1.5% of the total RMBS

14   rated by S&P during the period 2004 to 2007) and 107 CDOs (less than 16% of the

15   CDOs rated by S&P during that same period).[1]

16       As discussed below, the United States has proposed a discovery plan it

17   believes more than reasonable for this case as narrowed, particularly given that

18   during the initial discovery period, the United States has provided S&P with all of

19   the sworn testimony and virtually all of the documents it gathered in the course of

20   its FIRREA investigation, and the parties have identified those limited areas in

21   which unresolved discovery disputes will require court rulings.[2] S&P, however,

22

23   [1] The figures above are for RMBS and CDOs considered as a whole. On a tranche level, the narrowing of the government's case is equally substantial. Of 67,503

24   RMBS tranches rated by S&P between 2004 and 2007, the government has identified 62 (approximately 0.1%). Of 3,916 CDO tranches rated by S&P

25   between 2004 and 2007, the government has identified 724 (approximately 18.5%). The relatively larger number of CDOs reflects the fact that the Complaint

26   limits to CDOs its allegations that between March and October 2007 S&P issued ratings it knew did not reflect those CDOs' true credit risks.

27   [2] The United States has not produced to S&P summaries and notes of witness

28

1  continues to assert that it cannot propose any schedule for the case as narrowed by
2  the government. Its arguments in support of this position are without merit.

3      First, S&P argues that rather than narrowing this case, the United States has
4  expanded it. This argument is based on S&P's flawed contention that the case
5  should be held to have been originally limited to the 26 CDOs explicitly referenced
6  in paragraphs 277 and 278 of the Complaint. As the United States explained in the
7  parties' original joint Rule 26(f) submission, the Complaint made clear that these
8  26 CDOs were alleged in the Complaint as "examples and that the actual number
9  of FIRREA violations arising from the alleged scheme to defraud is much greater."
10 [Dkt. 23 at 5-6 & n.3] Pleading in this way is neither improper nor unusual.
11 Indeed, in a recent FIRREA case tried in the Southern District of New York, the
12 United States' complaint itself identified only 7 specific loans that defaulted, but
13 discovery, trial, and the determination of penalties currently pending before the
14 court have proceeded on the basis that the fraud alleged encompassed at least
15 11,481 loans. See United States ex rel. O'Donnell v. Bank of America Corp., 12-
16 cv-1422 (JSR) (Dkt. 315, filed Nov. 20, 2013) (Bank Defendants' Memorandum
17 Of Law Regarding Penalties at 18-20 – contending to court that fraud found by
18 jury was limited to 11,481 loans, while noting government's contention that fraud
19 extended to 28,882 loans). In short, there is no basis for S&P's contention that the
20 original Complaint limited the scope of the alleged fraud to 26 CDOs, and hence
21 no basis for its contention that the United States' significant, and voluntary,
22 limiting of its case is, to the contrary, an expansion.

23 _____

24 interviews conducted by the Department of Justice during the course of the
   FIRREA investigation because these documents are protected by the attorney-
25 client privilege, deliberative process privilege, law enforcement privilege, work-
   product doctrine, and/or joint prosecution/common interest doctrine. As noted
26 below, S&P has elected not to challenge the United States' assertions of these
   protections at this time, while reserving its ability to challenge them on a case-by-
27 case basis as discovery proceeds.

3

28

Case 2:13-cv-00779-DOC-JCG   Document 82   Filed 12/02/13   Page 6 of 41   Page ID #:1561

1   Second, S&P contends that each separate RMBS and CDO "will raise a host

2 of deal-specific issues" requiring discovery and trial time that continue to render

3 the case, even as narrowed by the government, "unmanageable." In making this

4 argument, S&P continues to misapprehend the nature of the FIRREA violations at

5 issue. This is not a securities fraud case in which reliance and loss causation

6 would be elements of liability. To the contrary, the underlying FIRREA predicates

7 are ordinary mail, wire, and bank fraud, which require that the United States

8 establish only that S&P made false or misleading representations, that were

9 material, with the intent to defraud. E.g., Neder v. United States, 527 U.S. 1, 24-25

10 (1999) ("By prohibiting the 'scheme to defraud,' rather than the completed fraud,

11 the elements of reliance and damage would clearly be inconsistent with the statutes

12 Congress enacted"); United States v. Reynolds, 189 F.3d 521, 525 (7th Cir. 1999)

13 ("[e]vidence that the bank would not have relied on [defendant's] representations,

14 and instead would have made an exception for him, does not establish that the

15 representations were immaterial"; "there is no requirement that the statement must

16 in fact influence the decisionmaker (that would be reliance)"). As these elements

17 make clear, what is at issue in establishing liability is S&P's conduct. That

18 remains the case even with respect to the Complaint's allegations that between

19 March and October 2007 S&P acted contrary to its representations of objectivity

20 and independence by issuing credit ratings for CDOs that it knew did not reflect

21 those CDOs' true credit risks – the issue is whether S&P, based on the information

22 it had, knowingly issued such ratings during this limited time period.

23   Though S&P continues to make every effort to shift the focus from its own

24 conduct to that of those who issued or purchased the rated securities, that effort is

25 unavailing. The law is clear that neither negligence nor gullibility on the part of a

26 victim is a defense to mail, wire, or bank fraud. E.g, United States v. Hanley, 190

27 F.3d 1017, 1023 (9th Cir. 1999) ("In this circuit, it is immaterial whether only the

28

4

1   most gullible would have been deceived by the defendants' scheme"); <u>United</u>

2   <u>States v. Taylor</u>, 832 F.2d 1187, 1198-99 (10th Cir. 1987) (no defense that victim

3   could have eliminated deception by reviewing document). Moreover, with respect

4   to FIRREA violations, three separate courts have ruled that liability may apply

5   even where the affected financial institution was a "willful participant in the

6   scheme." <u>United States v. Bank of New York Mellon</u>, --- F. Supp. 2d ---, 2013

7   WL 1749418 (S.D.N.Y. Apr. 24, 2013) (Kaplan, J.) (discussing text and history of

8   FIRREA at length); <u>United States v. Countrywide Financial Corp., et al.</u>, --- F.

9   Supp. 2d ---, 2013 WL 4437232 (S.D.N.Y. Aug. 16, 2013) (Rakoff, J.); <u>United</u>

10  <u>States v. Wells Fargo Bank N.A.</u>, --- F. Supp. 2d ---, 2013 WL 5312564, at *20,

11  *28 (S.D.N.Y. Sep. 24, 2013) (Furman, J.).

12         In light of this law, S&P's assertions regarding Western Corporate Federal

13  Credit Union ("WesCorp") are particularly illuminating. As an initial matter, the

14  NCUA findings cited by S&P to the effect that WesCorp's executives placed

15  undue reliance on S&P's ratings of RMBS and CDOs would seem to support the

16  Complaint's allegations that ratings were material and that S&P's representations

17  regarding its objectivity and independence encouraged just such reliance. More

18  importantly, however, in citing these findings, S&P contends they are "critical

19  because they belie any suggestion that the sizeable losses that the Government now

20  claims S&P should pay in the form of a penalty could have resulted from any

21  misconduct by S&P." As this suggests, the relevance, if any, of S&P's contentions

22  regarding issuers and purchasers goes to the determination of penalties, not

23  liability.   With respect to penalties, the United States has limited the losses it will

24  contend give rise to FIRREA penalties to those suffered by a total of 22 victims,

25  hardly an unmanageable number. And, the United States remains of the view that

26  that the determination of penalties is appropriately a question for the court, after a

27

28

1   bifurcated determination of liability by the jury.[3]  In the Bank of America FIRREA

2   case cited above, the court followed just this course, removing any consideration of

3   penalties from the jury's determination of liability and conducting its own separate

4   determination of penalties.  See United States ex rel. O'Donnell v. Bank of

5   America Corp., et al., 12-cv-1422 (JSR) (Dkt. 266, filed Oct. 23, 2013) (The

6   Court's Instructions Of Law To The Jury at 10, Instruction No. 8: "I remind you

7   that, if liability is found as to any defendant, the issue of what monetary penalties,

8   if any, are to be imposed is an issue for the Court, not the jury.").

9        In light of all of the above, there is no basis for S&P's contention that this

10  case must be further narrowed.  It is easy to understand S&P's incentives for

11  seeking such a narrowing, as it would limit both the government's proof and

12  S&P's potential exposure.  But there is simply no basis for S&P's contention that

13  this case, as already significantly narrowed by the United States, remains

14  unmanageable and must for this reason be further narrowed.  A determination of

15  whether S&P engaged in the alleged scheme to defraud with respect to the limited

16  set of 65 RMBS and 107 CDOs does not present an unmanageable task either for

17  discovery or trial, particularly given that much of that discovery has already

18  occurred.  In the Bank of America FIRREA case cited above, the court proceeded

19  to trial on liability on a scheme to defraud alleged to encompass more than 11,000

20  fraudulent loans, with a discovery period believed to have been of less than one

21  year and a trial that lasted only approximately 21 days.  There is no reason this

22  case, as already significantly narrowed by the United States, cannot proceed on a

23

24   [3]  Though this Court has expressed its inclination to put the question of losses,
25  which will determine the maximum FIRREA penalties, to the jury, this issue has
     not been briefed, and the Court's initial comments were made prior to the trial in
26  the Bank of America FIRREA case, in which, as discussed below, the court
     removed consideration of penalties from the jury and is in the process of itself
27  determining the losses that will set the maximum FIRREA penalties.

28

1    similar time frame as proposed by the United States below.[4]

2    **B.**    **Statement of S&P**

3       The Government's case—involving more than 150 securities and nearly two

4    dozen alleged victim financial institutions—is unworkable, unmanageable, and in

5    violation of the Court's August 2, 2013 Order. Should the Court permit the

6    Government to proceed on all identified securities, *at least* two years of discovery

7    and several months for trial are needed. Should the Court instead elect to try this

8    case in a shorter period, it should limit the present case to the adjudication of

9    liability and penalty for a narrowed set of securities. S&P respectfully submits

10    such a narrowed trial should focus upon securities that allegedly resulted in losses

11    to Citigroup and its affiliates. Because Citigroup purchased more securities and

12    allegedly suffered greater losses than any other entity, such a narrowed trial would

13    still enable the Government to try a robust set of securities and, if successful,

14    attempt to secure substantial penalties—indeed approximately one-third of all

15    losses the Government has identified stem from securities purchased by Citigroup.

16    Such a narrowed trial would have the added benefit of providing guidance to the

17    parties for any possible future proceeding.

18    **1.**    **The Government Failed to Narrow its Case as Required by the Court's August 2, 2013 Order.**

19

20       On August 2, this Court ordered the Government to narrow its case and

21    "identify the limited set of RMBS and CDOs . . . that will form that basis for its

22

23    [4] S&P proposes as an alternative that the court require the United States to try this case first with respect only to those CDOs in which Citigroup and its affiliates are

24    alleged to have incurred losses, with unspecified "future proceedings" to address the remaining substantial losses alleged to have been incurred by other entities as

25    the result of S&P's fraud. Such a proposal is completely unworkable as it would potentially require multiple presentations, to multiple juries, of the same evidence

26    relating to S&P's liability. In short, there is no way to sever S&P's fraudulent conduct as it related to one purchaser/investor from that conduct as it related to

27    other purchasers/investors.

28

1  proof at trial." The purpose of this supplemental disclosure, and the initial

2  discovery period that the Government asserted was necessary for it to do so, was to

3  "facilitate the parties' ability to more clearly define the breadth and necessary time

4  for subsequent discovery." [Dkt. 44]  Instead of narrowing its case, the

5  Government now proposes that discovery and trial in this action will concern more

6  than *five times as many securities* as it identified in the Complaint, while

7  simultaneously proposing a *shorter schedule* for the rest of discovery.  The

8  Government's disclosure identifies more than 100 CDOs and more than 50

9  RMBS,[5] as well as hundreds of specific tranches, hundreds of tranche purchasers

10  and other entities involved in the transactions that the Government contends were

11  "affected" under the FIRREA statute, and more than 20 financial institutions that it

12  will contend suffered losses.  The Government thus identifies hundreds of ratings

13  and hundreds of allegedly affected institutions that will "form the basis for the

14  government's proof at trial."

15      A trial of this magnitude remains unmanageable, most certainly on anything

16  like the schedule proposed by the Government.  Assuming the parties devote at

17  least one trial day for each RMBS and CDO at issue, a trial on the more than 150

18  securities identified in the Government's November 18 supplement is likely to last

19  more than eight months —and this is before S&P even begins to put on its defense

20  case.[6]  This is an extraordinary burden to put on a jury, the parties, and the Court.

21

22  [5]  S&P believes that due to a number of errors in the Government's disclosure, the number of securities identified is not accurately cited in the Government's

23  summary above.  It is clear, however, that more than 150 separate securities and hundreds of tranche-level ratings are identified.

24  [6]  The Government's reliance on *United States ex rel. O'Donnell v. Bank of America Corp* for the proposition that discovery in this case can be completed in

25  less than a year is misplaced.  That case involved a single underwriting program lasting at most nine months, whereas here the conduct at issue spans more than 3

26  years, involves numerous different rating methodologies, and entailed continuous work over that period to update the models and methodologies used to arrive at the

27  ratings now challenged by the Government.  *See e.g., Bank Defendants'*

8

28

1   At the same time, S&P will require commensurate discovery into the facts unique

2   to each deal.  The Government's proposed eleven-month schedule for fact

3   discovery was unworkable when it had identified only 26 CDOs as giving rise to

4   predicate violations of the FIRREA statute.  Now that it proposes to offer proof

5   with respect to more than 100 CDO ratings and more than 50 RMBS ratings, its

6   proposed schedule (which provides even less time for S&P to take discovery on its

7   defenses) is even more unreasonable.  Should the Court permit the Government to

8   proceed on all of the more than 150 securities it has identified, S&P is prepared to

9   proceed as well—but it must be given adequate time to take discovery and present

10  its case at trial.  This is because each security presents unique issues relevant to

11  both liability and penalties, as discussed below.

12          **2.     S&P is Entitled to and Intends to Defend Itself as to Each**
                     **Security.**
13

14          S&P will require adequate time to take discovery on and ultimately present

15  its defenses at trial. As detailed by S&P in the June 24 Joint Report, each security

16  raises individualized issues of liability and loss, and S&P will need and, in any

17  event, may choose, to defend itself as to *each* of the securities at trial.[7]  The

18  Government attempts to minimize these concerns by arguing "This is not a

19  securities fraud case in which reliance and loss causation would be elements of

20  liability." But this misses the mark. The Government has already told this Court

21  that it intends to prove that each of S&P's ratings were false.  In the July 8, 2013

22  hearing on S&P's Motion to Dismiss, counsel for the Government stated:

23                  But, again, just so I can get back to our allegations, in
24                  terms of the second part of our fraud, which actually does

25  Memorandum of Law Regarding Penalties (Nov. 20, 2013 S.D.N.Y. 12-cv-1422
26  (JSR)) at 31.

27  [7]  *See* Joint Report at 12-15.

28  SECOND SUPPLEMENTAL RULE 26(f) CONFERENCE REPORT
    CASE NO.  CV13-779 DOC (JCGx)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> go to the ratings; in other words, *there is a portion of our fraud where we allege the ratings were false.* That's the second portion from March to October 2007. There, we have provided a list of—I think its 30 or 34 CDOs that are named in the Complaint . . . *as to which we intend to prove that those ratings were false.*

Tr. 69:23-70:7 (emphasis added).[8]

Even if the Government is now moving away from this representation to the Court, its current position remains that it will seek to prove at trial that "S&P falsely represented that its *credit ratings* of RMBS and CDOs were objective, independent, and uninfluenced by any conflicts of interest that might compromise S&P's analytic judgment." *Supra* at 1-2. Regardless of the manner in which *the Government* intends to meet its burden of proof with respect to each of the credit ratings at issue, *S&P* is entitled to prove that each rating reflected its good faith opinion of the credit risks associated with the security and that each rating was neither motivated by an intent to defraud nor material. S&P is entitled to take discovery on all of these issues for each CDO and RMBS that the Government will introduce at trial. S&P is also entitled to take discovery as to the identical ratings issued by other rating agencies with respect to the same securities as to which S&P is now accused of fraud.

For each security, S&P is also entitled to take discovery and present facts at trial regarding penalties. The Government dismisses the scope of this project by noting, "With respect to penalties, the United States has limited the losses ... [to] 22 victims, hardly an unmanageable number." *Supra* at 5. But what matters in

---

[8] In fact, counsel for the Government acknowledged that *precisely because* S&P intends to defend the validity of each rating, the case must be narrowed to a manageable size. Tr. at 71:24-72:6 ("[I]f, in fact, [the validity of each rating] is going to be the defense and if the Court is going to allow that defense, we would try to narrow the case.").

1   assessing penalties is not simply the number of victims, but the details behind the

2   alleged victim's purchase of each security as well as the factors that contributed to

3   the losses allegedly suffered as a result.  The Court has already recognized that

4   these factual issues are properly within the province of the jury.  *See* July 8, 2013

5   Hearing on Motion to Dismiss Tr. at 25:11-13, 50:12-13 ("You might find the

6   Court hesitant to have a bifurcated trial and have the issue of damages submitted to

7   a court.  It raises all sorts of constitutional issues . . . I'm not inclined to

8   bifurcate.").[9]

9        The Government's trial plan simply offers no proposal for how a fact-finder

10  is to assess the amount of the alleged loss incurred by affected financial institutions

11  and any resulting penalty; indeed, after four months of discovery on this issue, the

12  Government remains unable to identify *any* losses for nearly half of the CDOs nor

13  most of the hundreds of purchasers it identified in its November 18 supplement.

14  Moreover, the Government's suggestion that much of the necessary discovery has

15  already occurred is disingenuous.  While the Government has provided S&P

16  transcripts of on-the-record testimony from certain witnesses, it has refused to

17  provide information about what occurred and what was said in other portions of

18  those same interviews that the Government chose not to place on-the-record.  In

19  any event, none of the interviews conducted by the Government are admissible

20  since S&P was not permitted to attend and participate, and thus most, if not all, of

21  those witnesses will need to be deposed.  Moreover, not a single purchaser of *any*

22  of the securities at issue has yet been deposed, and, as discussed above, that

23  testimony will go to the heart of S&P's defenses on both liability and penalty.  But

24

25  [9]  Although S&P reserves the right to dispute the Government's theories with
    respect to the permissible and appropriate range of penalties available under
26  FIRREA, it must nevertheless take the discovery necessary to address the
    Government's theories on the facts, which necessarily involves a highly detailed
27  inquiry.

28

1   even if, as the Government argues, that discovery is relevant only to the penalty

2   aspect of the case, S&P is entitled to take it, and there is much to learn.

3    Indeed, public information suggests that each CDO and RMBS will raise a

4   host of deal-specific issues—many of which undermine the Government's theory

5   of *both* liability and penalty.  For instance, the securities identified in the

6   Government's November 18 supplement include CDOs where the "victim"

7   institution accused parties other than S&P of fraud in connection with the deal;

8   CDOs where the "victim" institution was *itself* accused of fraud in connection with

9   the deal; and CDOs where the issuing banks have been sued for fraud for lying to

10  the rating agencies about the quality of the underlying collateral.  Such facts bear

11  directly on the elements of liability and penalty.  A look at a few CDOs and alleged

12  victims identified by the Government is illustrative:

13     **a.** **High Grade CDO**

14   High Grade Structured Credit CDO 2007-1 ("High Grade CDO") was a $4

15  billion CDO-squared structured by Bank of America in May 2007.[10]  Bank of

16  America arranged, sold, and insured the CDO, which received identical ratings

17  from both S&P and Moody's.  Two features of High Grade CDO are relevant here:

18  how the security was rated and who Bank of America—the alleged victim—

19  believes is responsible for its alleged losses.

20   *First*, a significant portion of Bank of America's losses on High Grade are

21  attributable to a put agreement entered with respect to the CDO's commercial

22  paper notes.  Although the Complaint suggests all CDOs were rated in the same

23  manner, in fact, S&P's process for rating commercial paper notes applied specific

24  criteria that depended in part upon the credit rating of the put counterparty – *i.e.*,

25

26  _____

27  [10] "Bank of America" as used in this section refers to Bank of America, National Association and Banc of America Securities, LLC.

28

1   Bank of America itself – and thus implicate entirely unique issues with respect to

2   the rating process and any alleged losses incurred as a result of the put agreement.

3        *Second*, Bank of America itself took the position in litigation against the CDO

4   manager—Bear Stearns—that its losses arose not from issues with the credit rating

5   of the CDO but from representations or omissions by Bear Stearns with respect to

6   the market value of the underlying collateral.[11]  Bank of America's expert in the

7   case opined that it had overpaid for the initial collateral by hundreds of millions of

8   dollars for reasons totally unrelated to S&P's credit rating opinions.[12]

9   ## b.   Armitage ABS CDO

10        Armitage ABS CDO, another CDO identified by the Government, is the

11   subject of ongoing litigation in the Southern District of New York.  In 2012, Woori

12   Bank sued the CDO's arranger Citigroup Global Markets, Inc. ("Citigroup") for

13   fraud and negligent misrepresentation, alleging that Citigroup knew but failed to

14   disclose to S&P that many of the loans underlying the RMBS assets contained in

15   the CDOs failed to conform with underwriting guidelines.[13]  Woori alleges that

16   Citigroup "made misrepresentations and omissions *to the ratings agencies with*

17   *the knowledge that the ratings agencies would rely on them* and give CDOs,

18   including the Armitage CDO, inflated ratings."[14]  In this case, by contrast, the

19   Government asserts that a penalty should be imposed on S&P in the amount of the

20   losses allegedly incurred *by Citigroup*.

21

22

---

23   [11] Second Amended Complaint at ¶¶ 72-74, *Bank of America v. Bear Stearns Asset Management*, 2013 WL 4734495 (S.D.N.Y. July 19, 2012).

24   [12] *Bank of America v. Bear Stearns Asset Management*, 2013 WL 4734495, at *5 (S.D.N.Y. Sept. 3, 2013).

25

26   [13] *See* Amended Complaint, *Woori Bank v. Citigroup*, No. 12-cv-3868 (S.D.N.Y Aug. 28, 2013). [Dkt. 59]

27   [14] *Id.* at ¶98 (emphasis added).

28

### c.     Ridgeway Court Funding II CDO

Similarly, Ridgeway Court Funding II was the subject of a lawsuit concerning credit default swaps executed between Ambac Credit Products, LLC ("Ambac") and Citigroup, Inc.[15]  Ambac alleged that Citigroup *either intentionally provided the ratings agencies with false information or withheld information that [they] knew was necessary for the ratings agencies to accurately rate the true credit quality of Ridgeway II's notes.*"[16]  In 2012, Citigroup paid $590 million to settle a separate class action case filed in the Southern District of New York, alleging securities fraud against it in connection with Ridgeway Court Funding II and six other CDOs that the United States has now identified and is seeking to attribute all losses to S&P.[17]

///

### d.     Western Corporate Federal Credit Union

S&P will not only need to present evidence regarding each of the securities at issue, but also facts and testimony regarding the purchasing decisions of the alleged victims.  These details, as evidenced in the discussion below, are critical because they belie any suggestion that the sizeable losses that the Government now claims S&P should pay in the form of a penalty could have resulted from any misconduct by S&P.

---

[15] "Citigroup, Inc." as used in the context of the *Ambac* lawsuit refers to Citigroup, Inc. and its wholly-owned subsidiary Citigroup Global Markets Ltd., both of which were named defendants.

[16] *See* Complaint at ¶90, *Ambac Credit Prods., LLC v. Citigroup, Inc., et al.* (Sup. Ct. N.Y. 602387/2009) (emphasis added).

[17] "Citigroup" as used in reference to this class action case refers to Citigroup Inc., as well as current and former Citigroup employees who were individual named defendants.  *See* Amended Consolidated Class Action Complaint, *In re Citigroup Inc. Securities Litig.*, No. 07-cv-9901 (S.D.N.Y. Feb. 24, 2009) (Dkt. 74); Final Judgment and Order of Dismissal With Prejudice, *In Re Citigroup Inc. Securities Litig.*, No. 07-cv-9901 (Dkt. 276).

14

1      Western Corporate Federal Credit Union ("WesCorp") is one of five credit

2  union "victims" identified by the Government.  Although the Department of

3  Justice now seeks to pin WesCorp's sizeable losses from RMBS investments upon

4  *S&P*, another agency of the United States government—the National Credit Union

5  Administration ("NCUA")—previously concluded that WesCorp shouldered

6  significant blame for its losses, suing the former officers and directors of WesCorp

7  *in this very Court* for their alleged malfeasance.[18]

8      The NCUA placed WesCorp into conservatorship in March 2009 and issued

9  a report on November 16, 2010 identifying the misconduct of WesCorp executives

10  that gave rise to the ultimate demise of the credit union.[19]  The Report criticized

11  WesCorp's "aggressive investment strategy" as having "unreasonable limits in

12  place that allowed for excessive investments in privately-issued residential

13  mortgage backed securities."  The Report criticized WesCorp for failing to

14  adequately manage "concentration risk, credit risk, market risk, and liquidity risk"

15  because it allowed "overexpos[ure]" to certain types of mortgage related

16  securities.[20]  The Report pointedly noted:

> A credit rating is not a substitute for prudent due
> diligence and should only be considered as one factor in
> an investment decision.  The ratings and other opinions
> issued by rating agencies are not recommendations to
> buy securities and there is not a warranty on the
> accuracy, timeliness, completeness or fitness of the
> information provided.

---

[18] *National Credit Union Administration Board as Conservator for Western Corporate Federal Credit Union v. Robert A. Siravo, et al.*, Case No. 10-cv-1597 (C.D. Cal.) (MANx).

[19] Material Loss Review of Western Corporate Federal Credit Union, Report # OIG-10-19 (Nov. 16, 2010), National Credit Union Administration Office of Inspector General (hereinafter "MLR") at 1(The NCUA noted that it "did not analyze the role that third party conduct, including but not limited to, the conduct of underwriters, issuers, and raters, may have played in WesCorp's losses...").

[20] MLR at 13, 15-16.

1  It also noted, "Credit Analysts are not expected to possess greater insights than

2  rating agencies, but they are expected to understand the implications and

3  conclusions of a rating agency's research and form an independent judgment."[21]

4  These are the *Government's* findings.

5  In its Report, the NCUA did not spare itself from criticism. The Report

6  noted that NCUA's Office of Corporate Credit Unions failed to "adequately and

7  aggressively address WesCorp's increasing concentration of privately-issued

8  RMBS and the increasing exposure of WesCorp's balance sheet to credit, market,

9  and liquidity risks."[22]

10  In March 2010, the NCUA intervened in a state court action against

11  executives of WesCorp filed by WesCorp's credit union members and removed

12  that case to this Court. In its complaint, the NCUA accused WesCorp executives

13  of breaching their fiduciary duties and committing fraud that resulted in the

14  collapse of WesCorp. Many of these executives ultimately entered settlements

15  with NCUA requiring them to pay a fine and forego future employment at other

16  credit unions.

17                                                                     ***

18  Although the facts recounted above are examples presently known to S&P

19  based upon public information, additional relevant information is expected to come

20  out during discovery. The jury and this Court must learn these details in order to

21  make a fair determination of liability and the facts relevant to the assessment of

22  any penalty in this case. To conduct this exercise with respect to more than 100

23  CDOs, more than 50 RMBS and more than 20 alleged purchasers of rated

24  securities, as now proposed by the Government, would require lengthy discovery

25  _____

26  [21] *Id.* at 15.

27  [22] *Id.* at 1.

28

1    and result in an unwieldy and unmanageable trial in this action.

2        The Court is thus left with two options: either (1) permit the Government to

3    proceed on the vast scope it has proposed, which will require at least 2-3 years of

4    discovery and result in a trial lasting many months or (2) narrow the case in a

5    manner consistent with the purpose of the initial discovery phase that has just been

6    completed, as the Government has failed to do.  Should the Court elect the latter

7    course, S&P proposes that the Government's proof be limited to the securities it

8    identified in the November 18 supplement where Citigroup and its affiliates

9    allegedly incurred losses.  This would narrow discovery and trial to 15 CDOs –

10   still an enormously complex scope, but far more manageable than what the

11   Government now proposes.  The scope of such a narrowed case would also include

12   a substantial portion of the universe of ratings and supposed victims and losses that

13   the Government is now proposing.

14   **II.   INITIAL PHASE OF LIMITED DISCOVERY**

15       Between July 29, 2013 and November 18, 2013, the parties engaged in the

16   initial phase of limited discovery authorized by the initial scheduling order issued

17   by the Court on August 2, 2013 [Dkt. 44].  The parties described the progress of

18   this initial phase of limited discovery in status reports filed with the Court on

19   October 14, 2013 [Dkt. 60, 61].

20       **A.   United States' Rule 45 Subpoenas**

21       On August 5, 6, and 9, 2013, pursuant to Federal Rule of Civil Procedure

22   45(b)(1), the United States served subpoenas for documents as set forth in the

23   United States' Status Update Re: Initial Discovery; Exhibits 1-4 filed with the

24   Court on October 14, 2013 [Dkt. 61].  The recipients of these document subpoenas

25   included: federally insured financial institutions, foreign banks, collateral

26   managers, investment banks, and trustees, from whom the subpoenas sought

27   records relating to certain specifically identified CDOs; and broker/dealers, from

28   

17

SECOND SUPPLEMENTAL RULE 26(f) CONFERENCE REPORT
CASE NO.  CV13-779 DOC (JCGx)

1   whom the subpoenas sought records identifying purchasers of a broader set of

2   CDOs and RMBS.

3       Pursuant to agreement with S&P, in response to certain of S&P's Rule 34

4   document requests, and subject to the protections of the protective order in this

5   case, the United States has been producing to S&P on an ongoing basis the records

6   produced pursuant to these subpoenas. On September 23, October 8, October 11,

7   October 21, October 24, November 7, 2013, and November 22, 2013, the United

8   States provided S&P with the materials produced pursuant to these subpoenas.

9     **B.**   **Rule 30(b)(6) Depositions**

10      The United States served 30(b)(6) deposition subpoenas on Bank of America

11   and Citigroup on the limited issues of: the roles played by them and their federally

12   insured affiliates in certain specified CDOs; purchases/retentions by them and their

13   federally insured affiliates of tranches in these CDOs; and losses accruing to them

14   and their federally insured affiliates as the result of their roles in and/or

15   purchases/retentions of tranches in these CDOs. The United States coordinated

16   scheduling of these depositions with defendants. The United States advised S&P

17   that the production of documents by these entities obviated the need for the United

18   States to conduct these depositions prior to the United States' submission of its

19   supplemental disclosures on November 18, 2013.

20     **C.**   **United States' Rule 34 Document Request**

21      On September 27, 2013, the United States served on S&P the United States'

22   First Request for Production of Documents ("US First Request"), which sets forth

23   9 document requests. In discussions among the parties, S&P agreed to the United

24   States' request to give priority to requests 1-3, and advised that (with the exception

25   of some emails falling within the scope of these requests) it believed it could

26   complete a substantial production on these requests within the 30-days specified in

27   the US First Request. On October 30, 2013, defendants served a formal written

18

28

1   response to the US First Request (Defendants' Responses and Objections to

2   Plaintiff's First Request for Production of Documents).  Also on October 30, 2011,

3   defendants produced an initial set of documents responsive to requests 1- 6 in the

4   US First Request.  The parties will continue to discuss production of the balance of

5   the documents sought by the US First Request.

6   **D.   S&P's Rule 34 Document Request**

7        On August 20, 2013, S&P served on the United States Defendants' First

8   Request for Production of Documents ("S&P's First Request"), which sets forth 53

9   requests for categories of documents.  S&P agreed to the United States' request to

10   extend to October 19, 2013 the time for the United States' response to S&P's First

11   Request.  Pursuant to this extension, the United States served its formal written

12   response to S&P's First Request on October 18, 2013 (United States' Response To

13   Defendants' First Request For Production Of Documents; Exhibits 1-2).

14        The parties have engaged in a series of discussions regarding S&P's First

15   Request, the US First Request, depositions, the United States' Rule 45 subpoenas,

16   and other matters, including nine telephone conferences, as set forth on page 1

17   above.  The results of certain of these discussions are reflected in sections A

18   through C above.  With respect to S&P's First Request, as a result of these

19   discussions, among other things:

20        (1)   With respect to documents gathered and sworn testimony taken in the

21   course of the United States' FIRREA investigation of S&P that led to the filing of

22   the Complaint, the United States has advised S&P that it has already provided the

23   sworn testimony (with accompanying exhibits) taken by DOJ attorneys during the

24   FIRREA investigation, and that, absent objection from the third-parties who

25   produced documents, it intends to provide S&P with the documents gathered in the

26   FIRREA investigation, as well as the FIRREA subpoenas issued to third-parties

27   and the United States' communications with those third-parties relating to those

28

1  FIRREA subpoenas.[23]  Attached as Exhibit 1 is a table describing the materials

2  already produced to S&P and the dates on which those materials were produced.

3  Due to the volume of documents involved, production remains ongoing.

4        The United States has stated that it is withholding some documents or

5  portions of documents provided by third parties and received by it pursuant to Rule

6  45 requests or otherwise responsive to S&P's Rule 34 requests because of

7  confidentiality objections expressed by those third parties.  To date, the United

8  States has stated that it has withheld only redactions from two pages of materials

9  obtained from one third party, but that it has received objections from third parties

10 to its production of a limited number of other documents and is not now in a

11 position to estimate the volume of material it will be withholding based on those

12 objections.  S&P believes that any objections to the production of responsive

13 materials in the United States' possession due to third party confidentiality

14 concerns is unsustainable on its face and is in any event misplaced in light of this

15 Court's entry of a protective order.  If the parties are unable to resolve this matter,

16 S&P will seek judicial intervention.

17        (2)     With respect to a number of the requests, including in particular

18 requests that require the attorneys for the United States in this case to reach out to

19 other United States Attorney's Offices ("USAOs"), other DOJ components, and

20 other federal agencies, S&P, at the United States' request, provided additional

21 information to focus and/or narrow the requests.  With this additional information,

22 the United States reached out to other USAOs, other DOJ components, and certain

23 other federal agencies to ascertain their positions.  These inquiries were slowed by

24

25 [23] Although the United States has provided sworn testimony from certain witnesses
   it has not produced information relating to facts gleaned during the interviews that

26 on occasion preceded the sworn testimony.  While S&P is not now pursuing its
   document requests seeking interview notes with respect to such witnesses, it

27 reserves its right to seek such notes on a witness-by-witness basis.

28

the intervening government shutdown and the resulting furloughs of a number of government employees. In a November 18, 2013, letter, the United States advised S&P of the results of its inquiries. The parties anticipate additional discussions regarding the requests that were the subject of the government's inquiries.

(3) Although the parties continue to meet and confer, they have reached an impasse upon three issues:

(a)   The parties continue to disagree as to S&P's requests seeking any analyses made by the United States of the independence of ratings or rating agencies and the quality of credit ratings of RMBS or CDOs, and of any documents received from any rating agency bearing on such issues. With respect to any such documents gathered in the course of any pending investigation that are held by the Department of Justice (or other offices of the United States) the United States has asserted both investigatory privilege and work product protection.[24]

To address these concerns, S&P narrowed its request to documents created by other branches of the United States government or by third parties (*i.e.* not

---

[24] The attorneys for the United States in this case have advised S&P that (a) they will not respond to a Rule 34 discovery request addressed to the United States as party plaintiff on behalf of the Board of Governors and the Open Market Committee of the Federal Reserve System; and (b) that documents are properly sought from those entities by Rule 45 subpoena. *See United States v. American Telephone & Telegraph Co.*, 461 F. Supp. 1314, 1334-36 & n.65 (D.D.C. 1978). S&P contends that this position is contrary to the position the United States took in *United States in Starr International Company, v. United States*, No. 11-CV-00779-TCW (Fed. Cl.). The United States has stated to S&P that it does not agree with this view. While not agreeing with the United States' position, S&P has served Rule 45 subpoena on these entities (as well the New York Federal Reserve Bank). To date, objections have been made by each of those entities. Meet and confer conferences have been held with each and it appears that judicial intervention may be required.

Because the United States has refused to produce in response to a Rule 34 document request documents from a number of what the United States has identified as "independent regulatory entities," S&P likely will issue Rule 45 subpoenas to certain of those independent entities. The identity of those entities and the precise scope of the requests will be a product of S&P's review of the November 18 disclosures and this Court's resolution of S&P's proposal set forth above for narrowing the case for trial.

21

1   material generated by the DOJ in its investigation efforts), including materials third

2   parties produced starting with material received in investigations already closed.[25]

3   The United States has advised that it stands on its objections to production of these

4   documents as set forth in its formal response to S&P's document request, and the

5   parties remain at an impasse.

6         (b)    The parties continue to disagree as to S&P's requests seeking

7   documents gathered in investigations by the United States into the conduct of

8   various mortgage lenders, financial institutions, and security issuers concerning the

9   types of securities at issue here. The United States has objected to production

10  primarily on grounds of relevancy, burden, and investigatory privilege. S&P has

11  offered to limit its request to documents received from third parties (*i.e. not*

12  *generated by the United States in the course of its investigation*), and to start, at

13  least, with materials obtained in investigations now closed.

14      While refusing to produce underlying third party documents collected on

15  these issues, the United States identified in a November 18, 2013 letter a number

16  of publicly available summary reports on the subject of mortgage fraud. S&P

17  counsel are reviewing these reports now to determine if the data and other

18  information described therein can provide any substitute for the actual third-party

19  documents sought. Any motion filed on this subject would reflect the results of

20  such review and any follow-up meet and confer conference with the United States.

21        (c)    S&P seeks discovery related to S&P's pleaded defense that the

22  United States has, in violation of the First Amendment, improperly singled out

23  S&P as the target of a FIRREA action because S&P downgraded the United States'

24  credit rating. The United States asserts that S&P has not made, and cannot make,

25  

26  [25] S&P is not now pursuing the request for interview notes reflected in Request

27  No. 38, while, as noted above, reserving the right to seek such notes as needed on a witness by witness basis.

28

1  the preliminary showing required to obtain discovery relating to such an asserted

2  defense (including in particular discovery of documents that otherwise would be

3  protected from discovery by the attorney-client and deliberative process privileges

4  and the work product doctrine).  See United States v. Bass, 536 U.S. 862, 863-64

5  (2002) (per curiam); United States v. Armstrong, 517 U.S. 456, 468-70 (1996);

6  United States v. One 1985 Mercedes, 917 F.2d 415, 421 (9th Cir. 1990); United

7  States v. Sequoia Orange Co., 1994 WL 903688 (E.D. Cal. Mar. 14, 1994).  S&P

8  submits that unlike the ruling in United States v. National Broadcasting Co., 65

9  F.R.D 415, 417 (C.D.Cal 1974), none of these cases relate to a claim that an action

10  was initiated against a defendant in retaliation for the exercise of its First

11  Amendment rights, that no threshold standard is imposed by law, and that the

12  Federal Rules in any event entitle S&P to discovery relevant to its defense of

13  constitutionally improper motive.[26]  In any event, in support of its motion to

14  compel this discovery, S&P intends to describe the differential treatment of

15  similarly situated entities, as well as evidence of retaliatory intent.  The parties

16  have determined that agreement cannot be reached with respect to this issue.

17       The Parties seek the Court's permission to address the three issues identified

18  above through the filing by S&P of a comprehensive motion to compel production

19  relating to these issues, pursuant to the proposed briefing schedule set out below.

20  It may be possible that materials relating to one or more of the issues listed above

21  can be confined to entities identified as the result of the November 18 disclosure

22  by the United States, but this awaits further review by both parties of the impact of

23

24  [26] The United States believes the National Broadcasting opinion cited by S&P to

25  be inapposite because it addressed only the appropriate sanction for the

26  government's failure to comply with an existing discovery order -- not the facts or legal basis for the issuance of that discovery order, which related to the defendants'

27  claim that the antitrust action being pursued against them was retaliation by the Nixon administration for their exercise of First Amendment rights.

28

1   such a compromise in light of the specifics of that disclosure. That process is

2   currently underway. The parties believe the schedule set out below will permit a

3   timely and efficient consideration of the issues while also allowing sufficient time

4   for a comprehensive review by S&P of the United States' recent submission to

5   determine whether any of the disputes can be narrowed. While Local Rule 37-2

6   sets out procedures for the filing of certain discovery motions, the parties

7   respectfully submit that briefing this matter directly to the Court on the proposed

8   schedule will best serve the interests of the parties and the Court in resolving the

9   issues identified above as expeditiously as possible.

10              (1)     Deadline for filing moving papers – January 20, 2014

11              (2)     Deadline for filing opposition papers – February 17, 2014

12              (3)     Deadline for filing reply papers – February 24, 2014

13   **III.    DISCOVERY PLAN**

14       **A.    Initial Disclosures**

15          The United States served its initial disclosures on May 9, 2013. The United

16   States served supplemental initial disclosures on May 28, 2013 after meeting and

17   conferring with S&P's counsel about S&P's claims regarding the adequacy of the

18   United States' initial disclosures. In addition, on April 26, 2013, and May 8, 2013,

19   the United States provided S&P with copies, in pdf and, for the transcripts

20   themselves, electronic text format, of sworn testimony taken by the Department of

21   Justice from witnesses during the course of the Department's FIRREA

22   investigation, together with the exhibits used during the taking of that testimony.

23          S&P provided its initial disclosures on May 9, 2013. In addition to these

24   disclosures, S&P has previously provided the Government with extensive

25   document productions over the course of its more than three-year investigation.

26   S&P estimates that the electronic information produced during the investigation

27   amounts to the equivalent of more than 30 million pages of materials. On May 31,

28

24

1   2013, at the request of the United States, and in an effort to assist the United States

2   in narrowing its case, S&P provided the United States with a list of all RMBS and

3   CDOs backed by RMBS that S&P rated between 2004 and 2007.

4     The United States supplemented its Initial Disclosures pursuant to the

5   Court's August 2, 2013 Initial Scheduling Order [Dkt. 44]. The November 18

6   Supplement is discussed in detail at Section I.A, *supra*.

7     **B.** **Subject On Which Discovery May Be Needed**

8     The parties' positions on this issue are reflected in Section VII.B of the June

9   25 Joint Report [Dkt. 23].

10     **C.** **Whether Discovery Should Be Conducted in Phases or Otherwise Limited**

11     The United States believes that, with the exception of the recently concluded

12   initial phase of limited discovery, and a proposed expert discovery phase, it

13   currently sees no reason to conduct discovery in phases or to otherwise limit it.

14   For the reasons set forth in detail in Section I(A)(1) above, the United States does

15   not agree with S&P's contentions that this case, as already significantly narrowed

16   by the United States, is unmanageable, or that the case should be limited to

17   securities on which Citigroup is alleged to have incurred losses. Nor does the

18   United States agree that at least two years will be needed for discovery. Rather,

19   the United States believes that the discovery schedule it proposes below is

20   reasonable and appropriate for this case as already narrowed.

21     S&P believes, for the reasons set forth in more detail at Section I(A)(2)

22   above, the current scope of the case is unmanageable. Should the Court not limit

23   the scope of this case to those securities allegedly purchased by Citigroup then

24   S&P contends that at least two years will be needed for discovery.

25

26

27

28

SECOND SUPPLEMENTAL RULE 26(f) CONFERENCE REPORT
CASE NO. CV13-779 DOC (JCGx)

**D.    Changes in Limitations on Discovery**

    **1.    Interrogatories**

The Government believes that 25 substantive interrogatories are sufficient, as provided in Fed. R. Civ. P. 33.  S&P believes that, given the expansive nature of the Government's allegations, and in light of the overbroad universe of securities currently at issue in this case, at least 50 substantive interrogatories are needed.  If the Court orders that the parties will try securities upon which Citigroup suffered a loss, S&P agrees that 25 substantive interrogatories will be sufficient.

    **2.    Depositions**

        **a.    Statement of the United States**

Assuming the availability of certain witnesses to testify at trial, the United States currently anticipates requiring the depositions of approximately 40 witnesses.  This estimate includes: current and former S&P employees who were involved in S&P's ratings of the Specified RMBS and CDOs; current and former S&P employees who were involved in the development and modification of the models used to provide those ratings; representatives of certain investment banks that arranged for S&P to be retained to rate the Specified RMBS and CDOS; and representatives of certain financial institutions that purchased, retained, otherwise invested in, and/or played other roles in the Specified RMBS and CDOs.  These depositions will include discovery of individuals designated pursuant to Fed. R. Civ. P. 30(b)(6).  Accordingly, it will be necessary to expand the limitation on the total number of depositions set forth in Fed. R. Civ. P. 30(a)(2)(A).  If certain witnesses that the United States plans to call at trial are unavailable to testify at trial, the United States anticipates that it will require additional depositions to preserve the complete testimony of those witnesses not available to testify at trial.[27]

---

[27]  S&P has stated that it "objects to the government's proposal to use deposition testimony at trial instead of live witnesses."  The use of deposition testimony at

26

1    Based on the government's experience in its FIRREA investigation, and its

2  review of depositions in other civil actions against S&P, the government believes

3  that some of the depositions will take more than the limit of 1 day of 7 hours

4  imposed by Fed. R. Civ. P. 30(d)(1).  The United States will make every effort to

5  complete depositions within this limit, but anticipates that it will be seeking

6  agreement and/or court permission to exceed this limit for a limited number of

7  witnesses.

8    The United States anticipates that there are many witnesses whom the

9  United States and S&P will both seek to depose.  The United States anticipates that

10  for certain of these witnesses it will be seeking agreement from S&P and/or court

11  permission to exceed the 7-hour limit in order to allow both parties sufficient time

12  to complete their examinations of the witnesses.  In the absence of an agreed-upon

13  or court-permitted extension of the 7 hour limit, the United States and S&P agree

14  that where both the United States and S&P seek to depose the same witness, both

15  parties shall divide the 7 hours equally unless they both agree or a party obtains

16  court permission for an alternative division of time.

17    The Attorneys General of Connecticut and Illinois, both of which have

18  lawsuits pending against S&P in their respective state courts that are proceeding

19  into discovery, have approached both the United States and S&P to discuss the

20  possibility of coordinating depositions of individuals who would otherwise likely

21  be deposed separately in this case and in the lawsuits brought by these Attorneys

22  General.  The United States has raised with S&P the possibility of such

23  coordination, and the parties are considering it.

24

25

26  trial, however, is anticipated by the Civil Rules.  See Fed. R. Civ. P. 32 ("Using

Depositions in Court Proceedings"); Civil L.R. 32-1 ("Use at Trial or in a

27  Motion").

27

28  SECOND SUPPLEMENTAL RULE 26(f) CONFERENCE REPORT
CASE NO.  CV13-779 DOC (JCGx)

1

### b.   Statement of S&P

2       S&P agrees it will be necessary to increase the limitation on the total number
3   of depositions set forth in Fed. R. Civ. P. 30(a)(2)(A).  Given the breadth of the
4   Government's November 18 supplement and until this Court indicates whether the
5   Government can proceed on all of the securities it has identified, S&P is not yet in
6   a position to identify precisely how many depositions will be required.  However,
7   S&P views the Government's statement that it will require only 40 depositions to
8   be implausible, given the breadth of its supplemental disclosures which identify,
9   among other things, more than 20 different purchasers of rated CDOs and RMBS,
10   as well as hundreds of other allegedly "affected" institutions   S&P anticipates that
11   it will require deposition testimony from at least the following individuals or
12   entities: (i) individuals interviewed by the Government during its investigation of
13   S&P; (ii) Governmental agencies, including the Department of Justice, the
14   Treasury Department, the Federal Reserve, the Securities and Exchange
15   Commission, the Federal Deposit Insurance Corporation, and the National Credit
16   Union Administration; (iii) purported "affected" financial institutions identified by
17   the Government in its November 18 supplement, which at present include all
18   purchasers and deal participants, regardless of whether or not they suffered a loss;
19   and (iv) third parties that packaged, structured, and/or sold each of the RMBS and
20   CDOs at issue in the Government's case, including arrangers, CDO managers, and
21   trustees.  To the extent the Court orders a narrowing of the case to those securities
22   purchased by Citigroup, or otherwise narrows the scope of the Government's case,
23   the depositions described in parts (iii) and (iv) would be limited accordingly.  S&P
24   does not believe that any individual witness should be subjected to more than
25   seven hours of deposition by an individual party.

26   ### E.   Discovery of Electronically Stored Information

27       The parties' agreement on this issue is reflected in Section VII.E of the June

28

1  24 Joint Report [Dkt. 23].

2  **F.    Claims of Privilege or Protection as Trial-Preparation Materials**

3      Any potential inadvertent production of attorney-client privileged and/or

4  work product protected documents will be governed by the Protective Order [Dkt.

5  56] and the Rule 502(d) Order [Dkt. 75] currently in place in this case. The

6  parties' agreement on this issue is otherwise reflected in Section VII.F of the June

7  24 Joint Report [Dkt. 23].

8  **G.    Proposed Discovery Schedule (including timing of disclosures of**

9        **expert witnesses)**

10     The Government proposes the discovery schedule set forth in attached

11 Exhibit 2, which includes the following proposed discovery cutoff dates:

12 ///

13     Non-Expert Discovery:           8/25/2014

14     Expert Discovery:              11/3/2014

15     S&P proposes that if the trial is limited to those securities that allegedly

16 resulted in losses to Citigroup and its affiliates, non-expert discovery should close

17 on October 15, 2014 and expert discovery should close on March 30, 2015.

18 Should the case proceed on all of the securities the Government has added to its

19 list, S&P proposes no discovery cutoff or trial date be set at this time. Given the

20 vast number of securities and institutions upon which discovery would have to be

21 conducted, the time needed for discovery is likely to be at least two years. Rather

22 than setting a trial date now, S&P proposes a further CMC be held after the parties

23 have made substantial progress upon discovery at which point a trial can be

24 scheduled.

25 **IV.    TRIAL**

26     The Government's plans for trial is reflected in Section VIII.A of the June

27 24 Joint Report [Dkt. 23].

29

28

Case 2:13-cv-00779-DOC-JCG   Document 82   Filed 12/02/13   Page 32 of 41   Page ID #:1587

1    The Government proposes the following for the four specific dates required

2  by the Court's Order Setting Scheduling Conference:

3      Discovery Cut-Off Date

4          Non-Expert Discovery:                8/25/2014

5          Expert Discovery:                    11/3/2014

6      Dispositive Motion Cut-Off Date:         12/8/2014

7      Final Pretrial Conference:               4/27/2015

8      Trial:                                   5/19/2015

9    The Government proposes these dates in conjunction with its more complete

10  proposed schedule for proceedings in this case, which is attached as Exhibit 2.

11    S&P proposes the following dates should the Court limit the securities at

12  issue to those that allegedly resulted in losses to Citigroup and its affiliates:

13      Non-Expert Discovery Cutoff:            10/15/2014

14      Expert Discovery Cutoff:                3/31/2015

15      Dispositive Motion Cut-Off Date:        4/23/2015

16      Final Pretrial Conference:              10/7/2015

17      Trial:                                  11/9/2015

18  S&P proposes these dates in conjunction with its more complete proposed schedule

19  for proceedings in this case should the Court limit the securities at issue to those

20  that allegedly resulted in losses to Citigroup and its affiliates, attached hereto as

21  Exhibit 3.

22  ///

23

24

25

26

27

28

SECOND SUPPLEMENTAL RULE 26(f) CONFERENCE REPORT
CASE NO. CV13-779 DOC (JCGx)

## V.    CONCLUSION

Counsel for plaintiff and defendants jointly submit this report and request that the Court resolve the issues identified herein.  The joint submission should not be taken as reflecting agreement with respect to any position identified as being that of an individual party.

Dated:    December 2, 2013                      KEKER & VAN NEST LLP


                                               By: /s/ John W. Keker
                                                   John W. Keker


Dated:    December 2, 2013                      Respectfully Submitted,

STUART F. DELERY                               ANDRE BIROTTE JR.
Acting Assistant Attorney General              United States Attorney
United States Department of Justice
Civil Division
MAAME EWUSI-MENSAH
FRIMPONG
Deputy Assistant Attorney General              /s/George S. Cardona/
MICHAEL S. BLUME                               GEORGE S. CARDONA
Director, Consumer Protection Branch           LEON W. WEIDMAN
ARTHUR R. GOLDBERG                             ANOIEL KHORSHID
Assistant Director, Fed. Prog. Branch          RICHARD E. ROBINSON
JAMES T. NELSON                                Assistant United States Attorneys
BRADLEY COHEN
JENNIE KNEEDLER
SONDRA L. MILLS
THOMAS D. ZIMPLEMAN
Trial Attorneys, Civil Division

31

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 1

32

**Exhibit 1: Documents Produced Responsive to S&P's First Request**

| Date | Documents |
|------|-----------|
| April 26 & 28, 2013 | Transcripts and exhibits for sworn testimony taken by DOJ attorneys in the course of the FIRREA investigation of S&P (with text files & videos where available) |
| September 23, 2013 | Rule 45 Subpoena Documents |
| October 8, 2013 | Rule 45 Subpoena Documents |
| October 11, 2013 | (a)  Rule 45 Subpoena Documents<br><br>(b)  Additional videos of sworn testimony taken by DOJ attorneys from two witnesses in the course of the FIRREA investigation of S&P<br><br>(c)  Hard drive with documents obtained in the course of the FIRREA investigation of S&P from 8 entities and one individual |
| October 21, 2013 | Rule 45 Subpoena Documents |
| October 24, 2013 | Rule 45 Subpoena Documents |
| October 25, 2013 | (a)  Transcripts and exhibits obtained by DOJ from the SEC in the course of the FIRREA investigation of S&P (with videos where available)<br><br>(b)  Discs containing wave files obtained in the course of the FIRREA investigation of S&P from one entity |
| October 30, 2013 | (a)  Hard drive with documents obtained in the course of the FIRREA investigation of S&P from 5 entities and 12 individuals<br><br>(b)  Discs containing replacement materials for possibly corrupted materials in October 11 production<br><br>(c)  Hardcopies of certain FIRREA subpoenas issued to and correspondence with two entities in the course of the FIRREA investigation of S&P |
| November 7, 2013 | Rule 45 Subpoena documents |

SECOND SUPPLEMENTAL RULE 26(f) CONFERENCE REPORT
CASE NO.  CV13-779 DOC (JCGx)

| November 18, 2013 | (a)  Links to certain materials publicly available on federal government agency and entity websites<br><br>(b)  Hardcopies of certain materials obtained from DOJ, FBI, and NARA |
| --- | --- |
| November 18, 2013 | (a)  Two hard drives containing documents obtained by DOJ from the SEC in the course of the FIRREA investigation of S&P<br><br>(b)  Two hard drives with documents obtained in the course of the FIRREA investigation of S&P from 10 entities<br><br>(c)  Discs containing documents obtained in the course of the FIRREA investigation from two entities<br><br>(d)  Discs containing replacement materials for possibly corrupted materials in October 30 production |
| November 22, 2013 | (a)  Rule 45 Subpoena documents<br><br>(b)  Hard drive with documents obtained in the course of the FIRREA investigation of S&P from one entity |

34

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 2

35

## DOJ PROPOSED SCHEDULE

| Event | Proposed Date |
|---|---|
| Complaint Filed [Actual] | 2/4/2013 |
| Complaint Served [Actual] | 2/13/2013 |
| Defendants' Notice of Appearance [Actual] | 2/20/2013 |
| S&P Motion to Dismiss Complaint [Actual] | 4/22/2013 |
| Rule 26(f) Conferences [Actual] | 4/25/2013, 5/22/2013, 6/3/2013, 6/17/2013, 7/22/2013, 7/24/2013, 7/25/2013, 7/26/2013, 11/22/2013 |
| US Response to Motion to Dismiss [Actual] | 5/20/2013 |
| S&P Reply re Motion to Dismiss [Actual] | 6/3/2013 |
| Rule 26(f) Report [Actual] | 6/24/2013 |
| Hearing on Motion to Dismiss [Actual] | 7/8/2013 |
| Scheduling Conference [Actual] | 7/8/2013 |
| Order Denying Motion to Dismiss [Actual] | 7/16/2013 |
| Scheduling Conference [Actual] | 7/29/2013 |
| Initial Scheduling Order [Actual] | 8/2/2013 |
| S&P Corrected Answer to Complaint [Actual] | 9/3/2013 |
| Initial Discovery Period [Actual] | through 11/18/2013 |
| S&P and US Status Updates re Initial Discovery  [Actual] | 10/14/2013 |
| US Supplemental Rule 26(e) Disclosure [Actual] | 11/18/2013 |
| Updated Rule 26(f) Report [Actual] | 12/2/2013 |
| Scheduling Conference (to set Discovery Cutoff, Discovery Motion, Dispositive Motion, Pretrial Conference, and Trial dates) | 12/16/2013 |

36

| S&P Motion to Compel (First Amendment retaliation, Rule 45, Brady) | 1/20/2014 |
|---|---|
| US Response to Motion to Compel | 2/17/2014 |
| S&P Reply re Motion to Compel | 2/24/2014 |
| Hearing on Motion to Compel | TBD |
| Non-Expert Discovery Cutoff | 8/25/2014 |
| Expert Witness Disclosure | 9/15/2014 |
| Rebuttal Expert Witness Disclosure | 10/20/2014 |
| Expert Discovery Cutoff | 11/3/2014 |
| Dispositive Motions | 12/8/2014 |
| Responses to Dispositive Motions | 1/12/2015 |
| Replies on Dispositive Motions | 1/26/2015 |
| Last Day for Hearing Dispositive Motions | 2/16/2015 |
| Meeting of Counsel Before Final Pretrial Conference; Last Day to Conduct Settlement Conference | 3/16/2015 |
| Lodge Pretrial Conference Order; File Exhibit and Witness Lists; File Memorandum of Contentions of Fact and Law; File Status Report re Settlement; File Agreed-On Set of Jury Instructions and Verdict Forms; File Joint Statement re Disputed Jury Instructions and Verdict Forms; File Motions in Limine | 4/6/2015 |
| Responses to Motions in Limine | 4/20/2015 |
| Final Pretrial Conference; Proposed Voir Dire Questions lodged; Agreed-to Statement of Case filed; Hearing on Motions in Limine; Hearing on Disputed Jury Instructions | 4/27/2015 |
| Trial Date | 5/19/2015 |

37

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 3

SECOND SUPPLEMENTAL RULE 26(f) CONFERENCE REPORT
CASE NO.  CV13-779 DOC (JCGx)

## S&P PROPOSED SCHEDULE

| Event | Proposed Date |
|---|---|
| Scheduling Conference (to set Discovery Cutoff, Discovery Motion, Dispositive Motion, Pretrial Conference, and Trial dates) | 12/16/2013 |
| S&P Motion to Compel | 1/20/2014 |
| U.S. Response to Motion to Compel | 2/10/2014 |
| S&P Reply re Motion to Compel | 2/17/2014 |
| Hearing on Motion to Compel | TBD |
| Non-Expert Discovery Cutoff | 10/15/2014 |
| Expert Witness Disclosure | 12/17/2014 |
| Rebuttal Expert Witness Disclosure | 2/12/2015 |
| Expert Discovery Cutoff | 3/31/2015 |
| Dispositive Motions | 4/23/2015 |
| Responses to Dispositive Motions | 5/28/2015 |
| Replies on Dispositive Motions | 6/25/2015 |
| Last Day for Hearing Dispositive Motions | 8/25/2015 |
| Meeting of Counsel Before Final Pretrial Conference; Last Day to Conduct Settlement Conference | 8/28/2015 |
| Memorandum of Contentions of Facts and Law; Witness Lists; Joint Exhibit List; Motions in Limine | 9/16/2015 |
| Responses to Motions in Limine | 9/24/2015 |
| Lodge Final Pretrial Conference Order | 9/25/2015 |
| Final Pretrial Conference | 10/7/2015 |
| Trial Briefs | 11/2/2015 |
| Trial Date | 11/9/2015 |

SECOND SUPPLEMENTAL RULE 26(f) CONFERENCE REPORT
CASE NO.  CV13-779 DOC (JCGx)

# EXHIBIT F

**Testing Conflicts of Interest at Bond Ratings Agencies with Market Anticipation:**

**Evidence that Reputation Incentives Dominate**

Daniel M. Covitz

Federal Reserve Board


Paul Harrison

Federal Reserve Board

Latest Draft:  December 2003

This paper reflects the views of the authors only and not necessarily those of the Board of Governors, other members of its staff, or the Federal Reserve System.  We thank Shannon Hart for outstanding research assistance.

Please address correspondence to Daniel Covitz, Mail Stop 89, Federal Reserve Board, 20th and C Sts. NW, Washington, DC 20551, phone (202)-452-5267, fax (202)-452-5295, email dcovitz@frb.gov.

1

## Abstract

This paper presents the first comprehensive test of whether well-known conflicts of interest at bond rating agencies importantly influence their actions. This hypothesis is tested against the alternative that rating agency actions are primarily influenced by a countervailing incentive to protect their reputations as delegated monitors. These two hypotheses generate a number of testable predictions regarding the anticipation of credit-rating downgrades by the bond market, which we investigate using a new data set of about 2,000 credit rating migrations from Moody's and Standard & Poor's, and matching issuer-level bond prices. The findings strongly indicate that rating changes do not appear to be importantly influenced by rating agency conflicts of interest but, rather, suggest that rating agencies are motivated primarily by reputation-related incentives.

2

## I. Introduction

Bond rating agencies have an obvious conflict of interest. They have a financial incentive to accommodate the preferences of bond issuers because they are selected and paid by the issuers. This incentive conflicts with agencies' stated goal of supplying independent and objective credit-risk analysis to investors.[1] Bond rating agencies also have a countervailing incentive to build and protect their reputations for being independent and objective. This paper empirically tests whether rating agency actions systematically vary in a manner which suggests they favor issuer interests – the "conflict of interest hypothesis" – or investor interests – the "reputation hypothesis."

The ongoing string of financial scandals in recent years has highlighted the pervasiveness of conflicts of interest at financial monitors and intermediaries, as well as the fact that these conflicts are not always successfully counterbalanced by reputation-related incentives.[2] The still-accruing evidence indicates that objectivity (and even fiduciary responsibility) has been subjugated to self interest by some accounting firms, equity analysts, corporate officers and board members, stock-exchange specialists, and mutual funds, despite the importance of reputation to franchise value in each of these sectors. Thus, there is an ex ante basis for concern about conflicts of interest at rating agencies, a concern expressed explicitly in recent Congressional legislation and SEC proposals.[3]

Conflicts of interest at rating agencies are important given the fundamental role that

---

[1] This goal is articulated in Moody's (2003), for instance.

[2] In other settings, it has been shown that reputations mitigate moral hazard problems, as in Diamond (1991). Of course, there are also examples of when reputations are ineffective (as in Bulow and Rogoff, 1989).

[3] See, Sarbanes-Oxely Act (2002), SEC (2003).

3

rating agencies play as delegated monitors in today's capital markets. Most (non-Treasury) debt securities issued in the U.S. are rated by at least one rating agency, and their importance to investors, by many accounts, has grown in recent years (see, for instance, Cantor and Packer, 1994, Sinclair, 2003, Fabozzi, 2001, SEC, 2003). In addition, ratings are likely to be particularly important where the benefits are small, or costs large, to independent credit analysis, such as for high-grade issuers and asset-backed issuance, respectively. Regulations also rely heavily on ratings. The SEC designates "Nationally Recognized Statistical Rating Organizations" (NRSROs), which currently are referenced by at least 8 federal statutes, 47 federal regulations, and over 100 state laws and regulations.[4]

However, rating agencies have not been formally charged with any illegal activity; and perhaps there are institutional reasons to expect that their conflicts of interest are well managed. Certainly rating agencies argue (see, for instance, SEC, 2003, p.23) that safeguarding their reputation is of "paramount importance." Rating agencies also claim they effectively manage their conflicts of interest by separating compensation from revenue generation and by diversifying their revenue base. Conflicts of interest might also be ameliorated by the limited competition in the ratings industry. With less pressure to compete for fees, rating agencies may have little incentive to coddle issuers and may instead focus on managing their reputations. Of course, the degree to which reputation-related incentives keep conflicts of interest in check is an empirical question.

Our approach to addressing this question is guided by recent criticism of rating agencies, which has focused on their *delay* in recognizing the credit-quality deterioration of Enron Corp, prior to its failure at the end of 2001. For example, Zuckerman and Sapsford (2001) summarize:

---

[4] According to the Senate Governmental Affairs Committee report, "Financial Oversight of Enron: The SEC and Private-Sector Watchdogs," October 2002.

4

"in waiting until Enron's bonds had plummeted in value, the ratings agencies failed in their job of anticipating a company's financial problems and giving investors an early warning." Investor skepticism was heightened by news reports (as in Smith and Zuckerman, 2001) that Moody's, S&P, and Fitch had behind-the-scenes meetings with, and had been lobbied by, executives from Enron, Dynegy, J.P. Morgan Chase, and Citigroup, and "agreed to hold off on making any ratings move," essentially so as not to bankrupt the company. Rating agencies claimed their decision to hold-off on the downgrade was justified, given their belief, at the time, that a pending merger was likely to protect bondholders.

We measure delay as the degree to which ratings changes are anticipated by the bond market, where anticipation is defined as the ratio of an issuer's bond-yield-spread change over the five months preceding the month of the rating change to the total spread change over those five months plus the month of the rating change itself.[5] So, if all of the spread change occurred in the month of the rating change then anticipation would be 0, while if all of the movement occurred in the prior months then anticipation would be 1. By using a monthly frequency, we abstract from delays of only a few days, which is justified by the finding in Holthausen and Leftwich (1985) that the anticipation of rating changes, measured with abnormal equity returns, is large and runs into many months.

Our analysis is novel along a number of dimensions: Our measure of rating change anticipation is new; we are the first to document cross-sectional differences in anticipation and total effects (anticipation plus announcement effects) associated with rating changes; and we are the first to address rating agency conflicts of interest and reputation incentives. We also use a new data set of about 2000 corporate-bond rating changes by Moody's and S&P from 1997 to

---

[5] As discussed later, spreads are calculated relative to other similarly rated and similar maturity corporate bonds.

5

2002, about twice the size of the data in Holthausen and Leftwich (1985), both in terms of years and number of observations.

We find that downgrades are roughly 75 percent anticipated, but our cross-sectional analysis of anticipation yields no support for the conflict of interest hypothesis. To the contrary, we find substantial evidence consistent with rating agencies protecting their reputations as delegated monitors with timely actions in cases likely to have generated substantial publicity. The results are robust to a variety of controls for other factors that might affect anticipation, such as the size of the downgrade, the size of the total bond-market movement, ratings level, time, industry, having been put on a "watchlist" for a downgrade, and having been downgraded by both firms, as well as to various permutations in the construction of the dependent variable.[6] We also analyze Moody's and S&P rating changes separately. In this analysis, we again find no evidence for the conflict of interest hypothesis, but do find stronger support for the importance of reputation concerns at S&P than at Moody's. We also formulate four additional tests, the results of which also point towards the importance of reputation concerns and away from the conflict of interest hypothesis.

Our findings complement the literature on rating change announcement effects. That literature documents significant announcement effects for downgrades, but not for upgrades, and stronger announcement effects for high-yield downgrades than for investment-grade downgrades.[7] If diminished announcement effects are due to greater anticipation (and we do find greater anticipation for the categories of rating changes found in the literature to have

---

[6] The anticipation measure can be ill behaved when the total effect (the denominator) is small or the anticipation is negative, so we impose restrictions which are varied in the analysis.

[7] See Goh and Ederington (1999), Hand, Holthausen, and Leftwich, (1992), Goh and Ederington (1993), and Holthausen and Leftwich (1985).

6

insignificant or small announcement effects), our general findings suggest that reputation

concerns may help explain differential announcement effects. It is also possible that the

diminished announcement effects simply reflect relatively "minor" credit quality events.

Consistent with this possibility, we find that total effects are small for the categories of rating

changes found in the literature to have insignificant or small announcement effects.

The paper proceeds as follows: Section II formulates the two hypotheses and their

testable implications; Section III presents the main results; Section IV addresses robustness,

Section V presents additional tests, and Section VI concludes.


## II. Hypothesis Development

The incentive for rating agencies to act in the interest of issuers derives from institutional

arrangements, whereby issuers pay for issuer-level and bond-level ratings, and also choose

which rating agency – possibly more than one – will produce the ratings. Almost all rating

agency revenues are from ratings fees. Rating agencies also offer fee-based ancillary consulting-

type services to issuers, which may exacerbate conflicts of interest. For example, prior to being

issued a public rating, issuers can purchase an "indicative" or private rating, along with "advice"

regarding how the company might improve their rating.

Clearly, one mechanism for acting in the interest of issuers is to delay rating downgrades.

Delaying the negative news in downgrades may benefit issuers in a number of ways. It

postpones the concomitant increase in funding costs. But the benefits may extend well beyond

the costs of borrowing, since a downgrade could trigger certain covenants or other conditional

obligations. In general, lower rated firms typically must post more collateral and might be

treated differently by suppliers – that is, a rating downgrade may have negative feedback effects.

In addition a delay gives the firm time, and hence option value, to be able to correct its

7

deterioration in credit quality. This might take the form of detailed discussions with the rating agencies to try to convince them that the downgrade is not warranted, or it might be fundamental changes in capital structure that reduce the firm's leverage and/or enhance its liquidity.

The incentive to delay downgrades may be large in some cases. For example, the incentive to delay downgrades to please issuers may be large when the issuer is a relatively large client, because the fees obtained from issuers are increasing in the number and size of rated bonds. For instance, in addition to an annual fee, Moody's charges between $33,000 and $275,000 *per issue* based on the par value (and complexity) of the issue. The standard per issue fee is calculated as 0.033 percent for the first $500 million of par value and 0.02 percent of additional par value, with a $33,000 minimum and a $275,000 maximum (Moody's 2002).[8]

The delay incentive should also be larger when the downgrade itself is particularly costly to the issuer. One example of a costly rating change is the downgrade from investment-grade to high yield, creating what is commonly referred to as a fallen angel. Financial contracts often contain triggers explicitly tied to this change. For instance, bank-credit lines may be revoked, or derivative contracts may require additional collateral when a firm becomes a fallen angel. In addition, many investors are unable (due to rules and regulations), or unwilling, to hold high-yield securities. This could adversely impact the issuer's ability to access capital markets, adding to the liquidity problems associated with the triggers.

Of course, downgrade delays may be also costly to the reputations of rating agencies. As rating changes become more delayed, investors might find rating agencies less useful as delegated monitors. This gives rating agencies an incentive to be diligent and on top of credit-

---

[8] The rating agencies argue that even the largest issuer provides only a small amount of their total revenue, so this incentive cannot be large. But, of course, that argument does not apply to the incentive to favor an entire class of clients (say all large issuers together).

8

quality changes. Furthermore, when rating the same issuer, rating agencies may also compete with each other to be perceived as *relatively* timely by investors, and thus the reputation costs of downgrade delays may be enhanced. While multiple ratings can mitigate the conflict of interest via a reputation effect, the custom of multiple ratings could also diminish issuers' leverage over rating agencies.

As evidence that they do not subjugate investors' interests to those of issuers, rating agencies point proudly to their attempts to mitigate the conflict of interest by using fixed fee schedules, rating committees, independent analyst compensation, and other "fire walls" between raters and the collection of revenue. The multitude of measures (as well as their marketing) underscores the reality that the rating agencies must convince investors that ratings are indeed independent, and thus inadvertently emphasizes the seriousness of the incentive to coddle issuers.

The crucial role of reputation to rating agencies implies that they could never completely neglect investor interests. In general, since ratings are widely used by the investment community and rating changes move market prices (we document this later, but it has been well-established by the literature), it appears that the rating agencies have avoided the widespread perception that they serve issuer interests. Even the SEC report to Congress (SEC, 2003, p.23) concluded that "for the most part" market participants believe that the rating agencies have "effectively managed" their conflict of interest. This, perhaps, could be summarized as the view that ratings agencies are generally getting it right.

Rating agencies may also have an incentive to "get it right" faster for some issuers to minimize negative publicity and its consequent reputation cost. Negative publicity, and thus reputation costs, may be increasing when an issuer is a large client and when the downgrade creates a fallen angel, since such cases tend to involve substantial publicity and investor losses.

9

Empirically, the relative delay for large clients and fallen angels then allows us to identify which incentive is driving the behavior of rating agencies. Evidence that downgrade delays are larger for fallen angels and big clients would suggest that rating agencies are acting in the interest of issuers – support for the "conflict of interest hypothesis." Evidence of smaller downgrade delays for fallen angels and large clients would suggest that rating agencies are primarily acting in the interest of investors to protect their reputations as delegated monitors – support for the "reputation hypothesis."

We measure rating agency delay by the degree to which the bond market anticipates rating changes. There are, of course, a number of other factors that could generate anticipation of rating changes besides intentional delay. For instance, rating agencies will appear slow if they do not respond immediately to gradual changes in credit quality because they only reassess ratings periodically or because ratings move in discrete notches. Second, rating agencies' information advantage over investors may be greater in some cases, or at certain times. Third, there may be other factors relating to the size of the credit quality shock or the firm's initial rating that effect the speed of rating agencies relative to the market. Thus, our main test of these hypotheses, involves regressing the anticipation of a downgrade against variables indicating whether the firm is a large client or a fallen angel, and a variety of controls for other factors that might influence anticipation.

## III. Data

We take monthly bond yield and ratings data from Merrill Lynch's bond database. The data, which underlie the widely-followed Merrill Lynch broad corporate bond indexes, includes daily pricing and monthly rating information on over 3000 large, public corporate bonds, from more than 1200 issuers, traded in the US bond market from January 1997 to August 2002. Over

10

90% of the bonds are issued by firms domiciled in the US, and all the bonds have face value greater than or equal to $100 million and over 1 year in remaining maturity. While on a daily frequency many of the prices will not be from real trades, at a monthly frequency even dealer quotes will be closely tied to the behavior of the individual credit (see Harrison, 2002).

The Merrill Lynch data contains monthly composite bond credit ratings, calculated as the average of the bond's credit rating from Moody's and S&Ps. When the average falls between two ratings, the composite is rounded to the lower rating. This means that the composite rating will tend to capture the first, or "leading edge," downgrade. Composite ratings are updated on the first day of each month to incorporate changes that occurred in the prior month.

To create an issuer-level data set from the bond-level data, we limit the sample to one rating migration per issuer, per month, by selecting the issuer's largest (and, arguably, most liquid and, therefore, best priced) bond when there are multiple bonds migrating within a particular month. We only select migrations with sufficient data to construct yield changes over the six month period ending in the month of the rating change and where there was no rating change within the five months prior to that migration. Prior rating changes could confound the interpretation of our delay measure. For about half the sample, we hand check the migrations data on Bloomberg to confirm that there was no rating actions in the prior 5 months, to alleviate any concern about the composite nature of the ratings, as well as to supplement the data with information on prior "watchlist" assignment and on the identity of which (or both) rating agency changed their rating.

The sample of issuer-level ratings migrations is summarized in Table 1. The sample includes 773 upgrades and 1234 downgrades, all of which took place in the period from July 1, 1997 to July 1, 2002. The greater number of downgrades reflects a substantial increase in the annual pace of downgrades after 1999, as macroeconomic conditions deteriorated.

11

The original bond-level Merrill Lynch data are also used to create 56 daily "effective" bond-yield-to-maturity indexes, grouped by time-to-maturity and rating. We group the bonds into 7 ratings buckets: AAA, AA, A, BBB, BB, B, and CCC or less. We then take the bonds in each rating group and divide them into 8 maturity buckets.[9] For each sub-bucket, we calculate an average, end of month, bond yield. For each rating change, yield spreads are calculated as the difference between the bond yield at the end of the month (calculated with the first available yield in the subsequent month) and the "appropriate" rating-maturity indexes, based on the bond's rating and maturity in the month prior to the rating change.

## IV. Empirical Analysis

### 1. Total Effect of Rating Changes On Bond Spread Changes

As a prelude to our investigation of delay, we examine bond-spread changes leading up to and through the rating change month. We call this the "total-period" spread change and define it as: $[Spread_t - Spread_{t-i}]$), where spreads are calculated monthly at the end of the month, $t$ refers to the month containing the migration month, and $i$ refers to the number of months in the period. We take spreads versus other corporate bonds in order to mimic the change in the credit quality (i.e., default probability or recovery expectation) of that issuer and not market-wide movements that should not show up in ratings, such as cyclical swings, liquidity premiums, and risk premiums.[10]

Table 2a shows the lower quartile, median, and upper quartile of total-period spread

---

[9] Based on whether the maturity is closest to 1, 2, 3, 5, 7, 10, 15, or 20 years. These maturities are chosen to match the maturity of frequently quoted treasury yields.

[10] While rating changes are cyclical, issuers are not downgraded just because the economy weakens.

12

changes for total periods ranging in length from 1 to 6 months. The table separates downgrades and upgrades, which are then further divided by the issuer's initial and final rating into three categories: high-yield (initial and final rating are both high yield), investment-grade (initial and final rating are both investment grade), and fallen angels (or rising devils, where initial and final rating change category).

The table yields a number of observations. First, consistent with rating changes reflecting credit quality changes, median total period spread changes are greater than zero for downgrades and less than zero for upgrades. Second, the magnitude of the effect varies with the initial and ending rating and is much larger for high-yield firms than for investment grade firms. Apparently a rating change is a bigger credit quality event at lower ratings. Third, the total-period spread changes for downgrades are much larger than for upgrades. This is consistent with the findings in the announcement-effect literature (see, for instance, Hand, Holthausen, and Leftwich, 1992).

Importantly, the results in the table also clearly show that the size of the effect is bigger over a longer window. For example the median total-period spread changes for high-yield downgrades is 390 basis points over a six month total period, but falls to about 80 basis points when calculated over the one month period. The pattern is similar for the other groups. In addition, the inter-quartile ranges narrow as the total-period length narrows. For example, the inter-quartile range for the high-yield downgrade effect is about [25, 1290] with a six month total period, but is only about [-30, 480] with a one month period. Taken together, these last two observations strongly imply that total-period spread changes look more like white noise as the total period narrows, suggesting that bond investors anticipate rating changes months before they

13

occur.[11]

## 2. Bond Market Anticipation

We attempt to quantify this effect by constructing a measure of bond-market anticipation of rating changes. We define anticipation as the degree to which corporate bond spreads move leading up to the month of the rating change – "prior period spread change" – relative to their movement through the migration month (the "total period" discussed above). More precisely:

$$\text{Anticipation} = 100 * [\text{Prior Period Spread Change}]/ [\text{Total Period Spread Change}]$$
$$= 100 * [\text{Spread}_{t-1} - \text{Spread}_{t-i}]/ [\text{Spread}_t - \text{Spread}_{t-i}], \qquad (1)$$

where, again, $t$ denotes the month of the rating change and $i$ denotes the number of total months. So, if a rating change is timely, either in the sense that it quickly reflects observable information or reveals new information, this ratio will be close to zero. In contrast, a value near one indicates that the market largely anticipated the rating change.

Measuring anticipation in months is consistent with our findings in the previous section that spread changes are very large in the months before a rating change, as well as with the findings reported by Holthausen and Leftwich (1985) and our view that the monthly frequency is the right one for the costs and benefits of delay to be meaningful to issuers and investors. Using monthly data means we liberally attribute the entire bond spread movement during the month of the rating change to the rating change. This treatment of the timing should have no implications for our cross-sectional regressions.

---

[11] Recall, our spreads are taken to other corporate bonds and so this effect must reflect idiosyncratic anticipation not broad market deterioration.

14

Table 2b summarizes the anticipation measure across the different groups of rating changes discussed in the previous table. The point estimates in the table confirm that rating changes tend to be mostly anticipated before the month of the rating change. The median anticipations over the six month period range from about 55 percent for fallen angel downgrades, to nearly 85 percent for investment-grade upgrades. The point estimates also show that anticipation decreases with the length of the total period, consistent with the observation from the previous table that total period spread changes become noisier as the total-period length shrinks.

## 3. Main Results

Our empirical strategy is to regress the anticipation of downgrades on our proxies for intentional delay, controlling for factors which affect anticipation. Our basic specification is:

$$\text{Downgrade Anticipation}_i = \alpha + \beta_1 (\text{Fallen Angel Dummy})_i + \beta_2 (\text{Big Client})_i + \beta_{3,...} (\text{Controls})_i + \epsilon_i \qquad (2)$$

The key variables of interest are the variables "Fallen Angel Dummy" and "Big Client" since these have a differential implication for the conflicts of interest and reputation hypotheses. If rating agencies act in the interest of issuers, $\beta_1$ and $\beta_2$ should be greater than zero – downgrades of fallen angels and large clients are more anticipated by the market because the agencies have delayed. Conversely, if rating agencies act in the interest of investors to protect their reputations, $\beta_1$ and $\beta_2$ should be less than zero. We focus on downgrades because that is when the two hypotheses offer opposite predictions for the key variables. A finding of zero for these

15

coefficients would imply that the rating agencies are unbiased.

Table 3a presents results from four different specifications of Equation 2, using a six month event window. The results in this table are all calculated with the following intuitive restrictions on the anticipation measure: We cap anticipation at 100 percent, bound it below at 0 percent, and set it to 100 percent when the total period spread change is less than 20 basis points. Conceptually, 100 and 0 percent are natural bounds for the anticipation measure. In addition, when the denominator (i.e., the total spread change) is small or negative one might reasonably infer that the rating change was fully anticipated and was reflected in bond spreads *before* the total period. So, in these instances we set anticipation to its maximum. Robustness with respect to various restrictions on the anticipation measure is presented after the discussion of our main results.

The first specification in Table 3a includes the fallen angel dummy variable, the log of the number of bonds an issuer has outstanding (our first proxy for "large client"), and a dummy variable indicating if the initial rating is high-yield. The results, shown in column 1, indicate that fallen angels are 20 percentage points less anticipated by the bond market than other investment-grade downgrades (the omitted rating category), and that downgrades of firms with 1 percent more bonds outstanding are 5 percent less anticipated. The rating agencies appear more timely at changing ratings in cases when the downgrades are likely to generate substantial publicity, which we interpret as evidence for the reputation hypothesis and against the conflict of interest hypothesis. The coefficient on the high-yield dummy is -18, which is consistent with riskier downgrades generally being less anticipated by the bond market.

The next specifications show that the evidence in favor of the reputation hypothesis is robust to additional controls. Moreover, because the estimated coefficients on the control variables have the "expected" signs, they buttress our interpretation of the left-hand-side variable

16

as a measure of anticipation. The first of these additional specifications, shown in column 2,

augments the stripped-down specification with three control variables: the magnitude of the

rating change, the total period bond-spread change, and the square of the total period bond-

spread change. The coefficients are all significant at the 5 percent level. The coefficient on the

fallen angel dummy and the log of the number of bonds are again negative, but a bit smaller in

absolute size than in the first specification. The coefficients on the control variables indicate that

downgrades are 12 percent less anticipated when the issuer's original rating is high-yield, 3

percent less anticipated when they occur over 1 additional rating notch, and 3 percent less

anticipated for every 1 percentage point (100 basis point) increase in the total-period spread

change. The coefficient on the square of the total-period change is close to zero. The negative

relationship between downgrade anticipation and the size of the total period spread change, as

well as the rating notch variable, may reflect the fact that our anticipation measure is constructed

from bond *yields*, which are convex functions of bond *default risk*.

The next specification tests robustness to replacing the log of the number of bonds with

the log of the issuer's total par value of outstanding bonds. As shown in column 3, downgrades

are about 3 percent less anticipated when an issuer has 1 percent more outstanding bonds. The

point estimate is significant at the 5 percent level. The other coefficients and their statistical

significance are essentially identical to those in the previous specification. The results are also

immaterially different, as shown in column 4, when quarterly-time-dummy variables and

industry-dummy variables are included. F tests, not shown, indicate that the quarterly dummies

are statistically different from 0, but the industry dummies are not.

Table 3b addresses the robustness to alternative restrictions on the anticipation measure

and the sample. All specifications in the table use the full list of control variables used in the last

specification of the previous table. The table first considers robustness to using a longer-term (1

17

year) measure of anticipation. Given the requirement that the migration not be preceded by another migration during the total period, the longer-term delay measure reduces the sample size from 1234 to 809 downgrades. Nevertheless, as shown in the first column, the qualitative results are the same as in the previous table. The size of all the coefficient estimates are smaller, but still statistically significant at the five percent level – again, except the industry dummies.

The second specification (column 2) uses the six-month anticipation measure, but drops the restriction that all downgrades not be preceded by other rating changes in the total period, which increases the sample size to 1772 rating downgrades. The coefficient estimates and their significance levels are very close to the results in the previous table.

Next, we change the definition of a trivial spread change – the cut off below which the downgrade is assumed to have been anticipated – from 20 basis points to 10 basis points. As shown in the third column, this reduces the magnitude of the coefficient on the fallen angel dummy and the log of the number of bonds a bit, but again the results are very similar. As another alternative, we drop the observations with negative total period spread changes, rather than assume, as we did, that such observations imply 100 percent anticipation. As shown in column 4, the results are again similar, except the coefficient on the fallen angel dummy jumps to -21.

The last specification, the results for which are shown in column 5, drops all restrictions relating to the anticipation measure. This yields a regression with almost no explanatory power, indicating that the intuitive restrictions on the anticipation measure are important. However, the consistency of the results to various alternative restrictions indicates that the results do not depend on the precise way in which the restrictions are imposed.

## 4. Anticipation Analysis by Rating Agency

18

While the majority of our analysis is conducted on our sample of composite rating migrations, we conduct analysis of Moody's and S&P downgrades separately to look for differential effects. The test for the conflict of interest versus the reputation hypothesis is the same as in the previous tables. However, we also add a control for whether the firm was put on "watch" for a downgrade during the total period, as well as a dummy variable indicating whether the downgrade by one rating agency was affirmed by a downgrade from the other rating agency. Clearly being put on the watch list is expected to increase anticipation. The expected impact of a downgrade affirmation is less clear. However, to the extent that a downgrade affirmation implies a larger event, one would expect less anticipation, as we have already shown that larger events generate less anticipation independently of delay. Because they were hand collected only for downgrades with total-period spread changes greater than 20 basis points, the sample is reduced to 372 Moody's downgrades and 358 Standard and Poor's downgrades.

The results for the Moody's sample, displayed in Table 3c, point in the direction of the reputation hypothesis, but are somewhat weaker than those obtained using the composite ratings. In all three specifications, the coefficients on the fallen angel dummies are not significant, but the coefficients on the "Big Client" proxies are still negative and significant – two at the 5 percent level and one at the 10 percent level. The coefficients on the two new variables in specifications without the quarterly and time dummy variables, shown in the first two columns, indicate that downgrades are 7 percentage points more anticipated when the firm is put on watch for a downgrade in the prior period, and 8 percentage points less anticipated when both rating agencies downgrade the firm in the migration month. When quarterly and time dummies are added, as shown in the third column, coefficients on the two new variables are somewhat smaller than in the first two specifications and insignificantly different from zero.

The results for the S&P regressions, shown in Table 3d, point more strongly in the

19

direction of the reputation hypothesis. The coefficients on the fallen angel dummy variables, shown in columns 1-3, are all about -19, and significant at the 5 percent level, and the coefficients on the client size proxies are negative, with all but one significant at the 10 percent level. The other coefficients are similar to those in the Moody's regressions. Putting a firm on watch for a downgrade leads to between 7 and 10 percentage points more anticipation, and having been downgraded by both rating agencies tends to coincide with between 4 and 8 percentage points less anticipation.

In both the Moody's and S&P regressions, the positive impact on anticipation of the watch list is intuitive, and the negative impact of "double agency" downgrades is consistent with the previously discussed result that larger downgrades tend to coincide with less anticipation. One difference with the results in Table 3a is that the total period spread change is no longer significant, although if we combine the Moody's and Standard and Poor's samples (not shown) the coefficient on the total period spread change is again significant and negative.

## V. Additional Results

### 1. Upgrades versus Downgrade Delays

The conflict of interest hypothesis predicts that rating agencies would delay downgrades and perhaps hasten upgrades, since downgrades delays benefit issuers. The reputation hypothesis predicts rating agencies might be more timely with downgrades, since downgrades may generate more publicity than upgrades. Thus the conflict of interest hypothesis would predict that downgrades are more anticipated by the bond market than upgrades, while the reputation hypothesis would predict the opposite. To test this implication, we combine our

20

sample of downgrades with upgrades, and regress:[12]

$$\text{Anticipation}_i = \alpha + \beta_1 (\text{Upgrade vs. Downgrade})_i + \beta_{2...} (\text{Controls})_i + \epsilon_i \quad (3)$$

The results, summarized in Table 4, again point towards the reputation hypothesis. As
shown in the first column, in a stripped down specification with only a constant and a dummy
variable for whether the rating change is an upgrade, we find that upgrades are 10 percent more
anticipated than downgrades. The result is significant at the 5 percent confidence level. Adding
our usual list of controls, along with a dummy variable for whether the rating change creates a
rising devil (upgrade from high-yield to investment-grade), weakens the result to a still
statistically significant 7 percent, as shown in the second column.

## 2. Is Reputation Only A Post-Enron Concern?

Soon after Enron defaulted towards the end of 2001, criticism of rating agencies peaked.
To test whether reputation concerns at rating agencies were a response to this criticism, and thus
only a recent concern among rating agencies, we split the sample into a pre-2002 period and a
post-2001 period and re-run the regressions in Equation 2. However, as the results in Table 5
show, the evidence is actually stronger for the reputation hypothesis pre-Enron. In the early
sample period, the coefficient on the fallen angel dummy variable is -22, the coefficient on the
log of the number of bonds is -4, and both are statistically significant at the five percent level. In
the post-2001 period, the coefficient on the log of the number of bonds is -5 and significant at
the 10 percent level, but the coefficient on the fallen angle dummy is insignificantly different

---

[12] Analogous restrictions on the anticipation measure for upgrades are made.

21

from zero. The limited evidence of the reputation hypothesis in the later period could be due to the difficulty in identifying significance with the smaller sample size (203 observations) relative to the earlier period (1031 observations). It is also possible that the bond market may have become more diligent in the post-Enron period. Regardless, the results suggest that the importance of reputation concerns is not a post-Enron phenomenon.

## 3. Downgrade Propensity

One potential concern is that our methodology only considers downgrades that actually occur, so our test would fail to detect conflicts of interest that manifest in favored clients not being downgraded at all. To explore this possibility, we expand our sample and then test whether the probability of an issuer being downgraded in a particular month is negatively related to being a "Big Client," after controlling for other factors that are likely to affect the probability of a downgraded.

The new sample contains 32,983 monthly issuer-level observations. The dependent variable is a dummy variable for whether the issuer has been downgraded in that month. Our independent variable of interest is, as above, the "Big Client" proxy (either the log of the number of bonds or a dummy variable for whether the issuer has greater than the upper quartile number of bonds). The controls include a variable for the initial rating at the beginning of a six month total period, the prior-period spread change from t-6 to t-1, and an interaction between the high-yield dummy and the five month prior-period spread change. The model is estimated with a Probit specification:

$$\text{Downgrade}_{i,t} = \alpha + \beta_1 \, (\text{Big Client})_{i,t} + \beta_2 \, (\text{Prior Spread Change})_{i,t} + \beta_{3,\ldots} \, (\text{Controls})_{i,t} + \epsilon_{i,t} \quad (4)$$

22

The results from the model, shown in Table 6, once again point towards the reputation hypothesis. As shown in the first column, which reports marginal effects and standard errors, a one percent increase in the number of bonds leads to a 0.3 percent increase in the likelihood of a downgrade. The result is significant at the 5 percent level. The marginal effects for the control variables are as expected. High-yield issuers are more likely to be downgraded, issuers with large prior-period bond spread changes are more likely to be downgraded, but the effect is mitigated if they are high-yield (i.e., the marginal effect on the interaction term is negative). This last result is consistent with the greater gap in credit quality between rating notches at the lower-end of the credit quality spectrum. The second specification replaces the log of the number of bonds variable with a dummy variable for whether the issuer has more than the upper quartile number of bonds. The marginal effect, shown in the second column, indicates that large firms defined in this way our .5 percent more likely to be downgraded, controlling for other factors. The marginal effects and their significance are the same as in the previous specification.

## 4. Anticipation and Opacity

Our results could potentially be biased due to the omission of controls for issuer opacity, although the direction with which opacity effects anticipation is ambiguous. On the one hand, opacity may make it more difficult for ratings agencies to evaluate firms, and thus opacity ceteris paribus would increase rating agency delays (in the spirit of Morgan, 2002, who shows that rating agencies disagree more when there is more opaqueness). On the other hand, opacity creates more scope for ratings agencies to have an informational advantage over investors and thus opacity would decrease delays. We address this question in Table 7 by adding new controls to Equation 2 for firm opacity. The opacity proxies are a variety of balance-sheet measures from Compustat: the ratio of tangible assets to total assets, the ratio of income taxes paid to total

23

assets, the ratio of dividends paid to total assets, the ratio of goodwill to total assets, total assets, the ratio of current assets to current liabilities, the ratio of total debt to total assets, and the ratio of interest expense to operating income.  None of the controls are significant, either singly or jointly, suggesting that anticipation and delay are not strongly tied to issuer complexity (at least after controlling for other variables, such as rating and spread change).  Because of the need to merge with Compustat, however, the sample size is significantly reduced.  Regardless, the evidence for the reputation hypothesis remains quite robust in all four specifications.


## VI. Conclusion

In conclusion, our analysis indicates that the bond market anticipates rating changes, but we find no evidence consistent with rating agencies acting in the interests of issuers due to a conflict of interest.  Instead, rating agencies appear to be relatively responsive to reputation concerns and so protect the interests of investors.  Of course, our analysis is not a comprehensive test of rating agency behavior.  Conflicts of interest may manifest in ways we do not test, such as biased rating levels.  Moreover, our results only show what is statistically discernable, on average, and thus can not rule out the possibility that in some instances rating agencies have acted in the interest of issuers.  A final caveat is that our measure of anticipation—constructed with monthly data—cannot discern delays of a few days.

24

## References:

Bulow, Jeremy and Kenneth Rogoff, 1989, "Sovereign Debt: Is to Forgive to Forget?" *American Economic Review*, 79, 43-50.

Cantor, Richard and Frank Packer, 1994, "The Credit Rating Industry," *Quarterly Review*, Federal Reserve Bank of New York, 19, 1-26.

Diamond, Douglas W., 1991, "Monitoring and Reputation: The Choice Between Bank Loans and Directly Placed Debt," *Journal of Political Economy*, 99, 689-721.

Fabozzi, Frank J., ed., 2001, *The Handbook of Fixed Income Securities*, 6th Edition, McGraw Hill: NY.

Goh, Jeremy C. and Louis H. Ederington, 1993, "Is a Bond Rating Downgrade Bad News, Good News, or No News for Stockholders," *Journal of Finance*, 48, 2001-8.

Goh, Jeremy C. and Louis H. Ederington, 1999, "Cross-Sectional Variation in the Stock Market Reaction to Bond Rating Changes," *Quarterly Review of Economics and Finance*, 39, 101-12.

Hand, John R. M., Holthausen, Robert W., and Leftwich, Richard W., 1992, "The Effect of Bond Rating Agency Announcements on Bond and Stock Prices," *Journal of Finance*, 47, 733-52.

Harrison, Paul, 2002, "The Impact of Market Liquidity in Times of Stress on Corporate Bond Issuance," in *Proceedings of the Third Joint Central Bank Research Conference on Risk Measurement and Systemic Risk.* Basel: Bank for International Settlements.

Holthausen, Robert W. and Richard W. Leftwich, 1985, "The Effect of Bond Rating Changes on Common Stock Prices," *Journal of Financial Economics*, 17, 57-89.

Moody's Investor Service, 2002, "Moody's Debt and Preferred Stock Rating Fee Schedule," November 2002.

Moody's Investor Service, 2003, "The Role and Function of Rating Agencies: Evolving Perceptions and the Implications for Regulatory Oversight," February 2003.

Morgan, Donald P., 2002, "Rating Banks: Risk and Uncertainty in an Opaque Industry," *American Economic Review*, 92, 874-888.

The Securities and Exchange Commission, 2003, "Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets," January 2003.

The Senate Governmental Affairs Committee, 2002, "Financial Oversight of Enron: The SEC and Private-Sector Watchdogs," United States Senate, October 2002.

Sinclair, Timothy J., 2003, "Bond Rating Agencies," *New Political Economy*, 8, 147-161.

25

Smith, Rebecca and Gregory Zuckerman, "Enron, Dynegy Work to Salvage Merger Deal," *The Wall Street Journal*, November 28, 2001, page A3.

Zuckerman, Gregory and Jathon Sapsford, "Why Credit Agencies Didn't Switch Off Enron – S&P Cries 'Junk,' But the Warning Comes Too Late," *The Wall Street Journal*, November 29, 2001, page C1.

## TABLE 1: RATING CHANGES
By Year and Rating

| | UPGRADES | | | |
|---|---|---|---|---|
| | Investment Grade -> Investment Grade | High Yield -> Investment Grade | High Yield -> High Yield | Total |
| 1997 | 45 | 6 | 29 | 80 |
| 1998 | 90 | 11 | 66 | 167 |
| 1999 | 76 | 13 | 62 | 151 |
| 2000 | 90 | 12 | 59 | 161 |
| 2001 | 82 | 12 | 65 | 159 |
| 2002 | 20 | 5 | 30 | 55 |
| Total | 403 | 59 | 311 | 773 |

| | DOWNGRADES | | | |
|---|---|---|---|---|
| | Investment Grade -> Investment Grade | Investment Grade -> High Yield | High Yield -> High Yield | Total |
| 1997 | 27 | 3 | 19 | 49 |
| 1998 | 96 | 15 | 71 | 182 |
| 1999 | 86 | 19 | 121 | 226 |
| 2000 | 90 | 10 | 102 | 202 |
| 2001 | 152 | 19 | 201 | 372 |
| 2002 | 84 | 13 | 106 | 203 |
| Total | 535 | 79 | 620 | 1234 |

## TABLE 2a: Total Effect Of Rating Changes On Bond-Spread Changes

Bond-Spreads are the bond's option adjusted yield to maturity relative to corporate bond-yield indexes with similar rating and maturity as the bond experiencing the rating change.  The length of the total period is the number of months leading up to and going through the end of the month of the rating change.  *High yield* refers to those rating changes for which the bond's rating is below BBB- before and after the rating change.  *Investment grade* refers to migrations for which the bond's rating is above BB+ both before and after the rating change.  *Fallen angels* refers to those rating changes for which the bond's rating is investment grade before the rating change and high-yield after.  *Rising devils* refers to the opposite case.

### Total-Period Bond-Spread Changes (Basis Points)

| | Downgrades | | | | Upgrades | | | |
|---|---|---|---|---|---|---|---|---|
| | # | Lower Quartile | Median | Upper Quartile | # | Lower Quartile | Median | Upper Quartile |
| **High yield** | | | | | | | | |
| **Length of total period (months)** | | | | | | | | |
| 1 | 620 | -26 | 81 | 479 | 311 | -54 | -7 | 29 |
| 2 | 620 | -23 | 143 | 697 | 311 | -80 | -18 | 24 |
| 3 | 620 | -13 | 214 | 892 | 311 | -85 | -15 | 33 |
| 4 | 620 | 4 | 272 | 995 | 311 | -112 | -35 | 30 |
| 5 | 620 | 1 | 332 | 1258 | 311 | -151 | -40 | 30 |
| 6 | 620 | 25 | 390 | 1292 | 311 | -170 | -49 | 32 |
| **Fallen Angels and Rising Devils** | | | | | | | | |
| **Length of total period (months)** | | | | | | | | |
| 1 | 79 | -9 | 21 | 155 | 59 | -58 | -15 | 12 |
| 2 | 79 | -6 | 47 | 158 | 59 | -70 | -22 | 7 |
| 3 | 79 | 0 | 79 | 177 | 59 | -76 | -26 | 6 |
| 4 | 79 | -4 | 90 | 171 | 59 | -122 | -35 | 2 |
| 5 | 79 | 10 | 98 | 172 | 59 | -138 | -51 | -9 |
| 6 | 79 | -1 | 101 | 195 | 59 | -145 | -68 | -1 |
| **Investment Grade** | | | | | | | | |
| **Length of total period (months)** | | | | | | | | |
| 1 | 535 | -5 | 3 | 17 | 403 | -9 | -1 | 7 |
| 2 | 535 | -6 | 6 | 31 | 403 | -13 | -1 | 9 |
| 3 | 535 | -7 | 9 | 39 | 403 | -17 | -2 | 11 |
| 4 | 535 | -7 | 11 | 48 | 403 | -23 | -5 | 8 |
| 5 | 535 | -7 | 12 | 51 | 403 | -28 | -5 | 10 |
| 6 | 535 | -8 | 14 | 57 | 403 | -28 | -7 | 11 |

## TABLE 2b: Bond Market Anticipation

Bond-yield spreads are calculated as in the previous panel. *Anticipation* refers to the bond-spread change over the prior period relative to the bond spread change over the total period, where the prior and total periods begin some number of months before the migration, the prior period ends at the beginning of the migration month, and the total period goes through the migration month.

| | Anticipation (percent) | | | |
| --- | --- | --- | --- | --- |
| | Downgrades | | Upgrades | |
| **Length of total period (months)** | # | Median | # | Median |
| **High Yield** | | | | |
| 1 | — | — | — | — |
| 2 | 620 | 33 | 311 | 39 |
| 3 | 620 | 52 | 311 | 66 |
| 4 | 620 | 61 | 311 | 79 |
| 5 | 620 | 64 | 311 | 80 |
| 6 | 620 | 67 | 311 | 84 |
| **Fallen Angels and Rising devils** | | | | |
| 1 | — | — | — | — |
| 2 | 79 | 17 | 59 | 29 |
| 3 | 79 | 47 | 59 | 54 |
| 4 | 79 | 60 | 59 | 69 |
| 5 | 79 | 56 | 59 | 70 |
| 6 | 79 | 58 | 59 | 83 |
| **Investment Grade** | | | | |
| 1 | — | — | — | — |
| 2 | 535 | 44 | 403 | 43 |
| 3 | 535 | 63 | 403 | 60 |
| 4 | 535 | 69 | 403 | 73 |
| 5 | 535 | 74 | 403 | 81 |
| 6 | 535 | 77 | 403 | 83 |

## TABLE 3a:  Evidence For Reputation Hypothesis:  Downgrade Anticipation Regressions

The construction of the dependent variable is as follows: The event window is the 6 months leading up to and through the end of the rating change month; the raw anticipation measure is the bond spread change over the first five months of the total period expressed as a percent of the bond spread change over the entire total period; anticipation is capped at 100 percent and bounded below at zero; when the bond spread change over the total period is less than 20 basis points, anticipation is set at 100 percent. *High yield* refers to an indicator variable for whether the initial rating is lower than BBB-. *Fallen angel* refers to an indicator variable for whether the downgrade changes the bond's status from investment-grade to high-yield. *Number of bonds* and *Total par value* refer, respectively, to the issuer's number and total par value of bonds outstanding. *Magnitude of rating change* refers to the number of notches over which a migration occurred. *Total-period spread change* refers to the bond spread change over the six month total period. Industry dummy groups are banking and finance, basic industry, capital goods, communications and media, consumer goods, energy and utility, and services (the omitted category). Coefficient standard errors are reported in parentheses.

| Independent Variables | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Constant | 89** (1.77) | 91** (2.08) | 106** (5.92) | 95** (4.40) |
| Fallen angel | -20** (3.92) | -16** (3.99) | -16** (3.99) | -16** (4.02) |
| Log(number of bonds) | -5** (1.20) | -4** (1.17) | -- | -4** (1.19) |
| Log(total par value) | -- | -- | -3** (0.87) | -- |
| High yield | -18** (2.03) | -12** (2.08) | -12** (2.11) | -12** (2.15) |
| Magnitude of rating change | -- | -3** (1.05) | -3** (1.05) | -3** (1.05) |
| Total-period spread change | -- | -1** (0.08) | -1** (0.08) | -1** (0.08) |
| Total-period spread change squared | -- | 0** (0.00) | 0** (0.00) | 0** (0.00) |
| Quarterly dummies | No | No | No | Yes |
| Industry dummies | No | No | No | Yes |
| # of Observations | 1234 | 1234 | 1234 | 1234 |
| $R^2$ | 6.58% | 12.49% | 12.45% | 15.14% |
| F-Test | <0.0001 | <0.0001 | <0.0001 | <0.0001 |

\* indicates significance at the 10% level
\*\* indicates significance at the 5% level

**TABLE 3b:  Robustness of Evidence For Reputation Concerns:**
**Additional Downgrade Anticipation Regressions**

The dependent variable is anticipation.  Independent variables are defined as in the previous panel, and coefficient standard errors are reported in parentheses.  Column numbers identify new dependent variable restrictions and sample construction.  Specifically:
(1) Anticipation is calculated using a 12 month event window.
(2) The sampling restriction that rating chnages are not preceded by ratings changes in the previous six months is dropped.
(3) The assumption that when the total period spread change is less than 20 basis points, anticipation is 100 percent is replaced with the assumption that when the total period spread change is less than 10 basis points, anticipation is 100 percent.
(4) Observations with total period spread change less than 0 are dropped.
(5) All restrictions on the raw anticipation measure are dropped.

| Independent Variables | (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|---|
| Constant | 93** | 93** | 90** | 88** | -59 |
|  | (5.51) | (3.64) | (4.58) | (5.70) | (51.68) |
| Fallen angel | -9** | -16** | -12** | -21** | 19 |
|  | (4.51) | (3.36) | (4.19) | (5.08) | (47.27) |
| LOG(number of bonds) | -3** | -2** | -3** | -3** | 8 |
|  | (1.42) | (0.95) | (1.24) | (1.47) | (14.00) |
| High yield | -5* | -9** | -8** | -16** | 32 |
|  | (2.61) | (1.77) | (2.24) | (2.85) | (25.28) |
| Magnitude of rating change | -2* | -3** | -3** | -3** | -14 |
|  | (1.13) | (0.91) | (1.10) | (1.31) | (12.39) |
| Total-period spread change | -1** | 0** | -1** | 0** | -1 |
|  | (0.10) | (0.05) | (0.08) | (0.10) | (0.95) |
| Total-period spread change squared | 0** | 0** | 1** | 0** | 0 |
|  | (0.00) | (0.00) | (0.00) | (0.00) | (0.00) |
| Quarterly dummy variables | Yes | Yes | Yes | Yes | Yes |
| Industry dummy variables | Yes | Yes | Yes | Yes | Yes |
| # of Observations | 809 | 1772 | 1234 | 891 | 1234 |
| $R^2$ | 13.55% | 12.20% | 12.13% | 12.02% | 2.69 |
| F-Test | <0.0001 | <0.0001 | <0.0001 | <0.0001 | 0.4135 |

* indicates significance at the 10% level
** indicates significance at the 5% level

**TABLE 3c:  Evidence Of Reputaton Concerns At Moody's:**
**Downgrade Anticipation Regressions**

The construction of the dependent variable assumes a six month total period.  The sample is defined as downgrades by Moody's that are not preceded by another rating change from either rating agency in the five months leading up to the downgrade, and that coincide with at least a 20 basis point total-period spread change.  *Watch list* refers to a dummy variable for whether an issuer was put on watch for a downgrade in the five months leading up to the downgrade month.  *Moody's and S&P downgrade* refers to a dummy variable for whether both Moody's and Standard and Poor's downgraded the firm in the migration month. The other independent variables are defined as in the previous panels  Coefficient standard errors are reported in parentheses.

| Independent Variables | (1) | (2) | (3) |
|---|---|---|---|
| Constant | 69** | 84** | 65** |
|  | (5.17) | (12.16) | (9.53) |
| Fallen angel | -1 | -2 | 0 |
|  | (6.98) | (7.01) | (7.09) |
| Log(number of bonds) | -5** | -- | -5** |
|  | (2.37) |  | (2.45) |
| Log(total par value) | -- | -3* | -- |
|  |  | (1.73) |  |
| High yield | -8 | -7 | -8 |
|  | (5.05) | (5.13) | (5.21) |
| Watch List | 7* | 7* | 5 |
|  | (3.83) | (3.88) | (4.03) |
| Moody's and S&P downgrade | -8* | -8** | -4 |
|  | (4.03) | (4.04) | (4.18) |
| Magnitude of rating change | -1 | -1 | -2 |
|  | (2.07) | (2.08) | (2.09) |
| Total-period spread change | 0 | 0 | 0 |
|  | (0.29) | (0.29) | (0.31) |
| Total-period spread change squared | 0 | 0 | 0 |
|  | (0.00) | (0.00) | (0.00) |
| Quarterly dummy variables | No | No | Yes |
| Industry dummy variables | No | No | Yes |
| # of Observations | 372 | 372 | 372 |
| $R^2$ | 5.97% | 5.46% | 15.84% |
| F-Test | 0.0040 | 0.0085 | 0.0032 |

* indicates significance at the 10% level
** indicates significance at the 5% level

**TABLE 3d:  Evidence Of Reputaton Concerns At Standard and Poor's:**
**Downgrade Anticipation Regressions**

The construction of the dependent variable assumes a six month event window.  The sample is defined as downgrades by Standard and Poor's that are not preceded by another rating change from either rating agency in the five months leading up to the downgrade, and that coincide with at least a 20 basis point total-period spread change.  Independent variables are defined as in the previous panels.  Coefficient standard errors are reported in parentheses.

| Independent Variables | (1) | (2) | (3) |
|---|---|---|---|
| Constant | 71** | 85** | 70** |
| | (5.19) | (12.44) | (11.97) |
| Fallen angel | -19** | -19** | -18** |
| | (8.06) | (8.09) | (8.34) |
| Log(number of bonds) | -5* | -- | -5* |
| | (2.47) | | (2.61) |
| Log(total par value) | -- | -3 | -- |
| | | (1.80) | |
| High yield | -9* | -8 | -10* |
| | (5.00) | (5.04) | (5.21) |
| Watch list | 9** | 10** | 7* |
| | (3.86) | (3.90) | (3.92) |
| Moody's and S&P downgrade | -7* | -7* | -6 |
| | (3.99) | (3.99) | (4.28) |
| Magnitude of rating change | -2 | -2 | -3* |
| | (1.74) | (1.75) | (1.78) |
| Total-period spread change | 0 | 0 | 0 |
| | (0.18) | (0.18) | (0.19) |
| Total-period spread change squared | 0 | 0 | 0 |
| | (0.00) | (0.00) | (0.00) |
| Quarterly dummy variables | No | No | Yes |
| Industry dummy variables | No | No | Yes |
| # of Observations | 358 | 358 | 358 |
| $R^2$ | 7.19% | 6.89% | 15.59% |
| F-Test | 0.0009 | 0.0015 | 0.0052 |

* indicates significance at the 10% level
** indicates significance at the 5% level

TABLE 4:  Additional Evidence For Reputation Hypothesis:
Test of Upgrade Relative to Downgrade Anticipation

The construction of the dependent variable is as follows: The event window is the 6 months leading up to and through the end of the rating change month; the raw anticipation measure is the bond spread change over the first five months of the total period expressed as a percent of the bond spread change over the entire total period; anticipation is capped at 100 percent and bounded below at zero; when the bond spread change over the total period is less than 20 basis points, anticipation is set at 100 percent.  *Upgrade* refers to a dummy variable for whether the rating change is an upgrade.  *High yield* refers to an indicator variable for whether the initial rating is lower than BBB-.  *Fallen angel* refers to a dummy variable for whether the rating change is a downgrade and also changes the bond's status from investment grade to high yield.  *Risen devil* refers to a dummy variable for whether the rating chnage is an upgrade and also changes the bond's status from high yield to investment grade  *Number of bonds* refers to the issuer's number of bonds outstanding.  *Total-period spread change* refers to the absolute value of the total period spread change.  *Magnitude of rating change* refers to the number of notches over which a migration occurred.  Industry dummy groups are banking and finance, basic industry, capital goods, communications and media, consumer goods, energy and utility, and services (the omitted category).  Coefficient standard errors are reported in parentheses.

| Independent Variables | (1) | (2) |
|---|---|---|
| Constant | 76** | 91** |
|  | (0.90) | (3.51) |
| Upgrade | 10** | 7** |
|  | (1.45) | (1.53) |
| Fallen angel | -- | -7* |
|  |  | (3.71) |
| Risen devil | -- | -19** |
|  |  | (4.26) |
| High yield | -- | -11** |
|  |  | (1.61) |
| Number of bonds | -- | -2** |
|  |  | (0.86) |
| Magnitude of rating change | -- | -1 |
|  |  | (0.72) |
| Total-period spread change | -- | -1** |
|  |  | (0.08) |
| Total-period spread change squared | -- | 0** |
|  |  | (0.00) |
| Quarterly dummy variables | No | Yes |
| Industry dummy variables | No | Yes |
| # of Observations | 2007 | 2007 |
| $R^2$ | 2.18% | 12.33% |
| F-Test | <0.0001 | <0.0001 |

* indicates significance at the 10% level
** indicates significance at the 5% level

**TABLE 5: Is Reputation Only A Post-Enron Concern?**

The construction of the dependent variable is as follows: The event window is the 6 months leading up to and through the end of the rating change month; the raw anticipation measure is the bond spread change over the first five months of the total period expressed as a percent of the bond spread change over the total period; anticipation is capped at 100 percent and bounded below at zero; when the bond spread change over the total period is less than 20 basis points, anticipation is set at 100 percent. *High yield* refers to an indicator variable for whether the initial rating is lower than BBB-. *Fallen angel* refers to an indicator variable for whether the downgrade changes the bond's status from investment-grade to junk. *Log(number of bonds)* and *Log(total par value)* refer, respectively, to the issuer's number and total par value of bonds outstanding. *Magnitude of rating change* refers to the number of notches over which a migration occurred. *Total-period spread change* refers to the bond spread change over the six month total period. Industry dummy groups are banking and finance, basic industry, capital goods, communications and media, consumer goods, energy and utility, and services (the omitted category). Coefficient standard errors are reported in parentheses.

| | DOWNGRADES | |
| Independent Variables | (1) 1997-2001 | (2) 2002 |
| --- | --- | --- |
| Constant | 89** (4.17) | 86** (8.55) |
| Fallen angel | -21** (4.42) | 5 (9.84) |
| Log(number of bonds) | -4** (1.33) | -4* (2.65) |
| High yield | -13** (2.38) | -2 (5.39) |
| Magnitude of rating change | -2** (1.11) | -2 (3.62) |
| Total period spread change | -1** (0.10) | -1** (0.22) |
| Total period spread change squared | 0** (0.00) | 0** (0.00) |
| Quarterly dummy variables | Yes | Yes |
| Industry dummy variables | No | Yes |
| # of Observations | 1031 | 203 |
| $R^2$ | 13.01% | 17.99% |
| F-Test | <0.0001 | 0.0121 |

\* indicates significance at the 10% level
\*\* indicates significance at the 5% level

## TABLE 6:  THE PROBABILITY OF MIGRATION

The dependent variable is a dummy variable for whether the issuer has been downgraded in month t.  *Number of bonds* refers to the number of bonds outstanding for an issuer in month t.  *High-yield (t-6)* refers to a dummy variable for whether the initial rating at the beginning of a six month total period is greater than BBB-.  *Prior-period spread change* refers to the yield spread change from t-6 to t-1.  The model is estimated as a probit specification.  Sandard errors for the marginal effects are reported in parentheses.

| Independent Variables | DOWNGRADED IN MONTH t Marginal Effects In Percent | |
|---|---|---|
| | (1) | (2) |
| Constant | −4.5** | −4.4** |
| | (0.08) | (0.07) |
| High yield (t − 6) | 1.7** | 1.6** |
| | (0.07) | (0.07) |
| Log(number of bonds) | 0.3** | − |
| | (0.04) | |
| Greater than upper quartile number of bonds | − | 0.5** |
| | | (0.06) |
| Prior-period spread change | 0.3** | 0.3** |
| | (0.04) | (0.04) |
| High yield (t − 6) * Prior-period spread change | −0.3** | −0.3** |
| | (0.04) | (0.04) |
| # of observations | 32983 | 32983 |
| Log likelihood | −5118 | −5131 |
| Significance | (0.00) | (0.00) |

* indicates significance at the 10% level
** indicates significance at the 5% level

**TABLE 7:  OPACITY AND DELAY**

The construction of the dependent variable is as follows: The event window is the 6 months leading up to and through the end of the rating change month; the raw anticipation measure is the bond spread change over the first five months of the total period expressed as a percent of the bond spread change over the entire total period; anticipation is capped at 100 percent and bounded below at zero; when the bond spread change over the total period is less than 20 basis points, anticipation is set at 100 percent. *High yield* refers to an indicator variable for whether the initial rating is lower than BBB-. *Fallen angel* refers to an indicator variable for whether the downgrade changes the bond's status from investment-grade to high-yield. *Number of bonds* and *Total par value* refer, respectively, to the issuer's number and total par value of bonds outstanding.  *Magnitude of rating change* refers to the number of notches over which a migration occurred.  *Total-period spread change* refers to the bond spread change over the six month total period.  All models include quarterly and time dummies (not reported).  Industry dummy groups are banking and finance, basic industry, capital goods, communications and media, consumer goods, energy and utility, and services (the omitted category).  Coefficient standard errors are reported in parentheses.

| Independent Variables | DOWNGRADES | | | |
|---|---|---|---|---|
| | (1) | (2) | (3) | (4) |
| Constant | 86** | 78** | 66** | 80** |
| | (6.70) | (12.14) | (11.60) | (12.53) |
| Fallen Angel | -8 | -9* | -- | -9 |
| | (5.24) | (5.35) | | (5.44) |
| LOG(number of bonds) | -5** | -5** | -- | -5** |
| | (1.81) | (1.84) | | (1.89) |
| High yield | -8** | -9** | -- | -9** |
| | (3.29) | (3.59) | | (3.87) |
| Magnitude of rating change | -1 | -1 | -- | -1 |
| | (1.73) | (1.73) | | (1.74) |
| Total-period spread change | -1** | -1** | -1** | -1** |
| | (0.22) | (0.23) | (0.22) | (0.23) |
| Total-period spread change squared | 0** | 0** | 0** | 0** |
| | (0.00) | (0.00) | (0.00) | (0.00) |
| Tangible assets/total assets | -- | 8 | 9 | 8 |
| | | (10.81) | (10.85) | (10.91) |
| Income taxes paid/total assets | -- | -32 | 17 | -31 |
| | | (97.63) | (95.18) | (98.29) |
| Dividends paid/total assets | -- | -8079 | 271 | -8499 |
| | | (9543.70) | (9164.60) | (9768.10) |
| Goodwill/total assets | -- | 17 | 19 | 17 |
| | | (13.68) | (13.72) | (13.81) |
| Total assets | -- | -- | -- | 0 |
| | | | | (0.00) |
| Current assets/current liabilities | -- | -- | -- | 0 |
| | | | | (2.00) |
| Total debt/total assets | -- | -- | -- | -1 |
| | | | | (4.82) |
| Interest expense/operating income | -- | -- | -- | 0 |
| | | | | (0.56) |
| # of Observations | 555 | 555 | 555 | 555 |
| $R^2$ | 14.21% | 14.64% | 12.84% | 14.75% |
| F-Test | <0.0001 | <0.0001 | <0.0001 | <0.0001 |

* indicates significance at the 10% level
** indicates significance at the 5% level