# EXHIBIT G



Moody's Investors Service

Code of Professional Conduct
December 2005





Moody's Investors Service

# Table Of Contents

**I.  Definitions**                                                                     4

**II. What Are Credit Ratings?**                                                         7

**III. The Provisions**                                                                  8

    **1.  Quality and Integrity of the Rating Process**                            8

        **A.  Quality of the Rating Process**                                   8

        **B.  Monitoring and Updating**                                        10

        **C.  Integrity of the Rating Process**                                10

    **2.  Independence and Management of Conflicts of Interest**                   11

        **A.  General**                                                       11

        **B.  Procedures and Policies**                                        12

        **C.  Analyst and Employee Independence**                              13

    **3.  Responsibilities to Investors and Issuers**                              14

        **A.  Transparency of Timeliness of Ratings Disclosure**               14

        **B.  Treatment of Confidential Information**                          17

    **4.  Enforcement and Disclosure of the Code of Conduct and Communication with Market Participants**                                19

Financial markets should be efficient and fair to all market participants. Credit rating agencies play an important information role in these markets. Moody's Investors Service ("MIS") provides opinions in the form of credit ratings and related research about the creditworthiness of Issuers of securities and their financial obligations. Our credit ratings are forward-looking opinions that speak to the relative probability that principal and interest will be repaid in a timely manner. Given the vast amount of information available to investors today - some of it valuable, some of it not - MIS helps investors and others sift through this information and analyze the credit risks they face when lending to a particular borrower, or when purchasing an Issuer's debt and debt-like securities.[1] For public debt instruments, MIS makes our credit ratings available to investors globally on a contemporaneous basis, publicly and free of charge.

In order to enhance market understanding and confidence in MIS's credit ratings, MIS has adopted this Code of Professional Conduct (the **"MIS Code"** or **"Code"**). Through this Code, MIS seeks to protect the integrity of the rating process, to ensure that investors and Issuers are treated fairly, and to safeguard confidential information provided to us by Issuers. To use MIS ratings effectively, the market should be informed of both their attributes and limitations. It is our responsibility to be as transparent as practicable with respect to our:

- analytical methodologies;
- rating policies and practices; and
- overall track record.

This Code, as well as associated policies, is accessible on MIS's public website, moodys.com.[2]

The MIS Code is organized into three sections:[3]

- The Quality and Integrity of the Rating Process;
- Independence and the Avoidance of Conflicts of Interest; and,
- Responsibilities to the Investing Public and Issuers.

---

[1] MIS provides credit ratings for different types of debts and financial obligations - including, for example, private loans, publicly and privately traded debt securities, preferred shares and other securities that offer a fixed or variable rate of return. For simplicity's sake, the term "debt and debt-like securities" is used herein to refer to debt securities, preferred shares, and other financial obligations of these sorts.

[2] Although, in the interest of transparency, we have posted this Code and other related policies on moodys.com, MIS does not assume, as a result of such public disclosure, any responsibility or liability to any third party arising out of or relating to this Code or those policies. The MIS Code is not part of any contract with any third party, and no third party shall have any right to enforce any of its provisions. MIS also retains complete discretion to revise this Code at any time to reflect changes in MIS ratings policies and procedures or to address changes in market, legal, or regulatory circumstances.

[3] The MIS Code has been structured in this manner in order to track the International Organization of Securities Commissions' Code of Conduct Fundamentals for Credit Rating Agencies (the "IOSCO Code") as closely as possible.

Code of Professional Conduct   3

# I. Definitions

For the purposes of this document, the terms below are defined as follows:

- **International Organization of Securities Commissions' Code of Conduct Fundamentals for Credit Rating Agencies ("IOSCO Code")** is a framework Code of Conduct published on December 23, 2004 by the International Organization of Securities Commissions.  It was developed through cooperative efforts of international securities regulatory authorities, rating agencies, issuers and other market participants.  MIS has publicly endorsed the IOSCO Code.

- **International Organization of Securities Commissions' Principles Regarding the Activities of Credit Rating Agencies ("IOSCO Principles")** is a set of broad principles developed by the international regulatory community and published on September 25, 2003.  The IOSCO Principles is the document upon which the IOSCO Code is based.  MIS has publicly endorsed the IOSCO Principles.

- **MCO** refers to Moody's Corporation and is the listed parent company of MIS and all of its subsidiaries, including the group of companies that comprise MIS.

- **MIS** refers to Moody's Investors Service, Inc., and those subsidiaries or affiliated entities whose Credit Rating Services are under its operational control.

- **Credit Rating Services** are those products and services that are derived from the Credit Rating process and include, but are not limited to, the production and sale of Credit Ratings and related research, data products and related analytical tools.

- **Ancillary Services** are those products and services provided by MIS that are related to, but not necessarily derived from, the Credit Rating process.

- **Non-Rating Services** are those products and services that are unrelated to the Credit Rating process.

- An **Employee** is any individual who works for MIS in any capacity.

- An **Analyst** is an Employee whose primary function is participation in the Credit Rating analysis process.

- **Management** or **Managers** are those Employees who have personnel management responsibilities.

- **MIS Code of Professional Conduct ("MIS Code" or the "Code")** is this code of conduct for MIS. The MIS Code governs the conduct of:

     a) MIS; and

     b) all Employees whether employed by MIS in a full-time or part-time capacity.

- An **Issuer** is any entity that issues debt, a credit commitment or debt like securities.

- A **Credit Rating** is MIS's current opinion regarding the relative future creditworthiness of an entity, a credit commitment, a debt or debt-like security, as determined by a rating committee and expressed using its established Aaa to C alpha-numeric rating scale, or other Credit Rating scales as identified from time to time by MIS.

- **Unsolicited Credit Ratings** are those Credit Ratings published under the following two conditions:

     a) the Credit Rating is a first-time assignment related to a given Issuer; and,

     b) the Credit Rating was not requested by the Issuer, and was initiated by MIS.

- **Non-Participating Credit Ratings** are those published Credit Ratings for which the Issuer:

     a) has not participated in the rating process for the past 12 months; and,

     b) has declined MIS's offer to participate in the rating process on a going-forward basis.

- **Credit Rating Announcements** are those written communications, including press releases, that publicly announce to the market a new MIS Credit Rating or a change to an existing MIS Credit Rating.

- **Confidential Information** is any information received by MIS from an Issuer or its authorized agent in connection with the ratings process in respect of which MIS has received written notice specifically indicating the proprietary and confidential nature of the information. However, the term "Confidential Information" shall not include:

    a) information that is or later becomes publicly known;

    b) information available to MIS on a non-confidential basis prior to disclosure by the Issuer or its agents;

    c) information that becomes available to MIS on a nonconfidential basis from a third party not reasonably known by MIS to be bound by a confidentiality agreement with the Issuer or otherwise prohibited from making available such information;

    d) information developed independently by MIS without reference to the Confidential Information; or

    e) information that has been aggregated or transformed in such a way that it is no longer identified as relating to any individual Issuer.

- **The Office of Compliance** is the office designated by MIS to be responsible for MIS's and its Employees' compliance with the policies and procedures described in this Code.

- **The Credit Policy Committee** is the committee which formulates high level rating policies for each of the rating groups.  The composition of the committee may change from time to time in response to changing conditions.

- For the purposes of this Code, the terms **Security** and **Derivative** shall not include those securities listed as "exempt" in MIS's internal securities trading policies, including:

    a) holdings in widely diversified, open-end mutual funds and exchange traded funds or derivative securities thereof; and

    b) securities in a "blind trust" held for the benefit of an Employee or his/her family members.

# II. What Are Credit Ratings?

Credit Ratings are MIS's current opinions of the relative future creditworthiness of entities or instruments, not statements of current or historical fact.   Credit Ratings do not constitute investment or financial advice, and Credit Ratings are not recommendations to purchase, sell, or hold particular securities.   Credit Ratings do not comment on the suitability of an investment for any particular investor.   MIS issues its Credit Ratings with the expectation and understanding that each investor will make its own study and evaluation of each security that is under consideration for purchase, holding, or sale.

MIS Credit Ratings are based on information obtained by MIS from sources believed by MIS to be accurate and reliable, including but not limited to Issuers and their agents and advisors (e.g., accountants, legal counsel, and other experts).   MIS relies on Issuers and their agents to provide accurate, timely, and complete information.

MIS has no obligation to perform, and does not perform, due diligence with respect to the accuracy of information it receives or obtains in connection with the rating process.   MIS does not independently verify any such information.   Nor does MIS audit or otherwise undertake to determine that such information is complete.   Thus, in assigning a Credit Rating, MIS is in no way providing a guarantee or any kind of assurance with regard to the accuracy, timeliness, or completeness of factual information reflected, or contained, in the Credit Rating or any related MIS publication.

In the rating process, MIS maintains independence in its relationships with Issuers and other interested entities.   MIS does not have a fiduciary relationship with the Issuer whose security is being rated (or any other party).   Nor does MIS act as an advisor to the Issuers it rates.   MIS may comment on the potential credit implications of proposed structural elements of a security, but MIS does not participate in the actual structuring of any security under consideration for a Credit Rating.

As a matter of policy, and in keeping with its role as an independent and objective publisher of opinions, MIS retains complete editorial control over the content of its Credit Ratings, credit opinions, commentary, and all related publications.   MIS reserves the right at any time to suspend, modify, lower, raise or withdraw a Credit Rating, or place a rating on the watchlist in accordance with MIS policies and procedures.   MIS editorial control includes its right to decide whether, and when, to issue a Credit Rating or publish any information or commentary, except in those rare instances where the public disclosure of a Credit Rating has been contractually limited. (See Section 3.3 below.)

# III. The Provisions

## 1. Quality and Integrity of the Rating Process

As described in the IOSCO Principles, MIS will endeavor to provide forward-looking opinions on the relative creditworthiness of Issuers of debt and debt instruments in order to help reduce the information asymmetry that exists between those Issuers and potential purchasers of their debt.

### A. Quality of the Rating Process

1.1   Since Credit Ratings are probabilistic opinions about future creditworthiness, the performance of an individual Credit Rating opinion will not be judged on the basis of the individual outcome, but on whether the individual Credit Rating was formed pursuant to MIS's established processes. Where possible, the performance of Credit Ratings collectively will be evaluated on the basis of how they perform on a statistical basis ex post (e.g., default studies, accuracy ratios and stability measures).

1.2   MIS will develop and maintain rigorous and systematic rating methodologies. Where possible, resulting Credit Ratings will be periodically subjected to objective validation based on historical experience. The Credit Policy Committee will be responsible for monitoring the appropriateness and completeness of rating methodologies and procedures, and for approving any significant changes to MIS's rating methodologies and procedures.

1.3   In assessing an Issuer or obligation's creditworthiness, Analysts involved in the preparation or review of any Credit Rating action will use MIS's methodologies.  Analysts will apply a given methodology in a consistent manner, as determined by MIS.

1.4    Credit Ratings will be determined by rating committees and not by any individual Analyst.[4] Credit Ratings will reflect consideration of all information known, and believed to be relevant, by the applicable MIS Analyst and rating committee, in a manner generally consistent with MIS's published methodologies.  In formulating Credit Ratings, MIS will employ Analysts who, individually or collectively, have appropriate knowledge and experience in developing a rating opinion for the type of credit being analyzed.

1.5    MIS will maintain internal records to support its Credit Ratings in accordance with MIS's internal record retention policies and applicable law.

1.6    MIS and its Analysts will take steps to avoid issuing any credit analyses, Credit Ratings or reports that knowingly contain misrepresentations or are otherwise misleading as to the general creditworthiness of an Issuer or obligation.

1.7    MIS will invest resources sufficient to carry out high-quality credit assessments of Issuers or obligations.  When deciding whether to rate or continue rating an obligation or Issuer, MIS will assess whether it is able to devote sufficient personnel with appropriate skills to make a proper rating assessment, and whether its personnel likely will have access to sufficient information needed in order to make such an assessment.

1.8    MIS will organize its rating committees to promote continuity and avoid bias in the rating process.

---

4    Once a rating committee has determined the appropriate ratings to be assigned to an Issuer's debt classes (e.g., senior unsecured), or to debt issued under specific program documents, MIS will assign such ratings to such classes unless and until a subsequent rating committee determines otherwise.  Debt issuance by an Issuer or under specific program documents may be routine (e.g., refinance) or may be material to the Issuer's creditworthiness or the program structure. (e.g., a material change in the Issuer's leverage).  It is the responsibility of the Analyst to monitor the Issuer's debt issuance and leverage and changes to program documents and to bring material changes to the rating committee's attention.

## B. Monitoring and Updating

1.9   Except for Credit Ratings that clearly indicate they do not entail ongoing surveillance, once a Credit Rating is published, MIS will monitor the Credit Rating on an ongoing basis and update it by:

    1.9.1   periodically reviewing the creditworthiness of the Issuer or other relevant entity or debt or debt-like securities;

    1.9.2   initiating a review of the status of the Credit Rating upon becoming aware of any information that might reasonably be expected to result in a Credit Rating action (including termination of a Credit Rating), consistent with the applicable rating methodology; and

    1.9.3   updating on a timely basis the Credit Rating, as appropriate, based on the results of such review.

1.10   In accordance with MIS's published <u>Rating Withdrawal Policy,</u> MIS will announce via press release if it discontinues a public Credit Rating on an Issuer or obligation.

## C. Integrity of the Rating Process

1.11   MIS and its Employees will comply with all applicable laws and regulations governing their activities in the jurisdictions in which MIS operates.

1.12   MIS and its Employees will deal fairly and honestly with Issuers, investors, other market participants, and the public.

1.13   MIS will hold its Employees to high standards of integrity.   MIS will not knowingly employ any individuals with demonstrably compromised integrity.

1.14   MIS and its Analysts will not, either implicitly or explicitly, give any assurance or guarantee of a particular Credit Rating prior to a rating committee.   This does not preclude MIS from developing provisional assessments used in structured financings or similar transactions.

1.15  The Office of Compliance will be responsible for assessing adherence to the various procedural provisions of this Code.  The reporting line of the Office of Compliance will be independent of MIS's rating operations and the compensation of individuals in this function will be determined by individuals without Credit Ratings operation responsibilities at MIS.

1.16  While Employees are not expected to be experts in the law, they are expected to report activities of which they are aware that a reasonable person would question as a potential violation of the law or this Code.  Any MIS Manager or officer who receives such a report from an Employee is obligated to report it promptly to the Legal Department or the Office of Compliance, which will take appropriate action, as determined by the laws and regulations of the jurisdiction and the rules and guidelines set forth by MIS.  Employees may also report any such matters on a confidential basis by calling the MCO integrity hotline.

1.17  Management will prohibit retaliation by any Employee or by MIS itself against any Employee who, in good faith, reports a possible violation of the law or this Code.

## 2. Independence and Avoidance of Conflicts of Interest

### A. General

2.1  MIS will not forbear or refrain from taking a Credit Rating action based on the potential effect (economic, political, or otherwise) of the action on MIS, an Issuer, an investor, or other market participant.

2.2  MIS and its Analysts will use care and professional judgment to maintain both the substance and appearance of independence and objectivity.

2.3  The determination of a Credit Rating will be influenced only by factors relevant to the credit assessment.

2.4  The Credit Rating MIS assigns to an Issuer or obligation will not be affected by the existence of, or potential for, a business relationship between MIS (or its affiliates) and the Issuer (or its affiliates) or any other party, or the non-existence of any such relationship.

2.5   MIS will separate, operationally and legally, its Credit Rating Services and Analysts from any other businesses, including Non-Rating Services and consulting businesses, that may present a conflict of interest. For Ancillary Services that do not necessarily present conflicts of interest with MIS's Credit Rating Services, MIS will have in place procedures and mechanisms designed to minimize the likelihood that conflicts of interest will arise, or to appropriately manage those conflicts that may arise.

## B. Procedures and Policies

2.6   MIS will adopt written internal procedures and mechanisms to:

2.6.1  identify; and

2.6.2  eliminate, or manage and disclose, as appropriate, actual or potential conflicts of interest that may influence the opinions and analyses MIS makes or the judgment and analyses of Employees who have an influence on Credit Ratings decisions.

2.7   MIS's disclosures of known actual and potential conflicts of interest will be complete, timely, clear, concise, specific and prominent. Such disclosures will be made through moodys.com.

2.8   MIS will disclose the general nature of its compensation arrangements with rated entities. MIS does not provide Non-Rating Services and as such does not receive from rated Issuers compensation unrelated to its Credit Rating Services or Ancillary Services, such as compensation for consulting services. If MIS were to receive from a rated Issuer compensation for Non-Rating Services unrelated to its Credit Rating Services or Ancillary Services, MIS would disclose the proportion such Non-Rating fees constitute against the fees MIS receives from the Issuer for Credit Rating Services.

2.9   In accordance with MIS's internal securities trading policies, MIS and its Employees will not engage in any Securities or Derivatives trading that present conflicts of interest with MIS's rating activities.

2.10  In instances where rated entities (e.g., governments) have, or are simultaneously pursuing, affiliated oversight functions related to MIS, MIS will use different Employees to conduct its Credit Rating evaluations for such rated entities than those Employees involved in its oversight issues.

## C. Analyst and Employee Independence

2.11   Reporting lines for Employees and their compensation arrangements will be organized to eliminate or effectively manage actual and potential conflicts of interest.  Analysts will not be compensated or evaluated on the basis of the amount of revenue that MIS derives from Issuers that the Analyst rates or with which the Analyst regularly interacts.

2.12   MIS will not have Analysts who are directly involved in the rating process initiate, or participate in, discussions regarding fees or payments with any entity they rate.

2.13   In accordance with the MIS's <u>Core Principles for the Conduct of Rating Committee</u> no Employee will participate in or otherwise influence the determination of the Credit Rating of any particular entity or obligation if the Employee:

2.13.1   owns Securities or Derivatives of the rated entity;

2.13.2   owns Securities or Derivatives of any entity related to a rated entity, the ownership of which may cause or may be perceived as causing a conflict of interest;

2.13.3   has had a recent employment or other significant business relationship with the rated entity that may cause or may be perceived as causing a conflict of interest;

2.13.4   has an immediate relation (i.e., a spouse, partner, parent, child, or sibling) who currently works for the rated entity; or

2.13.5   has, or had, any other relationship with the rated entity or any related entity thereof that may cause or may be perceived as causing a conflict of interest.

2.14   In accordance with MIS's internal securities trading policies, Employees who are involved in the rating process (or their spouse, partner or minor children) are prohibited from buying, selling or engaging in any transaction in any Security or Derivative of any Security issued, guaranteed, or otherwise supported by any entity within such Employee's area of primary analytical responsibility.

2.15   Employees are prohibited from soliciting money, gifts or favors from anyone with whom MIS does business and are prohibited from accepting gifts or favors from such persons or entities other than those expressly sanctioned by the MCO Code of Business Conduct.

2.16   Any Analyst or Manager who becomes involved in any personal relationship that creates the potential for any real or apparent conflict of interest (including, for example, any personal relationship with an employee of a rated entity or agent of such entity within his or her area of analytic responsibility), will be required, subject to applicable law, to disclose such relationship to either their immediate supervisor, their department head, or a member of the Human Resources or Legal Department.   Based on the assessment of this information, MIS will take appropriate steps to mitigate the real or apparent conflict.

# 3.   Responsibilities to the Investing Public and Issuers

## A.   Transparency and Timeliness of Ratings Disclosure

3.1   In accordance with MIS's <u>Core Principles for the Conduct of Rating Committee</u> MIS will distribute as soon as practicable its Credit Rating opinions regarding the Issuers, debt and debt-like obligations it rates.

3.2   MIS will make Credit Rating actions on public debt obligations or public debt Issuers available to the public without cost.   Such Credit Rating actions will be posted on MIS's public website and through simultaneous transmission to the news media as well as via electronic or print subscription services. The public will be able to obtain a current public Credit Rating for any Issuer, debt or debt-like obligation without cost.   Rating actions and a brief explanation of the rationale for the rating action will remain on MIS's public website for a minimum of seven consecutive calendar days.

3.3   Upon the request of an Issuer, and at MIS's sole discretion, MIS may agree to keep a Credit Rating confidential.  However, if an Issuer or security - including a tranche of a structured finance security - already carries a public Credit Rating from MIS, all subsequent decisions to change or discontinue such Credit Rating will be made available to the public without cost.

3.4   MIS will publicly disclose and keep current its policies for distributing Credit Ratings, reports and updates.

3.5   In each of its Credit Rating Announcements, MIS will reference the last associated Credit Rating, if any.

3.6   MIS will publish sufficient information about its procedures, methodologies and any assumptions that deviate materially from information contained in the Issuer's published financial statements so that financial market professionals can understand how a Credit Rating assessment was made.

3.7   When issuing or revising a Credit Rating, MIS will explain in the Credit Rating Announcement the key elements underlying the Credit Rating.

3.8   In accordance with MIS's <u>Core Principles for the Conduct of Rating Committee</u> where feasible and appropriate, prior to issuing or revising a Credit Rating, MIS will inform the Issuer of the critical information and principal considerations upon which the Credit Rating is based and afford the Issuer an opportunity to submit additional factual information not previously available to the Issuer, or clarify any likely factual misperceptions in order to produce a well-informed Credit Rating.  MIS will duly evaluate the Issuer's response.  Where in particular circumstances MIS has not informed the Issuer prior to issuing or revising a Credit Rating, MIS will inform the Issuer as soon as practicable thereafter and, generally, will explain the reason for the delay.

3.9   Where not precluded by specific circumstances, MIS will allow the Issuer a brief period of time, which may vary depending on the circumstances, to notify MIS of the Issuer's desire to appeal the Credit Rating decision. Appeals must be based on information not previously available to the Issuer or MIS.

3.10   In order to promote transparency and to enable the market to best judge the aggregate performance of Credit Ratings on debt instruments, where possible, MIS will publish sufficient information about its historical default rates by rating category, the transitions between rating categories, and periodic performance metrics so that financial market professionals can understand the historical performance of rating categories.

3.11   In order to promote transparency, and in accordance with MIS's Policy on Designation of Ratings in Which the Issuer Has Not Participated, MIS will publicly designate and disclose Non Participating Credit Ratings.

3.12   MIS has not assigned Unsolicited Credit Ratings in the recent past. However, as a publisher of opinions about credit, MIS reserves the right in the future to issue Unsolicited Credit Ratings if MIS believes: (i) there is a meaningful credit market or investor interest served by the publication of such a rating; and (ii) it has sufficient information to support adequate analysis and, if applicable, ongoing surveillance. In accordance with MIS's Policy on Designating Unsolicited Credit Ratings, when a Credit Rating is an Unsolicited Credit Rating, MIS will not seek or accept remuneration for its analytical services from the Issuer for at least one year after the publication of such rating.

3.13   MIS will publicly disclose via press release and posting on moodys.com any material modifications to its rating methodologies and related significant practices, procedures, and processes. Where feasible and appropriate, disclosure of such material modifications will be made subject to a "request for comment" from market participants prior to their implementation.  MIS will carefully consider the various uses of Credit Ratings before modifying its rating methodologies, practices, procedures and processes.

3.14   As a publisher of credit research related to its Credit Ratings, MIS will seek to provide clear, accurate, transparent and high quality research about rated Issuers and issues.  Research sales shall be separated from the research and rating process in ways that help protect the latter activities from improper conflicts of interest. As provided elsewhere in this section, Confidential Information and non-public information about MIS's future rating actions may not be selectively disclosed to research subscribers or others.

## B. Treatment of Confidential Information

3.15  MIS and its Employees will:

    3.15.1  Preserve the confidentiality of Confidential Information communicated to them by an Issuer or its agent; and

    3.15.2  Unless they have received permission from the Issuer, refrain from publicly disclosing Confidential Information in any manner, including in Credit Rating Announcements, or through research, conferences, or conversations with investors, other issuers, or any other persons.

    3.15.3  Notwithstanding the foregoing, MIS shall not be restricted from:

        a) publishing any Credit Rating or other opinion regarding a particular security or transaction which incorporates Confidential Information without specifically disclosing it;

        b) using third party contractors or agents bound by appropriate confidentiality obligations to assist in any aspect of the ratings process or related business activities; or

        c) disclosing information as required by any applicable law, rule, or regulation, or at the request of any governmental agency or authority;

        d) disclosing information to third parties with an independent legal right to receive it.

3.16  MIS will use Confidential Information only for purposes related to its Credit Rating Services.

3.17  Employees will take all reasonable measures to protect all property and records belonging to or in possession of MIS from fraud, theft or misuse.

3.18  In accordance with MIS's internal securities trading policies, Employees will be prohibited from engaging in transactions in Securities and Derivatives when they possess Confidential Information concerning the Issuer of such Securities.

3.19  Employees will familiarize themselves with MIS's internal securities trading policies, and periodically certify their compliance as required by such policies.

3.20  Employees will not disclose any non-public information about rating opinions or possible future rating actions of MIS, except to the Issuer or its designated agents.

3.21  Employees will not share Confidential Information entrusted to MIS with employees of any affiliated entities except to the extent such employees are acting as agents of MIS with respect to the ratings process, and are bound by appropriate confidentiality obligations.  Employees will not share Confidential Information within MIS except on a "reason-to-know" basis.

3.22  Employees will not use or share Confidential Information for the purpose of trading securities, or for any other purpose except as described in Provision 3.16 of this Code.

3.22.1 Except as required under any applicable law, rule, regulation, or at the proper request of any governmental agency or authority, MIS's internal deliberations and the identities of persons who participated in a rating committee will be kept strictly confidential and will not be disclosed to persons outside of MIS.

# 4. Enforcement and Disclosure of the Code of Conduct and Communication with Market Participants

4.1 Management will be responsible for the implementation and the enforcement of the MIS Code. The Office of Compliance will annually review and assess the efficacy of such implementation and enforcement.

4.2 The provisions of this Code are derived from the IOSCO Principles and the IOSCO Code. However, MIS made certain modifications to more closely correspond with MIS's business mode and practices. Such modifications will be specifically identified and explained in a report that MIS will publish annually outlining compliance with the MIS Code and explaining any deviations that may exist between the MIS Code and the IOSCO Code.

4.3 With respect to the subjective standards that are incorporated in this Code, MIS will use its good faith efforts in implementing such standards.

4.4 This Code, and any modifications made to it going forward, will be made public and readily accessible via moodys.com.

4.5 MIS's Communications Department is charged with communicating with market participants and the public about any questions, concerns or complaints that MIS may receive about MIS's adherence with the Code. The objective of this function is to help ensure that MIS officers and its Management have adequate market intelligence when setting MIS's policies.

New York • Tokyo • London • Paris • Sydney • San Francisco • Frankfurt • Madrid • Dallas • Toronto
Hong Kong • Singapore • Limassol • São Paulo • Milan • Mexico City • Beijing • Buenos Aires • Taipei
Chicago • Johannesburg • Jersey City • Boston • Seoul • Moscow • Mumbai • Prague • Jakarta • Dubai

**Moody's Investors Service**

# EXHIBIT H

Page 1

```
 1

 2

 3      IN RE:

 4      TESTIMONY OF FIRREA INVESTIGATION

 5

 6

 7

 8              Statement of JAMES HOTCHKISS, taken before

 9      Deborah Habian, Certified Shorthand Reporter and a

10      Notary Public in and for the County of Cook, State of

11      Illinois, on Wednesday, July 18, 2012, at 10:30 a.m.

12      at First Midwest Bank, One Pierce Place, Suite 1500,

13      Itasca, Illinois.

14

15

16

17

18

19

20

21

22

23

24

25
```

DOJ-FIRREA-TRS-00005586

Page 2

1    A P P E A R A N C E S:

2

3         UNITED STATES DEPARTMENT OF JUSTICE

4         OFFICE OF CONSUMER LITIGATION

5         BY:  GEOFFREY GRABER, ESQ.

6              MICHAEL NASH, INVESTIGATOR

7         450 Fifth Street, N.W.

8         Room 6400 South

9         Washington, D.C.  20001-2739

10        (202) 305-3630

11              on behalf of the Department of Justice;

12

13        PAUL R. SIMPSON, ESQ.

14        GENERAL COUNSEL, FIRST MIDWEST BANK

15        One Pierce Place, Suite 1500

16        Itasca, Illinois  60143-2682

17        (630) 875-7240

18              on behalf of First Midwest Bank

19              and James Hotchkiss.

20

21

22

23

24

25

DOJ-FIRREA-TRS-00005587

James Hotchkiss

Itasca, IL

July 18, 2012

Page 9

1    CDOs?

2              A.    Yes, we did.

3              Q.    And what were the names of those CDOs?

4              A.    In April of '05 we bought Duke Funding

5    Ltd. and July of '05 a piece of Gemstone CDO, Ltd. and

6    June of '05 a piece of Belhaven ABS CDO, Ltd.

7              Q.    And were the bonds purchased in connection

8    with those CDOs rated by credit agencies?

9              A.    Yes.

10             Q.    And were they rated by Standard & Poors?

11             A.    Yes, they were.

12             Q.    And what were the ratings?

13             A.    The ratings on Standard & Poors went from

14   A to A-.

15             Q.    And did you rely in part on the credit

16   rating on those CDOs when making your investment

17   recommendation?

18             A.    Yes, we did.

19             Q.    And between 2005 and 2007 was it your

20   understanding that S&P was a neutral and objective and

21   independent party to the CDOs purchased by First

22   Midwest Bank?

23             A.    Yes, we assumed that.

24             Q.    And was it your understanding that S&P was

25   objective and independent in the way it issued credit

James Hotchkiss                                                          July 18, 2012
                              Itasca, IL

                                                              Page 10

1    ratings, including ratings on CDOs?

2            A.    Yes, that was my understanding.

3            Q.    Let me show you a document, Mr. Hotchkiss.

4                      (Exhibit No. 1 marked for ID)

5    BY MR. GRABER:

6            Q.    Handing you and your counsel what's been

7    marked at Exhibit No. 1.  And for the record, this is

8    a document entitled "Standard & Poors Rating Services

9    Code of Conduct" dated October 2005.

10                     And if I could direct your attention,

11   Mr. Hotchkiss, to page 4 of the document.

12           MR. SIMPSON:  Page number 4 or 004?

13           MR. GRABER:  Internal 4.

14           MR. SIMPSON:  Okay.

15   BY MR. GRABER:

16           Q.    Under "Integrity of the Ratings Process",

17   do you see that there?

18           A.    Yes, I do.

19           Q.    And you see Section 1.12?

20           A.    Um-hum.

21           Q.    And it says, "Rating Services and its

22   employees shall deal fairly and honestly with issuers

23   and other market participants and the public."

24                     Do you see that?

25           A.    Yes.

Page 11

1        Q.    Okay.   Is that statement consistent with

2    your understanding in 2005 to 2007 of S&P's

3    representations regarding its objectivity and

4    independence?

5        A.    Yes.

6        Q.    And was that understanding an important

7    and significant factor in making your investment

8    recommendation on behalf of First Midwest Bank?

9        A.    Yes, it was.

10       Q.    Okay.   Let me direct your attention now to

11   page 5, the following page.   And you see there under

12   "Independence and Avoidance of Conflicts of Interest"?

13       A.    Yes.

14       Q.    And it says under 2.1, "Ratings Services

15   shall not forebear or refrain from taking a rating

16   action, if appropriate, based on the potential effect,

17   economic, political or otherwise, of the rating action

18   on Rating Services, an issuer, an investor or other

19   market participant."

20              Do you see that?

21       A.    Yes.

22       Q.    Okay.   Is that a statement consistent with

23   your understanding in 2005 to 2007 of S&P's

24   representations regarding its objectivity and

25   independence?

Page 36

```
 1                    CERTIFICATE OF DEPONENT

 2

 3      I hereby certify that I have read and examined the

 4      foregoing transcript, and the same is a true and

 5      accurate record of the testimony given by me.

 6      Any additions or corrections that I feel are

 7      necessary, I will attach on a separate sheet of

 8      paper to the original transcript.

 9

10                        _____

11                           Signature of Deponent

12

13      I hereby certify that the individual representing

14      himself/herself to be the above-named individual,

15      appeared before me this _____ day of _____,

16      2012, and executed the above certificate in my

17      presence.

18

19                        _____

20                           NOTARY PUBLIC IN AND FOR

21

22                        _____

23                           County Name

24

25      MY COMMISSION EXPIRES:
```

James Hotchkiss

Itasca, IL

July 18, 2012

Page 37

```
 1    STATE OF ILLINOIS.)
                        )    ss:
 2    COUNTY OF C O O K  )
                I, Deborah Habian, a Certified Shorthand
 3    Reporter within and for the State of Illinois, do
 4    hereby certify:
 5                That previous to the commencement of the
 6    examination of the witness, the witness was duly sworn
 7    to testify the whole truth concerning the matters
 8    herein;
 9                That the foregoing deposition was reported
10    stenographically by me, was thereafter
11    reduced to printed transcript by me, and constitutes a
12    true record of the testimony given and the proceedings
13    had;
                That the said deposition was taken before
14    me at the time and place specified;
15                That the reading and signing by the
16    witness of the deposition transcript was agreed upon
17    as stated herein;
                That I am not a relative or employee of
18    attorney or counsel, nor a relative or employee of
19    such attorney or counsel for any of the parties
20    hereto, nor interested directly or
21    indirectly in the outcome of this action.
                IN WITNESS WHEREOF, I do hereunto set my
22    hand this ____ day of _____, 20___.
23
24                DEBORAH HABIAN, CSR, RMR, CRR, CBC
               Notary Public
25               CSR No. 084-02432
```

# EXHIBIT I

---------------------------------------------------

Examination of ALEXANDER CRAIG

Pursuant to Subpoena

---------------------------------------------------

June 28, 2012

3:50 p.m.

26 Federal Plaza

New York, New York

Reported by:

Susan B. Ratner, a Shorthand Reporter and

Notary Public of the State of New York

REPORTERS CENTRAL, LLC * 212-594-3582

DOJ-FIRREA-TRS-00002108

```
 1
 2   A P P E A R A N C E S:
 3
 4   UNITED STATES DEPARTMENT OF JUSTICE
 5   Civil Division
 6        950 Pennsylvania Avenue, N.W.
 7        Washington, D.C. 20530
 8   BY:   GEOFFREY A. GRABER, ESQ.
 9
10   UNITED STATES DEPARTMENT OF JUSTICE
11   Consumer Protection Branch
12        450 Fifth Street N.W., Room 6407
13        Washington, D.C. 20001
14   BY:   JAMES T. NELSON, ESQ.
15
16   ARTHUR H. SALMAN, ESQ.
17   Attorney for the Witness
18        Group Vice President
19        Deputy General Counsel
20        M&T Bank
21        One M&T Plaza - 12th Floor
22        Buffalo, New York 14203
23
24
25
```

1                         A. Craig

2        Q.   Did the credit ratings that were attached

3   to those bonds that M&T purchased lead you to

4   believe that the bonds were relatively safe?

5        A.   Yes.

6   FURTHER EXAMINATION

7   BY MR. NELSON:

8        Q.   Did M&T policy require you to require the

9   bonds to be rated by more than one credit rating

10  agency?

11       A.   No.

12  FURTHER EXAMINATION

13  BY MR. GRABER:

14       Q.   In 2007, was it your understanding that

15  Standard & Poor's, or S&P, was a neutral party to

16  the CDOs purchased by M&T?

17       A.   Yes.

18       Q.   Was it your understanding that S&P was

19  objective and independent in the way that it issued

20  credit ratings, including ratings on CDOs?

21       A.   Yes.

22       Q.   Mr. Craig, I want to show you a few

23  documents here with respect to the question that I

24  just asked.

25            (Government Exhibit 1 (on Craig

REPORTERS CENTRAL, LLC * 212-594-3582

```
 1              A. Craig
 2        examination), 12-page document, "Testimony
 3        of Kathleen A. Corbet President of Standard
 4        & Poor's, a Division of the McGraw-Hill
 5        Companies, Inc., Before the Committee on
 6        Banking, Housing and Urban Affairs, United
 7        States Senate, February 8, 2005," Bates
 8        stamped Nos. S&P DOJ 0068378 through
 9        S&P DOJ 0068389, marked for identification,
10        as of this date.)
11  BY MR. GRABER:
12        Q.   I am handing you what has been marked as
13  Government Exhibit 1.
14        MR. GRABER:  I should state for the
15        record that you are represented by counsel
16        here.
17        You should state your presence on the
18        record.
19        MR. SALMAN:  Arthur Salman, S-a-l-m-a-n.
20        MR. GRABER:  Just for the record, I am
21        handing the exhibit and a copy to you and
22        your counsel.
23        Q.   If you could take a look at that
24  document for a moment, I will direct your attention
25  to the portion that I am going to ask you about.
```

DOJ-FIRREA-TRS-00002117

```
 1                    A. Craig
 2            MR. GRABER:  Just for the record, this is
 3        a document entitled "Testimony of Kathleen A.
 4        Corbet President of Standard & Poor's, a
 5        Division of the McGraw-Hill Companies, Inc.,
 6        Before the Committee on Banking, Housing
 7        and Urban Affairs, United States Senate,
 8        February 8, 2005."
 9        Q.   I direct your attention to page 8, and
10   to the language toward the bottom of the page, just
11   before the bullets, where it says, "...Our mission
12   to provide high-quality, objective and rigorous
13   analytical information to the marketplace."
14            Do you see that?
15        A.   Yes.
16        Q.   Is that statement consistent with your
17   understanding of the way Standard & Poor's
18   conducted its business and issued credit ratings?
19        A.   It is.
20            (Government Exhibit 2 (on Craig
21        examination), 16-page document, "Standard &
22        Poor's Ratings Services Code of Conduct,"
23        dated October 2005, Bates stamped Nos.
24        S&P DOJ 0466703, S&P DOJ 0466703.0002
25        through S&P DOJ 0466704.0016, marked for
```

REPORTERS CENTRAL, LLC * 212-594-3582

```
 1                    A. Craig
 2  its business and arrived at its credit ratings?
 3      A.   It is.
 4      Q.   And the way that it monitored credit
 5  ratings, right?
 6      A.   Yes.
 7      Q.   If you go to page 10, do you see
 8  "Independence of Rating Decisions" there?
 9      A.   Yes.
10      Q.   The first paragraph says, "It is a
11  central tenet of Ratings Services that its ratings
12  decisions not be influenced by the fact that Ratings
13  Services receives fees from issuers."
14           Do you see that?
15      A.   Yes.
16      Q.   Is that consistent with your
17  understanding in 2007 as to the way S&P conducted
18  its business and arrived at credit ratings?
19      A.   It is.
20      Q.   Was your understanding in this regard an
21  important and significant factor in your decision to
22  rely, in part, on S&P's ratings?
23      A.   It was.
24      Q.   I am going to show you some additional
25  documents, Mr. Craig.
```

REPORTERS CENTRAL, LLC * 212-594-3582

```
 1
 2                    C E R T I F I C A T E
 3   STATE OF NEW YORK    )
 4                        : ss.
 5   COUNTY OF NEW YORK   )
 6
 7            I, SUSAN B. RATNER, a Shorthand Reporter
 8   and a Notary Public within and for the State of
 9   New York, do hereby certify that the foregoing
10   examination of ALEXANDER CRAIG was taken before me
11   on the 28th day of June, 2012;
12            That the said witness was duly sworn
13   before the commencement of his testimony; that the
14   said testimony was taken stenographically by me and
15   then transcribed.
16            I further certify that I am not related
17   by blood or marriage to any of the parties to this
18   action or interested directly or indirectly in the
19   matter in controversy; nor am I in the employ of any
20   of the counsel in this action.
21            IN WITNESS WHEREOF, I have hereunto set
22   my hand this 3rd day of July, 2012.
23
24
25                    SUSAN B. RATNER
```

REPORTERS CENTRAL, LLC * 212-594-3582

# EXHIBIT J

Page 1

1

2               FIRREA INVESTIGATIVE MATTER

3                    Phoenix, Arizona

4                     July 19, 2012

5

6

7

8          Deposition of Dale Gibbons, a witness herein,

9    called for examination by counsel for the Government in

10   the above-entitled matter, the witness having been duly

11   sworn, taken at the offices of Western Alliance

12   Bancorporation, One East Washington Street, Suite 1400,

13   Phoenix, Arizona at 10:00 a.m., on Thursday, July 19,

14   2012, and the proceedings being taken down by Stenotype by

15   MARK MILLER, RMR and transcribed under his direction.

16

17

18                          ALDERSON COURT REPORTING

19                          1155 Connecticut Ave., NW

20                               Suite 200

21                          Washington, DC 20036

22                     Telephone: 1-800-FOR DEPO

23                          Fax:  866-304-4621

24

25

DOJ-FIRREA-TRS-00003155

Dale Gibbons                                                      July 19, 2012
                        Phoenix, AZ

                                                              Page 2

1    APPEARANCES:

2

3    For the U.S. Department of Justice:

4         U.S. DEPARTMENT OF JUSTICE

5         Office of Consumer Litigation

6         By:  Mr. Geoffrey Graber, Esq.

7              Mr. Michael A. Nash, CPA, CFE

8         450 Fifth Street, N.W.

9         Room 6407

10        Washington, DC 20001-2739

11

12

13   For Western Alliance Bancorporation:

14        Mr. Randall S. Theisen

15        One East Washington Street, Suite 1400,

16        Phoenix, Arizona 85004

17

18

19

20

21

22

23

24

25

DOJ-FIRREA-TRS-00003156

Dale Gibbons                                                                July 19, 2012
                              Phoenix, AZ

                                                              Page 5

1    Alliance Bancorp?

2         A.    In May of 2003.

3         Q.    And what was the bank called back then?

4         A.    BankWest Nevada Corporation.

5         Q.    And can you just tell me generally what positions

6    you have held at the bank?

7         A.    Yes.   I was chief financial officer for Bank of

8    Nevada and for BankWest Nevada Corporation and -- and now

9    am chief CFO for Western Alliance Bancorporation and still

10   executive vice president of Bank of Nevada, which is the

11   successor to BankWest.

12        Q.    In 2007 what position did you hold?

13        A.    I was chief financial officer for Western

14   Alliance Bancorporation and head of EVP Finance for Bank

15   of Nevada.

16        Q.    In 2007 did you have responsibility for making

17   recommendations with respect to certain investments?

18        A.    Yes.

19        Q.    Did that include the purchase of collateralized

20   debt obligations or CDOs?

21        A.    Yes.

22        Q.    And can you just outline for us, very generally,

23   what were your responsibilities in that regard?

24        A.    I was responsible for evaluating the efficacy of

25   any, you know, investment purchases that -- you know,

DOJ-FIRREA-TRS-00003159

Page 9

1   with these, but it was a matter of basis points what would

2   be expected losses to be.

3      Q.   In 2007 was it your understanding that S&P was a

4   neutral party to the CDOs purchased by Bank of Nevada?

5      A.   Yes.

6      Q.   And was it your understanding that S&P was

7   objective and independent in the way it issued credit

8   ratings, including ratings on CDOs?

9      A.   Yes.

10     Q.   I show you some documents now.

11              I am showing you what has been marked as

12   Exhibit 1.  For the record, this is a document entitled

13   S&P Ratings Services Code of Conduct dated October 2005.

14              And if I could draw your attention to page

15   4.

16     A.   Okay.

17     Q.   Do you see under subpart C Integrity of the

18   Rating Process?

19              Are you there?

20     A.   Yes.

21     Q.   You see under 1.12 it states Ratings Services and

22   its employees shall deal fairly and honestly with issuers,

23   investors, other market participants and the public?

24              Do you see that?

25     A.   I do see that.

DOJ-FIRREA-TRS-00003163

Page 10

1       Q.    Is that statement consistent with your

2    understanding in 2007 of S&P's representations regarding

3    its objectivity and independence?

4       A.    It is.

5       Q.    And was that understanding an important and

6    significant factor in making your investment

7    recommendation on behalf of Bank of Nevada?

8       A.    Yes.   Integrity of the process and reliability on

9    what information we are receiving from the rating agencies

10   is imperative to be able to rely upon.

11      Q.    Let me draw your attention to the next page, page

12   5.

13      A.    Okay.

14      Q.    You see there in the middle of the page there is

15   Independence and Avoidance of Conflicts of Interest?

16      A.    Yes.

17      Q.    Do you see under 2.1 -- let me read that for you.

18   It states, "Ratings Services shall not forbear or refrain

19   from taking a Rating Action, if appropriate, based on the

20   potential effect (economic, political, or otherwise) of

21   the Rating Action on Ratings Services, an issuer, an

22   investor or other market participant."

23                  Do you see that?

24      A.    I do.

25      Q.    And is that statement consistent with your

Dale Gibbons                                                                July 19, 2012
                              Phoenix, AZ

Page 34

```
 1                    CERTIFICATE OF DEPONENT

 2

 3        I hereby certify that I have read and examined the

 4   foregoing transcript, and the same is a true and

 5   accurate record of the testimony given by me.

 6   Any additions or corrections that I feel are

 7   necessary, I will attach on a separate sheet of

 8   paper to the original transcript.

 9

10                         _____

11                         Signature of Deponent

12

13        I hereby certify that the individual representing

14   himself/herself to be the above-named individual,

15   appeared before me this _____ day of _____,

16   2012, and executed the above certificate in my

17   presence.

18

19                         _____

20                         NOTARY PUBLIC IN AND FOR

21

22                         _____

23                         County Name

24

25   MY COMMISSION EXPIRES:
```

Alderson Reporting Company
1-800-FOR-DEPO

DOJ-FIRREA-TRS-00003188

Page 35

1   STATE OF ARIZONA          )

2   COUNTY OF MARICOPA        )

3            BE IT KNOWN that the foregoing deposition

4   was taken by me pursuant to stipulation of counsel; that I

5   was then and there a Certified Reporter in and for the

6   County of Maricopa, State of Arizona, and by virtue

7   thereof authorized to administer an oath; that the witness

8   before testifying was duly sworn by me to testify to the

9   whole truth; that the questions propounded by counsel and

10  the answers of the witness thereto were taken down by me

11  in shorthand and thereafter transcribed into typewriting

12  under my direction; that the foregoing pages are a full,

13  true and accurate transcript of all proceedings and

14  testimony had and adduced upon the taking of said

15  deposition, all to the best of my skill and ability.

16            I FURTHER CERTIFY that I am in no way

17  related to nor employed by any parties hereto nor am I in

18  any way interested in the outcome hereof.

19            DATED at Phoenix, Arizona, this 22nd day of

20  July, 2012.

21

22                              Mark Miller

23                              CCR # 50474

24

25

# EXHIBIT K

```
 1  STUART DELERY
    Acting Assistant Attorney General
 2  MAAME EWUSI-MENSAH FRIMPONG
       (CA Bar No. 222986)
 3  ARTHUR R. GOLDBERG
    MICHAEL S. BLUME
 4  JAMES T. NELSON
    BRADLEY COHEN
 5  JENNIE KNEEDLER
    SONDRA L. MILLS (CA Bar No. 090723)
 6  THOMAS D. ZIMPLEMAN
    United States Department of Justice, Civil Division
 7     P.O. Box 261, Ben Franklin Station
       Washington, D.C. 20044
 8     Telephone: (202) 616-2376
       Facsimile: (202) 514-8742
 9     Email: James.Nelson2@usdoj.gov

10  ANDRÉ BIROTTE JR.
    United States Attorney
11  GEORGE S. CARDONA (CA Bar No. 135439)
    LEON W. WEIDMAN (CA Bar No. 104078)
12  ANOIEL KHORSHID (CA Bar No. 223912)
    RICHARD E. ROBINSON (CA Bar No. 090840)
13  Assistant United States Attorneys
       Room 7516 Federal Building
14     300 N. Los Angeles St.
       Los Angeles, California 90012
15     Telephone: (213) 894-8323/6086
       Facsimile: (213) 894-7819 [Main]
16     Email: George.S.Cardona@usdoj.gov / Anoiel.Khorshid@usdoj.gov

17  Attorneys for United States of America

18
                    UNITED STATES DISTRICT COURT
19
                 FOR THE CENTRAL DISTRICT OF CALIFORNIA
20
    UNITED STATES OF AMERICA,        No. 2:13-cv-00779-DOC-JCG
21
             Plaintiff,              SECOND SUPPLEMENT TO PLAINTIFF
22                                   UNITED STATES' INITIAL DISCLOSURES
               v.                    PURSUANT TO FEDERAL RULE OF CIVIL
23                                   PROCEDURE 26(a)(1)(A); EXHIBITS A
    MCGRAW-HILL COMPANIES, INC.,     AND B
24  and STANDARD & POOR'S
    FINANCIAL SERVICES LLC,
25
             Defendants.
26

27

28
```

1    On May 9, 2013, plaintiff, United States of America (the

2    "government") served its Initial Disclosures Pursuant to Federal

3    Rule of Civil Procedures 26(a)(1)(A) ("Government's Initial

4    Disclosures") on counsel for defendants McGraw-Hill Companies, Inc.,

5    and Standard & Poor's Financial Services LLC (in both the

6    Government's Initial Disclosures and hereafter collectively referred

7    to as "S&P").   On May 28, 2013, the government served its Supplement

8    To Plaintiff United States' Initial Disclosures Pursuant To Federal

9    Rule Of Civil Procedure 26(a)(1)(A) ("Government's Supplemental

10   Disclosures") on counsel for S&P.   In accordance with the

11   Supplemental Joint Report Of Parties Pursuant To Federal Rule Of

12   Civil Procedure 26(f) filed with the court on July 26, 2013, and

13   pursuant to the court's Initial Scheduling Order issued August 2,

14   2013, the government now provides this second supplement to the

15   Government's Initial Disclosures.

16   **A.   LIMITED SET OF RMBS AND CDOS**

17       Attached as Exhibit A is a spreadsheet identifying the RMBS

18   that will form the basis for the government's proof at trial.   With

19   respect to the identified RMBS, the government will rely for its

20   proof at trial on the particular tranches identified by CUSIP number

21   in attached Exhibit A, all of which were purchased by the identified

22   financial institutions, and all of which were rated AAA by S&P at

23   the time of their purchase.[1]

24       Attached as Exhibit B is a spreadsheet identifying the CDOs

25   that will form the basis for the government's proof at trial.   With

26   _____

27   [1] Both Exhibit A and Exhibit B are marked "Confidential –
     Subject to Protective Order" because they contain purchaser and loss

28   information that has been produced with a request for confidential
     treatment.

2

1   respect to CDOs, as alleged in the Complaint (paragraphs 79-90), and

2   as will be established by proof at trial, ratings were issued to all

3   of the tranches of the CDO at the same time, in a single rating

4   letter issued by S&P, based on S&P's analysis of all of the CDO's

5   tranches, including in particular the credit support provided by

6   lower tranches (including unrated subordinate and/or income

7   tranches) for those tranches above them.  As a result, for each of

8   the listed CDOs, all of the particular CDO's tranches, both rated

9   and unrated, will provide a basis for the government's proof at

10  trial, and all of these tranches are identified in Exhibit B.

11  Exhibit B also identifies, for each tranche, the tranche purchasers

12  that will provide a basis for the government's proof at trial.[2]

13      **B.   FINANCIAL INSTITUTIONS AFFECTED BY THE FRAUD**

14      With respect to RMBS, for purposes of proof at trial, the

15  government will contend that the financial institutions identified

16  in Exhibit A as purchasers of the listed RMBS were affected by the

17  fraud alleged in the Complaint.

18      With respect to CDOs, for purposes of proof at trial, the

19  government will contend that the following financial institutions

20  were affected by the fraud alleged in the Complaint: (a) financial

21  institutions (including foreign financial institutions) that

22  retained or purchased, or whose affiliates retained or purchased,

23  identified tranches of the identified CDOs, as specified in Exhibit

24  B; and (b) financial institutions (including foreign financial

25      [2] With respect to both RMBS and CDOs, the government's
    identification of the tranche purchasers and losses is based on the

26  information gathered by the government to date.  The government
    reserves the right to update, correct, and modify its identification

27  of the tranche purchasers and their losses should additional or
    different information come to light as discovery continues in this

28  case.

3

1   institutions) that participated, or whose affiliates participated,

2   in various roles in the identified CDOS, as specified in Exhibit B.[3]

3       C.   **FINANCIAL INSTITUTION LOSSES**

4       With respect to the RMBS tranches identified in Exhibit A, the

5   financial institution losses the government will contend provide a

6   basis for determining the penalties that may be imposed in this case

7   pursuant to FIRREA (12 U.S.C. § 1833a(b)(3)(A)) are the losses

8   suffered by the financial institution purchasers of those tranches.

9   Exhibit A sets out current estimates of these losses as identified

10  to date.   These estimated losses total approximately $2.6 billion.[4]

11      With respect to the CDOs identified in Exhibit B, the financial

12  institution losses the government will contend provide a basis for

13  determining the penalties that may be imposed in this case pursuant

14  to FIRREA (12 U.S.C. § 1833a(b)(3)(A)) are the losses suffered by

15  financial institutions (including foreign financial institutions) as

16  the result either of the roles they (or their affiliates) played in

17  the CDOs or of their retention or purchase (or their affiliates'

18  retention or purchase) of identified tranches of those CDOs.

19  Exhibit B sets out current estimates of these losses as identified

20  to date.   These estimated losses total approximately $19.3 billion.[5]

21      [3] With respect to both RMBS and CDOs, the government's
    identification of the financial institutions affected by the fraud
22  alleged in the Complaint is based on the information gathered by the
    government to date.   The government reserves the right to modify,
23  update, and correct its identification of affected financial
    institutions should additional or different information come to
24  light as discovery continues in this case.

25      [4] As set forth in note 1 above, with respect to both RMBS and
    CDOs, the government reserves the right to modify, update and
26  correct its current estimates of losses should additional or
    different information come to light as discovery continues in this
27  case.

28      [5] FIRREA sets forth general maximum penalties of $1.1 million
    for each violation or, in the case of a continuing violation, the

4

Dated: November 18, 2013

STUART F. DELERY                    ANDRÉ BIROTTE JR.
Acting Assistant Attorney General   United States Attorney
United States Department of Justice
Civil Division
MAAME EWUSI-MENSAH FRIMPONG
Deputy Assistant Attorney General   /S//George S. Cardona/
MICHAEL S. BLUME                    GEORGE S. CARDONA
Director, Consumer Protection Branch LEON W. WEIDMAN
ARTHUR R. GOLDBERG                  ANOIEL KHORSHID
Assistant Director, Fed.Prog.Branch RICHARD E. ROBINSON
JAMES T. NELSON                     Assistant U.S. Attorneys
BRADLEY COHEN
JENNIE KNEEDLER
SONDRA L. MILLS
THOMAS D. ZIMPLEMAN
Trial Attorneys, Civil Division

lesser of $1.1 million per day or $5.5 million.  12 U.S.C. §
1833a(b)(1), (2); 28 C.F.R. § 85.3.  The statute specifies, however,
that if "any person derives pecuniary gain from the violation, or if
the violation results in pecuniary loss to a person other than the
violator," the maximum penalty for the violation increases to "the
amount of such gain or loss."  12 U.S.C. § 1833a(b)(3)(A).  In
computing loss for these purposes, a court needs to make only a
reasonable estimate of the loss.  Moreover, the statutory language
does not limit the determination of maximum penalties either to
losses incurred by financial institutions or to net, as opposed to
gross, losses.  Consistent with the plain language of the statute,
and consistent with FIRREA's purpose of imposing civil penalties as
a means of deterring frauds that put financial institutions at risk,
the government maintains the position that reasonable estimates of
gross, as opposed to net, losses to financial institutions, as well
as to non-financial institutions, should be used to set the maximum
FIRREA penalties.  Accordingly, while the loss figures set forth in
Exhibits A and B reflect current estimates of what, in many
instances, the government understands to be net losses to financial
institutions and their affiliates, the government reserves the right
to argue that additional losses, both gross losses to financial
institutions and their affiliates and additional losses to non-
financial institutions, should be considered by the court both in
fixing the maximum FIRREA penalties and in determining what FIRREA
penalties the court ultimately should impose within the maximum.

5

# EXHIBIT L

PRESS RELEASE

## SEC Charges Mizuho Securities USA with Misleading Investors by Obtaining False Credit Ratings for CDO

**Firm to Pay $127.5 Million to Settle Charges**

**FOR IMMEDIATE RELEASE**
**2012-139**

*Washington, D.C., July 18, 2012* — The Securities and Exchange Commission today charged the U.S. investment banking subsidiary of Japan-based Mizuho Financial Group and three former employees with misleading investors in a collateralized debt obligation (CDO) by using "dummy assets" to inflate the deal's credit ratings. The SEC also charged the firm that served as the deal's collateral manager and the person who was its portfolio manager.

According to the SEC's complaint against Mizuho Securities USA Inc., the firm made approximately $10 million in structuring and marketing fees in the deal. Mizuho agreed to pay $127.5 million to settle the SEC's charges, and the others charged also agreed to settle the SEC's actions against them.

The SEC alleges that Mizuho structured and marketed Delphinus CDO 2007-1, a CDO that was backed by subprime bonds at a time when the housing market was showing signs of severe distress. The deal was contingent upon Mizuho obtaining credit ratings it used to market the notes to investors. When its employees realized that Delphinus could not meet one rating agency's newly announced criteria intended to protect CDO investors from the uncertainty of ratings downgrades, they submitted to the rating firm a portfolio containing millions of dollars in dummy assets that inaccurately reflected the collateral held by Delphinus. Once the firm rated the inaccurate portfolio, Mizuho closed the transaction and sold the notes to investors using the misleading ratings. Delphinus defaulted in 2008 and eventually was liquidated in 2010. Mizuho sustained substantial losses from Delphinus.

"This case demonstrates once again that bankers and market participants who embrace a 'get the deal done at all costs' strategy will be identified, charged, and punished," said Robert Khuzami, Director of the SEC's Division of Enforcement. "This is a constant theme throughout the many SEC enforcement actions arising out of the financial crisis, and is one that everyone involved in securities transactions and our financial markets would be well-advised to respect."

Kenneth Lench, Chief of the SEC's Enforcement Division's Structured and New Products Unit, added, "Mizuho and its employees undermined the integrity of the rating process by furnishing inaccurate information about the Delphinus portfolio. Investors expect and are entitled to receive legitimate ratings in order to help them assess their investments."

According to the SEC's settled administrative proceedings against the three former Mizuho employees responsible for the Delphinus deal, Alexander Rekeda headed the group that structured the $1.6 billion CDO, Xavier Capdepon modeled the transaction for the rating agencies, and Gwen Snorteland was the transaction manager responsible for structuring and closing Delphinus. Delaware Asset Advisers (DAA) served as Delphinus's collateral manager and the DAA portfolio manager was Wei (Alex) Wei.

According to the SEC's complaint against Mizuho filed in federal court in Manhattan, all of the collateral assets for Delphinus had been purchased by July 17, 2007, and the transaction was scheduled to close on July 19. However, around noon on July 18, Standard & Poor's (S&P) issued a press release announcing changes to its CDO rating criteria requiring certain categories of

subprime residential mortgage-backed securities (RMBS) to be adjusted downward for purposes of calculating their default probability. The Mizuho employees knew that Delphinus's actual portfolio contained a substantial amount of RMBS that were subject to the downward ratings, and that Delphinus, as constructed, could not meet its rating targets under these tougher standards. To enable Delphinus to close anyway, the Mizuho employees e-mailed multiple alternative portfolios to S&P that contained dummy assets that were superior in credit quality to the assets that had been actually acquired for the CDO. Once the necessary ratings were secured by the use of dummy assets, the Delphinus transaction closed by mid-afternoon on July 19 and securities were sold based upon these higher ratings. Investors were thus misled to believe that the Delphinus notes had achieved the advertised ratings that the actual closing portfolio would not support.

According to the SEC's complaint, in connection with Delphinus's subsequent request for a required rating confirmation from S&P, Mizuho employees provided and arranged for others to provide further inaccurate information about the composition of Delphinus's assets. Primarily, they misrepresented that Delphinus's effective date was August 6 rather than July 19. S&P then provided Delphinus with the ratings confirmation using the improper effective date of August 6.

Everyone charged by the SEC agreed to settlements without admitting or denying the charges. Mizuho consented to the entry of a final judgment requiring payment of $10 million in disgorgement, $2.5 million in prejudgment interest, and a $115 million penalty. The settlement, which requires court approval, also permanently enjoins Mizuho from violating Sections 17(a)(2) and (3) of the Securities Act.

In the related administrative proceedings against Rekeda, Capdepon, and Snorteland, the SEC found that Rekeda violated Sections 17(a)(2) and (3) of the Securities Act, and Capdepon and Snorteland violated Section 17(a). Rekeda and Capdepon each agreed to pay a $125,000 penalty while the decision on whether there will be a penalty for Snorteland will be decided at a later date. Rekeda agreed to be suspended from the securities industry for 12 months, Capdepon and Snorteland each agreed to be barred from the securities industry for one year, and all three agreed to cease and desist from further violations of the respective sections of the Securities Act they violated.

The SEC instituted settled administrative proceedings against DAA and Wei based on their post-closing conduct. DAA consented to the entry of an order requiring the firm to pay disgorgement of $2,228,372, prejudgment interest of $357,776, and a penalty of $2,228,372. Wei consented to the entry of an order requiring him to pay a $50,000 penalty and suspending him from associating with any investment adviser for six months. Both DAA and Wei consented to cease and desist from violating Section 17(a)(2) and (3) of the Securities Act and Section 206(2) of the Advisers Act.

The SEC investigation into the Delphinus transaction, which is continuing, was conducted by the Enforcement Division's Structured and New Products Unit led by Kenneth Lench and Reid Muoio. The investigative attorneys were Robert Leidenheimer, Lawrence Renbaum, and James Murtha, and the trial attorneys were Jan Folena, Suzanne Romajas, and Alan Lieberman.

For more information about dozens of other SEC enforcement actions related to the financial crisis, visit the SEC website at: http://www.sec.gov/spotlight/enf-actions-fc.shtml.

<center>###</center>

**Related Materials**

- Complaint: Mizuho Securities USA Inc.
- Administrative Proceeding: Alexander V. Rekeda

SEC.gov | SEC Charges Mizuho Securities USA with Misleading Investo... http://www.sec.gov/News/PressRelease/Detail/PressRelease/1365171483316

- Administrative Proceeding: Xavier Capdepon and Gwen Snorteland
- Administrative Proceeding: Delaware Asset Advisers and Wei (Alex) Wei

# EXHIBIT M

U.S. v. National Broadcasting Co., Inc., 65 F.R.D. 415 (1974)

1974-2 Trade Cases P 75,396

65 F.R.D. 415
United States District Court, C. D. California.

UNITED STATES of America, Plaintiff,
v.
NATIONAL BROADCASTING
COMPANY, INC., Defendant.
UNITED STATES of America, Plaintiff,
v.
COLUMBIA BROADCASTING
SYSTEM, INC., et al., Defendants.
UNITED STATES of America, Plaintiff,
v.
AMERICAN BROADCASTING
COMPANIES, INC., Defendant.

Nos. 72–819–72–821.   |   Nov.
26, 1974.   |   Appeal Dismissed
April 28, 1975.   |   See 95 S.Ct. 1668.

United States brought antitrust actions against three major television networks. On networks' motions to dismiss upon Government's failure to comply with discovery orders which were directed at certain presidential documents which would allegedly show that the actions were brought for improper motive, the District Court, Kelleher, J., held that Government's refusal to produce the documents or to take necessary steps to ascertain whether former president's assertion of executive privilege barred compliance with the orders warranted sanction; and that where, although court was faced with clear violation of its orders, it appeared that failure to comply with the orders in no way prejudiced defendants, court would dismiss without prejudice as such a dismissal foreclosed any future affirmative defense to a refiling of the actions based upon any improper motive on the part of the former administration.

Dismissed without prejudice.

West Headnotes (7)

[1]      **Antitrust and Trade Regulation**
         🖛 Right of Action;  Persons Entitled to Sue;
         Standing; Parties

While the Department of Justice, upon proper authorization by the Attorney General, brings antitrust actions, the Department is not the plaintiff; the Department of Justice is plaintiff's counsel and the plaintiff is the Government of the United States acting on behalf of its citizens.

1 Cases that cite this headnote

[2]      **Federal Civil Procedure**
         🖛 Failure to respond; sanctions

When considering what actions were or were not taken in compliance with court's discovery orders in antitrust action, court will look to the actions or inaction of the Government as a whole, not just the Department of Justice, including any action or inaction of the executive office of the president and its staff. Fed.Rules Civ.Proc. rule 37, 28 U.S.C.A.

1 Cases that cite this headnote

[3]      **Federal Civil Procedure**
         🖛 Government records, papers and property

For purposes of determining compliance with discovery orders directed at documents in the possession of the president, or the executive office of the president, which might pertain to motives for bringing antitrust action against three major television networks, court was not concerned with ownership of the documents but rather with possession, custody and control of the documents. Fed.Rules Civ.Proc. rule 33, 28 U.S.C.A.

2 Cases that cite this headnote

[4]      **Federal Civil Procedure**
         🖛 Government records, papers and property
         **Federal Civil Procedure**
         🖛 Failure to Comply; Sanctions

If agreement between former president and GSA administrator resulted in transfer of custody of presidential papers to former president, Government's voluntary transfer would violate discovery orders entered by court in antitrust action and, if the agreement did not accomplish the transfer, Government's failure to produce the

U.S. v. National Broadcasting Co., Inc., 65 F.R.D. 415 (1974)

1974-2 Trade Cases P 75,396

papers, which would then be in its possession, custody and control, would constitute voluntary refusal to comply with discovery orders. Fed.Rules Civ.Proc. rule 33, 28 U.S.C.A.

1 Cases that cite this headnote

**[5]    Federal Civil Procedure**
        ☞ Failure to Comply; Sanctions

Where Government based its failure to produce certain presidential documents, which were sought by defendants in antitrust actions for purposes of establishing defense of improper motive, upon claim of privilege which had been asserted by former president, dilatoriness of Government in indexing the presidential materials and in seeking early determination as to whether assertion of the privilege barred Government's compliance with the discovery order warranted imposition of some sanction. Sherman Anti-Trust Act, §§ 1, 2, 15 U.S.C.A. §§ 1, 2; Fed.Rules Civ.Proc. rules 33, 34(a), 37, 28 U.S.C.A.

1 Cases that cite this headnote

**[6]    Federal Civil Procedure**
        ☞ Violation of a court order or rule in general

Broad discretion is reposed in court with regard to imposition of sanctions on motions to dismiss for voluntary actions on part of a party in failing diligently to do what the court ordered it to do.

1 Cases that cite this headnote

**[7]    Federal Civil Procedure**
        ☞ Failure to Comply; Sanctions

Where court was faced with clear violation of discovery orders on the part of the Government, but where it appeared that antitrust defendants were in no way prejudiced by failure to comply with discovery orders which sought presidential documents which would allegedly demonstrate that antitrust actions against three major television networks were brought for improper motive, dismissal without prejudice was appropriate sanction as such dismissal would foreclose any future affirmative defenses

to a refiling of the antitrust actions based on any improper motive on the part of former administration. Fed.Rules Civ.Proc. rules 33, 37(b)(2), 28 U.S.C.A.

1 Cases that cite this headnote

**Attorneys and Law Firms**

*416  Bernard M. Hollander, Harry G. Sklarsky, Washington, D. C., Stanley E. Disney, Los Angeles, Cal., Barry J. Kaplan and James A. Gilbert, United States Dept. of Justice, Antitrust Division, Washington, D. C., for United States.

Schrader, Harrison, Segal & Lewis, Bernard G. Segal, Harvey Levin, Jerome J. Shestack, Michael J. Mangan, Philadelphia, *417 Pa., of counsel; Gibson, Dunn & Crutcher, Samuel O. Pruitt, Jr., Don J. Belcher, John J. Hanson, Los Angeles, Cal., of counsel, for National Broadcasting Company.

Cravath, Swaine & Moore, Bruce Bromley, Jay E. Gerber, W. Dennis Cross, Robert S. Rifkind, Paul C. Saunders, New York City, of counsel; Wilmer Cutler & Pickering, Lloyd N. Cutler, C. Boyden Gray, Timothy B. Dyk, Alan S. Weitz, Washington, D. C., of counsel; O'Melveny & Myers, William W. Vaughn, Robert S. Draper, Los Angeles, Cal., of counsel, for Columbia Broadcasting System.

Bergson, Borkland, Margolis & Adler, Herbert A. Bergson, Daniel H. Margolis, Washington, D. C., Lillick, McHose, Wheat, Adams & Charles, Anthony Liebig, David Bruce Toy, Los Angeles, Cal., of counsel, for American Broadcasting Companies.

**Opinion**

MEMORANDUM OF DECISION

KELLEHER, District Judge.

On April 14, 1972, plaintiff United States of America, acting by and through the Department of Justice, filed in this Court three separate actions charging the three defendant television networks, American Broadcasting Companies, Inc. ('ABC'), Columbia Broadcasting System, Inc. ('CBS'), National Broadcasting Company ('NBC'), and Viacom International, Inc., a former subsidiary of CBS (a consent judgment has been entered as against the latter named defendant), with conduct violating Sections 1 and 2 of the Sherman Antitrust

Act. Each action alleged that the respective defendants have used their control of access to air time to monopolize prime time television entertainment programming.

Specifically, the actions allege that each network has used it control over access to prime evening air time (1) to exclude from network broadcasts those entertainment programs in which the network had no ownership interest, (2) to compel outside program suppliers to grant the network financial interests in television programs which it accepts for broadcast, (3) to refuse to offer air time to advertisers and other outside program suppliers seeking to have their own programs shown to the network, (4) to control the prices paid by the network for television exhibition rights to motion picture feature films, and (5) to obtain competitive advantages over other producers and distributors of television entertainment programs and of motion picture feature films.

There has been almost no discovery as of this date directed at the merits of these law suits. The effort of both sides has been almost exclusively concerned with the affirmative defenses of the networks claiming 'improper motives' on the part of the government in bringing suit in violation of their First Amendment rights.

On July 17, 1974, this Court entered orders (1) denying plaintiff's motion to strike ABC's 6th, 7th and 8th defenses, CBS's 2d, 3rd and 4th defenses, and NBC's 2d and 3rd defenses; (2) denying plaintiff's motion for a protective order against defendants' discovery relating to those defenses by limiting defendants' first phase of discovery in certain respects; and (3) requiring plaintiff to answer, within sixty days from the date of entry of the orders, interrogatories calling for the identification of documents and tapes located, *inter alia*, in the Executive Office of the President.

A month later, upon the publication of reports in the press that the government might surrender possession, custody and control of these and other documents to former President Nixon, defendants sought an order from the Court restraining any such transfer. At the hearing on that application, on August 16, 1974, the Court sought and received from plaintiff's counsel assurances that the appropriate government officials were fully apprised of the Court's previous *418 orders and plaintiff's obligation thereunder.

On September 27, 1974, all three defendants filed identical motions, pursuant to Rule 37, Federal Rules of Civil Procedure, seeking to dismiss these actions on the ground that the plaintiff has voluntarily and intentionally failed to comply with the Court's discovery orders entered July 17,

1974, and the Court's directives of August 16, 1974, or, in the alternative, to have the facts alleged in the affirmative defenses asserting improper motives on plaintiff's part taken as established and to dismiss the respective actions upon that basis. The plaintiff filed its Memorandum in Opposition to Defendants' Motions to Dismiss on October 25, 1974.

After full oral argument in a hearing before this Court on November 11, 1974, a minute order was entered granting defendants' motions and dismissing each of the complaints without prejudice.

The Court's orders of July 17, 1974, which in substance were the same as to all three defendants, state in pertinent part:

> 'Within sixty (60) days from the date of entry of this order, plaintiff United States of America shall answer defendant CBS's interrogatories as modified by the Court and annexed hereto as Exhibit A.'

Exhibit A provides in pertinent part:
'Pursuant to Rule 33 of the Federal Rules of Civil Procedure, defendant Columbia Broadcasting System, Inc. ('CBS') hereby requests that plaintiff identify, in accordance with the definitions and instructions contained herein, the documents described herein within 60 days from the date of service hereof.'

> 'As used herein, the term 'document' means any written, recorded, taped or graphic matter, and all copies thereof, in the possession, custody or control of the President, the Executive Office of the President, the Antitrust Division, and the Office of the Attorney General of the Department of Justice, not including the Federal Bureau of Investigation or the Watergate Special Prosecution Force.'

Interrogatory No. 1—'[Identify] [e]ach document relating or referring to actual or prospective antitrust litigation, or any suggestion, proposal or decision to commence or not to commence such litigation . . . against . . . the television networks or the news media, written, recorded, sent or received by the President, any person employed in, assigned to or acting on behalf of the Executive Office of the President . . . [. . . during the period October 17, 1969, to December 31, 1972.]'

U.S. v. National Broadcasting Co., Inc., 65 F.R.D. 415 (1974)

1974-2 Trade Cases P 75,396

In response to this interrogatory, the government filed in part the following answer:

'(a) Attached hereto in Exhibit A is a list identifying each document presently in the possession, custody or control of the United States Department of Justice, which relates or refers to actual or prospective antitrust litigation. . . .'

'(c) Plaintiff, despite repeated written requests to counel for the President, dated June 13, June 21, July 22, August 5, August 21, and September 10, 1974, has been unable to identify any documents of the type sought, which were within the possession, custody or control of the President or the Executive Office of the President for the reasons set forth in the letter of Philip W. Buchen, dated September 10, 1974 [See Exhibit C], except for the identification of the documents, attached hereto as Exhibit A–6, which are of public record having been released by the Senate Select Committee or the Judiciary Committee of the House of Representatives.'

*419 Exhibit C, the letter from Philip W. Buchen dated September 10, 1974 states in pertinent part:

'As I am sure you are aware, it has not been possible to furnish the information in question until their legal status was determined by the Attorney General's opinion of September 7, 1974 and the letter of agreement between former President Nixon and GSA Administrator Sampson dated September 6, 1974 ('Nixon-Sampson Agreement'). Accordingly, the files in question are not within the custody or control of the White House and can only be provided in accordance with the above Nixon-Sampson Agreement, which, of course, makes provision for the compliance with Court orders.'

Defendants contend that these suits should be dismissed because plaintiff has given up possession, custody and control of former President Nixon's 'documents,' thereby voluntarily placing itself in a position where it is unable to comply with the Court's orders of July 17, 1974.

In its Memorandum in Opposition to Defendants' Motion to Dismiss, plaintiff argues that the plaintiff fully complied with the Court's orders of July 17, 1974, and its directives of August 16, 1974, 'within its ability to do so.' Plaintiff argues that dismissal here is improper because full compliance was due to circumstances outside its control rather than to willfulness, bad faith or fault. Moreover, plaintiff argues that it would be improper to dismiss this action now in light of Attorney General Saxbe's affidavit filed in support of their opposition which reaffirms as meritorious the allegations contained in the original complaint. That affidavit states in pertinent part:

'Because of the allegations that these suits were initially filed by Attorney General Richard G. Kleindienst and that their prosecution has continued as the result of allegedly improper motives or purposes on the part of the those at high levels of the Executive Branch, I have undertaken a personal review of the allegations of these complaints and the relief sought by them.

'In the course of this review, I have considered the staff's factual memorandum and the several memoranda from Assistant Attorney General McLaren to the Attorney General recommending that these actions be filed against each of the networks, and have concluded that the information contained in those memoranda establishes that the allegations contained in the complaints are well founded.

'I believe it essential and in the public interest that the prosecution of these actions be continued and that the relief sought by the complaints be achieved as promptly as possible in order to restore competition in the television entertainment programming field. This is particularly important in view of the charge that the antitrust violations described in these complaints are continuing.'

Preliminary to resolution of the question whether there has been any failure of compliance with the Court's orders, several important considerations arise.

[1] [2] First, while the Department of Justice upon proper authorization by the Attorney General brings antitrust actions, the Department is not the 'plaintiff.' The Department of Justice is the plaintiff's counsel. The plaintiff is the Government of the United States acting on behalf of its citizens. Therefore, when considering what action was or was not taken in compliance with the Court's orders, this Court will look to the actions or inaction of the government as a whole, not just the Department of Justice, including any

**U.S. v. National Broadcasting Co., Inc., 65 F.R.D. 415 (1974)**

1974-2 Trade Cases P 75,396

action or inaction of the Executive Office of the President and its staff.

[3] Secondly, it must be noted that any determinations made by this Court *420 regarding the motions before it does not involve the question of 'ownership' of former President Nixon's documents. What is involved here is the 'possession, custody and control' of these documents. For, as the Attorney General correctly pointed out on September 6, 1974, in his opinion on the status of former President Nixon's documents: 'Even though the Government is merely the custodian and not the owner, it can properly be subjected to court directives relating to the materials. The Federal Rules of Criminal Procedure authorize the courts, upon motion of a defendant, to order the Government to permit access to papers and other objects 'which are within the possession, custody or control of the government . . . .' Fed.R.Crim.P. 16(b), A similar provision is applicable with regard to discovery in civil cases involving material within the 'possession, custody or control' of a party (including the Government). Fed.R.Civ.P. 34(a). In addition, in both criminal and civil cases, a subpoena may be issued directing a person to produce documents or objects which are within his possession, but which belong to another person. Fed.R.Crim.P. 17(c); Fed.R.Civ.P. 45(b). *See e. g.,* Couch v. United States, 409 U.S. 322 [93 S.Ct. 611, 34 L.Ed.2d 548] (1973); Schwimmer v. United States, 232 F.2d 855, 860 (8th Cir. 1956), cert. denied, 352 U.S. 333 [833, 77 S.Ct. 48, 1 L.Ed.2d 52]; United States v. Re, 313 F.Supp. 442, 449 (S.D.N.Y.1970).'

The government has taken two positions with regard to 'possession, custody and control' of former President Nixon's documents. On the one hand, in answers to the interrogatories, it stated: 'the files in question are not within the custody or control of the White House and can only be provided in accordance with the . . . Nixon-Sampson Agreement.' The government's briefs filed in opposition to the motions to dismiss base the contention that the government has done all 'within its ability to do' on the assumption that the Nixon-Sampson Agreement validly transferred 'custody' to the former President. On the other hand, the government, in oral argument, conceded in the hearing on November 11, 1974, that former President Nixon's documents are now within the government's physical custody and control.

At that hearing, this Court was informed of the pending suit, Nixon v. Sampson, (D.D.C., filed October 17, 1974) and consolidated cases, brought by former President Nixon

to effectuate his agreement with the government concerning his presidential materials and documents. Judge Richey on October 21, 1974, in a temporary restraining order that was supplemented on October 22, 1974, enjoined the coming into effect of the Nixon-Sampson Agreement. The government informs this Court that at no time has any interest or claim raised by the affirmative defenses in this law suit been put before Judge Richey nor do they contemplate any such action. This Court was further informed on November 11, 1974, that an agreement between the White House and the Special Prosecutors Office was entered which now gives the Special Prosecutor, under certain conditions, access to former President Nixon's documents and files.

In support of the contention that the motion to dismiss should be denied because the government did all within its power to comply with the Court's orders, plaintiff relies on Societe et Commerciales, S. A. v. Rogers, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958). That reliance is unfounded. In *Societe,* the Supreme Court held a dismissal under Rule 37, Federal Rules of Civil Procedure, improper where plaintiff's inability to comply with the Court's order was due to circumstances outside its control, rather than to willfulness, bad faith or fault. Here, regardless of the position taken by the government on the status *421 of former President Nixon's documents and files, its actions appear voluntary.

[4] First, on September 6, 1974, the government voluntarily entered an agreement with former President Nixon to surrender 'custody' of his presidential materials. Thereafter, the government in response to the court-ordered interrogatories cited that agreement as a bar to the request for an indexing of those documents and files containing discussions of the motivation for bringing these actions. Assuming that the Nixon-Sampson Agreement accomplished what the government claims it accomplished, the government's voluntary transfer of custody to former President Nixon would obstruct the discovery process and, thereby, violate this Court's orders.

Secondly, if the former President's documents and files are, in fact, within the 'possession, custody and control' of the government, as the government seems to now concede, then the government has voluntarily chosen not to comply with the Court's orders. For, as the Court was informed in the November 11, 1974, hearing, the government has made no effort to index the documents and files as required by the court-ordered interrogatories.

[5] This failure or refusal of the government is predicated on their position that a claim of privilege has been asserted

U.S. v. National Broadcasting Co., Inc., 65 F.R.D. 415 (1974)
1974-2 Trade Cases P 75,396

by the former President. Faced with that claim they could not on their own resolve that question of privilege; hence, their conduct falls short of justifying a dismissal with prejudice or a finding that the alleged improper motives are established and the actions accordingly dismissed with prejudice. However, there has been on the part of the government sufficient dilatoriness in proceeding to index the former President's materials as required by the July 17, 1974, orders, or in seeking an early determination in these cases that the assertion of privilege bars their compliance, as to warrant some sanction.

[6]   As *Societe, supra,* held in part: '[f]or purposes of subdivision (b)(2) of Rule 37, we think that a party 'refuses to obey' simply by failing to comply with an order. So construed the Rule allows a court all the flexibility it might need in framing an order appropriate to a particular situation.' 357 U.S. at 208, 78 S.Ct. at 1094. Moreover, when faced with a violation of a discovery order, Rule 37(b)(2) provides that 'the court in which the action is pending may make such orders in regard to the failure as are just.' It is clear that broad discretion is reposed in this Court with regard to the imposition of sanctions on motions to dismiss for voluntary actions on the part of a party in failing diligently to do what it was ordered.

The Court regards the Attorney General's assertion that these suits are well founded as worthy of acceptance. However, one defendant has taken the position that the bad motives have so infected these suits as to be incapable of purge. We need not decide this issue, and the Court is ill disposed to allow pursuit thereof. There is a better way.

[7]   On the one hand this Court is faced with a clear violation of its orders by the government, while on the other, in light of Attorney General Saxbe's affidavit, it appears that defendants are in no way prejudiced by plaintiff's failure to comply with the Court's orders. A dismissal without prejudice under Rule 37(b)(2), Federal Rules of Civil Procedure, as a sanction would be fully appropriate here, for it recognizes (1) the government's failure to comply with the Court's orders and (2) the fact that plaintiff's failure to comply has not prejudiced defendants. While one defendant asserts a reservation to challenge any newly filed action because it might not have been adequately reconsidered by the Attorney General, all parties agree that a dismissal without prejudice does foreclose any future affirmative defenses to a refiling of these actions based on any improper motivation on the part of *422 the Nixon Administration. Also, it appears that all parties desire at an early date, and in an expeditious manner, to litigate the merits of the matter, after the filing of new actions by the plaintiff, if it be so advised.

Accordingly, pursuant to Rule 37(b)(2), Federal Rules of Civil Procedure, each of the respective complaints filed herein has been ordered dismissed without prejudice.

**Parallel Citations**

1974-2 Trade Cases P 75,396

---

**End of Document**                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT N

Reproduced from the holdings of the *National Archives at Riverside*

FILED

JUL 17 1974

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | Civil No. 72-819-RJK |
| v. | ) | |
| NATIONAL BROADCASTING COMPANY, INC., | ) | O R D E R |
| Defendant. | ) | |

This cause came on to be heard on plaintiff's motion pursuant to Rule 12(f), Federal Rules of Civil Procedure, for an order striking defendant National Broadcasting Company's ("NBC") second, third, fourth and tenth defenses.

After hearing, defendant NBC lodged with the Court an order providing for first phase discovery relative to the above defenses; plaintiff United States of America thereafter filed objections to the form and content of the lodged order. Now, having considered the proposed order and the objections thereto,

IT IS ORDERED THAT:

1. The motion to strike defendant NBC's second, third, and fourth defenses is denied.

2. The motion to strike defendant NBC's tenth defense is granted.

3. The first phase of defendant NBC's discovery with

1309

respect to its second and third defenses shall be limited as follows:

       (a)  Within sixty (60) days from the date of entry of this order, plaintiff United States of America shall answer defendant NBC's interrogatories as modified by the Court and as annexed hereto as Exhibit A.

       (b)  Within thirty (30) days after the service of plaintiff's answers to the interrogatories referred to in paragraph 3(a) above, defendant NBC shall commence the depositions provided for in the notice to take depositions annexed hereto as Exhibit B, such depositions to be taken as expeditiously as possible thereafter.

DATED:  July 17, 1974.

ROBERT J. KELLEHER
United States District Judge

Reproduced from the holdings of the *National Archives at Riverside*

1  SCHNADER, HARRISON, SEGAL & LEWIS
   BERNARD G. SEGAL
2  JEROME J. SHESTACK
   HARVEY LEVIN
3  PETER S. GREENBERG
   1719 Packard Building
4  Philadelphia, Pennsylvania 19102

5  GIBSON, DUNN & CRUTCHER
   SAMUEL O. PRUITT, JR.
6  JOHN J. HANSON
   DON J. BELCHER
7  515 South Flower Street
   Los Angeles, California 90071
8  Telephone:  (213) 488-7000

9  Attorneys for Defendant
   National Broadcasting Company, Inc.
10

11              UNITED STATES DISTRICT COURT

12              CENTRAL DISTRICT OF CALIFORNIA

13

14  UNITED STATES OF AMERICA,       )    CIV. NO. 72-819-RJK
                                    )
15              Plaintiff,          )
                                    )
16        v.                        )    NBC'S FIRST SET OF
                                    )    INTERROGATORIES
17  NATIONAL BROADCASTING           )
    COMPANY, INC.,                  )
18                                  )
                Defendant.          )
19                                  )
    _____)
20

21        Pursuant to Rule 33 of the Federal Rules of Civil Pro-

22  cedure, defendant National Broadcasting Company, Inc. ("NBC")

23  hereby requests that plaintiff identify, in accordance with the

24  definitions and instructions contained herein, the documents

25  described herein within 60 days from the date of service hereof.

26        The following definitions and instructions are

27  applicable to this Request for the identification of documents:

28                        Definitions

29        As used herein, the term "NBC" means defendant National

30  Broadcasting Company, Inc., its subsidiaries, affiliates, officers

31  and employees.

32  - - -

Reproduced from the holdings of the *National Archives at Riverside*

1      As used herein, the term "document" means any written,
2 recorded, taped or graphic matter, and all copies thereof, in
3 the possession, custody or control of the President, the
4 Executive Office of the President, the Antitrust Division, and
5 the Office of the Attorney General of the Department of Justice,
6 not including the Federal Bureau of Investigation or the Water-
7 gate Special Prosecution Force.

8      As used herein, the term "television networks" means
9 NBC, Columbia Broadcasting System, Inc., and American Broadcasting
10 Companies, Inc., their respective parents, subsidiaries, affili-
11 ates, officers and employees, or any of them.

12      As used herein with respect to a document, the term
13 "identify" means to specify each author, addressee, copyee, and
14 the date and subject matter thereof.

15      As used herein with respect to a person, the term
16 "identify" means to specify his name, employer and title.

17              Instructions

18      With respect to any document or portion thereof as to
19 which you assert a claim of privilege, identify in your response
20 all persons known to have seen or heard such document and the
21 basis of your claim of privilege, in addition to identifying
22 each author, addressee and copyee, and the date and subject
23 matter thereof.

24      Each paragraph herein should be construed independently
25 and not by reference to any other paragraph for the purpose of
26 limitation.

27      "And" as well as "or" shall be construed either dis-
28 junctively or conjunctively as necessary to bring within the
29 scope of the identification or specification all responses which
30 might otherwise be construed to be outside its scope.

31    - - -

32    - - -

GIBSON, DUNN & CRUTCHER

4

1312

Reproduced from the holdings of the *National Archives at Riverside*

<u>Period of Request</u>

This Request covers all documents dated, prepared, sent or received, in whole or in part, during the period October 17, 1969, to December 31, 1972.

<u>Documents and Persons to be Identified</u>

1.  Each document relating or referring to actual or prospective antitrust litigation, or any suggestion, proposal or decision to commence or not to commence such litigation or to threaten to commence such litigation against NBC, the television networks or the news media, written, recorded, sent or received by the President, any person employed in, assigned to or acting on behalf of the Executive Office of the President, the Attorney General or Acting Attorney General, the Executive Assistant to the Attorney General, the Deputy Attorney General or Acting Deputy Attorney General, or the Committee to Re-elect the President.

2.  Each document constituting a part of or reflecting, relating or referring to any proposal or plan, whether effectuated or not, to use any power, authority, facility or influence of the Department of Justice to inhibit or otherwise affect or harass NBC or the television networks in the reporting of news or public affairs, or to retaliate against NBC or the television networks for their reporting of news or public affairs by threat or use of any litigation.

3.  Each person, other than stenographic, secretarial, or other clerical personnel, who participated in the preparation of the answers to these interrogatories.

- 5 -

1313

Reproduced from the holdings of the *National Archives at Riverside*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,          )
                                   )
                Plaintiff,         )        Civil No. 72-819-RJK
                                   )
        v.                         )
                                   )        NOTICE TO TAKE DEPOSITIONS
NATIONAL BROADCASTING              )
COMPANY, INC.,                     )
                                   )
                Defendant.         )
                                   )

        PLEASE TAKE NOTICE that in accordance with the Federal

Rules of Civil Procedure and the laws of the United States,

and pursuant to the Court's order of July 16, 1974, defendant

National Broadcasting Company, Inc., will take the oral testi-

mony of the named deposition witnesses on the dates specified

and will require the production of documents that are in their

possession, custody or control in accordance with the attached

schedule:

        Name                  Address                  Date

Richard G. Kleindienst    1707 B Street N.W.

                          Washington, D. C.

John N. Mitchell

                          New York, New York

                          Exhibit B

                              6

PPS SANDSTONE—
12-1-66—76M—1192

1314

Reproduced from the holdings of the *National Archives at Riverside*

1      The depositions will commence at 10:00 a.m. on the

2  days specified, before a Notary Public or some other officer

3  authorized by law to administer oaths, and will continue there-

4  after from day to day until concluded.

5      The depositions will be held at the United States Court

6  House, 312 North Spring Street, Los Angeles, California, or at

7  such other places as may be agreed upon.

8      DATED: June 4, 1974.

9                 SCHNADER, HARRISON, SEGAL & LEWIS

10                AND GIBSON, DUNN & CRUTCHER

11

12     By _____

13                   John J. Hanson
             Attorneys for Defendant
         National Broadcasting Co., Inc.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32

GIBSON, DUNN & CRUTCHER

7

1315

Reproduced from the holdings of the *National Archives at Riverside*.

SCHEDULE OF DOCUMENTS

Definitions

As used herein, the term "NBC" means defendant National Broadcasting Company, Inc., its subsidiaries, affiliates, officers and employees.

As used herein, the term "document" means any written, recorded, taped or graphic matter, and all copies thereof, in your possession, custody or control.

As used herein, the term "television networks" means NBC, Columbia Broadcasting System, Inc. and American Broadcasting Companies, Inc., their respective parents, subsidiaries, affiliates, officers and employees or any of them.

Instructions

Each paragraph herein should be construed independently and not by reference to any other paragraph for the purpose of limitation.

"And" as well as "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the subpoena all responses which might otherwise be construed to be outside its scope.

Period of Subpoena

This subpoena covers all documents dated, prepared, sent or received, in whole or in part, during the period October 17, 1969 to December 31, 1972.

Documents To Be Produced

1. Each document relating or referring to actual or prospective antitrust litigation, or any suggestion, proposal or decision to commence or not to commence such litigation or to threaten to commence such litigation against NBC, the television networks or the news media, written, recorded, sent or received by the President, any person employed in, assigned to or acting on behalf of the Executive Office of the President, the Attorney

GIBSON, DUNN & CRUTCHER

8

1316

Reproduced from the holdings of the *National Archives at Riverside*

1  General or Acting Attorney General, the Executive Assistant to
2  the Attorney General, the Deputy Attorney General or Acting
3  Deputy Attorney General, or the Committee to Re-Elect the Presi-
4  dent.
5       2.  Each document constituting a part of or reflecting,
6  relating or referring to any proposal or plan, whether effectuated
7  or not, to use any power, authority, facility or influence of the
8  Department of Justice to inhibit or otherwise affect or harass
9  NBC or the television networks in the reporting of news or public
10 affairs, or to retaliate against NBC or the television networks
11 for their reporting of news or public affairs by threat or use
12 of any litigation.

1317

Reproduced from the holdings of the *National Archives at Riverside*

1  

2  

3  CERTIFICATE OF SERVICE BY MAIL

4  _____ PAMELA A. GILLIS _____ certifies as follows:

5  I am a citizen of the United States and am employed

6  in the County of Los Angeles, State of California; I am over

7  the age of eighteen years and am not a party to this action;

8  my business address is 515 South Flower Street, Los Angeles,

9  in said County and State; I am employed in the office of

10 DON J. BELCHER _____, a member of the bar of this

11 Court, and at his direction on the __4__ day of __June__,

12 19 _74_, I served the within

13 ORDER

14 

15 

16 on the plaintiff

17 in this action, by placing _1_ true copy(ies) thereof in an

18 envelope addressed to __its__ attorney(s) of record, addressed

19 as follows:

20 Stanley E. Disney, Esq.
   U.S. Antitrust Division
   1444 U.S. Courthouse
   312 North Spring Street
   Los Angeles, CA 90012

21 

22 and by then sealing said envelope and depositing the same, with

23 postage thereon fully prepaid, in the mail at Los Angeles,

24 California.

25 I certify under penalty of perjury that the foregoing

26 is true and correct.

27 Executed on __June 4__, 19 _74_, at

28 Los Angeles, California.

29 

30 

31 _Pamela A. Gillis_

32 Declarant
   PAMELA A. GILLIS

1318