United States District Court
*for the*
Central District of California
Southern Division

---

No. CV13-779 DOC (JCGx)

---

UNITED STATES OF AMERICA,

*Plaintiff,*

v.

MCGRAW-HILL COMPANIES, INC. and STANDARD & POOR'S
FINANCIAL SERVICES LLC,

*Defendants.*

---

**DECLARATION OF FLOYD ABRAMS EXHIBITS O AND P**

---

January 20, 2014

# EXHIBIT O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>          - *against* -<br><br>MCGRAW-HILL COMPANIES, INC. and STANDARD & POOR'S FINANCIAL SERVICES LLC,<br><br>                           Defendants. | Case No. CV13-779 DOC (JCGx)<br><br>**AFFIDAVIT** |

| | | |
|---|---|---|
| STATE OF NEW YORK | ) | |
| | ) | ss.: |
| COUNTY OF NEW YORK | ) | |

Harold McGraw III, being duly sworn, deposes and says:

    1.    I am the Chairman of the Board, President and Chief Executive Officer of Defendant McGraw Hill Financial, Inc.  I held those same positions with the company in August 2011 when its name was The McGraw-Hill Companies, Inc. ("McGraw-Hill")

    2.    On Friday, August 5, 2011 Standard & Poor's Ratings Services ("S&P"), a unit of Standard & Poor's Financial Services, LLP, itself a subsidiary of McGraw-Hill, announced it had downgraded the long-term credit rating of the United States from AAA to AA+.  Such decisions are made by ratings committees comprised of S&P analysts.  I am not involved in such decisions and I was not involved in the decision to downgrade S&P's rating of the United States.

3.      On Sunday August 7, the security desk at my office received a telephone call for me from Terrence J. Checki, then the Executive Vice-President of the New York Federal Reserve Bank. Mr. Checki left both an office telephone number and a private mobile number and left a message asking me to return his call the following day. I called Mr. Checki back the next day, Monday August 8. He told me that he was calling to pass a message to me from Timothy Geithner, formerly Mr. Checki's superior as President of the New York Fed and then the Secretary of the Treasury. He said that Secretary Geithner was very angry at S&P. He said that Mr. Geithner viewed S&P's processes as flawed. He said that it would have been better if I had called Mr. Geithner on Friday to let him know what was happening.

4.      Later that morning, I received a call from Mr. Geithner himself. I was not available when the call came in, and I returned it.

5.      Mr. Geithner expressed anger at the downgrade. In the course of our discussion, he referred to an asserted two trillion dollar error in S&P's work, an error that he had described in various discussions with the media following the announcement of the downgrade. Having been briefed on the issue by S&P personnel in the wake of those statements by Mr. Geithner, I explained to him that in relying on Congressional Budget Office figures, as it had, S&P had not made an error. Mr. Geithner said that S&P had made a huge error and that "you are accountable for that." He added that S&P had a previous history of errors and that this was not the first mistake it had made.

6.      As I reported contemporaneously to my colleagues, he said that "you have done an enormous disservice to yourselves and to your country", that the U.S. economy was bad and that the downgrade had done real damage. S&P's conduct would be "looked at very

2

carefully" he said.  Such behavior could not occur, he said, without a response from the government.

_Harold W. McGraw III_

Harold McGraw III

Sworn to before me this
28 th day of _Octob_  2013

_[signature]_

Notary Public

PETER J. O'CONOR
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01OC4816506
Qualified in Queens County
Certificate Filed in New York County
Commission Expires May 31, 20 _14_

3

# EXHIBIT P

## Chronology in Support of S&P's First Amendment Retaliation Defense[1]

- August 2007 – SEC initiates examinations of all **three major credit rating agencies, S&P, Moody's and Fitch**, "to review their role in the recent turmoil in the subprime mortgage-related securities markets."  (Abrams Decl. Ex. P(1) at 1)

- June 2008 – NY Attorney General Andrew Cuomo reaches agreements with S&P, Moody's and Fitch to institute reforms **by all three agencies** regarding the rating of RMBS. (Ex. P(2))

- July 2008 – SEC releases its "Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies," including criticism of the ratings process and management of conflicts of interest for **all three major credit rating agencies**. (Ex. P(1))

- August 25, 2008 – Abu Dhabi Commercial Bank files lawsuit on behalf of a putative class of investors against **S&P and Moody's,** including claims for negligent misrepresentation and fraud arising from the credit ratings on the Cheyne Structured Investment Vehicle ("SIV") (Fitch had not issued a rating on the SIV).  Plaintiffs also allege conflicts of interest stemming from the issuer-pays fee system and faulty models. (Ex. P(3))

- October 22, 2008 – Hearing by the House Oversight and Government Reform Committee in which the Committee released internal documents from **S&P and Moody's**. (Ex. P(4))

- July 2009 – California Public Employees' Retirement System ("CalPERS") sues **S&P, Moody's and Fitch**, including claims for negligent misrepresentation in connection with the ratings of certain SIVs. (Exs. P(5) & P(6))

- October 2009 – King County, Washington and Iowa Student Loan Liquidity Corporation file lawsuit on behalf of a putative class of investors against **S&P, Moody's and Fitch**, including claims for negligent misrepresentation and fraud arising from the credit ratings on the Rhinebridge SIV.  Plaintiffs also allege conflicts of interest stemming from the issuer-pays fee system and faulty mod-

---

[1] Citations for exhibits P(1)-P(39) supporting the items in this chronology are set forth in a list at the end of this document.

1

els. (Exs. P(7) & P(8))

- March 10, 2010 – Connecticut Attorney General Richard Blumenthal sues **S&P and Moody's**, alleging misrepresentations regarding independence, objectivity, and management of conflicts of interest. (Exs. P(9), P(10) & P(11))

- April 2010 – The Permanent Subcommittee on Investigations ("PSI") holds a series of hearings regarding the causes and consequences of the financial crisis. One of these hearings addresses the role of the credit ratings agencies, focusing on **S&P and Moody's**. (Exs. P(12) & P(13), at 7)

- January 2011 – The Financial Crisis Inquiry Commission report is released, discussing issues pertaining to credit rating agencies including **S&P, Moody's and Fitch**, with particular emphasis on **Moody's**, which the Commission used as a case study. (Ex. P(14), at xxv and 146)

- April 13, 2011 – The PSI releases a report discussing issues pertaining to credit rating agencies including **S&P, Moody's and Fitch**. The report, "Wall Street and the Financial Crisis: Anatomy of a Financial Collapse," notes that "one of the primary issues is the conflicts of interest inherent in the 'issuer-pays' model" used by **all three credit rating agencies**. (Ex. P(13), at 7, 247, 272-73 and 314)

- April 18, 2011 – S&P changes credit outlook for the U.S. from "stable" to "negative." S&P is immediately criticized by government officials for its announcement. The *Wall Street Journal* publishes an article entitled, "U.S. Treasury Criticizes S&P Move," quoting critical comments about S&P made by senior government officials. (Exs. P(15) & P(16))

- April 19, 2011 – Treasury Secretary Timothy Geithner criticizes S&P, stating in media interviews that there is "no risk" of downgrade. (Ex. P(17))

- April 20, 2011 – News outlets report that Obama administration officials, including Treasury officials, had been trying to convince S&P not to lower its outlook for U.S. debt in the weeks leading up to S&P's announcement. (Ex. P(18))

2

- May 10, 2011 – Mississippi Attorney General files lawsuit against **S&P and Moody's**, alleging misrepresentations regarding independence, objectivity, and management of conflicts of interest. (Exs. P(19) & P(20))

- July 14, 2011 – S&P places its 'AAA' long-term and 'A-1+' short-term sovereign credit ratings on the U.S. on CreditWatch with negative implications. (Ex. P(21))

- July 16, 2011 – The *Los Angeles Times* reports that "[t]his week, two bigger credit raters, Moody's Investors Service and Standard & Poor's, warned that they might soon cut the U.S. government's top-rung AAA debt rating because of the political battle in Washington over the federal debt ceiling and spending cuts." (Ex. P(22))

- August 5, 2011 – S&P downgrades the credit rating of the United States. (Ex. P(23))

- August 7, 2011 - Treasury Secretary Timothy Geithner reacts critically to the news of the downgrade of the United States by saying: "I think S&P has shown really terrible judgment, and they've handled themselves very poorly." His public comments criticize past ratings of S&P, stating: "[L]ook at the quality of judgments they've made in the past." (Ex. P(24))

- August 6-8, 2011 – Gene Sperling, Assistant to the President for Economic Policy and Director of the National Economic Council under President Obama, attacks S&P for sticking to its decision to downgrade the U.S. credit rating after an alleged error was discovered in S&P's original fiscal projections.  Sperling accused S&P of "starting with a conclusion and shaping any arguments to fit it" and described the credit rating agency's actions as "reckless" and "irresponsible." (Exs. P(25) & P(26))

- August 7, 2011 – Terrence J. Checki, Executive Vice President of the New York Federal Reserve Bank, attempts to contact Harold McGraw III, Chairman of S&P's parent company, at Mr. McGraw's office on a Sunday.  (Abrams Decl. Ex. O ¶ 3)

- August 8, 2011 – The following day, Mr. McGraw returns Mr. Checki's call, and Checki informs him that Secretary of the Treasury Timothy Geithner was angry at S&P, that he viewed S&P's processes as flawed and that it would have

3

been better if Mr. McGraw had called Secretary Geithner in advance of the downgrade. (Abrams Decl. Ex. O ¶ 3)

- August 8, 2011 – Mr. McGraw receives a call from Secretary Geithner himself. Mr. McGraw returns the call. Secretary Geithner tells him that S&P had made a huge error and "done an enormous disservice to yourselves and to your country," that the U.S. economy was bad and that the downgrade had done real damage. Secretary Geithner tells Mr. McGraw that S&P's conduct will be "looked at very carefully" and that the conduct could not occur without a response from the government. (Abrams Decl. Ex. O ¶¶ 4-6)

- August 8, 2011 – President Obama gives address regarding the downgrade, criticizing S&P's announcement, and stating, "No matter what some agency may say, we've always been and always will be [a] AAA country." In his remarks, he refers to Moody's investor Warren Buffett's high opinion of the U.S.'s creditworthiness. (Exs. P(27) & P(28))

- August 18, 2011 – *The New York Times* publishes an article entitled, "Justice Inquiry Is Said to Focus on S.&P. Ratings," reporting on the government's investigation of S&P and noting that "[i]t is unclear if the Justice Department investigation involves the other two ratings agencies, Moody's and Fitch, or only S.& P." The article points out that "[t]he investigation began before Standard & Poor's cut the United States' AAA credit rating this month, but it is likely to add fuel to the political firestorm that has surrounded that action." Additionally, the article notes that "people with knowledge of the investigation said it had picked up steam early this summer." (Ex. P(29))

- August 18, 2011 – *The Atlantic* publishes "The Backlash Against S&P Begins," stating that "[e]ven if this investigation was started before any of this downgraded business began, it is now hopelessly compromised. To the extent that those who have influence in Washington can push the Justice Department to go harder on S&P, they probably will. It's also worth noting that the other rating agencies -- which made just as terrible mistakes as S&P during the housing bubble -- are not known to be targets of similar investigations." (Ex. P(30))

- February 4, 2013 – DOJ files its Complaint against **only S&P**, alleging misrepresentations about objectivity, independence, and conflicts of interest and inaccurate ratings. (Ex. P(31))

- February 5, 2013 – *McClatchy Newspapers* publishes, "Is U.S. Suit Against Rating Agency S&P Actually Retaliation?" The authors report that while the DOJ's original investigation included S&P and Moody's Investors Service, "[i]nvestigator interest in Moody's apparently dropped off around the summer of 2011, about the same time S&P issued the historic downgrade of the U.S. government's creditworthiness because of mounting debt and deficits." The article also quotes a source familiar with the investigations as stating: "After the U.S. downgrade, Moody's is no longer part of this." (Ex. P(32))

- February 5, 2013 – After consultation and coordination with the Department of Justice, thirteen states (Arizona, Arkansas, California, Colorado, Delaware, Idaho, Iowa, Maine, Missouri, North Carolina, Pennsylvania, Tennessee, and Washington) and the District of Columbia file lawsuits against **only S&P**, alleging misrepresentations regarding independence, objectivity, and management of conflicts of interest. (Ex. P(33))

- February 5, 2013 – Attorney General Eric Holder holds a press conference along with the Attorneys General of California, Connecticut, Delaware, the District of Columbia, Illinois, Iowa and Mississippi, regarding the state and federal lawsuits against S&P. In his remarks at the press conference, Mississippi Attorney General Jim Hood notes that Mississippi's suit, filed in May 2011, was against both **S&P and Moody's,** because these rating agencies **both** held themselves out to be independent. (Ex. P(34))

- February 5, 2013 – During the Q&A portion of Attorney General Holder's press conference concerning the DOJ's lawsuit against S&P, questions from the press reflect an already widespread perception that the case's focus on S&P is retaliation for S&P's 2011 downgrade of the U.S. One of the questions posed to Associate Attorney General Tony West is: "For the average citizen at home, explain why . . . some critics are saying that this is retribution for the lowering of the U.S. credit." As a follow-up, the question is raised, "Can someone talk about the irony of the case you're bringing today, alleging basically fraud on the part of this company, and yet it's the same company that lowered the U.S. credit rating, which many think led to another hit on the economy?" Responding to this press inquiry, Eric Holder says that there is "no connection" between the new actions against **only S&P** and S&P's downgrade of the U.S. (Ex. P(34))

- February 6, 2013 – Despite Attorney General Holder's denial of a connection between the DOJ's lawsuit and S&P's downgrade of the U.S. in 2011, media

5

coverage of the government's press conference continues to quote experts suggesting such a link. An AP story reported that: "Michael Robinson, a former communications official at the SEC, said that while all three major rating agencies have lost credibility since the financial crisis, S&P's downgrade of U.S. debt put a bull's-eye on its back. 'Once you get on the government's radar, it's hard to get off scot-free,' Robinson said." (Ex. P(35))

- February 6, 2013 – The *Wall Street Journal* publishes an editorial entitled "Payback for a Downgrade?" The editorial notes that there are "disturbing questions related to the timing and the target of this federal civil prosecution," and points out that "the company that put a shot across the Beltway bow over deficit spending is now the only target of a credit-ratings prosecution." (Ex. P(36))

- February 25, 2013 – *The Guardian* publishes an op-ed entitled, "Moody's, S&P and Other Credit Rating Agencies Deserve a Failing Grade," in which the author draws the following connection between S&P and Egan-Jones: "Further, Egan Jones and S&P share two characteristics that should raise an eyebrow: both downgraded the US and subsequently faced disciplinary action from the US government. Perhaps this helps explain why Moody's chose to downgrade the UK while leaving the US at Aaa. The two countries have virtually identical central government net debt-to-GDP ratios, while the UK has significantly smaller central government deficits and is less subject to interest rate spikes due to the longer average maturity of its bond issues." (Ex. P(37))

- September 4, 2013 – Mark Calabria of the CATO Institute publishes an op-ed, noting that before the S&P's downgrade, the smaller rating agency, Egan-Jones, downgraded the U.S. and was investigated by the SEC shortly thereafter. The editorial posits that, "We see what starts to look like a pattern here: downgrade the United States and expect some abuse. Don't and you will be largely left alone." (Ex. P(38))

- September 9, 2013 – The *Wall Street Journal* publishes an editorial entitled, "S&P and Downgrade Payback," concluding that, "We don't think Justice's dubious claims should be levelled against anyone, and its banks-as-victims argument is ludicrous. But far more troubling is that this case has the aroma of political payback." (Ex. P(39))

6

<u>Exhibits Cited in Chronology in Support of S&P's First Amendment Retaliation Defense:</u>

Ex. P(1)    Securities and Exchange Commission, "Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies," July 2008, *available at* http://www.sec.gov/news/studies/2008/craexamination070808.pdf.

Ex. P(2)    "Credit Rating Agencies Reach Agreement With New York AG," *BCD News and Comment*, June 24, 2008, Vol. 50 No. 2.

Ex. P(3)    Excerpts from the Complaint filed in *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, No. 08-CIV-7508 (S.D.N.Y.), on Aug. 25, 2008.

Ex. P(4)    Aaron Lucchetti and Judith Burns, "U.S. News: Moody's CEO Warned Profit Push Posed a Risk to Quality of Ratings," *The Wall Street Journal*, Oct. 23, 2008, at A4.

Ex. P(5)    Karen Gullo, "S&P, Moody's Must Face Calpers Lawsuit Over Ratings, Judge Rules," *Bloomberg Businessweek*, Jan. 13, 2012, *available at* http://www.businessweek.com/printer/articles/241438?type=bloomberg.

Ex. P(6)    Complaint filed in *California Public Employees' Retirement Sys. v. Moody's Corp.*, on July 9, 2009, CGC-09-490241 (Cal. Super. Ct.).

Ex. P(7)    Excerpts from Complaint filed in *King Cnty., Wash. v. IKB Deutsche Industriebank AG*, No. 09-CIV-8387 (S.D.N.Y.), on Oct. 2, 2009.

Ex. P(8)    Excerpts from Complaint filed in *Iowa Student Loan Liquidity Corp. v. IKB Deutsche Industriebank AG*, No. 09-CV-8822 (S.D.N.Y.), on Oct. 16, 2009.

Ex. P(9)    "Connecticut Sues Moody's and S.&P. Over Ratings," *The New York Times Dealbook*, Mar. 10, 2010.

Ex. P(10)   Complaint filed in *Connecticut v. Moody's Corp.* (Conn. Super. Ct.) on Mar. 10, 2010; Excerpts from Complaint filed in *Connecticut v. McGraw-Hill Cos.* (Conn. Super. Ct.), on Mar. 10, 2010.

Ex. P(11)   Press Release, Conn. Att'y Gen., "Attorney General Leads Multistate Coalition Challenging Standard & Poor's Ratings" (Feb. 5, 2013), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=518298&A=2341&pp=12&n=1.

Ex. P(12)   Senator Carl Levin, "Permanent Subcommittee on Investigations," *available at* http://www.levin.senate.gov/senate/committees/investigations/ (last visited on or about Jan. 12, 2014).

Ex. P(13)   Excerpts from U.S. Senate: Permanent Subcommittee on Investigations, "Wall Street And The Financial Crisis: Anatomy of a Financial Collapse," Apr. 13, 2011, *available at* http://www.hsgac.senate.gov/imo/media/doc/Financial_Crisis/ FinancialCrisisReport.pdf?attempt=2.

Ex. P(14)   Excerpts from The Financial Crisis Inquiry Commission, "Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States," Jan. 2011, *available at* http://fcic-static.law.stanford.edu/cdn_media/ fcic-reports/fcic_final_report_full.pdf.

7

Ex. P(15)   Press Release, Standard & Poor's, "'AAA/A-1+' Rating On United States of America Affirmed; Outlook Revised To Negative," Apr. 18, 2011, *available at* http://www.standardandpoors.com/ratings/articles/en/us/?assetID=1245302886884.

Ex. P(16)   Patrick O'Connor, "U.S. Treasury Criticizes S&P Move," *The Wall Street Journal,* Washington Wire, Apr. 18, 2011, *available at* http://blogs.wsj.com/washwire/2011/04/18/u-s-treasury-criticizes-sp-move/.

Ex. P(17)   David Lawder, "Geithner Says 'No Risk' U.S. Will Lose AAA Rating," *Reuters News*, Apr. 19, 2011.

Ex. P(18)   Zachary A. Goldfarb, "Treasury Was Unable to Sway S&P," *The Washington Post*, Apr. 20, 2011, at A05.

Ex. P(19)   Press Release, "Attorney General Hood Applauds Multistate Coalition Challenging Standard & Poor's Ratings," Feb. 5, 2013, *available at* http://www.ago.state.ms.us/wp-content/uploads/2013/08/Feb.-5_-AG-Applauds-Multistate-Coalition-Challenging-Standard-Poors-Rating-Mortgage.pdf.

Ex. P(20)   Complaint filed in *Mississippi v. McGraw-Hill Cos.,* on May 10, 2011, G2011-835S/A (Miss. Ch. Ct.).

Ex. P(21)   Press Release, Standard & Poor's, "United States of America 'AAA/A-1+' Ratings Placed On CreditWatch Negative On Rising Risk Of Policy Stalemate," July 14, 2011, *available at* https://www.standardandpoors.com/ratings/articles/en/us/?articleType=HTML&assetID=1245315237257.

Ex. P(22)   Tom Petruno, "No More AAA Rating for U.S. Debt?" *Los Angeles Times*, July 16, 2011.

Ex. P(23)   Binyamin Applebaum and Eric Dash, "S.&P. Downgrades Debt Rating of U.S. for the First Time," *The New York Times*, Aug. 6, 2011, at A1.

Ex. P(24)   John Harwood, "10 Questions for Geithner," *The New York Times*, The Caucus, Aug. 8. 2011.

Ex. P(25)   Lauren Effron, "Obama Economic Advisor: S&P's Downgrade Was 'Reckless'," ABC News Blog, Aug. 8, 2011, *available at* http://abcnews.go.com/blogs/politics/2011/08/obama-economic-advisor-sps-downgrade-was-reckless/.

Ex. P(26)   Laura MacInnis and Eric Walsh, "White House Advisor Slams S&P After U.S. Downgrade," *Reuters News*, Aug. 7, 2011.

Ex. P(27)   "U.S. President Barack Obama Delivers Remarks – Final," FD (Fair Disclosure) Wire, Aug. 8, 2011 ("In fact, Warren Buffett, who knows a thing or two about good investments, said, 'If there were a AAAA rating, I'd give the United States that.'").

Ex. P(28)   GuruFocus, "As Moody's Stock Price Recovers, Warren Buffett Sells," *Forbes*, May 2, 2013 (discussing the extent of Warren Buffett's Berkshire Hathaway's investments in Moody's), *available at* http://www.forbes.com/sites/gurufocus/2013/05/02/as-moodys-stock-price-recovers-warren-buffett-sells/.

Ex. P(29)   Louise Story, "Justice Inquiry Is Said to Focus on S.&.P. Ratings," *New York*

*Times*, Aug. 18, 2011, at A1.

Ex. P(30)    Daniel Indiviglio, "The Backlash Against S&P Begins," *The Atlantic,* Aug. 18, 2011, *available at* http://www.theatlantic.com/business/archive/2011/08/the-backlash-against-s-p-begins/243806/.

Ex. P(31)    Excerpts from Complaint filed in *United States v. McGraw-Hill Cos.* on Feb. 4, 2013 (C.D. Cal.).

Ex. P(32)    Kevin G. Hall & Greg Gordon, "Is U.S. Suit Against Rating Agency S&P Actually Retaliation?" *McClatchy Newspapers*, Feb. 5, 2013.

Ex. P(33)    Press Release, "Biden, 12 States and Federal Government Sue S&P for Deceiving Consumers and Investors with Devastating Economic Consequences" (Feb. 5, 2013), *available at* http://news.delaware.gov/2013/02/05/biden-12-states-and-federal-government-sue-sp-for-deceiving-consumers-and-investors-with-devastating-economic-consequences/ (noting that the state and federal lawsuits were "part of a coordinated law enforcement action").

Ex. P(34)    Transcript, Press Conference, Attorney General Eric Holder, Associate Attorney General Tony West and Deputy Assistant Attorney General Stuart Delery, "Announcement of a Major Financial Fraud Enforcement Action," Fed. News. Ser., Feb. 5, 2013.

Ex. P(35)    AP, "US Accuses S&P of Inflating Ratings To Satisfy Banks," *Telegraph Online (UK)*, Feb. 6, 2013.

Ex. P(36)    Editorial, "Payback for a Downgrade?" *The Wall Street Journal*, Feb. 6, 2013, at A12.

Ex. P(37)    Marc Joffe, "Moody's, S&P and Other Credit Rating Agencies Deserve a Failing Grade," *The Guardian*, Feb. 25, 2013, *available at* http://www.theguardian.com/commentisfree/2013/feb/25/moodys-sp-credit-rating-agencies-need-reform/.

Ex. P(38)    Mark A. Calabria, "SP's Dilemma: Rating Your Regulator," Cato@Liberty, Sept. 4, 2013.

Ex. P(39)    Editorial, "S&P and Downgrade Payback," *The Wall Street Journal*, Sept. 9, 2013, at A14.

9

# EXHIBIT P(1)



# Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies

**By the Staff of the**
**Office of Compliance Inspections and Examinations**
**Division of Trading and Markets and**
**Office of Economic Analysis**

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

## July 2008

# TABLE OF CONTENTS

I.    Summary ............................................................................................................... 1

II.   Background ........................................................................................................... 2
      A.    The Examinations .................................................................................... 2
      B.    Current Regulatory Requirements and Proposed New Rules and Rule
            Amendments With Respect to Credit Rating Agencies .......................... 4

III.  The Ratings Process ............................................................................................ 6
      A.    The Creation of RMBS and CDOs .......................................................... 6
      B.    Determining Credit Ratings for RMBS and CDOs ................................. 7

IV.   The Staff's Examinations: Summary of Factual Findings, Observations and
      Recommendations ............................................................................................. 10
      A.    There was a Substantial Increase in the Number and in the Complexity of
            RMBS and CDO Deals Since 2002, and Some Rating Agencies Appeared to
            Struggle with the Growth .................................................................... 10
      B.    Significant Aspects of the Ratings Process Were Not Always Disclosed ........ 13
      C.    Policies and Procedures for Rating RMBS and CDOs Can be Better
            Documented ........................................................................................ 16
      D.    Rating Agencies are Implementing New Practices with Respect to the
            Information Provided to Them .............................................................. 17
      E.    Rating Agencies Did Not Always Document Significant Steps in the Ratings
            Process -- Including the Rationale for Deviations From Their Models and for
            Rating Committee Actions and Decisions -- and They Did Not Always
            Document Significant Participants in the Ratings Process ...................... 19
      F.    The Surveillance Processes Used by the Rating Agencies Appear to Have
            Been Less Robust Than Their Initial Ratings Processes ........................ 21
      G.    Issues Were Identified in the Management of Conflicts of Interest and
            Improvements Can be Made ................................................................. 23
            1.    The "Issuer Pays" Conflict .................................................... 23
            2.    Analysts' Compensation ....................................................... 27
            3.    Securities Transactions by Employees of Credit Rating Agencies ....... 28
      H.    Internal Audit Processes ...................................................................... 29

V.    Observations by the Office of Economic Analysis .......................................... 31
      A.    Conflicts of Interest ............................................................................. 31
      B.    Factual Summary of the Ratings Process for RMBS ............................. 33
            1.    Risk Variables ...................................................................... 34
            2.    Use of Historical Data ......................................................... 35
            3.    Surveillance of Ratings ........................................................ 35
      C.    Factual Summary of the Ratings Process for CDOs .............................. 36

VI.   Conclusion ......................................................................................................... 37

**Summary Report of Issues Identified in the Commission Staff's Examinations
of Select Credit Rating Agencies
By the Staff of the Securities and Exchange Commission
July 8, 2008**

## I.     Summary

In August 2007, the Securities and Exchange Commission's Staff initiated examinations of three credit rating agencies -- Fitch Ratings, Ltd. ("Fitch"), Moody's Investor Services, Inc. ("Moody's") and Standard & Poor's Ratings Services ("S&P") -- to review their role in the recent turmoil in the subprime mortgage-related securities markets.  These firms registered with the Commission as nationally recognized statistical rating organizations in September 2007 (collectively, the examined firms are referred to in this report as the "rating agencies" or "NRSROs").  These firms were not subject to the Credit Rating Agency Reform Act of 2006 or Commission regulations for credit rating agencies until September 2007.  The focus of the examinations was the rating agencies' activities in rating subprime residential mortgage-backed securities ("RMBS") and collateralized debt obligations ("CDOs") linked to subprime residential mortgage-backed securities.  The purpose of the examinations was to develop an understanding of the practices of the rating agencies surrounding the rating of RMBS and CDOs.  This is a summary report by the Commission's Staff of the issues identified in those examinations.[1]

In sum, as described in Section IV of this report, while the rating agencies had different policies, procedures and practices and different issues were identified among the firms examined, the Staff's examinations revealed that:

- there was a substantial increase in the number and in the complexity of RMBS and CDO deals since 2002, and some of the rating agencies appear to have struggled with the growth;

- significant aspects of the ratings process were not always disclosed;

- policies and procedures for rating RMBS and CDOs can be better documented;

- the rating agencies are implementing new practices with respect to the information provided to them;

- the rating agencies did not always document significant steps in the ratings process -- including the rationale for deviations from their models and for rating committee actions and decisions -- and they did not always document significant participants in the ratings process;

---

[1]  This is a report of the Commission's Staff and does not include findings or conclusions by the Commission.  This report also includes a description of the examinations conducted and current regulatory requirements for NRSROs (in Section II) and a description of the ratings process (in Section III).

- the surveillance processes used by the rating agencies appear to have been less robust than the processes used for initial ratings;

- issues were identified in the management of conflicts of interest and improvements can be made; and

- the rating agencies' internal audit processes varied significantly.

This report also summarizes generally the remedial actions that the examined NRSROs have said they will take as a result of these examinations. In addition, this report also describes the Commission's proposed rules, which, if adopted, would require that the NRSROs take further actions.[2]

In conjunction with the Staff's examinations of the three rating agencies, the Staff of the Office of Economic Analysis ("OEA Staff") reviewed the processes used by these firms with respect to rating RMBS and CDOs that held subprime RMBS securities. The purpose of the OEA Staff's review was to gain insight into the conflicts of interest in the ratings process for RMBS and CDOs, and to gain an understanding of the ratings methodologies employed by the rating agencies so that the Staff could better evaluate the extent to which conflicts of interest may have entered into and affected the ratings process. Section V of this report summarizes conflicts of interest that are unique to these products and provides a factual summary of the models and methodologies used by the rating agencies. This information is provided in this report solely to provide transparency to the ratings process and the activities of the rating agencies in connection with the recent subprime mortgage turmoil. The Staff does not make recommendations or seek to regulate the substance of the methodologies used.[3]

## II.     Background

### A.      The Examinations

Beginning in 2007, delinquency and foreclosure rates for subprime mortgage loans in the United States dramatically increased, creating turmoil in the markets for residential mortgage-backed securities backed by such loans and collateralized debt obligations linked to such securities. As the performance of these securities continued to deteriorate, the three rating agencies most active in rating these instruments downgraded a significant number of their ratings. The rating agencies performance in rating these structured finance products raised questions about the accuracy of their credit ratings generally as well as the integrity of the ratings process as a whole.

---

[2]     Prior to being registered as NRSROs, Fitch, Moody's and S&P were designated as NRSROs pursuant to No-Action Letters issued by the Staff of the Division of Trading and Markets. *See* Release No. 34-55857 (June 18, 2007).

[3]     In conducting these examinations, the Commission was expressly prohibited from regulating "the substance of the credit ratings or the procedures and methodologies" by which any NRSRO determines credit ratings. 15 U.S.C. §78o-7(c)(2).

On August 31, 2007, the Staff in the Commission's Office of Compliance Inspections
and Examinations ("OCIE"), Division of Trading and Markets ("Trading & Markets")
and Office of Economic Analysis ("OEA Staff") (collectively "the Staff") initiated
examinations of Fitch, Moody's and S&P with respect to their activities in rating
subprime RMBS and CDOs.[4]   Specifically, key areas of review included:

- ➢ the NRSROs' ratings policies, procedures and practices, including gaining an
  understanding of ratings models, methodologies, assumptions, criteria and
  protocols;

- ➢ the adequacy of the disclosure of the ratings process and methodologies used by
  the NRSROs;

- ➢ whether the NRSROs complied with their ratings policies and procedures for
  initial ratings and ongoing surveillance;

- ➢ the efficacy of the NRSROs' conflict of interest procedures; and

- ➢ whether ratings were unduly influenced by conflicts of interest related to the
  NRSROs' role in bringing issues to market and the compensation they receive
  from issuers and underwriters.

The examinations also included a review of whether the examined rating agencies had
policies and procedures to detect and address ratings determined to be inaccurate as a
result of errors in ratings models used.  Initial observations as a result of this aspect of the
examinations are also included in this report.

The examination review period generally covered January 2004 through the present.  The
firms under examination became subject to regulation as NRSROs when they registered
with the Commission as NRSROs in September 2007.  Although these rating agencies
were not subject to legal obligations applicable to NRSROs during most of the review
period, the Staff nonetheless sought to make relevant factual findings and observations
with respect to the activities of these firms in rating subprime RMBS and CDOs during
the period, as well as to identify possible areas for improvement in their practices going
forward.

The examinations included extensive on-site interviews with the rating agencies' staff,
including senior and mid-level managers, initial ratings analysts and surveillance
analysts, internal compliance personnel and auditors, personnel responsible for building,
maintaining and upgrading the ratings models and methodologies used in the ratings
process and other relevant rating agency staff.

In addition, the Staff reviewed a large quantity of the rating agencies' internal records,
including written policies, procedures and other such documents related to initial ratings,

---

[4]      Over 50 Commission Staff participated in these examinations.

Page 3

the ongoing surveillance of ratings, the management of conflicts of interest and the public disclosures of the procedures and methodologies for determining credit ratings. The Staff also reviewed deal files for subprime RMBS and CDO ratings, internal audit reports and records and other internal records, including a large quantity of email communications (the rating agencies produced over two million emails and instant messages that were sorted, analyzed and reviewed using software filtering tools). Finally, the Staff reviewed the rating agencies' public disclosures, filings with the Commission and other public documents.

### B.   Current Regulatory Requirements and Proposed New Rules and Rule Amendments With Respect to Credit Rating Agencies

The Rating Agency Reform Act was enacted on September 29, 2006. The Act created a new Section 15E of the Securities Exchange Act of 1934 ("Exchange Act"), providing for Commission registration of NRSROs if specific requirements are met. Section 15E also provides authority for the Commission to implement financial reporting and oversight rules with respect to registered NRSROs. The Rating Agency Reform Act amended Section 17(a) of the Exchange Act to provide for Commission authority to require reporting and recordkeeping requirements for registered NRSROs, as well as examination authority with respect to ratings activity conducted by the NRSROs. The Rating Agency Reform Act expressly prohibits the Commission from regulating "the substance of the credit ratings or the procedures and methodologies" by which any NRSRO determines credit ratings. The Commission voted to adopt rules related to NRSROs on June 18, 2007, which became effective on June 26, 2007.

Under the new law and rules, NRSROs are required to make certain public disclosures, make and retain certain records, furnish certain financial reports to the Commission, establish procedures to manage the handling of material non-public information and disclose and manage conflicts of interest. The Commission's rules additionally prohibit an NRSRO from having certain conflicts of interest and engaging in certain unfair, abusive, or coercive practices.

In order to increase transparency in the ratings process and to curb practices that contributed to recent turmoil in the credit market, on June 11, 2008 the Commission proposed additional rules with respect to NRSROs.[5] The Commission was informed by, among other things, the information from these then-ongoing Staff examinations. In sum, the Commission proposed to:

> ➢ Prohibit an NRSRO from issuing a rating on a structured product unless information on the characteristics of assets underlying the product is available, in order to allow other credit rating agencies to use the information to rate the

---

[5]   *Proposed Rules for Nationally Recognized Statistical Rating Organizations*, June 16, 2008, http://www.sec.gov/rules/proposed/2008/34-57967.pdf. The comment period for the proposed rules extends through July 25, 2008.

product and, potentially, expose a rating agency whose ratings were unduly influenced by the product's sponsors.

➢ Prohibit an NRSRO from issuing a rating where the NRSRO or a person associated with the NRSRO has made recommendations as to structuring the same products that it rates.

➢ Require NRSROs to make all of their ratings and subsequent rating actions publicly available, to facilitate comparisons of NRSROs by making it easier to analyze the performance of the credit ratings the NRSROs issue in terms of assessing creditworthiness.

➢ Prohibit anyone who participates in determining a credit rating from negotiating the fee that the issuer pays for it, to prevent business considerations from undermining the NRSRO's objectivity.

➢ Prohibit gifts from those who receive ratings to those who rate them, in any amount over $25.

➢ Require NRSROs to publish performance statistics for one, three and ten years within each rating category, in a way that facilitates comparison with their competitors in the industry.

➢ Require disclosure by the NRSROs of whether and how information about verification performed on the assets underlying a structured product is relied on in determining credit ratings.

➢ Require disclosure of how frequently credit ratings are reviewed; whether different models are used for ratings surveillance than for initial ratings; and whether changes made to models are applied retroactively to existing ratings.

➢ Require NRSROs to make an annual report of the number of ratings actions they took in each ratings class.

➢ Require documentation of the rationale for any material difference between the rating implied by a qualitative model that is a "substantial component" in the process of determining a credit rating and the final rating issued.

➢ Require NRSROs to differentiate the ratings they issue on structured products from other securities, either through issuing a report disclosing how procedures and methodologies and credit risk characteristics for structured finance products differ from other securities, or using different symbols, such as attaching an identifier to the rating.

### III.    The Ratings Process

The general processes used to create and rate RMBS and CDOs are described below.

#### A.    The Creation of RMBS and CDOs

The process for creating a RMBS begins when an arranger, generally an investment bank, packages mortgage loans -- generally thousands of separate loans -- into a pool, and transfers them to a trust that will issue securities collateralized by the pool.  The trust purchases the loan pool and becomes entitled to the interest and principal payments made by the borrowers.  The trust finances the purchase of the loan pool through the issuance of RMBS to investors.  The monthly interest and principal payments from the loan pool are used to make monthly interest and principal payments to the investors in the RMBS.

The trust typically issues different classes of RMBS (known as "tranches"), which offer a sliding scale of coupon rates based on the level of credit protection afforded to the security.  Credit protection is designed to shield the tranche securities from the loss of interest and principal due to defaults of the loans in the pool.  The degree of credit protection afforded a tranche security is known as its "credit enhancement" and is provided through several means, each of which is described below.

The primary source of credit enhancement is subordination, which creates a hierarchy of loss absorption among the tranche securities.  For example, if a trust issued securities in 10 different tranches, the first (or senior) tranche would have nine subordinate tranches, the next highest tranche would have eight subordinate tranches and so on down the capital structure.  Any loss of interest and principal experienced by the trust from delinquencies and defaults in loans in the pool are allocated first to the lowest tranche until it loses all of its principal amount and then to the next lowest tranche and so on up the capital structure.  Consequently, the senior tranche would not incur any loss until all the lower tranches have absorbed losses from the underlying loans.

A second form of credit enhancement is over-collateralization, which is the amount that the principal balance of the mortgage pool exceeds the principal balance of the tranche securities issued by the trust.  This excess principal creates an additional "equity" tranche below the lowest tranche security to absorb losses.  In the example above, the equity tranche would sit below the tenth tranche security and protect it from the first losses experienced as a result of defaulting loans.

A third form of credit enhancement is excess spread, which is the amount that the trust's monthly interest income exceeds its monthly liabilities.  Excess spread is comprised of the amount by which the total interest received on the underlying loans exceeds the total interest payments due to investors in the tranche securities (less administrative expenses of the trust, such as loan servicing fees, premiums due on derivatives contracts, and bond insurance).  This excess spread can be used to build up loss reserves or pay off delinquent interest payments due to a tranche security.

The process for creating a typical CDO is similar to that of an RMBS. A sponsor creates a trust to hold the CDO's assets and issue its securities. Generally, a CDO is comprised of 200 or so debt securities (rather than mortgage loans that are held in RMBS pools). The CDO trust uses the interest and principal payments from the underlying debt securities to make interest and principal payments to investors in the securities issued by the trust. Similar to RMBS, the trust is structured to provide differing levels of credit enhancement to the securities it issues through subordination, over-collateralization, excess spread and bond insurance. In addition to the underlying assets, one significant difference between a CDO and an RMBS is that the CDO may be actively managed such that its underlying assets change over time, whereas the mortgage loan pool underlying an RMBS generally remains static.

In recent years, CDOs have been some of the largest purchasers of subprime RMBS and the drivers of demand for those securities. According to one NRSRO, the average percentage of subprime RMBS in the collateral pools of CDOs it rated grew from 43.3% in 2003 to 71.3% in 2006. As the market for mortgage-related CDOs grew, CDO issuers began to use credit default swaps to replicate the performance of subprime RMBS and CDOs. In this case, rather than purchasing subprime RMBS or CDOs, the CDO entered into credit default swaps referencing subprime RMBS or CDOs, or indexes on RMBS. These CDOs, in some cases, are composed entirely of credit default swaps ("synthetic CDOs") or a combination of credit default swaps and cash RMBS ("hybrid CDOs").

### B.  Determining Credit Ratings for RMBS and CDOs

A key step in the process of creating and ultimately selling a subprime RMBS and CDO is the issuance of a credit rating for each of the tranches issued by the trust (with the exception of the most junior "equity" tranche). The credit rating for each rated tranche indicates the credit rating agency's view as to the creditworthiness of the debt instrument in terms of the likelihood that the issuer would default on its obligations to make interest and principal payments on the debt instrument.

The three examined rating agencies generally followed similar procedures to develop ratings for subprime RMBS and CDOs. The arranger of the RMBS initiates the ratings process by sending the credit rating agency a range of data on each of the subprime loans to be held by the trust (e.g., principal amount, geographic location of the property, credit history and FICO score of the borrower, ratio of the loan amount to the value of the property and type of loan: first lien, second lien, primary residence, secondary residence), the proposed capital structure of the trust and the proposed levels of credit enhancement to be provided to each RMBS tranche issued by the trust. Upon receipt of the information, the rating agency assigns a lead analyst who is responsible for analyzing the loan pool, proposed capital structure and proposed credit enhancement levels and, ultimately, for formulating a ratings recommendation for a rating committee composed of analysts and/or senior-level analytic personnel.

The next step in the ratings process is for the analyst to develop predictions, based on a quantitative expected loss model and other qualitative factors, as to how many of the

loans in the collateral pool would default under stresses of varying severity. This analysis also includes assumptions as to how much principal would be recovered after a defaulted loan is foreclosed. To assess the potential future performance of the loan under various possible scenarios, each rating agency generally uses specific credit characteristics to analyze each loan in the collateral pool. These characteristics include the loan information described above as well as the amount of equity that the borrowers have in their homes, the amount of documentation provided by borrowers to verify their assets and/or income levels and whether the borrowers intend to rent or occupy their homes.

The purpose of this loss analysis is to determine how much credit enhancement a given tranche security would need for a particular category of credit rating. The severest stress test (i.e., the one that would result in the greatest number of defaults among the underlying loans) is run to determine the amount of credit enhancement required for an RMBS tranche issued by the trust to receive the highest rating. The next severest stress test is run to determine the amount of credit enhancement required of the next highest tranche and so on down the capital structure. The lowest rated tranche is analyzed under a more benign market scenario. Consequently, its required level of credit enhancement -- typically provided primarily or exclusively by a subordinate equity tranche -- is based on the number of loans expected to default in the normal course given the lowest possible level of macroeconomic stress.

The next step in the ratings process is for the analyst to check the proposed capital structure of the RMBS against requirements for a particular rating. Typically, if the analyst concludes that the capital structure of the RMBS does not support the desired ratings, this preliminary conclusion would be conveyed to the arranger. The arranger could accept that determination and have the trust issue the securities with the proposed capital structure and the lower rating or adjust the structure to provide the requisite credit enhancement for the senior tranche to get the desired highest rating. Generally, arrangers aim for the largest possible senior tranche, i.e., to provide the least amount of credit enhancement possible, since the senior tranche -- as the highest rated tranche -- pays the lowest coupon rate of the RMBS' tranches and, therefore, costs the arranger the least to fund.

The next step in the process is for the analyst to conduct a cash flow analysis on the interest and principal expected to be received by the trust from the pool of subprime loans to determine whether it will be sufficient to pay the interest and principal due on each RMBS tranche issued by the trust. The rating agency uses quantitative cash flow models that analyze the amount of principal and interest payments expected to be generated from the loan pool each month over the terms of the RMBS tranche securities under various stress scenarios. The outputs of this model are compared against the priority of payments (the "waterfall") to the RMBS tranches specified in the trust legal documents. The waterfall documentation could specify over-collateralization and excess spread triggers that, if breached, reallocated principal and interest payments from lower tranches to higher tranches until the minimum levels of over-collateralization and excess spread were reestablished. Ultimately, the monthly principal and interest payments derived from the

loan pool need to be enough to satisfy the monthly payments of principal and interest due by the trust to the investors in the RMBS tranches as well as to cover the administrative expenses of the trust. The analyst also reviews the legal documentation of the trust to evaluate whether it is bankruptcy remote, i.e., isolated from the effects of any potential bankruptcy or insolvency of the arranger.

Following these steps, the analyst develops a rating recommendation for each RMBS tranche and then presents it to a rating committee composed of analysts and/or senior-level analytic personnel. The rating committee votes on the ratings for each tranche and usually communicates its decision to the arranger. In most cases, an arranger can appeal a rating decision, although the appeal is not always granted (and, if granted, may not necessarily result in any change in the rating decision). Final ratings decisions are published and subsequently monitored through surveillance processes. Typically, the rating agency is paid only if the credit rating is issued, though sometimes it receives a breakup fee for the analytic work undertaken even if the credit rating is not issued.

The rating agencies' process for assigning ratings to subprime CDOs is similar and also involves a review of the creditworthiness of each tranche of the CDO. As with RMBS, the process centers on an examination of the pool of assets held by the trust and an analysis of how they would perform individually and in correlation during various stress scenarios. However, this analysis is based primarily on the credit rating of each RMBS or CDO in the underlying pool (or referenced through a credit default swap entered into by the CDO) and does not include an analysis of the underlying asset pools in the RMBS.

CDOs collateralized by RMBS or by other CDOs often are actively managed. Consequently, there can be frequent changes to the composition of the cash assets (RMBS or CDOs), synthetic assets (credit default swaps), or combinations of cash and synthetic assets in the underlying pool. As a result, ratings for managed CDOs are based not on the composition of the pool but instead on covenanted limits for each potential type of asset that could be put in the pool. Typically, following a post-closing period in which no adjustments can be made to the collateral pool, the CDO's manager has a predetermined period of several years in which to adjust that asset pool through various sales and purchases pursuant to covenants set forth in the CDO's indenture. These covenants set limitations and requirements for the collateral pools of CDOs, often by establishing minimum and maximum concentrations for certain types of securities or certain ratings.

In developing a rating for a CDO, the analyst uses the CDO's indenture guidelines to run "worst-case" scenarios based on the collateral that is permitted under the indenture. In preparing a rating for that CDO, an analyst will run the rating agency's models based on all possible collateral pools permissible under the indenture guidelines, placing the most weight on the results from the weakest potential pools (i.e., the minimum permissible amount, 10%, of the highest-rated securities and the lowest-rated investment grade securities for the remaining 90%). As with RMBS ratings, the analyst then compares the model results against the capital structure of the proposed CDO to confirm that the level of subordination, over-collateralization and excess spread available to each tranche

provides the necessary amount of credit enhancement to sustain a particular rating. The process is the same as for an RMBS rating, the analyst makes a recommendation for a rating to a ratings committee, which votes on the rating for each tranche and usually communicates its decision to the arranger.

## IV.   The Staff's Examinations: Summary of Factual Findings, Observations and Recommendations

The Staff's general factual findings, observations and recommendations from the examinations are summarized below. This is a general summary of the issues identified, and the practices, policies and procedures varied among the firms examined.[6] Not all of the issues described below were found at each rating agency. The Staff notes that the rating agencies cooperated with the Staff's examinations. Each of the rating agencies examined has agreed to implement the Staff's recommendations, though individual firms may not have agreed with the Staff's factual findings giving rise to the recommendation.

### A.   There was a Substantial Increase in the Number and in the Complexity of RMBS and CDO Deals Since 2002, and Some Rating Agencies Appeared to Struggle with the Growth

From 2002 to 2006, the volume of RMBS and CDO deals rated by the rating agencies examined substantially increased, as did the revenues the firms derived from rating these products. As the number of RMBS and CDOs rated by these agencies increased, each rating agency also increased, to varying degrees, the number of staff assigned to rate these securities. With respect to RMBS, each rating agency's staffing increase approximately matched the percentage increase in deal volume. With respect to CDOs, however, two rating agencies' staffing increases did not appear to match their percentage increases in deal volume.

---

[6]   Because Commission Staff examinations of specific firms are non-public in nature, this public report provides a summary of the issues found. It does not, however, identify any particular rating agency. Firm identifications are made only with respect to information that is already public. The Staff provided each rating agency examined with the opportunity to explain or clarify its internal documents, including emails (and in particular, the emails cited in this report). In some instances, a rating agency may disagree with the Staff's characterization of the emails or other documents referred to in this report.





The structured finance products that the rating agencies were asked to evaluate also became increasingly complex, including the expanded use of credit default swaps to replicate the performance of mortgage-backed securities. Further, the loans to retail borrowers being securitized into RMBS, particularly subprime RMBS, became more complex and less conservative.

> ➤ *Internal documents at two of the rating agencies appear to reflect struggles to adapt to the increase in the volume and complexity of the deals.*

      o  There are indications that ratings were issued notwithstanding that one or more issues raised during the analysis of the deal remained unresolved.[7]

      o  For example, in one exchange of internal communications between two analysts at one rating agency, the analysts were concerned about whether they should be rating a particular deal.  One analyst expressed concern that her firm's model did not capture "half" of the deal's risk, but that "it could be structured by cows and we would rate it."[8]

      o  Resource issues appear to have existed in other structured finance groups outside of the RMBS and CDO areas.  For instance, at one rating agency, an analytical manager in the firm's real estate group stated in one email that "[o]ur staffing issues, of course, make it difficult to deliver the value that justifies our fees"[9] and in another email that "[t]ensions are high.  Just too much work, not enough people, pressure from company, quite a bit of turnover and no coordination of the non-deal 'stuff' they want us and our staff to do."[10]  Similarly, an email from an employee in the same firm's asset backed securities group stated that "[w]e ran our staffing model assuming the analysts are working 60 hours a week and we are short on resources. . . . The analysts on average are working longer than this and we are burning them out.  We have had a couple of resignations and expect more."[11]

***Remedial Action:***  The Staff has recommended that each examined NRSRO evaluate, both at this time and on a periodic basis, whether it has sufficient staff and resources to manage its volume of business and meet its obligations under the Section 15E of the

---

[7]    For example, documents in a deal file state, regarding an issue related to the collateral manager: "We didn't ha [sic] time to discuss this in detail at the committee, so they dropped the issue for this deal due to timing.  We will need to revisit in the future." Another document describes an outstanding issue as "poorly addressed – needs to be checked in the next deal" and addresses the question of weighted average recovery rate by writing "(WARR- don't ask ☺)." (Deal File Documents 1 & 2).

[8]    Email No. 1: Analytical Staff to Analytical Staff (Apr. 5, 2007, 3:56 PM).  In another email, an analytical manager in the same rating agency's CDO group wrote to a senior analytical manager that the rating agencies continue to create an "even bigger monster – the CDO market.  Let's hope we are all wealthy and retired by the time this house of cards falters.;o)." Email No. 2: Analytical Manager to Senior Analytical Manager (Dec. 15, 2006, 8:31 PM).

[9]    Email No. 3: Senior Business Manager to Senior Business Manager (Apr. 27, 2007, 1:13 PM).

[10]    Email No. 4: Senior Business Manager to External Consultant (May 3, 2006, 10:20 AM).

[11]    Email No. 5: Analytical Manager to Senior Analytical Manager (Dec. 3, 2004, 11:10 AM).

Exchange Act and the rules applicable to NRSROs.  Each examined NRSRO stated that it will implement the Staff's recommendation.

**B.        Significant Aspects of the Ratings Process Were Not Always Disclosed**

The rating agencies stated to the Staff that, prior to being registered as NRSROs, they disclosed their ratings process.[12]  It appears, however, that certain significant aspects of the ratings process and the methodologies used to rate RMBS and CDOs were not always disclosed, or were not fully disclosed, as described below.

> ➢ *Relevant ratings criteria were not disclosed.*  Documents reviewed by the Staff indicate the use of unpublished ratings criteria.

> o   At one firm, communications by the firm's analytical staff indicate that they were aware of the use of unpublished criteria.  For example:

> > o   "[N]ot all our criteria is published.  [F]or example, we have no published criteria on hybrid deals, which doesn't mean that we have no criteria."[13]

> > o   A criteria officer in the Structured Finance Surveillance group noted "our published criteria as it currently stands is a bit too unwieldy and all over the map in terms of being current or comprehensive.  It might be too much of a stretch to say that we're complying with it because our SF [structured finance] rating approach is inherently flexible and subjective, while much of our written criteria is detailed and prescriptive.  Doing a complete inventory of our criteria and documenting all of the areas where it is out of date or inaccurate would appear to be a huge job - that would require far more man-hours than writing the principles-based articles."[14]

> > o   Another rating agency, from 2004 to 2006, reduced its model's raw loss numbers for second lien loans based upon internal matrices.  The raw loss outputs from the model were adjusted to set numbers from the matrices depending on the issuer and the raw loss numbers.  The rating agency did not publicly disclose its use of matrices to adjust model outputs for second lien loans.

---

[12]   Prior to being registered as NRSROs, the rating agencies did not have a regulatory requirement to disclose their methodologies.

[13]   Email No. 11: Analytical Manager to Issuer/Banker (Aug. 31, 2006, 12:04 PM).

[14]   Email No. 13: Senior Analytical Manager to Senior Analytical Manager (Mar. 14, 2007, 6:45 PM).

    ○   This rating agency also maintained a published "criteria report" that was no longer being used in its ratings process. The criteria report stated the rating agency conducted an extensive review of origination and servicing operations and practices, despite the fact that the RMBS group no longer conducted a formal review of origination operations and practices. This rating agency identified this discrepancy in its internal audit process and corrected it.

    ○   At a third rating agency in certain instances there was a time lag from the date at which the firm implemented changes to its criteria and the date at which it published notice of these changes to the market.[15] Additionally, the Staff discovered emails indicating that the firm's analysts utilized an unpublished model to assess data.[16]

➢ ***Rating agencies made "out of model adjustments" and did not document the rationale for the adjustment.*** In certain instances, the loss level that was returned by application of the rating agency's quantitative model was not used, and another loss level was used instead. These decisions to deviate from the model were approved by ratings committees but in many cases the rating agency did not have documentation explaining the rationale for the adjustments, making it difficult or impossible to identify the factors that led to the decision to deviate from the model. Two rating agencies frequently used "out of model" adjustments in issuing ratings.

    ○   One rating agency regularly reduced loss expectations on subprime second lien mortgages from the loss expectations output by its RMBS model, in some cases reducing the expected loss. While the rating agency's analysts might have discussed the adjustment with issuers in the course of rating a deal, it appears that the firm did not publicly disclose the practice of overriding model outputs regarding loss expectations on subprime second liens.

    ○   Another rating agency indicated to the Staff that its ratings staff, as a general practice, did not adjust its collateral or cash flow analysis based upon factors that were not incorporated into the firm's models. However, the Staff observed instances in the firm's deal files that demonstrated adjustments from the cash flow models as well as instances where the firm implemented changes to its ratings criteria which were utilized prior to disclosure or used before being incorporated into its models.

---

[15]   Email No. 14: Analytical Manager to Analytical Manager (Nov. 29, 2007, 20:08 GMT). Also email No. 15: Senior Business Manager to Senior Analytical Manager (Apr. 24, 2007, 18:50 GMT). Also email No. 16: Analytical Manager to Senior Analytical Manager (Feb. 7, 2007, 20:54 GMT). Also email No. 17: Analytical Staff to Analytical Staff (Nov. 15, 2006, 19:10 GMT).

[16]   Email No. 18: Analytical Staff to Senior Analytical Manager (Sept. 24, 2007, 18:26 GMT).

***Current Regulatory Requirements***: The Exchange Act and rules applicable to NRSROs
specifically address the importance of disclosure (the firms examined became subject to
these rules in September 2007).  An NRSRO is required to disclose in its application for
registration the procedures and methodologies that the applicant uses in determining
ratings.[17]  An NRSRO is required to include a description of the procedures and
methodologies it uses (but is not required to include each such written procedure or
methodology) on its registration form (Form NRSRO).  The instructions to the form
require that the description must be sufficiently detailed to provide users of credit ratings
with an understanding of the processes the applicant or NRSRO employs to determine
credit ratings.  The instructions also identify a number of areas that must be addressed in
the description, to the extent they are applicable.[18]

***Remedial Action:***  The Staff has recommended that each NRSRO examined conduct a
review of its current disclosures relating to processes and methodologies for rating
RMBS and CDOs to assess whether it is fully disclosing its ratings methodologies in
compliance with Section 15E of the Exchange Act and the rules applicable to NRSROs.
Further, the Staff has recommended that each NRSRO examined review whether its
policies governing the timing of disclosure of a significant change to a process or
methodology are reasonably designed to comply with these requirements.  Each
examined NRSRO stated that it will implement the Staff's recommendations.

***Proposed Rules and Rule Amendments That Would Address These Issues:***  The
Commission has proposed to require enhanced disclosures about the procedures and
methodologies that an NRSRO uses to determine credit ratings.[19]  The Commission also
proposed to add additional areas that an applicant and a registered NRSRO would be
required to address in its description of its procedures and methodologies in its Form
NRSRO.  Disclosure would be enhanced regarding the actions that an NRSRO is, or is
not taking, in determining credit ratings.  The additional areas proposed to be required to
be addressed in its Form NRSRO would be:

---

[17]     Section 15E(a)(1)(B)(ii) of the Exchange Act. 15 U.S.C. 78o-7(a)(1)(B)(ii).

[18]     Specifically, the instructions require an NRSRO to provide descriptions of the following areas (as
applicable): policies for determining whether to initiate a credit rating; a description of the public
and non-public sources of information used in determining credit ratings, including information
and analysis provided by third-party vendors; the quantitative and qualitative models and metrics
used to determine credit ratings; the methodologies by which credit ratings of other credit rating
agencies are treated to determine credit ratings for securities or money market instruments issued
by an asset pool or as part of any asset-backed or mortgaged-backed securities transaction; the
procedures for interacting with the management of a rated obligor or issuer of rated securities or
money market instruments; the structure and voting process of committees that review or approve
credit ratings; procedures for informing rated obligors or issuers of rated securities or money
market instruments about credit rating decisions and for appeals of final or pending credit rating
decisions; procedures for monitoring, reviewing, and updating credit ratings; and procedures to
withdraw, or suspend the maintenance of, a credit rating.

[19]     *Proposed Rules for Nationally Recognized Statistical Rating Organizations*, June 16, 2008,
http://www.sec.gov/rules/proposed/2008/34-57967.pdf.

o   How frequently credit ratings are reviewed, whether different models or criteria are used for ratings surveillance than for determining initial ratings, whether changes made to models and criteria for determining initial ratings are applied retroactively to existing ratings and whether changes made to models and criteria for performing ratings surveillance are incorporated into the models and criteria for determining initial ratings;

o   Whether and, if so, how information about verification performed on assets underlying or referenced by a security or money market instrument issued by an asset pool or as part of any asset-backed or mortgage-backed securities transaction is relied on in determining credit ratings; and

o   Whether and, if so, how assessments of the quality of originators of assets underlying or referenced by a security or money market instrument issued by an asset pool or as part of any asset-backed or mortgage-backed securities transaction play a part in the determination of credit ratings.

**C.   Policies and Procedures for Rating RMBS and CDOs Can be Better Documented**

Each of the rating agencies has policies that emphasize the importance of providing accurate ratings with integrity. Upon their registration as NRSROs in September 2007, each of the rating agencies examined became subject to a requirement to make and retain certain internal documents relating to their business, including the procedures and methodologies they use to determine credit ratings.[20] The Staff noted that the rating agencies improved their policies and procedures during the examination period, particularly in connection with their registration as NRSROs.

> ➢ ***None of the rating agencies examined had specific written procedures for rating RMBS and CDOs.*** One rating agency maintained comprehensive written procedures for rating structured finance securities, but these procedures were not specifically tailored to rating RMBS and CDOs. The written procedures for the two other rating agencies were not comprehensive and did not address all significant aspects of the RMBS and/or CDO ratings process. For example, written materials set forth guidelines for the structured finance ratings committee process (including its composition, the roles of the lead analyst and chair, the contents of the committee memo and the voting process) but did not describe the ratings process and the analyst's responsibilities prior to the time a proposed rating is presented to a ratings committee.

The lack of full documentation of policies and procedures made it difficult for the Staff to confirm that the actual practice undertaken in individual ratings was consistent with the

---

[20]   Rule 17g-2 under the Exchange Act. 17 CFR 240.17g-2.

firm's policies and procedures. This lack of full documentation could also impede the effectiveness of internal and external auditors conducting reviews of rating agency activities.

In addition, the Staff is examining whether there were any errors in ratings issued as a result of flaws in ratings models used. While this aspect of the examinations is ongoing, as a result of the examinations to date, the Staff notes that:

> ➢ *Rating agencies do not appear to have specific policies and procedures to identify or address errors in their models or methodologies.* For example, policies and procedures would address audits and other measures to identify possible errors, and what should be done if errors or deficiencies are discovered in models, methodologies, or other aspects of the ratings process (e.g., the parameters of an investigation, the individuals that would conduct the investigation, the disclosures that should be made to the public about errors and guidelines for rectifying errors).

*Current Regulatory Requirements*: An NRSRO is required to make and retain certain records relating to its business and to retain certain other business records made in the normal course of business operations.[21] Among the records required to be kept is a record documenting the established procedures and methodologies used by the NRSRO to determine credit ratings.[22] These rules applied to these rating agencies in September 2007.

*Remedial Action:* The Staff has recommended that each NRSRO examined conduct a review to determine whether its written policies and procedures used to determine credit ratings for RMBS and CDOs are fully documented in accordance with the requirements of Rule 17g-2. Each examined NRSRO stated that it will implement the Staff's recommendation.

### D.     Rating Agencies are Implementing New Practices with Respect to the Information Provided to Them

There is no requirement that a rating agency verify the information contained in RMBS loan portfolios presented to it for rating. Additionally, rating agencies are not required to insist that issuers perform due diligence, and they are not required to obtain reports concerning the level of due diligence performed by issuers. The observations in this section are included in the report to describe how the rating agencies approached due diligence during the review period, and how they have stated that they intend to approach it in the future.

---

[21]     Rule 17g-2 under the Exchange Act. 17 CFR 240.17g-2. The rule also prescribes the time periods and manner in which all these records must be retained.

[22]     Rule 17g-2 under the Exchange Act. 17 CFR 240.17g-2(a)(6).

The Staff notes that each rating agency publicly disclosed that it did not engage in any due diligence or otherwise seek to verify the accuracy or quality of the loan data underlying the RMBS pools they rated during the review period. Each rating agency's "Code of Conduct" (available on each rating agency's website) clearly stated that it was under no obligation to perform, and did not perform, due diligence. Each also noted that the assignment of a rating is not a guarantee of the accuracy, completeness, or timeliness of the information relied on in connection with the rating. The rating agencies each relied on the information provided to them by the sponsor of the RMBS. They did not verify the integrity and accuracy of such information as, in their view, due diligence duties belonged to the other parties in the process. They also did not seek representations from sponsors that due diligence was performed.

> *All of the rating agencies examined have implemented, or announced that they will implement, measures that are designed to improve the integrity and accuracy of the loan data they receive on underlying RMBS pools.*

   o   One rating agency began conducting "Enhanced Originator/Issuer Reviews" for all subprime transactions in January 2008. These reviews involve a more extensive review of mortgage originations and their practices, including a review of originator/conduit/issuer due diligence reports and a sample of mortgage origination files.[23]

   o   Another rating agency recently announced that for transactions closing after May 1, 2008, it is requesting updated loan level performance data from issuers on a monthly basis. In addition, it intends to incorporate the quality of an originator's fraud tools and detection policies into its ratings criteria by mid-year 2008.

   o   In addition, as reported in press accounts of a May 2008 agreement with the New York State Attorney General, the rating agencies examined each agreed to develop and publicly disclose due diligence criteria to be performed by underwriters on all mortgages comprising RMBS, and to review those results prior to issuing ratings.[24]

***Proposed Rules and Rule Amendments That Would Address Verification:*** The Commission proposed to add two additional areas that an NRSRO (or an applicant to become an NRSRO) would be required to address in its descriptions of its procedures and methodologies in Form NRSRO.[25] These disclosures would provide information about how the NRSROs treat due diligence in the NRSROs' ratings process. The additional proposed disclosures would include:

---

[23]   The same rating agency conducted an internal review of 45 loan files and reported that it found the appearance of fraud or misrepresentation in almost every file.

[24]   http://www.oag.state.ny.us/press/2008/june/june5a_08.html.

[25]   *Proposed Rules for Nationally Recognized Statistical Rating Organizations*, June 16, 2008, http://www.sec.gov/rules/proposed/2008/34-57967.pdf.

o   Whether and, if so, how information about verification performed on assets underlying or referenced by a security or money market instrument issued by an asset pool or as part of any asset-backed or mortgage-backed securities transaction is relied on in determining credit ratings; and

o   Whether and, if so, how assessments of the quality of originators of assets underlying or referenced by a security or money market instrument issued by an asset pool or as part of any asset-backed or mortgage-backed securities transaction play a part in the determination of credit ratings.

E.   **Rating Agencies Did Not Always Document Significant Steps in the Ratings Process -- Including the Rationale for Deviations From Their Models and for Rating Committee Actions and Decisions -- and They Did Not Always Document Significant Participants in the Ratings Process**

Following their registration as NRSROs in September 2007, the rating agencies became subject to a requirement to retain their internal records, including non-public information and workpapers, which were used to form the basis of a credit rating they issued.  Prior to being registered as NRSROs, all of the rating agencies examined had established policies and procedures generally requiring documentation of the ratings committee process and its key deliberations.

The Staff notes, however, that the rating agencies examined did not always fully document certain significant steps in their subprime RMBS and CDO ratings process. This made it difficult or impossible for Commission examiners to assess compliance with their established policies and procedures, and to identify the factors that were considered in developing a particular rating.  This lack of documentation would similarly make it difficult for the rating agencies' internal compliance staff or internal audit staff to assess compliance with the firms' policies and procedures when conducting reviews of rating agency activities.  Examples include:

➤   *The rationale for deviations from the model or out of model adjustments was not always documented in deal records.*  As a result, in its review of rating files, the Staff could not always reconstruct the process used to arrive at the rating and identify the factors that led to the ultimate rating.

➤   *There was also a lack of documentation of committee actions and decisions.* At one rating agency, the vote tallies of rating committee votes were rarely documented despite being a required item in the rating committee memorandum or addendum; in addition, numerous deal files failed to include the required addenda and/or included no documentation of the ratings surveillance process.  At two of the rating agencies, there were failures to make or retain committee memos and/or minutes as well as failures to include certain relevant information in committee reports.

The Staff noted instances where the rating agencies failed to follow their internal
procedures and document the ratings analyst and/or ratings committee participants who
approved credit ratings.  For example:

> ***There was sometimes no documentation of committee attendees.***  At one
> rating agency, approximately a quarter of the RMBS deals reviewed lacked an
> indication of the chairperson's identity, and a number lacked at least one
> signature of a committee member, although internal procedures called for this
> documentation.  At another rating agency, an internal audit indicated that
> certain relevant information, including committee attendees and quorum
> confirmation, were sometimes missing from committee memos, though the
> Staff noted improvements in this area during the review period.

***Current Regulatory Requirements***:  An NRSRO is required to make and retain certain
records relating to its business and to retain certain other business records made in the
normal course of business operations.[26]  An NRSRO is specifically required to make and
retain certain records, including records with respect to each current credit rating that
indicate: (1) the identity of any credit analyst(s) that participated in determining the credit
rating; (2) the identity of the person(s) that approved the credit rating before it was
issued; (3) whether the credit rating was solicited or unsolicited; and (4) the date the
credit rating action was taken.[27]  These rules applied to these rating agencies in
September 2007.

***Remedial Action:***  The Staff has recommended that each NRSRO examined conduct a
review of its current policies and practices for documenting the credit ratings process and
the identities of RMBS and CDO ratings analysts and committee members to review
whether they are reasonably designed to ensure compliance with Rule 17g-2 and to
address weaknesses in the policies or in adherence to existing policies that result in gaps
in documentation of significant steps and participants in the credit ratings process.  Each
examined NRSRO stated that it will implement the Staff's recommendations.

***Proposed Rules and Rule Amendments That Would Address These Issues:***  The
Commission proposed an amendment to its rules that, if adopted, would require that if a
quantitative model is a substantial component of the credit ratings process, an NRSRO
would be required to keep a record of the rationale for any material difference between
the credit rating implied by the model and the final credit rating issued.[28]

---

[26]   Rule 17g-2 of the Exchange Act. 17 CFR 240.17g-2. The rule also prescribes the time periods and
manner in which these records must be retained.

[27]   Rule 17g-2 of the Exchange Act. 17 CFR 240.17g-2(a)(2).

[28]   *Proposed Rules for Nationally Recognized Statistical Rating Organizations*, June 16, 2008,
http://www.sec.gov/rules/proposed/2008/34-57967.pdf.

**F.** **The Surveillance Processes Used by the Rating Agencies Appear to Have Been Less Robust Than Their Initial Ratings Processes**

While NRSROs are not required under the law to perform surveillance, a rating agency will generally monitor the accuracy of its ratings on an ongoing basis in order to change the ratings when circumstances indicate that a change is required.  This process is generally called "monitoring" or "surveillance," and each rating agency charges issuers, upfront or annually, ratings surveillance fees.  Performing adequate and timely surveillance is important, particularly when issuers of structured products do not make publicly available their due diligence information and underlying loan performance information, which would enable independent analysis by investors and third parties.

Each of the rating agencies examined conducts some type of surveillance of its ratings.  The Staff notes that weaknesses existed in the rating agencies' surveillance efforts, as described below:

➢ **Resources appear to have impacted the timeliness of surveillance efforts.** For example:

o In an internal email at one firm, an analytical manager in the structured finance surveillance group noted:  "I think the history has been to only re-review a deal under new assumptions/criteria when the deal is flagged for some performance reason.  I do not know of a situation where there were wholesale changes to existing ratings when the primary group changed assumptions or even instituted new criteria. The two major reasons why we have taken the approach is (i) lack of sufficient personnel resources and (ii) not having the same models/information available for surveillance to relook [sic] at an existing deal with the new assumptions (i.e., no cash flow models for a number of assets)."[29]

o At the same firm, internal email communications appear to reflect a concern that surveillance criteria used during part of review period were inadequate.[30]

➢ *There was poor documentation of the surveillance conducted.*  One rating agency could not provide documentation of the surveillance performed (copies of monthly periodic reports, exception reports and exception

---

[29] Email No. 20: Analytical Manager to Senior Analytical Manager (July 11, 2005, 8:09 PM).   A similar email from the Senior Analytical Manager of RMBS Surveillance noted similar issues: "He asked me to begin discussing taking rating actions earlier on the poor performing deals.  I have been thinking about this for much of the night.  We do not have the resources to support what we are doing now." "I am seeing evidence that I really need to add to the staff to keep up with what is going on with sub prime and mortgage performance in general, NOW."  Email No. 21: Senior Analytical Manager to Senior Analytical Manager (Feb. 3, 2007, 12:02 PM).

[30] Email No. 22: Senior Analytical Manager to Analytical Manager (June 15, 2007, 9:05 AM).

parameters), though it asserted that such surveillance was conducted. Internal communications by the surveillance staff indicate awareness of this issue.[31] At this firm, the Staff was unable to assess the information generated by the surveillance group during the review period. Another rating agency did not run monthly "screener reports" required by its own procedures for three months during the review period. It stated that the entire vintage of high risk subprime RMBS and CDOs were under a targeted review for two of the months. As a result, the Staff could not assess the information generated by the rating agency's surveillance staff for those months.

> ***Lack of Surveillance Procedures.*** Two rating agencies do not have internal written procedures documenting the steps that their surveillance staff should undertake to monitor RMBS and CDOs.

***Current Regulatory Requirements:*** Under the Exchange Act and the rules applicable to NRSROs, an NRSRO is required to disclose publicly the procedures and methodologies it uses in determining credit ratings. Further, the Commission may censure, limit the activities, functions, or operations of, suspend, or revoke the registration of an NRSRO that fails to maintain adequate financial and managerial resources to produce credit ratings with integrity (the provisions of the Act applied to the rating agencies examined upon their registration in September 2007).[32]

***Remedial Action:*** The Staff has recommended that each NRSRO examined conduct a review to determine if adequate resources are devoted to surveillance of outstanding RMBS and CDO ratings. This review should include, for example, whether the rating agency maintains adequate staffing and has adequate expertise dedicated to performing ongoing surveillance. The Staff has also recommended that the NRSROs ensure that they have comprehensive written surveillance procedures. Finally, the Staff has recommended that all appropriate surveillance records be maintained. Each examined NRSRO stated that it will implement the Staff's recommendations.

***Proposed Rules and Rule Amendments That Would Address These Issues:*** The Commission has proposed to enhance disclosures about the procedures and methodologies that an NRSRO uses to determine credit ratings.[33] Among other things, the Commission proposed to require an NRSRO to disclose how frequently credit ratings are reviewed, whether different models or criteria are used for ratings surveillance than for determining initial ratings, whether changes made to models and criteria for determining initial ratings are applied retroactively to existing ratings and whether

---

[31]   "If I were the S.E.C. I would ask why can [sic] you go back and run the report for each of the months using the same assumptions? In theory we should be able to do this." Email No. 22: Senior Analytical Manager to Analytical Manager (June 15, 2007, 9:05 AM).

[32]   Section 15E(d) of the Exchange Act.

[33]   *Proposed Rules for Nationally Recognized Statistical Rating Organizations*, June 16, 2008, http://www.sec.gov/rules/proposed/2008/34-57967.pdf.

changes made to models and criteria for performing ratings surveillance are incorporated into the models and criteria for determining initial ratings.

### G. Issues Were Identified in the Management of Conflicts of Interest and Improvements Can be Made

Each of the rating agencies examined has established its own policies and procedures to address and mitigate conflicts of interest. Generally, the Staff notes that the rating agencies enhanced their procedures at the time they sought registration as NRSROs. The Staff reviewed these policies and procedures in the following areas: procedures to address the "issuer pays" conflict of interest and procedures to address conflicts of interest due to personal financial interests by analysts and other firm employees. Each area is summarized below.

#### 1. The "Issuer Pays" Conflict

Each of the NRSROs examined uses the "issuer pays" model, in which the arranger or other entity that issues the security is also seeking the rating, and pays the rating agency for the rating. The conflict of interest inherent in this model is that rating agencies have an interest in generating business from the firms that seek the rating, which could conflict with providing ratings of integrity. The Commission's rules specify that it is a conflict of interest for an NRSRO being paid by issuers or underwriters to determine credit ratings with respect to securities they issue or underwrite.[34] They are required to establish, maintain and enforce policies and procedures reasonably designed to address and manage conflicts of interest.[35] Such policies and procedures are intended to maintain the integrity of the NRSRO's judgment, and to prevent an NRSRO from being influenced to issue or maintain a more favorable credit rating in order to obtain or retain business of the issuer or underwriter.[36]

Each of the NRSROs has policies that emphasize the importance of providing accurate ratings with integrity. To further manage the conflicts of interest arising from the "issuer pays" model, each of the examined NRSROs established policies to restrict analysts from participating in fee discussions with issuers. These policies are designed to separate those individuals who set and negotiate fees from those employees who rate the issue, in order to mitigate the possibility or perception that a rating agency would link its ratings with its fees (e.g., that an analyst could explicitly or implicitly link the fee for a rating to a particular rating).

---

[34]   Exchange Act Rule 17g-5(b)(1).

[35]   Section 15E(h) of the Exchange Act .

[36]   *See* Release No. 34-55857 and Exchange Act Rule 17g-5.

> *While each rating agency has policies and procedures restricting analysts
> from participating in fee discussions with issuers, these policies still allowed
> key participants in the ratings process to participate in fee discussions.*

  o One rating agency allowed senior analytical managers to participate
    directly in fee discussions with issuers until early 2007 when it changed its
    policy.

  o At another rating agency an analyst's immediate supervisor could engage
    in fee negotiations directly with issuers.  The firm changed its procedure
    in October 2007 so that analytical staff (including management) may no
    longer engage in fee discussions with issuers; only business development
    personnel may do so.

  o One rating agency permits an analytical manager to participate in internal
    discussions regarding which considerations are appropriate for
    determining a fee for a particular rated entity.

  o Only one rating agency actively monitors for compliance with its policy
    against analysts participating in fee discussions with issuers, and, as a
    result was able to detect and correct certain shortcomings in its process.

**Proposed Rules and Rule Amendments That Would Address These Issues:**  The
Commission has proposed amendments to its rules that would address the conflict created
by NRSRO employees being involved in both fee discussions and ratings decisions by
prohibiting an NRSRO from having the conflict that arises when a person within an
NRSRO who has responsibility for participating in determining credit ratings, or for
developing or approving procedures or methodologies used for determining credit
ratings, participate in any fee discussions or arrangements.[37]

> *Analysts appeared to be aware, when rating an issuer, of the rating agency's
> business interest in securing the rating of the deal.*  The Staff notes multiple
> communications that indicated that some analysts were aware of the firm's fee
> schedules, and actual (negotiated) fees.[38]  There does not appear to be any
> internal effort to shield analysts from emails and other communications that

---

[37]   *Proposed Rules for Nationally Recognized Statistical Rating Organizations*, June 16, 2008,
       http://www.sec.gov/rules/proposed/2008/34-57967.pdf.

[38]   In one instance, a Senior Analytical Manager in the RMBS group distributed a negotiated fee
       schedule and a large percentage of the recipients were analytical staff.  Email No. 23: Senior
       Analytical Manager to Analytical Manager (Dec. 29, 2005, 5:29 PM).  In another instance,
       analytical staff is copied on an email communication to an issuer containing a letter confirming the
       fees for a transaction.  Email No. 24: Research Staff to Issuer/Banker copying Analytical Staff
       (Mar. 27, 2007, 4:02 PM).  Also email No. 25: Senior Analytical Manager to Analytical Manager
       (Dec. 19, 2005, 1:08 PM).

discuss fees and revenue from individual issuers.[39]  In some instances, analysts discussed fees for a rating.  Examples are set forth below:

o   At one firm, an analyst wrote to his manager asking about whether the firm would be charging a fee for a particular service and what the fee schedule will be.[40]

o   At another firm, a business manager in the RMBS group wrote to several analysts: ". . . if you have not done so please send me any updates to fees on your transactions for this month.  It is your responsibility to look at the deal list and see what your deals are currently listed at."[41]

o   At two rating agencies, there were indications that analysts were involved in fee discussions with employees of the rating agency's billing department.[42]

➢   ***Rating agencies do not appear to take steps to prevent considerations of market share and other business interests from the possibility that they could influence ratings or ratings criteria***.  At one firm, internal communications appear to expose analytical staff to this conflict of interest by indicating concern or interest in market share when firm employees were discussing whether to make certain changes in ratings methodology.  In particular, employees discussed concerns about the firm's market share relative to other rating agencies, or losing deals to other rating agencies.  While there is no evidence that decisions about rating methodology or models were made based on attracting or losing market share, in most of these instances, it appears that rating agency employees who were responsible for obtaining ratings business (i.e., marketing personnel) would notify other employees, including those responsible for criteria development, about business concerns they had related to the criteria.

---

[39]   An email communication from a senior analytical manager to at least one analyst requests that the recipient(s): "Please confirm status codes as soon as possible on the below mentioned deals.  Additionally, any fees that are blank should be filled in.  All issuer/bankers should be called for confirmation."  In the same email chain, this request is reinforced by a senior Analytical Manager who states "It is imperative that deals are labeled as to Flow or Pending, etc as accurately and timely as possible.  These codes along with the fee and closing date, drive our weekly revenue projections . . .."  Email No. 26: Senior Analytical Manager to Senior Analytical Manager (Aug. 24, 2005, 3:53 PM).

[40]   Email No. 28: Analytical Staff to Senior Analytical Manager (May 7, 2006, 13:38 GMT).

[41]   Email No. 29: Business Manager to Analytical Manager (Jan. 31, 2007, 9:33 AM).

[42]   Email No. 30: Analytical Staff to Business Manager (Aug. 23, 2007, 23:10 GMT).  Email No. 31: Analytical Staff to Analytical Staff (Mar. 15, 2007, 1:37 PM).

o   For instance, a senior analytical manager in the Structured Finance group
     wrote "I am trying to ascertain whether we can determine at this point if
     we will suffer any loss of business because of our decision [on assigning
     separate ratings to principal and interest] and if so, how much?"
     "Essentially, [names of staff] ended up agreeing with your
     recommendations but the CDO team didn't agree with you because they
     believed it would negatively impact business."[43]

o   In another example, after noting a change in a competitor's ratings
     methodology, an employee stated: "[w]e are meeting with your group this
     week to discuss adjusting criteria for rating CDOs of real estate assets this
     week because of the ongoing threat of losing deals."[44]  In another email,
     following a discussion of a competitor's market share, an employee of the
     same firm states that aspects of the firm's ratings methodology would
     have to be revisited to recapture market share from the competing rating
     agency.[45]  An additional email by an employee stated, following a
     discussion of losing a rating to a competitor, "I had a discussion with the
     team leaders here and we think that the only way to compete is to have a
     paradigm shift in thinking, especially with the interest rate risk."[46]

o   Another rating agency reported to the Staff that one of its foreign ratings
     surveillance committees had knowledge that the rating agency had issued
     ratings on almost a dozen securities using a model that contained an
     error.[47]  The rating agency reported to the Staff that, as a result, the
     committee was aware that the ratings were higher than they should have
     been.  Nonetheless, the committee agreed to continue to maintain the
     ratings for several months, until the securities were downgraded for other
     reasons.  Members of the committee, all analysts or analytical managers,
     considered the rating agency's reputational interest in not making its error
     public, according to the rating agency.

***Current Regulatory Requirements***:  An NRSRO is required to establish, maintain and
enforce policies and procedures reasonably designed, taking into consideration the nature
of its business, to address and manage conflicts of interest.[48]  An NRSRO is further
prohibited from having certain conflicts unless it has disclosed the type of conflict of

---

43   Email No. 32: Senior Analytical Manager to Senior Business Manager (Nov. 9, 2004, 12:11 PM).

44   Email No. 33: Senior Business Manager to Senior Business Manager (Aug. 17, 2004, 6:14 PM).

45   Email No. 34: Senior Analytical Manager to Analytical Manager (Sept. 25, 2006, 6:50 PM).

46   Email No. 35: Senior Business Manager to Senior Business Manager (May 25, 2004, 12:08 PM).

47   The affected securities, while structured products, were not RMBS or CDOs.

48   Section 15E(h)(1) of the Exchange Act. 15 U.S.C. 78o-7(h)(1).

interest, and has implemented policies and procedures to address and manage it.[49]
Included among these conflicts is being paid by issuers or underwriters to determine
credit ratings with respect to securities or money market instruments they issue or
underwrite.[50]  These requirements applied to these firms in September 2007.

***Remedial Action:***  The Staff recommended that each NRSRO examined review its
practices, policies and procedures for mitigating and managing the "issuer pays" conflict
of interest.  In particular, the Staff recommended that each NRSRO examined consider
and implement steps that would insulate or prevent the possibility that considerations of
market share and other business interests could influence ratings or ratings criteria.  Each
examined NRSRO stated that it would implement the Staff's recommendations.

***Proposed Rules and Rule Amendments That Would Address These Issues:***  The
Commission proposed rules that would prohibit a credit rating agency from issuing or
maintaining a rating on a structured product unless information on assets underlying the
product was disclosed.[51]  The intent of the disclosure is to create the opportunity for other
credit rating agencies, including those not registered with the Commission as NRSROs,
to use the information to rate and monitor the rating of the instrument as well.  Any
resulting "unsolicited ratings" could be used by market participants to evaluate the ratings
issued by the rating agency hired to rate the product and, in turn, potentially expose a
rating agency whose ratings were influenced by the desire to gain favor with the product
sponsor in order to obtain more business.  The proposal is also designed to make it more
difficult for product sponsors to exert influence on the rating agencies.  Specifically, by
opening up the ratings process to greater scrutiny, the proposal is designed to make it
easier for the hired rating agency to resist pressure from the product sponsors by
increasing the likelihood that any steps taken to inappropriately favor the product sponsor
could be exposed to the market.

## 2.    Analysts' Compensation

Each of the rating agencies examined has a similar policy with respect to compensating
their analysts.  These policies generally provide that an analyst may not be compensated
or evaluated based upon the amount of revenue that the rating agency derives from
issuers or issues that the analyst rates, or with whom the analyst regularly interacts.  The
internal compensation guidelines reviewed by the Staff indicated that analysts' salaries
generally were based on seniority and experience, and bonuses were determined both by
individual performance and the overall success of the firm.  The Staff's review did not
find indications that rating agencies compensated analysts in a manner contrary to their
stated policies.

---

[49]     15 U.S.C. 78o-7(h)(1).

[50]     17 CFR 240.17g-5(b)(1).

[51]     *Proposed Rules for Nationally Recognized Statistical Rating Organizations*, June 16, 2008,
http://www.sec.gov/rules/proposed/2008/34-57967.pdf.

### 3.     Securities Transactions by Employees of Credit Rating Agencies

To minimize the possibility that an analyst's objectivity could be compromised by the analyst's individual financial interests, each of the rating agencies examined prohibits persons with significant business or any economic ties (including stock ownership) to a rated entity from participating in the ratings process for that issuer.  Each rating agency also monitors and restricts the securities trading activity of employees (particularly with respect to rated issuers).

Each rating agency examined has adopted policies prohibiting employees (and their immediate family members) from owning any security that is subject to a credit rating by a team on which the employee is a member.

> ➢ *While each rating agency has policies and procedures with respect to employees' personal securities holdings, the rating agencies vary in how rigorously they monitor or prevent prohibited transactions, including personal trading, by their employees from occurring.*

- o  Two of the rating agencies require employees to have duplicate copies of brokerage statements sent to the rating agency, and the third requires its ratings staff to either have an account with a brokerage firm that has agreed to provide the firm with reports of the employee's transactions or to manually report transactions to the firm within ten days of execution.

- o  One rating agency reviews requested transactions by employees against a list of prohibited securities before clearing the proposed transactions for execution; the other rating agencies employ exception reports to identify restricted transactions after execution.

- o  Only one rating agency employs a third-party service to identify undisclosed brokerage accounts, thus monitoring whether employees are submitting complete information about their brokerage accounts.

- o  Two rating agencies do not appear to prohibit structured finance analysts from owning shares of investment banks that may participate in RMBS and CDO transactions.[52]

- o  The Staff discovered indications that an employee of one rating agency appears to have engaged in personal trading practices inconsistent with the firm's policies.

***Current Regulatory Requirements***:  An NRSRO is required to establish, maintain and enforce policies and procedures reasonably designed to address and manage conflicts of

---

[52]     One of these rating agencies is currently reviewing this policy.

interest.[53]  An NRSRO is prohibited from having certain conflicts relating to the issuance of a credit rating unless it has disclosed the type of conflict of interest, and has implemented policies and procedures to address and manage it.[54]  A conflict is created when persons within the rating agency directly own securities or have other direct ownership interests in issuers or obligors subject to a credit rating issued by the rating agency.[55]  In addition, an NRSRO is prohibited from having certain conflicts -- regardless of whether it discloses them or establishes procedures to manage them.  Among these absolute prohibitions is issuing or maintaining a credit rating, when the rating agency, a credit analyst that participated in determining the credit rating, or a person responsible for approving the credit rating, directly owns securities of, or has any other direct ownership interest in, the person that is subject to the credit rating.[56]

*Remedial Action:* The Staff has recommended that each NRSRO examined conduct a review of its policies and procedures for managing the securities ownership conflict of interest to determine whether these policies are reasonably designed to ensure that their employees' personal trading is appropriate and comply with the requirements of Rule 17g-5.  Each examined NRSRO stated that it will implement the Staff's recommendation.

## H.    Internal Audit Processes

The examined rating agencies each maintained internal audit programs that were designed to provide verification that the firm and its employees were complying with the firms' internal policies and procedures.  Internal audit programs are an important internal control used by many organizations.  In general, internal auditors conduct routine and special reviews of different aspects of an organization's operations, and report results and recommendations to management.  A firm's internal audit staff generally operates in an organizational unit that is independent of the firm's business operations.

The Staff reviewed each rating agency's internal audit programs and activities related to its RMBS and CDO groups for the time period January 2003 to November 2007.   The Staff concluded that the rating agencies' internal audit programs varied in terms of scope and depth of the reviews performed.

---

[53]    Section 15E(h)(1) of the Exchange Act. 15 U.S.C. 78o-7(h)(1).

[54]    Rule 17g-5 of the Exchange Act and Section 15E(h)(1) of the Exchange Act.  17 CFR 240.17g-5(b)(6) and 15 U.S.C. 78o-7(h)(1).

[55]    Rule 17g-5 of the Exchange Act. 17 CFR 240.17g-5(b)(6).

[56]    Rule 17g-5 of the Exchange Act. 17 CFR 240.17g-5(c)(2).  In adopting the rule, the Commission stated that the prohibition applied to "direct" ownership of securities and, therefore, would not apply to indirect ownership interests, for example, through mutual funds or blind trusts.  *See* Adopting Release, 72 FR at 33598.

> ➤ *The internal audit program of one rating agency appeared adequate in terms of assessing compliance with internal control procedures.*

     o One rating agency maintained an internal audit program that appeared to be adequate during the entire examination period. It regularly conducted both substantive audits of ratings business units (e.g., RMBS or CDOs) as well as functional reviews across units for particular concerns (e.g., email, employee securities trading and issuer requested review of rating). In addition, these internal audits produced substantial recommendations that were responded to in an adequate manner by management.

> ➤ *The internal audit or management response processes at two examined rating agencies appeared inadequate.*

     o At one rating agency, its internal audits of its RMBS and CDO groups appeared to be cursory. The reviews essentially constituted a one-page checklist limited in scope to evaluate the completeness of deal files. The rating agency provided only four examples where the reviewer forwarded findings to management and no examples of management's response thereto.

     o Another rating agency's internal audits of its RMBS and CDO groups uncovered numerous shortcomings, including non-compliance with document retention policies, lack of adherence to rating committee guidelines and most significantly, the failure of management to formally review/validate derivatives models prior to posting for general use. The rating agency did not provide documentation demonstrating management follow-up.

*Current Regulatory Requirements*: NRSROs are required to maintain internal audit plans, reports and related follow-up documents, including internal audit plans and reports, documents relating to audit follow-up measures and documents identified by auditors as necessary to audit an activity relating to the NRSRO's business as a rating agency.[57] Retention of these records will identify the rating agency's activities that its internal auditors had determined, raised, or did not raise, and compliance or control issues. In addition, this requirement is also meant to assist the Commission in determining whether the rating agency is complying with its methods, procedures and policies.

*Remedial Action:* The Staff has recommended that two of the NRSROs examined review whether their internal audit functions, particularly in the RMBS and CDO ratings areas, are adequate and whether they provide for proper management follow-up. Both of these NRSROs stated that it will implement the Staff's recommendation.

---

[57]    Rule 17g-2(b)(5) under the Exchange Act.

With respect to the NRSRO that maintained an adequate internal audit program, Staff recommended that it continue to conduct appropriate audits and periodically review whether improvements are warranted.  That NRSRO committed to do so.

## V.      Observations by the Office of Economic Analysis

In conjunction with the Staff's examinations of the three rating agencies, the Staff of the Office of Economic Analysis ("OEA Staff") reviewed the processes used by these firms with respect to rating RMBS and CDOs that held subprime RMBS securities.

The purpose of the OEA Staff's review was to gain an understanding of the ratings methodologies employed by the rating agencies.  The review assisted the Staff to better evaluate the extent to which conflicts of interest may have entered into and affected the ratings process.  Review of the models helped provide a base-line for understanding the processes used by the NRSROs.  This type of review can also assist the Staff in its assessment of whether the processes used in developing the models, their application, any adjustments made and their upkeep may have been potentially subject to conflicts of interest.

In conducting this review, the Staff, including OEA Staff, was mindful that the Commission is expressly prohibited from regulating "the substance of the credit ratings or the procedures and methodologies" by which any NRSRO determines credit ratings.[58] The Staff does not make recommendations or seek to regulate the substance of the methodologies used.

Described below are conflicts of interest that are inherent, and in some cases unique, to these products and a factual summary of the models and methodologies used by the rating agencies.  This information is provided in this public report solely to provide transparency to the ratings process and the activities of the rating agencies in connection with the recent subprime mortgage turmoil.  The following description does not draw any conclusion as to whether conflicts of interest affected the ratings methodology or surrounding processes.

### A.      Conflicts of Interest

As the Commission noted in its recent release, some observers have indicated that while conflicts of interest due to the "issuer pays" model exist with respect to all asset classes that receive ratings, the conflicts created from the "issuer pays" model in rating structured finance products, particularly RMBS and related-CDOs, may be exacerbated for a number of reasons.  First, the arranger is often the primary designer of the deal and as such, has more flexibility to adjust the deal structure to obtain a desired credit rating as compared to arrangers of non-structured asset classes. As well, arrangers that underwrite RMBS and CDO offerings have substantial influence over the choice of rating agencies hired to rate the deals.

---

[58]      Section 15E(c)(2) of the Exchange Act.

Second, there is a high concentration in the firms conducting the underwriting function.
Based on data provided by the three rating agencies examined, the Staff reviewed a
sample of 642 deals.  While 22 different arrangers underwrote subprime RMBS deals, 12
arrangers accounted for 80% of the deals, in both number and dollar volume.  Similarly,
for 368 CDOs of RMBS deals, although 26 different arrangers underwrote the CDOs, 11
arrangers accounted for 92% of the deals and 80% of the dollar volume.[59]  In addition,
12 of the largest 13 RMBS underwriters were also the 12 largest CDO underwriters,
further concentrating the underwriting function, as well as the sources of the rating
agencies' revenue stream.

Achieving accuracy in ratings in a fast-changing market for a relatively new security may
require frequent updating of the models used to produce the ratings, leading to quickly-
changing ratings processes.  The combination of the arrangers' influence in determining
the choice of rating agencies and the high concentration of arrangers with this influence
appear to have heightened the inherent conflicts of interest that exist in the "issuer pays"
compensation model.  One area where arrangers could have benefited in this context is in
the ratings process itself.  In discussions with OEA Staff, the ratings agencies indicated
that arrangers preferred that the ratings process be fast and predictable.  For instance,
arrangers and their employees are generally compensated, at least in part, by the volume
of deals completed and the total dollar volume of those deals.  The Staff understands that
at least one rating agency allowed deals that were already in the ratings process to
continue to use older criteria, even when new criteria had been introduced.

Pressure from arrangers could also come in the form of requiring more favorable ratings
or reduced credit enhancement levels.  Such outcomes would reduce the cost of the debt
for a given level of cash inflows from the asset pool.  This benefit is particularly valuable
to an arranger when it also serves as the sponsor of the RMBS or CDO trust.  Such
pressure could influence the rating agencies' decisions on whether to update a model
when such an update would lead to a less favorable outcome.

High profit margins from rating RMBS and CDOs may have provided an incentive for a
rating agency to encourage the arrangers to route future business its way.[60]  Unsolicited
ratings were not available to provide an independent check on the rating agencies'
ratings, and the structures of these securities were complex, and information regarding
the composition of the portfolio of assets, especially prior to issuance, was difficult to
obtain for parties unrelated to the transaction.

---

[59]     For a sample of 650 subprime RMBS deals issued with a par value of $650 billion and 375 CDOs
of RMBS issued with a par value of $310 billion during 2006 and 2007.

[60]     As some rating agencies are either private firms or parts of conglomerates, it is difficult to
evaluate their rate of return.  White, *"The Credit Ratings Industry: An Industrial Organization
Analysis,"* in Levich, Majnoni, and Reinhart, ed, *Ratings, Rating Agencies, and the Global
Financial System* (2002) at 49 cites data that indicates that one rating agency  had an average rate
of return of slightly over 42% from 1995 to 2000.  The Economist, *"Measuring the Measurers,"*
May 31, 2007 reports a rating agency's operating margin at 54% for 2006.

### B.    Factual Summary of the Ratings Process for RMBS

Subprime mortgage origination has grown substantially over the last 12 years both in terms of absolute dollar volume and as a percentage of all mortgage origination.  In its recent release, the Commission noted that one rating agency reported that subprime mortgages had increased (in dollars) from $421 billion to $640 billion between 2002 and 2006.  As a percentage of all mortgages originated, subprime mortgages grew to represent from 14% to 22% of the pool over the same period.  The dollar value of originations of subprime mortgages rose from $96.8 billion in 1996[61] to approximately $600 billion in 2006.[62]

In addition to the recent growth in subprime origination, there has also been a growth in the risk factors associated with subprime mortgages.  Studies indicate that the percentage of subprime loans with less-than-full documentation, high combined loan to total value (CLTVs), and second liens grew substantially between 1999 and 2006.[63]  Notably, while 2/28 adjustable rate mortgages comprised just 31% of subprime mortgages in 1999, they comprised almost 69% of subprime loans in 2006.[64]  Further, 40-year mortgages were virtually non-existent prior to 2005, but they made up almost 27% of the subprime loans in 2006.  These data provide evidence that the majority of subprime origination occurred within the last five years, and the loans containing very high risk combinations are even more recent.

Based on publications by the ratings agencies describing their methods, as well as other studies, the OEA Staff observed that all three of the examined rating agencies used similar approaches to rating RMBS bonds.  They employed three primary models: probability of default, loss severity and the cash flow model.  The first two models estimate default probabilities and loss severity given default, respectively, on a loan-by-loan basis.  Historical loan performance data is used to estimate the conditional relationships between loan and borrower characteristics and the default probability and the loss severity given default.  The parameters from the estimation are then applied to the loans in the RMBS portfolio based on the loan and borrower characteristics specific to each loan.  The parameters are re-estimated periodically using updated loan performance data.

Relying on the materials described above, the OEA Staff understands the ratings agencies used the following approaches.  One rating agency used hazard rates to predict time to

---

[61]    http://research.stlouisfed.org/publications/review/06/01/ChomPennCross.pdf

[62]    Adam Ashcraft and Til Schuermann, "*Understanding the Securitization of Subprime Mortgage Credit,*" Federal Reserve Bank of New York working paper, 2008.

[63]    *Ibid.*

[64]    A 2/28 ARM is a type of mortgage that has an initial two-year fixed rate that subsequently adjusts (is reset) to a variable rate for the remaining 28 years.  The fixed rate typically is lower than a comparable 30-year fixed rate; however, the reset rate is higher.

default, simultaneously predicting time to prepayment and using Monte Carlo simulations of macroeconomic variables to create a loss distribution. Another rating agency used a logistic regression instead of a hazard rate model, to estimate probability of default, and similarly used Monte Carlo simulation of macroeconomic variables to create a loss distribution.[65] The Monte Carlo method simulates a time series of macroeconomic variables in a stochastic (random) process.[66] A third rating agency used several different types of models to determine the effect of a factor on the probability of default, with the form of the model depending on the relationship between the factor and default probability. Some examples of factors employed are FICO scores, documentation and loan type. This rating agency's model is a static model.[67]

From its conversations with the ratings agencies, OEA Staff understands that prior to 2007, one rating agency did not appear to rely upon a specific subprime model, and used a combination of the output from the model used to rate prime home mortgage RMBS and credit enhancement level benchmarks of previously issued deals by the same originator. Adjustments have been described as having been made based on the perceived relative risk of the pool as compared to the previously issued pools; however, no loan-by-loan analysis was done. RMBS pools are comprised of thousands of loans whose quality could change significantly over time.[68]

## 1.    Risk Variables

The default probability and loss severity models incorporate loan and borrower characteristics as well as macroeconomic variables.[69] Loan characteristics include information about the loan term, the interest rate and whether the loan is for the purchase of the home as a residence or for investment purposes. Examples of borrower characteristics include FICO score, debt-to-income ratio and income documentation levels.

---

[65]    A logistic regression is a model used for prediction of the probability of occurrence of an event by fitting data to a logistic curve.

[66]    Monte Carlo Simulation is an analytical technique in which a large number of simulations are run using random quantities for uncertain variables and looking at the distribution of results to infer which values are most likely.

[67]    According to the rating agency, the static models used a limited number of values to represent a variable over time.

[68]    In fact, evidence suggests that pool characteristics did deteriorate over time in the 2001-2006 period, with certain originators allowing greater slippage in pool quality than others. Yuliya Demyanyk and Otto Van Hemert, 2008, "*Understanding the Subprime Mortgage Crisis,*" Federal Reserve Bank of St. Louis and New York University working paper.

[69]    Based on information provided to the Staff by the ratings agencies, the loan and borrower characteristics as well as other deal information are typically provided to the NRSRO by the arranger.

Each rating agency stated to the OEA Staff that it typically made explicit adjustments for the quality of the loan servicer since each perceived that the servicer can affect the probability that the borrower will continue to make regular and full payments on the loan. The three examined rating agencies described a process where they evaluated the originator and its underwriting practices less formally. This evaluation has been described to potentially include visits to an individual originator, perceived differences in performance of loan pools created by different originators, or other anecdotal experiences with the originator. As long as the originator was determined to be of sufficient quality, no other adjustment was made.[70]

Studies indicate that there was a steady deterioration in the performance of subprime mortgages between 2001 and mid-year 2006, even controlling for the factors included in the agencies models.[71]  At least one study attributes the deterioration in loan performance to be due in large part to the deterioration in the lending standards of originators.[72]

### 2.       Use of Historical Data

According to the ratings agencies, credit raters relied upon historical data in order to predict future behavior. As discussed above, the performance history of the types of subprime mortgages that dominated many of the RMBS portfolios, for example, 2/28 ARMS and zero-downs with second liens, has been very short.  Further, the performance history that did exist occurred under very benign economic conditions.  These conditions included: consistent high economic growth, interest rates at historic lows, very low volatility in interest rates and a period where housing prices increased consistently year over year.  Based on discussions with the rating agencies examined and documents provided by them, it appears that the parameters of the models were re-estimated by executing the model with new data infrequently.

### 3.       Surveillance of Ratings

The ratings agencies stated publicly and to the OEA Staff that they maintained surveillance procedures to monitor for the accuracy of their ratings.  The rating agencies examined did not appear to use loan-level data as part of the surveillance process. Rather, they relied upon pool level triggers to determine whether there had been significant deterioration in the credit quality of the assets used to collateralize securities. These triggers typically were based upon factors such as the amount of remaining over-collateralization after defaults.  The rating agencies examined told the OEA Staff that analysts relied upon over-collateralization levels to ensure sufficient loss coverage for the various bonds.  As long as a pool of assets contained collateral in excess of that necessary to meet the RMBS's obligations, the pool was deemed unimpaired.

---

[70]     One credit rating agency began making adjustments for originator quality in December 2006.

[71]     Op. cit. Demyanyk and Van Hemert (2008).

[72]     *Ibid.*

As described to the OEA Staff, the over-collateralization test used by the ratings agencies typically relied upon the total amount of losses on the underlying loan pool measured against the total dollar value of credit enhancements.

## C.   Factual Summary of the Ratings Process for CDOs

The OEA Staff reviewed publications by the ratings agencies describing their methods, as well as discussions with the ratings agencies and other studies. Based on these materials, the OEA Staff observes that the process used to rate CDOs by the rating agencies examined is fundamentally similar to that used for rating RMBS. But while RMBS default probability and loss severity (recovery rate) models required 50 to 60 inputs, CDO models required only five inputs: current credit rating, maturity, asset type, country and industry. These five inputs were used to determine the three assumptions that went into the loss model: default probability, recovery rate and asset correlation. These are described below.

The OEA Staff further observes that the default probability assumption was determined by the current credit rating and the maturity of the individual RMBS included in the pool. The rating agencies examined typically used their own rating on the underlying asset, where available. These ratings were translated into default probabilities based on the maturity of the asset. Until very recently, the rating agencies maintained that the default probabilities were consistent across asset classes; thus, the historical corporate bond rating performance was used as the probability of default for the securities in the CDO pool. Based on significant differences in the performance history of RMBS and CDOs (when compared to similarly rated corporate bonds) the rating agencies have more recently developed asset-specific default probability tables.

The rating agencies described the recovery rate assumption as determined by the asset type and country of origin. Each rating agency employed different recovery rate assumptions for subprime RMBS. These assets were assumed to have a lower recovery rate than similarly rated corporate bonds.

Asset correlations were employed to determine the likelihood that an asset would default given that another asset in the pool has already defaulted. If they are uncorrelated, then there is no predictive power of one asset default leading to the other. Correlation does not necessarily affect the expected loss on the portfolio but it does create higher probabilities of extremely high or extremely low portfolio losses.

Once estimated, default probability, recovery rate and asset correlation were generally entered into a Monte Carlo simulation along with macroeconomic variables to simulate thousands of scenarios for defaults and recoveries. An expected loss curve was generated to determine the default hurdle rate and loss recovery for each ratings level.

The CDO modeling techniques used required few factors but with very precise measurement. For instance, the default probability was a function of the current rating on the underlying RMBS. As discussed above, recently the agencies developed asset-specific default probability tables. Finally, because the rating agencies reassessed the

Page 36

ratings every 12 to 18 months, if the current ratings on the underlying assets were biased upward or downward, the predicted probability of default for the portfolio would also be biased in the same direction.

Variables typically used to estimate asset correlations were trading prices, ratings migration,[73] and defaults; however there is little history of subprime RMBS bonds.[74]  To estimate RMBS asset correlations, the rating agencies generally used a combination of historical corporate bond correlations and an assumption that RMBS securities are likely to have a higher correlation than corporate bonds.

All three rating agencies examined have recently stated publicly that they increased the assumed correlation among subprime RMBS bonds used in their CDO ratings models. As discussed above, correlation increases the probability of extremely high or low portfolio losses. Underestimate of this correlation is a loss to senior bondholders but a benefit to equity holders.

## VI.    Conclusion

As described in this report, while the various rating agencies had differing practices and, as to each, the Staff identified a range of issues to be addressed, each of the examined firms can take steps to improve their practices, policies and procedures with respect to rating RMBS and CDOs, and other structured finance securities.  Each credit rating agency was cooperative in the course of these examinations and has committed to taking remedial measures to address the issues identified.

---

[73]    Ratings migration approximates the changing credit quality of a security measured as the path-dependent change in the ratings over the life of the security.

[74]    In the corporate bond markets, there are decades of high quality data that are used to estimate asset correlations.

# EXHIBIT P(2)

 LexisNexis®

1 of 1 DOCUMENT

Copyright 2008 LRP Publications
All Rights Reserved
BCD News and Comment

June 24, 2008

**SECTION:** Vol. 50 No. 2

**LENGTH:** 612   words

**HEADLINE:** Credit rating agencies reach agreement with New York AG

**BODY:**

In the lineup of those accused of contributing to the bludgeoning subprime mortgage crisis, credit rating agencies found themselves standing alongside lenders, securitizers, and due diligence providers.

Attorneys general in New York and Ohio launched investigations into the credit rating agencies' practices; Connecticut Attorney General Richard Blumenthal's office initiated an antitrust investigation; and the SEC began an investigation into whether the rating agencies were influenced by issuers and underwriters of residential mortgage-backed securities to publish higher ratings.

Rating agencies responded to criticisms in testimony before the Senate Committee on Banking, Housing and Urban Affairs by claiming that they were caught unaware by the extent of the incidences of mortgage delinquencies in 2006.

In New York, Attorney General Andrew M. Cuomo's recently completed investigation did indeed find that misrepresentations and misunderstanding of the true value of mortgage securities played a role in the mortgage crisis. That investigation led to sweeping reform agreements between Cuomo's office and the big three credit rating agencies: Standard & Poor's, Moody's, and Fitch. The agencies are welcoming the reforms with open arms, saying they improve the independence, transparency and quality of their ratings.

The investigation found that credit rating agencies were typically only compensated by investment banks if they were selected by those banks to provide an ultimate rating on a loan pool, providing an incentive for the agencies to rate favorably. The agencies were paid no fees during their initial reviews of the loan pools or during their discussions and negotiations with the investment banks about the structuring of the loan pools. Investment banks were thus able to get free previews of securitization assessments from multiple credit rating agencies, enabling the investment banks to hire the agency that provided the best rating, Cuomo's office said. Under the reforms, the agencies will now establish a fee-for-service structure, under which they will be compensated regardless of whether the investment bank ultimately selects them to rate a residential mortgage backed security.

The attorney general's investigation also found that the credit rating agencies were not provided with pertinent information that investment banks had about the mortgages comprising the loan pools. Under the agreement, the agencies will develop criteria for the due diligence information that is collected by investment banks on the mortgages comprising a residential mortgage backed security, and will disclose their due diligence criteria on their Web sites. Also coming soon to credit rating agencies' Web sites will be the agencies' evaluations of mortgage originators and the origination process.

Credit rating agencies agreed to disclose information about all securitizations submitted for their initial review, enabling investors to determine whether issuers sought, but subsequently decided not to use, ratings from a credit rating agency.

While the New York Attorney General's office continues its investigation into the mortgage industry, the SEC prepares to publicly release the results of its investigation. Chairman Christopher Cox praised Cuomo's office for coordinating their efforts with the SEC to ensure that they were consistent with the SEC's pending rulemaking for credit rating agencies. Recently, the SEC voted to propose a series of credit rating agency reforms aimed at increasing transparency and curbing practices "that contributed to recent turmoil in the credit markets," suggesting that the SEC's probe did not come up empty-handed.

**LOAD-DATE:** June 25, 2008

# EXHIBIT P(3)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

ABU DHABI COMMERCIAL BANK,
Individually and On Behalf of All Others
Similarly Situated,

                     Plaintiff,

      vs.

MORGAN STANLEY & CO.
INCORPORATED, MORGAN STANLEY &
CO. INTERNATIONAL LIMITED, THE
BANK OF NEW YORK MELLON (f/k/a THE
BANK OF NEW YORK), QSR
MANAGEMENT LIMITED, MOODY'S
INVESTORS SERVICE, INC., MOODY'S
INVESTORS SERVICE LTD., STANDARD
& POOR'S RATINGS SERVICES and THE
McGRAW HILL COMPANIES, INC.,

                 Defendants.

———————————————————— x

Civil Action No. 08-CIV-7508

CLASS ACTION

COMPLAINT FOR BREACH OF
FIDUCIARY DUTY, BREACH OF
CONTRACT, COMMON LAW FRAUD,
NEGLIGENT MISREPRESENTATION,
UNJUST ENRICHMENT AND AIDING
AND ABETTING

DEMAND FOR JURY TRIAL

## XII.   JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  August 25, 2008

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD


_____
          /S/ Samuel H. Rudman
         SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
PATRICK J. COUGHLIN
DAVID C. WALTON
PATRICK W. DANIELS
DANIEL S. DROSMAN
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
JASON C. DAVIS
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone:  415/288-4545
415/28804534 (fax)

Attorneys for Plaintiff

C:\DOCUME~1\janets.000\LOCALS~1\Temp\MetaSave\Cpt Morgan Stanley SIV.doc

# EXHIBIT P(4)



1 of 1 DOCUMENT

Copyright 2008 Factiva ®, from Dow Jones
All Rights Reserved

## Dow Jones Factiva

(Copyright (c) 2008, Dow Jones & Company, Inc.)

## THE WALL STREET JOURNAL.

The Wall Street Journal

October 23, 2008 Thursday

**SECTION:** Pg. A4

**LENGTH:** 694 words

**HEADLINE:** U.S. News: Moody's CEO Warned Profit Push Posed a Risk to Quality of Ratings

**BYLINE:** By Aaron Lucchetti and Judith Burns

**BODY:**

The chief executive of Moody's Corp. told directors last year that the credit-ratings firm's push to increase profitability posed a "risk" to the quality of the ratings process, according to an internal document released at a House hearing Wednesday.

The five-hour hearing by the House Oversight and Government Reform Committee included a string of emails and other documents that showed in unflattering detail how far Moody's and Standard &Poor's, which dominate the business of rating debt securities, went to accommodate bond issuers that generated giant fees for the two firms during the housing boom.

While both firms have shaken up their management ranks, tightened conflict-of-interest rules and made other sweeping changes in hopes of restoring their credibility, lawmakers were skeptical that those moves are enough. "The story of the credit-rating agencies is a story of colossal failure," said Rep. Henry Waxman (D., Calif.), chairman of the House committee.

The Moody's CEO, Raymond McDaniel, insisted to committee members Wednesday that Moody's ratings weren't influenced by the bottom line. But company documents suggested that he and other Moody's executives were torn between maintaining the integrity of the ratings process and easing standards in an effort to win more business.

U.S. News: Moody's CEO Warned Profit Push Posed a Risk to Quality of Ratings The Wall Street Journal October 23, 2008 Thursday

"Analysts and MDs [managing directors] are continually 'pitched' by bankers, issuers, investors -- all with reasonable arguments -- whose views can color credit judgment, sometimes improving it, other times degrading it (we 'drink the kool-aid')," the CEO wrote in a presentation for directors in October 2007, according to a document released by the committee. "Coupled with strong internal emphasis on market share &margin focus, this does constitute a 'risk' to ratings quality."

Another document underscored the tension and anxiety expressed by some Moody's employees as subprime-mortgage-related securities awarded top ratings by the firm were staggered by ballooning delinquencies. Billions of dollars worth of mortgage-backed securities were sold to investors on the premise that the securities were safe under most market conditions. "It seems to me that we had blinders on and never questioned the information we were given," an unidentified Moody's employee wrote as part of a survey after a September 2007 town-hall meeting. "Combined, these errors make us look either incompetent at credit analysis, or like we sold our soul to the devil for revenue, or a little bit of both."

A separate email forwarded by Brian Clarkson, former president of Moody's Investors Service, showed that the firm competed fiercely to outdo its rivals. Mr. Clarkson's aggressive push to win business was the subject of a page-one article in The Wall Street Journal in April.

At S&P, one employee wrote in an instant-message exchange: "btw-that deal is ridiculous." A colleague replied: "it could be structured by cows and we would rate it."

Deven Sharma, president of S&P, said the language was "inappropriate" but showed that the firm encourages analysts to raise concerns. The Securities and Exchange Commission examined the exchange and found no misconduct, he added.

With stock and credit markets around the world still reeling from losses that began with downgrades by the ratings agencies last summer, Wednesday's revelations are likely to fuel efforts to rein in the industry and improve its reliability. The SEC will consider new rules as soon as next month.

Moody's, McGraw-Hill Cos.' S&P unit, and the Fitch Ratings unit of Fimalac SA still have immense influence as arbiters of financial strength, especially in the world of corporate bonds.

---

                         Private Concerns

From an April 2007 instant-message exchange between two S&P employees:

Rahul Dilip Shah: 'btw -- that deal is ridiculous'

Shannon Mooney: 'I know right . . . model def does not capture half of the risk'

Shah: 'we should not be rating it'

Mooney: 'it could be structured by cows and we would rate it'

Shah: 'but there's a lot of risk associated with it -- I personally do not feel comfy signing off as a committee member'

License this article from Dow Jones Reprint Service

**NOTES:**

U.S. News: Moody's CEO Warned Profit Push Posed a Risk to Quality of Ratings The Wall Street Journal October 23, 2008 Thursday

PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** May 31, 2010

# EXHIBIT P(5)

Case 2:13-cv-00779-DOC-JCG   Document 101-4   Filed 01/20/14   Page 67 of 103   Page ID
#:2193

**Bloomberg Businessweek**

# News From Bloomberg

http://www.businessweek.com/news/2012-01-13/s-p-moody-s-must-face-calpers-lawsuit-over-ratings-judge-rules.html

**Bloomberg News**

# S&P, Moody's Must Face Calpers Lawsuit Over Ratings, Judge Rules

By Karen Gullo January 13, 2012

Jan. 12 (Bloomberg) -- Standard & Poor's and Moody's Investors Service Inc. must face California Public Employees' Retirement System's $1 billion lawsuit over their ratings of structured investment vehicles, a judge said.

The pension fund "produced sufficient evidence" that the ratings companies made misrepresentations "without reasonable grounds" to believe they were telling the truth, state court Judge Richard Kramer in San Francisco said in a ruling yesterday.

Calpers, the largest U.S. pension fund, sued the three major bond-rating companies in July 2009 for losses it said were caused by their "wildly inaccurate" risk assessments on so- called SIVs.

The ratings companies all gave top marks to Cheyne Finance LLC, Stanfield Victoria Funding LLC and Sigma Finance Inc., prompting Calpers to invest in them in 2006, the fund said in its complaint. The SIVs collapsed in 2007 and 2008, according to the Calpers complaint. The underlying assets of the three firms consisted primarily of risky subprime mortgages, Calpers said.

Kramer's ruling rejected a request by the rating companies to dismiss the case under a California law designed to fend off lawsuits meant to chill public debate. He ruled in 2010 that the ratings are a form of speech that's protected by the law. To fend off dismissal, Calpers then had to show a probability of prevailing in the lawsuit by presenting sufficient facts.

'Strategic Lawsuits'

"It's not a ruling on the merits of the case," said Paul Clifford, an attorney at the California Anti-Slapp Project, a Berkeley, California-based law firm that specializes in similar lawsuits. SLAPP stands for "strategic lawsuits against public participation."

Moody's and S&P have 60 days to appeal the ruling, and the appeals court would take a fresh look at the evidence without considering whether Kramer erred in his decision, Clifford said in a phone interview. Neither side can present new evidence, he added.

Edward Sweeney, a spokesman for McGraw-Hill Cos.' Standard & Poor's Rating Services reached via e-mail, had no immediate comment about the ruling. Michael Adler, a Moody's spokesman, didn't immediately respond to an e-mail message seeking comment on the decision. A phone call to

Sacramento-based Calper's media office wasn't immediately returned.

Kramer refused to dismiss the case on other grounds in 2010. Fitch Ratings Ltd. settled the lawsuit in August, agreeing to provide Calpers with documents from a lawsuit over some of the same investments pending in New York.

The SIVs, unregistered securities, could be sold only to specific classes of buyers. The assets underlying the SIVs were known only to the SIVs, and the rating companies, which published the ratings in offering materials on their websites for a brief period and on private financial reporting services, Calpers said in its complaint.

The case is California Public Employees' Retirement Systems v. Moody's Corp., 09-490241, Superior Court of California, County of San Francisco.

--Editors: Peter Blumberg, Mary Romano

To contact the reporter on this story: Karen Gullo in San Francisco at kgullo@bloomberg.net.

To contact the editor responsible for this story: Michael Hytha at mhytha@bloomberg.net.

SPECIAL OFFER    SUBSCRIBE NOW AND SAVE 86%

©2013 Bloomberg L.P. All Rights Reserved. Made in NYC

# EXHIBIT P(6)

ORIGINAL

1  Joseph J. Tabacco, Jr. (SBN 75484)
   Email: jtabacco@bermandevalerio.com
2  James Magid (SBN 233043)
   Email: jmagid@bermandevalerio.com
3  **BERMAN DeVALERIO**
   425 California Street, Suite 2100
4  San Francisco, CA 94104
   Telephone: (415) 433-3200
5  Facsimile: (415) 433-6382

6  *Attorneys for Plaintiff*

F I L E D
Superior Court of California
County of San Francisco

JUL 9 2009

GORDON PARK-LI, Clerk
BY: _____
Deputy Clerk

NO SUMMONS ISSUED

CASE MANAGEMENT CONFERENCE SET

DEC 1 1 2009 - 9ᵃᵐ AM

7

8

9            SUPERIOR COURT OF THE STATE OF CALIFORNIA

                          DEPARTMENT 212

10                  COUNTY OF SAN FRANCISCO

11

12  CALIFORNIA PUBLIC EMPLOYEES'      )   Case No.   **CGC-09.490241**
    RETIREMENT SYSTEM,               )
13                                   )   **COMPLAINT FOR NEGLIGENT**
            Plaintiff,               )   **MISREPRESENTATION UNDER**
14                                   )   **COMMON LAW AND CAL. CIV. CODE**
            v.                       )   **§§ 1709 AND 1710 AND NEGLIGENT**
15                                   )   **INTERFERENCE WITH PROSPECTIVE**
    MOODY'S CORP.,                   )   **ECONOMIC ADVANTAGE**
16  MOODY'S INVESTORS SERVICE, INC., )
    THE MCGRAW HILL COMPANIES, INC., )
17  FITCH, INC.,                     )
    FITCH GROUP, INC.,               )
18  FITCH RATINGS, LTD., and         )   JURY TRIAL DEMANDED
    DOES 1 THROUGH 100,              )
19                                   )
            Defendants.              )
20                                   )
                                     )
21                                   )
                                     )
22

23

24

25

26

27

28

COMPLAINT

1    Plaintiff, as defined below in paragraph 4, alleges the following upon personal knowledge

2    as to themselves and their own acts and upon information and belief as to all other matters.

3    Plaintiff's information and belief are based on the investigation of their undersigned counsel,

4    whose investigation continues.  Many of the facts related to Plaintiff's allegations are known only

5    by the Defendants named herein, or are exclusively within their custody or control.  Plaintiff

6    believes that substantial additional evidentiary support for the allegations set forth below will be

7    developed after a reasonable opportunity for discovery.

8    **I.    SUMMARY OF THE ACTION**

9        1.    This action arises from the defendant credit rating agencies' grant of their highest

10   credit ratings to three Structured Investment Vehicles ("SIVs") which, in 2006, plaintiff

11   California Public Employees' Retirement System ("CalPERS") acquired interests in by investing

12   a total of $1.3 billion.  The three SIVs, named Cheyne Finance LLC ("Cheyne"), Stanfield

13   Victoria Funding LLC ("Stanfield Victoria"), and Sigma Finance, Inc. ("Sigma"), collapsed in

14   2007 and 2008, defaulting on their payment obligations to CalPERS and resulting in hundreds of

15   millions, and perhaps more than $1 billion, of investment losses for CalPERS.

16       2.    SIVs were massive structured finance products which held billions of dollars of

17   assets and issued billions of dollars of debt.  The Rating Agencies (as defined below in paragraph

18   8) were indispensable players in the structuring and issuance of SIV debt, which they

19   subsequently rated for huge fees paid by the issuers – "rating their own work" according to a

20   recent Securities and Exchange Commission ("SEC") Report highly critical of the Rating

21   Agencies.  SIVs were opaque; the Rating Agencies were the only entities (other than those

22   running the SIV) with knowledge of what assets a SIV actually purchased.  They gave the SIVs

23   purchased by CalPERS their highest credit ratings, and by doing so made negligent

24   misrepresentations to CalPERS and CalPERS' money manager agents, which have caused and

25   will cause CalPERS to suffer substantial investment losses.

26       3.    The credit ratings on the three SIVs ultimately proved to be wildly inaccurate and

27   unreasonably high.  The Rating Agencies' methods used to rate the SIVs and their underlying

28   assets were seriously flawed in conception and incompetently applied.  Moreover, the SIVs,

COMPLAINT                                                                                                1

1    which the Rating Agencies represented by their "AAA" credit ratings as most likely able to

2    withstand an economic depression, were structured with Rating Agency participation in a manner

3    that used certain flawed assumptions which ended up ensuring SIVs' collapse when a recession

4    actually occurred.

5    **II.     THE PARTIES**

6          4.      Plaintiff California Public Employees' Retirement System ("CalPERS") is the

7    largest state public pension fund in the United States and was established for the benefit of

8    California's public employees in 1932. CalPERS is a defined benefit retirement plan with assets

9    totaling approximately $173 billion as of January 31, 2009. CalPERS manages retirement

10   benefits for more than 1.6 million California public employees, retirees and their families. As of

11   June 30, 2008, CalPERS provided benefits to 1,126,133 active and inactive members and 476,252

12   retirees.

13         5.      Defendant Moody's Investors Service, Inc. is a division of Moody's Corp., a

14   Delaware corporation (collectively "Moody's"). Moody's provides credit ratings, research and

15   risk analysis to investors. Moody's also played an integral role in the structuring, issuance, and

16   continued rating of the three SIVs invested in by Plaintiff. Moody's also maintains offices

17   located at One Front Street, Suite 1900, San Francisco, California 94111.

18         6.      Defendant The McGraw-Hill Companies, Inc. ("McGraw Hill"). is a New York

19   corporation, with several offices in California, including in San Francisco, California. Standard &

20   Poor's ("S&P"), is a division of McGraw-Hill providing credit ratings , risk evaluation,

21   investment research and data to investors. As detailed herein, S&P also played an integral role in

22   the structuring, issuance, and continued rating of the three SIVs invested in by Plaintiff. S&P has

23   offices located at Steuart Tower, Suite 1500, One Market, San Francisco, California 94105.

24         7.      Defendant Fitch, Inc. ("Fitch"), and its affiliate, Defendant Fitch Ratings, Ltd.

25   ("Fitch Ratings") (collectively, "Fitch"), is a credit rating agency that has dual headquarters in

26   New York and London. Defendant Fitch Ratings is a part of Fitch Group, Inc. a subsidiary of a

27   French company, Fimalac, S.A. Defendant Fitch, Inc. has offices located at 650 California Street,

28   4th Floor, San Francisco, California 94108.

COMPLAINT                                                                                  2

8.    Defendant McGraw-Hill, inclusive of S&P, defendant Moody's, and defendant Fitch, inclusive of Fitch Ratings, are collectively referred to herein as the "Rating Agencies" or "Defendants."

9.    The true names and identities, whether individual, associate or corporate, of the defendants sued herein as Does 1-100 inclusive, and the full nature and extent of the participation of the said Doe defendants in the activities and conduct on which this action is based, are presently unknown to plaintiff, who prays leave to amend to allege the true names and identities, and the extent of participation in the wrongful activities and conduct, when the same shall become known.

## III.    JURISDICTION AND VENUE

10.    Plaintiff CalPERS is an arm of the State of California, operating pursuant to the California Constitution (Article 16, Section 17) and the California Government Code.

11.    Each Defendant has sufficient contacts with California, or otherwise purposefully avails itself of benefits from California or has property in California so as to render the exercise of jurisdiction over each by the California courts consistent with traditional notions of fair play and substantial justice.

12.    Each Defendant maintains permanent offices in California and conducts substantial amounts of business in the state.

13.    Each Defendant, for example, rates the state of California's bond debt, as well as the debt of many California municipalities and corporations.

14.    Each Defendant is qualified to do business in California.

15.    One or more of the Defendants also conducted phone calls with Plaintiff CalPERS' agents, and made representations concerning the Cheyne, Stanfield Victoria and/or Sigma SIVs.

16.    Venue is proper as each Defendant's California offices are located in San Francisco County.

17.    The amount in controversy exceeds the jurisdictional minimum of this Court.

18.    This action is not preempted by the Federal Securities Litigation Uniform Standards Act of 1998, Pub. L. No. 105-353 (1998) ("SLUSA"), because this Complaint only

COMPLAINT                                                                                           3

1  asserts state law claims, and is not a class action, an action brought by a representative party, or an

2  action that seeks damages on behalf of more than fifty persons.

3  **IV.     FACTUAL BACKGROUND**

4          19.     Between February 2006 and November 2006, CalPERS invested approximately

5  $1.3 billion in medium term notes ("MTNs") and commercial paper ("CP") issued by three SIVs:

6  Cheyne, Stanfield Victoria and Sigma.  The notes and commercial paper were, like traditional

7  corporate bonds, promises to repay borrowed investment money at a determined rate of interest.

8  An investor decides to lend funds and accept the "IOU" in the form of a note or commercial paper

9  based almost solely on the perceived creditworthiness of the borrower.  SIVs were corporations

10  with one business activity:  issuing debt.  Other than the Rating Agencies' evaluation and

11  subsequent credit rating of a SIV, an investor had no access to any information on which to base a

12  judgment of a SIV's creditworthiness.

13          20.     At the time of CalPERS' purchases, the senior debt issued by Cheyne, Stanfield

14  Victoria and Sigma were rated AAA/A-1+ by S&P, and Aaa/P-1 by Moody's.  Fitch rated Sigma

15  AAA.  These credit ratings are the highest assigned by each agency for long-term debt.

16  **A.     SIVs in General**

17          21.     SIVs are a type of special-purpose entity. SIVs purchase mainly medium and long-

18  term assets, raising money to do so with issues of highly-rated short-term commercial paper and

19  medium term notes, as well as less highly-rated junior notes.  A SIV profits from the leveraged

20  spread between the lower yields it pays for its funding and the higher yield it receives for the

21  maturing, underlying assets which it holds.

22          22.     The assets which make up SIVs are typically represented in offering materials to

23  be mostly highly-rated asset-backed securities from many sectors: financial, auto loans, student

24  loans, credit card loans, home equity loans, mortgage-backed securities (both commercial and

25  residential), and other structured finance products like collateralized debt obligations ("CDOs")

26  and collateralized loan obligations ("CLOs").

27

28

COMPLAINT                                                                                    4

23.     In the cases of Cheyne, Stanfield Victoria and Sigma the underlying assets consisted in large part of risky subprime mortgages, held in securitized form as residential mortgage backed securities ("RMBS"), CDOs, and securitized home equity loans ("HEL").

24.     SIVs can be "sponsored," or formed, by major commercial banks (so-called "bank-sponsored SIVs") or by other entities, such as investment or asset management companies (so-called "nonbank-sponsored SIVs").  Sponsors may or may not provide liquidity support or invest its own money in a portion of the capital structure.  Cheyne, Sigma and Stanfield Victoria were "non-bank sponsored" SIVs without the liquidity support of a major commercial bank.

25.     SIVs also have an asset manager, usually the sponsoring institution, to provide investment advice, funding and operational support.  SIVs are "actively managed," in that the manager has the authority to buy and sell assets as long as they are in accordance with certain limits (preordained in the documents which form and structure the SIV) on asset portfolio quality, tenor, concentration of individual assets, ratings, as well as industrial and geographic concentrations.

26.     SIVs have a structural hierarchy of liabilities: CP and MTNs are senior in priority to junior, medium-term debt, often called "capital notes."  In the event that the SIV experiences any losses, it is the junior debt that will absorb the losses first.

27.     SIV managers generally ran various structural tests, weekly or even daily, to determine if the SIV possessed adequate capital, collateral, and liquidity.  Ordinarily, SIVs were structured to cover the largest five-to-ten day periods of maturities without selling assets held by the SIV.  In the event that one or more of these tests were breached, and not remedied within the relevant cure period, this would constitute an "enforcement event" that would trigger the wind-down of the vehicle.

28.     The Rating Agencies rated the senior debt of all three SIVs here at issue (Cheyne, Stanfield Victoria and Sigma) "AAA" or the equivalent until at least August 2007.

29.     The Rating Agencies purported to base their ratings of SIVs on (a) the supposedly high quality of the assets contained in the SIV; and (b) the structural mechanisms of SIVs, which

COMPLAINT                                                                                                    5

1   were supposed to ensure that a SIV would sell off its underlying assets in order to keep a

2   minimum threshold of capital, and thus keep noteholders' investments safe.

3          30.     Approximately 28 SIVs have ever been created.  The oldest dates back twenty

4   years to 1989.  SIVs experienced a growth spike beginning in 2005, when eighteen SIVs were

5   created in the 2005-2007 time period.  According to a former consultant for S&P, SIVs came to

6   be nothing more than a mechanism by which investment banks could move exposure to risky

7   assets off their balance sheets.  In the consultant's view, SIVs were the "end of the road" for these

8   assets.

9          31.     In a report published in January 2008, Moody's stated that "the entire SIV business

10  model is now widely acknowledged as unsustainable without restructuring."

11         **B.     The Three SIVs:  Cheyne, Stanfield Victoria and Sigma**

12                **1.     The Cheyne SIV**

13         32.     Cheyne Capital Management (UK) LLP, a private London-based hedge fund

14  management company, was founded in 1999.  In 2005, it formed the Cheyne SIV.  As of

15  September 6, 2007 it was reported that the value of its total portfolio was about $8.8 billion.

16         33.     Moody's and S&P rated Cheyne during its existence.

17                **2.     The Stanfield Victoria SIV**

18         34.     Ceres Capital, based in New York, was started in 1999 to run structured funding

19  vehicles, including SIVs.  Stanfield Capital Partners LLC, another New York based firm, bought a

20  majority stake of Ceres Capital in 2002, the same year the firm launched the Stanfield Victoria

21  SIV.

22         35.     Moody's and S&P rated Stanfield Victoria during its existence.

23                **3.     The Sigma SIV**

24         36.     Gordian Knot, a London-based investment management company founded in

25  1993, formed the Sigma SIV in 1995.  Sigma evolved into what would be the historically largest

26  SIV before its collapse.

27         37.     Moody's, S&P, and Fitch rated Sigma during its existence.

28

COMPLAINT                                                                                    6

C. **The Rating Agencies' Structured Finance Boom**

38.     In the last thirty years, the Rating Agencies' business has drastically changed. Traditionally, investors paid a subscription fee to the Rating Agencies for access to published ratings and analysis.  Beginning in the 1970s, however, the Rating Agencies began to move to an "issuer pays" model, whereby the Rating Agencies are paid by the issuers whose debt is receiving the credit rating.  Today, 95% of the agencies' annual revenue is from issuer fees.

39.     *What* the Rating Agencies are rating has also changed.  Traditionally, they rated bonds issued by corporations, municipalities, sovereign nations – entities that were ongoing concerns sensitive to market, economic and industry developments.  To determine the risk to the note-holder, their analysis emphasized the expected cash flow generated by the obligors' ongoing business.  A rated entity could do little to change their credit characteristics before or during the rating process.

40.     This was no longer the case beginning no later than 2000.  The Ratings Agencies became actively involved in the creation and ongoing operation of structured finance products like SIVs.  Indeed, not only did they help structure the Cheyne, Stanfield Victoria and Sigma SIVs here in question, but they were also actively involved in the creation of the structured finance assets held by SIVs, like RMBS and CDOs.

41.     Structured finance was lucrative.  S&P and Moody's earned three times more for grading CDOs, for example, as they did from traditional corporate bonds.

42.     Rating a typical SIV commanded $300,000 to $500,000 or more, and some fees for rating SIVs climbed to the $1 million level.  Moreover, the SIV rating fee was on top of the fees the Rating Agency already generated by assigning ratings to the SIV's underlying assets.  What is more, the fees were contingent on the SIV ultimately being offered to investors.  This meant the Rating Agencies had a contingent fee interest and thus every incentive to give high "investment grade" ratings, or else they wouldn't receive their full fee.

43.     Structured finance increasingly became Moody's dominate source of income.  For example, Moody's charged between $200,000 and $250,000 to rate a $350 million mortgage pool. By contrast, rating a traditional municipal bond of an equivalent size would have generated only

COMPLAINT                                                                                         7

1    $50,000 in fees.  In 2005, structured finance generated $715 million, or 41% of Moody's total

2    revenue.  By the first quarter of 2007, structured finance accounted for 53% of Moody's revenue.

3         44.    Moody's financial statements show that from 2000 to 2007, operating margins

4    averaged 53%.  These margins outpaced those of Exxon and Microsoft.  For five years in a row,

5    Moody's had the highest profit margin of any company in the S&P 500.

6         45.    S&P charged comparable rates for its ratings as Moody's.  For structured finance

7    deals, this meant as high as eleven basis points, compared with 4.25 basis points for corporate

8    bonds.  The revenue S&P garnered from structured financed grew 800% from 2002 to 2006.  In

9    2006, its revenues rose by 20% to $12.7 billion, with almost half of that growth from increased

10   sales of structured finance ratings.

11        46.    Though Fitch is the smallest of the Rating Agencies, it too brought in record

12   profits for rating structured finance products.  Fitch charged 7-8 basis points to rate a CDO, more

13   than its 3-7 basis point fee to rate a traditional bond.  Fitch reported that structured finance

14   accounted for 51% of its total revenue of $480.5 million in the fiscal year that ended on

15   September 30, 2006.  According to Forbes, before the subprime shock waves hit, Fitch had its

16   best year ever in 2007, earning $240 million before interest and taxes, up 22% from the year

17   before, on revenue of $1.1 billion, up 18% from the previous year.

18        **D.    The Ratings Agencies' Active Role in Structured Finance**

19        47.    As detailed above, and unlike their previous roles as independent raters, Rating

20   Agencies became an integral part of the issuance of SIVs and their underlying collateral like

21   RMBS and CDOs.  The Rating Agencies no longer played a passive role, but would help the

22   arrangers structure their deals so that they could rate them as highly as possible.  As former chief

23   Operating Officer of Moody's, Brian Clarkson said, "You start with a rating and build a deal

24   around a rating."  With regard to structured finance products, Charles Calomiris, the Henry

25   Kaufman professor of financial institutions at Columbia University in New York, told

26   Bloomberg:

27        It's important to understand that unlike in the corporate bond market, in the
          securitization market, the rating agencies run the show . . . . **This is not a passive**
28        **process of rating corporate debt.  This is a financial engineering business.**

COMPLAINT                                                                                          8

48.     Because the Rating Agencies would not get their full fees unless the issuance of a SIV or other structured finance product was completed and the target rating was attained, they were highly incentivized to get deals done and the products marketed to investors.

49.     This active role played by the Rating Agencies in participating in the structuring of financial products like SIVs was seen as problematic by the SEC, which has since criticized the practice as "in effect, rating their own work."

**E.      Ratings Symbols**

50.     Ratings reflect the particular rating agency's expert opinion of the underlying financial strength of the security.  Typically, ratings may take into consideration various factors, but usually consider the issue of the likelihood of default.  Ratings are based on the aggregate of relevant factors, and are expressed in the form of combinations of letters indicating the relative safety or risk of the security.  In addition, "+" and "-" signs are employed to signify shades of risk within a given rating score.

51.     The ratings assigned to the MTNs and CP issued by the Cheyne, Sigma and Stanfield Victoria SIVs and purchased by CalPERS are as follows:

| Rating Agency | Symbol | Meaning |
| --- | --- | --- |
| Moody's | Aaa | The highest quality; minimal credit risk; highest investment grade |
| Moody's | P-1 | Issuers (or supporting institutions) rated Prime-1 have superior ability to repay short-term debt obligations |
| Standard & Poor's | AAA | The best quality borrowers, reliable and stable (many of them governments); highest investment grade |
| Standard & Poor's | A-1+ | Obligor's capacity to meet its financial commitment on the obligation is strong |
| Fitch | AAA | Highest investment grade |
| Fitch | F1+ | Obligor has superior ability to repay short-term debt |

COMPLAINT                                                                                                    9

52. Using S&P's scale, ratings of "AA," "A," and "BBB" represent high credit quality, upper-medium credit quality and medium credit quality, respectively. These are considered "investment grade" ratings. Any instrument rated below BBB is considered below investment-grade, or "junk bond."

## V. THE RATING AGENCIES' MISREPRESENTATIONS CONCERNING THE THREE SIVS

53. The Rating Agencies provided credit ratings for the MTNs and CP issued by Cheyne, Stanfield Victoria and Sigma to the companies which offered the SIVs to investors. CalPERS purchased $1.3 billion at par value of these debt issues in the period February 2006 to November 2006. The SIV issuers paid the rating agencies to assign the ratings. The ratings appeared in (i) private placement memoranda ("offering materials"), (ii) on the Rating Agencies' respective websites (at least briefly available in downloadable form), and (iii) in the mix of information about the SIVs debt issues provided by financial reporting services such as Bloomberg and Reuters. The initial ratings persisted with ongoing "surveillance" of the SIVs by the Rating Agencies.

### A. Cheyne

54. Moody's carried a rating of Aaa/P-1 on Cheyne at the time CalPERS acquired Cheyne's CP notes. CalPERS relied on the rating.

55. According to Moody's, its ratings on Cheyne "address the likelihood that investors will receive payments as promised" and "address the expected loss posed to investors in relation to timely payment of interest (if applicable) and timely payment of principal at par on the final legal maturity date." Moody's emphasized that its rating was based "primarily" on several factors, including the "assets purchased" by Cheyne. Moody's reported that Cheyne was structured to permit certain "sector concentrations" of structured finance assets. The structural parameters permitted an asset mixture of up to 55% RMBS and 40% CDOs.

56. S&P carried a AAA/A-1+ rating on Cheyne when CalPERS acquired it. CalPERS relied on the rating.

COMPLAINT                                                                    10

57.     According to S&P, its ratings on Cheyne "address timely payment of interest and principal" and are based principally on certain factors, including "[a]ppropriate asset and liability portfolio composition." To determine if Cheyne's asset mixture was appropriate for the highest credit rating, S&P reported:

> A variety of different scenarios were analyzed .... Each scenario assumed different asset and liability compositions with regard to the impact of stress ... [including the] expected operating portfolios ... Standard & Poor's is comfortable that the minimum capital requirements ensure that under the tested scenarios the senior liabilities will be repaid in full.

**B.     Stanfield Victoria**

58.     Moody's carried a rating of Aaa/P-1 on Stanfield Victoria at the time CalPERS acquired Stanfield Victoria MTNs. CalPERS relied on the rating.

59.     According to Moody's, its ratings on the Stanfield Victoria notes "address the likelihood that investors will receive payments as promised." Moody's states that its rating is based upon Stanfield Victoria's "portfolio of assets and liabilities ...."

60.     S&P carried a AAA/A-1+ rating on the Stanfield Victoria MTNs when CalPERS acquired them. CalPERS relied on the rating.

61.     According to S&P, its ratings "are based on Standard & Poor's assessment of [Stanfield] Victoria's structure and capital adequacy" emphasizing the assets it contains. S&P represented that it evaluated the default probabilities for the SIV's assets and their probable market losses, and was ensured that "under the scenarios tested, the senior liabilities would be repaid in full."

**C.     Sigma**

62.     Moody's initially assigned Sigma a rating of Aaa/P-1, and carried that rating at the time CalPERS acquired Sigma notes. S&P likewise rated Sigma AAA/A-1+. Fitch, too, rated Sigma AAA. CalPERS relied on these ratings.

**VI.     THE RATING AGENCIES' REPRESENTATIONS CONCERNING CHEYNE, SIGMA AND STANFIELD VICTORIA WERE UNTRUE BECAUSE THE RATINGS WERE INACCURATE AND UNJUSTIFIABLY HIGH**

63.     The Ratings Agencies did not have a reasonable ground for giving the SIVs their highest AAA or equivalent rating for the reasons set forth below.

COMPLAINT                                                                11

1    64.    The Rating Agencies created or approved structural tests that supposedly made the

2    Cheyne, Stanfield Victoria and Sigma SIVs virtually impervious to default.  The tests, however,

3    were critically flawed because they did not take into account the foreseeable scenario that the

4    SIVs would be unable to liquidate the assets in the SIVs' portfolios.  Those who invested in SIVs,

5    such as public pension funds like CalPERS, would not continue to roll over or "finance" SIV

6    notes or CP if there was a sign of trouble, given their prudent nature as investors in safe, liquid

7    assets.  The SIV managers, and the Rating Agencies, knew a ratings downgrade would doom the

8    SIV.  Consequently, in relatively good macroeconomic conditions, the SIVs' structure held; in the

9    "bust" of a "boom and bust" cycle, the SIVs' structure consigned them to collapse.

10   65.    The Rating Agencies used asset correlations in their mathematical and statistical

11   models that were insufficient to capture the risk of the SIVs given that the SIVs could, and did,

12   contain large concentrations of RMBS (made up of loans from the same geographic regions) and

13   CDOs.  This concentration (or lack of diversification) made the SIVs more susceptible to losses

14   from any one kind of investment, such as RMBS and CDOs.

15   66.    The Rating Agencies created or approved investment parameters that permitted the

16   SIVs' portfolios to become concentrated in assets that were of the same class, industry, and

17   geographic region.  This concentration (or lack of diversification) made the SIVs more susceptible

18   to losses from the classes, industries, and geographic regions in which the SIV had invested.

19   67.    The Rating Agencies created or approved investment parameters that were based

20   on the credit ratings of the assets. Thus the input for the SIV investment parameters was based on

21   the output of the Rating Agencies' faulty models they used to rate RMBS and CDOs, as described

22   below.

23   68.    The Rating Agencies, who were only paid by the issuer if a deal was rated,

24   employed increasingly lax standards when they rated SIVs and underlying structured finance

25   assets such as RMBS and CDOs.  They did so to ensure the SIVs could be successfully pedaled to

26   primarily institutional investors like CalPERS, thus permitting the Rating Agencies to be paid

27   their contingent fee.  This conflict of interest led to the Rating Agencies giving high credit

28   rankings to increasingly riskier deals.  The SEC recently described this inherent conflict of

COMPLAINT                                                                                      12

interest in its Summary Report of Issues in the Commission Staff's Examinations of Select Credit

Rating Agencies published in July 2008 ("SEC Report"), and recommended the rating agencies

establish and enforce policies to prohibit it.

69.     This competition between the Rating Agencies led to a market share war, which

deteriorated into a "race to the bottom" for standards of quality credit rating. The casualties were

the accuracy of the models.

70.     The pressure can be seen in internal communications. In an internal S&P email, an

employee laments that they had "lost a huge Mizuho RMBS deal to Moody's due to a huge

difference in the required credit support level." He was told by the arranger that they lost the deal

because the credit required by S&P "was at least 10% higher than Moody's."

71.     Even Raymond McDaniel ("McDaniel"), Moody's current Chief Executive

Officer, realized that the lowering of standards would lead to dire consequences. In a presentation

to Moody's board of directors in 2007, McDaniel stated that the market-share war had

undermined all three of the rating agencies work product. He also stated that:

> The real problem is not that the market does underweights [sic] ratings quality but
> rather that . . . it actually penalizes quality by awarding rating mandates based on
> the lowest credit enhancement needed for the highest rating. **Unchecked,**
> **competition on this basis can place the entire financial system at risk**.

72.     Internal S&P documents reveal that even within the Company, the rating standards

for structured finance were openly mocked:

- An analyst at S&P, expressed concern that her firm's model did not
  capture "half" of a particular deal's risk, but that "it could be structured
  by cows and we would rate it."

- Another analyst in the same agency's CDO group wrote to a senior
  manager that the Rating Agencies were creating an "even bigger
  monster- the CDO market. Let's hope we are all wealthy and retired by
  the time this house of cards falters. ;o)" (computerized wink in
  original).

73.     With regard to rating the RMBS and CDO products that SIVs would often invest

in, according to the SEC Report, the Rating Agencies:

- Failed to disclose relevant rating criteria;

- Did not have specific written procedures for the rating of RMBS and

COMPLAINT                                                                                    13

CDOs;

- Had no rationale for deviations from their models and for rating committee actions and decisions that made out-of-model "adjustments" resulting in higher ratings; and

- Did not have specific policies and procedures to identify or address errors in their models or methodologies.

74. The same SEC report also stated that the Rating Agencies failed to maintain enough trained personnel to competently rate all the deals that were coming through the doors and completely failed to maintain enough staff to monitor the deals they had previously rated. According to the SEC Report:

- A document in a deal file described an outstanding issue as "poorly addressed – needs to be checked in the next deal" and addresses the question of weighted average recovery rate by writing "(WARR – don't ask ☺)" (computerized smiley face in original).

- An email from one Rating Agency said that their "staffing issues, of course, make it difficult to deliver the value that justifies our fees" and another said "[t]ensions are high. Just too much work, not enough people, pressure from company, quite a bit of turnover and no coordination of the non-deal 'stuff' they want us and our staff to do."

- Another email said "[w]e ran our staffing model assuming the analysts are working 60 hours a week and we are short on resources . . . . The analysts on average are working longer than this and we are burning them out. We have had a couple of resignations and expect more."

75. In the same way that the Rating Agencies used inadequate asset correlation values for SIVs, they also increasingly lowered the asset correlation values for CDOs. This means models would not have predicted industry-wide negative trends, like depreciation of home value, defaulting and delinquent mortgages. Given the higher concentration of RMBS (and thus lower "diversity") in the CDOs described above, this number should have been raised so as to increase the correlation of the underlying assets by the Rating Agencies, not lowered.

76. With regard to rating RMBS deals, the Rating Agencies did not take into account the deterioration of loan origination standards especially for sub-prime mortgage loans. It was not until June 2007, well after the subprime crisis had begun, that Moody's decided it should even look at the individual loans and their origination standards in the mortgage pools it was rating.

77.     The Rating Agencies also failed to differentiate between a first mortgage and a "piggyback" second mortgage loan.  A "piggyback" loan was a second loan taken out, usually from a different lender, to finance the entire purchase of a property.  The Rating Agencies failed to recognize that whether or not there was a second "piggyback" loan would (1) render the first lien loan far more risky, as the borrower has a second loan and 0% equity; and (2) render the piggyback loan itself riskier.  These critical factors impacted the creditworthiness of the three SIVs sold to CalPERS at issue here, which turned out to have high concentrations of RMBS, CDOs, and HEL.

78.     The Rating Agencies also used the historical default rates for traditional mortgage loans to assume what the loss rates would be for the current crop of subprime and exotic mortgages.  Moody's used historical data going back to the 1960s and 1970s to determine the default and delinquency rates on the new breed of riskier mortgages.  As Mark Adelson, a former managing director in Moody's structured-finance division, remarked in a New York Times article, it was "like observing 100 years of weather in Antarctica to forecast the weather in Hawaii." Frank Raiter, former Managing Director and Head of Residential Mortgage Backed Securities Ratings at S&P, testified before Congress in late 2008 that a "consequence of continuing to use outdated versions of the rating model was the failure to capture changes in performance of the new non-prime rating products.  As a result, expected loss estimates no longer provided the equity necessary to support the AAA bonds."

79.     The Rating Agencies thus used inadequate models, premised on useless or outdated data to structure and rate RMBS deals, which had severe effects for SIVs' credit worthiness.  They also used fanciful asset correlation values in their CDO and SIV models.  As a result, the Ratings Agencies also allowed unreasonable amounts of concentration of underlying assets in specific kinds of investments, such as RMBS and CDOs.  This is the exact opposite of the "diversification" that is normally recommended for highly rated and "safe" investments. Moreover, the Ratings Agencies used their own ratings on the underlying assets, as a parameter to gauge the credit worthiness of the SIV, thus using the faulty output of their RMBS and CDO models as the input for their SIV models.

80.     As a consequence of the foregoing, the Rating Agencies had no reasonable ground for believing that the Cheyne, Stanfield Victoria and Sigma SIVs should carry their highest, safest, credit rating at any time.

**VII.   WITHOUT THE HIGH CREDIT RATINGS THERE WOULD HAVE BEEN NO MARKET FOR SIVS, AND CALPERS WOULD NEVER HAVE COME TO INVEST IN THEM**

81.     High credit ratings were critical to the SIVs' existence.  The high ratings enabled SIVs to be promoted as means to generate stable financial returns, with exposure only to safe, high-grade assets.

82.     Cheyne, Stanfield Victoria and Sigma were not available for purchase by the general investor community, but could only be sold to a specific class of investors.  The three SIVs were offered only via private placement as unregistered securities, exempt from registration (and concomitant disclosure requirements) under SEC Rule 144A.  By law, Cheyne, Stanfield Victoria and Sigma could be sold only to those who were both "Qualified Institutional Buyers" ("QIBs)" under Rule 144A and "Qualified Purchasers" ("QPs") pursuant to the 1940 Act § 2(a)51(A).  Public pension funds like CalPERS are one of the few types of investors who qualify as QIBs and QPs.

83.     Like CalPERS, most QIBs are well known to have policies restricting corporate note purchases to those that are at the upper tiers of "investment grade" ratings.  Consequently, if the SIV notes were not rated "AAA" or as investment grade, the limited pool of investors who could otherwise buy them would have been prevented from doing so, and there would have been no market at all for SIVs.

84.     Had Moody's and S&P not assigned the highest credit ratings to Cheyne, Stanfield Victoria and Sigma, CalPERS would not have purchased their debt issues for its portfolio and would not have suffered the related investment losses.

**VIII.   CALPERS JUSTIFIABLY RELIED ON THE SIV RATINGS**

85.     No amount of diligence by CalPERS could have given CalPERS actual knowledge of (a) the actual conflicts of interest at the Rating Agencies and their effect on the quality of the SIV ratings; (b) the race to bottom that gutted any legitimacy or assurance of competence in rating

COMPLAINT                                                                                              16

1    SIVs and other structured finance products held by SIVs; and (c) what assets the SIV actually

2    contained – for example, that Cheyne contained 50% RMBS and CDOs, concentrated in sub-

3    prime exposure, in 2007.

4         86.    Only the SIV manager and the Rating Agencies knew what assets made up

5    Cheyne, Sigma and Stanfield Victoria.  The exact make-up of assets was treated as confidential,

6    lest anyone, even investors, learn CUSIP-level data of what was contained in the SIVs and be able

7    to copy it.  CalPERS justifiably relied on the "AAA" ratings which persisted into 2007 and 2008,

8    even as alarm over subprime mortgages grew.

9         87.    In fact, on July 20, 2007, just ten days after Moody's had downgraded 431 RMBS

10   valued at $5.2 billion, Moody's released a report entitled "SIVs: An Oasis of Calm in the Sub-

11   prime Maelstrom."  In the report, Moody's offered assurances that SIVs were structured to

12   weather the subprime crisis.  According to Moody's, the structure of SIVs "obviates the need to

13   liquidate large buckets of assets at potentially the worst period in the life of the vehicle."

14   Moody's was quickly proven wrong as this was exactly what happened, which permanently

15   impaired the SIVs and forced their collapse.

16        88.    Not to be outdone, on August 15, 2007, S&P issued a report declaring that SIVs

17   were weathering the growing market turmoil well, reminding investors that SIVs' short term notes

18   were rated as the highest investment grade.

19   **IX.   DEFENDANTS OBJECTIVELY KNEW THEIR RATINGS OF CHEYNE,
          STANFIELD VICTORIA AND SIGMA WOULD BE RELIED UPON BY A
20        NARROW CLASS OF INVESTORS**

21        89.    The terms of the offering materials show that the Cheyne, Stanfield Victoria and

22   Sigma SIVs were marketed to a specific, narrow class of investors – QIBs and QPs, defined by

23   federal securities laws as that class of investors to whom unregistered securities may be offered.

24        90.    The Rating Agencies participated directly in assembling the offering materials and

25   contributed to their content.

26        91.    In addition, with respect to the Cheyne, Stanfield Victoria and Sigma SIVs, one or

27   more of the Rating Agencies communicated about the SIVs directly with the agent of CalPERS

28   which purchased the debt issues of the Cheyne, Stanfield Victoria and Sigma SIVs.

COMPLAINT                                                                                      17

92.     What is more, Moody's and S&P each participated in the formation of the offering materials for the SIVs, typically via telephone conference calls with the issuers to help draft the language in the offering documents.

93.     The Rating Agencies, much like their role with RMBS and CDOs, helped set up SIVs through the same "iterative" process with the issuers. The Rating Agencies would create or approve investment parameters that mandated the type, geography, tenor, and size of the assets that the SIV could contain.

94.     In addition, the information used by Rating Agencies to rate SIVs was confidential, non-public information: only the arrangers and the Rating Agencies ever actually knew what was in a SIV's portfolio.

## X.    THE DOWNGRADES AND DEMISE OF THE SIVS

### A.    The Collapse of Cheyne

95.     As early as July 31, 2007, the same time period that the Rating Agencies were downgrading RMBS assets, approximately 50% of Cheyne's portfolio had direct exposure to sub-prime mortgages, in the form of RMBS and home equity loans. A JP Morgan analyst said at the time that Cheyne had the highest known concentration of real estate assets in any SIV.

96.     Just two weeks later, on August 15, 2007, S&P issued its report stating that SIVs, including Cheyne, were weathering the market disruption well and declared short term notes to be the highest investment grade.

97.     Just a week and a half after S&P's rosy report, on August 28, 2007, Cheyne Capital Management sent S&P and Moody's a letter notifying them that Cheyne had breached its "Major Capital Loss" test, an "enforcement event" which forced the vehicle to wind down. On this news, S&P abruptly downgraded the credit rating on Cheyne's MTNs by six notches from AAA to A-. It lowered the SIVs CP to A-2 from A-1 plus. According to a JP Morgan analyst covering the CP market, "If the rating agencies have to downgrade six notches in a single day, it undermines investor confidence. It is sort of hard to fathom what so much has changed in that time and makes investors wonder whether the rating agencies were paying attention to what was going on in the portfolio."

COMPLAINT                                                                18

98.     Moody's did not react until September 5, 2007, the day that Cheyne was forced into receivership.  Moody's reaction was mild.  It placed Cheyne on a "review" for "possible downgrade" in the medium term note program.  Moody's said it took the action not only because of the breach of the trigger and the "entering an irreversible wind-down mode," but also because Cheyne had a concentration of its assets in 48% RMBS.  In the same announcement, Moody's announced it had "adapted its rating methodology."

99.     On October 19, 2007, S&P cut the credit rating of all Cheyne issuances to "D," meaning in "default."  In less than two months, S&P ratings of Cheyne fell from "AAA" to below even "junk" status.   Also on this date, S&P reported that Cheyne's portfolio consisted of 56% RMBS, 6% CDOs of ABS, and 38% corporate CDOs and CMBS.

100.    It was not until July 15, 2008, that Moody's downgraded Cheyne's European and U.S. MTNs to Ca, based in part of "losses from a 'fire sale,'" stemming from the auctioning off of Cheyne's assets.

101.    Between July 15 and 23, 2008, approximately $1.8 billion of Cheyne's portfolio was auctioned.  Approximately 21% of Cheyne investors decided to "cash out" after the auction that paid them 55% of their original $7 billion investment.  The remaining assets have now been sold to Goldman Sachs into a new vehicle, the Gryphon pass-through Notes.

**B.      The Collapse of Stanfield Victoria**

102.    On October 31, 2007, S&P downgraded Stanfield Victoria's senior debt to AA from AAA.

103.    On, December 21, 2007, Moody's downgraded senior debt ratings of Stanfield Victoria from Prime-1 to Not Prime, and the European and U.S. MTNs from Aaa/Prime-1 to Baa3/Not Prime.

104.    According to Moody's the Stanfield Victoria portfolio consisted of 28% CDOs (including 10% CDO of ABS), Financials 21%, CMBS 16%, prime US RMBS 15%, Non Prime US RMBS 5%, ABS 11% and monocline wrapped RMBS, CDO of ABS and home equity loans 4%.

105.    On January 7, 2008, S&P cut Stanfield Victoria 13 levels to junk, from AA to B-.

COMPLAINT

106.   On January 14, 2008, S&P cut Stanfield Victoria to D, the lowest ranking, due to its "technical default" when it failed to pay CP that matured on January 10.  S&P further stated that Stanfield Victoria's portfolio included a high concentration of CDOs involving "corporate, residential, and commercial real estate exposure."  Senior investors had until January 17 to decide whether they want to liquidate a percentage of its portfolio equal to their share of debt.

107.   On April 17, 2008, Ceres Capital, the owners of Stanfield Victoria, filed for Chapter 11 bankruptcy protection.

**C.    The Collapse of Sigma**

108.   From its inception until 2007 Sigma was given the highest ratings by all three Rating Agencies.  It was not until December 18, 2007 that S&P even put Sigma on "negative outlook."  S&P noted that Sigma's debt was not on CreditWatch Negative.

109.   On January 8, 2008, Gordian Knot announced that it would not renew its ratings contract with Fitch.

110.   On January 28, 2008, Fitch withdrew its AAA grade on the $34 billion of debt sold by Sigma.  Fitch said it could no longer rate Sigma because Gordian Knot was no longer willing to provide information.

111.   On February 27, 2008, Moody's put Sigma's senior notes on review for downgrade.  Moody's cited concerns about the lack of any market value or ratings-based enforcement triggers.  Moody's also stated that Sigma's portfolio is 45% Aaa-rated and 43% Aa rated, and has "limited exposure to ABS CDO and monoline wraps, and has no direct exposure to US subprime RMBS."  Moody's said review could result could downgrade long-term rating to the double-A range and the short-term to P-2.

112.   On April 4, 2008, Moody's downgraded Sigma's MTNs from Aaa to A2, and U.S. CP was downgraded Prime-1 to Prime-2.  Moody's said the 5-notch downgrade, which skipped the double-A range, was due to continuing uncertainties concerning Sigma's ability to absorb further deterioration in Sigma's asset prices.

113.   On April 8, 2008, S&P cuts Sigma's long-term debt rating three notches from AAA to AA-.

COMPLAINT                                                                                          20

114.     September 12, 2008, S&P downgraded Sigma's long-term senior debt two levels from AA- to A.  Sigma was, at this point, the last surviving SIV.

115.     On October 1, 2008, Sigma announced that it would cease trading and may appoint a receiver in a wind down.

116.     On December 1, 2008, Moody's downgraded Sigma to C from Ca.

117.     On December 4, 2008, it was reported that Sigma received bids of about $306 million for a pool of bank debt and structured bonds with a face value of about $2 billion. Bloomberg also reported that creditors who held bonds due after October 23, 2008 might not recover anything after the company's assets were liquidated.

### FIRST CAUSE OF ACTION
### (NEGLIGENT MISREPRESENTATION)
### (COMMON LAW AND CAL. CIVIL CODE §§ 1709 AND 1710)
### (Against All Defendants)

118.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set for the herein.

119.     This is a claim for negligent misrepresentation against the Rating Agencies.

120.     The Rating Agencies assigned untrue, inaccurate, and unjustifiably high credit ratings to the senior debt of the SIVs named Cheyne, Stanfield Victoria and Sigma.

121.     These credit ratings were false at the time they were initially assigned, and continued to be false during the existence of the SIVs.

122.     These false and misleading ratings were communicated to Plaintiff via the offering materials of the notes Plaintiff invested in, the Rating Agencies' respective websites, through financial reporting services, and directly to CalPERS authorized agent, and were relied upon by CalPERS.

123.     The Ratings Agencies knew at all times that their SIV ratings would be relied upon by the same qualified institutional buyers and qualified purchasers, such as CalPERS, to which the SIVs were marketed.  Accordingly, the Rating Agencies owed a duty to CalPERS, which relied on the ratings in purchasing the Cheyne, Sigma and Stanfield Victoria MTNs and CP.

COMPLAINT                                                                                          21

124.    The senior debt of the SIVs purchased by CalPERS would not have issued at all but for the Rating Agencies' false and misleading credit ratings. But for the untrue, inaccurate, and unjustifiably high credit ratings maintained by the Rating Agencies on Cheyne, Stanfield Victoria and Sigma, CalPERS would never have acquired their debt and suffered the resulting investment losses.

125.    The Ratings Agencies hold themselves out as experts on the risk of structured investment vehicles and

    1.   helped structure the portfolio guidelines and covenants of each SIV,

    2.   had access to material information as to the underlying assets of the SIV, which neither the Plaintiff nor the public had access to, and

    3.   had access to the results of the SIVs structural tests

126.    The Rating Agencies had no reasonable basis for their false and misleading credit ratings because

    1.   the Rating Agencies lowered their standards to give higher ratings to ever-riskier SIV deals and deals for the RMBS and CDOs held by the SIVs,

    2.   of the inherent conflict of interest given that they helped structure the very deals they were supposed to be rating, and

    3.   they knew the models they used to rate SIVs, RMBS, and CDOs, were inadequate and were not capturing the true risk of the deals

127.    Plaintiff has suffered damages as result of the Rating Agencies negligent misrepresentations.

**SECOND CAUSE OF ACTION**
**(NEGLIGENT INTERFERENCE WITH**
**PROSPECTIVE ECONOMIC ADVANTAGE)**
**(Against All Defendants)**

128.    Plaintiff realleges each allegation in each of the paragraphs above as if fully set forth herein.

129.    The Cheyne, Sigma and Stanfield Victoria SIVs each contracted with two or more Rating Agency Defendants for credit rating services of their debt issues and ongoing monitoring of the creditworthiness of their debt issues.

COMPLAINT                                                                                          22

1        130.    Plaintiff made investments in debt issued by the Cheyne, Sigma and Stanfield

2    Victoria SIVs, which investments the SIVs promised to repay in the form of the investment

3    principal plus interest.

4        131.    The Rating Agencies had knowledge of the economic relationships between

5    Plaintiff and the three SIVs.

6        132.    Defendants knew or should have known that the economic relationship between

7    Plaintiff and the three SIVs would never have existed but-for the Rating Agencies' failure to act

8    with reasonable care regarding their initial and ongoing credit rating of the three SIVs' debt

9    issues.

10        133.    The Rating Agencies' credit rating actions on the Cheyne, Sigma and Stanfield

11    Victoria SIVs was intended to affect Plaintiff and they caused foreseeable harm to Plaintiff.

12        134.    As a result of the Rating Agencies' negligent ratings of Cheyne, Sigma and

13    Stanfield Victoria, those SIVs came to marketed and were purchased by Plaintiff, causing Plaintiff

14    to be deprived of investment principal and interest income that it reasonably expected.

15        135.    A high degree of certainty existed that Plaintiff would suffer injury as a result of

16    the Rating Agencies' negligent rating actions.

17        136.    There is a close connection between the Rating Agencies' negligent rating actions

18    and Plaintiff's injury.

19        137.    The Rating Agencies acted in a morally blameworthy fashion by failing to exercise

20    reasonable care in their rating actions.

21        138.    The public policy goal of preventing future harm of the kind suffered by Plaintiff

22    will be served by imposing liability on the Rating Agencies.

23                           **PRAYER FOR RELIEF**

24    WHEREFORE, Plaintiff prays for judgment as follows:

25    1.    Awarding Plaintiff compensatory damages;

26    2.    Awarding Plaintiffs pre-judgment and post-judgment interest, as well as

27    reasonable attorneys' fees, expert witness fees and other costs;

28    3.    Awarding such other relief as permitted by law, equity and the appropriate state

COMPLAINT                                       23

law remedies; and

4.    Awarding such other relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated:  July 9, 2009

                                        **BERMAN DeVALERIO**

                                        By: _____

                                        Joseph J. Tabacco, Jr.
                                        James C. Magid
                                        425 California Street, Suite 2400
                                        San Francisco, CA  94104
                                        Telephone:  (415) 433-3200
                                        Facsimile:  (415) 433-6382

                                        *Attorneys for California Public Employees'*
                                        *Retirement System*

COMPLAINT                                                                 24

# EXHIBIT P(7)

JUDGE SCHEINDLIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KING COUNTY, WASHINGTON, Individually and on Behalf of All Others Similarly Situated, | Civil Action No. |
| Plaintiff, | CLASS ACTION |
| vs. | COMPLAINT FOR VIOLATIONS OF NEW YORK STATE LAW |
| IKB DEUTSCHE INDUSTRIEBANK AG, IKB CREDIT ASSET MANAGEMENT, GmbH, MOODY'S INVESTORS SERVICE, INC., MOODY'S INVESTORS SERVICE LIMITED, THE McGRAW HILL COMPANIES, INC. (d/b/a STANDARD & POOR'S RATINGS SERVICES), FITCH, INC., WINFRIED REINKE and STEFAN ORTSEIFEN, | |
| Defendants. | DEMAND FOR JURY TRIAL |

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including punitive damages against IKB given its self-dealing and other conduct warranting such damages.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  October 2, 2009                     COUGHLIN STOIA GELLER
                                              RUDMAN & ROBBINS LLP
                                            SAMUEL H. RUDMAN
                                            ROBERT M. ROTHMAN
                                            DAVID A. ROSENFELD


                                                      SAMUEL H. RUDMAN

                                            58 South Service Road, Suite 200
                                            Melville, NY  1177
                                            Telephone:  631/367-7100
                                            631/367-1173 (fax)

                                            COUGHLIN STOIA GELLER
                                              RUDMAN & ROBBINS LLP
                                            PATRICK J. COUGHLIN
                                            DAVID C. WALTON
                                            ANNE L. BOX
                                            655 West Broadway, Suite 1900
                                            San Diego, CA  92101-3301
                                            Telephone:  619/231-1058
                                            619/231-7423 (fax)

                                            COUGHLIN STOIA GELLER
                                              RUDMAN & ROBBINS LLP
                                            JASON C. DAVIS
                                            100 Pine Street, Suite 2600
                                            San Francisco, CA  94111
                                            Telephone:  415-288-4545
                                            415/288-4534 (fax)

                                            Attorneys for Plaintiff

- 49 -

# EXHIBIT P(8)

09  CV  8822

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| IOWA STUDENT LOAN LIQUIDITY CORPORATION, Individually and on Behalf of All Others Similarly Situated, | : | Civil Action No. |
|  | : | CLASS ACTION |
| Plaintiff, | : | |
|  | : | COMPLAINT FOR COMMON LAW FRAUD |
| vs. | : | |
| IKB DEUTSCHE INDUSTRIEBANK AG, IKB CREDIT ASSET MANAGEMENT, GmbH, MOODY'S INVESTORS SERVICE, INC., MOODY'S INVESTORS SERVICE LIMITED, THE McGRAW HILL COMPANIES, INC. (d/b/a STANDARD & POOR'S RATINGS SERVICES), FITCH, INC., WINFRIED REINKE and STEFAN ORTSEIFEN, | : | |
|  | : | |
| Defendants. | : | |

DEMAND FOR JURY TRIAL

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and

proper, including punitive damages against IKB given its self-dealing and other conduct warranting

such damages.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: October 16, 2009           COUGHLIN STOIA GELLER
                                      RUDMAN & ROBBINS LLP
                                  SAMUEL H. RUDMAN
                                  ROBERT M. ROTHMAN
                                  DAVID A. ROSENFELD


                                  DAVID A. ROSENFELD

                                  58 South Service Road, Suite 200
                                  Melville, NY  1177
                                  Telephone:  631/367-7100
                                  631/367-1173 (fax)

                                  COUGHLIN STOIA GELLER
                                      RUDMAN & ROBBINS LLP
                                  PATRICK J. COUGHLIN
                                  DAVID C. WALTON
                                  ANNE L. BOX
                                  655 West Broadway, Suite 1900
                                  San Diego, CA  92101-3301
                                  Telephone:  619/231-1058
                                  619/231-7423 (fax)

                                  COUGHLIN STOIA GELLER
                                      RUDMAN & ROBBINS LLP
                                  JASON C. DAVIS
                                  100 Pine Street, Suite 2600
                                  San Francisco, CA 94111
                                  Telephone:  415-288-4545
                                  415/288-4534 (fax)

                                  Attorneys for Plaintiff


- 49 -

# EXHIBIT P(9)

**NewsRoom**

3/10/10 DealBook (Pg. Unavail. Online)
2010 WLNR 13727248

DealBook
Copyright © 2010 The New York Times Company

March 10, 2010

Section: dealbook

Connecticut Sues Moody's and S.&P. Over Ratings

DEALBOOK

Connecticut's attorney general sued Moody's Investors Service and Standard &#038; Poor's on Wednesday over ratings that they issued on risky investments.

March 10, 2010

Connecticut's attorney general suedMoody's Investors ServiceandStandard & Poor'son Wednesday over ratings that they issued on risky investments,The Associated Press reports.

Attorney GeneralRichard Blumenthalasserted in his lawsuit thatMoody'sand S.&P. knowingly assigned false ratings to complex investments that pushed the country into recession.

More from The A.P.:The suit, which Mr. Blumenthal called the first of its kind against ratings agencies, is being brought under Connecticut's unfair trade practices law.The attorney general is seeking penalties and fines that could reach into the hundreds of millions of dollars, he said.

"Moody's and S.&P. violated public trust -- resulting in many investors purchasing securities that contained far more risk than anticipated and that have ultimately proven to be nearly worthless," Mr. Blumenthal said.

The securities in question are complex bonds backed by pools of mortgages.Most of the mortgages were subprime loans given to customers with shaky credit history.Those investments have lost much of their value in recent years as mortgage defaults skyrocketed.

The attorney general called the ratings process "deceptive and misleading" during a news conference.He said lucrative fees Moody's and S.&P. received for rating the investments affected their objectivity in rating the debt.Companies issuing the investments paid Moody's and S.&P. to rate it.

Many of the investments were given top "AAA" ratings during the peak of the housing market from 2005 to 2007.Then the market turned.Defaults mounted, home prices plummeted and the investments lost much of their value.

Most of the ratings have since been cut severely by Moody's and S.&P.

Steven Weiss, a spokesman for S.&P.'s parent, the McGraw-Hill Companies, said, "We believe the claim has no legal or factual merit and we intend to vigorously defend ourselves against it."

A spokesman from Moody's was not immediately available to comment.

Some pension funds have already sued Moody's and S.&P. as well as Fitch Ratings over their role in rating risky investments that collapsed during the recession and credit crisis.

Wednesday's lawsuit comes on top of past civil charges that Mr. Blumenthal made against the ratings agencies claiming they created dual standards for rating government and corporate debt. In July 2008, Mr. Blumenthal accused Moody's, S.&P. and Fitch Ratings of giving cities and towns artificially low credit ratings that ultimately cost taxpayers millions of dollars in unnecessary insurance and higher interest payments.

That suit is still pending. In November, Ohio's attorney general sued Standard & Poor's, Moody's and Fitch Ratings, asserting that they provided misleading credit ratings that led to hundreds of millions of losses for the state's pension funds.

Go to Article from The Associated Press via The New York Times>>Go to Related Item from DealBook>>

---- Index References ----

News Subject: (Credit Ratings (1CR83); Government Litigation (1GO18); Legal (1LE33))

Industry: (Banking (1BA20); Consumer Finance (1CO55); Financial Services (1FI37); Loans (1LO12); Mortgage Banking (1MO85); Retail Banking Services (1RE38); Subprime Lending (1SU05))

Region: (Americas (1AM92); Connecticut (1CO13); North America (1NO39); U.S. New England Region (1NE37); USA (1US73))

Language: EN

Other Indexing: (Richard A. Blumenthal; Richard Blumenthal; Steven Weiss)

Keywords: News; Blumenthal; Richard; Attorneys General;Investments;Pensions and Retirement P; Fitch Ratings;McGraw-Hill Cos;Moody's Investors Service; Connecticut; McGraw-Hill Cos; MHP; NYSE; Fitch Ratings; McGraw-Hill; Moody's Investors Service; Richard Blumenthal; Standard & Poor's; Financial Services; Legal; Top Headline

Word Count: 480

**End of Document** © 2014 Thomson Reuters. No claim to original U.S. Government Works.

**NewsRoom**