# EXHIBIT P(10)

RETURN DATE:  MARCH 30, 2010

| | | |
|---|---|---|
| STATE OF CONNECTICUT | : | SUPERIOR COURT |
| | : | |
| | : | JUDICIAL DISTRICT OF HARTFORD |
| Plaintiff, | : | |
| | : | AT HARTFORD |
| v. | : | |
| | : | |
| MOODY'S CORPORATION and | : | |
| MOODY'S INVESTORS SERVICE, INC. | : | |
| | : | MARCH 10, 2010 |
| Defendants. | : | |

<u>**COMPLAINT**</u>

**I.     SUMMARY OF THE CASE**

1.     This lawsuit seeks redress for Moody's Corporation's and Moody's Investors Service, Inc.'s (referred to herein collectively as "Moody's") unfair, deceptive, and illegal business practice of systematically and intentionally misrepresenting that the ratings it assigned to structured finance securities were objective, independent and not influenced by either Moody's or its clients' financial interests.  These representations were untrue and Moody's knew it.

2.     Moody's represents that its ratings of structured finance securities are independent, objective, and the result of the highest quality credit analytics that are available to Moody's.  Indeed, Moody's reputation for independence, objectivity and integrity is emphasized by Moody's to the users of its ratings at nearly every turn.

3.      As Moody's CEO, Raymond McDaniel stated in 2005, "Moody's is committed to reinforcing among all relevant stakeholders – debt issuers, the investment community, employees, governmental authorities and shareholders – a sense of trust in the accuracy, independence and reliability of Moody's products and services, and our stewardship of the business."

4.      This principle has been further emphasized by Moody's in its publicly available Code of Conduct in which Moody's explicitly pledges that its ratings on structured finance securities are objective and uninfluenced by "the potential effect . . . [of the rating] on Moody's, an issuer, an investor, or other market participants."

5.      Despite this intentional and explicit representation, Moody's failed to live up to its statements of independence and objectivity when rating structured finance securities and thereby violated the trust that it successfully cultivated with the marketplace. Moreover, Moody's knew its false representations of independence and objectivity were especially misleading and harmful to participants in the structured finance securities market because structured finance securities are particularly complex and their creditworthiness is difficult, if not impossible, to evaluate even for the most sophisticated financial entities.

6.      Starting in at least 2004, Moody's knowingly allowed its desire for increased revenue and market share in the structured finance ratings market to influence the rating methodologies it developed for rating structured finance securities, as well as the ratings that were ultimately assigned to these investments.

2

7.     In particular, by at least 2004 Moody's desire to maximize revenue and market share by rating as many structured finance deals as possible led Moody's to cater to the preferences of large investment banks and other repeat issuers of structured finance securities that dominated Moody's revenue base, rather than focusing on what Moody's said it was doing, which was providing independent and objective credit analysis.

8.     Thus, when formulating its rating methodologies for structured finance securities, Moody's intentionally developed a rating methodology that mirrored what its competitors were using, but which Moody's knew did not capture all the credit risk that Moody's knew existed. Moody's engaged in this conduct because it enabled Moody's to continue to assign the high ratings that Moody's frequent customers desired, thus enabling Moody's to maximize its revenue and preserve its already high market share for rating structured finance securities.

9.     The reason for Moody's breach of its own standards was further explained by Moody's CEO, Raymond McDaniel, in a presentation that he made to his Board of Directors in October of 2007 when he admitted: "Analysts and MDs [managing directors] are continually pitched by bankers, issuers, investors . . . whose views can color credit judgment . . . (we drink the kool-aid). Coupled with strong internal emphasis on market share and margin focus, this does constitute a risk to ratings quality."

10.     As privately acknowledged by Mr. McDaniel in October of 2007, Moody's acted with the full knowledge that it was allowing the financial interests of itself and the dominant issuers that paid Moody's the majority of its fees to influence its ratings of structured finance

3

securities, and that Moody's was not living up to its public representations of independence and objectivity.

11.     For purposes of clarity, this lawsuit does not challenge Moody's judgment regarding which rating methodology to use, or how to apply it, when rating any specific structured finance security.  Similarly, the State's lawsuit is not brought for the purpose of demonstrating that any particular rating on a structured finance security was incorrect (*i.e.*, too high or too low.)

12.     Rather, the State's lawsuit takes issue with the fact that Moody's represented that its ratings on structured finance securities were independent, objective and, as stated in its Code of Conduct, "not . . . affected by the existence of, or potential for, a business relationship between [Moody's] . . . and the Issuer . . . or any other party, or the non-existence of any such relationship." This representation by Moody's was false and Moody's knew it.

13.     By intentionally and knowingly misrepresenting and / or omitting factors it considered when rating structured finance securities, Moody's offered a product and / or service that was materially different from what it purported to provide to the marketplace.

14.     Moody's conduct as described herein constitutes a deceptive, unfair and illegal business practice in violation of the Connecticut Unfair Trade Practices Act.  Pursuant to Conn. Gen. Stat. § 42-110m, the Connecticut Attorney General, in the name of the State of Connecticut, seeks restitution, disgorgement, and civil penalties, as well as other injunctive and equitable

relief to prevent these unfair, deceptive and illegal business practices from happening in the future.

## II.   PARTIES

15.    Plaintiff State of Connecticut, represented by Richard Blumenthal, Attorney General of the State of Connecticut, brings this action in its sovereign enforcement capacity pursuant to Conn. Gen. Stat. § 42-110m and at the request of Jerry Farrell, Jr, Commissioner of the Department of Consumer Protection for the State of Connecticut.

16.    Defendant Moody's Corporation is a Delaware corporation with its principal place of business at 7 World Trade Center at 250 Greenwich Street, New York, New York 10007. Moody's Corporation is divided into two divisions, Moody's Investors Service, Inc. and Moody's Analytics. In 2008, Moody's reported total revenue of approximately $1.7 billion worldwide and employed approximately 3,900 people.

17.    Defendant Moody's Investors Service, Inc. is a Delaware corporation with its principal place of business located at 7 World Trade Center at 250 Greenwich Street, New York, New York 10007. Moody's Investors Service, Inc. is a division and subsidiary of Moody's Corporation and operates as a credit rating agency that assigns credit ratings on a broad range of securities, including structured finance securities, issued in domestic and international financial markets. As of 2008, Moody's Investors Service, Inc. had rated and currently monitored ratings on approximately 109,000 structured finance obligations.

18.     Moody's holds a dominant position in the credit rating agency market, particularly with respect to the market for rating structured finance securities. According to Moody's own documents, Moody's routinely rates over 90% of the structured finance securities issued into the global capital markets. In 2006, of Moody's total ratings revenue of approximately $1.6 billion, over $800 million of the revenue originated from Moody's rating of structured finance securities.

19.     Moody's regularly transacts business in the State of Connecticut and derives substantial revenue from its business within the State of Connecticut. Moody's rates structured finance securities issued by issuers located within Connecticut. Additionally, Moody's ratings on structured finance securities are routinely viewed and relied on by investors and other participants in the financial markets located within the State of Connecticut. Based on Moody's public representations, these individuals and entities depend on Moody's to provide independent and objective assessments of the relative credit risk of structured finance securities, unaffected by Moody's or its clients' financial interests.

## III.    BACKGROUND

### A.    The Creation and Rating of Structured Finance Securities

#### 1.    What is a Structured Finance Security?

20.     Broadly stated, structured finance securities are Asset-Backed Securities ("ABS"), which are financial products whose value is derived from a stream of revenue flowing from a pool of underlying assets. These assets are sold to buyers / investors who rely upon the revenue

stream generated from the underlying asset pool for the repayment of their principal and interest. Many different types of assets can serve as collateral for ABS. Some of the most common types of assets used to support an ABS are residential and commercial mortgages.

21.     The largest type of structured finance securities are securities backed by residential mortgages ("RMBS"). For example, during 2006, approximately $2.5 trillion in mortgages were originated in the United States. Approximately 80% of those mortgages were securitized into RMBS. Additionally, approximately 25% of all RMBS issued were backed by subprime mortgages. Between 2002 and 2005 the annual volume of mortgage securities sold to private investors tripled to $1.2 trillion and the subprime portion of these obligations rose to approximately $456 billion.

22.     Structured finance securities can also be backed by a variety of other types of assets, such as commercial mortgages ("CMBS"), student loans, and credit card balances.

23.     Collections or "pools" of asset backed securities such as RMBS can themselves serve as the collateral for structured finance securities that gather together an asset pool of various ABS securities and then issue a further round of derivative securities.

24.     The most common type of structured finance securities collateralized by other securities are known as collateralized debt obligations ("CDOs"). According to the Securities Industry and Financial Markets Association, the value of CDOs backed by RMBS during 2005 was $177 billion, during 2006 was $314 billion, and during 2007 was $263 billion. Additionally,

from 2005-2007 there were hundreds of billions of dollars of CDOs backed by bonds and by high yield loans called collateralized loan obligations ("CLOs").

25.     A key entity in the structured finance securities market is a structured investment vehicle ("SIV").  A SIV is a special purpose entity that borrows money by issuing short and medium term debt and then uses that money to buy longer term securities.  A SIV's long term assets typically include investment grade rated RMBS and CDOs, which entitle the investor in the SIV to principal and interest drawn from the revenue generated by the underlying collateral.

26.     As the market for mortgage related structured finance securities grew, the securities that provided the underlying value for these investments became increasingly complex. In addition to issuing CDOs made up of RMBS or other CDOs ("CDOs squared"), issuers began to use credit default swaps and other derivative securities to serve as the underlying collateral of the obligation, which were designed to replicate the performance of subprime RMBS and CDOs. In this case, rather than purchasing subprime RMBS or CDOs, the CDO primarily entered into credit default swaps referencing subprime RMBS or CDOs.  These CDOs in some cases are composed entirely of credit default swaps (*i.e.*, "synthetic CDOs") or a combination of credit default swaps and actual cash RMBS (*i.e.*, "hybrid CDOs").

27.     While the asset pool underlying a structured finance security may vary, the mechanism for transforming the pool of assets into an ABS by way of the securitization process is generally the same.

28.     For example, the process for creating a RMBS begins when an arranger, generally an investment bank, packages mortgage loans into a pool and transfers them to a trust that will issue securities collateralized by the pool.  The trust purchases the loan pool and becomes entitled to the interest and principal payments made by the borrowers, which is used to make monthly interest and principal payments to the investors in the RMBS.

29.     To appeal to investors with different risk appetites, the trust also issues different classes of RMBS, known as tranches, which offer a sliding scale of interest rates based on the level of risk or credit protection afforded to the tranche.  Credit protection is designed to shield the securities within a tranche from the loss of interest and principal due to defaults of the loans in the overall pool.  The degree of credit protection afforded any tranche of securities is known as credit enhancement.

30.     The main sources of credit enhancement are subordination, over-collateralization, and excess spread.  Subordination refers to the hierarchy of loss absorption among the tranches where any loss of interest and principal experienced by the trust from delinquencies and defaults in loans in the pool are allocated first to the lowest tranche until it loses all of its principal amount and then to the next lowest tranche up the capital structure.  Consequently, the most senior tranche, and therefore the highest rated, would not incur any loss until all the lower tranches have absorbed losses from the underlying loans.

31.     Over-collateralization refers to the amount by which the principal balance of the mortgage pool exceeds the principal balance of the securities issued by the trust.  This excess

principal creates an additional equity tranche below the lowest debt tranche. The equity tranche absorbs losses up to its total value before any debt tranche is affected by defaults in the underlying collateral. Commensurate with this "first loss" position, however, the equity tranche offers the greatest possibility for investment gains if the underlying collateral does not default. The equity tranche is often retained by the issuer / sponsor of the structured finance security.

32.     Finally, excess spread refers to the difference between the interest rate on the underlying loans and the interest rate paid to the investors in the securities, which normally results in the trust taking in more money in interest payments than it is required to pay out. Part of the excess spread pays administrative expenses of the trust such as loan servicing fees. The excess spread also can be used to build up reserves or pay off delinquent interest payments due to a debt tranche. Any amount that is not used to pay expenses or paid over to the debt tranches is retained by the equity tranche.

33.     The process for creating a typical CDO is similar to that of an RMBS. A sponsor creates a trust or other special purpose entity to hold assets and issue securities. Instead of the mortgage loans that are held in RMBS pools, a CDO trust is typically comprised of approximately 200 debt securities such as RMBS or other CDOs. The trust then uses the interest and principal payments from the underlying debt securities to make interest and principal payments to investors in the CDO securities issued by the trust. CDO trusts are among the largest purchasers of subprime RMBS and have been one of the biggest drivers of demand for these securities.

34.     A CDO trust also issues different classes of securities divided into tranches that provide differing levels of credit enhancement to the securities it issues through the use of subordination, over-collateralization and excess spread.  So long as the underlying assets continue to perform, the cash flow continues and the performance of each of the tranches of the CDO remains strong.  Just as is the case with RMBS, the senior CDO tranches are paid first from the incoming cash flow generated from the collateral, followed by each subordinate tranche in the capital structure.  Conversely, if the underlying assets begin to default, the cash flow diminishes and the investors at each CDO tranche level are subjected to risk starting from the bottom or equity tranches and proceeding upward.

## 2.     The Need for a Credit Rating

35.     A necessary step in the process of creating and ultimately selling any ABS, including an RMBS or a CDO, is the assignment of a credit rating for each of the tranches issued by the trust.  Indeed, many institutional investors can invest only in securities that have received a certain rating level from Moody's or another credit rating agency recognized by the Securities and Exchange Commission ("SEC").

36.     Moody's engages in the following steps when rating a RMBS.  Upon receiving a range of data on a pool of mortgage loans from an investment bank or some other arranger, Moody's assigns a lead analyst to the transaction.  Information provided to the lead analyst about the transaction includes principal amount, geographic location of the property, credit history and FICO score of the borrower, loan to value ratio, type of loan, as well as the proposed capital

structure of the trust and the proposed levels of credit enhancement to be provided to each tranche.  The lead analyst is responsible for analyzing the loan pool, proposed capital structure and proposed credit enhancement levels provided by the issuer.

37.     The next step in the process is for the Moody's analyst to use Moody's rating methodologies to develop predictions, based on a quantitative expected loss model, as to how many loans in the collateral pool would default individually and in correlation with each other under varying levels of stress.  The purpose of this default and loss analysis is to determine how much credit enhancement a given tranche security would need for a particular category of rating. Moody's runs the most severe stress test to determine the credit enhancement required for a RMBS tranche to receive its highest "Aaa" rating.  The next most severe stress test is run to determine the amount of credit enhancement required of the next highest tranche, and so on down the capital structure.

38.     After determining the level of credit enhancement required for each credit rating category, Moody's checks the proposed capital structure of the RMBS trust against Moody's requirements for a particular credit rating.

39.     Upon analyzing the proposed capital structure, if Moody's determines that the issuer's proposal does not allow for sufficient credit enhancement to receive a "Aaa," then Moody's is supposed to let the issuer know that the most senior class of securities could only receive a "Aa" or lower rating.  Presented with this information, the issuer could accept that determination and have the trust issue the securities with the proposed capital structure and lower

rating, or it could adjust the structure to provide the requisite credit enhancement for the senior tranche to receive the desired "Aaa" rating.

40.     Moody's next step in the process is to conduct a cash flow analysis on the interest and principal expected to be received by the trust from the collateral pool to determine whether it is sufficient to pay the interest and principal due on each tranche of the trust. Ultimately, the monthly principal and interest payments derived from the loan pool needs to be enough to satisfy the monthly payments of principal and interest due by the trust to the investors in the RMBS tranches, as well as to cover the administrative expenses of the trust. Assuming that the proposed structure allows for sufficient cash flow, Moody's develops a recommendation for a final credit rating for each tranche of RMBS, which is presented to an internal Moody's ratings committee for final approval.

41.     Similarly, the steps Moody's follows for assigning ratings to CDOs involves a review of the creditworthiness of each tranche of CDO. The process centers on an examination of the pool of assets held by the trust and, through the use of rating methodologies developed by Moody's, an analysis of how these assets would perform both individually and in correlation with each other during various stress scenarios. With respect to CDOs, however, the analysis is based primarily on the credit rating of each RMBS (or other structured finance security) in the underlying pool and does not include an analysis of the underlying loan pools collateralizing the RMBS.

**B.     The Market for Structured Finance Securities**

13

42.     The market for structured finance securities consists of the issuers (*i.e.*, sellers or sponsors), who create a trust to hold the underlying collateral and issue ABS such as RMBS and CDOs, and the buyers (*i.e.*, investors) that purchase these investments. Issuers of structured finance securities are financial companies such as banks, mortgage companies, finance companies and investment banks. Buyers of structured finance securities are institutional investors, including financial institutions, pension funds, insurance companies, mutual funds, hedge funds, money managers and investment banks.

43.     Structured finance securities are typically not marketed to or purchased by retail investors. However, the credit ratings that RMBS, CDOs and other ABS receive, and the performance of these investments, have significant real world implications for the finances of individual investors. In particular, structured finance securities are often included in mutual fund and pension fund portfolios that play significant roles in the retirement and investment strategies of many individuals, including citizens of Connecticut.

44.     In order for an issuer to successfully market and sell a structured finance security such as an RMBS or a CDO to a buyer / investor, the security must receive a credit rating. Moreover, due to SEC regulations limiting the type of investments that certain institutional investors can purchase, often ratings from multiple credit rating agencies are required for issuers to successfully market and sell a structured finance security to the broadest group of potential buyers / investors.

45.     There are few credit rating agencies that assign ratings on structured finance securities.  Consequently, the market for rating structured finance securities is extremely concentrated.  Moody's, and its primary competitor, Standard & Poor's ("S&P"), dominate the rating of these investments.

46.     For example, according to industry publication Asset-Backed Alert, Moody's rated 91.5% of the CDOs issued in 2003, 76.8% of the CDOs issued in 2004, 85.1% of the CDOs issued in 2005, and 96.8% of the CDOs issued in 2006.

47.     The market for rating structured finance securities is also very lucrative.  Moody's has repeatedly been one of the most profitable publicly traded companies in existence, frequently posting profit margins of over 40%.  Much of the revenue that drives this profitability comes from Moody's ratings of structured finance securities.  For example, by 2006, over half of Moody's total ratings revenue (*i.e.*, $800 million) originated from its rating of structured finance securities.

48.     Finally, unlike the markets for most financial products, the market for structured finance securities is comprised of a relatively narrow group of sellers (*i.e.*, investment banks) that act as repeat issuers or sponsors of RMBS, CDOs and other ABS.  Accordingly, there are a relatively small group of banks that hire Moody's to rate their products on a regular basis.  For example, in 2006, of the 96,000 structured finance securities rated by Moody's that year, the ten largest issuers were responsible for over half of Moody's structured finance rating business.

49.     The implication of these facts has been described by Professor John C. Coffee of Columbia University, a frequent expert witness before Congress on the credit rating agencies' role in the most recent financial crisis:

> The major change that destabilized rating agencies appears to have been the rise of structured finance . . . The rating agency is no longer facing an atomized market of clients who each come to it only intermittently (and thus lack market power), but instead large repeat clients who have the ability to take their business elsewhere. Today, structured finance accounts for a major share of some rating agencies' total revenues; equally important, these amounts are paid by a small number of investment banks that know how to exploit their leverage. . . .

**C.      Moody's Role in the Market for Structured Finance Securities**

50.     Credit rating agencies distinguish among grades of debt creditworthiness. In other words, a credit rating is a statement as to the likelihood that the borrower or issuer will meet its contractual, financial obligations as they become due. Thus, Moody's is a gatekeeper on whom investors and other market participants necessarily rely.

51.     As Professor Coffee noted in his Congressional testimony: "Gatekeepers are reputation intermediaries who provide verification and certification services to investors. . . . [T]he professional gatekeeper essentially assesses or vouches for the corporate clients own statements about itself or a specific transaction. This duplication is necessary because the market recognizes that the gatekeeper has a lesser incentive to lie than does its client and thus regards the gatekeeper's assurance or evaluation as more credible."

52.     Moody's role as a "gatekeeper" takes on special importance in the market for structured finance securities because its investment grade rating is a necessary condition before many institutional investors are permitted under SEC regulations to buy debt securities.  In this sense, Moody's rating also acts as a defacto regulatory license that expands the universe of potential buyers / investors capable of purchasing a particular structured finance security. Moody's knows this fact.

53.     Moody's role as a "gatekeeper" is also affected by the fact that structured finance securities are fundamentally different from other debt investments (*i.e.*, corporate and public bonds).  For example, the issuing entity of a corporate bond has some independent existence and measurable value in and of itself that usually can be verified, at least in part, by reference to publicly available materials.  This characteristic does not exist in the world of structured finance.

54.     As a former senior managing director at Moody's has publicly noted, "[s]omewhat unique to the structured finance [security] market is the opacity of the rated securities.  In certain situations, the details of the underlying asset pool and often the structure of the transaction are not publicly available for external scrutiny. . . .  Moreover, the tools to analyze credit risk, even with transparent assets, are beyond the grasp of many investors.  Rating methods are quite technical, often relying on advanced statistical techniques.  Documentation supporting a transaction can be equally daunting, reading more like a legal brief than helpful financial guidance.  In turn, a solid understanding of how to value structured [finance] securities remains elusive."

55.     In light of the opaque nature of structured finance securities as an investment, buyers / investors in Connecticut (and elsewhere), issuers of structured finance securities, and other market participants are dependent on the ratings assigned by Moody's to obtain some relative assessment of the credit risk associated with the various RMBS, CDOs and other ABS tranches that are issued.  Indeed, Moody's intends that buyers / investors of structured finance securities be the primary recipients of the information that a Moody's credit rating is meant to provide, and issuers obtain a credit rating from Moody's for the specific purpose of making the risk characteristics of the structured finance security understandable to investors.

56.     As such, the rating that Moody's assigns to a particular structured finance security is a significant factor in any investor's decision to purchase or not to purchase a structured finance security.  Moody's is well aware of buyers' / investors' and other market participants' use and reliance on Moody's credit ratings in this manner.

57.     For example, in its Rating Symbols and Definitions publication, Moody's describes its credit ratings of structured finance securities as follows:  "Moody's ratings on long-term structured finance obligations primarily address *the expected loss an investor might incur* on or before the legal final maturity of such obligations vis-à-vis a defined promise.  As such, these ratings incorporate Moody's assessment of the default probability and loss severity of the obligations."  (Emphasis added.)

58.     Similarly, in its Code of Conduct, Moody's has noted that "[g]iven the vast amount of information available to investors today – some of it valuable, some of it not –

[Moody's] helps investors and others sift through this information and analyze the credit risk they face when lending to a particular borrower, or when purchasing an issuer's debt or debt like securities." Additionally, in its 2005 Best Practices Handbook Moody's acknowledged as follows: "We serve investors by providing them with timely credit research and independent, thoughtful, and accurate rating opinions on which they can base their investment decisions. Moody's has always derived its value from its acceptance by the investment community and such acceptance continues to be essential to the success of our business model."

59.     There are many buyers / investors of structured finance securities in Connecticut, including, banks, mutual funds, insurance companies, hedge funds, and pension funds, as well as individual persons whose investment strategies are affected by the performance of these entities' structured finance security portfolios, that expect and depend on Moody's to independently and objectively fulfill its self described role as alleged above.

**D.     Moody's Credit Rating Scale for Structured Finance Securities**

60.     Moody's ratings for structured finance securities are expressed on what is called the Moody's Global Scale. Moody's describes its Global Scale as follows: ". . . an assessment of probability of default as well as expectation of loss in the event of default. It is Moody's intention that the expected loss rate associated with a given rating symbol and time horizon be the same across obligations and issuers rated on the Global Scale."

61.     Moody's ratings for structured finance securities expressed on its Global Scale are expressed in the form of a letter grade. According to its ratings definitions, Moody's letter

grades are expressed in relative rank order, with a structured finance security rated "Aaa" by Moody's "judged to be of the highest quality, with minimal credit risk," and a structured finance security rated "Aa" by Moody's "judged to be of high quality and subject to very low credit risk." Structured finance securities rated "A," "Baa," "Ba," "B," "Caa," "Ca," and "C" are represented by Moody's to have progressively less creditworthiness with each succeeding reduction in grade level.

62.     Moody's also appends numerical modifiers of "1," "2," and "3" to each generic rating category from "Aa" through "Caa." The modifier "1" indicates that the issuer or obligation ranks in the higher end of Moody's generic rating category, while the modifier "2" indicates a mid-range ranking and the modifier "3" indicates a ranking in the lower end of that generic rating category.

63.     Structured finance securities bearing a Moody's rating of "Baa" or above are also described as "investment grade."

64.     A higher Moody's credit rating on a particular tranche of a structured finance security corresponds to a lower coupon (i.e., interest) rate that the issuer becomes obligated to pay the buyer / investor. Thus, a tranche rated "Aaa" by Moody's generally carries a lower coupon rate than a tranche rated "Aa" by Moody's because it is assumed that there is a lower level of credit risk to the investor. Similarly, a structured finance security rated "Aa" by Moody's generally carries a lower coupon rate than a structured finance security rated "A" by Moody's, and so on down Moody's letter rating scale.

### E.    The Issuer Pays Business Model

65.    Moody's is compensated by the same entities that issue the structured finance securities that Moody's is tasked with evaluating.  Specifically, in exchange for providing its credit ratings on structured finance securities, Moody's charges the issuer a fee based on the complexity and size of the structured finance security being rated.  As has been repeatedly noted in Congressional testimony, this business model ensures that Moody's is essentially "a watchdog paid by the persons it is to watch."

66.    Prior to 1970, Moody's did not accept payment from any issuer of a security that it rated.  Instead, Moody's financed its ratings operation primarily through a subscription based model where investors paid for access to Moody's publications.  At that time, the primary subscribers to Moody's services were investors and libraries.  Moody's routinely refused even to meet with companies it rated, and ratings were assigned by a relatively small group of inaccessible analysts and managers.

67.    Beginning in the 1970s, however, Moody's shifted its business model from a subscription-funded business and began to receive the vast majority of its fees from issuers.

68.    By 1994, Moody's began to rethink who its clients were and how best to deal with them.  In particular, since issuers largely paid the bills, Moody's undertook a concerted effort to make the firm more issuer-friendly.  The focus of Moody's shifted from protecting investors to being a marketing driven organization concerned with meeting the demands of issuers.  Among

other things, Moody's implemented this new emphasis on customer service by conducting

detailed surveys of client (*i.e.*, issuer) needs and attitudes.

69.     In 2000, Moody's became a stand-alone public company.  This move heightened

Moody's focus on maximizing revenues by pleasing issuers.  As one former Moody's Vice

President described it:  "Starting in 2000 there was a systematic and aggressive strategy to

replace a culture that was very conservative, an accuracy and quality oriented culture, a getting

the rating right kind of culture, with a culture that was supposed to be business friendly but was

consistently less likely to assign a rating that was tougher than our competitors."

70.     Another byproduct of this transition in 2000 was that managers who were

considered good business people – not necessarily the best credit analysts – rose through

Moody's ranks and began to set rating policies for the company.  Unfortunately, despite

Moody's public proclamations to the contrary, these rating policies were increasingly influenced

by the financial incentives inevitably linked to the Issuer Pays business model, where Moody's

desire for additional revenue and market share could only be realized by pleasing the issuers of

the securities it was rating.

71.     By at least 2004, the pressures of Moody's Issuer Pays business model on its

rating of structured finance securities became particularly acute.  As the volume of RMBS, CDO

and other ABS issuance increased, the volume of opportunities to earn lucrative fees for issuing

"Aaa" ratings on structured finance securities increased as well.  For Moody's to take advantage

of these opportunities and, therefore, realize additional revenue, it consistently had to please the

relatively small number of issuers of structured finance securities who had become Moody's repeat customers, or run the risk of not being retained by these issuers in the future.

72.    Moody's ability to please issuers of structured finance securities is dependent on its rating models and rating committees requiring the smallest amount of additional credit enhancement to achieve the issuer's desired Aaa rating.  The smaller or lower the credit enhancement, the more profitable the security is to the issuer.

73.    Issuers of structured finance securities are well aware of the incentives built into the Issuer Pays business model and use it to their advantage to get higher ratings from Moody's. Specifically, an issuer typically requests ratings from not only Moody's but also from Moody's main competitors, S&P and Fitch, Inc. ("Fitch.")  If the issuer is unhappy with the credit enhancement levels proposed by Moody's after it conducts its analysis, the issuer can inform Moody's of the credit enhancement levels proposed by either S&P or Fitch in order to influence the outcome of Moody's analysis.  In such a situation, Moody's is faced with the dilemma of either adjusting its analysis to win the business, and therefore realize additional revenue, or staying true to its original assessment and potentially losing the business.

74.    This practice is most commonly known as "ratings shopping" because issuers offer the business of rating their structured finance security to competing rating agencies and usually give the business to the firm (or firms) that find the least amount of credit enhancement necessary to achieve the rating levels desired by the issuer.

75.     One former Moody's managing director confirmed the inherent dangers of the Issuer Pays business model in September of 2007 when he testified before Congress as follows: "Another aspect of conflict of interest . . . is that . . . rating agencies can come under pressure to loosen their standards for a whole sector. And this can happen from behavior from the issuers called ratings shopping, where . . . an issuer . . . shows a deal to multiple rating agencies and then picks one or two that have the easiest standards to rate the deal. Then the other rating agencies that had tougher standards become invisible, and, once more, they don't make any money, because the way you make money . . . is you rate the deal and charge the issuer. So it puts pressure on the rating agencies to loosen their standards . . . . [W]e call this competitive laxity."

## IV.   MOODY'S REPRESENTS ITSELF TO THE PUBLIC AS AN INDEPENDENT AND OBJECTIVE EVALUATOR OF STRUCTURED FINANCE SECURITIES

### A.   Moody's Pledge to Safeguard the Integrity of the Rating's Process

76.     Moody's represents to investors and other participants in the financial markets, including those in Connecticut, that its credit ratings, including those of structured finance securities, are independent, objective and free from outside influence. Moody's repeatedly, consistently, and publicly emphasizes its independence and objectivity to investors and other market participants in a variety of public statements.

77.     For example, in describing Moody's role in the global capital markets, Moody's current web site states: "Moody's independence and integrity have earned us the trust of capital market participants worldwide . . . . [Moody's] credit ratings and research help investors analyze

the credit risks associated with fixed-income securities.  Such independent credit ratings and research also contribute to efficiencies in fixed-income markets . . . by providing credible and independent assessments of credit risk."

78.  Similarly, in its 2003 Annual Report, Moody's noted that: "Moody's recognizes the vital role that credit rating agencies play in the capital markets.  We carefully manage the potential conflicts of interest inherent in our business model, where the issuers we rate provide most of our revenue.  We . . . appreciate the need to treat all market participants – issuers, intermediaries, and investors – professionally and fairly."

79.  In Moody's 2005 annual report, Mr. McDaniel once again publicly reiterated Moody's emphasis on independence and objectivity when he stated:  "**Moody's is committed to reinforcing** among all relevant stakeholders – debt issuers, the investment community, employees, governmental authorities and shareholders – **a sense of trust in the accuracy, independence and reliability of Moody's products and services, and our stewardship of the business.**  To do this, we must keep pace with innovations in dynamic global financial markets, deliver products and services that sustain Moody's relevance, and enhance the perception that Moody's helps facilitate the fairness and efficiency of credit markets worldwide."  (Emphasis added.)

80.  Mr. McDaniel went on to emphasize as follows:  "[I]n reflecting on my first year as Moody's Chief Executive Officer, I can do no better than to repeat the commitment in our shareholder letter of last year:  **most importantly, we remain committed to upholding the**

**independence and integrity of our business.** We will preserve what Moody's has built over the last hundred years and we will prepare for what must be built in the years to come for Moody's to continue its track record of professional and financial success." (Emphasis in original.)

81.     Moody's vow of independence, objectivity and integrity were codified in June of 2005, when it adopted a Code of Professional Conduct ("Moody's Code" or the "Code") for its ratings practices. In a 2006 report explaining its implementation of the Code, Moody's noted: "Moody's Code sets forth the overall policies through which we seek to further our objective to protect the integrity, objectivity and transparency of our credit rating process. The Code reflects the guidance provided in the International Organization of Securities Commissions ("IOSCO") Code of Conduct. . . .  Moody's endorses the principles expressed in the IOSCO Code, and we are committed to implementing them through our own Code."

82.     One of the key principles set forth in the IOSCO Code (first published in December of 2004) was the need for credit rating agencies such as Moody's to maintain independence from the issuers who pay it for its ratings.

83.     In particular, the IOSCO Code sets forth the principle that "the essential purpose of the Code Fundamentals is to promote investor protection by safeguarding the integrity of the rating process. IOSCO members recognize that credit ratings, despite their numerous other uses, exist primarily to help investors assess the credit risks they face when making certain kinds of investments. Maintaining the independence of credit rating agencies vis-à-vis the issuers they

rate is vital to achieving this goal. Provisions of the Code Fundamentals dealing with credit rating obligations to issuers are designed to improve the quality of credit ratings and their usefulness to investors."

84.    Similarly, the IOSCO Code also emphasizes that "[r]ating analyses of low quality or produced through a process of questionable integrity are of little use to market participants," and that "[w]here conflicts of interest or a lack of independence is common at a credit rating agency and hidden from investors, overall investor confidence in the transparency and integrity of a market can be harmed."

85.    With these principles as a guide, since June of 2005, Moody's has made several representations in its Code about the manner in which Moody's maintains its independence and avoids conflicts of interest with issuers. The most important of these representations are found in sections 1.14 and 2.1 – 2.4 of the Code, which currently remain in effect as purported limitations on the factors that Moody's considers when rating structured finance securities.

86.    Specifically, Section 1.14 of Moody's Code states: "Moody's and its employees will deal fairly and honestly with issuers, investors, other market participants, and the public."

87.    Section 2.1 of Moody's Code states: "Moody's will not forbear or refrain from taking a Credit Rating action based on the potential effect (economic, political, or otherwise) of the action on Moody's, an issuer, an investor, or other market participants."

88.     Section 2.2 of Moody's Code states: "Moody's and its analysts will use care and professional judgment to maintain both the substance and appearance of independence and objectivity."

89.     Section 2.3 of Moody's Code states: "The determination of a Credit Rating will be influenced only by factors relevant to the credit assessment."

90.     Section 2.4 of Moody's Code states: "The Credit Rating Moody's assigns to an issuer or obligation will not be affected by the existence of, or potential for, a business relationship between Moody's (or its affiliates) and the Issuer (or its affiliates), or any other party, or the non-existence of any such relationship."

91.     Moody's Code is available on its web site and the promises contained in Sections 1.14 and 2.1 through 2.4 have continued to be referenced in several public statements by Moody's since the Code's adoption in June of 2005.

**B.     Moody's Reassures the Public of its Role as an "Independent Expert"**

92.     Moody's 2006 Annual Report, published in March of 2007, picks up on the same themes and once again reiterates Moody's objectivity and independence from issuers. Specifically, Mr. McDaniel notes: "Moody's is a standards business: public and private sector organizations worldwide rely on the accuracy, stability, consistency and independence of our opinions and services for the contribution they make to fair and efficient financial markets. For Moody's to continue to meet or exceed these expectations requires that we embrace the demand for trust from several perspectives."

93.     Recognizing the challenges presented by the Issuer Pays business model, Mr. McDaniel went on to state: "[S]ome will not find independence and customer focus to be an intuitive pairing.  The nature of an independent expert is to communicate information that will be influential and that, from time to time, recipients will not welcome.  To do so with the highest degree of professionalism and with attention to and respect for the perspectives of stakeholders being served is, however, both intuitive and good business."

94.     Similarly, in Moody's 2007 Annual Report, published in March of 2008, Mr. McDaniel acknowledged the conflicts of interest inherent in Moody's compensation structure, but emphasized as follows:  "The question is not whether potential conflicts exist – they always will – but whether they are properly managed.  At Moody's, we have taken a leadership position in setting industry standards regarding the management of potential conflicts.  Our Code of Professional Conduct sets forth rigorous procedures that govern the roles and responsibilities of our rating agency employees, with the primary goal of ensuring that our analytical activities remain appropriately distanced from commercial management of our business."

95.     Furthermore, apparently in an attempt to provide additional reassurance to the marketplace, in this same public statement Mr. McDaniel noted:  "Oversight by our internal Compliance Department as well as external examination by government authorities serves to reinforce, validate and improve our controls and procedures."

96.     In sum, the statements made by Moody's in its Code of Conduct, web site, and public filings depict a pattern and practice of public statements intended to repeatedly emphasize

several basic representations by Moody's to buyers / investors and other market participants. First, that Moody's ratings of structured finance securities have been, and continue to be, independent, objective and free from consideration of Moody's desire for revenue or winning additional business from issuers.

97.    Second, recognizing that Moody's holds a position of trust in the marketplace, Moody's represents that it deals fairly and honestly with the public, including the buyers / investors of the structured finance securities that it rates.

98.    Third, that Moody's understands the Issuer Pays business model creates conflicts of interest, but that these conflicts have been adequately managed by its Compliance Department and the principles set forth in Moody's Code so as to ensure that its credit ratings are purely a function of credit analytics.  Investors and other market participants depend on Moody's to properly manage this conflict and reasonably interpret Moody's representations to understand that Moody's does so.

99.    Fourth, that Moody's agrees with and has implemented the principles set forth in the IOSCO Code of Conduct by maintaining independence, objectivity and integrity of its ratings of structured finance securities.

100.    Fifth, that Moody's understands its role as an independent and objective expert sometimes requires it to provide answers that its clients (*i.e.*, issuers) don't like, but that doing so is critical to following through on its commitment to enhance the transparency and efficiency of the global capital markets.

101.    The above representations made by Moody's are material to buyers / investors of structured finance securities, as well as other market participants located in Connecticut, and also have been reasonably interpreted by those same individuals and entities in light of the circumstances in which the representations have been made.

102.    None of the above representations made by Moody's were true.  Moody's knows of this fact and yet Moody's continues to make the same misrepresentations to this day with this full knowledge.

## V.    MOODY'S EVALUATION OF STRUCTURED FINANCE SECURITIES WAS NOT INDEPENDENT AND OBJECTIVE

103.    Rather than maintaining independence and objectivity when rating structured finance securities as its public statements promised, Moody's was focused on pleasing the relatively small group of repeat issuers that pay its lucrative fees, thereby increasing its market share and its revenue.  As a result, Moody's has hidden from the public that its credit analytics for rating structured finance securities were influenced by the very business and revenue considerations that its public statements consistently and explicitly disavow and its Code of Conduct prohibits.

104.    Moody's sacrifice of its independence and objectivity due to its desire to please issuers of structured finance securities has manifested itself in several ways.  Although not an exhaustive recitation, some examples of this conduct are set forth below.

### A.    Ratings Shopping Corrupts the Integrity of the Process

105.    "Ratings shopping" refers to the practice of an issuer offering its business to the

rating agency requiring the least amount of credit enhancement necessary to achieve the issuer's

desired rating.

106.    The effect of the practice has been described in industry publications as follows:

"The discussion tends to proceed in this sort of way.  'Look, I know that you aren't comfortable

with such and such assumption but apparently [our competitor's] are even lower and if that is the

only thing standing between rating this deal and not rating this deal, are we really hung up on

that assumption?'  You don't have infinite information.  Nothing is perfect.  So the line in the

sand shifts and shifts, and can shift quite a bit."

107.    Between at least 2004 and 2007, when the markets for RMBS and CDOs were

particularly active, Moody's experienced this pressure on a daily basis.  Unfortunately, contrary

to its public representations, the pressure did in fact influence the ratings that Moody's assigned

to structured finance securities, the recommendations that Moody's analysts made to their

superiors, and the feedback that Moody's provided to issuers.

108.    For example, in 2007 during the course of rating a particular RMBS a Moody's

analyst reported to his superiors as follows:  "I received a call from [the issuer] . . . – our levels

are off the other agencies at both Aaa and B2 . . . .  We added 35 [basis points] at Aaa to 2.25% .

. . .  If [Moody's managing director] believes that the adjustment at Aaa is ill-founded, I can be

convinced to come back to 2% . . . – this would get us on the Aaa ratings.  (I don't want to

necessarily meet the rating competition – but it may be warranted to move back at Aaa)."  Before

revising his initial insistence for additional credit enhancement, the Moody's managing director asks for the opinion of one of his colleagues. This individual writes that he "agrees with going down on the Aaa," thus allowing Moody's to match the same lower level of credit enhancement for the transaction that was calculated by its competitors.

109.    Another issuer provided the following feedback to Moody's after being presented with its ratings analysis of a structured finance security. "This is literally the worst [over collateralization] levels since . . . when Moody's and the entire rating agency universe had no idea what to look for or how to model this collateral . . . . In the interest of full disclosure . . . here's S&P's levels – which, by the way, for over 3 years have been historically worse than Moody's [S&P's proposed levels of credit enhancement included] . . . . I'd appreciate a call to help me understand your results. These levels kill the current execution as well as the viability of the platform, and we'll have to pull the deal."

110.    As part of this same transaction, the issuer went over the head of the analyst and forwarded its complaints, including the information about S&P's rating assessment, directly to senior managing directors within Moody's and emphasized that "[w]ith the kind of inconsistent or irrational results highlighted [above], [this type of transaction] goes away, which is unfortunate because we've been doing this longer (over 4 years), with more deals (15 to date) . . . than anyone we know of." The implicit threat embedded in the issuer's complaints is clear: that if Moody's holds true to its analysis, the opportunity to rate this type of structured finance security and, therefore, the revenue that accompanies it, will no longer be available to Moody's.

111.    Additionally, in the context of rating a complex CDO in 2006, a Moody's analyst informed his superiors of S&P's willingness to accept a lower level of credit enhancement: "FYI – I communicated these levels to [the issuer] and they resisted somewhat saying that S&P was 6 notches lower at Aaa and their Ba2 was 6.15 v. our 9.15." Following this exchange, the Moody's analyst relented and contacted the issuer again with the recommendation that Moody's "reconsider the previously committed loss coverage levels." Pressure from the issuer and the implication of S&P's lower credit enhancement levels clearly influenced Moody's process and its approach to rating this transaction.

112.    Similarly, in the midst of voting on the rating for another structured finance security, a third Moody's analyst informed her team that "[the issuer] would like for us to consider a newly proposed loss trigger threshold . . . [because] S&P came back with wider thresholds than what the issuer originally proposed and what we approved in committee." Moody's repeated benchmarking of its analytics against the work of its primary competitor in this manner directly contradicts its public guarantees of independence and objectivity.

113.    Furthermore, within the context of rating yet another structured finance transaction in 2006, a different Moody's analyst informed his supervisors of a number of different structures proposed by the issuer. After explaining one of these options, the analyst noted as follows: "I know [Moody's managing director] sent an e-mail that this should not be allowed but I want to understand what changes we would make if the bankers insisted this be the case." Notably, this mentality of pleasing the issuer by bending to its demands bears sharp

contrast to Moody's public affirmation of the "independent expert," ready to say "no" when necessary.

114. The above examples demonstrate that issuers influenced Moody's credit assessment, that this influence included pressure from ratings shopping as well as the threat of lost business and revenue, and that these factors routinely compromised the integrity of the ratings process because they effected the actions that Moody's took when rating structured finance securities.

115. In stark contrast to his public representations (see Section IV), in October of 2007 Mr. McDaniel privately conceded to his Board the import of these influences: "Analysts and MDs [managing directors] are continually pitched by bankers, issuers, investors . . . whose views can color credit judgment, sometimes improving it, other times degrading it (we drink the kool-aid). Coupled with strong internal emphasis on market share & margin focus, this does constitute a risk to ratings quality." Along these same lines, Mr. McDaniel confessed to his Board that "[i]t turns out that ratings quality has surprisingly few friends: issuers want high ratings; investors don't want rating downgrades; short-sighted bankers labor short-sightedly to game the rating agencies for a few extra basis points on execution."

116. The fact that these outside influences did in fact affect Moody's ratings of structured finance securities was not disclosed by Moody's in its public statements. To the contrary, Moody's represented quite the opposite by repeatedly stating that its ratings are not influenced by its business relationships.

**B.     Moody's Revenue / Market Share Goals Influenced its Rating Methodology**

117.    Moody's desire for more fees also influenced the entire rating methodology that Moody's developed for rating structured finance securities.  Specifically, by at least 2004, Moody's focus on monitoring and growing market share and not losing out to S&P or Fitch on rating CDOs or other structured finance securities dominated the attention of Moody's senior management.

118.    This compulsion to put new business before credit analytics and, therefore, maximize its revenue influenced the rating methodologies that Moody's developed and implemented for rating structured finance securities.  Moody's believed that the only way for it to successfully compete for an issuer's structured finance business was to make sure that its levels of proposed credit enhancement reflected the issuer's expectations.  As a result, there was a real fear at Moody's of losing new deals to a competitor and, consequently, Moody's internal business strategy focused on matching the ratings of S&P and Fitch, rather than providing an objective credit analysis uninfluenced by either Moody's or its clients' financial concerns.

119.    Once again, these realities were confirmed no better than by Moody's CEO, Mr. McDaniel in October of 2007 when, unbeknownst to either the buyers / investors of the structured finance securities that Moody's rates, or any other market participants, he described in detail to his Board the role that Moody's quest for market share played in its rating practices:

> In an increasing number of markets, Fitch is an acceptable substitute for either S&P or Moody's.  In other markets, any one of the three is

enough.  With the loosening of the traditional duopoly, how do rating agencies compete?

Ideally, competition would be primarily on the basis of ratings quality, with a second component of price and a third component of service.  Unfortunately, of the three competitive factors, rating quality is proving the least powerful . . . .

The real problem is not that the market does underweights [sic] ratings quality but rather that, in some sectors, it actually penalizes quality by awarding rating mandates based on the lowest credit enhancement needed for the highest rating.  **Unchecked, competition on this basis can place the entire financial system at risk** . . . . [Emphasis added.]

Moody's for years has struggled with this dilemma.  On the one hand, we need to win the business and maintain market share, or we cease to be relevant.  On the other hand, our reputation depends on maintaining ratings quality (or at least avoiding big visible mistakes). For the most part, we hand the dilemma off to the team of MDs to solve.  As head of corporate ratings, I offered my managers precious few suggestions on how to address this very tough problem, just assumed that they would strike an appropriate balance . . . .

Although the business does square the circle in some situations, the market share pressure persists in others.  Moody's has erected safeguards to keep teams from too easily solving the market share problem by lowering standards . . . .

Ratings are assigned by committee, not individuals.  (However, entire committees, entire departments, are susceptible to market share objectives.)

Methodologies & criteria are published and thus put boundaries on rating committee discretion.  (However, there is usually plenty of latitude within those boundaries to register market influence.) . . . .

> This does NOT solve the problem though. The RMBS and CDO and
> SIV ratings are simply the latest instance of trying to hit perfect rating
> pitch in a noisy market place of competing interests.
>
> [B]ad ratings must be perceived to have (much) worse consequences
> than market share slippage. Accountability is key. (It is also tricky to
> implement.)

120.    In practice, when this problem was turned over to the Moody's managing

directors responsible for rating structured finance securities, they allowed the business concerns

and pressure for enhanced market share and revenue generation that was so valued by the

company to dominate their judgment and directly influence the methodologies developed to rate

structured finance securities.

121.    For example, by at least 2004, Moody's believed that it had started to lose out on

rating many of the new CDOs backed primarily by RMBS because its existing rating

methodology, called the Binomial Expansion Technique ("BET"), valued a diverse collateral

base (*i.e.*, high diversity score). In particular, Moody's received feedback from its clients that its

emphasis on the diversity score was outdated and was going to present a problem for the new

type of deals being developed.

122.    In short, older vintage CDOs were typically comprised of a variety of different

types of assets such as aircraft leases, franchise loans, high yield bonds and mortgages, while the

CDOs issued by at least 2004 were consistently dominated by one asset class such as RMBS.

Typically, CDOs with diverse types of collateral show lower loss default correlations and, hence,

require less credit enhancement to generate a particular rating. By contrast, collateral pools

dominated by a single type of collateral tend to show much higher correlation in default

probabilities and demand greater credit enhancement.

123.    The industry publication, Asset Backed Alert, confirmed Moody's perception of

vulnerability to lost market share by reporting Moody's share of the market for rating CDOs as

dropping from 91.5% in 2003 to 76.8% in 2004.

124.    This drop in market share occurred primarily because, for CDOs dominated by

one asset type (*i.e.*, RMBS), Moody's BET methodology was not generating the low credit

enhancement levels that issuers demanded.  Moody's started work in earnest on this problem and

by August of 2004 developed a new ratings methodology for CDOs with a low diversity score

called the Correlated Binomial Model.  When it was introduced on August 10, 2004, Moody's

stated that "the primary motivation behind the introduction of the Correlated Binomial is that the

actual assets in a CDO portfolio are correlated and their default distribution has correspondingly

higher probabilities of multiple defaults."  In other words, Moody's believed the Correlated

Binomial Model led to a more accurate reflection of credit risk because it was designed for the

types of CDOs then going to market.

125.    At first, Moody's implemented the Correlated Binomial Model only for a very

limited group of CDOs that were comprised of a particularly concentrated asset base.  In

response to this action, Moody's encountered resistance from investment banks and other issuers,

because it turned out that the Correlated Binomial Model actually was even more rigorous in

certain respects than Moody's BET.  Put another way, as first introduced, Moody's Correlated Binomial Model gave structured finance securities even lower ratings that Moody's BET.

126.   As a result, Moody's noticed that it continued to lose business to S&P for rating CDOs collateralized by RMBS, and senior management in the structured finance group became increasingly worried about how to further adjust its models to stem the erosion of its market share for rating CDOs backed predominantly by mortgaged backed securities.  This concern was amplified by the fact that Moody's believed that S&P had adopted a rating methodology that enabled it to assign AAA ratings with relatively lower levels of credit enhancement to these same structured finance securities.

127.   By early 2005, Moody's structured finance group agreed that a further update to Moody's Correlated Binomial Model was necessary, but there was disagreement over which direction the company should move.  One Moody's managing director responsible for CDO rating methodology advocated for a methodology that built on the work previously done in the summer of 2004.  However, more senior Moody's managing directors in the structured finance group rejected this suggestion and instead implemented a plan centered on modifying some of the correlation assumptions built into the Correlated Binomial Model, so that it more closely mimicked the lower credit enhancement levels that S&P was calculating when rating concentrated CDOs.

128.   Thus, by at least late spring of 2005, Moody's was focused on keeping its rating methodology closely aligned to the results of S&P's methodology and Moody's employees

involved in methodology development were keenly aware that any actions that further hurt Moody's market share would be viewed negatively by Moody's upper management.

129.    In June of 2005, Moody's implemented the first step in this strategy by publishing a follow-up paper entitled "Moody's Revisits its Assumptions Regarding Structured Finance Default (and Asset) Correlations for CDOs." This publication introduced a new set of correlation estimates for structured finance securities based on historical default data between approximately 1993 and 2003 and presented a framework for incorporating the revised correlation assumptions into the modeling of CDOs backed by these obligations.

130.    On September 26, 2005, Moody's published a methodology paper entitled "Moody's Modeling Approach to Rating Structured Finance Cash Flow CDO Transactions," which implemented the concepts introduced in its June publication and officially "adopted a new quantitative modeling approach for structured finance cash flow CDO transactions." Essentially, Moody's had altered its Correlated Binomial Model to incorporate the new asset correlations published in June 2005 as an input that ultimately made the ratings methodology less conservative than the BET or the first version of the Correlated Binomial Model introduced a year earlier.

131.    Moody's official public explanation for this transition was as follows: "As structured finance cash flow CDOs evolve towards transactions with increasingly concentrated collateral pools, mostly with more than 50% of the assets in the RMBS sector, it is important to

have a modeling method that can accurately capture the correlation among the underlying assets .

. . . [T]he Correlated Binomial Model is better suited for this task than the BET."

132.    In fact, the default correlations and loss estimates for the underlying RMBS and

other ABS that Moody's built into its Correlated Binomial Model in September of 2005 were far

too low because they had been developed on a relatively limited data set and were influenced by

Moody's desire to mimic the credit enhancement levels calculated by its competitors.  This

reality led Moody's to knowingly underestimate the credit risk associated with these structured

finance securities.

133.    In sum, although presented publicly as an attempt to significantly improve

analytical precision in credit risk evaluation, Moody's adaptations to its Correlated Binomial

Model implemented in September of 2005 were in fact influenced by its desire to adopt an

analytical approach that generated credit enhancement levels no more demanding than its chief

competitor, S&P, and thereby regain its lost market share and enhance Moody's revenue.  None

of these objectives were consistent with Moody's Code of Conduct or its public commitment to

maintaining the highest level of independence, objectivity and integrity in its credit ratings.  The

action did have the desired effect of boosting Moody's market share for rating CDOs, however,

which increased to approximately 85% in 2005 and 96% in 2006.

134.    The extent to which Moody's quest for market share factored into the

development of rating methodologies, as well as the decision making of Moody's structured

finance group generally, is also demonstrated by the routine inquiries senior Moody's executives

made to their subordinates about deal flow.  For example, during the time period when key decisions about ratings criteria and methodology were being made, senior Moody's personnel, sent monthly e-mails to all of the managing directors in the structured finance group summarizing Moody's market share for structured finance ratings and inquiring about the transactions that Moody's did not rate.

135.    For those transactions in which Moody's did not participate, the executives in the structured finance group were pressured to explain why the deal had not been rated by Moody's. One such e-mail posed the question as follows:  "Please review your deal(s) and advise the reason for any rating discrepancy vis-à-vis our competitors."  Even the slightest down-tick in market share caused a ripple effect from senior management to lower level executives.  As one e-mail put it bluntly:  "Market share by deal count dropped to 94%, though by volume it's 97%. It's lower than the 98+% in prior quarters.  Any reason for concern, are issuers being more selective to control costs (is Fitch cheaper?) or is it an aberration."  Faced with such a demand, a Moody's Group Managing Director immediately inquired of her subordinates as follows:  "Can you please take a look at the deals that we didn't rate from the spreadsheet . . . sent out last night to double check the information and to let me know any of the stories?"

136.    The message sent by Moody's senior management in monitoring market share in this manner was clearly heard and understood by Moody's managers.  As one Moody's managing director responsible for rating structured finance transactions routinely told his staff, "I will be fired if we lose out on a single deal."

137.   In 2008, Moody's made further adjustments to its methodology for rating CDOs backed by any ABS as the underlying collateral.  Unfortunately, the influence of the revenue, market share and other business considerations identified above on Moody's approach to rating structured finance securities also played a role during this time frame.  In the words of one former Moody's managing director, "[Moody's] continues to recklessly flout procedures and take analytical short cuts in their quest for revenue," and "the culture at Moody's [is] to never say no to a deal."

138.   Specifically, in October of 2008, Moody's Credit Policy Team asked one of its managing directors who had previously been in charge of rating CDOs backed by sub-prime and other RMBS to evaluate the adjustments to its existing rating methodology.  He informed them as follows:

> [M]y recommendation is that we do not rate ABS CDOs.  The reasoning behind this recommendation is that due to the complexity of the product and multiple layers of risk, it is NEVER possible to have the requisite amount of information to rate . . . .
>
> [A]s to the issue of the adequacy of the proposal, I believe that it is completely inappropriate and irresponsible . . . .
>
> We are not using the best tools available to us . . . .
>
> [T]he presentation even acknowledges that the methodology is interim.  I strongly argue, based on the regulatory expectations . . . that we do not rate based on incomplete data.
>
> The correlation numbers are generally too low.  I am attaching an ABX research piece from JPM showing the expected write downs across the ABX series.  The ABX serves as a great indicator of the

average credit quality of the relevant vintages. As you can see, 100% average write downs in the base scenario extend from AA in 07-2 to BBB in 06. 100% write downs across and within several vintages also implies 100% loss correlation. This proposal does not appear to be capable of achieving such levels . . . .

In many ways the methodology actually lowers standards: a) by adding strategic asset categories which when used in a tree structure actually reduce overall correlation . . . . It is inappropriate to lower correlations in this environment.

139.    After receiving this report, members of Moody's Credit Policy Team asked: "Any suggestion on minimum numbers?" and "Do you think rating agencies can reasonably rate ABS CDOs but at some rating level lower than Aaa? If so, what level?" In response to these inquiries, the Moody's managing director who conducted the analysis replied:

I believe the answer is no, given the present financial system. Let me give you a short answer and an invitation now and a longer answer later.

What I have observed is that given a framework (be it a methodology, regulation, etc.) poorly incentivized individuals will try to arbitrage it. This arbitrage takes the form of delivering products or information which nominally meets the requirements, but actually holds far more risk than the regulations or methodology account for.

The broader the framework, the more opportunity there is for arbitrage, and there is no broader framework than ABS CDOs . . . .

I would like to invite you to a talk I am giving this morning to the [financial institutional group] entitled 'Lessons from the Crisis - - Origins, Hedged Trades, Counterparty Risk and Convexity." The main theme of the discussion is how poorly incentivized bankers took advantage of banking regulation by creating products or structures which fit the regulatory framework, but were in fact very risky.

45

140.   In late 2008, despite the warnings, criticism, and ultimate rejection by the managing director tasked with evaluating Moody's proposed adjustments to its rating methodology, Moody's approved the adjustments and implemented them when rating structured finance securities in late 2008 and into 2009.  This decision was directly influenced by Moody's desire to maximize its business opportunities (*i.e.*, participate in rating as many structured finance transactions as possible) and to enhance its revenue.  As described by one Moody's managing director, ". . . the primary motivation for the rating methodology is increasing revenue and not actual credit [risk]."  Moreover, "[Moody's] has become desperate to generate revenue.  This has led to the approval and rating of more complex and highly questionable transactions."

141.   Once again, neither of these objectives was consistent with Moody's Code of Conduct or its public commitment to maintaining the highest level of independence, objectivity and integrity in its ratings for structured finance securities.  To the contrary, as of at least late 2008, Moody's independence and objectivity when formulating its rating methodologies for structured finance securities was still influenced and compromised by inappropriate business considerations such as revenue generation, catering to the preferences of issuers, and market share.

## C.   Moody's Compensation Plan Improperly Incentivized its Analysts

142.   Moody's compensation plan for its analysts was a significant factor in the loss of independence and objectivity in its ratings of structured finance securities.  Specifically, beginning in 2000, Moody's opened up its employee stock ownership plan to employees

involved in rating analysis, which meant that at the same time that Moody's was developing new rating methodologies for structured finance securities and assigning ratings for these investments, its mid-level managers and senior rating analysts were receiving a compensation bonus – in the form of stock options – that was tied directly to the performance of the company.

143.    This form of incentive compensation further aligned the interests of those Moody's employees who interacted most directly with issuers of structured finance securities, and provided recommendations on the issuers proposed levels of credit enhancement, with the interests of the issuers themselves instead of the interests of the market participants who relied on Moody's ratings to be independent and uninfluenced by Moody's prospect for financial gain.

144.    In practice, instituting a stock option component to an employee's compensation structure meant that junior Moody's employees who were in a position to influence the process on a day to day basis were much more likely to make decisions that could increase – rather than decrease – the value of Moody's stock.

145.    The relative portion that this incentive compensation represented in an analyst's overall compensation could be quite significant. In the words of one former Moody's analyst, "there were mid-level managers responsible for analytics that were able to retire based on the stock options and other incentive compensation that they had received."

146.    This mindset was precisely what senior Moody's managers had in mind, for at its core, a stock ownership plan is designed to incentivize employees to perform because the employee has a long term stake in the future of the company. This served to only exacerbate the

conflicts of interest inherent in the Issuer Pays business model. From a financial perspective, employees at nearly every level of Moody's management structure had every incentive to tell issuers "yes" instead of "safeguarding the integrity of the rating process" as Moody's committed to do when it endorsed the IOSCO Code in 2005.

### D.     Moody's Punished Employees Who Expressed Dissenting Views

147.    Moody's sacrifice of its independence and objectivity due to its desire to please issuers of structured finance securities is also evidenced by the manner in which it responded to dissent within the organization. Specifically, those Moody's analysts who displeased issuers of structured finance securities (*i.e.*, those who disagreed with the proposed level of credit enhancement necessary to achieve a particular rating) were given negative performance evaluations and were reassigned away from issuers that lodged complaints with the relevant Moody's managing director. Similarly, those Moody's employees who internally raised concerns about the manner in which Moody's was rating structured finance securities were marginalized within the company, received less compensation and were demoted.

148.    For example, in September of 2007, a Moody's managing director expressed concern to his direct supervisor with respect to the underlying credit quality of many ABS CDOs rated by Moody's. Specifically, he noted that market data suggested severe downgrades of RMBS collateralized by subprime mortgages were necessary and that Moody's RMBS group was currently in the process of calculating the appropriate downgraded ratings for all of the affected RMBS tranches. What particularly concerned this individual, however, was that during

this same time frame there were several CDOs backed by the affected RMBS that were still in the pipeline for issuance and waiting to be rated by Moody's.

149.   As described in Section III.A, Moody's CDO rating methodology uses ratings on RMBS as a measure of credit risk to determine the rating ultimately assigned to a CDO collateralized by the securities.  If the ratings on RMBS are faulty then the ratings on the CDOs backed by these investments will also be faulty.

150.   Based on the looming threat of downgrades for subprime RMBS and the fact that issuers were still seeking ratings on CDOs backed by these assets, the Moody's managing director advised his supervisor that Moody's should stop rating all ABS CDOs until Moody's had completed its downgrades of RMBS, thus allowing the new CDOs backed by these assets to be rated in a manner that accurately reflected Moody's assessment of their credit risk.

151.   When presented with the managing director's recommendation, his supervisor admonished him and was more concerned with losing market share to a competitor than addressing his concerns.  Undeterred, the managing director facilitated a meeting with a more senior Moody's executive.  Following this meeting, Moody's decided to continue rating ABS CDOs backed by subprime RMBS.

152.   Equally as important, however, was the manner in which Moody's treated the employee, and the clear message it sent to his colleagues in Moody's structured finance group. Rather than being rewarded for bringing these concerns to the attention of Moody's senior management, the managing director was marginalized within the company.  In particular, he was

excluded from meetings and decisions related to the rating of ABS CDOs. Additionally, he was transferred from his existing position to a position in another unit within Moody's structured finance department that was not budgeted at the managing director level. As a result, the managing director's role within the company, and concomitantly, his compensation were reduced.

153.     In his new position, the managing director continued to voice his concerns regarding the manner in which Moody's rated structured finance securities and the rating methodologies developed to rate ABS CDOs. His recommendations were repeatedly rejected by Moody's senior management, who instead, unbeknownst to the buyers / investors in the structured finance securities that Moody's rated as well as other market participants, elected to continue to pursue a business strategy focused on revenue and market share enhancement to the detriment of ratings quality.

154.     The powerful message conveyed to Moody's employees by the above actions was clear: if you speak up and potentially interfere with Moody's ability to please issuers and, therefore, generate additional revenue for Moody's, you should be prepared to pay the consequences. This set of incentives is directly at odds with Moody's public emphasis on maintaining independence and objectivity in its ratings of structured finance securities.

**E.     Moody's Compromised the Objectivity of its Compliance Department**

155.     Central to the success of Moody's plan to cater to the demands of the dominant issuers of structured finance securities rather than adhere to its commitment to safeguard the

integrity of the ratings process was Moody's decision to marginalize and render powerless its Compliance Department.

156.    Despite Moody's public representations to the contrary, its Compliance Department was not valued within the company and was prevented from monitoring Moody's adherence to its Code of Conduct.  For example, in the spring of 2006 two of the most competent and experienced compliance officers at Moody's were fired and replaced by employees from Moody's structured finance department.  The replacements were not qualified for their new positions and their arrival hindered the Department's ability to do its job effectively.

157.    What was particularly problematic about this personnel change is that it compromised the Compliance Department's own independence and objectivity.  With the transfer of the former structured finance employees several compliance personnel were now in the unenviable position of judging the behavior of their friends and former colleagues.

158.    What made this conflict even worse was that the former structured finance employees' stint in Compliance was only temporary and upon completion Moody's expected them to rejoin the structured finance group and resume working with the very managing directors and analysts that they were supposed to be policing.  Such a revolving door mentality further compromised the integrity of Moody's compliance function because, as a group, it now had even less incentive to push back against the demands of the business.  In short, Moody's Compliance officers were in the position of reviewing, and possibly criticizing, the same conduct they had

engaged in and might be expected to resume upon their rotation back to the structured finance group.

159.    Starting in at least 2006, Moody's Compliance Department was marginalized within the company, excluded from receiving information necessary to do its job effectively and prevented from participating in decisions that would normally fall under the compliance function.  In the words of the head of the Department during this time period, "my guidance was routinely ignored if that guidance meant making less money or emplacing separation requirements to address conflicts of interest between the ratings side and the business development side . . . .  I was deliberately left out of discussions which had a significant compliance dimension and on which I would have given very strong guidance."

160.    The takeover of Moody's Compliance Department by the structured finance group culminated in 2008, when the previous head of the Compliance Department was fired and replaced by a managing director from the structured finance group who previously had specialized in rating mortgage backed securities.

161.    Moody's general lack of interest in its Compliance Department, despite its public representations to the contrary, is also evident by the response of Moody's senior management when problems were brought to its attention.  Indeed, rather than being encouraged to follow up on concerns that were raised about Moody's ratings process, the head of Moody's Compliance Department was simply instructed by Moody's legal department "not to mention the issue in any e-mails or any other written form."

162.   Moody's growing disdain for its compliance function and its perception of the Compliance Department as an obstacle rather than a partner was also expressed at meetings open to a broader group of Moody's employees.  For example, at a dinner party following an end of the year Board Meeting attended by Moody's Compliance Department and several senior Moody's managing directors, the President at the time of Moody's Investors Service, Inc. walked by the head of the Compliance Department and said quite loudly, "Hey . . . how much revenue did Compliance bring in this year?"

163.   Just as is the case with constantly monitoring market share, requiring senior managers to explain why deals had not been rated even after just the smallest drop in market share, punishing individuals with dissenting viewpoints and instilling a culture of fear if business development goals were not met, the implications of the above actions are the same.  What was valued – and rewarded – at Moody's was rating the deal and not forgoing revenue that could be captured by a competitor.  By contrast, adhering to the requirements of Moody's Code of Conduct and its public representations was denigrated.

164.   In sum, the stated purpose and work of Moody's Compliance Department was subordinated to its desire to please the relatively small group of repeat issuers that were Moody's frequent customers, Moody's quest for market share, and its goals of revenue enhancement. These actions are yet more examples of the manner in which Moody's independence, objectivity and integrity have been sacrificed to achieve the same goals.

## VI.   CAUSES OF ACTION

**First Count:  Violation of the Connecticut Unfair Trade Practices Act**
**(Conn. Gen. Stat. § 42-110a, et seq.)**

1-164. Paragraphs 1 through 164 of the Complaint are hereby repeated and realleged as Paragraphs 1 through 164 of this First Count as if fully set forth herein.

165.   At all times relevant to this Complaint, Moody's was engaged in the trade or commerce of providing credit ratings to issuers located in Connecticut and providing credit ratings for use by investors and other market participants within the State of Connecticut.

166.   By engaging in the acts and practices alleged herein, Moody's made or caused to be made to Connecticut consumers, directly or indirectly, explicitly or by implication, representations which are material, reasonably interpreted, false and likely to mislead, including, but not limited to, the following:

> a.   that Moody's ratings of structured finance securities are independent, objective, and free from consideration of Moody's desire for revenue or additional business from issuers;
>
> b.   that Moody's understands that it holds a position of trust in the marketplace and, as such, deals fairly and honestly with the public, including the buyers / investors of the structured finance securities that it rates;

c.    that Moody's understands that the Issuer Pays business model creates conflicts of interest but that these conflicts have been adequately managed and neutralized by its Compliance Department and the principles set forth in Moody's Code of Conduct;

d.    that Moody's agrees with and has implemented the principles set forth in the IOSCO Code of Conduct pertaining to its obligation as a credit rating agency to maintain the independence, objectivity and integrity of its ratings of structured finance securities; and

e.    that Moody's understands that its independence and objectivity requires it to sometimes provide answers that its clients (*i.e.*, issuers) don't like, and that it undertakes this task because doing so is necessary for proper credit analytics.

167.    By engaging in the acts and practices alleged herein, Moody's made omissions to Connecticut consumers that it had a duty to disclose by virtue of Moody's other representations to Connecticut consumers, including, but not limited to, the following

a.    that Moody's ratings of structured finance securities were influenced by its desire to please its clients, increase market share, and enhance revenue for the company;

b.      that Moody's does not deal fairly and honestly with buyers / investors of structured finance securities or other market participants;

c.      that Moody's allowed business and revenue considerations to influence the rating methodologies it developed to rate structured finance securities;

d.      that Moody's Compliance Department was not valued within the company and, therefore, was incapable of preventing the demands of the Issuer Pays business model from compromising Moody's independence and objectivity;

e.      that Moody's did not operate its business in conformance with either its own Code of Conduct, or the principles set forth in the IOSCO Code;

f.      that Moody's structured finance ratings were based in part on the preferences of the narrow group of repeat issuers of structured finance securities that dominated Moody's revenues; and

g.      that Moody's structured finance ratings were based in part on a desire to promote Moody's own economic interests.

168.    Moody's acts and practices regarding Connecticut consumers as alleged herein are unfair, oppressive or unscrupulous and violated the public policy of the State of Connecticut, including, but not limited to the public policy against:

       a.     misrepresenting the nature and extent of your services in business; and

       b.     abusing and unfairly profiting from a dominant position in the market.

169.    Moody's acts and practices as alleged herein have directly and proximately caused substantial injury to consumers within the State of Connecticut.

170.    Moody's knew or should have known that its conduct alleged herein violated Conn. Gen. Stat. § 42-110b.

171.    Moody's acts or practices alleged herein constitute unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b.

## PRAYER FOR RELIEF

WHEREFORE, the State of Connecticut requests the following relief:

1.      A finding that by the acts alleged herein, Moody's engaged in unfair and deceptive acts and practices in the course of engaging in the trade or commerce of a credit rating agency within the State of Connecticut in violation of the Connecticut Unfair Trade Practices Act;

2.      An injunction pursuant to Conn. Gen. Stat. § 42-110m enjoining Moody's from engaging in any acts that violate the Connecticut Unfair Trade Practices Act, including, but not limited to, the unfair and deceptive acts and practices alleged herein;

3.      An order pursuant to Conn. Gen. Stat. § 42-110m requiring that Moody's submit to an accounting to determine the amount of improper fees and revenue paid to Moody's as a result of its unfair and deceptive acts and practices;

4.      An order pursuant to Conn. Gen. Stat. § 42-110o directing Moody's to pay a civil penalty of $5,000 for each and every willful violation of the Connecticut Unfair Trade Practices Act;

5.      An order pursuant to Conn. Gen. Stat. § 42-110m directing Moody's to pay restitution;

6.      An order pursuant to Conn. Gen. Stat. § 42-110m directing Moody's to disgorge all revenues, profits, and gains achieved in whole or in part through the unfair acts or practices complained of herein;

7.    An order pursuant to Conn. Gen. Stat. § 42-110m directing Moody's to pay reasonable attorneys' fees to the State of Connecticut;

8.    Costs of suit; and

9.    Such other relief as this Court deems just and equitable.

Plaintiff State of Connecticut hereby demands a trial by jury on all issues and causes of action so triable.

Dated at Hartford, Connecticut, this 10th day of March, 2010.


PLAINTIFF
STATE OF CONNECTICUT

By:    _____
RICHARD BLUMENTHAL
ATTORNEY GENERAL

By:    _____
Michael E. Cole
    Chief, Antitrust Department
George W. O'Connell
Matthew J. Budzik
Laura J. Martella
Assistant Attorneys General
Antitrust Department
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120
Tel: (860) 808-5040
Fax: (860) 808-5033

RETURN DATE:  MARCH 30, 2010

| | | |
|---|---|---|
| STATE OF CONNECTICUT | : | SUPERIOR COURT |
| | : | |
| | : | JUDICIAL DISTRICT OF HARTFORD |
| Plaintiff, | : | |
| | : | AT HARTFORD |
| v. | : | |
| | : | |
| MOODY'S CORPORATION and | : | |
| MOODY'S INVESTORS SERVICE, INC. | : | MARCH 10, 2010 |
| | : | |
| Defendants. | : | |

## AMOUNT IN DEMAND

The amount, legal interest or property in demand is $15,000.00 or more, exclusive of interest and costs.

PLAINTIFF
STATE OF CONNECTICUT

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY:  _George O'Connell_
Michael E. Cole
    Chief, Antitrust Department
George W. O'Connell
Matthew J. Budzik
Laura J. Martella
Assistant Attorneys General
Antitrust Department
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120
Tel: (860) 808-5040
Fax: (860) 808-5033

[This Page Was Intentionally Left Blank]

RETURN DATE: MARCH 30, 2010

| | | |
|---|---|---|
| STATE OF CONNECTICUT | : | SUPERIOR COURT |
| | : | |
| | : | JUDICIAL DISTRICT OF |
| Plaintiff, | : | OF HARTFORD |
| | : | |
| v. | : | ·AT HARTFORD |
| | : | |
| THE MCGRAW-HILL COMPANIES, INC. and | : | |
| STANDARD & POOR'S FINANCIAL | : | |
| SERVICES LLC | : | |
| | : | |
| Defendants. | : | MARCH 10, 2010 |

## COMPLAINT

## I.   SUMMARY OF THE CASE

1.     This lawsuit seeks redress for The McGraw-Hill Companies, Inc.'s, Standard & Poor's Financial Services LLC's, and its business unit Standard & Poor's Ratings Services' (referred to herein collectively as "S&P") unfair, deceptive, and illegal business practice of systematically and intentionally misrepresenting that the ratings assigned to structured finance securities by S&P were objective, independent and not influenced by either S&P's or its clients' financial interests. These representations were untrue and S&P knew it.

2.     S&P represents that its ratings of structured finance securities are independent, objective, and the result of the highest quality credit analytics that are available to S&P. Indeed, S&P's reputation for independence, objectivity and integrity is emphasized by S&P to the users of its ratings at nearly every turn.

7.      An order pursuant to Conn. Gen. Stat. § 42-110m directing S&P to pay reasonable attorneys' fees to the State of Connecticut;

8.      Costs of suit; and

9.      Such other relief as this Court deems just and equitable.

Plaintiff State of Connecticut hereby demands a trial by jury on all issues and causes of action so triable.

Dated at Hartford, Connecticut, this 10th day of March, 2010.

PLAINTIFF
STATE OF CONNECTICUT

By:      _____
RICHARD BLUMENTHAL
ATTORNEY GENERAL

By:      _____
Michael E. Cole
        Chief, Antitrust Department
George W. O'Connell
Matthew J. Budzik
Laura J. Martella
Assistant Attorneys General
Antitrust Department
55 Elm Street, P.O. Box 120
Hartford, CT  06141-0120
Tel:  (860) 808-5040
Fax:  (860) 808-5033

# EXHIBIT P(11)

CT Attorney General



### STATE OF CONNECTICUT
# ATTORNEY GENERAL GEORGE JEPSEN

February 5, 2013

## Attorney General Leads Multistate Coalition Challenging Standard & Poor's Ratings

Attorney General George Jepsen announced today that the U.S. Department of Justice, 16 states and the District of Columbia have filed lawsuits against Standard & Poor's Financial Services LLC (S&P), for alleged misconduct by the credit rating agency involving structured finance securities, which were at the heart of the nation's financial crisis.

Attorney General Jepsen joined U.S. Attorney General Eric Holder at the Department of Justice for the announcement, with attorneys general from several of the participating states. Connecticut was the first state to sue S&P and its parent, The McGraw-Hill Companies, Inc., on these allegations in March, 2010, and is leading the multistate coalition.

The federal and state complaints allege that despite S&P's repeated statements emphasizing its independence and objectivity, the credit rating agency allowed its analysis to be influenced by its desire to earn lucrative fees from its investment bank clients, and knowingly assigned inflated credit ratings to toxic assets packaged and sold by the Wall Street investment banks.  This alleged misconduct began as early as 2001, became particularly acute between 2004 and 2007, and continued as recently as 2011.

Structured finance securities backed by subprime mortgages were at the center of the 2008 financial crisis.  These financial products, including residential mortgage-backed securities (RMBS) and collateral debt obligations (CDOs), derive their value from the monthly payments consumers make on their mortgages.

"We believe that S&P's analytical models for rating structured finance securities were directly influenced by the demands of S&P's powerful investment banking clients. Contrary to what S&P was publicly representing, S&P served its own financial interests and those of the investment banks. Countless investors and market participants, including state regulators, were misled by S&P's promise that its analysis was independent and objective.  S&P violated the trust that it purposefully cultivated with the marketplace leading to disastrous results," Attorney General Jepsen said.

The state lawsuits seek court orders to stop S&P from making misrepresentations to the public; changes in the way the company does business; civil penalties and disgorgement of ill-gotten profits,

which may total hundreds of millions of dollars.

Connecticut's lawsuit, brought under the Connecticut Unfair Trade Practices Act, is pending in Hartford Superior Court.  The States of Mississippi and Illinois filed lawsuits against S&P in 2011 and 2012, respectively, based on Connecticut's theory of the case.

Filing lawsuits today are:  Arizona, Arkansas, California, Colorado, Delaware, the District of Columbia, Idaho, Iowa, North Carolina, Maine, Missouri, Pennsylvania, Tennessee, and Washington.

Connecticut also assisted the initial stages of the Department of Justice's investigation because of its earlier investigation of S&P. "Today's announcement is the result of unprecedented cooperation between state attorneys general and the Department of Justice.  Combining the resources and authority of our state and federal offices increases the likelihood of success in complex financial cases, and winning real protections for consumers," Jepsen said.

The complaints allege that investors and other market participants, such as state regulators, relied on S&P's promises of independence and objectivity.  Instead, S&P acted to benefit its own financial interests by adjusting its analytical models for rating residential mortgage-backed securities and collateral debt obligations to ensure it assigned as many AAA ratings as possible.  Assessing actual credit risk was of secondary importance to revenue goals and winning new business, the complaints allege.

Further, the complaints allege that S&P's profit motive affected its monitoring, or surveillance, on previously rated RMBS and CDOs. In order to continue earning lucrative fees, the complaints allege, S&P delayed taking rating actions on impaired RMBS and continued rating new CDOs even after it determined that the security's underlying collateral was impaired.

The congressionally appointed bipartisan Financial Crisis Inquiry Commission concluded in its final report that the financial crisis "could not have happened" without ratings agencies such as S&P.

S&P and its chief competitor, Moody's Investors Service, Inc. (Moody's), dominate the market for rating structured finance securities and are responsible for rating virtually all structured finance securities issued into the global capital markets. Connecticut has brought a similar lawsuit against Moody's, which is pending in state court.

Staff from the OAG's Finance and Antitrust and Government Program Fraud departments are working with the Attorney General on this case, including Assistant Attorneys General Matthew Budzik, Finance department head; Michael Cole, Antitrust and Government Program Fraud department head; George O'Connell and Lorrie Adeyemi; Legal Fellow Ryan Ponte, and Paralegal Holly MacDonald. Former Assistant Attorney General Laura Martella also assisted.

View Connecticut's complaint here.

###

**Media Contact:**
Susan E. Kinsman

susan.kinsman@ct.gov
860-808-5324 (office)
860-478-9581 (cell)


**Consumer Inquiries:**
860-808-5318
attorney.general@ct.gov
**Facebook:** Attorney General George Jepsen
**Twitter:** @AGJepsen


Content Last Modified on 2/25/2013 3:54:10 PM

# EXHIBIT P(12)

## Permanent Subcommittee on Investigations

*"The Permanent Subcommittee on Investigations is one of the few institutions in Congress that's still working. Carl Levin is a big reason why." National Journal, February 11, 2012.*

Senator Levin has been a member of the Permanent Subcommittee on Investigations, the Senate's premier investigating committee, since 1999. He has chaired the subcommittee from June 2001 to January 2003 and from 2007 to the present.

The Permanent Subcommittee on Investigations (PSI) has jurisdiction to conduct investigations into a broad range of issues, including federal waste, fraud and abuse, corporate crime, offshore banking and tax practices, energy markets, corruption, and national security.

In 2010, Senator Levin led Congress' most in-depth examination into Wall Street and the financial crisis. He has also investigated the credit card industry, shell companies, abusive tax schemes and offshore tax havens. The PSI investigations have made major contributions to several laws including the Wall Street Reform and Consumer Protection Act, the Credit CARD Act, and the Patriot Act.

Click each section title below to learn more about it.

### Wall Street Reform and Consumer Protection Act »
### Wall Street and the Financial Crisis »

The financial crisis was not an act of nature; it was a man-made economic assault that cost millions of jobs, evaporated billions of dollars in retirement savings, and put our nation in the worst economic tailspin since the Great Depression.

In April 2010, the Permanent Subcommittee on Investigations held a series of hearings in order to examine some of the causes and consequences of the crisis.  The goals of the hearings were threefold: to construct a public record of the facts to deepen public understanding of what happened and to try to hold some of the perpetrators accountable; to inform the legislative debate about the need for financial reform; and to provide a foundation for building better defenses to protect Main Street from the excesses of Wall Street.

The hearings were based on an in-depth bipartisan investigation that began in November 2008.  The Subcommittee conducted over 100 detailed interviews and depositions, consulted with dozens of experts, and collected and initiated review of millions of pages of documents.  Given the extent of the economic damage and the complexity of its root causes, the Subcommittee's approach has been to develop detailed case studies to examine each stage of the crisis.

The first hearing examined the role of high risk home loans and the mortgage backed securities that those loans produced, using as a case history the policies and practices of Washington Mutual Bank.

The second hearing examined the role of the banking regulators charged with ensuring the safety and soundness of the U.S. banking system, again using Washington Mutual as a case history.

The third hearing focused on the role of the credit rating agencies (CRAs), specifically the two largest CRAs: Moody's and Standard and Poor's.

The final hearing focused on the role of investment banks, using Goldman Sachs as a case study.

## Hearing One: The Role of High Risk Home Loans

The first hearing, April 13, 2010, focused on the role of high risk loans, using Washington Mutual Bank as a case history. It showed how the bank originated and sold hundreds of billions of dollars in high risk loans to Wall Street in return for big fees, polluting the financial system with toxic mortgages.

**The Subcommittee investigation reached the following findings of fact:**

1. **High Risk Lending Strategy.** Washington Mutual ("WaMu") executives embarked upon a high risk lending strategy and increased sales of high risk home loans to Wall Street, because they projected that high risk home loans, which generally charged higher rates of interest, would be more profitable for the bank than low risk home loans.
2. **Shoddy Lending Practices.** WaMu and its affiliate, Long Beach Mortgage Company ("Long Beach"), used shoddy lending practices riddled with credit, compliance, and operational deficiencies to make tens of thousands of high risk home loans that too often contained excessive risk, fraudulent information, or errors.
3. **Steering Borrowers to High Risk Loans.** WaMu and Long Beach too often steered borrowers into home loans they could not afford, allowing and encouraging them to make low initial payments that would be followed by much higher payments, and presumed that rising home prices would enable those borrowers to refinance their loans or sell their homes before the payments shot up.
4. **Polluting the Financial System.** WaMu and Long Beach securitized over $77 billion in subprime home loans and billions more in other high risk home loans, used Wall Street firms to sell the securities to investors worldwide, and polluted the financial system with mortgage backed securities which later incurred high rates of delinquency and loss.
5. **Securitizing Delinquency-Prone and Fraudulent Loans.** At times, WaMu selected and securitized loans that it had identified as likely to go delinquent, without disclosing its analysis to investors who bought the securities, and also securitized loans tainted by fraudulent information, without notifying purchasers of the fraud that was discovered.
6. **Destructive Compensation.** WaMu's compensation system rewarded loan officers and loan processors for originating large volumes of high risk loans, paid extra to loan officers who overcharged borrowers or added stiff prepayment penalties, and gave executives millions of dollars even when its high risk lending strategy placed the bank in financial jeopardy.

**More Information**

- Levin-Coburn memo - *Wall Street and the Financial Crisis: The Role of High Risk Home Loans* **[PDF] (/imo/media/doc/supporting/2010/PSI.LevinCoburnmemo.041310.pdf)** - April 13, 2010
- Opening Statement - **PSI Hearing on Wall Street and the Financial Crisis: The Role of High Risk Home Loans (/newsroom/release.cfm?id=323765)** - April 13, 2010
- Exhibits - PSI Hearing on Wall Street and the Financial Crisis: The Role of High Risk Home Loans **[PDF 51 MB] (http://hsgac.senate.gov/public/_files/Financial_Crisis/041310Exhibits.pdf)** - April 13, 2010
- Hearing information - **Homeland Security and Governmental Affairs Committee website (http://www.hsgac.senate.gov/subcommittees/investigations/hearings/wall-street-and-the-financial-crisis-the-role-of-high-risk-home-loans)** - April 13, 2010
- Press release - **Senate Subcommittee Launches Series of Hearings on Wall Street and Financial Crisis (/newsroom/release.cfm?id=323762)** - April 12, 2010

## Hearing Two: The Role of Bank Regulators

The second hearing, on April 16, 2010, focused on regulators, using as a case study the role of the Office of Thrift Supervision (OTS), and the Federal Deposit Insurance Corporation (FDIC) in exercising oversight of Washington Mutual Bank.

Feeble oversight by regulators, combined with weak regulatory standards and agency infighting, allowed Washington Mutual Bank, a $300 billion thrift and the sixth largest U.S. depository institution, to engage in high-risk and shoddy lending practices and the sale of toxic and sometimes fraudulent mortgages that contributed to both the bank's demise and the 2008 financial crisis.

**The Subcommittee investigation reached the following findings of fact:**

1. **Largest U.S. Bank Failure.** From 2003 to 2008, OTS repeatedly identified significant problems with Washington Mutual's lending practices, risk management, and asset quality, but failed to force adequate corrective action, resulting in the largest bank failure in U.S. history.
2. **Shoddy Lending Practices.** OTS allowed Washington Mutual and its affiliate Long Beach Mortgage Company to engage year after year in shoddy lending and securitization practices, failing to take enforcement action to stop its origination and sale of loans with fraudulent borrower information, appraisal problems, errors, and notoriously high rates of delinquency and loss.
3. **Unsafe Option ARM Loans.** OTS allowed Washington Mutual to originate hundreds of billions of dollars in high risk Option Adjustable Rate Mortgages, knowing that the bank used unsafe and unsound teaser rates, qualified borrowers using unrealistically low loan payments, permitted borrowers to make minimum payments resulting in negatively amortizing loans (i.e., loans with increasing principal), relied on rising house prices and refinancing to avoid payment shock and loan defaults, and had no realistic data to calculate loan losses in markets with flat or declining house prices.
4. **Short Term Profits Over Long Term Fundamentals.** OTS abdicated its responsibility to ensure the long-term safety and soundness of Washington Mutual by concluding that short-term profits obtained by the bank precluded enforcement action to stop the bank's use of shoddy lending and securitization practices and unsafe and unsound loans.
5. **Impeding FDIC Oversight.** OTS impeded FDIC oversight of Washington Mutual by blocking its access to bank data, refusing to allow it to participate in bank examinations, rejecting requests to review bank loan files, and resisting FDIC recommendations for stronger enforcement action.
6. **FDIC Shortfalls.** FDIC, the backup regulator of Washington Mutual, was unable to conduct the analysis it wanted to evaluate the risk posed by the bank to the Deposit Insurance Fund, did not prevail against unreasonable actions taken by OTS to limit its examination authority, and did not initiate its own enforcement action against the bank in light of ongoing opposition by the primary federal bank regulators to FDIC enforcement authority.
7. **Recommendations Over Enforceable Requirements.** Federal bank regulators undermined efforts to end unsafe and unsound mortgage practices at U.S. banks by issuing guidance instead of enforceable regulations limiting those practices, failing to prohibit many high risk mortgage practices, and failing to set clear deadlines for bank compliance.
8. **Failure to Recognize Systemic Risk.** OTS and FDIC allowed Washington Mutual and Long Beach to reduce their own risk by selling hundreds of billions of dollars of high risk mortgage backed securities that polluted the financial system with poorly performing loans, undermined investor confidence in the secondary mortgage market, and contributed to massive credit rating downgrades, investor losses, disrupted markets, and the U.S. financial crisis.
9. **Ineffective and Demoralized Regulatory Culture.** The Washington Mutual case history exposes the regulatory culture at OTS in which bank examiners are frustrated and demoralized by their inability to stop unsafe and unsound practices, in which their supervisors are reluctant to use formal enforcement actions even after years of serious bank deficiencies, and in which regulators treat the banks they oversee as constituents rather than arms-length regulated entities.

**More Information**

- Levin-Coburn memo - *Wall Street and the Financial Crisis: The Role of Bank Regulators* **[PDF] (/imo/media/doc/supporting/2010/PSI.LevinCoburnmemo.041610.pdf)** - April 16, 2010

- Opening statement - **PSI Hearing on Wall Street and the Financial Crisis: The Role of Bank Regulators (/newsroom/release.cfm?id=323920)** - April 16, 2010
- Exhibits - PSI hearing on Wall Street and the Financial Crisis: The Role of Bank Regulators **[PDF 25 MB] (http://hsgac.senate.gov/public/_files/Financial_Crisis/041610Exhibits.pdf)** - April 16, 2010
- Hearing information - **Homeland Security and Governmental Affairs Committee website (http://www.hsgac.senate.gov/subcommittees/investigations/hearings/-wall-street-and-the-financial-crisis-the-role-of-bank-regulators)** - April 16, 2010
- Press release - **Senate Subcommittee Holds Second Hearing on Wall Street and the Financial Crisis: The Role of Bank Regulators (/newsroom/release.cfm?id=323906)** - April 15, 2010

## Hearing Three: The Role of Credit Rating Agencies.

The third hearing, on April 23, 2010, focused on the role of the credit ratings agencies (CRAs). Moody's and Standard and Poor's, the two largest credit ratings agencies, rated tens of thousands of residential mortgage-backed securities (RMBS) and collateralized debt obligations (CDOs) that were based on high-risk home loans.

While making record profits from 2004 to 2007, CRAs –which are paid by the issuers of the securities they rate— gave the highest possible ratings to securities underpinned by high-risk home loans. In 2007, after delinquencies rose and the subprime market began to collapse, the CRAs had to massively downgrade many of these securities, resulting in major shocks to the financial system.

**The Subcommittee investigation reached the following findings of fact:**

1. **Inaccurate Rating Models.** From 2004 to2007, Moody's and Standard & Poor's used credit rating models with data that was inadequate to predict how high risk residential mortgages, such as subprime, interest only, and option adjustable rate mortgages, would perform.
2. **Competitive Pressures.** Competitive pressures, including the drive for market share and need to accommodate investment bankers bringing in business, affected the credit ratings issued by Moody's and Standard & Poor's.
3. **Failure to Re-evaluate** By 2006, Moody's and Standard & Poor's knew their ratings of residential mortgage backed securities (RMBS) and collateralized debt obligations (CDOs) were inaccurate, revised their rating models to produce more accurate ratings, but then failed to use the revised model to re-evaluate existing RMBS and CDO securities, delaying thousands of rating downgrades and allowing those securities to carry inflated ratings that could mislead investors.
4. **Failure to Factor in Fraud, Laxity, or Housing Bubble.** From 2004 to 2008, Moody's and Standard & Poor's knew of increased credit risks due to mortgage fraud, lax underwriting standards, and unsustainable housing price appreciation, but failed adequately to incorporate those factors into their credit rating models.
5. **Inadequate Resources.** Despite record profits from 2004 to 2008, Moody's and Standard & Poor's failed to assign sufficient resources to adequately rate new products and test the accuracy of existing ratings.
6. **Mass Downgrades Shocked Market** Mass downgrades by Moody's and Standard & Poor's, including downgrades of hundreds of subprime RMBS over a few days in July 2007, downgrades by Moody's of CDOs in October 2007, and downgrades by Standard & Poor's of over 6,300 RMBS and 1,900 CDOs on one day in January 2008, shocked the financial markets, helped cause the collapse of the subprime secondary market, triggered sales of assets that had lost investment grade status, and damaged holdings of financial firms worldwide, contributing to the financial crisis.
7. **Failed Ratings.** Of [12,000] RMBS that, from 2006 to 2007, received AAA ratings from Moody's or Standard & Poor's, about [one-third] have since received a rating downgrade, some within 6 months of their initial rating.
8. **Statutory Bar.** The U.S. Securities and Exchange Commission is barred by statute from conducting needed oversight into the substance, procedures, and methodologies of the credit rating models.

**More Information**

- Levin-Coburn memo - Wall Street and the Financial Crisis: The Role of Credit Rating Agencies **[PDF] (/imo/media/doc/supporting/2010/PSI.LevinCoburnmemo.042310.pdf)** - April 23, 2010
- Opening statement - **PSI Hearing on Wall Street and the Financial Crisis: The Role of Credit Rating Agencies (/newsroom/release.cfm?id=324137)** - April 23, 2010
- Exhibits - PSI Hearing on Wall Street and the Financial Crisis: The Role of Credit Rating Agencies **[PDF 23 MB] (http://hsgac.senate.gov/public/_files/Financial_Crisis/042310Exhibits.pdf)** - April 23, 1010
- Hearing information - **Homeland Security and Governmental Affairs Committee website (http://www.hsgac.senate.gov/subcommittees/investigations/hearings/wall-street-and-the-financial-crisis-the-role-of-credit-rating-agencies)** - April 23, 2010
- Press release - **Senate Subcommittee Holds Third Hearing on Wall Street and the Financial Crisis: The Role of Credit Rating Agencies (/newsroom/release.cfm?id=324129)** - April 22, 2010

## Hearing Four: The Role of Investment Banks.

The final hearing, held on April 27, 2010, focused on the role of investment banks, using Goldman Sachs as a case study. Goldman Sachs and other investment banks played a crucial role in building and running the conveyor belt that fed toxic mortgages and mortgage-backed securities into the financial system.

For Goldman Sachs, this role included underwriting securities backed by or related to mortgages from some of the most notorious subprime mortgage lenders, including Long Beach. Goldman Sachs also designed and sold billions of dollars of collateralized debt obligations (CDOs) that further spread the risks associated with toxic mortgages, and issued derivative financial products, such as synthetic collateralized debt obligations (CDOs), which had no underlying assets and were merely bets that referenced mortgage-backed securities. In several cases, Goldman was marketing deals to its clients as good investment opportunities while simultaneously betting that these very same deals would fail.

**The Subcommittee investigation reached the following findings of fact:**

1. **Securitizing High Risk Mortgages.** From 2004 to 2007, in exchange for lucrative fees, Goldman Sachs helped lenders like Long Beach, Fremont, and New Century, securitize high risk, poor quality loans, obtain favorable credit ratings for the resulting residential mortgage backed securities (RMBS), and sell the RMBS securities to investors, pushing billions of dollars of risky mortgages into the financial system.
2. **Magnifying Risk.** Goldman Sachs magnified the impact of toxic mortgages on financial markets by re-securitizing RMBS securities in collateralized debt obligations (CDOs), referencing them in synthetic CDOs, selling the CDO securities to investors, and using credit default swaps and index trading to profit from the failure of the same RMBS and CDO securities it sold.
3. **Shorting the Mortgage Market.** As high risk mortgage delinquencies increased, and RMBS and CDO securities began to lose value, Goldman Sachs took a net short position on the mortgage market, remaining net short throughout 2007, and cashed in very large short positions, generating billions of dollars in gain.
4. **Conflict Between Client and Proprietary Trading.** In 2007, Goldman Sachs went beyond its role as market maker for clients seeking to buy or sell mortgage related securities, traded billions of dollars in mortgage related assets for the benefit of the firm without disclosing its proprietary positions to clients, and instructed its sales force to sell mortgage related assets, including high risk RMBS and CDO securities that Goldman Sachs wanted to get off its books, creating a conflict between the firm's proprietary interests and the interests of its clients.
5. **Abacus Transaction.** Goldman Sachs structured, underwrote, and sold a synthetic CDO called Abacus 2007-AC1, did not disclose to the Moody's analyst overseeing the rating of the CDO that a hedge fund client taking a short position in the CDO had helped to select the referenced assets, and also did not disclose that fact to other investors.
6. **Using Naked Credit Default Swaps.** Goldman Sachs used credit default swaps (CDS) on assets it did not own to bet against the mortgage market through single name and index CDS transactions, generating substantial revenues in the process.

**More Information:**

Shell Companies »
Credit Card Industry Investigation »
Abusive Tax Schemes »
Oil and Energy Prices »
Money Laundering and Foreign Corruption »
Federal Contractors' Tax Delinquencies »
Misconduct in the United Nations Oil-For-Food Program »
Enron »

Case 2:13-cv-00779-DOC-JCG   Document 101-5   Filed 01/20/14   Page 76 of 106   Page ID #:2305

# EXHIBIT P(13)

*United States Senate*
*PERMANENT SUBCOMMITTEE ON INVESTIGATIONS*
*Committee on Homeland Security and Governmental Affairs*

*Carl Levin, Chairman*
*Tom Coburn, Ranking Minority Member*

# WALL STREET AND
# THE FINANCIAL CRISIS:
## Anatomy of a Financial Collapse

### MAJORITY AND MINORITY
### STAFF  REPORT

### PERMANENT SUBCOMMITTEE
### ON INVESTIGATIONS

### UNITED STATES SENATE



**April 13, 2011**

The Subcommittee's investigation uncovered a host of factors responsible for the inaccurate credit ratings issued by Moody's and S&P. One significant cause was the inherent conflict of interest arising from the system used to pay for credit ratings. Credit rating agencies were paid by the Wall Street firms that sought their ratings and profited from the financial products being rated. Under this "issuer pays" model, the rating agencies were dependent upon those Wall Street firms to bring them business, and were vulnerable to threats that the firms would take their business elsewhere if they did not get the ratings they wanted. The rating agencies weakened their standards as each competed to provide the most favorable rating to win business and greater market share. The result was a race to the bottom.

Additional factors responsible for the inaccurate ratings include rating models that failed to include relevant mortgage performance data; unclear and subjective criteria used to produce ratings; a failure to apply updated rating models to existing rated transactions; and a failure to provide adequate staffing to perform rating and surveillance services, despite record revenues. Compounding these problems were federal regulations that required the purchase of investment grade securities by banks and others, which created pressure on the credit rating agencies to issue investment grade ratings. While these federal regulations were intended to help investors stay away from unsafe securities, they had the opposite effect when the AAA ratings proved inaccurate.

Evidence gathered by the Subcommittee shows that the credit rating agencies were aware of problems in the mortgage market, including an unsustainable rise in housing prices, the high risk nature of the loans being issued, lax lending standards, and rampant mortgage fraud. Instead of using this information to temper their ratings, the firms continued to issue a high volume of investment grade ratings for mortgage backed securities. If the credit rating agencies had issued ratings that accurately reflected the increasing risk in the RMBS and CDO markets and appropriately adjusted existing ratings in those markets, they might have discouraged investors from purchasing high risk RMBS and CDO securities, and slowed the pace of securitizations.

It was not in the short term economic interest of either Moody's or S&P, however, to provide accurate credit ratings for high risk RMBS and CDO securities, because doing so would have hurt their own revenues. Instead, the credit rating agencies' profits became increasingly reliant on the fees generated by issuing a large volume of structured finance ratings. In the end, Moody's and S&P provided AAA ratings to tens of thousands of high risk RMBS and CDO securities and then, when those products began to incur losses, issued mass downgrades that shocked the financial markets, hammered the value of the mortgage related securities, and helped trigger the financial crisis.

**(4)   Investment Bank Abuses:**
**Case Study of Goldman Sachs and Deutsche Bank**

The final chapter examines how investment banks contributed to the financial crisis, using as case studies Goldman Sachs and Deutsche Bank, two leading participants in the U.S. mortgage market.

247

## B. Background

### (1) Credit Ratings Generally

Credit ratings, which first gained prominence in the late 1800s, are supposed to provide independent assessments of the creditworthiness of particular financial instruments, such as a corporate bond, mortgage backed security, or CDO. Essentially, credit ratings predict the likelihood that a debt will be repaid.[957]

The United States has three major credit rating agencies: Moody's, S&P, and Fitch Rating Ltd., each of which is a NRSRO. By some accounts, these three firms issue about 98% of total credit ratings and collect 90% of total credit rating revenue.[958]

**Paying for Ratings.** Prior to the 1929 crash, credit rating agencies made money by charging subscription fees to investors who were considering investing in the financial instruments being rated. This method of payment was known as the "subscriber-pays" model. Following the 1929 crash, the credit rating agencies fell out of favor. As one academic expert has explained:

> "Investors were no longer very interested in purchasing ratings, particularly given the agencies' poor track record in anticipating the sharp drop in bond values beginning in late 1929. … The rating business remained stagnant for decades."[959]

In 1970, the credit rating agencies changed to an "issuer-pays" model and have used it since.[960] In this model, the party seeking to issue a financial instrument, such as a bond or security, pays the credit rating agency to analyze the credit risk and assign a credit rating to the financial instrument.

**Credit Ratings.** Credit ratings use a scale of letter grades, from AAA to C, with AAA ratings designating the safest investments and the other grades designating investments at greater risk of default.[961] Investments with AAA ratings have historically had low default rates. For example, S&P reported that its cumulative RMBS default rate by original rating class (through September 15, 2007) was 0.04% for AAA initial ratings and 1.09% for BBB.[962] Financial

---

[957] 9/3/2009 "Credit Rating Agencies and Their Regulation," report prepared by the Congressional Research Service, Report No. R40613 (revised report issued 4/9/2010).
[958] Id.
[959] "How and Why Credit Rating Agencies Are Not Like Other Gatekeepers," Frank Partnoy, University of San Diego Law School Legal Studies Research Paper Series (5/2006), at 63.
[960] 9/3/2009 "Credit Rating Agencies and Their Regulation," report prepared by the Congressional Research Service, Report No. R40613 (revised report issued 4/9/2010). A few small credit rating agencies use the "subscriber-pays" model. However, 99% of outstanding credit ratings are issued by agencies using the "issuer-pays" model. 1/2011 "Annual Report on Nationally Recognized Statistical Rating Organizations," report prepared by the SEC, at 6.
[961] The Moody's rating system is similar in concept but with a slightly different naming convention. For example its top rating scale is Aaa, Aa1, Aa2, Aa3, A1, A2, A3.
[962] Prepared statement of Vickie A. Tillman, Executive Vice President, Standard & Poor's Credit Market Services, "The Role of Credit Rating Agencies in the Structured Finance Market," before U.S. House of Representatives Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises, Cong.Hrg. 110-62

272

The FBI's fraud warnings were repeated by industry analysts. The Mortgage Bankers Association's Mortgage Asset Research Institute (MARI), for example, had been reporting increasing fraud in mortgages for years. In April 2007, MARI reported a 30% increase in 2006 in loans with suspected mortgage fraud. The report also noted that while 55% of overall fraud incidents reported to MARI involved loan application fraud, the percentage of subprime loans with loan application fraud was even higher at 65%.[1053]

**Press Reports.** Warnings in the national press concerning the threat posed by deteriorating mortgages and unsustainable housing prices were also prevalent. A University of Florida website has collected dozens of these articles, many of which were published in 2005. The headlines include: "Fed Debates Pricking the U.S. Housing 'Bubble'," New York Times, May 31, 2005; "Yale Professor Predicts Housing 'Bubble' Will Burst," NPR, June 3, 2005; "Cover Story: Bubble Bath of Doom" [warning of overheated real estate market], Washington Post, July 4, 2005; "Housing Affordability Hits 14-Year Low," The Wall Street Journal, December 22, 2005; "Foreclosure Rates Rise Across the U.S.," NPR, May 30, 2006; "For Sale Signs Multiply Across U.S.," The Wall Street Journal, July 20, 2006; and "Housing Gets Ugly," New York Times, August 25, 2006.[1054]

Had Moody's and S&P heeded their own warnings as well as the warnings in government reports and the national press, they might have issued more conservative, including fewer AAA, ratings for RMBS and CDO securities from 2005 to 2007; required additional credit enhancements earlier; and issued ratings downgrades earlier and with greater frequency, gradually letting the air out of the housing bubble instead of puncturing it with the mass downgrades that began in July 2007. The problem, however, was that neither company had a financial incentive to assign tougher credit ratings to the very securities that for a short while increased their revenues, boosted their stock prices, and expanded their executive compensation. Instead, ongoing conflicts of interest, inaccurate credit rating models, and inadequate rating and surveillance resources made it possible for Moody's and S&P to ignore their own warnings about the U.S. mortgage market. In the longer run, these decisions cost both companies dearly. Between January 2007 and January 2009, the stock price for both The McGraw-Hill Companies (S&P's parent company) and Moody's fell nearly 70%, and neither share price has fully recovered.

### (2) CRA Conflicts of Interest

In transitioning from the *fact* that the rating agencies issued inaccurate ratings to the question of *why* they did, one of the primary issues is the conflicts of interest inherent in the "issuer-pays" model. Under this system, the firm interested in profiting from an RMBS or CDO security is required to pay for the credit rating needed to sell the security. Moreover, it requires the credit rating agencies to obtain business from the very companies paying for their rating

---

[1053] 4/2007 "Ninth Periodic Mortgage Fraud Case Report to Mortgage Bankers Association," prepared by the Mortgage Asset Research Institute, LLC, at 10.
[1054] "Business Library – The Housing Bubble," University of Florida George A. Smathers Libraries, http://www.uflib.ufl.edu/cm/business/cases/housing_bubble.htm.

273

judgment. The result is a system that creates strong incentives for the rating agencies to inflate their ratings to attract business, and for the issuers and arrangers of the securities to engage in "ratings shopping" to obtain the highest ratings for their financial products.

The conflict of interest inherent in an issuer-pay setup is clear: rating agencies are incentivized to offer the highest ratings, as opposed to offering the most accurate ratings, in order to attract business. It is much like a person trying to sell a home and hiring a third-party appraiser to make sure it is worth the price. Only, with the credit rating agencies, it is the seller who hires the appraiser on behalf of the buyer – the result is a misalignment of interests. This system, currently permitted by the SEC, underlies the "issuers-pay" model.

The credit rating agencies assured Congress and the investing public that they could "manage" these conflicts, but the evidence indicates that the drive for market share and increasing revenues, ratings shopping, and investment bank pressures have undermined the ratings process and the quality of the ratings themselves. Multiple former Moody's and S&P employees told the Subcommittee that, in the years leading up to the financial crisis, gaining market share, increasing revenues, and pleasing investment bankers bringing business to the firm assumed a higher priority than issuing accurate RMBS and CDO credit ratings.

### (a)   Drive for Market Share

Prior to the explosive growth in revenues generated from the ratings of mortgage backed securities, the credit rating agencies had a reputation for exercising independent judgment and taking pride in requiring the information and performing the analysis needed to issue accurate credit ratings. A journalist captured the rating agency culture in a 1995 article when she wrote: "Ask a [company's] treasurer for his opinion of rating agencies, and he'll probably rank them somewhere between a trip to the dentist and an IRS audit. You can't control them, and you can't escape them."[1055]

But a number of analysts who worked for Moody's during the 1990s and into the new decade told the Subcommittee that a major cultural shift took place at the company around 2000. They told the Subcommittee that, prior to 2000, Moody's was academically oriented and conservative in its issuance of ratings. That changed, according to those interviewed, with the rise of Brian Clarkson who worked at Moody's from 1990 to 2008, and rose from Group Managing Director of the Global Asset Backed Finance Group to President and Chief Operating Officer of Moody's. These employees indicated that during Mr. Clarkson's tenure Moody's began to focus less on striving for accurate credit ratings, and more on increasing market share and "servicing the client," who was identified as the investment banks that brought business to the firm.

This testimonial evidence that increasing revenues gained importance is corroborated by documents obtained by the Subcommittee during the course of its investigation. For example, in a March 2000 email, the head of Moody's Structured Finance Group in Paris wrote that she was

---

[1055] "Rating the Rating Agencies," Treasury and Risk Management (7/1995).

314

"failed to detect Enron's problems – or take sufficiently seriously the problems they were
aware of – until it was too late because they did not exercise the proper diligence. …
[T]he agencies did not perform a thorough analysis of Enron's public filings; did not pay
appropriate attention to allegations of financial fraud; and repeatedly took company
officials at their word … despite indications that the company had misled the rating
agencies in the past." [1223]

The report also found the credit rating "analysts [did] not view themselves as accountable for
their actions," since the rating agencies were subject to little regulation or oversight, and their
liability for poor quality ratings was limited by regulatory exemptions and First Amendment
protections. [1224]   The report recommended "increased oversight for these rating agencies in order
to ensure that the public's trust in these firms is well-placed." [1225]

In 2002, the Sarbanes-Oxley Act required the SEC to conduct a study into the role of
credit rating agencies in the securities markets, including any barriers to accurately evaluating
the financial condition of the issuers of securities they rate. [1226]   In response, the SEC initiated an
in-depth study of the credit rating industry and released its findings in a 2003 report.  The SEC's
oversight efforts "included informal discussions with credit rating agencies and market
participants, formal examinations of credit rating agencies, and public hearings, where market
participants were given the opportunity to offer their views on credit rating agencies and their
role in the capital markets." [1227]   The report expressed a number of concerns about CRA
operations, including "potential conflicts of interest caused by the [issuer-pays model]." [1228]

The Credit Rating Agency Reform Act, which was signed into law in September 2006,
was designed to address some of the shortcomings identified by Congress and the SEC.  The Act
made it clear that the SEC had jurisdiction to conduct oversight of the credit rating industry, and
formally charged the agency with designating companies as NRSROs. [1229]   The statute also
required NRSROs to meet certain criteria before registering with the SEC.  In addition, the
statute instructed the SEC to promulgate regulations requiring NRSROs to establish policies and
procedures to prevent the misuse of nonpublic information and to disclose and manage conflicts
of interest. [1230]   Those regulations were designed to take effect in September 2007.

In the summer of 2007, after the mass downgrades of RMBS and CDO ratings had begun
and as the financial crisis began to intensify, the SEC initiated its first examinations of the major

---

[1223] 10/8/2002 "Financial Oversight of Enron:  The SEC and Private-Sector Watchdogs," prepared by the U.S.
Senate Committee on Governmental Affairs, at 6, 108.
[1224] Id. at 122.
[1225] Id. at 6.
[1226] Section 702 of the Sarbanes-Oxley Act of 2002.
[1227] 1/2003 "Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets,"
prepared by the SEC, at 4.
[1228] Id. at 19.
[1229] 9/3/2009 "Credit Rating Agencies and Their Regulation," report prepared by the Congressional Research
Service, Report No. R40613 (revised report issued 4/9/2010).
[1230] Id.

# EXHIBIT P(14)

# THE
# FINANCIAL
# CRISIS
# INQUIRY REPORT



**Final Report of the National Commission
on the Causes of the Financial and
Economic Crisis in the United States**

◦ **OFFICIAL GOVERNMENT EDITION** ◦

2004, to May 31, 2007. Synthetic CDOs created by Goldman referenced more than 3,400 mortgage securities, and 610 of them were referenced at least twice. This is apart from how many times these securities may have been referenced in synthetic CDOs created by other firms.

Finally, when the housing bubble popped and crisis followed, derivatives were in the center of the storm. AIG, which had not been required to put aside capital reserves as a cushion for the protection it was selling, was bailed out when it could not meet its obligations. The government ultimately committed more than $180 billion because of concerns that AIG's collapse would trigger cascading losses throughout the global financial system. In addition, the existence of millions of derivatives contracts of all types between systemically important financial institutions—unseen and unknown in this unregulated market—added to uncertainty and escalated panic, helping to precipitate government assistance to those institutions.

• **We conclude the failures of credit rating agencies were essential cogs in the wheel of financial destruction.** The three credit rating agencies were key enablers of the financial meltdown. The mortgage-related securities at the heart of the crisis could not have been marketed and sold without their seal of approval. Investors relied on them, often blindly. In some cases, they were obligated to use them, or regulatory capital standards were hinged on them. This crisis could not have happened without the rating agencies. Their ratings helped the market soar and their downgrades through 2007 and 2008 wreaked havoc across markets and firms.

In our report, you will read about the breakdowns at Moody's, examined by the Commission as a case study. From 2000 to 2007, Moody's rated nearly 45,000 mortgage-related securities as triple-A. This compares with six private-sector companies in the United States that carried this coveted rating in early 2010. In 2006 alone, Moody's put its triple-A stamp of approval on 30 mortgage-related securities every working day. The results were disastrous: 83% of the mortgage securities rated triple-A that year ultimately were downgraded.

You will also read about the forces at work behind the breakdowns at Moody's, including the flawed computer models, the pressure from financial firms that paid for the ratings, the relentless drive for market share, the lack of resources to do the job despite record profits, and the absence of meaningful public oversight. And you will see that without the active participation of the rating agencies, the market for mortgage-related securities could not have been what it became.

\* \* \*

THERE ARE MANY COMPETING VIEWS as to the causes of this crisis. In this regard, the Commission has endeavored to address key questions posed to us. Here we discuss three: capital availability and excess liquidity, the role of Fannie Mae and Freddie Mac (the GSEs), and government housing policy.

First, as to the matter of excess liquidity: in our report, we outline monetary policies and capital flows during the years leading up to the crisis. Low interest rates, widely available capital, and international investors seeking to put their money in real

CDOs created by Goldman Sachs.[110] Because of such deals, when the housing bubble burst, billions of dollars changed hands.

Although Goldman executives agreed that synthetic CDOs were "bets" that magnified overall risk, they also maintained that their creation had "social utility" because it added liquidity to the market and enabled investors to customize the exposures they wanted in their portfolios.[111] In testimony before the Commission, Goldman's President and Chief Operating Officer Gary Cohn argued: "This is no different than the tens of thousands of swaps written every day on the U.S. dollar versus another currency. Or, more importantly, on U.S. Treasuries . . . This is the way that the financial markets work."[112]

Others, however, criticized these deals. Patrick Parkinson, the current director of the Division of Banking Supervision and Regulation at the Federal Reserve Board, noted that synthetic CDOs "multiplied the effects of the collapse in subprime."[113] Other observers were even harsher in their assessment. "I don't think they have social value," Michael Greenberger, a professor at the University of Maryland School of Law and former director of the Division of Trading and Markets at the Commodity Futures Trading Commission, told the FCIC. He characterized the credit default swap market as a "casino." And he testified that "the concept of lawful betting of billions of dollars on the question of whether a homeowner would default on a mortgage that was not owned by either party, has had a profound effect on the American public and taxpayers."[114]

## MOODY'S: "ACHIEVED THROUGH SOME ALCHEMY"

The machine churning out CDOs would not have worked without the stamp of approval given to these deals by the three leading rating agencies: Moody's, S&P, and Fitch. Investors often relied on the rating agencies' views rather than conduct their own credit analysis. Moody's was paid according to the size of each deal, with caps set at a half-million dollars for a "standard" CDO in 2006 and 2007 and as much as $850,000 for a "complex" CDO.[115]

In rating both synthetic and cash CDOs, Moody's faced two key challenges: first, estimating the probability of default for the mortgage-backed securities purchased by the CDO (or its synthetic equivalent) and, second, gauging the correlation between those defaults—that is, the likelihood that the securities would default at the same time.[116] Imagine flipping a coin to see how many times it comes up heads. Each flip is unrelated to the others; that is, the flips are uncorrelated. Now, imagine a loaf of sliced bread. When there is one moldy slice, there are likely other moldy slices. The freshness of each slice is highly correlated with that of the other slices. As investors now understand, the mortgage-backed securities in CDOs were less like coins than like slices of bread.

To estimate the probability of default, Moody's relied almost exclusively on its own ratings of the mortgage-backed securities purchased by the CDOs.[117] At no time did the agencies "look through" the securities to the underlying subprime mortgages. "We took the rating that had already been assigned by the [mortgage-backed securi-

# EXHIBIT P(15)

Feedback | Americas [Select Region] | Register | Login

General site search...

**Benchmarks, Research, Data and Analytics**

# 'AAA/A-1+' Rating On United States of America Affirmed; Outlook Revised To Negative

Publication date: 18-Apr-2011 09:01:33 EST

View Analyst Contact Information

**Contact Client Services**
1-877-SPCLIENT
1-877-772-5436
*Call Tree Options*
Contact Us

- We have affirmed our 'AAA/A-1+' sovereign credit ratings on the United States of America.
- The economy of the U.S. is flexible and highly diversified, the country's effective monetary policies have supported output growth while containing inflationary pressures, and a consistent global preference for the U.S. dollar over all other currencies gives the country unique external liquidity.
- Because the U.S. has, relative to its 'AAA' peers, what we consider to be very large budget deficits and rising government indebtedness and the path to addressing these is not clear to us, we have revised our outlook on the long-term rating to negative from stable.
- We believe there is a material risk that U.S. policymakers might not reach an agreement on how to address medium- and long-term budgetary challenges by 2013; if an agreement is not reached and meaningful implementation is not begun by then, this would in our view render the U.S. fiscal profile meaningfully weaker than that of peer 'AAA' sovereigns.

NEW YORK (Standard & Poor's) April 18, 2011--Standard & Poor's Ratings Services said today that it affirmed its 'AAA' long-term and 'A-1+' short-term sovereign credit ratings on the U.S. Standard & Poor's also said that it revised its outlook on the long-term rating of the U.S. sovereign to negative from stable.

Our ratings on the U.S. rest on its high-income, highly diversified, and flexible economy. It is backed by a strong track record of prudent and credible monetary policy, evidenced to us by its ability to support growth while containing inflationary pressures. The ratings also reflect our view of the unique advantages stemming from the dollar's preeminent place among world currencies.

"Although we believe these strengths currently outweigh what we consider to be the U.S.'s meaningful economic and fiscal risks and large external debtor position, we now believe that they might not fully offset the credit risks over the next two years at the 'AAA' level," said Standard & Poor's credit analyst Nikola G. Swann.

"More than two years after the beginning of the recent crisis, U.S. policymakers have still not agreed on how to reverse recent fiscal deterioration or address longer-term fiscal pressures," Mr. Swann added.

In 2003-2008, the U.S.'s general (total) government deficit fluctuated between 2% and 5% of GDP. Already noticeably larger than that of most 'AAA' rated sovereigns, it ballooned to more than 11% in 2009 and has yet to recover.

On April 13, President Barack Obama laid out his Administration's medium-term fiscal consolidation plan, aimed at reducing the cumulative unified federal deficit by US$4 trillion in 12 years or less. A key component of the Administration's strategy is to work with Congressional leaders over the next two months to develop a commonly agreed upon program to reach this target. The President's proposals envision reducing the deficit via both spending cuts and revenue increases.

Key members in the U.S. House of Representatives have also advocated fiscal tightening of a similar magnitude, US$4.4 trillion, during the coming 10 years, but via different methods. House Budget Committee Chairman Paul Ryan's plan seeks to balance the federal budget by 2040, in part by cutting non-defense spending. The plan also includes significantly reducing the scope of Medicare and Medicaid, while bringing top individual and corporate tax rates lower than those under the 2001 and 2003 tax cuts.

We view President Obama's and Congressman Ryan's proposals as the starting point of a process aimed at broader engagement, which could result in

substantial and lasting U.S. government fiscal consolidation. That said, we see the path to agreement as challenging because the gap between the parties remains wide. We believe there is a significant risk that Congressional negotiations could result in no agreement on a medium-term fiscal strategy until after the fall 2012 Congressional and Presidential elections. If so, the first budget proposal that could include related measures would be Budget 2014 (for the fiscal year beginning Oct. 1, 2013), and we believe a delay beyond that time is possible.

Standard & Poor's takes no position on the mix of spending and revenue measures the Congress and the Administration might conclude are appropriate. But for any plan to be credible, we believe that it would need to secure support from a cross-section of leaders in both political parties.

If U.S. policymakers do agree on a fiscal consolidation strategy, we believe the experience of other countries highlights that implementation could take time. It could also generate significant political controversy, not just within Congress or between Congress and the Administration, but throughout the country. We therefore think that, assuming an agreement between Congress and the President, there is a reasonable chance that it would still take a number of years before the government reaches a fiscal position that stabilizes its debt burden. In addition, even if such measures are eventually put in place, the initiating policymakers or subsequently elected ones could decide to at least partially reverse fiscal consolidation.

In our baseline macroeconomic scenario of near 3% annual real growth, we expect the general government deficit to decline gradually but remain slightly higher than 6% of GDP in 2013. As a result, net general government debt would reach 84% of GDP by 2013. In our macroeconomic forecast's optimistic scenario (assuming near 4% annual real growth), the fiscal deficit would fall to 4.6% of GDP by 2013, but the U.S.'s net general government debt would still rise to almost 80% of GDP by 2013. In our pessimistic scenario (a mild, one-year double-dip recession in 2012), the deficit would be 9.1%, while net debt would surpass 90% by 2013. Even in our optimistic scenario, we believe the U.S.'s fiscal profile would be less robust than those of other 'AAA' rated sovereigns by 2013. (For all of the assumptions underpinning our three forecast scenarios, see "U.S. **Risks To The Forecast: Oil We Have to Fear Is?**," March 15, 2011, RatingsDirect.

"Our negative outlook on our rating on the U.S. sovereign signals that we believe there is at least a one-in-three likelihood that we could lower our long-term rating on the U.S. within two years," Mr. Swann said. "The outlook reflects our view of the increased risk that the political negotiations over when and how to address both the medium- and long-term fiscal challenges will persist until at least after national elections in 2012."

Some compromise that achieves agreement on a comprehensive budgetary consolidation program--containing deficit-reduction measures in amounts near those recently proposed, and combined with meaningful steps toward implementation by 2013--is our baseline assumption and could lead us to revise the outlook back to stable. Alternatively, the lack of such an agreement or a significant further fiscal deterioration for any reason could lead us to lower the rating.

Standard & Poor's will hold a global teleconference call and Web cast today--April 18, 2011--at 11:30 a.m. New York time (4:30 p.m. London time). For dial-in and streaming audio details, please go to www.standardandpoors.com/cmlive.
RELATED CRITERIA AND RESEARCH

- **Sovereign Credit Ratings: A Primer, May 29, 2008.**

This unsolicited rating(s) was initiated by Standard & Poor's. It may be based solely on publicly available information and may or may not involve the participation of the issuer. Standard & Poor's has used information from sources believed to be reliable based on standards established in our Credit Ratings Information and Data Policy but does not guarantee the accuracy, adequacy, or completeness of any information used.

Complete ratings information is available to subscribers of RatingsDirect on the Global Credit Portal at www.globalcreditportal.com. All ratings affected by this rating action can be found on Standard & Poor's public Web site at www.standardandpoors.com. Use the Ratings search box located in the left column.

**Primary Credit Analyst:**

Nikola G Swann, CFA, FRM, Toronto (1) 416-507-2582;
nikola_swann@standardandpoors.com

**Secondary Contacts:** John Chambers, CFA, New York (1) 212-438-7344;
john_chambers@standardandpoors.com

David T Beers, London (44) 20-7176-7101;
david_beers@standardandpoors.com

Marko Mrsnik, Madrid +34 913 896 953;
marko_mrsnik@standardandpoors.com

Takahira Ogawa, Singapore (65) 6239-6342;
takahira_ogawa@standardandpoors.com

No content (including ratings, credit-related analyses and data, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P. The Content shall not be used for any unlawful or unauthorized purposes. S&P, its affiliates, and any third-party providers, as well as their directors, officers, shareholders, employees or agents (collectively S&P Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content, or for the security or maintenance of any data input by the user. The Content is provided on an "as is" basis. S&P PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs) in connection with any use of the Content even if advised of the possibility of such damages.

Credit-related analyses, including ratings, and statements in the Content are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions. S&P assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P's opinions and analyses do not address the suitability of any security. S&P does not act as a fiduciary or an investment advisor. While S&P has obtained information from sources it believes to be reliable, S&P does not perform an audit and undertakes no duty of due diligence or independent verification of any information it receives.

S&P keeps certain activities of its business units separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain business units of S&P may have information that is not available to other S&P business units. S&P has established policies and procedures to maintain the confidentiality of certain non-public information received in connection with each analytical process.

S&P may receive compensation for its ratings and certain credit-related analyses, normally from issuers or underwriters of securities or from obligors. S&P reserves the right to disseminate its opinions and analyses. S&P's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.

Any Passwords/user IDs issued by S&P to users are single user-dedicated and may ONLY be used by the individual to whom they have been assigned. No sharing of passwords/user IDs and no simultaneous access via the same password/user ID is permitted. To reprint, translate, or use the data or information other than as provided herein, contact Client Services, 55 Water Street, New York, NY 10041; (1) 212-438-7280 or by e-mail to: research_request@standardandpoors.com.

Regulatory Affairs and Disclaimers | Terms of Use | Privacy and Cookie Notice | Contact Us
Copyright © 2014 Standard & Poor's Financial Services LLC, a part of McGraw Hill Financial. All rights reserved.

# EXHIBIT P(16)

Case 2:13-cv-00779-DOC-JCG   Document 101-5   Filed 01/20/14   Page 95 of 106   Page ID #:2324

**Should you be sitting in cash right now?**

If you have a $500,000 portfolio, download the latest report by *Forbes* columnist Ken Fisher's firm. It tells you where we think the market is headed and why. This must-read report includes research and analysis you won't find anyplace else. Don't miss it!       Click Here to Download Your Report!

FISHER INVESTMENTS®

## THE WALL STREET JOURNAL.
WSJ.com

April 18, 2011, 11:08 AM ET

# U.S. Treasury Criticizes S&P Move

ByPatrick O'Connor

Wall Street has been underlined warning Washington for months now that skittish bond markets may not wait until mid-summer for the White House and congressional Republicans to broker a bipartisan deficit-reduction deal.

The Standard & Poor's Ratings Service underscored those warnings Monday by cutting its outlook for U.S. debt to negative, a predecessor to actually downgrading the country's AAA credit rating.

Republicans have been silent so far about the S&P decision, which for now affirmed the AAA rating, and the Treasury Department issued a statement critical of the decision.

"We believe S&P's negative outlook underestimates the ability of America's leaders to come together to address the difficult fiscal challenges facing the nation," said **Mary Miller**, assistant secretary for financial markets at the Treasury Department. And White House Council of Economic Advisers Chairman **Austan Goolsbee said**, "I don't think that the S&P's political judgment is right."

The ratings firm blamed policymakers for failing to agree "on how to reverse recent fiscal deterioration or address longer-term fiscal pressures" and put the chances of a downgrade at one-in-three.

President **Barack Obama** just initiated talks last week with Congress over a deficit-reduction package that could be paired with an increase in the country's borrowing limit, but lawmakers don't expect those negotiations to yield legislation until June or July. Bond investors, meanwhile, would like to see action by mid-May.

Those competing expectations will complicate the negotiations, if markets swoon as lawmakers bicker. The Treasury sought to reassure investors Monday that both parties have agreed to deal with the problem.

"As the President said last week, addressing the current fiscal situation is well within our capacity as a country," Ms. Miller said in her statement. "He has initiated a bipartisan process that will allow us to make progress on a balanced approach to restoring fiscal responsibility.  The U.S. economy is strengthening as it emerges from the recent recession. Both political parties now agree that it is time to begin bringing down deficits as a share of GDP."

Left unsaid: Republicans and Democrats have very different visions for what must be done to address the swelling U.S. debt.

Copyright 2013 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com

# EXHIBIT P(17)

UPDATE 3-Geithner says 'no risk' U.S. will lose AAA rating

**NewsRoom**

4/19/11 Reuters News 13:48:53

Reuters News
Copyright © 2011 Reuters

April 19, 2011

UPDATE 3-Geithner says 'no risk' U.S. will lose AAA rating

David Lawder

* Geithner says U.S. will keep top-tier rating

* Prospects for deficit reduction improving -Geithner

* Deal to "lock in" $4 trillion in cuts achievable

(Updates with bond market reaction, other details)

WASHINGTON, April 19 (Reuters) - U.S. Treasury Secretary Timothy Geithner, going on the offensive one day after Standard & Poor's threatened to lower its top-tier rating on U.S. government debt, said on Tuesday there was "no risk" of a downgrade.

Prospects for a deficit-reduction deal were improving, Geithner said on Tuesday as he appeared in a morning blitz of television shows.He said in one appearance that he did not have to reassure foreign buyers of U.S. debt in the wake of S&P's warning.

Geithner said Democrats and Republicans now agree on the need to put in place "enforceable" targets to slash deficits by some $4 trillion over the next decade or so.

"If you listen carefully now, you see the leadership of the United States of America ... recognizing now this is the right thing to do for the economy," he told Fox Business Network.

Standard & Poor's on Monday threatened to downgrade its AAA rating on U.S. Treasury debt unless the Obama administration and Congress find a way to slash the staggering federal budget deficit within two years.

A downgrade would erode the status of the United States as the world's most powerful economy and diminish the dollar's role as the dominant global currency.It also would likely raise borrowing costs, potentially hurting economic recovery as investors demand higher returns for holding U.S. debt.

Geithner disputed S&P's finding that the U.S. credit outlook was negative, and said it was difficult for people outside Washington to cut through partisan political rhetoric.

"Actually, I think things are better than they've been if you want to think about the prospects for improving our long-term fiscal position," he said on CNBC.

UPDATE 3-Geithner says 'no risk' U.S. will lose AAA rating

"If you're looking very carefully at what's happening in Washington, you see people on both sides -- Democrats and Republicans -- agreeing with the president that we have to put in place some reforms now to bring down our long-term deficits," he added.

Prices for U.S. government debt were little changed after Geithner's remarks, but later rose modestly as worries about euro-zone debt bolstered a safety bid for Treasuries. The benchmark 10-year note <US10YT=RR> rose 4/32 in price, while its yield of 3.36 percent, fell slightly for a second straight day.

LOCKING IN TARGETS

Geithner told Bloomberg Television there was no need to reassure foreign buyers of U.S. debt in the wake of S&P's revised outlook, noting investors still had confidence in U.S. debt and the growth prospects of the U.S. economy.

"You can see that in the price at which we borrow every day, but we have to earn that confidence," he said.

President Barack Obama and Republican lawmakers have laid out competing visions for how to tackle the deficit, which is projected to hit $1.4 trillion this fiscal year.

Obama wants wealthy Americans to shoulder a greater share of the tax burden and has also proposed cuts in spending on domestic programs and the military. Republicans are pushing for deeper spending cuts and want to make permanent Bush-era tax cuts for families earning more than $250,000 a year.

Geithner said he believed it was possible for the Obama administration to secure a deal with Congress to "lock in" targets and mechanisms to cut deficits by $4 trillion over the next 10 to 12 years.

Entitlement programs such as Social Security and Medicare would have to be part of the discussions, he said.

Long-term deficit reduction also will require some "modest" tax hikes for wealthier Americans, Geithner said.

Obama, speaking at a student forum in Virginia, said he also believed that Republicans and Democrats can reach a deal to cut the deficits, but it won't be easy.

"There will be some fierce disagreements," Obama said. [ID:nN19299101]

(Reporting by David Lawder; Editing by Jan Paschal)

((david.lawder@thomsonreuters.com; Tel: +1-202-898-8395; Reuters Messaging: david.lawder.reuters.com@reuters.net))

((Multimedia versions of Reuters Top News are now available for: * 3000 Xtra: visit http://topnews.session.rservices.com

* BridgeStation: view story .134 For more information on Top News: http://topnews.reuters.com))

---- Index References ----

News Subject: (Economics & Trade (1EC26); Legislation (1LE97); National Government Debt (1NA73); Economic Policy & Policymakers (1EC69); Credit Ratings (1CR83); Government (1GO80); Taxation (1TA10); Public Finance (1PU60); U.S. Legislation (1US12); Top World News (1WO62); Municipal Bonds (1MU39))

Industry: (Fixed Income Investments (1FI12); Accounting, Consulting & Legal Services (1AC73))

**UPDATE 3-Geithner says 'no risk' U.S. will lose AAA rating**

Region: (USA (1US73))

Language: EN

Other Indexing: (Timothy Geithner; Barack Obama)

Keywords: USA RATINGS; GEITHNER

Word Count: 706

---

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

**NewsRoom**

# EXHIBIT P(18)



4 of 100 DOCUMENTS

Copyright 2011 The Washington Post
All Rights Reserved

# The Washington Post

## washingtonpost.com

The Washington Post

April 20, 2011 Wednesday
Suburban Edition

**SECTION:** A-SECTION; Pg. A05

**DISTRIBUTION:** Every Zone

**LENGTH:** 279 words

**HEADLINE:** Treasurywas unableto sway S&P

**BYLINE:** Zachary A. Goldfarb

**BODY:**

The Obama administration privately urged Standard & Poor's in recent weeks not to lower its outlook on the United States - a suggestion the credit-rating agency ignored Monday, two people familiar with the matter said.

Treasury Department officials had been discussing with S&P whether the rating agency should change its outlook on the United States to "negative" from "stable," an indication that the country could lose its crucial AAA rating in coming years over its soaring debt levels.

Treasury officials told S&P analysts that they were underestimating the ability of politicians in Washington to fashion a compromise to curb deficits, a Treasury official said. They argued that a change in ratings was not needed at this time because the debt was manageable and the administration had a viable plan in the works, the official said.

But S&P analysts told Treasury officials Friday that they were unmoved - and released a report that expressed skepticism that the political parties could come together on how to bring spending in line with revenue.

Any doubts by credit-rating agencies about government debt have the potential to increase borrowing costs for the

Treasurywas unableto sway S&P The Washington Post April 20, 2011 Wednesday

Treasury.

It is not uncommon for companies and governments to push back when they don't agree with a decision made by a credit- rating agency. Sometimes, companies that issue debt - which also pay for the ratings - will shop around for the best rating.

But the U.S. government is an unusual case - it doesn't solicit ratings. S&P and the other major credit-rating agencies offer their judgments notwithstanding.

Spokesmen for the Treasury Department and S&P declined to comment on the record.

goldfarbz@washpost.com

**LOAD-DATE:** April 20, 2011

# EXHIBIT P(19)

## STATE OF MISSISSIPPI



### JIM HOOD
### ATTORNEY GENERAL

**Attorney General Hood Applauds Multistate Coalition Challenging Standard & Poor's Ratings**
*Structured Finance Securities Backed by Subprime Mortgages Contributed to the Financial Crisis*
February 5, 2013

Contact:  Jan Schaefer
Public Information Officer
jscha@ago.state.ms.us
601-359-2002

Jackson, MS--Attorney General Jim Hood Tuesday welcomed additional federal and state enforcement actions against Standard and Poor's seeking accountability for alleged misconduct by the credit rating agency involving structured finance securities backed by subprime mortgages that were at the heart of the nation's financial crisis.

Attorney General Hood has had a consumer protection lawsuit pending against Standard & Poor's, as well as Moody's, since May 2011.

Like Mississippi's lawsuits, the new federal and state complaints allege that despite S&P's repeated statements emphasizing its independence and objectivity, S&P allowed its analysis to be influenced by its desire to earn lucrative fees from its investment bank clients – who paid three times more for ratings of mortgage-backed securities than for ratings of traditional bonds and knowingly assigned inflated credit ratings to toxic assets packaged and sold by the Wall Street investment banks.

This alleged misconduct began as early as 2001, became particularly acute between 2004 and 2007, and there is new evidence that it continued as recently as 2011.  Structured finance securities backed by subprime mortgages were at the center of the financial crisis. These financial products, including residential mortgage-backed securities (RMBS) and collateral debt obligations (CDOs), derive their value from the monthly payments consumers make on their mortgages.

"I am pleased that the U.S. Department of Justice and attorneys general from across the nation are joining us in our efforts to hold the credit rating agencies accountable by initiating lawsuits like the one we filed almost two years ago," Attorney General Jim Hood said.

"The credit rating agencies, including Standard & Poor's and Moody's, are just as culpable as the investment banks in causing the financial crisis. In some ways, the conduct by the credit rating agencies was worse because these agencies held themselves out to be objective and independent," continued Attorney General Hood.  "As Mississippi has alleged in its lawsuit – and as is echoed now by the U.S. Department of Justice and multiple sister states in similar complaints – these representations were false."

Like Mississippi's pending case, the enforcement actions filed today seek court orders to stop S&P from making misrepresentations to the public; changes in the way the company does business; and civil penalties and disgorgement of ill-gotten profits, which may total hundreds of millions of dollars.

Connecticut was the first state to sue S&P and Moody's on these allegations in March 2010.  Mississippi filed a similar lawsuit against both ratings agencies in May 2011, and included additional allegations about the competence of the rating agencies. Illinois later filed suit against S&P in 2012.

(more)

States filing actions today include: Arizona, Arkansas, California, Delaware, the District of Columbia, Idaho, Iowa, North Carolina, Maine, Missouri, Pennsylvania, Tennessee, and Washington.

The congressionally appointed bipartisan Financial Crisis Inquiry Commission concluded in its final report that the financial crisis "could not have happened" without ratings agencies such as S&P.

During the housing boom, the demand for ratings of mortgage-backed securities increased exponentially.

Mississippi's lawsuit alleges that, during the housing boom, S&P and Moody's each earned fees in excess of $1 billion annually for rating these securities.

"The rating agencies should be disgorged of the hundreds of millions in profits they made from banks.  As described in our complaint, these banks were submitting the faulty mortgage backed securities in exchange for the agencies' seal of approval," continued Attorney General Hood.  "The rating agencies' actions almost bankrupted our country. Although these are civil cases, somebody should have gone to jail over this."

###