# EXHIBIT P(20)

**IN THE CHANCERY COURT OF THE FIRST JUDICIAL DISTRICT**
**OF HINDS COUNTY, MISSISSIPPI**

FILED

MAY 10 2011

EDDIE JEAN CARR, CHANCERY CLERK

BY_____D.C.

STATE OF MISSISSIPPI, *ex rel.*
JIM HOOD, ATTORNEY GENERAL

       **Plaintiff**

      **vs.**

Civil Action No.:

G 2011·835⁹⁄₂

THE McGRAW-HILL COMPANIES, INC.,
STANDARD & POOR'S FINANCIAL SERVICES, LLC,
MOODY'S CORPORATION AND
MOODY'S INVESTORS SERVICE, INC.

      **Defendants**

## COMPLAINT

    **COMES NOW,** the Honorable Jim Hood, Attorney General for the State of Mississippi,

on behalf of the State of Mississippi, by and through the undersigned counsel, and files this

Complaint against Defendants The McGraw-Hill Companies, Inc.; Standard & Poor's Financial

Services, LLC; Moody's Corporation; and Moody's Investors Service, Inc.; and in support

thereof, would show unto the Court as follows:

## I.    INTRODUCTION

    1.    This lawsuit seeks redress from The McGraw-Hill Companies, Inc.; Standard &

Poor's Financial Services, LLC and its business unit Standard & Poor's Ratings Services

(hereinafter referenced collectively as "S&P"); and Moody's Corporation and Moody's Investors

Service, Inc. (hereinafter referenced collectively as "Moody's"); for their unfair and deceptive

- 1 -

business practices of intentionally and systematically misrepresenting as independent, objective and competent, their ratings services for structured finance securities, in violation of Miss. Code Ann. § 75-24-5. These assurances were deceptive and false, and they enriched Defendants by billions of dollars while harming Mississippi consumers, including the banks, insurance companies, government regulators, mutual funds, and pension funds that relied on these assurances when deciding to purchase certain securities. Government regulators also were harmed because they relied on these assurances when using information provided by Defendants to determine the capital reserves necessary for banks and insurance companies and to assess the relative health of the entities conducting business and issuing policies within the State of Mississippi.

2.      Plaintiff, the Attorney General for the State of Mississippi, in the name of the State of Mississippi, seeks penalties pursuant to Miss. Code Ann. § 75-24-19, injunctive relief pursuant to Miss. Code Ann. § 75-24-9, and other equitable relief pursuant to Miss. Code. Ann. § 75-24-11 for Defendants' practices of (1) knowingly and willfully misrepresenting their business model and services as objective and independent, and (2) knowingly and willfully misrepresenting their competence to rate certain structured finance securities.

3.      Defendants, Moody's and S&P, are the two largest rating agencies. Each assigns ratings for approximately 90% (ninety percent) of all structured finance securities (structured finance securities generally receive ratings from two credit rating agencies).

4.      Credit ratings agencies ("CRAs") achieved critical importance in the 1970s

-2-

when the U.S. Securities and Exchange Commission ("SEC") designated the three biggest agencies – S&P, Moody's and Fitch – as "Nationally Recognized Statistical Rating Organizations" ("NRSROs").   Since that time, other CRAs have obtained the NRSRO designation – but S&P, Moody's and Fitch remain the largest.   The NRSRO designation has the effect of making these CRAs "gatekeepers" in the financial markets, because banks issuing the securities must obtain a rating from at least one (and usually two) NRSROs before they can sell the security.   As such, the integrity of these CRAs – including their ability to be objective and independent, and to be competent to render the services they advertise – is essential to the rating agency business model and to the stability of the financial industry overall.

5.     Defendants disseminated these assurances in every manner possible – including in their annual reports, on their websites, in their Codes of Conduct, in press releases accompanying the issuance of a new security or rating, in newspaper articles, and even in sworn testimony before the United States Congress and other governmental entities.   Without these guarantees of independence, objectivity and competence, the ratings services that Moody's and S&P provided would have had little or no value.

6.     These representations took on particular importance during the housing boom of the early to mid-2000s, when Defendants increasingly focused on rating certain types of securities known as "structured finance securities."   Structured finance securities include asset-backed securities (*i.e.*, securities based on pools of assets such as credit card or student loan debt), commercial mortgage-backed securities, and structured investment vehicles. The manner

- 3 -

in which the CRAs structured their business models for rating residential mortgage-backed securities ("RMBS") and collateralized debt obligations ("CDOs") provides a key illustration of the serious and deceptive disconnect between Defendants' assurances about the integrity of their services and the reality of their business model.

7.     During the housing boom, the demand for ratings of RMBS and CDOs increased exponentially. Investment banks compensate CRAs to rate RMBS and CDOs at a rate that is up to three times (3X) higher than the banks pay CRAs to rate traditional bonds. Moody's and S&P's profits increased significantly as more of these profitable RMBS and CDOs became available to rate. By 2006, structured finance securities (including RMBS and CDOs) comprised more than fifty percent (50%) of Moody's total $1.6 billion revenue and approximately forty percent (40%) of S&P's total $2.7 billion revenue. From 2002 to 2008, investment banks issued between $1 and $2 trillion *each year* in new RMBS, and from 2003 to 2007, more than $700 billion in CDOs. Upon information and belief, fees for RMBS alone equaled approximately $1 billion in revenue *per year* for the Defendants. This flood of available revenue ultimately tainted the integrity of Defendants' business models because the CRAs allowed themselves to rate increasingly complex and speculative deals on an accelerated timeline dictated by the issuing banks and the vast revenue these banks provided. By at least 2006, Defendants knew that the models they had been using were deficient and they began revising their models, but they waited at least a year to inform the public of this information – all the while continuing to rate thousands of speculative securities using outdated and unreliable models. The result was that the CRAs

- 4 -

compromised their hallmark advertisements of independence, objectivity and competence by acting in a manner that valued profits over honesty, accuracy, and integrity. Defendants knew that putting their stamp of approval on these structured finance securities – in the form of "investment grade" ratings – would result in public reliance on these ratings, because the public trusted Defendants' assurances that the CRAs operated in a manner that guaranteed independence, objectivity and competence.

8.      The Financial Crisis Inquiry Commission ("FCIC") concluded that the "credit rating agencies were key enablers of the financial meltdown. The mortgage-related securities at the heart of the crisis could not have been marketed and sold without their seal of approval. . . . This crisis could not have happened without the rating agencies. Their ratings helped the market soar and their downgrades through 2007 and 2008 wreaked havoc across markets and firms."

9.      United States Senator Carl Levin described the problem in his April 22, 2010 press release accompanying the Permanent Subcommittee on Investigation's formal findings of fact with regard to the ratings agencies. "From 2002 to 2007, the credit rating agencies earned record profits, reporting $6 billion in gross revenues in 2007. They also allowed the drive for profits and market share to affect ratings. Knowing that Wall Street firms might take their business elsewhere if they didn't get [the ratings they wanted], the agencies were vulnerable to pressure from issuers and investment bankers. . . . After it became clear that their [analytic] models failed to accurately predict the performance of securities tied to risky mortgages, the agencies began revising those models. But they took until July 2006 [to do so], and in a decision

- 5 -

with severe consequences for the market and the economy, refused to apply the revised model to existing securities. . . . [T]he agencies waited until July of 2007[] to begin a series of mass downgrades.  The sudden shock of those downgrades contributed to the collapse of the secondary markets for subprime residential mortgage backed securities (RMBS) and collateralized debt obligations (CDOs) . . . and helped precipitate the financial crisis."

10.     As United States Representative Henry Waxman stated during a House Committee on Oversight and Government Reform hearing, "[t]he story of the credit rating agencies is a story of a colossal failure.  The credit rating agencies occupy a special place in our financial markets.  Millions of investors rely on them for independent objective assessments. The rating agencies broke this bond of trust. . . ."

11.     The Mississippi Consumer Protection Act ("MCPA" or "Consumer Protection Act") prohibits, among other things, "[m]isrepresentation of affiliation, connection, or association with, or certification by another;" "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have . . .;" "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" and "[m]isrepresentation of the . . . certification of goods or services." Miss. Code Ann. §§ 75-24-5(2) (b) (c), (e), (g).

12.     Defendants advertised to Mississippi consumers, investors, insurance regulators and pension funds (among others) that their services were predicated on a business model that was objective, independent and competent.  Moody's and S&P made these representations on

- 6 -

their websites, in press releases accompanying ratings and, upon information and belief, through documents mailed to shareholders and investors and via other media.

13.     Mississippi consumers purchased securities rated by Defendants because Defendants advertised themselves as objective, independent and competent.  These assurances misrepresented the true nature of Defendants' services because the CRAs allowed their compensation structure, desire for profits and fear of losing investment bank clients to taint the integrity of their businesses.  This deception affected Mississippi banks, insurance companies, pension funds and mutual funds that purchased the securities, and all of the consumers in Mississippi whose retirement monies were invested in pension or mutual funds that included these securities.  Mississippi government entities, including insurance regulators, also relied on Defendants' assurances of independence, objectivity and competence when utilizing information provided by Defendants to determine the quality of reserves held by insurance companies and the solvency of businesses in the State of Mississippi.

14.     The ratings assigned to structured finance securities, and the performance of those investments, have significant, real-world implications for government regulators in the State of Mississippi, for the overall economy of the State of Mississippi, for Mississippi consumers whose  retirement funds are invested in these securities, and for Mississippi institutional investors – such as pension funds and 401k managers – that make decisions about whether and which of these securities are appropriate investments.  Structured finance securities often are included in mutual fund and pension fund portfolios that play significant roles in the

- 7 -

retirement and investment strategies of Mississippi consumers. Lenders, businesses and government regulators rely on CRAs' to conduct their operations objectively, independently and competently. Banks and broker-dealers calculate their net capital requirements based on the ratings assigned to the securities they own. Insurance regulators use the ratings to calculate the strength of the reserves held by insurance companies.

15.     Pursuant to Miss. Code Ann. § 75-24-19, the Attorney General seeks civil penalties in an amount not to exceed Ten Thousand Dollars ($10,000.00) for each violation of § 75-24-5, injunctive relief pursuant to Miss. Code Ann. § 75-24-9; and equitable relief, including disgorgement of profits pursuant to Miss. Code Ann. § 75-24-11 and § 75-24-19, Mississippi common law, and any other claim this Honorable Court may enforce. The Attorney General also seeks an injunction against S&P and Moody's to prohibit their future use of these unfair or deceptive business practices.

16.     The Attorney General disclaims any federal remedies and does not assert herein any claim for relief or seek any remedy arising out of a federal statute, federal regulation or provision of federal common law.

## II.     JURISDICTION AND VENUE

17.     Jurisdiction and venue are proper pursuant to Miss. Code Ann. §§ 11-11-3 and 75-24-9.

III.   **PARTIES**

18.   Plaintiff State of Mississippi, through Jim Hood in his sovereign enforcement capacity as the Attorney General, brings this action pursuant to Miss. Code Ann. § 75-24-9, for violations of Miss. Code Ann. § 75-24-5, and seeks civil penalties pursuant to Miss. Code Ann. § 75-24-19 and injunctive relief pursuant to Miss. Code Ann. § 75-24-9, and equitable relief pursuant to Miss. Code Ann. § 75-24-11. Additionally, Plaintiff asks that Defendants disgorge illegally obtained profits and/or fees.

19.   Defendant The McGraw-Hill Companies, Inc. ("McGraw-Hill") is a New York corporation with its principal place of business at 1221 Avenue of the Americas, New York, NY 10020. McGraw-Hill is registered with the Mississippi Secretary of State to conduct business in the State of Mississippi, and may be served with process through its registered agent domiciled in Hinds County, Mississippi, the same being Prentice-Hall Corporation System, 506 South President Street, Jackson Mississippi 39201.

20.   Defendant Standard & Poor's Financial Services LLC is a Delaware limited liability company and wholly owned subsidiary of Defendant McGraw-Hill with its principal place of business at 55 Water Street, New York, NY 10041. Within Standard & Poor's Financial Services LLC is the business unit Standard & Poor's Rating Services, which operates a credit rating agency that assigns credit ratings on a broad range of securities, including structured finance securities, which are issued and published in domestic and international financial markets.

- 9 -

21.     S&P regularly conducts business in the State of Mississippi and derives substantial revenue from its business within the State of Mississippi.

22.     Defendant Moody's Corporation is a Delaware corporation with its principal place of business located at 7 World Trade Center, 250 Greenwich Street, New York, NY 10007.

23.     Moody's Corporation is divided into two divisions: Moody's Investors Service, Inc. and Moody's Analytics (collectively, "Moody's").   Defendant Moody's Investors Service, Inc. is a Delaware corporation with its principal place of business located at 7 World Trade Center, 250 Greenwich Street, New York, NY 10007.  Moody's Investors Service, Inc. is a division and subsidiary of Moody's Corporation and operates as a credit rating agency that assigns credit ratings on a broad range of securities, including structured finance securities, issued in domestic and international financial markets.  Moody's regularly conducts business in the State of Mississippi and derives substantial revenue from its business within the State of Mississippi.

## IV.   DEFENDANTS PROMISED TO BE INDEPENDENT, OBJECTIVE AND COMPETENT

24.     Defendants S&P and Moody's are the two largest CRAs, a status they could not have achieved without persistent efforts to convince the public of their objectivity, independence and competence.   Without a reputation for objectivity, independence and competence, Defendants would be out of business because the services they provide would be useless.

25.     S&P and Moody's have gone to great lengths to advertise their independence

- 10 -

and objectivity as hallmark traits of their businesses. For example:

        a)     S&P and Moody's annual reports also tout these qualities. These annual reports are a medium for advertising the strength and success of the companies to their shareholders, investors and potential clients. Upon information and belief, Defendants send these annual reports to investors and shareholders directly.

        i)     Moody's 2005 annual report represents that "Moody's is committed to reinforcing among all relevant stakeholders – debt issuers, the investment community, employees, governmental authorities and shareholders – a sense of trust in the accuracy, independence and reliability of Moody's products and services, and our stewardship of the business." Moody's used similar language to advertise its independence in every annual report between 2002 and 2010. Language regarding its objectivity also appears in every annual report between 2000 and 2003, and from 2006 through 2010. Moody's 2007 Annual Report vows to "set[] industry standards regarding the management of potential conflicts" through the Moody's Code, which has "rigorous" conflict procedures "with the primary goal of ensuring that [Moody's] analytical activities remain appropriately distanced from the commercial management of our business." In the same 2007 Annual Report, Moody's CEO Raymond McDaniel acknowledged the conflicts of interest inherent in the company's compensation structure, but emphasized that "[a]t Moody's, we have taken a leadership position in setting industry standards regarding the management of potential conflicts. Our Code of Professional Conduct sets forth rigorous procedures that govern the roles and responsibilities of our rating agency employees,

with the primary goal of ensuring that our analytical activities remain appropriately distanced from the commercial management of our business." Moody's makes similar representations about its ability to manage conflicts of interest in each annual report between 2002 and 2009.

      ii)    In 2004, McGraw-Hill's Annual Report (which contains a section devoted to S&P, hereinafter referred to the "S&P annual report") stated that the company "provides investors with the independent benchmarks they need to feel more confident about their investment and financial decisions." Similarly, McGraw-Hill's 2006 annual report represents that "[m]any investors know [S&P] for its respected role as an independent provider of credit ratings. . . . As financial markets grow more complex, the independent analysis . . . offered by [S&P] [is] an integral part of the global financial infrastructure." The 2007 report boasted that, "[s]ince 1916, markets across the globe have relied on the independent analysis and integrity of Standard & Poor's credit ratings." Similar language advertising S&P's independence has appeared in every S&P annual report since at least 2003.

      b)    Both Moody's and S&P codified their vows of independence, objectivity and integrity in their public Codes of Conduct. The Codes of Conduct for both Defendants promise independence and objectivity, stating that the CRA is "not . . . affected by the existence of, or potential for, a business relationship between [the CRA] . . . and the Issuer. . . ."

      i)    The Moody's Code, first adopted in June 2005 (and, upon information and belief, since its inception), emphasizes the "objectivity and transparency" of the its rating process and highlighted the principals of independence that the International

- 12 -

Organization of Securities Commissions Code of Conduct Fundamentals for Credit Rating Agencies ("IOSCO Code") established.  Moody's Code is consistent with the goals of the IOSCO, whose central purpose was to "promote investor protection by safeguarding the integrity of the rating process" because credit ratings "exist primarily to help investors assess the credit risks they face when making certain kinds of investments."  Moody's Code also promises that "[t]he determination of a Credit Rating will be influenced only by factors relevant to the credit assessment."  In keeping with this, the Moody's Code promises to implement policies that "eliminate, or manage and disclose, as appropriate, actual or potential conflicts of interest that may influence the opinions and analyses" it offers.  Moody's Code also states that its services are designed to "help[] investors and others sift through [the vast amount of information available to investors] and analyze the credit risks they face when lending to a particular borrower, or when purchasing an issuer's debt or debt-like securities."  Upon information and belief, the Code has contained this language since S&P adopted it.

ii)       S&P's Code of Conduct, which is also consistent with the goals and principals of the IOSCO Code (and, upon information and belief, has included similar language since its inception in 2005), likewise advertises S&P's "mission . . . to provide high-quality, objective, independent, and rigorous analytical information to the marketplace."  The S&P Code also assures consumers, shareholders, investors and regulators that S&P "endeavors to conduct the rating and surveillance processes in a manner that is transparent and credible and that also maintains the integrity and independence of such processes in order to avoid any

- 13 -

compromise by conflicts of interest, abuse of confidential information, or other undue influences."

        c)     Other portions of Moody's and S&P's websites also advertise their independence, objectivity and competence.

        i)     Moody's website proclaims that its "independent credit ratings and research" contribute to market efficiency "by providing credible and independent assessments of credit risk." Moody's online advertising brochure for its Structured Finance Research promises that "Moody's rigorous, transparent rating methodologies and analytic expertise help synthesize diverse perspectives and key factors driving structured finance credit quality. The result? Ratings and research that help you navigate markets with confidence."

        ii)     S&P's website emphasizes the company's integrity through independence, assuring consumers that "[m]ost notably, [S&P is] known as an independent provider of credit ratings." In a document available on its website, "The Fundamentals of Structured Finance Ratings," S&P acknowledges the risk that issuers will influence their analysis, and reassures investors in claiming, "[w]e are intensely aware that our entire franchise rests on our reputation for independence and integrity. Therefore, giving in to 'market capture' would reduce the very value of the rating, and is not in the interest of the rating agency."

        d)     Moody's and S&P also issue press releases to accompany the issuance of new ratings or ratings changes. These press releases are available on Bloomberg and on the CRAs' websites and other places accessible to the public.

      i)      Moody's press releases contain language promising to maintain procedures "to address the independence of [its] ratings and rating processes." Upon information and belief, Moody's has included the same or similar representations in all press releases accompanying the issuance of new ratings or ratings changes since at least 2004.

      ii)      S&P advertises to the public in its widely distributed press releases that it "is the world's foremost provider of independent credit ratings, indices, risk evaluation, investment research and data," and that it provides investors with "independent benchmarks." S&P goes on to remind the public that it undertakes its analysis in such a way so as to "preserve the independence and objectivity" of its risk assessments. Upon information and belief, S&P makes the same or similar representations in most, if not all, of its press releases.

      e)      In Moody's 2005 Best Practices Handbook, it states that rating agencies "serve investors by providing them with timely credit research and independent, thoughtful, and accurate rating opinions on which they can base their investment decisions."

      f)      The SEC requires Moody's to issue a disclosure regarding its fee arrangements. In this disclosure, Moody's represents that it "maintain[s] policies and procedures to address the independence, objectivity and integrity of [Moody's] ratings and rating processes." The disclosure also references the Moody's Code of Conduct.

      g)      S&P's emails contain language that emphasizes the company's integrity in analyzing securities, stating that "ratings and other analytic services are performed as entirely separate activities" and that this division preserves the "independence and objectivity of each

- 15 -

analytic process."

       h)     In sworn testimony before the Senate Committee on Banking, Housing and Urban Affairs in April 2007, S&P's then managing director of RMBS testified that S&P's credit ratings were "grounded in the cornerstone principles of independence, transparency, credibility and quality" – themes reiterated by the testimony from the President of Standard & Poor's Financial Services LLC in October 2008, before the House Committee on Oversight and Government Reform: "[t]he key question for any approach, whether it be investor or issuer paid, is then whether the rating agency takes appropriate steps to preserve its independence. For S&P, that independence is a core principle of our business." The CRAs have made these assurances not only to Congress, but also in materials provided to the financial industry and public at large, in an effort to maintain and expand their market share and profits.

       i)     S&P and Moody's also have made consistent and blanket proclamations of their competence and expertise, notably without any caveats for rating even the most exotic securities:

       a)     The annual reports of both Defendants provide many examples:

       i)     Moody's 2007 annual report promised "to bring the fullest range of perspective, knowledge and insight to the analysis of structured products." In that same annual report, Moody's also advertised its readiness and competence to meet "the demand for independent expertise in assessing credit and fostering consistent, comparative standards for credit should also grow accordingly." In the same annual report, Moody's asserted that, "as the

- 16 -

sophistication and complexity of derivative structures continues to grow, Moody's is deepening the breadth of credit expertise [it] bring[s] to the analysis of even highly specialized transactions through our rating committees." It stated that it "draw[s] on the expertise of analysts from different areas . . . to bring the fullest range of perspective, knowledge and insight to the analysis of structured products." Moody's advertises the quality and competence of its services in a similar fashion in annual reports in 2002 and 2003, as well as 2006 through 2008.

                ii)      S&P's 2007 annual report promises that its "capabilities and expertise continue to expand to meet the complex demands of the global financial markets." S&P made similar representations in each report issued from at least 2006 through 2008.

                b)      Moody's 2006 Report on its Code of Professional Conduct advertised that the company "seeks to employ Analysts who have the requisite skills and are appropriately qualified for their positions, and who demonstrate good judgment and adhere to high standards of integrity." Additionally, "Moody's . . . employs a staff of professionals specializing in accounting and financial reporting, off-balance sheet risk, corporate governance and, for financial institutions, risk management assessment."

      26.      These representations are material to financial market participants, consumers and government regulators in Mississippi. Consumers whose retirement funds are invested in structured finance securities such as RMBS and CDOs depend on the integrity of Moody's and S&P to behave in a manner that is – as promised –independent, objective and competent. Similarly, government regulators in Mississippi, such as the Department of Insurance, depend on

- 17 -

the Defendants' promises of independence, objectivity and competence when using Defendants' ratings to assess capital adequacy requirements and other indicia of the financial health of entities that held structured finance securities on their balance sheets. Without these promises, and the ability to rely on them as accurate representations of the Defendants' business model, the ratings themselves would be useless. For this reason, Defendants' misrepresentations about the integrity of the services they provide constitute deceptive practices under the Mississippi Consumer Protection Act.

## V. PUTTING DEFENDANTS' PROMISES IN CONTEXT: THE ROLE OF CRAs IN THE SECURITIZATION MARKET

27. The structured finance market consists mainly of issuers, institutional investors that purchase the securities as investments and government regulators who rely on the ratings to assess the financial strength of various businesses, and the CRAs themselves. Issuers – typically banks, mortgage companies or other financial institutions – create trusts that hold the collateral underlying the RMBS and CDOs. These banks also issue the securities (thus, the label "issuers"). Institutional investors typically include pension funds, mutual funds, insurance companies and other financial institutions. While individual investors in Mississippi and elsewhere generally are not "qualified investors" for purposes of purchasing RMBS or CDOs directly, these structured finance products comprise part of many mutual fund and pension fund portfolios for Mississippi residents and workers. In addition, government regulators – including the Mississippi Department of Insurance and the Mississippi Department of Banking and

Consumer Finance – rely on the CRAs to provide services that are independent, objective and competent, because the risk represented by complex securities is virtually impossible for these agencies or other participants in the financial marketplace to assess on their own.

28.     CRAs serve as gatekeepers between institutional investors and the structured finance securities those investors purchase. This gatekeeper role is important for several reasons. First, SEC regulations require many pension and retirement funds to purchase only those securities with an "investment-grade" rating (a rating of Baa or above for Moody's and BBB or above for S&P). In addition, unlike other kinds of debt securities (where the corporate bond has a verifiable collateral that allows for an assessment of the bond's value based on tangible information), structured finance products are far more opaque because the investor does not have access to information about the underlying collateral. As a former senior manager at Moody's noted, "the details of the underlying asset pool and often the structure of the transactions are not publicly available for external scrutiny" and "the tools to analyze credit . . . are beyond the grasp of many investors." Therefore, the nature of structured finance securities require even sophisticated, institutional investors and government entities to rely on the CRAs' promises of objectivity and independence, as well as on the implicit guarantee of competence to provide the services they advertise.

29.     Moody's rates securities on a scale of "Aaa" to "C," with each level down indicating a decrease in creditworthiness and an increase in investment risk. Moody's deems "Aaa" securities to be "of the highest quality, with minimal credit risk," and "Aa" securities to be

- 19 -

"of high quality and . . . subject to very low credit risk." Securities rated at "Baa" and above also receive the label "investment grade." For a debt obligation to be considered an "investment security," it must be "marketable." A security can qualify as "marketable" if it is: 1) offered via SEC Rule 144A, and 2) considered "investment grade" by recognized CRAs (or one CRA, if the security has received only one rating). The SEC and Mississippi law require an investment-grade rating for certain institutional investors, such as pension funds and insurance companies, to invest in the security.

30.   S&P uses a scale that rates securities from "AAA" through "D," with each level down indicating a decrease in creditworthiness and an increase in investment risk. Securities rated at BBB and above qualify for the label "investment grade."

31.   Institutional investors such as hedge funds, life insurers, state and private pension funds, and mutual funds are eligible to purchase RMBS and CDOs. Money market funds also may invest only in securities above a certain rating, *see* 17 C.F.R. § 270.2(a)-7. And as noted previously, certain kinds of investors (*e.g.*, state pension funds) may only purchase or hold securities with ratings at or above a certain level based upon their governing investment guidelines. As observed by former SEC Commissioner Richard Y. Roberts, "[m]ost financial institutions in the United States (banks, insurance companies, mutual funds, pension funds) are required by law to incorporate NRSRO ratings in their business decisions."

32.   As noted above, structured finance securities, including RMBS and CDOs, are issued based on a pooled collection of assets. To reduce the risk of any particular investment,

- 20 -

financial institutions create these "structured finance products" (a/k/a structured finance securities), which pool multiple assets of different risk profiles together.  Grouping assets in this manner – a process known as securitization – is intended to diversify the overall risk and thus limits the loss an investor may suffer if any one of the assets in the pool defaults.

33.     One way to create a structured finance product is through an Asset-Backed Security ("ABS").  An ABS is a financial product that derives its value from a stream of revenue produced by a pool of underlying assets.  While the assets in an ABS can be comprised of credit card receivables, student loans or any number of other loans/receivables, commercial and residential mortgages are the most common form of collateral used for ABS.  The oldest and most common type of structured finance securities utilizes residential mortgages as the sole form of collateral, in a product called Residential Mortgage Backed Securities ("RMBS").  From 2000 to 2006 alone, investment banks underwrote nearly $2 trillion in mortgage-backed securities.

34.     Collateralized Debt Obligations ("CDOs") are similar to RMBS in some ways, but they are exponentially more complex because they typically are comprised of RMBS from multiple, different mortgage pools.  For example, a single CDO could contain securities from hundreds of different RMBS mortgage pools, as well as other types of assets, such as commercial mortgage backed securities.  When a CDO's underlying assets also include other CDOs, the new CDO is deemed a "squared" or "cubed" CDO – thus making information about the risk associated with the underlying collateral practically impossible for any investor to assess.

35.     All securities are divided into tiers (also called "tranches"), which represent

- 21 -

different levels of risk. Each tranche receives a credit rating that reflects that risk. The revenue stream created by the payment of the underlying loans represents the revenue paid to investors, and the investors in the "senior" tranches (those with the least credit risk) are paid first. Ultimately, the investors with the least senior tranches bear the greatest risk of not being paid at all because any loss in revenue – from, for example, unpaid mortgage payments – is absorbed by junior tranches first.

36.     The loan-level data underlying structured finance securities (which can include, among other things, the credit scores of borrowers, appraisal value of the property, loan-to-value ratios, loan-to-debt rations, and the income of the borrowers) is not readily available to the general public. Also, the securities themselves are complex because they rely on a large asset pool that is sub-divided into tranches, and, in the case of CDOs, often do not contain a fixed pool of assets. Therefore, investors and other marketplace participants must rely on the credit rating as a proxy for the investment's risk.

37.     Final ratings for structured finance products such as RMBS and CDOs are assigned by the CRAs themselves, and appear quickly after such assignment in prospectuses and media outlets such as Bloomberg and financial news websites. The ratings (and changes in ratings) for some securities are publicly available in papers filed with the SEC, on the CRAs' websites, and through press releases by the CRAs. As described above, the CRAs made many misrepresentations about their independence, objectivity and competence through these vehicles.

38.     With each level of securitization (and then re-securitization, from an RMBS

- 22 -

onward to a cubed CDO), investors become further and further removed from the actual collateral (in most cases, mortgages on houses) and the risks associated with that collateral (*i.e.*, the risk of default on the mortgage). Investors and other market participants rely on the CRAs' advertised independence, objectivity and competence as the precursor and prerequisite for accepting the rating as the product of an independent, objective and competent process. As Defendant Moody's itself stated in its 2005 Best Practices Handbook, rating agencies "serve investors by providing them with timely credit research and independent, thoughtful, and accurate rating opinions on which they can base their investment decisions."

39. As Senator Levin noted in his comments before the Permanent Subcommittee on Investigations, "[b]ecause these so-called 'structured finance products' are so hard to understand, investors often place heavy reliance on credit ratings to determine whether they can or should buy them." The RMBS are arranged in complicated capital structures and rely on thousands of loans with unique risk factors. Rating them is next to impossible for most investors. Because CDOs are comprised of many RMBS and other securitized debt, and because the asset pool underlying a CDO is permitted to change over time, the CDO rating analysis is disconnected by at least two levels (and often more) from the actual collateral upon which the payments of the securities ultimately depend. As discussed below, the opacity of the data and impenetrability of the structure makes them effectively impossible to rate without the resources and purported expertise enjoyed by the CRAs. This complexity means that investors and other market participants must rely on the rating agencies for an assessment of the security's risk.

- 23 -

## VI.   DEFENDANTS' CONDUCT DEMONSTRATES THAT THEIR PROMISES OF OBJECTIVITY, INDEPENDENCE AND COMPETENCE WERE DECEPTIVE

### A.   The "Issuer Pays" Model and Ratings Shopping Compromised the CRAs' Independence and Objectivity

40.     In filings with the SEC, their own annual reports and websites, publicly available codes of conduct, press releases, testimony under oath and via emails (among other media), Defendants continuously represented that their services were based on a business model that maintained independence, objectivity and competence. These promises deceived consumers because the CRAs allowed the Issuer Pays model to undermine the integrity of the services the CRAs claimed to be providing.

41.     Under the Issuer Pays model, issuers of the securities – generally, investment banks – pay the CRAs to rate the investments. The CRAs' astronomical increase in profits through the housing boom was funded by a very small number of investment banks. These banks provided an overwhelming percentage of Defendants' ratings work for structured finance securities. Therefore, alienating even one of the banks would have reduced Defendants' revenue and market share dramatically. The banks were repeat players in this market, and "kn[e]w how to exploit their leverage." As a result, the CRAs had to cater to banks' desires or risk them "tak[ing] their business elsewhere." For example, this type of blatant pressure was captured in a 2006 email in which a United Bank of Scotland (UBS) banker warned an S&P senior manager not to use a new, more conservative rating model for CDOs. He wrote: "[H]eard you guys are revising your residential [mortgage backed security] rating methodology—getting very punitive

- 24 -

on silent seconds.  [H]eard your ratings could be 5 notches back of [Moody's] equivalent. [G]onna kill your resi[dential] biz.  [M]ay force us to do moodyfitch only cdos!"  When asked by his colleague about the change to the model, another senior manager, Thomas Warrack, noted that the new model "took a more conservative approach" that would result in "raising our credit support requirements going forward," but Mr. Warrack was quick to add "[w]e certainly did [not] intend to do anything to bump us off a significant amount of deals."

42.      Senator Levin explained how the booming securitization market, CRA revenues and the Issuer Pays model were all connected: "[T]he credit rating agencies were operating with an inherent conflict of interest because the revenues they pocketed came from the companies whose securities they rated.  It's like one of the parties in court paying the judge's salary or one of the teams in a competition paying the salary of the referee. The credit rating agencies assured Congress and the investing public that they could manage that conflict; that their ratings were independent and rigorous. But the documents tell a different story."  As Congressman Waxman explained, "[t]he leading credit rating agencies grew rich rating mortgage-backed securities and CDOs. . . . [T]he total revenues for the three firms, double from $3 billion in 2002 to over $6 billion in 2007. At Moody's, profits quadrupled between 2000 and 2007. In fact, Moody's had the highest profit margin of any company in the S&P 500 for 5 years in a row."

43.      In light of the explosion of RMBS and CDOS and because the banks paid higher fees to have Defendants rate these structured finance securities than they paid to have the CRAs rate traditional bonds, the CRAs allowed the Issuer Pays model to compromise their hallmark

- 25 -

promises of independence and objectivity. Although Defendants utilize the Issuer Pays model in other sectors of the ratings market, they do not allow the issuing banks to have such unprecedented and inappropriate influence over the ratings process in these other sectors. The fact that the CRAs allowed the banks to influence the ratings process so substantially (and ultimately to influence the final ratings) served as the ultimate compromise of the CRAs' integrity and triggered the deception at the heart of this case – that the CRAs' promises of independence, objectivity and competence were tainted by the inappropriate influence of the banks and the CRAs' greed.

44.    In the words of a former CRA managing director, Defendants engaged in a "market-share war where [ratings] criteria were relaxed" as the Defendants pursued profits over independence and objectivity. This battle for market share encouraged each Defendant to relax its respective standards in order to supply issuers with the ratings that they desired. In the words of a former Moody's managing director, Jerome Fons, "a large part of the blame" for this misconduct stemmed from the abuse of the Issuer Pays model. In his view, "[a] drive to maintain or expand market share made the rating agencies willing participants in this [ratings] shopping spree. It was also relatively easy for the major banks to play the agencies off one another because of the opacity of the structured transactions and the high potential fees earned by the winning agency."

45.    In 2007, a former Moody's managing director, who later became a high-ranking S&P managing director, testified before Congress that:

- 26 -

> rating agencies can come under pressure to loosen their standards for a whole sector. And this can happen from a behavior by the issuers called rating shopping, where . . . an issuer . . . shows a deal to multiple rating agencies and then picks one or two that have the easiest standards to rate the deal. Then the other rating agencies that had tougher standards become invisible, and, once more, they don't make any money, because the way you make money . . . is you rate the deal and charge the issuer. So it puts pressure on the rating agencies to loosen their standards. . . .

46.     The "fox-guarding-the-henhouse" nature of the Issuer Pays model – as financial law expert, Professor John Coffee, labeled it in his Congressional testimony – created an unconscionable situation where the CRA was "a watchdog paid by the person[] they are to watch." In the words of S&P executive Michael Gutierrez, the CRAs "bec[a]me so beholden to their top issuers for revenue they . . . all developed a kind of Stockholm syndrome which they mistakenly tag[ged] as Customer Value creation . . ."

47.     As a former Moody's Vice President described it: "[t]he story at Moody's doesn't start in 2007; it starts in 2000. This was a systematic and aggressive strategy to replace a culture that was very conservative, an accuracy and quality oriented (culture), a getting-the-rating-right kind of culture, with a culture that was supposed to be 'business-friendly,' but was consistently less likely to assign a rating that was tougher than our competitors." Moody's CEO Raymond McDaniel confirmed these facts in an October 2007 presentation to Moody's Board of Directors, but (tellingly) not to the public:

> Ideally, competition would be primarily on the basis of ratings quality, with a second component of price and a third

- 27 -

> component of service.   Unfortunately, of the three
> competitive factors, rating quality is proving the least
> powerful . . . The real problem is not that the market does
> underweights [sic] ratings quality but rather that, in some
> sectors, it actually penalizes quality by awarding rating
> mandates based on the lowest credit enhancement needed
> for the highest rating.

In a moment of prescience, Moody's CEO also stated to his own Board of Directors that, left

"unchecked," this system "can place the entire financial system at risk."

48.     Author Richard Bitner, a 14-year veteran of the lending industry and author of

"Confessions of a Subprime Lender: An Insider's Tale of Greed, Fraud, and Ignorance," opined

that "the focus was on feeding the securitization machine and driving profits," and as a result,

"no one was paying attention to the basic fundamental principles of risk management." Instead,

"[w]hen an investment bank ha[d] a security filled with garbage loans, the [CRAs] advise them

how to structure the deals in order to maximize profit."

49.     Richard Michalek, a former Moody's vice president and senior credit officer,

agreed that the push for revenues and market share undermined the integrity of Moody's

operations: "[T]he threat of losing business to a competitor rating agency, even if not realized,

absolutely tilted the balance away from the independent arbiter of risk towards captive facilitator

of risk transfer."

50.     A former S&P executive, Kai Gilkes, acknowledged that the incentive to match

a competitor's credit enhancement was intense, because failing to match meant losing the deal.

As a result of the pressure to move forward with the deal, "the line in the sand shifts and shifts,

- 28 -

and can shift quite a bit."  A former managing director at Moody's, Gary Witt, testified that banks regularly threatened to take their business elsewhere if the CRAs didn't meet their demands for a certain outcome: "It's like . . . 'Well, next time, we're just going to go with Fitch and S&P.'"  Thus, "rating shopping" – the practice whereby an issuer offers its business to the CRA that agrees to the most desirable rating – also polluted the integrity of Defendants' analysis for market share and other CRAs' willingness to give the security the issuer's desired rating.

51.     Defendants were keenly aware of how their competitors were handling ratings. As the former Moody's CEO described in 2007: "What happened in '04 and '05 with respect to subordinated tranches is that our competition, Fitch and S&P, went nuts. Everything was [designated] investment grade. It didn't really matter." Moody's decided it could only survive by playing the same game – publishing high ratings for lower-quality securities

52.     In contrast to their publicly advertised independence and objectivity, Defendants internally conceded that the investment banks' ratings shopping and volume of business had a major impact on the rating process.  In October 2007, Moody's CEO stated to his Board of Directors: "Analysts and [managing directors] are continually 'pitched' by bankers, issuers, investors . . . whose views can color credit judgment, sometimes improving it, other times degrading it (we 'drink the kool-aid').  Coupled with strong internal emphasis on market share & margin focus, this does constitute a 'risk' to ratings quality."

53.     Despite Defendants' private awareness that these dynamics were "color[ing] credit judgment" and that CRAs were "being bullied into caving in to bank pressure," Moody's

- 29 -

and S&P's public filings, Codes of Conduct and other promises stated precisely the opposite. As one Moody's manager with responsibility for rating structured finance securities bluntly told his staff, "I will be fired it we lose out on a single deal."

54.     Defendants' conduct had far-reaching and disastrous effects for the entire financial industry. According to Joseph Stiglitz, a Nobel Laureate and professor of economics at Columbia University, Defendants were "key culprits" in the housing crisis. The CRAs "were the part[ies] that performed that alchemy that converted the securities from F-rated to A-rated. The banks could not have done what they did without the complicity of the ratings agencies."

### B.     The Opacity and Complexity Inherent to Structured Finance Securities Made the Ratings Process Inaccessible to Mississippi Investors, Regulators and Consumers

55.     Defendants knew that consumers, investors and regulators could not replicate the CRAs' analytical process.  To do so would require: (1) access to the same data available to the CRAs and issuers (only the CRAs and issuers had access to the full complement of data); (2) access to all of the same analytical models the CRAs used to analyze the underlying data (although some models were made available for free, others were not available to the public or were prohibitively expensive; and it would be impossible for most investors, regulators and consumers to create their own analytical model); (3) substantial, expert resources necessary to apply the analytical model to the data (CRAs and issuers employ entire departments of highly specialized and expensive mathematicians and statisticians for this purpose, and these kinds of resources are well beyond the reach of government regulator budgets or pension fund managers);

- 30 -

and (4) access to the negotiations between the CRAs and the issuers about how to adjust parameters and data to achieve the desired rating result (these are highly confidential discussions that go to the heart of the Issuer Pays conflict, so the CRAs and issuers would never release this information to the public).

56.     As author and industry veteran Richard Bittner explained, "[t]he security gets spliced and diced into a hodgepodge of separate investment vehicles [including CDOs] . . . all of which represent different ways to distribute credit risk.  The security gets diluted even further as some CDOs are backed by other CDOs, which can then invest again in other CDOs. . . . Since the original mortgages are no longer recognizable, judging the quality of the assets is next to impossible.  Think of it this way:  Imagine taking 10 different vegetables and pureeing them in a food processor until you have something close to soup.  Ask someone to identify the ingredients but don't let him taste it—make him rely strictly on his sense of sight."

57.     Bittner notes that "[i]nvestors who buy these securities face the same challenge. Many believe the confusing nature of the investments means the fund managers who purchased them had no clue what they were buying.  For this reason, the ratings agencies are vital to the process.    Without their objective analysis, investors wouldn't be able to recognize the risk associated with purchasing the securities."

58.     Despite this reality, the CRAs continued to misrepresent the complexity and inaccessibility of the structured finance ratings process.  In fact, from at least 2005 through 2011, Moody's disclaimers advertised that users of the ratings service could, and in fact "must"

- 31 -

undertake their own analysis of the security. From at least 2005 through present, disclaimers accompanying Moody's public press releases announcing new ratings or ratings adjustments stated that "each such user *must accordingly make its own study* and evaluation of each security . . . that it may consider purchasing, holding or selling." (Emphasis added.) Consistent with this suggestion that complex securities like RMBS and CDOs can and should be analyzed by each of its customers, S&P's 2007 downgrade press releases instructed users that they "should not rely on any credit rating" provided by S&P.

59.     At the same time, the press releases also emphasized the quality and independence of Defendants' business model and ratings services. S&P's 2007 press release advertised the company as "the world's foremost provider of independent credit ratings, indices, risk evaluation, investment research and data," one that has "played a leading role for more than 140 years in providing investors with the independent benchmarks they need to feel more confident about their investment and financial decisions." Moody's press releases promise that the company "maintain[s] policies and procedures to address the independence of [its] ratings and ratings processes."

60.     The desired impact of these disclaimers and promises was twofold. First, the CRAs falsely assured consumers, investors and regulators that their business model was free from outside influence and impropriety, and encouraged users to have confidence in the integrity of the services offered. Then, the CRAs told consumers, investors and regulators that they should verify the ratings analysis by conducting their own analysis. The mixed message

- 32 -

generated confusion, as Congresswoman Eleanor Holmes Norton observed in a hearing before the Committee on Oversight and Government Reform: "On the one hand, the legal disclaimers saying people shouldn't rely on what you say because it's your opinion, they can't possibly be accurate or inaccurate. On the other hand, you are telling investors and they are paying because they believe you . . . that you have the best methodology and the best rating record and the most expertise, so they should pay you billions of dollars. And they comply." This implied both that the CRAs themselves were competent to provide the ratings services offered *and* that consumers, investors and regulators could somehow verify the accuracy and integrity of the CRAs' product by conducting their own analysis. Thus, the CRAs falsely advertised their own competence as well as the transparency and accessibility of their analytical process.

61.     Experts agreed that the complexity of the models and lack of accessible data rendered even the most sophisticated investors and regulators unable to assess the risk attached to complicated securities, especially CDOs. As Professor Coffee testified before the Senate Banking Committee in 2007, "[s]tructured finance particularly relies on the credit-rating agency because investors have no ability to evaluate on their own the securitized pools of financial assets that structured finance creates." That same year, Drexel University's Joseph Mason agreed with this position in his remarks before the House Subcommittee on Capital Markets, Insurance, and Government Sponsored Enterprises: "While the statistical techniques used by the [CRAs] are transparent, the ratings criteria (the variables incorporated into the statistical techniques) are not disclosed up to a level of replicability. Without disclosure, even to a regulatory authority,

- 33 -

NRSRO models are black boxes. Hence, it came as a surprise when Moody's revealed that their ratings models lacked many key variables needed to properly evaluate non-prime loan products."

62.     Kevin Fry, as chairman of the Invested Asset Working Group of the National Association of Insurance Commissioners, said: "As regulators, we just have to trust that rating agencies are going to monitor CDOs and find the subprime[.] . . . We can't get there. We don't have the resources to get our arms around it."   Similarly, as the Financial Crisis Inquiry Commission concluded in its exhaustive study, "[m]any investors, such as some pension funds and university endowments, relied on credit ratings because they had neither access to the same data as the rating agencies nor the capacity or analytical ability to assess the securities they were purchasing."

63.     Federal Reserve Chairman Ben Bernanke explained in his September 2, 2010 testimony to the FCIC that:

> Rating agencies' ratings of asset-backed securities were revealed to be subject to conflicts of interest and faulty models.   At the end of the chain were investors that often relied mainly on ratings.   Even if the end-investors wanted to do their own credit analysis, the information needed to do so was often difficult or impossible to obtain.

64.     The underlying data needed to assess the creditworthiness of the securities is not available to the general public.   As Moody's former Managing Director, Jerome Fons, acknowledged, "subprime RMBS and their offshoots offer little transparency around the composition and characteristics of the underlying loan collateral. . . . Loan-by-loan data, the

- 34 -

highest level of detail, is generally not available to investors."

65.     Mississippi consumers, investors and government regulators relied on Moody's and S&P's representations that they provided services that were impartial, independent and of the highest quality available.  Defendants made those promises so that consumers, investors and regulators would also rely on their ratings.  At the end of the day, the promises did not accurately represent the CRAs' business model.  Defendants occupied a position of public trust, which they abused in the name of profits.

**C.     The Decision to Rate Increasingly Exotic Securities Compromised the Truthfulness of CRAs' Advertised Competence**

66.     As noted above, the Issuer Pays model produced conflicts of interest that led Defendants to rate any deal, no matter how complex, how little data was available, or how inadequate their models were for capturing the risk presented.  Despite the fact that the CRAs knew their analytical models could not assess the most complex securities with accuracy, they continued to rate these exotic products.  Their decision to continue in this manner turned their overt and implicit promises of competence into deceptions.

67.     S&P's experience with rating RMBS in the early 2000s is a telling example.  To rate RMBS, S&P traditionally had used a statistical modeling program, called "LEVELs," to estimate the likelihood of default and expected loss associated with the collateral in a loan pool of residential mortgages.  When LEVELs was implemented and published in 1996, S&P's intention was to continue to refine the program to enhance the reliability of the data that would

- 35 -

ultimately be used to determine the appropriate rating for RMBS. One such refinement occurred in 1999, when S&P incorporated data going back six to eight years for more than 900,000 residential mortgages.

68. Tellingly, a refined LEVELs model that incorporated data for approximately 2.5 million residential mortgages was developed in 2001, and a further revised LEVELs model was created in 2004 with data from approximately 9.5 million residential mortgages – but S&P chose not to implement either revised model, instead continuing to use the outdated (and incompetent) model. A former S&P senior managing director confirmed in testimony before Congress that S&P maintained a trove of residential mortgage data, but, as late as October 2008, failed to use it to refine LEVELs. Between 2001 and 2008, S&P chose again and again to use an outdated version of its LEVELs model for RMBS collateral, a decision motivated by the company's desire to keep its issuer clients happy through the continued assignment of AAA ratings to RMBS.

69. The willingness to apply an outdated model compromised S&P's ability to perform its basic function: to assess the risk of the securities it was paid to rate. As the former managing director concluded in his Congressional testimony, "[a]s a result, *we didn't have the data going forward in 2004 and 2005 to really track what was happening with the subprime products and some of the new alternative-payment type products*. And we did not, therefore, have the ability to forecast when they started to go awry." (Emphasis added.) In his opinion, "had these models been implemented we would have had an earlier warning about the performance of many of the new products that subsequently lead to such substantial losses."

- 36 -

70.     Defendants' claims of competence were particularly deceptive with respect to CDOs, where the ratings process is even more complex.  Ratings for CDOs often are not based on the actual pool of loans, but rather on agreed-upon limits for each type of potential asset that could be in the pool.  This makes rating such products more speculative because the analyst can make, at best, an educated guess about what the actual composition of the loan pool collateral he or she is rating will be.  Nevertheless, CRAs continued to provide CDOs with ratings as high as the ratings they gave to large, financially sound corporations.  As Richard Bitner wrote: "To claim a subprime CDO carries the same risk as bonds issued by the most financially sound corporations is not only mind-boggling, it's negligent."  CRAs nonetheless routinely rated CDOs triple-A.

71.     On the CDO front, S&P violated its internal policies by rating certain CDOs without analyzing the underlying data, another sign that S&P knew it was providing a service that it was not competent to provide.  For example, in connection with its efforts to rate a certain CDO in 2001, the issuer structured the CDO using an RMBS that another agency had rated.  Pursuant to its internal rules, S&P should have independently examined the loan data underlying that RMBS before providing an estimate for the CDO that relied on those RMBS.  However, the head of S&P's CDO group and member of the Executive Committee responded to a request from a managing director for actual loan-level data for the RMBS by calling the request "TOTALLY UNREASONABLE!!"  The managing director was told to "devise some method" for providing the credit estimates, even without information on the underlying loan levels, flouting internal

- 37 -

S&P procedures that required analysts to obtain appropriate data before carrying out a credit analysis. Significant portions of the CDO received a AAA rating for the credit estimate, despite the fact that the managing director in charge of rating the deal was essentially asked to "provide a guess" as to the appropriate rating. And in direct response to requests that CDO ratings requirements be lessened to maintain market share in 2004, the head of S&P's CDO unit and member of the company's Executive Committee endorsed lessening ratings standards by noting: "OK with me to revise criteria."

72.     Moody's also misrepresented its competence to rate these complex securities. A senior managing director at Moody's urged the company to "not rate [asset backed securities] CDOs" because the "complexity of the product and multiple layers of risk" render it "NEVER possible to have the requisite amount of information to rate." Nevertheless, Moody's continued to rate the CDOs.

73.     Moody's had become increasingly "desperate to generate revenue," leading to "the approval and rating of more complex and highly questionable transactions." Indeed, Moody's even allowed the banks to control the pace and volume of ratings. Where a CRA had taken six to eight weeks to rate a CDO before the housing boom, by 2006 Moody's gave an AAA rating to an average of 30 mortgage securities per business day. According to Eric Kolchinsky, a former managing director, executives at Moody's failed to provide him with the necessary staff to update risk models or perform analysis on complex structured finance securities; understaffed and overwhelmed by issuer pressure, "[e]ach deal was a crisis." By May of that year, an internal

- 38 -

Moody's email would prove the managing director right, referring to Moody's ABS CDO ratings as "the biggest credit risk management failure ever."

74.      Instead of informing the public about this risk or limiting the CDOs it rated, S&P continued to conduct "business as usual" – as if rating these exotic CDOs fell within the CRA's core competence. As an S&P employee noted, "[r]ating agencies continue to create and [sic] even bigger monster – the CDO market. Let's hope we are all wealthy and retired by the time this house of cards falters. 😵 "

75.      As one former managing director at Moody's stated, "a lot of people just should have said no to some of these products. And that is 20/20 hindsight, but I think that is the major part, to have just said, we can't analyze this with any degree of confidence and we should just walk away from it. But that was just not possible[,]" because the fear of losing market share or revenue superseded any sense of obligation to provide the independent, objective and competent services the CRAs so proudly advertised.

76.      An Instant Message between two S&P officials who worked in the Structured Finance (CDO) division reflects an example of the deterioration of the CRAs' competence and independence:

> Analyst 1: "btw – that deal is ridiculous"
> Analyst 2: "I know right . . . model def does not capture half of the rish…risk"
> Analyst 1: "we should not be rating it"
> Analyst 2: "we rate every deal . . . *it could be structured by cows and we would rate it*"
> Analyst 1: "But there's a lot of risk associated with it – I personally

- 39 -

don't feel comfy signing off as a committee member."

(Emphasis added).  According to the SEC, S&P nonetheless rated the deal.

77.     By continuing to assign credit ratings to these extremely complex financial securities, Moody's and S&P knowingly catered to the demands of investment banks, focusing on profits instead of adhering to longstanding and public assurances of objectivity, independence and competence.  The ultimate result was that Moody's and S&P gave their bank clientele what they wanted – the best ratings that money could buy, at the expense of Mississippi consumers, regulators and investors.   If Moody's and S&P had not given their Good Housekeeping Seal of Approval to these risky and poorly analyzed investments, the issuers of these securities could not have sold them to investors and others.  The people of Mississippi were misled into believing that the CRAs' analysis was independent, objective and competent when it was nothing more than a siren song penned to sooth the ears of big investment banks, while at the same time causing devastating harm to Mississippi investors and consumers.  Moody's and S&P issued the investment grade ratings that made RMBS and CDOs seem like safe investments, helping to build an active market for these securities.  Furthermore, after the mass downgrades in July 2007, the value of these securities plummeted, precipitating first the collapse of the RMBS and CDO markets and second the collapse of the overall economy.  More than any other players in the financial crisis, the role that Moody's and S&P played had a more significant impact that triggered the nationwide economic meltdown.

## VII.   CAUSES OF ACTION

**FIRST COUNT**
**Violation of the Mississippi Consumer Protection Act,**
Miss. Code Ann. § 75-24-1, *et seq.*

78.    Plaintiff realleges and incorporates herein by reference the preceding allegations of this Complaint.

79.    At all times relevant to this Complaint, S&P and Moody's were engaged in the trade or commerce of providing credit ratings for use by market participants, regulators and investors within the State of Mississippi.

80.    By engaging in the acts and practices alleged herein, S&P and Moody's made or caused to be made to Mississippi consumers, directly or indirectly, representations which are material, reasonably interpreted, false and likely to mislead in violation of Miss. Code Ann. § 75-24-5. Specifically, Miss. Code Ann. § 75-24-5 prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics . . . that they do not have . . ." and "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another . . ." and "[m]isrepresentation of the source, sponsorship, approval, or certification of goods or services" and "[m]isrepresentation of affiliation, connection, or association with, or certification by another." *See* Miss. Code Ann. §§ 75-24-5 (2) (b), (c), (e) and (g). Moody's and S&P's false, misleading and deceptive representations include, but are not limited to, the following:

A.    Moody's and S&P misrepresented that they dealt fairly and honestly with

- 41 -

Mississippi consumers, government regulators, investors or other market participants;

B.      Moody's and S&P misrepresented that their business models were independent, objective and free of influence from investment banks and the desire for increased market share and revenue;

C.      Moody's and S&P misrepresented their competence to provide expert analysis of certain structured finance products;

D.      Moody's and S&P misrepresented that they operated their businesses in conformance with their respective Codes of Conduct and the principles set forth in the IOSCO Code;

81.     Mississippi consumers, investors, government regulators and other members of the financial marketplace viewed Defendants' misrepresentations.

82.     Moody's and S&P's unfair and deceptive business practices as alleged herein directly and proximately caused substantial injury to consumers within the State of Mississippi in the form of deceiving the banks, insurance companies, government regulators, mutual funds and pension funds, which relied on these assurances when deciding to purchase certain securities.

83.     Moody's and S&P knew or should have known that the conduct alleged herein violated Miss. Code Ann. § 75-24-5 and that their acts and practices alleged herein constitute unfair and deceptive trade practices as they are defined in said statute.

**SECOND COUNT**
**Injunctive Relief**
**Miss. Code Ann. § 75-24-9**

- 42 -

84.      Plaintiff re-alleges and incorporates herein by reference the foregoing allegations of this Complaint.

85.      Plaintiff herein seeks injunctive relief pursuant to Miss. Code Ann. § 75-24-9 enjoining S&P and Moody's from engaging in any acts that violate the Mississippi Consumer Protection Act, including, but not limited to the deceptive or unfair trade practices alleged herein.

**THIRD COUNT**
**Disgorgement/Unjust Enrichment**

86.      Plaintiff re-alleges and incorporates herein by reference the foregoing allegations of this Complaint.

87.      Defendants have been unjustly enriched – in the form of increased revenues and profits – as a result of their misrepresentations of independence, objectivity and competence, in violation of the laws of the State of Mississippi.  This civil action is founded on principles of equity and is brought under the common law and Mississippi law to recover for damages, and for such other relief as equitably may be obtained, for the harms intentionally and wrongfully done to the State by the Defendants, who have been and continue to be unjustly enriched.  Due to this unjust enrichment, the Defendants should be required by this Court to submit to an accounting and to disgorge any profits that were obtained as a result of said misrepresentations.

**PRAYER FOR RELIEF**

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff, Attorney General Jim Hood on behalf of the State of Mississippi, requests the following relief from this Honorable Court:

- 43 -

88.     A finding by the Court that, by the acts alleged herein, Moody's and S&P

engaged in unfair and deceptive business acts and practices in the course of engaging in the trade

or commerce of a credit rating agency within the State of Mississippi in violation of the

Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1, *et seq.*;

89.     An injunction pursuant to Miss. Code Ann. § 75-24-9 enjoining Moody's and

S&P from engaging in any acts that violate the Mississippi Consumer Protection Act, including,

but not limited to, the unfair and deceptive acts and practices alleged herein;

90.     An order requiring that Moody's and S&P submit to an accounting to determine

the amount of improper fees and revenue paid to Moody's and S&P as a result of their unfair and

deceptive trade practices and acts and disgorge those ill-gotten gains;

91.     An order pursuant to Miss. Code Ann. § 75-24-19(1)(b) directing Moody's and

S&P to pay a civil penalty not to exceed Ten Thousand Dollars ($10,000.00) for each and every

violation of the Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-5;

92.     An order directing Moody's & S&P to pay attorneys' fees and costs of this

action;

93.     An order directing Moody's & S&P to pay punitive damages; and

94.     Such other relief as this Court deems just and equitable in the premises.

DATED this ___ day of May, 2011.

                        **PLAINTIFF, STATE OF MISSISSIPPI, et rel.**
                        **JIM HOOD, ATTORNEY GENERAL**

- 44 -

By: _____

Geoffrey Morgan MSB No. 3474
George W. Neville MSB No. 3822
Meredith M. Aldridge MSB No. 100696
Special Assistant Attorneys General
Office of the Mississippi Attorney General
P.O. Box 220
Jackson, MS 39205
Phone/Fax 601-359-3680 / 601-359-2003
Email: gnevi@ago.state.ms.us, gmorg@ago.state.ms.us
    maldr@ago.state.ms.us

Blake A. Tyler (MSB No. 101786)
775 East Fortification Street
Jackson, Mississippi 39202
Phone/Fax: 601 949 5000 / 601 510 9089
Email: btyler@pgtlaw.com

Vaterria Martin (MSB No. 101235)
5709 Highway 80 West
Jackson, Mississippi 39209
Phone/Fax: 601 923 1577/ 601 923 1579
Email: vmmartin@4martinsatlaw.com

COUNSEL FOR THE STATE OF MISSISSIPPI

- 45 -

# EXHIBIT P(21)

Feedback | Americas [Select Region] | Register | Login

General site search...

**Benchmarks, Research, Data and Analytics**

# United States of America 'AAA/A-1+' Ratings Placed On CreditWatch Negative On Rising Risk Of Policy Stalemate

Publication date: 14-Jul-2011 19:34:26 EST

**Contact Client Services**
1-877-SPCLIENT
1-877-772-5436
*Call Tree Options*
Contact Us

View Analyst Contact Information

- Standard & Poor's has placed its 'AAA' long-term and 'A-1+' short-term sovereign credit ratings on the United States of America on CreditWatch with negative implications.
- Standard & Poor's uses CreditWatch to indicate a substantial likelihood of it taking a rating action within the next 90 days, or in response to events presenting significant uncertainty to the creditworthiness of an issuer. Today's CreditWatch placement signals our view that, owing to the dynamics of the political debate on the debt ceiling, there is at least a one-in-two likelihood that we could lower the long-term rating on the U.S. within the next 90 days. We have also placed our short-term rating on the U.S. on CreditWatch negative, reflecting our view that the current situation presents such significant uncertainty to the U.S.' creditworthiness.
- Since we revised the outlook on our 'AAA' long-term rating to negative from stable on April 18, 2011, the political debate about the U.S.' fiscal stance and the related issue of the U.S. government debt ceiling has, in our view, only become more entangled. Despite months of negotiations, the two sides remain at odds on fundamental fiscal policy issues. Consequently, we believe there is an increasing risk of a substantial policy stalemate enduring beyond any near-term agreement to raise the debt ceiling.
- As a consequence, we now believe that we could lower our ratings on the U.S. within three months.
- We may lower the long-term rating on the U.S. by one or more notches into the 'AA' category in the next three months, if we conclude that Congress and the Administration have not achieved a credible solution to the rising U.S. government debt burden and are not likely to achieve one in the foreseeable future.
- We still believe that the risk of a payment default on U.S. government debt obligations as a result of not raising the debt ceiling is small, though increasing. However, any default on scheduled debt service payments on the U.S.' market debt, however brief, could lead us to revise the long-term and short-term ratings on the U.S. to 'SD.' Under our rating definitions, 'SD,' or selective default, refers to a situation where an issuer, the federal government in this case, has defaulted on some of its debt obligations, while remaining current on its other debt obligations.
- We may also lower the long-term rating and affirm the short-term rating if we conclude that future adjustments to the debt ceiling are likely to be the subject of political maneuvering to the extent that questions persist about Congress' and the Administration's willingness and ability to timely honor the U.S.' scheduled debt obligations.

TORONTO (Standard & Poor's) July 14, 2011--Standard & Poor's Ratings Services today said it placed its 'AAA' long-term and 'A-1+' short-term sovereign credit ratings on the United States of America on CreditWatch with negative implications.

The CreditWatch action reflects our view of two separate but related issues. The first issue is the continuing failure to raise the U.S. government debt ceiling so as to ensure that the government will be able to continue to make scheduled payments on its debt obligations. The second pertains to our current view of the likelihood that Congress and the Administration will agree upon a credible, medium-term fiscal consolidation plan in the foreseeable future.

On May 16, 2011, the U.S. government reached its Congressionally mandated

Hide

2 of 10

the global financial system means that the consequences of default would be
particularly severe.... Even a short-term default could cause irrevocable
damage to the American economy." The Treasury currently estimates that it will
have exhausted these exceptional measures on or about Aug. 2, 2011, at which
time it will either have to curtail certain current expenses or risk missing a
scheduled payment of interest or principal on Treasury securities held by the
public.

Standard & Poor's still anticipates that lawmakers will raise the debt ceiling
by the end of July to avoid those outcomes. However, if the government is
forced to undergo a sudden, unplanned fiscal contraction--as a result of
Treasury efforts to conserve cash and avoid default absent an agreement to
raise the debt ceiling--we think that the effect on consumer sentiment, market
confidence, and, thus, economic growth will likely be detrimental and long
lasting. If the government misses a scheduled debt payment, we believe the
effect would be even more significant and, under our criteria, would result in
Standard & Poor's lowering the long-term and short-term ratings on the U.S. to
'SD' until the payment default was cured.

Congress and the Administration are debating various fiscal consolidation
proposals. At the high end, budget savings of $4 trillion phased in over 10 to
12 years proposed by the Adminstration, (separately) by Congressional leaders,
as well as by the Fiscal Commission in its December 2010 report, if
accompanied by growth-enhancing reforms, could slow the deterioration of the
U.S. net general government debt-to-GDP ratio, which is currently nearing 75%.
Under our baseline macroeconomic scenario, net general government debt would
reach 84% of GDP by 2013. (Our baseline scenario assumes near 3% annual real
growth and a post-2012 phaseout of the December 2010 extension of the 2001 and
2003 tax cuts.) Such a percentage indicates a relatively weak government debt
trajectory compared with those of the U.S.' closest 'AAA' rated peers (France,
Germany, the U.K., and Canada).

We expect the debt trajectory to continue increasing in the medium term if a
medium-term fiscal consolidation plan of $4 trillion is not agreed upon. If
Congress and the Administration reach an agreement of about $4 trillion, and
if we to conclude that such an agreement would be enacted and maintained
throughout the decade, we could, other things unchanged, affirm the 'AAA'
long-term rating and A-1+ short-term ratings on the U.S.

Standard & Poor's takes no position on the mix of spending and revenue
measures that Congress and the Administration might agree on. But for any
agreement to be credible, we believe it would require support from leaders of
both political parties.

Congress and the Administration might also settle for a smaller increase in
the debt ceiling, or they might agree on a plan that, while avoiding a
near-term default, might not, in our view, materially improve our base case
expectation for the future path of the net general government debt-to-GDP
ratio. U.S. political debate is currently more focused on the need for
medium-term fiscal consolidation than it has been for a decade. Based on this,
we believe that an inability to reach an agreement now could indicate that an
agreement will not be reached for several more years. We view an inability to
timely agree and credibly implement medium-term fiscal consolidation policy as
inconsistent with a 'AAA' sovereign rating, given the expected government debt
trajectory noted above.

Further delays in raising the debt ceiling could lead us to conclude that a
default is more possible than we previously thought. If so, we could lower the
long-term rating on the U.S. government this month and leave both the
long-term and short-term ratings on CreditWatch with negative implications
pending developments. If Congress and the Administration agree to raise the
debt ceiling (with commensurate fiscal adjustments), we aim to review the
details of such agreement within the next 90 days to determine whether, in our



**Will Japan's Three Core Strategies Hit Their
Mark?**
...and will the growth momentum be reignited to finally get the
country out of deflation?

Read more >>

Hide

2 of 10

S&P | United States of America 'AAA/A-1+' Ratings Placed On CreditW...   https://www.standardandpoors.com/ratings/articles/en/us/?articleType...

assign a stable outlook.

If a debt ceiling agreement does not include a plan that seems likely to us to credibly stabilize the U.S.' medium-term debt dynamics but the result of the debt ceiling negotiations leads us to believe that such a plan could be negotiated within a few months, all other things unchanged, we expect to affirm both the long- and short-term ratings and assign a negative outlook, pending review of the eventual plan. If such an agreement is reached, but we do not believe that it likely will stabilize the U.S.' debt dynamics, we, again all other things unchanged, would expect to lower the long-term 'AAA' rating, affirm the 'A-1+' short-term rating, and assign a negative outlook on the long-term rating.

Following today's CreditWatch listings for the long- and short-term credit ratings on the U.S. government, Standard & Poor's will issue separate media releases concerning affected ratings in the funds, government-related entities, financial institutions, insurance companies, public finance, and structured finance sectors.

RELATED CRITERIA AND RESEARCH

- **Special Report: U.S. Negative CreditWatch Placement And The Knock-On Effects,** published July 18, 2011
- **U.S. Weekly Financial Notes: Lesson Of The Week--Expect The Unexpected,** July 8, 2011
- **Sovereign Ratings Criteria,** June 30, 2011
- **2011 Midyear Credit Outlook: Unresolved Economic And Regulatory Issues Loom Large,** June 22, 2011
- **Global Aging 2011: In The U.S., Going Gray Will Likely Cost Even More Green, Now,** June 21, 2011
- **United States of America 'AAA/A-1+' Rating Affirmed; Outlook Revised To Negative,** April 18, 2011
- **Fiscal Challenges Weighing On The 'AAA' Sovereign Credit Rating On The Government Of The United States,** April 18, 2011
- **A Closer Look At The Revision Of The Outlook On The U.S. Government Rating,** April 18, 2011
- **Banking Industry Country Risk Assessments,** March 8, 2011
- **Behind The Political Brinkmanship Of Raising The U.S. Debt Ceiling,** Jan. 18, 2011
- **U.S. Government Cost To Resolve And Relaunch Fannie Mae And Freddie Mac Could Approach $700 Billion,** Nov. 4, 2010,
- **Global Aging 2010: In The U.S., Going Gray Will Cost A Lot More Green,** Oct. 25, 2010,
- **Apr?s Le Deluge, The U.S. Dollar Remains The Key International Currency,"** March 10, 2010,
- **Banking Industry Country Risk Assessment: United States of America,** Feb. 1, 2010

This unsolicited rating(s) was initiated by Standard & Poor's. It may be based solely on publicly available information and may or may not involve the participation of the issuer. Standard & Poor's has used information from sources believed to be reliable based on standards established in our Credit Ratings Information and Data Policy but does not guarantee the accuracy, adequacy, or completeness of any information used.

Complete ratings information is available to subscribers of RatingsDirect on the Global Credit Portal at www.globalcreditportal.com. All ratings affected by this rating action can be found on Standard & Poor's public Web site at www.standardandpoors.com. Use the Ratings search box located in the left column.

**Primary Credit Analyst:**   Nikola G Swann, CFA, FRM, Toronto (1) 416-507-2582;
                        nikola_swann@standardandpoors.com

**Secondary Contacts:**   John Chambers, CFA, New York (1) 212-438-7344;
                        john_chambers@standardandpoors.com

                        David T Beers, London (44) 20-7176-7101;
                        david_beers@standardandpoors.com



**Will Japan's Three Core Strategies Hit Their Mark?**
...and will the growth momentum be reignited to finally get the country out of deflation?

**Read more >>**

Hide

2 of 10

No content (including ratings, credit-related analyses and data, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P. The Content shall not be used for any unlawful or unauthorized purposes. S&P, its affiliates, and any third-party providers, as well as their directors, officers, shareholders, employees or agents (collectively S&P Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content, or for the security or maintenance of any data input by the user. The Content is provided on an "as is" basis. S&P PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs) in connection with any use of the Content even if advised of the possibility of such damages.

Credit-related analyses, including ratings, and statements in the Content are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions. S&P assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P's opinions and analyses do not address the suitability of any security. S&P does not act as a fiduciary or an investment advisor. While S&P has obtained information from sources it believes to be reliable, S&P does not perform an audit and undertakes no duty of due diligence or independent verification of any information it receives.

S&P keeps certain activities of its business units separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain business units of S&P may have information that is not available to other S&P business units. S&P has established policies and procedures to maintain the confidentiality of certain non-public information received in connection with each analytical process.

S&P may receive compensation for its ratings and certain credit-related analyses, normally from issuers or underwriters of securities or from obligors. S&P reserves the right to disseminate its opinions and analyses. S&P's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.

Any Passwords/user IDs issued by S&P to users are single user-dedicated and may ONLY be used by the individual to whom they have been assigned. No sharing of passwords/user IDs and no simultaneous access via the same password/user ID is permitted. To reprint, translate, or use the data or information other than as provided herein, contact Client Services, 55 Water Street, New York, NY 10041; (1) 212-438-7280 or by e-mail to: research_request@standardandpoors.com.

Regulatory Affairs and Disclaimers | Terms of Use | Privacy and Cookie Notice | Contact Us

Copyright © 2013 Standard & Poor's Financial Services LLC, a part of McGraw Hill Financial. All rights reserved.



**Will Japan's Three Core Strategies Hit Their Mark?**
...and will the growth momentum be reignited to finally get the country out of deflation?

Read more >>

Hide

2 of 10

# EXHIBIT P(22)

**NewsRoom**

7/16/11 L.A. Times 1
2011 WLNR 14120760

Los Angeles Times
Copyright © 2011 Los Angeles Times

July 16, 2011

Section: Business

No more AAA rating for U.S. debt?

TOM PETRUNO

Column

Nearly three years after the financial system crash, the concept of investment risk continues to be turned on its head.

Things have happened in the markets and the economy that have far exceeded most people's worst-case scenarios. What many Americans thought they knew about investing turned out to be dead wrong.

That learning experience is speeding up again. Investors are being forced to rethink a generally accepted financial principle of the postwar era: that the world's developed nations are inherently low-risk places to put money.

The debt problems that have mushroomed in the U.S., Europe and Japan since 2008 have "shattered the concept of the major economies being stable, dependable investments," said Sean Egan, head of Egan-Jones Ratings Co., a smaller rival to Wall Street's credit-rating giants.

This week, two bigger credit raters, Moody's Investors Service and Standard & Poor's, warned that they might soon cut the U.S. government's top-rung AAA debt rating because of the political battle in Washington over the federal debt ceiling and spending cuts.

Think of it. U.S. Treasury bonds are supposed to be the world's "risk-free" asset, in the sense that there should be zero doubt about the government's willingness and ability to pay promised interest and repay principal in full. Treasuries have long been the benchmark by which the risk of other investments is measured. Other interest rates, such as mortgage rates, are set based on Treasury yields.

So it's monumental that S&P, in an announcement Thursday, said that if Congress and the Obama administration failed to agree on a "credible" plan to rein in deficit spending, it might drop its U.S. debt rating from AAA "into the AA category."

That would put the U.S. in with a group of countries that includes Japan, China, Spain and Slovenia. And America would be considered less creditworthy than remaining AAA-rated countries including Canada, Germany, Switzerland, Finland, Norway and Australia.

Finland: The new risk-free asset?

Still, in the realm of debt-rating-speak, a AA rating is considered "high quality." By contrast, that description no longer applies to bonds of Ireland and Portugal, according to Moody's. The firm this month cut both of those countries' ratings to the Ba level, which is the top rung of junk status, or non-investment-grade -- i.e., speculative.

A junk rating for Ireland would have been inconceivable to the Irish people just a few years ago. The country's once fast-growing economy, the Celtic tiger of Europe, held Moody's top Aaa rating, or close to it, for most of the last two decades. But since 2009 Ireland's rating has been on a fast slide. Ditto for Portugal and, of course, for Greece, the epicenter of Europe's financial crisis.

The ratings firms -- and, belatedly, investors -- have come to realize how heavy the debt burdens of these countries have become and how difficult it will be for them to grow their way out of that debt. The same borrowing that fueled their growth since 1990 now is a millstone.

Ireland's public debt equals about 94% of its annual gross domestic product. Portugal's percentage is 83%. Greece's is a stunning 144%. By comparison, U.S. public debt is about 60% of GDP, not counting what's owed to government agencies such as Social Security.

At the other end of the debt spectrum from Western Europe are countries such as South Korea, Slovakia and Brazil, which have public-debt-to-GDP ratios of 24%, 41% and 61%, respectively. Not surprisingly, their investment-grade credit ratings have been untainted by the 2008 global financial crash and its aftereffects.

Greece, Portugal and Ireland, each of which has gone to the European Union for financial aid, now are caught in a vicious cycle: Investors are demanding double-digit market yields on their bonds to compensate for the risk implied by low credit ratings. The annualized yield on two-year Greek bonds is a stunning 33.1%; on Irish two-year bonds it's 23.1%.

If those rates are sustained, the countries will be unable to borrow what they need from investors to roll over maturing debt. Moody's says that makes it more likely the countries will need further help from the European Union -- and that the EU eventually will require private bondholders to bear some of the bailout pain by writing off part of the debt.

The U.S., nearly everyone presumes, is a long way from the fates of Greece, Portugal and Ireland. Even so, with both Moody's and S&P threatening credit downgrades this week, it would be logical for some investors to feel a bit unnerved about Treasury bonds and demand higher interest rates.

Yet so far, that isn't happening. The yield on two-year Treasury notes ended Friday at a mere 0.36%, down from 0.39% a week ago and near the 2011 low of 0.33% reached June 24. The 10-year T-note yield ended the week at 2.91%, down from 3.03% a week ago.

Byron Wien, a veteran money manager at Blackstone Group in New York, has been predicting for the last year that the 10-year T-note yield would rise to 5%. "I've been very wrong," he said. "I am astonished" that yields remain so low.

Wall Street, usually prone to overreaction, remains underwhelmed by the ratings-cut threats. Why? There is disbelief that the cuts really will happen. Congress must raise the $14.3-trillion federal debt ceiling by Aug. 2 or risk the Treasury running out of money, but by Thursday there was talk in Washington of a compromise between President Obama and Republican leaders that would avert that potential debacle.

What's more, investors rightly are suspicious of the ratings firms. There is the sense that Moody's and S&P are playing hardball with Uncle Sam because their reputations are so tarnished by the many AAA ratings they handed out to mortgage bonds that crumbled with the housing bust.

Wien adds another reason investors keep funneling cash to Treasuries: "U.S. rates are so low because there's so much fear around the world." U.S. consumer confidence in the economy is plummeting again, to lows last seen in 2009. Europe's debt crisis has spread to Spain and Italy. The Middle East remains racked by social upheaval.

Meanwhile, the developing world has a different set of problems. China, India, Brazil and other fast-growing developing countries are tightening credit to curb inflation. That has whacked their stock markets this year while the Dow Jones industrial average holds on to a 7.8% year-to-date gain.

But looking out a few years, global investors are presented with two starkly different choices: Developed countries' onerous debt burdens will continue to retard growth, and those burdens will grow heavier if interest rates rise. For the developing world, where debt levels are light, growth prospects remain bright and interest rates could come down if inflation recedes.

Boiled down to that, it doesn't look like much of a competition.

tom.petruno@latimes.com

PHOTO: DEBT TALKS: President Obama with House Speaker John A. Boehner (R-Ohio), left, and Senate Minority Leader Mitch McConnell (R-Ky.) on Wednesday.

PHOTOGRAPHER:Charles Dharapak Associated Press

---- Index References ----

Company: MOODYS INVESTORS SERVICE INC; BLACKSTONE GROUP LP (THE); EGAN JONES RATINGS CO; STANDARD AND POORS FINANCIAL SERVICES LLC

News Subject: (Funding Instruments (1FU41); European Union (1EU94); EU News (1EU58); Government Securities (1GO57); Economic Policy & Policymakers (1EC69); Public Finance (1PU60); Credit Ratings (1CR83); Economics & Trade (1EC26); World Organizations (1IN77))

Industry: (Financial Services (1FI37); Investment Management (1IN34); Banking (1BA20); Retail Banking Services (1RE38); Fixed Income Investments (1FI12); Consumer Finance (1CO55); Securities Investment (1SE57))

Region: (Southern Europe (1SO59); Finland (1FI41); Austria (1AU39); Eastern Asia (1EA61); Iberia (1IB61); Northern Europe (1NO01); Ireland (1IR50); Europe (1EU83); Mediterranean (1ME20); Scandinavia (1SC27); Portugal (1PO90); Central Europe (1CE50); Eurozone Countries (1EU86); Western Europe (1WE41); Asia (1AS61))

Language: EN

Other Indexing: (CHARLES DHARAPAK ASSOCIATED PRESS) (Byron Wien; Mitch McConnell; Sean Egan; Barack Obama; John Boehner)

Keywords: UNITED STATES; FEDERAL DEBT CEILING; CREDIT RATINGS

Edition: Home Edition

Word Count: 1171

**End of Document**                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

No more AAA rating for U.S. debt?, 2011 WLNR 14120760

**News**Room

# EXHIBIT P(23)

**News**Room

8/6/11 N.Y. Times A1
2011 WLNR 15576315

New York Times (NY)
Copyright © 2011 The New York Times Company

August 6, 2011

Section: A

S.&P. Downgrades Debt Rating Of U.S. For The First Time

BINYAMIN APPELBAUM and ERIC DASH; Eric Dash contributed reporting from New York.

Standard & Poor's removes United States government from its list of risk-free borrowers for first time; downgrade is freighted with symbolic significance but carries few clear financial implications; company, one of three that offers advice to investors in debt securities, says it is cutting its rating on longterm federal debt to AA plus, one notch below AAA; describes decision as judgment about nation's leaders, noting that gulf between political parties has reduced its confidence in government's ability to manage its finances; graph (M)

WASHINGTON -- Standard & Poor's removed the United States government from its list of risk-free borrowers for the first time on Friday night, a downgrade that is freighted with symbolic significance but carries few clear financial implications.

The company, one of three major agencies that offer advice to investors in debt securities, said it was cutting its rating of long-term federal debt to AA+, one notch below the top grade of AAA.It described the decision as a judgment about the nation's leaders, writing that "the gulf between the political parties" had reduced its confidence in the government's ability to manage its finances.

"The downgrade reflects our view that the effectiveness, stability, and predictability of American policymaking and political institutions have weakened at a time of ongoing fiscal and economic challenge," the company said in a statement.

The Obama administration reacted with indignation, noting that the company had made a significant mathematical mistake in a document that it provided to the Treasury Department on Friday afternoon, overstating the federal debt by about $2 trillion.

"A judgment flawed by a $2 trillion error speaks for itself," a Treasury spokeswoman said.

The downgrade could lead investors to demand higher interest rates from the federal government and other borrowers, raising costs for governments, businesses and home buyers.But many analysts say the impact could be modest, in part because the other ratings agencies, Moody's and Fitch, have decided not to downgrade the government at this time.

The announcement came after markets closed for the weekend, but there was no evidence of any immediate disruption.A spokesman for the Federal Reserve said the decision would not affect the ability of banks to borrow money by pledging government debt as collateral, a statement that could set the tone for the reaction of the broader market.

S.&P. Downgrades Debt Rating Of U.S. For The First Time, 2011 WLNR 15576315

S.& P. had prepared investors for the downgrade announcement with a series of warnings earlier this year that it would act if Congress did not agree to increase the government's borrowing limit and adopt a long-term plan for reducing its debts by at least $4 trillion over the next decade.

Earlier this week, President Obama signed into law a Congressional compromise that raised the debt ceiling but reduced the debt by at least $2.1 trillion.

On Friday, the company notified the Treasury that it planned to issue a downgrade after the markets closed, and sent the department a copy of the announcement, which is a standard procedure.

A Treasury staff member noticed the $2 trillion mistake within the hour, according to a department official.The Treasury called the company and explained the problem.About an hour later, the company conceded the problem but did not indicate how it planned to proceed, the official said.Hours later, S.& P. issued a revised release with new numbers but the same conclusion.

In a statement early Saturday morning, Standard & Poor's said the difference could be attributed to a "change in assumptions" in its methodology but that it had "no impact on the rating decision."

In a release on Friday announcing the downgrade, it warned that the government still needed to make progress in paying its debts to avoid further downgrades.

"The downgrade reflects our opinion that the fiscal consolidation plan that Congress and the administration recently agreed to falls short of what, in our view, would be necessary to stabilize the government's medium-term debt dynamics," it said.

The credit rating agencies have been trying to restore their credibility after missteps leading to the financial crisis.A Congressional panel called them "essential cogs in the wheel of financial destruction" after their wildly optimistic models led them to give top-flight reviews to complex mortgage securities that later collapsed.A downgrade of federal debt is the kind of controversial decision that critics have sometimes said the agencies are unwilling to make.

On the other hand, S.& P. is acting in the face of evidence that investors consider Treasuries among the safest investments in the world.Yields rose before the Congressional deal on fears of default and a possible downgrade.But after a deal was struck, yields sank as money poured into Treasuries as a safe haven from sharply falling stocks and the turmoil of the European debt markets.

On Friday, the price of Treasuries fell sharply in heavy selling, and yields rose, reversing the moves of recent sessions.The 10-year Treasury note ended the day with a yield of 2.56 percent.

The United States has maintained the highest credit rating for decades.S.& P. first designated it AAA in 1941, reflecting a steadfast belief that the richest nation in the world would not default on its debt payments.The rating was also bolstered by the role of the dollar as the world's leading currency, ensuring that demand for American debt securities would remain strong in spite of burgeoning deficits.

"What's changed is the political gridlock," said David Beers, S.& P.'s global head of sovereign ratings, in an e-mail several days before a debt ceiling agreement was announced. "Even now, it's an open question as to whether or when Congress and the administration can agree on fiscal measures that will stabilize the upward trajectory of the U.S. government debt burden."

Experts say the fallout could be modest.

The federal government makes about $250 billion in interest payments a year, so even a small increase in the rates demanded by investors in United States debt could add tens of billions of dollars to those payments.

S.&P. Downgrades Debt Rating Of U.S. For The First Time, 2011 WLNR 15576315

In addition, S.& P. may now move to downgrade other entities backed by the government, including Fannie Mae and Freddie Mac, the government-controlled mortgage companies, raising rates on home mortgage loans for borrowers.

However, because Treasury bonds have always been considered perfectly safe, many rules prohibiting institutions from investing in riskier securities are written as if there were no possibility that the credit rating of Treasuries would be less than stellar.

Banking regulations, for example, accord Treasuries a special status that is not contingent on their rating.The Fed affirmed that status in guidance issued to banks on Friday night.Some investment funds, too, often treat Treasuries as a separate asset category, so that there is no need to sell Treasuries simply because they are no longer rated AAA.In addition, downgrade of long-term Treasury bonds does not affect the short-term federal debt widely held by money market mutual funds.

In other words, almost no one would be precluded from investing in federal debt, and even the ratings agencies have concluded that few investors would walk away voluntarily.

---- Index References ----

News Subject: (Credit Ratings (1CR83); Funding Instruments (1FU41); Government Securities (1GO57))

Industry: (Banking (1BA20); Consumer Finance (1CO55); Financial Services (1FI37); Fixed Income Investments (1FI12); Investment Management (1IN34); Loans (1LO12); Mortgage Banking (1MO85); Retail Banking Services (1RE38); Securities Investment (1SE57))

Region: (Americas (1AM92); North America (1NO39))

Language: EN

Other Indexing: (David Beers; Barack Obama)

Edition: Late Edition - Final

Word Count: 1190

---

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

NewsRoom

# EXHIBIT P(24)

**NewsRoom**

8/8/11 Caucus (Pg. Unavail. Online)
2011 WLNR 15678130

Caucus, The
Copyright © 2011 The New York Times Company

August 8, 2011

Section: thecaucus

10 Questions for Geithner
The Caucus

JOHN HARWOOD

Treasury Secretary Timothy F. Geithner sat down with John Harwood of The New York Times and CNBC to discuss the credit rating downgrade

August 08, 2011

Shortly after announcing that he would remain on the job as President Obama's Treasury secretary rather than leave the administration and return home to New York, Timothy F. Geithner sat down with John Harwood of The New York Times and CNBC on Sunday to discuss Standard & Poor's decision to downgrade the United States government's credit rating and America's economic road ahead. Below is a condensed, edited view of their conversation.

1. S&P downgraded Friday night. Over the weekend, Michelle Bachmann, the Republican presidential candidate, among others, said you should resign. Today you did the opposite and announced that you're staying. Why?

GEITHNER: I believe in this president, John. I believe in what he's trying to do for the country. I love my work. And I think if a president asks you to serve, you have to do it. And we have men and women dying to protect the country in Afghanistan. We have unemployment above 9 percent. Still trying to heal the scars of this crisis. We have a lot of work to do.

2: Do you feel that you or the administration's policies are in any way responsible for this downgrade?

GEITHNER: Absolutely not. You've seen the president work incredibly hard and make really amazing progress trying to heal the damage caused by this terrible crisis. And you saw him work his heart out to try and bring both parties together to reach agreement on a long-term fiscal deal. Made some progress, didn't solve it all, but a very good down payment.

3. Alan Greenspan, former chairman of the Federal Reserve, today said that markets would react negatively, that it's been a blow to the psyche of the United States. What is your message to investors?

GEITHNER: Let's just start with this particular judgment by S&P. I think S&P has shown really terrible judgment, and they've handled themselves very poorly. And they've shown a stunning lack of knowledge about basic U.S. fiscal budget math. And I think they drew exactly the wrong conclusion from this budget agreement.

They, like many people, looked at this terrible debate we've had over the past few months, should the U.S. default or not. That was very damaging. Congress ultimately owns the credit rating of the United States. They have the power of the purse on the Constitution. And they're going to have a chance now to earn back confidence of investors around the world. But our country is much stronger than Washington. We have a very resilient economy. And I have enormous confidence in the basic regenerative capacity of the American economy and the American people.

4. Are U.S. treasuries as safe this week as they were last week?

GEITHNER: The judgment by S&P changed nothing. It added nothing to what people know about this country. There's no risk the U.S. would never meet its obligations. We've got some challenges ahead of us, but we'll be able to work with those challenges. We'll get through this.

5. You said a moment ago that Congress owns the credit rating. John Kerry, Democratic senator, said today, "This is the Tea Party downgrade." Is that right?

GEITHNER: I'm not going to do politics. If we've learned anything these last few months, it's time to put the economy ahead of politics. Again, these are challenges facing the country of the United States, not facing one party or the other. We both have some responsibility for coming together to dig our way out of this stuff.

6. Help the average American who's been absorbing this information this weekend: what's going to happen to the interest rates on their mortgages, their car loans, their business loans?

GEITHNER: I don't like to talk about markets. It's hard to know what'll happen in this context. But I think that everyone can be confident, both here and around the world, that treasuries are the strongest place to put your money at a time like this.

You'll see markets reset. Interest rates are very, very low. Those interest rates reflect the confidence of the world.

7. Why should anybody expect that the political system will function more effectively going forward than it has so far?

GEITHNER: Because it always has in the past and it always will. That's the great strength about this country. Faced with tremendous challenge, our country has shown a unique and extraordinary capacity over time to act, with a tremendous record of judgment in crisis over time.

8. China said over the weekend that the United States has to cure its addiction to debt. are you worried that they're going to stop lending us money?

GEITHNER: No concern about that. I'm sure they'll be strong investors in the U.S. going forward, as will investors around the world. There's no surprise that the U.S. has a long-term and unsustainable fiscal position.

We can't solve it overnight. It would be damaging, counterproductive to try to solve it overnight, because we have an economy still healing.

9. Have the headwinds you've referred to made a double-dip recession a possibility?

GEITHNER: I don't think that's likely, but it depends on the quality of judgments of the governments and central banks.

10. How did you feel when you got the word that S&P was downgrading? Were you angry?

**10 Questions for Geithner, 2011 WLNR 15678130**

GEITHNER: I won't characterize what I felt at that point. (CHUCKLES) But just look at the quality of judgments they've made in the past.


---- Index References ----

Company: NEW YORK TIMES CO (THE); STANDARD AND POORS FINANCIAL SERVICES LLC

News Subject: (Recession (1RE01); Political Parties (1PO73); Government (1GO80); Economic Policy & Policymakers (1EC69); U.S. Legislation (1US12); Economics & Trade (1EC26); Legislation (1LE97))

Region: (North America (1NO39); Americas (1AM92); USA (1US73))

Language: EN

Other Indexing: (John Harwood; Barack Obama; Michelle Bachmann; John Kerry; Alan Greenspan; Timothy Geithner)

Keywords: News; Geithner, Timothy F; United States Economy; Standard & Poor's Corp; Treasury Department; United States; The Caucus

Word Count: 901

---

**End of Document**                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

**NewsRoom**

# EXHIBIT P(25)

abcnews.go.com/blogs/politics/2011/08/obama-economic-advisor-sps-downgrade-was-reckless/

ABC NEWS BLOGS    >    POLITICS    >    THE NOTE

# The Note

HEADLINES | POLITICS | ENTERTAINMENT | HEALTH | LIFESTYLE

# Obama Economic Advisor: S&P's Downgrade Was 'Reckless'



Aug 8, 2011 7:39pm

ABC News' Lauren Effron (@leffron831) reports: The public blame game over Standard & Poor's downgrade of the United States' credit rating continued to rage today.

It was an expensive day on Wall Street, as $2.3 trillion was lost in stock market wealth by the sound of the closing bell. As President Obama addressed the nation for the first time since the downgrade was announced Aug. 5, the Dow Jones industrial average dipped below the 11,000 mark.

In an exclusive "Nightline" interview, Director of the National Economic Council Gene Sperling ripped apart the S&P's report, calling it "irresponsible" and "reckless," and claimed the rating agency rushed through its assessment.

"[S&P] simply changed their press release," Sperling said. "They simply decided on the spot that they had a different lead rationale for why they were going to downgrade the United States. That was very irresponsible thing to do and a bit reckless to do at a moment of such fragility in the markets."

**Watch "Nightline's" full report tonight at 11:35 p.m. ET**

That "fragility" certainly proved true today, when S&P also announced it was downgrading the government-backed mortgage debt. As a result, the stock market faced its biggest plunge since 2008. The Dow closed down 634 points, the S&P 500 lost 79 points and the Nasdaq ended 174 points lower, dropping almost 7 percent.

Sperling said Obama's economic team's biggest worry was that the downgrade would have caused "very negative consequences" had the U.S. faced default. Echoing the president's remarks earlier today, Sperling urged the need for bipartisanship in the debt reduction deal later this year.

"We don't agree that [S&P] political analysis and certainly their flawed economic and budget analysis justify the downgrade in any way," Sperling said. "But we don't disagree with what is a very obvious point too ... that we need to be able to overcome the degree of line drawing, the degree of my-way-or-the-highway that is keeping us as a country, as a government, from coming together on the type of bipartisan agreement we need right now to get our deficit down and on the right path."

S&P continued to stand by its decision to downgrade the nation from an AAA credit rating to AA+, saying it based its decision on the nasty political fight between the Obama administration and Congress over raising the debt ceiling.

   

# EXHIBIT P(26)

**News**Room

8/7/11 Reuters News 01:39:24

Reuters News
Copyright © 2011 Reuters

August 7, 2011

UPDATE 1-White House adviser slams S&P after U.S. downgrade

Laura MacInnis

Eric Walsh

WASHINGTON, Aug 6 (Reuters) - A top White House economic adviser slammed Standard & Poor's on Saturday for having stuck with its decision to downgrade the U.S. credit rating despite having made a $2 trillion mistake in its fiscal projections.

"The magnitude of their error combined with their willingness to simply change on the spot their lead rationale in the press release once the error was pointed out was breathtaking," National Economic Council head Gene Sperling said in a statement.

"It smacked of an institution starting with a conclusion and shaping any arguments to fit it," he said.

S&P, a major credit rating agency, cut the long-term U.S. credit rating by one notch from AAA to AA-plus on Friday on concerns about the government's budget and rising debt burden.

The U.S. Treasury said the rating agency's debt calculations were wrong by some $2 trillion.S&P has confirmed it changed its economic assumptions after discussion with the Treasury Department but said that did not affect its decision to downgrade. [ID:nN1E774236]

A major theme in S&P's analysis was the apparent breakdown in the ability of Republicans and President Barack Obama's Democrats to govern effectively, as evidenced in the fractious negotiations leading to a last-minute debt limit deal that brought the United States to the edge of default.

(Adds background)

(Reporting by Laura MacInnis; Editing by Eric Walsh)

((laura.macinnis@thomsonreuters.com, +1 202 997 6024))

(C) Reuters 2011.All rights reserved.Republication or redistribution of Reuters content, including by caching, framing or similar means, is expressly prohibited without the prior written consent of Reuters.Reuters and the Reuters sphere logo are registered trademarks and trademarks of the Reuters group of companies around the world.

---- Index References ----

News Subject: (Top World News (1WO62); Municipal Bonds (1MU39); Bond Issues (1BO94); Economics & Trade (1EC26); Credit Ratings (1CR83); Bond Terms & Conditions (1BO16); Bond Instruments (1BO92); Emerging Market Countries (1EM65); National Government Debt (1NA73); Economic Policy & Policymakers (1EC69); Legislation (1LE97); Interest Rates (1IN23); U.S. Legislation (1US12); Funding Instruments (1FU41); Government (1GO80))

Industry: (Securities Investment (1SE57); Credit (1CR60); Investment Management (1IN34); Fixed Income Investments (1FI12); Bonds (1BO97); Major Central Banks (1MA01); Financial Services (1FI37); Banking (1BA20); Retail Banking Services (1RE38))

Region: (United Kingdom (1UN38); Western Europe (1WE41); Asia (1AS61); China (1CH15); Europe (1EU83); Japan (1JA96); USA (1US73))

Language: EN

Other Indexing: (Barack Obama; Gene Sperling)

Keywords: USA RATING; S&P WHITEHOUSE

Word Count: 284

End of Document                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

NewsRoom

# EXHIBIT P(27)

**NewsRoom**

8/8/11 FD (Fair Disclosure) Wire 15:00:00

FD (FAIR DISCLOSURE) WIRE
Copyright © 2011 CCBN, Inc. and Roll Call, Inc.

August 8, 2011

U.S. President Barack Obama Delivers Remarks - Final

Presentation

BARACK OBAMA, PRESIDENT, US ADMINISTRATION: Good afternoon, everybody.

On Friday, we learned that the United States received a downgrade by one of the credit rating agencies, not so much because they doubt our ability to pay our debt if we make good decisions, but because after witnessing a month of wrangling over raising the debt ceiling, they doubted our political system's ability to act.

The markets, on the other hand, continue believe our credit status is AAA.In fact, Warren Buffett, who knows a thing or two about good investments, said, "If there were a AAAA rating, I'd give the United States that."I and most of the world's investors agree.

That doesn't mean we don't have a problem.The fact is we didn't need a rating agency to tell us that we need a balanced long-term approach to deficit reduction.That was true last week.That was true last year.That was true the day I took office.

And we didn't need a rating agency to tell us that the gridlock in Washington over the last several months has not been constructive, to say the least.

We knew from the outset that a prolonged debate over the debt ceiling, a debate where the threat of default was used as a bargaining chip, could do enormous damage to our economy and the world's.

That threat, coming after a string of economic disruptions in Europe, Japan and the Middle East, has now roiled the markets and dampened consumer confidence and slowed the pace of recovery.

So all of this is a legitimate source of concern.But here's the good news.Our problems are imminently solvable.And we know what we have to do to solve them.

With respect to debt, our problem is not confidence in our credit. The markets continue to reaffirm our credit as among the world's safest.Our challenge is the need to tackle our deficits over the long term.

Last week we reached an agreement that will make historic cuts to defense and domestic spending.But there's not much further we can cut in either of those categories.What we need to do now is combine those spending cuts with two additional steps, tax reform that will ask those who can afford it to pay their fair share and modest adjustments to health care programs like Medicare.

U.S. President Barack Obama Delivers Remarks - Final

Making these reforms doesn't require any radical steps. What it does require is common sense and compromise. There are plenty of good ideas about how to achieve long-term deficit reduction that doesn't hamper economic growth right now. Republicans and Democrats on the bipartisan fiscal commission that I set up put forth good proposals. Republicans and Democrats in the Senate's gang of six came up with some good proposals. John Boehner and I came up with some good proposals when we came close to agreeing on a grand bargain.

So it's not a lack of plans or policies that is the problem here. It's a lack of political will in Washington. It's the insistence on drawing lines in the sand, a refusal to put what's best for the country ahead of self-interest or party or ideology. And that's what we need to change.

I realize that after what we just went through, there's some skepticism that Republicans and Democrats on the so-called "super committee," this joint committee that's been set up, will be able to reach a compromise. But my hope is that Friday's news will give us a renewed sense of urgency. I intend to present my own recommendations over the coming weeks on how we should proceed. And that committee will have this administration's full cooperation. And I assure you, we will stay on it until we get the job done.

Of course, as worrisome as the issues of debt and deficits may be, the most immediate concern of most Americans, and of concern to the marketplace as well, is the issue of jobs and the slow pace of recovery coming out of the worst recession in our lifetimes.

And the good news here is that by coming together to deal with the long-term debt challenge, we would have more room to implement key proposals that can get the economy to grow faster.

Specifically, we should extend the payroll tax cut as soon as possible so that workers have more money in their paychecks next year and businesses have more customers next year.

We should continue to make sure that if you're one of the millions of Americans who is out there looking for a job, you can get the unemployment insurance that your tax dollars contributed to. That will also put money in people's pockets and more customers in stores.

In fact, if Congress fails to extend the payroll tax cut and the unemployment insurance benefits that I've called for, it could mean 1 million fewer jobs and half a percent less growth.

This is something we can do immediately, something we can do as soon as Congress gets back.

We should also help companies that want to repair our roads and bridges and airports so that thousands of construction workers who've been without a job for the last few years can get a paycheck again. That will also help to spur economic growth.

These aren't Democratic proposals. These aren't big government proposals. These are all ideas that traditionally Republicans have agreed to, have agreed to countless times in the past. There's no reason we shouldn't act on them now. None.

I know we're going through a tough time right now. We've been going through a tough time for the last two and a half years. I know a lot of people are worried about the future.

But here's what I also know. There will always be economic factors that we can't control. Earthquakes. Spikes in oil prices. Slowdowns in other parts of the world. But how we respond to those tests, that's entirely up to us.

Markets will rise and fall, but this is the United States of America. No matter what some agency may say, we've always been and always will be AAA country.

U.S. President Barack Obama Delivers Remarks - Final

All the challenges we face -- we continue to have the best universities, some of the most productive workers, the most innovative companies, the most adventurous entrepreneurs on Earth.

What sets us apart is that we've always not just had the capacity but also the will to act; the determination to shape our future; the willingness in our democracy to work out our differences in a sensible way; and to move forward not just for this generation but for the next generation.

And we're going to need to summon that spirit today.

The American people have been through so much over the last few years, dealing with the worse recession, the biggest financial crisis since the 1930s -- and they've done it with grace.And they're working so hard to raise their families.

And all they ask is that we work just as hard here in this town to make their lives a little bit easier.And that's not too much to ask.

And ultimately, the reason I am so hopeful about our future, the reason I have faith in these United States of America is because of the American people.It's because of their perseverance and their courage and their willingness to shoulder the burdens we face together as one nation.

One last thing.There is no one who embodies the qualities I mentioned more than the men and women of the United States armed forces, and this weekend we lost 30 of them when their helicopter crashed during am mission in Afghanistan.

No loss is a stark reminder of the risks that our men and women in uniform take every single day on behalf of their country.Day after day, night after night, they carry out missions like this in the face of enemy fire and grave danger.

And in this mission, as in so many others, they were also joined by Afghan troops, seven of whom lost their lives as well.

So I've spoken to our generals in the field, as well as President Karzai, and I know that our troops will continue the hard work of transitioning to a stronger Afghan government and ensuring that Afghanistan is not a safe haven for terrorists.

We will press on and we will succeed.But now is also a time to reflect on those we lost and the sacrifices of all who serve, as well as their families.These men and women put their lives on the line for the values that bind us together as a nation.They come from different places, and their backgrounds and beliefs reflect the rich diversity of America.

But no matter what differences they might have as individuals, they serve this nation as a team.They meet their responsibilities together, and some of them, like the 30 Americans who were lost this weekend, give their lives for their country.Our responsibility is to ensure that their legacy is an America that reflects their courage, their commitment and their sense of common purpose.

Thank you very much.

[Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items.Such forward-looking statements are based upon current expectations and involve risks and uncertainties.Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings.Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the

assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS.IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.]

[Copyright: Content copyright 2011 Thomson Financial.ALL RIGHTS RESERVED.Electronic format, layout and metadata, copyright 2011 ASC LLC (www.ascllc.net) ALL RIGHTS RESERVED.No license is granted to the user of this material other than for research.User may not reproduce or redistribute the material except for user's personal or internal use and, in such case, only one copy may be printed, nor shall user use any material for commercial purposes or in any fashion that may infringe upon Thomson Financial's or ASC's copyright or other proprietary rights or interests in the material; provided, however, that members of the news media may redistribute limited portions (less than 250 words) of this material without a specific license from Thomson Financial and ASC so long as they provide conspicuous attribution to Thomson Financial and ASC as the originators and copyright holders of such material.This is not a legal transcript for purposes of litigation.]

---- Index References ----

Company: THOMSON FINANCIAL LTD

News Subject: (Public Finance (1PU60); Legislation (1LE97); Economics & Trade (1EC26); Recession (1RE01); Government (1GO80); Economic Policy & Policymakers (1EC69); U.S. Legislation (1US12))

Industry: (Internet Technology (1IN39); Internet (1IN27); Internet Advanced Technology (1IN45))

Region: (Afghanistan (1AF45); North America (1NO39); USA (1US73); Asia (1AS61); Americas (1AM92); Western Asia (1WE54))

Language: EN

Other Indexing: (ASC LLC) (Barack Obama; Warren Buffett; Hamid Karzai; John Boehner)

Word Count: 1924

**End of Document**                                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

**News**Room

# EXHIBIT P(28)



# Forbes

**GuruFocus**, Contributor
We track the stock picks & portfolios of the world's best investors.

INVESTING | 5/02/2013 @ 5:54AM | 6,931 views

# As Moody's Stock Price Recovers, Warren Buffett Sells

Warren Buffett's Berkshire Hathaway (BRK.A)(BRK.B) sold 1.7 million shares of Moody's (MCO) over the past two days. After the sale, Berkshire still owns 26.6 million shares of Moody's, or 11.9% of the company. Berkshire's average sale price was a little above $60 a share.

Berkshire owned 48 million shares of Moody's before June 2009. It received its shares from the spin-off of Dun & Bradstreet (DNB), with a cost base of about $10 a share. Once traded at above $70 a share, Moody's stock price collapsed to below $20 amid its role in the financial crisis and the market crash in 2009. Warren Buffett sold 15 million shares at the prices of $20s. The recent bull market pushed Moody's stock price up to $60 again. So Warren Buffett started to sell again.

Warren Buffett liked Moody's because the unique position of the company in credit ratings. It has a wide moat and extremely low capital requirement. But Moody's has largely lost its most important asset during the financial crisis – its credibility. That is probably why Warren Buffett sells.



As Moody's Stock Price Recovers, Warren Buffett Sells - Forbes                    Page 2 of 2

Buffett still owns more than 26 million shares of Moody's. We won't be surprised to see he continues to sell these shares. We will monitor this closely and report any buys and sells in GuruFocus Real Time Picks.

Here is the complete portfolio of Warren Buffett. Also check out:

1. Warren Buffett's Undervalued Stocks
2. Warren Buffett's Top Growth Companies, and
3. Warren Buffett's High Yield stocks
4. Stocks that Warren Buffett keeps buying

---

**This article is available online at:**
http://www.forbes.com/sites/gurufocus/2013/05/02/as-moodys-stock-price-recovers-warren-buffett-sells/

# EXHIBIT P(29)



1 of 2 DOCUMENTS

Copyright 2011 The New York Times Company
The New York Times

August 18, 2011 Thursday
Late Edition - Final

**SECTION:** Section A; Column 0; Business/Financial Desk; Pg. 1

**LENGTH:** 1327 words

**HEADLINE:** Justice Inquiry Is Said to Focus On S.&P. Ratings

**BYLINE:** By LOUISE STORY

**BODY:**

The Justice Department is investigating whether the nation's largest credit ratings agency, Standard & Poor's, improperly rated dozens of mortgage securities in the years leading up to the financial crisis, according to two people interviewed by the government and another briefed on such interviews.

The investigation began before Standard & Poor's cut the United States' AAA credit rating this month, but it is likely to add fuel to the political firestorm that has surrounded that action. Lawmakers and some administration officials have since questioned the agency's secretive process, its credibility and the competence of its analysts, claiming to have found an error in its debt calculations.

In the mortgage inquiry, the Justice Department has been asking about instances in which the company's analysts wanted to award lower ratings on mortgage bonds but may have been overruled by other S.& P. business managers, according to the people with knowledge of the interviews. If the government finds enough evidence to support such a case, which is likely to be a civil case, it could undercut S.& P.'s longstanding claim that its analysts act independently from business concerns.

It is unclear if the Justice Department investigation involves the other two ratings agencies, Moody's and Fitch, or only S.& P.

During the boom years, S.& P. and other ratings agencies reaped record profits as they bestowed their highest ratings on bundles of troubled mortgage loans, which made the mortgages appear less risky and thus more valuable. They failed to anticipate the deterioration that would come in the housing market and devastate the financial system.

Since the crisis, the agencies' business practices and models have been criticized from many corners, including in Congressional hearings and reports that have raised questions about whether independent analysis was corrupted by the drive for profits.

Justice Inquiry Is Said to Focus On S.&P. Ratings The New York Times August 18, 2011 Thursday

The Securities and Exchange Commission has also been investigating possible wrongdoing at S.& P., according to a person interviewed on that matter, and may be looking at the other two major agencies, Moody's and Fitch Ratings.

Ed Sweeney, a spokesman for S.& P., said in an e-mail: "S.& P. has received several requests from different government agencies over the last few years. We continue to cooperate with these requests. We do not prevent such agencies from speaking with current or former employees." S.& P. is a unit of the McGraw-Hill Companies, which is under pressure from some investors and has been considering whether to spin off businesses or make other strategic changes this summer.

The people with knowledge of the investigation said it had picked up steam early this summer, well before the debt rating issue reached a high pitch in Washington. Now members of Congress are investigating why S.& P. removed the nation's AAA rating, which is highly important to financial markets.

Representatives of the Justice Department and the S.E.C. declined to comment, as is customary for those departments, on whether they are investigating the ratings agencies.

Even though the Justice Department has the power to bring criminal charges, witnesses who have been interviewed have been told by investigators that they are pursuing a civil case.

The government has brought relatively few cases against large financial concerns for their roles in the housing blowup, and it has closed investigations into Washington Mutual and Countrywide, among others, without taking action.

The cases that have been brought are mainly civil matters. In the spring, the Justice Department filed a civil suit against Deutsche Bank and one of its units, which the government said had misrepresented the quality of mortgage loans to obtain government insurance on them. Another common thread -- in that case and several others -- is that no bank executives were named.

Despite the public scrutiny and outcry over the ratings agencies' failures in the financial crisis, many investors still rely heavily on ratings from the three main agencies for their purchases of sovereign and corporate debt, as well as other complex financial products.

Companies and some countries -- but not the United States -- pay the agencies to receive a rating, the financial market's version of a seal of approval. For decades, the government issued rules that banks, mutual funds and others could rely on a AAA stamp for investing decisions -- which bolstered the agencies' power.

A successful case or settlement against a giant like S.& P. could accelerate the shift away from the traditional ratings system. The financial reform overhaul known as Dodd-Frank sought to decrease the emphasis on ratings in the way banks and mutual funds invest their assets. But bank regulators have been slow to spell out how that would work. A government case that showed problems beyond ineptitude might spur greater reforms, financial historians said.

"I think it would have a major impact if there was a successful fraud case that would suggest there would be momentum for legislation that would force them to change their business model," said Richard Sylla, a professor at New York University's Stern School of Business who has studied the history of ratings firms.

In particular, Professor Sylla said that the ratings agencies could be forced to stop making their money off the entities they rate and instead charge investors who use the ratings. The current business model, critics say, is riddled with conflicts of interest, since ratings agencies might make their grades more positive to please their customers.

Before the financial crisis, banks shopped around to make sure rating agencies would award favorable ratings before agreeing to work with them. These banks paid upward of $100,000 for ratings on mortgage bond deals, according to the Financial Crisis Inquiry Commission, and several hundreds of thousands of dollars for the more

Justice Inquiry Is Said to Focus On S.&P. Ratings The New York Times August 18, 2011 Thursday

complex structures known as collateralized debt obligations.

Ratings experts also said that a successful case could hamper the agencies' ability to argue that they were not liable for ratings that turned out to be wrong.

"Their story is that they should be protected by full First Amendment protections, and that would be harder to make in the public arena, in Congress and in the courts," said Lawrence J. White, another professor at New York University's Stern School of Business, who has testified alongside ratings executives before Congress. "If they mixed business and the ratings, it would certainly make their story harder to tell."

The ratings agencies lost a bit of ground on their First Amendment protections in the recent financial reform bill, which put the ratings firms on the same legal liability level as accounting firms, Professor White said. But that has yet to be tested in court.

People with knowledge of the Justice Department investigation of S. & P. said investigators had made references to several individuals, though it was unclear if anyone would be named in any potential case. Investigators have been asking about a remark supposedly made by David Tesher about mortgage security ratings, two people said. The investigators have asked witnesses if they heard Mr. Tesher say: "Don't kill the golden goose," in reference to mortgage securities.

S.& P. declined to provide a comment for Mr. Tesher.

Several of the people who oversaw S.& P.'s mortgage-related ratings went on to different jobs at McGraw-Hill, including Joanne Rose, the former head of structured finance; Vickie Tillman, the former head of ratings; and Susan Barnes, former head of residential mortgage bond ratings. Investigators have told witnesses that they are looking for former employees and that has proved difficult because so many crucial people still work at the company.

One former executive who has been mentioned in investigators' interviews is Richard Gugliada, who helped oversee ratings of collateralized debt obligations. Calls to his home were not returned.

**URL:** http://www.nytimes.com

**GRAPHIC:** PHOTOS: Investigators want to interview former S.& P. employees, but many are at new jobs in the company or its parent, McGraw-Hill, like Vickie Tillman, former head of ratings services, left, and Susan Barnes, former head of residential mortgage bond ratings. (PHOTOGRAPHS BY BRENDAN McDERMID/REUTERS
JIN LEE/BLOOMBERG NEWS
 HARRY HAMBURG/ASSOCIATED PRESS) (B10)

**LOAD-DATE:** August 18, 2011

# EXHIBIT P(30)



• SUBSCRIBE
• RENEW
• GIVE A GIFT
• DIGITAL EDITION

*The* Atlantic

Print | Close

# The Backlash Against S&P Begins

*By Daniel Indiviglio*

*The U.S. has launched an investigation of the rating agency, and municipalities are shunning it*



Apparently, it isn't so fun to get downgraded. Earlier this month, Standard and Poor's downgraded the U.S., which caused a domino effect and pushed down the ratings of bonds issued by other entities implicitly guaranteed by the U.S like some municipalities. The retaliation appears to have begun.

This week, we're learning that some of those local governments are dropping the agency from the group it pays to rate its debt. Meanwhile, the U.S. Justice Department is reportedly investigating S&P for its mortgage bond rating mistakes. Yet S&P rejected a proposal that would have changed the ratings market framework in a way that might have prevented bond issuer retaliation. The agency may only have itself to blame for its situation.

## The U.S. Investigation

Let's start with the news. It certainly may seem convenient that the U.S. is now investigating S&P for its poorly conceived ratings on mortgage-backed securities during the housing bubble. While there's little doubt that the agency erred in handing out strong ratings to so many weak deals, should we question the U.S.'s motives here? Is it just looking for revenge after the agency downgraded the nation's debt?

Perhaps, but according to the New York Times, the investigation began before S&P downgraded the U.S. -- but how long before? Remember S&P got the rating agency outrage ball rolling back in April. It was the first to question rising political risk in the U.S. as it revised the nation's debt outlook to negative. Moody's and Fitch followed with their own warnings, of course.

Even if this investigation was started before any of this downgraded business began, it is now hopelessly compromised. To the extent that those who have influence in Washington can push the Justice Department to go harder on S&P, they probably will. It's also worth noting that the other rating agencies -- which made just as terrible mistakes as S&P during the housing bubble -- are not known to be targets of similar investigations.

## Municipalities Drop S&P

Some municipalities are clearly and directly retaliating against their downgrades stemming from the U.S. rating change. Los Angeles, for example, has dropped S&P from the group of agencies that rate its bonds. So have two other counties, with others considering similar moves. This will mean lost income for S&P, but the agency should have anticipated such potential consequences to its contrarian stance going in.

## Lost Credibility With Other Issuers and Investors?

The bigger question for S&P's future prospects is whether or not the U.S. downgrade will have broader, lasting negative effects on its business. Losing fees from a handful of municipalities isn't going to break the firm. But if other issuers worry that S&P is becoming overly conservative in its rating approach, then they might also choose to turn to other agencies instead. We'll have to wait to see.

Investors' reaction has been somewhat mixed. After the U.S. was downgraded, Treasury yields dropped, which means that investors were willing to pay even more money for Treasuries. This is precisely the opposite of what would have occurred if investors had abandoned U.S. bonds due to the risk that S&P's downgrade attempted to highlight. Yet reports indicate that municipal bonds were affected more adversely.

So investors' view here is complex. Apparently, they must see the prospect of a U.S. default highly unlikely, despite the downgrade. But perhaps they believe that the U.S.'s poor fiscal position could result in a decision not to bail out municipalities that face default.

## The Problem This Causes

The reactions of the federal and municipal governments are somewhat hypocritical. Back when Congress was holding hearings about all of the problems that we saw during the financial crisis, they loudly criticized lenders for cherry-picking rating agencies. They appeared deeply concerned that mortgage bond issuers pressured the agencies to provide overly optimistic ratings to ensure future business. Separately, some municipalities have criticized the agencies for not being conservative enough with their ratings, after the local governments lost money on mortgage bonds held by pension funds.

## The Solution: Unsolicited Ratings

Yet even if the U.S. decided that it no longer wanted S&P to rate its debt, the agency would still do so.

Case 2:13-cv-00779-DOC-JCG   Document 101-6   Filed 01/20/14   Page 85 of 130   Page ID #:2420

Rating agencies sometimes provide unsolicited ratings on important debt issuance for which they have publicly available data to base a rating. Although they don't get paid, they believe getting their opinion out there is worth doing this work for free.

But the way the market currently works, agencies can't provide unsolicited ratings for every bond out there. Ultimately, they need income to compensate their rating analysts. As a result, the possibility that issuers drop conservative raters must remain a real business concern to the agencies.

A reform was proposed to fix this problem when the financial regulation bill was being created. It would have created a panel of investors who randomly pick one agency to rate every deal, which issuers could not drop. Though, issuers could solicit additional ratings as well. Under this proposal, the agencies wouldn't have to worry as much about adverse reactions to their ratings, as the issuers would not solicit all ratings.

The agencies fought against this proposal, however, and it was ultimately dropped from the final bill. Instead, the legislation calls for a study to be completed by mid-2012 to determine such a system's feasibility. But perhaps if the agencies -- including S&P -- had embraced this rule, they wouldn't have to worry as much about getting dropped when issuing a conservative rating. Under the proposed framework, agencies wouldn't have as much of an incentive to pacify issuers.

Ultimately, the only way to end this conflict-of-interest is to reform the system. As long as issuers have all the power over who provides their ratings, bonds are doomed to suffer from overly optimistic assessments, and contrarians will be punished instead of embraced.

Image Credit: REUTERS/Brendan McDermid

This article available online at:

http://www.theatlantic.com/business/archive/2011/08/the-backlash-against-s-p-begins/243806/

Copyright © 2013 by The Atlantic Monthly Group. All Rights Reserved.

# EXHIBIT P(31)

1  STUART F. DELERY
   Principal Deputy Assistant Attorney General
2  MAAME EWUSI-MENSAH FRIMPONG
      (Cal. Bar No. 222986)
3  MICHAEL S. BLUME
   ARTHUR R. GOLDBERG
4  JAMES T. NELSON
   BRADLEY COHEN
5  JENNIE KNEEDLER
   SONDRA L. MILLS   (Cal. Bar No. 090723)
6  THOMAS D. ZIMPLEMAN
   United States Department of Justice, Civil Division
7     P.O. Box 261, Ben Franklin Station
      Washington, D.C. 20044
8     Telephone:   (202) 616-0219/8474 [Main]
      Facsimile:   (202) 514-8742 & (202) 616-8470 [Main]
9     Email:      James.Nelson2@usdoj.gov / Bradley.Cohen@usdoj.gov
                  Jennie.L.Kneedler@usdoj.gov /  Sondra.Mills@usdoj.gov /
10                Thomas.D.Zimpleman@usdoj.gov

11 ANDRÉ BIROTTE JR.
   United States Attorney
12 GEORGE S. CARDONA   (Cal. Bar No. 135439)
   LEON W. WEIDMAN      (Cal. Bar No. 104078)
13 ANOIEL KHORSHID     (Cal. Bar No. 223912)
   RICHARD E. ROBINSON (Cal. Bar No. 090840)
14 Assistant United States Attorneys
      Room 7516 Federal Building
15    300 North Los Angeles Street
      Los Angeles, California 90012
16    Telephone:   (213) 894-8323/2404/6086/0713
      Facsimile:   (213) 894-7819 [Main]
17    Email:      George.S.Cardona@usdoj.gov / Lee.Weidman@usdoj.gov /
                  Anoiel.Khorshid@usdoj.gov / Richard.Robinson@usdoj.gov
18
   Attorneys for Plaintiff United States of America
19
                   UNITED STATES DISTRICT COURT
20
                   CENTRAL DISTRICT OF CALIFORNIA
21

22 UNITED STATES OF AMERICA,          CASE NO. CV13-00779-DOC

23              Plaintiff,

24        v.                          COMPLAINT FOR CIVIL MONEY
                                      PENALTIES AND DEMAND FOR
25 McGRAW-HILL COMPANIES, INC.,       JURY TRIAL
   and STANDARD & POOR'S
26 FINANCIAL SERVICES LLC,            [12 U.S.C. § 1833a; 18 U.S.C. §§ 1341,
                                      1343 & 1344]
27              Defendants.

28

                          COMPLAINT

## VIII.  PRAYER FOR JUDGMENT

WHEREFORE, the United States of America prays for judgment against defendants as follows:

A.      Civil money penalties under FIRREA up to the maximum amount allowed by law.

B.      All other relief this Court deems just and proper, including post-judgment interest, attorneys' fees and litigation fees as appropriate, and costs of this action.

DATED:  February 4,  2013              Respectfully submitted,

STUART F. DELERY
Principal Deputy Assistant Attorney General
United States Department of Justice,
Civil Division

MAAME EWUSI-MENSAH FRIMPONG
Deputy Assistant Attorney General

MICHAEL S. BLUME
Director, Consumer Protection Branch
ARTHUR R. GOLDBERG
Assistant Director, Federal Programs Branch

JAMES T. NELSON
BRADLEY COHEN
JENNIE KNEEDLER
SONDRA L. MILLS
THOMAS D. ZIMPLEMAN
Trial Attorneys, Civil Division

ANDRÉ BIROTTE JR.
United States Attorney
Central District of California

GEORGE S. CARDONA
Chief Assistant United States Attorney
LEON W. WEIDMAN
ANOIEL KHORSHID
RICHARD E. ROBINSON
Assistant United States Attorneys

Attorneys for Plaintiff United States of America

118
COMPLAINT

1

## DEMAND FOR JURY TRIAL

2

3          Plaintiff United States of America hereby demands a trial by jury.

4

5     DATED:  February 4, 2013              Respectfully submitted,

6                                           STUART F. DELERY
                                            Principal Deputy Assistant Attorney General
7                                           United States Department of Justice
                                            Civil Division
8
                                            MAAME EWUSI-MENSAH FRIMPONG
9                                           Deputy Assistant Attorney General

10                                          MICHAEL S. BLUME
                                            Director, Consumer Protection Branch
11                                          ARTHUR R. GOLDBERG
                                            Assistant Director, Federal Programs Branch
12

13

14                                          JAMES T. NELSON
                                            BRADLEY COHEN
15                                          JENNIE KNEEDLER
                                            SONDRA L. MILLS
16                                          THOMAS D. ZIMPLEMAN
                                            Trial Attorneys, Civil Division
17

18                                          ANDRÉ BIROTTE JR.
                                            United States Attorney
19                                          Central District of California

20

21                                          GEORGE S. CARDONA
                                            Chief Assistant United States Attorney
22                                          LEON W. WEIDMAN
                                            ANOIEL KHORSHID
23                                          RICHARD E. ROBINSON
                                            Assistant United States Attorneys
24

25                                          Attorneys for Plaintiff United States of America

26

27

28

                                        119
                                      COMPLAINT

# EXHIBIT P(32)

Case 2:13-cv-00779-DOC-JCG   Document 101-6   Filed 01/20/14   Page 91 of 130   Page ID
#:2426
Is U.S. suit against rating agency S&P actually retaliation?

**News**Room

2/5/13 Washington D.C. Bureau 00:13:00

McClatchy Washington Bureau
Copyright © 2013 McClatchy-Tribune Information Services

February 5, 2013

Is U.S. suit against rating agency S&P actually retaliation?

Kevin G. Hall and Greg Gordon

McClatchy Newspapers

Trying to get ahead of a potentially explosive story, credit rating agency Standard & Poor's announced Monday that the Justice Department had informed the company that it's the subject of a civil lawsuit for the AAA ratings it gave to complex bonds in 2007 that later turned out to be junk.

In a highly unusual statement, S&P, a subsidiary of publishing giant The McGraw-Hill Companies Inc. , said that the Justice Department would sue the company for failing to predict the full magnitude of the U.S. housing downturn, something Wall Street banks and federal regulators all missed as well.

Given that S&P issued a historic downgrade of U.S. creditworthiness in August 2011 and has threatened to take that rating down a further notch, the pending suit is raising questions of whether it actually amounts to retaliation.

At issue are financial instruments called collateralized debt obligations, shorthanded as CDOs, which were sold to investors in 2007 and are comprised of mortgages and other consumer and business debt pooled together into a complex bond. Investors bought into differing levels of risk and thus got varying levels of financial return.

S&P said Monday that it's being unfairly singled out.

"It would disregard the central facts that S&P reviewed the same subprime mortgage data as the rest of the market – including U.S. government officials who in 2007 publicly stated that problems in the subprime market appeared to be contained – and that every CDO that DOJ has cited to us also independently received the same rating from another rating agency," the company said.

Justice Department spokeswoman Adora Andy declined comment. An S&P official said the company was told it would be charged under the Financial Institutions Reform, Recovery and Enforcement Act. That statute dates back to the savings and loan crisis in the late 1980s and early 1990s.

"This has never been used in conjunction with a rating agency and is unprecedented," Catherine Mathis , S&P's senior vice president of marketing and communications, told McClatchy. "They have used it against some of the banks in the past. Clearly this was not the purpose for which it was intended."

Ratings agencies historically have enjoyed First Amendment protection under the law, with courts determining that their ratings amount to protected free speech since they reflect opinions about the creditworthiness of an issuer of a bond.

Is U.S. suit against rating agency S&P actually retaliation?

Reporting by McClatchy, later confirmed in Senate hearings and by the special Financial Crisis Inquiry Commission , found that ratings agencies effectively let their lucrative business for rating complex bonds – a subset called structured finance – erode the quality of ratings.

Further complicating matters, AAA ratings on government bonds issued by, say, France are based on a long history of past performance, something that didn't exist for complex mortgage bonds that were being offered by giant Wall Street investment banks. The ratings agencies had to invent a methodology to approximate past performance based partly on geography, which turned out to be a poor measure of the chance of a bond's default.

Critics of the ratings agencies say a lawsuit is long overdue.

"I think that the American public has been hungering for holding the rating agencies accountable for AAA ratings that by any commonsense understanding of the word could not have applied to pools of subprime mortgages," said Michael Greenberger , a University of Maryland law professor and former financial regulator. "My only fear is that the Department of Justice has had a record of letting financial institutions off lightly for their wrongdoings."

Among the many questions raised by the pending Justice Department civil suit is why S&P alone is being charged. A person familiar with the department's investigation of ratings agencies said the probe has gone on for three years and originally also involved Moody's Investors Service. A Moody's spokesman did not respond to a request for comment, but Daniel Noonan , a spokesman for Fitch Ratings, the third major rating agency and the only one that is not a publicly traded company, said that "we have no reason to believe Fitch is a target of any such action."

Investigator interest in Moody's apparently dropped off around the summer of 2011, about the same time S&P issued the historic downgrade of the U.S. government's creditworthiness because of mounting debt and deficits.

"After the U.S. downgrade, Moody's is no longer part of this," said the person familiar with the case, who demanded anonymity in order to speak freely about the matter.

Others share that perception.

"Why not Moody's and Fitch?" asked Sylvain Raynes , a onetime Moody's employee who has crusaded for reforms on Wall Street. "Are they innocent of similar things? Why S&P? Because they downgraded the United States. The fact that this targeted one rating agency when all three are equally guilty is suspicious, (needs) to be explained and leads me to believe that this is a politically motivated lawsuit. Yes, there is wrongdoing, but not everybody who speeds on the highway gets stopped by the cops."

S&P, he cautioned, is "certainly guilty of gross negligence, which is, I'm sure, provable."

Arguments are "pretty strong" that bundles of risky mortgage bonds that S&P rated were fraudulent, said structured securities expert Ann Rutledge .

"And they're equally fraudulent in the case of Moody's and S&P, because they worked in pretty much the same way," said Rutledge, who is married to Raynes.

In another unusual element of the pending civil suit, McClatchy has learned that the Justice Department apparently will bring its case in Southern California, one of the hardest hit regions during the housing crisis and an area where jurors presumably would be more sympathetic. New York City is usually the venue for civil lawsuits against Wall Street players tied to the U.S. financial crisis.

**Is U.S. suit against rating agency S&P actually retaliation?**

It's not clear which complex bonds are subject to the Justice Department civil suit.


**---- Index References ----**

Company: MOODYS INVESTORS SERVICE INC; MCGRAW HILL COMPANIES INC (THE); MCCLATCHY CO (THE)

News Subject: (Government Litigation (1GO18); Credit Ratings (1CR83); Legal (1LE33))

Industry: (Mortgage Banking (1MO85); Subprime Lending (1SU05); Retail Banking Services (1RE38); Consumer Finance (1CO55); Banking (1BA20); Financial Services (1FI37))


Language: EN

Other Indexing: (Sylvain Raynes; Ann Rutledge; Daniel Noonan; Adora Andy; Michael Greenberger; Catherine Mathis) (Wall Street) (France) (Wall Street) (the United States) (Southern California) (New York City) (Wall Street) (nam; weur; fr; us; am; eur; us.ca; us.md; us.ny; us.ny.nyc)

Keywords: (XC/any.company); (XC/any.private); (CT/ebf.fin.sts.rtg); (CT/ebf.fin.sts); (CT/ebf.fin); (CT/ebf); (MC/HOT#9); (MC/HOT); (NT/Bonds); (WD/Economy); (XC/any)

Word Count: 968

**End of Document**                                      © 2014 Thomson Reuters. No claim to original U.S. Government Works.

**NewsRoom**

# EXHIBIT P(33)

Biden, 12 States And Federal Government Sue S&P For Deceiving Con... http://news.delaware.gov/2013/02/05/biden-12-states-and-federal-gover...

 (http://www.delaware.gov)  (http://www.delaware.gov)

(http://news.delaware.gov)

Menu

# Biden, 12 States And Federal Government Sue S&P For Deceiving Consumers and Investors With Devastating Economic Consequences

*Posted On: Tuesday, February 5th, 2013*

Categories:  Criminal (http://news.delaware.gov/category/justice/prs/criminal/)

 Department of Justice (http://news.delaware.gov/category/justice/)

 Press Releases (http://news.delaware.gov/category/justice/prs/)

 SHARE 🔗 (//addthis.com/bookmark.php?v=300)
Lawsuit charges company with misrepresenting independence of its
ratings of securities backed by toxic mortgages

Wilmington – Delaware Attorney Beau Biden announced Tuesday that
his office is filing a lawsuit against Standard & Poor's, charging the
rating agency with violating state law by misrepresenting that its
evaluations of mortgage-backed securities were fair and impartial
when actually S&P made decisions based on its own financial
interests – the desire for more fees from financial institutions that
issued the mortgage-backed securities.

The lawsuits announced are the first joint federal-state law
enforcement action against a credit rating agency.

"Our markets and our economy only work when everyone plays by the
rules," Biden said.  "S&P broke the rules and helped push our
economy into the housing crisis.  Today, my office has filed a
complaint to hold S&P accountable for deceiving consumers and
investors when they publicly misrepresented the independence and
objectivity of their credit ratings."

Biden's suit, which is being filed today in Delaware Superior Court, is
one of several suits that 13 states, the federal government, and the
District of Columbia are filing against S&P this week as part of a

coordinated law enforcement action.  The suits focus on ratings S&P made beginning in 2001, and while most of the ratings activity on subprime-backed mortgage securities occurred between 2004 and 2007, Delaware's suit alleges this activity continued up until 2012. The suit includes four counts charging violations of Delaware's Consumer Fraud act and six Counts charging violations of Delaware's Deceptive Trade Practices Act.  It seeks civil penalties, restitution, and changes to the company's business practices.

Investors make money off of mortgage-backed securities when homeowners make their monthly mortgage payments.  These securities consist of large numbers of mortgages that are bundled together, and securities backed by higher-quality loans should be rated higher than securities backed by riskier, subprime mortgages. The state and federal suits allege that, despite S&P's repeated statements emphasizing its independence and objectivity, it allowed its analysis to be influenced by the desire to earn lucrative fees from its investment bank clients and to knowingly assign inflated credit ratings to subprime mortgage-backed securities that were packaged and sold by investment banks.  Those investors then lost significant sums of money when the housing market crashed and borrowers defaulted on subprime mortgage loans.

# # #

SHARE 🅕 🅨 ✉  (//addthis.com/bookmark.php?v=300)

(http://attorneygeneral.delaware.gov)
Department of Justice, Attorney General's Website
(http://attorneygeneral.delaware.gov)

# EXHIBIT P(34)



1 of 2 DOCUMENTS

Copyright 2013 Federal News Service, Inc.
All Rights Reserved
Federal News Service

February 5, 2013 Tuesday

**LENGTH:** 7640 words

**HEADLINE:** Press Conference with Attorney General Eric Holder; Associate Attorney General Tony West; Deputy Assistant Attorney General Stuart Delery Subject: Announcement of a Major Financial Fraud Enforcement Action Location: Justice Department, Washington, D.C. Time: 11:14 a.m. EST Date: Tuesday, February 5, 2013

**BODY:**

Press Conference with Attorney General Eric Holder; Associate Attorney General Tony West; Deputy Assistant Attorney General Stuart Delery Subject: Announcement of a Major Financial Fraud Enforcement Action Location: Justice Department, Washington, D.C. Time: 11:14 a.m. EST Date: Tuesday, February 5, 2013

ATTORNEY GENERAL ERIC HOLDER: Good morning. I want to thank you all for being here.

Today I'm joined by the associate attorney general, Tony West; the principal deputy assistant attorney general for the Civil Division, Stuart Delery; United States Attorney Andre Birotte for the Central District of California in Los Angeles; and attorneys general from six states as well as from the district of Columbia in announcing the latest steps forward in our ongoing efforts to protect the American people from financial fraud, to hold accountable those who violate our laws and abuse the public trust and to seek justice for all those whose lives were devastated by the recent economic crisis.

Yesterday the Justice Department filed a civil lawsuit against Standard & Poor's Financial Services as well as its parent company, McGraw-Hill, alleging that the credit rating agency S&P engaged in a scheme to defraud investors in financial products known as residential mortgage-backed securities, or RMBS, and collateralized debt obligations, or CDOs. We allege that by knowingly issuing inflated credit reported ratings for CDOs which misrepresented their creditworthiness and understated their risks, S&P misled investors, including many federally insured financial institutions, causing them to lose billions of dollars.

In addition, we allege that S&P falsely claimed that its ratings were independent, that they were objective and that they were not influenced by the company's relationship with the issuers who hired S&P to rate the securities in question when in reality, the ratings were affected by significant conflicts of interest, and S&P was driven by its desire to increase its profits and market share to favor the interest of issuers over investors.

Now, yesterday's action was brought under the Financial Institution Reform, Recovery and Enforcement Act of 1989, which allows the Justice Department to seek civil penalties equal to the losses suffered by federally insured

Press Conference with Attorney General Eric Holder; Associate Attorney General Tony West; Deputy Assistant
Attorney General Stuart Delery Subject: Announcement of a Major Financial Fraud Enforcement A

financial institutions, the statute that we call FIRREA. To date we have identified more than $5 billion in such losses resulting from CDOs that were rated by S&P between March and October of 2007. During this period nearly every single mortgage- backed CDO that was rated by S&P not only unperformed but failed.

Put simply, this alleged conduct is egregious, and it goes to the very heart of the recent financial crisis. Our investigation into this matter began in November of 2009, in connection with the president's Financial Fraud Enforcement Task Force. And it showed that as early as 2003 analysts with S&P raised concerns about the accuracy of the company's rating system, as well as the underlying methodology. S&P executives allegedly ignored these warnings and between 2004 and 2007 concealed facts, made false representations to investors and to financial institutions and took other steps to manipulate criteria and credit models to increase revenue and market share.

Even in 2007 when S&P's internal data showed a severe deterioration in the creditworthiness of the RMBS that it had rated, S&P allegedly continued to rate hundreds of billions of dollars' worth of CDOs backed by RMBS collateral, ignoring their own analysts' performance projections showing that the ratings on that collateral would not hold.

The action that we announce today marks an important step forward in the administration's ongoing efforts to investigate as well as to punish to the conduct that is believed to have contributed to the worst economic crisis in recent history. And it's just the latest example of the critical work that president's Financial Fraud Enforcement Task Force is making possible. The complaint that we filed yesterday compliments the actions of the task force's working groups, including the Residential Mortgage-Backed Securities Fraud Working Group, the Mortgage Fraud Working Group and the Security and Commodities Fraud Working Group, members of which played key roles in the cases that we're announcing today.

Now, I've been honored to chair the task force since its inception in 2009, and I'd like to take a moment to acknowledge the task force members, Justice Department leaders and talented investigators, prosecutors, law enforcement officers and other partners, and particularly the attorneys general from six states and the District of Columbia who are here with us today and a number of others who will also be advancing parallel actions and also contributed to this investigation and who continued to advance a wide range of important matters, both civil as well as criminal, across the country. Thanks of their tremendous efforts over the last three fiscal years alone, the Justice Department has filed nearly 10,000 financial fraud cases against nearly 15,000 defendants, including more than 2,900 mortgage fraud defendants. I believe we can all be proud of these results and encouraged by the significant action that we've gathered here today to announce.

But it's clear that we cannot yet be satisfied. And that's why here in Washington and across the country, this critical work continues. Our determination to build on the progress that's been made and to strengthen the partnerships that we have established across all levels of government and law enforcement has never been stronger. And as this action proves, our approach has never been more strategic, more comprehensive or more effective.

Once again I'd like to thank everyone who made this enforcement action possible.

And at this time I'd like to turn things over to the acting associate attorney general, Tony West, who will be providing additional details.

TONY WEST: Thank you, Mr. Attorney General. And thank you for your tremendous leadership both on the case that we are announcing here today and on the department's efforts to fight financial fraud over the last four years.

My name is Tony West. I'm the acting associate attorney general here at the Department of Justice. And I'm pleased to share the stage with my colleagues Stuart Delery and Andre Birotte, who have been and continue to be such great partners, as well as several state attorneys general: Beau Biden of Delaware, Kamala Harris of California, James Hood of Mississippi, George Jepsen of Connecticut, Lisa Madigan of Illinois, Tom Miller of Iowa and of course Irvin Nathan of the District of Columbia. I think their presence here today really speaks to the tremendous federal-state relationship we've built over the past four years and that's become a model of cooperation and teamwork.

Press Conference with Attorney General Eric Holder; Associate Attorney General Tony West; Deputy Assistant Attorney General Stuart Delery Subject: Announcement of a Major Financial Fraud Enforcement A

Now, as many of you know, S&P is the largest credit rating agency in the world.  And as such, it plays a unique role on Wall Street.

Many investors, financial analysts and the general public, they look to S&P to be fair and impartial when it comes to the ratings that it issues. And in the years preceding the financial crisis, S&P played a role in rating the vast majority of financial transactions involving the two types of securities that the attorney general mentioned: residential mortgage-backed securities, or RMBS, and the collateralized debt obligations, or CDOs.

And between 2004 and 2007, S&P issued ratings on literally trillions of dollars' worth of RMBS and CDOs.  And those ratings, they were important.  They were important because without a stamp of approval by S&P or one of the other major credit rating agencies, these financial transactions simply could not have occurred.  That's because nearly every single RMBS or CDO sold required a credit rating, typically a triple-A rating, in order to attract the attention and confidence of investors.

And repeatedly, S&P promised that its ratings would be objective and independent.  Even though the banks and other institutions hired S&P to rate these financial products, even though S&P earned millions -- hundreds of millions of dollars as a result of rating those -- issuing those ratings, S&P promised that its ratings would be unaffected by their concerns about market share, their concerns about revenue, their concerns about profits.

But the evidence -- the evidence that we have uncovered tells a very different story.  We allege that from at least 2004 to 2007, S&P lied about its objectivity and independence.  They said one thing, yet they did another.

The evidence reveals that S&P promised investors and the public that their ratings were based on data and analytical models reflecting the company's true credit judgment, when in fact internal S&P documents made clear that the company would regularly tweak or bend, delay updating or otherwise adjust its ratings models to suit the company's business needs.

We also allege that from at last March 2007 to October 2007, S&P issued ratings for certain CDOs, ratings S&P knew were inflated at the time that they issued them.  And how did S&P know that the CDO ratings that they were issuing were inflated?  Because those CDOs -- those CDO ratings were derived in large part from the ratings on classes of subprime mortgage bonds which backed to those CDOs, classes of mortgage bonds whose own ratings S&P knew it was going to have to downgrade, yet did nothing to adjust the overall CDO ratings to reflect that inevitability.

It's sort of like buying sausage from your favorite butcher and he assures you that the sausage was made fresh that morning and is safe.  What he doesn't tell you, what he doesn't tell you is that it was made with meat he knows is rotten and plans to throw out later that night.

Now, how did all this happen?  Well, our complaint alleges that as of late 2006, executives at S&P began hearing alarm bells about subprime residential mortgage-backed securities as S&P's internal information revealed that borrower delinquencies in subprime mortgages were rising dramatically, leading the financial instruments that were based on these mortgages to perform far worse than their S&P ratings suggested that they should perform.

And by early 2007, S&P's own analysts had come to believe that the mortgage-backed securities -- many of the mortgage-backed securities were in trouble.  They began recommending that the company start the process of lowering the credit ratings for hundreds of subprime mortgage bonds that S&P had previously rated.  But S&P's business executives -- S&P's business executives rejected those downgrade recommendations, choosing instead to continue raiding subprime mortgage bonds for their bank clients, whose appetite for highly rated mortgage-based securities continued to grow.

By March 2007, we allege that S&P knew that mortgage-backed securities were in such deep trouble that unprecedented downgrades were inevitable.  It wasn't a matter of if, but when.  Of course, such downgrades meant that the value of subprime mortgage bonds on the books of some of S&P's most significant bank clients would be

Press Conference with Attorney General Eric Holder; Associate Attorney General Tony West; Deputy Assistant Attorney General Stuart Delery Subject: Announcement of a Major Financial Fraud Enforcement A

dramatically reduced.  So to avoid the significant financial hits such a downgrade would have caused, these banks packaged those subprime mortgage bonds into CDOs and sold them to investors as a way to get those bonds off of their books.

And we have evidence that S&P not only knew this was what the banks were doing, S&P helped them to do it.  As our complaint explains through the spring and summer of 2007, S&P moved at a record pace, rating hundreds of billions of dollars' worth of CDOs packed with subprime mortgage bonds.  Yet throughout this period, S&P made no adjustments in issuing these ratings.  In fact, S&P gave AAA ratings to nearly all of the CDOs it rated during this time period, and they did this despite their own internal information, showing that the ratings on the mortgage bonds on which the financial quality of these CDOs depended would not hold.

Even after S&P executives chose the date on which to inform the public of their plan to institute mass downgrades, S&P continued to issue ratings on CDOs as if nothing had changed.  On July 11th, 2007, just one day before S&P publicly announced the downgrades, an internal S&P email to executives warned, quote:  "CDO deals that close now will be downgraded if we don't stop them."  Yet on that very day S&P rated two new CDOs backed by subprime bonds. In fact, S&P gave them AAA ratings, making no rating adjustments to the downgrades -- for the downgrades that S&P knew were inevitable and were coming.

And in July 2007, S&P issued the mass downgrades it had known for months were inevitable.  Soon after, credit markets in the United States and around the world collapsed, nearly every CDO that S&P rated between March and October 2007 defaulted, and the ratings were downgraded to junk.  The failure of those CDOs let to billions of dollars in losses to federally insured financial institutions and to other investors.

Now, in the Justice Department our code name for this investigation was "Alchemy."  Centuries ago medieval alchemists tried various methods to turn lead into gold.  Here we allege that S&P's desire to ensure market share, to ensure profit, to ensure revenue led it on a misguided venture to take securities it knew were lead and to tell the world, through its ratings, that they were gold.

And in so doing, we believe that S&P played a significant role in helping to bring our economy to the brink of collapse.

Now, before I turn it over to the next speaker, let me single out two people:  George Cardona, fist assistant United States attorney for the Central District of California and one of the lead attorneys on this matter; and Geoff Graber, counsel to the civil division assistant attorney general, who was one of the originating forces behind this case and who's been instrumental to bringing it to fruition.  Both of these men have led extraordinary -- an extraordinary team of civil and criminal attorneys who have worked tirelessly to investigate this matter, identify and interview witnesses and review countless documents and craft this complaint.

It's now my pleasure to introduce Stuart Delery, the principal assistant attorney general for the Civil Division. Stuart?

STUART DELERY:  Thank you, Tony.  My name is Stuart Delery, and I head the Justice Department's Civil Division, which, along with the United States Attorney's Office for the Central District of California, led the investigation that resulted in this action.

From the beginning of his tenure, the attorney general established twin commitments to the American people:  that the Department of Justice will devote significant resources to combating financial fraud, and that we'll be as aggressive and creative as we can be in holding accountable those who, in violating the law, contributed to the financial crisis. This case demonstrates the full force of those commitments.

First, today's action culminates a massive, multiyear investigation by a team of nearly two dozen lawyers from the United States Attorney's Office in Los Angeles and the federal programs and consumer protection branches of the Civil

Press Conference with Attorney General Eric Holder; Associate Attorney General Tony West; Deputy Assistant Attorney General Stuart Delery Subject: Announcement of a Major Financial Fraud Enforcement A

Division here in Washington.

Our lawyers and support staff served hundreds of civil subpoenas, spent thousands of hours reviewing and analyzing millions of pages of documents and contacted and interviewed over 150 witnesses, including dozens of former S&P analysts and executives. This enormous task would not have been possible without the combined expertise and tireless efforts of this team, and I thank them for their commitment to this historic investigation and congratulate them on reaching this important milestone here today.

Second, the lawsuit being announced today demonstrates the department's commitment to using every available legal tool to bring to justice those who bear responsibility for the financial crisis. Our complaint asserts claims under the Financial Institutions Reform, Recovery and Enforcement Act of 1989, or FIRREA. This statute was enacted in the wake of the savings and loan crisis in the late 1980s but has not been used very often in recent years.

One of Congress' stated purposes for FIRREA was to provide enhanced enforcement powers and increase civil and criminal monetary penalties for crimes of fraud against financial institutions. Under this law, the Department of Justice can seek civil penalties for violations of certain underlying criminal statutes, including mail fraud, wire fraud and bank fraud, which the department alleges as part of this lawsuit. But unlike a criminal case, which requires proof beyond a reasonable doubt, the FIRREA provisions underlying today's lawsuit require proof by a preponderance of the evidence. And in addition, FIRREA authorizes the department to seek civil penalties up to the amount of the loss suffered by a federally insured financial institution as a result of the violations. So as a result of these provisions, FIRREA is a powerful weapon for combating financial fraud and will continue to play a key role in the department's efforts to hold accountable those who violated the law.

Before I conclude, I would like to thank Tony West for his leadership on this investigation, and I want to thank the state attorneys general who are here, as well as those across the country who will be filing today as well, for their partnership in our continuing fight against financial fraud, a partnership that's absolutely critical.

And now it's my pleasure to introduce the United States attorney for the Central District of California, Andre Birotte.

ANDRE BIROTTE (U.S. attorney, Central District of California): Well, good morning. Again, my name is Andre Birotte. I am the United States attorney for the Central District of California. My office is located in Los Angeles, where the complaint against Standard & Poor's was filed.

Now, this case was filed in my district, where there was significant harm caused by S&P's alleged conduct. Now, across the seven counties in my district, where some of the country's most aggressive leaders -- lenders did business, we had huge numbers of homeowners who were given mortgages only because those loans could later be securitized into debts -- instruments that were given the unsound AAA rating by Standard & Poor's. Now, this led to untold number of loans being made to unqualified borrowers during the housing bubble, which in turn led to an untold number of foreclosures that caused economic harm not only in Southern California but throughout the United States.

In addition, S&P's actions caused damage to institutional investors both in the Central District of California and across the nation. One example is Western Federal Corporate Credit Union, or WesCorp, which is based in my district and suffered huge losses after investing billions, billions of dollars in securities that WesCorp thought were safe because they had these AAA ratings from Standard & Poor's.

WesCorp put approximately $14 billion into RMBS and CDO investments that turned out, in the end, to be essentially worthless. As a result of its losses, WesCorp was placed into conservatorship and ultimately closed after doing 34 years of business.

Now this office, the Central District of California, is pleased to be part of this great team that has brought this lawsuit in the United States District Court in Los Angeles, and we look forward to our continuing both with the

Press Conference with Attorney General Eric Holder; Associate Attorney General Tony West; Deputy Assistant Attorney General Stuart Delery Subject: Announcement of a Major Financial Fraud Enforcement A

Department of Justice and with all the state attorney generals who are here today and abroad for addressing the harm that was caused by S&P's alleged conduct.

Thank you.

Let me now introduce the Connecticut attorney general, George Jepsen.

ATTORNEY GENERAL GEORGE JEPSEN (D-CT):  Thank you, Andre.

Thank you, General Holder.

The work on this case represents another example of the excellent partnership between the Department of Justice and state attorneys general.  I want to thank the attorney general, Associate Attorney General Tony West and all the staff and attorneys on his team for their hard work in making today's announcement possible.

I would also like to recognize my predecessor, now U.S. Senator Richard Blumenthal, for having the courage nearly three years ago to step up and file suit against Standard & Poor's.  Our suit has survived two motions to dismiss, and today it is alive and well.

I'd also like to recognize -- and if they could raise their hands, please -- Assistant Attorneys General Matthew Budzik and George O'Connell.  They've put in hundreds of hours developing the case in Connecticut, working with Justice and working more and more with state attorneys general from around the country to develop the multistate litigation.

The federal and state enforcement actions against Standard & Poor's are seeking accountability for alleged misconduct by the credit rating agency involving the structured finance securities that were at the center of the 2008 financial collapse.

Standard & Poor's held itself out to investors, government regulators and the public as independent and objective. Its statements were relied on by market participants all over the world to judge the creditworthiness of those investments.

Standard & Poor's said it was guided by the core principles of independence, objectivity and not allowing its own financial interests to influence the ratings that it assigned to structured financial securities.  We believe those statements are false.  Despite its promises to the public, we allege that Standard & Poor's repeatedly allowed its own financial interests to influence the models it used to rate the mortgage-backed securities.  These undisclosed influences resulted in analytical models that were designed to increase Standard & Poor's market share and revenue by delivering triple-A ratings that issuers of structured financial securities very much desired.  Simply put, what was best for Standard & Poor's business was in fact a major guiding principle driving Standard & Poor's ratings.

The lawsuits filed today are asking the courts to order Standard & Poor's to disgorge the ill-gotten gains from its alleged misconduct, an amount which may run into hundreds of millions of dollars.  We are also asking for civil penalties and business reforms to prevent this kind of alleged misconduct from ever happening again.  Connecticut looks forward to partnering with its state colleagues and the Department of Justice to achieve these critical goals.

And now in addition to -- I'm going to read the states that are filing today.  In addition to Connecticut, Mississippi and Illinois, who have already filed suit, today we'll be filing Arizona -- it's a bipartisan group -- Arizona, Arkansas, California, Colorado, Delaware, Idaho, Iowa, North Carolina, Maine, Missouri, Pennsylvania, Tennessee and Washington state, plus the District of Columbia.  That means we will have 16 states with suits actively against Standard & Poor's, plus the District of Columbia.

Thank you.

Press Conference with Attorney General Eric Holder; Associate Attorney General Tony West; Deputy Assistant
Attorney General Stuart Delery Subject: Announcement of a Major Financial Fraud Enforcement A

I'd also like to add, if you have questions about the state- coordinated effort, I'd invite you to talk to Matt and George after the press conference.

Kamala Harris.

MR.   :  Great state of California.

ATTORNEY GENERAL KAMALA HARRIS (D-CA):  Good morning.  Thank you, Attorney General Eric Holder, for your leadership, and Associate Attorney General Tony West for your leadership, and my fellow attorneys general.

California is filing suit today against Standard & Poor's in California Superior Court.  Our lawsuit focuses on the ratings S&P gave to mortgage-backed securities that the state of California purchased through its pension funds, CalPERS and CalSTRS, which each are considered two of the largest pension funds in the United States.

We are suing because S&P's inflated rates and ratings violated our state's unfair competition laws, our state's false advertising laws and, very importantly, our state's False Claims Act, under which losses are automatically trebeled.

California lost almost $1 billion attributable to S&P's conduct.  Our false claims lawsuit is the result of nearly two years of investigation.  I want to thank Mark Breckler, Martin Goyette and Michael Troncoso for your leadership in that endeavor.

In 2011, I formed the California Mortgage Fraud Strike Force to investigate misconduct cases across the mortgage industry.  We had in California seven, if not eight, of the top 10 cities in the country hardest hit by the foreclosure crisis last year.  Our investigation shows that S&P ratings played a critical role in the mortgage feeding frenzy on Wall Street.

S&P called itself a gatekeeper but acted more like a toll collector.

Ignoring obvious risks and flaws in the methods used to evaluate risk, S&P gave premium ratings to risky investments, including investments backed by toxic mortgages.

Today, we insist that S&P accept responsibility for its role in the crisis and for its conduct.  Our suit seeks restitution for losses California sustained because of its conduct.

Thank you again, AG Holder, Associate AG West and my fellow state attorneys general for all of your leadership.

And I would now like to introduce -- (laughter) -- and I would now like to introduce a great attorney general, the attorney general of the state of Delaware, Beau Biden.

ATTORNEY GENERAL BEAU BIDEN (D-DE):  General Holder, thank you for your leadership, especially for that of Tony.  Thank you for your mind and how hard you and your team have worked on this -- on this case.

One of the things that has made America great is the honesty and credibility of our financial markets.  Our markets only work when everyone plays by the rules.  When those rules are broken, those that break them must be held accountable.  Standard & Poor's broke the rules and is being held accountable today.

Today, my office will file a consumer fraud complaint and deceptive trade practice complaint similar to the one filed by the -- state of Connecticut to hold S&P accountable for deceiving consumers and investors, for publicly misrepresenting their independence and objectivity of their credit-rating system.  Their credit-rating system was neither independent nor objective.

Again, General, thank you for your leadership, your continuing leadership on getting accountability for the American people, and thank you, Tony.

Press Conference with Attorney General Eric Holder; Associate Attorney General Tony West; Deputy Assistant Attorney General Stuart Delery Subject: Announcement of a Major Financial Fraud Enforcement A

With that, I'd like to introduce my friend from Mississippi, the attorney general, Jim Hood.

ATTORNEY GENERAL JIM HOOD (D-MS): Good morning.

I'm Jim Hood from the state of Mississippi.

Mississippi filed a complaint against Moody's and Standard & Poor in May of 2011. We filed that action because I was outraged about the conduct of these rating agencies. You know, with the Wall Street investment banks, you expected -- they have profit motives; you expected them to cut corners -- but not those who are supposed to be independent, to evaluate these CDOs and mortgage-backed securities.

You know, they portrayed themselves to be as pure as the driven snow when we found they had a profit motives. In fact, they were charging three to four times as much as they were for other evaluations as they were for these -- it was -- given, they're more complicated, but they made a lot of money, in other words. They made at least hundreds of million dollars, perhaps billions of dollars, for packaging these instruments.

So Mississippi sued initially on behalf of our securities claims, our public employees' retirement system. Many of those actions were dismissed because the court decided that that didn't meet the definition of securities as to what they were doing in that regard. So in May of 2011 we filed this action for violations of our Consumer Protection Act.

You know, I've noted, apparently, S&P got out in front of this and tried to change the course of the media's reaction to this by saying they had a First Amendment right. Well, that's laughable. I mean, you can make a representation, but it's got to be true, or otherwise, it's in violation of states' consumer protection laws.

The Department of Justice has brought a separate action. And Attorney General Holder and Tony West, I appreciate all the work that the Department of Justice has done, as well as my colleagues in other states; Connecticut, Mississippi and Illinois have worked closely together.

So anyway, we hope that these rating agencies will be held accountable, and we welcome all the support of all those that are here today and those other attorneys general who were not available.

So at this time I'd like to turn this over to my friend and colleague Lisa Madigan, the attorney general from the state of Illinois.

ATTORNEY GENERAL LISA MADIGAN (D-IL): Good morning.

Over a year ago I filed a lawsuit in Illinois against S&P for fraudulently assigning its highest ratings to risky mortgage-backed investments that enabled the destruction of our nation's economy and resulted in the loss of millions of Americans' jobs, homes and financial security.

I have litigated Illinois' case vigorously and have defeated S&P's motion to dismiss, which alleged that the First Amendment protected it from liability. The judge did not agree with S&P's argument and held that S&P cannot cloak fraud in the protections of the First Amendment.

Today these new lawsuits demonstrate an expanding state and national effort to hold S&P accountable for its central role in the subprime mortgage market's collapse. Quite frankly, S&P was a trigger for the destruction of our economy. While big banks and lenders built mortgage-backed bombs, it was S&P's faulty ratings that detonated them. As alleged in my lawsuit, S&P abandoned its independence and objectivity and repeatedly gave the highest seal of approval to investments backed by some of the most dangerous mortgages. Investors relied on S&P's seal of approval. In fact most investors, including many pension plans, could not have purchased those investments without it.

As a result of S&P's misconduct, the retirement savings of hardworking men and women in Illinois and families throughout the nation were devastated, all because S&P put amassing profits ahead of doing its job, and for that, S&P

Press Conference with Attorney General Eric Holder; Associate Attorney General Tony West; Deputy Assistant Attorney General Stuart Delery Subject: Announcement of a Major Financial Fraud Enforcement A

must be held accountable.

I stand firm with my colleagues at the state and federal level in our shared commitment to aggressively pursue these lawsuits until justice is served. Thank you.

And at this time, let me bring forward the dean of the state attorneys general, the great attorney general from the state of Iowa, Tom Miller.

ATTORNEY GENERAL THOMAS MILLER (D-IA): Thanks, Lisa. But I always have ambivalent feelings when I'm called the dean, for a variety of reasons.

You know, this is an important case. It was an important case to file because of the issues involved and because of the consequences that we've already felt. I don't think it can be said enough that without the AAA ratings that were given to so many securities, the financial collapse would not have happened. It was essential to have so many mortgage-backed securities sold and to generate the kind of problems that we saw. It wouldn't have happened but for the AAA ratings.

And I also want to acknowledge, as others have, the work of the Justice Department. They did a lot of work, as you can tell from their description, on this case that they have shared with the states. And, you know, I've been around as dean of the attorney generals quite a while, and I've seen many administrations, but I've never seen the kind of working relationship that the state AGs have with the Department of Justice under Eric Holder. It's one of trust, confidence, give and take, cooperation. It is a relationship that I've never seen before and a relationship that's very important to serve the public interest.

And I'd also like to acknowledge the work of the Connecticut AG's office. They brought this case first. They're the leader of the AGs on this group. They have been terrific. And of course, special mention for Illinois and Mississippi, also who have also filed.

And finally, bipartisanship. This case is filed by Democrat and Republican attorney generals. I believe the state attorney generals work together across party lines more -- maybe far more than any elected officials in this country.

And I think that's a good thing, and I also think it's a thing that serves the interest of the citizens of our individual states.

MR. WEST: Are there any questions?

Q: What is the exposure for S&P? Can you explain this a little bit to us? Because under the legal theory, you can collect funds equal to what -- losses suffered by an institution. So, you know, what's S&P's exposure here?

And secondly, some of the AGs have mentioned other rating services. In terms of the federal lawsuit, why are the others off the hook?

MR. WEST: Well, let me actually start with the second one first and just say, you know, this case is about S&P. We're here to talk about S&P. To the extent that there are or are not other pending investigations going on, we're not going to comment about that.

The potential exposure is outlined in our complaint. We allege more than $5 billion in potential losses to federally insured financial institutions. We think we've been fairly conservative, frankly, in that estimate, and we'll see how the lawsuit unfolds.

Q: But is that what you'll seek?

MR. WEST: Well, that is what the lawsuit is claiming, is right at this point is the extent or is sort of the floor on

Press Conference with Attorney General Eric Holder; Associate Attorney General Tony West; Deputy Assistant Attorney General Stuart Delery Subject: Announcement of a Major Financial Fraud Enforcement A

the damages. You know, that could change as the lawsuit unfolds.

Q: I'm not sure I understand the answer to that question, because the lawsuit actually says, we seek whatever damages the court thinks we should have.

MR. WEST:  Right.

Q: But what will you ask for?

MR. WEST:  Well, as we said, we think that at the very least, we believe conservatively that S&P's actions make it liable for more than $5 billion in civil penalties.

Q: For the average citizen at home, explain why this is not a criminal case and why some critics are saying that this is retribution for the lowering of the U.S. credit.

MR. WEST:  Well, look, we use the tools that Congress has given us aggressively to hold individuals and institutions accountable. Here we have brought a case that we believe is well-supported by the evidence, by the facts. And we have, I think, been quite assertive and quite aggressive in bringing those facts and evidence to bear in the form of this lawsuit.

Q: And just one follow-up.  Can someone talk about the irony of the case you're bringing today, alleging basically fraud on the part of this company, and yet it's the same company that lowered the US. credit rating, which many think led to another hit on the economy.

MR. WEST:  I don't have any comment on that.

ATTY GEN. HOLDER:  -- other than the fact -- other than the fact that there's no connection between the two.  I mean, they did what they did assessing what the creditworthiness was of this nation.  We looked at the facts, the law and the investigation that these great prosecutors and civil lawyers put together and made a determination that the filing of these lawsuits was appropriate.  But they are not in any way connected.

MR. WEST:  (Off mic) -- add to that, as the attorney general said in his comments, this is investigation that started in November 2009, which predated I think the incident that you're talking about.

Q: A lawyer for S&P said this morning that this does not count as fraud because the people who issued these ratings at the time believed that they were true.  Do you agree that that's the -- that that's the central question in this case?

MR. WEST:  Well, I think -- I think there are two issues in this case, two basic questions.  One, did S&P do what it promised to do?  S&P promised to issue ratings that were not affected by its business considerations; in fact, it issued ratings that were affected by its business considerations.

It also issued ratings that we believe it knew at the time it issued those ratings were inflated.  So, you know, I think we would disagree with the characterization, as you put it.

Q: Sort of along the same lines, the complaint includes a lot of examples of analysts disagree each other about -- with each other about what the criteria should be for ratings and for their models. How does that add up to an intent to defraud?  I mean, was there really -- was that really the purpose of S&P, that they had an intention to defraud investors?

MR. WEST:  Well, look, I mean, let's take the examples that we've given in the complaint.  One of the examples is that, you know, S&P slowed down, toned down one of the more accurate CDO rating models that it could have adopted, and they did that once an important investment bank client pointed out to them that they could jeopardize potential businesses -- business if they adopted the more accurate CDO rating model.  So we think -- that's only one example.

Press Conference with Attorney General Eric Holder; Associate Attorney General Tony West; Deputy Assistant
Attorney General Stuart Delery Subject: Announcement of a Major Financial Fraud Enforcement A

We think there are a number of examples where S&P chose to ignore internal information and instead rate CDOs even though it knew classes of collateral that supported those CDOs would inevitably be downgraded or impaired.

ATTY GEN. HOLDER:  (Off mic) -- I mean, there are obviously going to be questions of proof, but we would not have brought this case unless we felt we had a case that we could bring and that we would win.  And that's what I expect to have happen.

Q:  Do you think you could settle this case still?

ATTY GEN. HOLDER:  We're always open to conversations that anybody wants to engage.  But we feel serious enough about this case, are concerned enough about the conduct that we saw that we took this step to bring this $5 billion case.  And we'll see what happens between now and the time it's -- we have to go before a judge.

Q:  Attorney General Holder, if we could just change the subject for a little bit, last night NBC reported a white paper that was prepared by the Justice Department, undated, unsigned, about the legal -- the legal pinnacles for targeting Americans overseas.  Could you please give us what the precise definition is and how that would be carried out?

ATTY. GEN. HOLDER:  Well, there have been a -- there are a series of speeches that I gave, Jeh Johnson gave, John Brennan gave where we tried to lay out for the American people the considerations that go into the operations.  And one of the things I want to make sure that everybody understands is that our primary concern is to keep the American people safe but to do so in a way that's consistent with our laws and consistent with our values.

We are -- we have as a basis for action that we take a congressional statute that allows us to operate against al-Qaida and associated entities not only in Pakistan or not only in Afghanistan but in other parts of the world.  We would say that we only take these kinds of actions when there's an imminent threat, when capture is not feasible and when we are confident that we're doing so in a way that's consistent with federal and international law.  I mean, I -- as I said, I think we laid it out, I think, fairly well in those -- in those three -- those three speeches.

Q:  Attorney General, you brought up the phrase "imminent threat."  Is that the same as an ongoing threat, or is there a difference between those two?

ATTY. GEN. HOLDER:  Well, I mean, I -- you know, some of these -- some of these things are fact-based, and I can't necessarily get into the weeds or kind of parse these things.  You can't, I think, examine these terms without having a reference to the facts.

And I'm not in a position in this environment, in a -- in a classified environment, I can get more specific, but I'm confident that the definitions that we have used and the explanations that, for instance, that I used in my Northwestern speech, are accurate representations of the drivers, the facts --

Q:  Why not release the memos?  I mean, you were a driving force behind releasing the Bush administration's torture memos.  Why aren't you a force for this?

ATTY GEN. HOLDER:  Well, I mean, we'll have to, you know, look at this and see how -- what it is we want to do with these memos.  But you have to understand that we are talking about things that are -- that go into really kind of how we conduct our offensive operations against a clear and present danger to this nation.

Q:  Bring us into the classified setting, then.

ATTY GEN. HOLDER:  I'm not sure you could pass -- (laughter) -- a background check.  I'm just kidding.  I'm just kidding.  (Laughter.)

Q:  Mr. Attorney General --

Press Conference with Attorney General Eric Holder; Associate Attorney General Tony West; Deputy Assistant Attorney General Stuart Delery Subject: Announcement of a Major Financial Fraud Enforcement A

ATTY GEN. HOLDER:  But that is a -- that is a real concern, to reveal sources, potentially reveal sources and methods, and put at risk the very mechanisms that we use to try to keep the American people safe, which is our primary responsibility.

Q:  This memo -- the memo doesn't seem to be classified.  The writer is marked "confidential" but not "classified." Why not release that to the general public?  And in that memo, it seems to me, if you take an -- (inaudible) -- ongoing threat amounts to an imminent threat.  So you said you could only discuss that in a classified setting, but in this memo you're discussing the difference between those -- that we're taking what sounds like an ongoing threat and saying that it's an imminent threat.

ATTY GEN. HOLDER:  Yeah.  Well, I mean, that's something -- we'd have to look into, you know, what's exactly in the white paper.  We'd have to look into that.

Q:  Are you not aware of what's in the white paper?

ATTY GEN. HOLDER:  Would have to -- we'll have to look into that.

Q:  Mr. Attorney General, I'm from WTOV in Steubenville.  I'm wondering where the federal investigation on the Steubenville rape case stands right now.

ATTY GEN. HOLDER:  Well, I'm not sure that I'm -- I want to comment on where it is.  It's something that obviously we are aware of, involved in.

But I'm not sure I'm in a position at this point to comment on it.

Q:  Can you say what your involvement in the case is right now at all?

ATTY GEN. HOLDER:  No, I wouldn't want to do that.

Q:  (Name inaudible) -- with Financial Times.  Mr. West, you've mentioned how the banks in the spring of 2007 -- it appears that they knew that there would be ratings downgrades, and so they packaged these subprime mortgage bonds into CDOs and sold them to investors as a way to get those bonds off their books.  How is that not fraud if they knew that ratings downgrades were coming and then they packaged these CDOs and sold them to unwitting investors?  Why is there only a suit against S&P and not all the issuers that are mentioned in the various CDO deals outlined in your complaint?

MR. WEST:  Well, again, we do believe it was fraud, which is why we've charged S&P with that.  And again, as -- you know, as regards any other institution or any other individual, you know, we're just not in a position to make any comments on where we are in those regards.

Q:  So those other issues did not commit fraud in selling -- packaging these bonds -- (off mic) -- they knew the downgrades were coming into CDOs and selling them to CalSTRS and CalPERS -- (inaudible) -- teachers, et cetera, et cetera?  That was totally legal?

MR. WEST:  Well, again, I'm making no comments about anyone other than S&P today.  Any other -- any other investigations or -- pending or not, it's just something I'm not going to comment on today.

Q:  Mr. Holder?

Q:  Mr. Holder, with regard to S&P, we heard from Attorney General Hood his view on the First Amendment question -- we'd like to get a federal perspective on that -- and also, the argument made by S&P that at the time, 2007, there were top federal officials, including the chairman of the Federal Reserve at that time, who suggested the subprime mortgage crisis could be contained; other people got this wrong.

Press Conference with Attorney General Eric Holder; Associate Attorney General Tony West; Deputy Assistant Attorney General Stuart Delery Subject: Announcement of a Major Financial Fraud Enforcement A

MR. WEST:  Look, you know, the First Amendment protects a lot of things.

It does not protect saying one thing and doing another.  It does not protect issuing ratings that you know are inflated at the time you issued them.  And those are the two basic allegations in this lawsuit.

So, you know, one of the things that this lawsuit is not about, it's not about predicting the future; it's not about whether people could figure out how bad the mortgage crisis was going to be.  It's really about promising to do one thing and doing something else and issuing ratings that you know are inflated at the time you issued them.

Q:  Mr. Holder, could you tell us your thoughts about how the Alabama hostage situation yesterday came down and the role of the federal agencies that were involved?

ATTY GEN. HOLDER:  Well, I was getting briefed on this over the course of the -- of the week.  I thought that the FBI action yesterday was exemplary.  And as, I think, more details are shared, you will understand why I use the word "exemplary."  In conjunction with our state and local partners there and with the focus on trying to rescue that young boy as quickly as we could, as safely as we could, I think the FBI has done a superb job.

As I said, there will be more facts, I'm sure, that will come out and talk about how they were able to accomplish what was a difficult -- a difficult task, but did so in a way that saved that young boy's life.

STAFF:  Last question.

Q:  Mr. Birotte, given the confession of Lance Armstrong to all the things --

MR. BIROTTE:  (Off mic.)

Q:  -- (chuckles) -- to all the things that you in the end decided you couldn't bring a case about, can you give us your thoughts on that case now and whether you might take another look at it?

MR. BIROTTE:  We made a decision on that case, I believe, a little over a year ago.

Obviously we've been well-aware of the statements that have been made by Mr. Armstrong and other media reports.  That has not changed my view at this time.  Obviously we'll consider -- we'll continue to look at the situation, but that hasn't changed our view as I stand here today.

STAFF:  All right, thank you very much.

MR.     :  Thank you.

(C) 2013 Federal News Service

**LOAD-DATE:** February 5, 2013

# EXHIBIT P(35)

US accuses S&P of inflating ratings to satisfy banks, 2013 WLNR 2959693

**NewsRoom**

2/6/13 Telegraph Online (U.K.) (Pg. Unavail. Online)
2013 WLNR 2959693

Telegraph Online (UK)
Copyright © 2013 Telegraph.co.uk-NonSyndicated

February 6, 2013

US accuses S&P of inflating ratings to satisfy banks
The US Department of Justice has released details accusing Standard &
Poor's credit rating agency of refusing to warn investors that the housing...

AP

The US Department of Justice has released details accusing Standard & Poor's credit rating agency of refusing to warn investors that the housing market was collapsing in 2006 because it would be bad for business.

The civil charges were the administration's most aggressive action to date against those deemed responsible for contributing to the worst financial crisis since the Great Depression.

They followed years of criticism that the US government had failed to do enough.

The Justice Department accused S&P of knowingly inflating its ratings of risky mortgage investments that helped trigger the crisis. It is now demanding $5bn (£3.2bn) in penalties.

According to the lawsuit, S&P gave high marks to the investments because it wanted to earn more business from the banks that issued them.

"This alleged conduct is egregious - and it goes to the very heart of the recent financial crisis," Attorney General Eric Holder said at a news conference.

He added that the case "an important step forward in our ongoing efforts to investigate and punish the conduct that is believed to have contributed to the worst economic crisis in recent history."

According to the lawsuit, S&P recognized that home prices were sinking and that borrowers were having trouble repaying loans.

Yet these facts weren't reflected in the safe ratings S&P gave to complex real-estate investments known as mortgage-backed securities and collateralized debt obligations, the lawsuit alleges.

At least one S&P executive who had raised concerns about the company's proposed methods for rating investments was ignored.

S&P executives expressed concern that lowering the ratings on some investments would anger the clients selling these investments and drive new business to S&P's rivals, the government claims.

S&P, a unit of New York-based McGraw-Hill called the lawsuit "meritless."

"Hindsight is no basis to take legal action against the good-faith opinions of professionals," the company said in a statement. "Claims that we deliberately kept ratings high when we knew they should be lower are simply not true."

High ratings from the three agencies made it possible for banks to sell trillions in risky investments.

Some investors, including pension funds, can buy only securities that carry high credit ratings.

The $5bn in penalties the government is demanding would amount to several times the annual revenue of McGraw-Hill's Standard & Poor's Ratings division. The ratings business generated $1.77bn in revenue in 2011. McGraw-Hill's total revenue was $6.25bn.

The fraudulent ratings contributed to the failure of a California credit union that required a multibillion dollar government bailout, the lawsuit said. It said Western Federal Corporate Credit Union bought the investments because of S&P's endorsement.

Western Federal was among five wholesale credit unions that regulators took over in 2009 and 2010. To wind them down, the National Credit Union Administration borrowed $11.2 billion from the Treasury. It's repaid about $6.1 billion. The agency said the costs will be paid by the credit union industry and Treasury will be fully repaid.

Critics complained that the government's action on Tuesday involves civil rather than criminal charges. Criminal charges, which would carry the possibility of jail time, would be harder to prove.

Former Senator Ted Kaufman, a Democrat who served on a panel that investigated the financial crisis, argued that actions by S&P and its employees amounted to criminal fraud.

"If you're selling something that you're saying has a certain level of safety, and you know it doesn't have that level of safety, that's fraud," Mr Kaufman said.

He said big civil fines just end up hurting shareholders.

"The executives, the folks that did it, aren't going to pay anything," Kaufman said.

Experts said the lawsuit could serve as a template for future action against Fitch and Moody's, the other two major credit rating agencies.

"I think the S&P case is likely to be a template for use against the other rating agencies as long as the government believes it has the evidence to make its case," said Jacob Frenkel, a lawyer formerly with the Securities and Exchange Commission.

According to the lawsuit, S&P didn't issue a mass downgrade of subprime-backed securities until mid-2007, even though it knew in 2006 that many borrowers were struggling or failing to make payments.

The mortgages were faring so poorly "that analysts initially thought the data contained typographical errors," according to the lawsuit.

In a 2007 email, another analyst said some at S&P wanted to downgrade mortgage investments earlier, "before this thing started blowing up. But the leadership was concerned of pissing off too many clients and jumping the gun ahead of Fitch and Moody's."

US accuses S&P of inflating ratings to satisfy banks, 2013 WLNR 2959693

The complaint includes a trove of embarrassing emails and other evidence that S&P analysts recognized the market's problems early.

In 2007, for example, an analyst who was reviewing mortgage bundles forwarded a video of himself singing and dancing to a song written to the tune of "Burning Down the House": "Going - all the way down, with/Subprime mortgages." The video showed colleagues laughing at his performance.

Critics have long argued that the rating agencies operate with a conflict of interest: They're paid by the banks that create the investments they're rating. If one agency appeared too strict, banks could shop around for a better rating.

S&P typically charged up to $150,000 for rating a subprime mortgage-backed security and up to $750,000 for certain other securities, the lawsuit says.

If S&P lost the business to Fitch or Moody's, its main rivals, the analyst who issued the rating would have to submit a "lost deal" memo explaining why he or she lost the business.

An analyst complained in 2004 that S&P had lost a deal because its standards for a rating were stricter than Moody's. "We need to address this now in preparation for the future deals," the analyst wrote.

The documents "make clear that the company regularly would 'tweak,' 'bend,' delay updating or otherwise adjust its ratings models to suit the company's business needs," said acting Associate Attorney General Tony West.

S&P countered that the emails were "cherry picked," that they were "taken out of context, are contradicted by other evidence, and do not reflect our culture, integrity or how we do business."

It said analysts' concerns were addressed before a rating was issued and that the government left out important context.

The ratings "reflected our current best judgments," S&P said in its statement. It noted that other agencies gave the same high ratings and said the government also failed to predict the subprime mortgage crisis.

The lawsuit comes just 18 months after S&P cut its rating on long-term US government debt by a notch. The downgrade followed a contentious debate between the White House and Congress over the raising of the government's borrowing limit that was resolved at the last hour.

Holder was asked about a possible link between the lawsuit and the downgrade.

"There's no connection," Holder said. He added that the department's investigation began in 2009.

But Michael Robinson, a former communications official at the SEC, said that while all three major rating agencies have lost credibility since the financial crisis, S&P's downgrade of U.S. debt put a bull's-eye on its back.

"Once you get on the government's radar, it's hard to get off scot-free," Robinson said.

The government charged S&P under a law intended to make sure banks invest safely. If S&P is found to have committed civil violations, it could face not only fines but also limits on how it does business.

McGraw-Hill shares closed down nearly 11pc Tuesday. On Monday, after the lawsuit was first reported, they plunged nearly 14pc.

**US accuses S&P of inflating ratings to satisfy banks, 2013 WLNR 2959693**

Shares of Moody's, the parent of Moody's Investors Service, another rating agency, lost nearly 9pc Tuesday after closing down nearly 11pc Monday.

---- Index References ----

Company: MCGRAW HILL INTERNATIONAL ENTERPRISES INC

News Subject: (Real Estate Investments (1RE04); Credit Ratings (1CR83); Securitization (1SE75); Funding Instruments (1FU41); Mortgage-Backed Markets (1MO87))

Industry: (Securities Investment (1SE57); Financial Services (1FI37); Consumer Finance (1CO55); Retail Banking Services (1RE38); Loans (1LO12); Investment Management (1IN34); Subprime Lending (1SU05); Banking (1BA20); Mortgage Banking (1MO85))

Language: EN

Other Indexing: (Jacob Frenkel; Michael Robinson; Ted Kaufman; Eric Holder; Tony West)

Word Count: 1283

End of Document                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

**NewsRoom**

# EXHIBIT P(36)



1 of 1 DOCUMENT

Copyright 2013 Factiva ®, from Dow Jones
All Rights Reserved

## Dow Jones Factiva

(Copyright (c) 2013, Dow Jones & Company, Inc.)

## THE WALL STREET JOURNAL.

The Wall Street Journal

February 6, 2013 Wednesday

**SECTION:** REVIEW & OUTLOOK (Editorial); Pg. A12

**LENGTH:** 927 words

**HEADLINE:** Payback for a Downgrade?

**BODY:**

Now, this is awkward. One agency of the federal government is suing a company for fraud while another agency continues to endorse it.

On Monday in Los Angeles, the Department of Justice sued Standard & Poor's and its parent McGraw-Hill for $5 billion. The claim is that S&P committed civil fraud when it issued high credit ratings on mortgage-related securities prior to the financial crisis of 2008. Sixteen states and the District of Columbia have piled on the suit.

No doubt investors who relied on the opinions of S&P and the other big credit-rating agencies, Moody's and Fitch, suffered terrible losses during the crisis. That was in part because the federal governmentforced investors to rely on them. Longstanding rules at the Securities and Exchange Commission and other agencies required institutions to hold assets graded highly by these government-approved rating agencies.

And to this day, more than two years after the Dodd-Frank law ordered their repeal, SEC rules still force institutions to follow the advice of these government-anointed credit raters. Therefore the more appropriate defendant for Monday's lawsuit would be the SEC. But as a modest first step before suing a company for $5 billion, shouldn't the government at least stop mandating its products?

We've long argued that the government should not endorse any company's opinions about credit risk, which at the end of the day is all a credit rating is -- an opinion. And for that reason the government will not have an easy time making a fraud case.

Payback for a Downgrade? The Wall Street Journal February 6, 2013 Wednesday

Justice quotes internal emails from S&P personnel suggesting that, in its desire to win rating assignments from the investment banks that created securities, S&P was too generous in handing out high grades. For its part, S&P said in a Tuesday statement, "Claims that we deliberately kept ratings high when we knew they should be lower are simply not true."

If a publisher deliberately misleads, it loses its First Amendment protection. S&P concedes "there was robust internal debate" inside the firm but says it "applied the collective judgment of our committee-based system in good faith."

Some of the emails in the government suit do look bad, at least as presented in the lawsuit and just like a lot of the rating-agency internal emails that the SEC released in a 2008 report. In fact, some of the same internal S&P messages from that five-year-old report are now reprinted in the new lawsuit.

So why wasn't a federal case made in 2008 or 2009 or 2010 or 2011 or 2012? In the United States it has always been difficult to prosecute publishers of financial opinions for securities fraud. Yes, the SEC has sometimes successfully prosecuted the proprietors of sham newsletters that touted stocks with bogus claims while secretly accepting payments from the companies being hyped.

But everyone already knows the big credit raters get paid to issue their opinions. And courts have often looked askance at broadly using the laws on securities fraud to go after people outside of the business of issuing, underwriting and dealing in securities.

This may be why the SEC, which had been investigating the credit raters, is not part of this week's lawsuit. Justice is instead trying to break new ground by using a 1989 statute intended to prevent bank fraud. Since federally insured financial institutions were among those who relied on credit ratings, argues Justice, S&P can be charged with fraud.

The suit names a specific credit union in California as an alleged victim. In other words, the government that keeps blaming the bankers for the crisis is now painting banks as the victims of rating agencies whose opinions the banks were ordered by the government to follow.

There are other disturbing questions related to the timing and the target of this federal civil prosecution. S&P's attorney Floyd Abrams tells us that "things seemed to rev up in terms of the intensity" of the federal investigation after S&P's historic downgrade of United States credit following Washington's debt-limit fight in 2011.

Meanwhile, a McClatchy Newspapers report says that it was around that time that Moody's, which did not downgrade the government, was dropped from the federal investigation. Ask any investor and he'll likely tell you that Moody's was equally awful in forecasting the mortgage debacle.

Speaking of the debt-limit fight, that's also coincidentally when White House Chief of Staff Jack Lew was aggressively promoting the President's campaign to prevent entitlement reform. Mr. Lew had worked in the heart of Citigroup's subprime investment factory, and the President has not only been willing to forgive and forget. He's even nominated Mr. Lew to become Secretary of the Treasury. But the company that put a shot across the Beltway bow over deficit spending is now the only target of a credit-ratings prosecution.

Why not just take away its government-enforced advantage instead? Both regulators and regulated institutions still yearn for the ability to outsource the tough decisions on credit risk to some certified experts. But it's folly to think that some anointed class can ever be counted on to warn of all potential default dangers.

If prosecutors continue to focus on how the rating process works, they may allow Washingtonians to celebrate downgrade payback, but they won't serve investors or taxpayers. Americans will benefit most when few people care how the rating agencies operate, because their judgments won't be that important.

Payback for a Downgrade? The Wall Street Journal February 6, 2013 Wednesday

Page 3

Subscribe to WSJ:  http://online.wsj.com?mod=djnwires

License this article from Dow Jones Reprint Service

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** February 6, 2013

# EXHIBIT P(37)



**the**guardian

Search

# Moody's, S&P and other credit rating agencies deserve a failing grade

The traditional credit rating business is broken. Perhaps there is a way to use open source models to fix it

**Marc Joffe**
theguardian.com, Monday 25 February 2013 16.30 EST



Moody's believes the UK's recovery is unlikely to gain traction until at least 2015. Photograph: Brendan Mcdermid/Reuters

Five years after the financial crisis, European and US regulators have yet to solve the problem of biased credit rating opinions. Moody's downgrade of the UK's credit rating and the recent US lawsuit against S&P remind us that credit ratings remain both consequential and controversial. More importantly, they are a byproduct of a broken industry hamstrung by obsolete regulation.

Rating agency regulation needs to evolve in order to encourage rather than stifle innovation. Just as TripAdvisor has disrupted the status quo for travel reviews, 21st century technologies can revolutionize the way that fixed income investors glean wisdom about bonds.

Rating agencies first found their way into US federal rulemaking in the wake of the Depression. Regulators decided that expert third-party evaluations were needed to ensure that banks were investing depositor funds wisely, especially since taxpayers started guaranteeing deposits under the auspices of the FDIC.

In the 1970s, after rating agencies adopted the issuer pays model, the federal government implemented NRSRO (Nationally Recognized Statistical Rating Organization) registration – albeit without oversight. Finally, the 2006 Credit Rating Agency Reform Act – passed in reaction to the controversy over Enron's and WorldCom's ratings – stiffened regulation of NRSROs.

To become a new NRSRO, a firm must submit 10 letters from Qualified Institutional Buyers stating that they have happily used the firm's ratings for at least three years. This requirement is somewhat circular, because it is hard for a new rater to gain attention from institutional buyers without being an NRSRO.

Once a rating agency joins the NRSRO club it faces enormous compliance costs in terms of both employee training and reporting. Upstart Egan Jones recently found that the

penalties for making errors on mandatory Securities and Exchange Commission (SEC) filings can be quite severe. The compliance burden actually favors the big three because they generate enough revenue to fully staff compliance units. New entrants often lack this luxury.

Further, Egan Jones and S&P share two characteristics that should raise an eyebrow: both downgraded the US and subsequently faced disciplinary action from the US government. Perhaps this helps explain why Moody's chose to downgrade the UK while leaving the US at Aaa. The two countries have virtually identical central government net debt-to-GDP ratios, while the UK has significantly smaller central government deficits and is less subject to interest rate spikes due to the longer average maturity of its bond issues.

Expert opinions about bond risk can play an important social role. Since most people lack the time and expertise to thoroughly evaluate these instruments, delegating this task makes sense. Further, correct and credible expert opinions about fixed income securities promote a proper alignment of interest rates to risk, ensuring that our society's scarce capital is effectively deployed. So rather than simply dismiss the ratings business, we should be trying to fix it.

What could a 21st Century rating industry look like? Today, computer models are available to rate all major classes of fixed income securities. In some cases, rating agencies use such models, but the workings of these models and the data entered into them are not fully disclosed. This creates opportunities to massage inputs and outputs, or to ignore potential improvements that produce commercially inconvenient results – as alleged in the Department of Justice's complaint against S&P. Further, model results can be overridden by a rating committee, whose proceedings are kept secret.

A more modern alternative would leverage open source models with fully transparent inputs and outputs. As with Linux and Wikipedia, the software and data would be open to a worldwide peer review process, which could facilitate their rapid improvement. A number of examples for this radically open approach to credit modeling now exist including the National University of Singapore Risk Management Institute's Credit Risk Initiative for corporate bonds and this author's open source public sector credit framework for government bonds.

Regulators can accelerate the innovation process by empowering one or more certification boards to review and approve open source credit models. This way, rigorous modeling efforts can be differentiated from the dross that often plagues open source communities. A rough template for such a certification body is the World Wide Web Consortium that sets standards for HTML, XML and other internet technologies.

Well-meaning government regulations often have the negative unintended consequence of locking in outmoded ways of conducting business. A modern regulatory regime would empower mass collaboration technologies to improve credit rating performance.

| More from the Guardian What's this? | More from around the web What's this? |
|---|---|
| Winter clothing ideas for cyclists 17 Dec 2013 | RFK Jr.'s Secret Diary Surfaces: Exposes 37 Affairs, Fierce Jabs At Rev. Al Sharpton, Jesse Jackson (Radar Online) |
| Segregation: our secular values need to be protected 15 Dec 2013 | Pastor Starts 'War on Hanukkah' With His Ignorant Church Sign (VIDEO) (Articles in the News) |
| Rowan Atkinson Comic Relief sketch prompts most complaints in 2013 16 Dec 2013 | Iran gets an early Christmas gift: Turkey (Nikkei Asian Review) |
| Whether or not it's Heathrow, airport expansion is just another glamorous project for the rich 17 Dec 2013 | Man of Who? 15 Of The Most Suspect Preachers Around (MadameNoire) |
| Woolwich trial: The culture of hate that drove Michael Adebolajo and Michael Adebowale to murder 19 Dec 2013 | |

Phil Robertson puts out statement about his
homophobic speech (Allvoices)

© 2013 Guardian News and Media Limited or its affiliated companies. All rights reserved.

;

# EXHIBIT P(38)



1 of 5 DOCUMENTS

Copyright 2013 Newstex LLC
All Rights Reserved
Cato@Liberty

September 4, 2013 Wednesday 4:52 PM EST

**LENGTH:** 408 words

**HEADLINE:** SP's Dilemma: Rating your Regulator

**BODY:**

Sep 04, 2013 (Cato@Liberty:http://www.cato.org/blog Delivered by Newstex)
Mark A. Calabria

In a court filing today, the rating agency Standard Poor's (SP) claims[1] that the federal case against them is motivated by retaliation for its 2011 decision to strip the United States of its 'AAA' credit rating.

It might be easy to dismiss this claim, but they aren't the only ones in this situation. Before SP's U.S. downgrade, the smaller firm Egan-Jones, which relies on a subscriber model also downgraded the United States. Not long after, Egan-Jones was investigated [2]by the SEC and ultimately barred for a time from rating U.S. debt. Let's remember that Egan-Jones was ahead of the curve in spotting both the subprime bubble and the failures of WorldCom and Enron.
If you didn't downgrade the United States, what happened? Basically nothing. We see what starts to look like a pattern here: downgrade the United States and expect some abuse. Don't and you will be largely left alone. And as the recent IRS treatment of Tea Party groups has shown: this administration isn't above targeting its enemies.
There are, as expected, several twisted ironies to the case. First, the Department of Justice is claiming to act on behalf of banks that suffered losses from holding rated securities. But who was it that imbedded ratings into the bank regulatory process? The bank regulators. If the DOJ wants to punish someone for bank losses on rated securities it should start with the Basel Committee. And then there's the DOJ itself, which uses a flawed theory of disparate impact to pressure banks to make bad loans in the first place. The DOJ doesn't have to go far to find the guilty: just try looking in a mirror.
The solution here is ultimately to get the federal government out of regulating the rating agencies. Our entire financial system is built on sovereign debt. The crisis in Europe shows what happens when you get the treatment of sovereign debt wrong (for a good summary of sovereign risk in bank regulation, see this BIS speech[3]). The conflicts of interest between raters and regulators are ultimately a far greater threat to our system than any conflict between corporate issuers and raters.
[1]: http://www.reuters.com/article/2013/09/03/us-mcgrawhill-sandp-lawsuit-idUSBRE98210L20130903 [2]: http://www.bloomberg.com/news/2013-01-22/egan-jones-lives-to-fight-the-government-another-day.html [3]: http://www.bis.org/speeches/sp111026.htm

SP's Dilemma: Rating your Regulator Cato@Liberty September 4, 2013 Wednesday 4:52 PM EST

**LOAD-DATE:** September 04, 2013

# EXHIBIT P(39)



1 of 2 DOCUMENTS

Copyright 2013 Factiva ®, from Dow Jones
All Rights Reserved

# Dow Jones Factiva

(Copyright (c) 2013, Dow Jones & Company, Inc.)

# THE WALL STREET JOURNAL.

The Wall Street Journal

September 9, 2013 Monday

**SECTION:** REVIEW & OUTLOOK (Editorial); Pg. A14

**LENGTH:** 964 words

**HEADLINE:** S&P and Downgrade Payback

**BODY:**

Standard & Poor's says in a court filing that it's being sued by the Justice Department "in retaliation" for the company's exercise of its "free speech rights with respect to the creditworthiness of the United States of America." S&P may have a point, and more importantly a federal judge is doing the public service of giving the credit-rating firm a chance to prove it.

Justice's lawsuit, which seeks a notably punitive $5 billion in damages, is ostensibly a claim that S&P defrauded banks prior to the 2008 financial crisis when it placed high ratings on mortgage bonds. You read that correctly -- the government really is claiming that when Bank of America and Citigroup created mortgage-backed securities, they were misled about their quality by S&P. Even though Citi and BofA supplied the information about mortgage quality to S&P, and despite what the government has claimed in separate lawsuits against these same banks, in this case the government wants everyone to believe the banks were victims.

S&P's answer is that this prosecution isn't really about 2008, or the years preceding it. It's about 2011, when S&P was the one major credit-rater that dared to downgrade the U.S. Treasury, stripping the government of the triple-A rating it had held for 70 years. Last winter S&P lawyer Floyd Abrams told us that "things seemed to rev up in terms of the intensity" of the federal investigation after the firm's historic downgrade of U.S. credit. It sure looks that way based on the timeline leading up to the August 2011 downgrade.

---

S&P and Downgrade Payback The Wall Street Journal September 9, 2013 Monday

From the onset of the financial crisis, it was clear that flawed opinions from the credit-rating oligopoly were a key contributor to the crisis. This oligopoly included S&P, its main competitor Moody's, and the smaller Fitch. The government had anointed all three as official judges of credit risk, and regulations required financial institutions to follow their advice. So when these firms slapped triple-A ratings on mortgage bonds, investors bought them by the truckload.

When the mortgage market went south, the Beltway crowd didn't want to blame itself for forcing banks to listen to the raters. So it began to focus on how the raters had come to their decisions. And for years regulators and politicians did not single out S&P, but instead treated both S&P and Moody's as highly culpable, with Fitch sometimes also receiving criticism.

A 2008 Securities and Exchange Commission report highlighted problems at all three ratings firms. Around the same time, New York's then-Attorney General Andrew Cuomo struck a settlement with all three, allegedly to reform the way they were paid to rate securities.

The following year, Ohio's then-Attorney General Richard Cordray sued all three. In 2010, Connecticut's then-Attorney General Richard Blumenthal sued both Moody's and S&P. California's then-AG Jerry Brown was investigating all three but singled out Moody's for being uncooperative.

Meanwhile, hearings on Capitol Hill aired at least as many allegations against Moody's as S&P. Carl Levin of the Senate's Permanent Investigations Subcommittee didn't single out one firm. He said his inquiry had found that "those credit-rating agencies allowed Wall Street to impact their analysis, their independence, and their reputation for reliability. And they did it for the money." Congress's Financial Crisis Inquiry Commission split along partisan lines, but one thing both sides agreed on was the destruction caused by investor reliance on both ratings giants.

We've been skeptical of all of these investigations, since credit ratings are merely opinions. The simple solution is for the government to stop forcing people to pay attention to them. But the point of this chronology is that there is an unambiguous record from 2008 through 2010 of various government bodies investigating both S&P and Moody's.

Then along comes 2011. In April of that year, S&P shifted the U.S. credit outlook to "negative" from "stable." As is its custom, S&P made this change to warn markets that Uncle Sam could face a downgrade.

Team Obama was not happy. The Washington Post reported that Administration officials had urged S&P not to make this move. After it was announced, officials criticized S&P's analysis. Treasury Secretary Timothy Geithner dismissed the warning and said there was "no risk" of a downgrade.

Two months later, this newspaper reported that the SEC was investigating both Moody's and S&P, with particular attention to S&P. Two months after that, in August, S&P announced its downgrade, triggering a stock market selloff and embarrassing the President.

Fewer than two weeks later, the New York Times reported that Justice was conducting an investigation specifically of S&P. The Times said it was "unclear" whether Moody's, which did not downgrade the U.S., was also being investigated. And now we know that Moody's has not been charged in the Justice suit. Coincidentally, Moody's counts among its owners Berkshire Hathaway, run by Obama pal Warren Buffett.

Yet Moody's had a rating identical to S&P's on nearly every tranche of every security mentioned in the lawsuit. All of which raises the question posed by federal Judge David Carter of the Central District of California in a recent court hearing: "Where's Moody's?"

---

We don't think Justice's dubious claims should be levelled against anyone, and its banks-as-victims argument is

S&P and Downgrade Payback The Wall Street Journal September 9, 2013 Monday

ludicrous. But far more troubling is that this case has the aroma of political payback. So it's welcome news that Judge Carter is giving S&P the opportunity to conduct discovery to determine what government officials were saying to each other about this case before and after the 2011 downgrade. A deposition of Attorney General Eric Holder would be a good start.

License this article from Dow Jones Reprint Service

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** September 9, 2013