1   STUART DELERY
    Assistant Attorney General
2   MAAME EWUSI-MENSAH FRIMPONG
       (CA Bar No. 222986)
3   ARTHUR R. GOLDBERG
    MICHAEL S. BLUME
4   JAMES T. NELSON
    BRADLEY COHEN
5   JENNIE KNEEDLER
    SONDRA L. MILLS (CA Bar No. 090723)
6   THOMAS D. ZIMPLEMAN
    United States Department of Justice, Civil Division
7      P.O. Box 261, Ben Franklin Station
       Washington, D.C. 20044
8      Telephone: (202) 616-2376
       Facsimile: (202) 514-8742
9      Email: James.Nelson2@usdoj.gov

10  ANDRÉ BIROTTE JR.
    United States Attorney
11  GEORGE S. CARDONA (CA Bar No. 135439)
    LEON W. WEIDMAN (CA Bar No. 104078)
12  ANOIEL KHORSHID (CA Bar No. 223912)
    RICHARD E. ROBINSON (CA Bar No. 090840)
13  Assistant United States Attorneys
       Room 7516 Federal Building
14     300 N. Los Angeles St.
       Los Angeles, California 90012
15     Telephone: (213) 894-8323/6086
       Facsimile: (213) 894-7819
16     Email: George.S.Cardona@usdoj.gov / Anoiel.Khorshid@usdoj.gov

17  Attorneys for Plaintiff
    United States of America

18

19              UNITED STATES DISTRICT COURT

20          FOR THE CENTRAL DISTRICT OF CALIFORNIA

21                  SOUTHERN DIVISION

22  UNITED STATES OF AMERICA,          No. 2:13-cv-00779-DOC (JCGx)

23          Plaintiff,                 [REDACTED] UNITED STATES'
                                       OPPOSITION TO DEFENDANTS' MOTION
24          v.                         TO COMPEL DISCOVERY AND CROSS-
                                       MOTION FOR PROTECTIVE ORDER AND TO
25  MCGRAW-HILL COMPANIES, INC.,       STRIKE DEFENSE
    and STANDARD & POOR'S
26  FINANCIAL SERVICES LLC,            Date: March 11, 2014 7:30 a.m.
                                       Location: Courtroom 9D
27          Defendants.                Judge: Hon. David O. Carter

28

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES........................................... iii

I.   INTRODUCTION.............................................. 1

II.  ARGUMENT................................................. 2

    A.   S&P FAILS TO MAKE THE THRESHOLD SHOWING REQUIRED FOR
        DISCOVERY ON ITS FIRST AMENDMENT RETALIATION DEFENSE..... 2

        1.   <u>S&P Must Make A Preliminary Showing Before Being
             Entitled To Discovery On This Defense</u>............... 3

        2.   <u>S&P Fails To Make The Required Threshold Showing
             That It Was Singled Out Or That This Case Was
             Filed In Response To Its Downgrade Of The United
             States</u>................................................ 9

    B.   S&P'S FAILURE TO MAKE THE THRESHOLD SHOWING REQUIRED
        TO JUSTIFY DISCOVERY WARRANTS AN ORDER STRIKING ITS
        ASSERTED FIRST AMENDMENT RETALIATION DEFENSE AND
        PRECLUDING ANY FURTHER DISCOVERY RELATING TO IT........ 14

    C.   S&P'S DISCOVERY REQUESTS ON ITS ASSERTED FIRST
        AMENDMENT RETALIATION DEFENSE ARE ALSO OVERBROAD,
        UNDULY BURDENSOME, AND FAIL TO SATISFY THE HEIGHTENED
        STANDARDS FOR DISCOVERY DIRECTED AT THE EXECUTIVE
        OFFICE OF THE PRESIDENT................................ 16

        1.   <u>As Directed To Executive Branch Components Other
             Than DOJ, The Requests Are Overbroad And Unduly
             Burdensome</u>........................................... 17

        2.   <u>S&P Fails To Satisfy The Heightened Standards For
             Discovery Requests Directed To The Executive
             Office Of The President</u>............................. 21

    D.   S&P'S REQUESTS FOR DOCUMENTS RELATING TO PRACTICES OF
        OTHER NRSROs GATHERED BY DOJ IN OTHER INVESTIGATIONS
        ARE OVERBROAD AND UNDULY BURDENSOME AND SEEK DOCUMENTS
        NOT RELEVANT TO ANY PROPERLY RAISED CLAIM OR DEFENSE.... 23

        1.   <u>The Documents S&P Seeks Regarding Other NRSROs
             Are Not Relevant To S&P's Alleged FIRREA
             Violations</u>........................................... 25

        2.   <u>The Burdens The Proposed Discovery Would Impose
             On The Government Outweigh Any Possible Benefit</u>.... 29

i

**TABLE OF CONTENTS (CONTINUED)**

PAGE

████████████████████████████████████████████████████████

E.    S&P'S REQUESTS FOR DOCUMENTS GATHERED FROM
      INVESTIGATIONS OF RMBS AND CDO ISSUERS ARE OVERBROAD
      AND UNDULY BURDENSOME; SEEK DOCUMENTS NOT RELEVANT TO
      ANY PROPERLY RAISED CLAIM OR DEFENSE; AND IMPINGE ON
      THE LAW ENFORCEMENT INVESTIGATORY FILES PRIVILEGE....... 32

      1.    S&P's Request Relating To Any "Fraud Or Deceptive
            Practices" By Issuers Is Vastly Overbroad And
            Seeks Documents Irrelevant To The Alleged FIRREA
            Violations......................................... 33

      2.    The Burdens The Proposed Discovery Would Impose
            On The Government Outweigh Any Possible Benefit.... 34

      3.    The Discovery Sought Can Be Obtained From The
            Private Third Parties and Independent Entities
            Who Produced Documents To The Government And Who
            Are In A Better Position To Identify And Address
            Confidentiality Concerns.......................... 35

      4.    Certain Materials Sought By These Requests Are
            Subject to Limited Assertions of The Law
            Enforcement Investigatory Files Privilege......... 36

F.    S&P'S REQUESTS FOR EVALUATIONS AND STUDIES ARE VAGUE,
      OVERBROAD, AND UNDULY BURDENSOME, AND SEEK DOCUMENTS
      NOT RELEVANT TO ANY PROPERLY RAISED CLAIM OR DEFENSE.... 44

III. CONCLUSION................................................ 47

**TABLE OF AUTHORITIES**

DESCRIPTION                                                              PAGE

**CASES**

A.N.S.W.E.R. Coalition v. Jewell,
    292 F.R.D. 44 (D.D.C. 2013)................................. 42

Anderson v. Marion Cnty. Sheriff's Dep't,
    220 F.R.D. 555 (S.D. Ind. 2004)........................ 41, 42

Attorney General of the U.S. v. Irish People, Inc.,
    684 F.2d 928 (D.C. Cir. 1982)............................... 4

Borchers v. Commercial Union Assurance Co.,
    874 F. Supp. 78 (S.D.N.Y. 1995)....................... 37, 43

Cheney v. U.S. Dist. Court for Dist. of Columbia,
    542 U.S. 367 (2004)............ 20, 21, 22, 23, 38

Church of Scientology v. Commissioner of Internal Revenue,
    823 F.2d 1310 (9th Cir. 1987)............................ 5, 7

Collins v. Swanson/Am. Exp., Inc.,
    112 F.R.D. 227 (D.D.C. 1986)..................... 41, 43, 44

Crawford-El v. Britton,
    523 U.S. 574 (1998)........................................ 20

Dellwood Farms, Inc. v. Cargill, Inc.,
    128 F.3d 1122 (7th Cir. 1997)........................ 37, 43

Estate of Bui v. City of Westminster Police Dep't,
    244 F.R.D. 591 (C.D. Cal. 2007)........................... 39

Exxon Shipping Co. v. U.S. Dep't of Interior,
    34 F.3d 774 (9th Cir. 1994)............................... 19

Franzon v. Massena Mem'l Hosp.,
    32 F. Supp. 2d 528 (N.D.N.Y. 1998)........................ 6

Friedman v. Bache Halsey Stuart Shields, Inc.,
    738 F.2d 1336 (D.C. Cir. 1984)............................ 36

G-69 v. Degnan,
    130 F.R.D. 339 (D.N.J. 1990)........................ 41, 43

Hartman v. Moore,
    547 U.S. 250 (2006)..................................... 3, 13

Huskey v. City of San Jose,
    204 F.3d 893 (9th Cir. 2000)......................... 4, 10

In re City of New York,
    607 F.3d at 945.................................... 36, 42, 44

iii

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                     PAGE

In re Dep't of Investigation of City of New York,
      856 F.2d 481 (2d Cir. 1988)................................ 40, 43

In re McKesson Gov. Entities Avg. Wholesale Price Litig.,
      264 F.R.D. 595 (N.D. Cal. 2009)............................... 38

In re Sealed Case,
      856 F.2d 268 (D.C. Cir. 1988)................................. 38

Jones v. City of Indianapolis,
      216 F.R.D. 440 (S.D. Ind. 2003).................. 37, 41, 42, 43

Kampinen v. Individuals of Chi. Police Dep't,
      2002 WL 238443 (N.D. Ill. Feb. 19, 2002)................. 37, 43

Karme v. Commissioner of Internal Revenue,
      673 F.2d 1062 (9th Cir. 1982)................................. 5

Kasza v. Browner,
      133 F.3d 1159 (9th Cir. 1998)................................ 38

Kelly v. City of San Jose,
      114 F.R.D. 653 (N.D. Cal. 1987).............................. 39

Linder v. Calero-Portocarrero,
      183 F.R.D. 314 (D.D.C. 1998)................................. 19

McPeek v. Ashcroft,
      202 F.R.D. 332 (D.D.C. 2001)................................. 37

Miller v. Pancucci,
      141 F.R.D. 292 (C.D. Cal. 1992).............................. 36

Mullen v. Surtshin,
      2009 WL 3817948 (N.D. Cal. Nov. 10, 2009).................... 4

NASD Dispute Resolution, Inc. v. Judicial Council of State of
      Cal.,
      488 F.3d 1065 (9th Cir. 2007)................................. 7

Noble v. Gonzalez,
      2013 WL 4517774 (E.D. Cal. Aug. 26, 2013).................... 6

Oppenheimer Fund v. Sanders,
      437 U.S. 340 (1978).......................................... 17

Public Serv. Enter. Group Inc. v. Philadelphia Elec. Co.,
      130 F.R.D. 543 (D. N.J. 1990)................................ 15

Puckett v. City of Glen Cove,
      631 F. Supp. 2d 226 (E.D.N.Y. 2009).......................... 6

iv

1

**TABLE OF AUTHORITIES (CONTINUED)**

2   DESCRIPTION                                                                PAGE

3   R.C.O. Reforesting v. United States,
          42 Fed. Cl. 405 (1998).......................................... 41
4
    Sanchez v. City of Santa Ana,
5         936 F.2d 1027 (9th Cir. 1990).................................. 38
6   Skoog v. Cnty of Clackamas,
          469 F.3d 1221 (9th Cir. 2006).................................. 13
7
    Soto v. City of Concord,
8         162 F.R.D. 603 (N.D. Cal. 1995)................................ 36
9   Stanislaus Towing & Recovery Serv., Inc. v. City of Modesto,
          2011 WL 5375000 (E.D. Cal. Nov. 4, 2011)....................... 6
10
    Tuite v. Henry,
11        181 F.R.D. 175 (D.D.C. 1998)............................. passim
12  United States v. Am. Elec. Power Serv. Corp.,
          258 F. Supp. 2d 804 (S.D. Ohio 2003).......................... 4
13
    United States v. American Telephone & Telegraph Co.,
14        461 F. Supp. 1314 (D.D.C. 1978)............................... 24
15  United States v. Armstrong,
          517 U.S. 456 (1996)...................................... 3, 4, 5, 6
16
    United States v. Candia-Veleta,
17        104 F.3d 243 (9th Cir. 1996).................................. 18
18  United States v. Dwyer,
          287 F. Supp. 2d 82 (D. Mass. 2003)............................ 11
19
    United States v. Fleetwood Enterprises,
20        702 F.Supp. 1082 (D. Del. 1988) ............................. 5
21  United States v. Gallegos-Curiel,
          681 F.2d 1164 (9th Cir. 1982)............................... 4, 7
22
    United States v. Gomez-Lopez,
23        62 F.3d 304 (9th Cir. 1995)................................... 18
24  United States v. Nat'l Broad. Co., Inc.,
          65 F.R.D. 415 (C.D. Cal. 1974)................................ 7
25
    United States v. One 1985 Mercedes,
26        917 F.2d 415 (9th Cir. 1990) .............................. 4, 5, 7
27  United States v. Sells Engineering, Inc.,
          463 U.S. 418 (1983)........................................... 43
28

v

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                 PAGE

United States v. Snepp,
        595 F.2d 926 (4th Cir. 1979) .................................. 5

Victor Stanley, Inc. v. Creative Pipe, Inc.,
        269 F.R.D. 497 (D. Md. 2010)................................. 17

Vogel v. Huntington Oaks Delaware Partners, LLC,
        291 F.R.D. 438 (C.D. Cal. 2013)............................. 15

Watts v. S.E.C.,
        482 F.3d 501 (D.C. Cir. 2007)............................... 19

**RULES**

Federal Rule of Civil Procedure 26 .......................... passim

Federal Rule of Criminal Procedure 6(e)....................... 43

**REGULATIONS**

28 C.F.R. § 0.45(h)....................................... 12, 18

## I.   INTRODUCTION

The government has produced to S&P the vast majority of the non-privileged materials it gathered in its FIRREA investigation in this case.[1]  The government has also voluntarily narrowed its case, identifying a limited set of RMBS and CDOs that will form the basis for its proof at trial and the losses on which it will seek to base penalties.  S&P maintains that the case still remains unmanageable, asserting that it cannot agree to any discovery or trial schedule unless the case is further and drastically narrowed.  Ironically, it is S&P that now seeks to broaden the case.  In an obvious effort to shift the focus from its own conduct, S&P moves to compel discovery in areas that go well beyond the narrowed FIRREA allegations: other investigations of the practices of other rating agencies and of financial institutions' issuance of securities other than the 54 RMBS and 109 CDOs to which this case has been narrowed; all mortgage loan origination fraud between 2004 and 2008; and S&P's unsupported allegation that this action was filed in 2013 in retaliation for S&P's 2011 downgrade of the United States' credit rating.

S&P's overbroad requests for irrelevant and burdensome discovery must be rejected.  It fails to make the threshold showing required to justify <u>any</u> discovery on its alleged First Amendment retaliation defense, much less the broad intrusions it seeks into Executive Branch communications, including those within the Executive Office of the President ("EOP").  Its requests for

---

[1] These materials include sworn testimony taken from witnesses by the Department of Justice ("DOJ") pursuant to FIRREA; materials gathered by DOJ from third parties including issuers and purchasers of RMBS and CDOs; the FIRREA subpoenas issued by DOJ together with correspondence relating to those subpoenas; and materials obtained by DOJ from the SEC and certain other government entities.

documents gathered in other investigations impinge on law enforcement privilege, seek to impose on the government the burden of searching massive volumes of documents for materials of minimal if any relevance, and ignore the need to protect valid third-party confidentiality interests.  Without substantial narrowing, S&P's requests for a wide range of government studies similarly require unduly burdensome searches for irrelevant materials.  For all these reasons, S&P's motion to compel must be denied, and, with respect to S&P's alleged First Amendment retaliation defense, the government's cross-motion for a protective order precluding further discovery and to strike should be granted.

## II.   ARGUMENT

### A.   S&P FAILS TO MAKE THE THRESHOLD SHOWING REQUIRED FOR DISCOVERY ON ITS FIRST AMENDMENT RETALIATION DEFENSE

Asserting that DOJ's decision to file the Complaint in this case violated the First Amendment because it singled S&P out from other credit rating agencies (in particular Moody's) "in retaliation for S&P's decision to downgrade the credit rating of the United States," Motion at 15-16, S&P seeks to compel wide-ranging searches through Executive Branch files in the hope that something there might support its claim.[2]  S&P's motion to compel must be denied because S&P has failed to make the threshold showing required to justify any discovery on its First Amendment retaliation defense.

S&P's asserted defense is contradicted by the facts.  First, DOJ initiated its FIRREA investigation well before, and filed the

_____

[2] As discussed in Section II.C below, the document requests S&P seeks to enforce (21, 33, 34, 51, 52, and 53) do not limit themselves to DOJ, the Executive Branch agency that made the decision to file the Complaint.  Instead, they extend to agencies that had no authority to make such a decision, including in particular Treasury, and seek to reach within EOP as well.

2

Complaint well after, the alleged protected activity, timing

inconsistent with the asserted retaliatory motive.  Second, the

Court's denial of S&P's motion to dismiss establishes that DOJ's

lengthy FIRREA investigation resulted in a Complaint whose

allegations are sufficient to support the full scope and breadth of

the United States' claims.  S&P has not shown that DOJ possesses

similar evidence regarding similarly broad claims against any other

credit rating agency.  Finally, S&P is not the only credit agency to

take negative action with respect to the United States' credit

rating, and DOJ has not sued other agencies who did so.

    Given these facts, S&P's effort to make the required showing –

based on an affidavit recounting a brief phone conversation with the

former Treasury Secretary two and one half years ago, an incomplete

chronology of events, and media speculation – fails, and S&P's

requests for discovery related to its First Amendment retaliation

defense must be denied.

    1.    S&P Must Make A Preliminary Showing Before Being
          Entitled To Discovery On This Defense

    A selective or vindictive prosecution defense must overcome

"the presumption of regularity [which] supports [] prosecutorial

decisions," because "in the absence of clear evidence to the

contrary, courts presume that [prosecutors] have properly discharged

their official duties."  *United States v. Armstrong*, 517 U.S. 456,

464 (1996) (internal quotation omitted); *see also Hartman v. Moore*,

547 U.S. 250, 263 (2006) ("this presumption that a prosecutor has

legitimate grounds for the action he takes is one we do not lightly discard, given our position that judicial intrusion into executive discretion of such high order should be minimal"). To overcome this presumption, a defendant must present "clear evidence to the contrary" demonstrating both that the enforcement action "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Id.* at 465 (internal quotations omitted). Where, as here, the alleged improper basis for enforcement is retaliation for First Amendment protected speech, S&P cannot simply allege that the enforcement decision followed protected speech; rather, S&P must demonstrate a "nexus between the two." *Mullen v. Surtshin*, 2009 WL 3817948, at *6 (N.D. Cal. Nov. 10, 2009) (citing *Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000)); *see also United States v. Gallegos-Curiel*, 681 F.2d 1164, 1168 (9th Cir. 1982) ("link of vindictiveness cannot be inferred simply because the prosecutor's actions followed the exercise of a right").

*Armstrong* recognized that even where raised as a defense to a criminal prosecution, the "justifications for a rigorous standard for the elements of a selective-prosecution claim thus require a correspondingly rigorous standard for discovery in aid of such a claim." 517 U.S. at 468. Similarly, courts have stressed that in civil enforcement actions brought by the government, there must be a "colorable showing" as to both prongs before obtaining discovery on a selective enforcement defense.[3]  Whether the showing necessary to

---

[3] *See Attorney General of the U.S. v. Irish People, Inc.*, 684 F.2d 928, 932 n.8, 947-48 (D.C. Cir. 1982); *United States v. Am. Elec. Power Serv. Corp.*, 258 F. Supp. 2d 804, 807 (S.D. Ohio 2003); *see also United States v. One 1985* Mercedes, 917 F.2d 415, 421 (9th Cir. 1990) (requiring "prima facie showing of a likelihood of vindictiveness by some evidence tending to show the essential elements of the defense"). Other courts have gone further, holding that a selective prosecution defense is unavailable in a civil

obtain discovery is described as "colorable basis," "substantial threshold showing," "substantial and concrete basis," or "reasonable likelihood," *see Armstrong*, 517 U.S. at 468, it requires more than the conjecture and speculation on which S&P's motion is based.

S&P backhandedly acknowledges that the evidence in its "timeline" does not meet this standard by protesting that the threshold requirement for discovery does not apply at all.  Motion at 17, 22-25.  This is wrong for several reasons.

First, S&P's claim runs contrary to Ninth Circuit precedent applying a standard as rigorous as *Armstrong*'s to selective prosecution defenses to civil enforcement actions by the government. *See Church of Scientology v. Commissioner of Internal Revenue*, 823 F.2d 1310, 1320-21 (9th Cir. 1987); (claim of selective prosecution in response to IRS enforcement action); *Karme v. Commissioner of Internal Revenue*, 673 F.2d 1062, 1064 (9th Cir. 1982) (same); *One 1985 Mercedes*, 917 F.2d at 420-21 (claim of vindictive prosecution as defense to civil forfeiture action).

Second, *Armstrong*'s concerns about interfering with one of the "core powers" of the Executive Branch, "the power to prosecute," 517

---

penalty action.  *See United States v. Fleetwood Enterprises*, 702 F. Supp. 1082, 1091-92 & n.26 (D. Del. 1988) ("[T]his Court is not convinced that a civil penalty action brought by the Federal Government is the punitive equivalent of a criminal action to the extent that selection of a civil defendant based on the exercise of protected rights is unconstitutional and a bar to the civil proceeding."); *United States v. Snepp*, 595 F.2d 926, 933 (4th Cir. 1979), *rev'd on other grounds,* 444 U.S. 507 (1980) ("Defendant has cited, and we have found, no authority suggesting that the defense of selective enforcement, normally applied in criminal cases, should be extended to civil actions.").  While reserving the position that these courts are correct, and that no such defense should be recognized in civil actions, the government recognizes that this Court is bound to follow Ninth Circuit cases that appear to assume that a selective prosecution defense may be raised in civil enforcement actions.

U.S. at 467, apply to civil enforcement actions.  FIRREA, under which this action is brought, authorizes the Attorney General to pursue civil penalties based on violations of criminal statutes. Although not a criminal prosecution, this action remains a clear exercise of the Executive's "broad discretion" to "enforce the Nation's criminal laws."  *Armstrong*, 517 U.S. at 464.  S&P's allegation of First Amendment retaliation is "not a defense on the merits to the ... charge itself," but an "independent assertion" that the government "has brought the charge for reasons forbidden by the Constitution." *Id.* at 463.  To keep such collateral issues from interfering with the Executive's enforcement discretion, "the showing necessary to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims."  *Id.* at 464.

Third, the cases cited by S&P for the proposition that a defendant need only sufficiently plead a First Amendment retaliation defense to be entitled to discovery, Motion at 22-23, are readily distinguishable.  They are all cases in which the First Amendment retaliation claim was the core of an affirmative civil rights case, rather than a defense raised to avoid liability on an unrelated claim.[4]  In contrast, as S&P itself appears to recognize, Motion at 24 n.38 (quoting *United States v. Dwyer*, 287 F. Supp. 2d 82, 88 (D.

---

[4]  *See Franzon v. Massena Mem'l Hosp.*, 32 F. Supp. 2d 528, 533 (N.D.N.Y. 1998) (Section 1983 action alleging retaliation for exercise of First Amendment rights); *Noble v. Gonzalez*, 2013 WL 4517774 (E.D. Cal. Aug. 26, 2013) (Section 1983 action by state prisoner alleging attack by prison guards in retaliation for filing administrative appeals); *Stanislaus Towing & Recovery Serv., Inc. v. City of Modesto*, 2011 WL 5375000 at *9-10 (E.D. Cal. Nov. 4, 2011) (Section 1983 claim alleging police issued violations of towing agreement in retaliation for complaints about conduct of police department); *Puckett v. City of Glen Cove*, 631 F. Supp. 2d 226, 240-41 (E.D.N.Y. 2009) (Section 1983 claim alleging city issued building permit in retaliation for opposition to development).

Mass. 2003)), when vindictive prosecution in retaliation for exercise of a constitutional right is alleged as a defense, courts have required a threshold showing. *See One 1985 Mercedes*, 917 F.2d at 421; *Gallegos-Curiel*, 681 F.2d at 1169 ("In every case alleging inferred vindictive prosecution, there must be a threshold showing of vindictiveness or the likelihood of it before the court is justified in inquiring into the prosecutor's actual motives.").

Finally, this is not an issue that is "decided," Motion at 20, by *United States v. Nat'l Broad. Co., Inc.,* 65 F.R.D. 415 (C.D. Cal. 1974) ("*NBC*"). First, *NBC* is a single, non-precedential, 40-year old opinion. *See NASD Dispute Resolution, Inc. v. Judicial Council of State of Cal.*, 488 F.3d 1065, 1069 (9th Cir. 2007) ("district court opinion does not have binding precedential effect"). Second, *NBC* predates both *Armstrong* and Ninth Circuit decisions such as *One 1985 Mercedes* and *Church of Scientology*, and thus cannot be used to support a conclusion contrary to those cases. Third, the published *NBC* opinion addresses only the penalties for non-compliance with a discovery order, not the basis for that order. To the extent S&P relies on the earlier discovery order, it omits almost all of the relevant detail underlying it, including the context of that case as a whole (the Watergate investigations) and the weighty threshold showing the defendants made to justify discovery.

To provide the omitted detail, the United States has attached the pleading filed by ABC and CBS in opposition to the United States' motion to strike. Cardona Decl. ¶ 3, Ex. 4. This pleading reveals stark differences with this case. First, the networks acknowledged the relevance of the selective prosecution cases and explicitly sought discovery under the standard they set. *See* Ex. 4

at 8-9.  Second, the networks did not claim that merely pleading the defense was sufficient to obtain discovery.  Rather, they submitted voluminous documents setting out facts to support their claims regarding President Nixon's intent and efforts to influence the filing of the antitrust actions.  Ex. 4 at 22-37.[5]  Third, the networks largely limited their requests to information concerning the relationship between the White House and the Antitrust Division, the DOJ component responsible for the filing decision.[6]

---

[5]   The supporting material included a memo from an aide to President Nixon recommending that the White House "[u]tilize the anti-trust division to investigate various media relating to anti-trust violations.  Even the possible threat of anti-trust action I think would be effective in changing their views in the above matter."  Cardona Decl. ¶ 4, Ex. 5 at A-5.  They also produced documents showing that in April 1971, President Nixon, irritated with the "failure of the head of the Antitrust Divisoin . . . to follow his policy" himself "placed a call to Deputy Attorney General Kleindienst and ordered" that an appeal in antitrust litigation against ITT not be filed..  After the Solicitor General threatened to resign if the appeal was not filed, "the President reversed his decision . . . and authorized the Department of Justice to proceed."  Thereafter, the President "approved a proposal for creating a central clearing-house for information about Government antitrust policy within the White House, to ensure that he President's views on the subject could be made known to all the operating agencies."  Cardona Decl. ¶ 5, Ex. 6 at A-101 to 102.  Finally, the affidavits produced by the Antitrust Division itself had disclosed that "the Government's purposes in bringing these actions is the subject of an ongoing criminal investigation" by the Watergate Special Prosecution Force, albeit it one that according to the prosecutor had not yet turned up any evidence of criminal activity in connection with the filing of the suits, and which was subsequently closed.  Cardona Decl. ¶ 3, 6, 7, Ex. 4 at 22, Ex. 7, 8.  S&P's brief history of the case –- "After denying those motions, Judge Kelleher ordered that discovery on the properly pled affirmative defenses proceed," Motion at 21 –- omits this important context.

[6]   To the extent the networks sought "the deposition of the high-ranking officials of the Department of Justice involved in the decision to bring the civil claim against the networks," Motion at 22, they did so because the Attorney General had signed the complaints and "affidavits submitted by the Government" showed that "neither the head of he Antitrust Division nor his staff had ultimate control over the decision to commence these actions and that that control was exercised either by the the Attorney General or by those upon whose instructions the Attorney General acted."  Cardona Decl. ¶¶ 2, 3, Ex. 1-3, 4 at 23.  Here, S&P has moved to

1    In the end, *NBC* has little relevance to this case, but to the

2    extent S&P asks this Court to consider it, *NBC* is consistent with

3    the case law requiring S&P to make a substantial threshold showing

4    establishing a nexus between DOJ's decision to file this lawsuit and

5    S&P's First Amendment activity before it can be entitled to any

6    discovery on its First Amendment retaliation defense.

7         2.    S&P Fails To Make The Required Threshold Showing That
               It Was Singled Out Or That This Case Was Filed In
8              Response To Its Downgrade Of The United States

9    In submitting an affidavit purporting to recount a brief phone

10   conversation two and half years ago that on its face provides no

11   evidence of selective or retaliatory prosecution, an incomplete

12   chronology of events, and media speculation,[7] S&P brushes past

13   important differences between its conduct and that of other credit

14   rating agencies and fails to provide any plausible evidence

15   connecting DOJ's filing of this lawsuit to S&P's downgrade of the

16   United States' credit rating.

17   S&P cannot meet the first prong of the *Armstrong* standard

18   (discriminatory effect) because it is not in the same position as

19   the other credit rating agencies with respect to this lawsuit.   S&P

20   ────────────────────────────────────────────────────

21   compel the production of documents from Treasury, a department that
     has no authority, statutory or otherwise, to direct DOJ, and has
     refused to limit its requests even to communications from Treasury

22   to DOJ, instead seeking not only communications within Treasury, but
     also communications between Treasury and White House officials, and

23   between Treasury and other agencies with no authority to direct DOJ.

24        [7] Through no fault of its own, S&P's chronology of events is
     incomplete because it omits information not known to S&P,

25   ███████████████████████████████████████

     ████████████████████████████   S&P also relies almost exclusively on

26   newspaper articles by third parties that speculate about the reasons
     behind the lawsuit or editorialize for greater or lesser prosecution

27   of credit rating agencies.   Def. Exh. P (29-30, 32, 36-39).   This is
     a far cry from the evidence presented to the court in *NBC*, as

28   discussed in notes 5 and 6 above.

9

alleges that other agencies issued similar ratings of RMBS and CDOs and made similar statements about independence and objectivity. Motion at 4, 7, 16-17. But that disregards the entirety of the Complaint, which focuses as well on additional material representations made by S&P, and on the evidence gathered by DOJ in its multi-year investigation, begun prior to any of the alleged protected activity, to demonstrate that S&P knew that these representations and its ratings were false and misleading.[8] S&P does not allege that the other rating agencies engaged in this same conduct -- publicly misrepresenting business practices in their codes of conduct or other statements, manipulating their ratings models and criteria for business reasons, and ignoring concerns about deteriorating subprime RMBS performance. Nor does S&P maintain that DOJ has completed gathering evidence sufficient to file FIRREA actions of similar scope against other agencies. Instead, S&P goes out of its way to disclaim that any such actions are warranted. Motion at 16 n.28.[9]

S&P also fails to make even a preliminary showing that it has been sued because of its exercise of a constitutional right. *See Huskey*, 204 F.3d at 899 (finding plaintiff failed to demonstrate required "nexus" between statements and later alleged retaliatory action, and cautioning courts not "to engage in the logical fallacy

---

[8] The scope and specificity of the government's allegations regarding S&P's knowledge and intent, including citations to emails and other internal S&P documents, were referenced in the Court's order denying S&P's motion to dismiss. Dkt. 34 at 10-11.

[9] In an attempt to show discriminatory effect, S&P refers to two State lawsuits brought against S&P and Moody's. Motion at 19. As S&P has acknowledged, those cases were brought under state consumer protection statutes that employ a legal standard far different than FIRREA's. See Def's. Reply in Supp. of Motion to Dismiss at 9, n.7.

10

of post hoc, ergo proper hoc, literally, 'after this, therefore because of this'") (internal citation omitted).  There is no plausible nexus between the start of DOJ's FIRREA investigation, the filing of this lawsuit, and the April and August 2011 events cited by S&P.  It is undisputed that DOJ's FIRREA investigation that led to this lawsuit began in November 2009, more than 16 months before S&P's April 2011 negative change in credit outlook and more than 20 months before S&P's August 2011 downgrade.  See Cardona Decl. ¶ 9.[10] DOJ did not file the current lawsuit against S&P until February 4, 2013, more than 21 months after S&P's April 2011 negative outlook and more than 17 months after the August 2011 downgrade, making any alleged causal connection even more tenuous.[11]

Nor does the affidavit of Harold McGraw, Dkt. 101-4 at 3-5, provide a nexus between S&P's downgrade of the United States and DOJ's decision to file a civil enforcement action based on an already long-ongoing investigation.  The affidavit contains a one-

---

[10] The investigation was active during this time.  Before the April 2011 negative outlook, S&P received 7 FIRREA subpoenas and produced roughly 3.78 million pages in response. Other investigative steps were also taken during this time. Cardona Decl. ¶ 10.

[11] S&P's actions do not set it apart from other credit rating agencies, as S&P has not stood alone in exercising its First Amendment right to criticize the government's fiscal policy by taking negative action on the United States' credit rating.  Egan-Jones Ratings Co. downgraded the United States in July 2011, April 2012, and September 2012. (see www.marketwatch.com/story/egan-jones-downgrades-us-rating-on-qe3-move-2012-09-14; www.cnbc.com/id/49037337; www.nation.foxnews.com/us-credit-rating-downgrade/2012/04/06/egan-jones-downgrades-us-credit-rating).  Moody's issued a negative outlook on the United States' Aaa credit rating in August 2011 (see www.moodys.com/ research/Moodys-confirms-US-Aaa-Rating-assigns-negative-outlook--PR_223568).  Fitch placed the United States' AAA credit rating on rating watch negative in October 2013 (see www.bloomberg.com/ news/2013-10-15/u-s-aaa-rating-put-on-negative-watch-by-fitch-on-delayed-budget.html), as did Dominion Bond Rating Services (see www.bloomberg. com/news/2013-10-09/dbrs-places-u-s-s-aaa-credit-rating-under-review-for-downgrade.html). (Websites last visited Feb. 17, 2014).

sided recounting of a conversation with former Treasury Secretary Timothy Geithner that happened after the downgrade, over two years ago.  As the supposed "predicate to the discovery sought," S&P's motion to compel relies on the affidavit's description of Secretary Geithner's purported "anger at the downgrade," and cites from the affidavit a partial hearsay quotation from this conversation, "S&P's conduct would be 'looked at very carefully' he said," and the affiant's description of another portion of this conversation, "Such behavior could not occur, he said, without a response from the government."  McGraw Aff. ¶¶ 5, 6 (cited in Motion at 17).

Even assuming this recitation of the conversation is accurate, it does not support the required threshold showing of retaliation. The affidavit makes clear that the discussion concerned "an asserted two trillion dollar error in S&P's work, an error that [Secretary Geithner] had described in various discussions with the media following the announcement of the downgrade." *Id.* at ¶ 5.  It is entirely understandable that Secretary Geithner would respond with appropriate gravity and urgency to a $2 trillion math error with potential serious consequences to the United States and global economies.[12]  But it is entirely implausible that this conversation threatened or had any connection to DOJ's later filing of this lawsuit, a decision taken pursuant to regulation by the Assistant Attorney General for DOJ's Civil Division ("DOJ-Civ").  *See* 28 C.F.R. § 0.45(h) (discussed in note 16 below).  Because Treasury has no authority over DOJ-Civ's initiation of FIRREA penalty actions,

---

[12]  Treasury publicly commented on the error and its potential effects. "Just the Facts: S&P's $2 Trillion Mistake," Aug. 6 2011, www.treasury.gov/connect/ blog/Pages/Just-the-Facts-SPs-2-Trillion-Mistake.aspx (last visited Feb. 17, 2014).

the suggestion that Secretary Geithner was conveying the threat of such an action in August 2011, when DOJ's investigation remained incomplete, and more than 17 months before DOJ filed this case, is without support and provides no basis for any nexus between the protected activity and the alleged retaliatory action.

*Hartman v. Moore*, 547 U.S. 250, 263-64 (2006), supports this conclusion.  There, the Court addressed, in the context of a *Bivens* action alleging vindictive prosecution, the requirement that a non-prosecutor government official's animus be shown to have "induced the action of a prosecutor who would not have pressed the charges otherwise."  *Id.* at 263.  Since an unconstitutional motive must be the "but for" cause of retaliatory conduct, *id.* at 260, it is not enough to make allegations regarding the motives of the non-prosecuting official.  Rather, "[s]ome sort of allegation ... is needed both to bridge the gap between the nonprosecuting government agent's motive and the prosecutor's action, and to address the presumption of prosecutorial regularity."  *Id.* at 263; *see also Skoog v. Cnty of Clackamas*, 469 F.3d 1221, 1234 (9th Cir. 2006). Neither the McGraw affidavit nor any other evidence identified by S&P makes the required threshold showing of causation.[13]

_____

[13] The Attorney General has publicly affirmed that there was "no connection" between S&P's lowering of the United States' credit rating and the filing of the case, explaining, "they did what they did assessing what the creditworthiness was of this nation.  We looked at the facts, the law and the investigation . . . and made a determination that the filing of these lawsuits was appropriate. But they are not in any way connected."  Cardona Decl. ¶ 39, Ex. 38, Transcript of Feb. 5, 2013 Press Conference (filed April 22, 2013 by S&P as Exhibit A in support of Defendants' Response To United States Of America's Statement Of Interest Supporting Motions To Remand Filed By State Attorneys General, *Delaware v. McGraw-Hill Cos., Inc., et al.*, 13-cv-00363-RGA (D. Del) (Dkt. 31-1).  Absent any evidence to the contrary, the Attorney General's statement is entitled to a presumption of validity as it is consistent with the presumption of prosecutorial regularity.

**B.    S&P'S FAILURE TO MAKE THE THRESHOLD SHOWING REQUIRED TO JUSTIFY DISCOVERY WARRANTS AN ORDER STRIKING ITS ASSERTED FIRST AMENDMENT RETALIATION DEFENSE AND PRECLUDING ANY FURTHER DISCOVERY RELATING TO IT**

Though its motion to compel relates only to S&P's first request for production of documents, this is not the only discovery S&P has sought relating to its alleged First Amendment retaliation defense. After filing its motion, on January 31, 2014, S&P served on the United States a second request for documents containing 36 additional wide-ranging requests for documents relating solely to this asserted defense, requests extending to internal communications at Treasury, and to communications between various Treasury and White House officials, including requests directed at communications between the Treasury Secretary, President, and Vice President. Cardona Decl. ¶ 31; Ex. 29.  S&P also issued Rule 45 subpoenas to former Treasury Secretary Geithner and Terrence J. Checki, former Executive Vice President of the Federal Reserve Bank of New York ("FRBNY"), seeking similar information.  Cardona Decl. ¶¶ 33-34; Ex. 32-33.  The overbreadth of these more recent requests and the unwarranted intrusion they would work on the internal deliberations and discussions of Treasury is problematic enough.  To target multiple requests at more than 10 high-level White House officials, even going so far as to demand, without any legitimate predicate, searches for communications involving the President himself, is truly astounding.  These additional requests reveal the extent to which S&P, based solely on this asserted defense, seeks to use the civil discovery process not, as intended, to obtain information that may be useful in addressing the merits of the FIRREA violations alleged in the Complaint, but rather improperly to create a sideshow

14

and diversion from those allegations.  *See Public Serv. Enter. Group Inc. v. Philadelphia Elec. Co.*, 130 F.R.D. 543, 552 (D. N.J. 1990) ("[N]o discovery device can be used ... to create a substantial sideshow. ...  This is the sort of tactic that the rule of proportionality was meant to control ....").  It is time to put an end to this sideshow.

Because S&P has failed to make the threshold showing required for any discovery relating to the First Amendment retaliation defense, the Court should not only deny S&P's motion to compel, but also issue a protective order precluding S&P from seeking any further discovery relating to this defense and quashing the following: (1) S&P's second request for documents from the United States; (2) the Rule 45 subpoena served on former Treasury Secretary Geithner; and (3) the Rule 45 subpoena served on former FRBNY Executive Vice President Checki.[14]  Also, given S&P's failure to make even the threshold showing required to justify discovery, there is no basis for finding plausible S&P's allegation of its First Amendment retaliation defense, and that defense should therefore be stricken.  *See, e.g., Vogel v. Huntington Oaks Delaware Partners, LLC*, 291 F.R.D. 438, 440-41 (C.D. Cal. 2013) (Wright, J.) (affirmative defense properly stricken where pleading fails to set forth facts rendering it "plausible"; "[r]equiring a defendant to bolster its affirmative defenses with some factual support comports with *Iqbal*'s message that discovery should not be used as a fishing expedition") (citation omitted).

---

[14]   The United States seeks to quash the Rule 45 subpoenas to Mr. Geithner and Mr. Checki on its own behalf, without prejudice to any separate motions to quash that may be filed by Mr. Geithner, Mr. Checki, or the FRBNY.

**C.    S&P'S DISCOVERY REQUESTS ON ITS ASSERTED FIRST AMENDMENT RETALIATION DEFENSE ARE ALSO OVERBROAD, UNDULY BURDENSOME, AND FAIL TO SATISFY THE HEIGHTENED STANDARDS FOR DISCOVERY DIRECTED AT THE EXECUTIVE OFFICE OF THE PRESIDENT**

Even were this Court to determine that S&P is entitled to some limited discovery on its asserted First Amendment retaliation defense, its motion to compel on these requests should be denied because they remain overbroad and unduly burdensome, and because S&P fails to satisfy the heightened standards that must be met before seeking discovery from EOP.

S&P moves to compel on requests 21, 33, 34, 51, 52, and 53, all of which would require wide-ranging searches for documents throughout the Executive Branch, with some extending to require searches even within EOP.  Requests 51 and 52, for example, seek any "documents constituting, referring or relating to any statement or inquiry" concerning "the possibility of civil or criminal actions, sanctions or other possible steps of any kind leading to adverse consequences of any kind against S&P" by either Gene Sperling, then the Director of the National Economic Council ("NEC") and Assistant to the President for Economic Policy, or Secretary Geithner.

While S&P tentatively proposed a limitation of requests 51 and 52 to communications to and from Secretary Geithner and NEC Director Sperling themselves, it was unwilling to limit these requests to communications with DOJ, the agency authorized to make, and that made, the filing decision in this case.  In discussing potential limitations on these broad requests, in a letter dated November 18, 2013, the government advised S&P:

> With respect to requests 51 and 52 . . . . Treasury reviewed
> former Secretary Geithner's emails from January 2011
> through the end of his term and did not identify any
> communications with DOJ regarding the possibility of civil

16

or criminal actions, sanctions, or any other similar
adverse action against S&P.  In light of this, we believe
any more comprehensive searches would be unduly
burdensome, with no reasonable expectation that materials
of this type would be found, and as a result, stand on our
objections to request 52 as set forth in the Response.  We
similarly stand on our objections to request 51 as set
forth in the Response, awaiting your response to our
proposal that you agree to limit this request to a limited
search of the emails of appropriate DOJ officials for any
communications between Mr. Sperling and DOJ relating to
adverse action against S&P.

Cardona Decl. ¶ 20; Ex. 18.  After discussions among counsel, no

agreement regarding a narrowing of these requests could be reached.

S&P now seeks their enforcement in their broadest interpretation.

> 1.  <u>As Directed To Executive Branch Components Other Than DOJ, The Requests Are Overbroad And Unduly Burdensome</u>

Federal Rule of Civil Procedure 26(b)(2)(C) authorizes courts

to limit discovery where "the burden or expense of the proposed

discovery outweighs its likely benefit" or the discovery sought is

"unreasonably cumulative or duplicative" or "can be obtained from

some other source that is more convenient, less burdensome, or less

expensive."  *See Oppenheimer Fund v. Sanders*, 437 U.S. 340, 351

(1978) ("discovery, like all matters of procedure, has ultimate and

necessary boundaries") (citation omitted); *Victor Stanley, Inc. v.

Creative Pipe, Inc*., 269 F.R.D. 497, 523 (D. Md. 2010) (Grimm, J.)

(in accordance with Rule 26(b)(2)(C) "all permissible discovery must

be measured against the yardstick of proportionality").  As directed

to Executive Branch components other than DOJ, S&P's requests

related to its asserted First Amendment retaliation defense exceed

the boundaries of reasonableness defined by Rule 26.

First, there is no need for discovery from components other

than DOJ because it is DOJ's filing decision that is put at issue by

S&P's asserted defense.  As the Ninth Circuit recognizes, for

17

discovery purposes "the proper focus in discriminatory prosecution cases is on the ultimate decision maker." *United States v. Gomez-Lopez*, 62 F.3d 304, 306-07 (9th Cir. 1995) (pre-*Armstrong* reversal of order for circuit-wide discovery on selective prosecution issue where "no evidence that the decision to prosecute [defendant] was made by anyone other than the USAO for the Central District").[15] The same is true with respect to vindictive prosecution claims. *Id.* at 306. S&P has presented nothing to indicate that the decision to file the Complaint was made or directed by anyone other than DOJ, and there is therefore no basis for compelling discovery from other Executive Branch components.[16]

Second, assuming discovery from DOJ, further discovery from other Executive Branch components would be cumulative and duplicative, and impose unnecessary burdens outweighing any likely benefit. Both the Ninth and D.C. Circuits have recognized "the government's serious and legitimate concern that its employee resources not be commandeered into service by private litigants to

---

[15] *See also United States v. Candia-Veleta*, 104 F.3d 243, 246 (9th Cir. 1996) (post-*Armstrong*, affirming denial of nationwide discovery on selective prosecution claim where defendant's submissions failed to "provide any indication that the Attorney General, or some other official in Washington" exercised control over charging decision).

[16] Within DOJ, because this is a civil penalties action that was worked jointly with the United States Attorney's Office for the Central District of California, authorization to approve the filing of the Complaint rested with the Assistant Attorney General for DOJ-Civ ("AAG-Civil") and the United States Attorney for the Central District of California ("USA-CAC"). 28 C.F.R. § 0.45(h). At the time of filing, the AAG-Civil position was vacant, and authority of this position was exercised by Stuart Delery, then the Principal Deputy Assistant Attorney General for DOJ-Civ, and currently the AAG-Civil. As indicated by the caption of the Complaint, Mr. Delery and USA-CAC André Birotte Jr. authorized the filing of the Complaint. Accordingly, if there is to be any discovery at all, it should initially be limited to them as the actual decision makers.

the detriment of the smooth functioning of government operations." *Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 779 (9th Cir. 1994).[17]   DOJ compliance with S&P's requests would already involve significant burdens as it would require searches of both hard copy documents and emails, including archival email searches, for all DOJ personnel who worked on the FIRREA investigation and/or were involved in consideration of the filing of the Complaint, and subsequent review of any recovered documents.  Requiring compliance with these requests by other Executive Branch components would onerously multiply these burdens, requiring additional searches within every Executive Branch component for any documents generated at any time from April 2011 to the present that might refer to the referenced subject matters.  Amplifying these burdens are the sweeping and vague nature of the requests, which include documents relating to any statements about "possible steps *of any kind* leading to adverse consequences *of any kind* against S&P" (emphasis added).

The imposition of these extra burdens beyond DOJ could have no bearing on the ultimate issue raised by S&P's asserted defense – the basis for DOJ's decision to file the Complaint.  Limiting discovery to the actual decision makers within DOJ would include any relevant communications from other Executive Branch components to DOJ.  To the extent searches in other Executive Branch components reveal these same communications, obtaining them would be cumulative and duplicative.  To the extent these searches reveal internal

---

[17] *See also Watts v. S.E.C.*, 482 F.3d 501, 509 (D.C. Cir. 2007) (same); *Linder v. Calero-Portocarrero*, 183 F.R.D. 314, 320 (D.D.C. 1998) ("time and expense" required for response and "whether compliance threatens the normal operations of the responding agencies" both relevant in assessing undue burden).

discussions that were not communicated to DOJ, they could not have influenced DOJ's filing decision and are irrelevant.

As directed to other Executive Branch components, S&P's document requests also seek information that would be protected by recognized privileges, including the presidential communications privilege, the deliberative process privilege, the attorney-client privilege, and the attorney work product doctrine. For example, request 51 on its face would seek communications among high level EOP officials, including the President, relating to the "*possibility* of civil or criminal actions" or "other *possible* steps of any kind leading to adverse consequences of any kind against S&P." S&P's instructions, moreover, define the documents requested to include "preliminary versions, drafts, and revisions." Dkt. 101-1 at 3. On their face, these requests call for material that is privileged.[18]

For all these reasons, even if some discovery on S&P's asserted retaliation claim is authorized, its motion to compel as directed to Executive Branch components other than DOJ must be denied.

---

[18] Due to the breadth of S&P's requests, the government does not here undertake an exhaustive assertion of applicable privileges. This approach is consistent with the recognition in *Cheney* (discussed further in Section II.C.2 below) that the Executive Branch does not "bear the burden" of "invoking executive privilege with sufficient specificity and of making particularized objections" in response to discovery requests that are unduly broad or otherwise inappropriate. 542 U.S. at 388 (internal quotation marks omitted). *Cheney* makes clear that the Executive Branch does not "bear the onus of critiquing the unacceptable discovery requests line by line," and that "just the opposite" is the case. *Id.* Consistent with the Court's "broad discretion to tailor discovery narrowly and to dictate the sequence of discovery," *Crawford-El v. Britton*, 523 U.S. 574, 599 (1998), the government should not be required to undertake the extraordinarily burdensome task of preparing detailed privilege logs unless and until a determination has been made that potentially privileged documents are otherwise subject to production.

20

2.   S&P Fails To Satisfy The Heightened Standards For Discovery Requests Directed To The Executive Office Of The President

S&P's document requests would have EOP search for, and if responsive produce, documents from the Offices of the President and Vice President, and an array of senior advisors, indeed, anyone within EOP who may have had any communication relating or referring to certain statements made by Secretary Geithner or NEC Director Sperling, including communications to and from the President.

S&P's motion to compel on these sweeping requests as directed to EOP must be denied for the same reasons discussed in Section II.C.1 above.  Even assuming for the sake of argument that S&P is entitled to some discovery on its retaliation defense, its requests do not satisfy the Rule 26 standards governing civil discovery: (1) there is no need for discovery from EOP to litigate S&P's challenge to DOJ's filing decision; (2) the requests are overbroad and non-specific and compliance would thus place an undue burden on EOP; and (3) the requests on their face seek documents that would fall within well-recognized privileges, including the presidential communications and deliberative process privileges.

With respect to EOP, additional considerations relating to its special role and responsibilities weigh even more strongly against enforcement of S&P's requests.  The Supreme Court has firmly established that sweeping civil discovery requests of the type here directed to EOP are generally inappropriate.  *See Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367, 384-90 (2004).  As *Cheney* recognized, "special considerations control when the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications

21

are implicated." *Id.* at 385.  Thus, courts must take special care to ensure that civil discovery requests do not intrude on the "public interest" in (1) "afford[ing] Presidential confidentiality the greatest protection consistent with the fair administration of justice"; and (2) "protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties." *Id.* at 382.  These same considerations render the burdens imposed on EOP by overbroad discovery demands of the type made by S&P here an especially "important factor" weighing heavily against their enforcement. *Id.* at 385.

*Cheney*'s heightened standards leave no doubt that S&P's motion to compel on its requests addressed to EOP must be denied.  Those requests are strikingly broad in scope.  On their face, they seek, from *all* individuals and offices within EOP, *all* documents concerning the identified topics.  Requests 51 and 52 in particular, even if limited to communications to and from NEC Director Sperling and Secretary Geithner as S&P initially proposed, extend to communications with the President, Vice President, and their most senior advisors, and would require a search by every individual and office within EOP of every document received or transmitted over a two-year time period to determine if any of those materials contain a communication falling within the scope of the requests.  Moreover, these two requests are not limited to the specific action that forms the basis of S&P's asserted defense (the filing of the Complaint), but extend to the "possibility" of any "civil or criminal actions, sanctions or other possible steps of any kind leading to adverse consequences of any kind against S&P."  Requests 51 & 52 (emphasis added).  Compliance with these requests in the absence of a

heightened showing of relevance, not to mention specificity, would impose a substantial and unjustified burden on EOP, impinging on its ability to perform its vital Executive functions, and intruding on privileges intended to preserve Presidential confidentiality, exactly what *Cheney* precludes.  542 U.S. at 385 (Executive's "constitutional responsibilities and status [are] factors counseling judicial deference and restraint in the conduct of litigation against it") (internal quotation marks and citation omitted).

As directed to EOP, therefore, S&P's requests do not seek documents necessary to its asserted defense, and (particularly in light of the more recent additional requests discussed in Section II.B above) should be seen for what they truly are: an impermissible attempt to initiate an extensive fishing expedition through the files of high-ranking White House officials, which would cause "unnecessary intrusion into the operation of the Office of the President," in clear violation of *Cheney*.  Thus, as it relates to document requests directed to EOP, having satisfied neither the ordinary standards governing those requests under Rule 26, nor the heightened and particularized standards applicable to discovery requests addressed to EOP, S&P's motion to compel must be denied.

**D.  S&P'S REQUESTS FOR DOCUMENTS RELATING TO PRACTICES OF OTHER NRSROs GATHERED BY DOJ IN OTHER INVESTIGATIONS ARE OVERBROAD AND UNDULY BURDENSOME AND SEEK DOCUMENTS NOT RELEVANT TO ANY PROPERLY RAISED CLAIM OR DEFENSE**

The Court should deny S&P's motion to compel production of documents relating to the practices of other Nationally Recognized Statistical Rating Organizations ("NRSROs") that DOJ has gathered in

1    other investigations.[19]   The documents sought are not relevant to the

2    alleged FIRREA violations or S&P's ability to defend against those

3    alleged violations.   Compliance with the requests would impose undue

4    burdens unlikely to result in significant benefit to S&P's ability

5    to defend against the alleged FIRREA violations.

14   S&P has agreed to limit requests 38, 40, 44,
     and 46 (and requests 31, 32, and 45) by "excluding documents created
15   by DOJ itself" in the course of these investigations.   Motion at 8,
     15.   In addition, S&P has advised that "[r]egarding Department of
16   Justice interview memoranda and notes, we are not, at this time,
     moving to compel internal DOJ notes regarding particular witness
17   interviews in other FIRREA investigations."   Cardona Decl. ¶ 35, Ex.
     34.   Given these limitations, the discussion in Sections II.D, E,
18   and F below will not address such documents, including in particular
     interview notes and memoranda, which otherwise might fall within the
19   scope of certain of these requests, but as to which (along with many
     other of these documents) the government would also assert work
20   product protection and/or other privileges.   The discussion in
     Sections II.D, E, and F below also does not address documents
21   regarding other NRSRO's practices or the conduct of mortgage
     lenders, financial institutions, and issuers that may have been
22   gathered or generated by, and remain in the possession, custody, and
     control of any state Attorney General's office or any independent
23   regulatory entities or non-governmental entities, including in
     particular the SEC, FHFA, FINRA, OCC, FDIC, NCUA, Federal Reserve
24   Board of Governors, Federal Open Markets Committee, Federal Reserve
     Bank of New York, various FHLBs, Fannie Mae, and Freddie Mac
25   (hereafter, collectively, "Independent Entities").   As the
     government has advised S&P, documents are appropriately sought from
26   the states and these Independent Entities directly through Rule 45
     subpoenas.   Cardona Decl. ¶ 20, Ex. 18; *see United States v.*
27   *American Telephone & Telegraph Co.*, 461 F. Supp. 1314, 1334-36 &
     n.65 (D.D.C. 1978).   S&P has served Rule 45 subpoenas on a number of
28   these Independent Entities.   Cardona Decl. ¶¶ 13-15, 22-24, 26-30,
     32, Ex. 12-14, 20-22, 24-28, 30-31.

24

1.   <u>The Documents S&P Seeks Regarding Other NRSROs Are Not Relevant To S&P's Alleged FIRREA Violations</u>

S&P's motion to compel should be denied because none of the documents sought regarding the activities of other NRSROs are necessary for, or even relevant to, a defense against the alleged FIRREA violations.  The Complaint alleges S&P made specifically-identified statements knowing that they were materially false and misleading.  As a result, it is S&P's conduct, and S&P's knowledge and intent when engaging in that conduct, that the Complaint puts at issue, not any similar conduct that may or may not have been engaged in by other NRSROs.  The conduct of other NRSROs has no bearing on whether S&P itself committed fraud.  Despite this, S&P asserts as a basis for relevance that other NRSROs made representations regarding "objectivity" and "independence" and that documents relating to the other NRSROs' understanding of these representations is essential to understanding what S&P itself meant by the representations alleged in the Complaint to have been false.  Motion at 5-7.

This claim of relevance fails because S&P's focus solely on the terms "objective" and "independent" suffers from the same flaws exposed by its similar effort to focus solely on these terms in its

motion to dismiss.[21]  Reading S&P's motion to compel, one is left with the impression that S&P used only the terms "objective" and "independent" to describe its ratings and ratings process without any further context as to their meaning, and that the Complaint is solely the result of DOJ's unilateral and excessively broad interpretation of these two terms.  But as the Complaint alleges, S&P made additional statements that gave specific context and meaning to its claims of objectivity and independence, including assertions that its ratings were not affected in any way by rating fees or its relationships with the issuers who retained and paid it. See, e.g., Complaint at 29 ¶111.c-e; 32 ¶117.b; 34 ¶119.c; 35 ¶120.b; 35-36 ¶120.c.  As this Court held in denying S&P's motion to dismiss, these more specific representations gave meaning to S&P's claims of objectivity and independence, rendering them not vague and indeterminate assertions, but specific promises with clear meanings:

> S&P stands accused of fashioning a unified public image of trustworthiness backed by specific statements designed to induce consumers to rely on the objectivity of its ratings. S&P's statements were not a "general, subjective claim" about the avoidance of conflicts of interest, but rather a promise that it had "established policies and procedures to address the conflicts of interest through a combination of internal controls and disclosure." Compl. ¶ 111(b). Specific examples of these policies and procedures make up the bulk of the government's complaint, and they appear designed to induce reliance on current policies and

---

[21]  In its motion to dismiss, S&P asserted that its repeated public statements alleged in the Complaint to be false and misleading were inactionable "mere puffery," a claim this Court found "deeply and unavoidably troubling when you take a moment to consider its implications."  Dkt. 34 at 7-8.  S&P now argues, Motion at 4-7, as purported support for its claim of relevance an equally troubling position – that, without reference to third-party understandings (including, in particular, those of other NRSROs), S&P cannot know what its own repeated public statements were intended to mean.  S&P made this same claim at the hearing on its unsuccessful motion to dismiss: "What does it mean, to be independent? . . . What does it mean to be objective?  That's almost [an] epistemological question."  Dkt. 32, Transcript of Hearing on Motion to Dismiss at 11, ln. 8-15.

practices. . . .  Despite Defendants' protestations to the contrary, the Court cannot find that all of these "shalls" and "must nots" are the mere aspirational musings of a corporation setting out vague goals for its future. Rather, they are specific assertions of current and ongoing policies that stand in stark contrast to the behavior alleged by the government's complaint.

Dkt. 34 at 9-10.

S&P argues that the government's prior examinations of representatives of banks that invested in securities rated by S&P are an indication of the relevance of third-party understandings of these terms.  Motion at 7 & n.15.  These investors are alleged in the Complaint to be victims of S&P's fraud, and so stand in a far different position than other third-parties such as other NRSROs, other "market participants," or "employees or agencies of the United States" with respect to whose understandings S&P seeks documents. Motion at 6.  The victims' understanding of S&P's representations and their confirmation that their falsity could have mattered to them are relevant to the alleged FIRREA violations.  The examinations addressed these relevant matters, focusing on whether knowledge of various examples of of S&P's internal conduct, of which the victims were not aware, could have mattered to them in considering S&P's ratings.  The testimony indicated their understanding of S&P's representations,[22] and demonstrated that S&P's previously unknown internal conduct was inconsistent with S&P's

---

[22] Tr. Hotchkiss Jul. 18, 2012, at 9:18-17:10 (S&P's public statements of objectivity and independence were consistent with his understanding of S&P's conduct which was important factor in bank's investment decisions); Tr. Craig Jun. 28, 2012, at 9:14-10:13; 10:23-16:23 (same); Tr. Gibbons Jul. 19, 2012, at 9:3-13:19; 14:5-17:2 (same).  See Cardona Decl. ¶¶ 36-38, Ex. 35-37.

27

public statements and would have been of concern to the victim representatives.[23]

S&P also contends that "materials relating to the methodologies employed by Moody's and other NRSROs . . . are relevant because the conduct of similarly situated entities contemporaneously performing the same role as S&P, involving the same market conditions and the same securities, and producing similar and often identical ratings bear on the alleged 'falsity' of S&P's statements."  Motion at 7. This claim fails because whether or not a competitor engaged in fraud is generally irrelevant.  Even if other NRSROs reached the same ratings based on the same information and actually believed in them, it would still be fraud for S&P to issue those ratings knowing them to be false.  The issues are S&P's knowledge and intent, not the other NRSROs'.  As a result, discovery from the government regarding the methodologies of other NRSROs cannot be relevant.  If S&P was aware of the methodologies (a necessary predicate for those methodologies to have any bearing on S&P's knowledge and intent), then S&P is already in possession of the information regarding those methodologies and no discovery from the government would be

---

[23] Tr. Hotchkiss Jul. 18, 2012, at 17:13-29:7; 34:23-35:13 (internal S&P documents "[t]otally inconsistent with the way [he] thought [S&P] did business," and bank "would not have purchased the deals had I known this"); Tr. Craig Jun. 28, 2012, at 17:12-33:23 (internal S&P documents "not consistent" with S&P's public statements, "very troubling," and would have made bank less likely to invest in CDOs as to which it lost money); Tr. Gibbons Jul. 19, 2012, at 17:4-33:11 (internal documents "very disturbing" and "[c]ertainly not" consistent with S&P's public statements; in light of internal documents, S&P's ratings "have no value" and "are worthless," and he would not have recommended investing in CDOs as to which bank lost money if he had known).  See Cardona Decl. ¶¶ 36-38, Ex. 35-37.

necessary.[24]  If S&P was not aware of those methodologies, then they cannot be relevant, and there is no basis for ordering discovery from the government.

> 2.  The Burdens The Proposed Discovery Would Impose On The Government Outweigh Any Possible Benefit

Allowing the discovery S&P seeks would interfere significantly with the government's ability to carry out its law enforcement obligations.  At any given time, the government, including DOJ's many components, has numerous investigations underway to uncover potential civil, criminal, and administrative violations of law. Frequently such investigations involve similar entities engaged in similar conduct within the same industry.  It simply cannot be the case that when the government files a suit, or brings an administrative action, in the public interest, the defendant in that particular suit or action is entitled to discover the existence of all arguably similar investigations and gain access to the investigatory materials gathered in those other investigations. Such wide-ranging access to the government's law enforcement activities would unduly burden the government both by hindering its investigations of potentially unlawful conduct and by serving as an improper deterrent to its initiation of well-founded lawsuits and administrative actions.  Particularly where, as here, the conduct of

---

[24]  The Complaint alleges that much of the reason why S&P reached the same ratings as other NRSROs provides evidence of S&P's fraud because S&P strove to arrive at ratings at least as high as other NRSROs in order to successfully compete for business.  *See*, *e.g.*, Complaint at 41 ¶130 (Aug. 17, 2004 email referencing SFLT having authorized actions in response to "the competitive threats that Moody's is taking in CDOs"); 53-54 ¶¶177-179 (in July 2005, S&P "toned down and slowed down" release of new CDO ratings model after client feedback indicated new model would cause S&P to lose competitive advantages over Moody's and Fitch); 99 ¶249 (July 5, 2007 email in which S&P employee states that S&P did not downgrade its ratings sooner out of concern over "p*ssing off too many clients and jumping the gun ahead of Fitch and Moody's").

other entities is entirely irrelevant to S&P's alleged liability, the burdens imposed on the government's law enforcement activities by permitting S&P discovery regarding other government investigations outweigh any possible need for that discovery.

S&P's requests for discovery from other investigations also reach far beyond the scope of this case and would place enormous logistical burdens on the government. Initially, S&P's requests would require the government to identify every investigation that gathered any documents relating to NRSRO practices throughout the entirety of DOJ, including its criminal components and every United States Attorney's Office. The government would then need to review all the gathered documents to determine which, if any, fall within the scope of S&P's requests. Because the information S&P seeks is not even relevant to this case, such an impractical exercise would be unduly burdensome on the government.

———————————

[26]   S&P argues that the Protective Order in place in this case is sufficient to "protect any confidential information of third parties" that might be produced by the government.  Motion at 11.  This argument is without merit.  First, the Protective Order extends only to information designated by a producing party as confidential; for the reasons discussed in the text, the NRSROs are better positioned than the government to make this designation, or to determine that particular information needs broader protection than the protective order provides.  Second, the Protective Order provides only limited protection, permitting the disclosure of confidential information to S&P employees, and not extending to the use of confidential information "in open court at any hearing or trial."  Protective Order, Dkt. 56 at 4, 12.  For particularly

**E.     S&P'S REQUESTS FOR DOCUMENTS GATHERED FROM INVESTIGATIONS OF RMBS AND CDO ISSUERS ARE OVERBROAD AND UNDULY BURDENSOME; SEEK DOCUMENTS NOT RELEVANT TO ANY PROPERLY RAISED CLAIM OR DEFENSE; AND IMPINGE ON THE LAW ENFORCEMENT INVESTIGATORY FILES PRIVILEGE**

S&P moves to compel production in on requests 44 and 46, which seek documents relating to: (1) "DOJ's investigation of any issuer, arranger, sponsor, underwriter or seller of RMBS or CDOs for fraud or deceptive practices relating to RMBS and/or CDOs exposed to RMBS issued between 2004 and 2008"; and (2) investigations by any Executive Branch component "involving fraud, misrepresentations or omissions with respect to material information relating to RMBS or CDOs backed by RMBS supplied by any federally insured financial institution, or any other financial institution to S&P during the 2004 to 2008 time period."[27]   S&P's motion to compel on these

sensitive proprietary or business information, the NRSROs, or other third parties who have produced documents to government investigators, may seek broader protection, in particular a prohibition on dissemination to S&P employees.

[27]   As government counsel has advised S&P, DOJ components, including United States Attorney's Offices located across the country, are conducting a number of ongoing investigations relating to the securitization of RMBS and/or CDOs exposed to RMBS issued between 2004 and 2008.  Dkt. 101-1 at 75.  Many of these investigations are being conducted under the coordination of the RMBS Working Group, the identity and purpose of which have been the subject of public announcements, and the members of which include various United States Attorney's Offices, other DOJ components, several Independent Entities, and several state Attorneys General. *Id.*  As government counsel has also advised S&P, these investigations have generated an immense volume of documents, more than 22 terabytes of data (in excess of 21 million documents), gathered from private third-parties.  *Id.* at 77.  The discussion in this section pertains to the documents gathered in these investigations from private third-parties and certain Independent Entities that are within the possession, custody, or control of the United States as party-plaintiff.  To the extent documents were gathered in these investigations from other NRSROs or relating to the practices of other NRSROs, the arguments set forth in Section II.E above apply and are incorporated here by reference.  The limitations set forth in footnote 19 above also apply to the

requests should be denied because: (1) they are vastly overbroad and
extend to documents not relevant to the alleged FIRREA violations or
S&P's ability to defend against them; (2) compliance would impose
undue burdens unlikely to result in significant benefit to S&P's
ability to defend against the alleged FIRREA violations; (3) they
seek documents obtained by the government from private third-
parties, an alternative source from which the documents can be
obtained without imposing unwarranted and expansive burdens on the
government, and in a way that will allow those private parties to
identify and assert confidentiality interests prior to production to
S&P; and (4) with respect to eight categories of documents,
production would impinge on the investigatory files privilege.

>    1.   S&P's Request Relating To Any "Fraud Or Deceptive
>         Practices" By Issuers Is Vastly Overbroad And Seeks
>         Documents Irrelevant To The Alleged FIRREA Violations

While request 46 limits itself to conduct relating to S&P,
namely, "misrepresentations or omissions with respect to material
information relating to RMBS or CDOs backed by RMBS" made by issuers
"to S&P," request 44 contains no similar limitation.  Request 44
extends to any fraud, committed by any issuer of RMBS or CDOs backed
by RMBS, regardless of whether that fraud has any connection to S&P
or to the 56 RMBS and 109 CDOs that the government identified in its
November 18, 2013 supplemental disclosures as the "basis for the

discussion below.                            As a result, these documents too should be sought from
the state Attorneys General and Independent Entities through Rule 45
subpoenas.

government's proof at trial."   Dkt. 101-3 at 50-51.   Request 44 is
thus vastly overbroad as it seeks documents that can have no bearing
on the FIRREA violations at issue in this case.

    S&P cites its offer to narrow these two requests to "encompass
documents relating only to the purchasers, issuers, arrangers,
sponsors, underwriters, or sellers" of the 56 RMBS and 109 CDOs
identified by the government.   Motion at 12.   This is no limitation
at all, because the 59 RMBS and 109 CDOs include as purchaser,
issuer, arranger, underwriter, or seller virtually every large
financial institution involved in the issuance or purchase of RMBS
and CDOs during the time period 2004 through 2008.   Because S&P's
document requests remain tied to investigations of fraud committed
by those financial institutions, as opposed to investigations of
fraud related to the specific securities, the two requests would
still encompass a broad swath of conduct having nothing to do with
either S&P or the RMBS and CDOs actually at issue in this case.[28]

        2.   The Burdens The Proposed Discovery Would Impose On
             The Government Outweigh Any Possible Benefit

    As discussed in Section II.D.2 above, permitting S&P the wide
ranging discovery it seeks from other government investigations

_____

[28] S&P argues that the requested materials are relevant to
determining FIRREA penalties "because they will demonstrate that
other factors are responsible for or contributed to the losses
suffered by the financial institutions at issue."   Motion at 14.
The government, however, has agreed to limit the losses on which it
will seek to base penalties to the limited set of 56 RMBS and 109
CDOs.   S&P cites as an example of documents to which it believes it
is "entitled" those relating to the SEC's agreement with Mizuho to
settle charges arising from the structuring and marketing of
Delphinus CDO 2007-1.   That is one of the 109 CDOs included in the
limited set identified by the government.   The government has
already produced to S&P the non-privileged documents it obtained
from the SEC relating to this CDO.   As the government has advised
S&P, because the SEC is an Independent Entity, a request for any
additional documents in the SEC's possession must be made to the SEC
through a Rule 45 subpoena.   Cardona Decl. ¶ 20; Ex. 18.

34

would both unduly burden the government's ability to carry out its law enforcement obligations and place enormous logistical burdens and expense on the government.  Particularly given the volume of documents involved (more than 21 million) and the relatively narrow scope of what might be relevant in this case (documents relating to misstatements and omissions to S&P or fraud or deceptive practices by issuers in connection with the limited set of 54 RMBS and 109 CDOs), imposing these burdens on the government is unjustified.

> 3.   <u>The Discovery Sought Can Be Obtained From The Private Third Parties and Independent Entities Who Produced Documents To The Government And Who Are In A Better Position To Identify And Address Confidentiality Concerns</u>

As discussed in Section II.D.3 above, considering the vast impracticality and expense of requiring DOJ to root through all its components to uncover potentially responsive documents, Rule 26 mandates that S&P be required to pursue the discovery it seeks regarding fraud or deceptive practices by issuers from the private third parties and Independent Entities that provided documents to the government in connection with its other investigations.  Those parties are also in a far better position than the government to identify which, if any, responsive documents pose confidentiality concerns in connection with production to S&P (as opposed to any earlier production to DOJ for use in its investigations).[29]  There is no basis for allowing S&P to circumvent confidentiality concerns that might be asserted by these other parties by seeking their

---

[29]  For the reasons discussed in note 26 above, the current Protective Order does not extinguish concerns over third party confidentiality interests.  The limitations of the current Protective Order are further discussed in the context of the investigatory files privilege in paragraph 14 of the Under Seal Walsh Declaration referenced in Section II.E.4 below.

35

documents from the United States as opposed to from those other parties directly.[30]

### 4.  Certain Materials Sought By These Requests Are Subject to Limited Assertions of The Law Enforcement Investigatory Files Privilege

The Federal common law recognizes that investigatory files compiled for law enforcement purposes are privileged.[31] *See, e.g.*, *In re City of New York*, 607 F.3d at 945 (discussing privilege's history and "strong presumption against disclosure"); *Friedman*, 738 F.2d at 1341; *Soto v. City of Concord*, 162 F.R.D. 603, 613 (N.D. Cal. 1995). The privilege safeguards against attempts to compromise the investigatory process and thereby serves the public's interest in

---

[30] On February 10, 2014, as part of an effort to narrow the issues raised by S&P's motion to compel, government counsel raised with S&P the possibility, in exchange for S&P excluding certain categories of documents from its discovery request, of identifying to S&P the private third parties from whom documents had been obtained by way of subpoena in the course of the RMBS investigations so that S&P could serve those third-parties with Rule 45 subpoenas. While agreeing to exclude two more limited categories of documents from its requests, S&P rejected this as a possibility. Thereafter, government counsel raised with S&P the possibility of working with S&P to conduct searches of the documents obtained from private third-parties in DOJ's possession to identify a limited set of potentially relevant documents, with the understanding that this limited set would then be presented to the producing third parties to ascertain if they wished to assert any confidentiality interests. S&P responded that it was unwilling to agree to this proposal "at this time," asserting "we think this proposal does not eliminate issues for the Court's consideration, but instead delays them for later." Cardona Decl. ¶ 35, Ex. 34. Given S&P's rejection of the offered compromise, the government remains of the position that, for the reasons set forth in the text above, if any discovery on these issues is permitted, S&P should be required to seek documents directly from the private third parties and Independent Entities who produced those documents to the government.

[31] Courts refer to the privilege variously as the "investigatory files privilege," *Friedman v. Bache Halsey Stuart Shields, Inc.*, 738 F.2d 1336, 1341 (D.C. Cir. 1984), "law enforcement privilege," *In re City of New York*, 607 F.3d 923, 944 (2d Cir. 2010), and "official information privilege," *Miller v. Pancucci*, 141 F.R.D. 292, 299 (C.D. Cal. 1992). The government will refer to it herein as the "investigatory files privilege."

effective law enforcement. *See McPeek v. Ashcroft*, 202 F.R.D. 332,
336 (D.D.C. 2001) ("privilege serves the societal interest in the
prompt and fair investigation of improper behavior by protecting
sources of information, encouraging them to come forward, and
preventing the premature disclosure of information which could harm
a person's reputation unfairly and unnecessarily"); *Tuite v. Henry*,
181 F.R.D. 175, 176 (D.D.C. 1998) (privilege "prevent[s] disclosure
of information that would be contrary to the public interest in the
effective functioning of law enforcement").

Courts apply the investigatory files privilege to protect both
civil and criminal investigatory files and to shield a broad range
of information from civil discovery by private litigants. *See
Dellwood Farms, Inc. v. Cargill, Inc.*, 128 F.3d 1122, 1125 (7th Cir.
1997) (criminal investigatory files); *McPeek*, 202 F.R.D. at 336
(non-criminal investigatory files). It protects information related
to ongoing investigations, *see, e.g.*, *Jones v. City of Indianapolis*,
216 F.R.D. 440, 447 (S.D. Ind. 2003), and, where appropriate, may
also protect information from closed cases, *see, e.g.*, *Kampinen v.
Individuals of Chi. Police Dep't*, 2002 WL 238443, at *4 (N.D. Ill.
Feb. 19, 2002); *Borchers v. Commercial Union Assurance Co.*, 874 F.
Supp. 78, 80 (S.D.N.Y. 1995). It also protects both factual data and
evaluative material, which are often intertwined within the same
document. *See Tuite*, 181 F.R.D. at 180 (citing cases).

On October 18, 2013, the government formed S&P that in response
to S&P's document requests the government asserted the investigatory
files privilege where necessary. *See, e.g.,* Dkt. 101-1 at 65, 77,
79, 80-81, 85, 87, 89, 93, 95, 97. To assert the privilege in
response to a motion to compel, an appropriate agency official must

37

submit a declaration to the court. *See, e.g.*, *In re Sealed Case*, 856 F.2d 268, 271 (D.C. Cir. 1988).[32]   The government has filed with this response the under seal declaration of John F. Walsh, United States Attorney for the District of Colorado and co-chair of the RMBS Working Group, which asserts the privilege on behalf of the DOJ entities within the RMBS Working Group, with respect to RMBS Working Group matters.   The declaration explains that the privilege is being asserted over eight categories of documents, identifying harms that would result from disclosure.   A supplemental declaration by USA Walsh discussing confidential bases for the privilege will be filed with the Court ex parte and under seal for in camera review.

When the investigatory files privilege is invoked, the court "must weigh the potential benefits of disclosure against the potential disadvantages.   If the latter is greater, the privilege bars discovery." *Sanchez v. City of Santa Ana*, 936 F.2d 1027, 1033-34 (9th Cir. 1990).   Courts have considered ten factors in balancing

---

[32] Given the overbreadth of S&P's requests, this Court could defer consideration of the privilege until the requests are narrowed.   *Cf. Cheney*, 542 U.S. at 388 (as discussed in note 18 above, Executive Branch need not invoke privilege until party seeking discovery has shown that requests are sufficiently narrow and proper).   In an abundance of caution, however, an invocation of the privilege is submitted here in the form of an affidavit from an agency official who has a coordinating role over the investigations at issue and is sufficiently familiar with those investigations and the materials they have generated to identify the specific categories of materials covered by the privilege.   *See Kasza v. Browner*, 133 F.3d 1159, 1168-70 (9th Cir. 1998) (upholding assertion of state secrets privilege where agency declarant "adequately identified categories of privileged information"); *In re McKesson Gov. Entities Avg. Wholesale Price Litig.*, 264 F.R.D. 595, 601 (N.D. Cal. 2009) (agency official invoking deliberative process privilege need not be agency head but must be "in position of high authority" able to evaluate "materials involved from a vantage point involving both expertise and an overview-type perspective") (internal quotation marks and citation omitted).

38

the interests of law enforcement agencies against a private litigant's interest:

> (1) the extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information;

> (2) the impact upon persons who have given information of having their identities disclosed;

> (3) the degree to which governmental self-evaluation and consequent program improvement will be chilled by disclosure;

> (4) whether the information sought is factual data or evaluative summary;

> (5) whether the party seeking the discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question;

> (6) whether the police investigation has been completed;

> (7) whether any intradepartmental disciplinary proceedings have arisen or may arise from the investigation;

> (8) whether the plaintiff's suit is non-frivolous and brought in good faith;

> (9) whether the information sought is available through other discovery or from other sources; and

> (10) the importance of the information sought to the plaintiff's case.

*Kelly v. City of San Jose*, 114 F.R.D. 653, 663 (N.D. Cal. 1987); *see also Estate of Bui v. City of Westminster Police Dep't*, 244 F.R.D. 591, 595–96 (C.D. Cal. 2007) (Carney, J.); *Tuite*, 181 F.R.D. at 177.

Here, the government asserts the investigatory files privilege over eight categories of documents: (1) the FIRREA subpoenas issued in these investigations and correspondence with recipients discussing the FIRREA subpoenas' content; (2) materials obtained by the DOJ entities by subpoena or request in pending law enforcement investigations from targets of the investigation or from third

39

parties, including but not limited to documents obtained from other

law enforcement agencies and documents provided by private parties

litigating their own RMBS actions; (3) notes and memoranda of

witness interviews; (4) transcripts of witness examinations

conducted under FIRREA; (5) communications between DOJ attorneys and

opposing counsel that discuss RMBS Working Group investigations

and/or legal theories and supporting facts for proposed actions in

connection with those investigations; (6) any materials gathered in

a criminal investigation, including but not limited to materials

gathered in the course of grand jury proceedings; (7) any documents

obtained pursuant to the Bank Secrecy Act; and (8) all other

internal work product assembled by DOJ attorneys handling RMBS

Working Group investigations.[33]   The balance of relevant factors

supports application of the privilege to each of the relevant

categories of documents.[34]  In general terms:

As for the first factor, disclosure of materials in categories

1-4 and 6-7 from highly-sensitive civil and criminal investigations

would chill the crucial flow of information to law enforcement. *See,*

*e.g., In re Dep't of Investigation of City of New York*, 856 F.2d

---

[33] With respect to certain materials falling within category 2,
the government notes that third parties have submitted confidential
business information and proprietary information to United States
Attorney's offices conducting various RMBS investigations around the
country.  Under Seal Walsh Declaration ¶¶ 5, 10, 18, 20.  As
discussed in Sections ▮▮▮▮ and II.E.3 above, S&P has declined to
seek these materials directly from the third parties or to agree to
any procedure to permit these third parties to assert
confidentiality interests and seek protection for these materials,
whether under the current Protective Order or any more restrictive
protective orders that might be appropriate.  While such a procedure
would mitigate some of the factors supporting assertion of the
privilege with respect to those materials, in the absence of such a
procedure, the privilege is appropriately asserted over those
materials.  See Under Seal Walsh Declaration ¶ 14.

[34] Factors five, seven, and eight do not apply in this case.

481, 485 (2d Cir. 1988) (noting "danger of ... deterring witnesses from cooperating with law enforcement agencies out of fear of disclosure"); *Jones*, 216 F.R.D. at 445-46 ("chilling effect on witnesses coming forward to assist law enforcement in future investigations"); *Tuite*, 181 F.R.D. at 178-79 (absent ability to maintain confidentiality "it is logical to conclude that witnesses would indeed be less forthcoming and more reticent in their dealings with OPR").  The nature of the investigations at issue here stands in contrast to situations in which the need for witness confidentiality was less pressing. *See, e.g.*, *Anderson v. Marion Cnty. Sheriff's Dep't*, 220 F.R.D. 555, 565 (S.D. Ind. 2004) (statements from "internal sexual harassment investigation").

The second factor addresses whether disclosure of a witness's identity may create "the potential for reprisal," *R.C.O. Reforesting v. United States*, 42 Fed. Cl. 405, 409 (1998), and place their "effectiveness" as a witness at risk, *Tuite*, 181 F.R.D. at 179. *See Collins v. Shearson/Am. Exp., Inc.*, 112 F.R.D. 227, 230 (D.D.C. 1986) (disclosure of investigatory documents "could harm particular witnesses and stifle witnesses in general"). Often witnesses only come forward based upon an expectation, whether explicit or implicit, of confidentiality. *See R.C.O. Reforesting*, 42 Fed. Cl. at 409 (witness's provision of "serious and damaging allegations of misconduct that could initiate criminal investigations or lead to other serious sanctions can reflect an implied assurance of confidentiality") (citation omitted); *G-69 v. Degnan*, 130 F.R.D. 339, 348 (D.N.J. 1990) ("[i]nnocent third parties who have been interviewed as witnesses ... should not be faced with risk of exposure where the disclosure confers no countervailing benefit upon

41

the cause of justice"). This factor favors application of the privilege to materials in categories 1- 6.

As for the third factor, disclosure of materials reflecting evolving legal theories or law enforcement techniques creates a significant risk of impairing governmental self-critiques. *See, e.g.*, *A.N.S.W.E.R. Coalition v. Jewell*, 292 F.R.D. 44, 52 (D.D.C. 2013); (disclosure of Secret Service security documents "likely would chill governmental self-evaluation and consequent program improvement in this area"); *Jones*, 216 F.R.D. at 446 (disclosure of materials revealing investigatory tactics "may compromise [law enforcement's] ability to build upon previous successful investigatory methods, or revise or eliminate the ones that fail"); *Anderson*, 220 F.R.D. at 566 ("need for open and frank communications" in internal investigations weighed against disclosure). This factor favors application of the privilege to all 8 categories, particularly categories 1, 5, 6, and 8.

As for the fourth factor, disclosure of evaluative and factual material may equally create a significant risk to current law enforcement techniques and ongoing investigations. *See Tuite*, 181 F.R.D. at 180. S&P appears to accept the validity of the privilege with respect to evaluative material created by DOJ. Motion at 8 ("S&P has agreed to limit its requests by excluding documents created by DOJ itself in the course of its investigations."). But contrary to S&P's assertion, simply because a document is factual in nature does not exclude it from the privilege. Courts have extended the privilege to protect from disclosure a variety of factual information. *See, e.g.*, *In re City of New York*, 607 F.3d at 930, 946 (reports memorializing "meetings and discussions with" targets);

*Dellwood Farms*, 128 F.3d at 1124-25 (undercover audio and video recordings); *In re Dep't of Investigation*, 856 F.2d at 483 ("transcripts" of witness testimony and "notes and memoranda" of witness interviews); *Jones*, 216 F.R.D. at 449 ("any handwritten notes, reports, probable cause affidavits, e-mails, or other data generated" in criminal investigation); *G-69*, 130 F.R.D. at 346-48 (criminal investigative files, including "raw information").  This factor favors application of the privilege to all 8 categories as well, particularly categories 1, 5, 6, and 8.

As for the sixth factor, pendency of investigations is a crucial weight against disclosure. *See, e.g.*, *Dellwood Farms*, 128 F.3d at 1125 (civil litigants should not "have a right to force the government to tip its hand to criminal suspects and defendants"); *Jones*, 216 F.R.D. at 447 (ongoing criminal investigation); *Borchers*, 874 F. Supp. at 80 (same); *Collins*, 112 F.R.D. at 230 (same). Certain categories of information from closed investigations still may be subject to the privilege.  *See Tuite*, 181 F.R.D. at 181 ("It is clear that if investigatory files were made public subsequent to the termination of enforcement proceedings, the ability of any investigatory body to conduct future investigations would be seriously impaired."); *Kampinen*, 2002 WL 238443, at *4; *Borchers*, 874 F. Supp. at 80.  This factor supports applying the privilege to all 8 categories.[35]

---

[35] Any grand jury information obtained in parallel criminal investigations cannot be disclosed except as permitted under Federal Rule of Criminal Procedure 6(e). *See United States v. Sells Engineering, Inc.*, 463 U.S. 418, 443 (1983) (requiring "a strong showing of particularized need for grand jury materials before any disclosure will be permitted").

As for the ninth and tenth factors, a litigant's need for
privileged information is greatly diminished by its availability
from other, non-privileged sources.  *See, e.g.*, *In re City of New
York*, 607 F.3d at 946-47 (party seeking to overcome privilege must
show that information sought is not available "through other
discovery or from other sources" and that information is so
important that party has "*compelling* need" for it; noting as well
that even compelling need "does not automatically entitle a litigant
to privileged information" because "disclosure is required only if
that compelling need outweighs the public interest in
nondisclosure") (emphasis in original) ; *Collins*, 112 F.R.D. at 229
("plaintiffs have made a very week showing of any such need").
Here, as discussed above, S&P can obtain much of the information it
seeks through other, non-privileged discovery.  Thus, the ninth and
tenth factors support applying the privilege to all 8 categories.

On balance, the relevant factors support the government's
assertion of investigatory files privilege with respect to the 8
identified categories of documents gathered or generated in the RMBS
Working Group investigations.  As to each of these categories of
documents, S&P's motion to compel should be denied.

**F.    S&P'S REQUESTS FOR EVALUATIONS AND STUDIES ARE VAGUE,
        OVERBROAD, AND UNDULY BURDENSOME, AND SEEK DOCUMENTS NOT
        RELEVANT TO ANY PROPERLY RAISED CLAIM OR DEFENSE**

S&P moves to compel on requests 31, 32, and 45, which seek
evaluations, assessments, studies, findings, and analyses certain
NRSRO activities and residential mortgage loan fraud, as well as
documents "obtained in the course of investigations conducted by the
United States" of "instances of residential mortgage loan fraud"

between 2004 and 2008.  Dkt. 101-1 at 20.[36]  As set out in the chronologies attached to the Cardona Declaration as Exhibits 10 and 11, the government has provided S&P with large amounts of information in response to these requests.  On November 18, 2013, in its final letter providing information relating to these requests, the government advised S&P that once it had "reviewed the materials cited, if you have narrowed, more specific requests for documents falling within the scope of these three requests, we will be happy to discuss those with you."  Cardona Decl. ¶ 20, Ex. 18.  The response from S&P was a letter dated December 19, 2013, addressing only Request 45 and proposing only a limitation to "documents relating to financial institutions implicated by the set of RMBS and CDOs identified in the 11.18.13 Disclosure, including the tranche purchasers you have identified as well as the issuers, arrangers, sponsors, underwriters or sellers of the securities listed."  Cardona Decl. ¶ 21, Ex. 19.  As discussed in Section II.E.1, this is no limit at all.

S&P's motion to compel on these requests should be denied for all the following reasons:

(1)  For reasons discussed in Section II.D.1 above, requests 31 and 32 seek information relating to other NRSROs that is not necessary for, or even relevant to, a defense against the alleged FIRREA violations.

(2)  For reasons similar to those discussed in Section II.E.1 above, request 45 is patently overbroad and seeks information that is not necessary for, or even relevant to, a defense against the alleged FIRREA violations in that it seeks documents relating to all residential mortgage loan origination fraud committed between 2004 and

---

[36] The government also here addresses request 38 to the extent it is interpreted as seeking documents similar to those sought by requests 31 and 32. The limitations set forth in note 19 above apply to the discussion in this section as well.

2008, without regard to whether those frauds had any relationship to the FIRREA violations.

(3)   S&P has made clear that request 45 seeks documents obtained in government investigations.  For reasons set forth in Section II.E.2 above, such discovery would interfere significantly with the government's ability to carry out its law enforcement obligations.  Particularly where, as here, the discovery sought is of minimal, if any, relevance, the burdens imposed on the government's law enforcement activities by permitting S&P discovery regarding other government investigations outweigh any possible need for that discovery.

(4)   The breadth and vagueness of Requests 31, 32, and 45 would impose enormous logistical burdens on the government. These requests would require the government to search through large portions of the Executive Branch to identify any evaluations or studies that reference NRSRO practices and performance, and through DOJ and all its components, including each USAO, to identify any investigations of residential mortgage loan fraud conducted between 2004 and 2008.  The government would then need to review all the gathered documents to determine which, if any, fall within the scope of S&P's requests, and for appropriate assertion of work product protection and other privileges.  For reasons discussed in Sections II.D.2 and II.E.2 above, because the information S&P seeks is of minimal, if any, relevance in this case, such an impractical exercise would be unduly burdensome on the government.

(5)   Were the requests sufficiently narrowed, and searches performed, an additional issue would be posed to the extent the requests seek non-public documents obtained in any investigations or in preparing any evaluations or studies.  For the reasons discussed in Sections II.D.3 and II.E.3, to the extent any non-public documents were obtained from any other NRSRO or any other non-party this action, those non-parties would need to be given an opportunity to identify and assert confidentiality interests that might be posed by disclosure of their documents to S&P, as opposed to the government for use in an investigation, evaluation, or study.

**III.  CONCLUSION**

   For all the reasons set forth above, defendants' motion to compel should be denied, the United States' cross-motion should be granted, and the court should issue an order striking defendants' First Amendment retaliation defense, quashing the Rule 45 subpoenas issued to Mr. Geithner and Mr. Checki, and precluding S&P from seeking further discovery related to that defense.

Dated: February 17, 2014

STUART F. DELERY                          ANDRÉ BIROTTE JR.
Acting Assistant Attorney General         United States Attorney
United States Department of Justice
Civil Division
MAAME EWUSI-MENSAH FRIMPONG
Deputy Assistant Attorney General         /S//George S. Cardona/
MICHAEL S. BLUME                          GEORGE S. CARDONA
Director, Consumer Protection Branch      LEON W. WEIDMAN
ARTHUR R. GOLDBERG                        ANOIEL KHORSHID
Assistant Director, Fed.Prog.Branch       RICHARD E. ROBINSON
JAMES T. NELSON                           Assistant U.S. Attorneys
BRADLEY COHEN
JENNIE KNEEDLER
SONDRA L. MILLS
THOMAS D. ZIMPLEMAN
Trial Attorneys, Civil Division