# Exhibit 4

(Cardona Declaration)

# United States District Court

FOR THE CENTRAL DISTRICT OF CALIFORNIA

No. 72-820 (R.J.K.)

UNITED STATES OF AMERICA,
*Plaintiff,*
*v.*
COLUMBIA BROADCASTING SYSTEM, INC., *et. al.,*
*Defendants.*

No. 72-821 (R.J.K.)

UNITED STATES OF AMERICA,
*Plaintiff,*
*v.*
AMERICAN BROADCASTING COMPANIES, INC.,
*Defendant.*

## MEMORANDUM FOR CBS AND ABC IN OPPOSITION TO THE GOVERNMENT'S MOTIONS TO STRIKE DEFENSES AND BAR DISCOVERY

BRUCE BROMLEY
ROBERT S. RIFKIND
LEONARD P. NOVELLO
ROBERT F. MULLEN
PAUL C. SAUNDERS
DOUGLAS D. BROADWATER
STEVEN M. EDWARDS
One Chase Manhattan Plaza
New York, N. Y. 10005
(212) 422-3000

WILLIAM W. VAUGHN
611 West Sixth Street
Los Angeles, California 90017
(213) 620-1120
*Attorneys for Defendant CBS.*

CRAVATH, SWAINE & MOORE
One Chase Manhattan Plaza
New York, N. Y. 10005

O'MELVENY & MYERS
611 West Sixth Street
Los Angeles, California 90017
*Of Counsel.*

HERBERT A. BERGSON
DANIEL H. MARGOLIS
21 Dupont Circle, NW
Washington, D. C. 20036
(202) 785-5900

ANTHONY E. LIEBIG
611 West Sixth Street
Los Angeles, California 90017
(213) 620-9000
*Attorneys for Defendant ABC.*

BERGSON, BORKLAND, MARGOLIS & ADLER
21 Dupont Circle, NW
Washington, D. C. 20036

LILLICK, McHOSE, WHEAT, ADAMS & CHARLES
611 West Sixth Street
Los Angeles, California 90017
*Of Counsel.*

April 26, 1974.



## TABLE OF CONTENTS

PAGE NO.

Table of Authorities .................................. ii

Statement .................................. 1

I. The Defenses Alleging That These Actions Were Brought for an Unconstitutional Purpose Are Sufficient As a Matter of Law .................................. 5

A. The Authorities Uniformly Support the Legal Sufficiency of the Defenses of Unconstitutional Purpose ... 6

B. There are Good Grounds to Support the Defenses of Unconstitutional Purpose .................................. 22

II. The Government's Objections to Defendants' Discovery Are Without Merit .................................. 37

A. The Government's Privilege Claims, If Any, Have Been Waived .................................. 39

B. Even If Not Waived, the Government's Claim That Its Reasons for Bringing This Action Are Protected As Attorney's "Work Product" Is Without Merit ...... 41

C. Even Absent Waiver, the Government's Claim of "Executive Privilege" Is Without Merit Because Evidence of Unconstitutional Conduct Cannot Be "Privileged" .. 42

III. It is Neither "Frivolous" Nor "Insufficient In Law" To Defend This Action on the Ground That Certain Relief Sought Bars The Networks From Engaging in Constitutionally Protected Speech .................................. 48

IV. The Twenty-Year History of Government Involvement With This Industry And Its Failure to Sue Until 1972 Supports The Laches Defense Asserted Here ........... 57

Conclusion .................................. 59

## TABLE OF AUTHORITIES

### United States Constitution

PAGE NO.

Article I, § 7 .......................................... 50

Article II, § 3 .......................................... 15

First and Fifth Amendments .......................... *passim*

### Cases

*Accardi* v. *Shaughnessy*, 347 U. S. 260 (1954) ............. 15

*Adams* v. *Richardson*, 480 F. 2d 1159 (D. C. Cir. 1973) ...... 7

*Ahmad, United States* v., 347 F. Supp. 912 (M. D. Pa. 1972), *aff'd sub nom.*, *United States* v. *Berrigan*, 482 F. 2d 171 (3d Cir. 1973) .......................................... 43

*Alarik, United States* v., 439 F. 2d 1349 (8th Cir. 1971) ...... 13

*Aldridge, United States* v., 484 F. 2d 655 (7th Cir. 1973) ..... 43

*Amalgamated Food Employees Union Local 590* v. *Logan Valley Plaza, Inc.*, 391 U. S. 308 (1968) ...................... 51

*American Cyanamid Co.* v. *Hercules Powder Co.*, 211 F. Supp. 85 (D. Del. 1962) .................................. 39

*American Pharmaceutical Ass'n* v. *United States Dep't of Justice, Antitrust Div.*, 467 F. 2d 1290 (6th Cir. 1972) ..... 16

*Andolschek, United States* v., 142 F. 2d 503 (2d Cir. 1944) .... 47

*Associated Gas & Electric Co., In re*, 59 F. Supp. 743 (S. D. N. Y. 1944) .......................................... 40

*Associated Press* v. *United States*, 326 U. S. 1 (1945) ........ 54, 55

*Association of American Railroads, United States* v., 4 F. R. D. 510 (D. Neb. 1945) .................................. 17

*Bank Line, Ltd.* v. *United States*, 76 F. Supp. 801 (S. D. N. Y 1948) .......................................... 47

*Bank of Dearborn* v. *Saxon*, 244 F. Supp. 394 (E. D. Mich. 1965), *aff'd*, 377 F. 2d 496 (6th Cir. 1967) .............. 45

*Bell* v. *Commercial Ins. Co.*, 280 F. 2d 514 (3d Cir. 1960) .... 42

PAGE NO.

*Berrigan, United States* v., 482 F. 2d 171 (3d Cir. 1973), *aff'g United States* v. *Ahmad*, 347 F. Supp. 912 (M. D. Pa. 1972) 13, 43

*Berrios, United States* v., 73-CR-308, 73-CR-22 (E. D. N. Y., Jan. 7, 1974) .......................................... 12, 45

*Black* v. *Sheraton Corp.*, No. 440-67 (D. D. C., Jan. 21, 1974) . 43, 48

*Bob, United States* v., 106 F. 2d 37 (2d Cir.), *cert. denied*, 308 U. S. 589 (1939) .......................................... 43

*Bolling* v. *Sharpe*, 347 U. S. 497 (1954) .................... 14

*Bourget* v. *Gov't Employees Ins. Co.*, 48 F. R. D. 29 (D. Conn. 1969) .......................................... 42

*Boyd* v. *United States*, 345 F. Supp. 790 (E. D. N. Y. 1972) ... 7, 8, 21

*Bridges* v. *California*, 314 U. S. 252 (1941) ................ 56

*Burr, United States* v., 25 Fed. Cas. 30 (C. C. D. Va. 1807) .. 46

*Carignan* v. *United States*, 48 F. R. D. 323 (D. Mass. 1969) .. 18

*Carl Zeiss Stiftung* v. *V. E. B. Carl Zeiss*, 40 F. R. D. 318 (1966), *aff'd*, 384 F. 2d 979 (D. C. Cir. 1967) .......... 47

*Carroll* v. *President & Commissioners*, 393 U. S. 175 (1968) .. 51

*Carter* v. *Carlson*, 56 F. R. D. 9 (D. D. C. 1972) .......... 48

*Center on Corporate Responsibility, Inc.* v. *Schultz*, 368 F. Supp. 863 (D. D. C. 1973) .......................................... 28, 43, 47

*Certain Parcels of Land, United States* v., 15 F. R. D. 224 (S. D. Cal. 1953) .......................................... 39

*Chattanooga Pharmaceutical Ass'n* v. *United States Dep't of Justice*, 358 F. 2d 864 (6th Cir. 1966) (*per curiam*) ...... 16, 20

*City of New York* v. *Ruckelshaus*, 358 F. Supp 669 (D. D. C. 1973) .......................................... 7

*Clark* v. *United States*, 289 U. S. 1 (1933) ................ 42, 43

*Columbia Broadcasting System, Inc.* v. *Democratic Nat'l Committee*, 412 U. S. 94 (1973) .......................... 50, 53, 54

*Committee for Nuclear Responsibility* v. *Seaborg*, 463 F. 2d 788 (D. C. Cir. 1971) .......................................... 43

*Commonwealth of Pa.* v. *Lynn*, 362 F. Supp. 1363 (D. D. C. 1973) .......................................... 15

*Continental Can Co., United States* v., 22 F. R. D. 241 (S. D. N. Y. 1958) .......................................... 47

*Cotton Valley Operators Committee, United States* v., 75 F. Supp. 1 (W. D. La. 1948) .......................................... 18

*Crowthers, United States* v., 456 F. 2d 1074 (4th Cir. 1972) .. 11, 12, 20, 21

PAGE NO.

*Dear Wing Jung* v. *United States*, 312 F. 2d 73 (9th Cir. 1962) 17
*Devito* v. *Shultz*, 300 F. Supp. 381 (D. D. C. 1969) ........ 15
*D'Ippolito* v. *Cities Service Co.*, 39 F. R. D. 610 (S. D. N. Y. 1965) ........................................... 39
*D. C. Federation of Civic Ass'ns* v. *Volpe*, 459 F. 2d 1231 (D. C. Cir. 1972) ............. .................... 15
*Dixon* v. *District of Columbia*, 394 F. 2d 966 (D. C. Cir. 1968) 12, 13, 20, 21
*Dombrowski* v. *Pfister*, 380 U. S. 479 (1965) ............. 19, 20, 56
*Dunbar & Sullivan Dredging Co.* v. *Jurgenson Co.*, 44 F. R. D. 467 (S. D. Ohio 1967), *aff'd*, 396 F. 2d 152 (6th Cir. 1968) 5
*Eastman Kodak Co.* v. *International Harvester Co.*, 14 F. R. Serv. 2d 1272 (S. D. N. Y. 1970) ...................... 39
*Edelman* v. *California*, 344 U. S. 357 (1953) ............... 14, 19
*Elliot, United States* v., 266 F. Supp. 318 (S. D. N. Y. 1967) .. 12
*Environmental Protection Agcy* v. *Mink*, 410 U. S. 73 (1973) 46, 47
*Evans* v. *United States*, 10 F. R. D. 255 (W. D. La. 1950) .... 39
*Falk, United States* v., 479 F. 2d 616 (7th Cir. 1973), *rev'g en banc* 472 F.2d 1101 (1973) ......................... 10, 11, 15, 19, 20, 45
*Fed. Deposit Ins. Corp.* v. *St. Paul Fire & Marine Ins. Co.*, 53 F. R. D. 260 (W. D. Okla 1971) ...................... 46, 47
*Fleming* v. *Bernardi*, 1 F. R. D. 624 (N. D. Ohio 1941) ...... 47
*Follett* v. *McCormick*, 321 U. S. 573 (1944) ............... 14, 20
*Friedman, United States* v., 445 F. 2d 1076 (9th Cir.), *cert. denied*, 404 U. S. 958 (1971) ......................... 43
*Gates, United States* v., 35 F. R. D. 524 (D. Colo. 1964) ...... 47
*Gebhart, United States* v., 441 F. 2d 1261 (6th Cir. 1971) .... 13
*General Instrument Corp., United States* v., 87 F. Supp. 157 (D. N. J. 1949) .................................... 57
*Grosjean* v. *American Press Co.*, 297 U. S. 233 (1936)...... 14, 20, 56
*Gulf Constr. Co.* v. *St Joe Paper Co.*, 24 F. R. D. 411 (S. D. Tex. 1959) ........................................ 42
*Gutknecht* v. *United States*, 396 U. S. 295 (1970) .......... 19
*Healy* v. *James*, 408 U. S. 169 (1972) .................... 20
*Hunt* v. *Blackburn*, 128 U. S. 464 (1888).................. 40
*Jackson, United States* v., 390 U. S. 570 (1967) ........... 14
*Jacoby-Bender, Inc.* v. *Jacques Kreisler Mfg. Corp.*, 287 F. Supp. 134 (S. D. N. Y. 1968)........................ 5

PAGE NO.

*Johnson* v. *Zerbst*, 304 U. S. 458 (1938) .................. 39
*Joseph Burstyn, Inc.* v. *Wilson*, 343 U. S. 495 (1952)........ 50

*Kahn* v. *HEW*, 53 F. R. D. 241 (D. Mass. 1971)........... 45
*Kaiser Aluminum & Chemical Corp.* v. *United States*, 157 F. Supp. 939 (Ct. Cl. 1958) ............................ 46
*Kearney & Trecker Corp.* v. *Giddings & Lewis, Inc.* 296 F. Supp. 979 (E. D. Wis. 1969) .......................... 42
Kelsey-Hayes Wheel Co., United States v., 15 F. R. D. 461 (E. D. Mich. 1954)................................ 39
*Kendall* v. *Stokes*, 37 U. S. (12 Pet.) 524 (1828) ............ 7
*Kirkland* v. *Morton Salt Co.*, [illegible] F. R. D. 28 (N. D. Ga. 1968) 42
*Kohen* v. *H. S. Crocker Co.*, 260 F. 2d 790 (5th Cir. 1958) .... 5
*Krasnov, United States* v., 143 F. Supp. 184 (E. D. Pa. 1956), *aff'd per curiam*, 355 U. S. 5 (1957) .................... 39

*Lamont* v. *Postmaster Gen'l*, 381 U. S. 301 (1965) .......... 14
*L[illegible] [illegible] Corp.* v. *Deramus*, 313 F. Supp. 224 (D. Del. [illegible]) ........................................ 40
[illegible] *[illegible]s*, 383 F. 2d 20 (9th Cir. 1967) ........ 9, 13, 17, 20
[illegible] 2677, [illegible] *Federation of Government Employees* v. *[illegible]*, 35[illegible] F. Supp. 60 (D. D. C. 1973) ................ 7
*Lorain [illegible] Co., United States* v., 92 F. Supp. 794 (N. D. Ohio 19[illegible]), *aff'd*, 342 U. S. 143 (1951) ................. 55
*Lovell* v. *Griffin*, 303 U. S. 444 (1938) .................... 51, 52
*Lyons, Commonwealth of Pa.* v., 362 F. Supp. 1363 (D. D. C. 197[illegible]) .............................................. 15

*MacDonald* v. *Musick*, 425 F. 2d 373 (9th Cir.), *cert. denied*, 400 U. S. 852 (1970) .............................. 9, 13, 17, 20, 21
*Magida* v. *Continental Can Co.*, 12 F. R. D. 74 (S. D. N. Y. 1951) ............................................... 39
[illegible] Mfg. v. *Elco Corp.*, 307 F. Supp. 1177 (E. D. Pa. 1969) 40
*[illegible]nowski, United States* v., 347 F. Supp. 347 (E. D. Pa. 1972), *aff'd*, 472 F. 2d 850 (3d Cir.), *cert. denied*, 411 U. S. [illegible]0 (1973) ............................................ 13
*Maplewood Poultry Co., United States* v., 320 F. Supp. 1395 (D. Me. 1970) ..................................... 13
*Marbury* v. *Madison*, 5 U. S. (1 Cranch) 137 (1803)........ 7, 16
*Marsh* v. *Alabama*, 326 U. S. 501 (1946).................. 51, 52
*McCray* v. *United States*, 195 U. S. 27 (1904).............. 18

PAGE NO.

*McCullough Tool Co.* v. *Pangeo Atlas Corp.*, 40 F. R. D. 490 (E. D. Tex. 1966) .......... 42
*McLeod, United States* v., 385 F. 2d 734 (5th Cir. 1967) .......... 11
*Mitchell* v. *Bass*, 252 F. 2d 513 (8th Cir. 1958) .......... 46
*Morris* v. *Atchison, Topeka & Santa Fe RR.*, 21 F. R. D. 155 (W. D. Mo. 1958) .......... 39
*Moss* v. *Hornig*, 314 F. 2d 89 (2d Cir. 1963) .......... 9, 12, 14
*Mt. Mansfield Television, Inc.* v. *FCC*, 442 F. 2d 470 (2d Cir. 1971) .......... 53
*Murdock* v. *Pennsylvania*, 319 U. S. 105 (1943) .......... 14, 19, 56

*NAACP* v. *Alabama*, 357 U. S. 449 (1958) .......... 56
*NAACP* v. *Button*, 371 U. S. 415 (1963) .......... 56
*Nader* v. *Butz*, No. 148-72 (D. D. C. 1970) .......... 47
*National Broadcasting Co.* v. *United States*, 319 U. S. 190 (1943) .......... 54
*Natta, In re*, 48 F. R. D. 319 (D. Del. 1969) .......... 39
*Near* v. *Minnesota*, 283 U. S. 697 (1931) .......... 50, 51, 55, 56
*N. Y. Times Co.* v. *Sullivan*, 376 U. S. 254 (1964) .......... 21
*N. Y. Times Co.* v. *United States*, 403 U. S. 713 (1971) .......... 51
*Nixon* v. *Sirica*, 487 F. 2d 700 (D. C. Cir. 1973) .......... 46, 48

*O'Brien, United States* v., 391 U. S. 367 (1968) .......... 18, 19
*Oestereich* v. *Selective Svc. Bd.*, 393 U. S. 233 (1968) .......... 19
*Olson Rug Co.* v. *NLRB*, 291 F. 2d 655 (7th Cir. 1961) .......... 46
*Oregon State Medical Society, United States* v., 343 U. S. 326 (1952) .......... 58
*Overby* v. *U. S. Fidelity & Guaranty Co.*, 224 F. 2d 158 (5th Cir. 1955) .......... 39
*Oyler* v. *Boles*, 386 U. S. 448 (1962) .......... 8, 14, 19

*Palmer* v. *Thompson*, 463 U. S. 217 (1971) .......... 19
*Penn Central Commercial Litigation, In re*, 61 F. R. D. 453 (S. D. N. Y. 1973) .......... 40
*Pennsalt Chemicals Corp., United States* v., 262 F. Supp. 101 (E. D. Pa. 1967) .......... 57
*Perma Life Mufflers* v. *International Parts Corp.*, 392 U. S. 134 (1968) .......... 17, 18
*Pfizer Inc.* v. *Lord*, 456 F. 2d 545 (8th Cir. 1972) .......... 43
*Phila. Electric Co.* v. *Anaconda American Brass Co.*, 275 F. Supp. 146 (E. D. Pa. 1967) .......... 39

PAGE NO.

*Pittsburgh Press Co.* v. *Pittsburgh Commission on Human Relations*, 413 U. S. 376 (1973) ........................ 50

*Pleasant Hill Bank* v. *United States*, 58 F. R. D. 97 (W. D. Mo. 1973) ........................................ 43, 46, 48

*Ponzi* v. *Fessenden*, 258 U. S. 254 (1922) ................ 23

*Procter & Gamble Co., United States* v., 174 F. Supp. 233 (D. N. J. 1959) and 25 F. R. D. 485 (D. N. J. 1960) ...... 41, 42, 43, 44

*RCA* v. *Rauland Corp.* 18 F. R. D. 440 (N. D. Ill. 1955) .... 39

*Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367 (1969) .... 52, 53

*Reiss* v. *British General Ins. Co.*, 9 F. R. D. 610 (S. D. N. Y. 1949) ........................................ 39

*Rekeweg* v. *Federal Mutual Ins. Co.*, 27 F. R. D. 431 (N. D. Ind. 1961) ........................................ 39, 42

*Reynolds, United States* v., 345 U. S. 1 (1953) ............ 39, 43, 47

*Robel, United States* v., 389 U. S. 258 (1967) .............. 7

*Rose, United States* v., CR No. 73-174 (D. Ore. March 5, 1974) 10

*Rosee* v. *Board of Trade*, 36 F. R. D. 684 (N. D. Ill. 1965) .. 44

*Rosenbloom* v. *Metromedia*, 403 U. S. 29 (1971) ............ 21, 50

*Roth* v. *United States*, 354 U. S. 476 (1957) ................ 50

*Ruckelshaus, City of New York* v., 358 Supp. 669 (D. D. C. 1973) ........................................ 7

*Schacht* v. *United States*, 398 U. S. 58 (1970) .............. 50

*Schneider* v. *State*, 308 U. S. 147 (1939) .................. 51, 52

*Schwartz* v. *Travelers Ins. Co.*, 17 F. R. D. 330 (S. D. N. Y. 1954) ........................................ 39

*Scott* v. *United States*, 419 F. 2d 264 (D. C. Cir. 1969) ...... 13, 14

*Sherbert* v. *Verner*, 374 U. S. 398 (1963) ................ 14

*Shiner* v. *American Stock Exchange*, 28 F. R. D. 34 (S. D. N. Y. 1961) ........................................ 39

*Singer Sewing Machine Co.* v. *NLRB* 329 F. 2d 200 (4th Cir. 1964) ........................................ 45

*Snowden* v. *Hughes*, 321 U. S. 1 (1944) .................. 8, 9, 14 19

*Sperandeo* v. *Milk Drivers & Dairy Employees Local* 537, 334 F. 2d 381 (10th Cir. 1964) ........................ 45, 46

*Stamler* v. *Willis*, 415 F. 2d 1365 (7th Cir. 1969), *cert. denied*, 399 U. S. 929 (1970) .............................. 7

PAGE NO.

*State Highway Commission of Missouri* v. *Volpe*, 479 F. 2d 1099 (8th Cir. 1973) .......... 7, 15
*Steele, United States* v., 461 F. 2d 1148 (9th Cir. 1972) .... 9, 17, 20, 21
*Steen* v. *First Nat'l Bank*, 298 F. 36 (8th Cir. 1924) ...... 40
*Sun Publishing Co.* v. *Walling*, 140 F. 2d 445 (6th Cir.), *cert. denied*, 322 U. S. 728 (1944) .......... 55, 56
*Swain* v. *Alabama*, 380 U. S. 202 (1965) .......... 14

*Taylor* v. *Board of Ed.*, 191 F. Supp. 181 (S. D. N. Y.), *aff'd*, 294 F. 2d 36 (2d Cir 1961) .......... 14
*Teleprompter Corp.* v. *Columbia Broadcasting System, Inc.*, 94 S. Ct. 1129, 39 L. Ed. 2d 415 (1974) .......... 52
*Thill Securities Corp.* v. *New York Stock Exchange*, 57 F. R. D. 133 (E. D. Wis. 1972) .......... 48
*30 Jars, More or Less, etc., United States* v., 43 F. R. D. 181 (D. Del. 1967) .......... 48
*Thomas* v. *Collins*, 323 U. S. 516 (1945) .......... 52
*Thornhill* v. *Alabama*, 310 U. S. 88 (1940) .......... 56
*Times-Picayune Publishing Co.* v. *United States*, 345 U. S. 594 (1953) .......... 58
*TWA* v. *Hughes*, 332 F. 2d 602 (2d Cir. 1964), *cert. dismissed as improvidently granted*, 380 U. S. 249 (1965) .......... 40

*Underwater Storage, Inc.* v. *United States Rubber Co.*, 314 F. Supp. 546 (D. D. C. 1970) .......... 39
*Union Oil Co.* v. *Morton*, 56 F. R. D. 643 (D. C. Cal. 1972) .. 46
*United States* v. *Ahmad*, 347 F. Supp. 912 (M. D. Pa. 1972), *aff'd sub nom., United States* v. *Berrigan*, 482 F. 2d 171 (3d Cir. 1973) .......... 43
*United States* v. *Alarik*, 439 F. 2d 1349 (8th Cir. 1971) ...... 13
*United States* v. *Aldridge*, 484 F. 2d 655 (7th Cir. 1973) .... 43
*United States* v. *Andolschek*, 142 F. 2d 503 (2d Cir. 1944) .... 47
*United States* v. *Association of American Railroads*, 4 F. R. D. 510 (D. Neb. 1945) .......... 17
*United States* v. *Berrigan*, 482 F. 2d 171 (3d Cir. 1973), *aff'g United States* v. *Ahmad*, 347 F. Supp. 912 (M. D. Pa. 1972) 13, 43
*United States* v. *Berrios*, 73-CR-308, 73-CR-22 (E. D. N. Y. January 7, 1974) .......... 12, 45
*United States* v. *Bob*, 106 F. 2d 37 (2d Cir.), *cert. denied*, 308 U. S. 589 (1939) .......... 43
*United States* v. *Burr*, 25 Fed Cas. 30 (C. C. D. Va. 1807) ... 46

PAGE NO.

*United States* v. *Certain Parcels of Land*, 15 F. R. D. 224 (S. D. Cal. 1953) .................................... 39

*United States* v. *Continental Can Co.*, 22 F. R. D. 241 (S. D. N. Y. 1958) .................................... 47

*United States* v. *Cotton Valley Operators Committee*, 75 F. Supp. 1 (W. D. La. 1948) .......................... 18

*United States* v. *Crowthers*, 456 F. 2d 1074 (4th Cir. 1972) ... 11, 12, 20, 21

*United States* v. *Elliot*, 266 F. Supp. 318 (S. D. N. Y. 1967) ... 12

*United States* v. *Falk*, 479 F. 2d 616 (7th Cir. 1973), *rev'g en banc*, 472 F. 2d 1101 (1973) ..................... ..... 10, 11, 15, 19, 20, 45

*United States* v. *Friedman*, 445 F. 2d 1076 (9th Cir.), *cert. denied*, 404 U. S. 958 (1971) .......................... 43

*United States* v. *Gates*, 35 F. R. D. 524 (D. Colo. 1964) ...... 47

*United States* v. *Gebhart*, 441 F. 2d 1261 (6th Cir. 1971) ..... 13

*United States* v. *General Instrument Corp.*, 87 F. Supp. 157 (D. N. J. 1949) .................................... 57

*United States* v. *Jackson*, 390 U. S. 570 (1967) .............. 14

*United States* v. *Kelsey-Hayes Wheel Co.*, 15 F. R. D. 461 (E. D. Mich. 1954) .................................... 39

*United States* v. *Krasnov*, 143 F. Supp. 184 (E. D. Pa. 1956), *aff'd per curiam*, 355 U. S. 5 (1957) ...... ............. 39

*United States* v. *Lorain Journal Co.*, 92 F. Supp. 794 (N. D. Ohio 1950), *aff'd*, 342 U. S. 143 (1951) ................ 55

*United States* v. *Malinowski*, 347 F. Supp. 347 (E. D. Pa. 1972), *aff'd*, 472 F. 2d 850 (3d Cir.), *cert. denied*, 411 U. S. 970 (1973) .................................... 13

*United States* v. *Maplewood Poultry Co.*, 320 F. Supp. 1395 (D. Me. 1970) .................................... 13

*United States* v. *McLeod*, 385 F. 2d 734 (5th Cir. 1967) ...... 11

*United States* v. *O'Brien*, 391 U. S. 367 (1968) ............ 18, 19

*United States* v. *Oregon State Medical Society*, 343 U. S. 326 (1952) .................................... 58

*United States* v. *Pennsalt Chemicals Corp.*, 262 F. Supp. 101 (E. D. Pa. 1967) .................................... 57

*United States* v. *Procter & Gamble Co.*, 174 F. Supp. 233 (D. N. J. 1959) and 25 F. R. D. 485 (D. N. J. 1960) ...... 41, 42, 43, 44

*United States* v. *Reynolds*, 345 U. S. 1 (1953) ............. 39, 43, 47

*United States* v. *Robel*, 389 U. S. 258 (1967) .............. 7

PAGE NO.

*United States* v. *Rose*, CR No. 73-174 (D. Ore. March 5, 1974) 10

*United States* v. *Steele*, 461 F. 2d 1148 (9th Cir. 1972) ....... 9, 17, 20, 21

*United States* v. *30 Jars, More or Less, etc.*, 43 F. R. D. 181 (D. Del. 1967) .................................... 48

*Valentine* v. *Chrestensen*, 316 U. S. 53 (1942) .............. 50

*Verrazano Trading Corp.* v. *United States*, 349 F. Supp. 1401 (Cust. Ct. 1972) ................................ 46

*Western Union Tel. Co.* v. *Baltimore & Ohio Tel. Co.*, (C. C. S. D. N. Y. 1885) ................................ 40

*White* v. *Thacker*, 78 F. 862 (5th Cir. 1897) ............... 40

*Wild* v. *Payson*, 7 F. R. D. 495 (S. D. N. Y. 1946) .......... 40

*Williams* v. *Field*, 416 F. 2d 483 (9th Cir. 1969), *cert. denied*, 397 U. S. 1016 (1970) ............................ 14

*Wong Wing Hang* v. *Immigration & Naturalization Svce.*, 360 F. 2d 715 (2d Cir. 1966) ........................... 15

*Yick Wo* v. *Hopkins*, 118 U. S. 356 (1886) ........... .... 8, 9, 14, 20

*Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579 (1952) 7, 15

**Statutes and Other Authorities**

5 U. S. C. § 552 (Freedom of Information Act) ........... 46

15 U. S. C. § 1 .......................................... 21

15 U. S. C. § 2 .......................................... 21

15 U. S. C. § 4 .......................................... 15, 24

15 U. S. C. § 15 ......................................... 21

15 U. S. C. § 16(a) ...................................... 21

15 U. S. C. § 1312(a) .................................... 16

29 U. S. C. § 504 ........................................ 12

47 U. S. C. § 153(o) ..................................... 52

47 U. S. C. § 326 ........................................ 53

Fed. R. Civ. P. 12(b)(6) ................................. 17

PAGE NO.

Fed. R. Civ. P. 12(f) .................................. *passim*

Fed. R. Civ. P. 26(b)(3) . ........ .................. 41, 42

Fed. R. Civ. P. 56 .................................... 6, 23

Rule 3(g)(1) of the Local Rules of the Central District of California .................................... 6

21 CONG. REC. 4090 (1890) ............................ 24

P & F Radio Reg. 2d 1223 ............................ 26-27

Arnold, *Fair and Effective Use of Present Antitrust Procedure*, 47 YALE L. J. 1294 (1938) ............................ 15

A. BICKEL, THE LEAST DANGEROUS BRANCH (1962) ....... 19

Ely, *Legislative and Administrative Motivation in Constitutional Law*, 79 YALE L. J. 1205 (1970) .................. 14

4 MOORE, FEDERAL PRACTICE (2 ed. 1974) ................ 42

Richardson, *The Building of a New Confidence*, N. Y. S. B. J. 455 (Nov. 1973) .................................. 46

Ungar, *The Undoing of the Justice Department*, *The Atlantic* (Jan. 1974) ........................................ 34

8 WIGMORE, EVIDENCE, § 2327 (McNaughton rev. ed. 1961).. 40

# United States District Court
FOR THE CENTRAL DISTRICT OF CALIFORNIA

No. 72-820 (R.J.K.)

UNITED STATES OF AMERICA,
*Plaintiff,*
*v.*
COLUMBIA BROADCASTING SYSTEM, INC., *et. al.,*
*Defendants.*

No. 72-821 (R.J.K.)

UNITED STATES OF AMERICA,
*Plaintiff,*
*v.*
AMERICAN BROADCASTING COMPANIES, INC.,
*Defendant.*

## MEMORANDUM FOR CBS AND ABC IN OPPOSITION TO THE GOVERNMENT'S MOTIONS TO STRIKE DEFENSES AND BAR DISCOVERY

### Statement

Columbia Broadcasting System, Inc. ("CBS") and American Broadcasting Companies, Inc. ("ABC") submit this memorandum in opposition to the Government's motions under Rule 12(f), Fed. R. Civ. P., to strike certain of the defenses pleaded in their respective answers and to bar the discovery that CBS and ABC have sought with respect to the issues raised by some of those defenses. For the reasons set forth in the argument below, we submit that those defenses are sufficient as a matter of law and that the discovery sought is proper.

These two actions, together with a third action against the National Broadcasting Company, Inc. ("NBC"), were commenced on April 14, 1972, after some twenty years of what the Government describes as "intermittent investigation of the program practices of NBC, CBS and ABC by the Antitrust Division which commenced in the mid-1950's" (Gov't Memo, p. 3). Notwithstanding that protracted investigation, the Government's complaints were remarkable for their staleness. Most of the relief sought covered matters that had been dealt with by the

Federal Communications Commission's regulations promulgated in May 1970. Moreover, despite the Government's twenty years of "intermittent investigation", and despite repeated assurances to counsel for ABC that he would be given an opportunity to be heard by the head of the Antitrust Division before any recommendation to institute suit was made, counsel for the networks were summoned to the Department of Justice in Washington on a few hours' notice and were there told that, unless their clients consented within seven days to all the relief requested in the complaints, which had already been signed by the Acting Attorney General, these suits would be instituted. (App. 2, 315-16)*

The actions were filed six months before a presidential election that brought in its wake an unprecedented and profoundly disturbing series of congressional and judicial investigations into the conduct of the Executive Branch of the Federal Government. Those investigations are continuing at this time. They have already disclosed, however, that high officials sought to utilize the machinery of the Federal Government to achieve improper political ends and to suppress criticism of the Administration, notwithstanding the prohibitions of the First Amendment to the Constitution.

On December 21, 1973, the networks answered the complaints in these actions.** Attacked by the Government here as "prejudicial, immaterial and insufficient in law" (Gov't Memo, p. 20), or "not a subject of proper inquiry" (Gov't Memo, p. 17) or "devoid of any factual basis" (Gov't Memo, p. 20), or as "frivolous and insufficient" (Gov't Memo, pp. 21-26) are defenses pleaded by the networks which allege:

(i) these actions were brought for the purpose of interfering with rights guaranteed by the Constitution;***

(ii) these actions seek certain relief which would bar the networks from creating and transmitting any of their own entertainment programming, which is a form of speech protected by the First Amendment;† and

---

*"App." refers to the separately bound Appendix of affidavits and exhibits thereto, which is submitted herewith. For the convenience of the Court, the Appendix also contains copies of the few as yet unreported decisions cited herein.

**By stipulation and order, the time within which to answer was extended pending resolution of the primary jurisdiction motion to December 21, 1973.

***CBS's second, third and fourth defenses; ABC's sixth, seventh and eighth defenses; NBC's second and third defenses.

†CBS's fifth and sixth defenses; ABC's fourth and fifth defenses; NBC's fourth defense.

(iii) the Government's delay in bringing these actions over a period of more than twenty years must be considered in determining whether the networks violated any law, and, if so, what relief might be appropriate.*

The Government's position on the networks' defenses is that—whatever the facts may ultimately prove to be—the defenses must be stricken from these actions now because, in the Government's view, the law does not permit any of them under any state of facts. That position is, we submit, wrong as a matter of law. Furthermore, the Government is wrong in attempting to characterize the defenses as "frivolous" or "devoid of any factual basis". Those defenses were pleaded with the utmost gravity and with a full awareness of the serious nature of the matters involved. In particular, they were pleaded in the light of factual disclosures from governmental investigations which indicated that there was good ground to support them and that genuine issues of fact warranting discovery were present. For example:

(1) It was made public in November 1973, that, three years before these actions were brought, the Administration's Deputy Director of Communications, J. S. Magruder, had written the White House Chief of Staff, H. R. Haldeman, proposing that, in order to stifle network criticism of the Administration, the Government should "use the power at hand", and, in particular should:

> "Utilize the anti-trust division to investigate various media relating to anti-trust violations. Even the possible threat of anti-trust action I think would be effective in changing their views in the above matter." (App. 5)

(2) It has now been disclosed that in April 1971, the President established an antitrust clearinghouse at the White House "to ensure that the President's views on the subject could be made known to all the operating agencies." (White House statement on ITT at App. 102)

(3) Also made public was the program outlined by Counsel to the President John Dean for H. R. Haldeman and John Ehrlich-

*CBS's twelfth defense; NBC's tenth defense. ABC did not plead the defense.

man (Assistant to the President for Domestic Affairs) in August 1971. That program sought to "maximize the fact of our incumbency in dealing with persons known to be active in their opposition to our Administration" by determining "how we can best screw them (*e.g.*, grant availability, federal contracts, *litigation, prosecution*, etc.)" (App. 139; emphasis added).

(4) Dan Rather, CBS White House news correspondent, was told in February 1971 by Ronald Ziegler, Presidential Press Secretary and Assistant to the President, that the television networks were "anti-Nixon" and that "they are going to have to pay for that, sooner or later, one way or another". (App. 327)

(5) After these suits were brought, Dr. Frank Stanton, CBS's chief operating officer, was told by Special Counsel to the President Charles Colson that the Administration would "bring you to your knees in Wall Street and on Madison Avenue" in retaliation for CBS's failure to "play ball" with the Administration. (App. 299)

As to the unconstitutional relief sought by the Government, the fact that it requests a ban of all network-produced television entertainment programming is set forth explicitly in paragraph 5 of the prayer for relief in the complaints. And, with respect to the Government's twenty year delay in proceeding against what it now claims was illegal all along, the Government's Memorandum itself contains a historical recital sufficient to demonstrate the merits of the laches claim.

On January 8, 1974, CBS and ABC served substantially identical document production requests and deposition notices designed to discover additional evidence in support of the claim of unconstitutional purpose. The Government requested and received a 75-day extension of its time to move against the answers under Rule 12(f), Fed. R. Civ. P. Likewise, the Government's time within which to respond to defendants' document requests was extended to March 25 and the depositions were adjourned until various dates commencing on June 25.

On March 25, 1974, the Government (1) moved to strike the networks' defenses in issue here, (2) moved for a protective order quashing CBS's and ABC's requests for documents and notices of depositions on the ground that the networks are entitled to "neither discovery nor production of documents nor inquiry" on their defenses;*

*The Government has not—but surely could—seek a protective order designed to protect its interest in confidentiality without foreclosing defendants' interest in discovery. In so far as the Government's opposition to any discovery is based on any legitimate concern over "public scrutiny" of the materials requested (Gov't Memo, p. 39), such a protective order would appear to be an appropriate remedy.

and (3) moved to stay the networks' discovery pending decision on plaintiff's motion to strike.

In Part I of this memorandum, we show that, as a matter of law, the Government's purpose in bringing this action is properly in issue, and that if that purpose was unlawful, there is a complete defense to the Government's claims.

In Part II, we show that neither attorney's work product nor executive privilege can here be a legitimate bar to CBS's and ABC's discovery requests.

In Parts III and IV, we show that the First Amendment defense to certain relief requested and CBS's laches defense are legally sufficient.

I.

**THE DEFENSES ALLEGING THAT THESE ACTIONS WERE BROUGHT FOR AN UNCONSTITUTIONAL PURPOSE ARE SUFFICIENT AS A MATTER OF LAW.**

The networks have alleged that these actions were commenced by Government officials for a purpose which they cannot lawfully pursue. Thus, CBS in its second defense, and ABC in its sixth defense, plead that the First Amendment bars the maintenance of this action because it was commenced for the unconstitutional purpose of harassing, intimidating and inhibiting them in their exercise of First Amendment rights. CBS, in its third defense, and ABC, in its eighth defense, plead that the commencement of these suits for this purpose constitutes an impermissible use of the powers vested in the President and the Attorney General by the Constitution and laws of the United States Finally, CBS, in its fourth defense, and ABC, in its seventh defense, plead that prosecution for this unconstitutional purpose violates the due process clause of the Fifth Amendment.

As the Government concedes (Gov't Memo, p. 5), since this is a motion to strike under Rule 12(f) of the Federal Rules of Civil Procedure, the facts alleged must be assumed to be true, and the only question is whether, if those facts are established, they would constitute a defense to the lawsuits.* We show in part A below that, under decisions of the Supreme Court, the Court of Appeals for this Circuit,

---

**E.g., Kohen* v. *H. S. Crocker Co.*, 260 F. 2d 790, 792 (5th Cir. 1958); *Jacoby-Bender, Inc.* v. *Jacques Kreisler Mfg. Corp.*, 287 F. Supp. 134, 135 (S. D. N. Y. 1968); *Dunbar & Sullivan Dredging Co.* v. *Jurgenson Co.*, 44 F. R. D. 467, 472 (S. D. Ohio 1967), *aff'd*, 396 F. 2d 152 (6th Cir. 1968).

and courts in every circuit in which the question has been raised, the defense that a Government action was instituted for an unconstitutional purpose is sufficient in law.

Given the Government's choice to proceed by way of a motion to strike under Rule 12(f), there was no occasion for it to submit affidavits, and they should not be considered by this Court. That is particularly so in as much as the Government is simultaneously moving to block all discovery on the defenses—including even the deposition of one of the Government's affiants, former Acting Assistant Attorney General Comegys. Moreover, the filing of affidavits should not be deemed to convert the Government's motion into a motion for summary judgment under Rule 56, Fed. R. Civ. P. The Government has not complied with Rule 3(g)(1) of the Local Rules of the Central District of California which, among other things, requires a party seeking summary judgment to file proposed findings of fact stating "the material facts as to which the moving party contends there is no genuine issue".

In any event, even if this were a motion for summary judgment, discovery would be available to the networks under the provisions of Rule 56(e)-(f). Since the Government's purpose in bringing these actions is, of course, a matter peculiarly within its own knowledge, such discovery is essential to a full and fair hearing on such a motion.* Nevertheless, a number of Government documents already released to the public together with public and private statements made by representatives of the Administration (which are set forth in the Appendix and are discussed in part B below) demonstrate that the defenses are interposed in good faith, that there is good ground to support them, and that the Government's charge that the defenses are "devoid of any factual basis" (Gov't Memo, p. 20) is unwarranted. Those materials clearly permit the inference that these actions were authorized for a constitutionally impermissible purpose and that the discovery sought is justified. They also show that if this were a motion for summary judgment, the Government could not sustain its burden of establishing that "there is no genuine issue as to any material fact" within the meaning of Rule 56(c), Fed. R. Civ. P.

**A. The Authorities Uniformly Support the Legal Sufficiency of the Defenses of Unconstitutional Purpose.**

The Government argues that its purpose in bringing these actions is "irrelevant and immaterial" (Gov't Memo, pp. 5, 20) and therefore

*Affidavit of Robert S. Rifkind, sworn to April 26, 1974, ¶ 3, App. 2.

the defenses are "insufficient in law" (Gov't Memo, p. 20). That is not the law. Nor has it ever been true that high Government officials, including those involved in the filing of these actions, have been immune from judicial examination of their purpose.

Ours is a government of limited powers. Action in furtherance of a design expressly forbidden by the Constitution is action in which Government officials have no legitimate authority to engage and from which the courts will restrain them. From the time of *Marbury* v. *Madison* to the present day, this has been the highest office of our courts. Just as the judiciary intervenes to prevent the legislature from infringing constitutional rights, *United States* v. *Robel*, 389 U. S. 258 (1967), it will intervene to prevent the executive from doing the same, *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 597 (1952); *Stamler* v. *Willis*, 415 F. 2d 1365 (7th Cir. 1969), *cert. denied*, 399 U. S. 929 (1970). Federal judicial power has repeatedly been invoked to compel the highest officers of the Federal Government to act within the bounds of the Constitution and the laws of the United States. *E.g., Marbury* v. *Madison*, 5 U. S. (1 Cranch) 137 (1803) (Secretary of State); *Youngstown Sheet & Tube, supra* (Secretary of Commerce); *Kendall* v. *Stokes*, 37 U. S. (12 Pet.) 524 (1828) (Postmaster General); *Adams* v. *Richardson*, 480 F. 2d 1159 (D. C. Cir. 1973) (Secretary of HEW); *State Highway Commission of Missouri* v. *Volpe*, 479 F. 2d 1099 (8th Cir. 1973) (Secretary of Transportation); *Local 2677, American Fed'n of Gov't Employees* v. *Phillips*, 358 F. Supp. 60 (D. D. C. 1973) (Acting Director of OEO); *City of New York* v. *Ruckelshaus*, 358 F. Supp. 669 (D. D. C. 1973) (Administrator of Environmental Protection Agency).

No different case is presented with respect to the constitutional limitations on the authority of the Attorney General. Neither he nor those operating under his authority enjoy any special immunity from the strictures of the Constitution. As the court said in *Boyd* v. *United States*, 345 F. Supp. 790, 792 (E. D. N. Y. 1972):

> "The Attorney General's discretion in the conduct of litigation must be exercised within the framework of applicable constitutional and statutory standards. A prosecutor may not use his discretion in initiating or conducting proceedings—*whether criminal or civil*—to derogate the statutory or constitutional rights of defendants or others." (Emphasis supplied.)

While many of the cases discussed below involved criminal prosecutions, they are based on a constitutional principle, which as the court in *Boyd* recognized, necessarily applies to civil litigation as well. (*see* p. 21, *infra*)

The Government's argument against the sufficiency of the defense relies on cases where either (i) the Government's purpose was not challenged on constitutional grounds, or (ii) the purpose of the legislative, rather than the executive, branch was challenged. Those cases, however, as we show below (pp. 17-19), are not relevant to the networks' allegations that the executive branch acted on a constitutionally impermissible basis.

The constitutional principle supporting the networks' defenses has been clear at least since the Supreme Court's decision in *Yick Wo* v. *Hopkins,* 118 U. S. 356 (1886). There, several Chinese laundrymen challenged their convictions for operating laundries without the consent of the San Francisco board of supervisors. A city ordinance, passed as a fire prevention measure, required that such consent be obtained by all persons operating laundries in wooden buildings. Holding that a law "fair on its face and impartial in appearance" could not be applied "with an evil eye and an unequal hand" (118 U. S. at 373-74), the Supreme Court reversed the convictions because of the unconstitutional purpose demonstrated by discriminatory enforcement:

> "No reason for it is shown and the conclusion cannot be resisted, that no reason for it exists except hostility to the race and nationality to which the petitioners belong. . . ." 118 U. S. at 374.

More recently, in *Oyler* v. *Boles,* 368 U. S. 448 (1962), the Supreme Court also held that inquiry into unconstitutional purpose was relevant in considering the validity of a conviction. There, petitioner sought reversal of his conviction under a habitual offender statute on the ground that others with as many previous convictions had not been prosecuted under that statute. In denying the petition, the Supreme Court noted that an unconstitutional purpose could not be inferred from the facts alleged but indicated that petitioner could succeed if he demonstrated that the prosecution had been "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification". 368 U. S. at 456. *See also Snowden*

v. *Hughes,* 321 U. S. 1, 8-10 (1944); *Moss* v. *Hornig,* 314 F. 2d 89, 93 (2d Cir. 1963).

*Yick Wo* and *Oyler* thus firmly established that an unconstitutional purpose—that is, one based on a constitutionally "unjustifiable standard"—is a ground for dismissing a case. And in the aftermath of *Oyler,* courts in this and virtually every other jurisdiction have held that an action cannot be maintained when an unconstitutional purpose has been shown.

For example, in *United States* v. *Steele,* 461 F. 2d 1148 (9th Cir. 1972), the Court of Appeals reversed a conviction where testimony by Government officials suggested that defendant (who was convicted of refusing to answer questions in a census questionnaire) was prosecuted because of his First Amendment activities. The Court held that:

> "An enforcement procedure that focuses upon the vocal offender is inherently suspect, since it is vulnerable to the charge that those chosen for prosecution are being punished for their expression of ideas, a constitutionally protected right." 461 F. 2d at 1152.

Moreover,

> "The government offered no explanation for its selection of defendant other than prosecutorial discretion. That answer simply will not suffice in the circumstances of this case." *Id.*

Similarly, in *MacDonald* v. *Musick,* 425 F. 2d 373 (9th Cir.), *cert. denied,* 400 U. S. 852 (1970), the Court of Appeals reversed a conviction where it was clear that petitioner was prosecuted for the purpose of discouraging him from exercising his First Amendment rights. The District Attorney had offered to withdraw a charge of driving while intoxicated if petitioner would stipulate to the existence of probable cause for arrest. It was admitted that the purpose of the stipulation was to prevent petitioner from suing for false arrest. When petitioner refused to stipulate he was tried and convicted. The Court of Appeals reversed on the ground that a prosecutor cannot use his discretion for the purpose of coercing a defendant into foregoing his First Amendment right to petition the Government for a redress of grievances.

In *Lenske* v. *United States,* 383 F. 2d 20 (9th Cir. 1967), appellant was convicted of tax fraud and tax evasion. On appeal, he argued that he had been prosecuted because of his political activities. In a report

recommending prosecution, a special internal revenue agent had stated that there was reason to believe that Lenske was a communist and that Lenske had engaged in a variety of left-wing activities. While the conviction was reversed on the ground that there was insufficient evidence of tax evasion, Judge Madden found it necessary to write a separate opinion in which he stated:

> "I regard what I have recited above as a scandal of the first magnitude in the administration of the tax laws of the United States. It discloses nothing less than a witch-hunt, a crusade by the key agent of the United States in this prosecution, to rid society of unorthodox thinkers and actors by using federal income tax laws and federal courts to put them in the penitentiary. *No court should become an accessory to such a project.*" 383 F. 2d at 27-28 (emphasis added).*

The Seventh Circuit dealt with the question of unconstitutional purpose at length in *United States* v. *Falk*, 479 F. 2d 616 (7th Cir. 1973) (*en banc*). There defendant moved to dismiss an indictment charging him with failure to possess a draft card on the ground that "the prosecution sought the indictment for the improper purpose of chilling the exercise of rights guaranteed by the first amendment and to punish him for participation in a draft counseling organization".

---

*Just last month, in *United States* v. *Rose*, CR No. 73-174 (D. Ore., March 5, 1974), Chief Judge Belloni expressed the same view when presented with evidence that defendant was prosecuted for tax evasion in part because he was a prominent rabbi. While granting acquittal on other grounds, he said:

> "While I've said I decided not to decide this point directly, I don't need to. It will ultimately be raised in a case where the issue is presented squarely. Time did not allow me sufficient research to make positive conclusions, but it is possible the decision to prosecute and the prosecution based in part on defendant's status as a religious leader violates his First Amendment rights to free exercise of religion. It is possible that it also violates the defendant's First Amendment rights of freedom of association. It is possible that it also deprives defendant of his liberty under the Fifth Amendment and that it deprives him of his practice of ministry and his right to be free from improper prosecution without due process of law.
>
> "Prosecution which categorizes and treats a defendant in a different and more severe manner by subjecting him to prosecution because of his status as a religious leader probably denies him equal protection of the law as is implied in the Fifth Amendment. Prosecution of the defendant under the circumstances is so repugnant to this society's basic notion of fundamental fairness. that it is shocking and probably violates the due process clause of the Fifth Amendment." (App. 347, 349-50)

479 F. 2d at 618. The district court denied the motion on the ground that the defense was invalid, and defendant was convicted. On appeal, the Seventh Circuit held that defendant's allegations, if proven, constituted a valid defense, and the court remanded with instructions that defendant's motion to dismiss should be denied only "[i]f the district court finds that the prosecution was not the result of a purpose to punish Falk for exercising First Amendment rights as a draft counselor and Vietnam protestor. . . ." 479 F. 2d at 624.

The Fifth Circuit held that purpose is a critical factor in determining the validity of an action in *United States* v. *McLeod,* 385 F. 2d 734 (5th Cir. 1967). There, several blacks were arrested, prosecuted and convicted for maintaining improper license plate lights. They claimed that the real purpose for their arrests was to inhibit a voter registration drive. Judge Wisdom, speaking for the court said:

> "If the person is clearly guilty, the probability that the police have acted for a legitimate reason is much greater than it is if the arrest is clearly baseless. But the fact that the person is guilty does not end the inquiry. Police may arrest guilty people for reasons other than their guilt—for example for the reason that they are Negroes who want to register and vote.
>
> "In [this] sort of case, then, the focus of inquiry is on the real purpose of the arrests. . . ." 385 F. 2d at 744.

After finding that the "real purpose" of the arrests and subsequent prosecutions was to inhibit the voter registration drive, the court held that state officials should be ordered to return all fines, expunge from the record all arrests and convictions and pay all attorneys' fees because "[t]he individuals so prosecuted would not have had to bear the costs of their defense had these prosecutions been enjoined as they should have been". 385 F. 2d at 750.

In *United States* v. *Crowthers,* 456 F. 2d 1074 (4th Cir. 1972), the Fourth Circuit reversed a conviction where it appeared that the decision to prosecute had been based on defendants' exercise of their First Amendment rights. Defendants were convicted of "disorderly conduct" and unauthorized leafletting while participating in a "Mass for Peace" on the steps of the Pentagon. The record suggested that the decision to prosecute was "made not by measuring the amount of obstruction or noise but because of governmental disagreement with ideas expressed by the accused". 456 F. 2d at 1079. In light of those

f·cts, the cou.. . ·ersed the convictions and held that the Governm·ent cannot enforc· laws "according to whether it agrees with the views expressed" I·

The Dis... of Columbia Circuit, in *Dixon* v. *District of Columbia*, 39· F. 2d 966 (D. C. Cir. 1968), a case similar to *Musick*, reversed a conviction where the case had been brought for the purpose of deterring appellant's exercise of First Amendment rights to petition for the redress of grievances. There, the Government had offered not to prosecute appellant on two traffic charges if he would agree to withdraw a complaint of police misconduct which he had filed with the Counsel on Human Relations. Appellant refused and was tried and convicted on both charges. In holding that a prosecution for the purpose of punishing appellant for filing his complaint "would clearly violate the first amendment", the court said:

> "The Government may not prosecute for the purpose of deterring people from exercising their right to protest official misconduct and petition for redress of grievances." 394 F. 2d at 968.

Courts in the Second Circuit have held that purpose is relevant on several occasions. In *United States* v. *Berrios*, 73-CR-308, 73-CR-22 (E. D. N. Y. Jan. 7, 1974) (App. 336, 344), the district court granted a motion to dismiss an indictment under 29 U. S. C. § 504 (holding a union office within five years after a felony conviction) where defendant alleged "that the prosecution was initiated because of the defendant's exercise of rights guaranteed by the First Amendment". Defendant charged that he was prosecuted because he was an outspoken leader of pro-McGovern forces within the Teamsters Union, and he sought production of the Government's memorandum recommending prosecution. The Government resisted on the ground, *inter alia*, that the defense was invalid; and the court, holding that the defense was valid, ordered production. When the Government refused to comply, the court dismissed the case. *See also Moss* v. *Hornig*, 314 F. 2d 89, 93 (2d Cir. 1963); *United States* v. *Elliot*, 266 F. Supp. 318, 325 (S. D. N. Y. 1967) (prosecution would be invalid if brought with "an evil motive, based upon a constitutionally impermissible standard").

Courts in the First, Third, Sixth and Eighth Circuits have also acknowledged that an unconstitutional purpose warrants dismissal, although the defendants in those cases were unsuccessful because they failed sufficiently to prove the existence of such an improper purpose.

In each of those cases, the principle that there could not be a prosecution for a constitutionally invalid reason was explicitly recognized.*

Indeed, in one of the cases relied upon by the Government, *United States* v. *Berrigan*, 482 F. 2d 171 (3d Cir. 1973), defendants had moved for acquittal on the ground that they were being prosecuted because of their opposition to the war in Vietnam. While the district court denied the motion because defendants failed to prove the existence of an unconstitutional purpose, it added:

> "Could these motives, attributed to the Department of Justice, be sustained there would be no doubt in our mind that prosecution here would fall outside of the proscribed limits of the discretionary control of the executive over the prosecution of criminal cases." 347 F. Supp. at 928.

Quoting from that language on appeal, the court of appeals affirmed but also acknowledged that such a defense, if established by the evidence, was sufficient in law. 482 F. 2d at 176, 179.

The decisions cited above provide ample authority for the legal sufficiency of the networks' defenses. They show that the Government's motion to strike must be denied for each of three separate and independent reasons.

*First,* the defenses are legally sufficient because the conduct alleged constitutes an attempt to place a price on the exercise of First Amendment rights. *See, e.g., MacDonald* v. *Musick*, 425 F. 2d 373; *Dixon* v. *District of Columbia*, 394 F. 2d 966; *Lenske* v. *United States*, 383 F. 2d 20. The principle involved is described in *Scott* v. *United States*, 419 F. 2d 264 (D. C. Cir. 1969). There the court, noting that "the standards which guide prosecutors in the exercise of their discretion are as much a part of the law as the rules applied in court", held that plea bargaining could not be entered into "with the goal of deter-

---

**See United States* v. *Gebhart*, 441 F. 2d 1261, 1265 (6th Cir.), *cert. denied*, 404 U. S. 855 (1971) ("decision to prosecute . . . based upon some invidious or inherently suspect classification such as ones based upon race, religion, wealth or political beliefs"); *United States* v. *Alarik*, 439 F. 2d 1349, 1351 (8th Cir 1971) ("an unjustifiable standard such as race, religion, or other arbitrary classification"); *United States* v. *Malinowski*, 347 F. Supp. 347, 354 (E. D. Pa. 1972), *aff'd*, 472 F. 2d 850 (3d Cir.), *cert. denied*, 411 U. S. 970 (1973) ("decision to prosecute . . . influenced by . . . political persuasion"); *United States* v. *Maplewood Poultry Co.*, 320 F. Supp. 1395, 1396 (D. Me. 1970) ("Prosecutions . . . deliberately based upon any arbitrary, illegal or otherwise unjustifiable standard").

ring the defendant from the exercise of his right to trial". 419 F. 2d at 277-78. According to the court, such a purpose violated defendant's constitutional rights because,

> "[w]hether the defendant surrenders his right to trial because of a bargain with court or prosecutor, or exercises his right at the cost of a stiffer sentence, *a price has been put on the right.*" 419 F. 2d at 271 (emphasis added).

Courts have repeatedly proscribed governmental action that has such a purpose or effect. *See, e.g., United States* v. *Jackson,* 390 U. S. 570 (1967); *Lamont* v. *Postmaster General,* 381 U. S. 301, 307 (1965); *Sherbert* v. *Verner,* 374 U. S. 398, 404-05 (1963); *Murdock* v. *Pennsylvania,* 319 U. S. 105, 113 (1943); *Grosjean* v. *American Press Co.,* 297 U. S. 233, 251 (1936). As the Court said in *Follett* v. *McCormick,* 321 U. S. 573, 577 (1944):

> "The exaction of a tax as a condition to the exercise of the great liberties guaranteed by the first amendment is as obnoxious (*Grosjean* v. *Amercian Press Co., supra; Murdock* v. *Pennsylvania, supra*) as the imposition of a prior restraint."

*Second,* the defenses are legally sufficient because the conduct alleged constitutes a discriminatory enforcement of the laws in violation of the due process clause of the Fifth Amendment. *Bolling* v. *Sharpe,* 347 U. S. 497 (1954). Discrimination cases generally take on two forms. In some cases, unlawful discrimination is demonstrated by by the impact of governmental action. *E.g., Yick Wo, supra.* In other cases, where unlawful discrimination cannot be demonstrated by impact alone, courts have recognized that it can be demonstrated by proof of an unconstitutional purpose. *See, e.g., Swain* v. *Alabama,* 380 U. S. 202 (1965) (jury selection); *Oyler* v. *Boles,* 368 U. S. 448 (1962) (prosecutions); *Edelman* v. *California,* 344 U. S. 357, 359 (1954) (prosecutions); *Snowden* v. *Hughes,* 321 U. S. 1, 8-10 (1944) (election certification); *Williams* v. *Field,* 416 F. 2d 483, 486 (9th Cir. 1969), *cert. denied,* 397 U. S. 1016 (1970) (treatment of prisoners); *Moss* v. *Hornig,* 314 F. 2d 89, 93 (2d Cir. 1963) (prosecutions); *Taylor* v. *Board of Education,* 191 F. Supp. 181, 194 (S. D. N. Y.), *aff'd,* 294 F. 2d 36, 39 (2d Cir. 1961) (school redistricting); Ely, *Legislative and Administrative Motivation in Constitutional Law,* 79 YALE L. J. 1205 (1970).

We recognize, as others have, that because of the breadth of the antitrust laws and the limited resources of the Antitrust Division "[a]ll complaints cannot be prosecuted. A selection must be made." Arnold, *Fair and Effective Use of Present Antitrust Procedure*, 47 YALE L. J. 1294, 1300 (1938). Thus, failure to prosecute others, in and of itself, does not demonstrate unlawful discrimination. Selection of these defendants from among all potential defendants when prompted by an unconstitutional purpose, however, does.*

*Third,* the defenses are legally sufficient because the conduct alleged constitutes an impermissible use of the powers vested in the executive branch by the Constitution and laws of the United States. The Government does not have inherent or plenary power to bring civil antitrust actions; it is authorized to bring such actions by 15 U. S. C. § 4, an act of Congress. The only power the Government has with respect to the laws of Congress is to execute them "faithfully" pursuant to Article II, § 3 of the Constitution. *Commonwealth of Pennsylvania* v. *Lynn*, 362 F. Supp. 1363, 1372 (D. D. C. 1973); *cf. Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 587 (1952). Execution of the laws for a purpose that Congress could not have intended to make relevant—here for the purpose of deterring the exercise of First Amendment rights—is an impermissible use of those powers and, as such, it cannot stand. *E.g., State Highway Commission* v. *Volpe*, 479 F. 2d 1099, 1114 (8th Cir. 1973) (Secretary of Transportation may not exercise discretion "to withhold approval of construction projects for reasons remote and unrelated to the [Federal Aid Highway] Act"); *D. C. Federation of Civic Ass'ns* v. *Volpe*, 459 F. 2d 1231, 1247 (D. C. Cir. 1972) (political pressures are "'considerations that Congress could not have intended to make relevant'"); *Wong Wing Hang* v. *Immigration & Naturalization Service*, 360 F. 2d 715, 718-19 (2d Cir. 1966) (Attorney General may not exercise his discretion for "'considerations that Congress could not have intended to make relevant'"). *Cf. Accardi* v. *Shaughnessy*, 347 U. S. 260, 265-68 (1954) As the court said in *DeVito* v. *Shultz*, 300 F. Supp. 381, 383 (D. D. C. 1969),

*In *United States* v. *Falk, supra,* an initial appellate panel rejected Falk's arguments of discrimination because he alleged unconstitutional purpose but "he did not allege that other registrants had not been prosecuted for the same or equivalent offenses". 472 F. 2d 1101, 1107 (7th Cir. 1973). Reviewing Falk's allegation of unconstitutional purpose, however, the Seventh Circuit sitting *en banc* found that "[i]n the present case intentional discrimination is alleged" 479 F. 2d at 619.

with respect to the Secretary of Labor's discretion to bring suits under the Labor-Management Reporting and Disclosure Act:

> "... The courts have a duty to maintain minimum standards in the Executive Department to assure that the wishes of Congress are not frustrated. This duty has been clear since Marbury v. Madison, 1 Cranch (5 U. S.) 137 (1803). . . . Therefore, plaintiffs have a judicially enforceable right to demand that the Secretary exercise his discretionary authority in a manner consistent with the requirements of the Act and not arbitrarily or capriciously."

Particularly pertinent here is *Chattanooga Pharmaceutical Ass'n* v. *United States Department of Justice*, 358 F. 2d 864 (6th Cir. 1966) (*per curiam*). There the Department served a civil investigative demand on the Association pursuant to 15 U. S. C. § 1312(a), which empowers the Department to issue such a demand whenever it has reason to believe that a person may have evidence relevant to a civil antitrust investigation. The Association moved to quash the demand on the ground, *inter alia*, that it was

> "... a plan to utilize the full forces of the United States Government and the Department of Justice to intimidate, harass and under duress force four members of your petitioner to drop a suit now pending in this Honorable Court for the enforcement of the Tennessee Fair Trade Act. . . ." 358 F. 2d at 866.

The Government did not respond to the Association's allegations, and the court, taking those allegations as true,* quashed the demand and held:

> "... It seems plain to us that Congress did not intend, nor should the Courts permit, a use of the salutory provisions of the Antitrust Civil Process for the purpose conceded by the pleadings in this case." 358 F. 2d at 867.

*In a subsequent case, *American Pharmaceutical Ass'n* v. *United States Dep't of Justice, Antitrust Div.*, 467 F. 2d 1290 (6th Cir. 1972), the Government denied allegations of an improper purpose and submitted uncontroverted evidence in support of that denial. Holding that the association moving to quash a civil investigative demand had failed to demonstrate improper purpose, the court denied the motion. In the present posture of this case, by contrast, allegations of improper purpose must, as in *Chattanooga Pharmaceutical*, be taken as true.

The few authorities cited by the Government do not undercut in any way the three separate constitutional reasons why the networks' defenses are valid here. The court in *United States* v. *Association of American Railroads*, 4 F. R. D. 510 (D. Neb. 1945) (cited at Gov't Memo, pp. 16-17), holding that matters going beyond the face of the complaint could not be considered on a 12(b)(6) motion, declined to consider affidavits alleging that the case was brought for the purpose of undermining a congressional grant of limited antitrust immunity. The court, however, added:

> "It is conceivable that, upon the final trial on its merits of this action, the contention just adverted to may develop from the evidence to be true . . . . In that eventuality the court will readily meet the issue thus presented, and also and as its preliminary step, determine whether such a suit may be tolerated . . . ." 4 F. R. D. at 523.

The Government's reliance on *Dear Wing Jung* v. *United States*, 312 F. 2d 73 (9th Cir. 1962) (Gov't Memo, pp. 19-20), is similarly misplaced. The court there did not hold that the defense of unconstitutional purpose was legally insufficient, but only that defendant's motion to dismiss failed and his offer of proof was properly rejected because his allegations related to the Immigration and Naturalization Service and

> "[t]he decision whether to prosecute an offense against the United States rests with the United States Attorney rather than with the Immigration and Naturalization Service, which is merely the investigative agency." 312 F. 2d at 75.

Contrary to the Government's view, *Dear Wing Jung* simply is not inconsistent with the more recent opinions of the Court of Appeals for this Circuit in *Steele*, *Musick* and *Lenske supra*, all of which find the unconstitutional purpose defense sufficient in law.

The Government's long discussion of *Perma Life Mufflers* v. *International Parts Corp.*, 392 U. S. 134 (1968) (Gov't Memo, pp. 11-12), where the Supreme Court refused to apply the *in pari delicto* defense, is wholly beside the point. That case was a private treble damage action brought for a lawful purpose where plaintiff's illegal acts were raised as a defense. It was not alleged that the suit was com-

menced in furtherance of any illegal acts and, indeed, Justice White noted that the result would have been different if the suit were brought "to further an unlawful . . . arrangement". 392 U. S. at 145 (concurring opinion). Most important, *Perma Life* was concerned with "the inappropriateness of invoking broad common-law barriers to relief where a suit serves important public purposes". 392 U. S. at 138. Here the barrier to relief is the Constitution, not the common law. Congress does not have the power to eliminate a constitutional barrier to relief, and it is pointless to suggest that it intended to do so.

That is why the Government's reliance (Gov't Memo, pp. 12-16) on *United States* v. *Cotton Valley Operators Committee*, 75 F. Supp. 1 (W. D. La. 1948), is also misplaced. There the district court concluded that, if the Government brought that case for the purpose of repaying a political debt, that would not be a defense. It is clear, however, that the defendant never charged the Government with an unconstitutional purpose in bringing the action, nor, of course, did the district court view the defense as founded on the Constitution.*

The remainder of the Government's argument (Gov't Memo, pp. 18-19) rests on *United States* v. *O'Brien*, 391 U. S. 367 (1968). In that case defendant burned his draft card in protest against the Vietnam war. He argued that the statute outlawing such actions was passed for the purpose of stifling protest, but the Court said that the judiciary should not examine the legislature's purpose, a legitimate purpose being apparent on the face of the statute. The Government argues that the same principle applies with respect to the executive's purpose, but that is not the law.

The Supreme Court has consistently treated the executive and legislative branches quite differently for reasons suggested in *O'Brien*:

> "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork." 391 U. S. at 384.**

---

*Cf. *Carignan* v. *United States*, 48 F. R. D. 323, 327-28 (D. Mass. 1969), which distinguishes between the inherent disciplinary power possessed by federal courts when United States attorneys or their agents are charged with constitutional or federal statutory violations and the absence of such power when the claim against them has some other basis.

***McCray* v. *United States*, 195 U. S. 27 (1904), upon which the Government also relies (Gov't Memo, pp. 17-18), like *O'Brien* deals with review of Congress's purpose in legislating—there to tax yellow margarine more than uncolored margarine—and has nothing to do with review of actions taken by the executive branch.

No such problem is presented by the inherently hierarchical structure of the executive branch. As Professor Bickel has noted, inquiry into the executive's purpose does not entail the "difficulty of proof, which is in fact insuperable when legislative motive is in question. . . ." A. BICKEL, THE LEAST DANGEROUS BRANCH 214 (1962).

Thus, in cases both prior and subsequent to *O'Brien* the Supreme Court has held that the purpose of officials within the executive branch is relevant in determining whether their actions are constitutionally proper. *See, e.g., Gutknecht* v. *United States,* 396 U. S. 295, 307-08 (1970); *Oestereich* v. *Selective Service Board,* 393 U. S. 233, 237 (1968); *Dombrowski* v. *Pfister,* 380 U.S. 479, 490 (1965); *Oyler* v. *Boles,* 368 U. S. 448, 456 (1962); *Edelman* v. *California,* 344 U. S. 357, 359 (1953); *Snowden* v. *Hughes,* 321 U. S. 1, 8-10 (1944).*

The Government places great weight on the important public policies served by the Sherman Act. We do not question those policies or their importance. But those considerations are quite beside the point in assessing the legal sufficiency of the defenses. The imperatives of the Constitution clearly take pecedence over any statutory policy, and among the values enshrined in the Constitution, none has a higher place than the rights protected by the First Amendment. *Murdock* v. *Pennsylvania,* 319 U. S. 105, 115 (1943).

Hence, even if we supposed that there were merit in the Sherman Act claims now advanced, the prohibitions of the First Amendment would nonetheless have to prevail.** Indeed, the courts have not hesi-

---

*The argument that *O'Brien* precludes examination of the Government's purpose in commencing an action has been made before and emphatically rejected. *United States* v. *Falk,* 479 F. 2d 616, *rev'g en banc,* 472 F. 2d 1101 (7th Cir. 1973). The validity of *O'Brien* even in the legislative context may be questionable after *Palmer* v. *Thompson,* 403 U. S. 217 (1971), another case relied upon by the Government (Gov't Memo, p. 18). There, five Justices examined the legislative purpose in determining the constitutionality of a decision by the city council of Jackson, Mississippi, to close down the municipal swimming pools. Four found an improper purpose, while the fifth (Mr. Justice Blackmun) found that the city council's purpose was proper.

**Although, for purposes of this motion, we assume *arguendo* the sufficiency of the complaints, they appear unsupported by any known Sherman Act principles or precedent. For example, the complaints allege that the television networks (contrary to what everyone knows to be the case) do not compete with each other in that each is said to constitute a separate "relevant market" for purposes of the Government's monopolization claim (CBS Complaint ¶ 19, ABC Complaint ¶ 17, NBC Complaint ¶ 16). Yet elsewhere in the same complaints the Government recognizes that a "relevant market" cannot be defined as a single television network when it

tated to dismiss cases brought for unconstitutional purposes even where the prosecution was appropriate on the merits of the claim. In *Yick Wo,* for example, the defendants admittedly violated the ordinance under which they were charged. In *Falk,* the defendants admitted nonpossession of his draft card in violation of the Selective Service Act. In *Steele,* the defendant conceded that he had refused to complete a census questionnaire in violation of 13 U. S. C. § 221(a). In *Crowthers,* the Fourth Circuit, evaluating defendants' conduct without reference to the Government's purpose, found that "[n]othing else appearing, the convictions would have to be affirmed." 456 F. 2d 1074, 1078. And in *Dixon,* the District of Columbia Circuit held that even "if the Government should have prosecuted Dixon in the first place . . . . "We must . . . . bar prosecutions which are brought because the defendant refused to promise or reneged on a promise not to file a complaint against the police". 394 F. 2d at 969.

In short, while we believe that the Government's complaints here are implausible on their face and will ultimately prove to be devoid of merit, the defenses are valid irrespective of the merits of the Government complaints and not "affected by the prospects of its success or failure." *Dombrowski* v. *Pfister,* 380 U. S. 479, 487 (1965).

It has been a fundamental tenet of judicial enforcement of the right to freedom of speech (as with other First Amendment freedoms) that speech is protected from indirect as well as direct assaults. Not only is censorship proscribed, but also all other governmental action that might serve to restrain, inhibit or chill the fullest exercise of the freedom of speech. *Dombrowski* v. *Pfister,* 380 U. S. at 487; *Follett* v. *McCormick,* 321 U. S. 573, 577 (1944); *Grosjean* v. *American Press Co.,* 297 U. S. 233 (1936). The First Amendment's freedoms "are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." *Healy* v. *James,* 408 U. S. 169, 183 (1973). *Falk, Steele, Lenske, Dixon, Musick* and *Chattanooga Pharmaceutical* all involved indirect attempts to penalize the exercise of constitutionally protected rights by means that were not, on their face directed at the exercise of those rights.

states that ". . . the *three* nationwide commercial television networks (CBS, NBC and ABC) constitute the primary market for television entertainment programs" (CBS Complaint ¶ 12, ABC Complaint ¶ 10, NBC Complaint ¶ 10; emphasis supplied). While this is not the place to pursue those problems, such fundamental inconsistencies in the definition of the "market" supposed to be monopolized at the very least cast further doubt on the purpose to be served by the litigation.

Similarly, although the defense of unconstitutional purpose has been raised primarily in criminal litigation, there is no doubt that it is equally applicable in civil actions designed to chill the exercise of First Amendment rights. Thus, in *Boyd* v. *United States*, 345 F. Supp. 790, 792 (E. D. N. Y. 1972), the court observed:

> "A prosecutor may not use his discretion in initiating or conducting proceedings—*whether criminal or civil*—to derogate the statutory or constitutional rights of defendants or others. . . ." (Emphasis added.)

The chilling effect of civil litigation can be just as great if not greater than that of criminal litigation. Thus, it could hardly be contended that the nominal fines involved in *Dixon, Musick, Crowthers* and *Steele* had a greater chilling effect than the burdens imposed by a major antitrust action under a statute which also carries criminal penalties (15 U. S. C. §§ 1, 2) and which, by providing that a Government judgment of liability may be used as *prima facie* evidence in private litigation (15 U. S. C. § 16(a)), can be used to recover a statutorily required award of treble damages (15 U. S. C. § 15). Indeed, even comparatively circumscribed private litigation has been held unduly to deter freedom of expression. As the Supreme Court said in *Rosenbloom* v. *Metromedia*, 403 U. S. 29, 52-53 (1971):

> "The very possibility of having to engage in litigation, an expensive and protracted process, is threat enough to cause discussion and debate to 'steer far wider of the unlawful zone' thereby keeping protected discussion from public cognizance."

And as the Supreme Court held in *New York Times Co.* v. *Sullivan*, 376 U. S. 255, 277 (1964):

> "What a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law of libel. The fear of damage awards under a rule such as that invoked by the Alabama courts here may be markedly more inhibiting than the fear of prosecution under a criminal statute."

By this motion to strike, the Government asserts that it should be a matter of total indifference to this Court whether, as alleged in the defenses, this action was brought with the purpose of suppressing free-

dom of speech. For the reasons stated, there is no support in law or policy for the Government's position and it should be rejected by this Court.

**B. There are Good Grounds to Support the Defenses of Unconstitutional Purpose.**

The defenses of unconstitutional purpose were not lightly interposed here. They were advanced largely on the basis of facts which were first disclosed in the course of governmental investigations over the past several months. Those facts and the inferences which they justify are of such compelling significance to these actions that we could not fail to plead the matter and to seek the discovery warranted by such pleading.

We show below that those facts are not controverted by the Government's affidavits. We also show that they appear to present a triable issue. We do not, however, suggest that the defenses are conclusively established at this preliminary stage, prior to any discovery. We suggest only that the facts provide ample warrant for the defenses and for the discovery we have sought.

1. *The Government's Affidavits Do Not Traverse the Averments of the Defenses.*

The affidavit of Hamilton P. Fox, III (an attorney in the office of the Watergate Special Prosecution Force), discloses that the Government's purposes in bringing these actions is the subject of an ongoing criminal investigation and asserts that the "evidence" available to him "indicates" that these actions "were motivated by proper, antitrust considerations" (¶ 3).

While the Fox affidavit is somewhat unclear as to the scope of his investigation, it appears to have been limited largely to the files and personnel of the Department of Justice.* There is no indication

*Even as to the files of the Department of Justice, there is room to doubt the possibility of a sufficient review. For example, the Government's trial counsel has conceded that the typewritten copies of Mr. McLaren's memorandum to the Attorney General and the Deputy Attorney General (a draft of which is annexed to Mr. McLaren's affidavit) cannot be found in the Department's files. (App. 53) This may be explained in part by the fact that, following Mr. Mitchell's resignation as Attorney General, a "house cleaning operation" conducted by the Executive Assistant to the Attorney General resulted in the dispersal of some files and the return of some documents to the White House. (App. 54, 294-95)

in the affidavit that Mr. Fox's investigation has yet included present or former members of the White House staff and their files, but that is precisely the focus of the discovery we seek. We have never challenged the complete good faith of the staff of the Antitrust Division; but, as we show below, it is clear both from the Government's affidavits and from other sources that officials at much higher levels in the Administration were involved in the decision to commence these long deferred actions. An investigation that has not covered those aspects of the matter is necessarily inconclusive, and Mr. Fox acknowledges that "the investigation is not yet complete" (¶ 2). In all events, neither the Court nor counsel here can abdicate their functions on the basis of an affidavit satisfying none of the standards of Rule 56(e), Fed. R. Civ. P.

The affidavits of Richard W. McLaren (head of the Antitrust Division from February 1, 1969, to February 2, 1972) and Walker B. Comegys (acting head of the Antitrust Division from February 3, 1972, to June 27, 1972) deny that they recommended the filing of complaints against CBS, NBC and ABC for any purpose other than enforcement of the antitrust laws. Those assertions do not address the questions raised by the defenses. The Government's suggestion that the defenses "impute improper motives to former officials of the Antitrust Division and reflect upon their character and professional conduct" (Gov't memo, p. 30) is simply misplaced indignation. The denials of personal impropriety by Messrs. McLaren and Comegys do not meet the thrust of the defenses.

It is clear from the affidavits submitted by the Government that neither the head of the Antitrust Division nor his staff had ultimate control over the decision to commence these actions and that that control was exercised either by the Attorney General or by those upon whose instructions the Attorney General acted. (See *Ponzi* v. *Fessenden*, 258 U. S. 254, 262 (1922) (the Attorney General is "the hand of the President"). Mr. McLaren *recommended* the commencement of antitrust actions to Attorney General Mitchell, but Mr. Mitchell did not authorize the filing of the complaints (McLaren Aff. ¶¶ 5, 7, 9). Mr. Comegys *urged* Acting Attorney General Kleindienst to approve the actions, but he ultimately proceeded only upon Mr. Kleindienst's instructions (Comegys Aff. ¶¶ 3, 5).

In short, the recommendation of the Antitrust Division has not been sufficient for the commencement of an antitrust action. The

Sherman Act provides that such actions shall be brought only "under the direction of the Attorney General" (15 U. S. C. § 4). That requirement was imposed by Congress with careful advertence. The reason for the language—"under the direction of the Attorney General"—was described by Representative Culberson during debate in the House of Representatives:

> "This is a very grave proceeding. It will probably involve immense litigation in the courts. The legislation contemplated is so far-reaching, affecting such large and important interests, that I do not think a district attorney in a rural district or elsewhere outside of the great commercial centers should be empowered to bring a suit to restrain these combinations unless under the direction of the Attorney-General." 21 Cong. Rec. 4090 (1890), Bills and Debates in Congress Relating to Trusts, Fiftieth Congress to Fifty-Seventh Congress, First Session, Inclusive, S. Doc. No. 147, 57th Cong., 2d Sess. at 332 (1903).

To the question whether this provision required the Attorney General's approval in every instance, the response was affirmative:

> "Mr. Henderson, of Iowa. I call the gentleman's attention to that point for this reason: Cases might arise where an injunction or a restraining order ought to be obtained promptly from the court, and it might involve too much delay if, for instance, a district attorney in Texas had to write to the Attorney-General in Washington to get authority to act.
>
> "Mr. Culberson, of Texas. Well, in such matters we rely now upon the telegraph. I do not think the bill can be improved in that respect. It would be very unwise, in my judgment, to invest the district attorneys throughout the United States with such authority." *Id.*

The defense here questions the basis upon which the Attorney General exercised his statutory authority in directing the commencement of antitrust suits against three television networks just six months before a presidential election. The affidavits submitted by the Government do not answer that question. Significantly, the Government did not file an affidavit by former Attorney General Kleindienst, who authorized these suits, who signed the complaints, and whose deposition

is resisted by the Government. Nor did the Government file affidavits from 13 of the other 14 persons whose depositions have been noticed, and, as the documents described below make clear, those persons (including Messrs. Magruder, Haldeman, Colson, Ehrlichman and Mitchell) appear to have been involved in the Administration's consideration of litigation against the networks. Indeed, as we show below, the affidavits the Government did submit, when taken together with other information now available, clearly tend to support the averments of the defenses and, at a minimum, demonstrate the existence of genuine issues of fact and the appropriateness of the discovery requested.

2. *The Affidavits Submitted by the Government Together With Other Information That Is Now Public Demonstrate That There Is a Genuine Issue of Fact.*

On October 17, 1969, at the request of White House Chief of Staff H. R. Haldeman, the White House Deputy Director of Communications J. S. Magruder wrote a memorandum entitled "The Shot-gun versus the Rifle". That memorandum set forth a proposal designed to "have much more impact on the media and other anti-administration spokesmen" than numerous isolated actions by members of the White House staff. Magruder proposed "to use the power at hand to achieve our long term goals which is [*sic*] eight years of a Republican Administration".

Magruder suggested five specific White House actions against the media to achieve those goals:

"1. Begin an official monitoring system through the FCC as soon as Dean Burch is officially on board as Chairman . . . .

"2. *Utilize the antitrust division to investigate various media relating to antitrust violations. Even the possible threat of anti-trust action I think would be effective in changing their views in the above matter.*

"3. Utilizing the Internal Revenue Service as a method to look into the various organizations that we are most concerned about. Just a threat of a IRS investigation will probably turn their approach.

> "4. Begin to show favorites within the media. Since they are basically not on our side let us pick the favorable ones as Kennedy did. I'm not saying we should eliminate the open Administration, but by being open we have not gotten anyone to back us on a consistent basis and many of those who were favorable towards us are now giving it to us at various times, i.e., Ned Lewis, Hugh Sidey.
>
> "5. Utilize Republican National Committee for major letter writing efforts. . . ." (Emphasis added.) (App. 5-6)

If these lawsuits against the networks were instituted as part of an effort to change their "views", they constitute a flat violation of the First Amendment. The Magruder memorandum is evidence of such an effort and that utilization of the Antitrust Division was part of the plan.

Furthermore, there is evidence that Magruder's proposals did not fall on deaf ears. Thus, his memorandum proposed "an official monitoring system through the FCC as soon as Dean Burch is officially on board as Chairman". Two weeks later, on October 31, 1969, Dean Burch became Chairman of the FCC, and on November 4, 1969, at the behest of the White House, he called the President of CBS (and subsequently the Presidents of ABC and NBC) to request a readily available transcript of the news analysis carried by CBS News following the President's address of November 3. (App. 58-59, 296-97) There is no explanation of why the White House should impose on the chairman of an independent agency, responsible for regulating broadcasting, to call the presidents of three network organizations in order to obtain readily available transcripts unless the White House was seeking a method of forcefully signaling that, henceforth, network news would be closely monitored by the Administration. Chairman Burch subsequently indicated that he had simply been unaware of the proper protocol, that the approach had been "unwarranted", and that the FCC would not serve as "the national 'arbiter' of the 'truth' of a news event". (App. 60-61)* Thereafter the White House continued its monitoring of network news without involving the FCC. (App. 8-11, 66-67, 96-97, 299)

*In a statement adopted unanimously by the FCC on November 20, 1969, and widely interpreted as a clarification of the matter, the Commission stated:

> "... in a democracy, dependent upon the fundamental rights of free speech and press, no Government agency can authenticate the news, or should try to do so. Such an attempt would cast the chill of omnipresent government

It is now also apparent that the White House made strenuous efforts to utilize the Internal Revenue Service "as a method to look into" organizations hostile to the Administration and to "turn their approach". (App. 68, 155-56, 163-64) The White House did "show favorites within the media"; a program of "massive, official hostility to all but a few, selected portions of the news media" became apparent to the White House press corps. (App. 71, 98) The White House did launch "major letter writing efforts", including ghost-written telegrams attacking newsmen to be sent "by 20 names around the country from our letter writing system". (App. 80-97) Finally, two months after the Magruder memorandum was written, draft complaints against the networks were on Mr. McLaren's desk and were "the subject of extensive review and analysis". (McLaren Aff. ¶ 4)—notwithstanding the earlier decision to hold the Antitrust Division's investigation in abeyance "pending a determination of the issues involved in the FCC proceeding" (Gov't Memo, p. 3), which determination was not reached until five months later.

These indications that there was follow-through on Magruder's proposals all support the inference that the decision to commence this litigation was influenced by the constitutionally impermissible considerations Magruder advanced. But that inference is also supported by other circumstances. There is evidence, discussed below, (1) that the Administration carried out a program involving numerous departments and agencies, to utilize the machinery of the Federal Government to punish those deemed to be political enemies, (2) that that partisan program extended to at least some of the activities of the Antitrust Division (albeit apparently without the knowledge of the Division head or his staff as to the purposes being served), and (3) that the Administration perceived the news media—and the networks in particular—to be enemies against which the most intensive pressure should be directed.

*First.* In August 1971, Counsel to the President, John Dean, outlined for H. R. Haldeman and John Ehrlichman a program designed to "maximize the fact of our incumbency in dealing with persons known to be active in their opposition to our administration" by determining "how we can best screw them (*e.g.*, grant availability, federal contracts,

censorship over the newsmen's independence in news judgment. Were this the case a newsman might decide to 'play it safe,' and not broadcast a valuable news story or documentary for fear he might later be held up to censure. This Commission is thus not the national arbiter of the 'truth' of a news event. It cannot properly investigate to determine whether an account or analysis of a news commentator is 'biased' or 'true.'" 20 P&F Radio Reg. 2d 1223, 1224. (App. 63-64)

*litigation, prosecution,* etc.)" (App. 139-40; emphasis added) Documents released in recent months have shown that there existed within the White House a disposition to use the machinery of various branches of the federal government for political or other improper purposes.

For example, White House memoranda have evidenced an avowedly successful but secret program in early 1972 for "improving departmental responsiveness in support of the President's re-election". (App. 142-44) An investigation by the Special Subcommittee on Intelligence of the House Armed Services Committee disclosed that top White House officials enlisted the Central Intelligence Agency in the illegal domestic activities of the White House "plumbers." (App. 145-48) The subcommittee found "there existed in the White House staff a propensity for using the CIA for purposes not intended by the Congress". (App. 147)

The White House made repeated and strenuous efforts to utilize the Internal Revenue Service for improper purposes. In 1972 John Dean gave the Commissioner of the IRS the now notorious list of Administration "enemies" with the instruction that they be subjected to special audits and the request to "see what type of information could be developed". (App. 68-69) In March 1970 Special Assistant to the President Patrick J. Buchanan urged getting "a friendly fellow with a friendly staff in the Tax-Exempt office" willing "to engage in combat with some of these lesser anti-adminstration institutions". (App. 149-54) In 1973, the district court in *Center on Corporate Responsibility, Inc.* v. *Schultz,* 368 F. Supp. 863 (D. D. C. 1973) found:

> "Plaintiff was denied a favorable ruling because it was singled out for selective treatment for political, ideological and other improper reasons which have no basis in the statute and regulations. . . ." 368 F. Supp. at 880.

Investigations of such misuse of the IRS are continuing. (*See* App. 163-64, 155)

This willingness of the White House to use the various branches of the federal government to penalize political "enemies" supports at least inferentially the validity and serious nature of an inquiry into whether the Antitrust Division was also used as a perhaps unwitting instrumentality to get the media to change their supposed views.

*Second.* Directly and indirectly, members of the White House staff were, in fact, deeply involved in decision-making with respect to the work of the Antitrust Division. Mr. McLaren's affidavit discloses that at least three members of the White House Staff were involved in the Department's actions in these cases many months before the

actions were commenced: Herbert Klein, White House Director of Communications; John Ehrlichman, Assistant to the President for Domestic Affairs; and Richard A. Moore, Special Counsel to the President. (McLaren Aff. ¶¶ 9, 10, 11 and Exhibit A)*

Furthermore, the White House has now disclosed that in April 1971, the President established an antitrust clearinghouse at the White House "to ensure that the President's views on the subject could be made known to all the operating agencies." (White House statement on ITT at App. 101-02)

The establishment of the White House antitrust clearinghouse itself resulted from the President's irritation at the Department's lack of responsiveness to his wishes with respect to the ITT litigation. It is now clear that, contrary to the testimony of Mr. Kleindienst and others, first John Ehrlichman and then the President personally directed the Department's decisions at a critical stage in that litigation and that the President had found it necessary to instruct Mr. Kleindienst in blunt and insulting terms to refrain from an appeal, notwithstanding threats of resignation of both Kleindienst and the Solicitor General. (App. 101-08)**

*It should also be noted that Mr. McLaren's recollection is apparently faulty in significant respects. Thus, his affidavit states that he discussed the proposed complaints "with Richard A. Moore (who was at that time a special assistant to the Attorney General and who had extensive experience in the television industry) on different occasions during the Spring and Summer of 1971" (McLaren Aff. ¶ 6). However, Mr. Moore testified before the Senate Select Committee on Presidential Campaign Activities: "In April 1971 I was appointed special counsel to the President." (App. 118) It appears, therefore, that at the time that Mr. McLaren was reviewing "the proposed allegations" and "the form of relief to be requested" with Mr. Moore, Mr Moore was not in the Department of Justice as McLaren supposes but rather in the White House.

**In April 1972 then Acting Attorney General Kleindienst stated to the Senate Judiciary Committee holding hearings on his nomination to be Attorney General:

> "In the discharge of my responsibilities as the Acting Attorney General in these cases, I was not interfered with by anybody at the White House. I was not importuned; I was not pressured; I was not directed. I did not have conferences with respect to what I should or should not do. So, I know that.
>
> * * *
>
> "... I would have had a vivid recollection if someone at the White House had called me up and said, 'Look, Kleindienst, this is the way we are going to handle that case'.... No such conversation occurred." (App. 104-05)

This testimony has been directly rebutted by the Presidential statement on the ITT case. (App. 101-02) Indeed, according to the *New York Times*, the President called Kleindienst on the telephone and said: "You son of a bitch! Don't you understand the English language?" followed directly by an order to drop the appeal. (App. 117)

Moreover, recent disclosures from the White House files show more instances in which the White House staff involved itself in antitrust matters with unconstitutional objectives. In late 1971, Counsel to the President John Dean coordinated White House efforts to counter a series of investigatory newspaper articles on the business affairs of Mr. Rebozo undertaken by *Newsday*, an east coast corporate affiliate of *The Los Angeles Times*. Carefully considered as part of this effort was launching "the most likely antitrust action that might be considered" against *The Los Angeles Times*. (App. 119-23)

Likewise in late 1971, White House documents show that Special Counsel Charles Colson became aware of a pending Antitrust Division investigation of the Associated Milk Producers, Inc. and secretly warned H. R. Haldeman:

> "If this goes too far there will be a number of very serious adverse consequences which I would be glad to elaborate on in detail. I do think this should be taken up at one of your meetings. I would like to stay out of it." (App. 124)

After John Dean had looked into "current activities" within the Justice Department and Haldeman, Dean and Magruder had a meeting on "political matters" with Attorney General John Mitchell, Mr. Mitchell turned down Assistant Attorney General McLaren's repeated requests for a grand jury investigation of the Associated Milk Producers, Inc. (App. 125-130). Significantly, an affidavit by Mr. McLaren filed elsewhere indicates that he was unaware of the involvement of the White House staff in blocking a criminal investigation by the Antitrust Division. (App. 132-33; see also App. 295)*

---

*Documents in the Appendix (App. 124-138) disclose the following chronology:

On September 9, 1971, McLaren sought authorization for a grand jury investigation into possible antitrust violations by Associated Milk Producers, Inc. (AMPI). (App. 128-29) On September 24, 1971, Colson informed Haldeman of the Antitrust Division investigation of the milk cooperatives. (App. 124) On September 28, 1971, Strachan reminded Haldeman of the investigation, stating: "John Dean is checking this report on a very low key basis. A talking paper for the Attorney General is attached." (App. 125) Dean forwarded a report on the investigation to Strachan on October 6, 1971. (App. 126) On October 29, 1971, McLaren again asked Mitchell to approve a grand jury. (App. 129) A "political matters" meeting with Attorney General Mitchell, Haldeman, Magruder and Strachan was scheduled for November 4, 1971, to discuss, *inter alia*, this antitrust investigation. (App. 127) About November 30, 1971, Mitchell instructed McLaren to proceed civilly, without a grand jury. (App. 129-30)

*Third.* The overall object of Magruder's proposals was to ensure "eight years of a Republican administration". Determination to deal effectively with those media "enemies" who might impair the chances of re-election increased steadily from 1969 to 1972 (*See* App. 6, 165-71).* The intensity of the Administration's preoccupation with and hostility toward the news media in general and the networks in particular is clearly evidenced by the steady drum-fire of public attack from high Administration officials.** In the thirty-six month period between Vice President Agnew's address in Des Moines on November 13, 1969, and the national elections, at least twenty public statements were made by members of the Administration attacking the news media. Administration spokesmen on that subject included the Vice President (November 13, 1969, November 20, 1969, February 21, 1970, May 18, 1971); Herbert Klein (November 16, 1969, November 19, 1969, July 9, 1970); L. Patrick Gray (April 28, 1972); and John N. Mitchell (April 30, 1971). (App. 186-213) In those addresses, the public was repeatedly warned of "the trend towards monopolization" in the media; and the media were told that their newsmen were unrepresentative of America, with the explicit warning that if they failed to examine "the problems you have today . . . you do invite the government to come in." (App. 190-91, 196-97, 207)

We are not concerned here with the validity *vel non* of those criticisms; nor do we suggest that the press is immune from criticism. Those remarks are significant here as evidence of the Administration's state of mind, of its intense displeasure with network news, of its determination to warn the news media of unspecified modes of government intervention, and of its frequent reference to rather inchoate notions of antitrust and monopoly.

To be sure, Charles Colson, former Special Counsel to the President, asserted that those attacks could not constitute intimidation

*The Administration's undiminished concern is reflected in a March 14, 1972 "Attack Organization & Strategy" memo reminding John Mitchell "what the national networks did to RN in 1968; this has to be prevented in 1972." (App. 178)

**Even before the disclosures of the last year, the Administration's attitude and action toward national news organizations were seen as a "war on the press" and led *The New York Times* on July 22, 1972, to conclude:

> "During its three and a half years in office, the Nixon Administration has evinced undisguised hostility toward working reporters and has attempted by threats and by legal and economic reprisals to intimidate television networks, influential metropolitan newspapers, and magazines." (App. 184-85)

because they were public. He explained that if the government were to take actions or threaten actions quietly or covertly, *that* would constitute intimidation. (App. 214) But the Administration's attacks were not confined to public statements, as Colson had good reason to know. Representatives of the networks were quietly and privately threatened (App. 8-11, 299) and covert actions were taken (App. 17-31, 46-51). Presidential assistant Ehrlichman met for breakfast with Richard Salant, President of CBS News, and indicated that White House correspondent Dan Rather should be transferred or fired. (App. 216) Ehrlichman told Rather that "the networks will get theirs, of that you can be sure"; Presidential Press Secretary Ronald Ziegler told Rather that the networks "are going to have to pay" for their supposed anti-Administration stance. (App. 327)

CBS Washington correspondent Marvin Kalb was the subject of a protracted wiretap by the FBI. (App. 52) And in what Theodore H. White characterized in THE MAKING OF THE PRESIDENT —1972 as "one of the most shameful attempts on record to intimidate a reporter into submission or moderation of tone" (at 354), CBS correspondent Daniel Schorr was subjected to an intensive investigation by the FBI, at the request of the White House, under the pretext, now admitted to be false (App. 46-47), that he was under consideration for an important government position (App. 31, 37-38, 41-42). Only two months earlier, on June 24, 1971, Schorr had been designated "a real media enemy" in a memorandum John Dean forwarded to Charles Colson. (App. 227-30)

The Administration's wrath was not confined to the newsmen for the commercial networks. On June 8, 1972, Special Assistant to the President, P. J. Buchanan, and his assistant K. Khachigian, prepared a campaign "ASSAULT STRATEGY", stating:

> "Incidentally, given his performance the other night, [Sandy] Vanocur [of The Public Broadcasting System] is a positive disaster for us—and McGovern's most effective campaigner. He may have to be fired or discredited—if we are to get anything approaching an even shake out of the left-wing, taxpayer-subsidized network." (App. 224)

Nor were such actions confined to reporters. In November 1970, after meetings with the chief executives of CBS, ABC and NBC, Colson reported to Haldeman that the networks are "very much afraid

of us and are trying hard to prove they are 'good guys.'" He concluded: "they are damned nervous and scared and we should continue to take a very tough line, face to face, and in other ways" to show the networks "we are not bluffing". (App. 8-11) Shortly after the election, Colson called the president of CBS and threatened: "We'll bring you to your knees in Wall Street and on Madison Avenue" because CBS "didn't play ball" with the Administration during the campaign. (App. 299) That message appears to follow up on the President's instructions to John Dean in September 1972 to "keep a good list of the press people giving us trouble, because we will make life difficult for them after the election". (App. 243-44)

In sum, in both words and deeds the Administration evidenced its disposition to engage in threats and reprisals against its critics.

*Fourth.* The Administration itself perceived a connection between its displeasure with the supposed partisanship of the news media and the institution of these actions. According to Mr. McLaren, the actions were held in abeyance for more than half a year so that the White House Director of Communications, Herbert G. Klein, could inform the chief executives of the networks "that these cases were not politically motivated" (McLaren Aff. ¶ 9). When the complaints were filed, and again a month later, the Department of Justice issued press releases denying that the suits constituted an attack on network news. (*See* Ex. A to Gov't Memo; Ex. A to Comegys' Aff.) It is hard to escape the feeling that the Administration was protesting too much. After all, the networks never asserted that there was a political connection until they filed their answers to the complaints in December 1973. Rather, it was Administration spokesmen who repeatedly linked their political antagonism with antitrust concepts. It was Vice President Agnew who repeatedly warned of network "monopolies" while disparaging network news. And it was Patrick Buchanan who said a few weeks after the complaints were filed:

> ". . . a monopoly like this of a group of people with a single point of view and a single political ideology, who tend to continually freeze out opposing points of view and opposing information, that you're going to find something done in the area of antitrust action, I would think." (App. 249-51)

And when Mr. Buchanan was reminded that antitrust suits had been instituted against the networks, he remarked: "Well, that's just testing out the theory, that's all." (*Id.*)

The perceived connection is also apparent in the message that Mr. McLaren understands that White House Communications Director Klein was supposed to deliver to the network executives—that there was no political connection. But that message never got delivered, apparently because Mr. Ehrlichman changed the signals at the last minute. (McLaren Aff. ¶¶ 9-11; App. 299, 314-16) Indeed, the only message from Klein was an ambiguous warning which certainly did not signify that an antitrust action was going to be brought, but rather just left open that possibility. (App. 314)

Furthermore, the connection between the Administration's political interests and the proposed antitrust actions was perceived not only by the Attorney General and those on the White House staff but also by some in the Department of Justice. As a reporter who covered the Department has observed:

> "What bothered some Justice Department professionals more . . . was what seemed to be the ideological politicalization of law enforcement under Mitchell's leadership. Among the signs was an anti-trust suit against the television networks—long in the works but considered unwise and unwinable by a succession of anti-trust policy managers—launched just in the midst of the Administration's bitter effort to discredit the news media and still pending." (S. Ungar, "The Undoing of the Justice Department", *The Atlantic*, January 1974, pp. 29, 31)

Months before the evidence thrown up by the investigation and hearings of the Senate Select Committee on Presidential Campaign Activities had come to light, there were grounds for viewing these suits with suspicion. The complaints set forth charges that had languished in the Department of Justice for more than twenty years and had repeatedly been rejected as unworthy. The facts alleged were very largely out of date. The relief sought had very largely been supplied by the FCC. A private antitrust action against the networks by the major movie studios was well underway.* Although the Department

*The "bombshell" of this case was a puzzling "surprise" to the District Judge in that case as well. "Something must have happened in Washington. some other heads must have become enthusiastic about case that they were not enthusiastic about sometime ago." (App. 253)

went through the motions of inviting prefiling negotiations, the networks' counsel were summoned to the Department on a few hours' notice and were advised that they must agree in principle, within seven days, to all of the relief sought in the Government's prayer. (App. 315-16) Even to those not directly involved, the matter seemed strange indeed. An editorial in *The New York Times* on April 18, 1972 stated:

> "One question in particular need of an answer is why the Justice Department chose to move now on long ignored staff proposals . . . . A regulated medium of communications, subject to periodic license review, is particularly vulnerable to hints of governmental harassment. When those hints come as frequently as they have from this Administration, the danger that they will exert a chilling effect on freedom to comment and criticize—especially in a national election year—is incontestable. That danger is magnified when the line between law enforcement and intimidation comes into question.
>
> "If resentment against past shows of independence by the networks had not been so manifest and if vigor in applying the antitrust laws had not been so erratic, the cloud over the present suit would not be so ominous." (App. 12-13)*

In the succeeding months, we have learned that there were those in the Administration who were willing and eager to "maximize the fact of our incumbency in dealing with persons known to be active

*Similarly, an editorial in the April 21, 1972, issue of the *Washington Post* referred to the antitrust suits filed against the networks as follows:

> "These strike us as being peculiar, partly because the facts on which the complaints are based are outdated, partly because the cases have been dormant inside the Justice Department since 1970, and partly because the complaints seem to ignore some of the realities of the television business. The basic charge in these suits is that the networks have used their control over access to prime evening time to exclude programs in which they do not have a financial interest.
>
> "This set of cases has been kicking around the Justice Department for more than a decade. They were sidelined by three Attorneys General until Mr. Kleindienst resurrected them. They involve an area which the FCC has investigated and in which it ordered major changes last year. Yet the suits filed last week are grounded in 1967 data and appear not to recognize the changes, including those ordered by the FCC, which have occurred since.
>
> "The issues in almost all antitrust cases are extremely complex and those against the networks are no exception. Thus, we are not about to venture a guess as to their possible outcome. It is the circumstances under which they were filed, as much as the content, which bothers us. . . ." (App. 14-16)

in their opposition to our administration . . . [by using] the available Federal machinery to screw our political enemies". Or, as put more elegantly by former Special Prosecutor Cox in an address to the Association of the Bar of the City of New York, there was

> ". . . evidence giving reason to believe that there has been criminal abuse of power and position by persons at the highest levels of the executive branch.
>
> "The charges and evidence of probable cause symbolized by Watergate are peculiarly damaging because of their nature. The essence in almost every instance is the abuse of governmental authority and position for the sake of building or perpetuating the personal and political power of those currently in office." (App. 255)

Neither the Department of Justice nor its Antitrust Division was exempted from utilization for those purposes. In short, the customary restraints, the common sense of propriety, which would normally render implausible the charges made in the defenses here, appear to have been inoperative. In light of the events of the past year there is no basis on which it can be assumed that the principal actors on this stage were bound by those customary restraints. It was John N. Mitchell who signed the complaint in September 1971 and then directed that it not be filed. It was Jeb Stuart Magruder who recommended an antitrust suit against the media to "change their views" and to ensure a Republican victory in 1972. It was H. R. Haldeman to whom the Magruder recommendation was made and to whom Charles W. Colson reported his efforts at network intimidation and to whom "political matters" to be handled through the Attorney General were referred. It was Charles W. Colson who had the responsibility directly to intimidate the networks and who threatened to bring CBS to its knees on Wall Street and Madison Avenue. It was John D. Ehrlichman who ordered Herbert Klein not to tell the networks that the unfiled lawsuits were not politically inspired. It was Richard G. Kleindienst who signed the complaints and who almost concurrently denied repeatedly to the Senate Judiciary Committee that the White House had in any way directed him on how to conduct the ITT-Hartford merger case while he was Deputy Attorney General. Finally, it was John W. Dean, III, who created the "enemies list", urged litigation in order to "screw" those

on it, recommended that the Administration use the available federal machinery in order to accomplish that, coordinated the effort to retaliate against *The Los Angeles Times,* and who acted as a liaison between the White House and the Department of Justice.

Following the release of the Magruder memorandum and other documents by the Senate Select Committee on Presidential Campaign Activities last November, the Chairman of the Communications Subcommittee of the House Commerce Committee, Congressman Torbert Macdonald, reviewed the public evidence and found a "pattern of hostility and calculated intimidation toward the television networks" so clear that "its significance and its ruthless purpose are obvious". (App. 271) Referring to the Administration's actions towards the networks, he stated:

> "To me it was a very clear pattern.
>
> "Is there a missing master memo spelling out this coordinated plan of attack? I don't think it really matters, because the plan obviously existed in the minds of its planners. And I'm convinced that while they were trying to pull the teeth of all unfriendly press, or what they considered unfriendly . . . the White House group had their Public Enemy Number One, the television networks." (App. 275)

In these circumstances, it simply cannot be said that no question of fact has been or even can be raised with respect to the constitutional propriety of the purpose of these actions. At the very least, CBS and ABC are entitled to the discovery they have sought and the Government's attempt to preclude all such inquiry must fail.

## II.

### THE GOVERNMENT'S OBJECTIONS TO DEFENDANTS' DISCOVERY ARE WITHOUT MERIT.

The Government objects to the depositions noticed by ABC and CBS and to their document requests on the grounds that they will not elicit information relevant to the subject matter of the actions. The Government objects to the document requests on the additional grounds that "virtually all" the documents requested are either privileged as

"attorney's work product" or are "subject to executive privilege". (Gov't Memo, p. 35)*

The Government's objection, in so far as it rests on the supposed irrelevance of the information sought, is expressly and necessarily tied to the Government's motion to strike the defenses based on unconstitutional purposes. (Gov't Memo, p. 29) The discovery was designed to elicit information relevant to those defenses. If the Court denies the motion to strike those defenses, the objection based on relevance must fail because the information sought is clearly relevant to the issues they raise.

The Government objects to the document requests, even assuming the relevance of the documents, on grounds of privilege. In interposing this blanket claim as a barrier to document production, however, the Government has not specified any particularized claim of privilege with respect to any specified document. It has merely asserted that "virtually all" the documents are privileged in one way or the other. Such a vague and unspecified assertion of privilege hardly constitutes an appropriate response under Rule 34 or an effective invocation of privilege.

We show in part A below that, given the fact that the Government has selectively released considerable information of the type sought and, indeed, has filed affidavits setting forth a version of the events by a few of the participants, the Government has plainly waived any privilege it might have claimed for the documents requested. The Government cannot both attempt to prove that the allegations set forth in the defenses are untrue and, at the same time, block all inquiries into the facts on grounds of privilege. Furthermore, we show in parts B and C below that the claims of attorney's work product and executive privilege cannot be sustained as a matter of law. We emphasize at the outset, however, that even if there were colorable grounds for the claims of privilege and even if they had not been waived, they cannot

*The Government also says it "may have" other privileges "with respect to any particular document or any information which may be responsive to defendants' discovery". (Gov't Memo, p. 39, n. 16.) That suggestion is clearly untimely. The requests for documents under Rule 34 were served on January 8, 1974. The Government requested and received defendants' consent to an extension of time within which to respond to those requests from February 7 to March 25, 1974. Further, by Minute Order dated March 15, 1974, the Court directed the Government to respond by March 24, 1974. That time has now long passed, and it is too late for the Government to suggest that at some unspecified time in the future it may raise some other objections.

be sustained simply on the Government's blanket assertion that the information sought is not discoverable. As the Supreme Court held in *United States* v. *Reynolds*, 345 U. S. 1, 9-10 (1953), "[j]udicial control of the evidence in a case cannot be abdicated to the caprice of executive officers".*

**A. The Government's Privilege Claims, If Any, Have Been Waived.**

The issue raised by the defenses in question is whether these actions were commenced for a constitutionally impermissible purpose. The Government has permitted the publication of memoranda and information of the kind sought to be discovered by CBS and ABC. The Government has submitted affidavits purporting to describe numerous communications within the Department of Justice and between Department personnel and others inside and outside the Government. Given these intentional disclosures, any claim of privilege that might otherwise be appropriate has been waived.**

The McLaren, Fox and Comegys affidavits submitted with the Government's motion here, together with the memorandum from McLaren to Attorney General Mitchell and Deputy Attorney General Kleindienst (attached as an exhibit to the McLaren affidavit), each concern the question why these actions were brought—and that is the precise subject which the Government claims is privileged. Having submitted those documents, the Government cannot shield others on the same subject from discovery. As Wigmore states the rule:

---

**See also R.keweg* v. *Federal Mut. Ins. Co.*, 27 F. R. D. 431, 437 (N. D. Ind. 1961); *Shiner* v. *American Stk. Exch.*, 28 F. R. D. 34 (S. D. N. Y. 1961); *United States* v. *Certain Parcels of Land*, 15 F. R. D. 224, 231-32 (S. D. Cal. 1953); *Evans* v. *United States*, 10 F. R. D. 255 (W. D. La. 1950); *Morris* v. *Atchinson, R. R.*, 21 F. R. D. 155 (W. D. Mo. 1957); *Overby* v. *United States Fidelity & Guar. Co.*, 224 F. 2d 158 (5th Cir. 1955); *Reiss* v. *British General Ins. Co.*, 9 F. R. D. 610, 611 (S. D. N. Y. 1949).

***Johnson* v. *Zerbst*, 304 U. S. 458, 464 (1938) ("waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege"); *see, e.g., Eastman Kodak Co.* v. *International Harvester Co.*, 14 F. R. Serv. 2d 1272 (S. D. N. Y. 1970); *Philadelphia Elec. Co.* v. *Anaconda American Brass Co.*, 275 F. Supp. 146, 148 (E. D. Pa. 1967); *D'Ippolito* v. *Cities Service Co.*, 39 F. R. D. 610 (S. D. N. Y. 1965); *United States* v. *Kelsey-Hayes Wheel Co.*, 15 F. R. D. 461, 464-65 (E. D. Mich. 1954); *Magida* v. *Continental Can Co.*, 12 F. R. D. 74 (S. D. N. Y. 1951); *In re Natta*, 48 F. R. D. 319 (D. Del. 1969); *Underwater Storage, Inc.* v. *United States Rubber Co.*, 314 F. Supp. 546, 548-49 (D. D. C. 1970); *American Cyanamid Co.* v. *Hercules Powder Co.*, 211 F. Supp. 85 (D. Del. 1962); *Schwartz* v. *Travelers Ins. Co.*, 17 F. R. D. 330 (S. D. N. Y. 1954); *United States* v. *Krasnov*, 143 F. Supp. 184, 190-91 (E. D. Pa. 1956), *aff'd per curiam*, 355 U. S. 5 (1957); *RCA* v. *Rauland Corp.*, 18 F. R. D. 440, 444 (N. D. Ill. 1955).

"There is always also the objective consideration that when [a party's] conduct touches a certain point of disclosure, fairness requires that his privilege shall cease whether he intended that result or not. He cannot be allowed, after disclosing as much as he pleases, to withhold the remainder." 8 WIGMORE, EVIDENCE § 2327, at 636 (McNaughton rev. ed. 1961).

So, in *TWA* v. *Hughes*, 332 F. 2d 602 (2d Cir. 1964), *cert. dismissed as improvidently granted*, 380 U. S. 249 (1965), where the privilege was claimed as to documents containing information discussed in an attorney's affidavit, the court held:

"... As the Master noted, the Cook affidavit purports to be based upon information received by Cook as Attorney for Toolco and in many respects parallels the allegations made in the answer and counterclaims. The district court properly held that under these circumstances the affidavit constituted a waiver by Toolco of the attorney-client privilege." 332 F. 2d at 615.

Furthermore, many other documents relating to the subject on which we seek discovery were disclosed by the Government even before those affidavits were filed. (*See e.g.*, App. 282-90) Irrespective of the purpose of those disclosures, they have so far eroded the confidentiality which evidentiary privileges are designed to protect as to make continued protection of the remaining documents unwarranted. In *In re Associated Gas & Electric Co.*, 59 F. Supp. 743, 744 (S. D. N. Y. 1944), where only two letters from attorneys were produced at a deposition without objection, the court held:

"The privilege is not divisible. The petitioners having waived as to some of the letters relating to a specific subject open the door to all the privileged correspondence between it and its attorney on that specific subject."

In sum, the courts have repeatedly refused to permit a party to proceed as the Government has here—affirmatively using affidavits and documents concerning the subject in controversy—while simultaneously asserting privilege claims as to all other documents on the same subject.*

**See also Hunt* v. *Blackburn*, 128 U. S. 464, 470-71 (1888); *Steen* v. *First Nat'l Bank*, 298 F. 36, 41-42 (8th Cir. 1924); *White* v. *Thacker*, 78 F. 862, 865 (5th Cir. 1897); *Western Union Tel. Co.* v. *Baltimore & O. Tel. Co.*, 26 F. 55 (C. C. S. D. N. Y. 1885); *In re Penn Central Commercial Paper Litigation*, 61 F. R. D. 453, 462-64 (S. D. N. Y. 1973); *Lee National Corp.* v. *Deramus*, 313 F. Supp. 224, 226-27 (D. Del. 1970); *Malco Mfg. Co.* v. *Elco Corp.*, 307 F. Supp. 1177 (E. D. Pa. 1969); *Wild* v. *Payson*, 7 F. R. D. 495, 500 (S. D. N. Y. 1946).

**B. Even If Not Waived, the Government's Claim That Its Reasons for Bringing This Action Are Protected A~ Attorney's "Work Product" Is Without Merit.**

The document demands served by ABC and CBS were carefully drafted to avoid reaching the "mental impressions, conclusions, opinions or legal theories" of the Government's trial counsel. Paragraph 1 of both requests calls only for documents that were either sent or received by persons outside the Antitrust Division. The types of trial preparation materials normally considered to be attorney's work product—witness interview memoranda, outlines of examination and argument, and the like—are not the sort of documents one would expect to be sent or received by the President of the United States, the Attorney General or the other persons specified in the requests. Paragraph 2 of both requests calls for documents dealing with plans to intimidate the networks (and paragraph 3 of CBS's request calls for documents which reflect implementation of such plans); clearly, the documents called for could not constitute anything ever considered to be privileged as attorney's work product.

Indeed, the Government concedes that what is sought is not "work product", defined by the Federal Rules of Civil Procedure as "trial preparation materials" (Fed. R. Civ. P. 26(b)(3)). The Government states that the depositions objected to relate "to neither the proof nor the disproof of any antitrust issue in the case" (Gov't Memo, p 32) and that the "discovery sought by the Requests [for documents] is not intended to elicit evidence or information bearing either on the merits of the complaint or a resolution of the antitrust issues" (Gov't Memo, p. 33).

We agree. We seek information about why this suit was brought, not about whatever views Antitrust Division personnel may have entertained on the facts and law relating to whatever antitrust theory they may have had. The Government documents already made public have nothing to do with the antitrust merits; instead they talk about "the possible threat of antitrust action" as "effective in changing their [media] views", and using "the available Federal machinery to screw our political enemies" (*supra*, pp. 25-37). These documents are not protected by any "work product" privilege. In *United States* v. *Procter & Gamble Co.*, 174 F. Supp. 233, 238 (D. N. J. 1959), for example, the court held "work product" protection is not available for information concerning the Government's decision to initiate a prosecution, since

such information is "far different from the reasons bearing on what evidence to use or not to use on the trial of a certain indictment, the latter being a common example of work product".

The Government also claims that the "defendants have made no showing of essentiality" (Gov't Memo, p. 37) as contemplated by Fed. R. Civ. P. 26(b)(3) for discovery of "trial preparation materials". That argument, of course, proceeds from the faulty premise that the documents are "work product". But, even assuming *arguendo* the validity of the premise, it seems clear that the documents showing why this action was brought are "essential" to the networks' defenses and are peculiarly within the knowledge and control of the plaintiff. As stated in MOORE'S FEDERAL PRACTICE:

> "These cases indicate that when the activities of counsel are inquired into because they are at issue in the action before the court, there is cause for production of documents that deal with such activities, though they are 'work product'. The authors suggest that while Rule 26(b)(3) provides that protection against discovery of the attorney's or representative's 'mental impressions, conclusions, opinions, or legal theories' *shall* be provided, such protection would not screen information directly at issue. . . ." 4 MOORE, FEDERAL PRACTICE ¶ 26.64[4]. at 26-447 (2d ed. 1974) (emphasis in original).*

Limited grants of immunity from discovery cannot be used to shield official misconduct or illegality where substantial allegations of impropriety are raised. *United States* v. *Procter & Gamble Co.*, 25 F. R. D. 485, 490 (D. N. J. 1960); *Clark v. United States*, 289 U. S. 1 (1933).

**C. Even Absent Waiver, the Government's Claim of "Executive Privilege" Is Without Merit Because Evidence of Unconstitutional Conduct Cannot Be "Privileged".**

1. *"Executive privilege" does not cover the information sought here.* Documents concerning improper governmental conduct are not protected by any privilege. That has long been the law with respect to

**Kearney & Trecker Corp.* v. *Giddings & Lewis, Inc.*, 296 F. Supp. 979 (E. D. Wis. 1969). *Kirkland* v. *Morton Salt Co.*, 46 F. R. D. 28 (N. D. Ga. 1968); *Rekeweg* v. *Federal Mutual Ins. Co.*, 27 F. R. D. 431, 437 (N. D. Ind. 1961); *Bell* v. *Commercial Ins. Co.*, 280 F. 2d 514, 517-18 (3d Cir. 1960); *Bourget* v. *Gov't Employees Ins. Co.*, 48 F. R. D. (D. Conn. 1969); *McCullough Tool Co.* v. *Pan Geo. Atlas Corp.*, 40 F. R. D. 490, 493-94 (E. D. Tex. 1966); *Gulf Constr. Co.* v. *Joe Paper Co.*, 24 F. R. D. 411, 414 (S. D. Tex. 1959).

attorney-client privilege. *See e.g., Clark* v. *United States,* 289 U. S. 1, 15 (1933); *United States* v. *Aldridge,* 484 F. 2d 655, 658 (7th Cir. 1973); *Pfizer Inc.* v. *Lord,* 456 F. 2d 545, 548-49 (8th Cir. 1972); *United States* v. *Friedman,* 445 F. 2d 1076, 1086 (9th Cir.), *cert. denied,* 404 U. S. 958 (1971); *United States* v. *Bob,* 106 F. 2d 37 (2d Cir. 1939), *cert. denied,* 308 U. S. 589 (1939). The same principle applies to claims of executive privilege. *See, e.g., Committee for Nuclear Responsibility* v. *Seaborg,* 463 F. 2d 788, 794 (D. C. Cir. 1971); *Black* v. *Sheraton Corp.* No. 440-67 (D. D. C. Jan. 21, 1974) (App. 328, 333-34); *United States* v. *Procter & Gamble Co.,* 25 F. R. D. 485, 490 (D. N. J. 1960).

Executive privilege is a qualified privilege, and, as the Supreme Court has held is "not to be lightly invoked." *United States* v. *Reynolds,* 345 U. S. 1, 7 (1953). The Government has the burden of establishing the privilege, *Pleasant Hill Bank* v. *United States,* 58 F. R. D. 97, 101 (W. D. Mo. 1973), and the privilege may not be used to cover up evidence of governmental misconduct:

> "Any claim to executive absolutism cannot override the duty of the court to assure that an official has not exceeded his charter or flouted the legislative will. . . . Otherwise the head of an executive department would have the power on his own say so to cover up all evidence of fraud and corruption when a federal court or grand jury was investigating malfeasance in office, and this is not the law." *Committee on Nuclear Responsibility* v. *Seaborg,* 463 F. 2d 788, 793-94 (D. C. Cir. 1971).

Here, as demonstrated above, threats made to network executives coupled with internal Administration documents released to the public raise a serious question as to the constitutional propriety of the Administration's decision to bring these actions. A blanket claim of executive privilege cannot be honored where, as here, the parties seeking disclosure "present evidence from which at least an inference of improper standards can be drawn". *United States* v. *Ahmad,* 347 F. Supp. 912, 928 (M. D. Pa. 1972), *aff'd sub nom., United States* v. *Berrigan,* 482 F. 2d 171 (3d Cir. 1973). Thus:

> —In *Center on Corporate Responsibility, Inc.* v. *Shultz,* 368 F. Supp. 863 (D. D. C. 1973), where testimony before the Senate Select Committee on Campaign Practices revealed that the White House had attempted to use the IRS against political

enemies, the court permitted a plaintiff complaining of arbitrary denial of a tax exemption broad discovery of White House and IRS files:

"These indicia of political intervention, combined with the unusual and protracted processing of plaintiff's application, have triggered a warning signal requiring the Court to fully investigate the issue." 368 F. Supp. at 871.

—In *Rosee* v. *Board of Trade*, 36 F. R. D. 684 (N. D. Ill. 1965), where "one possible explanation" for certain facts was improper governmental conduct (36 F. R. D. 687), the court held:

"We do not suggest that litigants may, simply by alleging official misconduct, traverse an otherwise appropriate claim of privilege for government documents. In the instant case, plaintiff has shown (1) that there is a reasonable basis for his request and (2) that the defendant government agents played some part in the operative events. We therefore hold that he is entitled to inspect all relevant documents and correspondence written by the agents, prepared under their supervision, directed to them by their superiors, subordinates or co-workers or subject to their examination." 36 F. R. D. at 690.

—In *United States* v. *Procter & Gamble Co.*, 174 F. Supp. 233 (D. N. J. 1959), and 25 F. R. D. 485 (D. N. J. 1960), where the known facts permitted an inference that the Government had used a grand jury for the improper purpose of gathering evidence in a civil case, the court permitted defendant to serve interrogatories on the Justice Department, examine its documents and take the depositions of two former Attorneys General because:

"... [I]f there has been a subversion by the use of Grand Jury procedure for civil purposes only, as condemned by our highest Court, not only the decision to do so, but also evidence material to that decision, are not the subject of the privilege, but are subject to disclosure. It also follows that evidence material to showing that no such violation of law occurred is also material to counteract possible proof to the contrary...." 25 F. R. D. 490.

—In *United States* v. *Falk*, discussed *supra*, where defendant demonstrated that (i) the action was brought long after the alleged violations occurred, (ii) the action was first approved by high-level Government officials, and (iii) defendant's constitutionally protected speech was known to annoy the Government, and there were statements by officials linking the commencement of the action to a plan to punish defendant for such outspokenness, and (iv) there were factors indicating that, as a practical matter, the action would not ordinarily have been brought, the court held:

> "Certainly, the prospect of government prosecutors being called to the stand by every criminal defendant for cross-examination as to their motives in seeking an indictment is to be avoided. That does not mean that a criminal defendant is never to be afforded an opportunity to prove that the prosecution stems from an improper prosecutorial design or that he may never question a prosecutor under oath. The presumption is always that a prosecution for violation of a criminal law is undertaken in good faith and in nondiscriminatory fashion for the purpose of fulfilling a duty to bring violators to justice. However, when a defendant alleges intentional purposeful discrimination and presents facts sufficient to raise a reasonable doubt about the prosecutor's purpose, we think a different question is raised." 479 F. 2d at 620-21.*

The Government argues that discovery should not be had because it "would expose to public scrutiny the opinions, ideas, points of view

*See also *Sperandeo* v. *Milk Drivers & Dairy Employees Local 537*, 334 F. 2d 381, 385 (10th Cir. 1964) (failure to prosecute others raised question about NLRB Regional Director's good faith); *Singer Sewing Machine Co.* v. *NLRB*, 329 F. 2d 200, 208 (4th Cir. 1964) (proffered evidence raised *prima facie* case of NLRB misconduct, and, hence, such evidence should not have been excluded under "mental process rule"); *United States* v. *Berrios*, 73-CR-308, 73-CR-22 (E. D. N. Y. Jan. 7, 1974) (App. 336) (offer of proof showing connection of persons involved to President Nixon and defendant's support of McGovern created a *prima facie* case of unconstitutional purpose); *Kahn* v. *HEW*, 53 F. R. D. 241 (D. Mass. 1971) (contradictory explanations given for rejecting plaintiff for commission in Public Health Service raised possibility that rejection was based on First Amendment conduct); *Bank of Dearborn* v. *Saxon*, 244 F. Supp. 394, 402 (E. D. Mich. 1965), *aff'd*, 377 F. 2d 496 (6th Cir. 1967) (approval by Comptroller of Currency of action by bank that appeared to violate state law created *prima facie* case of comptroller's "sham and subterfuge").

and recommendations, of numerous government employees. . . ." Gov't Memo, p. 39) But that is precisely the kind of information (however labeled) held discoverable in the cases set out above where the Government's purpose in prosecuting was found to be properly in issue. Executive privilege—even as to advisory opinions—is overcome when the need for disclosure outweighs the need to preserve confidentiality. *See, eg., United States* v. *Burr,* 25 Fed. Cas. 30 (C. C. D. Va. 1807); *Nixon* v. *Sirica,* 487 F. 2d 700, 717-18 (D. C. Cir. 1973); *Union Oil Co.* v. *Morton,* 56 F R. D. 643, 644 (C. D. Cal. 1972); *Kaiser Aluminum & Chemical Corp.* v. *United States,* 157 F. Supp. 939, 946 (Ct. Cl. 1958) (Reed, J.):*

Here, in addition to the strong inference of governmental misconduct, and the fact that selected documents concerning the subject in issue have been made public by the Government, the evidence is also in the exclusive control of the Government and that weighs heavily in favor of disclosure. *See, e.g., Nixon* v. *Sirica,* 487 F. 2d at 717; *Olson Rug Co.* 1. NLRB, 291 F. 2d 655, 660-61 (7th Cir. 1961); *Mitchell* v. *Bass,* 252 F. 2d 513, 518 (8th Cir. 1958).**

A final consideration is the fact that the Government has invoked the processes of the court "and is, therefore, bound by the discovery provisions of the Federal Rules of Civil Procedure in the same respects as any ordinary litigant." *Sperandeo* v. *Milk & Dairy Employees Local 537,* 334 F. 2d 381, 385 (10th Cir. 1964). Indeed, there is a substantial body of authority that the Government waives executive privilege when it institutes suit. *E.g., Federal Deposit Ins. Corp.* v. *St. Paul*

---

*The Government's reference to the Freedom of Information Act (Gov't Memo, p. 38) has nothing to do with what is in issue here. That Act only provides that a private party, not in litigation with the Government, "is entitled to all such memoranda or letters that a private party could discover in litigation with the agency". *Environmental Protection Agency* v. *Mink,* 410 U. S. 73, 85-86 (1973). The argument that the Act *creates* any executive privilege has been explicitly rejected. *E.g., Pleasant Hill Bank* v. *United States,* 58 F. R. D. 97, 100 (W. D. Mo. 1973); *Verrazzano Trading Corp.* v. *United States,* 349 F. Supp. 1401, 1403 (Cust. Ct. 1972).

**The Justice Department now has a procedure whereby every employee must make a memorandum of any communication from any non-involved party (including officials of other Government departments and agencies) about any matter pending before the Department so that there will be "a contemporary record of contacts with the Department that can be called upon should the need arise to rebut some accusation of improper influence". E. Richardson, *The Building of a New Confidence,* N. Y. S. B. J. 455, 456 (Nov. 13, 1973). *See also* App. 291-95.

*Fire & Marine Ins. Co.*, 53 F. R. D. 260, 262 (W. D. Okla. 1971); *United States* v. *Gates*, 35 F. R. D. 524, 529 (D. Colo. 1964); *United States* v. *Continental Can Co.*, 22 F. R. D. 241, 245 (S. D. N. Y. 1958); *Fleming* v. *Bernardi*, 1 F. R. D. 624 (N. D. Ohio 1941); *See also United States* v. *Andolschek*, 142 F. 2d 503, 506 (2d Cir. 1944); *Bank Line, Ltd.* v. *United States*, 76 F. Supp. 801 (S. D. N. Y. 1948), which are referred to in *Environmental Protection Agency* v. *Mink*, 410 U. S. 73, 86 n. 13 (1973), one of the decisions cited in the Government's Memorandum (pp. 37-38).

There is, in sum, no justification for preserving confidentiality in this case, and in the face of the showing made here concerning the possibility of governmental impropriety the need for disclosure is clear. In circumstances such as these, the natural response to a claim of executive privilege is perhaps best exemplified by Judge Jones' comments in *Nader* v. *Butz*, No. 148-72 (D. D. C., filed Jan. 24, 1972):

> "What you're saying is . . . corruption could run wild behind those doors but nobody could find out about it because of intra-agency memoranda. . . . What kind of a country do we live in if the people can't have that right? . . . . It seems to me the government ought to take the position 'Here, take these documents.' I simply can't understand that principle." Quoted in HEARINGS BEFORE THE SPECIAL SUBCOMMITTEE ON REFORM OF FEDERAL CRIMINAL LAWS OF THE HOUSE COMMITTEE ON THE JUDICIARY, 93 CONG., 1st SESS. 516 (1973).

2. *Even assuming the Government could invoke "executive privilege", no such claim has been properly asserted.* As with work product, the determination of a claim of executive privilege is a judicial function. Before such a determination can be made the privilege must be properly asserted.

*First*, "[t]here must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer". *United States* v. *Reynolds*, 345 U. S. 1, 7-8 (1953). Thus, with respect to Justice Department documents, the privilege must be claimed by the Attorney General. *See Carl Zeiss Stiftung* v. *V.E.B. Carl Zeiss*, 40 F. R. D. 318, 326 (D. D. C. 1966). And with respect to White House documents, the privilege must be claimed by the President. *Center on Corporate Responsibility* v. *Shultz*, 368 F. Supp. 863, 873 (D. D. C. 1973). No such authoritative claim has been presented here.

*Second,* the documents as to which privilege is claimed must be specifically identified and described. *Black* v. *Sheraton Corp. of America,* No. 440-67, at 5 (D. D. C. Jan. 21, 1974) (App. 328); *Pleasant Hill Bank* v. *United States,* 58 F. R. D. 97, 101 (W. D. Mo. 1973); *Thill Securities Corp.* v. *New York Stock Exchange,* 57 F. R. D. 133, 138 (E. D. Wis. 1972). That has not been done.

*Third,* the basis for the claim must be stated. *Nixon* v. *Sirica,* 487 F. 2d at 700, 721 (D. C. Cir. 1973); *Pleasant Hill Bank* v. *United States, supra,* at 101; *Carter* v. *Carlson,* 56 F. R. D. 9, 11 (D. D. C. 1972); *United States* v. *30 Jars, More or Less of "Ahead Hair Restorer for New Hair Growth",* 43 F. R. D. 181, 190 (D. Del. 1967). And again, apart from conclusory assertions applying equally to all the discovery requested, the basis for any particular claim of privilege has not been stated here.

**III.**

**IT IS NEITHER "FRIVOLOUS" NOR "INSUFFICIENT IN LAW" TO DEFEND THIS ACTION ON THE GROUND THAT CERTAIN RELIEF SOUGHT BARS THE NETWORKS FROM ENGAGING IN CONSTITUTIONALLY PROTECTED SPEECH.**

All three networks have pleaded that the relief sought by the Government would bar them from engaging in constitutionally protected speech in violation of the First Amendment. (CBS's fifth and sixth defenses; ABC's fourth and fifth defenses; NBC's fourth defense.) The Government has moved to strike those defenses on the ground that they are "frivolous" and "insufficient".

As set forth in paragraphs 26 and 27 of CBS's answer, the defenses in question aver:

> "26. This action is brought to prohibit CBS from transmitting for broadcast any television entertainment programs produced by CBS or any other commercial television network, to prohibit CBS from allowing any television entertainment programs produced by CBS to be transmitted over any other commercial television network, and to restrain CBS's freedom to determine what to broadcast and transmit for broadcast; therefore it is barred by the First Amendment to the United States Constitution."
>
> "27. This action is brought to restrain CBS from engaging in the production of television programs which constitute a form

of speech; therefore, it is barred by the First Amendment to the United States Constitution."

These defenses are distinct from and independent of those, discussed above, relating to the unconstitutional purpose that led to the commencement of this action. The defenses here under consideration relate to the unconstitutional nature of the relief sought in these actions.

Given the fact that the defenses go solely to the Government's claim for relief—a matter which may well never be reached—the Government's motion to strike could well be regarded as premature, and decision of the question raised by the motion could be deferred until such time as it becomes necessary to reach it. Nevertheless, the Government having made its motion, we have no hesitance in demonstrating the sufficiency of the defense at this time.

The predicate of the defenses is the prayer for relief set forth at the foot of the complaints. In paragraph 5 of the prayer of the CBS Complaint, the Government demands:

> "That the defendant CBS be prohibited from transmitting for exhibition over the CBS television network any television entertainment programs, including feature films, produced by the defendant CBS or any other commercial television network, and from allowing any television entertainment programs produced by CBS to be transmitted over any other commercial television network."

Identical decrees are demanded against the other networks. In short, as alleged in the defenses, the Government seeks an injunction restraining the broadcast over any commercial television network of any entertainment program produced by any network. The only question presented by the Government's motion to strike these defenses . whether such a decree is permissible under the First Amendment or whether, as we believe, by forbidding the networks from engaging in protected speech the relief requested strikes at the very core of the First Amendment's prohibitions.

We show below that television entertainment programs—*i.e.,* plays in a form suitable for transmission to television sets—are a form of speech protected by the First Amendment and that to prohibit the production and dissemination of a protected form of speech is to do precisely what the First Amendment forbids.

It should be recognized at the outset, however, that we are not urging that the First Amendment immunizes networks or broadcasters from the antitrust laws. The Government's contention that that is the substance of our argument (Gov't Memo, p. 22) is simply a misapprehension. The question presented here is whether, assuming the applicability of the antitrust laws and assuming, *arguendo*, a violation of the antitrust laws by the defendants, this Court can grant the particular type of injunctive relief the Government has demanded. That question is wholly independent of the question of liability, and the answer does not foreclose the grant of other types of relief. The First Amendment does not immunize broadcasters or publishers from the antitrust laws, any more than the cruel-and-unusual punishments clause of the Eighth Amendment immunizes all citizens from the criminal law. But, just as a court presumably could not, consistent with the Eighth Amendment, order a man tortured no matter how heinous his offense, so too a court cannot, consistent with the First Amendment, prohibit a defendant from engaging in protected speech. Yet that, we submit, is precisely what the Government seeks here.

The controlling principles of law are simple and settled. Movies, plays and musical comedies are all protected speech (*Schacht* v. *United States*, 398 U. S. 58, 63 (1970); *Joseph Burstyn, Inc.* v. *Wilson*, 343 U. S. 495, 501 (1952)); and they do not lose their First Amendment protection because the speaker hopes to make a profit (*Pittsburgh Press Co.* v. *Pittsburgh Commission on Human Relations*, 413 U. S. 376, 385 (1973)), or because the speaker is a television network or a broadcast station (*Columbia Broadcasting System, Inc.* v. *Democratic National Committee*, 412 U. S. 94 (1973); *Rosenbloom* v. *Metromedia, Inc.*, 415 F. 2d 892, 895 (3d Cir. 1969), *aff'd*, 403 U. S. 29 (1971)).

Further, television entertainment programming does not fall within any of the kinds of utterances that the Supreme Court has excepted from First Amendment protection. Thus, it is not obscene (*Roth* v. *United States*, 354 U. S. 476, 481 (1957)). Nor is it "purely commercial advertising" (*Valentine* v. *Chrestensen*, 316 U. S. 52, 54 (1942)) which does "no more than propose a commercial transaction" (*Pittsburgh Press Co.* v. *Pittsburgh Commission on Human Relations*, 413 U. S. 376, 385 (1973)). Nor are we concerned here with publications that violate copyrights sanctioned by the Constitution (Art. 1, § 7) or that constitute a "clear and present danger" (*Near* v. *Minnesota*, 283

U. S. 697, 713 (1931)), much less "grave and irreparable danger" to national security (*New York Times* v. *United States*, 403 U. S. 713, 732 n. 2 (1971)).

The relief sought would enjoin a network from "transmitting" any television play—such as "I Love Lucy" or "All in the Family"—if a network happened to be the producer of the play. The only practical use a network can make of television entertainment programs is to transmit them for use on television. By asking for an injunction against "transmission" of network-produced programs, the Government seeks to prohibit their only practical use and thus totally to bar the networks from this form of speech.

The fact that the Government would leave the networks free to produce news, sports and public affairs programming is completely irrelevant to the First Amendment analysis of what it would proscribe. A decree prohibiting Doubleday from publishing novels and poetry would not be rescued from constitutional infirmity because it did not bar the publication of history and biography. *See Schneider* v. *State*, 308 U. S. 147, 163 (1939). Nor does the fact that the Government would leave the networks free to carry entertainment programming produced by others cure the defect. Presumably a newspaper could subsist on wire service stories and syndicated columnists—but it cannot be compelled to do so (even if it were the only newspaper in town) because the First Amendment guarantees to its editors the right to speak their own mind. Yet the Government would prohibit each of the networks from carrying its own version of *Merchant of Venice*, *Rigoletto* or *Porgy and Bess*, or from using its talents to create new works such as *Miss Jane Pitman* or *Gunsmoke*—or even from having its own announcers read the poems of Robert Frost or Walt Whitman. Such an injunction against protected speech is absolutely barred by the First Amendment. *E.g.*, *New York Times Co.* v. *United States*, 403 U. S. 713, 714 (1971); *Carroll* v. *President and Commissioners*, 393 U. S. 175, 181 (1968); *Lovell* v. *Griffin*, 303 U. S. 444, 451-52 (1938); *Near* v. *Minnesota*, 283 U. S. 697, 713 (1931).

The Supreme Court has repeatedly held that the Government, in imposing otherwise reasonable regulations of business activity, cannot proceed in a way which, as here, would result in the elimination of a form of speech. *E.g.*, *Amalgamated Food Employees Local 590* v. *Logan Valley Plaza, Inc.*, 391 U. S. 308, 315 (1968); *Marsh* v. *Ala-*

*bama*, 326 U. S. 501, 504 (1946); *Thomas* v. *Collins*, 323 U. S. 516, 532 (1945); *Schneider* v. *State*, 308 U. S. 147 (1939); *Lovell* v. *Griffin*, 303 U. S. 444 (1938).

The fundamental point is that there is no decision which, whatever the circumstances, holds that a form of protected speech may be absolutely suppressed. And while the Government prays for precisely that relief, the decisions upon which it relies show instead why such relief is not available under the First Amendment.

The Government relies upon cases in which regulations of the Federal Communications Commission were sustained despite a claim that a First Amendment right was in conflict with what the Commission did. Those cases rest on the proposition that the inherent properties and limitations of the broadcast frequencies make government licensing and regulation essential if any effective use is to be made of them at all.* Each of those cases, however, recognizes First Amendment constraints upon what can lawfully be done by the Government. Thus, in *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367 (1969), the Supreme Court said:

> "There is no question here of the Commission's refusal *to permit the broadcaster to carry a particular program or to publish his*

---

*As the Supreme Court stated in *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 375-77 (1969):

> "Before 1927, the allocation of frequencies was left entirely to the private sector, and the result was chaos. It quickly became apparent that broadcast frequencies constituted a scarce resource whose use could be regulated and rationalized only by the Government. Without government control, the medium would be of little use because of the cacaphony of competing voices, none of which could be clearly and predictably heard. Consequently, the Federal Radio Commission was established to allocate frequencies among competing applicants in a manner responsive to the public 'convenience, interest, or necessity.'" (Footnotes omitted.)

It should be recognized that network transmission to which the relief sought here relates does not entail the use of broadcast frequencies nor, indeed, "broadcasting" as the term is defined by the Communications Act—*i.e.*, the transmission of a signal for reception "by the public" (47 U. S. C. § 153(o)). The broadcasting of television entertainment programs is performed by hundreds of local stations throughout the country, which are licensed to do so by the FCC and which are not parties to these actions. Networks do not broadcast. Instead, networks transmit programs over telephone lines only to local stations. The local stations then determine what to broadcast, as the Supreme Court has recently noted, by "exercising a creative choice among the many possible programs available from the national network with which it is affiliated, from copyright holders of new or rerun motion pictures, or from its own facilities to generate and produce entirely original program material." *Teleprompter Corp.* v. *Columbia Broadcasting System, Inc.*, 94 S. Ct. 1129, 1139 (1974).

> *own views.*... Such questions would raise more serious First Amendment issues." 395 U. S. at 396 (emphasis added).

*Red Lion* sustained the FCC's Fairness Doctrine, which, far from prohibiting speech, has been held to require broadcasters to "initiate programming on public issues if no one else seeks to do so." *Columbia Broadcasting System, Inc* v. *Democratic National Committee,* 412 U. S. 94, 111 (1973). It is precisely the "more serious" First Amendment issues recognized in *Red Lion* that are presented here, because the Government here claims that a network cannot "publish . . . [its] own views" by transmitting "a particular program" which it produces.

Similarly, the Second Circuit in *Mt. Mansfield Television, Inc.* v. *FCC,* 442 F. 2d 470, 476 (2d Cir. 1971), recognized that it "is well settled that First Amendment protection is applicable to the broadcast industry" while upholding FCC regulations which, in effect, governed the amount of network-supplied programming that certain stations could broadcast during certain time periods. The regulations did not impose any limitation, much less a flat prohibition, on network production or transmission of programming. What was not sought there, and is sought here, is the total elimination of network production. *Mt. Mansfield* clearly does not support the extraordinary proposition, advanced by the Government on this motion to strike, that the networks are not entitled to any First Amendment protection or that any act of Congress takes precedence over the First Amendment.

In *Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S. 94 (1973), the Supreme Court held that a television network was not required to sell advertising time to a political party.* The Court noted that the Communications Act provides (47 U. S. C. § 326) that the FCC shall not have "the power of censorship" and that "no regulation or condition shall be promulgated or fixed by the Commission which shall interfere with the right of free speech by

*By barring the networks from producing any entertainment programming themselves, the Government's requested relief here necessarily would compel the networks to purchase all such programming from some nonnetwork supplier. But if, under the Supreme Court's decision in *Democratic National Committee* a network cannot be compelled to *sell* advertising time, neither can it be compelled to *buy* someone else's programming. Congress, too, has legislated against any such approach to broadcasters, providing in the Communications Act that "a person engaged in radio broadcasting shall not . . . be deemed a common carrier". 47 U. S. C. § 153(h). *See also* 47 U. S. C. § 326.

means of radio communication". The Court emphasized that "the right to exercise editorial judgment was granted to the broadcaster" (*id.* at 111), that broadcasters are editors, that "editing is what editors are for; and editing is selection and choice of material" (*id.* at 124); and finally that any governmental interference with the "process involving the very editing that licensees perform as to regular programming" (*id.* at 126) would meet with disapproval:

> "... Although the use of a public resource by the broadcast media permits a limited degree of Government surveillance, as is not true with respect to private media, see *National Broadcasting Co.* v. *United States,* 319 U. S. 190, 216-219 (1943), the Government's power over licensees, as we have noted, is by no means absolute and is carefully circumscribed by the Act itself." *Id.**

In *National Broadcasting Co.* v. *United States,* 319 U. S. 190 (1943), the Court dealt with regulations that governed the contractual relationships between radio networks and stations. Those regulations did not prohibit networks or stations from producing programming of any sort. The Court upheld the regulations in the face of a First Amendment challenge, but added that if, for example, the regulations had touched on "political, economic or social views", then "the issue before us would be wholly different". 319 U. S. at 226. Entertainment programming, of course, reflects such views in myriad ways, and the Government's request to prohibit the networks from producing such programming is the "wholly different" issue present here.

The Government also cites two antitrust cases involving newspapers, but both dealt with business practices unrelated to the First Amendment and each stated why there was no clash between the relief decreed and the First Amendment.

In *Associated Press* v. *United States,* 326 U. S. 1 (1945), the Supreme Court held that an association of publishers could be enjoined from excluding other publishers from membership in the association. The Court was careful to point out that the decree involved had no effect whatsoever on the First Amendment activities of the association:

*Even the two dissenting Justices who would have required broadcasters to accept some editorial paid advertising, emphasized that "this case deals *only* with the allocation of advertising time—air time that broadcasters regularly relinquish to others without the retention of significant editorial control. Thus we are concerned here not with the speech of broadcasters themselves. . . ." *Id.* at 199-200; emphasis in original.

"... The decree does not compel AP or its members to permit publication of anything which their 'reason' tells them should not be published. It only provides that after their 'reasc ' has permitted publication of news, they shall not, for their ov ˆnancial advantage, unlawfully combine to limit its publication. .." 326 U. S. at 20 n.18.

Similarly, in *United States* v. *Lorain Journal Co.*, 92 F. Supp. 794 (N. D. Ohio 1950), *aff'd*, 342 U. S. 143 (1951), the only newspaper publisher in a community sought to destroy competition from a new radio station by refusing to accept advertising from anyone who dealt with the radio station. Th_ was enjoined because, as the district court wrote, "prior restraint on the substance of expression is one thing; injunctive relief against the repetition of the commercial abuse proved here is quite another". 92 F. Supp. at 801. The court also wrote that

"There is no appeal to any Court more apt to strike a responsive chord than an appeal to rights guaranteed by the First Amendment and under no consideration would this Court reach the conclusions here expressed were they instrumental in undermining or even affecting a free press. In the balance of our constitutional scheme the importance of the First Amendment may be such that sanctions consonant with the Commerce Clause, art. 1, § 8, cl. 3, and clearly applicable to other enterprises cannot be used against a newspaper. . . ." 92 F. Supp. at 800.

By contrast, in *Sun Publishing Co.* v. *Walling*, 140 F. 2d 445 (6th Cir.), *cert. denied*, 322 U. S. 728 (1944), where the district court had enjoined delivery or transport of newspapers that had been published by an employer who violated the Fair Labor Standards Act, the court of appeals found the injunction constitutionally impermissible because

"[t]he effect of the presently ordered injunction is not the mere withdrawal from the appellant of the second class mailing privilege ... but is to close to it all the channels of commerce." 140 F. 2d at 450.

As such, it amounted to "suppression and injunction which is a restraint upon publication. Near v. State of Minnesota, supra." *Id.*

Like the decree reversed in *Sun Publishing*, the relief requested by the Government here explicitly seeks "suppression and injunction" of all network-produced entertainment programs. This kind of sanction must be tested against a long history of Supreme Court decisions which have gone far to assure not only that First Amendment rights are protected against the direct restraint sought here but also that they are protected from various kinds of indirect restraints or "chilling effects."* If "chilling effects" upon speech are not tolerated, if even the publication of documents stolen from the Pentagon will not be enjoined, then a First Amendment defense to an action seeking an injunction against television entertainment programming should be sustained.**

That is particularly so where, as here, the First Amendment issue is framed solely on the pleadings. The Government simply states that the First Amendment can have no bearing on the relief it seeks and moves to eliminate it from any further consideration in the case. But that, as amply demonstrated by the cases which the Government has cited, is wholly inconsistent with what the courts have held.

---

**E.g.*, *Dombrowski* v. *Pfister*, 380 U. S. 479 (1965) (chilling effect on First Amendment rights of threatened prosecution under statute purporting to regulate expression justifies injunctive relief by federal court); *NAACP* v. *Button*, 371 U. S. 415 (1963) (law prohibiting NAACP from assisting in litigation voided as infringing First Amendment rights); *NAACP* v. *Alabama*, 357 U. S. 449 (1958) (state cannot compel disclosure of list of organization's members be cause of interference with their constitutional right of association); *Murdock* v. *Pennsylvania*, 319 U. S. 105 (1943) (state cannot impose a tax upon the exercise of a First Amendment right); *Bridges* v. *California*, 314 U. S. 252 (1941) (contempt of court convictions for publications held to offend First Amendment); *Thornhill* v. *Alabama*, 310 U. S. 88 (1940) (state cannot regulate labor disputes by statute which also violates First Amendment rights); *Grosjean* v. *American Press Co.*, 297 U. S. 233 (1936) (state cannot impose a tax which has the purpose of curtailing newspaper circulation); *Near* v. *Minnesota*, 283 U. S. 697 (1931) (state cannot regulate press by statute permitting injunction against future publications).

**Inasmuch as the Court has previously recognized the substantial constraints on relief imposed by the necessity of accommodating FCC policy (Opinion and Order of October 29, 1973, at 9-10), the recognition of still further constraints imposed by the Constitution can only heighten doubts as to whether the prosecution of the litigation is worthwhile and, indeed, "might render the prosecution of these cases unnecessary" (*id.* at 10).

IV.

**THE TWENTY-YEAR HISTORY OF GOVERNMENT INVOLVEMENT WITH THIS INDUSTRY AND ITS FAILURE TO SUE UNTIL 1972 SUPPORTS THE LACHES DEFENSE ASSERTED HERE.**

The Government cites several cases for the proposition that the defense of laches* cannot lie under any circumstances in Government antitrust actions (Gov't Memo, pp. 25-26). Some of the Government's cases, however, do not concern laches, and in those instances where a question concerning laches was actually in issue, the facts underlying the claim were either undeveloped or far less compelling than the facts here.

Thus, in *United States* v. *General Instrument Corp.*, 87 F. Supp. 157 (D. N. J. 1949), decided upon cross motions for summary judgment, not on a motion to strike a defense of laches from the pleadings, defendants complained of a twenty-month delay, during the Second World War, in filing charges of conspiracy to monopolize. Defendants claimed that the Government had

> " 'knowledge of such information as would put a reasonable person upon inquiry, if pursued, would [*sic*] have led to knowledge of the matters and things about which plaintiff now complains . . .' " 87 F. Supp. at 164.

The court found that

> "[T]o develop the facts necessary to initiate an action of the scope here involved required a tremendous investigatory task. The plaintiff was not placed on notice leading to a reasonable belief of suppression of competition in violation of the Sherman Act . . . until sometime during the war emergency a bottleneck developed in variable condenser production. . . . [The proof] necessitated minute and detailed study to develop the facts." *Id.*

In *United States* v. *Pennsalt Chemicals Corp.*, 262 F. Supp. 101 (E. D. Pa. 19[illegible]), the Government challenged acquisitions made within a four-year period before the suit was filed. While holding that laches was not a defense to that action, the court stated:

> "Of course, facts which would amount to laches can properly be considered in choosing among various alternative forms of

*Asserted by CBS as its twelfth defense and by NBC as its tenth defense. ABC did not plead the defense.

relief if framing a decree becomes appropriate. And it should perhaps be mentioned, in view of the probable motivation of counsel in contesting the present motion, that striking the defense of laches from the pleadings does not determine the limits of permissible discovery." 262 F. Supp. at 101-102.

*Times-Picayune Publishing Co.* v. *United States*, 345 U. S. 594, 623-24 (1953), also cited by the Government, which reversed a district court judgment against the defendants after "intensive trial of the facts" (at 597), did not concern whether laches was an affirmative defense. Moreover, the "long tolerated trade arrangements" referred to in the Courts' opinion (Gov't Memo, p. 25) were not the practices of the defendants but of others in the industry. Furthermore, the Court observed that the "prosecutor's delay" was "not wholly irrelevant" (345 U. S. at 624) in determining whether the defendants could be liable under the antitrust claims made against them. Thus, not only was the question of laches not in issue, but if *Times-Picayune* has any bearing on the question, it supports our contention that it is proper to plead it as a defense.*

The Government's other citations (Gov't Memo, pp. 25-26) also do not deal with the question whether laches can be pleaded as an affirmative defense to a Government civil antitrust action.

Here, by contrast, the Government itself essentially establishes its own laches by stating that "[t]he filing of the complaints [in 1972] was the culmination of an intermittent investigation of the program practices of NBC, CBS and ABC by the Antitrust Division which commenced in the mid-1950's". (Gov't Memo, p. 3; *see also* App. 310-11) The Government has known since that time anything it wanted to learn about the networks' business practices. They were conducted in public, out in the open, and they were indeed investigated and scrutinized for years.**

---

**See United States* v. *Oregon State Medical Society*, 343 U. S. 326 (1952), in which the Supreme Court affirmed the dismissal of a Government anti-trust complaint and also approved the district court's refusal to consider proof of defendant's activities during the first eleven years of the eighteen-year period prior to trial as "ancient history" (at 332).

**Nevertheless, the Government here has called for production of documents from the networks dating back to 1952. The Government seeks to justify such discovery by claiming that the "roots" of what is here alleged to be unlawful "will be found in illegal conduct which occurred in the 1950's." (Gov't Memo 4/22/74, p. 6) The Government claims no greater knowledge now about the 1950's than its investigations produced then, and yet it made no claims of "illegal conduct" for twenty years.

There is no charge of conspiracy in these cases; no suggestion that defendants have hidden their activities or kept them secret from the Government. Yet the Government claims a right retroactively to cancel business arrangements in which substantial investments have been made by asking that unspecified "contracts . . . be declared void" (Memorandum of the United States in Opposition to Defendants' Motion to Dismiss or Stay These Actions, 10/16/72, p. 22). How long must a corporate citizen continue to invest substantial sums in doing business in a particular way only to learn years later that such activity, though meticulously scrutinized by the Government during all that time, was undertaken at its peril because the Government finally decided for whatever reason to bring suit?

## CONCLUSION

For the foregoing reasons, the Government's motions should be denied.

Respectfully submitted,

BRUCE BROMLEY
ROBERT S. RIFKIND
LEONARD P. NOVELLO
ROBERT F. MULLEN
PAUL C. SAUNDERS
DOUGLAS D. BROADWATER
STEVEN M. EDWARDS
One Chase Manhattan Plaza
New York, N. Y. 10005
(212) 422-3000

WILLIAM W. VAUGHN
611 West Sixth Street
Los Angeles California 90017
(213) 620-1120
*Attorneys for Defendant CBS.*

CRAVATH, SWAINE & MOORE
One Chase Manhattan Plaza
New York, N. Y. 10005

O'MELVENY & MYERS
611 West Sixth Street
Los Angeles, California 90017
*Of Counsel.*

HERBERT A. BERGSON
DANIEL H. MARGOLIS
21 Dupont Circle, NW
Washington, D. C. 20036
(202) 785-5903

ANTHONY E. LIEBIG
611 West Sixth Street
Los Angeles, California 90017
(213) 620-9000
*Attorneys for Defendant ABC.*

BERGSON, BORKLAND, MARGOLIS & ADLER
21 Dupont Circle, NW
Washington, D. C. 20036

LILLICK, McHOSE, WHEAT, ADAMS & CHARLES
611 West Sixth Street
Los Angeles, California 90017
*Of Counsel.*

April 26, 1974.