# **Exhibit 6**

(Cardona Declaration)

*Exhibit 26*

*Excerpts from White House Statement on ITT Antitrust Decision, Weekly Compilation of Presidential Documents, Vol. 10, No. 2, pp. 28-32.*

### BACKGROUND ON THE ITT LITIGATION

The Justice Department in 1969 initiated civil litigation against the International Telephone and Telegraph Co., a major "conglomerate," for alleged violations of the antitrust laws. The allegations involved acquisitions by ITT of the Grinnell Corporation, the Hartford Fire Insurance Company, and the Canteen Corporation. These were only the latest and among the largest of a series of acquisitions made by ITT in the years since 1963, a period in which favorable tax laws, among other things, made acquisitions popular.

Under Assistant Attorney General McLaren, the Antitrust Division of the Justice Department was concerned with the implementation of an antitrust policy which attacked the general merger trend not only because the effect of the corporate growth "may be substantially to lessen competition," conduct clearly proscribed by the antitrust laws, but also because of the economic concentration itself.

Other experts, including many of the President's advisers, did not see the role of antitrust law in such all-encompassing terms. They believed that to use the law of antitrust to achieve political and economic aims beyond prevention of restraint of trade was unsound. If there were dangers such as Mr. McLaren and his colleagues feared from conglomerates, President Nixon and his advisers, along with other experts, preferred solving them through legislation.

Executives of ITT were also concerned about the Justice Department action, and talked with various administration officials to learn their views. The chief executive officer of ITT, Harold Geneen, was sufficiently concerned that he attempted to talk to the President personally about these issues in the summer of 1969. The President's advisers thought that such a meeting was not appropriate, and the meeting was not held.

Other White House officials, however, did talk to various representatives of ITT about antitrust policy. Those discussions invariably focused on the legal and economic issues of whether antitrust suits should be pursued simply because companies are large or rather because they are actually restraining trade in a tangible way. Papers relating to those conversations have been voluntarily turned over to the Special Prosecutor.

*Exhibit 26*

*Excerpts from White House Statement on ITT Antitrust Decision, Weekly Compilation of Presidential Documents, Vol. 10, No. 2, pp. 28-32.*

### MAKING THE ITT CASES CONSISTENT WITH ADMINISTRATON POLICY ON ANTITRUST

During the latter part of 1970, there was a question among White House advisers about whether the antitrust actions against the ITT were consistent with the notion of keeping hands off companies unless they had committed some clear restraint of trade rather than simply becoming large in size, and generally whether the ITT suits were consistent with administration policy on antitrust.

\* \* \*

By the spring of 1971, the President, based on the information and advice he had received, had concluded that the ITT litigation was inconsistent with his own views on antitrust policy. The Department of Justice and some of the President's advisers continued to maintain, however, that the cases were not an attack on bigness and were based on clear anti-competitive effects of the acquisitions.

On April 19, 1971, in a meeting with John Ehrlichman and George Shultz, then Director of the Office of Management and Budget, the President was told by Mr. Ehrlichman that the Justice Department had filed an appeal with the Supreme Court in the Grinnell case which Mr. Ehrlichman described as an "attack on a conglomerate." Mr. Ehrlichman further told the President that he believed that prosecution of the case was contrary to the President's antitrust policy and that, as a result, he had tried to persuade the Justice Department not to file a jurisdictional statement (due the following day) so as to terminate the appeal. He indicated, however, that he had been unsuccessful with the Justice Department.

The President expressed irritation with the failure of the head of the Antitrust Division, Mr. McLaren, to follow his policy. He then placed a telephone call to Deputy Attorney General Kleindienst and ordered that the appeal not be filed. The meeting continued with a further discussion of antitrust policy during which Mr. Schultz expressed the view that conglomerates had been unfairly criticized.

The Justice Department, on April 20, 1971, requested and was granted a delay in filing the appeal which was due that day. On the

*Exhibit 26*

*Excerpts from White House Statement on ITT Antitrust Decision, Weekly Compilation of Presidential Documents, Vol. 10, No. 2, pp. 28-32.*

following day, April 21, 1971, Mr. John N. Mitchell, the Attorney General, advised the President that in his judgment it was inadvisable for the President to order no appeal to the Supreme Court in the Grinnell case. The Attorney General reasoned that, as a personal matter, Mr. Edwin N. Griswold, Solicitor General of the United States, had prepared his brief for appeal and would resign were the appeal not to proceed. The Attorney General further feared legislative repercussions if the matter were dropped entirely. Based upon the Attorney General's recommendations, the President reversed his decision of April 19, 1971, and authorized the Department of Justice to proceed with the case in accordance with its own determinations. He said that he did not care about ITT as such, but that he wanted the Attorney General to see that his antitrust policy was carried out.

At the end of the same month, April 1971, the President approved a proposal for creating a central clearing-house for information about Government antitrust policy within the White House, to ensure that the President's views on the subject could be made known to all the operating agencies.

On April 29, 1971, a meeting of ITT representatives, Department of Justice and Department of Treasury officials was held at the Department of Justice wherein ITT made a presentation concerning the financial ramifications of the proposed divestiture actions. Following the meeting, the Department of Justice requested that the Treasury Department and an outside consultant specializing in financial analysis evaluate the ITT claims. These evaluations were made in addition to the Justice Department's own analysis of competitive effect.

Based on the completed assessment, Assistant Attorney General McLaren, on June 17, 1971, sent a memorandum to the Deputy Attorney General outlining a proposed settlement. This proposal was subsequently communicated to ITT representatives and after further negotiations a final settlement, extremely similar to Mr. McLaren's June 17 proposal, was agreed upon in principle on July 31, 1971, and final consent judgments were entered by the United States District Courts on September 24, 1971.

\* \* \*

A-103

## Exhibit 26

*Excerpts from White House Statement on ITT Antitrust Decision, Weekly Compilation of Presidential Documents, Vol. 10, No. 2, pp. 28-32.*

SELECTION OF SAN DIEGO FOR REPUBLICAN NATIONAL CONVENTION

The separate and unrelated process of decisionmaking regarding the Republican National Convention began in 1971, when the site selection committee started to examine prospective sites.

\* \* \*

The White House Staff report to Chief of Staff H. R. Haldeman on possible convention sites made no mention of ITT. Rather, it recommended San Diego because of California's Republican Governor, San Diego's Republican Congressman, its proximity to the Western White House, its outstanding climate, its relatively large bid in money and services, the importance of California in the electoral tally, the attractive outdoors atmosphere of the town, and the excellent security which could be offered.

The President, himself, informed Senator Robert Dole, Chairman of the Republican National Committee, that whatever Senator Dole and the site selection committee decided was agreeable to him. Subsequently, the President approved the selection of San Diego by the site selection committee.

\* \* \*