# Exhibit 35

(Cardona Declaration)

### Page 1

```
            Examination of ALEXANDER CRAIG
                 Pursuant to Subpoena

                                June 28, 2012
                                3:50 p.m.
                                26 Federal Plaza
                                New York, New York




Reported by:
Susan B. Ratner, a Shorthand Reporter and
Notary Public of the State of New York
```

### Page 2

```
APPEARANCES:

UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
   950 Pennsylvania Avenue, N.W.
   Washington, D.C. 20530
BY: GEOFFREY A. GRABER, ESQ.

UNITED STATES DEPARTMENT OF JUSTICE
Consumer Protection Branch
   450 Fifth Street N.W., Room 6407
   Washington, D.C. 20001
BY: JAMES T. NELSON, ESQ.

ARTHUR H. SALMAN, ESQ.
Attorney for the Witness
   Group Vice President
   Deputy General Counsel
   M&T Bank
   One M&T Plaza - 12th Floor
   Buffalo, New York 14203
```

### Page 3

1 
2 ALEXANDER CRAIG,
3  called as a witness, having been first duly
4  sworn by the Notary Public (Susan B. Ratner),
5  was examined and testified as follows:
6 EXAMINATION BY
7 MR. GRABER:
8  Q. Good afternoon.
9     Would you please state your name and
10 spell your last name for the record.
11  A. Alexander Craig, A-l-e-x-a-n-d-e-r
12 C-r-a-i-g.
13  Q. Thank you, again, for speaking with the
14 government today.
15     Before we begin, Mr. Craig, you are not
16 on any medication, or under the influence of any
17 drugs that would interfere with your ability to give
18 truthful and accurate testimony today; is that
19 right?
20  A. That is right.
21  Q. Mr. Craig, you work at M&T Bank; is that
22 right?
23  A. Yes.
24  Q. When did you start working there?
25  A. In 1995.

### Page 4

1  A. Craig
2  Q. What positions have you held, just
3 generally?
4  A. Generally, trading positions and
5 portfolio manager.
6  Q. In 2007, what position did you hold?
7  A. I was the portfolio manager for M&T Bank.
8  Q. Can you briefly describe for me your
9 responsibilities as the portfolio manager in 2007?
10  A. I led a team of analysts to investigate
11 various investment options that the bank may want to
12 pursue.
13  Q. In 2006 and 2007, were there investment
14 guidelines at M&T Bank?
15  A. Yes, there were.
16  Q. Did that include a minimum credit rating
17 on financial products purchased by the bank?
18  A. Yes.
19  Q. In 2006 and 2007, what was the minimum
20 credit rating that a financial product had to have
21 to be eligible for investment by the bank?
22  A. Through much of 2006 the minimum credit
23 rating for an initial purchase was an AA rating.
24     Towards the end of 2006 the policy was
25 modified to make the minimum credit rating for a

Page 5

1    A. Craig
2 purchase A.
3    Q. In late 2006, was there a decision to
4 start looking at possible investments in
5 collateralized debt obligations, or CDOs?
6    A. Yes.
7    Q. Who made that decision?
8    A. The treasurer of the bank, Adam Kugler.
9    Q. Did he give you any direction with
10 respect to that decision?
11    A. He asked that I investigate the
12 collateralized debt obligation marketplace, and
13 follow up on several investment managers in that
14 space.
15    Q. Let me turn back very quickly to the
16 investment guidelines at M&T.
17       You mentioned that there is a minimum
18 credit rating requirement.
19       Do you recall that?
20       We just discussed that.
21    A. Yes.
22    Q. Can you explain, what was your
23 understanding as to why there was a credit rating
24 requirement?
25    A. The bank needed to -- all of the

Page 6

1    A. Craig
2 investments in the portfolio needed to be bank
3 eligible.
4       To qualify for bank eligibility those
5 investments needed to have a credit rating that was
6 investment grade or better.
7 EXAMINATION BY
8 MR. NELSON:
9    Q. What was your understanding of why that
10 was the case, why was this requirement?
11    A. That requirement was, I believe, a
12 regulatory requirement focused on the safety and
13 soundness of the institution.
14    Q. Was the requirement at M&T higher than
15 the bank requirement?
16    A. Yes.
17       The banking regulatory requirement of an
18 investment grade was lower than M&T Bank's minimum
19 credit rating for an initial investment.
20    Q. What was your understanding of why M&T
21 chose a higher minimum credit rating?
22    A. M&T's investment portfolio's primary goal
23 is interest rate risk management, the second goal is
24 liquidity, and the third goal is to try and utilize
25 excess capital.

Page 7

1    A. Craig
2       The first goal, being interest rate risk
3 management, meant we tried to not take any credit
4 risk, any material credit risk. That was really the
5 domain of the rest of the bank, the commercial and
6 retail bank.
7    Q. Was part of the higher threshold a way to
8 ensure that your investments were safer, at the
9 higher credit rating threshold?
10    A. Higher than the regulatory minimum, yes.
11 FURTHER EXAMINATION
12 BY MR. GRABER:
13    Q. In 2007, when purchasing financial
14 products such as collateralized debt obligations,
15 did you rely, in part, on the credit rating?
16    A. Yes.
17    Q. In 2007, did M&T Bank purchase CDOs?
18    A. Yes.
19    Q. What were the names of those CDOs, to the
20 best of your recollection?
21    A.
22
23    Q.
24    A.
25    Q. Were the bonds purchased in connection

Page 8

1    A. Craig
2 with those two CDOs rated by credit rating agencies?
3    A. Yes, they were.
4    Q. Were they rated by Standard & Poor's?
5    A. Yes, they were.
6    Q. To the best of your recollection, what
7 were the ratings on the CDOs that M&T purchased?
8    A. They purchased two classes of
9 One was rated AAA. The other was rated AA.
10       We purchased one class of the      CDO.
11 It was rated AAA.
12    Q. Did you make certain recommendations with
13 respect to these investments?
14    A. I did.
15       Upon researching and reviewing the
16 investment manager for the CDO, HPK, spending time
17 in their office, and interviewing them, I was
18 comfortable recommending them as an investment
19 manager for these CDOs.
20    Q. Did you also rely, in part, on the credit
21 ratings on                    CDOs when making
22 your investment recommendation?
23    A. We did.
24       It was a requirement of the investment
25 portfolio policy to have an AAA, AA, or A rating.

Page 9

1      A. Craig
2   Q. Did the credit ratings that were attached
3 to those bonds that M&T purchased lead you to
4 believe that the bonds were relatively safe?
5   A. Yes.
6 FURTHER EXAMINATION
7 BY MR. NELSON:
8   Q. Did M&T policy require you to require the
9 bonds to be rated by more than one credit rating
10 agency?
11   A. No.
12 FURTHER EXAMINATION
13 BY MR. GRABER:
14   Q. In 2007, was it your understanding that
15 Standard & Poor's, or S&P, was a neutral party to
16 the CDOs purchased by M&T?
17   A. Yes.
18   Q. Was it your understanding that S&P was
19 objective and independent in the way that it issued
20 credit ratings, including ratings on CDOs?
21   A. Yes.
22   Q. Mr. Craig, I want to show you a few
23 documents here with respect to the question that I
24 just asked.
25      (Government Exhibit 1 (on Craig

Page 10

1      A. Craig
2   examination), 12-page document, "Testimony
3   of Kathleen A. Corbet President of Standard
4   & Poor's, a Division of the McGraw-Hill
5   Companies, Inc., Before the Committee on
6   Banking, Housing and Urban Affairs, United
7   States Senate, February 8, 2005," Bates
8   stamped Nos. S&P DOJ 0068378 through
9   S&P DOJ 0068389, marked for identification,
10   as of this date.)
11 BY MR. GRABER:
12   Q. I am handing you what has been marked as
13 Government Exhibit 1.
14      MR. GRABER: I should state for the
15   record that you are represented by counsel
16   here.
17      You should state your presence on the
18   record.
19      MR. SALMAN: Arthur Salman, S-a-l-m-a-n.
20      MR. GRABER: Just for the record, I am
21   handing the exhibit and a copy to you and
22   your counsel.
23   Q. If you could take a look at that
24 document for a moment, I will direct your attention
25 to the portion that I am going to ask you about.

Page 11

1      A. Craig
2      MR. GRABER: Just for the record, this is
3   a document entitled "Testimony of Kathleen A.
4   Corbet President of Standard & Poor's, a
5   Division of the McGraw-Hill Companies, Inc.,
6   Before the Committee on Banking, Housing
7   and Urban Affairs, United States Senate,
8   February 8, 2005."
9   Q. I direct your attention to page 8, and
10 to the language toward the bottom of the page, just
11 before the bullets, where it says, "...Our mission
12 to provide high-quality, objective and rigorous
13 analytical information to the marketplace."
14      Do you see that?
15   A. Yes.
16   Q. Is that statement consistent with your
17 understanding of the way Standard & Poor's
18 conducted its business and issued credit ratings?
19   A. It is.
20      (Government Exhibit 2 (on Craig
21   examination), 16-page document, "Standard &
22   Poor's Ratings Services Code of Conduct,"
23   dated October 2005, Bates stamped Nos.
24   S&P DOJ 0466703, S&P DOJ 0466703.0002
25   through S&P DOJ 0466704.0016, marked for

Page 12

1      A. Craig
2   identification, as of this date.)
3 BY MR. GRABER:
4   Q. I am handing you and your counsel what
5 has been marked as Government Exhibit 2.
6      MR. GRABER: For the record, this is a
7   document entitled "Standard & Poor's Ratings
8   Services Code of Conduct," dated October 2005.
9   Q. I direct your attention to page 4.
10      Under part C, "Integrity of the Rating
11 Process," section 1.12 -- do you see that?
12   A. Yes.
13   Q. -- it says, "Ratings Services and its
14 employees shall deal fairly and honestly with
15 issuers, investors, other market participants, and
16 the public."
17      Do you see that?
18   A. Yes.
19   Q. Is that consistent with your
20 understanding in 2007 of the way that S&P conducted
21 its business and issued credit ratings?
22   A. It is.
23   Q. I direct you to the next page, page 5,
24 under "Independence and Avoidance of Conflicts of
25 Interest," subpart A -- do you see that there?

Page 13

1      A. Craig
2      A. Yes.
3      Q. -- under 2.1, it states, "Ratings
4  Services shall not forbear or refrain from taking a
5  Rating Action, if appropriate, based on the
6  potential effect (economic, political, or otherwise)
7  of the Rating Action on Ratings Services, an issuer,
8  an investor, or other market participant."
9         Do you see that?
10     A. Yes.
11     Q. Is that statement consistent with your
12 understanding of the way that S&P conducted its
13 business and issued credit ratings?
14     A. It is.
15     Q. Then, in 2.2, it states, "Ratings
16 Services and its Analysts shall use care and
17 analytic judgment to maintain both the substance and
18 appearance of independence and objectivity."
19        Do you see that?
20     A. Yes.
21     Q. Is that consistent with your
22 understanding at the time, in 2007, with regard to
23 the way S&P conducted its business, and the way that
24 S&P issued credit ratings?
25     A. It is.

Page 14

1      A. Craig
2      Q. If you go to 2.4, it says, "Ratings
3  assigned by Ratings Services to an issuer or issue
4  shall not be affected by the existence of, or
5  potential for, a business relationship between
6  Ratings Services (or any Non-Ratings Business) and
7  the issuer (or its affiliates) or any other party,
8  or the non-existence of such a relationship."
9         Do you see that there?
10     A. Yes.
11     Q. Is that consistent with your
12 understanding at the time, in 2007, with regard to
13 how S&P conducted its business and the way that it
14 arrived at its credit ratings?
15     A. It is.
16        (Government Exhibit 3 (on Craig
17        examination), 17-page document, "Report on
18        Implementation of Standard & Poor's Ratings
19        Services Code of Conduct, February 2006,"
20        marked for identification, as of this date.)
21 BY MR. GRABER:
22     Q. I am handing you and your counsel what
23 has been marked as Government Exhibit 3.
24        MR. GRABER: For the record, the title of
25     this document is "Report on Implementation of

Page 15

1      A. Craig
2  Standard & Poor's Ratings Services Code of
3  Conduct, February 2006."
4      Q. I direct your attention to page 1.
5         Do you see the second paragraph there in
6  the introduction, and the first sentence?
7         "Ratings Services recognizes its role in
8  the global capital markets and is committed to
9  providing ratings that are objective, independent
10 and credible."
11        Do you see that?
12     A. Yes.
13     Q. Is that consistent with your
14 understanding in 2007 as to the way S&P conducted
15 its business and arrived at credit ratings?
16     A. It is.
17     Q. If you go to page 6, under
18 "Surveillance," do you see there, it says, "Ratings
19 are monitored on an ongoing basis in accordance with
20 Ratings Services policies unless the rating is a
21 point in time confidential rating without
22 surveillance"; do you see that?
23     A. Yes.
24     Q. Is that consistent with your
25 understanding in 2007 as to the way S&P conducted

Page 16

1      A. Craig
2  its business and arrived at its credit ratings?
3      A. It is.
4      Q. And the way that it monitored credit
5  ratings, right?
6      A. Yes.
7      Q. If you go to page 10, do you see
8  "Independence of Rating Decisions" there?
9      A. Yes.
10     Q. The first paragraph says, "It is a
11 central tenet of Ratings Services that its ratings
12 decisions not be influenced by the fact that Ratings
13 Services receives fees from issuers."
14        Do you see that?
15     A. Yes.
16     Q. Is that consistent with your
17 understanding in 2007 as to the way S&P conducted
18 its business and arrived at credit ratings?
19     A. It is.
20     Q. Was your understanding in this regard an
21 important and significant factor in your decision to
22 rely, in part, on S&P's ratings?
23     A. It was.
24     Q. I am going to show you some additional
25 documents, Mr. Craig.

Page 17

1  A. Craig
2  (Government Exhibit 4 (on Craig
3  examination), three-page document (the
4  first page two-sided) being printout of
5  e-mail string, the top e-mail on the first
6  page dated March 23, 2005, to
7  and others, from            , Bates
8  stamped Nos. PSI-SP-000226 through
9  PSI-SP-000228, marked for identification,
10  as of this date.)
11 BY MR. GRABER:
12  Q. I am handing you and your counsel what
13 has been marked as Exhibit 4.
14  I direct your attention to the e-mail
15 sent by            to others at Standard & Poor's
16 on Wednesday, March 23, 2005, time stamped 8:42 and
17 51 seconds.
18  Do you see that e-mail?
19  A. Yes.
20  Q. Do you see that         states, "While
21 I agree with number 1, I'm puzzled. When we first
22 reviewed 6.O results **a year ago** we saw the
23 sub-prime and Alt-A numbers going up and that was a
24 major point of contention which led to all the model
25 tweaking we've done since. Version 6.0 could've

Page 18

1  A. Craig
2 been released months ago and resources assigned
3 elsewhere if we didn't have to massage the sub-prime
4 and Alt-A numbers to preserve market share"; do you
5 see that?
6  A. Yes.
7  Q. Do you understand that          is
8 referring to a rating model called LEVELS that was
9 used to rate RMBS transactions?
10  A. Yes.
11  Q. Are the statements contained in this
12 e-mail that I just read consistent with your
13 understanding of S&P's objectivity and independence
14 in 2007?
15  A. It was not consistent.
16  Q. Why is that?
17  A. We expect an independent source of
18 information to guide expected losses, appropriate
19 credit support, to achieve a rating.
20  The statement "...have to massage the
21 sub-prime and Alt-A numbers to preserve market
22 share" is very troubling.
23  Q. Wouldn't you have wanted to know the
24 information that is contained in this e-mail in 2007
25 when you were making your decision to invest in

Page 19

1  A. Craig
2 these securities,                    and rely,
3 in part, on S&P's rating?
4  A. Yes.
5  We would have liked to have known their
6 true expectations for the possibility of default and
7 losses on a non-massaged basis.
8  Q. Would this information have been an
9 important and significant factor in making your
10 investment recommendation on behalf of M&T and your
11 decision to rely, in part, on S&P's rating?
12  A. Yes.
13 FURTHER EXAMINATION
14 BY MR. NELSON:
15  Q. Would it have made you less likely to
16 recommend instruments rated by S&P?
17  A. It would have.
18  (Government Exhibit 5 (on Craig
19  examination), 93-page document, "Standard &
20  Poor's Credit Market Services Global
21  Structured Finance Ratings, 2006 Strategic
22  Plan," Bates stamped Nos. S&P DOJ 1366911,
23  1366911.0002 through S&P DOJ 1366911.0091,
24  and S&P DOJ 1366910, marked for
25  identification, as of this date.)

Page 20

1  A. Craig
2 FURTHER EXAMINATION
3 BY MR. GRABER:
4  Q. I am showing you and your counsel what
5 has been marked as Government Exhibit 5.
6  MR. GRABER: For the record, this is a
7  document entitled "Standard & Poor's Credit
8  Market Services Global Structured Finance
9  Ratings, 2006 Strategic Plan."
10  Q. Let me direct your attention, Mr. Craig,
11 to page 17 of 92.
12  Towards the middle of the page there, the
13 second entry under the bold "Identify Adverse Trends
14 and Discuss Expected Impact" -- do you see that?
15  A. Yes.
16  Q. -- says, "(ALL) Competition among rating
17 agencies has helped to drive down support levels in
18 deals - this will create more ratings volatility and
19 put more pressure on surveillance resource needs."
20  Do you see that?
21  A. Yes.
22  Q. Would this information have been an
23 important and significant factor in making your
24 investment recommendation on behalf of M&T Bank and
25 your decision to rely, at least in part, on S&P's

Page 21

1       A. Craig
2  credit rating?
3       A.  Yes, it would have.
4           The statement that they were driving down
5  support levels is certainly troubling.
6  FURTHER EXAMINATION
7  BY MR. NELSON:
8       Q.  Why is it troubling?
9       A.  It implies that they were expecting
10 higher levels of defaults and losses, and that
11 information would have been important for us to know
12 with respect to thinking about making an investment
13 in these products.
14          (Government Exhibit 6 (on Craig
15      examination), 25-page memorandum on the
16      stationery of Standard & Poor's dated
17      August 20, 2005, to             from
18           Bates stamped Nos. S&P DOJ 1359438,
19      S&P DOJ 1359438.0002 through S&P DOJ
20      1359438.0025, marked for identification, as
21      of this date.)
22 FURTHER EXAMINATION
23 BY MR. GRABER:
24      Q.  I hand you what has been marked as
25 Government Exhibit No. 6.

Page 22

1       A. Craig
2       MR. GRABER:  For the record, this is a
3   memorandum, the subject line is "Global CDO
4   Activity Report," to Joanne Rose, who, for
5   the record, is the executive managing director
6   of the structured finance group, from
7           who, for the record, was the global
8   practice leader in charge of the CDO group,
9   dated August 20, 2005.
10      Q.  I direct your attention, Mr. Craig, to
11 page 4 of the document.
12          Do you see towards the top there it
13 states, "Due to the not insignificant impact on
14 lowly rated (BBB and down) reference pools, where
15 additional cashflow and recovery assumptions could
16 not be tailored towards lessening rating downgrade
17 pressure especially in synthetic transactions, we
18 have toned down and slowed down our roll out of E3
19 to the market, pending measures to deal with such
20 negative results"; do you see that there?
21      A.  Yes.
22      Q.  I can represent to you that "E3" is a
23 reference to CDO Evaluator 3.0, which was an updated
24 CDO rating model that was used by S&P to rate CDOs.
25          With that said, would this information

Page 23

1       A. Craig
2  have been something that you would have wanted to
3  know in making your investment decision, and also
4  relying, in part, on S&P's credit rating when making
5  an investment recommendation on behalf of M&T Bank?
6       A.  Yes.
7           It would have been important to know that
8  there was a higher possibility of downgrading the
9  underlying collateral given that some of the
10 triggers within the CDOs themselves are based upon
11 the credit rating of the collateral, such that if
12 they were artificially maintaining, or not
13 downgrading some of that collateral, that did not
14 represent the true risk of the investment.
15      Q.  Do you think that this statement is
16 consistent with your understanding as to the
17 objectivity and independence of S&P?
18      A.  It is not consistent with my
19 understanding at the time.
20          (Government Exhibit 7 (on Craig
21     examination), 13-page document, being
22     printout of Standard & Poor's PowerPoint
23     presentation entitled "Pre-presentation to
24     CDO GPL and SF CCO, April 10, 2007,"
25     subtitled "A New Approach to Estimating ABS

Page 24

1       A. Craig
2     PDs," by                           Bates
3     stamped Nos. S&P DOJ 1359017.0001 through
4     S&P DOJ 1359017.0013, marked for
5     identification, as of this date.)
6  BY MR. GRABER:
7       Q.  I am handing you and your counsel what
8  has been marked as Government Exhibit No. 7.
9       MR. GRABER:  For the record, this is a
10     document, a PowerPoint presentation, entitled
11     "Pre-presentation to CDO GPL and SF CCO,
12     April 10, 2007."
13          For the record, it is our understanding
14     that this references the CDO global practice
15     leader, and the structured finance chief
16     criteria officer.
17          The PowerPoint is then subtitled
18     "A New Approach to Estimating ABS PDs" from
19
20      Q.  What is your understanding of the
21 meaning of "PDs"?
22      A.  I understand that to mean probability of
23 default.
24      Q.  You understand that probabilities of
25 default are one of the fundamental underlying

Page 25

1     A. Craig
2  assumptions going into financial models such as CDO
3  rating models?
4     A.  Yes.
5     Q.  If I could direct your attention to
6  page 4, do you see there, at the top, it says, "A
7  Better Mousetrap:  Doing it the other way round via
8  Hypothesis Testing"; do you see that?
9     A.  Yes.
10    Q.  Do you see there it says, "The Old way:
11 One Way Street," and it starts with "Data," and then
12 there is an arrow saying, "One Way," and underneath
13 it says, "Can't tweak if they contradict data," and
14 then it goes to "Idealized PDs," and it says, "Does
15 this work our rating business?" and then underneath
16 that it says, "If it does not, need to tweak PDs,"
17 or probabilities of default; do you see that?
18    A.  Yes.
19    Q.  Is what is being described on the page
20 consistent with your understanding of S&P's
21 representations regarding objectivity and
22 independence?
23    A.  It is not consistent with my
24 understanding, no.
25

Page 26

1     A. Craig
2  FURTHER EXAMINATION
3  BY MR. NELSON:
4     Q.  What about it is inconsistent with your
5  understanding?
6     A.  The idea that they are changing the
7  assumptions to meet specific levels required for
8  their rating business is inconsistent with an
9  independent approach to thinking about future
10 potential loss levels.
11 FURTHER EXAMINATION
12 BY MR. GRABER:
13    Q.  Let me draw your attention to the
14 language on the left.
15       It says they are "To come up with PDs" --
16 probabilities of default -- "and asset correlations
17 in CDOE 2.4.3, we look at our raw data and come up
18 with a statistical best fit.  When this does not
19 meet our business needs, we have to change our
20 parameters ex-post to accommodate.  This is not easy
21 to do as the best fit is 'unique and optimal' by
22 definition."
23       Do you see that?
24    A.  Yes.
25    Q.  Is that consistent with your

Page 27

1     A. Craig
2  understanding of the way that S&P was supposed to
3  conduct its rating business?
4     A.  It's not.
5        Again, I would have expected that the
6  analysis on an un-massaged or un-tweaked basis would
7  represent their opinion of the likelihood of a
8  default.
9     Q.  Let me just represent to you, for the
10 record, that one of the CDOs that was purchased by
11 M&T,           was rated using the CDO Evaluator
12 2.4.3 model that is referenced here.
13       Do you see that?
14    A.  Yes.
15    Q.  Would it have been important for you to
16 have known this information when you were making
17 your investment recommendation with regard to
18           and relying, in part, on S&P's credit
19 rating?
20    A.  It would have been important to know that
21 they were tweaking PDs to attain a certain credit
22 enhancement and a certain credit rating, yes.
23    Q.  Would this information have been a
24 significant and important factor in your decision to
25 recommend an investment in           nd relying, in

Page 28

1     A. Craig
2  part, on S&P's credit rating?
3     A.  It would have.
4        We were, again, relying on the credit
5  rating agencies to provide an independent analysis
6  of the risks of the investment.
7  FURTHER EXAMINATION
8  BY MR. NELSON:
9     Q.  Would it have made you less likely to
10 invest in CDOs rated by S&P?
11    A.  It would have.
12 FURTHER EXAMINATION
13 BY MR. GRABER:
14    Q.  Sitting here today, and seeing this
15 document, and seeing that they are talking about the
16 rating model that they used to rate the transaction
17 that you recommended, are you disappointed in
18 reading this?
19    A.  Yes.
20       Again, we were relying on the rating
21 agencies to provide an independent analysis, and an
22 independent opinion based upon their best thoughts
23 of how likely or unlikely losses would flow through.
24       So to see that they are tweaking their
25 analysis to meet a particular rating is troubling.

Page 29

1    A. Craig
2  FURTHER EXAMINATION
3  BY MR. NELSON:
4    Q.  If you look at the bottom half of this
5  page, the graph starts out with "Rating Business,"
6  and then moves to "Idealized PDs," probabilities of
7  default, and then the question is asked, "Are they
8  reasonable given our data according to our
9  hypothesis testing?"  "If it does not, use another
10 set of PDs," probabilities of default.
11      Do you see that?
12   A.  I do.
13   Q.  Is it consistent with your understanding
14 at the time of how S&P conducted business, and
15 arrived at its credit ratings, that S&P would start
16 out, as a first step, in updating its model with its
17 rating business?
18   A.  No, that is not consistent.
19      Again, I would have expected that they
20 used the best information that they had to forecast
21 defaults, probabilities of default, and how that
22 would translate into the underlying investment.
23      To the extent that they are using a
24 different set of PDs to match up with a particular
25 credit rating is bad.

Page 30

1    A. Craig
2    Q.  If you knew at the time that this was
3  S&P's plan for moving forward with its model
4  updates, would that have affected your decision to
5  invest in securities rated by S&P?
6    A.  It would have.
7    Q.  If you look at the left on the bottom of
8  the document, it says, and I quote, "We decide on a
9  number of business friendly PD matrices first.
10 Statistical Hypothesis testing allows us to test if
11 our first trial-and-error set is reasonable.  If it
12 is not, we can try another or many other matrices."
13      Do you see that?
14   A.  Yes.
15   Q.  Does that bother you?
16   A.  Yes.
17      It appears that they are trying to,
18 again, change some of their inputs into the model to
19 achieve the output that they are looking for.
20   Q.  Was it your understanding at the time
21 that S&P was looking for business-friendly models
22 that were reasonable, or that they were going for
23 something else?
24   A.  It was my understanding at the time that
25 they were an independent, objective analyst that

Page 31

1    A. Craig
2  would deliver an honest opinion about the likelihood
3  of defaults going forward.
4    Q.  Is what you see here in this exhibit
5  consistent with that?
6    A.  This is not.
7       (Government Exhibit 8 (on Craig
8       examination), one-page printout of e-mail
9       string, the top e-mail dated August 16,
10      2007, to          rom
11      Bates stamped No. SAP015-00009150, marked
12      for identification, as of this date.)
13 FURTHER EXAMINATION
14 BY MR. GRABER:
15   Q.  Mr. Craig, I am showing you and your
16 counsel what has been marked as Government
17 Exhibit 8.
18      MR. GRABER:  For the record, this is an
19 e-mail, at the top, from          to
20              dated August 16, 2007;
21 the underlying e-mail from
22 dated August 2, 2007, to          and
23 several other members of the structured
24 finance group at S&P, the subject line
25 stating "        second 9 month project."

Page 32

1    A. Craig
2      It is our understanding that this is a
3  further description of the project that was
4  outlined in the PowerPoint presentation that
5  we just showed you.
6    Q.          states, "Pat, I believe it is
7  worth pointing out that while the initial project
8  did focus on Hypothesis Testing to buy us the
9  operational freedom to defend multiple business
10 friendly default matrices, the single first step in
11 coming up with a Hypothetical default matrix to be
12 tested (i.e. where do we begin?) itself is based on
13 Maximum Likelihood Estimation (i.e. But couldn't
14 really pull it out of thin air like we did with
15 CDOE3.2)."
16      I can represent to you that "CDOE3.2" is
17 a reference to CDO Evaluator 3.2, which was the
18 rating model used by S&P to rate CDOs in 2007.
19      Do you see that there?
20   A.  Yes.
21   Q.  Then he goes on to say, "To incorporate
22 now transition data on top of default data means we
23 need a richer and more descriptive theoretical
24 model.  That only means the Maximum Likehood [sic]
25 Estimation exercise to come up with a starting

Page 33

1       A. Craig
2  Hypothetical transition matrix will be a lot more
3  complex and sophisticated.  We then 'bend' this
4  transition matrix to suit our business needs.  How
5  reasonable or defendable we are will now once again
6  be gauged by Hypothesis Testing."
7       Do you see that?
8    A.  Yes.
9    Q.  Is what is said in this e-mail here
10 consistent with your understanding in 2007 as to
11 S&P's objectivity and independence in the way that
12 it conducted its ratings business and arrived at
13 credit ratings?
14   A.  It is not.
15 FURTHER EXAMINATION
16 BY MR. NELSON:
17   Q.  What is your reaction upon seeing that in
18 this document?
19   A.  Again, it's troubling to see the words
20 "...'bend' this transition matrix to suit out
21 business needs," which implies they are not using an
22 honest and independent approach to evaluating the
23 likelihood of defaults on ongoing collateral.
24
25

Page 34

1       A. Craig
2  FURTHER EXAMINATION
3  BY MR. GRABER:
4    Q.  Mr. Craig, in 2007, was it your
5  understanding that S&P took into account all
6  relevant information when rating a CDO?
7    A.  It was.
8    Q.  For example, would you have expected that
9  S&P would take into account internal information
10 regarding the impairment of collateral backing the
11 CDOs purchased by M&T?
12   A.  Yes.
13   Q.  If S&P's RMBS surveillance group had
14 identified a significant portion of the RMBS
15 collateral backing           as high risk and likely
16 to be downgraded, would you have expected that S&P
17 would have taken that information into account when
18 rating          ?
19   A.  I would have.
20   Q.  Why is that?
21   A.  For two reasons in particular.
22       If the underlying collateral is
23 downgraded, via the rules, in a CDO transaction,
24 there are several triggers that are ratings based.
25       If there was a high likelihood or

Page 35

1       A. Craig
2  probability that the collateral going into the CDO
3  were to be downgraded, thereby tripping those
4  triggers, that would have certainly been important
5  information, and would have given pause for the
6  investment.
7       Secondly, the loans that go into the
8  bonds that go into the CDOs, one would have thought
9  that an independent analysis from S&P would have
10 given us an idea as to the riskiness of the overall
11 investment, and if they were not taking the opinion
12 of other groups from S&P into consideration when
13 rating the CDO, that certainly would have given us
14 pause.
15   Q.  Would it have been an important and a
16 significant factor in your decision to recommend the
17 investment, and to rely, in part, on S&P's credit
18 rating?
19   A.  Yes, it would.
20       (Government Exhibit 9 (on Craig
21       examination), one-page chart headed
22       "Average Defaults by Origination Vintage,"
23       Bates stamped No. S&P DOJ 2003170, marked
24       for identification, as of this date.)
25   Q.  I am handing you and your counsel what

Page 36

1       A. Craig
2  has been marked as Government Exhibit No. 9.
3       What I am showing you here is a summary
4  of the results of a Monte Carlo simulation that was
5  being run by senior analysts in the structured
6  finance group at S&P regarding the default forecasts
7  with respect to the 2005 and 2006 vintage subprime
8  RMBS.
9       Just so we are clear, Mr. Craig, do you
10 have an understanding of what a Monte Carlo
11 simulation is?
12   A.  Yes, I do.
13 FURTHER EXAMINATION
14 BY MR. NELSON:
15   Q.  Can you explain to us what your
16 understanding is?
17   A.  Yes.
18       A Monte Carlo simulation is an analysis
19 in which a large number of paths, whether they be
20 interest rate paths, or lost cash flow paths, are
21 run to develop a data set of outcomes.
22 FURTHER EXAMINATION
23 BY MR. GRABER:
24   Q.  Is it your understanding it's one way to
25 do a forecast or a projection?

Page 37

1           A. Craig
2       A.  That is right.
3           It's one way to develop a somewhat random
4  forecast of events.
5       Q.  If you take a look here at the results,
6  what they are getting -- and I can represent to you
7  that this was their output in late April 2007 --
8  where it says, "Average Defaults by Origination
9  Vintage" -- do you see that?
10      A.  Yes.
11      Q.  -- if you go into that table there, and
12 you go down to the BBB level, "BBB Defaults (Medium
13 Losses)" -- do you see that?
14      A.  Yes.
15      Q.  -- it's projecting for BBB defaults for
16 the 2005 vintage, 47.44 percent will default.
17          Do you see that?
18      A.  Yes.
19      Q.  The 2006 first half, 56.27 percent will
20 default.
21          Do you see that?
22      A.  Yes.
23      Q.  The second half of 2006, they are
24 projecting 35 percent defaults.
25          Do you see that?

Page 38

1           A. Craig
2       A.  Yes.
3       Q.  Then, if you go to the BBB minuses on the
4  medium losses, the 2005 book, it's 64.44 percent
5  defaults.
6           Do you see that?
7       A.  Yes.
8       Q.  It's 71.74 percent for the first half of
9  '06, and 51.01 percent for the second half of '06.
10          Do you see that?
11      A.  Yes.
12      Q.  Those are pretty high numbers, aren't
13 they?
14      A.  Yes, they are.
15      Q.  It was your understanding in 2007 that
16 the collateral backing the CDOs that M&T purchased
17 were made up, in large part, by these types of bonds,
18 especially the BBB-level bonds; is that correct?
19      A.  That's correct.
20 FURTHER EXAMINATION
21 BY MR. NELSON:
22      Q.  What was your understanding of the makeup
23 of the underlying collateral on these two CDOs?
24      A.  My understanding was that the collateral
25 in the BBB and BB-rated bonds, the collateral in

Page 39

1           A. Craig
2  those bonds, the underlying loans were subprime and
3  mid-prime, not prime bonds -- not prime quality
4  loans that went into those securities.
5  FURTHER EXAMINATION
6  BY MR. GRABER:
7       Q.  So it was your understanding that BB
8  bonds were also included in there?
9       A.  In the              yes.
10      Q.  Do you see there, for the BB bonds, that
11 they are projecting defaults in the 90s?
12      A.  Yes.
13      Q.  Would you have expected S&P to take this
14 type of information into account when rating CDOs,
15 including the CDOs that you purchased?
16      A.  Yes, absolutely.
17 FURTHER EXAMINATION
18 BY MR. NELSON:
19      Q.  If you had known at the time that several
20 people at S&P, including business managers, were
21 aware that there would be unprecedented downgrades
22 to non-prime RMBS, including non-prime RMBS at the
23 BB level, would that have been a significant and
24 important factor in your decision to invest in these
25 CDOs?

Page 40

1           A. Craig
2       A.  It would have.
3           Again, part of the CDO triggers in the
4  documentation, if there had been downgrades, it
5  would have had a material impact on the CDOs
6  themselves.
7           Clearly, if we had known that there were
8  going to be downgrades across these credit ratings,
9  it would have affected the rest of our investment
10 portfolio as well.
11      Q.  Would that have made you less likely to
12 recommend the           and the          CDO?
13      A.  Yes.
14          We would have been -- we would likely not
15 have recommended if we had that information at the
16 time.
17 FURTHER EXAMINATION
18 BY MR. GRABER:
19      Q.  If you had known that, for example, the
20 head of the RMBS group at S&P knew in March 2007
21 that there would be unprecedented downgrades to the
22 non-investment-grade ratings, meaning BBs, would you
23 have recommended any CDO that was backed by that
24 type of collateral?
25      A.  Likely not.

Page 41

1        A. Craig
2    Q.  Does it trouble you to hear that, sitting
3  here today?
4    A.  It does.
5    Q.  Does it disappoint you?
6    A.  Again, we relied upon the rating agencies
7  as independent opinions on the quality of the
8  collateral going into these deals.
9    Q.  Let me put the question a slightly
10 different way.
11       When you were considering purchasing
12 these CDOs, or representing these CDOs for purchase,
13 if you knew that S&P was in the process of actively
14 reviewing RMBS collateral for downgrades, would you
15 have expected S&P to have taken that information
16 into account when rating CDOs backed by the same
17 collateral under review for downgrade?
18    A.  Absolutely.
19    Q.  Just to ask a slightly different
20 question, Mr. Craig, was it your understanding at
21 the time that the rating agency fees were paid out
22 of the deal proceeds in a CDO transaction?
23    A.  Yes.
24    Q.  And you understood that the deal proceeds
25 were provided by the investors, right?

Page 42

1        A. Craig
2    A.  Yes.
3    Q.  Was it your understanding at the time
4  that the investors, including M&T, were ultimately
5  paying S&P's rating fee?
6    A.  Yes.
7    Q.  In light of the information that you have
8  seen today, would you still have relied on the
9  ratings issued by S&P with respect to the
10            CDOs?
11    A.  We would not.
12 FURTHER EXAMINATION
13 BY MR. NELSON:
14    Q.  Would you have decided to invest in
15 something else?
16    A.  Yes, we would have.
17       We would not have pursued these
18 investments if we knew that the models were being
19 tweaked to achieve a particular rating because that
20 was not giving us a true and fair concept of the
21 risk in the investments.
22       MR. GRABER:  That's all we have.
23       Thank you very much for your time.
24       We are off the record.
25       (Time noted:  4:45 p.m.)

Page 43

1
2          C E R T I F I C A T E
3  STATE OF NEW YORK   )
4                     : ss.
5  COUNTY OF NEW YORK  )
6
7       I, SUSAN B. RATNER, a Shorthand Reporter
8  and a Notary Public within and for the State of
9  New York, do hereby certify that the foregoing
10 examination of ALEXANDER CRAIG was taken before me
11 on the 28th day of June, 2012;
12      That the said witness was duly sworn
13 before the commencement of his testimony; that the
14 said testimony was taken stenographically by me and
15 then transcribed.
16      I further certify that I am not related
17 by blood or marriage to any of the parties to this
18 action or interested directly or indirectly in the
19 matter in controversy; nor am I in the employ of any
20 of the counsel in this action.
21      IN WITNESS WHEREOF, I have hereunto set
22 my hand this 3rd day of July, 2012.
23
24
25               SUSAN B. RATNER

Page 44

1
2  June 28, 2012
3         I N D E X
4  WITNESS
5  ALEXANDER CRAIG, by
6  MR. GRABER: 3, 7, 9, 20, 21, 26, 28, 31, 34, 36, 39,
7  40
8  MR. NELSON: 6, 9, 19, 21, 26, 28, 29, 33, 36, 38,
9  39, 42
10
11         E X H I B I T
12 GOVERNMENT EXHIBIT #              FOR IDENT.
13 1 - 12-page document, "Testimony of Kathleen A.
14 Corbet President of Standard & Poor's, a
15 Division of the McGraw-Hill Companies, Inc.,
16 Before the Committee on Banking, Housing and
17 Urban Affairs, United States Senate, February 8,
18 2005," Bates stamped Nos. S&P DOJ 0068378
19 through S&P DOJ 0068389...................... 9
20 2 - 16-page document, "Standard & Poor's Ratings
21 Services Code of Conduct," dated October 2005,
22 Bates stamped Nos. S&P DOJ 0466703,
23 S&P DOJ 0466703.0002 through
24 S&P DOJ 0466704.0016......................... 11
25