# Exhibit 36

(Cardona Declaration)

```
 1
 2
 3    IN RE:
 4    TESTIMONY OF FIRREA INVESTIGATION
 5
 6
 7
 8              Statement of JAMES HOTCHKISS, taken before
 9    Deborah Habian, Certified Shorthand Reporter and a
10    Notary Public in and for the County of Cook, State of
11    Illinois, on Wednesday, July 18, 2012, at 10:30 a.m.
12    at First Midwest Bank, One Pierce Place, Suite 1500,
13    Itasca, Illinois.
14
15
16
17
18
19
20
21
22
23
24
25
```

James Hotchkiss                                                          July 18, 2012
Itasca, IL

**Page 6**

1  Treasurer.
2      Q. And when did you first start at First
3  Midwest Bank?
4      A. July of 2000.
5      Q. And if you could just outline for me at a
6  very high level what positions you've held at the
7  bank?
8      A. I was hired as a Senior Vice President and
9  Treasurer and it elevated up to Executive Vice
10 President I believe in '03, 2003.
11     Q. And during your time as Treasurer, you had
12 certain responsibilities for making recommendations
13 with respect to investments; is that right?
14     A. Correct. I have an investment director
15 that reports up to me. It's his job to find different
16 types of investments. He brings it to my attention,
17 we review it, we bring it to the ALCO Committee, which
18 is the Asset Liability Committee of the bank. The
19 ALCO Committee themselves, they -- we decide
20 collectively should we buy or sell or invest or not
21 invest.
22     Q. In the 2005 to 2007 time period, were
23 there investment guidelines at First Midwest Bank?
24     A. Yes, there were.
25     Q. And did that include a minimum credit

**Page 7**

1  rating on financial products purchased by the bank?
2      A. Yes, it did.
3      Q. And what was the minimum credit rating, to
4  the best of your recollection, that a financial
5  product had to have to be eligible for investment by
6  the bank in the 2005 to 2007 time period?
7      A. In November 2005, our policy minimum CDO
8  was Moody's A3 and Standard & Poors A-. Prior to that
9  I believe it was just above investment grade.
10     Q. So the financial products had to have that
11 rating and they also had to be rated, period, right?
12     A. Yes, correct.
13     Q. And let me just step back for a second and
14 so we're clear for the record, I should point out that
15 you have counsel here.
16     A. Yes, I do.
17     Q. And if you could just say --
18     MR. SIMPSON: Paul Simpson, S-I-M-P-S-O-N. I'm
19 the bank's General Counsel.
20     MR. GRABER: Okay. Thank you very much.
21 BY MR. GRABER:
22     Q. And going back to what we were talking
23 about, Mr. Hotchkiss, was this requirement this credit
24 rating requirement part of the bank's policy to make
25 investments that were consistent with maintaining the

**Page 8**

1  safety and soundness of the bank?
2      A. Yes.
3      Q. And when purchasing financial products
4  such as Collateralized Debt Obligations or CDOs, did
5  you rely in part on the credit rating when making an
6  investment recommendation?
7      A. Yes, we did.
8      Q. And why was that?
9      A. These were structured deals, they were
10 highly complex, not plain vanilla, and so we needed
11 outside support for these types of investments and
12 that's what would have come through the ratings.
13     Q. And did the ratings on the CDOs that you
14 recommended lead you to believe that they were
15 relatively safe?
16     A. Yes.
17     Q. Now, in 2007 you recommended the purchase
18 of CDOs by First Midwest Bank; is that right?
19     A. Yes.
20     Q. What were the names of those CDOs?
21     A. In March of '07 we purchased 
22 and in May of '07 we purchased
23 CDO,
24
25     Q. And in 2005 did the bank purchase other

**Page 9**

1  CDOs?
2      A. Yes, we did.
3      Q. And what were the names of those CDOs?
4      A. In April of '05 we bought
5  and July of '05 a piece of             CDO        and
6  June of '05 a piece of            CDO,
7      Q. And were the bonds purchased in connection
8  with those CDOs rated by credit agencies?
9      A. Yes.
10     Q. And were they rated by Standard & Poors?
11     A. Yes, they were.
12     Q. And what were the ratings?
13     A. The ratings on Standard & Poors went from
14 A to A-.
15     Q. And did you rely in part on the credit
16 rating on those CDOs when making your investment
17 recommendation?
18     A. Yes, we did.
19     Q. And between 2005 and 2007 was it your
20 understanding that S&P was a neutral and objective and
21 independent party to the CDOs purchased by First
22 Midwest Bank?
23     A. Yes, we assumed that.
24     Q. And was it your understanding that S&P was
25 objective and independent in the way it issued credit

3 (Pages 6 to 9)

```
                                Page 10
 1   ratings, including ratings on CDOs?
 2       A.  Yes, that was my understanding.
 3       Q.  Let me show you a document, Mr. Hotchkiss.
 4           (Exhibit No. 1 marked for ID)
 5   BY MR. GRABER:
 6       Q.  Handing you and your counsel what's been
 7   marked at Exhibit No. 1.  And for the record, this is
 8   a document entitled "Standard & Poors Rating Services
 9   Code of Conduct" dated October 2005.
10           And if I could direct your attention,
11   Mr. Hotchkiss, to page 4 of the document.
12       MR. SIMPSON:  Page number 4 or 004?
13       MR. GRABER:  Internal 4.
14       MR. SIMPSON:  Okay.
15   BY MR. GRABER:
16       Q.  Under "Integrity of the Ratings Process",
17   do you see that there?
18       A.  Yes, I do.
19       Q.  And you see Section 1.12?
20       A.  Um-hum.
21       Q.  And it says, "Rating Services and its
22   employees shall deal fairly and honestly with issuers
23   and other market participants and the public."
24           Do you see that?
25       A.  Yes.
```

```
                                Page 11
 1       Q.  Okay.  Is that statement consistent with
 2   your understanding in 2005 to 2007 of S&P's
 3   representations regarding its objectivity and
 4   independence?
 5       A.  Yes.
 6       Q.  And was that understanding an important
 7   and significant factor in making your investment
 8   recommendation on behalf of First Midwest Bank?
 9       A.  Yes, it was.
10       Q.  Okay.  Let me direct your attention now to
11   page 5, the following page.  And you see there under
12   "Independence and Avoidance of Conflicts of Interest"?
13       A.  Yes.
14       Q.  And it says under 2.1, "Ratings Services
15   shall not forebear or refrain from taking a rating
16   action, if appropriate, based on the potential effect,
17   economic, political or otherwise, of the rating action
18   on Rating Services, an issuer, an investor or other
19   market participant."
20           Do you see that?
21       A.  Yes.
22       Q.  Okay.  Is that a statement consistent with
23   your understanding in 2005 to 2007 of S&P's
24   representations regarding its objectivity and
25   independence?
```

```
                                Page 12
 1       A.  Yes, it was.
 2       Q.  And was that understanding an important
 3   and significant factor in making your investment
 4   recommendation on behalf of First Midwest Bank?
 5       A.  Yes, it was.
 6       Q.  And you see under 2.2, "Rating Services
 7   and its analysts shall use care and analytic judgment
 8   to maintain both the substance and appearance of
 9   independence and objectivity."
10           Do you see that there?
11       A.  Yes.
12       Q.  Okay.  And then let me direct your
13   attention also to 2.4 where it says, "Ratings assigned
14   by Rating Services to an issuer or issued shall not be
15   affected by the existence of or potential for a
16   business relationship between Rating Services or any
17   non-ratings business and the issuer, or its
18   affiliates, or any other party or the non-existence of
19   such a relationship."
20           Do you see that there?
21       A.  Yes, I do.
22       Q.  And those two statements that I just read
23   to you, were they consistent with your understanding
24   in 2005 to 2007 of S&P's representations regarding its
25   objectivity and independence?
```

```
                                Page 13
 1       A.  Yes, they were.
 2       Q.  And was that understanding an important
 3   and significant factor in making your investment
 4   recommendation on behalf of First Midwest Bank?
 5       A.  Yes.
 6       Q.  Thank you.  You can go ahead and set those
 7   aside.
 8       A.  (Witness so doing.)
 9           (Exhibit No. 2 marked for ID)
10   BY MR. GRABER:
11       Q.  Handing your and your counsel what's been
12   marked as Exhibit No. 2.  For the record, this
13   document is titled "Testimony of Kathleen A. Corbet,
14   President of Standard & Poors, a division of the
15   McGraw-Hill Companies, Inc., before the Committee on
16   Banking, Housing and Urban Affairs, United States
17   Senate, February 8th, 2005."
18           Do you see that there?
19       A.  Yes.
20       Q.  I'd just direct your attention very
21   quickly to internal page 8.  Do you see that?
22       A.  Yes.
23       Q.  And you see the second full paragraph it
24   states, "As part of our commitment to continuous
25   improvement and in order to ensure that ratings are
```

```
                                    Page 14
 1  responsive to evolving market needs, S&P Rating
 2  Services has recently initiated a broad range of
 3  actions that support 'our mission to provide high
 4  quality, objective and rigorous analytical information
 5  to the marketplace.'"
 6          Do you see that there?
 7      A.  Yes.
 8      Q.  Is that statement consistent with your
 9  understanding in 2005 to 2007 of S&P's representations
10  regarding its objectivity and independence?
11      A.  Yes.
12      Q.  And was that understanding an important
13  and significant factor in making your investment
14  recommendation on behalf of First Midwest Bank?
15      A.  Yes, it was.
16      Q.  Okay.  You can set that aside.
17      A.  (Witness so doing.)
18          (Exhibit No. 3 marked for ID)
19  BY MR. GRABER:
20      Q.  Handing you and your counsel what's been
21  marked as Exhibit No. 3.  For the record, it's a
22  document entitled "Report on Implementation of
23  Standard & Poors' Rating Services Code of Conduct
24  dated February 2006."
25          I direct your attention to the page

                                    Page 15
 1  that bears Bates label SAP019-00005632.  It's the
 2  third page in.  And you see it says "Introduction" at
 3  the top?
 4      A.  Um-hum.
 5      Q.  Okay.  And the second paragraph states,
 6  "Rating Services recognizes its role in global capital
 7  markets and is committed to providing ratings that are
 8  objective, independent and credible."
 9          Do you see that?
10      A.  Yes, I do.
11      Q.  Is that statement consistent with your
12  understanding in 2005 to 2007 of Standard & Poors
13  representations regarding it's objectivity and
14  independence?
15      A.  Yes.
16      Q.  And was that understanding an important
17  and significant factor in making your investment
18  recommendation on behalf of First Midwest Bank?
19      A.  Yes, it was.
20      Q.  Okay.  Now let me just direct your
21  attention several pages in to the page that has a
22  Bates number ending in 5461.  It says "Independence of
23  Rating Decisions" at the top.
24      A.  Um-hum.
25      Q.  Do you see that?

                                    Page 16
 1      A.  Yes, I do.
 2      Q.  It says there, "It is a central tenent of
 3  Rating Services that its rating decisions not be
 4  influenced by the fact that Ratings Services receives
 5  fees from issuers."
 6          Do you see that?
 7      A.  Yes.
 8      Q.  Is that statement consistent with your
 9  understanding in 2005 to 2007 of S&P's representations
10  regarding its objectivity and independence?
11      A.  Yes.
12      Q.  And was that understanding an important
13  and significant factor in making your investment
14  recommendation on behalf of First Midwest Bank?
15      A.  Yes, it was important.
16      Q.  Okay.  We can set that aside.  Thank you.
17      A.  (Witness so doing.)
18      Q.  Mr. Hotchkiss, let me ask you some
19  questions now about models and analytics used by
20  Standard & Poors.
21          Was it an important and significant
22  factor in making your investment recommendations to
23  First Midwest Bank whether to buy [redacted]
24  CDO and the other CDOs purchased by the bank that S&P
25  would not weaken or lessen the stringency of its

                                    Page 17
 1  credit rating criteria to get more business?  Was that
 2  an important factor?
 3      A.  Yes, it was a very important factor.
 4      Q.  And was it your understanding between 2005
 5  and 2007 that S&P was unbiased and that its analytical
 6  judgment regarding the CDOs the bank purchased was not
 7  affected by conflict of interest?
 8      A.  Yes, I assumed that.
 9      Q.  That was very important to you, right?
10      A.  Very important.
11          (Exhibit No. 4 marked for ID)
12  BY MR. GRABER:
13      Q.  I show you a document that's marked as
14  Exhibit 4.  I'm handing you and your counsel two
15  copies of that.
16          For the record, this is a series of
17  e-mails, the top e-mail from [redacted] to [redacted]
18  and other members of the Structured Finance
19  Group at Standard & Poors dated March 23rd, 2005.  And
20  then if I could direct your attention to an underlying
21  e-mail from [redacted] to [redacted] and others at
22  Standard & Poors, and that was sent on March 23rd,
23  2005 at 8:42 a.m.
24          Do you see that there?
25      A.  Yes.
```

James Hotchkiss                                                                                      July 18, 2012
Itasca, IL

Page 18

1   Q. And ▓▓▓ states in part in his
2   e-mail, "While I agree with No. 1, I'm puzzled. When
3   we first reviewed 6.0 results a year ago, we saw the
4   subprime and Alt-A numbers going up and that was a
5   major point of contention which led to all the model
6   tweaking we've done since. Version 6.0 could have
7   been released months ago and resources assigned
8   elsewhere if we didn't have to massage the subprime
9   and Alt-A numbers to preserve market share."
10          Do you see that?
11  A. Yes, I do.
12  Q. Would have knowing that information, the
13  information that's contained in this document, been an
14  important and significant factor in making your
15  investment recommendations on behalf of First Midwest
16  Bank?
17  A. It would have been extremely important.
18  Q. Is this consistent with the way you
19  thought S&P conducted its rating business?
20  A. Totally inconsistent with the way I
21  thought they did business. We would not have
22  purchased the deals had I known this.
23  Q. Are you disappointed to see this?
24  A. Yes. This -- this clearly turns my
25  stomach "massaging data to preserve market share."

Page 19

1   Totally against everything we just read about
2   Standard & Poors' ethics and the code.
3   Q. Let me -- I'm sorry. Go ahead. I didn't
4   mean to interrupt you.
5   A. And the code, the codes that we just read.
6   Q. You can set that aside. Let me show you
7   some additional documents.
8          (Exhibit No. 5 marked for ID)
9   BY MR. GRABER:
10  Q. Handing you what's been marked as
11  Exhibit 5. And for the record, this series of
12  e-mails, the top e-mail from ▓▓▓▓▓▓ dated
13  Tuesday, April 20th, 2004, to several members of the
14  Structured Finance Group at Standard & Poors, subject
15  line "Default Matrix Changes."
16         Do you see that there?
17  A. Yes.
18  Q. And I can represent to you, Mr. Hotchkiss,
19  that the general discussion here in this e-mail
20  concerns updates to default assumptions in S&P's CDO
21  rating model which was referred to as "CDO Evaluator."
22         So do you understand that?
23  A. Yes.
24  Q. And you have a general understanding of
25  the function of default assumptions?

Page 20

1   A. Yes, I do.
2   Q. Okay. And you see ▓▓▓ is writing
3   on April 13th, 2004. ▓ states "▓▓▓ I am still
4   operating on the understanding that the revisions of
5   the default table proposed by the London team cannot
6   be accepted in its current form for one reason, namely
7   the potential adverse impact on cash flow CDOs backed
8   by NIG," which we understand to mean non-investment
9   grade collateral.
10         Do you see that?
11  A. Yes, I do.
12  Q. And then the next e-mail from ▓▓▓
13  dated April 20, 2004 states, "This is also my
14  understanding that the issue with the revised table
15  from ▓▓ team gave too low an outcome for
16  non-investment grade portfolios."
17         Do you see that?
18  A. Yes.
19  Q. Would have knowing this information been
20  an important and significant factor in making your
21  investment recommendations on behalf of First Midwest
22  Bank?
23  A. Yes, very important.
24  Q. Is this consistent with your understanding
25  of S&P's objectivity and independence at the time?

Page 21

1   A. No, not consistent at all.
2   Q. Okay. You can set that aside. Thank you.
3   A. (Witness so doing.)
4          (Exhibit No. 6 marked for ID)
5   BY MR. GRABER:
6   Q. Handing you what's been marked as
7   Exhibit 6.
8   A. Okay.
9   Q. And for the record, this is an Activity
10  Report from ▓▓▓▓▓ the head of the CDO Group at
11  Standard & Poors to ▓▓▓▓▓ ead of the
12  Structured Finance Group, subject line "Global CDO
13  Activity Report dated August 20, 2005."
14         Do you see that there?
15  A. Yes.
16  Q. Okay. If I could direct your attention to
17  internal page 4. It's page 4 of the document. And I
18  can represent to you that this is again a discussion
19  of updates to Standard & Poors' CDO Evaluator rating
20  model.
21         And if you look at the -- towards the
22  top of page 4 just above III, do you see that there?
23  A. Yes.
24  Q. Okay. It says "Due to the not
25  insignificant impact on lowly rated BBB and down

6 (Pages 18 to 21)

## Page 22

1  reference pools where additional cash flow and
2  recovery assumptions could not be tailored towards
3  lessening rating downgrade pressure, especially in
4  synthetic transactions, we have toned down and slowed
5  down our rollout of E-3 to the market pending further
6  measures to deal with such negative results."
7          Do you see that?
8      A. Yes.
9      Q. And would have knowing that information
10 been an important and significant factor in making
11 your investment recommendations on behalf of First
12 Midwest Bank with respect to the CDOs that it
13 purchased?
14     A. Yes, it would have.
15     Q. Okay. Is this statement consistent with
16 your understanding at the time of S&P's objectivity
17 and independence?
18     A. No, totally inconsistent.
19     Q. You can set that aside.
20     A. (Witness so doing.)
21          (Exhibit No. 7 marked for ID)
22 BY MR. GRABER:
23     Q. Handing you and your counsel what's been
24 marked as Exhibit No. 7. And for the record, it's a
25 PowerPoint presentation entitled "A New Approach to

## Page 23

1  Estimating ABS PDs." It's our understanding that
2  refers to probabilities of default.
3          Are you generally familiar with that
4  concept?
5      A. Yes, I am.
6      Q. Okay. And above that it says,
7  "Pre-presentation to CDO, GPL and SFCCO April 10,
8  2007." And I can represent to you that that refers to
9  the CDO Global Practice Leader, the person who was in
10 charge of the entire CDO Group at Standard & Poors at
11 the time Pat Jordan, and Structured Finance CCO is
12 Structured Finance Chief Criteria Officer, who is Tom
13 Gillis at the time.
14         Do you understand that?
15     A. Yes.
16     Q. And then the authors of this are ▓
17 ▓▓▓▓▓▓▓▓▓▓ senior analysts and senior members
18 of the CDO team at Standard & Poors, okay?
19     A. Okay, yes.
20     Q. If I could direct your attention to page 4
21 of the document. And at the top there, you see it
22 says, "A better mouse trap, doing it the other way
23 round via hypothesis testing."
24         Do you see that?
25     A. Yes, I see that.

## Page 24

1      Q. And if you see -- let's start on the left
2  with the text. It says, "To come up with
3  probabilities of default and asset correlations in CDO
4  E2.4.3" -- that's referring to CDO Evaluator 2.4.3 --
5  "we look at our raw data and come up with a
6  statistical best fit. When this does not meet our
7  business needs, we have to change our parameters
8  ex post to accommodate."
9          Do you see that?
10     A. Yes, I do.
11     Q. And then if I direct your attention to the
12 chart, the flow chart to the right, it says, "The old
13 way, a one-way street."
14         Do you see that?
15     A. Yeah.
16     Q. And it starts with "data" and then there's
17 an arrow one way and underneath it says "can't tweak
18 if this contradict data."
19         Do you see that?
20     A. Yes.
21     Q. Then it goes to "idealized probabilities
22 of default" and it says "Does this work our rating
23 business" which it's our understanding that that's
24 supposed to say "Does this work for our rating
25 business." And underneath it says, "If it does not,

## Page 25

1  need to tweak probabilities of default."
2          Do you see that?
3      A. Yes, I do.
4      Q. And then it says "Rating Business" on the
5  far right. Do you see that?
6      A. Yeah.
7      Q. And is this consistent with your
8  understanding of S&P's objectivity and independence?
9      A. No, it's definitely not consistent.
10 Changing methodologies to accommodate business needs
11 is not consistent at all.
12     Q. Would knowing this information been an
13 important and significant factor in making your
14 investment recommendations on behalf of First Midwest
15 Bank?
16     A. It would have been a major factor. I
17 would not have purchased the deals had I known this.
18     Q. Are you disappointed to see this?
19     A. I'm extremely disappointed.
20     Q. And if I represented to you that some of
21 the CDOs purchased by First Midwest Bank were rated by
22 Standard & Poors using the CDO Evaluator model 2.4.3
23 that's referenced in here, does that bother you?
24     A. Yes, it does. Clearly what they -- the
25 ratings associated with the CDO did not match the

### Page 26

1  inherent value in the other CDO itself. We purchased
2  something that was mislabeled.
3       Q. And then let me just show you what they
4  had under consideration here, Mr. Hotchkiss. They're
5  talking about "a new way."
6           Do you see that?
7       A. I see that.
8       Q. And it says, "So we came up with a new
9  methodology, emphasizing on flexibility. We decide on
10 a number of business-friendly probabilities of default
11 matrices first."
12          Do you see that there? So it says
13 they start with the rating business and then --
14      A. They back into it.
15      Q. -- they back into it?
16      A. Yes.
17      Q. Is that consistent with your understanding
18 of the way S&P rated deals?
19      A. No, it's definitely inconsistent. Backing
20 in -- again, changing a model to result in an answer
21 that they want to get is not independent.
22      Q. Is that what you thought were you getting
23 when you --
24      A. No, I did not.
25      Q. You can set that aside.

### Page 27

1       A. (Witness so doing.)
2           (Exhibit No. 8 marked for ID)
3  BY MR. GRABER:
4       Q. Handing you and your counsel what's been
5  marked as Exhibit 8. For the record, these are a
6  series of e-mails. The top e-mail's from
7  to              dated Thursday, August 16th, 2007.
8  And I can represent to you that these e-mails are
9  discussing the same project that we just looked at in
10 Exhibit 7.
11          And if I could direct your attention
12 to the underlying e-mail from           to
13 dated Thursday August 2nd, 2007, and he says -- he
14 says here in the second paragraph -- do you see that
15 there?
16      A. Yes.
17      Q. -- "To incorporate now transition data" --
18 I think he means new. "To incorporate new transition
19 data on top of default data means we need a richer and
20 more descriptive theoretical model. That only means
21 the maximum likelihood estimation exercise to come up
22 with a starting hypothetical transition matrix will be
23 a lot more complex and sophisticated. We then 'bend'
24 this transition matrix to suit our business needs."
25          Do you see that there?

### Page 28

1       A. Yes.
2       Q. Would have knowing the information in this
3  e-mail been an important and significant factor in
4  making your investment recommendations on behalf of
5  First Midwest Bank?
6       A. It would have been very important to know
7  this information. We would not have purchased the
8  deals had we known this.
9       Q. Are you disappointed to see this?
10      A. Yes, equally as disappointed as I
11 mentioned before. Bending information to come up with
12 a conclusion to make more money for their own selves
13 is not independent and again it goes against our --
14 what we thought Standard & Poors was all about at the
15 time.
16      Q. Okay. Let's set this aside.
17      A. Okay.
18      Q. Thank you.
19          Mr. Hotchkiss, would it have been an
20 important and significant factor in making your
21 investment recommendation to the bank if you had known
22 that business heads of the CDO Group pushed back
23 against analysts' proposed updates to analytical
24 models used by S&P to rate CDOs on several occasions,
25 causing updates to those models to be delayed and

### Page 29

1  watered down because the proposed updates would have
2  had a significant negative effect on S&P's market
3  share and ratings business? Would that have been an
4  important and significant factor?
5       A. It would have been an extremely important
6  factor. Again, we would not have purchased any of the
7  CDOs had we known that.
8       Q. Now, Mr. Hotchkiss, was it your
9  understanding in 2005 through 2007 that S&P took into
10 account all relevant information when rating a CDO?
11      A. It was assumed, yes. I assumed.
12      Q. For example, would you have expected that
13 S&P would take into account internal information
14 regarding the impairment of collateral backing the
15 CDOs purchased by First Midwest Bank?
16      A. Yes, I would have expected that.
17      Q. If S&P's RMBS Surveillance Group had
18 identified a significant portion of the classes of
19 RMBS collateral backing                 as high
20 risk and likely to be downgraded, would you have
21 expected that S&P would have taken that information
22 into account in rating that CDO?
23      A. Yes, I would have expected that from a
24 professional organization.
25      Q. If you knew S&P failed to take into

Page 34

```
 1  in a CDO could trigger an event of default?
 2      A.  We -- the documents were very large,
 3  inches, inches deep, and we went through the documents
 4  when we purchased these things.
 5          We did know that, but we didn't think
 6  based on the food chain, where we were sitting on the
 7  food chain and the subordination below us, that we
 8  would ever see that happening, given the ratings where
 9  they were.  Again, they were rated A or -- A
10  basically, A- to A in Standard & Poors.  It would have
11  been a far drop for that to have occurred.
12      Q.  All right.  But you understood then and
13  you understand now that downgrades to the underlying
14  collateral could have a negative impact on the CDO
15  rating, right?
16      A.  Yes.  Yes.
17      Q.  If S&P were in the process of actively
18  reviewing RMBS collateral for downgrades, would you
19  have suspected that S&P would have taken that
20  information into account when rating a CDO back to
21  that same collateral in effect for a downgrade?
22      A.  Definitely.
23      Q.  Mr. Hotchkiss, in light of the information
24  that you have reviewed today, would you have still
25  relied on the ratings issued by S&P with respect to
```

Page 35

```
 1  the CDOs purchased by First Midwest Bank?
 2      A.  No, I would not have relied on their
 3  ratings at all, nor would I have purchased the CDOs.
 4      Q.  Are you disappointed in Standard & Poors
 5  in light of what you've seen today?
 6      A.  Extremely disappointed.  Again, we pay
 7  them a fee each year we use their services, like every
 8  other investor, believing that they were independently
 9  looking at investments and based on the best knowledge
10  that they would rate that fairly and then we would
11  have to do our own due diligence, of course, to back
12  that up, which we did.  And clearly that was not the
13  case based on the documents I've seen here.
14      Q.  And did First Midwest Bank take
15  significant losses on the CDOs that were rated by
16  Standard & Poors that we've discussed today?
17      A.  Yes, we did.  They all went -- we lost
18  every dime we invested in all the CDOs that we talked
19  about today.
20      MR. GRABER:  Let's go off the record.
21          (Discussion off the record.)
22      MR. GRABER:  Mr. Hotchkiss, we have no more
23  questions.  Thank you again for speaking with us
24  today.
25          (Statement completed at 11:33 a.m.)
```

Page 36

```
 1              CERTIFICATE OF DEPONENT
 2
 3      I hereby certify that I have read and examined the
 4  foregoing transcript, and the same is a true and
 5  accurate record of the testimony given by me.
 6  Any additions or corrections that I feel are
 7  necessary, I will attach on a separate sheet of
 8  paper to the original transcript.
 9
10               _____
11                 Signature of Deponent
12
13  I hereby certify that the individual representing
14  himself/herself to be the above-named individual,
15  appeared before me this _____ day of _____,
16  2012, and executed the above certificate in my
17  presence.
18
19               _____
20               NOTARY PUBLIC IN AND FOR
21
22               _____
23                    County Name
24
25  MY COMMISSION EXPIRES:
```

Page 37

```
 1  STATE OF ILLINOIS.)
                     ) ss:
 2  COUNTY OF COOK   )
        I, Deborah Habian, a Certified Shorthand
 3  Reporter within and for the State of Illinois, do
 4  hereby certify:
 5      That previous to the commencement of the
 6  examination of the witness, the witness was duly sworn
 7  to testify the whole truth concerning the matters
 8  herein;
 9      That the foregoing deposition was reported
10  stenographically by me, was thereafter
11  reduced to printed transcript by me, and constitutes a
12  true record of the testimony given and the proceedings
13  had;
        That the said deposition was taken before
14  me at the time and place specified;
15      That the reading and signing by the
16  witness of the deposition transcript was agreed upon
17  as stated herein;
        That I am not a relative or employee of
18  attorney or counsel, nor a relative or employee of
19  such attorney or counsel for any of the parties
20  hereto, nor interested directly or
21  indirectly in the outcome of this action.
        IN WITNESS WHEREOF, I do hereunto set my
22  hand this ____ day of _____, 20___.
23
24       DEBORAH HABIAN, CSR, RMR, CRR, CBC
         Notary Public
25       CSR No. 084-02432
```