# Exhibit 37

(Cardona Declaration)

Page 1

```
 1
 2                  FIRREA INVESTIGATIVE MATTER
 3                       Phoenix, Arizona
 4                        July 19, 2012
 5
 6
 7
 8         Deposition of Dale Gibbons, a witness herein,
 9    called for examination by counsel for the Government in
10    the above-entitled matter, the witness having been duly
11    sworn, taken at the offices of Western Alliance
12    Bancorporation, One East Washington Street, Suite 1400,
13    Phoenix, Arizona at 10:00 a.m., on Thursday, July 19,
14    2012, and the proceedings being taken down by Stenotype by
15    MARK MILLER, RMR and transcribed under his direction.
16
17
18                                     ALDERSON COURT REPORTING
19                                     1155 Connecticut Ave., NW
20                                                    Suite 200
21                                         Washington, DC 20036
22                                    Telephone: 1-800-FOR DEPO
23                                          Fax:  866-304-4621
24
25
```

```
                                    Page 2                                              Page 4
 1   APPEARANCES:                                1      (Exhibits 1 through 9 were pre-marked for
 2                                               2   identification.)
 3   For the U.S. Department of Justice:         3           DALE GIBBONS,
 4       U.S. DEPARTMENT OF JUSTICE              4   called as a witness herein, having been first duly sworn
 5       Office of Consumer Litigation           5   by the Certified Reporter to speak the truth and nothing
 6       By: Mr. Geoffrey Graber, Esq.           6   but the truth, was examined and testified as follows:
 7           Mr. Michael A. Nash, CPA, CFE       7
 8       450 Fifth Street, N.W.                  8              EXAMINATION
 9       Room 6407                               9
10       Washington, DC 20001-2739              10     Q.  BY MR. GRABER:  Good morning.
11                                              11     A.  Good morning.
12                                              12     Q.  Can you please state your name and spell your
13   For Western Alliance Bancorporation:       13   last name for the record?
14       Mr. Randall S. Theisen                 14     A.  Dale Gibbons, G-i-b-b-o-n-s.
15       One East Washington Street, Suite 1400,15     Q.  Thank you for agreeing to speak with the
16       Phoenix, Arizona 85004                 16   Government today.
17                                              17         Mr. Gibbons, you are not on any medication
18                                              18   or under the influence of any drugs that would interfere
19                                              19   with your ability to give truthful and accurate testimony
20                                              20   today; is that right?
21                                              21     A.  Correct.
22                                              22     Q.  You currently work at Western Alliance Bancorp;
23                                              23   is that correct?
24                                              24     A.  Yes.
25                                              25     Q.  With did you start working at what is now Western
```

```
                                    Page 3                                              Page 5
 1              I N D E X                        1   Alliance Bancorp?
 2                                               2     A.  In May of 2003.
 3   WITNESS                         PAGE        3     Q.  And what was the bank called back then?
 4   DALE GIBBONS                                4     A.  BankWest Nevada Corporation.
 5       Examination by Mr. Graber       4       5     Q.  And can you just tell me generally what positions
 6                                               6   you have held at the bank?
 7           INDEX TO EXHIBITS                   7     A.  Yes.  I was chief financial officer for Bank of
 8   No.      Description            Page        8   Nevada and for BankWest Nevada Corporation and -- and now
 9       (All exhibits retained by Mr. Nash)     9   am chief CFO for Western Alliance Bancorporation and still
10   1   Standard & Poor's Ratings Services    10   executive vice president of Bank of Nevada, which is the
11       Code Of Conduct               9       11   successor to BankWest.
12   2   document entitled Testimony of  12     12     Q.  In 2007 what position did you hold?
13       Kathleen A. Corbet                    13     A.  I was chief financial officer for Western
14   3   Report On Implementation Of    14     14   Alliance Bancorporation and head of EVP Finance for Bank
15       Standard & Poor's Ratings Services    15   of Nevada.
16       Code Of Conduct                       16     Q.  In 2007 did you have responsibility for making
17   4   string of e-mails             17     17   recommendations with respect to certain investments?
18   5   string of e-mails             18     18     A.  Yes.
19   6   Standard & Poor's Executive Summary   19     Q.  Did that include the purchase of collateralized
20   7   Pre-presentation to CDO GPL and SF CCO 22 20   debt obligations or CDOs?
21   8   email from ▇▇▇▇ to ▇▇▇▇       25     21     A.  Yes.
22       dated 8-16-07                          22     Q.  And can you just outline for us, very generally,
23   9   document reflecting three charts  29  23   what were your responsibilities in that regard?
24                                              24     A.  I was responsible for evaluating the efficacy of
25                                              25   any, you know, investment purchases that -- you know,
```

Dale Gibbons                                                                July 19, 2012
Phoenix, AZ

                                                    Page 6
 1  first and foremost considered the risk and the low risk
 2  tolerance that the bank had for such investments.
 3      Q.  Okay.
 4      A.  And then also was the return commensurate with
 5  that loan risk.
 6      Q.  In 2007 were there investment guidelines at Bank
 7  of Nevada?
 8      A.  Yes.
 9      Q.  Would that include a minimum credit rating on
10  financial products purchased by the bank?
11      A.  Yes.
12      Q.  What was the minimum credit rating that a
13  financial product had to have to be eligible for
14  investment by the bank in 2007?
15      A.  Of any type it had to be an investment grade at
16  least Triple B.
17      Q.  What about for CDOs?
18      A.  That is a single A.
19      Q.  Was that a required part of the bank's policy to
20  maintain investments that were consistent with maintaining
21  the safety and soundness of the bank?
22      A.  Yes.
23      Q.  And in purchasing financial products such as
24  collateralized debt obligations, did you rely in part on
25  credit rating?

                                                    Page 7
 1      A.  Yes.
 2      Q.  And why was that?
 3      A.  Credit ratings are an integral part of, you know,
 4  the regulatory framework that would be used in assessing
 5  whether a particular investment, you know, complied with
 6  not only with our investment objectives but also with
 7  regulatory requirements.
 8      Q.  In 2007 you recommended the purchase of CDOs by
 9  Bank of Nevada; is that right?
10      A.  I did.
11      Q.  And what were the names of those CDOs?
12      A.  ▓▓▓▓▓▓▓▓▓
13      Q.  Okay.
14      A.  ▓▓▓▓
15      Q.  And if you could just tell us, very generally,
16  what was your role in recommending the securities for
17  purchase?
18      A.  My role was reviewing the -- the prospectus on
19  these offerings and confirming that it met our criteria of
20  what we were looking for in terms of, you know, risk of
21  return.
22      Q.  Were the bonds purchased in connection with those
23  two CDOs rated by credit rating agencies?
24      A.  They were.
25      Q.  Were they rated by Standard & Poor's?

                                                    Page 8
 1      A.  Yes, both.
 2      Q.  To the best of your recollection, what were the
 3  ratings on those bonds?
 4      A.  ▓▓▓ I believe was a single A and ▓▓▓ was double
 5  A.
 6      Q.  And did you rely in part on the credit rating on
 7  those CDOs when making your investment recommendation?
 8      A.  Absolutely.
 9      Q.  And why is that?
10      A.  In this particular space, you know, we did not
11  have a lot of expertise, these were CDO squared examples,
12  and I had -- I knew what the rating agencies -- I had my
13  own interaction with them, both from Moody's and Standard
14  & Poor's, in terms of going through that process and
15  believed that that would be a very strong source of
16  reliability that we could use to depend upon.
17      Q.  Did the S&P ratings on these bonds lead you to
18  believe in part that the investments were relatively safe?
19      A.  That they were very safe.
20          You know, the historical loss that we looked
21  at in terms of securities that are rated, you know, in
22  these categories, A and double A, are well under 1
23  percent.
24      Q.  Okay.
25      A.  So we didn't think there was zero risk associated

                                                    Page 9
 1  with these, but it was a matter of basis points what would
 2  be expected losses to be.
 3      Q.  In 2007 was it your understanding that S&P was a
 4  neutral party to the CDOs purchased by Bank of Nevada?
 5      A.  Yes.
 6      Q.  And was it your understanding that S&P was
 7  objective and independent in the way it issued credit
 8  ratings, including ratings on CDOs?
 9      A.  Yes.
10      Q.  I show you some documents now.
11          I am showing you what has been marked as
12  Exhibit 1.  For the record, this is a document entitled
13  S&P Ratings Services Code of Conduct dated October 2005.
14          And if I could draw your attention to page
15  4.
16      A.  Okay.
17      Q.  Do you see under subpart C Integrity of the
18  Rating Process?
19          Are you there?
20      A.  Yes.
21      Q.  You see under 1.12 it states Ratings Services and
22  its employees shall deal fairly and honestly with issuers,
23  investors, other market participants and the public?
24          Do you see that?
25      A.  I do see that.

## Page 10

1  Q. Is that statement consistent with your
2  understanding in 2007 of S&P's representations regarding
3  its objectivity and independence?
4      A. It is.
5      Q. And was that understanding an important and
6  significant factor in making your investment
7  recommendation on behalf of Bank of Nevada?
8      A. Yes. Integrity of the process and reliability on
9  what information we are receiving from the rating agencies
10 is imperative to be able to rely upon.
11     Q. Let me draw your attention to the next page, page
12 5.
13     A. Okay.
14     Q. You see there in the middle of the page there is
15 Independence and Avoidance of Conflicts of Interest?
16     A. Yes.
17     Q. Do you see under 2.1 -- let me read that for you.
18 It states, "Ratings Services shall not forbear or refrain
19 from taking a Rating Action, if appropriate, based on the
20 potential effect (economic, political, or otherwise) of
21 the Rating Action on Ratings Services, an issuer, an
22 investor or other market participant."
23         Do you see that?
24     A. I do.
25     Q. And is that statement consistent with your

## Page 11

1  understanding in 2007 of S&P's representations regarding
2  its objectivity and independence?
3      A. Yes.
4      Q. And was that understanding an important and
5  significant factor in making your investment
6  recommendation on behalf of Bank of Nevada?
7      A. Yes.
8      Q. If I go to 2.2 it states, "Ratings Services and
9  its Analysts shall use care and analytic judgement to
10 maintain both the substance and appearance of independence
11 and objectivity."
12         See that?
13     A. Yes.
14     Q. Is that statement also consistent with your
15 understanding in 2007 of S&P's representations regarding
16 its objectivity and independence?
17     A. Yes.
18     Q. And was that understanding an important and
19 significant factor in making your investment
20 recommendation on behalf of Bank of Nevada?
21     A. Yes.
22     Q. Let me draw your attention to section 2.4. It
23 states, "Ratings assigned by Ratings Services to an
24 insurer or issue shall not be affected by the existence
25 of, or potential for, a business relationship between

## Page 12

1  Ratings Services (or any Non-Ratings business) and the
2  issuer (or its affiliates) or any other party, or the
3  nonexistence of such a relationship."
4          Do you see that there?
5      A. I do.
6      Q. Is that statement also consistent with your
7  understanding in 2007 of S&P's representations regarding
8  its objectivity and independence?
9      A. Yes.
10     Q. And was that understanding an important and
11 significant factor in making your investment
12 recommendation on behalf of Bank of Nevada?
13     A. It was.
14     Q. Let's set that aside.
15     A. Okay.
16     Q. Let me show you another document very quickly.
17         Handing you what has been marked as Exhibit
18 2.
19         And this, for the record, is a document
20 entitled Testimony of Kathleen A. Corbet, President of
21 Standard & Poor's, a Division of The McGraw-Hill
22 Companies, Inc., Before The Committee On Banking, Housing
23 and Urban Affairs, United States Senate, February 8th,
24 2005.
25         And if I could draw your attention to page

## Page 13

1  8, last full paragraph where it states, "As part of our
2  commitment to continuous improvement and in order to
3  ensure that ratings are responsive to evolving market
4  needs, S&P Ratings Services has recently initiated a broad
5  range of actions that support our mission to provide
6  high-quality, objective and rigorous analytical
7  information to the marketplace."
8          Do you see that?
9      A. Yes.
10     Q. And is that statement also consistent with your
11 understanding in 2007 of S&P's representations regarding
12 its objectivity and independence?
13     A. Yes, it is.
14     Q. And was that understanding an important and
15 significant factor in making your investment
16 recommendation on behalf of Bank of Nevada?
17     A. Right.
18     Q. Yes?
19     A. Yes.
20     Q. Thank you.
21         We should have stated for the record, you
22 are represented here by counsel.
23         MR. GRABER: If you could state your
24 presence here.
25         MR. THEISEN: My name is Randy Tyson. I am

## Page 14

1  general counsel to Western Alliance Bancorporation and for
2  Bank of Nevada.
3           MR. GRABER:  Thank you very much.
4           MR. THEISEN:  Sure.
5      Q.  BY MR. GRABER:  Handing you and your counsel what
6  has been marked as Exhibit 3.
7      A.  Okay.
8      Q.  For the record, this document is a Report on
9  Implementation of Standard & Poor's Ratings Services Code
10 of Conduct, February 2006.
11          Do you see that?
12     A.  Yes.
13     Q.  And if I could draw your attention about three
14 pages in, Bates numbers ending in 5632, states
15 Introduction at the top.
16          See that?
17     A.  Uh-huh.
18     Q.  If I draw your attention to the second full
19 paragraph where it states, "Ratings Services recognizes
20 its role in the global capital markets and is committed to
21 providing ratings that are objective, independent and
22 credible."
23          See that?
24     A.  Yes.
25     Q.  Is that statement also consistent with your

## Page 15

1  understanding in 2007 of S&P's representations regarding
2  its objectivity and independence?
3      A.  Absolutely.
4      Q.  And was that understanding an important and
5  significant factor in making your investment
6  recommendation on behalf of Bank of Nevada?
7      A.  It was.
8      Q.  If I could draw your attention now to the page
9  ending in 5641.  It states at the top of that page
10 Independence of Rating Decisions?
11     A.  Yes.
12     Q.  See that?
13     A.  Yes.
14     Q.  The first paragraph there states, "It is a
15 central tenet of Ratings Services that its ratings
16 decisions not be influenced by the fact that Ratings
17 Services receives fees from issuers."
18          See that?
19     A.  Yes.
20     Q.  Is that statement consistent with your
21 understanding in 2007 of S&P's representations regarding
22 its objectivity and independence?
23     A.  Absolutely.
24     Q.  And was that understanding an important and
25 significant factor in making your investment

## Page 16

1  recommendation on behalf of Bank of Nevada?
2      A.  It was.
3      Q.  Okay.  You can set that aside.  Thank you very
4  much.
5           Mr. Gibbons, in 2007, was it an important
6  and significant factor in making your investment
7  recommendations to Bank of Nevada whether to buy the AMP
8  and      CDOs that S&P would not weaken or lessen the
9  stringency of its credit rating criteria to get more
10 business?
11     A.  Yes.
12     Q.  And was it your understanding in 2007 that S&P
13 was unbiased and that its analytical judgment regarding
14 the CDOs the bank purchased was not affected by conflicts
15 of interest?
16     A.  Yes.
17     Q.  If you could, tell us briefly, why was that
18 important?
19     A.  We were relying upon the rating agencies and
20 their confirmation as represented by the broker in this
21 deal that these were, you know, high investment grade
22 products, and from my experience with the rating agencies
23 and looking at the historical loss behavior of other
24 similarly, you know, rated securities, that these were
25 kind of within the tolerance levels of risks that the bank

## Page 17

1  would assume; otherwise we wouldn't have been interested
2  in pursuing a purchase of them.
3      Q.  Let me show you some documents now.
4           Handing you what has been marked as Exhibit
5  4.
6           For the record, this is a series of e-mails
7  among members of the Structured Finance Group of Standard
8  & Poor's, top email from            dated Wednesday,
9  March 23rd, 2005, to various members of the Structured
10 Finance Group, Subject one, Levels 5.6 (c).
11          Do you see that there?
12     A.  Yes.
13     Q.  I can represent to you that the Levels model was
14 the analytical model that S&P used to rate RMBS
15 transactions.
16          Do you follow me?
17     A.  Okay.
18     Q.  And if I could draw your attention to the
19 underlying e-mail from            to various members of
20 the Structured Finance Group dated Wednesday, March 23rd,
21 2005, sent at 8:42 a.m., subject line, Levels 5.6 (c).
22          And he states there in his first paragraph,
23 "While I agree with number 1, I am puzzled.  When we first
24 reviewed 6.0 results a year ago, we saw the subprime and
25 Alt-A numbers going up, and that was a major point of

Page 18

1   contention, which led to all the model tweaking we have
2   done since.
3       Version 6.0 could have been released months
4   ago and resources assigned elsewhere if we didn't have to
5   massage the subprime and Alt-A numbers to preserve market
6   share."
7       Do you see that?
8   A.  Yes.
9   Q.  Is this consistent with your understanding of
10  S&P's representations regarding its objectivity and
11  independence?
12  A.  Certainly not.
13  Q.  Would knowing this information that is contained
14  in this e-mail here been an important, significant factor
15  in making your investment recommendations on behalf of
16  Bank of Nevada?
17  A.  I would not have made such a recommendation if I
18  would have known that they allowed market share to affect
19  the ratings, which is how I read this.
20  Q.  Thank you.  You can set that aside.
21      I am handing you and your counsel what has
22  been marked as Exhibit 5.
23  A.  Okay.
24  Q.  For the record, this is a series of e-mails.  The
25  top e-mail is from             dated Tuesday, April

Page 19

1   20, 2004, to various members of the Structured Finance
2   Group at S&P, subject line, Default Matrix changes.
3       And I will represent to you that the subject
4   matter of these e-mails concerns updates to the default
5   assumptions going into CDO Evaluator, which was the model
6   used to rate CDOs.
7       You may want to take just a second to look
8   at the e-mail.
9   A.  Okay.
10  Q.  And you see in the e-mail from           sent on
11  Tuesday, April 13th, 2004,           is writing to
12  which I can represent to you is a reference to
13           who is head of the CDO Group at the time, he
14  states, "I am still operating on the understanding that
15  the revision of the default table proposed by the London
16  team cannot be accepted in its current form for one
17  reason, namely the potential adverse impact on cash flow
18  CDOs backed by NIG," which means noninvestment grade,
19  "collateral."
20      Do you see that?
21  A.  Yes.
22  Q.  And then that is confirmed in the subsequent
23  e-mail sent by           sent Tuesday, April 20, 2004,
24  where he says, "This is also my understanding, that the
25  issue with the revised table from      team gave too low

Page 20

1   an outcome for noninvestment grade portfolios."
2       Do you see that there?
3   A.  I do.
4   Q.  Would have knowing this information been an
5   important and significant factor in making your investment
6   recommendation on behalf of Bank of Nevada?
7   A.  Absolutely.
8   Q.  All right.
9   A.  Even reading the next sentence, "then our
10  proposed default table will not work for the high-yield
11  sector."
12  Q.  Yes.
13  A.  Yes, that is very disturbing.
14  Q.  Let's set that aside.
15  A.  Okay.
16  Q.  Handing you and your counsel what has been marked
17  as Exhibit 6.
18      And for the record, this is a memorandum,
19  subject line Global CDO Activity Report, from
20  who I can represent to you at the time was head of the CDO
21  Group, to             who I will represent was at the
22  time the head of the Structured Finance Group at S&P, and
23  this is dated August 20th, 2005.
24      If I could draw your attention to internal
25  page 4.  If you look at the language above Roman numeral

Page 21

1   III.
2       You see that there?
3   A.  Yes.
4   Q.  I can represent to you they are discussing here
5   again updates to the CDO Evaluator model.  It states here,
6   "Due to the not insignificant impact on lowly-rated Triple
7   B and down reference pools where additional cash flow and
8   recovery assumptions could not be tailored towards less
9   than rating down grade pressure, especially in synthetic
10  transactions, we have toned down and slowed down our
11  roll-out of E3 to the market and further measures to deal
12  with such negative results."
13      Do you see that there?
14  A.  I do.
15  Q.  Is that consistent with your understanding in
16  2007 of S&P's --
17  A.  Definitely not.
18  Q.  Let me finish the question.
19  A.  Okay.
20  Q.  Is what I just read to you consistent with your
21  understanding in 2007 of S&P's representations regarding
22  its objectivity and independence?
23  A.  No.
24  Q.  Why not?
25  A.  What I interpret this to say is that they have

```
                    Page 22                                              Page 24
 1  information that indicates that loss behavior is        1  with a statistical best fit and this does not meet our
 2  significantly higher than what the model assumes, but they 2  business needs, we have to change our parameters ex-post
 3  are not including that in their analyses, because they  3  to accommodate.
 4  have to deal with the impact of what this would mean for 4       Do you see that?
 5  them on their negative results.                          5     A.  Yes.
 6     Q.  Would have knowing this information here been an  6     Q.  Is this consistent with your understanding in
 7  important and significant factor in making your investment 7  2007 of S&Ps representations regarding their objectivity
 8  recommendations on behalf of Bank of Nevada?             8  and independence?
 9     A.  It would have.                                    9     A.  It is wholly inconsistent.
10     Q.  Set that aside.  Thank you.                      10     Q.  Okay.
11         Handing you and your counsel what has been       11     A.  The old way I think is already flawed whereby
12  marked as Exhibit 7.                                    12  they are effecting their -- the old way where they allow
13     A.  Okay.                                            13  Probabilities of Default to tweak their idealized PDs to
14     Q.  For the record, this is a PowerPoint presentation 14  work on the rating business is already flawed, and then
15  entitled at the top Pre-presentation to CDO GPL and SF  15  the new way is even more bastardized in which the entire
16  CCO, April 10, 2007.  And I can represent to you that the 16  structure of assessing Probabilities of Default is
17  reference there is to CDO Global Practice Leader and the 17  dependent upon the rating business.
18  Structured Finance Chief Criteria Officer.  And the title 18     Q.  Sitting here today and reading this, does this
19  of the presentation is A New Approach To Estimating ABS 19  call into question the reality of the ratings?
20  PDs, which I can represent to you means Probabilities of 20     A.  Yes, it -- yes, they have no value.  They are
21  Default.                                                21  worthless.
22         Do you see that?  Is that consistent with       22         And frankly, they are insidious because of
23  your understanding of what that means?                 23  the architecture they have and the statements around them
24     A.  Yes.                                            24  and the process that I knew about when I worked with S&P
25     Q.  You are familiar with that concept, Probabilities 25  on getting rated before whereby the financing piece was

                    Page 23                                              Page 25
 1  of Default?                                             1  wholly separate from when you talked to anybody when they
 2     A.  I am.                                            2  were rating you.
 3     Q.  ▇▇▇▇▇▇▇▇▇▇▇ were senior members of              3     Q.  Would have knowing the information contained in
 4  the CDO Group at the time.  I will also represent that to 4  this document here been an important and significant
 5  you.                                                    5  factor in making your investment recommendations on behalf
 6     A.  Okay.                                            6  of Bank of Nevada?
 7     Q.  If I could draw your attention now to internal   7     A.  It would have.
 8  page 4.  And you see there it says at the top A Better  8     Q.  Would you have relied on S&P's ratings at all if
 9  Mousetrap Doing It the Other Way Around By a Hypothesis 9  you had known this?
10  Testing?                                               10     A.  No.
11     A.  I do.                                           11     Q.  I show you another document, Mr. Gibbons.
12     Q.  You see there the old way, one way street, it   12  Handing you and your counsel what has been marked as
13  states data one way, there is an arrow one way, then it 13  Exhibit 8.
14  says can't tweak if they contradict data, and then it   14         And for the record, it is a series of
15  moves on to idealized Probabilities of Default, and it  15  e-mails starting with an e-mail from ▇▇▇▇▇▇ to ▇▇▇▇
16  says, does this work for our rating business -- does this 16  ▇▇▇▇▇▇ sent Thursday, August 16th, 2007, subject line
17  work for our rating business.  Underneath it says if it 17  Anton's second 9 month project.
18  does not, need to tweak Probabilities of Default, and then 18         And I can represent to you that this is a
19  the arrow goes on to rating business.                  19  series of e-mails that concern the same project that was
20         Do you see that there?                          20  reflected in the prior exhibit that we just discussed.
21     A.  I do.                                           21     A.  Okay.
22     Q.  If I just draw your attention to the left, the  22     Q.  If I could draw your attention to the e-mail from
23  bullet point with text, it says, to come up with PDs and 23  ▇▇▇▇▇▇ sent Thursday, August 2nd, 2007, to ▇▇▇▇
24  asset correlations in CDO E2.4.3, which means CDO       24  subject line again is ▇▇▇▇ second 9 month project.
25  Evaluator 2.4.3, if we look at our raw data and come up 25         He states, "Pat, I believe it is worth
```

7 (Pages 22 to 25)

```
                                      Page 26
 1   pointing out that while the initial project did focus on
 2   Hypothesis Testing to buy us the operational freedom to
 3   defend multiple business friendly default matrices, the
 4   single first step in coming up with a Hypothetical default
 5   matrix to be tested (i.e. where do we begin?) itself is
 6   based on Maximum Likelihood Estimation         which is
 7   a reference to            ("couldn't really pull it out
 8   of thin air like we did with CDOE3.2."
 9           See that?
10       A.  Uh-huh.
11       Q.  "To incorporate now" -- I think that means
12   "new" -- "to incorporate new transition data on top of
13   default data means we need a richer and more descriptive
14   theoretical model.  That only means the Maximum Likelihood
15   Estimation exercise to come up with a starting
16   Hypothetical transition matrix will be a lot more complex
17   and sophisticated."
18           We then, quote-unquote, bend this transition
19   matrix to suit our business needs.
20           See that?
21       A.  Yes.
22       Q.  Is this consistent with your understanding of
23   S&P's representations regarding its objectivity and
24   independence?
25       A.  No.
```

```
                                      Page 27
 1       Q.  No.
 2           And would have knowing that information been
 3   an important and significant factor in making your
 4   investment recommendations on behalf of Bank of Nevada?
 5       A.  Yes.
 6       Q.  Set that aside.
 7           Would it have been an important and
 8   significant factor in making your investment
 9   recommendation to the bank if you had known that business
10   heads of the CDO Group push back against analyst proposed
11   updates to analytical models used by S&P to rate CDOs and
12   on several occasions causing updates to those models to be
13   delayed and watered down because the proposed updates
14   would have had significant negative effect on S&P's market
15   share and rating business?
16       A.  It would have.
17       Q.  Was it your understanding at the time, 2007, that
18   S&P took into account all relevant information when rating
19   a CDO?
20       A.  Yes.
21       Q.  For example, would you have expected that S&P
22   would take into account internal information regarding the
23   impairment of collateral backing the CDOs purchased by
24   Bank of Nevada?
25       A.  Certainly.
```

```
                                      Page 28
 1       Q.  Okay.
 2       A.  That is the value added that they can have that
 3   we don't have access to.
 4       Q.  If S&P's own RMBS surveillance group had
 5   identified a significant portion of the classes of RMBS
 6   collateral ultimately backing the CDOs purchased by the
 7   bank as high risk and likely to be downgraded, would you
 8   have expected that S&P would have taken that information
 9   into account in rating those CDOs?
10       A.  Yes.
11       Q.  If S&P failed to take into account that
12   information, would that have been an important and
13   significant factor in your decision to recommend an
14   investment in the CDOs purchased by the bank?
15       A.  It would have.
16       Q.  Can you tell us briefly why?
17       A.  Well, you know, as we said at the beginning, we
18   were relying upon the veracity, the integrity and the
19   competence of the rating agencies and the recommendations
20   in order to be able to assess whether this was a
21   reasonable investment, moderate risk that fit within the
22   investment policy and the regulatory guidelines.
23       Q.  Okay.
24       A.  That puts all that in question.
25       Q.  I show you briefly another document.
```

```
                                      Page 29
 1           Handing you and your counsel what has been
 2   marked as Exhibit 9.
 3           For the record, this is a document
 4   reflecting three charts, top chart stating Average
 5   Defaults By Origination Vintage.  I can represent to you
 6   that this analysis reflects work that was being done in
 7   April of 2007 to project defaults on the 2005 and 2006
 8   subprime RMBS books based on expected aggregate losses to
 9   those books that were within the range of S&P's published
10   loss projections for those books.
11           Do you follow me?
12       A.  I do.
13       Q.  And these are projection defaults, meaning bonds
14   that -- they are projecting bonds that are likely to take
15   a loss and therefore be downgraded to keep --
16           So I draw your attention to, for example,
17   the triple defaults at the medium loss scenario.
18           Do you see that there --
19       A.  Yes.
20       Q.  -- in the top chart?
21           And under the 2005 Vintage it is projecting
22   47.44 percent to default.
23           Do you see that?
24       A.  I do.
25       Q.  You see the triple B minus defaults medium losses
```

8 (Pages 26 to 29)

Page 30

1  projecting 64.44 percent to default.
2       See that?
3    A.  Yes.
4    Q.  Under the first half 2006 triple B defaults under
5  medium losses projecting 56.27 percent of those bonds to
6  default and the triple B minus level they are projecting
7  71.74 to default.
8       Do you see that?
9    A.  I do.
10   Q.  And for the first half of 2006 the projection is
11 35 percent to default at the triple B level under medium
12 loss scenario and at the triple B minus medium loss
13 scenario projecting 51 percent, 51.01 percent to default.
14      See that there?
15   A.  Yes.
16   Q.  Would you have expected S&P to take this type of
17 information into account when rating CDOs backed by these
18 classes of collateral?
19   A.  Absolutely.
20   Q.  Can we agree that the projected loss numbers
21 here -- excuse me -- the projected defaults here are
22 terrible?
23   A.  Yes.  Well, I would say -- the default -- the
24 default -- as I read this, the default to me would be that
25 71 percent.  For example, 71.74 percent of those rated

Page 31

1  triple B minus in this originated the second half -- or
2  the first half of 2006 will breach their compliance with
3  their contractual terms, irrespective of what losses
4  ultimately occurred.
5    Q.  Okay.
6    A.  Now that would be dramatically higher than what
7  would support the ratings of single A and double A that we
8  had on the securities that were rated.
9    Q.  Mr. Gibbons, if you had known at the time that
10 several senior analysts at S&P, including business
11 managers, were aware that there would be unprecedented
12 downgrades to nonprime RMBS, would that have been a
13 significant and important factor in your decision to
14 invest in       and       CDOs?
15   A.  Yes.  We wouldn't have done it.
16   Q.  And I can represent to you, Mr. Gibbons, that on
17 June 29th, 2007, S&P had settled on the precise dates and
18 times of the mass downgrades that occurred in the middle
19 of July 2007.
20      Do you have that in mind there?
21   A.  I do.
22   Q.  And you have --
23   A.  I recall that.
24   Q.  I'm sorry?
25   A.  I recall that.

Page 32

1    Q.  And you understand that the       CDO that the bank
2  purchased was rated on June 29th, 2007?
3    A.  Right.
4    Q.  If you had known that information at the time
5  that S&P had already decided on the exact date and time
6  the announcement, the mass downgrades on the date that
7  your CDO was being rated, would you have recommended it --
8    A.  No.
9    Q.  -- for purchase?
10   A.  No.
11   Q.  Sitting here today and hearing what I am telling
12 you now, do you have any reaction to that information?
13   A.  Yes.  I think it is -- I don't understand why
14 they are withholding information that is critical not only
15 to us but to the marketplace.
16   Q.  Okay.
17   A.  At the time that that took place I wonder -- they
18 didn't finish just rating all these yesterday.  Why did
19 they do this, you know, massive downgrade?  As they had
20 information available why didn't they present it to the
21 market?
22      In our case with this one being rated in
23 that time frame we would not have proceeded with that
24 purchase.
25   Q.  If S&P were in the process of actively reviewing

Page 33

1  RMBS collateral for downgrades, would you have expected
2  that S&P would have taken that information into account
3  when rating a CDO backed by that same collateral under
4  review for downgrade?
5    A.  Certainly.
6    Q.  I know we have gone over some of this already,
7  but in light of the information you have reviewed today,
8  would you have still relied on the rating issued by S&P
9  with respect to the CDOs purchased by Bank of Nevada?
10   A.  I wouldn't have relied upon them and we wouldn't
11 have purchased them either.
12       MR. GRABER:  Let's go off the record.
13       (Discussion off the record.)
14       MR. GRABER:  Thank you very much for taking
15 your time to be with us today.
16       We have no more questions.
17       (Whereupon the deposition concluded at 10:40
18 a.m.)

9 (Pages 30 to 33)

```
                                      Page 34
 1        CERTIFICATE OF DEPONENT
 2
 3   I hereby certify that I have read and examined the
 4   foregoing transcript, and the same is a true and
 5   accurate record of the testimony given by me.
 6   Any additions or corrections that I feel are
 7   necessary, I will attach on a separate sheet of
 8   paper to the original transcript.
 9
10            _____
11                Signature of Deponent
12
13   I hereby certify that the individual representing
14   himself/herself to be the above-named individual,
15   appeared before me this _____ day of _____,
16   2012, and executed the above certificate in my
17   presence.
18
19            _____
20            NOTARY PUBLIC IN AND FOR
21
22            _____
23                  County Name
24
25   MY COMMISSION EXPIRES:
```

```
                                      Page 35
 1   STATE OF ARIZONA    )
 2   COUNTY OF MARICOPA  )
 3        BE IT KNOWN that the foregoing deposition
 4   was taken by me pursuant to stipulation of counsel; that I
 5   was then and there a Certified Reporter in and for the
 6   County of Maricopa, State of Arizona, and by virtue
 7   thereof authorized to administer an oath; that the witness
 8   before testifying was duly sworn by me to testify to the
 9   whole truth; that the questions propounded by counsel and
10   the answers of the witness thereto were taken down by me
11   in shorthand and thereafter transcribed into typewriting
12   under my direction; that the foregoing pages are a full,
13   true and accurate transcript of all proceedings and
14   testimony had and adduced upon the taking of said
15   deposition, all to the best of my skill and ability.
16        I FURTHER CERTIFY that I am in no way
17   related to nor employed by any parties hereto nor am I in
18   any way interested in the outcome hereof.
19        DATED at Phoenix, Arizona, this 22nd day of
20   July, 2012.
21
22              Mark Miller
23              CCR # 50474
24
25
```

10 (Pages 34 to 35)