# Exhibit 38

(Cardona Declaration)



2/5/13 Fed. News Serv. Transcripts 00:00:00

Federal News Service Transcripts
Copyright © 2013 Federal News Service

February 5, 2013

Press Conference with Attorney General Eric Holder; Associate Attorney
General Tony West; Deputy Assistant Attorney General Stuart Delery Subject:...

Press Conference with Attorney General Eric Holder; Associate Attorney General Tony West; Deputy Assistant Attorney General Stuart Delery Subject: Announcement of a Major Financial Fraud Enforcement Action Location: Justice Department, Washington, D.C. Time: 11:14 a.m. EST Date: Tuesday, February 5, 2013

```
Press Conference with Attorney General Eric Holder; Associate Attorney General Tony West; Deputy Assistant
Attorney General Stuart Delery Subject: Announcement of a Major Financial Fraud Enforcement Action Location:
Justice Department, Washington, D.C. Time: 11:14 a.
m. EST Date: Tuesday, February 5, 2013 -------- ATTORNEY GENERAL ERIC HOLDER: Good morning. I want to
thank you all for being here.
Today I'm joined by the associate attorney general, Tony West; the principal deputy assistant attorney
general for the Civil Division, Stuart Delery; United States Attorney Andre Birotte for the Central District
of California in Los Angeles; and attorneys general from six states as well as from the district of Columbia
in announcing the latest steps forward in our ongoing efforts to protect the American people from financial
fraud, to hold accountable those who violate our laws and abuse the public trust and to seek justice for
all those whose lives were devastated by the recent economic crisis. Yesterday the Justice Department
filed a civil lawsuit against Standard & Poor's Financial Services as well as its parent company, McGraw-
Hill, alleging that the credit rating agency S&P engaged in a scheme to defraud investors in financial
products known as residential mortgage-backed securities, or RMBS, and collateralized debt obligations, or
CDOs. We allege that by knowingly issuing inflated credit reported ratings for CDOs which misrepresented
their creditworthiness and understated their risks, S&P misled investors, including many federally insured
financial institutions, causing them to lose billions of dollars.
In addition, we allege that S&P falsely claimed that its ratings were independent, that they were objective
and that they were not influenced by the company's relationship with the issuers who hired S&P to rate the
securities in question when in reality, the ratings were affected by significant conflicts of interest,
and S&P was driven by its desire to increase its profits and market share to favor the interest of issuers
over investors. Now, yesterday's action was brought under the Financial Institution Reform, Recovery and
Enforcement Act of 1989, which allows the Justice Department to seek civil penalties equal to the losses
suffered by federally insured financial institutions, the statute that we call FIRREA. To date we have
identified more than $5 billion in such losses resulting from CDOs that were rated by S&P between March
and October of 2007.
During this period nearly every single mortgage- backed CDO that was rated by S&P not only unperformed
but failed. Put simply, this alleged conduct is egregious, and it goes to the very heart of the recent
financial crisis. Our investigation into this matter began in November of 2009, in connection with the
president's Financial Fraud Enforcement Task Force.
And it showed that as early as 2003 analysts with S&P raised concerns about the accuracy of the company's
rating system, as well as the underlying methodology. S&P executives allegedly ignored these warnings and
between 2004 and 2007 concealed facts, made false representations to investors and to financial institutions
and took other steps to manipulate criteria and credit models to increase revenue and market share. Even
in 2007 when S&P's internal data showed a severe deterioration in the creditworthiness of the RMBS that
```

it had rated, S&P allegedly continued to rate hundreds of billions of dollars' worth of CDOs backed by RMBS collateral, ignoring their own analysts' performance projections showing that the ratings on that collateral would not hold.

The action that we announce today marks an important step forward in the administration's ongoing efforts to investigate as well as to punish to the conduct that is believed to have contributed to the worst economic crisis in recent history. And it's just the latest example of the critical work that president's Financial Fraud Enforcement Task Force is making possible. The complaint that we filed yesterday compliments the actions of the task force's working groups, including the Residential Mortgage-Backed Securities Fraud Working Group, the Mortgage Fraud Working Group and the Security and Commodities Fraud Working Group, members of which played key roles in the cases that we're announcing today.

Now, I've been honored to chair the task force since its inception in 2009, and I'd like to take a moment to acknowledge the task force members, Justice Department leaders and talented investigators, prosecutors, law enforcement officers and other partners, and particularly the attorneys general from six states and the District of Columbia who are here with us today and a number of others who will also be advancing parallel actions and also contributed to this investigation and who continued to advance a wide range of important matters, both civil as well as criminal, across the country. Thanks of their tremendous efforts over the last three fiscal years alone, the Justice Department has filed nearly 10,000 financial fraud cases against nearly 15,000 defendants, including more than 2,900 mortgage fraud defendants. I believe we can all be proud of these results and encouraged by the significant action that we've gathered here today to announce.

But it's clear that we cannot yet be satisfied. And that's why here in Washington and across the country, this critical work continues. Our determination to build on the progress that's been made and to strengthen the partnerships that we have established across all levels of government and law enforcement has never been stronger.

And as this action proves, our approach has never been more strategic, more comprehensive or more effective. Once again I'd like to thank everyone who made this enforcement action possible. And at this time I'd like to turn things over to the acting associate attorney general, Tony West, who will be providing additional details.

TONY WEST: Thank you, Mr. Attorney General. And thank you for your tremendous leadership both on the case that we are announcing here today and on the department's efforts to fight financial fraud over the last four years.

My name is Tony West. I'm the acting associate attorney general here at the Department of Justice. And I'm pleased to share the stage with my colleagues Stuart Delery and Andre Birotte, who have been and continue to be such great partners, as well as several state attorneys general: Beau Biden of Delaware, Kamala Harris of California, James Hood of Mississippi, George Jepsen of Connecticut, Lisa Madigan of Illinois, Tom Miller of Iowa and of course Irvin Nathan of the District of Columbia.

I think their presence here today really speaks to the tremendous federal-state relationship we've built over the past four years and that's become a model of cooperation and teamwork. Now, as many of you know, S&P is the largest credit rating agency in the world. And as such, it plays a unique role on Wall Street. Many investors, financial analysts and the general public, they look to S&P to be fair and impartial when it comes to the ratings that it issues. And in the years preceding the financial crisis, S&P played a role in rating the vast majority of financial transactions involving the two types of securities that the attorney general mentioned: residential mortgage-backed securities, or RMBS, and the collateralized debt obligations, or CDOs. And between 2004 and 2007, S&P issued ratings on literally trillions of dollars' worth of RMBS and CDOs.

And those ratings, they were important. They were important because without a stamp of approval by S&P or one of the other major credit rating agencies, these financial transactions simply could not have occurred. That's because nearly every single RMBS or CDO sold required a credit rating, typically a triple-A rating, in order to attract the attention and confidence of investors.

And repeatedly, S&P promised that its ratings would be objective and independent. Even though the banks and other institutions hired S&P to rate these financial products, even though S&P earned millions -- hundreds of millions of dollars as a result of rating those -- issuing those ratings, S&P promised that its ratings would be unaffected by their concerns about market share, their concerns about revenue, their concerns about profits. But the evidence -- the evidence that we have uncovered tells a very different story.

We allege that from at least 2004 to 2007, S&P lied about its objectivity and independence. They said one thing, yet they did another. The evidence reveals that S&P promised investors and the public that their ratings were based on data and analytical models reflecting the company's true credit judgment, when in fact internal S&P documents made clear that the company would regularly tweak or bend, delay updating or otherwise adjust its ratings models to suit the company's business needs.

We also allege that from at last March 2007 to October 2007, S&P issued ratings for certain CDOs, ratings S&P knew were inflated at the time that they issued them. And how did S&P know that the CDO ratings that they were issuing were inflated? Because those CDOs -- those CDO ratings were derived in large part from the ratings on classes of subprime mortgage bonds which backed to those CDOs, classes of mortgage bonds whose own ratings S&P knew it was going to have to downgrade, yet did nothing to adjust the overall CDO ratings to reflect that inevitability. It's sort of like buying sausage from your favorite butcher and he assures you that the sausage was made fresh that morning and is safe.

What he doesn't tell you, what he doesn't tell you is that it was made with meat he knows is rotten and plans to throw out later that night. Now, how did all this happen? Well, our complaint alleges that as of late 2006, executives at S&P began hearing alarm bells about subprime residential mortgage-backed securities as S&P's internal information revealed that borrower delinquencies in subprime mortgages were rising dramatically, leading the financial instruments that were based on these mortgages to perform far worse than their S&P ratings suggested that they should perform. And by early 2007, S&P's own analysts had come to believe that the mortgage-backed securities -- many of the mortgage-backed securities were in trouble.

They began recommending that the company start the process of lowering the credit ratings for hundreds of subprime mortgage bonds that S&P had previously rated. But S&P's business executives -- S&P's business executives rejected those downgrade recommendations, choosing instead to continue raiding subprime mortgage bonds for their bank clients, whose appetite for highly rated mortgage-based securities continued to grow. By March 2007, we allege that S&P knew that mortgage-backed securities were in such deep trouble that unprecedented downgrades were inevitable.

It wasn't a matter of if, but when. Of course, such downgrades meant that the value of subprime mortgage bonds on the books of some of S&P's most significant bank clients would be dramatically reduced. So to avoid the significant financial hits such a downgrade would have caused, these banks packaged those subprime mortgage bonds into CDOs and sold them to investors as a way to get those bonds off of their books.

And we have evidence that S&P not only knew this was what the banks were doing, S&P helped them to do it. As our complaint explains through the spring and summer of 2007, S&P moved at a record pace, rating hundreds of billions of dollars' worth of CDOs packed with subprime mortgage bonds. Yet throughout this period, S&P made no adjustments in issuing these ratings.

In fact, S&P gave AAA ratings to nearly all of the CDOs it rated during this time period, and they did this despite their own internal information, showing that the ratings on the mortgage bonds on which the financial quality of these CDOs depended would not hold. Even after S&P executives chose the date on which to inform the public of their plan to institute mass downgrades, S&P continued to issue ratings on CDOs as if nothing had changed. On July 11th, 2007, just one day before S&P publicly announced the downgrades, an internal S&P email to executives warned, quote: "CDO deals that close now will be downgraded if we don't stop them.
" Yet on that very day S&P rated two new CDOs backed by subprime bonds. In fact, S&P gave them AAA ratings, making no rating adjustments to the downgrades -- for the downgrades that S&P knew were inevitable and were coming. And in July 2007, S&P issued the mass downgrades it had known for months were inevitable.

Soon after, credit markets in the United States and around the world collapsed, nearly every CDO that S&P rated between March and October 2007 defaulted, and the ratings were downgraded to junk. The failure of those CDOs let to billions of dollars in losses to federally insured financial institutions and to other investors. Now, in the Justice Department our code name for this investigation was "Alchemy.
" Centuries ago medieval alchemists tried various methods to turn lead into gold. Here we allege that S&P's desire to ensure market share, to ensure profit, to ensure revenue led it on a misguided venture to take securities it knew were lead and to tell the world, through its ratings, that they were gold. And in so doing, we believe that S&P played a significant role in helping to bring our economy to the brink of collapse.

Now, before I turn it over to the next speaker, let me single out two people: George Cardona, fist assistant United States attorney for the Central District of California and one of the lead attorneys on this matter; and Geoff Graber, counsel to the civil division assistant attorney general, who was one of the originating forces behind this case and who's been instrumental to bringing it to fruition. Both of these men have led extraordinary -- an extraordinary team of civil and criminal attorneys who have worked tirelessly to investigate this matter, identify and interview witnesses and review countless documents and craft this complaint. It's now my pleasure to introduce Stuart Delery, the principal assistant attorney general for the Civil Division.

Stuart? STUART DELERY: Thank you, Tony. My name is Stuart Delery, and I head the Justice Department's Civil Division, which, along with the United States Attorney's Office for the Central District of California, led the investigation that resulted in this action. From the beginning of his tenure, the attorney general established twin commitments to the American people: that the Department of Justice will devote significant

resources to combating financial fraud, and that we'll be as aggressive and creative as we can be in holding accountable those who, in violating the law, contributed to the financial crisis.

This case demonstrates the full force of those commitments. First, today's action culminates a massive, multiyear investigation by a team of nearly two dozen lawyers from the United States Attorney's Office in Los Angeles and the federal programs and consumer protection branches of the Civil Division here in Washington. Our lawyers and support staff served hundreds of civil subpoenas, spent thousands of hours reviewing and analyzing millions of pages of documents and contacted and interviewed over 150 witnesses, including dozens of former S&P analysts and executives.

This enormous task would not have been possible without the combined expertise and tireless efforts of this team, and I thank them for their commitment to this historic investigation and congratulate them on reaching this important milestone here today. Second, the lawsuit being announced today demonstrates the department's commitment to using every available legal tool to bring to justice those who bear responsibility for the financial crisis. Our complaint asserts claims under the Financial Institutions Reform, Recovery and Enforcement Act of 1989, or FIRREA.

This statute was enacted in the wake of the savings and loan crisis in the late 1980s but has not been used very often in recent years. One of Congress' stated purposes for FIRREA was to provide enhanced enforcement powers and increase civil and criminal monetary penalties for crimes of fraud against financial institutions. Under this law, the Department of Justice can seek civil penalties for violations of certain underlying criminal statutes, including mail fraud, wire fraud and bank fraud, which the department alleges as part of this lawsuit.

But unlike a criminal case, which requires proof beyond a reasonable doubt, the FIRREA provisions underlying today's lawsuit require proof by a preponderance of the evidence. And in addition, FIRREA authorizes the department to seek civil penalties up to the amount of the loss suffered by a federally insured financial institution as a result of the violations. So as a result of these provisions, FIRREA is a powerful weapon for combating financial fraud and will continue to play a key role in the department's efforts to hold accountable those who violated the law.

Before I conclude, I would like to thank Tony West for his leadership on this investigation, and I want to thank the state attorneys general who are here, as well as those across the country who will be filing today as well, for their partnership in our continuing fight against financial fraud, a partnership that's absolutely critical. And now it's my pleasure to introduce the United States attorney for the Central District of California, Andre Birotte. ANDRE BIROTTE (U.S.

attorney, Central District of California): Well, good morning. Again, my name is Andre Birotte. I am the United States attorney for the Central District of California.

My office is located in Los Angeles, where the complaint against Standard & Poor's was filed. Now, this case was filed in my district, where there was significant harm caused by S&P's alleged conduct. Now, across the seven counties in my district, where some of the country's most aggressive leaders -- lenders did business, we had huge numbers of homeowners who were given mortgages only because those loans could later be securitized into debts -- instruments that were given the unsound AAA rating by Standard & Poor's. Now, this led to untold number of loans being made to unqualified borrowers during the housing bubble, which in turn led to an untold number of foreclosures that caused economic harm not only in Southern California but throughout the United States. In addition, S&P's actions caused damage to institutional investors both in the Central District of California and across the nation. One example is Western Federal Corporate Credit Union, or WesCorp, which is based in my district and suffered huge losses after investing billions, billions of dollars in securities that WesCorp thought were safe because they had these AAA ratings from Standard & Poor's.

WesCorp put approximately $14 billion into RMBS and CDO investments that turned out, in the end, to be essentially worthless. As a result of its losses, WesCorp was placed into conservatorship and ultimately closed after doing 34 years of business. Now this office, the Central District of California, is pleased to be part of this great team that has brought this lawsuit in the United States District Court in Los Angeles, and we look forward to our continuing both with the Department of Justice and with all the state attorney generals who are here today and abroad for addressing the harm that was caused by S&P's alleged conduct.

Thank you. Let me now introduce the Connecticut attorney general, George Jepsen. ATTORNEY GENERAL GEORGE JEPSEN (D-CT): Thank you, Andre.

Thank you, General Holder. The work on this case represents another example of the excellent partnership between the Department of Justice and state attorneys general. I want to thank the attorney general, Associate Attorney General Tony West and all the staff and attorneys on his team for their hard work in making today's announcement possible.

I would also like to recognize my predecessor, now U.S. Senator Richard Blumenthal, for having the courage nearly three years ago to step up and file suit against Standard & Poor's.

Our suit has survived two motions to dismiss, and today it is alive and well. I'd also like to recognize -- and if they could raise their hands, please -- Assistant Attorneys General Matthew Budzik and George O'Connell. They've put in hundreds of hours developing the case in Connecticut, working with Justice and working more and more with state attorneys general from around the country to develop the multistate litigation.

The federal and state enforcement actions against Standard & Poor's are seeking accountability for alleged misconduct by the credit rating agency involving the structured finance securities that were at the center of the 2008 financial collapse. Standard & Poor's held itself out to investors, government regulators and the public as independent and objective. Its statements were relied on by market participants all over the world to judge the creditworthiness of those investments.

Standard & Poor's said it was guided by the core principles of independence, objectivity and not allowing its own financial interests to influence the ratings that it assigned to structured financial securities. We believe those statements are false. Despite its promises to the public, we allege that Standard & Poor's repeatedly allowed its own financial interests to influence the models it used to rate the mortgage-backed securities.

These undisclosed influences resulted in analytical models that were designed to increase Standard & Poor's market share and revenue by delivering triple-A ratings that issuers of structured financial securities very much desired. Simply put, what was best for Standard & Poor's business was in fact a major guiding principle driving Standard & Poor's ratings. The lawsuits filed today are asking the courts to order Standard & Poor's to disgorge the ill-gotten gains from its alleged misconduct, an amount which may run into hundreds of millions of dollars.

We are also asking for civil penalties and business reforms to prevent this kind of alleged misconduct from ever happening again. Connecticut looks forward to partnering with its state colleagues and the Department of Justice to achieve these critical goals. And now in addition to -- I'm going to read the states that are filing today.

In addition to Connecticut, Mississippi and Illinois, who have already filed suit, today we'll be filing Arizona -- it's a bipartisan group -- Arizona, Arkansas, California, Colorado, Delaware, Idaho, Iowa, North Carolina, Maine, Missouri, Pennsylvania, Tennessee and Washington state, plus the District of Columbia. That means we will have 16 states with suits actively against Standard & Poor's, plus the District of Columbia. Thank you.

I'd also like to add, if you have questions about the state-coordinated effort, I'd invite you to talk to Matt and George after the press conference. Kamala Harris. MR.

: Great state of California. ATTORNEY GENERAL KAMALA HARRIS (D-CA): Good morning. Thank you, Attorney General Eric Holder, for your leadership, and Associate Attorney General Tony West for your leadership, and my fellow attorneys general.

California is filing suit today against Standard & Poor's in California Superior Court. Our lawsuit focuses on the ratings S&P gave to mortgage-backed securities that the state of California purchased through its pension funds, CalPERS and CalSTRS, which each are considered two of the largest pension funds in the United States. We are suing because S&P's inflated rates and ratings violated our state's unfair competition laws, our state's false advertising laws and, very importantly, our state's False Claims Act, under which losses are automatically trebled.

California lost almost $1 billion attributable to S&P's conduct. Our false claims lawsuit is the result of nearly two years of investigation. I want to thank Mark Breckler, Martin Goyette and Michael Troncoso for your leadership in that endeavor.

In 2011, I formed the California Mortgage Fraud Strike Force to investigate misconduct cases across the mortgage industry. We had in California seven, if not eight, of the top 10 cities in the country hardest hit by the foreclosure crisis last year. Our investigation shows that S&P ratings played a critical role in the mortgage feeding frenzy on Wall Street.

S&P called itself a gatekeeper but acted more like a toll collector. Ignoring obvious risks and flaws in the methods used to evaluate risk, S&P gave premium ratings to risky investments, including investments backed by toxic mortgages. Today, we insist that S&P accept responsibility for its role in the crisis and for its conduct.

Our suit seeks restitution for losses California sustained because of its conduct. Thank you again, AG Holder, Associate AG West and my fellow state attorneys general for all of your leadership. And I would now like to introduce -- (laughter) -- and I would now like to introduce a great attorney general, the attorney general of the state of Delaware, Beau Biden.

ATTORNEY GENERAL BEAU BIDEN (D-DE): General Holder, thank you for your leadership, especially for that of Tony. Thank you for your mind and how hard you and your team have worked on this -- on this case. One of the things that has made America great is the honesty and credibility of our financial markets.

Our markets only work when everyone plays by the rules. When those rules are broken, those that break them must be held accountable. Standard & Poor's broke the rules and is being held accountable today.

Today, my office will file a consumer fraud complaint and deceptive trade practice complaint similar to the one filed by the -- state of Connecticut to hold S&P accountable for deceiving consumers and investors, for publicly misrepresenting their independence and objectivity of their credit-rating system. Their credit-rating system was neither independent nor objective. Again, General, thank you for your leadership, your continuing leadership on getting accountability for the American people, and thank you, Tony.

With that, I'd like to introduce my friend from Mississippi, the attorney general, Jim Hood. ATTORNEY GENERAL JIM HOOD (D-MS): Good morning. I'm Jim Hood from the state of Mississippi.

Mississippi filed a complaint against Moody's and Standard & Poor in May of 2011. We filed that action because I was outraged about the conduct of these rating agencies. You know, with the Wall Street investment banks, you expected -- they have profit motives; you expected them to cut corners -- but not those who are supposed to be independent, to evaluate these CDOs and mortgage-backed securities.

You know, they portrayed themselves to be as pure as the driven snow when we found they had a profit motives. In fact, they were charging three to four times as much as they were for other evaluations as they were for these -- it was -- given, they're more complicated, but they made a lot of money, in other words. They made at least hundreds of million dollars, perhaps billions of dollars, for packaging these instruments.

So Mississippi sued initially on behalf of our securities claims, our public employees' retirement system. Many of those actions were dismissed because the court decided that that didn't meet the definition of securities as to what they were doing in that regard. So in May of 2011 we filed this action for violations of our Consumer Protection Act.

You know, I've noted, apparently, S&P got out in front of this and tried to change the course of the media's reaction to this by saying they had a First Amendment right. Well, that's laughable. I mean, you can make a representation, but it's got to be true, or otherwise, it's in violation of states' consumer protection laws. The Department of Justice has brought a separate action. And Attorney General Holder and Tony West, I appreciate all the work that the Department of Justice has done, as well as my colleagues in other states; Connecticut, Mississippi and Illinois have worked closely together. So anyway, we hope that these rating agencies will be held accountable, and we welcome all the support of all those that are here today and those other attorneys general who were not available.

So at this time I'd like to turn this over to my friend and colleague Lisa Madigan, the attorney general from the state of Illinois. ATTORNEY GENERAL LISA MADIGAN (D-IL): Good morning. Over a year ago I filed a lawsuit in Illinois against S&P for fraudulently assigning its highest ratings to risky mortgage-backed investments that enabled the destruction of our nation's economy and resulted in the loss of millions of Americans' jobs, homes and financial security.

I have litigated Illinois' case vigorously and have defeated S&P's motion to dismiss, which alleged that the First Amendment protected it from liability. The judge did not agree with S&P's argument and held that S&P cannot cloak fraud in the protections of the First Amendment. Today these new lawsuits demonstrate an expanding state and national effort to hold S&P accountable for its central role in the subprime mortgage market's collapse.

Quite frankly, S&P was a trigger for the destruction of our economy. While big banks and lenders built mortgage-backed bombs, it was S&P's faulty ratings that detonated them. As alleged in my lawsuit, S&P abandoned its independence and objectivity and repeatedly gave the highest seal of approval to investments backed by some of the most dangerous mortgages.

Investors relied on S&P's seal of approval. In fact most investors, including many pension plans, could not have purchased those investments without it. As a result of S&P's misconduct, the retirement savings of hardworking men and women in Illinois and families throughout the nation were devastated, all because S&P put amassing profits ahead of doing its job, and for that, S&P must be held accountable.

I stand firm with my colleagues at the state and federal level in our shared commitment to aggressively pursue these lawsuits until justice is served. Thank you. And at this time, let me bring forward the dean of the state attorneys general, the great attorney general from the state of Iowa, Tom Miller.

ATTORNEY GENERAL THOMAS MILLER (D-IA): Thanks, Lisa. But I always have ambivalent feelings when I'm called the dean, for a variety of reasons. You know, this is an important case.

It was an important case to file because of the issues involved and because of the consequences that we've already felt. I don't think it can be said enough that without the AAA ratings that were given to so many

securities, the financial collapse would not have happened. It was essential to have so many mortgage-backed securities sold and to generate the kind of problems that we saw.

It wouldn't have happened but for the AAA ratings. And I also want to acknowledge, as others have, the work of the Justice Department. They did a lot of work, as you can tell from their description, on this case that they have shared with the states.

And, you know, I've been around as dean of the attorney generals quite a while, and I've seen many administrations, but I've never seen the kind of working relationship that the state AGs have with the Department of Justice under Eric Holder. It's one of trust, confidence, give and take, cooperation. It is a relationship that I've never seen before and a relationship that's very important to serve the public interest.

And I'd also like to acknowledge the work of the Connecticut AG's office. They brought this case first. They're the leader of the AGs on this group.

They have been terrific. And of course, special mention for Illinois and Mississippi, also who have also filed. And finally, bipartisanship.

This case is filed by Democrat and Republican attorney generals. I believe the state attorney generals work together across party lines more -- maybe far more than any elected officials in this country. And I think that's a good thing, and I also think it's a thing that serves the interest of the citizens of our individual states.

MR. WEST: Are there any questions? Q: What is the exposure for S&P? Can you explain this a little bit to us? Because under the legal theory, you can collect funds equal to what -- losses suffered by an institution. So, you know, what's S&P's exposure here? And secondly, some of the AGs have mentioned other rating services. In terms of the federal lawsuit, why are the others off the hook? MR. WEST: Well, let me actually start with the second one first and just say, you know, this case is about S&P. We're here to talk about S&P.

To the extent that there are or are not other pending investigations going on, we're not going to comment about that. The potential exposure is outlined in our complaint. We allege more than $5 billion in potential losses to federally insured financial institutions.

We think we've been fairly conservative, frankly, in that estimate, and we'll see how the lawsuit unfolds. Q: But is that what you'll seek? MR. WEST: Well, that is what the lawsuit is claiming, is right at this point is the extent or is sort of the floor on the damages.

You know, that could change as the lawsuit unfolds. Q: I'm not sure I understand the answer to that question, because the lawsuit actually says, we seek whatever damages the court thinks we should have. MR. WEST: Right. Q: But what will you ask for? MR. WEST: Well, as we said, we think that at the very least, we believe conservatively that S&P's actions make it liable for more than $5 billion in civil penalties. Q: For the average citizen at home, explain why this is not a criminal case and why some critics are saying that this is retribution for the lowering of the U.S. credit. MR. WEST: Well, look, we use the tools that Congress has given us aggressively to hold individuals and institutions accountable.

Here we have brought a case that we believe is well-supported by the evidence, by the facts. And we have, I think, been quite assertive and quite aggressive in bringing those facts and evidence to bear in the form of this lawsuit. Q: And just one follow-up.

Can someone talk about the irony of the case you're bringing today, alleging basically fraud on the part of this company, and yet it's the same company that lowered the US. credit rating, which many think led to another hit on the economy. MR. WEST: I don't have any comment on that.

ATTY GEN. HOLDER: -- other than the fact -- other than the fact that there's no connection between the two. I mean, they did what they did assessing what the creditworthiness was of this nation.

We looked at the facts, the law and the investigation that these great prosecutors and civil lawyers put together and made a determination that the filing of these lawsuits was appropriate. But they are not in any way connected. MR. WEST: (Off mic) -- add to that, as the attorney general said in his comments, this is investigation that started in November 2009, which predated I think the incident that you're talking about. Q: A lawyer for S&P said this morning that this does not count as fraud because the people who issued these ratings at the time believed that they were true. Do you agree that that's the -- that that's the central question in this case? MR. WEST: Well, I think -- I think there are two issues in this case, two basic questions.

One, did S&P do what it promised to do? S&P promised to issue ratings that were not affected by its business considerations; in fact, it issued ratings that were affected by its business considerations. It also issued ratings that we believe it knew at the time it issued those ratings were inflated. So, you know, I think we would disagree with the characterization, as you put it.

Q: Sort of along the same lines, the complaint includes a lot of examples of analysts disagree each other about -- with each other about what the criteria should be for ratings and for their models. How does

that add up to an intent to defraud? I mean, was there really -- was that really the purpose of S&P, that they had an intention to defraud investors? MR. WEST: Well, look, I mean, let's take the examples that we've given in the complaint.

One of the examples is that, you know, S&P slowed down, toned down one of the more accurate CDO rating models that it could have adopted, and they did that once an important investment bank client pointed out to them that they could jeopardize potential businesses -- business if they adopted the more accurate CDO rating model. So we think -- that's only one example. We think there are a number of examples where S&P chose to ignore internal information and instead rate CDOs even though it knew classes of collateral that supported those CDOs would inevitably be downgraded or impaired.

ATTY GEN. HOLDER: (Off mic) -- I mean, there are obviously going to be questions of proof, but we would not have brought this case unless we felt we had a case that we could bring and that we would win. And that's what I expect to have happen.

Q: Do you think you could settle this case still? ATTY GEN. HOLDER: We're always open to conversations that anybody wants to engage. But we feel serious enough about this case, are concerned enough about the conduct that we saw that we took this step to bring this $5 billion case.

And we'll see what happens between now and the time it's -- we have to go before a judge. Q: Attorney General Holder, if we could just change the subject for a little bit, last night NBC reported a white paper that was prepared by the Justice Department, undated, unsigned, about the legal -- the legal pinnacles for targeting Americans overseas. Could you please give us what the precise definition is and how that would be carried out? ATTY. GEN. HOLDER: Well, there have been a -- there are a series of speeches that I gave, Jeh Johnson gave, John Brennan gave where we tried to lay out for the American people the considerations that go into the operations.

And one of the things I want to make sure that everybody understands is that our primary concern is to keep the American people safe but to do so in a way that's consistent with our laws and consistent with our values. We are -- we have as a basis for action that we take a congressional statute that allows us to operate against al-Qaida and associated entities not only in Pakistan or not only in Afghanistan but in other parts of the world. We would say that we only take these kinds of actions when there's an imminent threat, when capture is not feasible and when we are confident that we're doing so in a way that's consistent with federal and international law.

I mean, I -- as I said, I think we laid it out, I think, fairly well in those -- in those three -- those three speeches. Q: Attorney General, you brought up the phrase "imminent threat." Is that the same as an ongoing threat, or is there a difference between those two? ATTY. GEN. HOLDER: Well, I mean, I -- you know, some of these -- some of these things are fact-based, and I can't necessarily get into the weeds or kind of parse these things.

You can't, I think, examine these terms without having a reference to the facts. And I'm not in a position in this environment, in a -- in a classified environment, I can get more specific, but I'm confident that the definitions that we have used and the explanations that, for instance, that I used in my Northwestern speech, are accurate representations of the drivers, the facts -- Q: Why not release the memos? I mean, you were a driving force behind releasing the Bush administration's torture memos. Why aren't you a force for this? ATTY GEN. HOLDER: Well, I mean, we'll have to, you know, look at this and see how -- what it is we want to do with these memos.

But you have to understand that we are talking about things that are -- that go into really kind of how we conduct our offensive operations against a clear and present danger to this nation. Q: Bring us into the classified setting, then. ATTY GEN. HOLDER: I'm not sure you could pass -- (laughter) -- a background check. I'm just kidding. I'm just kidding. (Laughter.) Q: Mr. Attorney General -- ATTY GEN. HOLDER: But that is a -- that is a real concern, to reveal sources, potentially reveal sources and methods, and put at risk the very mechanisms that we use to try to keep the American people safe, which is our primary responsibility. Q: This memo -- the memo doesn't seem to be classified. The writer is marked "confidential" but not "classified." Why not release that to the general public? And in that memo, it seems to me, if you take an -- (inaudible) -- ongoing threat amounts to an imminent threat.

So you said you could only discuss that in a classified setting, but in this memo you're discussing the difference between those -- that we're taking what sounds like an ongoing threat and saying that it's an imminent threat. ATTY GEN. HOLDER: Yeah.

Well, I mean, that's something -- we'd have to look into, you know, what's exactly in the white paper. We'd have to look into that. Q: Are you not aware of what's in the white paper? ATTY GEN. HOLDER: Would have to -- we'll have to look into that. Q: Mr. Attorney General, I'm from WTOV in Steubenville. I'm wondering where the federal investigation on the Steubenville rape case stands right now.

ATTY GEN. HOLDER: Well, I'm not sure that I'm -- I want to comment on where it is. It's something that obviously we are aware of, involved in.

But I'm not sure I'm in a position at this point to comment on it. Q: Can you say what your involvement in the case is right now at all? ATTY GEN. HOLDER: No, I wouldn't want to do that.

Q: (Name inaudible) -- with Financial Times. Mr. West, you've mentioned how the banks in the spring of 2007 -- it appears that they knew that there would be ratings downgrades, and so they packaged these subprime mortgage bonds into CDOs and sold them to investors as a way to get those bonds off their books.

How is that not fraud if they knew that ratings downgrades were coming and then they packaged these CDOs and sold them to unwitting investors? Why is there only a suit against S&P and not all the issuers that are mentioned in the various CDO deals outlined in your complaint? MR. WEST: Well, again, we do believe it was fraud, which is why we've charged S&P with that. And again, as -- you know, as regards any other institution or any other individual, you know, we're just not in a position to make any comments on where we are in those regards.

Q: So those other issues did not commit fraud in selling -- packaging these bonds -- (off mic) -- they knew the downgrades were coming into CDOs and selling them to CalSTRS and CalPERS -- (inaudible) -- teachers, et cetera, et cetera? That was totally legal? MR. WEST: Well, again, I'm making no comments about anyone other than S&P today. Any other -- any other investigations or -- pending or not, it's just something I'm not going to comment on today.

Q: Mr. Holder? Q: Mr. Holder, with regard to S&P, we heard from Attorney General Hood his view on the First Amendment question -- we'd like to get a federal perspective on that -- and also, the argument made by S&P that at the time, 2007, there were top federal officials, including the chairman of the Federal Reserve at that time, who suggested the subprime mortgage crisis could be contained; other people got this wrong.

MR. WEST: Look, you know, the First Amendment protects a lot of things. It does not protect saying one thing and doing another.

It does not protect issuing ratings that you know are inflated at the time you issued them. And those are the two basic allegations in this lawsuit. So, you know, one of the things that this lawsuit is not about, it's not about predicting the future; it's not about whether people could figure out how bad the mortgage crisis was going to be.

It's really about promising to do one thing and doing something else and issuing ratings that you know are inflated at the time you issued them. Q: Mr. Holder, could you tell us your thoughts about how the Alabama hostage situation yesterday came down and the role of the federal agencies that were involved? ATTY GEN. HOLDER: Well, I was getting briefed on this over the course of the -- of the week.

I thought that the FBI action yesterday was exemplary. And as, I think, more details are shared, you will understand why I use the word "exemplary." In conjunction with our state and local partners there and with the focus on trying to rescue that young boy as quickly as we could, as safely as we could, I think the FBI has done a superb job.

As I said, there will be more facts, I'm sure, that will come out and talk about how they were able to accomplish what was a difficult -- a difficult task, but did so in a way that saved that young boy's life. STAFF: Last question. Q: Mr. Birotte, given the confession of Lance Armstrong to all the things -- MR. BIROTTE: (Off mic.) Q: -- (chuckles) -- to all the things that you in the end decided you couldn't bring a case about, can you give us your thoughts on that case now and whether you might take another look at it? MR. BIROTTE: We made a decision on that case, I believe, a little over a year ago.

Obviously we've been well-aware of the statements that have been made by Mr. Armstrong and other media reports. That has not changed my view at this time.

Obviously we'll consider -- we'll continue to look at the situation, but that hasn't changed our view as I stand here today. STAFF: All right, thank you very much. MR.

: Thank you. (C) 2013 Federal News Service

Copyright 2013 by Federal News Service, Inc., Ste. 500, 1000 Vermont Avenue NW, Washington, DC 20005 USA. Federal News Service is a private firm not affiliated with the federal government. No portion of this transcript may be copied, sold or retransmitted without the written authority of Federal News Service, Inc.. Copyright is not claimed as to any part of the original work prepared by a United States government officer or employee as a part of that person's official duties. For information on subscribing to the FNS Internet Service at www.fednews.com, please email Carina Nyberg at cnyberg@fednews.com or call 1-800-211-4020.

**---- Index References ----**

Company: ISATORI INC; MCGRAW HILL COMPANIES INC (THE); FINANCIAL TIMES LIMITED(THE); MOODYS CORP; DAIWA ASSOCIATE HOLDINGS LTD; WESCORP ENERGY INC; FEDERAL NEWS SERVICE INC

News Subject: (Criminal Law (1CR79); Mortgage-Backed Markets (1MO87); Funding Instruments (1FU41); Fraud (1FR30); Securitization (1SE75); Financial Fraud (1FI18); Crime (1CR87); Legal (1LE33); Real Estate Investments (1RE04); Social Issues (1SO05); Government Litigation (1GO18))

Industry: (Mortgage Banking (1MO85); Retail Banking Services (1RE38); Investment Management (1IN34); Securities Investment (1SE57); Consumer Finance (1CO55); Banking (1BA20); Financial Services (1FI37))

Region: (Delaware (1DE13); Mississippi (1MI74); Missouri (1MI10); Connecticut (1CO13); Americas (1AM92); U.S. Mid-Atlantic Region (1MI18); Illinois (1IL01); USA (1US73); North America (1NO39); U.S. New England Region (1NE37); Ohio (1OH35); U.S. West Region (1WE46); U.S. Midwest Region (1MI19); California (1CA98); U.S. Southeast Region (1SO88); Iowa (1IO85); District of Columbia (1DI60))

Language: EN

Other Indexing: (RESIDENTIAL MORTGAGE BACKED SECURITIES FRAUD WORKING GROUP; FEDERAL NEWS SERVICE INC; COMMODITIES FRAUD WORKING GROUP; STANDARD AND POOR; MORTGAGE FRAUD WORKING GROUP) (Mark Breckler; Eric Holder; Thomas Miller; Lance Armstrong; Tony West; Matt; George Jepsen; Michael Troncoso; George Cardona; Jeh Johnson; Irvin Nathan; Geoff Graber; Martin Goyette; Matthew Budzik; Stuart Delery; Jim Hood; Lisa Madigan; George O'Connell; James Hood; John Brennan; Richard Blumenthal; Beau Biden; Kamala Harris; Andre Birotte)

Keywords: NW1; FI1; JU1; BB1; FN40

Word Count: 7818

**End of Document** © 2013 Thomson Reuters. No claim to original U.S. Government Works.

