1  KEKER & VAN NEST LLP
   JOHN KEKER (SBN 49092)
2  jkeker@kvn.com
   ELLIOT R. PETERS (SBN 158708)
3  epeters@kvn.com
   633 Battery Street
4  San Francisco, CA 94111-1809
   Telephone:  415 391 5400
5  Facsimile:   415 397 7188

6  CAHILL GORDON & REINDEL LLP
   FLOYD ABRAMS (*pro hac vice*)
7  fabrams@cahill.com
   S. PENNY WINDLE (*pro hac vice*)
8  pwindle@cahill.com
   80 Pine Street
9  New York, New York 10005-1702
   Telephone: 212 701 3000
10 Facsimile: 212 269 5420

11 KELLER RACKAUCKAS LLP
   JENNIFER L. KELLER (SBN 84412)
12 keller@krlawllp.com
   18300 Von Karman Avenue, Suite 930
13 Irvine, CA 92612
   Telephone: 949 476 8700
14 Facsimile: 949 476 0900

15 Attorneys for Defendants THE MCGRAW-HILL
   COMPANIES, INC. and STANDARD & POOR'S
16 FINANCIAL SERVICES LLC

17             UNITED STATES DISTRICT COURT

18             CENTRAL DISTRICT OF CALIFORNIA

19                  SOUTHERN DIVISION

20
   UNITED STATES OF AMERICA,          Case No. CV13-779 DOC (JCGx)
21
        Plaintiff,                    **REPLY MEMORANDUM IN**
22                                    **SUPPORT OF DEFENDANTS'**
        v.                            **MOTION TO COMPEL DISCOVERY**
23
   MCGRAW-HILL COMPANIES, INC.        Date:    March 11, 2014 7:30 a.m.
24 and STANDARD & POOR'S              Dept.:   Courtroom 9D
   FINANCIAL SERVICES LLC,            Judge:   Honorable David O. Carter
25
        Defendants.                   Complaint filed February 4, 2013
26

27

28
   _____

# TABLE OF CONTENTS

**Page**

I.  Introduction. ................................................................................. 1

II. S&P Is Entitled to Discovery on Its Properly Pled First
    Amendment Retaliation Defense. ............................................... 2

    A.  S&P Is Entitled to Seek Evidence in Support of Its First
        Amendment Retaliation Defense. ..................................... 3

        1.  S&P's Discovery Requests Are Targeted and
            Supported by the Evidence Already in S&P's
            Possession. ............................................................ 4

        2.  The Government's Challenge to the Substance of
            S&P's Requests Represents a Transparent Effort to
            Evade the Federal Rules. ...................................... 9

    B.  S&P Has Made the Requisite Showing to Seek Discovery
        from the Executive Office of the President. ................... 11

III. The United States Must Produce Documents Relating to the
     Independence or Objectivity of Ratings or Rating Agencies and
     Documents Relating to the Conduct of Mortgage Lenders,
     Financial Institutions and Issuers of the Securities at Issue. .......... 13

    A.  S&P Seeks Discovery that Is Directly Relevant to the
        Claims and Defenses in this Action. .............................. 14

    B.  The Burdens Imposed by S&P's Requests Are Entirely
        Consistent with the Liberal Discovery Allowed of a Plaintiff
        in Civil Litigation. ......................................................... 17

    C.  S&P Is Not Obligated to Seek Documents from Third
        Parties that the Government Already Has in Its Possession. ............. 18

    D.  The United States Has Failed to Meet Its Burden of
        Asserting an Investigatory Privilege Over Materials
        Gathered in Related Investigations. .............................. 21

        1.  Scope of the Current Dispute ............................... 21

        2.  Applicability of the Investigatory Privilege. ....... 22

            a.  Failure to Make Threshold Showing. ........ 22

            b.  Availability of the Investigatory Privilege. ........ 24

IV. Conclusion. .............................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abourezk* v. *Reagan*, 785 F.2d 1043 (D.C. Cir. 1986),
  *aff'd*, 484 U.S. 1 (1987) ................................................................ 23

*In re Bankers Trust Co.*,
  61 F.3d 465 (6th Cir. 1995) ............................................................ 20n

*Bews* v. *Town of Carroll*,
  2009 WL 1664064 (D.N.H. June 15, 2009) .................................... 4n

*Branch Ministries, Inc.* v. *Richardson*,
  970 F. Supp. 11 (D.D.C. 1997) ...................................................... 7n

*Cheney* v. *U.S. District Court for the District of Columbia*,
  542 U.S. 367 (2004) .............................................................. 12, 12n

*Dairyland Power Cooperative* v. *United States*,
  2008 WL 8776547 (Fed. Cl. Mar. 17, 2008) .................................. 13

*Duenez* v. *City of Manteca*,
  2013 WL 684654 (E.D. Cal. Feb. 22, 2013) .................................. 23

*Enough for Everyone, Inc.* v. *Provo Craft & Novelty, Inc.*,
  2012 WL 177576 (C.D. Cal. Jan. 20, 2012) .................................... 3

*Exxon Shipping Co.* v. *United States Department of Interior*,
  34 F.3d 774 (1994) ........................................................................ 17

*FDIC* v. *Broom*,
  2013 WL 4781706 (D. Colo. Sept. 5, 2013) ............................. 19-20

*Friedman* v. *Bache Halsey Stuart Shields, Inc.*,
  738 F.2d 1336 (D.C. Cir. 1984) .................................................... 22

*Gaison* v. *Scott*,
  59 F.R.D. 347 (D. Haw. 1973) ...................................................... 24

*Kasza* v. *Browner*,
  133 F.3d 1159 (9th Cir. 1998) ...................................................... 23

ii

*Kerr* v. *U.S. District Court for the Northern District of California*,
  511 F.2d 192 (9th Cir. 1975), *aff'd*, 426 U.S. 394 (1976) ................................. 22

*Murray* v. *Atkinson*,
  2007 WL 4126622 (E.D. Mich. Nov. 20, 2007) .................................. 24

*Nidec Corp.* v. *Victor Co. of Japan*,
  249 F.R.D. 575 (N.D. Cal. 2007) ....................................... 19

*Noble* v. *Gonzalez*,
  2013 WL 4517774 (E.D. Cal. Aug. 26, 2013) .................................. 4n

*Oppenheimer Fund, Inc.* v. *Sanders*,
  437 U.S. 340 (1978) ............................................................... 2

*In re Packaged Ice Antitrust Litigation*,
  2011 WL 1790189 (E.D. Mich. May 10, 2011) ........................... 25

*SEC* v. *Collins & Aikman Corp.*,
  256 F.R.D. 403 (S.D.N.Y. 2009) ........................................ 17

*SEC* v. *Gowrish*,
  2010 WL 1929498 (N.D. Cal. May 12, 2010) ........................... 25

*Simmons* v. *Navajo County*,
  609 F.3d 1011, 1023 (9th Cir. 2010) .................................... 3

*Soto* v. *Castlerock Farming & Transport*,
  2011 WL 2680839 (E.D. Cal. July 8, 2011) ........................... 19

*Soto* v. *City of Concord*,
  162 F.R.D. 603 (N.D. Cal. 1995) ....................................... 23

*Stanislaus Towing & Recovery Services, Inc.* v. *City of Modesto*,
  2011 WL 5375000 (E.D. Cal. Nov. 4, 2011) ........................... 4n

*In re United States Department of Homeland Security*,
  459 F.3d 565 (5th Cir. 2006) ........................................... 24n

*United States* v. *ABC*,
  No. 72-821 (C.D. Cal. 1974) ............................................ 3-4, 4n, 7n

iii

*United States* v. *AMR Corp.*,
   2001 WL 303048 (D. Kan. Feb. 5, 2001) ....................................... 20n

*United States* v. *Armstrong*,
   517 U.S. 456 (1996) .................................................................. 7n

*United States* v. *CBS*,
   No. 72-820 (C.D. Cal. 1974) ............................................. 3-4, 4n, 7n

*United States* v. *Jones*,
   159 F.3d 969 (6th Cir. 1998) ..................................................... 7n

*United States* v. *NBC*,
   No. 72-819 (C.D. Cal. 1974) .............................................. 3-4, 4n, 7n

*United States* v. *Marshall*,
   2010 WL 1409445 (D.S.D. Apr. 1, 2010) ..................................... 24n

*United States* v. *Reynolds*,
   345 U.S. 1 (1953) ..................................................................... 22

**Constitutional Provisions**

U.S. Const. Amend. I ............................................................... *passim*

**Rules**

C.D. Cal. L.R. 6-1 .................................................................... 3

C.D. Cal. L.R. 7-4–7-8 ............................................................... 3

Fed. R. Civ. P. 12(f) ................................................................. 3

Fed. R. Civ. P. 26 ..................................................... 2, 3, 4n, 6, 9

Fed. R. Civ. P. 34 ................................................................... 19

Fed. R. Civ. P. 45 ................................................................ 8, 13

Fed. R. Evid. 801 .................................................................. 10n

Fed. R. Evid. 803 .................................................................. 10n

iv

## Treatises

8B Charles Alan Wright & Arthur R. Miller *et al.*,
*Federal Practice & Procedure* (3d ed. 2010) ...................................................... 19

6 James W. Moore *et al.*, *Moore's Federal Practice* (3d ed. 2013) ....................... 19

## Other Authorities

FOMC, *January 29-30, 2008 Meeting Presentation Materials*,
*available at* http://www.federalreserve.gov/monetarypolicy/
files/FOMC20080130material.pdf .................................................................... 15n

U.S. Department of the Treasury, *Calendars of the Treasury Secretary*,
http://www.treasury.gov/FOIA/Pages/calendars.aspx
(last visited Feb. 24, 2014) ........................................................ 6, 8-9, 8n, 12-13

## I.   INTRODUCTION

The Government's Opposition ("Opp.") rests upon the proposition that the Federal Rules of Civil Procedure, the case law interpreting them, and the laws and procedures that govern the conduct of every civil litigant in the United States Courts do not apply to the Government.  Courts have uniformly and consistently held otherwise.  We ask this Court to do the same.

Some of the discovery that the Government refuses to produce pertains to S&P's Eleventh Affirmative Defense, namely that this suit was undertaken in retaliation for S&P's decision to exercise its First Amendment rights by downgrading its rating of the debt of the United States.  Apparently recognizing that S&P is plainly entitled to discovery with respect to its pleaded defenses, the Government, which had not timely moved to strike that defense, now styles its response to the discovery motion as, inter alia, "a cross-motion . . . to strike defense."  But, the motion is nearly a half-year out of time and so much an afterthought that the Government does not even provide the formal documents required for any motion.  In any event, the notion that the "defense is contradicted by the facts," as the United States alleges, is an extraordinary proposition on a motion to strike, which takes the facts as pleaded, and all the more extraordinary in the face of documentary evidence proffered by S&P.  S&P is entitled to the discovery needed to pursue its well-pleaded affirmative defense.

The Government also claims that responsive information about the entities that issued, arranged or purchased the relevant CDOs and RMBS or the other NRSROs which issued similar ratings and made similar statements as to independence or objectivity need not be produced because it is not relevant.  Here, the Government pursues a novel and impermissibly narrow approach to the scope of civil discovery: it asserts that a defendant accused of fraud may only discover information about its own actions.  This not only mischaracterizes and

1

impermissibly narrows S&P's possible avenues of defense, it is inconsistent with the broad scope of civil discovery.

Finally, in response to the requests, the Government seeks to avoid production of materials in its possession by arguing that S&P should instead seek those same documents from others. Civil discovery does not function this way. *Parties* are expected to produce material in their possession. The Government has used its vast subpoena powers to collect relevant documents from many quarters, and the rules require it to search for and produce responsive and relevant documents in its possession. The Government's excuse that some of the documents it has may be confidential in the view of the third parties who produced them to the Government is frivolous. It is not even clear that the documents were produced pursuant to any confidentiality agreement or order at all (the Government has not made any such claim). In any event, confidentiality concerns are best addressed through the governing Protective Order, not by shutting down discovery.

The Government brought this case against a single company, seeking huge penalties, seeking to lay at S&P's doorstep the collective blame for our nation's housing meltdown and the associated financial crisis. S&P is entitled to documents in the Government's possession in aid of its defense.

## II.    S&P IS ENTITLED TO DISCOVERY ON ITS PROPERLY PLED FIRST AMENDMENT RETALIATION DEFENSE.

The standard governing S&P's discovery in support of its First Amendment defense is set forth in the Federal Rules of Civil Procedure: "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). As even the cases cited by the Government hold, Rule 26 "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc.* v. *Sanders*, 437 U.S. 340, 351 (1978). Under this standard, S&P is entitled to the discovery it seeks concerning

2

its First Amendment retaliation defense.

While the Government has not even *attempted* to argue that the discovery S&P seeks is outside the scope of Rule 26 and irrelevant to its First Amendment retaliation defense, its Opposition argues that such discovery is nevertheless improper.

As a threshold matter, apparently recognizing that S&P is entitled to discovery on its pleaded defense, the Government now refers in the caption of its Opposition to a "cross-motion . . . to strike defense." But S&P filed its Corrected Answer and Demand for Jury Trial on September 3, 2013. Federal Rule of Civil Procedure 12(f) grants a party "21 days after being served with the pleading" to file a motion to strike. If the Government had wished to strike an affirmative defense, it had to move by September 24. It did not do so. So pro forma is its present "motion" that the Government does not even attempt to comply with the applicable procedural rules requiring a notice of motion and the like. *See* C.D. Cal. L.R. 6-1 & 7-4 through 7-8. Moreover, its argument that the defense should be stricken because it is, the Government claims, "*contradicted by the facts*" (Opp. at 2 (emphasis added)) is a classic example of what *cannot* provide a basis to strike a defense. A defense, like a claim, may be stricken only if it fails to apprise a plaintiff of "'fair notice of the defense.'" *Enough for Everyone*, *Inc.* v. *Provo Craft & Novelty*, *Inc.*, 2012 WL 177576, at *2 (C.D. Cal. Jan. 20, 2012) (Carter, J.) (quoting *Simmons v. Navajo County*, 609 F.3d 1011, 1023 (9th Cir. 2010)). The Government makes no such claim.

### A.    S&P Is Entitled to Seek Evidence in Support of Its First Amendment Retaliation Defense.

As explained in S&P's opening brief, the propriety of the discovery S&P seeks concerning its retaliation defense was decided some forty years ago by this Court in *United States* v. *NBC*, No. 72-819 (C.D. Cal. 1974); *United States* v. *CBS*, No. 72-820 (C.D. Cal. 1974); and *United States* v. *ABC*, No. 72-821 (C.D. Cal.

3

1974) (collectively "*NBC*").[1]  Contrary to the Government's assertion that *NBC* is of "little relevance," Opp. at 9, in that case, as here, the defendants asserted that civil enforcement actions brought against them by the Justice Department were in retaliation for criticism of the government.  In that case, as here, the Government resisted producing the discovery defendants sought in connection with their properly pled affirmative defenses.  And in that case Judge Kelleher ordered that such discovery be produced and ultimately dismissed the case when the Government failed to comply.  Nothing counsels a different result here.[2]

### 1. S&P's Discovery Requests Are Targeted and Supported by the Evidence Already in S&P's Possession.

The Government suggests that S&P must make some preliminary showing before it can obtain discovery for its defense. This is not the requirement under the Federal Rules and certainly *NBC* imposed no such requirement.  In any event, S&P has offered uncontradicted facts obtained even without discovery that support its claim and has targeted its discovery based on those facts.

---

[1] Litigants regularly challenge retaliatory Government actions infringing on First Amendment protected speech, and Rule 26 has routinely been applied to authorize civil discovery relevant to such allegations.  *See, e.g.*, *Noble* v. *Gonzalez*, 2013 WL 4517774, at *6 (E.D. Cal. Aug. 26, 2013) (granting motion to compel even where relevance of requested documents "appear[ed] remote" but could relate to First Amendment retaliation claim); *see also Stanislaus Towing & Recovery Services, Inc.* v. *City of Modesto*, 2011 WL 5375000, at *10 (E.D. Cal. Nov. 4, 2011) (ruling that where plaintiff had made a clear First Amendment retaliation allegation, "[d]etails regarding the exact statements made and the form of the retaliatory conduct are properly sought during discovery").

[2] The United States grasps at the fact that the *NBC* case is a "40-year old opinion." That is obviously true, but the principle it stands for—that there is nothing unique about a defendant asserting a First Amendment retaliation defense in a civil action brought by the government—remains valid today.  *See, e.g.*, *Bews* v. *Town of Carroll*, 2009 WL 1664064, at *5 n.6 (D.N.H. June 15, 2009) ("There is no doubt that the Bews could have presented their . . . First Amendment retaliation claims as defenses to the initial enforcement action . . . .").

4

In S&P's opening papers, it laid out the circumstances that, even absent any discovery, supported its claim that this lawsuit was filed in retaliation for S&P's downgrade of the United States. Without repeating that showing here, we note that the detailed chronology demonstrated that while all three major rating agencies issued similar ratings for the securities at issue and all three made statements asserting their independence and objectivity in reaching those ratings, only S&P downgraded the sovereign debt of the United States and only S&P was sued by the United States with respect to its ratings. S&P offered a sworn statement of its then Chairman and CEO, Harold McGraw III, describing an extraordinary series of calls immediately after the downgrade, first on behalf of, and then from, the Secretary of the Treasury reflecting his anger about the downgrade, his claim that S&P and Mr. McGraw had done a "disservice to yourselves and to your country" and his statement that the downgrade could not go without a response from the United States.

In its Opposition, the United States does not dispute that this extraordinary confrontation occurred. Notwithstanding its assertion that the "defense is contradicted by the facts" (Opp. at 2), it offers no statement, sworn or otherwise, disputing Mr. McGraw's affidavit. The undisputed record reflects:

- After close of business on Friday, August 5, 2011 and after learning of the imminence of S&P's downgrade of the United States' credit rating—Treasury Secretary Timothy Geithner placed a call to his former subordinate Terrence J. Checki, an executive at the Federal Reserve Bank of New York. Two days later, on Sunday, August 7, Mr. Checki left a telephone message for Harold McGraw III, the CEO of McGraw Hill of which S&P was a unit.

- When Mr. McGraw returned the call the following day, Mr. Checki conveyed to Mr. McGraw Secretary Geithner's anger with S&P's rating action.

- Later that same Monday morning, August 8, 2011, Secretary Geithner

5

met with President Obama in the Oval Office from 9:30 a.m. to 10:10 a.m.

- Immediately after his meeting with the President, Secretary Geithner returned to his office and, at 10:15 a.m., he called Mr. McGraw personally.  On that call, Secretary Geithner stated to Mr. McGraw that S&P had done an "enormous disservice to yourselves and to your country;" that S&P's conduct would be "looked at very carefully;" and that such behavior could not occur without a response.

Abrams Decl. Exs. O, P.  And see calendars attached to S&P's Second Request for Production of Documents ("S&P Second Req.") (Reply Declaration of Floyd Abrams dated February 24, 2014 ("Abrams Reply Decl.") Ex. A) at Exs. 1-4.

The Government does not challenge the timing of these events; indeed they are confirmed by the Government's own public documents: the calendars of the Treasury Secretary, which are available on the Treasury Department's website.  In minute-by-minute detail, the calendar entries memorialize Secretary Geithner's activities, including the individuals with whom he met and the telephone calls he made and received.  *See* U.S. Department of the Treasury, *Calendars of the Treasury Secretary*, http://www.treasury.gov/FOIA/Pages/calendars.aspx (last visited Feb. 24, 2014).  These calendars, not quoted by or responded to in the Government's submission, were included in discovery requests served on the United States and Messrs. Geithner and Checki, discovery requests which the Government now challenges in its Opposition.

Given the evidence S&P has already proffered, here and in its opening papers, it is difficult to understand the basis for the Government's assertions that S&P's requests for discovery surrounding these facts are "tenuous" (Opp. at 11), "without support" (*id.* at 13) and lacking in "any legitimate predicate" (*id.* at 14).  Although S&P *need not* provide any "legitimate predicate" (the Government's phrase) for obtaining Rule 26 discovery on its well-pleaded, affirmative defense, it is hard to imagine how S&P could provide a *more* "legitimate predicate" for the

6

discovery it seeks without already having obtained the discovery itself.[3]

The Government contends that S&P's requests suffer from "overbreadth" and are "wide-ranging" and "unwarranted."  Opp. at 14.  Not so.  For example, in S&P's Second Request for Documents, served on January 31, 2014, and which the

---

[3] Consistent with the Government's assertion that S&P's First Amendment retaliation defense is really a "selective prosecution" defense, the Government contends that "the [*NBC* defendants] acknowledged the relevance of the selective prosecution cases and explicitly sought discovery under the standard they set." Opp. at 7-8.  That is simply not the case.  The passage referenced by the Government does not relate to discovery and the defendants in that brief were specific that when a motion to strike is denied, the availability of potentially relevant discovery is clear.  *See* Cardona Decl. Ex. 4, at 37-38.  The liberal standard under which defendants in that case sought discovery is identical to the standard under which S&P seeks discovery here.

In any event, even were S&P's Eleventh Affirmative Defense to be subject to the rules governing a selective prosecution defense, S&P has supplied more than enough evidence to make the threshold showing required under *United States* v. *Armstrong* "that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose."  517 U.S. 456, 465 (1996) (citation and internal quotation marks omitted).  As to the former requirement, a discriminatory effect is apparent from the undisputed fact that S&P alone of the three major rating agencies was ultimately sued for statements all three made. (The Government plays fast and loose with the facts in trying to respond on this issue.  It asserts that "S&P is not the only credit agency to take *negative action* with respect to the United States' credit rating, and DOJ has not sued other agencies who did so."  Opp. at 3 (emphasis added).  Of course, while Moody's and Fitch took some negative action as to U.S. debt, they ultimately did not *downgrade* that debt.  S&P was the only major NRSRO to do so.)

As to the motivational requirement of *Armstrong*, S&P has set forth in this reply and its opening papers facts raising a powerful inference of retaliatory animus directed towards the exercise of its First Amendment rights.  *See United States* v. *Jones*, 159 F.3d 969, 978 (6th Cir. 1998) (meeting *Armstrong* "some evidence" standard and stating "[o]bviously, a defendant need not prove his case in order to justify discovery on an issue"); *see also Branch Ministries, Inc.* v. *Richardson*, 970 F. Supp. 11, 17 (D.D.C. 1997).

7

Government now puts at issue in this motion, S&P posed a series of tailored document requests to the United States seeking information concerning the four-day period, Friday, August 5, 2011 through Monday, August 8, 2011.  *See* S&P Second Req. (Abrams Reply Decl. Ex. A).  S&P attached to those requests the relevant entries from Secretary Geithner's calendar showing who participated in the meetings.  The individual requests cross-reference the corresponding calendar entries.  *See id.* at No. 1 (seeking "[a]ny documents relating to the call identified on the Calendar at Exhibit 1 as 'Call to Terry McGraw, McGraw Publishing' on August 8, 2011, between 10:15 AM and 10:25 AM.").  On February 10 and 11, 2014, S&P served Rule 45 document subpoenas on Messrs. Geithner and Checki,[4] respectively, attaching discovery requests tailored in a similar manner.

Although the Government challenges the requests to "10 high-level White House officials" as baseless (Opp. at 14), each of the individuals in question is listed by name in Secretary Geithner's calendar as meeting with Secretary Geithner during the four-day period following the downgrade.  And while the Government

---

[4] Although served on the Government following the filing of this motion, the Government has now put these additional discovery requests directly at issue, asserting that S&P is not entitled to the limited discovery those requests seek. Opp. at 14-15.  The Government included the requests and the subpoenas in the Opposition submission, *see* Cardona Decl. Exs. 29, 32-33, but it omitted the attached calendars themselves, despite the fact that the document requests made specific reference to such calendars.  The calendars are available on the Internet, U.S. Department of the Treasury, *Calendars of the Treasury Secretary*, http://www.treasury.gov/FOIA/Pages/calendars.aspx (last visited Feb. 24, 2014), and are attached to S&P's Second Request for Documents (S&P Second Req. (Abrams Reply Decl. Ex. A) at Exs. 1-4) and attached to the subpoenas to Messrs. Checki and Geithner.  *See* Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action to Terrence J. Checki (Abrams Reply Decl. Ex. B) at Ex. 1; Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action to Timothy F. Geithner (Abrams Reply Decl. Ex. C) at Exs. 1-4.

asserts that a narrow request for documents relating to communications with the President referring to S&P or reactions to the downgrade is "without any legitimate predicate," it does not even address the uncontested facts that the requests are limited to three specific meetings with the President on August 7 and 8 explicitly identified in Secretary Geithner's calendar, the second of which immediately preceded Secretary Geithner's call to Mr. McGraw.  These are focused requests with a legitimate, documented and uncontested "predicate."

### 2. The Government's Challenge to the Substance of S&P's Requests Represents a Transparent Effort to Evade the Federal Rules.

The Government's substantive response to S&P's requests to these same "10 high-level White House officials" reflects the Government's position that its disagreements with the substance of S&P's First Amendment defense somehow justify its non-compliance with S&P's requests.  The Government's basis for its assertion is astonishing:

> These additional requests reveal the extent to which S&P, based solely on this asserted defense, seeks to use the civil discovery process not, as intended, to obtain information that may be useful in addressing the merits of the FIRREA violations alleged in the Complaint, but rather improperly to create a sideshow and diversion from those allegations.

Opp. at 14-15.  This assertion is simply at war with the precise intent of the civil discovery process.  The Federal Rules—by their express language—permit a party to obtain information relevant to any "defense," just as it may any "claim."  Fed. R. Civ. P. 26(b)(1).  It is through the civil discovery process that S&P intends to prove its specific allegations that the Government commenced this action in retaliation for S&P's exercise of its First Amendment right to criticize the Government.  This is not a "diversion," but a vindication of its right to express its opinion free from Government retaliation.

The Government attempts to distract from the reality that it has no legitimate basis to withhold documents responsive to S&P's well-tailored requests by arguing

9

the *merits* of S&P's retaliation defense.  For instance, the Government contends
that "[i]t is *entirely understandable* that Secretary Geithner would respond with
appropriate gravity and urgency" to S&P's downgrade of the Government's debt
but that "it is *entirely implausible* that th[e] conversation [between Secretary
Geithner and Mr. McGraw] threatened or had any connection to DOJ's later filing
of this lawsuit."  Opp. at 12 (emphasis added).  It alludes to, but does not provide,
facts in its sole possession supposedly supporting claimed "important differences
between [S&P's] conduct and that of other credit rating agencies."  Opp. at 9, 12.
And it asserts that the "timing" of S&P's proffered narrative is "inconsistent with
the asserted retaliatory motive."  Opp. at 2-3.

S&P of course disagrees with all of the foregoing, but that debate is for
another day.  S&P is first entitled to explore what additional proof of retaliation is
in the Government's possession.  The Government implicitly acknowledges as
much when it states that Mr. McGraw's affidavit constitutes a "one-sided
recounting of a conversation"[5] and that S&P "through no fault of its own" provided
only an "incomplete chronology of events" that "omits information not known to
S&P."  Opp. at 9 & 9 n.7, 11-12.  The Government's position is ultimately that
S&P's retaliation defense is meritless because the Government says so and because
S&P has had no access to facts that could prove otherwise.  That position turns the

---

[5] Contrary to the Government's assertion at page 12 of its Opposition, the contents
of the McGraw Affidavit may not be ignored because, the Government contends, it
is "hearsay."  First, of course, on this discovery motion, hearsay would provide a
perfectly acceptable predicate to obtain discovery leading to admissible evidence.
But the statement is not hearsay.  At this stage, S&P is not offering the affidavit for
the truth of Secretary Geithner's statements, but for the fact that he made them.  In
any event, the statements fall into well-recognized exceptions to the hearsay rule
and are admissible to prove the fact that the conversation discussed therein
occurred and to prove the impact that Secretary Geithner's statements had on Mr.
McGraw.  Fed. R. Evid. 801, 803.

civil discovery process on its head.[6]

### B. S&P Has Made the Requisite Showing to Seek Discovery from the Executive Office of the President.

The Government argues that because "S&P has presented nothing to indicate that the decision to file the Complaint was made or directed by anyone other than DOJ . . . there is therefore no basis for compelling discovery from other Executive Branch components."  Opp. at 18; *see also id*. at 2 n.2, 8-9 n.6.  This argument assumes as true precisely what S&P alleges was not.  It assumes that because the decision to file this case *should* have been made by an individual at the DOJ, that individual *was* the one to make that decision.  The very core of S&P's affirmative defense, however, is that officials in the highest echelons of the Executive Branch (and outside the DOJ) influenced, or even directed, the Government's decision to file this case in retaliation for First Amendment-protected criticism of which those officials disapproved.  It is precisely the point of S&P's defense that those officials, as the Government concedes, had "no authority to make such a decision."  Opp. at 2 n.2.

The Government argues that the discovery requests directed to the Executive Office of the President do not meet initial thresholds of relevance and calibration required for requests directed to the Executive Office.  Opp. at 16-23.  This ignores the showing that has already been made.  As explained above, S&P's targeted requests to materials held by White House employees are reasonably tailored to what is known about specific statements made by Secretary Geithner that directly relate to S&P's First Amendment Retaliation Defense.

---

[6] The characterization of Mr. McGraw's affidavit as a "one-sided recounting of a conversation with former Treasury Secretary Timothy Geithner" (Opp. at 11-12) is notable for the fact that Mr. Geithner does *not* contradict it.  Moreover, to the extent the objection is to a "one-sided" approach, the remedy is clear: provide the "other side" via discovery.

11

The Government's primary support for its position is *Cheney* v. *U.S. District Court for the District of Columbia*, 542 U.S. 367 (2004), but *Cheney* does not begin to support the Government on the facts here.  In *Cheney*, a public interest group sued the National Energy Policy Development Group ("NEPDG") to establish that the NEPDG had to comply with statutory disclosure requirements. *Id.* at 384 ("The District Court ordered discovery here, not to remedy known statutory violations, but to ascertain whether FACA's disclosure requirements even apply to the NEPDG in the first place.").

Here, the United States is not a third party or an indirect defendant.  It is, by its choice, a plaintiff in a civil action, and the requests at issue here are far more targeted than those at issue in *Cheney*.[7]  The requests here relate to communications with specific individuals named in narrow time periods set out in Secretary Geithner's calendars with respect to specific meetings identified in those calendars.  The requests are focused on very specific subjects, and in the two requests seeking communications with the President, the requests are even more narrowly limited to (1) communications related to S&P or the downgrade that occurred in one of three identified meetings (No. 16), or (2) communications with Secretary Geithner as to a single statement by the President on the subject of the credit rating of the United States (No. 24).  S&P Second Req. (Abrams Reply Decl. Ex. A) Nos. 16, 24.  The narrow tailoring of S&P's requests ensures this is no "unnecessary intrusion into the operation of the Office of the President." *Cheney*, 542 U.S. at 387.

---

[7] *Compare* S&P Second Req. (Abrams Reply Decl. Ex. A) No. 1 ("Any documents relating to the call identified on the Calendar at Exhibit 1 as 'Call to Terry McGraw, McGraw Publishing' on August 8, 2011, between 10:15 AM and 10:25 AM."), *with Cheney*, 542 U.S. at 387 ("All documents concerning any communication relating to the activities of the Task Force, the activities of any Sub–Groups, or the preparation of the Report . . . .").

Not only do S&P's requests meet the initial threshold to seek discovery from the Executive Office, both S&P and this Court have a substantial need for the materials that would overcome any invocation of privilege. *See, e.g.*, *Dairyland Power Cooperative* v. *United States*, 2008 WL 8776547 (Fed. Cl. Mar. 17, 2008) (ruling that assertion of presidential privilege was overridden). Documents held by Executive Office personnel and relating, for example, to (i) any discussion at the meetings referenced in the requests (and in Secretary Geithner's calendars) of reaction to the downgrade; (ii) discussion of the need to "look[] very carefully" at S&P's actions; or (iii) the need for a "response" to S&P's downgrade by the Government, lie at the core of the defense and have been put at issue by statements made by the Treasury Secretary. The United States has brought this case, and now it must permit S&P to prepare its defenses.

**III.    THE UNITED STATES MUST PRODUCE DOCUMENTS RELATING TO THE INDEPENDENCE OR OBJECTIVITY OF RATINGS OR RATING AGENCIES OR DOCUMENTS RELATING TO THE CONDUCT OF MORTGAGE LENDERS, FINANCIAL INSTITUTIONS AND ISSUERS OF THE SECURITIES AT ISSUE.**

As with its effort to prohibit discovery on S&P's retaliation defense, the Government's broad-brush challenge to the remainder of S&P's requests stands in stark contrast to the obligations imposed on parties in civil discovery. The Government acknowledges that it has a large volume of responsive documents collected from scores of third parties. Its reasons for refusing to produce them do not pass muster. Indeed, in many cases the Government assumes away the need for discovery on the theory that since the Government has advanced allegations that, if true, would render the documents irrelevant, S&P is not entitled to pursue in its defense documents that would undermine those basic allegations. That is plainly wrong.

So too is the Government's insistence that S&P obtain documents and information in the Government's possession from third parties by individual Rule 45 subpoenas. The Federal Rules are clear that a party is responsible for producing

13

documents in its own custody or control.  And the Government's further efforts to block S&P's discovery by asserting confidentiality concerns on the part of third parties, unsubstantiated and vague claims of overbroad requests, and assertions of privilege further fail basic rules of civil procedure, and ignore the protections of the Protective Order this Court already considered and issued.  We discuss each of these issues in this Section but start our discussion with the Government's challenge to the relevance of the discovery sought.

A. **S&P Seeks Discovery that Is Directly Relevant to the Claims and Defenses in this Action.**

In its assertion as to the purported irrelevance of S&P's discovery, the Government alternatively ignores or misstates S&P's arguments concerning the relevance of the discovery into the meaning and understanding of the terms "independent" and "objective"—the very terms on which the Government has pinned so much of its case.  The Government contorts S&P's argument by asserting that S&P is actually seeking discovery to understand what its own statements of independence and objectivity were intended by it to mean.  Opp. at 25.  In so doing, it avoids addressing S&P's actual argument concerning the relevance of the discovery it seeks, namely that (i) views within the United States Government, including the views of organizations that deal with issues of NRSRO independence more routinely than DOJ, are relevant to any analysis concerning the falsity and materiality of the statements DOJ has put at issue and/or S&P's intent; and (ii) the understanding of S&P's statements (and those of other NRSROs) by sophisticated market participants is equally relevant for the same reasons.

The Government asserts that because it has accused S&P of knowing fraud, with respect to, inter alia, specific statements as to independence and objectivity, documents of recipients of such statements made by S&P (or other NRSROs making similar statements) are irrelevant because, the Government says, S&P knew what it said and what it meant.  The Government insists that because it has

14

alleged that S&P knew that what it was saying was false no discovery is to be permitted.  That argument simply ignores the reality that in our system a defendant is entitled to challenge a plaintiff's allegations and to defend itself by showing that those allegations are false or fail to account for what the statements in question were understood to mean.[8]  The information sought in this regard bears on issues of falsity, knowledge of falsity and materiality and in that regard what other NRSROs said and were understood to mean is crucial as well.

The Opposition fails to deal with the reality that there is evidence (offered in S&P's opening brief) that other agents of the United States do not share DOJ's view of the conflict/independence issue.  *See* Mot. at 5-6 nn.10-12.[9]  The Opposition does not address this, nor offer any reason why the United States should not be required to search for other such materials which are relevant to the presentation of a defense that S&P did not misstate the reality of its independence nor was it understood to be doing so even by officers of the United States who had

---

[8] S&P is free to show that its personnel or others did not understand the statements to mean what the Government contends.  S&P is entitled to offer evidence not only from its own personnel (those involved with the emails and others), but evidence of what was understood by others about S&P's statements and similar ones made by other NRSROs.  The Government may not preclude such discovery by, in effect, deciding for itself that S&P's statements were false and, as understood by the Government, known to be false.

[9] As this reply brief was being written, the Federal Reserve's Open Market Committee released transcripts of its 2008 meetings.  In material prepared by its staff, it considered the role of NRSROs in the financial crisis.  While not uncritical of rating agencies, the staff presentation as to "Subprime RMBS" was explicit that there was "[n]o evidence that conflicts of interest had an impact on ratings."  FOMC, *January 29-30, 2008 Meeting Presentation Materials*, at 241, *available at* http://www.federalreserve.gov/monetarypolicy/files/FOMC20080130material.pdf.  While hardly dispositive, this statement makes clear the diversity of views within the Government and the need for discovery of what other parts of the United States and the marketplace said about "conflicts."  *See also* Mot. at 5 n.10, 6 n.13.

REPLY MEMORANDUM IN SUPPORT OF MCGRAW HILL'S MOTION TO COMPEL
CASE NO. CV13-779 DOC (JCGX)

studied the matter.

In its assertions as to the purported irrelevance of S&P's discovery, the Government has acknowledged that the understandings of the so-called "victims" of S&P's public statements "*are relevant* to the alleged FIRREA violations." Opp. at 27 (emphasis added). The Government has produced four "depositions" (not subject to cross-examination by S&P) of such alleged "victims." To the extent the Government advances the argument that it is *only* these four statements as to the understanding of S&P's statements of independence and objectivity that are relevant, to the exclusion of the understanding of all others, that position strains credulity. The discovery sought by S&P will provide essential understanding of what the alleged "victims," those from whom deposition excerpts have been supplied and those for whom no transcripts were furnished, thought. It will disclose, as well, what other market participants understood the statements to mean. This bears directly on falsity and materiality and, to the extent the meaning of S&P statements are at issue, also bears on allegations of knowing falsity. If market participants did not place the interpretation the Government places on these statements, S&P testimony that it did not intend the alleged false meaning offered by the Government would be validated.

With regard to Requests 38 and 40, the Government contends that "[t]he issues are S&P's knowledge and intent, not the other NRSROs'." Opp. at 28. In other words, documents concerning other NRSROs—whether about their independence, objectivity, practices or otherwise—cannot be relevant because the documents have no bearing on S&P's conduct or S&P's knowledge and intent when engaging in that conduct. *See* Opp. at 25-29. But the policies, practices and methodologies utilized by other NRSROs, independent of S&P, bear on just what those in the marketplace knew was being said and done with respect to NRSRO independence and objectivity. If Moody's and Fitch, for example, were seen by

16

investor institutions to have similar policies as to independence and objectivity and if these entities viewed the behavior of the three leading NRSROs to be similar and not inconsistent with their understanding of independence or objectivity, S&P should have access to such evidence for use in its defense.  This is especially true where, as here, other NRSROs issued similar ratings on the CDOs and RMBS at issue in this case.  And, of course, to the extent the practices and ratings of other NRSROs parallel those of S&P, this bears directly on concepts as to the alleged "falsity" of S&P's ratings as well as the distinct issue as to the understanding of "independence" and "objectivity" with respect to ratings.

### B. The Burdens Imposed by S&P's Requests Are Entirely Consistent with the Liberal Discovery Allowed of a Plaintiff in Civil Litigation.

The Government's complaints of an "undue burden" imposed by S&P's requests mischaracterize the actual burdens that would be imposed by S&P's requests.  The Government's burden arguments boil down to an assertion that the United States Government is too impossibly vast and unwieldy for the DOJ to identify relevant materials obtained by other elements of the Government.  Opp. at 29-30, 34-35, 46.  But the Government initiated this case, not S&P.  And the Government put over 150 securities at issue, not S&P.  "Like any ordinary litigant, the Government must abide by the Federal Rules of Civil Procedure.  It is not entitled to special consideration concerning the scope of discovery, *especially when it voluntarily initiates an action*."  *SEC* v. *Collins & Aikman Corp.*, 256 F.R.D. 403, 414 (S.D.N.Y. 2009) (emphasis added); *see also Exxon Shipping Co.* v. *United States Department of Interior*, 34 F.3d 774, 776 n.4 (9th Cir. 1994) ("When the government is named as a party to an action, it is placed in the same position as a private litigant, and the rules of discovery in the Federal Rules of Civil Procedure apply.").

Similarly unavailing is the Government's cry that "[i]t simply cannot be the

17

case" that every time the Government files a lawsuit, the defendant is entitled to discovery of "all arguably similar investigations and [to] gain access to the investigatory materials gathered in those other investigations."  Opp. at 29.  The focus of the discovery sought here is not on investigations for their own sake, but on facts gathered in other contexts that bear directly on the broad charges the Government puts forth here which involve institutions and securities as to which the Government has gathered extensive factual material.

The Government's fears of unchecked scope are unfounded.  S&P has consistently sought ways to narrow its requests and work with DOJ to avoid an undue burden.  As the Opposition notes, despite complaints that S&P's requests are not limited to identified securities, S&P did in fact offer to limit its requests to purchasers, issuers, arrangers, etc. of the "56 RMBS and 109 CDOs" in a December 19, 2013 letter.  *See* Cardona Decl. Ex. 19.  The Government did not respond to this letter and now in its Opposition rejects this offer as inadequate because the limitation did not confine the requests to those entities' activities with respect to the specified securities.  Opp. at 34.  S&P is perfectly willing to confine its requests at this time with respect to Requests 44-46 to all documents relating to possible fraud involving any of the 56 RMBS and 109 CDOs that the Government has put at issue.[10]

### C.  S&P Is Not Obligated to Seek Documents from Third Parties that the Government Already Has in Its Possession.

The United States refuses to produce documents within its possession on the grounds that the documents may implicate third-party confidentiality concerns, and thus should be obtained from those entities themselves.  *See* Opp. at 30-31, 35-36 & 46.  The Government seeks to shift to S&P the burden of tracking down from

---

[10] As the text suggests, the Government mischaracterizes the reach of Requests 44-46, each of which is tailored, both through actual language and subsequent narrowing proposals, to identify relevant documents and information.

numerous third parties information in the Government's possession.  That is not how civil discovery works.

As a party, the United States cannot escape its obligation to produce responsive materials—including third-party materials—in its possession.  *See* Fed. R. Civ. P. 34(a) ("A party may serve on any other party a request . . . to produce . . . items in the responding party's possession, custody, or control . . . ."); *see also* 8B Charles Alan Wright & Arthur R. Miller *et al*., *Federal Practice & Procedure* § 2210, at 163 (3d ed. 2010) ("A party may be required to produce documents and things that it possesses even though they belong to a third person who is not a party to the action.").  In fact, there is a clear preference in the law for parties to seek and obtain documents *from each other* rather than non-parties.  *See Soto* v. *Castlerock Farming & Transport, Inc*., 2011 WL 2680839, at *9 (E.D. Cal. July 8, 2011) (citing cases); *Nidec Corp.* v. *Victor Co. of Japan*, 249 F.R.D. 575, 577 (N.D. Cal. 2007) ("There is simply no reason to burden nonparties when the documents sought are in possession of the party defendant.").

The United States fails to identify a single case supporting its argument that S&P must seek third-party materials already in the possession of the United States from third parties.  And the fact that the Government obtained these documents in various investigations through its subpoena powers changes nothing.  When it filed the present suit, it availed itself of the Federal Rules of Civil Procedure, and it must comply with them.  Documents in its possession need to be produced.

That the information in the Government's possession may be confidential to a third party does not change the analysis.  Third-party confidentiality concerns do not absolve the United States of its obligation under the Federal Rules to respond to S&P's requests.  *See* 6 James W. Moore *et al*., *Moore's Federal Practice* § 26.101[2][b] (3d ed. 2013); *see also FDIC* v. *Broom*, 2013 WL 4781706, at *2 (D. Colo. Sept. 5, 2013) ("[D]ocuments are not immune from discovery merely

19

because they are subject to contracts requiring that they be maintained confidentially.") (citation omitted).  Parties produced this information to the Government, it is in the possession of the Government, and it should be produced. If the information was subject to a court-ordered protective order or federal regulation that limits disclosure (and the Government has made no such claim), the Government should have notified S&P and the Court of the controlling order and the information protected.  Or, if there was no such order but the Government had concerns, it could have provided notice to the third parties that the information would be disclosed so they could intervene directly. [11]   None of this has occurred. Instead, the Government has refused to produce documents, for example, of one of the alleged "victims" whose losses it has put at issue apparently because the entity desired it to do so.  This it cannot do.[12]

---

[11] This approach is by no means unknown to the United States.  *See United States* v. *AMR Corp.*, 2001 WL 303048, at *1 (D. Kan. Feb. 5, 2001).  Other courts have reached similar conclusions where a governmental party attempts to mandate a convoluted discovery procedure for documents held by a party to an action.  *See In re Bankers Trust Co.*, 61 F.3d 465, 471 (6th Cir. 1995) ("It seems illogical to this court to require [plaintiff] to initiate the much more cumbersome procedure of serving a subpoena on the Federal Reserve in Washington, D.C. simply to enable [plaintiff] to obtain the same documents that [defendant] possesses.  [Plaintiff] would incur needless delays with such maneuvering and would be forced to litigate any objections to the subpoena before a D.C. district court that may not be as fully informed of the underlying facts and circumstances of the case.").

[12] The parties in this case entered into a protective order, litigated before and entered by this Court, that governs the use of confidential information.  That order was drafted by the United States and modeled after a Northern District of California order.  The United States vigorously litigated the confidentiality provisions and ultimately all parties agreed to its appropriateness.  The United States should not now be heard citing the insufficiency of the Protective Order as grounds for refusing production.  S*ee* Opp. at 31-32 n.26 and Walsh Decl. ¶ 14.  To the extent the Government complains about the inadequacy from the third parties' point of view of the provisions of the protective order that it itself proposed and insisted on here, S&P is quite prepared to discuss increasing those protections for

### D. The United States Has Failed to Meet Its Burden of Asserting an Investigatory Privilege Over Materials Gathered in Related Investigations.

The Government's assertion of the investigatory privilege defense falls short in two respects: (1) its articulation of the scope of the current discovery dispute and (2) the faulty manner in which it attempts to assert the privilege itself.

#### 1. Scope of the Current Dispute.

It is critical to clarify which requests are and are not in dispute. The Government seeks to preclude discovery as to any request that touches upon various categories for which it asserts an investigatory privilege. (The requests themselves, of course, are directed at relevant documents, not such categories, but the Government's discussion of even the categories it describes is inaccurate.) The Government highlights eight categories of documents, but S&P has made clear it is *not* now seeking discovery of *five* of these; documents falling within these are highlighted in bold below.[13]

| Category | S&P's Position |
|---|---|
| 1. FIRREA subpoenas and meet and confer correspondence | S&P seeking discovery. |
| 2. Materials obtained by DOJ via subpoenas or other requests in pending investigations | S&P seeking discovery. |
| 3. Notes and memoranda of witness interviews | **S&P not now seeking discovery.**[14] |
| 4. Transcripts of witness examinations under FIRREA | S&P seeking discovery. |
| 5. Communications between DOJ and opposing counsel regarding RMBS Working Group Investigations | **S&P not seeking discovery.** |
| 6. Materials gathered in criminal investigations | **S&P not seeking grand jury proceeding materials.** |

appropriate circumstances. It has never been asked to do so by the Government.

[13] Indeed, Exhibit 34 to Mr. Cardona's Declaration reflects S&P's agreement not to seek discovery on these materials. Cardona Decl. Ex. 34.

[14] As S&P has consistently made clear, it may seek specific notes or memoranda if the need for such notes becomes clear.

21

| 7. Materials obtained pursuant to Bank Secrecy Act | **S&P not seeking suspicious activity reports.** |
| 8. All other internal work product assembled by RMBS Working Group Investigations | **S&P not seeking discovery.** |

S&P is also not requesting documents *generated* by the DOJ in its investigations, a limitation substantially reducing the risk of interfering with any investigation. *See* Opp. at 42.

### 2.    Applicability of the Investigatory Privilege.

As for those categories that are in genuine dispute, S&P is entitled to discovery both because the Government has failed to make the showing needed to invoke the investigatory privilege and, in any event, the privilege does not apply.

### a.    Failure to Make Threshold Showing.

The Government approaches the investigatory privilege inquiry with a sledgehammer when it requires a scalpel. The Government must make a particularized showing of the *specific materials* over which it asserts privilege and the *specific policy concerns* that justify shielding those specific documents. Not only has it not done that, but it seeks to shroud its arguments via *in camera* submissions and thereby avoid the bright light of the adversarial process.

For the Government to invoke the investigatory privilege, it must identify specific concerns about the specific documents it claims are subject to the privilege. *See Friedman* v. *Bache Halsey Stuart Shields, Inc.*, 738 F.2d 1336, 1342-43 (D.C. Cir. 1984). This is not a technicality. It is intended to ensure the privilege is not asserted without due consideration. *See Kerr* v. *U.S. District Court for the Northern District of California*, 511 F.2d 192, 198 (9th Cir. 1975) (government privilege "is not to be lightly invoked") (citation omitted), *aff'd*, 426 U.S. 394 (1976); *see also United States* v. *Reynolds*, 345 U.S. 1, 9-10 (1953) ("Judicial control over the evidence in a case cannot be abdicated to the caprice of executive officers."). Every case the Government relies on in support of its claim

22

of investigatory privilege requires it.  Opp. at 36-44.  The sole example the Government cites to the contrary involved a claim of state secrets privilege, which is afforded "utmost deference" and is not at issue here.  *Kasza* v. *Browner*, 133 F.3d 1159, 1166 (9th Cir. 1998).  Simply put, the Government has failed to meet its burden.

The version of the John F. Walsh Declaration provided to S&P (S&P, of course, does not have access to the *in camera* Walsh submission) contains only generalized concerns.  The Government simply parrots these generalized concerns in its brief, Opp. at 39-44, albeit supplementing them with case citations.  But this is insufficient.  The Government has made no attempt—other than its naked assertions—to establish *how* those concerns are at issue here.

Courts deny claims of investigatory privilege in these circumstances.  *See, e.g., Duenez* v. *City of Manteca*, 2013 WL 684654, at *12 (E.D. Cal. Feb. 22, 2013); *Soto* v. *City of Concord*, 162 F.R.D. 603, 614 (N.D. Cal. 1995) ("[A] general claim of harm to the 'public interest' is insufficient to overcome the burden placed on the party seeking to shield material from disclosure. . . . The party resisting discovery 'must *specifically* describe how disclosure of the requested documents in that particular case . . . would be harmful.'") (citations and internal quotation marks omitted).

Perhaps the Government attempts to make a more particularized showing in its *in camera* submission, but, of course, S&P cannot know that, and S&P objects to any reliance upon this submission.  "It is a hallmark of our adversary system that we safeguard party access to the evidence tendered in support of a requested court judgment. . . .  It is therefore the firmly held main rule that a court may not dispose of the merits of a case on the basis of *ex parte*, *in camera* submissions."  *Abourezk* v. *Reagan*, 785 F.2d 1043, 1060-61 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987).  The Government has failed to offer any justification as to why anything thus far filed

23

on this motion should be sealed or subject to *in camera* inspection.

   **b.** **Availability of the Investigatory Privilege.**

  Even if the Government had made the showing needed to trigger the investigatory privilege, it still has failed to establish that the material sought deserves protection.  The third-party documents sought and obtained by the DOJ as part of pending investigations (category 2) constitute only *factual materials* generated by third parties and not the DOJ.[15]  *See, e.g.*, *Gaison* v. *Scott*, 59 F.R.D. 347, 352-53 (D. Haw. 1973) (investigatory privilege does not shield factual material); *Murray* v. *Atkinson*, 2007 WL 4126622, at *2 (E.D. Mich. Nov. 20, 2007) (same).  Once again, the Government fails to cite a single case holding that such materials are subject to the investigatory privilege.  The only cases cited by the Government in support of its claim involve reports and other documents generated by the Government itself.  *See* Opp. at 42-43.  Perhaps recognizing this, the Government's primary concerns regarding these materials relate to confidentiality.  *See* Opp. at 40 n.33.  As explained above, these concerns are meritless and, in any event, S&P is willing to address them through a modified protective order.

  The other documents sought by S&P—deposition transcripts (category 4) and government subpoenas (category 1)—provide at most minimal insight into the government's investigative strategy.  Courts have found that the information

---

[15] The Government appears to acknowledge that it cannot assert privilege over materials gathered in closed civil investigations.  *See* Opp. at 39 ("[M]aterials obtained by the DOJ entities by subpoena or request in *pending* law enforcement investigations . . . .") (emphasis added)).  To the extent closed investigation materials remain at issue, the Government has failed to meet its burden of demonstrating why they should be treated differently from the general presumption that such materials are not privileged.  *See* Mot. at 9 (citing *In re United States Department of Homeland Security*, 459 F.3d 565, 571 (5th Cir. 2006); *United States* v. *Marshall*, 2010 WL 1409445, at *4 (D.S.D. Apr. 1, 2010)).

gathered from witness interviews is not subject to the investigatory privilege.  *See SEC* v. *Gowrish*, 2010 WL 1929498, at \*2 (N.D. Cal. May 12, 2010).  Whatever investigative strategies these materials contain, they are not particularly sensitive—indeed the recipients of the subpoena or the witnesses interviewed are aware of the Government's investigative strategy and not under an obligation to maintain such insights confidential.  Absent a protective order, which the Government has not alluded to, they can be disclosed by the third parties.

S&P also has a compelling need for these materials.  Transcripts from these investigations may, as explained above, contain contemporaneous recordings of highly probative information.  *See In re Packaged Ice Antitrust Litigation*, 2011 WL 1790189, at \*7-8 (E.D. Mich. May 10, 2011).  The Government has produced transcripts or other sworn statements of but four alleged "victims."  Does it have documents from other entities not alleged to be "victims" that set out facts relating to the statements or securities or practices at issue here?  Such materials are crucial to S&P's defense and not protected by any privilege.

## IV.  CONCLUSION

For the reasons set forth herein and in its initial memorandum, the Court should grant McGraw Hill's motion to compel.


Dated:  February 24, 2014                    CAHILL GORDON & REINDEL LLP


                                 By:  /s/ Floyd Abrams

                                 Floyd Abrams