SACV 13-779-DOC - 03/11/2014 - VOL. II

1          **UNITED STATES DISTRICT COURT**

2          **CENTRAL DISTRICT OF CALIFORNIA**

3      **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4          # CERTIFIED TRANSCRIPT

5              - - - - - - -

6   UNITED STATES OF AMERICA,        )
                                     )
7           Plaintiff(s),            )
                                     )
8        vs.                         ) No. SACV 13-779-DOC
                                     )      VOL. II
9   MCGRAW-HILL COMPANIES, INC. ET   )
    AL,                              )
10                                   )
            Defendant(s).            )
11  _____)

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              HEARING ON MOTIONS

17              SANTA ANA, CALIFORNIA

18          TUESDAY, MARCH 11, 2014

19

20  *Maria Beesley-Dellaneve, RPR, CSR 9132*
21  *Official Federal Reporter*
    *Ronald Reagan Federal Building, room 1-053*
22  *411 West 4th Street*
    *Santa Ana, California 92701*
23  *(714) 564-9259*

24

25

```
                 SACV 13-779-DOC - 03/11/2014 - VOL. II


 1   APPEARANCES OF COUNSEL:

 2   FOR THE PLAINTIFF:   ANDRÉ BIROTTE, JR.
                          UNITED STATES ATTORNEY
 3                        BY:  GEORGE CARDONA,
                               ANOIEL KHORSHID,
 4                        ASSISTANT UNITED STATES ATTORNEY
                          300 NORTH LOS ANGELES STREET, ROOM 7616
 5                        LOS ANGELES, CALIFORNIA 90012

 6   FOR THE DEFENDANT(S): KEKER AND VAN NEST LLP
                          BY:  JOHN KEKER, ESQ.
 7                        710 SANSOME STREET
                          SAN FRANCISCO, CALIFORNIA 94111
 8                        (415)391-5400

 9   FOR THE DEFENDANT(S): KELLER RACKAUCKAS
                          BY:  JENNIFER KELLER, ESQ.
10                        18500 VON KARMAN AVENUE
                          SUITE 560
11                        IRVINE, CALIFORNIA 92612

12   FOR THE DEFENDANT(S): DEBEVOISE & PLIMPTON LLP
                          BY:  NICHOLAS C. TOMPKINS, ESQ.
13                        919 THIRD AVENUE
                          NEW YORK, NEW YORK 10022
14                        (212)606-6949

15   FOR THE DEFENDANT(S): FEDERAL RESERVE BANK OF NEW YORK
                          BY:  DAVID SEWELL, ESQ.
16                        33 LIBERTY STREET
                          NEW YORK, NEW YORK 10045
17                        (212)720-5344

18   FOR THE DEFENDANT(S): CAHILL GORDON & REINDEL
                          BY:  FLOYD ABRAMS, ESQ.
19                        and  DEAN RINGEL, ESQ.
                          80 PINE STREET
20                        NEW YORK NEW YORK 10005
                          (212)701-3000
21

22

23

24

25
```

SACV 13-779-DOC - 03/11/2014 - VOL. II

1          **SANTA ANA, CALIFORNIA, TUESDAY, MARCH 11, 2014**

2                              **VOL. II**

3                              (2:27)

4     *(Whereupon there was a change in reporters and DEBBIE GALE*

5     *reported VOL. I.)*

02:27  6          MR. CARDONA:  Thank you, Your Honor.  And I will get to,

7     I think, all of the areas in which you have asked questions.  But

8     if I could, I'd like to go back and start in a certain place and

9     work forward from there.

02:27 10          So what I'd like to do is go back for a moment to the

11    First Amendment question; the First Amendment retaliation claim,

12    and try and answer some of the court's questions there.  So I want

13    to go back to *Armstrong* for a second and start for a second with

14    *Armstrong.*  And *Armstrong* makes clear -- and if you look at the

15    language in *Armstrong*, it's clear that the standard that --

16    Armstrong -- proposed was in fact what the court characterized as

17    a, "rigorous standard."  What they said was, there's a rigorous

18    standard for the person alleging selective or vindictive

19    prosecution to make a prima facia case and that same rigorous

20    standard should apply to discovery and, as a result, they chose

21    the requirement that there be some evidence, as Your Honor has

22    noted, as to both prongs of the selective prosecution defense.

02:28 23          THE COURT:  And you have noted some evidence.  It's a

24    lower standard for discovery and may be much higher for trial.

02:28 25          MR. CARDONA:  Understand.  And the court noted that that

SACV 13-779-DOC - 03/11/2014 - VOL. II

 1  had been phrased a number of different ways:  Colorable basis,

 2  colorable showing, words like that.  That's what we're looking

 3  for.

02:28  4         But importantly -- and this is the thrust of

 5  *Armstrong* -- what *Armstrong* made clear is that evidence has to be

 6  on both prongs:  Discriminatory effect and discriminatory intent.

02:28  7         So let me turn to intent first because here, putting

 8  aside the claim as to whether there has to be a showing of

 9  discriminatory effect and putting aside S&P's claims that that's

10  not really what they're talking about -- they're not talking about

11  selection even though they focused on Moody's and how they're

12  different -- put that aside for a second, in terms of intent,

13  there are two things I want to do:  First is I want to answer your

14  question about why this call; why the call from Secretary Geithner

15  to S&P and were there valid reasons for that.

02:29 16         And if Your Honor looks at it and thinks about it, I

17  think it will be clear that there are valid reasons.  Secretary

18  Geithner was in the position of being the secretary of the

19  Treasury who was responsible for overseeing the United States

20  finances and, in particular, overseeing the United States'

21  participation in credit markets, the issuance of treasury bonds,

22  the setting of rates.

02:29 23         So the credit rating of the United States is important

24  to that.  This was the first downgrade.  We're not disputing this

25  was important.  This was the first downgrade in history that had

SACV 13-779-DOC - 03/11/2014 - VOL. II

1   occurred, or at least in recent times.  This was an issue that was

2   on Treasury secretary Geithner's plate.  And on top of that, as

3   Mr. McGraw's declaration itself makes clear, the Treasury

4   Department had a belief that S&P had made a $2 trillion error at

5   arriving at this downgrade.

02:30 6           It would be entirely appropriate, as we have noted in

7   our papers, for Secretary Geithner to try, as there had been

8   efforts prior to this amongst Treasury staff and S&P as a number

9   of the articles that Mr. Abrams has included made clear, there had

10  been discussions amongst Treasury staff and S&P to try and figure

11  out what was going on; to see if Treasury could persuade S&P that

12  they were wrong.  This was simply the culmination of those

13  efforts.  Was it an effort to convince S&P that they should change

14  their mind and do something different?  Yes.  But that's not

15  inappropriate for someone in his position.  And now let's focus on

16  that position.

02:30 17          Because the second thing that Armstrong makes clear is

18  that the intent we look at has to be the intent of the

19  decision-maker who is making the decision with respect to the

20  action that is alleged to be retaliation.

02:31 21          And again, this gets back to what you have recognized,

22  which is that DOJ is independent from Treasury.  They are two

23  different agencies with two different missions.  Treasury's

24  mission:  Oversee the finances; DOJ's mission:  Oversee these

25  types of investigations.

SACV 13-779-DOC - 03/11/2014 - VOL. II

02:31 1          There is nothing in Mr. McGraw's declaration to suggest

2    in any way that Mr. Geithner was even aware of DOJ's investigation

3    of S&P.  There is nothing in Mr. McGraw's declaration to suggest

4    that Mr. Geithner played any role in the decision to pursue this

5    action as filed two years later against S&P.

02:31 6          And to indicate why that's important I would bring the

7    court back to the case that S&P has relied on; back to the NBC

8    case.  In the NBC case the networks in that case -- ABC, CBS,

9    NBC -- made a showing to the court.  They showed that, in fact,

10   there had been interference with DOJ's normal evaluation of cases.

11   They presented evidence that President Nixon had conversations

12   with the solicitor general to try and get certain actions down in

13   antitrust cases; had had conversations with the attorney general

14   that his staff had set up an antitrust oversight to oversee the

15   efforts of the department.  That was the basis for having

16   discovery into a part of the government other than DOJ with

17   respect to decisions that were made by DOJ in filing cases.

02:32 18         Here, Mr. McGraw's declaration provides nothing along

19   those lines.  There is simply nothing to tie, even assuming for

20   the moment that Mr. Geithner's motive was improper, which we don't

21   think is shown by this, but even assuming it were, there is

22   nothing to show that that had any affect on the decision-maker.

02:32 23         And I would point the court in particular to two of the

24   cases we have cited to the court which are *Gomez Lopez* and *Candia

25   Veleta* where courts in the Ninth Circuit have dealt with this

SACV 13-779-DOC - 03/11/2014 - VOL. II

1    issue.  And in those cases there were requests for nationwide

2    discovery regarding a selective prosecution claim.

02:33  3         And in each of those, the Ninth Circuit rejected that

4    saying the proper focus is the actual decision-maker.  In those

5    cases, the actual United States Attorney's Office had made the

6    decision even though that U.S. Attorney's Office was actually part

7    of the broader Department of Justice that they were seeking

8    discovery of because there hadn't been the showing as there had

9    been in the NBC case.

02:33 10         So for all those reasons we don't think they have made

11   the showing necessary to get discovery.

02:33 12         So let me move on and say for a moment that were the

13   court to disagree with us -- because this will get to another

14   question the court asked -- were the court to disagree with us, in

15   other words, were the court to conclude that, in fact, a showing

16   had been made as to discovery, where would that get us?  What

17   would that do?  And the answer is, on this we agree with Standard

18   and Poors in certain respects and not in others.

02:34 19         In connection with whether it would be a jury issue, we

20   agree with Standard and Poors that it would not.  This is not a

21   defense on the merits; it is a collateral issue that is properly

22   raised with the court to have the court resolve and determine

23   whether there has been a showing sufficient to establish it and

24   then, to be honest, what the sanctions would be; what the

25   appropriate response would be.

SACV 13-779-DOC - 03/11/2014 - VOL. II

02:34    1            Now, how that would proceed, in our view, first, they
         2    have the burden of showing that they have made a sufficient
         3    showing to get discovery.  If we get past that, then the
         4    appropriate thing to do for the court would be to order discovery,
         5    but to limit that discovery to what the court believes are the
         6    appropriate issues in the case.  That's what the court in NBC did.
02:34    7            And in this case, again, our view would be that the
         8    proper focus of that discovery would be the decision-maker, the
         9    civil division at DOJ to ascertain whether, in fact, there was any
        10    evidence that the civil division at DOJ was subjected to any
        11    pressure by anyone outside of DOJ, for example, anyone at
        12    Treasury, in connection with the pursuit of this case.  That would
        13    be, in our view, the proper focus of the discovery as we have set
        14    forth in our papers, and as I think the court has indicated it's
        15    inclined to do.
02:35   16            Once that was done, it would then be up to S&P to
        17    determine whether they wanted to pursue the motion.  If they did
        18    pursue the motion, the case law is fairly clear that it would be
        19    their burden to make a prima facie showing there had, in fact,
        20    been retaliatory prosecution.  If they fail at that showing, which
        21    is a higher standard than the discovery burden, there would be no
        22    basis for going forward.  If they made that showing, then we would
        23    then have the ability and the opportunity to present evidence to
        24    rebut that showing, and then it would be before the court.  In
        25    terms of when the court would decide that, I think the court would

SACV 13-779-DOC - 03/11/2014 - VOL. II

1    have discretion as to when to decide it.

02:36  2          Depending on what the showing was, you might make a

3    conclusion before trial that no showing had been made.  Or if you

4    believe that it was important to assess the evidence of liability,

5    in other words, one factor that could weigh into the court's

6    decision ultimately would be how strong the evidence was, which

7    would obviously be a factor that could be weighed in bringing the

8    case, then the court would also have the ability to put that off

9    until after the trial on liability had been held, which would also

10   have the advantage, of course, if we failed to prove liability,

11   then there would be no need for the court to reach the issue.

02:36 12          So in our view that's how it would proceed if, in fact,

13   they have made the preliminary showing to justify any discovery,

14   which we, for all the reasons I have said, don't believe they have

15   made.

02:36 16          So with that, Your Honor, that's my presentation on the

17   First Amendment issue, and I'd be happy to answer any questions.

18   But we also have here counsel for Mr. Geithner and counsel for

19   Mr. Checki.  And I think this might be an opportune time for them

20   to get up and answer any questions you might have about that with

21   respect to their client.  I could then get up and the answer the

22   balance of the issues Mr. Keker has raised.

02:37 23          THE COURT:  I'm not going to ask them any questions.  If

24   they have a statement they would like to make, if they would like

25   to participate in the argument, I welcome them.

SACV 13-779-DOC - 03/11/2014 - VOL. II

02:37   1          MR. TOMPKINS:  Thank you, Your Honor.  Nick Tompkins on

        2     behalf of former Treasury secretary Tim Geithner.

02:37   3          I'd like to start by addressing a statement that the

        4     court made prior to the first recess concerning the potential need

        5     for a deposition of Secretary Geithner.  And I believe that

        6     Mr. Abrams correctly noted that at this time S&P is not actually

        7     seeking to depose Secretary Geithner, and that it would only seek

        8     a deposition following a preliminary evidence-gathering process

        9     during which it would gather evidence to justify a showing of need

       10     for the deposition.

02:38  11          What I understand S&P to be seeking at this time is

       12     preliminary, certain preliminary discovery from Secretary Geithner

       13     in an attempt to determine whether there is any link between the

       14     call between Secretary Geithner and Mr. McGraw and the DOJ's

       15     decision to bring this suit.

02:38  16          And I believe the court stated earlier that in Your

       17     Honor's view the only evidence that could potentially be relevant

       18     to S&P's retaliation defense is evidence concerning the call with

       19     Mr. McGraw.  And I would submit that evidence concerning the call

       20     with Mr. McGraw, standing alone, is not actually relevant to the

       21     retaliation defense unless there is some showing of a link between

       22     that call and the decision to bring suit.

02:38  23          What I believe S&P is arguing is that it should be

       24     entitled to take discovery from Secretary Geithner at this stage

       25     in an attempt to determine whether or not that link exists.  They

SACV 13-779-DOC - 03/11/2014 - VOL. II

1    don't know that that link exists.  They speculate that that link

2    exists.  But at this time there hasn't been any showing or any

3    demonstration of the link between the call and the Department of

4    Justice's decision to bring suit.

02:39   5           And in general, I believe that the court earlier

6    suggested that discovery with regard to S&P's retaliation defense

7    should proceed in stages, taking into account what evidence was

8    available at that time and what evidence had come to light in

9    order to avoid unnecessarily imposing discovery burdens in the

10   event that S&P's speculation that there is such a link is

11   ultimately unfounded.

02:39   12          I think that's consistent with the position that we put

13   forward in our papers, that S&P should have to make a threshold

14   showing of need for particular discovery from Secretary Geithner

15   that it is unable to receive from other sources before jumping the

16   ladder, jumping to the top of the ladder, so to speak, to get that

17   discovery from the former secretary.

02:40   18          THE COURT:  Who are those other entities by name?

19   Because I saw that argument and I thought, well, there's only

20   three people who seem to be party to these conversations:

21   Geithner, Checki and McGraw.  So why am I searching out a plethora

22   of other people who might have heard a rumor, or someone might

23   have talked to, why am I going through that laborious process and

24   wasting time and money?  I have seen that in the documents so many

25   times, "judge, you can go to another source."  Name it for me.

                    SACV 13-779-DOC - 03/11/2014 - VOL. II


02:40  1              MR. TOMPKINS:  The source that I was naming in this

        2  circumstance was in fact the Department of Justice.

02:40  3              THE COURT:  Who?  Hold on.  Who?

02:40  4              MR. TOMPKINS:  I don't know their names.

02:40  5              THE COURT:  Name them for me.

02:40  6              MR. TOMPKINS:  I do not know their names, but it would

        7  be the decision-makers at the Department of Justice who were

        8  involved in the decision to bring suit.

02:41  9              THE COURT:  Because there, once again, the argument is

       10  that they're independent; that there was no influence from

       11  Geithner; that the conversation with Geithner was not, in effect,

       12  a threat or intended to have a chilling of threat or change

       13  McGraw's mind.  And even if it was, under the worst circumstances,

       14  DOJ is independent and Geithner would have no influence as a

       15  government entity on them.

02:41 16              MR. TOMPKINS:  That's correct, Your Honor.

02:41 17              THE COURT:  Should there be more skepticism when I have

       18  one government agency dealing with another agency compared to a

       19  company?  So I'm the XYZ company and I come to you as a prosecutor

       20  and I say, a terrible wrong has been done to me.  I'm suing the

       21  company.  Some people might be skeptical that when a government

       22  agency goes to another government agency, there is a certain

       23  degree of, let's say, credibility, and that there might be more

       24  influence with one government agency coming to another government

       25  agency.

SACV 13-779-DOC - 03/11/2014 - VOL. II

02:42  1        MR. TOMPKINS:  I'm not certain there would be a need to

       2  be more or less skeptical.  I believe that the position that we're

       3  advancing is, you would not need to be skeptical because if there

       4  is in fact evidence in the record from the Department of Justice,

       5  the Department of Justice is in the position to know whether or

       6  not Secretary Geithner had any influence.

02:42  7        THE COURT:  Let's go back then to my original question

       8  because, remember, discovery is far different than a court

       9  allowing evidence before a jury.  And I don't read *Armstrong* the

      10  same way as the government does.  I read it as the two-pronged

      11  approach.  No disagreement.  But it's a lower threshold for

      12  discovery.

02:43 13        You certainly can't answer for Geithner and I find no

      14  fault, but it's curious that regardless of his position, the call

      15  is placed.  And the first curiosity from the defense probably

      16  isn't that the downgrade had done real damage to the economy, but

      17  the second portion of that statement is that S&P would be "looked

      18  at very carefully."

02:43 19        The government initially started their argument,

      20  unconnected to yours, "judge, we started the investigation 17

      21  months before."  If so, there is no reason for the call.

02:43 22        Number two, there is no reason for the call unless from

      23  the defense's perspective it has a chilling effect.

02:44 24        MR. TOMPKINS:  Your Honor, I would join in the statement

      25  that Mr. Costano made earlier which is that I'm unaware of

                    SACV 13-779-DOC - 03/11/2014 - VOL. II


 1   Secretary Geithner even being aware of the investigation taking

 2   place.  And I think --

02:44  3        THE COURT:  How do I know that?  You see, how am I

 4   guessing based upon an affidavit from McGraw, who hasn't been

 5   deposed, how I do even know these words are accurate?  There is an

 6   attestation to that.  And what position does your client have at

 7   the present time that makes him such an insulated person?

02:44  8        I'm not dealing with any national secret.  In fact,

 9   quite the opposite.  I seem to be dealing with a debacle that

10   maybe we could not go through in the future if there was more

11   transparency.  So this isn't some secret government program.  He

12   is a private citizen.  Why can't he be deposed?

02:45 13        MR. TOMPKINS:  No, not at all, Your Honor.  It's not a

14   secret program.  What we are asking for is that the protections of

15   the Morgan Doctrine, which generally apply to current and former

16   high-level officials, be applied at the preliminary -- this

17   preliminary stage.

02:45 18        THE COURT:  I have no disagreement with that.  I'm not

19   ready to jump there.  You have to understand, I'm trying to think

20   ahead about where I could be literally in front of a jury.  I'm

21   trying to think ahead where I'm going to be in the future.  And

22   you and I both know if we start down this road, if I open the

23   floodgate at all, S&P is going to be back in a week or a month

24   bringing this very motion in front of the court.  And you know it

25   and I know it.  So might as well just discuss it now.

SACV 13-779-DOC - 03/11/2014 - VOL. II

02:45 1            Now, I'm not ready to jump into a deposition.  You

2      understand that.  There is a process that we're going to go

3      through.  But unless you want to live out here, maybe we ought to

4      start discussing what happens.  And it just seems to me my

5      greatest fear is this:  If the floodgates get opened, I don't want

6      to go through a deposition of level one, level two, level three,

7      level four, and we just waste months and months when there are

8      only three people involved apparently in the conversation.  And

9      it's a great place to start if we ever did start:  McGraw, Checki

10     and Geithner.

02:46 11           MR. TOMPKINS:  And our position is that if the court is

12     of the belief that discovery as to the conversation between McGraw

13     and Secretary Geithner is, in fact, material and relevant to the

14     defense in that Secretary Geithner only has information, or rather

15     that only Secretary Geithner could provide information, he will

16     provide discovery.  Our position has been that in the absence --

02:46 17           THE COURT:  Just a moment.  Who else would be?  He is

18     the one who placed the call and allegedly made the statement to

19     McGraw.  Where else would I go?

02:47 20           MR. TOMPKINS:  That's correct, Your Honor.  Where I was

21     going is that we think the missing piece is that the absence of

22     any link between that call and DOJ's decision to bring suit,

23     discovery as to Secretary Geithner's version of events surrounding

24     the call is not relevant to the retaliation defense.

02:47 25           THE COURT:  Let's assume for a moment we have great,

                    SACV 13-779-DOC - 03/11/2014 - VOL. II

 1   great faith in DOJ's civil division and that they would never,

 2   ever state anything other than what occurred.  Okay?  Given,

 3   right?

02:47   4          MR. TOMPKINS:  Yes.

02:47   5          THE COURT:  The problem is fragmentation.  You got time

 6   for a story?

02:47   7          MR. TOMPKINS:  I do.

02:47   8          THE COURT:  You got no choices.  It's not that there is

 9   something intended.

02:48  10          Are you a United States attorney?

02:48  11          MR. TOMPKINS:  No, I am not.

02:48  12          THE COURT:  Would you like to be?  I'm just kidding you.

02:48  13          It's a silly way to illustrate how people don't intend.

14   And so it's -- Mr. Keker will be the first to tell me that this

15   has nothing to do with it because this is criminal.

02:48  16          You paying attention?

02:48  17          MR. TOMPKINS:  Yes, Your Honor.

02:48  18          THE COURT:  It just drove this home to me.  There is an

19   incredible attorney named Mark Overland and he had the defense of

20   a guy named Martinez who was charged with a death penalty.  And

21   way back when, this gentleman named Martinez had been incarcerated

22   for 15 years for a bunch of robberies.  And he was at Corcoran.

23   And out in this part of the world there were allegations on *60*

24   *Minutes* of the Corcoran gladiator fights.  There were allegations

25   that the guards were shooting at prisoners and killing them

SACV 13-779-DOC - 03/11/2014 - VOL. II

1    without warning.  And Corcoran was infamous, although unproven.

02:49  2           And the United States Attorney's Office brought a case

3    in the Eastern District of California against I think seven or

4    nine prison guards.  I forget.  And they claimed that there were

5    records that existed showing transportation and movement within

6    the prison so that people who were kept in solitary confinement --

7    in the SHU -- and completely locked down, doing 23 1/2 hours a day

8    with 30 minutes of exercise, were put into a yard where they would

9    come in contact with each other from the Nuestra Familia, the

10   Mexican Mafia, the Aryan Brother, the Black Guerilla Family, et

11   cetera.

02:50 12           And I forget the exact year, but it was '88, '89, '90,

13   up in the Eastern District.  And the United States Attorney's

14   Office made a valiant, valiant effort and brought these guards to

15   trial.  I don't know if they were guilty or not.  And it was

16   represented at the time by the California Department of

17   Corrections that there were no movement records; that they had all

18   been destroyed; that there were no videotapes -- although people

19   had allegedly seen the videotapes -- and therefore it just didn't

20   exist.

02:50 21           In the meantime, to make this more complicated, a man

22   named Lieutenant Rigg was appearing on *60 Minutes* and he was

23   claiming that these fights were taking place and that prisoners

24   were being shot and the gladiator Corcoran fights were going on.

25   The United States Attorney's Office got a not-guilty verdict up in

SACV 13-779-DOC - 03/11/2014 - VOL. II

1       the Eastern District.  You have that part so far?

02:51   2          Now move forward a couple years to this gentleman I

3       mentioned to you called Martinez.  And the government brings death

4       penalty allegations against Chuey Martinez.  And one of the

5       nonstatutory aggravating factors is that he should be executed

6       because during his time in incarceration, he had gotten involved

7       in three vicious fights.  And therefore, if you are already doing

8       15 years and you are getting involved in three vicious fights,

9       certainly that's a valid argument for at least a jury to hear.

02:51  10          So let's just pretend you are done with a six-month

11      case, you have taken a month off and you are starting into the

12      death penalty phase and the government has now proceeded with new

13      government officials from D.C. to come in and to use these as one

14      of the nonstatutory aggravating factors.  Right?

02:52  15          Let's assume that a wonderful attorney like you, just to

16      cover the bases, always having heard that these records don't

17      exist, says, judge, just in case, I have got to bring this motion

18      again to produce all the videotapes and all these movement

19      records.  And the government, in good faith -- and I mean in good

20      faith -- the United States Attorney's Office represents that they

21      don't exist.  We have been told by the CDC that they don't exist.

02:52  22          And let's just say that just to be careful and cautious,

23      a judge says, produce the warden because I want an attestation

24      from the warden.  And instead, you receive a records sergeant.

02:52  25          Now, that records sergeant, in good faith, is standing

SACV 13-779-DOC - 03/11/2014 - VOL. II

1  before the court and he or she is representing to the court those

2  records don't exist.  They have gone out and looked for them.  And

3  the records sergeant probably did.  But you and I both know if

4  those records ever turn up, the court is not going to send a

5  records sergeant to jail for contempt for making what he or she

6  thought was a valiant effort.

02:53  7      So let's just say the court is obstinate and says, I

8  still want the attestation of the warden.  And three days later we

9  get a lieutenant, a very nice lieutenant, who tells me that they

10  have made a search and they just can't find any records.

02:53 11      Now, just to cover the bases, let's just assume we've

12  still got a pretty obstinate judge who still wants the warden to

13  attest and hasn't seen that yet and orders the warden to appear,

14  because under penalty of perjury now we know exactly who to go to.

15  And four days later, the next week, we get a captain.

02:53 16      Now, let's just assume that we're done playing games and

17  now you want head of the California Department of Corrections

18  instead.  And now we have got attorneys who fill a courtroom and

19  nobody has done anything wrong.  Do you understand?  Nobody has

20  lied to the court.  Nobody has perjured themselves.  It's a

21  disconnect.  And you know what is found?  No, there are no

22  videotapes, but what they found are movement records that

23  previously the California Department of Corrections had

24  represented to the United States Attorney's Office didn't exist.

02:54 25      And those records show that Duberry, the head of the

                         SACV 13-779-DOC - 03/11/2014 - VOL. II


1   Black Guerilla Family, is moved out of the SHU, out of isolation,

2   out of East Block at Corcoran where he is supposed to be doing 23

3   hours and 15 minutes of alone time in a jail cell, and he's moved

4   the night before to a yard.  And when the gate opens in the

5   morning, there is the head of the Mexican Mafia, Mr. Chuey

6   Martinez.  And those two clash and then they're moved back.

02:55  7        And then Bart Simpson -- you don't know him -- head of

8   the AB, he is moved a couple weeks later from his cell.  And the

9   records show that when the gates open the next morning, there is

10  the head of the Nuestra Familia.  And they clash.  And the third

11  clash is caused by the same conduct.

02:55 12        Now, understand, nobody lied.  The records sergeant

13  wasn't lying to the court; the lieutenant wasn't lying to the

14  court; the captain wasn't lying to the court; the warden wasn't

15  even lying to the court.  I don't ever assume I'm going to get

16  nothing but the truth.  What I'm worried about is a disconnect.

02:55 17        Why am I going to these separate people, or a person in

18  the Justice Department, when I have got the primary speaker and

19  three simple people -- Checki, your client, and McGraw -- who can

20  cure this quickly and efficiently and set this aside and it stops?

02:56 21        MR. TOMPKINS:  Understood, Your Honor.

02:56 22        THE COURT:  No, you don't.  No, you don't.  You don't

23  understand.  Could you imagine that piece of evidence not coming

24  into court on a death penalty case?  Can you fathom that?  When

25  the government's very argument -- and in good faith.  These are

SACV 13-779-DOC - 03/11/2014 - VOL. II

```
      1   good prosecutors.  They're not lying.  They're coming out of D.C.
      2   and they really believe that CDC has given them all the
      3   information and that information is, no records exist.
02:56 4           So therefore, you see my concern, and it's not one of
      5   perjury.  I don't even think that.  It's one of, why am I going to
      6   these secondary sources?  Now your response is going to be, and
      7   counsel can rise to join you and tell me, that they're an
      8   independent agency.
02:56 9           What is the simple question to your client?  Did you
     10   speak to anybody?  Who?  Did you speak to anybody in the Justice
     11   Department?  What was your conversation?  Did you encourage this
     12   prosecution?  If so, when?  If not, fine.
02:57 13          MR. TOMPKINS:  Your Honor, perhaps I could draw a
     14   distinction between discovery that is directed towards Secretary
     15   Geithner's conversation with Mr. McGraw which, as you correctly
     16   say, only he is in a position to speak to.
02:57 17          THE COURT:  Doesn't the defense have the right to ask
     18   him to waive and place the call?
02:57 19          MR. TOMPKINS:  I was going to suggest perhaps, Your
     20   Honor, that there may be, in the interest of taking less
     21   burdensome steps, there may be, rather than subjecting Secretary
     22   Geithner to wide-ranging discovery or document requests --
02:57 23          THE COURT:  It's not going to be wide-ranging.  That's
     24   why I suggested if we ever got that far -- and I don't know that
     25   we are.  This has to scare the heck out of you.  I'm not intending
```

SACV 13-779-DOC - 03/11/2014 - VOL. II

1    to do that, but I am going to explore a lot of things today

2    because once I hand down the ruling, that's going to be it.  I

3    just don't understand why we're going through all of these

4    secondary sources when I have only got three people involved in

5    this conversation and I get absolute clarity.

02:58  6          And as far as wide-ranging, I can cure that very

7    quickly, which is why I have been exploring for a long time do I

8    need a special master.  Nobody has answered that.  I tried to

9    explore the East Coast deposition versus the West Coast

10   deposition.  I've tried to explore whether another judge would

11   have more control over this after my rulings.

02:58  12         MR. TOMPKINS:  Your Honor, I think that we would be

13   amenable to providing limited information, or targeted

14   information, rather, along the lines that you have described

15   regarding Mr. Geithner's understanding of his call with

16   Mr. McGraw.

02:58  17         THE COURT:  And I don't want it written by attorneys.  I

18   don't like interrogatories.  I don't like things written and

19   siphoned.  I think the best truth is in the adversarial process.

02:58  20         And so when you say "information," already my antenna is

21   up.  If you are suggesting it's written information screened by

22   attorneys and nursemaided, no.

02:59  23         I don't know that we're going there.  Once again, it has

24   to frighten you.  It has to concern you.  But if we are, I can

25   probably assure you it's going to be structured, limited.  I'm

                   SACV 13-779-DOC - 03/11/2014 - VOL. II


 1   going to want to know the questions and I'm going to want to have

 2   some control over that.

02:59  3          So my first question is, if we got that far, would it be

 4   on the East Coast or the West Coast?  West Coast.  Excellent.  So

 5   I'm hearing your client would voluntarily come and I wouldn't have

 6   jurisdictional problems.  Excellent.  Thank you.

02:59  7          MR. TOMPKINS:  I do not anticipate raising any

 8   jurisdictional questions.

02:59  9          THE COURT:  Then I could control it across the street,

10   couldn't I?

02:59 11          MR. TOMPKINS:  Yes, Your Honor.  You could.

02:59 12          THE COURT:  Deposition could take place right next door.

13   If there was a problem, I could either have a special master or

14   you could come right here so it would be protected.  Very short,

15   very direct, and it would set this issue aside or it would expand

16   it very quickly, wouldn't it?  Do you know how much taxpayer money

17   we would save if we did that?

03:00 18          MR. TOMPKINS:  When we came here, it was in response to

19   S&P's request for documents.  So I have not had a chance to

20   consult with my client regarding his availability.

03:00 21          THE COURT:  I know that's of great concern to you and we

22   haven't done that, have we?  I promised you I would not jump

23   there, but that's exactly where S&P is going.  And if I open this

24   up to any further discovery, they're going to be right back in the

25   door in a week or a month from now making the motion to depose

                 *MARIA BEESLEY, OFFICIAL REPORTER*

                     SACV 13-779-DOC - 03/11/2014 - VOL. II


    1    your client.  If you don't believe that --
03:00  2            MR. TOMPKINS:  I believe that they might, but they would
    3    have to have the sufficient showing in order to justify it.
03:00  4            THE COURT:  That's why we're going to take each step.
    5    And I agree with you.  I'm not jumping there.
03:00  6            MR. TOMPKINS:  That's all I'm asking, is that we take
    7    staggered steps in order to get at Secretary Geithner's
    8    information without exposing him to broader burdens.  Thank you.
03:00  9            THE COURT:  And they have got to cross all the T's and
    10   dot all the I's if we ever get there.  And I'm not representing --
    11   but I'm giving you stuff to think about in case we did.  I've got
    12   to plan for the worst.  Remember that?  That's why I keep asking
    13   counsel, what does this look like in terms of a motion if we get
    14   to that stage?  Is it in front of the jury or not?  How am I going
    15   to deal with the jurisdictional problems concerning discovery?  Do
    16   I lose control if it's on the East Coast?  Do I need a special
    17   master?
03:01  18           That's why I'm raising all these things.  I'm not making
    19   any rulings.  And if you were listening to me right now, you ought
    20   to be terrified.  But so should the other side, so it's okay.
03:01  21           MR. TOMPKINS:  Thank you, Your Honor.
03:01  22           THE COURT:  Counsel, if you would like to join.
03:01  23           Are you the one who missed your plane?
03:01  24           MR. KHORSHID:  No, sir.
03:01  25           THE COURT:  Did you miss your plane?

SACV 13-779-DOC - 03/11/2014 - VOL. II

03:01 1              MR. CARDONA:  No, Your Honor.  No one has missed his

2     plane.  Mr. Walsh did leave given the representations that there

3     were unlikely to be questions.

03:01 4              MR. SEWELL:  I'm David Sewell.

03:01 5              THE COURT:  I know you represent Mr. Checki, but state

6     that for the record.

03:01 7              MR. SEWELL:  I represent the Federal Reserve Bank of New

8     York -- I'm a staff attorney there -- and Mr. Checki who is

9     executive vice president of the Federal Reserve Bank of New York.

03:01 10             I don't know that I have much to add, Your Honor, and I

11    don't want to waste your time.  I would just say that as

12    attenuated as it seems to us the connection between former

13    secretary Geithner and the institution of the proceedings that

14    bring us here today, as attenuated as those are, they're doubly

15    attenuated with respect to Mr. Checki.

03:02 16             For the court's information, Mr. Checki is executive

17    vice president of the New York Fed with over 40 years, I believe,

18    of service; about to retire.  He is in no way connected to our

19    enforcement division.  He is in no way connected to any legal

20    proceedings that I'm aware of.  And I don't see any relevance,

21    frankly, to the conversation that did occur in August of 2011.

03:02 22             We don't dispute the conversation.  And I know Mr.

23    Abrams earlier in the day mentioned that we hadn't put in an

24    affidavit, and I can represent to Your Honor that Mr. Checki will

25    not challenge any of the facts that Mr. McGraw has alleged in that

                     SACV 13-779-DOC - 03/11/2014 - VOL. II

 1   affidavit.  We simply believe that taking them as true, there is

 2   not a basis to seek discovery.

03:03  3         THE COURT:  That's also why I asked the question

 4   regardless, even if a showing has been made, which is a low

 5   threshold for discovery.  You understand that?

03:03  6         MR. SEWELL:  I understand that.

03:03  7         THE COURT:  Regardless of what the government is

 8   arguing, it's very low for discovery, but it's a whole different

 9   threshold if I was to ever let this kind of evidence in front of a

10   jury.

03:03 11         So the third question I keep asking is, so what?  If all

12   this occurred, where does that leave me?  That's why we got into

13   the unanalogous discussion about outrageous government conduct:

14   How is this to be handled?  Is it a legal question?  Which it

15   appears to be by stipulation of counsel.  When would that be

16   handled?  I'm trying to look down the road a year rather than

17   making snap decisions.

03:03 18         So I want to thank you for your appearance and thank you

19   for your patience today.

03:03 20         Counsel.

03:03 21         MR. CARDONA:  With that, Your Honor, I would like to

22   move on from the First Amendment issue and turn to the banks, if I

23   could for a second, to try and address some of your concerns with

24   respect to the banks.

03:04 25         The first thing I want to get at is we have been doing

SACV 13-779-DOC - 03/11/2014 - VOL. II

1  discovery; both sides have been doing discovery. And part of that

2  has been an effort to try and figure out where we are in

3  connection with the discovery and what's going to succeed. In

4  terms of an assessment as to whether the discovery with the bank

5  is going to succeed, I think we are entirely preliminary in terms

6  of that. Let me give you a couple of points on that.

03:04  7          First, in terms of our investigation, the investigation

8  that we did of S&P in which we served FIRREA subpoenas on a number

9  of banks, we have produced all that material to S&P with the

10  exception of a couple of specific exceptions that we have

11  identified to them that we are trying to work through.

03:04  12          THE COURT: Just a moment. I'm going to read back to

13  you what you just said.

14              (Record read.)

03:05  15          THE COURT: How many banks and which banks? Just a

16  moment. It's a very simple question. Go consult your counsel.

17  How many banks and which banks?

03:05  18          MR. KEKER: You want these numbers while they're

19  consulting, Your Honor?

03:05  20          THE COURT: We have got all day and night. Don't worry

21  about it.

03:05  22          MR. CARDONA: Your Honor, I don't have the precise

23  number with me. I can get that and get that to you.

03:05  24          THE COURT: Have you two consulted? You must know. You

25  must know how many banks.

SACV 13-779-DOC - 03/11/2014 - VOL. II

03:05  1            MR. CARDONA:  Yes, Your Honor.  We have produced -- when

       2    we have produced the documents, we have provided them with

       3    spreadsheets that identify the sources of the documents we have

       4    provided which list the banks.  I just have to go back and count

       5    how many banks.

03:05  6            THE COURT:  So this parade of horribles has been thrown

       7    out, 57 banks, judge, we have tried to get information from them.

       8    We can't get any information from anybody.  That leaves me --

03:06  9            MR. CARDONA:  I think that's too preliminary, and here's

       10   why.  One, the majority of the subpoenas that they've served, the

       11   rule 45 subpoenas, the subpoenas they've served were issued

       12   between January 14 and March 3rd, at least according to the

       13   records we've gotten.

03:06 14            THE COURT:  Not enough time for the banks to respond.

03:06 15            MR. CARDONA:  Twenty-four of those appear to us to have

       16   been issued on March 3rd.

03:06 17            THE COURT:  So in other words, for many of these banks,

       18   they're being, in a sense, castigated when they may be

       19   cooperating.

03:06 20            MR. CARDONA:  Right.  For many of them it appears the

       21   due date on the subpoenas that were served hasn't even been come

       22   to yet.

03:06 23            THE COURT:  What is the due date?

03:07 24            MR. CARDONA:  I believe on the March 3rd subpoenas, I

       25   believe it was April 2nd, but obviously they can correct me if

SACV 13-779-DOC - 03/11/2014 - VOL. II

1    that was wrong.

03:07  2           THE COURT:  So in other words, before the banks are

3    castigated, they haven't even had a chance to analyze or respond?

03:07  4           MR. CARDONA:  Right.

03:07  5           The second point I'd like to make is, if the court

6    recalls, in addition, we had our limited phase of discovery which

7    we did prior to November 18 before we served the initial

8    disclosures limiting our case to the 56 RMBS and the 109 CDOs.  In

9    the course of that discovery, part of what the government did was

10   ourselves serve rule 45 subpoenas, the financial institutions.

11   And we in fact obtained information from banks like CitiGroup,

12   Bank of America, most of the other large issuers that they have

13   now served subpoenas on.

03:07 14           THE COURT:  What is your objection to turning that over

15   to the defense?

03:07 16           MR. CARDONA:  We have.

03:07 17           THE COURT:  So they've got it.

03:07 18           MR. CARDONA:  We gave them the materials that we

19   gathered from the bank through rule 45 subpoenas on a,

20   essentially, contemporaneous basis.  In other words, as we got it,

21   we copied it, we provided it to them.

03:08 22           THE COURT:  Let me repeat back to you.  Of the 56 and

23   106 CDOs, you served rule 45 subpoenas on those banks involved

24   with those CDOs.

03:08 25           MR. CARDONA:  That was the basis for us selecting those

SACV 13-779-DOC - 03/11/2014 - VOL. II

1    CDOs.  In other words, here is how it went --

03:08  2          THE COURT:  Answer yes or no.  In other words, if I have

3    109 CDOs, and I don't know how many banks, I haven't counted, you

4    served and obtained information under rule 45 from those financial

5    institutions?

03:08  6          MR. CARDONA:  I would have to go back and check to make

7    absolutely sure that it covered each and every one of those, but

8    we did serve rule 45 subpoenas on virtually all of the financial

9    institutions that S&P has served on in order to get the

10   information that led us to narrow it to those RMBS and CDOs.

03:09 11          THE COURT:  And that's been turned over to the defense?

03:09 12          MR. CARDONA:  Yes.

03:09 13          THE COURT:  Give me a time frame.

03:09 14          MR. CARDONA:  We turned that over on a rolling basis as

15   we got it.  In other words, as the banks provided us with the

16   information -- typically it was provided in electronic format --

17   we copied that and we provided it to S&P.  There were often a

18   little bit of time delay for us to copy it, but as we copied it,

19   we provided it to them.

03:09 20          We sent them a letter, which is included in my

21   declaration, on January 16 of this year, I believe, advising them

22   that we had provided them with all of the materials we had

23   gathered through rule 45 subpoenas.

03:09 24          THE COURT:  So then what do you have in your possession

25   that S&P might be complaining about?

SACV 13-779-DOC - 03/11/2014 - VOL. II

03:10  1          MR. CARDONA:  What they are seeking over and above what

       2   we have given them.  And what we've given them is basically,

       3   again, with a few minor exceptions, everything that we have

       4   gathered in our investigation.  What they are seeking is

       5   documents, not from our investigation, but from these other

       6   investigations that are being conducted by other offices, not of

       7   the rating agencies, but of issuers of various, in particular,

       8   RMBS.

03:10  9          THE COURT:  Wouldn't you have a legitimate, from your

       10   perspective, claim of investigative privilege?

03:10 11          MR. CARDONA:  Yes.  And that's what we have asserted.

       12   And the cases that Mr. Keker refers to that say that the

       13   government didn't assert the investigative files privilege are as

       14   to the investigation that has led to the filing of that case,

       15   which we haven't asserted.

03:10 16          THE COURT:  Now, let me be the devil's advocate.  Why do

       17   you believe you have got the ability to control, in a sense --

       18   that's a bad word.  But to shape, in a sense, the discovery?

       19   Because your claim will be -- and without any fault finding,

       20   remember that.  I'm exploring -- judge, we have given them

       21   everything that we chose to subpoena.

03:11 22          And their position will be, yes, but there are other

       23   offices and that you are one governmental agency.  In other words,

       24   you are one entity.  That you can't segment yourself out by virtue

       25   of either being in the Los Angeles office or undertaking a

                      SACV 13-779-DOC - 03/11/2014 - VOL. II


        1    specific investigation.

03:11   2              MR. CARDONA:  I understand that, Your Honor.  And we

        3    have not asserted, we have not taken the position that we are not

        4    in the possession, custody, or control of those documents.  In

        5    other words, that would be the segmentation for us to assert,

        6    look, we don't even have to get there because --

03:11   7              THE COURT:  Let's get there.  Are you in control of

        8    other documents from other agencies that haven't been turned over?

        9    And I'm not finding fault, but are you, yes or no?

03:11  10              MR. CARDONA:  We do not have right now access to those,

       11    but we are not asserting that we can't get those.

03:11  12              THE COURT:  You're an excellent lawyer.  I'm going to do

       13    that again.  I apologize.  You must have misunderstood me.

03:12  14              Yes or no, do you have access or do you have control of

       15    documents from other government agencies that hasn't been turned

       16    over to S&P?

03:12  17              MR. CARDONA:  Within the meaning -- I'm going to have to

       18    give you a qualified answer, so if you'll bear with me --

03:12  19              THE COURT:   Investigative privilege?

03:12  20              MR. CARDONA:  No.  Before we get to that, within the

       21    meaning of the law, if the court orders us to produce documents

       22    from those other investigations, we would have the ability to get

       23    them.

03:12  24              THE COURT:  Just a moment.  I'm not doing that.  I want

       25    you to have a full and fair prosecution.  They're going to have a

                    SACV 13-779-DOC - 03/11/2014 - VOL. II


  1   full and fair defense.  You're asking for money, so be it.  Been

  2   pretty expansive so far.  But they get a pretty expansive defense.

03:12  3         So what I'm hearing is this -- and you don't have to

  4   verify it -- judge, we may not have them in our locker box, but we

  5   certainly have access to them.  In fact, we may even have

  6   knowledge about what the contents are.  We may have contact with

  7   other U.S. attorneys.

03:13  8         I'll just leave it at that.

03:13  9         MR. CARDONA:  I don't think that would be fair.  We do

  10  not have free and unfettered access to those documents in terms of

  11  using them in our investigation.  We can, however, if in fact

  12  there is a discovery order, we can get them.  And that is why we

  13  are not asserting that they're not within our control for purposes

  14  of a discovery request.

03:13 15         THE COURT:  How I do know that they're even relevant?

  16  In other words, I'm not trying to burden you, but by the same

  17  token, I don't know if other agencies or offices are involved that

  18  you have the right to segment yourself.  And I don't want to put

  19  you through the burden, but by the same token it's not fair if you

  20  have any knowledge or increased wisdom and there's documents that

  21  might be of benefit.

03:13 22         If this was a criminal matter as counsel alluded to, the

  23  rules would be much changed.  Much different.  Game over.

03:13 24         MR. CARDONA:  They would and they wouldn't.  Remember

  25  that in the criminal context the court still recognized that in

SACV 13-779-DOC - 03/11/2014 - VOL. II

 1    general there is not a general obligation on the part of one

 2    investigation to reach out across the country and look for

 3    documents in all the other investigations.  Those typically have

 4    to be narrowed requests that demonstrate the relevance of the

 5    documents and demonstrate that.

03:14  6          And our point here is, one, they haven't done that.

03:14  7          THE COURT:  Have you had an adequate time, other than

 8    the adversarial process today in court and your past dealings with

 9    Mr. Keker, yourself and other counsel, to discuss this and are you

10    two at the loggerheads where you want the court to take complete

11    control?  Because I'm happy to do so.

03:14 12          In other words, if there is any additional conferencing

13    that you want to do today -- and I'm not suggesting that -- and

14    the lines have been drawn, decisions aren't a problem for me.  If

15    there is any benefit to the two of you talking, you have that one

16    last opportunity to control your own destiny.

03:14 17          MR. CARDONA:  Yes, I understand that, Your Honor.  If I

18    could, I'd like to make one other point on the banks, which is,

19    again, to get back to the point that Your Honor raised earlier,

20    which is both in our investigation we sought limited documents

21    from the banks.  We cannot guarantee that we have everything that

22    is relevant to their defense.  It is the same with all these other

23    investigations.

03:15 24          THE COURT:  And you heard my same concern.  And if I

25    cause you to divulge these documents, I can just see, if liability

                        SACV 13-779-DOC - 03/11/2014 - VOL. II


 1    is forthcoming, the appeal that states we didn't get everything.

 2    And in fact, the government hid something and the accusation that

 3    flows from it.  Not from this counsel, but maybe from appellate

 4    counsel.

03:15  5          Number two, I'm going to go through a series of work

 6    product and investigative privilege issues that are going to be

 7    nonending.  By the same token, they're not going to be left

 8    without the ability to defend themselves.  Do you hear me?

03:15  9          MR. CARDONA:  I understand what Your Honor is saying.

03:15 10          THE COURT:  If you leave that to me, I don't know what

11    I'm going to do yet, but they're not going to be sitting in this

12    situation:  Judge, we can't get it from the U.S. Attorney's

13    Office, but we can't get it from the banks either because we have

14    a whole set of banks out there fighting us and, judge, you don't

15    have jurisdiction.

03:16 16          MR. CARDONA:  And this is what I'm suggesting, that the

17    answer to that question right now is too preliminary to answer.

18    The banks have just gotten the subpoenas.  Some of the banks have

19    responded to them because we know we got copied on one of these

20    letters.  At least one of the banks responded to them saying, hey,

21    look, the stuff you are asking for is the stuff we already gave

22    the government, and our understanding is the government already

23    gave it to you.

03:16 24          I don't know how many of those we're going to get.

03:16 25          THE COURT:  This isn't a legal ruling, but a long time

SACV 13-779-DOC - 03/11/2014 - VOL. II

1    ago when I might have sat in your position, a long time ago, not

2    with your office, of course, I always found that if I made the

3    call literally on behalf of my opponent on the defense side, that

4    somehow law enforcement responded.  It was amazing how quickly

5    they responded.  Whereas, if the defense counsel called, usually

6    the officer was on vacation.

03:17   7         And I'm just joking with you, but I'm not.  And

8    therefore, I'm just imploring you, I hope you hear my message.

9    It's not too subtle.

03:17  10         MR. CARDONA:  I hear your message, Your Honor.

03:17  11         THE COURT:  You've got this power because you are the

12   government.  You are the transparent entity that we depend upon.

13   And I know that if you reach out, banks would just love to

14   cooperate with you because you regulate them.

03:17  15         MR. CARDONA:  Your Honor, I understand exactly what you

16   are saying.  And we in fact have taken that position trying to

17   assist in dealing with both the number of government agencies that

18   we don't represent and the banks.

03:17  19         THE COURT:  Do you and Mr. Keker want to talk about that

20   privately for a moment?

03:17  21         MR. CARDONA:  Your Honor, I think it will involve a

22   conversation with more than just me and Mr. Keker, and I don't

23   think we could resolve that today.

03:17  24         If I can point out a couple of things.  First, prior to

25   their reply, the agreement to limit it to the 56 RMBS and 109

SACV 13-779-DOC - 03/11/2014 - VOL. II

1   CDOs, that was something new that was in the reply.  That was not

2   our understanding of their positions.  That in fact gives us

3   something to work with.  And it may be that we could work with

4   that.  And if we can agree that in fact what we are looking for

5   are documents from third parties that are related specifically to

6   those securities, that may be something we can work with.

03:18  7          Now, before I leave Your Honor with anything, it may

8   still be that after we look for those -- in other words, that

9   would give us a basis to look for documents that might potentially

10  be responsive -- once we do that, we would be in the position that

11  Your Honor has recognized, which is we might be in a position

12  where, as to certain of those, we could come back and say we can't

13  produce those because of the investigative files privilege, or

14  because of the work product doctrine, or because the bank is

15  asserting that they have a confidentiality interest in those and

16  they have told us we can't produce them; they want to come in an

17  object.

03:18  18         All of those are possibilities down the road if we go

19  that route, but that would at least give us a basis for trying to

20  identify a more narrow set of documents that might then give us a

21  more narrow basis for discussing all those issues.

03:19  22         THE COURT:  How much, when I gave you that time at the

23  beginning -- because I believe you're working well together.  I

24  find no fault with the parties.  None at all -- how much do you

25  think you have narrowed your case?  10 percent, 20 percent,

SACV 13-779-DOC - 03/11/2014 - VOL. II

1   5 percent, 50 percent?

03:19  2         MR. CARDONA:  We have narrowed it well beyond that.  And

3   if I can, I'd like to talk about that briefly.  Our case is

4   allegations of systematic fraud.  Systematic misrepresentations by

5   S&P that, as we have told the court before, would apply to all of

6   their RMBS and all of their CDOs.  That was a huge number.  Our

7   narrowing reduced it to approximately 1 percent of the RMBS they

8   have rated over the relevant time period and approximately

9   15 percent of the CDOs.

03:20 10         THE COURT:  Those are the -- yes, but in terms of money,

11  what did you narrow it to?  In other words, if $2 billion was on

12  the table, did you narrow it to a billion?  If a billion was on

13  the table, did you narrow it to 500 million?

03:20 14         I know the quantity went down, but some of those were --

03:20 15         MR. CARDONA:  I can't give you an answer as to that.  We

16  did not ascertain -- prior to narrowing the case, we did not

17  ascertain the losses that flowed from all of the RMBS and CDOs.

18  So I just can't give you a figure for that.  My guess would be

19  that it would be several orders of magnitude bigger than the

20  losses that we are currently alleging flowed from the limited set

21  of RMBS and CDOs.

03:20 22         So there are two things along those lines.  One, it is

23  an allegation of systematic fraud.  And it is important to our

24  case precisely because of some of the defenses that S&P will

25  raise, defenses that particular issuers may have misled them.

*MARIA BEESLEY, OFFICIAL REPORTER*

SACV 13-779-DOC - 03/11/2014 - VOL. II

1    Defenses that particular purchasers may have viewed something as

2    not material.

03:21  3         Part of our case is the pattern of how that occurred

4    across different issuers, the pattern of how it occurred across

5    different purchasers.  Just as in many mail fraud and wire fraud

6    cases, a significant part of our case, to defeat those types of

7    defenses, is the pattern.

03:21  8         THE COURT:  So if I didn't take Mr. Keker up on his

9    offer about taking CitiGroup and/or Bank of America together, it's

10   certainly to your advantage to get this information over to the

11   defense to foreclose a court even considering that, because if

12   that information goes to the defense you might have a much

13   stronger argument.

03:21 14         MR. CARDONA:  I understand what you are saying, Your

15   Honor.

03:21 16         THE COURT:  No, I'm not.  I'm just talking out loud for

17   a moment.

03:21 18         MR. CARDONA:  I understand.  There is still the issues

19   as to what is discoverable, and we will do our best to try and

20   work that out and see if we can get them that.

03:22 21         THE COURT:  You understand as those become greater and

22   greater issues, as I'm faced with privilege, as I'm faced with the

23   seeming unfairness of you as a transparent government entity

24   asking for money and the defense not being able, however the

25   machinations, whatever the reasons, at the end of the day not

SACV 13-779-DOC - 03/11/2014 - VOL. II

1    being able to defend because discovery is not either forthcoming

2    from you or the banks give jurisdictional problems to them, then

3    the court is going to resolve that.

03:22  4          MR. CARDONA:  Let me focus on the jurisdictional issue

5    if I could --

03:22  6          THE COURT:  The court is going to resolve that.  Do you

7    understand that?

03:22  8          MR. CARDONA:  I do understand that.

03:22  9          THE COURT:  And you want to control your future, don't

10   you?  And you have a meeting with Mr. Keker for a moment.  I'm

11   going to go take a restroom break.

03:22 12          MR. CARDONA:  Can I make one point before you go?

03:22 13          THE COURT:  Absolutely.  At my age I can sit here

14   longer.

03:22 15          MR. CARDONA:  I'll be very brief.  In terms of the

16   jurisdictional issue, in the recess we very quickly looked through

17   the notices that have been served on us indicating who they've

18   served their subpoenas on.  They have served them on a number of

19   financial institutions.  I would note that we went through and

20   looked through the list, and at least 25 of the institutions that

21   they served with rule 45 subpoenas, 18 were served on a corporate

22   agent for service of process who is here in Los Angeles or Santa

23   Ana.  Another six were in Sacramento, one was in San Francisco.

03:23 24          THE COURT:  Jurisdictional issues are no problem.

03:23 25          MR. CARDONA:  I think many of the jurisdictional issues

SACV 13-779-DOC - 03/11/2014 - VOL. II

1    we can in fact resolve.

03:23  2           THE COURT:  I haven't sorted that out yet.  Let me do

3    this.  Not forcing the two of you to talk, but this is your last

4    opportunity, because after this I start making decisions.  Once I

5    make decisions, you are not bargaining with me.  It doesn't turn

6    around with, judge, you made a mistake and let's do the following.

7    You won't believe that, but trust me.

03:23  8           So you've got 15 minutes to talk.  That's it.  I'm going

9    to go take a restroom break.  If you want to talk, great.  If you

10   don't, don't.  Because I'm prepared, I think, to make some

11   decisions.

03:23 12           MR. CARDONA:  Your Honor, we'll talk.  There are some

13   other points that you raised that I'd like to address.

03:23 14           THE COURT:  Think about a trial date.

03:23 15           MR. CARDONA:  Yes, and also some of the other issues on

16   discovery that you touched on briefly.

03:24 17           THE COURT:  Let me sit here and hear those before I

18   leave, then.

03:24 19           MR. CARDONA:  Certainly.  One of those was if we talk

20   about the loss and gains, I don't know if Your Honor wants to hear

21   about that.

03:24 22           THE COURT:  I do.  It's intriguing to me.  Judge Raykoff

23   apparently is listening to that argument.  On one hand, gain, if I

24   was you I would be thinking well, what's the future deterrence if

25   Judge Rakoff or this court hands down gain.

                    SACV 13-779-DOC - 03/11/2014 - VOL. II

03:24  1          In other words, you gain something, it's the cost of

       2   doing business.  You lose $60 million, you get $60 million back or

       3   less.  I would imagine you'd be arguing against that.

03:24  4          On the other side, loss.  So great, so speculative,

       5   almost like unintended loss.  Just the concept of never ending and

       6   how that unwinds.  I don't know how to balance that yet, but the

       7   motion is not in front of me.

03:24  8          So two things are intriguing to me still.  One, if you

       9   want to put that motion in front of me, I'm happy to try to decide

      10   that.

03:25 11          Second, I'm not too certain that Mr. Keker's idea of a

      12   segmented trial is at all out of bounds.  Just depends a lot on

      13   discovery.  That's why we're having this joint, very unorganized

      14   discussion today.

03:25 15          MR. CARDONA:  Understand that.  The only thing I wanted

      16   to point out is that Judge Rakoff has not made a ruling that it's

      17   not loss.

03:25 18          THE COURT:  I know.  And I won't call him and he won't

      19   call me.

03:25 20          MR. CARDONA:  That's fine.

03:25 21          THE COURT:  We may come out on opposite ends of that.

      22   I'd certainly be interested in his writing and I think he would be

      23   interested in mine.  I think, though, he seems to be a little bit

      24   ahead in this process hearing arguments on Wednesday.  I haven't

      25   even had briefing.  It just came up today as far as a suggestion

SACV 13-779-DOC - 03/11/2014 - VOL. II

1    is concerned.  That's another matter that the two of you can

2    discuss.  I doubt that you'll reach an accord on that.  You'll be

3    opposed to it and Mr. Keker will want to bring that motion.

03:25 4          MR. CARDONA:  Yes, I suspect that will be a motion

5    before the court in the future.

03:25 6            With that, we will have our conversation and --

03:26 7          THE COURT:  You don't have to.  Remember this.  Shortly

8    you lose all control.  You then don't have any options.  Okay.

03:26 9            Thank you very much.

03:26 10           What is a convenient time for you?

03:26 11         MR. KEKER:  As soon as possible, Your Honor.  I don't

12   think we have a lot to talk about, frankly.  We're ready to go.

03:26 13         THE COURT:  If you don't want to talk to opposing

14   counsel --

03:26 15         MR. KEKER:  I really don't want to talk to Mr. Cardona.

16   We have been talking about this since October.  But I don't want

17   to interfere with a break.

03:26 18         THE COURT:  Believe it or not, that was a facade.  At my

19   age I don't need to use the bathroom.

03:26 20         Mr. Keker, your turn.

03:26 21         MR. KEKER:  As I say, we have been talking about for a

22   long time.  Just a few things.

03:26 23         THE COURT:  So decision time.

03:26 24         MR. KEKER:  Yes, sir.  It is decision time.  And first

25   of all, the banks.  What we're asking that we don't have, we have

SACV 13-779-DOC - 03/11/2014 - VOL. II

1    asked them for essentially three things:  Let us see the subpoenas

2    that you sent to the banks and then the narrowing that you did so

3    we can see what they produced that -- how you narrowed your -- so

4    if we see the subpoena, we see the breadth of it and then we see

5    how you narrowed it, that tells us what we need to fight for that

6    we don't have from the government.

03:27  7         THE COURT:  Just a moment.

03:27  8         Is the government objecting to that?

03:27  9         MR. KEKER:  Yes.

03:27 10         THE COURT:  Why?

03:27 11         MR. CARDONA:  Yes, we do, Your Honor.  That's based on

12    the investigative privilege issue because the FIRREA subpoenas and

13    the conversations about those in fact are something that will

14    reveal the scope and the direction of those other investigations.

03:27 15         We have offered, in the past we have offered to give

16    them a list of people we subpoenaed so they could either subpoena

17    those people directly --

03:27 18         THE COURT:  Thank you.  Next issue.

03:27 19         MR. KEKER:  The other thing that we have asked for are

20    the materials that have been obtained by DOJ.  You kept talking

21    about other parts of the government.  We're talking about their

22    part of the government.  Their part.  Washington.  DOJ.  If they

23    have factual materials -- not work-product materials, not their

24    memos -- factual materials from people, deposition transcripts,

25    this, that, or the other thing relating to the CDO and the RMBS

SACV 13-779-DOC - 03/11/2014 - VOL. II

1   that we are going to litigate in this case, they should give them

2   to us.  So that's the second thing.

03:28  3        And then the third thing -- well, it's that, including

4   the FIRREA transcripts.  All of this is laid out at page 21 of our

5   rebuttal.  And they haven't given us everything.  They say that

6   the banks that gave them things during the investigation have some

7   confidentiality privilege.  We say, we don't care if the bank has

8   a confidentiality privilege.  You give us what you have and you

9   tell the bank you are going to give it to us, and if the bank

10  wants to come in and come to Judge Carter and complain and you

11  can't turn it over, let the bank do it.

03:28 12        Same with the rating agencies.  If Moody's has a problem

13  with what they have given the government, the government tells

14  them we have to turn this stuff over because they have demanded it

15  in a case where it's part of the investigation, Moody's can come

16  in and say, judge, blah, blah, blah, whatever they're going to

17  say, and you can decide it and then we'll know.

03:29 18        So that's what we are asking for.  These jurisdictional

19  issues -- the jurisdictional issue with respect to the documents,

20  we did a lot of, we hope, useful looking around and trying to find

21  a local so maybe we could get documents and come in and try to

22  enforce it here.  It's never going to work for depositions.  I

23  know that.  The deposition -- the deponent is the deponent is the

24  deponent.

03:29 25        The other thing that you need to understand that they're

SACV 13-779-DOC - 03/11/2014 - VOL. II

1  not telling you, this was a disaster in 2008.  All the big banks

2  fired everybody.  Everybody that worked in this -- and I'm again,

3  exaggerating -- but most of these people are gone.  I know

4  something about Citibank.  Almost all of the people that know

5  about this are gone and they're now working at other institutions.

03:29  6        So when we find the person who presumably knows

7  something about this CDO issued by Citibank back in 2007, and we

8  want to talk to that person, that person is now working at a hedge

9  fund in Atlanta and says, I'm not really interested in helping

10  you.  The sort of the scope of these discovery problems is just

11  enormous, which is why I come back to where I ended, and that is a

12  more limited trial.

03:30  13        You asked --

03:30  14        THE COURT:  Well, you suggested a more limited trial and

15  you start with CitiGroup.

03:30  16        MR. KEKER:  And you asked us to add up Bank of America

17  and --

03:30  18        THE COURT:  60 percent, you said.

03:30  19        MR. KEKER:  60 percent of the losses that they claim of

20  the losses.  And what it works out to be is instead of the 150

21  depositions that we were projecting for the arrangers and the

22  issuers and the trustees and so on, it comes out, if we just did

23  just Bank of America and CitiGroup, about 54 depositions more or

24  less.

03:31  25        THE COURT:  How do you respond to their argument?  And

SACV 13-779-DOC - 03/11/2014 - VOL. II

1 that is, judge, if you do that, you are destroying our lawsuit in

2 the sense that we need to be able to show this continuity.  In

3 other words, it's not just the large amounts of money with the two

4 banks, it's also the fact that this is continually repeated over a

5 spectrum.

03:31 6          MR. KEKER:  That is the most hypocritical argument I

7 have heard in this courtroom yet.  Their position has always been,

8 judge, our case is -- they call it systematic fraud.  What they're

9 saying is we don't like what they did with the models.  The models

10 aren't any good.  The models were used for everything.  They can

11 prove that in the Citi case, they can prove that in the Bank of

12 America case.  Just in a regular mail fraud case you prove they

13 did this and when you get down to what counts of mail fraud are we

14 talking about, we pick certain things.

03:31 15         That's what we're talking about.  If they say they want

16 to prove something is systematic, I'm not waiving arguments or

17 motions in limine or whatever.  But you know and I know and Mr.

18 Cardona, because he is a great criminal defense lawyer, he knows

19 the way this is done.  And when he says systematic -- he is.  We

20 have done a lot of criminal work together.

03:32 21         THE COURT:  He is a prosecutor.

03:32 22         MR. KEKER:  I mean prosecutor.  Not defense lawyer.

23 Whatever.  But he knows criminal law.  He knows criminal law is my

24 point I guess.  He is a prosecutor, that's for sure.  But in any

25 event, he knows that when it comes to making some sort of

SACV 13-779-DOC - 03/11/2014 - VOL. II

1  broadbrush statement, ladies and gentlemen, here is the models and

2  so on, he can do that in a case with a limited number of CDOs or

3  he can do it in a case, a limited number of CDOs, which when you

4  get granular, can be tried in a month or so.  And he can also do

5  it in a case where he is trying 150 which is going to take four to

6  six months.  And that's what we're saying makes all the difference

7  in terms of discovery that's necessary.

03:32  8       Because it's one thing to deal with a systematic case.

9  We can almost do that now.  We can think about what we're going to

10  do.  It's when we come to the individual CDOs -- CDO by CDO, what

11  happened in this one; what happened in that one.  Is there a

12  disconnect between the rating and the loss and so on -- that this

13  huge number of CDOs and RMBS becomes unworkable.

03:33 14       That's why we're asking -- we still think the manageable

15  number is like one issuer, 15 CDOs, and make your overarching

16  points, and then at the end of that case argue that that

17  overarching point has been made as a matter of estoppel or res

18  judicata.  I can see that.  Or law of the case.

03:33 19       That's where we're coming from and why we're so

20  concerned about the schedule.  At first you said July or you said

21  May or September.  We choose September is our vote, if we have a

22  vote.  And we need as much time, whatever the case is, before

23  discovery closes as we can get.  And you said two weeks -- two

24  years from when you first got the case.  That would be at least

25  February of 2015.  We would be able to take discovery up to that.

SACV 13-779-DOC - 03/11/2014 - VOL. II

1    And that's going to be a bear, a real bear of discovery all over

2    the country even if you accept our proposal to cut it all down.

03:34  3         THE COURT:  Nobody is answering my question.  Do I need

4    a special master?

03:34  5         MR. KEKER:  No.  The special master is going to --

6    unless you get jurisdiction over a lot of things that are

7    happening here.  But what we're worried about and believe is that

8    the special master simply will add a different layer when we're

9    here.  We're going to end up having to come to you and the special

10   master is not really going to resolve these things which are very

11   principled problems.  And so it will just add a layer.

03:34 12         THE COURT:  The special master isn't going to get

13   involved in any of the issues today.  I mean at the time of the

14   deposition.

03:34 15         Here is my greatest fear:  At the time of the

16   deposition, a privilege is asserted or an objection is made.  And

17   I don't have my primary counsel, my primary counsel in that room.

18   I have got associates in that room.  Terrific associates, by the

19   way.  But they just don't have the maturity or the holistic

20   thought about this case.  So everybody gets mad and the deposition

21   ceases.

03:35 22         Now the deponent goes home.  It's hard to get them back,

23   it's hard to reschedule.  Unfortunately, that's happened to me

24   before.  Therefore, when it's conducted across the street, which I

25   think is ludicrous flying people out here, I don't want to do

SACV 13-779-DOC - 03/11/2014 - VOL. II

```
        1    that.

03:35   2               MR. KEKER:  This is not the Bratz case.

03:35   3               THE COURT:  Can't even remember that case.

03:35   4          So let's do it this way.  If I'm not going to run into

        5    that problem, I don't need a special master sitting in the room.

        6    A special master isn't going to help me with these issues because

        7    you're right, it adds one layer.  If I'm doing my job, if I get a

        8    magistrate judge or a special master, I have to review it de novo

        9    anyway.  It's a waste of time.  It takes twice as long.  So I

        10   agree.

03:36   11          But what about the depositions themselves?  What happens

        12   if we get into a hypothetical position with McGraw or Checki in a

        13   room or somebody, and all sorts of objections are raised?  In

        14   fact, counsel I think wisely expressed how would this be

        15   channeled.  We start off here, but counsel presses too

        16   aggressively, expands upon whatever a court's ruling,

        17   hypothetically, is, and now your client is being subject to this

        18   bombardment with a series of "don't respond to that question."

03:36   19          How do we control that?

03:36   20               MR. KEKER:  You break it up.  If it's a government

        21   deposition of a government agency, Mr. Geithner, Mr. Checki,

        22   somebody who has those kind of privileges, you ask them to come

        23   out here; you do it here; you are available and we see what

        24   happens.  I don't think we need a special master, but we try to do

        25   it here.
```

SACV 13-779-DOC - 03/11/2014 - VOL. II

03:36   1          If it's an S&P deposition, they say they want to take 40

        2    depositions, I don't think there is going to be any problem with

        3    the S&P depositions.  We're going to be there.  We know the rules.

        4    I don't think there is going to be a lot of acrimony in those.

03:37   5          The place where there is going to be a problem are going

        6    to be depositions of these third parties, the hedge fund manager

        7    in Atlanta who used to work at Bank of America who none of us have

        8    any control over.  And when we call his lawyer who happens to be

        9    his nextdoor neighbor that he barbecues with and we say the judge

        10   wants you to do it this way, he's going to say, what -- so a

        11   special master -- and we say we would like to have a special

        12   master attend and control it, he's going to say forget it.  So I

        13   don't think a special master works.

03:37   14         THE COURT:  And of no value, the special master doesn't

        15   have any authority.  So it's a waste of time.

03:37   16         MR. KEKER:  And if I'm wrong with the S&P depositions

        17   and we get into huge beefs, then we'll worry about it then.  But I

        18   don't think that's going to happen.  It adds another layer of

        19   scheduling.  Just all the problems of special masters.

03:37   20         THE COURT:  What I'm worried about is this:  Also, if

        21   you were literally across the street, I would see you on a weekly

        22   basis.  I'm not suggesting this now, but I would see you on a

        23   weekly basis because the depositions will get intense at some

        24   point.

03:38   25              But I'm sitting here until 8:00 o'clock or 9:00 o'clock

                      SACV 13-779-DOC - 03/11/2014 - VOL. II


  1    at night.  You're working across the street.  If you have an

  2    objection, you run over here and I resolve it.  Now you are on the

  3    East Coast.  A critical question gets asked.  There is an

  4    objection.  How do I resolve it?  I'm not going to pick up the

  5    phone.  I have 400 other cases.

03:38  6             MR. KEKER:  If they're S&P depositions, I'm not worried

  7    about those.  We'll figure that out.  The ones that I'm worried

  8    about, that we're, on our side, worried about, are third party

  9    depositions that I think we're going to have to do the plodding,

 10    Sherman's march through Georgia, file a motion in the district, do

 11    the whole thing.  That's just with the way it is.  That's why

 12    we're so discouraged about how that discovery is going to work.

03:38 13             THE COURT:  Now, you have got a number of federal judges

 14    potentially making consistent or inconsistent decisions, depending

 15    upon their view of a case, taking place in California that,

 16    frankly, if it was coming from the East Coast and it was my

 17    situation I'd know very little about.

03:39 18             MR. KEKER:  Can I go back and say that if this case

 19    involved -- because the court ruled only one big issuer bank with

 20    15 CDOs, or maybe even two big issuer banks with 21 CDOs, this

 21    whole thing might look and feel a little bit different.  The

 22    general counsel of those two big banks may say, look, why do it

 23    the hard way?  Why not go along with what Judge Carter would like

 24    us to do?  And then we may need a special master, but they would

 25    say we're going to accept the authority of -- we can cross that

SACV 13-779-DOC - 03/11/2014 - VOL. II

1    bridge when we come to it.  But narrowing the case would make it

2    more possible that this out-of-state jurisdiction --

03:39   3         THE COURT:  CitiGroup and B of A would give you

4    60 percent.

03:40   5         MR. KEKER:  Give them 60 percent of what they say the

6    losses are that they want to talk about in the penalty phase to

7    the jury.  They want to say, look, the loses that came --

03:40   8         THE COURT:  You want to talk to your team, see if there

9    is anything else you want to say?  Then I'll turn back to the

10   government.

11             (Brief pause in proceedings.)

03:41   12        MR. KEKER:  One final point, Your Honor, if I may, and

13   that is with respect to Mr. Cardona's point about the systematic

14   nature and the time period, if you took just Citi, the

15   allegations, the CDOs that they allege that Citi wrongly rated

16   that they want to prove covered the time period of the complaint

17   so that it's not like we're zeroing in on a month or some time,

18   they'd pick up if you limited it to Citi, or Citi and B of A picks

19   up the whole time period and makes, from their point of view,

20   relevant what happened over that time period.

03:42   21        It's further to my point that in terms of the proof, it

22   doesn't burden the government at all.  It just simply simplifies

23   what the jury has to decide and makes the trial much shorter

24   because you don't have to go the details of so many CDOs.

03:42   25        THE COURT:  Okay.  What happens, why would I consider

SACV 13-779-DOC - 03/11/2014 - VOL. II

1    your limitation of Bank of America or CitiGroup if you were going

2    to bring a motion concerning gain versus loss?  And Judge Rakoff

3    or I had the same opinion -- or different opinions, it's my

4    court -- and I found that gain was the appropriate measure, not

5    loss, hypothetically, would I ever make the decision now to

6    segment out CitiGroup and/or CitiGroup and Bank of America, or

7    Bank of America and CitiGroup?  Why wouldn't I decide that issue

8    first?

03:43  9          Because at that time if it was gain and not loss, and

10   that's really on the table as a motion, and quickly, then the

11   government or your position might be to wrap this whole thing up.

12   Then you are dealing with $60 million.  You are not dealing with

13   whatever the number is, a billion dollars.  And that might change

14   your whole perspective.  And what I don't want to do is once I

15   start making motions, start flip-flopping on different people's

16   tactics and needs.

03:43  17         MR. KEKER:  That's one way to do it.  And what we were

18   concerned about -- that's why I was suggesting originally the

19   shirtsleeves talking about it before you ruled.

03:44  20         THE COURT:  I'll come down there right now.

03:44  21         MR. KEKER:  I mean after briefing.  But really getting a

22   real taste.  What we're basically asking you to do is decide jury

23   instructions and sort of post-trial stuff.  And we were worried

24   that by asking you to decide it definitely too early in the case

25   before you had your arms around the whole thing, that it would be

SACV 13-779-DOC - 03/11/2014 - VOL. II

1    a problem.  But some guidance on that.

03:44  2         It's the most important thing in the case.  You are

3    absolutely right.  If this is a fraction of a $60 million case as

4    opposed to what they claim, then everything changes.

03:44  5         THE COURT:  And positions are going to change.  If we're

6    blunt about that, you don't care if it's $60 million.  What

7    happens is you are going to want to wrap the whole thing in a

8    trial.  My suspicion is you two will probably even enter into

9    settlement negotiations because the sums are so small compared to

10   the liability you are facing now.

03:45 11         MR. KEKER:  Further affiant sayeth not, Your Honor.

03:45 12         THE COURT:  That's why I keep asking you two to control

13   your future because what you may see is a series of rulings that

14   I'm just not backing up on.  And now you come to me and say, oh,

15   judge, now we would like to bring a motion for loss versus gain.

16   In other words, I don't know what you're planning.  I don't know

17   if you two have even talked about it.

03:45 18         MR. KEKER:  What we want -- we can talk, but what we

19   want is you to grapple with what we're requesting.  You grapple

20   with this loss versus gain issue --

03:45 21         THE COURT:  There's no motion in front of me.

03:45 22         MR. KEKER:  -- in the near future and so we'll make a

23   motion.

03:45 24         THE COURT:  There is no motion in front of me.  I'm not

25   going to grapple with a thing.  I'm not going to go out and do my

SACV 13-779-DOC - 03/11/2014 - VOL. II

1    own research until I see what your research is.  I'm not going to

2    decide a motion until it comes to me for a decision.  I'm not

3    going to jump to Geithner based upon a request by you to climb the

4    ladder.

03:45   5            So we're going to go in stages now.  All these things

6    I'm doing today is my attempt to look down the line a year from

7    now.  And so therefore I know I've probably frightened both of you

8    with some of the questions.  You both have to leave a little

9    concerned.  I understand that.  But my job not only is to make it

10   fair today, I have got to make certain it looks fair and feels

11   fair and is fair a year from now when you get in trial.  And I'm

12   assuming you are going to trial.

03:46  13            MR. KEKER:  Certainly the way things are set up now

14   we're going to trial.  We don't have any choice but to go to

15   trial.  This is an existential problem.

03:46  16            What we're requesting specifically is instead of a

17   motion, both sides filing briefs just as we would do in a pretrial

18   conference or whatever.  You having the chance to read and

19   consider the briefs, a 25-page brief or some brief within the next

20   three weeks or 30 days and then we come back and we talk to you

21   about your reactions to the briefs and your reaction to the whole

22   problem just as you began to react now, as opposed to making a

23   formal motion and making you decide something that you may want to

24   reconsider as the case goes on.

03:47  25            THE COURT:  Here is my preference:  In anything that's

SACV 13-779-DOC - 03/11/2014 - VOL. II

1    that dispositive, I would want it on the record.  I would want it

2    briefed and I would want it formal.  I would never step down in

3    the well and just give you an indication that would steer each of

4    you.  It's not fair.

03:47    5          The second thing is you walked in this morning on a

6    discovery dispute that was easily resolved off the record.  It had

7    nothing to do with dispositive issues.  It simply had to do with

8    the trading of some information that didn't take place.  In fact,

9    for both parties and their clients it's better it wasn't on the

10   record.  Their clients wouldn't like to read that.  So it kind of

11   protected the attorneys.  That was basically by agreement of all

12   of us.

03:47   13          But something that's dispositive of gain or loss and

14   moving from 68 million potential in liability or $1 billion, it's

15   going to be on the record.

03:48   16          So if you want to set up a briefing schedule, it's your

17   chance to talk to the gentlemen, because right now the only thing

18   I'm going to decide are the discovery issues.  But the way I

19   decide these discovery issues put both of you in a situation

20   where -- well, it just is going to be dispositive of a lot of

21   things in the future.

03:48   22          Have you had enough time to talk to your team?

03:48   23          MR. KEKER:  If I could check.

03:48   24          THE COURT:  Sure, take your time.  Remember this, if you

25   have a chance to set up the motions in some orderly fashion,

SACV 13-779-DOC - 03/11/2014 - VOL. II

1   otherwise, they'll come piecemeal.  I don't care.  I'm not forcing

2   you to do that.  But trust me, when I was practicing, if I could

3   control the judge in terms of agreement, I was never sure what he

4   or she would do.

03:48  5            MR. CARDONA:  I agree, Your Honor.  That's why we set

6   briefing schedules for these motions this way.

03:48  7            THE COURT:  If gain or loss is on the table, let's get

8   it decided quickly.  Remember this, Judge Rakoff may want to see

9   my writing, but I may want to see his.  He's farther ahead.  It

10   doesn't mean I rely upon it.  In fact, we could have a split.

03:49 11            MR. KEKER:  Your Honor, we hear you loud and clear.

12   We're going to talk to our client and you may be hearing from us

13   in terms of a motion.

03:49 14            THE COURT:  But in other words, how long do I delay?  I

15   tend to get back to things as quickly as this weekend.  I'll be in

16   trial the next three days, but by this weekend I'm back to your

17   case and we're starting to write.  You have very limited time now.

03:49 18            MR. KEKER:  We'll be back to you before this weekend.

03:49 19            THE COURT:  That means you'll talk to the opposition

20   also and see what a briefing schedule would look like and if you

21   want to bring that gain or loss issue before the court.

03:49 22            MR. KEKER:  Yes, sir.

03:49 23            THE COURT:  Also talk to them about any potential last

24   moment discovery issues that you can resolve.

03:49 25            MR. KEKER:  Yes, sir.

SACV 13-779-DOC - 03/11/2014 - VOL. II

03:49  1           THE COURT:  Doesn't hurt.  Okay.

03:50  2           Counsel.

03:50  3           MR. CARDONA:  I just want to make two final points in

       4  terms of the narrowing.  Part of the problem is that there are a

       5  number of defenses they are going to raise that are in fact issuer

       6  specific, in particular with respect to CitiGroup and Bank of

       7  America.  You have heard them say that they're going make

       8  allegations that the issuers were involved in deception of S&P.

       9  Obviously that's going to vary by issuer.  And important for us is

     10  to be able to show that across the different issuers the same

     11  things occurred regardless of what their allegations are.

03:50 12           Similarly, for CitiGroup and Bank of America many of the

     13  tranches were primarily retained by CitiGroup and Bank of America.

     14  That is very different from a number of our other situations where

     15  other financial institutions purchased.

03:50 16           So again, there is a cross-section of purchasers that we

     17  need to get to.  I don't think a CitiGroup and Bank of America

     18  narrowing will work.  And again, I would urge the court, this is

     19  consistent with the approach the court took last time, we are now

     20  approximately two and a half months further in discovery,

     21  discovery that was opened up on the entire group.  I would urge

     22  the court not to narrow it at this time; to allow us to proceed

     23  with discovery to see where we get and, in particular, where we do

     24  get with some of these banks.

03:51 25           If in fact, we have huge problems, we may very well be

SACV 13-779-DOC - 03/11/2014 - VOL. II

1  coming back and saying, yes, we have no problem.  Let's cut them

2  out.  But if we don't and if we're moving forward and it's

3  working, I would urge the court not to impose a narrowing down and

4  to wait and see a little bit how we go.

03:51 5       So I'll leave that with the court.  And obviously if the

6  court thinks that a narrowing is appropriate, we would like to

7  propose potentially something different in terms of how that

8  happens.

03:51 9       THE COURT:  Propose it now because, trust me, what I'm

10  doing now is going to bind you.  You are not going to have the

11  opportunity of coming back.  So give me another proposal.

03:51 12      MR. CARDONA:  We would have to go back and look and try

13  and pick a cross-section of the RMBS and CDOs that covers a range

14  of issuers and a range of purchasers.

03:51 15      THE COURT:  You are foreseeing my next question.  My

16  next question was, I'm now giving, hypothetically, S&P one entity:

17  CitiGroup, Bank of America, whatever.  I'm giving you one entity.

18  Who would you like?  Hypothetically.  Not holding you to it, but

19  give me an entity.

03:52 20      MR. CARDONA:  I don't have that information in front of

21  me.  I would have to go back and look at the entity issuers.  They

22  have picked it on the basis of the issuers; the CitiGroup or Bank

23  of America issuers.  I would have to look at more information than

24  that.  I need to look at a cross-section of the purchasers as well

25  and see how that plays out with the issuers.  I just don't have

SACV 13-779-DOC - 03/11/2014 - VOL. II

1    that in front of me right now.

03:52  2        THE COURT:  Okay.  Why don't you talk to your team for a

3    moment and make sure.  And counsel have been courteous on behalf

4    of Mr. Geithner and Mr. Checki.

5            (Counsel confer)

03:53  6        MR. CARDONA:  I did want to briefly address two other

7    things that Mr. Keker raised in terms of his discovery request:

8    The FIRREA subpoenas, the subpoenas that were issued in the other

9    RMBS working group investigations and the transcripts of sworn

10   testimony from those other working group investigations.

11   Obviously those are the claims of the investigative privilege that

12   has been provided to you in connection -- in the declarations we

13   submitted including the in camera declaration, as to those.

14   Again, on a broad basis, obviously we're asserting the privilege.

03:53 15        If in fact we could work out a narrowing that came down

16   to some narrower set of the RMBS and CDOs and could narrow that

17   down after doing some searches, we may be able to narrow those

18   assertions.  But right now those are the subject of assertions of

19   the privilege.

03:54 20        THE COURT:  I think that's your primary problem right

21   now honestly, and that is that if a court has the feeling that a

22   defendant cannot defend, then you are not giving me very many

23   options, either narrowing or forcing on you discovery that may be

24   onerous.  I'm choosing right now not to do either.  But unless I

25   have some way out of that "box," then I'm not going to have the

SACV 13-779-DOC - 03/11/2014 - VOL. II

1    feeling that the defendant has a fair opportunity.

03:54  2           And so, I understand the legal ramifications of the

3    investigative privilege.  I understand the legal -- of work

4    privilege.  I understand the burden on your office, et cetera.

5    And I don't want to set myself up for endless appeals fighting

6    over the investigative privilege and the work product issues.

03:54  7           But as far as the burden on your office, if there is no

8    other option, if you continue on which you are with the loss

9    theory, and if I found loss to be the appropriate vehicle, then

10   the defense is entitled to have a full opportunity in discovery.

11   And the difficulty with that is then that control is turned over

12   across the country to all sorts of different entities.  And then

13   I'm not too certain I don't need a special master and here is why.

03:55  14          I agree with you, Mr. Keker, that a special master may

15   not be of true value in the deposition, but the special master

16   starts to summarize issues for me because this is going to be

17   voluminous and entirely time-consuming for me.

03:55  18          So I may want that initial look through the door from

19   somebody keeping up full time, and that means the two of you are

20   splitting the bills which now will cause you problems because I

21   don't know if the government can pay or wants to pay, but I would

22   force half on each of you.

03:55  23          So number two, when do you want me to hand down these

24   decisions?  Because these decisions are very weighty as far as the

25   rest of your case is concerned.  I could do it probably by Monday

SACV 13-779-DOC - 03/11/2014 - VOL. II

1    or Tuesday or I can do that in a month after you see what happens

2    with the other banks and how they respond.

03:56 3          MR. KEKER:  Why don't you do it in a month, Your Honor.

03:56 4          MR. CARDONA:  Well, Your Honor --

03:56 5          THE COURT:  Just a moment.  You two talk.  Unless I have

6    disagreement, I'm going to move pretty fast now.  In other words,

7    also then we're going to talk about a trial date right now also.

8              (Counsel confer)

03:56 9          THE COURT:  Mr. Keker, Mr. Cardona, while you are

10   talking, we're going to set a trial date in just a few moments and

11   then work backwards.  I understand that that's unfair, and let me

12   explain to you how I understand that that's unfair.  I don't know

13   how voluminous it is, so it puts tremendous pressure on Mr. Keker

14   and tremendous complaints.  But by the same token I'm going to get

15   this case moving in some reasonable period of time, and it's not

16   moving right now to my satisfaction.

03:57 17         And that will also force motions and will force, trust

18   me, people racing up and down the hallway to get things resolved.

19   Nothing like a good trial date.

03:57 20         And I'll look at the later part, Mr. Keker, Mr. Cardona,

21   I'll look at the later part of 2015 if we need to.  I'll push that

22   off from May.  I can push it into September.  I just worry about

23   Thanksgiving, the Christmas holidays and how those breaks take

24   effect on a jury.  I can push the time out.  Discovery won't be in

25   February or June.  Just have it cut off in May of whatever, give

SACV 13-779-DOC - 03/11/2014 - VOL. II

1    you as much time as possible.

03:57   2         MR. KEKER:  My suggestion would be could we -- first of

3    all, please don't make these rulings from our perspective for a

4    month until a couple of things happen:  Until we come back to you

5    and say there is going to be a motion with respect to the gain

6    loss and schedule that, and we have a chance to talk to Mr.

7    Cardona.

03:58   8         THE COURT:  Didn't think you wanted to talk to him.

03:58   9         MR. KEKER:  No.  About what you just said; May cutoff

10   for discovery, September trial.  Having heard you I think we

11   probably -- and we'll tell you on Friday.  I would just file

12   pleadings, notice of intent to do whatever about the motion.

03:58  13         THE COURT:  Give me a date that you want these motions

14   handed down by.  In other words, I'll give you enough breathing

15   room, but not too much.

03:58  16         MR. KEKER:  We'll consult about all of that.

03:58  17         THE COURT:  No.  Just tell me.  April 8?  April 15?

18   What date?

03:58  19         MR. CARDONA:  That's fine.  I don't have a problem.  I

20   would ask --

03:58  21         THE COURT:  No.  I'm going to know it now.  I'm leaving

22   the bench and you are going to tell me a date to hand down these

23   motions by.  I'm going to down and check in with the judges so we

24   a quorum, then I'm going to sneak out and come back up here, okay?

25   So why don't you take a little bit of a break and I'll see you in

SACV 13-779-DOC - 03/11/2014 - VOL. II

1    half an hour.

2               (Recess taken, from 3:59 to 4:42.)

04:42  3          THE COURT:  All counsel are present.

04:42  4          Counsel.

04:42  5          MR. CARDONA:  Your Honor, we have had an opportunity to

6    discuss, and what we would like to do is the following if it's

7    acceptable to you.  We would like to submit by next Tuesday a

8    proposed schedule working backwards from a trial date in September

9    of 2015.

04:42 10          THE COURT:  Just a moment.  2016?

04:42 11          MR. CARDONA:  2015.

04:42 12          MR. KEKER:  We would like '16, Your Honor.  We agreed

13    over our objection.

04:42 14          MR. CARDONA:  And then we would ask, if it's convenient

15    to the court, to assure ruling on the motions that were before you

16    today by April 15.

04:42 17          THE COURT:  April 15.  Okay.

04:43 18          MR. CARDONA:  And our schedule --

04:43 19          THE COURT:  Is this joint or singular?

04:43 20          MR. KEKER:  This is joint in the sense that we're going

21    to say preserving all our objections and all the things we have

22    said that are a problem.  But listening to Your Honor about the

23    S&P date, we'll agree on the schedule.

04:43 24          So we're going to do it without prejudice, we hope.  And

25    we're also going to make a decision, we'll talk to the government

SACV 13-779-DOC - 03/11/2014 - VOL. II

1   and make a decision about the penalty briefing, and talk to the

2   government about a briefing schedule if we decide to go ahead with

3   that and present that in the schedule as well.

04:43   4        THE COURT:  Okay.

04:43   5        MR. KEKER:  The opening brief coming to you before

6   April 15.

04:43   7        MR. CARDONA:  That is what we have discussed.

04:43   8        THE COURT:  You want me to hold off on a decision until

9   April 15.  You are going to accept, over objection of the defense,

10   a trial some time in september or at least -- you are going to

11   work backwards from there concerning your pretrial and your motion

12   and your discovery cutoff date.

04:44   13        MR. CARDONA:  And I assume Your Honor wants the four

14   dates that are in your scheduling order that we work back to.

04:44   15        THE COURT:  I didn't hear the --

04:44   16        MR. CARDONA:  Your Honor I assume will want the four

17   dates that are in your scheduling order to be included in our

18   proposed schedule.

04:44   19        THE COURT:  Yes, please.  Anything further this evening?

04:44   20        MR. KEKER:  No, Your Honor.

04:44   21        THE COURT:  My thanks and appreciation.  I know I tossed

22   out a lot of things.  You can't take anything I've said today to

23   the bank.  All of that was exploratory.

04:44   24        And we'll see you.  I wouldn't be too concerned about

25   some of the comments the court made right now, but it was more of

SACV 13-779-DOC - 03/11/2014 - VOL. II

1    an exploration in some cases.

04:44  2              But thank you very much for your courtesy.  Good night.

3                  (Whereupon the proceedings were adjourned at 4:44.)

4

5                              -oOo-

6

7                          CERTIFICATE

8

9          I hereby certify that pursuant to Section 753, Title 28,

10   United States Code, the foregoing is a true and correct transcript

11   of the stenographically reported proceedings held in the

12   above-entitled matter.

13

14   Date:  MARCH 13, 2014

15

16   /S/
     _____
17   MARIA BEESLEY-DELLANEVE
     OFFICIAL COURT REPORTER
18

19

20

21

22

23

24

25