1              **UNITED STATES DISTRICT COURT**

2              **CENTRAL DISTRICT OF CALIFORNIA**

3         **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                    – – – – – – –

5    UNITED STATES OF AMERICA,        )
                                      )
6              Plaintiff,             )
                                      )
7          vs.                        ) No. LACV 13-0779 DOC
                                      )      Volume I
8    McGRAW-HILL COMPANIES, INC., et  )
     al.,                             )
9                                     )
               Defendant.             )
10   _____)

11

12

13            REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                    Hearing on Motions

15                  Santa Ana, California

16                Tuesday, March 11, 2014

17

18

19

20

21   Debbie Gale, CSR 9472, RPR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141
24

25   13cv0779 McGraw-Hill 2014-03-14 V1

Case 2:13-cv-00779-DOC-JCG  Document 148  Filed 03/18/14  Page 2 of 102  Page ID #:3709
LACV 13-0779 DOC 03/11/2014 – Volume I

2

1    **APPEARANCES OF COUNSEL:**

2

      FOR THE UNITED STATES OF AMERICA:

3

4         UNITED STATES DEPARTMENT OF JUSTICE
          OFFICE OF UNITED STATES ATTORNEY
5         BY:  George S. Cardona
              Chief Assistant United States Attorney
6         312 North Spring Street
          12th Floor
7         Los Angeles, California 90012
          213-894-2434
8         USACAC.Criminal@usdoj.gov

9

          UNITED STATES DEPARTMENT OF JUSTICE
10        OFFICE OF UNITED STATES ATTORNEY
          Civil Division – Federal Building
11        BY:  Anoiel Khorshid
              Assistant United States Attorney
12        300 North Los Angeles Street
          Room 7616
13        Los Angeles, California 90012
          213-894-6086
14        anoiel.khorshid@usdoj.gov

15

16    ALSO PRESENT:

17

          UNITED STATES DEPARTMENT OF JUSTICE
18        OFFICE OF CONSUMER LITIGATION
          BY:  James. T. Nelson  *(not on court docket)*
19            Trial Attorney
          P.O. Box 386
20        Washington, DC 20044
          202-616-2376
21        james.nelson2@usdoj.gov

22

23

24

25

```
 1    FOR THE DEFENDANT MCGRAW-HILL COMPANIES, INC., ET AL.:

 2
          KEKER AND VAN NEST LLP
 3        BY:  John W. Keker
              Attorney at Law
 4        710 Sansome Street
          San Francisco, California 94111
 5        415-391-5400
          jkeker@kvn.com
 6

 7        KELLER RACKAUCKAS LLP
          BY:  Jennifer L. Keller
 8            Attorney at Law
          18300 Von Karman Avenue
 9        Suite 930
          Irvine, California 92612
10        949-476-8700
          jkeller@krlawllp.com
11

12        CAHILL GORDON AND REINDEL LLP
          BY:  Floyd Abrams (pro hac vice)
13            Attorney at Law
          80 Pine Street
14        New York, New York 10005
          212-701-3000
15        fabrams@cahill.com

16
     ALSO PRESENT:
17

18        CAHILL GORDON AND REINDEL LLP
          BY:  Dean Ringel (not on court docket)
19            Attorney at Law
          80 Pine Street
20        New York, New York 10005
          212-701-3000
21        dringel@cahill.com

22

23

24

25
```

Case 2:13-cv-00779-DOC-JCG   Document 148   Filed 03/18/14   Page 4 of 102   Page ID #:3711
LACV 13-0779 DOC 3/11/2014 - Volume I

4

```
 1    FOR OBJECTOR/NON-PARTY TIMOTHY F. GEITHNER:

 2
          DEBEVOISE & PLIMPTON LLP
 3        BY:  Nicholas C. Tompkins (pro hac vice)
              Attorney at Law
 4        919 Third Avenue
          New York, New York 10022
 5        212-606-6949
          ntompkins@debevoise.com
 6

 7    FOR OBJECTOR FEDERAL RESERVE BANK OF NEW YORK:

 8
          Federal Reserve Bank of New York
 9        BY:  David G. Sewell (pro hac vice)
              Attorney at Law
10        33 Liberty Street
          New York, New York 10045
11        212-720-5344
          David.Sewell@ny.frb.org
12


13
      ALSO PRESENT:
14
          UNITED STATES DEPARTMENT OF JUSTICE
15        UNITED STATES ATTORNEY'S OFFICE
          BY:  John F. Walsh
16            United States Attorney
          1225 Seventeenth Street
17        Suite 700
          Denver, Colorado 80202
18        303-454-0100
          john.walsh2@usdoj.gov
19


20
          UNITED STATES DEPARTMENT OF JUSTICE
21        CONSUMER PROTECTION BRANCH
          BY:  Michael S. Blume
22            Director
          Liberty Square Building
23        450 Fifth Street, N.W.
          Room 6400 South
24        Washington, D.C. 20530
          202-307-3009
25        michael.s.blume@usdoj.gov
```

LACV 13-0779 DOC 3/11/2014 – Volume I

5

1    Hearing on Motions                                6

2    Defense argument by Mr. Abrams                    9
       (Re First Amendment defense)
3
     Government's Response re by Mr. Cardona          27
4      (Re First Amendment defense)

5    Argument by Mr. Abrams (Re Retaliation defense)   53

6    Argument by Mr. Keker                            66

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|       |    | **SANTA ANA, CALIFORNIA, TUESDAY, MARCH 11, 2014** |
|-------|----|---|
|       | 1  |  |
|       | 2  | **Volume I** |
|       | 3  | (8:23 a.m.) |
| 08:47 | 4  | **HEARING ON MOTIONS** |
| 08:23 | 5  | THE COURT:  S&P matter.  Counsel, your |
|       | 6  | appearances, starting with the plaintiff, please. |
| 08:23 | 7  | MR. CARDONA:  Good morning, Your Honor.  George |
|       | 8  | Cardona, here with James Nelson, Anoiel Khorshid, for the |
|       | 9  | United States. |
| 08:23 | 10 | THE COURT:  Pleasure. |
| 08:23 | 11 | MR. CARDONA:  We have our two declarants here, the |
|       | 12 | persons who submitted declarations:  John Walsh, |
|       | 13 | U.S. Attorney from Colorado and the co-chair of the RMBS |
|       | 14 | Working Group. |
| 08:24 | 15 | THE COURT:  Thank you for being here. |
| 08:24 | 16 | MR. CARDONA:  And we also have Michael Blume, who |
|       | 17 | is the Director of the Consumer Protection. |
| 08:24 | 18 | THE COURT:  Pleasure. |
| 08:24 | 19 | MR. CARDONA:  Back at DOJ. |
| 08:24 | 20 | THE COURT:  Thank you.  I don't know that it's |
|       | 21 | necessary that you're here, but it's nice to have you here. |
|       | 22 | Okay?  Thank you for your courtesy. |
| 08:24 | 23 | All right.  Now, my lead counsel, Mr. Cardona, I |
|       | 24 | know it's you.  And who else? |
| 08:24 | 25 | MR. CARDONA:  Your Honor, with me at counsel -- |

| 08:24 | 1 | THE COURT: Who's my lead counsel? |
| 08:24 | 2 | You? |
| 08:24 | 3 | MR. CARDONA: Mr. Khorsid and Mr. Nelson. |
| | 4 | *(Indicating.)* |
| 08:24 | 5 | THE COURT: So we're gonna have three counsel |
| | 6 | speaking at trial? |
| 08:24 | 7 | MR. CARDONA: At various parts, yes -- |
| 08:24 | 8 | THE COURT: Did I represent that? |
| 08:24 | 9 | MR. CARDONA: -- and different witnesses, yes. |
| 08:24 | 10 | THE COURT: Did I represent that: That you're |
| | 11 | going to have three counsel or two counsel? |
| 08:24 | 12 | MR. CARDONA: We're going to have three, |
| | 13 | Your Honor. |
| 08:24 | 14 | THE COURT: No, no. I don't know you are yet. |
| 08:24 | 15 | Did I say you were going to have three? |
| 08:24 | 16 | MR. CARDONA: I don't think you said anything. |
| 08:24 | 17 | THE COURT: I don't think I've said that yet. So |
| | 18 | maybe we've got three, and maybe we've got two. It depends |
| | 19 | how far we get and how disjointed. So, right now, welcome |
| | 20 | to all three counsel. Okay? And I hope I have all three of |
| | 21 | you, but we'll find out. |
| 08:25 | 22 | Okay. Let me turn to the defense for just a |
| | 23 | moment. |
| 08:25 | 24 | Mr. Keker. |
| 08:25 | 25 | MR. KEKER: Good morning, Your Honor. John Keker |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | for Standard & Poor's, McGraw-Hill.                          |
| 08:25 | 2  | THE COURT:  Nice to see you.                                 |
| 08:25 | 3  | MR. KEKER:  I'm with Jennifer Keller.                        |
| 08:25 | 4  | THE COURT:  Pleasure.                                        |
| 08:25 | 5  | MS. KELLER:  Good morning, Your Honor.                       |
| 08:25 | 6  | MR. KEKER:  Floyd Abrams and Dean Ringel.  And we            |
|       | 7  | have heard your admonishment about the number of counsel     |
|       | 8  | before.  We're too far from figuring that out.  Certainly, I |
|       | 9  | will be lead counsel at trial.  And who else we ask you to   |
|       | 10 | permit speak, we will deal with that.                        |
| 08:25 | 11 | THE COURT:  And I'm probably going to go with               |
|       | 12 | three counsel, eventually, not four or five.  But I'm not   |
|       | 13 | sure of that yet.  I may cut it down to two.  It just        |
|       | 14 | depends upon how I see this unraveling.                      |
| 08:25 | 15 | MR. KEKER:  That's a question in our minds too.             |
| 08:25 | 16 | But today, Mr. Abrams -- we hope Mr. Abrams is              |
|       | 17 | gonna make a presentation.  I'm gonna make part of the       |
|       | 18 | presentation, if that's all right with you.                  |
| 08:26 | 19 | THE COURT:  Today, as many counsel as you want to          |
|       | 20 | make the presentation because I don't want to surprise you. |
|       | 21 | Okay.  So this premotion or pretrial work is fine.          |
| 08:26 | 22 | Well, let's get started, then.                              |
| 08:26 | 23 | Counsel, would you like to start?                           |
| 08:26 | 24 | MR. CARDONA:  Your Honor, if I might, there's also         |
|       | 25 | counsel for two non-parties here on the motions to quash.   |

| | | |
|---|---|---|
| 08:26 | 1 | THE COURT:  Please. |
| 08:26 | 2 | MR. TOMPKINS:  *(Inaudible.)* |
| 08:26 | 3 | THE COURT:  We can't hear you. |
| 08:26 | 4 | MR. TOMPKINS:  Good morning, Your Honor.  Nick |
| | 5 | Tompkins of Debevoise & Plimpton, on behalf of non-party, |
| | 6 | former Treasury Secretary Tim Geithner. |
| 08:26 | 7 | THE COURT:  Pleasure.  Nice having you here. |
| 08:26 | 8 | MR. TOMPKINS:  Thank you. |
| 08:26 | 9 | THE COURT:  Did you come from Washington D.C.? |
| 08:26 | 10 | MR. TOMPKINS:  I came from New York. |
| 08:26 | 11 | THE COURT:  Okay.  Thank you. |
| 08:26 | 12 | Counsel. |
| 08:26 | 13 | MR. SEWELL:  David Sewell on behalf of non-parties |
| | 14 | Federal Reserve Bank of New York and Terrence Checki. |
| 08:26 | 15 | Your Honor, I might point out, my *pro hac* has been |
| | 16 | filed, but you have not granted it yet. |
| 08:26 | 17 | THE COURT:  *(To the clerk:)* Julie, find it for me. |
| 08:27 | 18 | *(To Counsel:)* And consider it granted. |
| 08:27 | 19 | MR. BLUME:  Thank you, sir. |
| 08:27 | 20 | THE COURT:  And thank you for your courtesy. |
| 08:27 | 21 | What would you like to start with?  In other |
| | 22 | words, you have three primary areas before the Court.  I |
| | 23 | don't care which motion you start with. |
| 08:27 | 24 | MR. ABRAMS:  Should I? |
| 08:27 | 25 | **DEFENSE ARGUMENT BY MR. ABRAMS** |

08:27    1           MR. ABRAMS:  Good morning, Your Honor.  I'm Floyd

         2    Abrams.  I'm from the New York firm Cahill Gordon and

         3    Reindel.  And I'm going to address the -- all matters

         4    relating to the 11th affirmative defense, which is the First

         5    Amendment retaliation defense.

08:27    6           It comes up, as Your Honor will have seen with the

         7    papers filed before you, in a few different contexts.  We've

         8    made a motion to compel with respect to documents that the

         9    government has refused to turn over.  There are certain

        10    motions which these third party entities have made with

        11    respect to similar requests.  But I'll speak at this time,

        12    Your Honor, with respect to the motion to compel on the

        13    First Amendment retaliation affirmative defense.

08:28   14           As regards to that, I would simply start by saying

        15    that the notion that the government may not punish a person

        16    or an entity for voicing its views on government policy is

        17    so well-established that many, many cases have been brought.

        18    We cite a bunch of them at pages 22 and 23 of our initial

        19    brief, but many cases have been brought as direct actions

        20    against the government.

08:28   21           And there are, as well, First Amendment defenses

        22    which have been asserted.  One of the ones in this Court

        23    that we've cited is the *NBC* case from the 1970's.  That

        24    affirmative defense was asserted by us.  There was no motion

        25    to strike by the government.  We served discovery requests

Case 2:13-cv-00779-DOC-JCG  Document 148  Filed 03/18/14  Page 11 of 102  Page ID #:3718
LACV 13-0779 DOC 3/11/2014 – Volume I

11

                1    and we have received nothing.  The government has been

                2    unwilling to turn over a single document responsive to the

                3    First Amendment affirmative defense.

08:29           4           As the briefing went on and as time passed and we

                5    served former Treasury Secretary Geithner and Mr. Checki --

                6    who has played a role that I'll describe here -- other

                7    motions have been made, including a motion by the government

                8    to strike the 11th affirmative defense in its entirety.  So

                9    I'm gonna address the validity of that defense and the

               10    essentiality of allowing us to obtain discovery in order to

               11    prove, if we can, that this action was brought in

               12    retaliation for Standard & Poor's downgrading the credit

               13    rating of the United States.

08:30          14           In that respect I have brought two enormous visual

               15    aids -- which I have decided to abandon, as I look at you.

08:30          16                (Laughter in the courtroom.)

08:30          17           THE COURT:  No, no, Counsel.  I have x-ray vision.

               18    Since you brought those two displays, why don't you use

               19    them.  You'll feel better about your presentation.

08:30          20           MR. ABRAMS:  All right.

08:30          21           THE COURT:  You can have Ms. Keller or Mr. Keker

               22    walk around like "Eat at Joe's Restaurant" or whatever, and

               23    flash them.  I'm just kidding you.  But, if you want to show

               24    them, you prepared 'em, you're more than welcome to.

08:31          25           If fact, if you want to, you can put them right up

LACV 13-0779 DOC - 3/11/2014 – Volume I

12

| | |
|---|---|
| | 1 over here on these two seats. |
| 08:31 | 2 Ms. Keller, if you would be helpful, put 'em over |
| | 3 here on these seats.  That way everybody can see them.  The |
| | 4 government can see them at the same time.  And thank you for |
| | 5 your help. |
| 08:31 | 6 And why don't you put the first one up.  We'll get |
| | 7 a -- thank you very much.  To the rescue, we have -- we can |
| | 8 use this right here. |
| 08:31 | 9 MR. CARDONA:  Your Honor, they handed me a copy. |
| | 10 I can give it to you. |
| 08:31 | 11 THE COURT:  I don't know why we can't put them up |
| | 12 on the ELMO also.  We can use the screens. |
| 08:31 | 13 MS. KELLER:  We have an easel. |
| 08:32 | 14 THE COURT:  Use the easel and put it there. |
| 08:32 | 15 Number two, turn on the ELMO screens. |
| 08:32 | 16 MR. ABRAMS:  I should say, I know it's diverting |
| | 17 to have them -- all right.  I'll wait. |
| 08:33 | 18 THE COURT:  Thank you.  We'll use all this |
| | 19 wonderful technology. |
| 08:33 | 20 Okay. |
| 08:33 | 21 MR. ABRAMS:  Thank you. |
| 08:34 | 22 What I said was accurate, that they haven't |
| | 23 produced anything.  I should say that their position |
| | 24 initially was we were obliged to make a sort of threshold |
| | 25 showing before they would produce anything and they have |

08:34

08:34

08:35

1  persisted in the position that whatever we said did not

2  constitute such a threshold showing.

3          Our view, as a legal matter, is we don't have to.

4  That is to say, we have asserted the affirmative defense, we

5  are entitled to proceed with discovery on the affirmative

6  defense, and there is no authority that we're aware of with

7  respect to a First Amendment retaliation claim which

8  requires a showing.  But a showing we have made, and I'd

9  like to start with that at this time.

10         Basically, we start with the proposition that

11  there are three major rating agencies in the United States,

12  and that all the ratings that have been put at issue by the

13  government in this case -- they have identified 159 ratings

14  of CDO and RMBS -- that all of those ratings were all but

15  totally identical to either those of Moody's and Fitch, or

16  Moody's, or Fitch.  All of them had at least two ratings.

17  And we have asserted from the start and it has not been

18  denied by the government that the ratings were essentially

19  the same.

20         Second, the statements which have been put in

21  issue in this case by Standard & Poor's as to its

22  independence and objectivity are similar in nature to

23  statements that have been made by the other two large rating

24  agencies.  There's one big difference.  Only one rating

25  agency, my client, downgraded the debt of the United States,

Case 2:13-cv-00779-DOC-JCG   Document 148   Filed 03/18/14   Page 14 of 102   Page ID #:3721
LACV 13-0779 DOC   3/11/2014 – Volume I

14

|       |    |                                                               |
|-------|----|---------------------------------------------------------------|
|       | 1  | and that was done in August of 2011.  That was announced on   |
|       | 2  | August 5th, a Friday.                                          |
| 08:36 | 3  | THE COURT:  Tipple A to AA–Plus?                               |
| 08:36 | 4  | MR. ABRAMS:  Yes, Your Honor.  AA–Plus is still a              |
|       | 5  | very high rating, but it is not Triple A.                      |
| 08:36 | 6  | And to continue:  Of the three, only one, our                 |
|       | 7  | client, was sued by the United States.                        |
| 08:36 | 8  | We follow that up by talking about events that we             |
|       | 9  | have learned about in a variety of ways, but most of all      |
|       | 10 | from the fact that the Secretary Geithner's calendar is a     |
|       | 11 | public document.  He and other Secretaries of Treasury after  |
|       | 12 | him are obliged by Treasury Department regulations or         |
|       | 13 | practices to put down who they see, when they see them, and   |
|       | 14 | the like, subject to only not doing it for confidential or    |
|       | 15 | personal matters.                                             |
| 08:37 | 16 | And on the right, the calendar of                             |
|       | 17 | Secretary Geithner is set forth there, starting with the end  |
|       | 18 | of the day on the 5th.                                        |
| 08:37 | 19 | THE COURT:  Could you move the document on the                |
|       | 20 | ELMO so I could see that?  And then could you blow that up?   |
| 08:37 | 21 | Okay.  Please continue.                                        |
| 08:37 | 22 | MR. ABRAMS:  I should have said, Your Honor,                   |
|       | 23 | before you turn to the calendar –– which we came upon in the  |
|       | 24 | process of preparing for this showing, as it were –– that in  |
|       | 25 | our initial papers, we did submit an affidavit by Harold      |

Case 2:13-cv-00779-DOC-JCG   Document 148   Filed 03/18/14   Page 15 of 102   Page ID #:3722
LACV 13-0779 DOC 3/11/2014 - Volume I

15

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | McGraw III, then the President/CEO of McGraw-Hill, in which   |
|       | 2  | he said basically that he received a phone call on Sunday at  |
|       | 3  | his office from a Mr. Checki -- Sunday being August 7th.      |
| 08:38 | 4  | THE COURT:  There's a call to Terri Checki,                  |
|       | 5  | Sunday, 7:10 p.m.; is that correct?                           |
| 08:38 | 6  | MR. ABRAMS:  Yeah.  That's not -- the call that             |
|       | 7  | I'm talking about was a call that Mr. Checki made on Sunday   |
|       | 8  | which would not be reflected here because this is             |
|       | 9  | Mr. Geithner's calendar.                                      |
| 08:39 | 10 | What I'm saying is that the affidavit of the head         |
|       | 11 | of McGraw-Hill basically said, "I received -- I got to my     |
|       | 12 | office on Monday the 8th" -- the downgrade was the 5th --     |
|       | 13 | "and I learned that the day before, Sunday, Mr. Checki, a     |
|       | 14 | very high-ranking official in the Federal Reserve Bank had    |
|       | 15 | called me" -- the New York Fed, that is -- "had called me    |
|       | 16 | and asked me to call him back."                               |
| 08:39 | 17 | The affidavit says, "I called him back on Monday         |
|       | 18 | and Mr. Checki basically said that the Secretary of           |
|       | 19 | Treasury, Mr. Geithner, was very angry at the downgrade,      |
|       | 20 | angry at Mr. McGraw; that Mr. McGraw should have told him in  |
|       | 21 | advance about the downgrade; and that Mr. Geithner -- that    |
|       | 22 | Mr. Checki also said that, uh -- expect that the Secretary    |
|       | 23 | of Treasury himself would want to speak to Mr. McGraw."       |
| 08:40 | 24 | The Secretary of Treasury called, and that is            |
|       | 25 | reflected here, on Monday.  And what is reflected in the      |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | calendar here is two things:                                 |
| 08:40 | 2  | One -- it's the first yellowed material -- is that           |
|       | 3  | on 7:10 p.m., a Friday evening, there was a call made to      |
|       | 4  | Mr. Checki from the secretary.                                |
| 08:40 | 5  | The second thing that is reflected --                        |
| 08:40 | 6  | THE COURT:  Let me go back to the top of that                |
|       | 7  | document for just a moment.                                   |
| 08:41 | 8  | MR. ABRAMS:  Yes.                                             |
| 08:41 | 9  | THE COURT:  Jay Carney, I'm assuming, is the White           |
|       | 10 | House Press Secretary.                                        |
| 08:41 | 11 | MR. ABRAMS:  Yes, Your Honor.                                 |
| 08:41 | 12 | THE COURT:  Who's Gene Sperling?                             |
| 08:41 | 13 | MR. ABRAMS:  Chief Economic Adviser to the                   |
|       | 14 | President.                                                    |
| 08:41 | 15 | THE COURT:  Bill Daley.                                       |
| 08:41 | 16 | MR. ABRAMS:  The Chief of Staff at that time of              |
|       | 17 | the President.                                                |
| 08:41 | 18 | THE COURT:  Okay.  So there are calls then taking            |
|       | 19 | place, from your position, into the White House on a Sunday,  |
|       | 20 | during the evening hours; and then this subsequent call to   |
|       | 21 | Mr. Checki, who later relates the -- okay.  Thank you.        |
| 08:41 | 22 | MR. ABRAMS:  The 5th is Friday.  So the call to              |
|       | 23 | Mr. Checki from Secretary Geithner was on Friday evening at   |
|       | 24 | 7:10 p.m.                                                     |
| 08:42 | 25 | We have filed with the Court the totality of these           |

days:  The 5th, 6th, 7th, 8th.  But I simply am pointing out
to the Court that on the 5th, in the evening at 7:10, right
around the time of the downgrade being announced, there was
the call made to Mr. Checki.

08:42　　　On Monday, the first working day after the
downgrade, Secretary Geithner, as one would expect, was
extremely busy, had many calls, many meetings.  The relevant
one here, I think, is that, at 9:30 a.m., Secretary Geithner
met with the President in his office, was there from 9:30
until 10:10; that he returned to his office, and that the
very first thing he did on his return was to make the call
to Terri McGraw.

08:43　　　Now, that call to Mr. McGraw is set forth in
Mr. McGraw's affidavit.  There is nothing contrary in the
record before you.  Mr. Geithner appears here through
counsel; he did not submit an affidavit.  Mr. Checki appears
here through counsel; he did not submit an affidavit.  And
essentially what the affidavit does say, of Mr. McGraw, is
that in the call -- and it's described in just a paragraph
or two in the letter -- in the affidavit -- but that, in the
call what was said, basically, was -- this is my language
now -- a threatening language; and, back to Mr. McGraw's
language, was that the downgrade was a disservice to the
country and its people, and that the government could not
simply let that stand, and that S&P would be looked at,

1    quote, "very carefully," unquote.

08:44    2         So that is the record so far about the exchanges.

08:44    3         Now, in the affidavit of Mr. McGraw, there's a

4    description of Secretary Geithner being very angry at what

5    he characterized as a $2 trillion error in the computations

6    of S&P.  Mr. McGraw said, "I responded to him.  I told him

7    there was no error."

08:45    8         From our perspective, regardless of what Mr.-- of

9    what Secretary Geithner was angry at, whatever the cause in

10   his mind was, it's that, on this record, he was not only

11   angry but threatening, and that language of being "looked at

12   very carefully" and that the behavior could not occur

13   without a response from the government is very serious,

14   indeed.

08:45   15         And so, if we were obliged to make a threshold

16   showing to proceed -- and that, of course, is all we're

17   talking about here today, is whether we may proceed with

18   this affirmative defense and take discovery in support of

19   the affirmative defense, that we not only have what I

20   suppose the government will claim is the -- coincidence or

21   the randomness perhaps of S&P having been chosen to be the

22   party, the entity that was sued, but -- but being sued after

23   it did something that was deeply offensive to the highest

24   ranking officials of the United States, resulting in -- and

25   directly and contemporaneously resulting in a significant

08:47

 1    threat of a response from the government.  And that call, as

 2    I said, was made immediately after a meeting between the

 3    Secretary and the President.

 4            And so we've been seeking to probe the

 5    government's files.  We've been trying to find out if the

 6    Department of Justice received any information about the

 7    downgrade 'cause they shouldn't.  Downgrade shouldn't be

 8    their business at all.  We were trying to find out just what

 9    was said between Mr. Checki and Secretary Geithner.  We were

10    trying to find out what was said between Secretary Geithner

11    and the President, but relating only and narrowly -- and we

12    have tried very hard to be very narrow in these requests --

13    only and narrowly to the specific issue of the downgrade and

14    Standard & Poor's.

08:47

15            We're not asking for anything about policy

16    decisions and the like, world reaction, what was the

17    administration doing, response -- except as regards Standard

18    & Poor's.  And all the discovery that we have been seeking

19    has been focused on that sort of issue.  And so we have

20    filed a Rule 45 subpoena on now former Secretary Geithner

21    asking him to produce, if he has it, information focused --

22    and I think very narrowly focused -- on payback/retaliation

23    against Standard & Poor's.

08:48

24            We have asked Mr. Checki to turn over, if he's got

25    documents relating to his conversations of the 7:10 p.m.

Case 2:13-cv-00779-DOC-JCG  Document 148  Filed 03/18/14  Page 20 of 102  Page ID #:3727
LACV 13-0779 DOC 3/11/2014 – Volume I

20

08:49

         1   conversation on the 5th, and the conversation with

         2   Mr. McGraw.  And we have received nothing.

         3         As the chart on the left says, neither the

         4   government nor Secretary Geithner nor Mr. Checki will

         5   explain or reveal whether there was any discussion involving

         6   Secretary Geithner with respect to potential retaliation in

         7   the White House or out of the White House.  They won't

         8   answer questions about why Secretary Geithner asked

         9   Mr. Checki, who doesn't work for him -- Mr. Checki is a

        10   high-ranking official at the New York Fed.  Why did he call

        11   him, asked him to call Mr. McGraw to tell him how angry

        12   Secretary Geithner was? -- what sort of careful look, if

        13   any, the government took after the downgrade; what response

        14   from the government followed the downgrade.  They haven't

        15   told us if -- because they won't tell us anything -- if

        16   there was any investigation about the supposed $2 trillion

        17   error.

08:50   18         What we have here, then, is a pleading which is a

        19   well-recognized violation of Constitutional rights.  And if

        20   we need it -- and we maintain that we don't -- significant

        21   support for at least our ability to go forward and to get a

        22   level of transparency from the government about these issues

        23   relating -- and specifically relating to the behavior by the

        24   government, the conversations within the government and the

        25   like, with respect to retaliation.

Case 2:13-cv-00779-DOC-JCG  Document 148  Filed 03/18/14  Page 21 of 102  Page ID #:3728
LACV 13-0779 DOC 3/11/2014 - Volume I

21

08:51    1          And so, we have in our first series of requests,

2    at numbers 33 and 34 -- we've asked for documents relating

3    to both the FIRREA case and the downgrade.  Not separate.

4    Both of them together.  And we've asked for documents

5    relating to the downgrade or any other rating action of S&P

6    and the investigation of S&P.

08:51    7          In our Requests 51 and 52, which are at issue

8    here, we asked for statements of Mr. Sperling, who was then

9    the Director of National Economic Council and the Assistant

10   to the President for national Economic Policy, and

11   Secretary Geithner.  And we limited that.  We wanted

12   documents concerning civil or criminal actions or sanctions

13   against S&P.

08:52   14          Paragraph 53 is "Communications sent or received

15   by the Department of Justice with respect to the downgrade."

08:52   16          And then, as I said, there was a second wave of

17   requests which asked about the telephone calls, the

18   exchanges, what people said to each other about the

19   downgrade and S&P, in one way or another.

08:53   20          That's what we're asking for at this time.  It

21   should be no secret that, depending on what we get, we may

22   then proceed to seek former Secretary Geithner's deposition

23   and the deposition of others.  Right now, all we're asking

24   for are documents:  Documents that they have personally,

25   documents that the government has.

Case 2:13-cv-00779-DOC-JCG   Document 148   Filed 03/18/14   Page 22 of 102   Page ID #:3729
LACV 13-0779 DOC   3/11/2014 – Volume I

22



08:53   1          And the "government," as Your Honor will recall,

2    was defined -- the government, represented by the gentlemen

3    on my right here, included the Treasury Department.  That's

4    what they said.  And that is true; they do represent them.

08:53   5          I should advise the Court as well that we have

6    received a letter, which has been attached to one of the

7    submissions of Mr. Cardona -- a letter from the Treasury

8    Department saying that they don't permit Secretary Geithner

9    to reveal any information until we have complied with a

10   so-called Touhy rules, which essentially leave it not to

11   you, but, of all people, to the General Counsel of the

12   Defense Department, to make a decision as to whether we can

13   proceed to obtain these documents.

08:54   14         The Ninth Circuit has held, in the *Exxon Shipping*

15   case, that the Touhy rules do not govern in a situation in

16   which a Rule 45 subpoena has been served.  And it is a

17   Rule 45 subpoena that we have served on Secretary Geithner

18   and on Mr. Checki.

08:55   19         The only responses we have had from the government

20   on any of this, apart from our supposed failure to make some

21   sort of threshold showing -- which we certainly believe

22   we've made -- is of two sorts:

08:55   23         One, they have sort of mischaracterized what our

24   claim is, as being one of selective prosecution.  There is a

25   case, the *Armstrong* case, which, in a selective prosecution

08:55

08:56

08:56

08:57

```
 1   case, requires a showing.  Again, we don't think that
 2   applies to our situation.  A First Amendment retaliation
 3   claim is one we would have made if there were no Moody's and
 4   were no Fitch.  We're in better shape on that because of the
 5   differences and similarities that arise from their presence,
 6   and the like.
 7           But retaliation claim is precisely what was made
 8   in that NBC case.  All three networks there were being sued
 9   under the antitrust law, and all three had an affirmative
10   defense saying, in that case, President Nixon was doing this
11   as payback, et cetera.  And they were allowed discovery.
12           That's as far as we're going today, is just to say
13   that we should be allowed discovery to find out more about
14   what was being said, who was talking to whom, and the like.
15           The failure of the government to respond in these
16   areas is illustrated by their response to one of our
17   efforts.  Our 35th request on our second demand, we said,
18   "Please give us Attorney General Holder's public calendar."
19           The Department of Justice, as well as Treasury,
20   has internal rules and policies requiring the disclosure of
21   this sort of information.  Attorney General Holder has
22   released them with respect to January through July of 2011,
23   but not August of 2011.  We asked for that.  And we got an
24   objection in response to the release of the very documents
25   that he has previously, and is supposed to, release.  If
```

Case 2:13-cv-00779-DOC-JCG   Document 148   Filed 03/18/14   Page 24 of 102   Page ID #:3731
LACV 13-0779 DOC   3/11/2014 – Volume I

24

08:57

08:58

08:58

08:59

1    they don't have it, that's one thing.  But that's not what

2    they're saying.

3             They're saying they won't give it to us.

4    Notwithstanding that, in the papers, I think, of Mr. Checki

5    and of Secretary Geithner, they both say, "Why don't you

6    talk to other people first."

7             Well, we are seeking, as best we can, to gather

8    all the information that we can on this.  We have served --

9    that's just one example, is that we're not limiting

10   ourselves to these individuals.  We simply think that we

11   ought to have a chance to gather the information to prove

12   our case.

13            So I would wind up this initial presentation to

14   Your Honor by simply emphasizing that there is nothing that

15   I said in terms of Mr. McGraw's representation in terms of

16   our possible interpretation of the calendar and the like,

17   which has been answered -- this is not a question of

18   competing inferences to be drawn from dueling affidavits.

19   We're the only one that has spoken, and there has been no

20   response.

21            And one reads the government papers, and they say

22   that we've made a one-sided presentation.  Well, the answer

23   to the one-sided presentation is let's hear the other side.

24   And the way we get to hear the other side is by allowing us

25   discovery.

08:59    1              That's all I have at this time, Your Honor.

08:59    2              If you have any questions, I'd be glad to respond.

         3    Otherwise, I'll pass the ball to Mr. Keker.

08:59    4              THE COURT:  Thank you.

08:59    5              Mr. Keker.

08:59    6              MR. KEKER:  Well, Your Honor, the motion had three

         7    parts.  And we certainly don't want to waive the other two,

         8    but I thought maybe it would be more useful --

08:59    9              THE COURT:  Well, I leave that to you.

08:59   10              MR. KEKER:  Our suggestion --

08:59   11              THE COURT:  I leave that to each of you.

08:59   12              MR. KEKER:  Our suggestion would be deal with

        13    this --

08:59   14              THE COURT:  Just a moment.

08:59   15              As you two approach each other quietly and discuss

        16    this -- as you move towards each other, as you have a

        17    private conversation, and you decide how you would like it

        18    to be conducted.  So what's fair to both of you in terms of

        19    your presentation.

09:00   20          (Government and defense Counsel confer.)

09:00   21              THE COURT:  How would you like to proceed?

09:00   22              MR. CARDONA:  If we can have one second.

09:00   23              THE COURT:  Certainly.  Take your time with it.

        24    In other words, I'm trying to give you that power, if you

        25    will, to make your presentation by agreement.

09:00   1          MR. CARDONA:  Your Honor, I've spoken with

2     Mr. Keker.  I think it would make sense for me to address

3     the First Amendment argument now, while it's all fresh.

09:00   4          But, if I could, I've talked to them as to whether

5     they want to cross our declarants, Mr. Walsh and Mr. Blume.

6     They've indicated they don't.  So, if the Court doesn't have

7     any questions -- both Mr. Walsh and Mr. Blume have also

8     submitted *in camera* declarations.  I'm assuming the Court

9     doesn't have any questions for them *in camera*, I could let

10    them go.  Then I would be happy to move on to the First

11    Amendment.

09:00   12         THE COURT:  Just a moment.

09:00   13         Mr. Keker?

09:00   14         MR. KEKER:  I spoke too soon because I'd forgotten

15    about that.

09:00   16         We object to Mr. Walsh's -- we object to the

17    *in camera* exhibits.  And we were going to ask you -- we'd

18    like to see them, if you think that they matter to anybody.

19    And we'd like to see them, in any event, because there's no

20    reason this should be done *ex parte* with the Court.

09:01   21         So, depending on what's in them, if we could see

22    them, we -- I don't know what we'd want to do with

23    Mr. Walsh.  But our position with both those declarations is

24    that they are just high-level fluff that anybody could say

25    about anything and, therefore, there's nothing to

|        |    |                                                           |
|--------|----|-----------------------------------------------------------|
|        | 1  | cross-examine.  They just say government's important and law |
|        | 2  | enforcement is important.  And that's not, to us, too      |
|        | 3  | important.                                                 |
| 09:01  | 4  | THE COURT:  How would you two like the                    |
|        | 5  | presentation to go?  Would you like to respond now to the |
|        | 6  | First Amendment argument?                                  |
| 09:01  | 7  | Or would you like the defendants to continue on           |
|        | 8  | with the second and third parts?                          |
| 09:01  | 9  | MR. CARDONA:  I am happy to respond on the First          |
|        | 10 | Amendment part --                                         |
| 09:01  | 11 | THE COURT:  Your response.                                |
| 09:01  | 12 | MR. CARDONA:  -- which I think makes sense,               |
|        | 13 | Your Honor.                                               |
| 09:01  | 14 | **GOVERNMENT'S RESPONSE BY MR. CARDONA**                   |
| 09:01  | 15 | MR. CARDONA:  First, the law in the Ninth Circuit         |
|        | 16 | does require that there be a preliminary showing by the   |
|        | 17 | defense before they can be entitled to discovery of any sort |
|        | 18 | on a defense such as this, a selective or a retaliatory or a |
|        | 19 | vindictive prosecution claim against the government.       |
| 09:02  | 20 | And the Ninth Circuit's cases, which we've                |
|        | 21 | provided the Court, make clear that that standard applies |
|        | 22 | not only in criminal cases but also in civil enforcement  |
|        | 23 | cases, of which this is one.  So the law, I think, is clear |
|        | 24 | that there has to be that showing.                        |
| 09:02  | 25 | THE COURT:  Under *Armstrong*?                            |

09:02   1          MR. CARDONA:  Under *Armstrong* and the Ninth

2   Circuit's cases that have addressed *Armstrong* in the civil

3   context, going forward.

09:02   4          And that, of course, is the position we have taken

5   consistently and the reason why we have not provided the

6   explanations that Mr. Abrams has said they are seeking,

7   which are, in fact, part of the discovery they are seeking.

09:02   8          And our position is that, even assuming, for the

9   sake of argument, the accuracy of the facts they have

10   presented -- that is, even assuming the accuracy of

11   Mr. McGraw's affidavit and the calendar entries that they've

12   presented and the other things on which they rely -- which I

13   will turn to in a moment -- they have not made the required

14   preliminary showing.  And that preliminary showing, if it

15   were a selective prosecution claim -- which, in part, it is,

16   since they are claiming they were singled out from Moody's,

17   improperly -- would be to show that there was a similarly

18   situated individual or entity that had not been the subject

19   of action and that that selection was the result of a

20   retaliatory motive.

09:03   21          Two prongs.  If it's characterized as just a

22   retaliatory claim, without the selection part, then

23   obviously, it's just a colorable showing, a preliminary

24   threshold showing on the retaliation part.  However you

25   characterize it, our position is that they have not made

|       |    |                                                                       |
|-------|----|-----------------------------------------------------------------------|
|       | 1  | that showing.  And if I could, I'd like to explain that               |
|       | 2  | briefly by looking at some additional timeline entries that           |
|       | 3  | are not on Mr. Abrams' timeline.                                       |
| 09:03 | 4  | THE COURT:  So, for that proposition, it appears                      |
|       | 5  | to me that you're arguing the Ninth Circuit case of                   |

*United States/One 1985 Mercedes.*  And, basically, the
proposition is that there's broad discretion accorded to
prosecutors in deciding whom to prosecute.  It's not
unfettered.  The decision to prosecute may not be
deliberately based upon the exercise of protected statutory
rights.  And, in order to defeat this presumption, the
selected prosecution claimant must demonstrate,
quote/unquote, that "federal prosecutorial policy had a
discriminatory effect and was motivated by the
discriminatory purpose."

09:04    Now, that goes back to *Armstrong*.  But *Armstrong*
is somewhat -- well, doesn't answer a lot of questions,
unfortunately.

09:04    MR. CARDONA:  Well, it's not just that -- that
case.  It's not just *One Mercedes.*  It's also the Ninth
Circuit's decision in the Church of Scientology case and the
*Karma (phonetic)* case, both of which involved retaliation
claims made in defense of IRS enforcement actions.

09:04    THE COURT:  So *Attorney General of the U.S. Irish
Public* --

09:05    1              MR. CARDONA:  Yes.

09:05    2              THE COURT:  -- or *Irish People* -- you're

         3    referring --

09:05    4              MR. CARDONA:  Yes.

09:05    5              THE COURT:  But that is a DC Circuit case.

09:05    6              MR. CARDONA:  That is a DC Circuit case.

09:05    7              THE COURT:  And the Ninth Circuit case is *Church*

         8    *of Scientology.*

09:05    9              MR. CARDONA:  Ninth Circuit case is *Church of*

        10    *Scientology* and *Karma.*  And all of those cases take the same

        11    approach.  They basically say, even in civil enforcement

        12    actions, *Armstrong* controls because, when the government is

        13    exercising its discretion to elect to bring a civil

        14    enforcement action, the government is essentially exercising

        15    the same type of prosecutorial discretion that it exercises

        16    in criminal cases, in which *Armstrong* makes clear that

        17    there's this preliminary requirement.  And so those cases

        18    have clearly required that.

09:05   19              So then the question becomes, has S&P made the

        20    necessary preliminary showing.  In other words, is there a

        21    sufficient basis for the Court to infer that there is a

        22    preliminary threshold showing that this is the result of

        23    retaliation.

09:05   24              With respect to that, there are a few things that

        25    aren't up here.  Importantly, one, our investigation began

|       | 1  | almost two years before this, in November of 2009, when the |
|       | 2  | downgrade had not yet even been contemplated.  It continued |
|       | 3  | throughout that time period.  And two, the filing of our |
|       | 4  | case did not occur in any proximity to the events here.  The |
|       | 5  | filing of our case did not occur until February of 2013, |
|       | 6  | more than roughly 20 months or so after the events here. |
| 09:06 | 7  | The second thing I would note, Your Honor, is |
|       | 8  | that, if we go through this timeline, there's a couple of |
|       | 9  | other things that aren't on here.  If you -- |
| 09:06 | 10 | THE COURT:  Please put that exhibit back up -- |
|       | 11 | Mr. Geithner's page -- please. |
| 09:06 | 12 | MR. CARDONA:  Sure. |
| 09:06 | 13 | *(Exhibit redisplayed.)* |
| 09:06 | 14 | MR. CARDONA:  That's the one I'd like to -- |
| 09:06 | 15 | THE COURT:  Move it over, Counsel, to the other |
|       | 16 | direction.  Thank you.  Now, would you move it down. |
| 09:06 | 17 | MR. CARDONA:  Sure.  This way? |
| 09:06 | 18 | THE COURT:  Yes.  Thank you very much. |
| 09:06 | 19 | Okay.  Please continue. |
| 09:07 | 20 | MR. CARDONA:  So, if Your Honor will remember, the |
|       | 21 | 5th is a Friday.  The 5th is a Friday when S&P announces |
|       | 22 | their downgrade.  As we have noted in our papers -- in our |
|       | 23 | papers, on the 6th, August 6th, the Treasury publicly |
|       | 24 | commented on the downgrade.  So on the 6th there is a public |
|       | 25 | comment by the Treasury on the downgrade and it's potential |

Case 2:13-cv-00779-DOC-JCG   Document 148   Filed 03/18/14   Page 32 of 102   Page ID #:3739
LACV 13-0779 DOC 3/11/2014 – Volume I

32

1  effects, commenting on Treasury's view that S&P has made a

2  $2 trillion error in calculating.

09:07  3        On the 7th, according to Mr. McGraw's declaration,

4  he receives a call from Mr. Checki, who is employed at the

5  Federal Reserve Bank of New York, where Mr. Geithner had

6  previously worked before he became the Treasury Secretary,

7  to set up, in essence, the call that Mr. Geithner then makes

8  on the 8th.

09:08  9        On the 8th, we have Mr. McGraw's affidavit

10  describing the call.  Again, for our purposes here, we are

11  assuming that is accurate.  But there are certain things I'd

12  like to point out there.  One, it is clear that that

13  conversation, even according to Mr. McGraw, focuses on the

14  $2 trillion error that the Treasury has identified, that

15  they've already publicly commented on.

09:08  16       I would ask Your Honor to look at the language of

17  that declaration.  There is no reference to the Department

18  of Justice.  There is no reference to the pending

19  investigation of S&P, which has already been pending for

20  almost two years, since November of 2009.  And there is

21  reference only in Mr. McGraw's declaration to a response.

09:08  22       Significantly, later on the 8th, after this call,

23  according to Mr. Abrams' timeline -- on August 8th, in the

24  afternoon -- in other words, after Mr. Geithner's call with

25  Mr. McGraw -- later that day, the President gives an address

1  regarding the downgrade.  And to quote from Mr. Abrams'

2  timeline, quote, "President Odama (sic) gives address

3  regarding the downgrade, criticizing S&P's announcement,"

4  and stating, quote, "No matter what some agency may say,

5  we've always been and always will be a AAA, Triple A,

6  country," closed quote.

09:09  7      Exhibits P27 and P28 to Mr. Abrams' declaration

8  indicate that that occurred that afternoon after the call in

9  which Mr. Geithner had referred to Mr. -- uh, Mr. Geithner

10  had, according to Mr. McGraw, said something about a

11  response.

09:09  12      Now, then, if you look at Mr. Geithner's

13  calendars, again, nothing to indicate any communication with

14  DOJ.  And is there a filing next month?  Next year?  There's

15  no action by the Department.  There's no filing by the

16  Department until February of 2013.

09:10  17      Now, during that time period, the investigation

18  continued.  And, as Mr. Abrams and the other attorneys at

19  Cahill are well aware, during that time period, afterwards,

20  there were additional subpoenas served.  There were

21  subpoenas served on third parties to gather additional

22  information.  There were interviews, both sworn and unsworn,

23  of various S&P employees -- in other words, the evidence

24  gathering approach that one would expect if the Department

25  was looking at the facts to try and make a determination as

DEBBIE GALE, U.S. COURT REPORTER

Case 2:13-cv-00779-DOC-JCG  Document 148  Filed 03/18/14  Page 34 of 102  Page ID
#:3741
LACV 13-0779 DOC  3/11/2014 – Volume I

34

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
|       | 1  | to whether the facts supported a filing.  And the filing |
|       | 2  | then occurred almost two years later, approximately 20   |
|       | 3  | months later, in February of 2013.  Nothing in this timeline |
|       | 4  | about that time period or anything relating to that.     |
| 09:11 | 5  | So our point is that there is simply nothing to          |
|       | 6  | tie this or to suggest in any way that, in some way, in  |
|       | 7  | August of 2011, Mr. Geithner was somehow conveying a veiled |
|       | 8  | threat that the Department, almost 20 months later, after it |
|       | 9  | engaged in extensive additional investigation to determine |
|       | 10 | whether charges were appropriate, would file that.  I don't |
|       | 11 | think there's any support for drawing that inference.    |
| 09:11 | 12 | So let's go to the second part of their showing.         |
| 09:11 | 13 | The second part of their showing -- or their             |
|       | 14 | purported showing -- focuses on Moody's.  And their point -- |
|       | 15 | they point out, up there, you know, the ratings that Moody's |
|       | 16 | gave were the same.  There were similar statements of     |
|       | 17 | independence and objectivity; but, of the three, Fitch,  |
|       | 18 | Moody's and S&P, the three primary ones, only S&P downgraded |
|       | 19 | the debt and only S&P has been sued.                     |
| 09:12 | 20 | Those facts are not untrue, but they don't support       |
|       | 21 | the inference for various reasons.  And, in particular, I |
|       | 22 | would point the Court to what we have provided you in some |
|       | 23 | of the underseal -- and particularly the underseal       |
|       | 24 | declaration of Mr. Blume -- that discusses various credit |
|       | 25 | rating agencies and various actions that have and haven't |

09:12
 1  been taken against them.

 2          And I would point the Court to a footnote in our

 3  reply that is under seal that talks about the various

 4  actions that have and haven't been taken with respect to

 5  various credit agencies.

09:12
 6          When you look at those in total -- and I can't

 7  discuss them in detail in open court; it's under seal -- but

 8  when you look at those actions, in total, I would submit

 9  they simply don't support the inference that they're trying

10  to have you draw, which is that S&P has been singled out for

11  action, as opposed to either Moody's or the other credit

12  agencies based on the downgrade.

09:13
13          To the contrary, I would submit, the actions that

14  have been taken or not taken with respect to various credit

15  agencies, together with the timeline, simply supports the

16  inference that what the Department was doing is what it's

17  supposed to do, which is conducting investigations, looking

18  at the facts that have been gathered, and making a

19  determination as to whether those facts support pursuing a

20  claim.

09:13
21          In that connection, I would also note, Your Honor,

22  as the Court found in denying the motion to dismiss, the

23  allegations we have laid out in our complaint clearly are

24  sufficient, relate to specific e-mails and communications

25  within S&P that provide us with a basis for proceeding on

Case 2:13-cv-00779-DOC-JCG   Document 148   Filed 03/18/14   Page 36 of 102   Page ID #:3743
LACV 13-0779 DOC   3/11/2014 - Volume I

36

1    FIRREA allegations that require evidence of knowledge and

2    intent.

09:13    3    There is simply no showing by S&P that we are in a

4    position, based on the information we have right now, to

5    pursue similar FIRREA allegations against any of the other

6    credit rating agencies.  And hence, we are in a different

7    situation than the cases that have looked at similarly

8    situated defendants, where it was clear that the government

9    had the ability to charge the other defendants, but had not.

09:14    10    The mere fact that Moody's has issued similar

11    ratings, the mere fact that they have similar

12    representations, does not support the conclusion that we

13    have the information that would be needed to allege that,

14    for example, Moody's had knowingly and intentionally made

15    false ratings.

09:14    16    As Your Honor can see from the Complaint, to

17    develop that case against S&P relied on a huge volume of

18    documents that had been gathered in the course of that

19    investigation.  *(Verbatim.)*  So to suggest that this alone

20    is sufficient to draw the inference that the Court would

21    have to draw to find that they have made that colorable

22    showing, I would submit there's no basis for that.

09:15    23    So, for all those reasons, this simply doesn't

24    make the showing that's required.  And, as a result, we have

25    not answered the questions; we have not provided the

|       |    |                                                         |
|-------|----|---------------------------------------------------------|
|       | 1  | discovery.  And we don't think we're required to.       |
| 09:15 | 2  | Now, the second -- as a secondary portion -- and,       |
|       | 3  | if the Court has any questions about that, I'd be happy to |
|       | 4  | answer that -- you know, there are also issues with the |
|       | 5  | breadth of those requests and whether those requests are |
|       | 6  | appropriately directed to individuals, at least in the first |
|       | 7  | instance, who were not involved in the charging decision. |
| 09:15 | 8  | THE COURT:  I think the way we should proceed is        |
|       | 9  | what's the import of *Armstrong*.  Does a threshold showing |
|       | 10 | need to be made?  If it is made, what is that showing?  If |
|       | 11 | the Court ever took that avenue, then the breadth.      |
| 09:15 | 12 | I don't think we're too concerned about the             |
|       | 13 | breadth now --                                          |
| 09:16 | 14 | MR. CARDONA:  Okay.                                      |
| 09:16 | 15 | THE COURT:  -- until we decide the initial issue.       |
| 09:16 | 16 | MR. CARDONA:  Then I think that's the initial           |
|       | 17 | issues.  And, of course, we've provided the Court with the |
|       | 18 | cases that we think support that in our pleadings.      |
| 09:16 | 19 | THE COURT:  Okay.  Well, with your permission, let      |
|       | 20 | me ask you both a couple questions during this recess.  I |
|       | 21 | have to make a couple calls in chambers, then I'll be right |
|       | 22 | back with you, so why don't you have a seat, Counsel.   |
| 09:16 | 23 | Assume for a moment that you're correct:  That          |
|       | 24 | *Armstrong* stands for the proposition that an initial showing |
|       | 25 | should be made.  And assume for a moment, hypothetically, |

09:16

09:17

09:17

09:18

```
 1    that the Court discounted the argument of Counsel that an
 2    affirmative defense, in and of itself, leads to discovery.
 3          You've pointed to two salient factors that give
 4    your argument, from your perception, strength.  The first is
 5    that, "Judge, we started the investigation 17 months to 22
 6    months before the actual phone call."  And second, I'm
 7    hearing in your argument and your papers that DOJ is
 8    obviously an independent agency and that your decisions
 9    aren't tied to Geithner, the Treasury, et cetera, whatever
10    their motivations were or were not.  I understand those
11    arguments.
12          I also understand that the Courts need to be very
13    careful about any expansion into the Executive branch of
14    government, unless there's a good reason.  But I toss these
15    questions back to you for just a moment.
16          There's a difference between discovery and
17    admissible evidence.  And I think your greatest fear is that
18    the government or individuals would be embarrassed that this
19    is potentially leverage from the defense; that it ratchets
20    up the specter of the White House being involved; that
21    eventually it leads to high-ranking officials in the White
22    House.  The expansiveness of this should be of great concern
23    to you, and it's of great concern to the Court.
24          But from the defense's perspective, they seem to
25    have an argument that has specificity.  And the specificity
```

09:18

09:19

09:20

09:20

```
 1    that I'm reading in your papers is as follows:

 2         If S&P was being investigated 17 months before,

 3    what is the possible motivation of the Secretary of the

 4    Treasury to call a company other than to have a chilling

 5    effect or to encourage a re-evaluation?

 6         And from your perspective, without any finding on

 7    this Court's part, your documents state that Mr. Geithner

 8    expressed anger at S&P -- I don't find that of great

 9    consequence -- asserting that it made a $2 trillion error --

10    the President had spoken apparently about that nationally,

11    as well; I don't find that of great consequence -- but that

12    S&P had a previous history of errors and that McGraw was

13    accountable for that.

14         And then, if Mr. McGraw is accurate, quote, "that

15    the downgrade had done real damage to the economy" and that

16    S&P's conduct would be, quote, "looked at very carefully,"

17    end of quote, that last portion is the issue I want you to

18    help the Court with when you return.  And my questions are

19    this:

20         If S&P is a target, or at least is being

21    investigated, why does any official of the government,

22    whether it's Mr. Geithner or anybody else, call that person

23    other than from the defense's perspective, which may be

24    well-reasoned or not, other than to have a chilling effect

25    or threaten them?
```

Case 2:13-cv-00779-DOC-JCG Document 148 Filed 03/18/14 Page 40 of 102 Page ID #:3747
LACV 13-0779 DOC 3/11/2014 – Volume I

40

09:21  1        If you're being investigated, continue the

       2   investigation.  File the charge.  Why place a phone call?

09:21  3        My greatest concern is where that leads or takes

       4   us.  Eventually, we could wind through discovery that the

       5   defense seems entitled to, if you accept the defense's

       6   version as a possibility, and it leads nowhere.  It doesn't

       7   lead to a, quote/unquote, "affirmative defense."

09:21  8        So, from your perspective, I want you to address

       9   where this takes me, because there's some analogy to

      10   outrageous government conduct.  In the criminal sphere, if

      11   you look at the law concerning outrageous government

      12   conduct, you'll find it doesn't go very far.  I'll give you

      13   an example.

09:22 14        In the Mexican Mafia cases, in 2001 through 2003,

      15   law enforcement had entered into almost two and a half years

      16   of investigation involving the EME.  In those 84,000-some

      17   phone calls, there were numerous phone calls from the

      18   leaders of the Mexican Mafia, Chuy Martinez and others, that

      19   the green lights were going to be put on a number of people.

      20   They were going to be killed.  And law enforcement was

      21   placed in a very difficult position of either ending their

      22   investigation and therefore destroying whatever RICO

      23   possibilities they had because, as they arrested those

      24   people that they could hear might be committing murders,

      25   that investigation would have surely stopped concerning the

Case 2:13-cv-00779-DOC-JCG  Document 148  Filed 03/18/14  Page 41 of 102  Page ID
#:3748
LACV 13-0779 DOC  3/11/2014 – Volume I

41

```
        1    breadth, if you will, of the Mexican Mafia.
09:23   2            At the same time, there were so many people who
        3    were allegedly going to be murdered, that law enforcement
        4    couldn't sort out what was reality and what wasn't when
        5    taxes were being payed.
09:23   6            Now, that's a very poor analogy.  But eventually,
        7    I think the law rightfully determined that this was an act
        8    by the criminal organization itself and that the outrageous
        9    government conduct motions, although they caused great
        10   notoriety because some people were, in fact, killed during
        11   that investigation, didn't take the government into the
        12   position of outrageousness because these were the facts of a
        13   criminal organization.
09:23   14           It's a poor analogy.  But these motions have to
        15   lead somewhere.  And what I'm having a difficult time
        16   sorting out is how relevant or tangential these are
        17   eventually to the charges that you brought.
09:24   18           Without Mr. Geithner's phone call, I don't know if
        19   I would have -- and, by the way, finding no fault.  I don't
        20   know.  It's simply a threshold issue.  Is it discoverable?
        21   If so, how does that take place?  But that doesn't mean it's
        22   relevant for trial.  Those are a whole different issue.
09:24   23           The question, though, is back to the government,
        24   why isn't the defense allowed to develop that?  Why are they
        25   being cut off when a Secretary of the Treasury reaches out
```

Case 2:13-cv-00779-DOC-JCG Document 148 Filed 03/18/14 Page 42 of 102 Page ID #:3749
LACV 13-0779 DOC - 3/11/2014 – Volume I

42

1    to literally a private party?  I mean, could you imagine,

2    from their perspective, if I called you tonight, "Hi.  Um,

3    I'm the Judge.  And I don't appreciate X, Y and Z."  I mean,

4    it would have a chilling effect on you.  You're the

5    government.

09:25    6    And the idea that the investigation started 20

7    months before actually seems a strong point for the

8    defense --

09:25    9    No.  You can respond.  I've got lots of questions

10    for them also, trust me.  Okay?  I'm gonna give you a fair

11    chance on both sides.

09:25    12    -- actually, seems a strong point for the defense

13    because there's no reason for Geithner to place that phone

14    call, no matter how outraged he is, as a government official

15    'cause that's the United States calling, from their

16    perspective.  And it can only have one purpose:  Either

17    change your opinion; you shouldn't have made it.  Otherwise,

18    it has no purpose from their perspective.  Now, I don't know

19    if that's true or not.

09:25    20    What I'm having trouble with is why he isn't

21    deposed?  He's not a present official of the United States.

22    These aren't the secret machinations of our armed forces or

23    the DARPA program that is going to harm our country.  And I

24    thought that the lawsuit was filed for number of reasons.

25    One, is compensation.  You're seeking liability, money.  But

          1    I thought that, on behalf of the government, the lawsuit was

          2    filed also for transparency.  In other words, what happened

          3    here, so it doesn't happen again.

09:26     4           I don't know that money is even of that great a

          5    consequence to you.  It may be.  But it seems to me what

          6    happened in our government should be of great consequence,

          7    and I don't know how you proceed without transparency.

09:26     8           Now, I'm gonna speak to the Executive branch in

          9    just a moment, or the lawyers representing whomever, and

         10    have your position known on the record, as a courtesy.  So

         11    I'm glad you stayed.  I was a little concerned you were just

         12    leaving, because my initial thought is, I'm also very

         13    concerned about the breadth of this.

09:27    14           This is clear:  your effort to get into the White

         15    House is broad, no matter what counsel's argued.  It's

         16    "Let's start with Geithner," and get right into the White

         17    House.  I don't think I'm going there.

09:27    18           But here's my problem:  If I take the government's

         19    position that other people can answer, then we do what I

         20    call climb the ladder.  In other words, you depose somebody

         21    in the government, who gives you a little bit of

         22    information; and if there's value there, then you work up

         23    the ladder.  And meanwhile, we go through five or ten

         24    depositions and constant fights.  The person who made these

         25    representations -- there's only three people, it seems

Case 2:13-cv-00779-DOC-JCG  Document 148  Filed 03/18/14  Page 44 of 102  Page ID #:3751
LACV 13-0779 DOC 3/11/2014 – Volume I

44

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
|       | 1  | like -- Checki, Geithner, and McGraw.                    |
| 09:27 | 2  | And so there's a benefit and a value to you.  If I       |
|       | 3  | allowed a deposition or further discovery and Geithner   |
|       | 4  | doesn't give you anything, I'm apt to cut it right there. |
|       | 5  | You're not going into the White House.                   |
| 09:28 | 6  | I mean, you've got to make some real close               |
|       | 7  | tactical decisions about what you're asking.  And I don't |
|       | 8  | know that I'm going to expand it into five, ten or fifteen |
|       | 9  | depositions and fishing around.                          |
| 09:28 | 10 | So if I climb the ladder, and I allow Geithner, it       |
|       | 11 | seems to me, that I save a whole lot of effort, a lot of  |
|       | 12 | depositions, a lot of wasted time because you're gonna be in |
|       | 13 | trial shockingly very quickly.  We haven't talked about that |
|       | 14 | yet.                                                     |
| 09:28 | 15 | The third issue I want to discuss is what have you       |
|       | 16 | been doing the last three months.  Besides these motions, I |
|       | 17 | want to hear in depth what depositions you've been seeking |
|       | 18 | and doing.  Because you represented to me that you needed |
|       | 19 | two years.  I'm counting that minimally from the time you |
|       | 20 | first appeared in my court, for this reason:  You've been |
|       | 21 | investigating and involved in this for over a year before |
|       | 22 | you came to my court.  There's a lot of investigation of  |
|       | 23 | documents that have already passed.  You should have been |
|       | 24 | ready for trial a long time ago.                         |
| 09:29 | 25 | Number two, I gave you a four- or five-month             |

Case 2:13-cv-00779-DOC-JCG  Document 148  Filed 03/18/14  Page 45 of 102  Page ID #:3752
LACV 13-0779 DOC  3/11/2014 - Volume I

45

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | extension cause you were working well together -- and you    |
|       | 2  | have my compliments, absolutely -- and then another          |
|       | 3  | three-months extension.  You're looking at trial sometime in |
|       | 4  | 2015.  You don't know that yet.                              |
| 09:29 | 5  | So if I take the position of winding through                 |
|       | 6  | Treasury Department Official 1, Treasury Department Official  |
|       | 7  | 2, Treasury Department Official 3 -- you still want          |
|       | 8  | Geithner.  It's absolutely obvious to the Court.  And having |
|       | 9  | made these statements, I think the government has to respond  |
|       | 10 | to me about this statement that they're gonna be looked at   |
|       | 11 | very carefully.  I just don't see the purpose of that other  |
|       | 12 | than a potential threat, from your perspective.              |
| 09:29 | 13 | As far as the White House, I'm probably gonna cut            |
|       | 14 | that off at this stage.  And you're gonna have to climb an   |
|       | 15 | uphill ladder about getting over into the White House.  I    |
|       | 16 | just don't see the nexus.  So you're on warning.  Okay?      |
|       | 17 | Geithner is in play.  But I'm not certain how that plays out |
|       | 18 | because I'm not certain in terms of where that eventually    |
|       | 19 | leads me.  And if it doesn't lead me anyplace, I don't want  |
|       | 20 | to go down that road.                                        |
| 09:30 | 21 | As far as you being an independent agency, I                |
|       | 22 | accept that, for the record.  Okay?  But also, you're        |
|       | 23 | subject to input from people and therefore your decision to  |
|       | 24 | file is based upon those people coming to you.  So, yes      |
|       | 25 | you're independent; yes, you may have made the good --       |

LACV 13-0779 DOC 3/11/2014 – Volume I

```
           1    decision in good faith.  Then why is Geithner calling?

           2    What's he doing getting on the phone here?

09:30      3              Now, I'm going to take a recess.  I've got to make

           4    a couple phone calls.  I've got a jury that I was supposed

           5    to start, and I just want a time estimate 'cause you're my

           6    first priority.  I almost called you off today and it wasn't

           7    fair 'cause you picked this date.  But I've actually got a

           8    jury and a criminal matter.  And if I need to send them home

           9    today, I will.  Okay?

09:30     10              So your time estimate.  I'd suggest you'd probably

          11    tell me to start my criminal trial tomorrow, wouldn't you?

09:31     12              MR. CARDONA:  I suspect that would be our

          13    suggestion.  I don't know how long they're going to take.

09:31     14              THE COURT:  Counsel, wouldn't you?  Because I

          15    think that when we're done with this, I'm going to start

          16    giving you trial dates today.

09:31     17              MR. KEKER:  Well, especially, if we're gonna go

          18    down that road, we would like some time today to talk to you

          19    about alternatives and ideas and so on.  And, yes, we would

          20    very much like to take you up on your -- what you told us

          21    was that we were gonna have today to talk to you.

09:31     22              THE COURT:  There's no reason to run you back and

          23    forth from Los Angeles and San Francisco.  In other words,

          24    we can resolve a lot of issues, even if I don't decide these

          25    issues today.  Let me give you couple other ideas just to
```

Case 2:13-cv-00779-DOC-JCG   Document 148   Filed 03/18/14   Page 47 of 102   Page ID #:3754
LACV 13-0779 DOC 3/11/2014 - Volume I

47

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       |  1 | think about.  These are not rulings yet.                             |
| 09:31 |  2 |         I don't understand why, with Exhibit No. 31, that            |
|       |  3 | the government is throwing out the specter of the depth and          |
|       |  4 | breadth and how crushing this would be.  I've heard that             |
|       |  5 | argument from the defense; and that is, how crushing these           |
|       |  6 | various allegations are, and how burdensome, and how they're         |
|       |  7 | not able to defend.                                                  |
| 09:32 |  8 |         So now I'm hearing the same thing from the                   |
|       |  9 | government, that these are crushing and burdensome discovery         |
|       | 10 | requests.  And yet you're the ones seeking money.  You're           |
|       | 11 | the transparent entity.  I would encourage you not to put            |
|       | 12 | yourself in the position of ever appearing to be less than          |
|       | 13 | absolutely transparent.                                             |
| 09:32 | 14 |         Finally, if 32 -- oh, I'm sorry -- 31.  It seeks             |
|       | 15 | documents concerning the analysis of the United States made          |
|       | 16 | during the period of 2004 to 2008.  That's not only not             |
|       | 17 | crushing, that's easily produced.  It's sitting probably in          |
|       | 18 | Washington D.C. or New York, and you probably have a couple          |
|       | 19 | volumes on a shelf.  And the idea of you going across the            |
|       | 20 | country into every office seems ridiculous.                         |
| 09:33 | 21 |         Request No. 32 seeks an evaluation and studies and           |
|       | 22 | assessments of the analysis by the United States relating to        |
|       | 23 | the independence, quality and performance of ratings of             |
|       | 24 | RMBS's, and CDO by RMBS's.  Yeah, I don't see any reason             |
|       | 25 | that that is crushing or burdensome, as your papers                 |

Case 2:13-cv-00779-DOC-JCG   Document 148   Filed 03/18/14   Page 48 of 102   Page ID #:3755
LACV 13-0779 DOC 3/11/2014 – Volume I

48

09:33

09:33

09:33

09:34

09:34

09:34

          1    indicate, as long as I confine it to Moody's and to Fitch.
          2         I'm not gonna let the defense go on a wild fishing
          3    expedition into every U.S. Attorney's office that you throw
          4    out as the big scare tactic for the Court.  It's limited.
          5    Those are very easy to produce.
          6         Request No. 38 seeks documents concerning the
          7    rating, methodologies and procedures of other rating
          8    agencies.  I want to talk to you a little bit about that.  I
          9    don't know that Fitch and Moody's have to disclose that.  I
         10    don't know that a competitor is entitled to that, quite
         11    frankly, concerning their algorithms or their methodology.
         12         Request 40 seeks documents by the Department of
         13    Justice received from any rating agency concerning
         14    independence or objectivity of the ratings.  I want to talk
         15    to you about that, especially in light of the Requests 44,
         16    45 and 46.
         17         Let me turn to those for just a moment.  I don't
         18    understand S&P's argument concerning 44, 45 and 46.
         19         And now I get to do what you do to me.  You see,
         20    during your arguments, you throw out numbers, and I'm
         21    supposed to scramble and remember them.  Now I'm throwing
         22    numbers back at you.  And you should have a clear indication
         23    in your mind about what I'm talking about.
         24         Why would I ever accept your position that the
         25    government is supposed to hand over documents concerning

1    DOJ's investigation of "an issuer" in 44, or

2    "communications" in 45, or "investigations" in 46?  I'm

3    going to run into a myriad of investigative/privilege

4    requests, that may be extraordinarily well-taken, by the

5    government, and sorting out work product.

09:35    6           Number two, it seems to me a ludicrous position

7    because you're really asking for information controlled or

8    received by the government.  And how could you ever be

9    satisfied?  So here's what I'm thinking really is happening:

09:35   10           Tactically, you must be very concerned, as you

11   should be, about going to the very banks that are clients of

12   S&P.  And I see you shaking your head, so let me finish my

13   idle thought.  But I don't see why you shouldn't be.  I'm

14   not foreclosing you from that information.  But why the

15   government has to disclose that -- how would you ever be

16   satisfied that you received all of these documents?  And how

17   would you ever be satisfied that they're complete?  And why

18   wouldn't you be requesting these documents in the future?

19   So why aren't you going to the original source, like the

20   banks, of which the Court would probably be very supportive?

09:35   21           And then we can fight with Wells Fargo or Bank of

22   America or whoever else they think that they've got a

23   privilege with.  But that way you'd be the original source.

24   You'd be requesting the documents.  And you wouldn't be

25   depending upon whatever the government got during their

Case 2:13-cv-00779-DOC-JCG  Document 148  Filed 03/18/14  Page 50 of 102  Page ID #:3757
LACV 13-0779 DOC 3/11/2014 – Volume I

50

```
          1   investigation, and your opponent controlling.  So I toss

          2   that back to you to tell me why I'm wrong, after the recess.

          3   Because I'm not closing that door.  In fact, I'm encouraging

          4   you to go there, if you want to.

09:36     5         But therefore, I've got a complete record, and I'm

          6   not having the government as an intermediary, and I'm not

          7   running into work-privilege issues and I'm not running into

          8   governmental privilege issues.

09:36     9         The next thing is, just generally to think about:

         10   I want you to tell me where these motions go eventually.  In

         11   other words, I'm not gonna call them outrageous government

         12   conduct motions, as the criminal side.  Let's call them"

         13   chilling First Amendment issues," which they're properly

         14   labeled.  I want you to walk me down the eventual results,

         15   if we go down that road, of what this looks like at the time

         16   of trial.

09:37    17         What's the practical reflection for a jury?  How

         18   does the Court instruct the jury that this is relevant?

         19   Does it go to the mitigation of damages?  Is it a complete

         20   defense?  And I want you to cite case law for me.

09:37    21         Now, those are some of the beginning issues that

         22   we want to deal with.

09:37    23         Number two, I want you to start looking at your

         24   calendar and start looking at either May or September.  I

         25   want to avoid getting a jury sooner than that so I fulfill
```

Case 2:13-cv-00779-DOC-JCG  Document 148  Filed 03/18/14  Page 51 of 102  Page ID #:3758
LACV 13-0779 DOC  3/11/2014 – Volume I

51

```
       1   that two-year requirement.

09:37  2         Number three, I want you to consider whether I

       3   need a special master or not.  I imagine that if we

       4   eventually get to your position concerning, at least

       5   Geithner and others, there's going to be a huge roadblock.

       6   In other words, the Court will make a ruling, if we get

       7   there, and there's going to be counsel that come in with a

       8   myriad of objections.

09:38  9         Where is that deposition gonna take place?  Who's

      10   going to be present?  When the first 50 objections flow,

      11   does the deposition then cease and everybody goes home? --

      12   as in the Bratz case, and they come back for the 17th time?

      13   In other words, how is that going to be completed?  And why

      14   wouldn't I have a special master?

09:38 15         I've got a dozen more questions.  That's just the

      16   start, I think, of our day.

09:38 17         Now, unfortunately, I teach at UCI tonight.  And I

      18   apologize.  I've got to leave at 5:30 today.  And therefore,

      19   normally, I'd hold a night session, but I'm going to send my

      20   criminal jury home until tomorrow and hope that we can

      21   complete this today as a courtesy to all you folks, which is

      22   a tragedy.

09:38 23         So, Julie, I'm gonna want the criminal counsel in

      24   here at 10:00 o'clock.

09:38 25         THE CLERK:  Okay.
```

09:38   1          THE COURT:  *(To Counsel:)* And I'm gonna ask you to

        2   leave your papers on the seat that you occupy, and I'm gonna

        3   ask you to come back at 10:15, and I'm going to humbly

        4   apologize to the jury, and start my jury trial tomorrow

        5   morning so you have the time today.  That way, you gentlemen

        6   won't be inconvenienced from the East Coast and from

        7   different parts of the country.

09:39   8          All right.  Those are the beginning of the

        9   questions.

09:39  10          See you in about 35 minutes.

09:39  11      *(Recess held at 9:39 a.m.)*

10:16  12      *(Proceedings resumed at 10:16 a.m.)*

10:17  13          THE COURT:  All right.  We're back on the record.

       14   All counsel are present.

10:17  15          There's another question I've got.  Eventually,

       16   sometime today, I don't understand S&P's position concerning

       17   "independent" and "objective," and who's viewing that.

       18   You're reaching out for independent and objective criteria

       19   like a *Strickland* examination almost, from other parties.  I

       20   don't know that that isn't a subjective evaluation and why

       21   other parties are being brought in and subpoenaed in that

       22   area.  So we'll talk about that more in the future.

10:18  23          Now I'm going to turn you loose.  I'm gonna let

       24   the government go first.  You've got *carte blanche*.  You can

       25   start wherever you want to.

Case 2:13-cv-00779-DOC-JCG   Document 148   Filed 03/18/14   Page 53 of 102   Page ID #:3760
LACV 13-0779 DOC 3/11/2014 – Volume I

53

| | | |
|---|---|---|
| 10:18 | 1 | No.  I'm sorry.  My apologies.  The defense.  You |
| | 2 | started.  Your motion.  Please. |
| 10:18 | 3 | MR. KEKER:  Would you like us to respond to |
| | 4 | some -- |
| 10:18 | 5 | THE COURT:  Anything.  You can have a rebuttal |
| | 6 | argument to what they said.  You can respond to my concerns. |
| 10:18 | 7 | MR. KEKER:  Why doesn't Mr. Abrams talk about your |
| | 8 | questions about the retaliation defense.  And then I'd like |
| | 9 | to talk about the rest of our motion and answer some of the |
| | 10 | questions that you raised. |
| 10:18 | 11 | THE COURT:  Okay.  As long as you get an agreement |
| | 12 | from the other side.  Okay? |
| 10:18 | 13 | Sir. |
| 10:18 | 14 | **ARGUMENT BY MR. ABRAMS (RE RETALIATION DEFENSE)** |
| 10:18 | 15 | MR. ABRAMS:  I feel like saying "good afternoon." |
| 10:19 | 16 | Good morning, Your Honor. |
| 10:19 | 17 | I wanted to address first the series of questions |
| | 18 | that Your Honor asked. |
| 10:19 | 19 | In the line of "where we are moving towards," what |
| | 20 | -- "what's the end game of the First Amendment retaliation |
| | 21 | defense." |
| 10:19 | 22 | As we see it, the end game is a motion by us to |
| | 23 | dismiss the case. |
| 10:19 | 24 | THE COURT:  Okay.  For? |
| 10:19 | 25 | MR. ABRAMS:  But -- for government misconduct |

Case 2:13-cv-00779-DOC-JCG  Document 148  Filed 03/18/14  Page 54 of 102  Page ID #:3761
LACV 13-0779 DOC  3/11/2014 - Volume I

54

```
 1    that -- as in the Armstrong case.  Now, I'll assume
 2    Armstrong does cover -- I mean, if there were enough proof,
 3    sufficient proof in a case in which counsel was arguing
 4    about being improperly selected as a defendant -- I mean,
 5    assuming one -- assuming Armstrong goes to the end of the
 6    line, and the party has sufficient evidence to show
 7    sufficient misconduct -- I'll call it -- the only end is not
 8    a jury decision on that.  I don't view this as a jury issue
 9    at the end of the day -- but a motion which would either
10    succeed or fail that -- that because of the government's
11    misconduct or violation of the First Amendment, that you
12    should dismiss the case.
13            Now, I will say there are not a lot of cases in
14    which First Amendment retaliation has been an affirmative
15    defense.
16            THE COURT:  Nor outrageous government conduct in
17    the criminal area.  Neither one.
18            MR. ABRAMS:  In those cases, if it is outrageous
19    enough, the cases have been dismissed.  I mean, Judge Byrne
20    dismissed, back in the Nixon days, a case.
21            THE COURT:  Right.
22            MR. ABRAMS:  I'm not suggesting that fact scenario
23    at all here.  But all I'm saying is, is that that's where it
24    goes.  And so if one goes back to the NBC/CBS/ABC case in
25    this court back in the 70's, that's where that was going to
```

10:20  (line 13)
10:20  (line 16)
10:20  (line 18)
10:21  (line 21)
10:21  (line 22)

Case 2:13-cv-00779-DOC-JCG  Document 148  Filed 03/18/14  Page 55 of 102  Page ID
#:3762
LACV 13-0779 DOC 3/11/2014 – Volume I

55

|        |    |                                                          |
|--------|----|----------------------------------------------------------|
|        | 1  | go.  That is to say, the three networks filed an affirmative |
|        | 2  | defense saying this is all being brought to punish us    |
|        | 3  | because you don't like what we said about you.           |
| 10:21  | 4  | THE COURT:  Then why does this evidence come             |
|        | 5  | before a jury, or does it?                               |
| 10:21  | 6  | MR. ABRAMS:  I don't think it does, Your Honor.          |
| 10:21  | 7  | THE COURT:  So these motions then are motions for        |
|        | 8  | a court to decide.  Let me summarize this quickly for you. |
| 10:21  | 9  | MR. ABRAMS:  Yes.                                         |
| 10:21  | 10 | THE COURT:  Your position is that these motions          |
|        | 11 | are motions for a court to decide.  And Mr. Geithner is  |
|        | 12 | never testifying in front of a jury.                     |
| 10:21  | 13 | MR. ABRAMS:  On these issues, no.  I mean, there         |
|        | 14 | maybe other matters, but on First Amendment affirmative  |
|        | 15 | defense, I don't view as a jury defense.                 |
| 10:22  | 16 | THE COURT:  And when would the Court decide this?        |
| 10:22  | 17 | MR. ABRAMS:  When we, in a timely manner, make a         |
|        | 18 | motion to you.                                           |
| 10:22  | 19 | THE COURT:  You'll find that most of the case law        |
|        | 20 | that's dealt with this or when it's come to a practical, you |
|        | 21 | know, the "rubber hits the road," in reality, most courts |
|        | 22 | haven't decided this until the end of the case.  They simply |
|        | 23 | gathered all the evidence during the proceeding itself so |
|        | 24 | they could make a decision at the end.  In other words, they |
|        | 25 | left it in limbo.                                        |

| 10:22 | 1 | MR. ABRAMS:  I think what we would urge on you is |

10:22   1        MR. ABRAMS:  I think what we would urge on you is

2    that, if we gather enough evidence, you know, to be in the

3    ballpark -- "evidence" is the wrong word.

10:22   4        THE COURT:  Hear me now.

10:22   5        MR. ABRAMS:  Yes.

10:22   6        THE COURT:  Why?  In other words, why would a

7    court make that decision before I had heard this case in

8    front of a jury and given the government the opportunity of

9    showing if there was, you know, liability here that should

10   attach?  In other words, why would I prematurely decide that

11   without hearing the totality of this?

10:23  12        Because the government -- let's give you your best

13   argument.  They should have gone after one or two other

14   ratings agencies, as well as your client.  It doesn't mean

15   that your client is absolved from liability.  It just means

16   that the government might have made a choice that was good,

17   bad, tactical, or whatever.  So why are you entitled to have

18   that take place before a trial?  Why wouldn't a court listen

19   to the government's presentation and make a reasoned

20   decision after a four-month trial?

10:23  21        MR. ABRAMS:  Because the evidence would not be

22   admitted during a four-month trial.

10:23  23        THE COURT:  Remember, you just told me it's not

24   going in front of a jury.

10:23  25        MR. ABRAMS:  That's what I'm saying.  I'm saying

1    because --

10:23   2          THE COURT:  Okay.  Let me tell you, I humbly

3    disagree with you, and let me tell you why.  I would think

4    that the Court would hear the totality of the evidence that

5    the government had to present during a trial in front of a

6    jury.  I think a Court would be wise to do that, so I had

7    all of the evidence in front of me, to see if there was

8    liability or not.  And I don't know why I would decide this

9    on the front side of a trial.

10:24   10          So that's why I keep asking:  Where is this going?

11    And if it's not going in front of a jury...?

10:24   12          MR. ABRAMS:  Well, there are only two places it

13    can go -- is to a jury or to you.

10:24   14          It could go to you at the end of the trial, yes;

15    but only if, then, we are permitted to put

16    Secretary Geithner on the stand.  I mean -- we can't not

17    have some opportunity to align the evidence and to make the

18    argument to you based on the evidence.

10:24   19          THE COURT:  That's where we ended up in the

20    Mexican Mafia trial.  Nobody quite knew where outrageous

21    government conduct was going, but the defense was allowed to

22    put the evidence on the stand.

10:25   23          MR. ABRAMS:  Well, we don't object to that,

24    Your Honor.  I was --

10:25   25          THE COURT:  I'm not certain that that's

Case 2:13-cv-00779-DOC-JCG  Document 148  Filed 03/18/14  Page 58 of 102  Page ID #:3765
LACV 13-0779 DOC 3/11/2014 – Volume I

58

1    appropriate.

10:25    2        MR. ABRAMS:  I'm conceding that this sort of

3    situation doesn't arise very often.

10:25    4        But what does arise very often are claims made of

5    First Amendment retaliation.  And our claim is not that

6    Moody's and Fitch should be in the "dock" with us.  That is

7    really not what we were saying.  Our claim is we were sued

8    because we criticized the government.  And that's a claim we

9    could make without regard to Moody's or Fitch.

10:25    10        Now we are using --

10:25    11        THE COURT:  No, Counsel.  If you're still -- if

12    your client's still liable, then, even if the government had

13    a, quote/unquote, "vindictive motive," does that mean the

14    Court is supposed to grant your motion, even with liability

15    that a jury would find?

10:26    16        I don't think so.

10:26    17        MR. ABRAMS:  Well, I think, Your Honor, that all

18    these defenses, to the extent they are defenses -- that is

19    to say, whether one characterizes it as an affirmative

20    defense, as we have, as a First Amendment retaliatory issue,

21    or if it were selective prosecution, to the extent one --

22    which is not what we are arguing, but if it were, that a

23    time would come, either pre- or post trial, in which the

24    judge before whom it arises will pass upon the validity of

25    the defense and -- or, otherwise, it's just not a defense.

| | | |
|---|---|---|
| 10:26 | 1 | THE COURT:  You didn't answer my question.  I'm |
| | 2 | gonna come back to it. |
| 10:27 | 3 | MR. ABRAMS:  Yes. |
| 10:27 | 4 | THE COURT:  You've been very unclear about whether |
| | 5 | it comes before or after.  You've thrown up a cloud to me so |
| | 6 | far.  You've been very unclear about whether this goes |
| | 7 | before a jury or not. |
| 10:27 | 8 | MR. ABRAMS:  Your Honor, my answer is -- what it |
| | 9 | was:  I believe that it comes to you via a motion. |
| 10:27 | 10 | THE COURT:  I heard that. |
| 10:27 | 11 | MR. ABRAMS:  I understand.  And I'm -- |
| 10:27 | 12 | THE COURT:  Before or after a jury? |
| 10:27 | 13 | MR. ABRAMS:  Either, Your Honor.  I think it would |
| | 14 | be proper at either time.  It would certainly not be |
| | 15 | improper for you to consider it afterwards, but -- |
| 10:27 | 16 | THE COURT:  If it's after a jury, why am I sending |
| | 17 | us down the road of a deposition of Mr. Geithner at this |
| | 18 | time? |
| 10:27 | 19 | MR. ABRAMS:  So we can gather the information to |
| | 20 | make the defense.  I mean, if we can't -- if we can't gather |
| | 21 | the information, we can't pursue it. |
| 10:27 | 22 | Whatever the ultimate answer is, Your Honor, to |
| | 23 | the question when you consider it, we still, we believe, are |
| | 24 | entitled to the opportunity to gather the evidence.  And so |
| | 25 | that -- that's why. |

| 10:28 | 1 | THE COURT:  Okay. |

10:28  2      MR. ABRAMS:  On an easier level, in terms of

3  questions that you put to us, so far as we're concerned, a

4  deposition of Secretary Geithner, taking him as an example

5  "A" should follow our gathering -- or your authorizing us to

6  gather whatever evidence is -- whatever information is

7  proper for us to have via the various efforts we have made

8  by our motions.

10:28  9      We're quite content to have it occur here or in

10  New York.  But here would be fine with us.  Counsel for

11  Secretary Geithner is here in court today.  I believe he's

12  appearing therefore before you.  So, so far as we're

13  concerned, the deposition could occur here or any other

14  place of the Court's choosing.

10:29  15      Where we think the Court should go -- what we urge

16  upon the Court -- is to allow us at this time to require the

17  government to respond via the production of documents to two

18  sorts of requests we'd made.  One, which I outlined earlier:

19  Requests 33, 34, which were the ones where we were asking

20  the government to turn over documents relating both to the

21  FIRREA case and the downgrade, and information about the

22  downgrade and the investigation -- not the investigation by

23  itself, but downgrade and the investigation -- as well as

24  communications received by the DOJ -- this is number 53 with

25  respect to the downgrade of the U.S. and 51 and 52 -- I'll

10:30

10:31

10:31

1    leave out 51 –– 52, which is material from

2    Secretary Geithner about documents concerning civil or

3    criminal actions or sanctions against our client.

4            And then the only other thing I'd mention is that

5    these later-filed requests, which were the Rule 45 subpoena,

6    which Secretary Geithner's counsel is here in court to ask

7    you to quash, are all materials which we think we have

8    redrafted narrowly.  We tried to draft narrowly.  All of

9    them are focused on the possibility of government misconduct

10   in bringing the action as a retaliatory matter against our

11   client.

12           The Rule 45 subpoena we served on Mr. Checki ––

13   counsel for Mr. Checki is in court today –– in which we've

14   asked basically the same sort of things:  Turn over

15   documents bearing on your calls that I've referred to and

16   anything that you have with respect to potential violations

17   of First Amendment rights.

18           So our conclusion on these issues to you is that,

19   with that information, we would be prepared at a time of

20   everyone's choosing to proceed –– at this point, we haven't

21   even noticed a deposition –– but to proceed to a deposition

22   of Secretary Geithner.  And, I would think, at some point we

23   would, at one of our meetings with you, talk with you about

24   where we go from here and whether it's a viable defense,

25   whether we've gathered information which helps us or not.

10:32   1            Our position today is simply we really think we

        2   are entitled to this threshold discovery.  Even the

        3   *Armstrong* case talks about needing some evidence.  And we

        4   would like a chance beyond what we've already set forth to

        5   you to develop that evidence.

10:32   6            Thank you, Your Honor.

10:32   7            THE COURT:  I think I'm prepared to indicate in

        8   the strongest terms that you're not blanket-ly entitled to

        9   a -- to discovery based upon putting forth an affirmative

       10   defense.  I think, under *Armstrong* -- I'll read the test

       11   back to you -- and that is the threshold is quite low.

       12   *Armstrong* ultimately described the requisite showing in the

       13   following way:

10:33  14            "A party's entitled to discovery on a

       15             selective prosecution claim if there is,

       16             quote 'some evidence tending to show the

       17             existence of the essential elements of

       18             the defense, discriminatory effect, and

       19             discriminatory intent,'" end of quote.

10:33  20            So, therefore, your discovery threshold under

       21   *Armstrong* is very low.  That's very favorable to you under

       22   the Supreme Court test.

10:33  23            MR. ABRAMS:  It is.

10:33  24            THE COURT:  But I'm still asking you to set out

       25   for me how this looks.  In other words, what's the practical

| | | |
|---|---|---|
| | 1 | world and reality of this.  And you may want to talk to your |
| | 2 | co-counsel who's going to be presenting this case, whoever |
| | 3 | the counsel are.  Because, in the cases on the criminal |
| | 4 | side, where I've had outrageous government conduct, this |
| | 5 | Court did not decide that issue until the end of the case -- |
| 10:34 | 6 | MR. ABRAMS:  Yeah. |
| 10:34 | 7 | THE COURT:  -- because it allowed me to look at |
| | 8 | the entire case and the conduct of the government. |
| 10:34 | 9 | And, yes, there, people were killed during the |
| | 10 | prosecution of that case.  But so many people were marked |
| | 11 | for death; and then, when they paid their taxes, they were |
| | 12 | not killed.  The government's position simply was:  We |
| | 13 | didn't cause this.  We tried to stop it as best we could, |
| | 14 | but this was a RICO violation involving the entire EME. |
| | 15 | Okay? |
| 10:34 | 16 | Now you can imagine, from the public's |
| | 17 | perspective, people, you know, literally being killed; but |
| | 18 | by the same token, why would I decide that at the front |
| | 19 | side?  I would decide that at the backside. |
| 10:35 | 20 | So what I'm cautioning you about is, if you ever |
| | 21 | got a ruling that was favorable from me in this matter, why |
| | 22 | I would decide this at the front side.  And that's what |
| | 23 | you're really hoping for.  Let me state what you're really |
| | 24 | hoping for in very simple terms. |
| 10:35 | 25 | "Judge, jump quickly into Geithner," and your |

1   motion's so broad -- "jump quickly into the Executive branch

2   and the White House."  That's where you're going.  No matter

3   what you say about discovery material now, that's the gist

4   of your motion.

10:35   5   Number two, it's overly broad.  I could reject it

6   out of hand right now.

10:35   7   Number three, if I let you climb the ladder --

8   which is what you want to -- piecemeal, your counsel, lead

9   counsel will be scrambling breathlessly right before trial.

10:35   10   So, if we're going to do this, it seems to me that

11   the relevance comes from Geithner's phone call.  Because

12   without that, I'm not certain that this wouldn't be

13   dismissed out of hand by the Court.

10:36   14   And I'm having trouble with the government's

15   argument, and I've put them on notice concerning that, about

16   why anybody from the government would call somebody who's

17   being investigated and say, "By the way, I'm on the phone,

18   and you're gonna be looked at very closely."  I mean, just

19   indict them or charge them, but not a phone call.  It

20   appears, from your perspective, to have a chilling effect

21   and be designed to change the opinion rendered.

10:36   22   Now, your threshold's so low that, for discovery

23   purposes, you may be entitled to this.  But for evidentiary

24   purposes, or in front of a jury, I don't know that that

25   would ever come before a jury.  So I keep asking -- and I

```
        1    think you've explained to me that, "Judge, it's a judicial
        2    decision.  We hope you make it beforehand," which I'm
        3    indicating to you now that I'm not inclined to do until I
        4    hear the case and, therefore, I'm in a much better position
        5    to know if your client has liability or not.
10:37   6              That means that Geithner, even if you deposed him,
        7    may never come in front of an American jury.  It's simply a
        8    Court determination at the end.
10:37   9              So, knowing all that, do you still want Geithner
       10    deposed eventually?  And who's kidding who?  Do you?
10:37  11              MR. ABRAMS:  Yes, Your Honor.
10:37  12              THE COURT:  Okay.  Obviously.
10:37  13              And, number two, all these discovery documents
       14    that you seek are eventually leading toward Geithner's
       15    deposition.  That's where you want to go.
10:37  16              MR. ABRAMS:  Yes.
10:37  17              THE COURT:  I want you to take a moment, talk to
       18    Mr. Keker, 'cause I assume he's your lead counsel, and
       19    Ms. Keller.  I want you to have a quiet conversation based
       20    upon some of my initial comments.
10:37  21              MR. KEKER:  I think --
10:37  22              THE COURT:  I want you to have a quiet
       23    conversation, Mr. Keker.  And then I'll pay all the
       24    deference to you in the world.
10:38  25              (Defense counsel confer.)
```

Case 2:13-cv-00779-DOC-JCG   Document 148   Filed 03/18/14   Page 66 of 102   Page ID #:3773
LACV 13-0779 DOC 3/11/2014 - Volume I

66

| 10:38 | 1 | THE COURT:  Okay.  Mr. Keker, please. |
| 10:38 | 2 | MR. KEKER:  Yes, sir. |
| 10:38 | 3 | THE COURT:  And, Counsel, thank you.  You're |
| | 4 | welcome to come back to the lectern anytime. |
| 10:38 | 5 | MR. ABRAMS:  Thank you, sir. |
| 10:38 | 6 | THE COURT:  Okay.  Mr. Keker, please. |
| 10:38 | 7 | **ARGUMENT BY MR. KEKER** |
| 10:38 | 8 | MR. KEKER:  And this is going to take me into some |
| | 9 | other parts of the motion to compel about the rating agency |
| | 10 | independence and objectivity, and some of your questions |
| | 11 | about who cares whether it's subjective or objective or what |
| | 12 | people think. |
| 10:38 | 13 | THE COURT:  It's -- who's measuring that?  It's |
| | 14 | from S&P's perspective or other people's -- other entities |
| | 15 | perspective? |
| 10:38 | 16 | MR. KEKER:  Let me start with this. |
| 10:38 | 17 | I think that this -- that outrageous government |
| | 18 | conduct, as you were using it, has nothing to do with what |
| | 19 | we're talking about here.  Outrageous government conduct, in |
| | 20 | my experience, has been a situation where either the |
| | 21 | government induced a crime or permitted a crime to happen to |
| | 22 | get something that they wanted, and so on.  That's not what |
| | 23 | we're talking about, and that -- and, therefore, you need to |
| | 24 | have a trial to figure out everything that's going on. |
| 10:39 | 25 | What we're talking about is this -- and, as long |

|  |  |
|---|---|
|  | 1 |
|  | 2 |
|  | 3 |
|  | 4 |
|  | 5 |

1   as we're being blunt, let's be blunt:  People began to come

2   after the rating agencies back in 2008.  Right away said,

3   "How could this happen?"  And there were investigations of

4   the rating agents, including Moody's and Fitch and S&P,

5   widely publicized.

10:39   6       Look, please, at Mr. Abrams declaration,

7   Exhibit P.  It's got the chronology.  And it's the three

8   little -- the three rating agencies:  S&P, Moody's and

9   Fitch.

10:39   10       They're going after them; they're going after

11   them; everybody's looking at them; they're in the press.

10:40   12       All of a sudden, in 2011 something happens.  And

13   all of a sudden -- then they keep going after S&P.  And all

14   of a sudden, Moody's off the hook.  I almost heard him say

15   that it was because Moody's was innocent.

10:40   16       Now, I'm sure Moody's is innocent.  We're not

17   trying to accuse Moody's of anything.  But apparently these

18   *in camera* declarations suggest, "We looked into Moody's.  We

19   didn't find any nasty conduct; therefore, we didn't charge

20   'em."

10:40   21       Well, just from a commonsense point of view,

22   Moody's gave the same ratings.  Moody's knew everything --

23   not just Moody's.  Fitch too.  Everybody knew the same facts

24   that were out there.  Everybody knew about the subprime

25   problem, including Mr. Geithner.  Everybody knew all of

Case 2:13-cv-00779-DOC-JCG  Document 148  Filed 03/18/14  Page 68 of 102  Page ID #:3775
LACV 13-0779 DOC 3/11/2014 – Volume I

68

```
 1    these facts.  Everybody knew that all the rating agencies
 2    were rating things exactly the same way.  Everybody knew
 3    that the rating agencies were competing with each other.
 4    Everybody knew that they were for-profit organizations.
 5    Everybody knew that they were making the same
 6    representations about objectivity and independence.
 7                And somehow, out of this, the government concludes
 8    that only S&P is responsible for billions and billions and
 9    billions of dollars of -- of stuff.
10                And you said something about you don't know if
11    they're doing it for money.  That's the only reason they're
12    doing it.  Because there's been all of this reformed -- SEC
13    is all over the rating agencies.  All kinds of things have
14    changed.  And so, what this case is about is money.  And
15    we're gonna talk about that in just a second --
16                THE COURT:  Could I stop you.
17                MR. KEKER:  Yes, sir.  Sorry.
18                THE COURT:  We've got all day.
19                I can feel the passion.
20                MR. KEKER:  Well, I'm -- I'm feeling some passion
21    because --
22                THE COURT:  Hang on.
23                MR. KEKER:  Yes, sir.
24                THE COURT:  Why should this case be just about
25    money?
```



10:41   1            You know, one of my colleagues, Rakoff, has made a

        2    number of statements across the country that can't help but

        3    be noticed by everyone.  Who went to jail?  So when you

        4    think about a case like this, it might also be, whether it's

        5    about money or not, what about transparency?  How does this

        6    not happen again?

10:42   7            If you look at the press, at least what I can read

        8    in the *Wall Street Journal* and other press, everything seems

        9    to settle.

10:42  10            So I see Chase:  $30 billion.  That may be a great

       11   settlement from the government's perspective, but nobody

       12   knows what really occurred.  There's no transparency.  How

       13   does the public know that $50 billion worth of damage wasn't

       14   done, and 13 billion was collected back?

10:42  15            So it seems to me, in the government, that there

       16   should be two motivations:  One is money, but the other is

       17   transparency.

10:42  18            Academics can examine it.  The press can examine

       19   it.  But it seems like the stone never quite gets turned

       20   over because, last moment, all the settlements take place.

10:42  21            Now, if that's -- trust me.  We're not settling,

       22   right?  We're not -- no.  No.  We're not doing that.  Good.

10:42  23            So the end result is that at some point nobody

       24   gets to examine what happened in 2007 or 2008.  I would

       25   think the government's perspective would be that they would

Case 2:13-cv-00779-DOC-JCG   Document 148   Filed 03/18/14   Page 70 of 102   Page ID #:3777
LACV 13-0779 DOC 3/11/2014 – Volume I

70

10:43
10:43
10:43
10:43
10:43
10:44

```
 1   want these cases to go to trial; that they would want
 2   transparency; that they wouldn't want this to occur again.
 3        So I would hope that they'd have two motivations:
 4   One is money and second is absolutely transparency.
 5        And that means banks, S&P, and the government.
 6        Now, I'm sorry.
 7        MR. KEKER:  No.  Don't be sorry.  It takes me to a
 8   place that I wasn't gonna go till much later in the
 9   presentation, but this is the time, since we're not gonna
10   see you for a while, and since you've already, it sounds
11   like, made up your mind there's gonna be a trial in 2015,
12   that we need to speak some -- some -- some truth.
13        One of the things that Judge Rakoff is dealing
14   with right now, and I been before -- I've been before Judge
15   Rakoff in cases where he's refused settlements for the
16   CitiGroup thing.  Judge Rakoff is your East Coast
17   counterpart.
18        Judge Rakoff is grappling right now with a FIRREA
19   case -- the only one that we know, except for one that
20   Judge Morrow did -- where he's trying to decide what the
21   consequences of Bank of America losing a *Countrywide* case
22   is.  And what Judge Rakoff said is, when they got to the
23   penalty phase, he said:  You know, I think this is all about
24   gain.  I think the government's got it wrong when they come
25   in here and try to pile up losses.  I don't think that's
```

LACV 13-0779 DOC   3/11/2014 – Volume I

|      |    |                                                          |
|------|----|----------------------------------------------------------|
|      |  1 | what the statute is about.  It's about gain.  I've read the |
|      |  2 | statute.                                                 |
| 10:44 |  3 |         Now, let's be blunt.  If this case were about     |
|      |  4 | gain -- if you're gonna tell the jury that this case is  |
|      |  5 | about gain and they should figure out what the gain is, we |
|      |  6 | are talking about something that we would love to try and |
|      |  7 | Standard & Poor's and the government could have it out, and |
|      |  8 | the consequences would not be existential for Standard & |
|      |  9 | Poor's.                                                  |
| 10:44 | 10 |         THE COURT:  What do you mean by "gain"?           |
| 10:45 | 11 |         MR. KEKER:  I mean, by "gain," they -- the total  |
|      | 12 | revenues they made on all of the -- all of the ratings of |
|      | 13 | these 158 securities that are listed now are $60 million. |
|      | 14 | The profit is far less than that.  So we're talking about |
|      | 15 | tens of millions of dollars, which is a lot of money, but |
|      | 16 | manageable.                                              |
| 10:45 | 17 |         If you get over where the government wants to     |
|      | 18 | go -- and it's also in the statute.  It talks about loss. |
|      | 19 | And if you get over to loss, the government wants to say, |
|      | 20 | "Oh, no, no.  This is no" -- there's no proportionality.  |
|      | 21 | There's -- it's all -- it's like joint and several -- "every |
|      | 22 | loss we can pin up on the wall."  And that's tens -- that's |
|      | 23 | more money than S&P has.                                 |
| 10:45 | 24 |         I mean, it's -- so -- so if we're gonna have a    |
|      | 25 | trial for -- and we'd love to have the trial.  We're here to |

Case 2:13-cv-00779-DOC-JCG   Document 148   Filed 03/18/14   Page 72 of 102   Page ID #:3779
LACV 13-0779 DOC 3/11/2014 – Volume I

72

```
 1   have the trial about liability, about whether or not S&P did

 2   anything wrong.  If we could have that trial knowing that

 3   the consequences -- which eventually is gonna be your

 4   decision.  It's the most important decision in the case.

 5   You're gonna have to decide -- after listening to whatever

 6   the jury says to you, you're gonna have to decide what that

 7   penalty is.
```

10:46    8       If you end up, like judge Morrow -- if there is a

```
 9   liability finding, if you end up like Judge Morrow saying

10   it's gain, then -- okay.  I mean, it's something that you

11   can live with.  It's a trial that you could have.
```

10:46    12       If you say it's all the losses with no

```
13   proportionality, with no nothing, then it's -- it's asking a

14   company to go to trial against the government in what I

15   would hyperbolically describe as an extortion situation,

16   where you just can't afford any chance -- five percent

17   chance of losing means the company's dead.
```

10:46    18       So one of the things we're gonna ask you about

```
19   before, if you are not willing to take our suggestion to cut

20   this down to size so that we could have a manageable jury

21   trial that could be done in like a month, like your other

22   jury trial, rather than four to six months -- and I -- it

23   terrifies -- having seen the jurors walk out of here -- I

24   mean asking those folks to sit for four/six months and

25   listening to 158 -- just, it seems so unfair.
```

Case 2:13-cv-00779-DOC-JCG   Document 148   Filed 03/18/14   Page 73 of 102   Page ID #:3780
LACV 13-0779 DOC 9/11/2014 - Volume I

73

10:47   1          But if you're not willing to do that, we would ask

2     you to grapple now with this question of what is the proper

3     measure, the penalty.  Like Judge Rakoff is doing.  He's got

4     a hearing Thursday, I think, where they briefed it.

10:47   5          And so what we would suggest is that both sides

6     write up good briefs -- I mean, give us time to do it, but

7     come back here -- three weeks, a month -- some convenient

8     time, and maybe just have one of these sit-down sessions,

9     not on the record, and get some guidance from you about

10    where we're going in the case.

10:47   11         Because you would find out -- if you said, you

12    know, "I agree with Judge Rakoff.  I think -- and

13    Judge Morrow -- I think this is really about gain," and so

14    on, you would find this side of the table not nearly as

15    concerned about running down every single -- I mean, we're

16    planning 150 depositions.

10:48   17         I mean, if it's about gain, we'll skip -- you

18    know, we'll take some representative ones, or we'd handle it

19    a lot different way than if you said, you know, "I'm with

20    the government."  Whatever number they can splatter up on

21    the board, no matter how big it is, I'm gonna -- that's

22    gonna be our number, um, then that's when you're getting

23    this -- this, really, screaming with pain.

10:48   24         And I have to tell you also, Your Honor, you --

25    we've just got to remind you.  We came in here, couldn't do

Case 2:13-cv-00779-DOC-JCG  Document 148  Filed 03/18/14  Page 74 of 102  Page ID #:3781
LACV 13-0779 DOC-3/11/2014 - Volume I

74

1    discovery until the case management conference.  The case

2    management conference, we agreed with the government -- and

3    you wanted 'em to cut down their case 'cause it was too

4    broad.  They said they would do it.  And we set up a period

5    where they were gonna cut down their case, and we were only

6    gonna do discovery of the government.

10:48    7        We jumped on the discovery of the government, got

8    all our, uh -- our subpoenas out, our demands, all that,

9    spent just week after week after week meeting and

10   conferring, and here we are.  We haven't gotten zip

11   from -- you know.

10:49   12        And -- and then we're here in December, and you

13   said do a lot of things between now and -- and now.  We've

14   gotten out 57 subpoenas every bank, everything -- every

15   manager, every government agency.  Zip.  No -- nobody is

16   gonna give us anything.

10:49   17        You tell -- and -- and what we're complaining

18   about is we come in -- they've got it and we don't.  I mean,

19   they -- this is information.

10:49   20        THE COURT:  Let's focus on that.

10:49   21        MR. KEKER:  Okay.

10:49   22        THE COURT:  The banks are the genesis of the need

23   for S&P.  No criticism of the banks.  I've always been

24   baffled with why Double A, and B's, and different categories

25   come together in these securitization packages.  I'm not an

DEBBIE GALE, U.S. COURT REPORTER

10:50

1    economist, and I don't understand that.  But capitalism,

2    Wall Street, the dynamics of a free marketplace, I take for

3    granted as an American citizen.

4         But one of the things that appears, to me, to be

5    is that we need liquidity in the marketplace; and,

6    therefore, if I'm a bank and I can bring together a 400- to

7    800 million package, I'm gonna do that quickly to give

8    myself liquidity.  And there's nothing wrong with that.  I

9    bring together my A's, my B's, my subprimes, and I need a

10   rating agency.  And out it goes to the street.  And you may

11   even have another bank, et cetera, as a purchaser.

10:51

12        Okay.  Now, in a pristine world, you could take

13   50 million of that 800 million and have them all supposedly

14   A's.  And it would make it easy for a rating agency to

15   decide if those were A's or Double A's.  And it would make a

16   difference for the pension funds who'd have to invest

17   40 percent of their investment portfolio in what are

18   supposedly high-yield securitizations:  B's and above.

10:51

19        The reason probably that that isn't done -- and

20   I'm guessing at this now.  The reason that probably isn't

21   done is because you can't gain liquidity fast enough.  In

22   other words, if I have a $50 million securitization, that

23   gets me out to the streets with A's, for instance, but I

24   prefer, as a bank, to bring together $800 million at a time,

25   in a larger securitization.  So S&P, Fitch, Moody's, you

Case 2:13-cv-00779-DOC-JCG   Document 148   Filed 03/18/14   Page 76 of 102   Page ID #:3783
LACV 13-0779 DOC 3/11/2014 – Volume I

76

| | |
|---|---|
| | 1 |

1    come into play in terms of that rating service.

10:52    2         There has to be a value in the marketplace for

3    this liquidity.  And it's the very liquidity, before I got

4    this case, that I understood that the government sought

5    during the debacle; and long before this case had come into

6    my court, the press was very good in reporting to the

7    American public that actually banks were called into the

8    Treasury, apparently -- I don't know if this is true or

9    not -- and told that there was a liquidity crises and that

10    "You," on Bank A, "were going to take a loan."

10:52    11         Some banks, apparently at that table, said, "We

12    don't need a loan from the government.  We don't want your

13    $25 billion."  But apparently there was such a crisis in

14    this country at one time that the government couldn't afford

15    to believe that all of your assets were in order; that your

16    bank records were correct.  And maybe you didn't even know

17    it.  In good faith, you thought you had operating capital

18    and margins of error that would sustain a crisis.

10:53    19         So when the press reported this, long before I got

20    this case, I think the American public watched with interest

21    as the banks were forced, or took, loans for one reason:  To

22    get this liquidity.

10:53    23         So I guess I'm assuring you and the government

24    that I don't have any disagreement with the way the system

25    operates.  I don't care if they're $800 million

1    securitizations or $50 million.  But if they're going to be

2    securitizations that the banks are forming, then there's

3    every reason for the credit agencies to exist.  You're

4    valuable.

10:54    5    So I'm going to stop there with that idle thought

6    and ask you why is S&P's position that, when you are

7    independent and claim independency -- or you're independent,

8    why you seek discovery or care about what the opinion of

9    other entities are?  Why isn't it enough that you

10    demonstrate that internally?  In other words, why in

11    discovery am I chasing these discovery requests about what

12    other agencies think?

10:54    13    I don't understand.

10:54    14    MR. KEKER:  Okay.  Because -- now I'll go to --

15    that's 44, 45 and 46.  These banks, they're -- it's not just

16    banks.  It's issuers, it's arrangers, it's purchasers, all

17    of whom are in this market purchasing these securities.

10:55    18    What did they understand when a rating agent says,

19    "We're independent and objective and believe in our

20    ratings"?  Did they know that they're in business for

21    profit?  They knew that.  And we want to show that.

10:55    22    Did they know that they work according to models,

23    which are observable, and you can look at the model and see

24    if you disagree with it?  They knew that.

10:55    25    Did they know that they are putting in RMBS that's

10:55

10:56

10:56

10:56

10:56

```
 1   rated such and such into a CDO; and that they're using the
 2   RMBS rating to do the CDO?  They knew that.
 3          And all down -- did they know that the rating
 4   agencies are paid -- and actually this is not true -- they
 5   are paid by the special purpose vehicle which creates these
 6   deals.  I mean, that's -- you know, that's the one that pays
 7   out the bank fees and pays out the rating agency fees.  Did
 8   they understand that?  Yes, they understood that.
 9          Did they understand that the SEC and other
10   agencies and the press have been talking about whether or
11   not all of this creates a conflict of interest, and the
12   rating agency shouldn't be trusted; and yet, they're still
13   calling themselves independent/objective?  They knew that,
14   too.
15          So when the rating agencies say that, "We're
16   independent and objective," it means -- and it meant to
17   everybody -- that they are not owned -- they're not a
18   subsidiary of some bank or issuer, or whatever.  They're a
19   freestanding entity.  They're independent in that sense.
20   They're objective and independent in the sense that they
21   announce, "Here's how we do it.  Here's what we're doing.
22   Here's the results of what we get."  And the people
23   understand that.
24          Now, the government has turned that around and has
25   said, "Oh, because you're worried about market share, you're
```

Case 2:13-cv-00779-DOC-JCG   Document 148   Filed 03/18/14   Page 79 of 102   Page ID #:3786
LACV 13-0779 DOC 3/11/2014 - Volume I

79

1    worried about how much money your company makes" -- the

2    people knew that these were profit, uh, things.  But they've

3    turned around, said, independence/objectivity has some

4    almost heavenly meaning, and S&P is liable and -- and, of

5    course, Moody's, who says exactly the same thing, is not.

6    That's one thing.

10:57    7         But now let's go to the next piece of it.  Because

8    most of these CDO's and RMBS that they're claiming losses

9    on, and that they're gonna want to pile up these big numbers

10   on -- they say the ratings were false.  So let's talk about

11   that for a second.

10:57    12        What does "falsity" mean?  Falsity -- they're

13   false at S&P because S&P didn't believe 'em, but they're not

14   false when Moody's does it and gets exactly the same rating.

10:57    15        Now, I understand how you can sort of parse that

16   through in your mind.  But that's a little odd, and -- and

17   so -- and think of what a rating is.

10:57    18        A rating is:  We see this as Triple A.  What does

19   Triple A mean?  It means it's really pretty safe, and we

20   think an awful lot of really bad things have to happen

21   before you have to worry about risk.  We think it's not very

22   risky.

10:57    23        It's a prediction.  It's an opinion.  Did the

24   market understand that exactly?  If they did, maybe this,

25   what they're claiming, is not material.  Maybe what

Case 2:13-cv-00779-DOC-JCG   Document 148   Filed 03/18/14   Page 80 of 102   Page ID #:3787
LACV 13-0779 DOC 3/11/2014 – Volume I

80

|      | 1  | they're -- and -- and, fundamentally, in a criminal case, |

10:58

they're -- and -- and, fundamentally, in a criminal case,

which this is -- they're bringing -- criminal case.  They're

saying, "You committed wire fraud."  You're criminals.

There's a criminal in this organization.

10:58

        And -- and we're saying, how can a jury find fraud

when all the market participants had the same key facts,

operated the same way, came to the same conclusions of

Standard & Poor's.  And that's not -- and let me go back to

the banks and the arrangers.  When the banks set out to do

this, they say it's not so much liquidity they're looking

for.  They're looking for fees.  And sometimes they're

looking to buy some of what they create.  But they -- they

go out and they say their syndicate desk -- and this is a

case we did before Judge Rakoff -- the syndicate desk goes

out, says, "You know, we're putting -- thinking of putting

together a billion-dollar CDO.  And it's gonna have -- about

half of it'll be Triple A and another piece'll be Double A,

and on down, so on.  You wanna buy some?"

10:59

        And they begin to line up customers.  And people

say, "Well, I'm not too interested in that."  But

eventually, they come -- "We think we can put a deal

together, because there's people who are willing to buy it,

so let's move forward."  So they hire a manager.  The

manager looks at all this stuff.

10:59

        Then, at some point -- because it is required --

|      |    |                                                              |
|------|----|--------------------------------------------------------------|
|      | 1  | the rating agency has got to get in the game and say, "We're  |
|      | 2  | gonna –– we're gonna rate this."  But, in the meantime,       |
|      | 3  | they're –– the structures in the bank are working through     |
|      | 4  | this.  'Cause they know the models.  They're –– they say,     |
|      | 5  | "If we put in these A's or these B's, or whatever we're       |
|      | 6  | putting into this deal, the securitization, what kind of      |
|      | 7  | ratings are we gonna get?"                                    |
| 10:59| 8  | "Oh, well, that's not gonna work, so let's change             |
|      | 9  | it."  And they keep changing it to try to make the fees.      |
|      | 10 | And then, finally they get something they think works.  They  |
|      | 11 | take it to the rating agency.  The rating agency runs it      |
|      | 12 | through these public models.  The rating agency says ––       |
|      | 13 | whatever it says.  Bank comes back, looks at it, and ––       |
|      | 14 | say (sic), "Gee, that's not enough Triple A.  We need more    |
|      | 15 | because we're not gonna be able –– have enough interest to    |
|      | 16 | make money on our fees."  And so they tweak it some more.     |
|      | 17 | Take it back to the rating agency –– I mean, the rating       |
|      | 18 | agency is a pimple on –– on this whole thing.                 |
| 11:00| 19 | And –– and we need –– and so now they're bringing             |
|      | 20 | this case where they say, "You don't need to take any         |
|      | 21 | discovery of the –– of the banks and the issuers."  Well,     |
|      | 22 | the banks –– the SEC is suing one of the banks –– I mean,     |
|      | 23 | suing in one deal ––                                          |
| 11:00| 24 | THE COURT:  Let me go back to that point.                     |
| 11:00| 25 | Why are you depending upon the government, your               |

Case 2:13-cv-00779-DOC-JCG   Document 148   Filed 03/18/14   Page 82 of 102   Page ID #:3789
LACV 13-0779 DOC 3/11/2014 – Volume I

82

|       |    |                                                                   |
|-------|----|-------------------------------------------------------------------|
|       | 1  | very adversary, to hand over the discovery that you're            |
|       | 2  | seeking?  Why isn't it better that you go after the banks         |
|       | 3  | that are securitize -- or packaging this on the street?          |
| 11:00 | 4  | And let me tell you why.  The thought might occur                 |
|       | 5  | to some that those are your very clients.  And I'm sensitive     |
|       | 6  | to that.  I mean, S&P's in a business.  And all of a sudden       |
|       | 7  | you're involved in a public forum, in a lawsuit with some        |
|       | 8  | notoriety to it.  And you start subpoenaing the very banks        |
|       | 9  | who are your clients.  It can absolutely destroy your            |
|       | 10 | company.                                                          |
| 11:01 | 11 | I'm obviously sensitive to that.  But, by the same               |
|       | 12 | token, I don't understand why you go to the government for       |
|       | 13 | the very same information.  And then we depend upon              |
|       | 14 | completeness.  How do we know they've got complete records?      |
| 11:01 | 15 | MR. KEKER:  We don't.                                             |
| 11:01 | 16 | THE COURT:  And you're depending upon your                        |
|       | 17 | adversary now to turn them over.  When they start claiming       |
|       | 18 | privileges, et cetera, some may be very good privileges and     |
|       | 19 | you're not gonna get all the records.  Why aren't you           |
|       | 20 | tussling with the banks?                                          |
| 11:01 | 21 | MR. KEKER:  We have Rule 45 subpoenas out.  And                   |
|       | 22 | before I give you the list, I want to tell that we've been       |
|       | 23 | stiffed on every one, and we're gonna have to fight through      |
|       | 24 | every one.  Here's who we subpoenaed:                           |
| 11:01 | 25 | Bank of America Corporation.                                      |

Case 2:13-cv-00779-DOC-JCG  Document 148  Filed 03/18/14  Page 83 of 102  Page ID #:3790
LACV 13-0779 DOC   9/11/2014 – Volume I

83

11:01  1          Bank of America NA.

11:02  2          Citigroup.

11:02  3          Global Markets.

11:02  4          Royal Bank of Scotland.

11:02  5          Allied Financial, a successor to GMAC.

11:02  6          Barclays Capital.

11:02  7          THE COURT:  Now, just a moment.  Before you read

       8  that list, I can probably read that list.  Okay?  That's

       9  very dramatic.

11:02  10          Let me help you with this.  You got stiffed on

       11  'em, but you haven't brought it to the Court yet.

11:02  12          MR. KEKER:  No.  We're -- we're engaging --

       13  "stiffed" is -- I get too hyperbolic.  We're -- "meeting and

       14  conferring" is the polite term for it.

11:02  15          THE COURT:  It's a great word.  Okay?  Either one.

11:02  16          MR. KEKER:  I call it "stiffed."  They call it

       17  "meeting and conferring."

11:02  18          THE COURT:  You haven't brought it to the Court

       19  yet.

11:02  20          MR. KEKER:  No, sir.  Because we haven't worked

       21  through the full process of "Gee, whiz.  Can't you do this?

       22  Can't do you that?"

11:02  23          THE COURT:  Why do I care, as a Judge?  Just bring

       24  it to me.  I'm not giving you any indication.  Bring the

       25  banks in here.

11:02　1　　　　　MR. KEKER:  You don't have jurisdiction over -- I

2　mean, they are gonna claim you don't have jurisdiction over

3　most of them; that we have to bring -- the subpoena was

4　served on them in a foreign -- they're gonna assert the

5　Federal Rules of Civil Procedure and say, "Bring a motion in

6　the Southern District of New York," or in the District of

7　New Jersey, or whatever.

11:03　8　　　　　THE COURT:  And there's what I pointed out with

9　clairvoyance nine months ago.  I told both of you I was

10　concerned about the lawsuit being filed on the West Coast

11　when the gravamen of this lawsuit seemed to be in

12　Washington D.C. and New York.

11:03　13　　　　　MR. KEKER:  We didn't file it.

11:03　14　　　　　THE COURT:  I know.  I know.  I'm just saying that

15　to the government.  I'm looking at you, but I'll look at the

16　government.  Okay?

11:03　17　　　　　MR. KEKER:  And --

11:03　18　　　　　THE COURT:  And why that occurred, I don't really

19　care.  But I recognize my jurisdictional problems to begin

20　with.

11:03　21　　　　　And I have to go give a speech.  I'm leaving you

22　now.  I want you to come back here at 1:45 -- with my

23　apologies.  I've got a bunch of people waiting.

11:03　24　　　　　MR. CARDONA:  Can I just raise one issue before

25　you go?  Mr. Walsh has a flight --

11:04    1          THE COURT:  Up to you, Counsel.

11:04    2          MR. CARDONA:  Very well.

11:04    3          THE COURT:  But I have to leave.  Thank you very

        4    much.  He can do whatever he wants to.

11:04    5          (Proceeding recessed at 11:04 a.m.)

02:06    6          (Proceedings resumed at 2:06 p.m.)

02:06    7          THE COURT:  Okay.  Mr. Keker, please.

02:06    8          We're on the record.

02:06    9          MR. KEKER:  Good afternoon, Your Honor.

02:06   10          THE COURT:  Good afternoon.

02:06   11          MR. KEKER:  When we broke, I was talking about the

        12   difficulty of getting the documents from the banks.  And

        13   this is in the context, not of something that you need to do

        14   something about now, but in response to your comments about

        15   why are you trying to get this material from the government?

        16   Why don't you get it from the banks?

02:06   17          And I take it, unless you want me to, I will not

        18   list the 57 subpoenas that are out.  But I can guarantee you

        19   that these are all the big banks and that the idea that S&P

        20   is pulling punches with respect to the big banks is not --

        21   is not true.

02:07   22          THE COURT:  Let's talk about that now.  This is a

        23   very scattered hearing, but there's a lot to cover.  Okay?

        24   And I haven't lost track of Geithner.  I haven't lost track

        25   of the reasons you're here.  But let's just talk about some

1    of the concerns.

02:07    2         And, remember, I don't, own anything I'm saying

3    today.  I'm exploring with you.

02:07    4         I'll repeat *ad nauseam* what I'm concerned about is

5    I understand that you need to defend.  You have to have

6    discovery to defend.  And I think I understand the Catch 22

7    that occurs, which is very unfair.

02:07    8         On one hand, if you go to the government and you

9    depend upon discovery from the government, if -- the

10   government should resist, on many occasions, rightly or

11   wrongly, but assert the privilege -- investigative

12   privilege, work-product privilege -- so every time that

13   occurs, if I make one mistake, I set up an appealable issue

14   for you.

02:08    15        In other words, the government's right on a

16   investigative privilege.  They're right again on another

17   investigative privilege.  They're right on a work-product

18   privilege.  And I make a mistake.

02:08    19        In the -- hold on.  Bear with me.

02:08    20        MR. KEKER:  Yes, sir.  Sorry.

02:08    21        THE COURT:  I'm not getting any sleep.  I'm trying

22   to -- so now, depending upon the government and going to

23   them, I have a whole string of your opposition literally

24   controlling -- and in good faith, attempting to do the right

25   thing, but controlling and always asserting different

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | privileges that I have to deal with.                                 |
| 02:09 | 2  | If I go to the bank and -- have you go to the               |
|       | 3  | bank, I'm equally concerned that you have fair defense.              |
|       | 4  | Remember, the government's asking for money.  Whether it's           |
|       | 5  | gain or loss, they're asking for money.                              |
| 02:09 | 6  | So how do you defend yourself?  I understand if             |
|       | 7  | you go to the bank, I'm going to have a flood of lawyers in          |
|       | 8  | here claiming that I don't have jurisdiction.                        |
| 02:09 | 9  | Now it goes to another judge who's much wiser, who          |
|       | 10 | makes those decisions.  But I'm not controlling my own              |
|       | 11 | lawsuit.  I'm at the mercy of other courts who are not              |
|       | 12 | intimately involved -- who are going to make excellent             |
|       | 13 | decisions, by the way.                                              |
| 02:09 | 14 | MR. KEKER:  They always do.                                  |
| 02:09 | 15 | THE COURT:  Yeah, they always do.                            |
| 02:09 | 16 | So what's my remedy?  I can do draconian things,            |
|       | 17 | like put the government in the position of non-discovery,           |
|       | 18 | didn't come from the banks, of just dismissing that claim.          |
| 02:09 | 19 | But that's not fair to the government.  Because             |
|       | 20 | they will claim, "Judge, we didn't have anything to do with         |
|       | 21 | this.  The banks didn't give discovery."  But it still              |
|       | 22 | leaves you in the position where the government's asking for        |
|       | 23 | money, and you have to have enough information to defend            |
|       | 24 | your claim.                                                         |
| 02:10 | 25 | I don't know what to do with that right now.                |

Case 2:13-cv-00779-DOC-JCG  Document 148  Filed 03/18/14  Page 88 of 102  Page ID #:3795
LACV 13-0779 DOC 5/11/2014 - Volume I

88

02:10     1          MR. KEKER:  Can I respond to a couple things?

          2  'Cause I think we have ideas about what you should, and why.

02:10     3          Let me start with your premise.  The idea -- in a

          4  case that the government brings, there's plenty of case law

          5  that says they can't assert the investigatory privilege.

          6  *Wright and Miller* says that.  *United States v. Anderson*, an

          7  FRD case, 139 FRD in the Second Circuit, in the Southern

          8  District, says that the government, as plaintiff in a civil

          9  action, may not proceed affirmatively against a defendant

         10  while at the same time seeking, under the guise of

         11  privilege, to deprive the defendant of evidence useful to

         12  the defense.  And *Wright and Miller* lays it out more

         13  clearly.  So we don't accept the premise that they have an

         14  investigatory privilege.

02:10    15          However, we are accepting, by our narrowing of our

         16  requests, the fact that we are not asking for their work

         17  product.  We are not asking for anything that would spoil

         18  investigations.  We have narrowed -- I won't say it's very

         19  limited, but it's limited to factual materials that they

         20  have gathered from these other people.

02:11    21          And what we're saying is a very, very simple

         22  premise.  We're in litigation with them.  We're gonna go to

         23  trial before a jury with them.  They've got it and we don't.

         24  Why -- how could that possibly be?

02:11    25          THE COURT:  Will you be satisfied, now and for

Case 2:13-cv-00779-DOC-JCG   Document 148   Filed 03/18/14   Page 89 of 102   Page ID #:3796
LACV 13-0779 DOC 9/11/2014 - Volume I

89

|       |    |                                                                         |
|-------|----|-------------------------------------------------------------------------|
|       | 1  | appellate purposes, that you've really received all of the              |
|       | 2  | things that you need, that you normally would go to the bank            |
|       | 3  | for, but for your fear of, you know, lack of jurisdiction of            |
|       | 4  | this Court in getting that information?                                  |
| 02:11 | 5  | Because you're placing yourself in the hands of                         |
|       | 6  | your adversary in terms of decision-making.  And I can't                |
|       | 7  | imagine that they're not going to assert investigative                  |
|       | 8  | privilege, and even more importantly, work product.                     |
| 02:12 | 9  | MR. KEKER:  Well, work product, we're saying --                         |
|       | 10 | we're accepting.  And we have narrowed our request to get               |
|       | 11 | out of work product.                                                     |
| 02:12 | 12 | What we're not accepting is investigatory                               |
|       | 13 | privilege.  I mean, for example, they know -- they've gone              |
|       | 14 | out and talked to -- I don't know how many people.  10,000              |
|       | 15 | people.  They've cited to you four people who say, "Oh, I               |
|       | 16 | think S&P -- now that you've read me some e-mail, I think               |
|       | 17 | that's just terrible, and I would have changed my opinion."             |
| 02:12 | 18 | How many of the other 9,990 said, "We don't                            |
|       | 19 | actually use S&P that way.  That's not the way we see it."              |
|       | 20 | I mean, this -- if this were a criminal case, we would be              |
|       | 21 | entitled to *Brady* material.  And the government couldn't sit         |
|       | 22 | there not telling us who -- what witnesses and evidence is             |
|       | 23 | against their theory.                                                    |
| 02:12 | 24 | It's a civil case.  And we don't have *Brady*.                         |
|       | 25 | They've told us they don't -- we don't have *Brady*.  They             |

Case 2:13-cv-00779-DOC-JCG   Document 148   Filed 03/18/14   Page 90 of 102   Page ID #:3797
LACV 13-0779 DOC 3/11/2014 – Volume I

90

1   say, "In a civil case, use civil discovery."  We're trying

2   to use civil discovery to get the *Brady* material, I mean, to

3   get all of these people that they've talked to who say, "I

4   don't agree with your theory," or "That's not the way I view

5   the rating agency's role in these things," or "It was

6   actually our bank who made all the mistakes in issuing this"

7   or, "We didn't really give the true and correct information

8   to the rating agencies" -- all of that material, which we

9   think is very, very powerful for lots of reasons in our

10  case, they had -- I'm not saying "all" -- but they've got --

11  whatever they have of that, we're trying to get from them.

02:13   12          Now, what that will allow us to do, I hope, is

13  sort of get moving.  We've been trying to --

02:13   14          THE COURT:  Just a moment.  Don't leave that

15  thought.

02:13   16          MR. KEKER:  All right.

02:13   17          THE COURT:  Will you be satisfied with all the

18  material that they have in their possession?  Because I read

19  your documents as going further.  At least the government

20  brought back an argument; and that is, this is so burdensome

21  because we have to go through every office.  And the specter

22  was thrown out that this was the beginning of a discovery

23  process, which would cause them to do more than turn over

24  the present files.  It would cause them to go forward and

25  attempt to get additional discovery on your behalf.  And

DEBBIE GALE, U.S. COURT REPORTER

Case 2:13-cv-00779-DOC-JCG   Document 148   Filed 03/18/14   Page 91 of 102   Page ID
#:3798
LACV 13-0779 DOC   3/11/2014 - Volume I

91

02:14  1   that's a dangerous place for the government to be.  I don't
       2   think that they can ever accede to that.
02:14  3         MR. KEKER:  But -- but the government is suing us.
       4   And we've limited our request to information that they have
       5   in their files -- or, I mean, in their "files," being the
       6   big collective government -- about the securities that they
       7   say formed the basis of both liability and their arguments
       8   about loss.  And if there are people -- I mean, for example,
       9   I'll give you one that --
02:14 10         THE COURT:  What happens if 99 percent of this is
      11   in Washington D.C. or New York, and they miss one percent
      12   out in Kansas City or someplace?  Why should the government
      13   be held to that standard?
02:15 14         MR. KEKER:  Well, then, we're talking about
      15   discovery sanctions, and you can deal with that then.
02:15 16         But what we're talking about is just give us
      17   what -- I mean, they're not even giving us what they have in
      18   their files in the Central District of California in
      19   Los Angeles, or what these gentlemen back in Washington have
      20   in their files.
02:15 21         They know, Your Honor.  They're taking some of
      22   these securities, which they're blaming S&P for, and they're
      23   investigating banks that issued those securities and making
      24   accusations about people, or maybe thinking about making
      25   accusations, and gathering information that people are

 1  telling 'em about how/why that security happened and what

 2  went wrong with that security.  And now, with that

 3  information, they're gonna try a case against us and not

 4  tell us that information.

02:15    5       I mean, it's -- it strikes me as preposterous.

 6  And it points out to me the enormity of this task.  And

 7  we'll get to this in a minute.  But, if we were talking

 8  about like one issuer and 15 securities or something, then

 9  all of this, I think it would be a lot easier to work out.

02:16   10       The reason that we're worrying about Kansas City

 11  is because we've got 158 securities not -- for many, many

 12  issuers, 21 issuers, so -- but I'm gonna talk about that.

 13  I'm gonna talk about that in a second.

02:16   14       But let me go to the next step.  We're not

 15  stopping our discovery against the banks.  I mean, we're --

 16  we plan to get documents from the banks.  We plan to take

 17  depositions of the banks.  But I know we are going to be

 18  fighting with a lot of these banks a year from now.  And

 19  what we're gonna have to do is take -- is treat -- as we

 20  were talking at lunch -- the good, as the enemy -- the

 21  best -- we're gonna have to take what we have, and figure

 22  out who we're gonna depose, and get out there.  Because we

 23  have like 150 depositions to take, if this case stays as big

 24  as it is.

02:16   25       And in order to do that, at least we ought to have

| | |
|---|---|
| | 1 |

what the government's already got and -- turn over to us.

02:17  Now they raise things that -- the burden we
responded to that -- they raise things like "poor Moody's
and Fitch" --

02:17  THE COURT:  Now, just a moment.

02:17  "Objection.  Your Honor, this is investigative
privilege.  And although S&P is defending itself, we have an
ongoing investigation against bank one, two and five.  And
we've got an ongoing investigation against Rating Agency
No. 3."

02:17  MR. KEKER:  And you know that witness A, B, C and
D are saying things that are relevant, that if S&P knew
about it, would be very, very interesting to use to defend
this case.  And you know about it, and you don't tell us
about it.  That's wrong.  I mean, if this were -- if this
were a criminal case, it would clearly be wrong.

02:17  As a civil case -- and that's why we say this --
they brought the case.  If they don't want to let us know
that Joe Blow gave a FIRREA deposition in some investigation
of another bank, and said certain things that would be
extremely helpful to us in this case -- if they don't want
us to know that, then they can dismiss the case, or they can
get rid of those -- of that security or whatever.

02:18  THE COURT:  I'm gonna want to talk to you about
any ideas that you have that would be less burdensome but

02:18

 1    would guarantee information getting to S&P about defending,

 2    especially when you're after, a loss concept versus a gain

 3    concept.

 4          Or, does S&P have a good point –– that Mr. Keker

 5    raised a couple months ago; and that is, "Hey, a trial run."

 6    You know, a smaller case for –– now, I don't think the

 7    government wants that, but, you know, that's the other

 8    possibility.  So that's still on the table.

02:18

 9          MR. KEKER:  I mean, I've just got a little bit

10    more about that, if I may, Your Honor.

02:18

11          The point of this is, the government is the one

12    who's saying, "Let's get this case tried quickly."  You want

13    to get it tried in 2015.  It's clear.  I mean, we're

14    listening to what you're –– what you're saying.  But at the

15    same time –– I mean, we said, "Judge, we're gonna get

16    discovery from the government during that four-month hiatus.

02:19

17          THE COURT:  Right.

02:19

18          MR. KEKER:  We've been trying to get that

19    discovery.  And here we are.  I mean, we are not getting ––

20    so if people want a trial in the near term, our first point

21    is how about turning over the information that we're asking

22    for, and let's get –– let's be done with it and get moving.

02:19

23          The second is, as you say, let's limit the case.

24    Our suggestion is only one.  We can do it other ways, but

25    our suggestion was take Citigroup.  You've got 30 percent

Case 2:13-cv-00779-DOC-JCG   Document 148   Filed 03/18/14   Page 95 of 102   Page ID #:3802
LACV 13-0779 DOC 3/11/2014 - Volume I

95

```
 1   was alleged losses -- that's big numbers -- in that thing:

 2   15 securities.  One issuer.  A manageable deal.  We'd all

 3   just pour ourselves into that one.

 4          At the end of that trial, there would be a

 5   decision on liability.  We'd win or we'd lose.  There would

 6   be decisions made about what -- you would look at it and

 7   say, "Well, now that I've heard this, this is how I'm a

 8   gonna deal with this all-important penalty thing."

 9          You would have decided what jury instruction --

10   which is what we need -- what jury instruction the jury's

11   gonna get about what they're supposed to decide about money

12   in this case.  And, yes, there would still be other parts of

13   their allegation.

14          But, boy, we'd be a long way down the road towards

15   either motion practice, which says all of this has been

16   decided and it can't be litigated again, which would be the

17   legal way to go, or everybody getting real and looking at

18   it, saying, "This is what's happened so far.  I guess we

19   don't need to fight about it anymore.  Let's just work it

20   out," but -- and so that's a possibility.

21          And then the third thing that we think, as -- as

22   I've mentioned, is this gain-loss problem.  They alleged in

23   the complaint -- they didn't allege that the criminal intent

24   here is to cause anybody a loss.  They allege that the

25   criminal intent is to get a gain for Standard & Poor's; that
```

02:19

02:19

02:20

02:20

Case 2:13-cv-00779-DOC-JCG   Document 148   Filed 03/18/14   Page 96 of 102   Page ID #:3803
LACV 13-0779 DOC 3/11/2014 – Volume I

96

02:20

that's the allegation in the Complaint.

And now they want to turn around and make loss the all -- the "be-all and end-all."  And they don't want any apportionment.  They want -- they don't want -- the fact that 99 percent -- 99.9 percent of the fault lies elsewhere.  If any of the fault lies with S&P, they want a hundred percent of the loss, and so on.

02:21

Those are -- are matters that Judge Margaret Morrow, in this district, has grappled with in the *Menendez* case in 2013; Judge Rakoff is grappling with, as we speak -- and we'll have a hearing on Thursday, and an opinion to come out.  And we offer -- we'll send you a transcript of the things he said before.

02:21

What happened in that case is the government came in after the trial, and they said, "Okay.  Here's what we want for penalty."  And it was all loss.  And Judge Rakoff, at the hearing, said, "I've studied this.  I've thought about it.  I think the statute should be focused on gain.  Go back and do it again."  And the parties re-briefed it.  And now he's about to hear it, and eventually will decide it.

02:21

If we could have a session based on decent briefing, with a shirt-sleeve session -- we're not asking you to make final rulings -- after filing a brief and letting you really grapple with it, which you're eventually

Case 2:13-cv-00779-DOC-JCG   Document 148   Filed 03/18/14   Page 97 of 102   Page ID #:3804
LACV 13-0779 DOC 3/11/2014 – Volume I

97

|      |    |                                                              |
|------|----|--------------------------------------------------------------|
|      | 1  | gonna have to do, and decide what's the role of gain.  As I   |
|      | 2  | reiterate, the gain in this is –– is a fraction of            |
|      | 3  | $60 million in terms of what S&P got for rating these         |
|      | 4  | securities.                                                   |
| 02:22 | 5  | The loss, under the government's theory, is, as              |
|      | 6  | you know, billions and billions.                             |
| 02:22 | 7  | So those three things:  Make 'em give us the                |
|      | 8  | discovery, so we can get this thing moving.  We'll continue   |
|      | 9  | to fight with the banks, which is gonna be a mess, and ––     |
|      | 10 | and a huge, um, uh, use of time and effort.  And who knows    |
|      | 11 | what we're gonna get out of it, but we'll be running around   |
|      | 12 | the country trying to do something about that.               |
| 02:22 | 13 | And –– but if –– instead of doing that, if we               |
|      | 14 | could run around the country –– and here's another thing      |
|      | 15 | about picking maybe an "issuer."  If this trial were gonna    |
|      | 16 | be about one federally insured bank, I'll bet you would have  |
|      | 17 | a lot easier time persuading the general counsel or the CEO   |
|      | 18 | or somebody of that bank to cooperate in the way that you     |
|      | 19 | think is necessary for a fair trial, rather than 45 or 22     |
|      | 20 | banks, which is what we're ––                                 |
| 02:23 | 21 | THE COURT:  Explain that further.  How would that           |
|      | 22 | bank be chosen?                                              |
| 02:23 | 23 | If I was one of those 57 entities or banks that            |
|      | 24 | you mentioned, the last thing I would want to do is be seen   |
|      | 25 | as a test case and read my name in the press.               |

02:23   1              MR. KEKER:  Well, no test -- none of 'em are gonna

        2    be happy being involved in this case.

02:23   3              THE COURT:  How do we choose that bank?

02:23   4              MR. KEKER:  Well, we think you choose that bank

        5    by -- there's two huge elephants in the corner.  One is

        6    Citigroup and one is Bank of America.  So that's why we've

        7    suggested pick one of the huge elephants in the corner.

02:24   8              THE COURT:  No.  Just a moment.

02:24   9              MR. KEKER:  And Citigroup is the biggest.  So we

       10    picked the biggest.

02:24  11              THE COURT:  How big are those combined?

02:24  12              MR. KEKER:  How big is the case?

02:24  13              THE COURT:  Yeah.

02:24  14              MR. KEKER:  Citigroup has 15 CDOs, and Bank of

       15    America has six or seven.  And the amount of alleged loss

       16    just for Citigroup is like 30 percent of the allegations.

02:24  17              THE COURT:  What about Bank of America?

02:24  18              MR. KEKER:  And for the two, it's like 60 of the

       19    allegations -- 60 percent of the dollar --

02:24  20              THE COURT:  So 30 percent for each?

02:24  21              MR. KEKER:  Something like that.

02:24  22              THE COURT:  So you're dealing with a finite number

       23    of banks, a finite number of discovery problems, and

       24    60 percent of the loss that could be resolved, even if I

       25    viewed it as loss and not gain?

Case 2:13-cv-00779-DOC-JCG   Document 148   Filed 03/18/14   Page 99 of 102   Page ID #:3806
LACV 13-0779 DOC 9/11/2014 - Volume I

99

02:24   1          MR. KEKER:  Yes, sir.  And -- yes, sir.

02:24   2          And you're also dealing with banks who are used to

        3    the vagaries of the federal government.  I mean, they got to

        4    get along with the federal government and so on.

02:24   5          The idea that there would be more influence to

        6    yield with those banks to get their witnesses and their

        7    folks under the jurisdiction of this Court would, I think,

        8    at least have some prospect.  It has no prospect, if we --

02:25   9          THE COURT:  So I'm gonna repeat back to you.

       10    Another way of saying it is that the 40 percent is the

       11    burdensome part.  The other 40 percent out there of those

       12    bank or entities involved in the CDOs are causing us the

       13    majority of our problems?

02:25  14          MR. KEKER:  We've said that we think that the

       15    little -- that the Citigroup case alone is a huge burden.

       16    It would be a double burden to do the two -- huge case --

       17    but a lot better than what we've got now.  I mean, it's -- I

       18    don't want to make it sound like, gee, we've gotten this

       19    great victory.  We don't have to do much.  I mean, getting

       20    discovery from these banks and all of these CDOs is gonna be

       21    a huge task.  Our suggestion was, if you cut it down to just

       22    Citi, the trial would be in late 2015.

02:26  23          But -- anyway, we can talk about the specific

       24    schedule.  But, yes, it's -- I don't want to leave you with

       25    the impression that somehow this is a little small case.

Case 2:13-cv-00779-DOC-JCG   Document 148   Filed 03/18/14   Page 100 of 102   Page ID #:3807
LACV 13-0779 DOC   3/11/2014 – Volume I

100

| | | |
|---|---|---|
| 02:26 | 1 | THE COURT:  I don't -- |
| 02:26 | 2 | MR. KEKER:  We're still in a huge world of -- |
| | 3 | world of hurt, but it's not -- it's not this.  And it's not |
| | 4 | the same 150 depositions.  It's gonna be a lot less |
| | 5 | depositions. |
| 02:26 | 6 | THE COURT:  How many? |
| 02:26 | 7 | MR. KEKER:  But there's still a lot of -- you |
| | 8 | know, the -- |
| 02:26 | 9 | THE COURT:  How many depositions? |
| 02:26 | 10 | MR. KEKER:  Well, we've listed the potential |
| | 11 | depositions that we need before trial.  We've listed nine |
| | 12 | government entities. |
| 02:26 | 13 | THE COURT:  No, no.  If it was Citigroup, how many |
| | 14 | depositions approximately?  Not holding you to it; just an |
| | 15 | idea. |
| 02:26 | 16 | MR. KEKER:  Uh, the purchase -- we'd do the home |
| | 17 | loan banks.  We wouldn't do the credit unions.  We would |
| | 18 | still have to do the arrangers.  I don't know how many -- |
| | 19 | there's 19 arrangers. |
| 02:26 | 20 | THE COURT:  Come up with a figure later for me |
| | 21 | today.  Give me a rough idea. |
| 02:27 | 22 | MR. KEKER:  Okay. |
| 02:27 | 23 | THE COURT:  It's not something I'm holding you to |
| | 24 | that.  It's something you have to calculate. |
| 02:27 | 25 | MR. KEKER:  Okay. |

Case 2:13-cv-00779-DOC-JCG  Document 148  Filed 03/18/14  Page 101 of 102  Page ID #:3808
LACV 13-0779 DOC 3/11/2014 – Volume I

101

| | | |
|---|---|---|
| 02:27 | 1 | THE COURT:  I'm just trying to get my hands around |
| | 2 | what officially gets this case off the ground. |
| 02:27 | 3 | MR. KEKER:  It would be a lot less.  We'll do it. |
| | 4 | We'll do it. |
| 02:27 | 5 | THE COURT:  Okay.  All right.  Give me an idea |
| | 6 | later on. |
| 02:27 | 7 | MR. KEKER:  Okay. |
| 02:27 | 8 | Anything else, Your Honor, for now? |
| 02:27 | 9 | THE COURT:  Hundreds of things.  But we'll come |
| | 10 | back to it.  Okay? |
| 02:27 | 11 | Counsel, the lectern's yours for any issue you'd |
| | 12 | like, and any issue you'd like. |
| 02:27 | 13 | *(Live reporter swith at 2:27 p.m.)* |
| 02:27 | 14 | *(Further proceedings reported by Maria Dellaneve* |
| | 15 | *in Volume II.)* |
| 02:27 | 16 | -oOo- |
| 02:27 | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

02:27    1                              -oOo-

02:27    2

02:27    3                            CERTIFICATE

02:27    4

02:27    5          I hereby certify that pursuant to Section 753,

         6    Title 28, United States Code, the foregoing is a true and

         7    correct transcript of the stenographically reported

         8    proceedings held in the above-entitled matter and that the

         9    transcript page format is in conformance with the

        10    regulations of the Judicial Conference of the United States.

02:27   11

02:27   12    Date:  March 14, 2014

02:27   13

02:27   14
02:27                             /s/ Debbie Gale
02:27   15                         _____
02:27                             DEBBIE GALE, U.S. COURT REPORTER
02:27   16                         CSR NO. 9472, RPR

02:27   17

        18

        19

        20

        21

        22

        23

        24

        25