KEKER & VAN NEST LLP
JOHN KEKER (SBN 49092)
jkeker@kvn.com
ELLIOT R. PETERS (SBN 158708)
epeters@kvn.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188

CAHILL GORDON & REINDEL LLP
FLOYD ABRAMS (*pro hac vice*)
fabrams@cahill.com
S. PENNY WINDLE (*pro hac vice*)
pwindle@cahill.com
80 Pine Street
New York, NY 10005-1702
Telephone: 212 701 3000
Facsimile: 12 269 5420

KELLER RACKAUCKAS LLP
JENNIFER L. KELLER (SBN 84412)
jkeller@krlawllp.com
18300 Von Karman Avenue, Suite 930
Irvine, CA 92612
Telephone: 949 476 8700
Facsimile: 949 476 0900

Attorneys for Defendants MCGRAW-HILL FINANCIAL, INC., and STANDARD & POOR'S FINANCIAL SERVICES LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MCGRAW-HILL COMPANIES, INC. and STANDARD & POOR'S FINANCIAL SERVICES LLC,<br><br>Defendants. | Case No. CV13-779 DOC (JCGx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PHASED TRIALS PURSUANT TO RULE 42(B)**<br><br>Date:   April 14, 2014<br>Dept.:  Courtroom 9D<br>Judge:  Honorable David O. Carter<br><br>Complaint filed February 4, 2013 |

# TABLE OF CONTENTS

**Page**

I. Introduction ................................................................................................. 1

II. Background ................................................................................................. 2

III. Argument .................................................................................................... 4

    A. The Scope of the Government's Case Is Too Broad for a Single Trial. ............................................................................................. 5

        1. Trial on 158 Securities Is Needlessly Complex, Inefficient, and Risks Juror Confusion. ........................................ 5

        2. Discovery Necessary for a 158-Security Trial Cannot Be Completed by May 2015. ..................................................... 9

    B. The Court Should Order an Initial Trial on those Securities in which Citigroup Is Alleged to Have Suffered Losses. ................... 10

    C. Alternatively, the Court Could Order the Parties to Provide Separate-Trial Proposals for the Court's Selection ........................... 11

IV. Conclusion ................................................................................................ 12

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Calmar, Inc. v. Emson Research, Inc.*
  850 F. Supp. 861 (C.D. Cal. 1994) ................................................................... 5

*City of Detroit v. Simon*
  247 F.3d 619 (6th Cir. 2001) .......................................................................... 12

*Ellingson Timber Co. v. Great N. Ry. Co.*
  424 F.2d 497 (9th Cir. 1970) ........................................................................... 5

*Federal Home Loan Bank of San Francisco v. Deutsche Bank Secs.*
  No. CVC-10-497839 (Aug. 21, 2013) ........................................................... 12

*Space Coast Credit Union v. Merrill Lynch, Pierce, Fenner & Smith Inc., et al.*
  No. 12-cv-60430 (S.D. Fla. March 25, 2014) ................................................. 5

*Spellbound Dev. Grp., Inc. v. Pac. Handy Cutter, Inc.*
  SACV No. 09-951, 2011 WL 1810961, at *4 (C.D. Cal. May 12, 2011) ........ 4

**Federal Rules**

Fed. R. Civ. P. 26(f) ............................................................................................ 11

Fed. R. Civ. P. 42(b) ................................................................................. 1, 2, 4, 5

Fed. R. Civ. P. 45 .................................................................................................. 9

## I. Introduction

The Government has alleged a case of such sweeping breadth that it cannot fairly be tried in a single trial.  The Government's case, as constituted, encompasses S&P's ratings on more than 150 distinct securities spread out over 4 years, each of which implicates a host of third parties who arranged, issued, managed, and purchased them.  A fair trial will require a jury to consider the specifics of each security, including but not limited to its formation, accumulation of collateral, marketing and sales of notes, pricing, initial rating, obligations on closing, effective date confirmation, subsequent performance of the security, in addition to details on the ownership, gains, and alleged losses by the purchasers.  The Government cannot reasonably expect a single jury to consider the crushing amount of evidence that would necessarily be presented in such a trial.

S&P's solution to this problem is efficient, practical, and fair: conduct an initial trial beginning in September of 2015 as to a limited but significant subset of the securities that the Government has put at issue, while deferring trial as to the remaining securities to a later date.  S&P proposes an initial trial on the securities identified by the Government where Citigroup is alleged to have suffered losses.  Such a trial would include 17 of the securities and more than 30% of the alleged losses put at issue by the Government, while permitting the parties to put on a manageable trial and limiting the risk of juror confusion.  Moreover, such a limited trial would correspondingly limit the amount of evidence needed by S&P to prepare its defense.  A limited set of securities would shrink the universe of "victim" institutions and necessary third parties, in addition to reducing the number of potential witnesses from S&P.  Finally, because such a case would still permit the Government to put on evidence spanning all relevant time periods and relating to a substantial amount of alleged losses, it can show no prejudice.

This type of narrowing is common in cases of this unmanageable scope. Rule 42(b) of the Federal Rules of Civil Procedure empowers district judges to

modify the scope of trials for a variety of reasons, including "convenience, to avoid prejudice, or to expedite and economize" the proceedings.  Rule 42(b) exists because of cases like this.  The Government's response to date—that its case does not require analysis of each individual security—is not accurate, relevant, or fair.  The Government's case inevitably concerns the specific ratings assigned to specific tranches of specific securities.  And even if the Government disagrees, S&P's defense will highlight those specifics and the good-faith basis of every single rating.  S&P is entitled to pursue evidence in support of its defenses, yet the Government has consistently pushed for a discovery schedule that would make sufficient discovery on the full breadth of securities impossible.

The Government's proposed case benefits only one party: the Government.  It wishes to push this Court into holding a multi-month trial in which its case will rely on abstractions regarding "independence" and "objectivity," and S&P will be forced to present the jury with an overwhelming amount of information regarding the actual securities at issue and the detailed processes by which S&P determined their individual ratings.  Such a case is not fair to the Court or to the jury, and it would severely prejudice S&P.

## II.   Background

The unmanageable scope of the Government's proposed trial is a direct result of the complex nature of the securities at issue in this case.  A brief background regarding the many deal participants involved in the construction, sale, and purchase of those securities—principally, Residential Mortgage Backed Securities ("RMBS") and Collateralized Debt Obligations ("CDOs")—illustrates the need for separate trials.

In RMBS, an arranging entity and/or an investment bank representing an arranging entity transfers a large quantity of residential mortgages into a pool held by a trust.  Complaint ("Compl.") ¶ 22.  The arranging entity then issues notes, typically referred to as "tranches," each of which functions like a bond, paying

interest and principle to the note-holder according to its terms. *Id.* ¶¶ 22-23. As homeowners make payments on their mortgages, the trust receives the income from those payments and uses it to pay the note holders. *See id.* ¶ 23.

CDOs are similar, distinguished in part by the kind of collateral that generates the payments to the investors. A CDO is backed by other securities, for example tranches of RMBS or other CDOs. *See* Compl. ¶30. Similar to an RMBS, the arranging bank creates a special corporate entity—a special purpose vehicle ("SPV")—that purchases the collateral and issues notes. *Id.* ¶ 31.

Thus, aside from the S&P witnesses, for each RMBS or CDO, a variety of potentially separate entities are responsible for the funding, design, issuance, marketing, and eventual purchase of tranches of the security. *See* Compl. ¶ 31 (defining "issuer" to include four separate entities). For a typical CDO, the arranging bank is responsible for designing the structure of the security, meaning determining the hierarchy of payments of interest and principle to different "tranches." The cash flows generated by the CDO are distributed according to a "waterfall" in which the senior-most tranches are generally the first to be paid, with the junior tranches being the first to suffer losses in the event of defaults in the underlying collateral.

Before the closing date of the CDO, the arranging bank or collateral manager selects most of the collateral for the CDO. Regardless of which entity actually selects the collateral, the arranging bank finances the purchases and houses the collateral in a "warehouse," which is a segregated account. The arranging bank, or underwriter, is also generally responsible for marketing the security to potential investors. Such marketing efforts typically include representations regarding the type and quality of collateral supporting the CDO. Once the deal closes, the collateral transfers to the SPV. After that point, the Trustee entity manages the distribution of funds and generates trustee reports reflecting payments made by the SPV and tracking the performance of the

1 collateral.

2 As the Court is aware, S&P did not create, issue, sell, or receive any interest
3 in RMBS or CDOs, and S&P did not select the portfolio of assets underlying the
4 RMBS or CDOs.  *See* Comp. ¶¶ 22, 31.  Instead, S&P contracted with the
5 arranging bank on behalf of the to-be-formed SPV in order to provide ratings for
6 the RMBS or CDO tranches to be issued.  Each rating was issued by a separate
7 rating committee, comprised of a number of S&P employees.

8 The Government's Second Supplement to its Initial Disclosures runs twenty-
9 six pages long and identifies 158 securities for purposes of its proof at trial and for
10 calculation of any penalties.  Exhibit B to the Second Supplement identifies the
11 CDOs by name, including a chart reflecting a variety of the entities that were
12 responsible for arranging the CDO, in addition to purchasers of the various
13 tranches.  For example, with regard to the CDO called Ridgeway Court Funding II,
14 the Government's chart reflects that Citigroup Global Markets, Inc. ("Citigroup")
15 was the arranging bank, Credit Suisse Alternative Capital, Inc. was the collateral
16 manager, and Wells Fargo Bank, N.A. was the trustee.  The chart further reflects
17 17 purchasers of the different tranches, including Citigroup itself, which arranged
18 the deal in the first instance.  Nevertheless, the Government alleges Citigroup's
19 losses on this CDO are solely attributable to S&P's supposed fraud.

20 **III.   Argument**

21 Ordering an initial trial on a subset of securities is well within the Court's
22 authority.  "Rule 42(b) of the Federal Rules of Civil Procedure affords a court
23 broad discretion to conduct separate trials of discrete issues or claims if it finds that
24 such bifurcation would be '[f]or convenience, to avoid prejudice, or to expedite
25 and economize . . . .'"  *Spellbound Dev. Grp., Inc. v. Pac. Handy Cutter, Inc.*,
26 SACV No. 09-951, 2011 WL 1810961, at *4 (C.D. Cal. May 12, 2011) (Carter, J.)
27 (citation omitted).  District Courts weigh a variety of factors in considering a
28 motion under Rule 42(b), including "complexity of issues, factual proof, risk of

4

jury confusion, difference between the separated issues, the chance that separation will lead to economy in discovery, and the possibility that the first trial may be dispositive of the case." *Calmar, Inc. v. Emson Research, Inc.*, 850 F. Supp. 861, 866 (C.D. Cal. 1994). The Ninth Circuit has explained that "[o]ne of the purposes of Rule 42(b) is to permit deferral of costly and possibly unnecessary discovery proceedings pending resolution of potentially dispositive preliminary issues." *Ellingson Timber Co. v. Great N. Ry. Co.*, 424 F.2d 497, 499 (9th Cir. 1970).

### A.   The Scope of the Government's Case Is Too Broad for a Single Trial.

The Government's case cannot be efficiently or fairly tried in a single trial, and even if it could, S&P does not have adequate time to conduct the necessary discovery in advance of a September 2015 trial date. Thus, S&P proposes that the Court hold an initial trial that is limited to those securities purchased by Citigroup and its affiliates. In the alternative, S&P proposes that the Court either (i) order the parties to agree to a specified, reduced number of securities, or (ii) order that each party propose for the Court's consideration some other form of initial narrowed trial.

#### 1.   Trial on 158 Securities Is Needlessly Complex, Inefficient, and Risks Juror Confusion.

The Government's 158-security case will require security-by-security proof as to the arrangement of each security, its marketing, sale of particular tranches to particular investors, and losses as to any identified purchaser. The Government's repeated suggestion that its case can focus on alleged flaws in S&P's models, rather than individual ratings, is an illusion. Indeed, Judge Cohn of the Southern District of Florida recently dismissed fraud claims alleged against S&P on the grounds that the plaintiff failed to connect the alleged flaws in the model with the specific ratings at issue. *See Space Coast Credit Union v. Merrill Lynch, Pierce, Fenner & Smith Inc., et al.*, No. 12-cv-60430 (S.D. Fla. March 25, 2014).

Similarly here, evidence regarding the specific ratings on the identified

5

securities is essential. The Government is alleging that each rating was fraudulent. Assuming that each security could be addressed in a single trial day—which is optimistic[1]—the Government's case would require a minimum of six months to try. Such a trial would require at the very least exploration of the detailed background of each security, including the good-faith basis of S&P's ratings, and evidence challenging the Government's allegations that losses on the securities existed in the amounts the Government suggests, and are properly attributable to S&P.

The CDO discussed above—Ridgeway Court Funding II—illustrates the problem. At a minimum, the following witnesses are likely to be called for that security alone:

(1) Witnesses from Citigroup Global Markets, Inc., the arranging bank, to testify about their understanding of the role of S&P and its ratings in structured finance, the initial arrangement and marketing of the CDO, including any independent credit analyses of the collateral, in addition to communications with S&P and other NRSROs regarding the appropriate credit rating for the various tranches. This testimony is directly relevant to the issues of the alleged "falsity" of S&P's statements and ratings, the materiality of the statements made, and the good-faith judgments and actions taken by S&P's employees during an unprecedented time.

Indeed, S&P expects that such evidence will show that the marketplace understood that S&P's ratings actions were, as stated, "independent and objective," and that S&P acted independently and consistently applied its rating criteria and did not change its criteria under pressure. Such evidence is directly relevant to the

---

[1] In July 2012, the undersigned counsel tried a case in the Southern District of New York regarding allegations of securities fraud by a single individual relating to a single CDO. The parties produced tens of millions of pages of documents. Sixteen witnesses were called at trial, and trial lasted two weeks. Not only does this case implicate vastly more relevant securities, it further involves the details of the ratings process, and an adequate trial would be even longer than the multitude of securities alone would suggest.

Government's allegations that S&P's ratings were wrongly influenced by business considerations. Moreover, witnesses from the arranging bank—whose employees typically have access to extensive detail regarding the mortgages that underlie the security—could testify as to the bank's understanding of the creditworthiness of the collateral in the CDO. S&P expects that such evidence will show that S&P's rating was consistent with the views held by knowledgeable persons involved at the arranging bank, and those of other NRSROs, as to the creditworthiness of the securities, and will undermine the Government's view that S&P altered its ratings beyond what was analytically justified. Similarly, such evidence will show that S&P—like the vast majority of other participants in the financial markets, including CDO arrangers—was stunned at the depth of the financial panic that occurred in 2007 and 2008, and that its ratings represented its good-faith judgment at the time they were issued.

(2) Witnesses from Credit Suisse Alternative Capital, Inc., the collateral manager, to testify about the selection of collateral (including any post-closing acquisition of collateral), including any analyses of the performance of such collateral and risk assessments of likely future performance, and communication of those risk assessments to other parties. This testimony is relevant to, among other things, the alleged falsity of S&P's statements and ratings, the materiality of its statements, and the cause of any losses for the individual securities.

For example, such witnesses could testify about the analysis of and understanding of the collateral managers of the creditworthiness of the collateral selected for the securities, and the role played, if any, by the rating issued by S&P or another NRSRO in selection. Such witnesses could further testify about efforts undertaken to replace poorly performing collateral in the pool, and about how the financial conditions in mid- to late-2007 prevented the collateral manager from acquiring new collateral and thus caused the security to suffer losses. Such evidence is directly relevant to the Government's alleged losses, and it will prove

that the losses identified by the Government were a result of broader economic considerations and conditions, not misconduct on the part of S&P.

(3) Witnesses from Wells Fargo Bank, N.A., the trustee, to testify to the payments made by the CDO to investors, defaults in the collateral, payments made by the CDO after default, and evidence related to the causes of default. This testimony will be relevant to rebut the Government's allegations regarding the purchases and losses in the identified securities, in addition to the understanding of the marketplace as to the credit quality of the securities and the collateral backing those securities. For example, such witnesses could testify to payments made to CDO investors over the lifetime of the security, the cause and effects of a declared "event of default," whether those securities continued to perform after such default, whether those securities were eventually liquidated, and who held what tranche of the security at that time. This testimony will bring necessary details to the Government's overly broad, generalized, and inaccurate depiction of alleged losses.

(4) Witnesses from alleged "victim" institutions to testify about their decision to either retain or invest in the securities, mitigation efforts undertaken or considered, existence of and calculation of gains or alleged losses. This testimony too is relevant to the issues of falsity, materiality, and loss. For example, such witnesses could testify to the reasons the institution chose to invest in the first place, and whether S&P's rating was material to that decision. Such witnesses could also testify to the institution's holding of any particular security, subsequent actions with respect to those securities, and accounting of any alleged loss. Losses in this case will not be a simple matter of arithmetic; a financial institution's accounting for structured-finance instruments is a complex and multi-faceted. Specific testimony from the institution itself will be necessary to provide details that the Government appears not to be providing.

(5) Witnesses from S&P to testify about the ratings of the tranches, among

other things. This testimony will be relevant to all issues in the case, including rebutting the Government's allegations of falsity, the reasonableness of the ratings and good efforts of those who worked on the ratings. Indeed, as every S&P rating was issued by a separate rating committee, a representative of that committee will, of course, need to be called to testify about the rating of each security.

A trial relating to 158 securities, in which each security will require calling a minimum of five witnesses (not including additional S&P witnesses regarding the ratings assigned and to rebut the Government's allegations that are not security-specific), is neither manageable nor fair to the Court or the jury.

### 2. Discovery Necessary for a 158-Security Trial Cannot Be Completed by May 2015.

In order for S&P to adequately prepare its defenses in a trial on more than 150 securities, it must take discovery of the various parties involved in those securities. To that end, S&P has already issued 60 third-party document subpoenas and it is actively meeting and conferring with subpoena recipients in order to obtain responsive documents as quickly as possible. This is in addition to S&P's review of the more than 3 million documents produced by the Government that it received from third parties during its pre-Complaint investigation of S&P and pursuant to Rule 45 subpoenas in this matter. Despite diligent efforts, S&P's experience thus far in discovery proves that S&P will not be able to complete the necessary discovery by May 2015. Certain third parties have thus far resisted production, and S&P expects that more motions practice will be necessary. Other third parties, while cooperative, are successors-in-interest to the parties that were involved in the subject CDOs, and locating and producing responsive documents has proved challenging and will require significant time.

Once document production is complete, of course, S&P will then require months in which to take depositions of the same entities that will likely be called at trial—CDO managers, arrangers, trustees, and purchasers. On the CDOs alone, the

Government's preferred case will require upwards of 150 depositions on S&P's side, which does not include the required depositions of the Government officials and entities that oversaw, and in many cases, criticized those who issued, arranged, and purchased the securities at issue, in addition to those government agencies that criticized the regulators themselves.

### B. The Court Should Order an Initial Trial on those Securities in which Citigroup Is Alleged to Have Suffered Losses.

While the Government's identification of relevant securities lists dozens of entities as relevant to the case, one bank in particular (including its affiliates) is at the center of the Government's allegations: Citigroup.  A trial limited to the securities in which Citigroup is alleged by the Government to have suffered losses would trim discovery to a much more manageable scope and would permit trial to focus on securities that have a tangible fact in common: all were purchased by the same entity.  Such a limitation will shorten trial, ease the jury's burden, and permit a distinct set of issues to be discovered and presented while potentially developing the law of the case.[2]

This cross-section of the Government's securities has the simultaneous benefit of being large enough to put at issue a substantial portion of the Government's alleged losses, while also retaining a sufficient number of securities, spread out over a sufficiently long time, to capture all the time periods and factual issues that the Government might want to pursue.  In other words, the Government will not be prejudiced by such a trial.

In terms of specific CDOs, the Government has alleged that Citigroup suffered losses on 17 CDOs.  That amounts to nearly 20% of the total number of CDOs the Government wishes to put into play.  But because of the efficiencies

---

[2] Another possibility that was discussed during the March 11 hearing was a trial limited to securities purchased by Citigroup and Bank of America.  While S&P is open to discussing such a limitation, it believes that such a trial would still be overly cumbersome and inefficient.  By limiting trial to those securities where a single "victim," like Citigroup, is alleged to have suffered losses, the Court would crystallize the issues as much as possible for the benefit of the jury.

gained by limiting the range of securities to only one victim, the comparative benefit in terms of witnesses needed for depositions and at trial is even more dramatic. Where the Government's case would require testimony from 23 "victims," S&P's will require testimony from only 7. Similarly, the universe of arranging banks also shrinks dramatically under S&P's proposed plan. Citigroup itself arranged all but two of the CDOs in which it is alleged to have suffered losses. Thus, rather than needing discovery and depositions as to 11 arranging entities, a trial limited along S&P's proposed lines will require discovery of no more than 3 arranging banks.

In prior filings, the Government has objected to this plan on the grounds that it "would potentially require multiple presentations, to multiple juries, of the same evidence relating to S&P's liability." Second Supplemental Joint Report of Parties Pursuant to Federal Rule of Civil Procedure 26(f), Dkt. No. 82, at 7 n.4. The Government misses the point. *First*, each security listed by the Government involves different players and raises different facts. Thus any subsequent trial on other securities will raise *new* facts regarding those different securities. *Second*, to the extent some jury finding in the first trial is relevant to subsequent trials, such a finding may well have some law-of-the-case effect. There will be no need to have multiple juries considering the same evidence. Finally, the outcome of an initial narrowed trial will undoubtedly affect each party's evaluation of its case and may permit the parties to reach a resolution.

### C. Alternatively, the Court Could Order the Parties to Provide Separate-Trial Proposals for the Court's Selection

In the event the Court will entertain an initial trial, but does not agree with the narrowing proposed by S&P, S&P proposes that the Court issue a preliminary order granting the motion and instruct the parties to either agree on a specified limited number of securities, or, if the parties are unable to reach agreement, to submit narrowing proposals for the Court's consideration. Such methods have

been employed in federal courts, *cf. City of Detroit v. Simon*, 247 F.3d 619, 629 (6th Cir. 2001), and Judge Munter of the San Francisco Superior Court recently agreed to such an approach on a motion to narrow trial in a case involving mortgage-backed securities, *see Federal Home Loan Bank of San Francisco v. Deutsche Bank Secs.*, No. CVC-10-497839 (Aug. 21, 2013).

## IV. Conclusion

For the foregoing reasons, S&P's Motion for Phased Trials should be granted.

Dated: March 25, 2014                KEKER & VAN NEST LLP

By: /s/ *John W. Keker*
John W. Keker

Attorneys for Defendants MCGRAW-HILL FINANCIAL, INC., and STANDARD & POOR'S FINANCIAL SERVICES LLC