UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br><br>vs.<br><br>MCGRAW-HILL COMPANIES, INC. and STANDARD & POOR'S FINANCIAL SERVICES LLC,<br><br>Defendants. | Case No.:  CV 13-779-DOC (JCGx)<br><br><br>ORDER DENYING THE MOTION FOR PHASED TRIALS and PARTIALLY GRANTING THE MOTION TO COMPEL DISCOVERY [100] [153] |

Before the Court are Defendants McGraw-Hill Financial, Inc. and Standard & Poor's Financial Services LLC's (together, "S&P's") Motion to Compel Discovery ("Discovery Motion") (Dkt. 100) and Motion for Phased Trials ("Phased Trials Motion") (Dkt. 153), and Plaintiff United States' (the "Government's") Cross-Motion to Strike S&P's First Amendment retaliation defense. *See* Cross-Motion to Strike Defense (Dkt. 115).  For the reasons explained below, the Court DENIES the Phased Trials Motion, partially GRANTS the Discovery Motion, and DENIES the Cross-Motion to Strike Defense.

## I.  BACKGROUND

### A.  Factual Background

#### 1.  S&P's Ratings

S&P is one of the three major credit rating agencies in the United States.  The Securities and Exchange Commission ("SEC") identified S&P as a Nationally Recognized Statistical Rating Organization ("NRSRO") based on the SEC's determination that S&P was known for credible and reliable ratings.  Compl. ¶ 36.  As of June 2007, NRSRO status was based, in part, on S&P's submission of its "Code of Conduct" to address questions about the management of "conflicts of interest."  *Id.*  ¶ 38.

S&P rated certain structured debt securities: Residential Mortgage Backed Securities ("RMBSs"), which are collateralized by pools of residential mortgage loans, and Collateralized Debt Obligations ("CDOs"), which are collateralized by pools of other debt securities that often include RMBSs.  *Id.* ¶ 2.

During the period relevant to this case, from 2004 to 2007, the issuers of RMBSs and CDOs would structure different classes of notes, or "tranches," securitized by the RMBSs and CDOs, and then these issuers would pay S&P (or a rival agency) to provide letter-grade credit ratings for each tranche based on its creditworthiness.  *Id.* ¶¶ 2-4.  Ratings ranging from AAA, the highest, to D, the lowest, were issued publicly and published to S&P's website.  *Id.* ¶¶ 4-5.  Ratings were important because a system of "subordination" between tranches meant that more senior tranches, with higher credit ratings but lower interest rates, paid out to investors before more junior tranches, with lower credit ratings and higher interest rates that tracked the heightened risk of default.  *Id.* ¶ 23.

Investors in the tranches included federally insured financial institutions, and they relied on S&P's credit ratings to "identify and compare credit risks" between tranches; ordinarily, these institutions would avoid investing in tranches with ratings lower than BBB-.  *Id.* ¶¶ 5-6.

#### 2.  Allegations of Manipulation and Misrepresentation

The Government alleges that S&P deliberately misrepresented the integrity of its ratings, in order to further its own financial interests.  *See generally* Compl.

S&P publicly stated that it had "established policies and procedures to address conflicts of interest through a combination of internal controls and disclosure." *Id.* ¶ 111(a). Those policies were laid out in various "Codes of Conduct" and official policy statements. *Id.* ¶¶ 111-117 (describing September 2004 "Code of Practices and Procedures," October 2005 and June 2007 versions of "Code of Conduct," November 2005 "Analytic Firewalls Policy," and February 2006 "Report on Implementation of S&P's Rating Services Code of Conduct").

S&P repeatedly explained that its analyses were not influenced by issuer fees, existing or potential business relationships, or any other factors that did not bear on the validity of the ratings themselves. *See, e.g.*, *id.* ¶¶ 111(c)-(e), 115(b), 116. Rather, it explained that those ratings represented only the "current opinions regarding the future creditworthiness of issuers or issues," and the "likelihood that payments of principal and interest will be made on a timely basis in accordance with the terms of the obligations." *Id.* ¶¶ 121, 122.

However, the Government identifies numerous occasions when S&P issued or confirmed ratings that did not accurately reflect true credit risks. *Id.* ¶¶ 234(a)-(d), 236(a)-(b), 238(a)-(d), 241(a)-(e), 244(a)-(b), 261(a)-(e), 269(a)-(c). S&P documents suggest that it knew that certain classes of non-prime RMBSs were rapidly deteriorating, that the deterioration of these classes of non-prime RMBSs would affect the credit risks of CDOs, that the ratings of these CDOs were not adjusted to account for the deterioration of these classes of non-prime RMBSs, and that S&P nonetheless issued the ratings for these CDOs. *Id.* The Government alleges that S&P executives did not want to threaten record profits and, therefore, prevented analysts—despite public representations to the contrary—from issuing credit ratings that accurately represented the falling creditworthiness of CDOs backed by RMBSs. *Id.* ¶ 211.

Pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1833a, the Government seeks civil penalties for S&P's violations of three criminal fraud statutes: 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud); and 18 U.S.C. § 1344(1), (2) (financial institution fraud). *See generally id.*

**B.  Procedural Background**

The Government filed its complaint on February 4, 2013.  *See generally* Compl.  On July 16, 2013, the Court denied S&P's Motion to Dismiss.  Order, July 16, 2013 (Dkt. 34).  Between the filing of the complaint and now, the Court has held several status conferences to discuss the progress of the suit.  At the insistence of the parties, a scheduling order has yet to be issued.

On December 12, 2013, the Court held a status conference, at which the parties discussed the possibility of splitting the suit into phases.  Minutes, December 12, 2013 (Dkt. 92).  On January 20, 2014, S&P filed the Discovery Motion to resolve a number of disputes between the parties.  On March 11, 2014, the Court held a hearing on the Discovery Motion.  Minutes, March 11, 2014 (Dkt. 146).  At the hearing, the parties requested that the Court refrain from issuing an order until April 15, 2014.  Between that hearing and now, S&P formally filed the Phased Trials Motion.

Given that the two motions raise many of the same concerns, the Court resolves them together.

**II.    MOTION FOR PHASED TRIALS**

S&P argues that "[t]he Government has alleged a case of such sweeping breadth that it cannot fairly be tried in a single trial."  Phased Trials Mot. at 1.  S&P's solution is to "conduct an initial trial beginning in September of 2015 as to a limited but significant subset of the securities that the Government has put at issue, while deferring trial as to the remaining securities to a later date."  *Id.*  Specifically, S&P proposes that the Court select one or two "victim" institutions, such as Citigroup, that allegedly suffered losses.  *Id.*

The Government responds that splitting the action into phased trials would "seriously prejudice [its] ability to present the full and complete nature of S&P's alleged fraud to any single jury."  Opp'n to Phased Trials Mot. at 1.  The Government further argues that "S&P's proposed bifurcation created a nearly inescapable likelihood of violating the [Government's] jury trial right under the Seventh Amendment[.]"  *Id.* at 21.  Nevertheless, at the Court's urging,

1    the Government presented two alternative proposals for phased trials.  *See* Opp'n at 22-25; *see*
2    *also* Minute Order, March 31, 2014 (Dkt. 156).

3          All three proposals run up against the Seventh Amendment's Reexamination Clause and,
4    therefore, the Court denies S&P's Phased Trials Motion.

5          **A.  Legal Standard**

6          "For convenience, to avoid prejudice, or to expedite and economize, the court may order
7    a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party
8    claims."  Fed. R. Civ. P. 42(b).  A court's discretion, however, is circumscribed by the Seventh
9    Amendment's guarantee of the right to a jury trial in federal civil cases.  *Arthur Young & Co. v.*
10   *United States Dist. Court*, 549 F.2d 686, 692 (9th Cir. 1977); *accord* Fed. R. Civ. P. 42(b)
11   ("When ordering a separate trial, the court must preserve any federal right to a jury trial.").
12   "Actions brought by or on behalf of the United States are . . . civil actions with the same right
13   to trial as any other civil action."  9 Charles A. Wright & Arthur R. Miller, *Federal Practice &*
14   *Procedure* § 2314 (2013).

15         The Seventh Amendment provides, in pertinent part, that "no fact tried by a jury shall be
16   otherwise reexamined in any Court of the United States."  U.S. Const. amend. VII.  In order to
17   avoid reexamination, "[t]he constitutional right to a jury trial has been held to require trial of all
18   issues before one jury in some circumstances."  *Arthur Young*, 549 F.2d at 692 (citing *Gasoline*
19   *Prods. Co. v. Champlin Ref. Co.*, 283 U.S. 494 (1931) and *United Air Lines, Inc. v. Wiener*, 286
20   F.2d 302 (9th Cir. 1961)).  For instance, bifurcation is proscribed by the Seventh Amendment
21   when "the questions sought to be bifurcated [are] 'so interwoven . . . that the one cannot be
22   submitted to the jury independently of the other without confusion and uncertainty which
23   would amount to a denial of a fair trial.'"  *Id.* (quoting *United Air Lines*, 286 F.2d at 306).

24         **B.  Analysis**

25         The bifurcation proposals presented to this Court are atypical.  The Court is not being
26   asked to bifurcate trial into a liability phase and a damages phase, nor is it being asked to
27   bifurcate trial into a classwide liability phase and an individual liability phase.  Courts routinely
28   adopt such schemes.  *See, e.g.*, *Arthur Young*, 549 F.2d at 697 ("[S]eparation of the trial on

individual damages issues from the class trial in this securities fraud class action is not a novel procedure, nor in contravention of the Seventh Amendment."); *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 542-544 (N.D. Cal. 2012) (bifurcating trial into one stage to determine classwide liability and availability of punitive damages, and a second stage to determine the aggregate amount and individual distribution of damages); *Butler v. Home Depot, Inc.*, C-94-4335, 1996 U.S. Dist. LEXIS 3370, at *6 (N.D. Cal. Jan. 25, 1996) ("Courts have routinely adopted the approach advocated by plaintiffs in which the first phase of the proceedings focuses exclusively on classwide claims[.]").

Instead, S&P proposes that the Court have a full trial—including all parties and claims, and almost all defenses and damages—on a sliver of the securities that the Government puts at issue, pushing off a substantially similar trial on the rest of the securities.

It is true that each security will raise issues unique to particular financial institutions, such as: were S&P's false representations material to the investment decisions of that financial institution?  But, the heart of each of the Government's claims is that S&P engaged in a "scheme to defraud."  *See* Compl. at 116-17; 12 U.S.C. § 1833a; 18 U.S.C. § 1341; 18 U.S.C. § 1343; 18 U.S.C. § 1344(1), (2).  The central question—did S&P engage in a scheme to defraud?—will be answered by facts that are common to all, or nearly all, of the securities.  For example, one of the first issues that the Government must prove is that S&P represented that its ratings were objective, independent, and uninfluenced by conflicts of interest that might compromise its analytic judgment.  *See* Compl. ¶¶ 110-122.  In support of that premise, the Government offers S&P's widely distributed and publicly available Codes of Practices and Procedures, Codes of Conduct, Analytic Firewalls Policy, reports, and testimony before regulatory and legislative bodies.  *Id.*  The question of whether S&P's public representations were directed at and available to one institution is "so interwoven" with the question of whether those same public representations were directed at and available to another institution, that "one cannot be submitted to the jury independently of the other without confusion and uncertainty."  *See United Air Lines*, 286 F.2d at 306.  Indeed, both the first and second juries would need to answer precisely the same question regarding these representations: were they false?

Other courts have held that such interwoven issues cannot be separated without violating the Seventh Amendment. For example, in *Benner v. Becton Dickinson & Co.*, 214 F.R.D. 157 (S.D.N.Y. 2003), the court considered whether issues of negligence and comparative negligence could be separated, with the first jury determining whether the defendant was negligent and the second jury apportioning fault between the parties. *Id.* at 174. The court held that "such bifurcation would violate the Seventh Amendment" because "the second jury could reevaluate the defendant's fault, even going so far as to reapportion 100% of the fault to the plaintiff." *Id.* (quotations and citations omitted). Likewise, in *Ellis*, the court considered whether the availability of punitive damages should be considered in the first phase of trial, along with liability, or in the second phase of trial, along with individual damages determinations. 285 F.R.D. at 540-44. It remarked that "the classwide liability question of whether Defendant has engaged in a pattern or practice of intentional discrimination may overlap substantially with the question of whether Defendant acted with malice or reckless indifference to Plaintiff's protected rights," and that, therefore, presenting those questions to two separate, successive juries would potentially violate the Seventh Amendment's prohibition on re-examination. *Id.* at 543.

Here, following any of the three proposals presented by S&P and reluctantly presented by the Government, two juries would need to answer many overlapping questions, such as: did S&P make representations regarding its independence and objectivity, and were those representations false? As with *Benner* and *Ellis*, the presentation of such overlapping questions to two, successive juries would involve reexamining issues that are "so interwoven . . . that the one cannot be submitted to the jury independently of the other without confusion and uncertainty[.]'" *Id.* (quoting *United Air Lines*, 286 F.2d at 306).

S&P assures the Court that doctrines such as law of the case and collateral estoppel would prevent the reexamination of issues in cases such as this one, where parties are the same. Reply at 17-18. If it is true that such doctrines would obviate all Seventh Amendment concerns, then decisions such as *Arthur Young*, 549 F.2d at 686—where, under S&P's theory, issues resolved in the first phase would carry preclusive effect for the second phase—would be

1   rendered meaningless.  Even if it was possible, it is hard for this Court to imagine a special

2   verdict form of such detail that would eliminate the "confusion and uncertainty" over which

3   jury is deciding which issue.  *Cf. Newsome v. Up-To-Date Laundry, Inc.*, 219 F.R.D. 356, 364

4   (D. Md. 2004) (finding that the Court could "avoid conflicts with the reexamination clause of

5   the Seventh Amendment by using a detailed verdict form to record the first phase of [the] jury's

6   factual findings").

7          In short, the Court cannot take a slice of the Government's case—complete with all

8   parties and claims, and most defenses and damages—and force it to be tried first.  Therefore,

9   the Court DENIES the Phased Trials Motion.[1]

10  ### III.    MOTION TO COMPEL DISCOVERY

11         S&P moves to compel the Government to produce (1) documents relating to the

12  independence or objectivity of ratings or ratings agencies, (2) documents relating to the conduct

13  of mortgage lenders, financial institutions, and issuers of the securities at issue, and (3)

14  documents relating to S&P's First Amendment retaliation defense.  *See generally* Discovery

15  Mot.

16         The Government responds that (1) documents relating to the practices of other ratings

17  agencies are irrelevant and the requests are unduly burdensome, (2) documents gathered

18  through investigations of mortgage lenders, financial institutions, and issuers are overbroad and

19  burdensome, and are protected by the investigatory files privilege, and (3) S&P has not made a

20  threshold showing as to its First Amendment retaliation defense, such that it is barred from

21  pursuing discovery on the defense and the Court should strike it.

22         None of the Government's grounds for withholding production are availing.  In short,

23  the Government's obligation to produce documents is commensurate with the Government's

24  election to bring a suit of such broad scope and magnitude.  Therefore, the Court GRANTS

25  S&P's Discovery Motion.

26

27

28  [1] If Parties can jointly stipulate to phased trials, the Court will entertain such a stipulation if it is clear that the Government can and does partially waive its Seventh Amendment rights.

## A.  Investigatory Files Privilege[2]

The Court begins with the Government's assertion of the investigatory files privilege, which potentially applies to most of the documents at issue.  The Government asserts the investigatory files privilege over three categories of documents: FIRREA subpoenas and related correspondences regarding other investigations, materials obtained by the Government by subpoena, and transcripts of witness examinations conducted under FIRREA.[3]  Opp'n to Discovery Mot. at 39-40.

### 1.     Legal Standard

Under certain conditions, investigatory files compiled for law enforcement purposes are privileged.  *See, e.g.*, *In re City of New York*, 607 F.3d 923, 945 (2d Cir. 2010); *Friedman v. Bache Halsey Stuart Shields, Inc.*, 738 F.2d 1336, 1341 (D.C. Cir. 1984); *Soto v. City of Concord*, 162 F.R.D. 603, 613 (N.D. Cal. 1995).  The privilege acts to "prevent disclosure of information that would be contrary to the public interest in the effective functioning of law enforcement."  *Tuite v. Henry*, 181 F.R.D. 175, 176 (D.D.C. 1998).  Courts apply the privilege to protect both civil and criminal investigatory files.  *See, e.g.*, *City of New York*, 607 F.3d at 945 (criminal investigatory files); *McPeek v. Ashcroft*, 202 F.R.D. 332, 336 (D.D.C. 2001) (non-criminal investigatory files).  Courts also apply the privilege to protect information related to both ongoing and closed investigations.  *See, e.g.*, *Jones v. City of Indianapolis*, 216 F.R.D. 440, 447 (S.D. Ind. 2003) (ongoing investigations); *Borchers v. Commercial Union Assurance Co.*, 874 F. Supp. 78, 80 (S.D.N.Y. 1995) (closed investigations).  The Ninth Circuit has noted that the privilege is qualified, "contingent upon the competing interests of the requesting litigant and subject to disclosure especially where protective measures are taken."  *Kerr v. U.S. Dist. Court for Northern Dist. of California*, 511 F.2d 192, 198 (9th Cir. 1975).

---

[2] Courts ascribe different labels to the privilege, including "law enforcement privilege," *In re City of New York*, 607 F.3d 923, 944 (2d Cir. 2010) and "official information privilege," *Miller v. Pancucci*, 141 F.R.D. 292, 299 (C.D. Cal. 1992).  The Court will adopt the Government's label and refer to it as the "investigatory files privilege," *Friedman v. Bache Halsey Stuart Shields, Inc.*, 738 F.2d 1336, 1341 (D.C. Cir. 1984).
[3] The Government asserts the privilege over eight categories of documents, but S&P is not pursuing discovery as to five of the eight categories.

"The governmental privilege must be formally asserted and delineated in order to be raised properly." *Kerr*, 511 F.2d at 198 (citing *United States v. Reynolds*, 345 U.S. 1, 7-8 (1953)). "The claiming official must have seen and considered the contents of the documents and himself have formed the view that on grounds of public interest they ought not to be produced and state with specificity the rationale of the claimed privilege." *Id.* (quotations omitted). As the D.C. Circuit Court of Appeals explained in greater detail, to assert the privilege, three requirements must be met:

> (1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege.

*In re Sealed Case*, 856 F.2d 268, 271 (D.C. Cir. 1988).

### 2. Analysis

The Government filed a sealed declaration of John F. Walsh, the United States Attorney for the District of Colorado and co-chair of the RMBS Working Group, who asserts the privilege on behalf of the Government entities. *See generally* Sealed Decl. of John F. Walsh (Dkt. 107); Sealed Suppl. Decl. of John F. Walsh (Dkt. 116) (together, "Walsh Decl."). He identifies eight categories of documents over which he formally asserts the investigatory files privilege, and enumerates several bases for how disclosure would cause harm to the public interest. *See generally* Walsh Decl.

However, Mr. Walsh's declaration is far too general and sweeping to satisfy the requirements set out by the Ninth Circuit. *See Kerr*, 511 F.2d at 198. Mr. Walsh does not claim that he has seen and considered the contents of the documents himself; rather, he claims only generalized knowledge of the documents at issue. Therefore, the Government's formal assertion of the investigatory files privilege fails at the outset. *See id.* ("The claiming official must have seen and considered the contents of the documents[.]"). Moreover, Mr. Walsh's declaration does not sufficiently specify the documents over which the privilege is claimed, nor

does it sufficiently explain why each document or category of documents falls within the scope of the privilege.  *See id.* ("The claiming official must . . . state with specificity the rationale of the claimed privilege."); *In re Sealed Case*, 856 F.2d at 271 ("[T]he information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege.").

Mr. Walsh's declaration is akin to those rejected as insufficient by both the Ninth Circuit and the D.C. Circuit.  In *Kerr*, the Ninth Circuit rejected a "blanket objection" that attempted to cover any and all documents in seven document requests.  511 F.2d at 198-99.  In *Friedman*, the D.C. Circuit rejected a formal assertion of privilege over broad categories of documents that would allegedly "reveal law enforcement techniques and sources," including the disclosure of strategy, procedures, and directions of the investigations.  738 F.2d at 1342-43.  As in both *Kerr* and *Friedman*, the Court cannot consider the claims of privilege "with appropriate deliberation and precision" until the Government has adequately invoked it.  *See id.*  In other words, while the privilege may apply to some of the documents, the Court will not protect those documents until the "claiming official [has] seen and considered the contents of the documents" and "state[s] with specificity the rationale of the claimed privilege."  *See Kerr*, 511 F.2d at 198.

In short, the Government cannot escape its duty to disclose documents by merely brandishing a general claim of privilege.  *See United States v. Reynolds*, 345 U.S. 1, 9-10 (1953) ("Judicial control over evidence in a case cannot be abdicated to the caprice of executive officers.").  Rather, it must return to the Court with a privilege log that more precisely identifies the documents that are privileged, and more fully explains why the privilege attaches to those particular documents.

## B.  Relevance and Undue Burden

The Government also refuses to produce two categories of documents—(1) those related to the "independence" or "objectivity" of ratings or ratings agencies (Requests 31, 32, 38, and 40) and (2) those related to the conduct of mortgage lenders, financial institutions, and issuers of the securities at issue (Requests 44-46)—on the grounds that they are irrelevant and would be unduly burdensome to produce.  *See* Opp'n at 23-36.

1.      **Legal Standard**

A party "may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense."  Fed. R. Civ. P. 26(b)(1).  "Relevant information [need only be] . . . reasonably calculated to lead to the discovery of admissible evidence."  *Id.*; *see also Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (a relevant matter is "any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case").  "Relevance for purposes of discovery is defined very broadly." *Garneau v. City of Seattle*, 147 F.3d 802, 812 (9th Cir. 1998).

However, a court must limit the frequency or extent of discovery if it determines that: (1) "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive"; (2) "the party seeking discovery has had ample opportunity to obtain the information by discovery in the action"; or (3) "the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(2).

Upon a motion to compel discovery, the movant has the initial burden of demonstrating relevance.  *Apple Inc. v. Samsung Elecs. Co.*, No. 12-CV-0630, 2013 U.S. Dist. LEXIS 91450, at *32 (N.D. Cal. June 26, 2013).  "In turn, the party opposing discovery has the burden of showing that discovery should not be allowed, and also has the burden of clarifying, explaining and supporting its objections with competent evidence."  *La. Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer*, No. C 09-03529, 2012 U.S. Dist. LEXIS 162971, at *9 (N.D. Cal. Nov. 14, 2012) (citing *DirecTV, Inc. v. Trone*, 209 F.R.D. 455, 458 (C.D. Cal. 2002)).

2.      **Relevance**

a.  **Documents Related to the "Independence" and "Objectivity" of Ratings**

"S&P moves to compel on four requests seeking documents in the United States' possession relating to the independence or objectivity of ratings and rating agencies."  Mot. at 3.  Specifically,

- Request 31 seeks documents concerning analyses the United States made during the period 2004-2008 regarding the independence or objectivity of any rating agency.

- Request 32 seeks evaluations, studies, assessments or analyses by the United States relating to the independence, quality and performance of ratings of RMBS and/or CDOs backed by RMBS.
- Request 38 seeks documents concerning the rating methodologies and procedures of other rating agencies.
- Request 40 seeks documents by the Department of Justice received from any rating agency concerning the independence or objectivity of ratings.

Mot. at 3 (summarizing S&P's First Request for Production of Documents, Abrams Decl. Ex. A at 14-15, 16-18).

This suit is, in large part, about the veracity of S&P's representations that its ratings were reached "independently" and "objectively."  In order to establish that a representation was true or false, parties must first pin down a definition of "independent" and "objective."

The Government argues that only S&P's own definition of "independent" and "objective" are relevant.  *See* Opp'n at 25 ("[I]t is S&P's conduct, and S&P's knowledge and intent when engaging in that conduct, that the Complaint puts at issue, not any similar conduct that may or may not have engaging in by other NRSROs."); *see also* Opp'n at 26 ("S&P made additional statements that gave specific context and meaning to its claims of objectivity and independence[.]").  On the other hand, S&P argues that it should be permitted to distill a definition of "independent" and "objective" from a variety of sources, including other NRSROs and federal agencies.  *See* Mot. at 4 ("It is axiomatic that the understanding of the marketplace is relevant to evaluating the claims of the alleged falsity and materiality of statements concerning independence and objectivity.").

At least for the purposes of discovery, the Court agrees with S&P.  The factfinder will need to give meaning to the terms "independent" and "objective," and it can do so only if those terms are placed in a particular context.  The Government's arguments to the contrary are premature.  Of course, at trial, S&P will need to do more than point the finger at others and say, "they did it too."  But, the understandings of the terms "independent" and "objective" from the perspective of other market participants and regulators are at least relevant at this stage.  *See Garneau*, 147 F.3d at 812 ("Relevance for purposes of discovery is defined very broadly.").

### b.  Documents Related to the Conduct of Mortgage Lenders, Financial Institutions, and Issuers of the Securities at Issue

Next, S&P moves to compel discovery as to the following Requests for Production:

- Request 44: All documents relating to DOJ's investigation of any issuer, arranger, sponsor, underwriter or seller of RMBS or CDOs for fraud or deceptive practices relating to RMBS and/or CDOs exposed to RMBS issued between 2004 and 2008.
- Request 45: All documents and communications relating to [DOJ's] knowledge or awareness between 2004 and 2008 of instances of residential mortgage loan origination fraud, including but not limited to complaints and investigations relating to the practices of any issuer, arranger, sponsor, underwriter or seller of RMBS or CDOs.
- Request 46: All documents relating to investigations conducted by [DOJ] involving fraud, misrepresentations or omissions with respect to material information relating to RMBS or CDOs backed by RMBS supplied by any federally insured financial institution, or any other financial institution to S&P during the 2004 to 2008 time period.

Abrams Decl. Ex. A at 18-19.

These requests address discovery that is relevant to S&P's defenses for many of the same reasons that the discovery related to ratings agencies is relevant.  *See supra* III.B.2.a.  In addition, to the extent that these requests address issuers, arrangers, sponsors, underwriters, or sellers of the specific RMBSs and CDOs at issue in this action, the discovery is relevant to the losses suffered on the investments.  For example, any fraud or other liable conduct on the part of these other financial institutions would potentially reduce S&P's liability.  Therefore, Requests 44-46 are clearly relevant for the purposes of discovery.

### 3.  Undue Burden

A court must limit discovery if (1) "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive"; (2) "the party seeking discovery has had ample opportunity to obtain the information by discovery in the action"; or (3) "the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(2).

The Government argues that compliance with Requests 31, 32, 38, 40, and 44-46 will be unduly burdensome, explaining:

> S&P's requests for discovery from other investigations also reach far beyond the scope of this case and would place enormous logistical burdens on the government. Initially, S&P's requests would require the government to identify every investigation that gathered any documents relating to NRSRO practices throughout the entirety of DOJ, including its criminal components and every United States Attorney's Office. The government would then need to review all the gathered documents to determine which, if any, fall within the scope of S&P's requests.

Opp'n at 30. The Court has no doubt that a great deal of time and effort will be required.

However, these documents are critical to any defense mounted by S&P, and they are in the ready possession of the Government. It is indeed true that compliance with these requests will be burdensome to the Government, but that burden is not undue. The Government elected to bring a suit of broad scope, and it cannot escape the duty to comply with discovery requests that naturally attend the prosecution of such a suit.

Therefore, the Court GRANTS S&P's Discovery Motion as to Requests 31, 32, 38, 40, and 44-46.

### C. Discovery Related to S&P's Selective-Prosecution Claim

S&P's eleventh defense is that "[the Government] commenced this action in retaliation for Defendants' exercise of their free speech rights with respect to the creditworthiness of the United States of America." Def.'s Ans. at 70. S&P propounded several requests in support of that defense. *See* Abrams Decl. Ex. A, Nos. 21, 33, 34, 51, 52, & 53. The Government argues that S&P has not made the required preliminary showing to be entitled to discovery on its retaliation defense and, additionally, moves to strike the defense altogether.

#### 1. Legal Standard

"A selective-prosecution claim is not a defense on the merits to the charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the

Constitution." *Unites States v. Armstrong*, 517 U.S. 456, 463 (1996). While *Armstrong* addresses selective-prosecution claims in the criminal context, such claims are also available in the civil enforcement context. *See, e.g.*, *Church of Scientology v. Comm'r*, 823 F.2d 1310, 1320-21 (9th Cir. 1987) (examining the revocation of tax-exempt status under the selective prosecution standard); *Attorney General of the U.S. v. Irish People, Inc.*, 684 F.2d 928, 932 n.8 (D.C. Cir. 1982) (noting that it "need not reach the question of to what extent the selective prosecution defense may be inappropriate in a civil suit context," but nonetheless holding that in such circumstances, claimants must make a "colorable showing of each prong of the defense in order to be entitled to discovery"); *United States v. Am. Elec. Power Serv. Corp.*, 258 F. Supp. 2d 804, 807-08 (S.D. Ohio 2003) (noting that there is some authority that "a selective enforcement defense may be raised in civil enforcement cases").

Generally, "courts presume that [prosecutors] have properly discharged their official duties[,]" but "a prosecutor's discretion is 'subject to constitutional constraints.'" *Armstrong*, 517 U.S. at 464 (quoting *United States v. Batchelder*, 442 U.S. 114, 125 (1979)); *see also United States v. One 1985 Mercedes*, 917 F.2d 415, 421 (9th Cir. 1990) ("The broad discretion accorded prosecutors in deciding whom to prosecute is not 'unfettered,' and a decision to prosecute may not be deliberately based upon the exercise of protected statutory rights."). In order to defeat this presumption, a selective-prosecution claimant "must demonstrate that the federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *Armstrong*, 517 U.S. at 465 (quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15 (1926)).

As the Government correctly points out, in *Armstrong*, the Supreme Court noted that the "rigorous standard for the elements of a selective-prosecution claim . . . require[s] a correspondingly rigorous standard for discovery in aid of such a claim." *Id.* at 468. Therefore, it is clear that some preliminary showing must be made before a claimant is entitled to discovery on a selective-prosecution claim. *See id.*

The question is: what type of a showing must a party make in order to be entitled to discovery on a selective-prosecution claim? In *One 1985 Mercedes*, the Ninth Circuit

1   identified the standard as "a prima facie showing of a likelihood of vindictiveness by some

2   evidence tending to show the essential elements of the defense." 917 F.2d at 421.  Later, in

3   *Armstrong*, the Supreme Court noted that circuits used a "variety of phrases" to describe the

4   requisite showing—e.g., "colorable basis," "substantial threshold showing," "substantial and

5   concrete basis," and "reasonable likelihood"—but "the many labels for this showing conceal

6   the degree of consensus about the evidence necessary to meet it." 517 U.S. at 468.  Ultimately,

7   *Armstrong* described the requisite showing in the following way: a party is entitled to discovery

8   on its selective-prosecution claim if there is "some evidence tending to show the existence of

9   the essential elements of the defense, discriminatory effect and discriminatory intent." *Id.* at

10  468 (internal citations and quotations omitted); *see id.* at 469 (considering "what evidence

11  constitutes some evidence tending to show the existence of the discriminatory effect element");

12  *id.* at 470 (concluding that respondents' "'study' did not constitute 'some evidence tending to

13  show the existence of the essential elements of' a selective-prosecution claim").

14          **2.     Analysis**

15        The Government argues that S&P fails to make a showing as to either element of a

16  selective-prosecution claim.  Opp'n at 9-13.  The Court disagrees.

17        As to the first element, discriminatory effect, S&P is entitled to discovery if there is

18  "some evidence tending to show the existence" of "different treatment of similarly situated

19  persons." *Armstrong*, 517 U.S. at 470.  Of the three major ratings agencies, the Government

20  has elected to file a complaint, for now, against only S&P.  The Government may indeed have

21  many good reasons for its decisions: the relative strengths of each case, general deterrence

22  values, enforcement priorities, and the case's relationship to the Government's overall

23  enforcement plan.  *See id.* at 465; *see also One 1985 Mercedes*, 917 F.2d at 421 ("The fact that

24  not all criminals are prosecuted is no valid defense to the one prosecuted . . . .  The

25  administration of such a matter lies in the discretion of the prosecuting attorney.").  But, S&P is

26  entitled to test the Government's case through discovery because it has presented "some

27  evidence tending to show the existence" of "different treatment of [other NRSROs]." *See*

28  *Armstrong*, 517 U.S. at 470.

As to the second element, discriminatory purpose, S&P is entitled to discovery if there is "some evidence tending to show the existence" of a purpose to retaliate against S&P for its exercise of a constitutional right.  *See id.*

S&P's showing as to the second element consists of circumstantial evidence.  In November 2009, the Government opened a civil investigation of S&P and served FIRREA subpoenas seeking documents.  Decl. of Michael S. Blume ("Blume Decl.") ¶ 3.  Nearly two years later, on Friday, August 5, 2011, S&P downgraded the credit rating of United States debt.  Mot. at 18.  After the close of business that day, Chairman, CEO, and President of McGraw Hill, Harold McGraw III ("Mr. McGraw"), received a telephone message from Terrence J. Checki ("Mr. Checki"), then the Executive Vice President of the New York Federal Reserve Bank, who passed along a message from Timothy Geithner ("Secretary Geithner"), then the Secretary of the Treasury, expressing anger over S&P's downgrade.  Decl. of Harold McGraw III ("McGraw Decl.") ¶ 3.

The next Monday morning, August 8, 2011, Secretary Geithner met with President Obama from 9:30 a.m. to 10:10 a.m.  Abrams Decl. Exs. O, P.  Immediately after that meeting, Secretary Geithner called Mr. McGraw and personally expressed his anger at S&P, asserting that it made a two-trillion dollar error, that S&P had a previous history of errors, and that "[Mr. McGraw] [was] accountable for that."  McGraw Decl. ¶ 5.  He added that, "you have done an enormous disservice to yourselves and to your country," that the downgrade had done real damage to the economy, and that S&P's conduct would be "looked at very carefully."  *Id.* ¶ 6.

S&P's evidence of discriminatory intent is circumstantial but sufficient.  Secretary Geithner responded to S&P's downgrade by pointing to S&P's history of errors and promising that its conduct would be "looked at very carefully."  He levied these criticisms just minutes after speaking to other executive officials, including President Obama.  Secretary Geithner's statements are susceptible to several interpretations and it is unclear whether there is a nexus between his displeasure and the Department of Justice's litigation decisions.  But, such open questions are properly answered after—not before—discovery.  For now, it is enough that S&P has presented "*some* evidence *tending to show* the existence" of an improper purpose.  *See*

*Armstrong*, 517 U.S. at 470 (emphasis added).  Therefore, S&P is entitled to additional discovery regarding its selective-prosecution claim.[4]

However, "special considerations control when the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated."  *Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367, 384-90 (2004).  Accordingly, to the extent that it is directed at the Executive Office of the President, a ruling on the Discovery Motion is held in abeyance.  For now, the Government must produce those documents that are related to the selective-prosecution claim but are not protected by the privileges that specially attach to the Executive Office of the President.  Only after such discovery is propounded and considered, will the Court entertain a renewed motion to compel the production of documents from the Executive Office of the President.

## IV.   DISPOSITION

For the reasons explained above, the Court DENIES S&P's Phased Trials Motion and partially GRANTS its Discovery Motion.  The Government must produce documents that respond to Requests 31, 32, 38, 40, and 44-46.

However, the following issues remain:

- First, some documents might be protected by the investigatory files privilege.  The claiming official must, however, declare that he has seen and considered the contents of each document, and present a privilege log that explicates the rationale of each claimed privilege.  *Supra* III.A; *see also Kerr*, 511 F.2d at 198.
- Second, the third-party institutions that turned over documents to the Government might have legitimate objections to their disclosure.  For example, S&P's Request 38, seeking documents concerning the methodologies and procedures of other ratings agencies, might be subject to a trade secrets objection.  The Court holds that the Government cannot assert those objections on behalf of the third parties, and it cannot withhold documents on those grounds.  But, those third-party institutions should be afforded the opportunity to raise their legitimate objections themselves.  *Supra* III.B.

---

[4] The Government also moves to strike the defense altogether.  *See* Cross-Motion to Strike (Dkt. 115).  Since the motion is untimely, the Government implores the Court to strike the defense "on its own."  *Id.* at 12 (citing Fed. R. Civ. P. 12(f)(1) and *Williams v. Jader Fuel Co., Inc.*, 944 F.2d 1388, 1399 (7th Cir. 1991)).  But, here, there was "fair notice of the defense."  *See Simmons v. Navajo Cnty.*, 609 F.3d 1011, 1023 (9th Cir. 2010).  Therefore, the Court declines the Government's invitation to strike the defense sua sponte.

- Third, while the Government must produce documents that respond to S&P's selective-prosecution claim, it does not yet need to produce documents from the Executive Office of the President. *Supra* III.C.

The third issue will be decided by the Court upon a renewed motion to compel, following preliminary discovery that does not implicate the privileges enjoyed by the Executive Office of the President. The first two issues will be resolved in the following way:

- The Government must immediately begin to collect the documents that respond to Requests 31, 32, 38, 40, and 44-46. The Government must notify all third parties from whom these documents were originally collected that, without an objection, these documents will be disclosed to S&P.
- On or before April 28, 2014, Parties must submit a joint filing setting out each side's position on whether the document-by-document concerns regarding the first two issues should be heard by a magistrate judge or a special master. In that same filing, Parties must propose the names of three special masters who, if the Court finds it appropriate, will make recommendations regarding particular documents that implicate the first two issues.
- On or before May 5, 2014, the Court will select either one of the proposed special masters or the magistrate judge, or both.
- On or before May 19, 2014, Parties will meet and confer, along with either the special master or the magistrate judge, and submit a joint filing that sets out a process for expeditiously hearing and making determinations regarding documents that implicate the first two issues.
- On May 27, 2014 at 3:00 p.m., the Court will hold a hearing to make final determinations regarding the process by which the first two issues will be resolved on a document-by-document basis.

DATED:      April 15, 2014


_____
DAVID O. CARTER
UNITED STATES DISTRICT JUDGE