1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3             HONORABLE DAVID O. CARTER, JUDGE PRESIDING

4    UNITED STATES OF AMERICA,        )
                                      )
5                                     )
                                      )
6                      Plaintiff,     )
                                      )
7                                     )
                                      )
8          Vs.                        )   No. SACV13-00779-DOC
                                      )
9                                     )
                                      )
10   MCGRAW-HILL COMPANIES, INC., ET  )
     AL,                              )
11                                    )
                                      )
12                                    )
                       Defendants.    )
13   _____ )

14

15

16              REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                    SANTA ANA, CALIFORNIA

18                   TUESDAY, MAY 27, 2014

19

20

21          MIRIAM V. BAIRD, CSR 11893, CCRA
         OFFICIAL U.S. DISTRICT COURT REPORTER
22         411 WEST FOURTH STREET, SUITE 1-053
              SANTA ANA, CALIFORNIA 92701
23                 (714) 894-5384
                  MVB11893@aol.com
24

25

1                        **A P P E A R A N C E S**

2


3    **IN BEHALF OF THE PLAINTIFF,**      GEORGE S. CARDONA
     **UNITED STATES AMERICA:**           ANOEIL KHORSHID
4                                         AUSA - OFFICE OF US
                                          ATTORNEY
5                                         CHIEF ASSISTANT UNITED
                                          STATE ATTORNEY
6                                         312 NORTH SPRING STREET
                                          12TH FLOOR
7                                         LOS ANGELES, CA 90012-4700

8


9


10


11


12   **IN BEHALF OF THE DEFENDANT,**      FLOYD ABRAMS
     **MC GRAW-HILL COMPANIES, INC.,**    BRIAN MARKLEY
     **ET AL:**                           S. PENNY WINDLE
13                                        CAHILL GORDON AND REINDEL
                                          LLP
14                                        80 PINE STREET
                                          NEW YORK, NY 10005
15
                                          JOHN W. KEKER
16                                        PAVEN MALHOTRA
                                          KEKER AND VAN NEST LLP
17                                        710 SANSOME STREET
                                          SAN FRANCISCO, CA 94111
18
                                          JENNIFER L. KELLER
19                                        THOMAS H. KAO
                                          KELLER RACKAUCKAS LLP
20                                        18500 VON KARMAN AVENUE
                                          SUITE 560
21                                        IRVINE, CA 92612

22   **IN BEHALF OF THE DEFENDANT,**      ANDREW M. HETHERINGTON
     **NCUA:**                            KELLOGG HUBER HANSEN TODD
23                                        EVANS AND FIGEL PLLC
                                          1615 M STREET NW SUITE 400
24                                        WASHINGTON, DC 20036
                                          - AND -
25                                        TERRY W BIRD
                                          BIRD MARELLA BOXER WOLPERT

UNITED STATES DISTRICT COURT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

NESSIM DROOKS LINCENBERG RHOW PC
1875 CENTURY PARK EAST 23RD FLOOR
LOS ANGELES, CA 90067-2561

```
 1        SANTA ANA, CALIFORNIA; TUESDAY, MAY 27, 2014; 4:00 P.M.

 2                              ---

 3

 4        THE COURT:  Last time you were here you had an

 5   appointment, I was very respectful of that.  And I wanted to

 6   be respectful of that, but now time is unlimited.  In other

 7   words, if we get this done in five minutes, great.  If we get

 8   it done by 3:00 this morning, great.  But this will probably

 9   the most important session in trying to structure this, and

10   I'm going to take input from you tonight.

11        I've got some very definite ideas about what I

12   want, but I'm not certain I'm right.

13        Isn't that humbling and humiliating?

14        I know you can't possibly try this case in your

15   lifetime.  No, I'm just kidding you.  And i know that you're

16   absolutely ready to go, except you're having problems with my

17   order, and I'm going to talk to you about that in a moment

18   about how quickly you're going to get this done.

19        So why don't you make your appearances first.  And,

20   if you want, I can have an informal session because you

21   wanted that at one time.

22        But who is here from the press?

23        That's great.  You're more than welcome.  Whatever

24   I do, you'll be a part of.  Because if I'm talking about

25   transparency, I won't have an informal session and then
```

```
 1    exclude you.

 2              Fair enough?

 3              Okay.

 4              Who are you with, by the way?

 5              UNIDENTIFIED SPEAKER:  I'm with Bloomberg News,

 6    sir.

 7              THE COURT:  Who are they?

 8              No, I'm just kidding you.

 9              Okay.  Anybody else?

10              We'll extend that to your colleagues, then.  If

11    they come in as a courtesy, they -- so they don't feel that

12    you got special treatment.

13              Okay.

14              So, Counsel, your appearances tonight.

15              Mr. Cardona?

16              MR. CARDONA:  George Cardona for the United States.

17              THE COURT:  Okay.  Counsel?

18              MR. KHORSHID:  Your Honor, Anoiel Khorshid on

19    behalf of the United States.

20              MR. NELSON:  Jim Nelson for the United States, Your

21    Honor.

22              THE COURT:  Pleasure, folks.

23              MR. BIRD:  Terry Bird representing NCUA, Your

24    Honor.

25              THE COURT:  Okay.  We're going to hear it tonight.
```

```
 1              MR. HETHERINGTON:  Andrew Hetherington also on
 2     behalf of NCUA.
 3              THE COURT:  I couldn't hear you.
 4              MR. HETHERINGTON:  Andrew Hetherington also on
 5     behalf of NCUA.
 6              THE COURT:  Thank you, sir.
 7              MR. HETHERINGTON:  And with me are
 8     (unintelligible), all are NCUA.
 9              THE COURT:  Okay.  Thank you very much, gentlemen.
10     It's a pleasure.
11              Does that complete -- okay.
12              MR. ABRAMS:  Floyd Abrams from the Cahill Gordon
13     firm --
14              THE COURT:  Pleasure.
15              MR. ABRAMS:  -- for the defendant.
16              Thank you.
17              MS. KELLER:  Good afternoon, Your Honor.
18              Jennifer Keller on behalf of the defendant, as
19     well, from Keller Rackauckas.
20              MR. KEKER:  John Keker, Keker & Van Nest, good
21     afternoon, Your Honor.
22              MR. MARKLEY:  Your Honor, Brian Markley from Cahill
23     Gordon for the defendant.
24              MR. WINDLE:  And Penny Windle from Cahill Gordon
25     for the defendant.
```

1          THE COURT:  Thank you.

2          MR. MALHOTRA:  Paven Malhotra of Keker & Van Nest

3    for the defendants.

4          THE COURT:  Okay.  The rest of you folks, I assume,

04:02PM   5    are associates helping on the case or just interested

6    parties.

7          Without me dictating to you for a moment, without

8    me getting so far down the line that I just come out and tell

9    you what I'm going to do, I still want to leave that door or

04:03PM  10    wedge open for a discussion tonight.

11          So I want to start with you, Mr. Cardona.  And the

12    first thing that I would think you would want to raise would

13    be how are you possibly going to comply with a discovery

14    order that I signed that says you're supposed to turn over

04:03PM  15    various investigations from 2004 to 2008 in different

16    offices --

17          MR. CARDONA:  I can break that down into pieces and

18    explain the issue.

19          THE COURT:  Because I saw Mr. Keker complained that

04:03PM  20    you weren't responding fast enough in this order that I got.

21    And so the intuition was that nothing was moving.  And then,

22    of course, I got the concern that because I hadn't appointed

23    a Special Master in the last week, that nobody could do

24    anything.

04:04PM  25          MR. CARDONA:  Well, that's not true.  We've been

|     |     |
| --- | --- |
| | 1 | moving forward. |
| | 2 | THE REPORTER:  I'm sorry.  Can you state your name |
| | 3 | again? |
| | 4 | MR. CARDONA:  Sure. |
| 04:04PM | 5 | George Cardona for the United States. |
| | 6 | THE REPORTER:  Thank you. |
| | 7 | MR. CARDONA:  And, Your Honor, I can break it down |
| | 8 | into pieces.  There are certain parts of the discovery order |
| | 9 | that I think were well along the way towards complying with, |
| 04:04PM | 10 | and there's another piece that is more difficult that I can |
| | 11 | talk to you about.  So, if you want, I can just dive into it. |
| | 12 | THE COURT:  Tonight is the night that we get all of |
| | 13 | the formalities out of the way. |
| | 14 | MR. CARDONA:  So, you know, basically, in terms of |
| 04:04PM | 15 | investigations, there were three pieces of investigations. |
| | 16 | There were certain investigations relating to rating |
| | 17 | agencies.  There were certain investigations relating to |
| | 18 | fraud by the issuers and originators of residential |
| | 19 | mortgage-backed securities.  And then there was the broadest |
| 04:05PM | 20 | request, Request 45, which, in essence, sought all |
| | 21 | information in the Government's possession regarding to its |
| | 22 | knowledge of mortgage fraud during the period 2004 to 2008, |
| | 23 | which, if interpreted very, very broadly, would encompass, |
| | 24 | essentially, every mortgage fraud investigation that was |
| 04:05PM | 25 | being conducted by every U.S. Attorney's Office throughout |

```
 1   the country during that time period.

 2           So let me start with the NRSRO investigation.  What

 3   we have done since the order was issued, is we have sent out

 4   notices to the people who produced documents to the

 5   Government in connection with what is a very limited subset

 6   of investigations.  We have asked them to advise us as to

 7   whether they have objections or would intervene to interpose

 8   objections to our production of those documents, as your

 9   order prescribed.  And also to advise us as to how they want

10   us to designate their documents if they don't object to us

11   producing them, whether they want those designated

12   confidential or -- and this has come up in the course of our

13   discussions, highly confidential.

14           We've now gotten back, I think, the majority of the

15   advice from those third parties, and we are in a position to

16   start processing those documents.  It's a rather large volume

17   of documents, so it will take some time just to process to

18   produce to S&P once Your Honor signs off on a revised

19   protective order.

20           So let me talk about the revised protective order,

21   if I can, for one second.  We've worked with S&P.  I believe

22   we -- we circulated out a revised protective order to the

23   ratings agencies who obviously have an interest in the

24   confidentiality of their documents because S&P is a

25   competitor.  We've also circulated it out to the financial
```

04:05PM (line 5)
04:05PM (line 10)
04:06PM (line 15)
04:06PM (line 20)
04:06PM (line 25)

|      |                                                             |
|------|-------------------------------------------------------------|
| 1    | institutions in the course of our notices, requested certain |
| 2    | clauses in a protective order.  We've now received back, and |
| 3    | I think we're in a position -- I think I'm still waiting for |
| 4    | confirmation from one of the rating agencies, but hope to    |
| 5    | have that soon to submit to Your Honor a revised protective  |
| 6    | order that will address the concerns that have been raised by |
| 7    | the financial institutions and the ratings agencies who have |
| 8    | produced documents.                                          |
| 9    | We hope to submit that.  And if Your Honor is all           |
| 10   | right with that, we would simply submit that for your        |
| 11   | signature with the revised terms, which would then, I think, |
| 12   | enable us to produce the majority of the documents that have |
| 13   | been gathered from financial institutions and rating agencies |
| 14   | in the course of those investigations.  And the balance, once |
| 15   | we have all of the positions back, which we should have very |
| 16   | soon, we'll be in a position to start producing those.  So   |
| 17   | that's the NRSRO investigations.                             |
| 18   | We then have the --                                          |
| 19   | THE COURT:  Let me stop for just a moment.  Just           |
| 20   | ask a question.  Give me a time frame.  Give me some dates.  |
| 21   | MR. CARDONA:  I expect that we'll be able to start          |
| 22   | production once Your Honor signs off on the revised          |
| 23   | protective order.                                            |
| 24   | THE COURT:  Give me some dates.                             |
| 25   | MR. CARDONA:  I hope to have back the final notice          |

04:06PM — line 5
04:07PM — line 10
04:07PM — line 15
04:07PM — line 20
04:07PM — line 25

|       |                                                                                          |
|-------|------------------------------------------------------------------------------------------|
| 1     | I need next week, which would allow us to submit the revised                              |
| 2     | protective order to you.  And assuming Your Honor signs off                               |
| 3     | on it next week, I would hope to be able to start production                              |
| 4     | of those documents on a rolling basis starting at the end of                             |
| 5     | next week.  And that's including -- this is a huge volume of                              |
| 6     | documents that we're going to have to copy and get ready.                                 |
| 7     | We're going to start doing that now.  But it's going to take                              |
| 8     | some period of time.  If you want an estimate as to when we                               |
| 9     | will be able to complete that production, I would have to go                              |
| 10    | back to our technical people and sort out exactly how many                                |
| 11    | terabytes of information it is and how long that processing                                |
| 12    | is going to take.                                                                          |
| 13    | THE COURT:  And who are those technical people, by                                        |
| 14    | name, you would contact?                                                                   |
| 15    | MR. CARDONA:  I would contact our -- basically our                                        |
| 16    | technical manager at the company that's doing this.                                       |
| 17    | THE COURT:  What is his name?                                                              |
| 18    | MR. CARDONA:  Shamus McCloskey.                                                            |
| 19    | THE COURT:  And where is he located?                                                       |
| 20    | MR. CARDONA:  He's located in Washington, D.C.                                            |
| 21    | THE COURT:  So it's three hours time difference                                           |
| 22    | right now?                                                                                 |
| 23    | MR. CARDONA:  Yes.                                                                         |
| 24    | THE COURT:  How do I stay with a trial date in                                            |
| 25    | September that the defense is already complaining about                                    |

Time stamps (left margin): 04:08PM (line 5), 04:08PM (line 10), 04:08PM (line 15), 04:08PM (line 20), 04:09PM (line 25)

1    because of the breadth of the case when or if I don't get

2    speedy 24/7 compliance?

3            MR. CARDONA:  Well, Your Honor, I think a -- we are

4    trying to comply as quickly as we can, given that we have to

04:09PM  5    notify third parties that we need to process it.  I mean, I

6    expect that we'll have all of this done sometime in the next

7    two months.  Which still leaves us -- you know, the discovery

8    cutoff under the proposed order we submitted is not until May

9    of next year.

04:09PM  10           Si even if we don't finish production of all these

11   documents, in taking into account the processing time until

12   two months from now, we're still looking at, you know,

13   approximately ten months until the discovery cutoff.

14           THE COURT:  And when I hear the complaint that

04:09PM  15   people can't properly be deposed because the information is

16   still forthcoming, how do I resolve that?  Is it dependent

17   upon the Government to produce documents.

18           MR. CARDONA:  I think, Your Honor, we are in the

19   process of starting those depositions.  They have noticed

04:10PM  20   five depositions of some of our financial institutions that

21   we have referenced.  There's purchases of securities in the

22   complaint.  We're going to be taking those depositions

23   starting this Friday, running through towards the middle to

24   end of June.

04:10PM  25           THE COURT:  You're going to need backup.

         1            Did anybody tell you that tonight?

         2            (Discussion off the record.)

         3            THE COURT:  Counsel, she's leaving at 5:45.

         4            MR. CARDONA:  So those depositions are moving

04:11PM  5    forward.  In addition, we've spoken with S&P about scheduling

         6    another set of four depositions of individuals we want to

         7    take to follow right after those, contingent on S&P finishing

         8    their production to us of certain documents.

         9            So, I think, Your Honor, we are proceeding with

04:11PM 10    depositions.  And, again, as in most cases, you know, we are

        11    doing some depositions now that we think we can do with the

        12    documents that are there, and then we'll proceed with those

        13    depositions as document production is completed.

        14            You know -- some of these, you know, we'll be

04:11PM 15    producing these documents from the ratings agency

        16    investigations.

        17            Let me turn for a second, if I could, to the

        18    residential mortgage-backed securities investigations.  We've

        19    done the same thing there.  And, again, have sent out

04:11PM 20    notices, have received back the majority of responses.  And,

        21    again, once we get the revised protective order in place,

        22    we'll be in a position to start production on a rolling

        23    basis.

        24            Now, for these, given the volume of materials,

04:12PM 25    we've talked to S&P, the defendants and Counsel, and they

have agreed to accept production.  Rather than us putting

everything on a hard drive, they have agreed to accept

production through us, essentially, mirroring the database

that is already in existence, which should greatly speed up

the processing time in order to transfer those documents.

I'm in a position now where tomorrow I will be

talking with the person who manages that database to begin

putting the documents into the database that S&P will be able

to access those documents through, the ones that are being

produced, once we get the revised protective order in place,

and we can confirm with the third-party entities that -- with

that revised protective order, they authorize us to do that.

So, again, that should be fairly quick.

Now, in terms of doing that production -- you know,

if I may, Your Honor, I didn't -- unfortunately, I didn't

realize there would be this many people, but I would like to

just hand to the Court --

THE COURT:  We've got all night.

MR. CARDONA:  Okay.  You know, we are proceeding,

you know -- what we are going to be producing in connection

with those investigations are basically three sets of

materials:  The documents that we've obtained from third

parties; again, to the extent that the third parties don't

say they're going to intervene, and/or that there isn't a

more detailed assertion of investigatory files privilege.

|          | 1  | THE COURT:  How do I get some kind of idea of those |
|----------|----|-----|
|          | 2  | who want to intervene versus those who don't? |
|          | 3  | MR. CARDONA:  Right now, Your Honor, I can tell you |
|          | 4  | that based on all of the replies back that I have gotten, |
| 04:13PM  | 5  | there is no one who is going to intervene, assuming that |
|          | 6  | Your Honor signs the revised protective order. |
|          | 7  | I can also tell you that with respect to objections |
|          | 8  | based on investigatory files privilege, I expect that those |
|          | 9  | are going to be very limited.  As of right now, I am not |
| 04:14PM  | 10 | aware of any that would apply to the documents, although |
|          | 11 | there is a possibility there may be very few, but I don't |
|          | 12 | expect there to be many, if any, with respect to the |
|          | 13 | documents that we've gotten from third parties. |
|          | 14 | THE COURT:  Are those the dates, 2004, 2008, that |
| 04:14PM  | 15 | length of time that makes some of these -- |
|          | 16 | MR. CARDONA:  It's in -- it's, in part, that, and |
|          | 17 | it's, in part, that through these notifications the subjects |
|          | 18 | of those investigations have become aware and are aware of |
|          | 19 | the documents that are being sought.  I think there was less |
| 04:14PM  | 20 | concern about the documents. |
|          | 21 | Now, the second category of things that we're going |
|          | 22 | to be producing are -- again, absent objections or assertions |
|          | 23 | of investigatory files privilege, would be the transcripts of |
|          | 24 | witness examinations that were taken under FIRREA. |
| 04:14PM  | 25 | As to those, those are being reviewed, and I expect |

1    that there may be some assertions of investigatory files

2    privilege.  Again, this is a fairly limited subset of

3    documents because there simply weren't that many interviews

4    conducted in this way.  And so, again, I expect that that's

04:15PM  5    going to be a limited subset of objections.  And absent those

6    objections, we'll be producing those.

7         The third set of materials we are going to be

8    producing is the actual subpoenas that were used to gather

9    those materials and the production letters that the third

04:15PM  10   parties gave us in terms of producing those.  Now, there are

11   some limitations that we are applying based on positions that

12   S&P took in its pleadings.  I want to make sure we're all on

13   the same page so that I understand, because if these

14   limitations don't apply, there may be other issues.

04:15PM  15        But, you know, we are not going to be producing

16   notes and memoranda of witness interviews.  And if you recall

17   in their pleadings, S&P said they weren't seeking those.

18        We are not going to be producing substantive

19   communications between the Department of Justice or the U.S.

04:15PM  20   Attorney's Office and these parties.  And that would be

21   either separate substantive communications or to the extent

22   the production letters contain substantive communications,

23   those would be redacted out.  And, again, that's based on

24   representations S&P made in its pleadings.

04:16PM  25        We're not going to be producing any grand jury

|    |    |
|----|----|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 04:16PM | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 04:16PM | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 04:16PM | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 04:17PM | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 04:17PM | 25 |

1  proceeding materials, and that would be anything that would

2  be viewed in the jurisdiction in which the materials were

3  obtained as Rule 6(E) information.  And I say that

4  specifically because the Ninth Circuit and certain other

5  circuits take different views as to what is or is not 6(E)

6  information.  And since these materials were gathered in

7  other jurisdictions that my apply their own 6(E) rules, we're

8  not going to be producing anything that would be viewed in

9  that jurisdiction as 6(E) material.

10       We're also not going to be producing anything that

11  was generated by the Department of justice in the course of

12  its investigations; that is, spreadsheets, analyses or other

13  things that the DOJ did.  Again, based on a position that S&P

14  took in its reply where it said that they weren't seeking

15  those precisely because they --

16       THE COURT:  Now, two things.  Are you saying we are

17  not?  Is this because you had a prior discussion with the

18  defense and they are agreeing to this, and I'm going to see

19  this in an order that's stipulated to between the parties, or

20  is this your position?

21       MR. CARDONA:  This is based on representations that

22  they made in their pleadings in connection with the Motion to

23  Compel.

24       THE COURT:  And I take it you've had conversations,

25  an open line of communication back and forth so that as they

1 hear this -- I'm seeing nods of heads.

2    MR. CARDONA:  I think that's true.

3    MR. KEKER:  Yes, Your Honor.

4    I can't vouch for every single one.  Ms. Windle

04:17PM 5 is a -- Ms. Windle is an expert.

6    THE COURT:  Okay.

7    MR. KEKER:  But, basically -- we've talked about

8 it.

9    THE COURT:  But you're listening --

04:17PM 10    MR. KEKER:  We've talked through this.

11    MR. CARDONA:  The other one -- and this is one that

12 we will be applying to a certain extent, but to some extent

13 it's not feasible, given the nature of the documents, which

14 is S&P had indicated it was willing to confine its request to

04:17PM 15 documents relating to fraud involving the particular

16 securities that are at issue in this case, the 56 RMBS and

17 104 CDOs.  That will not be applied across the board,

18 because, in some instances, it's simply not feasible to

19 segregate the documents that were produced in that way.  In

04:18PM 20 other words, in the investigations that were done, the

21 documents were not produced that way.  So there will be a

22 very limited set of circumstances in which we may apply that

23 limitation.  And, obviously, we'll tell S&P if and when we

24 apply that.

04:18PM 25    And, finally, if Your Honor recalls, there were

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 04:18PM | 5 |

certain members of the RMBS working group that were State
Attorneys General and some independent entities.  And
pursuant to the agreements under which they shared those
documents, they have retained effective possession of those
documents.  We will not be producing those documents.  Those
are things that -- and I believe S&P has served Rule 45
subpoenas on most of those entities, and obviously they can
tell you about their success in getting those documents or
not through their third-party subpoenas.

But those are -- with those limitations, we're
essentially going to be producing the vast majority of a very
large database that has been put together and documents that
have been gathered by these investigations.  It's on the
order of somewhere between 30 and 45 terabytes of
information.

Even with the database production, simply moving
that volume of data in a way that they can access it, is
going to take a significant amount of time.  I reached out to
our technical person to try and get an estimate.  They were
unable to give me an estimate right now.  They are still
working on it.  And as soon as I have an estimate, I will
provide it both to S&P and to the Court.

So that's the RMBS working group investigations.

THE COURT:  Okay.

MR. CARDONA:  The final set of investigations is,

04:20PM

04:20PM

04:20PM

04:20PM

04:21PM

1    of course, the one that is the most problematic, which is the

2    mortgage fraud.  And, here, I will seek clarification from

3    the Court.  You know, we have had conversations with S&P.

4    And Mr. Keker can confirm, but they have been unwilling, to

5    date, to limit it definitively to exclude these types of

6    investigations.

7         I -- it would take me forever, essentially, to

8    reach out to every U.S. Attorney's Office and try to gather

9    documents from 2004 to 2008.  What we are doing instead is we

10   have reached out to the Department of Justice, to the FBI, to

11   HUD to try and get more kind of top-level documents as to

12   what was going on in connection with mortgage fraud during

13   that time; analyses that may have been done within those

14   agencies; statistical information.  If there were large-scale

15   initiatives relating to mortgage fraud, that's what we've

16   tried to locate and identify.

17        I have had conversations with S&P.  That was what

18   they asked us to focus on as an initial matter, reserving the

19   right to seek the more, shall we say, individualistic

20   investigatory information.  I would ask for clarification.  I

21   don't see how individual mortgage fraud investigations

22   carried out in individual U.S. Attorney's Offices that would

23   encompass, for example, you know, the submission by an

24   individual borrower of false documents to a lender, I can't

25   imagine that that would be relevant.

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 04:21PM | 5 |
| | 6 |

1    We have agreed with S&P to look for, to the extent

2  we can, investigations in which some of the larger entity

3  issuers, some of the entities that are also issuers in the

4  securities in our case.  For example, if there was an

5  investigation of Bank of America for mortgage fraud, we are

6  trying to locate that.  So we are trying to do that.

7    But with the exception of those larger

8  investigations of people who were actually issuers in our

9  case and/or the top-level documentation regarding mortgage

10  fraud, I don't think it's practical and could not be done

11  within the time constraints we have to try and do a more

12  granular search at the individual level, and I don't think,

13  based on my conversations with Mr. Keker and Ms. Windle, that

14  ultimately that is going to be something they want or need.

15    THE COURT:  How did he do?  Okay?  Do you have

16  anything you want to add?

17    MR. KHORSHID:  No, Your Honor.

18    THE COURT:  Anything else?

19    MR. CARDONA:  No, Your Honor.

20    That's with respect to the investigations, and,

21  obviously, there are other requests that were the part of the

22  order, but we can talk about those later.

23    THE COURT:  Now, I'm going to structure my portion.

24  That's why these four colleagues are sitting with me right

25  now.  What I can't afford to do is take the representation

```
 1   that this doesn't blow up into a full-fledge war between the

 2   two of you.  I mean, with very congenial excellent counsel.

 3   But I can't assume that I'm not going to have banks that

 4   don't want to comply.  I can't assume that I'm not going to

 5   have privileges at different times.  And how I use the

 6   Special Masters, or something, I'm going to be talking to you

 7   about.

 8           For instance, in an investigation phase, I didn't

 9   know what I was going to hear, and I thought, you know, my

10   Magistrate Judges might be better suited for investigative

11   material and the Government might feel more comfortable;

12   whereas, I wasn't going to put my Magistrate Judges on the

13   plane because you have the right to bring it to the West

14   Coast.  I have an awful lot of jurisdictional problems.  And,

15   quite frankly, a lot of gravity on the East Coast.  So if I'm

16   going to get involved in the depositions, then I'm going to

17   have Special Masters and I'm not putting my Magistrate Judges

18   and tying their time up.

19           So what you kind of came down to was a consensus

20   that you were opposing a gentleman in New York.  I didn't

21   invite him out for that reason.  Somebody is opposing

22   somebody, it's a non-starter.

23           So you seem to be accepting of Judge Smith and

24   Robert O'Brien, but if you're not at the end of the evening,

25   come and tell me, and they're off.  And just -- you know,
```

04:22PM (line 5)
04:23PM (line 10)
04:23PM (line 15)
04:23PM (line 20)
04:23PM (line 25)

hold on.  My turn now.  They're gone.  There just isn't a

question about that.  I'm going to start off with everybody

having a good feeling about who is involved.  And, if not,

you're going to find somebody, but it's got to somebody that

I trust also and that I can get to.  I'm not willing to take

East Coast folks, not because they're not qualified.  If I

call them right now, I can get anybody down to court by 7:00

tonight.  I can't get somebody from the East Coast down to my

court at 7:00 tonight.  So I need local folks defined as

Los Angeles, Orange County, fine.

          Okay?

          So you'll sort that out.  I haven't decided how to

use these folks yet.  So that's going to be a structure that

I put in place this evening, or, at least, I have a better

idea.

          So why don't you just introduce yourselves for the

record.

          Robert, why don't you start with you, and then I'll

turn to Judge Smith, and then to the Magistrate Judges.

          MR. O'BRIEN:  Sure.

          Thank you, Your Honor.

          Robert O'Brien.  I am the California managing

partner for Arent Fox.  I have a commercial litigation

practice with a fair amount of international arbitration

work.  In addition to serving as counsel in arbitrations, I

| | |
|---|---|
| 1 | also serve as a neutral.  I have probably done a dozen |
| 2 | international arbitrations, chair, or arbitrator, and I |
| 3 | served as a Special Master in this district either for |
| 4 | discovery or for other issues on probably another half dozen |
| 04:25PM  5 | cases. |
| 6 | THE COURT:  Now, I came into contact with him for |
| 7 | the first time, perhaps, on the *Bratz/Barbie* doll case, is |
| 8 | what I call it, because he was the Special Master for Judge |
| 9 | Larson.  When the case -- when Judge Larson left the bench, |
| 04:25PM 10 | the case came over to me, and I wanted to have a Special |
| 11 | Master in place.  I didn't know if I was going to use him or |
| 12 | not.  I found that he was a very good Special Master, and so |
| 13 | I invited him back in and tossed out that name as a potential |
| 14 | person to work with. |
| 04:25PM 15 | Judge Smith is the former presiding judge of the |
| 16 | Superior Court, but now he's over at JAMS. |
| 17 | And so I just want you to introduce yourself. |
| 18 | MR. SMITH:  You already have. |
| 19 | I was a Superior Court judge for 27 years.  I've |
| 04:26PM 20 | been doing this for 17 years.  I have somewhat of an emphasis |
| 21 | in e-Discovery, quite a bit of experience in e-Discovery. |
| 22 | THE REPORTER:  Your Honor, may he speak up, please? |
| 23 | THE COURT:  Yeah. |
| 24 | Just a little bit louder. |
| 04:26PM 25 | MR. SMITH:  I have quite a bit of experience in |

UNITED STATES DISTRICT COURT

1    e-Discovery, and have a very esoteric type of practice.  I've

2    done just about everything there is.  Maybe none of it very

3    well, but I've done just about everything.

4                THE COURT:  Okay.

5                And for the Magistrate Judges, why don't you

6    introduce yourself.

7                HON. JUDGE MCCORMICK:  My name is Doug McCormick.

8    I am a Magistrate Judge here in the Santa Ana Courthouse.  I

9    joined the bench in August of 2013.  Prior to that, I was an

10   AUSA here in this district for 12-and-a-half years.

11               HON. JUDGE GANDHI:  Jay Gandhi.  I'm a Magistrate

12   Judge now in Santa Ana.  I was previously up in Los Angeles.

13   I was appointed in 2010.  Prior to that, I was in private

14   practice.

15               THE COURT:  Okay.

16               I have no idea, yet, the extent that any of these

17   people will be here.  That's the open discussion that we're

18   starting tonight.  But I'm going to get my structure in place

19   so that I meet whatever needs or demands you have on an

20   almost instantaneous basis.  And eventually tonight, sometime

21   tonight, or whenever, this morning, you're going to have a

22   private conversation with them.  If any of you aren't

23   accepting on either side, any of these folks, they're off.

24   That's it.

25               Understood?

|   |   |
|---|---|
| 1 | MR. CARDONA:  Yes. |
| 2 | THE COURT:  Understood? |
| 3 | MR. KEKER:  Yes, sir. |
| 4 | THE COURT:  And that's why the New York gentleman |
| 04:27PM 5 | may be competent, qualified, but once you didn't accept him, |
| 6 | there was no reason to fly him out, you know, for a parade. |
| 7 | There's just no reason.  But I want to start off with a |
| 8 | feeling that you have confidence in these people.  That |
| 9 | there's no issue concerning conflicts, integrity, a run-in |
| 04:27PM 10 | you've had, et cetera.  But I'm going to have at least two |
| 11 | Magistrate Judges working the case and two Special Masters, |
| 12 | and I want those people, though, close in locality.  Because |
| 13 | this weekend, I -- how many calls did I place?  A lot of |
| 14 | phone calls went into different homes on home phone numbers |
| 04:28PM 15 | just so I can work Saturday and Sunday on your case, and I |
| 16 | had a pretty good structure in place or a pretty good idea, |
| 17 | and orders were going out this weekend for them to read. |
| 18 | Now, I want to turn to you because suddenly I'm |
| 19 | going to kid you a little bit about what I'm reading. |
| 04:28PM 20 | MR. KEKER:  Can I stand up, Your Honor? |
| 21 | THE COURT:  No.  Sit down. |
| 22 | MR. KEKER:  I can't talk sitting down. |
| 23 | THE COURT:  You can pace.  Walk around.  It's okay. |
| 24 | MR. KEKER:  Good. |
| 04:28PM 25 | THE COURT:  Just move around. |

1          MR. KEKER:  Good.

2          THE COURT:  Golly gosh, Judge, you know, you

3     haven't put your Magistrate Judges in place, so kind of the

4     intonation I got -- and I'm kidding, you now.  We're kind of

04:28PM  5     floundering here.  And my thought was, you know, with

6     hundreds of witnesses, I don't think so.

7          So what you're getting is a tremendous courtesy

8     tonight.  I could have done this on the paper.  But it's

9     giving you a chance to sort out on both sides and have a

04:29PM  10    discussion with these people privately, because I'm going to

11    leave in a few moments and come back in an hour or two.  I'll

12    be back in chambers.  And they're going to help me, through

13    you, structure something that makes sense in terms of them as

14    far as depositions are concerned.  Because you're going to

04:29PM  15    start with Special Masters until I'm certain I don't have a

16    problem.  You're not going to start with no Special Master

17    telling me you're getting along very, very well.  It doesn't

18    work that way.

19         Now, after 5 or 10 or 50 or however many we're

04:29PM  20    having, may not be a problem.  My confidence level may be sky

21    high, but it has nothing to do with your integrity.  It has

22    to do with banks.  It has to do with how they react.  Because

23    I can guarantee you one thing, if this was on the other side

24    and the Government was reaching out to a bank, as you're

04:29PM  25    going to have to, I bet you that there would be almost

```
 1    immediate compliance.  Because they regulate.

 2              Now, you've got an uphill battle, and the

 3    Government is willing to help you to a certain extent.  But

 4    when you reach out to a bank, that's also an entity that

 5    feeds S&P, in a sense.  You've got some folks out there

 6    probably looking at you as you make those demands or requests

 7    in the future, and I've got to sort that out and try to get

 8    that information to you.  And unless the Government can

 9    comply rather quickly with what they perceive are my overly

10    broad orders, and your response is that they have an overly

11    broad case, then somebody is going to make a motion to

12    continue this case in September, aren't they?

13              MR. KEKER:  Well, I mean, that's --

14              THE COURT:  Yeah.  Let's get the rule straight.

15    No.

16              MR. KEKER:  Yeah, that's what we --

17              THE COURT:  Now, here's the hardest problem as

18    we're having our -- I'll stand up, also, okay?

19              Here's the hardest problem we've got.  I Googled

20    you, and you're an outstanding attorney.  I hope that's on

21    the record.  Take off your coats after 5:00.  It gets hot.

22    Take off your coats.

23              And my question is that the Government can muscle

24    up on you.  What they can do is they can throw a 24/7

25    entourage at you.  And I'm worried that you have a lot of
```

```
        1   folks that you may be involved with who are clients.  And I'm
        2   worried that you've got the time -- not the time.  Certainly
        3   the ability to devote yourself to this case 24/7.  I don't
        4   know that you do.  And we're going to have a discussion about
04:31PM 5   that.
        6          MR. KEKER:  Okay.
        7          THE COURT:  Okay?
        8          Because as you look at your able colleagues, you
        9   may need one, two or three more people over on this other
04:31PM 10  side of the fence.
        11         The next thing I heard at the first session was,
        12  oh, Judge, this could take 80 days.  And I was thinking I've
        13  got the finest trial teams in the country on respective
        14  sides, I would enjoy having you more than 80 days, it would
04:31PM 15  be great.
        16         So when you start throwing out the Boogie Man of
        17  time to me, I'm thinking that's a blessing.  If you want a
        18  120-day trial, you just tell me.  You'll have a 120-day
        19  trial.  You can't hold up to it.  Because once we start
04:32PM 20  trial, you'll be with me almost every weekend.  Because going
        21  in, you'll have to know that I'll have to see every document
        22  before it's presented or it's a stipulation off the board
        23  before it ever goes to the jury.  So, in preparing you for
        24  that, I just want you to know that you don't have a life on
04:32PM 25  weekends and you don't have a life at nights, unless we get
```

down to business and the minutia gets cut out.

And, you know, and the chain -- and I think that's
going to happen, by the way.  You're such professionals.  I
don't think I'm going to have any problems with that.  But if
I say that now, then I can back off and be kind.  If I'm kind
now and I don't give you that warning, then you're going to
say, well, gee, what happened to -- so demands are
extraordinary.

The other general comment I have is I accept your
Seventh Amendment argument.  I think you're right on the law.
But you brought a huge case.  I'm not going to sit very still
for very long listening to why you can't comply in a
nanosecond.  You are the United States Government.  And what
I don't want to do is put you in a position to be the
threatening you with sanctions or embarrassing you publicly.
So we're going to work out sometimes, which you're going to
comply.  Okay?

And I -- and I -- in good faith, I know you'll do
that.  That's not a threat.  It's just a demand.  I don't
care how big your case is.  You could have acceded to the
severance if you wanted it, that S&P brought.  And once you
brought this size case, the duty is completely on you.  I'm
not sure you have enough personnel for what I'm about to
demand.  Okay?  I'm sure you have enough people.  So I'm just
warning you.

|  | 1 | MR. KEKER:  Okay. |

```
          1            MR. KEKER:  Okay.

          2            THE COURT:  Okay?

          3            So from now on, potentially, you're 24/7.  And I

          4     don't know if you're clientele can take that if you have

04:33PM   5     other clients.  I don't know if you have enough person power.

          6     But I'm not going to sit still very long because you're going

          7     to trial in September.

          8            Now, also, you did something that was really

          9     interesting.  You put a month in there for negotiations.  Do

04:34PM  10     you now how disappointed I'm going to be if I devote my

         11     weekends for almost a year of my personal life and you decide

         12     to settle it --

         13            MR. KEKER:  How do you think I'll feel?

         14            THE COURT:  No.  Let me talk to you.  I'm joking

04:34PM  15     with you now.  The record won't reflect that.  I will devote

         16     my Saturdays and Sundays, and my wife is going to sit at home

         17     and wonder if she's married.  And you're going to potentially

         18     come to me with a settlement just before trial that you put

         19     in a month so you two can negotiate.  Look at your settle --

04:34PM  20     look at your structure.  Judge, we're going to have

         21     dispositive motions.  Now we want to have a month for

         22     settlement discussions and Now we want to have a pretrial.

         23     Don't you dare do it.  If you're going to settle it, try to

         24     settle it right now.  If not, go to trial.  But don't waste,

04:34PM  25     you know, my time, my nights, and my weekends, unless you're
```

```
 1    going to trial; understood?
 2              MR. CARDONA:  Understood.
 3              THE COURT:  Because I get paid the same amount, and
 4    I'm sitting here on Saturdays and Sundays, and I'll give you
 5    my life and soul.  But you come to me with that settlement, I
 6    may not have an opportunity, but that happens time and time
 7    again.  So I'm giving you a good part of my life.  And I want
 8    you to hear that on a very personal professional basis.
 9              Understood.
10              MR. KEKER:  Yes, sir.
11              THE COURT:  Okay.
12              MR. KEKER:  Yes, sir.
13              And we don't have a month in here to negotiate
14    settlement.  We have a month in here to get ready for
15    pretrial and so on.  But I -- we hear you totally.
16              THE COURT:  Okay.
17              MR. KEKER:  If we're going to settle, we ought to
18    do it now.
19              THE COURT:  Now, tell me your biggest concern.
20              MR. KEKER:  My biggest -- my biggest concern is a
21    practical.  We came here understanding that you weren't going
22    to pull back from the September 2000 -- notwithstanding our
23    motion and so on.  That the case was going to go to trial in
24    September of 2015.  Being practical people, there are three
25    huge areas that we need your help in and the Special Masters'
```

04:34PM   5
04:35PM  10
04:35PM  15
04:35PM  20
04:35PM  25

|   | |
|---|---|
| 1 | help, after you appoint the Special Masters, but I don't |
| 2 | think that the Special Masters can solve these problems |
| 3 | without getting guidance from you.  And the three problems |
| 4 | are:  The -- the pace of Government discovery, which we're |
| 04:35PM 5 | quite sympathetic with and Ms. Windle can talk about. |
| 6 | They're talking now about it's going to take the FBI until |
| 7 | June 20th to even come up with the search terms to do the |
| 8 | search.  And then -- and so -- so mega, giga -- |
| 9 | THE COURT:  You have time for a story? |
| 04:36PM 10 | MR. KEKER:  Sure. |
| 11 | THE COURT:  It's a great story.  Have a seat. |
| 12 | MR. KEKER:  Okay.  I will. |
| 13 | THE COURT:  Do you want to hear the story? |
| 14 | MR. KEKER:  Yeah, I do. |
| 04:36PM 15 | THE COURT:  It's a great story. |
| 16 | MR. KEKER:  Yeah, I do. |
| 17 | THE COURT:  It's a great story. |
| 18 | The Aryan Brotherhood case, I think, came out of |
| 19 | your office. |
| 04:36PM 20 | MR. CARDONA:  Yes, it did. |
| 21 | THE COURT:  And in good faith, the Government had |
| 22 | gone to a central depository in Washington, D.C., and it |
| 23 | produced 250,000 pages of documents.  That sounds like a lot. |
| 24 | MR. KEKER:  You've told us this story, if you'll |
| 04:36PM 25 | forgive me, about the death penalty. |

```
 1              THE COURT:  Because I'm old, let me tell it to you
 2     again.
 3              MR. KEKER:  All right.
 4              THE COURT:  And the Aryan Brotherhood felt that
 5     they had been attacked first, but there was no documentation.
 6     And it turned out that nobody had gone to the special
 7     investigative units at each prison in the six Federal prisons
 8     and looked at their documents.  No problem.  It was supposed
 9     to be centralized.  And there it did show exactly what the AB
10     said.  And whether that was a good defense or not for killing
11     somebody, what the end result is 50 or 75,000.  I was told
12     the same thing.  They couldn't be produced.
13              Well, I think you remember -- were you involved in
14     that case?  They came down here --
15              MR. CARDONA:  Yeah.
16              THE COURT:  -- and sat for seven days.  We got it
17     produced.  So you're right.  There's a slowness to it that
18     may make September honestly an impossibility.  I recognize
19     that.  But if I don't bear down, I can try this case in 2017,
20     and it's still impossible.
21              MR. KEKER:  That's -- and that's why --
22              THE COURT:  I've got an open mind.  Hear me this.
23              MR. KEKER:  Okay.
24              THE COURT:  If the Government is not complying, I'm
25     going to have two choices.  One, to be very nasty and to
```

1   sanction them, or to embarrass them in front of Bloomberg --

2   just kidding you -- or the press.  I don't want to do that.

3   By the same token, I will.

4           I don't know how demanding, though, I can be yet

04:38PM  5   until I have that session tonight, but you're going to get

6   these documents quicker than he imagines.

7           MR. KEKER:  Okay.

8           That's not the only -- that's not the only problem.

9   The second problem -- and this one, I think, is indicative of

04:38PM  10  a lot of other things.  We sent an interrogatory -- the

11  Government has been investigating this case for three years

12  before we even got started.  They're ahead of us.  They --

13  according to their Chief of the Civil Division, when he had

14  his big press conference when he announced the case, we've

04:38PM  15  interviewed 150 witnesses.

16          We sent them an interrogatory saying, who have you

17  interviewed and what did they tell you?

18          They eventually, after a lot of fussing, but now

19  we're here.  We -- they have sent us information about 105

04:38PM  20  people that they have interviewed, many of them multiple

21  times, some of them six times, some of them leading up to a

22  deposition, some of them never getting to a deposition so

23  that they'll be interview, interview, interview.

24          THE COURT:  I see.

04:39PM  25          MR. KEKER:  Nothing.

1          So there's all of that.

2          Now, we can go out -- this is just the practical

3    part of it, thinking about September 2015.  We can go out and

4    take 105 depositions and we can say to 105 people, what did

5    you say to the Government?  It's not privileged, tell us.

6    The person is going to say either "I don't remember, I'm not

7    really sure."  They're going to say something that's going to

8    lead us to come back to one of these gentleman and say, we

9    now have a particularized need because of what happened in

10   this deposition for the particular statements, not the middle

11   impressions, but the -- the statements.  There was somebody

12   there taking notes of what the person said.

13          If this were a criminal case and there -- some of

14   that information was favorable to us, if the person says I

15   don't remember anything and now all of a sudden he's

16   testifying wildly at the trial that they do remember things,

17   we need to be able to get that.  You could tell them what are

18   you trying to hide.  Get off it.  Let's -- we understand

19   about work product.  We understand how this can be a

20   multi-stage program that would take us thousands of hours,

21   multiple depositions.  Take a deposition once.  They can't

22   answer the question.

23          We get it.  We understand how that can happen.  But

24   there's no reason for that to happen.  They don't have any

25   reason to be hiding what they're hiding.  You could tell

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| 04:40PM | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 04:40PM | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 04:41PM | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 04:41PM | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 04:41PM | 25 |

1   them, come on, you're the Government.  This isn't a normal

2   civil case.  Let's cut through that one.  That's one thing

3   that would be --

4              THE COURT:  Let's stop right there.

5              MR. KEKER:  -- extremely helpful.

6              THE COURT:  Let's stop right there.

7              MR. KEKER:  Yes, sir.

8              THE COURT:  I don't know who I'm dealing with here.

9   I was dealing with you and Mr. Cardona.  You two are solely

10  responsible, and it wasn't designated out to somebody in

11  Washington, D.C. that they have to go talk to, or whatever.

12  I might get that kind of compliance.  It's when I get a

13  good-faith, a large case and the associates are involved, or

14  even other partners, that it starts to fragment.  I've got

15  one person, in a sense, supervising for each side, but

16  there's a whole bunch of decision-makers, and it takes time.

17            I need to cut that logistics train somehow so I

18  know who to directly go to.  And eventually I'll ask the

19  Government, who do you call, or do you have absolute

20  authority?  In other words, can you make a decision -- don't

21  answer now -- can you make a decision, or do you have to go

22  to Mr. West, who was sitting here on the last occasion and

23  the occasion before?  In other words, can you make the

24  decisions right here, or do you have to check with people in

25  D.C.?  And I don't want an answer right now, because it may

UNITED STATES DISTRICT COURT

|  |  |
|---|---|
| | 1 |

depend upon what I'm asking, obviously.

So -- I don't know that it's reasonable that I demand that only lead counsel involved in depositions.  I don't think I want to do that.  But I do need to make certain that the decision-making is centralized, and I don't want to get so far down the associate train that I got very bright associates doing very good things at deposition, and they're reporting back to the head person, but they're making their mark.  They're going through the same minutia that you just described, you know, spurious objections that may be well taken, and in a practical sense in the real world with all of our experience, they don't make a difference.

I'm going to listen to the problems tonight.  But somehow you're right.  I need to get that to you because there's no reason for you to have a deposition if you don't have the material.  You just got to invite the person back or come back and ask me for leave to extend beyond seven hours.

You know what I'm most worried about?

I'm most worried about my jurisdiction on the East Coast.

MR. KEKER:  Well, this is -- this is the Government, the United States Government, Mr. Cardona's group, interviewing 105 people.  They have control of the notes.  We're not talking about any third party.  This is our opponent who has, I think, 302s, but they're interview memos

| | |
|---|---|
| 1 | from all of these people.  Some of them will have favorable |
| 2 | information to us in it, I think.  Some of them may have |
| 3 | impeachment material in them.  But we will never -- the way |
| 4 | for us to find out is to go through this cumbersome process. |
| 04:43PM 5 | The way the -- for -- to get this case to trial in |
| 6 | September 2015 is to tell the Government tonight, that this |
| 7 | isn't a case-by-case thing.  You've got these notes.  Give |
| 8 | them the notes.  Redact your middle impressions.  Give them |
| 9 | the notes so that they can decide who to depose, and what to |
| 04:43PM 10 | ask them once. |
| 11 | THE COURT:  Tell me the process that you've gone |
| 12 | through that causes this frustration? |
| 13 | MR. KEKER:  We sent interrog -- |
| 14 | THE COURT:  Did you talk to Mr. Cardona and he |
| 04:43PM 15 | refused? |
| 16 | MR. KEKER:  Yes. |
| 17 | And we -- in eloquent letters.  And we could -- we |
| 18 | can file a motion, attach these beautiful discovery letters. |
| 19 | I mean, they're works of art on both sides.  He writes back |
| 04:43PM 20 | and cites cases, includes "Judge Carter once said this," and |
| 21 | we cite cases.  They're really magnificent, but they're |
| 22 | not -- they're not work for grown men and women.  I mean, |
| 23 | that's the problem.  It's -- we are fussing about -- |
| 24 | THE COURT:  Don't respond yet. |
| 04:44PM 25 | MR. CARDONA:  I won't.  I will hold myself back, |

| | |
|---|---|
| 1 | Your Honor. |
| 2 | THE COURT:  It's not fit for grown men and women. |
| 3 | MR. CARDONA:  I understand. |
| 4 | THE COURT:  Keep going. |
| 04:44PM 5 | MR. KEKER:  And you could -- as the judge, you |
| 6 | could say, okay, this is one area of litigation we just don't |
| 7 | need in this case.  There can't be a reason for the |
| 8 | Government to have in its files what people have said before |
| 9 | when the defense is -- doesn't have the same information.  I |
| 04:44PM 10 | mean, we're not going to have a trial where the person gets |
| 11 | on the stand -- |
| 12 | THE COURT:  This is what I heard before I got the |
| 13 | case.  I used to read the newspaper.  Now I don't read about |
| 14 | you anymore. |
| 04:44PM 15 | MR. KEKER:  Okay. |
| 16 | THE COURT:  Okay. |
| 17 | It was my understanding that when you came to me |
| 18 | that you two had been negotiating for a long period of time. |
| 19 | MR. KEKER:  Not me. |
| 04:44PM 20 | THE COURT:  No.  Hold on.  Hold on. |
| 21 | What I had heard is that there had been some |
| 22 | voluntary compliance between both sides in terms of an |
| 23 | investigation and materials handed over, and I kind of was |
| 24 | concerned that there would be an exchange of some materials |
| 04:45PM 25 | where S&P might have thought that they were a target.  Just |

|   | 1 | trying to head off that kind of notoriety.  Genuinely |
|---|---|---|
|   | 2 | believed you've done nothing wrong, and you were turning over |
|   | 3 | documents to the Government.  In fact, you told me that. |
|   | 4 | MR. KEKER:  And that's true. |
| 04:45PM | 5 | MR. ABRAMS:  That's true, yes. |
|   | 6 | THE COURT:  I didn't make that up. |
|   | 7 | MR. CARDONA:  I agree. |
|   | 8 | THE COURT:  Now, hold on. |
|   | 9 | So you're not quite helpless.  When you're saying |
| 04:45PM | 10 | all of these things to this dastardly person on the other |
|   | 11 | side, you've been out there with some documents over there |
|   | 12 | playing the game also about handing them over.  So you're not |
|   | 13 | helpless. |
|   | 14 | MR. KEKER:  No.  But we're talking apples and |
| 04:45PM | 15 | oranges, Your Honor. |
|   | 16 | THE COURT:  How do I get witnesses into a |
|   | 17 | deposition for you so that you have a deposition -- so here's |
|   | 18 | rule number one without me consulting any of you? |
|   | 19 | At this trial, people will appear in person.  Write |
| 04:46PM | 20 | that down and take it to the bank.  And the reason for that |
|   | 21 | is the American juror has the right to see and hear a person |
|   | 22 | in court.  They don't have the right if the person is still |
|   | 23 | alive or not dying to get a deposition testimony either in |
|   | 24 | writing or on videotape because demeanor is supposed to be |
| 04:46PM | 25 | part of the judgment call that we make. |

```
 1              The second thing is, and you can quote me on this,

 2    a deposition has limited value.  One side is bearing down on

 3    what they perceive to be an adversarial witness, and the

 4    other side is defending and trying to get out just as quick

 5    as they can.  So there's no cross.  And so what you have,

 6    then, is the unfairness of one side asking all of the great

 7    questions.  The other side partially defending, but not

 8    getting the answers that they -- and the end result is it's a

 9    great discovery vehicle.

10              In my court, I literally will give you an adverse

11    finding.  I will read something God awful to the jury, and

12    people will get them here.  And that's a large burden on the

13    Government.  Because what I won't accept is you can't get

14    them here, including, you're going to be surprised, some

15    banks.

16              And we'll talk about that in a moment.  I know you

17    say you don't have control, but you watch.  If this was

18    reversed --

19              MR. KEKER:  And we'd like to talk about the banks.

20    But, first, I'd like to just pin this one down.  This -- we

21    can cut through thousands of hours of legal work.  There's

22    105 people, more than 50 of whom we didn't even know that

23    they interviewed because they didn't eventually end up in an

24    investigative transcript.

25              THE COURT:  What happens if they're not going to
```

04:46PM (line 5)
04:46PM (line 10)
04:47PM (line 15)
04:47PM (line 20)
04:47PM (line 25)

present them as witnesses?

MR. KEKER:  We -- well, then we -- we need to go out and find what they told them that makes them not want to present them as witnesses.  These are 105 people that they thought were important to interview, and I suspect that a number of them said no, you're barking up the wrong tree.  That's not what happened.  And so -- so, in fairness to us, that's the *Brady* side of this in the civil context.

THE COURT:  And you wrote a very nice letter, and he refused to give these to you?

MR. KEKER:  A very nice letter, Your Honor.  And he wrote a -- he wrote a strong lucid letter back, which made no sense, and refused to give it to us.

THE COURT:  But what's your position this evening?

MR. KEKER:  My position is that you -- before we appoint Special Masters, before we have a place where people can bring myriad motions and have a lot of discovery practice, this is one area, one important area of 105, or however many there are, witnesses that the Government is interviewed where you, today, can say we're going to cut through this.

MR. CARDONA:  I --

THE COURT:  No.  Let him respond to that.  Let's see what he's willing to do.

MR. KEKER:  I don't think he has anything he could

| | |
|---|---|
| 1 | say, Your Honor. |
| 2 | THE COURT:  Sure, he does. |
| 3 | MR. CARDONA:  Well, Your Honor, I mean, we did |
| 4 | write back.  And we did interview -- |
| 04:48PM  5 | THE COURT:  Tell me what your position is now.  I |
| 6 | don't care -- |
| 7 | MR. CARDONA:  Our position is that these are notes |
| 8 | and memoranda that were prepared by attorneys and/or |
| 9 | investigators working for attorneys of questions that were |
| 04:48PM  10 | asked that reveal what we viewed as important in the case, |
| 11 | and hence, fall clearly within what is work product, as |
| 12 | Your Honor has already held in a number of cases and a number |
| 13 | of other cases have held. |
| 14 | Now, what Mr. Keker is talking about is |
| 04:49PM  15 | practicality in terms of speeding up the case and getting |
| 16 | stuff over to him.  And we are certainly willing to consider |
| 17 | that.  But I don't, again, want to be in a position where |
| 18 | this is one-sided.  You know, we know that S&P has also |
| 19 | conducted interviews of witnesses in the course of the |
| 04:49PM  20 | investigation.  And if we're going to work this out, it's |
| 21 | going to need to be a mutual exchange. |
| 22 | THE COURT:  We'll work it out tonight.  Don't worry |
| 23 | about that.  You may be brushing your teeth at midnight, but |
| 24 | we're going to work it out.  Okay? |
| 04:49PM  25 | MR. CARDONA:  Understood. |

|          | 1  | THE COURT:  So if you have materials, are you |
|          | 2  | willing to turn it over to them? |
|          | 3  | MR. KEKER:  No. |
|          | 4  | THE COURT:  Okay. |
| 04:49PM  | 5  | MR. KEKER:  The materials that S&P has, Your Honor, |
|          | 6  | are pure attorney-client -- actually, I shouldn't say that. |
|          | 7  | With respect to S&P employees and former employees covered by |
|          | 8  | the attorney-client privilege, trying to get information, |
|          | 9  | that's privileged -- that's attorney-client privileged |
| 04:50PM  | 10 | information.  The information that we're talking about that |
|          | 11 | the Government has is not attorney-client privileged |
|          | 12 | information.  Instead, it's interview information.  We can |
|          | 13 | take a deposition.  We can ask the person what was said.  If |
|          | 14 | they can remember what was said, they -- they can tell us. |
| 04:50PM  | 15 | There is no attorney-client privilege implicated at all. |
|          | 16 | THE COURT:  You have the list of these 105 people? |
|          | 17 | MR. KEKER:  Yes, sir. |
|          | 18 | MR. CARDONA:  Your Honor, I will simply note that a |
|          | 19 | large number of those are current or former S&P employees to |
| 04:50PM  | 20 | whom they have access. |
|          | 21 | MR. KEKER:  Well, that's fine.  If they've -- some |
|          | 22 | of these people -- there's one on here -- this guy, Frank |
|          | 23 | Radar, they interviewed him, I don't know how many times, |
|          | 24 | five times.  We know he's -- he's -- he's said nasty things |
| 04:50PM  | 25 | about S&P.  Our position is he doesn't know what he's talking |

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 04:51PM | 5 |

        1    about.  He wasn't in a position to observe and so on.

        2         They've talked to him five times.  Why do they have

        3    to talk to -- if this were a criminal case, I would get very

        4    suspicious that a witness needs to be talked to so many

04:51PM 5    times.  Gee, didn't he say the right thing the first time?

        6    What did -- how did he change?  All of that makes for

        7    magnificent impeachment in the right situation, but you got

        8    to get at it.  If it were a criminal case, we'd be able to

        9    get at it.

04:51PM 10        MR. CARDONA:  And, Your Honor, I'll just note that

       11    Mr. Radar has been a witness in a case that S&P was a party

       12    to.  S&P participated in his deposition.  And no -- no later

       13    than last week or May 20th or 21st, whatever that date is,

       14    Cahill Gordon was counsel in a case involving S&P in which

04:51PM 15    Mr. Radar was again deposed in the State actions that are

       16    pending in the multi-district -- the Connecticut and Illinois

       17    State actions where the issues are essentially the same.

       18        THE COURT:  Here's what I'm hearing without being

       19    arbitrary and capricious on my part, just taking a side, that

04:51PM 20    somehow we need to get started with some of these problems so

       21    I can start sorting them out.  Not all 105.  But I need a dry

       22    run of 15 or 20 people in depositions immediately, and I need

       23    to see what privileges are asserted.  I need to see what

       24    categories they fall into.  And -- that's my initial thought.

04:52PM 25        And then if these privileges aren't good

```
 1    privileges, and I'm playing, you know, I'm seeing

 2    gamesmanship here, I can resolve it.

 3              MR. KEKER:  Gamesmanship is the work product

 4    privilege that -- that -- it's the particular -- I mean --

 5              THE COURT:  You see by getting started, though, I

 6    start seeing that.  Those motions start coming in front of

 7    me.  Right now, I'm in a vacuum.

 8              So I hear what you're saying, and I think I'm

 9    somewhat sympathetic towards it.

10              MR. KEKER:  Let me -- let me go to the last one,

11    which is the banks, which is taking -- you're concerned about

12    our --

13              THE COURT:  Yeah.

14              MR. KEKER:  It's a -- it's a Marine Corps problem.

15    If you have too many people, you can't do it as well as a

16    small unit sometimes.  So we're trying to keep it -- to have

17    a reasonably small unit to meet your concerns so that you

18    don't have all kinds of disparate people working on the

19    litigation, but -- and that's why we're trying to solve that

20    problem.

21              The new one is the banks.  We have 85 Rule 45

22    subpoenas out to banks, to federal agencies, to all these

23    people that they say they don't control.  They -- every one

24    of them has law firms that are masters of the meet-and-confer

25    process.  There should be a course in law school on meeting
```

04:52PM  5
04:52PM 10
04:52PM 15
04:53PM 20
04:53PM 25

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 04:53PM | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 04:54PM | 10 |

1    and conferring.  And the first thing they tell you is meet

2    and confer and be nice and let it drag on and then get to the

3    point and stiff them and then when they threaten you that

4    they're going to do something, change your position --

5             THE COURT:  Just one moment.

6             I'm sorry.  What I just said out of your presence

7    was this is my greatest fear.

8             MR. KEKER:  Well -- and it -- but it's happening.

9    And they're wonderful lawyers and wonderful firms who are

10   masters of meet and confer.  I mean, I think that's all they

11   do is go to meetings.  And they -- and we've just -- have

12   been through this process.  We were about to bring a motion,

13   bring it before you, let you begin to cut through it, and

14   boom, boom.  They go, okay, well, we'll change this and that,

15   and so they sort of took away the grounds of the motion.

16            We have one today, later on.  The National

17   Credit -- the National Credit Union administrator says, you

18   didn't meet and confer after -- first, they stiff us.  Then

19   we file a motion.  Then they say, oh, wait a minute, you

20   didn't talk to us enough.  We're going through that with

21   85 -- and I'm sure there's -- there's somebody decent out

22   there someplace, but most of the 85 are treating us like

23   that.

24            I don't know what we're going to do about it except

25   to recognize that it takes time.  I mean, you can't -- you

cannot cut the Gordian Knot without -- you have to talk to

people, and then they're going to be on vacation next week,

and so then I can get back to you the next Friday.  And then

by the next Friday, they're confused about something, and

04:54PM  then it's the next Friday.  And I'm sure every gentleman up

there has been through this, but we're getting it 85 times.

And it makes it very, very difficult -- and the answer is not

more litigation about it.  The answer really is trying to get

these lawyers in good faith.  And some people are producing.

04:55PM  We're beginning to get documents from banks, but --

THE COURT:  What banks are you not getting it from?

MR. KEKER:  Well, we weren't getting them from

Citi -- Citi is the one I was talking about where we're about

to bring a motion, but now Citi has changed its position, so

04:55PM  we're not in a position to make a motion because they're

saying they're going to give us a lot of documents.  And

there's other people better than I that -- Bank of America

has been giving us some documents, and we have begun to get

that flow going.  But it's a little bit like dealing with the

04:55PM  Government.  I mean, once you -- once you get the flow going,

they say, well, it takes time to do this.  And if you're

completely unreasonable about -- if you say, no, I want it

tomorrow, we can't be you.  We can't say, I'm doing it

tomorrow.  They say I need a little bit more time.  And so it

04:56PM  all gets stretched out.

| | |
|---|---|
| 1 | We think that we are going to succeed with most of |
| 2 | the banks getting most of what we need eventually with a |
| 3 | minimum of -- of motions to compel, we hope, but -- but |
| 4 | it's -- it really is a drawn-out process. |
| 04:56PM    5 | THE COURT:  I -- I believe you believe that.  I |
| 6 | don't believe that's going to happen to you.  I think along |
| 7 | the way you're going to have enough resistance and it's |
| 8 | painful. |
| 9 | MR. KEKER:  Well, it's painful now. |
| 04:56PM   10 | THE COURT:  And that's going to depend upon what |
| 11 | law firm is involved; you know, who wants to make their mark, |
| 12 | honestly; how much time they want to spend. |
| 13 | MR. KEKER:  And money. |
| 14 | THE COURT:  I think this is my greatest fear, |
| 04:56PM   15 | frankly. |
| 16 | MR. KEKER:  Well, that's -- it's happening and |
| 17 | we're not throwing up our hands.  We're just saying that -- |
| 18 | that the -- that you start something in February and you're |
| 19 | still doing it in June, and you've seen very few documents, |
| 04:56PM   20 | and you still have unresolved issues.  That's the kind of |
| 21 | process that you're going through.  And that's sort of normal |
| 22 | civil discovery, and it's particularly normal civil discovery |
| 23 | in a case as big as this.  That's our problem. |
| 24 | We're doing all kinds of things to limit what we're |
| 04:57PM   25 | asking for.  We're narrowing it to the securities involved |

         1    here.  We're trying to -- we're trying to make it easier on

         2    people to comply, and trying to make as narrow a demand as we

         3    can consistent with the needed to defend the client.

         4              And, further, I think you -- it will be maybe

04:57PM  5    helpful to listen to Ms. Windle, who's been really hands on

         6    in dealing with the discover -- with some of these problems

         7    about the delay.

         8              THE COURT:  I respect you greatly.  We've got three

         9    lead counsel, and that's it.  Everything I hear will be

04:57PM 10    through the three lead counsel that you've designated.

        11    That's it.  So let's just set that rule.

        12              And no discourtesy.  If you're one of the lead

        13    counsel, you're on.  Okay?  And you're welcome to be one of

        14    the lead counsel.  I'm going to deal with three lead counsel.

04:58PM 15              MR. KEKER:  Well, as our -- okay.  Then -- then

        16    with respect to that, if you want more detail about where we

        17    are with which bank --

        18              THE COURT:  Consult with your --

        19              MR. KEKER:  I'm not sure it's going to be useful to

04:58PM 20    you.  It's just that is a -- that's a huge category that

        21    needs to be -- well, I -- and I'm not -- what I'm saying, I

        22    guess, is that -- is that if any -- a Special Master or you

        23    went to the lawyers that we're dealing with, they would say,

        24    hey, we put a lot of time and effort into this.  We've put

04:58PM 25    huge amount -- we've met with them ten times.  We've done

1      this, we've done that.  We're trying, Judge.

2              THE COURT:  I can move very quickly because of the

3      resources I have sitting on both sides.  I don't think you

4      can keep up right now.  I don't mean that in a derogatory

04:58PM   5      fashion.  I can bring more resources to bear.  And, quite

6      frankly, you are responsible for finding out what these banks

7      are going to do immediately.

8              Get those requests out there.

9              MR. KEKER:  Well, they're out.

04:59PM  10      THE COURT:  Well, then let's set some dates tonight

11      after you talk to these folks.  Because I'll get people in.

12      We'll get it done.  But I don't want to move hearing the

13      complaint, which I understand, and I'm sympathetic towards.

14              What I'm sympathetic towards, from your position,

04:59PM  15      is, Judge, how can we adequately prepare unless the

16      Government turns over not what you think, but what you're

17      entitled to?  Whatever my rulings are.  Number two, Judge,

18      how can we prepare until we get, you know, the bank's

19      position?

04:59PM  20              And my response to that is if you've got 87

21      requests out there, then let's move on it, and we'll sort

22      that out tonight.

23              We're going to be a very busy court, and I'm really

24      questioning if I'm not setting up camp right across the

04:59PM  25      street right now.  I'm not sure yet.  That's what we're going

|   |   |
|---|---|
| 1 | to decide tonight.  I hope not, but these banks are going to |
| 2 | be in here.  And the greatest fear I have as my jurisdiction, |
| 3 | which both of you so ably pointed out, which is why I'm not |
| 4 | sympathetic to the Government.  You brought it on the West |
| 5 | Coast.  You're welcome to, but now you better be jumping |
| 6 | through hoops, you know, getting these folks to comply, |
| 7 | because you can get them to comply also. |
| 8 | You see, the Government has tremendous power.  They |
| 9 | don't have legal power.  They don't have a legal requirement |
| 10 | to do this, but morally and ethically they do.  And I |
| 11 | guarantee if the Government had reached out to these banks, |
| 12 | they would be flying into this courtroom.  You reaching out |
| 13 | to them, S&P, they're coming in here at their own pace or |
| 14 | whatever they perceive that I might be in a position to do or |
| 15 | not.  And I'm worried about these banks being centered on the |
| 16 | East Coast. |
| 17 | MR. KEKER:  We're asking these banks whether or not |
| 18 | there's any indication in their files that they had any |
| 19 | responsibility, whatsoever, for the crisis of 2008, and |
| 20 | they're not all that enthusiastic about coughing it up. |
| 21 | THE COURT:  Why would they be? |
| 22 | MR. KEKER:  I don't know. |
| 23 | THE COURT:  Why would you expect voluntary |
| 24 | compliance? |
| 25 | MR. KEKER:  I -- that's -- we didn't expect it. |

05:00PM (line 5)
05:00PM (line 10)
05:00PM (line 15)
05:00PM (line 20)
05:01PM (line 25)

UNITED STATES DISTRICT COURT

```
 1    That's why we sent subpoenas.

 2           THE COURT:  Well, you say to me gee, Judge, these

 3    people are going to get it --

 4           MR. KEKER:  No, no.  I think that we are going to

 5    get it because -- because you -- the process has so far

 6    yielded agreements to produce documents and some documents

 7    from some of the smaller banks, and the big banks are

 8    scheduled to -- we're getting there, but it's just like

 9    pulling teeth.

10           THE COURT:  That doesn't give me an idea of the

11    time frame.

12           MR. KEKER:  Neither -- we don't have an idea either

13    and we don't have an idea when the Government tells us that

14    they're still -- they're working out search terms as it -- it

15    will take until June 20 to work --

16           THE COURT:  We're going to do that tonight, aren't

17    we?  Sure.

18           MR. KEKER:  It will take them --

19           THE COURT:  You're not going home until we have

20    search terms.

21           MR. KEKER:  Okay.

22           THE COURT:  I mean, all the problems, believe it or

23    not, are going to get resolved tonight in some form.  I don't

24    know if I'm going to issue final orders tonight, but they're

25    going to get resolved tonight.
```

|       |                                                              |
|-------|--------------------------------------------------------------|
| 1     | MR. KEKER:  Okay.                                             |
| 2     | THE COURT:  Fair enough.                                     |
| 3     | Well, anything else you want to say?  Because I'm            |
| 4     | going to go talk to my team back there and I'm going to open |

05:02PM  5    up the complex courtroom next door and you can talk to any of

6    them individually to see if your comfort level or non-comfort

7    level.  Okay?  But that's in conjunction with each other.

8                MR. KEKER:  Your Honor, before the court reporter

9    goes, what is your plan for the NCUA motion, which we were

05:02PM  10    hoping --

11                THE COURT:  Unfortunately, I didn't know -- I

12    wanted to take a dry run at that motion tonight.  I wanted to

13    hear that as an example of what might be occurring, but I

14    can't.  I don't have the resources, unfortunately.  So

05:02PM  15    probably Wednesday.

16                MR. BIRD:  I mean, I --

17                THE REPORTER:  Can you state your name, Counsel?

18                MR. BIRD:  Terry Bird representing NCUA.

19                So, in other words --

05:02PM  20                THE COURT:  Wednesday.

21                MR. BIRD:  Wednesday?

22                THE CLERK:  Thursday.

23                THE COURT:  Thursday.  I'm tied up Wednesday.

24                MR. BIRD:  So Thursday?

05:03PM  25                THE COURT:  Thursday.

```
 1              MR. BIRD:  Thursday?

 2              THE COURT:  Thank you.

 3              I would have had you sitting here for no reason.

 4              So Thursday.

 5              MR. BIRD:  I was enjoying all of the bouquets that

 6    John was going to send over our way.

 7              THE COURT:  So Thursday.  I'll take the motion on

 8    Thursday.

 9              MR. CARDONA:  Your Honor, if we -- if we can,

10    there's one other issue that I think we need resolved with

11    respect to your order --

12              THE COURT:  Sure.

13              MR. CARDONA:  -- and the scope of the order, which

14    relates to the Executive Office of the President.

15              If you recall in your order, you recognized that

16    there were certain requests that implicated privileges that

17    attached to the Executive Office of the President, and you

18    ordered that we produce those documents related to the

19    selective prosecution claims that are not protected by those

20    privileges.

21              As a result, we have -- and we have been working

22    with Treasury primarily to address the requests that

23    redacted -- if you remember Secretary Geitner's phone calls

24    and the communications that relate to that.  We have not

25    gotten documents that reflect communications to or from the
```

|   |   |
|---|---|
| 1 | Executive Office of the President which implicate those |
| 2 | privileges.  Whether those documents are in Treasury, in DOJ, |
| 3 | or within the Executive Office of the President, S&P differs |
| 4 | with that.  S&P has taken the position that except for those |
| 05:04PM 5 | documents that are actually within the Executive Office of |
| 6 | the President, in other words, on that side of the |
| 7 | communication, we should be gathering those. |
| 8 | We think the Court's order made clear that we don't |
| 9 | need to gather those communications now.  That that's for a |
| 05:04PM 10 | subsequent phase down the road after we produced the other |
| 11 | communications that relate to Treasury, DOJ that don't |
| 12 | involve the Executive Office of the President. |
| 13 | MR. ABRAMS:  Your Honor, may I? |
| 14 | On that one, we had thought the basis of |
| 05:04PM 15 | Your Honor's conclusion that at least not yet and perhaps not |
| 16 | at all, but not yet for the Executive Office of the President |
| 17 | that if the Treasury department has in its files material |
| 18 | reflecting potentially relevant information bearing on the |
| 19 | case, that we were entitled to it. |
| 05:05PM 20 | And Mr. Cardona quite right that our position is |
| 21 | that at least you hadn't set it, and we didn't think that you |
| 22 | meant that if Treasury, which he does represent, and which is |
| 23 | part of the United States, and which is not the executive |
| 24 | branch, has relevant materials which we called for, that we |
| 05:05PM 25 | should have it. |

1          THE COURT:  Okay.

2          MR. CARDONA:  And our problem, of course, is that

3     to the extent those materials are, for example, an e-mail

4     from Secretary Geitner to the president, not that I know that

05:05PM  5     there is such an e-mail, but if there were one, that would

6     implicate the executive privilege, which we've put aside for

7     the moment.

8          MR. ABRAMS:  Well, our understanding was that what

9     you were protecting was the Offices of the President that we

05:06PM  10    should not be flitting through their files.  We should not be

11    intruding upon the -- the -- that part of the executive

12    branch at this stage of the case.  But we thought if -- if

13    there is a document, such as Mr. Cardona posits

14    hypothetically, I assume, and it's in the former Secretary

05:06PM  15    Geitner's files at home or the Treasury Department now, that

16    it is not an intrusion.  Certainly, not that sort of

17    intrusion, to have Treasury turn over to us something which

18    bears so directly on an issue that you have said that we

19    could go forward on.

05:06PM  20         THE COURT:  Okay.

21         Do you want to visit with these gentlemen?  Is

22    there any --

23         MR. KEKER:  Your Honor, could I ask a -- I'm

24    concerned about this NCUA situation.  You've got 50 minutes

05:07PM  25    with the court reporter, and I really do think that -- that

| | | |
|--|--|--|
| | 1 | hearing -- using some of that time to hear argument on this |
| | 2 | motion would help advise you on things that we're doing |
| | 3 | tonight.  I mean, it's the kind of -- this is the kind of |
| | 4 | dispute, the kind of hairsplitting, the kind of everything. |
| 05:07PM | 5 | THE COURT:  How long is your estimate? |
| | 6 | MR. KEKER:  In the Ninth Circuit, 50 minutes is |
| | 7 | more -- |
| | 8 | THE COURT:  How long is your estimate? |
| | 9 | MR. BIRD:  Well -- sorry, Your Honor. |
| 05:07PM | 10 | I would guess we could probably do it in -- by |
| | 11 | 5:45, but it really depends upon John's argument. |
| | 12 | THE COURT:  Okay.  Let's start. |
| | 13 | MR. KEKER:  Mr. Markley is planning to argue it for |
| | 14 | our side, Your Honor, and I hope that doesn't violate your |
| 05:07PM | 15 | rule. |
| | 16 | THE COURT:  Because I haven't been definite in my |
| | 17 | rules, you're more than welcome to argue this evening. |
| | 18 | MR. MARKLEY:  Thank you, Judge. |
| | 19 | THE COURT:  But I don't know about Cahill.  And no |
| 05:07PM | 20 | discourtesy intended to you, Counsel, but you're more than |
| | 21 | welcome to come up to be lead counsel at any time. |
| | 22 | All right. |
| | 23 | Then your appearances, Mr. Bird? |
| | 24 | MR. BIRD:  Thank you, Your Honor. |
| 05:08PM | 25 | Terry Bird representing NCUA. |

1          MR. HETHERINGTON:  Andrew Hetherington for NCUA,

2     Your Honor.

3          MR. MARKLEY:  And, Your Honor, Brian Markley from

4     Cahill Gordon for the defendant, S&P.

5          Your Honor --

6          THE COURT:  Just a moment.  Let's take a dry run --

7          MR. MARKLEY:  Sure.

8          THE COURT:  -- through one so we all hear the

9     problem and we can discuss it.

10          All right.  Counsel?

11          MR. MARKLEY:  Judge, the NCUA, or the National

12     Credit Union Administration, is an agency of the U.S.

13     Government that regulates and supervises federally-insured

14     credit unions, including five of the very entities who are

05:08PM   15     alleged to have suffered losses in this case.  So they

16     regulate extremely relevant entities.

17          As explained in our papers, Judge, this agency the

18     Federal Government possess various categories of documents

19     that are obviously relevant to our defense in the case and

05:08PM   20     should be produced.  To date, however, they have produced

21     nothing, not one single document in their capacity as the

22     regulator of these credit unions.

23          Our motion, Judge, is simple.  We're asking the

24     Court to compel compliance with all of our requests, not just

05:09PM   25     a handful of categories, as NCUA suggested in their sur-reply

last week, but everything.  And we know that there is very

relevant information in their possession.  Among other

things, as I said, they're the regulator of the institutions

that allegedly suffered losses here.  Thus, they have in

05:09PM  their files, their own files, not just the files that they

hold as custodian for failed credit unions, but their own

agency files, documents that are very relevant.

They have documents relating to the specific

investments at issue here, and they have documents in their

05:09PM  files reflecting their examination of why those investments

went wrong.  And what I'm talking about, Judge, are documents

that underlie their so-called Material Loss Reviews, or MLRs,

as we've described them in our papers.  And these were

conducted by NCUA's Office of Inspector General, it's OIG.

05:10PM  They're studies of the very investments at issue here,

including analyses of the causes for those losses, losses

that the Government attributes to a reliance on S&P's

ratings.

The Material Loss Reviews concluded, among other

05:10PM  things, that NCUA itself, as regulator, and the credit

union's own management were largely responsible for their

losses.  They failed to have appropriate risk management

strategies in place.  They created undue credit market

liquidity risk.  They acquired securities with collateral

05:10PM  that was overconcentrated in certain jurisdictions like

         1    California.  And they were not adequately supervised by NCUA,

         2    itself.

         3             The Court has already held that that kind of

         4    information, information that describes potential causes of

05:10PM  5    the losses, other than reliance on S&P's ratings, are

         6    relevant.  That was a significant portion of the judge -- of

         7    the Court's April 15th opinion.  We want to see the facts

         8    that underlie the conclusions of these MLRs, their work

         9    papers, their memoranda, the statements that were made by the

05:11PM  10   credit unions, and by NCUA management about the investments.

         11   In other words, the backup that caused them to conclude that

         12   these losses were caused by the credit unions' own actions,

         13   NCUA's supervision, and possibly the activities of third

         14   parties.

05:11PM  15            Among other things we know, that in connection with

         16   these reports, the OIG interviewed NCUA management about the

         17   losses, maybe the credit unions themselves.  That raises a

         18   whole host of questions that we would like answers to.

         19            What did management say about these investments?

05:11PM  20   What did they say about their reliance on ratings?  What did

         21   they say about their understanding of ratings of independents

         22   and objectivity, focal points of the April 15th opinion?

         23   What did they say about their knowledge of the rating

         24   agencies, including S&P's Issuer-Pays Model?  What did they

05:11PM  25   say about the reasons for their investments?  Did they say

```
 1    they were chasing yield?  Did they say that they were aware

 2    of and concerned with liquidity risk, and what were the other

 3    investment factors?  All of these things are relevant.

 4          Did they suggest in these interviews or in their

 5    e-mail correspondence that we've subpoenaed that they were

 6    aware of trouble in the housing or mortgage markets, or did

 7    they say something to suggest that they, as regulators, like

 8    everyone else, was surprised by what ultimately transpired,

 9    and that their views were, in large part, consistent with

10    those of S&P?

11          Another specific example, Judge, we know that the

12    executive director of the NCUA, in connection with one of

13    these reports, sent a letter to the OIG, and what it said

14    was, quote:  "WesCorp," that's one of the credit unions,

15    "overrelied on the credit ratings assigned by the NRSROs

16    despite guidance that credit ratings were not a substitute

17    for prudent due diligence.  That's the executive director of

18    NCUA, the regulator, of the entities that allegedly lost

19    money speaking to the OIG."

20          We think that we are entitled to know why the

21    executive director of the NCUA reached this decision, and not

22    just about WesCorp, but whether he reached that decision

23    about other credit unions, as well.  We think he did.  What

24    led him to the conclusion that these credit unions that he

25    was regulating, that his agency was regulating, essentially,
```

1    misused or overrelied on S&P's ratings.  And did that

2    warning -- did that concern get communicated to the credit

3    unions prior to the investment losses?  And if not, then why

4    not?

05:13PM   5         We also know that NCUA, before these MLRs, did its

6    own examination of the credit unions.  Particularly, of

7    WesCorp, the one that I'm focused on now.  They looked at

8    supervision reports.  They looked at correspondence about the

9    basis and the factors that led to the investments.  We think

05:13PM  10    that we would -- we should be entitled to that as well.  And

11    there are other documents called for by the subpoena that we

12    are focused on, including anything that relates to the use of

13    and reliance on ratings.

14         Now, NCUA's response to the subpoena, as I said,

05:13PM  15    has been to produce nothing in its role as regulator.  They

16    have, essentially, Judge, been engaged in a charade for three

17    months that culminated with a letter we received on

18    March 13th called a "Final Determination."  And what it said

19    was, quote, "NCUA does not intend to produce documents in

05:14PM  20    response to S&P's requests."

21         Initially, when we served our subpoena, their

22    response, for three months really, was that they didn't need

23    to comply because we hadn't satisfied -- S&P hadn't satisfied

24    certain internal agency regulations called Touhy regulations.

05:14PM  25    And we don't have to get into the details of those, because

they've totally disavowed this line of argument.  But, essentially, what they said for three months was you have to convince us that you're entitled to these above and beyond the requirements of Rule 45 or you can't have them.  And we cited very clear Ninth Circuit precedent, a case called *Exxon* that said that is absolutely no answer.  It was a frivolous argument if ever there was one.  And the moment we filed our Motion to Compel, they dropped it, and I think that that shows that the positions they were taking were disingenuous.

So after receiving the final determination letter, and after they dropped these unsustainable arguments, and after we filed our Motion to Compel, we went to them and said, you say you want to meet and confer, we'll meet and confer.  We've been ready to meet and confer.  And we -- we said we would propose search terms to them that they could apply to documents that had already been gathered or were in the process of being gathered in connection with other litigations that they're involved in.  And they said, send us your search terms, we'll think about your proposal.

Well, they came back to us in a few days, and this is all described in our reply brief, and they said, we're actually not interested in your search terms.  We don't even want you to send them to us, because unless you take these regulator documents off the table, unless you only accept documents that we hold merely as a custodian for failed

```
 1    credit unions, we're not interested in the deal.  They

 2    weren't willing to produce documents to us in their capacity

 3    as regulator.

 4            And why?

 5            They say that they're just not relevant and that

 6    they're overly burdensome.  But the reality, Judge, is that

 7    they have no sound basis to refuse production.

 8            They contend that there are clear policies that

 9    relate to reliance on credit ratings.  They say it's -- it's

10    clear from our rules that no credit union could invest in a

11    security unless it has a double layer hire.  And because it's

12    so clear, you're not entitled to anything we have, any

13    communications we have about that policy or the factors that

14    went into the investment.  And we don't agree.  We think

15    discovery --

16            THE COURT:  Just a minute.  Slow down.  The court

17    reporter completely lost you.  You slurred your words.  You

18    speeded up.

19            MR. MARKLEY:  Sorry, Judge.

20            They've taken the --

21            THE COURT:  Just a moment.

22            MR. MARKLEY:  Yes?

23            THE COURT:  Any communication we have about that

24    policy are factors that went into the investment, that's

25    where you lost her.
```

         1              MR. MARKLEY:  Okay.

         2          I'll pick right up.

         3          They have taken the position, Judge, that because

         4    the rules about relying on ratings are clear, we're not

05:16PM  5    entitled to anything underneath that.  We're not entitled to

         6    any documents that reflect their understanding of these

         7    terms.  And to make that point, Judge, they cited your

         8    April 15th opinion, and they said that their documents as

         9    regulator won't say anything about how independence and

05:17PM 10    objectivity and those meanings are interpreted by the

        11    marketplace.  And it's true that their documents probably

        12    won't say much about the marketplace's interpretation.  They

        13    might say some.  But what they left out, either intentionally

        14    or not, I don't know -- is that your order said very clearly

05:17PM 15    that the perspective of the marketplace and the regulators is

        16    relevant.  Federal agencies' perspective of the meaning of

        17    independence and objectivity is relevant.

        18              So we think that based on the clear terms of your

        19    order, we're entitled to these documents.

05:17PM 20              They've also made a lot of noise in their briefs,

        21    Judge, about privilege.  We think the argument is misplaced,

        22    and, in any event, premature.  And I'll make this quick

        23    because I know we're on the clock.  But, for one, the

        24    privilege that they have invoked, the deliberative process

05:17PM 25    privilege, only applies to documents that are pre-decisional

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 05:18PM | 5 |

so that precede a determination, a rulemaking, a policy

determination by an agency, and that reflect the give and

take of a deliberative process.  And what we're talking about

here, in large part, are documents that reflect a

backward-looking post-hoc analysis of the causes of the

losses.

And we've cited several cases on this point.  One

is called *Seafirst Corp vs. Jenkins,* and it essentially

holds --

THE REPORTER:  I'm sorry.  Counsel, repeat that,

please.

MR. MARKLEY:  The case is called *Seafirst Corp vs.*

*Jenkins*, and it stands for the proposition that a post-hoc

examination report by the OCC is not covered by the

deliberative process privilege, because it's backwards

looking.  It's not pre-decisional.  It's not deliberative.

And, more broadly, we believe it would be

fundamentally unfair to permit the Government to stand

behind, and we're calling them the Government because they

are the Government, and -- and we serve them pursuant to a

Rule 45 subpoena.  We're not suggesting they're a party to

the case, but they are part of the U.S. Government.

And, for that reason, we think it would be

fundamentally unfair for them to stand behind a governmental

privilege in a case that the Government brought.  And we've

cited four cases and a treatise for this proposition.  They

haven't cited anything in support of their contention that it

matters not.  That they're just an independent agency.

The last point on deliberative process, Judge, is

05:19PM  that this privilege or the chilling effect or potential

chilling effect that underlies the privilege isn't present

here, because these credit unions, some of them at least, are

no longer intact.  And we've cited case law showing that

where a credit union no longer exists that the chilling

05:19PM  effect that underlies the deliberative process doesn't

attach.

But all of this about the privilege is -- if the

Court finds that there's the potential for privilege here,

it's premature.  Because what they need to do, as you wrote

05:19PM  in your April 15th opinion, is explain why the privilege

applies on a document-by-document basis, explain why the

documents they're withholding are pre-decisional and

deliberative.  And they haven't done that.  They have just

broadly contended in their brief that the privilege applies.

05:20PM  So they have a lot of work to do if they intend on

withholding documents on the basis of this privilege.

And lastly, in closing, Judge, I just want to

mention that we did serve four other subpoenas on NCUA, not

in its capacity as regulator, but in its capacity as the

05:20PM  custodian of documents for failed credit unions.  And they've

|     |     |
| --- | --- |
| 1   | produced a handful of materials, not many, in response to |
| 2   | these.  And I think the problem has been that ever since we |
| 3   | filed this motion, they've seen fit to stonewall us. |
| 4   | And I mention before at the top, Judge, that we |
| 5   | offered to give them search terms, and then they turned |
| 6   | around four days later and said, we don't want them, anyway, |
| 7   | if you're going to pursue this motion.  We sent them anyway |
| 8   | soon thereafter.  And we got a letter last week that -- in |
| 9   | response to a letter we had sent, and what it said was that |
| 10  | we're still evaluating your search terms.  Six weeks later |
| 11  | they're still evaluating our search terms to think about |
| 12  | whether they want to apply those terms or other terms to the |
| 13  | documents that they, I believe, have already gathered in |
| 14  | connection with other litigations. |
| 15  | And I think the reason that Mr. Keker suggested |
| 16  | this would be a good starting point tonight is because this |
| 17  | reflects the kind of resistance that we've gotten, and the |
| 18  | kind of stonewalling that we've gotten.  They could have |
| 19  | applied those search terms immediately, but they chose not |
| 20  | to. |
| 21  | And it matters because, as we discussed before, we |
| 22  | have depositions that are scheduled.  We have a deposition of |
| 23  | an executive from the WesCorp Credit Union coming up at the |
| 24  | end of June, and we've only gotten a fraction of the |
| 25  | documents that we subpoenaed from NCUA in its capacity as the |

05:20PM (line 5)
05:21PM (line 10)
05:21PM (line 15)
05:21PM (line 20)
05:21PM (line 25)

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 05:21PM | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 05:22PM | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 05:22PM | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 05:22PM | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 05:22PM | 25 |

custodian for WesCorp.  I think we may go forward with the

deposition anyway in June because we're tired of waiting, but

we're going to reserve our right to pursue those, and we may

in front of you shortly thereafter this hearing, sometime

thereafter, with a motion demanding the production of those,

because there's no basis for, at all, for them to refuse to

produce those.

            That's it, Your Honor.

            THE COURT:  Counsel?

            And I know who you are.  But, once again,

reintroduce yourself so the record does.

            MR. HETHERINGTON:  Good evening, Your Honor.

            Andrew Hetherington, NCUA.

            THE COURT:  Thank you.

            MR. HETHERINGTON:  Your Honor, one very good point

that S&P just made is that the subpoenas issued to NCUA as

the liquidator of the failed credit unions are not before the

Court tonight.  They are completely different subpoenas.  The

NCUA has produced documents in response to those subpoenas.

Any dispute about the adequacy of that response is not part

of this Motion to Compel.  It's just a distraction.

            Your Honor, NCUA is in a bit of a difficult

position here.  We're the poster child, supposedly, for the

reasons why this case is being delayed.  I'm a little

surprised to hear that from S&P.  I've litigated against S&P

1    before, including many of these attorneys.  I've tried to get

2    documents from them.  And the suggestion that S&P doesn't

3    engage in delay or meet and confers ad nauseam is

4    breathtaking.

05:23PM   5        Your Honor, there are three reasons why this motion

6    should be denied.  The first, which I'll come to in a moment,

7    is that it's not enough just to use the word "relevant"

8    repeatedly.  There has been no showing that non-public

9    documents in NCUA's files possibly could be relevant to this

05:23PM  10    case.  Nearly all of the documents that could have relevance

11    that have been described here, they're all public.

12        How do you think that S&P knows so much about what

13    NCUA did after the credit unions failed?

14        It's because it's public.  NCUA's regulations are

05:23PM  15    public.  The reasons for the regulations are public.  That

16    promulgated in notice incumbent rulemaking interpretive

17    decisions.  The Material Loss Reviews, these post-hoc

18    findings, several hundred pages.  They're all public.

19        So we need to be clear here.  Masses of information

05:24PM  20    that may be pertinent to this case is out there in the public

21    domain.  What S&P wants is deliberative documents, work

22    papers underlying those, not the regulations themselves.

23    That's the first reason.

24        The second reason, Your Honor, is if this Court

05:24PM  25    were to impose NCUA the burden of what we believe simply is a

1   fishing expedition, not only would that interfere with and

2   have a chilling effect on NCUA as an agency's internal

3   deliberations and debate, but it also potentially would open

4   the door for the very first time, as far as I know, to

05:24PM  5   third-party litigants in any litigation involving credit

6   agencies to demand that the NCUA, as a regulator, stop what

7   it's doing, turn over all of its internal files just on the

8   off-chance that something interesting might turn up.

9        The third reason is, although S&P repeatedly

05:25PM 10   conflates NCUA with the quote, "Government," NCUA is not part

11   of the Department of Justice.  We didn't bring this case.  We

12   didn't determine the scope of the case.  We didn't invite any

13   burden upon ourselves, as Your Honor found the Government has

14   done.  And what's more, any burden, financial burden on NCUA

05:25PM 15   of complying with the subpoena would fall not on the

16   Government as a whole or the taxpayer, but on the credit

17   unions that fund NCUA and ultimately on the customers of the

18   credit unions.

19        So we would ask that at a minimum, if this Court

05:25PM 20   were to grant NCUA -- S&P's motion, even in part, then as

21   Rule 45 mandates, S&P, not those credit unions, should have

22   to bear the burden of complying with the subpoena.

23        Your Honor, let's talk about relevance.  We

24   received the subpoena.  We received five subpoenas in

05:26PM 25   February.  Four were to NCUA as the conservator of the credit

|   | |
|---|---|
| 1 | unions.  So, in other words, we're standing in the credit |
| 2 | unions's shoes.  As I say, those subpoenas are not before the |
| 3 | Court today.  We produced documents.  We actually invited S&P |
| 4 | to propose search terms within days of getting the subpoena. |
| 05:26PM 5 | Forty-five days later, when our production was due, |
| 6 | we had heard not a word.  So we produced what we had.  Only |
| 7 | recently have they asked us to also run search terms.  We're |
| 8 | talking to them about that.  But the subpoena today is to us |
| 9 | as the regulator, not the credit unions. |
| 05:26PM 10 | We look to the subpoena.  It looks like party |
| 11 | discovery.  There are 44 requests, more than 100 subparts. |
| 12 | Unlike some of the targets of the other subpoenas like |
| 13 | Secretary Geitner and some of the banks, we were not involved |
| 14 | in any of the underlying actions.  We didn't issue the |
| 05:27PM 15 | securities.  We're not implicated by the selective |
| 16 | prosecution claim.  So we wrote to S&P.  And we said, so far |
| 17 | in your cover letter you gave us two sentences saying why you |
| 18 | need this material.  Please tell us in more detail, as to |
| 19 | each of the requests, why they're relevant and what you |
| 05:27PM 20 | propose to do to limit the burden on us as a third party. |
| 21 | Forty-five days later, we had heard not a peep.  So |
| 22 | we sent them a letter saying, you didn't give us any further |
| 23 | information.  We don't think these are relevant.  We're not |
| 24 | going to produce. |
| 05:27PM 25 | Your Honor, even in cases that the NCUA has brought |

in the shoes of the credit unions, so NCUA at least nominally

is a party to the case.  We have not been ordered to produce

documents from NCUA as regulator.  Three District Courts have

considered and rejected the very arguments S&P is making

05:27PM  here, and that's why we're a party to the case, at least on

paper.  Here, we're a third party.

The reason why S&P never got back to us, I think,

is clear.  They can't articulate why the non-public documents

are relevant to this case.  The salient allegation here is

05:28PM  that S&P knew that the credit unions and other investors

relied on S&P's ratings.

Well, Your Honor, they did so because NCUA's

regulations, during the time that's pertinent here, required

that they do so.  There's no mystery to that.  As I say,

05:28PM  there's no mystery to the reasons why NCUA required that.

It's in the Federal register.

In other words, whenever NCUA expressed an opinion

as its -- as a regular about the independence or objectivity

of ratings or when it acted upon those opinions, which is

05:28PM  what S&P claims to be interested in, it did so publicly.

Everybody knows NCUA's position.

Now, S&P suggests there might be internal e-mails

or communications that express a contrary view.  First of

all, that is wholly speculative, Your Honor.  Second of all,

05:29PM  so what.

UNITED STATES DISTRICT COURT

05:29PM

05:29PM

05:30PM

05:30PM

05:30PM

1          What possible relevance could it have if an

2    individual NCUA employee expressed an opinion contrary to the

3    NCUA's official position in lawful -- lawfully-binding

4    regulations that required the credit unions to rely on the

5    regulations?

6          That's what's important here.

7          There's no -- what even would S&P do with an e-mail

8    from somebody at NCUA who knew something about credit ratings

9    that was never communicated to the credit unions, or it would

10   be in the credit unions' files, which is subject of a

11   different subpoena.

12         If NCUA ever told something to the credit unions in

13   an e-mail, that was contrary to the regulations, that

14   wouldn't change the requirement, the legal requirement that

15   the credit unions adhere to the regulations.  And we've

16   already given S&P all of the deal files.  They can verify

17   whether or not the credit unions complied with the

18   regulations thereby proving that any contrary advice that

19   they might hypothesize might have been given had no effect,

20   whatsoever.

21         Even if these documents did exist, the mere

22   possibility of an e-mail of some interest to S&P, surely,

23   Your Honor, does not justify imposing on NCUA, a third party,

24   the burden of running figuring out whose documents to search,

25   where those documents are.  The subpoena covers the period

|     |     |
| --- | --- |
|     | 1   |

2004 through the present.  It's a lot of people, it's a lot
of documents.  All just in the hope that something might
exist.

Your Honor, that's where these other orders
declining to require NCUA to produce documents are so
relevant here.  We would hope that they would be persuasive.
But more important, unlike the credit unions whose documents
have been gathered, they are with a vendor, were in the
process of producing documents to the third -- to the other
parties in our litigation, NCUA hasn't done that.  We would
have to start from square one.  Would be incredibly
burdensome.  And I submit to you, Your Honor, we haven't
heard any compelling reason why that would be justified.

In addition to any financial burden, Your Honor, as
a regulator, NCUA potentially is the target of third-party
discovery in any case involving credit unions.

The *Exxon* case, cited by my friend here, made a
note that agencies such as NCUA have a quote, "serious and
legitimate concern that their employee resources not be
commandeered into service by private litigants," which is
what would happen here, and the floodgates would open.  This
was echoed in the Southern District of New York.  The burden
on an agency and its personnel could quickly become
overwhelming if parties were able to compel the agency to
provide testimony concerning its own failure to uncover fraud

```
 1   whenever a defendant --

 2              THE REPORTER:  I'm sorry.  Counsel?

 3              THE COURT:  Counsel, way too fast.  You've lost the

 4   court reporter.

 5              MR. HETHERINGTON:  I apologize.

 6              THE COURT:  If parties were able to come -- restart

 7   to read.  She can't keep --

 8              MR. HETHERINGTON:  You know what, I can sum it up,

 9   Your Honor.

10              THE COURT:  Why don't you do that.

11              MR. HETHERINGTON:  The burden on agencies, such as

12   NCUA, would rapidly become intolerable if any litigant

13   involving purchases of securities by a credit union can drag

14   NCUA into this as a regulator and argue that NCUA should have

15   known, should have done better -- Your Honor, as I say, as

16   far as I can determine from inquiring at NCUA, they're not

17   aware, at least for the last 30 years, of NCUA ever being

18   ordered to produce documents as a third party.  I don't think

19   we've heard anything here that would make this the first

20   time.  I agree -- we're on the clock.

21              I agree with S&P that questions about privilege, I

22   think, are probably premature.  We don't think anything needs

23   to be produced.  And our argument about privilege was simply

24   that S&P did not seem to be aware, when it sent us the

25   subpoena, that a great number of the documents that it thinks
```

05:32PM (line 5)
05:32PM (line 10)
05:32PM (line 15)
05:33PM (line 20)
05:33PM (line 25)

1      it wants are in the public domain and/or obviously

2      privileged, such as deliberative notes preceding final

3      determinations.  Those are all public, Your Honor.

4            Your Honor has no more questions, I'm happy to sit

05:33PM   5      down.

6            THE COURT:  Counsel, your response, five minutes.

7      No longer.

8            MR. MARKLEY:  Thank you, Your Honor.

9            I won't need all five minutes.  We know what's

05:33PM  10      publically available, and we reviewed all of what we think is

11      relevant that's publicly available well before we served the

12      subpoena.  What we're interested in here are the materials we

13      can't get on the Internet.  We're interested in e-mails with

14      the credit unions regarding the event investments at issue.

05:34PM  15      We're interested in work papers for the MLR reports, which

16      deal with the investment losses at issue.  The facts that

17      were reviewed in connection with those MLR reports cannot

18      conceivably be subject to any privilege, and they are plainly

19      relevant for the sole reason that they concern the

05:34PM  20      investments that the Government is trying to hold us

21      responsible for.

22            What about the executive director of NCUA sending a

23      letter to the OIG claiming that there was undue reliance on

24      credit ratings?  Why did he say that?  What led to that

05:34PM  25      statement?  What did he say about that statement in his

|   | |
|---|---|
| 1 | e-mails before he made it?  Did he ever make such a statement |
| 2 | to the credit unions themselves; and, if so, when and to |
| 3 | whom? |
| 4 | Mr. Hetherington is worried about precedential |
| 05:35PM 5 | effect and the possibility that this decision that we're |
| 6 | asking for could open the floodgates to further discovery, |
| 7 | but what I would submit, Judge, is that this isn't any other |
| 8 | case.  This is not a random securities case in State or |
| 9 | Federal Court where they may possess relevant documents. |
| 05:35PM 10 | This is a case where my client is being accused by the |
| 11 | Government, of which NCUA is a part, of defrauding the |
| 12 | agency -- the entities that they regulate.  So if there's |
| 13 | ever a time to order them to produce these kinds of internal |
| 14 | non-public materials, this is it. |
| 05:35PM 15 | Mr. Hetherington said that they're talking to us |
| 16 | about search terms.  They're not.  We sent them search terms |
| 17 | six weeks ago.  And he responded almost immediately with a |
| 18 | letter dated April 3rd, to my colleague, Dean Rangel, in |
| 19 | which he said:  "Please note, however, that NCUA did not and |
| 05:35PM 20 | does not agree to produce to S&P any documents produced in |
| 21 | NCUA's own ongoing litigation or to negotiate additional |
| 22 | search terms with S&P for that production."  They refused |
| 23 | even to negotiate, and he told you tonight that we're still |
| 24 | talking about it.  This was April 3rd.  And he sent a letter |
| 05:36PM 25 | last week for the first time since then stating that they're |

1    now evaluating, that was his word, the six-week-old search

2    terms.

3              The last thing I would say, Your Honor, is that the

4    cases he talked about from other courts are totally

05:36PM  5    irrelevant.  NCUA submitted them with the notice -- with

6    additional judicial authorities.  It was hard for us to even

7    figure out what they were about.  But they're not about this.

8    They concern different facts.  They don't concern a case

9    where the defendant is being alleged with having committed

05:36PM  10   systemic fraud.  So they're of no precedential value,

11   whatsoever.

12             And -- and the only other thing I'll say is that I

13   didn't say anything about searching through the weeds to find

14   e-mails expressing contrary opinions to published

05:36PM  15   regulations.  Maybe that's there, but that's not what our

16   subpoena is focused on, and it's not what this motion is

17   about.  Our motion is to obtain documents reflecting their

18   understanding of credit ratings, their knowledge of our

19   business, the meaning of independence and objectivity, and

05:37PM  20   their own analysis and facts that they gathered for that

21   analysis regarding the explanations and the causation for the

22   losses that are alleged to have been caused by my client.

23             MR. HETHERINGTON:  May I briefly respond,

24   Your Honor?

05:37PM  25             THE COURT:  Please.  Five minutes, Counsel.

1          MR. HETHERINGTON:  Your Honor, if you want to get

2     into the weeds of the other subpoenas and why I think that my

3     letters were misrepresented, I'm happy to do that.  But, as I

4     say, they're not before the Court, and I find it very telling

05:37PM   5     that our challenge to the subpoena, essentially, is that

6     there's been no showing of relevance that could overcome the

7     immense burden on a third party.  And in response to that

8     challenge, Your Honor, we got a screen about meet and

9     discovery letters that are not even before the Court.  I

05:38PM   10    think that is very telling, Your Honor.  That was S&P's

11    chance to tell you why these documents are relevant.  They

12    came up with one example, a letter that was written by NCUA's

13    executive director that is published in the Material Loss

14    Reviews.  That's how S&P knows about it.  It's a public

05:38PM   15    document.

16          Why did the person express that opinion?

17          Well, I sympathize for S&P.  Maybe they're

18    interested.

19          But is that interest really worth forcing NCUA, a

05:38PM   20    third party, to engage in what essentially is party

21    discovery?

22          Your Honor, we thought that the motion at least

23    cabined this to two categories of documents.  Now S&P is

24    telling you they want the whole 44 categories.  Those -- we

05:39PM   25    have no idea what those topics are even focused on.  It's

05:39PM

1    party discovery, Your Honor, and I would implore you before

2    this Court even were to consider ordering NCUA to comply with

3    the subpoena in its entirety, as opposed to the specific

4    categories of documents that are in the papers and were

5    mentioned here tonight, please review the subpoena.

6            Thank you, Your Honor.

7            THE COURT:  Thank you very much.

8            Now, go home.

9            (Proceedings concluded at 5:39 p.m.)

10                        CERTIFICATE

11   I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

12   TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS IN

13   THE ABOVE MATTER.

14   FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

15   REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

16   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

17

18   /s/ Miriam V. Baird              06/05/2014

19   MIRIAM V. BAIRD                         DATE
     OFFICIAL REPORTER
20

21

22

23

24

25