1      **UNITED STATES DISTRICT COURT**

2      **CENTRAL DISTRICT OF CALIFORNIA**

3      **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                      – – – – – – –

5   UNITED STATES OF AMERICA,            )
                                         )        **CERTIFIED**
6              Plaintiff,                )
                                         )
7          vs.                           )  No. 2:13-CV-0779-DOC
                                         )        Volume I
8   McGRAW-HILL COMPANIES, INC., and     )
    STANDARD & POOR'S FINANCIAL          )
9   SERVICES, LLC,                       )
                                         )
10             Defendants.               )
    _____)

11

12

13

14              REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                    Hearing on Motions

16                   Santa Ana, California

17                  Tuesday, July 29, 2014

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141
24

25   13cv0779 McGraw-Hill Hearing V1

1    **APPEARANCES:**

2

    FOR THE UNITED STATES OF AMERICA:

3

4        OFFICE OF UNITED STATES ATTORNEY
         BY:  George S. Cardona
5            Chief Assistant United States Attorney
         312 North Spring Street
6        12th Floor
         Los Angeles, California 90012-4700
7        213-894-2434

8

         OFFICE OF UNITED STATES ATTORNEY
9        Civil Division - Federal Building
         BY:  Anoiel Khorshid
10           Assistant United States Attorney
         300 North Los Angeles Street
11       Room 7616
         Los Angeles, California 90012
12       213-894-6086

13

14

    FOR DEFENDANT McGRAW-HILL COMPANIES, INC. and STANDARD &
15  POOR'S FINANCIAL SERVICES LLC:

16

         KEKER AND VAN NEST LLP
17       BY:  John W. Keker
             Attorney at Law
18       710 Sansome Street
         San Francisco, California 94111
19       415-391-5400

20

         KEKER AND VAN NEST LLP
21       BY:  Steven K. Taylor
             Attorney at Law
22       633 Battery Street
         San Francisco, California 94111
23       415-391-5400

24

25

1    **APPEARANCES (Continued):**

2        KEKER AND VAN NEST LLP
         BY:  Michelle Ybarra
3             Attorney at Law
         633 Battery Street
4        San Francisco, California 94111
         415-391-5400
5

6        KEKER AND VAN NEST LLP
         BY:  Paven Malhotra
7             Attorney at Law
         710 Sansome Street
8        San Francisco, California 94111
         415-391-5400
9

10       KELLER RACKAUCKAS UMBERG ZIPSER LLP
         BY:  Jennifer L. Keller
11            Attorney at Law
         18300 Von Karman Avenue
12       Suite 930
         Irvine, California 92612
13       949-476-8700

14

15       CAHILL GORDON AND REINDEL LLP
         BY:  Floyd Abrams
             Attorney at Law
16       80 Pine Street
         New York, New York 10005
17       202-862-8900

18

19       CAHILL GORDON AND REINDEL LLP
         BY:  Brian T. Markley
             Attorney at Law
20       80 Pine Street
         New York, New York 10005
21       202-701-3000

22

23

24

25

1   **APPEARANCES (Continued):**

2

    ALSO PRESENT:

3

    FOR NON-PARTY CITIGROUP GLOBAL MARKETS, INC., and
4   CITIBANK, NA:

5         PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
          BY:  Susanna M. Buergel
6              Attorney at Law
          1285 Avenue of the Americas
7         New York, New York 10019
          212-373-3553

8

9

    FOR NON-PARTY NATIONAL CREDIT UNION ADMINISTRATION (NCUA):
10
          KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, PLLC
11        BY:  Andrew M. Hetherington
               Attorney at Law
12        1615 M Street, N.W.
          Suite 400
13        Washington, D.C. 20036
          202-326-7900

14

15  FOR NON-PARTY DEUTSCHE BANK SECURITIES, INC.:

16        PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
          BY:  Jessica S. Carey
17             Attorney at Law
          1285 Avenue of the Americas
18        New York, New York 10019
          212-373-3566

19

20  FOR NON-PARTY BANK OF AMERICA and MERRILL LYNCH:

21        CLEARY GOTTLIEB STEEN & HAMILTON LLP
          BY:  Antonio M. Pozos
22             Attorney at Law
          2000 Pennsylvania Avenue, N.W.
23        Washginton, D.C. 20006
          202-974-1500

24

25

1   **APPEARANCES (Continued):**

2   FOR NON-PARTY COUNTRYWIDE SECURITIES CORPORATION:

3        REEDSMITH LLP
         BY:  Michael Garabed
4             Attorney at Law
         355 South Grand Avenue
5        Suite 2900
         Los Angeles, California 90071
6        213-457-8086

7

     FOR NON-PARTY RBS SECURITIES, INC.
8
         WILMER CUTLER PICKERING HALE AND DORR LLP
9        BY:  Theresa Titolo
              Attorney at Law
10       1875 Pennsylvania Avenue, N.W.
         Washington, D.C. 20006
11       202-663-6527

12
         WILMER CUTLER PICKERING HALE AND DORR LLP
13       BY:  Allyson Fortier
              Attorney at Law
14       350 South Grand Avenue
         Suite 2100
15       Los Angeles, California 90071
         213-443-5307
16       allyson.fortier@wilmerhale.com

17
         WILMER CUTLER PICKERING HALE AND DORR LLP
18       BY:  Michael Mugmon
              Attorney at Law
19       950 Page Mill Road
         Palo Alto, CA 93404
20       650-858-6103
         michael.mugmon@wilmerhale.com
21

22

23

24

25

**I N D E X**

| PROCEEDINGS | PAGE |
|---|---|
| Statements by Ms. Buergel on behalf of Non-Party Citigroup Global Markets and Citibank NA | 14 |
| Statements by Ms. Carey on behalf of Non-Party Deutsche Bank Securities | 18 |
| Statements by Mr. Garabed on behalf of Non-Party Countrywide Securities | 23 |
| Argument by Mr. Pozos on behalf of Non-Party Bank of America and Merrill Lynch | 24 |
| Statements by Ms. Ybarra for Defendant S&P | 28 |
| Further argument by Mr. Pozos | 35 |
| Response by Ms. Ybarra | 49 |
| Argument by Mr. Markley for Defendant S&P | 57 |
| Argument by Mr. Hetherington on behalf of NCUA | 66 |
| Response by Mr. Markley | 78 |
| Argument by Mr. Markley for S&P Re RBS | 81 |
| Statements by Mr. Cardona on behalf of the government | 82 |
| Statement by Ms. Titolo on behalf of RBS Securities, Inc. | 84 |
| Argument by Mr. Keker on behalf of S&P | 86 |
| Response by Mr. Pozos | 94 |

```
 1              SANTA ANA, CALIFORNIA, TUESDAY, JULY 29, 2014

 2                              Volume I

 3                           (9:39 a.m.)

 4              THE COURT:  Counsel, we're on the record.

 5              I want to begin with whichever party would like to

 6       start.

 7              Mr. Keker, why don't you.

 8              MR. KEKER:  Thank you, Your Honor.

 9              Your Honor, I am very happy to report that your

10       May 28 order has been extraordinarily effective, and it

11       broke the logjam which had been going on since January in

12       terms of discovery.

13              Some banks that had been ignoring us began to pay

14       attention; others, who had been recalcitrant, began to

15       become more reasonable.  The meet and confer sessions became

16       more reasonable, and it's been going on right up to outside

17       in the hall this morning, so that we have resolved -- except

18       for the cost issue, we have resolved matters with Citibank,

19       Deutsche Bank, Countrywide.

20              As I've told you, the Bank of America, we think

21       the argument will take a total of 30 minutes; NCUA, a total

22       of 40 minutes; and Royal Bank of Scotland, a total of 5

23       minutes.

24              In addition, I would like to address -- the people

25       that will be talking about this are the people who have been
```

1  doing the work, meeting and conferring, spending scores of

2  hours talking about narrowing the issues and getting them to

3  a point where they're ready for your resolution.  The issues

4  that run through all of these are mostly resolved, but one

5  of them -- who pays for the cost of production -- is

6  something that I would like to address.  And my suggestion

7  is maybe we address that at the end, after you have had an

8  opportunity to listen to some of the arguments about the

9  scope of production.  But we can do that any time.

10      The date of production, which we thought was going

11  to be an issue, doesn't seem to be an issue.  I think 30

12  days hence is what everybody is shooting for to give the

13  documents that have been agreed to be given.

14      And then the other thing I wanted to raise is how

15  effective this protocol has been in your May 28 order:  This

16  idea of disputes coming to you; parties knowing that you're

17  going to be the one that hears them using a five-page

18  letter, reply a week later with a five-page letter, reply a

19  week later with a two-page letter, and get the matter

20  resolved.  We would like the protocol to be applied ongoing

21  in the case with other third parties or if we need to come

22  back and with respect to these third parties.

23      So the only question is how do you want to start?

24  We have -- I'd suggest maybe Bank of America first, NCUA and

25  RBS next, and then costs.

```
 1              THE COURT:  I'd like to talk to Citibank, Deutsche
 2    Bank, Countrywide first, just for a moment --
 3              MR. KEKER:  Sure.
 4              THE COURT:  -- to get a representation also on the
 5    record, and have them introduced on the record.
 6              MR. KEKER:  Yes, sir.
 7              THE COURT:  And I'd like to ask them also that, if
 8    they'd need to remain and argue the issue concerning cost of
 9    production, or if that's part of what you say has been
10    resolved or not.
11              Because what I don't want to do is hand down an
12    order eventually concerning costs that affects Bank of
13    America, NCUA and RBS -- and it's been represented to me
14    that resolved, and I believe that "resolved" is also the
15    costs of production, and it's not.
16              So let me just start with --
17              MR. KEKER:  Then I misspoke, Your Honor.
18              The cost issue runs across all the banks.  And I
19    believe it's the -- when we say it's resolved, those banks
20    expect that the ruling that you make about costs will apply
21    to them as well.
22              THE COURT:  Let me speak to Citibank first, then.
23              Counsel, it's a pleasure to meet you.  By the way,
24    I should inform at least the record that I've spoken to
25    counsel informally just before we came on the record, and
```

1    I'd indicated a number of things:

2            First, that I'd been in contact with the special

3    masters on so many occasions; the last was at 5:30 or

4    6:00 o'clock this morning, and Saturday night and Sunday, I

5    believe, over the weekend.

6            And I compliment all counsel concerning the

7    depositional work, and some of the associates and partners

8    who are undertaking that work, and certainly Mr. Cardona,

9    who's been present at almost all of the depositions and his

10   team.  The feedback I've gotten has been that your conduct

11   has been exemplary.  By that, I mean, not without objection,

12   but very professional in terms of the way you've conducted

13   yourselves.  So I wanted to pass back to you the input the

14   Court was getting and compliment the parties.

15           Also, it appears to me from the input I've gotten

16   that you're going to meet your depositional schedule of 25.

17   I've retraced for you informally, and will on the record,

18   the grand design I originally had.  But, of course, at the

19   beginning of the case, the courts aren't as familiar with

20   the case as the parties are, and, therefore, I had indicated

21   a trial date, but you noted I hadn't specifically set

22   September as the trial date in a minute order.

23           First, in entering into this process, I knew it

24   would be very difficult at the very beginning just to get

25   the case moving; although, I had professionals on both sides

 1   who are conducting themselves in an exemplary manner.  And,

 2   therefore, the depositional schedule was somewhat subject to

 3   the production by the United States Attorney's Office and

 4   how quickly they could produce.  But I'd seen a great

 5   concern on Mr. Cardona's part, not because of a --

 6   reticent -- but just the volume of material.  I was

 7   forewarned about that.  But, in good faith, I think the

 8   government has been proceeding in a diligence manner.

 9            So the 25 depositions were really scheduled over

10   about six to seven weeks.  But the Court viewed this as the

11   most leisurely time for the parties.  And I've been informed

12   by both counsel that you really have over 25.  One special

13   master believes 27 or 28.  The other believes 28 or 29.  And

14   two more were just noted, and I was informed this morning.

15   So I'm not quite certain of the numbers, but it's over 25.

16   And so, therefore, I expected that they'll be completed.

17            I was also told that some of the depositions

18   taking part -- are going to take part on Saturday in

19   New York.  My compliments to both of you.  You've got the

20   special master back there so you're not wasting time.

21            In October I envisioned another 25.  It's going to

22   be more hectic.  In November -- I'm sorry -- in September,

23   another 25.  In November *(sic)*, another 25.  In November and

24   December, though, those two months, a total of 25.  And the

25   reason for that:  I was concerned about your need to take a

1    little bit of a break and also Thanksgiving, the Jewish

2    holidays and Christmas.  Therefore, I'd envisioned and

3    expected a hundred would be completed.

4              I think that there was the request for 105.  I

5    found no issue with that.  So I had approximately a hundred

6    completed by the last part of December.  Early January was

7    the completion of the rest of the depositions initially

8    requested, and then what I believed would be a claw-back

9    period:  A period where the Court would need to reflect and

10   honor some of the requests by counsel who needed to come

11   back to a deponent and ask that deponent to reappear because

12   there was some information that the government in good faith

13   tried to but didn't get to the defense team.

14             Number two, I didn't know what the position of the

15   Federal Reserve was going to be, and Mr. Geithner.  On one

16   hand, Mr. Geithner's counsel offered that he would be

17   voluntarily here.  I'm not too certain that that's true or

18   not.  I'm not even certain if he's going to be deposed, or

19   if you've requested that; and I'll find out later, and

20   that's not subject to discussion today, nor the Federal

21   Reserve.  So, therefore, I thought that those would be a

22   longer period of time, and I don't really care for comment

23   on that at the present time.

24             So I envisioned a claw-back period, and not

25   knowing what to expect, of February and March.  And I also

Case 2:13-cv-00779-DOC-JCG  Document 323  Filed 09/23/14  Page 13 of 99  Page ID #:7331
2:13-CV-0779-DOC 4/29/2014 – Volume I

13

 1   expect privilege logs coming from various banks on different

 2   occasions.  I didn't know the volume of those privilege

 3   logs; but, depending upon what those banks thought was

 4   privileged, et cetera, different people may need to be

 5   brought back for deposition depending upon the Court's

 6   ruling.

 7          I expected your motions to be prepared sometime in

 8   March because, by that time, you knew your case -- April,

 9   even May -- but I expected to have the hearings on

10   dispositive motions in May or June.  And I wasn't tied to

11   those dates.  I expected to have your pretrial sometime in

12   July.  What I hadn't shared with you is that although you

13   suggested September, my suggestion was August.  But if you

14   noticed, I never put a definite trial date in my record.  I

15   just indicated dates.  And the reason for that, at the

16   beginning of the case -- of course, it's a voluminous case,

17   and I wanted to be sure I was correct.

18          The reason for August isn't to be difficult with

19   all of you, but it's because I get a clear run at trial

20   work.  I get a good portion of the month of August,

21   September, October, even part of November.  And, if the case

22   is truly a 120-day case, fine.  Fine.  But I get a straight

23   run.  What I didn't want do was catch witnesses between

24   Christmas and Thanksgiving.  I hoped to have the case to the

25   jury.

 1          So I don't want to surprise you, but I'm thinking

 2   about August, and we'll discuss that a little bit later.

 3          Couple other things.  Oh, beyond that, the

 4   informal discussion was simply once that banks were either

 5   discussing this matter with S&P, or they had negotiated and

 6   resolved the issues.  And instead of saying that there's

 7   been pushback, let me be much more positive:  The banks have

 8   made a magnificent effort so far, so we have a better

 9   record, of trying to comply or negotiate with S&P in a

10   reasonable fashion.

11          So let me start with Citibank.  And, once again,

12   your name, please.

13          MS. BUERGEL:  Sure, of course.  Thank you,

14   Your Honor.

15          I'm Susanna Buergel from Paul, Weiss in New York.

16          THE COURT:  Pleasure.

17          MS. BUERGEL:  Thank you for having me.

18   **STATEMENTS BY MS. BUERGEL ON BEHALF OF NON-PARTY CITIGROUP**

19        **GLOBAL MARKETS, INC. and CITIBANK, N.A.**

20          MS. BUERGEL:  As Mr. Keker indicated, we have

21   resolved the last outstanding issues.  We actually had made

22   pretty significant progress before -- well before we were

23   brought into these proceedings.  But we have resolved the

24   remaining issues.

25          THE COURT:  Okay.  That resolution may eventually,

Case 2:13-cv-00779-DOC-JCG  Document 323  Filed 09/23/14  Page 15 of 99  Page ID
#:7333
2:13-CV-0779-DOC  7/29/2014 - Volume I

15

```
 1   though, bring a certain amount of privileged logs that may
 2   be in dispute into my court.
 3            Do you have any idea in this resolution between
 4   the basic discoverable materials or not if that's been
 5   resolved, or if I can expect a voluminous number of
 6   privilege logs?
 7            MS. BUERGEL:  So, Your Honor, our production will
 8   consist of both material that we've previously produced to,
 9   um -- largely in the context of prior government inquiries
10   into various of the bank's activities.  With respect to
11   those materials, I'll have to go back and check
12   specifically, but I believe we largely have privilege logs
13   prepared, so we should be able to present those in
14   reasonably short order.
15            The second component involves --
16            THE COURT:  Now, let me stop right there.
17            MS. BUERGEL:  Sure.
18            THE COURT:  I don't know --
19            MS. BUERGEL:  My sense --
20            THE COURT:  S&P will push back on your privilege
21   logs.  So what I'm weighing is how I get you into court, you
22   know, quickly and get those resolved fairly for both
23   parties.  So I'll just leave that on the table.
24            MS. BUERGEL:  Sure.
25            THE COURT:  Because right now you don't know and I
```

```
1   don't know; but, obviously, with some privilege logs there
2   may be some disagreement between the parties.
3           So we'll leave that to the future.
4           MS. BUERGEL:  I'll just make one observation --
5   and it will depend very much on our ongoing discussions --
6   but a not insubstantial amount of the privileged material,
7   among the types of the documents that we are reproducing or
8   expect to collect and produce, relates to, um, drafting of
9   offering circulars and the like for the underlying
10  securities.
11          And my sense, subject to further discussions, is
12  there won't be a large amount of dispute around that; but,
13  of course, that remains to be seen.
14          THE COURT:  What's the volume of material
15  approximately?
16          MS. BUERGEL:  We've already produced 16-and-a-half
17  million pages of documents, Your Honor.
18          THE COURT:  Just a moment.
19          So Citibank is about 16-and-one-half million.
20          Was that previously produced to the government?
21          MS. BUERGEL:  It was.
22          THE COURT:  So, in a sense, you're duplicating
23  what the government already has?
24          MS. BUERGEL:  Correct.
25          THE COURT:  How long has the government had that
```

1    16-and-a-half million pages?

2         MS. BUERGEL:  Those productions date back,

3    Your Honor, to 2008.

4         THE COURT:  Okay.

5         MS. BUERGEL:  Not -- not exclusively -- it was

6    produced on -- many of these investigations lasted over a

7    period of years.

8         THE COURT:  The reason I'm asking is what you

9    don't suspect; and that is, I'm trying to weigh if the

10   government's had the 16-and-a-half million pages and

11   documents for years, if S&P's had that, and if I'm being

12   fair eventually in terms of setting a trial date, so they're

13   equally prepared.  So let me talk to Mr. Cardona and Mr.

14   Keker for just a moment.

15        MS. BUERGEL:  Sure.  Let me just make one comment.

16        When I say the government here, I represent

17   Citigroup.  And Citigroup has faced the government in many

18   forms over the years.

19        THE COURT:  How are you doing with them?  I'm just

20   kidding.

21        MS. BUERGEL:  So the production I was referring to

22   a moment ago was made in an underlying Securities and

23   Exchange Commission inquiry, so different government than

24   this government.

25        THE COURT:  Different?  So Mr. Cardona's getting

 1   them at the same time as Mr. Keker is?

 2            MS. BUERGEL:  That's right.

 3            THE COURT:  Oh, then, gentlemen, it's not

 4   necessary to discuss.

 5            I just want to make sure that one side isn't

 6   unbalanced where they've been able to look at 16-and-a-half

 7   million documents for two years and the other side's

 8   receiving it.  Well, they'll feel equal stress, then.  Okay?

 9            So you've resolved your matter.  And I want to

10   thank you for your appearance.  If you would remain, because

11   I think the cost issue will be of import to you.

12            MS. BUERGEL:  Happy to stay.

13            THE COURT:  Thank you very much.

14            DB or Deutsche Bank, please.

15            MS. CAREY:  Good morning, Your Honor.  Jessica

16   Carey from Paul, Weiss for Deutsche Bank Securities Inc.

17            THE COURT:  Jessica Carey.  Thank you.

18            **STATEMENTS BY MS. CAREY ON BEHALF OF**

19              **NON-PARTY DEUTSCHE BANK SECURITIES**

20            MS. CAREY:  Your Honor, we have reached agreement

21   now with S&P regarding the scope of our response to the

22   subpoena that was issued to DBSI.  The remaining issues I

23   think that we still have on the table are the cost issue,

24   and I'm happy to brief that or to follow later with

25   additional comments on that issue.

DEBBIE GALE, U.S. COURT REPORTER

Case 2:13-cv-00779-DOC-JCG  Document 323  Filed 09/23/14  Page 19 of 99  Page ID #:7337
2:13-CV-0779-DOC 7/29/2014 - Volume I

19

```
1           The other item, Your Honor, is it was said, I
2     think by Mr. Keker, here at the beginning, that we had
3     agreed to production within 30 days.  I want to be clear,
4     for DBSI, we still haven't had a conversation with S&P about
5     the search terms that are going ultimately to be applied to
6     the documents that we are collecting and will ultimately
7     produce.
8           And as a result -- and because we're going to need
9     to be gathering documents that we have not gathered before
10    for certain people, the 30 days is not a date that is
11    possible for us to meet.  However, we anticipate producing
12    documents on a rolling basis and have agreed to do so and
13    have also offered to prioritize the order in which we
14    produce those documents so that S&P is getting what it deems
15    most relevant in the -- in the fastest fashion possible.
16          THE COURT:  Okay.  Would you remain for the cost
17    of production argument and participate in that?  I think
18    that you'll find that -- well, I want to hear the arguments.
19    But we've got a tentative that's prepared, and it's -- I
20    want to hear the arguments first, in case I'm wrong.  But I
21    think it will be resolved very quickly.
22          MS. CAREY:  Certainly, Your Honor.  I'd be happy
23    to.
24          THE COURT:  I'm glad to have you here.
25          Oh, by the way, what's the volume of material you
```

1    expect to be produced?

2         MS. CAREY:  Your Honor, DBSI has already, through

3    its productions to the Department of Justice or other

4    regulators, produced -- I think now we're talking about

5    upwards of close to 50 million pages of documents.  That is

6    comprised of approximately 19 million pages of documents

7    that relate to CDO investigations, and the remainder were --

8    have -- are being produced still on an ongoing basis in

9    connection with the RMBS investigations.

10        THE COURT:  When you say "the government," help me

11   because that can be a lot of different agencies.

12        MS. CAREY:  So, um, it's a bit complicated.  What

13   we are covering here, I think, are Department of Justice.

14        THE COURT:  Okay.

15        MS. CAREY:  But that is comprised of documents

16   that also were previously produced to other bodies.

17        THE COURT:  Who?

18        MS. CAREY:  I believe that there's also some SEC

19   material within that, but I would have to confirm,

20   Your Honor.  There's also productions that were produced to

21   private litigants.

22        THE COURT:  Are these parties, though --

23   Mr. Cardona and Mr. Keker and the Department of Justice and

24   S&P -- receiving them at the same time?  In other words, you

25   heard my conversation with counsel for Citi.  What I don't

1  want is the unfairness of one party having the documents,

2  let's say, for years and the other party's getting them and

3  absorbing millions of pages of document; in other words,

4  co-equal, and whether that's fair or not, at least it's

5  equal.

6          MS. CAREY:  Your Honor, Deutsche Bank has produced

7  documents to the Department of Justice dating back at least

8  to 2010 to the, um -- to various offices of the U.S.

9  Attorney's Office, and to main justice --

10          THE COURT:  Okay.

11          MS. CAREY:  -- the fraud division.

12          So, however you slice the Department of Justice --

13  it hasn't been specifically to Mr. Cardona, but there have

14  been productions to "Department of Justice" dating back a

15  number of years.

16          THE COURT:  Mr. Cardona, have you had access to

17  those documents?

18          MR. CARDONA:  Your Honor, my belief is that the

19  bulk of those documents were produced to other U.S.

20  Attorney's Offices in connection with their investigations

21  of two things:  One, a fraud involving a CDO that was

22  conducted out of the District of Connecticut, and fraud

23  relating to some RMBS issuances that is currently ongoing.

24          We have not had access to those documents until we

25  have been gathering those and producing those either through

Case 2:13-cv-00779-DOC-JCG  Document 323  Filed 09/23/14  Page 22 of 99  Page ID #:7340
2:13-CV-0779-DOC  9/29/2014 - Volume I

22

1    the database that we've made available to S&P or on hard

2    drives where we've been getting documents and copying them.

3              THE COURT:  Okay.  Thank you very much.

4              MS. CAREY:  Your Honor, I just wanted to make one

5    additional clarifications.  Those bodies of documents that

6    are being reproduced to S&P from the Department of Justice

7    productions are in addition to whatever we'll be producing

8    in response to specific requests that are not covered by

9    those 50-odd million pages of documents.

10             So we anticipate obviously further production,

11   which we, in connection with the cost discussion, have

12   estimated will be, you know, over a million documents,

13   potentially, depending on what the search terms look like.

14             MR. CARDONA:  Your Honor, I just want to make one

15   thing clear.  As they indicated, Deutsche Bank did make some

16   productions to the Securities and Exchange Commission.  We

17   have, in the course of our FIRREA investigation, obtained

18   some documents from the SEC.  But I do not have an estimate

19   as to how many of those documents involve Deutsche Bank.

20             THE COURT:  Okay.  Thank you.

21             Countrywide, please.

22             MR. GARABED:  Good morning, Your Honor.  Michael

23   Garabed for Countrywide Securities Corporation.

24             THE COURT:  Thank you.

25

Case 2:13-cv-00779-DOC-JCG  Document 323  Filed 09/23/14  Page 23 of 99  Page ID #:7341
2:13-CV-0779-DOC 1/29/2014 - Volume I

23

1      **STATEMENTS BY MR. GARABED ON BEHALF OF**

2    **NON-PARTY COUNTRYWIDE SECURITIES CORPORATION**

3          MR. GARABED:  Your Honor, we also have resolved

4    the issues with respect to our motion with the exception of

5    the cost issue.  I don't think there's any need for me to

6    argue that.  We'll agree to be bound by your ruling with

7    respect to the other banks.

8          THE COURT:  All right.  I want you to remain

9    regardless.

10          MR. GARABED:  Thank you.  I will.

11          THE COURT:  Just in case.

12          The amount of documents you've turned over or you

13    believe approximately that you're going to be turning

14    over -- in other words, a combination -- what am I dealing

15    with, with Countrywide?

16          MR. GARABED:  Yes, Your Honor.  Our best estimate

17    is that our agreement will result in S&P receiving something

18    in the neighborhood of 100 million pages of documents.

19          THE COURT:  Okay.  Well, I want to thank you very

20    much.

21          MR. GARABED:  Thank you, Your Honor.

22          THE COURT:  Let me speak to Bank of America, then,

23    please.

24          And, Counsel?

25          MR. POZOS:  Good morning, Your Honor.  Antonio

1    Pozos of Cleary Gottlieb, Washington DC, on behalf of Bank

2    of America NA and Merrill Lynch.

3              THE COURT:  All right.  Thank you.

4              And, Counsel, you agreed to 30 minutes, so this is

5    your time to argue, please.

6              **ARGUMENT BY MR. POZOS ON BEHALF OF NON-PARTY**

7                   **BANK OF  AMERICA AND MERRILL LYNCH**

8              MR. POZOS:  Thank you, Your Honor.

9              Just to address some points that you'd raised with

10   prior counsel.

11             To date, Bank of America and Merrill Lynch have

12   produced approximately 195,000 pages of documents.  In

13   consultation with Ms. Ybarra, counsel for S&P, I think we've

14   resolved some of the issues pertaining to custodians.  We've

15   discussed custodial productions from an initial 17

16   custodians, plus an additional six what -- of what S&P has

17   described as "loss custodians."  We've discussed additional

18   noncustodial document productions, so none-mail documents

19   that have come from the bank's files.  And we've also

20   discussed the production of documents that were produced in

21   prior litigations and investigations.

22             As far as an estimate of the total volume that we

23   would propose to produce at this time, we've done

24   preliminary testing in documents from eight of those

25   custodians.  We believe that -- at this point that the

1   production from those eight is approximately going to be in

2   the neighborhood of 500,000 documents to -- running to about

3   2 million pages.  And while it's difficult to estimate what

4   the rest of the production will be, um, that's the starting

5   point that we have.  And we expect that there'll be

6   commensurate productions from the additional custodians as

7   we continue to work through that.

8           Um, we really have two issues, Your Honor.  There

9   are the issues regarding the actual productions themselves.

10  And the issue of cost -- I understand the Court, uh, is

11  going to be entertaining issues of cost at the end.  I'm

12  certainly happy to address those at that time.  So perhaps

13  it makes sense to address the outstanding substantive areas

14  first.

15          THE COURT:  Okay.

16          MR. POZOS:  Your Honor, with respect to

17  noncustodial documents, I think there were some

18  misunderstandings in the papers about how those were going

19  to be collected and searched.  I spoke with Ms. Ybarra in

20  the hallway, and I think we've resolved their concern about

21  searching for custodial documents using search terms.

22          Essentially our proposal's to --

23          THE COURT:  "Essential our proposal is to."

24          MR. POZOS:  -- to produce documents from two sets

25  of noncustodial sources.

```
 1              The first is a categorical of sources.  So, if
 2   we're going to try and find a particular set of policies or
 3   deal files, um, we've agreed to go and look for those
 4   documents and produce them regardless of whether they hit
 5   the parties' agreed-upon search terms.
 6              There's another set of noncustodial documents
 7   which have been gathered and put into databases at various
 8   times, so they may be combined with custodial e-mails in a
 9   larger database.  And in one case, they're in a simple
10   database of their own.  And we would propose to search those
11   documents using the agreed-upon search terms that we have
12   discussed with S&P.
13              So we think that that resolves a lot of the issues
14   with respect to noncustodial files.  But to the extent I'm
15   mistaken, I'm certainly happy to address that.
16              Uh, with respect to custodians --
17              THE COURT:  What are you asking me to rule on,
18   then?
19              MR. POZOS:  Uh, Your Honor, I just wanted to make
20   sure that we were on the same page in case there was a -- a
21   disagreement about --
22              THE COURT:  Why don't you step over and talk to
23   counsel for just a moment.  Because I'm not sure what I'd be
24   ruling on.  You two have a private conversation.
25              Just step over.  Approach each other.
```

```
 1              (Counsel confer.)

 2              MR. POZOS:  Well, I think, Your Honor, the issue

 3    is -- I think we've resolved a number of issues, but, um, to

 4    the extent there are issues that remain to be resolved,

 5    um -- I would hesitate to take Court's time, as opposed to

 6    just addressing the issues that S&P still has outstanding.

 7    I believe those issues relate to, um, topics of, um --

 8              THE COURT:  Just a moment.

 9              MR. POZOS:  Yes.

10              THE COURT:  Do you want additional time to discuss

11    this, or do you want me to hand down dispositive rulings?

12    In other words, I'm giving you control first to resolve, if

13    you can; and if not, then I'm happy to resolve this for you.

14              So you have the control right now.  And right now

15    this argument's confusing to me because I don't know what's

16    really on the table.  And it sounds to me like you're still

17    discussing it, which is fine.  There's no rush.

18              Do you want some additional time today to discuss

19    this, or have you drawn the lines and you need a ruling?

20              MS. YBARRA:  Your Honor, I think we've reached an

21    impasse on certain discrete categories of documents that we

22    would like the Court to rule on.

23              THE COURT:  Okay.  Do you have those written down,

24    or can you slowly tell me what those are so that I can --

25              MS. YBARRA:  Absolutely.
```

Case 2:13-cv-00779-DOC-JCG  Document 323  Filed 09/23/14  Page 28 of 99  Page ID #:7346
2:13-CV-0779-DOC 9/29/2014 - Volume I

28

1           And I'd be happy to address them if Mr. Pozos is

2     finished with his update to the Court.

3           THE COURT:  Okay.

4           Please, Counsel.

5           MS. YBARRA:  Thank you.

6           THE COURT:  I'm sorry.  Did you want to finish?

7           MR. POZOS:  No, Your Honor.  I think that what we

8     have concerns about, and we can address them, are the

9     categories of government oversight documents, in which,

10    quite frankly, we are still waiting to understand what S&P's

11    actual request to us is, so that we can respond and come up

12    with a proposal.

13          With respect to timing, Your Honor --

14          THE COURT:  Why hasn't that discussion taken

15    place?  In other words...

16          MS. YBARRA:  That discussion has taken place,

17    Your Honor, and I'd be happy to address it.

18          We have a couple other areas of dispute that I'd

19    like to discuss also.

20          THE COURT:  Okay.

21          MS. YBARRA:  And for the record, I'm Michelle

22    Ybarra, from Keker Van Nest, for defendants.

23          **STATEMENTS BY MS. YBARRA FOR DEFENDANT S&P**

24          MS. YBARRA:  S&P brought a motion to compel

25    against Bank of America and Merrill Lynch on three discrete

Case 2:13-cv-00779-DOC-JCG   Document 323   Filed 09/23/14   Page 29 of 99   Page ID #:7347
2:13-CV-0779-DOC   7/29/2014 - Volume I

29

```
 1    categories of documents.  The first relates to documents

 2    regarding the losses that the government alleges Bank of

 3    America and Merrill suffered on the securities that the

 4    government has put at issue in the case.

 5            The second category are the government oversight

 6    documents Mr. Pozos just referred to.  Those are documents

 7    regarding the bank's communications with state and federal

 8    regulators about the securities at issue in the case.

 9            The third category concerns materials the

10    government --

11            THE COURT:  Just a moment, Counsel.

12            MS. YBARRA:  I'm sorry.

13            THE COURT:  All right.

14            The third category.

15            MS. YBARRA:  The third category concerns materials

16    the banks have produced in other litigations and

17    investigations regarding the same securities at issue here.

18            And so if I might start with the loss documents,

19    the documents regarding the losses the banks are alleged to

20    have suffered at the securities at issue here.  As of 7:50

21    this morning we reached agreement on production of those

22    documents from six particular custodians that S&P has

23    identified.  Up until this morning, the bank had -- had

24    taken the position that those custodians e-mails and

25    documents weren't relevant.  As of this morning, they've
```

Case 2:13-cv-00779-DOC-JCG   Document 323   Filed 09/23/14   Page 30 of 99   Page ID #:7348
2:13-CV-0779-DOC 7/29/2014 - Volume I

30

1   changed their position.

2          So all we're asking for from the Court on that

3   issue is to order a date certain for completion of

4   production, because we've been waiting for several months

5   for it.  We'd like production to be complete within 30 days.

6          THE COURT:  Let me pay the courtesy back to the

7   bank.

8          What is their position concerning what's

9   reasonable?

10          MR. POZOS:  Your Honor, the documents from the six

11   prior custodians were collected in other matters.  We're

12   assessing what the current status of those databases are

13   right now and how long it will take to bring them back up to

14   speed.

15          THE COURT:  Just a moment.  I'm trying to be

16   courteous and get a time frame from knowledgeable counsel,

17   like yourself; otherwise, you're going to just get a time

18   period and, if you don't obey it, I'm going to put sanctions

19   on you.

20          Now you don't want that, so I'm asking you

21   politely what time period.

22          MR. POZOS:  Your Honor, unfortunately at this

23   point, I don't have an answer for you.

24          THE COURT:  You'll be on the phone today, then,

25   and we'll be back.  I'll have that answer 'cause I'm trying

Case 2:13-cv-00779-DOC-JCG  Document 323  Filed 09/23/14  Page 31 of 99  Page ID #:7349
2:13-CV-0779-DOC 7/29/2014 - Volume I

31

1   to give you that control.  Otherwise, once I set a date, I'm

2   not going to back away.

3           MR. POZOS:  Thank you, Your Honor.

4           THE COURT:  That can get expensive, and get you to

5   the front page.  Okay?

6           MR. POZOS:  Yes, Your Honor.

7           THE COURT:  All right. I don't think you want that

8   for the bank.

9           MR. POZOS:  Of course not, Your Honor.

10          THE COURT:  Okay.

11          Counsel.

12          MS. YBARRA:  All right.

13          Your Honor, the second category of documents, the

14  government oversight documents, these are communications the

15  banks had with regulators about the securities at issue in

16  this case -- with regulators and other government agencies.

17          We have never had a dispute with the bank that the

18  documents are relevant.  And they are relevant, as

19  Your Honor has already recognized in the context of the NCUA

20  motion.  They're relevant because they could shed light on

21  wrongdoing by the banks that potentially reduces S&P's

22  liability.

23          Bank of America and Merrill Lynch have raised

24  different objections at different times to producing these

25  documents.  In their opposition, they object that some of

Case 2:13-cv-00779-DOC-JCG  Document 323  Filed 09/23/14  Page 32 of 99  Page ID #:7350
2:13-CV-0779-DOC  9/29/2014 - Volume I

32

1    these documents are privileged.  We've never seen a

2    privilege log from them.  We know that they're -- or we

3    suspect that there are all sorts of communications that are

4    not privileged, um, that we're entitled to.

5           They've also objected that S&P should go get these

6    documents from the government.  But that doesn't make any

7    sense to us.

8           THE COURT:  Just a moment.  Just a moment.

9           All right.  Please continue.

10          MS. YBARRA:  The second objection that the banks

11   have raised to production of these documents is that S&P

12   should go get them from our sources.  But S&P, we don't

13   think, should have to run around and subpoena many different

14   agencies and look for the documents in many different

15   places, when we know that the bank has them, and we can go

16   to one source.

17          Prior to this hearing, Mr. Pozos and I just talked

18   in the hall, and he expressed that the bank is willing to

19   work with us on these requests, which is -- which is a new,

20   uh -- a new posture for the bank on this specific category

21   of document, um, but that -- the bank claims now that

22   they're not sure what we're looking for:  That the request

23   is too broad and could encompass the bank's communications

24   with many different regulators.

25          Now this is the first time that we've heard this

Case 2:13-cv-00779-DOC-JCG  Document 323  Filed 09/23/14  Page 33 of 99  Page ID
#:7351
2:13-CV-0779-DOC   4/29/2014 - Volume I

33

 1   objection from the banks.  We had a meet-and-confer call

 2   with them a month ago where they told us they understood

 3   what we were looking for, and they were gonna go back and

 4   investigate potential custodians to satisfy this request.

 5          Um, we've never received those custodians.  We --

 6   we don't know, you know, what regulators they were talking

 7   to about these securities.  But if that's -- you know, if we

 8   need to further meet and confer on that, we're willing to do

 9   so.  But this is all, uh, new ground for us here.

10          THE COURT:  All today or shortly before --

11          MS. YBARRA:  Correct, Your Honor.

12          THE COURT:  -- we formally started hearing?

13          Okay.  Anything else?

14          MS. YBARRA:  Yeah.  There's one more category of

15   documents that we're seeking production on.

16          THE COURT:  This is the fourth category.

17          I'm going to readback to you.

18          The first category was the alleged government --

19   or the losses the government alleges.

20          The second category you told me about were

21   government's oversight communication with regulators.

22          The third were the materials the banks have

23   produced in other litigation.

24          And this is the fourth category?

25          MS. YBARRA:  No.  I'm referring to the third, the

Case 2:13-cv-00779-DOC-JCG   Document 323   Filed 09/23/14   Page 34 of 99   Page ID
#:7352
2:13-CV-0779-DOC  7/29/2014 - Volume I

34

 1   material the banks have produced in other litigation

 2   regarding securities.

 3          THE COURT:  Okay.

 4          MS. YBARRA:  We have -- you know, it's no surprise

 5   that in 2014 now there have been lots of other litigations

 6   and investigations regarding the securities the government

 7   has put at issue here.

 8          And S&P has identified some of those cases where

 9   we believe document productions that were made in those

10   cases are relevant here.  And we've asked the bank to

11   leverage the work that they've done in those other cases and

12   turn those productions over to us, uh, where they concern

13   the same -- the same securities that are at issue here.

14          Uh, we believe that'd be efficient and fast and

15   cheap.  And we'd been asking Bank of America particularly to

16   do this for months with regard to, uh, the high-grade CDO.

17          The High-grade CDO is the largest transaction at

18   issue in this case.  And it was the subject of litigation

19   between Bank of America and Bear Stearns in 2008.  We know

20   there was voluminous document productions in that case.

21   We've been asking Bank of America to turn those document

22   productions over to us since March.  And they have never

23   agreed to do so.  They've continually told us they are

24   looking into the availability of that reproduction; they're

25   confirming the condition of that production.  That's what

 1    they put in their opposition.  We don't know what that

 2    means.  They've never been able to explain to us what that

 3    means.  Um, and we don't know why that would take four

 4    mouths.

 5            But we've wasted, you know, four months now, when

 6    we could have been reviewing documents and taking discovery.

 7    So we'd asked the Court to order those productions within 30

 8    days as well.

 9            THE COURT:  Okay.

10            MS. YBARRA:  Thank you.  That's all.

11            THE COURT:  Counsel.

12            MR. POZOS:  Thank you, Your Honor.

13                **FURTHER ARGUMENT BY MR. POZOS**

14            MR. POZOS:  Perhaps it makes sense to deal with

15    the lowest-hanging fruit first, the issue of the prior

16    litigations, Your Honor.

17            We have identified, in response to their subpoena,

18    three prior pieces of litigation:  One involving the

19    High-grade security, which Ms. Ybarra just referred to.  We

20    have obtained those documents, and I believe that producing

21    those in 30 days is very possible, and we hope to do that

22    much sooner.

23            THE COURT:  Is that an agreement between the two

24    of you, or is there a pushback?  I don't understand.

25            MR. POZOS:  Well, Your Honor, the pushback is

1    going to be, um, we've agreed to produce the underlying

2    documents from that litigation.  The other -- the rest of

3    the request which we received from S&P is for other

4    materials from the litigation, such as expert reports,

5    transcripts, unredacted filings, um, and materials of that

6    sort.

7            Given the burden involved in resolving

8    confidentiality issues, we've taken the position that we

9    think that we should produce the underlying documents first.

10   Um, and that the "additional materials" -- I'll refer to

11   them as -- um, aren't necessary, given the cost.  But to the

12   extent the Court is inclined to order the bank to produce

13   those types of extra materials, we believe that S&P should

14   be required to pay.

15           And in support of that position, we noted the

16   *First American* case, which S&P has put in their position on

17   cost, which we can expound upon later.  But that was

18   actually a case involving attorney's fees incurred, uh, in

19   the process of resolving confidentiality hurdles:  In that

20   case, Kayman Island confidentiality hurdles and U.K.

21   confidentiality hurdles.

22           And to the extent the Court is inclined to order

23   the bank to produce those additional types of litigation

24   materials, we would ask that the Court direct S&P to assume

25   the bank's costs for doing so.

Case 2:13-cv-00779-DOC-JCG   Document 323   Filed 09/23/14   Page 37 of 99   Page ID #:7355
2:13-CV-0779-DOC 7/29/2014 - Volume I

37

```
1              THE COURT:  Okay.

2              MR. POZOS:  With respect to the other two

3   securities that we've identified, we are still in the

4   process of finding those.  Although I suspect that 30 days

5   will be, uh, perfectly fine for that, Your Honor.

6              Um, but I do want to raise one issue, which is

7   that, in addition to these, uh, litigation investigations

8   involving these three securities, S&P has asked for, um,

9   materials involving two RMBS, the Merrill Lynch Alternative

10  Note Asset Trust, which is, uh, 2007-OAR-2, and the Merrill

11  Lynch Mortgage Investors Trust series 2006-RM-3.

12             Those are securities which we don't believe are

13  actually responsive to the subpoena.  And the reason we

14  believe that, Your Honor, is Request 31 of the subpoena

15  governs request for prior litigation.  Um, specifically, it

16  asks for,

17                  "Any documents from 2004 to the present

18                  relating to any litigation, threatened

19                  litigation, or assertion of any legal

20                  claims concerning the securities,

21                  whether initiated by you or another

22                  party."

23             Your Honor, "the securities" is a defined term

24  which focuses on 31 specific securities.  And it defines the

25  securities to include the High-grade security, the Pinnacle
```

 1   Point security and the Tricadia security.  But does not

 2   include these other two securities, Your Honor.

 3           And this is a concern that we've had of the

 4   goalpost moving, Your Honor.  We've gone -- and we think

 5   we're going to be in very good position to deal with these

 6   three that are actually called for by the subpoena.  But to

 7   the extent there are additional securities that are put at

 8   issue, that's problematic for the bank, Your Honor.  And we

 9   think we should just respond to the subpoena to the extent

10   it requires our production of documents associated with

11   those three securities.

12           THE COURT:  Thank you.

13           Counsel, are you satisfied with your arguments?

14   If not, there's another round.

15           MR. POZOS:  Your Honor, would you like me to

16   address the government oversight?

17           THE COURT:  No.  That's fine.  I didn't know when

18   you were done.  You started to step away and collect your

19   notes.

20           MR. POZOS:  Oh.  Thank you, Your Honor.

21           With respect to the government oversight

22   documents, the government oversight documents, we must

23   admit, continue to be a bit of a mystery to us.  When we go

24   to the actual requests, they asked for communications

25   between the bank and the govern -- and any governmental

Case 2:13-cv-00779-DOC-JCG  Document 323  Filed 09/23/14  Page 39 of 99  Page ID #:7357
2:13-CV-0779-DOC 7/29/2014 - Volume I

39

```
 1   entity regarding securities, which, again, is a set of 31

 2   defined securities.

 3            When we look at their motion to compel,

 4   unfortunately, though, it's a much broader demand that

 5   they're asking for.  They're asking for any communications

 6   with government agencies about -- in their first motion --

 7   their dealing in mortgage-backed securities, generally.

 8   They're asking for their monitoring/analysis of the

 9   U.S. residential housing market.

10            THE COURT:  Slower.

11            MR. POZOS:  My apologies.

12            They're asking for communications pertaining to

13   the market for mortgage-backed securities in general.

14   That's in their first motion.

15            In their reply, it's a slightly different

16   formulation.  It's the securities -- which are the 31

17   securities, which are actually referred to in the

18   subpoena -- and then it goes more broadly into dealings in

19   RMBS, into the U.S. residential housing market, and the

20   market for mortgage-backed securities.

21            So, Your Honor, as a first step, we would like the

22   Court, in whatever order ends up coming out of this process,

23   not to direct the bank to produce documents which are not

24   called for by the subpoena -- specifically called for by the

25   subpoena, and to prevent these categories from being
```

 1   enlarged yet further.

 2           With respect to the scope of the subpoenas, again

 3   it's an incredible scope.  It seeks documents going back

 4   from -- to 2004, and running to present -- again, ten years

 5   of communications -- with any governmental agency.

 6           Your Honor, I don't have to tell you that these

 7   banks are heavily, heavily regulated enterprises.  We've

 8   attempted to move forward and identify a smaller subset of

 9   these communications which might be helpful.  We've

10   suggested that perhaps, uh, we should focus on

11   communications with prudential regulators, who might be on

12   site at the bank, as opposed to other governmental agencies

13   which are conducting investigations to avoid a lotta

14   privilege issues and really get to the core of the

15   communication which were contemporaneous to the period in

16   dispute in this case.

17           Unfortunately, we haven't received an indication

18   from them of the types of agencies that they're interested

19   in, um, to help us formulate a proposal that would allow us

20   to drill down and try and find a way forward here.

21           Um, we've -- also have the issues of confidential

22   supervisory information, which I under- --

23           THE COURT:  Counsel, there's no way my court

24   reporter could have gotten that.

25           Strike and start again.

Case 2:13-cv-00779-DOC-JCG   Document 323   Filed 09/23/14   Page 41 of 99   Page ID
#:7359
2:13-CV-0779-DOC 7/29/2014 - Volume I

41

 1          MR. POZOS:  Yes.

 2          Your Honor, there is also the issue of

 3   confidential supervisory information covering communications

 4   with federal banking regulators such as the fed, the office

 5   of the comptroller of the currency, and others, which would

 6   need to be resolved.  But we think that it's premature to

 7   address that because we simply don't know if they are

 8   seeking conversations with those regulators.

 9          Further, Your Honor, to the extent they're seeking

10   communications with the government -- the federal

11   government, as a party -- um, and we think that to the

12   extent that's really the thrust of what they're seeking,

13   they should pursue that through party discovery.

14          So with respect to the government overside

15   documents, Your Honor, we would ask that, um, you direct the

16   bank -- or the S&P certainly to identify what they're

17   actually seeking; uh, direct S&P to seek documents -- or

18   communications with the government from the government; um,

19   and that you restrict the scope of this and really urge them

20   to do so because, otherwise, this is going to be an

21   extremely broad exercise.

22          Finally, Your Honor, I did wanna raise one last

23   issue, which is the bank's reply raises the issue that they

24   seem to be seeking responsive internal bank communications

25   as part of this government oversight category.  It's not

Case 2:13-cv-00779-DOC-JCG  Document 323  Filed 09/23/14  Page 42 of 99  Page ID #:7360
2:13-CV-0779-DOC 7/29/2014 - Volume I

42

1    clear to the bank what they're asking for and what

2    response -- or what requests they're hanging their hats on.

3          But more fundamentally, to the extent that what

4    they're really trying to do is to get a belt and suspenders

5    here to cover communications with the government that may

6    not have been memorialized by the party government or to get

7    information about the bank's impressions of what the

8    government may be trying to do, we think that that's

9    speculative; we think that it's cumulative; and we don't

10   think that the Court should allow S&P to rummage for that

11   sort of information.

12         THE COURT:  I want to make sure -- last time you

13   started to fold up your notes, and I thought you were

14   leaving -- I want to make sure:  Have you completed your

15   arguments?

16         MR. POZOS:  No, Your Honor, that's -- that is all.

17         THE COURT:  Okay.  Now let me ask you just a

18   couple questions, general questions.

19         You're obviously lead counsel on behalf of the

20   bank.

21         MR. POZOS:  Yes, Your Honor.

22         THE COURT:  And offices are located?

23         MR. POZOS:  In Washington, Your Honor.

24         THE COURT:  DC.

25         MR. POZOS:  Washington, DC.

1          THE COURT:  Okay.

2          Are you the -- I know you're the primary legal

3    spokesperson for the bank.

4          Who do you call and communicate with at the Bank

5    of America?  Is it a committee or a vice president or the

6    president?

7          MR. POZOS:  Uh, from time to time, it has been

8    various in-house lawyers, Your Honor.

9          THE COURT:  Okay.  So I'm dealing with "lawyer" to

10   "in-house lawyer."

11         MR. POZOS:  Correct, Your Honor.

12         THE COURT:  Could I have the name of the in-house

13   lawyers you're dealing with, please.

14         MR. POZOS:  Yes, Your Honor.

15         Jared Winnick.

16         THE COURT:  Gerald Winnick?

17         MR. POZOS:  Jared.  J-A-R-E-D.

18         THE COURT:  I'm sorry.  J-A-R-E-D?

19         MR. POZOS:  Yes, Your Honor.

20         THE COURT:  What's his last name?

21         MR. POZOS:  Winnick.

22         THE COURT:  Spell that, please.

23         MR. POZOS:  W-I-N-N-I-C-K.

24         THE COURT:  I-C-K.

25         And he's house counsel for Bank of America?

Case 2:13-cv-00779-DOC-JCG   Document 323   Filed 09/23/14   Page 44 of 99   Page ID #:7362
2:13-CV-0779-DOC   7/29/2014 - Volume I

44

```
 1              MR. POZOS:  Yes, Your Honor.
 2              THE COURT:  Where's he located?
 3              MR. POZOS:  In New York, Your Honor.
 4              THE COURT:  So he, then, must be talking to the
 5   client, in a sense; or he may be the sole decision-maker.
 6   Because, in this day and age, you have to understand that
 7   house counsel have often become decision-makers for
 8   corporate entities.
 9              MR. POZOS:  Yes, Your Honor.
10              THE COURT:  It's a really interesting blur.
11              Who else are you speaking to?
12              MR. POZOS:  Your Honor, a woman named Susan
13   Kivelson.
14              THE COURT:  Could spell her last name.
15              MR. POZOS:  K-I-V-E-L --
16              THE COURT:  -- K-I-B-E-L --
17              MR. POZOS:  Sorry.  V, as in Victor, Your Honor.
18              THE COURT:  I'm sorry.  Do that again.  I want to
19   apologize.
20              K-I-B?
21              MR. POZOS:  K-I-V, as in Victor.
22              THE COURT:  Oh.  V, as in victor.  Okay.
23              MR. POZOS:  E-L.
24              THE COURT:  E-L.
25              MR. POZOS:  S-O-N.
```

```
1              THE COURT:  And she's also in-house counsel?

2              MR. POZOS:  Correct, Your Honor.

3              THE COURT:  Where is she located?

4              MR. POZOS:  I believe in New York.

5              THE COURT:  All right.  Thank you.  Who else are

6    you speaking to?

7              MR. POZOS:  A woman named Jill Fairbrother.

8              THE COURT:  Could you spell her last name.

9              MR. POZOS:  F-A-I-R.

10             THE COURT:  F-A-I-R -- and brother, B-R-O-T-H-E-R?

11             MR. POZOS:  Correct.  All one word.

12             THE COURT:  Thank you.  Your next person.

13             MR. POZOS:  Your Honor, I believe those are the

14   primary individuals.

15             THE COURT:  Who's the big boss?  Who's the head of

16   the totem pole here for in-house counsel?

17             MR. POZOS:  Your Honor, I believe that describing

18   it as a committee is probably the more accurate way to

19   describe it.

20             THE COURT:  So if I need to speak to them, I'd

21   have to speak to all three?  Is that the position you're

22   taking?  In other words, if I wanted some answers on behalf

23   of the bank, I'd need to get all three in my court?

24             MR. POZOS:  No, Your Honor.

25             THE COURT:  Now we have hierarchy.  What's the
```

```
1   hierarchy?  Who is the person, then, who goes to the vice
2   president of the Bank of America or the president and speaks
3   to them.  'Cause I don't want to get all three of 'em here.
4              MR. POZOS:  Yes, Your Honor.
5              THE COURT:  Who speaks to the client?
6              MR. POZOS:  Substantively, Your Honor, I believe
7   the correct person would be Jared Winnick.
8              THE COURT:  Okay.  When's the last time you spoke
9   to Mr. Winnick?
10             MR. POZOS:  At approximately 7:40 this morning,
11  Your Honor.
12             THE COURT:  Excellent.
13             So on behalf of the bank, I've got outstanding
14  counsel.  Let me say that on the record.  But I don't have
15  counsel in the sense that can take other than a generalized
16  legal position, and I don't have the decision-maker here on
17  behalf of the bank to negotiate with S&P.
18             In other words, I'm dealing with generalizations,
19  aren't I?
20             MR. POZOS:  Your Honor, I believe that that is
21  true to a certain extent.
22             THE COURT:  Okay.  Now, how are we gonna resolve
23  that?
24             MR. POZOS:  Your Honor, I believe with respect
25  to --
```

Case 2:13-cv-00779-DOC-JCG  Document 323  Filed 09/23/14  Page 47 of 99  Page ID
#:7365
2:13-CV-0779-DOC 7/29/2014 - Volume I

47

1            THE COURT:  Mr. Winnick's going to come and see

2    me?  Excellent.

3            MR. POZOS:  Your Honor --

4            THE COURT:  Excellent.

5            Now, Mr. Winnick is better than the vice president

6    of the Bank of America, isn't he?

7            MR. POZOS:  Your Honor, I'd hesitate to speak for

8    Mr. Winnick in that regard.

9            THE COURT:  Okay.  And would Mr. Winnick be

10   available tomorrow?

11           MR. POZOS:  I --

12           THE COURT:  Excellent.  I'm glad he is.

13           MR. POZOS:  Thank you, Your Honor.

14           THE COURT:  And you'll -- no, you haven't heard me

15   yet.  "Thank you, Your Honor" what?  What am I insinuating?

16           MR. POZOS:  *(No response.)*

17           THE COURT:  What did I just insinuate?

18           MR. POZOS:  *(No response.)*

19           THE COURT:  That you're going to call Mr. Winnick,

20   aren't you?

21           MR. POZOS:  Yes, Your Honor.

22           THE COURT:  And he's going to be here tomorrow.

23           MR. POZOS:  Yes, Your Honor.

24           THE COURT:  Voluntarily.

25           MR. POZOS:  Thank you, Your Honor.

Case 2:13-cv-00779-DOC-JCG   Document 323   Filed 09/23/14   Page 48 of 99   Page ID #:7366
2:13-CV-0779-DOC 7/29/2014 - Volume I

48

```
1              THE COURT:  Or somebody else from the Bank of
2     America will be by order.  And I think we'd rather have the
3     in-house counsel here than inconveniencing the client, don't
4     you?
5              MR. POZOS:  I understand Your Honor's position.
6              THE COURT:  Okay.
7              So it's not an order yet.  We're trying to
8     amicably work this out.  But you understand that the banks
9     can push back.  And I need you here for the argument
10    concerning cost production.  I think we're going to resolve
11    it very quickly, by the way.  I think we really are.
12             I think you're going to find that, depending upon
13    the tentative and the arguments I hear, that it's going to
14    be an amicable solution that's well-taken by both parties,
15    and require additional negotiations.
16             I'm just worried that you're doing an outstanding
17    job with the legal arguments, but I don't have the
18    decision-maker here, and that there has to be a chain of
19    "consultations" taking place, which is why you weren't here
20    when I asked Mr. Cardona who made the decisions on behalf of
21    the government.  Did he have authority.  And I asked him
22    that about three months ago.
23             So we're setting that in motion.  I just want to
24    make sure he's available.  Okay?
25             MR. POZOS:  Thank you, Your Honor.
```

DEBBIE GALE, U.S. COURT REPORTER

 1          THE COURT:  And if he's not, then I'll take a

 2    different tact.

 3          So let's courteously reach out to Mr. Winnick.

 4    Okay?

 5          MR. POZOS:  Thank you, Your Honor.

 6          THE COURT:  Thank you very much.

 7          Counsel.

 8          MS. YBARRA:  Your Honor, I'd like to respond to a

 9    few points Mr. Pozos made.

10                    **RESPONSE BY MS. YBARRA**

11          MS. YBARRA:  First of all, concerning the

12    materials produced in other litigation and investigations,

13    we are pleased to hear that Bank of America now commits to

14    producing those underlying document productions to S&P

15    within 30 days.

16          THE COURT:  Well, just a moment.  I'm not sure of

17    that yet.

18          I hear that, as of this morning.  But you didn't

19    hear that until this morning, did you?

20          MS. YBARRA:  I thought that I heard it just now.

21          THE COURT:  I did too.  But I'm not sure.  That's

22    why, if you noticed, I asked counsel what his authority was.

23    He's excellent counsel, but I'm not sure he has that

24    authority.

25          Do you have that authority to make that concrete

Case 2:13-cv-00779-DOC-JCG  Document 323  Filed 09/23/14  Page 50 of 99  Page ID #:7368
2:13-CV-0779-DOC 7/29/2014 - Volume I

50

 1    representation, Counsel?

 2            MR. POZOS:  Your Honor, with respect to the three

 3    securities which I described -- High-grade, Pinnacle Point,

 4    and Tricadia -- I am authorized.

 5            THE COURT:  Okay.  Great.  I just wanted to make

 6    sure.  Thank you for the courtesy.

 7            Counsel.

 8            MS. YBARRA:  Great.  I'm pleased to hear that too.

 9            That is the first time that we have gotten that

10    commitment from Bank of America.  This has been an ongoing

11    dispute for months.

12            THE COURT:  Just a moment.  Just a moment.

13    Outstanding bank.  I'm very pleased with their appearance.

14    I'm very pleased with the arguments, so let's keep that on a

15    very complimentary basis.

16            MS. YBARRA:  Okay.

17            Concerning the other materials produced in those

18    litigations -- uh, deposition transcripts, expert reports,

19    unredacted filings -- Mr. Pozos suggested that it would be

20    burdensome for the bank to undertake a confidentiality

21    review of those materials before turning them over to S&P.

22            We think the protective order in this case is

23    sufficient and should avoid wasting time spent reviewing

24    those documents for confidentiality issues.

25            THE COURT:  Why don't we talk that out with you

Case 2:13-cv-00779-DOC-JCG   Document 323   Filed 09/23/14   Page 51 of 99   Page ID #:7369
2:13-CV-0779-DOC   7/29/2014 - Volume I

51

1    and counsel.

2              Counsel, come up and join your colleague.

3              I expect back -- I expect pushback, and rightfully

4    so, in terms of privilege logs.  And regardless of the

5    amount of documentation that you think is forthcoming, a lot

6    of this is going to be dependent upon my decision concerning

7    cost production.

8              First instance, if S&P bears the cost of this,

9    they may decide to narrow their requests appreciably.  In

10   other words, it may be something that they go back and

11   relook at because the costs could be astronomical.  And I'm

12   still waiting for that argument.  So I need you to remain.

13             In fact, why don't you delay that phone call to

14   Mr. Winnick for another hour or so.  Okay?

15             But, depending upon my ruling, what I can't

16   tolerate is, whatever period of time I set -- whether

17   30 days, 45 days, 60 days -- pushback from any banks that

18   disturb the trial schedule I eventually set for S&P.  And,

19   therefore, that would turn into a sanctions issue.  And I

20   don't want any bank in good faith appearing in my court

21   who's trying to make these available in that position.

22             That's why I don't want you on the firing line.  I

23   want "house" counsel or the vice president or president of

24   Bank of America.  Okay?  So I leave that to you, but

25   whoever's coming has full authority to make decisions on the

Case 2:13-cv-00779-DOC-JCG   Document 323   Filed 09/23/14   Page 52 of 99   Page ID
#:7370
2:13-CV-0779-DOC 7/29/2014 - Volume I

52

 1    spot.  And we'll get to that in the bottom of -- today, the

 2    next day, or whatever, until this is resolved.  There's no

 3    reason to bring you back.

 4              Now, Counsel, please continue.

 5              MS. YBARRA:  Your Honor, Mr. Pozos also suggested

 6    that S&P is seeking documents from other litigations

 7    involving two RMBS, Merrill Lynch Mortgage Investors Trust

 8    Series 2006-RM-3 and Merrill Lynch Alternative Note Asset

 9    Trust series 2007-OAR-2.

10              Mr. Pozos suggested that those securities are

11    outside the scope of the subpoenas.  And that's just --

12              THE COURT:  Well, he also suggested it was a

13    moving goalpost, that it was hard to comply, and that he

14    wanted more specificity.  That was the second part of his

15    argument.

16              MS. YBARRA:  Well, the -- first, those securities

17    are not outside the scope of the subpoena.  They are

18    identified as schedules attached to the subpoena.  They're

19    defined as "government designated RMBS" --

20              THE COURT:  A little bit slower.

21              Start again.  Strike her answer.

22              MS. YBARRA:  Those securities are identified in

23    the schedules attached to the subpoena.  They've been

24    defined in the subpoena as "government designated RMBS and

25    CDO's."  And we have outstanding requests pertaining to

Case 2:13-cv-00779-DOC-JCG   Document 323   Filed 09/23/14   Page 53 of 99   Page ID #:7371
2:13-CV-0779-DOC   1/29/2014 - Volume I

53

1    those securities.

2            Now, Mr. Pozos didn't join the meet-and-confer

3    discussions with Bank of America until June 20th.

4            THE COURT:  If S&P bore the cost of this -- if

5    eventually, hypothetically, I found under case law and

6    even/or the seven-factor balancing test that S&P was to bear

7    the cost of all these productions --

8            MS. YBARRA:  We --

9            THE COURT:  -- you better be careful, because if I

10   make that final ruling, then I'm not gonna let S&P come back

11   and say, "Oh, Judge, I was just kidding.  You know, we

12   really wanted a hundred million documents but now -- or a

13   hundred thousand pages, or a hundred billion pages -- but

14   Gee, Judge, now we" -- I'm going inflict the costs.  And I

15   think the bank's going to be happy to produce it and, quite

16   frankly, just churn up the number.

17           So really be careful if that's the position you

18   want.  And I think, in fairness, maybe we should have heard

19   the cost-shifting argument first.

20           MS. YBARRA:  I -- I understand, Your Honor.  But

21   on these two specific RMBS, let me just make this point:

22   What we're asking for from Bank of America is to take

23   productions concerning those RMBS that were already made in

24   other cases, in other litigation -- those documents have

25   been processed and searched and collected -- and we're

```
 1    asking them to flip those productions in their entirety to

 2    S&P in large part to minimize the burden of production to

 3    the banks.

 4             THE COURT:  And the bank says that this is

 5    confusing?

 6             MS. YBARRA:  The bank says -- or Mr. Pozos says

 7    that these securities are outside the scope of the subpoena.

 8    And that's not correct.  They're called for in Requests

 9    No. 11 and 24.  We propose to the bank that they reproduce

10    these prior productions to us as a way to satisfy their

11    discovery obligations on those requests and on these

12    securities.

13             THE COURT:  Okay.  What firm are you with?

14             MS. YBARRA:  Keker Van Nest.

15             THE COURT:  Okay.  And you can spend some time

16    with us also, so we can sort this out, on consecutive days.

17             What I don't want to do is hold up Countrywide and

18    some of the other entities.  I want to get to the costs

19    eventually, excuse them from the proceedings, once I make a

20    tentative or final ruling.

21             But you can stay with us?

22             MS. YBARRA:  Absolutely.

23             THE COURT:  And you have authority?

24             MS. YBARRA:  Uh, Mr. Keker has authority as --

25             MR. KEKER:  She has authority.
```

 1              THE COURT:  She has authority.

 2         All right.  Okay.

 3         MS. YBARRA:  If I could just address one other

 4    category of documents, the government oversight documents

 5    Mr. Pozos was talking about.

 6              I think he suggested to the Court that the

 7    subpoena is seeking ten years of communications and, you

 8    know, every e-mail in the world.  That's not correct.  Every

 9    request in the subpoena is limited to the 2004 to 2008 time

10    period unless otherwise noted, and most of them are limited

11    to that four-year period, which we think is the most

12    relevant period in the case.

13              And Mr. Pozos has said, "Well, now we don't know

14    what S&P is asking for.  There are too many regulators we're

15    communicating with about the securities."

16              Um, this is -- this is the farthest that we have

17    gotten in meet-and-confer discussions.  Up until late this

18    month --

19              THE COURT:  No, no.  We're going to be -- the

20    glass is half full.

21              MS. YBARRA:  Okay.

22              THE COURT:  You're doing just fine.

23              MS. YBARRA:  Okay.  Now that we know that the bank

24    is willing to produce documents in response to this request

25    and they're not shutting us down completely, we're happy to

1    talk to them and further narrow it.  But this is -- this is

2    where we are today because we've never --

3              THE COURT:  Wonderful bank.  Everybody's -- okay.

4    That's fine.  We'll hammer this out.

5              I don't want you, Counsel, in the position of

6    making decisions on the fly.  We're going to need somebody

7    with authority.  We'll be working at this for the next

8    couple of days.  There's no reason to come back to it.

9              Okay.  Counsel, anything else?

10             MS. YBARRA:  No.  Nothing further, Your Honor.

11             THE COURT:  All right.  Time means absolutely

12   nothing to me.

13             Counsel, if you have anything else that either one

14   of you'd like to say; if not, I'm going to pass on to the

15   next entity.

16             MR. POZOS:  Your Honor, nothing until costs.

17             THE COURT:  Okay.  Thank you very much.

18             NCUA, please.  And, Counsel, I had the pleasure of

19   meeting you on the last occasion.  But would you reintroduce

20   yourself to the record, please.

21             MR. HETHERINGTON:  Yes, Your Honor.  Andrew

22   Hetherington.

23             THE COURT:  Pleasure.

24             MR. HETHERINGTON:  Your Honor --

25             MR. KEKER:  Can I make a suggestion?  These are

Case 2:13-cv-00779-DOC-JCG  Document 323  Filed 09/23/14  Page 57 of 99  Page ID
#:7375
2:13-CV-0779-DOC 7/29/2014 - Volume I

57

```
 1    motions to compel.  And just for the order, it seems that we
 2    ought to start and make the argument about what we're
 3    fussing about and then they can --
 4              THE COURT:  I agree.  But this was the way it was
 5    presented to me.  I gave you carte blanche to begin with and
 6    this is the way the parties popped up.
 7              MR. KEKER:  If Mr. Markley could start and say
 8    what remains as a problem with NCUA, we'd appreciate it.
 9              MR. HETHERINGTON:  We have no objection to that.
10              THE COURT:  All right.  Thank you.
11              I'm giving you carte blanche to present your
12    arguments.
13              MR. MARKLEY:  Good morning, Your Honor.  Brian
14    Markley from Cahill, Gordon, Reindel, on behalf of
15    defendants.
16              ARGUMENT BY MR. MARKLEY FOR DEFENDANT S&P
17              MR. MARKLEY:  As the Court is aware, the National
18    Credit Union Administration, or NCUA, is an agency of the
19    federal government that regulates federally insured credit
20    unions, including several of the entities at issue in this
21    case who --
22              THE COURT:  Counsel, time out.  You're a
23    tremendous counsel.  That's a waste of my time.
24              MR. MARKLEY:  Okay.  I'll cut to the chase,
25    Your Honor.
```

Case 2:13-cv-00779-DOC-JCG  Document 323  Filed 09/23/14  Page 58 of 99  Page ID
#:7376
2:13-CV-0779-DOC 9/29/2014 - Volume I

58

1          THE COURT:  Okay.  Good.

2          MR. MARKLEY:  The key issue underlying the

3    dispute, Your Honor, is that this particular non-party has

4    failed to conduct any new searches, uh, in the files of the

5    specific personnel involved in the specific securities that

6    the government put at issue in the case.

7          We moved, Your Honor, in connection with five

8    different subpoenas.  And I'll start with the first one, and

9    the Court is familiar with it.  This is the subpoena served

10   on NCUA as the regulator.  I'll refer to it as the

11   "regulator subpoena."  It was the subject of our earlier

12   motion.  And I won't belabor the point because, as I say,

13   the Court is familiar with it and issued an order June 13th

14   compelling compliance with the entirety of the subpoena.

15         That order, from our perspective, Your Honor, has

16   been largely ignored.  Prior to the July 2nd, which was the

17   date our motion was filed, NCUA had produced nothing in the

18   response to the June 13th order.

19         We've since received two productions related to

20   this regulator subpoena that was the subject of the order

21   and those were received during the briefing:  The first one

22   on the date of NCUA's opposition; and the second on

23   July 17th, which was the date of our reply.  These contained

24   documents that almost entirely consisted of publicly

25   available materials, and a very limited number of e-mails

Case 2:13-cv-00779-DOC-JCG   Document 323   Filed 09/23/14   Page 59 of 99   Page ID #:7377
2:13-CV-0779-DOC 7/29/2014 - Volume I

59

1    and documents that were produced in other cases in response
2    to requests other than ours.  And so they're not even close
3    to the core of what we're interested in.
4            What they have failed to do in connection with
5    that regulator subpoena and the Court's order is to conduct
6    searches and produce documents about the specific securities
7    at issue in this case.  And I'm talking about communications
8    to and from the particular credit union and NCUA personnel
9    who are involved in the securities at issue here.  They have
10   failed to produce documents related to their use of and
11   reliance on credit ratings, which includes, uh, issues such
12   as the meaning of the terms "independent" and "objective."
13           They have failed to produce -- and this is an
14   important one, Your Honor -- unredacted work papers related
15   to their own internal material loss reviews, which
16   ultimately were published.  We talked about this last time.
17   It was a significant subject of the Court's order on
18   June 13th.
19           These reports contain stark findings which are
20   exculpatory to S&P.  They blame the regulator for having lax
21   oversight.  They blame the credit unions themselves, the
22   investors, for having made poor investment decisions and
23   having taken excessive risk.
24           What we're looking for, and what the Court ordered
25   them to produce previously, are the documents underlying

```
 1    these reports.  And they've withheld them thus far based on
 2    a deliberative process privilege, which I will come to in a
 3    minute once I finish describing what they haven't done --
 4    because they've also failed to produce documents regarding
 5    the NCUA as an agency, its expectations for the performance
 6    of the mortgage and housing markets in the relevant years,
 7    and their knowledge of fraud in those markets.  And they
 8    failed to produce documents relating to the alleged losses
 9    on the investments in this case, which the government,
10    again, hopes to pin on S&P.
11            They don't dispute, as far as I can tell, that
12    they're required to produce these materials.  Instead, they
13    have two arguments:  The first is that they simply need more
14    time; and the second relates to the issue of costs which
15    we're going to talk about later.  And there are some unique
16    issues about NCUA on the cost component of this argument
17    today, which I certainly can address.
18            On the first point we think 30 days from an order
19    granting the motion is sufficient.
20            Let -- let me talk for just a moment, Your Honor,
21    about the other subpoenas at issue here because they've not
22    been brought to the Court's attention, other than in
23    passing.
24            In addition to the regulator subpoena that I've
25    just described, NCUA has failed to produce documents
```

Case 2:13-cv-00779-DOC-JCG   Document 323   Filed 09/23/14   Page 61 of 99   Page ID #:7379
2:13-CV-0779-DOC 7/29/2014 - Volume I

61

```
 1    responsive to four other subpoenas that S&P served on them

 2    in their capacity as the custodian of records for four

 3    failed credit unions.  They've possessed these documents.

 4    And, thus far, they have failed to produce anything in

 5    response to the subpoena, except one production -- which,

 6    again, was received the same date that we filed our motion,

 7    which they knew was coming and again fell short of what

 8    required -- what was required.

 9                 It's an eleventh-hour document dump that includes

10    publicly --

11                 THE REPORTER:  Slow down.

12                 MR. MARKLEY:  It's an eleventh-hour document dump

13    containing mostly publicly available documents and documents

14    that were produced in other cases in response to other

15    parties' requests.  And, again, in response to these

16    subpoenas, they failed to conduct, as far as we can tell --

17    and they certainly haven't produced -- any communications to

18    and from the particular individuals at these credit unions.

19                 THE COURT:  What was the time for production?

20                 MR. MARKLEY:  Set forth in the subpoena,

21    Your Honor?

22                 THE COURT:  Yes.

23                 MR. MARKLEY:  I think it probably required

24    production within 45 days.

25                 THE COURT:  When would that run?
```

1           MR. MARKLEY:  The subpoena was served, uh, early

2    in 2014, Your Honor.  We did engage --

3           THE COURT:  How would I be aware of that?  How

4    would this be within my knowledge bank?

5           MR. MARKLEY:  Uh, Your Honor, the subpoena is

6    attached, I think, to some of the papers that have been

7    filed by S&P.

8           THE COURT:  Okay.

9           And so you believe that the most egregious

10   violation, from your standpoint, is pushback by NCUA to the

11   already court-ordered production.

12          And, specifically, I'm going to repeat to you what

13   I heard; and that is a failure to produce information

14   concerning the regulators, credit ratings, et cetera, and

15   especially the unredacted work that you're seeking; and that

16   they have a deliberative-process privilege.

17          And is that pending for resolution?  In other

18   words, have I been slow and not resolved this?

19          MR. MARKLEY:  You've not been slow, Your Honor --

20          THE COURT:  Well, just a moment.

21          MR. MARKLEY:  -- to address that.

22          THE COURT:  If they have this privilege, they have

23   due-process rights.  They have the right to argue that in

24   front of the Court.

25          How do we get that in front of the Court?

1          MR. MARKLEY:  It is in front of the Court,

2    Your Honor.  It's been in front of the Court only since

3    Friday, however.

4          THE COURT:  Since Friday?

5          MR. MARKLEY:  We were -- yes.

6          THE COURT:  So -- just a moment.

7          So that means it's winding its way through the

8    labyrinth downstairs.

9          I haven't seen it, frankly, over the weekend.  I

10   didn't look at it.

11         MR. MARKLEY:  We knew it was coming about six days

12   before it was filed.

13         THE COURT:  So, in other words, I need to look at

14   that.  I, frankly, will share with both of you:  I'm not

15   aware that the deliberative-process privilege had been

16   filed.  So we'll resolve it.

17         All right.  Now, are you going to respond to this

18   in writing in some way?  How are we going to get this in

19   front of the Court?

20         MR. MARKLEY:  Yes.  With respect to the

21   deliberative process, Your Honor, yes, we certainly will.

22         THE COURT:  Well, now why am I going to decide

23   that or press today, then?  In other words, when am I going

24   to decide this?

25         MR. MARKLEY:  We can do it any way you like,

 1    Your Honor.  I can actually discuss why we think --

 2              THE COURT:  You can write it down.

 3              MR. MARKLEY:  Yes.  And we will.

 4              THE COURT:  When?  When do I have it in front of

 5    me?

 6              MR. MARKLEY:  Our brief is due --

 7              THE COURT:  Three months from now?  Two days from

 8    now?  What?

 9              MR. MARKLEY:  Our brief is due on Monday.

10              THE COURT:  On Monday.  Okay.  That's good

11    information.

12              MR. MARKLEY:  We requested --

13              THE COURT:  Then I'm going to have to bring you

14    all back to court for that.

15              MR. MARKLEY:  It's returnable at the end of

16    August, Your Honor.

17              THE COURT:  Okay.

18              What I'm, of course, weighing holistically aren't

19    these individual issues, but how this affects a trial date

20    I'm about to set and never back away from.

21              And once I do that, if I get pushback and it's

22    inappropriate, then I'm going to find sanctions against

23    either/or all parties involved.  So I have to be very

24    careful with these dates right now.

25              So I'm going to hear from NCUA in just a moment

 1   because they haven't had a chance to state their position.

 2              MR. MARKLEY:  Okay.

 3              Your Honor, I've basically said all that I need

 4   to --

 5              THE COURT:  Thank you very much, Counsel.

 6              MR. MARKLEY:  -- say but there was one additional

 7   issue --

 8              THE COURT:  Please.

 9              MR. MARKLEY:  -- if you'll give me just a moment,

10   Your Honor.

11              In addition to the deliberative-process privilege,

12   it seems that NCUA has chosen to invoke, as well, a

13   bank-examiner privilege.  And they've done this in

14   connection with documents that were produced or were called

15   to be produced by the DOJ in response to S&P's request.

16              We have received from DOJ a privilege log,

17   prepared by NCUA -- or at least reviewed by them -- which

18   contains listings for invocation of a bank-examiner

19   privilege.

20              What they haven't done for those invocations of

21   privilege is submit a declaration from a high-ranking

22   officer of the NCUA, as the Court required in the June 13th

23   order, and as they've done with respect to this most

24   recently filed motion about the deliberative-process

25   privilege.

```
 1              We think these invocations of bank-examiner

 2     privilege should be treated the same way, and they should be

 3     required to submit evidence, to submit facts, a declaration

 4     that explains why they're entitled to withhold documents

 5     consistent with the -- or pursuant to the bank-examiner

 6     privilege, which is --

 7              THE COURT:  So here's what I'm hearing your

 8     argument is; and that is, that NCUA could have brought these

 9     objections earlier, and that these are coming now in a

10     piecemeal and stalling fashion, from your perspective.

11              MR. MARKLEY:  Correct.

12              THE COURT:  That's what I'm hearing.

13              MR. MARKLEY:  Correct.

14              THE COURT:  All right.  Let me hear from NCUA.

15              MR. HETHERINGTON:  Thank you, Your Honor.

16              THE COURT:  Counsel, please.

17          ARGUMENT BY MR. HETHERINGTON ON BEHALF OF NCUA

18              MR. HETHERINGTON:  Quite a litany of accusations.

19     I'll try to deal with them one by one and obviously answer

20     any questions that you have.

21              Dealing with the last one first, the motion that

22     we filed in compliance with your order, um, I'm sensing,

23     generally, you don't like to hear people passing the buck,

24     and so I will try not to do that.

25              We started the steps in motion to comply with your
```

```
 1   order very shortly after the order --
 2            THE COURT:  Have you complied with it, in your
 3   opinion?
 4            MR. HETHERINGTON:  Well, you'll see from the
 5   date --
 6            THE COURT:  Just a moment.
 7            Have you complied with the order, in your opinion?
 8            MR. HETHERINGTON:  Yes.
 9            THE COURT:  You have.  Thank you.
10            MR. HETHERINGTON:  You'll see from the date on the
11   declaration that we obtained and have now submitted in
12   compliance with your order that we did that promptly.  The
13   only reason for the delay was because we had to submit a
14   privilege log that lists the individual documents.  There
15   are 231 documents.
16            We had control numbers for those.  We only very
17   recently got the Bates numbers that they were produced
18   under.  Once we did that, we drew up a motion.  It took a
19   few days.  That's the reason.
20            There was no attempt to delay, Your Honor.
21            THE COURT:  By the way, in good faith, I think
22   that I'm going to get a number of privilege logs in the
23   future; and I think the people need to go back, regardless
24   of my rulings, and take a look at some of this discoverable
25   material afresh.  So I'm not affronted or concerned by that.
```

Case 2:13-cv-00779-DOC-JCG   Document 323   Filed 09/23/14   Page 68 of 99   Page ID #:7386
2:13-CV-0779-DOC 9/29/2014 - Volume I

68

 1          I am concerned, though, about eventually any bank

 2  entity or party delaying this case unnecessarily.  So I'll

 3  look at that closely.  But right now I take that in good

 4  faith.

 5          MR. HETHERINGTON:  I should mention in that very

 6  connection, Your Honor, um, shortly I'm gonna discuss how

 7  many hours in-house NCUA employees and counsel and outside

 8  counsel have spent.

 9          A good amount of that time was spent dealing with

10  issues of privilege because -- unlike the attorney-client

11  privilege where it largely nowadays can be done

12  automatically and then obviously checked, but you know the

13  names of the attorneys -- for the bank-examiner privilege,

14  it requires quite a lot of discussion.  And I can tell you,

15  in earnest, that the bulk of the discussion was focused on

16  what we did not need to assert the privilege for.  There are

17  very few documents in the privilege log -- it's not to say

18  that there won't be more, but we were very sparing, we

19  believe.  And you'll decide ultimately in our invocation of

20  the privilege.

21          There is a sizeable document that has a small

22  number of targeted redactions, for example.  We didn't

23  withhold the whole document.

24          And with regard to the "material loss" review that

25  you've heard is exculpatory of the banks, the "material

 1   loss" review is a sizeable document.  It has these

 2   conclusions in it.  It's been made public.

 3          What the deliberative-process dispute is about --

 4   and, again, I'm not anticipating the briefing here -- are

 5   the redactions of some work papers that went into the

 6   creation of that report.  But the report, itself, which

 7   presumably is the best evidence that the agency reached

 8   these exculpatory conclusions, is a public document that's

 9   been made available to S&P.

10          So to circle back a little bit, Your Honor, we

11   believe that NCUA has already reasonably complied with all

12   five of the subpoenas subject to the resolution of the cost

13   issue.

14          THE COURT:  I want to assume that also.

15          Now let me ask the question:  Do you have the

16   authority to make these types of decisions?  Or are you in

17   the same position of being esteemed counsel, but you have to

18   consult with somebody?  And if so, who is that person?

19          MR. HETHERINGTON:  I have considerable authority,

20   Your Honor.  However --

21          THE COURT:  I'm sorry.  I'm sorry.

22          I want to apologize to you.  I was unclear.  I

23   didn't ask for "considerable authority."  I asked for

24   "authority."

25          Do you have the authority to make these decisions

Case 2:13-cv-00779-DOC-JCG  Document 323  Filed 09/23/14  Page 70 of 99  Page ID #:7388
2:13-CV-0779-DOC 7/29/2014 - Volume I

70

```
 1   or do you have to consult with somebody?  And if so, who is
 2   that person?
 3            MR. HETHERINGTON:  That was the second part of my
 4   response, Your Honor.
 5            In addition to that, as with last time we were
 6   here, uh, we have with us today in-house counsel for NCUA.
 7            THE COURT:  Where's that gentleman?
 8            MR. HETHERINGTON:  Mr. Ian Marenna.
 9            THE COURT:  Thank you very much.  It's a pleasure.
10   Would you spell your last name, sir.
11            AUDIENCE MEMBER:  M-A-R-E-N-N-A.
12            THE COURT:  Great.  Thank you very much.
13            MR. HETHERINGTON:  The most senior lawyer that I
14   deal with at NCUA is a man named John Ianno, I-A-N-N-O.  He
15   was here the last time we were here before Your Honor.  He
16   couldn't be here today.  That's why he's not here.
17            Um, we don't need to be ordered to get
18   decision-makers down here.  We do -- you know, we discussed
19   ahead of time what we're gonna do.
20            Essentially with regard to the subpoena to the
21   NCUA regulator, the subject of your last order -- within
22   days of that order coming down, we were on the phone with
23   S&P.  We said, "Please tell us what you want to prioritize."
24            Their response was, "We're not willing to narrow
25   any of our requests."
```

```
 1                THE COURT:  I see.

 2                MR. HETHERINGTON:  So we went away.

 3                The countless times Mr. Keker referred to that S&P

 4      may have spent narrowing requests with the banks -- who

 5      incidentally, perhaps not incidentally, are the source of

 6      many of S&P's revenues -- they spent zero hours with us

 7      trying to narrow their requests.

 8                What we did was said, "Okay.  Look, we asked you

 9      to pay the significant portion of our costs."  S&P has

10      declined to do so.  So we said, "Well, what can we do that

11      is a reasonable production?"

12                We have spent, in the terms of the various

13      subpoenas, more than 500 hours total.  So that's not all on

14      the NCUA subpoena.  Spent almost $200,000 dealing with these

15      subpoenas.  This is a significant amount.  We have not

16      searched individual custodians because that is what takes so

17      much time and money.  We've looked at common sources of

18      documents.  We've produced --

19                THE COURT:  If, hypothetically, these costs fell

20      by case law and the seven-factor test to S&P, what other

21      obstacles do you have other than the privilege logs to

22      production?

23                MR. HETHERINGTON:  Virtually --

24                THE COURT:  In other words, of course, you know,

25      substantial costs.  But if this fell to S&P -- in other
```

1    words, they have their choice about how wide or how narrow?

2              MR. HETHERINGTON:  Virtually none.

3              THE COURT:  Okay.

4              MR. HETHERINGTON:  And I will tell you,

5    Your Honor, that our approach, which is still ongoing --

6    it's taken quite a long time because NCUA, unlike a big

7    bank, hasn't really done this before.  We spent a lot of

8    time figuring out who custodians are.  We've been

9    downloading terabytes of data.

10             And our intention is to provide essentially a menu

11   to S&P that says, "This is how much this, we estimate, is

12   gonna cost.  If you want us to do it, we'll do it."

13             Now, it's not quite without limit.  We think that

14   some of the documents they're targeting -- uh, for example,

15   documents from the files of communications between in-house

16   and outside counsel -- we think that those are just

17   presumptively off limits, as they typically are in

18   litigation.  Most litigants don't search their own lawyers

19   files after the commencement of litigation.  But, setting

20   that aside, it really is all about the costs.

21             And I do want to talk-up for a moment, Your Honor,

22   since we're on the record, that this is not -- we haven't

23   just ignored categories of information.  Part of the issue

24   here is that S&P appears to believe that a lot of types of

25   "document" exist that just doesn't exist.

1        So they asked us for all documents that the NCUA

2   has, all policies and regulations, documents concerning the

3   use of credit ratings.  And we said, "These are all public.

4   They're in the federal register.  They're in the CFR.

5   They're on the website.  And it's burdensome to ask us to

6   produce these, when you can go and get them."

7        And they came to court and they asked Your Honor

8   to order us to do that anyway.  We did.  And now they're

9   here complaining that what we said was true, which is, most

10  of these things are public.  There isn't a secret set of

11  off-the-book reqs for dealing with credit ratings.

12       What we haven't done is search custodians' files.

13  Our only objection to doing that is the time and expense of

14  doing so.

15       Let me talk about the other four subpoenas, the

16  credit union subpoenas.  S&P, after delaying by about two

17  months -- so the return date of that subpoena, Your Honor,

18  I'd like to address that, because that was a long time

19  ago -- when we first received the subpoenas for credit

20  unions' files, we talked to S&P and we said, "Look, right

21  off the bat, we'll give you the deal files.  Let's talk

22  search terms and custodians.  Get back to us."  The return

23  date for the subpoenas came and went with not a peep.  So we

24  handed over the deal files.

25       Sometime later, we got search terms.  By this

Case 2:13-cv-00779-DOC-JCG   Document 323   Filed 09/23/14   Page 74 of 99   Page ID #:7392
2:13-CV-0779-DOC   7/29/2014 - Volume I

74

1    time, we're already producing from the credit unions' files

2    in the RMBS litigation that is being brought on behalf of

3    the failed credit unions.  So we said, "Well" -- again, "We

4    are happy to make a production that is reasonable and not

5    immensely costly.  Anything else, if you want to pay for it,

6    we'll do it."

7           So, for example, we have collected documents from

8    the credit unions' files from 2005 onwards, not 2004 onwards

9    as S&P has requested.  We're searching the documents we

10   gathered from 2005 onwards.

11          If they want us to restore the documents, 2004,

12   that's gonna cost money.  We're searching documents that

13   have already been reviewed for privilege so that we don't

14   have to go through all that.  If they want us to search

15   documents that haven't already been reviewed, that, again,

16   is a cost issue.  That's the obstacle once again,

17   Your Honor.

18          There are hundreds of thousands of pages that have

19   been produced.  I do think that a lot of the supposed

20   disconnect is because there just aren't these parallel sets

21   of documents; there aren't any other manuals.

22          We've produced highly sensitive manuals, which

23   essentially are -- describe how NCUA goes about its

24   regulatory business, which I can tell you NCUA was very

25   reluctant to have produced.  We had lengthy discussions

Case 2:13-cv-00779-DOC-JCG  Document 323  Filed 09/23/14  Page 75 of 99  Page ID
#:7393
2:13-CV-0779-DOC  7/29/2014 - Volume I

75

```
 1    internally about privilege and we decided to produce those
 2    documents subject to the protective order.
 3              This is not a case of just playing "hide the
 4    ball."  These are the documents with which NCUA carries out
 5    the task that S&P professes to be so interested in; namely
 6    communicating with...
 7              THE REPORTER:  I couldn't hear the last.
 8              MR. HETHERINGTON:  Uh, namely -- sorry --
 9    regulating the credit agencies.
10              I think everything else that -- most of what else
11    I wanted to say does concern the cost issue, Your Honor.
12    I'd like to be heard on that on behalf of NCUA later.  And,
13    obviously, I'd like to address any of the NCUA specific
14    points that Mr. Markley mentioned.
15              Just to kinda wrap up a couple of other things
16    that he mentioned.  With regard to a deadline, um, I don't
17    really know where the "30 days" ever came from.  Um, we
18    think that since we made a production -- let me just address
19    the time -- the productions.
20              It so happened that the NCUA production, the first
21    most significate one, fell around the time that S&P filed
22    its motion.  That's because it filed its motion three weeks
23    after getting the order.  And the only reason it actually
24    didn't arrive until the day it filed its motion is because
25    of the July 4th holiday, which held up Federal Express.
```

Case 2:13-cv-00779-DOC-JCG  Document 323  Filed 09/23/14  Page 76 of 99  Page ID
#:7394
2:13-CV-0779-DOC 4/29/2014 – Volume I

76

1         With regard to the production from the credit

2    unions' files, which Mr. Markley described as an

3    "eleventh-hour document dump," we're making these

4    productions in parallel to the productions that are being

5    made in the RMBS cases.  So we make a production there; we

6    make a production here.

7         We've already produced -- we've been hearing

8    numbers of pages, numbers of documents.  It's always big

9    numbers.  We produced thousands of documents.  We've already

10   committed to producing hundred -- well, at least, tens of

11   thousands more documents.

12        We've gotta production of probably 35,000

13   documents that will be made this week, if it goes on

14   schedule.  Not because of this hearing, Your Honor, but

15   because of the timing of the other productions.

16        So, with regard to timing, what we request is that

17   any productions that we made, subject to the resolution of

18   the cost issue, go on a parallel track to our productions in

19   the other RMBS litigation so that we're not doing the same

20   work twice.

21        Judge Cote has ordered a schedule in those

22   actions.  Document production is to be complete by

23   October 31st.  That's not to say that everything will be

24   left until then.  But we are making these productions one by

25   one, and we've already produced a great amount.

Case 2:13-cv-00779-DOC-JCG   Document 323   Filed 09/23/14   Page 77 of 99   Page ID
#:7395
2:13-CV-0779-DOC  7/29/2014 - Volume I

77

```
 1          Uh, with regard to the bank-examiner privilege,

 2   Your Honor, we, uh, set forth in our supposition papers

 3   cases, uh, treating them very differently with regard to the

 4   need for a declaration.  Um, unlike the deliberative process

 5   privilege, we don't believe that the bank-examiner privilege

 6   typically does require that.  Uh, S&P has not cited any

 7   authority to the contrary in its reply brief.  Um, and so I

 8   note that.

 9          Finally, one of S&P's requests was for every

10   document received in discovery in the other RMBS cases.  We

11   don't really have a dog in that fight.  We are obliged under

12   the protective order to contact the defendants and

13   third-parties who have produced documents and data to us to

14   allow them to object.  Most of them have not.  But a few of

15   them have.

16          Two of them actually submitted papers to the

17   Court.  S&P told them, "Well, we don't really need your

18   documents," but have not made clear to us why -- what the

19   difference was.

20          What we asked there, Your Honor, is, it's not very

21   many defendants and third parties.  We asked that we not be

22   required to produce documents where the people who've

23   produced them to us have objected to production.

24          Other than the cost issue, Your Honor, that's --

25   those are the points that I wanted to address.
```

Case 2:13-cv-00779-DOC-JCG  Document 323  Filed 09/23/14  Page 78 of 99  Page ID #:7396
2:13-CV-0779-DOC  7/29/2014 - Volume I

78

 1          THE COURT:  All right.  Thank you.

 2          I'll come back to you, Counsel.  Briefly.

 3                  **RESPONSE BY MR. MARKLEY**

 4          MR. MARKLEY:  Just a brief rebuttal, Your Honor.

 5          Mr. Hetherington talked about the production of

 6   sensitive manuals and other material.  And it's true he did

 7   produce those manuals.  But the fact remains, as he

 8   acknowledged -- as NCUA acknowledges -- that they have not

 9   run searches through the e-mails of the individual

10   custodians with the names, for example, of the deals at

11   issue here, so that we can see the communications to and

12   from --

13          THE COURT:  Is that going to involve search terms,

14   Counsel?  And the breadth of those search terms?

15          MR. MARKLEY:  It will, Your Honor.

16          THE COURT:  Okay.  Of course, then, there will be

17   a dispute over the search terms, et cetera, which we haven't

18   resolved yet.

19          MR. MARKLEY:  Yes.  And we've already provided

20   some sample search terms to NCUA.

21          THE COURT:  Initially, I'll leave you -- after the

22   future arguments, I think, today it will become clear.  Some

23   of those will be resolved, quite frankly, I think by

24   agreement of the parties shortly.

25          MR. MARKLEY:  Okay.  Yes, Your Honor.

 1          NCUA takes the position that it doesn't have

 2    sufficient experience to produce these documents in a timely

 3    fashion.

 4          Um, to the contrary, they have, as plaintiff,

 5    filed numerous litigations.  Mr. Hetherington referred to

 6    them as the RMBS cases.  I think they know how to produce

 7    these documents in a timely fashion.

 8          Um, with respect to the third parties who filed

 9    objections, we have been clear with NCUA previously that we

10    weren't interested in documents such as underlying mortgage

11    loan files that had produced -- been produced in some of

12    these other cases.  And we simply passed that on to these

13    third-parties, who, as you may have seen yesterday, withdrew

14    their submissions.

15          Um, and lastly, Mr. Keker later, I think, will

16    address the subject of costs.  I would just say that NCUA

17    is, I think, um, a good case study on this because, as

18    Mr. Keker will explain, there are certain factors courts

19    have identified for equitable balancing and for avoiding the

20    cost-shifting that some other courts have talked about.  And

21    those include a party's involvement in the underlying facts.

22          And here, we have the published MLR's that

23    Mr. Hetherington talked about, which accuse NCUA and the

24    credit unions of causing the losses.  So I would say that,

25    in their case, that prong is particularly favorable to us.

```
 1           Another prong, Your Honor, is a party's interest
 2    in the outcome of the case.  And what you'll see, when the
 3    Court has an opportunity to read the submission that was
 4    filed Friday, is that in addition to a deliberative-process
 5    privilege, they have claimed a common-interest protection.
 6           In other words, they're saying, by producing
 7    privileged documents to the government -- have an affected a
 8    waiver.  And the reason why they say that is because they're
 9    in common interest with the government.  And they've likened
10    their position with DOJ to that of a joint defense
11    agreement.  So having taken that position, we're -- I
12    don't -- we don't understand how they can then say they
13    don't have an interest in the outcome of the case.
14           They have articulated clearly and loudly a,
15    quote/unquote, "common interest with the government."  So we
16    think that, again, that particular factor, uh, favors us in
17    the cost-shifting issue, which will be addressed later on.
18           THE COURT:  Okay.  Thank you.
19           Counsel?
20           MR. HETHERINGTON:  Well, Your Honor, I have a
21    question.
22           Would you like me to -- most of what Markley
23    just -- Mr. Markley just spoke about concerns the cost
24    issue.
25           THE COURT:  Not yet.
```

Case 2:13-cv-00779-DOC-JCG  Document 323  Filed 09/23/14  Page 81 of 99  Page ID
#:7399
2:13-CV-0779-DOC 9/29/2014 - Volume I

81

1          MR. HETHERINGTON:  That's what I was going to ask

2     you.

3          The only thing I would say is that the MLR's do

4     not accuse either the NCUA or the credit unions of causing

5     the losses.  Indeed, one of the reasons why we have been so

6     baffled by NC -- S&P's laser-like focus on these MLR's as,

7     uh, reaching conclusions about the causes of the losses is

8     that they each specifically state that they did not consider

9     the cause of the losses.  So they didn't consider why the

10    banks, for example, may have participated, why S&P may have

11    participated.

12         Um, they do concern overconcentration in

13    securities that failed, but they don't ascribe blame --

14    certainly not to NCUA -- for the losses that are "issue" in

15    the government's case.  *(Verbatim.)*

16         I'll address the cost issues later.

17         THE COURT:  Thank you very much.

18         Then let me hearing from RBS, Royal Bank of

19    Scotland, please.

20         Counsel, would you be kind enough to reintroduce

21    yourself to the record.

22         MR. MARKLEY:  Your Honor, Brian Markley again,

23    um -- for S&P.

24         **ARGUMENT BY MR. MARKLEY FOR S&P RE RBS**

25         MR. MARKLEY:  Our subpoena to RBS is one of the

Case 2:13-cv-00779-DOC-JCG  Document 323  Filed 09/23/14  Page 82 of 99  Page ID #:7409
2:13-CV-0779-DOC 7/29/2014 – Volume I

82

1    ones that we think has, um, been resolved.  There was one

2    remaining issue, uh, which I will address, and I think

3    counsel for RBS will address, and Mr. Cardona may have a few

4    words about.

5           It relates to our request for documents related to

6    six CDO's that RBS contends were purchased, uh, in London.

7    And there are -- they had some concerns about the

8    jurisdictional reach of FIRREA, and told us we didn't need

9    these documents because the statute didn't apply to these

10   particular investments.

11          We responded that we would, of course, be happy

12   with that result -- and I'd like to think it's correct --

13   but it has been resolved now because Mr. Cardona has agreed,

14   as he will explain in his own words, to take those

15   securities off the table, which, from our perspective, means

16   we don't need those related documents.

17          THE COURT:  Well, then, what remains?  What's the

18   remaining issue?

19          MR. MARKLEY:  Costs.

20          THE COURT:  Costs.  So we're back to costs.

21          MR. MARKLEY:  Yes.

22          THE COURT:  Okay.

23          Mr. Cardona, thank you.

24   **STATEMENTS BY MR. CARDONA ON BEHALF OF THE GOVERNMENT**

25          MR. CARDONA:  Your Honor, just to clarify.

Case 2:13-cv-00779-DOC-JCG   Document 323   Filed 09/23/14   Page 83 of 99   Page ID
#:7401
2:13-CV-0779-DOC 4/29/2014 - Volume I

83

```
 1              My understanding is that the issue that remains
 2    relates to six tranches of particular securities on which
 3    RBS's role was strictly as a purchaser of those tranches.
 4    And we've been advised that the RBS entity that made those
 5    purchases was an overseas entity, and that any arrangement
 6    RBS had with respect to those tranches post purchase was
 7    also solely overseas.
 8              THE COURT:  I see.
 9              MR. CARDONA:  So what we have said is, without
10    getting into whether or not FIRREA jurisdiction would extend
11    to that -- because these particular tranches and RBS's
12    purchase of those tranches is a fairly small part of our
13    case -- in the interest of avoiding disputes, we have agreed
14    that we will not pursue RBS's purchase of those particular
15    tranches as part of our case, which we think would render
16    those documents irrelevant, given that.
17              But that's the limitation of our agreement.  We
18    are not taking those securities, as a whole, off the table.
19    It's just RBS's role in purchasing those tranches, which is
20    what we understand is what the documents relate to.
21              THE COURT:  What I've really heard is both of you
22    have taken my trip to London off the table.
23              MR. CARDONA:  At least with respect to those
24    particular tranches, yes.
25              THE COURT:  Okay.
```

Case 2:13-cv-00779-DOC-JCG  Document 323  Filed 09/23/14  Page 84 of 99  Page ID #:7402
2:13-CV-0779-DOC 7/29/2014 - Volume I

84

```
 1              MS. TITOLO:  Your Honor, may I?

 2              THE COURT:  Please.

 3              MS. TITOLO:  Good afternoon, Your Honor.

 4         My name is Theresa Titolo.  I am from Wilmer Hale

 5    LLP, representing RBS Securities Inc.

 6              Just one housekeeping item.  I filed a *pro hac*

 7    *vice* application on Friday.  That hasn't come through yet.

 8              THE COURT:  I haven't seen it.  I'm happy to sign

 9    it.

10              THE CLERK:  It's been processed.

11              THE COURT:  Okay.

12              It's been processed.  Okay.  We'll stamp it.

13    You're now appearing pro hac vice.

14              MS. TITOLO:  Perfect.  Thank you very much.

15         **STATEMENT BY MS. TITOLO ON BEHALF OF RBS SECURITIES**

16              MS. TITOLO:  First, I want to thank Mr. Cardona

17    and Mr. Markley today for our ability to reach a resolution

18    of this issue to avoid some of the burdens to RBS.  I

19    appreciate that very much.

20              I'd -- one minor clarification.  Just for the

21    record, there were six CDO's for which RBS was identified as

22    purchaser only.  For one of the six, the U.S. trade-runs

23    show a single $3 million purchase.  That would have been RBS

24    Securities in the U.S., as opposed to London.  So it's a

25    minor clarification.
```

Case 2:13-cv-00779-DOC-JCG  Document 323  Filed 09/23/14  Page 85 of 99  Page ID #:7403
2:13-CV-0779-DOC  7/29/2014 – Volume I

85

1          For the others, you know, from everything that

2     we've looked at, at this time, the purchases were made in

3     RBS London.  So, uh -- just minor clarification for that

4     one.

5               THE COURT:  So now I'm confused.

6          Let me ask all three of you.  Why don't you join

7     your colleagues, along with Mr. Cardona.  And I apologize.

8     I didn't get it.

9          What remains for me to decide?

10              MS. TITOLO:  Oh, nothing.

11              THE COURT:  Mr. Cardona says that these --

12    frankly, in terms of jurisdiction, whether he has it or not,

13    he doesn't believe he does, but he's not going to make that

14    statement.  It's just, quite frankly, *de minimis* in terms of

15    this lawsuit, and probably not worth the government

16    pursuing.

17         But your position is he doesn't have jurisdiction;

18    these were purchased by RBS in London.  It sounds to me like

19    you're still stating the problem, but there's nothing for me

20    to decide.

21              MS. TITOLO:  Your Honor, I don't think there's an

22    issue to decide.  I just wanted to make sure that I

23    clarified --

24              THE COURT:  No, no.  Time out.  Fine.

25         Is there something you want me to resolve between

1    RBS and S&P?

2          MS. TITOLO:  Um, other than the cost issue that I

3    think --

4          THE COURT:  Other than the cost issue, is there

5    anything that you want me to resolve?

6          MS. TITOLO:  No.

7          MR. MARKLEY:  No.

8          THE COURT:  Okay.  Well, that makes it a pleasure

9    hearing your arguments.

10         Mr. Cardona, thank you.

11         MR. CARDONA:  Your Honor, just for the record, her

12    clarification doesn't affect our position.

13         THE COURT:  Exactly.

14         MR. MARKLEY:  Nor ours.

15         THE COURT:  Okay.

16         MS. TITOLO:  Thank you.

17         THE COURT:  The end result is there's nothing for

18    me to resolve.

19         MS. YBARRA:  That's the good news.

20         THE COURT:  Okay.  Now, then the real gravamen of

21    this comes down to the cost issues, doesn't it?

22         MR. KEKER:  Yes, sir.

23         THE COURT:  I mean, this is really the 800-pound

24    gorilla that's facing us today.

25

Case 2:13-cv-00779-DOC-JCG  Document 323  Filed 09/23/14  Page 87 of 99  Page ID #:7405
2:13-CV-0779-DOC 7/29/2014 - Volume I

87

```
1              ARGUMENT BY MR. KEKER ON BEHALF OF S&P

2              MR. KEKER:  An 800-pound gorilla it is,

3    Your Honor.

4              Just to back up, the government brought this case,

5    and they claim that S&P defrauded somebody.  Who did they

6    defraud?  They defrauded Bank of America, including

7    Countrywide and Merrill Lynch.  They defrauded Citigroup

8    and, to a lesser extent, Deutsche Bank and RBS.

9              And then the government -- so the government goes

10   out and collects documents and prepares its case to prove

11   fraud against these poor victims.  Almost 70 -- just take B

12   of A and Citigroup -- we've told you this before -- 70

13   percent of these losses amount to securities that these big

14   banks arranged, put together to sell.  And they got 'em

15   rated by S&P, and they couldn't sell 'em.  And they had to

16   eat 'em.  70 percent of these losses.  And the government

17   says, "Oh, these poor banks were defrauded because they

18   arranged/put together securities that they couldn't sell."

19             We want to oppose that, as we've made -- I think

20   we've been saying loud and clearly since the beginning of

21   this case.  So we need to do discovery.  We need to go in

22   and find, not just the documents that the government has,

23   which we're now getting in droves, thanks to your order,

24   which, up to now has not been as forthcoming as we wanted,

25   but now it is, thanks to your order, last time around -- and
```

```
 1    we need to get -- because these are supposed to be victims,
 2    we need to find out who is -- what's the problem with these
 3    securities that you arranged, Mr. Bank, that you couldn't
 4    sell.  What's the problem?  Who's fault is that?  Is that
 5    because of S&P?  Or is it because of something that you did?
 6            So our discovery has been aimed at that.  And you
 7    said in your previous orders, in April, you said that's
 8    relevant material.  I mean, that's what -- that's what this
 9    trial is in part going to be about.
10            Now, in the process of getting to where we've
11    gotten, the government issued FIRREA subpoenas to these
12    banks, and they produced a huge amount of material.  Did
13    they pay for it?  Government to pay for it?  Of course, not.
14            During the six-month hiatus when we were asking
15    the government to narrow its case, and you permitted them to
16    do that, they issued Rule 45 subpoenas to these banks, same
17    as us, to non-party banks.  Did the banks say, "Pay for it"?
18    No.  Government gets everything that it wants for free.
19            Amended Rule 45, which was amended in 1991, was
20    intended to protect disinterested third-parties who need
21    protection.  An example that the advisory committee gives is
22    that some expert, who's worked on some other case, and all
23    of the sudden, out of the blue comes a subpoena and says,
24    "We want your files.  We want this and that because we want
25    to use it in some other case."  A disinterested third party
```

Case 2:13-cv-00779-DOC-JCG  Document 323  Filed 09/23/14  Page 89 of 99  Page ID
#:7407
2:13-CV-0779-DOC 7/29/2014 - Volume I

89

1   who needs protection.

2          But it's also clear the advisory committee and

3   courts since then have said all that case law that was

4   developed both before and after the amendment doesn't go

5   away -- all those equitable considerations.  And the

6   equitable considerations -- which I think you're well

7   aware -- of is, is the non-party who gets the Rule 45

8   subpoena -- does that non-party have an interest in the

9   case.

10          Here we say very strongly, of course it does.

11  They're the so-called victims or targets.  And they're

12  also -- they have an interest in the case because the

13  government is going after them simultaneously with going

14  after Standard & Poor's.

15          The government just settled every CDO that

16  Citigroup, for example, according to newspaper reports, that

17  ever issued -- they settled all those CDO's for $4 billion

18  plus all the RMBS.  In this case, they want -- for a

19  fraction of these CDO's, they're claiming losses that are --

20  that are huge.

21          The second factor -- the second equitable factor

22  that arises in the cases, is can -- who can more readily

23  bear the costs.  Now, I'm not suggesting that Standard &

24  Poor's is some nothing entity.  But when they rely, as

25  they're doing, on the case -- the most recent Ninth Circuit

```
 1   case, which was the Legal Voice v. Stormers (sic), where the
 2   Northwest Women's Law Center was being subpoenaed by right
 3   wing organizations from Washington D.C. to try to get
 4   records about who was trying to get contraception from this
 5   Northwest -- I mean, you got to consider that maybe $20,000
 6   to that pro bono organization, and given the circumstances
 7   of that case, things were a little bit different.
 8          Here these banks can readily bear the cost.  They
 9   have, when the government asked them for documents.
10   They've -- under Rule 45 and under FIRREA, they've never
11   made a peep about getting costs.
12          And then, finally, the factor is the litigation of
13   public importance.  Lord knows, we all believe that it is.
14   The Attorney General of the United States attended the press
15   conference with Mr. Cardona and other officials of the
16   Department of Justice, and announced how important this case
17   was when it was filed.  And nothing has changed to lessen
18   its importance.
19          So we believe that equitable factors -- I heard
20   what you said earlier, and it concerns me a great deal
21   because, yes, an easy thing to do would be say, "Well, if
22   you want discovery, you pay for it."  Um, but when it comes
23   to Bank of America, Merrill Lynch, Countrywide, and NCUA who
24   claims a common-interest privilege with the government, as
25   Mr. Markley pointed out, you should do what Judge Pauley did
```

Case 2:13-cv-00779-DOC-JCG  Document 323  Filed 09/23/14  Page 91 of 99  Page ID
#:7409
2:13-CV-0779-DOC 7/29/2014 - Volume I

91

```
 1   in New York in the Honeywell case, which is recognize that
 2   the banks here are more interested non-parties than the
 3   accounting firm was in that case, and that they have offered
 4   no basis for determining what costs are reasonable, and deny
 5   their request to shift costs.  So that's our first request.
 6            The second request, if you're not going to deny
 7   completely their request to shift costs, is make the cost of
 8   production a reasonable cost of production, and only the
 9   cost of production, not attorneys fees, for all the
10   equitable reasons that I've mentioned above.
11            There is absolutely no reason for privilege review
12   of these documents.  We can agree right now to a claw-back
13   procedure where, if something is inadvertently produced or
14   is produced without -- without review, people can get it
15   back when they need to.
16            That's no need for a responsiveness review to go
17   through the pages and pages of documents.  You've heard
18   these numbers:  A hundred million from Countrywide;
19   19 million from -- about CDO's from Deutsche Bank,
20   50 million total; Citi was talking about 19 million, but
21   we -- apparently we just got 20 million in RMBS documents
22   that the government has had.
23            And, Your Honor, you've been asking -- at least in
24   the beginning, you were asking about the unfairness of the
25   government having a lot of this material much longer than
```

Case 2:13-cv-00779-DOC-JCG   Document 323   Filed 09/23/14   Page 92 of 99   Page ID
#:7410
2:13-CV-0779-DOC 7/29/2014 - Volume I

92

1    S&P has.  And I suggest that that's a very important thing

2    for you to consider when we talk about timing later.  But

3    right now we're just talking about -- about costs.

4           The case law, as late as 2014 in the *Spears*

5    *(phonetic)* case, the magistrate there was talking about

6    non-parties are generally not entitled to fees that are

7    incurred in responding to discovery requests.  And certainly

8    we shouldn't be paying fees for the high-price brand of

9    New York and Washington lawyers that we have here --

10   wonderful lawyers doing a great job trying to thwart

11   discovery on behalf of their clients, but spending, as

12   Mr. Hetherington said, 500 hours fussing with things that

13   actually don't need to be fussed with.  Nobody should have

14   to pay attorney's fees for that.

15          And the final point I would like to make -- I'd

16   like to save some time for rebuttal -- but the final point

17   is that -- is whatever you think the case law says, whatever

18   the rules are about this cost business, you always have

19   discretion to make sure that there's going to be a fair

20   trial in this case.

21          We have complained loudly and long, and you're

22   sick of hearing about it, about this case being too big to

23   be fairly tried and prepared.  And you've made your

24   decision.  And, obviously, we accept it.  We have no choice,

25   but we totally accept it and know that we will be going to

Case 2:13-cv-00779-DOC-JCG  Document 323  Filed 09/23/14  Page 93 of 99  Page ID #:7411
2:13-CV-0779-DOC 4/29/2014 - Volume I

93

 1   trial.

 2          But to add the burden on S&P, which is trying to

 3   put together and get ready for a trial in -- whenever you

 4   decide -- someplace around September -- and I hope you'll

 5   let us be heard on that too, but -- but sometime in 2014, in

 6   the relatively near future -- to add this burden to S&P

 7   under these equitable considerations, we believe, is wrong

 8   and unfair.

 9          And one of the ways you can do it, I suppose, is

10   to go back and revisit that whole discussion we had.  And if

11   this is -- if we're supposed to pay costs and we're supposed

12   to do it with all these documents, let's cut the case down.

13   Let's try a Citi case or let's try a B of A case and see

14   what comes out of it.  I don't mean to revisit it, but I'm

15   just saying that you have discretion to make this work so

16   that we can get a fair trial.

17          And we asked you to do that by not shifting costs

18   and telling these folks to promptly forthwith give us the

19   documents, quit stalling.  If there're legitimate disputes

20   to be had, let's carve out those disputes and have 'em

21   separately.  But, in the meantime, get the documents flowing

22   so we can review 'em and get ready to take depositions.

23          Unless you have questions, that's my opening.  And

24   I'm sure I'll have some kind of response reply.

25          THE COURT:  Not in the first round.  But thank

 1   you.

 2           MR. KEKER:  Yes, sir.

 3           THE COURT:  Who would like to argue?

 4           MR. POZOS:  Your Honor, I'm happy to, from B of A.

 5           THE COURT:  Okay.  Bank of America.  And, once

 6   again, restate your name.

 7           MR. POZOS:  Certainly, Your Honor.  Antonio Pozos

 8   of Cleary Gottlieb on behalf of Bank of America N.A. and

 9   Merrill Lynch.

10                   **RESPONSE BY MR. POZOS**

11           MR. POZOS:  Your Honor, I'd just like to take a

12   moment to emphasize that *Legal Voice* is, in our view, an

13   incredibly important case.  Not only was it decided

14   recently, it does –- it did enunciate all of the

15   considerations that go into Rule 45.  And the upshot of

16   *Legal Voice* really is that Rule 45 is be mandatory and it

17   requires cost-shifting when there's significant expense.

18   There are no exceptions.

19           So to the extent there are cases out there that

20   have been cited in the briefs that say that cost-shifting

21   may not be appropriate at all under certain circumstances

22   where the equities apply is no longer consistent with the

23   law in *Legal Voice*.  *Legal Voice* says there are no

24   exceptions.

25           There's argument that we can have about what level

```
 1    of cost is significant.  We certainly understand that.  We
 2    recognize in the Legal Voice case it was $20,000.  The bank
 3    is certainly willing to assume that.  The bank has produced
 4    hundreds of thousands of pages of documents.
 5           But Your Honor, when it comes to that level,
 6    wherever it may be, the bank is entitled to be protected
 7    from higher costs.  Able counsel cited cases -- or, rather,
 8    mentioned that the respondent in the Legal Voice case were
 9    different.  They were a nonprofit.
10           I'd like to take a moment to point out, Your
11    Honor, a case that S&P cited, the BlueShield case.  In that
12    case, it was a very large entity receiving --
13           THE COURT:  Just a moment.  Stop.
14         (Court and court reporter confer.)
15           THE COURT:  Okay.
16           MR. POZOS:  Thank you, Your Honor.
17           In that case, as S&P pointed out, the court found
18    that all three equitable factors weighed against the
19    recipient, but the court still found there that the costs of
20    $14,000 for one respondent and approximately 16,000 for the
21    other were substantial, notwithstanding the fact that these
22    were large corporate entities.  So the idea that, um, the
23    number is much higher than 20,000 we would certainly
24    disagree with.  We think that it's a lot of money for
25    anybody, and we think the costs do need to be shifted down
```

Case 2:13-cv-00779-DOC-JCG  Document 323  Filed 09/23/14  Page 96 of 99  Page ID #:7414
2:13-CV-0779-DOC 4/29/2014 - Volume I

96

 1    to be rendered nonsignificant.

 2          Your Honor, I've been in contact with my client

 3    about the cost issue.  They estimate that the costs will be

 4    substantial.  So, for example, to the extent we're talking

 5    about new custodians, I'm informed that, depending on the

 6    volume of e-mails and the returns on the search terms, those

 7    costs can be 40,000 or more per year, per custodian.  So,

 8    Your Honor, it adds up fast.

 9          Even with respect to some of these collections

10    which we've done previously, we understand that there's a

11    database that has 11 of our proposed custodians.  And the

12    estimates that we're receiving from our vendor to just

13    restart and get that database going are between 60- and

14    $70,000.  So, Your Honor, we do believe that cost-shifting

15    is appropriate, and we do think that it's appropriate for

16    this Court to fix a threshold beyond which the banks should

17    not be required to bear the incremental cost of these

18    productions.

19          I would also like to take a brief moment to

20    address the argument that the government has brought a very

21    broad case, and that S&P should not be required to bear the

22    costs of that.

23          I would just like to point Court's attention to

24    the *United States v. CBS* case.  It's a little bit older

25    case, from the Ninth Circuit, 666 F.2d 364 at 372.  That

 1   case was instructive because it was another large piece of

 2   litigation.  It was antitrust litigation involving studios,

 3   movie companies.  And the court found there that the third

 4   parties had no control over the breadth of the case that the

 5   government was bringing, and that the government -- and that

 6   simply because we're talking about large entities, it didn't

 7   mean that one large entity had to subsidize the litigation

 8   costs of another entity.

 9          And we think that is very instructive here.  While

10   these are large companies, we think it's unfair for the

11   banks to be required to subsidize the case -- or the cost of

12   S&P's defense.

13          Um, finally, Your Honor, with respect to the point

14   about, uh, the absence of definitive estimates as far as

15   costs are concerned, uh, again, those are not required.

16   Again, I'd point the Court to the *CBS* case, where the court

17   found that it could fix the amount of costs at the

18   conclusion of litigation.  There the Ninth Circuit had a

19   case where there were five --

20          THE COURT:  Just a moment.

21          *(To the reporter:)* "Were five different status

22   reports," I think he said.

23          MR. POZOS:  "Written," Your Honor.

24          THE COURT:  Slow down, please.

25          MR. POZOS:  Yes.

Case 2:13-cv-00779-DOC-JCG  Document 323  Filed 09/23/14  Page 98 of 99  Page ID #:7416
2:13-CV-0779-DOC 7/29/2014 - Volume I

98

```
 1              THE COURT:  That's going to be my last warning.
 2   The next warning, you'll be seated without further argument.
 3              MR. POZOS:  Thank you, Your Honor.
 4              THE COURT:  Okay.
 5              MR. POZOS:  There the court received five written
 6   status reports over 18 months in which the respondent
 7   reported the progress that they were making, the types of
 8   services and facilities that they were providing, and the
 9   costs they were incurring.  And the 1991 advisory
10   committee's comments to Rule 45 noted the CBS case, and said
11   that, in some cases, it may be preferable to leave uncertain
12   costs to be determined after the materials have been
13   produced, provided the risk of uncertainty is fully
14   disclosed to the discovering party.
15              And, Your Honor, where there is such broad
16   discovery sought, we think that that is an appropriate
17   approach.
18              THE COURT:  Okay.
19              MR. POZOS:  Thank you, Your Honor.
20              THE COURT:  Okay.  We're going to take a break.
21         (Pause in the proceedings at 11:28 a.m.)
22         (Further proceedings reported by Sharon Seffens
23      in Volume II.)
24                          -oOo-
25
```

1                              -oOo-

2

3                          CERTIFICATE

4

5           I hereby certify that pursuant to Section 753,

6    Title 28, United States Code, the foregoing is a true and

7    correct transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the

10   regulations of the Judicial Conference of the United States.

11

12   Date:  August 4, 2014

13

14

                            /s/ Debbie Gale
15                  _____
                    DEBBIE GALE, U.S. COURT REPORTER
16                  CSR NO. 9472, RPR, CCRR

17

18

19

20

21

22

23

24

25