1    **UNITED STATES DISTRICT COURT**

2    **CENTRAL DISTRICT OF CALIFORNIA**

3    **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4    – – – – – – –

5    UNITED STATES OF AMERICA,          )
                                        )    **CERTIFIED**
6            Plaintiff,                 )
                                        )
7        vs.                            )  No. 2:13-CV-0779-DOC
                                        )      Volume I
8    McGRAW-HILL COMPANIES, INC., and   )
     STANDARD & POOR'S FINANCIAL        )
9    SERVICES, LLC,                     )
                                        )
10           Defendants.                )
     _____)

11

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                  Hearing on Motions

16                Santa Ana, California

17              Tuesday, September 9, 2014

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141
24

25   13cv0779 McGraw-Hill 2014-09-09 V1

1    **APPEARANCES OF COUNSEL:**

2

     FOR THE UNITED STATES OF AMERICA:

3

4        OFFICE OF US ATTORNEY
         BY:  George S. Cardona
5            Chief Assistant United State Attorney
         312 North Spring Street
6        12th Floor
         Los Angeles, California 90012-4700
7        213-894-2434

8

         Anoiel Khorshid
9        AUSA - Office of US Attorney
         Civil Division - Federal Building
10       300 North Los Angeles Street
         Room 7616
11       Los Angeles, California 90012
         213-894-6086

12

13       James T. Nelson, Trial Attorney
         United States Department of Justice
14       P.O. Box 386
         Washington, D.C. 20044
15       202-616-2376

16

17

     FOR DEFENDANTS McGRAW-HILL COMPANIES, INC. and STANDARD &
18   POOR'S FINANCIAL SERVICES LLC:

19       John W. Keker
         KEKER AND VAN NEST LLP
20       710 Sansome Street
         San Francisco, California 94111
21       415-391-5400

22

         Jennifer L. Keller
23       KELLER RACKAUCKAS UMBERG ZIPSER LLP
         18300 Von Karman Avenue
24       Suite 930
         Irvine, California 92612
25       949-476-8700

1    **APPEARANCES OF COUNSEL (Continued):**

2

3        Floyd Abrams *(pro hac vice)*
         CAHILL GORDON AND REINDEL LLP
         80 Pine Street
4        New York, New York 10005
         212-701-3000
5
         Brian T Markley *(pro hac vice)*
6        CAHILL GORDON AND REINDEL LLP
         80 Pine Street
7        New York, New York 10157
         212-701-3000
8        bmarkley@cahill.com

9        Paven Malhotra
         KEKER AND VAN NEST LLP
10       710 Sansome Street
         San Francisco, California 94111
11       415-391-5400

12       Michelle S. Ybarra
         KEKER AND VAN NEST LLP
13       633 Battery Street
         San Francisco, California 94111
14       415-391-5400
         mybarra@kvn.com

15

16    FOR OBJECTOR TIMOTHY F. GEITHNER:

17

18       Nicholas C. Tompkins *(pro hac vice)*
         DEBEVOISE & PLIMPTON LLP
19       919 Third Avenue
         New York, New York 10022
20       212-606-6949
         ntompkins@debevoise.com

21

22

23

24

25

2:13-CV-0779-DOC – 9/9/2014 – Volume I

4

1                    **I N D E X**

2    **PROCEEDINGS**                              **PAGE**

3    Statements by Mr. Abrams                      17

4    Argument by Mr. Tompkins                      25

5    Argument by Mr. Cardona                       36

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            SANTA ANA, CALIFORNIA, TUESDAY, SEPTEMBER 9, 2014

 2                              Volume I

 3                           (9:55 a.m.)

 4            THE COURT:  All right.  Counsel on the S&P case,

 5   if you would come forward.  Good morning.

 6            We're on the record.  And, Counsel, would you be

 7   kind enough to state your names.  I certainly know you, but

 8   the record needs to record who's here.

 9            MR. CARDONA:  Good morning, Your Honor.  George

10   Cardona, Anoiel Khorshid, and James Nelson for the

11   government.

12            MR. KEKER:  Good morning, Your Honor.  John Keker,

13   Jennifer Keller, Floyd Abrams, and others on behalf of

14   Standard & Poor's and McGraw-Hill.

15            THE COURT:  Okay.  You're really here as a

16   courtesy so that I can extend to you any additional argument

17   concerning the redactions or the motions that have been

18   brought.

19            To begin with, I'll say to the government I think

20   you've done a relatively good job in terms of the requests

21   as it being work product, privileged information, or

22   irrelevant, quite frankly.  In other words, you played by

23   the rules basically.  There may be some slight disagreement,

24   but I can ferret that out once again in chambers.

25            I have to tell you that I'm not as impressed by
```

DEBBIE GALE, U.S. COURT REPORTER

1   the arguments concerning Mr. Geithner.  I think he's in a

2   far different position as a former public official in terms

3   of transparency, his notations -- where is his counsel?

4           Let me address you.  When you get into these

5   arguments -- I'm very impressed with you, young man -- I'm

6   not impressed with the arguments, so be prepared to argue in

7   just a few moments, not now, the following; and that is,

8   these original notes, et cetera, where we go into a book

9   publication are really falling on deaf ears as a draft and

10  why that should remain confidential.

11          Now, could I get my notes from you, Cynthia -- or

12  Ben.  I gave all my notes to him.

13          LAW CLERK:  I'll get 'em.

14          THE COURT:  So just be prepared -- a little bit

15  different position holistically right now, but some of that

16  may be privileged.  You're not out of the -- but a little

17  bit different position than the government.

18          And then I'd like to have a little bit of a

19  scheduling conference today.  I'd like to turn this into a

20  very productive meeting between the two of us.  I'd like to

21  inquire about some of the depositions, where you're at.  I'd

22  like to have that -- kind of a spit-and-growl session where

23  you're telling me what's going wrong.  I've got a few

24  thoughts, in looking at the way and who you're deposing, but

25  I want to hold those thoughts and see if we can be

1   productive.

2            I started to ask both special masters to be

3   present, and decided not to, today.  I didn't think I needed

4   their resources.

5            So let me turn to the government, and then let me

6   turn to counsel involving Mr. Geithner.

7            And so, Mr. Cardona, anything additional that

8   you'd like to add to the papers?  It's just your

9   opportunity.  And I've indicated to you so far I think most

10  of your positions are well-taken.

11           MR. CARDONA:  You know, if that's the case,

12  Your Honor, you know --

13           THE COURT:  Don't be too confident yet.  We

14  reverse ourselves.

15           MR. CARDONA:  I understand that.

16           I think, as Your Honor's recognized, I just wanna

17  make sure that we're all clear on the classifications, which

18  I think might help the Court just in terms of handling the

19  documents.

20           THE COURT:  Sure.

21           MR. CARDONA:  In that regard, Your Honor, given

22  some of what was in the defendant's reply papers, I have

23  just prepared an exhibit that kind of outlines the numbers

24  of documents and the different categories.

25           THE COURT:  Please.  Take your time with that.

```
 1          MR. CARDONA:  So if I could, I'd like to hand up
 2    what I've marked as Hearing Exhibit H-1.
 3          THE COURT:  Use the ELMO also.  We'll turn that on
 4    for you.
 5          (Exhibit distributed to counsel and the Court.)
 6          MR. CARDONA:  With that, Your Honor, I've
 7    exhausted the numbers of copies I've made, but -- so
 8    Your Honor gets a sense of this, obviously, in our
 9    investigation as a whole, we've generated -- I don't even
10    know the number of documents.
11          THE COURT:  Doesn't matter.
12          MR. CARDONA:  It doesn't.
13          From that, we identified approximately 1200 that
14    referenced S&P's negative rating actions.  The bulk of those
15    were produced without reductions.
16          THE COURT:  I think you have eleven hundred and
17    sixty-one to be exact.
18          MR. CARDONA:  Maybe something like that.  I
19    thought it was --
20          THE COURT:  Well, of one thousand sixty-nine
21    documents, 166 of those were redacted.
22          MR. CARDONA:  Yeah.  And then there were some
23    withheld.  So we have a total that were redacted or withheld
24    of 170.  That basically breaks down into three categories.
25          One category was e-mails circulating various press
```

1    articles, of which 94 were redacted for nonresponsive

2    information.  And of those 94, if you go down the column on

3    the left, S&P provided you with certain examples.  We've

4    provided the Court with unredacted versions of those

5    examples, so you can see the redactions we made.

6            There were 19 that were withheld as opinion

7    work-product.  We tried to be very sparse in our withholding

8    as opinion work-product, but we provided you with all 19 of

9    those.  We do believe they are core opinion work-product

10   that are either irrelevant to or would not assist the

11   defendants, and that was the basis for our withholding,

12   which we think is justified given the context of the case.

13           There were 52 documents that were e-mails

14   circulating what were various versions of questions and

15   answers, or FAQ's, that were prepared for senior DOJ

16   management when they announced the filing of this case.

17   Those were redacted for nonresponsive information.  We've

18   provided you with examples of those.  I think the Court can

19   see that what we redacted was really completely irrelevant

20   to S&P's claims.

21           Finally, there were the five documents that we

22   withheld in their entirety as opinion work-product.  We've

23   provided all five of those to the Court for the Court's

24   review in their unredacted form.  And again, I think that

25   review will show that, um, you know, they are core opinion

Case 2:13-cv-00779-DOC-JCG  Document 324  Filed 09/23/14  Page 10 of 45  Page ID #:7427
2:13-CV-0779-DOC 9/9/2014 - Volume I

10

1   work-product; they would not be helpful to the defense; and,

2   hence, that there is a valid basis for withholding them.  So

3   I think -- and I hope that this is helpful to the Court in

4   terms of seeing the categorization of the documents and how

5   we did the withholding.

6           I do think it was appropriate, um -- uh, you know,

7   bottom line is, you know, if we look at those documents, and

8   if you actually look at them, there is nothing in them, in

9   the redacted portions or in the withheld documents, to

10  support -- and, indeed, certain of the documents that we

11  have withheld as opinion work-product or redacted opinion

12  work-product, um, I think the Court can see would actually

13  support our arguments.

14          Now, nevertheless, by withholding them, we have

15  foregone reliance on them for that purpose, and we are

16  willing to abide by that.  Should the Court change that and

17  order to those disclosed, we would, of course, rely on

18  those.

19          Um, but with that -- you know, again, bottom line

20  is I think neither in the documents that we have disclosed,

21  the unredacted versions or in the redactions, is there

22  really anything that from our point of view would support

23  the defendant's motions.  We have nevertheless produced the

24  materials.  And we'll obviously be addressing the merits of

25  any further discovery at some later point in time, most

1    likely after the deposition of Mr. Checki, which they have

2    scheduled for September 16th, and which I assume is one of

3    the depositions we'll be discussing.

4            So, with that, I'll reserve my ability to respond

5    to anything that Mr. Keker may say -- or Mr. Abrams.  But I

6    don't have anything to add unless the Court has further

7    questions.

8            THE COURT:  No.  Let me just have a two-way

9    discussion with you.

10           Quote, you've stated that "The Department of

11   Justice affirmatively," quote, "recognizes that its

12   determination not to produce this redacted information to

13   S&P on grounds that it is opinion work-product will preclude

14   the United States from relying on this information to rebut

15   S&P's defense," end of quote.

16           I want to try to look down the line to August or

17   September of next year and, actually, the litigation for

18   just a moment and make very certain of what that means.

19           My greatest fear is that if you received an

20   adverse ruling or a partially adverse ruling by the Court,

21   that then you would seek to unredact -- which you're not, by

22   the way; I understand that, but I just want to be absolutely

23   clear about this -- that you would either seek to unredact

24   or bring a motion for reconsideration.  And ethically what I

25   cannot do is I can't rely on what may even be exculpatory

Case 2:13-cv-00779-DOC-JCG   Document 324   Filed 09/23/14   Page 12 of 45   Page ID #:7429
2:13-CV-0779-DOC 9/9/2014 - Volume I

12

1  information that the Department of Justice may have that you

2  truly believe, for instance, is work-product, choose not to,

3  for ethical and procedural reasons, to go against that even

4  though it might be very helpful to your position.

5           But at the time of trial, I want to make certain

6  that the other party isn't prejudiced by "now" any of this

7  information coming forward.

8           So what does this mean in terms of a trial?

9           MR. CARDONA:  It means --

10          THE COURT:  Does it mean that in rebuttal that you

11 are foregoing the use of this information regardless of

12 what's said?

13          MR. CARDONA:  We are foregoing use of these

14 documents from which we have redacted that information.

15          THE COURT:  Throughout the trial?

16          MR. CARDONA:  Yes.

17          THE COURT:  You don't know -- well, whatever that

18 defense is that S&P's going to put before the jury, that

19 means that these document will not be used.

20          MR. CARDONA:  The documents will not be used, you

21 know, there is information in those documents that we might

22 present in a different way, but we would not be using these

23 documents.

24          In other words, if -- if we get to trial, and if

25 we have --

Case 2:13-cv-00779-DOC-JCG   Document 324   Filed 09/23/14   Page 13 of 45   Page ID
#:7430
2:13-CV-0779-DOC 9/9/2014 - Volume I

13

```
 1            THE COURT:  Let me give you an example.

 2            MR. CARDONA:  Yes.

 3            THE COURT:  I understand Mr. West has left the

 4    office.  And, hypothetically, there's correspondence between

 5    Mr. West and Mr. Holder about a certain subject.  Okay?  S&P

 6    doesn't have these documents at this time.  And they got

 7    caught flatfooted.  By that, there's something exculpatory

 8    that the Department of Justice has.  And here comes Tony

 9    West.

10            Now, the documents -- technically, you've abided

11    by your ethics; you've made a correct representation -- but

12    now Mr. West is on the stand.  And that's what I'm fearful

13    of, the different way.

14            In other words, I'm almost going to preclude -- I

15    want the rules very finite here.  I'm probably going to

16    preclude that kind of testimony, even in light of, you know,

17    S&P bringing a defense.

18            And do you really want to be in that position,

19    because some of this is very helpful to you?

20            MR. CARDONA:  Yes, Your Honor.  And I don't think

21    we either want to or should be in that position.  In other

22    words, at this point in time, the question is, is there a

23    basis for Court ordering the discovery of the documents?

24    And for the reasons we've indicated, we don't believe there

25    is.
```

Case 2:13-cv-00779-DOC-JCG Document 324 Filed 09/23/14 Page 14 of 45 Page ID #:7431
2:13-CV-0779-DOC 9/9/2014 - Volume I

14

```
 1            THE COURT:  At this time.

 2            MR. CARDONA:  In addition, I anticipate that there

 3   will come a time in the very near future when we will be

 4   again moving the Court to preclude further discovery with

 5   respect to the defense and to basically preclude that

 6   defense from going forward to trial.  In the course of those

 7   motions, we will not be relying on this work product.  We

 8   would not rely on testimony of the type you've indicated.

 9            Were we to lose that motion and were this to go to

10   the merits at trial, if we had to present testimony at

11   trial, there would be a possibility that we would call

12   witnesses to rebut that.  In your hypothetical, there is at

13   least a potential that we might make an election, for trial,

14   to call Mr. West.

15            If, in fact, that were the determination, at some

16   point prior to trial I think the rules of discovery would

17   change and at that point we might have to disclose the

18   documents, but our anticipation would be that that would be

19   sufficiently in advance of trial --

20            THE COURT:  Okay.

21            MR. CARDONA:  -- that it would not come as a

22   surprise or a shock to the defendants.

23            THE COURT:  Now, that's what I'm anticipating

24   also.  I'm not anticipating that this will occur, but I'm

25   trying to play out different scenarios in my mind and look
```

 1    ahead.

 2            In my own mind, I didn't think I wanted to put the

 3    government in the position of giving me a finite witness

 4    list now.  I think when courts do that, we have the

 5    inclination to hold to that list and accuse you of bringing

 6    a new witness, and the defense says "surprise."  I'm

 7    probably not going to ask for that until February –– the

 8    minimal amount of time so you have a chance to really sort

 9    out who those witnesses are that best present your position.

10    And I haven't asked S&P what their defense is, nor would I.

11            But I think that you and S&P should be forewarned

12    that this ruling today, if it's favorable to you, doesn't

13    close the door.  I'm going to have a little bit better idea

14    of what your presentation is when I see that witness list,

15    which is not what I'm requiring now.  And I think I can make

16    a little bit better decision, and I've got time to reopen

17    that door if necessary, if S&P receives an adverse ruling.

18            But I'm kind of putting you on notice that this

19    can't be in front of the jury.  This can't be where I hold a

20    sidebar, that this comes up, that I send the jury home for a

21    day or two.  That's when you're going to get preclusion.

22    And you're going to say, "Judge, that's not fair because

23    this came up in S&P's defense, and we have the right to

24    present it because witness X said this."

25            What you're going to find is a Court that comes

```
 1   back and says, "You know, if this would have come up in
 2   March or April, no problem," Mr. Cardona.
 3           MR. CARDONA:  No.  I understand that.  And I
 4   anticipate that there will be further litigation on this
 5   defense.  And to be blunt, so that the Court knows where
 6   we're going, um, we don't believe that this defense, even if
 7   the Court allows it to go forward, should be one that's
 8   presented in front of the jury.
 9           Our position is that it's one that's appropriately
10   heard by the Court, if the Court finds that there is a basis
11   for hearing it.
12           THE COURT:  You may be right.  But you may be
13   wrong.  And I've gotta plan if you're right what do I do and
14   if you're wrong what do I do.
15           MR. CARDONA:  Understood.
16           THE COURT:  Right now, I've got to hypothetically
17   assume that you're wrong so I play out the worst- or
18   best-case scenario because when I get the public in here
19   we're not gonna have sidebars.
20           MR. CARDONA:  Understand that, Your Honor.
21           THE COURT:  If I have a surprise, and you're
22   controlling discovery and making representations, the ruling
23   will go against you.
24           MR. CARDONA:  Understand.
25           THE COURT:  Okay.  As long as we have the rule
```

Case 2:13-cv-00779-DOC-JCG  Document 324  Filed 09/23/14  Page 17 of 45  Page ID #:7434
2:13-CV-0779-DOC  9/9/2014 - Volume I

17

1    straight, that way there's no -- Okay.

2         Okay.  You're welcome to add anything that you'd

3    like to, to your arguments and the papers.  And, by the way,

4    we've already reviewed the documents and gone through the

5    documents.  We can probably hand down rulings today but I

6    wanted to make sure each of you'd had your say.

7         MR. ABRAMS:  Your Honor, I'm Floyd Abrams for S&P.

8         THE COURT:  Pleasure.

9                    **STATEMENTS BY MR ABRAMS**

10        MR. ABRAMS:  I did want to point out a few things.

11        One, you have not been provided with all the

12   documents.  There's no wrongdoing in that.  I'm just saying

13   that, for example, of the 95 documents that have redactions

14   on them, you've been provided with only four by the

15   government.

16        So if -- if you are going to make the decision on

17   a sort of page-by-page or item-by-item basis, I think it

18   would be good for you to have everything in front of you.

19        Our view, as you know, was that we, in the first

20   instance, with whatever knowledge we have of our case, would

21   be best placed to have a first shot at that.  If Your Honor

22   is undertaking that, I would certainly urge you to have

23   before you all of the materials that are at issue here.

24        Now, obviously, we're in the position of not

25   knowing what we don't know.  We don't know what's in the

Case 2:13-cv-00779-DOC-JCG  Document 324  Filed 09/23/14  Page 18 of 45  Page ID #:7435
2:13-CV-0779-DOC  9/9/2014 – Volume I

18

1   redactions.  So from -- from our perspective, we come to you

2   saying, "Look, when we read what we do have, and we see a

3   set of e-mails that say that there's -- that, 'There has

4   been a downgrade.  Let's have a meeting on Friday,' we're

5   very interested in everything that that -- that could be

6   contained in the document."

7          If Your Honor has read the document, Your Honor's

8   gonna make a ruling on that.  That's obviously well within

9   your power to do.  I'm just pointing out from our

10  perspective the overview that we take of the material that

11  we have received from the government.  And the reason we

12  think its important that we have as much of an opportunity

13  as possible to see what we haven't seen, uh, is that we

14  think the documents we have seen do show, at the least, that

15  key lawyers in the department exchanged e-mails, which

16  mocked -- at the least, mocked the methodology of S&P in

17  engaging in the downgrade, proposed meetings to discuss the

18  downgrade, sent each other articles about the downgrade in

19  which they wrote things we cannot know, but wrote -- wrote

20  various things.  So we obviously think that, in making our

21  case to you when that day comes, it could be of significant

22  value to us to be able to fill in those blanks.

23         But, in any event, certainly, if Your Honor is

24  gonna make those decisions, I think you must have before you

25  all the documents at issue.  And at this moment you don't.

Case 2:13-cv-00779-DOC-JCG  Document 324  Filed 09/23/14  Page 19 of 45  Page ID
#:7436
2:13-CV-0779-DOC 9/9/2014 - Volume I

19

```
 1            The sort of document that I'd like to just devote

 2    a few minutes to are the ones described by Mr. Cardona as

 3    "opinion work-product."  As regards opinion work-product, we

 4    think the law is really clear that, to the extent that what

 5    is at issue is mental impressions -- why the department did

 6    things -- that there is a compelling need for us to have

 7    responsive documents.  Now, if they're not responsive --

 8    that is to say, if they don't speak at all to what our

 9    affirmative defense is about, that's something else.  We

10    just can't know that.

11            But I am saying that -- to take one example They

12    have not produced at all to us -- that is to say, they've

13    not even given us a redacted version of the following:

14            They interviewed a senior Standard & Poor's

15    official.  He was not employed in 2007 or 2008.  So at the

16    time of the alleged wrongdoing of "I" S&P.  So he knows

17    nothing of that.  They had -- and this comes from

18    Mr. Nelson's affidavit -- they had, when they interviewed

19    him, an internal document, a consultant's report prepared

20    for S&P about the downgrade.  They have told us -- very

21    candidly told us that they have three sorts of documents

22    resulting from that interview:

23            One, were questions they had prepared; Two, were

24    notes that they wrote of the Q&A's; and, three, was a

25    summary.
```

1          And they said all three of those contained what we

2     and they have defined as responsive documents, responsive in

3     the sense that we've asked for all documents that they have

4     from the FIRREA investigation which referred to the

5     downgrade.

6          So they've told us -- in Section 5(a) of

7     Mr. Nelson's affidavit, they've told us that they have, in

8     all three of these categories, responsive material.  Their

9     position is they are opinion work-product.

10          Our position is, based on the *Holgrum (phonetic)*

11     case and the *Roberts* case -- other cases we've cited to

12     you -- is that one of the real exceptions to the notion of

13     opinion work-product arises in situations where what is at

14     issue is state of mind.

15          We've cited cases involving prosecutors who had to

16     testify about their state of mind.  We're not talking about

17     testimony today, but -- but the law, as we understand it,

18     and in the cases that we've cited to you say that, yes, we

19     understand that opinion work-product is a very protected

20     sort of material.  But not in a situation in which the

21     mental state of the party who has prepared the work-product

22     is center stage, as it is here, and where the need is

23     compelling, as we would argue to you it is here.

24          How can we best have a shot at being able finally

25     to present to you our best case as to why the government

```
 1    proceeded against only Standard & Poor's and no one else?

 2    And it was a coincidence that only Standard & Poor's

 3    downgraded the United States?

 4              So we find ourselves being told the following:

 5              "Yes, we have these documents.  We have questions

 6    prepared.  We have interview notes, and we have a summary.

 7    And all of them are," quote "responsive," unquote.  "But we

 8    don't give you any of them or even any part of them because

 9    it's opinion work-product."

10              And our view is that, as to those, and others

11    cited in our brief for similar reasons, that we have

12    overcome the opinion work-product defense, as it were, the

13    protective barrier, as it were, that they've cited.  And so

14    we should have a chance to review those.

15              We have the same view with respect to 19 other

16    documents that they have identified as subject to the same

17    privilege, not just work-product, but attorney opinion

18    work-product.

19              To be very clear, they've turned over a lot of

20    work product.  They've been very candid about it.  We asked

21    for it.  They said, correctly, that your order is your order

22    to turn over relevant materials bearing on the affirmative

23    defense.  And then that has happened.

24              But they have not turned over 19 other documents

25    in addition to the ones I've just mentioned, which have
```

 1   comments written by Mr. Khorshid, counsel here.  The article

 2   that is being sent back and forth is about nothing less than

 3   the objectivity of S&P in doing the downgrade.

 4            So what do we know, as counsel?  We know they have

 5   that article.  They sent it around.  Counsel wrote something

 6   on it.  We don't know what he wrote on it.  And they tell

 7   us, yes, it's responsive in the sense that our document

 8   demands asked for whatever you've got, which has two

 9   qualities to it:  One, part of your FIRREA investigation;

10   and, two, deals with the downgrade.

11            So we think there are two -- again, I don't think

12   what's there.  All I'm saying is that to the extent there is

13   responsive material -- and they've said that there is -- we

14   think we're entitled to it.  And we think that, to make the

15   best showing to you when that day comes as to what the

16   government's motivation was, it's especially relevant,

17   particularly relevant to have material which may indeed show

18   their state of mind so long as the state of mind has

19   something to do, at least, potentially, with the downgrade.

20            So we argue to let us see those documents.  Or, if

21   Your Honor, himself, reviews them, to review them bearing in

22   mind how potentially relevant material of this sort could

23   be.

24            There's one more whole area that I'll simply refer

25   to, which is the materials that they have not logged at all.

Case 2:13-cv-00779-DOC-JCG  Document 324  Filed 09/23/14  Page 23 of 45  Page ID #:7440
2:13-CV-0779-DOC 9/9/2014 – Volume I

23

1   And that's material within the Department of Justice or

2   within Treasury as to which they are not claiming some sort

3   of Executive privilege, but either went to or from the

4   Executive.  Could have come from DOJ unsolicited to the

5   Executive.  That's not privileged on any theory of

6   Presidential privilege.

7          Well, what they've done is to basically say, "Even

8   if we have it -- even if we have material" -- and they say,

9   basically, "We haven't looked" -- "We found two examples,"

10  they say, "But we haven't taken a serious look," our view's

11  that you ought to order them, as regards material within the

12  Department of Justice and/or within the Department of

13  Treasury and as to which they're not claiming Executive

14  privilege, to turn it over to us.

15         And for them to say, "Well, we haven't looked at

16  them because it could be subject to Executive privilege," we

17  think is unacceptable and basically unfair to us.  I mean,

18  we're the ones, again, who don't know what's in the

19  documents we haven't seen.

20         But as regards that sort of material, material

21  reposing -- if they are there -- documents reposing in the

22  DOJ or in the Department of Treasury, which they're not

23  prepared to say are privileged, and they are responsive, we

24  think that we're entitled to them.  And as to that, they

25  have not given you anything -- there's nothing for you to

Case 2:13-cv-00779-DOC-JCG   Document 324   Filed 09/23/14   Page 24 of 45   Page ID
#:7441
2:13-CV-0779-DOC  9/9/2014 - Volume I

24

```
 1   read because they have chosen not to look for the documents
 2   which could indeed be particularly relevant in this area.
 3           Finally, as regards to the same sort of material,
 4   we've also urged on you that, to the extent that DOJ has or
 5   Treasury has material that they think might be -- that is
 6   responsive -- we're only talking about responsive
 7   material -- to the extent they have material which is
 8   responsive, that -- uh, and as to which they think they may
 9   claim Executive privilege -- at least to log it so we can
10   start the process of seeing where we go from there.
11           We're not asking for anything that reposes in the
12   White House at this time.  We're not asking for anything
13   that is anywhere else than in the Department of Treasury and
14   in the DOJ itself.  And we're only asking for material which
15   is responsive to our requests.
16           And, again, we think, just as a matter of basic
17   fairness in preparing our submission to you with respect to
18   this defense, that we should have that material.  And --
19   and, in particular, we should have that material to the
20   extent that they're not claiming any privilege as to it.
21   The idea that they won't look even for material which is
22   unprivileged simply because at some point or other it went
23   one way or the other to the -- to the Executive branch or to
24   the White House seems to us unacceptable.
25           Finally, I won't add anything to what Your Honor
```

DEBBIE GALE, U.S. COURT REPORTER

Case 2:13-cv-00779-DOC-JCG  Document 324  Filed 09/23/14  Page 25 of 45  Page ID
#:7442
2:13-CV-0779-DOC  9/9/2014 - Volume I

25

 1   has said about former Secretary Geithner.  We think that

 2   your earlier ruling governs the matter before you now.  We

 3   think that, even if this were a closed case -- and we really

 4   don't think it is -- that, in a situation in which somebody

 5   writes a sort of tell-all book about his situation in the

 6   department, and we asked for materials bearing on our

 7   motion, bearing on our affirmative defense, that -- that for

 8   him to say to you now that's either private or "I'm entitled

 9   to my own, uh, thoughts about it," simply doesn't hold

10   water.

11           Thank you, Your Honor.

12           THE COURT:  Mr. Abrams, thank you very much.

13           I'm going to ask you a few questions in a moment,

14   but I want to hear from Mr. Geithner's counsel for a moment.

15   Then I'll come back.

16           MR. TOMPKINS:  Thank you, Your Honor.  Nick

17   Tompkins on behalf of Mr. Geithner.

18           THE COURT:  Pleasure.  How are you today?

19           MR. TOMPKINS:  Good.  Thank you.

20               **ARGUMENT BY MR. TOMPKINS**

21           MR. TOMPKINS:  I'd like to start by responding to

22   actually the point that Mr. Abrams just ended with, and one

23   of the points that Your Honor raised initially.  Um, and

24   I -- I think it's actually important to emphasize that S&P's

25   motion has entirely to do with nonresponsive materials.

```
 1          Your Honor suggested that Mr. Geithner might be in
 2   a different situation than the government with regard to
 3   protecting his materials.  Um, but Mr. Geithner has fully
 4   produced all responsive material S&P's –– or what we're ––
 5   what we're talking about with S&P's motion here is
 6   nonresponsive material that happens to be included in the
 7   same documents.
 8          And with regard to Mr. Abrams' point about
 9   publishing a tell–all book, these internal notes and kind of
10   raw materials for the book go far beyond what Mr. Geithner
11   ultimately decided to put into the book.  Everything in his
12   raw book material as related to S&P has been produced.  None
13   of that has been held back.  So what we're talking about
14   here are documents in which he is going through –– excuse
15   me –– materials in a book chapter or his notes on various
16   topics, or interview transcripts where he did with his book,
17   collaborators where he happens to touch on S&P very briefly
18   or in an aside or in a passing reference, or the fact of the
19   downgrade.  But the vast majority of the documents have to
20   do with entirely unrelated aspects of his government
21   service.
22          Um, some aspects of those made it into his book,
23   but many of those did not at all.  Uh, some of those
24   discussions include what we would, uh, consider to be kind
25   of confidential and private discussions, including with a
```

Case 2:13-cv-00779-DOC-JCG  Document 324  Filed 09/23/14  Page 27 of 45  Page ID #:7444
2:13-CV-0779-DOC 9/9/2014 - Volume I

27

 1     President, including policy determinations that, again, have

 2     nothing whatsoever to do with "S" or -- S&P or the S&P

 3     downgrade.

 4              So what S&P's position is -- because these

 5     materials include some limited reference to S&P, they're

 6     necessarily entitled to discovery of everything else that's

 7     in there.  And what I would submit to you, Your Honor, is --

 8     is you referenced transparency earlier.  And Mr. Geithner,

 9     as a former Secretary of the Treasury, has been nothing but

10     transparent in his production of the materials that actually

11     relate to S&P.  All that we're asking for here is protection

12     of the non-S&P-related materials.

13              And one final point.  I think, uh, Mr. Abrams said

14     that Your Honor's prior ruling controls.  On that point, you

15     know, we -- we put in front of you, the last time around,

16     some authorities that we think show solicitude for

17     protecting internal thoughts of former high-level

18     officials -- I think, in the contents of seeking to quash

19     S&P's subpoena entirely.

20              Your Honor allowed S&P to take discovery, to test

21     their claims.  And we produced material in response to that.

22     All that we're saying here is that, where Mr. Geithner has

23     produced the material that S&P is entitled to, uh, some

24     solicitude for protecting his private thoughts on his time

25     and service in government that has nothing to do with S&P is

 1  worthy of protection.

 2       Uh, that's all I have to say at this point.  I --

 3  if Mr. Abrams has a response, I may wish to say something

 4  further.  But other than that --

 5       THE COURT:  Why don't --

 6       MR. TOMPKINS:  -- I'd be happy to answer any

 7  questions that you have.

 8       THE COURT:  Why don't we have a conversation for a

 9  moment before we turn back to the government.

10       In my previous order, if you noticed, I worded it

11  very specifically.  I'm going to read a portion to you.

12       "Protected by the privileges that

13        especially attach to the Executive

14        Office of the President."

15       In other words, I was very concerned about

16  intruding into the White House.  And the reason for that was

17  the *Cheney* case.  I pointed out the judiciary is forced into

18  a very difficult task in balancing the need for information

19  in a judicial proceeding against the Executive's Article II

20  progressives.

21       But, holistically, I don't think that applies to

22  the Executive branch.  I said "the Executive Office of the

23  President," and I did that for a reason.

24       And let's get one thing set aside; and that is,

25  nonrelevant material isn't going to be disclosed to S&P.  It

 1    has to be related to this lawsuit and S&P.  So that's why

 2    we're having the *in camera* proceeding.  I can assure you, if

 3    Mr. Geithner shared that he was going to plant roses or

 4    talked about a different branch of the government with the

 5    President, that isn't forthcoming.

 6           But it appears to me holistically that the rulings

 7    are going to go strongly in S&P's favor concerning

 8    transparency, including thoughts that Mr. Geithner had that

 9    go into his book, that didn't go into his book.  And I say

10    to you, you've been exemplary.  Your client's been

11    exemplary.  You've turned over information.

12           But I want to tell you, quite frankly, that I

13    agree with Mr. Abrams, tentatively, subject to your

14    arguments today, that a former official in our government

15    who rightfully decides to publish a book that you can buy

16    over at Costco, by the way -- I resisted buying it just so I

17    didn't have a conflict -- it's a little difficult for me to

18    take with any seriousness an argument that the notes that

19    weren't included, if they pertain to S&P, or thoughts about

20    S&P wouldn't be divulged to S&P.

21           MR. TOMPKINS:  Yes.

22           THE COURT:  I want you to push back now and

23    explain to me why I'm wrong.

24           MR. TOMPKINS:  I'd be happy to, Your Honor.

25           On the last point, once again, no notes that

Case 2:13-cv-00779-DOC-JCG  Document 324  Filed 09/23/14  Page 30 of 45  Page ID
#:7447
2:13-CV-0779-DOC  9/9/2014 – Volume I

30

1    relate to S&P have not been produced to S&P.

2              THE COURT:  I know that.

3              Now that's not what I said, though.  We've already

4    covered that.

5              MR. TOMPKINS:  Okay.

6              THE COURT:  Those notes that were produced, if

7    they weren't put in the book, you're still arguing are

8    privileged.  And I strongly disagree with that.

9              MR. TOMPKINS:  No.  Sorry.  We may have a

10   misunderstanding.

11             We are not asserting privilege over any aspect of

12   Mr. Geithner's materials.  Our redactions have been based

13   entirely on nonresponsiveness.

14             And so, to go to your -- to your point that you

15   raised just a minute ago about the *Cheney* case, um, the case

16   law that we're citing doesn't go to the Executive, uh --

17   Office of the President.  The case law that I was referring

18   to, and that is in our paper, is the *Morgan* line of cases,

19   which protects high-level officials and former high-level

20   officials from all branches of government from having to

21   divulge their internal thinking about their time in office,

22   unless there is a demonstrated showing of need.  And --

23             THE COURT:  And that's what I'm having a difficult

24   time --

25             MR. TOMPKINS:  So my position on that, Your Honor,

```
 1    is the -- the showing of need that I think S&P demonstrated,

 2    that Your Honor allowed them to have discovery on

 3    previously, was to have, um -- to have discovery that

 4    related to their retaliation claim and to have discovery

 5    that was responsive to S&P.

 6           Um, they have no showing of need.  I don't think

 7    they could make any demonstration of need for materials that

 8    happen to be in the same document that relate to things

 9    other than S&P.

10           And -- and just to drive the point home:  You

11    know, some of these documents, uh, are very long.  They jump

12    around on different topics.  You know, Mr. Geithner was

13    pulling together his thoughts on various aspects of his time

14    in service.  And I think you can see in -- for example, in

15    two of the notes documents that we've presented to you, it's

16    many pages which are essentially him pulling together his

17    thoughts on various different aspects of his time in

18    Treasury.  And there's, you know, two bullet points about

19    S&P that are scattered there.  But the rest of the document

20    has nothing to do with it.

21           The argument we're making is we are fully prepared

22    to and have given S&P everything that they need to -- to --

23    uh -- to advance their defense from Mr. Geithner's

24    materials, but that the *Morgan* line of cases, um, and

25    frankly, just -- just the -- excuse me -- the *Morgan* line of
```

1    cases supports that there should be some solicitude for not

2    having to turn over the rest of his materials that have

3    nothing to do with their defense and for which they can show

4    no need whatsoever.

5              THE COURT:  Well, I agree to the latter, but not

6    the former.

7              So if there's no need, there is no reason.  If

8    it's irrelevant, there's no reason.  If it's a discussion

9    about another department unrelated to S&P, there's no

10   reason.  That's why we're having the hearing.

11             But Mr. Geithner produced 42 responsive documents,

12   each had extensive redactions which were purportedly

13   nonresponsive information.  This Court has the unredacted

14   versions of the documents that it's examined *in camera*.

15             You've argued, quote:

16             "A large portion of his product -- or

17             production consisted of raw, unpublished

18             materials related to his recent book" --

19             This is the quote from Secretary Geithner, really

20   from you --

21             "-- which contained a limited number of

22             isolated references to S&P or the fact

23             of the S&P downgrade scattered among

24             extensive discussions of various topics

25             unrelated to S&P's requests."

DEBBIE GALE, U.S. COURT REPORTER

```
 1            I may agree with you that those unrelated areas
 2   have no relevance and there's no reason for -- to turn those
 3   over for the titillation of Mr. Abrams or S&P.  They're not
 4   relevant.  That's why we're having the in camera proceeding.
 5            But I'm not going to permit unilateral redactions,
 6   unless it serves a legitimate and important interest.  And
 7   so, on the other hand (sic) of that coin that you may be
 8   resisting -- but I'm not certain because you're mixing two
 9   different areas in your argument -- you've gestured towards
10   the proprietary interest and privacy concerns in your
11   documents.  You've thrown that argument to the Court.
12            And I caution you that, while indeed Mr. Geithner
13   is, in fact, a private citizen at this time, um, and has
14   privacy concerns, I think any risk is remote, given that all
15   the produced discovery is subject to a protective order to
16   begin with.  And, although he's a private citizen now and
17   the courts have recognized the need to shield high Executive
18   officials from cumbersome discovery demands -- especially
19   when they're in offense, which is Morgan -- I think the
20   Supreme Court's also rightfully -- well, I don't think they
21   care if I think that they're right or not, but they've cited
22   that the public has the right to every man's evidence.  And
23   I think that fundamental maxim would have to be rendered
24   meaningless if a former executive or official could with one
25   hand withhold information implicated in a case of
```

Case 2:13-cv-00779-DOC-JCG  Document 324  Filed 09/23/14  Page 34 of 45  Page ID #:7451
2:13-CV-0779-DOC  9/9/2014 - Volume I

34

```
 1    significant public importance.  And I can't imagine a more
 2    public importance to millions of people who had homes
 3    foreclosed upon, or the debacle of this last downturn, or
 4    the ability to not have that occur, while, on one hand,
 5    Mr. Geithner rightfully chooses or wrongfully chooses --
 6    it's not my business -- to literally collect money from the
 7    sales of a book containing much of the same information.  So
 8    that's where your argument falls on deaf ears.
 9           I'm going to give you one more opportunity to push
10    back on that because you did throw at me the privacy
11    concerns of Mr. Geithner.  And while I agree with you that
12    irrelevant material isn't Mr. Abrams' or S&P's concern, I'm
13    going to be pretty expansive and pretty liberal in terms of
14    disclosing when a former official of our government decides
15    to go out and sell books -- which is fine -- and proclaim
16    all of the good things that he's done to prevent the debacle
17    or help this country, which he well may have done, and then
18    to throw at me this privacy argument that you threw at me in
19    the papers, that I don't agree with.
20           MR. TOMPKINS:  Certainly, Your Honor.
21           I think, again, it bears noting that certain of
22    these documents, including conversations that Mr. Geithner
23    had with his book collaborators -- um, even some of the
24    draft books, include discussions of his personal
25    relationships, including --
```

     1            THE COURT:  No, no.  You're dancing with me now.

     2            I said "S&P."  I'm not interested in his personal

     3   relationship, whether he's growing roses in his garden.

     4            I'm interested if he had a conversation with his

     5   book publisher about anything to do with S&P.  And whether

     6   he published it or not, I really don't care.

     7            MR. TOMPKINS:  All of those materials have been

     8   provided to S&P.

     9            THE COURT:  Okay.  Every one of 'em?

    10            MR. TOMPKINS:  Yes.

    11            THE COURT:  Okay.

    12            MR. TOMPKINS:  All of the responsive references in

    13   Mr. Geithner's book materials have been produced to S&P.

    14   We, in response to S&P's motion, gave you -- gave the Court

    15   for *in camera* inspection just four of those documents, which

    16   were the four that they had challenged.  There's a

    17   relatively small universe of 42 documents in total.

    18            We would be happy to put any or all of them in

    19   front of Your Honor, in front of the special masters.  I

    20   think we're confident that --

    21            THE COURT:  I'll do my own work.

    22            MR. TOMPKINS:  Okay.

    23            THE COURT:  I want them in front of me.

    24            MR. TOMPKINS:  Okay.

    25            THE COURT:  All right.  Special masters are for

Case 2:13-cv-00779-DOC-JCG  Document 324  Filed 09/23/14  Page 36 of 45  Page ID
#:7453
2:13-CV-0779-DOC 9/9/2014 - Volume I

36

 1    depositions.  They're not for this.

 2            Okay.  I'll come back to you.  We're gonna have

 3    two rounds.  Okay?

 4            MR. TOMPKINS:  Thank you, Your Honor.

 5            THE COURT:  Thank you very much.

 6            Counsel, Mr. Cardona.

 7                     **ARGUMENT BY MR. CARDONA**

 8            MR. CARDONA:  Your Honor, a couple of quick

 9    points, and I'll start where Mr. Abrams started with the

10    opinion work-product.

11            I just wanna make clear all of the documents that

12    we either redacted or withheld on the basis of opinion

13    work-product we have provided you already with unredacted

14    versions.  You can --

15            THE COURT:  Right.

16            MR. CARDONA:  -- see those.  And I think, when you

17    look at those, you hopefully will agree with us that that's

18    proper.

19            You know, for example, to take the interview

20    report that Mr. Abrams talked to -- we've given you the

21    report, the notes, and the memo -- you can see that there

22    are very isolated references in the context of an interview,

23    who was at S&P during that time period; and, hence, it was

24    just simply relevant to his experience there.  It says

25    nothing about this case, what was going on, um -- and you

Case 2:13-cv-00779-DOC-JCG  Document 324  Filed 09/23/14  Page 37 of 45  Page ID
#:7454
2:13-CV-0779-DOC  9/9/2014 – Volume I

37

 1   can see that.  I don't think there's any basis for requiring

 2   us to disclose that.

 3          The same with the other matters that we withheld

 4   as opinion work-product.  So there you've got everything.

 5          The other redacted documents, uh, the vast bulk of

 6   the documents were, in fact, redacted for nonresponsive

 7   information.  In other words, we've provided S&P with

 8   everything that we believe is responsive.  We redacted only

 9   the information that we believe had nothing to do with their

10   claims.

11          For those we only gave you, as did Mr. Geithner --

12   we only provided you with the unredacted versions of the

13   examples that they cited in their pleadings.  Um, we are

14   happy -- and I have available here if -- if Your Honor wants

15   them -- we are happy to provide you with all the doc- --

16   unredacted versions of all of the documents that we redacted

17   on nonresponsiveness for the Court's review.  I think the

18   review will show, as with the examples, that what we

19   redacted was, in fact, nonresponsive information.  But we

20   are happy to make those available to the Court if the Court

21   wants to look at those.

22          Um, so let me turn, then, to the Executive Office

23   of the President, the other point that was raised.  And we

24   did understand your Court -- the Court's order as being

25   limited to protecting the Executive Office of the President.

Case 2:13-cv-00779-DOC-JCG   Document 324   Filed 09/23/14   Page 38 of 45   Page ID #:7455
2:13-CV-0779-DOC 9/9/2014 – Volume I

38

```
 1    But I think there's an important point there.  And, in part,
 2    I will explain the searches we did, what we found.
 3              In other words, we have run searches within both
 4    DOJ and Treasury –– two cabinet–level offices within the
 5    Executive branch.  We have run searches within those offices
 6    for subject–matter specific documents; that is, documents
 7    relating to the downgrade.
 8              And in the course of those searches, we identified
 9    a very small set of documents that came out that we believe
10    relate to communications with the Executive Office of the
11    President.
12              Those documents, that limited subset –– I believe
13    there's one in the Treasury set and four or five that DOJ
14    found that we noted in our opposition –– those –– that very
15    limited subset of documents, we neither logged nor produced
16    because they relate to the Executive Office of the
17    President.
18              What we did not search for, and what we have told
19    S&P and what we told the Court previously we would not
20    search for is, a number of their document requests
21    specifically asking for communications between, for example,
22    Mr. Geithner and various identified persons within the
23    Executive Office of the President.  We did not ask the
24    Executive Office of the President to search on their side
25    for those e–mails, and we believe we should not be required
```

Case 2:13-cv-00779-DOC-JCG   Document 324   Filed 09/23/14   Page 39 of 45   Page ID #:7456
2:13-CV-0779-DOC 9/9/2014 – Volume I

39

1    to search on Treasury's side for what is essentially that

2    same e-mail that just happens to reside on Treasury's

3    server, as opposed to the Executive Office of the

4    President's server.

5              It's the same document.  It's "e-mail" back and

6    forth.  The fact that it's located in Treasury as opposed to

7    the Executive Office of the President, we would submit,

8    under *Cheney* doesn't make a difference.  The interest is the

9    same.

10             And to support that, in fact, *Cheney* addressed not

11   just discovery of documents within the Executive Office of

12   the President, but documents that implicated Executive

13   Office of the President concerns in the possession of other

14   cabinet-level officials.  Indeed, the discovery requests in

15   *Cheney* were addressed to both the Executive Office of the

16   President and to certain senior government officials in

17   other cabinet-level agencies related to their communications

18   with the Executive Office of the President.

19             THE COURT:  What happens if -- and hypothetically,

20   I don't know -- Mr. Geithner publishes a book in which he

21   makes certain statements and there were e-mails that

22   contradicted that?  Now, this is just a hypothetical.  I

23   don't mean to infer in any way that that occurred.  But I've

24   got to think ahead.

25             So I'm very careful in terms of, quote/unquote,

 1  the Executive Branch, referring to the President, and the

 2  White House.  Very cautious.  I think the courts are very

 3  wise when they look at separation of powers to watch where

 4  we tread in terms of our other branches of government.

 5          But, by the same token, if there's an e-mail

 6  within Treasury directed to a White House official, and it

 7  contradicts what Mr. Geithner is saying in a deposition, or

 8  adds a different flavor, while I understand the privilege,

 9  there it would seem that there's a very strong argument that

10  S&P would have for the disclosure on that Treasury side,

11  although there's overlap into the White House.

12          How would I deal with that?

13          MR. CARDONA:  And, Your Honor, again, given your

14  hypothetical, I don't necessarily disagree, but I think it's

15  important that we step back for one second because I think

16  the Court's original order correctly foresaw that this was

17  going to have to be a phased process that we --

18          THE COURT:  Now let's not go any further.

19          It is going to be --

20          MR. CARDONA:  Right.

21          THE COURT:  In other words, I -- notice, I never

22  ordered that.

23          MR. CARDONA:  Right.

24          THE COURT:  I'm waiting to see what your

25  depositions show.  I'm probably waiting till January so I

```
 1    have a better flavor.  I'm just raising these hypotheticals.
 2           MR. CARDONA:  And I think that hypothetical is one
 3    that would come as we move down the phases.  In other words,
 4    we're now at a point where we've produced some documents.
 5    S&P has them --
 6           THE COURT:  Now I'm going to interrupt you.  I
 7    apologize.
 8           We're at a deposition, got a special master
 9    sitting someplace, and the special master says to the
10    witness, "Did you write, indicate, send by carrier
11    pidgeon" -- I'm being facetious -- "any message to the White
12    House concerning the downgrading of S&P?"
13           "Yes, I did."
14           "What did you say?"
15           "Privilege."
16           I've got my special master on the East Coast.
17    I've got a person claiming the privilege.  My special master
18    doesn't know what's in that because I haven't examined, you
19    know, all of the logs, or I haven't conveyed that
20    information to my special master.
21           The danger is that you're now coming back, and I
22    might have to inconvenience that witness again and again.
23    And then it becomes a charade as we go piecemeal through
24    that.  That's why I was suggesting, if Mr. Geithner or other
25    member of the Federal Reserve or other government officials
```

Case 2:13-cv-00779-DOC-JCG   Document 324   Filed 09/23/14   Page 42 of 45   Page ID #:7459
2:13-CV-0779-DOC   9/9/2014 - Volume I

42

```
 1    were being deposed, it would be wise to have that out here
 2    so I could sit across the street, resolve it quickly, do it
 3    in once session and get them back.  'Cause I'm not going to
 4    fly out to the East Coast for a deposition.  It would be
 5    improper.  And I'm probably not going to send a magistrate
 6    judge to the East Coast.  I'd probably send a special master
 7    to the East Coast.
 8            So I'm a little bit worried about the piecemeal
 9    effect of a truthful-but-incomplete answer, or a privilege,
10    as we get into what I call government witnesses.  And I'm
11    trying not to cause the inconvenience, which -- so,
12    therefore, by not making the decisions now, I agree with you
13    that they're phased.  And I'm trying to be cautious about
14    that, get as much information as I can to make a decent
15    decision.  But the downside of that is a helter-skelter
16    January and February where everybody's running at breakneck
17    speed, and a request for continuance -- which I'm going to
18    deny.
19            MR. CARDONA:  I understand that, Your Honor.  And,
20    I think, when we get to the point, if we get to the point,
21    that there is going to be a deposition scheduled of
22    Mr. Geithner -- in other words, if we ever get to that
23    point -- and again, for various reasons, as I think I've
24    made clear to the Court, I anticipate there will be
25    litigation over whether that should go forward.
```

DEBBIE GALE, U.S. COURT REPORTER

Case 2:13-cv-00779-DOC-JCG  Document 324  Filed 09/23/14  Page 43 of 45  Page ID
#:7460
2:13-CV-0779-DOC  9/9/2014 - Volume I

43

```
 1              THE COURT:  I do too.  There's a good possibility

 2    he won't, but there's a good possibility he will.

 3              MR. CARDONA:  Right.

 4              THE COURT:  And you have to assume the worst.

 5              MR. CARDONA:  I guess that's what I'm getting at.

 6              Were we to lose that, and if that deposition were

 7    to proceed, I would foresee some process prior to that

 8    deposition where we could deal with those issues.  In other

 9    words, at that point, we could go back to Treasury, consider

10    whether we would do those searches, pull the communications

11    from Mr. Geithner that might be relevant and, at that point,

12    make the election as to whether privileges would be

13    asserted.

14              THE COURT:  That's what I'm going to talk to you

15    both about.

16              Mr. Keker asked for kind of an "elbow-sleeve"

17    conversation about two months ago.  We're going to have that

18    today.  Okay?

19              MR. CARDONA:  So, with that, the only other thing

20    I will say is the documents that we located with our

21    searches that we did do that we believe implicate "Executive

22    Office of the President" interests -- we do have those

23    available and we are happy to provide those to the Court as

24    well for in camera review.

25              THE COURT:  I heard that.  Okay.
```

Case 2:13-cv-00779-DOC-JCG   Document 324   Filed 09/23/14   Page 44 of 45   Page ID #:7461
2:13-CV-0779-DOC 9/9/2014 - Volume I

44

1          Okay.  I want to thank you very much, Mr. Cardona.

2          Mr. Abrams.

3       *(Further proceeding reported by Maria Dellaneve*

4    *in Volume II.)*

5                              -oOo-

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 2:13-cv-00779-DOC-JCG  Document 324  Filed 09/23/14  Page 45 of 45  Page ID #:7462
2:13-CV-0779-DOC  9/9/2014 - Volume I

45

1                          -oOo-

2

3                      CERTIFICATE

4

5        I hereby certify that pursuant to Section 753,

6  Title 28, United States Code, the foregoing is a true and

7  correct transcript of the stenographically reported

8  proceedings held in the above-entitled matter and that the

9  transcript page format is in conformance with the

10 regulations of the Judicial Conference of the United States.

11

12 Date:  September 15, 2014

13

14

                       /s/ Debbie Gale
15            _____
                   DEBBIE GALE, U.S. COURT REPORTER
16                 CSR NO. 9472, RPR, CCRR

17

18

19

20

21

22

23

24

25